**ORAL ARGUMENT NOT YET SCHEDULED**
No. 24-1050 (and consolidated cases)

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――

COMMONWEATH OF KENTUCKY, *et al.,*

*Petitioner,*

*v.*

U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.,*

*Respondents.*

―――――――――

On Petition For Judicial Review Of Final Agency Action Of The United States Environmental Protection Agency, 89 Fed. Reg. 16,202 (Mar. 6, 2024)

―――――――――

## AMICUS CURIAE BRIEF IN SUPPORT OF INDUSTRY AND ARIZONA COALITION PETITIONERS

―――――――――

Kathy G. Beckett
*Counsel of Record*
David M. Flannery
Keeleigh S. Huffman
Steptoe & Johnson PLLC
Post Office Box 1588
Charleston, WV 25326
(304) 353-8000
Kathy.Beckett@steptoe-johnson.com
Dave.Flannery@steptoe-johnson.com
Keeleigh.Huffman@steptoe-johnson.com

Edward L. Kropp
Steptoe & Johnson PLLC
Post Office Box 36425
Indianapolis, Indiana 46236
(317) 946-9882
Skipp.Kropp@steptoe-johnson.com

*Counsel for Amicus Curiae Midwest Ozone Group*
Dated: June 12th, 2024

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Midwest Ozone Group provides the following:

**A. Parties, Intervenors, and Amici Curiae**

**Petitioners:**

- 24-1050 (lead case): Commonwealth of Kentucky; State of West Virginia; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Georgia; State of Idaho; State of Indiana; State of Iowa; State of Kansas; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of North Dakota; State of Ohio; State of Oklahoma; State of South Carolina; State of South Dakota; State of Tennessee; State of Utah; State of Wyoming

- 24-1051: Chamber of Commerce of the United States of America; American Chemistry Council; American Forest & Paper Association; American Petroleum Institute; American Wood Council; National Association of Manufacturers; National Mining Association; Portland Cement Association

- 24-1052: State of Texas; Texas Commission on Environmental Quality

- 24-1073: Warren Petersen, President of the Arizona State Senate; Ben Toma, Speaker of the Arizona House of Representatives; Arizona Chamber of Commerce and Industry

- 24-1091: Essential Minerals Association

**Respondents:**

Respondents are the United States Environmental Protection Agency and Michael S. Regan, Administrator, United States Environmental Protection Agency.

**Intervenors for the Respondents:**

Alliance of Nurses for Healthy Environments; American Lung Association; Citizens for Pennsylvania's Future; Commonwealth of Massachusetts; Commonwealth of Pennsylvania; Conservation Law Foundation; District of Columbia; Environmental Defense Fund; Harris County, Texas; Natural Resources Defense Council; Northeast Ohio Black Health Coalition; Rio Grande International Study Center; Sierra Club; State of Arizona; State of California; State of Connecticut; State of Illinois; State of Maryland; State of Michigan; State of Minnesota; State of New Jersey; State of New York; State of Oregon; State of Rhode Island; State of Vermont; State of Washington; State of Wisconsin; City of New York

**Amici Curiae for Petitioners:**

Government Accountability & Oversight

**Movant-Amici Curiae for Petitioners:**

Midwest Ozone Group

## B. Rulings Under Review

Petitioners challenge a final action taken by the United States Environmental Protection Agency entitled "*Reconsideration of the National Ambient Air Quality Standards for Particulate Matter,*" published at 89 Fed. Reg. 16,202 on March 6, 2024.

## C. Related Cases

Petitions for review of the prior agency action that was reconsidered in the agency action at issue here are pending before this Court in: *State of California, et al. v. EPA, et al.*, No. 21-1014; *American Lung Association, et al. v. EPA, et al.*, No. 21-1027; *Center for Biological Diversity v. EPA, et al.*, No. 21-1054. These consolidated cases are currently held in abeyance.

## CERTIFICATE OF JUSTIFICATION FOR SEPARATE BRIEFING

Counsel for Midwest Ozone Group makes the following statement pursuant to D.C. Circuit Rule 29(d):

Midwest Ozone Group certifies that a separate brief is necessary to provide the unique scientific and technical perspective that illustrates how EPA's failure to provide a reasoned explanation of key aspects of its decision such as, number of non-attainment counties impacted and therefore the costs to be borne by the nation's economy due to the number of sources required to research, design, and install control measures, air quality modeling, permitting, operational changes and economic modification to business operations.

