**ORAL ARGUMENT NOT YET SCHEDULED**
No. 24-1050 (and consolidated cases)

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

---

COMMONWEALTH OF KENTUCKY, *et al.*,

*Petitioners*,

— v. —

U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents.*

---

## BRIEF OF THE INSTITUTE FOR POLICY INTEGRITY AT NEW YORK UNIVERSITY SCHOOL OF LAW AS *AMICUS CURIAE* IN SUPPORT OF RESPONDENTS

Jessica H. Arnell
Jason A. Schwartz
INSTITUTE FOR POLICY INTEGRITY
139 MacDougal Street, 3rd Floor
New York, NY 10012
(212) 992-8932
jason.schwartz@nyu.edu

*Counsel for* Amicus Curiae
*Institute for Policy Integrity*

August 26, 2024

## CIRCUIT RULE 28(A)(1) STATEMENT

As required by Circuit Rule 28(a)(1), counsel for the Institute for Policy Integrity at New York University School of Law certify as follows:

(1)   All parties, intervenors, and amici appearing in this case are listed in Petitioners' briefs.

(2)   References to the final agency action under review and related and consolidated cases appear in Petitioners' opening briefs.

## RULE 26.1 DISCLOSURE STATEMENT

The Institute for Policy Integrity (Policy Integrity) is a nonpartisan, not-for-profit organization at New York University School of Law.[1] No publicly held entity owns an interest in Policy Integrity. Policy Integrity does not have any members who have issued shares or debt securities to the public.

---

[1] This brief does not purport to represent the views, if any, of New York University School of Law.

# TABLE OF CONTENTS

**Page**

CIRCUIT RULE 28(A)(1) STATEMENT ..................................................... i

RULE 26.1 DISCLOSURE STATEMENT ................................................. ii

TABLE OF AUTHORITIES....................................................................... v

GLOSSARY OF ACRONYMS & ABBREVIATIONS ............................ vii

INTEREST OF *AMICUS CURIAE* & AUTHORITY TO FILE................ 1

SUMMARY OF ARGUMENT.................................................................... 2

ARGUMENT................................................................................................. 4

    I.    EPA Appropriately Assessed Costs In Its Separate Regulatory Impact Analysis. ................................................... 4

        A.    Even when agencies may not consider costs to set standards, they should assess costs (and benefits) in regulatory impact analyses...................................... 5

        B.    EPA's cost estimates are in line with the cost estimates of previous standards. ................................... 7

        C.    Petitioners misleadingly imply the Final Rule will cause "health costs." ......................................... 9

    II.    Considering Regulatory Costs Would Not Lead To A Less Stringent Standard. ........................................................ 11

        A.    EPA's separate RIA assessed not just costs in isolation, but both costs and benefits. ......................... 11

        B.    EPA found significant quantified and unquantified benefits, and the standard was cost-benefit justified......................................................................... 13

        C.    Cost-benefit-based standards would not have been less stringent................................................................. 16

    III.    There Is No History Of EPA Considering Costs When Reviewing Standards. ......................................................... 18

        A.    Since *Whitman*, EPA has not considered costs when revising the NAAQS. ......................................... 19

      B.     The 2011 letter from OIRA agreed that EPA
            cannot consider costs when setting NAAQS. .............. 20

CONCLUSION ........................................................................... 23

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Business Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011) ............... 12

*Center for Biological Diversity v. National Highway Traffic Safety Administration*, 538 F.3d 1172 (9th Cir. 2008).................................. 13

*Whitman v. American Trucking Associations,* 531 U.S. 457 (2001) .................................................................. 5, 10, 11


**Regulations and Supporting Documents**

EPA, Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (Final Rule)*,* 89 Fed. Reg. 16,202 (Mar. 6, 2024) ...................................... 2, 15, 16, 17

EPA, *Final Regulatory Impact Analysis for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter* (2024) (EPA-HQ-OAR-2019-0587-0279) (RIA) .. 4, 6, 7, 9, 11, 13, 14, 15, 16, 18

EPA, *Cost Analysis Models/Tools for Air Pollution Regulations* (2024)................................................................................................ 7

EPA, Review of National Ambient Air Quality Standards for Particulate Matter, 85 Fed. Reg. 82,684 (Dec. 18, 2020)................................. 18, 19

