ORAL ARGUMENT NOT YET SCHEDULED

Case Nos. 24-**1050**, -1051, **-1052**, -1073, -1091

# In the United States Court of Appeals for the District of Columbia Circuit

COMMONWEALTH OF KENTUCKY and
STATE OF WEST VIRGINIA, *et al.*,

*Petitioners*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents*

ALLIANCE OF NURSES FOR HEALTHY ENVIRONMENTS, *et al.*,

*Intervenors*

---

On Petitions for Review of a Final Action
of the U.S. Environmental Protection Agency

---

### REPLY BRIEF FOR STATE PETITIONERS

**RUSSELL COLEMAN**
**Attorney General of Kentucky**

| | |
|---|---|
| Matthew F. Kuhn | Office of the Kentucky |
| *Solicitor General* | Attorney General |
| Jacob M. Abrahamson | 700 Capital Avenue, Suite 118 |
| *Assistant Solicitor General* | Frankfort, Kentucky 40601 |
| Lindsey R. Keiser | (502) 696-5300 |
| *Assistant Attorney General* | Matt.Kuhn@ky.gov |
| | Jacob.Abrahamson@ky.gov |
| | Lindsey.Keiser@ky.gov |

*Counsel for Petitioner*
*Commonwealth of Kentucky*          (Additional counsel below)

**PATRICK MORRISEY**
**Attorney General of West Virginia**

Michael R. Williams
  *Solicitor General*

Office of the West Virginia
Attorney General
State Capitol, Bldg 1,
Room E-26
Charleston, West Virginia 25305
Michael.R.Williams@wvago.gov

*Counsel for Petitioner*
*State of West Virginia*

(Additional counsel listed after the signature block)

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## I. Parties and Amici

The State Petitioners are petitioners in Case No. 24-1050—the Commonwealth of Kentucky and the States of West Virginia, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, and Wyoming—and petitioners in consolidated Case No. 24-1052—the State of Texas and the Texas Commission on Environmental Quality. Along with the State Petitioners, the following are petitioners in the consolidated petitions for review: the Chamber of Commerce of the United States of America, American Chemistry Council, American Forest & Paper Association, American Petroleum Institute, American Wood Council, National Association of Manufacturers, National Mining Association, and Portland Cement Association (24-1051); President of the Arizona State Senate Warren Petersen, Speaker of the Arizona House of Representatives Ben Toma, and the Arizona Chamber of Commerce and Industry (24-1073); and Essential Minerals Association (24-1091).

Respondents are the United States Environmental Protection Agency and Michael S. Regan, in his official capacity as Administrator of the United States Environmental Protection Agency.

Intervenors in support of Respondents are The Sierra Club, Citizens for Pennsylvania's Future, Conservation Law Foundation, Northeast Ohio Black Health Coalition, Rio Grande International Study Center, Natural Resources Defense Council, Alliance of Nurses for Healthy Environments, American Lung Association, Environmental Defense Fund; the States of California, Arizona, Connecticut, Illinois, Maryland, Michigan, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin; the Commonwealths of Massachusetts and Pennsylvania; the City of New York; and Harris County, Texas.

Amici Curiae for Petitioner are Government Accountability & Oversight and Midwest Ozone Group. Amici Curiae for Respondent are WE ACT for Environmental Justice, Greater Birmingham Alliance to Stop Pollution, West End Revitalization Association, South Bronx Unite, and Community Health Aligning Revitalization, Resistance & Sustainability; National Parks Conservation Association; Environmental Protection Network; and Institute for Policy Integrity at New York University Law School.

## II. Ruling Under Review

"Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," 89 Fed. Reg. 16,202 (Mar. 6, 2024) (effective May 6, 2024) (Final Rule).

## III. Related Cases

The cases consolidated with this case are:

1. *Chamber of Commerce of the United States of America, et al. v. Environmental Protection Agency, et al.*, No. 24-2051 (D.C. Cir.).

2. *State of Texas, et al. v. Environmental Protection Agency, et al.*, No. 24-1052 (D.C. Cir.).

3. *Warren Petersen, et al. v. Environmental Protection Agency, et al.*, No. 24-1073 (D.C. Cir.).

4. *Essential Minerals Association v. Environmental Protection Agency, et al.*, No. 24-1091 (D.C. Cir.).

State Petitioners are unaware of any related cases pending in this Court other than the consolidated cases.

