UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

COMMONWEALTH OF KENTUCKY, et al.,
*Petitioners*,

*v.*

U.S. ENVIRONMENTAL PROTECTION AGENCY, MICHAEL S. REGAN
*Respondents.*

On Petitions for Review of Final Agency Action
of the United States Environmental Protection Agency
89 Fed. Reg. 16,202 (Mar. 6, 2024)

**REPLY BRIEF OF INDUSTRY
AND ARIZONA COALITION PETITIONERS**

Lucinda Minton Langworthy
Erica N. Peterson
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
clangworthy@HuntonAK.com
epeterson@HuntonAK.com
(202) 955-1500

Elbert Lin
 *Counsel of Record*
Hunton Andrews Kurth LLP
951 East Byrd Street, East Tower
Richmond, VA 23219
elin@HuntonAK.com
(804) 788-8200

*Counsel for Petitioners Chamber of Commerce of the United States of America,
American Chemistry Council, American Forest & Paper Association, American
Petroleum Institute, American Wood Council, National Association of
Manufacturers, National Mining Association, and Portland Cement Association*

*Additional counsel listed on following pages*

Andrew R. Varcoe
Stephanie A. Maloney
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062

*Counsel for Petitioner Chamber of Commerce of the United States of America*

Nate Curtisi
Michael G. Bailey
Arizona Chamber of Commerce
100 N. 7th Ave, Suite 120
Phoenix, Arizona 85007
(602) 248-4430
ncurtisi@azchamber.com

*Counsel for Arizona Chamber of Commerce and Industry*

Erica Klenicki
Michael A. Tilghman II
NAM Legal Center
733 Tenth Street, NW
Suite 700
Washington, DC 20001

*Counsel for Petitioner National Association of Manufacturers*

Brunn (Beau) W. Roysden III
Fusion Law, PLLC
7600 N. 15th St., Suite 150
Phoenix, Arizona 85020
beau@fusion.law
(602) 315-7545

*Counsel for President of the Arizona State Senate Warren Petersen and Speaker of the Arizona House of Representatives Ben Toma*

Kristina (Tina) R. Van Bockern
Holland & Hart LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Ph. 303-295-8107 / Fax 720-545-9952
trvanbockern@hollandhart.com

Emily C. Schilling
Sydney J. Sell
Holland & Hart LLP
101 South Main Street, Suite 2200
Salt Lake City, UT 84101
Ph. 801-799-5753 / Fax 202-747-6574
ecschilling@hollandhart.com
sjsell@hollandhart.com

*Counsel for Petitioner Essential
Minerals Association*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28, Industry and Arizona Coalition Petitioners, through undersigned counsel, hereby certify the following as to parties, rulings, and related proceedings in this case:

## I. Parties, Intervenors, and Amici Curiae

These cases involve the following parties:

### A. Petitioners

No. 24-1050: The Commonwealth of Kentucky, State of West Virginia, State of Alabama, State of Alaska, State of Arkansas, State of Florida, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of North Dakota, State of Ohio, State of Oklahoma, State of South Carolina, State of South Dakota, State of Tennessee, State of Utah, and State of Wyoming.

No. 24-1051: The Chamber of Commerce of the United States of America, American Chemistry Council, American Forest & Paper Association, American Petroleum Institute, American Wood Council, National Association of Manufacturers, National Mining Association, and Portland Cement Association.

No. 24-1052: The State of Texas and the Texas Commission on Environmental Quality.

No. 24-1073: President of the Arizona State Senate Warren Petersen, Speaker of the Arizona House of Representatives Ben Toma, and the Arizona Chamber of Commerce and Industry.

No. 24-1091: The Essential Minerals Association.

**B. Respondents**

U.S. Environmental Protection Agency (EPA or Agency) and Michael S. Regan, in his official capacity as Administrator of EPA.

**C. Intervenors for Respondents**

There are four sets of Intervenors for Respondents in the consolidated cases:

1. The Sierra Club, Citizens for Pennsylvania's Future (PennFuture), Conservation Law Foundation, Northeast Ohio Black Health Coalition, the Rio Grande International Study Center, and the Natural Resources Defense Council;

2. The State of California, State of Arizona, State of Connecticut, District of Columbia, State of Illinois, State of Maryland, Commonwealth of Massachusetts, State of Michigan, State of Minnesota, State of New Jersey, State of New York, State of Oregon, Commonwealth of Pennsylvania, State of Rhode Island, State of Vermont, State of Washington, State of Wisconsin, and City of New York;

3. The Alliance of Nurses for Healthy Environments, American Lung Association, and Environmental Defense Fund; and

4. Harris County, Texas.

**D.** *Amici Curiae*

Government Accountability & Oversight and the Midwest Ozone Group were granted leave to participate as *amicus curiae* in support of Petitioners. WE ACT for Environmental Justice; Greater Birmingham Alliance to Stop Pollution; West End Revitalization Association; South Bronx Unite; Community Health Aligning Revitalization, Resistance & Sustainability; National Parks Conservation Association; Environmental Protection Network; and Institute for Policy Integrity at New York University School of Law filed *amici curiae* briefs in support of Respondents.

**II. Rulings Under Review**

These consolidated cases involve final agency action of EPA entitled "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," 89 Fed. Reg. 16,202 (Mar. 6, 2024).

**III. Related Cases**

These consolidated petitions—*Commonwealth of Kentucky, et al. v. EPA, et al.*, No. 24-1050; *Chamber of Commerce of the United States of America, et al. v. EPA, et al.*, No. 24-1051; *State of Texas, et al. v. EPA, et al.*, No. 24-1052; *Warren Petersen, et al. v. EPA, et al.*, No. 24-1073; and *Essential Minerals Association v. EPA, et al.*, No. 24-1091—have not previously been before this Court or any other court.