As the Midwest Ozone Group is not aware of any other amicus brief addressing these issues, it certifies that joinder in a single brief with other amici would be impractical.

## RULE 26.1 DISCLOSURE STATEMENT

The Petitioner makes the following statement pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26:

***The Midwest Ozone Group*** is a 'trade association,' within the meaning of Circuit Rule 26.1(b), as it is a continuing association of organizations and individual entities operated to promote the general interests of its membership on matters related to air emissions and air quality. The Midwest Ozone Group has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public, although specific individuals in the Midwest Ozone Group have done so. The Midwest Ozone Group has no outstanding shares or debt securities in the hands of the public and has no parent company. No publicly held company has a 10% or greater ownership interest in the Midwest Ozone Group.

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............... ii

CERTIFICATE OF JUSTIFICATION FOR SEPARATE BRIEFING .................... v

RULE 26.1 DISCLOSURE STATEMENT .................................................. vi

TABLE OF AUTHORITIES .................................................................. ix

TABLE OF FIGURES AND EXHIBITS ................................................... x

GLOSSARY OF ABBREVIATIONS, ACRONYMS, AND TERMS ........................ xi

IDENTITY AND INTEREST OF AMICUS & AUTHORITY TO FILE .............. xii

AUTHORSHIP AND FUNDING ............................................................ xiii

INTRODUCTION .............................................................................. 1

ARGUMENT ................................................................................... 4

I.    Revising The PM NAAQS In a Manner Inconsistent with Section 109 of the Clean Air Act Renders this Final Rule Inappropriate As it Fails To Deliver a Well-Reasoned Agency Action Resulting in Significant Harm Caused By Agency Overreach ......................................................................... 4

II.    Lowering the annual particulate matter standard will result in significant implications for permitting sources and source sectors in the US economy that are already stressed ............................................................... 7

III.    The NAAQS at 9.0 μg/m3 will have significant impact across most of the United States ...................................................................................... 12

IV.    There Are Significant Issues With The Updated Modeling Platform Used To Project Attainment For 9.0 μg/m3 Annual Primary PM2.5 Standard ............... 12

V.    EPA's PM NAAQS Revision Fails To Consider The Impact Of Its Data Adjustments To The Monitoring Requirement Revisions Finalized In Its PM2.5

NAAQS Reconsideration ................................................................ 15

VI.  EPA's Decision Not To Extend The Effective Date Of The Rule Is Arbitrary And Capricious ........................................................................ 17

CONCLUSION ............................................................................................ 19

CERTIFICATE OF COMPLIANCE ........................................................... 20

CERTIFICATE OF SERVICE ...................................................................... 21

# TABLE OF AUTHORITIES

**Cases**                                                                                     <u>**Page(s)**</u>

*Michigan v. EPA*, 576 U.S. 743, 752 (2015) ................................................................ 5

**Federal Statutes**

CAA § 108, 42 U.S. Code § 7408 ..................................................................... 4-5

CAA § 109, 42 U.S. Code § 7409 ..................................................................1, 4-5

**Federal Register Notices**

89 Fed. Reg. 16,202 (March 6, 2024) ..........................................................1, 5-6

89 Fed. Reg. 42,874 (May 16, 2024) .............................................................. 15

## TABLE OF FIGURES AND EXHIBITS

**Figure 1**            Monitored counties and expanded Core Base Statistical Areas modeled by EPA in nonattainment of the 9.0 ug/m3 NAAQS in 2032.

**Figure 2**            Headroom map of US counties using preliminary 2021-2023 annual PM2.5 design values (ug/m3).

**Figure 3**            Top 5 state anthropogenic total annual 2032 PM2.5 emission increases and decreases (%) between proposed and final modeling platforms.

**Figure 4**            2032 annual PM2.5 emissions for the unpaved road dust category.

## GLOSSARY OF ABBREVIATIONS, ACRONYMS, AND TERMS

AQS                         Air Quality System

CAA                         Clean Air Act

CBSA                        Core Base Statistical Areas

DV                          Design Value

EPA                         United States Environmental Protection Agency

NAAQS                       national ambient air quality standard(s)

$PM_{2.5}$                  Particulate Matter with a nominal mean aerodynamic
                            diameter less than or equal to 2.5 micrometers ($\mu m$)

## IDENTITY AND INTEREST OF AMICUS & AUTHORITY TO FILE

Midwest Ozone Group[1] is a collection of corporations and associations that have banded together to support the development of air quality programs compliant with legal and technical requirements and to work with policymakers tasked with crafting those requirements. Rules and actions concerning air quality affect not only the facilities and employees of Midwest Ozone Group members and participants, but also contractors and consumers. In the interest of all those affected by air quality rules and actions, Midwest Ozone Group assesses exceptional events and air quality rules and standards, files Clean Air Act petitions, and supports the development of appropriate state implementation plans. It also advocates for the interests of those affected by filing amicus briefs in Clean Air Act cases including those related to exceptional events and National Ambient Air Quality Standards (NAAQS).