EPA, National Ambient Air Quality Standards for Particulate Matter, 78 Fed. Reg. 3086 (Jan. 15, 2013).................................................. 18, 19

EPA, *Regulatory Impact Analysis for the Final Revisions to the National Ambient Air Quality Standards for Particulate Matter* (EPA-452/R-12-005) (2012) ...................................................... 8

EPA, National Ambient Air Quality Standards for Particulate Matter, 71 Fed. Reg. 61,144 (Oct. 17, 2006) ............................................. 18, 19

EPA, *Regulatory Impact Analysis for the Review of the Particulate Matter National Ambient Air Quality Standards* (EPA-HQ-OAR-2006-0834) (2006) .......................................... 8

## Administrative and Executive Materials

Exec. Order No. 12,866,
58 Fed. Reg. 51,735 (Oct. 4, 1993) ................................... 5, 6, 12, 14, 20

Exec. Order No. 14,094,
88 Fed. Reg. 21,879 (Apr. 11, 2023) ...................................................... 5

Letter from OIRA to EPA (Sept. 2, 2011) .......................................... 21, 22

Letter from OIRA to Dept. of Com. (Oct. 3, 2007) ................................. 21

Letter from OIRA to Fed. Hous. Enter. Oversight of Com. (Dec. 9, 2005) ................................................................................................ 21

Letter from OIRA to Soc. Sec. Admin. (Nov. 15, 2001) .......................... 21

Letter from OIRA to Dept. of Transp. (Sept. 20, 2001) .......................... 21

Letter from OIRA to Dept. of Transp. (Jul. 20, 2001) ............................ 21

Office of Mgmt. & Budget, *Circular A-4: Assessing Benefits and Costs* (2023) ............................................................................................... 12

## Other Authorities

Brief of Pol'y Integrity as *Amicus Curiae* in Support of Respondent, *Murray Energy Corp. v. EPA*, 936 F.3d 597 (2019) .............................. 2

Jason A. Schwartz, *Approaches to Cost-Benefit Analysis, in Handbook of Regulatory Impact Assessment* 33 (Claire A. Dunlop & Claudio M. Radaelli eds., 2016) ................................................................. 6

Michael A. Livermore & Richard L. Revesz, *Rethinking Health-Based Environmental Standards,* 89 N.Y.U. L. Rev. 1184 (2014) ............ 1, 10

Michael A. Livermore & Richard L. Revesz, *Rethinking Health-Based Environmental Standards and Cost-Benefit* Analysis, 46 Envtl. L. Rep. 10,674 (2016) .................................................................... 17

National Science and Technology Council, *Advancing the Frontiers of Benefit-Cost Analysis: Federal Priorities and Directions for Future Research* (2023) .............................................................................. 15

Richard L. Revesz & Michael A. Livermore, *Retaking Rationality: How Cost-Benefit Analysis Can Better Protect the Environment and Our Health* (2008) ......................................................................... 10

## GLOSSARY OF ACRONYMS & ABBREVIATIONS

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

| | |
|---|---|
| AQI | Air Quality Index |
| CAA | Clean Air Act |
| EPA | Environmental Protection Agency |
| NAAQS | National Ambient Air Quality Standards |
| OIRA | Office of Information and Regulatory Affairs |
| $PM_{2.5}$ | Fine Particulate Matter |
| RIA | Regulatory Impact Analysis |

## INTEREST OF *AMICUS CURIAE* & AUTHORITY TO FILE

The Institute for Policy Integrity at New York University School of Law (Policy Integrity) is a nonpartisan, not-for-profit think tank dedicated to improving the quality of government decisionmaking through advocacy and scholarship in the fields of administrative law, economics, and public policy, focusing primarily on environmental issues.[1]

Policy Integrity and its directors have published academic scholarship on the relationship between Environmental Protection Agency (EPA) regulations setting National Ambient Air Quality Standards (NAAQS) under the Clean Air Act (CAA), and the agency's separate regulatory impact analyses (RIAs) accompanying those regulations. *See* Michael A. Livermore & Richard L. Revesz, *Rethinking Health-Based Environmental Standards,* 89 N.Y.U. L. Rev. 1184 (2014). Policy Integrity also previously submitted an *amicus curiae* brief to this Court in earlier litigation on a substantially similar topic. Brief of Pol'y

---

[1] Per Federal Rule of Appellate Procedure 29(a)(4)(E), no party's counsel authored this brief wholly or partly, and no person contributed money intended to fund its preparation or submission.