<u>/s/</u> Jacob M. Abrahamson

Dated: September 30, 2024

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .i

TABLE OF AUTHORITIES .................................................................v

GLOSSARY ........................................................................viii

INTRODUCTION ..................................................................1

ARGUMENT ........................................................................2

    I.    EPA can only regulate NAAQS for public-health reasons............2

    II.   EPA's climate priorities led to a rushed and flawed reconsideration. ................................................................5

    III.  EPA cannot ignore the consequences of its reconsideration. .......14

CONCLUSION ....................................................................18

CERTIFICATE OF COMPLIANCE.......................................26

CERTIFICATE OF SERVICE................................................27

# TABLE OF AUTHORITIES

**Cases**

*Am. Petroleum Inst. v. EPA,*
52 F.3d 1113 (D.C. Cir. 1995)....................................................................3

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy,*
72 F.4th 1324 (D.C. Cir. 2023) ................................................................12

*Arizona v. EPA,*
77 F.4th 1126 (D.C. Cir. 2023) ..................................................................3

*City of Arlington v. FCC,*
569 U.S. 290 (2013)....................................................................................2

*Ctr. for Auto Safety v. Fed. Highway Admin.,*
956 F.2d 309 (D.C. Cir. 1992)..................................................................11

*Dep't of Com. v. New York,*
588 U.S. 752 (2019)....................................................................................4

*DHS v. Regents of the Univ. of Cal.,*
591 U.S. 1 (2020) .....................................................................................12

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016)..................................................................................13

*Lead Indus. Ass'n, Inc. v. EPA,*
647 F.2d 1130 (D.C. Cir. 1980)..................................................................8

*Loper Bright Enters. v. Raimondo,*
144 S. Ct. 2244 (2024) ...............................................................................8

*Massachusetts v. EPA,*
549 U.S. 497 (2007)..................................................................................11

*Michigan v. EPA,*
268 F.3d 1075 (D.C. Cir. 2001)..............................................................1, 2

*Michigan v. EPA,*
576 U.S. 743 (2015)........................................................2, 15

*Mingo Logan Coal Co. v. EPA,*
829 F.3d 710 (D.C. Cir. 2016)...........................................16

*Miss. Comm'n on Env't Quality v. EPA,*
790 F.3d 138 (D.C. Cir. 2015)............................................2

*Mississippi v. EPA,*
744 F.3d 1334 (D.C. Cir. 2013)..........................................7

*Murray Energy Corp. v. EPA,*
936 F.3d 597 (D.C. Cir. 2019).........................................17

*Whitman v. Am. Trucking Ass'ns,*
531 U.S. 457 (2001) ..................................... 1, 2, 3, 5, 15

**Statutes**

42 U.S.C:
§ 7409(d)(1) ................................... 3, 5, 6, 7, 14, 15

§ 7409 .....................................................................1, 2

§ 7409(b)(1) ...........................................................3, 15

§ 7607(d)(9)...............................................................1

§7407(a).....................................................................2

**Regulations**

85 Fed. Reg. 82,684 (Dec. 18, 2020) ...............................9, 10

75 Fed. Reg. 2,938, 2,943 (Jan. 19, 2010) .............................6

78 Fed. Reg. 3,086 (Jan. 15, 2013) .....................................12

Executive Order 13,990,
86 Fed. Reg. 7,037 (Jan. 25, 2021) ............................3, 4, 6, 7

89 Fed. Reg. 16,202 (Mar. 6, 2024) .................... 3, 4, 9, 10, 11, 13, 16, 17

# GLOSSARY

| | |
|---|---|
| EPA | United States Environmental Protection Agency |
| NAAQS | National Ambient Air Quality Standards |
| PM | Particulate Matter |
| µg/m$^3$ | Micrograms per cubic meter |
| JA | Joint Appendix |
| Act | Clean Air Act |

## INTRODUCTION

EPA rushed into reconsidering the National Ambient Air Quality Standards for Particulate Matter for the first time despite few new public-health reasons suggesting that reconsideration was even necessary (but plenty of climate-policy reasons to supposedly do so). EPA now says this Court should turn a blind eye to political context. After reversing its own recent decision to exercise caution in the face of scientific uncertainty, EPA now argues that any new evidence, however limited, justifies its about-face. And after making a costly decision to issue the most stringent PM NAAQS to date, EPA disclaims any obligation to explain those costs. If EPA were right, it would paint a bleak picture for the people and entities it regulates. Altogether, EPA and its supporting Intervenors claim EPA is owed unprecedented deference.

But when Congress passed the Clean Air Act, it did not write the blank check EPA now attempts to cash. Instead, Section 109 gives EPA the carefully cabined authority to protect the public health—and only the public health—from air pollutants. 42 U.S.C. § 7409; *see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 465–66 (2001) (*American Trucking*); *Michigan v. EPA*, 268 F.3d 1075, 1083–84 (D.C. Cir. 2001). And more broadly, the Act's judicial-review provisions require EPA to engage in reasoned decisionmaking. *See* 42 U.S.C. § 7607(d)(9); *Miss. Comm'n on*

*Env't Quality v. EPA*, 790 F.3d 138, 150 (D.C. Cir. 2015). Because the Final Rule transgresses these statutory limits, the Court should vacate it.

**ARGUMENT**

The limits on EPA's authority here are clear. EPA's Final Rule must "be within the scope of its lawful authority," and "the process by which it" was promulgated "must be logical and rational." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (citation omitted). EPA satisfied neither requirement when it issued the Final Rule. For the reasons pressed in Petitioners' initial briefs, and those offered in reply below, the Court should vacate the Final Rule.