Petitions for review of the prior agency action that was reconsidered in the agency action at issue here are pending before this Court in: *State of California, et al. v. EPA, et al.*, No. 21-1014; *American Lung Association, et al. v. EPA, et al.*, No. 21-1027; *Center for Biological Diversity v. EPA, et al.*, No. 21-1054. As of the date of this filing, these consolidated cases remain in abeyance pending further order from this Court. Dkt. No. 2057116, *State of California v. EPA, et al.*, No. 21-1014 (May 30, 2024).

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...............................................................................vi

GLOSSARY OF TERMS ............................................................................... viii

INTRODUCTION ............................................................................................1

ARGUMENT ...................................................................................................4

I.     EPA acted without authority in purporting to reconsider a prior decision not to revise a NAAQS. ....................................................................................4

    A.     EPA admits that it did not conduct a "thorough review" as required by section 109(d)(1), but rather claims to have undertaken a "reconsideration" under separate authority. ..........................................4

    B.     Section 109(d)(1) displaced any implicit reconsideration authority.....5

    C.     The second sentence of section 109(d)(1) does not save EPA. ............8

        1.     There is no mention of reconsideration anywhere in section 109(d)(1). ...................................................................................9

        2.     The second sentence of section 109(d)(1) is not a distinct grant of authority untethered from the first........................................10

        3.     At the very least, the second sentence of section 109(d)(1) does not grant EPA the authority the Agency claims. .......................14

    D.     This Court cannot affirm EPA's "reconsideration" as harmless error. ..................................................................................................15

II.     EPA's failure to consider costs, attainability, and current air quality in its reconsideration is an independent error that warrants vacatur......................15

    A.     No alleged source of reconsideration authority excuses EPA from considering all relevant factors. .......................................................16

    B.     Nothing in the second sentence of section 109(d)(1) excuses EPA from considering all relevant factors when considering *whether* to revise..............................................................................................17

    C.     The first sentence of section 109(d) does not preclude the consideration of costs, attainability, and current air quality either.....19

    D.     The intervenors' and EPA's remaining arguments regarding costs, attainability, and current air quality lack merit. ...............................22

III.    The Final Rule is arbitrary and capricious in other respects. ........................24

CONCLUSION ...............................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                       **Page(s)**

*Am. Methyl Corp. v. EPA*,
749 F.2d 826 (D.C. Cir. 1984)................................................................5, 6

*American Petroleum Institute v. EPA*,
684 F.3d 1342 (D.C. Cir. 2012)..................................................................23

*Globalstar, Inc. v. FCC*,
564 F.3d 476 (D.C. Cir. 2009)......................................................................9

*Ivy Sports Med., LLC v. Burwell*,
767 F.3d 81 (D.C. Cir. 2014).......................................................................7

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2244 (2024)........................................................................14, 20

*Michigan v. EPA*,
576 U.S. 743 (2015)....................................................................15, 20, 21

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).....................................................................................24

*Murray Energy Corp. v. EPA*,
936 F.3d 597 (D.C. Cir. 2019).....................................................................18

*Nat'l Res. Def. Council v. Regan*,
67 F.4th 397 (D.C. Cir. 2023).......................................................................7

*Nat'l Tel. Coop. Ass'n v. FCC*,
563 F.3d 536 (D.C. Cir. 2009).....................................................................22

*New Jersey v. EPA*,
517 F.3d 574 (D.C. Cir. 2008)......................................................................5

*Ohio v. EPA*,
144 S. Ct. 2040 (2024)................................................................................24

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943)....................................................................2, 10, 17, 22

*U.S. Sugar Corp. v. EPA*,
    113 F.4th 984 (D.C. Cir. 2024)..............................................................14

*Whitman v. American Trucking Ass'ns, Inc.*,
    531 U.S. 457 (2001)...........................................................................18

*Yates v. United States*,
    574 U.S. 528 (2015)...........................................................................21

**Statutes**

42 U.S.C. § 7408(a)(2)......................................................................13, 15

42 U.S.C. § 7409(d)(1)........ 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 14, 16, 17, 18, 19, 20, 21

42 U.S.C. § 7607(d) .............................................................................8, 15

**Other Authorities**

88 Fed. Reg. 5558 (Jan. 27, 2023) ...........................................................9

89 Fed. Reg. 16,202 (Mar. 6, 2024)............................... iii, ix, 9, 23, 24, 25

H.R. Conf. Rep. No. 95-564 (1977)..........................................................12

# GLOSSARY OF TERMS

| | |
|---|---|
| Act (or CAA) | Clean Air Act |
| EPA (or Agency) | United States Environmental Protection Agency |
| JA | Joint Appendix |
| $\mu g/m^3$ | Micrograms per cubic meter |
| NAAQS | National Ambient Air Quality Standard(s) |
| PA | Policy Assessment |
| $PM_{2.5}$ | Particulate matter with a nominal mean aerodynamic diameter less than or equal to 2.5 micrometers ($\mu m$) |
| Final Rule | U.S. Environmental Protection Agency, Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, Final Rule, 89 Fed. Reg. 16,202 (Mar. 6, 2024) |

## INTRODUCTION

In section 109(d)(1) of the Clean Air Act (CAA), Congress provided EPA express authority and instructions for changing an existing National Ambient Air Quality Standard (NAAQS). EPA must periodically review and revise existing NAAQS by undertaking a "thorough review" of the air quality criteria on which the NAAQS is based, and then determining whether and how the NAAQS should be revised. These requirements to ensure careful deliberation make sense, given the significance of revising an existing NAAQS. Any change in a NAAQS triggers a massive domino effect across the country, requiring action from every state and a wide array of businesses.