---

[1] Midwest Ozone Group is comprised of Alcoa, Ameren, American Electric Power, American Forest & Paper Association, American Iron and Steel Institute, American Wood Council, Appalachian Region Independent Power Producers Association, Associated Electric Cooperative, Berkshire Hathaway Energy, Big Rivers Electric Corp., Citizens Energy Group, City Water, Light & Power (Springfield, Ill.), Cleveland Cliffs, Council of Industrial Boiler Owners, Duke Energy Corp., East Kentucky Power Cooperative, ExxonMobil, FirstEnergy Corp., Indiana Energy Association, Indiana-Kentucky Electric Corporation, Indiana Municipal Power Agency, Indiana Utility Group,  Hoosier Energy Rural Electric Cooperative Inc., Louisville Gas and Electric Company and Kentucky Utilities Company, Marathon Petroleum Company, National Lime Association, North American Stainless, Nucor Corporation, Ohio Utility Group, Ohio Valley Electric Corporation, Olympus Power, Steel Manufacturers Association, and Wabash Valley Power Alliance.

Midwest Ozone Group is interested in this appeal because its members and participants own and operate stationary sources subject to the Clean Air Act. Thus, Midwest Ozone Group is affected by policies relating to the revised NAAQS Rule that is the subject of this case.

Accordingly, this brief focuses on the merits of the Rule and its impact on the regulated community and the economy. Rule 29 permits Midwest Ozone Group to file an amicus brief by leave of this Court; accordingly, Midwest Ozone Group has contemporaneously filed a motion for leave before this Court. *See* Fed. R. App. P. 29(a)(2).

## AUTHORSHIP & FUNDING

Counsel for Midwest Ozone Group authored this brief. Midwest Ozone Group alone contributed money intended to fund preparing and submitting this brief; no other person contributed money to fund preparing and submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E).

**INTRODUCTION**

This amicus brief is filed in support of Industry and Arizona Coalition Petitioners' challenge of EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 89 Fed. Reg. 16,202 (March 6, 2024) by Midwest Ozone Group. The Opening Brief of the Industry and Arizona Coalition Petitioners raises issues concerning a "thorough review" standard set for EPA by section 109(d) of the Clean Air Act.  EPA failed to assess the impact of the revised NAAQS relative to diminished "headroom" impacting regulatory action for areas that meet the standard but have limited "headroom" between ambient concentration levels and revised NAAQS. EPA utilized a 2016 emissions modeling platform in the proposed rule yet in the final action, EPA moved to a 2018 platform.  The result is a revised NAAQS based on defective data and flaws that were identified by Midwest Ozone Group to EPA, but the agency offered no response to the substantive scientific and technical errors. MOG takes the position that this Court should vacate the Rule including the revised NAAQS because it will sow economic harm and is based on improper and inconsistent data.

If allowed to go forward, the revised NAAQS will harm the economy of the United States. For one, despite EPA's predictions, more counties across the country will be in nonattainment status and thus subject to additional emission control requirements. Consequently, more facilities will be required to decrease emissions, which will be costly. The revised NAAQS will also increase the cost of manufacturing

1

and industrial facilities, stunting economic growth. For example, new facilities and those undergoing major modifications will have to clear additional hurdles and install costly air quality analyzers. Even more, counties in in attainment status will not emerge unscathed because the revised NAAQS limit their "headroom."

All those economic harms will be the product of inconsistent data and projections based on a platform never subject to review. For example, after initially using a 2016 platform to project attainment in 2032, EPA switched to a 2018 platform. Yet after that switch, EPA gave no notice for comment and review although the differences between the platforms could impact projections and attainment designations. The platforms also rely on reporting inconsistencies that further undermine EPA's reliance on air quality data based on those reports and incorporated in the platforms.