Integrity as *Amicus Curiae* in Support of Respondent, *Murray Energy Corp. v. EPA*, 936 F.3d 597 (2019).

Policy Integrity's expertise on environmental and administrative law in general, and on cost-benefit analysis in particular, provides a unique perspective on this case. Policy Integrity submits this *amicus curiae* brief to address EPA's appropriate assessment of costs and benefits in its separate RIA accompanying the NAAQS set for fine particulate matter (PM$_{2.5}$) in 2024. 89 Fed. Reg. 16,202 (Mar. 6, 2024) (Final Rule).

All parties have consented to the filing of this brief. A single joint *amicus curiae* brief is not practicable in this case due to the numerous and complicated issues involved.

## SUMMARY OF ARGUMENT

Petitioners argue that EPA should have considered costs when setting its 2024 NAAQS for PM$_{2.5}$. Industry Br. 36. But EPA followed longstanding practices and the best interpretation of legal requirements by setting its standards consistent with relevant statutory factors. After first setting its standards, EPA separately and appropriately assessed

costs in its independent regulatory impact analysis (RIA), to comply with presidential guidance on cost-benefit analysis. Far from being "extravagant," as Petitioners implies, State Br. 20, the Final Rule's costs are estimated to be as little as one-tenth of the costs of previous $PM_{2.5}$ NAAQS, and around 1% of the Final Rule's monetized health benefits.

Petitioners also imply that if EPA *had* considered costs, EPA would have selected a less stringent standard or determined not to revise the standards. Industry Br. 21. To the contrary, were EPA permitted to consider costs and weigh them against benefits as part of the NAAQS-setting process, such an approach would not have led to a less stringent standard. In fact, EPA's RIA shows not only that the $PM_{2.5}$ standard it finalized (9.0 μg/m³) will yield significant net benefits—up to $46 billion per year—but also that the agency could have generated even greater net benefits for society by setting a *more* stringent standard (specifically, up to $97 billion per year under a 8.0 μg/m³ standard).[2] EPA, *Final Regulatory Impact Analysis for the Reconsideration of the National*

---

[2] Both net benefit values shown for year 2032, in 2017$, using Pope et al. mortality estimates, at a 3% discount rate.

*Ambient Air Quality Standards for Particulate Matter* 27, 412 (2024) (EPA-HQ-OAR-2019-0587-0279) (RIA).

In addition, contrary to Petitioners' suggestion, *e.g.*, Industry Br. 29–30, EPA has *not* considered costs when reconsidering the NAAQS in any previous rulemaking, including the prior administration's 2020 review. Petitioners misleadingly reference a 2011 letter from a White House office asking EPA to reconsider a proposed revision of the ozone NAAQS as precedent to consider costs when revising NAAQS. Industry Br. 30. The letter, in fact, affirms that EPA cannot consider costs when setting the NAAQS.

For all these reasons, this Court should deny the petitions.

## ARGUMENT

## I.  EPA Appropriately Assessed Costs In Its Separate Regulatory Impact Analysis.

EPA may not consider costs while setting NAAQS, *see* EPA Br. 45–52, but under presidential guidance, EPA still separately assesses costs (and benefits) in regulatory impact analyses (RIAs) for "significant" rulemakings (as defined by Executive Order 12,866 and modified by Executive Order 14,094). Exec. Order No. 12,866 §§ 3(f), 6(a)(3)(C), 58

Fed. Reg. 51,735, 51,738, 51,741 (Oct. 4, 1993). The estimates in EPA's RIA for its 2024 revision of the $PM_{2.5}$ NAAQS (Final Rule) show that costs will be anything but "extravagant," State Br. 20; to the contrary, the Final Rule's monetized health benefits far exceed its costs, which are also as little as one-tenth of the costs of at least one previous $PM_{2.5}$ NAAQS. Petitioners attempt to inflate the Final Rule's cost estimates fails.

### A. Even when agencies may not consider costs to set standards, they should assess costs (and benefits) in regulatory impact analyses.

Under the CAA, EPA may not take regulatory costs into account when setting or revising NAAQS. *See Whitman v. American Trucking Associations,* 531 U.S. 457, 465–472, 475–76 (2001). To fulfill its obligations under Executive Orders, however, EPA assesses regulatory costs in separate RIAs for significant rulemakings.