## I. EPA can only regulate NAAQS for public-health reasons.

Only Congress can give EPA the authority to regulate. *See, e.g.*, *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). And it did so here: Section 109 of the Clean Air Act tasks EPA with regulating air pollutants by setting NAAQS, which States then implement. 42 U.S.C. §§ 7409; 7407(a). But Congress coupled that conception of *what* EPA may regulate with a limited reason *why* EPA may regulate. Specifically, Congress instructed EPA to do no "more than necessary" to protect public health when setting NAAQS. *American Trucking*, 531 U.S. at 473.

These statutory limits explain why this Court has, in other contexts, "remind[ed] EPA that its mission is not a roving commission to achieve pure air or any other laudable goal." *Michigan*, 268 F.3d at 1084

(citations omitted). Instead, Section 109's "specific statutory directive defines the relevant functions of EPA in" the NAAQS-setting context. *Am. Petroleum Inst. v. EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995). That directive is worth repeating. Primary NAAQS are set at levels "which in the judgment of the Administrator, based on [air quality] criteria and allowing an adequate margin of safety, are requisite to protect the public health." 42 U.S.C. § 7409(b)(1). At the heart of EPA's directive is "the health of the public." *American Trucking*, 531 U.S. at 466. And EPA, after "a thorough review of the [air quality] criteria," may revise the NAAQS "as may be appropriate." *Id.* § 7409(d)(1).

Because public health is central to EPA's NAAQS-setting authority, EPA's reasons for conducting this reconsideration matter. And it explained them. The first paragraph outlining the background of the Final Rule describes Executive Order 13,990, which "directed review of certain agency actions . . ., including the 2020 Particulate Matter NAAQS Decision." Final Rule at 16,210, JA___. As this Court described it, the order "directed federal agencies to consider whether Trump-era rules fit the new administration's agenda." *Arizona v. EPA*, 77 F.4th 1126, 1128 (D.C. Cir. 2023) (citation omitted).

EPA objects (at 77) to State Petitioners' shorthand for Executive Order 13,990—the Climate Order. EPA correctly notes that the Order's first section lists multiple policy goals. *Id.* But the Order itself considers

all those policies to be in service of the larger goal of "confront[ing] the climate crisis." Climate Order at 7,037. And it directs that where the federal government has failed to meet its policy commitments, "it must advance environmental justice." *Id.* Fixation on climate policy—or as its title says, "tackl[ing] the climate crisis"—comes from the Climate Order itself. So this "climate crisis," not public health, was EPA's starting point in issuing the Final Rule. Final Rule at 16,210, JA___; *see also* State Pet. Br. 28 (explaining that the Final Rule targets the same sources as EPA's climate-change initiatives); Gov't Accountability Oversight Amicus Br., ECF#2053669, at 6–9 (Apr. 5, 2024) (collecting statements from EPA Administrator on climate policy).

In defending its changed policy priorities, EPA fails to square the Final Rule's origins in the President's *climate*-focused order with Congress's *health*-focused statute. It instead notes that "[i]t is hardly improper for an agency head to come into office with policy preferences and ideas." EPA Br. 82–83 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 755 (2019)). State Petitioners agree. *See* State Pet. Br. 24 ("Presidents are no doubt permitted to reconsider policy."). But that general point elides State Petitioners' specific concern: whether those "policy preferences and ideas" are appropriate reasons for EPA to invoke Section 109 to conduct a reconsideration.

4

In the NAAQS-setting context, Congress has made clear that they are not. Major policy choices are not made in a vacuum. Presidents may have different government-wide policy priorities and execute those priorities in part through agencies. But if Congress limits what an agency can consider in making its policy choices, courts act as a check to confirm those limits. Congress did that here—EPA's first job is "to identify the maximum airborne concentration of a pollutant that the public health can tolerate, decrease the concentration to provide an 'adequate' margin of safety, and set the standard at that level." *American Trucking*, 531 U.S. at 465. It can then revise the standard "as may be appropriate." 42 U.S.C. § 7409(d)(1). Climate policy has no place in either step. So when EPA cites the Climate Order to explain the genesis of its reconsideration, the Court should not ignore the contents and political context of that Order.

## II. EPA's climate priorities led to a rushed and flawed reconsideration.

That EPA chose to act for non-public-health reasons is borne out by the unprecedented nature of the Final Rule. Both EPA's history of NAAQS reviews and revisions (it has never revised a NAAQS after a voluntary reconsideration) and how quickly it began this reconsideration (it acted before current science demanded action) show why that is true. So the Court should not afford EPA its requested "presumption of

regularity," EPA Br. 78, for actions it has never before taken. Simply put, the process that resulted in the Final Rule was not business as usual.

**A.** Start with how EPA has traditionally reviewed and revised a NAAQS. Review is expected to occur "at five-year intervals," 42 U.S.C. § 7409(d)(1), and it sometimes results in a revision. EPA has announced a reconsideration of NAAQS for ozone twice (once in 2008 and once in 2023), but both were tabled. *See* State Pet. Br. 26–27. EPA acknowledges as much, but it says (at 79) those data points are "irrelevant." Yet EPA's response (at 80) that its "assertion of authority to revise criteria or standards" early is "hardly novel" is lacking.