Everyone agrees that EPA did not follow these instructions here. Instead, EPA claims that some *other* source of authority permits it to *sua sponte* "reconsider" a prior NAAQS decision without first undertaking a thorough review—or any review—of the supporting air quality criteria, and to do so at any time, as long as it provides notice and an opportunity to comment. As EPA admits, this is a first-of-its-kind case, governed by no precedent of this Court.

EPA's novel effort runs into several independent roadblocks that, notwithstanding some evasive maneuvers by the Agency, are fatal to its action. The first is that EPA lacks authority to simply "reconsider" a prior NAAQS decision *sua sponte*—as opposed to starting a new revision process. Though agencies often have

1

implicit power to reconsider past decisions, Congress displaced any such power in this context with the revision authority in section 109(d)(1). EPA thus must follow that statutory provision, and nothing in it allows EPA to *sua sponte* "reconsider" a previous NAAQS decision. If EPA believed its previous NAAQS decision was incorrect, it should have started a new revision process under section 109(d)(1) and completed all the requirements. EPA's failure to do so dooms its Final Rule.

That should be the end of this case. Indeed, recognizing its fatal mistake, EPA tries to recast its "reconsideration" as a "revision" instead. But that post-hoc attempt to rewrite the record is barred by the *Chenery* doctrine and must be rejected. In the Final Rule, EPA claimed the power to "reconsider"—presumably because it believed that gave it the fastest and broadest discretion to act—and now it may defend the Final Rule only on that ground.

Even if this Court were to construe EPA's reconsideration action as a revision, EPA would still lack the authority to proceed as it did. EPA pins its hopes on disaggregating the two sentences of section 109(d)(1). The Agency claims that, while the first sentence indisputably commands EPA to undertake a revision only after a "thorough review" of the underlying air quality criteria, the second sentence turns around and confers on EPA *distinct* and *unrelated* authority to "revise" existing NAAQS at any time *without* completing such a thorough review, or any review at all. EPA misunderstands the way the provision works, however. The second

2

sentence of section 109(d)(1) is not a separate, free-wheeling grant of authority untethered from the first sentence, but rather a simple modification to the frequency with which EPA may complete the requirements set forth in the first, including the thorough review.

Finally, even assuming EPA had discretionary authority for what it did, its failure to consider costs, attainability, and current air quality would be yet another independent error that warrants vacatur. Under principles of reasoned decision-making applicable to any discretionary agency action, EPA was required to consider all relevant factors unless Congress said otherwise by statute. And there is no statutory instruction excusing EPA from considering those factors, under any of EPA's proffered sources of authority. If EPA were exercising implicit reconsideration authority, then no statute would foreclose consideration of costs and other factors. And if EPA were instead acting under the second sentence of section 109(d)(1), nothing in that provision bars the consideration of costs, attainability, and air quality either.

For these and other reasons, the Final Rule is unlawful and should be vacated.

**ARGUMENT**

**I.** **EPA acted without authority in purporting to reconsider a prior decision not to revise a NAAQS.**

    **A.** **EPA admits that it did not conduct a "thorough review" as required by section 109(d)(1), but rather claims to have undertaken a "reconsideration" under separate authority.**

As Industry and Arizona Coalition Petitioners (Industry Petitioners) explained, section 109(d)(1) sets forth requirements governing EPA's review and possible revision of an existing NAAQS. Industry Pet'rs' Br. 5–6, 24–25. The first of the two sentences requires EPA, at five-year intervals, to "complete a thorough review" of the air quality criteria and NAAQS. 42 U.S.C. § 7409(d)(1). After that review, EPA may determine that revisions to the criteria and NAAQS are "appropriate" and, if so, make revisions "in accordance with" sections 108 and 109(b). *Id.* The second sentence of section 109(d)(1) then provides that EPA may act "earlier or more frequently" than the five-year intervals "required under this paragraph." *Id.*

There is no dispute that EPA did not complete the "thorough review" required above, but instead purported to have *distinct* authority to conduct a more streamlined "reconsideration" of its 2020 decision not to revise. EPA said so in the Final Rule. *See* Industry Pet'rs' Br. 24–25. And the Agency's brief not only confirms as much, *see, e.g.*, EPA Br. 17, 28, 43, it also admits that "the Final Rule is the first time a

4

proceeding described by EPA as a 'reconsideration' has resulted in revised standards." *Id.* at 79.

According to EPA, this separate "reconsideration" authority is fully discretionary, can be invoked at any time, and does not require the Agency to conduct a "thorough review" of the supporting air quality criteria. *Id.* at 28. EPA claims that this distinct, free-wheeling reconsideration authority is "implicit[]" and also found "expressly" in the second sentence of section 109(d)(1). *Id.* at 28–29. As explained below, EPA is wrong on both counts. The Final Rule, therefore, must be vacated.

**B.      Section 109(d)(1) displaced any implicit reconsideration authority.**

As Industry Petitioners explained (at 24–25), Congress has "limit[ed] [the] agency's discretion to reverse itself," *New Jersey v. EPA*, 517 F.3d 574, 583 (D.C. Cir. 2008), by creating a statutory "mechanism capable of rectifying mistaken" NAAQS decisions, *Am. Methyl Corp. v. EPA*, 749 F.2d 826, 835 (D.C. Cir. 1984). Specifically, by requiring EPA to conduct a "thorough review" and then make appropriate revisions, Congress created in section 109(d)(1) express authority for EPA to change existing NAAQS. That is a mechanism "capable of rectifying" a perceived prior mistake via revision.

EPA and State Intervenors dispute that Congress displaced any implicit reconsideration power for NAAQS decisions. EPA Br. 29; State Intervenors Br. 6.