In addition to those faults, EPA also failed to adjust to account for biased data. The number of monitors has likely produced biased data that has increased nonattainment designations, but EPA did not account for that data. Rather EPA confirmed the bias of historical data, and further consideration reveals that the biased data resulted in improper nonattainment designations.

Finally, EPA has ignored MOG as a commenter. In its comments, MOG implored EPA to extend the Rule's effective date, which would provide enough time to correct errors and to revise the 2032 modeling platforms. EPA neither acknowledged

nor responded to MOG's comments, underscoring EPA's refusal to engage in reasonable rulemaking.

At bottom, the revised NAAQS is not the product of a reasoned process that accounted for problematic data or that was conducted in the open. It is, instead, arbitrary and capricious; and it is thus subject to vacatur.

# ARGUMENT

As stated in the Opening Brief of the Industry and Arizona Coalition Petitioners, the Rule before the Court should be vacated for a variety of reasons including failure to consider costs, failure to consider the numerous requirements being imposed by the Rule on regulated entities and failure to consider a host of implementation obligations. Midwest Ozone Group incorporates in this brief that Opening Brief and offers the following additional support for granting the petition for review and vacatur of the Rule.

## I. Revising The PM NAAQS In A Manner Inconsistent With Section 109 Of The Clean Air Act Renders This Final Rule Inappropriate As It Fails To Deliver A Well-Reasoned Agency Action Resulting In Significant Harm Caused By Agency Overreach.

As described in detail by the Industry and Arizona Coalition Petitioners, the Clean Air Act sections 108 and 109 provide a whether and how assessment process for EPA to follow for the promulgation of a NAAQS and for review/revision to an existing NAAQS. EPA unlawfully concluded its action did not require assessment of costs, attainability, or technical feasibility. *Id.* at 5564, JA-__. By failing to properly implement the Clean Air Act, the revised PM$_{2.5}$ NAAQS imposes on Midwest Ozone Group a litany of obligations including research, design, and installation of control measures, air quality modeling, permitting, operational changes and economic modification to business operations. EPA-HQ-OAR-2015-0072-2093. Illustrating the scale of the real world consequences of EPA's revised and improperly promulgated rule, the following

4

facts and technical data are provided. EPA must be held to reasoned decision making standard consistent with *Michigan v. EPA*, 576 U.S. 743, 752 (2015). EPA's abbreviated and dismissive process for reconsideration of the NAAQS is not reflective of Section 109 congressional directives and is not an appropriate consideration of all of the relevant factors. *Id.*

EPA's varied statements about this revised NAAQS demonstrate its awkward attempt at a show of reasoned decision making. EPA confirms its Final Rule as an "economically significant regulatory action" as submitted to The Office of Management and Budget for review.  EPA also asserts that this action is not a "significant energy action" because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy." 89 Fed. Reg. at 16,374. The exercise of noting "significance" as defined by definitions not relevant to Section 109, does not substitute for the need to assess all relevant factors. The revised $PM_{2.5}$ NAAQS is certainly economically and energy relevant, both of which are key factors as illustrated by the maps in Figures 1 and 2.

EPA's Regulatory Impact Analysis indicates the annualized controls costs are estimated at 593.8 million dollars. United States Environmental Protection Agency, *Final Regulatory Impact Analysis Reconsideration of the National Ambient Air Quality Standards*, at 14 (Jan. 2024) ("Final RIA") (access at https://shorturl.at/3ZoJA). To illustrate the areas where emissions reductions will be required to meet the revised standard, EPA lists 52 counties located across the country that will need $PM_{2.5}$ emissions reductions:

twelve in Eastern States, seven in Southeast, ten Western States, and twenty-three in California. *Id.* at 10. However, the agency is quick to note that its Regulatory Impact Analysis was done for information purposes only, and that the final Rule was not based on consideration of such information or analyses – illustrating a fundamental defect in the Rule. 89 Fed. Reg. at 16,206. Citing inapplicable case law and posing with its head in the sand, EPA asserts its final rule is reasoned decision making. United States Environmental Protection Agency, *Responses to Significant Comments on the 2023 Proposed Rule for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter,* Docket ID No. EPA-HQ- OAR-2015-0072 (Mar. 6 2024) at 118-119.

EPA also admits that it did not engage in assessment of the economic impacts or disbenefits. In launching the tremendous burden of this Rule to states EPA offered the following:

> The action does not prescribe specific pollution control strategies by which these ambient standards and monitoring revisions will be met. Such strategies will be developed by states on a case-by-case basis, and the EPA cannot predict whether the control options selected by states will include regulations on energy suppliers, distributors, or users. Thus, the EPA concludes that this proposal does not constitute a significant energy action as defined in Executive Order 13211.