Since 1993, Executive Order 12,866 has called for agencies to promote transparency and the public interest by, among other requirements, publishing cost-benefit analyses for significant rules.[3] In

---

[3] Subsequent Orders have reaffirmed these principles. *See* Exec. Order 14,094, 88 Fed. Reg. 21,879 (Apr. 11, 2023).

5

particular, Executive Order 12,866 requires agencies to assess and, to the extent feasible, quantify costs and benefits, including any economic, environmental, public health, and safety impacts. Exec. Order 12,866 § 6(a)(3)(C), 58 Fed. Reg. at 51,741. Even when statutes bar agencies from considering costs in setting their regulations, RIAs under Executive Order 12,866 play a valuable role in "mak[ing] the [regulatory] process more accessible and open to the public." *Id.* at 51,735.

Such RIAs benefit the public. The transparency provides the public, stakeholders, and political actors with information about the effects of the choices that agencies make. Jason A. Schwartz, *Approaches to Cost-Benefit Analysis*, *in Handbook of Regulatory Impact Assessment* 33, 44–46 (Claire A. Dunlop & Claudio M. Radaelli eds., 2016). The RIAs prepared to accompany NAAQS regulations also help states identify cost-effective strategies for their subsequent implementation plans. RIA at 33–34. To promote transparency under Executive Orders and to assist state implementation, EPA therefore assessed and quantified the costs associated with its 2024 $PM_{2.5}$ NAAQS in a distinct, publicly available RIA.

**B.    EPA's cost estimates are in line with the cost estimates of previous standards.**

Consistent with Executive Order 12,866 and subsequent orders reaffirming its central tenets, EPA prepared a separate RIA including cost estimates for the 2024 $PM_{2.5}$ NAAQS. EPA used reasonable assumptions and best available tools and evidence to arrive at these *ex ante* cost projections. RIA at 40, 168; *see id.* at 214 (explaining the limits of the cost estimates given that states manage implementation). EPA used the Control Strategy Tool (CoST) to estimate engineering costs, *id.* at 178, a methodology developed in 2008 and used regularly since. EPA, *Cost Analysis Models/Tools for Air Pollution Regulations* (2024).[4]

Using these assumptions and methods, EPA estimated annualized costs for its Final Rule between $350–$470 million per year (in 2017$) over the 2032–2051 period. RIA at 28.[5] Petitioners argue that "[w]hen a

---

[4] *Available at* https://perma.cc/EU7U-UWCN. Historical documentation for CoST from 2010 and 2014 available at https://perma.cc/J2EX-HRNH; 2018 documentation available at https://perma.cc/RWP5-3JT4.
[5] The range reflects different discount rates. EPA also presents an annualized value for year 2032 costs of $590 million. RIA at 27; *see id.* at 3 (explaining why 2032 is EPA's primary year of analysis).

regulation's . . . costs are high," EPA should "avoid . . . extravagan[ce]." States' Br. 20. The Final Rule's estimated costs, however, not only are not extravagant, they are in line with previous $PM_{2.5}$ NAAQS revisions. For example, the 2013 revision's estimated annual costs were up to $394 million per year (adjusted to 2017$).[6] And the cost estimates for the Final Rule are significantly below those for the 2006 revision, which had estimated annual costs of $7.9 billion per year (adjusted to 2017$).[7]

For further context on the size of these reasonable cost estimates, EPA compared the 2024 rule's projected costs and benefits. While the estimated annual costs for the revisions are around $470 million, the

---

[6] EPA, *Regulatory Impact Analysis for the Final Revisions to the National Ambient Air Quality Standards for Particulate Matter* ES-15 (2012) (EPA-452/R-12-005), https://perma.cc/YC62-UKQ6 (listing cost estimates in year 2020 at up to $350 million in 2010$). The value above is adjusted to 2017$ using the Bureau of Labor Statistics CPI Inflation Calculator, *available at* https://perma.cc/DU8A-J9LT.