What matters here is the actual reconsideration and revision of the PM NAAQS. EPA admits (at 79) that both actions are without precedent. So was EPA's reliance on the Climate Order to trigger the reconsideration process. New presidential administrations have, of course, previously issued government-wide directives to rethink policies to align with administration priorities. *See, e.g.*, 75 Fed. Reg. 2,938, 2,943 (Jan. 19, 2010) (directing a general review of the prior Administration's significant policies, including NAAQS). But although those directives told agencies to review their past actions, they did not purport to give agencies a new mandate altogether. That distinction makes EPA's reliance on the Climate Order different—and unlawful. The Climate Order was issued with specific policy goals—"advanc[ing] environmental

6

justice" and "confront[ing] the climate crisis"—in mind. Climate Order at 7,037. Without corresponding authority in the Act, neither goal can give EPA reason to act, much less act in a way it has never acted before.

EPA's track record in this context is clear. Until the Climate Order ushered in a wave of climate-focused regulations, review and revision of NAAQS was a slow, deliberative process, with reviews separated by, at the very least, the Act's "five-year intervals." 42 U.S.C. § 7409(d)(1).

**B.** That raises the second point. EPA's attempt (at 80) to cast its reconsideration as a run-of-the-mill occurrence depends in part on purportedly "new, relevant information." But EPA sets itself too low a bar. Any change in "the Administrator's judgment," it says (at 82), is enough to trigger this unprecedented reconsideration and revision process—no matter how unjustified. To ask for more, EPA continues (at 81–82), is to demand "the sort of presumptive validity" for current NAAQS that this Court refused to require in *Mississippi v. EPA*, 744 F.3d 1334, 1343 (D.C. Cir. 2013).

But asking whether EPA rushed its reconsideration because of the politically oriented Climate Order does not require presuming that the old standards were valid. It instead requires looking to decades of NAAQS-setting and NAAQS-revision practice (rather than the standards themselves) and asking whether EPA "reasonably explained" its decision to depart from that practice. *See id.* And looking to the "longstanding

7

practice of the government" is standard fare in reviewing agency action, *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2258 (2024); it does not result in some new and impermissible presumption.

EPA claims (at 1) that Petitioners "do not seriously contest" the science EPA relied on to rush this reconsideration. State Petitioners acknowledge that this Court it is not the proper forum for "second-guess[ing]" scientific judgments, *Lead Indus. Ass'n, Inc. v. EPA*, 647 F.2d 1130, 1146 (D.C. Cir. 1980) (citation omitted), despite State Petitioners' disagreement with some of those judgments here, *see* State Pet. Br. 33 (citing State Petitioners' Comments (EPA-HQ-OAR-2015-0072-1525) at 6–9, JA___–___). But the Court still "must undertake a 'substantial inquiry' into the facts, one that is 'searching and careful,'" to determine whether the agency made a reasoned decision. *Lead Indus.*, 647 F.2d at 1145. And this Court is the right place to ask whether EPA had public-health reasons for taking unprecedented actions or, in the alternative, if its haste was tied to broader, climate-policy goals set by the President, no Congress. Clear-cut examples of scientific change might support the former conclusion, but continued scientific uncertainty supports the latter.

As State Petitioners explained in their initial brief, uncertainty wins the day here. *See* State Pet. Br. 33–38 (comparing the uncertainties described in the 2020 action with the Final Rule). A climate-policy-driven decision "to place less weight on" that uncertainty does most of the work

in the Final Rule, Final Rule at 16,276, JA\_\_\_, leaving room for EPA's improper policy concerns to control its decision.

A few points deserve emphasis here.

One is EPA's consideration of epidemiological studies using a hybrid modeling approach. As State Petitioners flagged, hybrid-method studies present challenge-inducing uncertainties and, as ambient $PM_{2.5}$ lowers, those challenges only grow. State Pet. Br. 34 (citing 2020 Action at 82,705, 82,711, JA\_\_\_, \_\_\_). EPA notes that hybrid-method studies "have reduced exposure measurement error and uncertainty in the health effect estimates," EPA Br. 73 (quoting Final Rule at 16,248, JA\_\_\_), but it omits the follow-on discussion of the method's "inherent limitations and uncertainties," Final Rule at 16,248, JA\_\_\_. The only other argument EPA offers is a conclusion that the hybrid-method studies "are an advancement in the available science." EPA Br. 73 (quoting Final Rule at 16,275, JA\_\_\_). But that alone does not explain why the new hybrid-method studies can overcome uncertainty concerns. The mean concentrations of epidemiological studies are crucial to EPA's decision, EPA Br. 73–74, so that uncertainty needs to be explained.