5

Their main argument appears to be that *New Jersey* and *American Methyl* apply only where a statute is specifically "*designed for* 'rectifying mistaken actions.'" State Intervenors Br. 5 (emphasis added); *see also* EPA Br. 36.

That is not what those cases say. They found displacement where a statute was merely "*capable* of rectifying mistaken actions." *Am. Methyl*, 749 F.2d at 835 (emphasis added). In *American Methyl*, for example, EPA had reversed on reconsideration a decision granting a waiver for a certain fuel blend. This Court concluded that Congress had displaced any inherent authority to do so because there was a statute generally governing the "control or prohibition" of fuels in commerce. *Id.* The statute was not designed for, or aimed at, rectifying mistaken waivers. Yet because it was "capable" of having the effect of undoing a waiver (*i.e.*, it was "sufficient to th[e] task"), this Court determined it "not reasonable to infer" that the Agency retained any implicit reconsideration authority. *Id.* at 835–36.

Under that proper understanding of this Court's cases, there is no serious question that section 109(d)(1) displaced any implicit authority to reconsider NAAQS. By its terms, the provision clearly provides authority to change NAAQS. Even EPA itself repeatedly describes the statute as "expressly confer[ring] authority to revisit and revise prior standards." *E.g.*, EPA Br. 29, 49. The provision therefore displaces any implicit reconsideration authority because it "covers the same concerns[] and achieves the same result." *Ivy Sports Med., LLC v. Burwell*, 767 F.3d

81, 87 (D.C. Cir. 2014) (Kavanaugh, J.) (following *American Methyl*); *see also Nat'l Res. Def. Council v. Regan*, 67 F.4th 397, 402 (D.C. Cir. 2023) (rejecting claim of implicit reconsideration authority in light of statutorily-"authorized course of action").

EPA's other arguments are non-sequiturs. EPA contends, for example, that the first sentence of section 109(d)(1) describes a nondiscretionary duty to review and revise NAAQS. EPA Br. 35. That is true, but it is also true that section 109(d)(1) displaces any implicit reconsideration authority. The same problem befalls EPA's other argument—namely, that section 109(b)(1) "instructs EPA to revise standards 'in the same manner as promulgated.'" *Id.* at 36. As the Agency itself goes on to explain, that instruction is merely a mandate that when EPA exercises revision authority, it must do so through notice and comment. *Id.* at 42. It says nothing about whether section 109(d)(1), in granting revision authority, displaces any implicit power to reconsider.

State Intervenors' remaining arguments are similarly unpersuasive. First, State Intervenors point to this Court's having remanded portions of NAAQS rules to EPA "without requiring the agency to reopen every part of those rules." State Intervenors' Br. 8. But this mixes apples and oranges. This Court's authority to remand after judicial review in no way forecloses Congress's ability to displace EPA's authority to reconsider decisions *sua sponte*.

Second, State Intervenors argue (at 7) that CAA section 307(d)(7)(B) somehow means EPA must still have the implicit authority to reconsider a NAAQS decision. This, too, compares apples with oranges. Section 307(d)(7)(B) sets forth limited circumstances under which EPA is commanded by statute to undertake a reconsideration—specifically, when a party raises certain objections that were "impracticable to raise" during the comment period. 42 U.S.C. § 7607(d)(7)(B). That statutory command has no bearing on whether Congress can, and did, displace EPA's authority to reconsider a NAAQS decision on its own.[1]

Indeed, to accept either argument, this Court would have to overrule *New Jersey* and *American Methyl Corp.*—both cases involving sections of the CAA displacing EPA's claimed implicit reconsideration authority.

### C. The second sentence of section 109(d)(1) does not save EPA.

As noted, EPA ultimately retreats to the second sentence of section 109(d)(1) as the purported reconsideration "authority … relied on … in the Final Rule." EPA Br. 29. For several independent reasons, explained below, that sentence does not provide EPA the lifeboat it seeks.

---

[1] State Intervenors concede, as they must, that EPA did not act here under section 307(d)(7)(B). Indeed, petitions were filed, but EPA did not grant them. State Intervenors' Br. 12.

### 1. There is no mention of reconsideration anywhere in section 109(d)(1).

This Court's analysis should begin and end with the fact that the word "reconsideration" appears nowhere in section 109(d)(1). The words "revise" and "revision" are there, but *reconsideration* of a decision not to revise—what EPA said it did here—is not the same thing. If nothing else, a reconsideration would take as its starting point the previous decision not to revise and the associated record; a revision must build a record from scratch. *Cf. Globalstar, Inc. v. FCC*, 564 F.3d 476, 485 (D.C. Cir. 2009) (describing "reconsideration" as "outgrowth of the ongoing proceeding" rather than "a new and distinct" one). In the Final Rule, EPA claimed the power to "reconsider"—presumably because it wanted more discretion and to move more quickly.

Realizing now that it lacks a plausible textual basis in the statute for reconsideration, EPA attempts to subtly recast its "reconsideration" as a "revision." EPA Br. 29. But that sleight of hand must be rejected. Throughout the rulemaking process, EPA was clear that it was conducting a "reconsideration" of its 2020 decision. *See* 88 Fed. Reg. 5558, 5561 (Jan. 27, 2023), JA__; 89 Fed. Reg. 16,202, 16,203 (Mar. 6, 2024), JA__. EPA cannot now claim to have started a "revision" instead. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

**2. The second sentence of section 109(d)(1) is not a distinct grant of authority untethered from the first.**

Even if this Court were now to deem EPA to have undertaken a revision, rather than a reconsideration, the second sentence of section 109(d)(1) does not save EPA. The Agency claims that, while the first sentence grants EPA power to revise a NAAQS only after a "thorough review" of the underlying air quality criteria, the second sentence confers on EPA the seemingly opposite authority to revise a NAAQS *without* completing such a thorough review, or any review at all. The two sentences cannot, however, be disaggregated that way.