89 Fed. Reg. at 16,374.

This thin assessment is better informed by the expansive list of counties and sources this Rule will engage. Sources and emissions of $PM_{2.5}$ are discussed in detail in the Policy Assessment. EPA-HQ-OAR-2015-0072-15 at 2-3. Briefly, anthropogenic sources of PM include both stationary (e.g., fuel combustion for electricity production

6

and other purposes, industrial processes, agricultural activities) and mobile (e.g., diesel-and gasoline-powered highway vehicles and other engine-driven sources) sources. *Id.* Natural sources of PM$_{2.5}$ include dust from the wind erosion of natural surfaces, sea salt, wildfires, and biological particles such as bacteria and pollen. *Id.* Wildland fire, which encompasses both wildfire and prescribed fire, accounts for over 44% of emissions of primary PM$_{2.5}$ emissions. *See* 89 Fed. Reg at 16,214.

The low level selected in this Rule for the revised primary PM$_{2.5}$ NAAQS will have a significant economic and feasibility impacts and should have undergone thorough review pursuant to the Clean Air Act. This revised PM$_{2.5}$ NAAQS must be vacated as improperly promulgated.

## II.    Lowering The Annual Particulate Matter Standard Will Result In Significant Implications For Permitting Sources And Source Sectors In The United States Economy That Are Already Stressed.

It is estimated that there are 119 monitored counties in nonattainment with the new revised NAAQS of 9.0 µg/m$^3$ using annual PM2.5 2022 design values ("DVs") and this number is predicted to decrease to 52 monitored counties according to EPA's 2032 air quality modeling. Final RIA at 10; *see also*, United States Environmental Protection Agency, *Design Values in Areas Previously Designated Nonattainment for the 2015 8-Hour Ozone NAAQS* (May 22, 2023) (access at https://shorturl.at/HSaNw).

For establishing nonattainment designations, EPA will look not only at counties violating the standard, but also examine nearby areas that may contribute to the violation in the nonattainment area. In most instances, after identifying a violating

7

county, the states, will look at surrounding counties within the metropolitan area (e.g., Core Based Statistical Area) in which the violating monitor is located. Designation also takes into consideration that measured ambient PM2.5 concentrations across urban-scale distances tend to highly correlate with emissions (both primary and secondary) from sources within these urban areas. In other words, urban area air quality issues are largely related to emission sources in nearby counties. Ultimately, EPA will look at multiple other parameters, including air quality, emissions, meteorology, geography, and jurisdictional boundaries, to eventually designate nonattainment areas. United States Environmental Protection Agency, *Initial Area Designations for the 2012 Revised Primary Annual Fine Particle National Ambient Air Quality Standard* at 5 (Apr. 16 2013) (access at https://shorturl.at/VmcVE).

As presented in Figure 1 and following EPA guidance on the determination of nonattainment area boundaries, when the number of monitored counties identified by EPA is expanded to include all counties in Core Based Statistical Areas associated with the violating monitors, the 52 counties projected to be in violation of a 9.0 µg/m3 standard in 2032 increases to 187 counties. *Id.*; *see also* Final RIA at 10. All these counties, if designated, would be subject to additional emission control requirements to be included in the implementation plans prepared by the states for EPA review. Such plans would require lower emissions at multiple facilities within the nonattainment area and a review, including possible retrofit of new controls for existing sources. At these

8

locations, multiple decisions will need to be considered regarding cost of control, both existing and retrofit, as well as the remaining useful life of each facility.



*Figure 1. Monitored counties and expanded Core Based Statistical Areas modeled by EPA in nonattainment of the 9.0 ug/m3 NAAQS in 2032.*

Major new projects, including new or planned facilities and modifications to existing facilities, will require controls to meet the more stringent "Lowest Achievable Emission Rate" instead of "Best Available Control Technology" controls. Emissions offsets will also be required, not only for directly emitted particulate matter, but also for pollutants that can create particulate matter in the atmosphere (e.g., nitrogen dioxide and sulfur dioxide). An immediate impact of a lower PM2.5 NAAQS is that new or expanded manufacturing and other industrial projects may become too costly in areas defined as nonattainment and either not be pursued, or projects may be relocated to

9

attainment areas. Based on the current projections, large swaths of the country will be impacted.[2]