[7] EPA, *Regulatory Impact Analysis for the Review of the Particulate Matter National Ambient Air Quality Standards* ES-7 (2006) (EPA-HQ-OAR-2006-0834), https://perma.cc/Y4B6-RYAN (listing annualized social costs at $5.4 billion in 1999$). Most costs ($4 billion per year) were attributable to California reaching full attainment. *Id.* at ES-10.

estimated annual benefits are up to $46 billion. RIA at 28.[8] In other words, the Final Rule's estimated costs are around 1% of its benefits. The 2024 estimated costs are also less than one-tenth of the estimated costs of some previous standards.

### C. Petitioners misleadingly imply the Final Rule will cause "health costs."

Petitioners try to suggest that the Final Rule will cause not just economic costs, but "health costs" as well, implying EPA should consider such costs when setting the NAAQS. States' Br. 16. Specifically, Petitioners imply that the revision's effects on employment would translate into health losses, since less wealthy individuals tend to suffer worse health, and suggest that such costs should be considered. *Id.* ("economic and health costs of the Final Rule" will be "massive."); *id.* at 43 ("If a regulation produces less employment and more poverty, it may result in worse health as well."). This implication is deceptive, and it would have been inappropriate for EPA to have considered any alleged

---

[8] Using Pope et al. mortality estimates in year 2032, at a 3% discount rate. EPA also presents a benefits value of $36 billion per year annualized over 2032–2051.

negative impact on public health from compliance costs as a loophole around its statutory prohibition on factoring costs into setting the NAAQS. *See Whitman* 531 U.S. at 466, 469 (considering and rejecting the idea that EPA could shoehorn costs into its NAAQS-setting by reinterpreting them as health risks).

Granted, wealth and health are often *correlated*; the wealthy do, on average, enjoy longer lives. *See* Richard L. Revesz & Michael A. Livermore, *Retaking Rationality: How Cost-Benefit Analysis Can Better Protect the Environment and Our Health* 67 (2008). But any *causal* relationships behind that simple correlation are complex and remain a subject of ongoing economic and public health research. Even if there were a causal relationship between wealth and health, the effect would likely depend on additional factors, like age, education, income level, and access to subsidized health insurance. *See* Michael A. Livermore & Richard L. Revesz, *Rethinking Health-Based Environmental Standards,* 89 N.Y.U. L. Rev. 1184, 1230 (2014). Thus, any health effects resulting from the costs of a regulation would be "tightly linked to the distribution of [those] costs." *Id.* In fact, improved health is just as likely to contribute

10

to increased wealth as the other way around. In the Final Rule's RIA, EPA finds productivity benefits, such as hundreds of thousands fewer lost workdays, associated with the health benefits of the revision, RIA at 17; these productivity effects are an important monetized benefit, as explored further below.

## II.    Considering Regulatory Costs Would Not Lead To A Less Stringent Standard.

Petitioners argue that EPA should consider costs while setting NAAQS. But statutory text "unambiguously bars cost considerations from the NAAQS-setting process." *Whitman,* 531 U.S. at 471. Even if EPA had been permitted to consider costs when setting the NAAQS, the resulting standard would likely be more stringent, not less stringent.

### A.    EPA's separate RIA assessed not just costs in isolation, but both costs and benefits.

Petitioners call on EPA to consider costs in the NAAQS-setting process, but it would be unreasonable for an agency to assess *only* costs. Agencies both logically and legally should assess benefits alongside costs when they conduct RIAs to comply with Executive Order 12,866. That Executive Order, which has governed agency cost-benefit analysis for

three decades, instructs agencies to assess, through both "quantifiable measures" and "qualitative measures," "all costs and benefits" of a proposed rule, including harms to "health, safety, and the natural environment" and "adverse effects of the efficient functioning of the economy." Exec. Order No. 12,866 §§ 1(a), 6(a)(3)(C)(ii), 58 Fed. Reg. at 51,735, 51,741.

Circular A-4, the Office of Management and Budget's guidance to agencies on conducting analyses under Executive Order 12,866, further provides that RIAs "should discuss the anticipated benefits and costs of the selected regulatory option and reasonable alternatives." Office of Mgmt. & Budget, *Circular A-4: Assessing Benefits and Costs* 27 (2023).[9] Courts agree that it is arbitrary for an agency's regulatory analysis to focus on certain effects (like costs) without also paying attention to mirror image effects (like benefits). *Business Roundtable v. SEC*, 647 F.3d 1144, 1148–49 (D.C. Cir. 2011) (chastising SEC for "inconsistently and opportunistically fram[ing] the costs and benefits"); *Center for Biological Diversity v. National Highway Traffic Safety Administration*, 538 F.3d

---

[9] *Available at* https://perma.cc/8WLD-KY85.