The same is true for EPA's handling of accountability studies. In 2020, EPA found existing accountability studies lacking for several reasons. 2020 Action, at 82,717, JA\_\_\_; State Pet. Br. 35. Most relevant here, the studies did not evaluate $PM_{2.5}$ at or below the then-current

standards, 12 µg/m³, and could not "disentangle health impacts of the interventions from background trends in health." 2020 Action at 82,717, JA___. The new studies considered for the Final Rule address the first uncertainty, as State Petitioners acknowledge. State Pet. Br. 37 (citing Final Rule at 16,256, JA___). But EPA accuses State Petitioners of "misleadingly cit[ing]" the 2020 Action to explain that the second problem persisted. EPA Br. 72. But the only mention of that concern in the Final Rule is in reference to the 2020 Action. *See* Final Rule at 16,222, JA___. Otherwise, there is no indication that the three new accountability studies that EPA considered resolved the concern. Without an explanation for a different conclusion in the Final Rule (and now EPA's brief), State Petitioners rightly categorized it as a continued uncertainty.

State Petitioners also emphasized risk estimates as uncertain in both 2020 and 2024. State Pet. Br. 34 (citing 2020 Action at 82,717, JA___), 36–37 (citing Final Rule at 16,250, JA___). EPA agrees. EPA Br. 73. But in 2024, EPA still considered the risk estimates "a useful tool" to aid its decision. *Id.* (citing Final Rule at 16,275, JA___); *see also id.* 64 (citing Final Rule at 16,282–83, JA___–___). Not so for 2020, when EPA gave them "little weight," consistent with past practice. 2020 Action at 82,717, JA___. Once again, uncertainty gave way to EPA's preferred policy position in the reconsideration process.

Note the centrality of the Administrator's new say-so to the Final Rule. On close examination, the uncertainties that existed in the 2020 review still existed during the 2024 reconsideration. Supplemental studies were considered, but EPA has offered little explanation of how they resolved the key uncertainties it identified in 2020. *See* State Pet. Br. 33–38. The change that made the difference was in the Administrator's judgment based on nearly identical facts and data. *See* EPA Br. 70; Final Rule at 16,276, JA___. EPA claims (at 82) that is enough to justify its actions here. But EPA's "leeway reasonably to resolve uncertainty, as a policy matter, in favor of more regulation or less," *Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 316 (D.C. Cir. 1992), extends only to policy choices Congress gave EPA to make. So given the unprecedented steps EPA took to conduct this reconsideration, *supra* 5–10, and the reconsideration's roots in the climate-policy directives of the Climate Order, the Court should not provide EPA the extraordinary deference it requests. "Put another way, the use of the word 'judgment' is not a roving license to ignore the statutory text. It is but a direction to exercise discretion within defined statutory limits." *Massachusetts v. EPA*, 549 U.S. 497, 533 (2007).

**C.** The above all supports State Petitioners' claim that EPA's unprecedented actions are tied to the Climate Order's policy pronouncements, not public health. But it also goes to show why EPA's

decisionmaking process was arbitrary and capricious. As noted already, EPA took unprecedented action, in a departure from its own past practice, without explanation. *See* State Pet. Br. 31 (citing *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1342 (D.C. Cir. 2023)). That choice affected the reliance interests created by the longstanding 2013 PM NAAQS, so those interests had to "be taken into account." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (citation omitted).

EPA and its Intervenors are simply wrong to wave off State Petitioners' reliance interests. *See* EPA Br. 86; State Intervenor Br. 13–14. In State Intervenors' view (at 13–14), challenges to the 2020 Action created "a cloud of legal uncertainty," so no reliance interests could form. EPA likewise ties (at 86) potential reliance interests to the lack of implementation activities after the 2020 Action. But reliance here runs much deeper: the pre-reconsideration NAAQS have been in place for over ten years. *See* 78 Fed. Reg. 3,086 (Jan. 15, 2013).

States are engaged in ensuring compliance with those standards. Take Kentucky as an example. Its Division of Air Quality achieves attainment within Kentucky through rulemakings, program administration, and permitting. Kennedy Decl. ¶3, 8a–9a. That means "performing stack tests, overseeing the monitoring network and adhering to the monitoring plan, state implementation plan development . . ., and regulatory development of necessary updates to the [permitting

process].” *Id.* ¶17, 14a. In short, significant resources are directed at maintaining attainment. And since attainment is based on current NAAQS, reliance interests understandably develop with respect to those standards, particularly because EPA has never revised NAAQS outside of the standard, five-year timeline.

But revised NAAQS for $PM_{2.5}$ upend the current system years ahead of the expected schedule. About 17 Kentucky counties will require reevaluation for attainment, causing immediate costs and diversion of resources. *Id.* ¶¶19–22, 14a–16a. As the declarations gathered in the Addendum to State Petitioners’ brief show, other States face similar challenges. *See* State Pet. Br. 18–20. Indeed, EPA “anticipates” new nonattainment areas under the Final Rule’s stringent standards. Final Rule at 16,370, JA___. Despite anticipating an expansion in the number of nonattainment areas, EPA failed to acknowledge the consequential challenges for States and explain its decision.

All told, EPA failed to explain its departure from past practices. Without “adequate reasons,” EPA could not act. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). So even if EPA invoked Section 109 for the right reasons (and it did not), the Court should vacate the Final Rule.