The second sentence—which says that EPA "may review and revise criteria or promulgate new standards earlier or more frequently than required under this paragraph"—is not a separate grant of power but a modification to the timing requirements for the mandate in the first sentence. 42 U.S.C. § 7409(d)(1). As Industry Petitioners explained (at 26–27), that follows mainly from the phrase "earlier or more frequently than required under this paragraph," *id.*, which indisputably links the second sentence to the first. By its plain terms, it instructs that *some* mandate in the first sentence may be performed more often than the first sentence dictates. Of course, there is only *one* mandate in the first sentence—*i.e.*, to "complete a thorough review" of the air quality criteria and then "make such revisions" and "promulgate such new standards" as "may be appropriate"—which

the second sentence summarizes simply as "review and revise criteria or promulgate new standards." 42 U.S.C. § 7409(d)(1).

EPA criticizes this reading as "unnatural" and inconsistent with canons of construction, EPA Br. 38, but it is EPA's approach that is so. The Agency admits that "earlier or more frequently than required under this paragraph" refers back to the first sentence. *Id*. But according to EPA, "review and revise criteria or promulgate new standards" does not similarly refer back, and instead confers a *distinct* authority to revise a NAAQS *absent* the mandate to complete a thorough review first. EPA Br. 39.

To support its interpretation, EPA must engage in selective textualism. The Agency (at 39) makes much of the fact that "review and revise criteria or promulgate new standards" does not repeat each word of the mandate in the first sentence— particularly, "thorough." But EPA does not acknowledge another difference. Whereas the first sentence refers to *both* "revisions in … standards *and* promulgat[ing] such new standards," the second sentence mentions *only* the latter. 42 U.S.C. § 7409(d)(1) (emphasis added). So if read as truly independent of the first sentence, as EPA urges, the second sentence does not grant the very power the Agency claims it exercised. EPA attempts to paper over this glaring hole with the bald assertion that the phrase "review and revise criteria or promulgate new standards" in the second sentence empowers EPA to "revise air quality standards."

EPA Br. 41. The Agency cannot have it both ways, however. EPA cannot insist on flyspecking the phrase to escape "*thorough* review," and then turn a blind eye to the lack of any mention of *revising* standards.

The better and more principled reading is also the more obvious one. The second sentence is not a wholly separate grant of power but merely a modification to the timing requirements for the single mandate in the first sentence; and "review and revise criteria or promulgate new standards" simply summarizes that mandate. The phrase does not mechanically track every word in the first sentence, because the surrounding context and structure make clear what it means.

EPA also turns to legislative history, but that history cannot trump the text and is at best ambiguous. That EPA was "expected to revise standards whenever available information justifies a revision," EPA Br. 40–41 (quoting H.R. Conf. Rep. No. 95-564 at 124 (1977)), says nothing about whether EPA must conduct a thorough review of the air quality criteria before revising the standards. And as Industry Petitioners noted (at 27 n.10), other history points *toward* such a requirement.

Nor is EPA's appeal to statutory purpose any more helpful to it. According to EPA (at 32), Congress gave it the power to do less than a thorough review between the five-year marks because "[n]ot every element of the air quality criteria will be relevant to the ultimate … standards." But that proves too much. Why, then, did

Congress require a thorough review at all? Statutory structure and context make clear that Congress did not want EPA to be able to cherry-pick what information the Agency thinks is relevant to the NAAQS, which makes eminent sense given how immensely consequential the NAAQS are for the environment and the economy. And it would make no sense that by simply *speeding up* its action, EPA would have *more* power to single out the information it deems "relevant," to support whatever end the Administration then in power hopes to achieve. Indeed, under the Agency's view, so long as it is not conducting a five-year review, it has the freedom to "revise air quality standards *without reviewing air quality criteria at all*." EPA Br. 41 (emphasis added). That would be an extraordinary amount of power buried in a sentence that looks and reads like an after-thought.

EPA's supposed statutory purpose also cannot be squared with the text of section 108. That provision requires that air quality criteria "accurately reflect the latest scientific knowledge useful in indicating the kind and extent of *all* identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air, in varying quantities." 42 U.S.C. § 7408(a)(2) (emphasis added). The statutory language does not contemplate giving EPA any discretion in deciding which "identifiable effects on public health" should be updated, and which should not, as EPA now claims it can. EPA Br. 32.

For all these reasons, Industry Petitioners' reading of section 109(d)(1) is "the best." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024); *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 991 (D.C. Cir. 2024). Industry Petitioners' reading fits best with the text and context of section 109(d)(1), as well as the statute's structure and purpose. The Agency, of course, no longer receives deference on questions of statutory interpretation. *Loper Bright*, 144 S. Ct. at 2273; *U.S. Sugar Corp.*, 113 F.4th at 991 n.7.[2]

      **3.**     **At the very least, the second sentence of section 109(d)(1) does not grant EPA the authority the Agency claims.**

In all events, even if this Court were to reject Industry Petitioners' reading, there is no plausible alternative interpretation that confers on EPA the authority it claims. As noted above, if the second sentence is treated as a stand-alone grant of authority, it must be limited to what it says. And it does not mention *revising* standards. *See supra* p.11. To be clear, Industry Petitioners do not believe it is the best reading of the statute to isolate the second sentence in this way. But if the Court chooses to do so, it must follow that road to its logical conclusion.