Industry in areas that are in attainment, but close (1-3 µg/m3) to the proposed standard alternatives will also need to consider how close their area is to the new NAAQS. There will be areas that meet the standard but have limited "headroom" between ambient concentration levels and revised NAAQS. Headroom here is defined as the amount of remaining PM2.5 concentration (in µg/m3) from measured or modeled conditions to an alternate NAAQS nonattainment threshold. For example, as the annual PM2.5 NAAQS has been set at 9.0 µg/m3 and a county had a design value of 8.0 µg/m3, that county, by the NAAQS truncation convention, would have headroom of 1.1 µg/m3 (9.1 – 8.0 µg/m3). *Id.*

Figure 2 presents a continental U.S. scale map of county-based headroom calculations for the NAAQS at 9.0 µg/m3. To generate these metrics, the maximum PM2.5 DVs from preliminary 2021-2023 were used to represent each monitored county or associated county within CBSAs. Values were calculated for non-monitored counties using a geospatial statistical interpolation that is used to estimate non-monitored county values using an inverse-distance weighted averaging method.[3] Headroom was calculated as PM2.5 concentration (µg/m3) remaining compared to the standard.

---

[2] Air & Waste Management Association, EM Magazine (May 2023) (access at https://shorturl.at/aalIu).
[3] Columbia Mailman School of Public Health, Public Health Population Health Methods / Kriging Interpolation (access at https://shorturl.at/wMPn8).



*Figure 2. Headroom map of US counties using preliminary 2021-2023 annual PM2.5 design values (ug/m3).*

Red counties in Figure 2 represent counties that currently exceed, or are interpolated to have, a failure of the new standard at 9.0 µg/m3. Orange counties represent areas where the headroom falls within 1-3 µg/m3 of 9.0 µg/m3 and identifies areas where plant modifications or plans for new facilities may need to be given significant consideration. Counties in green have headroom calculations of 3+ µg/m3 and are likely in less jeopardy than orange-highlighted counties for sources considering new builds or plant modifications.

Prevention of Significant Deterioration applies to new major sources or major modifications at existing sources for pollutants where the area the source is located is in attainment or unclassifiable with the NAAQS. It requires installation of Best

11

Available Control Technology, an air quality analysis, an additional impacts analysis, and public involvement.[4]

### III. The NAAQS At 9.0 μg/m³ Will Have Significant Impact Across Most Of The United States.

The reduction in the PM standard will lower the compliance threshold in situations where air quality dispersion modeling is used to document compliance with the NAAQS, such as new air permit applications. However, even with all known, cost-effective control technologies expended in EPA's regulatory impact analysis, emission reductions from existing sources will not be enough to reach levels of attainment at the lower end of the proposed range for the NAAQS. *See* Final RIA. EPA's failure to consider the cost and implementation factors constitute a fatal flaw in the Rule justifying its vacatur.

### IV. There Are Significant Issues With The Updated Modeling Platform Used To Project Attainment For 9.0 μg/m³ Annual Primary PM₂.₅Standard.

EPA utilized a 2016 emissions modeling platform with projections to 2032 to support air quality modeling and to inform the proposed revised NAAQS review. *See* United States Environmental Protection Agency, *Regulatory Impact Analysis for the Proposed Reconsideration of the National Ambient Air Quality Standards for Particulate Matter* (Dec. 2022) ("Proposed NAAQS RIA") (access at https://shorturl.at/NJJmq). In the final action, EPA moved to a 2018 platform, without notice for comment and review. *See* Final RIA.

---

[4] United States Environmental Protection Agency, *Prevention of Significant Deterioration Basic Information* (Jan. 17, 2024) (access at https://shorturl.at/Qaytq).

The 2018 platform was one not previously used by EPA to support its proposed rule and includes multiple changes in both the base year and future year data which has impacted projected nonattainment and implementation of the NAAQS an EPA's related assessment of the impact of the Rule – all without offering the public the opportunity to review and comment on the 2018 platform

The table below presents projected 2032 state anthropogenic $PM_{2.5}$emission differences calculated from EPA's modeling from the proposed rule 2016 platform and the final rule 2018 platform. *See* United States Environmental Protection Agency, *Proposed Rule 2016 Modeling Platform* ("Proposed Rule Platform") (access at https://shorturl.at/NnNpz); *See also*, United States Environmental Protection Agency *Final Rule 2018 Modeling Platform* ("Final Rule Platform") (access at https://shorturl.at/apxDH).