1172, 1198 (9th Cir. 2008) (criticizing NHTSA for putting "a thumb on the scale" by treating costs and benefits inconsistently). Thus, when EPA conducted its RIA of the 2024 PM$_{2.5}$ NAAQS to comply with Executive Order 12,866, it appropriately assessed both costs and benefits.

### B. EPA found significant quantified and unquantified benefits, and the standard was cost-benefit justified.

EPA found that the Final Rule yields substantial quantifiable benefits, including up to $46 billion worth of benefits from avoided PM$_{2.5}$-related morbidities and premature deaths. RIA at 307.

These projected benefits include the prevention of about 4,500 premature deaths per year from particulate matter exposure; hundreds of avoided hospital admissions and emergency room visits per year from cardiovascular and respiratory diseases, heart attacks and strokes, and Parkinson's and Alzheimer's Disease; and about 5,700 fewer children developing asthma and 800,000 fewer exacerbated asthma attacks in children each year. *Id.* at 281, 304. Additionally, EPA estimated that the Final Rule avoids about 290,000 lost workdays per year, valued at $51 million (in 2017$ at a 3% discount rate) in 2032. *Id.* at 304–05.

13

EPA further explained that not every important benefit from the revision could be quantified. Federal administrative standards and best economic practices counsel that "unquantified" does not mean "unimportant." Indeed, federal guidelines on economic analysis explicitly require evaluating unquantified benefits. *See* Exec. Order No. 12,866 § 1(a), 58 Fed. Reg. at 51,735 ("[I]nclude both quantifiable measures . . . and qualitative measures of costs and benefits that are difficult to quantify, but nevertheless essential to consider."). In short, significant benefits should not be excluded from RIAs simply because they are not yet fully quantifiable. EPA acted consistently with best practices by including a complete assessment of the Final Rule's many important, unquantifiable benefits.

The many unquantifiable benefits include likely reductions of other co-pollutants, such as ozone, sulfur dioxide, and nitrogen oxides, depending on the specific control strategies that states and industries use to reduce their $PM_{2.5}$ concentrations. RIA at 291. These additional emissions reductions are associated with many human health effects including respiratory and metabolic morbidity, as well as "asthma

14

attacks, hospital admissions, emergency department visits, and school loss days." *Id.*

The unquantified benefits of the Final Rule also include benefits from the revisions to the air quality index (AQI). The AQI provides useful, timely information about air quality risks and pollution. As EPA notes, "the AQI is recognized internationally as a proven tool to effectively communicate air quality information to the public as demonstrated by the fact that many countries have created similar indices based on the AQI." EPA, *Reconsideration of the National Ambient Air Quality Standards for Particulate Matter,* 89 Fed. Reg. 16202, 16301 (Mar. 6, 2024). Quantifying the value of information is a key challenge, but that challenge does not make the information any less beneficial – it provides critical safety information. *See* National Science and Technology Council, *Advancing the Frontiers of Benefit-Cost Analysis: Federal Priorities and Directions for Future Research* 18 (2023) (noting the importance but difficulty of quantifying "information describing location-specific environmental risks").

Taken together, these additional human health, welfare, and information benefits of the Final Rule, although currently unquantified, are significant. And the revision will generate those benefits on top of the billions of dollars in monetized health and welfare benefits every year.

EPA's Final Rule is cost-benefit justified, with the estimated net benefits (i.e., benefits minus costs) in 2032 valued between $22 billion and $46 billion. RIA at 412. The RIA's projected net benefits are not only large but also much higher than the two less-stringent alternatives analyzed by EPA. *Id.*[10] In fact, for the $PM_{2.5}$ NAAQS alternatives evaluated, net benefits rise with increasing stringency.

## C. Cost-benefit-based standards would not have been less stringent.

As EPA explained in the Final Rule, the agency did not consider costs in setting the NAAQS, consistent with case law and with the best interpretation of its statutory authority. 89 Fed. Reg. at 16,205. Instead, EPA prepared a separate RIA to fulfill the distinct requirements of Executive Order 12,866 and "to provide the public with information on

---

[10] Specifically, the two less-stringent alternatives have net benefits ranging from $8.3–21 billion.

the potential costs and benefits of attaining several alternative PM$_{2.5}$ standard levels." *Id.* at 16,206.