## III. EPA cannot ignore the consequences of its reconsideration.

EPA's departure from its past practices to conduct this reconsideration was unlawful and unreasoned. That alone justifies vacatur of the Final Rule. But it also led to EPA's decision to revise the PM NAAQS that was itself unreasoned for failing to consider the harms that will result from the Final Rule. That failure is rooted in EPA's incorrect application of *American Trucking* to Section 109(d)(1)'s appropriateness requirement.

Before diving in, a clarifying point is in order. EPA (at 75, n.11) sees "some tension" between State Petitioners' argument that EPA's decision to trigger the reconsideration process was motivated by climate policy, not the public health, and the argument that EPA had to consider the consequences of that process before deciding whether to revise the NAAQS. None exists. The former concerns the unlawful reasons behind EPA's choice to begin the process at all. At that point (if EPA can conduct a reconsideration at all, *see* Industry Pet. Br. at Section I.A), only EPA's mandate to protect public health (not government-wide climate policy) can drive EPA's decisionmaking. But the latter argument concerns a different decision, one the Act requires EPA to make—whether NAAQS revisions "may be appropriate." 42 U.S.C. § 7409(d)(1).

Turn to that issue now. In EPA's view (at 53), the Act "prohibits cost considerations." But that reading of Section 109(d)(1) gives EPA

14

discretion with no guardrails. EPA claims (at 54) that this argument is a "straw-man," but it does not identify what "meaningful constraints" exist under its view of the Act. Of course, *American Trucking* explained that EPA, when setting NAAQS, must exercise a "certain degree of discretion" when regulating "pollutants that inflict a continuum of adverse health effects." 531 U.S. at 475 (citation omitted). So the Act "does not require the EPA to eliminate every health risk, however slight, at any economic cost, however great." *Id.* at 494 (Breyer, J., concurring) (citation omitted).

That logic, applied in *American Trucking* to EPA's NAAQS-setting authority in Section 109(b)(1), applies even more explicitly to its NAAQS-revision authority in Section 109(d)(1). That's because Congress allows EPA to revise NAAQS only "as may be appropriate." 42 U.S.C. § 7409(d)(1). As State Petitioners explained, appropriateness "naturally and traditionally includes consideration of all the relevant factors," with cost as a key factor in "paying attention to the advantages and the disadvantages of" the decision. State Pet. Br. 39–40 (citing *Michigan*, 576 U.S. at 752–53 (citation omitted) (emphasis removed)). By permitting only "appropriate" revisions here, Congress tasked EPA with pausing to consider costs before deciding whether to revise NAAQS and issue standards like those in the Final Rule.

What's more, in the NAAQS-revision context, even when EPA exercises the "judgments of degree," *American Trucking*, 531 U.S. at 475,

15

it (at 54) points to here, the reality is that overall costs must be considered by any rational regulator. *See* State Pet. Br. 41–42. The upshot of EPA's position is that it may consider costs without saying so, safe behind assertions that policy choices are left to the Administrator. *Id.* (citing Final Rule at 16,206, JA___). The Act does not offer EPA that type of unlimited discretion. *See, e.g.*, *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 732–37 (D.C. Cir. 2016) (Kavanaugh, J., dissenting) (explaining why the Administrative Procedure Act generally requires consideration of costs and why cost analysis is particularly important when an agency changes position).

State Petitioners also dispute State Intervenors' contention (at 18–22) that cooperative federalism demands that EPA ignore the consequences of the Final Rule. The State Intervenors are not all wrong: States are no doubt best suited to judge how to implement the NAAQS, and the Act requires it. *See* State Pet. Br. 5–7. But it does not follow that cooperative federalism renders EPA unable to predict in the costs that the revised NAAQS will impose. *See* State Intervenor Br. 19. State Petitioners told EPA what those costs would be before finalization. *See* State Petitioners' Comments at 9–11, JA___–___. Even if EPA lacked exact cost figures, State Intervenors are wrong to conclude that EPA cannot consider the costs its decision will impose. Nor is EPA's refusal to consider costs necessary to allow States to adopt varying implementation

16

strategies. *See* State Intervenor Br. 19–22. As State Petitioners' declarations demonstrate, EPA's revised NAAQS will overwhelm the state regulators tasked with implementing them, both in terms of money and human resources. *See* State Pet. Br. 18–20. In other words, state regulators expect the Final Rule to require regulatory triage to avoid federal implementation, not to present an opportunity to pursue unique strategies. Regulating without attention to those costs effectively removes the ability to implement an effective, state-level system.

One final note. Environmental Intervenors are correct (at 30) that EPA's "interpretation of the Act cannot alter whether the Act included an intelligible principle." *Murray Energy Corp. v. EPA*, 936 F.3d 597, 624 (D.C. Cir. 2019). But that responds to a claim State Petitioners are not making. This Court is bound to follow *American Trucking*. The parties have offered competing interpretations of what that means for this challenge. EPA's version (at 53)—that it is prohibited from considering anything it describes as a cost consideration—would create a nondelegation problem. This constitutional concern is yet another reason to accept State Petitioners' reading of *American Trucking*, which requires EPA to explain appropriateness when deciding whether to revise NAAQS. To the extent the Court believes EPA is right, however, State Petitioners preserve for further review the argument that *American Trucking* was incorrectly decided.