---

[2] Moreover, EPA cannot point to any interpretation that it "issued contemporaneously with the statute at issue, and which ha[s] remained consistent over time." *Loper Bright*, 144 S. Ct. at 2262. Again, as EPA admits, this is the first time it has completed an action such as this one. EPA Br. 79.

**D. This Court cannot affirm EPA's "reconsideration" as harmless error.**

As a last-ditch effort, both EPA (at 43) and State Intervenors (at 11–12) claim harmless error. But as the State Intervenors acknowledge (at 11), the CAA's harmless error rule applies only to "procedural errors." 42 U.S.C. § 7607(d)(8), (9). And the issue here is whether the Agency acted ultra vires. EPA claims that it has both implicit and express statutory authority to reconsider (or revise) a NAAQS *without* conducting a "thorough review." If that is wrong, the Agency has not simply committed a procedural error; it has exceeded its power. What is more, conducting a "thorough review" is not a mere paperwork requirement. It is a substantive condition that ensures any change to a NAAQS is informed by "the latest scientific knowledge." 42 U.S.C. § 7408(a)(2).

**II. EPA's failure to consider costs, attainability, and current air quality in its reconsideration is an independent error that warrants vacatur.**

As explained above, the Final Rule must be vacated because EPA lacked authority to do what it did. But as Industry Petitioners further explained, even if EPA had authority for its action, EPA's failure to consider costs, attainability, and current air quality is an independent error. Under principles of reasoned decision-making applicable to any exercise of agency discretion, EPA was required to consider all relevant factors, unless Congress said otherwise by statute. Industry Pet'rs' Br. 28; *see Michigan v. EPA*, 576 U.S. 743, 753 (2015) ("reasonable regulation ordinarily

requires paying attention to the advantages *and* the disadvantages of agency decisions"). And there is no statutory instruction excusing EPA from considering those factors, under any of EPA's proffered sources of authority.

**A.      No alleged source of reconsideration authority excuses EPA from considering all relevant factors.**

As discussed above, EPA has suggested two potential sources of reconsideration authority: its implicit powers and the second sentence of section 109(d)(1). But in neither circumstance can it be said that Congress has relieved (or barred) EPA from considering all relevant factors, including cost. Indeed, as Industry Petitioners explained (at 29–30), on the only other occasion when EPA attempted a NAAQS "reconsideration," in 2011, EPA did not finalize the reconsideration due to cost considerations.

First, if this Court determines that EPA somehow retained and acted under implicit authority to reconsider, there could be, by definition, no statute to foreclose consideration of costs or any other factor. Industry Pet'rs' Br. 29. And second, if this Court instead concludes that EPA somehow was granted reconsideration authority by the second sentence of section 109(d)(1), nothing in those twenty words says anything about departing from the principles of reasoned decision-making (much less about a "reconsideration," as noted above). *Id.*

EPA never squarely responds to either point. Nowhere in its brief does EPA even attempt to explain why *this* "reconsideration" should not be treated like any

other reconsideration—subject to ordinary principles of reasoned decision-making, including the consideration of all relevant factors. The closest it comes is the assertion that "[t]he Supreme Court and this Court have barred the consideration of costs by interpreting Section 7409(b), which sets forth the substantive standards that apply to promulgating or revising NAAQS—including *revision* under the second sentence of Section 7409(d)(1)." EPA Br. 49-50 (emphasis omitted and added).

But that is the same sleight of hand by EPA—a surreptitious recasting of its "reconsideration" as a new "revision" instead—that Industry Petitioners earlier refuted. *See supra* I.C. Those two actions are different. EPA deliberately chose to undertake the former in the Final Rule, and it cannot now claim to have done a revision. *Chenery*, 318 U.S. at 87.

**B.      Nothing in the second sentence of section 109(d)(1) excuses EPA from considering all relevant factors when considering *whether* to revise.**

As before, even if this Court were to accept EPA's post-hoc argument and deem the action a revision that proceeded solely under the second sentence of section 109(d)(1), that would still not save EPA. As noted, EPA contends that it could not consider costs in that scenario because "[t]he Supreme Court and this Court have barred the consideration of costs by interpreting Section 7409(b)." EPA Br. 49–50. But as Industry Petitioners have explained, this argument fails to distinguish between

the two logically distinct steps in any revision: *whether* to revise and, if so, *how* to revise. Industry Pet'rs' Br. 30–31, 33–34.

The cases relied on by EPA all concerned EPA's selection of the level at which to *set* a NAAQS under section 109(b)—*i.e.*, the question of *how* to revise. In *Whitman v. American Trucking Ass'ns, Inc.*, the Supreme Court addressed "[w]hether the Administrator may consider the costs of implementation in *setting* … NAAQS under § 109(b)(1)." 531 U.S. 457, 462 (2001) (emphasis added). Likewise, this Court in *Murray Energy Corp. v. EPA* addressed disputes over "*setting* the primary and secondary standards." 936 F.3d 597, 620-21 (D.C. Cir. 2019) (per curiam) (emphasis added). The same is true of the other cases. Industry Petitioners do not dispute (in this Court at least, *see* Industry Pet'rs' Br. 42 n.16) that costs and other relevant factors cannot be considered in answering *how* to revise.

But the antecedent question of *whether* to revise at all is governed instead, on EPA's own reasoning, by the second sentence of section 109(d)(1). EPA itself says that is what gives the Agency "*discretion*[]" to revise. EPA Br. 39, 44 (emphasis added); *see id.* at 29 (arguing that the second sentence "expressly confers authority to revisit and revise prior standards"); *id.* at 49 ("EPA here exercised the authority of the second sentence"). And the problem for EPA is that nothing in that sentence excuses EPA from the mandates of reasoned decision-making, including the consideration of all relevant factors, when EPA makes a discretionary decision.