| State | Annual 2032 Anthropogenic PM2.5 Emissions (Tons) | | | |
|---|---|---|---|---|
| | Proposed | Final | Change (Tons) | Change (%) |
| Kentucky | 75,839 | 41,462 | -34,378 | -45% |
| Tennessee | 74,087 | 52,868 | -21,219 | -29% |
| Kansas | 158,268 | 117,492 | -40,776 | -26% |
| Wyoming | 93,203 | 71,353 | -21,850 | -23% |
| Idaho | 129,561 | 103,910 | -25,651 | -20% |
| | | | | |
| Colorado | 73,077 | 125,097 | 52,020 | 71% |
| Oregon | 115,933 | 231,787 | 115,855 | 100% |
| California | 204,254 | 414,174 | 209,920 | 103% |
| Nevada | 28,505 | 62,409 | 33,904 | 119% |
| Utah | 30,193 | 76,963 | 46,770 | 155% |

*Figure 3. Top 5 state anthropogenic total annual 2032* $PM_{2.5}$*emission increases and decreases (%) between proposed and final modeling platforms.*

13

Any one of these emission deltas at the state level could have impacted modeled air quality in 2032 and changed designations between attainment and nonattainment. Location of these emissions, temporal distribution of emissions, speciation of these emissions, in addition to the new meteorological platform (moving from 2016 to 2018) could have potentially and significantly changed the proposed modeled concentrations, nonattainment designations, and required incremental emission reductions necessary for areas to attain proposed lower levels of the NAAQS. And yet no opportunity was afforded the public to review and comment on these changes.

Furthermore, major inconsistencies have been identified in state-to-state reporting of emission categories of $PM_{2.5}$ for application to the modeling platforms. As an example, EPA's 2032 final reconsideration emissions platform illustrates the inconsistency in the reporting of unpaved road dust emissions by the states. *See* Final Rule Platform. Figure 4 below shows this inconsistency in modeled emissions for this category noting that Missouri has the largest reported unpaved road dust $PM_{2.5}$ emissions in the continental US (106,858 tpy) (more than 72% greater than Texas), while Indiana has zero reported unpaved road dust $PM_{2.5}$ emissions in this same platform.

*Figure 4. 2032 annual PM2.5 emissions for the unpaved road dust category.*

EPA's reliance on air quality modeling data based on these defects creates a fatal

flaw in the Rule that compels its vacatur.

**V.    EPA's PM NAAQS Revision Fails To Consider The Impact Of Its Data Adjustments To The Monitoring Requirement Revisions Finalized In Its PM$_{2.5}$ NAAQS Reconsideration.**

EPA retroactively applied approved modification of the Federal Equivalent

Method designation for the Teledyne Advanced Pollution Instrumentation Model T640

PM$_{2.5}$ mass monitor including the 640X option to all of the concentration data for

PM2.5 from the T640 and T640X monitors in the EPA's Air Quality System that was

reported prior to the modification. 89 Fed. Reg. 42,874. The EPA processed the

unmodified hourly PM$_{2.5}$ concentration data in AQS using collocated or paired ambient

temperature when available. EPA stated that updated data would be available in Air

15

Quality System by May 13, 2024, and recommended that air agencies review the updated data by May 28, 2024.

There were more than 400 of the Teledyne T640 and 640X monitors in service as of 2023. That number of monitors clearly have an impact on $PM_{2.5}$ nonattainment designations and it's likely that some of the current nonattainment designations may be based on data that is biased high, meaning that some areas currently designated as nonattainment might not be in nonattainment once the biased data is corrected.

The data adjustments, while laudable, occurred after EPA promulgated the revised $PM_{2.5}$ NAAQS, and EPA did not account for the impact of the biased data in establishing the revised $PM_{2.5}$ NAAQS. Indeed, in its May 13, 2024, response to comments on the proposed data adjustment EPA conceded that "[o]ne commenter asserted that this comprehensive Network Data Alignment is improper because the EPA failed to consider the potential health effects associated with the action" and added that "[t]his comment is beyond the scope of this action, as any health impacts related to PM2.5 monitoring and NAAQS attainment are addressed through the 2024 Final PM2.5 NAAQS rule and will likely be addressed by any future NAAQS-setting actions." United States Environmental Protection Agency, *Summary of and Responses to Public Comments on the EPA's Plan to Update PM2.5 Data from T640/T640X PM Mass Monitors*, Docket ID No. EPA-HQ-OAR-2023-0642 (May 13, 2024).