Petitioners assume that if EPA had considered costs, EPA could not have justified the Final Rule, and so Petitioners would have avoided incurring costs from modeling their new compliance requirements and from installing "more rigorous control measures." Industry Br. 22. In fact, if EPA were able to consider regulatory costs when determining the appropriate stringency of this NAAQS revision, those considerations would not, in this case, lead the agency to impose a weaker standard. Because in such a scenario EPA would have considered both costs and benefits, the resulting cost-benefit-based standard, as Petitioners argue is necessary, would have likely been *more* stringent, leading Petitioners to incur even higher compliance costs. *See* Michael A. Livermore & Richard L. Revesz, 46 Envtl. L. Rep. 10,674, 10,678 & tbl.2 (2016) (reviewing past NAAQS rules and their RIAs and concluding that if EPA were allowed to consider costs and benefits, "[b]ased on the agency's analysis, a more stringent standard would be justified").

The RIA shows the estimated net benefits in 2032 for the 9.0 µg/m³ standard (i.e., the Final Rule) valued between $22–46 billion; but the estimated net benefits for the 8.0 µg/m³ standard (i.e., the *more* stringent option) were even higher, between $46–97 billion. RIA at 412. Thus, had EPA calibrated the stringency of the NAAQS using cost-benefit analysis, as Petitioners imply they should have, the agency likely would have set a *more* stringent standard.

## III.  There Is No History Of EPA Considering Costs When Reviewing Standards.

Petitioners argue that EPA was required to consider costs when deciding whether to revise the NAAQS, but there is no history of EPA considering costs when reviewing NAAQS. Like the Final Rule, EPA's three prior reviews of $PM_{2.5}$ NAAQS also did not consider costs. National Ambient Air Quality Standards for Particulate Matter, 71 Fed. Reg. 61144, 61146 (Oct. 17, 2006); National Ambient Air Quality Standards for Particulate Matter, 78 Fed. Reg. 3086, 3089 (Jan. 15, 2013); Review of National Ambient Air Quality Standards for Particulate Matter, 85 Fed. Reg. 82684, 82686 (Dec. 18, 2020) (2020 Decision).

**A.    Since *Whitman*, EPA has not considered costs when revising the NAAQS.**

Following *Whitman*, EPA has never considered costs when deciding whether to revise the NAAQS or suggested that it is statutorily permitted to do so. In fact, in 2006, 2013, and 2020, EPA used substantially similar language to describe the statutory prohibition. *See* 71 Fed. Reg. at 61,146; 78 Fed. Reg. at 3089; 85 Fed. Reg. at 82,686.

Petitioners reference the 2020 Decision not to amend the NAAQS as a model process. Industry Br. 7–9. The most glaring problem with this example is that, in the very same rulemaking, EPA *reaffirmed* that it could not consider costs when revising the NAAQS. 85 Fed. Reg. at 82,686. Notably, EPA did not even prepare a separate RIA in 2020 "because th[e] action [it took did] not change the existing PM NAAQS." *Id.* at 82,744. By failing to prepare a separate RIA of alternative policy options, the 2020 Decision was, if anything, *less* transparent about costs than the Final Rule, which was accompanied by a separate RIA transparently disclosing costs.

19

## B. The 2011 letter from OIRA agreed that EPA cannot consider costs when setting NAAQS.

Petitioners reference a 2011 letter from the Office of Information and Regulatory Affairs (OIRA) to EPA, suggesting it demonstrates the "require[ed] consideration of costs here." Industry Br. 29–30 & n.11. But the letter does not demonstrate that EPA was required to consider costs when revising the NAAQS. Petitioners' contrary suggestion reveals that they misconstrue the OIRA review process.