17

# CONCLUSION

For the reasons offered here and in State Petitioners' initial brief, the petitions for review should be granted and the Final Rule should be vacated.

Respectfully submitted,

**RUSSELL COLEMAN**
**Attorney General of**
**Kentucky**

/s/ Jacob M. Abrahamson
Matthew F. Kuhn
 *Solicitor General*
Jacob M. Abrahamson
 *Assistant Solicitor General*
Lindsey R. Keiser
 *Assistant Attorney General*
Office of the Kentucky
Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jacob.Abrahamson@ky.gov
Lindsey.Keiser@ky.gov

*Counsel for Petitioner*
*Commonwealth of Kentucky*

(Counsel for Additional Petitioners Below)

**PATRICK MORRISEY**
**Attorney General of**
**West Virginia**

/s/ Michael R. Williams
Michael R. Williams
 *Solicitor General*
Office of the West Virginia
Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, West Virginia 25305
(681) 313-4550
Michael.R.Williams@wvago.gov

*Counsel for Petitioner*
*State of West Virginia*

**STEVE MARSHALL**
**Attorney General of Alabama**

/s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
  *Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for Petitioner*
*State of Alabama*

**TREG R. TAYLOR**
**Attorney General of Alaska**

/s/ Jennifer J. Seely
Jennifer J. Seely
  *Assistant Attorney General*
Environmental Section
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 269-5211
Jennifer.seely@alaska.gov

*Counsel for Petitioner*
*State of Alaska*

**TIM GRIFFIN**
**Attorney General of Arkansas**

/s/ Nicholas J. Bronni
Nicholas J. Bronni
  *Solicitor General*
Dylan L. Jacobs
  *Deputy Solicitor General*
Office of the Arkansas
Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
Nicholas.Bronni@ArkansasAG.gov
Dylan.Jacobs@ArkansasAG.gov

*Counsel for Petitioner*
*State of Arkansas*

**ASHLEY MOODY**
**Attorney General of Florida**

/s/ Henry C. Whitaker
Henry C. Whitaker
  *Solicitor General*
James H. Percival
  *Chief of Staff*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
henry.whitaker@myfloridalegal.com
james.percival@myfloridalegal.com

*Counsel for Petitioner*
*State of Florida*

19

**CHRISTOPHER M. CARR**
**Attorney General of Georgia**

/s/ Stephen J. Petrany
Stephen J. Petrany
  *Solicitor General*
Office of the Georgia
Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Petitioner*
*State of Georgia*


**THEODORE E. ROKITA**
**Attorney General of Indiana**

/s/ James A. Barta
James A. Barta
  *Solicitor General*
Office of the Attorney General
IGC South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
(317) 232-0709
James.Barta@atg.in.gov

*Counsel for Petitioner*
*State of Indiana*


**RAÚL R. LABRADOR**
**Attorney General of Idaho**

/s/ Alan M. Hurst
Alan M. Hurst
  *Solicitor General*
Office of the Idaho
Attorney General
P.O. Box 83720
Boise, Idaho 83720-0010
Tel: (208) 334-2400
Fax: (208) 854-8071
Alan.Hurst@ag.idaho.gov

*Counsel for Petitioner*
*State of Idaho*


**BRENNA BIRD**
**Attorney General of Iowa**

/s/ Eric H. Wessan
Eric H. Wessan
  *Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for Petitioner*
*State of Iowa*

20

**KRIS KOBACH**
**Attorney General of Kansas**

/s/ Anthony J. Powell
Anthony J. Powell
  *Solicitor General*
Office of Kansas Attorney General
Kris W. Kobach
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Office: (785) 368-8539
Fax: (785) 296-3131
Anthony.Powell@ag.ks.gov

*Counsel for Petitioner*
*State of Kansas*


**LYNN FITCH**
**Attorney General of Mississippi**

/s/ Justin L. Matheny
Justin L. Matheny
  *Deputy Solicitor General*
Office of the Mississippi
Attorney General
P.O. Box 220
Jackson, Mississippi 39205-0220
(601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for Petitioner*
*State of Mississippi*


**LIZ MURRILL**
**Attorney General of Louisiana**

/s/ J. Benjamin Aguiñaga
J. Benjamin Aguiñaga
  *Solicitor General*
Office of the Louisiana
Attorney General
1885 North Third Street
Baton Rouge, Louisiana 70802
(225) 485-2458
aguinagab@ag.louisiana.gov

*Counsel for Petitioner*
*State of Louisiana*


**ANDREW BAILEY**
**Attorney General of Missouri**

/s/ Joshua M. Divine
Joshua M. Divine
  *Solicitor General*
Office of the Attorney General
207 West High St.
Jefferson City, Missouri 65101
(573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for Petitioner*
*State of Missouri*

21

**AUSTIN KNUDSEN**
**Attorney General of Montana**

/s/ Christian B. Corrigan
Christian B. Corrigan
  *Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov

*Counsel for Petitioner*
*State of Montana*


**DREW WRIGLEY**
**Attorney General of**
**North Dakota**

/s/ Philip Axt
Philip Axt
  *Solicitor General*
North Dakota Attorney
General's Office
600 East Boulevard Avenue,
Dept. 125
Bismarck, North Dakota 58505
(701) 328-2210
pjaxt@nd.gov

*Counsel for Petitioner*
*State of North Dakota*


**MICHAEL T. HILGERS**
**Attorney General of Nebraska**

/s/ Grant D. Strobl
Grant D. Strobl
  *Assistant Solicitor General*
Office of the Attorney General
of Nebraska
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
Grant.Strobl@nebraska.gov

*Counsel for Petitioner*
*State of Nebraska*


**DAVE YOST**
**Attorney General of Ohio**

/s/ T. Elliot Gaiser
T. Elliot Gaiser
  *Solicitor General*
Mathura Sridharan
  *Deputy Solicitor General*
Ohio Attorney General's Office
30 E. Broad Street, Floor 17
Columbus, Ohio 43215
(614) 466-8980
elliot.gaiser@ohioago.gov
mathura.sridharan@ohioago.gov

*Counsel for Petitioner*
*State of Ohio*

**GENTNER F. DRUMMOND**
**Attorney General of Oklahoma**

/s/ Garry M. Gaskins, II
Garry M. Gaskins, II
  *Solicitor General*
Jennifer L. Lewis
  *Deputy Attorney General*
Oklahoma Office of the
Attorney General
313 Northeast 21st Street
Oklahoma City, Oklahoma 73105
(405) 312-2451
Garry.Gaskins@oag.ok.gov

*Counsel for Petitioner*
*State of Oklahoma*

**MARTY J. JACKLEY**
**Attorney General of**
**South Dakota**

/s/ Steven Blair
Steven Blair
  *Deputy Attorney General*
South Dakota Attorney
General's Office
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501
(605) 773-3215
atgservice@state.sd.us

*Counsel for Petitioner*
*State of South Dakota*

**ALAN WILSON**
**Attorney General of**
**South Carolina**

/s/ Joseph D. Spate
Robert D. Cook
  *Solicitor General*
J. Emory Smith, Jr.
  *Deputy Solicitor General*
Thomas T. Hydrick
  *Assistant Deputy Solicitor General*
Joseph D. Spate
  *Assistant Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for Petitioner*
*State of South Carolina*

**JONATHAN SKRMETTI**
**Attorney General & Reporter**
**of Tennessee**

/s/ Whitney Hermandorfer
Whitney Hermandorfer
  *Director of Strategic Litigation*
Harrison Gray Kilgore
  *Strategic Litigation Counsel*
  *and Assistant Solicitor General*
Office of the Attorney General and
Reporter of Tennessee
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 741-7403
Whitney.Hermandorfer@ag.tn.gov
Harrison.Kilgore@ag.tn.gov

*Counsel for Petitioner*
*State of Tennessee*

**SEAN D. REYES**
**Attorney General of Utah**

/s/ Stanford E. Purser
Stanford E. Purser
  *Solicitor General*
Office of the Utah Attorney General
160 E. 330 S., 5th Floor
Salt Lake City, Utah 84111
(385) 382-4334
spurser@agutah.gov

*Counsel for Petitioner*
*State of Utah*

**BRIDGET HILL**
**Attorney General of Wyoming**

/s/ D. David DeWald
D. David DeWald
  *Deputy Attorney General*
Wyoming Attorney General's
Office Water & Natural
Resources Division
109 State Capitol
Cheyenne, Wyoming 82002
(307) 777-7895 phone
(307) 777-3542 fax
david.dewald@wyo.gov

*Counsel for Petitioner*
*State of Wyoming*

24

| **KEN PAXTON** | /s/ Clayton Smith |
| **Attorney General of Texas** | CLAYTON SMITH |
| | Assistant Attorney General |
| **BRENT WEBSTER** | D.C. Circuit Bar No. 65145 |
| **First Assistant Attorney** | Texas Bar No. 24091234 |
| **General** | clayton.smith@oag.texas.gov |
| | |
| **JAMES LLOYD** | |
| **Deputy Attorney General for** | |
| **Civil Litigation** | Office of the Attorney General of Texas |
| | |
| **KELLIE E. BILLINGS-RAY** | Environmental Protection Division |
| **Chief, Environmental** | P.O. Box 12548, MC 066 |
| **Protection Division** | Austin, Texas 78711-2548 |
| | Tel: (512) 971-0139 |
| | Fax: (512) 320-0911 |

*Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality in Consolidated Case No. 24-1052*

**CERTIFICATE OF COMPLIANCE**

As required by Federal Rule of Appellate Procedure 32(f) and (g), I certify that this brief complies with this Court's May 14, 2024 Scheduling Order, because it contains 3,956 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Century Schoolbook font using Microsoft Word.

*/s/* Jacob M. Abrahamson

**CERTIFICATE OF SERVICE**

I certify that on September 30, 2024, I electronically filed the above with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/* Jacob M. Abrahamson