EPA's main response is that dividing the revision process into two steps "slic[es] the baloney too thinly." *Id.* at 48. But as Industry Petitioners noted, EPA itself sliced the revision process the same way in the Final Rule. Industry Pet'rs' Br. 12 (discussing EPA's consideration of *whether* to revise and then *how* to revise). Indeed, EPA ultimately admits as much. EPA Br. 48.

EPA then falls back to arguing that "nothing in the statute's text or structure indicates that EPA is to apply separate substantive standards to [each] step[]," and it proposes simply extending the case law about setting NAAQS under section 109(b) to both steps. *Id.* But as discussed above, the statute does provide such an indication. Under EPA's argument, the second sentence of section 109(d)(1) is what grants authority to revise, so it clearly governs the question of *whether*. Again, EPA itself contends that the "discretion[]" to revise is "grant[ed]" not by section 109(b) but by the second sentence of section 109(d)(1). *Id.* at 44.

### C. The first sentence of section 109(d)(1) does not preclude the consideration of costs, attainability, and current air quality either.

As Industry Petitioners explained (at 32), EPA is barred by the positions it took in the Final Rule from arguing that the *first* sentence of section 109(d)(1) now somehow saves it. EPA apparently agrees, though it proceeds to analyze the sentence anyway. *See, e.g.*, EPA Br. 49 (reaffirming reliance on the second sentence of 109(d)(1) and describing any discussion of the first sentence's bearing on costs and

other relevant factors as "out of place"). Accordingly, this Court need not and should not delve any deeper into that provision.

Nevertheless, if this Court does consider whether the first sentence supports EPA, it should hold that the provision does not do so. As Industry Petitioners explained (at 36–38), far from prohibiting the consideration of all relevant factors, the first sentence affirmatively requires as much by providing that EPA regulate only "as may be appropriate" in addressing the antecedent question *whether* to revise a NAAQS. The Supreme Court's recent *Loper Bright* decision, citing *Michigan* and its interpretation of "appropriate," reinforces that discussion. 144 S. Ct. at 2263 (citing *Michigan*, 576 U.S. at 752).

EPA's arguments to the contrary are wrong. First, EPA misinterprets the statute. In relevant part, the first sentence of section 109(d)(1) provides that EPA "shall make such revisions in such criteria and standards and promulgate such new standards as may be appropriate in accordance with section [108] and [109(b)]." 42 U.S.C. § 7409(d)(1). EPA insists (at 50) that the phrase "as may be appropriate" must be read together, and limited by, the neighboring phrase "in accordance with section [108] and [109(b)]." But that renders "as may be appropriate" superfluous. The sentence would have the same meaning if it just said "in accordance with [section 108] and [109(b)]." Industry Pet'rs' Br. 34. As Industry Petitioners explained (at 36), that is the same interpretive move the Supreme Court rejected in

20

*Michigan*, in which EPA similarly asserted that neighboring statutory terms were meant to restrict the "capaciousness" of the phrase "appropriate and necessary." Furthermore, contrary to EPA's assertion (at 50), the *noscitur a sociis* canon does not support its reading. That canon is used to give a word or phrase "more precise content by the neighboring words with which it is associated," not to deprive it of any "independent function." *Yates v. United States*, 574 U.S. 528, 543 (2015) (citation omitted).

Second, EPA also misunderstands *Michigan*. The Agency implies (at 51) that the Supreme Court answered the very question at issue here: whether the word "appropriate" in section 109(d)(1) encompasses cost. The Court did not do so. Rather, the Court looked at the specific language in section *109(b)*—"requisite to protect the public health" with an "adequate margin of safety"—and observed that "*that* discrete criterion does not encompass cost." *Michigan*, 576 U.S. at 755 (emphasis added). It then went on to distinguish that language—which "expressly directs EPA to regulate on the basis of a factor that on its face does not include cost"—from the "far more comprehensive" phrase "'[a]ppropriate and necessary.'" *Id.* at 755–56. Thus, contrary to EPA's suggestion, *Michigan* supports the conclusion that cases interpreting section 109(b) should *not* be extended to interpreting the word "appropriate" in section 109(d)(1).

**D.    The intervenors' and EPA's remaining arguments regarding costs, attainability, and current air quality lack merit.**

State Intervenors offer various policy arguments against considering costs, none of which are persuasive. For example, they argue that requiring consideration of costs runs afoul of the CAA's cooperative-federalism structure. State Intervenors' Br. 18-23. Not so. The decision whether to revise a NAAQS is EPA's, and EPA's alone. Including costs in that decision in no way interferes with the State's subsequent role of implementing standards, which is triggered if and only if EPA exercises its prerogative to change them.

State and Environmental Intervenors also claim that EPA cannot know costs definitively until the States implement the standards. *Id.*; Envt'l Intervenors' Br. 21–22. But that could be said for any regulation that requires a predictive judgment of costs or other implementation consequences. EPA and other agencies are required to make such judgments all the time, subject to judicial review. *See, e.g.*, *Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 541 (D.C. Cir. 2009) (reviewing "agency's predictive judgments about the likely economic effects of a rule").