Because the bias of historical data for the many Teledyne $PM_{2.5}$ monitors in the monitoring network has been confirmed by EPA, and especially because that bias is

16

likely to be more pronounced for wildfire smoke events, the data may have resulted in both inaccurate calculation of $PM_{2.5}$ design values and erroneous designation of $PM_{2.5}$nonattainment areas. EPA's failure to assess the impact of the biased data on PM nonattainment as part of its $PM_{2.5}$ NAAQS reconsideration is a demonstrable fact that the agency failed to consider all relevant facts as prescribed by the Court in *Michigan*, accordingly this rule is not based on reasoned decision-making.

Further, as a result of EPA conceding that multiple years of air quality monitoring data could be positively higher than it should have been by 20% or more, it is now likely that EPA's assessment of current $PM_{2.5}$ air quality is in error. EPA's failure to consider the impact of the biased data in establishing the revised PM NAAQS is arbitrary and capricious.

## VI.  EPA's Decision Not To Extend The Effective Date Of The Rule Is Arbitrary And Capricious.

As stated above, the air quality modeling analysis used by EPA to support the Rule is fatally flawed on both procedural and technical bases and cannot be used to support the Rule.

In its comments on the proposed rule, the Midwest Ozone Group offered detailed comments related to these defects and efforts that were needed to correct those errors in the air quality modeling being utilized by EPA. Those comments urged EPA to extend the effective date of the Rule to allow time to revise its 2032 modeling platform to correct the errors involved. EPA-HQ-OAR-2015-0072-2093. EPA not

17

only failed to respond to such comments but also failed to even acknowledge the comment. EPA's failure to explain its basis for proceeding without any such explanation, is an arbitrary and capricious action that underscores this fatal flaw in the Rule.

Extending the effective date of the Rule, would also allow states the opportunity to revise their existing federally approved implementation plan requirements that lock-in the previous NAAQS standard for $PM_{2.5}$. This is illustrated by the current EPA approved state implementation plan for the State of West Virginia which provides that the applicable NAAQS standards to be applied in that state are those in effect in 2021. 40 C.F.R. Part 52, Subpart XX.

EPA's failure to establish an effective date of the Rule that is compatible with the development of appropriate data and allows for the process of updating federally approved state implementation plans, demonstrates lack of reasoned decision-making and therefore requires vacatur.

## CONCLUSION

For the reasons set forth above, the Court should find the Rule challenged by Petitioners should be vacated.


s/ *Kathy G. Beckett*
Kathy G. Beckett

Kathy G. Beckett
    *Counsel of Record*
David M. Flannery
Keeleigh S. Huffman
Steptoe & Johnson PLLC
707 Virginia Street, East
Post Office Box 1588
Charleston, WV 25326
(304) 353-8000
Kathy.Beckett@steptoe-johnson.com
Dave.Flannery@steptoe-johnson.com
Keeleigh.Huffman@steptoe-johnson.com

Edward L. Kropp
Steptoe & Johnson PLLC
Post Office Box 36425
Indianapolis, Indiana 46236
(317) 946-9882
Skipp.Kropp@steptoe-johnson.com

*Counsel for Amicus Midwest Ozone Group*

Dated: June 12th 2024

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limitation of Fed. R. App. P. 28, 29(a)(5), 32(a)(7), Circuit Rule 28, 29, and 32 because it contains 3,946 words, excluding exempted parts, according to the count of Microsoft Word 2010. I further certify that the foregoing brief also complies with Fed. R. App. P. 32 because it has been prepared using Microsoft Word 2010 in 14-point proportionally spaced Garamond typeface.

s/ *Kathy G. Beckett*
Kathy G. Beckett

Kathy G. Beckett
Steptoe & Johnson PLLC
707 Virginia Street, East
Post Office Box 1588
Charleston, West Virginia 25326
(304) 353-8000
Kathy.Beckett@steptoe-johnson.com

20

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of June 2024, the foregoing **AMICUS BRIEF** was served electronically on all registered counsel through the Court's CM/ECF system.

s/ *Kathy G. Beckett*
Kathy G. Beckett

Kathy G. Beckett
Steptoe & Johnson PLLC
707 Virginia Street, East
Post Office Box 1588
Charleston, West Virginia 25326
(304) 353-8000
Kathy.Beckett@steptoe-johnson.com