OIRA is the White House office that leads the inter-agency policy review process for significant rulemakings. The inter-agency policy review includes feedback for the authoring agency (e.g., EPA) from other agencies as well as White House policy offices. Under Executive Order 12,866, OIRA reviews not just the cost-benefit analysis, but also whether the rule is consistent with "the President's priorities" and with other agency policies. Exec. Order. No. 12,866 § 6(b), 58 Fed. Reg. at 51,742. Following the inter-agency policy review, OIRA may send the authoring agency a letter asking for "further consideration" of the proposal. *Id.* at § 6(b)(3). Such letters have been relatively rare, but several letters have focused exclusively on policy concerns unrelated to cost-benefit analysis,

20

such as potential conflicts with international trade agreements, questions about application of rule provisions to state agencies, and the implication of pending legislative proposals.[11]

Contrary to Petitioners' suggestion that OIRA returned the proposed 2011 reconsideration of the ozone and $PM_{2.5}$ NAAQS "due to cost considerations," Industry Br. 29–30, the 2011 letter focuses mainly on the timing and state of a then-forthcoming scientific review, not costs. Letter from OIRA to EPA 1 (Sept. 2, 2011) (Letter).[12] True, the letter mentions that "more generally, the President has directed [OIRA] to . . . minimize regulatory cost and burdens" across "*all* executive agencies" of the federal government—not just EPA. *Id.* at 2 (emphasis added). But this is not the letter's main focus. On the contrary, it is not even

---

[11] OIRA letters are generally available at https://www.reginfo.gov/public/do/eoReturnLetters. *See*, *e.g.* Letter from OIRA to Dept. of Com. (Oct. 3, 2007), *available at* https://perma.cc/X4VE-5XBZ; Letter from OIRA to Fed. Hous. Enter. Oversight of Com. (Dec. 9, 2005), *available at* https://perma.cc/7TKL-Z8XW; Letter from OIRA to Soc. Sec. Admin. (Nov. 15, 2001), *available at* https://perma.cc/Y7NU-7LEM; Letter from OIRA to Dept. of Transp. (Sept. 20, 2001), *available at* https://perma.cc/7WE9-38KR; Letter from OIRA to Dept. of Transp. (Jul. 20, 2001), *available at* https://perma.cc/N3BK-59QX.

[12] *Available at* https://perma.cc/WVG3-3PR6.

21

mentioned as one of the three numbered and emphasized points explaining the requested reconsideration from EPA. The three main points that the 2011 letter suggested EPA should reconsider were: (1) the timing of the review cycles; (2) the timing and state of a forthcoming scientific review; and (3) the possible interactions with multiple other public health rules EPA had recently passed that also would reduce ozone. *Id.* at 1–2; *see also* EPA Br. 85 (explaining that during the 2011 inter-agency review, "EPA had already begun updating the criteria as part of its next five-year review"). Cost is mentioned only among several concluding thoughts offered "generally," not as a reason for EPA to reconsider its approach to the substance or process for setting NAAQS. Letter at 2.

What is more, the 2011 OIRA letter specifically affirmed that "the relevant provisions of the Clean Air Act forbid EPA to consider costs in deciding on the stringency of the national ambient air quality standards, both primary and secondary." *Id.* at 1. Thus, contrary to Petitioners' argument, the 2011 OIRA letter creates no precedent for EPA to consider

22

costs in setting the NAAQS but instead supports EPA's longstanding approach under the Clean Air Act.

## CONCLUSION

For the foregoing reasons, this Court should deny the petitions.

August 26, 2024                     Respectfully submitted,

                                    /s/ Jason A. Schwartz
                                    Jason A. Schwartz
                                    INSTITUTE FOR POLICY INTEGRITY
                                    139 MacDougal Street, 3rd Floor
                                    New York, NY 10012
                                    (212) 992-8932
                                    jason.schwartz@nyu.edu

                                    Counsel for Amicus Curiae
                                    Institute for Policy Integrity

## CERTIFICATE OF COMPLIANCE

This *amicus curiae* brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because this brief contains 4,027 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as counted by counsel's word processing system.

This *amicus curiae* brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

DATED:    August 26, 2024        Respectfully submitted,

/s/ Jason A. Schwartz

*Counsel for Amicus Curiae*
*Institute for Policy Integrity*

# CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of August 2024, a true and correct copy of the foregoing Brief of the Institute for Policy Integrity at New York University School of Law as Amicus Curiae in Support of Respondents was filed with the Clerk of the United States Court of Appeals for the District of Columbia Circuit via the Court's CM/ECF system. Counsel for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

DATED:    August 26, 2024        Respectfully submitted,

/s/ Jason A. Schwartz

*Counsel for Amicus Curiae*
*Institute for Policy Integrity*