As to attainability, EPA asserts (at 58) that Industry Petitioners "are simply wrong," and notes that its modeling and monitoring data both showed background $PM_{2.5}$ levels of 0.5-3.0 $\mu g/m^3$. But EPA's categorical refusal in the Final Rule to consider attainability means this defense now comes too late. *Chenery*, 318 U.S. at 87. In any event, EPA still has no answer to the fact that its data was based on a very

small sample of monitoring sites—only five throughout the West. EPA-HQ-OAR-2015-0072-1584 (2022 PA) at 2-68, JA__. That problem is compounded by the fact, for which EPA also has no explanation, that EPA relied on the same information from its 2020 review, including background monitoring data not updated since 2016, *id.* at 2-72, JA__, despite the recently increased frequency and magnitude of wildfires, a major contributor to background $PM_{2.5}$ levels. Not only does this failure undermine EPA's attainability analysis, but it is at odds with EPA's claimed desire to rely on the latest science and also shows why a thorough review is so important. Finally, as Industry Petitioners have explained (at 40–41), the exceptional events mechanism is not an adequate answer. EPA makes a half-hearted attempt to dismiss the problems with the exceptional events mechanism as beyond the scope of the Final Rule, EPA Br. 59, but EPA itself put the exceptional events process in issue in this rulemaking, 89 Fed. Reg. at 16,366–67, JA__-__.

Finally, EPA's defense of its refusal to consider actual air quality, and its decision instead to assume that all parts of the country had no better air quality than the existing standard, is unpersuasive. EPA Br. 68. EPA says it has to protect public health, but does not explain why that requires EPA to assume some unrealistic, hypothetical condition. EPA also relies on *American Petroleum Institute v. EPA*, 684 F.3d 1342 (D.C. Cir. 2012), but as Industry Petitioners explained, that case is

distinguishable for several reasons, including that it concerned *setting* NAAQS under section 109(b), just like all of EPA's other cases.

## III.    The Final Rule is arbitrary and capricious in other respects.

Industry Petitioners' brief also explained (at 42–44) that the Final Rule is arbitrary and capricious in at least two additional ways: (1) failing to explain its different response to uncertainties and limitations identified in 2020; and (2) failing to reasonably explain its decision to set the standard at 9.0 µg/m³. EPA's and Environmental Intervenors' responses to these points are unconvincing. *See Ohio v. EPA*, 144 S. Ct. 2040, 2054 (2024) (staying rule when EPA likely failed to provide a reasoned response to comments raising "important aspect of the problem").

First, EPA (at 69) and Environmental Intervenors (at 17) note that "[u]ncertainties are inherent in scientific studies." But that does not absolve EPA of its obligation to provide a "'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). The problem is that EPA acknowledged that "some evidence of potential [copollutant] confounding" remains, 89 Fed. Reg. at 16,226, JA__, yet it did not, and still does not, explain why the studies on which it relies are more persuasive—beyond a general appeal to the Administrator's "judgment." EPA Br. 70.

Second, EPA (at 65) and Environmental Intervenors (at 18) defend the decision to set the level at 9.0 µg/m$^3$ rather than 10.0 µg/m$^3$ as necessary to "protect[] the health of the most vulnerable people," despite what Industry Petitioners noted (at 43) about EPA's own logic. But as EPA itself recognized in the Final Rule, "[t]he Act does not require that primary standards be set at a zero-risk level or to protect the most sensitive individual, but rather at a level that avoids unacceptable risks to public health." 89 Fed. Reg. at 16,284, JA__.

## CONCLUSION

For the foregoing reasons and those in Industry Petitioners' opening brief, the petitions should be granted and the Final Rule vacated.

Dated: September 30, 2024

Respectfully submitted,

Andrew R. Varcoe
Stephanie A. Maloney
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062

*Counsel for Petitioner Chamber of Commerce of the United States of America*

Erica Klenicki
Michael A. Tilghman II
NAM Legal Center
733 Tenth Street, NW
Suite 700
Washington, DC 20001

*Counsel for Petitioner National Association of Manufacturers*

/s/ Elbert Lin
Elbert Lin
   *Counsel of Record*
Hunton Andrews Kurth LLP
951 East Byrd Street, East Tower
Richmond, VA 23219
elin@HuntonAK.com
(804) 788-8200

Lucinda Minton Langworthy
Erica N. Peterson
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500
clangworthy@HuntonAK.com
epeterson@HuntonAK.com

*Counsel for Petitioners Chamber of Commerce of the United States of America, American Chemistry Council, American Forest & Paper Association, American Petroleum Institute, American Wood Council, National Association of Manufacturers, National Mining Association, and Portland Cement Association*

26

/s/ Nate Curtisi
Nate Curtisi
Michael G. Bailey
ARIZONA CHAMBER OF
COMMERCE
100 N. 7th Ave, Suite 120
Phoenix, Arizona 85007
(602) 248-4430
ncurtisi@azchamber.com

*Counsel for Arizona Chamber of
Commerce and Industry*

/s/ Brunn (Beau) W. Roysden III
Brunn (Beau) W. Roysden III
FUSION LAW, PLLC
7600 N. 15th St., Suite 150
Phoenix, Arizona 85020
beau@fusion.law
(602) 315-7545

*Counsel for President of the
Arizona State Senate Warren
Petersen and Speaker of the Arizona
House of Representatives Ben Toma*

/s/ Kristina (Tina) R. Van Bockern
Kristina (Tina) R. Van Bockern
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Ph. 303-295-8107 / Fax 720-545-9952
trvanbockern@hollandhart.com

Emily C. Schilling
Sydney J. Sell
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101
Ph. 801-799-5753 / Fax 202-747-6574
ecschilling@hollandhart.com
sjsell@hollandhart.com

*Counsel for Petitioner Essential Minerals Association*

**CERTIFICATE OF COMPLIANCE**

As required by Fed. R. App. P. 32(f) and (g), I certify that this Reply Brief of Industry and Arizona Coalition Petitioners complies with this Court's May 14, 2024, Scheduling Order, because it contains 5,762 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Times New Roman font using Microsoft Word.

/s/ Elbert Lin

**CERTIFICATE OF SERVICE**

I certify that on September 30, 2024, I electronically filed the foregoing Reply Brief of Industry and Arizona Coalition Petitioners with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Elbert Lin