**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 24-1050 (and consolidated cases)**

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

COMMONWEALTH OF KENTUCKY, et al.,
*Petitioners*,

*v.*

U.S. ENVIRONMENTAL PROTECTION AGENCY, MICHAEL S. REGAN
*Respondents.*

On Petitions for Review of Final Agency Action
of the United States Environmental Protection Agency
89 Fed. Reg. 16,202 (Mar. 6, 2024)

**DEFERRED JOINT APPENDIX**
**VOLUME 3 OF 6**
**JA1186 to JA1560**

Lucinda Minton Langworthy
Erica N. Peterson
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
clangworthy@HuntonAK.com
epeterson@HuntonAK.com
(202) 955-1500

Elbert Lin
*Counsel of Record*
Hunton Andrews Kurth LLP
951 East Byrd Street, East Tower
Richmond, VA 23219
elin@HuntonAK.com
(804) 788-8200

October 7, 2024

*Counsel for Petitioners Chamber of Commerce of the United States of America, American Chemistry Council, American Forest & Paper Association, American Petroleum Institute, American Wood Council, National Association of Manufacturers, National Mining Association, and Portland Cement Association*

*Additional counsel listed on following pages*

Andrew R. Varcoe
Stephanie A. Maloney
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
(202) 463-5337
*Counsel for Petitioner Chamber of Commerce of the United States of America*

Erica Klenicki
Michael A. Tilghman II
NAM Legal Center
733 Tenth Street, NW, Suite 700
Washington, DC 20001
*Counsel for Petitioner National Association of Manufacturers*

Nate Curtisi
(D.C. Cir. Bar No. 65164)
Michael G. Bailey
(Arizona Bar No. 013747)
Arizona Chamber of Commerce
100 N. 7th Ave, Suite 120
Phoenix, Arizona 85007
(602) 248-4430
ncurtisi@azchamber.com
*Counsel for Arizona Chamber of Commerce and Industry*

Brunn (Beau) W. Roysden III
(DC Cir. Bar No. 64493)
Fusion Law, PLLC
7600 N. 15th St., Suite 150
Phoenix, Arizona 85020
beau@fusion.law
(602) 315-7545
*Counsel for President of the Arizona State Senate Warren Petersen and Speaker of the Arizona House of Representatives Ben Toma*

Kristina (Tina) R. Van Bockern
Holland & Hart LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Ph. 303-295-8107 / Fax 720-545-9952
trvanbockern@hollandhart.com

Emily C. Schilling
Sydney J. Sell
Holland & Hart LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101
Ph. 801-799-5753 / Fax 202-747-6574
ecschilling@hollandhart.com
sjsell@hollandhart.com
*Counsel for Petitioner Essential Minerals Association*

**RUSSELL COLEMAN**
**Attorney General of Kentucky**
Matthew F. Kuhn
*Solicitor General*
Jacob M. Abrahamson
*Assistant Solicitor General*
Lindsey R. Keiser
*Assistant Attorney General*
Office of the Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jacob.Abrahamson@ky.gov
Lindsey.Keiser@ky.gov
*Counsel for Petitioner*
*Commonwealth of Kentucky*

**PATRICK MORRISEY**
**Attorney General of West Virginia**
Michael R. Williams
*Principal Deputy Solicitor General*
Office of the West Virginia Attorney General
State Capitol, Bldg. 1, Room E-26
Charleston, West Virginia 25305
(681) 313-4550
Michael.R.Williams@wvago.gov
*Counsel for Petitioner*
*State of West Virginia*

**STEVE MARSHALL**
**Attorney General of Alabama**
Edmund G. LaCour Jr.
*Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
*Counsel for Petitioner*
*State of Alabama*

**TREG R. TAYLOR**
**Attorney General of Alaska**
Cody Doig
*Senior Assistant Attorney General*
Environmental Section
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 269-5211
cody.doig@alaska.gov
*Counsel for Petitioner*
*State of Alaska*

**TIM GRIFFIN**
**Attorney General of Arkansas**
Nicholas J. Bronni
*Solicitor General*
Dylan L. Jacobs
*Deputy Solicitor General*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
Nicholas.Bronni@ArkansasAG.gov
Dylan.Jacobs@ArkansasAG.gov
*Counsel for Petitioner State of Arkansas*

**ASHLEY MOODY**
**Attorney General of Florida**
Henry C. Whitaker
*Solicitor General*
James H. Percival
*Chief of Staff*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
henry.whitaker@myfloridalegal.com
james.percival@myfloridalegal.com
*Counsel for Petitioner State of Florida*

**CHRISTOPHER M. CARR**
**Attorney General of Georgia**
Stephen J. Petrany
*Solicitor General*
Office of the Georgia Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
*Counsel for Petitioner State of Georgia*

**RAÚL R. LABRADOR**
**Attorney General of Idaho**
Joshua N. Turner
*Chief of Constitutional Litigation and Policy*
Alan M. Hurst
*Solicitor General*
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720-0010
Tel: (208) 334-2400
Fax: (208) 854-8071
Josh.Turner@ag.idaho.gov
Alan.Hurst@ag.idaho.gov
*Counsel for Petitioner State of Idaho*

**THEODORE E. ROKITA**
**Attorney General of Indiana**
James A. Barta
*Solicitor General*
Office of the Attorney General
IGC South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
(317) 232-0709
James.Barta@atg.in.gov
*Counsel for Petitioner*
*State of Indiana*

**BRENNA BIRD**
**Attorney General of Iowa**
Eric H. Wessan
*Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
*Counsel for Petitioner*
*State of Iowa*

**KRIS KOBACH**
**Attorney General of Kansas**
Anthony J. Powell
*Solicitor General*
Office of Kansas Attorney General
Kris W. Kobach
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Office: (785) 368-8539
Fax: (785) 296-3131
Anthony.Powell@ag.ks.gov
*Counsel for Petitioner*
*State of Kansas*

**LIZ MURRILL**
**Attorney General of Louisiana**
J. Benjamin Aguiñaga
*Solicitor General*
Office of the Louisiana Attorney General
1885 North Third Street
Baton Rouge, Louisiana 70802
(225) 485-2458
aguinagab@ag.louisiana.gov
*Counsel for Petitioner*
*State of Louisiana*

**LYNN FITCH**
**Attorney General of Mississippi**
Justin L. Matheny
*Deputy Solicitor General*
Office of the Mississippi Attorney General
P.O. Box 220
Jackson, Mississippi 39205-0220
(601) 359-3825
justin.matheny@ago.ms.gov
*Counsel for Petitioner*
*State of Mississippi*

**ANDREW BAILEY**
**Attorney General of Missouri**
Joshua M. Divine
*Solicitor General*
Office of the Attorney General
207 West High St.
Jefferson City, Missouri 65101
(573) 751-8870
Josh.Divine@ago.mo.gov
*Counsel for Petitioner*
*State of Missouri*

**AUSTIN KNUDSEN**
**Attorney General of Montana**
Christian B. Corrigan
*Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
*Counsel for Petitioner*
*State of Montana*

**MICHAEL T. HILGERS**
**Attorney General of Nebraska**
Grant D. Strobl
*Assistant Solicitor General*
Office of the Attorney General of Nebraska
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
Grant.Strobl@nebraska.gov
*Counsel for Petitioner*
*State of Nebraska*

**DREW WRIGLEY**
**Attorney General of North Dakota**
Philip Axt
*Solicitor General*
North Dakota Attorney General's Office
600 East Boulevard Avenue, Dept. 125
Bismarck, North Dakota 58505
(701) 328-2210
pjaxt@nd.gov
*Counsel for Petitioner*
*State of North Dakota*

**DAVE YOST**
**Attorney General of Ohio**
T. Elliot Gaiser
*Solicitor General*
Mathura Sridharan
*Deputy Solicitor General*
Ohio Attorney General's Office
30 E. Broad Street, Floor 17
Columbus, Ohio 43215
(614) 466-8980
elliot.gaiser@ohioago.gov
mathura.sridharan@ohioago.gov
*Counsel for Petitioner*
*State of Ohio*

**GENTNER F. DRUMMOND**
**Attorney General of Oklahoma**
Garry M. Gaskins, II
*Solicitor General*
Jennifer L. Lewis
*Deputy Attorney General*
Oklahoma Office of the Attorney General
313 Northeast 21st Street
Oklahoma City, Oklahoma 73105
(405) 312-2451
Garry.Gaskins@oag.ok.gov
*Counsel for Petitioner*
*State of Oklahoma*

**ALAN WILSON**
**Attorney General of South Carolina**
Robert D. Cook
*Solicitor General*
J. Emory Smith, Jr.
*Deputy Solicitor General*
Thomas T. Hydrick
*Assistant Deputy Solicitor General*
Joseph D. Spate
*Assistant Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov
*Counsel for Petitioner*
*State of South Carolina*

**MARTY J. JACKLEY**
**Attorney General of South Dakota**
Steven Blair
*Deputy Attorney General*
South Dakota Attorney General's Office
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501
(605) 773-3215
atgservice@state.sd.us
*Counsel for Petitioner*
*State of South Dakota*

**JONATHAN SKRMETTI**
**Attorney General & Reporter of Tennessee**
Whitney Hermandorfer
*Director of Strategic Litigation*
Harrison Gray Kilgore
*Strategic Litigation Counsel and Assistant Solicitor General*
Office of the Attorney General and Reporter of Tennessee
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 741-7403
Whitney.Hermandorfer@ag.tn.gov
Harrison.Kilgore@ag.tn.gov
*Counsel for Petitioner*
*State of Tennessee*

**SEAN D. REYES**
**Attorney General of Utah**
Stanford E. Purser
*Solicitor General*
Office of the Utah Attorney General
160 E. 330 S., 5th Floor
Salt Lake City, Utah 84111
(385) 382-4334
spurser@agutah.gov
*Counsel for Petitioner*
*State of Utah*

**BRIDGET HILL**
**Attorney General of Wyoming**
D. David DeWald
*Deputy Attorney General*
Wyoming Attorney General's Office
Water & Natural Resources Division
109 State Capitol
Cheyenne, Wyoming 82002
(307) 777-7895 phone
(307) 777-3542 fax
david.dewald@wyo.gov
*Counsel for Petitioner*
*State of Wyoming*

**KEN PAXTON**
**Attorney General of Texas**
Brent Webster
*First Assistant Attorney General*
James Lloyd
*Deputy Attorney General for Civil Litigation*
Kellie E. Billings-Ray
*Chief, Environmental Protection Division*
Clayton Smith
*Assistant Attorney General*
Office of the Attorney General of Texas Environmental Protection Division
P.O. Box 12548, MC 066
Austin, Texas 78711-2548
Tel: (512) 971-0139
Fax: (512) 320-0911
clayton.smith@oag.texas.gov
D.C. Circuit Bar No. 65145
Texas Bar No. 24091234
*Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality in Consolidated Case No. 24-1052*

TODD KIM
*Assistant Attorney General*
SARAH A. BUCKLEY
ALEXANDRA L. ST. ROMAIN
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 616-7554 (Buckley)
(202) 532-3284 (St. Romain)
sarah.buckley@usdoj.gov
alexandra.st.romain@usdoj.gov

Of Counsel:
David P.W. Orlin
*Attorney*
U.S. Environmental Protection Agency

*Counsel for Respondents U.S. Environmental Protection Agency and Michael S. Regan, in his official capacity as Administrator, EPA*

FOR THE STATE OF CALIFORNIA
ROB BONTA
Attorney General of California
TRACY L. WINSOR
Senior Assistant Attorney General
MYUNG J. PARK
CHRISTIE VOSBURG
Supervising Deputy Attorneys General
STACY LAU
COREY M. MOFFAT
JONATHAN A. WIENER
Deputy Attorneys General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94114
(415) 510-3549
Jonathan.Wiener@doj.ca.gov

FOR THE STATE OF ARIZONA
KRISTIN K. MAYES,
Attorney General
KRISTIN M. WROBEL
Assistant Attorney General
Environmental Protection Unit
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-8594
ENVProtect@azag.gov

FOR THE STATE OF CONNECTICUT
WILLIAM TONG
Attorney General
MATTHEW I. LEVINE
Deputy Associate Attorney General
JILL LACEDONIA
Assistant Attorney General
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
(860) 808-5250
jill.lacedonia@ct.gov

FOR THE STATE OF ILLINOIS
KWAME RAOUL
Attorney General
JASON E. JAMES
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental Enforcement/
Asbestos Litigation Division
Office of the Attorney General
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(872) 276-3583
jason.james@ilag.gov

FOR THE STATE OF MARYLAND
ANTHONY G. BROWN
Attorney General
MICHAEL F. STRANDE
Assistant Attorney General
Office of the Attorney General
Maryland Dept. of the Environment
1800 Washington Blvd.
Baltimore, MD 21230
(410) 537-3014
Michael.Strande@maryland.gov

FOR THE COMMONWEALTH OF MASSACHUSETTS
ANDREA JOY CAMPBELL
Attorney General
TURNER SMITH
Assistant Attorney General &
Deputy Chief
BRIAN CLAPPIER
Assistant Attorney General
MARCUS HOLMES
Assistant Attorney General
Energy & Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
Turner.Smith@mass.gov

FOR THE PEOPLE OF THE STATE OF MICHIGAN
ELIZABETH MORRISSEAU
Assistant Attorney General
Environment, Natural Resources, and Agriculture Division
6th Floor G. Mennen Williams Building
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
MorrisseauE@michigan.gov

FOR THE STATE OF MINNESOTA
KEITH ELLISON
Attorney General
PETER N. SURDO
Special Assistant Attorney General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 757-1061
Peter.Surdo@ag.state.mn.us

FOR THE STATE OF
NEW JERSEY
MATTHEW J. PLATKIN
Attorney General
LISA MORELLI
Deputy Attorney General
Division of Law
25 Market Street
P.O. Box 093
Trenton, NJ 08625-093
609-376-2740
lisa.morelli@law.njoag.gov

FOR THE STATE OF
NEW YORK
LETITIA JAMES
Attorney General
BARBARA D. UNDERWOOD
Solicitor General
JUDITH N. VALE
Deputy Solicitor General
ELIZABETH A. BRODY
Assistant Solicitor General
MICHAEL J. MYERS
Senior Counsel
NICHOLAS C. BUTTINO
Assistant Attorney General
Environmental Protection Bureau
The Capitol
Albany, NY 12224
(518) 776-2382
michael.myers@ag.ny.gov

FOR THE STATE OF OREGON
ELLEN F. ROSENBLUM
Attorney General
PAUL GARRAHAN
Attorney-in-Charge
STEVE NOVICK
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.oregon.gov
Steve.Novick@doj.oregon.gov

FOR THE COMMONWEALTH OF
PENNSYLVANIA
MICHELLE A. HENRY
Attorney General
ANN R. JOHNSTON
Assistant Chief Deputy Attorney
General
Civil Environmental Enforcement
Unit
Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
717-497-3678
ajohnston@attorneygeneral.gov

FOR THE STATE OF
RHODE ISLAND
PETER F. NERONHA
Attorney General
ALISON HOFFMAN CARNEY
Assistant Attorney General
Chief, Environment and Energy
Unit
Rhode Island Office of the Attorney
General
150 South Main Street
Providence, RI 02903
(401) 274-4400 ext 2116
acarney@riag.ri.gov

FOR THE STATE OF VERMONT
CHARITY R. CLARK
Attorney General
MELANIE KEHNE
Assistant Attorney General
Office of the Attorney
General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Melanie.kehne@vermont.gov

FOR THE STATE OF
WASHINGTON
ROBERT W. FERGUSON
Attorney General
CHRISTOPHER H. REITZ
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, Washington 98504-0117
(360) 586-4614
chris.reitz@atg.wa.gov

FOR THE STATE OF
WISCONSIN
JOSHUA L. KAUL
Attorney General
BRADLEY J. MOTL
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 267-0505
motlbj@doj.state.wi.us

FOR THE DISTRICT OF COLUMBIA
BRIAN L. SCHWALB
Attorney General
CAROLINE S. VAN ZILE
Solicitor General
Office of the Attorney General for the District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

FOR THE CITY OF NEW YORK
MURIEL GOODE-TRUFANT
Acting Corporation Counsel
CHRISTOPHER GENE KING
Senior Counsel, Environmental Law Division
NATHAN TAYLOR
Senior Counsel
New York City Law Department
100 Church Street
New York, NY 10007
212.356.2074
cking@law.nyc.gov

FOR HARRIS COUNTY, TEXAS
SARAH JANE UTLEY
Environmental Division Director
ELIZABETH HIDALGO
Assistant County Attorney
1019 Congress Plaza, 15th Floor
Houston, Texas 77002
713.274.5124
Sarah.Utley@cao.hctx.net

IRVINE & CONNER PLLC
CHARLES IRVINE
JANET CAMPOS
4709 Austin Street
Houston, Texas 77004
713.533.1704
charles@irvineconner.com
*Attorneys for Harris County, Texas*

Seth L. Johnson
Marvin C. Brown IV
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 797-5245
(202) 794-5355
sjohnson@earthjustice.org
mcbrown@earthjustice.org
*Counsel for Respondent-Intervenors Alliance of Nurses for Healthy Environments, American Lung Association, Environmental Defense Fund, Natural Resources Defense Council, Northeast Ohio Black Health Coalition, Rio Grande International Study Center, and Sierra Club*

John Walke
Emily Davis
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 289-6868
jwalke@nrdc.org
edavis@nrdc.org
*Counsel for Respondent-Intervenor Natural Resources Defense Council*

Shaun A. Goho
Hayden W. Hashimoto
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(617) 678-2516
sgoho@catf.us
hhashimoto@catf.us
*Counsel for Respondent-Intervenors Citizens for Pennsylvania's Future and Conservation Law Foundation*

# TABLE OF CONTENTS

## VOLUME 1 of 6

## ACTIONS UNDER REVIEW

EPA-HQ-OAR-2015-0072-1543, EPA, Reconsideration of the National Ambient Air Quality Standards for Particulate Matter; Proposed Rule, 88 Fed. Reg. 5558 (Jan. 27, 2023) .................................. JA0001

EPA-HQ-OAR-2015-0072-5839, EPA, Reconsideration of the National Ambient Air Quality Standards for Particulate Matter; Final Rule, 89 Fed. Reg. 16,202 (Mar. 6, 2024)....................................... JA0163

## INDEXED RECORD MATERIAL

EPA-HQ-OAR-2015-0072-0037, Comments by the Independent Particulate Matter Review Panel (formerly EPA CASAC Particulate Matter Review Panel) on EPA's Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft – September 2019) (Oct. 22, 2019) (excerpts) ......................................................................... JA0363

EPA-HQ-OAR-2015-0072-0069, EPA, Review of the National Ambient Air Quality Standards for Particulate Matter; Proposed Action, 85 Fed. Reg. 24,094 (Apr. 30, 2020) (excerpts) ........................... JA0414

EPA-HQ-OAR-2015-0072-0105, Qian Di, et al., *Air Pollution and Mortality in the Medicare Population*, NEW ENGLAND JOURNAL OF MEDICINE (June 29, 2017) ........................................................................ JA0418

## VOLUME 2 of 6

EPA-HQ-OAR-2015-0072-0212, EPA, EPA/600/R-19/188, Integrated Science Assessment for Particulate Matter, (Dec. 2019) (excerpts) ......... JA0428

## VOLUME 3 of 6

EPA-HQ-OAR-2015-0072-0224, Press Release, EPA, Administrator Wheeler Announces New CASAC Member, Pool of NAAQS Subject Matter Experts (Sept. 13, 2019) ........ JA1186

EPA-HQ-OAR-2015-0072-0251, Letter from Dr. Louis Anthony Cox, Jr., Chair, Clean Air Scientific Advisory Committee, to The Honorable Andrew R. Wheeler, Administrator, EPA, re: CASAC Review of the EPA's *Integrated Science Assessment for Particulate Matter (External Review Draft – October 2018)* (Apr. 11, 2019) (excerpts) ........ JA1188

EPA-HQ-OAR-2015-0072-0260, Letter from Dr. Louis Anthony Cox, Jr., Chair, Clean Air Scientific Advisory Committee, to The Honorable Andrew R. Wheeler, Administrator, EPA, re: CASAC Review of the EPA's *Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft – September 2019)* (Dec. 16, 2019) (excerpts) ........ JA1190

EPA-HQ-OAR-2015-0072-0262, EPA, EPA-452/R-20-002, Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (Jan. 2020) (excerpts) [-0262 is duplicated in the docket at EPA-HQ-OAR-2015-0072-1583] ........ JA1200

EPA-HQ-OAR-2015-0072-0702, Comments by National Medical Societies and Public Health and Patient Advocacy Organizations on EPA's Proposed Rule on the National Ambient Air Quality Standards for Particulate Matter (undated) ........ JA1223

EPA-HQ-OAR-2015-0072-0752, Comments by Achieving Community Tasks Successfully (ACTS), et al. on EPA's Proposed Rule on the National Ambient Air Quality Standards for Particulate Matter (June 29, 2020) ........ JA1233

EPA-HQ-OAR-2015-0072-0973, Comments by Clean Air Task Force, et al. on EPA's Proposed Rule on the National Ambient Air Quality Standards for Particulate Matter, 85 Fed. Reg. 24,094 (Apr. 30, 2020) (June 29, 2020) (excerpts) ........ JA1236

EPA-HQ-OAR-2015-0072-1166, EPA, Review of the National Ambient Air Quality Standards for Particulate Matter; Final Action, 85 Fed. Reg. 82,684 (Dec. 18, 2020) .......... JA1256

EPA-HQ-OAR-2015-0072-1241_Attachment 2, Petition for Reconsideration submitted on behalf of the States of California (b and through Attorney General Xavier Becerra and the California Air Resources Board), Connecticut, Delaware, Illinois, Maryland, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin; the Commonwealths of Massachusetts, Pennsylvania, and Virginia; and the City of New York (Feb. 16, 2021) .......... JA1321

EPA-HQ-OAR-2015-0072-1242_Attachment 2, Petition for Reconsideration submitted by American Lung Association, Clean Air Task Force, Chesapeake Bay Foundation, Earthjustice, Environment America, Environmental Defense Fund, Environmental Law & Policy Center, National Parks Conservation Association, Natural Resources Defense Council, Sierra Club, and Union of Concerned Scientists (Feb. 16, 2020) .......... JA1455

EPA-HQ-OAR-2015-0072-1273, Press Release, EPA, EPA to Reexamine Health Standards for Harmful Soot that Previous Administration Left Unchanged (June 10, 2021) .......... JA1478

EPA-HQ-OAR-2015-0072-1277, Press Release, EPA, EPA Announces Selections of Charter Members to the Clean Air Scientific Advisory Committee; Concurrently, EPA issues a call for nominations for the CASAC Particulate Matter Panel (June 17, 2021) .......... JA1480

EPA-HQ-OAR-2015-0072-1285, Press Release, EPA, Administrator Regan Directs EPA to Reset Critical Science-Focused Federal Advisory Committees; Past administration actions hindered the recruitment and retention of members for the Science Advisory Board and the Clean Air Scientific Advisory Committee (Mar. 31, 2021) .......... JA1482

EPA-HQ-OAR-2015-0072-1394, Ki-Do Eum, et al., *Impact of long-term temporal trends in fine particulate matter ($PM_{2.5}$) on associations of annual $PM_{2.5}$ exposure and mortality; An analysis of over 20 million Medicare beneficiaries*, ENVIRONMENTAL EPIDEMIOLOGY (2018) ........ JA1484

EPA-HQ-OAR-2015-0072-1424, Joel Schwartz, et al., *A National Difference in Differences Analysis of the Effect of $PM_{2.5}$ on Annual Death Rates*, ENVIRONMENTAL RESEARCH (2021) ........ JA1491

EPA-HQ-OAR-2015-0072-1441, Lauren H. Wyatt, et al., *Association of short-term exposure to ambient $PM_{2.5}$ with hospital admissions and 30-day readmissions in end-stage renal disease patients: population-based retrospective cohort study*, BMJ OPEN (2020) ........ JA1516

EPA-HQ-OAR-2015-0072-1471, X. Wu, et al., *Evaluating the impact of long-term exposure to fine particulate matter on mortality among the elderly*, SCIENCE ADVANCES (2020) ........ JA1525

EPA-HQ-OAR-2015-0072-1501, EPA, EPA-452/R-15-007, EPA, Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone (Sept. 2015) (excerpts) ........ JA1535

EPA-HQ-OAR-2015-0072-1522, Comments by Joel Schwartz, Professor of Environmental Health, Harvard TH Chan School of Public Health, on EPA's Policy Assessment for PM2.5 (undated) (excerpts) ........ JA1545

EPA-HQ-OAR-2015-0072-1525, Comments on behalf of the Commonwealth of Kentucky and the States of Alabama, Alaska, Arkansas, Indiana, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, Utah, West Virginia, and Wyoming on Policy Assessment for Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, External Review Draft (Dec. 14, 2021) ........ JA1548

## VOLUME 4 of 6

EPA-HQ-OAR-2015-0072-1584, EPA, EPA-452/R-22-004, Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (May 2022) (excerpts) .............. JA1561

EPA-HQ-OAR-2015-0072-1585, EPA, EPA/600/R-22/028, Supplement to the 2019 Integrated Science Assessment for Particulate Matter (May 2022) (excerpts) ................................................ JA1836

EPA-HQ-OAR-2015-0072-1587, Letter from Dr. Elizabeth A. (Lianne) Sheppard, Chair, Clean Air Scientific Advisory Committee, to the Honorable Michael S. Regan, Administrator, EPA, re: CASAC Review of the EPA's *Supplement to the 2019 Integrated Science Assessment for Particulate Matter (External Review Draft – October 2021)* (excerpts) (Mar. 18, 2022) ....................... JA1995

EPA-HQ-OAR-2015-0072-1593, Letter from Dr. Elizabeth A. (Lianne) Sheppard, Chair, Clean Air Scientific Advisory Committee, to the Honorable Michael S. Regan, Administrator, EPA, re: CASAC Review of the EPA's *Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft – October 2021)* (excerpts) (Mar. 18, 2022) ............................................................. JA2000

EPA-HQ-OAR-2015-0072-1964, Comments by the Arizona Department of Environmental Quality on Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (Mar. 20, 2023) ........................................................................... JA2023

EPA-HQ-OAR-2015-0072-1989, Comments by the Arizona Chamber of Commerce & Industry and the Arizona Manufacturers Council on EPA's Proposed Rule on National Ambient Air Quality Standards for Particulate Matter (Mar. 24, 2023) ..................................... JA2028

EPA-HQ-OAR-2015-0072-2091, Comments by the Essential Minerals Association on Reconsideration of the National Ambient Air Quality Standards for Particulate Matter Proposed Rule (Mar. 28, 2023) ................................................................................. JA2032

EPA-HQ-OAR-2015-0072-2125, Comments by Joel Schwartz, Professor of Environmental Epidemiology, Director, Harvard Center for Risk Analysis, Harvard University, on EPA's Proposed Revision to the PM2.5 NAAQS (undated) (excerpts) .............................. JA2038

**VOLUME 5 of 6**

EPA-HQ-OAR-2015-0072-2192, Comments by the Texas Commission on Environmental Quality on EPA's Proposed Rule for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (Mar. 28, 2023)..................................... JA2045

EPA-HQ-OAR-2015-0072-2193, Comments by the National Association of Manufacturers on EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (Mar. 28, 2023) .......................................................................... JA2079

EPA-HQ-OAR-2015-0072-2210, Comments by the National Mining Association on EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 88 Fed. Reg. 5558 (Jan. 27, 2023) (Mar. 28, 2023) ............................................................ JA2083

EPA-HQ-OAR-2015-0072-2212, Comments by the Commonwealth of Kentucky and the Energy and Environment Cabinet, the Division for Air Quality, on EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 88 Fed. Reg. 5558 (Jan. 27, 2023) (Mar. 28, 2023) ...................................... JA2140

EPA-HQ-OAR-2015-0072-2233_Attachment 1, Comments of Appalachian Mountain Club, Chesapeake Bay Foundation, Citizens For Pennsylvania's Future, Clean Air Council, Clean Air Task Force, CleanAirNow, Earthjustice, Environmental Defense Fund, Group Against Smog & Pollution, National Parks Conservation Association, Natural Resources Defense Council, Sierra Club, Southern Environmental Law Center, and Union of Concerned Scientists on the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (Mar. 28, 2023)." ............................................................................... JA2145

EPA-HQ-OAR-2015-0072-2348, Comments by Health, Medical, and Nursing Organizations on EPA's Proposed Rule in the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 88 Fed. Reg. 5558 (Jan. 27, 2023) (Mar. 28, 2023) ........ JA2322

EPA-HQ-OAR-2015-0072-2361, Comments by the NAAQS Regulatory Review & Rulemaking Coalition on EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (Mar. 28, 2023) ........ JA2336

**VOLUME 6 of 6**

EPA-HQ-OAR-2015-0072-2422_Attachment 14, Industrial Economics, Inc., Analysis of $PM_{2.5}$-Related Health Burdens Under Current and Alternative NAAQS; Updated Final Report, 9 µg/$m^3$ Supplement Added March 21, 2023 (excerpts) ........ JA2540

EPA-HQ-OAR-2015-0072-2426, Comments by Boyden Gray & Associates PLLC on EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 88 Fed. Reg. 5558 (Jan. 27, 2023) (Mar. 28, 2023) ........ JA2617

EPA-HQ-OAR-2015-0072-2428, Comments by the Chamber of Commerce of the United States on EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 88 Fed. Reg. 5558 (Jan. 27, 2023) (Mar. 28, 2023) ........ JA2640

EPA-HQ-OAR-2015-0072-2482_Attachment 5, Ihab Mikati, BS, et al., *Disparities in Distribution of Particulate Matter Emission Sources by Race and Poverty Status*, AJPH ENVIRONMENTAL JUSTICE (Apr. 2018) ........ JA2655

EPA-HQ-OAR-2015-0072-2485_Attachment 8, Christopher W. Tessum, et al., *$PM_{2.5}$ polluters disproportionately and systemically affect people of color in the United States*, Science Advances (Apr. 28, 2021) ........ JA2661

EPA-HQ-OAR-2015-0072-2485_Attachment 9, Maninder P.S. Thind, et al., *Fine Particulate Air Pollution from Electricity Generation in the US: Health Impacts by Race, Income, and Geography*, ENVIRONMENTAL SCIENCE & TECHNOLOGY (2019) .................................. JA2668

EPA-HQ-OAR-2015-0072-4525, Comment by Ben Toma, Speaker of the House, Arizona House of Representatives on EPA's Proposed Rule Change for PM2.5 (posted May 3, 2023) .......................................... JA2678

EPA-HQ-OAR-2015-0072-6025, EPA, Responses to Significant Comments on the 2023 Proposed Rule for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (undated) .......................................................................................... JA2680

**<u>MATERIALS PROVIDED FOR THE CONVENIENCE OF THE COURT</u>**

Appalachian Power Co. et al. Respondents' Brief in Support of Petitioners, *Am. Trucking Ass'ns v. Whitman*, No. 99-1426 (U.S. July 20, 2000) (excerpts) ............................................................. JA2838

Appalachian Power Co. et al. Reply Brief, *Am. Trucking Ass'ns v. Whitman*, No. 99-1426 (U.S. Oct. 5, 2000) (excerpts) ............................. JA2842

Joint Reply Brief of State Petitioners, Non-State Petitioners, and Supporting Intervenors, *NEDA CAP v. EPA*, 686 F.3d 803 (D.C. Cir. 2012) (No. 10-1252, Feb. 8, 2012) (excerpts) ................................... JA2846

Final Joint Opening Brief of Industry Petitioners, *Murray Energy Corp. v. EPA*, 936 F.3d 597 (D.C. Cir. 2019) (No. 15-1385, Sept. 26, 2016) (excerpts) .................................................................... JA2849

State Petitioners' Opening Brief, *Murray Energy Corp. v. EPA*, 936 F.3d 597 (D.C. Cir. 2019) (No. 15-1385, Sept. 26, 2016) (excerpts) ........................................................................................ JA2851

Respondent EPA's Motion to Continue Oral Argument, *Murray Energy Corp. v. EPA*, No. 15-1385 (D.C. Cir. Apr. 7, 2017) (ECF No. 1670218) (excerpt) ............................................................ JA2855

Office of Management and Budget Comments on EPA Proposed Rule: "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," RIN 2060-AV52, Cover Comments (undated), Docket No. EPA-HQ-OAR-2015-0072-1618_Attachment 1 ........................................................................ JA2856

Memorandum from Joseph Goffman, Assistant Administrator, EPA, to Regional Administrators Regions 1-10, re: Initial Area Designations for the 2024 Revised Primary Annual Fine Particle National Ambient Air Quality Standard (Feb. 7, 2024) ............................ JA2880

An official website of the United States government.

Close

We've made some changes to EPA.gov. If the information you are looking for is not here, you may be able to find it on the EPA Web Archive or the January 19, 2017 Web Snapshot.

EPA United States Environmental Protection Agency

# News Releases from Headquarters › Office of the Administrator (AO)

# Administrator Wheeler Announces New CASAC Member, Pool of NAAQS Subject Matter Experts

09/13/2019

Contact Information:
EPA Press Office (press@epa.gov)

**WASHINGTON (September 13, 2019)** — Today, U.S. Environmental Protection Agency (EPA) Administrator Andrew Wheeler announced the appointment of a new member to the Chartered Clean Air Scientific Advisory Committee (CASAC), Dr. Ronald Kendall. He also announced the selection of a pool of non-member subject matter experts to support the Chartered CASAC's review of particulate matter and ozone.

"We are pleased to announce the appointment of Dr. Ronald Kendall, whose expertise and impressive career in academia will make him a valuable member of the Chartered Clean Air Scientific Advisory Committee," **said EPA Administrator Andrew Wheeler.** "We are also announcing the non-member, subject matter experts who will provide technical expertise to help CASAC ensure a rigorous and timely review of the National Ambient Air Quality Standards for particulate matter and ozone."

Dr. Kendall is the Head of the Wildlife Toxicology Laboratory and Professor of Environmental Toxicology at Texas Tech University. He is replacing Dr. Lewis, who retired from federal service earlier this year. Like Dr. Lewis, Dr. Kendall's expertise is also in ecology. CASAC provides independent advice to the EPA Administrator on the technical basis for EPA's National Ambient Air Quality Standards.

The pool of subject matter experts will support the Chartered CASAC efforts in reviewing the National Ambient Air Quality Standards for particulate matter and ozone. These subject matter experts are being provided in response to the

CASAC's request for additional expertise in its letter to the Administrator on April 11, 2019.

The subject matter experts are not members of the Chartered CASAC, but will be available to the Chartered CASAC to assist with specific technical questions. The 12 consultants from nine different states are as follows:

Dr. Constantin Aliferis, University of Minnesota

Dr. Brent Auvermann, Texas A&M University

Dr. Daniel Jaffe, University of Washington-Bothell

Mr. John Jansen, Southern Company Services, Inc (retired)

Dr. Kristen Johnson, Washington State University

Dr. Frederick Lipfert, Consultant

Dr. Joseph Lyon, University of Utah

Dr. D. Warner North, NorthWorks

Dr. David Parrish, Consultant

Dr. Lorenz Rhomberg, Gradient, Inc.

Dr. Sonja Sax, Ramboll, Inc.

Dr. Duncan Thomas, University of Southern California

These consultants were selected by the Administrator from the nominations provided by the public's response to an August 7, 2019 Federal Register Notice soliciting nominations.

LAST UPDATED ON SEPTEMBER 13, 2019

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**WASHINGTON D.C. 20460**

**OFFICE OF THE ADMINISTRATOR**
**SCIENCE ADVISORY BOARD**

April 11, 2019

EPA-CASAC-19-002

The Honorable Andrew R. Wheeler
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Subject: CASAC Review of the EPA's *Integrated Science Assessment for Particulate Matter (External Review Draft – October 2018)*

Dear Administrator Wheeler:

The Chartered Clean Air Scientific Advisory Committee (CASAC) met on December 12-13, 2018, and March 28, 2019, to peer review the EPA's *Integrated Science Assessment for Particulate Matter (External Review Draft – October 2018)*, hereafter referred to as the Draft ISA. The CASAC's consensus responses to the agency's charge questions and individual review comments from members of the CASAC are enclosed. Major comments and recommendations are highlighted below and detailed in the consensus responses to charge questions.

Overall, the CASAC finds that the Draft ISA does not provide a sufficiently comprehensive, systematic assessment of the available science relevant to understanding the health impacts of exposure to particulate matter (PM). The CASAC recommends that the following fundamental limitations be remedied in a second draft of the ISA for CASAC review.

- *Lack of comprehensive, systematic review* - some of the relevant and important scientific literature is not reviewed and study quality is not systematically considered. The revised ISA should provide a clearer and more complete description of the process and criteria for study quality assessment, including an explanation of how systematic assessments of individual study quality were used in preparing the ISA and the causality determinations.
- *Inadequate evidence for altered causal determinations* - the CASAC finds that the Draft ISA does not present adequate evidence to conclude that there is likely to be a causal relationship between long-term $PM_{2.5}$ exposure and nervous system effects; between long-term ultrafine particulate (UFP) exposure and nervous system effects; or between long-term $PM_{2.5}$ exposure and cancer.
- *Clearer discussion of causality and causal biological mechanisms and pathways* - specifically including pulmonary inflammation.

**Consensus Responses to Charge Questions on the EPA's**
***Integrated Science Assessment for Particulate Matter (External Review Draft – October 2018)***

**Overall Comments and Recommendations on the Integrated Science Assessment (ISA)**

Additional expertise is needed for the Clean Air Scientific Advisory Committee (CASAC) to provide a thorough review of the particulate matter (PM) National Ambient Air Quality Standards (NAAQS) documents. The breadth and diversity of evidence to be considered exceeds the expertise of the statutory CASAC members, or indeed of any seven individuals. For example, the chartered CASAC has found it difficult to achieve consensus in some areas (summarized below), and to do so likely requires further scientific expertise from, and discussion with, epidemiologists and additional experts in human clinical studies and toxicology. Some of the proposed changes in causality determinations in the Draft ISA, for example changing the causality designation of long-term exposure to ultrafine particles (UFP) on nervous system outcomes from "inadequate" to "likely," are driven primarily by animal toxicology studies. Therefore, additional expertise is needed in comparative toxicology, dosimetry, and extrapolation of findings in animals to humans.

Over the past 30 years, the CASAC's advice to the EPA on NAAQS reviews has been assisted by expert review panels that supplement and expand the scientific expertise brought to bear. Such a review panel was appointed by the EPA for the current PM review. However, the panel was disbanded by the EPA prior to the release of the Draft ISA.

The CASAC recommends that the EPA reappoint the previous CASAC PM panel or appoint a panel with similar expertise, as well as adding expertise in biological mechanisms of causation, causal inference, multi-stressor interactions, and potentially others such as: epidemiology, human clinical studies; comparative toxicology, dosimetry, and extrapolation of findings in animals to humans; characterization of sampling errors and biases from continuous ambient PM measurements and satellite remote sensing aerosol optical depth (AOD) analysis; errors and biases in dispersion modeling and photochemical grid modeling; errors-in-variables methods and effects of exposure (and covariate) estimation errors on epidemiologic study results; epidemiology of low-dose causal concentration-response functions; and effects of PM on visibility impairment, climate, and materials. The panel should be appointed in time to review the Second Draft ISA.

Causality Determination of Mortality from $PM_{2.5}$ Exposure

The CASAC did not reach consensus on the causality determination of mortality from $PM_{2.5}$ exposure.

**Some members of the CASAC** think that the EPA must better justify their determination that short-term or long-term exposure to $PM_{2.5}$ causes mortality. The EPA should address the following considerations:

- Biological action of PM. How do low concentrations of $PM_{2.5}$ cause mortality? The EPA should discuss not just general, possible mechanisms, but specifically how ambient concentrations of $PM_{2.5}$ can move into and through the biological systems in the body to activate a cascade of effects that ultimately lead to a person's death.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**WASHINGTON D.C. 20460**

OFFICE OF THE ADMINISTRATOR
SCIENCE ADVISORY BOARD

December 16, 2019

EPA-CASAC-20-001

The Honorable Andrew R. Wheeler
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Subject: CASAC Review of the EPA's *Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft – September 2019)*

Dear Administrator Wheeler:

The Chartered Clean Air Scientific Advisory Committee (CASAC) met on October 22, 2019, and October 24-25, 2019, to peer review the EPA's *Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft – September 2019)*, hereafter referred to as the Draft PM PA. The CASAC approved this report on the Draft PM PA on December 3, 2019. The CASAC's consensus responses to the agency's charge questions and individual review comments from members of the CASAC are enclosed. Questions from CASAC members to the pool of non-member consultants and their responses are also enclosed. Major comments and recommendations are highlighted below and detailed in the consensus responses to charge questions.

The Draft PM PA depends on a Draft Particulate Matter (PM) Integrated Science Assessment (ISA) that, as noted in the April 11, 2019, CASAC Report on the Draft PM ISA, does not provide a sufficiently comprehensive, systematic assessment of the available science relevant to understanding the health impacts of exposure to PM, due largely to a lack of a comprehensive, systematic review of relevant scientific literature; inadequate evidence and rationale for altered causal determinations; and a need for clearer discussion of causality and causal biological mechanisms and pathways. Given these limitations in the underlying science basis for policy recommendations, and diverse opinions about what quantitative uncertainty analysis and further analysis of all relevant data using the best available scientific methods would show, some CASAC members conclude that the Draft PM PA does not establish that new scientific evidence and data reasonably call into question the public health protection afforded by the current 2012 $PM_{2.5}$ annual standard. Other members of CASAC conclude that the weight of the evidence, particularly reflecting recent epidemiology studies showing positive associations between $PM_{2.5}$ and health effects at estimated annual average $PM_{2.5}$ concentrations below the current standard, does reasonably call into question the adequacy of the 2012 annual $PM_{2.5}$ National Ambient Air Quality Standards (NAAQS) to protect public health with an adequate margin of safety. The

CASAC also finds, in agreement with the EPA, that the available evidence does not reasonably call into question the adequacy of the current 24-hour $PM_{2.5}$ standard, $PM_{10}$ standard, or secondary PM standards and concurs that they should be retained.

Turning to specific comments on chapters in the Draft PM PA, the CASAC finds that Chapter 1 provides a clear, although brief, discussion of legislative background and history that provides useful context for the review. The CASAC recommends that the EPA consider adding a discussion of the exceptional nature of the current CASAC and NAAQS review process, including (a) Administrator Pruitt's "Back to Basics" memorandum; (b) the disbanding of the CASAC PM Review Panel and streamlining of the review process to promote timely advice; and (c) the appointment of a pool of non-member consultants to expand the expertise and fields of knowledge used to inform the CASAC's review. A brief discussion of the accelerated timeline, which has led to tight schedules, condensed procedures, and a Draft PM PA being produced before the PM ISA was revised/finalized, might also be useful. The CASAC recommends several measures, most of which are already discussed in the CASAC Report on the Draft PM ISA, to more fully realize the Draft PM PA's stated goals of serving as a source of policy-relevant information, being understandable to a broad audience, and facilitating the CASAC's advice to the Agency and recommendations to the Administrator.

The CASAC finds the information in Chapter 2 to be clearly presented and useful as context for the review, but recommends adding discussions of (a) uncertainties in the emissions inventory (magnitude, spatial allocation, temporal allocation, and speciation) for each pollutant and source sector, and how these uncertainties affect the air quality modeling results and risk analysis in Chapter 3; (b) national maps of county-level emissions of pollutants to show variability across the country; (c) measurement uncertainty (accuracy, precision, bias, and error) for Federal Reference Method (FRM), continuous Federal Equivalent Method (FEM), Chemical Speciation Network (CSN), and Interagency Monitoring of Protected Visual Environments (IMPROVE) monitors and results of comparing measurements from co-located FRM/FEMs across the country; and (d) how measurement errors and biases for $PM_{2.5}$ affect the evidence-based and risk-based assessments in Chapter 3. Chapter 2 should add discussions of the Southeastern Aerosol Research and Characterization Study (SEARCH) network; air sensor shortcomings and performance issues; the concept of "urban increment," including examples comparing $PM_{2.5}$ speciation in urban areas to nearby Class I areas; and how exceptional events are accounted for in the setting of the standard. Although Chapter 2 adequately covers annual background concentrations, it should add a discussion of $^{14}C$ research to distinguish between fossil-derived carbon and "modern" carbon and a discussion of background concentrations for the daily $PM_{2.5}$ standard.

For Chapter 3, the CASAC urges the EPA to follow the CASAC's advice on the Draft PM ISA by providing a balanced summary of the study results for each health endpoint; updating the causality determinations for $PM_{2.5}$ and cancer and nervous system effects, and for long-term ultrafine particulate exposure and nervous system effects; and describing and quantifying uncertainties (including epistemic uncertainties from measurement errors and model uncertainty) and the extent to which they have changed since the last review. The PM PA should discuss the rationale for comparing long-term and short-term $PM_{2.5}$ concentrations and should clarify the use and interpretation of pseudo-design values. Some members of the CASAC are concerned that the risk assessment approach in Chapter 3 treats regression concentration-response (C-R) functions (that is, functions describing associations between past estimated exposure concentration levels and mortality rates) as if they were causal C-R functions (that is, functions describing how changing future exposure concentrations would change future mortality rates). Because this is technically unsound, these CASAC members recommend that the PM

PA explicitly state the implicit assumption that regression coefficients can be used to quantify causality, noting that it is not necessarily a valid assumption, and provide information about whether the assumption has been tested and what the results were. Methodological details should be added to Appendix C of the PM PA, model validation results for BenMAP should be discussed, CMAQ model performance should be evaluated specifically at the study city locations, and study areas with poor model performance should not be used. Future changes in public health risks that might be caused by reducing $PM_{2.5}$ exposures are currently highly uncertain. The CASAC recommends that the PM PA better characterize this uncertainty using quantitative uncertainty analysis. Such an analysis should account for model uncertainty, exposure estimation errors, and both inference (internal validity) and generalization (external validity) uncertainties. As described above and in further detail in the consensus responses, the CASAC members did not come to consensus on whether the new scientific evidence and data reasonably call into question the public health protection afforded by the current 2012 $PM_{2.5}$ annual standard. The CASAC recommends that the final PM PA provide quantitative uncertainty and sensitivity analyses to provide a clearer technical and scientific basis for data interpretation and policy making. The CASAC agrees with the EPA and finds that the available evidence does not call into question the adequacy of public health protection afforded by the current 24-hour $PM_{2.5}$ standard and concurs that it be retained.

Chapter 4 provides a helpful summary and background for approaches taken in previous reviews of the $PM_{10}$ standard. Some CASAC members conclude that new studies since the previous review justify the change in causality determination from “inadequate” to “suggestive” for long-term exposure to $PM_{10-2.5}$ and mortality and cardiovascular effects, and that the new data strengthen evidence for effects on cancer, and short-term effects on mortality, cardiovascular disease, and respiratory disease. Other CASAC members find the definitions of causal determination categories given in the Draft PM ISA and summarized in the Draft PA PM unclear, and the change to “suggestive” not clearly justified. These members also find that the evidence presented does not imply, or make likely, that $PM_{10-2.5}$ caused these effects. The CASAC agrees with the EPA conclusion that “…the available evidence does not call into question the adequacy of the public health protection afforded by the current primary $PM_{10}$ standard and that evidence supports consideration of retaining the current standard in this review.”

The CASAC finds much of the information in Chapter 5 on visibility and material effects of $PM_{2.5}$ to be useful, but recommends that the PM PA should more thoroughly address effects of reducing $PM_{2.5}$ on climate change by providing quantitative estimates and uncertainty bands for effects of changes in $PM_{2.5}$ on global dimming and global warming and their consequences for economic and welfare effects on the United States. At a minimum, estimates of the change in warming caused by a change in $PM_{2.5}$ should be discussed and implications for human welfare in the United States should be evaluated. The CASAC agrees with the EPA that the available evidence does not call into question the protection afforded by the current secondary PM standards and concurs that they should be retained.

The CASAC recommends that it be provided an opportunity to review a revised draft of the PM PA based on the final PM ISA. The CASAC appreciates the opportunity to provide advice on the Draft PM PA and looks forward to the agency's response.

Sincerely,

/S/

Dr. Louis Anthony Cox, Jr., Chair
Clean Air Scientific Advisory Committee

Enclosures

**Consensus Responses to Charge Questions on the EPA's**
***Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft – September 2019)***

## Overarching Recommendations

The purpose of the Policy Assessment (PA) is to bridge the gap between EPA's scientific assessments and the judgement required by the EPA Administrator when determining whether to retain or revise the National Ambient Air Quality Standards (NAAQS). It is unusual for the CASAC to review a draft PA while the Draft Integrated Science Assessment (ISA) has not been revised/finalized. The CASAC stands ready to review additional drafts of the PM ISA, PM REA, and PM PA, should they be provided. The CASAC recommends that it be provided an opportunity to review a revised draft of the PM PA based on the final PM ISA. This document is limited to providing advice on the Draft PM PA given the documents provided to date.

## Chapter 1 – Introduction

*To what extent does the CASAC find that the information in Chapter 1 is clearly presented and that it provides useful context for the review?*

The discussions of legislative background and history are clearly, although briefly, presented. They provide useful context for the review. The CASAC recommends that the EPA consider adding a discussion of the exceptional nature of the current CASAC and NAAQS review process. Specifically, relevant background on changes in processes and procedures could include: (a) further details of Administrator Pruitt's "Back to Basics" memorandum (adding to the discussion on p. 1-12); (b) the disbanding of the CASAC Particulate Matter (PM) Review Panel and streamlining of the review process to promote timely advice; and (c) the appointment of a pool of non-member consultants to expand the expertise and fields of knowledge used to inform the CASAC's review. A brief discussion of the accelerated timeline, which has led to tight schedules, condensed procedures, and a Draft PM PA being produced before the PM ISA was revised/finalized, might also be useful. Relevant background on methodological changes in the current CASAC's scientific and technical approach in this review cycle could be provided in a separate section. These changes include stronger emphasis on:

(1) Statistical vs. biological (mechanistic) concepts of causation;
(2) Emphasis on more effective integration of information from animal toxicology and controlled human exposure studies to:
    a. Elucidate and validate potential (i.e., hypothesized) causal biophysical mechanisms underlying epidemiologically suggested health risks; and
    b. Better characterize C-R functions for pulmonary inflammation and other physiological responses.

The stated intentions for the Draft PM PA presented in Chapter 1 include "to serve as a source of policy-relevant information;" "to be understandable to a broad audience;" and "to facilitate advice to the Agency and recommendations to the Administrator" from the CASAC. The CASAC recommends that these intentions be more fully realized in the PM PA by undertaking the following measures:

3. Analyses of pseudo-design values indicating substantial portions of study area health events/populations in locations with air quality likely to have met the current $PM_{2.5}$ standards
4. Risk assessment estimates that the current primary standards could allow thousands of $PM_{2.5}$-associated deaths per year – most at annual average $PM_{2.5}$ concentrations from 10 to 12 µg/m3 (well within the range of overall mean concentrations in key epidemiologic studies).

Some members of the CASAC find this rationale compelling; others CASAC members do not. The CASAC provides the following points and areas of consensus and non-consensus,

**Point 1** (Long-standing body of health evidence, strengthened in this review, supporting relationships between short- and long-term $PM_{2.5}$ exposures and various outcomes, including mortality and serious morbidity effects):

All members of the CASAC agree with this statement. However, members of the CASAC differ in their assessments of the causal and policy significance of these associations:

- Some members think that such associations can reasonably be explained in light of uncontrolled confounding and other potential sources of error and bias (discussed below); that associations are not effects (Petitti 1991); and that in intervention studies, reductions of $PM_{2.5}$ concentrations have not clearly reduced mortality risks, especially when confounding was tightly controlled (Henneman et al. 2017; Burns et al. 2019). These members of the CASAC think that, while the data on associations should certainly be carefully considered, this data should not be interpreted more strongly than warranted based on its methodological limitations.
- Other members of the CASAC think that the entire body of evidence for PM health effects justifies the causality determinations made in the Draft PM ISA that form the basis for the Draft PM PA. This body of evidence, as reviewed in the Draft PM ISA, includes not only associations repeatedly demonstrated in epidemiology studies, but also biological plausibility established by human clinical and toxicology studies. These members find it highly unlikely that the extensive body of evidence on positive C-R associations at low estimated exposures could be fully explained by confounding or by other non-causal explanations.

**Point 2** (Recent U.S. and Canadian epidemiologic studies reporting positive and statistically significant health effect associations for $PM_{2.5}$ air quality likely to be allowed by the current standards):

Some members of the CASAC, as well as several public commenters, note that many relevant time-series studies, intervention studies, and accountability studies are not included in the literature reviewed in the Draft PM ISA and relied on in the Draft PM PA (e.g., Burns et al., 2019 and studies reviewed therein; Eum et al., 2018; Greven et al., 2011; Henneman et al., 2017; Pun et al., 2017). Some members of the CASAC think that for point 2, similar to point 1, interpretation of the more recent U.S. and Canadian epidemiology studies should be refined to more fully account for effects of confounding, measurement and estimation errors, model uncertainty, and heterogeneity (see Appendix A for possible technical options); and that evidence from additional negative studies, intervention studies, accountability studies, and time-series studies should also be taken into account. These CASAC members also think that the new studies of positive associations at lower estimated exposure concentrations in Canada and the United States mainly confirmed what had already been anticipated or assumed in setting the 2012 NAAQS. Particularly focusing on the long-term epidemiology studies that supported the 2012 NAAQS and that are cited in the current review, these studies are based on a Cox

proportional hazards model that assumes a linear non-threshold relationship between $PM_{2.5}$ and the health effect (often mortality). The long-term $PM_{2.5}$ concentrations in the study areas vary substantially, but the effect of the model is to draw a line through these concentrations to determine the slope of the relationship between the health effect and $PM_{2.5}$ concentrations.

Other members of the CASAC, as well as the Independent PM Review Panel (members of the disbanded CASAC PM Review Panel), think that the epidemiologic evidence demonstrating the health effects of $PM_{2.5}$ is strong, with biological plausibility provided by human controlled exposure and animal toxicological studies. These CASAC members do not think that this evidence is diminished because of the lack of consistent support from newer intervention and accountability studies. Newer studies demonstrating that the associations between $PM_{2.5}$ and health effects occur at a diversity of locations, in different time periods, with different populations, using different exposure estimation and statistical methods, make this dataset even more robust. Most important are the recent findings that there are associations between $PM_{2.5}$ and health effects in areas with average long-term $PM_{2.5}$ concentrations below the standard, as well as studies that show positive associations even when estimated daily concentrations above 12 $\mu g/m^3$ are excluded. Altogether these members of CASAC find EPA's point 2 to be crucial in their determination that the current scientific evidence calls into question the adequacy of the 2012 $PM_{2.5}$ annual standard to protect public health.

**Point 3** (Analyses of pseudo-design values indicating substantial portions of study area health events/populations in locations with air quality likely to have met the current $PM_{2.5}$ standards):

The CASAC finds that the pseudo-design value assessment is difficult to interpret. Please refer to the comments made above on the description and conclusions from pseudo-design values.

**Point 4** (Risk assessment estimates that the current primary standards could allow thousands of $PM_{2.5}$-associated deaths per year – most at annual average $PM_{2.5}$ concentrations from 10 to 12 µg/m3 (well within the range of overall mean concentrations in key epidemiologic studies)):

Some CASAC members find that the Draft PM PA's risk assessment conclusion that the current primary standards could allow thousands of $PM_{2.5}$-associated deaths per year is based on modeling assumptions that are potentially flawed and that have not been empirically verified. Because they are driven by such assumptions, the conclusions from the risk assessment do not comprise valid empirical evidence or grounds for revising the current NAAQS. This is based on concerns noted above that i) the risk assessment treats regression coefficients as causal coefficients with no justification or validation provided for this decision; ii) the estimated regression C-R functions in Appendix C and Chapter 3 of the Draft PM PA have not been adequately adjusted to correct for confounding, errors in exposure estimates and other covariates, model uncertainty, and heterogeneity in individual biological (causal) C-R functions; iii) the estimated C-R functions do not contain quantitative uncertainty bands that reflect model uncertainty or effects of exposure and covariate estimation errors; and iv) no regression diagnostics are provided justifying the use of proportional hazards (PH) and other modeling assumptions. These potential sources of error and bias, and technical methods for addressing them, have been discussed in previous CASAC deliberations and comments on the Draft PM ISA, and in public comments on the Draft PM ISA and Draft PM PA. In response to a request from the EPA, Appendix A discusses some possible technical options for addressing them in the near term.

Other CASAC members find that the approaches used in the Draft PM PA are appropriate and well justified, that the new evidence available since the last review has reduced uncertainties regarding health effects at exposure concentrations below the current standard, and that the evidence strengthens the concern that the current standard is not adequately protective.

As a decision framework for addressing to what extent the current scientific literature supports the adequacy (or not) of the 2012 $PM_{2.5}$ standards to protect human health, the CASAC considers how the evidence has changed since the last PM review. One way to view this is by considering the entire PM assessment as a whole to be a risk assessment with the following components: hazard assessment (the ISA), exposure assessment (the PA), dose-response assessment (the PA), and risk characterization (the PA).

Hazard Identification – The purpose of the hazard identification is to determine which health effects could be caused by $PM_{2.5}$ exposure at relevant ambient concentrations (the EPA defines a relevant concentration as being less than 2 $mg/m^3$). The CASAC agrees that the causal designations have not substantially changed since the last assessment (setting aside the three "likely causal" upgrades, which the CASAC found were not justified in the review of the Draft PM ISA). Although the causal designations have not changed, some CASAC members find that there is greater evidence supporting those causal designations, and at lower exposure concentrations. Other CASAC members did not think that the somewhat lower exposure concentrations in the newer studies are relevant for hazard identification, because this step of the risk assessment process only identifies the hazards, and those identified hazards have not changed in this review.

Exposure Assessment – An exposure assessment determines how much $PM_{2.5}$ the target population is exposed to. $PM_{2.5}$ concentrations have continued to decrease nationwide since the last review. Fundamentally, the NAAQS seek to reduce health risk by reducing exposure. The CASAC had substantial discussions about the studies that are available showing that changes in standards have decreased $PM_{2.5}$ concentrations, and how these concentration decreases may correlate with decreases in health effects attributed to $PM_{2.5}$ (such as mortality). These accountability studies provide potentially crucial information about whether and how much decreasing $PM_{2.5}$ causes decreases in future health effects, which reflects the primary purpose of the NAAQS (to decrease air pollutants to protect the public from experiencing future health effects). This type of interventional causality can be contrasted with epidemiology studies using retrospective information, which determine the association between past $PM_{2.5}$ concentrations and past health effects. Some members of the CASAC identified a number of these types of studies conducted (reviews include Burns et al., 2019 and Henneman et al., 2017) and note that clear evidence of decreases in health effects caused by interventions that decreased $PM_{2.5}$ is lacking, particularly when appropriate controls are included in the analyses. Other members of CASAC do not think that there is enough evidence to make definitive determinations about $PM_{2.5}$ decreases leading to decreases in health effects, and that absence of evidence is not evidence of absence.

Dose-Response Assessment – This aspect of the risk assessment addresses the expected change in the health endpoint caused by a unit change in $PM_{2.5}$. In the last review, the EPA concluded that the dose-response for the major hazards (total mortality, cardiovascular and respiratory morbidity and mortality) were low-dose linear with no threshold. The EPA draws the same conclusion in this review, and the slopes of the linear estimates are similar in the last review and the current review. Some members of the CASAC see this evidence as showing the same dose-response association in the current review as in the last review and note that neither review quantifies effects caused by *changes* in exposure, as opposed to

## Dr. James Boylan

### Chapter 1 – Introduction

*To what extent does the CASAC find that the information in Chapter 1 is clearly presented and that it provides useful context for the review?*

The CASAC review letter on EPA's Draft ISA submitted to the EPA Administrator on April 11, 2019 recommended the development of a Second Draft ISA for CASAC review and the reappointment of the previous CASAC PM panel (or appoint a panel with similar expertise) in time to review the Second Draft ISA. Instead, EPA has provided CASAC with a pool of consultants that can respond to written questions from the CASAC. Although the pool of consultants has provided additional insight and useful information, they do not serve the same role as the former PM review panel since there are no deliberations and only written answers to specific questions. I feel that the traditional review process (with pollutant specific review panels) is significantly more informative to CASAC's recommendations since it allows verbal discussions and deliberations among experts with differing backgrounds and opinions resulting in a more comprehensive examination of controversial topics.

The purpose of the PA is to bridge the gap between EPA's scientific assessments and the judgement required by the EPA Administrator when determining whether to retain or revise the NAAQS. It is unusual to review a draft PA when the ISA had not been finalized. Also, it is unusual to include the REA as part of the PA rather than a stand-alone document that is reviewed prior to the release of the draft PA. I feel that a second draft of the PA (with an updated REA) should be reviewed by the CASAC after the final ISA is released.

### Chapter 2 – PM Air Quality

*To what extent does the CASAC find that the information in Chapter 2 is clearly presented and that it provides useful context for the review?*

This chapter discusses particle size distribution, PM emissions, ambient PM monitoring methods and networks, trends in ambient air concentrations, hybrid $PM_{2.5}$ modeling approaches, and background PM. Overall, the information in this chapter is clearly presented and provides useful context for the review. However, there are a few areas that should be expanded to provide additional context for the review.

<u>Sources of PM Emissions</u>

This chapter presents estimated national values for 2014 NEI emissions (e.g., 5.4 million tons of $PM_{2.5}$ (page 2-4); 13 million tons $PM_{10}$ (page 2-6); 1.5 million tons of particulate OC (page 2-7); 431,000 tons of particulate EC (page 2-8); 4.8 million tons of $SO_2$ (page 2-9); 14.4 million tons of NOx (page 2-9); 3.6 million tons $NH_3$ (page 2-9), and 17 million tons VOCs (page 2-9)). However, there is no detailed discussion on the uncertainty associated with each pollutant and source sector. Some pollutants and sectors will be much more or much less certain than others. For example, $SO_2$ emissions from electric

## Dr. Mark Frampton

**General Comments**

In response to a CASAC request in its April 11 letter to the Administrator, EPA has appointed a panel of twelve expert consultants as a resource in the review of this PM PA, as well as for the ozone review. Those panel members have already provided helpful and insightful responses to specific questions posed by the chartered CASAC members. However, CASAC had stated in its April 11 letter, "Additional expertise is needed for the Clean Air Scientific Advisory Committee (CASAC) to provide a thorough review of the particulate matter (PM) National Ambient Air Quality Standards (NAAQS) documents. The breadth and diversity of evidence to be considered exceeds the expertise of the statutory CASAC members, or indeed of any seven individuals."

CASAC recommended that "…the EPA reappoint the previous CASAC PM panel (or appoint a panel with similar expertise)…". EPA has not done so. The panel of 12 consultants appointed by EPA does not have the breadth or depth of expertise that was represented on the original (dismissed) PM panel, and moreover does not include additional areas of expertise requested. The newly appointed panel of consultants does not include sufficient expertise and experience in air pollution epidemiology research. This is a scientific discipline that is obviously of key importance in the review of the PM standards. None of the current chartered CASAC members are experts in air pollution epidemiology. In addition, the restrictive process for interacting with the newly appointed consultants, which was imposed by EPA without consultation with CASAC, prevents open and frank discussions that are part of the process of achieving consensus. These limitations adversely affect the ability of CASAC to provide the EPA with the best and most relevant advice on the adequacy of the current NAAQS.

We note the difficulty and limitation in providing cogent and insightful advice on this PA document, given that the ISA has yet to be finalized, and the CASAC advice for revisions to the ISA, that were made in the CASAC letter to the Administrator (April 11, 2019), have yet to be addressed. Thus CASAC is attempting to review policy assessment and planning that is based on an incomplete scientific review.

**Chapter 1.** Section 1.4, summarizing the current NAAQS review, is incomplete. It omits a description of the changes to the NAAQS review process, the CASAC, and the PM NAAQS review since 2016. This section of the PA should summarize these changes, and indicate how these changes deviate from the process described in the IRP.

***Chapter 3 – Review of the Primary PM2.5 Standards:*** *What are the CASAC views on the approaches described in chapter 3 to considering the $PM_{2.5}$ health effects evidence and the risk assessment in order to inform preliminary conclusions on the primary $PM_{2.5}$ standards? What are the CASAC views regarding the rationales supporting the preliminary conclusions on the current and potential alternative primary $PM_{2.5}$ standards?*

# Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter

find it "highly unlikely" that the extensive body of evidence indicating positive associations at low estimated exposures could be fully explained by confounding or by other non-causal explanations (Cox, 2019, p. 8 of consensus responses). They additionally conclude that "the risk characterization does provide a useful attempt to understand the potential impacts of alternate standards on public health risks" (Cox, 2019, p. 11 of consensus responses). These committee members conclude that the evidence available in this review reasonably calls into question the protection provided by the current primary $PM_{2.5}$ standards and supports revising the annual standard to increase that protection (Cox, 2019).

We also received a number of public comments on the adequacy of the current primary $PM_{2.5}$ standards. Some of these commenters, including several representing industry groups and states, agree with the CASAC members who conclude that the evidence supports retaining the current standards. These public commenters often cite the same types of uncertainties that are highlighted by members of the CASAC who support retaining (e.g., potential for confounding, exposure error, etc.). Other public commenters, including those representing environmental and public health organizations and several members of the academic research community, conclude that the current primary $PM_{2.5}$ standards should be revised in order to increase public health protection. These commenters generally cite the large body of evidence supporting relationships between $PM_{2.5}$ exposures and mortality or serious morbidity-related outcomes, including studies reporting such outcomes for $PM_{2.5}$ air quality likely to be allowed in locations meeting the current standards. They conclude that the existing body of epidemiologic studies appropriately considers potential confounders and sources of error, and that this evidence provides robust support for revising the current standards.

## 3.5 CONCLUSIONS ON THE PRIMARY $PM_{2.5}$ STANDARDS

This section describes our conclusions regarding the adequacy of the current primary $PM_{2.5}$ standards (section 3.5.1) and regarding potential alternatives for consideration (section 3.5.2). As described more fully in section 3.1.2, our approach to reaching conclusions is based on considering the EPA's assessment of the current scientific evidence for health effects attributable to $PM_{2.5}$ exposures (discussed in detail in the ISA; U.S. EPA, 2019), quantitative assessments of $PM_{2.5}$-associated health risks, and analyses of $PM_{2.5}$ air quality. We also consider the range of advice received from the CASAC (Cox, 2019) and comments from the members of the public. These considerations and conclusions are intended to inform the Administrator's judgments regarding primary standards for fine particles that are requisite to protect public health with an adequate margin of safety. We seek to provide as broad an array of policy options as is supportable by the available science, recognizing that the selection of a specific approach to

reaching final decisions on the primary $PM_{2.5}$ standards will reflect the judgments of the Administrator as to what weight to place on the various types of information.

### 3.5.1 Current Standards

We initially consider the adequacy of the current primary $PM_{2.5}$ standards. As discussed more fully in section 3.1.2, our approach recognizes that the current annual standard (based on arithmetic mean concentrations) and 24-hour standard (based on 98th percentile concentrations), together, are intended to protect the public health against the full distribution of short- and long-term $PM_{2.5}$ exposures. In considering the combined effects of these standards, we recognize that changes in $PM_{2.5}$ air quality designed to meet an annual standard would likely result not only in lower short- and long-term $PM_{2.5}$ concentrations near the middle of the air quality distribution, but also in fewer and lower short-term peak $PM_{2.5}$ concentrations. Additionally, changes designed to meet a 24-hour standard, with a 98th percentile form, would result not only in fewer and lower peak 24-hour $PM_{2.5}$ concentrations, but also in lower annual average $PM_{2.5}$ concentrations. Thus, our focus in evaluating the current primary standards is on the protection provided by the combination of the annual and 24-hour standards against the distribution of both short- and long-term $PM_{2.5}$ exposures.

Our consideration of the adequacy of the current annual and 24-hour $PM_{2.5}$ standards is framed by the first overarching policy-relevant question posed at the beginning of this chapter:

- **Does the currently available scientific evidence and risk-based information support or call into question the adequacy of the public health protection afforded by the current annual and 24-hour $PM_{2.5}$ standards?**

In answering this question, we consider the nature of the health effects reported to occur following short- or long-term $PM_{2.5}$ exposures, the strength of the evidence supporting those effects, and the evidence that certain populations may be at increased risk (discussed in more detail in sections 3.2.1 and 3.2.2); the $PM_{2.5}$ exposures shown to cause effects and the ambient concentrations in locations where $PM_{2.5}$ health effect associations have been reported (section 3.2.3); estimates of $PM_{2.5}$-associated health risks for air quality adjusted to simulate just meeting the current annual and 24-hour primary $PM_{2.5}$ standards (section 3.3); and advice from the CASAC, based on its review of the draft PA (Cox, 2019). These considerations, and our conclusions on the current primary $PM_{2.5}$ standards, are summarized below.

As an initial matter, we note the longstanding body of health evidence supporting relationships between $PM_{2.5}$ exposures (short- and long-term) and mortality or serious morbidity effects. The evidence available in this review (i.e., assessed in U.S. EPA, 2019 and summarized above in section 3.2.1) reaffirms, and in some cases strengthens, the conclusions from the 2009 ISA regarding the health effects of $PM_{2.5}$ exposures (U.S. EPA, 2009). Much of this evidence

comes from epidemiologic studies conducted in North America, Europe, or Asia that demonstrate generally positive, and often statistically significant, $PM_{2.5}$ health effect associations. Such studies report associations between estimated $PM_{2.5}$ exposures and non-accidental, cardiovascular, or respiratory mortality; cardiovascular or respiratory hospitalizations or emergency room visits; and other mortality/morbidity outcomes (e.g., lung cancer mortality or incidence, asthma development). Recent experimental evidence, as well as evidence from panel studies, strengthens support for potential biological pathways through which $PM_{2.5}$ exposures could lead to the serious effects reported in many population-level epidemiologic studies. This includes support for pathways that could lead to cardiovascular, respiratory, nervous system, and cancer-related effects.

Epidemiologic studies report $PM_{2.5}$ health effect associations with mortality and/or morbidity across multiple U.S. cities and in diverse populations, including in studies examining populations and lifestages that may be at comparatively higher risk of experiencing a $PM_{2.5}$-related health effect (e.g., older adults, children). Such studies employ various designs and examine a variety of health outcomes, geographic areas, and approaches to controlling for confounding variables. With regard to controlling for potential confounders in particular, key studies use a wide array of approaches. Time-series studies control for potential confounders that vary over short time intervals (e.g., including temperature, humidity, dew point temperature, and day of the week) while cohort studies control for community- and/or individual-level confounders that vary spatially (e.g., including income, race, age, socioeconomic status, smoking, body mass index, and annual weather variables such as temperature and humidity) (Appendix B, Table B-12). Sensitivity analyses indicate that adding covariates to control for potential confounders can either increase or decrease the magnitude of $PM_{2.5}$ effect estimates, depending on the covariate, and that none of the covariates examined can fully explain the association with mortality (e.g., Di et al., 2017b, Figure S2 in Supplementary Materials). Thus, while no individual study adjusts for all potential confounders, a broad range of approaches have been adopted across studies to examine confounding, supporting the robustness of reported associations.

Available studies additionally indicate that $PM_{2.5}$ health effect associations are robust across various approaches to estimating $PM_{2.5}$ exposures and across exposure windows. This includes recent studies that estimate exposures using ground-based monitors alone and studies that estimate exposures using data from multiple sources (e.g., satellites, land use information, modeling), in addition to monitors. While none of these approaches eliminates the potential for exposure error in epidemiologic studies, such error does not call into question the fundamental findings of the broad body of $PM_{2.5}$ epidemiologic evidence. In fact, the ISA notes that while bias in either direction can occur, exposure error tends to lead to underestimation of health

effects in epidemiologic studies of PM exposure (U.S. EPA, 2019, section 3.5). Consistent with this, a recent study reports that correction for $PM_{2.5}$ exposure error using personal exposure information results in a moderately larger effect estimate for long-term $PM_{2.5}$ exposure and mortality (Hart et al., 2015). While most $PM_{2.5}$ epidemiologic studies have not employed similar corrections for exposure error, several studies report that restricting analyses to populations in close proximity to a monitor (i.e., in order to reduce exposure error) result in larger $PM_{2.5}$ effect estimates (e.g., Willis et al., 2003; Kloog et al., 2013). The consistent reporting of $PM_{2.5}$ health effect associations across exposure estimation approaches, even in the face of exposure error, together with the larger effect estimates reported in some studies that have attempted to reduce exposure error, provides further support for the robustness of associations between $PM_{2.5}$ exposures and mortality and morbidity.

Consistent findings from the broad body of epidemiologic studies are also supported by an emerging body of studies employing "causal inference" or quasi-experimental statistical approaches to further inform the causal nature of the relationship between long- or short-term term $PM_{2.5}$ exposure and mortality (U.S. EPA, 2019, sections 11.1.2.1, 11.2.2.4). These studies are summarized above in section 3.2.1.1, including a recent accountability study that reports a reduction in mortality following reductions in ambient $PM_{2.5}$ due to the introduction of diesel emission controls (Yorifuji et al., 2016).[74] Other recent studies additionally report that declines in ambient $PM_{2.5}$ concentrations over a period of years have been associated with decreases in mortality rates and increases in life expectancy, improvements in respiratory development, and decreased incidence of respiratory disease in children, further supporting the robustness of $PM_{2.5}$ health effect associations reported in the epidemiologic evidence (summarized in sections 3.2.1 to 3.2.3).

In addition to broadening our understanding of the health effects that can result from exposures to $PM_{2.5}$ and strengthening support for some key effects (e.g., nervous system effects, cancer), recent epidemiologic studies strengthen support for health effect associations at relatively low ambient $PM_{2.5}$ concentrations. Studies that examine the shapes of concentration-response functions over the full distribution of ambient $PM_{2.5}$ concentrations have not identified a threshold concentration, below which associations no longer exist (U.S. EPA, 2019, section 1.5.3). While such analyses are complicated by the relatively sparse data available at the lower

[74] Air pollution accountability studies have reported mixed results overall (e.g., as reviewed in Burns et al., 2019 and Henneman et al., 2017). However, many of the available studies have not focused on $PM_{2.5}$, were not able to attribute changes in ambient $PM_{2.5}$ concentrations to the interventions under evaluation, and/or were not able to disentangle health impacts of the intervention from background trends in health. The study by Yorifuji et al. (2016), included in the review by Burns et al. (2019), is an example of a study that was able to link a particular policy intervention to a decline in ambient $PM_{2.5}$ concentrations, and that did include a control population to correct for background trends in mortality.

end of the air quality distribution (U.S. EPA, 2019, section 1.5.3), several studies report positive and statistically significant associations in additional analyses restricted to annual average $PM_{2.5}$ exposures below 12 μg/m$^3$ (Lee et al., 2015; Di et al., 2017b) and 10 μg/m$^3$ (Shi et al., 2016), or to daily exposures below 25 μg/m$^3$ (Di et al., 2017a), 30 μg/m$^3$ (Shi et al., 2016), and 35 μg/m$^3$ (Lee et al., 2015).

These and other recent studies provide support for health effect associations at lower ambient $PM_{2.5}$ concentrations than in previous reviews. For example, in the last review key epidemiologic studies that were conducted in the U.S. or Canada, and that supported "causal" or "likely to be causal" determinations in the ISA, reported generally positive and statistically significant associations with mortality or morbidity for $PM_{2.5}$ air quality distributions with overall mean concentrations at or above 12.8 μg/m$^3$ (U.S. EPA, 2011, Figure 2-8). In the current review, a large number of key studies report positive and statistically significant associations for air quality distributions with lower overall mean $PM_{2.5}$ concentrations (i.e., Figure 3-7 and Figure 3-8). These key studies indicate such associations consistently for distributions with long-term mean $PM_{2.5}$ concentrations at or above 8.1 μg/m$^3$ (8.2 μg/m$^3$ based on studies that use monitors alone to estimate $PM_{2.5}$ exposures), with the large majority (and all but one key U.S. study) reporting overall mean $PM_{2.5}$ concentrations at or above 9.6 μg/m$^3$ (10.7 μg/m$^3$ based on studies that use monitors alone). Air quality distributions with such low mean concentrations are likely to be allowed by the current $PM_{2.5}$ standards, based on analyses of the relationships between maximum annual $PM_{2.5}$ design values and annual average concentrations (i.e., averaged across multiple monitors in the same area) (section 3.2.3.2.1; Appendix B, section B.7).[75]

In assessing the adequacy of the current standard, we also consider what key epidemiologic studies may indicate for the current standards by calculating values similar to $PM_{2.5}$ design values, based on monitored air quality from the locations and time periods evaluated by those studies (i.e., section 3.2.3.2.2). This approach identifies study-relevant $PM_{2.5}$ air quality metrics similar to those used by the EPA to determine whether areas meet or violate the PM NAAQS. Compared to study-reported mean $PM_{2.5}$ concentrations, such "pseudo-design values" also have the advantage of being consistently calculated across key studies, regardless of how the studies themselves estimate $PM_{2.5}$ exposures (e.g., averaging across monitors, predictions from hybrid modeling approaches).

For some key studies that report positive and statistically significant $PM_{2.5}$ health effect associations, substantial portions of study area populations (e.g., > 50% or 75%) lived in

[75] Given that the annual standard is the controlling standard across much of the U.S. (e.g., see section 3.3), the $PM_{2.5}$ air quality distributions that occur in most locations meeting the current annual $PM_{2.5}$ standard are also likely to meet the current 24-hour standard (i.e., illustrated in Chapter 2, Figure 2-11).

locations with air quality likely to have met both the current annual and 24-hour $PM_{2.5}$ standards over study periods (or substantial portions of health events occurred in such areas) (section 3.2.3.2.2). While there is uncertainty in interpreting analyses of $PM_{2.5}$ pseudo-design values (e.g., some study locations and time periods would have met the current standards while others would have violated those standards, unmonitored areas are excluded from analyses; section 3.2.3.2.2), the importance of these uncertainties is lessened for studies with the large majority of the study area population in locations with pseudo-design values well-below current standard levels (e.g., Pinault et al., 2016; Shi et al., 2016; Weichenthal et al., 2016c). This uncertainty is also lessened for key studies reporting that positive and statistically significant associations persist in analyses restricted to relatively low annual average $PM_{2.5}$ exposure estimates (e.g., below 12 $\mu g/m^3$ in Di et al., 2017b; below 10 $\mu g/m^3$ in Shi et al., 2016), particularly given that the excluded exposure estimates account for about half of the deaths in the entire cohort.[76] Thus, analyses of $PM_{2.5}$ pseudo-design values support the occurrence of positive and statistically significant $PM_{2.5}$ health effect associations based largely on air quality likely to have met the current primary standards.

In addition to the evidence, we also consider what the risk assessment indicates with regard to the adequacy of the current primary $PM_{2.5}$ standards. The risk assessment estimates that the current primary $PM_{2.5}$ standards could allow a substantial number of deaths in the U.S., with the large majority of those deaths associated with long-term $PM_{2.5}$ exposures. For example, when air quality in the 47 study areas is adjusted to simulate just meeting the current standards, the risk assessment estimates from about 16,000 to 17,000 $PM_{2.5}$-related deaths from ischemic heart disease in a single year (i.e., for long-term exposures; confidence intervals range from about 12,000 to 21,000 deaths). While the absolute numbers of estimated $PM_{2.5}$-associated deaths vary widely across exposure durations, endpoints, populations, and concentration-response functions, the general magnitude of risk estimates supports the potential for significant public health impacts in locations meeting the current primary $PM_{2.5}$ standards. This is particularly the case given that the large majority of $PM_{2.5}$-associated deaths for air quality just meeting the current standards are estimated at annual average $PM_{2.5}$ concentrations from about 10 to 12 $\mu g/m^3$. These annual average $PM_{2.5}$ concentrations fall well-within the range of long-term average concentrations over which key epidemiologic studies provide strong support for reported positive and statistically significant $PM_{2.5}$ health effect associations.

Based on the information summarized above, and discussed in more detail in sections 3.2 and 3.3 of this PA, we particularly note the following in reaching conclusions on the current primary $PM_{2.5}$ standards:

[76] $PM_{2.5}$ effect estimates in these restricted analyses are slightly larger than in those based on the entire cohort.

- There is a long-standing body of strong health evidence demonstrating relationships between long- or short-term $PM_{2.5}$ exposures and a variety of outcomes, including mortality and serious morbidity effects. Studies published since the last review have reduced key uncertainties and broadened our understanding of the health effects that can result from exposures to $PM_{2.5}$.
- Recent U.S. and Canadian epidemiologic studies provide support for generally positive and statistically significant health effect associations across a broad range of ambient $PM_{2.5}$ concentrations, including for air quality distributions with overall mean concentrations lower than in the last review and for distributions likely to be allowed by the current primary $PM_{2.5}$ standards.
- Analyses of $PM_{2.5}$ pseudo-design values additionally support the occurrence of positive and statistically significant health effect associations based largely on air quality likely to have met the current annual and 24-hour primary standards.
- The risk assessment estimates that the current primary $PM_{2.5}$ standards could allow a substantial number of $PM_{2.5}$-associated deaths in the U.S. The large majority of these estimated deaths are associated with the annual average $PM_{2.5}$ concentrations near (and above in some cases) the average concentrations in key epidemiologic studies reporting positive and statistically significant health effect associations.

When taken together, we reach the conclusion that the available scientific evidence, air quality analyses, and the risk assessment, as summarized above, can reasonably be viewed as calling into question the adequacy of the public health protection afforded by the combination of the current annual and 24-hour primary $PM_{2.5}$ standards.

In contrast to this conclusion, a conclusion that the current primary $PM_{2.5}$ standards do provide adequate public health protection would place little weight on the broad body of epidemiologic evidence reporting generally positive and statistically significant health effect associations, particularly for $PM_{2.5}$ air quality distributions likely to have been allowed by the current primary standards, or on the $PM_{2.5}$ risk assessment. Rather, such a conclusion would place greater weight on uncertainties and limitations in the evidence and analyses (i.e., discussed in sections 3.2.3 and 3.3.2 above), including the following:

- Uncertainty in the biological pathways through which $PM_{2.5}$ exposures could cause serious health effects increases as the ambient concentrations being considered fall farther below the $PM_{2.5}$ exposure concentrations shown to cause effects in experimental studies. In the current review, such studies generally examine the occurrence of $PM_{2.5}$-attributable effects following exposures to $PM_{2.5}$ concentrations well-above those likely to occur in the ambient air in areas meeting the current primary $PM_{2.5}$ standards (i.e., discussed in section 3.2.3.1).
- Uncertainty in the potential public health impacts of air quality improvements increases as the ambient concentrations being considered fall farther below those present in studies that report improved health with reductions in $PM_{2.5}$ concentrations. In the current review, such

studies evaluate air quality improvements with "starting" mean $PM_{2.5}$ concentrations (i.e., prior to the reductions being evaluated) from about 13 to > 20 μg/m$^3$ (i.e., Table 3-3).[77]

- Uncertainty in the risk assessment results from uncertainties in the underlying epidemiologic studies, in the air quality adjustments, and in the application of study and air quality information to develop quantitative estimates of $PM_{2.5}$-associated mortality risks (section 3.3.2.4).

The considerations and conclusions discussed above are intended to inform the Administrator's judgments regarding the current primary $PM_{2.5}$ standards. In presenting these considerations and conclusions, we seek to provide information on a range of policy options, and on the potential approaches to viewing the scientific evidence and technical information that could potentially support various options. We recognize that the selection of a particular approach to reaching final decisions on the primary $PM_{2.5}$ standards will reflect the judgments of the Administrator as to what weight to place on the various types of evidence and information, including associated uncertainties. Given that this PA seeks to provide information on the range of policy options that could be supported by the scientific information, and given our conclusion (noted above) that the evidence and information can reasonably be viewed as calling into question the adequacy of the current primary $PM_{2.5}$ standards, in the next section we additionally consider support for potential alternative standards.

### 3.5.2 Potential Alternative Standards

In this section, we consider the potential alternative primary $PM_{2.5}$ standards that could be supported by the evidence and quantitative information available in this review. These considerations are framed by the following overarching policy-relevant question, posed at the beginning of this chapter:

- **What is the range of potential alternative standards that could be supported by the available scientific evidence and risk-based information to increase public health protection against short- and long-term fine particle exposures?**

In answering this question, we consider each of the elements of the annual and 24-hour $PM_{2.5}$ standards: indicator, averaging time, form, and level. The sections below discuss our consideration of these elements, and our conclusions that (1) it is appropriate to consider revising the level of the current annual standard, in conjunction with retaining the current indicator, averaging time, and form of that standard, to increase public health protection against fine

[77] As noted above, these retrospective studies tend to include data from earlier time periods where ambient $PM_{2.5}$ concentrations in the U.S. were considerably higher than they are at present.

particle exposures and (2) depending on the decision made on the annual standard, consideration could be given to either retaining or revising the level of the 24-hour $PM_{2.5}$ standard.

### 3.5.2.1 Indicator

In initially setting standards for fine particles in 1997, the EPA concluded it was appropriate to control fine particles as a group, rather than singling out any particular component or class of fine particles. The Agency noted that community health studies had found significant health effect associations using various indicators of fine particles, and that health effects in a large number of areas had significant mass contributions from differing components or sources of fine particles. In addition, a number of toxicological and controlled human exposure studies had reported health effects following exposures to high concentrations of numerous fine particle components (62 FR 38667, July 18, 1997). In establishing a size-based indicator in 1997 to distinguish fine particles from particles in the coarse mode, the EPA noted that the available epidemiologic studies of fine particles were based largely on $PM_{2.5}$ mass. The selection of a 2.5 µm size cut additionally reflected the regulatory importance of defining an indicator that would more completely capture fine particles under all conditions likely to be encountered across the U.S. and the monitoring technology that was generally available (62 FR 38666 to 38668, July 18, 1997).

Since the 1997 review, studies that evaluate fine particle-related health effects continue to provide strong support for such effects using $PM_{2.5}$ mass as the metric for fine particle exposures. Subsequent reviews have recognized the strength of this evidence, concluding that it has continued to support a $PM_{2.5}$ mass-based indicator for a standard meant to protect against fine particle exposures. In the last review, some studies had additionally examined health effects of exposures to particular sources or components of fine particles, or to the ultrafine fraction of fine particles. Based on limitations in such studies, together with the continued strong support for effects of $PM_{2.5}$ exposures, the Agency retained $PM_{2.5}$ mass as the indicator for fine particles and did not supplement the $PM_{2.5}$ standards with standards based on particle composition or on the ultrafine fraction (78 FR 3123, January 15, 2013).

As in the last review, studies available in the current review continue to provide strong support for health effects following long- and short-term $PM_{2.5}$ exposures (U.S. EPA, 2019). While some studies evaluate the health effects of particular sources of fine particles, or of particular fine particle components, evidence from these studies does not identify any one source or component that is a better predictor of health effects than $PM_{2.5}$ mass (U.S. EPA, 2019, section 1.5.4). The ISA specifically notes that the results of recent studies confirm and further support the conclusion of the 2009 ISA that many $PM_{2.5}$ components and sources are associated with health effects, and the evidence does not indicate that any one source or component is

consistently more strongly related with health effects than $PM_{2.5}$ mass (U.S. EPA, 2019, section 1.5.4). In addition, the evidence for health effects following exposures specifically to the ultrafine fraction of fine particles continues to be far more limited than the evidence for $PM_{2.5}$ mass as a whole. As discussed in the ISA, the lack of a consistent UFP definition in health studies and across disciplines, together with the variety of approaches to administering and measuring UFP in those studies, contribute to such limitations (U.S. EPA, 2019, section 1.4.3). Thus, for reasons similar to those discussed in the last review (78 FR 3121 to 3123, January 15, 2013), we conclude that the available information continues to support the $PM_{2.5}$ mass-based indicator and remains too limited to support a distinct standard for any specific $PM_{2.5}$ component or group of components, and too limited to support a distinct standard for the ultrafine fraction.

#### 3.5.2.2 Averaging Time

In 1997, the EPA initially set an annual $PM_{2.5}$ standard to protect against health effects associated with both long- and short-term $PM_{2.5}$ exposures, and a 24-hour standard to supplement the protection afforded by the annual standard (62 FR 38667 to 38668, July 18, 1997). In subsequent reviews, the EPA retained both annual and 24-hour averaging times, largely reflecting the strong evidence for health effects associated with annual and daily $PM_{2.5}$ exposure estimates (71 FR 61164, October 17, 2006; 78 FR 3123 to 3124, January 15, 2013).

In the current review, epidemiologic and controlled human exposure studies have examined a variety of $PM_{2.5}$ exposure durations. Epidemiologic studies continue to provide strong support for health effects associated with both long- and short-term $PM_{2.5}$ exposures based on annual (or multiyear) and 24-hour $PM_{2.5}$ averaging periods, respectively.

With regard to short-term exposures in particular, a smaller number of epidemiologic studies examine associations between sub-daily $PM_{2.5}$ exposures and respiratory effects, cardiovascular effects, or mortality. Compared to 24-hour $PM_{2.5}$ exposure estimates, associations with sub-daily estimates are less consistent and, in some cases, smaller in magnitude (U.S. EPA, 2019, section 1.5.2.1). In addition, studies of sub-daily exposures typically examine subclinical effects, rather than the more serious population-level effects that have been reported to be associated with 24-hour exposures (e.g., mortality, hospitalizations). Taken together, the ISA concludes that epidemiologic studies do not indicate sub-daily averaging periods are more closely associated with health effects than the 24-hour average exposure metric (U.S. EPA, 2019, section 1.5.2.1).

Additionally, while recent controlled human exposure studies provide consistent evidence for cardiovascular effects following $PM_{2.5}$ exposures for less than 24 hours (i.e., < 30 minutes to 5 hours), exposure concentrations in these studies are well-above the ambient concentrations typically measured in locations meeting the current standards (section 3.2.3.1). Thus, these

studies also do not suggest the need for additional protection against sub-daily $PM_{2.5}$ exposures, beyond that provided by the current primary standards.

Drawing from the evidence assessed in the ISA, and the observations noted above, we reach the conclusion that the available evidence continues to provide strong support for consideration of retaining the current annual and 24-hour averaging times. The available evidence suggests that $PM_{2.5}$ standards with these averaging times, when coupled with appropriate forms and levels, can protect against the range of long- and short-term $PM_{2.5}$ exposures that have been associated with health effects. Thus, as in the last review, the currently available evidence does not support considering alternatives to the annual and 24-hour averaging times for standards meant to protect against long- and short-term $PM_{2.5}$ exposures.

### 3.5.2.3 Form

The form of a standard defines the air quality statistic that is to be compared to the level in determining whether an area attains that standard. As in other recent reviews, our foremost consideration in reaching conclusions on form is the adequacy of the public health protection provided by the combination of the form and the other elements of the standard.

As noted above, in 1997 the EPA initially set an annual $PM_{2.5}$ standard to protect against health effects associated with both long- and short-term $PM_{2.5}$ exposures and a 24-hour standard to provide supplemental protection, particularly against the short-term exposures to "peak" $PM_{2.5}$ concentrations that can occur in some areas (62 FR 38667 to 38668, July 18, 1997). The EPA established the form of the annual $PM_{2.5}$ standard as an annual arithmetic mean, averaged over 3 years, from single or multiple community-oriented monitors. That is, the level of the annual standard was to be compared to measurements made at each community-oriented monitoring site or, if specific criteria were met, measurements from multiple community-oriented monitoring sites could be averaged together (i.e., spatial averaging) (62 FR 38671 to 38672, July 18, 1997). In the 1997 review, the EPA also established the form of the 24-hour $PM_{2.5}$ standard as the 98th percentile of 24-hour concentrations at each monitor within an area (i.e., no spatial averaging), averaged over three years (62 FR at 38671 to 38674, July 18, 1997). In the 2006 review, the EPA retained these standard forms but tightened the criteria for using spatial averaging with the annual standard (78 FR 3124, January 15, 2013).[78]

In the last review, the EPA's consideration of the form of the annual $PM_{2.5}$ standard again included a focus on the issue of spatial averaging. An analysis of air quality and population demographic information indicated that the highest $PM_{2.5}$ concentrations in a given area tended

[78] Specifically, the Administrator revised spatial averaging criteria such that "(1) [t]he annual mean concentration at each site shall be within 10 percent of the spatially averaged annual mean, and (2) the daily values for each monitoring site pair shall yield a correlation coefficient of at least 0.9 for each calendar quarter (71 FR 61167, October 17, 2006).

to be measured at monitors in locations where the surrounding populations were more likely to live below the poverty line and to include larger percentages of racial and ethnic minorities (U.S. EPA, 2011, p. 2-60). Based on this analysis, the PA concluded that spatial averaging could result in disproportionate impacts in minority populations and populations with lower SES. The Administrator concluded that public health would not be protected with an adequate margin of safety in all locations, as required by law, if disproportionately higher $PM_{2.5}$ concentrations in low income and minority communities were averaged together with lower concentrations measured at other sites in a large urban area. Therefore, she concluded that the form of the annual $PM_{2.5}$ standard should be revised to eliminate spatial averaging provisions (78 FR 3124, January 15, 2013).

In the last review, the EPA also considered the form of the 24-hour $PM_{2.5}$ standard. The Agency recognized that the existing 98th percentile form for the 24-hour standard was originally selected to provide a balance between limiting the occurrence of peak 24-hour $PM_{2.5}$ concentrations and identifying a stable target for risk management programs. Updated air quality analyses in the last review provided additional support for the increased stability of the 98th percentile $PM_{2.5}$ concentration, compared to the 99th percentile (U.S. EPA, 2011, Figure 2-2, p. 2-62). Thus, the Administrator concluded that it was appropriate to retain the 98th percentile form for the 24-hour $PM_{2.5}$ standard (78 FR 3127, January 15, 2013).

Nothing in the evidence that has become available since the last review calls into question the current forms of the annual and 24-hour $PM_{2.5}$ standards. As discussed above (section 3.2.3.2), epidemiologic studies continue to provide strong support for health effect associations with both long-term (e.g., annual or multi-year) and short-term (e.g., mostly 24-hour) $PM_{2.5}$ exposures. These studies provide the strongest support for such associations for the part of the air quality distribution corresponding to the bulk of the underlying data, typically around the overall mean concentrations reported (section 3.2.3.2.1). The form of the current annual standard (i.e., arithmetic mean, averaged over three years) remains appropriate for targeting protection against the annual and daily $PM_{2.5}$ exposures around these means of the $PM_{2.5}$ air quality distribution. In addition, controlled human exposure studies provide evidence for health effects following single short-term $PM_{2.5}$ exposures near the peak concentrations measured in the ambient air (section 3.2.3.1). Thus, the evidence also supports retaining a standard focused on providing supplemental protection against short-term peak exposures. Nothing in the evidence that has become available since the last review calls into question the decision to use a 98th percentile form for a 24-hour standard that is meant to provide a balance between limiting the occurrence of such peak 24-hour $PM_{2.5}$ concentrations and identifying a stable target for risk management programs. Thus, when the information summarized above is taken together, we reach the conclusion that it is appropriate in the current review to consider

retaining the forms of the current annual and 24-hour $PM_{2.5}$ standards, in conjunction with a revised level as discussed below.

### 3.5.2.4 Level

With regard to level, we specifically address the following policy-relevant question:

- **For primary $PM_{2.5}$ standards defined in terms of the current averaging times and forms, what potential alternative levels are appropriate to consider in order to increase public health protection against long- and short-term exposures to $PM_{2.5}$ in ambient air?**

In answering this question, we consider key epidemiologic studies that evaluate associations between $PM_{2.5}$ air quality distributions and mortality or morbidity, controlled human exposure studies examining effects following short-term $PM_{2.5}$ exposures, air quality analyses that help to place these studies into a policy-relevant context, and the risk assessment estimates of $PM_{2.5}$-associated mortality under various alternative standard scenarios.

As discussed above in section 3.1.2, consideration of the evidence and analyses, as summarized in this chapter, informs our evaluation of the public health protection that could be provided by alternative annual and 24-hour standards with revised levels. There are various ways to combine an annual standard (based on arithmetic mean concentrations) and a 24-hour standard (based on 98th percentile concentrations), to achieve an appropriate degree of public health protection. In particular, as noted in section 3.1.2, we recognize that changes in $PM_{2.5}$ air quality designed to meet an annual standard would likely result not only in lower short- and long-term $PM_{2.5}$ concentrations near the middle of the air quality distribution (i.e., around the mean of the distribution), but also in fewer and lower short-term peak $PM_{2.5}$ concentrations. Additionally, changes designed to meet a 24-hour standard, with a 98th percentile form, would result not only in fewer and lower peak 24-hour $PM_{2.5}$ concentrations, but also in lower average $PM_{2.5}$ concentrations.

However, while either standard could be viewed as providing some measure of protection against both average exposures and peak exposures, the 24-hour and annual standards are not expected to be equally effective at limiting both types of exposures. Specifically, the 24-hour standard (with its 98th percentile form) is more directly tied to short-term peak $PM_{2.5}$ concentrations, and thus more likely to appropriately limit exposures to such concentrations, than to the more typical concentrations that make up the middle portion of the air quality distribution. Therefore, compared to a standard that is directly tied to the middle of the air quality distribution, the 24-hour standard is less likely to appropriately limit the "typical" daily and annual exposures that are most strongly associated with the health effects observed in epidemiologic studies. In contrast, the annual standard, with its form based on the arithmetic mean concentration, is more likely to effectively limit the $PM_{2.5}$ concentrations that comprise the middle portion of the air

quality distribution, affording protection against the daily and annual $PM_{2.5}$ exposures that strongly support associations with the most serious $PM_{2.5}$-related effects in epidemiologic studies (e.g., mortality, hospitalizations).

For these reasons, as discussed in section 3.1.2, we focus on alternative levels of the annual $PM_{2.5}$ standard as the principle means of providing increased public health protection against the bulk of the distribution of short- and long-term $PM_{2.5}$ exposures, and thus protecting against the exposures that provide strong support for associations with mortality and morbidity in key epidemiologic studies. We additionally consider the 24-hour standard, with its 98th percentile form, primarily as a means of providing supplemental protection against the short-term exposures to peak $PM_{2.5}$ concentrations that can occur in some areas (e.g., those with strong contributions from local or seasonal sources), even when overall mean $PM_{2.5}$ concentrations remain relatively low.

To inform our consideration of potential alternative annual and 24-hour standard levels, we specifically note the following key observations regarding (1) the overall mean $PM_{2.5}$ concentrations reported in U.S. or Canadian epidemiologic studies, (2) the relationships between long-term mean $PM_{2.5}$ concentrations and annual design values in U.S. CBSAs, (3) the $PM_{2.5}$ pseudo-design values in study locations, (4) the $PM_{2.5}$ exposures shown to cause effects in controlled human exposure studies, and (5) estimated $PM_{2.5}$-associated risks.

***(1) Long-Term Mean $PM_{2.5}$ Concentrations in Key Epidemiologic Studies (section 3.2.3.2)***

- Key epidemiologic studies indicate consistently positive and statistically significant health effect associations based on air quality distributions with overall long-term mean $PM_{2.5}$ concentrations at and above 8.1 $\mu g/m^3$ (8.2 $\mu g/m^3$ based on studies that use monitors alone to estimate $PM_{2.5}$ exposures), with mean concentrations at or above 9.6 $\mu g/m^3$ in most key studies (10.7 $\mu g/m^3$ based on studies that use monitors alone to estimate $PM_{2.5}$ exposures). The ranges of ambient $PM_{2.5}$ concentrations accounting for the bulk of exposures and health data in these studies are expected to extend at least somewhat below the overall long-term mean concentrations reported.
- Epidemiologic studies provide more limited support for health effect associations based on air quality distributions with lower overall mean $PM_{2.5}$ concentrations. Specifically, two key studies report positive associations between short-term $PM_{2.5}$ exposures and emergency room visits based on cities in Ontario, Canada (Weichenthal et al., 2016b and Weichenthal et al., 2016c and), with overall mean $PM_{2.5}$ concentrations around 7.0 $\mu g/m^3$ (one of these studies reports an association that is statistically significant). Additionally, a U.S. study (Shi et al. (2016) reports positive and statistically significant associations in analyses restricted to relatively low annual or 24-hour $PM_{2.5}$ exposure estimates. This study does not report the overall mean $PM_{2.5}$ concentrations in restricted analyses, though such means are presumably somewhat below those based on the overall cohort (i.e., 8.1 and 8.2 $\mu g/m^3$).

***(2) Relationships between long-term mean $PM_{2.5}$ concentrations and annual design values (section 3.2.3.3; Appendix B, section B.7)***

- Areas meeting a particular annual $PM_{2.5}$ standard would be expected to have average $PM_{2.5}$ concentrations (i.e., averaged across the area and over time) somewhat below the level of that standard. This is supported by analyses of monitoring data in CBSAs across the U.S., which show that maximum annual $PM_{2.5}$ design values are often 10% to 20% higher than long-term mean $PM_{2.5}$ concentrations (Appendix B, Figure B-7; Table B-9).

***(3) $PM_{2.5}$ Pseudo-Design Values in Study Locations (section 3.2.3.2.2 and Appendix B, Figure B-9)***

- For most key epidemiologic studies with $PM_{2.5}$ pseudo-design values available, about 25% or more of study area populations lived in locations likely to have met the current primary $PM_{2.5}$ standards over study periods (or about 25% or more of health events occurred in such locations). For the U.S. studies in this group, annual pseudo-design values as low as 8.7 $\mu g/m^3$ correspond to 25th percentiles of study area population (or health events). For the smaller number of Canadian studies included in this group, annual pseudo-design values as low as 6.0 $\mu g/m^3$ correspond to the 25th percentiles of study area population (or health events).
- For several key epidemiologic studies, most of the study area populations (i.e., >50% of those living in areas with pseudo-design values) lived in locations with air quality likely to have met both standards over study periods (or >50% of health events occurred in locations with such air quality). For the U.S. studies in this group, annual pseudo-design values from 9.9 to 11.7 $\mu g/m^3$ correspond to 50th percentiles of study area populations (or health events). For the smaller number of Canadian studies included in this group, annual pseudo-design values from 7.3 to 7.4 $\mu g/m^3$ correspond to 50th percentiles of study area populations (or health events).
- For the U.S. study reporting the lowest annual average concentrations (Shi et al., 2016), an annual pseudo-design value of 11.0 $\mu g/m^3$ corresponds to the 75th percentile of the study area population (i.e., 75% of the study area population lives in locations with pseudo-design values < 11.0 $\mu g/m^3$). For the Canadian studies with the lowest ambient $PM_{2.5}$ concentrations, annual pseudo-design values from 8.4 to 8.6 $\mu g/m^3$ correspond to 75th percentiles of the study area populations (or health events).

***(4) $PM_{2.5}$ exposures shown to cause effects in controlled human exposure studies (section 3.2.3.1)***

- While controlled human exposure studies support the plausibility of the serious cardiovascular effects that have been linked with ambient $PM_{2.5}$ exposures (U.S. EPA, 2019, Chapter 6), the $PM_{2.5}$ exposure concentrations evaluated in most of these studies are well-above the ambient concentrations typically measured in locations meeting the current primary standards (and thus well-above those likely to be measured in locations that would meet revised standards with lower annual or 24-hour levels).

***(5) $PM_{2.5}$-Associated Risk Estimates (section 3.3)***

- The risk assessment estimates that, compared to the current standards, potential alternative annual standards with levels from 11.0 down to 9.0 μg/m$^3$ could reduce $PM_{2.5}$-associated mortality broadly across the U.S., including in most of the 47 urban study areas evaluated. In such locations, estimated risk reductions range from about 7 to 9% for a level of 11.0 μg/m$^3$, 14 to 18% for a level of 10.0 μg/m$^3$, and 21 to 27% for a level of 9.0 μg/m$^3$. For each of these standards, most of the risk remaining is estimated at annual average $PM_{2.5}$ concentrations that fall somewhat below the standard level.
- Risk reductions estimated for an alternative 24-hour standard with a level of 30 μg/m$^3$ are concentrated in only a few study areas in the western U.S. (several of which could also experience risk reductions in response to a revised annual standard with a level below 12.0 μg/m$^3$). In those few study areas for which risk reductions are estimated upon just meeting an alternative 24-hour standard with a level of 30 μg/m$^3$, reductions range from about 14 to 18%.

The information summarized in these key observations could support various decisions on the levels of the annual and 24-hour $PM_{2.5}$ standards, depending on the weight given to different aspects of the evidence, air quality and risk information, including its uncertainties. As noted above (section 3.1.2), in this PA we seek to provide as broad an array of policy options as is supportable by the available evidence and quantitative information, recognizing that the selection of a specific approach to reaching final decisions on the primary $PM_{2.5}$ standards will reflect the judgments of the Administrator as to what weight to place on the various types of evidence and information, and on associated uncertainties. Potential approaches to considering support for particular alternative annual and 24-hour standard levels are discussed below.

#### 3.5.2.4.1 Alternative Annual Standard Levels

As discussed above, the degree to which particular alternative annual standard levels below 12.0 μg/m$^3$ are supported will depend on the weight placed on various aspects of the scientific evidence, air quality and risk information, and its associated uncertainties. For example, a level as low as about 10.0 μg/m$^3$ could be supported to the extent weight is placed on the following:

- Setting a standard expected to maintain the $PM_{2.5}$ air quality distribution below those present in most key epidemiologic studies, recognizing that (1) the large majority of key studies reporting positive and statistically significant health effect associations (and all but one key U.S. study) examine distributions of ambient $PM_{2.5}$ with overall mean concentrations at or above 9.6 μg/m$^3$, while a few studies reporting such associations examine distributions with overall mean concentrations just above 8.0 μg/m$^3$ (section 3.2.3.2.1) and (2) analyses of $PM_{2.5}$ air quality in CBSAs indicate that maximum annual $PM_{2.5}$ design values are often 10% to 20% higher than average $PM_{2.5}$ concentrations (i.e., averaged across space and over several years) suggesting that areas meeting a particular annual $PM_{2.5}$ standard would be expected to have average $PM_{2.5}$ concentrations somewhat below the level of that standard (section 3.2.3.2.2; Appendix B, section B.7);

- Setting the standard level at or below the pseudo-design values corresponding to about the 50th percentiles of study area populations (or health events) in most key studies (particularly key U.S. studies), recognizing that a revised annual standard with a level as low as 10.0 µg/m$^3$ would be expected to maintain ambient $PM_{2.5}$ concentrations below the concentrations present during study periods for most of those populations (or below the concentrations in locations accounting for most health events) (section 3.2.3.2.2);
- Setting a standard estimated to reduce $PM_{2.5}$-associated health risks, such that a substantial portion of the risk reduction is estimated at annual average $PM_{2.5}$ concentrations ≥ about 8 µg/m$^3$ and recognizing that these concentrations are within the range of overall means for which key epidemiologic studies indicate consistently positive and statistically significant health effect associations (section 3.3.2).

In selecting a particular level from 10.0 µg/m$^3$ to < 12.0 µg/m$^3$, consideration of the evidence could take into account individual study characteristics such as study design and statistical approaches, precision of reported associations, study size and location, and uncertainties in the study itself or in our analyses of study area air quality. For example, if less weight is placed on the small number of studies reporting overall mean concentrations below 9.6 µg/m$^3$ and on the small number of studies with 50th percentile pseudo-design values below 10.0 µg/m$^3$, a standard higher than 10 µg/m$^3$ (but still below 12.0 µg/m$^3$) might be considered. Similarly, consideration of the risk assessment could take into account the magnitude of estimated risk reductions, compared to the current standards; the annual average $PM_{2.5}$ concentrations at which those reductions are estimated to occur; and the uncertainties in the underlying epidemiologic studies, in the air quality adjustments, or in other information that was used to model risks. For example, concern about the uncertainty in the potential public health importance of risk reductions estimated for a level as low as 10.0 µg/m$^3$, much of which is estimated at annual average $PM_{2.5}$ concentrations around 8 µg/m$^3$, might focus consideration on a standard level above 10 µg/m$^3$, where estimated risk reductions would occur at slightly higher concentrations.

A decision to not consider annual standard levels below 10.0 µg/m$^3$ might take into account the increasing uncertainty in the degree to which lower levels would result in additional public health improvements, due in part to the more limited amount of data available. Such a decision could note the following regarding the increasing uncertainty at lower ambient concentrations:

- Few key epidemiologic studies (and only one key U.S. study) report positive and statistically significant health effect associations for $PM_{2.5}$ air quality distributions with overall mean concentrations below 9.6 µg/m$^3$, and areas meeting a standard with a level of 10.0 µg/m$^3$ would generally be expected to have lower long-term mean $PM_{2.5}$ concentrations (and potentially around 8.0 µg/m$^3$ in some areas) (section 3.2.3.2.1; Appendix B, section B.7).

- There is increasing uncertainty in $PM_{2.5}$ exposure estimates in some of the largest key studies at lower ambient concentrations (i.e., those that use hybrid model predictions to estimate exposures), given the more limited information available to develop and validate model predictions (sections 2.3.3 and 3.2.3.2.1).
- Pseudo-design values corresponding to the 50th percentiles of study area populations (or health events) are ≥ about 10.0 μg/m$^3$ for almost all key studies, particularly those conducted in the U.S. (section 3.2.3.2.2).
- There is increasing uncertainty in quantitative estimates of $PM_{2.5}$-associated mortality risk for standard levels below 10.0 μg/m$^3$, given that a substantial proportion of the risk reductions estimated for lower standard levels occur at annual average $PM_{2.5}$ concentrations below 8 μg/m$^3$, and thus below the lower end of the range of overall mean $PM_{2.5}$ concentrations in key epidemiologic studies that consistently report positive and statistically significant associations (section 3.3.2).

In contrast, an annual standard with a level below 10.0 μg/m$^3$, and potentially as low as 8.0 μg/m$^3$, could be supported to the extent greater weight is placed on the potential public health improvements that could result from additional reductions in ambient $PM_{2.5}$ concentrations (i.e., beyond those achieved by a standard with a level of 10.0 μg/m$^3$) and less weight is placed on the limitations in the evidence that contribute to greater uncertainty at lower concentrations. For example, a level below 10.0 μg/m$^3$ could be supported to the extent greater weight is placed on the following:

- The two key studies in Canada with overall mean $PM_{2.5}$ concentrations below 8.0 μg/m$^3$ and the potential for overall mean concentrations below 8.0 μg/m$^3$ in restricted analyses in a key U.S. study (section 3.2.3.2.1);
- The ambient $PM_{2.5}$ concentrations somewhat below overall means (e.g., corresponding the lower quartile of underlying data), which contribute to the bulk of the data informing reported associations (section 3.2.3.2.1);
- Annual pseudo-design values corresponding to 25th percentiles of study area populations or health events for most studies, recognizing that the revised standard would be expected to maintain ambient $PM_{2.5}$ concentrations below the concentrations present during study periods for > ~75% of those populations (or below the concentrations in locations accounting for > 75% of health events) (section 3.2.3.2.2);
- Annual pseudo-design values for the smaller number of key studies conducted in Canada, which tend to be somewhat lower than those in the U.S. (section 3.2.3.2.2);
- The potential public health importance of the additional reductions in $PM_{2.5}$-associated health risks estimated for a level of 9.0 μg/m$^3$ and the potential for continued reductions at lower standard levels (i.e., below the lowest level examined in the risk assessment) (section 3.3).

As above, various levels from 8.0 μg/m$^3$ to < 10.0 μg/m$^3$ could be supported, depending on the weight placed on specific aspects of the evidence and analyses. For example, compared to a level of 8.0 μg/m$^3$, a higher level could be supported to the extent less weight is placed on the

two key Canadian studies reporting overall mean concentrations below 8.0 μg/m$^3$, on the potential for overall mean concentrations below 8.0 μg/m$^3$ in a U.S. study that reports associations in restricted analyses, and on the three Canadian studies with the lowest pseudo-design values. Such a judgment could also be informed by increasing uncertainty in the potential public health importance of risks estimated for a level as low as 8.0 μg/m$^3$, given that such risks, which were not quantified in the risk assessment, are likely to occur at annual average $PM_{2.5}$ concentrations largely below 8 μg/m$^3$ (i.e., below the mean concentrations in almost all key epidemiologic studies).

#### 3.5.2.4.2 Alternative 24-Hour Standard Levels

We additionally evaluate the degree to which the evidence supports considering potential alternative levels for the 24-hour $PM_{2.5}$ standard, in conjunction with the current 98th percentile form of that standard. As discussed above (section 3.1.1), in the last review, the EPA recognized that the annual standard would generally be the controlling standard across much of the U.S., except for certain areas in the western U.S. "where annual mean $PM_{2.5}$ concentrations have historically been low but where relatively high 24-hour concentrations occur, often related to seasonal wood smoke emissions" (78 FR 3163, January 15, 2013). In such areas, the 24-hour standard is the generally controlling standard. Thus, the EPA's approach in the last review was to focus on the annual standard as the principle means of limiting both long- and short-term $PM_{2.5}$ concentrations, recognizing that the 24-hour standard, with its 98th percentile form, would provide supplemental protection against short-term peak exposures, particularly for areas with high peak-to-mean ratios (e.g., areas with strong seasonal sources).

As discussed above (section 3.1.2), in the current review we again view the 24-hour standard (with its 98th percentile form) largely within the context of limiting short-term exposures to peak $PM_{2.5}$ concentrations. Compared to the annual standard, we recognize that the 24-hour standard is less likely to appropriately limit the more typical $PM_{2.5}$ exposures (i.e., corresponding to the middle portion of the air quality distribution) that are most strongly associated with the health effects observed in epidemiologic studies. Thus, as in the last review (78 FR 3161-3162, January 15, 2013), we focus on the annual $PM_{2.5}$ standard as the principle means of providing public health protection against the bulk of the distribution of short- and long-term $PM_{2.5}$ exposures, and the 24-hour standard as a means of providing supplemental protection against the short-term exposures to "peak" $PM_{2.5}$ concentrations, such as can occur in areas with strong contributions from local or seasonal sources.

Results of the risk assessment and of recent air quality analyses are consistent with our reliance on the 24-hour standard to provide supplemental protection in areas with relatively low long-term mean $PM_{2.5}$ concentrations. In particular, the risk assessment indicates that the annual

standard is the controlling standard across most of the urban study areas evaluated and revising the level of the 24-hour standard to 30 μg/m$^3$ would be estimated to lower $PM_{2.5}$-associated risks, compared to the current standards, largely in a few study areas located in the western U.S. (several of which are also likely to experience risk reductions upon meeting a revised annual standard). Additionally, recent air quality analyses indicate that almost all CBSAs with maximum annual $PM_{2.5}$ design values at or below 12.0 μg/m$^3$ also have maximum 24-hour design values below 35 μg/m$^3$ (and below 30 μg/m$^3$ in most areas) (Chapter 2, Figure 2-11). The exceptions are a few CBSAs in the western U.S.

Thus, taking into account the approach described above, an important consideration is whether additional protection is needed against short-term exposures to peak $PM_{2.5}$ concentrations in areas meeting both the current 24-hour standard and the current, or a revised, annual standard. To the extent the evidence indicates that such exposures can lead to adverse health effects, it would be appropriate to consider alternative levels for the 24-hour standard. In considering this issue, we evaluate the evidence from key health studies. With regard to these studies, we particularly note the following:

- To the extent a revised annual standard is determined to provide adequate protection against the 24-hour and annual $PM_{2.5}$ exposures associated with health effects in key epidemiologic studies, those studies do not indicate the need for additional protection against short-term exposures to peak $PM_{2.5}$ concentrations. As discussed in detail above (section 3.2.3.2.1), epidemiologic studies provide the strongest support for reported health effect associations for the part of the air quality distribution corresponding to the bulk of the underlying data (i.e., estimated exposures and/or health events), often around the overall mean concentrations evaluated rather than near the upper end of the distribution. Consistent with this, analyses that exclude the upper end of the distribution of estimated exposures still find positive and statistically significant associations with mortality. The magnitudes of the associations in restricted analyses are similar to (Shi et al., 2016) or larger than (Di et al., 2017a) the magnitudes of the associations based on the full cohorts, suggesting that, at a minimum, short-term exposures to peak $PM_{2.5}$ concentrations are not disproportionately responsible for reported health effect associations.

- Controlled human exposure studies do provide evidence for health effects following single, short-term $PM_{2.5}$ exposures to concentrations that typically correspond to upper end of the $PM_{2.5}$ air quality distribution in the U.S. (i.e., "peak" concentrations). However, most of these studies examine exposure concentrations considerably higher than are typically measured in areas meeting the current standards (section 3.2.3.1). In particular, while controlled human exposure studies often report statistically significant effects on one or more indicators of cardiovascular function following 2-hour exposures to $PM_{2.5}$ concentrations at and above 120 μg/m$^3$ (at and above 149 μg/m$^3$ for vascular impairment, the effect shown to be most consistent across studies), 2-hour ambient concentrations of $PM_{2.5}$ at monitoring sites meeting the current standards almost never exceed 32 μg/m$^3$. In fact, even the extreme upper end of the distribution of 2-hour $PM_{2.5}$ concentrations at sites meeting the current standards remains well-below the $PM_{2.5}$ exposure concentrations consistently shown to elicit effects

(i.e., 99.9th percentile of 2-hour concentrations at these sites is 68 µg/m$^3$ during the warm season). Thus, available $PM_{2.5}$ controlled human exposure studies do not indicate the need for additional protection against exposures to peak $PM_{2.5}$ concentrations, beyond the protection provided by the combination of the current 24-hour standard and the current or a revised annual standard (section 3.2.3.1).

When the information summarized above is considered in the context of the 24-hour standard, we reach the conclusion that, in conjunction with a lower annual standard level intended to increase protection against short- and long-term $PM_{2.5}$ exposures broadly across the U.S., the evidence does not support the need for additional protection against short-term exposures to peak $PM_{2.5}$ concentrations. In particular, while epidemiologic studies do support the need to consider increasing protection against the typical 24-hour and annual $PM_{2.5}$ exposures that provide strong support for reported health effect associations, these studies do not indicate that such associations are strongly influenced by exposures to the peak concentrations in the air quality distribution. Also, while controlled human exposure studies support the occurrence of effects following single short-term exposures to $PM_{2.5}$ concentrations that correspond to the peak of the air quality distribution, these concentrations are well above those typically measured in areas meeting the current standards. Thus, in the context of a 24-hour standard that is meant to provide supplemental protection (i.e., beyond that provided by the annual standard alone) against short-term exposures to peak $PM_{2.5}$ concentrations, the available evidence supports consideration of retaining the current 24-hour standard with its level of 35 µg/m$^3$.

However, we also recognize that a different policy approach than that described above could be applied to considering the level of the 24-hour standard. For example, consideration could be given to lower 24-hour standard levels in order to increase protection across the U.S. against the broader $PM_{2.5}$ air quality distribution. If such an approach is evaluated in the current review, consideration of 24-hour standard levels at least as low as 30 µg/m$^3$ could be supported (either alone or in conjunction with a lower annual standard level). The risk assessment estimates that a level of 30 µg/m$^3$ would increase protection compared to the current standards, though only in a small number of study areas largely confined to the western U.S. (section 3.3.2). Analyses of air quality in locations of some key epidemiologic studies indicate that substantial portions of study area populations lived in locations with 24-hour $PM_{2.5}$ pseudo-design values at or below about 30 µg/m$^3$ (or that substantial portions of study health events occurred in such locations), providing additional support for considering lower levels.

If this alternative approach to revising the primary $PM_{2.5}$ standards is adopted, the uncertainty inherent in using the 24-hour standard to increase protection against the broad distribution of $PM_{2.5}$ air quality should be carefully considered. Specifically, the degree of

protection provided by any particular 24-hour standard against the typical short- and long-term $PM_{2.5}$ exposures corresponding to the middle portion of the air quality distribution will vary across locations and over time, depending on the relationship between those typical concentrations and the short-term peak $PM_{2.5}$ concentrations that are directly targeted by the 24-hour standard (i.e., with its 98th percentile form). Thus, lowering the level of the 24-hour standard is likely to have a more variable impact on public health than lowering the level of the annual standard. Depending on the 24-hour standard level set, some areas could experience reductions that are greater than warranted, based on the evidence, while others could experience reductions that are less than warranted. Therefore, the rationale supporting this approach would need to recognize and account for the uncertainty inherent in using 24-hour standard, with a 98th percentile form, to increase protection against the broad distribution of $PM_{2.5}$ air quality.

## 3.6 AREAS FOR FUTURE RESEARCH AND DATA COLLECTION

In this section, we identify key areas for additional research and data collection for fine particles, based on the uncertainties and limitations that remain in the evidence and technical information. Additional research in these areas could reduce uncertainties and limitations in future reviews of the primary $PM_{2.5}$ standards. Important areas for future research include the following:

- Further elucidating the physiological pathways through which exposures to the $PM_{2.5}$ concentrations present in the ambient air across much of the U.S. could be causing mortality and the morbidity effects shown in many epidemiologic studies. This could include the following:
  - Controlled human exposure studies that examine longer exposure periods (e.g., 24-hour as in Bräuner et al. (2008); 5-hour as in Hemmingsen et al. (2015b)), or repeated exposures, to concentrations typically measured in the ambient air across the U.S.
  - Studies that evaluate the health impacts of decreasing $PM_{2.5}$ exposures (e.g., due to changes in policies or behavior, shifts in important emissions sources, or targeted interventions).
  - Additional animal toxicological studies that evaluate exposures to low $PM_{2.5}$ concentrations.
- Additional research into “causal inference” methods in epidemiologic studies to evaluate the causal nature of relationships between $PM_{2.5}$ exposure and mortality or morbidity.
- Improving our understanding of the $PM_{2.5}$ concentration-response relationships near the lower end of the $PM_{2.5}$ air quality distribution, including the shapes of concentration-response functions and the uncertainties around estimated functions for various health outcomes and populations (e.g., older adults, people with pre-existing diseases, children).

The Honorable Andrew Wheeler, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460

*Submitted via Regulations.gov*

**RE: Comments - *Docket ID No. EPA-HQ-OAR-2015-0072:* Review of the National Ambient Air Quality Standards for Particulate Matter**

Dear Administrator Wheeler:

As national medical societies and public health and patient advocacy organizations, we write to provide comments on the U.S. Environmental Protection Agency's proposed rule on the National Ambient Air Quality Standards (NAAQS) for particulate matter (Docket ID No. EPA-HQ-OAR-2015-0072). Our organizations fully understand the public health and medical threats from particle pollution and have a strong interest in standards that adequately protect our tens of thousands of members and the millions of people whose health we work to secure.

Clear and compelling scientific evidence gained since EPA's last particulate matter NAAQS review shows that that fine particulate matter (PM 2.5) exposure is far more lethal and dangerous than previously understood. Alarmingly, scientific research shows that exposure to PM 2.5 causes adverse health outcomes at levels far below current standards. These public health impacts are wide-reaching and significant, and disproportionately affect vulnerable populations. **We accordingly oppose EPA's proposal to retain current, inadequate standards for PM 2.5, and strongly urge the agency to strengthen the standards**.

Science and public health protection must prevail over any other consideration when EPA sets the final NAAQS for particulate matter. Here, based on the best available science, and pursuant to applicable legal standards, the only appropriate course of action for EPA is to strengthen the NAAQS for PM 2.5. Accordingly, our organizations strongly urge EPA to reconsider its proposal and establish primary NAAQS for fine particulate matter at levels that protect the health of the public with an adequate margin of safety, as the Clean Air Act requires:

- Annual average PM 2.5 standard of 8 micrograms per cubic meter (µg/m3)
- 24-hour average PM 2.5 standard of 25 micrograms per cubic meter (µg/m3)

**NAAQS must protect public health with an adequate margin of safety**

In establishing a NAAQS, the Clean Air Act requires, at a minimum, that EPA achieve one thing: protect public health with an adequate margin of safety. Here, strong scientific evidence shows that the current fine particulate matter standards are not adequate to protect public health with an adequate margin of safety.

Under the Clean Air Act, EPA must select a NAAQS that is based on air quality criteria reflecting "the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air . . . ." 42 U.S.C. § 7408(a)(2). Primary NAAQS must be set at a level "requisite to protect the public health" with "an adequate margin of safety." 42 U.S.C. § 7409(b)(1).

Simply put, any standards that EPA promulgates under these provisions must be adequate to (1) protect public health and (2) provide an adequate margin of safety, in order to (3) prevent any known or anticipated health-related effects from polluted air. The Act makes clear that there are significant limitations on the discretion granted to EPA in selecting a level for the NAAQS. In exercising its judgment, EPA must err on the side of protecting public health, and may not consider cost or feasibility in connection with establishing the numerical NAAQS or other important elements of the standard (e.g., form of the standard, averaging time, etc.). The United States Court of Appeals for the D.C. Circuit summed up EPA's mandate succinctly:

> Based on these comprehensive [air quality] criteria and taking account of the 'preventative' and 'precautionary' nature of the act, the Administrator must then decide what margin of safety will protect the public health from the pollutant's adverse effects – not just known adverse effects, but those of scientific uncertainty or that 'research has not yet uncovered.' Then, and without reference to cost or technological feasibility, the Administrator must promulgate national standards that limit emissions sufficiently to establish that margin of safety.

*American Lung Ass'n v. EPA*, 134 F.3d 388, 389 (D.C. Cir. 1998); see also *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 464-71 (2001).

**EPA must err on the side of protecting public health when there is scientific uncertainty**

Courts have properly characterized the NAAQS as "preventative in nature." *Ethyl Corp. v. EPA*, 541 F.2d 1, 15 (D.C. Cir. 1976). The Act's mandate requires that in considering uncertainty, EPA must err on the side of caution in terms of protecting human health and welfare. As the D.C. Circuit has held, "The Act requires EPA to promulgate protective primary NAAQS even where … the pollutant's risks cannot be quantified or 'precisely identified as to nature or degree.'" *Am. Trucking Ass'ns v. EPA*, 283 F.3d 355, 369 (D.C. Cir. 2002).

In keeping with the precautionary and preventative nature of the NAAQS, EPA must set a standard that protects against potential health effects—not just those impacts that have been well established by science. See *Am. Trucking Ass'ns*, 283 F.3d at 369 (citing Ozone NAAQS, 62 Fed. Reg. 38857 (section 109(b)(1)'s "margin of safety requirement was intended to address uncertainties associated with inconclusive scientific and technical information … as well as to

provide a reasonable degree of protection against hazards that research has not yet identified"); see also *API v. EPA*, 684 F.3d 1342, 1352 (D.C. Cir. 2012).

In a seminal NAAQS case, the D.C. Circuit found that Congress "specifically directed the Administrator to allow an adequate margin of safety to protect against effects which have not yet been uncovered by research and effects whose medical significance is a matter of disagreement." *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1154 (D.C. Cir. 1980). Limited data are not an excuse for failing to establish the level at which there is an absence of adverse effect. To the contrary, "Congress' directive to the Administrator to allow an 'adequate margin of safety' alone plainly refutes any suggestion that the Administrator is only authorized to set primary air quality standards which are designed to protect against health effects that are known to be clearly harmful." *Id.* at 1154-55.

**EPA must establish NAAQS that protect vulnerable subpopulations**

The NAAQS must be set at levels that are not only adequate to protect those with no enhanced vulnerability to air pollution, but that also guard against adverse effects in vulnerable subpopulations, such as children, the elderly, people with heart and lung disease, people of color, and people with low socioeconomic status. In fact, courts have repeatedly found that if a certain level of a pollutant "adversely affects the health of these sensitive individuals, EPA must strengthen the entire national standard." *American Lung Ass'n*, 134 F.3d at 390 (citations omitted); see also *American Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 524 (D.C. Cir. 2009); *Coalition of Battery Recyclers Ass'n v. EPA*, 604 F.3d 613, 618 (D.C. Cir. 2010).

EPA must likewise build into the NAAQS an adequate margin of safety for these sensitive subpopulations. *Am. Farm Bureau Fed'n*, 559 F.3d at 526. In other words, NAAQS must "be set at a level at which there is 'an absence of adverse effect' on these sensitive individuals." *Lead Indus. Ass'n*, 647 F.2d at 1153.

**New scientific research shows that PM 2.5 can cause numerous adverse health effects at levels far below the current NAAQS**

Overwhelming evidence shows that PM 2.5 can kill. Particle pollution can increase the risk of heart disease, lung cancer and asthma attacks and can interfere with the growth and work of the lungs. Over 10,000 peer-reviewed scientific studies over the past two decades have shed substantial light on the serious and diverse health effects from breathing PM 2.5.

Studies published since EPA's last review of particle pollution standards have improved our understanding of the extent and range of health effects of fine particulate matter. Alarmingly, these newer studies confirm adverse health effects at exposures much lower than current national air quality limits. The new evidence reinforces already strong existing studies and supports the conclusion that PM 2.5 can cause numerous adverse health effects in humans, at exposure levels far below the current standards.

Following its latest review of the current research on fine particle pollution, EPA concluded in written findings published in December 2019[1] that breathing PM 2.5 poses serious health threats, including the following:

- Causes early death (both short-term and long-term exposure);
- Causes cardiovascular harm (e.g., heart attacks, strokes, heart disease, congestive heart failure);
- Likely to cause respiratory harm (e.g., worsened asthma, worsened COPD, inflammation);
- Likely to cause cancer;
- Likely to cause harm to the nervous system (e.g., reduced brain volume, cognitive effects);
- May cause reproductive and developmental harm

—U.S. Environmental Protection Agency, *Integrated Science Assessment for Particulate Matter*, December 2019. EPA 600/R-19/188.

Significant for purposes of the present PM review, even at levels that meet current NAAQS, exposure to short-term PM 2.5 can be deadly. A 2016 study found that people aged 65 and older in New England faced a higher risk of premature death from particle pollution, even in places that met current standards for short-term particle pollution.[2] Another study in 2017 looked more closely at Boston and found a similar higher risk of premature death from particle pollution in a city that meets current limits on short-term particle pollution.[3] Looking nationwide in a 2017 study, researchers found more evidence that older adults faced a higher risk of premature death even when levels of short-term particle pollution remained well below the current national standards. This was consistent whether the older adults lived in cities, suburbs or rural areas.[4] Some of the strongest research has documented that short-term exposure to particle pollution causes premature death from respiratory and cardiovascular causes.[5]

It has long been known that breathing high levels of particle pollution day in and day out can be deadly, but recent research has confirmed that long-term exposure to particle pollution still kills,

---

[1] U.S. EPA, *Integrated Science Assessment (ISA) for Particulate Matter* (Final Report, 2019). U.S. Environmental Protection Agency, Washington, DC, EPA/600/R-19/188, 2019. Available at https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=347534.

[2] Shi L, Zanobetti A, Kloog I, et. al. Low-concentration PM2.5 and mortality: estimating acute and chronic effects in a population-based study. Environ Health Perspect. 2016;124:46-52. http://dx.doi.org/10.1289/ehp.1409111.

[3] Schwartz J, Bind MA, Koutrakis P. Estimating causal effects of local air pollution on daily deaths: Effect of low levels. Environ Health Perspect. 2017; 125:23-29. http://dx.doi.org/10.1289/EHP232.

[4] Di Q, Dai L, Wang Y, Zanobetti A, Choirat C, Schwartz JD, Dominici F. Association of Short-Term Exposure to Air Pollution with Mortality in Older Adults. JAMA. 2017;318:2446-2456.

[5] U.S. EPA, 2019, Section 11.1.

even with the declining levels in the U.S. since 2000[6] and even in areas, such as New England, that meet the current standard for year-round particle pollution.[7]

In 2013, the International Agency for Research on Cancer (known as IARC), part of the World Health Organization, concluded that particle pollution causes lung cancer. The IARC based its decision on the review of multiple studies from the U.S., Europe, and Asia and the presence of carcinogens on the particles.[8]

Studies examining the impact on the nervous system of long-term exposure to particle pollution have found links to cognitive affects in adults including reduced brain volume, cognitive decrements and dementia.[9] Scientists have found evidence that particle pollution may impact pregnancy and birth outcomes, such as preterm birth, low birth weight and fetal and infant mortality.[10]

It is clear from these many rigorous studies over the recent past that both the 24-hour and annual standard for PM 2.5 fail to protect public health. The newer studies validate and extend earlier research linking both acute and chronic fine particle pollution with serious morbidity and mortality. The newer research has also expanded our understanding of the range of health outcomes associated with PM, and has identified adverse respiratory and cardiovascular health effects at lower exposure levels than previously reported. Such a conclusion demands prompt action to protect human health.

**Disparities in the impact of air pollution call for more protection**

The burden of air pollution is not evenly shared. The list of populations who risk demonstrated harm from PM 2.5 has grown significantly since the previous review. Newer evidence shows that Black, Asian, and Hispanic persons, and persons who were eligible for Medicaid (i.e., those with low socioeconomic status), have a higher estimated risk of death from any cause in association with PM 2.5 exposure than the general population.[11] Health-based standards must be set at levels that will protect all people, but particularly these sensitive groups.

Poorer people and some racial and ethnic groups are among those who often face higher exposure to pollutants and who may experience greater responses to such pollution. Many studies have explored the differences in harm from air pollution to racial or ethnic groups and people who are in a low socioeconomic position, have less education, or live nearer to major sources of

[6] Thurston GD, Ahn J, Cromar KR, et al. Ambient particulate matter air pollution exposure and mortality in the NIH-AARP Diet and Health Cohort. Environ Health Perspect. 2015;124:484-490; Lepeule J, Laden F, Douglas Dockery D, and Schwartz J. Chronic exposure to fine particles and mortality: An extended follow-up of the Harvard Six Cities Study from 1974 to 2009. Environ Health Perspect. 2012;120:965-970.
[7] Shi L, Zanobetti A, et al. Low-concentration PM2.5 and mortality: estimating acute and chronic effects in a population-based study. Environ Health Perspect. 2015;124:46-52.
[8] Hamra GB, Guha N, Cohen A, et. al. Outdoor particulate matter exposure and lung cancer: A systematic review and meta-analysis. Environ Health Perspect. 2014;122:906-911.
[9] U.S. EPA, 2019, Section 8.2.9.
[10] U.S. EPA, 2019, Section 9.1.2, especially Section 9.1.2.3.1. and Section 9.1.2.6.
[11] Di Q, Wang Yan, Zanobetti A, Wang Yun, Koutrakis P, Choirat C, Dominici F, Schwartz JD. Air Pollution and Mortality in the Medicare Population. N Engl J Med 2017; 376:2513-2522.

pollution,[12] including a workshop the American Lung Association held in 2001 that focused on urban air pollution and health inequities.[13] The most recent EPA review of the research on the health effects of particle pollution concluded that nonwhite populations, especially Blacks, faced higher risk from particle pollution.[14]

Many studies have looked at differences in the impact of air pollution on premature death. Recent studies have looked at the mortality in the Medicaid population and found that those who live in predominantly Black or African American communities suffered greater risk of premature death from particle pollution than those who live in communities that are predominantly white.[15] Another large study found that Hispanics and Asians, but especially Blacks, had a higher risk of premature death from particle pollution than whites did. This study found that income did not drive the differences. Higher-income Blacks who had higher income than many whites still faced greater risk than those whites, suggesting that the impact of other factors such as chronic stress as a result of discrimination may be playing a role.[16] Other researchers have found greater risk for African Americans from hazardous air pollutants, including those pollutants that also come from traffic sources.[17] Due to decades of residential segregation, African Americans tend to live where there is greater exposure to air pollution.[18]

Socioeconomic position also appears tied to greater harm from air pollution, and multiple large studies show evidence of that link. Low socioeconomic status consistently increased the risk of premature death from fine particle pollution among 13.2 million Medicare recipients studied in the largest examination of particle pollution-related mortality nationwide.[19] In a 2008 study that found greater risk for premature death for communities with higher African American populations, researchers also found greater risk for people living in areas with higher unemployment or higher use of public transportation.[20] A 2008 study of Washington, DC, likewise found that poor air quality

---

[12] Institute of Medicine. Toward Environmental Justice: Research, Education, and Health Policy Needs. Washington, DC: National Academy Press, 1999; O'Neill MS, Jerrett M, Kawachi I, et al. Health, wealth, and air pollution: Advancing theory and methods. Environ Health Perspect. 2003;111:1861-1870; Finkelstein MM, Jerrett M, DeLuca P, et al. Relation between income, air pollution and mortality: A cohort study. CMAJ. 2003;169:397-402; Zeka A, Zanobetti A, Schwartz J. Short term effects of particulate matter on cause specific mortality: effects of lags and modification by city characteristics. Occup Environ Med. 2006;62:718- 725.

[13] American Lung Association. Urban air pollution and health inequities: A workshop report. Environ Health Perspect. 2001; 109 (suppl 3): 357-374.

[14] U.S. EPA, 2019, Section 12.5.4

[15] Kioumourtzoglou MA, Schwartz J, James P, Dominici F, Zanobetti A. PM2.5 and mortality in 207 us cities: Modification by temperature and city characteristics. Epidemiology, 2016;27:221-227.

[16] Di Q, et al, N Engl J Med, 2017.

[17] Apelberg BJ, Buckley TJ, White RH. Socioeconomic and racial disparities in cancer risk from air toxics in Maryland. Environ Health Perspect. 2005;113:693-699.

[18] Nardone A, Casey JA, Morello-Frosch R, Mujahid M, Balmes JR, Thakur N. Associations between historical residential redlining and current age-adjusted rates of emergency department visits due to asthma across eight cities in California: an ecological study. Lancet Planet Health. 2020;4(1):e24-e31.

[19] Zeger SL, Dominici F, McDermott A, Samet J. Mortality in the Medicare population and chronic exposure to fine particulate air pollution in urban centers (2000-2005). Environ Health Perspect. 2008;116:1614-1619.

[20] Bell ML, Dominici F. Effect modification by community characteristics on the short-term effects of ozone exposure and mortality in 98 US communities. Am J Epidemiol. 2008;167:986-997.

and worsened asthma went hand in hand in areas where Medicaid enrollment was high.[21] A 2016 study of New Jersey residents found that the risk of dying early from long-term exposure to particle pollution was higher in communities with larger African American populations, lower home values and lower median income.[22] Studies of Atlanta, GA, found that particle pollution increased the risk of asthma attacks for ZIP Codes where poverty was high and among people eligible for Medicaid.[23]

People of color also may be more likely to live in counties with higher levels of pollution. Non-Hispanic Blacks and Hispanics were more likely to live in counties that had worse problems with particle pollution, researchers found in a 2011 analysis. Income groups, by contrast, differed little in these exposures. However, since few rural counties have monitors, the primarily older, non-Hispanic white residents of those counties lack information about the air quality in their communities.[24]

Unemployed people, those with low income or low education and non-Hispanic Blacks were found to be more likely to live in areas with higher exposures to particle pollution in a 2012 study. However, the different racial/ethnic and income groups were often breathing very different kinds of particles; the different composition and structure of these particles may have different health impacts.[25]

EPA's proposal to retain outdated and inadequate PM 2.5 standards creates additional and unacceptable risks to these vulnerable communities, and also violates the Clean Air Act's requirement to build into the NAAQS an adequate margin of safety for sensitive and vulnerable subpopulations.

**Emerging links with the COVID-19 pandemic**

While the emerging nature of COVID-19 means that much uncertainty remains, early evidence suggests links between exposure to PM 2.5 and more severe disease outcomes. It is long-established that air pollution exposure is linked to greater risk of respiratory infections. Now, specific to the COVID-19 pandemic, a recent study from Harvard's School of Public Health found that an increase of only 1 $\mu g/m^3$ in long-term average exposure to PM 2.5 is associated with an 8% increase in the COVID-19 death rate.[26] While more research is clearly needed into this topic, the

---

[21] Babin S, Burkom H, Holtry R, et al. Medicaid patient asthma-related acute care visits and their associations with ozone and particulates in Washington, DC, from 1994-2005. Int J Environ Health Res. 2008;18(3):209-221.

[22] Wang Y, Kloog I, Coul BA, Kosheleva A, Zanobetti A, Schwartz JD. Estimating causal effects of long-term PM2.5 exposure on mortality in New Jersey. Environ Health Perspect. 2016;124:1182-1188.

[23] O'Lenick, CR, Winquist A, Mulholland JA, et al. Assessment of neighbourhood-level socioeconomic status as a modifier of air pollution-asthma associations among children in Atlanta. J Epi Comm Health. 2017;71(2):129-136; Strickland MJ, Klein M, Flanders WD, et al. Modification of the effect of ambient air pollution on pediatric asthma emergency visits: susceptible subpopulations, Epidemiology. 2014;25:843-850.

[24] Miranda ML, Edwards SE, Keating MH, Paul CJ. Making the environmental justice grade: The relative burden of air pollution exposure in the United States. Int J Environ Res Public Health. 2011;8:1755-1771.

[25] Bell ML, Ebisu K. Environmental inequality in exposures to airborne particulate matter component in the United States. Environ Health Perspect. 2012; 120:1699–1704.

[26] Wu X, Nethery RC, Sabath MB, Braun D, Dominici F. Exposure to air pollution and COVID-19 mortality in the United States: A nationwide cross-sectional study, 2020. medRxiv 2020.04.05.20054502; doi: https://doi.org/10.1101/2020.04.05.20054502

potential for links between PM 2.5 exposure and COVID-19 provides further justification for stronger standards.

**Scientific consensus for stronger standards**

Widespread consensus exists in the scientific and medical community that the current air quality standards for PM 2.5 are not protective of public health, and must be strengthened to save lives. A broad spectrum of public health and medical organizations called for stricter PM 2.5 standards during the last review than were ultimately finalized, including the American Lung Association, American Heart Association, American Public Health Association, and American Thoracic Society.[27]

Moreover, the Independent Particulate Matter Review Panel (IPMRP)[28] determined that the current fine particle standards are not protective of public health. Relying on studies published since 2012 that show exposure to PM 2.5 causes premature death at concentrations below current standards, the IPMRP recommended that EPA to strengthen both the annual and 24-hour standards. According to the IRMRP:

> US multicity epidemiological studies, supported by consistent results from Canadian multicity epidemiologic studies, consistent results from accountability studies, and coherent results from animal toxicological and controlled human exposure studies, provide clear and compelling scientific evidence that the current PM 2.5 standards are not adequate to protect human health. The epidemiological evidence is based on different locations, study designs, and statistical approaches, which enhances its robustness.[29]

In addition, EPA staff scientists in the EPA Office of Air Quality Planning and Standards reviewed the adequacy of the current primary PM 2.5 standards, and concluded: "**the available scientific evidence, air quality analyses, and the risk assessment … can reasonably be viewed as calling into question the adequacy of the public health protection afforded by the combination of the current annual and 24-hour primary PM 2.5 standards**."[30] In reaching this conclusion, EPA staff highlighted the following:

- There is a long-standing body of strong health evidence demonstrating relationships between long- or short-term PM 2.5 exposures and a variety of outcomes, including

[27] https://www.lung.org/getmedia/4cf8b993-18b2-4aac-870d-b43cb80f1ba5/epa-proposed-particle-soot-standard.pdf.pdf

[28] The Independent Particulate Matter Review Panel consists of members of the EPA Clean Air Scientific Advisory Committee (CASAC) Particulate Matter (PM) Review Panel that was dismissed without notice in October 2018.

[29] Frey HC, Adams P, Adgate JL, et al. Advice from the Independent Particulate Matter Review Panel (formerly EPA CASAC Particulate Matter Review Panel) on EPA's policy assessment for the review of the National Ambient Air Quality Standards for particulate matter (external review draft — September 2019), submitted to Hon. Andrew Wheeler, Administrator, docket ID no. EPA–HQ–OAR–2015–0072, and Clean Air Scientific Advisory Committee, U.S. Environmental Protection Agency. Washington, DC: October 22, 2019 Accessed at https://yosemite.epa.gov/sab/sabproduct.nsf/81DF85B5460CC14F8525849B0043144B/%24File/Independent+Particulate+Matter+Review+Panel+Letter+on+Draft+PA.pdf

[30] U.S. EPA. Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter, January 2020. EPA-452/R-20-002. (Section 3.5.1, page 3-106, 3-107). Accessed at https://www.epa.gov/sites/production/files/2020-01/documents/final_policy_assessment_for_the_review_of_the_pm_naaqs_01-2020.pdf.

mortality and serious morbidity effects. Studies published since the last review have reduced key uncertainties and broadened our understanding of the health effects that can result from exposures to PM 2.5.

- Recent U.S. and Canadian epidemiologic studies provide support for generally positive and statistically significant health effect associations across a broad range of ambient PM 2.5 concentrations, including for air quality distributions with overall mean concentrations lower than in the last review and for distributions likely to be allowed by the current primary PM 2.5 standards.
- Analyses of PM 2.5 pseudo-design values additionally support the occurrence of positive and statistically significant health effect associations based largely on air quality likely to have met the current annual and 24-hour primary standards.
- The risk assessment estimates that the current primary PM 2.5 standards could allow a substantial number of PM 2.5-associated deaths in the U.S. The large majority of these estimated deaths are associated with the annual average PM 2.5 concentrations near (and above in some cases) the average concentrations in key epidemiologic studies reporting positive and statistically significant health effect associations.

—U.S. Environmental Protection Agency, *Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter*, January 2020. EPA-425/R-20-002.

**EPA's inadequate process for this revie**w

The process that EPA used to arrive at its proposal to keep the current standards was deeply flawed. In previous reviews, the agency convened a panel of expert scientists to help review the recent research and recommend appropriate pollution limits. Such a review panel added breadth, depth and diversity of scientific expertise. This time, EPA Administrator Wheeler disbanded the agency's Particulate Matter Review Panel (PMRP), which nevertheless convened as the IPMRP and provided comments to EPA in support of strengthening the standards (see above.) EPA replaced the PMRP with an inadequate alternative that lacked equivalent expertise, could only respond to written questions, and restricted the review of scientific studies.

EPA also rushed to complete its review on an unreasonably tight timeline that did not allow for sufficient consideration of the scientific evidence. A process that typically takes years to complete was done in a matter of months. While EPA should certainly work to meet the five-year review timeframe for the NAAQS established in the Clean Air Act, starting the process late and then skipping steps to rush the timeframe is clearly not an adequate option to protect public health. In particular, we are deeply concerned that EPA departed from the past process that included the drafting of three separate, critical documents - an Integrated Scientific Assessment, a Risk and Exposure Assessment and a Policy Assessment – and completed this review without a stand-alone Risk and Exposure Assessment. Further, the Policy Assessment was drafted prior to the completion of the Integrated Science Assessment. This proposal falls short of the rigorous scientific review that the Clean Air Act requires.

**Conclusion**

EPA's proposed fine particulate matter standards are at odds with the best available science, endanger public health, and violate the Clean Air Act. Given the weight of the evidence, and in order to satisfy its legal obligation to protect against known and anticipated adverse health effects with an adequate margin of safety, **EPA must set the primary annual PM 2.5 standard at 8 μg/m3 and the 24-hour average PM 2.5 standard at 25 μg/m3.**

Thank you for considering our comments.

Allergy & Asthma Network

Alliance of Nurses for Healthy Environments

American Academy of Pediatrics

American Heart Association

American Lung Association

American Public Health Association

American Thoracic Society

Asthma and Allergy Foundation of America

Center for Climate Change and Health

Children's Environmental Health Network

Health Care Without Harm

International Society for Epidemiology -- North American Chapter

Medical Society Consortium on Climate and Health

National Association of County and City Health Officials

National Environmental Health Association

Public Health Institute

Regional Asthma Management and Prevention

June 29, 2020

Andrew Wheeler, Administrator
Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington, D.C. 20460

**RE: National Ambient Air Quality Standards for Particulate Matter; Proposed Rule Docket No. EPA-HQ-OAR-2015-0072**

Dear Administrator Wheeler,

We, the undersigned organizations, strongly oppose the proposal to retain the current, inadequate National Ambient Air Quality Standard for Particulate Matter and respectfully urge that the Environmental Protection Agency ("EPA") strengthen the standards to protect health and vulnerable communities with an adequate margin of safety.

Consistent with the most recent health science, we urge you to strengthen the annual health standard for fine particulate matter to 8 micrograms per cubic meter and we recommend the 24-hour standard be strengthened to 25 micrograms per cubic meter, levels that are requisite to protect public health with an adequate margin of safety. Particulate matter is a deadly pollutant that causes asthma attacks, heart attacks, strokes, and premature deaths. Children, older adults, people with lung and heart disease and low-income individuals face the greatest risk of health consequences.[1]

The latest health science clearly warrants a more protective standard. The body of evidence shows serious health harms caused by exposure to particulate matter at levels *below* the current standard. The agency's own analysis estimated that even if air quality around the country met the current standard, about 50,000 Americans per year would still suffer early deaths due to particulate matter.[2] The agency's science assessment includes robust evidence of mortality risks at levels as low as 8 micrograms per cubic meter, and increased precision in the risks estimates of exposures at levels below the current annual standard.[3]

The current COVID-19 public health crisis has illustrated just how crucial it is that public health standards are adequately protective of the most vulnerable members of society: the U.S. Centers for Disease Control and Prevention has identified heightened vulnerability for severe illness among Americans who already suffer from heart and lung disease, both of which can be caused

---

[1] U.S. EPA. Integrated Science Assessment (ISA) for Particulate Matter (Final Report, 2019). U.S. Environmental Protection Agency, Washington, DC, EPA/600/R-19/188, 2019.
[2] U.S. EPA. Policy Assessment (PA) for Particulate Matter (Final Report, 2020). U.S. Environmental Protection Agency, Washington, DC, EPA/452/R-20/002, 2020.
[3] U.S. EPA. Integrated Science Assessment (ISA) for Particulate Matter (Final Report, 2019). U.S. Environmental Protection Agency, Washington, DC, EPA/600/R-19/188, 2019.

by exposure to particulate matter.[4] The agency's failure to propose an adequate standard puts tens of thousands of people at risk not only of damaged cardiovascular and respiratory systems, but also increases their vulnerability to serious illnesses like COVID-19.

Based on the overwhelming body of scientific evidence, EPA's clear legal duties under the Clean Air Act, and the importance of air quality standards that adequately protect those most at risk, we respectfully urge the agency to finalize stronger standards that protect human health and the environment.

Sincerely,

**ACHIEVING COMMUNITY TASKS SUCCESSFULLY (ACTS)**

**AIR ALLIANCE HOUSTON**

**APPALACHIAN MOUNTAIN CLUB**

**CENTER FOR BIOLOGICAL DIVERSITY**

**CENTER FOR NEIGHBORHOOD TECHNOLOGY (CNT)**

**CLEAN POWER LAKE COUNTY**

**CLEAN WATER ACTION**

**CITIZENS AGAINST RUINING THE ENVIRONMENT**

**ENDANGERED SPECIES COALITION**

**EARTHJUSTICE**

**ENVIRONMENT AMERICA**

**ENVIRONMENTAL COMMUNITY ADVOCATES OF GALENA PARK**

**ENVIRONMENTAL DEFENSE FUND**

**ENVIRONMENTAL INTEGRITY PROJECT**

**ENVIRONMENTAL LAW & POLICY CENTER**

**ENVIRONMENT TEXAS**

**FRIENDS OF THE EARTH**

**GASP (BIRMINGHAM, ALA.)**

---

[4] U.S. CDC. "Coronavirus Disease 2019: People Who Are At Higher Risk" https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html

**GROUP AGAINST SMOG AND POLLUTION (PITTSBURGH, PA)**

**LEAGUE OF CONSERVATION VOTERS**

**MOMS CLEAN AIR FORCE**

**NATURAL RESOURCES DEFENSE COUNCIL**

**PARTNERSHIP FOR POLICY INTEGRITY**

**PUBLIC CITIZEN**

**U.S. PUBLIC INTEREST RESEARCH GROUP**

**WEACT FOR ENVIRONMENTAL JUSTICE**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

| | | |
|---|---|---|
| ***Review of the National Ambient Air Quality Standards for Particulate Matter, 85 Fed. Reg. 24,094*** | ) ) ) ) | ***Docket ID No. EPA–HQ–OAR–2015–0072*** *Submitted via Regulations.gov* *June 29, 2020* |

Clean Air Task Force, Earthjustice, Environmental Defense Fund, Environmental Law & Policy Center, Environmental Protection Network, Natural Resources Defense Council, National Parks Conservation Association, Sierra Club, Union of Concerned Scientists, Chesapeake Bay Foundation, Environment America, and U.S. Public Interest Research Group ("NGO Commenters") respectfully submit the following comments on the Environmental Protection Agency's ("EPA") "Review of the National Ambient Air Quality Standards for Particulate Matter," 85 Fed. Reg. 24,094 (Apr. 30, 2020). Our organizations represent millions of members and supporters across the country who are deeply concerned about the health, environmental, and economic impacts of air pollution and support implementation of strong, science-based National Ambient Air Quality Standards ("NAAQS") that ensure public health and the environment are protected.

Our comments discuss the following:


I. Introduction ........ 2

II. EPA's Legal Obligations in Setting and Reviewing the NAAQS ........ 3

III. EPA has Failed to Comply with the Clean Air Act's Requirements for Reviewing the NAAQS ........ 8

IV. EPA's Review of the $PM_{2.5}$ NAAQS Involved Critical Process Failures That Have Compromised the Basis for the Proposal. ........ 16

V. EPA's Proposal is Unlawful Because the Latest Scientific Knowledge Shows the Current Standard Is Not Requisite to Protect Public Health Within an Adequate Margin Of Safety ........ 34

VI. Administrator Wheeler's Proposed Decision to Retain the Primary Standards for $PM_{2.5}$ is Arbitrary and Unlawful ........ 75

VII. The Administrator's Reliance on Fringe Scientific Arguments by an Understaffed CASAC is Undercut by EPA's Own Final Assessments of the Science, the Assessment by the Disbanded PM Panel and the Substantial Body of the Most Recent Accountability and Related Studies

of $PM_{2.5}$ Reductions, as well as Other Causal Inference Studies Published After January 2018 .... 83

VIII. EPA Failed to Conduct Required Analyses Including an Adequate Environmental Justice Assessment under Executive Order 12,898 .... 112

IX. EPA's Proposal Process Further Demonstrates that It's Proposed Decision to Leave the $PM_{2.5}$ Standard Unchanged is Unsupported and Unlawful. .. 115

X. EPA's Secondary PM Standards Proposal Is Entirely Unsupported by Science or Policy Rationales and Fails to Protect Public Welfare .... 118

XI. Conclusion and Summary of Recommendations .... 179

## I. Introduction

Establishing the National Ambient Air Quality Standards ("NAAQS") for particulate matter ("$PM_{2.5}$") is one of the most consequential actions EPA takes to protect Americans' health and welfare. Under the Clean Air Act, EPA's review of the NAAQS must "accurately reflect" the "latest scientific knowledge." 42 U.S.C. § 7408(a)(2). The review must be "thorough." *Id.* § 7409(d)(1). The Clean Air Act also requires that EPA select standards which are requisite to protect public health and welfare, and which provide an adequate margin of safety to protect public health. It is a task which EPA should approach with the deepest sense of responsibility, because the decision's effects on public health and welfare are profound, and the law requires EPA to select a standard without relying on cost or technical feasibility of the standards set.

The proposal, however, does not set standards at the levels the statute's directive demands. It flies in the face of a coherent body of evidence which mandates strengthening revisions to the primary annual and 24-hour $PM_{2.5}$ standards, and the secondary welfare standard, to provide the requisite protection of health and welfare. It provides no margin of safety; indeed, the issue is not even addressed. The proposal results from a review process that marginalized scientific expertise, in part overseen by an advisory committee whose members lack the needed expertise to determine what the air quality criteria are, much less to conduct the thorough review the statute specifies. This followed the EPA Administrator's unlawful blocking of persons with that expertise from serving on the committee. The Administrator's rationale for not revising the standards, which is grounded in the notion that the science is "uncertain," is contrary to the evidence of record, and antithetical to the precautionary mandate of the Act. The statutory commands to provide requisite protection and an adequate margin of safety cannot be evaded by invoking nebulous and inflated uncertainties.

As we explain herein, these problems with the proposal require that the agency reverse course and reopen the process or finalize stronger revised standards that provide the protections the law requires. Given the evidence, NGO Commenters recommend an annual primary standard of 8 $\mu g/m^3$ and tightening the 24-hour standard to provide adequate protection. The NGO commenters

further recommend that EPA consider readily available scientific information, which supports strengthening the level of the secondary NAAQS and aligning the monitoring methods—in numeric standard and averaging time—with today's science to correlate with how the public perceives visibility. The existing record supports these actions now.

**II. EPA's Legal Obligations in Setting and Reviewing the NAAQS**

A. EPA's role in setting and revising the NAAQS

The Clean Air Act Amendments of 1970 first introduced the requirement to establish enforceable NAAQS. The amendments were intended to be "a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution." *Union Electric Co. v. EPA*, 427 U.S. 246, 256 (1976). The 1970 amendments "carrie[d] the promise that ambient air in all parts of the country shall have no adverse effects upon any American's health." 116 Cong. Rec. 42,329, 42,381 (Dec. 18, 1970) (remarks of Senator Muskie).

The NAAQS drive the Clean Air Act's requirements for controlling emissions of conventional air pollutants. Once EPA establishes NAAQS, states and EPA identify those geographic areas that fail to meet the standards. 42 U.S.C. § 7407(d). Each state must prepare an "implementation plan" designed to control pollutant emissions in order to reduce the ambient concentrations of the pollutant to below the level of the NAAQS and maintain that improved air quality. *Id.* § 7410.

The Clean Air Act provides a clear process for establishing the NAAQS. The first step in establishing NAAQS involves identifying those pollutants, the "emissions of which, in [EPA's] judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare," and "the presence of which in the ambient air results from numerous or diverse mobile or stationary sources." *Id.* §§ 7408(a)(1)(A), (B). Once EPA identifies a pollutant, it must select a NAAQS that is based on air quality criteria that "shall accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air." *Id.* § 7408(a)(2).

Primary NAAQS must be set at a level "requisite to protect the public health" with "an adequate margin of safety." *Id.* § 7409(b)(1). To ensure that the NAAQS keep pace with scientific understanding and continue to provide the necessary protection, EPA must review and revise as appropriate the underlying air quality criteria and the NAAQS themselves at least every five years. *Id.* § 7409(d)(1). Any primary NAAQS that EPA promulgates under these provisions must be adequate to protect public health and provide an adequate margin of safety, in order to prevent not only any known or anticipated health-related effects from polluted air, but also those that are scientifically uncertain or that research has not yet uncovered. Further, the statute makes clear that there are significant limitations on the discretion granted to EPA in selecting a level for the

More basically, the deadline is not a valid basis for substantively compromising the review. The statute still requires any decision to be based on the air quality criteria, which in turn are to be "useful" and to "accurately reflect the latest scientific knowledge." 42 U.S.C. § 7408(a)(2). The CASAC-approved IRP indicates what is necessary to properly fulfill those requirements. In particular, a second draft ISA is necessary not only to assess the science but also to augment the initial draft with further science emerging from the CASAC review and public comment process.

B. CASAC failed to conduct a meaningful scientific review of the ISA and PA.

1. EPA banned scientists from serving on committees (including CASAC) if they receive EPA grants, an unlawful, arbitrary and capricious policy

The Administrator's reliance on certain CASAC recommendations during this NAAQS review is unlawful and arbitrary because the Agency illegally limited the pool of potential appointees when selecting most of the members based on a directive issued by former EPA Administrator E. Scott Pruitt: "Strengthening and Improving Membership on EPA Federal Advisory Committees," U.S. Environmental Protection Agency, October 31, 2017 ("Pruitt directive"). That policy was rejected as arbitrary and capricious by both the D.C. Circuit and the Southern District of New York. *Physicians for Soc. Responsibility v. Wheeler*, 956 F.3d 634 (D.C. Cir. 2020); *Nat. Res. Def. Council v. EPA*, No. 19-cv-05174, 2020 WL 615072 (S.D.N.Y. Feb. 20, 2020) ("NRDC"). *See also Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 20 (1st Cir. 2020) (ruling the policy is judicially reviewable and remanding to the District of Massachusetts for further proceedings).

In the October 2017 directive, Administrator Pruitt announced that EPA would no longer allow scientists who have received grants from the agency to serve on its scientific committees. EPA grants are awarded through a competitive process and, therefore, researchers who receive those grants are often leading experts in their fields. As the D.C. Circuit recognized, this directive represented "a major break from the agency's prior policy, under which grantees regularly served on advisory committees." *Physicians for Soc. Responsibility,* 956 F.3d at 645.

The Southern District of New York declared EPA's exclusion of these experts arbitrary and capricious because, among other things, EPA failed to explain "why an outright ban on EPA grant recipients would improve the existing policies that required demanding and continuous conflict of interest reviews[.]" *Nat. Res. Def. Council*, No. 19-cv-05174, 2020 WL 615072, at *8 (Feb. 10, 2020) . The D.C. Circuit faulted EPA because it "nowhere confront[ed] the possibility that excluding grant recipients—that is, individuals who EPA has independently deemed qualified enough to receive competitive funding—from advisory committees might exclude" the candidates who are "'the most qualified, knowledgeable, and experienced[.]'" *Physicians for*

*Soc. Responsibility*, 956 F.3d at 647. The Southern District issued an order vacating the Pruitt directive on April 15, 2020, pronouncing these flaws "serious." *Nat. Res. Def. Council v. EPA*, No. 19-cv-05174, 2020 WL 2769491 (S.D.N.Y. Apr. 15, 2020). EPA has chosen not to appeal.[45] Accordingly, the Pruitt directive is void.

Because the CASAC advising EPA on this NAAQS review was illegally and arbitrarily constituted, EPA cannot lawfully rely on the advice of that CASAC for the proposed or final action in this matter. Due to the Pruitt directive, numerous scientists were illegally barred from even being considered for CASAC membership. Accordingly, CASAC's recommendations—on which the proposed action at issue here heavily relies—are legally void and the Administrator cannot lawfully rely on them.

The exclusion of scientists from CASAC based on the Pruitt directive thus rendered the decision-making process arbitrary. It was arbitrary for EPA both to take and to rely on advice from the illegally and arbitrarily formed CASAC, as described above. Further, had the Agency adhered to its longstanding practice, the pool of potential CASAC members would have included researchers with more expertise and experience with CASAC reviews. As the D.C. Circuit noted, "[t]he Administrator's failure to address [Office of Government Ethics] and EPA's contrary conclusions is especially glaring given that the prior regime existed, in part, for the very purpose of facilitating the critical role played by EPA's scientific advisory committees." *Physicians for Soc. Responsibility,* 956 F.3d at 647. Instead, the Agency relied on a policy that was based on specious concerns about independence and conflicts of interest to hinder the committees' work. The decision criteria relied upon in the policy were arbitrary, unlawful, and unrelated to expertise. It is worth noting EPA had expressed no concerns about members who work for or are funded by industries or government entities subject to EPA regulation. Indeed, members from industry or government comprised the majority of the CASAC's membership during this review.

In summary, EPA undermined its own ability to find and appoint qualified scientists with the necessary expertise to the CASAC for the purpose of conducting the NAAQS review. Indeed, before it was disbanded entirely, a number of scientists were removed from CASAC's particulate-matter panel as a result of the directive.[46] A number of scientists nominated to CASAC and Administrator Wheeler's non-member pool of particulate-matter experts, moreover,

---

[45] Press Release, U.S. EPA, EPA Will Not Appeal Adverse SDNY Decision Regarding October 31, 2017 Federal Advisory Committee Directive (June 24, 2020), https://www.epa.gov/newsreleases/epa-will-not-appeal-adverse-sdny-decision-regarding-october-31-2017-federal-advisory.

[46] Declarations of Peter Adams, Joel Kaufman, Rob McConnell, and Christopher Zarba (attached) (discussing removals from CASAC and its particulate-matter panel as a result of the directive).

were also ineligible as a result of the directive.[47] The directive required EPA to exclude many of the most qualified scientists from participating in the NAAQS review and frustrated the external review process, rendering the process and its outcome illegal and arbitrary.

2. EPA's Actions Denied the Agency the Very Expertise the Statute Demands EPA to Rely Upon in Setting the NAAQS

For four decades, the chartered seven-member CASAC has been augmented with additional experts to have the breadth, depth, and diversity of expertise needed to review multidisciplinary scientific issues relevant to each of the criteria pollutants regulated under the NAAQS.[48] That expert panel has been in place to fulfill the statute's requirement that the NAAQS reflect the latest scientific knowledge. The panel's intended role in the initial stages of this proposal, was reflected in the Independent Review Plan approved by CASAC and by the agency, and the panel selection was by open and lawful process.[49]

On October 10, 2018, without explanation, EPA Administrator Wheeler arbitrarily disbanded the Particulate Matter Review Panel, a group of independent experts on particulate pollution and health selected by the chartered CASAC to inform the EPA's review of the ambient particulate matter standard. The panel was actively participating in this review at the time of its unlawful disbanding.

---

[47] Compilation of EPA Grant Information regarding Nominees to CASAC and Administrator Wheeler's Expert Pool (attached) (documenting the ineligibility of three CASAC nominees—Howard Kipen, Rob McConnell, and Armistead Russell—and five expert-pool nominees—Peter DeCarlo, David Eaton, Joel Kaufman, Armistead Russell, and Ivan Rusyn—as a result of their EPA grants and the directive); *see also* Declaration of Edward Avol (attached) (noting that the directive had required him to choose between research funding and public service on the EPA's advisory committees, despite his previous work on numerous CASAC expert panels).

[48] CASAC's charter provides it with the authority to convene such expert panels. That charter states: "EPA, or CASAC with the Agency's approval, may form subcommittees or workgroups for any purpose consistent with this charter."" Of course, the panel is not CASAC, and does not itself make recommendations to the agency. As the CASAC charter states, "[s]uch subcommittees or workgroups may not work independently of the chartered committee and must report their recommendations and advice to the chartered CASAC for full deliberation and discussion. Subcommittees or workgroups have no authority to make decisions on behalf of the chartered committee, nor can they report directly to the EPA." United States Environmental Protection Agency Charter, Clean Air Scientific Advisory Committee, Filed with Congress, June 5, 2019, https://yosemite.epa.gov/sab/sabproduct.nsf/WebCASAC/2019casaccharter/$File/CASAC%202019%20Renewal% 20Charter%203.21.19%20-%20final.pdf. Additional experts have been appointed to review panels that interact with members of the chartered CASAC for all reviews since the late 1970s. Over time, the chartered CASAC has typically been augmented with 12 or more additional experts in a given review cycle for a given criteria pollutant. The average number of experts among 20 such panels for which membership data is available is 14, and the average size of the review panels is 20 members, inclusive of participating CASAC members.

[49] *See* Request for Nominations, 80 Fed. Reg. 6,086 (Feb. 4, 2015).

Members of the disbanded expert panel have since continued to offer the Agency their expertise, in oral and written comments, despite having been summarily dismissed by the Administrator, in the interest of public health and the environment. That group of experts, now called the Independent Particulate Matter Review Panel (IPMRP or Panel), reconvened to ensure independent science advice reaches EPA decision makers. The IPMRP submitted comprehensive comments on both the ISA and the PA, as well as follow up comments to the Administrator and to the chartered CASAC.[50]

The agency has neither provided an explanation for disbanding the particulate matter panel, nor has it even acknowledged the IPMRP comments and advice in the proposal. These omissions constitute clear legal error and are arbitrary. In order that this review "accurately reflect" the relevant body of science, and a "thorough review" of that science, see CAA section 108(a)(2) and 109(d)(1), the agency must consider the IPMRP advice, and indeed accord it considerable weight, and ultimately, either follow its advice or provide a reasoned explanation for any differences with that advice.

The improper dismissal has drastic consequences. As noted below, the chartered CASAC, by its own admission, lacks the expertise to review the body of science underlying this review, and requested expert assistance from this very Panel.[51] This has resulted in a CASAC lacking the requisite expertise to undertake a complete and thorough review of the underlying body of science, despite having had at the outset, an expert panel with precisely the expertise required. Indeed, such expertise is the reason EPA's longstanding practice has been to ensure the availability of a review panel. And it is why this specific group of experts was chosen in the first place. And it is why the reconstituted CASAC asked that "EPA reappoint the previous CASAC PM panel."[52] The only credible way to provide a "thorough review" that "accurately reflect[s] the latest scientific knowledge" – as required by the Clean Air Act, 42 U.S.C. §§ 7409(d)(1), 7408(a)(2) – is to engage scientists who are active at the leading edge of scientific work in disciplines and areas related to the subject matter of a review, as described in the February 4, 2015 Federal Register request for nominations, 80 Fed. Reg. 6,086, and as illustrated by the history of CASAC Review Panels.

---

[50] See comments of IPMRP, December 10, 2018; "Advice from Independent Particulate Matter Review Panel to Administrator Andrew Wheeler" ("IPMRP Advice") (October 22, 2019),

[51] Louis Anthony Cox et al., "CASAC Review of the EPA's *Integrated Science Assessment for Particulate Matter (External Review Draft - October 2018)*," Environmental Protection Agency, April 11, 2019, *available at* https://yosemite.epa.gov/sab/sabproduct.nsf/LookupWebReportsLastMonthCASAC/6CBCBBC3025E13B4852583D90047B352/%24File/EPA-CASAC-19-002+.pdf

[52] *Id.*

3. By its own admission, CASAC lacked the requisite expertise, including in epidemiology, to advise the Administrator on the PM NAAQS

Congress established CASAC to be an independent body providing expert scientific advice to EPA on NAAQS decisions. 42 U.S.C. § 7409(d). Here, however, even the members appointed by EPA to the reconstituted CASAC admitted that they lacked the scientific expertise to provide such advice, as a result of the disbanding of the Panel. They so stated in comments to EPA dated April 11, 2019:

> Additional expertise is needed for the Clean Air Scientific Advisory Committee (CASAC) to provide a thorough review of the particulate matter (PM) National Ambient Air Quality Standards (NAAQS) documents. The breadth and diversity of evidence to be considered exceeds the expertise of the statutory CASAC members, or indeed of any seven individuals. For example, the chartered CASAC has found it difficult to achieve consensus in some areas (summarized below), and to do so likely requires further scientific expertise from, and discussion with, epidemiologists and additional experts in human clinical studies and toxicology. Some of the proposed changes in causality determinations in the Draft ISA, for example changing the causality designation of long-term exposure to ultrafine particles (UFP) on nervous system outcomes from "inadequate" to "likely," are driven primarily by animal toxicology studies. Therefore, additional expertise is needed in comparative toxicology, dosimetry, and extrapolation of findings in animals to humans.
>
> Over the past 30 years, the CASAC's advice to the EPA on NAAQS reviews has been assisted by expert review panels that supplement and expand the scientific expertise brought to bear. Such a review panel was appointed by the EPA for the current PM review. However, the panel was disbanded by the EPA prior to the release of the Draft ISA.[53]

---

[53] Louis Anthony Cox, et al., "CASAC Review of the EPA's Integrated Science Assessment for Particulate Matter (External Review Draft - October 2018)," Environmental Protection Agency, April 11, 2019 ("CASAC Letter"), *available at* https://yosemite.epa.gov/sab/sabproduct.nsf/LookupWebReportsLastMonthCASAC/6CBCBBC3025E13B4852583D90047B352/%24File/EPA-CASAC-19-002+.pdf.

As well as conceding that it needed additional expertise in a range of fields pertaining particularly to the primary standard—"biological mechanisms of causation, causal inference, multi-stressor interactions, and potentially others such as: epidemiology, human clinical studies; comparative toxicology, dosimetry, and extrapolation of findings in animals to humans; characterization of sampling errors and biases from continuous ambient PM measurements and satellite remote sensing aerosol optical depth (AOD) analysis; errors and biases in dispersion modeling and photochemical grid modeling; errors-in-variables methods and effects of exposure (and covariate) estimation errors on epidemiologic study results; epidemiology of low-dose causal concentration-response functions"—CASAC also acknowledged it needed more expertise in fields pertaining to the secondary standard—"effects of PM on visibility impairment, climate, and materials."[54]

Given that CASAC, by its own admission, lacked the expertise to consider the breadth and diversity of the evidence, EPA's reliance on the non-consensus advice of CASAC in the proposal at issue here is arbitrary. CASAC was simply not equipped to provide expert advice to the Administrator on the key scientific and technical issues, and therefore its advice warranted no deference from the Administrator.

For the external review of the ISA, CASAC did not have the necessary expertise because EPA provided no other experts for the committee to rely on during its deliberations. As the CASAC noted in its review of the PM ISA, "[o]ver the past 30 years, the CASAC's advice to the EPA on NAAQS reviews has been assisted by expert review panels that supplement and expand the scientific expertise brought to bear."[55] Recognizing its own deficiencies, the CASAC, in a letter to the Administrator, appealed to EPA to reinstate the PM Panel or appoint a panel with similar expertise, to aid in its review of the NAAQS documents.[56] CASAC made this recommendation (along with requesting a second draft of the ISA for review) because of "[t]he need for substantial revisions to the Draft ISA to provide clearer definitions, and technical details and methods in order to enable meaningful independent scientific review."[57] Without these steps, the CASAC was apparently struggling or unable to provide a meaningful independent scientific review.

The CASAC's lack of expertise was also exacerbated by the fact that only six CASAC members participated in the review of the PM Policy Assessment, as one CASAC member left the committee during the NAAQS review process. Therefore, when reviewing the PM Policy Assessment document, the CASAC had fewer members (and less expertise) than required by the Clean Air Act, which calls for "an independent scientific review committee composed of seven

[54] *Id.*
[55] CASAC Letter, at 1.
[56] *Id.* at 2.
[57] *Id.*

members." 42 U.S.C § 109(d)(2)(A). Multiple members of the CASAC stated their desire to have additional expert help. The CASAC consensus letter asked for restoration of the expert Panel to provide that assistance.[58] At a CASAC meeting, at least one member of the CASAC called the process dysfunctional, and stated during the meeting that he was proceeding under protest, due to the lack of access to experts.[59] In all these respects—the inadequate composition of CASAC, the lack of critical expertise, and EPA's reliance on advice from this irremediably flawed CASAC—the Proposal is unlawful, arbitrary and capricious, and an abuse of discretion.[60]

The composition of the CASAC, as appointed by the EPA Administrator, further contributed to the CASAC's inability to conduct a meaningful scientific review. As noted in the preceding section, this particular CASAC lacked balanced representation, which significantly impaired its ability to conduct a meaningful scientific review of the PM science and policy documents. Five of the seven CASAC members appointed to review the ISA were from federal, state, or local governments, and four of the six CASAC members involved in the review of the PM policy assessment were from state or local governments. This severely limited the CASAC's representation of diverse perspectives and expertise. The unbalanced composition of the CASAC and the dearth of academic research scientists hindered the committee's ability to conduct the "thorough" review mandated by the Act. 42 U.S.C. § 7409(d)(1).

In addition, most of the members of this particular CASAC lacked previous experience in serving on CASAC review panels. These members lacked a reference point[61] and a full understanding of their untenable position and the difficult circumstances EPA created for this NAAQS review. Indeed, Dr. Frampton, the only academic scientist to participate in this review and a CASAC member with previous experience participating in a CASAC review, was particularly outspoken about the problematic process and lack of expertise in this CASAC. *See*, *e.g.*, CASAC Letter, at A-81; December 10, 2018 CASAC letter at B-29.

---

[58] CASAC Letter, at 2.

[59] Summary Minutes of the U.S. Environmental Protection Agency (EPA) Chartered Clean Air Scientific Advisory Committee (CASAC) Public Meeting on Particulate Matter, at 4. Oct. 24-25, 2019.

[60] As stated in the comment from the International Society for Environmental Epidemiology, a society comprised of eminent researchers who study environmental causes of ill-health, "The current CASAC is unqualified to interpret epidemiologic studies given that it lacks adequate depth and diversity of epidemiologic expertise. The myriad of changes to the NAAQS review process are collectively harmful to the quality, credibility, and integrity of the scientific review process and to the CASAC as an advisory body." Comment of June 17, 2020 p. 4.

[61] For example, the references to and descriptions of Greven (2011), not realizing that EPA had comprehensively analyzed that study in the previous review, and that their reading of the study was at odds with the views of Dr. Greven herself. Further, CASAC demonstrated an inability to comprehend how long-term measurements in short-term epidemiologic studies could be relevant to the level of the annual standard, not realizing that this was EPA's methodology in the last review, and that the D.C. Circuit had remanded a previous PM NAAQS for failing to analyze this very feature. *See Am. Farm Bureau*, 559 F. 3d 512, 522-23 (D.C. Cir. 2009). Clean Air Scientific Advisory Committee. 2019. "CASAC Review of the EPA's Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft – September 2019) (EPA-CASAC-20-001)," at 7-8 and A-2, December 16, 2019.

The Administrator's late appointment of a "pool" of experts after the CASAC review of the ISA does not rectify these failings. Appointment by the Administrator, rather than via the customary review process with SAB vetting and public participation, is an inadequate process and leads to at least the appearance of bias. And due to the Pruitt directive, eminent scientists were illegally barred from consideration for inclusion in the pool.[62]

While Administrator Wheeler has claimed the pool he ultimately selected addressed "CASAC's request for additional expertise[,]" this was not the case. [63] According to a report quoting one of CASAC's members in the wake of the Administrator's announcement, everyone named to the pool also "lacked 'sufficient expertise and experience' in epidemiology"—an area in which CASAC needed significant help.[64] Though an EPA roster identified Dr. Frederick Lipfert as an expert on "air quality" and "epidemiology," for example, a press report later quoted him as saying: "'I'm an amateur epidemiologist at best[.]'"[65] Another member of the pool, Dr. David Parrish, repeatedly stated in his responses to CASAC's questions that he had "no relevant expertise in evaluating exposure and risk," "no relevant expertise in evaluating public health implications," "no relevant epidemiological expertise," and "no relevant health effects expertise[.]"[66] The Administrator's decision to appoint pool members lacking relevant expertise was arbitrary and unlawful, particularly given the fact that candidates with relevant expertise had been included on the list of nominees.[67]

Six of the pool's twelve original members, moreover, were reportedly nominated by or affiliated with groups that have opposed the strengthening of NAAQS in the past.[68] As a report on the pool's members explained:

---

[62] *See* Compilation of EPA Grant Information regarding Nominees to CASAC and Administrator Wheeler's Expert Pool (attached) (documenting the ineligibility of five expert-pool nominees—Peter DeCarlo, David Eaton, Joel Kaufman, Armistead Russell, and Ivan Rusyn—as a result of their EPA grants and the directive).
[63] EPA Press Office, Administrator Wheeler Announces New CASAC Member, Pool of NAAQS Subject Matter Experts (Sept. 13, 2019) (attached).
[64] Sean Reilly, Documents Expose Ties Among EPA Panel's Experts, E&E News (Feb. 7, 2020) (attached), *available at* https://www.eenews.net/stories/1062289617.
[65] *Id.* (noting that Dr. Lipfert had nominated himself for the expert pool, and that his "educational background, which includes a doctorate, is in engineering and environmental studies"); List of Nominees for CASAC PM and Ozone Consultants (Aug. 2019) (attached).
[66]Responses to CASAC Questions on the Ozone PA from Consultant Dr. David Parrish at 5-6, 9-10 (attached); Documents Expose Ties Among EPA Panel's Experts, E&E News (Feb. 7, 2020).
[67] Documents Expose Ties Among EPA Panel's Experts, E&E News (Feb. 7, 2020) (noting that the EPA's own "roster shows that Wheeler passed over … academic specialists in epidemiology in appointing the experts"); List of Nominees for CASAC PM and Ozone Consultants (Aug. 2019).
[68] *Id.*

> Two of Wheeler's … picks work for well-known industry consulting firms that are representing clients with a stake in the reviews. … [B]oth were nominated by the National Rural Electric Cooperative Association, which opposed EPA's 2015 cut to the national ground-level ozone standard[.] … Another two—one of whom has since quit—were endorsed by the National Cattlemen's Beef Association, which unsuccessfully fought EPA's 2012 tightening of the annual limit on soot concentrations. … Yet another, the self-described amateur epidemiologist, is also on the advisory board of a conservative group known as the American Council on Science and Health. In comments to CASAC last fall, a trustee for the council disputed the long-established connection between soot exposure and early death. … [And] [a]nother expert working with the committee is … an independent consultant nominated by the Chicago-based Truck and Engine Manufacturers Association, which also opposed EPA's 2015 decision to trim the ozone threshold.[69]

This report raises questions about whether a number of members of the pool could be relied upon to provide wholly objective scientific advice.

Even if Administrator Wheeler had populated his pool with the experts CASAC needed to complete its review, the limitations he placed on the pool's members would have made it difficult for them to offer meaningful contributions to the process. While members of review panels typically participate in CASAC's meetings, which are public, Administrator Wheeler's pool was not allowed to join the committee's meetings—or to speak directly, even, with the committee's members. As one of CASAC's members has said, according to a recent report, the Administrator's requirement that the pool's members only communicate with the committee in writing "'adversely affect[ed]' CASAC's ability to advise EPA[.]"[70] The Administrator's "hurry-up schedule" further prevented the pool's members from offering useful comments. As a professor at Texas A&M University reportedly explained after resigning from the pool, "'I simply did not have as much time to devote to the tasks as the tasks would have required[.]'"[71]

All told, the pool of consultants selected by Administrator Wheeler failed to remedy the arbitrary and unlawful deficiencies in CASAC's review. Instead, the pool made the Administrator's reliance on CASAC's advice all the more arbitrary, for even with the consultants, CASAC lacked the necessary expertise to comment on the standards.

---

[69] Documents Expose Ties Among EPA Panel's Experts, E&E News (Feb. 7, 2020).
[70] *Id.*
[71] *Id.* (quoting Professor Brent Auvermann).

EPA has failed to recognize and consider the impact of these arbitrary decisions on the CASAC's ability to perform its duties and on the quality of the recommendations produced by the CASAC. Rushing through the external review process, without the typical subject matter experts and a shorthanded CASAC, was particularly egregious and undermined the CASAC's ability to conduct the required review, make recommendations, and advise the Administrator, as required by the CAA. The above factors and "exceptional nature" of this NAAQS review indicate that the current CASAC was simply unable to fulfill its role in this process under these challenging circumstances, and the Administrator's reliance on this broken process is arbitrary and unlawful.[72]

4. CASAC lacked necessary expertise to conduct the review of both the primary and secondary standards

The range and depth of expertise relating to both health and welfare effects of PM of the members of the now-disbanded IPMRP, discussed below, are substantially greater than that represented by the current CASAC committee. In fact, more than a year ago, the CASAC recommended that:

> [T]he EPA reappoint the previous CASAC PM panel (or appoint a panel with similar expertise) as well as adding expertise in biological mechanisms of causation, causal inference, … and potentially others such as: characterization of sampling errors and biases from continuous ambient PM measurements and satellite remote sensing aerosol optical depth (AOD) analysis; errors and biases in dispersion modeling and photochemical grid modeling; … and effects of PM on visibility impairment, climate, and materials. The panel should be appointed in time to review the Second Draft ISA.[73]

In the April 2019, consensus comments on the ISA, the CASAC expressed to EPA's Administrator that:

> It would be helpful for the CASAC to have ready access to an expert that studies the effects of PM on visibility impairment, climate, and materials. This would allow for additional insight into the nonecological welfare effects and better inform our recommendations on the appropriate level for the secondary PM standard.[74]

---

[72] Clean Air Scientific Advisory Committee. 2019. "CASAC Review of the EPA's Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft – September 2019) (EPA-CASAC-20-001)," at 1, December 16, 2019. https://yosemite.epa.gov/sab/sabproduct.nsf/E2F6C71737201612852584D20069DFB1/$File/EPA-CASAC-20-001.pdf.

[73] *Id.* at 25; EPA's *Integrated Science Assessment for Particulate Matter (External Review Draft – October 2018)"* cover letter at 2.

[74] CASAC Letter, at 25.

Three of the current CASAC committee members expanded on these consensus concerns and recommendations in their individual April 2019, review comments. The following are the concerns and recommendations from those individuals:

- *Current CASAC member Dr. James Boylan*: "I recommend that EPA reconvene the PM Review Panel. I believe that a PM Review Panel would provide the 7-member chartered CASAC with additional insight and expertise to allow for a more thorough and in-depth review of the relevant science and policy documents. My experience on the most recent $SO_2$ Review Panel has shown me the importance and value of having multiple independent experts (who are at the leading edge of research in their respective fields) thoroughly reviewing each chapter."[75]

- *Current CASAC member Dr. Mark W. Frampton:* **"Need to re-appoint the CASAC PM review panel.** Prior to the release of this draft PM ISA, and without consulting CASAC, EPA disbanded the expert PM review panel that had been previously appointed to assist CASAC in this important review. Over the past 30 years, NAAQS document reviews by CASAC have been assisted by expert review panels that supplement and expand the scientific expertise brought to bear. The seven chartered CASAC members by themselves do not have the breadth and depth of knowledge or expertise in many areas that are necessary to adequately advise the EPA, and to meet the statutory requirement for a thorough and accurate review. . . . In order to provide the needed expertise in the review process, EPA should immediately re-appoint the PM review panel, and convene an

[75] *Id.* at A-2. Additionally, Dr. Boylan expressed similar concerns in his individual comments that were one of the Enclosures to the CASAC's December 10, 2018, letter at B-2 ("The CASAC review letter on EPA's Draft ISA submitted to the EPA Administrator on April 11, 2019 recommended the development of a Second Draft ISA for CASAC review and the reappointment of the previous CASAC PM panel (or appoint a panel with similar expertise) in time to review the Second Draft ISA. Instead, EPA has provided CASAC with a pool of consultants that can respond to written questions from the CASAC. Although the pool of consultants has provided additional insight and useful information, they do not serve the same role as the former PM review panel since there are no deliberations and only written answers to specific questions. I feel that the traditional review process (with pollutant specific review panels) is significantly more informative to CASAC's recommendations since it allows verbal discussions and deliberations among experts with differing backgrounds and opinions resulting in a more comprehensive examination of controversial topics. The purpose of the PA is to bridge the gap between EPA's scientific assessments and the judgement required by the EPA Administrator when determining whether to retain or revise the NAAQS. It is unusual to review a draft PA when the ISA had not been finalized. Also, it is unusual to include the REA as part of the PA rather than a stand-alone document that is reviewed prior to the release of the draft PA. I feel that a second draft of the PA (with an updated REA) should be reviewed by the CASAC after the final ISA is released.")

additional CASAC public meeting to review and discuss the panel's comments, before CASAC finalizes its advice on the current draft ISA."[76]

- *CASAC Member Dr. Timothy E. Lewis*: "It would be helpful for the PM CASAC seven-member panel to have access to a much larger review panel that would allow for additional input into the non-ecological welfare effects and better inform our recommendations on the appropriate level for a secondary standard."[77]

Despite EPA's awareness of the fact that CASAC lacked the knowledge to provide EPA with the scientific advice that Congress intended, EPA failed to provide the committee with the experts required for an objective evaluation of the scientific issues raised. As the D.C. Circuit has held:

> Congress expected that CASAC's central role would be one of scientific analysis, explaining that CASAC's "main function" was "to assess the health and environmental effects of ambient air pollution." ... CASAC would "provide an outside mechanism for

[76] *Id.* at A-81 (emphasis added). Additionally, Dr. Frampton expressed similar concerns in his individual comments that were part of December 10, 2018 CASAC letter at B-29 ("In response to a CASAC request in its April 11 letter to the Administrator, EPA has appointed a panel of twelve expert consultants as a resource in the review of this PM PA, as well as for the ozone review. Those panel members have already provided helpful and insightful responses to specific questions posed by the chartered CASAC members. However, CASAC had stated in its April 11 letter, "Additional expertise is needed for the Clean Air Scientific Advisory Committee (CASAC) to provide a thorough review of the particulate matter (PM) National Ambient Air Quality Standards (NAAQS) documents. The breadth and diversity of evidence to be considered exceeds the expertise of the statutory CASAC members, or indeed of any seven individuals."
CASAC recommended that "…the EPA reappoint the previous CASAC PM panel (or appoint a panel with similar expertise)…". EPA has not done so. Instead, it selected a pool of 12 in a process again fraught with arbitrariness. The panel of 12 consultants appointed by EPA does not have the breadth or depth of expertise that was represented on the original (dismissed) PM panel, and moreover does not include additional areas of expertise requested. The newly appointed panel of consultants does not include sufficient expertise and experience in air pollution epidemiology research. This is a scientific discipline that is obviously of key importance in the review of the PM standards. None of the current chartered CASAC members are experts in air pollution epidemiology. In addition, the restrictive process for interacting with the newly appointed consultants, which was imposed by EPA without consultation with CASAC, prevents open and frank discussions that are part of the process of achieving consensus. These limitations adversely affect the ability of CASAC to provide the EPA with the best and most relevant advice on the adequacy of the current NAAQS.

We note the difficulty and limitation in providing cogent and insightful advice on this PA document, given that the ISA has yet to be finalized, and the CASAC advice for revisions to the ISA, that were made in the CASAC letter to the Administrator (April 11, 2019), have yet to be addressed. Thus CASAC is attempting to review policy assessment and planning that is based on an incomplete scientific review.")
[77] *Id.* at A-150. Notably Mr. Lewis' comments were brief, and contained in less than 1.5 pages.

> evaluating whether any pollutant may reasonably be anticipated to endanger public health or environment, for evaluating the scientific and medical data which might bear on this question, and for reviewing gaps in the available data and recommending additional needs for research." ... Given these functions, Congress expected that CASAC members would "be selected on the basis of their special expertise" in fields such as "environmental toxicology, epidemiology and/or clinical medicine."[78]

Thus, EPA flouted the Act's requirements as the Committee members appointed by the Administrator lacked the knowledge, breadth, and depth to advise EPA. EPA also failed to provide adequate time for the existing CASAC's review, contrary to the CASAC's request. Furthermore, it should be noted that all of the current CASAC members who offered comments on secondary standards specifically recommended that added expertise on PM welfare effects was needed. For the reasons given above, EPA's proceeding in this way and relying on CASAC's advice is both unlawful and arbitrary.

C. Additional process concerns

The particulate matter review is being speedily finalized during a global pandemic caused by a respiratory virus, which raises serious concerns about the adequacy of the opportunity for public comment and other issues with statutory requirements under the Clean Air Act. That is particularly of concern because the very respiratory health experts who are most relevant and best situated to provide detailed comments are, necessarily, currently preoccupied with the COVID-19 crisis. Notwithstanding the extent of the current crisis, EPA has only given the public a 60-day comment period, denying requests for an extension of time. This would be a remarkably short comment period for such a consequential, highly technical and scientific rulemaking, even in the absence of a deadly pandemic. Further the closure of the docket room (not to mention the closure of public reading areas, like libraries and schools that afford internet access to those who do not have it at home), coupled with the requirement that comments be submitted electronically (both changes necessitated by the pandemic) restrict opportunities for public input, potentially silencing important feedback. Pushing through this incredibly important review despite the current circumstances and changes to the process that further restrict public input is unacceptable, and must be remedied before the rule is finalized.

D. These arbitrary and unlawful process failures render the proposed decision arbitrary and unlawful

[78] *Mississippi v. EPA*, 744 F.3d 1344, 1354 (D.C. Cir. 2013) (citations omitted).

not call into question the protection afforded by the current secondary PM standards and concurs that they should be retained'' (Cox, 2019a, p. 3 of letter). 85 Fed. Reg. at 24,137.

Moreover, the Administrator inappropriately relies on advice from the ill-suited CASAC members in the proposed notice. For example:

- He asserts that his conclusions on the secondary standards are consistent with advice from the CASAC, which agrees ''that the available evidence does not call into question the protection afforded by the current secondary PM standards'' and recommends that the secondary standards ''should be retained'' (Cox, 2019a, p. 3 of letter). 85 Fed. Reg. at 24,139.

- The Administrator proposes to retain those standards (*i.e.,* the current 24-hour and annual PM2.5 standards, 24-hour PM10 standard), without revision, in part based on his consideration of CASAC advice on the secondary standards. 85 Fed. Reg. at 24,139.

## XI. Conclusion and Summary of Recommendations

EPA's proposal to retain the current PM primary NAAQS cannot lawfully be finalized because it fails to satisfy the requirements of the Clean Air Act, and reflects arbitrary and capricious decision-making. EPA must reopen the review process to ensure that the Agency satisfies its statutory obligations, as the current NAAQS review process has been marred by critical process flaws that have rendered it unlawful and undermined the scientific basis for this proposed rule. EPA implemented significant changes that truncated the review process and deviated from past practice and the CASAC-approved IRP in ways that impaired the CASAC's ability to conduct its statutorily required external review. 42 U.S.C. § 7409(d). These changes included having CASAC review the draft PM PA before the PM ISA had been finalized, a procedure the full CASAC referred to as "unusual."[483] In addition to being unusual, this change subverted the logically sequential process intended to separate the science and policy considerations. EPA also refused to provide revised drafts of these documents for review, as contemplated by the IRP, despite prior experience showing that these documents often require substantial revisions. EPA's deviation from the IRP without a reasoned explanation was arbitrary and capricious, as was the Agency's implementation of a new schedule and process that failed to provide the CASAC an opportunity for meaningful scientific review.

Furthermore, even if EPA had provided CASAC an adequate review opportunity, the committee lacked the necessary expertise to conduct a meaningful scientific review. EPA unlawfully and arbitrarily excluded recipients of EPA grants from consideration for CASAC membership and

[483] Clean Air Sci. Advisory Comm. EPA-CASAC-20-001, CASAC Review of the EPA's Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft – September 2019), (Dec. 16, 2019), https://yosemite.epa.gov/sab/sabproduct.nsf/E2F6C71737201612852584D20069DFB1/$File/EPA-CASAC-20-001.pdf.

disbanded the PM Panel previously assembled to assist CASAC in its review by providing additional expertise. Despite a request from CASAC, EPA declined to reinstate the expert PM Panel, and instead created a smaller panel of consultants who were incapable of providing the necessary assistance to CASAC. The unbalanced composition of CASAC, which for this review included only one academic research scientist, and the lack of NAAQS review experience among most of the members, further contributed to CASAC's inability to conduct a meaningful external review of the NAAQS documents. For these reasons, the Administrator's reliance on some CASAC members' recommendations in the Proposal is unlawful, arbitrary and capricious, and an abuse of discretion.

EPA's truncated review process also resulted in a failure to reflect the latest scientific knowledge, as the Agency failed to adequately consider the science available for the review. The Agency, without explanation, failed to assess key studies published after the PM ISA cutoff date. As a result, the Agency has not ensured that its air quality criteria actually reflect the latest scientific knowledge as required by the CAA.

For all of these reasons, the current PM NAAQS review process has been flawed, riddled with arbitrary and capricious decisions, and is unlawful. The Administrator's reliance on the recommendations of some members of the CASAC is also unlawful, arbitrary and capricious, and an abuse of discretion.

A. Primary Standard

This proposal is further unlawful because it would retain a primary standard that fails to protect public health with an adequate margin of safety as required by the Clean Air Act. If EPA refuses to reopen the NAAQS review process, the Agency must at least propose a revised standard. NGO commenters agree with the conclusions of the EPA Policy Assessment and of the IPMRP that the latest science indicates the current $PM_{2.5}$ standards do not protect public health—including the health of sensitive populations—with an adequate margin of safety. The coherent and robust body of evidence includes a number of important epidemiologic studies with larger numbers of subjects with increased power that show positive statistically significant associations with exposure to $PM_{2.5}$ at levels allowed by the current NAAQS. In some cases these effects persist even in truncated analyses that, in cohort studies, exclude concentrations exceeding the current annual standard and in short-term studies, exclude concentrations exceeding the 24-hour standards. The strongest associations are with the most serious adverse effects: total mortality, cardiovascular mortality, and cardiovascular and respiratory morbidity, all of which the ISA determined to be causal or likely causal. Both EPA's expert staff and the IPMRP found that this body of evidence strengthens the conclusions and reduces uncertainties as compared to the evidence from the previous review. IPMRP Advice at B-21; Policy Assessment at 3-43.

This evidence is strongly supported by the controlled human exposure and animal toxicity studies, which support the biological plausibility of the observed associations, strengthening the overall weight of evidence in reaching conclusions on causality. Further evidence of record supporting both causality and the concomitant need to revise the standards is provided by the emerging studies examining health benefits of reduced $PM_{2.5}$ concentrations, including

accountability and intervention studies as well as other studies using quasi-experimental and modern causal inference methods.

The weight of evidence and the risk assessment, as well as the Act's command to provide requisite protection with an adequate margin of safety—which includes the obligation to act without waiting for resolution of every imaginable uncertainty—mandate a decision to revise. The risks are disproportionately greater for vulnerable populations for whom the Act mandates protection, and EPA has failed to consider or explain how retaining the current standards will provide the requisite protection and an adequate margin of safety to sensitive populations.

In considering the level of a potential revised annual primary standard, NGO Commenters are informed by the analysis and conclusions of EPA's expert staff in the policy assessment, and guided by the advice from the IPMRP. EPA must also consider the results of a number of powerful new accountability studies and other causal inference studies published after the cutoff date for the ISA. These studies strongly suggest that reductions of $PM_{2.5}$ that start at levels near to or below the level of the current standards down to 10 ug/m3 and below are causally associated with significant public health benefits, and that a standard of 10 ug/m3 would not protect public health with an adequate margin of safety. Given the evidence, we believe the science indicates an annual standard level of 8 ug/m3 is requisite to protect public health.

This level is supported even considering only the evidence EPA has considered. Several US and Canadian studies reported significant associations between PM2.5 and health effects at mean levels at or below 9.6 ug/m3 (PA Figures 3-7, 3-8) including two U.S. studies that that found associations with when all data greater than the current standards (Di et al. 2017) or greater than 10 ug/m3 (Shi et al.,2016) were removed (PA at 105). Our recommended level of 8 ug/m3 is below the long-term mean in Di et al 2016 and just below the mean of the long-term air quality distribution in Shi et al. (2016), See Policy Assessment at 3-105. The analysis in Shi et al. that excluded levels above 10 ug/m3 indicates that the bulk of adverse effects are not disproportionately associated with the higher end of the air quality distributions, and therefore offers support to using a level below the mean of the long-term data as the basis for establishing the level of the annual standard. See Policy Assessment at 3-55, 3-77 and 3-105.

Both the EPA expert staff and the IPMRP agree that the evidence of record supports an annual level of 8 ug/m3. This level is based on U.S. and Canadian studies, and reflects the long-term mean of a key epidemiological study, Shi et al. 2016, as the analysis of truncated data in that study gives it added weight. Policy Assessment at 3-113; IPMRP Advice at B-14; see also IPMRP Advice at B-28 ("the Panel unanimously finds a scientific basis for 8 ug/m3 as being the lower bound of annual ranges for which there is strong weight of scientific evidence of adverse effects").

NGO commenters further recommend strengthening the protection afforded by the 24-hour standard. As the IPMRP Panel noted, "there are numerous studies that find adverse effects at levels well below the current standard, within a range of 30 ug/m3 to 25 ug/m3." IPMRP Advice at B-31 (referring to the Canadian studies Weichenthal et al. 2016 a and b, and to the Medicare cohort studies Di et al., 2017b and Shi et al. 2016). The Panel further found that "[e]ven with an annual level in the range of 10 ug/m3 to 8 ug/m3, a 24-hour standard at 30 ug/m3 may not be

protective of acute health effects that could occur with sub-daily exposures", particularly in areas that meet the annual standard and are subject to seasonally high peak levels, for example in areas with widespread use of wood for heating. Both Di et al. and Shi et al. also show statistically significant effects when the distributions are truncated to remove all days with concentrations of 30 ug /m3 and higher (30 ug/m3 for Shi et al.; 25 ug/m3 for Di et al.). Policy Assessment at 3-70. These studies indicate the need for revision of the standard, as the IPMRP found.

Finally, NGO commenters agree that "[t]he level of the coarse PM standard should be revised downward," as the IPMRP recommended, "consistent with the recommended downward revision of the 24-hour primary PM2.5 standard, to at least maintain, if not increase, the current level of public health protection to coarse particles." IPMRP Advice at 2.

B. Secondary Standard

EPA's proposal to maintain the secondary annual and 24-hour NAAQS is unlawful and arbitrary as it is clearly not supported by the latest compelling scientific knowledge. EPA ignores meta-analysis visibility studies and computer model enhancements that clearly demonstrate that the level of the current standard is not requisite to protect public welfare from any known or anticipated adverse effects. Further evidence of the need to strengthen the secondary NAAQS is found in recent studies documenting public welfare gains from visibility improvement, as well as negative impacts to tourism when visibility is degraded. There are readily available continuous monitoring methods and an existing network that EPA can and should use to replace the outdated methods. Current monitoring methods cover less than a third of the year, collecting data only once every three days, ignoring more than 30 days of data annually, and relying on an equation that recent studies show is flawed.

The NGO commenters recommend that EPA consider readily available scientific information, which supports strengthening the level of the 24-hour and annual NAAQS and aligning the monitoring methods – in numeric standard and averaging time - with today's science to correlate with how the public perceives visibility. Based on its assessment of recent research, the IPMRP also recommended revisions similar to ours, including strengthening the secondary NAAQS.

EPA must consider all effects on welfare, including: soils, water, crops, vegetation, animals, wildlife, weather, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being, whether caused by transformation, conversion, or combination with other air pollutants. Contrary the Act's mandate to consider all welfare effects, EPA arbitrarily evades review by punting ecosystem considerations to a future review. EPA's foot-dragging to revise the secondary NAAQS has already been going on for more than 30 years. Thanks to methodology developed and now published in research studies, EPA has tools it should use to strengthen the NAAQS to ensure the standards are requisite to protect all aspects of public welfare from any known or anticipated

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 50**

**[EPA–HQ–OAR–2015–0072; FRL–10018–11–OAR]**

**RIN 2060–AS50**

## Review of the National Ambient Air Quality Standards for Particulate Matter

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final action.

**SUMMARY:** Based on the Environmental Protection Agency's (EPA's) review of the air quality criteria and the national ambient air quality standards (NAAQS) for particulate matter (PM), the Administrator has reached final decisions on the primary and secondary PM NAAQS. With regard to the primary standards meant to protect against fine particle exposures (*i.e.,* annual and 24-hour $PM_{2.5}$ standards), the primary standard meant to protect against coarse particle exposures (*i.e.,* 24-hour $PM_{10}$ standard), and the secondary $PM_{2.5}$ and $PM_{10}$ standards, the EPA is retaining the current standards, without revision.

**DATES:** This final action is effective December 18, 2020.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2015–0072. Incorporated into this docket is a separate docket established for the Integrated Science Assessment (Docket ID No. EPA–HQ–ORD–2014–0859). All documents in the docket are listed in *https://www.regulations.gov/.* Although listed in the index, some information is not publicly available, *e.g.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. With the exception of such material, publicly available docket materials are available electronically through *https://www.regulations.gov/.* Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room are closed to the public, with limited exceptions, to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. For further information on EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:** Dr. Lars Perlmutt, Health and Environmental Impacts Division, Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Mail Code C539–04, Research Triangle Park, NC 27711; telephone: (919) 541–3037; fax: (919) 541–5315; email: *perlmutt.lars@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

### Basis for Immediate Effective Date

In accordance with section 307(d)(1)(V), the Administrator has designated this action as being subject to the rulemaking procedures in section 307(d) of the Clean Air Act (CAA). Section 307(d)(1) of the CAA states that: ''The provisions of section 553 through 557 * * * of Title 5 shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies.'' Thus, section 553(d) of the Administrative Procedure Act (APA), which requires publication of a substantive rule to be made ''not less than 30 days before its effective date'' subject to limited exceptions, does not apply to this action. In the alternative, the EPA concludes that it is s consistent with APA section 553(d) to make this action effective December 18, 2020.

Section 553(d)(3) of the APA, 5 U.S.C. 553(d)(3), provides that final rules shall not become effective until 30 days after publication in the **Federal Register** ''except . . . as otherwise provided by the agency for good cause found and published with the rule.'' ''In determining whether good cause exists, an agency should 'balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable amount of time to prepare for the effective date of its ruling.'' *Omnipoint Corp.* v. *Fed. Commc'n Comm'n,* 78 F.3d 620, 630 (D.C. Cir. 1996) (quoting *United States* v. *Gavrilovic,* 551 F.2d 1099, 1105 (8th Cir. 1977)). The purpose of this provision is to ''give affected parties a reasonable time to adjust their behavior before the final rule takes effect.'' *Id.; see also Gavrilovic,* 551 F.2d at 1104 (quoting legislative history).

The EPA is determining that in light of the nature of this action, good cause exists to make this final action effective immediately because the Agency seeks to provide regulatory certainty as soon as possible and the Administrator's decision to retain the current NAAQS does not change the status quo or impose new obligations on any person or entity. As a result, there is no need to provide parties additional time to adjust their behavior, and no person will be harmed by making the action immediately effective as opposed to delaying the effective date by 30 days. Accordingly, the EPA is making this action effective immediately upon publication.

### General Information

*Availability of Information Related to This Action*

A number of the documents that are relevant to this final decision are available through the EPA's website at *https://www.epa.gov/naaqs/particulate-matter-pm-air-quality-standards.* These documents include the Integrated Review Plan for the National Ambient Air Quality Standards for Particulate Matter (U.S. EPA, 2016), available at *https://www3.epa.gov/ttn/naaqs/standards/pm/data/201612-final-integrated-review-plan.pdf,* the Integrated Science Assessment for Particulate Matter (U.S. EPA, 2019), available at *https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=347534,* the Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (U.S. EPA, 2020), available at *https://www.epa.gov/naaqs/particulate-matter-pm-standards-policy-assessments-current-review-0,* and the notice of proposed rulemaking, available at *https://www.epa.gov/naaqs/particulate-matter-pm-standards-federal-register-notices-current-review.* These and other related documents are also available for inspection and copying in the EPA docket identified above.

### Table of Contents

The following topics are discussed in this preamble:

Executive Summary
I. Background
A. Legislative Requirements
B. Related PM Control Programs
C. History of the PM Air Quality Criteria and Standards
1. Reviews Completed in 1971 and 1987
2. Review Completed in 1997
3. Review Completed in 2006
4. Review Completed in 2012
D. Current Review of the Air Quality Criteria and Standards
E. Air Quality Information
1. Distribution of Particle Size in Ambient Air
2. Sources and Emissions Contributing to PM in the Ambient Air
3. Ambient Concentrations and Trends
a. $PM_{2.5}$ Mass
b. $PM_{2.5}$ Components
c. $PM_{10}$
d. $PM_{10-2.5}$
e. UFP
4. Background PM
II. Rationale for Decisions on the Primary $PM_{2.5}$ Standards

A. Introduction
1. Background on the Current Standards
2. Overview of Health Effects Evidence
a. Nature of Effects
i. Mortality
ii. Cardiovascular Effects
iii. Respiratory Effects
iv. Cancer
v. Nervous System Effects
vi. Other Effects
b. At-Risk Populations
c. Evidence-Based Considerations
i. $PM_{2.5}$ Concentrations Evaluated in Experimental Studies
ii. Ambient Concentrations in Locations of Epidemiological Studies
3. Overview of Risk and Exposure Assessment Information
B. Conclusions on the Primary $PM_{2.5}$ Standards
1. CASAC Advice in This Review
2. Basis for Proposed Decision
3. Comments on the Proposed Decision
4. Administrator's Conclusions
C. Decision on the Primary $PM_{2.5}$ Standards
III. Rationale for Decisions on the Primary $PM_{10}$ Standard
A. Introduction
1. Background on the Current Standard
2. Overview of Health Effects Evidence
a. Nature of Effects
i. Mortality
ii. Cardiovascular Effects
iii. Respiratory Effects
iv. Cancer
v. Metabolic Effects
vi. Nervous System Effects
B. Conclusions on the Primary $PM_{10}$ Standard
1. CASAC Advice in This Review
2. Basis for the Proposed Decision
3. Comments on the Proposed Decision
4. Administrator's Conclusions
C. Decision on the Primary $PM_{10}$ Standard
IV. Rationale for Decision on the Secondary PM Standards
A. Introduction
1. Background on the Current Standards
2. Overview of Welfare Effects Evidence
a. Nature of Effects
i. Visibility
ii. Climate
iii. Materials
3. Overview of Air Quality and Quantitative Information
a. Visibility Effects
b. Non-Visibility Effects
B. Conclusions on the Secondary Standards
1. CASAC Advice in This Review
2. Basis for the Proposed Decision
3. Comments on the Proposed Decision
4. Administrator's Conclusions
C. Decision on the Secondary PM Standards
V. Statutory and Executive Order Reviews
A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
B. Executive Order 13771: Reducing Regulations and Controlling Regulatory Costs
C. Paperwork Reduction Act (PRA)
D. Regulatory Flexibility Act (RFA)
E. Unfunded Mandates Reform Act (UMRA)
F. Executive Order 13132: Federalism
G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution or Use
J. National Technology Transfer and Advancement Act (NTTAA)
K. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
L. Determination Under Section 307(d)
M. Congressional Review Act (CRA)
References

## Executive Summary

This notice presents the Administrator's final decisions to retain the current primary (health-based) and secondary (welfare-based) National Ambient Air Quality Standards (NAAQS) for particulate matter (PM), without revision.

In ambient air, PM is a mixture of substances suspended as small liquid and/or solid particles. Particles in the atmosphere range in size from less than 0.01 to more than 10 micrometers (μm) in diameter. Particulate matter and its precursors are emitted from both anthropogenic sources (*e.g.,* electricity generating units, cars and trucks, agricultural operations) and natural sources (*e.g.,* sea salt, wildland fires, biological aerosols). When describing PM, subscripts are used to denote particle size. For example, $PM_{2.5}$ includes particles with diameters generally less than or equal to 2.5 μm and $PM_{10}$ includes particles with diameters generally less than or equal to 10 μm.

The EPA has established primary (health-based) and secondary (welfare-based) NAAQS for $PM_{2.5}$ and $PM_{10}$. This includes two primary $PM_{2.5}$ standards, an annual average standard with a level of 12.0 μg/m$^3$ and a 24-hour standard with a 98th percentile form and a level of 35 μg/m$^3$. It also includes a primary $PM_{10}$ standard with a 24-hour averaging time, a 1-expected exceedance form, and a level of 150 μg/m$^3$. Secondary PM standards are set equal to the primary standards, except that the level of the secondary annual $PM_{2.5}$ standard is 15.0 μg/m$^3$. In reaching decisions on these PM standards in the current review, the Administrator has considered the available scientific evidence assessed in the Integrated Science Assessment (ISA), analyses in the Policy Assessment (PA), advice from the Clean Air Scientific Advisory Committee (CASAC), and public comments on the proposal.

For the primary $PM_{2.5}$ standards, the Administrator concludes that there are important uncertainties in the evidence for adverse health effects below the current standards and in the potential for additional public health improvements from reducing ambient $PM_{2.5}$ concentrations below those standards. Based on the available evidence, the Administrator has concluded that the current primary $PM_{2.5}$ standards are requisite to protect public health, with an adequate margin of safety, from effects of $PM_{2.5}$ in ambient air and should be retained, without revision. Therefore, the EPA is retaining those standards (*i.e.,* both the annual and 24-hour standards), without revision.

For the primary $PM_{10}$ standard, the Administrator observes that, while the available health effects evidence has expanded, recent studies are subject to the same types of uncertainties that were judged important in the last review. He concludes that, based on the newly available evidence with its inherent uncertainties, the current primary $PM_{10}$ standard is requisite to protect public health, with an adequate margin of safety, from effects of $PM_{10}$ in ambient air, and should be retained, without revision. Therefore, the EPA is retaining that standard, without revision.

For the secondary standards, the Administrator observes that the expanded evidence for non-ecological welfare effects is consistent with the last review [1] and that updated quantitative analyses show results similar to those in the last review. Based on his consideration of the available evidence and quantitative information, he concludes that the current secondary PM standards are requisite to protect public welfare, against visibility effects and that there is insufficient information to establish distinct

[1] The welfare effects considered in this review include visibility impairment, climate effects, and materials effects. Ecological effects associated with PM, and the adequacy of protection provided by the secondary PM standards for those effects, are being addressed in the separate review of the secondary NAAQS for oxides of nitrogen, oxides of sulfur and PM (U.S. EPA, 2016, section 5.2; U.S. EPA, 2020, section 5.1.1) in recognition of the linkages between oxides of nitrogen, oxides of sulfur, and PM with respect to atmospheric deposition and ecological effects. Addressing the pollutants together enables the EPA to take a comprehensive approach to considering the nature and interactions of the pollutants, which is important for ensuring that all scientific information relevant to ecological effects is thoroughly evaluated. Information on the current review of these secondary NAAQS can be found at *https://www.epa.gov/naaqs/nitrogen-dioxide-no2-and-sulfur-dioxide-so2-secondary-air-quality-standards.*

secondary PM standards to address materials and climate effects. Therefore, the EPA is retaining those standards, without revision.

These decisions are consistent with the CASAC's consensus advice on the primary 24-hour $PM_{2.5}$ standard, the primary $PM_{10}$ standard, and the secondary standards. The CASAC provided differing views on the primary annual $PM_{2.5}$ standard, with some committee members recommending that the EPA retain the current standard and other members recommending revision of that standard.

## I. Background

### *A. Legislative Requirements*

Two sections of the CAA govern the establishment and revision of the NAAQS. Section 108 (42 U.S.C. 7408) directs the Administrator to identify and list certain air pollutants and then to issue air quality criteria for those pollutants. The Administrator is to list those pollutants ''emissions of which, in his judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare''; ''the presence of which in the ambient air results from numerous or diverse mobile or stationary sources''; and for which he ''plans to issue air quality criteria . . . .'' (42 U.S.C. 7408(a)(1)). Air quality criteria are intended to ''accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of [a] pollutant in the ambient air . . . .'' (42 U.S.C. 7408(a)(2)).

Section 109 [42 U.S.C. 7409] directs the Administrator to propose and promulgate ''primary'' and ''secondary'' NAAQS for pollutants for which air quality criteria are issued [42 U.S.C. 7409(a)]. Section 109(b)(1) defines primary standards as ones ''the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health.'' [2] Under section 109(b)(2), a secondary standard must ''specify a level of air quality the attainment and maintenance of which, in the judgment of the Administrator, based on such criteria, is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of [the] pollutant in the ambient air.'' [3]

In setting primary and secondary standards that are ''requisite'' to protect public health and welfare, respectively, as provided in section 109(b), the EPA's task is to establish standards that are neither more nor less stringent than necessary. In so doing, the EPA may not consider the costs of implementing the standards. See generally *Whitman* v. *American Trucking Associations,* 531 U.S. 457, 465–472, 475–76 (2001). Likewise, ''[a]ttainability and technological feasibility are not relevant considerations in the promulgation of national ambient air quality standards.'' *American Petroleum Institute* v. *Costle,* 665 F.2d 1176, 1185 (D.C. Cir. 1981); *accord Murray Energy Corporation* v. *EPA,* 936 F.3d 597, 623–24 (D.C. Cir. 2019).

The requirement that primary standards provide an adequate margin of safety was intended to address uncertainties associated with inconclusive scientific and technical information available at the time of standard setting. It was also intended to provide a reasonable degree of protection against hazards that research has not yet identified. See *Lead Industries Association* v. *EPA,* 647 F.2d 1130, 1154 (D.C. Cir 1980); *American Petroleum Institute* v. *Costle,* 665 F.2d at 1186; *Coalition of Battery Recyclers Ass'n* v. *EPA,* 604 F.3d 613, 617–18 (D.C. Cir. 2010); *Mississippi* v. *EPA,* 744 F.3d 1334, 1353 (D.C. Cir. 2013). Both kinds of uncertainties are components of the risk associated with pollution at levels below those at which human health effects can be said to occur with reasonable scientific certainty. Thus, in selecting primary standards that include an adequate margin of safety, the Administrator is seeking not only to prevent pollution levels that have been demonstrated to be harmful but also to prevent lower pollutant levels that may pose an unacceptable risk of harm, even if the risk is not precisely identified as to nature or degree. The CAA does not require the Administrator to establish a primary NAAQS at a zero-risk level or at background concentration levels, see *Lead Industries Ass'n* v. *EPA,* 647 F.2d at 1156 n.51, *Mississippi* v. *EPA,* 744 F.3d at 1351, but rather at a level that reduces risk sufficiently so as to protect public health with an adequate margin of safety.

In addressing the requirement for an adequate margin of safety, the EPA considers such factors as the nature and severity of the health effects involved, the size of the sensitive population(s), and the kind and degree of uncertainties. The selection of any particular approach to providing an adequate margin of safety is a policy choice left to the Administrator's judgment. See *Lead Industries Ass'n* v. *EPA,* 647 F.2d at 1161–62; *Mississippi* v. *EPA,* 744 F.3d at 1353.

Section 109(d)(1) of the Act requires the review every five years of existing air quality criteria and, if appropriate, the revision of those criteria to reflect advances in scientific knowledge on the effects of the pollutant on public health and welfare. Under the same provision, the EPA is also to review every five years and, if appropriate, revise the NAAQS, based on the revised air quality criteria.

Section 109(d)(2) addresses the appointment and advisory functions of an independent scientific review committee. Section 109(d)(2)(A) requires the Administrator to appoint this committee, which is to be composed of ''seven members including at least one member of the National Academy of Sciences, one physician, and one person representing State air pollution control agencies.'' Section 109(d)(2)(B) provides that the independent scientific review committee ''shall complete a review of the criteria . . . and the national primary and secondary ambient air quality standards . . . and shall recommend to the Administrator any new . . . standards and revisions of existing criteria and standards as may be appropriate. . . .'' Since the early 1980s, this independent review function has been performed by the Clean Air Scientific Advisory Committee (CASAC) of the EPA's Science Advisory Board. A number of other advisory functions are also identified for the committee by section 109(d)(2)(C), which reads:

> Such committee shall also (i) advise the Administrator of areas in which additional knowledge is required to appraise the adequacy and basis of existing, new, or revised national ambient air quality standards, (ii) describe the research efforts necessary to provide the required information, (iii) advise the Administrator on the relative contribution to air pollution concentrations of natural as well as anthropogenic activity, and (iv) advise the Administrator of any adverse public health, welfare, social, economic, or energy effects which may result from various strategies for attainment and maintenance of such national ambient air quality standards.

[2] The legislative history of section 109 indicates that a primary standard is to be set at ''the maximum permissible ambient air level . . . which will protect the health of any [sensitive] group of the population,'' and that for this purpose ''reference should be made to a representative sample of persons comprising the sensitive group rather than to a single person in such a group.'' S. Rep. No. 91–1196, 91st Cong., 2d Sess. 10 (1970).

[3] Under CAA section 302(h) (42 U.S.C. 7602(h)), effects on welfare include, but are not limited to, ''effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being.''

As previously noted, the Supreme Court has held that section 109(b) ''unambiguously bars cost considerations from the NAAQS-setting process.'' *Whitman* v. *Am. Trucking Associations,* 531 U.S. 457, 471 (2001). Accordingly, while some of these issues regarding which Congress has directed the CASAC to advise the Administrator are ones that are relevant to the standard setting process, others are not. Issues that are not relevant to standard setting may be relevant to implementation of the NAAQS once they are established.[4]

*B. Related PM Control Programs*

States are primarily responsible for ensuring attainment and maintenance of ambient air quality standards once the EPA has established them. Under sections 110 and 171–190 of the CAA, and related provisions and regulations, states are to submit, for the EPA's approval, state implementation plans (SIPs) that provide for the attainment and maintenance of such standards through control programs directed to sources of the pollutants involved. The states, in conjunction with the EPA, also administer the Prevention of Significant Deterioration (PSD) program (CAA sections 160 to 169). In addition, Federal programs provide for nationwide reductions in emissions of PM and other air pollutants through the Federal motor vehicle and motor vehicle fuel control program under title II of the Act (CAA sections 202 to 250), which involves controls for emissions from mobile sources and controls for the fuels used by these sources, and new source performance standards for stationary sources under section 111 of the CAA.

*C. History of the PM Air Quality Criteria and Standards*

1. Reviews Completed in 1971 and 1987

The EPA first established NAAQS for PM in 1971 (36 FR 8186, April 30, 1971), based on the original Air Quality Criteria Document (AQCD) (DHEW, 1969).[5] The federal reference method (FRM) specified for determining attainment of the original standards was the high-volume sampler, which collects PM up to a nominal size of 25 to 45 µm (referred to as total suspended particulates or TSP). The primary standards were set at 260 µg/m$^3$, 24-hour average, not to be exceeded more than once per year, and 75 µg/m$^3$, annual geometric mean. The secondary standards were set at 150 µg/m$^3$, 24-hour average, not to be exceeded more than once per year, and 60 µg/m$^3$, annual geometric mean.

In October 1979 (44 FR 56730, October 2, 1979), the EPA announced the first periodic review of the air quality criteria and NAAQS for PM. Revised primary and secondary standards were promulgated in 1987 (52 FR 24634, July 1, 1987). In the 1987 decision, the EPA changed the indicator for particles from TSP to $PM_{10}$,[6] in order to focus on the subset of inhalable particles small enough to penetrate to the thoracic region of the respiratory tract (including the tracheobronchial and alveolar regions), referred to as thoracic particles. The level of the 24-hour standards (primary and secondary) was set at 150 µg/m$^3$, and the form was one expected exceedance per year, on average over three years. The level of the annual standards (primary and secondary) was set at 50 µg/m$^3$, and the form was annual arithmetic mean, averaged over three years.

2. Review Completed in 1997

In April 1994, the EPA announced its plans for the second periodic review of the air quality criteria and NAAQS for PM, and in 1997 the EPA promulgated revisions to the NAAQS (62 FR 38652, July 18, 1997). In the 1997 decision, the EPA determined that the fine and coarse fractions of $PM_{10}$ should be considered separately. This determination was based on evidence that serious health effects were associated with short- and long-term exposures to fine particles in areas that met the existing $PM_{10}$ standards. The EPA added new standards, using $PM_{2.5}$ as the indicator for fine particles (with $PM_{2.5}$ referring to particles with a nominal mean aerodynamic diameter less than or equal to 2.5 µm). The new primary standards were as follows: (1) An annual standard with a level of 15.0 µg/m$^3$, based on the 3-year average of annual arithmetic mean $PM_{2.5}$ concentrations from single or multiple community-oriented monitors;[7] and (2) a 24-hour standard with a level of 65 µg/m$^3$, based on the 3-year average of the 98th percentile of 24-hour $PM_{2.5}$ concentrations at each monitor within an area. Also, the EPA established a new reference method for the measurement of $PM_{2.5}$ in the ambient air and adopted rules for determining attainment of the new standards. To continue to address the health effects of the coarse fraction of $PM_{10}$ (referred to as thoracic coarse particles or $PM_{10-2.5}$; generally including particles with a nominal mean aerodynamic diameter greater than 2.5 µm and less than or equal to 10 µm), the EPA retained the primary annual $PM_{10}$ standard and revised the form of the primary 24-hour $PM_{10}$ standard to be based on the 99th percentile of 24-hour $PM_{10}$ concentrations at each monitor in an area. The EPA revised the secondary standards by setting them equal in all respects to the primary standards.

Following promulgation of the 1997 p.m. NAAQS, petitions for review were filed by several parties, addressing a broad range of issues. In May 1999, the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) upheld the EPA's decision to establish fine particle standards, holding that ''the growing empirical evidence demonstrating a relationship between fine particle pollution and adverse health effects amply justifies establishment of new fine particle standards.'' *American Trucking Associations, Inc.* v. *EPA,* 175 F. 3d 1027, 1055–56 (D.C. Cir. 1999). The D.C. Circuit also found ''ample support'' for the EPA's decision to regulate coarse particle pollution, but vacated the 1997 $PM_{10}$ standards, concluding that the

[4] Some aspects of the CASAC's advice may not be relevant to the EPA's process of setting primary and secondary standards that are requisite to protect public health and welfare. Indeed, were the EPA to consider costs of implementation when reviewing and revising the standards ''it would be grounds for vacating the NAAQS.'' *Whitman,* 531 U.S. at 471 n.4. At the same time, the CAA directs the CASAC to provide advice on ''any adverse public health, welfare, social, economic, or energy effects which may result from various strategies for attainment and maintenance'' of the NAAQS to the Administrator under section 109(d)(2)(C)(iv). In *Whitman,* the Court clarified that most of that advice would be relevant to implementation but not standard setting, as it ''enable[s] the Administrator to assist the States in carrying out their statutory role as primary *implementers* of the NAAQS.'' *Id.* at 470 (emphasis in original). However, the Court also noted that the CASAC's ''advice concerning certain aspects of 'adverse public health . . . effects' from various attainment strategies is unquestionably pertinent'' to the NAAQS rulemaking record and relevant to the standard setting process. *Id.* at 470 n.2.

[5] Prior to the review initiated in 2007 (see section I.C.4), the AQCD provided the scientific foundation (*i.e.,* the air quality criteria) for the NAAQS. Beginning in that review, the Integrated Science Assessment (ISA) has replaced the AQCD.

[6] $PM_{10}$ refers to particles with a nominal mean aerodynamic diameter less than or equal to 10 µm. More specifically, 10 µm is the aerodynamic diameter for which the efficiency of particle collection is 50 percent.

[7] The 1997 annual $PM_{2.5}$ standard was compared with measurements made at the community-oriented monitoring site recording the highest concentration or, if specific constraints were met, measurements from multiple community-oriented monitoring sites could be averaged (*i.e.,* ''spatial averaging''). In the last review (completed in 2012), the EPA replaced the term ''community-oriented'' monitor with the term ''area-wide'' monitor. Area-wide monitors are those sited at the neighborhood scale or larger, as well as those monitors sited at micro- or middle-scales that are representative of many such locations in the same core-based statistical area (CBSA) (78 FR 3236, January 15, 2013).

EPA had not provided a reasonable explanation justifying use of $PM_{10}$ as an indicator for coarse particles. *American Trucking Associations* v. *EPA,* 175 F. 3d at 1054–55. Pursuant to the D.C. Circuit's decision, the EPA removed the vacated 1997 $PM_{10}$ standards, and the pre-existing 1987 $PM_{10}$ standards remained in place (65 FR 80776, December 22, 2000). The D.C. Circuit also upheld the EPA's determination not to establish more stringent secondary standards for fine particles to address effects on visibility. *American Trucking Associations* v. *EPA,* 175 F. 3d at 1027.

The D.C. Circuit also addressed more general issues related to the NAAQS, including issues related to the consideration of costs in setting NAAQS and the EPA's approach to establishing the levels of NAAQS. Regarding the cost issue, the court reaffirmed prior rulings holding that in setting NAAQS the EPA is ''not permitted to consider the cost of implementing those standards.'' *American Trucking Associations* v. *EPA,* 175 F. 3d at 1040–41. Regarding the levels of NAAQS, the court held that the EPA's approach to establishing the level of the standards in 1997 (*i.e.,* both for PM and for the ozone NAAQS promulgated on the same day) effected ''an unconstitutional delegation of legislative authority.'' *American Trucking Associations* v. *EPA,* 175 F. 3d at 1034–40. Although the court stated that ''the factors EPA uses in determining the degree of public health concern associated with different levels of ozone and PM are reasonable,'' it remanded the rule to the EPA, stating that when the EPA considers these factors for potential non-threshold pollutants ''what EPA lacks is any determinate criterion for drawing lines'' to determine where the standards should be set.

The D.C. Circuit's holdings on the cost and constitutional issues were appealed to the U.S. Supreme Court. In February 2001, the Supreme Court issued a unanimous decision upholding the EPA's position on both the cost and constitutional issues. *Whitman* v. *American Trucking Associations,* 531 U.S. 457, 464, 475–76. On the constitutional issue, the Court held that the statutory requirement that NAAQS be ''requisite'' to protect public health with an adequate margin of safety sufficiently guided the EPA's discretion, affirming the EPA's approach of setting standards that are neither more nor less stringent than necessary.

The Supreme Court remanded the case to the D.C. Circuit for resolution of any remaining issues that had not been addressed in that court's earlier rulings. Id. at 475–76. In a March 2002 decision, the D.C. Circuit rejected all remaining challenges to the standards, holding that the EPA's $PM_{2.5}$ standards were reasonably supported by the administrative record and were not ''arbitrary and capricious.'' *American Trucking Associations* v. *EPA,* 283 F. 3d 355, 369–72 (D.C. Cir. 2002).

3. Review Completed in 2006

In October 1997, the EPA published its plans for the third periodic review of the air quality criteria and NAAQS for PM (62 FR 55201, October 23, 1997). After the CASAC and public review of several drafts, the EPA's National Center for Environmental Assessment (NCEA) finalized the AQCD in October 2004 (U.S. EPA, 2004). The EPA's Office of Air Quality Planning and Standards (OAQPS) finalized a Risk Assessment and Staff Paper in December 2005 (Abt Associates, 2005; U.S. EPA, 2005).[8] On December 20, 2005, the EPA announced its proposed decision to revise the NAAQS for PM and solicited public comment on a broad range of options (71 FR 2620, January 17, 2006). On September 21, 2006, the EPA announced its final decisions to revise the primary and secondary NAAQS for PM to provide increased protection of public health and welfare, respectively (71 FR 61144, October 17, 2006). With regard to the primary and secondary standards for fine particles, the EPA revised the level of the 24-hour $PM_{2.5}$ standards to 35 µg/m$^3$, retained the level of the annual $PM_{2.5}$ standards at 15.0 µg/m$^3$, and revised the form of the annual $PM_{2.5}$ standards by narrowing the constraints on the optional use of spatial averaging. With regard to the primary and secondary standards for $PM_{10}$, the EPA retained the 24-hour standards, with levels at 150 µg/m$^3$, and revoked the annual standards.[9] The Administrator judged that the available evidence generally did not suggest a link between long-term exposure to existing ambient levels of coarse particles and health or welfare effects. In addition, a new reference method was added for the measurement of $PM_{10-2.5}$ in the ambient air in order to provide a basis for approving federal equivalent methods (FEMs) and to promote the gathering of scientific data to support future reviews of the PM NAAQS.

Several parties filed petitions for review following promulgation of the revised PM NAAQS in 2006. These petitions addressed the following issues: (1) Selecting the level of the primary annual $PM_{2.5}$ standard; (2) retaining $PM_{10}$ as the indicator of a standard for thoracic coarse particles, retaining the level and form of the 24-hour $PM_{10}$ standard, and revoking the $PM_{10}$ annual standard; and (3) setting the secondary $PM_{2.5}$ standards identical to the primary standards. On February 24, 2009, the D.C. Circuit issued its opinion in the case *American Farm Bureau Federation* v. *EPA,* 559 F. 3d 512 (D.C. Cir. 2009). The court remanded the primary annual $PM_{2.5}$ NAAQS to the EPA because the Agency had failed to adequately explain why the standards provided the requisite protection from both short- and long-term exposures to fine particles, including protection for at-risk populations. *Id. at* 520–27. With regard to the standards for $PM_{10,}$ the court upheld the EPA's decisions to retain the 24-hour $PM_{10}$ standard to provide protection from thoracic coarse particle exposures and to revoke the annual $PM_{10}$ standard. *Id.* at 533–38. With regard to the secondary $PM_{2.5}$ standards, the court remanded the standards to the EPA because the Agency failed to adequately explain why setting the secondary PM standards identical to the primary standards provided the required protection for public welfare, including protection from visibility impairment. *Id.* at 528–32. The EPA responded to the court's remands as part of the next review of the PM NAAQS, which was initiated in 2007.

4. Review Completed in 2012

In June 2007, the EPA initiated the fourth periodic review of the air quality criteria and the PM NAAQS by issuing a call for information (72 FR 35462, June 28, 2007). Based on the NAAQS review process, as revised in 2008 and again in 2009,[10] the EPA held science/policy

[8] Prior to the review initiated in 2007, the Staff Paper presented the EPA staff's considerations and conclusions regarding the adequacy of existing NAAQS and, when appropriate, the potential alternative standards that could be supported by the evidence and information. More recent reviews present this information in the Policy Assessment (PA).

[9] In the 2006 proposal, the EPA proposed to revise the 24-hour $PM_{10}$ standard in part by establishing a new $PM_{10-2.5}$ indicator for thoracic coarse particles (*i.e.,* particles generally between 2.5 and 10 µm in diameter). The EPA proposed to include any ambient mix of $PM_{10-2.5}$ that was dominated by resuspended dust from high density traffic on paved roads and by PM from industrial sources and construction sources. The EPA proposed to exclude any ambient mix of $PM_{10-2.5}$ that was dominated by rural windblown dust and soils and by PM generated from agricultural and mining sources. In the final decision, the existing $PM_{10}$ standard was retained, in part due to an ''inability . . . to effectively and precisely identify which ambient mixes are included in the [$PM_{10-2.5}$] indicator and which are not'' (71 FR 61197, October 17, 2006).

[10] The history of the NAAQS review process, including revisions to the process, is discussed at *https://www.epa.gov/naaqs/historical-information-naaqs-review-process.*

issue workshops on the primary and secondary PM NAAQS (72 FR 34003, June 20, 2007; 72 FR 34005, June 20, 2007), and prepared and released the planning and assessment documents that comprise the review process (*i.e.,* IRP (U.S. EPA, 2008), ISA (U.S. EPA, 2009c), REA planning documents for health and welfare (U.S. EPA, 2009b, U.S. EPA, 2009a), a quantitative health risk assessment (U.S. EPA, 2010a) and an urban-focused visibility assessment (U.S. EPA, 2010b), and PA (U.S. EPA, 2011)). In June 2012, the EPA announced its proposed decision to revise the NAAQS for PM (77 FR 38890, June 29, 2012).

In December 2012, the EPA announced its final decisions to revise the primary NAAQS for PM to provide increased protection of public health (78 FR 3086, January 15, 2013). With regard to primary standards for $PM_{2.5}$, the EPA revised the level of the annual $PM_{2.5}$ standard [11] to 12.0 μg/m$^3$ and retained the 24-hour $PM_{2.5}$ standard, with its level of 35 μg/m$^3$. For the primary $PM_{10}$ standard, the EPA retained the 24-hour standard to continue to provide protection against effects associated with short-term exposure to thoracic coarse particles (*i.e.,* $PM_{10-2.5}$). With regard to the secondary PM standards, the EPA generally retained the 24-hour and annual $PM_{2.5}$ standards [12] and the 24-hour $PM_{10}$ standard to address visibility and non-visibility welfare effects.

As with previous reviews, petitioners challenged the EPA's final rule. Petitioners argued that the EPA acted unreasonably in revising the level and form of the annual standard and in amending the monitoring network provisions. On judicial review, the revised standards and monitoring requirements were upheld in all respects. *NAM* v. *EPA,* 750 F.3d 921 (D.C. Cir. 2014).

### *D. Current Review of the Air Quality Criteria and Standards*

In December 2014, the EPA announced the initiation of the current periodic review of the air quality criteria for PM and of the $PM_{2.5}$ and $PM_{10}$ NAAQS and issued a call for information (79 FR 71764, December 3, 2014). From February 9 to February 11, 2015, the EPA's NCEA and OAQPS held a public workshop to inform the planning for the current review of the PM NAAQS (announced in 79 FR 71764, December 3, 2014). Workshop participants, including a wide range of external experts as well as EPA staff representing a variety of areas of expertise (*e.g.,* epidemiology, human and animal toxicology, risk/exposure analysis, atmospheric science, visibility impairment, climate effects), were asked to highlight significant new and emerging PM research, and to make recommendations to the Agency regarding the design and scope of this review. This workshop provided for a public discussion of the key science and policy-relevant issues around which the EPA has structured the current review of the PM NAAQS and of the most meaningful new scientific information that would be available in this review to inform understanding of these issues.

The input received at the workshop guided EPA staff in developing a draft IRP, which was reviewed by the CASAC Particulate Matter Review Panel and discussed on public teleconferences held in May 2016 (81 FR 13362, March 14, 2016) and August 2016 (81 FR 39043, June 15, 2016). Advice from the chartered CASAC, supplemented by the Particulate Matter Review Panel, and input from the public were considered in developing the final IRP (U.S. EPA, 2016). The final IRP discusses the approaches to be taken in developing key scientific, technical, and policy documents in this review and the key policy-relevant issues.

In May 2018, the Administrator issued a memorandum describing a ''back-to-basics'' process for reviewing the NAAQS (Pruitt, 2018). This memo announced the Agency's intention to conduct the current review of the PM NAAQS in such a manner as to ensure that any necessary revisions are finalized by December 2020. Following this memo, on October 10, 2018 the Administrator additionally announced that the role of reviewing the key assessments developed as part of the ongoing review of the PM NAAQS (*i.e.,* drafts of the ISA and PA) would be performed by the seven-member chartered CASAC (*i.e.,* rather than the CASAC Particulate Matter Panel that reviewed the draft IRP).[13]

The EPA released the draft ISA in October 2018 (83 FR 53471, October 23, 2018). The draft ISA was reviewed by the chartered CASAC at a public meeting held in Arlington, VA in December 2018 (83 FR 55529, November 6, 2018) and was discussed on a public teleconference in March 2019 (84 FR 8523, March 8, 2019). The CASAC provided its advice on the draft ISA in a letter to the EPA Administrator dated April 11, 2019 (Cox, 2019b). In that letter, the CASAC's recommendations address both the draft ISA's assessment of the science for PM-related effects and the process under which this review of the PM NAAQS is being conducted.

Regarding the assessment of the evidence, the CASAC letter states that ''the Draft ISA does not provide a sufficiently comprehensive, systematic assessment of the available science relevant to understanding the health impacts of exposure to particulate matter (PM)'' (Cox, 2019b, p. 1 of letter). The CASAC recommended that this and other limitations (*i.e.,* ''[i]nadequate evidence for altered causal determinations'' and the need for a ''[c]learer discussion of causality and causal biological mechanisms and pathways'') be remedied in a revised ISA (Cox, 2019b, p. 1 of letter).

Given the Administrator's timeline for this review, as noted above (Pruitt, 2018), the EPA did not prepare a second draft ISA (Wheeler, 2019). Rather, the EPA has taken steps to address the CASAC's comments in the final ISA (U.S. EPA, 2019). In particular, the final ISA includes additional text and a new appendix to clarify the comprehensive and systematic process employed by the EPA to develop the ISA. In addition, several causality determinations were re-examined and, consistent with the CASAC advice, the final ISA reflects a revised causality determination for long-term ultrafine particle (UFP) exposures and nervous system effects (*i.e.,* from ''likely to be causal'' to ''suggestive of, but not sufficient to infer, a causal relationship'').[14] The final ISA also contains additional text to clarify the evidence for biological pathways of particular PM-related effects and the role of that evidence in causality determinations.

Among its comments on the process, the chartered CASAC recommended ''that the EPA reappoint the previous CASAC PM panel (or appoint a panel with similar expertise)'' (Cox, 2019b). The Agency's response to this advice was provided in a letter from the Administrator to the CASAC chair dated

[11] The EPA also eliminated the option for spatial averaging.

[12] Consistent with the primary standard, the EPA eliminated the option for spatial averaging with the annual standard.

[13] The CASAC charter is available at: *https://yosemite.epa.gov/sab/sabproduct.nsf/WebCASAC/2019casaccharter/$File/CASAC%202019%20Renewal%20Charter%203.21.19%20-%20final.pdf.* The Administrator's announcement is available at: *https://archive.epa.gov/epa/newsreleases/acting-administrator-wheeler-announces-science-advisors-key-clean-air-act-committee.html.*

[14] Based on the CASAC's comments, the EPA also re-examined the causality determinations for cancer and for nervous system effects following long-term $PM_{2.5}$ exposures. The EPA's consideration of these comments in the final ISA is described in detail in the proposal in sections II.B.1.d (85 FR 24111, April 30, 2020) and II.B.1.e (85 FR 24113, April 30, 2020).

July 25, 2019.[15] In that letter, the Administrator announced his intention to identify a pool of non-member subject matter expert consultants to support the CASAC's review activities for the PM and ozone NAAQS. A **Federal Register** notice requesting the nomination of scientists from a broad range of disciplines ''with demonstrated expertise and research in the field of air pollution related to PM and ozone'' was published in August 2019 (84 FR 38625, August 7, 2019). The Administrator selected consultants from among those nominated, and input from members of this pool of consultants informed the CASAC's review of the draft PA.

The EPA released the draft PA in September 2019 (84 FR 47944, September 11, 2019). The draft PA drew from the assessment of the evidence in the draft ISA. It was reviewed by the chartered CASAC and discussed in October 2019 at a public meeting held in Cary, NC. Public comments were received via a separate public teleconference (84 FR 51555, September 30, 2019). A public meeting to discuss the chartered CASAC letter and response to charge questions on the draft PA was held in Cary, NC in December 2019 (84 FR 58713, November 1, 2019), and the CASAC provided its advice on the draft PA, including its advice on the current primary and secondary PM standards, in a letter to the EPA Administrator dated December 16, 2019 (Cox, 2019a).

With regard to the primary standards, the CASAC recommended retaining the current 24-hour $PM_{2.5}$ and $PM_{10}$ standards but did not reach consensus on the adequacy of the current annual $PM_{2.5}$ standard. With regard to the secondary standards, the CASAC recommended retaining the current standards. The CASAC's advice on the primary and secondary PM standards, and the Administrator's consideration of that advice in reaching proposed decisions, is discussed in detail in sections II.C.2 and II.C.3 (primary $PM_{2.5}$ standards), III.C.2 and III.C.3 (primary $PM_{10}$ standards), and IV.D.2 and IV.D.3 (secondary standards) of the proposal notice (85 FR 24094, April 30, 2020).

The CASAC additionally made a number of recommendations regarding the information and analyses presented in the draft PA. Specifically, the CASAC recommended that a revised PA include: (1) Additional discussion of the current CASAC and NAAQS review process; (2) additional characterization of PM-related emissions, monitoring and air quality information, including uncertainties in that information; (3) additional discussion and examination of uncertainties in the $PM_{2.5}$ health evidence and the risk assessment; (4) updates to reflect changes in the ISA's causality determinations; and (5) additional discussion of the evidence for PM-related welfare effects, including uncertainties (Cox, 2019a, pp. 2–3 in letter). In response to the CASAC's comments, the final PA[16] incorporated a number of changes, as described in detail in section I.C.5 of the proposal (85 FR 24100, April 2020).

Drawing from his consideration of the scientific evidence assessed in the ISA and the analyses in the PA, including uncertainties in the evidence and analyses, and from his consideration of advice from the CASAC, on April 14, 2020 the Administrator proposed to retain all of the primary and secondary PM standards, without revision. These proposed decisions were published in the **Federal Register** on April 30, 2020 (85 FR 24094, April 30, 2020). The EPA held virtual public hearings on the proposal on May 20–22, 2020 and May 27, 2020 (85 FR 26634, May 5, 2020). In total, the EPA received more than 66,000 comments on the proposal from members of the public and various stakeholder groups by the close of the public comment period on June 29, 2020. Major issues raised in the public comments are discussed throughout the preamble of this final action. A more detailed summary of all significant comments, along with the EPA's responses (henceforth ''Response to Comments''), can be found in the docket for this rulemaking (Docket No. EPA–HQ–OAR–2015–0072).

As in prior NAAQS reviews, the EPA is basing its decision in this review on studies and related information included in the air quality criteria, which have undergone CASAC and public review. The studies assessed in the ISA[17] and PA, and the integration of the scientific evidence presented in them, have undergone extensive critical review by the EPA, the CASAC, and the public. The rigor of that review makes these studies, and their integrative assessment, the most reliable source of scientific information on which to base decisions on the NAAQS, decisions that all parties recognize as of great import. Decisions on the NAAQS can have profound impacts on public health and welfare, and NAAQS decisions should be based on studies that have been rigorously assessed in an integrative manner not only by the EPA but also by the statutorily mandated independent scientific advisory committee, as well as the public review that accompanies this process. Some commenters have referred to and discussed individual scientific studies on the health effects of PM that were not included in the ISA (''new' studies'') and that have not gone through this comprehensive review process. In considering and responding to comments for which such ''new'' studies were cited in support, the EPA has provisionally considered the cited studies in the context of the findings of the ISA. The EPA's provisional consideration of these studies did not and could not provide the kind of in-depth critical review described above, but rather was focused on determining whether they warranted reopening the review of the air quality criteria to enable the EPA, the CASAC, and the public to consider them further.

This approach, and the decision to rely on studies and related information included in the air quality criteria, which have undergone CASAC and public review, is consistent with the EPA's practice in prior NAAQS reviews and its interpretation of the requirements of the CAA. Since the 1970 amendments, the EPA has taken the view that NAAQS decisions are to be based on scientific studies and related information that have been assessed as a part of the pertinent air quality criteria, and the EPA has consistently followed this approach. This longstanding interpretation was strengthened by new legislative requirements enacted in 1977, which added section 109(d)(2) of the Act concerning CASAC review of air quality criteria. See 71 FR 61144, 61148 (October 17, 2006, final decision on review of NAAQS for particulate matter) for a detailed discussion of this issue and the EPA's past practice.

As discussed in the EPA's 1993 decision not to revise the $O_3$ NAAQS, ''new'' studies may sometimes be of

[15] Available at: *https://yosemite.epa.gov/sab/sabproduct.nsf/0/6CBCBBC3025E13B4852583D90047B352/$File/EPA-CASAC-19-002_Response.pdf.*

[16] Given the Administrator's timeline for this review, as noted above (Pruitt, 2018), the EPA did not prepare a second draft PA. Rather, the CASAC's advice was considered in developing the final PA (U.S. EPA, 2020).

[17] Studies identified for the ISA were based on the review's opening ''call for information'' (79 FR 71764, December 3, 2014), as well as literature searches conducted routinely to identify and evaluate ''studies and reports that have undergone scientific peer review and were published or accepted for publication between January 1, 2009 and March 31, 2017. A limited literature update identified some additional studies that were published before December 31, 2017'' (U.S. EPA, 2019, Appendix, p. A–3). References that are cited in the ISA, the references that were considered for inclusion but not cited, and electronic links to bibliographic information and abstracts can be found at: *https://hero.epa.gov/hero/particulate-matter.*

such significance that it is appropriate to delay a decision in a NAAQS review and to supplement the pertinent air quality criteria so the studies can be taken into account (58 FR at 13013–13014, March 9, 1993). In the present case, the EPA's provisional consideration of ''new'' studies concludes that, taken in context, the ''new'' information and findings do not materially change any of the broad scientific conclusions regarding the health and welfare effects of PM in ambient air made in the air quality criteria. For this reason, reopening the air quality criteria review would not be warranted.

Accordingly, the EPA is basing the final decisions in this review on the studies and related information included in the PM air quality criteria that have undergone rigorous review by the EPA, CASAC and the public. The EPA will consider these ''new'' studies for inclusion in the air quality criteria for the next PM NAAQS review, which the EPA expects to begin soon after the conclusion of this review and which will provide the opportunity to fully assess these studies through a more rigorous review process involving the EPA, CASAC, and the public.

### *E. Air Quality Information*

This section provides a summary of basic information related to PM ambient air quality. It summarizes information on the distribution of particle size in ambient air (I.E.1), sources and emissions contributing to PM in the ambient air (I.E.2), ambient PM concentrations and trends in the U.S. (I.E.3), and background PM (I.E.4). Additional detail on PM air quality can be found in Chapter 2 of the Policy Assessment (U.S. EPA, 2020; PA) and section I.D of the proposal (85 FR 24100, April 30, 2020).

#### 1. Distribution of Particle Size in Ambient Air

In ambient air, PM is a mixture of substances suspended as small liquid and/or solid particles (U.S. EPA, 2019, section 2.2) and distinct health and welfare effects have been linked with exposures to particles of different sizes. Particles in the atmosphere range in size from less than 0.01 to more than 10 µm in diameter (U.S. EPA, 2019, section 2.2).The EPA defines $PM_{2.5}$, also referred to as fine particles, as particles with aerodynamic diameters generally less than or equal to 2.5 µm. The size range for $PM_{10-2.5}$, also called coarse or thoracic coarse particles, includes those particles with aerodynamic diameters generally greater than 2.5 µm and less than or equal to 10 µm. $PM_{10}$, which is comprised of both fine and coarse fractions, includes those particles with aerodynamic diameters generally less than or equal to 10 µm. In addition, UFP are often defined as particles with a diameter of less than 0.1 µm based on physical size, thermal diffusivity or electrical mobility (U.S. EPA, 2019, section 2.2). Atmospheric lifetimes are generally longest for $PM_{2.5}$, which often remains in the atmosphere for days to weeks (U.S. EPA, 2019, Table 2–1) before being removed by wet or dry deposition, while atmospheric lifetimes for UFP and $PM_{10-2.5}$ are shorter and are generally removed from the atmosphere within hours, through wet or dry deposition (U.S. EPA, 2019, Table 2–1; 85 FR 24100, April 30, 2020).

#### 2. Sources and Emissions Contributing to PM in the Ambient Air

PM is composed of both primary (directly emitted particles) and secondary particles. Primary PM is derived from direct particle emissions from specific PM sources while secondary PM originates from gas-phase chemical compounds present in the atmosphere that have participated in new particle formation or condensed onto existing particles (U.S. EPA, 2019, section 2.3). As discussed further in the ISA (U.S. EPA, 2019, section 2.3.2.1), secondary PM is formed in the atmosphere by photochemical oxidation reactions of both inorganic and organic gas-phase precursors. Sources and emissions of PM are discussed in more detail the PA (U.S. EPA, 2020, section 2.1.1) and in the proposal (85 FR 24101, April 30, 2020).

#### 3. Ambient Concentrations and Trends

This section summarizes available information on recent ambient PM concentrations in the U.S. and on trends in PM air quality. Sections I.E.3.a and I.E.3.b summarize information on $PM_{2.5}$ mass and components, respectively. Section I.E.3.c summarizes information on $PM_{10}$. Sections I.E.3.d and I.E.3.e summarize the more limited information on $PM_{10-2.5}$ and UFP, respectively. Additional detail on PM air quality and trends can be found in the PA (U.S. EPA, 2020, section 2.3) and in the proposal (85 FR 24100, April 30, 2020).

##### a. $PM_{2.5}$ Mass

At monitoring sites in the U.S., annual $PM_{2.5}$ concentrations from 2015 to 2017 averaged 8.0 µg/m$^3$ (and ranged from 3.0 to 18.2 µg/m$^3$) and the 98th percentiles of 24-hour concentrations averaged 20.9 µg/m$^3$ (and ranged from 9.2 to 111 µg/m$^3$) (U.S. EPA, 2020, section 2.3.2.1). The highest ambient $PM_{2.5}$ concentrations occur in the west, particularly in California and the Pacific northwest (U.S. EPA, 2020, Figure 2–8). Much of the eastern U.S. has lower ambient concentrations, with annual average concentrations generally at or below 12.0 µg/m$^3$ and 98th percentiles of 24-hour concentrations generally at or below 30 µg/m$^3$ (U.S. EPA, 2020, section 2.3.2).

Recent ambient $PM_{2.5}$ concentrations reflect the substantial reductions that have occurred across much of the U.S. (U.S. EPA, 2020, section 2.3.2.1). From 2000 to 2017, national annual average $PM_{2.5}$ concentrations have declined from 13.5 µg/m$^3$ to 8.0 µg/m$^3$, a 41% decrease (U.S. EPA, 2020, section 2.3.2.1).[18] These declines have occurred at urban and rural monitoring sites, although urban $PM_{2.5}$ concentrations remain consistently higher than those in rural areas (Chan et al., 2018) due to the impact of local sources in urban areas. Analyses at individual monitoring sites indicate that declines in ambient $PM_{2.5}$ concentrations have been most consistent across the eastern U.S. and in parts of coastal California, where both annual average and 98th percentiles of 24-hour concentrations have declined significantly (U.S. EPA, 2020, section 2.3.2.1). In contrast, trends in ambient $PM_{2.5}$ concentrations have been less consistent over much of the western U.S., with no significant changes since 2000 observed at some sites in the Pacific northwest, the northern Rockies and plains, and the southwest, particularly for 98th percentiles of 24-hour concentrations (U.S. EPA, 2020, section 2.3.2.1).

The recent deployment of $PM_{2.5}$ monitors near major roads in large urban areas provides information on $PM_{2.5}$ concentrations near an important emissions source. Of the 25 CBSAs with valid design values at near-road monitoring sites,[19] 52% measured the highest annual design value at the near-road site while 24% measured the highest 24-hour design value at the near-road site (U.S. EPA, 2020, section 2.3.2.2). Of the CBSAs with highest annual design values at near-road sites, those design values were, on average, 0.7 µg/m$^3$ higher than at the highest measuring non-near-road sites (range is 0.1 to 2.0 µg/m$^3$ higher at near-road sites). Although most near-road monitoring sites do not have sufficient data to evaluate long-term trends in

[18] See *https://www.epa.gov/air-trends/particulate-matter-pm25-trends* and *https://www.epa.gov/air-trends/particulate-matter-pm25-trends#pmnat* for more information.

[19] A design value is considered valid if it meets the data handling requirements given in 40 CFR Appendix N to part 50.

near-road $PM_{2.5}$ concentrations, analyses of the data at one near-road-like site in Elizabeth, NJ,[20] show that the annual average near-road increment has generally decreased between 1999 and 2017 from about 2.0 µg/m³ to about 1.3 µg/m³ (U.S. EPA, 2020, section 2.3.2.2).

b. $PM_{2.5}$ Components

Based on recent air quality data, the major chemical components of $PM_{2.5}$ have distinct spatial distributions. Sulfate concentrations tend to be highest in the eastern U.S., while in the Ohio Valley, Salt Lake Valley, and California nitrate concentrations are highest, and relatively high concentrations of organic carbon are widespread across most of the continental U.S. (U.S. EPA, 2020, section 2.3.2.3). Elemental carbon, crustal material, and sea salt are found to have the highest concentrations in the northeast U.S., southwest U.S., and coastal areas, respectively.

An examination of $PM_{2.5}$ composition trends can provide insight into the factors contributing to overall reductions in ambient $PM_{2.5}$ concentrations. The biggest change in $PM_{2.5}$ composition that has occurred in recent years is the reduction in sulfate concentrations due to reductions in $SO_2$ emissions. Between 2000 and 2015, the nationwide annual average sulfate concentration decreased by 17% at urban sites and 20% at rural sites. This change in sulfate concentrations is most evident in the eastern U.S. and has resulted in organic matter or nitrate now being the greatest contributor to $PM_{2.5}$ mass in many locations (U.S. EPA, 2019, Figure 2–19). The overall reduction in sulfate concentrations has contributed substantially to the decrease in national average $PM_{2.5}$ concentrations as well as the decline in the fraction of $PM_{10}$ mass accounted for by $PM_{2.5}$ (U.S. EPA, 2019, section 2.5.1.1.6; U.S. EPA, 2020, section 2.3.1).

c. $PM_{10}$

At monitoring sites in the U.S., the 2015–2017 average of 2nd highest 24-hour $PM_{10}$ concentration was 56 µg/m³ (ranging from 18 to 173 µg/m³) (U.S. EPA, 2020, section 2.3.2.4).[21] The highest $PM_{10}$ concentrations tend to occur in the western U.S. Seasonal analyses indicate that ambient $PM_{10}$ concentrations are generally higher in the summer months than at other times of year, though the most extreme high concentration events are more likely in the spring (U.S. EPA, 2019, Table 2–5). This is due to fact that the major $PM_{10}$ emission sources, dust and agriculture, are more active during the warmer and drier periods of the year.

Recent ambient $PM_{10}$ concentrations reflect reductions that have occurred across much of the U.S. (U.S. EPA, 2020, section 2.3.2.4). From 2000 to 2017, annual second highest 24-hour $PM_{10}$ concentrations have declined by about 30% (U.S. EPA, 2020, section 2.3.2.4).[22] These $PM_{10}$ concentrations have generally declined in the eastern U.S., while concentrations in much of the midwest and western U.S. have remained unchanged or increased since 2000 (U.S. EPA, 2020, section 2.3.2.4). Analyses at individual monitoring sites indicate that annual average $PM_{10}$ concentrations have also declined at most sites across the U.S., with much of the decrease in the eastern U.S. associated with reductions in $PM_{2.5}$ concentrations.

d. $PM_{10-2.5}$

Since the last review, the availability of $PM_{10-2.5}$ ambient concentration data has greatly increased because of additions to the $PM_{10-2.5}$ monitoring capabilities to the national monitoring network. As illustrated in the PA (U.S. EPA, 2020, section 2.3.2.5), annual average and 98th percentile $PM_{10-2.5}$ concentrations exhibit less distinct differences between the eastern and western U.S. than for either $PM_{2.5}$ or $PM_{10}$. Additionally, compared to $PM_{2.5}$ and $PM_{10}$, changes in $PM_{10-2.5}$ concentrations have been small in magnitude and inconsistent in direction (U.S. EPA, 2020, section 2.3.2.5).

e. UFP

Compared to $PM_{2.5}$ mass, there is relatively little data on U.S. particle number concentrations, which are dominated by UFP. Based on measurements in two urban areas (New York City, Buffalo) and at a background site (Steuben County) in New York, urban particle number counts were several times higher than at the background site (U.S. EPA, 2020, section 2.3.2.6; U.S. EPA, 2019, Figure 2–18). The highest particle number counts in an urban area with multiple sites (Buffalo) were observed at a near-road location.

Long-term trends in UFP are not routinely available at U.S. monitoring sites. At one site in Illinois with long-term data available, the annual average particle number concentration declined between 2000 and 2017, closely matching the reductions in annual $PM_{2.5}$ mass over that same period (U.S. EPA, 2020, section 2.3.2.6). In addition, a small number of published studies have examined UFP trends over time. While limited, these studies also suggest that UFP number concentrations have declined over time along with decreases in $PM_{2.5}$ (U.S. EPA, 2020, section 2.3.2.6).

4. Background PM

In this review, background PM is defined as all particles that are formed by sources or processes that cannot be influenced by actions within the jurisdiction of concern. U.S. background PM is defined as any PM formed from emissions other than U.S. anthropogenic (*i.e.,* manmade) emissions. Potential sources of U.S. background PM include both natural sources (*i.e.,* PM that would exist in the absence of any anthropogenic emissions of PM or PM precursors) and transboundary sources originating outside U.S. borders. Background PM is discussed in more detail in the PA (U.S. EPA, 2020, section 2.4) and in the proposal (85 FR 24102, April 30, 2020). At annual and national scales, estimated background PM concentrations in the U.S. are small compared to contributions from domestic anthropogenic emissions.[23] For example, based on zero-out modeling in the last review of the PM NAAQS, annual background $PM_{2.5}$ concentrations were estimated to range from 0.5–3 µg/m³ across the sites examined. In addition, speciated monitoring data from IMPROVE sites can provide some insights into how contributions from different sources, including sources of background PM, may have changed over time. Such data suggests the estimates of background concentrations using speciated monitoring data from IMPROVE monitors are around 1–3 µg/m³, and have not changed significantly since the last review. Contributions to background PM in the U.S. result

[20] The Elizabeth Lab site in Elizabeth, NJ is situated approximately 30 meters from travel lanes of the Interchange 13 toll plaza of the New Jersey Turnpike and within 200 meters of travel lanes for Interstate 278 and the New Jersey Turnpike.

[21] The form of the current 24-hour $PM_{10}$ standard is one-expected-exceedance, averaged over three years.

[22] For more information, see *https://www.epa.gov/air-trends/particulate-matter-pm10-trends#pmnat.*

[23] Sources that contribute to natural background PM include dust from the wind erosion of natural surfaces, sea salt, wildland fires, primary biological aerosol particles such as bacteria and pollen, oxidation of biogenic hydrocarbons such as isoprene and terpenes to produce secondary organic aerosols (SOA), and geogenic sources such as sulfate formed from volcanic production of $SO_2$ and oceanic production of dimethyl-sulfide (U.S. EPA, 2020, section 2.4). While most of these sources release or contribute predominantly to fine aerosol, some sources including windblown dust, and sea salt also produce particles in the coarse size range (U.S. EPA, 2019, section 2.3.3).

mainly from sources within North America. Contributions from intercontinental events have also been documented (*e.g.,* transport from dust storms occurring in deserts in North Africa and Asia), but these events are less frequent and represent a relatively small fraction of background PM in most places.

## II. Rationale for Decisions on the Primary $PM_{2.5}$ Standards

This section presents the rationale for the Administrator's decision to retain the current primary $PM_{2.5}$ standards. This decision is based on a thorough review in the ISA of the latest scientific information, published through December 2017,[24] on human health effects associated with long-and short-term exposures to $PM_{2.5}$ in the ambient air. This decision also takes into account analyses in the PA of policy-relevant information from the ISA, as well as information on air quality; the analyses of human health risks in the PA; CASAC advice; and consideration of public comments received on the proposal.

Section II.A provides background on the general approach for this review and the basis for the existing standard, and also presents brief summaries of key aspects of the currently available health effects and risk information. Section II.B summarizes the proposed conclusions and CASAC advice, addresses public comments received on the proposal and presents the Administrator's conclusions on the adequacy of the current standard, drawing on consideration of the scientific evidence and quantitative risk information, advice from the CASAC, and comments from the public. Section II.C summarizes the Administrator's decision on the primary $PM_{2.5}$ standards.

### *A. Introduction*

As in prior reviews, the general approach to reviewing the current primary $PM_{2.5}$ standards is based, most fundamentally, on using the EPA's assessment of current scientific evidence and associated quantitative analyses to inform the Administrator's judgment regarding primary $PM_{2.5}$ standards that protects public health with an adequate margin of safety. In drawing conclusions with regard to the primary $PM_{2.5}$ standards, the final decision on the adequacy of the standard is largely a public health policy judgment to be made by the Administrator. The Administrator's final decision draws upon scientific information and analyses about health effects, population risks, as well as judgments about how to consider the range and magnitude of uncertainties that are inherent in the scientific evidence and risk analyses. The approach to informing these judgments, discussed more fully below, generally reflects a continuum, consisting of levels at which scientists generally agree that health effects are likely to occur, through lower levels at which the likelihood and magnitude of the response become increasingly uncertain. This approach is consistent with the requirements of the NAAQS provisions of the CAA and with how the EPA and the courts have historically interpreted the Act. These provisions require the Administrator to establish primary standards that, in his judgment, are requisite to protect public health with an adequate margin of safety. In so doing, the Administrator seeks to establish standards that are neither more nor less stringent than necessary for this purpose. The Act does not require that primary standards be set at a zero-risk level, but rather at a level that avoids unacceptable risks to public health including the health of sensitive groups.[25] The four basic elements of the NAAQS (indicator, averaging time, form, and level) are considered collectively in evaluating the health protection afforded by a standard.

In evaluating the appropriateness of retaining or revising the current primary $PM_{2.5}$ standards, the EPA has adopted an approach that builds upon the general approach used in the last review and reflects the body of evidence of information now available. As summarized in section II.A.1 below, the Administrator's decisions in the prior review were based on an integration of information on health effects associated with exposure to $PM_{2.5}$ with information on the public health significance of key health effects, as well as on policy judgments as to when the standard is requisite to protect public health with an adequate margin of safety and on consideration of advice from the CASAC and public comments. These decisions were also informed by air quality and related analyses and quantitative risk information.

Similarly, in this review, as described in the PA, the proposal, and elsewhere in this document, we draw on the current evidence and quantitative assessments of public health risk of $PM_{2.5}$ in ambient air. The past and current approaches are both based, most fundamentally, on the EPA's assessments of the current scientific information and associated quantitative analyses. The EPA's assessments are primarily documented in the ISA and PA, which have received CASAC review and public comment (83 FR 53471, October 23, 2018; 83 FR 55529, November 6, 2018; 84 FR 8523, March 8, 2019; 84 FR 47944, September 11, 2019; 84 FR 51555, September 30, 2019; 84 FR 58713, September 30, 2019). To bridge the gap between the scientific assessments of the ISA and quantitative assessments of the PA and the judgments required of the Administrator in determining whether the current standard remains requisite to protect public health with an adequate margin of safety, the PA evaluates the policy implications of the current evidence in the ISA and of the quantitative analyses in the PA.

In considering the scientific and technical information, we consider both the information available at the time of the last review and information newly available since the last review, including most particularly that which has been critically analyzed and characterized in the current ISA. We additionally consider the quantitative risk information described in the PA that estimated population-level health risks associated with ambient $PM_{2.5}$ concentrations that have been adjusted to simulate air quality scenarios of policy interest (*e.g.,* "just meeting" the current standards) in multiple study areas. The evidence-based discussions presented below (and summarized more fully in the proposal) draw upon evidence from studies evaluating health effects related to exposures to $PM_{2.5}$, as discussed in the ISA. The risk-based discussions also presented below (and summarized more fully in the proposal) have been drawn from the quantitative analyses for $PM_{2.5}$, as discussed in the PA. Sections II.A.2 and II.A.3 below provide an overview for the current health effects evidence related to short- and long-term exposures to $PM_{2.5}$ and quantitative risk information with a focus on specific policy-relevant questions identified for these categories of information in the PA.

[24] In addition to the review's opening "call for information" (79 FR 71764, December 3, 2014), "the current ISA identified and evaluated studies and reports that have undergone scientific peer review and were published or accepted for publication between January 1, 2009 and March 31, 2017. A limited literature update identified some additional studies that were published before December 31, 2017" (U.S. EPA, 2019, Appendix, p. A–3). References that are cited in the ISA, the references that were considered for inclusion but not cited, and electronic links to bibliographic information and abstracts can be found at: *https://hero.epa.gov/hero/particulate-matter.*

[25] As noted in section I.A above, such protection is specified for the sensitive group of individuals and not to a single person in the sensitive group (see S. Rep. No. 91–1196, 91st Cong., 2d Sess. 10 [1970]).

1. Background on the Current Standards

The last review of the primary PM NAAQS was completed in 2012 (78 FR 3086, January 15, 2013). As noted above (section I.C.4), in the last review the EPA lowered the level of the primary annual $PM_{2.5}$ standard from 15.0 to 12.0 μg/m³,[26] and retained the existing 24-hour $PM_{2.5}$ standard with its level of 35 μg/m³. The 2012 decision to strengthen the suite of primary $PM_{2.5}$ standards was based on the prior Administrator's consideration of the extensive body of scientific evidence assessed in the 2009 ISA (U.S. EPA, 2009c); the quantitative risk analyses presented in the 2010 health risk assessment (U.S. EPA, 2010a); the advice and recommendations of the CASAC (Samet, 2009; Samet, 2010c; Samet, 2010b); and public comments on the proposed rule (78 FR 3086, January 15, 2013; U.S. EPA, 2012). In particular, she noted the ''strong and generally robust body of evidence of serious health effect associated with both long- and short-term exposures to $PM_{2.5}$'' (78 FR 3120, January 15, 2013). This included epidemiological studies reporting health effect associations based on long-term average $PM_{2.5}$ concentrations ranging from about 15.0 μg/m³ or above (*i.e.,* at or above the level of the then-existing annual standard) to concentrations ''significantly below the level of the annual standard'' (78 FR 3120, January 15, 2013). Based on her ''confidence in the association between exposure to $PM_{2.5}$ and serious public health effects, combined with evidence of such an association in areas that would meet the current standards'' (78 FR 3120, January 15, 2013), the prior Administrator concluded that revision of the suite of primary $PM_{2.5}$ standards was necessary in order to provide increased public health protection.

The prior Administrator next considered what specific revisions to the existing primary $PM_{2.5}$ standards were appropriate, given the available evidence and quantitative risk information. She considered both the annual and 24-hour $PM_{2.5}$ standards, focusing on the basic elements of those standards (*i.e.,* indicator, averaging time, form, and level). With regard to the indicator, the EPA recognized that the health studies available during the last review continued to link adverse health outcomes (*e.g.,* premature mortality, hospital admissions, emergency department visits) with long- and short-term exposures to $PM_{2.5}$ (78 FR 3121, January 15, 2013). In assessing the appropriateness of $PM_{2.5}$ mass as the indicator, the EPA also considered the available scientific evidence and information available related to ultrafine particles [27] [28] and PM components,[29] noting the significant uncertainties and limitations associated with the evidence, as well as the availability of monitoring data. Consistent with the considerations and conclusions in the 2011 PA, the CASAC advised that it was appropriate to consider retaining $PM_{2.5}$ as the indicator for fine particles. In light of the evidence and the CASAC's advice, the prior Administrator concluded that it was ''appropriate to retain $PM_{2.5}$ as the indicator for fine particles'' (78 FR 3123, January 15, 2013).

With regard to averaging time, in the last review, the EPA considered issues related to the appropriate averaging time for $PM_{2.5}$ standards, with a focus on evaluating support for the existing annual and 24-hour averaging times and for potential alternative averaging times based on sub-daily or seasonal metrics. Based on the evidence assessed in the 2009 ISA, the 2011 PA noted that the overwhelming majority of studies utilized annual (or multi-year) or 24-hour PM averaging periods (U.S. EPA, 2011, section 2.3.2). Given this evidence-base, and limitations in the data for alternatives, the 2011 PA reached the overall conclusions that the available information provided strong support for considering retaining the existing annual and 24-hour averaging times (U.S. EPA, 2011, p. 2–58). The CASAC agreed that these conclusions were reasonable (Samet, 2010a, p. 2–58). The prior Administrator concurred with the CASAC's advice. Specifically, she judged that it was ''appropriate to retain the current annual and 24-hour averaging times for the primary $PM_{2.5}$ standards to protect against health effects associated with long- and short-term exposure periods'' (78 FR 3124, January 15, 2013).

With regard to form, the EPA first noted that the form of the annual $PM_{2.5}$ standard was established in 1997 as an annual arithmetic mean, averaged over 3 years, from single or multiple community-oriented monitors.[30] That is, the level of the annual standard was to be compared to measurements made at each community-oriented monitoring site, or if criteria were met, measurements from multiple community-oriented monitoring sites could be averaged together (*i.e.,* spatial averaging) [31] (62 FR 38671–38672, July 18, 1997). In the 1997 review, the EPA also established the form of the 24-hour $PM_{2.5}$ standard as the 98th percentile of 24-hour concentrations at each monitor within an area (*i.e.,* no spatial averaging), averaged over three years (62 FR 38671–38674, July 18, 1997). In the 2006 review, the EPA retained these standard forms but tightened the criteria for using spatial averaging with the annual standard (71 FR 61167, October 17, 2006).[32]

At the time of the last review, the EPA again considered the form of the standard with a focus on the issue of spatial averaging. An analysis of air quality and population demographic information indicated that the highest $PM_{2.5}$ concentrations in a given area tended to be measured at monitors in locations where the surrounding populations were more likely to live below the poverty line and to include larger percentages of racial and ethnic minorities (U.S. EPA, 2011, p. 2–60). Based on this analysis, the 2011 PA concluded that spatial averaging could result in disproportionate impacts in at-risk populations and populations with

[26] The Agency also eliminated spatial averaging provisions as part of the form of the annual standard.

[27] In the last review, the ISA defined ultrafine particles (UFP) as generally including particles with a mobility diameter less than or equal to 0.1 μm. Mobility diameter is defined as the diameter of a particle having the same diffusivity or electrical mobility in air as the particle of interest and is often used to characterize particles of 0.5 μm or smaller (U.S. EPA, 2009c, pp. 3–2 to 3–3).

[28] The 2011 PA noted the limited body of evidence assessed in the 2009 ISA (summarized in U.S. EPA, 2009c, section 2.3.5 and Table 2–6) and the limited monitoring information available to characterized ambient concentrations of UFP (U.S. EPA, 2011, section 1.3.2).

[29] The 2009 ISA concluded that ''the evidence is not yet sufficient to allow differentiation of those constituents or sources that are more closely related to specific health outcomes'' (U.S. EPA, 2009c, pp. 2–26 and 6–212; 78 FR 3123, January 15, 2013). The 2011 PA further noted that ''many different constituents of the fine particle mixture as well as groups of components associated with specific source categories of fine particles are linked to adverse health effects'' (U.S. EPA, 2011, p. 2–55; 78 FR 3123, January 15, 2013).

[30] In the last review, the EPA replaced the term ''community-oriented'' monitor with the term ''area-wide'' monitor (U.S. EPA, 2020, section 1.3). *Area-wide* monitors are those sited at the neighborhood scale or larger, as well as those monitors sited at micro- or middle scales that are representative of many such locations in the same core-based statistical area (CBSA; 78 FR 3236, January 15, 2013). CBSAs are required to have at least one area-wide monitor sited in the area of expected maximum $PM_{2.5}$ concentration.

[31] The original criteria for spatial averaging included: (1) The annual mean concentration at each site shall be within 20% of the spatially averaged annual mean, and (2) the daily values for each monitoring site pair shall yield a correlation coefficient of at least 0.6 for each calendar quarter (62 FR 38671–38672, July 18, 1997).

[32] Specifically, the Administrator revised spatial averaging criteria such that ''(1) [t]he annual mean concentration at each site shall be within 10 percent of the spatially averaged annual mean, and (2) the daily values for each monitoring site pair shall yield a correlation coefficient of at least 0.9 for each calendar quarter'' (71 FR 61167, October 17, 2006).

lower socioeconomic status (SES). Therefore, the PA concluded that it was appropriate to consider revising the form of the annual $PM_{2.5}$ standard such that it did not allow for the use of spatial averaging across monitors (U.S. EPA, 2011, p. 2–60). The CASAC agreed with the PA conclusions that it was ''reasonable'' for the EPA to eliminate the spatial averaging provisions (Samet, 2010c, p. 2).

With regard to the form of the annual $PM_{2.5}$ standard, the prior Administrator concluded that public health would not be protected with an adequate margin of safety in all locations if disproportionately higher $PM_{2.5}$ concentrations in low income and minority communities were averaged together with lower concentrations measured at other sites in a larger urban area. Therefore, she concluded that the form of the annual $PM_{2.5}$ standard should be revised to eliminate spatial averaging provisions (78 FR 3124, January 15, 2013).

With regard to the form of the 24-hour $PM_{2.5}$ standard, the EPA recognized that the existing 98th percentile form was originally selected to provide a balance between limiting the occurrence of peak 24-hour $PM_{2.5}$ concentrations and identifying a stable target for risk management programs.[33] Updated air quality analyses in the last review provided additional support for the increased stability of the 98th percentile $PM_{2.5}$ concentration, compared to the 99th percentile (U.S. EPA, 2011, Figure 2–2, p. 2–62). Consistent with the PA conclusions based on this analysis, the prior Administrator concluded that it was appropriate to retain the 98th percentile form for the 24-hour $PM_{2.5}$ standard (78 FR 3127, January 15, 2013).

With regard to alternative levels of the annual and 24-hour $PM_{2.5}$ standards, in the last review, the EPA considered the public health protection provided by the standards, taken together, against mortality and morbidity effects associated with long- or short-term $PM_{2.5}$ exposures. This approach recognized that it is appropriate to consider the protection provided by attaining the air quality needed to meet the suite of standards, and that there is no bright line clearly directing the choice of levels. Rather, the choice of what is appropriate is a public health policy judgment entrusted to the Administrator. See *Mississippi,* 744 F.3d at 1358, *Lead Industries Ass'n,* 647 F.2d at 1147.

In selecting the levels of the annual and 24-hour $PM_{2.5}$ standards, the prior Administrator placed the greatest emphasis on health endpoints for which the evidence was strongest, based on the assessment of the evidence in the ISA and on the ISA's causality determinations (U.S. EPA, 2009c, section 2.3.1). She particularly noted that the evidence was sufficient to conclude a causal relationship exists between $PM_{2.5}$ exposures and mortality and cardiovascular effects (*i.e.,* for both long- and short-term exposures) and that the evidence was sufficient to conclude a causal relationship is ''likely'' to exist between $PM_{2.5}$ exposures and respiratory effects (*i.e.,* for both long- and short-term exposures). She also noted additional, but more limited, evidence for a broader range of health endpoints, including evidence ''suggestive of a causal relationship'' between long-term exposures and developmental and reproductive effects as well as carcinogenic effects (78 FR 3158, January 15, 2013).

To inform her decisions on an appropriate level for the annual standard, the Administrator considered the degree to which epidemiological studies indicate confidence in the reported health effect associations over distributions of $PM_{2.5}$ concentrations in ambient air. She noted that a level of 12.0 µg/m³ was below the long-term mean $PM_{2.5}$ concentrations reported in key epidemiological studies that provided evidence of an array of serious health effects (78 FR 3161, January 15, 2013). She further noted that 12.0 µg/m³ generally corresponded to the lower portions (*i.e.,* about the 25th percentile) of distributions of health events in the limited number of epidemiological studies for which population-level information was available. A level of 12.0 µg/m³ also reflected placing some weight on studies of reproductive and developmental effects, for which the evidence was more uncertain (78 FR 3161–3162, January 15, 2013).

Given the uncertainties remaining in the scientific evidence, the Administrator judged that an annual standard level below 12.0 µg/m³ was not supported. She specifically noted uncertainties related to understanding the relative toxicity of the different components in the fine particle mixture, the role of $PM_{2.5}$ in the complex ambient mixture, exposure measurement error in epidemiological studies, and the nature and magnitude of estimated risks at relatively low ambient $PM_{2.5}$ concentrations. Furthermore, she noted that epidemiological studies had reported heterogeneity in effect estimates both within and between cities and in geographic regions of the U.S. She recognized that this heterogeneity may be attributed, in part, to difference in $PM_{2.5}$ composition in different regions and cities. With regard to evidence for reproductive and developmental effects, the prior Administrator recognized that there were a number of limitations associated with this body of evidence, including the limited number of studies evaluating such effects; uncertainties related to identifying the relevant exposure time periods of concern, and limited toxicologic evidence providing information on the mode of action(s) or biological plausibility for an association between long-term $PM_{2.5}$ exposures and adverse birth outcomes. On balance, she found that the available evidence, interpreted in light of these remaining uncertainties, did not justify an annual standard level set below 12.0 µg/m³ as being requisite to protect public health with an adequate margin of safety (*i.e.,* a standard with a lower level would have been more stringent than necessary).

In conjunction with a revised annual standard with a level of 12.0 µg/m³, the prior Administrator concluded that the evidence supported retaining the 35 µg/m³ level of the 24-hour $PM_{2.5}$ standard. She noted that the existing 24-hour standard, with its 35 µg/m³ level and 98th percentile form, would provide supplemental protection, particularly for areas with high peak-to-mean ratios possibly associated with strong seasonal sources and for areas with $PM_{2.5}$-related effects that may be associated with shorter than daily exposure periods (78 FR 3163, January 15, 2013). Thus, she concluded that the available evidence and information, considered together with its inherent uncertainties and limitations, supported an annual standard with a level of 12.0 µg/m³ combined with a 24-hour standard with a level of 35 µg/m³.

2. Overview of Health Effects Evidence

In this section, we provide an overview of the policy-relevant aspects of the health effects evidence available for consideration in this review. Section II.B of the proposal provides a detailed summary of key information contained in the ISA (U.S. EPA, 2019) and in the PA (U.S. EPA, 2020) on the health effects associated with $PM_{2.5}$ exposures, and the related public health implications, focusing particularly on the information most relevant to consideration of effects associated with the presence of $PM_{2.5}$ in ambient air. The subsections below briefly

[33] See *ATA III,* 283 F.3d at 374–76 which concludes that it is legitimate for the EPA to consider overall stability of the standard and its resulting promotion of overall effectiveness of NAAQS control programs in setting a standard that is requisite to protect the public health.

summarize the information discussed in more detail in section II.B of the proposal (85 FR 24106 to 24114, April 30, 2020).

a. Nature of Effects

Drawing from the assessment of the evidence in the ISA (U.S. EPA, 2019), and the summaries of that assessment in the PA (U.S. EPA, 2020), the sections below summarize the evidence for relationships between long- or short-term $PM_{2.5}$ exposures and mortality (II.A.2.a.i), cardiovascular effects (II.A.2.a.ii), respiratory effects (II.A.2.a.iii), cancer (II.A.2.a.iv), nervous system effects (II.A.2.a.v), and other effects (II.A.2.a.vi). For these outcomes, the ISA concludes that the evidence supports either a ''causal'' or a ''likely to be causal'' relationship with $PM_{2.5}$ exposures.[34]

i. Mortality

Long-Term $PM_{2.5}$ Exposures

In the last review, the 2009 ISA reported that the evidence was ''sufficient to conclude that the relationship between long-term $PM_{2.5}$ exposures and mortality is causal'' (U.S. EPA, 2009c, p. 7–96). The strongest evidence supporting this conclusion was provided by epidemiological studies, particularly those examining two seminal cohorts, the American Cancer Society (ACS) cohort and the Harvard Six Cities cohort. Analyses of the Harvard Six Cities cohort included demonstrations that reductions in ambient $PM_{2.5}$ concentrations are associated with reduced mortality risk (Laden et al., 2006) and with increases in life expectancy (Pope et al., 2009). Further support was provided by other cohort studies conducted in North America and Europe that reported positive associations between long-term $PM_{2.5}$ exposures and risk of mortality (U.S. EPA, 2009c).

Recent cohort studies, which have become available since the 2009 ISA, continue to provide consistent evidence of positive associations between long-term $PM_{2.5}$ exposures and mortality. These studies add support for associations with total and non-accidental mortality,[35] as well as with specific causes of death, including cardiovascular disease and respiratory disease (U.S. EPA, 2019, section 11.2.2). Many of these recent studies have extended the follow-up periods originally evaluated in the ACS and Harvard Six Cities cohort studies and continue to observe positive associations between long-term $PM_{2.5}$ exposures and mortality (U.S. EPA, 2019, section 11.2.2.1, Figures 11–18 and 11–19). Adding to recent evaluations of the ACS and Six Cities cohorts, studies conducted with other cohorts also show consistent, positive associations between long-term $PM_{2.5}$ exposure and mortality across various demographic groups (*e.g.,* age, sex, occupation), spatial and temporal extents, exposure assessment metrics, and statistical techniques (U.S. EPA, 2019, sections 11.2.2.1 and 11.2.5). This includes some of the largest cohort studies conducted to date, with analyses of the U.S. Medicare cohort that include nearly 61 million enrollees (Di et al., 2017b) and studies that control for a range of individual and ecological covariates.

A recent series of accountability studies has additionally tested the hypothesis that past reductions in ambient $PM_{2.5}$ concentrations have been associated with increased life expectancy or a decreased mortality rate (U.S. EPA, 2019, section 11.2.2.5). Pope et al. (2009) conducted a cross-sectional analysis using air quality data from 51 metropolitan areas across the U.S., beginning in the 1970s through the early 2000s, and found that a 10 μg/m³ decrease in long-term $PM_{2.5}$ concentration was associated with a 0.61-year increase in life expectancy. In a subsequent analysis, the authors extended the period of analysis to include 2000 to 2007 (Correia et al., 2013), a time period with lower ambient $PM_{2.5}$ concentrations. In this follow-up study, a decrease in long-term $PM_{2.5}$ concentrations continued to be associated with an increase in life expectancy, though the magnitude of the increase was smaller than during the earlier time period (*i.e.,* a 10 μg/m³ decrease in long-term $PM_{2.5}$ concentration was associated with a 0.35-year increase in life expectancy). Additional studies conducted in the U.S. or Europe similarly report that reductions in ambient $PM_{2.5}$ are associated with improvements in longevity (U.S. EPA, 2019, section 11.2.2.5).

The ISA concludes that positive associations between long-term $PM_{2.5}$ exposures and mortality are robust across analyses examining a variety of study designs (*e.g.,* U.S. EPA, 2019, section 11.2.2.4), approaches to estimating $PM_{2.5}$ exposures (U.S. EPA, 2019, section 11.2.5.1), approaches to controlling for confounders (U.S. EPA, 2019, sections 11.2.3 and 11.2.5), geographic regions and populations, and temporal periods (U.S. EPA, 2019, sections 11.2.2.5 and 11.2.5.3). Recent evidence further demonstrates that associations with mortality remain robust in copollutant analyses (U.S. EPA, 2019, section 11.2.3), and that associations persist in analyses restricted to long-term exposures below 12 μg/m³ (Di et al., 2017b) or 10 μg/m³ (Shi et al., 2016).

Another important consideration in characterizing the potential for additional public health improvements associated with changes in $PM_{2.5}$ exposure is whether concentration-response relationships are linear across the range of concentrations or if nonlinear relationships exist along any part of this range. Several recent studies examine this issue, and continue to provide evidence of linear, no-threshold relationships between long-term $PM_{2.5}$ exposures and all-cause and cause-specific mortality (U.S. EPA, 2019, section 11.2.4). However, interpreting the shapes of these relationships, particularly at $PM_{2.5}$ concentrations near the lower end of the air quality distribution, can be complicated by relatively low data density in the lower concentration range, the possible influence of exposure measurement error, and variability among individuals with respect to air pollution health effects. These sources of variability and uncertainty tend to smooth and ''linearize'' population-level concentration-response functions, and thus could obscure the existence of a threshold or nonlinear relationship (85 FR 24107, April 30, 2020).

The biological plausibility of $PM_{2.5}$-attributable mortality is supported by the coherence of effects across scientific disciplines (*i.e.,* animal toxicologic, controlled human exposure studies, and epidemiologic). The ISA outlines the available evidence for plausible pathways by which inhalation exposure to $PM_{2.5}$ could progress from initial events (*e.g.,* respiratory tract inflammation, autonomic nervous system modulation) to endpoints relevant to population outcomes, particularly those related to cardiovascular diseases such as ischemic heart disease, stroke and atherosclerosis (U.S. EPA, 2019, section 6.2.1), and to metabolic disease and diabetes (U.S. EPA, 2019, section 7.2.1). The ISA notes ''more limited evidence from respiratory morbidity'' (U.S. EPA, 2019, p. 11–101) to support the biological plausibility of mortality due

[34] In this review of the PM NAAQS, the EPA considers the full body of health evidence, placing the greatest emphasis on the health effects for which the evidence has been judged in the ISA to demonstrate a ''causal'' or a ''likely to be causal'' relationship with PM exposures.

[35] The majority of these studies examined non-accidental mortality outcomes, though some Medicare studies lack cause-specific death information and, therefore, examine total mortality.

to long-term $PM_{2.5}$ exposures (U.S. EPA, 2019, section 11.2.1).

Taken together, recent studies reaffirm and further strengthen the body of evidence from the 2009 ISA for the relationship between long-term $PM_{2.5}$ exposure and mortality. Recent epidemiological studies consistently report positive associations with mortality across different geographic locations, populations, and analytic approaches. Recent experimental and epidemiological evidence for cardiovascular effects, and respiratory effects to a more limited degree, supports the plausibility of mortality due to long-term $PM_{2.5}$ exposures. The 2019 ISA concludes that, ''collectively, this body of evidence is sufficient to conclude that a causal relationship exists between long-term $PM_{2.5}$ exposure and total mortality'' (U.S. EPA, 2019, section 11.2.7; p. 11–102).

Short-Term $PM_{2.5}$ Exposures

The 2009 ISA concluded that ''a causal relationship exists between short-term exposure to $PM_{2.5}$ and mortality'' (U.S. EPA, 2009c). This conclusion was based on the evaluation of both multi- and single-city epidemiological studies that consistently reported positive associations between short-term $PM_{2.5}$ exposure and non-accidental mortality. Examination of the potential confounding effects of gaseous copollutants was limited, though evidence from single-city studies indicated that gaseous copollutants have minimal effect on the $PM_{2.5}$-mortality relationship (*i.e.,* associations remain robust to inclusion of other pollutants in copollutant models). The evaluation of cause-specific mortality found that effect estimates were larger in magnitude, but also had larger confidence intervals, for respiratory mortality compared to cardiovascular mortality. Although the largest mortality risk estimates were for respiratory mortality, the interpretation of the results was complicated by the limited coherence from studies of respiratory morbidity. However, the evidence from studies of cardiovascular morbidity provided both coherence and biological plausibility for the relationship between short-term $PM_{2.5}$ exposure and cardiovascular mortality.

Recent multicity studies evaluated since the 2009 ISA continue to provide evidence of primarily positive associations between daily $PM_{2.5}$ exposures and mortality, with percent increases in total mortality ranging from 0.19% (Lippmann et al., 2013) to 2.80% (Kloog et al., 2013) [36] at lags of 0 to 1 days in single-pollutant models. Whereas most studies rely on assigning exposures using data from ambient monitors, associations are also reported in recent studies that employ hybrid modeling approaches using additional $PM_{2.5}$ data (*i.e.,* from satellites, land use information, and modeling, in addition to monitors), allowing for the inclusion of more rural locations in analyses (Kloog et al., 2013, Shi et al., 2016, Lee et al., 2015).

Some recent studies have expanded the examination of potential confounders (*e.g.,* U.S. EPA, 2019, section 11.1.5.1) to include not only copollutants, but also systematic evaluations of the potential impact of inadequate control from long-term temporal trends and weather. Associations between short-term $PM_{2.5}$ exposures and mortality remain positive and relatively unchanged in copollutant models with both gaseous pollutants and $PM_{10-2.5}$ (U.S. EPA, 2019, Section 11.1.4). Additionally, the low ($r$ <0.4) to moderate correlations (r = 0.4–0.7) between $PM_{2.5}$ and gaseous pollutants and $PM_{10-2.5}$ increase the confidence in $PM_{2.5}$ having an independent effect on mortality (U.S. EPA, 2019, section 11.1.4).

The generally positive associations reported with mortality are supported by a small group of studies employing causal inference or quasi-experimental statistical approaches (U.S. EPA, 2019, section 11.1.2.1). For example, a recent study examined whether a specific regulatory action in Tokyo, Japan (*i.e.,* a diesel emission control ordinance) resulted in a subsequent reduction in daily mortality (Yorifuji et al., 2016). The authors report a reduction in mortality in Tokyo due to the ordinance, compared to Osaka, which did not have a similar diesel emission control ordinance in place.

Positive associations with total mortality are further supported by analyses reporting positive associations with cause-specific mortality, including cardiovascular and respiratory mortality (U.S. EPA, 2019, section 11.1.3). For cause-specific mortality, there has been only a limited assessment of potential copollutant confounding, though initial evidence indicates that associations remain positive and relatively unchanged in models with gaseous pollutants and $PM_{10-2.5}$. The evidence for ischemic events and heart failure, as detailed in the assessment of cardiovascular morbidity (U.S. EPA, 2019, chapter 6), provides biological plausibility for $PM_{2.5}$-related cardiovascular mortality, which comprises the largest percentage of total mortality (*i.e.,* ~33%) (U.S. National Institutes of Health, 2013). Although there is evidence for exacerbations of chronic obstructive pulmonary disease (COPD) and asthma, the collective body of evidence for respiratory effects, particularly from controlled human exposure studies, provides only limited support for the biological plausibility of $PM_{2.5}$-related respiratory mortality (U.S. EPA, 2019, chapter 5).

In the 2009 ISA, one of the main uncertainties identified was the regional and city-to-city heterogeneity in $PM_{2.5}$-mortality associations. Recent studies examine both city-specific as well as regional characteristics to identify the underlying contextual factors that could contribute to this heterogeneity (U.S. EPA, 2019, section 11.1.6.3). Collectively, these studies indicate that the heterogeneity in $PM_{2.5}$-mortality risk estimates cannot be attributed to one factor, but instead to a combination of factors including, but not limited to, PM composition and sources as well as community characteristics that could influence exposures (U.S. EPA, 2019, section 11.1.12).

A few recent studies have conducted analyses comparing the traditional 24-hour average exposure metric with a sub-daily metric (*i.e.,* 1-hour max). These initial studies provide evidence of a similar pattern of associations for both the 24-hour average and 1-hour max metric, with the association larger in magnitude for the 24-hour average metric (U.S. EPA, 2019, section 11.1.8.1).

Recent multicity studies indicate that positive and statistically significant associations with mortality persist in analyses restricted to short-term $PM_{2.5}$ exposures below 35 µg/m³ (Lee et al., 2015),[37] below 30 µg/m³ (Shi et al., 2016), and below 25 µg/m³ (Di et al., 2017a). Additional studies examine the shape of the concentration-response relationship and whether a threshold exists specifically for $PM_{2.5}$ (U.S. EPA, 2019, section 11.1.10). These studies have used various statistical approaches and consistently found linear relationships with no evidence of a threshold. Recent analyses provide initial evidence indicating that $PM_{2.5}$-mortality associations persist and may be stronger (*i.e.,* a steeper slope) at lower

[36] As detailed in the ISA, risk estimates are for a 10 µg/m³ increase in 24-hour average $PM_{2.5}$ concentrations, unless otherwise noted (U.S. EPA, 2019, Preface).

[37] Lee et al. (2015) also report that positive and statistically significant associations between short-term $PM_{2.5}$ exposures and mortality persist in analyses restricted to areas with long-term concentrations below 12 µg/m³.

concentrations (*e.g.,* Di et al., 2017a; U.S. EPA, 2019, Figure 11–12). However, given the limited data available at the lower end of the distribution of ambient $PM_{2.5}$ concentrations, the shape of the concentration-response curve remains uncertain at these low concentrations and, to date, studies have not conducted extensive analyses exploring alternatives to linearity when examining the shape of the $PM_{2.5}$-mortality concentration-response relationship.

Overall, recent epidemiological studies build upon and extend the conclusions of the 2009 ISA for the relationship between short-term $PM_{2.5}$ exposures and total mortality. Supporting evidence for $PM_{2.5}$-related cardiovascular morbidity, and more limited evidence from respiratory morbidity, provides biological plausibility for mortality due to short-term $PM_{2.5}$ exposures. The primarily positive associations observed across studies conducted in diverse geographic locations is further supported by the results from copollutant analyses indicating robust associations, along with evidence from analyses of the concentration-response relationship. The 2019 ISA states that, collectively, ''this body of evidence is sufficient to conclude that a causal relationship exists between short-term $PM_{2.5}$ exposure and total mortality'' (U.S. EPA, 2019, p. 11–58).

ii. Cardiovascular Effects

Long-Term $PM_{2.5}$ Exposures

The scientific evidence reviewed in the 2009 ISA was ''sufficient to infer a causal relationship between long-term $PM_{2.5}$ exposure and cardiovascular effects'' (U.S. EPA, 2009c). The strongest line of evidence comprised findings from several large epidemiological studies of U.S. cohorts that consistently showed positive associations between long-term $PM_{2.5}$ exposure and cardiovascular mortality (Pope et al., 2004, Krewski et al., 2009, Miller et al., 2007, Laden et al., 2006). Studies of long-term $PM_{2.5}$ exposure and cardiovascular morbidity were limited in number. Biological plausibility and coherence with the epidemiological findings were provided by studies using genetic mouse models of atherosclerosis demonstrating enhanced atherosclerotic plaque development and inflammation, as well as changes in measures of impaired heart function, following 4- to 6-month exposures to $PM_{2.5}$ concentrated ambient particles (CAPs), and by a limited number of studies reporting CAPs-induced effects on coagulation factors, vascular reactivity, and worsening of experimentally induced hypertension in mice (U.S. EPA, 2009c).

Studies conducted since the last review continue to support the relationship between long-term exposure to $PM_{2.5}$ and cardiovascular effects. As discussed above, results from recent U.S. and Canadian cohort studies consistently report positive associations between long-term $PM_{2.5}$ exposure and cardiovascular mortality (U.S. EPA, 2019, Figure 6–19) in evaluations conducted at varying spatial scales and employing a variety of exposure assessment and statistical methods (U.S. EPA, 2019, section 6.2.10). Positive associations between long-term $PM_{2.5}$ exposures and cardiovascular mortality are generally robust in copollutant models adjusted for ozone, $NO_2$, $PM_{10-2.5}$, or $SO_2$. In addition, most of the results from analyses examining the shape of the concentration-response relationship for cardiovascular mortality support a linear relationship with long-term $PM_{2.5}$ exposures and do not identify a threshold below which effects do not occur (U.S. EPA, 2019, section 6.2.16, Table 6–52).[38]

The available evidence examining the relationship between long-term $PM_{2.5}$ exposure and cardiovascular morbidity has greatly expanded since the 2009 ISA, with positive associations reported in several cohorts examining a range of cardiovascular outcomes (U.S. EPA, 2019, section 6.2). Though results for cardiovascular morbidity are less consistent than those for cardiovascular mortality (U.S. EPA, 2019, section 6.2), recent studies provide some evidence for associations between long-term $PM_{2.5}$ exposures and the progression of cardiovascular disease, including cardiovascular morbidity (*e.g.,* coronary heart disease, stroke) and atherosclerosis progression (*e.g.,* coronary artery calcification) (U.S. EPA, 2019, sections 6.2.2. to 6.2.9). Associations reported in such studies are supported by toxicologic evidence for increased plaque progression in mice following long-term exposure to $PM_{2.5}$ collected from multiple locations across the U.S. (U.S. EPA, 2019, section 6.2.4.2). A small number of epidemiological studies also report positive associations between long-term $PM_{2.5}$ exposure and heart failure, changes in blood pressure, and hypertension (U.S. EPA, 2019, sections 6.2.5 and 6.2.7). Associations with heart failure are supported by animal toxicologic studies demonstrating decreased cardiac contractility and function, and increased coronary artery wall thickness following long-term $PM_{2.5}$ exposure (U.S. EPA, 2019, section 6.2.5.2). Similarly, a limited number of animal toxicologic studies demonstrating a relationship between long-term exposure to $PM_{2.5}$ and consistent increases in blood pressure in rats and mice are coherent with epidemiological studies reporting positive associations between long-term exposure to $PM_{2.5}$ and hypertension. Further, a recent animal toxicologic study also demonstrates increased plaque progression in mice following long-term exposure to $PM_{2.5}$ and provides coherent results with epidemiological evidence reporting positive associations between long-term exposure to $PM_{2.5}$ and indicators of atherosclerosis (U.S. EPA, 2019, section 6.2.4.2).

Longitudinal epidemiological analyses also report positive associations with markers of systemic inflammation (U.S. EPA, 2019, section 6.2.11), coagulation (U.S. EPA, 2019, section 6.2.12), and endothelial dysfunction (U.S. EPA, 2019, section 6.2.13). These results are coherent with animal toxicologic studies generally reporting increased markers of systemic inflammation, oxidative stress, and endothelial dysfunction (U.S. EPA, 2019, section 6.2.12.2 and 6.2.14).

In summary, the 2019 ISA concludes that there is consistent evidence from multiple epidemiological studies illustrating that long-term exposure to $PM_{2.5}$ is associated with mortality from cardiovascular causes. Associations with CHD, stroke and atherosclerosis progression were observed in several additional epidemiological studies providing coherence with the mortality findings. Results from copollutant models generally support an independent effect of $PM_{2.5}$ exposure on mortality. Additional evidence of the independent effect of $PM_{2.5}$ on the cardiovascular system is provided by experimental studies in animals, which support the biological plausibility of pathways by which long-term exposure to $PM_{2.5}$ could potentially result in outcomes such as CHD, stroke, CHF and cardiovascular mortality. The combination of epidemiological and experimental evidence results in the ISA conclusion that ''a causal relationship exists between long-term exposure to $PM_{2.5}$ and cardiovascular effects'' (U.S. EPA, 2019, p. 6–222).

Short-Term $PM_{2.5}$ Exposures

The 2009 ISA concluded that ''a causal relationship exists between short-

[38] As noted above for mortality, uncertainty in the shape of the concentration-response relationship increases near the upper and lower ends of the concentration distribution where the data are limited.

term exposure to $PM_{2.5}$ and cardiovascular effects'' (U.S. EPA, 2009c). The strongest evidence in the 2009 ISA was from epidemiological studies of emergency department visits and hospital admissions for ischemic heart disease (IHD) and heart failure (HF), with supporting evidence from epidemiological studies of cardiovascular mortality (U.S. EPA, 2009c). Animal toxicologic studies reported evidence of reduced myocardial blood flow during ischemia and studies indicating altered vascular reactivity (*i.e.,* vascular function), which provided coherence and biological plausibility for the effects observed in epidemiological studies. In addition, both animal toxicologic and epidemiological panel studies reported effects of $PM_{2.5}$ exposure on ST segment depression, an electrocardiogram change that potentially indicates ischemia.[39] Key uncertainties from the last review included inconsistent results across disciplines with respect to the relationship between short-term exposure to $PM_{2.5}$ and changes in blood pressure, blood coagulation markers, and markers of systemic inflammation. In addition, while the 2009 ISA identified a growing body of evidence from controlled human exposure and animal toxicologic studies, uncertainties remained with respect to biological plausibility.

A large body of recent evidence confirms and extends the evidence from the 2009 ISA supporting the relationship between short-term $PM_{2.5}$ exposure and cardiovascular effects. This includes generally positive associations observed in multicity epidemiological studies of emergency department visits and hospital admissions for IHD, HF, and combined cardiovascular-related endpoints. In particular, nationwide studies of older adults (65 years and older) report positive associations between $PM_{2.5}$ exposures and hospital admissions for HF (U.S. EPA, 2019, section 6.1.3.1). Single-city epidemiological studies contribute some support, though associations reported are less consistently positive than in multicity studies, and include a number of studies reporting null associations (U.S. EPA, 2019, sections 6.1.2 and 6.1.3).

In addition, a number of more recent controlled human exposure, animal toxicologic, and epidemiological panel studies provide evidence that $PM_{2.5}$ exposure could plausibly result in IHD or HF through pathways that include endothelial dysfunction, arterial thrombosis, and arrhythmia (U.S. EPA, 2019, section 6.1.1). The most consistent evidence from recent controlled human exposure studies is for endothelial dysfunction, as measured by changes in brachial artery diameter or flow mediated dilation (U.S. EPA, 2019, section 6.1.13.2). These studies report variable results regarding the timing of the effect and the mechanism by which reduced blood flow occurs (*i.e.,* availability of vs. sensitivity to nitric oxide). Some controlled human exposure studies using $PM_{2.5}$ CAPs report evidence for small increases in blood pressure (U.S. EPA, 2019, section 6.1.6.3). In addition, although not entirely consistent, there is also some evidence across controlled human exposure studies for conduction abnormalities/arrhythmia (U.S. EPA, 2019, section 6.1.4.3), changes in heart rate variability (HRV) (U.S. EPA, 2019, section 6.1.10.2), changes in hemostasis that could promote clot formation (U.S. EPA, 2019, section 6.1.12.2), and increases in inflammatory cells and markers (U.S. EPA, 2019, section 6.1.11.2). Thus, when taken as a whole, controlled human exposure studies are coherent with epidemiological studies in that they provide evidence that short-term exposures to $PM_{2.5}$ may result in the types of cardiovascular endpoints that could lead to emergency department visits and hospital admissions for IHD or HF.

Animal toxicologic studies published since the 2009 ISA also support a relationship between short-term $PM_{2.5}$ exposure and cardiovascular effects. A recent study demonstrating decreased cardiac contractility and left ventricular pressure in mice is coherent with the results of epidemiological studies that report associations between short-term $PM_{2.5}$ exposure and heart failure (U.S. EPA, 2019, section 6.1.3.3). In addition, similar to results of controlled human exposure studies, there is generally consistent evidence in animal toxicologic studies for indicators of endothelial dysfunction (U.S. EPA, 2019, section 6.1.13.3). Studies in animals also provide evidence for changes in a number of other cardiovascular endpoints following short-term $PM_{2.5}$ exposure. Although not entirely consistent, these studies provide some evidence of conduction abnormalities and arrhythmia (U.S. EPA, 2019, section 6.1.4.4), changes in HRV (U.S. EPA, 2019, section 6.1.10.3), changes in blood pressure (U.S. EPA, 2019, section 6.1.6.4), and evidence for systemic inflammation and oxidative stress (U.S. EPA, 2019, section 6.1.11.3).

In summary, recent evidence supports the conclusions reported in the 2009 ISA indicating relationships between short-term $PM_{2.5}$ exposures and hospital admissions and ED visits for IHD and HF, along with cardiovascular mortality. Epidemiological studies reporting robust associations in copollutant models are supported by direct evidence from controlled human exposure and animal toxicologic studies reporting independent effects of $PM_{2.5}$ exposures on endothelial dysfunction as well as endpoints indicating impaired cardiac function, increased risk of arrhythmia, changes in HRV, increases in BP, and increases in indicators of systemic inflammation, oxidative stress, and coagulation (U.S. EPA, 2019, section 6.1.16). Epidemiological panel studies, although not entirely consistent, provide some evidence that $PM_{2.5}$ exposures are associated with cardiovascular effects, including increased risk of arrhythmia, decreases in HRV, increases in BP, and ST segment depression. Overall, the results from epidemiological panel, controlled human exposure, and animal toxicologic studies (in particular those related to endothelial dysfunction, impaired cardiac function, ST segment depression, thrombosis, conduction abnormalities, and changes in blood pressure) provide coherence and biological plausibility for the consistent results from epidemiological studies reporting positive associations between short-term $PM_{2.5}$ exposures and IHD and HF, and ultimately cardiovascular mortality. The 2019 ISA concludes that, overall, ''there continues to be sufficient evidence to conclude that a causal relationship exists between short-term $PM_{2.5}$ exposure and cardiovascular effects'' (U.S. EPA, 2019, p. 6–138).

iii. Respiratory Effects

Long-Term $PM_{2.5}$ Exposures

The 2009 ISA concluded that ''a causal relationship is likely to exist between long-term $PM_{2.5}$ exposure and respiratory effects'' (U.S. EPA, 2009c). This conclusion was based mainly on epidemiological evidence demonstrating associations between long-term $PM_{2.5}$ exposure and changes in lung function or lung function growth in children. Biological plausibility was provided by a single animal toxicologic study examining pre- and post-natal exposure to $PM_{2.5}$ CAPs, which found impaired lung development. Epidemiological evidence for associations between long-term $PM_{2.5}$ exposure and other respiratory outcomes, such as the

[39] Some animal studies included in the 2009 ISA examined exposures to mixtures, such as motor vehicle exhaust or woodsmoke. In these studies, it was unclear if the resulting cardiovascular effects could be attributed specifically to the particulate components of the mixture.

development of asthma, allergic disease, and COPD; respiratory infection; and the severity of disease was limited, both in the number of studies available and the consistency of the results. Experimental evidence for other outcomes was also limited, with one animal toxicologic study reporting that long-term exposure to $PM_{2.5}$ CAPs results in morphological changes in the nasal airways of healthy animals. Other animal studies examined exposure to mixtures, such as motor vehicle exhaust and woodsmoke, and effects were not attributed specifically to the particulate components of the mixture.

Recent cohort studies provide additional support for the relationship between long-term $PM_{2.5}$ exposure and decrements in lung function growth (as a measure of lung development), indicating a robust and consistent association across study locations, exposure assessment methods, and time periods (U.S. EPA, 2019, section 5.2.13). This relationship is further supported by a recent retrospective study that reports an association between declining $PM_{2.5}$ concentrations and improvements in lung function growth in children (U.S. EPA, 2019, section 5.2.11). Epidemiological studies also examined asthma development in children (U.S. EPA, 2019, section 5.2.3), with recent prospective cohort studies reporting generally positive associations, though several are imprecise (*i.e.,* they report wide confidence intervals). Supporting evidence is provided by studies reporting associations with asthma prevalence in children, with childhood wheeze, and with exhaled nitric oxide, a marker of pulmonary inflammation (U.S. EPA, 2019, section 5.2.13). A recent animal toxicologic study showing the development of an allergic phenotype and an increase in a marker of airway responsiveness supports the biological plausibility of the development of allergic asthma (U.S. EPA, 2019, section 5.2.13). Other epidemiological studies report a $PM_{2.5}$-related acceleration of lung function decline in adults, while improvement in lung function was observed with declining $PM_{2.5}$ concentrations (U.S. EPA, 2019, section 5.2.11). A recent longitudinal study found declining $PM_{2.5}$ concentrations are also associated with an improvement in chronic bronchitis symptoms in children, strengthening evidence reported in the 2009 ISA for a relationship between increased chronic bronchitis symptoms and long-term $PM_{2.5}$ exposure (U.S. EPA, 2019, section 5.2.11). A common uncertainty across the epidemiological evidence is the lack of examination of copollutants to assess the potential for confounding. While there is some evidence that associations remain robust in models with gaseous pollutants, a number of these studies examining copollutant confounding were conducted in Asia, and thus have limited generalizability due to high annual pollutant concentrations.

When taken together, the 2019 ISA concludes that ''the collective evidence is sufficient to conclude a likely to be causal relationship between long-term $PM_{2.5}$ exposure and respiratory effects'' (U.S. EPA, 2019, p. 5–220).

Short-Term $PM_{2.5}$ Exposures

The 2009 ISA (U.S. EPA, 2009c) concluded that a ''causal relationship is likely to exist'' between short-term $PM_{2.5}$ exposure and respiratory effects. This conclusion was based mainly on the epidemiological evidence demonstrating positive associations with various respiratory effects. Specifically, the 2009 ISA described epidemiological evidence as consistently showing $PM_{2.5}$-associated increases in hospital admissions and emergency department visits for COPD and respiratory infection among adults or people of all ages, as well as increases in respiratory mortality. These results were supported by studies reporting associations with increased respiratory symptoms and decreases in lung function in children with asthma, though the available epidemiological evidence was inconsistent for hospital admissions or emergency department visits for asthma. Studies examining copollutant models showed that $PM_{2.5}$ associations with respiratory effects were robust to inclusion of CO or $SO_2$ in the model, but often were attenuated (though still positive) with inclusion of $O_3$ or $NO_2$. In addition to the copollutant models, evidence supporting an independent effect of $PM_{2.5}$ exposure on the respiratory system was provided by animal toxicologic studies of $PM_{2.5}$ CAPs demonstrating changes in some pulmonary function parameters, as well as inflammation, oxidative stress, injury, enhanced allergic responses, and reduced host defenses. Many of these effects have been implicated in the pathophysiology for asthma exacerbation, COPD exacerbation, or respiratory infection. In the few controlled human exposure studies conducted in individuals with asthma or COPD, $PM_{2.5}$ exposure mostly had no effect on respiratory symptoms, lung function, or pulmonary inflammation. Available studies in healthy people also did not clearly find respiratory effects following short-term $PM_{2.5}$ exposures.

Recent epidemiological studies provide evidence for a relationship between short-term $PM_{2.5}$ exposure and several respiratory-related endpoints, including asthma exacerbation (U.S. EPA, 2019, section 5.1.2.1), COPD exacerbation (U.S. EPA, 2019, section 5.1.4.1), and combined respiratory-related diseases (U.S. EPA, 2019, section 5.1.6), particularly from studies examining emergency department visits and hospital admissions. The generally positive associations between short-term $PM_{2.5}$ exposure and asthma and COPD emergency department visits and hospital admissions are supported by epidemiological studies demonstrating associations with other respiratory-related effects such as symptoms and medication use that are indicative of asthma and COPD exacerbations (U.S. EPA, 2019, sections 5.1.2.2 and 5.4.1.2). The collective body of epidemiological evidence for asthma exacerbation is more consistent in children than in adults. Additionally, epidemiological studies examining the relationship between short-term $PM_{2.5}$ exposure and respiratory mortality provide evidence of consistent positive associations, demonstrating a continuum of effects (U.S. EPA, 2019, section 5.1.9).

Building on the studies evaluated in the 2009 ISA, recent epidemiological studies expand the assessment of potential copollutant confounding. There is some evidence that $PM_{2.5}$ associations with asthma exacerbation, combined respiratory-related diseases, and respiratory mortality remain relatively unchanged in copollutant models with gaseous pollutants (*i.e.,* $O_3$, $NO_2$, $SO_2$, with more limited evidence for CO) and other particle sizes (*i.e.,* $PM_{10-2.5}$) (U.S. EPA, 2019, section 5.1.10.1).

Insight into whether there is an independent effect of $PM_{2.5}$ on respiratory health is provided by findings from animal toxicologic studies. Specifically, short-term exposure to $PM_{2.5}$ has been shown to enhance asthma-related responses in an animal model of allergic airways disease and lung injury and inflammation in an animal model of COPD (U.S. EPA, 2019, sections 5.1.2.4.4 and 5.1.4.4.3). The experimental evidence provides biological plausibility for some respiratory-related endpoints, including limited evidence of altered host defense and greater susceptibility to bacterial infection as well as consistent evidence of respiratory irritant effects. Animal toxicologic evidence for other respiratory effects is inconsistent and controlled human exposure studies

provide limited evidence of respiratory effects (U.S. EPA, 2019, section 5.1.12).

The 2019 ISA concludes that ''[t]he strongest evidence of an effect of short-term $PM_{2.5}$ exposure on respiratory effects is provided by epidemiological studies of asthma and COPD exacerbation. While animal toxicologic studies provide biological plausibility for these findings, some uncertainty remains with respect to the independence of $PM_{2.5}$ effects'' (U.S. EPA, 2019, p. 5–155). When taken together, the ISA concludes that this evidence ''is sufficient to conclude a likely to be causal relationship between short-term $PM_{2.5}$ exposure and respiratory effects'' (U.S. EPA, 2019, p. 5–155).

iv. Cancer

The 2009 ISA concluded that the overall body of evidence was ''suggestive of a causal relationship between relevant $PM_{2.5}$ exposures and cancer'' (U.S. EPA, 2009c). This conclusion was based primarily on positive associations observed in a limited number of epidemiological studies of lung cancer mortality. The few epidemiological studies that had evaluated $PM_{2.5}$ exposure and lung cancer incidence or cancers of other organs and systems generally did not show evidence of an association. Toxicologic studies did not focus on exposures to specific PM size fractions, but rather investigated the effects of exposures to total ambient PM, or other source-based PM such as wood smoke. Collectively, results of in vitro studies were consistent with the larger body of evidence demonstrating that ambient PM and PM from specific combustion sources are mutagenic and genotoxic. However, animal inhalation studies found little evidence of tumor formation in response to chronic exposures. A small number of studies provided preliminary evidence that PM exposure can lead to changes in methylation of DNA, which may contribute to biological events related to cancer.

Since the 2009 ISA, additional cohort studies provide evidence that long-term $PM_{2.5}$ exposure is positively associated with lung cancer mortality and with lung cancer incidence, and provide initial evidence for an association with reduced cancer survival (U.S. EPA, 2019, section 10.2.5), with limited evidence of cancer in other organ systems. Reanalyses of the ACS cohort using different years of $PM_{2.5}$ data and follow-up, along with various exposure assignment approaches, provide consistent evidence of positive associations between long-term $PM_{2.5}$ exposure and lung cancer mortality (U.S. EPA, 2019, Figure 10–3). Additional support for positive associations with lung cancer mortality is provided by recent epidemiological studies using individual-level data to control for smoking status, in studies of people who have never smoked), and in analyses of cohorts that relied upon proxy measures to account for smoking status (U.S. EPA, 2019, section 10.2.5.1.1). Although studies that evaluate lung cancer incidence, including studies of people who have never smoked, are limited in number, recent studies generally report positive associations with long-term $PM_{2.5}$ exposures (U.S. EPA, 2019, section 10.2.5.1.2). In addition, a subset of the studies focusing on lung cancer incidence also examined histological subtypes, providing some evidence of positive associations for adenocarcinomas, the predominate subtype of lung cancer observed in people who have never smoked (U.S. EPA, 2019, section 10.2.5.1.2). Associations between long-term $PM_{2.5}$ exposure and lung cancer incidence were found to remain relatively unchanged, though in some cases confidence intervals widened, in analyses that attempted to reduce exposure measurement error by accounting for length of time at residential address or by examining different exposure assignment approaches (U.S. EPA, 2019, section 10.2.5.1.2).

To date, relatively few studies have evaluated the potential for copollutant confounding of the relationship between long-term $PM_{2.5}$ exposure and lung cancer mortality or incidence. The small number of such studies have generally focused on $O_3$ and report that $PM_{2.5}$ associations remain relatively unchanged in copollutant models (U.S. EPA, 2019, section 10.2.5.1.3). However, available studies have not systematically evaluated the potential for copollutant confounding by other gaseous pollutants or by other particle size fractions (U.S. EPA, 2019, section 10.2.5.1.3). Compared to total (non-accidental) mortality (discussed above), fewer studies have examined the shape of the concentration-response curve for cause-specific mortality outcomes, including lung cancer. Several of these studies have reported no evidence of deviations from linearity in the shape of the concentration-response relationship (Lepeule et al., 2012; Raaschou-Nielsen et al., 2013; Puett et al., 2014), though authors provided only limited discussions of results (U.S. EPA, 2019, section 10.2.5.1.4).

In support of the biological plausibility of an independent effect of $PM_{2.5}$ on cancer, the 2019 ISA notes evidence from recent experimental studies demonstrating that $PM_{2.5}$ exposure can lead to a range of effects indicative of mutagenicity, genotoxicity, and carcinogenicity, as well as epigenetic effects (U.S. EPA, 2019, section 10.2.7). For example, both in vitro and in vivo toxicologic studies have shown that $PM_{2.5}$ exposure can result in DNA damage (U.S. EPA, 2019, section 10.2.2). Although such effects do not necessarily equate to carcinogenicity, the evidence that PM exposure can damage DNA, and elicit mutations, provides support for the plausibility of epidemiological associations with lung cancer mortality and incidence. Additional supporting studies indicate the occurrence of micronuclei formation and chromosomal abnormalities (U.S. EPA, 2019, section 10.2.2.3), and differential expression of genes that may be relevant to cancer pathogenesis, following PM exposures. Experimental and epidemiological studies that examine epigenetic effects indicate changes in DNA methylation, providing some support for $PM_{2.5}$ exposure contributing to genomic instability (U.S. EPA, 2019, section 10.2.3).

Epidemiological evidence for associations between $PM_{2.5}$ exposure and lung cancer mortality and incidence, together with evidence supporting the biological plausibility of such associations, contributes to the 2019 ISA's conclusion that the evidence ''is sufficient to conclude there is a likely to be causal relationship between long-term $PM_{2.5}$ exposure and cancer'' (U.S. EPA, 2019, p. 10–77).

In its letter to the Administrator on the draft ISA, the CASAC states that ''the Draft ISA does not present adequate evidence to conclude that there is likely to be a causal relationship between long-term $PM_{2.5}$ exposure and . . . cancer'' (Cox, 2019a, p. 1 of letter). The CASAC specifically states that this causality determination ''relies largely on epidemiology studies that . . . do not provide exposure time frames that are appropriate for cancer causation and that there are no animal studies showing direct effects of $PM_{2.5}$ on cancer formation'' (Cox, 2019a, p. 20 of consensus responses).

With respect to the latency period, it is well recognized that ''air pollution exposures experienced over an extended historical time period are likely more relevant to the etiology of lung cancer than air pollution exposures experienced in the more recent past'' (Turner et al. 2011). However, many epidemiological studies conducted within the U.S. that examine long-term

$PM_{2.5}$ exposure and lung cancer incidence and lung cancer mortality rely on more recent air quality data because routine $PM_{2.5}$ monitoring did not start until 1999–2000. An exception to this is the ACS study that had $PM_{2.5}$ concentration data from two time periods, 1979–1983 and from 1999–2000. Turner et al. (2011), conducted a comparison of $PM_{2.5}$ concentrations between these two time periods and found that they were highly correlated (r >0.7), with the relative rank order of metropolitan statistical areas (MSAs) by $PM_{2.5}$ concentrations being ''generally retained over time.'' Therefore, areas where $PM_{2.5}$ concentrations were high remained high over decades (or were low and remained low) relative to other locations. Long-term exposure epidemiological studies rely on spatial contrasts between locations; therefore, if a location with high $PM_{2.5}$ concentrations continues to have high concentrations over decades relative to other locations a relationship between the $PM_{2.5}$ exposure and cancer should persist. This was confirmed in a sensitivity analysis conducted by Turner et al. (2011), where the authors reported a similar hazard ratio (HR) for lung cancer mortality for participants assigned exposure to $PM_{2.5}$ (1979–1983) and $PM_{2.5}$ (1999–2000) in two separate analyses.

While experimental studies showing a direct effect of $PM_{2.5}$ on cancer formation were limited to an animal model of urethane-induced tumor initiation, a large number of experimental studies report that $PM_{2.5}$ exhibits several key characteristics of carcinogens, as indicated by genotoxic effects, oxidative stress, electrophilicity, and epigenetic alterations, all of which provide biological plausibility that $PM_{2.5}$ exposure can contribute to cancer development. The experimental evidence, in combination with multiple recent and previously evaluated epidemiological studies examining the relationship between long-term $PM_{2.5}$ exposure and both lung cancer incidence and lung cancer mortality that reported generally positive associations across different cohorts, exposure assignment methods, and in analyses of never smokers further addresses uncertainties identified in the 2009 ISA. Therefore, upon re-evaluating the causality determination for cancer, when considering CASAC comments on the draft ISA and applying the causal framework as described (U.S. EPA, 2015; U.S. EPA, 2019, section A.3.2.1), the EPA continues to conclude in the 2019 ISA that the evidence for long-term $PM_{2.5}$ exposure and cancer supports a ''likely to be causal relationship'' (U.S. EPA, 2019, p. 10–77).

v. Nervous System Effects

Reflecting the very limited evidence available in the last review, the 2009 ISA did not make a causality determination for long-term $PM_{2.5}$ exposures and nervous system effects (U.S. EPA, 2009c). Since the last review, this body of evidence has grown substantially (U.S. EPA, 2019, section 8.2). Recent studies in adult animals report that long-term $PM_{2.5}$ exposures can lead to morphologic changes in the hippocampus and to impaired learning and memory. This evidence is consistent with epidemiological studies reporting that long-term $PM_{2.5}$ exposure is associated with reduced cognitive function (U.S. EPA, 2019, section 8.2.5). Further, while the evidence is limited, early markers of Alzheimer's disease pathology have been reported in rodents following long-term exposure to $PM_{2.5}$ CAPs. These findings support reported associations with neurodegenerative changes in the brain (*i.e.,* decreased brain volume), all-cause dementia, and hospitalization for Alzheimer's disease in a small number of epidemiological studies (U.S. EPA, 2019, section 8.2.6). Additionally, loss of dopaminergic neurons in the substantia nigra, a hallmark of Parkinson's disease, has been reported in mice following long-term $PM_{2.5}$ exposures (U.S. EPA, 2019, section 8.2.4), though epidemiological studies provide only limited support for associations with Parkinson's disease (U.S. EPA, 2019, section 8.2.6). Overall, the lack of consideration of copollutant confounding introduces some uncertainty in the interpretation of epidemiological studies of nervous system effects, but this uncertainty is partly addressed by the evidence for an independent effect of $PM_{2.5}$ exposures provided by experimental animal studies.

In addition to the findings described above, which are most relevant to older adults, several recent studies of neurodevelopmental effects in children have also been conducted. Epidemiological studies provided limited evidence of an association between $PM_{2.5}$ exposure during pregnancy and childhood on cognitive and motor development (U.S. EPA, 2019, section 8.2.5.2). While some studies report positive associations between long-term exposure to $PM_{2.5}$ during the prenatal period and autism spectrum disorder (ASD) (U.S. EPA, 2019, section 8.2.7.2). Interpretation of these epidemiological studies is limited due to the small number of studies, their lack of control for potential confounding by copollutants, and uncertainty regarding the critical exposure windows. Biological plausibility is provided for the ASD findings by a study in mice that found inflammatory and morphologic changes in the corpus collosum and hippocampus, as well as ventriculomegaly (*i.e.,* enlarged lateral ventricles) in young mice following prenatal exposure to $PM_{2.5}$ CAPs.

Taken together, the 2019 ISA concludes that the strongest evidence of an effect of long-term exposure to $PM_{2.5}$ on the nervous system is provided by toxicologic studies that show inflammation, oxidative stress, morphologic changes, and neurodegeneration in multiple brain regions following long-term exposure of adult animals to $PM_{2.5}$ CAPs. These findings are coherent with epidemiological studies reporting consistent associations with cognitive decrements and with all-cause dementia. The ISA determines that ''[o]verall, the collective evidence is sufficient to conclude a likely to be causal relationship between long-term $PM_{2.5}$ exposure and nervous system effects'' (U.S. EPA, 2019, p. 8–61).

In its letter to the Administrator on the draft ISA, the CASAC states that ''the Draft ISA does not present adequate evidence to conclude that there is likely to be a causal relationship between long-term $PM_{2.5}$ exposure and nervous system effects'' (Cox, 2019a, p. 1 of letter). The CASAC specifically states that ''[f]or a likely causal conclusion, there would have to be evidence of health effects in studies where results are not explained by chance, confounding, and other biases, but uncertainties remain in the overall evidence'' (Cox, 2019a, p. 20 of consensus responses). These uncertainties in the eyes of CASAC reflect that animal toxicologic studies ''have largely been done by a single group,'' and for epidemiological studies that examined brain volume that ''brain volumes can vary . . . between normal people'' and the results from studies of cognitive function were ''largely non-statistically significant'' (Cox, 2019a, p. 20 of consensus responses).

With these concerns in mind, and as noted in the proposed rule (85 FR 24114, April 30, 2020), the EPA re-evaluated the evidence and note that animal toxicologic studies were conducted in ''multiple research groups [and show a range of effects including] inflammation, oxidative stress, morphologic changes, and neurodegeneration in multiple brain regions following long-term exposure of adult animals to $PM_{2.5}$ CAPs'' (U.S. EPA, 2019, p. 8–61). The results from the

animal toxicologic studies ''are coherent with a number of epidemiological studies reporting consistent associations with cognitive decrements and with all-cause dementia'' (U.S. EPA, 2019, p. 8–61). Additionally, as discussed in the Preamble to the ISAs (U.S. EPA, 2015):

> ''. . . the U.S. EPA emphasizes the importance of examining the pattern of results across various studies and does not focus solely on statistical significance or the magnitude of the direction of the association as criteria of study reliability. Statistical significance is influenced by a variety of factors including, but not limited to, the size of the study, exposure and outcome measurement error, and statistical model specifications. Statistical significance . . . is just one of the means of evaluating confidence in the observed relationship and assessing the probability of chance as an explanation. Other indicators of reliability such as the consistency and coherence of a body of studies as well as other confirming data may be used to justify reliance on the results of a body of epidemiologic studies, even if results in individual studies lack statistical significance . . . [Therefore, the U.S. EPA] . . . does not limit its focus or consideration to statistically significant results in epidemiologic studies.''

Therefore, upon re-evaluating the causality determination, when considering the CASAC comments on the draft ISA and applying the causal framework as described (U.S. EPA, 2015; U.S. EPA, 2019, section A.3.2.1), the EPA continues to conclude in the 2019 ISA that the evidence for long-term $PM_{2.5}$ exposure and nervous system effects supports a ''likely to be causal relationship'' (U.S. EPA, 2019, p. 8–61).

vi. Other Effects

For other categories of health effects and $PM_{2.5}$ exposures,[40] the currently available evidence is ''suggestive of, but not sufficient to infer, a causal relationship,'' mainly due to inconsistent evidence across specific outcomes and uncertainties regarding exposure measurement error, the potential for confounding, and potential modes of action (U.S. EPA, 2019, sections 7.1.4, 7.2.10, 8.1.6, and 9.1.5). These causality determinations are revised from ''inadequate to infer a causal relationship'' or not evaluated in the 2009 ISA this review; however, the ''suggestive of, but not sufficient to infer, a causal relationship'' causality determinations reflect continued uncertainties in the evidence.

b. At-Risk Populations

In this review, we use the term ''at-risk populations'' to describe populations with a quality or characteristic in common (*e.g.,* a specific pre-existing illness or specific lifestage) that contributes to them having a greater likelihood of experiencing $PM_{2.5}$-related health effects. In the current review, consistent with the last review, the 2019 ISA cites extensive evidence indicating that ''both the general population as well as specific populations and lifestages are at risk for $PM_{2.5}$-related health effects'' (U.S. EPA, 2019, p. 12–1). For example, in support of its ''causal'' and ''likely to be causal'' determinations, the ISA cites substantial evidence for: PM-related mortality and cardiovascular effects in older adults (U.S. EPA, 2019, sections 11.1, 11.2, 6.1, and 6.2); PM-related cardiovascular effects in people with pre-existing cardiovascular disease (U.S. EPA, 2019, section 6.1); PM-related respiratory effects in people with pre-existing respiratory disease, particularly asthma exacerbations in children (U.S. EPA, 2019, section 5.1); and PM-related impairments in lung function growth and asthma development in children (U.S. EPA, 2019, sections 5.1 and 5.2; 12.5.1.1).

The ISA additionally notes that stratified analyses (*i.e.,* analyses that directly compare PM-related health effects across groups) provide support for racial and ethnic differences in $PM_{2.5}$ exposures and in $PM_{2.5}$-related health risk (U.S. EPA, 2019, section 12.5.4). Drawing from such studies, the ISA concludes that ''[t]here is strong evidence demonstrating that black and Hispanic populations, in particular, have higher $PM_{2.5}$ exposures than non-Hispanic white populations'' and that ''there is consistent evidence across multiple studies demonstrating an increase in risk for nonwhite populations'' (U.S. EPA, 2019, p. 12–38). Stratified analyses focusing on other groups also suggest that populations with pre-existing cardiovascular or respiratory disease, populations that are overweight or obese, populations that have particular genetic variants, populations that are of low socioeconomic status, and current/former smokers could be at increased risk for $PM_{2.5}$-related adverse health effects (U.S. EPA, 2019, Chapter 12).

Thus, the groups at greater risk of $PM_{2.5}$-related health effects represent a substantial portion of the total U.S. population. In evaluating the primary $PM_{2.5}$ standards, an important consideration is the potential for additional public health improvements in these populations.

c. Evidence-Based Considerations

The sections below summarize the PA's evaluation of the $PM_{2.5}$ exposure concentrations that have been examined in controlled human exposure studies, animal toxicology studies, and epidemiological studies.

i. $PM_{2.5}$ Concentrations Evaluated in Experimental Studies

Evidence for a particular $PM_{2.5}$-related health outcome is strengthened when results from experimental studies demonstrate biologically plausible mechanisms through which adverse human health outcomes could occur (U.S. EPA, 2015, p. 20). Two types of experimental studies are of particular importance in understanding the effects of PM exposures: Controlled human exposure and animal toxicologic studies. In such studies, investigators expose human volunteers or laboratory animals, respectively, to known concentrations of air pollutants under carefully regulated environmental conditions and activity levels. Thus, controlled human exposure and animal toxicology studies can provide information on the health effects of experimentally administered pollutant exposures under well-controlled laboratory conditions (U.S. EPA, 2015, p. 11).

Controlled human exposure studies have reported that $PM_{2.5}$ exposures lasting from less than one hour up to five hours can impact cardiovascular function (U.S. EPA, 2019, section 6.1). The most consistent evidence from these studies is for impaired vascular function (U.S. EPA, 2019, section 6.1.13.2). Table 3–2 in the PA (U.S. EPA, 2020) summarizes information from the ISA on available controlled human exposure studies that evaluate effects on markers of cardiovascular function following exposures to $PM_{2.5}$. Most of the controlled human exposure studies in Table 3–2 of the PA have evaluated average $PM_{2.5}$ exposure concentrations at or above about 100 $\mu g/m^3$, with exposure durations typically up to about two hours. Statistically significant effects on one or more indicators of cardiovascular function are often, though not always, reported following 2-hour exposures to average $PM_{2.5}$ concentrations at and above about 120 $\mu g/m^3$, with less consistent evidence for effects following exposures to lower concentrations. Impaired vascular function, the effect identified in the ISA as the most consistent across studies (U.S. EPA, 2019, section 6.1.13.2), is shown following 2-hour

[40] The other categories evaluated in the ISA include nervous system effects and short-term exposures; metabolic effects; reproduction and fertility; and pregnancy and birth outcomes (U.S. EPA, 2019, Table ES–1).

exposures to $PM_{2.5}$ concentrations at and above 149 μg/m³. Mixed results are reported in the few studies that evaluate longer exposure durations (*i.e.,* longer than 2 hours) and lower $PM_{2.5}$ concentrations (U.S. EPA, 2020, section 3.2.3.1).

To provide some insight into what these studies may indicate regarding the primary $PM_{2.5}$ standards, analyses in the PA examine monitored 2-hour $PM_{2.5}$ concentrations at sites meeting the current standards (U.S. EPA, 2020, section 3.2.3.1). At these sites, most 2-hour concentrations are below 11 μg/m³, and they almost never exceed 32 μg/m³. Even the highest 2-hour concentrations remain well-below the exposure concentrations consistently shown to cause effects in controlled human exposure studies (*i.e.,* 99.9th percentile of 2-hour concentrations is 68 μg/m³ during the warm season). Thus, while controlled human exposure studies support the plausibility of the serious cardiovascular effects that have been linked with ambient $PM_{2.5}$ exposures (U.S. EPA, 2019, Chapter 6), the PA notes that the $PM_{2.5}$ exposures evaluated in most of these studies are well-above the ambient concentrations typically measured in locations meeting the current primary standards (U.S. EPA, 2020, section 3.2.3.2.1).

With respect to animal toxicology studies, the ISA relies on animal toxicology studies to support the plausibility of a wide range of $PM_{2.5}$-related health effects. While animal toxicology studies often examine more severe health outcomes and longer exposure durations than controlled human exposure studies, there is uncertainty in extrapolating the effects seen in animals, and the $PM_{2.5}$ exposures and doses that cause those effects, to human populations.

As with controlled human exposure studies, most of the animal toxicology studies assessed in the ISA have examined effects following exposures to $PM_{2.5}$ concentrations well-above the concentrations likely to be allowed by the current $PM_{2.5}$ standards. Such studies have generally examined short-term exposures to $PM_{2.5}$ concentrations from 100 to >1,000 μg/m³ and long-term exposures to concentrations from 66 to >400 μg/m³ (*e.g.,* see U.S. EPA, 2019, Table 1–2). Two exceptions are a study reporting impaired lung development following long-term exposures (*i.e.,* 24 hours per day for several months prenatally and postnatally) to an average $PM_{2.5}$ concentration of 16.8 μg/m³ (Mauad et al., 2008) and a study reporting increased carcinogenic potential following long-term exposures (*i.e.,* 2 months) to an average $PM_{2.5}$ concentration of 17.7 μg/m³ (Cangerana Pereira et al., 2011). These two studies report serious effects following long-term exposures to $PM_{2.5}$ concentrations close to the ambient concentrations reported in some $PM_{2.5}$ epidemiological studies (U.S. EPA, 2019, Table 1–2), though still above the ambient concentrations likely to occur in areas meeting the current primary standards. Thus, as is the case with controlled human exposure studies, animal toxicology studies support the plausibility of various adverse effects that have been linked to ambient $PM_{2.5}$ exposures (U.S. EPA, 2019), but have not evaluated $PM_{2.5}$ exposures likely to occur in areas meeting the current primary standards.

ii. Ambient Concentrations in Locations of Epidemiological Studies

As summarized above in section II.A.2.a, epidemiological studies examining associations between daily or annual average $PM_{2.5}$ exposures and mortality or morbidity represent a large part of the evidence base supporting several of the ISA's ''causal'' and ''likely to be causal'' determinations for cardiovascular effects, respiratory effects, cancer, and mortality. The PA considers what information from these epidemiological studies may indicate regarding primary $PM_{2.5}$ standards. The use of information from epidemiological studies to inform conclusions on the primary $PM_{2.5}$ standards is complicated by the fact that such studies evaluate associations between distributions of ambient $PM_{2.5}$ and health outcomes, but do not identify the specific exposures that cause reported effects. Rather, health effects can occur over the entire distributions of ambient $PM_{2.5}$ concentrations evaluated, and epidemiological studies do not identify a population-level threshold below which it can be concluded with confidence that PM-associated health effects do not occur (U.S. EPA, 2020, section 3.2.3.2). Therefore, the PA evaluates the $PM_{2.5}$ air quality distributions over which epidemiological studies support health effect associations. As discussed further in the PA (U.S. EPA, 2020, section 3.2.3.2.1), studies of daily $PM_{2.5}$ exposures examine associations between day-to-day variation in $PM_{2.5}$ concentrations and health outcomes, often over several years. While there can be considerable variability in daily exposures over a multi-year study period, most of the estimated exposures reflect days with ambient $PM_{2.5}$ concentrations around the middle of the air quality distributions examined (*i.e.,* ''typical'' days rather than days with extremely high or extremely low concentrations). Similarly, for studies of annual $PM_{2.5}$ exposures, most of the estimated exposures reflect annual average $PM_{2.5}$ concentrations around the middle of the air quality distributions examined. In both cases, epidemiological studies provide the strongest support for reported health effect associations for this middle portion of the $PM_{2.5}$ air quality distribution, which corresponds to the bulk of the underlying data, rather than the extreme upper or lower ends of the distribution. Consistent with this, and as noted in the PA (U.S. EPA, 2020, section 3.2.1.1), several epidemiological studies report that associations persist in analyses that exclude the upper portions of the distributions of estimated $PM_{2.5}$ exposures, indicating that ''peak'' $PM_{2.5}$ exposures are not disproportionately responsible for reported health effect associations.

Thus, in considering $PM_{2.5}$ air quality data from epidemiological studies, the PA evaluates study-reported means (or medians) of daily and annual average $PM_{2.5}$ concentrations as proxies for the middle portions of the air quality distributions that support reported associations. In Figure 3–7, the PA highlights the overall mean (or median) $PM_{2.5}$ concentrations reported in key U.S. and Canadian epidemiological studies that use ground-based monitors alone to estimate long- or short-term $PM_{2.5}$ exposures. In Figure 3–8, the PA also considers the emerging body of studies that use hybrid modeling methods to estimate long- or short-term $PM_{2.5}$ exposures. Hybrid methods incorporate data from several sources, often including satellites and models, in addition to ground-based monitors.

Epidemiological studies using hybrid methods are generally new in this review. These modeling methods have improved the ability to estimate $PM_{2.5}$ exposure for populations throughout the conterminous U.S. compared with the earlier approaches based on monitoring data alone. Excellent performance in cross-validation tests suggests that hybrid methods are reliable for estimating $PM_{2.5}$ exposure in many applications. As discussed in Chapter 3 of the PA, good agreement in health study results between monitor- and model-based methods for urban areas (McGuinn et al., 2017) and general consistency in results for the conterminous U.S. (Jerrett et al., 2017; Di et al., 2016) also suggests that the fields are reliable for use in health studies. However, there are also important limitations associated with the modeled fields that should be kept in mind. First, performance evaluations

for the methods are weighted toward densely monitored urban areas at the scales of representation of the monitoring networks. Predictions at different scales or in sparsely monitored areas are relatively untested. Second, studies have reported heterogeneity in performance with relatively weak performance in parts of the western U.S., at low concentrations, at greater distance to monitors, and under conditions where the reliability and availability of key input datasets (*e.g.,* satellite retrievals and air quality modeling) are limited. Lastly, differences in predictions among different hybrid methods have also been reported and tend to be most important under conditions with the performance issues just noted. Differences in predictions can be related to the different approaches used to create long-term $PM_{2.5}$ fields (*e.g.,* averaging daily $PM_{2.5}$ fields vs. developing long-term average fields), which can be impacted by variability in monitoring schedules, and the spatial scale at which these fields are created. Future work to further characterize the performance of modeled fields will be useful in informing our understanding of the implications of using these fields to estimate $PM_{2.5}$ exposures in health studies (U.S. EPA, 2020, section 2.3.3.1.4).

In assessing how the overall mean (or median) $PM_{2.5}$ concentrations reported in key epidemiological studies can inform conclusions on the primary $PM_{2.5}$ standards, there are some important considerations. As noted in the PA, study-reported $PM_{2.5}$ concentrations reflect the averages of daily or annual $PM_{2.5}$ air quality concentrations or exposure estimates in the study population over the years examined by the study, and are not the same as the $PM_{2.5}$ design values used by the EPA to determine whether areas meet or violate the PM NAAQS (U.S. EPA, 2020, section 3.2.3.2.1). Overall mean $PM_{2.5}$ concentrations in key studies reflect averaging of short- or long-term $PM_{2.5}$ exposure estimates across locations (*i.e.,* across multiple monitors or across modeled grid cells) and over time (*i.e.,* over several years). In contrast, to determine whether areas meet or violate the NAAQS, the EPA measures air pollution concentrations at individual monitors (*i.e.,* concentrations are not averaged across monitors) and calculates design values at monitors meeting appropriate data quality and completeness criteria. For the annual $PM_{2.5}$ standard, design values are calculated as the annual arithmetic mean $PM_{2.5}$ concentration, averaged over 3 years (described in Appendix N of 40 CFR part 50). For an area to meet the NAAQS, all valid design values in that area, including the highest monitored values, must be at or below the level of the standard.

In the context of epidemiological studies that use ground-based monitors, analyses of recent air quality in U.S. CBSAs indicate that maximum annual $PM_{2.5}$ design values for a given three-year period are often 10% to 20% higher than average monitored concentrations (*i.e.,* averaged across multiple monitors in the same CBSA) (U.S. EPA, 2020, Appendix B, section B.7). This comparison is more difficult for epidemiological studies that use hybrid methods. To try to address this issue, the PA also considered a second approach to evaluating information from epidemiological studies. In this approach, the PA calculated study area air quality metrics similar to $PM_{2.5}$ design values (*i.e.,* referred to in the PA as pseudo-design values; U.S. EPA, 2020, section 3.2.3.2.2) and considered the degree to which such metrics indicate that study area air quality would likely have met or violated the current standards during study periods. This approach was generally not well received by commenters during the review of the PA.

### 3. Overview of Risk and Exposure Assessment Information

Beyond the consideration of the scientific evidence, discussed above in section II.A.2, the EPA also considers the extent to which new or updated quantitative analyses of $PM_{2.5}$ air quality, exposure, or health risks could inform conclusions on the adequacy of the public health protection provided by the current primary $PM_{2.5}$ standards. Conducting such quantitative analyses, if appropriate, could inform judgments about the potential for additional public health improvements associated with $PM_{2.5}$ exposure and related health effects and could help to place the evidence for specific effects into a broader public health context.

To this end, the PA includes a risk assessment that estimates population-level health risks associated with $PM_{2.5}$ air quality that has been adjusted to simulate air quality scenarios of policy interest (*e.g.,* ''just meeting'' the current standards). The general approach to estimating $PM_{2.5}$-associated health risks combines concentration-response functions from epidemiological studies with model-based $PM_{2.5}$ air quality surfaces, baseline health incidence data, and population demographics for 47 urban study areas (U.S. EPA, 2020, section 3.3, Figure 3–10 and Appendix C).

The risk assessment estimates that the current primary $PM_{2.5}$ standards could allow a substantial number of $PM_{2.5}$-associated deaths in the U.S. For example, when air quality in the 47 study areas is adjusted to simulate just meeting the current standards, the risk assessment estimates from about 16,000 to 17,000 long-term $PM_{2.5}$ exposure-related deaths from ischemic heart disease in a single year (*i.e.,* confidence intervals range from about 12,000 to 21,000 deaths).[41] Compared to the current annual standard, meeting a revised annual standard with a lower level is estimated to reduce $PM_{2.5}$-associated health risks by about 7 to 9% for a level of 11.0 µg/m$^3$, 14 to 18% for a level of 10.0 µg/m$^3$, and 21 to 27% for a level of 9.0 µg/m$^3$.

Uncertainty in risk estimates (*e.g.,* in the size of risk estimates) can result from a number of factors, including assumptions about the shape of the concentration-response relationship with mortality at low ambient PM concentrations, the potential for confounding and/or exposure measurement error in the underlying epidemiological studies, and the methods used to adjust $PM_{2.5}$ air quality. The PA characterizes these and other sources of uncertainty in risk estimates using a combination of quantitative and qualitative approaches (U.S. EPA, 2020, Appendix C, section C.3). As detailed further below in II.B.1, some members of CASAC advised that the risk assessment estimates did not provide useful information about whether the current standard is protective, while other members thought they were useful to understand potential impacts of alternative standards.

### *B. Conclusions on the Primary $PM_{2.5}$ Standards*

In drawing conclusions on the adequacy of the current primary $PM_{2.5}$ standards, in view of the advances in scientific knowledge and additional information now available, the Administrator has considered the evidence base, information, and policy judgments that were the foundation of the last review and reflects upon the body of evidence and information newly available in this review. In so doing, he considered the large body of evidence presented and assessed in the ISA (U.S.

[41] For the only other cause-specific mortality endpoint evaluated (*i.e.,* lung cancer), substantially fewer deaths were estimated (U.S. EPA, 2020, section 3.3.2, *e.g.,* Figure 3–5). Risk estimates were not generated for other ''likely to be causal'' outcome categories (*i.e.,* respiratory effects, nervous system effects).

EPA, 2019), the policy-relevant and risk-based conclusions and rationales as presented in the PA (U.S. EPA, 2020), views expressed by CASAC, and public comments. The Administrator has taken into account both evidence- and risk-based considerations in developing final conclusions on the adequacy of the current primary $PM_{2.5}$ standards. Evidence-based considerations include the assessment of epidemiological, animal toxicologic, and controlled human exposure studies evaluating long- or short-term exposures to $PM_{2.5}$ and the integration of evidence across each of these disciplines. These considerations, as assessed in the ISA (U.S. EPA, 2019), focus on the policy-relevant considerations, as discussed in II.A.2 above and in the PA (U.S. EPA, 2020, section 3.2.1). Risk-based considerations draw from the results of the quantitative analyses and policy-relevant considerations as discussed in II.A.3 above and in the PA (U.S. EPA, 2020, section 3.3.2).

Section II.B.1 summarizes the advice and recommendations of the CASAC. Section II.B.2 below summarizes the basis for the Administrator's proposed decision, drawing from section II.C.3 of the proposal, and section II.B.3 addresses public comments on the proposed decision. The Administrator's conclusions in this review regarding the adequacy of the current primary standard and whether any revisions are appropriate are described in section II.B.4.

1. CASAC Advice in This Review

With regard to the process for reviewing the PM NAAQS, the CASAC requested the opportunity to review a second draft ISA (Cox, 2019b, p. 1 of letter) and recommended that ''the EPA reappoint the previous CASAC PM panel (or appoint a panel with similar expertise)'' (Cox, 2019b, p. 2 of letter). As discussed above in section I.D, the Agency's responses to these recommendations were described in a letter from the Administrator to the CASAC chair (Wheeler, 2019).

As part of its review of the draft PA, the CASAC provided advice on the adequacy of the public health protection afforded by the current primary $PM_{2.5}$ standards.[42] Its advice is documented in a letter sent to the EPA Administrator (Cox, 2019a). In this letter, the committee recommended retaining the current 24-hour $PM_{2.5}$ standard but did not reach consensus on whether the scientific and technical information support retaining or revising the current annual standard. In particular, though the CASAC agreed that there is a long-standing body of health evidence supporting relationships between $PM_{2.5}$ exposures and various health outcomes, including mortality and serious morbidity effects, individual CASAC members ''differ[ed] in their assessments of the causal and policy significance of these associations'' (Cox, 2019a, p. 8 of consensus responses). Drawing from this evidence, ''some CASAC members'' expressed support for retaining the current annual standard while ''other members'' expressed support for revising that standard in order to increase public health protection (Cox, 2019a, p.1 of letter). These views are summarized below.

The CASAC members who supported retaining the current annual standard expressed the view that substantial uncertainty remains in the evidence for associations between $PM_{2.5}$ exposures and mortality or serious morbidity effects. These committee members asserted that ''such associations can reasonably be explained in light of uncontrolled confounding and other potential sources of error and bias'' (Cox, 2019a, p. 8 of consensus responses). They noted that associations do not necessarily reflect causal effects, and they contended that recent epidemiological studies reporting positive associations at lower estimated exposure concentrations mainly confirm what was anticipated or already assumed in setting the 2012 NAAQS. In particular, they concluded that such studies have some of the same limitations as prior studies and do not provide new information calling into question the existing standard. They further asserted that ''accountability studies provide potentially crucial information about whether and how much decreasing $PM_{2.5}$ causes decreases in future health effects'' (Cox, 2019a, p. 10), and they cited recent reviews (*i.e.*, Henneman et al., 2017; Burns et al., 2019) to support their position that in such studies, ''reductions of $PM_{2.5}$ concentrations have not clearly reduced mortality risks'' (Cox, 2019a, p. 8 of consensus responses). Thus, the committee members who supported retaining the current annual standard advise that, ''while the data on associations should certainly be carefully considered, this data should not be interpreted more strongly than warranted based on its methodological limitations'' (Cox, 2019a, p. 8 of consensus responses).

These members of the CASAC further concluded that the $PM_{2.5}$ risk assessment does not provide a valid basis for revising the current standards. This conclusion was based on concerns that (1) ''the risk assessment treats regression coefficients as causal coefficients with no justification or validation provided for this decision;'' (2) the estimated regression concentration-response functions ''have not been adequately adjusted to correct for confounding, errors in exposure estimates and other covariates, model uncertainty, and heterogeneity in individual biological (causal) [concentration-response] functions;'' (3) the estimated concentration-response functions ''do not contain quantitative uncertainty bands that reflect model uncertainty or effects of exposure and covariate estimation errors;'' and (4) ''no regression diagnostics are provided justifying the use of proportional hazards . . . and other modeling assumptions'' (Cox, 2019a, p. 9 of consensus responses). These committee members also contended that details regarding the derivation of concentration-response functions, including specification of the beta values and functional forms, were not well-documented, hampering the ability of readers to evaluate these design details. Thus, these members ''think that the risk characterization does not provide useful information about whether the current standard is protective'' (Cox, 2019a, p. 11 of consensus responses).

Drawing from their evaluation of the evidence and the risk assessment, these committee members concluded that ''the Draft PM PA does not establish that new scientific evidence and data reasonably call into question the public health protection afforded by the current 2012 $PM_{2.5}$ annual standard'' (Cox, 2019a, p.1 of letter).

In contrast, ''[o]ther members of CASAC conclude[d] that the weight of the evidence, particularly reflecting recent epidemiology studies showing positive associations between $PM_{2.5}$ and health effects at estimated annual average $PM_{2.5}$ concentrations below the current standard, does reasonably call into question the adequacy of the 2012 annual $PM_{2.5}$ [standard] to protect public health with an adequate margin of safety'' (Cox, 2019a, p.1 of letter). The committee members who supported this conclusion noted that the body of health evidence for $PM_{2.5}$ not only includes the repeated demonstration of associations in epidemiological studies, but also includes support for biological

[42] The CASAC also provided advice on the draft ISA's assessment of the scientific evidence (Cox, 2019b). That advice, and the resulting changes made in the final ISA and final PA, are summarized in section II.B.3 of the proposal (85 FR 24114, April 30, 2020).

plausibility established by controlled human exposure and animal toxicology studies. They pointed to recent studies demonstrating that the associations between $PM_{2.5}$ and health effects occur in a diversity of locations, in different time periods, with different populations, and using different exposure estimation and statistical methods. They concluded that ''the entire body of evidence for PM health effects justifies the causality determinations made in the Draft PM ISA'' (Cox, 2019a, p. 8 of consensus responses).

The members of the CASAC who supported revising the current annual standard particularly emphasized recent findings of associations with $PM_{2.5}$ in areas with average long-term $PM_{2.5}$ concentrations below the level of the annual standard and studies that show positive associations even when estimated exposures above 12 μg/m³ are excluded from analyses. They found it ''highly unlikely'' that the extensive body of evidence indicating positive associations at low estimated exposures could be fully explained by confounding or by other non-causal explanations (Cox, 2019a, p. 8 of consensus responses). They additionally concluded that ''the risk characterization does provide a useful attempt to understand the potential impacts of alternate standards on public health risks'' (Cox, 2019a, p. 11 of consensus responses). These committee members concluded that the evidence available in this review reasonably calls into question the protection provided by the current primary $PM_{2.5}$ standards and supports revising the annual standard to increase that protection (Cox, 2019a).

2. Basis for Proposed Decision

On April 14, 2020, the Administrator proposed to retain the current primary $PM_{2.5}$ standards. This proposal was published in the **Federal Register** on April 30, 2020 (85 FR 24094, April 30, 2020). In reaching his proposed decision to retain the current $PM_{2.5}$ standards (*i.e.,* annual and 24-hour $PM_{2.5}$ standards), the Administrator considered the assessment of the available evidence and conclusions reached in the ISA (U.S. EPA, 2019); the analyses in the PA (U.S. EPA, 2020), including uncertainties in the evidence and analyses; and the advice and recommendations from the CASAC. These considerations are summarized briefly below and discussed in detail in the proposal notice (85 FR 24094, April 30, 2020).

As described further in section II.A.2 of the proposal, the Administrator's consideration of the public health protection provided by the current primary $PM_{2.5}$ standards were based on his consideration of the combination of the annual and 24-hour standards, including the indicators ($PM_{2.5}$), averaging times, forms (arithmetic mean and 98th percentile, averaged over three years), and levels (12.0 μg/m³, 35 μg/m³) of those standards.

The Administrator's proposed decision noted that one of the methodological limitations highlighted by the CASAC members who support retaining the annual standard (see section II.B.1 above) is that associations reported in epidemiological studies are not necessarily indicative of causal relationships and such associations ''can reasonably be explained in light of uncontrolled confounding and other potential sources of error and bias'' (Cox, 2019a, p.8). In the proposed decision, the Administrator recognized that epidemiological studies examine associations between distributions of $PM_{2.5}$ air quality and health outcomes, and they do not identify particular $PM_{2.5}$ exposures that cause effects, as noted in the PA (U.S. EPA, 2020, section 3.1.2). The Administrator's proposed decision noted that experimental studies do provide evidence for health effects following particular $PM_{2.5}$ exposures under carefully controlled laboratory conditions and further notes that the evidence for a given $PM_{2.5}$-related health outcome is strengthened when results from experimental studies demonstrate biologically plausibility mechanisms through which such an outcome could occur. In the proposed decision, therefore, the Administrator expressed greatest confidence in the potential for $PM_{2.5}$ exposures to cause adverse effects at concentrations supported by multiple types of studies, including experimental studies as well as epidemiological studies.

In the proposed decision, in light of this approach to considering the evidence, the Administrator recognized that controlled human exposure and animal toxicology studies report a wide range of effects, many of which are plausibly linked to the serious cardiovascular and respiratory outcomes reported in epidemiological studies (including mortality), though he noted that the $PM_{2.5}$ exposures examined in these studies are above the concentrations typically measured in areas meeting the current annual and 24-hour standards (U.S. EPA, 2020, section 3.2.3.1). The Administrator was cautious about placing too much weight on reported $PM_{2.5}$ health effect associations for air quality meeting the current annual and 24-hour standards. He concluded in the proposed decision that such associations alone, without supporting experimental evidence at similar $PM_{2.5}$ considerations, left important questions unanswered regarding the degree to which the typical $PM_{2.5}$ exposures likely to occur in areas meeting the current standard could cause the mortality and morbidity outcomes reported in epidemiological studies. Given this concern, the Administrator noted in the proposal that he did not think that recent epidemiological studies reporting health effect associations at $PM_{2.5}$ air quality concentrations likely to have met the current primary standards support revising those standards. Rather, he judged that the overall body of evidence, including controlled human exposure and animal toxicologic studies, in addition to epidemiological studies, indicated continuing uncertainty in the degree to which adverse effects could result from $PM_{2.5}$ exposure in areas meeting the current annual and 24-hour standards.

The Administrator also considered the emerging body of evidence from accountability studies examining past reductions in ambient $PM_{2.5}$, and the degree to which those reductions resulted in public health improvements, but also recognized that interpreting such studies in the context of the current primary $PM_{2.5}$ standards was complicated by the fact that some of the available accountability studies have not evaluated $PM_{2.5}$ specifically, did not show changes in $PM_{2.5}$ air quality, or have not been able to disentangled health impacts of the interventions from background trends in health. The Administrator also recognized that the small number of available studies that do report public health improvements following past declines in ambient $PM_{2.5}$ have not examined air quality meeting the current standard. Together with the Administrator's concerns regarding the lack of experimental studies examining $PM_{2.5}$ exposures typical of areas meeting the current standards, the lack of demonstrated health improvements in areas with air quality meeting the current standards led him to conclude, at the time of proposal, that there was considerable uncertainty in the potential for increased public health protection from further reductions in ambient $PM_{2.5}$ concentrations beyond those achieved under the current primary $PM_{2.5}$ standards.

In addition to the evidence, the Administrator also considered the potential implications of the risk assessment for his proposed decision, noting that all risk assessments have limitations. He noted that such limitations in risk estimates can result

from uncertainty in the shapes of concentration-response functions, particularly at low concentrations; uncertainties in the methods used to adjust air quality; and uncertainty in estimating risks for populations, locations and air quality distributions different from those examined in the underlying epidemiological study. The Administrator noted agreement with some members of the CASAC who expressed concerns regarding limitations in the epidemiological evidence, which provides key inputs to the risk assessment. Thus, he judged it appropriate to place little weight on quantitative estimates of $PM_{2.5}$-associated mortality risk in reaching proposed conclusions on the primary $PM_{2.5}$ standards.

In reaching his proposed decision to retain the current primary $PM_{2.5}$ standards, the Administrator concluded that the scientific evidence assessed in the ISA (U.S. EPA, 2019), and the analyses based on that evidence in the PA (U.S. EPA, 2020), do not call into question the public health protection provided by the current annual and 24-hour $PM_{2.5}$ standards. In particular, the Administrator judged that there is considerable uncertainty in the potential for additional public health improvements from reducing ambient $PM_{2.5}$ below the concentrations achieved under the current primary standards and, therefore, that standards more stringent than the current standards (*e.g.,* with lower levels) are not supported. That is, he judged that such standards would be more than requisite to protect the public health with an adequate margin of safety. This judgment reflected his consideration of the uncertainties in the potential implications of recent epidemiological studies due in part to the lack of supporting evidence from experimental studies and accountability studies conducted at $PM_{2.5}$ concentrations meeting the current standards.

In addition, based on the Administrator's review of the science, including experimental and accountability studies conducted at levels just above the current standard, he judged that the degree of public health protection provided by the current standard is not greater than warranted. This judgment, together with the fact that no CASAC member expressed support for a less stringent standard, led the Administrator to conclude that standards less stringent than the current standards (*e.g.,* with higher levels) are also not supported.

Thus, based on his consideration of the available scientific evidence and technical information and his consideration of advice from the CASAC, the Administrator proposed to conclude that the current suite of primary standards, including the current indicators ($PM_{2.5}$), averaging times (annual and 24-hour), forms (arithmetic mean and 98th percentile, averaged over three years) and levels (12.0 µg/m$^3$, 35 µg/m$^3$), remain requisite to protect the public health. As discussed in detail in the proposal (85 FR 24094, April 30, 2020), this proposed conclusion reflected his judgment that limitations in the science lead to considerable uncertainty regarding the potential public health implications of revising the existing suite of $PM_{2.5}$ standards. Therefore, the Administrator proposed to retain the current standards, without revision.

3. Comments on the Proposed Decision

Overall, the EPA received a large number of unique public comments on the proposed decision to retain the annual and 24-hour $PM_{2.5}$ standards. These comments generally fall into one of two broad groups that expressed sharply divergent views. The first group is comprised of the many commenters, representing industries and industry groups, some state and local governments, and independent organizations, that support the Administrator's proposed decision to retain the primary $PM_{2.5}$ standards. The second group of commenters are those who asserted that the current primary $PM_{2.5}$ standards are not sufficient to protect public health with an adequate margin of safety. These commenters disagree with the EPA's proposed decision to retain the current $PM_{2.5}$ standards and generally recommend a revised annual standard of between 8–10 µg/m$^3$ and a revised 24-hour standard between a range of 25–30 µg/m$^3$. Among those calling for revisions to the current primary $PM_{2.5}$ standards were commenters representing national public health, medical, and environmental nongovernmental organization, tribes and tribal groups, some state and local governments and independent organizations and individuals.

We address the key public comments received on the proposal (85 FR 24094, April 30, 2020) and present the EPA's responses to those comments below. A more detailed summary of all significant comments, along with the EPA's responses (henceforth ''Response to Comments''), can be found in the docket for this rulemaking (Docket No. EPA–HQ–OAR–2015–0072). This document is available for review in the docket for this rulemaking and through the EPA's NAAQS website (*https://www.epa.gov/naaqs/particulate-matter-pm-air-quality-standards*).

With respect to the various elements of the standards, the EPA received very few comments related to indicator and none advocate for revising the current $PM_{2.5}$ indicator for fine particles. Those who express explicit support for retaining the current $PM_{2.5}$ indicator generally endorse the rationale put forward in the PA. The EPA agrees with these commenters, noting that the scientific evidence in this review, as in the last review, continues to provide strong support for health effects following short- and long-term $PM_{2.5}$ exposures and that the available information remains too limited to support a distinct standard for any specific $PM_{2.5}$ component or group of components or to support a distinct standard for the ultrafine fraction.

The EPA also received very few comments on averaging time and form. Those who did provide comments are mostly affiliated with public health organizations and environmental advocacy groups and generally discuss the need for future evaluation of the form and averaging time of the current 24-hour standard (98th percentile, averaged over three years). These commenters, acknowledging the current limitations and uncertainties in the available evidence, suggest that in future reviews the EPA should evaluate how well the current form of the 24-hour standard protects against potential sub-daily exposures based on new epidemiological and experimental evidence that considers sub-daily exposures, but these commenters support retaining the current indicators, averaging times, and forms.

The EPA acknowledges the comments related to averaging time and form of the 24-hour standard and agrees that the current information does not support a revision to the averaging time or form. The EPA will continue to evaluate the form and averaging time of the current 24-hour standard in future reviews based on any new relevant information.

With respect to the level of the 24-hour standard, commenters supporting revision generally support a revised level in the range of 25–30 µg/m$^3$. They contend the available scientific evidence supports that lower levels within this range are required to protect public health, including the health of at-risk populations, with an adequate margin of safety, and that lower levels within this range will provide additional margin of safety. The commenters cite controlled human exposure studies that assess short-term exposures (*i.e.,* 2 to 5 hours) and epidemiological studies that report

associations between adverse health effects and concentrations below the current standard level as supporting the need for this revision. They further add that while revising the 24-hour level to 25 μg/m³ would offer more health protection than 30 μg/m³, it would still not reduce the risk of adverse health outcomes to zero.

With respect to the level of the annual $PM_{2.5}$ standard, numerous comments were received that specifically focus on the Administrator's consideration of epidemiological evidence in this review. Commenters who support revision generally disagree with the Administrator's conclusions and judgments about the uncertainties in the epidemiological evidence and suggest that these studies support revision of the $PM_{2.5}$ annual standard to a level of 8–10 μg/m³. These commenters state that uncertainties in the epidemiological studies, alone, do not negate positive associations seen in studies using diverse study designs and capturing large geographic and population domains. These commenters note that the possibility of confounders and the other referenced uncertainties have been investigated and found not to be material given the overall strength and consistency of results from varying approaches. The commenters who support revising the primary $PM_{2.5}$ standards generally place substantial weight on epidemiologic evidence from multi-city U.S. and Canadian studies that captured a larger geographic domain and population size, and were included in the ISA and in the study-related analyses in the PA (U.S. EPA, 2020). Further, they also cite epidemiological studies in the ISA (U.S. EPA, 2019) that performed restricted/truncated analyses with populations living in areas of lower $PM_{2.5}$ concentrations and contend that associations still exist in these studies at the concentrations below the levels of the current annual and daily standards. Moreover, they state that there was no evidence for an ambient concentration threshold for adverse health effects at the lowest observed levels of either annual or 24-hour $PM_{2.5}$ concentrations.

The EPA disagrees with these commenters. First, the EPA notes that, consistent with past practices, the foremost consideration is the adequacy of the public health protection as provided by the combination of the annual and 24-hour standards together. The annual standard limits ''typical'' daily $PM_{2.5}$ concentrations that make up the bulk of the distribution, while the 24-hour standard adds supplemental protection against ''peak'' daily $PM_{2.5}$ concentrations. In the judgment of the Administrator, therefore, the current annual standard (arithmetic mean, averaged over three years) remains appropriate for targeting protection against the annual and daily $PM_{2.5}$ exposures around the middle portion of the $PM_{2.5}$ air quality distribution, while the current 24-hour standard (98th percentile, averaged over three years) continues to provide an appropriate balance between limiting the occurrence of peak 24-hour $PM_{2.5}$ concentrations and identifying a stable target for risk management programs (U.S. EPA, 2020, section 3.5.2.3). Further, the Administrator notes that changes in $PM_{2.5}$ air quality to meet an annual standard would likely result not only in lower short- and long-term $PM_{2.5}$ concentrations near the middle of the air quality distribution, but also in fewer and lower short-term peak $PM_{2.5}$ concentrations. Similarly, the Administrator recognizes that changes in air quality to meet a 24-hour standard, would result not only in fewer and lower peak 24-hour $PM_{2.5}$ concentrations, but also in lower annual average $PM_{2.5}$ concentrations.

Thus, in considering the adequacy of the 24-hour standard, an important consideration is whether additional protection is needed against short-term exposures to peak $PM_{2.5}$ concentrations. In examining the scientific evidence, the EPA notes that controlled human exposure studies do provide evidence for health effects following single, short-term $PM_{2.5}$ exposures to concentrations. These types of exposures correspond best to those to ambient exposures that might be experienced in the upper end of the $PM_{2.5}$ air quality distribution in the U.S. (*i.e.,* ''peak'' concentrations). However, and as noted above in section II.A.2.c.i, most of these studies examine exposure concentrations considerably higher than are typically measured in areas meeting the current standards (U.S. EPA, 2020, section 3.2.3.1). In particular, controlled human exposure studies often report statistically significant effects on one or more indicators of cardiovascular function following 2-hour exposures to $PM_{2.5}$ concentrations at and above 120 μg/m³ (at and above 149 μg/m³ for vascular impairment, the effect shown to be most consistent across studies). Commenters did specifically note one study (Hemmingsen et al., 2015b) and contend that this study shows significant effects on some outcomes at lower concentrations, following 5-hour exposures to 24 μg/m³. The PA notes that this study does not report effects consistent with other studies in the ISA that evaluate longer exposure durations (*i.e.,* longer than 2 hours) and lower $PM_{2.5}$ concentrations (*e.g.,* Bräuner et al., 2008 and Hemmingsen et al., 2015a). Furthermore, analyses in the PA show that the exposure concentrations included in this study are not observed in areas meeting the current standards (U.S. EPA, 2020, Figure A–2), suggesting that the current standards provide protection against these exposure concentrations. To provide insight into what these studies may indicate regarding the primary $PM_{2.5}$ standards, the PA (U.S. EPA, 2020, p.3–49) notes that 2-hour ambient concentrations of $PM_{2.5}$ at monitoring sites meeting the current standards almost never exceed 32 μg/m³. In fact, even the extreme upper end of the distribution of 2-hour $PM_{2.5}$ concentrations at sites meeting the current standards remains well-below the $PM_{2.5}$ exposure concentrations consistently shown in controlled human exposure studies to elicit effects (*i.e.,* 99.9th percentile of 2-hour concentrations at these sites is 68 μg/m³ during the warm season). Thus, available $PM_{2.5}$ controlled human exposure studies do not indicate the need for additional protection against exposures to peak $PM_{2.5}$ concentrations, beyond the protection provided by the combination of the current 24-hour standard and the current annual standard (U.S. EPA, 2020, section 3.2.3.1). With respect to the epidemiological evidence and as noted above in section II.A.2.c.ii, the information from such studies is most applicable to examining potential health impacts associated with typical (*i.e.,* average or mean) exposures and thus are most applicable in informing decisions on the annual standard (with its arithmetic mean form). Furthermore, as noted above, the available epidemiological studies do not indicate that associations in these studies are strongly influenced by exposures to peak concentrations in the air quality distribution, and thus do not indicate the need for additional protection against short-term exposures to peak $PM_{2.5}$ concentrations. As discussed above, the annual standard provides protection against the typical 24-hour and annual $PM_{2.5}$ exposures. Thus, in the context of a 24-hour standard that is meant to provide supplemental protection (*i.e.,* beyond that provided by the annual standard alone) against short-term exposures to peak $PM_{2.5}$ concentrations, the available evidence supports the Administrator's proposed conclusion to retain the current 24-hour standard with its level of 35 μg/m³.

With respect to commenters that support revision of the annual standard,

the EPA recognizes that there are a large number of studies, many of which include a variety of study populations and geographic locations, that show positive associations between mortality and morbidity and short-term and long-term $PM_{2.5}$ exposure. Furthermore, the EPA recognizes that while uncertainties exist, when the epidemiological evidence is viewed together in the context of the full body of evidence, the scientific information supports that exposure to $PM_{2.5}$ may cause adverse health effects (U.S.EPA, 2019, section 1.7.3, Table 1–4). Therefore, the EPA does not dispute commenters that note epidemiological studies support the conclusion that exposure to $PM_{2.5}$ is associated with morbidity and mortality.

However, while the epidemiological evidence when considered together with the full body of evidence supports health effects associated with $PM_{2.5}$ exposure, the EPA recognizes that important uncertainties and limitations in the health effects evidence remain. Epidemiological studies evaluating health effects associated with long- and short-term $PM_{2.5}$ exposures have reported heterogeneity in associations between cities and geographic regions within the U.S. Heterogeneity in the associations observed across $PM_{2.5}$ epidemiological studies may be due in part to exposure error related to measurement-related issues, the use of central fixed-site monitors to represent population exposure to $PM_{2.5}$, models used in lieu of or to supplement ambient measurements, limitations in hybrid models and our limited understanding of factors that may influence exposures (*e.g.,* topography, the built environment, weather, source characteristics, ventilation usage, personal activity patterns, photochemistry) (U.S. EPA, 2020, p.3–25), all of which can introduce bias and/or increased uncertainty is associated health effects estimates. Heterogeneity is expected when the methods or underlying distribution of covariates vary across studies (U.S. EPA, 2019, p. 6–221). In addition, where $PM_{2.5}$ and other pollutants (*e.g.,* ozone, nitrogen dioxide, and carbon monoxide) are correlated, it can be difficult to distinguish whether attenuation of effects in some studies results from copollutant confounding or collinearity with other pollutants in the ambient mixture (U.S. EPA, 2019, section 1.5.1). The EPA also recognizes that methodological study designs to address confounding, such as causal inference methods, are an emerging field of study (U.S. EPA, 2019, section 11.2.2.4 or U.S. EPA, 2020, p. 3–24). The Administrator weighs these uncertainties in the reported associations of $PM_{2.5}$ concentrations in the studies and considers them in the context of the entire body of evidence before the Agency when reviewing the standards.

Additionally, while epidemiological studies indicate associations between exposure to $PM_{2.5}$ and health effects, they do not identify particular $PM_{2.5}$ exposures that cause effects (section II.A.2.c.ii above and U.S. EPA, 2020, section 3.1.2). Further, using information from epidemiological studies to inform decisions on $PM_{2.5}$ standards is complicated by the recognition that no population threshold, below which it can be concluded with confidence that $PM_{2.5}$-related effects do not occur, can be discerned from the available evidence. As a result, any general approach to reaching decisions on what standards are appropriate necessarily requires judgments about how to translate the information available from the epidemiological studies into a basis for appropriate standards. This includes consideration of how to weigh the uncertainties in the reported associations in the epidemiological studies and the uncertainties in quantitative estimates of risk, in the context of the entire body of evidence before the Agency. Such approaches are consistent with setting standards that are neither more nor less stringent than necessary, recognizing that a zero-risk standard is not required by the CAA.

Commenters who support revising the $PM_{2.5}$ standards further contend that the Administrator has arbitrarily rejected an established practice of relying on epidemiological studies and of setting the standard below the long-term mean $PM_{2.5}$ concentrations reported in each of the studies that provide evidence of an array of serious health effects. The commenters state that in declaring that the latest epidemiological studies cannot justify a decision to strengthen the PM NAAQS, the Administrator has rejected—without acknowledgment or explanation—the EPA's long history of relying on such research as the basis for its primary standards.

As recognized in this and previous PM NAAQS reviews, including those completed in 2006 and 2012, evidence of an association in any epidemiological study is ''strongest at and around the long-term average where the data in the study are most concentrated.'' In the PA (U.S. EPA, 2020, section 3.2.3.2.1), the EPA assessed air quality distributions reported in key epidemiological studies included in the ISA, with a focus on characterizing the long-term average or mean $PM_{2.5}$ concentrations. In doing this, key studies[43] were identified that examined short- and long-term exposure and showed positive associations with either mortality or morbidity health outcomes. The studies either estimated $PM_{2.5}$ exposure using ground-based monitored data or using hybrid modeling data, which incorporate data from several sources, often including satellites and models, as well as ground-based monitors (U.S. EPA, 2020, section 2.3.3). The PA notes some important considerations in using study reported concentrations to inform conclusions on the primary $PM_{2.5}$ standards. In particular, it notes that the overall mean $PM_{2.5}$ concentrations reported by key epidemiological studies are not the same as the ambient concentrations used by the EPA to determine whether areas meet or violate the PM NAAQS. Mean $PM_{2.5}$ concentrations in key studies reflect averaging of short- or long-term $PM_{2.5}$ exposure estimates across locations (*i.e.,* across multiple monitors or across modeled grid cells) and over time (*i.e.,* over several years). In contrast, to determine whether areas meet or violate the PM NAAQS, the EPA measures air pollution concentrations at individual monitors (*i.e.,* concentrations are not averaged across monitors) and calculates design values[44] at monitors meeting appropriate data quality and completeness criteria.[45] For an area to meet the NAAQS, all valid design values in that area, including the highest annual and highest 24-hour monitoring values, must be at or below the standards. As a result, study reported mean concentration values are generally lower than the design value of the highest monitor in an area, which determines compliance.

The PA first presents results from key epidemiological studies that used ground-based monitoring data to estimate population exposure (U.S. EPA, 2020, section 3.2.3.2.1). Study reported mean (or medians)[46] were

---

[43] Studies included were multi-city studies in Canada and the U.S. that examined health endpoints with 'causal' or 'likely to be causal' determinations in the ISA.

[44] A design value is a statistic that summarizes the air quality data for a given area in terms of the indicator, averaging time, and form of the standard. Design values can be compared to the level of the standard and are typically used to designate areas as meeting or not meeting the standard and assess progress towards meeting the NAAQS.

[45] For the annual $PM_{2.5}$ standard, design values are calculated as the annual arithmetic mean $PM_{2.5}$ concentration, averaged over 3 years (described in appendix N of 40 CFR part 50). For the 24-hour standard, design values are calculated as the 98th percentile of the annual distribution of the 24-hour $PM_{2.5}$ concentrations, averaged over three years.

[46] Some epidemiological studies report median versus mean air quality concentrations offering that

examined from the air quality distributions reported in key epidemiological studies included in the ISA exposures (U.S. EPA, 2020, Figure 3–7). The PA noted that these values are most useful in the context of considering the level of the primary $PM_{2.5}$ annual standard. This is because the mean concentration values from these studies, which include studies examining both short- and long-term exposures, represent ''typical'' or mean exposures, which are most relevant to the form and averaging time of the annual standard, and not as relevant to the daily standard, whose form and averaging time focuses on protecting against peak concentrations. Further, the PA noted that in using these data it should be recognized that these mean concentrations are generally below the design values in the corresponding areas. In fact, analyses included in the PA of recent air quality in U.S. CBSAs indicate that maximum annual $PM_{2.5}$ design values for a given three-year period are often 10% to 20% higher than average monitored concentrations (*i.e.,* averaged across multiple monitors in the same CBSA) (U.S. EPA, 2020, Appendix B, section B.7). As noted in the PA, the difference between the maximum annual design value and the average concentrations in an area will depend on a number of factors including the numbers of monitors, monitor citing characteristics, and the distribution of ambient $PM_{2.5}$ concentrations. The PA also recognized that the recent requirement for $PM_{2.5}$ monitoring at near-road locations in large urban areas may further increase the ratios of maximum annual design values to average concentrations in some areas (U.S. EPA, 2020, section 3.2.3.2.1).

As detailed more in section II.A.2.c.ii, the PA next presents data from the epidemiological studies that used hybrid modeling approaches to estimate exposures (U.S. EPA, 2020, Figure 3–8). While studies using hybrid modeling approaches provide valid methods to estimate exposures in epidemiological studies and can expand the characterization of $PM_{2.5}$ exposures in areas with sparse monitoring networks, these exposure estimation methods provide additional challenges to comparing study reported mean concentrations to the annual standard level. In these studies, $PM_{2.5}$ concentrations are typically estimated based on a hybrid approach of ''fusing'' data from air quality models, satellites and ground-based monitors. As such, the reported mean concentrations in an area (*e.g.,* county or zip-code) from these studies are calculated using the estimated concentrations from thousands of grid cells across the area. Generally, this means a larger number of lower concentration grid cells being included in the calculation of the mean, resulting in a mean concentration even further below the design value of the highest monitor in the area (which is used for determining whether the area is meeting the current standard) and even further below the mean concentration reported in epidemiological studies utilizing ground-based monitors to estimate exposure.

It is also important to note that the performance of these hybrid modeling approaches in estimating $PM_{2.5}$ concentrations, which are being used as surrogates for population exposure in the epidemiological study, depends on the availability of monitoring data, air quality model and the ability of the satellite to estimate ground level concentration and, thus, varies by location. Factors that contribute to poorer model performance often coincide with relatively low ambient $PM_{2.5}$ concentrations (U.S. EPA 2020, 2.3.3) Thus, uncertainty in hybrid model predictions becomes an increasingly important issue as lower predicted concentrations are considered. This additional source of uncertainty is an important consideration, particularly when all grid cell estimates are being used to calculate the study mean concentration, and further adds to why using study reported mean concentrations from epidemiological studies that use hybrid approaches to inform conclusions on the primary $PM_{2.5}$ standards is a challenge.

Given all of this, the EPA concludes that the overall mean $PM_{2.5}$ concentrations in hybrid modeling studies are more difficult to directly compare to design values than ground-based monitoring concentrations in the context of setting a standard level. In fact, recognizing this challenge, the PA tried to assess information from hybrid modelling studies by calculating ''pseudo-design values'' in locations of the key epidemiological studies (U.S. EPA, 2020, section 3.2.3.2.2), as noted above in section II.A.2.c.ii and detailed further in section II.C.1.a.ii of the proposal (85 FR 24117, April 30, 2020). However, this analysis and the associated approach were highly criticized by most commenters, with none suggesting the methodology be carried forward in the review. While the EPA believes that the PA's ''pseudo-design value'' approach was a step in the right direction, the specific methodology itself needs further development.

Given these considerations, and in light of the comments received, the EPA believes it is reasonable to focus on study reported mean (or median) concentrations [47] from key U.S.[48] epidemiological studies that used ground-based monitors when considering information most comparable to the current annual standard, while also weighing the uncertainties associated with these studies and considering support provided by other lines of evidence. Based on the information shown in Figure 3–7 of the PA (U.S. EPA, 2020), the mean concentrations in 19 of the 21 these studies were equal to or greater than the level of the current annual standard of 12 µg/m³. There were two studies, both included in last review, for which the mean concentration (11.8 µg/m³; Peng et al., 2009) or median concentration (10.7 µg/m³ (Central Region); Zeger et al., 2008 [49]) was somewhat below 12 µg/m³. While these studies were included in the last review, the air quality distributions were not used by the prior Administrator in making a judgment on the level of the standard. The reported study mean concentration for one other study was 12 µg/m³ (Kioumourtzoglou et al., 2016). The mean [50] of the study reported means (or medians) of these 21 studies is 13.5 µg/m³, a concentration level above the current level of the primary annual standard of 12 µg/m³. Additionally, based on analyses in the PA, it would be expected that most of the design values (the metric most relevant for comparison to the standard level) in the areas included in these studies would be greater than 12 µg/m³ [51] (section II.A.2.c.ii above and U.S.

median is a better metric since it is less skewed by outlying concentrations. In most studies, the mean and median concentrations are very similar and are generally used here interchangeably.

[47] Some epidemiological studies report median versus mean air quality concentrations offering that median is a better metric since it is less skewed by outlying concentrations. In most studies, the mean and median concentrations are very similar and are generally used here interchangeably.

[48] Given how air quality monitors in other countries differ from the U.S. EPA FRM monitors discussed here, a focus on U.S. studies ensures that the results most closely compare to the data being used for calculating the design values and for compliance of the standard.

[49] We note that in this study the population was divided into regions of the country, with statistically significant associations in the Central and Eastern Regions and with median long-term $PM_{2.5}$ concentrations of: Central: 10.7 µg/m³; Western: 13.1 µg/m³ and Eastern: 14.0 µg/m³.

[50] The median of the study reported mean (or median) $PM_{2.5}$ concentrations is 13.3 µg/m³.

[51] Recent air quality in U.S. CBSAs in the PA indicate that maximum annual $PM_{2.5}$ design values

Continued

EPA 2020, Appendix B, section B.7). This is also supported by the pseudo-design value analysis in Figure 3–9 of the PA (U.S. EPA, 2020).

Therefore, although recognizing that the proposal identified certain concerns about the proper weight to be placed on epidemiological studies, the EPA finds that its assessment of the mean concentrations of the key short-term and long-term epidemiological studies in the U.S. that use ground-based monitoring (*i.e.,* those studies that can provide information most directly comparable to the current annual standard) is fundamentally consistent with the assessment in the last review, which established the current primary $PM_{2.5}$ standards.

Some commenters supporting revision of the primary $PM_{2.5}$ standards contend that the quantitative risk assessment finds the number of avoided deaths resulting from retention of the standards will likely number in the many thousands, and a substantial reduction in these events could be achieved by a more stringent $PM_{2.5}$ standard. While commenters who support revising the $PM_{2.5}$ standards support the recommendation of the PA to use the evidence-based approach, as opposed to the risk-based approach, as a basis for ascertaining whether and how to revise the primary standards, the commenters state that the risk assessment does provide qualitative support to revise the standards.

With regard to the quantitative risk assessment described by some commenters as showing health impacts that would be avoided by a more stringent standard, the EPA notes that these analyses utilize epidemiological study effect estimates as concentration-response functions to predict the occurrence of primarily premature mortality under different air quality conditions (characterized by the metric used in the epidemiological study). While the epidemiological studies that are inputs to the quantitative risk assessment are part of the evidence base that supports the conclusion of a ''causal'' or ''likely to be causal'' determination in the ISA (U.S. EPA, 2019), there are uncertainties inherent in the derivation of estimates of health effects (*e.g.,* total mortality or ischemic heart disease mortality) ascribed to $PM_{2.5}$ exposures using effect estimates from these studies. For example, the PA recognized several important uncertainties associated with aspects of the quantitative risk assessment approach and that the EPA concluded to have a medium or greater magnitude on risk estimates (U.S. EPA, 2020, section C.3.1 and table C–32). These uncertainties limit the applicability of the risk results for selecting a specific standard. Uncertainties in the shapes of concentration-response functions, particularly at low concentrations; uncertainties in the methods used to adjust air quality; and uncertainty in estimating risks for populations, locations and air quality distributions different from those examined in the underlying epidemiological study all limit utility (U.S. EPA, 2020, section 3.3.2.4). Further, the approach to weighing evidence-based and risk-based considerations is not a new approach and as in previous reviews, the selection of a specific approach to reaching final decisions on the primary $PM_{2.5}$ standards will reflect the judgments of the Administrator as to what weight to place on the various types of information available in the current review. The EPA notes that in the previous review, evidence-based considerations were given greater weight in the selection of standard levels than risk-based approaches (*e.g.,* 78 FR 3086, 3098–99, January 15, 2013) due to a recognition of similar limitations.

Some commenters who support the Administrator's rationale to retain the $PM_{2.5}$ standards contend that, due to uncertainties in extrapolating health effects observed in animal toxicology studies to humans, animal toxicology studies are of limited regarding the adequacy of the current standard. On the other hand, commenters who support revisions to the current suite of $PM_{2.5}$ standards generally contend that for experimental studies the Administrator: (1) Inappropriately tied the concept of biological plausibility to a specific concentration; (2) incorrectly interpreted animal/controlled human exposure studies; (3) ignored the limitations of experimental studies in relation to informing NAAQS levels and (4) gave inadequate weight to all of the evidence because the Administrator saw no absolute corroboration from clinical and accountability studies. The commenters emphasize their view that experimental studies provide important information regarding biological plausibility of numerous health effects (*e.g.,* cardiovascular, respiratory, nervous system, and cancer effects) associated with $PM_{2.5}$ exposure. Therefore, the commenters contend that experimental studies provide biological plausibility for human health effects linked to PM exposure in epidemiological studies and when viewed together, support revision of the current $PM_{2.5}$ standards.

The EPA notes that controlled human exposures studies provide crucial evidence in assessing whether protection is provided for short-term exposure concentrations consistently shown to elicit effects. In examining the controlled human exposure studies, the PA notes these studies provide evidence for health effects following single, short-term $PM_{2.5}$ exposures to concentrations, and thus, can be useful to assess whether these effects are likely to occur in the upper end of the $PM_{2.5}$ air quality distribution in the U.S. (*i.e.,* ''peak'' concentrations) (U.S. EPA, 2020, section 3.2.3.1). As noted by the commenters, most of these studies examine exposure concentrations considerably higher than are typically measured in areas meeting the current standards (U.S. EPA, 2020, section 3.2.3.1). As detailed in section II.A.2.c.i above, even the extreme upper end of the distribution of 2-hour $PM_{2.5}$ concentrations at sites meeting the current standards remains well-below the $PM_{2.5}$ exposure concentrations consistently shown to elicit effects. Further, human exposure studies have not reported health effects at $PM_{2.5}$ air quality concentrations likely to be seen in areas meeting the current primary $PM_{2.5}$ standards. As such, these studies do not call into question the protection provided by the current primary $PM_{2.5}$ standards.

Additionally, with respect to the experimental evidence, the EPA agrees that animal toxicologic studies can be useful in understanding and supporting the biological plausibility of various effects linked to $PM_{2.5}$ exposures. However, it is important to remember that for this body of evidence there is uncertainty in extrapolating from effects in animals to those in human populations. As such, animal toxicology studies are of limited utility in directly informing conclusions on the appropriate level of the standard. Thus, the available evidence from animal toxicologic studies do not call into question the protection provided by the current primary $PM_{2.5}$ standards.

Further, the ISA assesses both human exposures studies and animal toxicologic studies to evaluate the biological plausibility of various effects linked to $PM_{2.5}$ exposures, and thus, we agree with the commenters on the importance of experimental evidence on this account. Within the ISA's weight of evidence evaluation, which is based on the integration of findings from various lines of evidence, considerations in making causality determinations

for a given three-year period are often 10% to 20% higher than average monitored concentrations (*i.e.,* averaged across multiple monitors in the same CBSA) (U.S. EPA, 2020, Appendix B, section B.7).

include: ''determining whether laboratory studies of humans and animals, in combination with epidemiological studies, inform the biological mechanisms by which PM can impart health effects and provide evidence demonstrating that PM exposure can independently cause a health effect'' (U.S. EPA, 2019, p. ES–8). However, the ISA also notes that the strength of the $PM_{2.5}$ exposure-health effects relationship varies depending on the exposure duration (*i.e.,* short- or long-term) and broad health effects category (*e.g.,* cardiovascular effects, respiratory effects) examined, and that across the broad health effects categories examined, the evidence supporting biological plausibility varies. Additionally, while assessing plausible biological pathways is an important step in evaluating causality determinations, the degree of biological plausibility for different mechanisms and end points can also vary depending on the evidence available. As a result, without a more clear linkage between concentrations below the current standard levels and adverse health effects, the Administrator noted in the proposal that he was ''cautious about placing too much weight on reported $PM_{2.5}$ health effect associations'' observed in epidemiological studies (85 FR 24119, April 30, 2020). As discussed in the proposal, the Administrator's proposed decision was based on his evaluation of ''the overall body of evidence, including controlled human exposure and animal toxicologic studies, in addition to epidemiological studies'' (85 FR 24120, April 30, 2020). Thus, the experimental evidence does not suggest that the epidemiological evidence must be viewed differently than the Administrator has viewed such evidence in his proposed decision to retain the current primary standards.

Some commenters who support retaining the current primary $PM_{2.5}$ standards assert that the currently available accountability studies do not demonstrate that further reduction of the PM NAAQS would achieve a measurable improvement in public health. In contrast, commenters opposing the Administrator's proposed decision to retain the $PM_{2.5}$ standards criticize the Administrator's heavy reliance on accountability studies to guide his decision, while emphasizing that accountability studies are just one line of evidence to inform causality. The commenters acknowledge the importance of well-designed and conducted accountability studies but warn that accountability studies measuring past interventions that are highly localized may have actual effects too small to be reliably measured. Considering the limitations of the accountability studies, including findings leading to false negative results, such studies are not considered essential for the proof of evidence required by statute, according to these commenters.

The EPA agrees with the commenters that well-designed and conducted accountability studies can be informative and should be considered as one line of evidence, recognizing that that these studies offer insight into examples of how public health has responded to implementation of $PM_{2.5}$ reduction strategies. As discussed in the PA (U.S. EPA, 2020, section 3.2.3.2.1) and in section III.C.3 of the proposal (85 FR 24120, April 30, 2020), the EPA notes the availability of several such accountability studies and other retrospective health studies examining periods of declining $PM_{2.5}$ concentrations. As indicated in Table 3–3 of the PA (U.S. EPA, 2020), these studies conducted in the U.S. indicate that declines in ambient $PM_{2.5}$ concentrations over a period of years have been associated with decreases in mortality rates and increases in life expectancy, improvements in respiratory development, and decreased incidence of respiratory disease in children. When considering the overall means in these studies (*i.e.,* the part of the air quality distribution over which the studies provide the strongest support for reported health effect associations), we find that ''starting'' annual average $PM_{2.5}$ concentrations (*i.e.,* mean concentration prior to reductions being evaluated) range from 13.2–31.5 $\mu g/m^3$ and ''ending'' concentrations ranging from 11.6–17.8 $\mu g/m^3$. As such, the EPA notes that these retrospective studies tend to focus on time periods during which ambient $PM_{2.5}$ concentrations were substantially higher than those measured more recently, as well as ''starting'' annual average $PM_{2.5}$ concentrations above those allowed by the current primary $PM_{2.5}$ standards. As a result, the EPA believes that while these studies do provide evidence of public health improvements as ambient $PM_{2.5}$ has declined over time, no current studies have examined public health improvements following reductions in ambient $PM_{2.5}$ concentrations in areas where the ''starting'' concentration met the current primary standards. Thus, while acknowledging that this is an emerging field of study for $PM_{2.5}$-related health effects, the available evidence supports the Administrator's recognition that currently, there is a lack of accountability studies that clearly demonstrate that revising the current primary $PM_{2.5}$ standards would result in public health improvements.

Commenters opposed to the Administrator's proposed decision to retain the $PM_{2.5}$ standards contend that the EPA's proposed decision is a violation of the CAA because it fails to consider sensitive populations and contains no margin of safety for them, as required under the CAA. In particular, these commenters pointed to evidence drawn from epidemiological studies that included specific at-risk groups in their study design and results.

The EPA disagrees with these comments. As discussed above, the Administrator's proposed decision to retain the current primary $PM_{2.5}$ standards followed the same general approach used in previous reviews for reaching conclusions on what standards are appropriate. As such, the Administrator recognized that judgments of how to translate information available from epidemiological studies into a basis for appropriate standards must be considered in conjunction with the uncertainties in the epidemiological studies and in the context of the entire body of evidence before the Agency. This approach recognizes that the Administrator's judgment is particularly important for a pollutant where a population threshold cannot be clearly discerned with confidence from the evidence and where clinical evidence does not demonstrate health effects at typical ambient concentrations that meet the current standards. This approach is also consistent with the CAA requirement to set standards that are neither more nor less stringent than necessary, recognizing that a zero-risk standard is not required by the CAA.

With respect to protection of at-risk populations, the EPA has carefully evaluated and considered evidence of effects in at-risk populations. Unlike some of the other NAAQS reviews where the epidemiological evidence may be less complete, this PM NAAQS review has the benefit of having an ISA that considered many epidemiological studies that assessed impacts for populations considered at-risk (*e.g.,* populations of older adults, children, or those with preexisting conditions, like cardiovascular disease). In addition, some of the key epidemiology studies that the EPA assessed (included in Figure 3–7 of the PA) also specifically focused on and evaluated at-risk populations, including epidemiology studies that assessed morbidity and mortality associations for age-specific

populations (*e.g.,* Medicare populations), as well as epidemiology studies that evaluated associations between $PM_{2.5}$ exposure and specific health endpoints, like hospital admissions for cardiovascular effects in populations age 65 and older. The Agency takes note that it considered these studies to inform its review of the primary $PM_{2.5}$ standards, which include at-risk populations, as well as other studies in the full body of scientific evidence in evaluating effects associated with long or short-term $PM_{2.5}$ exposures (*i.e.,* premature mortality, cardiovascular effects, cancer, and respiratory effects).

More specifically, in weighing the scientific evidence to inform his decision on requisite $PM_{2.5}$ standards with an adequate margin of safety, including protection for at-risk populations, the Administrator's proposed conclusions recognized that epidemiological studies, many of which by design include at-risk populations, examine associations between distributions of $PM_{2.5}$ air quality and health outcomes. Further, in noting that epidemiological studies do not identify particular $PM_{2.5}$ exposures that cause effects, the PA focused on the reported mean concentrations from key epidemiological studies with the aim of providing a potential translation of information from epidemiological studies into the basis for consideration on standard levels (U.S. EPA, 2020, section 3.1.2). As discussed in more detail above, for the mean concentrations of the key epidemiological studies in the U.S. that use ground-based monitoring (*i.e.,* those studies that can provide information most directly comparable to the current annual standard), the majority of studies have long-term mean (or median) concentrations above the current NAAQS (12.0 μg/m³), with the mean of the study reported means or medians equal to 13.5 μg/m³, a concentration level above the current level of the primary annual standard of 12 μg/m³. The EPA notes that study reported mean (or median) concentration values are generally 10–20% lower than the design value of the highest monitor in an area, which determines compliance, and suggesting that that the current level of the standard provides even more protection than is suggested by the reported means.[52] In the proposal, the Administrator recognized that important uncertainties and limitations do remain in the epidemiological evidence and the Administrator weighed these uncertainties, while also considering support provided by other lines of evidence, in judging whether the current standards are requisite with an adequate margin of safety. The Administrator further considered the emerging body of evidence from accountability studies examining past reductions in ambient $PM_{2.5}$ and the degree to which those reductions have resulted in public health improvements. As discussed above, such studies have focused on time periods during which ambient $PM_{2.5}$ concentrations were substantially higher than those measured more recently and therefore do not demonstrate public health improvements attributable to reduction in ambient $PM_{2.5}$ at concentrations below the current standard.

Thus, the Administrator judged that the overall body of evidence indicates continued uncertainty in the degree to which adverse effects could result from $PM_{2.5}$ exposures in areas meeting the current annual and 24-hour standards. Additionally, the current annual standard is below the lowest ''starting'' concentration in the available accountability studies (*i.e.,* 13.2 μg/m³) and below the reported mean concentration in the majority of the key U.S. epidemiological studies using ground-based monitoring data[53] (*i.e.,* mean of the reported means was 13.5 μg/m³). In addition, concentrations in areas meeting the current 24-hour and annual standards remain well-below the $PM_{2.5}$ exposure concentrations consistently shown to elicit effects in controlled human exposure studies. In specifically assessing his proposed decision, the Administrator noted that more stringent standards would be more than requisite to protect public health with an adequate margin of safety.

### 4. Administrator's Conclusions

This section summarizes the Administrator's conclusions and final decisions related to the current primary $PM_{2.5}$ standards and presents his decision to retain those standards, without revision. As described above (section I.D) and in section II.A.2 of the proposal (85 FR 24105, April 30, 2020), the Administrator's approach to considering the adequacy of the current standards focuses on evaluating the public health protection afforded by the annual and 24-hour standards, taken together, against mortality and morbidity associated with long- or short-term $PM_{2.5}$ exposures. This approach recognizes that changes in $PM_{2.5}$ air quality designed to meet either the annual or the 24-hour standard would likely result in changes to both long-term average and short-term peak $PM_{2.5}$ concentrations and that the protection provided by the suite of standards results from the combination of all of the elements of those standards (*i.e.,* indicator, averaging time, form, level). Thus, the Administrator's consideration of the public health protection provided by the current primary $PM_{2.5}$ standards is based on his consideration of the combination of the annual and 24-hour standards, including the indicators ($PM_{2.5}$), averaging times, forms (arithmetic mean and 98th percentile, averaged over three years), and levels (12.0 μg/m³, 35 μg/m³) of those standards.

In establishing primary standards under the Act that are ''requisite'' to protect public health with an adequate margin of safety, the Administrator is seeking to establish standards that are neither more nor less stringent than necessary for this purpose. He recognizes that the requirement to provide an adequate margin of safety was intended to address uncertainties associated with inconclusive scientific and technical information and to provide a reasonable degree of protection against hazards that research has not yet identified. However, the Act does not require that primary standards be set at a zero-risk level; rather, the NAAQS must be sufficiently protective, but not more stringent than necessary.

Given these requirements, the Administrator's final decision in this review is a public health policy judgment drawing upon scientific and technical information examining the health effects of $PM_{2.5}$ exposures, including how to consider the range and magnitude of uncertainties inherent in that information. This public health policy judgment is based on an interpretation of the scientific and technical information that neither overstates nor understates its strengths and limitations, nor the appropriate inferences to be drawn, and is informed by the Administrator's consideration of advice from the CASAC and public comments received on the proposal notice.

As an initial matter, the Administrator recognizes that, with regard to effects classified as having evidence of a causal

[52] Analyses of recent air quality in U.S. CBSAs indicate that maximum annual $PM_{2.5}$ design values for a given three-year period are often 10% to 20% higher than average monitored concentrations (*i.e.,* averaged across multiple monitors in the same CBSA) (U.S. EPA, 2020, Appendix B, section B.7).

[53] As discussed above, the means from these studies are most relatable to the level of the annual standard. However, because the reported means in these studies are based on averaging the monitored concentration across an area, they are lower than the design value for that same area, since attainment of the standard is based on the measurements at the highest monitor (and not the average across multiple monitors.)

or likely causal relationship with long or short-term $PM_{2.5}$ exposures (*i.e.,* premature mortality, cardiovascular effects, cancer, and respiratory effects), the EPA considered the full range of studies evaluating these effects, including studies of at-risk populations, to inform its review of the primary $PM_{2.5}$ standards. Thus, the Administrator notes that his judgment in this final decision reflects placing the greatest weight on evidence of effects for which the ISA determined there is a causal or likely causal relationship with long- and short-term $PM_{2.5}$ exposures.

With respect to the indicator, the Administrator recognizes that the scientific evidence in this review, as in the last review, continues to provide strong support for health effects following short- and long-term $PM_{2.5}$ exposures. He notes the PA conclusion that the available information continues to support the $PM_{2.5}$ mass-based indicator and remains too limited to support a distinct standard for any specific $PM_{2.5}$ component or group of components, and too limited to support a distinct standard for the ultrafine fraction. Further, the Administrator notes that the EPA received very few comments on the indicator, with no commenters advocating for revising the current $PM_{2.5}$ indicator for fine particles. Thus, as proposed, the Administrator concludes that it is appropriate to retain $PM_{2.5}$ as the indicator for the primary standards for fine particulates.

With respect to averaging time and form, the Administrator notes that the scientific evidence continues to provide strong support for health effects associations with both long-term (*e.g.,* annual or multi-year) and short-term (*e.g.,* mostly 24-hour) exposures to $PM_{2.5}$ and, consistent with the conclusions in the PA, judges that the current evidence does not support considering alternatives (U.S. EPA, 2020, section 3.5.2). The Administrator also notes that very few comments were received related to averaging time and form and none directly advocated for changing the form or averaging time. In the current review, epidemiological and controlled human exposure studies have examined a variety of $PM_{2.5}$ exposure durations. Epidemiological studies continue to provide strong support for health effects associated with short-term $PM_{2.5}$ exposures based on 24-hour $PM_{2.5}$ averaging periods, and the EPA notes that associations with sub-daily estimates are less consistent and, in some cases, smaller in magnitude (U.S. EPA, 2019, section 1.5.2.1; U.S. EPA, 2020, section 3.5.2.2). In addition, controlled human exposure and panel-based studies of sub-daily exposures typically examine subclinical effects, as the commenters acknowledge, rather than the more serious population-level effects that have been reported to be associated with 24-hour exposures (*e.g.,* mortality, hospitalizations). Taken together, the ISA concludes that epidemiological studies do not indicate that sub-daily averaging periods are more closely associated with health effects than the 24-hour average exposure metric (U.S. EPA, 2019, section 1.5.2.1). Additionally, while recent controlled human exposure studies provide consistent evidence for cardiovascular effects following $PM_{2.5}$ exposures for less than 24 hours (*i.e.,* <30 minutes to 5 hours), exposure concentrations in these studies are well-above the ambient concentrations typically measured in locations meeting the current standards (U.S. EPA, 2020, section 3.2.3.1). Thus, these studies also do not suggest the need for additional protection against sub-daily $PM_{2.5}$ exposures, beyond that provided by the current primary standards. Therefore, the Administrator's judgment is that the current 24-hour averaging time remains appropriate.

In relation to the form of the 24-hour standard (98th percentile, averaged over three years), the Administrator notes that epidemiological studies continue to provide strong support for health effect associations with short-term (*e.g.,* mostly 24-hour) $PM_{2.5}$ exposures (U.S. EPA, 2020, section 3.5.2.3) and that controlled human exposure studies provide evidence for health effects following single short-term ''peak'' $PM_{2.5}$ exposures. Thus, the evidence supports retaining a standard focused on providing supplemental protection against short-term peak exposures and supports a 98th percentile form for a 24-hour standard. The Administrator further notes that this form also provides an appropriate balance between limiting the occurrence of peak 24-hour $PM_{2.5}$ concentrations and identifying a stable target for risk management programs (U.S. EPA, 2020, section 3.5.2.3). As such, the Administrator concludes, as proposed, to retain the form and averaging time of the current 24-hour standard (98th percentile, averaged over three years) and annual standard (annual average, averaged over three years).

The Administrator also proposed to retain the current levels of the 24-hour standard (98th percentile, averaged over three years) at 35 $\mu g/m^3$ and annual standard (annual average, averaged over 3 years) at 12 $\mu g/m^3$. The majority of the comments received focused on this proposed decision to retain the current levels of both standards. In reaching his final decision regarding the level of the standards, the Administrator considered the large body of evidence presented and assessed in the ISA (U.S. EPA, 2019), the policy-relevant and risk-based conclusions and rationales as presented in the PA (U.S. EPA, 2020), views expressed by the CASAC, and public comments. In particular, in considering the ISA and PA, he considers key epidemiological studies that evaluate associations between $PM_{2.5}$ air quality distributions and mortality and morbidity, including key ''accountability studies''; the availability of experimental studies to support biological plausibility; controlled human exposure studies examining effects following short-term $PM_{2.5}$ exposures; air quality analyses; and the important uncertainties and limitations associated with this information.

As an initial matter, the Administrator recognizes that the current annual standard is most effective in controlling $PM_{2.5}$ concentrations near the middle of the air quality distribution (*i.e.,* around the mean of the distribution), but can also provide some control over short-term peak $PM_{2.5}$ concentrations. On the other hand, the 24-hour standard, with its 98th percentile form, is most effective at limiting peak 24-hour $PM_{2.5}$ concentrations, but in doing so will also have an effect on annual average $PM_{2.5}$ concentrations. Thus, while either standard could be viewed as providing some measure of protection against both average exposures and peak exposures, the 24-hour and annual standards are not expected to be equally effective at limiting both types of exposures. Thus, consistent with previous reviews, the Administrator's consideration of the public health protection provided by the current primary $PM_{2.5}$ standards is based on his consideration of the combination of the annual and 24-hour standards. Specifically, he recognizes that the annual standard is more likely to appropriately limit the ''typical'' daily and annual exposures that are most strongly associated with the health effects observed in epidemiological studies. The Administrator concludes that an annual standard (arithmetic mean, averaged over three years) remains appropriate for targeting protection against the annual and daily $PM_{2.5}$ exposures around the middle portion of the $PM_{2.5}$ air quality distribution. Further, recognizing that the 24-hour standard (with its 98th percentile form) is more directly tied to short-term peak $PM_{2.5}$ concentrations, and thus more likely to appropriately limit exposures to such concentrations, the Administrator concludes that the

82716 Federal Register / Vol. 85, No. 244 / Friday, December 18, 2020 / Rules and Regulations

current 24-hour standard (98th percentile, averaged over three years) remains appropriate to provide a balance between limiting the occurrence of peak 24-hour $PM_{2.5}$ concentrations and identifying a stable target for risk management programs. However, the Administrator recognizes that changes in $PM_{2.5}$ air quality to meet an annual standard would likely result not only in lower short- and long-term $PM_{2.5}$ concentrations near the middle of the air quality distribution, but also in fewer and lower short-term peak $PM_{2.5}$ concentrations. The Administrator further recognizes that changes in air quality to meet a 24-hour standard, with a 98th percentile form, would result not only in fewer and lower peak 24-hour $PM_{2.5}$ concentrations, but also in lower annual average $PM_{2.5}$ concentrations.

Thus, in considering the adequacy of the 24-hour standard, the Administrator notes the importance of considering whether additional protection is needed against short-term exposures to peak $PM_{2.5}$ concentrations. In examining the scientific evidence, he notes that controlled human exposure studies provide evidence for health effects following single, short-term $PM_{2.5}$ exposures to concentrations. These types of exposures correspond best to those to ambient exposures that might be experienced in the upper end of the $PM_{2.5}$ air quality distribution in the U.S. (*i.e.,* ''peak'' concentrations). However, most of these studies examine exposure concentrations considerably higher than are typically measured in areas meeting the current standards (U.S. EPA, 2020, section 3.2.3.1). In particular, controlled human exposure studies often report statistically significant effects on one or more indicators of cardiovascular function following 2-hour exposures to $PM_{2.5}$ concentrations at and above 120 µg/m³ (at and above 149 µg/m³ for vascular impairment, the effect shown to be most consistent across studies). To provide insight into what these studies may indicate regarding the primary $PM_{2.5}$ standards, the PA (U.S. EPA, 2020, p.3–49) notes that 2-hour ambient concentrations of $PM_{2.5}$ at monitoring sites meeting the current standards almost never exceed 32 µg/m³. In fact, even the extreme upper end of the distribution of 2-hour $PM_{2.5}$ concentrations at sites meeting the current standards remains well-below the $PM_{2.5}$ exposure concentrations consistently shown in controlled human exposure studies to elicit effects (*i.e.,* 99.9th percentile of 2-hour concentrations at these sites is 68 µg/m³ during the warm season). Additionally, the Administrator notes the limited utility of the animal toxicologic studies in directly informing conclusions on the appropriate level of the standard given the uncertainty in extrapolating from effects in animals to those in human populations. Thus, the available experimental evidence does not indicate the need for additional protection against exposures to peak $PM_{2.5}$ concentrations, beyond the protection provided by the combination of the current 24-hour standard and the current annual standard (U.S. EPA, 2020, section 3.2.3.1).

With respect to the epidemiological evidence, the Administrator notes that the available epidemiological studies do not indicate that associations in those studies are strongly influenced by exposures to peak concentrations in the air quality distribution and thus do not indicate the need for additional protection against short-term exposures to peak $PM_{2.5}$ concentrations (U.S. EPA 2020, section 3.5.1). Lastly, the Administrator notes CASAC consensus support for retaining the current 24-hour standard. Thus, the Administrator concludes that the 24-hour standard with its level of 35 µg/m³ is adequate to provide supplemental protection (*i.e.,* beyond that provided by the annual standard alone) against short-term exposures to peak $PM_{2.5}$ concentrations.

In reviewing the level of the annual standard, the Administrator recognizes that the annual standard, with its form based on the arithmetic mean concentration, is most appropriately meant to limit the ''typical'' daily and annual exposures that are most strongly associated with the health effects observed in epidemiological studies. However, the Administrator also recognizes that while epidemiological studies examine associations between distributions of $PM_{2.5}$ air quality and health outcomes, they do not identify particular $PM_{2.5}$ exposures that cause effects and thus, they cannot alone identify a specific level at which the standard should be set, as such a determination necessarily requires the Administrator's judgment. Thus, any approach that uses epidemiological information in reaching decisions on what standards are appropriate necessarily requires judgments about how to translate the information available from the epidemiological studies into a basis for appropriate standards. This includes consideration of how to weigh the uncertainties in the reported associations between daily or annual average $PM_{2.5}$ exposures and mortality or morbidity in the epidemiological studies. Such an approach is consistent with setting standards that are neither more nor less stringent than necessary, recognizing that a zero-risk standard is not required by the CAA.

The Administrator recognizes that important uncertainties and limitations that were present in epidemiological studies in previous reviews, remain in the current review. As discussed above, these uncertainties include exposure measurement error; potential confounding by copollutants; increasing uncertainty of associations at lower $PM_{2.5}$ concentrations; and heterogeneity of effects across different cities or regions. The Administrator also recognizes the advice given by the CASAC on this matter. As discussed above (section II.B.1), the CASAC members who support retaining the annual standard expressed their concerns with available $PM_{2.5}$ epidemiological studies. They assert that recent epidemiological studies do not provide a sufficient basis for revising the current standards. They also identify several key concerns regarding the associations reported in $PM_{2.5}$ epidemiological studies and conclude that ''while the data on associations should certainly be carefully considered, this data should not be interpreted more strongly than warranted based on its methodological limitations'' (Cox, 2019a, p. 8 consensus responses).

Taking into consideration the views expressed by these CASAC members, the Administrator recognizes that epidemiological studies examine associations between distributions of $PM_{2.5}$ air quality and health outcomes, and they do not identify particular $PM_{2.5}$ exposures that cause effects (U.S. EPA, 2020, section 3.1.2). While the Administrator remains concerned about placing too much weight on epidemiological studies to inform conclusions on the adequacy of the current primary standards, he notes that several commenters advocated for using the epidemiological studies in a manner they characterized as similar to the last review, to determine the level of the annual standard. The previous PM NAAQS review completed in 2012 noted that the evidence of an association in any epidemiological study is ''strongest at and around the long-term average where the data in the study are most concentrated'' (78 FR 3140, January 15, 2013). Accordingly, the Administrator notes the characterization of study reported short-term and long-term mean $PM_{2.5}$ concentrations (section II.A.2.c.ii). As discussed in more detail above in section II.B.3 in responding to comments, when assessing the mean concentrations of the key short-term and

long-term epidemiological studies in the U.S. that use ground-based monitoring (*i.e.,* those studies that can provide information most directly comparable to the current annual standard), the majority of studies (*i.e.,* 19 out of 21) have mean concentrations at or above the level of the current annual standard (12.0 µg/m³), with the mean of the study reported means or medians equal to 13.5 µg/m³, a concentration level above the current level of the primary annual standard of 12 µg/m³.[54] The Administrator further notes his caution in directly comparing the reported study mean values to the standard level given that, as discussed in more detail above, study-reported mean concentrations, by design, are generally lower than the design value of the highest monitor in an area, which determines compliance. In fact, analyses of recent air quality in U.S. CBSAs indicate that maximum annual $PM_{2.5}$ design values for a given three-year period are often 10% to 20% higher than average monitored concentrations (*i.e.,* averaged across multiple monitors in the same CBSA) (U.S. EPA, 2020, Appendix B, section B.7). He further notes his concern in placing too much weight on any one epidemiological study but instead feels that it is more appropriate to focus on the body of studies together and therefore takes note of the calculation of the mean of study-reported means (or medians). Thus, in summary, while the Administrator is cautious about placing too much weight on the epidemiological evidence on its own, he notes: (1) The reported mean concentration in the majority of the key U.S. epidemiological studies using ground-based monitoring data are above the level of the current annual standard; (2) the mean of the reported study means (or medians) (*i.e.,* 13.5 µg/m³) is above the level of the current standard;[55] (3) air quality analyses show the study means to be lower than their corresponding design values by 10–20%; and (4) that these analyses must be considered in light of uncertainties inherent in the epidemiological evidence. When taken together, the Administrator judges that, even if he were to place greater weight on the epidemiological evidence, this information would not call into question the adequacy of the current standards.

In addition to the evidence, the Administrator also considers the potential implications of the risk assessment. He notes that all risk assessments have limitations and that he remains concerned about the uncertainties in the underlying epidemiological data used in the risk assessment. The Administrator also notes that in previous reviews, these uncertainties and limitations have often resulted in less weight being placed on quantitative estimates of risk than on the underlying scientific evidence itself (*e.g.,* 78 FR 3086, 3098–99, January 15, 2013). These uncertainties and limitations have included uncertainty in the shapes of concentration-response functions, particularly at low concentrations; uncertainties in the methods used to adjust air quality; and uncertainty in estimating risks for populations, locations and air quality distributions different from those examined in the underlying epidemiological study (U.S. EPA, 2020, section 3.3.2.4). Additionally, the Administrator notes similar concern expressed by members of the CASAC who support retaining the current standards; they highlighted similar uncertainties and limitations in the risk assessment (Cox, 2019a). In light of all of this, the Administrator judges it appropriate to place little weight on quantitative estimates of $PM_{2.5}$-associated mortality risk in reaching conclusions about the level of the primary $PM_{2.5}$ standards.

The Administrator additionally considers the emerging body of evidence from accountability studies examining past reductions in ambient $PM_{2.5}$, and the degree to which those reductions have resulted in public health improvements. The Administrator agrees with public commenters who note that well-designed and conducted accountability studies can be informative. However, the Administrator also recognizes that interpreting such studies in the context of the current primary $PM_{2.5}$ standards is complicated by the fact that some of the available studies have not evaluated $PM_{2.5}$ specifically (*e.g.,* as opposed to $PM_{10}$ or total suspended particulates), did not show changes in $PM_{2.5}$ air quality, or have not been able to disentangle health impacts of the interventions from background trends in health (U.S. EPA, 2020, section 3.5.1). He further recognizes that the small number of available studies that do report public health improvements following past declines in ambient $PM_{2.5}$ have not examined air quality meeting the current standards (U.S. EPA, 2020, Table 3–3). This includes recent U.S. studies that report increased life expectancy, decreased mortality, and decreased respiratory effects following past declines in ambient $PM_{2.5}$ concentrations. Such studies have examined ''starting'' annual average $PM_{2.5}$ concentrations (*i.e.,* prior to the reductions being evaluated) ranging from about 13.2 to >20 mg/m³ (*i.e.,* U.S. EPA, 2020, Table 3–3). Given the lack of available accountability studies reporting public health improvements attributable to reductions in ambient $PM_{2.5}$ in locations meeting the current standards, together with his broader concerns regarding the lack of experimental studies examining $PM_{2.5}$ exposures typical of areas meeting the current standards (discussed above), the Administrator judges that there is considerable uncertainty in the potential for increased public health protection from further reductions in ambient $PM_{2.5}$ concentrations beyond those achieved under the current primary $PM_{2.5}$ standards.

When the above considerations are taken together, the Administrator concludes that the scientific evidence that has become available since the last review of the PM NAAQS, together with the analyses in the PA based on that evidence and consideration of CASAC advice and public comments, does not call into question the adequacy of the public health protection provided by the current annual and 24-hour $PM_{2.5}$ standards. In particular, the Administrator judges that there is considerable uncertainty in the potential for additional public health improvements from reducing ambient $PM_{2.5}$ concentrations below the concentrations achieved under the current primary standards and, therefore, that standards more stringent than the current standards (*e.g.,* with lower levels) are not supported. That is, he judges that such standards would be more than requisite to protect the public health with an adequate margin of safety. This judgment reflects the Administrator's consideration of the uncertainties in the potential implications of the lower end of the air quality distributions from the epidemiological studies due in part to the lack of supporting evidence from experimental studies and retrospective accountability studies conducted at $PM_{2.5}$ concentrations meeting the current standards.

In reaching this conclusion, the Administrator notes that the current standards provide an adequate margin of safety. With respect to the annual standard, the level of 12 µg/m³ is below the lowest ''starting'' concentration (*i.e.,*

[54] There were two studies, both included in the last review, for which the mean concentration (11.8 µg/m³; Peng et al., 2009) or median concentration (10.7 µg/m³ (Central Region); Zeger et al., 2008) was somewhat below 12 µg/m³.

[55] The median of the study reported mean (or median) $PM_{2.5}$ concentrations is 13.3 µg/m³, which is also above the level of the current standard.

13.2 µg/m³) in the available accountability studies that show public health improvements attributable to reductions in ambient $PM_{2.5}$. In addition, while the Administrator places less weight on the epidemiological evidence for the purposes of selecting a standard, he notes that the current level of the annual standard is below the reported mean (and median) concentrations in the majority of the key U.S. epidemiological studies using ground-based monitoring data [56] (noting that these means tend to be 10–20% lower than their corresponding area design values which is the more relevant metric when considering the level of the standard) and below the mean of the reported means (or medians) of these studies (*i.e.,* 13.5 µg/m³). In addition, the Administrator recognizes that concentrations in areas meeting the current 24-hour and annual standards remain well-below the $PM_{2.5}$ exposure concentrations consistently shown to elicit effects in human exposure studies.

In addition, based on the Administrator's review of the science, including controlled human exposure studies examining effects following short-term $PM_{2.5}$ exposures, the epidemiological studies described above, and accountability studies conducted at levels just above the current standard, he judges that the degree of public health protection provided by the current standard is not greater than warranted. This judgment, together with the fact that no CASAC member expressed support for a less stringent standard, leads the Administrator to conclude that standards less stringent than the current standards (*e.g.,* with higher levels) are also not supported.

When the above information is taken together, the Administrator concludes that the available scientific evidence and technical information continue to support the current annual and 24-hour $PM_{2.5}$ standards. This conclusion reflects the fact that important limitations in the evidence remain. The Administrator concludes that these limitations lead to considerable uncertainty regarding the potential public health implications of revising the existing suite of $PM_{2.5}$ standards. Given this uncertainty, and the advice from some CASAC members, he concludes that the current suite of primary standards, including the current indicators ($PM_{2.5}$), averaging times (annual and 24-hour), forms (arithmetic mean and 98th percentile, averaged over three years) and levels (12.0 µg/m³, 35 µg/m³), when taken together, remain requisite to protect the public health. Therefore, the Administrator reaches the final conclusion that the current suite of primary $PM_{2.5}$ standards is requisite to protect public health from fine particles with an adequate margin of safety, including the health of at-risk populations, and is retaining the standards, without revision.

### *C. Decision on the Primary $PM_{2.5}$ Standards*

For the reasons discussed above and taking into account information and assessments presented in the ISA and PA, the advice from the CASAC, and consideration of public comments, the Administrator concludes that the current annual and 24-hour primary $PM_{2.5}$ standards are requisite to protect public health from fine particles with an adequate margin of safety, including the health of at-risk populations, and is retaining the current standards without revision.

## III. Rationale for Decisions on the Primary $PM_{10}$ Standard

This section presents the rationale for the Administrator's decision to retain the existing primary $PM_{10}$ standard. This decision is based on a thorough review of the latest scientific information, published through December 2017,[57] and assessed in the ISA, on human health effects associated with $PM_{10-2.5}$ in ambient air. This decision also accounts for considerations in the PA of the policy-relevant information, CASAC advice, and consideration of public comments received on the proposal.

Section III.A provides background on the general approach for this review and the basis for the existing standard, and also presents a brief summary of key aspects of the currently available health effects information. Section III.B summarizes the CASAC advice and the Administrator's proposed decision to retain the existing primary $PM_{10}$ standard, addresses public comments received on the proposal, and presents the Administrator's conclusions on the adequacy of the current standard, drawing on consideration of information in the ISA and the PA information, advice from the CASAC, and comments from the public. Section III.C summarizes the Administrator's decision on the primary $PM_{10}$ standard.

### *A. Introduction*

As in prior reviews, the general approach to reviewing the current primary $PM_{10}$ standard is based, most fundamentally, on using the EPA's assessment of the current scientific evidence to inform the Administrator's judgment regarding a primary $PM_{10}$ standard that protects public health with an adequate margin of safety. In drawing conclusions with regard to the primary $PM_{10}$ standard, the final decision on the adequacy of the current standard is largely a public health policy judgment to be made by the Administrator. The Administrator's final decision draws upon the scientific information about health effects, as well as judgments about how to consider the range and magnitude of uncertainties that are inherent in the scientific evidence. The approach to informing these judgments, discussed more fully below, is based on the recognition that the available health effects evidence generally reflects a continuum, consisting of levels at which scientists generally agree that health effects are likely to occur, through lower levels at which the likelihood and magnitude of the response become increasingly uncertain. This approach is consistent with the requirements of the NAAQS provisions in the CAA and with how the EPA and the courts have interpreted the Act. These provisions require the Administrator to establish primary standards that, in his judgment, are requisite to protect public health with an adequate margin of safety. In so doing, the Administrator seeks to establish standards that are neither more nor less stringent for this purpose. The Act does not require that primary standards be set at a zero-risk level, but rather at a level that avoids unacceptable risks to public health including the health of sensitive groups. The four basic elements of the NAAQS (indicator, averaging time, form, and level) are considered collectively in evaluating the health protection afforded by a standard.

In evaluating the appropriateness of retaining or revising the current primary

[56] As discussed above, the means from these studies are most relatable to the level of the annual standard. However, because the reported means in these studies are based on averaging the monitored concentration across an area, they tend to be lower than the design value for that same area, since attainment of the standard is based on the measurements at the highest monitor (and not the average across multiple monitors.)

[57] In addition to the review's opening ''call for information'' (79 FR 71764, December 3, 2014), ''the current ISA identified and evaluated studies and reports that have undergone scientific peer review and were published or accepted for publication between January 1, 2009 and March 31, 2017. A limited literature update identified some additional studies that were published before December 31, 2017'' (U.S. EPA, 2019, Appendix, p. A–3). References that are cited in the ISA, the references that were considered for inclusion but not cited, and electronic links to bibliographic information and abstracts can be found at: *https://hero.epa.gov/hero/particulate-matter.*

$PM_{10}$ standard, the EPA has adopted an approach which is similar to that used in the last review and which reflects the body of evidence and information now available. As summarized in section III.A.1 below, the Administrator's decisions in the prior review were based on an integration of information on health effects associated with exposure to $PM_{10-2.5,}$ on the public health significance of key health effects, on policy judgments as to whether the standard is requisite to protect public health with an adequate margin of safety, and on consideration of the CASAC advice and public comments.

Similarly, in this review, as described in the PA, the proposal, and elsewhere in this document, we draw on the current evidence pertaining to the public health risk of $PM_{10-2.5}$ in ambient air. The past and current approaches are both based, most fundamentally, on the EPA's assessment of the current scientific and technical information. The EPA's assessments are primarily documented in the ISA and the PA, which have received CASAC review and public comment (83 FR 53471, October 23, 2018; 84 FR 47944, September 11, 2019). To bridge the gap between the scientific assessment of the ISA and the judgments required of the Administrator in determining whether the current standard is requisite to protect public health with an adequate margin of safety, the PA evaluates the policy implications of the current evidence in the ISA.

In considering the scientific and technical information, we consider both the information available at the time of the last review and information newly available since the last review, including most particularly that which has been critically analyzed and characterized in the current ISA. The evidence-based discussions presented below in section III.A.2 (and summarized more fully in the proposal) draw upon evidence from studies evaluating health effects related to exposures to $PM_{10-2.5}$, as discussed in the ISA.

1. Background on the Current Standard

The last review of the PM NAAQS was completed in 2012 (78 FR 3086, January 15, 2013). In that review, the EPA retained the existing primary 24-hour $PM_{10}$ standard, with its level of 150 $\mu g/m^3$ and its one-expected-exceedance form on average over three years, to continue to provide public health protection against exposures to $PM_{10-2.5}$. In support of this decision, the prior Administrator emphasized her consideration of three issues: (1) The extent to which it was appropriate to retain a standard that provides some measure of protection against all $PM_{10-2.5}$ (regardless of composition or source of origin), (2) the extent to which a standard with a $PM_{10}$ indicator can provide protection against exposures to $PM_{10-2.5}$, and (3) the degree of public protection provided by the existing $PM_{10}$ standard.

First, the prior Administrator judged that the evidence provided ''ample support for a standard that protects against exposures to all thoracic coarse particles, regardless of their location or source of origin'' (78 FR 3176, January 15, 2013). In support of this, she noted that the epidemiological studies had reported positive associations between $PM_{10-2.5}$ and mortality or morbidity in a large number of cities across North America, Europe, and Asia, encompassing a variety of environments where $PM_{10-2.5}$ sources and composition were expected to vary widely. Though most of the available studies examined associations in urban areas, the Administrator noted that some studies had also found associations between mortality and morbidity and relatively high ambient concentrations of particles of non-urban crustal origin. In the last review, in considering this body of evidence, and consistent with the CASAC's advice, the Administrator concluded that it was appropriate to maintain a standard that provides some measure of protection against exposures to all thoracic coarse particles, regardless of their composition, location, or source of origin (78 FR 3176, January 15, 2013).

With regard to the appropriateness of retaining a $PM_{10}$ indicator for a standard meant to protect against exposures to $PM_{10-2.5}$ in ambient air, the prior Administrator noted that $PM_{10}$ mass included both coarse PM ($PM_{10-2.5}$) and fine PM ($PM_{2.5}$). As a result, the concentration of thoracic coarse particles ($PM_{10-2.5}$) allowed by a $PM_{10}$ standard set at a single level declines as the concentration of $PM_{2.5}$ increases. Because $PM_{2.5}$ concentrations tend to be higher in urban areas than in rural areas, she observed that a $PM_{10}$ standard would generally allow lower $PM_{10-2.5}$ concentrations in urban areas than in rural areas. She judged it appropriate to maintain such a standard given that much of the evidence for $PM_{10-2.5}$ toxicity, particularly at relatively low particle concentrations, came from study locations where thoracic coarse particles were of urban origin, and given that contaminants in urban areas would increase $PM_{10-2.5}$ particle toxicity. Therefore, in the last review, the Administrator concluded that it remained appropriate to maintain a standard that requires lower concentrations of $PM_{10-2.5}$ in ambient air in urban areas, where the strongest evidence was for associations between mortality and morbidity, and allows higher concentrations of $PM_{10-2.5}$ in non-urban areas, where the evidence of public health concerns was less certain. The Administrator concluded that the varying concentrations of coarse particles that would be permitted in urban versus non-urban areas under the 24-hour $PM_{10}$ standard, based the varying levels of $PM_{2.5}$ present, appropriately reflected the differences in the strength of evidence regarding the health effects of coarse particles.

With regard to evaluating the degree of public health protection provided by the current primary $PM_{10}$ standard, with its level of 150 $\mu g/m^3$ and its one-expected-exceedance form on average over three years, the Administrator recognized that the available scientific evidence and air quality information was much more limited for $PM_{10-2.5}$ than for $PM_{2.5}$. In particular, the strongest evidence for $PM_{10-2.5}$-related health effects was for cardiovascular effects, respiratory effects, and premature mortality following short-term exposures. For each of these categories of effects, the 2009 ISA concluded that the evidence was ''suggestive of a causal relationship'' (U.S. EPA, 2009c, section 2.3.3). The Administrator noted the significant uncertainties and limitations associated with the $PM_{10-2.5}$ scientific evidence leading to these causal determinations and questioned whether additional public health improvements would be achieved by revising the existing primary $PM_{10}$ standard. She specifically took note of several uncertainties and limitations, including the following:

- There were a limited number of epidemiological studies that employed copollutant models to address the potential for confounding, particularly by $PM_{2.5}$, that would further the understanding of the extent to which $PM_{10-2.5}$ itself, rather than copollutants, contributed to the reported health effects.
- The plausibility of the associations between $PM_{10-2.5}$ and mortality and morbidity reported in epidemiological studies was uncertain given the limited number of experimental studies providing support for these associations.
- Limitations in $PM_{10-2.5}$ monitoring data (*i.e.,* limited data available from FRM/FEM sampling methods) and the different approaches used to estimate $PM_{10-2.5}$ concentrations across epidemiological studies resulted in uncertainties in the ambient $PM_{10-2.5}$ concentrations at which the reported

effects occur, increasing uncertainty in estimates of the extent to which changes in ambient $PM_{10-2.5}$ concentrations would likely impact public health.

• While $PM_{10-2.5}$ effect estimates reported for mortality and morbidity were generally positive, most were not statistically significant, even in single pollutant models. This included effect estimates reported in some study locations where the ambient $PM_{10}$ concentrations were above those allowed by the current 24-hour $PM_{10}$ standard.

• The composition of $PM_{10-2.5}$, and the effects associated with specific components, were also key uncertainties in the evidence. With a lack of information on the chemical speciation of $PM_{10-2.5}$, the apparent variability in associations across study locations was difficult to characterize.

In considering these uncertainties and limitations, the prior Administrator particularly took note of degree of uncertainty associated with the extent to which health effects reported in the epidemiological studies are due to $PM_{10-2.5}$ itself, as opposed to one or more copollutants, especially $PM_{2.5}$. This uncertainty reflects the relatively small number of studies available for $PM_{10-2.5}$ in ambient air that had evaluated copollutant models, and the very limited evidence from controlled human exposure studies supporting the plausibility of adverse health effects attributable to $PM_{10-2.5}$ at ambient concentrations.

When considering the available evidence overall, the prior Administrator concluded that the degree of public health protection provided by the current $PM_{10}$ standard against exposures to $PM_{10-2.5}$ should be maintained (*i.e.,* neither increased nor decreased). Her judgment that a more stringent standard to provide additional protection was not necessary was supported by her consideration of the uncertainties in the overall body of evidence. Her judgment that a less stringent standard was not needed and that the degree of public health protection provided by the current standard was not greater than warranted was supported by the positive and statistically significant associations with mortality observed in some single-city study locations that were likely to have violated the current $PM_{10}$ standard. Therefore, the prior Administrator concluded that the existing 24-hour standard, with its one-expected exceedance form on average over three years and a level of 150 μg/m³, was requisite to protect public health with an adequate margin of safety against effects that have been associated with $PM_{10-2.5}$. In light of this conclusion, the EPA retained the existing primary $PM_{10}$ standard.

2. Overview of Health Effects Evidence

In this section, we provide an overview of the policy-relevant aspects of the $PM_{10-2.5}$-related health effects evidence available for consideration in this review. Section III.B of the proposal provides a detailed summary of key information contained in the ISA and the PA on the health effects associated with $PM_{10-2.5}$ exposures, and the related public health implications. As described in the proposal, the ISA does not identify any $PM_{10-2.5}$-related health outcomes for which the evidence supports either a ''causal'' or ''likely to be causal relationship'' (85 FR 24122, April 30, 2020). Therefore, for $PM_{10-2.5}$, we consider the evidence determined to be ''suggestive of, but not sufficient to infer, a causal relationship,'' recognizing the greater uncertainty in such evidence.[58]

While studies conducted since the time of the last review have strengthened support for relationships between $PM_{10-2.5}$ exposures and some key health outcomes, several key uncertainties from the last review have, to date, ''still not been addressed'' (U.S. EPA, 2019, section 1.4.2, p. 1–41). For example, in the last review, epidemiological studies relied on a number of methods to estimate $PM_{10-2.5}$ exposures, but the methods had not been systematically compared to evaluate spatial and temporal correlations in exposure estimates. Methods employed by these studies included: (1) Calculating the difference between $PM_{10}$ and $PM_{2.5}$ at co-located monitors, (2) calculating the difference between county-wide averages of monitored $PM_{10}$ and $PM_{2.5}$ based on monitors that are not necessarily co-located, and (3) direct measurement of $PM_{10-2.5}$ using a dichotomous sampler (U.S. EPA, 2019, section 1.4.2). More recent epidemiological studies, available since the last review, continue to use these approaches to estimate $PM_{10-2.5}$ concentrations. Some recent studies estimate long-term $PM_{10-2.5}$ exposures as the difference between $PM_{10}$ and $PM_{2.5}$ concentrations based on information from spatiotemporal or land use regression (LUR) models, in addition to monitors. As in the last review, the methods used to estimate $PM_{10-2.5}$ concentrations have not been systematically evaluated (U.S. EPA, 2019, section 3.3.1.1), contributing to the uncertainty regarding spatial and temporal correlations in $PM_{10-2.5}$ concentrations across methods and in $PM_{10-2.5}$ exposure estimates used in epidemiological studies (U.S. EPA, 2019, sections 2.5.1.2.3 and 2.5.2.2.3). Given the greater spatial and temporal variability of $PM_{10-2.5}$ and fewer $PM_{10-2.5}$ monitoring sites compared to $PM_{2.5}$, this uncertainty is particularly important for the coarse size fraction.

In addition to the uncertainty associated with $PM_{10-2.5}$ exposure estimates in the epidemiological studies, information in the current review remains limited with regard to the potential for confounding by copollutants and provides limited support for the biological plausibility of serious effects following $PM_{10-2.5}$ exposures; both of these limitations continue to contribute broadly to uncertainty in the $PM_{10-2.5}$ health evidence. Uncertainty related to potential confounding is related to the relatively few epidemiological studies that have evaluated $PM_{10-2.5}$ health effect associations in copollutant models with both gaseous pollutants and other PM size fractions. Uncertainty related to the biological plausibility of serious effects caused by $PM_{10-2.5}$ exposures results from the limited number of controlled human exposure and animal toxicology[59] studies that have evaluated the health effects of experimental $PM_{10-2.5}$ inhalation exposures. The evidence supporting the ISA's ''suggestive'' causality determinations for $PM_{10-2.5}$ and health effects, including the uncertainties in the evidence, are summarized in the sections below.

a. Nature of Effects

i. Mortality

With regard to long-term $PM_{10-2.5}$ exposure and mortality, very few studies were available at the time of the last review. As such, the 2009 ISA concluded that the evidence was ''inadequate to determine if a causal relationship exists'' (U.S. EPA, 2009c). Since the time of the last review, there is limited new evidence and many of the limitations noted in the 2012 review persist. In the current review, some recent cohort studies conducted in the U.S. and Europe reported positive associations between long-term $PM_{10-2.5}$ exposure and total (nonaccidental) mortality, though results are

[58] As noted in the Preamble to the ISA, ''suggestive'' evidence is ''limited, and chance, confounding, and other biases cannot be ruled out'' (U.S. EPA, 2015, Table II).

[59] Compared to humans, smaller fractions of inhaled $PM_{10-2.5}$ penetrate into the thoracic regions of rats and mice (U.S. EPA, 2019, section 4.1.6), contributing to the relatively limited evaluation $PM_{10-2.5}$ exposures in animal studies.

inconsistent across studies (U.S. EPA, 2019, Table 11–11). The examination of copollutant models in these studies remains limited, and when copollutants are included, $PM_{10-2.5}$ effect estimates are often attenuated after adjusting for $PM_{2.5}$ (U.S. EPA, 2019, Table 11–11). These studies employed a number of approaches for estimating $PM_{10-2.5}$ exposures, including direct measurements from dichotomous samplers, calculating the difference between $PM_{10}$ and $PM_{2.5}$ measured at co-located monitors, and calculating the difference of area-wide $PM_{10}$ and $PM_{2.5}$ concentrations. As discussed above as a limitation in the last review, temporal and spatial correlations between these approaches still have not been evaluated, contributing to uncertainty regarding the potential for exposure measurement error (U.S. EPA, 2019, section 3.3.1.1, Table 11–11). The 2019 ISA concludes that this uncertainty ''reduces the confidence in the associations observed across studies'' (U.S. EPA, 2020, p. 11–125) and that the evidence for long-term $PM_{10-2.5}$ exposures and cardiovascular effects, respiratory morbidity, and metabolic disease provide limited biological plausibility for $PM_{10-2.5}$-related mortality (U.S. EPA, 2019, sections 11.4.1 and 11.4). Taken together, the 2019 ISA concludes that ''this body of evidence is suggestive, but not sufficient to infer, that a causal relationship exists between long-term $PM_{10-2.5}$ exposure and total mortality'' (U.S. EPA, 2019, p. 11–125).

With regard to short-term $PM_{10-2.5}$ exposures and mortality, the 2009 ISA concluded that the evidence is ''suggestive of a causal relationship between short-term exposure to $PM_{10-2.5}$ and mortality'' (U.S. EPA, 2009c). Since the last review, multicity epidemiological studies conducted primarily in Europe and Asia continue to provide consistent evidence of positive associations between short-term $PM_{10-2.5}$ exposure and total (nonaccidental) mortality (U.S. EPA, 2019, Table 11–9). These studies contribute to increasing confidence in the relationship between the short-term $PM_{10-2.5}$ exposures and mortality, however, the use of varying approaches to estimate $PM_{10-2.5}$ exposures continue to contribute uncertainty to the associations observed. Additionally, the 2019 ISA notes than an analysis by Adar et al. (2014) indicates ''possible evidence of publications bias, which was not observed for $PM_{2.5}$'' (U.S. EPA, 2019, section 11.3.2, p. 11–106). Studies newly available in this review expand the assessment of potential copollutant confounding of the short-term $PM_{10-2.5}$-mortality relationship and provide evidence that $PM_{10-2.5}$ associations generally remain positive in copollutant models, although associations are attenuated in some instances (U.S. EPA, 2019, section 11.3.4.1, Figure 11–28, Table 11–10). The 2019 ISA concludes that, overall, the assessment of potential copollutant confounding is limited by a lack of information on the correlation between $PM_{10-2.5}$ and gaseous pollutants and the small number of locations where copollutant analyses have been conducted. Associations with cause-specific mortality provide some support for associations with total (nonaccidental) mortality, though associations with cause-specific mortality, particularly respiratory mortality, are more uncertain (*i.e.,* wider confidence intervals) and less consistent (U.S. EPA, 2019, section 11.3.7). As discussed further below, the ISA concludes that evidence for $PM_{10-2.5}$-related cardiovascular and respiratory effects provides only limited support for the biological plausibility of a relationship between short-term $PM_{10-2.5}$ exposure and cause-specific mortality (U.S. EPA, 2019, section 11.3.7). Based on the overall evidence, the 2019 ISA concludes that ''this body of evidence is suggestive, but not sufficient to infer, that a causal relationship exists between short-term $PM_{10-2.5}$ exposure and total mortality'' (U.S. EPA, 2019, p. 11–120).

ii. Cardiovascular Effects

With regard to long-term exposures, the evidence available in the last review describing the relationship between long-term exposure to $PM_{10-2.5}$ and cardiovascular effects was characterized in the 2009 ISA as ''inadequate to infer the presence or absence of a causal relationship.'' The limited number of epidemiological studies available at that time reported contradictory results and experimental evidence demonstrating an effect of $PM_{10-2.5}$ on the cardiovascular system was lacking (U.S. EPA, 2019, section 6.4).

The evidence of long-term $PM_{10-2.5}$ exposures and cardiovascular mortality remains limited, with no consistent pattern of associations across studies, and as discussed above, uncertainty from the use of various approaches for estimating $PM_{10-2.5}$ concentrations (U.S. EPA, 2019, Table 6–70). The evidence for associations between $PM_{10-2.5}$ and cardiovascular morbidity has grown and, while results across studies are not entirely consistent, some epidemiological studies report positive associations with IHD and myocardial infarction (MI) (U.S. EPA, 2019, Figure 6–34); stroke (U.S. EPA, 2019, Figure 6–35); atherosclerosis (U.S. EPA, 2019, section 6.4.5); venous thromboembolism (VTE) (U.S. EPA, 2019, section 6.4.7); and blood pressure and hypertension (U.S. EPA, 2019, section 6.4.6). With respect to copollutant confounding, the effect estimates for $PM_{10-2.5}$-cardiovascular mortality are often attenuated, but remain positive, in copollutant models adjusted for $PM_{2.5}$. For cardiovascular morbidity outcomes, associations are inconsistent in copollutant models that adjust for $PM_{2.5}$, $NO_2$, and chronic noise pollution (U.S. EPA, 2019, p. 6–276). The 2019 ISA concluded that ''evidence from experimental animal studies is of insufficient quantity to establish biological plausibility'' (U.S. EPA, 2019, p. 6–277). Despite this substantial data gap in the toxicologic evidence for long-term $PM_{10-2.5}$ exposures and based largely on the observation of positive associations in some high-quality epidemiological studies, the ISA concludes that ''evidence is suggestive of, but not sufficient to infer, a causal relationship between long-term $PM_{10-2.5}$ exposure and cardiovascular effects'' (U.S. EPA, 2019, p. 6–277).

With regard to short-term $PM_{10-2.5}$ exposures and cardiovascular effects, the 2009 ISA found the available evidence was ''suggestive of a causal relationship,'' based primarily on several epidemiological studies reporting associations between short-term $PM_{10-2.5}$ exposure and cardiovascular effects, including IHD hospitalizations, supraventricular ectopy, and changes in heart rate variability (HRV). In addition, studies found increases in cardiovascular disease emergency department visits and hospital admissions linked to dust storm events resulting in high concentrations of crustal material. However, the 2009 ISA noted the potential for exposure measurement error and copollutant confounding in these studies. Moreover, there was only limited evidence of cardiovascular effects from a small number of controlled human exposure and animal toxicologic studies that examined $PM_{10-2.5}$ exposures (U.S. EPA, 2009c, section 6.2.12.2). Therefore, the potential for exposure measurement error and copollutant confounding, along with the limited evidence of biological plausibility for cardiovascular effects following inhalation exposure, contributed uncertainty to the scientific evidence available at the time of the last review (U.S. EPA, 2009c, section 6.3.13).

The evidence related to short-term $PM_{10-2.5}$ exposure and cardiovascular

effects has somewhat expanded since the last review, but a number of important uncertainties persist. The 2019 ISA notes that there are a small number of epidemiological studies reporting positive associations between short-term $PM_{10-2.5}$ exposures and cardiovascular morbidity. There continues to be limited evidence, however, to suggest that these associations are biologically plausible, or independent of copollutant confounding. Additionally, the ISA concludes that it remains unclear how the approaches used to estimate $PM_{10-2.5}$ concentrations in epidemiological studies may impact exposure measurement error. The 2019 ISA concludes that overall ''the evidence is suggestive of, but not sufficient to infer, a causal relationship between short-term $PM_{10-2.5}$ exposures and cardiovascular effects'' (U.S. EPA, 2019, p. 6–254).

iii. Respiratory Effects

With regard to short-term $PM_{10-2.5}$ exposures and respiratory effects, the 2009 ISA concluded that, based on a small number of epidemiological studies observing some respiratory effects and limited evidence to support biological plausibility, the relationship is ''suggestive of a causal relationship.'' Epidemiological findings were consistent for respiratory infection and combined respiratory-related diseases, but not for COPD. Studies were characterized by overall uncertainty in the exposure assignment approach and limited information regarding potential copollutant confounding. Controlled human exposure studies of short-term $PM_{10-2.5}$ exposures found no lung function decrements and inconsistent evidence of pulmonary inflammation. Animal toxicologic studies were limited to those that used non-inhalation (*e.g.,* intra-tracheal instillation) routes of $PM_{10-2.5}$ exposure.

Recently available epidemiological studies link short-term $PM_{10-2.5}$ exposure with asthma exacerbation and respiratory mortality. Some associations remained positive in copollutant models including $PM_{2.5}$ or gaseous pollutants, although associations were attenuated in some studies of mortality. Limited evidence is available that observes positive associations with other respiratory outcomes, including COPD exacerbation, respiratory infection, and combined respiratory-related diseases (U.S. EPA, 2019, Table 5–36). The lack of systematic evaluation of the various methods used to estimate $PM_{10-2.5}$ concentrations and the resulting spatial and temporal variability in $PM_{10-2.5}$ concentrations compared to $PM_{2.5}$ continues to be an uncertainty in this evidence (U.S. EPA, 2019, sections 2.5.1.2.3 and 3.3.1.1). Based on the overall evidence, the 2019 ISA concludes that the ''evidence is suggestive of, but not sufficient to infer, a causal relationship between short-term $PM_{10-2.5}$ exposure and respiratory effects'' (U.S. EPA, 2019, p. 5–270).

iv. Cancer

In the last review, little information was available from studies of cancer following inhalation exposures to $PM_{10-2.5}$. Thus, the 2009 ISA concluded that the evidence was ''inadequate to assess the relationship between long-term $PM_{10-2.5}$ exposures and cancer'' (U.S. EPA, 2009c). Since the last review, the available studies of long-term $PM_{10-2.5}$ exposure and cancer remain limited, with a few recent epidemiological studies that report positive, but imprecise, associations with lung cancer incidence. Uncertainty remains in these studies due to exposure measurement error from the use of $PM_{10-2.5}$ predictions that have not been validated by monitored $PM_{10-2.5}$ concentrations (U.S. EPA, 2019, sections 3.3.2.3 and 10.3.4). Very few experimental studies of $PM_{10-2.5}$ exposures have been conducted, although the available studies indicate that $PM_{10-2.5}$ exhibits genotoxicity and oxidative stress, two key characteristics of carcinogens. While limited, these studies provide some evidence of biological plausibility for the findings in a small number of epidemiological studies (U.S. EPA, 2019, section 10.3.4). Taken together, the small number of available epidemiological and experimental studies, along with uncertainty related to exposure measurement error, contribute to the 2019 ISA conclusion that ''the evidence is suggestive of, but not sufficient to infer, a causal relationship between long-term $PM_{10-2.5}$ exposure and cancer'' (U.S. EPA, 2019, p. 10–87).

v. Metabolic Effects

The 2009 ISA did not make a causality determination for $PM_{10-2.5}$-related metabolic effects. Since the last review, one epidemiological study shows an association between long-term $PM_{10-2.5}$ exposure and incident diabetes, while additional cross-sectional studies report associations with effects on glucose or insulin homeostasis (U.S. EPA, 2019, section 7.4). Uncertainties with this evidence include the potential for copollutant confounding and exposure measurement error (U.S. EPA, 2019, Tables 7–14 7–15). There is limited evidence to support biological plausibility of metabolic effects, although a cross-sectional study that investigated biomarkers of insulin resistance and systemic and peripheral inflammation may support a pathway leading to type 2 diabetes (U.S. EPA, 2019, sections 7.4.1 and 7.4.3). Based on the somewhat expanded evidence available in this review, the 2019 ISA concludes that ''the evidence is suggestive of, but not sufficient to infer, a causal relationship between [long]-term $PM_{10-2.5}$ exposures and metabolic effects'' (U.S. EPA, 2019, p. 7–56).

vi. Nervous System Effects

The 2009 ISA did not make a causal determination for $PM_{10-2.5}$ exposures and nervous system effects. Newly available evidence since that time includes epidemiological studies that report associations between long-term $PM_{10-2.5}$ exposures and impaired cognition and anxiety in adults in longitudinal analyses (U.S. EPA, 2019, Table 8–25, section 8.4.5). Associations of long-term $PM_{10-2.5}$ exposure with neurodevelopmental effects are not consistently reported in children (U.S. EPA, 2019, section 8.4.4 and 8.4.5). Uncertainties in these studies include the potential for copollutant confounding, given that no studies examined copollutant models (U.S. EPA, 2019, section 8.4.5), and exposure measurement error based on the various methods used across studies to estimate $PM_{10-2.5}$ concentrations (U.S. EPA, 2019, Table 8–25). Additionally, there is very limited animal toxicologic evidence to provide support for biological plausibility of nervous system effects (U.S. EPA, 2019, sections 8.4.1 and 8.4.5). Considering the available studies and associated limitations, the 2019 ISA concludes that ''the evidence is suggestive of, but not sufficient to infer, a causal relationship between long-term $PM_{10-2.5}$ exposure and nervous system effects'' (U.S. EPA, 2019, p. 8–75).

*B. Conclusions on the Primary $PM_{10}$ Standard*

In drawing conclusions on the adequacy of the current primary $PM_{10}$ standard, in view of the advances in scientific knowledge and additional information now available, the Administrator has considered the evidence base, information, and policy judgments that were the foundation of the last review and reflects upon the body of evidence and information newly available in this review. In so doing, the Administrator has taken into account the evidence-based considerations, as well as advice from the CASAC and public comments. Evidence-based considerations draw upon the EPA's assessment and integrated synthesis of the scientific evidence from animal

toxicologic, controlled human exposure studies, and epidemiological studies evaluating health effects related to exposures to $PM_{10-2.5}$ as presented in the ISA and discussed in section III.A.2. In addition to the evidence, the Administrator has weighed a range of policy-relevant considerations as discussed in the PA and summarized in sections III.B and III.C of the proposal and summarized in section III.B.2 below. These considerations, along with the advice from the CASAC (section III.B.1) and public comments (section III.B.3), are discussed below. A more detailed summary of all significant comments, along with the EPA's responses (henceforth ''Response to Comments''), can be found in the docket for this rulemaking (Docket No. EPA–HQ–OAR–2015–0072). This document is available for review in the docket for this rulemaking and through the EPA's NAAQS website (*https://www.epa.gov/naaqs/particulate-matter-pm-air-quality-standards*). The Administrator's conclusions in this review regarding the adequacy of the current primary $PM_{10}$ standard and whether any revisions are appropriate are described in section III.B.4.

1. CASAC Advice in This Review

As a part of the review of the draft PA, the CASAC has provided advice on the adequacy of the public health protection afforded by the current primary $PM_{10}$ standard. As for $PM_{2.5}$ (section II.B.1 above), the CASAC's advice is documented in a letter sent to the EPA Administrator (Cox, 2019a).

In its comments on the draft PA, the CASAC concurs with the draft PA's overall preliminary conclusions that it is appropriate to consider retaining the current primary $PM_{10}$ standard without revision. The CASAC agrees with the draft PA ''that key uncertainties identified in the last review remain'' (Cox, 2019a, p. 13 of consensus responses) and that ''none of the identified health outcomes linked to $PM_{10-2.5}$'' were judged to be causal or likely causal. (Cox, 2019a, p. 12 of consensus responses). To reduce these uncertainties in future reviews, the CASAC recommends improvements to $PM_{10-2.5}$ exposure assessment, including a more extensive network for direct monitoring of the $PM_{10-2.5}$ fraction (Cox, 2019a, p. 13 of consensus responses). The CASAC also recommends additional controlled human exposure and animal toxicology studies of the $PM_{10-2.5}$ fraction to improve the understanding of biological causal mechanisms and pathway (Cox, 2019a, p. 13 of consensus responses). Overall, the CASAC agrees with the EPA that ''. . . the available evidence does not call into question the adequacy of the public health protection afforded by the current primary $PM_{10}$ standard and that evidence supports consideration of retaining the current standard in this review'' (Cox, 2019a, p. 3 of letter).

2. Basis for the Proposed Decision

At the time of the proposal, the Administrator carefully considered the assessment of the current evidence and conclusions reached in the ISA, considerations and staff conclusions and associated rationales presented in the PA, and the advice and recommendations of the CASAC (85 FR 24125, April 30, 2020). In reaching his proposed decision on the primary $PM_{10}$ standard, the Administrator first noted the decision to retain the primary $PM_{10}$ standard in the last review recognized that epidemiological studies had reported positive associations between $PM_{10-2.5}$ and mortality and morbidity in cities across North America, Europe, and Asia. The studies encompassed a variety of environments where $PM_{10-2.5}$ sources and composition were expected to vary widely. Although many of the studies examined associations between $PM_{10-2.5}$ and health effects in urban areas, some of the studies also linked mortality and morbidity with relatively high ambient concentrations of particles of non-urban crustal origin. Drawing on this information, the EPA judged that it was appropriate to maintain a standard that provides some measure of protection against exposures to $PM_{10-2.5}$, regardless of location, source of origin, or particle composition (78 FR 3176, January 15, 2013).

The Administrator noted that the evidence for several $PM_{10-2.5}$-related health effects, particularly for long-term exposures, has expanded since the time of the last review. Recently available epidemiological studies conducted in North America, Europe, and Asia continue to report positive associations with mortality and morbidity in cities where $PM_{10-2.5}$ sources and composition are expected to vary widely, but uncertainties remain with respect to the methods used to assign exposure in the studies. While the Administrator recognized that important uncertainties persist in the scientific evidence, as described below and in section III.A.2 above, he also recognized that $PM_{10-2.5}$ exposures may be associated with a broader range of health effects that have been linked with $PM_{10-2.5}$ exposures. These studies provide an important part of the body of evidence supporting the ISA's revised causality determinations, including new determinations, for long-term $PM_{10-2.5}$ exposures and mortality, cardiovascular effects, metabolic effects, nervous system effects, and cancer (U.S. EPA, 2019; U.S. EPA, 2020, section 4.2). Drawing on this information, the Administrator proposed to conclude that the scientific studies available since the last review continue to support a primary $PM_{10}$ standard that provides some measure of public health protection against $PM_{10-2.5}$ exposures, regardless of location, source of origin, or particle composition.

With regard to the uncertainties in the scientific evidence, the Administrator noted that the decision in the last review highlighted limitations in the estimates of ambient $PM_{10-2.5}$ concentrations used in epidemiological studies, the limited evaluation of copollutant models to address potential confounding, and the limited number of experimental studies to support biologically plausible pathways for $PM_{10-2.5}$-related health effects. These and other limitations raised questions as to whether additional public health improvements would be achieved by revising the existing $PM_{10}$ standard.

Despite some additional new evidence available in this review, the Administrator recognized that, similar to the last review, uncertainties remain in the scientific evidence for $PM_{10-2.5}$-related health effects. As summarized above (section III.A.2), these include uncertainties in the $PM_{10-2.5}$ exposure estimates used in epidemiological studies, in the independence of $PM_{10-2.5}$ health effect associations, and in support for the biologic plausibility of $PM_{10-2.5}$-related effects from controlled human exposure and animal toxicologic studies (U.S. EPA, 2020, section 4.2). These uncertainties contributed to the conclusions in the 2019 ISA that the evidence for key $PM_{10-2.5}$ health effects is ''suggestive of, but not sufficient to infer'' causal relationships (U.S. EPA, 2019). In light of his emphasis on evidence supporting ''causal'' or ''likely to be causal'' relationships in the current review, the Administrator judged that the evidence of health effects associated with $PM_{10-2.5}$ in ambient air provides an uncertain scientific foundation for making decisions for standard setting. As such, he further judged that, consistent with the last review, limitations in the evidence raise questions as to whether additional public health protections would be achieved by revising the existing $PM_{10}$ standard.

In reaching his proposed conclusions on the primary $PM_{10}$ standard, the Administrator additionally considered the advice and recommendations from the CASAC. As described above (section III.B.1), the CASAC recognized the

uncertainties in the evidence for $PM_{10-2.5}$-related health effects, stating that ''key uncertainties identified in the last review remain'' (Cox, 2019a, p. 13 of consensus responses). Given these uncertainties, the CASAC agreed with the PA conclusion that the evidence available in this review ''does not call into question the adequacy of the public health protection afforded by the current primary $PM_{10}$ standard'' (Cox, 2019a, p. 3 of letter). The CASAC further recommended that this evidence ''supports consideration of retaining the current standard in this review'' (Cox, 2019a, p. 3 of letter).

In considering the information above, the Administrator proposed to conclude that the available scientific evidence continues to support a $PM_{10}$ standard to provide some measure of protection against $PM_{10-2.5}$ exposures. This conclusion reflected the expanded evidence available in this review for health effects from $PM_{10-2.5}$ exposures. However, important uncertainties and limitations in the evidence remain. Consistent with the decision in the last review, the Administrator proposed to conclude that these limitations contribute to considerable uncertainty regarding the potential public health implications of revising the existing $PM_{10}$ standard. Given this uncertainty, and consistent with the advice from the CASAC, the Administrator proposed to conclude that the available evidence does not call into question the adequacy of the public health protection afforded by the current primary $PM_{10}$ standard. Therefore, he proposed to retain the primary $PM_{10}$ standard, without revision.

3. Comments on the Proposed Decision

Of the public comments received on the proposal, very few commenters provided comments on the primary $PM_{10}$ standard. Of those commenters who did provide comments on the primary $PM_{10}$ standard, the majority supported the Administrator's proposed decision to retain the current primary $PM_{10}$ standard, without revision. This group includes primarily industries and industry groups. All of these commenters generally note their agreements with the rationale provided in the proposal and the CASAC concurrence with the PA conclusion that the current evidence does not support revision to the standard. Most also cite the EPA and CASAC statements that the newly available information in this review does not call into question the adequacy of the current standard. The EPA agrees with these comments and with the CASAC advice regarding the adequacy of the current primary standard and the lack of support for revision of the standard.

Some commenters disagreed with the Administrator's proposed conclusion to retain the current primary $PM_{10}$ standard, primarily focusing their comments on the need for revisions to the form of the standard or the level of the standard. With regard to comments on the form of the standard, some commenters assert that the EPA should revise the standard by adopting a separate form (or a ''compliance threshold'' in their words)—the 99th percentile, averaged over three years—for the primary $PM_{10}$ standard for continuous monitors, which provide data every day, while maintaining the current form of the standard (one exceedance, averaged over three years) for 1-in-6 samplers, given the widespread use of continuous monitoring and to ease the burden of demonstrating exceptional events. These commenters, in support of their comment, contend that the 99th percentile would effectively change the form from the 2nd high to the 4th high and would allow no more than three exceedances per year, averaged over three years. These commenters additionally highlight the EPA's decision in the 1997 review to adopt a 99th percentile form, averaged over three years, citing to advantages of a percentile-based form in the Administrator's rationale in that review. The comments further assert that a 99th percentile form for the primary $PM_{10}$ standard is still more conservative than the form for other short-term NAAQS (*e.g.,* $PM_{2.5}$ and $NO_2$).

First, the EPA has long recognized that the form is an integral part of the NAAQS and must be selected together with the other elements of the NAAQS to ensure the appropriate stringency and requisite degree of public health protection. Thus, if the EPA were to change the form according to the monitoring method it would be establishing two different NAAQS, varying based on the monitoring method. The EPA has not done this to date, did not propose such an approach, and declines to adopt it for the final rule, as we believe such a decision in this final rule is beyond the scope of the proposal, and that each PM standard should have a single form, indicator, level and averaging time, chosen by the Administrator as necessary and appropriate. While certain continuous monitors may be established and approved as a Federal Equivalent Method (FEM) for $PM_{10}$, as an alternative to a Federal Reference Method (FRM), the use of an FEM is intended as an alternative means of determining compliance with the NAAQS, not as authorizing a different NAAQS.

Even if the commenters had asked that the change in form be made without regard to monitoring method, the EPA does not believe such a change would be warranted. The change in form for continuous monitors suggested by the commenters, without also lowering the level of such a standard, would allow more exceedances and thereby markedly reduce the public health protection provided against exposures to $PM_{10-2.5}$ in ambient air. These commenters have not provided new evidence or analyses to support their conclusion that an appropriate degree of public health protection could be achieved by allowing the use of an alternative form (*i.e.,* 99th percentile), while retaining the other elements of the standard.

With regard to the commenters' assertion that an alternate form of the standard would ease the burden of demonstrating exceptional events, the EPA first recognizes, consistent with the CAA, that it may be appropriate to exclude monitoring data influenced by ''exceptional'' events when making certain regulatory determinations. However, the EPA notes that the cost of implementation of the standards may not be considered by the EPA in reviewing the standards [60] and further the EPA believes it is unnecessary to alter the standard for the purpose of reducing the burden of demonstrating exceptional events. The EPA continues to update and develop documentation and tools to facilitate the implementation of the 2016 Exceptional Events Rule, including new documents intended to assist air agencies with the development of demonstrations for specific types of exceptional events. Moreover, with regard to the commenters' specific concerns for wildfires or high winds, the EPA released updated guidance documents on the preparation of exceptional event demonstrations related to wildfires in September 2016, high wind dust events in April 2019, and prescribed fires in August 2019. These guidance documents outline the regulatory requirements and provide examples for air agencies preparing demonstrations for wildfires, high wind dust, and prescribed fire events.

For all of the reasons discussed above, the EPA does not agree with the commenters that the form of the primary $PM_{10}$ standard should be revised to a 99th percentile for continuous monitors.

[60] See generally *Whitman* v. *American Trucking Associations,* 531 U.S. 457, 465–472, 475–76 (2001).

Some commenters who disagreed with the proposal to retain the current standard advocate for revision to the primary $PM_{10}$ standard to protect public health with an adequate margin of safety. In their recommendations for revising the standard, some commenters contend that the current standard, with its indicator of $PM_{10}$ to target exposures to $PM_{10-2.5}$, has become less protective as ambient concentrations of $PM_{2.5}$ have been reduced with revisions to that standard. These commenters assert that the current primary $PM_{10}$ standard allows increased exposure to $PM_{10-2.5}$ in ambient air because retaining the primary $PM_{10}$ would allow proportionately more $PM_{10-2.5}$ mass as the $PM_{2.5}$ standard has been revised downward. Moreover, in support of their recommendations, the commenters note that the available evidence of $PM_{10-2.5}$-related health effects has been expanded and strengthened since the time of the last review. Taken together, the commenters contend that the primary $PM_{10}$ standard should be revised and failure to do so would be arbitrary and capricious.

We disagree with the commenters that the primary $PM_{10}$ standard should be revised because reductions in ambient concentrations of $PM_{2.5}$ result in a less protective $PM_{10}$ standard. As an initial matter, we note that overall, ambient concentrations of both $PM_{10}$ and $PM_{2.5}$ have declined significantly over time. Ambient concentrations of $PM_{10}$ have declined by 46% across the U.S. from 2000 to 2019,[61] while $PM_{2.5}$ concentrations in ambient air have declined by 43% during this same time period.[62] While trends data is not currently available for $PM_{10-2.5}$ concentrations in ambient air, the expanded availability of monitoring data from the NCore network in this review can provide insight into the relative contributions of fine and coarse PM to total $PM_{10}$ concentrations.

The 2019 ISA provides a comparison of the relative contribution of $PM_{2.5}$ and $PM_{10-2.5}$ to $PM_{10}$ concentrations by region and season using the more comprehensive monitoring data from the NCore network available in this review (U.S. EPA, 2019, section 2.5.1.1.4). The data indicate that, for urban areas, there are roughly equivalent amounts of $PM_{2.5}$ and $PM_{10-2.5}$ contributing to $PM_{10}$ in ambient air, while rural locations have a slightly higher contribution of $PM_{10-2.5}$ contributing to $PM_{10}$ concentrations than $PM_{2.5}$ (U.S. EPA, 2019, section 2.5.1.1.4, Table 2–7). There is generally a greater contribution from the $PM_{2.5}$ fraction in the East and a greater contribution from the $PM_{10-2.5}$ fraction in the West and Midwest. However, as described in the 2019 ISA, $PM_{10}$ has become considerably coarser across the U.S. compared to similar observations in the 2009 ISA (U.S. EPA, 2019, section 2.5.1.1.4; U.S. EPA, 2009c).

The EPA recognizes that when the primary annual $PM_{2.5}$ standard was revised from 15 μg/m³ to 12 μg/m³ while leaving the 24-hour $PM_{2.5}$ standards unchanged at 35 μg/m³ and the 24-hour $PM_{10}$ standard unchanged at 150 μg/m³, the $PM_{10-2.5}$ fraction of $PM_{10}$ could increase in some areas as the $PM_{2.5}$ fraction decreases. Moreover, the EPA recognizes that in most areas of the country $PM_{2.5}$ and $PM_{10}$ concentrations have declined and are well below their respective 24-hour standards, which may also allow the relative ratio of $PM_{2.5}$ to $PM_{10-2.5}$ to vary. In considering the available health effects evidence in this review, there continue to be significant uncertainties and limitations that make it difficult to fully assess the public health implications of revising the primary $PM_{10}$ standard even considering the possibility for additional variability in the relative ratio of $PM_{2.5}$ to $PM_{10-2.5}$ in current $PM_{10}$ air quality across the U.S. As described in detail above in section III.A.2 and in the proposal (85 FR 24125, April 30, 2020), these uncertainties contribute to the determinations in the 2019 ISA that the evidence for key $PM_{10-2.5}$ health effects is ''suggestive of, but not sufficient to infer, a causal relationship'' (U.S. EPA, 2019). Beyond these uncertainties, the EPA also notes that, while the NCore monitoring network has been expanded since the time of the last review, epidemiological studies available in this review do not use $PM_{10-2.5}$ NCore data in evaluating associations between $PM_{10-2.5}$ in ambient air and long- or short-term exposures. In the absence of such evidence, the public health implications of changes in ambient $PM_{10}$ concentrations as $PM_{2.5}$ concentrations decrease remain unclear. Therefore, the EPA continues to recognize this as an area for future research, to address the existing uncertainties (U.S. EPA, 2020, section 4.5), and inform future reviews of the PM NAAQS.

Taken together, at the time of proposal, the Administrator concluded that these and other limitations in the $PM_{10-2.5}$ evidence raised questions as to whether additional public health improvements would be achieved by revising the existing $PM_{10}$ standard. Therefore, the EPA does not agree with the commenters that the currently available air quality information or scientific evidence support revisions to the primary $PM_{10}$ standard in this review.

4. Administrator's Conclusions

Having carefully considered advice from the CASAC and the public comments, as discussed above, the Administrator believes that the fundamental scientific conclusions on health effects of $PM_{10-2.5}$ in ambient air that were reached in the ISA and summarized in the PA remain valid. Additionally, the Administrator believes the judgments he proposed (85 FR 24125, April 30, 2020) with regard to the evidence remain appropriate. Further, in considering the adequacy of the current primary $PM_{10}$ standard in this review, the Administrator has carefully considered the policy-relevant evidence and conclusions contained in the ISA; the rationale and conclusions presented in the PA; the advice and recommendations from the CASAC; and public comments, as addressed in section III.B.3 above. In the discussion below, the Administrator gives weight to the PA conclusions, with which the CASAC has concurred, as summarized in section III.D of the proposal, and takes note of the key aspects of the rationale for those conclusions that contribute to his decision in this review. After giving careful consideration to all of this information, the Administrator believes that the conclusions and policy judgments supporting his proposed decision remain valid, and that the current primary $PM_{10}$ standard provides requisite protection of public health with an adequate margin of safety and should be retained.

In considering the PA evaluations and conclusions, the Administrator specifically notes that, while the health effects evidence is somewhat expanded since the last review, the overall conclusions are generally consistent with what was considered in the last review (U.S. EPA, 2020, section 4.4). In so doing, he additionally notes that the CASAC supports retaining the current standard, agreeing with the EPA that ''the available evidence does not call into question the adequacy of the public health protection afforded by the current primary $PM_{10}$ standard'' (Cox, 2019a, p. 3 of letter). As noted below, the newly available evidence for several $PM_{10-2.5}$-related health effects has

[61] $PM_{10}$ concentrations presented as the annual second maximum 24-hour concentration (in μg/m³) at 262 sites in the U.S. For more information, see: *https://www.epa.gov/air-trends/particulate-matter-pm10-trends.*

[62] $PM_{2.5}$ concentrations presented as the seasonally-weighted annual average concentration (in μg/m³) at 406 sites in the U.S. For more information, see: *https://www.epa.gov/air-trends/particulate-matter-pm25-trends.*

expanded since the last review, in particular for long-term exposures. The Administrator recognizes, however, that there are a number of uncertainties and limitations associated with the available information, as described in the proposal (85 FR 24125, April 30, 2020) and below.

With regard to the current evidence on $PM_{10-2.5}$-related health effects, the Administrator takes note of recent epidemiological studies that continue to report positive associations with mortality and morbidity in cities across North America, Europe, and Asia, where $PM_{10-2.5}$ sources and composition are expected to vary widely. While significant uncertainties remain, as described below, the Administrator recognizes that this expanded body of evidence has broadened the range of effects that have been linked with $PM_{10-2.5}$ exposures. These studies provide an important part of the scientific foundation supporting the ISA's revised causality determinations (and new determinations) for long-term $PM_{10-2.5}$ exposures and mortality, cardiovascular effects, metabolic effects, nervous system effects, and cancer (U.S. EPA, 2019; U.S. EPA, 2020, section 4.2). Drawing from his consideration of this evidence, the Administrator concludes that the scientific information available since the time of the last review supports a decision to maintain a primary $PM_{10}$ standard to provide public health protection against $PM_{10-2.5}$ exposures, regardless of location, source of origin, or particle composition.

With regard to uncertainties in the evidence, the Administrator first notes that a number of limitations were identified in the last review related to: (1) Estimates of ambient $PM_{10-2.5}$ concentrations used in epidemiological studies; (2) limited evaluation of copollutant models to address the potential for confounding; and (3) limited experimental studies supporting biological plausibility for $PM_{10-2.5}$-related effects. In the current review, despite the expanded body of evidence for $PM_{10-2.5}$ exposures and health effects, the Administrator recognizes that similar uncertainties remain. As summarized in section III.B.1 above and in responding to public comments, uncertainties in the current review continue to include those associated with the exposure estimates used in epidemiological studies, the independence of the $PM_{10-2.5}$ health effect associations, and the biologically plausible pathways for $PM_{10-2.5}$ health effects (U.S. EPA, 2020, section 4.2). These uncertainties contribute to the 2019 ISA determinations that the evidence is ''suggestive of, but not sufficient to infer'' causal relationships (U.S. EPA, 2019). In light of his emphasis on evidence supporting ''causal'' or ''likely to be causal'' relationships (sections II.A.2 and III.A.2 above), recognizing that the NAAQS should allow for a margin of safety but finding that there is too much uncertainty that a more stringent standard would improve public health, the Administrator judges that the available evidence provides support for his conclusion that the current standard provides the requisite level of protection from the effects of $PM_{10-2.5}$.

In making this judgment, the Administrator considers whether this level of protection is more than what is requisite and whether a less stringent standard would be appropriate to consider. He notes that there continues to be uncertainty associated with the evidence, for example exposure measurement error, as reflected by the ''suggestive of, but not sufficient to infer'' causal determinations. The Administrator recognizes that the CAA requirement that primary standards provide an adequate margin of safety, as summarized in section I.A above, is intended to address uncertainties associated with inconclusive scientific evidence and technical information, as well as to provide a reasonable degree of protection against hazards that research has not yet identified. Based on all of the considerations noted here, and considering the current body of evidence, including uncertainties and limitations, the Administrator concludes that a less stringent standard would not provide the requisite protection of public health, including an adequate margin of safety.

The Administrator also considers whether the level of protection associated with the current standard is less than what is requisite and whether a more stringent standard would be appropriate to consider. In so doing, the Administrator considers, as discussed above, the level of protection offered from exposures for which public health implications are less clear. In so doing, he again notes the significant uncertainties and limitations that persist in the scientific evidence in this review. In particular, he notes limitations in the approaches used to estimate ambient $PM_{10-2.5}$ concentrations in epidemiological studies, limited examination of the potential for confounding by co-occurring pollutants, and limited support for the biological plausibility of the serious effects reported in many epidemiological studies that are reflected by the ''suggestive of, but not sufficient to infer'' causal determinations. Thus, in light of the currently available information, including the uncertainties and limitations of the evidence base available to inform his judgments regarding protection against $PM_{10-2.5}$-related effects, the Administrator does not find it appropriate to increase the stringency of the standard in order to provide the requisite public health protection. Rather, he judges it appropriate to maintain the level of protection provided by the current $PM_{10}$ standard for $PM_{10-2.5}$ exposures and he does not judge the available information and the associated uncertainties to indicate the need for a greater level of public health protection.

In reaching his conclusions on the primary $PM_{10}$ standard, the Administrator also considers advice from the CASAC, including that regarding uncertainties that remain in this review (summarized in section III.B.1 above). In their comments, the CASAC noted that uncertainties persist in the evidence for $PM_{10-2.5}$-related health effects, stating that ''key uncertainties identified in the last review remain'' (Cox, 2019a, p. 13 of consensus responses). In considering these comments, the Administrator takes note of the CASAC consideration of the uncertainties related to the evidence and its conclusion that ''evidence does not call into question the adequacy of the public health protection afforded by the current primary $PM_{10}$ standard'' (Cox, 2019a, p. 3 of letter). The Administrator further notes the CASAC overall conclusion in this review that the current evidence ''supports consideration of retaining the current standard in this review'' (Cox, 2019a, p. 3 of letter).

Thus, in light of the currently available information, including uncertainties and limitations in the evidence base available to inform his judgments regarding public health protection, as well as CASAC advice, the Administrator does not find it appropriate to revise the standard. Rather, he judges it appropriate to retain the primary $PM_{10}$ standard to provide the requisite degree of public health protection against $PM_{10-2.5}$ exposures, regardless of location, source of origin, or particle composition.

With regard to the uncertainties identified above, the Administrator notes that his final decision in this review is a public health policy judgment that draws upon scientific information, as well as judgments about how to consider the range and magnitude of uncertainties that are inherent in the information. Accordingly, he recognizes that his decision requires judgments based on

the interpretation of the evidence that neither overstates nor understates the strength or limitations of the evidence nor the appropriate inferences to be drawn. He recognizes, as described in section I.A above, that the Act does not require that primary standards be set at a zero-risk level; rather, the NAAQS must be sufficient but not more stringent than necessary to protect public health, including the health of sensitive groups with an adequate margin of safety.

Recognizing and building upon all of the above considerations and judgments, the Administrator has reached his conclusion in the current review. As an initial matter, he recognizes the control exerted by the current primary $PM_{10}$ standard against exposures to $PM_{10-2.5}$ in ambient air. With regard to key aspects of the specific elements of a standard, the Administrator recognizes continued support in the current evidence base for $PM_{10}$ as the indicator for the standard. In so doing, he notes that such an indicator provides protection from exposure to all coarse PM, regardless of location, source of origin, or particle composition. Similarly, with regard to averaging time, form, and level of the standard, the Administrator takes note of uncertainties in the available evidence and information and continues to find that the current standard, as defined by its current elements, is requisite. He has additionally considered the public comments regarding revisions to these elements of the standard and continues to judge that the existing level and the existing form, in all its aspects, together with the other elements of the existing standard provide an appropriate level of public health protection.

For all of the reasons discussed above, and recognizing the CASAC conclusion that the current evidence provides support for retaining the current standard, the Administrator concludes that the current primary $PM_{10}$ standard (in all of its elements) is requisite to protect public health with an adequate margin of safety from effects of $PM_{10-2.5}$ in ambient air, and should be retained without revision.

### *C. Decision on the Primary $PM_{10}$ Standard*

For the reasons discussed above and taking into account information and assessments presented in the ISA and PA, the advice from the CASAC, and consideration of public comments, the Administrator concludes that the current primary $PM_{10}$ standard is requisite to protect public health with an adequate margin of safety, including the health of at-risk populations, and is retaining the current standard without revision.

## IV. Rationale for the Decision on the Secondary PM Standards

This section presents the rationale for the Administrator's decision to retain the current secondary PM standards, without revision. This decision is based on a thorough review of the latest scientific information generally published through December 2017,[63] as presented in the ISA, on non-ecological public welfare effects associated with PM and pertaining to the presence of PM in ambient air, specifically visibility, climate, and materials effects. This decision also accounts for analyses in the PA of policy-relevant information from the ISA and quantitative analyses of air quality related to visibility impairment; CASAC advice; and consideration of public comments received on the proposal.

The EPA is separately reviewing the ecological effects associated with PM in conjunction with reviews of other pollutants that, along with PM, contribute jointly to atmospheric deposition. As explained in both the PM IRP (U.S. EPA, 2016, p. 1–17) and the IRP for review of the secondary NAAQS for oxides of nitrogen, oxides of sulfur and PM (U.S. EPA, 2017, p. 1–1), and discussed in the proposal for this review (85 FR 24127, April 30, 2020), in recognition of the linkages between oxides of nitrogen, oxides of sulfur, and PM with respect to atmospheric deposition, and with respect to the ecological effects, the reviews of the ecological effects evidence and the secondary standards for these pollutants are being conducted together. Addressing the pollutants together enables the EPA to take a comprehensive approach to considering the nature and interactions of the pollutants, which is important for ensuring that all scientific information relevant to ecological effects is thoroughly evaluated. This combined review of the ecological criteria for oxides of nitrogen, oxides of sulfur, and particulate matter is ongoing.[64]

Section IV.A provides background on the general approach for this review and the basis for the existing secondary PM standards, and also presents brief summaries of key aspects of the currently available welfare effects evidence and quantitative information. Section IV.B summarizes the proposed conclusions and CASAC advice, addresses public comments received on the proposal, and presents the Administrator's conclusions on the adequacy of the current standards, drawing on consideration of this information, advice from the CASAC, and comments from the public. Section IV.C summarizes the Administrator's decision on the secondary PM standards.

### *A. Introduction*

As in prior reviews, the general approach to reviewing the current secondary standards is based, most fundamentally, on using the EPA's assessment of the current scientific evidence and associated quantitative analyses to inform the Administrator's judgment regarding secondary standards for PM that are requisite to protect the public welfare from known or anticipated adverse effects associated with the presence of PM in the ambient air. The EPA's assessments are primarily documented in the ISA and PA, both of which have received CASAC review and public comment (83 FR 53471, October 23, 2018; 84 FR 47944, September 11, 2019). To bridge the gap between the scientific assessments of the ISA and judgments required of the Administrator in determining whether the current standards provide the requisite welfare protection, the PA evaluates the policy implications of the assessment of the current evidence in the ISA and of the quantitative air quality information documented in the PA. In evaluating the public welfare protection afforded by the current standards, the four basic elements of the NAAQS (indicator, averaging time, level, and form) are considered collectively.

The secondary standard is to ''specify a level of air quality the attainment and maintenance of which in the judgment of the Administrator . . . is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air'' (CAA, section 109(b)(2)). The secondary

[63] In addition to the review's opening ''call for information'' (79 FR 71764, December 3, 2014), ''the current ISA identified and evaluated studies and reports that have undergone scientific peer review and were published or accepted for publication between January 1, 2009 and March 31, 2017. A limited literature update identified some additional studies that were published before December 31, 2017'' (U.S. EPA, 2019, Appendix, p. A–3). References that are cited in the ISA, the references that were considered for inclusion but not cited, and electronic links to bibliographic information and abstracts can be found at: *https://hero.epa.gov/hero/particulate-matter.*

[64] The final ISA was released in October 2020: *https://www.epa.gov/isa/integrated-science-assessment-isa-oxides-nitrogen-oxides-sulfur-and-particulate-matter.*

standard is not meant to protect against all known or anticipated PM-related effects, but rather those that are judged to be adverse to the public welfare, and a bright-line determination of adversity is not required in judging what is requisite (78 FR 3212, January 15, 2013; 80 FR 65376, October 26, 2015). Thus, the level of protection from known or anticipated adverse effects to public welfare that is requisite for the secondary standard is a public welfare policy judgment to be made by the Administrator. In exercising that judgment, the Administrator seeks to establish standards that are neither more nor less stringent than necessary for this purpose. The Act does not require that the standards be set at a zero-risk level, but rather at a level that reduces risk to protect the public welfare from known or anticipated adverse effects. In reaching conclusions on the standards, the Administrator's final decision draws upon the scientific information and analyses about welfare effects, environmental exposure and risks, and associated public welfare significance, as well as judgment about how to consider the range and magnitude of uncertainties that are inherent in the scientific evidence and quantitative analyses. The approach to informing these judgments is based on the recognition that the available evidence generally reflects a continuum, consisting of levels at which scientists generally agree that effects are likely to occur, through lower levels at which the likelihood and magnitude of the responses become increasingly uncertain. This approach is consistent with the requirements of the CAA and with how the EPA and the courts have historically interpreted the Act.

In considering the scientific and technical information, we consider both the information available at the time of the last review and information newly available since the last review, including most particularly that which has been critically analyzed and characterized in the current ISA. We additionally consider the quantitative information described in the PA that estimated visibility impairment associated with current air quality conditions in areas with monitoring data that met completeness criteria (U.S. EPA, 2020, chapter 5). The evidence-based discussions presented below (and summarized more fully in the proposal) draw upon evidence from studies evaluating visibility, climate, and materials effects related to PM in ambient air, as discussed in the ISA. The quantitative-based discussions also presented below (and summarized more fully in the proposal) have been drawn from the quantitative analyses for PM-related visibility impairment, as discussed in the PA.

1. Background on the Current Standards

In the last review, completed in 2012,[65] the EPA retained the secondary 24-hour $PM_{2.5}$ standard, with its level of 35 µg/m$^3$, and the 24-hour $PM_{10}$ standard, with its level of 150 µg/m$^3$ (78 FR 3228, January 15, 2013). The EPA also retained the level, set at 15 µg/m$^3$, and averaging time of the secondary annual $PM_{2.5}$ standard, while revising the form. With regard to the form of the annual $PM_{2.5}$ standard, the EPA removed the option for spatial averaging (78 FR 3228, January 15, 2013). Key aspects of the Administrator's decisions on the secondary PM standards in the last review for non-visibility effects and visibility effects are described below. In the previous PM NAAQS review, the prior Administrator concluded that there was insufficient information available to base a national ambient air quality standard on climate impacts associated with ambient air concentrations of PM or its constituents (78 FR 3225–3226, January 15, 2013; U.S. EPA, 2011, section 5.2.3). In reaching this decision, the prior Administrator considered the scientific evidence, noting the 2009 ISA conclusion ''that a causal relationship exists between PM and effects on climate'' and that aerosols[66] alter climate processes directly through radiative forcing and by indirect effects on cloud brightness, changes in precipitation, and possible changes in cloud lifetimes (U.S. EPA, 2009c, section 9.3.10). She also noted that the major aerosol components with the potential to affect climate processes (*i.e.,* black carbon (BC), organic carbon (OC), sulfates, nitrates and mineral dusts) vary in their reflectivity, forcing efficiencies, and direction of climate forcing (U.S. EPA, 2009c, section 9.3.10). The prior Administrator recognized the strong evidence indicating that aerosols affect climate and further considered what the available information indicated regarding the adequacy of protection provided by the secondary PM standards. In particular, she noted that a number of uncertainties in the scientific information (*i.e.,* the spatial and temporal heterogeneity of PM components that contribute to climate forcing, uncertainties in the measurement of aerosol components, inadequate consideration of aerosol impacts in climate modeling, insufficient data on local and regional microclimate variations and heterogeneity of cloud formations) affected our ability to conduct a quantitative analysis to determine a distinct secondary standard based on climate.

In the last review, the prior Administrator concluded that that it is generally appropriate to retain the existing secondary standards and that it is not appropriate to establish any distinct secondary PM standards to address PM-related materials effects (78 FR 3225–3226, January 15, 2013; U.S. EPA, 2011, p. 5–29). In reaching this conclusion, she considered materials effects associated with the deposition of PM (*i.e.,* dry and wet deposition), including both physical damage (materials effects) and aesthetic qualities (soiling effects). She noted the 2009 ISA conclusion that evidence was ''sufficient to conclude that a causal relationship exists between PM and effects on materials'' (U.S. EPA, 2009c, sections 2.5.4 and 9.5.4), but also recognized that the 2011 PA noted that quantitative relationships were lacking between particle size, concentrations, and frequency of repainting and repair of surfaces and that considerable uncertainty exists in the contributions of co-occurring pollutants to materials damage and soiling processes (U.S. EPA, 2011, p. 5–29).

In considering non-visibility welfare effects in the last review, as discussed above, the prior Administrator concluded that, while it is important to maintain an appropriate degree of control of fine and coarse particles to address non-visibility welfare effects, ''[i]n the absence of information that would support any different standards . . . it is appropriate to retain the

[65] The 2012 decision on the adequacy of the secondary PM standards was based on consideration of the protection provided by those standards for visibility and for the non-visibility effects of materials damage, climate effects and ecological effects. As noted earlier, the current review of the public welfare protection provided by the secondary PM standards against ecological effects is occurring in the separate, on-going review of the secondary NAAQS for oxides of nitrogen and oxides of sulfur (U.S. EPA, 2016, Chapter 1, section 5.2; U.S. EPA, 2020, Chapter 1, section 5.1.1). Thus, the consideration of ecological effects in the 2012 review is not discussed here.

[66] In the climate sciences research community, PM is encompassed by what is typically referred to as aerosol. An aerosol is defined as a solid or liquid suspended in a gas, but PM refers to the solid or liquid phase of an aerosol. In this review of the secondary PM NAAQS the discussion on climate effects of PM uses the term PM throughout for consistency with the ISA (U.S. EPA, 2019) as well as to emphasize that the climate processes altered by aerosols are generally altered by the PM portion of the aerosol. Exceptions to this practice include the discussion of climate effects in the last review, when aerosol was used when discussing suspended aerosol particles, and for certain acronyms that are widely used by the climate community that include the term aerosol (*e.g.,* aerosol optical depth, or AOD).

existing suite of secondary standards'' (78 FR 3225–3226, January 15, 2013). Her decision was consistent with the CASAC advice related to non-visibility effects. Specifically, the CASAC agreed with the 2011 PA conclusions that, while these effects are important, ''there is not currently a strong technical basis to support revisions of the current standards to protect against these other welfare effects'' (Samet, 2010a, p. 5). Thus, in considering non-visibility welfare effects, the prior Administrator concluded that it was appropriate to retain all aspects of the existing 24-hour $PM_{2.5}$ and $PM_{10}$ secondary standards. With regard to the secondary annual $PM_{2.5}$ standard, she concluded that it was appropriate to retain a level of 15.0 µg/m$^3$ while revising only the form of the standard to remove the option for spatial averaging (78 FR 3225–3226, January 15, 2013).

Having reached the conclusion it is generally appropriate to retain the existing secondary standards and that it is not appropriate to establish any distinct secondary PM standards to address non-visibility PM-related welfare effects, the prior Administrator next considered the level of protection that would be requisite to protect public welfare against PM-related visibility impairment and whether to adopt a distinct secondary standard to achieve this level of protection. In reaching her final decision that the existing 24-hour $PM_{2.5}$ standard provides sufficient protection against PM-related visibility impairment (78 FR 3228, January 15, 2013), she considered the evidence assessed in the 2009 ISA (U.S. EPA, 2009c) and the analyses included in the Urban-Focused Visibility Assessment (2010 UFVA; U.S. EPA, 2010b) and the 2011 PA (U.S. EPA, 2011). She also considered the degree of protection for visibility that would be provided by the existing secondary standard, focusing specifically on the secondary 24-hour $PM_{2.5}$ standard with its level of 35 µg/m$^3$. These considerations, and the prior Administrator's conclusions regarding visibility are summarized below and discussed in more detail in the proposal (85 FR 24128–24129, April 30, 2020).

In the last review, the ISA concluded that, ''collectively, the evidence is sufficient to conclude that a causal relationship exists between PM and visibility impairment'' (U.S. EPA, 2009c, p. 2–28). In consideration of the potential public welfare implication of various degrees of PM-related visibility impairment, the prior Administrator considered the available visibility preference studies that were part of the overall body of evidence in the 2009 ISA and reviewed as a part of the 2010 UFVA. These preference studies provided information about the potential public welfare implications of visibility impairment from surveys in which participants were asked questions about their preferences or the values they placed on various visibility conditions, as displayed to them in scenic photographs or in images with a range of known light extinction levels.[67]

In noting the relationship between PM concentrations and PM-related light extinction, the prior Administrator focused on identifying an adequate level of protection against visibility-related welfare effects. She first concluded that a standard in terms of a $PM_{2.5}$ visibility index would provide a measure of protection against PM-related light extinction that directly takes into account the factors (*i.e.,* PM species composition and relative humidity) that influence the relationship between $PM_{2.5}$ in ambient air and PM-related visibility impairment. A $PM_{2.5}$ visibility index standard would afford a relatively high degree of uniformity of visual air quality protection in areas across the country by directly incorporating the effects of differences of $PM_{2.5}$ composition and relative humidity. In defining a target level of protection in terms of a $PM_{2.5}$ visibility index, as discussed below, she considered specific elements of the index, including the basis for its derivation, as well as an appropriate averaging time, level, and form.

The prior Administrator concluded that it was appropriate to use an adjusted version of the original IMPROVE algorithm,[68] in conjunction with monthly average relative humidity data based on long-term climatological means, as the basis for deriving a visibility index. In so concluding, she noted the CASAC conclusion on the reasonableness of reliance on a $PM_{2.5}$ light extinction indicator calculated from $PM_{2.5}$ chemical composition and relative humidity, and she recognized that the mass monitoring methods available at that time were unable to measure the full water content of ambient $PM_{2.5}$ and did not provide information on the composition of $PM_{2.5}$, both of which contribute to visibility impacts (77 FR 38980, June 29, 2012). As noted at the time of the proposal, the prior Administrator recognized that suitable equipment and performance-based verification procedures did not then exist for direct measurement of light extinction and could not be developed within the time frame of the review (77 FR 38980–38981, June 29, 2012).

The prior Administrator concluded that a 24-hour averaging time would be appropriate for a visibility index (78 FR 3226, January 15, 2013). Although she recognized that hourly or sub-daily (4- to 6-hour) averaging times, within daylight hours and excluding hours with relatively high humidity, are more directly related to the short-term nature of the perception of PM-related visibility impairment and relevant exposure periods for segments of the viewing public than a 24-hour averaging time, she also noted that there were data quality uncertainties associated with the instruments used to provide the hourly $PM_{2.5}$ mass measurements required for an averaging time shorter than 24 hours. She also considered the results of analyses that compared 24-hour and 4-hour averaging times for calculating the index. These analyses showed good correlation between 24-hour and 4-hour average $PM_{2.5}$ light extinction, as evidenced by reasonably high city-specific and pooled R-squared values, generally in the range of over 0.6 to over 0.8. Based on these analyses and the 2011 PA conclusions regarding them, the prior Administrator concluded that a 24-hour averaging time would be a reasonable and appropriate surrogate for a sub-daily averaging time.

The statistical form of the index, 3-year average of annual 90th percentile values, was based on the prior Administrator's consideration of the analyses conducted in the 2011 UFVA of three different statistics and consistency of this statistical form with the Regional Haze Program, which targets the 20 percent most impaired days for improvements in visual air quality in Federal Class I areas. Moreover, the prior Administrator noted that a 3-year average form provided stability from the occasional effect of inter-annual meteorological variability that can result in unusually high pollution levels for a particular year (78 FR 3198, January 15, 2013; U.S. EPA,

[67] Preference studies were available in four urban areas in the last review. Three western preference studies were available, including one in Denver, Colorado (Ely et al., 1991), one in the lower Fraser River valley near Vancouver, British Columbia, Canada (Pryor, 1996), and one in Phoenix, Arizona (BBC Research & Consulting, 2003). A pilot focus group study was also conducted for Washington, DC (Abt Associates, 2001), and a replicate study with 26 participants was also conducted for Washington, DC (Smith and Howell, 2009). More details about these studies are available in Appendix D of the PA.

[68] The revised IMPROVE algorithm (Pitchford et al., 2007) uses major PM chemical composition measurements and relative humidity estimates to calculate light extinction. For more information about the derivation of and input data required for the original and revised IMPROVE algorithms, see 78 FR 3168–3177, January 15, 2013.

2011, p. 4–58).[69] The Administrator also noted that the available studies on people's preferences did not address frequency of occurrence of different levels of visibility and did not identify a basis for a different target for urban areas than that for Class I areas (U.S. EPA, 2011, p. 4–59). These considerations led the prior Administrator to conclude that 90th percentile form was the most appropriate annual statistic to be averaged across three years (78 FR 3226, January 15, 2013).

In selecting a level for the index, the prior Administrator considered the ''candidate protection levels'' (CPLs)[70] identified in the 2011 PA based on the visibility preference studies, ranging from 20 to 30 deciviews (dv),[71] while noting the uncertainties and limitations in these public preference studies.[72] She concluded that that the current substantial degrees of variability and uncertainty inherent in the public preference studies should be reflected in a higher target protection level than would be appropriate if the underlying information were more consistent and certain. Therefore, she concluded that it was appropriate to set a target level of protection in terms of a 24-hour $PM_{2.5}$ visibility index at 30 dv (78 FR 3226–3227, January 15, 2013).

Based on her considerations and conclusions summarized above, the prior Administrator concluded that the protection provided by a secondary standard based on a 3-year visibility metric, defined in terms of a $PM_{2.5}$ visibility index with a 24-hour averaging time, a 90th percentile form averaged over 3 years, and a level of 30 dv, would be requisite to protect public welfare with regard to visual air quality (78 FR 3227, January 15, 2013). Having reached this conclusion, she next determined whether an additional distinct secondary standard in terms of a visibility index was needed given the degree of protection from visibility impairment afforded by the existing secondary standards. Specifically, she noted that the air quality analyses showed that all areas meeting the existing 24-hour $PM_{2.5}$ standard, with its level of 35 µg/m$^3$, had visual air quality at least as good as 30 dv, based on the visibility index defined above (Kelly et al., 2012b, Kelly et al., 2012a). Thus, the secondary 24-hour $PM_{2.5}$ standard would likely be controlling relative to a 24-hour visibility index set at a level of 30 dv. Additionally, areas would be unlikely to exceed the target level of protection for visibility of 30 dv without also exceeding the existing secondary 24-hour standard. Thus, the prior Administrator judged that the 24-hour $PM_{2.5}$ standard ''provides sufficient protection in all areas against the effects of visibility impairment—*i.e.,* that the existing 24-hour $PM_{2.5}$ standard would provide *at least* the target level of protection for visual air quality of 30 dv which [she] judges appropriate'' (78 FR 3227, January 15, 2013). She further judged that ''[s]ince sufficient protection from visibility impairment would be provided for all areas of the country without adoption of a distinct secondary standard, and adoption of a distinct secondary standard will not change the degree of over-protection for some areas of the country . . . adoption of such a distinct secondary standard is not needed to provide requisite protection for both visibility and nonvisibility related welfare effects'' (78 FR 3228, January 15, 2013).

### 2. Overview of Welfare Effects Evidence

In this section, we provide an overview of the policy-relevant aspects of the welfare effects evidence available for consideration in this review. Sections IV.B and IV.C of the proposal provide a detailed summary of key information contained in the ISA and in the PA on the visibility and non-visibility welfare effects associated with PM in ambient air, and the related public welfare implications (85 FR 24129, April 30, 2020). The subsections below briefly summarize the nature of PM-related visibility and non-visibility effects.

#### a. Nature of Effects

The evidence base available in the current review includes decades of research on visibility impairment, climate effects, and materials effects associated with PM (U.S. EPA, 2004, 2009c, 2019). Visibility impairment can have implications for people's enjoyment of daily activities and for their overall sense of well-being (U.S. EPA, 2009c, section 9.2). The strongest evidence for PM-related visibility impairment comes from the fundamental relationship between light extinction and PM mass (U.S. EPA, 2009c), as well as studies of the public perception of visibility impairment (U.S. EPA, 2010b), which confirm a well-established ''causal relationship exists between PM and visibility impairment'' (U.S. EPA, 2009c, p. 2–28). Beyond its effects on visibility, the 2009 ISA also identified a causal relationship ''between PM and climate effects, including both direct effects of radiative forcing and indirect effects that involve cloud and feedbacks that influence precipitation formation and cloud lifetimes'' (U.S. EPA, 2009, p. 2–29). The evidence also supports a causal relationship between PM and effects on materials, including soiling effects and materials damage (U.S. EPA, 2009, p. 2–31).

The evidence newly available in this review is consistent with the evidence available at the time of the last review and supports the conclusions of causal relationships between PM and visibility, climate, and materials effects (U.S. EPA, 2019, chapter 13). Evidence newly available in this review augments the previously available evidence of the relationship between PM and visibility impairment (U.S. EPA, 2019, section 13.2), climate effects (U.S. EPA, 2019, section 13.3), and materials effects (U.S. EPA, 2019, section 13.4).

#### i. Visibility

Visibility refers to the visual quality of a human's view with respect to color rendition and contrast definition. It is the ability to perceive landscape form, colors, and textures. Visibility involves optical and psychophysical properties involving human perception, judgment, and interpretation. Light between the observer and the object can be scattered into or out of the sight path and absorbed by PM or gases in the sight path. Consistent with conclusions of causality in the last review, the 2019 ISA concludes that ''the evidence is sufficient to conclude that a causal relationship exists between PM and visibility impairment'' (U.S. EPA, 2019, section 13.2.6). These conclusions are based on the strong and consistent evidence that ambient PM can impair visibility in both urban and remote areas (U.S. EPA, 2019, section 13.1; U.S. EPA, 2009c, section 9.2.5).

The fundamental relationship between light extinction and PM mass, and the EPA's understanding of this relationship, has changed little since the

[69] The EPA recognized that a percentile form averaged over multiple years offers greater stability to the air quality management process by reducing the possibility that statistically unusual indicator values will lead to transient violations of the standard, thus reducing the potential for disruption of programs implementing the standard and reducing the potential for disruption of the protections provided by those programs.

[70] For comparison, 20 dv, 25 dv, and 30 dv are equivalent to 64, 112, and 191 megameters ($Mm^{-1}$), respectively.

[71] Deciview (dv) refers to a scale for characterizing visibility that is defined directly in terms of light extinction. The deciview scale is frequently used in the scientific and regulatory literature on visibility.

[72] Uncertainties and limitations in the public preference studies included the small number of stated preference studies available; the relatively small number of study participants and the extent to which the study participants may not be representative of the broader study area population in some of the studies; and the variations in the specific materials and methods used in each study.

2009 ISA (U.S. EPA, 2009c). The combined effect of light scattering and absorption by particles and gases is characterized as light extinction, *i.e.,* the fraction of light that is scattered or absorbed per unit of distance in the atmosphere. Light extinction is measured in units of 1/distance, which is often expressed in the technical literature as visibility per megameter (abbreviated $Mm^{-1}$). Higher values of light extinction (usually given in units of $Mm^{-1}$ or dv) correspond to lower visibility. When PM is present in the air, its contribution to light extinction is typically much greater than that of gases (U.S. EPA, 2019, section 13.2.1). The impact of PM on light scattering depends on particle size and composition, as well as relative humidity. All particles scatter light, as described by the Mie theory, which relates light scattering to particle size, shape, and index of refraction (U.S. EPA, 2019, section 13.2.3; Van de Hulst, 1981; Mie, 1908). Fine particles scatter more light than coarse particles on a per unit mass basis and include sulfates, nitrates, organics, light-absorbing carbon, and soil (Malm et al., 1994). Hygroscopic particles like ammonium sulfate, ammonium nitrate, and sea salt increase in size as relative humidity increases, leading to increased light scattering (U.S. EPA, 2019, section 13.2.3).

As at the time of the last review, direct measurements of PM light extinction, scattering, and absorption continue to be considered more accurate for quantifying visibility than PM mass-based estimates because measurements do not depend on assumptions about particle characteristics (*e.g.,* size, shape, density, component mixture, etc.) (U.S. EPA, 2019, section 13.2.2.2). Measurements of light extinction can be made with high time resolution, allowing for characterization of sub-daily temporal patterns of visibility impairment. A number of measurement methods have been used for visibility impairment (*e.g.,* transmissometers, integrating nephelometers, teleradiometers, telephotometers, and photography and photographic modeling), although each of these methods has its own strengths and limitations (U.S. EPA, 2019, Table 13–1). As recognized in the last review, there are no common performance-based criteria to evaluate these methods and none have been deployed broadly across the U.S. for routine measurement of visibility impairment.

In the absence of a robust monitoring network for the routine measurement of light extinction across the U.S., estimation of light extinction based on existing PM monitoring can be used. The theoretical relationship between light extinction and PM characteristics, as derived from Mie theory (U.S. EPA, 2019, Equation 13.5), and can be used to estimate light extinction by combining mass scattering efficiencies of particles with particle concentrations (U.S. EPA, 2019, section 13.2.3; U.S. EPA, 2009c, sections 9.2.2.2 and 9.2.3.1). This estimation of light extinction is consistent with the method used in the last review. The algorithm used to estimate light extinction, known as the IMPROVE algorithm,[73] provides for the estimation of light extinction ($b_{ext}$), in units of $Mm^{-1}$, using routinely monitored components of fine ($PM_{2.5}$) and coarse ($PM_{10-2.5}$) PM. Relative humidity data are also needed to estimate the contribution by liquid water that is in solution with the hygroscopic components of PM. To estimate each component's contribution to light extinction, their concentrations are multiplied by extinction coefficients and are additionally multiplied by a water growth factor that accounts for their expansion with moisture. Both the extinction efficiency coefficients and water growth factors of the IMPROVE algorithm have been developed by a combination of empirical assessment and theoretical calculation using particle size distributions associated with each of the major aerosol components (U.S. EPA, 2019, section 13.2.3.1, section 13.2.3.3).

At the time of the last review, two versions of the IMPROVE algorithm were available in the literature—the *original IMPROVE algorithm* (Malm and Hand, 2007; Ryan et al., 2005; Lowenthal and Kumar, 2004) and the *revised IMPROVE algorithm* (Pitchford et al., 2007). As described in detail in the proposal (85 FR 24130, April 30, 2020) and the ISA (U.S. EPA, 2019, section 13.2.3), the algorithm has been further evaluated and refined since the time of the last review (Lowenthal and Kumar, 2016), particularly for PM characteristics and relative humidity in remote areas. All three versions of the IMPROVE algorithm were considered in evaluating visibility impairment in this review.

Consistent with the evidence available at the time of the last review, our understanding of public perception of visibility impairment comes from visibility preference studies conducted in four areas in North America.[74] The detailed methodology for these studies are described in the proposal (85 FR 24131, April 30, 2020), the 2019 ISA (U.S. EPA, 2019), and the 2009 ISA (U.S. EPA, 2009c). In summary, the study participants were queried regarding multiple images that were either photographs of the same location and scenery that had been taken on different days on which measured extinction data were available or digitized photographs onto which a uniform ''haze'' had been superimposed. Results of the studies indicated a wide range of judgments on what study participants considered to be acceptable visibility across the different study areas, depending on the setting depicted in each photograph. Based on the results of the four cities, a range encompassing the $PM_{2.5}$ visibility index values from images that were judged to be acceptable by at least 50 percent of study participants across all four of the urban preference studies was identified (U.S. EPA, 2010b, p. 4–24; U.S. EPA, 2020, Figure 5–2). Much lower visibility (considerably more haze resulting in higher values of light extinction) was considered acceptable in Washington, DC, than was in Denver, and 30 dv reflected the level of impairment that was determined to be ''acceptable'' by at least 50 percent of study participants (78 FR 3226–3227, January 15, 2013). As noted in the proposal (85 FR 24131, April 30, 2020), the evidence base for public preferences of visibility impairment has not been augmented since the last review. There are no new visibility preference studies that have been conducted in the U.S. since the time of the last review and there is very little new information available regarding acceptable levels of visibility impairment in the U.S.

ii. Climate

The current evidence continues to support the conclusion of a causal relationship between PM and climate effects (U.S. EPA, 2019, section 13.3.9). Since the last review, climate impacts and been extensively studied and recent research reinforces and strengthens the evidence evaluated in the 2009 ISA. New evidence provides greater specificity about the details of radiative

[73] The algorithm is referred to as the IMPROVE algorithm as it was developed specifically to use monitoring data generated at IMPROVE network sites and with equipment specifically designed to support the IMPROVE program and was evaluated using IMPROVE optical measurements at the subset of monitoring sites that make those measurements (Malm et al., 1994).

[74] Preference studies were available in four urban areas in the last review: Denver, Colorado (Ely et al., 1991), Vancouver, British Columbia, Canada (Pryor, 1996), Phoenix, Arizona (BBC Research & Consulting, 2003), and Washington, DC (Abt Associates, 2011; Smith and Howell, 2009).

forcing effects [75] and increases the understanding of additional climate impacts driven by PM radiative effects. The Intergovernmental Panel on Climate Change (IPCC) assesses the role of anthropogenic activity in past and future climate change, and since the last review, has issued the Fifth IPCC Assessment Report (AR5; IPCC, 2013) which summarizes any key scientific advances in understanding the climate effects of PM since the previous report. As in the last review, the ISA draws substantially on the IPCC report to summarize climate effects. As discussed in more detail in the proposal (85 FR 24131, April 30, 2020), the general conclusions are similar between the IPCC AR4 and AR5 reports with regard to effects of PM on global climate. Consistent with the evidence available in the last review, the key components, including sulfate, nitrate, organic carbon (OC), black carbon (BC), and dust, that contribute to climate processes vary in their reflectivity, forcing efficiencies, and direction of forcing. Since the last review, the evidence base has expanded with respect to the mechanisms of climate responses and feedbacks to PM radiative forcing; however, the new literature published since the last review does not reduce the considerable uncertainties that continue to exist related these mechanisms.

As described in the proposal (85 FR 24133, April 30, 2020), PM has a very heterogeneous distribution globally and patterns of forcing tend to correlate with PM loading, with the greatest forcings centralized over continental regions. The climate response to this PM forcing, however, is more complicated since the perturbation to one climate variable (*e.g.,* temperature, cloud cover, precipitation) can lead to a cascade of effects on other variables. While the initial PM radiative forcing may be concentrated regionally, the eventual climate response can be much broader spatially or be concentrated in remote regions, and may be quite complex, affecting multiple climate variable with possible differences in the direction of the forcing in different regions or for different variables (U.S. EPA, 2019, section 13.3.6). The complex climate system interactions lead to variation among climate models, which have suggested a range of factors which can influence large-scale meteorological processes and may affect temperature, including local feedback effects involving soil moisture and cloud cover, changes in the hygroscopicity of the PM, and interactions with clouds (U.S. EPA, 2019, section 13.3.7). Further research is needed to better characterize the effects of PM on regional climate in the U.S. before PM climate effects can be quantified.

iii. Materials

Consistent with the last review, the current evidence continues to support the conclusion that there is a causal relationship between PM deposition and materials effects. Effects of deposited PM, particularly sulfates and nitrates, to materials include both physical damage and impaired aesthetic qualities, generally involving soiling and/or corrosion (U.S. EPA, 2019, section 13.4.2; 85 FR 24133, April 30, 2020). Because of their electrolytic, hygroscopic, and acidic properties and their ability to sorb corrosive gases, particles contribute to materials damage by adding to the effects of natural weathering processes, by potentially promoting or accelerating the corrosion of metals, degradation of painted surfaces, deterioration of building materials, and weakening of material components.[76] There is a limited amount of new data for consideration in this review from studies primarily conducted outside of the U.S. on buildings and other items of cultural heritage. However, these studies involved concentrations PM in ambient air greater than those typically observed in the U.S. (U.S. EPA, 2019, section 13.4).

Building on the evidence available in the 2009 ISA, and as described in detail in the proposal (85 FR 24134, April 30, 2020) and in the 2019 ISA (U.S. EPA, 2019, section 13.4), research has progressed on: (1) The theoretical understanding of soiling of items of cultural heritage; (2) the quantification of degradation rates and further characterization of factors that influence damage of stone materials; (3) materials damage from PM components besides sulfate and black carbon and atmospheric gases besides $SO_2$; (4) methods for evaluating soiling of materials by PM mixtures; (5) PM-attributable damage to other materials, including glass and photovoltaic panels; (6) development of dose-response relationships for soiling of building materials; and (7) damage functions to quantify material decay as a function of pollutant type and load. While the evidence of PM-related materials effects has expanded somewhat since the last review, there remains insufficient evidence to relate soiling or damage to specific PM levels in ambient air or to establish a quantitative relationship between PM and materials degradation. The current evidence is generally similar to the evidence available in the last review, including associated limitations and uncertainties and a lack of evidence to inform quantitative relationships between PM and materials effects, therefore leading to similar conclusions about the PM-related effects on materials.

3. Overview of Air Quality and Quantitative Information

a. Visibility Effects

In the current review, quantitative analyses were conducted to further our understanding of the relationship between recent air quality and calculated light extinction. As at the time of the last review, these analyses explored this relationship as an estimate of visibility impairment in terms of the 24-hour $PM_{2.5}$ standard and the visibility index. Generally, the results of the updated analyses are similar to those based on the data available at the time of the last review (U.S. EPA, 2020, section 5.2.1.1). Compared to the last review, updated analyses incorporate several refinements, including: (1) The evaluation of three versions of the IMPROVE equation [77] to calculate light extinction (U.S. EPA, 2020, Appendix D, Equations D–1 through D–3) in order to better understand the influence of variability in equation inputs; [78] (2) the

[75] Radiative forcing (RF) for a given atmospheric constituent is defined as the perturbation in net radiative flux, at the tropopause (or the top of the atmosphere) caused by that constituent, in watts per square meter ($Wm^{-2}$), after allowing for temperatures in the stratosphere to adjust to the perturbation but holding all other climate responses constant, including surface and tropospheric temperatures (Fiore et al., 2015; Myhre et al., 2013). A positive forcing indicates net energy trapped in the Earth system and suggests warming of the Earth's surface, whereas a negative forcing indicates net loss of energy and suggests cooling (U.S. EPA, 2019, section 13.3.2.2).

[76] As discussed in the ISA (U.S. EPA, 2019, section 13.4.1), corrosion typically involves reactions of acidic PM (*i.e.,* acidic sulfate or nitrate) with material surfaces, but gases like $SO_2$ and nitric acid ($HNO_3$) also contribute. Because ''the impacts of gaseous and particulate N and S wet deposition cannot be clearly distinguished'' (U.S. EPA, 2019, p. 13–1), the assessment of the evidence in the ISA considers the combined impacts.

[77] Given the lack of new information to inform a different visibility metric, the metric used in the updated analyses is that defined by the EPA in the last review as the target level of protection for visibility (discussed above in section IV.A.1): A $PM_{2.5}$ visibility index with a 24-hour averaging time, a 90th percentile form averaged over 3 years, and a level of 30 dv (U.S. EPA, 2020, section 5.2.1.2).

[78] While the $PM_{2.5}$ monitoring network has an increasing number of continuous FEM monitors reporting hourly $PM_{2.5}$ mass concentrations, there continue to be data quality uncertainties associated with providing hourly $PM_{2.5}$ mass and component measurements that could be input into IMPROVE equation calculations for sub-daily visibility impairment estimates. As detailed in the PA, there are uncertainties associated with the precision and

use of 24-hour relative humidity data, rather than monthly average relative humidity as was used in the last review (U.S. EPA, 2020, section 5.2.1.2, Appendix D); and (3) the inclusion of the coarse fraction in the estimation of light extinction in the subset of areas with $PM_{10-2.5}$ monitoring data available for the time period of interest (U.S. EPA, 2020, section 5.2.1.2, Appendix D). The analyses in the current review are updated from the last review and include 67 monitoring sites that measure $PM_{2.5}$, including 20 sites that measure both $PM_{10}$ and $PM_{2.5}$, that are geographically distributed across the U.S. in both urban and rural areas (U.S. EPA, 2020, Appendix D, Figure D–1).

In areas that meet the current 24-hour $PM_{2.5}$ standard for the 2015–2017 time period, all sites have light extinction estimates at or below 27 dv using the original and revised IMPROVE equations (and most areas are below 25 dv; U.S. EPA, 2020, section 5.2.1.2). In the one location that exceeds the current 24-hour $PM_{2.5}$ standard, light extinction estimates are at or below 27 dv (U.S. EPA, 2020, Figure 5–3). These findings are consistent with the findings of the analysis in the last review with older air quality data (Kelly et al., 2012b; 78 FR 3201, January 15, 2013).

Using the recently modified IMPROVE equation from Lowenthal and Kumar (2016), new in this review, the resulting 3-year visibility index is slightly higher at all of the sites compared to the original and revised IMPROVE equation estimates (U.S. EPA, 2020, Figure 5–4). These higher estimates are to be expected, given the higher OC multiplier included in the IMPROVE equation from Lowenthal and Kumar (2016), which reflects the use of data from remote areas with higher concentrations of organic PM when validating the equation. As such, it is important to note that the Lowenthal and Kumar (2016) version of the equation may overestimate light extinction in non-remote areas, including the urban areas in the updated analyses in this review.

Nevertheless, when light extinction is calculated using the Lowenthal and Kumar (2016) equation for those sites that meet the current 24-hour $PM_{2.5}$ standard, the 3-year visibility metric is generally at or below 30 dv. The one exception to this is a site in Fairbanks, Alaska that just meets the current 24-hour $PM_{2.5}$ standard in 2015–2017 and has a 3-year visibility index value just above 30 dv, rounding to 31 dv (compared to 27 dv when light extinction is calculated with the original IMPROVE equations) (U.S. EPA, 2020, Appendix D, Table D–3). The unique conditions at this urban site (*e.g.,* higher OC concentrations, much lower temperatures, and the complete lack of sunlight for long periods) that affect quantitative relationships between OC, OM and visibility (*e.g.,* Hand et al., 2012; Hand et al., 2013) may differ considerably from those under which the Lowenthal and Kumar (2016) equation has been evaluated, making the most appropriate approach for characterizing light extinction in this area unclear.

At the time of the last review, the EPA noted that $PM_{2.5}$ is the size fraction of PM responsible for most of the visibility impairment in urban areas (77 FR 38980, June 29, 2012). Data available at the time of the last review suggested that $PM_{10-2.5}$ was a minor contributor to visibility impairment (U.S. EPA, 2010b), although this fraction may be responsible for a larger contribution in some areas in the desert southwestern region of the U.S. However, at the time of the last review, there was very little data available from $PM_{10-2.5}$ monitors to quantify the contribution of coarse PM to calculated light extinction.

Since the last review, the expansion of $PM_{10-2.5}$ monitoring efforts has increased the availability of data for use in estimating light extinction. As such, both $PM_{2.5}$ and $PM_{10-2.5}$ concentrations can be included as inputs in the equations in the updated analyses in this review. For 2015–2017, 20 of the 67 $PM_{2.5}$ sites analyzed have collocated $PM_{10-2.5}$ monitoring data available. These 20 sites meet both the 24-hour $PM_{2.5}$ and 24-hour $PM_{10}$ standards. All of these sites have 3-year visibility metrics at or below 30 dv regardless of whether light extinction is calculated with or without the coarse fraction, and for all three versions of the IMPROVE equation. Generally, the coarse fraction contribution to light extinction is minimal, contributing less than 1 dv to the 3-year visibility metric. The 20 locations with collocated $PM_{2.5}$ and $PM_{10-2.5}$ monitoring data available in this review would be expected to have relatively low concentrations of coarse PM. In areas with higher concentrations of coarse PM, such as the southwestern U.S., the coarse fraction may be a more important contributor to light extinction and visibility impairment than in the locations included in the updated analyses in this review.

Overall, the results of the updated analyses in this review are consistent with those in the last review. The 3-year visibility metric is generally at or below 27 dv in areas that meet the current secondary standards, with only small differences observed for the three versions of the IMPROVE equation. Though such differences are modest, the IMPROVE equation from Lowenthal and Kumar (2016) results in higher light extinction values, which were expected given the higher OC multiplier in the equation and its validation using data from remote areas far away from emission sources. There are only small differences in estimates of light extinction when the coarse fraction is included in the equation, although a somewhat larger coarse fraction contribution to light extinction would be expected in areas with higher concentrations of coarse PM. Overall, the updated analyses indicate that the current secondary PM standards provide a degree of protection against visibility impairment similar to the target level of protection identified in the last review, in terms of a 3-year visibility index.

b. Non-Visibility Effects

Consistent with the evidence available at the time of the last review, and as described in detail in the PA (U.S. EPA, 2020, section 5.2.2.2), the data remain insufficient to conduct quantitative analyses for PM effects on climate and materials. For PM-related climate effects, as explained in more detail in the proposal (85 FR 24131–24133, 24136, April 30, 2020), our understanding of PM-related climate effects is still limited by significant key uncertainties. The newly available evidence does not appreciably improve our understanding of the spatial and temporal heterogeneity of PM components that contribute to climate forcing (U.S. EPA, 2020, sections 5.2.2.1.1 and 5.4). Significant uncertainties also persist related to quantifying the contributions of PM and PM components to the direct and indirect effects on climate forcing, such as changes to the pattern of rainfall, changes to wind patterns, and effects on vertical mixing in the atmosphere (U.S. EPA, 2020, sections 5.2.2.1.1 and 5.4). Additionally, while improvements have been made to climate models since the time of the last review, the models continue to exhibit variability in estimates of the PM-related climate effects on regional scales (*e.g.,* ~100 km) compared to simulations at the global scale (U.S. EPA, 2020, sections 5.2.2.1.1 and 5.4). While our understanding of

bias of 24-hour $PM_{2.5}$ measurements (U.S. EPA, 2020, p. 2–18), as well as to the fractional uncertainty associated with 24-hour PM component measurements (U.S. EPA, 2020, p. 2–21). Given the uncertainties present when evaluating data quality on a 24-hour basis, the uncertainty associated with sub-daily measurements may be even greater. Therefore, the inputs to these light extinction calculations are based on 24-hour average measurements of $PM_{2.5}$ mass and components, rather than sub-daily information.

climate forcing on a global scale is somewhat expanded since the last review, significant limitations remain to quantifying potential adverse PM-related climate effects in the U.S. and how they would vary in response to incremental changes in PM concentrations across the U.S. As such, while new research is available on climate forcing on a global scale, the remaining limitations and uncertainties are significant, and the new global scale research does not translate directly for use at regional spatial scales. Therefore, the evidence does not provide a clear understanding at the necessary spatial scales for quantifying the relationship between PM mass in ambient air and the associated climate-related effects in the U.S. that would be most relevant to informing consideration of a national PM standard on climate in this review (U.S. EPA, 2020, section 5.2.2.2.1; U.S. EPA, 2019, section 13.3).

For PM-related materials effects, as explained in more detail in the proposal (85 FR 24133–24134, 24137, April 30, 2020), the available evidence has been somewhat expanded to include additional information about the soiling process and the types of materials impacted by PM. This evidence provides some limited information to inform dose-response relationships and damage functions associated with PM, although most of these studies were conducted outside of the U.S. where PM concentrations in ambient air are typically above those observed in the U.S. (U.S. EPA, 2020, section 5.2.2.1.2; U.S. EPA, 2019, section 13.4). The evidence available in this review also includes studies examining effects of PM on the energy efficiency of solar panels and passive cooling building materials, although the evidence remains insufficient to establish quantitative relationships between PM in ambient air and these or other materials effects (U.S. EPA, 2020, section 5.2.2.1.2). While the available evidence is somewhat expanded since the time of the last review, quantitative relationships have not been established for PM-related soiling and corrosion and frequency of cleaning or repair that would help inform our understanding of the public welfare implications of materials effects (U.S. EPA, 2020, section 5.2.2.2.2; U.S. EPA, 2019, section 13.4). Therefore, there is insufficient information to inform quantitative analyses assessing materials effects to inform a consideration of a national PM standard on materials in this review (U.S. EPA, 2020, section 5.2.2.2.2; U.S. EPA, 2019, section 13.4).

### *B. Conclusions on the Secondary Standards*

In drawing conclusions on the adequacy of the current secondary PM standards, in view of the advances in scientific knowledge and additional information now available, the Administrator has considered the evidence base, information, and policy judgments that were the foundation of the last review and reflects upon the body of information and evidence available in this review. In so doing, the Administrator has taken into account both evidence-based and quantitative information-based considerations, as well as advice from the CASAC and public comments. Evidence-based considerations draw upon the EPA's assessment and integrated synthesis of the scientific evidence from studies evaluating welfare effects related to visibility, climate, and materials associated with PM in ambient air as discussed in the PA (summarized in sections IV..B, V.C, and IV.D.1 of the proposal, and section IV.A.2 above). The quantitative information-based considerations draw from the results of the quantitative analyses of visibility impairment presented in the PA (as summarized in section IV.D.1 of the proposal and section IV.A.3 above) and consideration of these results in the PA.

Consideration of the evidence and quantitative information in the PA and by the Administrator is framed by consideration of a series of policy-relevant questions. Section IV.B.2 below summarizes the rationale for the Administrator's proposed decision, drawing from section IV.D.3 of the proposal. The advice and recommendations of the CASAC and public comments on the proposed decision are addressed below in sections IV.D.2 and IV.D.3, respectively. The Administrator's conclusions in this review regarding the adequacy of the secondary PM standards and whether any revisions are appropriate are described in section IV.D.4.

#### 1. CASAC Advice in This Review

In comments on the draft PA, the CASAC concurred with the staff's overall preliminary conclusions that it is appropriate to consider retaining the current secondary standards without revision (Cox, 2019a). The CASAC ''finds much of the information . . . on visibility and materials effects of $PM_{2.5}$ to be useful, while recognizing that uncertainties and controversies remain about the best ways to evaluate these effects'' (Cox, 2019a, p. 13 of consensus responses). Regarding climate, while the CASAC agreed that research on PM-related effects has expanded since the last review, it also concluded that ''there are still significant uncertainties associated with the accurate measurement of PM to the direct and indirect effects of PM on climate'' (Cox, 2019a, pp. 13–14 of consensus responses). The committee recommended that the EPA summarize the ''current scientific knowledge and quantitative modeling results for effects of reducing $PM_{2.5}$'' on several climate-related outcomes (Cox, 2019a, p. 14 of consensus responses), while also recognizing that ''it is appropriate to acknowledge uncertainties in climate change impacts and resulting welfare impacts in the United States of reductions in $PM_{2.5}$ levels'' (Cox, 2019a, p. 14 of consensus responses). When considering the overall body of scientific information for PM-related effects on visibility, climate, and materials, the CASAC agreed that ''the available evidence does not call into question the protection afforded by the current secondary PM standards and concurs that they should be retained'' (Cox, 2019a, p. 3 of letter).

#### 2. Basis for the Proposed Decision

At the time of the proposal, the Administrator carefully considered the assessment of the current evidence and conclusions reached in the ISA; the currently available quantitative information, including associated limitations and uncertainties, described in detail and characterized in the PA; considerations and staff conclusions and associated rationales presented in the PA; and the advice and recommendations from the CASAC (85 FR 24137, April 30, 2020).

In reaching his proposed decision on the secondary PM standards, the Administrator first recognized the longstanding body of evidence for PM-related visibility impairment. The Administrator recognized that visibility impairment can have implications for people's enjoyment of daily activities and for their overall sense of well-being. In so doing, and consistent with the approach used in the last review (section IV.A.1 above), the Administrator first defined a target level of protection in terms of a PM visibility index that accounts for the factors that influence the relationship between PM in ambient air and visibility (*i.e.,* size fraction, species composition, and relative humidity). He then considered air quality analyses examining the relationship between this PM visibility index and the current 24-hour $PM_{2.5}$ and 24-hour $PM_{10}$ standards in areas that

met data completeness criteria for inclusion in the analyses.[79]

To identify a target level of protection, the Administrator first defined the specific characteristics of the visibility index, noting that in the last review, the EPA used an index based on estimates of light extinction by $PM_{2.5}$ components calculated using the IMPROVE algorithm. As described in section IV.A.2 above, the IMPROVE algorithm estimates light extinction using routinely monitored components of $PM_{2.5}$ and $PM_{10-2.5}$,[80] along with estimates of relative humidity. The Administrator recognized that, despite revisions to the IMPROVE algorithm since the last review (U.S. EPA, 2020, section 5.2.1.1), our fundamental understanding of the relationship between PM in ambient air and light extinction has changed little and that the various IMPROVE algorithms can appropriately reflect this relationship across the U.S. In the absence of a robust monitoring network to measure light extinction (85 FR 24130, 24135, April 30, 2020), the Administrator judged that estimated light extinction, as calculated using the IMPROVE algorithms, continued to provide a reasonable basis for defining a target level of protection against PM-related visibility impairment in the current review.

In further defining the characteristics of a visibility index based on estimates of light extinction, the Administrator considered the appropriate averaging time, form, and level of the index. The Administrator judged that the decisions made in the last review with regard to averaging time and form remain reasonable. In the last review, a 24-hour averaging time was judged to be an appropriate surrogate for the sub-daily periods relevant for visual perception,[81] recognizing the relatively strong correlations between 24-hour and sub-daily (*i.e.,* 4-hour) average $PM_{2.5}$ light extinction and that this longer averaging time may be less influenced by atypical conditions and/or atypical instrument performance (78 FR 3226, January 15, 2013). In the decision to set the form as the 3-year average of annual 90th percentile values in the last review, it was noted that: (1) A 3-year average provided stability from the occasional effect of interannual meteorological variability (78 FR 3198, January 15, 2013); (2) the 90th percentile corresponds to the 20 percent worst days for visibility, which are targeted in Class I areas by the Regional Haze program; and (3) available studies on people's visibility preferences did not identify a basis for a different target than that identified for Class I areas (U.S. EPA, 2011, p. 4–59). Recognizing that the information available in the current review is similar to that available in the last review, at the time of proposal the Administrator judged that these decisions remain reasonable, and it remains appropriate to define a visibility index based on estimated light extinction in terms of a 24-hour averaging time and a form based on the 3-year average of annual 90th percentile values.

At the time of the last review, the level of the visibility index was set at 30 dv, based on the upper end of the range of levels of visibility impairment judged to be acceptable by at least 50% of study participants in the available visibility preference studies (U.S. EPA, 2020, section 5.2.1.1). (78 FR 3226–27, January 15, 2013; 85 FR 24131 April 30, 2020).[82] In the last review, the Administrator concluded that the substantial degree of variability and uncertainty in the public preference studies should be reflected in a target protection level at the upper end of the 20 dv to 30 dv range of CPLs. Therefore, she concluded that it was appropriate to set a target level of protection in terms of a 24-hour $PM_{2.5}$ visibility index at 30 dv (78 FR 3226–27, January 15, 2013).

In considering the preference studies in this review, the Administrator first noted that, as a part of the last review, a range of levels was identified for the $PM_{2.5}$ visibility index based on an aggregated evaluation of the results of these studies that reflected variability in levels of visibility that were considered acceptable in the four study areas (U.S. EPA, 2010b). Because no visibility preference studies have been conducted in the U.S. since the last review, and given the general lack of new preference studies over the last several reviews, the Administrator proposed to conclude that the range considered in the last review remained appropriate to consider in the current review.

The Administrator highlighted the following uncertainties and limitations in the underlying public preference studies (U.S. EPA, 2020, section 5.2.1.1), consistent with those identified in the last review:

- The available studies may not capture the full range of visibility preferences in the U.S. population, particularly given the potential for preferences to vary based on the visibility conditions commonly encountered and the types of scenes being viewed.
- The available preference studies were conducted 15 to 30 years ago and may not reflect visibility preferences in the U.S. population today.
- The available preference studies have used a variety of methods, potentially influencing responses as to what level of visibility impairment is deemed acceptable.
- Factors that are not captured by the methods used in available preference studies may influence people's judgments on acceptable visibility, including the duration of visibility impairment, the time of day during which light extinction is greatest, and the frequency of episodes of visibility impairment.

After considering these preference studies, along with their inherent uncertainties and limitations, the Administrator judged in the proposal that a level of 30 dv continued to be an appropriate target level of protection for the visibility index in the current review.[83]

Having defined a target level of protection in terms of a visibility index based on the elements described above, (*i.e.,* with a 24-hour averaging time; a 3-year average of the annual 90th

[79] As described in detail in section IV.A.3.a above, the EPA's updated quantitative analyses in this review included 67 areas that met data completeness criteria for inclusion in the analyses (see U.S. EPA, 2020, Appendix D for details of the criteria). Of those monitoring locations that met the data completeness criteria, all but one location met the current secondary $PM_{2.5}$ standard (U.S. EPA, 2020, Table D–7).

[80] In the last review, the focus was on $PM_{2.5}$ components given their prominent role in PM-related visibility impairment in urban areas and the limited data available for $PM_{10-2.5}$ (77 FR 38980, June 29, 2010; U.S. EPA, 2020, section 5.2.1.2).

[81] While the $PM_{2.5}$ monitoring network has an increasing number of continuous FEM monitors reporting hourly $PM_{2.5}$ mass concentrations, there continue to be data quality uncertainties associated with providing hourly $PM_{2.5}$ mass and component measurements that could be input into IMPROVE equation calculations for sub-daily visibility impairment estimates. As detailed in the PA, there are uncertainties associated with the precision and bias of 24-hour $PM_{2.5}$ measurements (U.S. EPA, 2020, p. 2–18), as well as to the fractional uncertainty associated with 24-hour PM component measurements (U.S. EPA, 2020, p. 2–21). Given the uncertainties present when evaluating data quality on a 24-hour basis, the uncertainty associated with sub-daily measurements may be even greater. Therefore, the inputs to these light extinction calculations are based on 24-hour average measurements of $PM_{2.5}$ mass and components, rather than sub-daily information.

[82] Based on the preference studies, the 2011 PA identified a range of levels from 20 to 30 deciviews (dv) as being a reasonable range of ''candidate protection levels'' or ''CPLs'' for a visibility index (U.S. EPA, 2011, p. 4–61; U.S. EPA, 2020, section 5.2.1.1).

[83] As noted above, in the last review, the Administrator explained that the current substantial degrees of variability and uncertainty inherent in the public preference studies should be reflected in a higher target protection level than would be appropriate if the underlying information were more consistent and certain (78 FR 3216, January 15, 2013).

percentile form; and a level of 30 dv), the Administrator next considered the degree of protection from visibility impairment afforded by the existing secondary standards. In so doing, he considered the updated analyses of PM-related visibility impairment (U.S. EPA, 2020, section 5.2.1.2), specifically noting the improvements over the analyses in the last review, in particular the use of multiple versions of the IMPROVE algorithm, including the version incorporating revisions since the last review (85 FR 24135–24136, April 30, 2020). The analyses in this review expand upon our understanding of how variation in equation inputs impacts calculated light extinction (U.S. EPA, 2020, Appendix D) and also better characterizes the influence of the coarse fraction on light extinction for the subset of sites with available $PM_{10-2.5}$ monitoring data (U.S. EPA, 2020, section 5.2.1.2).

The Administrator noted that the results of the updated analyses are consistent with the results from the last review, regardless of the IMPROVE equation used. The results of the analyses demonstrated that, in areas meeting the 24-hour $PM_{2.5}$ standard, the 3-year visibility metric is at or below about 30 dv,[84] and is below 25 dv in most of the areas. In those locations with $PM_{10-2.5}$ monitoring data available, which met both the current 24-hour $PM_{2.5}$ and 24-hour $PM_{10}$ standards, 3-year visibility metrics were at or below 30 dv regardless of if the coarse fraction was included in the calculation (U.S. EPA, 2020, section 5.2.1.2). In considering these updated analyses, the Administrator proposed to conclude that the scientific and quantitative information available in this review support the adequacy of the current secondary $PM_{2.5}$ and $PM_{10}$ standards to protect against PM-related visibility impairment.

With respect to non-visibility welfare effects, the Administrator considered the evidence related to climate and materials effects and proposed to conclude that it is generally appropriate to retain the existing secondary standards and that it is not appropriate to establish any distinct secondary PM standards to address non-visibility PM-related welfare effects. With regard to climate, the Administrator recognized that a number of improvements and refinements have been made to climate models since the last review, while also noting that significant limitations continue to exist in quantifying the contributions of the direct and indirect effects of PM and PM components on climate forcing (85 FR 24139, April 30, 2020; U.S. EPA, 2020, sections 5.2.2.1.1 and 5.4). The Administrator also recognized that climate models continue to exhibit considerable variability in estimates of PM-related climate impacts at regional scales (*e.g.,* ~100 km) compared to simulations at global scales (85 FR 24139, April 30, 2020; U.S. EPA, 2020, section 5.2.2.1.1 and 5.4). In considering this uncertainty, the Administrator proposed to conclude that the scientific information available in the current review remains insufficient to quantify the impacts of ambient PM on climate in the U.S. with confidence (85 FR 34139, April 30, 2020; U.S. EPA, 2020, sections 5.2.2.1.1 and 5.4) and that there is insufficient information available in this review to base a national ambient air quality standard on climate impacts.

With respect to materials effects, the Administrator recognized that deposition of fine or coarse particles can result in physical damage and/or impaired aesthetic qualities. Particles can contribute to materials damage by adding to the effects of weathering processes and by promoting the corrosion of metals, the degradation of painted surfaces, the deterioration of building materials, and the weakening of material components. The Administrator, while recognizing that some new evidence of PM-related materials effects is available in this review, noted that this evidence is primarily from studies conducted outside of the U.S. with PM concentrations that are higher than those typically observed in ambient air in the U.S. (U.S. EPA, 2019, section 13.4). Consistent with the information available at the time of the last review, the Administrator recognized a limited amount of information available on the quantitative relationships between PM and materials effects in the U.S., and uncertainties in the degree to which those effects could be adverse to public welfare. Therefore, at the time of proposal, the Administrator judged that the scientific information available in this review remains insufficient to quantify the public welfare impacts of PM in ambient air on materials with confidence and that there is insufficient information available in this review to support a distinct national ambient standard based on materials effects.

Thus, based on consideration of the scientific and quantitative information available in this review, with its uncertainties and limitations, and information that might inform his public welfare judgments, as well as consideration of advice from the CASAC, including their concurrence with the PA conclusions that the current evidence does not support revision of the secondary PM standards (discussed in section IV.B.1 above). The Administrator proposed to conclude that it is appropriate to retain the current secondary PM standards without revision based on his judgment that the current secondary PM standards are requisite to protect against PM-related effects on visibility and that there is insufficient information available in this review to base a national ambient air quality standard for PM on climate and materials impacts.

3. Comments on the Proposed Decision

Of the public comments received on the proposal, very few were specific to the secondary PM standards. Of those commenters who did provide comments on the secondary PM standards, the majority support the Administrator's proposed decision to retain the current standards. Some commenters disagree with the Administrator's proposed conclusion to retain the current secondary standards, primarily focusing their comments on the need for a revised standard to protect against visibility impairment. In addition to the comments addressed in this notice, the EPA has prepared a Response to Comments document that addresses other specific comments related to setting the secondary PM standards. This document is available for review in the docket for this rulemaking and through the EPA's NAAQS website (*https://www.epa.gov/naaqs/particulate-matter-pm-air-quality-standards*).

Of the comments addressing the proposed decision, many of the commenters support the Administrator's proposed decision to retain the current secondary PM standards, without revision. This group includes industries and industry groups and state and local governments and organizations. All of these commenters generally note their agreement with the rationale provided in the proposal and with the views expressed by the CASAC that the current evidence does not support revision to the standards. Most also cite the EPA and CASAC statements that the scientific evidence and quantitative information in this review has not substantially altered our previous

[84] As discussed above and in the PA (U.S. EPA, 2020, section 5.2.1.2), one site in Fairbanks, Alaska just meets the current 24-hour $PM_{2.5}$ standard and has a 3-year visibility index value of 27 dv based on the original IMPROVE equation and 31 dv based on the Lowenthal and Kumar (2016) equation. At this site, use of the Lowenthal and Kumar (2016) equation may not be appropriate given that PM composition and meteorological conditions may differ considerably from those under which revisions to the equation have been validated.

understanding of the effects of PM on visibility, climate, and materials beyond what was previously examined and does not call into question the adequacy of the current standards. They all find the proposed decision to retain the current standards to be well supported and a reasonable exercise of the Administrator's public welfare policy judgment under the CAA. The EPA agrees with these comments and with the CASAC advice regarding the adequacy of the current secondary PM standards and the lack of support for revision of these standards.

Of the commenters who disagree with the proposal to retain the current standards, nearly all of these commenters recommend more stringent standards, primarily to protect against visibility impairment. These comments were submitted primarily by national public health, medical, and environmental nongovernmental organizations, and some individuals. The commenters who recommend strengthening the standards state their support for revisions to provide greater public welfare protection, generally claiming that the current standards are inadequate and do not provide the requisite protection against known or anticipated welfare effects. Additionally, some of the commenters who disagree with the proposal did not specifically recommend revising the current standards, but instead recommend additional research to address key uncertainties and limitations in the available scientific and quantitative information that would inform decisions regarding a national standard to protect against PM-related non-visibility and visibility effects.

The EPA received relatively few comments on the proposed decision that it is not appropriate to establish any distinct secondary PM standards to address PM-related climate effects. The majority of the comments that were received agree with the EPA that the currently available information is not sufficient for supporting quantitative analyses for the climate effects of PM in ambient air. These commenters support the Administrator's proposed decision not to set a distinct standard for climate. Several commenters note, however, that the EPA should frequently reconsider the available evidence and quantitative information and should revise the standard as necessary to provide requisite protection against PM-related climate effects. The EPA agrees with the commenters that quantitative analyses of the relationship between PM and climate effects are not supported by the available information in this review, and new information about PM-related welfare effects, including climate, will be assessed consistent with CAA requirements in the next review of the PM NAAQS.

There were also very few commenters who commented on the proposed decision that it is not appropriate to establish any distinct secondary PM standards to address PM-related material effects. As with comments on climate effects, commenters generally agree with the EPA that the evidence is not sufficient to support quantitative analyses for PM-related materials effects. However, some commenters contend that the EPA failed to consider the following information: (1) Studies conducted outside of the U.S. on the cost of soiling of materials that are also found in the U.S.; (2) recent work related to soiling of photovoltaic modules and other surfaces, and; (3) quantitative relationships between PM in ambient air and materials effects used in several studies. These commenters further assert that the EPA failed to specify a level of air quality that protects against adverse effects of PM on materials and failed to propose a standard that provides requisite protection against materials effects attributable to PM.

We disagree with the commenters that the EPA failed to consider the relevant scientific information about materials effects available in this review. As an initial matter, the ISA considered and included studies related to materials effects of PM, including studies conducted in and outside of the U.S., on newly studied materials including photovoltaic modules that were published prior to the cutoff date for the literature search.[85] These include the Besson et al. (2017) study referenced by the commenters (U.S. EPA, 2019, section 13.4.2). The Grøntoft et al. (2019) study referenced by the same commenters was published after the cutoff date for the literature search. However, the EPA has provisionally considered new studies, including the new studies highlighted by the commenters, in the context of the findings of the ISA (see Appendix in Response to Comments document).[86] Based on this provisional consideration, the EPA concludes that the new studies are not sufficient to alter the conclusions reached in the ISA regarding PM and materials effects.

Moreover, we disagree with the commenters that the EPA failed to consider quantitative information from studies available in this review. As detailed in section 5.2.2.1.2 of the PA, a number of new studies are available that apply new methods to characterize PM-related effects on previously studied materials; however, the evidence remains insufficient to relate soiling or damage to specific levels of PM in ambient air or to establish quantitative relationships between PM and materials degradation. The uncertainties in the evidence identified in the last review persist in the evidence in the current review, with significant uncertainties and limitations to establishing quantitative relationships between particle size, concentration, chemical components, and frequency of painting or repair of materials. While some new evidence is available in this review, overall, the data are insufficient to conduct quantitative analyses for PM-related materials effects. Quantitative relationships have not been established between characteristics of PM and frequency of repainting or cleaning of materials, including photovoltaic panels and other energy-efficient materials, that would help inform our understanding of the public welfare implications of soiling (U.S. EPA, 2020, section 5.2.2.2.2; U.S. EPA, 2019, section 13.4). Similarly, the information does not support quantitative analyses between microbial deterioration of surfaces and the contribution of carbonaceous PM to the formation of black crusts that contribute to soiling (U.S. EPA, 2020, section 5.2.2.2.2; U.S. EPA, 2019, section 13.4). We also note that quantitative relationships are difficult to assess, in particular those characterized using damage functions as these approaches depend on human perception of the level of soiling deemed to be acceptable and evidence in this area remains limited in the current review (U.S. EPA, 2020, section 5.2.2.1.2). Additionally, we note the CASAC's concurrence with conclusions in the PA that uncertainties remain about the best way to evaluate materials effects of PM in ambient air (Cox, 2019a, p. 13 of consensus responses). Further, no new studies are available in this review to link human perception of reduced aesthetic appeal of buildings

[85] As noted earlier in section IV, ''the current ISA identified and evaluated studies and reports that that have undergone scientific peer review and were published or accepted for publication between January 1, 2009 and March 31, 2017. A limited literature update identified some additional studies that were published before December 31, 2017'' (U.S. EPA, 2019, Appendix, p. A–3).

[86] As discussed in section I.D, the EPA has provisionally considered studies that were highlighted by commenters and that were published after the ISA. These studies are generally consistent with the evidence assessed in the ISA, and they do not materially alter our understanding of the scientific evidence or the Agency's conclusions based on that evidence or warrant reopening of the air quality criteria.

and other objects to materials effects and PM in ambient air. Finally, uncertainties remain about deposition rates of PM in ambient air to surfaces and the interaction of PM with copollutants on these surfaces (U.S. EPA, 2020, p. 5–34).

As summarized above and in the proposal, the evidence in this review for PM effects on materials is not substantively changed from that in the last review. There continues to be a lack of evidence related to materials effects that establishes quantitative relationships and supports quantitative analyses of PM-related materials soiling or damage. While the information available in this review continues to support a causal relationship between PM in ambient air and materials effects (U.S. EPA, 2019, section 13.4), the EPA is unable to relate soiling or damage to specific levels of PM in ambient air and is unable to evaluate or consider a level of air quality to protect against such materials effects. Although the EPA did not propose a distinct level of air quality or a national standard based on air quality impacts (85 FR 24139, April 30, 2020), we did identify data gaps that prevented us from doing so. The EPA identified a number of key uncertainties and areas of future research (U.S. EPA, 2020, p. 5–42) that may inform consideration of the materials effects of PM in ambient air in future reviews of the PM NAAQS.

Commenters who disagreed with the Administrator's proposed decision to retain the current secondary PM standards provided a number of comments on the scientific evidence and quantitative analyses for visibility impairment. These commenters criticize various aspects of the EPA's proposal to retain the standards, including specific aspects of the visibility index, the target level of protection identified by the Administrator, and the appropriateness of a single national standard for purposes of protecting against PM-related visibility impairment. In general, these comments indicated support for a more stringent standard for visibility impairment, although the commenters did not necessarily specify the alternative standard that would, in their judgment, address the concerns raised. Rather, most of these commenters focused on particular aspects of the visibility metric underlying the current secondary standard, including the form, averaging time, and target level of protection necessary to protect against visibility impairment.

Several commenters argue that the evidence does not support a single level of ''acceptable'' visibility. Commenters expressed the view that the public preference studies present important evidence related to the importance of visibility, but that they do not provide enough information to set a national standard for visibility impairment because the results show that visibility preferences vary regionally and/or locally for a variety of reasons. Commenters additionally state that the EPA failed to explain and analyze the uncertainties associated with the public preference studies, including: (1) The different methods used in the studies and their influence on the responses; (2) the impact of different scenes being viewed on the full range of public preferences; and (3) factors that were not considered in the study methods that could impact judgments in the studies. These commenters suggest that the secondary standards should account for regional variability, although they did not provide specific recommendations regarding how to accomplish this.

The EPA agrees with commenters that the available scientific evidence indicates that public preferences for ''acceptable'' visibility and air quality depends in large part on the characteristics of the scene being viewed. The EPA understands that there is a wide range of urban and rural scenes within the U.S. and included in the public preference studies, including natural vistas such as the Rocky Mountains in Colorado and man-made urban structures such as the Washington Monument. However, the EPA disagrees with commenters that the available evidence cannot support a national standard to protect against PM-related visibility impairment. As at the time of the last review, the EPA believes that the scenes presented in the public preference studies include important types of valued scenic views, and therefore, when considered together, can inform consideration of an acceptable level of visual air quality at the national scale, taking into account variation across the U.S. as evidenced in the studies.

With regard to the comments that these studies do not provide enough information to account for regional variability that is important to consider when setting a national standard for visibility protection, the EPA recognizes that there may be regional variability in the available evidence but believes that these studies provide significant information that is useful for the Administrator to consider in his judgments on the public welfare implications of PM-related visibility effects. While the EPA acknowledges that there may be regional differences in the stated preferences for visibility, the EPA finds there is not enough information available at this time to take such regional differences into account. The commenter did not provide specific recommendations for the EPA's consideration of such information even if such information were available, and the EPA finds the question of how, or if, to account for regional preferences in setting a national standard is a substantial question that should be addressed when it is presented by the available information.

With regard to the commenters' assertion that the current secondary standards are inadequate to protect the public welfare from PM-related visibility impairment, the EPA disagrees that the currently available information is sufficient to suggest that a more stringent standard is warranted. The EPA identified and addressed in great detail the limitations and uncertainties associated with the public preference studies as a part of the last review (78 FR 3210, January 15, 2013). Given that the evidence related to public preferences is the same in this review as it was at the time of the last review, the EPA reiterated the limitations and uncertainties inherent in this evidence as a part of the PA (U.S. EPA, 2020, section 5.5). The PA highlights key uncertainties associated with public perception of visibility impairment and identifies areas for future research to inform future PM NAAQS reviews, including those raised by the commenters (U.S. EPA, 2020, p. 5–41). For example, the PA notes the critical need for information to further our understanding of human perception of visibility impairment in public preference studies in order to address uncertainties and limitations in the evidence, including an expansion of the number and geographic coverage of preference studies in urban, rural, and Class I areas to account for the potential for people to have different preferences based on the conditions that they commonly encounter and potential differences in preferences based on the scene types (U.S. EPA, 2020, p. 5–41).

These same commenters further argue that the EPA omitted recent studies that could further inform our understanding of the public welfare implications of visibility impairment. Commenters specifically point to a recent meta-analysis of available preference studies (Malm et al., 2019) and also cites to several related studies (Malm et al., 2011; Malm, 2013, 2016; Molenar and Malm, 2012). Commenters additionally contend that studies of the economic effects of impaired visibility were omitted from the ISA and PA and were

not considered in the EPA's approach for evaluating visibility.

The EPA disagrees with the commenters that studies related to visibility were inappropriately omitted from the ISA in this review. As an initial matter, the ISA considered and included studies related to PM-related visibility impairment and public preferences that were published prior to the cutoff date for the literature search.[87] As described in the Preamble to the ISA, ''studies and reports that have undergone scientific peer review and have been published (or accepted for publication) are considered for inclusion in the ISA'' (U.S. EPA, 2015, p. 6). The meta-analysis by Malm et al. (2019) was published after the cutoff date for the literature search for the ISA, and therefore, was not included in the ISA. Malm et al. (2019) was provisionally considered, along with other studies published after the cut-off date, and the EPA concluded that these studies did not materially change the broad scientific conclusions of the ISA regarding welfare effects, including visibility impairment. Moreover, the other citations provided by the commenters (Malm et al., 2011; Malm, 2013, 2016; Molenar and Malm, 2012) are not peer-reviewed publications and as such do not meet the criteria for inclusion in the ISA. With regard to studies of economic effects, these studies were not considered to be within the scope of the ISA, and therefore were not included in this review (U.S. EPA, 2019, p. P–16). The studies submitted by the commenters, together with other new evidence, will be assessed consistent with CAA requirements in the next review of the PM NAAQS.

Some commenters contend that the EPA's visibility analyses only focused on locations that met the current standards. These commenters argue that the EPA concluded at the beginning of the analysis that the current standards do not need to be revised and that the EPA's approach ignores information available since the last review, leading to the Administrator to propose no revisions to the standards based on this flawed approach.

We disagree with commenters that the updated analyses of visibility impairment in this review only considered air quality in areas that meet the current standards. As described in detail in the PA, locations included in the analyses were those that met specific data completeness criteria for the monitoring data required as inputs to the IMPROVE equations for estimating light extinction (U.S. EPA, 2020, Appendix D). The data set used for the updated analyses is comprised of sites with data for the 2015–2017 period that supported a valid 24-hour $PM_{2.5}$ design value and met strict criteria for PM species. For $PM_{2.5}$ concentrations, data were screened so that all days either had a valid filter-based 24-hour concentration measurement or at least 18 valid hourly concentration measurements (U.S. EPA, 2020, section D.2.1.2).[88] For coarse PM concentrations, data were included for sites with ≥11 valid days for each quarter of 2015–2017. For $PM_{2.5}$ component concentrations, data were included for days with valid data for all chemical components listed in Table D–1 in the PA and for sites with ≥11 valid days for each quarter of 2015–2017.[89] Of all of the PM monitoring locations in the U.S., 67 monitoring sites met the data completeness criteria and light extinction was calculated without the coarse fraction in the IMPROVE equations. Of these 67 monitoring sites, 20 locations met the data completeness criteria for coarse PM, and as such, light extinction was also estimated with the coarse fraction as an input to the IMPROVE equation at these sites (U.S. EPA, 2020, section 5.2.1.2, Appendix D). For the sites that met the data completeness criteria for inclusion in the analyses, all of the sites met the annual $PM_{2.5}$ and 24-hour $PM_{10}$ standards, and all but one site (located in southern California) met the 24-hour $PM_{2.5}$ standard. Therefore, we disagree with the commenters that the analysis was designed to consider only locations that met the current standards and did not consider locations that did not meet the current secondary PM standards. Moreover, the EPA notes that data from areas exceeding the current standard are generally of limited use in deciding whether to retain the standard, or lower it, because it is not representative or informative of circumstances and effects that would be expected to be seen upon attainment of the standard.

Furthermore, it is unclear what additional information the commenters contend that the EPA omitted from its consideration in this review. All scientific information available in this review has been considered and integrated as a part of the ISA. The Administrator, in considering the adequacy of the current secondary PM standards, considered the available scientific evidence and quantitative information in this review, along with CASAC advice and public comments, and concluded that the current secondary PM standards provide requisite protection against visibility impairment.

Some commenters additionally contend that the EPA's evaluation of public welfare effects of PM in the proposal solely focuses on fine PM and ignores coarse PM. These commenters assert that trends data show that coarse PM is increasing, which they believe to be a concern to public welfare.

We disagree with the commenters that the EPA's proposal failed to consider the public welfare implications of coarse PM. First, we note that there is limited new scientific evidence available in this review on climate- and materials-related effects of coarse PM beyond that of the last review (85 FR 24131, April 30, 2020). With regard to the contribution of coarse PM to visibility impairment, we first note that at the time of the last review, the EPA noted that $PM_{2.5}$ is the size fraction of PM responsible for most of the visibility impairment in urban areas (U.S. EPA, 2020, p. 5–22). Data available for $PM_{10-2.5}$ was very limited in the last review and was not used in quantitative analyses of estimated $PM_{2.5}$ light extinction (U.S. EPA, 2020, Appendix D, section D–1). Since the time of the last review, an expansion of $PM_{10-2.5}$ monitoring efforts has increased the availability of data for use in estimating light extinction with both fine and coarse fractions of PM. As described in the PA, the analyses of visibility impairment were updated in this review to include consideration of the coarse fraction of PM in estimating light extinction in the subset of areas with $PM_{10-2.5}$ monitoring data available for the time period of interest (U.S. EPA, 2020, section 5.2.1.2, Appendix D). The updated analyses in this review included 20 sites that measured both $PM_{10}$ and $PM_{2.5}$ (U.S. EPA, 2020, section 5.2.1.2, Appendix D), all of which meet the current 24-hour $PM_{2.5}$ and $PM_{10}$ standards. All of these sites have 3-year visibility at or below 30 dv regardless of whether light extinction is calculated

[87] As noted earlier in section IV, ''the current ISA identified and evaluated studies and reports that that have undergone scientific peer review and were published or accepted for publication between January 1, 2009 and March 31, 2017. A limited literature update identified some additional studies that were published before December 31, 2017'' (U.S. EPA, 2019, Appendix, p. A–3).

[88] A valid filter-based 24-hour concentration measurement is one collected via FRM, and that has undergone laboratory equilibration (at least 24 hours at standardized conditions of 20–23 °C and 30–40% relative humidity) prior to analysis (see Appendix L of 40 CFR part 50 for the 2012 NAAQS for PM).

[89] For coarse PM and $PM_{2.5}$ components, data completeness criteria were selected for the quantitative analyses consistent with those in Appendix N of 40 CFR part 50 for the 2012 NAAQS for PM.

with or without the coarse fraction, and for all three versions of the IMPROVE equation used in this review. Generally, the contribution of the coarse fraction of PM to light extinction in these locations was minimal, contributing less than 1 dv to the 3-year visibility metric (U.S. EPA, 2020, section 5.2.1.2, Appendix D). While there were not monitoring data available to evaluate the impact of coarse PM on estimates of light extinction in locations expected to have higher concentrations of coarse PM, the coarse fraction may be a more important contributor to light extinction and visibility impairment than in those areas included in the PA analyses in this review. As additional information and monitoring data become available to further evaluate the impact of coarse PM on estimates of light extinction in more locations, including geographical locations expected to have high concentrations of coarse PM, such information will be considered in a future PM NAAQS review.

Several commenters in support of revising the secondary PM standards to protect against visibility impairment, generally recommend revisions to elements of the secondary standard and visibility index (indicator, averaging time, form, and level) consistent with those supported by the CASAC and public comments in previous PM reviews. We address comments on the elements of a visibility index and a revised standard for visibility effects below.

With regard to an indicator for the secondary standards to protect against visibility impairment, a number of commenters suggest that the EPA failed to explain why the current indicator is adequate and pointed to recommendations from the CASAC in the PM reviews completed in 2012 and 2006 with regard to alternate indicators. As noted by the commenters, in the 2012 review, the CASAC recommended three alternate indicators for a secondary standard to protect against visibility impairment: (1) Using direct, continuous measurement of PM light extinction to support hourly or multi-hour daylight-only averaging time(s); (2) using PM speciation data to calculate seasonal (or monthly) regional species and relative humidity values to combine with the denser continuous $PM_{2.5}$ monitoring network to calculate hourly PM light extinction; or, (3) using hourly $PM_{2.5}$ as a basis for a sub-daily (hourly or multi-hour) daylight-only indicator, which would intentionally remove the variable influence of water from the regulatory metric. In the 2006 review, as noted by the commenters, the CASAC recommended a $PM_{2.5}$ mass indicator, coupled with revisions to the averaging time, form, and level of the standard, to protect against visibility impairment.

The EPA generally agrees with commenters that an indicator based on directly measured light extinction would provide the most direct link between PM in ambient air and PM-related visibility impairment. However, as noted in the proposal (85 FR 24138, April 30, 2020, sections IV.B.1 and IV.D.1), the Administrator concluded that in the absence of a monitoring network to directly measure light extinction, he judged that estimated light extinction, as calculated using the IMPROVE algorithms, continues to provide a reasonable basis for defining a target level of protection against PM-related visibility impairment in the current review. There has been little progress in development of such a monitoring network since the time of the last review when CASAC concluded that, in the absence of such a monitoring network, relying on a calculated $PM_{2.5}$ light extinction indicator based on $PM_{2.5}$ components and relative humidity represented a reasonable approach and that the inputs for calculating light extinction were readily available through existing monitoring networks and approved monitoring protocols (78 FR 3205, January 15, 2013). Further, in this review, the CASAC generally agreed with the EPA that the available evidence does not call into question the protection afforded by the current secondary PM standards and concurs that they should be retained.

With regard to the elements of the visibility index, in considering the adequacy of the current secondary PM standards to protect against visibility impairment, as described in the proposal (85 FR 24135, April 30, 2020), the Administrator first defined an appropriate target level of protection in terms of a PM visibility index. In defining this target level of protection, the Administrator first considered the indicator of such an index. He noted that, given the lack of availability of methods and an established network for directly measuring light extinction, a visibility index based on estimates of light extinction by $PM_{2.5}$ components derived from an adjusted version of the original IMPROVE algorithm would be most appropriate, consistent with the last review. As described in the proposal and above (section IV.A.2.a.i), the IMPROVE algorithm estimates light extinction using routinely monitored components of $PM_{2.5}$ and $PM_{10-2.5}$, along with estimates of relative humidity. The Administrator, while recognizing that some revisions to the IMPROVE algorithm have been made since the time of the last review, noted that the fundamental relationship between ambient PM and light extinction has changed very little and the different versions of the IMPROVE algorithms can appropriately reflect this relationship across the U.S. (85 FR 24138, April 30, 2020). As such, he judged that defining a target level of protection in terms of estimated light extinction continues to be a reasonable approach in the current review.

With regard to averaging time, commenters were critical of the 24-hour averaging time to protect against visibility impairment and argue for a sub-daily averaging time. While some comments clearly focused on the averaging time of the current secondary $PM_{2.5}$ standard, other comments were unclear as to whether they recommended a sub-daily averaging time for the secondary $PM_{2.5}$ standard or for the visibility index used in defining a target level of the protection. Nonetheless, all of these commenters contend that people do not perceive visibility impairment over a 24-hour period, but rather their perception of impairment ranges from minutes to multiday, and that daylight hours are much more important in terms of visibility impairment, particularly in urban areas. As with comments on the indicator of the standard, some commenters also point to previous CASAC advice on the need for a sub-daily standard.

In defining the characteristics of a visibility index, the EPA continues to believe that a 24-hour averaging time is reasonable. This is in part based on analyses conducted in the last review that showed relatively strong correlations between 24-hour and sub-daily (*i.e.,* 4-hour average) $PM_{2.5}$ light extinction from the analyses conducted in the last review (85 FR 24138, April 30, 2020; 78 FR 3226, January 15, 2013), indicating that a 24-hour averaging time is an appropriate surrogate for the sub-daily time periods relevant for visual perception. The EPA believes that these analyses continue to provide support for consideration of a 24-hour averaging time for the visibility index in this review. The EPA also recognizes that the longer averaging time may be less influenced by atypical conditions and/or atypical instrument performance (85 FR 24138, April 30, 2020; 78 FR 3226, January 15, 2013). When taken together, the available scientific information and updated analyses of calculated light extinction available in this review continue to support that a 24-hour averaging time is appropriate when defining a target level of protection

against visibility impairment in terms of a visibility index.

Moreover, the EPA disagrees with commenters that a secondary $PM_{2.5}$ standard with a 24-hour averaging time does not provide requisite protection against the public welfare impacts of visibility impairment. At the time of the last review, the EPA recognized that hourly or sub-daily (*i.e.,* 4- to 6-hour) averaging times, within daylight hours and excluding hours with high relative humidity, are more directly related to the short-term nature of visibility impairment and the relevant viewing periods for segments of the viewing public than a 24-hour averaging time. At that time, the EPA agreed that a sub-daily averaging time would generally be preferable. However, the Agency noted significant data quality uncertainties associated with the instruments that would provide hourly $PM_{2.5}$ mass concentrations necessary to inform a sub-daily averaging time. These uncertainties, as described in the last review, included short-term variability in hourly data from available continuous monitoring methods, which would prohibit establishing a sub-daily averaging time (78 FR 3209, January 15, 2013). For all of these reasons, the EPA continues to believe that a sub-daily averaging time is not supported by the information available in this review.

With regard to the form of the visibility index, many of the commenters contend that the form used in evaluating visibility impairment is not appropriate. First, commenters contend that a 90th percentile form is too low and excludes too many days that could have visibility impairment. These same commenters also suggest that a 3-year average form is not justified and does not protect visibility and public welfare. These commenters also argue that the EPA failed to consider the 98th percentile form for the visibility index as a part of the proposal. Second, some commenters recommend a form for the visibility index within the range of 95th to 98th percentile, coupled with a multi-hour sub-daily averaging time, consistent with the CASAC advice in the 2006 review.

The EPA disagrees with these commenters on both points. With regard to the form of the visibility index, the EPA continues to conclude that a 3-year average of annual 90th percentile values is appropriate. In so doing, the EPA notes that a 3-year average form provides stability from the occasional effect of inter-annual meteorological variability that can result in unusually high pollution levels for a particular year, consistent with the decision in the last review (78 FR 3198, January 15, 2013; U.S. EPA, 2011, p. 4–58). With regard to the annual statistical form to be averaged over 3-years, the EPA considers the evaluation in the 2010 UFVA of three different statistics: 90th, 95th, and 98th percentiles (U.S. EPA, 2010b, chapter 4). In considering the alternative statistical forms, the 2011 PA noted that the Regional Haze Program targets the 20 percent most impaired days for improvements in visual air quality in Federal Class I areas and that the median of the distribution of these 20 percent worst days would be the 90th percentile. The 2011 PA further noted that strategies that are implemented so that 90 percent of days would have visual air quality that is at or below the level of the standard would reasonably be expected to lead to improvements in visual air quality for the 20 percent most impaired days. Finally, the 2011 PA recognized that the public preference studies available at the time of the last review did not address frequency of occurrence of different levels of visibility and did not identify a basis for a different target for urban areas than for Federal Class I areas (U.S. EPA, 2011, p. 4–59). The analyses and considerations for the form of a visibility index from the 2011 PA continue to provide support for a 90th percentile form, averaged across three years, in defining the characteristics of a visibility index in this review.

Some commenters contend that the EPA's proposal to retain the level of 30 dv for a visibility index is arbitrary, capricious, and not technically sound. These commenters assert that the EPA failed to consider recent research studies that provide a meta-analysis of visibility preference studies that suggest that a level of 30 dv is unacceptable to study participants included in the meta-analysis.

As an initial matter, as described above, the studies cited by the commenters in support of their rationale were either published after the cutoff date for the literature search for the ISA (Malm et al., 2019) or were not peer-reviewed studies that met the inclusion criteria for the ISA (Malm et al., 2011; Malm, 2013, 2016; Molenar and Malm, 2012). The EPA provisionally considered the Malm et al. (2019) study and concludes that this study does not sufficiently alter the conclusions reached in the ISA regarding PM and visibility effects.

With regard to a level of 30 dv for the visibility index, the EPA believes that it is appropriate to establish a target level of protection based on the upper end of the range of levels of visibility impairment judged to be acceptable by at least 50% of study participants in the available visibility preference studies (U.S. EPA, 2020, section 5.2.1.1). The 2011 PA identified a range of levels from 20 to 30 dv based on the responses in the public preference studies available at that time. Given the lack of new preferences studies available in this review, the EPA again relies on the same studies and the range of levels identified in those studies in the current review. As described in detail in the PA (U.S. EPA, 2020, sections 5.2.1.1 and 5.5), there are a number of uncertainties and limitations associated with the public preference studies, including those described in section IV.B.2 above. Recognizing these uncertainties and limitations, the EPA concludes that substantial degrees of variability and uncertainty in the public preference studies should be reflected in a target level of protection at the upper end of the range than if the information was more consistent and certain. Therefore, the EPA believes that 30 dv is an appropriate level for a visibility index in this review.

A number of commenters advocate for a more stringent standard, recommending that the level of the secondary $PM_{2.5}$ standards be lowered. Some commenters reference the recommendations of previous CASAC panels for revisions to the secondary 24-hour $PM_{2.5}$ standard. Additionally, some commenters contend that the secondary $PM_{2.5}$ standards should be set equal to the primary $PM_{2.5}$ standards, with some of the commenters aligning their support for their position with their recommendations for revisions to the primary $PM_{2.5}$ standards in this review.

We disagree with the commenters that the secondary $PM_{2.5}$ standard should be revised to provide additional public welfare protection beyond that achieved under the current standard. Based on the available scientific and quantitative information, and for the reasons discussed above, the EPA concludes that it is appropriate to define a target level of protection in terms of a visibility index based on estimated light extinction with a 24-hour averaging time, a 3-year 90th percentile form, and a level of 30 dv. In having concluded that this visibility index is appropriate, the EPA then considers the degree of protection from visibility impairment afforded by the existing standard. In so doing, we consider results of updated analyses of calculated light extinction that demonstrate that, in areas meeting the current PM mass-based standards, the target level of protection in terms of a visibility index is also achieved (85 FR 24135, April 30, 2020; U.S. EPA, 2020, section 5.2.1.2). The results of these analyses (as described in detail in

section IV.A.3.a above and in section 5.2.1.2 of the PA) demonstrate that the 3-year visibility metric is at or below about 30 dv in all areas meeting the current $PM_{2.5}$ standard, and below 25 dv in most areas. For those areas with available $PM_{10-2.5}$ monitoring data, which met both the current 24-hour $PM_{2.5}$ and $PM_{10}$ standards, 3-year visibility metrics were at or below 30 dv regardless of if the coarse fraction was included in the calculation (U.S. EPA, 2020, section 5.2.1.2). Given the results of these analyses, the Administrator concluded at the time of proposal that the updated scientific evidence and quantitative information support the adequacy of the current secondary $PM_{2.5}$ and $PM_{10}$ standards to protect against PM-related visibility impairment (85 FR 24138–24139, April 30, 2020).

With regard to comments recommending to set the secondary $PM_{2.5}$ standards equal to the current primary $PM_{2.5}$ standards, these commenters do not provide a basis for their recommendation, nor do they provide a rationale for revising the secondary $PM_{2.5}$ standards to their recommended revised levels of the primary $PM_{2.5}$ standards. However, we note that the primary annual $PM_{2.5}$ standard, with its lower level, would be the controlling standard. The EPA disagrees that such revisions would be appropriate, for all of the reasons discussed above.

4. Administrator's Conclusions

In considering the adequacy of the current secondary PM standards in this review, the Administrator has carefully considered the: (1) Policy-relevant evidence and conclusions contained in the ISA; (2) the quantitative information presented and assessed in the PA; (3) the evaluation of this evidence, the quantitative information, and the rationale and conclusions presented in the PA; (4) the advice and recommendations from the CASAC; and (5) public comments, as addressed in section IV.B.3 above. In the discussion below, the Administrator gives weight to the PA conclusions, with which the CASAC concurred, as summarized in section IV.D of the proposal, and takes note of key aspects of the rationale for those conclusions that contribute to his decision in this review. After giving careful consideration to all of this information, the Administrator believes that the conclusions and policy judgments supporting his proposed decision remain valid and the secondary PM standards should be retained.

In considering the PA evaluations and conclusions, the Administrator specifically takes note of the overall conclusions that the welfare effects evidence and quantitative information are generally consistent with what was considered in the last review (U.S. EPA, 2020, section 5.4). In so doing, he additionally notes that the CASAC supports retaining the current standard agreeing with the EPA ''that the available evidence does not call into question the protection afforded by the current secondary PM standards'' (Cox, 2019a, p. 3 of letter). As noted below, the newly available welfare effects evidence, critically assessed in the ISA as part of the full body of current evidence, reaffirms conclusions on the visibility, climate, and materials effects recognized in the last review, including key conclusions on which the current standard is based. Further, as discussed in more detail above, the updated quantitative analyses of visibility impairment for areas meeting the current standards support the adequacy of the current secondary $PM_{2.5}$ and $PM_{10}$ standards to protect against PM-related visibility impairment. The Administrator also recognizes limitations and uncertainties continue to be associated with the available information.

With regard to the current evidence on visibility effects, as summarized in the PA and discussed in detail in the ISA, the Administrator takes note of the long-standing body of evidence for PM-related visibility impairment. This evidence, which is based on the fundamental relationship between light extinction and PM mass, demonstrates that ambient PM can impair visibility in both urban and remote areas, and has changed very little since the last review (U.S. EPA, 2019, section 13.1; U.S. EPA, 2009a, section 9.2.5). The evidence related to public perception of visibility impairment comes from studies from four areas in North America. These studies provide information to inform our understanding of levels of visibility impairment that the public judged to be ''acceptable'' (U.S. EPA, 2010b; 85 FR 24131, April 30, 2020). In considering these public preference studies, the Administrator notes that, as described in the ISA, no new visibility studies have been conducted in the U.S. and there is little newly available information with regard to acceptable levels of visibility impairment in the U.S. The Administrator recognizes that visibility impairment can have implications for people's enjoyment of daily activities and their overall well-being, and therefore, considers the degree to which the current secondary standards protect against PM-related visibility impairment.

Based on the considerations discussed above in sections IV.B.2 and IV.B.3, the Administrator first concludes, consistent with the last review, that a target level of protection for a secondary PM standard is most appropriately defined in terms of a visibility index that directly takes into account the factors (*i.e.,* species composition and relative humidity) that influence the relationship between $PM_{2.5}$ in ambient air and PM-related visibility impairment. In defining a target level of protection, the Administrator has considered the specific aspects of such an index, including the appropriate indicator, averaging time, form, and level.

First, with regard to indicator, the Administrator notes that in the last review, the EPA used an index based on estimates of light extinction by $PM_{2.5}$ components calculated using an adjusted version of the IMPROVE algorithm. As described above (section IV.A.3), this algorithm allows the estimation of light extinction using routinely monitored components of $PM_{2.5}$ and $PM_{10-2.5}$, along with estimates of relative humidity. The Administrator recognizes that, while there have been some revisions to the IMPROVE algorithm since the time of the last review, our fundamental understanding of the relationship between PM in ambient air and light extinction has changed little and the various IMPROVE algorithms can appropriately reflect this relationship across the U.S. In the absence of a monitoring network for direct measurement of light extinction (section IV.A.3), he concludes that calculated light extinction indicator that utilizes the IMPROVE algorithms continues to provide a reasonable basis for defining a target level of protection against PM-related visibility impairment in the current review.

In further defining the characteristics of a visibility index, the Administrator next considers the appropriate averaging time, form, and level of the index. Given the available scientific information in this review, and in considering the CASAC's advice and public comments, the Administrator concludes that, consistent with the decision in the last review, a visibility index with a 24-hour averaging time and a form based on the 3-year average of annual 90th percentile values remains reasonable in this review. With regard to the averaging time and form of such an index, the Administrator takes note of analyses conducted in the last review that demonstrated relatively strong correlations between 24-hour and sub-daily (*i.e.,* 4-hour average) $PM_{2.5}$ light extinction (78 FR 3226, January 15,

2013), indicating that a 24-hour averaging time is an appropriate surrogate for the sub-daily time periods of the perception of PM-related visibility impairment and the relevant exposure periods for segments of the viewing public. This decision also recognized that a 24-hour averaging time may be less influenced by atypical conditions and/or atypical instrument performance (78 FR 3226, January 15, 2013). The Administrator recognizes that there is no new information in the current review to support updated analyses of this nature, and therefore, he believes these analyses continue to provide support for consideration of a 24-hour averaging time for a visibility index in this review. With regard to the statistical form of the index, the Administrator notes that, consistent with the last review: (1) A multi-year percentile form offers greater stability from the occasional effect of inter-annual meteorological variability (78 FR 3198, January 15, 2013; U.S. EPA, 2011, p. 4–58); (2) a 90th percentile represents the median of the distribution of the 20 percent worst visibility days, which are targeted in Federal Class I areas by the Regional Haze Program; and (3) public preference studies did not provide information to identify a different target than that identified for Federal Class I areas (U.S. EPA, 2011, p. 4–59). Therefore, the Administrator judges that a visibility index based on estimates of light extinction, with a 24-hour averaging time and a 90th percentile form, averaged over three years, remains appropriate.

With regard to the level of a visibility index, the Administrator judges that it is appropriate to establish a target level of protection of 30 dv, reflecting the upper end of the range of visibility impairment judged to be acceptable by at least 50% of study participants in the available public preference studies (78 FR 3226, January 15, 2013). The 2011 PA identified a range of levels from 20 to 30 dv based on the responses in the public preference studies available at that time. At the time of the last review, the Administrator noted a number of uncertainties and limitations in public preference studies, including the small number of stated preference studies available, the relatively small number of study participants and the extent to which the study participants may not be representative of the broader study area population in some of the studies, and the variations in the specific materials and methods used in each study. In considering the available preference studies, with their inherent uncertainties and limitations, the prior Administrator concluded that the substantial degree of variability and uncertainty in the public preference studies should be reflected in a target level of protection based on the upper end of the range of CPLs.

Given that there are no new preference studies available in this review, the Administrator notes that his judgments are based on the same studies, with the same range of levels, available in the last review. The Administrator recognizes a number of limitations and uncertainties associated with these studies, as identified in the PA (U.S. EPA, 2020, section 5.5), including the following: (1) Available studies may not represent the full range of preferences for visibility in the U.S. population, particularly given the potential variability in preferences based on the conditions commonly encountered and the scenes being viewed; (2) available preference studies were conducted 15 to 30 years ago and may not accurately represent the current day preferences of people in the U.S.; (3) the variety of methods used in the preference studies may potentially influence the responses as to what level of impairment is deemed acceptable; and (4) factors that are not captured in the methods of the preference studies, such as the time of day when light extinction is the greatest or the frequency of impairment episodes, may influence people's judgment on acceptable visibility (U.S. EPA, 2020, section 5.2.1.1). Therefore, in considering the scientific information, with its uncertainties and limitations, as well as public comments on the level of the target level of protection against visibility impairment, the Administrator concludes that it is appropriate to again use a level of 30 dv for the visibility index.

Having concluded that the protection provided by a standard defined in terms of a $PM_{2.5}$ visibility index, with a 24-hour averaging time, and a 90th percentile form, averaged over 3 years, set at a level of 30 dv, is requisite to protect public welfare with regard to visual air quality, the Administrator next considers the degree of protection from visibility impairment afforded by the existing secondary PM standards. This determination requires considering such protection not in isolation but in the context of the full suite of secondary standards.

In this context, the Administrator has considered the degree of protection from visibility afforded by the existing secondary $PM_{2.5}$ standards. The Administrator has considered both whether the existing 24-hour $PM_{2.5}$ standard of 35 $\mu g/m^3$ is sufficient (*i.e.,* not under-protective) and whether it is not more stringent than necessary (*i.e.,* not over-protective).

As discussed in section IV.A.3 above, the Administrator considers the updated analyses of visibility impairment presented in the PA (U.S. EPA, 2020, section 5.2.1.2), which reflect a number of improvements since the last review. Specifically, the updated analyses examine multiple versions of the IMPROVE equation, including the version incorporating revisions since the time of the last review (section IV.A.3.a above). These updated analyses provide a further understanding of how variation in the inputs to the algorithms impact the estimates of light extinction (U.S. EPA, 2020, Appendix D). Additionally, for a subset of monitoring sites with available $PM_{10-2.5}$ data, the updated analyses better characterize the influence of coarse PM on light extinction than in the last review (U.S. EPA, 2020, section 5.2.1.2).

As discussed above in section IV.A.3.a, the results of the updated analyses are consistent with those from the last review. Regardless of which version of the IMPROVE equation is used, the analyses demonstrate that, based on 2015–2017 data, the 3-year visibility metric is at or below about 30 dv in all areas meeting the current 24-hour $PM_{2.5}$ standard, and below 25 dv in most of those areas. In locations with available $PM_{10-2.5}$ monitoring, which met both the current 24-hour secondary $PM_{2.5}$ and $PM_{10}$ standards, 3-year visibility index metrics were at or below 30 dv regardless of whether the coarse fraction was included as an input to the algorithm for estimating light extinction (U.S. EPA, 2020, section 5.2.1.2). While the inclusion of the coarse fraction had a relatively modest impact on the estimates of light extinction, as noted in responding to comments in section IV.B.3 above, the Administrator recognizes the continued importance of the $PM_{10}$ standard given the potential for larger impacts on light extinction in areas with higher coarse particle concentrations, which were not included in the PA's analyses due to a lack of available data (U.S. EPA, 2019, section 13.2.4.1; U.S. EPA, 2020, section 5.2.1.2). He notes that the air quality analyses showed that all areas meeting the existing 24-hour $PM_{2.5}$ standard, with its level of 35 $\mu g/m^3$, had visual air quality at least as good as 30 dv, based on the visibility index. Thus, the secondary 24-hour $PM_{2.5}$ standard would likely be controlling relative to a 24-hour visibility index set at a level of 30 dv. Additionally, areas would be unlikely to exceed the target level of protection for visibility of 30 dv without

also exceeding the existing secondary 24-hour standard. Thus, the Administrator judges that the 24-hour $PM_{2.5}$ standard provides sufficient protection in all areas against the effects of visibility impairment—*i.e.,* that the existing 24-hour $PM_{2.5}$ standard would provide at least the target level of protection for visual air quality of 30 dv which he judges appropriate.

With respect to the non-visibility welfare effects of PM in ambient air, the Administrator concludes that it is generally appropriate to retain the existing standards and that there is insufficient information to establish any distinct secondary PM standards to address climate and materials effects of PM. With regard to climate, he recognizes that there have been a number of improvements and refinements to climate models since the last review. However, as discussed in sections IV.A.3.b and IV.B.3 above, while the evidence continues to support a causal relationship between PM and climate effects (U.S. EPA, 2019, section 13.3.9), the Administrator notes that significant limitations continue to exist related to quantifying the contributions of direct and indirect effects of PM and PM components on climate forcing (U.S. EPA, 2020, sections 5.2.2.1.1 and 5.4). He also recognizes that that models continue to exhibit considerable variability in estimates of PM-related climate impacts at regional scales (*e.g.,* ~100 km) as compared to simulations at global scales. Therefore, the resulting uncertainty leads the Administrator to conclude that the available scientific information in this review remains insufficient to quantify climate impacts associated with particular concentrations of PM in ambient air (U.S. EPA, 2020, section 5.2.2.2.1) or to evaluate or consider a level of PM air quality in the U.S. to protect against climate effects and that there is insufficient information available at this time to base a national ambient standard on climate impacts.

With regard to materials effects, the Administrator notes that the evidence available in this review continues to support a causal relationship between materials effects and PM deposition (U.S. EPA, 2019, section 13.4). He recognizes that the deposition of fine and coarse particles to materials can lead to physical damage and/or impaired aesthetic qualities. Particles can contribute to materials damage by adding to the natural weathering processes and by promoting the corrosion of metals, the degradation of painted surfaces, the deterioration of building materials, and the weakening of material components. While some new information is available in this review, as discussed in sections IV.A.3.b and IV.B.3 above, this information is primarily conducted outside the U.S. in areas where PM concentrations in ambient air are typically higher than those observed in the U.S. (U.S. EPA, 2020, section 13.4). Additionally, the newly available information in this review does not support quantitative analyses of PM-related materials effects in this review (U.S. EPA, 2020, section 5.2.2.2.2). Given the limited amount of information available and its inherent uncertainties and limitations, the Administrator concludes that he is unable to relate soiling or damage to specific levels of PM in ambient air or to evaluate or consider a level of air quality to protect against such materials effects, and that there is insufficient information available in this review to support a distinct national ambient standard based on materials effects.

With regard to the secondary PM standards, the Administrator concludes that it is appropriate to retain the existing secondary PM standards, without revision. This conclusion is based on the considerations discussed above in sections IV.A.3.b and IV.B.2, including the latest scientific information and the advice of the CASAC, and the public comments received on the proposal, as discussed above in section IV.B.3. For visibility effects, this decision also reflects his consideration of the evidence for PM-related light extinction, together with his consideration of the updated analyses of the protection provided against visibility impairment by the current secondary $PM_{2.5}$ and $PM_{10}$ standards. For climate and materials effects, this conclusion reflects his judgment that, although it remains important to maintain secondary $PM_{2.5}$ and $PM_{10}$ standards to provide some degree of control over long- and short-term concentrations of both fine and coarse particles, there is insufficient information to establish distinct secondary PM standards to address non-visibility PM-related welfare effects. The Administrator concurs with the advice of the CASAC, which agrees ''that the available evidence does not call into question the protection afforded by the current secondary PM standards'' and recommends that the secondary standards ''should be retained'' (Cox, 2019a, p. 3 of letter). This is also consistent with the conclusions at the time of the proposal (IV.B.2) and with the majority of public comments received on the proposed decision (section IV.B.3).

In addition, the Administrator judges that, based on his review of the science and his judgment that air quality should be maintained to provide the target level of protection for visual air quality of 30 dv (as discussed in more detail above), the degree of public welfare protection provided by the current secondary standards is not greater than warranted. This judgment, together with the fact that no CASAC member expressed support for a less stringent standard, leads the Administrator to conclude that standards less stringent than the current secondary standards (*e.g.,* with higher levels) are also not supported.

Thus, based on his consideration of the evidence and analyses for welfare effects, his consideration of the CASAC's advice and public comments on the secondary standards, and in the absence of information that would support establishment of any different standards, the Administrator concludes that it is appropriate to retain the current 24-hour and annual $PM_{2.5}$ standards and the 24-hour $PM_{10}$ standard, without revision.

### *D. Decision on the Secondary PM Standards*

For the reasons discussed above and taking into account information and assessments presented in the ISA and PA, advice from the CASAC, and consideration of public comments, the Administrator concludes that the current secondary PM standards are requisite to protect public welfare from known or anticipated adverse effects and is retaining the standards, without revision.

## V. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *http://www2.epa.gov/laws-regulations/laws-and-executive-orders.*

### *A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review*

The Office of Management and Budget (OMB) determined that this action is a significant regulatory action and it was submitted to OMB for review. Changes made during Executive Order 12866 review have been documented in the docket. Because this action does not change the existing PM NAAQS, it does not impose costs or benefits relative to the baseline of continuing with the current NAAQS in effect. Thus, the EPA has not prepared a Regulatory Impact Analysis for this action.

*B. Executive Order 13771: Reducing Regulations and Controlling Regulatory Costs*

This action is not an Executive Order 13771 regulatory action. There are no costs or cost savings compared to the current baseline for this action because EPA is retaining the current standards.

*C. Paperwork Reduction Act (PRA)*

This action does not impose an information collection burden under the PRA. There are no information collection requirements directly associated with a decision to retain a NAAQS without any revision under section 109 of the CAA and this action retains the current PM NAAQS without any revisions.

*D. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action will not impose any requirements on small entities. Rather, this action retains, without revision, existing national standards for allowable concentrations of PM in ambient air as required by section 109 of the CAA. See also *American Trucking Associations* v. *EPA,* 175 F.3d 1027, 1044–45 (D.C. Cir. 1999) (NAAQS do not have significant impacts upon small entities because NAAQS themselves impose no regulations upon small entities), reviewed in part on other grounds, *Whitman* v. *American Trucking Associations,* 531 U.S. 457 (2001).

*E. Unfunded Mandates Reform Act (UMRA)*

This action does not contain any unfunded mandate as described in the UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. This action imposes no enforceable duty on any state, local, or tribal governments or the private sector.

*F. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have tribal implications, as specified in Executive Order 13175. It does not have a substantial direct effect on one or more Indian Tribes. This action does not change existing regulations; it retains the existing PM NAAQS, without revision. Executive Order 13175 does not apply to this action.

*H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

This action is not subject to Executive Order 13045 because it is not economically significant as defined in Executive Order 12866. The health effects evidence for this action, which includes evidence for effects in children, is summarized in section II.B above and is described in the ISA and PA, copies of which are in the public docket for this action.

*I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution or Use*

This action is not a ''significant energy action'' as defined by Executive Order 13211 (66 FR 28355, May 22, 2001) because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy and has not otherwise been designated as a significant energy action by the Administrator of the Office of Information and Regulatory Affairs (OIRA).

*J. National Technology Transfer and Advancement Act (NTTAA)*

This action does not involve technical standards.

*K. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

The EPA believes that this action does not have disproportionately high and adverse human health or environmental effects on minority, low-income populations and/or indigenous peoples, as specified in Executive Order 12898 (59 FR 7629, February 16, 1994). The action described in this document is to retain without revision the existing PM NAAQS based on the Administrator's conclusions that the existing primary standards protect public health, including the health of sensitive groups, with an adequate margin of safety, and the existing secondary standards protect public welfare from known or anticipated adverse effects. As discussed in section II, the EPA expressly considered the available information regarding health effects among at-risk populations in reaching the decision that the existing standard is requisite.

*L. Determination Under Section 307(d)*

Section 307(d)(1)(V) of the CAA provides that the provisions of section 307(d) apply to ''such other actions as the Administrator may determine.'' Pursuant to section 307(d)(1)(V), the Administrator determines that this action is subject to the provisions of section 307(d).

*M. Congressional Review Act (CRA)*

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. The Administrator of OIRA has not determined that this action is a ''major rule'' as defined by 5 U.S.C. 804(2).

**References**


Abt Associates, Inc. (2001). Assessing public opinions on visibility impairment due to air pollution: Summary report. Research Triangle Park, NC, U.S. Environmental Protection Agency.

Abt Associates, Inc. (2005). Particulate matter health risk assessment for selected urban areas: Draft report. Research Triangle Park, NC, U.S. Environmental Protection Agency: 164.

Adar, SD, Filigrana, PA, Clements, N and Peel, JL (2014). Ambient coarse particulate matter and human health: A systematic review and meta-analysis. Current Environmental Health Reports 1: 258–274.

BBC Research & Consulting (2003). Phoenix area visibility survey. Denver, CO.

Besson, P; Munoz, C; Ramirez-Sagner, G; Salgado, M; Escobar, R; Platzer, W. (2017). Long-term soiling analysis for three photovoltaic technologies in Santiago Region. IEEE J Photovolt 7: 1755–1760.

Bräuner, EV; Møller, P; Barregard, L; Dragsted, LO; Glasius, M; Wåhlin, P; Vinzents, P; Raaschou-Nielsen, O; Loft, S. (2008). Exposure to ambient concentrations of particulate air pollution does not influence vascular function or inflammatory pathways in young healthy individuals. Part Fibre Toxicol 5: 13.

Burns, J, Boogaard, H, Polus, S, Pfadenhauer, LM, Rohwer, AC, van Erp, AM, Turley, R and Rehfuess, E (2019). Interventions to reduce ambient particulate matter air pollution and their effect on health. Cochrane Database of Systematic Reviews(5).

Cangerana Pereira, FA, Lemos, M, Mauad, T, de Assuncao, JV and Nascimento Saldiva, PH (2011). Urban, traffic-related particles and lung tumors in urethane treated mice. Clinics 66(6): 1051–1054.

Chan, EAW, Gantt, B and McDow, S (2018). The reduction of summer sulfate and switch from summertime to wintertime $PM_{2.5}$ concentration maxima in the United States. Atmos Environ 175: 25–32.

Correia, AW, Pope, CA, III, Dockery, DW, Wang, Y, un, Ezzati, M and Dominici, F

(2013). Effect of air pollution control on life expectancy in the United States: an analysis of 545 U.S. counties for the period from 2000 to 2007. Epidemiology 24(1): 23–31.

Cox, LA. (2019a). Letter from Louis Anthony Cox, Jr., Chair, Clean Air Scientific Advisory Committee, to Administrator Andrew R. Wheeler. Re: CASAC Review of the EPA's *Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft—September 2019).* December 16, 2019. EPA–CASAC–20–001. U.S. EPA HQ, Washington DC. Office of the Administrator, Science Advisory Board. Available at: *https://yosemite.epa.gov/sab/sabproduct.nsf/264cb1227d55e02c85257402007446a4/E2F6C71737201612852584D20069DFB1/$File/EPA-CASAC-20-001.pdf.*

Cox, LA. (2019b). Letter from Louis Anthony Cox, Jr., Chair, Clean Air Scientific Advisory Committee, to Administrator Andrew R. Wheeler. Re: CASAC Review of the EPA's *Integrated Science Assessment for Particulate Matter (External Review Draft—October 2018).* April 11, 2019. EPA–CASAC–19–002. U.S. EPA HQ, Washington DC. Office of the Administrator, Science Advisory Board. Available at: *https://yosemite.epa.gov/sab/sabproduct.nsf/LookupWebReportsLastMonthCASAC/932D1DF8C2A9043F852581000048170D?OpenDocument&TableRow=2.3#2.*

Di, Q, Kloog, I, Koutrakis, P, Lyapustin, A, Wang, Y and Schwartz, J (2016). Assessing $PM_{2.5}$ exposures with high spatiotemporal resolution across the Continental United States. Environ Sci Technol 50(9): 4712–4721.

Di, Q, Dai, L, Wang, Y, Zanobetti, A, Choirat, C, Schwartz, JD and Dominici, F (2017a). Association of short-term exposure to air pollution with mortality in older adults. J Am Med Assoc 318(24): 2446–2456.

Di, Q, Wang, Y, Zanobetti, A, Wang, Y, Koutrakis, P, Choirat, C, Dominici, F and Schwartz, JD (2017b). Air pollution and mortality in the Medicare population. New Engl J Med 376(26): 2513–2522.

Ely, DW, Leary, JT, Stewart, TR and Ross, DM (1991). *The establishment of the Denver Visibility Standard.* Denver, Colorado, Colorado Department of Health.

Fiore, AM, Naik, V and Leibensperger, EM (2015). Air quality and climate connections. J Air Waste Manage Assoc 65(6): 645–685.

Grøntoft, T, Verney-Carron, A, Tidbla, J. (2019). Cleaning costs for European sheltered white painted steel and modern glass surfaces due to air pollution since the year 2000. Atmosphere, 10 (4): 167.

Hand, JL, Schichtel, BA, Pitchford, M, Malm, WC and Frank, NH (2012). Seasonal composition of remote and urban fine particulate matter in the United States. Journal of Geophysical Research: Atmospheres 117(D5).

Hand, JL, Schichtel, BA, Malm, WC and Frank, NH (2013). Spatial and Temporal Trends in $PM_{2.5}$ Organic and Elemental Carbon across the United States. Advances in Meteorology.

Hemmingsen, JG; Jantzen, K; Møller, P; Loft, S. (2015a). No oxidative stress or DNA damage in peripheral blood mononuclear cells after exposure to particles from urban street air in overweight elderly. Mutagenesis 30: 635–642.

Hemmingsen, JG; Rissler, J; Lykkesfeldt, J; Sallsten, G; Kristiansen, J; Møller, P; Loft, S. (2015b). Controlled exposure to particulate matter from urban street air is associated with decreased vasodilation and heart rate variability in overweight and older adults. Part Fibre Toxicol 12: 6.

Henneman, LR, Liu, C, Mulholland, JA and Russell, AG (2017). Evaluating the effectiveness of air quality regulations: A review of accountability studies and frameworks. Journal of the Air Waste Management Association 67(2): 144–172.

Huang, Ra, Zhai, X, Ivey, CE, Friberg, MD, Hu, X, Liu, Y, Di, Q, Schwartz, J, Mulholland, JA and Russell, AG (2018). Air pollutant exposure field modeling using air quality model data fusion methods and comparison with satellite AOD-derived fields: application over North Carolina, USA. Air Quality, Atmosphere and Health 11(1): 11–22.

IPCC (2013). Climate change 2013: The physical science basis. Contribution of working group I to the fifth assessment report of the Intergovernmental Panel on Climate Change. T. F. Stocker, D. Qin, G. K. Plattner et al. Cambridge, UK, Cambridge University Press.

Jerrett, M, Turner, MC, Beckerman, BS, Pope, CA, van Donkelaar, A, Martin, RV, Serre, M, Crouse, D, Gapstur, SM, Krewski, D, Diver, WR, Coogan, PF, Thurston, GD and Burnett, RT (2017). Comparing the health effects of ambient particulate matter estimated using ground-based versus remote sensing exposure estimates. Environ Health Perspect 125(4): 552–559.

Jin, X, Fiore, AM, Civerolo, K, Bi, J, Liu, Y, van Donkelaar, A, Martin, RV, Al-Hamdan, M, Zhang, Y, Insaf, TZ, Kioumourtzoglou, M–A, He, MZ and Kinney, PL (2019). Comparison of multiple $PM_{2.5}$ exposure products for estimating health benefits of emission controls over New York State, USA. Environmental Research Letters 14(8): 084023.

Kelly, JT, Schmidt, M and Frank, N. (2012a). Memorandum to PM NAAQS Review Docket (EPA–HQ–OAR–2007–0492). Updated comparison of 24-hour $PM_{2.5}$ design values and visibility index design values. December 14, 2012. Docket ID No. EPA–HQ–OAR–2007–0492. Research Triangle Park, NC. Office of Air Quality Planning and Standards. Available at: *https://www3.epa.gov/ttn/naaqs/standards/pm/data/20121214kelly.pdf.*

Kelly, J, Schmidt, M, Frank, N, Timin, B, Solomon, D and Venkatesh, R. (2012b). Memorandum to PM NAAQS Review Docket (EPA–HQ–OAR–2007–0492). Technical Analyses to Support Surrogacy Policy for Proposed Secondary $PM_{2.5}$ NAAQS under NSR/PSD Programs. June 14, 2012. . Docket ID No. EPA–HQ–OAR–2007–0492. Research Triangle Park, NC. Office of Air Quality Planning and Standards. Available at: *https://www3.epa.gov/ttn/naaqs/standards/pm/data/20120614Kelly.pdf.*

Kelly, JT, Koplitz, SN, Baker, KR, Holder, AL, Pye, HOT, Murphy, BN, Bash, JO, Henderson, BH, Possiel, NC, Simon, H, Eyth, AM, Jang, CJ, Phillips, S and Timin, B (2019). Assessing $PM_{2.5}$ model performance for the conterminous U.S. with comparison to model performance statistics from 2007–2015. Atmos Environ 214: 116872.

Kioumourtzoglou, MA, Schwartz, J, James, P, Dominici, F and Zanobetti, A (2016). $PM_{2.5}$ and mortality in 207 us cities: Modification by temperature and city characteristics. Epidemiology 27(2): 221–227.

Kloog, I, Ridgway, B, Koutrakis, P, Coull, BA and Schwartz, JD (2013). Long- and short-term exposure to $PM_{2.5}$ and mortality: Using novel exposure models. Epidemiology 24(4): 555–561.

Krewski, D, Jerrett, M, Burnett, RT, Ma, R, Hughes, E, Shi, Y, Turner, MC, Pope, CA, III, Thurston, G, Calle, EE, Thun, MJ, Beckerman, B, Deluca, P, Finkelstein, N, Ito, K, Moore, DK, Newbold, KB, Ramsay, T, Ross, Z, Shin, H and Tempalski, B (2009). Extended follow-up and spatial analysis of the American Cancer Society study linking particulate air pollution and mortality. Boston, MA, Health Effects Institute. 140: 5–114; discussion 115–136.

Laden, F, Schwartz, J, Speizer, FE and Dockery, DW (2006). Reduction in fine particulate air pollution and mortality: extended follow-up of the Harvard Six Cities study. Am J Respir Crit Care Med 173(6): 667–672.

Lee, M, Koutrakis, P, Coull, B, Kloog, I and Schwartz, J (2015). Acute effect of fine particulate matter on mortality in three Southeastern states from 2007–2011. Journal of Exposure Science and Environmental Epidemiology 26(2): 173–179.

Lepeule, J, Laden, F, Dockery, D and Schwartz, J (2012). Chronic exposure to fine particles and mortality: An extended follow-up of the Harvard Six Cities study from 1974 to 2009. Environ Health Perspect 120(7): 965–970.

Lippmann, M, Chen, LC, Gordon, T, Ito, K and Thurston, GD (2013). National Particle Component Toxicity (NPACT) Initiative: Integrated epidemiologic and toxicologic studies of the health effects of particulate matter components: Investigators' Report. Boston, MA, Health Effects Institute: 5–13.

Lowenthal, DH and Kumar, N (2004). Variation of mass scattering efficiencies in IMPROVE. Journal of the Air and Waste Management Association (1990–1992) 54(8): 926–934.

Lowenthal, DH and Kumar, N (2016). Evaluation of the IMPROVE Equation for estimating aerosol light extinction. J Air Waste Manage Assoc 66(7): 726–737.

Malm, WC, Sisler, JF, Huffman, D, Eldred, RA and Cahill, TA (1994). Spatial and

seasonal trends in particle concentration and optical extinction in the United States. J Geophys Res 99(D1): 1347–1370.
Malm, WC and Hand, JL (2007). An examination of the physical and optical properties of aerosols collected in the IMPROVE program. Atmos Environ 41(16): 3407–3427.
Malm, WC, Molenar, JV, Pitchford, ML, Deck, L. (2011). ''Which Visibility Indicators Best Represent a Population's Preference for a Level of Visual Air Quality?'' Paper 2011–A–596–AWMA, Air & Waste Management Ass'n. 104th Annual Conference, Orlando, FL (June 21–24, 2011). Available at: *http://www.proceedings.com/13671.html.*
Malm, William C. (2013). ''What Level of Perceived Visual Air Quality Is Acceptable?'' Project 13–C–01–01. Available at: *https://www.firescience.gov/projects/13-C-01-01/project/13-C-01-01_Malm_Acceptable_Levels_Report_3.pdf.*
Malm, William C. ''Visibility: The Seeing of Near and Distant Landscape Features (2016). Available at: *https://www.elsevier.com/books/visibility/malm/978-0-12-804450-6.*
Malm, WC, Schichtel, B, Molenar, J, Prenni, A, Peters, M. (2019). ''Which Visibility Indicators Best Represent a Population's Preference for a Level of Visual Air Quality?'' Journal of the Air & Waste Management Association 169(2): 145–61.
Mauad, T, Rivero, DH, de Oliveira, RC, Lichtenfels, AJ, Guimaraes, ET, de Andre, PA, Kasahara, DI, Bueno, HM and Saldiva, PH (2008). Chronic exposure to ambient levels of urban particles affects mouse lung development. Am J Respir Crit Care Med 178(7): 721–728.
McGuinn, LA, Ward-Caviness, C, Neas, LM, Schneider, A, Di, Q, Chudnovsky, A, Schwartz, J, Koutrakis, P, Russell, AG, Garcia, V, Kraus, WE, Hauser, ER, Cascio, W, Diaz-Sanchez, D and Devlin, RB (2017). Fine particulate matter and cardiovascular disease: Comparison of assessment methods for long-term exposure. Environ Res 159: 16–23.
Mie, G (1908). Beitrage zur Optik truber Medien, speziell kolloidaler Metallosungen [Optics of cloudy media, especially colloidal metal solutions]. Annalen der Physik 25(3): 377–445.
Miller, KA, Siscovick, DS, Sheppard, L, Shepherd, K, Sullivan, JH, Anderson, GL and Kaufman, JD (2007). Long-term exposure to air pollution and incidence of cardiovascular events in women. New Engl J Med 356(5): 447–458.
Molenar, JV, Malm, WC. (2012). ''Effect of Clouds on the Perception of Regional and Urban Haze.'' Paper presented at the Specialty Conference on Aerosol and Atmospheric Optics: Visibility and Air Pollution, Whitefish, MT. Available at: *http://www.proceedings.com/17145.html.*
Myhre, G, Shindell, D, Bréon, FM, Collins, W, Fuglestvedt, J, Huang, J, Koch, D, Lamarque, JF, Lee, D, Mendoza, B, Nakajima, T, Robock, A, Stephens, G, Takemura, T and Zhang, H, Eds. (2013). Anthropogenic and natural radiative forcing. Cambridge, UK, Cambridge University Press.
Peng, RD; Chang, HH; Bell, ML; McDermott, A; Zeger, SL; Samet, JM; Dominici, F. (2008). Coarse particulate matter air pollution and hospital admissions for cardiovascular and respiratory diseases among Medicare patients. JAMA 299: 2172–2179.
Pitchford, M, Maim, W, Schichtel, B, Kumar, N, Lowenthal, D and Hand, J (2007). Revised algorithm for estimating light extinction from IMPROVE particle speciation data. J Air Waste Manage Assoc 57(11): 1326–1336.
Pope, CA, III, I, Burnett, RT, Thurston, GD, Thun, MJ, Calle, EE, Krewski, D and Godleski, JJ (2004). Cardiovascular mortality and long-term exposure to particulate air pollution: Epidemiological evidence of general pathophysiological pathways of disease. Circulation 109(1): 71–77.
Pope, CA, III, Ezzati, M and Dockery, DW (2009). Fine-particulate air pollution and life expectancy in the United States. New Engl J Med 360(4): 376–386.
Pruitt, E. (2018). Memorandum from E. Scott Pruitt, Administrator, U.S. EPA to Assistant Administrators. Back-to-Basics Process for Reviewing National Ambient Air Quality Standards. May 9, 2018. U.S. EPA HQ, Washington DC. Office of the Administrator. Available at: *https://www.epa.gov/criteria-air-pollutants/back-basics-process-reviewing-national-ambient-air-quality-standards.*
Pryor, SC (1996). Assessing public perception of visibility for standard setting exercises. Atmos Environ 30(15): 2705–2716.
Puett, RC, Hart, JE, Yanosky, JD, Spiegelman, D, Wang, M, Fisher, JA, Hong, B and Laden, F (2014). Particulate matter air pollution exposure, distance to road, and incident lung cancer in the Nurses' Health Study cohort. Environ Health Perspect 122(9): 926–932.
Raaschou-Nielsen, O, Andersen, ZJ, Beelen, R, Samoli, E, Stafoggia, M, Weinmayr, G, Hoffmann, B, Fischer, P, Nieuwenhuijsen, MJ, Brunekreef, B, Xun, WW, Katsouyanni, K, Dimakopoulou, K, Sommar, J, Forsberg, B, Modig, L, Oudin, A, Oftedal, B, Schwarze, PE, Nafstad, P, De Faire, U, Pedersen, NL, Östenson, CG, Fratiglioni, L, Penell, J, Korek, M, Pershagen, G, Eriksen, KT, Sørensen, M, Tjønneland, A, Ellermann, T, Eeftens, M, Peeters, PH, Meliefste, K, Wang, M, Bueno-De-mesquita, B, Key, TJ, De Hoogh, K, Concin, H, Nagel, G, Vilier, A, Grioni, S, Krogh, V, Tsai, MY, Ricceri, F, Sacerdote, C, Galassi, C, Migliore, E, Ranzi, A, Cesaroni, G, Badaloni, C, Forastiere, F, Tamayo, I, Amiano, P, Dorronsoro, M, Trichopoulou, A, Bamia, C, Vineis, P and Hoek, G (2013). Air pollution and lung cancer incidence in 17 European cohorts: Prospective analyses from the European Study of Cohorts for Air Pollution Effects (ESCAPE). The Lancet Oncology 14(9): 813–822.
Ryan, PA, Lowenthal, D and Kumar, N (2005). Improved light extinction reconstruction in interagency monitoring of protected visual environments. J Air Waste Manage Assoc 55(11): 1751–1759.
Samet, J. (2009). Letter from Jonathan Samet, Chair, Clean Air Scientific Advisory Committee, to Administrator Lisa Jackson. Re: CASAC Particulate Matter Review of Integrated Science Assessment for Particulate Matter (Second External Review Draft, July 2009). November 24, 2009. EPA–CASAC–10–001. U.S. EPA HQ, Washington DC. Office of the Administrator, Science Advisory Board. Available at: *http://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P1005PH9.txt.*
Samet, J. (2010a). Letter from Jonathan Samet, Chair, Clean Air Scientific Advisory Committee, to Administrator Lisa Jackson. Re: CASAC Review of Policy Assessment for the Review of the PM NAAQS—First External Review Draft (March 2010). May 17, 2010. EPA–CASAC–10–011. U.S. EPA HQ, Washington DC. Office of the Administrator, Science Advisory Board. Available at: *https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=9101XOXQ.txt.*
Samet, J. (2010b). Letter from Jonathan Samet, Chair, Clean Air Scientific Advisory Committee, to Administrator Lisa Jackson. Re: CASAC Review of Quantitative Health Risk Assessment for Particulate Matter—Second External Review Draft (February 2010). April 15, 2010. EPA–CASAC–10–008. U.S. EPA HQ, Washington DC. Office of the Administrator, Science Advisory Board. Available at: *https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P1007CVB.txt.*
Samet, J. (2010c). Letter from Jonathan Samet, Chair, Clean Air Scientific Advisory Committee, to Administrator Lisa Jackson. Re: CASAC Review of Policy Assessment for the Review of the PM NAAQS—Second External Review Draft (June 2010). September 10, 2010. EPA–CASAC–10–015. U.S. EPA HQ, Washington DC. Office of the Administrator, Science Advisory Board. Available at: *https://yosemite.epa.gov/sab/sabproduct.nsf/CCF9F4C0500C500F8525779D0073C593/$File/EPA-CASAC-10-015-unsigned.pdf.*
Shi, L, Zanobetti, A, Kloog, I, Coull, BA, Koutrakis, P, Melly, SJ and Schwartz, JD (2016). Low-concentration $PM_{2.5}$ and mortality: Estimating acute and chronic effects in a population-based study. Environ Health Perspect 124(1): 46–52.
Smith, AE and Howell, S (2009). An assessment of the robustness of visual air quality preference study results. Washington, DC, CRA International.
Turner, MC; Krewski, D; Pope, CA, III; Chen, Y; Gapstur, SM; Thun, MJ. (2011). Long-term ambient fine particulate matter air pollution and lung cancer in a large cohort of never smokers. Am J Respir Crit Care Med 184: 1374–1381.
U.S. DHEW. (1969). Air Quality Criteria for Sulfure Oxides. National Center for Air Pollution Control, Bureau of Disease Prevention and Environmental Control, Public Health Service Publication No. 1619, March 1967. Available at: *https://www3.epa.gov/ttn/naaqs/standards/so2/_so2_pr.html.*

U.S. EPA. (2004). Air Quality Criteria for Particulate Matter. (Vol I and II). Research Triangle Park, NC. Office of Research and Development. U.S. EPA. EPA–600/P–99–002aF and EPA–600/P–99–002bF. October 2004. Available at: *https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P100LFIQ.txt.*

U.S. EPA. (2005). Review of the National Ambient Air Quality Standards for Particulate Matter: Policy Assessment of Scientific and Technical Information, OAQPS Staff Paper. Research Triangle Park, NC. Office of Air Quality Planning and Standards. U.S. EPA. EPA–452/R–05–005a. December 2005. Available at: *https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P1009MZM.txt.*

U.S. EPA. (2008). Integrated Review Plan for the National Ambient Air Quality Standards for Particulate Matter Research Triangle Park, NC. Office of Research and Development, National Center for Environmental Assessment; Office of Air Quality Planning and Standards, Health and Environmental Impacts Division. U.S. EPA. EPA 452/R–08–004. March 2008. Available at: *https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P1001FB9.txt.*

U.S. EPA. (2009a). Particulate Matter National Ambient Air Quality Standards: Scope and Methods Plan for Health Risk and Exposure Assessment Research Triangle Park, NC. Office of Air Quality Planning and Standards, Health and Environmental Impacts Division. U.S. EPA. EPA–452/P–09–002. February 2009. Available at: *https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P100FLWP.txt.*

U.S. EPA. (2009b). Particulate Matter National Ambient Air Quality Standards: Scope and Methods Plan for Urban Visibility Impact Assessment Research Triangle Park, NC. Office of Air Quality Planning and Standards, Health and Environmental Impacts Division. U.S. EPA. EPA–452/P–09–001. February 2009. Available at: *https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P100FLUX.txt.*

U.S. EPA. (2009c). Integrated Science Assessment for Particulate Matter (Final Report). Research Triangle Park, NC. Office of Research and Development, National Center for Environmental Assessment. U.S. EPA. EPA–600/R–08–139F. December 2009. Available at: *https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=216546.*

U.S. EPA. (2010a). Quantitative Health Risk Assessment for Particulate Matter (Final Report). Research Triangle Park, NC. Office of Air Quality Planning and Standards, Health and Environmental Impacts Division. U.S. EPA. EPA–452/R–10–005. June 2010. Available at: *https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P1007RFC.txt.*

U.S. EPA. (2010b). Particulate Matter Urban-Focused Visibility Assessment (Final Document). Research Triangle Park, NC. Office of Air Quality Planning and Standards, Health and Environmental Impacts Division. U.S. EPA. EPA–452/R–10–004 July 2010. Available at: *https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P100FO5D.txt.*

U.S. EPA. (2011). Policy Assessment for the Review of the Particulate Matter National Ambient Air Quality Standards Research Triangle Park, NC. Office of Air Quality Planning and Standards, Health and Environmental Impacts Division. U.S. EPA. EPA–452/R–11–003 April 2011. Available at: *https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P100AUMY.txt.*

U.S. EPA. (2012). Responses to Significant Comments on the 2012 Proposed Rule on the National Ambient Air Quality Standards for Particulate Matter (June 29, 2012; 77 FR 38890). Research Triangle Park, NC. U.S. EPA. Docket ID No. EPA–HQ–OAR–2007–0492. Available at: *https://www3.epa.gov/ttn/naaqs/standards/pm/data/20121214rtc.pdf.*

U.S. EPA. (2015). Preamble to the integrated science assessments. Research Triangle Park, NC. U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment, RTP Division. U.S. EPA. EPA/600/R–15/067. November 2015. Available at: *https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=310244.*

U.S. EPA. (2016). Integrated review plan for the national ambient air quality standards for particulate matter. Research Triangle Park, NC. Office of Air Quality Planning and Standards. U.S. EPA. EPA–452/R–16–005. December 2016. Available at: *https://www3.epa.gov/ttn/naaqs/standards/pm/data/201612-final-integrated-review-plan.pdf.*

U.S. EPA. (2017). Integrated review plan for the secondary national ambient air quality standards for ecological effects of oxides of nitrogen, oxides of sulfur and particulate matter. Research Triangle Park, NC. Office of Air Quality Planning and Standards. U.S. EPA. EPA–452/R–17–002. Available at: *https://www.epa.gov/naaqs/nitrogen-dioxide-no2-and-sulfur-dioxide-so2-secondary-standards-planning-documents-current.*

U.S. EPA. (2018). Review of the Secondary Standards for Ecological Effects of Oxides of Nitrogen, Oxides of Sulfur, and Particulate Matter: Risk and Exposure Assessment Planning Document. Research Triangle Park, NC. Office of Air Quality Planning and Standards. U.S. EPA. EPA–452/D–18–001. Available at: *https://www.epa.gov/naaqs/nitrogen-dioxide-no2-and-sulfur-dioxide-so2-secondary-standards-planning-documents-current.*

U.S. EPA. (2019). Integrated Science Assessment (ISA) for Particulate Matter (Final Report). Washington, DC. U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment. U.S. EPA. EPA/600/R–19/188. December 2019. Available at: *https://www.epa.gov/naaqs/particulate-matter-pm-standards-integrated-science-assessments-current-review.*

U.S. EPA. (2020). Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter. Research Triangle Park, NC. U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, Heath and Environmental Impacts Division. U.S. EPA. EPA–452/R–20–002. January 2020. Available at: *https://www.epa.gov/naaqs/particulate-matter-pm-standards-policy-assessments-current-review-0.*

U.S. National Institutes of Health. (2013). NHLBI fact book, fiscal year 2012: Disease statistics. Bethesda, MD. U.S. National Institutes of Health, National Heart, Lung, and Blood Institute. U.S. National Institutes of Health, NH, Lung, and Blood Institute,. February 2013. Available at: *https://www.nhlbi.nih.gov/files/docs/factbook/FactBook2012.pdf.*

Van de Hulst, H (1981). *Light scattering by small particles.* New York, Dover Publications, Inc.

Van Donkelaar, A, Martin, RV, Li, C and Burnett, RT (2019). Regional estimates of chemical composition of fine particulate matter using a combined geoscience-statistical method with information from satellites, models, and monitors. Environ Sci Technol 53(5).

Wheeler, AR. (2019). Letter from Administrator Andrew R. Wheeler to Louis Anthony Cox, Jr.. Re: CASAC Review of the *EPA's Integrated Science Assessment for Particulate Matter (External Review Draft—October 2018).* July 25, 2019. Available at: *https://yosemite.epa.gov/sab/sabproduct.nsf/264cb1227d55e02c85257402007446a4/6CBCBBC3025E13B4852583D90047B352/$File/EPA-CASAC-19-002_Response.pdf.*

Yorifuji, T, Kashima, S and Doi, H (2016). Fine-particulate air pollution from diesel emission control and mortality rates in Tokyo: A quasi-experimental study. Epidemiology 27(6): 769–778.

Zeger, S; Dominici, F; McDermott, A; Samet, J. (2008). Mortality in the Medicare population and chronic exposure to fine particulate air pollution in urban centers (2000–2005). Environ Health Perspect 116: 1614–1619.

## List of Subjects in 40 CFR Part 50

Environmental protection, Air pollution control, Carbon monoxide, Lead, Nitrogen dioxide, Ozone, Particulate matter, Sulfur oxides.

Dated: December 4, 2020.

**Andrew Wheeler,**

*Administrator.*

[FR Doc. 2020–27125 Filed 12–17–20; 8:45 am]

**BILLING CODE 6560–50–P**

*XAVIER BECERRA*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: (916) 445-9555
Telephone: (916) 210-7815
E-Mail: Scott.Lichtig@doj.ca.gov

February 16, 2021

*Via Electronic Delivery[1] and First Class Mail*

Jane Nishida, Acting Administrator
Office of the Administrator
U.S. Environmental Protection Agency
Room 3000, EPA WJC
1200 Pennsylvania Ave., NW
Washington, DC 20460
nishida.jane@epa.gov

Lars Perlmutt
Sector Policies and Programs Division
(Mail Code C539-04)
Office of Air Quality Planning & Standards
U.S. Environmental Protection Agency
Research Triangle Park, NC 27711
perlmutt.lars@epa.gov

RE: Petition for Reconsideration of "Review of the National Ambient Air Quality Standards for Particulate Matter," 85 Fed. Reg. 82,684 (Dec. 18, 2020).

Dear Acting Administrator Nishida and Dr. Perlmutt:

Please find attached a Petition for Reconsideration submitted on behalf of the States of California (by and through Attorney General Xavier Becerra and the California Air Resources Board), Connecticut, Delaware, Illinois, Maryland, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin; the Commonwealths of Massachusetts, Pennsylvania, and Virginia; and the City of New York, with respect to the above referenced action, Docket ID EPA–HQ–OAR–2015–0072.

[1] This Petition is submitted electronically in light of the COVID-19 pandemic and EPA's guidance with respect to hard copy submissions while Agency staff is teleworking. *Notice Regarding "Hard Copy" Submissions to EPA During the COVID-19 National Emergency* (May 12, 2020), https://www.epa.gov/aboutepa/notice-regarding-hard-copy-submissions-epa-during-covid-19-national-emergency.

Sincerely,

*/s/ Scott J. Lichtig*
SCOTT J. LICHTIG
Deputy Attorney General

For XAVIER BECERRA
Attorney General for the State of California

(Attachments)

cc:
Associate General Counsel for the Air and Radiation Law Office
Office of General Counsel (Mail Code 2344A)
U.S. Environmental Protection Agency
1200 Pennsylvania Ave. NW
Washington, DC 20460
A-and-R-Docket@epamail.epa.gov

**BEFORE THE HONORABLE JANE NISHIDA, ACTING ADMINISTRATOR**
**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

IN RE PETITION FOR RECONSIDERATION OF REVIEW OF THE NATIONAL AMBIENT AIR QUALITY STANDARDS FOR PARTICULATE MATTER, 85 FED. REG. 82,684 (DECEMBER 18, 2020).

Submitted by:

The States of California (by and through Attorney General Xavier Becerra and the California Air Resources Board), Connecticut, Delaware, Illinois, Maryland, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin; the Commonwealths of Massachusetts, Pennsylvania, and Virginia; and the City of New York.

TABLE OF CONTENTS

INTRODUCTION ........ 3

LEGAL STANDARD ........ 6

ARGUMENT ........ 7

I. EPA Should Reconsider the Final Rule in Light of its Failure to Provide the Requisite Protection of Public Health and Welfare. ........ 7

II. EPA Must Reconsider the Final Rule in Light of New Studies Demonstrating Significant Long-Term Health Risks from Particulate Matter Exposure. ........ 10

A. Petitioners Were Unable to Raise These Objections During the Public Comment Period Because Key Studies Had Not Yet Been Published. ........ 11

1. A Key New Study Refutes EPA's Claim That Health Impacts from Particulate Matter Exposure Below the Current Standard May Be the Result of Unmeasured Confounders. ........ 11

2. Another New Study Highlights the Deadly Impacts of $PM_{2.5}$ Exposure and the Significant Health Benefits to Strengthening the NAAQS. ........ 13

3. Newly Available Studies Link Particulate Matter Exposure to Significant Health Impacts from Respiratory Viruses Like COVID-19. ........ 13

4. New Studies Show Increases in Serious Neurodegenerative Diseases from Exposure to Particulate Matter. ........ 16

B. The Identification of Serious New Threats to Health from Particulate Matter Exposure Are of Central Relevance to EPA's Unlawful Decision. ........ 17

RELIEF REQUESTED ........ 19

## INTRODUCTION

Pursuant to Clean Air Act Section 307(d), and for the reasons set forth below, the States of California (by and through Attorney General Xavier Becerra and the California Air Resources Board), Connecticut, Delaware, Illinois, Maryland, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin; the Commonwealths of Massachusetts, Pennsylvania, and Virginia; and the City of New York (collectively, State Petitioners) hereby petition the U.S. Environmental Protection Agency (EPA) for reconsideration of its recent final action determining that strengthening the National Ambient Air Quality Standard (NAAQS) for particulate matter is not necessary to protect the public health. That action appears in the Federal Register, titled "Review of the National Ambient Air Quality Standards for Particulate Matter," published at 85 Fed. Reg. 82,684 (Dec. 18, 2020). Reconsideration is warranted here because State Petitioners' objections are based on information that arose after the end of the comment period concerning issues of central relevance to EPA's final determination. 42 U.S.C. § 7607(d)(7)(B). Since the close of the public comments, several critical new studies have both demonstrated that the current particulate matter standard is inadequate to protect the public health and have linked previously unidentified harms with increased exposure to particulate matter, health impacts that also disproportionately impact environmental justice communities throughout the nation. State Petitioners urge EPA to expeditiously reconsider the final rule and adopt new particulate matter standards that adequately account for the new information documented by these new studies.

EPA's decision not to strengthen the eight-year old particulate matter NAAQS fails to protect the public health and welfare from the effects of exposure to particulate matter as required under the Clean Air Act and is arbitrary and capricious, an abuse of discretion, and

otherwise in violation of the Act.[1] EPA's decision ignores substantial evidence demonstrating the serious harm to human health from particulate matter exposure at or below the existing NAAQS, repeatedly dismissing studies documenting such significant impacts due to purported "uncertainties." 85 Fed. Reg. at 82,685. In light of these new studies further documenting this harm, EPA should reconsider its decision to retain the standard and act swiftly to correct these fundamental—and ultimately deadly—errors. The public health and welfare cannot wait another five years.

The Clean Air Act requires that EPA reconsider its decision in light of new research released after the close of the public comment period—adding to the mountain of evidence demonstrating the serious harms related to particulate matter exposure and further underscoring the fallacy of any purported uncertainty asserted by EPA.[2] 42 U.S.C. § 7607(d)(7)(B). Specifically, a new study explicitly refutes EPA's assertion that insufficient evidence exists to prove health harm to human health at levels below the existing particulate matter NAAQS, demonstrating clear benefits from further strengthening the particulate matter standards.[3] Another study just published found that fine particulate matter less than 2.5 microns ($PM_{2.5}$) from fossil fuel combustion was responsible for *double* the amount of premature death worldwide than previously believed, and similarly showed significant health benefits from

---

[1] State Petitioners accordingly filed a petition for review of EPA's final rule on January 13, 2021.
[2] State Petitioners submitted several of these studies to EPA in a Supplemental Comment Letter on November 20, 2020, but EPA's final decision does not adequately address the new information provided.
[3] Joel Schwartz, et al., *A National Difference in Differences Analysis of the Effect of $PM_{2.5}$ on Annual Death Rates* (Journal Pre-Proof), at 20, ENV'T. RSCH., Vol. 194 (Mar. 2021), *available at*: https://www.sciencedirect.com/science/article/abs/pii/S0013935120315462?via%t3Dihub.

reductions in particulate matter even at low levels of exposure.[4] Further, multiple studies have found links between increased mortality from COVID-19 and exposure to $PM_{2.5}$, identifying additional significant potential injury to public health unaddressed in EPA's determination.[5] New research also demonstrates particulate matter exposure can lead to additional negative health impacts from serious neurodegenerative disorders such as Alzheimer's disease and other dementia in older Americans. This new information demonstrates the clear need for EPA to issue stronger standards as quickly as possible.[6]

These new studies further establish that EPA's decision not to lower the particulate matter NAAQS represents a massive failure to address one of the most critical environmental justice issues facing the nation. As noted in State Petitioners' original comments, a study recently estimated that the Black population's $PM_{2.5}$ burden was 54 percent higher than that of the general population, and the Latinx population's $PM_{2.5}$ burden was 20 percent higher.[7] The study also found that those living in poverty experience a $PM_{2.5}$ burden 35 percent greater than the general

[4] Karn Vohra, et al., *Global Mortality from Outdoor Fine Particle Pollution Generated by Fossil Fuel Combustion: Results from GEOS-Chem* (Journal Pre-Proof), ENV'T. RSCH. (Feb. 9, 2021), *available at*: http://acmg.seas.harvard.edu/publications/2021/vohra_2021_ff_mortality.pdf, and *at*: http://acmg.seas.harvard.edu/publications/2021/vohra_2021_ff_sup.pdf (for Supplemental Materials).

[5] Andrea. Pozzer, et al., *Regional and Global Contributions of Air Pollution to Risk of Death from COVID-19*, 116 CARDIOVASCULAR RSCH. 14, 2247 (Sept. 30, 2020), *available at*: https://academic.oup.com/cardiovascres/advance-article/doi/10.1093/cvr/cvaa288/5940460; Xiao Wu, et al., *Air Pollution and COVID-19 Mortality in the United States: Strengths and Limitations of an Ecological Regression Analysis*, SCI. ADVANCES, at 1 (Nov. 4, 2020), *available at*: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7673673/.

[6] Liuhua Shi et al., *Long-term Effects of $PM_{2.5}$ on Neurological Disorders in the American Medicare Population: A Longitudinal Cohort Study*, 4 THE LANCET E557, (Oct. 19, 2020), *available at*: https://www.thelancet.com/action/showPdf?pii=S2542-5196%2820%2930227-8.

[7] I. Mikati, Disparities in Distribution of Particulate Matter Emission Sources by Race and Poverty Status, 108(4) *Am. J. of Public Health* 480, 482 (Table 1) (Apr. 2018), *available at*: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5844406/.

population. Both COVID-19 and neurocognitive disease, the two illnesses identified as exacerbated by particulate matter exposure, already disproportionately impact Black, Indigenous, and persons of color (BIPOC). Continuing to expose these historically burdened communities to dangerous levels of particulate matter will only exacerbate the disparity in the rates of diseases already suffered by these communities.

EPA must address this cycle of environmental injustice. State Petitioners are encouraged that the White House has identified the particulate matter NAAQS determination as one of EPA's actions to be reviewed for consistency with President Biden's January 20, 2021, "Executive Order on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis."[8] Promptly re-opening the proceedings would provide the opportunity for public comment on these significant harms and allow for EPA's consideration of this new substantial evidence showing the need for EPA to reduce exposure to particulate matter to protect the public health. Accordingly, the State Petitioners respectfully request that EPA convene proceedings for reconsideration of the final decision or take other appropriate action to efficiently and expeditiously correct the deficient standard. 42 U.S.C. § 7607(d)(7)(B).

## LEGAL STANDARD

EPA must convene a reconsideration proceeding if a person raising an objection shows: (1) grounds for the objection arose after the public comment period; and (2) the objection "is of central relevance to the outcome of the rule." 42 U.S.C. § 7607(d)(7)(B). An objection is "of

[8] *See Executive Order on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, Jan. 20, 2021, *available at*: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-protecting-public-health-and-environment-and-restoring-science-to-tackle-climate-crisis/; *see also Fact Sheet: List of Agency Actions for Review*, January 20, 2021, *available at*: https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-list-of-agency-actions-for-review/.

central relevance" if it provides "substantial support for the argument that the regulation should be revised." *Chesapeake Climate Action Network v. EPA*, 952 F.3d 310, 322 (D.C. Cir. 2020). Furthermore, EPA has discretion to reconsider its actions even where the standards for mandatory reconsideration are not met.

## ARGUMENT

The Clean Air Act requires that EPA promulgate and revise the primary NAAQS to assure the standards are stringent enough "to protect public health," with "an adequate margin of safety." 42 U.S.C. § 7409(b)(1). The NAAQS must be based on air quality criteria incorporating the "latest scientific knowledge." *Id.* § 7408(a)(2). Courts have rejected EPA determinations that there is no need to lower the NAAQS level to protect public health or to provide an adequate margin of safety when the agency has failed to properly consider relevant new evidence. *Am. Farm Bureau Fed'n v. E.P.A.*, 559 F.3d 512, 520 (D.C. Cir. 2009); *see also Am. Lung Ass'n v. EPA*, 134 F.3d 388, 392-93 (D.C. Cir. 1998) (EPA must provide adequate explanation for failure to revise NAAQS in light of relevant evidence); *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1154 (D.C. Cir. 1980) (EPA must "err on the side of caution" in favor of more protective standards when setting NAAQS).

### I. EPA Should Reconsider the Final Rule in Light of Its Failure to Provide the Requisite Protection of Public Health and Welfare.

The Final Rule is insufficiently protective of public health and welfare and is the product of arbitrary and capricious EPA decision making. Among other things, the agency arbitrarily gave little to no weight to epidemiological studies quantifying the mortality effects from particulate matter exposure, despite the centrality of that issue to the problem EPA is statutorily obligated to address.

Though there is no real doubt as to the value of the epidemiological studies, EPA chose to ignore them without good reason. As noted by Dr. Cristopher Frey, the head of the Independent Particulate Matter Review Panel and former member of the Clean Air Scientific Advisory Committee (CASAC) Review Panel for the 2012 revised PM NAAQS, "the weight of the evidence in this review is far stronger than what was available in the last review."[9] The Independent Particulate Matter Review Panel further noted that its conclusion that the particulate matter standards are insufficient to protect the public health is based on an *overwhelming* scientific consensus determined by conducting:

> [a] review of the scientific evidence from epidemiologic studies, toxicologic studies in animals, and controlled human exposure studies; this evidence is consistent within each discipline and coherent among the multiple disciplines in supporting a causal, biologically plausible relationship between ambient concentrations well below the current $PM_{2.5}$ standards and adverse health effects, including premature death. The epidemiologic evidence is consistent across studies with diverse designs, populations, pollutant mixtures, locations, and statistical approaches.[10]

Instead, EPA hid behind manufactured "uncertainties" alleged by some of members of the CASAC. 85 Fed. Reg. at 82,708, 82,717. But uncertainty is inherent in any scientific research, and can cut both ways—for instance, mortality effects from particulate matter exposure could well be *worse* than epidemiological studies suggest, not better. The statute explicitly requires EPA to account for such uncertainty when its sets the standards, telling EPA to select a standard that is sufficiently protective "with an adequate margin of safety." 42 U.S.C. § 7409(b)(1). EPA

---

[9] H. Christopher Frey, Ph.D., Public Comment on the Review of the National Ambient Air Quality Standards for Particulate Matter – The NAAQS PM Science Review Process and Outcome is Broken and Not Credible: EPA Should Follow the Science and the Law to Set Health Protective Annual and 24-Hour $PM_{2.5}$ Standards, 70 (June 29, 2020) (EPA-HQ-OAR-2015-0072-1006) [hereinafter Dr. Frey Comments on Proposed Rule].

[10] H. Christopher Frey, Ph.D., Comment Submitted by H. Christopher Frey, Chair, Independent Particulate Matter Review Panel et al. (Attachment 1 – The Need for a Tighter Particulate-Matter Air-Quality Standard) (June 22, 2020) (EPA-HQ-OAR-2015-0072-0669).

cannot use uncertainty alone to justify not lowering the standards while providing for the necessary margin of safety.

The agency also did not try to mitigate or lessen any uncertainty. Instead, EPA refused to meaningfully consider studies published after the Integrated Science Assessment (ISA), considering them only "provisionally." 85 Fed. Reg. 82,690 – 82,691. EPA considered studies published up to March 31, 2017, for analysis in the ISA, with only a "limited" update for studies published up to December 31, 2017. *Id*. 82,690. In limiting the scope of its review, EPA unlawfully failed to adequately consider substantial scientific evidence that clearly demonstrates the need to reduce ambient concentrations of particulate matter. *See Am. Farm Bureau Fed'n,* 559 F.3d at 520.

Further, as the CASAC commented "the Draft ISA does not provide a sufficiently comprehensive, systematic assessment of the available science relevant to understanding the health impacts of exposure to particulate matter." 85 Fed. Reg. 82,689. The CASAC recommended that EPA revise the ISA to consider a more comprehensive assessment of the available data, but EPA chose not to make any revisions, citing as justification the "back-to-basics" memo drafted by former EPA Administrator Scott Pruitt, in which EPA declared it would conduct the particulate matter NAAQS review in a manner to "ensure" any revisions were "finalized" by December 2020, the last month of the Trump Administration. *Id*. The record is clear that, at every turn, EPA had the opportunity and obligation to consider the full scope of the overwhelming evidence warranting the strengthening of the particulate matter NAAQS, but instead chose to ignore such evidence under the guise of "uncertainty."

Those errors and others *might* have been avoided had EPA not arbitrarily disbanded its particulate matter review panel or unlawfully purged CASAC of knowledgeable scientists whose work EPA had previously found deserving of grant funding, or even if EPA had simply given due consideration to the comments of the leading scientists that—having formerly made up the particulate matter review panel—formed the Independent Particulate Matter Review Panel. But EPA's final failure to promulgate appropriately protective particulate matter standards was nonetheless an unforced error, not an inevitability. The many flaws in EPA's process did not ultimately require that the agency arbitrarily ignore the strong scientific data demonstrating the connection between serious health risks and the current particulate matter standards. State Petitioners therefore request that EPA exercise its discretion to convene reconsideration proceedings to engage in a reasoned review of all of the evidence now before the agency, and that EPA promulgate tighter standards to adequately protect both human health, welfare, and the environment, as the Clean Air Act requires. As noted by Dr. Frey, "[i]f EPA followed the science using the same procedures and logic as in the last review, EPA would be proposing to revise the [particular matter NAAQS]."[11]

## II. EPA Must Reconsider the Final Rule in Light of New Studies Demonstrating Significant Long-Term Health Risks from Particulate Matter Exposure.

Further, EPA is statutorily required to convene reconsideration proceedings to evaluate important new evidence that arose after the close of public comment and is of central relevance to EPA's decision not to strengthen the NAAQS to adequately protect public health. These studies include those demonstrating significant public health risks at levels below the current

[11] Dr. Frey Comments on Proposed Rule, *supra* note 9, at 70.

NAAQS, in addition to studies linking particulate matter exposure to serious health impacts related to the COVID-19 pandemic and increases in dementia and other severe neurological disease.

### A. Petitioners Were Unable to Raise These Objections During the Public Comment Period Because Key Studies Had Not Yet Been Published.

Since the close of public comments in June 2020, new research has raised serious doubt about the accuracy of EPA's prior justification for not strengthening the particulate matter NAAQS. State Petitioners present several critical new studies below, necessitating reconsideration of EPA's prior decision not to establish stronger standards that adequately protect the public health and safety.

#### 1. A Key New Study Refutes EPA's Claim That Health Impacts from Particulate Matter Exposure Below the Current Standard May Be the Result of Unmeasured Confounders.

A new study to be published in March directly refutes EPA's assertion that strengthening the particulate matter NAAQS is unnecessary due to alleged uncertainties and biases in the available research. Public health researchers have determined that $PM_{2.5}$ exposure at levels below the current standard annual standard of 12 $\mu g/m^3$ is associated with increased mortality, concluding "that reducing $PM_{2.5}$ concentrations in the U.S. could save tens of thousands of premature deaths each year.[12] This new study was developed in direct response to the EPA Administrator's dismissal of the epidemiological studies showing a relationship between health impacts and $PM_{2.5}$ exposure.[13] Specifically, the new study responds to EPA's assertion that

[13] Joel Schwartz, et al., *supra* note 3, at 17 ("Some scientists . . . assert that studies using standard epidemiological methods should be given little weight in revising the NAAQS, and propose restricting to studies using causal methods .... Their main criticism is that traditional approaches

epidemiological studies "are not necessarily indicative of causal relationships," because such associations "'can reasonably be explained in light of uncontrolled confounding and other potential sources of error and bias.'" 85 Fed. Reg. 82,707. To address the Administrator's unsubstantiated concerns, the researchers developed a "causal method, controlling for temperature and socioeconomic status, and all individual and area level potential confounders, measured or unmeasured, that vary slowly over time."[14] Consistent with the prior epidemiological studies, the researchers found that exposure to $PM_{2.5}$ has significant negative impacts on public health, estimating that reducing the standard by 1 $\mu g/m^3$ could help avoid 239,900 early deaths each year.[15] In other words, the researchers concluded that 1 $\mu g/m^3$ of exposure, at levels below the current standard, for one year "results in an increased risk of dying of 4.26 per ten thousand."[16] Further, because this study's findings support the results of the epidemiological studies dismissed by the Administrator, those "other studies are unlikely to have been confounded by temperature, or slowly varying SES, racial, and behavioral factors which this study controlled for."[17]

---

only show associations that may be confounded... and do not inform causality .... [and] individual characteristics, socioeconomic status, and temperature may confound the published literature. EPA recently proposed not tightening the NAAQS for $PM_{2.5}$ relying on these arguments.").

[14] *Id.* at 17-18.

[15] *Id.* at 19.

[16] *Id.*

[17] *Id.*

### 2. Another New Study Highlights the Deadly Impacts of $PM_{2.5}$ Exposure and the Significant Health Benefits to Strengthening the NAAQS.

A new global study focusing on $PM_{2.5}$ attributable to the burning of fossil fuels demonstrates that exposure to such fine particulate matter causes significantly more disease and death than previously estimated.[18] The study estimates a global toll of 10.2 million annual premature deaths attributable to $PM_{2.5}$ exposure, including over 350,000 premature annual deaths in the United States, highlighting the astoundingly high health impacts from particulate matter exposure related to controllable sources like fossil fuel combustion. Critically, the study also indicates that decreases in $PM_{2.5}$ exposure at levels below the current NAAQS would substantially reduce mortality rates. At a mean exposure rate of 10 $\mu g/m^3$, each 1 $\mu g/m^3$ increase in $PM_{2.5}$ was associated with a 1.29% increase in mortality, whereas that rate decreased significantly to 0.94% at a mean exposure of 20 $\mu g/m^3$, 0.81% at 30 $\mu g/m^3$, and 0.79% at 40 $\mu g/m^3$.[19] This new evidence supports the conclusion that a reduction in the particulate matter NAAQS below the existing standards will substantially reduce mortality rates from particulate matter exposure and is necessary to protect the public health and safety.

### 3. Newly Available Studies Link Particulate Matter Exposure to Significant Health Impacts from Respiratory Viruses Like COVID-19.

As of February 16, 2021, over 27 million people in the United States have been infected with COVID-19, a deadly virus that attacks the same respiratory and cardiovascular systems harmed by particulate matter exposure.[20] Despite this unprecedented public health crisis and its

---

[18] Karn Vohra, et al., *supra* note 4.
[19] *See id*. at supplemental materials 11-12.
[20] COVID Data Tracker, Centers for Disease Control and Prevention (as of Feb. 16, 2021), *available at*: https://covid.cdc.gov/covid-data-tracker/#datatracker-home.

potential long-term health impacts, EPA has determined that no reduction in the particulate matter NAAQS is necessary to protect public health. While preliminary data noted a relationship between COVID-19 and exposure to particulate matter, research published since the close of public comment has clearly established a disturbing link between increased COVID-19 mortality and particulate matter exposure. In light of this new information, EPA must reconsider its decision and strengthen the particulate matter standards.

One study published after the end of public comments found dramatic increases in COVID-19 mortality attributable to exposure to $PM_{2.5}$.[21] The analysis characterized global exposure levels of $PM_{2.5}$ to determine the extent to which such exposure was a cofactor increasing the risk of death from COVID-19. Like the NAAQS, the study focused only on anthropogenic fossil fuel related $PM_{2.5}$ to determine the impact of *avoidable* air pollution on COVID-19 mortality. The findings were stark. In countries with strict air quality standards and lower air pollution like Australia, where the annual $PM_{2.5}$ limit is 8 $\mu g/m^3$, the fraction of COVID-19 mortality attributable to human-made air pollution was 3%.[22] By comparison, in the United States, where the annual $PM_{2.5}$ limit will remain 12 $\mu g/m^3$ under EPA's existing action, the COVID-19 mortality attributable to human-made air pollution was 18%, *six times higher* than the percentage in Australia. A second new study found a direct link between the amount of a region's long-term $PM_{2.5}$ exposure and its COVID-19 mortality rate.[23] Analyzing county-level data in the United States, the study found that a mere 1 $\mu g/m^3$ increase in the long-term average

[21] A. Pozzer et al., *Regional and Global Contributions of Air Pollution to Risk of Death from COVID-19*, Cardiovascular Research, Sept. 30, 2020, *available at*: https://academic.oup.com/cardiovascres/advance-article/doi/10.1093/cvr/cvaa288/5940460.
[22] *See* Andrea. Pozzer, et al., *supra* note 5, at Supplementary Table, Table S1.
[23] Xiao Wu, et al., *supra* note 5, at 1.

$PM_{2.5}$ is associated with a statistically significant 11% increase in the county's COVID-19 mortality rate.

Such studies serve to highlight the enormous health benefits from reducing particulate matter exposure, which include protecting those who may continue to battle health impacts related to COVID-19's devastation of respiratory systems over the long-term, or "long-haulers."[24] While uncertainty remains about COVID-19's long-term health impacts, initial studies have found instances of severely impaired pulmonary capacities months after initial infections.[25] As the nation confronts the lasting effects of the COVID-19 pandemic, and addresses new mutations and future viruses, EPA also must consider whether the particulate matter NAAQS is sufficiently protective of the public health in light of the long-term respiratory problems faced by recovering patients.

Despite the ongoing respiratory pandemic impacting millions of Americans, EPA's only acknowledgment of COVID-19 comes in a few sentences in its response to comments. Notably, it does not address any of the numerous relevant studies that came out after the close of the comment period, several of which were submitted by State Petitioners in its supplemental letter. It does make the remarkable and wholly unsupported claim that early studies tying COVID-19 to particulate matter exposure were somehow "generally consistent with the evidence assessed in

[24] *See, e.g.*, Rita Rubin, *As Their Numbers Grow, COVID-19 "Long Haulers" Stump Experts*, JAMA (Sept. 23, 2020), *available at*: https://jamanetwork.com/journals/jama/fullarticle/2771111.

[25] *See* Chaolin Huang, et al., *6-Month Consequences of COVID-19 in Patients Discharged from Hospital: A Cohort Study*, 397 THE LANCET 220-232 (Jan. 8, 2021), *available at*: https://www.thelancet.com/action/showPdf?pii=S0140-6736%2820%2932656-8. *See also* European Lung Foundation, *COVID-19 Patients Suffer Long-Term Lung and Heart Damage but it Can Improve with Time*, SCIENCE DAILY (Sept. 6, 2020), *available at*: https://www.sciencedaily.com/releases/2020/09/200906202950.htm.

the [Integrated Science Assessment]," Response to Comments, p. 37, despite the fact that the analysis referenced was completed *before* the first reported COVID-19 outbreak.

#### 4. New Studies Show Increases in Serious Neurodegenerative Diseases from Exposure to Particulate Matter.

An important new study demonstrating that increased particulate matter exposure exacerbates the risk of serious neurological disorders also warrants that EPA reconsider its decision not to lower the standards.[26] The study adds critical new evidence to emerging links between particulate matter air pollution and neurodegenerative conditions suffered by millions of American residents, including impaired cognitive function, accelerated cognitive decline, Parkinson's disease, Alzheimer's disease, and dementia.[27] This nationwide, long-term study found significant correlations between increased $PM_{2.5}$ exposure and first-time hospital admittances for diagnoses of Parkinson's disease, Alzheimer's disease, and related dementias in patients over 65.[28] Researchers found a strong linear relationship between incidences of neurodegenerative disease and increases in $PM_{2.5}$ exposure. This linear relationship was observed at $PM_{2.5}$ exposures down to 7µg/m$^3$—well below the current standard, indicating that lowering the $PM_{2.5}$ standard will have meaningful public health benefits across the country. This study released after the close of public comment further demonstrates the need for EPA to strengthen the particulate matter NAAQS to protect the State Petitioners' populations from the devastating impacts of serious cognitive disorders.

---

[26] Liuhua Shi et al., *supra* note 6.
[27] *Id*. at E564.
[28] *Id.* at E557.

### B. The Identification of Serious New Threats to Health from Particulate Matter Exposure Are of Central Relevance to EPA's Unlawful Decision.

New evidence of decreased mortality at levels of $PM_{2.5}$ exposure below existing standards and the existence of significant new threats to public health is of "central relevance" to EPA's decision not to strengthen the particulate matter NAAQS, obligating EPA to reconsider the decision. The additional studies clearly "provide substantial support for the argument that the regulation should be revised." *Chesapeake Climate Action Network*, 952 F.3d at 322. To justify its decision that strengthening the particulate matter NAAQS is unnecessary to protect public health with an adequate margin of safety, EPA's decision *repeatedly* cites the "uncertainty" of the health benefits from the studies reviewed.[29] These new studies dispel that alleged uncertainty.

As noted above, EPA's decision rests significantly on its dismissal of several critical epidemiological studies due to assertions that they do not necessarily prove causal relationships between negative health impacts and levels of particulate matter below the current NAAQS standard, pointing to "uncontrolled confounding and other potential sources of error and bias.'" 85 Fed. Reg. 82,707. But the new study by Schwartz et al. cited above successfully demonstrates that uncontrolled factors were not the source of any error and bias, solidifying the link between particulate matter exposure and serious negative health impacts. The study is of central relevance because it addresses and refutes the primary rationale the Administrator relied on to not strengthen the current particulate matter NAAQS, and it also demonstrates significant public

[29] *See* 85 Fed. Reg. 82,685 ("For the primary $PM_{2.5}$ standards, the Administrator concludes that there are *important uncertainties in the evidence* for adverse health effects below the current standards and in the potential for additional public health improvements from reducing ambient $PM_{2.5}$ concentrations below those standards… [The Administrator] concludes that, based on the newly available evidence *with its inherent uncertainties*, the current primary $PM_{10}$ standard is requisite to protect public health, with an adequate margin of safety, from effects of $PM_{10}$ in ambient air, and should be retained, without revision" [emphasis added].)

health impacts from exposure to particulate matter below the current standard. The study conducted by Vohra et al. also cited above further demonstrates the likelihood of substantial public health improvements below the current $PM_{2.5}$ standards and the need for EPA to strengthen the particulate matter NAAQS. Even if purported uncertainties were originally a valid basis for EPA's decision, these new studies substantially lessen any uncertainty, undercutting the basis for EPA's decision and requiring reconsideration.

Further, whatever margin of safety that may be embodied in the current NAAQS is significantly reduced, if not eliminated entirely, once the relationship to COVID-19 and increases in neurocognitive diseases are considered. In light these facts, EPA must strengthen the NAAQS to a level that reintroduces the necessary buffer to provide an adequate margin of safety as required by the Clean Air Act. Even if the COVID-19 pandemic somehow subsides entirely, the long-term respiratory impacts noted above will likely leave significant portions of the public more vulnerable to particulate matter harms. Likewise, the links between particulate matter exposure and devastating neurological diseases like Alzheimer's and Parkinson's, as established in the Shi et al. study discussed above, are particularly relevant to the millions of Americans over 65, a population that is expected to double by 2060. Such a demographic shift in the American population will substantially increase the amount of harm from particulate matter exposure suffered by the overall population.[30] EPA must open reconsideration proceedings in order to fully evaluate these significant negative public health impacts unaddressed in the current particulate matter NAAQS.

---

[30] Kevin A. Matthews, et al., *Racial and Ethnic Estimates of Alzheimer's Disease and Related Dementias in the United States (2015–2060) in Adults Aged ≥ 65 Years*, 15 ALZHEIMER'S & DEMENTIA 17-24, (Jan. 2019), *available at*: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6333531/.

The new studies also present further evidence that EPA's decision will only exacerbate existing environmental injustices. As the pandemic enters its second year, COVID-19 has been shown to have a devastating impact on the very same disadvantaged communities already struggling from high particulate matter exposure.[31] Similarly, Alzheimer's disease and related dementias also disproportionately impact the Black and Latinx populations, compared to the non-Hispanic White population.[32] In accordance with President Biden's recent Executive Order committing to address environmental justice[33] and the longstanding disproportionate impacts federal policies have on historically marginalized and overburdened BIPOC communities, EPA should convene reconsideration proceedings in order to address the environmental injustice created by disproportionate exposure to particulate matter.

## RELIEF REQUESTED

For the foregoing reasons, State Petitioners respectfully request that the Administrator immediately convene proceedings for reconsideration of the final action. 42 U.S.C. § 7607(d)(7)(B).

---

[31] Gregorio A. Millett MPH, et al., *Assessing Differential Impacts of COVID-19 on Black Communities*, 47 Annals of Epidemiology 37-44 (Jul. 2020), *available at*: https://doi.org/10.1016/j.annepidem.2020.05.003.

[32] Kevin A. Matthews et al., *supra* note 30, at 17-24.

[33] *See* Executive Order on Tackling the Climate Crisis at Home and Abroad (Jan. 27, 2021) ("Agencies shall make achieving environmental justice part of their missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts.") *Available at*: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/.

Dated: February 16, 2021

Respectfully Submitted,
FOR THE STATE OF CALIFORNIA

XAVIER BECERRA
Attorney General of California
ROBERT W. BYRNE
Senior Assistant Attorney General
DAVID A. ZONANA
Acting Senior Assistant Attorney General
MYUNG J. PARK
Supervising Deputy Attorney General
JONATHAN A. WIENER
SPARSH KHANDESHI
COREY MOFFAT
Deputy Attorneys General

*/s/ Scott J. Lichtig*
SCOTT J. LICHTIG
Deputy Attorney General
1300 I Street
Sacramento, CA 95814
Tel: (916) 210-7815
Scott.Lichtig@doj.ca.gov

*Attorneys for Petitioner State of California, by and through its Attorney General Xavier Becerra, and California Air Resources Board*

FOR THE STATE OF CONNECTICUT

WILLIAM TONG
Attorney General of Connecticut

*/s/ Jill Lacedonia*
JILL LACEDONIA
Assistant Attorney General
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5250
Jill.Lacedonia@ct.gov
*Counsel for the State of Connecticut*

FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Christian Douglas Wright*
CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation
VALERIE EDGE
Deputy Attorney General
Delaware Department of Justice
102 W. Water Street, 3rd Floor
Dover, DE 19902
(302) 257-3219
Christian.Wright@delaware.gov
*Counsel for the State of Delaware*

FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General of Illinois

/s/ *Daniel I. Rottenberg*
MATTHEW J. DUNN
Chief, Environmental Enforcement/Asbestos
Litigation Division
DANIEL I. ROTTENBERG
Assistant Attorney General
Office of the Attorney General
69 W. Washington St., 18th Floor
Chicago, IL 60602
(312) 814-3816
DRottenberg@atg.state.il.us
*Counsel for the State of Illinois*

FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General of Maryland

*/s/ Joshua M. Segal*
JOSHUA M. SEGAL
Special Assistant Attorney General
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202
(410) 576-6446
jsegal@oag.state.md.us
*Counsel for the State of Maryland*

FOR THE COMMONWEALTH OF MASSACHUSETTS

MAURA HEALEY
Attorney General of Massachusetts

*/s/ Megan M. Herzog*
CHRISTOPHE COURCHESNE
Assistant Attorney General and Deputy Chief
TURNER SMITH
Assistant Attorney General
MEGAN M. HERZOG
Special Assistant Attorney General
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Fl.
Boston, MA 02108
(617) 727-2200
turner.smith@mass.gov
*Counsel for the Commonwealth of Massachusetts*

FOR THE STATE OF MINNESOTA

KEITH ELLISON
Attorney General of Minnesota

*/s/ Leigh K. Currie*
LEIGH K. CURRIE
Special Assistant Attorney General
Minnesota Office of the Attorney General
445 Minnesota Street Suite 900
Saint Paul, MN 55101
(651) 757-1061
peter.surdo@ag.state.mn.us
*Counsel for the State of Minnesota*

FOR THE STATE OF NEW JERSEY

GURBIR GREWAL
Attorney General of New Jersey

*/s/ Daniel Resler*
DANIEL RESLER
Deputy Attorney General
Division of Law
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, NJ 08625
Tel: (609) 376-2735
Email: Daniel.Resler@law.njoag.gov
*Counsel for the State of New Jersey*

FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General of New York

*/s/ Andrew G. Frank*
MICHAEL J. MYERS
Senior Counsel
NICHOLAS C. BUTTINO
ANDREW G. FRANK
Assistant Attorneys General
LINDA M. WILSON
Staff Scientist
New York State Attorney General Office
28 Liberty Street
New York, New York 10005
(212) 416-8271
Nicholas.Buttino@ag.ny.gov
*Counsel for the State of New York*

FOR THE CITY OF NEW YORK

JAMES E. JOHNSON
Corporation Counsel for the City of New York

*/s/ Christopher Gene King*
Christopher Gene King
Senior Counsel
New York City Law Department
100 Church Street
New York, NY 10007
(917) 941-5603
cking@law.nyc.gov
*Counsel for the City of New York*

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General of Oregon

*/s/ Paul Garrahan*
PAUL GARRAHAN
Attorney-in-Charge
STEVE NOVICK
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4593
paul.garrahan@doj.state.or.us
steve.novick@doj.state.or.us
*Counsel for the State of Oregon*

FOR THE COMMONWEALTH OF PENNSYLVANIA

JOSH SHAPIRO
Attorney General of Pennsylvania

*/s/ Ann Johnston*
ANN JOHNSTON
Senior Deputy Attorney General
MICHAEL J. FISCHER
Chief Deputy Attorney General
Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, Pennsylvania 17120
(717) 705-6938
ajohnston@attorneygeneral.gov
*Counsel for the Commonwealth of Pennsylvania*

FOR THE STATE OF RHODE ISLAND

PETER F. NERONHA
Attorney General of Rhode Island

*/s/ Gregory S. Schultz*
GREGORY S. SCHULTZ
Special Assistant Attorney General
Rhode Island Office of Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
gschultz@riag.ri.gov
*Counsel for the State of Rhode Island*

FOR THE STATE OF VERMONT

THOMAS J. DONOVAN, JR.
Attorney General of Vermont

*/s/ Nicholas F. Persampieri*
NICHOLAS F. PERSAMPIERI
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
nick.persampieri@vermont.gov
*Counsel for the State of Vermont*

FOR THE COMMONWEALTH OF VIRGINIA

MARK R. HERRING
Attorney General of Virginia

*/s/ Caitlin C. G. O'Dwyer*
PAUL KUGELMAN, JR.
Senior Assistant Attorney General,
Chief, Environmental Section
CAITLIN C. G. O'DWYER
Assistant Attorney General
Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
(804) 786-1780
godwyer@oag.state.va.us
*Counsel for the Commonwealth of Virginia*

FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General of Washington

*/s/ Christopher H. Reitz*
CHRISTOPHER H. REITZ
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, Washington 98504-0117
(360) 586-4614
chris.reitz@atg.wa.gov
*Counsel for the State of Washington*

FOR THE STATE OF WISCONSIN

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Lorraine C. Stoltzfus*
LORRAINE C. STOLTZFUS
EMILY M. ERTEL
Assistant Attorneys General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-9226
stoltzfuslc@doj.state.wi.us
*Counsel for the State of Wisconsin*

# Journal Pre-proof




A National Difference in Differences Analysis of the Effect of $PM_{2.5}$ on Annual Death Rates

Joel Schwartz, Yaguang Wei, Ma'ayan Yitshak-Sade, Qian Di, Francesca Dominici, Antonella Zanobetti

PII: S0013-9351(20)31546-2

DOI: https://doi.org/10.1016/j.envres.2020.110649

Reference: YENRS 110649

To appear in: *Environmental Research*

Received Date: 10 November 2020

Revised Date: 16 December 2020

Accepted Date: 17 December 2020

Please cite this article as: Schwartz, J., Wei, Y., Yitshak-Sade, M.'a., Di, Q., Dominici, F., Zanobetti, A., A National Difference in Differences Analysis of the Effect of $PM_{2.5}$ on Annual Death Rates, *Environmental Research*, https://doi.org/10.1016/j.envres.2020.110649.

This is a PDF file of an article that has undergone enhancements after acceptance, such as the addition of a cover page and metadata, and formatting for readability, but it is not yet the definitive version of record. This version will undergo additional copyediting, typesetting and review before it is published in its final form, but we are providing this version to give early visibility of the article. Please note that, during the production process, errors may be discovered which could affect the content, and all legal disclaimers that apply to the journal pertain.

© 2020 Elsevier Inc. All rights reserved.

Journal Pre-proof

# A National Difference in Differences Analysis of the Effect of $PM_{2.5}$ on Annual Death Rates

Joel Schwartz[1,2],Yaguang Wei[1], Ma'ayan Yitshak-Sade[1,3], Qian Di[1,4], Francesca Dominici[5], Antonella Zanobetti[1]

1. Department of Environmental Health, Harvard TH Chan School of Public Health
2. Department of Epidemiology, Harvard TH Chan School of Public Health
3. Department of Environmental Medicine, Mount Sinai School of Medicine
4. Vanke School of Public Health, Tsinghua University, Beijing, China
5. Department of Biostatistics, Harvard TH Chan School of Public Health

Address communications to:

Joel Schwartz joel@hsph.harvard.edu. 401 Park Drive, Suite 404H, Boston MA 02215.

Journal Pre-proof


## Abstract

Many studies have reported that $PM_{2.5}$ was associated with mortality, but these were criticized for unmeasured confounding, not using causal modeling, and not focusing on changes in exposure and mortality rates. Recent studies have used propensity scores, a causal modeling approach that requires the assumption of no unmeasured confounders.

We used differences in differences, a causal modeling approach that focuses on exposure changes, and controls for unmeasured confounders by design to analyze $PM_{2.5}$ and mortality in the U.S. Medicare population, with 623,036,820 person-years of follow-up, and 29,481,444 deaths. We expanded the approach by clustering ZIP codes into 32 groups based on racial, behavioral and socioeconomic characteristics, and analyzing each cluster separately. We controlled for multiple time varying confounders within each cluster. A separate analysis examined participants whose exposure was always below 12 μg/m$^3$.We found an increase of 1 μg/m$^3$ in $PM_{2.5}$ produced an increased risk of dying in that year of 3.85x10$^{-4}$ (95% CI 1.95 x10$^{-4}$, 5.76 x10$^{-4}$). This corresponds to 14,000 early deaths per year per 1 μg/m$^3$. When restricted to exposures below 12 μg/m$^3$, the increased mortality risk was 4.26 x10$^{-4}$ (95% CI 1.43x10$^{-4}$, 7.09 x10$^{-4}$). Using a causal modeling approach robust to omitted confounders, we found associations of $PM_{2.5}$ with increased death rates, including below U.S. and E.U. standards.


Key words: Air pollution, $PM_{2.5}$, causal, difference in differences, mortality

Authors contributions: JS conceived the approach, developed the methodology, and did the analysis and reviewed and edited the draft manuscript; YW wrote the first draft and prepared the data; MY-W helped with the programming, methodology and commented on the draft; FD obtained funding and the Medicare data; AZ obtained funding.

Funding: This study was funded by NIH grants ES000002 and ES024332, and U.S. EPA grant RD-83615601. The funders had no input into the design or conduct of the study.

Dr. Schwartz declares that he has testified as a health expert for the U.S. Department of Justice in a law suit over clean air act violations. No other authors have anything to declare.

This study was approved by the Human Subjects Committee of the Harvard School of Public Health.

Journal Pre-proof

1. Introduction

The Clean Air Act requires the US Environmental Protection Agency (EPA) to set National Ambient Air Quality Standards (NAAQS) to protect vulnerable populations with an adequate margin of safety. Many studies have reported associations of $PM_{2.5}$ and mortality and morbidity following long and short-term exposure(Abu Awad et al., 2019; Beelen et al., 2014; Crouse et al., 2015; Di et al., 2017; Hoek et al., 2013; Pinault et al., 2016; Pope et al., 2019; Vodonos et al., 2018). These were undertaken by many investigators with over 50 cohorts in the most recent $PM_{2.5}$ meta-analysis(Vodonos et al., 2018), and have resulted in EPA sequentially tightening the $PM_{2.5}$ standard. The global burden of disease ranks air pollution among the largest public health risks.

Recent studies have reported associations between $PM_{2.5}$ and mortality at concentrations below the 2012 U.S. EPA NAAQS or World Health Organization air quality guidelines(Di et al., 2017; Wang et al., 2016; Yang et al., 2012). However, some have criticized many of these studies for not using causal modeling approaches.

Causal modeling methods can aid in assessing causality. The general approach is to try to make an observational study closely mimic a randomized trial. In addition, causal methods provide marginal estimates of the effects of exposure, that do not depend on the distribution of the covariates in the study population(Imai and van Dyke, 2004). A common approach is to use propensity score matching or inverse probability weighting to make the exposure independent of all measured confounders(Baccini et al., 2017; Rubin, 1997). Recent studies have used that approach to examine the association of $PM_{2.5}$ with mortality, and provided robust findings(Abu Awad et al., 2019; Schwartz et al., 2018; Wei et al., 2020; Wu et al., 2020; Yitshak-Sade et al., 2019). However, propensity scores only control for measured confounders, and therefore do not address the

argument that there is unmeasured confounding. Hence it is important to complement that approach using methods that can address unmeasured confounders.

Approaches that control for unmeasured confounders by design include difference-in-differences (DID) analyses (Wang et al., 2016; Yitshak-Sade et al., 2019). In a classical DID model, the mean response is calculated for the exposed and non-exposed groups in pre-exposure and post-exposure periods. Since all slowly varying predictors of outcome such as socioeconomic status (SES), smoking, obesity, etc. are the same in each group in both periods, the difference between outcomes in the two periods in the exposed group cannot be confounded by those variables. The difference between pre-exposure and post-exposure periods in the unexposed group is a negative outcome control for the difference in the exposed group. It controls for changes in an outcome due to covariates that can change between periods similarly between the two locations. The difference in these pairs of differences is a causal estimate, assuming that no other exposure has affected the two groups differently over time(Donald and Lang, 2007). Because the DID approach examines the effect of changes in exposure (post vs pre periods) on change in outcome, it is precisely the type of study that EPA's CASAC says it prefers. The method has been generalized to look at more than two locations, more than two time periods, and continuous, time varying exposures(Wang et al., 2016). With multiple locations time-invariant omitted confounders are controlled using an indicator variable for each location. However, it still require the assumption that changes in mortality rates by year due to changing risk factors are common across locations. Here we simultaneously adopt two approaches to relax that assumption, and hence strengthen the evidence for causality. We apply them to assess whether changes in $PM_{2.5}$ are associated with changes in mortality rates in a national cohort of Medicare participants in the U.S. In addition, as

few previous cohort studies have controlled for temperature, we adjusted for mean warm season and mean cold season temperature.

## 2.0 Data and Methods

### 2.1 Medicare cohort

We obtained the Medicare beneficiary denominator file, which contains information on all Medicare participants in the U.S., from the Centers for Medicare and Medicaid Services(RESDAC, 2018). We followed all beneficiaries' ≥65 years in the contiguous U.S. from 2000 to 2016. Medicare insurance covers over 95% of the population ≥65 years of age in the United States. Medicare participants alive on January 1 of the year following their enrollment in Medicare entered the open cohort, and follow-up periods were calendar years. For the DID analysis, we computed an annual mortality rate in each ZIP code, in each group stratified by age (>84 or not), sex, race, and Medicaid coverage. This study was approved by the human subjects committee at the Harvard T. H. Chan School of Public Health.

### 2.2 Covariates

From the Medicare denominator file for each calendar year, we obtained the age, sex, race, ZIP code of residence for that year, eligibility for Medicaid for that year, and date of death (or censoring) of each participant. Age, ZIP code, and Medicaid eligibility were updated annually. This file is publicly available from the Centers for Medicare and Medicaid Services(RESDAC, 2018).

We obtained small area-level social, economic, and housing characteristic variables from the U.S. Census Bureau 2000 and 2010 Census Summary File 3(Bureau, 2010) at the ZIP code tabulation-area level (ZCTA) and the American Household Survey for each year after 2010. These included percent of people ≥ 65 living in poverty, median household income, median house value, percent

of owner occupied homes, percent black, percent Hispanic, population density, and education. We updated these variables for missing years by linearly extrapolating between the measured years. In addition, the county-level percentage of people who ever smoked and their mean body mass index (BMI) were obtained from the CDC Behavioral Risk Factor Surveillance survey(CDC, 2013), which were then assigned to each ZCTA within the county and updated each year. From the Dartmouth Health Atlas, we obtained percentage of Medicare participants who had a hemoglobin A1c test, a low-density lipoprotein cholesterol (LDLC) test, a mammogram, an eye exam, and a visit to an annual checkup for each year in each hospital catchment area and assigned it to all ZCTAs in that area(Wennberg and Cooper, 1996). We also computed the distance from each ZIP code centroid to the nearest hospital. To capture long-term smoking history of Medicare participants in each ZIP code, we computed their hospitalization rate for lung cancer by ZIP code for each year. This risks over-control because air pollution has been associated with increased risk of lung cancer. To capture year-to-year changes in mortality rates due to temperature, we downloaded daily temperature data on a 12km grid from the NASA NLDAS-2 website (https://ldas.gsfc.nasa.gov/index.php/nldas/v2/models). We averaged all grid cells within the boundaries of a ZIP code, and constructed two measures for each year, the average temperature in the warm months (April-September) and in the cold months (October-March).

2.3 Exposure assessment

We estimated exposure using a validated prediction model calibrated to measurements at almost 2000 monitoring stations using an ensemble of machine learners that provided daily estimates for a 1km grid of the contiguous U.S.(Di et al., 2019; Di et al., 2020). In brief, the model used data from multiple sources including predictions of chemical transport models (GEOS-Chem, CMAQ, and MERRA-2), meteorological data, land-use terms, and satellite-based measures of aerosol

optical depth, surface reflectance, and absorbing aerosol index. We trained a neural network, a random forest, and a gradient boosting machine to monitoring data from the United States Environmental Protection Agency (EPA) Air Quality System to generate daily predictions on a 1×1 km grid. The models were fit using data from all years. The three predictions for $PM_{2.5}$ were combined in a nonlinear geographically weighted regression. The model showed good performance with ten-fold cross validation on held out monitoring sites yielding an out of sample $R^2$ of 0.89 for annual average predictions of $PM_{2.5}$. Penalized splines showed linear relationships between observed and predicted $PM_{2.5}$ from 0 to 60 μg/m$^3$. Predictions for all grid cells whose centroids were inside the ZIP code boundary were averaged for each year and assigned to participants in that ZIP code in that year.

2.4 Statistical analysis

The standard DID estimator for a continuous predictor posits that

$$E(Y_{ij}) = \beta_0 + \beta_1 PM_{2.5} + \beta_2 C_i + \beta_3 X_t \quad (1)$$

where $Y_{ij}$ is the mortality rate in ZIP code $i$ in demographic group (by age >84 or not, sex, race, and Medicaid coverage) $j$, $C_i$ are the time-invariant or slowly changing confounders in ZIP code $i$, $X_t$ are the time varying confounders that are common across ZIP codes. The $C_i$ are controlled by fitting individual intercepts for each ZIP code. The time varying confounders are removed by fitting a nonlinear time trend; we used a natural spline function of year with 3 degrees of freedom, yielding:

$$E(Y_{ij}) = \beta_0 + \beta_1 PM_{2.5} + \delta_i + ns(year, 3) \quad (2)$$

where $\delta_i$ is a dummy variable for each ZIP Code. Since ZIP code is controlled, this model compares year-to-year variations around ZIP code average $PM_{2.5}$ and common time trend to year-

to-year variations of mortality rates about ZIP code average and common time trend. Differences in e.g. SES, smoking, or diabetes between ZIP code are removed by the dummy variable for ZIP code. For a causal interpretation of the DID estimate to hold, we must assume that all the ZIP codes have parallel long-term time trends in mortality rates, other than those caused by different time trends in $PM_{2.5}$.

If covariates producing different time trends in mortality rate by ZIP code are not correlated with ZIP code specific $PM_{2.5}$ trends, the interpretation still holds. It would be preferable to further weaken this assumption.

We added two methods to relax the parallel trends assumption, and combined them in our analysis. We added to equation (2) terms for confounders that we have measured that change over time, possibly differentially by ZIP code. This will control for any temporal trends due to changes in these covariates, which include the SES, race, demographic, behavioral, and health access variables described above. Second, we grouped ZIP codes based on the above covariates and fit separate time trends in each group. We think that ZIP codes that are similar in racial composition, percent living below the poverty level, population density, smoking rates etc. are more likely to have similar time trends in mortality rates than disparate ZIP codes. To accomplish this, we fit a principal component analysis to all the listed potential confounders and took the first 5 principal components. We classified each ZIP code into whether it was higher or lower than average on each of the 5 components, producing 32 categories of ZIP codes. In each of these 32 categories of ZIP codes, we fit separate splines for time trend and separate control for all of the covariates. This controls for time trends in measured covariates such as racial composition, median income, etc, and fits 32 separate time trends to the data to capture any trends unexplained by time trends in the measured covariates. It also allows the effects of the measured covariates to differ by the 32

different groups. In addition by performing analyses stratified by the 32 different groups we are also controlling by matching for the covariate clusters (e.g. SES and race) that characterize each group. Combining these, the final modeling approach is to fit 32 models (k=1:32) and meta-analyze the 32 values of $\beta_1$.

$$E(Y_{ij},k) = \beta_0 + \beta_{1k}PM25 + \delta_i + \delta_{jk} + ns(year,3,k) + \beta_3 X_{tk} \quad (3)$$

Here $\delta_i$ are indicator variables for each ZIP code, $X_{tk}$ are the time varying covariates whose time trends may differ by ZIP code and by which group (k) the ZIP code is in, $ns(year,3,k)$ is a natural spline for time trend with 3 degrees of freedom for each group $k$, and $\delta_{jk}$ is an indicator variable for each age-race-sex-Medicaid stratum in group $k$. Results were combined over strata using a random effects meta-analysis.

Finally, equation (3) embodies an additive, rather than multiplicative model for the rate of mortality in each ZIP code-demographic group. This allows us to estimate the additive effect of $PM_{2.5}$ on the probability of dying, provides more interpretative interaction terms, and provides a marginal effect estimate (i.e. not dependent on the distribution of the covariates, as a multiplicative model would be). Additive probability or rate models give unbiased estimates of effect just as the more usual logistic models, but biased estimates of standard errors(Caudill and Jackson, 1989). Therefore have used robust standard errors to estimate the confidence intervals. In a second analysis, we reran the analysis on data restricted to persons whose exposure was always below 12 $\mu g/m^3$, the U.S. standard for $PM_{2.5}$.

### 3.0 Results

Table 1 shows the characteristics of the Medicare cohort between 2000 and 2016. There were 623,036,820 person-years of follow-up during the study, and 29,481,444 deaths. 85.4% of the

participants were white, and 12.9% were covered by Medicaid, which provides additional benefits to the poor. The mean $PM_{2.5}$ during the study was 10.3 μg/m$^3$.

**Table 1**

| Variable | Values |
|---|---|
| **Year** | |
| Mean (SD) | 2009.5 (4.90) |
| Median [25%, 75%] | 2010 [2004, 2013] |
| **Male** | 42.8 % |
| **Race** | |
| Black | 8.4% |
| Other | 6.2% |
| White | 85.4% |
| **Age > 84** | 13.2% |
| **Medicaid Coverage** | 12.9% |
| ***ZIP Code Covariates*** | |
| **Median Income** | |
| Mean (SD) | $53,177 ($22,082) |
| Median [25%, 75%] | $47,998 [$38,030, $63,031] |

| | |
|---|---|
| **Median House Value** | |
| Mean (SD) | $200,139 ($159,728) |
| Median [25%, 75%] | $150,400 [$98,600, $240,300] |
| **Percent ZIP code Black** | |
| Mean (SD) | 11% (17.9%) |
| Median [25%, 75%] | 3.7% [1.1%, 12.0%] |
| **Percent ZIP code Hispanic** | |
| Mean (SD) | 12.6% (16.4%) |
| Median [25%, 75%] | 5.3% [2.1%, 14.6%] |
| **Percent >65 below poverty** | |
| Mean (SD) | 9.5% (6.5%) |
| Median [25%, 75%] | 7.9% [5.3%, 11.8%] |
| **Percent Low Education** | |
| Mean (SD) | 25.3% (14.7%) |
| Median [25%, 75%] | 22.6% [14.2%, 33.7%] |
| **Percent with annual Mammogram** | |
| Mean (SD) | 63.7% (7.2%) |
| Median [25%, 75%] | 63.9% [59.2%, 68.2%] |

| | |
|---|---|
| **Percent with ambulatory Visit** | |
| Mean (SD) | 77.8% (6.2%) |
| Median [25%, 75%] | 79.0% [74.4%, 82.1%] |
| **Population Density** (persons/mi$^2$) | |
| Mean (SD) | 3397 (9032) |
| Median [25%, 75%] | 967 [167, 3353] |
| **Percent Owner Occupied** | |
| Mean (SD) | 68% (16%) |
| Median [25%, 75%] | 70.8% [59.8%, 79.2%] |
| **Mean BMI (kg/m$^2$)** | |
| Mean (SD) | 27.5 (1.58) |
| Median [25%, 75%] | 27.3 [26.7, 28.0] |
| **Distance to nearest hospital (km)** | |
| Mean (SD) | 6.5 (7.4) |
| Median [25%, 75%] | 3.90 [1.98, 8.07] |
| **Ever Smoker** | |
| Mean (SD) | 46.2% (6.8%) |
| Median [25%, 75%] | 46.2% [41.8%, 50.4%] |

Journal Pre-proof

| | |
|---|---|
| **Percent annual HbA1c test** | |
| Mean (SD) | 83.1% (4.9%) |
| Median [25%, 75%] | 83.7% [80.5%, 86.3%] |
| **Lung Cancer Rate (x $10^{-4}$)** | |
| Mean (SD) | 3.9 (2.8) |
| Median [25%, 75%] | 3.3 [1.9, 4.9] |
| **Percent annual LDL** | |
| Mean (SD) | 79.5% (6.2%) |
| Median [25%, 75%] | 80.1% [76.1%, 83.5%] |
| **Percent Annual Eye Exam** | |
| Mean (SD) | 67.4% (6.4%) |
| Median [25%, 75%] | 67.1% [63.9%, 71.0%] |
| **$PM_{2.5}$ (μg/$m^3$)** | |
| Mean (SD) | 10.3 (3.1) |
| Median [25%, 75%] | 9.8 [7.9, 12.0] |

Journal Pre-proof

In the meta-analysis of the results of the 32 strata-specific DID analyses, we found that the probability of dying in each year increased by 3.85x$10^{-4}$ (95% CI 1.95 x$10^{-4}$ , 5.76 x$10^{-4}$) for each 1 μg/$m^3$ increment in $PM_{2.5}$ in that year. The $I^2$ statistic for heterogeneity was 42%. When we restricted our analysis to persons whose exposure was always below 12 μg/$m^3$ during the follow-up period, we found a larger effect size, with the probability of dying in each year increased by 4.26 x$10^{-4}$ (95% CI 1.43x$10^{-4}$, 7.09 x$10^{-4}$) per 1 μg/$m^3$ increase in $PM_{2.5}$. Interaction terms for male gender, age > 84, and race were fit in the full data. Sex was a significant modifier (p for interaction <0.001), with larger effects in males ( 6.81x10-$^{4}$, 95% CI 4.14x$10^{-4}$ , 9.48x$10^{-4}$ ) then females(1.20x$10^{-4}$, 95% CI -8.80x$10^{-5}$, 3.29x$10^{-4}$). These results are shown in Figure 1. There was no interaction by age. Interaction models for race did not converge because residential segregation in the U.S. resulted in groups with too few Blacks or Asians and other races. Instead, we reran the analysis without separate models for each of the 32 groups. There was no significant interaction by race.



## 4.0 Discussion

Using a difference in differences design applied to a linear rate model, we found that each 1 $\mu g/m^3$ increment in $PM_{2.5}$ was associated with a 3.85 $x10^{-4}$ increase in the probability of dying in a given year. If the difference in differences assumptions are met, this is a causal increase. We believe they are met for the following reasons. First, since this design controls for each ZIP code, all individual and neighborhood level confounders that change little over time are controlled, whether measured or not. This includes most of the variables (e.g. SES, smoking history, diet) that have be posited as potential confounders. Consequently, only time varying factors can be confounders. Second, we controlled for potential confounding in each ZIP code due to time trends in median household income, median home value, percent owner occupied housing, percent of ZIP code that is Black, percent of households that are Hispanic, percent of persons aged 65 or older living in poverty, smoking rate, BMI, Medicaid eligibility, educational attainment, population density, lung cancer rates, multiple measures of the adequacy of medical care, and summer and winter temperature. Third, we grouped the ZIP codes by these factors, and fit separate nonlinear time trends within each of 32 groups to capture any remaining time trends due to omitted confounders could differ between groups, but would be similar within group. This approach effectively looks at the within ZIP code fluctuations in exposure around the ZIP code mean, trend due to measured time-varying covariates, and common trends by group of ZIP codes. It compares that to the same deviation in mortality. Such an approach, looking at yearly deviations from trend and ZIP code mean in exposure and outcome, is inherently examining the relationship of changes in exposure to changes in outcome. This also addresses the issue of whether previous studies effects are due to primarily recent exposure, or reflect long term exposure, including when pollution concentrations were

higher. The dummy variable for each ZIP code controls for long term exposure at that ZIP code, and the removal of nonlinear time trends during the period under study focuses the exposure variable on the year of the death. EPA Regulatory Impact Analyses spread the estimated mortality effects out over a 20 year period. This study provides an estimate of immediate impact. Because our study incorporates 17 years of follow-up, each year has a new exposure, and a new effect.

In addition this paper adds to the sparse literature controlling for temperature in studies of long-term exposure to air pollution, which some have argued is an important confounder. Further, we estimated the probability of dying in a year, which is more easily interpretable than an instantaneous hazard rate, and by using an additive rather than multiplicative model we estimated the marginal effect if $PM_{2.5}$, not the conditional effect estimated by Cox's proportionate hazard model. This allows one to estimate attributable deaths in health impact assessments without making further, possibly implausible assumptions required when using a conditional estimate.

Some scientists, including the current chair of EPA's Clean Air Scientific Advisory Committee (CASAC), assert that studies using standard epidemiological methods should be given little weight in revising the NAAQS, and propose restricting to studies using causal methods, and particularly ones showing changes in air quality are associated with changes in mortality(CASAC, 2019). The recent meetings of EPA's CASAC highlighted the importance of these issues(CASAC., 2019). Their main criticism is that traditional approaches only show associations that may be confounded, vary depending on modeling approaches, and do not inform causality, which can only be addressed by causal methods. They also emphasize that unmeasured variables, particularly individual characteristics, socioeconomic status, and temperature may confound the published literature.(Cox and Popken, 2015) EPA recently proposed not tightening the NAAQS for $PM_{2.5}$, relying on these arguments. This paper provides an analysis using a causal method, controlling for

temperature and socioeconomic status, and all individual and area level potential confounders, measured or unmeasured, that vary slowly over time.

That EPA proposal also asserted there was insufficient evidence of a causal association at lower levels. When we restricted our analysis to include only persons who never experienced concentrations above 12 μg/$m^3$ during 17 years of follow-up we found a somewhat larger effect estimate of 4.26 x$10^{-4}$ (95% CI 1.43x$10^{-4}$, 7.09 x$10^{-4}$) per 1 μg/$m^3$ increase in $PM_{2.5..5}$. This indicates that the current U.S. and E.U. standards are not sufficient to protect public health, and that the WHO standard of 10 μg/$m^3$ is unlikely to protect public health.

Other studies have applied causal modeling methods to air pollution, primarily propensity score methods(Abu Awad et al., 2019; Schwartz et al., 2018; Wang et al., 2017; Wei et al., 2020; Wu et al., 2020; Yitshak-Sade et al., 2019). These methods use the relationship between exposure and confounders to render the exposure independent of all of the measured confounders, and hence mimic a randomized trial. They have all reported that $PM_{2.5}$ increases mortality rates. The difference in differences approach complements those studies by its ability to deal with unmeasured confounders. All personal and small area time invariant or slowly varying confounders are removed by design, whether measured or not. All confounders whose time trends are due to measured time-varying confounders or similar within groups defined by race, SES, medical access, and behavioral characteristics are controlled whether measured or not. Hence, this paper adds assurance about many possible unmeasured confounders to the large literature of associational studies and smaller literature of propensity score-based models that provide causal estimates. Together, they provide strong evidence for a causal effect of $PM_{2.5}$ on mortality rates.

Since we estimate the probability of dying in each year and not a hazard rate, our effect sizes are not directly comparable to the other causal modeling studies. Compared to the larger literature, a

recent meta-analysis of then extant cohort studies estimated the effect size at 10 μg/$m^3$ (the mean concentration in this study) as a 1.29% increase in the rate per μg/$m^3$ increase in PM2.5, (95% CI 1.09%, 1.50%)(Vodonos et al., 2018).The annual mortality rate in the Medicare cohort was $4.7x10^{-2}$. A 1.29% increase in that rate is an additive increase of $6.1x10^{-4}$. The results from a previous Cox regression analysis of the Medicare cohort from 2000-2012 translate to an additive increase of $3.4x10^{-4}$. These are similar to our results. Hence these other studies are unlikely to have been confounded by temperature, or slowly varying SES, racial, and behavioral factors which this study controlled for.

Nor are these effects small. Multiplying our effect estimates by the total person-years in the Medicare cohort, we estimate that had everyone had 1 μg/$m^3$ lower exposure, 239,900 early deaths would have been avoided during the follow-up period. EPA's National Contingency Plan (40 C.F.R. § 300.430(d)(1)) states that the range of acceptable **lifetime risks** (of developing cancer) for carcinogens should be set between 1 in 10,000 and 1 in a million over a 70-year lifetime. Thus, when EPA considers regulations for carcinogens, it typically regulates if **lifetime risks** exceed 1 in a hundred thousand. In contrast, 1 μg/$m^3$ of exposure below the current EPA standard for only 1 year results in an increased risk of dying of 4.26 per ten thousand in our study.

Our finding has limitations. First, DID analyses depend on the change over time in other ZIP codes with different changes in $PM_{2.5}$ to serve as controls for changes over time in outcome that may have occurred independent of exposure. If the time trends in the ZIP codes are different, this control will fail. We have dealt with this by controlling for time trends in measured covariates and grouping ZIP codes into 32 groups that are similar on age, sex, race/ethnicity, SES, and access to medical care, and doing the analysis separately within each group, arguing that the time trends in

mortality rates will be similar within group. However, we cannot exclude the possibility that they are not. Second, our exposure estimates are not perfect. While an out of sample $R^2$ of 0.89 is high, there is still some exposure error, which may bias estimates. In addition, personal exposure within a neighborhood varies around the neighborhood ambient concentration. However, we believe most of that difference is likely to be Berksonian error, and hence not bias coefficients. Moreover, the principle reason for the differences between ambient and personal exposure are behavioral (more driving, more cooking, etc), and incorporating exposure related to those factors would require controlling for other related risk factors (e.g. stress from driving) that are not confounders of the neighborhood ambient concentrations. Hence, this exposure error is beneficial from the point of view of reducing confounding, as has been pointed out previously(Weisskopf and Webster, 2017).

In conclusion, we have found an effect of $PM_{2.5}$ on daily deaths using a causal modeling approach robust to unmeasured confounders. The effect size is similar to those reported in associational studies, suggesting that unmeasured confounders are not an issue with them, and is large enough to indicate that reducing $PM_{2.5}$ concentrations in the U.S. could save tens of thousands of premature deaths each year.

References

Abu Awad, Y., et al., 2019. Change in PM2.5 exposure and mortality among Medicare recipients. Environmental Epidemiology. 3, e054.
Baccini, M., et al., 2017. Assessing the short term impact of air pollution on mortality: a matching approach. Environ Health. 16, 7.
Beelen, R., et al., 2014. Effects of long-term exposure to air pollution on natural-cause mortality: an analysis of 22 European cohorts within the multicentre ESCAPE project. Lancet. 383, 785-95.
Bureau, U. S. C., US. Census 2000. Summary File 3 (SF 3). In: U. S. C. Bureau, (Ed.), 2010.
CASAC, Public Teleconference on Particulate Matter (PM). EPA Chartered Clean Air Scientific Advisory Committee (CASAC), Available at https://yosemite.epa.gov/sab/sabproduct.nsf/MeetingCalCASAC/4F40665AD1DDCEF6852583A000645464?OpenDocument., 2019.
CASAC., CASAC Review of the EPA's Integrated Science Assessment for Particulate Matter. . In: U. S. E. P. Agency, (Ed.), Washington, D.C., Apr. 2019, 2019.
Caudill, S., Jackson, J., 1989. Measuring Marginal Effects in Limited Dependent Variable Models. Journal of the Royal Statistical Society, Series B. 38, 203-6.
CDC, Behavioral Risk Factor Surveillance System. BRFSS 2013 Survey Data and Documentation. . In: C. f. D. Control, (Ed.), 2013.
Cox, L. A., Jr., Popken, D. A., 2015. Has reducing fine particulate matter and ozone caused reduced mortality rates in the United States? Ann Epidemiol. 25, 162-73.
Crouse, D. L., et al., 2015. Ambient PM2.5, O3, and NO2 Exposures and Associations with Mortality over 16 Years of Follow-Up in the Canadian Census Health and Environment Cohort (CanCHEC). Environ Health Perspect. 123, 1180-6.
Di, Q., et al., 2019. An ensemble-based model of PM2.5 concentration across the contiguous United States with high spatiotemporal resolution. Environ Int. 130, 104909.
Di, Q., et al., 2020. Assessing NO2 Concentration and Model Uncertainty with High Spatiotemporal Resolution across the Contiguous United States Using Ensemble Model Averaging. Environmental Science & Technology. 54, 1372-1384.
Di, Q., et al., 2017. Air Pollution and Mortality in the Medicare Population. N Engl J Med. 377, 1498-9.
Donald, S., Lang, K., 2007. Inference with difference-in-differences and other panel data. . Rev Econ Stat. 89, 221–233.
Hoek, G., et al., 2013. Long-term air pollution exposure and cardio- respiratory mortality: a review. Environ Health. 12, 43.
Imai, K., van Dyke, D. A., 2004. Causal inference with general treatment regimes: Generalizing the Propensity Score. Journal of the American Statistical Association. 99, 854:866.
Pinault, L., et al., 2016. Risk estimates of mortality attributed to low concentrations of ambient fine particulate matter in the Canadian community health survey cohort. Environmental Health. 15, 18.
Pope, C. A., 3rd, et al., 2019. Mortality Risk and Fine Particulate Air Pollution in a Large, Representative Cohort of U.S. Adults. Environ Health Perspect. 127, 77007.
RESDAC, Denominator File. 2018.

Rubin, D. B., 1997. Estimating causal effects from large data sets using propensity scores. Ann Intern Med. 127, 757-63.

Schwartz, J. D., et al., 2018. Estimating the Effects of PM2.5 on Life Expectancy Using Causal Modeling Methods. Environ Health Perspect. 126, 127002.

Vodonos, A., et al., 2018. The concentration-response between long-term PM2.5 exposure and mortality; A meta-regression approach. Environmental Research.

Wang, Y., et al., 2016. Estimating Causal Effects of Long-Term PM2.5 Exposure on Mortality in New Jersey. Environ Health Perspect. 124, 1182-8.

Wang, Y., et al., 2017. Doubly Robust Additive Hazards Models to Estimate Effects of a Continuous Exposure on Survival. Epidemiology (Cambridge, Mass.). 28, 771-779.

Wei, Y., et al., 2020. Causal effects of air pollution in Massachusetts. American journal of epidemiology. in press.

Weisskopf, M., Webster, T., 2017. Trade-offs of Personal Versus More Proxy Exposure Measures in Environmental Epidemiology. Epidemiology (Cambridge, Mass.). 635-43.

Wennberg, J., Cooper, M., 1996. The Dartmouth atlas of health care: . American Hospital Publishing Chicago, IL;.

Wu, X., et al., 2020. Evaluating the Impact of Long-term Exposure to Fine Particulate Matter on Mortality Among the Elderly. Science Advances.

Yang, C., et al., 2012. Alternative ozone metrics and daily mortality in Suzhou: the China Air Pollution and Health Effects Study (CAPES). Sci Total Environ. 426, 83-9.

Yitshak-Sade, M., et al., 2019. Estimating the causal effect of annual PM2.5 exposure on mortality rates in the Northeastern and mid-Atlantic states. Environmental Epidemiology. Latest Articles.

Figure Legend. Figure 1 shows the effect size estimate (absolute increase in the death rate for each 1 μg/m$^3$ increase in $PM_{2.5}$ exposure, and 95% Confidence Interval) for the entire Medicare Cohort in 2000-2016 (All), for only persons never exposed to $PM_{2.5}$ concentrations above 12 μg/m$^3$ (low) during the follow-up period, for males in the entire Medicare Cohort (males) and for females in the entire Medicare Cohort.

Journal Pre-proof

**Declaration of interests**

☐ The authors declare that they have no known competing financial interests or personal relationships that could have appeared to influence the work reported in this paper.

☒The authors declare the following financial interests/personal relationships which may be considered as potential competing interests:

Dr. Schwartz declares that he has testified as a health expert for the U.S. Department of Justice in a law suit over clean air act violations. No other authors have anything to declare.

# Global mortality from outdoor fine particle pollution generated by fossil fuel combustion: Results from GEOS-Chem

**Karn Vohra[1*], Alina Vodonos[2], Joel Schwartz[2], Eloise A. Marais[3,a], Melissa P. Sulprizio[4], Loretta J. Mickley[4]**

[1] School of Geography, Earth and Environmental Sciences, University of Birmingham, Birmingham, UK

[2] Harvard T.H. Chan School of Public Health, Department of Environmental Health, Harvard University, Boston, MA, USA

[3] Department of Physics and Astronomy, University of Leicester, Leicester, UK

[4] John A. Paulson School of Engineering and Applied Sciences, Harvard University, Cambridge, MA, USA

[a] Now at: Department of Geography, University College London, London, UK

* Corresponding author: Karn Vohra, Phone: +44 7716 496 867,

Email: kxv745@student.bham.ac.uk

**Keywords**; particulate matter, fossil fuel, mortality, health impact assessment

## Abstract

The burning of fossil fuels – especially coal, petrol, and diesel – is a major source of airborne fine particulate matter ($PM_{2.5}$), and a key contributor to the global burden of mortality and disease. Previous risk assessments have examined the health response to total $PM_{2.5}$, not just $PM_{2.5}$ from fossil fuel combustion, and have used a concentration-response function with limited support from

the literature and data at both high and low concentrations. This assessment examines mortality associated with $PM_{2.5}$ from only fossil fuel combustion, making use of a recent meta-analysis of newer studies with a wider range of exposure. We also estimated mortality due to lower respiratory infections (LRI) among children under the age of five in the Americas and Europe, regions for which we have reliable data on the relative risk of this health outcome from $PM_{2.5}$ exposure. We used the chemical transport model GEOS-Chem to estimate global exposure levels to fossil-fuel related $PM_{2.5}$ in 2012. Relative risks of mortality were modeled using functions that link long-term exposure to $PM_{2.5}$ and mortality, incorporating nonlinearity in the concentration response. We estimate a global total of 10.2 (95% CI: -47.1 to 17.0) million premature deaths annually attributable to the fossil-fuel component of $PM_{2.5}$. The greatest mortality impact is estimated over regions with substantial fossil fuel related $PM_{2.5}$, notably China (3.9 million), India (2.5 million) and parts of eastern US, Europe and Southeast Asia. The estimate for China predates substantial decline in fossil fuel emissions and decreases to 2.4 million premature deaths due to 43.7% reduction in fossil fuel $PM_{2.5}$ from 2012 to 2018 bringing the global total to 8.7 (95% CI: -1.8 to 14.0) million premature deaths. We also estimated excess annual deaths due to LRI in children (0-4 years old) of 876 in North America, 747 in South America, and 605 in Europe. This study demonstrates that the fossil fuel component of $PM_{2.5}$ contributes a large mortality burden. The steeper concentration-response function slope at lower concentrations leads to larger estimates than previously found in Europe and North America, and the slower drop-off in slope at higher concentrations results in larger estimates in Asia. Fossil fuel combustion can be more readily controlled than other sources and precursors of $PM_{2.5}$ such as dust or wildfire smoke, so this is a clear message to policymakers and stakeholders to further incentivize a shift to clean sources of energy.

**Introduction**

The burning of fossil fuels – especially coal, petrol, and diesel – is a major source of airborne particulate matter (PM) and ground-level ozone, which have both been implicated as key contributors to the global burden of mortality and disease (Apte et al., 2015; Dedoussi and Barrett, 2014; Lim et al., 2013). A series of studies have reported an association between exposure to air pollution and adverse health outcomes (Brook et al., 2010), even at low exposure levels (< 10 μg $m^{-3}$, the current World Health Organization, WHO, guideline) (Di et al., 2017). The Global Burden of Diseases, Injuries, and Risk Factors Study 2015 (GBD 2015) identified ambient air pollution as a leading cause of the global disease burden, especially in low-income and middle-income countries (Forouzanfar et al., 2016). Recent estimates of the global burden of disease suggest that exposure to $PM_{2.5}$ (particulate matter with an aerodynamic diameter < 2.5 μm) causes 4.2 million deaths and 103.1 million disability-adjusted life-years (DALYs) in 2015, representing 7.6% of total global deaths and 4.2% of global DALYs, with 59% of these in east and south Asia (Cohen et al., 2017).

A series of newer studies conducted at lower concentrations and at higher concentrations have reported higher slopes than incorporated into the GBD using the integrated exposure–response (IER) curve (Burnett et al., 2014). These studies examined mortality due to exposure to $PM_{2.5}$ at concentrations below 10 μg $m^{-3}$ in North America (Di et al., 2017; Pinault et al., 2016) and above 40 μg $m^{-3}$ in Asia (Katanoda et al., 2011; Tseng et al., 2015; Ueda et al., 2012; Wong et al., 2015; 2016; Yin et al., 2017). Here we have used a concentration-response curve from a recently published meta-analysis of long-term $PM_{2.5}$ mortality association among adult populations which incorporates those new findings at high and low $PM_{2.5}$ concentrations (Vodonos et al.,

2018). We also focus our study on the health impacts of fossil-fuel derived $PM_{2.5}$. In contrast, GBD reports only the health impacts of total $PM_{2.5}$ and does not distinguish mortality from fossil-fuel derived $PM_{2.5}$ and that from other kinds of $PM_{2.5}$, including dust, wildfire smoke, and biogenically-sourced particles. We focus only on $PM_{2.5}$ since recent studies have provided mixed results on the link between ozone and mortality (Atkinson et al., 2016) and there does not exist a global coherent concentration-response function (CRF) for ozone.

The developing fetus and children younger than 5 years of age are more biologically and neurologically susceptible to the many adverse effects of air pollutants from fossil-fuel combustion than adults. This differential susceptibility to air pollution is due to their rapid growth, developing brain, and immature respiratory, detoxification, immune, and thermoregulatory systems (Bateson and Schwartz, 2008; Perera, 2018). Children also breathe more air per kilogram of body weight than adults, and are therefore more exposed to pollutants in air (WHO, 2006; Xu et al., 2012). The WHO estimated that in 2012, 169,000 global deaths among children under the age of 5 were attributable to ambient air pollution (WHO, 2016). Further estimation of the burden of mortality due to $PM_{2.5}$ (particularly from anthropogenic sources) among the young population would highlight the need for intervention aimed at reducing children's exposure.

Using the chemical transport model GEOS-Chem, we quantified the number of premature deaths attributable to ambient air pollution from fossil fuel combustion. Improved knowledge of this very immediate and direct consequence of fossil fuel use provides evidence of the benefits to current efforts to cut greenhouse gas emissions and invest in alternative sources of energy. It also helps quantify the magnitude of the health impacts of a category of $PM_{2.5}$ that can be more readily controlled than other kinds of $PM_{2.5}$ such as dust or wildfire smoke.

## Materials and methods

### *Calculation of surface $PM_{2.5}$ concentrations*

Previous studies examining the global burden of disease from outdoor air pollution have combined satellite and surface observations with models to obtain improved estimates of global annual mean concentrations of $PM_{2.5}$ (Shaddick et al., 2018). However, the goal of such studies was to quantify the health response to $PM_{2.5}$ from all sources, both natural and anthropogenic (Brauer et al., 2016; Cohen et al., 2017). Here the focus of our study is on surface ambient $PM_{2.5}$ generated by fossil fuel combustion, and for that we rely solely on the chemical transport model GEOS-Chem since current satellite and surface measurements cannot readily distinguish between the sources of $PM_{2.5}$. Results from GEOS-Chem have been extensively validated against surface, aircraft, and space-based observations around the world, including simulation of surface pollution over the United States (Drury et al., 2010; Ford and Heald, 2013; Heald et al., 2012; Leibensperger et al., 2012; Marais et al., 2016; Zhang et al., 2012), Asia (Koplitz et al., 2016; Lin et al., 2014), Europe (Protonotariou et al., 2013; Veefkind et al., 2011), and Africa (Lacey et al., 2017; Marais et al., 2014a; 2014b; 2016; 2019). The model has also been applied to previous studies quantifying the global burden of disease from particulate matter from all sources (Brauer et al., 2016; Cohen et al., 2017).

In this analysis we used GEOS-Chem with fossil fuel emissions from multiple sectors (power generation, industry, ships, aircraft, ground transportation, backup generators, kerosene, oil/gas extraction), detailed oxidant-aerosol chemistry, and reanalysis meteorology from the NASA Global Modeling and Assimilation Office. Fossil fuel emissions are from regional inventories where these are available for the US, Europe, Asia, and Africa, and from global

inventories everywhere else (such as Mexico, Australia, South America and Canada). More details of the specific fossil fuel inventories used in GEOS-Chem are in Table S1. Global-scale simulations in GEOS-Chem were carried out on a coarse spatial grid (2° × 2.5°, about 200 km × 250 km). Four regional simulations were also performed at fine spatial scale (0.5° × 0.67°, about 50 km × 60 km) for North America, Europe, Asia, and Africa using boundary conditions from the global model. The regional simulations allow for a better match with the spatial distribution of population, thus enhancing the accuracy of the estimates of health impacts. All simulations were set up to replicate 2012 pollution conditions. As described in the Supplemental Material, we find that globally, GEOS-Chem captures observed annual mean $PM_{2.5}$ concentrations with a spatial correlation of 0.70 and mean absolute error of 3.4 μg $m^{-3}$, values which compare well with those from other models (Shindell et al., 2018; Xing et al., 2015). We performed two sets of simulations: one set with fossil fuel emissions turned on and the other with such emissions turned off. We then assumed that the difference between the two sets of simulations represents the contribution of fossil fuel combustion to surface $PM_{2.5}$. More information on our choice of GEOS-Chem, the model setup, details of relevant anthropogenic emissions, and model validation is described in the Supplemental material.

*Population and Health data*

We used population data from the Center for International Earth Science Information Network (CIESIN) (CIESIN, 2018). The Gridded Population of the World, Version 4 Revision 11 (GPWv4.11) is gridded with an output resolution of 30 arc-seconds (approximately 1 km at the equator). Since the population data are provided only at five-year intervals, we applied 2015 population statistics to the results of our 2012 GEOS-Chem simulation. CIESIN population data

was then aggregated to the spatial scale of the model for the exposure estimates. Country/region level data on baseline mortality rates were from GBD data for 2015 (based on the 2017 iteration) (IHME, 2017). USA state-specific mortality rates were obtained from the CDC Wide-ranging Online Data for Epidemiologic Research (WONDER) compressed mortality files (WONDER). Canada death estimates by province were obtained from Statistics Canada, CANSIM (Canada, 2018).

*$PM_{2.5}$ mortality concentration –response model*

The risk of air pollution to health in a population is usually estimated by applying a concentration–response function (CRF), which is typically based on Relative Risk (RR) estimates derived from epidemiological studies. CRFs are necessary elements for the quantification of health impacts due to air pollution and require regular evaluation and update to incorporate new developments in the literature.

Global assessments of air pollution risk often use the Integrated Exposure-Response model (IER) (Burnett et al., 2014), which combined information on $PM_{2.5}$–mortality associations from non-outdoor $PM_{2.5}$ sources, including secondhand smoke, household air pollution from use of solid fuels, and active smoking. The IER used data from active smoking and passive smoking to address the limited number of outdoor $PM_{2.5}$ epidemiologic studies at $PM_{2.5}$ > 40 μg $m^{-3}$ available at the time. The IER formed the basis of the estimates of disease burden attributable to $PM_{2.5}$ (e.g., 4 million deaths in 2015 in GBD 2015). This function was then updated in 2018 using the Global Exposure Mortality Model (GEMM). In GEMM, data from 41 epidemiological cohort studies were applied (Burnett et al., 2018). Independently conducted analyses were conducted on 15 of these cohorts to characterize the shapes of $PM_{2.5}$–mortality associations in each cohort, using a specified functional form of the CRF. For the remaining 26

cohorts, the concentration-response was examined with a linear concentration hazard ratio model. A recent meta-analysis of the association between long-term $PM_{2.5}$ and mortality (Vodonos et al., 2018) applied techniques involving flexible penalized spline CRF in a multivariate random effects and meta-regression model. This approach allows the data to specify the shape of the CRF. The meta-regression pooled 135 estimates from 53 studies examining long-term $PM_{2.5}$ and mortality of cohorts aged 15 years and older. The estimate of the confidence intervals about the CRF includes a random variance component. This meta-analysis provided evidence of a nonlinear association between $PM_{2.5}$ exposure and mortality in which the exposure-mortality slopes decreases at higher concentrations (Figure S5 in Supplemental Material). We have chosen to use the dose-response function from the meta-analysis rather than the GEMM function as the meta-regression approach is more flexible and does not constrain the CRF to a specific functional form, it incorporates a random variance component in estimating the uncertainty around that curve, it is derived with more studies than previous approaches, and its estimates at high and low exposures are closer to the estimates in cohorts restricted to only very high and very low exposures. To ensure consistency with the concentration-response curve, premature mortality rates for the portion of the population >14 years of age were determined using the population and baseline mortality rates for different age groups from GBD data for 2015.

*Health impact calculations*

We estimated the number of premature deaths attributable to fossil fuel $PM_{2.5}$ using: (1) GEOS-Chem $PM_{2.5}$ estimated with all emission sources and GEOS-Chem $PM_{2.5}$ estimated without fossil fuel emissions, as a comparison against the first simulation, (2) total population above the age of 14 gridded to the GEOS-Chem grid resolution, (3) baseline all-cause mortality rates for

population above the age of 14 (per country or per state in the US and province in Canada), and (4) the meta-analysis CRF (Vodonos et al., 2018). All health impacts were calculated on a per-grid basis at the spatial resolution of the model. We applied the following health impact function to estimate premature mortality related to exposure to fossil fuel $PM_{2.5}$ in each GEOS-Chem grid cell:

$$\sum \Delta y = y_o * p * AF \qquad (1)$$

$$AF = \frac{\exp^{(\bar{\beta} * \Delta x)} - 1}{\exp^{(\bar{\beta} * \Delta x)}} \qquad (2)$$

$$\bar{\beta}(PM_{2.5}) = \int_{PM_{2.5}\ \text{no fossil fuel}}^{PM_{2.5}\ \text{all emissions}} \beta(PM_{2.5}) \qquad (3)$$

where $\Delta y$ is the change in the number of premature deaths due to exposure to fossil fuel $PM_{2.5}$, $y_o$ is the country/state/province specific baseline (all-cause) mortality rate, p is to the total population above the age of 14, AF is the attributable fraction of deaths (the fraction of total deaths attributable to $PM_{2.5}$ exposure), $\bar{\beta}$ is the mean estimate for long-term $PM_{2.5}$ mortality concentration-response over a range of concentrations from the penalized spline model in the recent meta-analysis, and $\Delta x$ is the change in $PM_{2.5}$ concentration, calculated as the difference between GEOS-Chem $PM_{2.5}$ with all emissions and GEOS-Chem $PM_{2.5}$ without fossil fuel emissions.

For each country, we summed the change in premature deaths ($\Delta y$) in each grid cell over all grid cells in that country. To estimate the change in deaths between the two scenarios (with and without fossil fuel combustion), we computed the change in deaths in each grid cell, based on its

population, baseline rate, and exposure under the two scenarios (Equation (1)). The attributable fraction (AF), or proportion of deaths estimated as due to long-term exposure to $PM_{2.5}$ fossil fuel air pollution, was calculated using the concentration-response estimate, following the form shown in Equation (2) (Figure S5 in Supplemental material). Because these estimates of mortality concentration response ($\beta$) are a nonlinear function of concentration, we used the penalized spline model predictions from this meta-analysis to integrate the concentration-specific $\beta$ in each grid cell from the low $PM_{2.5}$ scenario (without fossil fuel emissions) to the high $PM_{2.5}$ scenario (with all emissions, including fossil fuel). In this way, we could calculate a mean value of $\beta$ for each grid cell. There exist insufficient epidemiological data to calculate a robust health response function specific to fossil-fuel $PM_{2.5}$. GEOS-Chem is a deterministic model. Therefore, our 95% confidence intervals (CI) for our estimates reflect only the 95% CI for the concentration response function.

### *Secondary analysis among children <5 years old*

Lower respiratory infections (LRI), including pneumonia and bronchiolitis of bacterial and viral origin, are the largest single cause of mortality among young children worldwide and thus account for a significant global burden of disease worldwide (Nair et al., 2010). As mentioned previously, young children are more susceptible to the adverse effects of particulate air pollution than adults. Mehta et al. (2013) estimated the overall impact of $PM_{2.5}$ concentration with Relative Risk (RR) of 1.12 for LRI mortality per 10 μg $m^{-3}$ increase in annual average $PM_{2.5}$ concentration, as compared to RR of 1.04 for respiratory mortality among adults (Vodonos et al., 2018). We estimated the number of premature deaths attributable to $PM_{2.5}$ among children under the age of 5 years due to a range of LRI classifications (ICD-10, International Classification of Diseases codes: A48.1, A70, J09-J15.8, J16-J16.9, J20-J21.9, P23.0-P23.4). Baseline numbers of deaths due to LRI were obtained from the GBD for 2015 (IHME, 2017). We used the Relative

Risk (RR) of 1.12 (1.03-1.30) for LRI occurrence per 10 μg $m^{-3}$ increase in annual average $PM_{2.5}$ concentration (Mehta et al., 2013). Studies of longer-term exposure of $PM_{2.5}$ and LRI in that meta-analysis were conducted in only a few developed countries with relatively low levels of annual mean $PM_{2.5}$ (< 25 μg $m^{-3}$), specifically the Netherlands, Czech Republic, Germany, Canada and USA. We therefore calculated the number of premature LRI deaths attributable to $PM_{2.5}$ only in North America, South America, and Europe.

## Results

### *Impact of fossil fuel use on $PM_{2.5}$*

Figure 1 shows the difference between global GEOS-Chem $PM_{2.5}$ with and without fossil fuel emissions, plotted as the annual mean for 2012. Results show large contributions of 50-100 μg $m^{-3}$ in $PM_{2.5}$ over China and India, with smaller increments of 10-50 μg $m^{-3}$ over large swaths of the United States and Europe, industrialized countries in Africa (South Africa and Nigeria), and along the North African coastline due to European pollution.

### *Global assessment of mortality attributable to $PM_{2.5}$*

Based on the annual $PM_{2.5}$ simulation with and without global fossil fuel emissions, we estimated the excess deaths and attributable fraction (AF %) for the population above 14 years old. Figure 2 shows the simulated annual global premature mortality due to exposure to ambient $PM_{2.5}$ from fossil fuel emissions. Greatest mortality is simulated over regions with substantial influence of fossil-fuel related $PM_{2.5}$, notably parts of Eastern North America, western Europe, and South-East Asia.

We estimated a total global annual burden premature mortality due to fossil fuel combustion in 2012 of 10.2 million (95% CI: -47.1 to 17.0 million). Table 1 reports the baseline number of deaths for people >14 years old, the annual $PM_{2.5}$ simulation with and without global fossil fuel emissions, the estimated excess deaths, and the attributable fraction for the populated continents. As shown in Table 1, we calculated 483,000 premature deaths in North America (95% CI: 284,000-670,000), 187,000 deaths in South America (95% CI: 107,000-263,000), 1,447,000 deaths in Europe (95% CI: 896,000-1,952,000), 7,916,000 deaths in Asia (95% CI: -48,106,000 to 13,622,000), and 194,000 deaths in Africa (95% CI: -237,000 to 457,000). The wide confidence intervals in Asia and Africa are due to the lack of data for areas where the exposure remains outside the range of the concentration response curve ($PM_{2.5} > 50$ μg $m^{-3}$; Figure S5). The population-weighted pollution concentrations presented in Table 1 are higher than the average $PM_{2.5}$ concentrations for each country, since fossil-fuel $PM_{2.5}$ is mainly emitted in populous areas. The two countries with the highest premature mortality are China with 3.91 million and India with 2.46 million. Supplemental Table S2 provides extended data of the health impact calculations for each country. For comparison, Table 1 also reports the number of premature deaths attributable to fossil fuel $PM_{2.5}$ when the GEMM function is applied to the GEOS-Chem output. For most regions, the number of premature deaths calculated with GEMM is significantly lower than that calculated with the new function from Vodonos et al. (2018). Globally, the GEMM function yields 6.7 million deaths in 2012 due to fossil fuel combustion.

*Assessment of children (under the age of 5) LRI mortality attributable to $PM_{2.5}$*

We estimated the number of premature deaths attributable to $PM_{2.5}$ among children under the age of 5 due to LRI only for those countries or regions with levels of annual $PM_{2.5}$

concentrations below 25 μg $m^{-3}$. These include North America, South America, and Europe. Based on the annual $PM_{2.5}$ simulation with and without fossil fuel emissions, we calculated 876 excess deaths due to LRI in North and Central America, 747 in South America, and 605 in Europe (Table 2). Using the GBD estimate of total deaths due to LRI (Institute for Health Metrics and Evaluation), we estimate that $PM_{2.5}$ from fossil fuel combustion accounted on average for 7.2% of LRI mortality among children under the age of 5 in these regions, with the largest proportion of 13.6% in Europe (95% CI -0.4 to 25.3%) .

**Discussion**

We used the chemical transport model GEOS-Chem to quantify the global mortality attributed to $PM_{2.5}$ air pollution from fossil fuel combustion. Using the updated concentration response relationship between relative mortality and airborne $PM_{2.5}$, we estimated global premature mortality in 2012 of 10.2 million per year from fossil fuel combustion alone. China has the highest burden of 3.91 million per year, followed by India with 2.46 million per year. These estimates carry large uncertainty (e.g., 95% CI of -47.1 to 17.0 million for the global estimate) from the concentration-response curve, as it is an improved function that provides a more realistic picture of the health consequences of $PM_{2.5}$ compared to previous studies.

Our estimate is for the year when fossil fuel emissions in China peaked and so predates large and dramatic reductions in fossil fuel emissions due to strict mitigation measures. These reductions led to a 30-50% decline in annual mean $PM_{2.5}$ across the country from 2013 to 2018 (Zhai et al., 2019). If we apply a 43.7% reduction in GEOS-Chem $PM_{2.5}$ concentrations from the simulation with all emission sources, premature mortality in China decreases from 3.91 million to

2.36 million. India has recently imposed controls on pollution sources, but there is not yet evidence of air quality improvements in densely populated cities like Delhi (Vohra et al., 2020). Consideration of the 2012-2018 decrease in $PM_{2.5}$ exposure in China reduces the total global premature mortality due to fossil fuel $PM_{2.5}$ from 10.2 million premature deaths each year to 8.7 (95% CI: -1.8 to 14.0) million.

In 2012, the population-weighted $PM_{2.5}$ is 72.8 μg $m^{-3}$ for China and 52.0 μg $m^{-3}$ for India from all sources and 9.9 μg $m^{-3}$ for China and 9.0 μg $m^{-3}$ for India without fossil fuel emissions. The low value of non-fossil fuel $PM_{2.5}$ is reasonable for southern India (Dey et al., 2012) but may be an underestimate in the Indo-Gangetic Plain where crop residue burning contributes to high levels of $PM_{2.5}$ (100-200 μg $m^{-3}$) during the post-monsoon season (Ojha et al., 2020). An increase in the concentration of non-fossil-fuel $PM_{2.5}$ would decrease our estimate of the number of premature deaths due to fossil fuel $PM_{2.5}$ in India and China, as this would decrease the risk of premature mortality with a unit change in $PM_{2.5}$ (Figure S5).

*Comparison with previous estimates of global mortality attributable to outdoor $PM_{2.5}$*

Previous estimates of the GBD for 2015 suggest that exposure to total $PM_{2.5}$ causes 4.2 million deaths (Cohen et al., 2017), whereas here we estimate more than double (10.2 million) the number of premature deaths from fossil fuel combustion alone in 2012. Differences between the current study and the 2015 GBD lower estimates are related mainly to the choice of the shape of the concentration-response function and the relative risk estimate. First, to provide information about exposure response at higher concentrations, the 2015 GBD study used the integrated exposure–response (IER) model in which active and second-hand smoking exposures were

converted to estimated annual $PM_{2.5}$ exposure equivalents using inhaled doses of particle mass (Burnett et al., 2014). Recent cohort studies from Asia indicate that this substantially underestimates the CRF at high concentrations. In contrast, in the current study we applied a CRF that was directly estimated from $PM_{2.5}$ studies alone, as described in a recent meta-analysis that included estimates from studies in countries like China with higher $PM_{2.5}$ concentrations than our included in previous derivations of CRFs (Vodonos et al., 2018). The CRF from this recent meta-analysis flattens out at higher concentrations, as does the IER curve. However, this flattening is not as great as in the IER, as Asian cohort studies at high $PM_{2.5}$ concentrations report larger effects than would be expected from the IER. Hence estimates of the global attributable fraction of deaths due to air pollution using the function from the recent meta-analysis are higher than the estimates using the IER function. In addition, at much lower concentrations ($< 10$ μg $m^{-3}$), we applied higher slopes than assumed in the IER function. Recent studies at very low concentrations similarly show that the IER underestimated effects in this range (Pinault et al., 2016). Since GEOS-Chem estimated quite low concentrations in developed countries in Europe and North America, the number of premature deaths from $PM_{2.5}$ in these countries is greater than previous estimates.

Following an approach similar to the recent meta-analysis (Vodonos et al., 2018), Burnett et al. (2018) modeled the shape of the association between $PM_{2.5}$ and non-accidental mortality using data from 41 cohorts from 16 countries with GEMM. In that study, the uncertainty in a subset (15 cohorts) was characterized in the shape of the concentration-response parameter by calculating the Shape-Constrained Health Impact Function, a prespecified functional form. These estimated shapes varied across the cohorts included in the function. GEMM predicted 8.9 million (95% CI: 7.5–10.3) deaths in 2015 attributable to long-term exposure to $PM_{2.5}$ from all sources; 120% higher excess deaths than previous estimates, but still lower than our estimate of mortality from exposure

to fossil-fuel derived $PM_{2.5}$ for 2012. Lelieveld et al. (2019) estimated the global and regional mortality burden of fossil fuel attributable $PM_{2.5}$ by applying the GEMM CRF to a global chemistry-climate model that is overall coarser (~1.9° latitude and longitude) than the model used in this work. The authors reported 3.61 million deaths per year attributable to pollution from fossil fuel combustion and 5.55 million deaths per year due to pollution from all anthropogenic sources. The estimated deaths from fossil fuel combustion are much lower than those in the current study for several reasons. First, the meta-analysis function used in our work includes 135 coefficients of all-cause mortality for adults aged 14-64 years old, together with cause-specific mortality and all-cause mortality among adults aged 65 and older, thus incorporating many more studies in a meta-regression framework than the 41 cohorts and coefficients in the GEMM function. Second, the approach used to estimate the CRF in Vodonos et al. (2018) allows for additional flexibility in the shape of the function because of its use of penalized splines. In contrast, the GEMM pooled CRF integrates a set of 26 log-linear functions and 15 functions characterized by three parameters governing the shape of the function. Third, while Cohen et al. (2017), Lelieveld et al. (2019) and Burnett et al. (2018) accounted for mortality from five specific causes (ischemic heart disease, stroke, chronic obstructive pulmonary disease, lung cancer and acute respiratory infections), in the current analysis we estimated changes in deaths from all causes. Fourth, some of the difference in the mortality estimates may come from differences in the age range. Our approach considers a wider population age range of over 14 years old (Vodonos et al., 2018) compared to the other studies, which considered a population age range of over 25 years (Burnett et al., 2018; Cohen et al., 2017; Lelieveld et al., 2019). Our approach has wider age range since the age range for the studies in the meta-analysis (Vodonos et al., 2018) included people younger than 25 years old (Hart et al., 2011; Pinault et al., 2016) . Finally, the finer spatial resolution that GEOS-Chem

utilizes over much of the globe improves co-location of PM hotspots and population centers, yielding higher estimates of excess mortality compared to Lelieveld et al. (2019).

*Limitations*

There are a number of limitations that must be acknowledged. First, vulnerability to $PM_{2.5}$ exposure may vary by population characteristics such as ethnicity, socio-economic status (SES), risk behaviors such as smoking and underlying comorbidities (Krewski et al., 2000; Pope et al., 2004; Wang et al., 2017) and by different exposure characteristics. We were limited in our ability to undertake a comprehensive analysis of factors influencing the association between $PM_{2.5}$ and mortality since the global mortality data were not available by detailed age, ethnicity, SES, lifestyle, and underlying disease strata. In addition, the 95% CI of our estimates reflect the lower and upper bound of the CRF, which flattens out at higher concentrations. Regions with very high concentrations (>50 μg $m^{-3}$) are beyond the data range in the meta-analysis; thus, the lower limit of the CI for those regions (China, West and North Africa; Table 1) are much less than zero. Second, for LRI in children, we have restricted our analysis to developed countries with annual $PM_{2.5} < 25$ μg $m^{-3}$, in accordance with the geographical locations of the studies included in the meta-analysis by Mehta et al. (2013). Developing countries have much higher LRI mortality rates, and this restriction doubtless results in an underestimate. Finally, GEOS-Chem estimates of $PM_{2.5}$ concentrations almost certainly contains errors in estimates of emissions of pollution precursors, meteorological effects on air quality, and representation of the complex physical and chemical formation pathways. In the absence of systematic bias, such model error may not produce large

aggregate errors in the mortality burden of $PM_{2.5}$, but bias may be present as well. In any event, it is challenging to estimate the true size of this error.

## Conclusions

The effects of $CO_2$-driven climate change on human health and welfare are complex, ranging from greater incidence of extreme weather events, more frequent storm-surge flooding, and increased risk of crop failure (Duffy et al., 2019). One consequence of increasing reliance on fossil fuel as an energy source that has thus far received comparatively little attention is the potential health impact of the pollutants co-emitted with the greenhouse gas $CO_2$. Such pollutants include $PM_{2.5}$ and the gas-phase precursors of $PM_{2.5}$. This study demonstrates that the fossil fuel component of $PM_{2.5}$ contributes a large global mortality burden. By quantifying this sometimes overlooked health consequence of fossil fuel combustion, a clear message is sent to policymakers and stakeholders of the co-benefits of a transition to alternative energy sources.

## Acknowledgments

This study was funded by the Wallace Global Fund, the Environment and Health Fund (EHF) Israel, and a University of Birmingham Global Challenges Fund PhD studentship awarded to KV.

## Declaration of interests

We declare no competing interests.

**Data availability.** GEOS-Chem code and output are available at the GEOS-Chem website (http://acmg.seas.harvard.edu/geos_chem.html) and upon request.

**Figures**




**Figure 1: Contribution of fossil fuel combustion to surface $PM_{2.5}$, as calculated by the chemical transport model GEOS-Chem.** The plot shows the difference in surface $PM_{2.5}$ concentrations from GEOS-Chem with and without fossil fuel emissions.




**Figure 2. Estimated annual excess deaths due to exposure to ambient $PM_{2.5}$ generated by fossil fuel combustion.**

**Table 1. Number of deaths attributable to exposure to fine particulate matter ($PM_{2.5}$) generated by fossil fuel combustion for the population >14 years old**

| GEOS-Chem spatial grid resolution[a] | Region[b] | | Total deaths >14 years old, in thousands | Population-weighted annual mean $PM_{2.5}$ concentration, μg $m^{-3}$ | | | Mean attributable fraction of deaths, % (95% CI)[d] | Deaths attributable to fossil-fuel related $PM_{2.5}$, in thousands (95% CI)[c] | GEMM function deaths attributable to fossil-fuel related $PM_{2.5}$, in thousands (95% CI)[e] |
|---|---|---|---|---|---|---|---|---|---|
| | | | | $PM_{2.5}$ from all emission sources | $PM_{2.5}$ without fossil fuel | Estimated $PM_{2.5}$ from fossil fuel, % | | | |
| Fine | North America | Central America & the Caribbean | 1,148 | 10.06 | 3.03 | 7.03 (69.9) | 8.2 (4.5-11.6) | 94 (52-133) | 80 (62-98) |
| | | USA | 2,705 | 11.81 | 2.15 | 9.66 (81.8) | 13.1 (7.8-18.1) | 355 (212-490) | 305 (233-375) |
| | | Canada | 250 | 12.01 | 1.76 | 10.25 (85.4) | 13.6 (8.0-18.7) | 34 (20-47) | 28 (22-35) |
| Coarse | South America | | 2,389 | 8.66 | 3.02 | 5.65 (65.2) | 7.8 (4.5-11.0) | 187 (107-263) | 159 (121-195) |
| Fine | Europe | | 8,626 | 19.22 | 4.68 | 14.54 (75.7) | 16.8 (10.4-22.6) | 1,447 (896-1,952) | 1,033 (798-1,254) |
| Fine | Asia | Eastern Asia | 25,468 | 51.72 | 8.68 | 43.05 (83.2) | 30.7 (-189.1-52.9) | 7,821 (-48,150-13,478) | 4,945 (3,943-5,826) |
| Coarse | | Western Asia & the Middle East | 1,456 | 26.95 | 20.73 | 6.22 (23.1) | 6.5 (3.0-9.9) | 95 (44-144) | 54 (43-65) |
| Fine | Africa | | 5,274 | 32.98 | 28.98 | 4.00 (12.1) | 3.7 (-4.5-8.7) | 194 (-237-457) | 102 (81-121) |
| Coarse | Australia & Oceania | | 189 | 4.17 | 2.19 | 1.98 (47.4) | 3.2 (1.6-4.8) | 6.0 (2.9-9.0) | 6.4 (4.8-7.9) |
| | Global | | 47,506 | 38.01 | 11.14 | 26.87 (70.7) | 21.5 (-99.0-35.7) | 10,235 (-47,054-16,972) | 6,713 (5,308-7,976) |

[a] Fine spatial scale is 0.5° × 0.67°, or about 50 km × 60 km. Coarse spatial scale is 2° × 2.5°, or about 200 km × 250 km

[b] List of countries for each region and subregion is provided in supplemental Table S2

[c] Annual number of deaths attributable to long-term exposure to $PM_{2.5}$ derived from fossil fuel combustion. CI is the confidence interval.

[d] Mean proportion of all deaths which can be attributed to long-term exposure to $PM_{2.5}$ generated by fossil fuel combustion, averaged over the country or region. CI; confidence interval.

[e] Attributable deaths calculated with the Global Exposure Mortality Model (GEMM) concentration-response function. [44]

**Table 2. Number of deaths due to lower respiratory infection (LRI) attributable to exposure to fine particulate matter ($PM_{2.5}$) from fossil fuel combustion for the population <5 years old**

| Region | Total deaths for children <5 years old due to LRI | LRI deaths attributable to fossil-fuel $PM_{2.5}$ (95% CI) [a] | Mean attributable fraction of deaths, % (95% CI) [b] |
|---|---|---|---|
| **North America** | **13,230** | **876 (-26-1,657)** | **6.6 (-0.2-12.5)** |
| Central America & the Caribbean | 12,507 | 802 (-23-1,516) | 6.4 (-0.2-12.1) |
| USA | 672 | 69 (-2-131) | 10.2 (-0.3-19.5) |
| Canada | 50 | 5 (0-10) | 10.8 (-0.3-20.5) |
| **South America** | **13,231** | **747 (-21-1,443)** | **5.7 (-0.2-10.9)** |
| **Europe** | **4,446** | **605 (-18-1,126)** | **13.6 (-0.4-25.3)** |

[a] Annual number of deaths attributed to long-term exposure to $PM_{2.5}$ derived from fossil fuel combustion.

[b] Mean proportion of deaths due to long-term exposure to $PM_{2.5}$ generated by fossil fuel combustion. CI is the confidence interval.

**References**


1. Apte, J. S., Marshall, J. D., Cohen, A. J., et al., Addressing Global Mortality from Ambient $PM_{2.5}$, Environ Sci Technol, 49, 8057-8066, doi:10.1021/acs.est.5b01236, 2015.

2. Atkinson, R. W., Butland, B. K., Dimitroulopoulou, C., et al., Long-term exposure to ambient ozone and mortality: a quantitative systematic review and meta-analysis of evidence from cohort studies, Bmj Open, 6, doi:10.1136/bmjopen-2015-009493, 2016.

3. Bateson, T. F., Schwartz, J., Children's response to air pollutants, J Toxicol Env Heal A, 71, 238-243, doi:10.1080/15287390701598234, 2008.

4. Brauer, M., Freedman, G., Frostad, J., et al., Ambient Air Pollution Exposure Estimation for the Global Burden of Disease 2013, Environ Sci Technol, 50, 79-88, doi:10.1021/acs.est.5b03709, 2016.

5. Brook, R. D., Rajagopalan, S., Pope, C. A., et al., Particulate Matter Air Pollution and Cardiovascular Disease An Update to the Scientific Statement From the American Heart Association, Circulation, 121, 2331-2378, doi:10.1161/CIR.0b013e3181dbece1, 2010.

6. Burnett, R., Chen, H., Szyszkowicz, M., et al., Global estimates of mortality associated with long-term exposure to outdoor fine particulate matter, P Natl Acad Sci USA, 115, 9592-9597, doi:10.1073/pnas.1803222115, 2018.

7. Burnett, R., Pope, C. A., Ezzati, M., et al., An Integrated Risk Function for Estimating the Global Burden of Disease Attributable to Ambient Fine Particulate Matter Exposure, Environ Health Persp, 122, 397-403, doi:10.1289/ehp.1307049, 2014.

8. Canada, S., Government of Canada. https://www150.statcan.gc.ca/n1/en/type/data, 2018.

9. CIESIN, Center for International Earth Science Information Network - Columbia University; Gridded Population of the World, Version 4 (GPWv4): Population Count Adjusted to Match 2015 Revision of UN WPP Country Totals, Revision 11. NASA Socioeconomic Data and Applications Center (SEDAC), Palisades, NY, https://doi.org/10.7927/H4PN93PB, 2018.

10. Cohen, A. J., Brauer, M., Burnett, R., et al., Estimates and 25-year trends of the global burden of disease attributable to ambient air pollution: an analysis of data from the Global Burden of Diseases Study 2015, Lancet, 389, 1907-1918, doi:10.1016/S0140-6736(17)30505-6, 2017.

11. Dedoussi, I. C., Barrett, S. R. H., Air pollution and early deaths in the United States. Part II: Attribution of $PM_{2.5}$ exposure to emissions species, time, location and sector, Atmos Environ, 99, 610-617, doi:10.1016/j.atmosenv.2014.10.033, 2014.

12. Dey, S., Di Girolamo, L., van Donkelaar, A., et al., Variability of outdoor fine particulate ($PM_{2.5}$) concentration in the Indian Subcontinent: A remote sensing approach, Remote Sens Environ, 127, 153-161, doi:10.1016/j.rse.2012.08.021, 2012.

13. Di, Q., Wang, Y., Zanobetti, A., et al., Air Pollution and Mortality in the Medicare Population, N Engl J Med, 376, 2513-2522, doi:10.1056/NEJMoa1702747, 2017.

14. Drury, E., Jacob, D. J., Spurr, R. J. D., et al., Synthesis of satellite (MODIS), aircraft (ICARTT), and surface (IMPROVE, EPA-AQS, AERONET) aerosol observations over eastern North America to improve MODIS aerosol retrievals and constrain surface aerosol concentrations and sources, J Geophys Res-Atmos, 115, doi:10.1029/2009jd012629, 2010.

15. Duffy, P. B., Field, C. B., Diffenbaugh, N. S., et al., Strengthened scientific support for the Endangerment Finding for atmospheric greenhouse gases, Science, 363, 597-+, doi:10.1126/science.aat5982, 2019.

16. Ford, B., Heald, C. L., Aerosol loading in the Southeastern United States: reconciling surface and satellite observations, Atmos Chem Phys, 13, 9269-9283, doi:10.5194/acp-13-9269-2013, 2013.

17. Forouzanfar, M. H., Afshin, A., Alexander, L. T., et al., Global, regional, and national comparative risk assessment of 79 behavioural, environmental and occupational, and metabolic risks or clusters of risks, 1990-2015: a systematic analysis for the Global Burden of Disease Study 2015, Lancet, 388, 1659-1724, doi:10.1016/S0140-6736(16)31679-8, 2016.

18. Hart, J. E., Garshick, E., Dockery, D. W., et al., Long-Term Ambient Multipollutant Exposures and Mortality, Am J Resp Crit Care, 183, 73-78, doi:10.1164/rccm.200912-1903OC, 2011.

19. Heald, C. L., Collett, J. L., Lee, T., et al., Atmospheric ammonia and particulate inorganic nitrogen over the United States, Atmos Chem Phys, 12, 10295-10312, doi:10.5194/acp-12-10295-2012, 2012.

20. IHME, Institute for Health Metrics and Evaluation. http://ghdx.healthdata.org/gbd-results-tool, 2017.

21. Katanoda, K., Sobue, T., Satoh, H., et al., An Association Between Long-Term Exposure to Ambient Air Pollution and Mortality From Lung Cancer and Respiratory Diseases in Japan, J Epidemiol, 21, 132-143, doi:10.2188/jea.JE20100098, 2011.

22. Koplitz, S. N., Mickley, L. J., Marlier, M. E., et al., Public health impacts of the severe haze in Equatorial Asia in September-October 2015: demonstration of a new framework for informing fire management strategies to reduce downwind smoke exposure, Environ Res Lett, 11, doi:10.1088/1748-9326/11/9/094023, 2016.

23. Krewski, D., Burnett, R. T., Goldberg, M. S., et al., Special report reanalysis of the Harvard six cities study and the American Cancer Society Study of particulate air pollution and mortality part II: Sensitivity Analyses Appendix C. Flexible Modeling of the Effects of Fine Particles and Sulphate on Mortality, Health Effects Institute, https://www.healtheffects.org/system/files/SR-PartIIAppC.pdf, 2000.

24. Lacey, F. G., Marais, E. A., Henze, D. K., et al., Improving present day and future estimates of anthropogenic sectoral emissions and the resulting air quality impacts in Africa, Faraday Discuss, 200, 397-412, doi:10.1039/c7fd00011a, 2017.

25. Leibensperger, E. M., Mickley, L. J., Jacob, D. J., et al., Climatic effects of 1950-2050 changes in US anthropogenic aerosols - Part 1: Aerosol trends and radiative forcing, Atmos Chem Phys, 12, 3333-3348, doi:10.5194/acp-12-3333-2012, 2012.

26. Lelieveld, J., Klingmuller, K., Pozzer, A., et al., Effects of fossil fuel and total anthropogenic emission removal on public health and climate, P Natl Acad Sci USA, 116, 7192-7197, doi:10.1073/pnas.1819989116, 2019.

27. Lim, S. S., Vos, T., Flaxman, A. D., et al., A comparative risk assessment of burden of disease and injury attributable to 67 risk factors and risk factor clusters in 21 regions, 1990-2010: a systematic analysis for the Global Burden of Disease Study 2010 (vol 380, pg 2224, 2012), Lancet, 381, 628-628, <Go to ISI>://WOS:000315189300032, 2013.

28. Lin, J. T., van Donkelaar, A., Xin, J. Y., et al., Clear-sky aerosol optical depth over East China estimated from visibility measurements and chemical transport modeling, Atmos Environ, 95, 258-267, doi:10.1016/j.atmosenv.2014.06.044, 2014.

29. Marais, E. A., Jacob, D. J., Guenther, A., et al., Improved model of isoprene emissions in Africa using Ozone Monitoring Instrument (OMI) satellite observations of formaldehyde: implications for oxidants and particulate matter, Atmos Chem Phys, 14, 7693-7703, doi:10.5194/acp-14-7693-2014, 2014a.

30. Marais, E. A., Jacob, D. J., Jimenez, J. L., et al., Aqueous-phase mechanism for secondary organic aerosol formation from isoprene: application to the southeast United States and co-benefit of $SO_2$ emission controls, Atmos Chem Phys, 16, 1603-1618, doi:10.5194/acp-16-1603-2016, 2016.

31. Marais, E. A., Jacob, D. J., Wecht, K., et al., Anthropogenic emissions in Nigeria and implications for atmospheric ozone pollution: A view from space, Atmos Environ, 99, 32-40, doi:10.1016/j.atmosenv.2014.09.055, 2014b.

32. Marais, E. A., Silvern, R. F., Vodonos, A., et al., Air Quality and Health Impact of Future Fossil Fuel Use for Electricity Generation and Transport in Africa, Environ Sci Technol, 53, 13524-13534, doi:10.1021/acs.est.9b04958, 2019.

33. Marais, E. A., Wiedinmyer, C., Air Quality Impact of Diffuse and Inefficient Combustion Emissions in Africa (DICE-Africa), Environ Sci Technol, 50, 10739-10745, doi:10.1021/acs.est.6b02602, 2016.

34. Mehta, S., Shin, H., Burnett, R., et al., Ambient particulate air pollution and acute lower respiratory infections: a systematic review and implications for estimating the global burden of disease, Air Qual Atmos Hlth, 6, 69-83, doi:10.1007/s11869-011-0146-3, 2013.

35. Nair, H., Nokes, D. J., Gessner, B. D., et al., Global burden of acute lower respiratory infections due to respiratory syncytial virus in young children: a systematic review and meta-analysis, Lancet, 375, 1545-1555, doi:10.1016/S0140-6736(10)60206-1, 2010.

36. Ojha, N., Sharma, A., Kumar, M., et al., On the widespread enhancement in fine particulate matter across the Indo-Gangetic Plain towards winter, Sci Rep-Uk, 10, doi:10.1038/s41598-020-62710-8, 2020.

37. Perera, F., Pollution from Fossil-Fuel Combustion is the Leading Environmental Threat to Global Pediatric Health and Equity: Solutions Exist, Int J Env Res Pub He, 15, doi:10.3390/ijerph15010016, 2018.

38. Pinault, L., Tjepkema, M., Crouse, D. L., et al., Risk estimates of mortality attributed to low concentrations of ambient fine particulate matter in the Canadian community health survey cohort, Environ Health-Glob, 15, doi:10.1186/s12940-016-0111-6, 2016.

39. Pope, C. A., Burnett, R. T., Thurston, G. D., et al., Cardiovascular mortality and long-term exposure to particulate air pollution - Epidemiological evidence of general pathophysiological pathways of disease, Circulation, 109, 71-77, doi:10.1161/01.Cir.0000108927.80044.7f, 2004.

40. Protonotariou, A. P., Bossioli, E., Tombrou, M., et al., Air Pollution in Eastern Mediterranean: Nested-Grid GEOS-CHEM Model Results and Airborne Observations. Advances in Meteorology, Climatology and Atmospheric Physics. Springer Atmospheric Sciences, Springer, Berlin, Heidelberg, 2013, pp. 1203-1209.

41. Shaddick, G., Thomas, M. L., Green, A., et al., Data integration model for air quality: a hierarchical approach to the global estimation of exposures to ambient air pollution, J R Stat Soc C-Appl, 67, 231-253, doi:10.1111/rssc.12227, 2018.

42. Shindell, D., Faluvegi, G., Seltzer, K., et al., Quantified, localized health benefits of accelerated carbon dioxide emissions reductions, Nat Clim Change, 8, doi:10.1038/s41558-018-0108-y, 2018.

43. Tseng, E., Ho, W. C., Lin, M. H., et al., Chronic exposure to particulate matter and risk of cardiovascular mortality: cohort study from Taiwan, Bmc Public Health, 15, doi:10.1186/s12889-015-2272-6, 2015.

44. Ueda, K., Nagasawa, S., Nitta, H., et al., Exposure to Particulate Matter and Long-term Risk of Cardiovascular Mortality in Japan: NIPPON DATA80, J Atheroscler Thromb, 19, 246-254, doi:10.5551/jat.9506, 2012.

45. Veefkind, J. P., Boersma, K. F., Wang, J., et al., Global satellite analysis of the relation between aerosols and short-lived trace gases, Atmos Chem Phys, 11, 1255-1267, doi:10.5194/acp-11-1255-2011, 2011.

46. Vodonos, A., Abu Awad, Y., Schwartz, J., The concentration-response between long-term $PM_{2.5}$ exposure and mortality; A meta-regression approach, Environ Res, 166, 677-689, doi:10.1016/j.envres.2018.06.021, 2018.

47. Vohra, K., Marais, E. A., Suckra, S., et al., Long-term trends in air quality in major cities in the UK and India: A view from space, Atmospheric Chemistry and Physics Discussions, doi:10.5194/acp-2020-342, 2020.

48. Wang, Y., Shi, L. H., Lee, M., et al., Long-term Exposure to $PM_{2.5}$ and Mortality Among Older Adults in the Southeastern US, Epidemiology, 28, 207-214, doi:10.1097/Ede.0000000000000614, 2017.

49. WHO, World Health Organization; Principles for evaluating health risks in children associated with exposure to chemicals. https://apps.who.int/iris/handle/10665/43604, 2006.

50. WHO, World Health Organization; Ambient air pollution: A global assessment of exposure and burden of disease. https://www.who.int/phe/publications/air-pollution-global-assessment/en/, 2016.

51. WONDER, C., Centers for Disease Control and Prevention Wide-ranging ONline Data for Epidemiologic Research https://wonder.cdc.gov/.

52. Wong, C. M., Lai, H. K., Tsang, H., et al., Satellite-Based Estimates of Long-Term Exposure to Fine Particles and Association with Mortality in Elderly Hong Kong Residents, Environ Health Persp, 123, 1167-1172, doi:10.1289/ehp.1408264, 2015.

53. Wong, C. M., Tsang, H., Lai, H. K., et al., Cancer Mortality Risks from Long-term Exposure to Ambient Fine Particle, Cancer Epidem Biomar, 25, 839-845, doi:10.1158/1055-9965.Epi-15-0626, 2016.

54. Xing, J., Mathur, R., Pleim, J., et al., Can a coupled meteorology-chemistry model reproduce the historical trend in aerosol direct radiative effects over the Northern Hemisphere?, Atmos Chem Phys, 15, 9997-10018, doi:10.5194/acp-15-9997-2015, 2015.

55. Xu, Z. W., Sheffield, P. E., Hu, W. B., et al., Climate Change and Children's Health-A Call for Research on What Works to Protect Children, Int J Env Res Pub He, 9, 3298-3316, doi:10.3390/ijerph9093298, 2012.

56. Yin, P., Brauer, M., Cohen, A., et al., Long-term Fine Particulate Matter Exposure and Nonaccidental and Cause-specific Mortality in a Large National Cohort of Chinese Men, Environ Health Persp, 125, doi:10.1289/Ehp1673, 2017.

57. Zhai, S. X., Jacob, D. J., Wang, X., et al., Fine particulate matter ($PM_{2.5}$) trends in China, 2013-2018: separating contributions from anthropogenic emissions and meteorology, Atmos Chem Phys, 19, 11031-11041, doi:10.5194/acp-19-11031-2019, 2019.

58. Zhang, L., Jacob, D. J., Knipping, E. M., et al., Nitrogen deposition to the United States: distribution, sources, and processes, Atmos Chem Phys, 12, 4539-4554, doi:10.5194/acp-12-4539-2012, 2012.

# Supplemental Material

## Global mortality from outdoor fine particle pollution generated by fossil fuel combustion: Results from GEOS-Chem

**Karn Vohra[1*], Alina Vodonos[2], Joel Schwartz[2], Eloise A. Marais[3,a], Melissa P. Sulprizio[4], Loretta J. Mickley[4]**

[1] School of Geography, Earth and Environmental Sciences, University of Birmingham, Birmingham, UK

[2] Harvard T.H. Chan School of Public Health, Department of Environmental Health, Harvard University, Boston, MA, USA

[3] Department of Physics and Astronomy, University of Leicester, Leicester, UK

[4] John A. Paulson School of Engineering and Applied Sciences, Harvard University, Cambridge, MA, USA

[a] Now at: Department of Geography, University College London, London, UK

* Corresponding author: Karn Vohra, Phone: +44 7716496867,

Email: kxv745@student.bham.ac.uk

**Description of GEOS-Chem.**

**Table S1.** GEOS-Chem anthropogenic emissions. All emissions are scaled to 2012 conditions.

**Figure S1.** Uncertainty in 2012 $PM_{2.5}$ due to interannual variability.

**Figure S2.** Representativeness of $PM_{2.5}$ in 2012, calculated as the absolute difference in 2012 and 2008-2016 mean $PM_{2.5}$ from Dalhousie (van Donkelaar et al., 2016) at 0.1°×0.1°.

**Figure S3.** Evaluation of GEOS-Chem $PM_{2.5}$. Points are annual mean $PM_{2.5}$ for coincident 0.5°×0.667° grid squares with at least 75% temporal coverage in the observations.

**Figure S4.** Comparison of the spatial distribution of observed and modeled $PM_{2.5}$ in Europe and North America. Data are on a uniform 0.5°×0.667° grid.

**$PM_{2.5}$ mortality concentration –response model**

**Figure S5.** Estimates for long-term $PM_{2.5}$ mortality dose-response, drawn from the meta-analysis of long-term association between $PM_{2.5}$ and mortality.

**Figure S6.** Hazard Ratio based on GEMM function (Burnett et al., 2018) compared to the Hazard Ration based on the meta-analysis.

**Table S2. Extended data.** Global regions, number of deaths, attributable fraction (%) for the population above 14 years old attributable to fine particulate matter ($PM_{2.5}$) exposure.

**References**

**Description of GEOS-Chem.**

GEOS-Chem is a three-dimensional chemical transport model that includes detailed oxidant-aerosol chemistry in the troposphere and is used by more than 80 groups worldwide (www.geos-chem.org). The model is widely cited in the peer-reviewed literature – e.g., more than 4000 times in the year 2017 alone (http://acmg.seas.harvard.edu/geos/geos_pub.html). The model has been frequently applied to interpret observed $PM_{2.5}$ in regions dominated by anthropogenic sources – e.g., China (Aunan et al., 2018), Korea (Lee et al., 2017), India (Venkataraman et al., 2018), and the US (Di et al., 2016; Silvern et al., 2017); and validation has been performed for specific source sectors – e.g., transportation (Travis et al., 2016), biogenic sources (Marais et al., 2017), and power plants (S. W. Wang et al., 2012). Here we use GEOS-Chem v10-01, driven by 2012 GEOS-5 meteorology (gmao.gsfc.nasa.gov/GEOS_systems/). The GEOS-5 data are produced at 0.5°×0.667° horizontal resolution and are re-gridded here to 2°×2.5° for the global simulation. We also perform four regional simulations – for Europe, North America, Africa, and Asia – and for these simulations we keep the native grid resolution. Boundary conditions at 2°×2.5° from the global simulation are applied to these regional simulations. Most fine-scale, regional models, such as the Community Multiscale Air Quality Model, rely on chemical boundary conditions from global models with different chemical schemes, but our approach permits application of a consistent scheme across the globe. The 0.5°×0.667° horizontal resolution in GEOS-Chem over key regions is, however, relatively coarse compared to that in some other regional models. Y. Li et al. (2016) show that application of coarse resolution leads

to an underestimate of health impacts of 8%, implying that our mortality estimates are conservative. Our choice of 2012 as the simulation year is discussed below.

GEOS-Chem simulates the mass concentrations of key particle types including sulfate, nitrate, and ammonium (Park et al., 2004; L. Zhang et al., 2012), organic carbon (Heald et al., 2006; 2011) black carbon (Q. Q. Wang et al., 2014), dust (Fairlie et al., 2007), and sea salt (Jaegle et al., 2011). Particle chemistry is coupled to gas-phase chemistry as described by (Mao et al., 2013). Gas/particle partitioning of sulfate, nitrate and ammonium (SNA) particles is computed with the ISORROPIA II thermodynamic module (Fountoukis and Nenes, 2007; Pye et al., 2009). Wet and dry deposition of particles follow Liu et al. (2001) and L. M. Zhang et al. (2001), respectively.

Emissions in GEOS-Chem are computed by the Harvard-NASA Emission Component (HEMCO) (Keller et al., 2014), which combines and regrids ensembles of user-selected emission inventories. We apply global anthropogenic emissions but supersede these with regional emissions where the latter are more reliable (Table 1). Fossil fuel emissions in Africa include (1) industry and power plants from the global inventories and (2) diffuse and inefficient combustion sources (diesel and petrol generators, ad-hoc oil refining, gas flares, kerosene use, cars, and motorcycles) from the DICE-Africa inventory (Marais and Wiedinmyer, 2016). We scale all anthropogenic inventories to 2012, as described by van Donkelaar et al. (2008). Biogenic emissions are from MEGAN v2.1 for volatile organic compounds (Guenther et al., 2012) and from Hudman et al. (2012) for soil nitrogen oxides. Lightning emissions of nitrogen oxides are computed as a function of cloud top height as described by Murray et al. (2012). Dust entrainment and deposition follow the DEAD scheme of Zender et al. (2003) as implemented in GEOS-Chem by Fairlie et al. (2007). Biomass burning emissions are from the Global Fire Emissions Database version 4 (GFED4) (Giglio et al., 2013).

For this study, we first calculate the surface fine particle mass concentrations ($PM_{2.5}$), with all emissions sources turned on. For consistency with the $PM_{2.5}$ measurement protocol set by the U.S. Environmental

Protection Agency, we assume 35% relative humidity everywhere (except for Europe) and standard ambient conditions, with temperature of 298.15 K and surface pressure of 1013.25 hPa. In Europe, we assume 50% relative humidity, as is the protocol there. We then perform the identical simulation with emissions arising from fossil fuel combustion turned off. The same meteorological fields are applied for both simulations – i.e., the simulation does not allow feedbacks from particles onto meteorology. In the no-fossil-fuel case, all fossil fuel sources are turned off in both the nested simulations and in the global simulation providing boundary conditions. The difference between the two simulations (with and without fossil fuel) represents the contribution of fossil-fuel combustion to surface $PM_{2.5}$. This approach assumes a linear response of surface $PM_{2.5}$ to changes in emissions.

Our choice of 2012 as the simulation year requires explanation. Air quality is influenced not just by emissions but also by meteorological variables such as surface temperature and wind speed, which can vary greatly on inter-annual timescales. Ideally, our analysis would involve multi-year simulations on both the coarse- and fine-scale grids, but such effort would be computationally expensive. We choose instead to do a one-year simulation for a year not influenced by El Niño conditions, which can worsen or ameliorate air pollution, depending on the region (e.g., Chang et al. (2016), Shen and Mickley (2017)). To gauge the error implied by our choice to simulate just one year rather than a span of years, we examine the inter-annual variation in total $PM_{2.5}$ concentrations at the surface estimated from the Dalhousie University archive (van Donkelaar et al., 2016). The $PM_{2.5}$ values in the Dalhousie archive are calculated by first combining satellite observations with GEOS-Chem estimates, and then calibrating the resulting concentrations with available ground-based observations (mostly Europe, the US, India and China). We find that the global mean average of the relative standard deviation of total $PM_{2.5}$ in the Dalhousie archive over 2008 to 2016 is just 7%. Averaged over large regions on the continental scale, the relative standard deviation ranges from 4% over Australia to 11% over the Asia nested grid domain (Figure S1). Inter-annual variability in this metric is greatest (> 60%) for smaller regions influenced by wildfires or biomass burning – e.g., Indonesia and remote areas at high northern latitudes where few people live. To test our choice of 2012 as a representative year,

we calculate the 2012 anomaly in the Dalhousie $PM_{2.5}$ time series (Figure S2). Again on a continental scale, we find that 2012 concentrations range from 0.7 μg $m^{-3}$ less to 0.4 μg $m^{-3}$ greater than the 2008-2016 average (Figure S2). Given the relatively small inter-annual variability in surface $PM_{2.5}$ in the Dalhousie archive over most populated regions, as well as the small anomalies in $PM_{2.5}$ in 2012 relative to the long-term mean, we conclude that the 2012 GEOS-Chem simulation provides a representative snapshot of global air quality.

To validate the 2012 $PM_{2.5}$ results from GEOS-Chem, we rely on archived $PM_{2.5}$ concentrations from the World Health Organization database (WHO). We find that GEOS-Chem captures the observed annual mean $PM_{2.5}$ concentrations with a correlation of 0.70, mean absolute error of 3.4 μg $m^{-3}$, and normalized mean bias of 27% (Figure S3). Our high bias in the US (where most North American WHO data are located) is opposite to the low bias estimated by Ford and Heald (2016) in urban (-25%) and rural (-6%) areas; such biases may be due to differences in US emission inventories for both gas-phase aerosol precursors and primary particles (Xing et al., 2015). A caveat in our comparison is that most observations (95%) in the WHO database with at least 75% temporal coverage in 2012 are in North America and Europe. We add to Figure S3 the 2012 observations from the US embassy in Shanghai (those for Beijing are already in the WHO dataset), and national monitoring sites embassies in Delhi (Cusworth et al., 2018), and the Highveld region in South Africa (South African Air Quality Information System; data obtained by request from the South African Weather Service in July 2018). Over the European domain in Figure S1, we find that GEOS-Chem yields a correlation of 0.60, mean absolute error of 5.2 μg $m^{-3}$ and a normalized mean bias of 33% in surface $PM_{2.5}$; over the North American domain in Figure S1, these values are 0.52, 1.8 μg $m^{-3}$ and 20% (Figure S4). Taken together, these validation statistics are similar to those reported by other studies examining surface $PM_{2.5}$ in global models (e.g., Shindell et al. (2018)) and regional models (e.g., Xing et al. (2015)) .

**Table S1.** GEOS-Chem anthropogenic emissions. All emissions are scaled to 2012 conditions.

| **Region** | **Inventory name** | **Species** | **Reference** |
|---|---|---|---|
| Global | EDGAR v4.2[a,c] | NO, CO, $SO_2$, sulfate, ammonia | Olivier and Berdowski (2001) |
| Global | RETRO[a,c] | Non-methane VOCs | Schultz et al. (2007) |
| Global | --- | Ethane | Xiao et al. (2008) |
| Global | GEIA | Biofuel ammonia | www.geiacenter.org |
| Global | BOND[a,c] | Carbonaceous particles | Bond et al. (2007) |
| Global | AEIC v2.0 aircraft | NO, CO, etc. | Stettler et al. (2011) |
| Global | ARTCAS ship | $SO_2$ | Eyring et al. (2005) |
| Global | ICOADS ship | CO | C. Wang et al. (2008) |
| Global | PARANOX ship | NO | Vinken et al. (2011) |
| United States | NEI 2011[a,b,c] | Many species | US EPA, www3.epa.gov/airtrends |
| Europe | EMEP[b,c] | Many species | www.emep.int |
| Asia | MIX[c] | Many species | M. Li et al. (2017), Venkataraman et al. (2018), X. Li et al. (2018) |
| Africa | DICE[c,d] | Many species | Marais and Wiedinmyer (2016) |
| Africa | --- | Open waste burning species | Wiedinmyer et al. (2014) |

[a] Includes biofuel sources

[b] Includes ship emissions

[c] Includes land-based transport emissions

[d] Includes only diffuse and inefficient sources of anthropogenic emissions – residential fuelwood, diesel and petrol generators, ad-hoc oil refining, gas flares, kerosene use, charcoal production and use, road transport (including motorcycles). For emissions from formal industry and powerplants, we use the global inventories.




**Figure S1.** Uncertainty in 2012 $PM_{2.5}$ due to interannual variability. Interannual variability is estimated as the relative standard deviation of the Dalhousie satellite-derived $PM_{2.5}$ product (van Donkelaar et al., 2016) for 2008-2016 at 0.1°×0.1°. Values inset are the domain mean relative standard deviations for North America, South America, Western Europe (including portions of North Africa and the Middle East), Africa (including a portion of the Middle East), Southeast Asia, and Australia.




**Figure S2.** Representativeness of $PM_{2.5}$ in 2012, calculated as the absolute difference in 2012 and 2008-2016 mean $PM_{2.5}$ from Dalhousie (van Donkelaar et al., 2016) at 0.1°×0.1°. Values inset are domain mean anomalies for North America, South America, Western Europe (including portions of North Africa and the Middle East), Africa (including a portion of the Middle East), Southeast Asia, and Australia.




**Figure S3.** Evaluation of GEOS-Chem $PM_{2.5}$. Points are annual mean $PM_{2.5}$ for coincident 0.5°×0.667° grid squares with at least 75% temporal coverage in the observations. GEOS-Chem $PM_{2.5}$ is estimated at 50% relative humidity (RH) in Europe and 35% RH everywhere else, following standard protocols in measurements of $PM_{2.5}$. Reduced major axis (RMA) regression line (solid black line) and statistics, and the Pearson's correlation coefficient for all coincident grid squares are given inset. Points in red are in Europe and in blue are in North America. Only 7 out of 957 points exceed the range shown.




**Figure S4.** Comparison of the spatial distribution of observed and modeled $PM_{2.5}$ in Europe and North America. Data are on a uniform 0.5°×0.667° grid. Only observations with at least 75% temporal coverage are used. $PM_{2.5}$ are obtained at 50% RH in Europe and 35% RH in North America. Data for the two domains are plotted on different scales. Mean $PM_{2.5}$ for coincident grid squares is given inset

**$PM_{2.5}$ mortality concentration –response model**

We estimated the number of premature deaths attributable to fossil-fuel related $PM_{2.5}$ using a health impact function. To estimate the excess number of deaths associated with $PM_{2.5}$ exposure one requires estimates of exposure, the size of the population exposed, the mortality rate for that population, and the fraction of total deaths attributable to that exposure (AF%).

Recent meta-analysis of the association between long-term $PM_{2.5}$ and mortality (Vodonos et al., 2018) applied a multivariate linear random effects meta-analysis and meta-regression models that polled 135 hazard ratio estimates derived from 53 studies examined long-term $PM_{2.5}$ and mortality. This meta-analysis provided an evidence of a nonlinear association where the exposure-mortality slopes decreased at higher concentrations (**Figure S5**). For example, each 1 μg $m^{-3}$ increase in $PM_{2.5}$ was associated with a 1.29% increase in all-age all-cause mortality (95%CI 1.09-1.50) at a mean exposure of 10 μg $m^{-3}$, which decreased to 0.94 % (95%CI 0.76-1.12) at a mean exposure of 20 μg $m^{-3}$, to 0.81% (95%CI 0.52-1.12) at 30 μg $m^{-3}$ and to 0.79% (95%CI 0.40-1.13) at 40 μg/$m^{3}$.

Hence, for examining a reduction of $PM_{2.5}$ levels from 15 to 10 μg/$m^3$, we calculated the mean slope as area under the curve between 0.014 and 0.011= 0.0125. A reduction of $PM_{2.5}$ levels from 30 to 20 μg/$m^3$, the mean slope was calculated as area under the curve between 0.009 and 0.008 = 0.00814

Mean value of estimates of mortality ($\bar{\beta}$) for each grid cell was calculated as area under the curve for the concentration-specific β in each grid cell from the low $PM_{2.5}$ scenario (without fossil fuel emissions) to the high $PM_{2.5}$ scenario (with all emissions, including fossil fuel) following the form shown in Equation

$$\bar{\beta}(PM_{2.5})=\int_{PM_{2.5}\ \text{no fossil fuel}}^{PM_{2.5}\ \text{all emissions}} \beta(PM_{2.5})$$




**Figure S5.** Estimates for long-term $PM_{2.5}$ mortality dose-response, drawn from the meta-analysis of long-term association between $PM_{2.5}$ and mortality (Vodonos et al., 2018).

**Table S2. Extended data.** Global regions, number of deaths, attributable fraction (%) for the population above 14 years old attributable to fine particulate matter ($PM_{2.5}$) exposure in 2012

| Country name | Total Deaths >14 years old | Mean population weighted annual $PM_{2.5}$ ($\mu g\ m^{-3}$) | | | Attributable deaths[a] | Mean attributable fraction (%)[b] |
|---|---|---|---|---|---|---|
| | | With all emission sources | Without fossil fuel | Estimated fossil fuel $PM_{2.5}$ | | |
| | | | | | | |
| **North America** | | | | | | |
| Bermuda | 488 | 3 | 1.9 | 1.1 | 9 | 1.8 |
| Greenland | 472 | 1.2 | 0.9 | 0.3 | 3 | 0.6 |
| | | | | | | |
| **Central America & the Caribbean** | | | | | | |
| Antigua and Barbuda | 538 | 4.4 | 4.1 | 0.3 | 2 | 0.4 |
| Bahamas | 2,347 | 4.1 | 2.8 | 1.4 | 53 | 2.3 |
| Barbados | 2,523 | 4.9 | 4.7 | 0.2 | 7 | 0.3 |
| Belize | 1,530 | 5 | 4 | 1.1 | 26 | 1.7 |
| Costa Rica | 38,094 | 5.4 | 2.9 | 2.6 | 1,557 | 4.1 |
| Cuba | 95,635 | 5.3 | 3.8 | 1.5 | 2,334 | 2.4 |
| Dominica | 668 | 4.9 | 4.7 | 0.2 | 2 | 0.3 |
| Dominican Republic | 60,949 | 11.2 | 5.3 | 6 | 4,925 | 8.1 |
| El Salvador | 44,036 | 9.7 | 3.4 | 6.3 | 4,029 | 9.1 |
| Grenada | 983 | 4.6 | 4.3 | 0.4 | 6 | 0.6 |
| Guatemala | 67,426 | 9.7 | 3.2 | 6.5 | 6,205 | 9.2 |
| Haiti | 70,013 | 8.2 | 4.9 | 3.3 | 3,409 | 4.9 |
| Honduras | 40,564 | 7.9 | 3.5 | 4.4 | 2,620 | 6.5 |
| Jamaica | 18,511 | 9.1 | 4.7 | 4.4 | 1,183 | 6.4 |

| Country name | Total Deaths >14 years old | Mean population weighted annual $PM_{2.5}$ (µg $m^{-3}$) | | | Attributable deaths[a] | Mean attributable fraction (%)[b] |
|---|---|---|---|---|---|---|
| | | With all emission sources | Without fossil fuel | Estimated fossil fuel $PM_{2.5}$ | | |
| | | | | | | |
| Mexico | 615,874 | 11.8 | 2.4 | 9.5 | 65,871 | 10.7 |
| Nicaragua | 20,467 | 5.4 | 3.5 | 1.9 | 614 | 3.0 |
| Panama | 16,364 | 4.7 | 2.5 | 2.2 | 594 | 3.6 |
| Puerto Rico | 28,717 | 5.5 | 4.6 | 0.9 | 409 | 1.4 |
| Saint Lucia | 1,191 | 5 | 4.8 | 0.2 | 4 | 0.3 |
| Saint Vincent and the Grenadines | 913 | 4.7 | 4.5 | 0.2 | 3 | 0.3 |
| Trinidad and Tobago | 19,561 | 5.4 | 4.5 | 0.9 | 277 | 1.4 |
| United States Virgin Islands | 1,202 | 4.6 | 4.2 | 0.4 | 7 | 0.6 |
| | | | | | | |
| **South America** | | | | | | |
| Argentina | 306,979 | 7.9 | 3.4 | 4.5 | 20,385 | 6.6 |
| Bolivia | 50,854 | 5.7 | 4.4 | 1.3 | 1,095 | 2.2 |
| Brazil | 1,161,922 | 8.9 | 2.9 | 6.1 | 94,216 | 8.1 |
| Chile | 108,995 | 10 | 2.4 | 7.6 | 11,202 | 10.3 |
| Colombia | 247,981 | 8.2 | 2.7 | 5.5 | 20,045 | 8.1 |
| Ecuador | 74,588 | 6.7 | 2.1 | 4.6 | 5,357 | 7.2 |
| Guyana | 4,830 | 8 | 6.6 | 1.4 | 96 | 2.0 |
| Paraguay | 29,665 | 9.2 | 6 | 3.2 | 1,374 | 4.6 |
| Peru | 120,778 | 7.3 | 1.8 | 5.5 | 10,209 | 8.5 |
| Suriname | 3,667 | 6.9 | 6.2 | 0.7 | 36 | 1.0 |
| Uruguay | 30,980 | 6.5 | 2.4 | 4.1 | 1,967 | 6.3 |
| Venezuela | 247,407 | 10.6 | 4.3 | 6.2 | 21,185 | 8.6 |

| Country name | Total Deaths >14 years old | Mean population weighted annual $PM_{2.5}$ (μg $m^{-3}$) | | | Attributable deaths[a] | Mean attributable fraction (%)[b] |
|---|---|---|---|---|---|---|
| | | With all emission sources | Without fossil fuel | Estimated fossil fuel $PM_{2.5}$ | | |
| | | | | | | |
| **Europe** | | | | | | |
| Albania | 20,072 | 19.8 | 8.6 | 11.2 | 2,458 | 12.2 |
| Andorra | 654 | 13.4 | 5.8 | 7.6 | 65 | 9.9 |
| Austria | 79,627 | 21.4 | 4.3 | 17.1 | 15,018 | 18.9 |
| Belarus | 115,131 | 20.6 | 2.9 | 17.8 | 23,397 | 20.3 |
| Belgium | 108,113 | 25.5 | 2.8 | 22.7 | 25,633 | 23.7 |
| Bosnia and Herzegovina | 36,427 | 21 | 6.8 | 14.2 | 5,628 | 15.5 |
| Bulgaria | 106,938 | 20.2 | 7.2 | 13 | 15,346 | 14.4 |
| Croatia | 52,156 | 20.2 | 5.6 | 14.6 | 8,454 | 16.2 |
| Cyprus | 7,171 | 15.4 | 9.2 | 6.3 | 543 | 7.6 |
| Czech Republic | 109,205 | 26.2 | 3.4 | 22.8 | 25,467 | 23.3 |
| Denmark | 51,600 | 16.3 | 2.1 | 14.2 | 9,202 | 17.8 |
| Estonia | 14,761 | 12.6 | 1.6 | 11 | 2,227 | 15.1 |
| Finland | 50,553 | 8.6 | 1.3 | 7.3 | 5,506 | 10.9 |
| France | 562,481 | 18.1 | 3.4 | 14.7 | 97,242 | 17.3 |
| Georgia | 51,550 | 23.3 | 10.2 | 13.1 | 6,670 | 12.9 |
| Germany | 896,319 | 23.9 | 3.2 | 20.7 | 198,569 | 22.2 |
| Greece | 116,757 | 15.6 | 8.1 | 7.5 | 10,616 | 9.1 |
| Hungary | 128,981 | 24.7 | 4.7 | 20 | 26,863 | 20.8 |
| Iceland | 1,891 | 2.6 | 1.6 | 1 | 31 | 1.6 |
| Ireland | 30,421 | 8.3 | 2 | 6.4 | 2,902 | 9.5 |
| Italy | 622,080 | 18.8 | 6 | 12.8 | 89,412 | 14.4 |
| Kazakhstan | 126,168 | 17.1 | 9.2 | 7.9 | 11,343 | 9.0 |

| Country name | Total Deaths >14 years old | Mean population weighted annual $PM_{2.5}$ (μg $m^{-3}$) | | | Attributable deaths[a] | Mean attributable fraction (%)[b] |
|---|---|---|---|---|---|---|
| | | With all emission sources | Without fossil fuel | Estimated fossil fuel $PM_{2.5}$ | | |
| | | | | | | |
| Latvia | 31,672 | 16.2 | 2 | 14.3 | 5,719 | 18.1 |
| Lithuania | 40,380 | 21.4 | 2.3 | 19.1 | 8,729 | 21.6 |
| Malta | 3,593 | 16 | 11.4 | 4.6 | 193 | 5.4 |
| Moldova | 43,245 | 25.4 | 5.2 | 20.2 | 8,922 | 20.6 |
| Montenegro | 6,223 | 18 | 7.9 | 10.1 | 724 | 11.6 |
| Netherlands | 143,387 | 24.2 | 2.7 | 21.5 | 32,972 | 23.0 |
| Norway | 29,299 | 5.9 | 1.4 | 4.5 | 2,065 | 7.0 |
| Poland | 393,724 | 26.5 | 3.1 | 23.4 | 93,842 | 23.8 |
| Portugal | 104,738 | 8.9 | 3.7 | 5.2 | 8,032 | 7.7 |
| Romania | 269,933 | 23.9 | 6.2 | 17.7 | 49,583 | 18.4 |
| Russia | 1,833,839 | 19 | 4.9 | 14.1 | 289,922 | 15.8 |
| Serbia | 100,172 | 24.8 | 6.9 | 17.9 | 18,076 | 18.0 |
| Slovakia | 53,258 | 24.9 | 4.1 | 20.8 | 11,522 | 21.6 |
| Slovenia | 19,680 | 21.7 | 5.3 | 16.3 | 3,528 | 17.9 |
| Spain | 418,063 | 12.9 | 4.8 | 8.1 | 44,603 | 10.7 |
| Sweden | 88,058 | 10 | 1.6 | 8.5 | 10,548 | 12.0 |
| Switzerland | 62,993 | 20.3 | 4.6 | 15.8 | 11,196 | 17.8 |
| Turkey | 361,723 | 18.2 | 8.1 | 10.1 | 41,811 | 11.6 |
| Ukraine | 731,672 | 19.4 | 5.1 | 14.3 | 120,217 | 16.4 |
| United Kingdom | 579,747 | 15.4 | 2 | 13.5 | 99,069 | 17.1 |

| Country name | Total Deaths >14 years old | Mean population weighted annual $PM_{2.5}$ ($\mu g\ m^{-3}$) | | | Attributable deaths[a] | Mean attributable fraction (%)[b] |
|---|---|---|---|---|---|---|
| | | With all emission sources | Without fossil fuel | Estimated fossil fuel $PM_{2.5}$ | | |
| | | | | | | |
| **Africa** | | | | | | |
| Algeria | 142,304 | 31.4 | 20.5 | 10.9 | 13,295 | 9.3 |
| Angola | 100,845 | 15.4 | 14.1 | 1.3 | 1,537 | 1.5 |
| Benin | 42,616 | 40.4 | 36.2 | 4.2 | 1,450 | 3.4 |
| Botswana | 12,721 | 8.2 | 6 | 2.1 | 397 | 3.1 |
| Burkina Faso | 84,040 | 55.9 | 54.6 | 1.3 | 855 | 1.0 |
| Burundi | 44,973 | 16.2 | 15.4 | 0.8 | 419 | 0.9 |
| Cameroon | 118,759 | 39.7 | 38.2 | 1.5 | 1,520 | 1.3 |
| Cape Verde | 2,545 | 66.9 | 66 | 0.9 | 18 | 0.7 |
| Central African Republic | 41,111 | 30.7 | 30.1 | 0.6 | 178 | 0.4 |
| Chad | 56,523 | 59.8 | 58.7 | 1 | 460 | 0.8 |
| Comoros | 3,878 | 1.6 | 1.4 | 0.1 | 9 | 0.2 |
| Congo | 21,705 | 20.6 | 19.3 | 1.3 | 287 | 1.3 |
| Cote d'Ivoire | 111,211 | 29.3 | 28.2 | 1.1 | 1,065 | 1.0 |
| Democratic Republic of the Congo | 419,021 | 21.3 | 20.7 | 0.6 | 2,261 | 0.5 |
| Djibouti | 4,509 | 21.2 | 17.5 | 3.8 | 164 | 3.6 |
| Egypt | 392,226 | 56.7 | 40.2 | 16.5 | 46,783 | 11.9 |
| Equatorial Guinea | 4,679 | 10 | 9.5 | 0.5 | 32 | 0.7 |
| Eritrea | 20,386 | 31.3 | 28.5 | 2.8 | 444 | 2.2 |
| Ethiopia | 287,855 | 17 | 15.2 | 1.8 | 5,657 | 2.0 |
| Gabon | 13,783 | 11 | 10.5 | 0.5 | 90 | 0.7 |
| Gambia | 9,610 | 58 | 56 | 2 | 151 | 1.6 |

| Country name | Total Deaths >14 years old | Mean population weighted annual $PM_{2.5}$ (μg $m^{-3}$) | | | Attributable deaths[a] | Mean attributable fraction (%)[b] |
|---|---|---|---|---|---|---|
| | | With all emission sources | Without fossil fuel | Estimated fossil fuel $PM_{2.5}$ | | |
| | | | | | | |
| Ghana | 149,177 | 31.5 | 28.9 | 2.6 | 3,361 | 2.3 |
| Guinea | 63,691 | 49.7 | 48.8 | 1 | 467 | 0.7 |
| Guinea-Bissau | 9,223 | 51.9 | 50.6 | 1.3 | 89 | 1.0 |
| Kenya | 219,806 | 8.3 | 6.4 | 2 | 6,035 | 2.7 |
| Lesotho | 25,223 | 12.6 | 7.5 | 5.1 | 1,689 | 6.7 |
| Liberia | 19,482 | 25.3 | 24.7 | 0.7 | 113 | 0.6 |
| Libya | 26,745 | 42.3 | 34.3 | 8 | 1,565 | 5.9 |
| Madagascar | 97,088 | 3.7 | 3.3 | 0.4 | 641 | 0.7 |
| Malawi | 83,919 | 9.9 | 9.4 | 0.6 | 681 | 0.8 |
| Mali | 69,737 | 60.3 | 59.3 | 1 | 555 | 0.8 |
| Mauritania | 13,520 | 98.7 | 97.4 | 1.3 | 159 | 1.2 |
| Mauritius | 9,564 | 1.6 | 1.3 | 0.3 | 43 | 0.4 |
| Morocco | 186,609 | 23.8 | 16.9 | 6.9 | 12,436 | 6.7 |
| Mozambique | 163,474 | 6.8 | 6.3 | 0.5 | 1,309 | 0.8 |
| Namibia | 12,923 | 11.1 | 10.2 | 0.9 | 159 | 1.2 |
| Niger | 63,052 | 73.3 | 71.6 | 1.7 | 844 | 1.3 |
| Nigeria | 689,902 | 59.7 | 54.9 | 4.8 | 25,282 | 3.7 |
| Rwanda | 43,547 | 16.4 | 15.2 | 1.2 | 557 | 1.3 |
| Sao Tome and Principe | 821 | 5.5 | 5.4 | 0.1 | 2 | 0.2 |
| Senegal | 61,877 | 71.2 | 69.3 | 1.8 | 916 | 1.5 |
| Seychelles | 702 | 1.5 | 1.2 | 0.3 | 4 | 0.6 |
| Sierra Leone | 33,549 | 42 | 41 | 0.9 | 230 | 0.7 |
| Somalia | 47,288 | 9.5 | 8.3 | 1.3 | 789 | 1.7 |

| Country name | Total Deaths >14 years old | Mean population weighted annual $PM_{2.5}$ ($\mu g\ m^{-3}$) | | | Attributable deaths[a] | Mean attributable fraction (%)[b] |
|---|---|---|---|---|---|---|
| | | With all emission sources | Without fossil fuel | Estimated fossil fuel $PM_{2.5}$ | | |
| | | | | | | |
| South Africa | 487,500 | 21.9 | 11.7 | 10.2 | 45,134 | 9.3 |
| Sudan[c] | 165,624 | 35.3 | 33.6 | 1.7 | 2,197 | 1.3 |
| Swaziland | 9,954 | 10.6 | 6.7 | 3.9 | 534 | 5.4 |
| Tanzania | 202,713 | 6.9 | 6.4 | 0.5 | 1,660 | 0.8 |
| Togo | 34,797 | 36.6 | 34.4 | 2.1 | 617 | 1.8 |
| Tunisia | 59,521 | 25.5 | 17.1 | 8.3 | 4,711 | 7.9 |
| Uganda | 127,825 | 13.1 | 11.8 | 1.3 | 2,018 | 1.6 |
| Zambia | 71,697 | 12.7 | 12.2 | 0.6 | 511 | 0.7 |
| Zimbabwe | 88,229 | 10.5 | 9 | 1.6 | 1,797 | 2.0 |
| | | | | | | |
| **Western Asia & the Middle East** | | | | | | |
| Afghanistan | 148,817 | 20.9 | 13.9 | 7 | 11,153 | 7.5 |
| Armenia | 25,420 | 22.6 | 11.9 | 10.7 | 2,721 | 10.7 |
| Azerbaijan | 85,764 | 29.8 | 17.6 | 12.2 | 8,733 | 10.2 |
| Bahrain | 3,315 | 33.1 | 30.2 | 2.9 | 73 | 2.2 |
| Iran | 330,324 | 28.5 | 23.8 | 4.7 | 13,168 | 4.0 |
| Iraq | 95,874 | 30.1 | 26.4 | 3.7 | 2,942 | 3.1 |
| Israel | 40,291 | 21.2 | 14.4 | 6.9 | 2,776 | 6.9 |
| Jordan | 13,031 | 22.9 | 16.6 | 6.2 | 766 | 5.9 |
| Kuwait | 5,120 | 37.4 | 34.4 | 3 | 110 | 2.1 |
| Kyrgyzstan | 29,441 | 17.3 | 8.4 | 8.9 | 3,041 | 10.3 |
| Lebanon | 27,756 | 18 | 11.7 | 6.3 | 1,931 | 7.0 |
| Oman | 7,482 | 46.5 | 40.6 | 5.8 | 321 | 4.3 |

| Country name | Total Deaths >14 years old | Mean population weighted annual $PM_{2.5}$ ($\mu g\ m^{-3}$) | | | Attributable deaths[a] | Mean attributable fraction (%)[b] |
|---|---|---|---|---|---|---|
| | | With all emission sources | Without fossil fuel | Estimated fossil fuel $PM_{2.5}$ | | |
| | | | | | | |
| Palestine | 12,562 | 22.7 | 15.6 | 7.1 | 853 | 6.8 |
| Qatar | 4,252 | 35.2 | 31.7 | 3.5 | 109 | 2.6 |
| Saudi Arabia | 82,403 | 32.6 | 29.6 | 3 | 1,893 | 2.3 |
| Syria | 140,751 | 19.4 | 12.7 | 6.7 | 10,159 | 7.2 |
| Tajikistan | 38,948 | 21.7 | 9.6 | 12.1 | 4,914 | 12.6 |
| Turkmenistan | 51,096 | 31.7 | 26.4 | 5.3 | 2,124 | 4.2 |
| United Arab Emirates | 16,636 | 54 | 45.8 | 8.1 | 1,000 | 6.0 |
| Uzbekistan | 205,829 | 24.8 | 12.8 | 12 | 23,912 | 11.6 |
| Yemen | 90,616 | 23 | 19.9 | 3.1 | 2,520 | 2.8 |
| | | | | | | |
| **Eastern Asia** | | | | | | |
| Bangladesh | 692,081 | 58.9 | 6.7 | 52.3 | 252,927 | 36.5 |
| Bhutan | 2,909 | 23.6 | 5.7 | 17.9 | 516 | 17.7 |
| Brunei | 1,684 | 6.1 | 3.3 | 2.8 | 72 | 4.3 |
| Cambodia | 85,803 | 20.9 | 11.6 | 9.2 | 8,445 | 9.8 |
| China | 9,720,397 | 72.8 | 9.9 | 62.9 | 3,910,916 | 40.2 |
| China (2018)[d] | 9,720,397 | 41 | 9.7 | 31.2 | 2,355,579 | 24.2 |
| India | 8,009,357 | 52 | 9 | 42.9 | 2,458,384 | 30.7 |
| Indonesia | 1,495,066 | 20.9 | 5.7 | 15.3 | 230,097 | 15.4 |
| Japan | 1,284,769 | 22.6 | 4.6 | 18 | 242,561 | 18.9 |
| Laos | 33,822 | 19.6 | 8 | 11.6 | 4,404 | 13.0 |
| Malaysia | 154,090 | 18.9 | 5.3 | 13.6 | 22,228 | 14.4 |
| Maldives | 865 | 5.9 | 2.3 | 3.7 | 50 | 5.8 |

| Country name | Total Deaths >14 years old | Mean population weighted annual $PM_{2.5}$ ($\mu g\ m^{-3}$) | | | Attributable deaths[a] | Mean attributable fraction (%)[b] |
|---|---|---|---|---|---|---|
| | | With all emission sources | Without fossil fuel | Estimated fossil fuel $PM_{2.5}$ | | |
| | | | | | | |
| Mongolia | 12,013 | 8.4 | 4.8 | 3.5 | 628 | 5.2 |
| Myanmar | 340,623 | 16.4 | 7.4 | 9 | 36,978 | 10.9 |
| Nepal | 168,690 | 38.8 | 9.5 | 29.3 | 39,066 | 23.2 |
| North Korea | 201,841 | 35.8 | 5.3 | 30.5 | 52,942 | 26.2 |
| Pakistan | 1,115,784 | 36.7 | 15.1 | 21.7 | 188,406 | 16.9 |
| Papua New Guinea | 63,224 | 3.1 | 2.9 | 0.2 | 168 | 0.3 |
| Philippines | 559,792 | 8.7 | 2.1 | 6.7 | 51,203 | 9.1 |
| Singapore | 14,100 | 21.9 | 4.9 | 16.9 | 2,616 | 18.6 |
| South Korea | 265,641 | 44 | 5.3 | 38.8 | 80,962 | 30.5 |
| Sri Lanka | 116,032 | 13.4 | 3.5 | 9.9 | 14,998 | 12.9 |
| Taiwan | 164,488 | 14.5 | 3.2 | 11.3 | 23,711 | 14.4 |
| Thailand | 418,824 | 20.6 | 4.7 | 15.9 | 71,184 | 17.0 |
| Timor-Leste | 5,381 | 6.4 | 5 | 1.4 | 115 | 2.1 |
| Vietnam | 541,064 | 31.7 | 4.4 | 27.4 | 127,614 | 23.6 |
| | | | | | | |
| **Australia & Oceania** | | | | | | |
| American Samoa | 301 | 0.7 | 0.7 | 0 | 0 | 0.0 |
| Australia | 142,935 | 4.9 | 2.4 | 2.5 | 5,686 | 4.0 |
| Federated States of Micronesia | 679 | 0.7 | 0.7 | 0 | 1 | 0.1 |
| Fiji | 5,538 | 1.3 | 1.2 | 0.1 | 9 | 0.2 |
| Guam | 1,112 | 1.2 | 1 | 0.2 | 4 | 0.4 |
| Kiribati | 852 | 0.8 | 0.8 | 0 | 0 | 0.0 |
| Marshall Islands | 336 | 1.1 | 1.1 | 0 | 0 | 0.0 |

| Country name | Total Deaths >14 years old | Mean population weighted annual $PM_{2.5}$ ($\mu g\ m^{-3}$) | | | Attributable deaths[a] | Mean attributable fraction (%)[b] |
|---|---|---|---|---|---|---|
| | | With all emission sources | Without fossil fuel | Estimated fossil fuel $PM_{2.5}$ | | |
| | | | | | | |
| New Zealand | 29,923 | 2.2 | 1.5 | 0.6 | 320 | 1.1 |
| Northern Mariana Islands | 249 | 1.3 | 1.1 | 0.3 | 1 | 0.4 |
| Samoa | 960 | 0.7 | 0.7 | 0 | 0 | 0.0 |
| Solomon Islands | 3,286 | 1.2 | 1.2 | 0 | 2 | 0.1 |
| Tonga | 657 | 1.2 | 1.1 | 0.1 | 1 | 0.2 |
| Vanuatu | 1,791 | 2.2 | 2.2 | 0.1 | 2 | 0.1 |

| **USA** | | | | | | |
|---|---|---|---|---|---|---|
| State name | Total Deaths >14 years old | Mean population weighted annual $PM_{2.5}$ ($\mu g\ m^{-3}$) | | | Attributable deaths[a] | Mean attributable fraction (%)[b] |
| | | With all emission sources | Without fossil fuel | Estimated fossil fuel $PM_{2.5}$ | | |
| Alabama | 50,411 | 9.4 | 2.6 | 6.9 | 5,067 | 10.1 |
| Alaska | 3,384 | 2.2 | 1.4 | 0.9 | 51 | 1.5 |
| Arizona | 56,565 | 7.9 | 4 | 3.9 | 3,263 | 5.8 |
| Arkansas | 26,345 | 10.3 | 2.6 | 7.6 | 2,887 | 11.0 |
| California | 259,363 | 12.2 | 2.4 | 9.8 | 34,081 | 13.1 |
| Colorado | 36,885 | 6.8 | 3 | 3.8 | 2,140 | 5.8 |
| Connecticut | 32,639 | 12.1 | 1.7 | 10.5 | 4,749 | 14.6 |
| Delaware | 4,436 | 13.2 | 1.7 | 11.5 | 694 | 15.6 |
| Florida | 191,646 | 6.6 | 2.4 | 4.2 | 12,483 | 6.5 |
| Georgia | 75,518 | 11.3 | 2.5 | 8.8 | 9,290 | 12.3 |

| State name | Total Deaths >14 years old | Mean population weighted annual $PM_{2.5}$ (µg $m^{-3}$) | | | Attributable deaths[a] | Mean attributable fraction (%)[b] |
|---|---|---|---|---|---|---|
| | | With all emission sources | Without fossil fuel | Estimated fossil fuel $PM_{2.5}$ | | |
| | | | | | | |
| Hawaii | 11,032 | 2.6 | 2.1 | 0.4 | 83 | 0.8 |
| Idaho | 13,006 | 6.2 | 3.3 | 2.8 | 581 | 4.5 |
| Illinois | 102,593 | 16.6 | 1.9 | 14.7 | 18,952 | 18.5 |
| Indiana | 66,979 | 17 | 1.9 | 15.1 | 12,637 | 18.9 |
| Iowa | 33,378 | 11.9 | 2.1 | 9.8 | 4,562 | 13.7 |
| Kansas | 33,671 | 10.4 | 1.9 | 8.5 | 4,094 | 12.2 |
| Kentucky | 52,325 | 14.3 | 2 | 12.4 | 8,500 | 16.2 |
| Louisiana | 42,176 | 10.4 | 2.8 | 7.5 | 4,505 | 10.7 |
| Maine | 14,555 | 7.7 | 1.6 | 6.1 | 1,350 | 9.3 |
| Maryland | 40,784 | 15.8 | 1.8 | 14.1 | 7,336 | 18.0 |
| Massachusetts | 53,851 | 11.8 | 1.6 | 10.2 | 7,654 | 14.2 |
| Michigan | 93,585 | 16.7 | 1.8 | 14.9 | 17,438 | 18.6 |
| Minnesota | 39,674 | 13.3 | 2.2 | 11.1 | 5,877 | 14.8 |
| Mississippi | 40,360 | 10 | 2.6 | 7.3 | 4,263 | 10.6 |
| Missouri | 48,205 | 11.2 | 2.1 | 9.1 | 6,161 | 12.8 |
| Montana | 9,520 | 5.1 | 3.4 | 1.7 | 266 | 2.8 |
| Nebraska | 13,881 | 9 | 2.1 | 7 | 1,432 | 10.3 |
| Nevada | 23,541 | 6.7 | 3.4 | 3.3 | 1,192 | 5.1 |
| New Hampshire | 12,314 | 10 | 1.6 | 8.3 | 1,495 | 12.1 |
| New Jersey | 97,747 | 15.7 | 1.6 | 14.1 | 17,646 | 18.1 |
| New Mexico | 21,308 | 4.9 | 2.2 | 2.7 | 938 | 4.4 |
| New York | 129,489 | 14.6 | 1.6 | 13 | 21,931 | 16.9 |
| North Carolina | 95,239 | 12.5 | 2.2 | 10.3 | 13,357 | 14.0 |

| State name | Total Deaths >14 years old | Mean population weighted annual $PM_{2.5}$ (μg $m^{-3}$) | | | Attributable deaths[a] | Mean attributable fraction (%)[b] |
|---|---|---|---|---|---|---|
| | | With all emission sources | Without fossil fuel | Estimated fossil fuel $PM_{2.5}$ | | |
| | | | | | | |
| North Dakota | 4,070 | 6.9 | 2 | 4.9 | 309 | 7.6 |
| Ohio | 115,955 | 16.8 | 1.7 | 15 | 21,818 | 18.8 |
| Oklahoma | 40,908 | 8.7 | 1.9 | 6.8 | 4,190 | 10.2 |
| Oregon | 38,128 | 8.1 | 2.4 | 5.6 | 3,152 | 8.3 |
| Pennsylvania | 133,771 | 17.1 | 1.7 | 15.4 | 25,382 | 19.0 |
| Rhode Island | 4,910 | 10 | 1.6 | 8.3 | 597 | 12.2 |
| South Carolina | 51,014 | 10.9 | 2.5 | 8.4 | 6,048 | 11.9 |
| South Dakota | 7,036 | 7.4 | 2.1 | 5.4 | 574 | 8.2 |
| Tennessee | 67,804 | 11.4 | 2.1 | 9.3 | 8,844 | 13.0 |
| Texas | 183,885 | 8.4 | 1.9 | 6.4 | 17,663 | 9.6 |
| Utah | 16,534 | 6.5 | 2.7 | 3.8 | 981 | 5.9 |
| Vermont | 6,415 | 9.8 | 1.6 | 8.2 | 770 | 12.0 |
| Virginia | 71,555 | 13.9 | 2 | 11.9 | 11,206 | 15.7 |
| Washington | 50,955 | 7.7 | 2.3 | 5.4 | 4,138 | 8.1 |
| West Virginia | 22,500 | 11 | 1.9 | 9.1 | 2,900 | 12.9 |
| Wisconsin | 59,470 | 14.7 | 2 | 12.7 | 9,842 | 16.5 |
| Wyoming | 3,642 | 4.7 | 2.8 | 1.9 | 114 | 3.1 |

| Canada | | | | | | |
|---|---|---|---|---|---|---|
| Province name | Total Deaths >14 years old | Mean population weighted annual $PM_{2.5}$ ($\mu g\ m^{-3}$) | | | Attributable deaths[a] | Mean attributable fraction (%)[b] |
| | | With all emission sources | Without fossil fuel | Estimated fossil fuel $PM_{2.5}$ | | |
| Alberta | 21,535 | 8 | 2 | 6 | 1,958 | 9.1 |
| British Columbia | 33,403 | 8.7 | 1.9 | 6.8 | 3,237 | 9.7 |
| Manitoba | 9,868 | 7.9 | 2.7 | 5.2 | 778 | 7.9 |
| New Brunswick | 7,095 | 4.8 | 1.5 | 3.4 | 391 | 5.5 |
| Newfoundland & Labrador | 1,588 | 2.4 | 1.4 | 1 | 27 | 1.7 |
| Northwest Territories | 172 | 3.2 | 2.8 | 0.4 | 1 | 0.6 |
| Nova Scotia | 9,158 | 4.9 | 1.6 | 3.3 | 497 | 5.4 |
| Nunavut | 129 | 1.2 | 0.8 | 0.4 | 1 | 0.8 |
| Ontario | 90,996 | 15 | 1.6 | 13.4 | 15,728 | 17.3 |
| Prince Edward Island | 1,269 | 4.3 | 1.4 | 2.9 | 61 | 4.8 |
| Quebec | 66,494 | 13.9 | 1.6 | 12.3 | 10,645 | 16.0 |
| Saskatchewan | 8,515 | 7.5 | 2.4 | 5.2 | 678 | 8.0 |
| Yukon Territory | 193 | 1.1 | 0.9 | 0.3 | 1 | 0.5 |

[a] Annual number of deaths attributed to long term exposure to $PM_{2.5}$ generated by fossil fuel combustion.

[b] Mean proportion of deaths attributed to long term exposure to fossil-fuel related $PM_{2.5}$.

[c] Includes South Sudan

[d] Estimates derived after applying a 43.7% reduction to $PM_{2.5}$ from all sources for China

## References


1. Aunan, K., Ma, Q., Lund, M. T., et al., Population-weighted exposure to $PM_{2.5}$ pollution in China: An integrated approach, Environ Int, 120, 111-120, doi:10.1016/j.envint.2018.07.042, 2018.

2. Bond, T. C., Bhardwaj, E., Dong, R., et al., Historical emissions of black and organic carbon aerosol from energy-related combustion, 1850-2000, Global Biogeochem Cy, 21, doi:10.1029/2006gb002840, 2007.

3. Burnett, R., Chen, H., Szyszkowicz, M., et al., Global estimates of mortality associated with long-term exposure to outdoor fine particulate matter, P Natl Acad Sci USA, 115, 9592-9597, doi:10.1073/pnas.1803222115, 2018.

4. Chang, L. Y., Xu, J. M., Tie, X. X., et al., Impact of the 2015 El Nino event on winter air quality in China, Sci Rep-Uk, 6, doi:10.1038/srep34275, 2016.

5. Cusworth, D. H., Mickley, L. J., Sulprizio, M. P., et al., Quantifying the influence of agricultural fires in northwest India on urban air pollution in Delhi, India, Environ Res Lett, 13, doi:10.1088/1748-9326/aab303, 2018.

6. Di, Q., Koutrakis, P., Schwartz, J., A hybrid prediction model for $PM_{2.5}$ mass and components using a chemical transport model and land use regression, Atmos Environ, 131, 390-399, doi:10.1016/j.atmosenv.2016.02.002, 2016.

7. Eyring, V., Kohler, H. W., van Aardenne, J., et al., Emissions from international shipping: 1. The last 50 years, J Geophys Res-Atmos, 110, doi:10.1029/2004jd005619, 2005.

8. Fairlie, T. D., Jacob, D. J., Park, R. J., The impact of transpacific transport of mineral dust in the United States, Atmos Environ, 41, 1251-1266, doi:10.1016/j.atmosenv.2006.09.048, 2007.

9. Ford, B., Heald, C. L., Exploring the uncertainty associated with satellite-based estimates of premature mortality due to exposure to fine particulate matter, Atmos Chem Phys, 16, 3499-3523, doi:10.5194/acp-16-3499-2016, 2016.

10. Fountoukis, C., Nenes, A., ISORROPIA II: a computationally efficient thermodynamic equilibrium model for $K^+$-$Ca^{2+}$-$Mg^{2+}$-$Nh_4^+$-$Na^+$-$SO_4^{2-}$-$NO_3^-$-$Cl^-$-$H_2O$ aerosols, Atmos Chem Phys, 7, 4639-4659, doi:10.5194/acp-7-4639-2007, 2007.

11. Giglio, L., Randerson, J. T., van der Werf, G. R., Analysis of daily, monthly, and annual burned area using the fourth-generation global fire emissions database (GFED4), J Geophys Res-Biogeo, 118, 317-328, doi:10.1002/jgrg.20042, 2013.

12. Guenther, A. B., Jiang, X., Heald, C. L., et al., The Model of Emissions of Gases and Aerosols from Nature version 2.1 (MEGAN2.1): an extended and updated framework for modeling biogenic emissions, Geosci Model Dev, 5, 1471-1492, doi:10.5194/gmd-5-1471-2012, 2012.

13. Heald, C. L., Coe, H., Jimenez, J. L., et al., Exploring the vertical profile of atmospheric organic aerosol: comparing 17 aircraft field campaigns with a global model, Atmos Chem Phys, 11, 12673-12696, doi:10.5194/acp-11-12673-2011, 2011.

14. Heald, C. L., Jacob, D. J., Turquety, S., et al., Concentrations and sources of organic carbon aerosols in the free troposphere over North America, J Geophys Res-Atmos, 111, doi:10.1029/2006jd007705, 2006.

15. Hudman, R. C., Moore, N. E., Mebust, A. K., et al., Steps towards a mechanistic model of global soil nitric oxide emissions: implementation and space based-constraints, Atmos Chem Phys, 12, 7779-7795, doi:10.5194/acp-12-7779-2012, 2012.

16. Jaegle, L., Quinn, P. K., Bates, T. S., et al., Global distribution of sea salt aerosols: new constraints from in situ and remote sensing observations, Atmos Chem Phys, 11, 3137-3157, doi:10.5194/acp-11-3137-2011, 2011.

17. Keller, C. A., Long, M. S., Yantosca, R. M., et al., HEMCO v1.0: a versatile, ESMF-compliant component for calculating emissions in atmospheric models, Geosci Model Dev, 7, 1409-1417, doi:10.5194/gmd-7-1409-2014, 2014.

18. Lee, H. M., Park, R. J., Henze, D. K., et al., $PM_{2.5}$ source attribution for Seoul in May from 2009 to 2013 using GEOS-Chem and its adjoint model, Environ Pollut, 221, 377-384, doi:10.1016/j.envpol.2016.11.088, 2017.

19. Li, M., Zhang, Q., Kurokawa, J., et al., MIX: a mosaic Asian anthropogenic emission inventory under the international collaboration framework of the MICS-Asia and HTAP, Atmos Chem Phys, 17, 935-963, doi:10.5194/acp-17-935-2017, 2017.

20. Li, X., Wu, J. R., Elser, M., et al., Contributions of residential coal combustion to the air quality in Beijing-Tianjin-Hebei (BTH), China: a case study, Atmos Chem Phys, 18, 10675-10691, doi:10.5194/acp-18-10675-2018, 2018.

21. Li, Y., Henze, D. K., Jack, D., et al., The influence of air quality model resolution on health impact assessment for fine particulate matter and its components, Air Qual Atmos Health, 9, 51-68, doi:10.1007/s11869-015-0321-z, 2016.

22. Liu, H. Y., Jacob, D. J., Bey, I., et al., Constraints from $^{210}$Pb and $^{7}$Be on wet deposition and transport in a global three-dimensional chemical tracer model driven by assimilated meteorological fields, J Geophys Res-Atmos, 106, 12109-12128, doi:10.1029/2000jd900839, 2001.

23. Mao, J. Q., Paulot, F., Jacob, D. J., et al., Ozone and organic nitrates over the eastern United States: Sensitivity to isoprene chemistry, J Geophys Res-Atmos, 118, 11256-11268, doi:10.1002/jgrd.50817, 2013.

24. Marais, E. A., Jacob, D. J., Turner, J. R., et al., Evidence of 1991-2013 decrease of biogenic secondary organic aerosol in response to $SO_2$ emission controls, Environ Res Lett, 12, doi:10.1088/1748-9326/aa69c8, 2017.

25. Marais, E. A., Wiedinmyer, C., Air Quality Impact of Diffuse and Inefficient Combustion Emissions in Africa (DICE-Africa), Environ Sci Technol, 50, 10739-10745, doi:10.1021/acs.est.6b02602, 2016.

26. Murray, L. T., Jacob, D. J., Logan, J. A., et al., Optimized regional and interannual variability of lightning in a global chemical transport model constrained by LIS/OTD satellite data, J Geophys Res-Atmos, 117, doi:10.1029/2012jd017934, 2012.

27. Olivier, J. G. J., Berdowski, J. J. M., Global emission sources and sinks. The Climate System. A.A. Balkema Publishers/Swets & Zeitlinger Publishers, Lisse, The Netherlands, 2001, pp. 33-78.

28. Park, R. J., Jacob, D. J., Field, B. D., et al., Natural and transboundary pollution influences on sulfate-nitrate-ammonium aerosols in the United States: Implications for policy, J Geophys Res-Atmos, 109, doi:10.1029/2003jd004473, 2004.

29. Pye, H. O. T., Liao, H., Wu, S., et al., Effect of changes in climate and emissions on future sulfate-nitrate-ammonium aerosol levels in the United States, J Geophys Res-Atmos, 114, doi:10.1029/2008jd010701, 2009.

30. Schultz, M. G., Backman, L., Balkanski, Y., et al., REanalysis of the TROpospheric chemical composition over the past 40 years: Final report. http://hdl.handle.net/11858/00-001M-0000-0011-FBDD-B, 2007.

31. Shen, L., Mickley, L. J., Effects of El Nino on Summertime Ozone Air Quality in the Eastern United States, Geophys Res Lett, 44, 12543-12550, doi:10.1002/2017gl076150, 2017.

32. Shindell, D., Faluvegi, G., Seltzer, K., et al., Quantified, localized health benefits of accelerated carbon dioxide emissions reductions, Nat Clim Change, 8, doi:10.1038/s41558-018-0108-y, 2018.

33. Silvern, R. F., Jacob, D. J., Kim, P. S., et al., Inconsistency of ammonium-sulfate aerosol ratios with thermodynamic models in the eastern US: a possible role of organic aerosol, Atmos Chem Phys, 17, 5107-5118, doi:10.5194/acp-17-5107-2017, 2017.

34. Stettler, M. E. J., Eastham, S., Barrett, S. R. H., Air quality and public health impacts of UK airports. Part I: Emissions, Atmos Environ, 45, 5415-5424, doi:10.1016/j.atmosenv.2011.07.012, 2011.

35. Travis, K. R., Jacob, D. J., Fisher, J. A., et al., Why do models overestimate surface ozone in the Southeast United States?, Atmos Chem Phys, 16, 13561-13577, doi:10.5194/acp-16-13561-2016, 2016.

36. van Donkelaar, A., Martin, R. V., Brauer, M., et al., Global Estimates of Fine Particulate Matter using a Combined Geophysical-Statistical Method with Information from Satellites, Models, and Monitors, Environ Sci Technol, 50, 3762-3772, doi:10.1021/acs.est.5b05833, 2016.

37. van Donkelaar, A., Martin, R. V., Leaitch, W. R., et al., Analysis of aircraft and satellite measurements from the Intercontinental Chemical Transport Experiment (INTEX-B) to quantify long-range transport of East Asian sulfur to Canada, Atmos Chem Phys, 8, 2999-3014, doi:10.5194/acp-8-2999-2008, 2008.

38. Venkataraman, C., Brauer, M., Tibrewal, K., et al., Source influence on emission pathways and ambient $PM_{2.5}$ pollution over India (2015-2050), Atmos Chem Phys, 18, 8017-8039, doi:10.5194/acp-18-8017-2018, 2018.

39. Vinken, G. C. M., Boersma, K. F., Jacob, D. J., et al., Accounting for non-linear chemistry of ship plumes in the GEOS-Chem global chemistry transport model, Atmos Chem Phys, 11, 11707-11722, doi:10.5194/acp-11-11707-2011, 2011.

40. Vodonos, A., Abu Awad, Y., Schwartz, J., The concentration-response between long-term $PM_{2.5}$ exposure and mortality; A meta-regression approach, Environ Res, 166, 677-689, doi:10.1016/j.envres.2018.06.021, 2018.

41. Wang, C., Corbett, J. J., Firestone, J., Improving spatial representation of global ship emissions inventories, Environ Sci Technol, 42, 193-199, doi:10.1021/es0700799, 2008.

42. Wang, Q. Q., Jacob, D. J., Spackman, J. R., et al., Global budget and radiative forcing of black carbon aerosol: Constraints from pole-to-pole (HIPPO) observations across the Pacific, J Geophys Res-Atmos, 119, 195-206, doi:10.1002/2013jd020824, 2014.

43. Wang, S. W., Zhang, Q., Streets, D. G., et al., Growth in $NO_x$ emissions from power plants in China: bottom-up estimates and satellite observations, Atmos Chem Phys, 12, 4429-4447, doi:10.5194/acp-12-4429-2012, 2012.

44. WHO, Ambient and household air pollution and health. World Health Organization, http://www.who.int/airpollution/data/en/.

45. Wiedinmyer, C., Yokelson, R. J., Gullett, B. K., Global Emissions of Trace Gases, Particulate Matter, and Hazardous Air Pollutants from Open Burning of Domestic Waste, Environ Sci Technol, 48, 9523-9530, doi:10.1021/es502250z, 2014.

46. Xiao, Y. P., Logan, J. A., Jacob, D. J., et al., Global budget of ethane and regional constraints on US sources, J Geophys Res-Atmos, 113, doi:10.1029/2007jd009415, 2008.

47. Xing, J., Mathur, R., Pleim, J., et al., Can a coupled meteorology-chemistry model reproduce the historical trend in aerosol direct radiative effects over the Northern Hemisphere?, Atmos Chem Phys, 15, 9997-10018, doi:10.5194/acp-15-9997-2015, 2015.

48. Zender, C. S., Bian, H. S., Newman, D., Mineral Dust Entrainment and Deposition (DEAD) model: Description and 1990s dust climatology, J Geophys Res-Atmos, 108, doi:10.1029/2002jd002775, 2003.

49. Zhang, L., Jacob, D. J., Knipping, E. M., et al., Nitrogen deposition to the United States: distribution, sources, and processes, Atmos Chem Phys, 12, 4539-4554, doi:10.5194/acp-12-4539-2012, 2012.

50. Zhang, L. M., Gong, S. L., Padro, J., et al., A size-segregated particle dry deposition scheme for an atmospheric aerosol module, Atmos Environ, 35, 549-560, doi:10.1016/S1352-2310(00)00326-5, 2001.

ESC European Society of Cardiology

Cardiovascular Research (2020) **116**, 2247–2253
doi:10.1093/cvr/cvaa288

# Regional and global contributions of air pollution to risk of death from COVID-19

**Andrea Pozzer [1,2], Francesca Dominici[3], Andy Haines[4], Christian Witt [5], Thomas Münzel [6,7]*, and Jos Lelieveld [2,8]***

[1]International Center for Theoretical Physics, Trieste, Italy; [2]Max Planck Institute for Chemistry, Atmospheric Chemistry Department, Mainz, Germany; [3]Harvard T.H. Chan School of Public Health, Department of Biostatistics, Boston, MA, USA; [4]Centre for Climate Change and Planetary Health, London School of Hygiene and Tropical Medicine, London, UK; [5]Charité University Medicine, Pneumological Oncology and Transplantology, Berlin, Germany; [6]University Medical Center of the Johannes Gutenberg University, Mainz, Germany; [7]German Center for Cardiovascular Research, Mainz, Germany; and [8]The Cyprus Institute, Climate and Atmosphere Research Center, Nicosia, Cyprus

*Received 24 June 2020; revised 3 October 2020; editorial decision 23 September 2020; accepted 30 September 2020; online publish-ahead-of-print 26 October 2020*

**Time for primary review: 6 days**

**Aims**

The risk of mortality from the coronavirus disease that emerged in 2019 (COVID-19) is increased by comorbidity from cardiovascular and pulmonary diseases. Air pollution also causes excess mortality from these conditions. Analysis of the first severe acute respiratory syndrome coronavirus (SARS-CoV-1) outcomes in 2003, and preliminary investigations of those for SARS-CoV-2 since 2019, provide evidence that the incidence and severity are related to ambient air pollution. We estimated the fraction of COVID-19 mortality that is attributable to the long-term exposure to ambient fine particulate air pollution.

**Methods and results**

We characterized global exposure to fine particulates based on satellite data, and calculated the anthropogenic fraction with an atmospheric chemistry model. The degree to which air pollution influences COVID-19 mortality was derived from epidemiological data in the USA and China. We estimate that particulate air pollution contributed ∼15% (95% confidence interval 7–33%) to COVID-19 mortality worldwide, 27% (13 – 46%) in East Asia, 19% (8–41%) in Europe, and 17% (6–39%) in North America. Globally, ∼50–60% of the attributable, anthropogenic fraction is related to fossil fuel use, up to 70–80% in Europe, West Asia, and North America.

**Conclusion**

Our results suggest that air pollution is an important cofactor increasing the risk of mortality from COVID-19. This provides extra motivation for combining ambitious policies to reduce air pollution with measures to control the transmission of COVID-19.

**Keywords** COVID-19 • Air pollution • Fine particulate matter • comorbidity • mortality

## 1. Introduction

Poor air quality, especially from fine particulate matter with a diameter <2.5 µm ($PM_{2.5}$), is one of the leading risk factors, and responsible for many excess deaths.[1,2] The global loss of life expectancy from long-term exposure to ambient air pollution exceeds that of infectious diseases, and is comparable with that of tobacco smoking.[1–3] The mortality from COVID-19 depends on comorbidities, including conditions that increase cardiovascular risks such as arterial hypertension, diabetes mellitus, obesity, and established coronary artery disease, as well as respiratory conditions such as asthma and chronic obstructive pulmonary disease (COPD), being similar to those that are influenced by air pollution.[3–6] The risk of death is strongly related to age, being particularly high in those aged >70. It is also higher amongst males, economically disadvantaged populations, and in some ethnic groups. In assessing the relationships between exposures to risk factors and outcomes, potential confounders therefore need to be accounted for in the design of studies and in data analysis. These include the age distribution of the population, availability of hospital beds (and intensive care capacity), and the proportion of the population living in poverty.

* Corresponding authors. Jos Lelieveld: Tel: +49 6131 305 4000, Fax: +49 6131 305 4019, Email: jos.lelieveld@mpic.de or Thomas Münzel: Tel: +49 6131 17 7250, Fax: +49 6131 17 6615, Email: tmuenzel@uni-mainz.de
© The Author(s) 2020. Published by Oxford University Press on behalf of the European Society of Cardiology.
This is an Open Access article distributed under the terms of the Creative Commons Attribution Non-Commercial License (http://creativecommons.org/licenses/by-nc/4.0/), which permits non-commercial re-use, distribution, and reproduction in any medium, provided the original work is properly cited. For commercial re-use, please contact journals.permissions@oup.com



Downloaded from https://academic.oup.com/cardiovascres/article/116/14/2247/5940460 by guest on 16 February 2021

A recent study, using an ecological design, assessed how environmental influences modify the severity of COVID-19 outcomes in the USA.[7] Potential confounders were identified, and statistical models were used to relate long-term exposure to ambient $PM_{2.5}$ to COVID-19 deaths. The computed mortality rate ratios (MRRs) express the relative increase in COVID-19 deaths for each microgram per cubic meter increment of $PM_{2.5}$ in ambient air. The $PM_{2.5}$ data were derived from satellite and ground-based measurements combined with atmospheric modelling,[8] and the confounders were determined from county-level censuses, homeland infrastructure, and meteorological data. Here we test the assumption that the derived MRRs are representative for the populations of other countries (China) and consider the global impact. In the present study, we apply the MRRs to estimate the excess mortality, i.e. the fraction of COVID-19 deaths that could be avoided if the population were exposed to lower counterfactual air pollution levels without fossil fuel-related and other anthropogenic emissions. We emphasize that our results are provisional, based on epidemiological data collected up to the third week of June 2020, and a comprehensive evaluation will need to follow after the COVID-19 pandemic.

### 1.1 SARS and air pollution

In the early 2000s, the first severe acute respiratory syndrome coronavirus (SARS-CoV-1) appeared in China (Guangdong Province). The virus was zoonotic, as it originally developed in bats.[9] The World Health Organization (WHO) reported that it resulted in a SARS epidemic with >8000 cases in 26 countries, mostly in south-east Asia and in Canada.[8] The disease emerged in November 2002 and was contained in July 2003. SARS-CoV-1 and SARS-CoV-2 have many similarities, as their RNA genomes are closely related and the viruses enter the host cells by binding to the same entry receptor angiotensin-converting enzyme 2 (ACE2).[10–12] About 2–14 days after infection, the systemic symptoms of both diseases are alike, and a similar fraction of patients develops severe symptoms with a mortality rate that increases strongly with advanced age.[13–16] In China alone, >5000 cases of SARS-CoV-1 were reported, leading to nearly 350 fatalities. Since the exposure to ambient air pollution is associated with respiratory and cardiovascular diseases, it was hypothesized that health outcomes of SARS were aggravated by poor air quality. A study in 2003 corroborated that in parts of China with moderate levels of air pollution, the risk of dying from the disease was >80% higher compared with areas with relatively clean air, while in heavily polluted regions the risk was twice as high.[17]

### 1.2 COVID-19 and air pollution

In 2019, the related second virus strain appeared (SARS-CoV-2) in China (Hubei Province), which also developed in bats,[4] causing COVID-19, which grew from an epidemic into a pandemic in the early part of 2020. A Chinese analysis indicated that the risk of symptomatic infection typically increases by ~4% for each year of age between 30 and 60, and that the lethality is highest for individuals >60 years.[15]COVID-19 is associated with a combination of respiratory and cardiovascular complications, which may comprise myocardial infarction, heart failure, venous thrombo-embolisms, and increases in biomarkers,[18] which are also found in connection with high levels of air pollutants.[5] In a recent analysis of 5700 patients hospitalized with COVID-19 in the New York City area, the most common comorbidities were hypertension (57%), obesity (42%), and diabetes (34%),[19] representing cardiovascular risk factors that are also observed in relation to elevated $PM_{2.5}$ concentrations,[5,20] suggesting additive or synergistic effects on the cardiovascular system. In addition, advanced age is a strong risk factor for cardiovascular disease, and the effects on immune function may be equally important for COVID-19 susceptibility. The age dependency coincides with that of excess mortality from $PM_{2.5}$.[3,15] The COVID-19 mortality rate has been estimated to be ~4% in symptomatic cases, in part because pre-existing conditions such as cardiovascular and respiratory disorders increase the risk.[21]

Considering the cardiovascular and respiratory health impacts of air pollution, the relationship to COVID-19 mortality is not unexpected. Preliminary studies addressed the influence of air pollution on COVID-19 in different regions. In China, the incidence of COVID-19 was found to be significantly enhanced by $PM_{2.5}$,[22] while a correlation between ambient $PM_{2.5}$ and the mortality rate was also established.[23] In Italy, it was found that the high pollution concentrations that are typical for the Po valley, especially in the Lombardy region of which Milan is the capital, were associated with a high mortality rate.[24] As mentioned above, in the USA the severity of COVID-19 outcomes was linked to $PM_{2.5}$ exposure, making use of Medicare data for >60 million people and nationwide air quality measurements.[7] Data were collected for 98% of the population in 3087 of the total number of 3142 counties, of which ~42% had reported COVID-19 deaths up to the third week of April 2020. The death counts relied on data from the Coronavirus Resource Center of the Johns Hopkins University.[25] The study accounted for 20 potential confounding factors including population size, age distribution, population density, time period since the beginning of the outbreak, time elapsed since the home confinements, hospital beds, number of individuals tested, meteorological conditions, and socioeconomic and risk factors such as obesity and smoking.[7] The results showed significant overlap between the causes of death in COVID-19 patients and those that lead to mortality from $PM_{2.5}$. The MRR, i.e. the percentage increase of COVID-19 mortality risk per $\mu g/m^3$ increase of exposure to $PM_{2.5}$, was found to be 8%, with a 95% confidence interval of 2–15%.[7] The calculations are continually updated based on the most recent data (up to 18 June at the time of writing), showing no significant changes in the MRR in the preceding 4 months.

## 2. Methods

### 2.1 Global model and data

We applied a global atmospheric chemistry general circulation model (EMAC) which comprehensively simulates atmospheric chemical and meteorological processes and interactions with the oceans and the biosphere, in the same set-up as in recent studies on climate change, air pollution, and public health.[3,26] In addition to the standard simulation, we performed two sensitivity calculations: (i) with fossil fuel-related emissions removed and (ii) with all anthropogenic emissions removed. The model results were used to estimate the ratio of fine particulates in simulation (i) and (ii) and the standard simulation. The annual atmospheric near-surface $PM_{2.5}$ concentrations were taken from model-integrated satellite data, for the year 2019.[8,27] The horizontal resolution is 0.01 by 0.01 degrees, corresponding to a grid size of ~1 km × 1 km. The near-surface concentrations of $PM_{2.5}$ for fossil fuel-related and all anthropogenic emissions are estimated by scaling this data set to the ratios (i) and (ii) obtained with the EMAC model simulations.

### 2.2 Relative risk

To estimate the relative risk (RR or hazard ratio) of excess COVID-19 mortality from the long-term exposure to air pollution, we used the exposure–response function of the WHO,[28]

Downloaded from https://academic.oup.com/cardiovascres/article/116/14/2247/5940460 by guest on 16 February 2021

$$\mathrm{RR} = \left(\frac{X+1}{X_0+1}\right)^{\beta},$$

RR is a function of the concentration of air pollutants, which specifies annual average exposure dependent on location (grid cell) derived from the data mentioned above. $X$ is the pollutant ($PM_{2.5}$) and $X_0$ is the pollutant threshold concentration below which exposure does not have implications for public health. Both $\beta$ and $X_0$ are estimated by fitting to data from the literature with a least square method (*Figure 1*). We adopted the threshold $PM_{2.5}$ concentration ($X_0$) from Burnett *et al.*[2] (i.e. < 2.4 $\mu g/m^3$ $PM_{2.5}$), forcing the curve fitting into this range. We tested different exposure–response functions, e.g. of Burnett *et al.*,[2] and values for $X_0$, and find that the results are not sensitive to these assumptions.

Because the COVID-19 mortality rate ratio due to air pollution, based on data in the USA alone,[7] may not represent countries with very high fine particle concentrations (associated with a lack of observations in such regions), we investigated the effect of including data from the enhanced mortality rate derived for the Chinese SARS epidemic in 2003.[17] We make the assumption that SARS and COVID-19 mortality are similarly affected by long-term exposure to air pollution. Since the analysis for SARS was based on the Chinese Air Pollution Index (API), we converted the API to $PM_{2.5}$ concentrations following empirical relationships from the literature.[29,30] The large uncertainty range in the fitting function to a large degree derives from those in these relationships (black squares and ranges in *Figure 1*). In spite of uncertainties, the curves for the USA only and those that include the Chinese results are almost identical, providing confidence in the function derived for conditions in the USA only.

## 2.3 Attributable fraction

We calculated RR globally using $PM_{2.5}$ distributions calculated under the standard scenario. The attributable fraction (AF) of COVID-19 mortality to air pollution is calculated from the RR by AF = 1 – 1/RR. From the globally distributed, gridded AFs, we aggregated into regional and country-level AFs, weighted according to the population density, in order to account for the varying population distributions within regions and countries. The population data for the year 2020 were obtained from the NASA Socioeconomic Data and Applications Center (SEDAC), hosted by the Columbia University Center for International Earth Science Information Network (CIESIN).[31] Our definition of AF does not imply a direct cause–effect relationship between air pollution and COVID-19 mortality (although it is possible). Instead it refers to relationships between the two, direct and indirect, i.e. by aggravating comorbidities that could lead to fatal health outcomes of the virus infection.

# 3. Results

## 3.1 Attribution of COVID-19 mortality

To estimate the AF from exposure to ambient $PM_{2.5}$ to COVID-19 mortality, we used the epidemiological data from the USA (red curve in *Figure 1*). The chronic exposure to $PM_{2.5}$ in the years prior to the COVID-19 outbreak was estimated on the basis of satellite observations over the year 2019. The anthropogenic and fossil fuel-related fractions were calculated with the global EMAC model. Here we focus on anthropogenic and fossil fuel-related $PM_{2.5}$ to determine the impact of potentially avoidable air pollution on COVID-19 mortality. *Figure 2* and *Table 1* present the average fractions of COVID-19 mortality attributed to the exposure to $PM_{2.5}$ pollution, both globally and regionally. *Table S1* (available as Supplementary material online) lists the results for all countries. To account for the different population distributions within countries, e.g. between rural and urban areas, the averages have been weighted accordingly.




**Figure 1** Exposure-response dependencies, based on a log-normal relationship[28]. The relative risk (or hazard ratio), from which the attributable fraction has been derived, is based on mortality rate ratios attributed to air pollution in the COVID-19 pandemic[7] and the SARS epidemic[17], indicated by the black bullet and squares, respectively. The triangle represents the threshold concentration below which $PM_{2.5}$does not have health implications[2]. The red curves depict the function fitted to the data from COVID-19 in the USA only[7], plus the threshold[2] (triangle and bullet). The blue curves depict the function fitted to all data[2,7,17]. The colored ranges show the 95% confidence intervals, which are wider after including the SARS-related results (blue), mostly due to uncertainty from converting Chinese API's into $PM_{2.5}$concentrations (black squares).

In regions with strict air quality standards and relatively low levels of air pollution, such as Australia, the attributable fraction by human-made air pollution to COVID-19 mortality is found to be a few percent only. Relatively high fractions occur in parts of east Asia (~35%), central Europe (~25%), and eastern USA (~25%). The country-level contribution to COVID-19 that we find for China, i.e. 27% (95% confidence interval 13 – 47%), agrees well with that found for the SARS epidemic in 2003.[17] The largest country-average fractions are found in the Czech Republic, Poland, China, North Korea, Slovakia, Austria, Belarus, and Germany, all above 25% (Supplementary material, *Table S1*). Globally, anthropogenic air pollution contributes ~15% (7 – 33%) to COVID-19 mortality, which could have been largely prevented, for example by adopting the air quality regulations applied in Australia (annual $PM_{2.5}$ limit of 8 $\mu g/m^3$). The global mean contribution of fossil fuel use to the anthropogenic fraction is ~56%, being highest in North America (83%), West Asia (75%), and Europe (68%) (*Table 1*).

# 4. Discussion

## 4.1 Pathophysiological aspects

Both the air pollutant $PM_{2.5}$ and the SARS-CoV-2 virus enter the lungs via the bronchial system (portal organ), with potential systemic health impacts through the blood circulation. Both $PM_{2.5}$ and SARS-CoV-2 cause vascular endothelial dysfunction, oxidative stress, inflammatory responses, thrombosis, and an increase in immune cells.[32–36] The SARS-CoV-2 infection facilitates the induction of endothelial inflammation in

Downloaded from https://academic.oup.com/cardiovascres/article/116/14/2247/5940460 by guest on 16 February 2021




**Figure 2** Estimated percentages of COVID-19 mortality attributed to air pollution from all anthropogenic sources (top), and from fossil fuel use only (bottom). The regions with high attributable fractions coincide with high levels of air pollution. The mapped results account for population density, thus reflecting population weighted exposure to $PM_{2.5}$.

several organs as a direct consequence of viral cytotoxic effects and the host inflammatory response, which can aggravate pre-existing chronic respiratory and vascular (coronary) dysfunction, and cause lung injury by alveolar damage, as well as stroke and myocardial infarction by inducing plaque rupture.[37] Potential common pathophysiological mechanisms of increased risk thus relate to endothelial injury[33,38] and pathways that regulate immune function.[39,40] Further, there are strong indications of increased susceptibility to viral infections from exposure to air pollution.[41–46]

Lung injuries, including the life-threatening acute respiratory distress syndrome and respiratory failure, as well as acute coronary syndrome, arrhythmia, myocarditis, and heart failure, were shown to be clinically dominant, leading to critical complications of COVID-19.[47,48] Recent studies in China, the USA, as well as Europe indicate that patients with cardiovascular risk factors or established cardiovascular disease and other comorbid conditions are predisposed to myocardial injury during the course of COVID-19.[19,46,49–52] From the available information, it thus follows that air pollution-induced inflammation leads to greater vulnerability and less resiliency, and the pre-conditions increase the host vulnerability. Air pollution causes adverse events through myocardial infarction and stroke, and it is an additional factor capable of increasing blood pressure, while there is emerging evidence for a link with type 2 diabetes and a possible contribution to obesity and enhanced insulin resistance.[36] Bronchopulmonary and cardiovascular pre-conditions, including hypertension, diabetes, coronary artery disease, cardiomyopathy, asthma, COPD, and acute lower respiratory illness, all negatively influenced by air pollution, lead to a substantially higher mortality risk in COVID-19. Furthermore, it seems likely that fine particulates prolong the atmospheric lifetime of infectious viruses, thus favouring transmission.[53] It is possible that future research will reveal additional pathways that mediate the relationship between air pollution and the risk of death from COVID-19.



Downloaded from https://academic.oup.com/cardiovascres/article/116/14/2247/5940460 by guest on 16 February 2021

**Table 1 Regional percentages of COVID-19 mortality attributed to fossil fuel-related and all anthropogenic sources of air pollution**

| Region | Population (million) | COVID-19 mortality fraction attributed to air pollution (%) | |
|---|---|---|---|
| | | Fossil fuel-related emissions | All anthropogenic emissions |
| Europe | 628 | 13 (6–33) | 19 (8–41) |
| Africa | 1345 | 2 (1–19) | 7 (3–25) |
| West Asia | 627 | 6 (3–25) | 8 (4–27) |
| South Asia | 2565 | 7 (3–22) | 15 (8–31) |
| East Asia | 1685 | 15 (8–32) | 27 (13–46) |
| North America | 525 | 14 (6–36) | 17 (6–39) |
| South America | 547 | 3 (1–23) | 9 (4–30) |
| Oceania | 28 | 1 (0–20) | 3 (1–23) |
| World | 7950 | 8 (4–25) | 15 (7–33) |

The 95% confidence levels are given in parentheses.

## 4.2 Limitations

Our results indicate that the long-term exposure to high levels of fine particulate matter is a significant cofactor that influences the severity of COVID-19 outcomes. Since $PM_{2.5}$ in China and the USA, from which epidemiological data have been used, is dominated by anthropogenic sources that are potentially preventable, we focus our analysis on this fraction of $PM_{2.5}$. The good agreement of our results for the USA and China is in line with recent studies, showing that the association between air pollution and excess mortality is valid for many different countries.[2,55] Nevertheless, the calculations of RRs (hazard ratios) and the AF to mortality rely on the use of data from an ecological study design that has limitations, even though 19 county-level variables and one state-level variable, some of which are more important than air pollution, were considered as potential confounders in the analysis—and the $PM_{2.5}$ exposure data have been extensively cross-validated.[7] However, we acknowledge that residual confounding cannot be excluded. While cross-sectional ecological studies do not allow conclusions about cause–effect relationships, the biological mechanisms of air pollution-related disorders, acting as comorbidities in COVID-19, are well documented.[56,57] Recent studies in England and The Netherlands corroborate the positive relationships between air pollution and the number of COVID-19 cases, hospital admissions, and mortality.[58–60] The reported MRRs for $PM_{2.5}$ range from 1–7% to 13–21% (we applied 2–15%), which confirms the significant role of air pollution but emphasizes the large uncertainty ranges. Furthermore, our approach is likely to realistically approximate the contribution of fossil fuels and other anthropogenic sources to the total excess deaths through long-term ambient $PM_{2.5}$ air pollution exposure.

We reiterate that the data used for China are associated with substantial uncertainty, and underly the assumption that comorbidity and mortality from air pollution in COVID-19 are the same as in SARS. Nonetheless, using these data does not change the results, providing confidence in the robustness of our findings. We emphasize that the data relevant to the present study are from upper-middle and high-income countries, and the representativeness of our results for low-income countries may be limited, and uncertainties are likely to exceed the 95% confidence intervals. It is expected that in countries with high levels of aeolian dust, e.g. in Africa and West Asia, $PM_{2.5}$ pollution is also a cofactor but with less contribution from human activities. Household air pollution is also likely to be important, being of particular relevance in low-income countries.[61] It will be critical to collect epidemiological evidence from many regions with different socio-economic and environmental conditions, to support analyses of the COVID-19 pandemic and investigate the role of environmental factors. The uncertainty ranges that accompany our results are considerable but, taking into account the biological plausibility of the relationship and the strong evidence of the impact of air pollution on conditions that are known to increase COVID-19 mortality, they can nevertheless inform policy decisions.

## 4.3 Short- and long-term health impacts

A new, though preliminary, finding of the present study is that a significant fraction of worldwide COVID-19 mortality is attributable to anthropogenic air pollution, of which ~50 – 60% is related to fossil fuel use (~70 – 80% in Europe, West Asia, and North America). This represents potentially avoidable, excess mortality. The links between economic activity, traffic, energy use, and public health have been illustrated by the strong reduction of air pollution in many locations during the lockdown measures.[62,63] There is ample evidence for a relationship between short-term exposure to $PM_{2.5}$ and adverse health effects, including excess mortality from cardiovascular and respiratory diseases.[55] While it is in principle possible to disentangle the acute from the chronic outcomes from short- and long-term exposure to air pollution,[64] at this stage it is difficult to make that distinction for $PM_{2.5}$-induced comorbidity and mortality from COVID-19. Generally, short-term associations between air pollution and mortality are substantially less than those from long-term exposure, due to the more persistent, cumulative effects from the latter.[65] By relating air pollution anomalies to short-term health outcomes during the COVID-19-induced societal lockdown, it was found that in China alone >4600 excess deaths may have been avoided.[62] This can be viewed as a health co-benefit from the containment measures, which may reduce air pollution-induced COVID-19 mortality. Such benefits could also be achieved after the COVID-19 lockdown. Both perspectives of air pollution during the pandemic underscore the important role of fossil fuel-related and other anthropogenic emissions.

## 4.3 Future directions

Our results suggest the potential for substantial benefits from reducing air pollution exposure even at relatively low $PM_{2.5}$ levels. Refinement of the exposure–response relationship and reducing uncertainties will require additional data analyses, including from large cohort studies as the COVID-19 pandemic evolves, but may appear too late to guide



Downloaded from https://academic.oup.com/cardiovascres/article/116/14/2247/5940460 by guest on 16 February 2021

decision-making. A lesson from our environmental perspective of the COVID-19 pandemic is that the quest for effective policies to reduce anthropogenic emissions, which cause both air pollution and climate change, needs to be accelerated. The pandemic ends with the vaccination of the population or with herd immunity through extensive infection of the population. However, there are no vaccines against poor air quality and climate change. The remedy is to mitigate emissions. The transition to a green economy with clean, renewable energy sources will further both environmental and public health locally through improved air quality and globally by limiting climate change.

# Supplementary material

Supplementary material is available at *Cardiovascular Reseach* online.

## Funding

We thank the Mainz Heart Foundation for continuous support. T.M. is the principal investigator of the DZHK (German Center for Cardiovascular Research), Partner Site Rhine-Main, Mainz, Germany.

**Conflict of interest:** none declared.

## Data availability

The data underlying this article will be shared upon reasonable request to the corresponding author.

## References

1. Cohen AJ, Brauer M, Burnett R, Anderson HR, Frostad J, Estep K, Balakrishnan K, Brunekreef B, Dandona L, Dandona R, Feigin V, Freedman G, Hubbell B, Jobling A, Kan H, Knibbs L, Liu Y, Martin R, Morawska L, Pope CA 3rd, Shin H, Straif K, Shaddick G, Thomas M, van Dingenen R, van Donkelaar A, Vos T, Murray CJL, Forouzanfar MH. Estimates and 25-year trends of the global burden of disease attributable to ambient air pollution: an analysis of data from the Global Burden of Diseases Study 2015. *Lancet* 2017;**389**:1907–1918.
2. Burnett R, Chen H, Szyszkowicz M, Fann N, Hubbell B, Pope CA, Apte JS, Brauer M, Cohen A, Weichenthal S, Coggins J, Di Q, Brunekreef B, Frostad J, Lim SS, Kan H, Walker KD, Thurston GD, Hayes RB, Lim CC, Turner MC, Jerrett M, Krewski D, Gapstur SM, Diver WR, Ostro B, Goldberg D, Crouse DL, Martin RV, Peters P, Pinault L, Tjepkema M, van Donkelaar A, Villeneuve PJ, Miller AB, Yin P, Zhou M, Wang L, Janssen NAH, Marra M, Atkinson RW, Tsang H, Quoc Thach T, Cannon JB, Allen RT, Hart JE, Laden F, Cesaroni G, Forastiere F, Weinmayr G, Jaensch A, Nagel G, Concin H, Spadaro JV. Global estimates of mortality associated with long-term exposure to outdoor fine particulate matter. *Proc Natl Acad Sci USA* 2018;**115**: 9592–9597.
3. Lelieveld J, Pozzer A, Pöschl U, Fnais M, Haines A, Münzel, T. Comparison of mortality from ambient air pollution with other risk factors: a worldwide perspective. *Cardiov Res* 2020;doi: 10.1093/cvr/cvaa025.
4. World Health Organization. *Report of the WHO–China Joint Mission on Coronavirus Disease 2019 (COVID-19)*. Geneva: WHO; 2020.
5. Miller MR. Oxidative stress and the cardiovascular effects of air pollution. *Free Radic Biol Med* 2020;**151**:69–87.
6. Williamson EJ, Walker AJ, Bhaskaran K, Bacon S, Bates C, Morton CE, Curtis HJ, Mehrkar A, Evans D, Inglesby, P, Cockburn J, McDonald HI, MacKenna B, Tomlinson L, Douglas IJ, Rentsch RT, Mathur R, Wong AYS, Grieve R, Harrison D, Forbes H, Schultze, A, Croker R, Parry J, Hester F, Harper S, Perera R, Evans SJW, Smeeth L, Goldacre B. Factors associated with COVID-19-related death using OpenSAFELY. *Nature* 2020;**584**:430–436.
7. Wu X, Nethery RC, Sabath MB, Braun D, Dominici F. Exposure to air pollution and COVID-19 mortality in the United States. *MedRxiv* 2020; doi: 10.1101/2020.04.05.20054502.
8. van Donkelaar A, Martin RV, Li C., Burnett RT. Regional estimates of chemical composition of fine particulate matter using a combined geoscience-statistical method with information from satellites, models, and monitors. *Environ Sci Technol* 2019;**53**: 2595-2611.
9. World Health Organization. SARS (Severe Acute Respiratory Syndrome) Disease Information. Geneva: WHO; 2020. https://www.who.int/ith/diseases/sars/en/
10. Shang J, Wan Y, Luo C, Ye G, Geng Q, Auerbach A, Li F. Cell entry mechanisms of SARS-CoV-2. *Proc Natl Acad Sci USA* 2020;**117**:11727–11734.
11. Li Y, Liu B, Cui J, Wang Z, Shen Y, Xu Y, Yao K, Guan Y. Similarities and evolutionary relationships of COVID-19 and related viruses. *arXiv* 2020;2020030316 (doi: 10.20944/preprints202003.0316.v1).
12. Zhou P, Yang XL, Wang XG, Hu B, Zhang L, Zhang W, Si HR, Zhu Y, Li B, Huang CL, Chen HD, Chen J, Luo Y, Guo H, Jiang RD, Liu MQ, Chen Y, Shen XR, Wang X, Zheng XS, Zhao K, Chen QJ, Deng F, Liu LL, Yan B, Zhan FX, Wang YY, Xiao GF, Shi ZL. A pneumonia outbreak associated with a new coronavirus of probable bat origin. *Nature* 2020;**579**:270–273.
13. Chan-Yeun M, Xu R-H. SARS: epidemiology. *Respiration* 2003;**8**:S9–S14.
14. Yang M, Li CK, Li K, Hon KLE, Ng MHL, Chan PKS, Fok TF. Hematological findings in SARS patients and possible mechanisms (Review). *Int J Mol Med* 2004;**14**:311–315
15. Wu JT, Leung K, Bushman M, Kishore N, Niehus R, de Salazar PM, Cowling BJ, Lipsitch M, Leung GM, Estimating clinical severity of COVID-19 from the transmission dynamics in Wuhan, China. *Nat Med* 2020;**26**:506–510.
16. Tian S, Hu N, Lou J, Chen K, Kang X, Xiang Z, Chen H, Wang D, Liu N, Liu D, Chen G, Zhang Y, Li D, Li J, Lian H, Niu S, Zhang L, Zhang J. Characteristics of COVID-19 infection in Beijing. *J Infect* 2020;**80**:401–406.
17. Cui Y, Zhang Z-F, Froines J, Zhao J, Wang H, Yu S-Z, Detels R. Air pollution and case fatality of SARS in the People's Republic of China: an ecologic study. *Environ Health* 2003;**2**:15.
18. Driggin E, Madhavan MV, Bikdeli B, Chuich T, Laracy J, Biondi-Zoccai G, Brown TS, Nigoghossian CD, Zidar DA, Haythe J, Brodie D, Beckman JA, Kirtane AJ, Stone GW, Krumholz HM, Parikh SA. Cardiovascular considerations for patients, health care workers, and health systems during the COVID-19 pandemic. *J Am Coll Cardiol* 2020;**75**: 2352–2371.
19. Richardson S, Hirsch JS, Narasimhan M, Crawford JM, McGinn T, Davidson KW, and the Northwell C-RC, Barnaby DP, Becker LB, Chelico JD, Cohen SL, Cookingham J, Coppa K, Diefenbach MA, Dominello AJ, Duer-Hefele J, Falzon L, Gitlin J, Hajizadeh N, Harvin TG, Hirschwerk DA, Kim EJ, Kozel ZM, Marrast LM, Mogavero JN, Osorio GA, Qiu M, Zanos TP. Presenting characteristics, comorbidities, and outcomes among 5700 patients hospitalized with COVID-19 in the New York City area. *JAMA* 2020;**323**:2052–2059.
20. Münzel T, Sorensen M, Gori T, Schmidt FP, Rao X, Brook J, Chen LC, Brook RD, Rajagopalan S. Environmental stressors and cardio-metabolic disease: part I—epidemiologic evidence supporting a role for noise and air pollution and effects of mitigation strategies. *Eur Heart J* 2017;**38**:550–556.
21. Wang C, Horby PW, Hayden FG, Gao GF. A novel coronavirus outbreak of global health concern. *Lancet* 2020;**395**:470–473.
22. Wang B, Liu J, Fu S, Xu X, Li L, Ma Y, Zhou J, Yao J, Liu X, Zhang X, He X, Yan H, Shi Y, Ren X, Niu J, Luo B, Zhang K. An effect assessment of airborne particulate matter pollution on COVID-19: a multi-city study in China. *MedRxiv* 2020;https://doi.org/10.1101/2020.04.09.20060137.
23. Yao Y, Pan J., Wang W, Liu X, Kan H., Meng X, Wang W. Spatial correlation of particulate matter pollution and death rate of COVID-19. *MedRxiv* 2020;https://doi.org/10.1101/2020.04.07.20052142.
24. Conticini E, Frediani B, Caro D. Can atmospheric pollution be considered a co-factor in extremely high level of SARS-CoV-2 lethality in Northern Italy? *Environ Poll* 2020; **261**:114465.
25. Coronavirus Resource Center. Johns Hopkins University and Medicine, Baltimore, MD, USA, 2020; https://coronavirus.jhu.edu.
26. Lelieveld J, Klingmüller K, Pozzer A, Burnett RT, Haines A, Ramanathan V. Effects of fossil fuel and total anthropogenic emission removal on public health and climate. *Proc Natl Acad Sci USA* 2019;**116**:7192–7197.
27. van Donkelaar A, Martin RV, Brauer M, Hsu NC, Kahn RA, Levy RC, Lyapustin A, Sayer AM, Winker D.M. Global estimates of fine particulate matter using a combined geophysical–statistical method with information from satellites, models, and monitors. *Environ Sci Technol* 2016;**50**:3762–3772.
28. Ostro B. *Outdoor Air Pollution: Assessing the Environmental Burden of Disease at National and Local Levels. World Health Organization Protection of the Human Environment.* Geneva: WHO; 2004.
29. Guo JP, Zhang X-Y, Che H-Z, Gong S-L, An X, Cao C-X, Guang J, Zhang H, Wang Y-Q, Zhang XC, Xue M, Li X-W. Correlation between PM concentrations and aerosol optical depth in eastern China. *Atmos Environ* 2009;**43**:5876–5886.
30. Zheng S, Cao CX, Singh RP. Comparison of ground based indices (API and AQI) with satellite based aerosol products. *Sci Total Environ* 2014;**488**:398–412.
31. Center for International Earth Science Information Network, CIESIN, Columbia University. *Gridded Population of the World, Version 4 (GPWv4): Population Count, Revision 11. Palisades, NY.* NASA Socioeconomic Data and Applications Center (SEDAC) 2020; https://doi.org/10.7927/H4JW8BX5.
32. Pope CA III, Bhatnagar A, McCracken JP, Abplanalp W, Conklin DJ, O'Tool T. Exposure to fine particulate air pollution is associated with endothelial injury and systemic inflammation. *Circ Res* 2016;**119**:1204–1214.
33. Münzel T, Gori, T, Al-Kindi S, Deanfield J, Lelieveld J, Daiber A, Rajagopalan S. Effects of gaseous and solid constituents of air pollution on endothelial function. *Eur Heart J* 2018;**39**:3543–3550.

Downloaded from https://academic.oup.com/cardiovascres/article/116/14/2247/5940460 by guest on 16 February 2021

34. Varga Z, Flammer AJ, Steiger P, Haberecker M, Andermatt R, Zinkernagel AS, Mehra MR, Schuepbach RA, Ruschitzka F, Moch H. Endothelial cell infection and endotheliitis in COVID-19. *Lancet* 2020;**395**:1417–1418.
35. Tsai D-H, Riediker M, Berchet A, Paccaud F, Waeber G, Vollenweider P, Bochud M. Effects of short- and long-term exposures to particulate matter on inflammatory marker levels in the general population. *Environ Sci Poll Res* 2019;**26**:19697–19704.
36. Thurston GD, Kipen H, Annesi-Maesano I, Balmes J, Brook RD, Cromar K, De Matteis S, Forastiere F, Forsberg B, Frampton MW, Grigg J, Heederik D, Kelly FJ, Kuenzli N, Laumbach R, Peters A, Rajagopalan ST, Rich D, Ritz B, Samet JM, Sandstrom T, Sigsgaard T, Sunyer J, Brunekreef B. A joint ERS/ATS policy statement: what constitutes an adverse health effect of air pollution? An analytical framework. *Eur Respir J* 2017;**49**:1600419.
37. Wenzel P, Kopp S, Göbel S, Jansen T, Geyer M, Hahn F, Kreitner K-F, Escher F, Schultheiss H-P, Münzel T. Evidence of SARS-CoV-2 mRNA in endomyocardial biopsies of patients with clinically suspected myocarditis tested negative for COVID-19 in nasopharyngeal swab. *Cardiovasc Res* 2020;**116**:1661–1663.
38. Ackermann M, Verleden SE, Kuehnel M, Haverich A, Welte T, Laenger F, Vanstapel A, Werlein C, Stark H, Tzankov A, Li WW, Li VW, Mentzer SJ, Jonigk D. Pulmonary vascular endothelialitis, thrombosis, and angiogenesis in Covid-19. *N Engl J Med* 2020; **383**:120–128.
39. Kelly FJ, Fussell JC. Linking ambient particulate matter pollution effects with oxidative biology and immune responses. *Ann N Y Acad Sci* 2015;**1340**:84–94.
40. O'Driscoll CA, Owens LA, Gallo ME, Hoffmann EJ, Afrazi A, Han M, Fechner JH, Schauer JJ, Bradfield CA, Mezrich JD. Differential effects of diesel exhaust particles on T cell differentiation and autoimmune disease. *Part Fibre Toxicol* 2018;**15**: 35.
41. Becker S, Soukup JM Exposure to urban air particulates alters the macrophage-mediated inflammatory response to respiratory viral infection. *J Toxicol Environ Health A* 1999;**57**:445–457.
42. Harrod KS, Jaramillo RJ, Rosenberger CL, Wang S-Z, Berger JA, McDonald JD, Reed MD. Increased susceptibility to RSV infection by exposure to inhaled diesel engine emissions. *Am J Respir Cell Mol Biol* 2003;**28**:451–463.
43. Kaan PM, Hegele RG. Interaction between respiratory syncytial virus and particulate matter in guinea pig alveolar macrophages. *Am J Respir Cell Mol Biol* 2003;**28**:697–704.
44. Lambert AL, Mangum JB, DeLorme MP, Everitt JI. Ultrafine carbon black particles enhance respiratory syncytial virus-induced airway reactivity, pulmonary inflammation, and chemokine expression. *Toxicol Sci* 2003;**72**:339–346.
45. Ye Q, Fu J, Mao J, Shang S. Haze is a risk factor contributing to the rapid spread of respiratory syncytial virus in children. *Environ Sci Poll Res* 2016;**23**:20178–20185.
46. Liang Y, Fang L, Pan H, Zhang K, Kan H, Brook JR, Sun Q. PM2.5 in Beijing—temporal pattern and its association with influenza. *Environ Health* 2014;**13**:102.
47. Chen T, Wu D, Chen H, Yan W, Yang D, Chen G, Ma K, Xu D, Yu H, Wang H, Wang T, Guo W, Chen J, Ding C, Zhang X, Huang J, Han M, Li S, Luo X, Zhao J, Ning Q. Clinical characteristics of 113 deceased patients with coronavirus disease 2019: retrospective study. *BMJ* 2020;**368**:m1091.
48. Guzik TJ, Mohiddin SA, Dimarco A, Patel V, Savvatis K, Marelli-Berg FM, Madhur MS, Tomaszewski M, Maffia P, D'Acquisto F, Nicklin SA, Marian AJ, Nosalski R, Murray EC, Guzik B, Berry C, Touyz RM, Kreutz R, Wang DW, Bhella D, Sagliocco O, Crea F, Thomson EC, McInnes IB. COVID-19 and the cardiovascular system: implications for risk assessment, diagnosis, and treatment options. *Cardiovasc Res* 2020;**116**: 1666–1687.
49. Guo T, Fan J, Chen M, Wu X, Zhang L, He T, Wang H, Wan J, Wang X, Lu Z. Cardiovascular implications of fatal outcomes of patients with Coronavirus Disease 2019 (COVID-19). *JAMA Cardiol* 2020;**5**:811–818.
50. Shi S, Qin M, Shen B, Cai Y, Liu T, Yang F, Gong W, Liu X, Liang J, Zhao Q, Huang H, Yang B, Huang C. Association of cardiac injury with mortality in hospitalized patients with COVID-19 in Wuhan, China. *JAMA Cardiol* 2020;**5**:802–810.
51. Inciardi RM, Adamo M, Lupi L, Cani DS, Di Pasquale M, Tomasoni D, Italia L, Zaccone G, Tedino C, Fabbricatore D, Curnis A, Faggiano P, Gorga E, Lombardi CM, Milesi G, Vizzardi E, Volpini M, Nodari S, Specchia C, Maroldi R, Bezzi M, Metra M. Characteristics and outcomes of patients hospitalized for COVID-19 and cardiac disease in Northern Italy. *Eur Heart J* 2020;**41**:1821–1829.
52. European Society of Cardiology (ESC). ESC guidance for the diagnosis and management of CV disease during the COVID-19 pandemic; https://www.escardio.org/Education/COVID-19-and-Cardiology/ESC-COVID-19-Guidance.
53. Frontera A, Martin C, Vlachos K, Sgubin G. Regional air pollution persistence links to COVID-19 infection zoning. *J Infect* 2020;**81**:318–356.
54. Yan J, Grantham M, Pantelic M, Bueno de Mesquita PJ, Albert B, Liu F, Ehrman S, Milton DK, EMIT Consortium. Infectious virus in exhaled breath of symptomatic seasonal influenza cases from a college community. *Proc Natl Acad Sci USA* 2018;**115**: 1081–1086.
55. Liu C, Chen R, Sera F, Vicedo-Cabrera AM, Guo Y, Tong S, Coelho MSZS, Saldiva PHN, Lavigne E, Matus P, Valdes Ortega N, Osorio Garcia S, Pascal M, Stafoggia M, Scortichini M, Hashizume M, Honda Y, Hurtado-Díaz M, Cruz J, Nunes B, Teixeira JP, Kim H, Tobias A, Íñiguez C, Forsberg B, Åström C, Ragettli MS, Guo Y-L, Chen B-Y, Bell ML, Wright CY, Scovronick N, Garland RM, Milojevic A, Kyselý J, Urban A, Orru H, Indermitte E, Jaakkola JJK, Ryti NRI, Katsouyanni K, Analitis A, Zanobetti A, Schwartz J, Chen J, Wu T, Cohen A, Gasparrini A, Kan H. Ambient particulate air pollution and daily mortality in 652 cities. *N Engl J Med* 2019;**381**:705–715.
56. Brook RD, Rajagopalan S, Pope CA III, Brook JR, Bhatnagar A, Diez-Roux AV, Holguin F, Hong Y, Luepker RV, Mittleman MA, Peters A, Siscovick D, Smith SCJrWhitsel, L Kaufman, JD; on behalf of the American Heart Association Council on Epidemiology and Prevention, Council on the Kidney in Cardiovascular Disease, and Council on Nutrition, Physical Activity and Metabolism. Particulate matter air pollution and cardiovascular disease. An update to the scientific statement from the American Heart Association. *Circulation* 2010;**121**:2331–2378.
57. Landrigan PJ, Fuller R, Acosta NJR, Adeyi O, Arnold R, Basu N, Baldé AB, Bertollini R, Bose-O'Reilly S, Boufford JI, Breysse PN, Chiles T, Mahidol C, Coll-Seck AM, Cropper ML, Fobil J, Fuster V, Greenstone M, Haines A, Hanrahan D, Hunter D, Khare M, Krupnick A, Lanphear B, Lohani B, Martin K, Mathiasen KV, McTeer MA, Murray CJL, Ndahimananjara JD, Perera F, Potočnik J, Preker AS, Ramesh J, Rockström J, Salinas C, Samson LD, Sandilya K, Sly PD, Smith KR, Steiner A, Stewart RB, Suk WA, van Schayck OCP, Yadama GN, Yumkella K, Zhong M. *The Lancet Commission on pollution and health. Lancet* 2018;**391**:464–512.
58. Office for National Statistics. *Coronavirus (COVID-19) Related Mortality Rates and the Effects of Air Pollution in England*. 2020; https://www.ons.gov.uk/economy/environmentalaccounts/methodologies/coronaviruscovid19relatedmortalityratesandtheeffectsofairpollutioninengland.
59. Cole MA, Ozgen C, Strobl E. *Air Pollution Exposure and COVID-19*. IZA Institute of Labor Economics 2020; IZA DP No. 13367: https://www.iza.org/publications/dp/13367/air-pollution-exposure-and-covid-19.
60. Travaglio M, Yu Y, Popovic R, Selley L, Santos Leal N, Martins LM. Links between air pollution and COVID-19 in England. https://www.medrxiv.org/content/10.1101/2020.04.16.20067405v5.
61. Smith KR, Bruce N, Balakrishnan K, Adair-Rohani H, Balmes J, Chafe Z, Dherani M, Hosgood HD, Mehta S, Pope D, Rehfuess E, and others in the HAP CRA Risk Expert Group. Millions dead: how do we know and what does it mean? Methods used in the Comparative Risk Assess of Household Air Pollution. *Ann Rev Pub Health* 2014;**35**: 185–206.
62. Chen K, Wang M, Huang C, Kinney PL, Anastas PT. Air pollution reduction and mortality benefit during the COVID-19 outbreak in China. *Lancet Planet Health* 2020; 10.1016/S2542-5196(20)30107-8.
63. Venter ZS, Aunan K, Chowdhury S, Lelieveld J. COVID-19 lockdowns cause global air pollution declines. *Proc Natl Acad Sci USA* 2020;**117**:18984–18990.
64. Eftim S, Dominici F. Multisite time-series studies versus cohort studies: methods, findings, and policy implications. *J Toxicol Environ Health A* 2005;**68**;1191–1205.
65. Beverland IJ, Cohen GR, Heal MR, Carder M, Yap C, Robertson C, Hart CL, Agius RM. A comparison of short-term and long-term air pollution exposure associations with mortality in two cohorts in Scotland. *Environ Health Perspect* 2012; **120**,1280–1285.

Downloaded from https://academic.oup.com/cardiovascres/article/116/14/2247/5940460 by guest on 16 February 2021

## Translational perspective

COVID-19 infections and air pollution cause excess mortality from cardiovascular and pulmonary diseases. We estimated the fraction of COVID-19 mortality attributable to the long-term exposure to ambient fine particulate air pollution ($PM_{2.5}$). Global exposure to $PM_{2.5}$ was characterized based on satellite data, and the anthropogenic fraction was calculated with an atmospheric chemistry model. $PM_{2.5}$ contributed ~15% to COVID-19 mortality worldwide, 27% in East Asia, 19% in Europe, and 17% in North America. Globally ~50–60% of the attributable, anthropogenic fraction is related to fossil fuel use, and 70–80% in Europe/West Asia/North America, indicating the potential for substantial health benefits from reducing air pollution exposure.

SCIENCE ADVANCES | RESEARCH ARTICLE

CORONAVIRUS

# Air pollution and COVID-19 mortality in the United States: Strengths and limitations of an ecological regression analysis

X. Wu[1]*, R. C. Nethery[1]*, M. B. Sabath[1], D. Braun[1,2], F. Dominici[1]†

Copyright © 2020 The Authors, some rights reserved; exclusive licensee American Association for the Advancement of Science. No claim to original U.S. Government Works. Distributed under a Creative Commons Attribution NonCommercial License 4.0 (CC BY-NC).

**Assessing whether long-term exposure to air pollution increases the severity of COVID-19 health outcomes, including death, is an important public health objective. Limitations in COVID-19 data availability and quality remain obstacles to conducting conclusive studies on this topic. At present, publicly available COVID-19 outcome data for representative populations are available only as area-level counts. Therefore, studies of long-term exposure to air pollution and COVID-19 outcomes using these data must use an ecological regression analysis, which precludes controlling for individual-level COVID-19 risk factors. We describe these challenges in the context of one of the first preliminary investigations of this question in the United States, where we found that higher historical $PM_{2.5}$ exposures are positively associated with higher county-level COVID-19 mortality rates after accounting for many area-level confounders. Motivated by this study, we lay the groundwork for future research on this important topic, describe the challenges, and outline promising directions and opportunities.**

## INTRODUCTION

The suddenness and global scope of the coronavirus disease 2019 (COVID-19) pandemic have raised urgent questions that require coordinated investigation to slow the disease's devastation. A critically important public health objective is to identify key modifiable environmental factors that may contribute to the severity of health outcomes [e.g., intensive care unit (ICU) hospitalization and death] among individuals with COVID-19. Numerous scientific studies reviewed by the U.S. Environmental Protection Agency (EPA) have linked fine particles ($PM_{2.5}$; particles with diameter, ≤ 2.5 μm) to a variety of adverse health events (*1*) including death (*2*). It has been hypothesized that because long-term exposure to $PM_{2.5}$ adversely affects the respiratory and cardiovascular systems and increases mortality risk (*3*–*5*), it may also exacerbate the severity of COVID-19 symptoms and worsen the prognosis of this disease (*6*).

Epidemiological studies to estimate the association between long-term exposure to air pollution and COVID-19 hospitalization and death is a rapidly expanding area of research that is attracting attention around the world. Two studies have been published using data from European countries (*7*, *8*), and many more are available as preprints. However, because of the unprecedented nature of the pandemic, researchers face serious challenges when conducting these studies. One key challenge is that, to our knowledge, individual-level data on COVID-19 health outcomes for large, representative populations are not publicly available or accessible to the scientific community. Therefore, the only way to generate preliminary evidence on the link between $PM_{2.5}$ and COVID-19 severity and outcomes using these aggregate data is to use an ecological regression analysis. With this study design, publicly available area-level COVID-19 mortality rates are regressed against area-level air pollution concentrations while accounting for area-level potential confounding factors. Here, we discuss the strengths and limitations of conducting ecological regression analyses of air pollution and COVID-19 health outcomes and describe additional challenges related to evolving data quality, statistical modeling, and control of measured and unmeasured confounding, paving the way for future research on this topic. We discuss these challenges and illustrate them in the context of a specific study, in which we investigated the impact of long-term $PM_{2.5}$ exposure on COVID-19 mortality rates in 3089 counties in the United States, covering 98% of the population.

### Illustration of an ecological regression analysis of historical exposure to $PM_{2.5}$ and COVID-19 mortality rate

We begin by describing how to conduct an ecological regression analysis in this setting. COVID-19 death counts (a total of 116,747 deaths) were obtained from the Johns Hopkins University Coronavirus Resource Center and were cumulative up to 18 June 2020. We used data from 3089 counties, of which 1244 (40.3%) had reported zero COVID-19 deaths at the time of our analysis. Daily $PM_{2.5}$ concentrations were estimated across the United States on a 0.01° × 0.01° grid for the period 2000–2016 using well-validated atmospheric chemistry and machine learning models (*9*). We used zonal statistics to aggregate $PM_{2.5}$ concentration estimates to the county level and then averaged across the period 2000–2016 to perform health outcome analyses. Figure 1 illustrates the spatial variation in 2000–2016 average (hereafter referred to as "long-term average") $PM_{2.5}$ concentrations and COVID-19 mortality rates (per 1 million population) by county.

We fit a negative binomial mixed model using COVID-19 mortality rates as the outcome and long-term average $PM_{2.5}$ as the exposure of interest, adjusting for 20 county-level covariates. We conducted more than 80 sensitivity analyses to assess the robustness of the findings to various modeling assumptions. We found that an increase of 1 $\mu g/m^3$ in the long-term average $PM_{2.5}$ is associated with a statistically significant 11% (95% CI, 6 to 17%) increase in the county's COVID-19 mortality rate (see Table 1); this association continues to be stable as more data accumulate (fig. S3). We also found that population density, days since the first COVID-19 case was reported, median household income, percent of owner-occupied housing, percent of the adult population with less than high school

[1]Department of Biostatistics, Harvard T.H. Chan School of Public Health, Boston, MA, USA. [2]Department of Data Sciences, Dana-Farber Cancer Institute, Boston, MA, USA.
*These authors contributed equally to this work.
†Corresponding author. Email: fdominic@hsph.harvard.edu




**Fig. 1. National maps of historical $PM_{2.5}$ concentrations and COVID-19 deaths.** Maps show (**A**) county-level 17-year long-term average of $PM_{2.5}$ concentrations (2000–2016) in the United States in μg/m$^3$ and (**B**) county-level number of COVID-19 deaths per 1 million population in the United States up to and including 18 June 2020.

education, age distribution, and percent of Black residents are important predictors of the COVID-19 mortality rate in the model. We found a 49% (95% CI, 38 and 61%) increase in COVID-19 mortality rate associated with a 1-SD (per 14.1%) increase in percent Black residents of the county. Details on the data sources, statistical methods, and analyses are summarized in the Supplementary Materials. All data sources used in the analyses, along with fully reproducible code, are publicly available at https://github.com/wxwx1993/PM_COVID.

### Strengths and limitations of an ecological regression analysis

Ecological regression analysis provides a simple and cost-effective approach for studying potential associations between historical exposure to air pollution and increased vulnerability to COVID-19 in large representative populations, as illustrated in our study in the previous section. This approach is regularly applied in many areas of research (*10*). Using our study as an example, we summarize in Table 2 the strengths, limitations, and opportunities considering (i) study design, (ii) COVID-19 health outcome data, (iii) historical exposure to air pollution, and (iv) measured and unmeasured confounders, with the goal of paving the way for future research.

Among the key limitations, by design, ecological regression analyses are unable to adjust for individual-level risk factors (e.g., age, race, and smoking status); when individual-level data are unavailable, this approach leaves us unable to make conclusions regarding individual-level associations. In the context of COVID-19 health outcomes, this is a severe limitation, as individual-level risk factors are known to affect COVID-19 health outcomes. It is important to note that confusion between ecological associations and individual associations may present an ecological fallacy. In extreme

cases, this fallacy can lead to associations detected in ecological regression that do not exist or are in the opposite direction of true associations at the individual level. However, ecological regression analyses still allow us to make conclusions at the area level, which can be useful for policy-making (*11*). For the association between COVID-19 health outcomes and $PM_{2.5}$ exposure, we argue that area-level conclusions are valuable, as they can inform important immediate policy actions that will benefit public health, such as (i) prioritization of precautionary measures [e.g., personal protective equipment (PPE) allocations and hospital beds] to areas with historical higher air pollution and (ii) further strengthening the scientific argument for lowering the U.S. National Ambient Air Quality Standards for $PM_{2.5}$ and other pollutants. To completely avoid potential ecological bias, a representative sample of individual-level data is necessary. While this may not be feasible in the near future, as some COVID-19 outcome data become available at the individual level, existing approaches that augment county-level data with individual-level data (*12*) could be used to correct for ecological bias.

**Table 1. Mortality rate ratios (MRR), 95% confidence intervals (CI), and *P* values for all variables in the main analysis.** Details of the statistical models are available in section S2. Q, quintile.

| | MRR | 95% CI | *P* value |
|---|---|---|---|
| $PM_{2.5}$ | 1.11 | (1.06–1.17) | 0.00 |
| Population density (Q2) | 0.91 | (0.71–1.15) | 0.42 |
| Population density (Q3) | 0.91 | (0.71–1.16) | 0.45 |
| Population density (Q4) | 0.74 | (0.57–0.95) | 0.02 |
| Population density (Q5) | 0.92 | (0.69–1.23) | 0.56 |
| % In poverty | 1.04 | (0.96–1.12) | 0.31 |
| Log(median house value) | 1.13 | (0.99–1.29) | 0.07 |
| Log(median household income) | 1.19 | (1.04–1.35) | 0.01 |
| % Owner-occupied housing | 1.12 | (1.04–1.20) | 0.00 |
| % Less than high school education | 1.20 | (1.10–1.32) | 0.00 |
| % Black | 1.49 | (1.38–1.61) | 0.00 |
| % Hispanic | 1.06 | (0.97–1.16) | 0.23 |
| % ≥ 65 years of age | 1.04 | (0.93–1.17) | 0.46 |
| % 45–64 years of age | 0.77 | (0.67–0.90) | 0.00 |
| % 15–44 years of age | 0.76 | (0.68–0.85) | 0.00 |
| Days since stay-at-home order | 1.18 | (0.92–1.52) | 0.20 |
| Days since first case | 2.40 | (2.05–2.80) | 0.00 |
| Rate of hospital beds | 1.00 | (0.93–1.08) | 0.95 |
| % Obese | 0.96 | (0.90–1.03) | 0.32 |
| % Smokers | 1.13 | (1.00–1.28) | 0.05 |
| Average summer temperature (°F) | 1.11 | (0.95–1.30) | 0.20 |
| Average winter temperature (°F) | 0.86 | (0.69–1.07) | 0.19 |
| Average summer relative humidity (%) | 0.93 | (0.80–1.09) | 0.38 |
| Average winter relative humidity (%) | 0.97 | (0.87–1.07) | 0.52 |

Furthermore, air pollution exposure misclassification, due to between-area mobility and within-area variation, is another potential source of bias that could affect the ecological regression results described in our example study. Methods to account for the propagation of exposure error into the ecological regression model (*13*) could be applied to help mitigate the impact of measurement error. Outcome misclassification is another limitation that can be partially overcome by accessing nationwide registry data with the validated cause of death (*14*). As in all observational studies, adjustment for measured and unmeasured confounding presents another key challenge in ecological regression analyses, which may be exacerbated when dealing with dynamic pandemic data, as in our study. Conducting studies using both traditional regressions and methods for causal inference as in Wu *et al.* (*2*) is necessary to assess the robustness of the findings.

Increasing the scientific rigor of research in this area requires access to representative, individual-level data on COVID-19 health outcomes, including information about patients' residential address, demographics, and individual-level confounders. This is an enormous challenge that will require consideration of many privacy, legal, and ethical trade-offs (*14*). Future areas of research also include the application of statistical methods to quantify and correct for ecological bias and measurement error, reproducible methods for causal inference, and sensitivity analysis of measured and unmeasured confounding bias as suggested above. These strengths and limitations are illustrated further in the context of our own study (see the Supplementary Materials).

## DISCUSSION

Ecological regression analyses are crucial to stimulate innovations in a rapidly evolving area of research. Ongoing research has already focused on overcoming some aspects of these limitations (*8*, *15*). For example, ecological regression analysis of air pollution and COVID-19, using data with finer geographic resolution, is being conducted for different countries and regions around the world. Cole *et al.* (*8*) published an ecological regression analysis using data in Dutch municipalities and found results consistent with our own investigation; the California Air Resources Board (CARB) is planning to conduct a similar study at the census tract level (*15*). Although an ecological regression analysis cannot provide insight into the mechanisms underlying the relationship between $PM_{2.5}$ exposure and COVID-19 mortality, studies are starting to shed light on the potential biological mechanisms that may explain the relationship between air pollution and viral infection outcomes (*16*). For example, it has been hypothesized that chronic exposure to $PM_{2.5}$ causes alveolar angiotensin-converting enzyme 2 (ACE-2) receptor overexpression and impairs host defenses (*17*). This could cause a more severe form

**Table 2. Strengths and limitations of ecological regression analyses applied to research on air pollution and COVID-19 and opportunities for future research.**

| | Strengths | Limitations | Future research |
|---|---|---|---|
| Study design: ecological regression | Feasible, timely, and cost-effective | Cannot be used to make inference about individual-level associations, doing so leads to ecological fallacy | Augment county-level data with individual-level data to adjust for ecological bias (*12*) |
| | Data are representative of the entire U.S. population | Cannot adjust for individual-level risk factors such as age, gender, and race (*19–21*) | Conduct studies of individual-level health records using traditional regression and causal inference methods as in Wu *et al.* (*2*) |
| | Allows inference at the area level, which can be useful for policy-making (*11*) | Results are sensitive to the assumptions of the statistical model (*11*) | |
| | Computationally efficient and can be conducted daily to allow for the dynamic nature of the data and observe temporal trends; see fig. S3 | | |
| | Facilitates comparison of results across countries | | |
| Outcome: COVID-19 deaths aggregated at the county level | Publicly available data updated almost daily | Potential for outcome misclassification (*22*), particularly differential misclassification over time and space, which could bias results | Access to nationwide registry data with the validated cause of death (*14*) |
| | | | Analyses using county excess deaths as the outcome (*23*) |
| Exposure: 2000–2016 average exposure to $PM_{2.5}$ at the county level | Use of well-validated atmospheric chemistry models and machine learning models (*9*, *24*) | Aggregation assumes that everyone in a county experiences the same exposures, leading to exposure misclassification, especially for the largest counties | Individual-level data on COVID-19 deaths with geocoded addresses to link to air pollution data at the place of residence |
| | $PM_{2.5}$ exposure estimated at fine grids, which can be aggregated to the county level to assess exposure even in unmonitored areas (*24*) | Can be used to assess historical exposures to air pollution but not real-time exposures | Additional statistical methods to account for the propagation of exposure error into the ecological regression model (*13*) |
| | As opposed to using monitor data, aggregation of modeled estimates ensures that county $PM_{2.5}$ exposure estimates represent the distribution across the entire area | | |
| Measured confounders | More than 20 area-level variables capture age distribution, race distribution, socioeconomic status, population density, behavioral risk factors, epidemic stage, and stay-at-home orders (see tables S1 and S2) | County average features may not represent the features of COVID-19 patients, leading to inadequate adjustment | Causal inference approaches to adjust for measured confounding bias, producing results that are less sensitive to statistical modeling assumptions |
| | These overlap with the confounder sets used in much of the previous literature on air pollution and health (*25*, *26*) | Difficult to formalize the notion of "epidemic stage," which may be an important confounder | |
| | | The threat of unmeasured confounding bias still present | Causal inference approaches to assess covariate balance (*2*) |
| | | Sensitive to the form of the statistical model specified (i.e., assumptions of linearity and no effect modification) | Individual-level data on key measured confounders such as smoking and body mass index |
| Unmeasured confounders | Leverage existing approaches, such as the calculation of the E-value (*27*), to assess how strong the effect of an unmeasured confounder would need to be to explain away the associations detected (see section S3) | The most important threat to the validity of any observational study<br>Even measures like the E-value cannot inform us about the likelihood that a strong unmeasured confounder exists; this must be evaluated on the basis of subject matter knowledge | Natural experiment designs and instrumental variables can be used to reduce the threat of unmeasured confounding but are less common |

of COVID-19 in ACE-2–depleted lungs, increasing the likelihood of poor outcomes, including death (*18*).

The associations detected in ecological regression analyses provide strong justification for follow-up investigations as more and higher-quality COVID-19 data become available. Such studies would include validation of our findings with other data sources and study types, as well as investigations into mediating factors and effect modifiers, biological mechanisms, impacts of $PM_{2.5}$ exposure timing, and relationships between $PM_{2.5}$ and other COVID-19 outcomes such as hospitalization. Research on how modifiable factors may exacerbate COVID-19 symptoms and increase mortality risk is essential to guide policies and behaviors to minimize fatality related to the pandemic. Such research could also provide a strong scientific argument for revision of the U.S. Ambient Air Quality Standards for $PM_{2.5}$ and other environmental policies in the midst of a pandemic.

## SUPPLEMENTARY MATERIALS

Supplementary material for this article is available at http://advances.sciencemag.org/cgi/content/full/6/45/eabd4049/DC1

## REFERENCES AND NOTES


1. U.S. Environmental Protection Agency (EPA), Integrated Science Assessment (ISA) for Particulate Matter (Final Report, 2019). U.S. Environmental Protection Agency, EPA/600/R-19/188 (2019); https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=347534 [accessed 15 September 2020].
2. X. Wu, D. Braun, J. Schwartz, M. A. Kioumourtzoglou, F. Dominici, Evaluating the impact of long-term exposure to fine particulate matter on mortality among the elderly. *Sci. Adv.* **6**, eaba5692 (2020).
3. R. D. Brook, S. Rajagopalan, C. Arden Pope III, J. R. Brook, A. Bhatnagar, A. V. Diez-Roux, F. Holguin, Y. Hong, R. V. Luepker, M. A. Mittleman, A. Peters, D. Siscovick, S. C. Smith Jr., L. Whitsel, J. D. Kaufman, Particulate matter air pollution and cardiovascular disease: An update to the scientific statement from the American Heart Association. *Circulation* **121**, 2331–2378 (2010).
4. C. A. Pope III, R. T. Burnett, G. D. Thurston, M. J. Thun, E. E. Calle, D. Krewski, J. J. Godleski, Cardiovascular mortality and long-term exposure to particulate air pollution: Epidemiological evidence of general pathophysiological pathways of disease. *Circulation* **109**, 71–77 (2004).
5. C. A. Pope III, N. Coleman, Z. A. Pond, R. T. Burnett, Fine particulate air pollution and human mortality: 25+ years of cohort studies. *Environ. Res.* **183**, 108924 (2020).
6. T. Benmarhnia, Linkages between air pollution and the health burden from COVID-19: Methodological challenges and opportunities. *Am. J. Epidemiol.* , kwaa148 (2020).
7. E. Conticini, B. Frediani, D. Caro, Can atmospheric pollution be considered a co-factor in extremely high level of SARS-CoV-2 lethality in Northern Italy? *Environ. Pollut.* **261**, 114465 (2020).
8. M. A. Cole, C. Ozgen, E. Strobl, Air pollution exposure and COVID-19 in Dutch municipalities. *Environ. Resour. Econ. (Dordr)* , 1–30 (2020).
9. A. van Donkelaar, R. V. Martin, C. Li, R. T. Burnett, Regional estimates of chemical composition of fine particulate matter using a combined geoscience-statistical method with information from satellites, models, and monitors. *Environ. Sci. Technol.* **53**, 2595–2611 (2019).
10. G. King, M. A. Tanner, O. Rosen, *Ecological Inference: New Methdological Strategies* (Cambridge Univ. Press, 2004).
11. A. Gelman, D. K. Park, S. Ansolabehere, P. N. Price, L. C. Minnite, Models, assumptions and model checking in ecological regressions. *J. Royal Stat. Soc. Ser. A* **164**, 101–118 (2001).
12. C. Jackson, N. Best, S. Richardson, Improving ecological inference using individual-level data. *Stat. Med.* **25**, 2136–2159 (2006).
13. J. Richmond-Bryant, T. C. Long, Influence of exposure measurement errors on results from epidemiologic studies of different designs. *J. Expo. Sci. Environ. Epidemiol.* **30**, 420–429 (2020).
14. D. F. Sittig, H. Singh, COVID-19 and the need for a national health information technology infrastructure. *JAMA* **323**, 2373–2374 (2020).
15. InisdeEPA.com, CARB study on pollution link to virus deaths may spur push for PM cuts (May 6, 2020); https://insideepa.com/daily-news/carb-study-pollution-link-virus-deaths-may-spur-push-pm-cuts.
16. J. Ciencewicki, I. Jaspers, Air pollution and respiratory viral infection. *Inhal. Toxicol.* **19**, 1135–1146 (2007).
17. L. Miyashita, G. Foley, S. Semple, J. Grigg, Traffic-derived particulate matterand angiotensin-converting enzyme 2 expression in human airway epithelial cells. *bioRxiv* 2020.2005.2015.097501 , (2020).
18. A. Frontera, L. Cianfanelli, K. Vlachos, G. Landoni, G. Cremona, Severe air pollution links to higher mortality in COVID-19 patients: The "double-hit" hypothesis. *J. Infect.* **81**, 255–259 (2020).
19. S. Greenland, H. Morgenstern, Ecological bias, confounding, and effect modification. *Int. J. Epidemiol.* **18**, 269–274 (1989).
20. S. Greenland, J. Robins, Invited commentary: Ecologic studies–Biases, misconceptions, and counterexamples. *Am. J. Epidemiol.* **139**, 747–760 (1994).
21. S. Richardson, I. Stücker, D. Hémon, Comparison of relative risks obtained in ecological and individual studies: Some methodological considerations. *Int. J. Epidemiol.* **16**, 111–120 (1987).
22. New York City Department of Health; Mental Hygiene Covid-Response Team, Preliminary estimate of excess mortality during the COVID-19 outbreak–New York City, March 11–May 2, 2020. *MMWR Morb. Mortal Wkly. Rep.* **69**, 603–605 (2020).
23. R. J. Acosta, R. A. Irizarry, Monitoring health systems by estimating excess mortality. *medRxiv* 2020.06.06.20120857 , (2020).
24. Q. Di, I. Kloog, P. Koutrakis, A. Lyapustin, Y. Wang, J. Schwartz, Assessing $PM_{2.5}$ exposures with high spatiotemporal resolution across the continental United States. *Environ. Sci. Technol.* **50**, 4712–4721 (2016).
25. Q. Di, Y. Wang, A. Zanobetti, Y. Wang, P. Koutrakis, C. Choirat, F. Dominici, J. D. Schwartz, Air pollution and mortality in the Medicare population. *N. Engl. J. Med.* **376**, 2513–2522 (2017).
26. D. W. Dockery, C. A. Pope III, X. Xu, J. D. Spengler, J. H. Ware, M. E. Fay, B. G. Ferris Jr., F. E. Speizer, An association between air pollution and mortality in six US cities. *N. Engl. J. Med.* **329**, 1753–1759 (1993).
27. S. Haneuse, T. J. VanderWeele, D. Arterburn, Using the E-value to assess the potential effect of unmeasured confounding in observational studies. *JAMA* **321**, 602–603 (2019).
28. E. Dong, H. Du, L. Gardner, An interactive web-based dashboard to track COVID-19 in real time. *Lancet Infect. Dis.* **20**, 533–534 (2020).
29. Q. Di, H. Amini, L. Shi, I. Kloog, R. Silvern, J. Kelly, M. B. Sabath, C. Choirat, P. Koutrakis, A. Lyapustin, Y. Wang, L. J. Mickley, J. Schwartz, An ensemble-based model of $PM_{2.5}$ concentration across the contiguous United States with high spatiotemporal resolution. *Environ. Int.* **130**, 104909 (2019).
30. J. G. Booth, G. Casella, H. Friedl, J. P. Hobert, Negative binomial loglinear mixed models. *Stat. Model.* **3**, 179–191 (2003).
31. R Core Team, R: A language and environment for statistical computing. R Foundation for Statistical Computing, Vienna, Austria (2018); www.R-project.org/.
32. X. Zhang, H. Mallick, Z. Tang, L. Zhang, X. Cui, A. K. Benson, N. Yi, Negative binomial mixed models for analyzing microbiome count data. *BMC Bioinformatics* **18**, 4 (2017).
33. D. Bates, M. Mächler, B. Bolker, S. Walker, Fitting linear mixed-effects models using lme4. *J. Stat. Softw.* **67**, 1–48 (2015).
34. Q. H. Vuong, Likelihood ratio tests for model selection and non-nested hypotheses. *Econometrica* **57**, 307–333 (1989).
35. T. J. VanderWeele, P. Ding, Sensitivity analysis in observational research: Introducing the E-value. *Ann. Intern. Med.* **167**, 268–274 (2017).
36. M. B. Mathur, P. Ding, C. A. Riddell, T. J. VanderWeele, Web site and R package for computing E-values. *Epidemiology* **29**, e45–e47 (2018).
37. D. D. Ingram, S. J. Franco, 2013 NCHS urban-rural classification scheme for counties. U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics (2014).
38. Health Effects Institute, State of global air 2019: A special report on global exposure to air pollution and its disease burden (2019); www.stateofglobalair.org/sites/default/files/soga_2019_report.pdf [accessed 15 September 2020].
39. R. D. Brook, B. Franklin, W. Cascio, Y. Hong, G. Howard, M. Lipsett, R. Luepker, M. Mittleman, J. Samet, S. C. Smith Jr., I. Tager, Air pollution and cardiovascular disease: A statement for healthcare professionals from the Expert Panel on Population and Prevention Science of the American Heart Association. *Circulation* **109**, 2655–2671 (2004).
40. F. Dominici, R. D. Peng, M. L. Bell, L. Pham, A. McDermott, S. L. Zeger, J. M. Samet, Fine particulate air pollution and hospital admission for cardiovascular and respiratory diseases. *JAMA* **295**, 1127–1134 (2006).
41. R. C. Puett, J. E. Hart, J. D. Yanosky, C. Paciorek, J. Schwartz, H. Suh, F. E. Speizer, F. Laden, Chronic fine and coarse particulate exposure, mortality, and coronary heart disease in the Nurses' Health Study. *Environ. Health Perspect.* **117**, 1697–1701 (2009).
42. R. J. Šrám, B. Binková, J. Dejmek, M. Bobak, Ambient air pollution and pregnancy outcomes: A review of the literature. *Environ. Health Perspect.* **113**, 375–382 (2005).
43. G. A. Wellenius, M. R. Burger, B. A. Coull, J. Schwartz, H. H. Suh, P. Koutrakis, G. Schlaug, D. R. Gold, M. A. Mittleman, Ambient air pollution and the risk of acute ischemic stroke. *Arch. Intern. Med.* **172**, 229–234 (2012).

44. J. Rhee, F. Dominici, A. Zanobetti, J. Schwartz, Y. Wang, Q. Di, J. Balmes, D. C. Christiani, Impact of long-term exposures to ambient $PM_{2.5}$ and ozone on ARDS risk for older adults in the United States. *Chest* **156**, 71–79 (2019).
45. Y. Cui, Z.-F. Zhang, J. Froines, J. Zhao, H. Wang, S.-Z. Yu, R. Detels, Air pollution and case fatality of SARS in the People's Republic of China: An ecologic study. *Environ. Health* **2**, 15 (2003).
46. C. A. Pope III, Respiratory disease associated with community air pollution and a steel mill, Utah Valley. *Am. J. Public Health* **79**, 623–628 (1989).
47. D. P. Croft, W. Zhang, S. Lin, S. W. Thurston, P. K. Hopke, E. van Wijngaarden, S. Squizzato, M. Masiol, M. J. Utell, D. Q. Rich, Associations between source-specific particulate matter and respiratory infections in New York State adults. *Environ. Sci. Technol.* **54**, 975–984 (2020).
48. B. D. Horne, E. A. Joy, M. G. Hofmann, P. H. Gesteland, J. B. Cannon, J. S. Lefler, D. P. Blagev, E. K. Korgenski, N. Torosyan, G. I. Hansen, D. Kartchner, C. A. Pope III, Short-term elevation of fine particulate matter air pollution and acute lower respiratory infection. *Am. J. Respir. Crit. Care Med.* **198**, 759–766 (2018).
49. Q. Di, L. Dai, Y. Wang, A. Zanobetti, C. Choirat, J. D. Schwartz, F. Dominici, Association of short-term exposure to air pollution with mortality in older adults. *JAMA* **318**, 2446–2456 (2017).
50. D.-H. Tsai, M. Riediker, A. Berchet, F. Paccaud, G. Waeber, P. Vollenweider, M. Bochud, Effects of short- and long-term exposures to particulate matter on inflammatory marker levels in the general population. *Environ. Sci. Pollut. Res. Int.* **26**, 19697–19704 (2019).
51. K. F. Morales, J. Paget, P. Spreeuwenberg, Possible explanations for why some countries were harder hit by the pandemic influenza virus in 2009 – A global mortality impact modeling study. *BMC Infect. Dis.* **17**, 642 (2017).
52. Z. Xu, W. Hu, G. Williams, A. C. A. Clements, H. Kan, S. Tong, Air pollution, temperature and pediatric influenza in Brisbane, Australia. *Environ. Int.* **59**, 384–388 (2013).
53. K. Clay, J. Lewis, E. Severnini, Pollution, infectious disease, and mortality: Evidence from the 1918 Spanish influenza pandemic. *J. Econ. Hist.* **78**, 1179–1209 (2018).
54. C. A. Pope III, A. Bhatnagar, J. P. McCracken, W. Abplanalp, D. J. Conklin, T. O'Toole, Exposure to fine particulate air pollution is associated with endothelial injury and systemic inflammation. *Circ. Res.* **119**, 1204–1214 (2016).
55. S. Becker, J. M. Soukup, Exposure to urban air particulates alters the macrophage-mediated inflammatory response to respiratory viral infection. *J. Toxicol. Environ. Health A* **57**, 445–457 (1999).
56. P. M. Kaan, R. G. Hegele, Interaction between respiratory syncytial virus and particulate matter in guinea pig alveolar macrophages. *Am. J. Respir. Cell Mol. Biol.* **28**, 697–704 (2003).
57. A. L. Lambert, J. B. Mangum, M. P. DeLorme, J. I. Everitt, Ultrafine carbon black particles enhance respiratory syncytial virus-induced airway reactivity, pulmonary inflammation, and chemokine expression. *Toxicol. Sci.* **72**, 339–346 (2003).
58. L. Peng, X. Zhao, Y. Tao, S. Mi, J. Huang, Q. Zhang, The effects of air pollution and meteorological factors on measles cases in Lanzhou, China. *Environ. Sci. Pollut. Res. Int.* **27**, 13524–13533 (2020).
59. Q. Ye, J.-f. Fu, J.-h. Mao, S.-q. Shang, Haze is a risk factor contributing to the rapid spread of respiratory syncytial virus in children. *Environ. Sci. Pollut. Res. Int.* **23**, 20178–20185 (2016).


**Acknowledgments:** The computations in this paper were run on (i) the Odyssey cluster supported by the FAS Division of Science, Research Computing Group at Harvard University and (ii) the Research Computing Environment supported by Institute for Quantitative Social Science in the Faculty of Arts and Sciences at Harvard University. We gratefully acknowledge support from the 2020 Star-Friedman Challenge for Promising Scientific Research, the Climate Change Solutions Fund at Harvard University, and the Fernholz Foundation. We would like to thank L. Goodwin and S. Tobin for editorial assistance in the preparation of this manuscript. **Funding:** This work was made possible by support from NIH grants R01 ES024332-01A1, P50MD010428, RO1 ES026217, RO1 ES028033, R01 ES030616, R01 AG066793-01, and R01 MD012769; Health Effects Institute grant (HEI) 4953-RFA14-3/16-4: and US EPA grant 83587201-0. The funding sources did not participate in the design or conduct of the study; collection, management, analysis, or interpretation of the data; or preparation, review, or approval of the manuscript. The research described in this article was conducted under contract to the HEI, an organization jointly funded by the EPA (Assistance Award No. R-83467701), and certain motor vehicle and engine manufacturers. The contents of this article do not necessarily reflect the views of HEI or its sponsors, nor do they necessarily reflect the views and policies of the EPA or motor vehicle and engine manufacturers. **Author contributions:** X.W. and R.C.N. contributed equally to the paper. X.W. and R.C.N. contributed to formulation of the idea, data preparation, data analysis, data interpretation, and writing of the manuscript. M.B.S. and D.B. contributed to data preparation, data interpretation, and review of the manuscript. F.D. contributed to formulation of the idea, study design, data interpretation, funding, and writing of the manuscript. All authors contributed to the interpretation of the results and critical revision of the manuscript for important intellectual content and approved the final version of the manuscript. The corresponding author attests that all listed authors meet authorship criteria and that no others meeting the criteria have been omitted. F.D. is the guarantor. **Competing interests:** The authors declare that they have no competing interests. **Data and materials availability:** All data needed to evaluate the conclusions in the paper are present in the paper and/or the Supplementary Materials. Data and code are publicly available at https://github.com/wxwx1993/PM_COVID. Additional data related to this paper may be requested from the authors.

Submitted 25 June 2020
Accepted 18 September 2020
Published 4 November 2020
10.1126/sciadv.abd4049

**Citation:** X. Wu, R. C. Nethery, M. B. Sabath, D. Braun, F. Dominici, Air pollution and COVID-19 mortality in the United States: Strengths and limitations of an ecological regression analysis. *Sci. Adv.* **6**, eabd4049 (2020).

# Long-term effects of $PM_{2.5}$ on neurological disorders in the American Medicare population: a longitudinal cohort study

*Liuhua Shi*, Xiao Wu*, Mahdieh Danesh Yazdi, Danielle Braun, Yara Abu Awad, Yaguang Wei, Pengfei Liu, Qian Di, Yun Wang, Joel Schwartz, Francesca Dominici, Marianthi-Anna Kioumourtzoglou†, Antonella Zanobetti†*

## Summary

**Background** Accumulating evidence links fine particulate matter ($PM_{2.5}$) to premature mortality, cardiovascular disease, and respiratory disease. However, less is known about the influence of $PM_{2.5}$ on neurological disorders. We aimed to investigate the effect of long-term $PM_{2.5}$ exposure on development of Parkinson's disease or Alzheimer's disease and related dementias.

**Methods** We did a longitudinal cohort study in which we constructed a population-based nationwide open cohort including all fee-for-service Medicare beneficiaries (aged ≥65 years) in the contiguous United States (2000–16) with no exclusions. We assigned $PM_{2.5}$ postal code (ie, ZIP code) concentrations based on mean annual predictions from a high-resolution model. To accommodate our very large dataset, we applied Cox-equivalent Poisson models with parallel computing to estimate hazard ratios (HRs) for first hospital admission for Parkinson's disease or Alzheimer's disease and related dementias, adjusting for potential confounders in the health models.

**Findings** Between Jan 1, 2000, and Dec 31, 2016, of 63 038 019 individuals who were aged 65 years or older during the study period, we identified 1·0 million cases of Parkinson's disease and 3·4 million cases of Alzheimer's disease and related dementias based on primary and secondary diagnosis billing codes. For each 5 μg/m³ increase in annual $PM_{2.5}$ concentrations, the HR was 1·13 (95% CI 1·12–1·14) for first hospital admission for Parkinson's disease and 1·13 (1·12–1·14) for first hospital admission for Alzheimer's disease and related dementias. For both outcomes, there was strong evidence of linearity at $PM_{2.5}$ concentrations less than 16 μg/m³ (95th percentile of the $PM_{2.5}$ distribution), followed by a plateaued association with increasingly larger confidence bands.

**Interpretation** We provide evidence that exposure to annual mean $PM_{2.5}$ in the USA is significantly associated with an increased hazard of first hospital admission with Parkinson's disease and Alzheimer's disease and related dementias. For the ageing American population, improving air quality to reduce $PM_{2.5}$ concentrations to less than current national standards could yield substantial health benefits by reducing the burden of neurological disorders.

**Funding** The Health Effects Institute, The National Institute of Environmental Health Sciences, The National Institute on Aging, and the HERCULES Center.

**Copyright** © 2020 The Author(s). Published by Elsevier Ltd. This is an Open Access article under the CC BY-NC-ND 4.0 license.

*Lancet Planet Health* 2020; 4: e557–65

Published Online October 19, 2020 https://doi.org/10.1016/S2542-5196(20)30227-8

*Contributed equally

†Co-senior authors

**Department of Environmental Health** (L Shi ScD, M Danesh Yazdi PhD, Y Wei MS, Prof J Schwartz PhD, A Zanobetti PhD) **and Department of Biostatistics** (X Wu MS, D Braun PhD, Y Wang PhD, Prof F Dominici PhD), **Harvard T H Chan School of Public Health, Boston, MA, USA; Gangarosa Department of Environmental Health, Rollins School of Public Health, Emory University, Atlanta, GA, USA** (L Shi); **Department of Data Sciences, Dana-Farber Cancer Institute, Boston, MA, USA** (D Braun); **Department of Psychology, Concordia University, Montreal, QC, Canada** (Y Abu Awad ScD); **School of Earth and Atmospheric Sciences, Georgia Institute of Technology, Atlanta, GA, USA** (P Liu PhD); **Vanke School of Public Health, Tsinghua University, Beijing, China** (Q Di ScD); **and Department of Environmental Health Sciences, Mailman School of Public Health, Columbia University, New York, NY, USA** (M-A Kioumourtzoglou ScD)

Correspondence to: Dr Antonella Zanobetti, Department of Environmental Health, Harvard T H Chan School of Public Health, Boston, MA 02215, USA **azanobet@hsph.harvard.edu**

## Introduction

Globally, neurological disorders are the leading group-cause of disability and the second leading group-cause of death, posing an urgent and substantial worldwide public health challenge.[1] Parkinson's disease and Alzheimer's disease and related dementias are the most prevalent neurodegenerative diseases.[2] Worldwide, an estimated 6 million people have Parkinson's disease and 44 million people have Alzheimer's disease and related dementias.[1] The Global Burden of Diseases, Injuries, and Risk Factors Study 2016 analysis estimated that, since 1990, the prevalence of Parkinson's disease has increased by 145% and Alzheimer's disease and related dementias have increased by 117%. The prevalence of these conditions is expected to continue to increase due to lengthening life expectancy.[1] As no cure exists yet for these conditions, the identification of modifiable risk factors, such as environmental exposures, should be a top research priority.

Concern is mounting that air pollution increases the risk for neurological disorders. Emerging evidence has shown that particulate air pollution is associated with impaired cognitive function,[3,4] accelerated cognitive decline,[5,6] Parkinson's disease, Alzheimer's disease, and dementia.[7–9] Research suggests that air pollution might contribute to the potential onset of neurodegeneration via mechanisms such as oxidative stress, systemic inflammation, and neuroinflammation, among others.[10–12] There is also evidence that air pollution might exacerbate disease progression by accelerating these biological pathways or worsening intermediate processes.[13,14] Therefore, the first hospital admission with a relevant diagnosis code is occurring sooner than expected. Previous studies that used hospital admission data to assess the effect of air pollution exposure on progression of Parkinson's disease and Alzheimer's disease and related dementias included populations residing in the southeastern US region,[7,15] the



JA1446

**Research in context**

**Evidence before this study**

Air pollution is a known risk factor for poorer human health. Concern is mounting that air pollution increases the risk for neurological disorders, the leading group-cause of disability and the second leading group-cause of death according to the Global Burden of Diseases, Injuries, and Risk Factors Study 2016. We searched PubMed and Google Scholar for studies examining associations of air pollution exposure with neurological disorders published from database inception until Aug 25, 2020. We used the keywords: ("PM2.5" OR "fine particulate matter" OR "fine particles" OR "air pollution" OR "air pollutants") AND ("neurological" OR "neurodegeneration" OR "neurodegenerative" OR "cognitive" OR "Parkinson's disease" OR "Alzheimer's disease" OR "dementia"). Although toxicological evidence links long-term $PM_{2.5}$ exposure with adverse effects on the nervous system, the epidemiological evidence remains scarce. Emerging evidence has shown that particulate matter air pollution is associated with impaired cognitive function, accelerated cognitive decline, Parkinson's disease, Alzheimer's disease, and dementia. The studies using hospital admission data to look at the effect of particulate matter air pollution on these conditions generally included populations residing in well monitored urban areas, or in a single region of the USA, or in a province of Canada. To date, no study has been done nationwide in the USA. Previous studies also focused on older data; air pollution concentrations in the USA have been steadily decreasing, so it is essential to establish whether these associations persist even at lower concentrations.

**Added value of this study**

To our knowledge, this is the first nationwide cohort study of the association between $PM_{2.5}$ exposures and neurodegenerative disease in the USA. Our findings provide strong epidemiological evidence for the association between air pollution and neurological disorders. We showed that long-term $PM_{2.5}$ exposures were significantly associated with an increased risk of first hospital admission with primary or secondary diagnosis codes for Parkinson's disease and Alzheimer's disease and related dementias. In addition, we observed that risk of first hospital admission with a diagnosis code for these conditions, as a proxy for neurodegeneration, linearly increased with increasing $PM_{2.5}$ concentrations less than the current national standards (annual mean 12 μg/m³), suggesting that no safe threshold exists for health-harming pollution concentrations. One highlight of this paper is that we are leveraging an unparalleled amount of data compared with any previous air pollution study to our knowledge, to provide robust epidemiological evidence with the highest possible scientific rigour. Another key feature is the use of innovative computational approaches to accommodate our very large datasets, which can be applicable to other epidemiological studies that face similar challenges in the era of big data.

**Implications of all the available evidence**

Our study adds to the small but emerging evidence base indicating that long-term air pollution exposures are linked to an increased risk of neurological health deterioration, even at $PM_{2.5}$ concentrations less than the current national standards. Our findings suggest that policies that result in further reductions in ambient $PM_{2.5}$ concentrations can yield substantial health benefits in the ageing American population, even for those already exposed to low $PM_{2.5}$ concentrations.

Ontario province of Canada,[8] and well monitored urban areas in the northeastern USA.[9] To the best of our knowledge, no study to date has been done in the whole US population. Previous studies also focused on older data; as air pollution concentrations have been steadily decreasing in the past few decades in the USA although increases have been seen in some regions, it is essential to establish whether these associations persist even at low concentrations. Hence, evidence remains scarce for the health effects of long-term exposure to low amounts of air pollution across the USA, including locations with sparse or no monitoring.

We aimed to investigate the effect of long-term exposure to fine particulate matter ($PM_{2.5}$) on hospital admissions with a Parkinson's disease or an Alzheimer's disease and related dementias diagnosis code. We leveraged a nationwide comprehensive dataset integrating highly accurate and well validated high-resolution $PM_{2.5}$ prediction models and health data for all fee-for-service Medicare beneficiaries across the contiguous United States (2000–16). To address the computational challenges, we applied a novel computationally scalable re-parameterised Cox-equivalent Poisson model.

## Methods

### Study design and participants

We did a longitudinal cohort study in which we constructed a cohort including all Medicare-fee-for-service beneficiaries who were aged 65 years or older in the USA from Jan 1, 2000, to Dec 31, 2016, using the Medicare part A data. We obtained the Medicare inpatient hospital claims from the Medicare Provider and Analysis Review files, which include one record per hospital admission. People are eligible to enter Medicare after they turn 65 years of age, and for each beneficiary, follow-up started on Jan 1, 2000, or Jan 1 of the year following entry into the cohort, until first admission with diagnosis codes for each outcome separately (ie, Parkinson's disease or Alzheimer's disease and related dementias), death, or the end of the study period, whichever came first. We extracted age, sex, race, postal code (ie, ZIP code) of residence, and Medicaid eligibility for each

beneficiary in each follow-up year. Medicaid (which is distinct from Medicare) is a joint federal–state insurance programme that provides health and nursing home coverage to Americans of all ages on low incomes or with disabilities. Medicaid eligibility is a proxy for individual-level socioeconomic status—ie, a Medicare beneficiary eligible for Medicaid is likely to have lower socioeconomic status. This study was done under a protocol approved by the Human Subjects Committee of the Harvard T H Chan School of Public Health. Written informed consent of individuals was not required due to the nature of the study.

## Procedures

We used International Classification of Diseases (ICD) codes to identify Parkinson's disease (ICD-9: 332; ICD-10: G20, G21·11, G21·19, and G21·8) or Alzheimer's disease and related dementias (ICD-9: 331·0, 290; ICD-10: G30·9, and F05) admissions as principal or secondary diagnoses during the study period (appendix p 3). We observed some overlap in diagnoses for Alzheimer's disease and dementia. We found that 298 461 (24·2%) of 1 233 132 Medicare-fee-for-service beneficiaries with a dementia diagnosis also received an Alzheimer's disease diagnosis, while of 2 490 431 Medicare-fee-for-service beneficiaries with Alzheimer's disease diagnoses, 298 461 (12·0%) also received a dementia diagnosis. This overlap in diagnoses probably reflects different classifications in different medical centres, but not diagnostic misclassification, as routinely collected health data have been shown to achieve high positive predictive values.[15] Therefore, following the literature,[8] we combined Alzheimer's disease and dementia into one outcome for the main analysis and treated them separately as a sensitivity analysis. Thus, separate analyses were done for the two outcomes: Parkinson's disease and Alzheimer's disease and related dementias.

We obtained daily $PM_{2·5}$ predictions at a 1 km² spatial resolution across the contiguous United States from a well validated ensemble model.[16] The model included more than 100 predictor variables from satellite data, land-use and meteorological variables, and chemical transport model simulations. The model was calibrated with daily $PM_{2·5}$ concentrations measured at 2156 monitors—data obtained from the US Environmental Protection Agency's Air Quality System database and IMPROVE monitoring network—and had excellent performance (10-fold cross-validated $r^2$ of 0·86 for $PM_{2·5}$ predictions across the USA, ranging from 0·77 in the mountainous USA to 0·92 in the eastern Midwestern USA). The technical details, including information on the model validation, have been previously published.[16] Using daily $PM_{2·5}$ predictions at 1 km² grid cells, we calculated the daily mean $PM_{2·5}$ concentration for each postal code, by averaging the predictions at the grid cells whose centroids fell within the boundary of that postal code. Based on these results, we estimated annual postal code means and assigned the postal code-wide annual $PM_{2·5}$ concentration means to Medicare enrollees according to the postal code of residence and calendar year. In the USA, the mean population per postal code is around 7500. Each postal code can cover a small area in cities but can be larger in rural areas. The median land area of a postal code is around 92 km².

## Statistical analysis

We collected neighbourhood-level socioeconomic status variables, available at county level or postal code tabulation areas level, which have both been associated with ambient air pollution and implicated in neurological health.[17,18] These variables were derived from the 2000–16 Behavioral Risk Factor Surveillance System, the 2000 and 2010 US Census, and the American Community Survey for each year from 2005 to 2016 (appendix pp 3–4). Region was classified as northeast, southeast, midwest, southwest, and west.

Given the very large dataset, we applied a Cox-equivalent re-parameterised Poisson approach for each of the two outcomes, coupled with parallel computing, to address the computational challenges (eg, inadequate memory size and lengthy computational time) faced by the conventional Cox proportional hazards model. Specifically, we proposed and fit a stratified quasi-Poisson model to estimate associations between the rate of first hospital admissions with neurological-related diagnosis codes (Parkinson's disease or Alzheimer's disease and related dementias) and time-varying annual mean $PM_{2·5}$ concentrations. The dependent variable was the count of outcome-related hospital admissions in each follow-up year, calendar year, and postal code location within strata specified by individual characteristics, using the corresponding total person-time of Medicare-fee-for-service beneficiaries as the offset. By stratifying on individual characteristics—ie, sex, race, Medicaid eligibility, and age at study entry in 2-year categories—we allowed for flexible strata-specific baseline rates. Mathematically, this stratified Poisson model is equivalent to a time-varying Cox proportional hazard model under an Anderson-Gill representation (appendix pp 4–5).[19] Importantly, the Cox-equivalent Poisson models also allowed use of parallel computing techniques that are not available for Cox models, further reducing the computation time. To account for within postal code correlated observations across years, we applied an m-out-n bootstrap method using postal code units to calculate statistically robust CIs.[20]

To adjust for potential confounding, we also included neighbourhood-level socioeconomic status factors in our analyses. To account for potential residual confounding by spatial and temporal trends, we included indicator variables for region and calendar years. We also estimated effects at low concentrations of $PM_{2·5}$, by restricting analyses to the subset of the cohort with annual exposures always lower than the current national standards

See **Online** for appendix

For the **Environmental Protection Agency's air quality data** see https://www.epa.gov/outdoor-air-quality-data



JA1448

(ie, 12 μg/m³) over the study period (low-exposure analysis). Finally, to evaluate any potential deviations from linearity in the concentration–response curves, we included penalised splines for the $PM_{2·5}$ term in the models.

| | Full cohort (n=63 038 019) | Low-exposure cohort (n=21 928 573) |
|---|---|---|
| Age at entry, years | | |
| 65–74 | 48 784 857 (77·4%) | 17 010 757 (77·6%) |
| 75–84 | 10 550 039 (16·7%) | 3 673 343 (16·8%) |
| 85–94 | 3 327 268 (5·3%) | 1 134 507 (5·2%) |
| 95–104 | 375 708 (0·6%) | 109 934 (0·5%) |
| 105–114 | 147 (<0·1%) | 32 (<0·1%) |
| Mean (SD) | 69·9 (7·2) | 69·8 (7·1) |
| Sex | | |
| Men | 28 295 987 (44·9%) | 10 084 588 (46·0%) |
| Women | 34 742 032 (55·1%) | 11 843 985 (54·0%) |
| Race | | |
| White | 53 229 370 (84·4%) | 19 776 603 (90·2%) |
| Black | 5 513 530 (8·7%) | 663 313 (3·0%) |
| Other* | 4 295 119 (6·8%) | 1 488 657 (6·8%) |
| Medicaid eligibility | | |
| Eligible | 7 853 739 (12·5%) | 2 405 354 (11·0%) |
| Ineligible | 55 184 280 (87·5%) | 19 523 219 (89·0%) |
| $PM_{2·5}$ concentration, μg/m³ | 9·7 (3·2) | 7·2 (2·3) |
| Body-mass index, kg/m² | 27·5 (1·1) | 27·3 (1·0) |
| Ever smoked, % | 47·1 (7·7) | 48·1 (7·8) |
| Hispanic, % | 9·2 (16·7) | 9·2 (16·3) |
| Black, % | 9·1 (17·3) | 2·7 (7·5) |
| Median household income, US$1000 | 48·0 (21·7) | 47·5 (18·9) |
| Median home value, $1000 | 159·0 (141·9) | 153·9 (131·8) |
| Below poverty level, % | 11·0 (10·9) | 9·7 (10·2) |
| Not graduated from high school, % | 28·7 (18·8) | 24·2 (17·1) |
| Owner-occupied housing, % | 71·1 (18·8) | 75·2 (14·8) |
| Population density, people per mile² | 1601·2 (5233·1) | 595·1 (1595·8) |

Data are n (%) or mean (SD). *Other included Asian, Hispanic, American Indian or Alaskan Native, and unknown.

*Table 1:* Cohort characteristics

| | Parkinson's disease | Alzheimer's disease and related dementias |
|---|---|---|
| **Main analyses** | | |
| Number of admissions | 1 033 669 | 3 425 102 |
| Total person-years | 478 335 593 | 473 696 618 |
| Median follow-up year | 7 | 7 |
| HR per 5 μg/m³ $PM_{2·5}$ | 1·13 (1·12–1·14) | 1·13 (1·12–1·14) |
| **Low-exposure analyses (<12 μg/m³)** | | |
| Number of admissions | 301 227 | 939 035 |
| Total person-years | 156 287 478 | 155 139 930 |
| Median follow-up year | 6 | 6 |
| HR per 5 μg/m³ $PM_{2·5}$ | 1·14 (1·12–1·16) | 1·18 (1·15–1·21) |

Data are n or HR (95% CI). HR=hazard ratio.

*Table 2:* Cause-specific admissions for Parkinson's disease and Alzheimer's disease and related dementias, 2000–16

To identify subpopulations who might be particularly susceptible, we assessed potential effect modification by sex (men *vs* women), race (white people *vs* Black people *vs* other [Asian, Hispanic, American Indian or Alaskan Native, and unknown]), age (≥80 years *vs* <80 years), Medicaid eligibility (dual *vs* non-dual eligibility) as a surrogate for individual-level socioeconomic status, and urbanicity (quartiles of population density), by including interaction terms between these potential modifiers and $PM_{2·5}$. Specifically, we calculated the effect of $PM_{2·5}$ in each category of the effect modifier and assessed significance of the interaction term. We chose the age of 80 years as a cutoff to distinguish the young and middle-old from the old-old.[21]

We did a series of sensitivity analyses to assess the robustness of our results to confounding, inclusion of prevalent cases, potential outcome misclassification, and exposure time window (appendix pp 5–8). Given that these neurodegenerative diseases are age-dependent, as additional sensitivity analysis we also considered stratification by age at entry using 1-year intervals. To remove potentially prevalent cases, we ran additional analyses excluding anyone who had a first admission for these outcomes in their first 2 years of follow-up and repeated our analyses. As information in Medicare is only available after beneficiaries turn 65 years old, it is possible that some study participants had a Parkinson's disease or Alzheimer's disease and related dementias hospital admission before enrolling to Medicare. This sensitivity analysis—excluding cases with an admission during their first 2 years of enrolment—increases the probability that we are capturing the first admission with a related code. To evaluate whether the associations we observed can be attributed to a different outcome also linked to air pollution, we excluded the subset of Parkinson's disease and Alzheimer's disease and related dementias cases with the most frequent category of primary discharge codes (ie, circulatory system disease [ICD-9: 390–459; ICD-10: I00–I99]) from analyses. The primary discharge code appeared in 392 588 (41·1%) cases of Parkinson's disease and 1 323 044 (45·3%) cases of Alzheimer's disease and related dementias. Additionally, we added a sensitivity analysis restricting cases only to those with primary diagnoses codes for Parkinson's disease or Alzheimer's disease and related dementias. Finally, we considered an alternative exposure window with 1-year lag period (ie, using the annual mean exposure during the year preceding the outcome). Considering that chemical composition of $PM_{2·5}$ mass (and thus relative toxicity) can vary markedly among different regions in the USA, we also did a subgroup analysis by region.

The computations of the analyses of this study were done on the Research Computing Environment, which is supported by the Institute for Quantitative Social Science at Harvard University. We used R software, version 3.3.2 for all analyses.

### Role of the funding source

The funder of the study had no role in study design, data collection, data analysis, data interpretation, or writing of the report. The corresponding author had full access to all the data in the study and had final responsibility for the decision to submit for publication.

## Results

Data were analysed for Medicare beneficiaries who were 65 years and older between Jan 1, 2000, and Dec 31, 2016. The full cohort included 63 038 019 individuals living in 39 065 postal codes (table 1). The mean age at entry was 69·9 years (SD 7·2). There were 478·3 million person-years of follow-up for Parkinson's disease and 473·7 million for Alzheimer's disease and related dementias (table 2). The total number of first admissions was 1·0 million for Parkinson's disease and 3·4 million for Alzheimer's disease and related dementias. The median follow-up was 7 years (IQR 8). Of the Parkinson's disease cases, 77 016 (7·5%) of 1 033 669 had Parkinson's disease as the primary discharge diagnosis code and, of the Alzheimer's disease and related dementias cases, 502 565 (14·7%) of 3 425 102 did. For the cases identified with secondary diagnoses of these conditions, we examined the distribution of primary diagnostic codes and found that the primary conditions were predominantly circulatory system diseases (appendix p 8).

The low-exposure cohort subset included 21 928 573 individuals living in 15 775 postal codes, with a mean entry age of 69·8 years (SD 7·1). For Parkinson's disease, the total person-years of follow-up was 156·3 million and for Alzheimer's disease and related dementias, it was 155·1 million. The number of first admissions was 0·3 million for Parkinson's disease and 0·9 million for Alzheimer's disease and related dementias (table 2).

The mean annual $PM_{2·5}$ concentration over the study period was 9·7 μg/m³ (SD 3·2, IQR 4·3, 5th to 95th percentile 5·2–15·9; figure 1A). $PM_{2·5}$ concentrations were generally higher in eastern USA than in western USA (except California). Figures 1B and 1C present the occurrence of first hospital admissions with a Parkinson's disease or an Alzheimer's disease and related dementias diagnosis code, per 100 000 Medicare beneficiaries across the contiguous United States (2000–16).

Overall, long-term exposure to $PM_{2·5}$ was significantly positively associated with both neurodegenerative outcomes in both the entire cohort and the low-exposure subset. Specifically, in the entire cohort we observed a hazard ratio (HR) of 1·13 (95% CI 1·12–1·14) for Parkinson's disease admissions and an HR of 1·13 (1·12–1·14) for Alzheimer's disease and related dementias admissions per 5 μg/m³ increase in annual $PM_{2·5}$ concentrations. In the low-exposure subset, we found a slightly elevated association (HR 1·14, 95% CI 1·12–1·16) for Parkinson's disease and an elevated association (HR 1·18, 1·15–1·21) for Alzheimer's disease and related dementias admissions per 5 μg/m³ $PM_{2·5}$ increase (table 2).




*Figure 1:* **Nationwide concentrations of $PM_{2·5}$, and occurrences of Parkinson's disease and Alzheimer's disease and related dementias across the contiguous United States**
(A) 17-year mean of annual $PM_{2·5}$ concentrations (μg/m³). (B) Occurrence of first Parkinson's disease hospital admissions per 100 000 Medicare beneficiaries. (C) Occurrence of first Alzheimer's disease and related dementias hospital admissions per 100 000 Medicare beneficiaries (2000–16).

Figure 2 shows the concentration–response relationships for Parkinson's disease and Alzheimer's disease and related dementias. We observed a strong linear relationship for annual mean $PM_{2·5}$ concentrations less than 16 μg/m³, followed by a plateaued association with increasingly larger confidence bands for both outcomes. However, less than 5% of the distribution of the $PM_{2·5}$ concentrations were greater than 16 μg/m³.

Among the effect modifiers, we found $PM_{2·5}$ effect estimates that were significantly larger in magnitude among individuals in more urban areas versus those in less urban areas (as expressed in quartiles of population density). We also observed higher HRs among those who identified as white than those who identified as Black or Asian, Hispanic, American Indian or Alaskan Native, and unknown, and for women compared with men (figure 3).

For both Parkinson's disease and Alzheimer's disease and related dementias, all sensitivity analyses yielded similar results to the main analyses (appendix pp 5–8). When excluding potentially prevalent cases (ie, excluding those who had a first admission in the first 2 years of follow-up), both effect estimates were slightly elevated. The sensitivity analysis in which Alzheimer's disease and dementia were treated as separate outcomes also yielded significant and positive associations between $PM_{2·5}$ and the two separate outcomes of interest. However, the effect estimates for Alzheimer's disease (HR 1·17, 95% CI 1·16–1·18) were higher than those for dementia (HR 1·06, 1·05–1·07). Our results were robust to confounding adjustment—ie, the results were almost unchanged when we excluded different sets of covariates in alternative models compared with the main one. Additionally, both exclusion of all cases identified through secondary diagnostic codes and exclusion of those secondary diagnostic cases with circulatory system disease as the primary diagnosis code did not change the main results. Finally, our results were robust to the use of a different exposure window. The 1-year lagged exposure analysis (eg, using annual mean $PM_{2·5}$ in 2005 to link the outcome in 2006) yielded results nearly identical to the findings from our main analysis.

All region-specific results consistently suggested a link between $PM_{2·5}$ and first Parkinson's disease and Alzheimer's disease and related dementias hospital admissions, although effect estimates varied by geographical region. In summary, we observed the highest HR for first Parkinson's disease hospital admission among Medicare enrollees in the northeastern USA and for first Alzheimer's disease and related dementias hospital admissions in the midwestern USA.




*Figure 2:* **Concentration–response curves of the association between long-term $PM_{2·5}$ exposure and neurological disorders**
Parkinson's disease (A) and Alzheimer's disease and related dementias (B).

## Discussion

In this large, nationwide prospective cohort of all Medicare-fee-for-service beneficiaries, long-term exposure to $PM_{2·5}$, an indicator for the air pollution mixture at each postal code, was associated with an increased risk of first hospital admission with a Parkinson's disease or an Alzheimer's disease and related dementias diagnosis code, even at concentrations less than the current annual national standards (12 μg/m³). We also identified women, white people, and more urbanised populations as particularly susceptible subgroups. These findings suggest that improving air quality, with $PM_{2·5}$ concentrations even lower than current national standards, could yield public health benefits.

The shape of the concentration–response relationship between air pollution and neurodegeneration has rarely been assessed in the literature. Only one previous study simply assessed non-linearity using quartiles and found no evidence of deviation.[9] This result was in agreement with our results, had we used quartiles. Use of splines allowed for a more detailed characterisation of the shape across the $PM_{2·5}$ concentration range. Risk of first hospital admission with a Parkinson's disease or an Alzheimer's disease and related dementias diagnosis code, as a proxy for neurodegeneration progression, linearly increased with increasing $PM_{2·5}$ concentrations less than the current annual standards (12 μg/m³), suggesting no safe threshold for harmful pollution. Although we detected some deviations from linearity at concentrations greater than 16 μg/m³, less than 5% of the observations were higher than that. It is possible that any deviation at such high concentrations could indicate that the flexible penalised splines are sensitive to potential outlying observations with high leverage.

Our findings regarding associations between $PM_{2·5}$ and Alzheimer's disease and related dementias are consistent with previous research, both in terms of direction and magnitude; of these, one was done in Ontario's Canadian population,[8] and the other two were done in regional subpopulations of US Medicare enrollees.[7,9] Mixed results,

including both positive and null findings, however, were reported for the association between $PM_{2\cdot5}$ and Parkinson's disease in the literature.[9,22,23] It is worth noting that a comprehensive city-level study in 50 northeastern US cities among Medicare enrollees found higher estimates in magnitude for Parkinson's disease and Alzheimer's disease and related dementias than the ones estimated in this study,[9] which matches our finding of significantly higher $PM_{2\cdot5}$ effects among urban dwellers. Other studies also found similar results in the urban populations they investigated.[7,8] The observed associations for the other grouping within race are not clear and more work is needed to understand these results. We note, however, that the percentage of the population aged older than 65 years in the USA who are not white or Black is 6·8%.

Both examined diseases have long insidious onsets and the exact timing of disease onset is not known.[24,25] Furthermore, disease diagnosis probably occurs at a neurologist's office and not during a hospital admission. Therefore, use of an administrative dataset does not allow investigation of the association between $PM_{2\cdot5}$ and onset of these outcomes. That is, with our analysis we cannot examine true onset incidence or incidence of diagnosis. Our analysis estimates incidence of first hospital admission, which can be interpreted as increased susceptibility to hospital admissions among this patient population and accelerated disease progression. In support of our hypothesis and main findings, the sensitivity analysis excluding people that had a first admission in the first 2 years of the cohort (ie, potentially prevalent cases) resulted in larger in magnitude effect estimates.

In our main analysis, 956 653 (92·5%) of the Parkinson's disease cases and 2 922 537 (85·3%) of the Alzheimer's disease and related dementias cases that we identified were based on secondary causes and had a different primary cause of admission. Although this observation was expected, as these outcomes are monitored by neurologists and do not necessarily show up as primary hospital admissions, we were concerned that the observed effect could reflect the signal with the most common primary diagnosis code for these outcomes. Exclusion, however, of Parkinson's disease and Alzheimer's disease and related dementias cases with a primary diagnosis for circulatory system disease did not change our results.

Toxicological studies suggest various potential mechanisms via which air pollution might contribute to neurodegenerative progression. Systemic and brain inflammation, for example, enhance the pathogenic alteration of α-synuclein, accelerating the progression of Parkinson's disease[14] and Alzheimer's disease.[13] Oxidative stress, in addition, is also involved both in initiation and progression, and plays an important role in accelerating Parkinson's disease progression.[26] Air pollution might play a key role in neuroinflammation and further exacerbate or initiate dysfunctional protein handling, in the context of amyloid plaques, tau hyperphosphorylation,




***Figure 3:*** **Identification of vulnerable subpopulations**
Hazard ratios for Parkinson's disease (A) and Alzheimer's disease and related dementias (B) associated with a 5 μg/m³ increase in $PM_{2\cdot5}$ concentrations by study subgroups. The shading represents the estimated main effects for the overall population. Dual or non-dual refers to eligibility for Medicaid. Density Q1–Q4 denote quartiles of population density—ie, low population density, low to medium population density, medium to high population density, and high population density. Other included Asian, Hispanic, American Indian or Alaskan Native, and unknown race. *Significant modification (at α=0·05 level).

and neurofibrillary tangles.[27] Several air pollutants, including $PM_{2\cdot5}$ and ultrafine (<0·1 μm) particulate matter, have been shown to easily cross the blood–brain barrier, providing an important route for air pollutants to interact with the CNS. Indeed, increases in air pollution can elicit increases in the inflammatory response in the prefrontal lobes, with concomitant increases in oxidative damage and amyloid β deposition. The origin of these pathological markers could arise from the direct interaction of air pollutants with microglia in the brain, resulting in a release of pro-inflammatory signals that further facilitate neuronal damage and protein aggregation. Elevation in pro-inflammatory signals can mediate dysfunctional protein handling, in the form of elevations in amyloid β and hyperphosphorylation of tau.[27] Given the pathogenesis of Alzheimer's disease and other neurogenerative diseases that are defined by neuroinflammation, oxidative damage, and protein misfolding, exposure to air pollution might serve as an important risk factor in the development and progression of

Alzheimer's disease and Parkinson's disease pathology and concomitant neurobehavioural deficits. For all neurological outcomes, we observed significantly higher effects of $PM_{2·5}$ among individuals in urban areas versus rural areas. One possible reason might be the abundance of metal-bearing nanoparticles in the urban atmosphere, which have very small diameters and can access the brain directly.[28] The higher estimates among white people and women could be attributed to a longer life expectancy in these groups—ie, the chance of competing risks among non-white individuals or men is greater, including the probability of death before developing Parkinson's disease or Alzheimer's disease and related dementias.[29]

Our study data and methods have several advantages. First, our study population of all Medicare-fee-for-service beneficiaries in the USA gives us ample power to detect effects. This statistical power is particularly useful in environmental studies in which exposures are highly prevalent but effect estimate sizes are often small. Second, our study assessed the whole of the USA, which has greater generalisability than previous smaller cohort studies that were geographically restricted, although our study might not be generalisable to other countries. Furthermore, the aggregation of data into strata of shared individual characteristics not only allowed us to create a more efficient model but also allowed us to analyse a very large dataset with a far smaller computational burden. Given the increase in the use of very large datasets, this novel analytical approach might be useful in other research as well.

Our findings, however, should be interpreted in light of some potential limitations. First, reliance on an administrative cohort did not allow us to examine the relationship between $PM_{2·5}$ and disease onset. Parkinson's disease and Alzheimer's disease and related dementias are diseases that do not require hospital admission for diagnosis and treatment; usually, hospital admission occurs at more advanced stages of the disease for treating complications or for adjusting the therapeutic plan. Thus, the hospital admission records cannot represent disease incidence and we probably underestimate the case number when using first hospital admission as a proxy for neurodegeneration. In addition, a positive predictive value of 0·65 for Parkinson's disease[30] and about 0·75 for Alzheimer's disease and related dementias[31] has been reported when Medicare claims were used, indicating the under-diagnosed nature of neurological conditions using claims records. Furthermore, our results only represent the Medicare-fee-for-service population, which does not include all Medicare beneficiaries. Specifically, earlier in our study period (eg, in 2003), the Medicare-fee-for-service population covered up to 29 230 838 (84·9%) of 34 423 305 Medicare beneficiaries, while in 2016 it was 30 974 063 (65·8%) of 47 099 370 Medicare beneficiaries. It is possible that Medicare-fee-for-service beneficiaries switched to Medicare-HMO (Medicare managed care plan) and back, potentially resulting in some missed cases in our data, as we have no information on Medicare-HMO claims records. Our findings, thus, might not be generalisable to the entire Medicare population. Second, the use of predicted concentrations for exposure assessment might have resulted in some exposure measurement error. However, the prediction model we used is considered to have excellent predictive accuracy,[16] substantially reducing potential exposure measurement error. In our study, exposure measurement error is likely to be non-differential because the error in the predicted ambient $PM_{2·5}$ concentrations is probably independent of outcome status. Thus, any resulting bias would be towards the null.[32] Third, we cannot exclude the possibility of potential residual confounding bias. We did, however, adjust all our models for multiple neighbourhood-level socioeconomic status variables, and thus any potential residual bias is expected to be very small. Individual-level risk factors for neurological disorders, such as smoking, are not available in Medicare. However, we used postal code mean predicted $PM_{2·5}$ to assign exposures, which could only covary with individual-level factors through postal code-level socioeconomic status,[33] for which we carefully adjusted, thus effectively minimising this potential source of bias. Fourth, our ensemble model predicts total $PM_{2·5}$ mass concentrations, but not all particles have the same toxicity; some studies have shown that traffic-related pollution might be particularly toxic.[34] Future studies should aim to disentangle specific effects of regional versus local particles.

In conclusion, our study provides strong epidemiological evidence that long-term exposure to air pollution is significantly associated with a higher risk of neurological health deterioration, even at concentrations less than the current national standards. Our findings suggest that policies that result in further reductions in ambient $PM_{2·5}$ concentrations can yield substantial health benefits in the ageing US population, even for those already exposed to low $PM_{2·5}$ concentrations.

**Contributors**

AZ and M-AK designed the research and directed its implementation. MDY, DB, YAA, YWe, YWa, PL, QD, JS, and FD prepared datasets. LS and XW analysed data. LS, XW, and PL made the figures. LS, XW, M-AK, and AZ wrote the paper, and all authors contributed to the revision of the manuscript.

**Declaration of interests**

We declare no competing interests.

**Acknowledgments**

We thank Benjamin Sabath for the support with the Research Computing Environment and William Michael Caudle for fruitful discussion. This study was supported by the Health Effects Institute (4953-RFA14-3/16-4), the National Institute of Environmental Health Sciences (NIEHS R01 ES024332, R01 ES028805, R21 ES028472, P30 ES009089, P30 ES000002), the National Institute on Aging (NIA/NIH R01 AG066793-01, P50 AG025688), and the HERCULES Center (P30ES019776). Research described in this Article was done under contract to the Health Effects Institute, an organisation jointly funded by the US Environmental Protection Agency (assistance award number R-83467701) and some motor vehicle and engine manufacturers. The contents of this Article do not necessarily reflect the views of the Health Effects Institute, or its sponsors, nor do they necessarily reflect

the views and policies of the US Environmental Protection Agency or motor vehicle and engine manufacturers. The computations in this paper were run on the Research Computing Environment supported by the Institute for Quantitative Social Science in the Faculty of Arts and Sciences at Harvard University.

## References


1 GBD 2016 Neurology Collaborators. Global, regional, and national burden of neurological disorders, 1990–2016: a systematic analysis for the Global Burden of Disease Study 2016. *Lancet Neurol* 2019; **18:** 459–80.

2 Maragakis NJ, Rothstein JD. Mechanisms of disease: astrocytes in neurodegenerative disease. *Nat Clin Pract Neurol* 2006; **2:** 679–89.

3 Ailshire J, Karraker A, Clarke P. Neighborhood social stressors, fine particulate matter air pollution, and cognitive function among older U.S. adults. *Soc Sci Med* 2017; **172:** 56–63.

4 Tzivian L, Dlugaj M, Winkler A, et al. Long-term air pollution and traffic noise exposures and mild cognitive impairment in older adults: a cross-sectional analysis of the Heinz Nixdorf recall study. *Environ Health Perspect* 2016; **124:** 1361–68.

5 Cacciottolo M, Wang X, Driscoll I, et al. Particulate air pollutants, APOE alleles and their contributions to cognitive impairment in older women and to amyloidogenesis in experimental models. *Transl Psychiatry* 2017; **7:** e1022.

6 Weuve J, Puett RC, Schwartz J, Yanosky JD, Laden F, Grodstein F. Exposure to particulate air pollution and cognitive decline in older women. *Arch Intern Med* 2012; **172:** 219–27.

7 Lee M, Schwartz J, Wang Y, Dominici F, Zanobetti A. Long-term effect of fine particulate matter on hospitalization with dementia. *Environ Pollut* 2019; **254:** 112926.

8 Chen H, Kwong JC, Copes R, et al. Living near major roads and the incidence of dementia, Parkinson's disease, and multiple sclerosis: a population-based cohort study. *Lancet* 2017; **389:** 718–26.

9 Kioumourtzoglou M-A, Schwartz JD, Weisskopf MG, et al. Long-term $PM_{2.5}$ exposure and neurological hospital admissions in the northeastern United States. *Environ Health Perspect* 2016; **124:** 23–29.

10 Bondy SC. Anthropogenic pollutants may increase the incidence of neurodegenerative disease in an aging population. *Toxicology* 2016; **341–343:** 41–46.

11 Calderón-Garcidueñas L, Solt AC, Henríquez-Roldán C, et al. Long-term air pollution exposure is associated with neuroinflammation, an altered innate immune response, disruption of the blood-brain barrier, ultrafine particulate deposition, and accumulation of amyloid β-42 and α-synuclein in children and young adults. *Toxicol Pathol* 2008; **36:** 289–310.

12 Block ML, Elder A, Auten RL, et al. The outdoor air pollution and brain health workshop. *Neurotoxicology* 2012; **33:** 972–84.

13 Bhatt DP, Puig KL, Gorr MW, Wold LE, Combs CK. A pilot study to assess effects of long-term inhalation of airborne particulate matter on early Alzheimer-like changes in the mouse brain. *PLoS One* 2015; **10:** e0127102.

14 Gao H-M, Zhang F, Zhou H, Kam W, Wilson B, Hong J-S. Neuroinflammation and α-synuclein dysfunction potentiate each other, driving chronic progression of neurodegeneration in a mouse model of Parkinson's disease. *Environ Health Perspect* 2011; **119:** 807–14.

15 Mosconi L, Tsui WH, Herholz K, et al. Multicenter standardized 18F-FDG PET diagnosis of mild cognitive impairment, Alzheimer's disease, and other dementias. *J Nucl Med* 2008; **49:** 390–98.

16 Di Q, Amini H, Shi L, et al. An ensemble-based model of $PM_{2.5}$ concentration across the contiguous United States with high spatiotemporal resolution. *Environ Int* 2019; **130:** 104909.

17 Baumgart M, Snyder HM, Carrillo MC, Fazio S, Kim H, Johns H. Summary of the evidence on modifiable risk factors for cognitive decline and dementia: a population-based perspective. *Alzheimers Dement* 2015; **11:** 718–26.

18 Wirdefeldt K, Adami H-O, Cole P, Trichopoulos D, Mandel J. Epidemiology and etiology of Parkinson's disease: a review of the evidence. *Eur J Epidemiol* 2011; **26** (suppl 1): S1–58.

19 Andersen PK, Gill RD. Cox's regression model for counting processes: a large sample study. *Ann Stat* 1982; **10:** 1100–20.

20 Bickel PJ, Götze F, van Zwet WR. Resampling fewer than n observations: gains, losses, and remedies for losses. *Statistica Sinica* 1997; **7:** 1.

21 Forman DE, Berman AD, McCabe CH, Baim DS, Wei JY. PTCA in the elderly: the "young-old" versus the "old-old". *J Am Geriatr Soc* 1992; **40:** 19–22.

22 Liu R, Young MT, Chen J-C, Kaufman JD, Chen H. Ambient air pollution exposures and risk of Parkinson disease. *Environ Health Perspect* 2016; **124:** 1759–65.

23 Kirrane EF, Bowman C, Davis JA, et al. Associations of ozone and $PM_{2.5}$ concentrations with Parkinson's disease among participants in the Agricultural Health Study. *J Occup Environ Med* 2015; **57:** 509–17.

24 Liu S-Y, Chan P, Stoessl AJ. The underlying mechanism of prodromal PD: insights from the parasympathetic nervous system and the olfactory system. *Transl Neurodegener* 2017; **6:** 4.

25 Tschanz JT, Corcoran CD, Schwartz S, et al. Progression of cognitive, functional, and neuropsychiatric symptom domains in a population cohort with Alzheimer dementia: the Cache County Dementia Progression study. *Am J Geriatr Psychiatry* 2011; **19:** 532–42.

26 Zhou C, Huang Y, Przedborski S. Oxidative stress in Parkinson's disease: a mechanism of pathogenic and therapeutic significance. *Ann N Y Acad Sci* 2008; **1147:** 93–104.

27 Leyns CEG, Holtzman DM. Glial contributions to neurodegeneration in tauopathies. *Mol Neurodegener* 2017; **12:** 50.

28 Gonet T, Maher BA. Airborne, vehicle-derived fe-bearing nanoparticles in the urban environment: a review. *Environ Sci Technol* 2019; **53:** 9970–91.

29 Shrestha LB. Life expectancy in the United States. Congressional Information Service, Library of Congress, 2005. https://www.everycrsreport.com/files/20050303_RL32792_ca5374f4af13937c82f8749ffee41be74a3f5909.pdf (accessed Oct 2, 2020).

30 Noyes K, Liu H, Holloway R, Dick AW. Accuracy of Medicare claims data in identifying Parkinsonism cases: comparison with the Medicare current beneficiary survey. *Mov Disord* 2007; **22:** 509–14.

31 Taylor DH Jr, Østbye T, Langa KM, Weir D, Plassman BL. The accuracy of Medicare claims as an epidemiological tool: the case of dementia revisited. *J Alzheimers Dis* 2009; **17:** 807–15.

32 Kioumourtzoglou M-A, Spiegelman D, Szpiro AA, et al. Exposure measurement error in $PM_{2.5}$ health effects studies: a pooled analysis of eight personal exposure validation studies. *Environ Health* 2014; **13:** 2.

33 Weisskopf MG, Webster TF. Trade-offs of personal vs. more proxy exposure measures in environmental epidemiology. *Epidemiology* 2017; **28:** 635–43.

34 Turner MC, Jerrett M, Pope CA 3rd, et al. Long-term ozone exposure and mortality in a large prospective study. *Am J Respir Crit Care Med* 2016; **193:** 1134–42.

February 16, 2020

Acting Administrator Jane Nishida
U.S. Environmental Protection Agency
Mail Code 1101A
1300 Pennsylvania Ave NW
Washington, DC 20460
Nishida.Jane@epa.gov

**Re: PETITION FOR RECONSIDERATION OF *NATIONAL AMBIENT AIR QUALITY STANDARDS FOR PARTICULATE MATTER*, 85 FED. REG. 82,684 (DEC. 18, 2020) - EPA–HQ–OAR–2015–0072**

Respectfully Submitted by American Lung Association, Clean Air Task Force, Chesapeake Bay Foundation, Earthjustice, Environment America, Environmental Defense Fund, Environmental Law & Policy Center, National Parks Conservation Association, Natural Resources Defense Council, Sierra Club, and Union of Concerned Scientists

Dear Acting Administrator Nishida,

On December 18th, the Environmental Protection Agency finalized its review of "National Ambient Air Quality Standards for Particulate Matter," otherwise known as the "PM NAAQS," 85 Fed. Reg. 82,684 *et seq.* (Dec. 18, 2020).

American Lung Association, Clean Air Task Force, Chesapeake Bay Foundation, Earthjustice, Environment America, Environmental Defense Fund, Environmental Law & Policy Center, National Parks Conservation Association, Natural Resources Defense Council, Sierra Club, and Union of Concerned Scientists respectfully petition EPA to convene a proceeding for reconsideration of these standards under Section 307(d) of the Clean Air Act, 42 U.S.C. § 7607(d), and in light of President Biden's recent Executive Orders, because the 2020 review did not set standards at the levels the statute's directive demands, despite a coherent body of evidence which mandates strengthening revisions to the primary annual and 24-hour $PM_{2.5}$ standards, and the secondary welfare standard, to provide the requisite protection of health and welfare.

The undersigned organizations represent millions of members and supporters across the country who are deeply concerned about the health, environmental, and economic impacts of air pollution and support setting strong, science-based National Ambient Air Quality Standards ("NAAQS") that ensure public health and the environment are protected.

## I. Introduction

The overriding purpose of the Clean Air Act is to "protect and enhance" air quality, 42 U.S.C. § 7401(a), and mitigate the "mounting dangers to the public health or welfare" caused by air pollution. 42 U.S.C. § 7401(a)(2). To that end, the Clean Air Act establishes "National

Ambient Air Quality Standards," or NAAQS, for some of the most common "criteria" pollutants in the "ambient air." 42 U.S.C. § 7409; *see also* 40 C.F.R. part 50.

Primary NAAQS must be set at a level "requisite to protect the public health" with "an adequate margin of safety." *Id.* § 7409(b)(1). Any primary NAAQS that EPA promulgates must be adequate to protect public health and provide an adequate margin of safety, in order to prevent not only any known or anticipated health-related effects from polluted air, but also those that are scientifically uncertain or that research has not yet uncovered. Further, the statute makes clear that there are significant limitations on the discretion granted to EPA in selecting a level for the NAAQS. In exercising its judgment, EPA must err on the side of protecting public health, and "taking account of the "preventative" and "precautionary" nature of the act… the Administrator must then decide what margin of safety will protect the public health from the pollutant's adverse effects – not just known adverse effects, but those of scientific uncertainty or that "research has not yet uncovered." *Am. Lung Ass'n v. EPA*, 134 F.3d 388, 389 (D.C. Cir. 1998) (citations omitted); *see also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 464-71 (2001).

Importantly, the NAAQS must be set at levels that are not simply adequate to protect the average member of the population, but must also protect against adverse effects in vulnerable subpopulations, such as children, the elderly, socially disadvantaged, and people with heart and lung disease. The D.C. Circuit has repeatedly found that if a certain level of a pollutant "adversely affects the health of these sensitive individuals, EPA must strengthen the entire national standard." *Am. Lung Ass'n*, 134 F.3d at 390 (citation omitted); see also *Coal. of Battery Recyclers Ass'n v. EPA*, 604 F.3d 613, 618 (D.C. Cir. 2010); *Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 524 (D.C. Cir. 2009). EPA must also build into the NAAQS an adequate margin of safety for these sensitive subpopulations. *See Am. Farm Bureau Fed'n*, 559 F.3d at 526.[1]

The Clean Air Act requires that secondary NAAQS "specify a level of air quality the attainment and maintenance of which . . . is requisite to protect the public welfare from any known or anticipated adverse effects." 42 U.S.C. § 7409(b)(2); *Am. Farm Bureau Fed'n*, 559 F.3d at 530. Effects on welfare include impacts on "soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being, whether caused by transformation, conversion, or combination with other air pollutants." 42 U.S.C. § 7602(h). Senator Muskie, one of the prime architects of the Act, in speaking about the amendments for public welfare during the Senate debates, noted that the protections for public welfare "are especially important because some pollutants may have serious effects on the environment at levels below those where health effects may occur" and will be set to be "protective against any know or adverse environmental effects." Legislative History of Clean Air Act Amendments of 1970 at 227 (Senate Debate on S. 4358, Sept. 21, 1970). The congressionally mandated "ongoing, periodic review and revision process set up by Congress . . . ensure[s] that regulatory guidelines and standards which protect human safety and welfare are kept abreast of rapid scientific and technological developments[,]" *Lung Ass'n v.*

---

[1] Petitioners direct the Agency to, and incorporate by reference, our comments on the underlying standards, at Doc. ID No. EPA-HQ-OAR-2015-0072-0973 A full discussion of the Agency's authority with respect to the NAAQS is found at pp. 3-8.

*Browner*, 884 F. Supp. 345, 347 (D. Ariz. 1994), and that "as the contours and texture of scientific knowledge change . . . EPA's NAAQS review necessarily changes as well[,]" *Mississippi v. EPA*, 723 F.3d 246, 255-56 (D.C. Cir.), *amended and superseded on reh'g*, 744 F.3d 1334 (D.C. Cir. 2013).

A. 2020 PM NAAQS Review

EPA last updated the annual PM standard in 2012, revising the $PM_{2.5}$ standard to 12 μg/m$^3$ (micrograms per cubic meter), and retaining the 24-hour $PM_{2.5}$ standard, at 35 μg/m$^3$, set in 2006. Prior to 2012, the Agency last updated the annual $PM_{2.5}$ standard in 1997. In 2018, then-EPA Administrator Pruitt announced a "back to basics" policy for the NAAQS that truncated scientific review processes and stacked review boards with industry appointees.[2]

The Trump Administration followed this approach in the PM review, and proposed to maintain the 2012 standards in April 2020. EPA allowed only 60 days for public comment (and denied requests to extend the comment period amidst the Covid-19 pandemic), and finalized the standards on December 7, making the rule effective immediately on publication in the Federal Register. "Review of the National Ambient Air Quality Standards for Particulate Matter," 85 Fed. Reg. 24,094 (Apr. 30, 2020) (Proposed Rule); "National Ambient Air Quality Standards for Particulate Matter," 85 Fed. Reg. 82,684 *et seq.* (Dec. 18, 2020) (Final Rule).

B. Authority for Reconsideration

As provided for under Section 307(d) of the Clean Air Act, 42 U.S.C. § 7607(d), EPA must immediately undertake a reconsideration proceeding of the 2020 PM standards. The Agency's final decision meets the test for reconsideration, as outlined herein. Reconsideration also is warranted because of the Agency's failure to set standards at the levels the statute's directive demands, despite a coherent body of evidence which mandates strengthening revisions to the primary annual and 24-hour PM2.5 standards, and the secondary welfare standard, to provide the requisite protection of health and welfare. Clean Air Act section 307(d)(7)(B) provides:

> Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a

---

[2] Memorandum from E. Scott Pruitt, Former Administrator, U.S. Environmental Protection Agency, on Back to Basics for Reviewing the National Ambient Air Quality Standards to EPA Assistant Administrators (May 9, 2018) ("2018 Pruitt NAAQS Memo") at 3, available at https://www.epa.gov/sites/production/files/2018- 05/documents/image2018-05-09-173219.pdf

> proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed.

42 U.S.C. § 7607(d)(7)(B). Therefore, a reconsideration proceeding must be convened when a person demonstrates that an objection was impracticable to raise during the comment period and the objection is of central relevance to the outcome. This provides members of the public with an opportunity to comment on aspects of a final rule that they were not given adequate notice of previously. "The first element's impracticability prong - rather than the 'arising after' prong - is met 'when the final rule was not a logical outgrowth of the proposed rule.'" *Chesapeake Climate Action Network v. EPA*, 952 F.3d 310, 319 (D.C. Cir. 2020) (internal citation omitted). "A final rule is the 'logical outgrowth' of a proposed rule if 'interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period.'" *Clean Air Council v. Pruitt*, 862 F.3d 1, 10 (D.C. Cir. 2017) (internal citation omitted).

An objection is of central relevance if it "provides substantial support for the argument that the regulation should be revised." *Coal. for Responsible Regulation v. EPA*, 684 F.3d 102, 125 (D.C. Cir. 2012), aff'd in part, rev'd in part on other grounds sub. nom. *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014); *see also* 42 U.S.C. § 7607(d)(7)(B).

As this Petition will demonstrate, the 2020 PM standards are in tension with EPA's core duty to protect public health and welfare in carrying out obligations in the Clean Air Act, and in setting the NAAQS with an adequate margin of safety. The final rule also differs significantly from the proposal in ways that do not represent a logical outgrowth of the proposal, making it impracticable to raise objections to certain issues prior to the final rule. The Administrator must therefore "convene a proceeding for reconsideration of the rule" in accordance with the requirements of the Act. Id. § 7607(d)(7)(B). But not all aspects of the rule are necessarily subject to mandatory reconsideration, and, because of the seriousness of the harms PM causes and the urgency of action to address those harms, Petitioners reserve their right to pursue litigation even without EPA action on this petition.

Similarly, the Biden Administration has pledged an ambitious, broad-based, "whole-of-government" approach to addressing environmental injustices. As EPA renews its commitment to environmental justice and civil rights, EPA must reconsider its decision to maintain outdated standards for particulate matter that disproportionately harm Black and brown communities.[3] Section 2 of Executive Order 13990 mandates that:

---

[3] Exec. Order No. 13990, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, 86 Fed. Reg. 7037 (Jan. 20, 2021); Exec. Order No. 12,898, 59 Fed. Reg. 7629 (1994); *20th Anniversary of Executive Order 12898 on Environmental Justice*, Proclamation No. 9082 of Feb. 10, 2014, 79 Fed. Reg. 8819 (Feb. 13, 2014), *available at* https://obamawhitehouse.archives.gov/the-press-office/2014/02/10/presidential-proclamation-20th-anniversary-executive-order-12898-environ.

> [t]he heads of all agencies shall immediately review all existing regulations, orders, guidance documents, policies, and any other similar agency actions (agency actions) promulgated, issued, or adopted between January 20, 2017, and January 20, 2021, that are or may be inconsistent with, or present obstacles to, the policy set forth in section 1 of this order. For any such actions identified by the agencies, the heads of agencies shall, as appropriate and consistent with applicable law, consider suspending, revising, or rescinding the agency actions.[4]

These executive orders affirm that a reconsideration of EPA's 2020 PM standards is necessary.

## II. EPA must grant swift reconsideration on the primary standard

### A. EPA's Final Action Introduces Issues of Central Relevance Regarding Treatment of Scientific Evidence and Provisional Consideration of Certain Studies that were Impracticable to Raise During the Comment Period

In the final action, EPA deviated from its proposed explanation for retaining the existing primary standard in ways beyond the limits of a logical outgrowth, and it was therefore impracticable to raise objections during the public comment period regarding two important issues in the final action that are of central relevance to the decision. EPA gave no indication of these changes to the Agency's rationale for retaining the standard, and therefore these are not changes that parties could or should have anticipated. Specifically, EPA provided a new explanation for why the available scientific evidence supposedly did not justify tightening the standard, and introduced what was referred to as "provisional consideration" for certain recent studies in the final decision. Because the Agency relied on this new explanation, these issues are of central relevance to the outcome of the rule, and objections were impracticable to raise during the comment period due to lack of notice prior to their introduction in the final action, EPA must convene a reconsideration proceeding for this action under section 307 of the CAA.

#### 1. EPA's Consideration and Treatment of Scientific Evidence

EPA's final action introduces an important new explanation for the former Administrator's decision not to revise the PM NAAQS despite compelling scientific evidence. Specifically, the EPA Administrator attempts to diminish the value of the epidemiological evidence by making a number of specious claims:

> (1) The reported mean concentration in the majority of the key U.S. epidemiological studies using ground-based monitoring data are above the level of the current annual standard; (2) the mean of the reported study means (or medians) (i.e., 13.5 μg/m$^3$) is above the level of the current standard; (3) air quality analyses show the study means to be lower than their corresponding design values by 10-20%; and (4) that these analyses must be considered in light

[4] Exec. Order No. 13990, 86 Fed. Reg. 7037 (Jan. 20, 2021).

> of uncertainties inherent in the epidemiological evidence. When taken together, the Administrator judges that, even if he were to place greater weight on the epidemiological evidence, this information would not call into question the adequacy of the current standards.

85 Fed. Reg. at 82717. Underpinning this attempt is the former Administrator's also novel dismissal of studies that relied on hybrid modeling approaches to develop their mean/median PM2.5 levels in favor of the ones that used ground-based monitors to develop their means/medians. 85 Fed. Reg. at 82,710/1-12/1, 82,714/1, 82,716/3-17/1. And clearly the final decision depends on ignoring this science, which supports a tighter standard. Public commentors could not have objected to these claims because the Administrator's specious criticism and hypothetical conclusion are significant departures from—and not a logical outgrowth of—the proposal. The epidemiological studies provide important evidence about health effects below the current standards, and therefore their consideration and the weight given to them are of central relevance to setting the standard.

Rather than focusing on this criticism of the epidemiology, the Proposal relied on "broader concerns regarding the lack of experimental studies examining $PM_{2.5}$ exposures typical of areas meeting the current standards" as an explanation for the Administrator's judgment that there was considerable uncertainty regarding increased public health protection of a tighter standard. 85 Fed. Reg. at 24,120. The significant addition to EPA's explanation may have been an effort to bolster the Agency's explanation in the face of criticism received with regard to its approach. EPA's rationale, specifically the "broader concerns" about lack of experimental studies at lower exposure levels, were strongly rebuked by the Centers for Disease Control and Prevention in the interagency review process. The CDC was highly critical of the Proposal, stating:

> EPA has not provided sufficient justification for discounting experimental evidence – both from controlled human exposure studies and animal toxicological studies. There is a large body of scientific literature describing why it is appropriate to conduct these studies at concentrations higher than what is measured under ambient conditions. Results from these studies can, and should, be used to directly inform the health effects of pollutant exposures and are invaluable for proper interpretation of epidemiologic findings. As written, the rationale is not scientifically defensible and is inconsistent with established practice within the EPA and other scientific agencies and organizations.

EPA-HQ-OAR-2015-0072-1229.[5] Regardless of the impetus for the change, it is clear that EPA made a significant change to its rationale for maintaining the existing primary standard in the final action. Members of the public could not have known to object to this rationale and criticism of the epidemiological evidence during the comment period because they were introduced in the final action and not a logical outgrowth of the proposal. EPA's treatment of this scientific

---

[5] Email from E. L. Hodsen Marten to Nicole Hagan, et al. regarding EO12866 review: PM NAAQS. Docket EPA-HQ-OAR-2015-0072, available at: https://beta.regulations.gov/document/EPA-HQ-OAR-2015-0072-1229

evidence is of central relevance to its decision regarding the level of the standard, and therefore warrants reconsideration of this action.

Further, EPA's new claims are specious. For example, they rest on the former Administrator's arbitrary dismissal of the epidemiologic studies that relied on hybrid modeling approaches. *See* 85 Fed. Reg. at 82,711/1-3 (citing purported remaining uncertainties and imperfections in hybrid modeling approach when throwing out such studies). The thoughtful, well-founded advice given by the Independent Particulate Matter Review Panel makes clear the Administrator's irrationality. The Panel praised the hybrid modeling approach's performance as "quite good" and explained that the approach's "substantial improvements" marked a "substantial advancement" that "enables epidemiologic studies of large cohorts not served by the ambient monitoring network," with the resulting new studies (which the Administrator dismissed without notice) being "groundbreaking" and "highly compelling." Advice from the Independent Particulate Matter Review Panel, EPA-HQ-OAR-2015-0072-0037 at B-7 to -8, B-14 to -15. The Administrator gave no rational explanation for why any remaining concerns about the approach called for entirely dismissing every single one of these powerful, profoundly important studies in assessing a requisite level of protection. Had EPA's new claims been subject to comment, their lack of rational basis would have been further exposed.

2. EPA's provisional consideration of new studies

In the final action, "EPA has taken the view that NAAQS decisions are to be based on scientific studies and related information that have been assessed as a part of the pertinent air quality criteria" and states that "[i]n the present case, the EPA's provisional consideration of 'new' studies concludes that, taken in context, the 'new' information and findings do not materially change any of the broad scientific conclusions regarding the health and welfare effects of PM in ambient air made in the air quality criteria. For this reason, reopening the air quality criteria review would not be warranted." 85 Fed. Reg. at 82,691. EPA did not include this conclusion regarding its "provisional consideration" of the new studies in the proposal, and therefore public commentors did not have an opportunity to raise objections to the Agency's conclusion regarding the lack of impact that this information would have on important scientific conclusions regarding health and welfare effects of particulate matter. Therefore, these objections were both impracticable to raise during the comment period and centrally relevant to setting the PM NAAQS. Further, EPA's response is not rational itself. First, it is not clear what EPA means by "broad scientific conclusions." Second, and relatedly, even if the new studies "do not materially change any of the <u>broad</u> scientific conclusions" about PM's health and welfare effects, they can have significant implications for key scientific conclusions, like whether the current standards are inadequately protective under the Act with respect to individual health effects.

3. Scientific Underpinnings of Provisional Assessment

As in previous reviews, EPA established a cutoff date for studies to be included in the first draft of the ISA. The final ISA noted the cutoff was about January 2018, or about nine months before release of the first draft. In past reviews, if particularly significant new or otherwise missed studies appeared during the review of the ISA, they could be identified by

CASAC and added during the preparation of the second draft, which would then be reviewed by CASAC. The so-called "streamlined" new NAAQS review process outlined by the "Back to Basics" memo precluded second reviews of the ISA and PA by CASAC and the public, missing the normal opportunity for inclusion of potentially significant new studies.

As an example of past practice, on December 14, 2012 EPA published its *Provisional Assessment Of Recent Studies On Health Effects Of Particulate Matter Exposure*. EPA noted at the time that the report "presents the findings of EPA's survey and provisional assessment of studies published since the completion of the 2009 PM ISA. EPA has screened and surveyed the recent literature and developed a provisional assessment that places those studies of potentially greatest relevance to the current PM NAAQS review in the context of the findings of the 2009 PM ISA." Such a thorough provisional assessment of peer-reviewed studies published too recently to be included in the December 2019 PM Integrated Science Assessment was not executed by EPA prior to finalization of the PM NAAQS proposal.

Moreover, given the continuing explosion of research on fine particles since the 1997 standards, recent PM proposals have announced and conducted "provisional assessment" of studies published after the cutoff date for the science (criteria) assessment, reflecting the Clean Air Act 108(a)(2) requirement that such assessments accurately reflect "the latest scientific knowledge." Though many relevant studies have been published since the January 2018 cutoff date, EPA ignored this step and its obligations under Clean Air Act section 108(a)(2). The Agency did not acknowledge this deviation from its past practice, much less provide a reasoned explanation for it. Further, by accepting CASAC's recommendation to consider a secondary reference on accountability studies that was published online in late 2019 and published in February 2020, EPA cannot now close the door to adding a number of important new studies that are far more relevant to the particulate matter NAAQS. A sample of important recent studies the Agency failed to adequately consider include:

**Abu Awad et al. 2019. Change In $PM_{2.5}$ Exposure And Mortality Among Medicare Recipients. Environmental Epidemiology 3:e054. http://journals.lww.com/01984727-201908000-00002**

Investigators examined $PM_{2.5}$ changes for over 12 million U.S. Medicare beneficiaries, who moved to a new zip code. The investigators conclude that "This study provides evidence of likely causal effects at concentrations below current limits of $PM_{2.5}$."

**Higbee, Joshua D., Jacob S. Lefler, Richard T. Burnett, Majid Ezzati, Julian D. Marshall, Sun-Young Kim, Matthew Bechle, Allen L. Robinson, and C. Arden Pope. "Estimating Long-Term Pollution Exposure Effects through Inverse Probability Weighting Methods with Cox Proportional Hazards Models:" *Environmental Epidemiology* 4, no. 2 (April 2020): e085. https://doi.org/10.1097/EE9.0000000000000085.**

This study used inverse probability weighting based on propensity scores, to examine the relationship between $PM_{2.5}$, and total and cardiovascular mortality in a cohort of 635,000 US individuals in the NHIS database. Long-term air quality reflected a 17-year average (1999-2015). The analysis included multiple covariates as confounders. "Covariate-adjusted estimated

relative risks per 10 μg/m$^3$ increase in PM exposure were estimated to be 1.117 (1.083, 1.152) for all-cause mortality and 1.232 (95% CI: 1.174-1.292) for cardiopulmonary mortality." The investigators concluded that "These results provide evidence that long-term exposure to PM contributes to increased mortality risk in US adults and that the estimated effects are generally robust to modeling choices… Estimated confounding due to measured covariates appears minimal in the NHIS cohort, and various distributional assumptions have little bearing on the magnitude or standard errors of estimated causal associations."

**Qiu, Xinye, Kelvin C. Fong, Liuhua Shi, Stefania Papatheodorou, Qian Di, Allan Just, Anna Kosheleva, Carmen Messerlian, and Joel D. Schwartz. "Prenatal Exposure to Particulate Air Pollution and Gestational Age at Delivery in Massachusetts Neonates 2001–2015: A Perspective of Causal Modeling and Health Disparities."** ***Environmental Epidemiology*** **4, no. 5 (October 2020): e113. https://doi.org/10.1097/EE9.0000000000000113.**

The authors found that prenatal exposure to $PM_{2.5}$ in late pregnancy reduced gestational age at delivery among Massachusetts neonates, especially among preterm/early-term births, male neonates, and neonates of younger and African American mothers. Importantly, low-exposure analyses yielded similar results, restricting to areas with $PM_{2.5}$ levels under US ambient annual standard of 12 μg/m$^3$.

**Rhee, Jongeun, Francesca Dominici, Antonella Zanobetti, Joel Schwartz, Yun Wang, Qian Di, John Balmes, and David C Christiani. "Impact of Long-Term Exposures to Ambient PM2. 5 and Ozone on ARDS Risk for Older Adults in the United States." Chest 156, no. 1 (2019): 71–79. https://doi.org/10.1016/j.chest.2019.03.017**

This observational study was conducted to estimate air pollution exposures at the ZIP code level and hospital admissions with ARDS among US Medicare beneficiaries aged ≥65 years from 2000 to 2012. There were a total of 1.16 million hospital admissions with ARDS in the cohort. Increases of 1 μg/m$^3$ in annual average PM2.5 were associated with increases in annual hospital admission rates for ARDS of 0.72% (95% CI, 0.62-0.82). In low-pollution regions (annual average PM2.5 level < 12 μg/m$^3$), the same annual increase in PM2.5 was associated with increases in annual hospital admission rates for ARDS of 1.50% (95% CI, 1.27-1.72).

**Schwartz et al., 2018. Estimating The Effects Of $PM_{2.5}$ On Life Expectancy Using Causal Modeling Methods. Environ Health Perspect 126:127002. https://ehp.niehs.nih.gov/doi/10.1289/EHP3130**

This study used propensity score causal modeling that analyzed directly the effect of $PM_{2.5}$ on life expectancy for nearly 17 million Medicare beneficiaries in the Northeast and Mid-Atlantic states. Investigators found that "estimated mean age at death for a population with an annual average $PM_{2.5}$ exposure of 12 μg/m$^3$ was 0.89 years less (95% CI: 0.88-0.91) than estimated for a counterfactual $PM_{2.5}$ exposure of 7.5 μg/m$^3$."

**Shi, Liuhua, Xiao Wu, Mahdieh Danesh Yazdi, Danielle Braun, Yara Abu Awad, Yaguang Wei, Pengfei Liu, et al. "Long-Term Effects of PM2.5 on Neurological Disorders in the American Medicare Population: A Longitudinal Cohort Study."** ***The Lancet Planetary***

***Health* 4, no. 12 (December 2020): e557–65. https://doi.org/10.1016/S2542-5196(20)30227-8.**

Authors conducted longitudinal cohort study in which they constructed a population-based nationwide open cohort including all fee-for-service Medicare beneficiaries (aged ≥65 years) in the contiguous United States (2000–16) with no exclusions. They reported that, for each 5 μg/m$^3$ increase in annual PM2·5 concentrations, the hazard ratio was 1.13 (95% CI 1.12–1.14) for first hospital admission for Parkinson's disease and 1.13 (1.12–1.14) for first hospital admission for Alzheimer's disease and related dementias. The mean $PM_{2.5}$ concentration for the whole cohort was 9.7 µg/m$^3$.

**Wei, Yaguang, Yan Wang, Xiao Wu, Qian Di, Liuhua Shi, Petros Koutrakis, Antonella Zanobetti, Francesca Dominici, and Joel Schwartz. "Causal Effects of Air Pollution on Mortality in Massachusetts." *American Journal of Epidemiology*, June 19, 2020. https://doi.org/10.1093/aje/kwaa098.**

Authors assessed causal associations of long- and short-term $PM_{2.5}$, O3, and NO2 exposures with all-cause mortality among Medicare beneficiaries in Massachusetts, 2000–2012. Per 10 million person-days, each 1 µg/m$^3$ increase in long- and short-term $PM_{2.5}$ levels was associated with 35.4 (95% CI: 33.4, 37.6) and 3.04 (95% CI: 2.17, 3.94) excess deaths, respectively. The authors indicate that within their study, air pollution was causally associated with mortality, even at levels below national standards. The mean long-term $PM_{2.5}$ level was 9.0 µg/m$^3$ and ranged from a minimum of 3.3 µg/m$^3$ to maximum of 16.4 µg/m$^3$. The mean long-term $PM_{2.5}$ level was 8.9 µg/m$^3$ and ranged from a minimum of 0.1 µg/m$^3$ to maximum of 65.3 µg/m$^3$.

**Wu et al., 2019. Causal Inference In The Context Of An Error Prone Exposure: Air Pollution And Mortality. Ann Appl Stat 13(1):520-547. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6812524/**

Authors estimated the causal effect of long-term exposure to $PM_{2.5}$ on mortality in New England Medicare beneficiaries for the period from 2000 to 2012. They found that exposure to moderate levels of $PM_{2.5}$ (8 -10 µg/m$^3$) caused a 2.8% (95% CI: 0.6%-3.6%) increase in all-cause mortality compared to low exposure ($PM_{2.5} \leq 8$ µg/m$^3$)." Although not evaluating reductions, this study using advanced causal methods, found a substantial increase in mortality risk when comparing $PM_{2.5}$ concentrations below 8 µg/m$^3$ and "higher" concentrations in a range between 8 and 10 µg/m$^3$.

**Wu, X., D. Braun, J. Schwartz, M. A. Kioumourtzoglou, and F. Dominici. "Evaluating the Impact of Long-Term Exposure to Fine Particulate Matter on Mortality among the Elderly." *Science Advances* 6, no. 29 (July 2020): eaba5692. https://doi.org/10.1126/sciadv.aba5692.**

Analyzing 68.5 million Medicare enrollees over 16 years, the authors provide strong evidence of the causal link between long-term $PM_{2.5}$ exposure and mortality under a set of causal inference assumptions. Using five distinct approaches, investigators found that a decrease in $PM_{2.5}$ (by 10 micrograms per cubic meter) leads to a statistically significant 6 to 7% decrease in mortality risk. Based on these models, lowering the air quality standard to 10 micrograms per cubic meter

would save 143,257 lives (95% CI: 115,581-170,645) in one decade. The study provides the most comprehensive evidence to date of the link between long-term $PM_{2.5}$ exposure and mortality, even at levels below current standards.

**Wu, X, RC Nethery, MB Sabath, D Braun, and F Dominici. "Air Pollution and COVID-19 Mortality in the United States: Strengths and Limitations of an Ecological Regression Analysis."** ***Science Advances*** **6, no. 45 (2020): eabd4049.**
**https://advances.sciencemag.org/content/6/45/eabd4049**

This study is an ecological analysis analyzing the relationship between long-term $PM_{2.5}$ exposure and county-level COVID-19 mortality rates, using air pollution data from 2000-2016 and COVID-19 death rates through 18 June 2020. After adjusting for multiple confounding variables, investigators reported an increase of 1 $\mu g/m^3$ in the long-term average $PM_{2.5}$ was associated with a statistically significant 11% (95% CI: 6-17%) increase in the county's COVID-19 mortality rate. The average reported $PM_{2.5}$ level amongst the counties was 8.4 $\mu g/m^3$.

**Yitshak-Sade, Maayan, Rachel Nethery, Yara Abu Awad, Fabrizia Mealli, Francesca Dominici, Itai Kloog, and Antonella Zanobetti. "Lowering Air Pollution Levels in Massachusetts May Prevent Cardiovascular Hospital Admissions."** ***Journal of the American College of Cardiology*** **75, no. 20 (May 26, 2020): 2642–44.**
**https://doi.org/10.1016/j.jacc.2020.03.056.**

This study used a differences-in-differences method for Medicare deaths and $PM_{2.5}$ in the Northeast and Mid-Atlantic states, finding a significant association between $PM_{2.5}$ and mortality.

### B. EPA's Decision to Leave the PM NAAQS Unchanged is Inconsistent with Recent Executive Actions

The final PM NAAQS decision is also inconsistent with a number of recent executive actions on protecting public health and the environment, racial equity, and scientific integrity that were issued after the public comment period for this action. EPA should convene a proceeding to reconsider this action in order to determine where it may be inconsistent with both the statutory requirements of the CAA and the directions and policies discussed in these executive actions.

On January 20, 2021, President Biden issued Executive Order 13990, entitled *Protecting Public Health and the Environment by Restoring Science to Tackle the Climate Crisis*, which states that it is the Biden Administration's policy "to improve public health and protect our environment; to ensure access to clean air and water; . . . and to prioritize both environmental justice and the creation of the well-paying union jobs necessary to deliver on these goals." 86 Fed. Reg. at 7,037. Executive Order 13990 directs federal agencies "to immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the last 4 years that conflict with these important national objectives . . . ." *Id.* For actions inconsistent with these policies, "the heads of agencies shall . . . consider suspending, revising, or rescinding the agency actions." *Id.*

In addition to the relevant general policies and directions, Executive Order 13990 has important implications for this particular action because it revoked the Presidential Memorandum of April 12, 2018 (Promoting Domestic Manufacturing and Job Creation Policies and Procedures Relating to Implementation of Air Quality Standards). As discussed above, the PM NAAQS review process was influenced by the Back-to-Basics Memorandum put in place by Administrator Pruitt, which was supposed to "help EPA meet its statutory obligations consistent with . . . President Trump's Memorandum on Promoting Domestic Manufacturing and Job Creation- Policies and Procedures Relating to Implementation of Air Quality Standards." Back-to-Basics Memorandum at 2. The quick revocation of the Trump Memorandum suggests the principles outlined in the Back-to-Basics Memorandum, which is referenced in the final action and had a significant impact on the NAAQS review process, may not be consistent with the Biden Administration's policy priorities, and that the final decision should be reconsidered. In light of the new administration's focus on following the science and protecting public health and the environment, EPA should ensure that the NAAQS was done properly and without improper political interference with the science.

Similarly, Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, issued on January 27, 2021 also states that "[w]e must listen to science—and act. We must strengthen our clean air and water protections. We must hold polluters accountable for their actions. We must deliver environmental justice in communities all across America." 86 Fed. Reg. at 7622. Executive Order 14008 also requires that "Agencies shall make achieving environmental justice part of their missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities," 86 Fed. Reg. at 7629, and that it is the Administration's policy to "to secure environmental justice and spur economic opportunity for disadvantaged communities that have been historically marginalized and overburdened by pollution." *Id.* This final action fails to strengthen clean air protections despite compelling scientific evidence supporting a stronger standard.

On January 20, 2021, President Biden issued Executive Order 13985, entitled *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*, which requires that the head of each agency conduct an equity assessment reviewing programs and policies and submit a report on a number of issues, including "[w]hether new policies, regulations, or guidance documents may be necessary to advance equity in agency actions and programs." The disproportionate burden from air pollution placed on communities of color is well documented, and EPA acknowledges this to some degree in the final action, noting that the "ISA additionally notes that stratified analyses (i.e., analyses that directly compare PM-related health effects across groups) provide support for racial and ethnic differences in PM exposures and in PM-related health risk (U.S. EPA, 2019, section 12.5.4)," Fed. Reg. 82,703, and that based on those studies "the ISA concludes that '[t]here is strong evidence demonstrating that black and Hispanic populations, in particular, have higher PM exposures than non-Hispanic white populations' and that 'there is consistent evidence across multiple studies demonstrating an increase in risk for nonwhite populations' (U.S. EPA, 2019, p. 12-38)." 85 Fed. Reg. at 82,703. EPA admits that "in evaluating the primary PM standards, an important consideration is the potential for additional public health improvements in these populations." *Id.* Yet in the final action the Agency states that "EPA believes that this action does not have disproportionately

high and adverse human health or environmental effects on minority, low-income populations and/or indigenous peoples," 85 Fed. Reg. at 82,745, and fails to adequately address disparities in the health burden of air pollution. EPA should reconsider this action in order to achieve the goals of racial equity and environmental justice discussed in President Biden's Executive Orders.

This action is inconsistent with President Biden's Executive Orders because it fails to improve air quality and public health despite EPA's determination in the policy assessment that available scientific evidence calls into question the adequacy of the standards, particularly the annual standard for fine particulate matter. Rather than following the science, the previous administration chose to lean on specious arguments to ignore or devalue the significance of the available scientific research. Furthermore, this action has significant environmental justice implications, as the disproportionate risk to fenceline and frontline communities, particularly those with large populations of people of color, due to exposure to particulate matter pollution, is well established. This issue is one of the largest environmental justice concerns, and strengthening the NAAQS should be a priority to achieve the environmental justice and racial equity goals discussed in the Executive Orders. As discussed in section II.E, the robust scientific evidence and the conclusions in the Policy Assessment are indicative of a lack of an adequate (or perhaps any) margin of safety in the existing standard.

Furthermore, on January 27, 2021, President Biden issued the Memorandum on Restoring Trust in Government Through Scientific Integrity and Evidence-Based Policymaking, which states that "It is the policy of my Administration to make evidence-based decisions guided by the best available science and data. Scientific and technological information, data, and evidence are central to the development and iterative improvement of sound policies, and to the delivery of equitable programs, across every area of government." EPA's treatment of scientific evidence in this final action strongly suggests that the decision was not made based on the best available science and data, and instead the previous Administrator appears to have attacked and diminished the significance of the scientific evidence.

This final action has significant implications for public health, the environment, racial equity, and scientific integrity. In light of these executive actions and the new administration's priorities, EPA should swiftly reconsider this decision.

C. EPA's failure to properly include a margin of safety, especially for vulnerable populations, warrants Reconsideration

EPA has failed to explain how retaining the PM NAAQS protects vulnerable groups with an adequate margin of safety. The Proposal was devoid of any such discussion. The final rule makes a few bare mentions of the margin of safety, but fails to rationally explain how the existing standard provides an adequate margin of safety for anyone, much less sensitive populations, in view of the strengthened evidence that $PM_{2.5}$ exposure at levels the current standards allow results in adverse effects. S*ee* 85 Fed. Reg. at 82,717/3-18/1 (contending current standards have margin of safety by looking solely at epidemiologic studies that rely on ground-based monitoring exclusively); *see supra* Section II.B (explaining how EPA arbitrarily dismissed epidemiologic studies that used hybrid modeling approach). Notably, too, EPA fails to consider

how the uncontroverted finding that PM2.5 is a non-threshold pollutant combines with the strengthened evidence of PM2.5's indisputably adverse effects at levels at and below the current NAAQS, strongly supporting a strengthened NAAQS. In all these failures, EPA has violated the Act, and its decision merits reconsideration.

With respect to sensitive populations, numerous studies have identified major respiratory health risks to older Americans from $PM_{2.5}$ pollution at levels below the current NAAQS.[6] These risks are especially urgent as the previous decline in exposures to $PM_{2.5}$ appears to have levelled off, in part due to the increasing burden of wildfire smoke. There is substantial evidence in the record of mortality and cardiovascular effects in older adults.[7] There is strong evidence of PM-related cardiovascular effects in people with pre-existing cardiovascular disease.[8] Likewise, there is strong evidence of PM-related respiratory effects in people with pre-existing respiratory disease, particularly asthma.[9] In a study by Liu et al. (2017),[10] short-term exposure to wildfire-specific $PM_{2.5}$ was associated with heightened risk of respiratory diseases in the elderly population in the Western United States.

---

[6] DeFlorio-Barker, Stephanie, James Crooks, Jeanette Reyes, and Ana G. Rappold. 2019. "Cardiopulmonary Effects of Fine Particulate Matter Exposure among Older Adults, during Wildfire and Non-Wildfire Periods, in the United States 2008–2010." *Environmental Health Perspectives* 127 (3): 037006. https://doi.org/10.1289/EHP3860.
Pope, C. Arden, Jacob S. Lefler, Majid Ezzati, Joshua D. Higbee, Julian D. Marshall, Sun-Young Kim, Matthew Bechle, et al. 2019. "Mortality Risk and Fine Particulate Air Pollution in a Large, Representative Cohort of U.S. Adults." *Environmental Health Perspectives* 127 (7): 077007. https://doi.org/10.1289/EHP4438.
Rhee, Jongeun, Francesca Dominici, Antonella Zanobetti, Joel Schwartz, Yun Wang, Qian Di, John Balmes, and David C. Christiani. 2019. "Impact of Long-Term Exposures to Ambient PM2.5 and Ozone on ARDS Risk for Older Adults in the United States." *Chest* 156 (1): 71–79. https://doi.org/10.1016/j.chest.2019.03.017.
Woo, Bongki, Nicole Kravitz-Wirtz, Victoria Sass, Kyle Crowder, Samantha Teixeira, and David T. Takeuchi. 2019. "Residential Segregation and Racial/Ethnic Disparities in Ambient Air Pollution." Race and Social Problems 11 (1): 60–67. https://doi.org/10.1007/s12552-018-9254-0.
[7] ISA sections 11.1, 11.2, 6.1 and 6.2.
[8] ISA section 6.1.
[9] ISA section 5.1.
[10] Liu, Jia Coco, Ander Wilson, Loretta J. Mickley, Francesca Dominici, Keita Ebisu, Yun Wang, Melissa P. Sulprizio, et al. 2017. "Wildfire-Specific Fine Particulate Matter and Risk of Hospital Admissions in Urban and Rural Counties:" *Epidemiology* 28 (1): 77–85. https://doi.org/10.1097/EDE.0000000000000556.

Similarly, the implications of the retained standard to potentially exacerbate racial disparities in air pollution exposures[11],[12],[13],[14] are not addressed by the Administrator, despite evidence that racial minorities experience disproportionate air pollution burdens. Most dramatically, the seminal Medicare chronic mortality study (Di et al. 2017a) showed three times higher relative risk (hazard ratio) for Black populations compared to the general population (a hazard ratio of 1.21 per 10μg/$m^3$ increase in $PM_{2.5}$).[15] A study by Thind et al. (2019)[16] identified high air pollution exposures among African Americans from electricity generation. In that study, disparities by race/ethnicity were observed for each income category, indicating that the racial/ethnic differences hold even after accounting for differences in income.[17]

The ISA notes specifically that analyses that directly compare PM-related health effects across groups -- i.e. stratified analyses -- indicate that minority populations have higher PM2.5 exposures than white populations, contributing to adverse health risk in non-white populations.[18] Coupled with the fact that multiple epidemiologic studies show adverse effects -- including premature mortality -- in many areas of the country with air quality allowed by the current NAAQS, it is evident, as the Policy Assessment finds, that the groups at increased risk "represent a substantial portion of the total U.S. population." Policy Assessment at 3-44. The final rule notes these studies in the ISA, yet entirely ignores all of these issues -- the Administrator literally does not discuss them. 85 Fed. Reg. at 82,703. This is antithetical to both evidence of record, and to the protective and precautionary requirements of section 109(d) of the Act. Specifically, the

---

[11] Mikati, Ihab, Adam F. Benson, Thomas J. Luben, Jason D. Sacks, and Jennifer Richmond-Bryant. 2018. "Disparities in Distribution of Particulate Matter Emission Sources by Race and Poverty Status." American Journal of Public Health 108 (4): 480–85. https://doi.org/10.2105/AJPH.2017.304297.
[12] Tessum, Christopher W., Joshua S. Apte, Andrew L. Goodkind, Nicholas Z. Muller, Kimberley A. Mullins, David A. Paolella, Stephen Polasky, et al. 2019. "Inequity in Consumption of Goods and Services Adds to Racial–Ethnic Disparities in Air Pollution Exposure." Proceedings of the National Academy of Sciences 116 (13): 6001–6. https://doi.org/10.1073/pnas.1818859116.
[13] Kravitz-Wirtz, Nicole, Kyle Crowder, Anjum Hajat, and Victoria Sass. 2016. "The Long-Term Dynamics of Racial/Ethnic Inequality in Neighborhood Air Pollution Exposure, 1990-2009." Du Bois Review: Social Science Research on Race 13 (2): 237–59.
[14] Parker, Jennifer D., Nataliya Kravets, and Ambarish Vaidyanathan. 2018. "Particulate Matter Air Pollution Exposure and Heart Disease Mortality Risks by Race and Ethnicity in the United States: 1997 to 2009 National Health Interview Survey With Mortality Follow-Up Through 2011." Circulation 137 (16): 1688–97. https://doi.org/10.1161/CIRCULATIONAHA.117.029376.
[15] IPMRP Advice, at B-12.
[16] Thind, Maninder P. S., Christopher W. Tessum, Inês L. Azevedo, and Julian D. Marshall. 2019. "Fine Particulate Air Pollution from Electricity Generation in the US: Health Impacts by Race, Income, and Geography." Environmental Science & Technology 53 (23): 14010–19. https://doi.org/10.1021/acs.est.9b02527.
[17] ISA section 11.
[18] ISA section 12.5.4.

"Administrator cannot fulfill [their] responsibility under the Clean Air Act to establish NAAQS 'requisite to protect the public health,'" if they do not "describe[] the standard under which" they have "arrived at this conclusion, supported by a 'plausible' explanation." *Am. Lung Ass'n v. E.P.A.*, 134 F.3d 388, 392 (D.C. Cir. 1998). In addition, the Response to Comments document directly acknowledges these disproportionate impacts, noting that "to the extent that the public health burden of PM air pollution is disproportionately affecting minority or low-income populations, reaching attainment with existing standards will effectively reduce that disparity." RTC, at 41. This entirely misses the point of the margin of safety mandate of the Act, and underscores that the Agency should swiftly grant reconsideration.

D. EPA Failed to Assess Environmental Justice Impacts

Compounding the error of disregarding the Act's requirements to provide requisite protection and adequate margin of safety to susceptible sub-populations, the final rule also ignores the significant inequities and environmental justice impacts resulting from the inadequate standard. While the final rule claims the action maintains the status quo and thus has no environmental justice implications, the disproportionate impacts of particle pollution are well-established and founded in EPA's own record. EPA's review documents note that there is "strong evidence for racial and ethnic differences in $PM_{2.5}$ exposures and in $PM_{2.5}$-related health risk. Such analyses indicate that minority populations such as Hispanic and non-Hispanic black populations have higher $PM_{2.5}$ exposures than non-Hispanic white populations, thus contributing to adverse health risk in non-white populations" (U.S. EPA, 2019, section 12.5.4). Likewise, a 2018 study by EPA scientists published in the American Journal of Public Health found that "Non-White populations overall experienced 1.28 times the burden of the general population, and Black populations, specifically, experienced the greatest degree of disparity in the siting of PM emitting facilities at national, state, and county levels, burdened with 1.54 times the PM emissions faced by the general population."[19]

While nearly half of all Americans breathe unhealthy air on a daily basis, disadvantaged communities and communities of color suffer disproportionately. EPA's most recent literature review of the science related to the health and welfare effects of particle pollution concluded that nonwhites, particularly Blacks, are at a greater risk for health impacts from fine particles, as are low socioeconomic populations. ISA at 12-31 to 12-38. African Americans and Hispanics tend to live in places where they are exposed to greater levels of air pollution.[20] And numerous studies

---

[19] Ihab Mikati et al., Disparities in Distribution of Particulate Matter Emission Sources by Race and Poverty Status https://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2017.304297?journalCode=ajph& (April, 2018).

[20] Nardone A, Casey JA, Morello-Frosch R, Mujahid M, Balmes JR, Thakur N. "Associations between historical residential redlining and current age-adjusted rates of emergency department visits due to asthma across eight cities in California: an ecological study." Lancet Planet Health. 2020:4(1):e24-e31; Miranda ML, Edwards SE, Keating MH, Paul CJ. "Making the environmental justice grade: The relative burden of air pollution exposure in the United States." Int J Environ Res Public Health. 2011; 8: 1755-1771; Ihab Mikati, Adam F. Benson, Thomas J.

have found that Hispanics, Asians, and especially Blacks have a higher risk of premature death from particle pollution than whites do.[21] The largest examination of particle pollution-related mortality nationwide found that low socioeconomic status consistently increased the risk of premature death from fine particulate pollution.[22] And the risk of dying and likelihood for asthma increase in populations with higher unemployment, higher use of public transportation and among people eligible for Medicaid.[23]

EPA also squarely acknowledges that the 2011 PM NAAQS review, which the agency now draws on heavily, made certain adjustments to the standard based on disproportionate effects on certain disadvantaged populations, including on the issue of spatial averaging. 85 Fed. Reg. at 24,104 ("An analysis of air quality and population demographic information indicated that the highest $PM_{2.5}$ concentrations in a given area tended to be measured at monitors in locations where the surrounding populations were more likely to live below the poverty line and to include larger percentages of racial and ethnic minorities (U.S. EPA, 2011, p. 2–60).") As the D.C. Circuit explained, in upholding the elimination of spatial averaging, "spatial averaging would enable some portions of a compliance area – particularly those areas where sensitive individuals are likely to live – to exceed the NAAQS for periods of time . . . EPA reasonably concluded that allowing those excess emissions under all the circumstances here was inconsistent with EPA's goal of ensuring that the NAAQS provides requisite protection for all individuals."[24] But the Agency has undertaken no similar effort during the 2020 review to update aspects of the standard based on similar continuing dipartites.

---

Luben, Jason D. Sacks, Jennifer Richmond-Bryant, "Disparities in Distribution of Particulate Matter Emission Sources by Race and Poverty Status", American Journal of Public Health 108, no. 4 (April 1, 2018): pp. 480-485, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5844406/.

[21] Kioumourtzoglou MA, Schwartz J, James P, Dominici F, Zanobetti A. PM2.5 and mortality in 207 US cities: Modification by temperature and city characteristics. Epidemiology, 2016; 27: 221-227. Di Q, et al, Air Pollution and Mortality in the Medicare Population. N Engl J Med, 2017; 376:2513-2522.

[22] Zeger, Scott L., Francesca Dominici, Aidan McDermott, and Jonathan M. Samet. "Mortality in the Medicare population and chronic exposure to fine particulate air pollution in urban centers (2000–2005)." Environmental Health Perspectives 116, no. 12 (2008): 1614-1619. See above noting that Di et al. (2017a) showed chronic mortality risk three times higher for African Americans. The study, as noted above, involved air quality distributions allowed by the current NAAQS.

[23] Bell ML, Dominici F. Effect modification by community characteristics on the short-term effects of ozone exposure and mortality in 98 US communities. Am J Epidemiol. 2008; 167: 986-997. Wang Y, Kloog I, Coul BA, Kosheleva A, Zanobetti A, Schwartz JD. Estimating causal effects of long-term PM2.5 exposure on mortality in New Jersey. Environ Health Perspect. 2016; 124: 1182-1188. O'Lenick, CR et al. Assessment of neighbourhood-level socioeconomic status as a modifier of air pollution-asthma associations among children in Atlanta. J Epi Comm Health. 2017:71(2):129-136; Strickland MJ, et al. Modification of the effect of ambient air pollution on pediatric asthma emergency visits: susceptible subpopulations, Epidemiology. 2014; 25: 843-850

[24] *Nat'l Ass'n of Mfrs.v. EPA*, 750 F. 3d 921, 925 (D.C. Cir. 2014) (Kavanaugh, J.).

Notwithstanding the Agency's attempt to characterize the rule as merely maintaining the status quo, and in addition to obligations mentioned above under the new executive mandates, the studies contained in EPA's own record are sufficient to trigger EPA's responsibility under E.O. 12,898, to assess whether health harms from maintaining the current PM standard are disproportionately borne by vulnerable communities and, if so, how EPA should address this disparity. As clearly prescribed by the Clean Air Act: the standards must be revised to provide requisite protection to this susceptible subpopulation. EPA's failure to do so is a violation of its legal requirement under E.O. 12,898 review.

Likewise, EPA has not considered the emerging literature on the association between exposures to $PM_{2.5}$ and risk of more severe adverse COVID-19 health impacts. As noted in section II, recent peer-reviewed science suggests, at the county level, a possible association between long-term exposure to $PM_{2.5}$ and statistically significant increases in COVID-19 death rates. Wu et al. (2020)[25] reported an increase of 1 $\mu g/m^3$ in the long-term average $PM_{2.5}$ was associated with a statistically significant 11% (95% CI: 6-17%) increase in the county's COVID-19 mortality rate. The average reported $PM_{2.5}$ level amongst the counties analyzed in that study was 8.4 $\mu g/m^3$. Prior to the pandemic, researchers also identified a statistically significant link between long-term PM2.5 exposure levels (in a restricted analysis to areas with levels below the current NAAQS) and risk of acute respiratory distress syndrome in older adults.[26] Because low-income communities and communities of color are more likely to experience higher long-term $PM_{2.5}$ pollution burdens,[27] they may also be suffering disproportionate mortality burden of COVID-19 due to lung disease and respiratory distress inflicted by chronic exposure to $PM_{2.5}$ air pollution.

## III. EPA Should Grant Swift Reconsideration on the Secondary Standard

EPA should also grant reconsideration of the secondary standard because the Biden Administration's recent Executive Order to deliver environmental justice in program implementation, which became available after the comment period closed, confirms that it is necessary for EPA to replace the methodology it used to assess visibility impairment.[28] The peer-reviewed scientific report published by Malm et al. in 2019 presented a new methodology that uses the "visual range" and scene viewed by the public and thus would include all views,

[25] Wu, X, RC Nethery, MB Sabath, D Braun, and F Dominici. "Air Pollution and COVID-19 Mortality in the United States: Strengths and Limitations of an Ecological Regression Analysis." *Science Advances* 6, no. 45 (2020): eabd4049.

[26] Rhee, Jongeun, Francesca Dominici, Antonella Zanobetti, Joel Schwartz, Yun Wang, Qian Di, John Balmes, and David C Christiani. "Impact of Long-Term Exposures to Ambient PM2. 5 and Ozone on ARDS Risk for Older Adults in the United States." Chest 156, no. 1 (2019): 71–79. https://doi.org/10.1016/j.chest.2019.03.017

[27] Colmer, Jonathan, Ian Hardman, Jay Shimshack, and John Voorheis. "Disparities in PM2.5 Air Pollution in the United States." Science 369, no. 6503 (July 31, 2020): 575–78. https://doi.org/10.1126/science.aaz9353.

[28] Executive Order on Tackling the Climate Crisis at Home and Abroad, § 201 (Jan. 27, 2021) (noting the Administration's commitment to "deliver[ing] environmental justice").

including the urban and rural views of minority and low-income populations.[29] Additionally, the new methodology is far superior and a more consistent predictor of "acceptable" visibility in comparison to the current one-size-fits-all approach, which relies on atmospheric extinction, and does not take into consideration what the public views.

EPA must consider the Malm et al. study because, as it acknowledged in its final action, "[t]he meta-analysis by Malm et al. (2019) was published after the cutoff date for the literature search for the ISA, and therefore, was not included in the ISA." *Id.* at 82,739. EPA only "provisionally considered" the study and, without considering the recent EO, reached the arbitrary—and confusing—conclusion that it "did not materially change the *broad* scientific conclusions of the ISA regarding welfare effects, including visibility impairment." *Id.* (emphasis added). EPA decided that it would wait five years until "the next review of the PM NAAQS" to consider the new, more inclusive methodology. *Id.* This cannot be permitted. Given the relevance and importance of the study, EPA should grant reconsideration and reassess PM's visibility impacts based on the methodology of Malm et al. (2019).

The importance of good visual air quality is well documented. Studies show that the inability to see and appreciate landscape features that reflect some sort of natural setting evokes feelings of anxiety and stress, and also result in an increased number of sick days and increasing post-operative recovery time.[30] Other studies demonstrate that emergency calls for psychiatric disturbances have increased as visual air quality decreased.[31] Studies have also reported reduced altruism and increased hostility and aggression during periods of poor air quality.[32] Finally, the importance of visual air quality includes the sky, as it has been found that clouds have positive effects on feelings of well-being.[33]

People regularly spend time viewing their surroundings whether outside or in an office setting. Visibility-acceptability studies clearly show that visibility becomes less acceptable to people as haze increases. However, there are large variations in the preference levels for different scenes when haze indicators, such as atmospheric extinction (the current approach), visual range (the Malm, *et al.*, methodology), or deciview are used to express visibility conditions. This demonstrates the importance and need of revising the indicator used in the secondary standard so that it reflects and protects the welfare of all members of the public.

EPA's evaluation of the secondary visibility standard found that the primary PM2.5 standard is protective of urban visibility. This assessment was arbitrarily based on a haze threshold derived from the Washington, D.C. acceptability study with a relatively near scene. Had a more distant scene been used in the Washington, D.C. study, or thresholds derived from other acceptability studies been used, it is likely the primary standard would *not* have been found

---

[29] Malm, William C et al. (2019), "Which Visibility Indicators Best Represent a Population's Preference for a Level of Visual Air Quality?" *Journal of the Air & Waste Management Association* 169(2):145-61, https://doi.org/10.1080/10962247.2018.1506370.
[30] Velarde et al. (2007)
[31] Rotton and Frey (1982)
[32] Cunningham, 1979; Jones and Bogat, 1978; Rotton et al., 1979.
[33] Stefani et al. (2012).

sufficiently protective of urban visibility. EPA should grant reconsideration in order to undertake this analysis and ensure that public welfare is adequately protected.

## IV. Conclusion

For the above reasons, Petitioners request that EPA swiftly conduct reconsideration proceedings and stay the effectiveness of the Rule during reconsideration for 90 days.

Sincerely,

**AMERICAN LUNG ASSOCIATION,**
**CLEAN AIR TASK FORCE,**
**CHESAPEAKE BAY FOUNDATION,**
**EARTHJUSTICE,**
**ENVIRONMENT AMERICA,**
**ENVIRONMENTAL DEFENSE FUND,**
**ENVIRONMENTAL LAW & POLICY CENTER,**
**NATIONAL PARKS CONSERVATION ASSOCIATION,**
**NATURAL RESOURCES DEFENSE COUNCIL,**
**SIERRA CLUB,**
**UNION OF CONCERNED SCIENTISTS**

**Index of Scientific Studies included in Footnote Citations**


1. Bell ML, Dominici F. Effect modification by community characteristics on the short-term effects of ozone exposure and mortality in 98 US communities. Am J Epidemiol. 2008; 167: 986-997.

2. Colmer, Jonathan, Ian Hardman, Jay Shimshack, and John Voorheis. "Disparities in PM2.5 Air Pollution in the United States." Science 369, no. 6503 (July 31, 2020): 575–78. https://doi.org/10.1126/science.aaz9353.

3. Cunningham, M. R. (1979). Weather, mood, and helping behavior: Quasi experiments with the sunshine samaritan. Journal of personality and social psychology, 37(11), 1947.

4. Email from E. L. Hodsen Marten to Nicole Hagan, et al. regarding EO12866 review: PM NAAQS. Docket EPA-HQ-OAR-2015-0072, available at: https://beta.regulations.gov/document/EPA-HQ-OAR-2015-0072-1229

5. DeFlorio-Barker, Stephanie, James Crooks, Jeanette Reyes, and Ana G. Rappold. 2019. "Cardiopulmonary Effects of Fine Particulate Matter Exposure among Older Adults, during Wildfire and Non-Wildfire Periods, in the United States 2008–2010." *Environmental Health Perspectives* 127 (3): 037006. https://doi.org/10.1289/EHP3860.

6. Di Q, et al, Air Pollution and Mortality in the Medicare Population. N Engl J Med, 2017; 376:2513-2522.

7. Jones, J. W., & Bogat, G. A. (1978). Air pollution and human aggression. Psychological Reports, 43(3), 721-722.

8. Kioumourtzoglou MA, Schwartz J, James P, Dominici F, Zanobetti A. PM2.5 and mortality in 207 US cities: Modification by temperature and city characteristics. Epidemiology, 2016; 27: 221-227.

9. Liu, Jia Coco, Ander Wilson, Loretta J. Mickley, Francesca Dominici, Keita Ebisu, Yun Wang, Melissa P. Sulprizio, et al. 2017. "Wildfire-Specific Fine Particulate Matter and Risk of Hospital Admissions in Urban and Rural Counties:" *Epidemiology* 28 (1): 77–85. https://doi.org/10.1097/EDE.0000000000000556.

10. Malm, William C et al. (2019), "Which Visibility Indicators Best Represent a Population's Preference for a Level of Visual Air Quality?" *Journal of the Air & Waste Management Association* 169(2):145-61, https://doi.org/10.1080/10962247.2018.1506370.

11. Mikati, Ihab, Adam F. Benson, Thomas J. Luben, Jason D. Sacks, and Jennifer Richmond-Bryant. 2018. "Disparities in Distribution of Particulate Matter Emission Sources by Race and Poverty Status." American Journal of Public Health 108 (4): 480–85. https://doi.org/10.2105/AJPH.2017.304297.

12. Miranda ML, Edwards SE, Keating MH, Paul CJ. "Making the environmental justice grade: The relative burden of air pollution exposure in the United States." Int J Environ Res Public Health. 2011; 8: 1755-1771

13. Nardone A, Casey JA, Morello-Frosch R, Mujahid M, Balmes JR, Thakur N. "Associations between historical residential redlining and current age-adjusted rates of emergency department visits due to asthma across eight cities in California: an ecological study." Lancet Planet Health. 2020:4(1):e24-e31

14. O'Lenick, CR et al. Assessment of neighbourhood-level socioeconomic status as a modifier of air pollution-asthma associations among children in Atlanta. J Epi Comm Health. 2017:71(2):129-136.

15. Parker, Jennifer D., Nataliya Kravets, and Ambarish Vaidyanathan. 2018. "Particulate Matter Air Pollution Exposure and Heart Disease Mortality Risks by Race and Ethnicity in the United States: 1997 to 2009 National Health Interview Survey With Mortality Follow-Up Through 2011." Circulation 137 (16): 1688–97. https://doi.org/10.1161/CIRCULATIONAHA.117.029376.

16. Pope, C. Arden, Jacob S. Lefler, Majid Ezzati, Joshua D. Higbee, Julian D. Marshall, Sun-Young Kim, Matthew Bechle, et al. 2019. "Mortality Risk and Fine Particulate Air Pollution in a Large, Representative Cohort of U.S. Adults." *Environmental Health Perspectives* 127 (7): 077007. https://doi.org/10.1289/EHP4438.

17. Rhee, Jongeun, Francesca Dominici, Antonella Zanobetti, Joel Schwartz, Yun Wang, Qian Di, John Balmes, and David C. Christiani. 2019. "Impact of Long-Term Exposures to Ambient PM2.5 and Ozone on ARDS Risk for Older Adults in the United States." *Chest* 156 (1): 71–79. https://doi.org/10.1016/j.chest.2019.03.017.

18. Rotton, J., & Frey, J. (1982). Air Pollution, Weather and Psychiatric Emergencies: A Constructive Replication. In *American Psychological Association Convention (Washington, DC: 1982)*.

19. Rotton, J., Frey, J., Barry, T., Milligan, M., & Fitzpatrick, M. (1979). The Air Pollution Experience and Physical Aggression 1. *Journal of Applied Social Psychology*, *9*(5), 397-412.

20. Stefani, O., Bues, M., Pross, A., Mebben, S., Westner, P., Dudel, H., & Rudolph, H. (2012). Moving clouds on a virtual sky affect well-being and subjective tiredness positively. *Proceedings of CIE Lighting Quality and Energy Efficiency, Hangzhou, China*, 19-21.

21. Strickland MJ, et al. Modification of the effect of ambient air pollution on pediatric asthma emergency visits: susceptible subpopulations, Epidemiology. 2014; 25: 843-850

22. Tessum, Christopher W., Joshua S. Apte, Andrew L. Goodkind, Nicholas Z. Muller, Kimberley A. Mullins, David A. Paolella, Stephen Polasky, et al. 2019. "Inequity in

Consumption of Goods and Services Adds to Racial–Ethnic Disparities in Air Pollution Exposure.” Proceedings of the National Academy of Sciences 116 (13): 6001–6. https://doi.org/10.1073/pnas.1818859116.

23. Thind, Maninder P. S., Christopher W. Tessum, Inês L. Azevedo, and Julian D. Marshall. 2019. “Fine Particulate Air Pollution from Electricity Generation in the US: Health Impacts by Race, Income, and Geography.” Environmental Science & Technology 53 (23): 14010–19. https://doi.org/10.1021/acs.est.9b02527.

24. Velarde, M. D., Fry, G., & Tveit, M. (2007). Health effects of viewing landscapes–Landscape types in environmental psychology. *Urban Forestry & Urban Greening*, *6*(4), 199-212.

25. Wang Y, Kloog I, Coul BA, Kosheleva A, Zanobetti A, Schwartz JD. Estimating causal effects of long-term PM2.5 exposure on mortality in New Jersey. Environ Health Perspect. 2016; 124: 1182-1188.

26. Woo, Bongki, Nicole Kravitz-Wirtz, Victoria Sass, Kyle Crowder, Samantha Teixeira, and David T. Takeuchi. 2019. “Residential Segregation and Racial/Ethnic Disparities in Ambient Air Pollution.” Race and Social Problems 11 (1): 60–67. https://doi.org/10.1007/s12552-018-9254-0.

27. Zeger, Scott L., Francesca Dominici, Aidan McDermott, and Jonathan M. Samet. "Mortality in the Medicare population and chronic exposure to fine particulate air pollution in urban centers (2000–2005)." Environmental Health Perspectives 116, no. 12 (2008): 1614-1619.

An official website of the United States government.

EPA United States Environmental Protection Agency

# News Releases from Headquarters › Air and Radiation (OAR)

# EPA to Reexamine Health Standards for Harmful Soot that Previous Administration Left Unchanged

06/10/2021

Contact Information:
EPA Press Office (press@epa.gov)

**WASHINGTON** (June 10, 2021) — Today, EPA announced that it will reconsider the previous administration's decision to retain the particulate matter (PM) National Ambient Air Quality Standards (NAAQS), which were last strengthened in 2012. EPA is reconsidering the December 2020 decision because available scientific evidence and technical information indicate that the current standards may not be adequate to protect public health and welfare, as required by the Clean Air Act.

"The most vulnerable among us are most at risk from exposure to particulate matter, and that's why it's so important we take a hard look at these standards that haven't been updated in nine years," **said EPA Administrator Michael S. Regan.** "EPA is committed to ensuring this review, and other upcoming NAAQS reviews, reflect the latest science and public health data."

The strong body of scientific evidence shows that long- and short-term exposures to fine particles (PM2.5) can harm people's health, leading to heart attacks, asthma attacks, and premature death. Large segments of the U.S. population, including children, people with heart or lung conditions, and people of color, are at risk of health effects from PM2.5. In addition, a number of recent studies have examined relationships between COVID and air pollutants, including PM, and potential health implications. While some PM is emitted directly from sources such as construction sites, unpaved roads, fields, smokestacks or fires, most particles form in the atmosphere as a result of complex reactions of chemicals such as sulfur dioxide and nitrogen oxides, which are pollutants emitted from power plants, industrial facilities and vehicles.

EPA's 2020 Policy Assessment concluded that the scientific evidence and information support revising the level of the annual standard for the PM NAAQS to below the current level of 12 micrograms per cubic meter while retaining the 24-hour standard. The agency also received numerous petitions for reconsideration as well as lawsuits challenging the December 2020 final action.

EPA will move expeditiously to reconsider the decision to retain the particulate matter NAAQS, in a manner that adheres to rigorous standards of scientific integrity and provides ample opportunities for public input and engagement. As part of this process, the agency will develop a supplement to the 2019 Final Integrated Science Assessment (ISA) that will take into account the most up-to-date science, including new studies in the emerging area of COVID-related research.

This supplement will be reviewed at a public meeting by the chartered Clean Air Scientific Advisory Committee (CASAC), supported by a particulate matter review panel of scientific experts on the health and welfare impacts of PM. The CASAC and the PM panel will also review a revised policy assessment and formulate advice to the Administrator. As with all reviews, the public will have opportunities to comment on these documents during the CASAC review process, as well as to provide input during the rulemaking through the public comment process and public hearings on any proposed decision.

EPA expects to issue a proposed rulemaking in Summer 2022 and a final rule in Spring 2023, following an open, transparent process with opportunities for public review and comment. In accordance with Executive Orders and guidance, the agency will be considering environmental justice during the rulemaking process.

For more information on the NAAQS review process and documents related to prior PM NAAQS reviews, visit https://www.epa.gov/naaqs/particulate-matter-pm-air-quality-standards

LAST UPDATED ON JUNE 10, 2021

An official website of the United States government.

EPA United States Environmental Protection Agency

# News Releases from Headquarters › Office of the Administrator (AO) › Office of Policy (OP)

# EPA Announces Selections of Charter Members to the Clean Air Scientific Advisory Committee

## Concurrently, EPA issues a call for nominations for the CASAC Particulate Matter Panel

06/17/2021

Contact Information:
EPA Press Office (press@epa.gov)

**WASHINGTON** (June 18, 2021) – Today, U.S. Environmental Protection Agency (EPA) Administrator Michael S. Regan announced his selections for membership of the Clean Air Scientific Advisory Committee (CASAC). The committee will be comprised of five women and two men, including three people of color, making it the most diverse panel since the committee was established. The Administrator's selections are well-qualified experts with a cross-section of scientific disciplines and experience needed to provide advice on the scientific and technical bases for the National Ambient Air Quality Standards (NAAQS).

"From the very beginning of my tenure, I have committed to ensuring that science is restored as the backbone of everything EPA does to protect people and the environment from pollution," **said EPA Administrator Michael S. Regan.** "The new Chartered CASAC—along with the support of pollutant-specific panels—will provide credible, independent expertise to EPA's reviews of air quality standards that is grounded in scientific evidence."

The membership solicitation, evaluation, and selection of these members used the agency's time-tested, fair, and transparent process—correcting for process irregularities made in recent years. Following the EPA's request for nominations to the committee in March 2021, significant public interest resulted in 100 candidates seeking membership on the CASAC. The new members include four prior members of the committee, including two members selected by the previous administration.

EPA will also publish a Federal Register Notice soliciting nomination of experts for the CASAC Particulate Matter Panel, which will support the Chartered CASAC in providing advice on the Agency's reconsideration of the particulate

matter NAAQS.

Administrator Regan made the following selections to the Chartered CASAC:

**Dr. Elizabeth A. (Lianne) Sheppard**, Chair, is a professor in the Departments of Environmental and Occupational Health Sciences, and Biostatistics at the University of Washington. She has also been named Rohm and Haas Professor in Public Health Sciences (effective July 1, 2021). She has expertise and experience in epidemiology, biostatistics, and exposure assessment. Dr. Sheppard is also a former Chartered CASAC member (2015-2018).

**Dr. Michelle Bell** is Mary E. Pinchot Professor of Environmental Health at the Yale University School of the Environment. She has expertise and experience in epidemiology, biostatistics, and environmental engineering. Dr. Bell is also a member of the National Academy of Medicine.

**Dr. James Boylan** is the Assistant Branch Chief in the Air Protection Branch of the Environmental Protection Division of the Georgia Department of Natural Resources. He has expertise and experience in air quality modeling and monitoring. Dr. Boylan is also a former Chartered CASAC member (2017-2020; 2020-2021).

**Dr. Judith C. Chow** is Nazir and Mary Ansari Chair in Science and Entrepreneurialism and a research professor in the Division of Atmospheric Sciences at the Desert Research Institute. She has expertise and experience in air quality, air quality monitoring, and environmental engineering. Dr. Chow is also a former Chartered CASAC member (2015-2018).

**Dr. Mark W. Frampton** is Professor Emeritus in Medicine in the Pulmonary and Critical Care Division of the University of Rochester Medical Center. He is a physician and has expertise and experience in respiratory medicine and inhalation toxicology. Dr. Frampton is also a former Chartered CASAC member (2018-2021).

**Dr. Christina H. Fuller** is Associate Professor of Environmental Health at Georgia State University. She has expertise and experience in epidemiology, exposure assessment, and health disparities.

**Dr. Alexandra Ponette-González** is Associate Professor of Geography and the Environment at the University of North Texas. She has expertise and experience in ecology and ecosystem effects of air pollution.

LAST UPDATED ON JUNE 21, 2021

An official website of the United States government.

# News Releases from Headquarters

## Administrator Regan Directs EPA to Reset Critical Science-Focused Federal Advisory Committees

## Past administration actions hindered the recruitment and retention of members for the Science Advisory Board and the Clean Air Scientific Advisory Committee

03/31/2021

Contact Information:
Press Office (press@epa.gov)

**WASHINGTON (MARCH 31, 2021)** - Today, U.S. Environmental Protection Agency (EPA) Administrator Michael S. Regan announced his decision to reestablish the membership of the Science Advisory Board (SAB) and the Clean Air Scientific Advisory Committee (CASAC), and reorient the SAB standing committees. EPA staff is now tasked with reconfiguring the independent committees in a way that returns the agency to its standard process of incorporating a balanced group of experts.

"Scientific integrity is one of EPA's foundational values - and as Administrator, I am committed to ensuring that every decision we make meets rigorous scientific standards," **said EPA Administrator Michael S. Regan**. "Resetting these two scientific advisory committees will ensure the agency receives the best possible scientific insight to support our work to protect human health and the environment. Today we return to a time-tested, fair, and transparent process for soliciting membership to these critically important advisory bodies."

Administrator Regan's decision to reset these federal advisory committees emphasizes the importance of the SAB and the CASAC to EPA's mission of protecting human health and the environment, and seeks to reverse deficiencies caused by decisions made in recent years. These actions include:

- An internal October 2017 directive that prevented qualified academics and non-government officials who received EPA research grants from concurrently serving on EPA advisory committees, significantly restricting member eligibility. (The portion of the directive pertaining to EPA grants

was vacated and remanded in April 2020 by the U.S. District Court for the Southern District of New York);

- Eliminating key air pollution review panels that have augmented the CASAC for decades; and,
- Not following the standard process for appointing committee members, as noted in a July 2019 Government Accountability Office report on EPA Advisory Committees.

These process irregularities led Administrator Regan to direct the SAB staff office to initiate the release of current members of the SAB and the CASAC, to reconstitute, restore and create new committees to better address EPA priorities, and to augment both the SAB and CASAC with specialized panels. Federal Register notices were published today to solicit nominations from all qualified experts in a variety of disciplines to the SAB, the SAB standing committees, and the CASAC.

EPA is grateful for the dedicated service of its current members and encourages all who are interested to reapply for consideration.

The SAB was established in 1978 by the Environmental Research, Development and Demonstration Authorization Act to provide independent advice to the Administrator on scientific and technical matters underlying the Agency's major policies and actions. The CASAC was established in 1977 under the Clean Air Act Amendments of 1977 and provides independent advice to the EPA Administrator on the technical bases for EPA's National Ambient Air Quality Standards.

For more information about the membership application, and the nomination and selection process, visit https://www.epa.gov/sab.

View the SAB Federal Register notices soliciting committee nominees (PDF).

View the CASAC Federal Register notices soliciting committee nominees (PDF).

LAST UPDATED ON APRIL 1, 2021

Original Research

ENVIRONMENTAL EPIDEMIOLOGY

OPEN

# Impact of long-term temporal trends in fine particulate matter ($PM_{2.5}$) on associations of annual $PM_{2.5}$ exposure and mortality

## *An analysis of over 20 million Medicare beneficiaries*

Ki-Do Eum*[a], Helen H. Suh[a], Vivian Chit Pun[b], Justin Manjourides[c]

Downloaded from http://journals.lww.com/environepidem by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0hCywCX1AWnYQp/IlQrHD3i3D0OdRyi7TvSFl4Cf3VC1y0abggQZXdgGj2MwlZLeI= on 02/09/2021

**Abstract**

Decreasing ambient fine particulate matter ($PM_{2.5}$) concentrations over time together with increasing life expectancy raise concerns about temporal confounding of associations between $PM_{2.5}$ and mortality. To address this issue, we examined $PM_{2.5}$-associated mortality risk ratios (MRRs) estimated for approximately 20,000,000 US Medicare beneficiaries, who lived within six miles of an Environmental Protection Agency air quality monitoring site, between December 2000 and December 2012. We assessed temporal confounding by examining whether $PM_{2.5}$-associated MRRs vary by study period length. We then evaluated three approaches to control for temporal confounding: (1) assessing exposures using the residual of $PM_{2.5}$ regressed on time; (2) adding a penalized spline term for time to the health model; and (3) including a term that describes temporal variability in $PM_{2.5}$ into the health model, with this term estimated using decomposition approaches. We found a 10 μg/m³ increase in $PM_{2.5}$ exposure to be associated with a 1.20 times (95% confidence interval [CI] = 1.20, 1.21) higher risk of mortality across the 13-year study period, with the magnitude of the association decreasing with shorter study periods. MRRs remained statistically significant but were attenuated when models adjusted for long-term time trends in $PM_{2.5}$. The residual-based, time-adjusted MRR equaled 1.12 (95% CI = 1.11, 1.12) per 10 μg/m³ for the 13-year study period and did not change when shorter study periods were examined. Spline- and decomposition-based approaches produced similar but less-stable MRRs. Our findings suggest that epidemiological studies of long-term $PM_{2.5}$ can be confounded by long-term time trends, and this confounding can be controlled using the residuals of $PM_{2.5}$ regressed on time.

**Keywords:** Medicare beneficiaries; Residual; Temporal confounding; Mortality; Fine particulate matter ($PM_{2.5}$)

## Introduction

Over the last 2 decades, ambient air pollution concentrations have decreased steadily across the United States primarily as the result of emissions controls instituted as part of the Clean Air Act Amendments. In the United States, $PM_{2.5}$, annual concentrations have dropped by 24% from 2001 to 2010, with 2010 mean concentrations ranging, by location, between 3 and 18 μg/m³.[1] These lower concentrations are projected to result in substantial health benefits. A 2011 US Environmental Protection Agency report, e.g., estimated that the Clean Air Act Amendments will prevent 230,000 early deaths in 2020, with most early deaths attributable to reductions in ambient $PM_{2.5}$.[1]

Despite these reductions, $PM_{2.5}$ concentrations continue to be linked with adverse health impacts.[2–6] Numerous multicity studies, including the American Cancer Society, Six Cities, Women's Health Initiative, Nurses' Health Study, and National Institutes of Health-American Association of Retired Persons (NIH-AARP) Diet and Health Cohort, have shown positive associations between long-term exposure and mortality.[2–7] The observed associations in these studies vary widely, with null associations in Health Professionals Follow-Up Study prospective cohort[8] and significant effect estimates ranging from a 3% increase (per 10 μg/m³ in $PM_{2.5}$) in the NIH-AARP cohort[7] to 26% in Nurses' Health Study.[9] Variability in effect sizes has been attributed to differences in cohort characteristics, $PM_{2.5}$ composition, modeling approaches, and confounding by correlated air pollutants or unmeasured covariates.[10–13]

Another possible, but little studied, explanation for the variation in $PM_{2.5}$-associated mortality risks is confounding by long-term time trends in both $PM_{2.5}$ and mortality, where decline in ambient $PM_{2.5}$ concentrations is accompanied by increased life expectancy. Several studies provide evidence of the impact of long-term time trends on $PM_{2.5}$-associated mortality.[14] In a simulation study, Griffin et al[15] showed that the length of the study period may adversely affect the performance of the Cox proportional hazards model, increasing bias and mean and squared error (MSE) and reducing power as the strength of the linear association between exposure and time increases, as may occur with the temporal trends observed for $PM_{2.5}$. Similarly, linear models may also produce biased effect estimate, if linear trends exist between both $PM_{2.5}$ and time, and mortality and time. Consistent with this, Janes et al,[16] Greven et al,[17] and Pun et al[18] found evidence of

[a]Department of Civil and Environmental Engineering, Tufts University, Medford, MA; [b]Jockey Club School of Public Health and Primary Care, The Chinese University of Hong Kong, Sha Tin, Hong Kong; and [c]Department of Health Sciences, Bouvé College of Health Sciences, Northeastern University, Boston, MA.

Sponsorships or competing interests that may be relevant to content are disclosed at the end of the article.

*Corresponding author. Address: Department of Civil and Environmental Engineering, Tufts University, 200 College Avenue, Anderson Hall, Medford, MA. E-mail address: kido.eum@tufts.edu (K.-D. Eum).

SDC Supplemental digital content is available through direct URL citations in the HTML and PDF versions of this article (www.epidem.com).

Copyright © 2017 The Authors. Published by Wolters Kluwer Health, Inc. on behalf of Environmental Epidemiology. All rights reserved. This is an open-access article distributed under the terms of the Creative Commons Attribution-Non Commercial-No Derivatives License 4.0, where it is permissible to download and share the work provided it is properly cited. The work cannot be changed in any way or used commercially.

Environmental Epidemiology (2018) 2:e009

Received: 27 November 2017; Accepted 6 February 2018

Published online 24 April 2018

DOI: 10.1097/EE9.0000000000000009



Copyright © 2018 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

unmeasured confounding of the association of $PM_{2.5}$ and all-cause mortality. They did so by decomposing $PM_{2.5}$ into two orthogonal components describing temporal and spatiotemporal variability, which they term "global" and "local" $PM_{2.5}$, respectively. When both terms were included in the health model, the coefficient for temporal $PM_{2.5}$ was larger and statistically significant compared with the spatiotemporal coefficient, which was null. The unequal temporal and spatiotemporal coefficients led the authors to conclude that $PM_{2.5}$ associations with mortality were confounded by unmeasured variables, such as long-term time trends.

To examine the possibility that temporal confounding is present in the mortality and $PM_{2.5}$ relationship, we analyzed data for over 20 million Medicare enrollees from 2000 to 2012 to assess the impact of long-term time trends on the association between 1-year–averaged $PM_{2.5}$ concentrations and mortality.

## Methods

The protocol was reviewed and approved by the Institutional Review Boards of Northeastern University.

### Medicare beneficiary and mortality data

We obtained monthly mortality counts for 2000–2012 in the United States (except for Alaska and Hawaii) using data from the Centers for Medicare and Medicaid Services Medicare enrollment file, which provides demographic (age and sex), ZIP code of residence, and survival, including date of death and data for all Medicare enrollees (≥65 years).

### $PM_{2.5}$ exposure

We compiled daily $PM_{2.5}$ concentrations from Environmental Protection Agency's Air Quality System from 2000 to 2012. We did so for monitoring sites ("site") with daily measurements for at least eight calendar years, with each year having 9+ months with 4+ daily measurements. For the 798 sites that met these criteria, we calculated long-term concentrations following Greven et al.[17] Briefly, we smoothed the time series at each site using a linear regression with the daily pollutant values as the response, and thin plate splines of time with four degrees of freedom per year as the predictor. For gaps longer than 90 days, we smoothed the $PM_{2.5}$ time series before and after each gap separately. We used the predicted daily values to calculate yearly moving averages for $PM_{2.5}$ each month. Yearly averages were considered valid when 350+ days were available. Sites were classified based on their geographical region: "East" of the Mississippi River, "Center" between the Mississippi River and the Sierra Nevada mountain range, and "West" of the Sierra Nevada mountain range.[17]

### Data linkage

We linked data for Medicare beneficiaries (65–120 years) to $PM_{2.5}$ monitors that met the study criteria for each month of the study, which restricted our sample to those beneficiaries living in ZIP codes with centroids within six miles of a valid monitor. We then linked data for beneficiaries living in these ZIP codes to the closest corresponding site's $PM_{2.5}$ concentration for the previous 12-month period ending in that study month. We performed the ZIP code identification and linkage by year to reduce exposure error introduced by residential moves and changes in ZIP code boundaries. For each month, we calculated the total number of Medicare beneficiaries at risk and the number of deaths associated with each site.

### Statistical analysis

All analyses were conducted for the entire study population living in the United States as well as separate analyses for Medicare beneficiaries living in each of three US regions (East, Central, and West). In general, we examined the variation in MRR estimates per 10 μg/m³ increase in exposure; although for analyses comparing MRRs for base to those for time-adjusted models, we make comparisons based on an interquartile range (IQR) increase in exposure given their different variabilities. We further present graphical summaries of this variation using linear regression. SAS statistical software package (SAS Institute Inc., Cary, NC, 2003) and R-Studio, Inc., (Boston, MA) were used for all analyses.

### Base models

To examine the association between $PM_{2.5}$ exposure and monthly rate of all-cause mortality, we fit an age-stratified log-linear model including offset terms for the size of the population at risk as our base model:

$$\log E\left(Y_{at}{}^{c}\right)=\log\left(h_0^c(a)\right)+\beta PM_t^c+\beta_c \text{BRFSS} \quad (1)$$

where $(Y_{at}{}^{c})$ is the number of deaths at time $t$, in age category $a$, associated with site C. The exposure measure $PM_t^c$ is the 1-year average $PM_{2.5}$ concentration at site $C$, preceding the month ($t$) of death. For each age group $a$ and site $C$, mortality counts are offset by both the baseline hazard of death, $h_0^c(a)$, and the total population at risk at time $t$, $N_{at}^c$. The Poisson model was selected (over the quasi-Poisson) as overdispersion parameter values varied from 1.02 to 1.25. To reduce the computational burden of this large dataset, we assumed a constant baseline hazard of death for all age groups above 90 years of age and models were fit via the backfitting algorithm.[17–19]

To adjust for potential, measured confounders, we performed additional analyses adjusting for county-level behavioral covariates from the Selected Metropolitan/Micropolitan Area Risk Trends of the Behavioral Risk Factor Surveillance System (BRFSS), including proportions of non-whites, current smokers, diabetes, asthma, individuals possessing health care plans, and mean income and body mass index.[20] $\beta_c$ is the vector of BRFSS adjustment variables. Because the BRFSS data are only available for 465 of the 798 sites with $PM_{2.5}$ monitoring data, we performed these analyses using the corresponding subset of the cohort. As appropriate, we converted results from previous studies into percent change per 10 μg/m³ $PM_{2.5}$ increase to compare with our results.[16–18] Additionally, we assessed whether unmeasured confounding of our base models remained by decomposing $PM_{2.5}$ into two orthogonal components that capture temporal and spatiotemporal variability, following methods described by Greven et al.[17] Briefly,

- The temporal component describes national trends in exposures by centering the average exposure nationally in month $t$, $\overline{PM_t}$, by the average concentration for all sites over the entire study period, $\overline{PM}$:

$$\text{Temporal} PM_t=\overline{PM_t}-\overline{PM}$$

- The spatiotemporal component describes site-specific temporal trends in exposure by centering the exposure in month $t$ at site $c$, $PM_t^C$, by the average exposure at site $c$, $\overline{PM_c}$, and the national trends, $(\overline{PM_t}-\overline{PM})$:

$$\text{Spation-temporal} PM_t^C=\left(\overline{PM_t^C}-\overline{PM_c}\right)-\left(\overline{PM_t}-\overline{PM}\right)$$

We included the temporal and spatiotemporal components jointly in our base models and compared their effect estimates, interpreting a difference in their estimates as evidence of unmeasured confounding.[17]

### Evaluation of temporal confounding

We evaluated long-term time trends as a potential source of unmeasured confounding. To do so, we ran our base models using data for the entire 13-year study period (2000–2012) and for shorter study periods, ranging between 3 and 12 years in


Copyright © 2018 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

length, with each of these study periods ending in 2012 (e.g., 2001–2012, 2002–2012, 2003–2012, etc., to 2009–2012). We compared mortality risk ratios (MRRs) for the entire 13-year period with those from each of these shorter study periods, assuming that in the absence of temporal confounding, MRRs would be uniform irrespective of the study period length.

In addition to fitting our base model, we also examined three approaches to control for long-term time trends in $PM_{2.5}$. In our first approach, we adjusted for long-term time trends in $PM_{2.5}$ using a new exposure measure calculated as the residual $r_t^c$ of the linear regression of $PM_{2.5}$ on time in 4-year intervals December 2000–2004, 2005–2008, and 2009–2012:

$$PM_t^c = \beta_0 + \beta_1 year_{2005-08} + \beta_2 year_{2009-12} + t_t^c$$

The term $r_t^c$ was subsequently used as the exposure measure in the log-linear model:

$$\log E(Y_{at}^c) = \log(h_0^c(a)) + \beta r_t^c \quad (2)$$

Our second approach adjusted for long-term time trends in $PM_{2.5}$ by adding a penalized spline term for time, $\delta^c(t)$, modeled as two knots per study year, to our base log-linear model:

$$\log E(Y_{at}^c) = \log(N_{at}^c) + \log(h_0^c(a)) + \beta_1 PM_t^c + \beta_2 \delta(t) \quad (3)$$

For our third approach, we included the temporal component of decomposed $PM_{2.5}$ into the base model as follows:

$$\log E(Y_{at}^c) = \log(N_{at}^c) + \log(h_0^c(a)) + \beta_1 PM_{2.5} + \beta_2 \text{Temporal} PM_t \quad (4)$$

where "temporal $PM_{2.5}$" was calculated by decomposing $PM_{2.5}$ into its orthogonal temporal and spatiotemporal components as above and in the study by Greven et al.[17]

For each of these time-adjusted approaches, we ran models using data for study periods ranging between 3 and 13 (2000–2012) years in length and examined whether MRRs varied by length of study period.

### *Sensitivity analyses*

We ran several sensitivity analyses to examine alternate specifications of our methods to adjust for long-term time trends in $PM_{2.5}$. Specifically, for the calculation of residuals for our residual-based approach, we adjusted for time as each year rather than for each 4-year interval as in our main analysis:

$$PM_t^c = \beta_0 + \beta_1 year_{2001} + \beta_2 year_{2002} + \cdots + \beta_{12} year_{2012} + r_{t_1}^c$$

as well as for years grouped into 2-, 3-, and 6-year intervals:

$$PM_t^c = \beta_0 + \beta_1 year_{2003-04} + \beta_2 year_{2005-06} + \cdots + \beta_5 year_{2011-12} + r_{t_2}^c$$

$$PM_t^c = \beta_0 + \beta_1 year_{2004-06} + \beta_2 year_{2007-09} + \beta_3 year_{2010-12} + r_{t_3}^c$$

$$PM_t^c = \beta_0 + \beta_1 year_{2007-12} + r_{t_6}^c$$

We subsequently used the residuals from these sensitivity analyses as exposure measures in our log-linear health models and compared their ability to control for confounding by time trends. Additionally, we assessed our ability to account for long-term time trends using penalized splines for time calculated using three, four, or five knots instead of the two knots used in our main analysis.

## Results

We examined 20.7 million Medicare enrollees, observing 5.5 million deaths between December 2000 and December 2012 near 798 sites across the contiguous United States (Table 1). Monthly, our analyses include on average over 9 million enrollees. $PM_{2.5}$ concentrations varied regionally, with sites located in the East having the highest mean concentrations. Yearly $PM_{2.5}$ concentrations decreased steadily during our study period (Figure 1), with larger decreases in the East and West as compared to Center. Declines in $PM_{2.5}$ concentrations were steepest between 2000 and 2009, with yearly concentrations more uniform during 2010–2012. The correlation between $PM_{2.5}$ and the residual-based exposure measure equaled 0.92, suggesting that this residual-based exposure measure explained most of the variation in $PM_{2.5}$.

### *Association of $PM_{2.5}$ and mortality*

#### *Base models*

We found that a 10 μg/m³ increase in 1-year $PM_{2.5}$ is significantly associated with a 1.20 times (95% CI = 1.20, 1.21 per 10 μg/m³) higher rate of mortality in our Medicare cohort when data from 2000 to 2012 were analyzed (Table 2). Associations varied by geographic region, with MRRs higher in the Central (1.27; 95% CI = 1.26, 1.28) and Eastern (1.26; 95% CI = 1.25, 1.26) regions compared with the Western United States (1.12; 95% CI = 1.11, 1.12). Associations were similar when models additionally adjust for behavioral covariates (Table S1; http://links.lww.com/EE/A4), suggesting that behavioral covariates did not confound associations of $PM_{2.5}$ and mortality.

Despite this, we showed potential confounding of the association of $PM_{2.5}$ and mortality by unmeasured variables. When $PM_{2.5}$ is decomposed into its spatiotemporal and temporal components, we estimated larger MRRs for the temporal as compared to spatiotemporal component of $PM_{2.5}$ (Table S1; http://links.lww.com/EE/A4) for both base and BRFSS-adjusted models, consistent with the previous study.[17] In base models, e.g., a 10 μg/m³ increase in temporal $PM_{2.5}$ corresponded to a 1.54 times (95% CI = 1.52, 1.56) higher rate of mortality, while spatiotemporal $PM_{2.5}$ was associated with only a 1.07 times (95% CI = 1.06, 1.09) higher rate.

**Table 1**

**Descriptive statistics of all-cause mortality for the period of December 2000 to December 2012.[a]**

| Variable | West | Center | East | United States |
|---|---|---|---|---|
| No. monitors[a] | 93 | 195 | 510 | 798 |
| 1-year $PM_{2.5}$ (μg/m³)[b] | 11.46 (4.57) | 9.87 (2.37) | 12.33 (2.68) | 11.65 (3.09) |
| No. Medicare enrollees[a] | | | | |
| Total | 3,931,203 | 3,112,854 | 13,832,532 | 20,744,214 |
| By month[b] | 1,739,901 (140,871) | 1,254,360 (123,762) | 6,062,825 (378,173) | 9,057,086 (609,378) |
| No. deaths | | | | |
| Total | 976,007 | 769,092 | 3,739,848 | 5,484,947 |
| By month[b] | 6,731 (703) | 5,304 (705) | 25,792 (2,409) | 37,827 (3,711) |

[a]Monitors include those with 8+ calendar years of data, each having 10+ months with 4+ valid measurements. All beneficiaries living in ZIP codes with centroids within 6 miles of a monitor were included in the analysis.

[b]Values are means (SD).



Copyright © 2018 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.




**Figure 1.** One-year average $PM_{2.5}$ concentrations: December 2000 to December 2012.

### *Evaluation of temporal confounding*

We showed $PM_{2.5}$-associated MRRs increase with the length of the study, consistent with the hypothesis of confounding by long-term time trends in $PM_{2.5}$. MRRs were lowest for the 3-year study periods (1.12; 95% CI = 1.11, 1.14) and increase steadily with longer study periods, resulting in a 0.08 higher MRR for the 13-year as compared to 3-year study period (Figure 2). Similar trends between MRRs and length of study period were observed when analyses were performed by geographic region, although these trends were less pronounced in the Central United States, consistent with the more gradual decline in $PM_{2.5}$ concentrations in the Central Unites States over the 13-year period (Figure S1; http://links.lww.com/EE/A4).

When models were adjusted for long-term time trends, MRRs remain statistically significant (Table 2) but were slightly attenuated (Table S2; http://links.lww.com/EE/A4). For the residual-based approach, we found the MRR to equal 1.04 (95% CI = 1.04, 1.04) per IQR increase in time-adjusted $PM_{2.5}$, as compared to 1.08 (95% CI = 1.08, 1.08) per IQR increase in the base model. MRRs estimated from the penalized spline- and decomposition-based approaches were also attenuated, with MRRs of 1.01 (95% CI = 1.01, 1.02) and 1.03 (95% CI = 1.02, 1.03) per IQR increase, respectively (Table S2; http://links.lww.com/EE/A4). While consistently lower, MRRs for each of the time-adjusted approaches follow the same regional patterns as with the base models, as time-adjusted MRRs were highest in the Central United States and lowest in the Western United States (Table 2; Figures S2–S4; http://links.lww.com/EE/A4).

When analyses were performed across varying study periods, we demonstrated that the residual-based approach produces MRRs that are nearly uniform (Figure 2). The residual-based MRRs for the 13- and 3-year study periods, e.g., were almost identical, with MRRs of 1.12 (95% CI = 1.11, 1.12) and 1.12 (95% CI = 1.11, 1.14) for a 10 µg/m$^3$ increase in exposure, respectively. In contrast to both the base and residual-based models, MRRs for the spline- and decomposition-based approaches decrease with longer study periods. MRRs from the spline-based approach decrease from 1.09 (95% CI = 1.07, 1.10) for 3-year study period to 1.03 (95% CI = 1.02, 1.04) for 13-year study period. The decomposition-based approach shows a similar decline in MRRs, with MRRs for 3- and 13-year study periods equaling 1.11 (95% CI = 0.10, 1.12) and 1.06 (95% CI = 1.06, 1.07), respectively.

### *Sensitivity analyses*

Sensitivity analyses demonstrated that alternate calculations of residual-based $PM_{2.5}$ exposures and of penalized splines produce similar MRRs. Residual-based exposures calculated by regressing $PM_{2.5}$ concentrations on time as 1-, 2-, or 3-year intervals result in similar MRRs as models controlling for time in 4-year intervals (Figure 3). Residual-based exposure with 6-year intervals showed slightly higher and less-consistent MRRs for longer

**Table 2**

**MRRs (95% confidence intervals) per 10 µg/m³ increase in 1-year moving average $PM_{2.5}$[a] for base and time-adjusted models: 2000–2012.**

| | | | Time-adjusted models | | |
|---|---|---|---|---|---|
| **Region** | **Monitors** | **Base model[b]** | **Residual[c]** | **Penalized spline[d]** | **Decomposition[e]** |
| United States | 798 | 1.20 (1.20, 1.21) | 1.12 (1.11, 1.12) | 1.03 (1.02, 1.04) | 1.06 (1.06, 1.07) |
| West | 93 | 1.12 (1.11, 1.12) | 1.04 (1.04, 1.05) | 0.91 (0.90, 0.92) | 1.00 (1.00, 1.01) |
| Center | 195 | 1.27 (1.26, 1.28) | 1.20 (1.18, 1.21) | 1.15 (1.13, 1.17) | 1.18 (1.17, 1.19) |
| East | 510 | 1.26 (1.25, 1.26) | 1.16 (1.15, 1.16) | 1.14 (1.13, 1.15) | 1.11 (1.10, 1.11) |

[a]Exposures estimated as the 1-year moving average $PM_{2.5}$ exposures for all models except for the residual-based time-adjusted model; exposures for the residual-based model estimated as the 1-year moving average of the residuals of $PM_{2.5}$ regressed on year in 4-year intervals.
[b]Log-linear models adjusted for age and regions; all $P < 0.001$.
[c]Model adjusted for long-term time trends in $PM_{2.5}$ using a new exposure measure based on the residuals of $PM_{2.5}$ regressed on year in 4-year intervals.
[d]Model adjusted for long-term time trends in $PM_{2.5}$ by adding a penalized spline term for time to the base model.
[e]Model adjusted for long-term time trends in $PM_{2.5}$ by adding a term that describes only temporal variation in $PM_{2.5}$, which was calculated by decomposing $PM_{2.5}$ into its temporal and spatiotemporal components following Greven et al.[17]


Copyright © 2018 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.




**Figure 2.** MRRs per 10 µg/m³ increase in $PM_{2.5}$ by length of study period: for base and time-adjusted models.

study periods, suggesting less reliability than with the other intervals. Residual-based exposures calculated using 4-year intervals, however, were more stable, as evidenced by lowest variation in MRRs across study period length. It is also notable that residual-based exposure using 4-year time intervals requires fewer parameters than 1-, 2-, or 3-year intervals, suggesting greater statistical efficiency. For spline-based models, increasing the number of knots per year from two to three or four had little effect on the MRR, thus we selected two knots for better efficiency (results not shown).

## Discussion

We showed consistent, statistically significant, and positive associations between 1-year $PM_{2.5}$ exposures and the rate of all-cause mortality among 20.7 million Medicare beneficiaries living across the United States from 2000 to 2012. In our base models, the mortality rate ratio associated with a 10 µg/m³ increase in 1-year average $PM_{2.5}$ equaled 1.20 (95% CI = 1.20, 1.21). Consistent with our hypothesis that long-term time trends in $PM_{2.5}$ positively confound the association between $PM_{2.5}$ and mortality, we found $PM_{2.5}$-associated rates of mortality to be associated with the length of the study period, with higher MRR per




**Figure 3.** MRRs per 10 µg/m³ increase in $PM_{2.5}$ by length of study period: residual-based model using different time intervals to control for temporal trends.

10 µg/m³ for 13-year as compared to 3-year study periods. Of the three examined approaches, we found the residual-based approach to best control for temporal confounding, as evidenced by its statistically significant and uniform MRRs across all study period lengths, with an MRR for the 3- and 13-year study period of 1.12 (95% CI = 1.11, 1.14) and 1.12 (95% CI = 1.11, 1.12) per 10 µg/m³ increase in exposure, respectively. Note, however, that based on our analysis alone, it is not possible to determine which approach is best suited to control for temporal confounding, indicating the need for further examination, possibly through a simulation study.

Our findings add to the body of evidence showing that long-term $PM_{2.5}$ exposures are associated with increased mortality,[2–7,9–13] lending additional support to findings from the American Cancer Society (ACS) cohort,[2] the Nurses' Health Study,[5] and the Medicare cohort.[4] Although no studies to date have explicitly examined the possible impact of temporal confounding on these associations, several studies have indirectly examined this possibility. In a study by Lepeule et al,[6] e.g., the original[21] and initial follow-up[22] of the Six Cities Study were extended to include 11 additional years of follow-up, comprising 36 years in total (1974–2009). MRRs were estimated for the entire 36-year study period and for four, equally divided 9-year time periods. While overall $PM_{2.5}$ concentrations decreased over the 36-year study period, this decrease was uniform neither by city nor over time. $PM_{2.5}$ concentrations exhibited strong downward trends over time in only the three most polluted cities—Steubenville, Kingston-Harriman, and St. Louis, with these trends steepest and most consistent between 1979 and 1992 and to a lesser extent 2000–2009. The authors found an overall MRR for all-cause mortality of 1.14 (95% CI = 1.07, 1.22) for a 10 µg/m³ increase in 1-year $PM_{2.5}$. When data for the four 9-year time periods were analyzed, MRRs varied widely, with values of 1.06 (95% CI = 0.96, 1.17) for 1974–1982, 1.32 (95% CI = 1.16, 1.50) for 1983–1991, 1.11 (95% CI = 0.98, 1.27) for 1992–2000, and 1.19 (95% CI = 0.91, 1.55) for 2001–2009. Notably, MRRs were highest during the period when temporal trends in $PM_{2.5}$ were strongest, providing some, albeit indirect, support for our findings of confounding by long-term temporal trends. The increased MRR for the last 9-year interval compared with the full 36-year MRR may reflect aging of the cohort.

Further support is provided by results from related studies by Janes et al,[16] Greven et al,[17] and Pun et al[18] who decomposed $PM_{2.5}$ into its temporal and spatiotemporal components and found higher and statistically significant MRRs for temporal as compared to spatiotemporal $PM_{2.5}$. The authors concluded that differences in the MRRs associated with temporal and spatiotemporal $PM_{2.5}$ reflected residual confounding by temporally varying covariates.



Copyright © 2018 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

Consistent with Greven et al,[17] additional adjustment for county-level BRFSS covariates did not reduce residual confounding, suggesting that the examined behavioral variables do not confound the $PM_{2.5}$ mortality association. This finding, however, differs from that reported by Pun et al,[18] who found that residual confounding decreased after adjustment for BRFSS covariates in models of $PM_{2.5}$ and mortality. This discrepancy likely results from the fact that the Pun et al[18] analysis assessed residual confounding by decomposing both $PM_{2.5}$ and BRFSS data into their temporal and spatiotemporal components, while we decomposed only $PM_{2.5}$ since our time-adjusted models already control indirectly for temporal trends in BRFSS data. Together, these results suggest that temporal trends in confounding variables are important to consider as well.

Our findings of increasing MRRs with longer study periods suggest that long-term temporal trends in $PM_{2.5}$ concentrations may be one source of this unmeasured confounding. We found residual-based exposures to successfully control for these time trends in $PM_{2.5}$. The ability of residual-based exposures to control for these time trends in $PM_{2.5}$ is consistent with previous studies.[23–25] For example, Mostofsky et al[25] used a residual-based approach to estimate the effect of $PM_{2.5}$ constituents while controlling for confounding by total amount of $PM_{2.5}$. To do so, they regressed each constituent of interest on the total $PM_{2.5}$ in a linear model and used the residual to estimate the effect of each individual constituent while holding $PM_{2.5}$ constant. This approach is similar to our residual-based exposure method, with the only difference being our focus on the effect of $PM_{2.5}$ while controlling for the unmeasured variables associated with long-term time trends. Because the unmeasured confounders are not perfectly correlated with time, complete control of time (through indicator functions for each month) would have likely over-adjusted for any potential confounding, as observed when the residual model was based on time controlled in 1-, 2-, and 3-year intervals. On the other hand, using a coarser measure of time (such as 6-year intervals) may not sufficiently control for the unmeasured variables, resulting in a lack of independence between time trends and both $PM_{2.5}$ and mortality. Our results suggest that the residual model controlling for time in 4-year intervals was able to provide MRR estimates that were least affected by study period length.

We found this residual-based method to perform better than the spline and decomposition approaches, both of which showed declining MRRs as study periods increased, suggesting that these methods over-controlled for long-term time trends. Further, by including terms for both $PM_{2.5}$ and some adjustment for time in the model, the spline- and decomposition-based approaches may result in biased effect estimates, given collinearities of $PM_{2.5}$ and time.[26] In our data, the correlations of $PM_{2.5}$ with both the spline of $PM_{2.5}$ and decomposed $PM_{2.5}$ varied with the length of study period, with correlations for $PM_{2.5}$ and the spline of $PM_{2.5}$ equaling 0.15 for 3-year periods and increasing to 0.44 for 12-year periods. Identical correlations were observed for $PM_{2.5}$ and decomposed $PM_{2.5}$. These results suggest that the bias in MRRs derived from the spline and decomposed $PM_{2.5}$ models increases as the study length increases.

Our results are limited by several factors. First, our log-linear models aggregated data by site and limited the number of strata for computational efficiency, thus limiting our ability to control for individual-level covariates. However, when we additionally adjusted for county-level behavioral covariates, we found similar MRRs, suggesting behavioral covariates did not confound associations (Table S1; http://links.lww.com/EE/A4). Second, individual exposure measurement error is unavoidable when using the monitor level air pollution data. This exposure error is likely to be small, given results from studies that show that $PM_{2.5}$ concentrations to be moderately uniform within a given county and ambient $PM_{2.5}$ concentrations to be strong surrogates for personal $PM_{2.5}$ exposure.[27] Thus, we expect any exposure error to bias observed associations toward the null and underestimate mortality risk estimates.[28] Third, although bias may also be introduced by the "healthy worker effect" where subjects less susceptible to $PM_{2.5}$ exposures remain in our study population for longer time periods, this bias would be in the opposite direction of the observed changes. Although our study could not examine the impact of temporal variation of $PM_{2.5}$ composition on MRRs, compositional variability is unlikely to explain our findings given the strong dependence of MRRs on $PM_{2.5}$ time trends and the inconsistent time trends in $PM_{2.5}$-associated total carbon concentrations between 2000 and 2010 in the United States.[29] Finally, while we found the residual model based on 4-year intervals to best control for temporal trends, further study, such as through a simulation study, is needed to confirm our findings.

## Summary

We found significant associations between 1-year $PM_{2.5}$ exposures and mortality. These associations were likely confounded by long-term temporal trends in $PM_{2.5}$. We successfully controlled for this confounding by using exposure measures based on the residual of $PM_{2.5}$ regressed on time in 4-year intervals. Controlling for long-term temporal $PM_{2.5}$ trends, we found significant 11.7% increase in all-cause mortality among Medicare beneficiaries for a 10 μg/m$^3$ increase in $PM_{2.5}$. This MRR was reduced compared to the model without controlling for the temporal confounding. These findings demonstrate the importance and need to account for temporal trends in future air pollution health effect studies.

## Conflicts of interest statement

The authors declare that they have no conflicts of interest with regard to the content of this report.

## References

1. US Environmental Protection Agency. *The Benefits and Costs of the Clean Air Act from 1990 to 2020: Final Report*. Washington, DC. 2011.
2. Pope CA 3rd, Burnett RT, Thun MJ, et al. Lung cancer, cardiopulmonary mortality, and long-term exposure to fine particulate air pollution. *JAMA*. 2002;287:1132–1141.
3. Miller KA, Siscovick DS, Sheppard L, et al. Long-term exposure to air pollution and incidence of cardiovascular events in women. *N Engl J Med*. 2007;356:447–458.
4. Eftim SE, Samet JM, Janes H, McDermott A, Dominici F. Fine particulate matter and mortality: a comparison of the six cities and American Cancer Society cohorts with a Medicare cohort. *Epidemiology*. 2008;19:209–216.
5. Puett RC, Hart JE, Yanosky JD, et al. Chronic fine and coarse particulate exposure, mortality, and coronary heart disease in the Nurses' Health Study. *Environ Health Perspect*. 2009;117:1697–1701.
6. Lepeule J, Laden F, Dockery D, Schwartz J. Chronic exposure to fine particles and mortality: an extended follow-up of the Harvard Six Cities Study from 1974 to 2009. *Environ Health Perspect*. 2012;120:965–970.
7. Thurston GD, Ahn J, Cromar KR, et al. Ambient particulate matter air pollution exposure and mortality in the NIH-AARP Diet and Health Cohort. *Environ Health Perspect*. 2015;124:484–490.
8. Puett RC, Hart JE, Suh H, Mittleman M, Laden F. Particulate matter exposures, mortality, and cardiovascular disease in the health professionals follow-up study. *Environ Health Perspect*. 2011;119:1130–1135.
9. Hoek G, Krishnan RM, Beelen R, et al. Long-term air pollution exposure and cardio-respiratory mortality: a review. *Environ Health*. 2013;12:43.
10. Zeger SL, Dominici F, McDermott A, Samet JM. Mortality in the Medicare population and chronic exposure to fine particulate air pollution in urban centers (2000–2005). *Environ Health Perspect*. 2008;116:1614–1619.
11. US Environmental Protection Agency. *Final Report: Integrated Science Assessment for Particulate Matter*. Washington, DC: Final Report; 2009.
12. Bell ML, Zanobetti A, Dominici F. Evidence on vulnerability and susceptibility to health risks associated with short-term exposure to particulate matter: a systematic review and meta-analysis. *Am J Epidemiol*. 2013;178:865–876.
13. Pope CA 3rd, Turner MC, Burnett RT, et al. Relationships between fine particulate air pollution, cardiometabolic disorders, and cardiovascular mortality. *Circ Res*. 2015;116:108–115.
14. Correia AW, Pope CA 3rd, Dockery DW, Wang Y, Ezzati M, Dominici F. Effect of air pollution control on life expectancy in the United States: an analysis of 545 U.S. counties for the period from 2000 to 2007. *Epidemiology*. 2013;24:23–31.



Copyright © 2018 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

15. Griffin BA, Anderson GL, Shih RA, Whitsel EA. Use of alternative time scales in Cox proportional hazard models: implications for time-varying environmental exposures. *Stat Med*. 2012;31:3320–3327.
16. Janes H, Dominici F, Zeger SL. Trends in air pollution and mortality: an approach to the assessment of unmeasured confounding. *Epidemiology*. 2007;18:416–423.
17. Greven S, Dominici F, Zeger S. An approach to the estimation of chronic air pollution effects using spatio-temporal information. *J Am Stat Assoc*. 2011;106:396–406.
18. Pun V, Kazemiparkouhi F, Manjourides J, Suh H. Long-term $PM_{2.5}$ exposure and respiratory, cancer, and cardiovascular mortality in older US adults. *Am J Epidemiol*. 2007;186:961–969.
19. Buja A, Hastie T, Tibshirani R. Linear smoothers and additive-models. *Ann Stat*. 1989;17:453–510.
20. Behavioral Risk Factor Surveillance System, Centers for Disease Control and Prevention. *SMART: BRFSS City and County Data and Documentation*. 2014. Updated 21 September 2016. http://www.cdc.gov/ brfss/smart/smart_data.htm. Accessed 20 June 2016.
21. Dockery DW, Pope CA 3rd, Xu X, et al. "An association between air pollution and mortality in six U.S. cities." *N Engl J Med*. 1993;329:1753–1759.
22. Laden F, Schwartz J, Speizer FE, Dockery DW. "Reduction in fine particulate air pollution and mortality: extended follow-up of the Harvard Six Cities Study." *Am J Respir Crit Care Med*. 2006;173:667–672.
23. Bell ML, Ebisu K, Leaderer BP, et al. "Associations of $PM_{2.5}$ constituents and sources with hospital admissions: analysis of four counties in Connecticut and Massachusetts (USA) for persons >/= 65 years of age." *Environ Health Perspect*. 2014;122:138–144.
24. Cavallari JM, Eisen EA, Fang SC, et al. "$PM_{2.5}$ metal exposures and nocturnal heart rate variability: a panel study of boilermaker construction workers." *Environ Health*. 2008;7:36.
25. Mostofsky E, Schwartz J, Coull BA, et al. "Modeling the association between particle constituents of air pollution and health outcomes." *Am J Epidemiol*. 2012;176:317–326.
26. Yoo W, Mayberry R, Bae S, Singh K, Peter He Q, Lillard JW Jr. "A study of effects of multicollinearity in the multivariable analysis." *Int J Appl Sci Technol*. 2014;4:9–19.
27. Samet JM, Zeger SL, Dominici F, et al. The national morbidity, mortality, and air pollution study. Part II: morbidity and mortality from air pollution in the United States. *Res Rep Health Eff Inst*. 2000;94(pt 2):5–70; discussion 71–79.
28. Kioumourtzoglou MA, Spiegelman D, Szpiro AA, et al. Exposure measurement error in $PM_{2.5}$ health effects studies: a pooled analysis of eight personal exposure validation studies. *Environ Health*. 2014;13:2.
29. Hand JL, Schichtel BA, Malm WC, Frank NH. Spatial and temporal trends in $PM_{2.5}$ organic and elemental carbon across the United States. *Adv Meteorol*. 2013;2013:1–13.



Copyright © 2018 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

# Journal Pre-proof




A National Difference in Differences Analysis of the Effect of $PM_{2.5}$ on Annual Death Rates

Joel Schwartz, Yaguang Wei, Ma'ayan Yitshak-Sade, Qian Di, Francesca Dominici, Antonella Zanobetti

PII: S0013-9351(20)31546-2

DOI: https://doi.org/10.1016/j.envres.2020.110649

Reference: YENRS 110649

To appear in: *Environmental Research*

Received Date: 10 November 2020

Revised Date: 16 December 2020

Accepted Date: 17 December 2020

Please cite this article as: Schwartz, J., Wei, Y., Yitshak-Sade, M.'a., Di, Q., Dominici, F., Zanobetti, A., A National Difference in Differences Analysis of the Effect of $PM_{2.5}$ on Annual Death Rates, *Environmental Research*, https://doi.org/10.1016/j.envres.2020.110649.

This is a PDF file of an article that has undergone enhancements after acceptance, such as the addition of a cover page and metadata, and formatting for readability, but it is not yet the definitive version of record. This version will undergo additional copyediting, typesetting and review before it is published in its final form, but we are providing this version to give early visibility of the article. Please note that, during the production process, errors may be discovered which could affect the content, and all legal disclaimers that apply to the journal pertain.

© 2020 Elsevier Inc. All rights reserved.

Journal Pre-proof

# A National Difference in Differences Analysis of the Effect of $PM_{2.5}$ on Annual Death Rates

Joel Schwartz[1,2], Yaguang Wei[1], Ma'ayan Yitshak-Sade[1,3], Qian Di[1,4], Francesca Dominici[5], Antonella Zanobetti[1]

1. Department of Environmental Health, Harvard TH Chan School of Public Health
2. Department of Epidemiology, Harvard TH Chan School of Public Health
3. Department of Environmental Medicine, Mount Sinai School of Medicine
4. Vanke School of Public Health, Tsinghua University, Beijing, China
5. Department of Biostatistics, Harvard TH Chan School of Public Health

Address communications to:

Joel Schwartz joel@hsph.harvard.edu. 401 Park Drive, Suite 404H, Boston MA 02215.

**Abstract**

Many studies have reported that $PM_{2.5}$ was associated with mortality, but these were criticized for unmeasured confounding, not using causal modeling, and not focusing on changes in exposure and mortality rates. Recent studies have used propensity scores, a causal modeling approach that requires the assumption of no unmeasured confounders.

We used differences in differences, a causal modeling approach that focuses on exposure changes, and controls for unmeasured confounders by design to analyze $PM_{2.5}$ and mortality in the U.S. Medicare population, with 623,036,820 person-years of follow-up, and 29,481,444 deaths. We expanded the approach by clustering ZIP codes into 32 groups based on racial, behavioral and socioeconomic characteristics, and analyzing each cluster separately. We controlled for multiple time varying confounders within each cluster. A separate analysis examined participants whose exposure was always below 12 μg/m$^3$.We found an increase of 1 μg/m$^3$ in $PM_{2.5}$ produced an increased risk of dying in that year of $3.85\times10^{-4}$ (95% CI 1.95 $\times10^{-4}$, 5.76 $\times10^{-4}$). This corresponds to 14,000 early deaths per year per 1 μg/m$^3$. When restricted to exposures below 12 μg/m$^3$, the increased mortality risk was 4.26 $\times10^{-4}$ (95% CI $1.43\times10^{-4}$, 7.09 $\times10^{-4}$). Using a causal modeling approach robust to omitted confounders, we found associations of $PM_{2.5}$ with increased death rates, including below U.S. and E.U. standards.

Key words: Air pollution, $PM_{2.5}$, causal, difference in differences, mortality

Authors contributions: JS conceived the approach, developed the methodology, and did the analysis and reviewed and edited the draft manuscript; YW wrote the first draft and prepared the data; MY-W helped with the programming, methodology and commented on the draft; FD obtained funding and the Medicare data; AZ obtained funding.

Funding: This study was funded by NIH grants ES000002 and ES024332, and U.S. EPA grant RD-83615601. The funders had no input into the design or conduct of the study.

Dr. Schwartz declares that he has testified as a health expert for the U.S. Department of Justice in a law suit over clean air act violations. No other authors have anything to declare.

This study was approved by the Human Subjects Committee of the Harvard School of Public Health.

1. Introduction

The Clean Air Act requires the US Environmental Protection Agency (EPA) to set National Ambient Air Quality Standards (NAAQS) to protect vulnerable populations with an adequate margin of safety. Many studies have reported associations of $PM_{2.5}$ and mortality and morbidity following long and short-term exposure(Abu Awad et al., 2019; Beelen et al., 2014; Crouse et al., 2015; Di et al., 2017; Hoek et al., 2013; Pinault et al., 2016; Pope et al., 2019; Vodonos et al., 2018). These were undertaken by many investigators with over 50 cohorts in the most recent $PM_{2.5}$ meta-analysis(Vodonos et al., 2018), and have resulted in EPA sequentially tightening the $PM_{2.5}$ standard. The global burden of disease ranks air pollution among the largest public health risks.

Recent studies have reported associations between $PM_{2.5}$ and mortality at concentrations below the 2012 U.S. EPA NAAQS or World Health Organization air quality guidelines(Di et al., 2017; Wang et al., 2016; Yang et al., 2012). However, some have criticized many of these studies for not using causal modeling approaches.

Causal modeling methods can aid in assessing causality. The general approach is to try to make an observational study closely mimic a randomized trial. In addition, causal methods provide marginal estimates of the effects of exposure, that do not depend on the distribution of the covariates in the study population(Imai and van Dyke, 2004). A common approach is to use propensity score matching or inverse probability weighting to make the exposure independent of all measured confounders(Baccini et al., 2017; Rubin, 1997). Recent studies have used that approach to examine the association of $PM_{2.5}$ with mortality, and provided robust findings(Abu Awad et al., 2019; Schwartz et al., 2018; Wei et al., 2020; Wu et al., 2020; Yitshak-Sade et al., 2019). However, propensity scores only control for measured confounders, and therefore do not address the

argument that there is unmeasured confounding. Hence it is important to complement that approach using methods that can address unmeasured confounders.

Approaches that control for unmeasured confounders by design include difference-in-differences (DID) analyses (Wang et al., 2016; Yitshak-Sade et al., 2019). In a classical DID model, the mean response is calculated for the exposed and non-exposed groups in pre-exposure and post-exposure periods. Since all slowly varying predictors of outcome such as socioeconomic status (SES), smoking, obesity, etc. are the same in each group in both periods, the difference between outcomes in the two periods in the exposed group cannot be confounded by those variables. The difference between pre-exposure and post-exposure periods in the unexposed group is a negative outcome control for the difference in the exposed group. It controls for changes in an outcome due to covariates that can change between periods similarly between the two locations. The difference in these pairs of differences is a causal estimate, assuming that no other exposure has affected the two groups differently over time(Donald and Lang, 2007). Because the DID approach examines the effect of changes in exposure (post vs pre periods) on change in outcome, it is precisely the type of study that EPA's CASAC says it prefers. The method has been generalized to look at more than two locations, more than two time periods, and continuous, time varying exposures(Wang et al., 2016). With multiple locations time-invariant omitted confounders are controlled using an indicator variable for each location. However, it still require the assumption that changes in mortality rates by year due to changing risk factors are common across locations. Here we simultaneously adopt two approaches to relax that assumption, and hence strengthen the evidence for causality. We apply them to assess whether changes in $PM_{2.5}$ are associated with changes in mortality rates in a national cohort of Medicare participants in the U.S. In addition, as

few previous cohort studies have controlled for temperature, we adjusted for mean warm season and mean cold season temperature.

## 2.0 Data and Methods

### 2.1 Medicare cohort

We obtained the Medicare beneficiary denominator file, which contains information on all Medicare participants in the U.S., from the Centers for Medicare and Medicaid Services(RESDAC, 2018). We followed all beneficiaries' ≥65 years in the contiguous U.S. from 2000 to 2016. Medicare insurance covers over 95% of the population ≥65 years of age in the United States. Medicare participants alive on January 1 of the year following their enrollment in Medicare entered the open cohort, and follow-up periods were calendar years. For the DID analysis, we computed an annual mortality rate in each ZIP code, in each group stratified by age (>84 or not), sex, race, and Medicaid coverage. This study was approved by the human subjects committee at the Harvard T. H. Chan School of Public Health.

### 2.2 Covariates

From the Medicare denominator file for each calendar year, we obtained the age, sex, race, ZIP code of residence for that year, eligibility for Medicaid for that year, and date of death (or censoring) of each participant. Age, ZIP code, and Medicaid eligibility were updated annually. This file is publicly available from the Centers for Medicare and Medicaid Services(RESDAC, 2018).

We obtained small area–level social, economic, and housing characteristic variables from the U.S. Census Bureau 2000 and 2010 Census Summary File 3(Bureau, 2010) at the ZIP code tabulation–area level (ZCTA) and the American Household Survey for each year after 2010. These included percent of people ≥ 65 living in poverty, median household income, median house value, percent

of owner occupied homes, percent black, percent Hispanic, population density, and education. We updated these variables for missing years by linearly extrapolating between the measured years. In addition, the county-level percentage of people who ever smoked and their mean body mass index (BMI) were obtained from the CDC Behavioral Risk Factor Surveillance survey(CDC, 2013) , which were then assigned to each ZCTA within the county and updated each year. From the Dartmouth Health Atlas, we obtained percentage of Medicare participants who had a hemoglobin A1c test, a low-density lipoprotein cholesterol (LDLC) test, a mammogram, an eye exam, and a visit to an annual checkup for each year in each hospital catchment area and assigned it to all ZCTAs in that area(Wennberg and Cooper, 1996). We also computed the distance from each ZIP code centroid to the nearest hospital. To capture long-term smoking history of Medicare participants in each ZIP code, we computed their hospitalization rate for lung cancer by ZIP code for each year. This risks over-control because air pollution has been associated with increased risk of lung cancer. To capture year-to-year changes in mortality rates due to temperature, we downloaded daily temperature data on a 12km grid from the NASA NLDAS-2 website (https://ldas.gsfc.nasa.gov/index.php/nldas/v2/models). We averaged all grid cells within the boundaries of a ZIP code, and constructed two measures for each year, the average temperature in the warm months (April-September) and in the cold months (October-March).

2.3 Exposure assessment

We estimated exposure using a validated prediction model calibrated to measurements at almost 2000 monitoring stations using an ensemble of machine learners that provided daily estimates for a 1km grid of the contiguous U.S.(Di et al., 2019; Di et al., 2020). In brief, the model used data from multiple sources including predictions of chemical transport models (GEOS-Chem, CMAQ, and MERRA-2), meteorological data, land-use terms, and satellite-based measures of aerosol

optical depth, surface reflectance, and absorbing aerosol index. We trained a neural network, a random forest, and a gradient boosting machine to monitoring data from the United States Environmental Protection Agency (EPA) Air Quality System to generate daily predictions on a 1×1 km grid. The models were fit using data from all years. The three predictions for $PM_{2.5}$ were combined in a nonlinear geographically weighted regression. The model showed good performance with ten-fold cross validation on held out monitoring sites yielding an out of sample $R^2$ of 0.89 for annual average predictions of $PM_{2.5}$. Penalized splines showed linear relationships between observed and predicted $PM_{2.5}$ from 0 to 60 μg/m$^3$. Predictions for all grid cells whose centroids were inside the ZIP code boundary were averaged for each year and assigned to participants in that ZIP code in that year.

2.4 Statistical analysis

The standard DID estimator for a continuous predictor posits that

$$E(Y_{ij}) = \beta_0 + \beta_1 PM_{2.5} + \beta_2 C_i + \beta_3 X_t \quad (1)$$

where $Y_{ij}$ is the mortality rate in ZIP code $i$ in demographic group (by age >84 or not, sex, race, and Medicaid coverage) $j$, $C_i$ are the time-invariant or slowly changing confounders in ZIP code $i$, $X_t$ are the time varying confounders that are common across ZIP codes. The $C_i$ are controlled by fitting individual intercepts for each ZIP code. The time varying confounders are removed by fitting a nonlinear time trend; we used a natural spline function of year with 3 degrees of freedom, yielding:

$$E(Y_{ij}) = \beta_0 + \beta_1 PM_{2.5} + \delta_i + ns(year, 3) \quad (2)$$

where $\delta_i$ is a dummy variable for each ZIP Code. Since ZIP code is controlled, this model compares year-to-year variations around ZIP code average $PM_{2.5}$ and common time trend to year-

to-year variations of mortality rates about ZIP code average and common time trend. Differences in e.g. SES, smoking, or diabetes between ZIP code are removed by the dummy variable for ZIP code. For a causal interpretation of the DID estimate to hold, we must assume that all the ZIP codes have parallel long-term time trends in mortality rates, other than those caused by different time trends in $PM_{2.5}$.

If covariates producing different time trends in mortality rate by ZIP code are not correlated with ZIP code specific $PM_{2.5}$ trends, the interpretation still holds. It would be preferable to further weaken this assumption.

We added two methods to relax the parallel trends assumption, and combined them in our analysis. We added to equation (2) terms for confounders that we have measured that change over time, possibly differentially by ZIP code. This will control for any temporal trends due to changes in these covariates, which include the SES, race, demographic, behavioral, and health access variables described above. Second, we grouped ZIP codes based on the above covariates and fit separate time trends in each group. We think that ZIP codes that are similar in racial composition, percent living below the poverty level, population density, smoking rates etc. are more likely to have similar time trends in mortality rates than disparate ZIP codes. To accomplish this, we fit a principal component analysis to all the listed potential confounders and took the first 5 principal components. We classified each ZIP code into whether it was higher or lower than average on each of the 5 components, producing 32 categories of ZIP codes. In each of these 32 categories of ZIP codes, we fit separate splines for time trend and separate control for all of the covariates. This controls for time trends in measured covariates such as racial composition, median income, etc, and fits 32 separate time trends to the data to capture any trends unexplained by time trends in the measured covariates. It also allows the effects of the measured covariates to differ by the 32

Journal Pre-proof

different groups. In addition by performing analyses stratified by the 32 different groups we are also controlling by matching for the covariate clusters (e.g. SES and race) that characterize each group. Combining these, the final modeling approach is to fit 32 models (k=1:32) and meta-analyze the 32 values of $\beta_1$.

$$E(Y_{ij}, k) = \beta_0 + \beta_{1k}PM25 + \delta_i + \delta_{jk} + ns(year, 3, k) + \beta_3 X_{tk} \quad (3)$$

Here $\delta_i$ are indicator variables for each ZIP code, $X_{tk}$ are the time varying covariates whose time trends may differ by ZIP code and by which group (k) the ZIP code is in, $ns(year, 3, k)$ is a natural spline for time trend with 3 degrees of freedom for each group $k$, and $\delta_{jk}$ is an indicator variable for each age-race-sex-Medicaid stratum in group $k$. Results were combined over strata using a random effects meta-analysis.

Finally, equation (3) embodies an additive, rather than multiplicative model for the rate of mortality in each ZIP code-demographic group. This allows us to estimate the additive effect of $PM_{2.5}$ on the probability of dying, provides more interpretative interaction terms, and provides a marginal effect estimate (i.e. not dependent on the distribution of the covariates, as a multiplicative model would be). Additive probability or rate models give unbiased estimates of effect just as the more usual logistic models, but biased estimates of standard errors(Caudill and Jackson, 1989). Therefore have used robust standard errors to estimate the confidence intervals. In a second analysis, we reran the analysis on data restricted to persons whose exposure was always below 12 $\mu g/m^3$, the U.S. standard for $PM_{2.5}$.

**3.0 Results**

Table 1 shows the characteristics of the Medicare cohort between 2000 and 2016. There were 623,036,820 person-years of follow-up during the study, and 29,481,444 deaths. 85.4% of the

Journal Pre-proof

participants were white, and 12.9% were covered by Medicaid, which provides additional benefits to the poor. The mean $PM_{2.5}$ during the study was 10.3 μg/m$^3$.

**Table 1**

| Variable | Values |
|---|---|
| **Year** | |
| Mean (SD) | 2009.5 (4.90) |
| Median [25%, 75%] | 2010 [2004, 2013] |
| **Male** | 42.8 % |
| **Race** | |
| Black | 8.4% |
| Other | 6.2% |
| White | 85.4% |
| **Age > 84** | 13.2% |
| **Medicaid Coverage** | 12.9% |
| ***ZIP Code Covariates*** | |
| **Median Income** | |
| Mean (SD) | $53,177 ($22,082) |
| Median [25%, 75%] | $47,998 [$38,030, $63,031] |

| | |
|---|---|
| **Median House Value** | |
| Mean (SD) | $200,139 ($159,728) |
| Median [25%, 75%] | $150,400 [$98,600, $240,300] |
| **Percent ZIP code Black** | |
| Mean (SD) | 11% (17.9%) |
| Median [25%, 75%] | 3.7% [1.1%, 12.0%] |
| **Percent ZIP code Hispanic** | |
| Mean (SD) | 12.6% (16.4%) |
| Median [25%, 75%] | 5.3% [2.1%, 14.6%] |
| **Percent >65 below poverty** | |
| Mean (SD) | 9.5% (6.5%) |
| Median [25%, 75%] | 7.9% [5.3%, 11.8%] |
| **Percent Low Education** | |
| Mean (SD) | 25.3% (14.7%) |
| Median [25%, 75%] | 22.6% [14.2%, 33.7%] |
| **Percent with annual Mammogram** | |
| Mean (SD) | 63.7% (7.2%) |
| Median [25%, 75%] | 63.9% [59.2%, 68.2%] |

Journal Pre-proof

| | |
|---|---|
| **Percent with ambulatory Visit** | |
| Mean (SD) | 77.8% (6.2%) |
| Median [25%, 75%] | 79.0% [74.4%, 82.1%] |
| **Population Density** (persons/mi²) | |
| Mean (SD) | 3397 (9032) |
| Median [25%, 75%] | 967 [167, 3353] |
| **Percent Owner Occupied** | |
| Mean (SD) | 68% (16%) |
| Median [25%, 75%] | 70.8% [59.8%, 79.2%] |
| **Mean BMI (kg/m²)** | |
| Mean (SD) | 27.5 (1.58) |
| Median [25%, 75%] | 27.3 [26.7, 28.0] |
| **Distance to nearest hospital (km)** | |
| Mean (SD) | 6.5 (7.4) |
| Median [25%, 75%] | 3.90 [1.98, 8.07] |
| **Ever Smoker** | |
| Mean (SD) | 46.2% (6.8%) |
| Median [25%, 75%] | 46.2% [41.8%, 50.4%] |

Journal Pre-proof

| | |
|---|---|
| **Percent annual HbA1c test** | |
| Mean (SD) | 83.1% (4.9%) |
| Median [25%, 75%] | 83.7% [80.5%, 86.3%] |
| **Lung Cancer Rate (x $10^{-4}$)** | |
| Mean (SD) | 3.9 (2.8) |
| Median [25%, 75%] | 3.3 [1.9, 4.9] |
| **Percent annual LDL** | |
| Mean (SD) | 79.5% (6.2%) |
| Median [25%, 75%] | 80.1% [76.1%, 83.5%] |
| **Percent Annual Eye Exam** | |
| Mean (SD) | 67.4% (6.4%) |
| Median [25%, 75%] | 67.1% [63.9%, 71.0%] |
| **$PM_{2.5}$ (μg/$m^3$)** | |
| Mean (SD) | 10.3 (3.1) |
| Median [25%, 75%] | 9.8 [7.9, 12.0] |

Journal Pre-proof

In the meta-analysis of the results of the 32 strata-specific DID analyses, we found that the probability of dying in each year increased by $3.85 \times 10^{-4}$ (95% CI $1.95 \times 10^{-4}$ , $5.76 \times 10^{-4}$) for each 1 μg/$m^3$ increment in $PM_{2.5}$ in that year. The $I^2$ statistic for heterogeneity was 42%. When we restricted our analysis to persons whose exposure was always below 12 μg/$m^3$ during the follow-up period, we found a larger effect size, with the probability of dying in each year increased by $4.26 \times 10^{-4}$ (95% CI $1.43 \times 10^{-4}$, $7.09 \times 10^{-4}$) per 1 μg/$m^3$ increase in $PM_{2.5}$. Interaction terms for male gender, age > 84, and race were fit in the full data. Sex was a significant modifier (p for interaction <0.001), with larger effects in males ( 6.81x10-$^{4}$, 95% CI $4.14 \times 10^{-4}$ , $9.48 \times 10^{-4}$ ) then females($1.20 \times 10^{-4}$, 95% CI $-8.80 \times 10^{-5}$, $3.29 \times 10^{-4}$). These results are shown in Figure 1. There was no interaction by age. Interaction models for race did not converge because residential segregation in the U.S. resulted in groups with too few Blacks or Asians and other races. Instead, we reran the analysis without separate models for each of the 32 groups. There was no significant interaction by race.



Journal Pre-proof

**4.0 Discussion**

Using a difference in differences design applied to a linear rate model, we found that each 1 µg/m$^3$ increment in $PM_{2.5}$ was associated with a 3.85 x$10^{-4}$ increase in the probability of dying in a given year. If the difference in differences assumptions are met, this is a causal increase. We believe they are met for the following reasons. First, since this design controls for each ZIP code, all individual and neighborhood level confounders that change little over time are controlled, whether measured or not. This includes most of the variables (e.g. SES, smoking history, diet) that have be posited as potential confounders. Consequently, only time varying factors can be confounders. Second, we controlled for potential confounding in each ZIP code due to time trends in median household income, median home value, percent owner occupied housing, percent of ZIP code that is Black, percent of households that are Hispanic, percent of persons aged 65 or older living in poverty, smoking rate, BMI, Medicaid eligibility, educational attainment, population density, lung cancer rates, multiple measures of the adequacy of medical care, and summer and winter temperature. Third, we grouped the ZIP codes by these factors, and fit separate nonlinear time trends within each of 32 groups to capture any remaining time trends due to omitted confounders could differ between groups, but would be similar within group. This approach effectively looks at the within ZIP code fluctuations in exposure around the ZIP code mean, trend due to measured time-varying covariates, and common trends by group of ZIP codes. It compares that to the same deviation in mortality. Such an approach, looking at yearly deviations from trend and ZIP code mean in exposure and outcome, is inherently examining the relationship of changes in exposure to changes in outcome. This also addresses the issue of whether previous studies effects are due to primarily recent exposure, or reflect long term exposure, including when pollution concentrations were

higher. The dummy variable for each ZIP code controls for long term exposure at that ZIP code, and the removal of nonlinear time trends during the period under study focuses the exposure variable on the year of the death. EPA Regulatory Impact Analyses spread the estimated mortality effects out over a 20 year period. This study provides an estimate of immediate impact. Because our study incorporates 17 years of follow-up, each year has a new exposure, and a new effect.

In addition this paper adds to the sparse literature controlling for temperature in studies of long-term exposure to air pollution, which some have argued is an important confounder. Further, we estimated the probability of dying in a year, which is more easily interpretable than an instantaneous hazard rate, and by using an additive rather than multiplicative model we estimated the marginal effect if $PM_{2.5}$, not the conditional effect estimated by Cox's proportionate hazard model. This allows one to estimate attributable deaths in health impact assessments without making further, possibly implausible assumptions required when using a conditional estimate.

Some scientists, including the current chair of EPA's Clean Air Scientific Advisory Committee (CASAC), assert that studies using standard epidemiological methods should be given little weight in revising the NAAQS, and propose restricting to studies using causal methods, and particularly ones showing changes in air quality are associated with changes in mortality(CASAC, 2019). The recent meetings of EPA's CASAC highlighted the importance of these issues(CASAC., 2019). Their main criticism is that traditional approaches only show associations that may be confounded, vary depending on modeling approaches, and do not inform causality, which can only be addressed by causal methods. They also emphasize that unmeasured variables, particularly individual characteristics, socioeconomic status, and temperature may confound the published literature.(Cox and Popken, 2015) EPA recently proposed not tightening the NAAQS for $PM_{2.5}$, relying on these arguments. This paper provides an analysis using a causal method, controlling for

Journal Pre-proof

temperature and socioeconomic status, and all individual and area level potential confounders, measured or unmeasured, that vary slowly over time.

That EPA proposal also asserted there was insufficient evidence of a causal association at lower levels. When we restricted our analysis to include only persons who never experienced concentrations above 12 $\mu g/m^3$ during 17 years of follow-up we found a somewhat larger effect estimate of $4.26 \times 10^{-4}$ (95% CI $1.43 \times 10^{-4}$, $7.09 \times 10^{-4}$) per 1 $\mu g/m^3$ increase in $PM_{2.5}$..$_{5}$. This indicates that the current U.S. and E.U. standards are not sufficient to protect public health, and that the WHO standard of 10 $\mu g/m^3$ is unlikely to protect public health.

Other studies have applied causal modeling methods to air pollution, primarily propensity score methods(Abu Awad et al., 2019; Schwartz et al., 2018; Wang et al., 2017; Wei et al., 2020; Wu et al., 2020; Yitshak-Sade et al., 2019). These methods use the relationship between exposure and confounders to render the exposure independent of all of the measured confounders, and hence mimic a randomized trial. They have all reported that $PM_{2.5}$ increases mortality rates. The difference in differences approach complements those studies by its ability to deal with unmeasured confounders. All personal and small area time invariant or slowly varying confounders are removed by design, whether measured or not. All confounders whose time trends are due to measured time-varying confounders or similar within groups defined by race, SES, medical access, and behavioral characteristics are controlled whether measured or not. Hence, this paper adds assurance about many possible unmeasured confounders to the large literature of associational studies and smaller literature of propensity score-based models that provide causal estimates. Together, they provide strong evidence for a causal effect of $PM_{2.5}$ on mortality rates.

Since we estimate the probability of dying in each year and not a hazard rate, our effect sizes are not directly comparable to the other causal modeling studies. Compared to the larger literature, a

recent meta-analysis of then extant cohort studies estimated the effect size at 10 μg/m$^3$ (the mean concentration in this study) as a 1.29% increase in the rate per μg/m$^3$ increase in PM2.5, (95% CI 1.09%, 1.50%)(Vodonos et al., 2018).The annual mortality rate in the Medicare cohort was $4.7x10^{-2}$. A 1.29% increase in that rate is an additive increase of $6.1x10^{-4}$. The results from a previous Cox regression analysis of the Medicare cohort from 2000-2012 translate to an additive increase of $3.4x10^{-4}$. These are similar to our results. Hence these other studies are unlikely to have been confounded by temperature, or slowly varying SES, racial, and behavioral factors which this study controlled for.

Nor are these effects small. Multiplying our effect estimates by the total person-years in the Medicare cohort, we estimate that had everyone had 1 μg/m$^3$ lower exposure, 239,900 early deaths would have been avoided during the follow-up period. EPA's National Contingency Plan (40 C.F.R. § 300.430(d)(1)) states that the range of acceptable **lifetime risks** (of developing cancer) for carcinogens should be set between 1 in 10,000 and 1 in a million over a 70-year lifetime. Thus, when EPA considers regulations for carcinogens, it typically regulates if **lifetime risks** exceed 1 in a hundred thousand. In contrast, 1 μg/m$^3$ of exposure below the current EPA standard for only 1 year results in an increased risk of dying of 4.26 per ten thousand in our study.

Our finding has limitations. First, DID analyses depend on the change over time in other ZIP codes with different changes in $PM_{2.5}$ to serve as controls for changes over time in outcome that may have occurred independent of exposure. If the time trends in the ZIP codes are different, this control will fail. We have dealt with this by controlling for time trends in measured covariates and grouping ZIP codes into 32 groups that are similar on age, sex, race/ethnicity, SES, and access to medical care, and doing the analysis separately within each group, arguing that the time trends in

mortality rates will be similar within group. However, we cannot exclude the possibility that they are not. Second, our exposure estimates are not perfect. While an out of sample $R^2$ of 0.89 is high, there is still some exposure error, which may bias estimates. In addition, personal exposure within a neighborhood varies around the neighborhood ambient concentration. However, we believe most of that difference is likely to be Berksonian error, and hence not bias coefficients. Moreover, the principle reason for the differences between ambient and personal exposure are behavioral (more driving, more cooking, etc), and incorporating exposure related to those factors would require controlling for other related risk factors (e.g. stress from driving) that are not confounders of the neighborhood ambient concentrations. Hence, this exposure error is beneficial from the point of view of reducing confounding, as has been pointed out previously(Weisskopf and Webster, 2017).

In conclusion, we have found an effect of $PM_{2.5}$ on daily deaths using a causal modeling approach robust to unmeasured confounders. The effect size is similar to those reported in associational studies, suggesting that unmeasured confounders are not an issue with them, and is large enough to indicate that reducing $PM_{2.5}$ concentrations in the U.S. could save tens of thousands of premature deaths each year.

References

Abu Awad, Y., et al., 2019. Change in PM2.5 exposure and mortality among Medicare recipients. Environmental Epidemiology. 3, e054.
Baccini, M., et al., 2017. Assessing the short term impact of air pollution on mortality: a matching approach. Environ Health. 16, 7.
Beelen, R., et al., 2014. Effects of long-term exposure to air pollution on natural-cause mortality: an analysis of 22 European cohorts within the multicentre ESCAPE project. Lancet. 383, 785-95.
Bureau, U. S. C., US. Census 2000. Summary File 3 (SF 3). In: U. S. C. Bureau, (Ed.), 2010.
CASAC, Public Teleconference on Particulate Matter (PM). EPA Chartered Clean Air Scientific Advisory Committee (CASAC), Available at https://yosemite.epa.gov/sab/sabproduct.nsf/MeetingCalCASAC/4F40665AD1DDCEF6852583A000645464?OpenDocument., 2019.
CASAC., CASAC Review of the EPA's Integrated Science Assessment for Particulate Matter. . In: U. S. E. P. Agency, (Ed.), Washington, D.C., Apr. 2019, 2019.
Caudill, S., Jackson, J., 1989. Measuring Marginal Effects in Limited Dependent Variable Models. Journal of the Royal Statistical Society, Series B. 38, 203-6.
CDC, Behavioral Risk Factor Surveillance System. BRFSS 2013 Survey Data and Documentation. . In: C. f. D. Control, (Ed.), 2013.
Cox, L. A., Jr., Popken, D. A., 2015. Has reducing fine particulate matter and ozone caused reduced mortality rates in the United States? Ann Epidemiol. 25, 162-73.
Crouse, D. L., et al., 2015. Ambient PM2.5, O3, and NO2 Exposures and Associations with Mortality over 16 Years of Follow-Up in the Canadian Census Health and Environment Cohort (CanCHEC). Environ Health Perspect. 123, 1180-6.
Di, Q., et al., 2019. An ensemble-based model of PM2.5 concentration across the contiguous United States with high spatiotemporal resolution. Environ Int. 130, 104909.
Di, Q., et al., 2020. Assessing NO2 Concentration and Model Uncertainty with High Spatiotemporal Resolution across the Contiguous United States Using Ensemble Model Averaging. Environmental Science & Technology. 54, 1372-1384.
Di, Q., et al., 2017. Air Pollution and Mortality in the Medicare Population. N Engl J Med. 377, 1498-9.
Donald, S., Lang, K., 2007. Inference with difference-in-differences and other panel data. . Rev Econ Stat. 89, 221–233.
Hoek, G., et al., 2013. Long-term air pollution exposure and cardio- respiratory mortality: a review. Environ Health. 12, 43.
Imai, K., van Dyke, D. A., 2004. Causal inference with general treatment regimes: Generalizing the Propensity Score. Journal of the American Statistical Association. 99, 854:866.
Pinault, L., et al., 2016. Risk estimates of mortality attributed to low concentrations of ambient fine particulate matter in the Canadian community health survey cohort. Environmental Health. 15, 18.
Pope, C. A., 3rd, et al., 2019. Mortality Risk and Fine Particulate Air Pollution in a Large, Representative Cohort of U.S. Adults. Environ Health Perspect. 127, 77007.
RESDAC, Denominator File. 2018.

Rubin, D. B., 1997. Estimating causal effects from large data sets using propensity scores. Ann Intern Med. 127, 757-63.

Schwartz, J. D., et al., 2018. Estimating the Effects of PM2.5 on Life Expectancy Using Causal Modeling Methods. Environ Health Perspect. 126, 127002.

Vodonos, A., et al., 2018. The concentration-response between long-term PM2.5 exposure and mortality; A meta-regression approach. Environmental Research.

Wang, Y., et al., 2016. Estimating Causal Effects of Long-Term PM2.5 Exposure on Mortality in New Jersey. Environ Health Perspect. 124, 1182-8.

Wang, Y., et al., 2017. Doubly Robust Additive Hazards Models to Estimate Effects of a Continuous Exposure on Survival. Epidemiology (Cambridge, Mass.). 28, 771-779.

Wei, Y., et al., 2020. Causal effects of air pollution in Massachusetts. American journal of epidemiology. in press.

Weisskopf, M., Webster, T., 2017. Trade-offs of Personal Versus More Proxy Exposure Measures in Environmental Epidemiology. Epidemiology (Cambridge, Mass.). 635-43.

Wennberg, J., Cooper, M., 1996. The Dartmouth atlas of health care: . American Hospital Publishing  Chicago, IL;.

Wu, X., et al., 2020. Evaluating the Impact of Long-term Exposure to Fine Particulate Matter on Mortality Among the Elderly. Science Advances.

Yang, C., et al., 2012. Alternative ozone metrics and daily mortality in Suzhou: the China Air Pollution and Health Effects Study (CAPES). Sci Total Environ. 426, 83-9.

Yitshak-Sade, M., et al., 2019. Estimating the causal effect of annual PM2.5 exposure on mortality rates in the Northeastern and mid-Atlantic states. Environmental Epidemiology. Latest Articles.

Figure Legend. Figure 1 shows the effect size estimate (absolute increase in the death rate for each 1 μg/$m^3$ increase in $PM_{2.5}$ exposure, and 95% Confidence Interval) for the entire Medicare Cohort in 2000-2016 (All), for only persons never exposed to $PM_{2.5}$ concentrations above 12 μg/$m^3$ (low) during the follow-up period, for males in the entire Medicare Cohort (males) and for females in the entire Medicare Cohort.

Journal Pre-proof

**Declaration of interests**

☐ The authors declare that they have no known competing financial interests or personal relationships that could have appeared to influence the work reported in this paper.

☒The authors declare the following financial interests/personal relationships which may be considered as potential competing interests:

Dr. Schwartz declares that he has testified as a health expert for the U.S. Department of Justice in a law suit over clean air act violations. No other authors have anything to declare.

Open access Original research

BMJ Open

# Association of short-term exposure to ambient $PM_{2.5}$ with hospital admissions and 30-day readmissions in end-stage renal disease patients: population-based retrospective cohort study

Lauren H Wyatt ,[1] Yuzhi Xi,[2] Abhijit Kshirsagar,[3] Qian Di,[4] Cavin Ward-Caviness,[1] Timothy J Wade,[1] Wayne E Cascio,[1] Ana G Rappold[1]

**To cite:** Wyatt LH, Xi Y, Kshirsagar A, *et al*. Association of short-term exposure to ambient $PM_{2.5}$ with hospital admissions and 30-day readmissions in end-stage renal disease patients: population-based retrospective cohort study. *BMJ Open* 2020;**10**:e041177. doi:10.1136/bmjopen-2020-041177

► Prepublication history and additional materials for this paper is available online. To view these files, please visit the journal online (http://dx.doi.org/10.1136/bmjopen-2020-041177).

Received 01 June 2020
Revised 22 October 2020
Accepted 23 November 2020

Check for updates

© Author(s) (or their employer(s)) 2020. Re-use permitted under CC BY-NC. No commercial re-use. See rights and permissions. Published by BMJ.

For numbered affiliations see end of article.

**Correspondence to**
Dr Ana G Rappold;
rappold.ana@epa.gov

## ABSTRACT

**Objectives** To examine the effect of short-term exposure to ambient fine particulate matter ($PM_{2.5}$) on all-cause, cardiovascular and respiratory-related hospital admissions and readmissions among patients receiving outpatient haemodialysis.

**Design** Retrospective cohort study.

**Setting** Inpatient hospitalisation claims identified from the US Renal Data System in 530 US counties.

**Participants** All patients receiving in-centre haemodialysis between 2008 and 2014.

**Primary and secondary outcome measures** Risk of all-cause, cardiovascular and respiratory-related hospital admissions and 30-day all-cause and cause-specific readmission following an all-cause, cardiovascular, and respiratory-related discharges. Readmission risk was evaluated for early (1–7 days postdischarge) and late (8–30 days postdischarge) readmission time periods. Relative risk is expressed per 10 µg/m$^3$ of $PM_{2.5}$.

**Results** Same-day ambient $PM_{2.5}$ was associated with increased hospital admission risk for cardiovascular causes (0.9%, 95% CI 0.2 to 1.7). Greater $PM_{2.5}$-related associations were observed with 30-day readmission risk. Early-readmission risk was increased by 1.6%–1.8% following all-cause (1.6%, 95% CI 0.6% to 2.6%), cardiovascular (1.8%, 95% CI 0.4% to 3.2%) and respiratory (1.8%, 95% CI 0.4% to 3.2%) discharges; while late-readmission risk increased by 1.2%–1.3% following all-cause and cardiovascular discharges. $PM_{2.5}$-related associations with readmission risk were greatest for certain cause-specific readmissions ranging 4.0%–6.5% for dysrhythmia and conduction disorder, heart failure, chronic obstructive pulmonary disease, other non-cardiac chest pain or respiratory syndrome and pneumonia. Following all-cause discharges, the cause-specific early-readmission risk was increased by 6.5% (95% CI 3.5% to 9.6%) for pneumonia, 4.8% (95% CI 2.3% to 7.4%) for dysrhythmia and conduction disorder, 3.7% (95% CI 1.4% to 6.0%) for heart failure and 2.7% (95% CI 1.2% to 4.2%) for other non-cardiac chest pain or respiratory syndrome-related causes.

**Conclusions** Daily ambient $PM_{2.5}$ was associated with an increased risk of cardiovascular admissions and 30-day readmissions following cardiopulmonary-related discharges in a vulnerable end-stage renal disease population. In the first week following discharge, greater $PM_{2.5}$-related risk of rehospitalisation was identified for some diagnoses.

### Strengths and limitations of this study

- ► Nearly complete representation of hospitalisation records (>1.8 million inpatient admissions), identified using the US Renal Data System, of patients undergoing in-centre haemodialysis between 2008 and 2014.
- ► Location of last dialysis visit was linked with daily population-weighted air pollution.
- ► Admission risk estimated using time and county stratified design to control for county-level time trends.
- ► Cox proportional hazard model with time-varying exposure was used to estimate readmission risk associated with daily fluctuations in ambient particulate matter ($PM_{2.5}$) controlled for time-varying confounders.
- ► Potential diagnosis misclassification from using diagnosis codes to classify cause-specific hospitalisations and exposure misclassification related to $PM_{2.5}$ exposure not captured by ambient air quality near dialysis centres.

## INTRODUCTION

Ambient fine particulate matter ($PM_{2.5}$) is a leading risk factor for all-cause mortality,[1–4] accounting for millions of premature deaths each year.[5] Daily variation in ambient $PM_{2.5}$ is also associated with increased rates of unplanned hospital admissions, urgent care visits and medication usage.[6 7] Greater health impacts have been observed consistently in sensitive populations, including the elderly and individuals with chronic health conditions such as chronic kidney disease (CKD).[3 8–11]

Additionally, $PM_{2.5}$ exposure during wildfire periods has been shown to increase the risk of mortality among patients managing their end-stage renal disease (ESRD) with haemodialysis.[12] However, the role of short-term $PM_{2.5}$ exposure at ambient levels on progression of disease and cause-specific morbidities has not been characterised.

CKD is a progressive condition that affects 8%–16% of the population worldwide,[13–15] and in the final stage, ESRD, many patients are transitioned to haemodialysis to prolong life. Patients receiving dialysis represent a particularly vulnerable population because of high rates of comorbidities, including diabetes and cardiovascular disease, which may contribute to the greater likelihood of hospital admission and readmission following PM exposure. In the USA, patients on haemodialysis average 1.7 inpatient admissions annually with a 30-day readmission rate twice that of other Medicare beneficiaries,[16] contributing to a substantial economic impact.[17] In 2016, US$35.4 billion in Medicare fee-for-service costs were attributed to ESRD,[16] motivating health promotion and cost-containment efforts to slow the progression of CKD and reduce hospitalisations and readmissions.[18] While many current strategies to reduce hospitalisations focus on care processes and patient-level factors,[19–22] there is a knowledge gap on the role of modifiable environmental risk factors—specifically ambient $PM_{2.5}$.[2 23–25]

In this study, we examined the risk of daily hospitalisation and subsequent 30-day readmission in relation to daily ambient $PM_{2.5}$ using data from the US Renal Data System (USRDS) over a 7-year period. We focused on all-cause, cardiovascular and respiratory hospitalisations and estimated changes in risk for early (1–7 days postdischarge) and late (8–30 days postdischarge) readmission accounting for the influence of different causal factors (ie, acute and chronic illness burden) that may influence early versus late readmissions.[26 27]

## METHODS

### Setting and study population

Using patient-level data from the USRDS, we constructed an open cohort of individuals receiving in-centre haemodialysis between 2008 and 2014. USRDS is a national data registry for dialysis services and includes records of patient demographic characteristics, hospitalisations and provider information on all patients receiving haemodialysis. Baseline demographic characteristics (sex, birth date, race and smoking status) recorded at the initiation of dialysis were extracted from the Medical Evidence Form CMS-2728 for each patient. For every inpatient hospital visit, we extracted the admission date, discharge date, discharge diagnoses codes and discharge status.

For the analysis of 30-day readmission risk, we considered only admissions where patients were discharged alive. Each readmission was counted once as a readmission relative to the prior index admission and was then considered as a new index admission. Thus, each admission could serve as both an index admission and readmission, consistent with previous studies.[28] An admission that occurred on the same day as a discharge was combined with the previous admission. These readmissions are likely to represent facility transfers for which we were not able to obtain information. Discharges occurring within 30 days of the end of the study period were excluded, as 30 days of follow-up data were not available. For both admissions and readmissions, patients could be represented more than once if they were admitted multiple times during the study period.

### Health outcomes

The primary outcomes included daily counts of all-cause, respiratory and cardiovascular-related admissions and the time to readmission following the cause-specific discharges. All-cause and cause-specific readmissions were examined separately. Readmissions were classified further as early readmissions, occurring within 1–7 days of an index hospitalisation discharge and late readmissions, occurring 8–30 days postdischarge.

International Classification of Diseases, 9th Revision (ICD-9) codes were used to identify cause-specific hospitalisations. Cardiovascular-related diagnoses included hypertension (ICD-9 codes 401–405), myocardial infarction (410), ischaemic heart disease (410–411, 413), pulmonary embolism (415), dysrhythmia and conduction

**Table 1** Baseline demographic characteristics of the study population between 2008 and 2014 by hospital admission category

| | No (%) | | |
|---|---|---|---|
| | All cause | Cardiovascular | Respiratory |
| Characteristic | n=351 294 | n=262 385 | n=247 829 |
| Age (year), mean (SD) | 64.69 (14.70) | 65.58 (14.53) | 65.61 (14.48) |
| Male sex (%) | 190 716 (54.3) | 140 206 (53.4) | 132 288 (53.4) |
| Race | | | |
| White | 209 921 (59.8) | 155 405 (59.2) | 147 204 (59.4) |
| Black | 122 943 (35.0) | 93 325 (35.6) | 87 831 (35.4) |
| Other | 18 430 (5.2) | 13 655 (5.2) | 12 794 (5.2) |
| Smoking status at initiation (no) | 330 837 (94.2) | 246 634 (94.0) | 232 396 (93.8) |

**Table 2** Hospital admission characteristics among the study population between 2008 and 2014

| | No of events (no of unique patients) | | |
|---|---|---|---|
| **Outcome** | **All-cause** | **Cardiovascular** | **Respiratory** |
| Admissions | 1 801 966 (351 294) | 832 255 (262 385) | 766 447 (247 829) |
| Discharged alive | 1 493 795 (312 521) | 685 680 (229 780) | 637 250 (217 221) |
| Early eadmission (1–7days) | 176 822 (91 508) | 83 193 (52 374) | 78 392 (49 343) |
| Late readmission (8–30 days) | 317 948 (130 454) | 150 080 (80 851) | 141 656 (76 444) |
| Length of stay, days | | | |
| Mean (SD) | 6.98 (10.68) | 7.05 (10.34) | 7.07 (10.38) |
| Median (IQR) | 4 (2–7) | 4 (2–8) | 4 (2–8) |
| Hospital visits in prior year | | | |
| 3+ visits | 637 503 (123 949) | 307 891 (93 399) | 292 803 (89 905) |
| Mean (SD) | 2.97 (3.80) | 3.14 (3.95) | 3.21 (3.89) |
| Median (IQR) | 2 (1–4) | 2 (1–4) | 2 (1–4) |

disorder (426–427), heart failure (428) and peripheral arterial disease (444). Respiratory-related diagnoses included asthma (493), chronic obstructive pulmonary disease (COPD) (491–492, 496), pneumonia (480–486) and other non-cardiac chest pain or respiratory syndrome (786).

### Environmental data

Daily concentrations of fine $PM_{2.5}$ were estimated using a previously described exposure prediction model.[29 30] Briefly, this model estimates daily $PM_{2.5}$ on a 1 km grid for the entire continental USA by incorporating satellite aerosol optical depth measurements, chemical transport model simulations, meteorology, land use and other variables. Gridded $PM_{2.5}$ estimates were subsequently converted to population-weighted county-level estimates using 2010 Census tract population values. To enable adjustment for potential confounding by weather conditions, temperature and relative humidity data were obtained from the National Centers for Environmental Information's Global Historical Climatology Network (Global Surface Summary of the Day)[31] and using the Community Multiscale Air Quality model, respectively. The study area was restricted to all counties containing at least one land surface station from the Global Historical Climatology Network (n=530).

Daily $PM_{2.5}$ was linked to patient hospitalisations based on the county of their last dialysis visit. Previous work has shown that patients in the USRDS cohort that receive in-centre dialysis three times a week have a median travel distance of 5.7 miles to their initial dialysis centre.[32 33]

### Study design and statistical analysis

#### Daily county hospital admissions

The relative risks of hospital admissions associated with daily $PM_{2.5}$ were estimated using a case-crossover design with conditional Poisson models for each of the three health outcomes separately (all-cause, cardiovascular, respiratory). Aggregated counts of daily admissions were time stratified by county-day, where each county served as its own control. For each county-day strata, $PM_{2.5}$ on the day of admission was compared with $PM_{2.5}$ concentrations on control days. Control days were defined as occurring on the same day of the week in the same month and year. This, by design, enabled us to control for differences in county characteristics, such as population size and risk characteristics, and the influence of day of the week, seasonal and long-term time trends.[34]

The relative risk of hospital admissions related to daily $PM_{2.5}$ for each health outcome was estimated using daily counts with respect to county-time strata, adjusted for meteorological conditions (temperature and humidity). Temperature and humidity effects were averaged over lag days 0, 1 and 2 and modelled using natural splines (df=3) to allow for non-linear effects.[35]

We evaluated immediate (same day) and delayed $PM_{2.5}$ effects on all-cause and cause-specific hospital admissions. Unconstrained distributed lag models were used to assess the delayed effects of short-term exposures to $PM_{2.5}$. Delayed exposure up to 14 days and models stratified on county socioeconomic status were considered. To assess the impact of county socioeconomic level, we used the percent of individuals below poverty from the 2010 US Census. Associations were assessed for counties both above and below the median poverty level (12.5%).

#### Early and late readmissions occurring within 30 days of discharge

Cox proportional hazards models were used to assess the relative risk of early (1–7 days postdischarge) and late (8–30 days postdischarge) readmission associated with daily $PM_{2.5}$ following all-cause and cause-specific index hospitalisations. Early-readmission models were censored at 7 days and late-readmission models at 30 days.

Models for readmissions incorporated both time-dependent and time-independent risk factors. Time-dependent variables included daily $PM_{2.5}$, daily temperature, daily relative humidity and day-of-the-week.



JA1518




**Figure 1** The relative risk (RR, 95% CI) for an all-cause early and late-readmission following all-cause and cause-specific discharges. Discharges are colour coded: all-cause discharges are indicated in black, cardiovascular causes in orange and respiratory causes in blue. Early readmissions are indicated with filled in circles, late readmissions with open circles. RR is expressed per 10 µg/m$^3$ increase in particulate matter ($PM_{2.5}$).

Time-independent factors included patient-specific, hospitalisation event-specific and county socioeconomic variables. Patient-specific variables included indicator of sex, race, baseline smoking status, whether the patient had three or more previous hospital visits in the year prior and age at discharge. Event-specific variables included whether the discharge occurred on a holiday and length of stay. To adjust for county socioeconomic level, the per cent of individuals below poverty was included as a covariate. Models were also adjusted for patient-specific clusters to account for repeated measures by individual. Lastly, models were adjusted for the competing cause of death by including death as an additional censoring criteria. The presented models represent the cause-specific readmission hazard. Non-linear $PM_{2.5}$ associations were also explored.




**Figure 2** The relative risk (RR, 95% CI) of cause-specific early and late-readmission following all-cause discharge. Readmission causes are colour coded: all-cause readmissions are indicated in black, cardiovascular causes in orange and respiratory causes in blue. RR is expressed per 10 µg/m3 increase in particulate matter ($PM_{2.5}$). COPD, chronic obstructive pulmonary disease; RR, rate ratio.

Daily county admission and readmission risks were expressed as the rate ratio (RR) per 10-µg/m$^3$ increase in $PM_{2.5}$. The proportion hospital admissions and readmissions associated with $PM_{2.5}$ is reported as the attributable fraction (AF), where AF = (RR-1) / RR.[36] All statistical analyses were performed with R software (V.3.6.0).[37]

## RESULTS

### Characterisation of clinical cohort and daily $PM_{2.5}$

Among 361 568 patients who were hospitalised during the study period, 10 274 were excluded due to missing baseline demographic values, with 351 294 patients remaining. Demographic descriptions are in table 1. Patients had on average 2.97 hospital visits in the year prior to an admission and more than 70% of patients had at least one hospital admission related to cardiovascular and respiratory causes (table 2). The average daily county-level $PM_{2.5}$ concentration was 9.3 µg/m$^3$ (range: 0.05–155.16 µg/m$^3$) (online supplemental table S1). The highest daily county-level $PM_{2.5}$ was observed in California (online supplemental figure S1).

### Description of clinical events, hospital admissions and readmissions

In total, there were 1 801 966 hospital admissions, of which 1 493 795 recorded the patient as alive at discharge. Of admissions that were discharged alive, 11.8% were readmitted within 7 days and 21.3% were readmitted 8 to 30 days postdischarge. The mean length of stay for all-cause, cardiovascular and respiratory admissions was 7.0, 7.0 and 7.1 days, respectively (table 2).

### Associations between $PM_{2.5}$ and readmission

#### Early readmission

Daily $PM_{2.5}$ was positively associated with increased risk for early readmission following all-cause, cardiovascular and respiratory-related discharges. Same day (lag 0) $PM_{2.5}$ was associated with a 1.6% (95% CI 0.6% to 2.6%), 1.8% (95% CI 0.4% to 3.2%) and 1.8% (95% CI 0.4% to 3.2%) increased risk of an early readmission for any cause following all-cause, cardiovascular and respiratory-related discharges, respectively (figure 1 and online supplemental table S2).

$PM_{2.5}$ associated early-readmission risk was greater for certain cause-specific outcomes. Following all-cause discharges, same day (lag 0) $PM_{2.5}$ was associated with increased early-readmission risk for dysrhythmia and conduction disorder (4.8%, 95% CI 2.3% to 7.4%), heart failure (3.7%, 95% CI 1.4% to 6.0%]), pneumonia 6.5%, (95% CI 3.5% to 9.6%) and other non-cardiac chest pain or respiratory syndrome (2.7%, 95% CI 1.2% to 4.2%) causes. $PM_{2.5}$ associated early-readmission risk was greatest for pneumonia-related readmissions following cardiovascular-related discharges (7.5%, 95% CI 3.5% to 11.7%). Other cause-specific early-readmission risks following cardiovascular and respiratory-related discharges were similar to estimates observed following discharge for any cause (figure 2 and online supplemental table S2).




**Figure 3** Mean proportion (95% CI) of all-cause and cause-specific hospital admissions, early readmissions (1–7 days) and late readmissions (8–30 days) with respect to particulate matter ($PM_{2.5}$) (µg/m$^3$). Hash marks above the x-axis represent the density of daily county $PM_{2.5}$. The 95% CI under 15.9 µg/m$^3$ is shaded darker to indicate where 90% of the data falls.




**Figure 4** Average daily county particulate matter ($PM_{2.5}$) (µg/m$^3$) between 2008 and 2014 (A) and the attributable fraction (AF) for early-readmission following an all-cause discharge based on the average $PM_{2.5}$ (B) for the 530 counties included in the study.

An average AF at 10 µg/m$^3$ of $PM_{2.5}$ at lag 0 was 1.5% (95% CI 0.6% to 2.5%), 1.7% (95% CI 0.4% to 3.1%) and 1.7% (95% CI 0.3% to 3.2%) for an early-readmission for any cause following all-cause, cardiovascular and respiratory discharges, respectively (figure 3). County AF ranged 0.5%–2.5%, 0.6%–2.8% and 0.6%–2.8% for an early-readmission following all-cause, cardiovascular and respiratory-related discharges, respectively (figure 4).

## Late readmission

Daily $PM_{2.5}$ was also associated with increased risk of late-readmission following all-cause, cardiovascular and respiratory-related discharges and the magnitude of risk related to all-cause readmissions was similar to that observed with early-readmission. Same day $PM_{2.5}$ was associated with a 1.3% (95% CI 0.6% to 2.0%), 1.2% (95% CI 0.3% to 0.2.2%) and 1.0% (95% CI 0.01% to 2.0%) increased risk of a late all-cause readmission following all-cause, cardiovascular and respiratory-related discharges, respectively (figure 1 and online supplemental table S2).

Similar to observations made for early-readmissions, $PM_{2.5}$ associated late-readmission risk was greater for certain cause-specific outcomes. Following all-cause discharges, a 10 µg/m$^3$ increase in same day (lag 0) $PM_{2.5}$ was associated with increased late-readmission risk for dysrhythmia and conduction disorder (3.1%, 95% CI 1.3% to 5.0%), heart failure (4.1%, 95% CI 2.5% to 5.8%), COPD (4.6%, 95% CI 1.7% to 7.6%), pneumonia (5.9%, 95% CI 3.7% to 8.2%) and other non-cardiac chest pain or respiratory syndrome (3.0%, 95% CI 1.9% to 4.1%) (figure 2 and online supplemental table S2).

The average AF at 10 µg/m$^3$ was 0.1% (95% CI 0.5% to 1.8%) and 1.0% (95% CI 0.1% to 2.0%) for a late readmission following all-cause and cardiovascular discharges, respectively (figure 3). County AF ranged 0.3%–1.9% for a late readmission following any cause (data not shown).

## Associations between $PM_{2.5}$ and daily admissions

Same day $PM_{2.5}$ was associated with an increase in RR of 0.3% (95% CI −0.2% to 0.9%) for all-cause admissions and 0.9% (95% CI 0.2% to 1.7%) for cardiovascular admissions (online supplemental figure S2 and table S3). We estimated 0.9% (95% CI 0.1% to 1.7%) of cardiovascular admissions could be attributed to 10 µg/m$^3$ ambient $PM_{2.5}$ (figure 3). Across counties, exposures accounted

for 0.3%–1.5% of cardiovascular admissions when evaluated at the average daily $PM_{2.5}$ for each county (data not shown).

No change in risk of all-cause and cardiovascular admissions was observed related to prior exposure (lags 1–14). Similarly, no change in risk for respiratory admissions was observed with same day exposure (lag 0) or prior exposure (lags 1–14) (online supplemental figure S2 and table S3). The model with a dose-specific association for $PM_{2.5}$ (non-linear dose-response function) did not improve model fit. Models stratified on median percent below poverty were similar (online supplemental figure S2 and table S3). In a sensitivity analysis, changing the number of df considered for temperature and relative humidity had a negligible effect (online supplemental figures S3 and S4).

## DISCUSSION

In a nationwide cohort study of 351 294 patients with ESRD managed with haemodialysis, we evaluated the association between 1.8 million inpatient admissions and nearly 0.5 million corresponding 30-day readmissions and the variation in daily ambient $PM_{2.5}$ in the USA over 7 years, 2008–2014. Daily variation in $PM_{2.5}$ was associated with increased risk of hospital admission and even greater risk of rehospitalisation. Following all-cause, cardiovascular and respiratory-related discharges, the early-readmission risk for any cause was increased by 1.6, 1.8, 1.8%, respectively per 10 $\mu g/m^3$ increase in daily $PM_{2.5}$. Importantly, readmissions related to some cardiorespiratory diagnoses had the greatest $PM_{2.5}$ attributed readmission risk that was observed to be elevated for both early and late readmissions. The early-readmission risk following all-cause discharges was increased by 6.5, 4.8, 3.7 and 2.7% for pneumonia, dysrhythmia and conduction disorder, heart failure, and other non-cardiac chest pain or respiratory syndrome-related readmissions, respectively. Overall, these results suggest that at 10 $\mu g/m^3$, 1.5%–1.7% of early-readmissions for any cause were attributable to short-term exposure. In the context of the daily $PM_{2.5}$ National Ambient Air Quality Standard (35 $\mu g/m^3$), this AF would be 5.3%–6.0%.

Our findings are consistent with previous studies that observed increased admission risks in elderly populations[6 9 38–42] and patients with cardiovascular health complications,[7 43] and increased readmission risk following cardiovascular-related admissions.[7 43 44] Studies in the Medicare population similarly observed a 1%–2% increase in cardiovascular hospital admissions associated with same-day $PM_{2.5}$ concentrations.[6 9 38 40] Risk appears to vary by diagnosis, as the increased risk was slightly less (0.13%) for ST-elevation myocardial infarction related admissions in a Chinese population[7] and greater (29%) for incident heart failure admissions in an Australian population.[43] Increases in respiratory admissions (1%–2%) have been noted in the Medicare population,[6 9 38–40] but were not observed in this study. Prior studies provide evidence that air pollution exposure is associated with adverse health outcomes including increased infection rates, acute lung edema and elevated concentrations of systematic inflammation markers.[45–47] Despite known associations between PM exposure and adverse cardiovascular and respiratory health outcomes, previous studies have not evaluated the impacts on hospital readmissions among individuals with ESRD.

Few studies have examined $PM_{2.5}$-related effects on readmissions, and those that have report on the long-term (>1 year) risk following cardiovascular-related admissions. Following cardiovascular hospitalisation, greater $PM_{2.5}$-related rehospitalisation risk was observed for some cardiac and respiratory readmissions (dysrhythmia, pneumonia) compared with our observations of all-cause readmissions (4.3%–7.5% vs 1.6%).

Studies in other populations have noted similar same-day cardiovascular-related readmission risks of 5.5%–7.7% and 2.6% associated with $PM_{2.5}$[7] and $PM_{10}$,[44] respectively. Additionally, one study in an Australian population with very low ambient air pollution concentrations (mean $PM_{2.5}$=2.9 $\mu g/m^3$) found no relationship between $PM_{2.5}$ and all-cause readmissions after an incident heart failure hospitalisation.[43] In some instances, short-term readmission risks were greater in comparison to the long-term readmission risks, suggesting the week following a discharge to be a window of heightened vulnerability. Prior work indicates that factors related to index hospitalisations and acute illness burden are predictive of an early readmission.[26 27] This may indicate that hospital readmissions related to certain acute illness burdens may be more susceptible to $PM_{2.5}$ exposure.

Our study contributes to the currently limited literature on the association between air pollution and health impacts among haemodialysis patients and shines a light on the vulnerability in this clinical population related to ambient airborne PM2.5. The 30-day rehospitalisation rate is 33% in this population, which is twice that of older Medicare beneficiaries without a kidney disease diagnosis.[16] As many as 70% of readmissions are thought to be unnecessary,[48] prompting efforts to improve outcomes. Economic healthcare costs associated with short-term increases in $PM_{2.5}$ are considerable; annual inpatient and postacute care costs related to a 10 $\mu g/m^3$ in daily $PM_{2.5}$ ranges US$30–US$70 million for cardiovascular and respiratory-related diseases.[49] $PM_{2.5}$ is a modifiable risk factor and reductions in short-term exposures could contribute to reduced healthcare costs. Our findings suggest that short-term increases in $PM_{2.5}$ contribute to healthcare usage through unplanned admissions and readmissions.

Additionally, the findings of the study may have a broader public health implication. In the conceptual framework for public health action, ambient airborne PM2.5 fits well into the base of a 5-tiered pyramid as a socioeconomic or social determinant of health.[50] Interventions that address the base of the pyramid may provide the greatest potential impact given the widespread population exposure

of such a determinant of health like ambient airborne PM2.5. Mitigation strategies would need to include policy initiatives to curb the expulsion of airborne pollutants, as well as education of persons, patients, hospital staff and others. Areas with the higher concentrations of ambient airborne PM2.5 may see the greatest benefit from mitigation strategies.

### Strengths and limitations

This study included a nearly complete cohort of US patients undergoing in-centre haemodialysis. To our knowledge, this is the largest analysis of short-term exposure to air pollution in the USA in this highly vulnerable population. The USRDS registry provides a complete registry of all hospitalisations and contains detailed information regarding demographics, dialysis, hospitalisation, rehospitalisation and comorbid conditions. Second, ambient $PM_{2.5}$ was estimated using a prediction model with highly resolved spatial and temporal resolution with proven accuracy.[29 30] Third, the time-stratified design allowed for county matching that reduced the potential confounding by factors that very slowly with time and those that are time-invariant. Fourth, the use of time-dependent risk factors in the Cox proportional hazard model allowed for readmission risk estimates to reflect the risk associated with daily fluctuations in ambient $PM_{2.5}$ and time-varying confounders.

This study also had some limitations. First, there was the potential for exposure misclassification as the location of the last dialysis visit was used to estimate individual level exposures. $PM_{2.5}$ around dialysis centres could differ from concentrations around hospitals and patient residences. However, given that patients generally reside less than six miles from their initial dialysis centre, differences in temporal variation of exposure should be small and not likely to contribute a systematic bias favouring an association between ambient $PM_{2.5}$ and clinical events.[32 33] Second, diagnosis misclassification was possible but was not likely to confound the relationship because it is not likely to vary on the same temporal scale as $PM_{2.5}$. Third, there is the possibility that some unmeasured time variant factors may have confounded our estimates (smoking status, medication usage, behaviours, lipid levels, C reactive protein levels, etc). Data availability restricted the consideration of some patient-level confounders, such as smoking status, to values recorded at baseline. We used a time stratified design to control for time-varying confounding for time scales larger than a month, such as the number of patients enrolled in the USRDS. At scales smaller than a month, the control of person time was not possible. Lastly, generalisation of the results is limited to the Medicare population with ESRD managed with haemodialysis treatment. Future studies are needed to understand $PM_{2.5}$-related impacts on specific health conditions, and if health impacts vary based on race, socioeconomic indicators or other individual and population factors.

## CONCLUSION

In conclusion, this US-wide cohort study identified increased risk in patients receiving in-centre haemodialysis associated with short-term increases in ambient air particle pollution. Elevated $PM_{2.5}$ concentrations were found to be associated with increased inpatient hospital admissions related to cardiovascular causes, and an increased likelihood of hospital readmission following cardiovascular and respiratory-related hospitalisations. Medicare spending for beneficiaries with ESRD is high. Traditional efforts to reduce the burden of disease focus on patient factors; however, these data suggest that air particle pollution is a factor that contributes to increased risks for hospital admission and subsequent readmission. To reduce $PM_{2.5}$-related morbidities, we echo the recommendations made in the Million Hearts initiative, that healthcare systems, insurers, physicians, and healthcare professionals should incorporate health risks related to ambient PM into patient care.

**Author affiliations**
[1]Center for Public Health and Environmental Assessment, US Environmental Protection Agency Research Triangle Park Campus, Research Triangle Park, North Carolina, USA
[2]US Environmental Protection Agency (ORISE), Chapel Hill, North Carolina, USA
[3]University of North Carolina Kidney Center and Division of Nephrology and Hypertension, Chapel Hill, North Carolina, USA
[4]Tsinghua University, Beijing, Beijing, China

**Acknowledgements** The patient data reported here have been supplied by the US Renal Data System (USRDS). We are grateful for the high resolution ambient $PM_{2.5}$ data provided by Drs Joel Schwartz and Qian Di. The interpretation and reporting of these data are the responsibility of the author(s) and in no way should be seen as an official policy or interpretation of the US government.

**Contributors** LW and AGR conceived and designed the study. TW, WEC and AK provided subject expert input into the study design and interpretation of evidence. AK, QD and CW-C provided access to the data for the study; LW managed and analysed the data and AGR oversaw the analysis. LW and AGR wrote the first draft of the manuscript. LW, YX, AK, CW-C, TW, WEC and AGR critically contributed to the manuscript and approved the final draft. LW and AGR are the guarantors. The corresponding author attests that all listed authors meet authorship criteria and that no others meeting the criteria have been omitted.

**Funding** This work was supported by an internal US Environmental Protection Agency grant (grant number not applicable).

**Disclaimer** The research described in this article has been reviewed by the Center for Public Health and the Environment, US Environmental Protection Agency, and approved for publication. Approval does not signify that the contents necessarily reflect the views and policies of the Agency, nor does the mention of trade names of commercial products constitute endorsement or recommendation for use. The source of funding had no role in study design, data collection, analyses, interpretation, and decision to submit the article for publication.

**Map disclaimer** The depiction of boundaries on this map does not imply the expression of any opinion whatsoever on the part of BMJ (or any member of its group) concerning the legal status of any country, territory, jurisdiction or area or of its authorities. This map is provided without any warranty of any kind, either express or implied.

**Competing interests** All authors have completed the ICMJE uniform disclosure form at www.icmje.org/coi_disclosure.pdf and declare: no support from any organisation for the submitted work; no financial relationships with any organisations that might have an interest in the submitted work in the previous three years; no other relationships or activities that could appear to have influenced the submitted work.

**Patient consent for publication** Not required.

**Ethics approval** This study was reviewed by the institutional review board at the University of North Carolina at Chapel Hill and determined to be exempt based on the study design involving secondary data analysis (IRB Number: 20-0984).

**Provenance and peer review** Not commissioned; externally peer reviewed.

**Data availability statement** The USRDS data may be obtained from a third party and are not publicly available to researchers. Data access to USRDS data sets is through an internal data use agreement with the University of North Carolina at Chapel Hill's Cecil G. Sheps Center. PM2.5 data were obtained through collaboration with Drs Joel Schwartz (Harvard TH Chan School of Public Health) and QD (Tsinghua University). For general data sharing inquiries contact rappold.ana@epa.gov or wyatt.lauren@epa.gov.

**Supplemental material** This content has been supplied by the author(s). It has not been vetted by BMJ Publishing Group Limited (BMJ) and may not have been peer-reviewed. Any opinions or recommendations discussed are solely those of the author(s) and are not endorsed by BMJ. BMJ disclaims all liability and responsibility arising from any reliance placed on the content. Where the content includes any translated material, BMJ does not warrant the accuracy and reliability of the translations (including but not limited to local regulations, clinical guidelines, terminology, drug names and drug dosages), and is not responsible for any error and/or omissions arising from translation and adaptation or otherwise.

**Open access** This is an open access article distributed in accordance with the Creative Commons Attribution Non Commercial (CC BY-NC 4.0) license, which permits others to distribute, remix, adapt, build upon this work non-commercially, and license their derivative works on different terms, provided the original work is properly cited, appropriate credit is given, any changes made indicated, and the use is non-commercial. See: http://creativecommons.org/licenses/by-nc/4.0/.

**ORCID iD**
Lauren H Wyatt http://orcid.org/0000-0002-4926-2058

## REFERENCES

1 Cohen AJ, Brauer M, Burnett R, *et al*. Estimates and 25-year trends of the global burden of disease attributable to ambient air pollution: an analysis of data from the global burden of diseases study 2015. *Lancet* 2017;389:1907–18.
2 Brook RD, Rajagopalan S, Pope CA, *et al*. Particulate matter air pollution and cardiovascular disease: an update to the scientific statement from the American heart association. *Circulation* 2010;121:2331–78.
3 Shi L, Zanobetti A, Kloog I, *et al*. Low-concentration PM2.5 and mortality: estimating acute and chronic effects in a population-based study. *Environ Health Perspect* 2016;124:46–52.
4 Kloog I, Ridgway B, Koutrakis P, *et al*. Long- and short-term exposure to PM2.5 and mortality: using novel exposure models. *Epidemiology* 2013;24:555–61.
5 WHO. *Country estimates of burden of disease from ambient air pollution for 2016*, 2018.
6 Dominici F, Peng RD, Bell ML, *et al*. Fine particulate air pollution and hospital admission for cardiovascular and respiratory diseases. *JAMA* 2006;295:1127–34.
7 Liu H, Tian Y, Cao Y, *et al*. Fine particulate air pollution and hospital admissions and readmissions for acute myocardial infarction in 26 Chinese cities. *Chemosphere* 2018;192:282–8.
8 Di Q, Dai L, Wang Y, *et al*. Association of short-term exposure to air pollution with mortality in older AdultsAssociation of short-term exposure to air pollution with mortality in older adults association of short-term exposure to air pollution with mortality in older adults. *JAMA* 2017;318:2446–56.
9 Bravo MA, Ebisu K, Dominici F, *et al*. Airborne fine particles and risk of hospital admissions for understudied populations: effects by Urbanicity and short-term cumulative exposures in 708 U.S. counties. *Environ Health Perspect* 2017;125:594–601.
10 Simoni M, Baldacci S, Maio S, *et al*. Adverse effects of outdoor pollution in the elderly. *J Thorac Dis* 2015;7:34–45.
11 Ran J, Sun S, Han L, *et al*. Fine particulate matter and cause-specific mortality in the Hong Kong elder patients with chronic kidney disease. *Chemosphere* 2020;247:125913.
12 Xi Y, Kshirsagar AV, Wade TJ, *et al*. Mortality in US hemodialysis patients following exposure to Wildfire smoke. *J Am Soc Nephrol* 2020;31:1824–35.
13 Coresh J, Selvin E, Stevens LA, *et al*. Prevalence of chronic kidney disease in the United States. *JAMA* 2007;298:2038–47.
14 Hsu C-yuan, Vittinghoff E, Lin F, *et al*. The incidence of end-stage renal disease is increasing faster than the prevalence of chronic renal insufficiency. *Ann Intern Med* 2004;141:95–101.
15 Cockwell P, Fisher L-A. The global burden of chronic kidney disease. *Lancet* 2020;395:662–4.
16 USRDS. *2018 USRDS annual data report: epidemiology of kidney disease in the United States*. Bethesda, MD: National Institutes of Health, National Institute of Diabetes and Digestive and Kidney Diseases, 2018.
17 Wang V, Vilme H, Maciejewski ML, *et al*. The economic burden of chronic kidney disease and end-stage renal disease. *Semin Nephrol* 2016;36:319–30.
18 Chen TK, Knicely DH, Grams ME. Chronic kidney disease diagnosis and management: a review. *JAMA* 2019;322:1294–304.
19 Flythe JE, Hilbert J, Kshirsagar AV, *et al*. Psychosocial factors and 30-day Hospital readmission among individuals receiving maintenance dialysis: a prospective study. *Am J Nephrol* 2017;45:400–8.
20 Perl J, McArthur E, Bell C, *et al*. Dialysis modality and readmission following hospital discharge: a population-based cohort study. *Am J Kidney Dis* 2017;70:11–20.
21 Chan L, Chauhan K, Poojary P, *et al*. National estimates of 30-day unplanned readmissions of patients on maintenance hemodialysis. *Clin J Am Soc Nephrol* 2017;12:1652–62.
22 Lin Y, Yang C, Chu H, *et al*. Association between the Charlson comorbidity index and the risk of 30-day unplanned readmission in patients receiving maintenance dialysis. *BMC Nephrol* 2019;20:363.
23 USEPA. *Integrated science assessment (ISA) for particulate matter*, 2009.
24 Newby DE, Mannucci PM, Tell GS, *et al*. Expert position paper on air pollution and cardiovascular disease. *Eur Heart J* 2015;36:83–93.
25 Yusuf S, Joseph P, Rangarajan S, *et al*. Modifiable risk factors, cardiovascular disease, and mortality in 155 722 individuals from 21 high-income, middle-income, and low-income countries (PURE): a prospective cohort study. *Lancet* 2020;395:795–808.
26 Graham KL, Auerbach AD, Schnipper JL, *et al*. Preventability of early versus late Hospital readmissions in a national cohort of general medicine patients. *Ann Intern Med* 2018;168:766–74.
27 Graham KL, Wilker EH, Howell MD, *et al*. Differences between early and late readmissions among patients: a cohort study. *Ann Intern Med* 2015;162:741–9.
28 Barrett MRS, Andrews R. *Overview of key readmission measures and methods. 2012. HCUP methods series report #2012-04 U.S. agency for healthcare research and quality*, 2012.
29 Makar M, Antonelli J, Di Q, *et al*. Estimating the causal effect of low levels of fine particulate matter on hospitalization. *Epidemiology* 2017;28:627–34.
30 Di Q, Kloog I, Koutrakis P, *et al*. Assessing PM2.5 exposures with high spatiotemporal resolution across the continental United States. *Environ Sci Technol* 2016;50:4712–21.
31 National Climatic Data Center. Global surface summary of the day - GSOD. Available: https://www.ncei.noaa.gov/access/metadata/landing-page/bin/iso?id=gov.noaa.ncdc:C00516
32 Prakash S, Coffin R, Schold J, *et al*. Travel distance and home dialysis rates in the United States. *Perit Dial Int* 2014;34:24–32.
33 Stephens JM, Brotherton S, Dunning SC, *et al*. Geographic disparities in patient travel for dialysis in the United States. *J Rural Health* 2013;29:339–48.
34 Carracedo-Martínez E, Taracido M, Tobias A, *et al*. Case-crossover analysis of air pollution health effects: a systematic review of methodology and application. *Environ Health Perspect* 2010;118:1173–82.
35 DeFlorio-Barker S, Crooks J, Reyes J, *et al*. Cardiopulmonary effects of fine particulate matter exposure among older adults, during Wildfire and Non-Wildfire periods, in the United States 2008-2010. *Environ Health Perspect* 2019;127:37006.
36 Hildebrandt M, Bender R, Gehrmann U, *et al*. Calculating confidence intervals for impact numbers. *BMC Med Res Methodol* 2006;6:32.
37 A language and environment for statistical computing. R Foundation for Statistical Computing [program] Vienna, Austria 2019.
38 Peng RD, Bell ML, Geyh AS, *et al*. Emergency admissions for cardiovascular and respiratory diseases and the chemical composition of fine particle air pollution. *Environ Health Perspect* 2009;117:957–63.
39 Peng RD, Chang HH, Bell ML, *et al*. Coarse particulate matter air pollution and hospital admissions for cardiovascular and respiratory diseases among Medicare patients. *JAMA* 2008;299:2172–9.
40 Powell H, Krall JR, Wang Y, *et al*. Ambient coarse particulate matter and hospital admissions in the Medicare cohort air pollution study, 1999-2010. *Environ Health Perspect* 2015;123:1152–8.

41 Zanobetti A, Dominici F, Wang Y, *et al*. A national case-crossover analysis of the short-term effect of PM2.5 on hospitalizations and mortality in subjects with diabetes and neurological disorders. *Environ Health* 2014;13:38.
42 Wellenius GA, Bateson TF, Mittleman MA, *et al*. Particulate air pollution and the rate of hospitalization for congestive heart failure among Medicare beneficiaries in Pittsburgh, Pennsylvania. *Am J Epidemiol* 2005;161:1030–6.
43 Huynh QL, Blizzard CL, Marwick TH, *et al*. Association of ambient particulate matter with heart failure incidence and all-cause readmissions in Tasmania: an observational study. *BMJ Open* 2018;8:e021798.
44 von Klot S, Peters A, Aalto P, *et al*. Ambient air pollution is associated with increased risk of hospital cardiac readmissions of myocardial infarction survivors in five European cities. *Circulation* 2005;112:3073–9.
45 Liu M-H, Chan M-J, Hsu C-W, *et al*. Association of uremic pruritus in hemodialysis patients with the number of days of high mean 24-hour particulate matter with a diameter of <2.5 μm. *Ther Clin Risk Manag* 2017;13:255–62.
46 Chiu PF, Chang CH, CL W, *et al*. High particulate matter 2.5 levels and ambient temperature are associated with acute lung edema in patients with nondialysis stage 5 chronic kidney disease. *Europ Renal Assoc* 2018 (published Online First: 2018/06/26).
47 Huang W-H, Yen T-H, Chan M-J, *et al*. Impact of environmental particulate matter and peritoneal dialysis-related infection in patients undergoing peritoneal dialysis. *Medicine* 2014;93:e149.
48 Mathew AT, Rosen L, Pekmezaris R, *et al*. Potentially avoidable readmissions in United States hemodialysis patients. *Kidney Int Rep* 2018;3:343–55.
49 Wei Y, Wang Y, Di Q, *et al*. Short term exposure to fine particulate matter and hospital admission risks and costs in the Medicare population: time stratified, case crossover study. *BMJ* 2019;367:l6258.
50 Frieden TR. A framework for public health action: the health impact pyramid. *Am J Public Health* 2010;100:590–5.

SCIENCE ADVANCES | RESEARCH ARTICLE

HEALTH AND MEDICINE

# Evaluating the impact of long-term exposure to fine particulate matter on mortality among the elderly

X. Wu[1]*, D. Braun[1,2]*, J. Schwartz[3], M. A. Kioumourtzoglou[4], F. Dominici[1]†

Copyright © 2020 The Authors, some rights reserved; exclusive licensee American Association for the Advancement of Science. No claim to original U.S. Government Works. Distributed under a Creative Commons Attribution NonCommercial License 4.0 (CC BY-NC).

**Many studies link long-term fine particle ($PM_{2.5}$) exposure to mortality, even at levels below current U.S. air quality standards (12 micrograms per cubic meter). These findings have been disputed with claims that the use of traditional statistical approaches does not guarantee causality. Leveraging 16 years of data—68.5 million Medicare enrollees—we provide strong evidence of the causal link between long-term $PM_{2.5}$ exposure and mortality under a set of causal inference assumptions. Using five distinct approaches, we found that a decrease in $PM_{2.5}$ (by 10 micrograms per cubic meter) leads to a statistically significant 6 to 7% decrease in mortality risk. Based on these models, lowering the air quality standard to 10 micrograms per cubic meter would save 143,257 lives (95% confidence interval, 115,581 to 170,645) in one decade. Our study provides the most comprehensive evidence to date of the link between long-term $PM_{2.5}$ exposure and mortality, even at levels below current standards.**

## INTRODUCTION

The Clean Air Act requires the U.S. Environmental Protection Agency (EPA) to set National Ambient Air Quality Standards (NAAQS). In 1971, EPA set the first NAAQS to best protect public health and welfare. NAAQS are periodically reviewed/revised on the basis of scientific evidence, resulting in a steady decrease in fine particle ($PM_{2.5}$; particles with diameter, ≤2.5 μm) concentrations. The association between long-term exposure to $PM_{2.5}$ and mortality is well documented (*1*–*4*). Recent studies have examined effect estimates among people who are exposed to $PM_{2.5}$ concentrations below the current NAAQS (*3*, *5*). These studies found that exposure to $PM_{2.5}$ below the U.S. standard is associated with an increased mortality risk.

Some scientists, including the current chair of EPA's Clean Air Scientific Advisory Committee, have argued against including studies that use traditional statistical approaches to informing revisions of the NAAQS and propose focusing on studies that apply causal inference approaches (*6*). Their main criticism is that traditional approaches that include potential confounders as covariates in the regression model do not inform causality. Recently, Goldman and Dominici (*7*) argued that although "causal inference approaches tend to be more robust to violation of assumptions, […] air pollution regulations must be based on existing evidence and demonstrated inference methods that arise from review of existing literature."

Our study bridges this divide. Using the largest air pollution study cohort to date (nationwide Medicare enrollees 2000–2016), we provide strong evidence of the causal link between long-term $PM_{2.5}$ exposure and mortality under a set of assumptions necessary for causal inference (described in detail in Materials and Methods). We applied traditional and causal inference approaches to the same data, assessed sensitivity to modeling assumptions and study period, and made statistical software available.

[1]Department of Biostatistics, Harvard T.H. Chan School of Public Health, Boston, MA, USA. [2]Department of Data Sciences, Dana-Farber Cancer Institute, Boston, MA, USA. [3]Department of Environmental Health, Harvard T.H. Chan School of Public Health, Boston, MA, USA. [4]Department of Environmental Health Sciences, Mailman School of Public Health, Columbia University, New York, NY, USA.
*These authors contributed equally to this work.
†Corresponding author. Email: fdominic@hsph.harvard.edu

## RESULTS

We obtained open cohort data for more than 68.5 million Medicare enrollees (65 years of age or older) from 2000 to 2016 (*8*), including demographic information on age, sex, race/ethnicity, date of death, and residential zip code. Each person was tracked through a unique patient ID. Annual $PM_{2.5}$ exposure estimates were obtained from a previously developed and validated ensemble prediction model (Fig. 1) (*9*). The model ensembles three machine learning algorithms to predict daily $PM_{2.5}$ at 1-$km^2$ grid resolution across the United States using remote sensing, output from chemical transport models, meteorological and land-use variables, and other predictors. As residential addresses for Medicare enrollees are available at the zip code level, we used zonal statistics to aggregate exposure estimates to the zip code level to perform the health analyses. To adjust for confounding, we considered 10 zip code– and county-level confounders including zip code–level socioeconomic status (SES) indicators from the 2000 and 2010 Census and the 2005–2012 American Community Surveys (ACS) and county-level information from the Centers for Disease Control and Prevention's Behavioral Risk Factor Surveillance System (BRFSS). We considered the following zip code–level meteorological variables: summer (June to September) and winter (December to February) average of (i) maximum daily temperatures and (ii) relative humidity in each zip code obtained from gridMET via Google Earth Engine. Materials and Methods and table S1 include details on the variables included in the analyses and the R code for the implementation of the methods (section S4). All study data sources are publicly available.

We implemented five statistical approaches to estimating the effect of $PM_{2.5}$ exposure on mortality, accounting for potential confounders. The two traditional approaches rely on regression modeling for confounding adjustment: (i) Cox proportional hazards model and (ii) Poisson regression. We created multiple observations for each individual, each observation representing a person year of follow-up. We fit Cox hazards models, using follow-up year as the time metric and annual $PM_{2.5}$ as the time-varying exposure, stratifying by age (5-year categories), sex, race/ethnicity, and Medicaid eligibility (a surrogate for individual-level SES). We fit Poisson models for aggregated outcomes (i.e., counts of death) by zip code and year, stratified by the same individual-level characteristics and follow-up year. We adjusted both for confounding by including 10 zip code– or county-level risk

Downloaded from http://advances.sciencemag.org/ on February 9, 2021




**Fig. 1. Annual average $PM_{2.5}$ concentrations in the continental United States for 2000 and 2016.**

factors, four zip code–level meteorological variables, and indicators for geographic region (Northeast, South, Midwest, and West). To account for long-term time trends, we included calendar year as a categorical variable.

We also considered three approaches for causal inference that rely on the potential outcomes framework and generalized propensity scores (GPSs). These approaches adjust for confounding using (i) matching by GPS, (ii) weighting by GPS, and (iii) adjustment by GPS, by including GPS as a covariate in the health outcome model. The GPSs were estimated by regressing the $PM_{2.5}$ exposure on confounders using a gradient boosting machine, including the same confounders as in the traditional approaches. Following GPS implementation, we fit a Poisson regression model stratified by individual-level characteristics and follow-up year, as if it was a stratified randomized experiment. All approaches are described in detail in Materials and Methods and in section S1.

All five approaches were fit on the 2000–2016 data. The 2000–2016 cohort consisted of 68,503,979 individuals (573,370,257 person years); we observed 27,106,639 deaths (39.6%; Table 1). Figure 1 shows the average $PM_{2.5}$ concentrations in 2000 and 2016. To estimate low-level $PM_{2.5}$ effects on mortality, we applied the five statistical approaches, restricting analyses to the subpopulation of Medicare enrollees who were always exposed to $PM_{2.5}$ levels lower than 12 μg/m$^3$ over the entire study period. Additional analysis was conducted on the previously used 2000–2012 cohort. To evaluate the model sensitivity to potential unmeasured confounders that vary over time, all five approaches were fit twice, once with year as a covariate (the main analysis) and once without (as a sensitivity analysis). Results for all additional analyses are shown in section S3. Effect estimates are presented as hazard ratios (HRs) per increase (10 μg/m$^3$) in annual $PM_{2.5}$. Ninety-five percent confidence intervals (CIs) for all models were evaluated by m-out-n blocked bootstrap to account for spatial correlation. More specifically, we recalculated the GPS and refit the outcome model in each bootstrapped sample to ensure that the bootstrapping procedure jointly accounted for the variability associated both with the GPS estimation and with the outcome model (see section S1).

The causal inference framework lends itself to the evaluation of covariate balance for measured confounders. The covariate balance indicates the quality of the causal inference approach at recovering randomized experiments and informs the degree to which we can make a valid causal assessment. A detailed discussion is provided in section S1. Covariate balance was evaluated using mean absolute correlation (AC), with values of <0.1 indicating high quality in recovering randomized experiments. Figure 2 shows that AC is smaller than 0.1 using causal inference GPS methods (matching and weighting), thus strengthening the interpretability and validity of our analyses as providing evidence of causality. Additional evaluation of covariate balance estimating the standardized mean difference after dichotomizing the continuous exposure is provided in fig. S3.

For the period 2000–2016, we found that all statistical approaches provide consistent results: A decrease (10 μg/m$^3$) in $PM_{2.5}$ led to a statistically significant decrease in mortality rate ranging between 6 and 7% (= 1 – 1/HR) [HR estimates, 1.06 (95% CI, 1.05 to 1.08) to 1.08 (95% CI, 1.07 to 1.09)]. The estimated HRs were larger when studying the cohort of Medicare enrollees that were always exposed to $PM_{2.5}$ levels lower than 12 μg/m$^3$ [1.23 (95% CI, 1.18 to 1.28) to 1.37 (95% CI, 1.34 to 1.40)] (Fig. 3; corresponding numbers are shown in table S3). Similar results were found for the period 2000–2012 (table S3), also showing consistency with Di *et al.* (*3*). We reanalyzed all data excluding year as a covariate. The estimated HRs were larger in magnitude, potentially indicating residual confounding bias by some unmeasured confounders with time trends that covary with time trends in the outcome and exposure (table S3). We conducted further sensitivity analyses to unmeasured confounding by calculating the E-value (*10*, *11*). The results, shown in table S5, suggest that our conclusions are overall robust to unmeasured confounding bias.

We estimated the total number of deaths avoided among elderly in a decade if, hypothetically, the U.S. standards followed the World Health Organization (WHO) annual guideline of 10 μg/m$^3$ and all zip codes complied. For this calculation, we used the most conservative HR estimate across all statistical approaches [HR, 1.06 (95% CI, 1.05 to 1.08) and 1.23 (95% CI, 1.18 to 1.28)]. We found that lowering the standards to 10 μg/m$^3$ would have saved 143,257 lives (95% CI, 115,581 to 170,645) in one decade.

## DISCUSSION

This study provides the most robust and reproducible evidence to date on the causal link between exposure to $PM_{2.5}$, even at levels below

Downloaded from http://advances.sciencemag.org/ on February 9, 2021

**Table 1. Characteristics for the study cohorts.** Note that mean (SD) is presented for continuous variables.

| **Variables** | **Entire Medicare enrollees** | **Medicare enrollees exposed to $PM_{2.5} \leq 12\ \mu g/m^3$** |
|---|---|---|
| Number of individuals | 68,503,979 | 38,366,800 |
| Number of deaths | 27,106,639 | 10,124,409 |
| Total person years | 573,370,257 | 259,469,768 |
| Median years of follow-up | 8.0 | 8.0 |
| **Individual-level characteristics** | | |
| **Age at entry (years)** | | |
| 65–74 (%) | 80.6 | 88.1 |
| 75–84 (%) | 14.9 | 9.0 |
| 85–94 (%) | 4.1 | 2.6 |
| 95 or above (%) | 0.4 | 0.2 |
| Mean (SD) | 69.2 (6.7) | 67.6 (5.6) |
| **Sex** | | |
| Female (%) | 55.5 | 53.8 |
| Male (%) | 44.5 | 46.2 |
| **Race** | | |
| White (%) | 83.9 | 84.7 |
| Black (%) | 9.1 | 7.3 |
| Asian (%) | 1.8 | 1.8 |
| Hispanic (%) | 2.0 | 2.2 |
| North American Native (%) | 0.3 | 0.4 |
| **Medicaid eligibility** | | |
| Eligible (%) | 11.7 | 10.9 |
| **Area-level risk factors characteristics** | | |
| Ever smoked (%) | 47.3 | 47.3 |
| Below poverty level (%) | 10.5 | 10.1 |
| Below high school education (%) | 28.5 | 25.6 |
| Owner-occupied housing (%) | 72.0 | 72.9 |
| Hispanic (%) | 8.9 | 7.5 |
| Black (%) | 8.9 | 9.2 |
| Population density (persons/km$^2$) | 600.0 (1953.9) | 489.1(1634.0) |
| Mean BMI (kg/m$^2$) | 27.6 (1.1) | 27.6 (1.1) |
| Median household income ($1000) | 48.9 (21.7) | 50.3 (22.0) |
| Median home value ($1000) | 162.5 (140.9) | 170.9 (146.2) |
| **Meteorological variables** | | |
| Summer temperature (°C) | 29.5 (3.7) | 29.5 (3.9) |
| Winter temperature (°C) | 7.6 (7.2) | 7.4 (7.6) |
| Summer relative humidity (%) | 88.0 (11.7) | 86.7 (12.7) |
| Winter relative humidity (%) | 86.2 (7.3) | 86.4 (7.6) |
| **$PM_{2.5}$ concentrations** ($\mu g/m^3$) | 9.8 (3.2) | 8.4 (2.3) |

12 $\mu g/m^3$, and mortality among Medicare enrollees. Considering (i) the massive study population, (ii) the numerous sensitivity analyses, and (iii) the transparent assessment of covariate balance that indicates the quality of causal inference for recovering randomized experiments, we conclude that long-term $PM_{2.5}$ exposure is causally related to mortality. This conclusion assumes that the causal inference assumptions hold and, more specifically, that we were able to adequately account for confounding bias. We explored various modeling approaches and conducted extensive sensitivity analyses and found that the results were robust across approaches and models. This work relies on publicly available data, and we provide code that allows for reproducibility of our analyses.

Downloaded from http://advances.sciencemag.org/ on February 9, 2021




**Fig. 2. Mean AC for unadjusted, weighted, and matched populations.** Mean AC was smaller than 0.1 using causal inference GPS methods (matching and weighting). AC values of <0.1 indicate good covariate balance, strengthening the interpretability and validity of our analyses as providing evidence of causality. BMI, body mass index.




**Fig. 3. HR and 95% CIs.** The estimated HRs were obtained under five different statistical approaches (two traditional approaches and three causal inference approaches). HRs were adjusted by 10 potential confounders, four meteorological variables, geographic region, and year.

Downloaded from http://advances.sciencemag.org/ on February 9, 2021

Both traditional and causal inference approaches rely on assumptions. Unless all assumptions are satisfied, regardless of approach, recovery of causal effects is not guaranteed. A critical assumption that guarantees our conclusion's validity is that our statistical analyses account for all confounders. This assumption must always be made in observational studies. We included several publicly available individual- and area-level potential confounders. To mitigate unmeasured confounding bias, we assessed the results' sensitivity by including year as a surrogate for some unmeasured confounders that might have covaried over time with $PM_{2.5}$ and mortality and, thus, confound their association. Even after adjustment for year, the analysis could be affected by confounding bias by unmeasured factors; therefore, we conducted further sensitivity analyses to unmeasured confounding by calculating the E-value and showed that our results are robust to unmeasured confounding bias.

Dominici and Zigler (*12*) previously discussed three notions of what constitutes evidence of causality in air pollution epidemiology. The first is causality inferred from evidence of biological plausibility (*13*). The second is consistency of results across many epidemiological studies and adherence to Bradford Hill causal criteria (*14*). The third is the use of causal inference methods that are more robust to model misspecification compared to traditional approaches and, when assumptions are met, can isolate causal relationships. More specifically, the causal inference approaches considered in this work require the estimation of GPS as the first step. Assuming all causal inference assumptions hold, these approaches are more robust to outcome model misspecification and allow for the transparent evaluation of covariate balance. However, note that if the models are accurately specified and all assumptions are met, then the traditional approaches have the potential to inform causal relationship as well. In particular, we found that a more flexible regression model specification may help adequately adjust for confounding; when implementing these flexible models, we observed similar results compared to the causal inference approaches.

This work estimates the causal relationship using causal inference methods, addressing just one of Dominici and Zigler's three notions of what constitutes scientific evidence of causality. The collective evidence across studies conducted in different populations, using different study designs and methods, is also imperative to inform regulatory action. A recent meta-analysis found robust evidence for an effect on mortality across 52 cohort studies at $PM_{2.5}$ levels below 10 $\mu g/m^3$ (*15*).

Exposure to $PM_{2.5}$ was estimated from a prediction model, which, while very good, is not perfect. The $PM_{2.5}$ exposure prediction model developed by Di *et al.* (*9*) that was used in this analysis indicated excellent model performance, with a 10-fold cross-validated $R^2$ of 0.89 for annual $PM_{2.5}$ predictions. However, exposure error could have affected all HR estimates. In the original study by Di *et al.* (*3*), the authors assessed the robustness of the results to the exposure predictions by repeating the analysis based on $PM_{2.5}$ exposure data obtained from 1928 EPA ambient monitors. The additional analysis was restricted to the subpopulation of individuals within 50 km of these monitors. While this subset does not represent the entire population, we found that the analysis based on nearest monitoring site led to an HR estimate that was only slightly lower than the one obtained using the exposure prediction model [i.e., 1.061 (95% CI, 1.059 to 1.063) versus 1.073 (95% CI, 1.071 to 1.075)]. Although these results are reassuring, we recognize that they are not a substitute to a formal analysis that accounts for exposure error.

Accounting for exposure measurement error under a causal inference framework using propensity scores is complex, as the exposure error will affect not only the estimation of the health effects but also the estimation of the propensity score and its implementation to adjust for measured confounders (*16*). Regression calibration is a common method for measurement error correction (*17*). Wu *et al.* (*18*) proposed a regression calibration approach for GPS analysis under categorical exposures. The proposed approach was applied in the context of long-term $PM_{2.5}$ exposure and mortality using the Medicare data in the Northeastern United States. When accounting for exposure error, there was a higher and still statistically significant association between exposure to $PM_{2.5}$ and mortality, although with larger CIs. How to propagate exposure error under a causal inference framework for a continuous exposure is still an area of active research; the presence of exposure measurement error could induce a bias toward the null in all of our estimates (*19*).

The model parameterization assumes that zip code–specific information is spatially independent, given covariates. Since we adjusted for numerous zip code–level predictors of mortality, including SES and meteorological variables, this assumption is likely to hold. If any residual spatial dependence remains under certain assumptions (e.g., those used in generalized estimating equations), then it would not have affected our point estimates but could have influenced the estimated SEs. However, our bootstrapping procedure partially accounts for this possibility. By randomly sampling zip codes for each bootstrap replicate, we were able to break down spatial dependence given covariates. Therefore, it is unlikely that our results are affected by spatial correlation.

Our study is based on publicly available data sources and have made all code developed for our analyses publicly available. Our approach maximizes reproducibility and transparency. We provide robust evidence that the current U.S. standards for $PM_{2.5}$ concentrations are not protective enough and should be lowered to ensure that vulnerable populations, such as the elderly, are safe.

Our results raise awareness of the continued importance of assessing the impact of air pollution exposure on mortality. There are currently numerous disputes regarding the evidence from previous air pollution epidemiologic studies, with arguments made for only using causal inference methods or only including studies that make participants' information publicly available. We oppose these very strongly. Most epidemiological studies must rely on confidential patient data to provide evidence on adverse health effects of environmental exposures on outcomes and also focus on populations that cannot be studied using administrative data. We hope this work will help researchers and policy makers, particularly as revision discussions of national $PM_{2.5}$ standards are underway.

## MATERIALS AND METHODS

### Study population

Our study population is composed of more than 68.5 million Medicare enrollees (≥65 years of age) between 2000 and 2016. Medicare claims data, obtained from the Centers for Medicare and Medicaid Services (*8*), are an open cohort, including demographic information such as age, sex, race/ethnicity, date of death, and residential zip code. A unique patient ID is assigned to each person to allow for tracking over time. Medicare enrollees entered our cohort in 2000 if enrolled before 2000, or upon their enrollment after 2000. After enrollment, each individual was followed annually until the year of their death

Downloaded from http://advances.sciencemag.org/ on February 9, 2021

or the end of our study period (31 December 2016). This study was conducted under a protocol approved by the Harvard T.H. Chan School of Public Health Human Subjects Committee.

### Exposure assessment

We estimated daily $PM_{2.5}$ levels at a high spatiotemporal resolution using a 1-km$^2$ grid network across the contiguous United States and a well-validated ensemble-based prediction model (*9*). This model used ensemble learning approaches to combining three machine learning models: a random forest regression, a gradient boosting machine, and an artificial neural network (*20*–*22*). These machine learning algorithms used more than 100 predictor variables from satellite data, land-use information, weather variables, and output from chemical transport model simulations. The ensemble-based model was trained on daily $PM_{2.5}$ concentrations measured at 2156 U.S. EPA monitoring sites, with an average cross-validated $R^2$ of 0.86 for daily $PM_{2.5}$ predictions and 0.89 for annual predictions, indicating excellent performance that was improved compared to previously developed models (*23*, *24*).

Residential addresses are not available for Medicare enrollees, only residential zip codes. For each standard zip code, we used zonal statistics to calculate the daily average $PM_{2.5}$ concentration based on all 1-km$^2$ grid cell predictions within the zip code via aggregations. More specifically, we first overlaid the zip code boundaries to the 1-km$^2$ grid cells and then averaged the predictions at 1-km$^2$ grid cells whose centroids fall within the boundary of that zip code (*25*). For P.O. Box–only zip codes, the average $PM_{2.5}$ concentrations were calculated by linking to the predictions from the nearest 1-km$^2$ grid cell. Annual zip code averages were estimated by averaging the daily concentrations. We assigned the annual estimated zip code average $PM_{2.5}$ concentration to individuals who resided in that zip code for each calendar year.

### Potential confounders

The stratification by individual-level characteristics also adjusted for potential confounding by these variables. Furthermore, to adjust for confounding bias by community-level factors, we used information about multiple zip code–level SES variables collected from the U.S. Census, ACS, and BRFSS. All data [including census data, which are reported for Zip Code Tabulation Area (ZCTA)] were mapped to postal zip codes. Specifically, we included (i) two county-level variables: average body mass index and smoking rate; (ii) eight zip code–level census variables: proportion of Hispanic residents, proportion of Black residents, median household income, median home value, proportion of residents in poverty, proportion of residents with a high school diploma, population density, and proportion of residents that own their house; and (iii) four zip code–level meteorological variables: the summer (June to September) and winter (December to February) averages of maximum daily temperatures and relative humidity. We obtained zip code–level meteorological variables using area-weighted aggregations based on daily temperature and humidity data on 4-km$^2$ gridded rasters from Gridmet via Google Earth Engine (*26*, *27*). We also considered two indicator variables indicating (i) the four census geographic regions of the United States (Northeast, South, Midwest, and West) and (ii) calendar years (2000–2016) to adjust for some residual or unmeasured spatial and temporal confounding, respectively. The data used for this study are publicly available and sources are listed in table S1.

### Data linkage

Outcome data were available at the postal zip code level, at which we also assigned annual $PM_{2.5}$ exposures. Outcome and exposure information were available for 35,924 zip codes. We then mapped potential confounders at ZCTA to postal zip codes to link the outcome and exposure data to potential confounders obtained from the U.S. Census, ACS, and the BRFSS. The total number of zip codes included in our main analysis with information about all outcome, exposure, and confounder data was 31,337. See section S2 for more details.

### Statistical analysis

For all models, we performed stratified outcome model analysis by four individual-level characteristics: (i) a 5-year category of age at entry (65 to 69, 70 to 74, 75 to 79, 80 to 84, 85 to 89, 90 to 94, 95 to 99, and above 100 years of age), (ii) race/ethnicity (White, Black, Asian, Hispanic, Native American, and other), (iii) sex (male or female), and (iv) an indicator variable for Medicaid eligibility (a surrogate for individual-level SES).

We fit five different statistical models to estimate the causal relationship between long-term $PM_{2.5}$ exposure and our outcome of interest, all-cause mortality among the elderly. Below, we describe the five approaches; details on the statistical methods and assumptions are provided in section S1.

#### *Cox proportional hazard approach*

We fit stratified Cox proportional hazards models using annual $PM_{2.5}$ as the time-varying exposure and stratifying by four individual-level characteristics. In our main analysis, we adjusted for 14 zip code– or county-level time-varying covariates, as well as a dummy region variable and dummy calendar year variable. The Cox proportional hazards survival model is specified as Survival(follow-up year, death) ~ $PM_{2.5}$ + area-level risk factors + meteorological variables + dummy year + dummy region + strata(age, race, gender, Medicaid eligibility).

#### *Poisson regression approach*

We fit the Poisson regression model, using annual $PM_{2.5}$ as the time-varying exposure; the count of deaths at the given follow-up year, calendar year, and zip code as the outcome and the corresponding total person-time as the offset term. To adjust for potential confounding, we included the same 14 zip code– or county-level time-varying covariates, as well as a dummy region variable and dummy calendar year variable, as those included in the Cox proportional hazards models. We used a stratified Poisson regression model formulation to account for the strata-specific baseline risk rates by stratifying on individual-level characteristics. The Poisson regression model is specified as log(E[death counts]) ~ $PM_{2.5}$ + area-level risk factors + meteorological variables + dummy year + dummy region + strata(age, race, gender, Medicaid eligibility, follow-up year) + offset(log[person year]).

#### *Causal inference approaches*

*GPS estimation.* The three proposed causal inference approaches required the estimation of GPS as the first step. In our study, we modeled the conditional density of exposure (i.e., annual average $PM_{2.5}$) on the 14 zip code– or county-level time-varying covariates, as well as a dummy region variable and dummy calendar year variable, using gradient boosting machine with normal residuals (*28*, *29*). The gradient boosting machine model is specified as $PM_{2.5}$ ~ area-level risk factors + meteorological variables + dummy year + dummy region + ε, where $\varepsilon \sim N(0, \sigma^2)$.

Downloaded from http://advances.sciencemag.org/ on February 9, 2021

*GPS matching approach.* We constructed the matched pseudo-population as described in section S1. We first checked the covariate balance in the matched pseudo-population, and if covariate balance was achieved (average AC, <0.1), then we fit a univariate Poisson regression model regressing the death counts with an offset person-time term, on the exposure $PM_{2.5}$, stratifying by four individual-level characteristics and the same follow-up year. The Poisson regression model is specified as log($E$[death counts]) ~ $PM_{2.5}$ + strata(age, race, gender, Medicaid eligibility, follow-up year) + offset(log[person year]), on the matched pseudo-population. Additional details on the matching procedure can be found in section S1.

*GPS weighting approach.* We constructed the weighted pseudo-population as described in section S1. We first checked the covariate balance on the weighted pseudo-population, and if covariate balance was achieved (average AC, <0.1), then we fit a weighted univariate Poisson regression model regressing the death count with offset term the person-time on $PM_{2.5}$ exposure incorporating the assigned weights and stratifying by the four individual-level characteristics and the same follow-up year. The Poisson regression model is specified as log($E$[death counts]) ~ $PM_{2.5}$ + strata(age, race, gender, Medicaid eligibility, follow-up year) + offset(log[person year]), weights = $f(PM_{2.5})$/GPS, where $f(PM_{2.5})$ is the marginal density function of exposure $PM_{2.5}$, which serves as a stabilizing term (*30*).

*GPS adjustment approach.* We modeled the conditional expectation of the death counts given the exposure and the estimated GPS as a stratified Poisson regression with flexible formulation of bivariate variables, with the corresponding person-time offset. The Poisson regression model was specified as log($E$[death counts]) ~ $PM_{2.5}$ + $PM_{2.5} \times$ GPS + GPS + $GPS^2$ + strata(age, race, gender, Medicaid eligibility, follow-up year) + offset(log[person year]). In contrast to the GPS matching/weighting approaches, where the analysis is complete after fitting the Poisson regression model, for the GPS adjustment approach, the coefficients from the Poisson regression model do not provide any causal interpretation; instead, the causal outcome analysis is conducted on the counterfactuals predicted by the Poisson model (*31*). We fit a univariate linear regression model regressing the counterfactual mean hazard rates for each $PM_{2.5}$ level, stratifying by four individual-level characteristics and the same follow-up year. The outcome linear regression model is specified as $E$(hazard rates) ~ $PM_{2.5}$ + strata(age, race, gender, Medicaid eligibility, follow-up year). Additional details are provided in section S1.

### Total events avoided

We estimated the total number of deaths that would be avoided among the elderly per decade if all areas were in compliance with the current WHO guidelines (annual $PM_{2.5}$ exposure, $\leq 10\ \mu g/m^3$) (*32*). Nethery *et al.* (*33*) defined and identified a causal quantity named the total events avoided (TEA) under causal assumptions 1 to 3 (see section S1), defined as the difference in the expected number of health events under the counter-factual pollution exposures and the observed number of health events under the factual pollution exposures. Such a causal quantity is particularly related to the health policy that intends to answer the question "How many deaths were avoided in the Medicare population per decade due to the U.S. National Ambient Air Quality Standards (NAAQS) changes in particulate matter ($PM_{2.5}$) in the same time?"

We created the counterfactual $PM_{2.5}$ exposures if all zip codes in the continental United States complied with the current WHO guidelines (annual $PM_{2.5}$, $\leq 10\ \mu g/m^3$). For zip codes that did not comply with the standard until 2016, their counterfactual was assumed to be exposure exactly at this hypothesized standard ($10\ \mu g/m^3$). This is a conservative estimate, as it answers the question of TEA if these zip codes were exactly at $10\ \mu g/m^3$ and not lower than this concentration. For zip codes already in compliance, we assumed that their concentration was unchanged, which otherwise would result in even higher TEA.

We compared this counterfactual scenario to the factual scenarios during the most recent decade (2007–2016). For zip codes with an annual $PM_{2.5}$ concentration of $>12\ \mu g/m^3$, the numbers for the TEA were obtained using the most conservative HR from our main analysis [HR, 1.06 (95% CI, 1.05 to 1.08); see table S3]. For zip codes with an annual $PM_{2.5}$ concentration of 10 to 12 $\mu g/m^3$, the numbers for the TEA were obtained using the most conservative HR from our low-level analysis [HR, 1.23 (95% CI, 1.18 to 1.28)]. Zip codes with an annual $PM_{2.5}$ concentration of $<10\ \mu g/m^3$ did not contribute to the TEA. For the CI calculation, we used the lower and upper bounds of the 95% CIs from the HR estimates (which were obtained by bootstrap).

### Evaluation of unmeasured confounding

We conducted a sensitivity analysis to evaluate the robustness of our results to unmeasured confounding by calculating the E-value. The E-value for the point estimate of interest (in our case, the HR) can be defined as the minimal strength of an association, on the risk ratio scale, that an unmeasured confounder would need to have with both the exposure and outcome, conditional on the covariates already included in the model, to fully explain the observed association under the null. We calculated the E-value for our reported HRs per increase ($10\ \mu g/m^3$) of long-term exposure to $PM_{2.5}$. The calculation of E-value can be implemented through the E-value calculator by Mathur *et al.* (*11*), available at https://www.evalue-calculator.com/.

## SUPPLEMENTARY MATERIALS

Supplementary material for this article is available at http://advances.sciencemag.org/cgi/content/full/6/29/eaba5692/DC1

View/request a protocol for this paper from *Bio-protocol*.

## REFERENCES AND NOTES

1. D. W. Dockery, C. A. Pope III, X. Xu, J. D. Spengler, J. H. Ware, M. E. Fay, B. G. Ferris Jr., F. E. Speizer, An association between air pollution and mortality in six U.S. cities. *N. Engl. J. Med.* **329**, 1753–1759 (1993).
2. R. Beelen, O. Raaschou-Nielsen, M. Stafoggia, Z. J. Andersen, G. Weinmayr, B. Hoffmann, K. Wolf, E. Samoli, P. Fischer, M. Nieuwenhuijsen, P. Vineis, W. W. Xun, K. Katsouyanni, K. Dimakopoulou, A. Oudin, B. Forsberg, L. Modig, A. S. Havulinna, T. Lanki, A. Turunen, B. Oftedal, W. Nystad, P. Nafstad, U. De Faire, N. L. Pedersen, C.-G. Östenson, L. Fratiglioni, J. Penell, M. Korek, G. Pershagen, K. T. Eriksen, K. Overvad, T. Ellermann, M. Eeftens, P. H. Peeters, K. Meliefste, M. Wang, B. Bueno-de-Mesquita, D. Sugiri, U. Kramer, J. Heinrich, K. de Hoogh, T. Key, A. Peters, R. Hampel, H. Concin, G. Nagel, A. Ineichen, E. Schaffner, N. Probst-Hensch, N. Künzli, C. Schindler, T. Schikowski, M. Adam, H. Phuleria, A. Vilier, F. Clavel-Chapelon, C. Declercq, S. Grioni, V. Krogh, M.-Y. Tsai, F. Ricceri, C. Sacerdote, C. Galassi, E. Migliore, A. Ranzi, G. Cesaroni, C. Badaloni, F. Forastiere, I. Tamayo, P. Amiano, M. Dorronsoro, M. Katsoulis, A. Trichopoulou, B. Brunekreef, G. Hoek, Effects of long-term exposure to air pollution on natural-cause mortality: An analysis of 22 European cohorts within the multicentre ESCAPE project. *Lancet* **383**, 785–795 (2014).
3. Q. Di, Y. Wang, A. Zanobetti, Y. Wang, P. Koutrakis, C. Choirat, F. Dominici, J. D. Schwartz, Air pollution and mortality in the Medicare population. *N. Engl. J. Med.* **376**, 2513–2522 (2017).
4. C. Liu, R. Chen, F. Sera, A. M. Vicedo-Cabrera, Y. Guo, S. Tong, M. S. Z. S. Coelho, P. H. N. Saldiva, E. Lavigne, P. Matus, N. Valdes Ortega, S. Osorio Garcia, M. Pascal, M. Stafoggia, M. Scortichini, M. Hashizume, Y. Honda, M. Hurtado-Díaz, J. Cruz, B. Nunes, J. P. Teixeira, H. Kim, A. Tobias, C. Iñiguez, B. Forsberg, C. Åström, M. S. Ragettli, Y.-L. Guo, B.-Y. Chen, M. L. Bell, C. Y. Wright, N. Scovronick, R. M. Garland, A. Milojevic, J. Kysely, A. Urban, H. Orru, E. Indermitte, J. J. K. Jaakkola, N. R. I. Ryti, K. Katsouyanni, A. Analitis, A. Zanobetti, J. Schwartz, J. Chen, T. Wu, A. Cohen, A. Gasparrini, H. Kan, Ambient

Downloaded from http://advances.sciencemag.org/ on February 9, 2021

particulate air pollution and daily mortality in 652 cities. *N. Engl. J. Med.* **381**, 705–715 (2019).
5. A. J. Pappin, T. Christidis, L. L. Pinault, D. L. Crouse, J. R. Brook, A. Erickson, P. Hystad, C. Li, R. V. Martin, J. Meng, S. Weichenthal, A. van Donkelaar, M. Tjepkema, M. Brauer, R. T. Burnett, Examining the shape of the association between low levels of fine particulate matter and mortality across three cycles of the Canadian Census Health and Environment Cohort. *Environ. Health Perspect.* **127**, 107008 (2019).
6. Environmental Protection Agency (EPA), Chartered Clean Air Scientific Advisory Committee (CASAC) public teleconference on particulate matter (PM) (2019); https://yosemite.epa.gov/sab/sabproduct.nsf/MeetingCalCASAC/4F40665AD1DDCEF6852583A000645464?OpenDocument [accessed 13 April 2020].
7. G. T. Goldman, F. Dominici, Don't abandon evidence and process on air pollution policy. *Science* **363**, 1398–1400 (2019).
8. Centers for Medicare and Medicaid Services (CMS); www.cms.gov [accessed 1 November 2017].
9. Q. Di, H. Amini, L. Shi, I. Kloog, R. Silvern, J. Kelly, M. B. Sabath, C. Choirat, P. Koutrakis, A. Lyapustin, Y. Wang, L. J. Mickley, J. Schwartz, An ensemble-based model of $PM_{2.5}$ concentration across the contiguous United States with high spatiotemporal resolution. *Environ. Int.* **130**, 104909 (2019).
10. T. J. VanderWeele, P. Ding, Sensitivity analysis in observational research: Introducing the E-value. *Ann. Intern. Med.* **167**, 268–274 (2017).
11. M. B. Mathur, P. Ding, C. A. Riddell, T. J. VanderWeele, Web site and R package for computing E-values. *Epidemiology* **29**, e45–e47 (2018).
12. F. Dominici, C. Zigler, Best practices for gauging evidence of causality in air pollution epidemiology. *Am. J. Epidemiol.* **186**, 1303–1309 (2017).
13. L. W. Stanek, J. S. Brown, J. Stanek, J. Gift, D. L. Costa, Air pollution toxicology—A brief review of the role of the science in shaping the current understanding of air pollution health risks. *Toxicol. Sci.* **120** Suppl 1, S8–S27 (2011).
14. A. B. Hill, The environment and disease: Association or causation? *Proc. R. Soc. Med.* **58**, 295–300 (1965).
15. A. Vodonos, Y. A. Awad, J. Schwartz, The concentration-response between long-term $PM_{2.5}$ exposure and mortality; a meta-regression approach. *Environ. Res.* **166**, 677–689 (2018).
16. D. Braun, M. Gorfine, G. Parmigiani, N. D. Arvold, F. Dominici, C. Zigler, Propensity scores with misclassified treatment assignment: A likelihood-based adjustment. *Biostatistics* **18**, 695–710 (2017).
17. R. J. Carroll, D. Ruppert, L. A. Stefanski, C. M. Crainiceanu, *Measurement Error in Nonlinear Models: A Modern Perspective* (CRC Press, ed. 2, 2006).
18. X. Wu, D. Braun, M.-A. Kioumourtzoglou, C. Choirat, Q. Di, F. Dominici, Causal inference in the context of an error prone exposure: Air pollution and mortality. *Ann. Appl. Stat.* **13**, 520–547 (2019).
19. M.-A. Kioumourtzoglou, D. Spiegelman, A. A. Szpiro, L. Sheppard, J. D. Kaufman, J. D. Yanosky, R. Williams, F. Laden, B. Hong, H. Suh, Exposure measurement error in $PM_{2.5}$ health effects studies: A pooled analysis of eight personal exposure validation studies. *Environ. Health* **13**, 2 (2014).
20. T. G. Dietterich, Ensemble learning, in *The Handbook of Brain Theory and Neural Networks*, M. A. Arbib, Ed. (MIT Press, ed. 2, 2002), pp. 405–408.
21. C. Zhang, Y. Ma, Eds., *Ensemble Machine Learning: Methods and Applications* (Springer Science & Business Media, 2012).
22. R. Polikar, Ensemble learning, in *Ensemble Machine Learning* (Springer, 2012), pp. 1–34.
23. Q. Di, I. Kloog, P. Koutrakis, A. Lyapustin, Y. Wang, J. Schwartz, Assessing $PM_{2.5}$ exposures with high spatiotemporal resolution across the continental United States. *Environ. Sci. Technol.* **50**, 4712–4721 (2016).
24. Q. Di, P. Koutrakis, J. Schwartz, A hybrid prediction model for $PM_{2.5}$ mass and components using a chemical transport model and land use regression. *Atmospheric Environ.* **131**, 390–399 (2016).
25. M. Zeiler, *Modeling Our World: The ESRI Guide to Geodatabase Design* (ESRI Inc., 1999).
26. J. T. Abatzoglou, Development of gridded surface meteorological data for ecological applications and modelling. *Int. J. Climatol.* **33**, 121–131 (2013).
27. N. Gorelick, M. Hancher, M. Dixon, S. Ilyushchenko, D. Thau, R. Moore, Google Earth Engine: Planetary-scale geospatial analysis for everyone. *Remote Sens. Environ.* **202**, 18–27 (2017).
28. T. Chen, C. Guestrin, Xgboost: A scalable tree boosting system, in *KDD '16: Proceedings of the 22nd ACM SIGKDD International Conference on Knowledge Discovery and Data Mining* (2016), pp. 785–794; https://doi.org/10.1145/2939672.2939785.
29. Y. Zhu, D. L. Coffman, D. Ghosh, A boosting algorithm for estimating generalized propensity scores with continuous treatments. *J. Causal Interferenc*e **3**, 25–40 (2015).
30. J. M. Robins, M. A. Hernán, B. Brumback, Marginal structural models and causal inference in epidemiology. *Epidemiology* **11**, 550–560 (2000).
31. K. Hirano, G. W. Imbens, The propensity score with continuous treatments, in *Applied Bayesian Modeling and Causal Inference from Incomplete-Data Perspectives*, A. Gelman, X.-L. Meng, Eds. (John Wiley & Sons Ltd., 2004), pp. 73–84.
32. World Health Organization, WHO air quality standards (WHO, 2005); www.who.int/news-room/fact-sheets/detail/ambient-(outdoor)-air-quality-and-health.
33. R. C. Nethery, F. Mealli, J. D. Sacks, F. Dominici, Causal inference and machine learning approaches for evaluation of the health impacts of large-scale air quality regulations. arXiv:1909.09611 [stat.AP] (15 September 2019).
34. P. K. Andersen, R. D. Gill, Cox's regression model for counting processes: A large sample study. *Ann. Statist.* **10**, 1100–1120 (1982).
35. T. R. Holford, The analysis of rates and of survivorship using log-linear models. *Biometrics* **36**, 299–305 (1980).
36. N. Laird, D. Olivier, Covariance analysis of censored survival data using log-linear analysis techniques. *J. Am. Statist. Assoc.* **76**, 231–240 (1981).
37. R. T. Burnett, A. Dewanji, F. Dominici, M. S. Goldberg, A. Cohen, D. Krewski, On the relationship between time-series studies, dynamic population studies, and estimating loss of life due to short-term exposure to environmental risks. *Environ. Health Perspect.* **111**, 1170–1174 (2003).
38. X. Wu, F. Mealli, M.-A. Kioumourtzoglou, F. Dominici, D. Braun, Matching on generalized propensity scores with continuous exposures. arXiv:1812.06575 [stat.ME] (17 December 2018).
39. J. Splawa-Neyman, D. M. Dabrowska, T. P. Speed, On the application of probability theory to agricultural experiments. Essay on principles. Section 9. *Statist. Sci.* **5**, 465–472 (1990).
40. D. B. Rubin, Causal inference using potential outcomes. *J. Am. Statist. Assoc.* **100**, 322–331 (2005).
41. A. P. Dawid, Causal inference without counterfactuals. *J. Am. Statist. Assoc.* **95**, 407–424 (2000).
42. J. M. Robins, S. Greenland, Comment: Causal inference without counterfactuals. *J. Am. Statist. Assoc.* **95**, 431–435 (2000).
43. D. B. Rubin, Comment: Causal inference without counterfactuals. *J Am Statist Assoc* **95**, 435–438 (2000).
44. P. R. Rosenbaum, D. B. Rubin, The central role of the propensity score in observational studies for causal effects. *Biometrika* **70**, 41–55 (1983).
45. R. J. Desai, J. M. Franklin, Alternative approaches for confounding adjustment in observational studies using weighting based on the propensity score: A primer for practitioners. *BMJ* **367**, l5657 (2019).
46. V. S. Harder, E. A. Stuart, J. C. Anthony, Propensity score techniques and the assessment of measured covariate balance to test causal associations in psychological research. *Psychol. Methods* **15**, 234–249 (2010).
47. G. W. Imbens, D. B. Rubin, *Causal Inference for Statistics, Social, and Biomedical Sciences: An Introduction* (Cambridge Univ. Press, 2015).
48. M.-A. Bind, Causal modeling in environmental health. *Annu. Rev. Public Health* **40**, 23–43 (2019).
49. E. H. Kennedy, Z. Ma, M. D. McHugh, D. S. Small, Nonparametric methods for doubly robust estimation of continuous treatment effects. *J. R. Stat. Soc. Series B Stat. Methodol.* **79**, 1229–1245 (2017).
50. D. R. Cox, *Planning of Experiments* (John Wiley & Sons Inc., 1958).
51. R. C. Nethery, Y. Yang, A. J. Brown, F. Dominici, A causal inference framework for cancer cluster investigations using publicly available data. arXiv:1811.05997 [stat.ME] (14 November 2018).
52. D. B. Rubin, For objective causal inference, design trumps analysis. *Ann. Appl. Statist.* **2**, 808–840 (2008).
53. E. A. Stuart, D. B. Rubin, Best practices in quasi-experimental designs: Matching methods for causal inference, in *Best Practices in Quantitative Methods*, J. Osborne, Ed. (Sage, 2008), pp. 155–176.
54. P. R. Rosenbaum, Modern algorithms for matching in observational studies. *Ann. Rev. Statist. Application* **7**, 143–176 (2020).
55. R. K. Crump, V. J. Hotz, G. W. Imbens, O. A. Mitnik, Dealing with limited overlap in estimation of average treatment effects. *Biometrika* **96**, 187–199 (2009).
56. B. K. Lee, J. Lessler, E. A. Stuart, Weight trimming and propensity score weighting. *PLOS ONE* **6**, e18174 (2011).
57. A. Agresti, M. Kateri, Categorical data analysis, in *International Encyclopedia of Statistical Science*, M. Lovric, Ed. (Springer Berlin Heidelberg, 2011), pp. 206–208.
58. P. C. Austin, Assessing covariate balance when using the generalized propensity score with quantitative or continuous exposures. *Stat. Methods Med. Res.* **28**, 1365–1377 (2019).
59. M. A. Hernán, B. Brumback, J. M. Robins, Marginal structural models to estimate the causal effect of zidovudine on the survival of HIV-positive men. *Epidemiology* **11**, 561–570 (2000).
60. H. Friedman, Magnitude of experimental effect and a table for its rapid estimation. *Psychol. Bull.* **70**, 245–251 (1968).
61. M. B. Mathur, T. J. VanderWeele, A simple, interpretable conversion from Pearson's correlation to Cohen's for *d* continuous exposures. *Epidemiology* **31**, e16–e18 (2020).
62. P. C. Austin, Balance diagnostics for comparing the distribution of baseline covariates between treatment groups in propensity-score matched samples. *Stat. Med.* **28**, 3083–3107 (2009).

Downloaded from http://advances.sciencemag.org/ on February 9, 2021

63. Q. Di, L. Dai, Y. Wang, A. Zanobetti, C. Choirat, J. D. Schwartz, F. Dominici, Association of short-term exposure to air pollution with mortality in older adults. *JAMA* **318**, 2446–2456 (2017).
64. J. Pearl, *Causality: Models, Reasoning, and Inference* (Cambridge Univ. Press, 2000).
65. M. A. Hernán, J. M. Robins, *Causal Inference: What If* (Chapman & Hall/CRC, 2020).

**Acknowledgments:** We would like to thank L. Goodwin for editorial assistance in the preparation of this manuscript. The computations in this paper were run on the Odyssey cluster, supported by the FAS Division of Science, Research Computing Group at Harvard University, and the Research Computing Environment, supported by the Institute for Quantitative Social Science in the Faculty of Arts and Sciences at Harvard University. **Funding:** This work was made possible by the support from NIH grants R01 ES024332-01A1, P50 MD010428, R21 ES024012, R01 ES026217, R01 ES028033, MD012769, R01 ES030616, and P30 ES09089; HEI grant 4953-RFA14-3/16-4; and USEPA grants 83587201-0 and RD-83479801. The contents are solely the responsibility of the grantee and do not necessarily represent the official views of the funding agencies. Further, the funding agencies do not endorse the purchase of any commercial products or services related to this publication. **Author contributions:** X.W.: study design, analysis, and writing. D.B.: study design and writing. J.S.: data preparation. M.A.K.: study design and writing. F.D.: study design and writing. **Competing interests:** J.S. served as an expert witness for the U.S. Department of Justice in a Clean Air Act violation case. The authors declare that they have no other competing interests. **Data and materials availability:** All data needed to evaluate the conclusions in the paper are present in the paper and/or the Supplementary Materials. Those interested in the original data and code can contact the corresponding author. Additional data related to this paper is available on https://github.com/wxwx1993/National_Causal.

Submitted 16 December 2019
Accepted 4 June 2020
Published 17 July 2020
10.1126/sciadv.aba5692

**Citation:** X. Wu, D. Braun, J. Schwartz, M. A. Kioumourtzoglou, F. Dominici, Evaluating the impact of long-term exposure to fine particulate matter on mortality among the elderly. *Sci. Adv.* **6**, eaba5692 (2020).

Downloaded from http://advances.sciencemag.org/ on February 9, 2021

Science Advances

# Evaluating the impact of long-term exposure to fine particulate matter on mortality among the elderly

X. Wu, D. Braun, J. Schwartz, M. A. Kioumourtzoglou and F. Dominici

*Sci Adv* **6** (29), eaba5692.
DOI: 10.1126/sciadv.aba5692originally published online June 26, 2020

**ARTICLE TOOLS** http://advances.sciencemag.org/content/6/29/eaba5692

**SUPPLEMENTARY MATERIALS** http://advances.sciencemag.org/content/suppl/2020/06/26/sciadv.aba5692.DC1

**REFERENCES** This article cites 46 articles, 2 of which you can access for free
http://advances.sciencemag.org/content/6/29/eaba5692#BIBL

**PERMISSIONS** http://www.sciencemag.org/help/reprints-and-permissions

Downloaded from http://advances.sciencemag.org/ on February 9, 2021

Use of this article is subject to the Terms of Service

*Science Advances* (ISSN 2375-2548) is published by the American Association for the Advancement of Science, 1200 New York Avenue NW, Washington, DC 20005. The title *Science Advances* is a registered trademark of AAAS.

Copyright © 2020 The Authors, some rights reserved; exclusive licensee American Association for the Advancement of Science. No claim to original U.S. Government Works. Distributed under a Creative Commons Attribution NonCommercial License 4.0 (CC BY-NC).

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

# Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone

EPA-452/R-15-007
September 2015

# Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone

U.S. Environmental Protection Agency
Office of Air and Radiation
Office of Air Quality Planning and Standards
Research Triangle Park, NC 27711

TABLE OF CONTENTS

page

LIST OF TABLES ... xi

LIST OF FIGURES ... xx

EXECUTIVE SUMMARY ... ES-1

Overview ... ES-1
ES.1 Overview of Analytical Approach ... ES-4
ES.1.1 Establishing the Baseline ... ES-5
ES.1.2 Control Strategies and Emissions Reductions ... ES-6
ES.1.2.1 Emissions Reductions from Identified Controls in 2025 ... ES-7
ES.1.2.2 Emissions Reductions beyond Identified Controls in 2025 ... ES-9
ES.1.2.3 Emissions Reductions beyond Identified Controls for Post-2025 ... ES-10
ES.1.3 Human Health Benefits ... ES-11
ES.1.4 Welfare Benefits of Meeting the Primary and Secondary Standards ... ES-13
ES.2 Results of Benefit-Cost Analysis ... ES-14
ES.3 Improvements between the Proposal and Final RIAs ... ES-19
ES.4 Uncertainty ... ES-21
ES.5 References ... ES-21

CHAPTER 1: INTRODUCTION AND BACKGROUND ... 1-1

Introduction ... 1-1
1.1 Background ... 1-3
1.1.1 National Ambient Air Quality Standards ... 1-3
1.1.2 Role of Executive Orders in the Regulatory Impact Analysis ... 1-3
1.1.3 Illustrative Nature of the Analysis ... 1-4
1.2 The Need for National Ambient Air Quality Standards ... 1-5
1.3 Overview and Design of the RIA ... 1-6
1.3.1 Establishing Attainment with the Current Ozone National Ambient Air Quality Standard ... 1-6
1.3.2 Establishing the Baseline for Evaluation of Revised and Alternative Standards ... 1-10
1.3.3 Cost Analysis Approach ... 1-12
1.3.4 Human Health Benefits ... 1-13
1.3.5 Welfare Benefits of Meeting the Primary and Secondary Standards ... 1-13
1.4 Updates between the Proposal and Final RIAs ... 1-13
1.5 Organization of the Regulatory Impact Analysis ... 1-15
1.6 References ... 1-16

CHAPTER 2: EMISSIONS, AIR QUALITY MODELING AND ANALYTIC METHODOLOGIES ... 2-1

Overview ... 2-1

2.1 Emissions and Air Quality Modeling Platform ........ 2-4
2.2 Projecting Ozone Levels into the Future ........ 2-6
2.2.1 Methods for Calculating Future Year Ozone Design Values ........ 2-6
2.2.2 Emissions Sensitivity Simulations ........ 2-8
2.2.3 Determining Ozone Response Factors from Emissions Sensitivity Simulations ........ 2-13
2.2.4 Combining Response from Multiple Sensitivity Runs to Determine Tons of Emissions Reductions to Meet Various NAAQS Levels ........ 2-16
2.2.5 Monitoring Sites Excluded from Quantitative Analysis ........ 2-18
2.3 Creating Spatial Surfaces for BenMap ........ 2-20
2.4 Improvements in Emissions and Air Quality for the Final RIA ........ 2-24
2.4.1 Improvement in Emissions ........ 2-24
2.4.2 Improvements in Air Quality Modeling ........ 2-26
2.5 References ........ 2-27

APPENDIX 2A: ADDITIONAL AIR QUALITY ANALYSIS AND RESULTS ........ 2A-1

2A.1 2011 Emissions and Air Quality Modeling Platform ........ 2A-1
2A.1.1 Photochemical Model Description and Modeling Domain ........ 2A-1
2A.1.2 Meteorological Inputs, Initial Conditions, and Boundary Conditions ........ 2A-2
2A.1.3 2025 Base Case Emissions Inputs ........ 2A-4
2A.1.4 2011 Model Evaluation for Ozone ........ 2A-8
2A.2 VOC Impact Regions ........ 2A-30
2A.3 Monitors Excluded from the Quantitative Analysis ........ 2A-30
2A.3.1 Sites without Projections Due to Insufficient Days ........ 2A-31
2A.3.2 Winter Ozone ........ 2A-32
2A.3.3 Monitoring Sites in Rural/Remote Areas of the West and Southwest ........ 2A-33
2A.4 Design Values for All Monitors Included in the Quantitative Analysis ........ 2A-36
2A.5 References ........ 2A-65

CHAPTER 3: CONTROL STRATEGIES AND EMISSIONS REDUCTIONS ........ 3-1

Overview ........ 3-1
3.1 The 2025 Control Strategy Scenarios ........ 3-2
3.1.1 Approach for the Revised Standard of 70 ppb and Alternative Standard of 65 ppb ........ 3-2
3.1.2 Identified Control Measures ........ 3-8
3.1.3 Results ........ 3-10
3.2 The Post-2025 Scenario for California ........ 3-17
3.2.1 Creation of the Post-2025 Baseline Scenario for California ........ 3-17
3.2.2 Approach for Revised Standard of 70 ppb and Alternative Standard of 65 ppb for California ........ 3-20
3.2.3 Results for California ........ 3-20
3.3 Improvements and Refinements since the Proposal RIA ........ 3-24
3.4 Limitations and Uncertainties ........ 3-26
3.5 References ........ 3-29

APPENDIX 3A: CONTROL STRATEGIES AND EMISSIONS REDUCTIONS ................ 3A-1

Overview ........................................................................................................ 3A-1
3A.1 Target Emissions Reductions Needed to Create the Baseline, Post-2025 Baseline and Alternatives ........................................................................ 3A-1
3A.2 Numeric Examples of Calculation Methodology for Changes in Design Values ........................................................................................ 3A-3
3A.3 Types of Control Measures ........................................................... 3A-4
3A.4 Application of Control Measures in Geographic Areas ..................... 3A-5
3A.5 $NO_x$ Control Measures for Non-EGU Point Sources ........................ 3A-8
3A.6 VOC Control Measures for Non-EGU Point Sources ........................ 3A-14
3A.7 $NO_x$ Control Measures for Nonpoint (Area) and Nonroad Sources .............. 3A-15
3A.8 VOC Control Measures for Nonpoint (Area) Sources ........................ 3A-15

CHAPTER 4: ENGINEERING COST ANALYSIS AND ECONOMIC IMPACTS ................ 4-1

Overview ........................................................................................................ 4-1
4.1 Estimating Engineering Costs ........................................................... 4-2
4.1.1 Methods and Data ............................................................................ 4-3
4.1.2 Engineering Cost Estimates for Identified Controls .......................... 4-10
4.2 The Challenges of Estimating Costs for Unidentified Control Measures ................ 4-16
4.2.1 Impact of Technological Innovation and Diffusion ........................... 4-18
4.2.2 Learning by Doing .......................................................................... 4-22
4.2.3 Incomplete Characterization of Available $NO_x$ Control Technologies ........ 4-24
4.2.4 Comparing Baseline Emissions and Controls across Ozone NAAQS RIAs from 1997 to 2014 ......................................................................... 4-30
4.2.5 Possible Alternative Approaches to Estimate Costs of Unidentified Control Measures ........................................................................... 4-31
4.2.6 Conclusion ..................................................................................... 4-35
4.3 Compliance Cost Estimates for Unidentified Emissions Controls ......................... 4-35
4.3.1 Methods ......................................................................................... 4-36
4.3.2 Compliance Cost Estimates from Unidentified Controls .......................... 4-40
4.4 Total Compliance Cost Estimates ..................................................... 4-41
4.5 Economic Impacts ........................................................................... 4-42
4.5.1 Introduction .................................................................................... 4-42
4.5.2 Summary of Market Impacts ........................................................... 4-44
4.6 Differences between the Proposal and Final RIAs ................................ 4-45
4.7 Uncertainties and Limitations ............................................................ 4-46
4.8 References ...................................................................................... 4-48

APPENDIX 4A: ENGINEERING COST ANALYSIS ........................................................ 4A-1

Overview ........................................................................................................ 4A-1
4A.1 Cost of Identified Controls in Alternative Standards Analyses ....................... 4A-1
4A.2 Alternative Estimates of Costs Associated with Emissions Reductions from Unidentified Controls ........................................................................ 4A-5

4A.3 Alternative Approaches to Estimating the Costs Associated with Emissions Reductions from Unidentified Controls ........ 4A-7
4A.3.1 Regression Approach ........ 4A-7
4A.3.2 Simulation Approach ........ 4A-9

CHAPTER 5: QUALITATIVE DISCUSSION OF EMPLOYMENT IMPACTS OF AIR QUALITY ........ 5-1

Overview ........ 5-1
5.1 Economic Theory and Employment ........ 5-1
5.2 Current State of Knowledge Based on the Peer-Reviewed Literature ........ 5-6
5.2.1 Regulated Sectors ........ 5-7
5.2.2 Economy-Wide ........ 5-8
5.2.3 Labor Supply Impacts ........ 5-8
5.3 Employment Related to Installation and Maintenance of $NO_x$ Control Equipment ........ 5-9
5.3.1 Employment Resulting from Addition of $NO_x$ Controls at EGUs ........ 5-9
5.3.2 Assessment of Employment Impacts for Individual Industrial, Commercial, and Institutional (ICI) Boilers and Cement Kilns ........ 5-15
5.4 Conclusion ........ 5-18
5.5 References ........ 5-19

CHAPTER 6: HUMAN HEALTH BENEFITS ANALYSIS APPROACH AND RESULTS ........ 6-1

6.1 Summary ........ 6-1
6.2 Overview ........ 6-3
6.3 Updated Methodology Presented in the Proposal and Final RIAs ........ 6-7
6.4 Human Health Benefits Analysis Methods ........ 6-9
6.4.1 Health Impact Assessment ........ 6-10
6.4.2 Economic Valuation of Health Impacts ........ 6-12
6.4.3 Estimating Benefits for 2025 and Post-2025 Analysis Years ........ 6-13
6.4.4 Benefit-per-ton Estimates for $PM_{2.5}$ ........ 6-14
6.5 Characterizing Uncertainty ........ 6-16
6.5.1 Monte Carlo Assessment ........ 6-17
6.5.2 Quantitative Analyses Supporting Uncertainty Characterization ........ 6-18
6.5.3 Qualitative Assessment of Uncertainty and Other Analysis Limitations ........ 6-20
6.6 Benefits Analysis Data Inputs ........ 6-20
6.6.1 Demographic Data ........ 6-21
6.6.2 Baseline Incidence and Prevalence Estimates ........ 6-21
6.6.3 Effect Coefficients ........ 6-25
6.6.3.1 Ozone Exposure Metric ........ 6-32
6.6.3.2 Ozone Premature Mortality Effect Coefficients ........ 6-33
6.6.3.3 $PM_{2.5}$ Premature Mortality Coefficients ........ 6-39
6.6.3.4 Hospital Admissions and Emergency Department Visits ........ 6-44
6.6.3.5 Acute Health Events ........ 6-47
6.6.3.6 Nonfatal Acute Myocardial Infarctions (AMI) (Heart Attacks) ........ 6-51
6.6.3.7 Worker Productivity ........ 6-53
6.6.3.8 Unquantified Human Health Effects ........ 6-53

6.6.4 Economic Valuation Estimates ........ 6-54
6.6.4.1 Mortality Valuation ........ 6-55
6.6.4.2 Hospital Admissions and Emergency Department Valuation ........ 6-66
6.6.4.3 Nonfatal Myocardial Infarctions Valuation ........ 6-67
6.6.4.4 Valuation of Acute Health Events ........ 6-69
6.6.4.5 Growth in WTP Reflecting National Income Growth over Time ........ 6-71
6.6.5 Benefit per Ton Estimates Used in Modeling $PM_{2.5}$-Related Co-benefits ... 6-75
6.7 Benefits Results ........ 6-77
6.7.1 Benefits of Attaining a Revised Ozone Standard in 2025 ........ 6-77
6.7.2 Benefits of the Post-2025 Scenario ........ 6-84
6.7.3 Uncertainty in Benefits Results (including Results of Quantitative Uncertainty Analyses) ........ 6-89
6.8 Discussion ........ 6-92
6.9 References ........ 6-95

APPENDIX 6A: COMPREHENSIVE CHARACTERIZATION OF UNCERTAINTY IN OZONE BENEFITS ANALYSIS ........ 6A-1

Overview ........ 6A-1
6A.1 Description of Classifications Applied in the Uncertainty Characterization... 6A-1
6A.1.1 Direction of Bias ........ 6A-2
6A.1.2 Magnitude of Impact ........ 6A-2
6A.1.3 Confidence in Analytic Approach ........ 6A-3
6A.1.4 Uncertainty Quantification ........ 6A-4
6A.2 Organization of the Qualitative Uncertainty Table ........ 6A-5
6A.3 References ........ 6A-13

Appendix 6B: QUANTITATIVE ANALYSES COMPLETED IN SUPPORT OF UNCERTAINTY CHARACTERIZATION ........ 6B-1

Overview ........ 6B-1
6B.1 Alternative C-R Functions for Short-term Exposure to Ozone ........ 6B-2
6B.2 Monetized Benefits for Premature Mortality from Long-term Exposure to Ozone ........ 6B-3
6B.3 Threshold Analysis for Premature Mortality Incidence and Benefits from Long-term Exposure to Ozone ........ 6B-4
6B.4 Alternative C-R Functions for $PM_{2.5}$–Related Mortality ........ 6B-6
6B.5 Income Elasticity of Willingness-to-Pay ........ 6B-11
6B.6 Age Group-Differentiated Aspects of Short-Term Ozone Exposure-Related Mortality ........ 6B-12
6B.7 Evaluation of Mortality Impacts Relative to the Baseline Pollutant Concentrations for both Short-Term Ozone Exposure-Related Mortality and Long-Term $PM_{2.5}$ Exposure-Related Mortality ........ 6B-17
6B.8 Ozone-related Impacts on Outdoor Worker Productivity ........ 6B-24
6B.9 References ........ 6B-26

CHAPTER 7: IMPACTS ON PUBLIC WELFARE OF ATTAINMENT STRATEGIES TO MEET PRIMARY AND SECONDARY OZONE NAAQS ........ 7-1

Overview ........ 7-1
7.1 Welfare Benefits of Strategies to Attain Primary and Secondary Ozone Standards . 7-2
7.2 Welfare Benefits of Reducing Ozone ........ 7-3
7.3 Additional Welfare Benefits of Strategies to Meet the Ozone NAAQS ........ 7-6
7.4 References ........ 7-8

CHAPTER 8: COMPARISON OF COSTS AND BENEFITS ........ 8-1

Overview ........ 8-1
8.1 Results ........ 8-1
8.2 Improvements between the Proposal and Final RIAs ........ 8-9
8.2.1 Relative Contribution of PM Benefits to Total Benefits ........ 8-11
8.2.2 Developing Future Control Strategies with Limited Data ........ 8-12
8.3 Net Present Value of a Stream of Costs and Benefits ........ 8-14
8.4 Framing Uncertainty ........ 8-16
8.5 Key Observations from the Analysis ........ 8-19
8.6 References ........ 8-20

CHAPTER 9: STATUTORY AND EXECUTIVE ORDER IMPACT ANALYSES ........ 9-1

Overview ........ 9-1
9.1 Executive Order 12866: Regulatory Planning and Review ........ 9-1
9.2 Paperwork Reduction Act ........ 9-1
9.3 Regulatory Flexibility Act ........ 9-3
9.4 Unfunded Mandates Reform Act ........ 9-3
9.5 Executive Order 13132: Federalism ........ 9-3
9.6 Executive Order 13175: Consultation and Coordination with Indian Tribal Governments ........ 9-4
9.7 Executive Order 13045: Protection of Children from Environmental Health & Safety Risks ........ 9-4
9.8 Executive Order 13211: Actions that Significantly Affect Energy Supply, Distribution, or Use ........ 9-5
9.9 National Technology Transfer and Advancement Act ........ 9-5
9.10 Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations ........ 9-6
9.11 Congressional Review Act (CRA) ........ 9-8

APPENDIX 9A: SOCIO-DEMOGRAPHIC CHARACTERISTICS OF POPULATIONS IN CORE BASED STATISTICAL AREAS WITH OZONE MONITORS EXCEEDING REVISED AND ALTERNATIVE OZONE STANDARDS ........ 9A-1

Overview ........ 9A-1
9A.1 Design of Analysis ........ 9A-1
9A.1.1 Demographic Variables Included in Analysis ........ 9A-3

9A.2 Considerations in Evaluating and Interpreting Results .................................. 9A-4
9A.3 Presentation of Results ........................................................................ 9A-5

- Encouraging Use of Warm Mix Asphalt over Hot Mix Asphalt - European and American companies have developed several techniques, collectively known as warm-mix asphalt (WMA), to increase the workability of asphalt by lowering the viscosity at temperatures as much as 100°F below that of hot-mix asphalt (HMA). WMA was introduced in Europe in 1997 and in the United States in 2002. WMA has shown potential for reducing emissions associated with the production of asphalt for paving projects when compared to HMA. Lower temperatures required for production, storage, transport, and application translates to lower fuel consumption, which in turn reduces the criteria air pollutant emissions associated with combustion.[73]

- Replacement of gas-powered leaf blowers and mowers – The South Coast Air Quality Management District has a program that subsidizes the replacement of existing two-stroke backpack blowers currently used by commercial landscapers/gardeners with new four-stroke backpack blowers that have significantly reduced emissions and noise levels.[74]

All of these additional and non-end-of-pipe measures and associated emissions reductions are not reflected in EPA's control strategy tools and represent additional abatement opportunities not accurately captured in this analysis.

---

[73] For additional information see http://www.fhwa.dot.gov/everydaycounts/technology/asphalt/intro.cfm ; slide 31 aci-na.org/static/entransit/sunday_warmmix_logan.pdf. FHWA estimates that warm mix asphalt uses 20 percent less energy than hot mix asphalt. Also see http://www.fhwa.dot.gov/everydaycounts/technology/asphalt/intro.cfm. Airports Council International reports 10-55 percent lower energy consumption and 20-55 percent reduction in emissions. (See http://aci-na.org/static/entransit/sunday_warmmix_logan.pdf, Slide 31)).

[74] Typically, ten exchange events are set up across the District, and for the convenience of the participants, the exchange events take place during consecutive weekdays. At the event site, the old leaf blowers will be tested for operation and then drained of all fluids in a responsible manner and collected for scrapping. The vendor will haul the traded-in blowers to a scrapping yard where they are crushed and recycled. The vendor will also provide training for the proper use of the equipment at each of the exchange sites. (http://www.aqmd.gov/docs/default-source/Lawn-Equipment/leafblower-brochure.pdf?sfvrsn=9)

Comments on EPA's Policy Assessment for PM2.5

Joel Schwartz
Professor of Environmental Health
Harvard TH Chan School of Public Health

p 2-49. Despite later referencing the Di 2019 PM model, the PA reports results for Di 2016 in most of its discussion about models, and comparing their predictions and not Di 2019, where CV R2 is 0.86 daily, 0.89 annually, and which was the source of data for the newer papers assessed in the ISA supplement providing new evidence on PM2.5 and health effects.
Pleasse note that downscaler simplicity in fitting is not an advantage when the other models have already been fit and available. It certainly does not justify using a worse fitting model.

The statement that "Relatively weak performance in parts of the western U.S., possibly due to the sharp concentration gradients, complex terrain, low concentrations (and therefore signal-to-noise ratio), less dense monitoring, prevalence of wildfire, and challenges in satellite retrievals and CTM modeling (Di et al., 2016; Wang et al., 24 2018b; Hu et al., 2017; Kelly et al., 2019a)." again ignores the later model of Di 2019, used in many discussed studies. Di 2019 reports a cross validated (CV) $R^2$ of 0.80 daily and 0.85 annually for the Pacific region. That is not much weaker than national, and certainly an excellent fit. The PA's omission of more recent PM models overestimates uncertainty.

Di 2019 does not report weaker predictive ability at lower concentrations. It reports a) that the relationship between predicted and monitored values remains linear from 0 to 60 $\mu g/m^3$ and that the uncertainty in the relationship was smallest between 4 and 15 $\mu g/m^3$. This is shown in the figure below from that paper, showing the spline fit and 95% CI. Clearly the uncertainty is low between 5 and 10.

e.g. 7 μg/$m^3$. In most of those studies, the confidence interval did not include zero. Some studies (e.g. Pinault) have fit piecewise linear models with multiple inflection points to identify if there is a threshold, i.e. a point below which the effect is zero. They have not found such a point. Other studies, such as the Wei et al paper discussed above, have excluded all observations above a series of values, and assessed whether there was a significant association between PM2.5 and death when restricted to observations below that value. Even when restricted to observations with annual averages below 6 μg/$m^3$, they found a significant association with mortality. The Wei causal dose response paper divided PM2.5 into decile ranges and found a significant increase in risk of death at mean concentrations of 6.6 μg/$m^3$ compared to concentrations in the lowest decile. None of these approaches found a threshold. The epidemiology studies do not fail to identify discernable threshold because "they do not identify the specific exposures that can lead to the reported effects"; they fail to identify a discernable threshold because it does not exist.

P 3-65 seeks to focus on the mean concentration in studies stating. "*there is significantly greater confidence in the magnitude and significance of observed associations for the part of the air quality distribution corresponding to where the bulk of the health events in each study have been observed, generally at or around the mean concentration. This is the case both for studies of daily PM2.5 exposures and for studies of annual average PM2.5 exposures.*"
This distorts the meaning of the epidemiology studies and represents a lack of understanding of both epidemiology and statistics. First, there is no reason to rely on ad hoc poorly justified arguments about focusing on the mean to reduce uncertainty when the statistical tools used in the studies provide mathematically proven methods to compute confidence intervals, which take into account the number of observations. The elevated risk of death at an annual concentration of 6.6 μg/$m^3$ in the Wei et al. paper comes with an appropriately computed confidence interval, which is far from including the null. This despite it being only the 20th percentile of the exposure distribution. The spline models and the models that excluded higher observations also have confidence intervals. While it is true they are smallest near the mean, this does not mean that they were not small elsewhere. These models correctly estimate the uncertainty, including taking into account how many events occurred at that exposure. Moreover, while the mean is a good measure of central tendency for Gaussian data, such as annual PM2.5, it is not for skewed data such as daily PM2.5, where most of the data is below the mean, and a Median is a better measure. And remember that half the observations for Gaussian data occur below the mean, so studies are hardly uninformative in that range.
Second, the comment fails to understand that some of these studies had very large sample sizes, so that there were sufficient observations even far from the mean exposure. The Medicare cohort, for example, had 637 million person-years of observation. Hence there were over 63 million observations at the tenth percentile or lower. This is a very large number for an epidemiology study and clearly would have enough health effects to generate confidence if it were a separate study on its own. If the PA wants to argue about whether there are enough observations to be confident in, it should discuss the absolute number of observations in different exposure ranges in studies, not the proportion.
Third, the distribution of exposures even in smaller cohorts is wide enough that there are many observations and deaths occurring at concentrations well below the mean. Also, the choice of CBSA averages to compare to the maximum monitor seems chosen to maximize the difference by include large areas in the mean. CBSA's are often quite large. Finally, the reason to rely on confidence intervals and not just arguments about "where most of the observations are" is that

confidence in an association depends not just on the number of observations. It depends on the strength of the association and other factors as well. This is accounted for in the confidence intervals, but not in the PA's approach. This argument to focus on the mean value in studies has no merit.

P 3-66. Again, large studies can provide strong support well below the mean. The support depends on the number of observations in that range, not the percentage.

P 3-67. The observation that the maximum is higher than the mean is truly revolutionary.

P 3-68. While it is true that the maximum monitor value is higher than the population average, it is also true that some people live near the maximum monitor. Hence, if a study reports increased death rates in a neighborhood where the concentrations are e.g. 8 μg/m$^3$, then failure to set a standard at 8 μg/m$^3$ will result to increased risk to people living near the maximum monitor, and at every other location where the exposure is above 8 μg/m$^3$, even if a maximum monitor value of e.g. 10 μg/m$^3$ meant that most people in that urban area were exposed to concentrations below 8 μg/m$^3$. Hence relying on most people being exposed below the maximum monitor value does not protect the heath of many people who are not. Again, this is based on the false belief that an epidemiology study only evaluates health effects at the mean exposure. The ability of hybrid exposure models to capture effects in suburban areas where exposure is lower is directly relevant to determining whether people in densely populated areas with currently higher exposures (e.g. the maximum monitor value) will benefit from a reduction in those exposures.

P 3-72. Table. When describing the Pinault study, this should note that Eighty percent of the population was exposed to concentrations below 8.8 μg/m$^3$.

P 3-79. The Puett studies rely on exposure estimates from the Yanoski model, and the model performance evaluation is in his studies not the Puett study. That is no reason for excluding it.

P 3-80. That studies using hybrid exposure models can capture whether there are health effects at low concentrations by providing evidence in suburban and rural areas is a key advantage of those studies. To argue that their mean exposure (irrelevant to the C-R curves) is therefore lower than the exposure at the highest monitor and therefore allowing higher exposure at the highest monitor is protective, turns logic on its head. The ability of hybrid exposure models to capture effects in suburban areas where exposure is lower is directly relevant to determining whether people in densely populated urban areas with currently higher exposures (e.g. the maximum monitor value) will benefit from a reduction in those exposures. Consider that in the Wei study, we found there is an elevated risk of death at 6.6 μg/m$^3$ in a study whose mean was 9.85 μg/m$^3$. Clearly this illustrates the poverty of interpreting the study as showing effects at it mean concentration. It also means that reducing exposure at the highest monitor from 10 μg/m$^3$ to 6.6 μg/m$^3$ would improve the health of people in that urban area who were exposed to 10, or 9, or 8, or 7 μg/m$^3$ by forcing all those exposures downward. To describe that study as estimating effect at 9.85 μg/m$^3$, and argue that a maximum monitor value of e.g. 11 or 12 μg/m$^3$ would suffice to protect people against the exposures seen in that study is ridiculous.

Commonwealth of Kentucky
Office of the Attorney General

Daniel Cameron
Attorney General

Capitol Building, Suite 118
700 Capital Avenue
Frankfort, Kentucky 40601
(502) 696-5300
Fax: (502) 564-2894

December 14, 2021

*Via Federal eRulemaking Portal*

U.S. Environmental Protection Agency
EPA Docket Center
Office of Air and Radiation Docket
Mail Code 28221T
1200 Pennsylvania Avenue NW
Washington, DC 20460.

Re: Policy Assessment for Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, External Review Draft (Docket ID No. EPA-HQ-OAR-2015-0072; FRL-8635-03-OAR)

On behalf of the Commonwealth of Kentucky and the sixteen undersigned States, we respectfully submit the following comments in response to the Environmental Protection Agency's (EPA) Policy Assessment for Reconsideration of the National Ambient Air Quality Standards (NAAQS) for Particulate Matter, External Review Draft (Draft Assessment).[1] The Draft Assessment indicates there is no need for reconsidering the NAAQS. We therefore urge the EPA to maintain the current NAAQS, which the EPA studied and reaffirmed just twelve months ago. We also urge the EPA to consider, where permissible, the adverse policy effects of more stringent standards and for the Clean Air Scientific Advisory Committee (the Advisory Committee) to advise the EPA regarding such effects.

---

[1] *Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter*, *External Review Draft*, EPA (Oct. 2021), https://perma.cc/KE68-2GTR [hereinafter Draft Assessment].

## I. Introduction

The Clean Air Act directs the EPA to propose and promulgate "primary" and "secondary" NAAQS for certain pollutants.[2] As part of this process, the EPA has set primary and secondary standards for two kinds of particulate matter: $PM_{10}$ (air pollution particles with a diameter less than 10 microns) and $PM_{2.5}$ (air pollution particles with a diameter less than 2.5 microns). The EPA's primary standards for $PM_{10}$ and $PM_{2.5}$ must reflect the national air quality levels "requisite to protect the public health."[3] Secondary standards are those "requisite to protect the public welfare from any known or anticipated adverse effects" from pollutants.[4]

The Clean Air Act requires the EPA to establish primary and secondary standards that are no more or less stringent than necessary. Importantly, the Clean Air Act does not require the EPA to establish primary standards that remove all pollutants, or all risks, from the air.[5] Instead, the EPA's criteria must provide only "an adequate margin of safety."[6]

Many factors influence the bounds of an "adequate margin of safety," including the number of people affected, the nature and severity of potential harm, and the uncertainties involved (*e.g.*, conflicting scientific reports[7] about the impact of NAAQS on air pollution levels and on public health).[8] The level of background pollution is another important consideration.[9] And while the EPA may not consider cost as a factor, it may "take account of comparative health risks."[10] For instance, a "rule likely to cause more harm to health than it prevents is not a rule that is 'requisite to protect public health.'"[11]

The requirement that primary standards establish an adequate margin of safety, instead of absolute safety, was intentional. There is no process for removing all pollutants from the air, and there is no method for determining conclusively the

---

[2] National Primary and Secondary Ambient Air Quality Standards, 42 U.S.C. § 7409(a).
[3] *Id.* at § 7409(b)(1).
[4] *Id.* at § 7409(b)(2).
[5] *See Lead Industries Assn. v. EPA*, 647 F.2d 1130, 1155 n.51 (D.C. Cir 1980), *cert. denied*, 449 U.S. 1042 (1980).
[6] 42 U.S.C. § 7409(b)(1).
[7] *See infra* section II.B.
[8] *See* Draft Assessment, *supra* note 1, at 1–5.
[9] *See id.* Here, "background pollution" refers to pollutants that are not the result of local emission sources. They can be naturally occurring, or they can be the result of others factors such as emissions from foreign nations. *See* Álvaro Gómez-Losada et al., *Modelling Background Air Pollution Exposure in Urban Environments: Implications for Epidemiological Research*, 106 ENVTL. MODELLING & SOFTWARE 13, 13 (2018).
[10] *Whitman v. American Trucking Assns.*, 531 U.S. 457, 495 (2001) (Breyer, J., concurring in part and in the judgment).
[11] *Id.*

exact impact of air quality on public health.[12] Consequently, as the EPA noted in 2020, the Clean Air Act intended the NAAQS to reflect merely the "best, current scientific information."[13]

Since the 1980s, the EPA has collected and reviewed the science and determined whether current standards are sufficient to protect public health, with an "adequate margin of safety."[14] About twelve months ago, that is exactly what the EPA did when it agreed to continue the standards set by the Obama Administration.[15]

Yet, on June 10, 2021, the Biden Administration announced that it would consider changes to the very standards that the EPA reviewed, debated, and established on December 18, 2020.[16] The Draft Assessment is a step toward making such changes. But these changes lack a legitimate impetus. There have been no groundbreaking scientific discoveries or new threats to public health since December 2020. Instead, the only things that have changed are the occupant of the White House and his views on the NAAQS.[17]

## II. Analysis

The EPA got it right in December 2020 when it left unchanged the Obama-era standards. It was correct to retain the standards because America leads the industrialized world in air quality and because the science has not changed since the current standards were established. Therefore, Kentucky and the undersigned States urge the EPA to maintain the current NAAQS. Likewise, we urge the EPA to consider, where permissible, the adverse policy effects of more stringent NAAQS and for the Advisory Committee to advise the EPA regarding such effects.

### A. America leads the industrialized world in air quality, so there is no justification for changing the NAAQS.

Fifty years ago, any administration would have been justified in imposing more stringent air quality standards. In the 1970s, poor air quality was a significant

---

[12] *See generally* Review of the National Ambient Air Quality Standards for Particulate Matter, 85 Fed. Reg. 82684 (Dec. 18, 2020) (noting conflicting reports on the exact impact of air quality on public health, especially the difficulty in separating air quality's impact from the impact of other factors and in determining the impact of more stringent standards) [hereinafter 2020 NAAQS Review].
[13] *Back-to-Basics Process for Reviewing National Ambient Air Quality Standards* at 1, EPA (May 9, 2018), https://perma.cc/6FFZ-RP8M [hereinafter Back-to-Basics Memo].
[14] 42 U.S.C. § 7409(b)(1).
[15] 2020 NAAQS Review, *supra* note 12.
[16] *Id.*
[17] In 2020, the EPA left unchanged the NAAQS established in 2015 by the Obama-Biden Administration. Now, as president, Biden seeks to undo the very standards crafted by an administration of which he was a leading figure.

problem for millions of Americans.[18] From New York to Los Angeles and from Cleveland to Birmingham, dangerous levels of smog, soot, and other particles clogged our air and our lungs.[19] It is why President Nixon proposed the establishment of the EPA in July of 1970 and why the EPA became operational so soon thereafter.[20]

In 1971, the EPA set its first standard for particle pollution in the air. That standard assessed the "total suspended particles" and permitted up to 260 µg/m3[21] of such particles in a given area over a 24-hour period.[22] By 1987, the EPA had changed its metric[23] for measuring µg/m3 but had dropped the permissible levels to just 150 µg/m3—a 40% drop.[24] Put another way, from 1971 to 1987, the EPA raised one air quality standard by over 40%.

And it worked. In the past forty years, total emissions for the six pollutants measured by the NAAQS have dropped by 71%.[25] In fact, the United States now has some of the highest quality air of any industrialized nation. Our $PM_{2.5}$ levels are approximately five times below the global average.[26] They are six times below Chinese levels.[27] And they are 20% lower than those of France, Germany, and Great Britain.[28] Likewise, between 2000 and 2019, average concentrations of $PM_{2.5}$—the

---

[18] *DOCUMERICA: The Environmental Protection Agency's Program to Photographically Document Subjects of Environmental Concern, 1972–1977*, NATIONAL ARCHIVES, https://catalog.archives.gov/id/542493.

[19] *Id.*

[20] The EPA became operational in December 1970. *See Public Papers of the Presidents: Richard Nixon,* 1970, 578–86; *see also Richard Nixon, Reorganization Plan No. 3 of 1970*, EPA.GOV (July 9, 1970), https://archive.epa.gov/epa/aboutepa/reorganization-plan-no-3-1970.html.

[21] The term "µg/m3" means micrograms per cubic meter of air. *See Particulate Matter Introduction*, CT.GOV (Oct. 14, 2020), https://portal.ct.gov/DEEP/Air/Planning/Particulate-Matter/Particulate-Matter-Fact-Sheet.

[22] *Id.*

[23] In the 1980s, the EPA changed the metric from a measurement of total suspended particles ("TSP") to particulate matter levels ($PM_{10}$ and $PM_{2.5}$). Generally, this change moved the EPA away from measuring a broad array of air particles to measuring more specific types and sizes of particulate matter. *See id.*

[24] This standard, now judged by the $PM_{10}$ metric, still stands today. *Timeline of Particulate Matter (PM) National Ambient Air Quality Standards (NAAQS)*, EPA.GOV, https://www.epa.gov/pm-pollution/timeline-particulate-matter-pm-national-ambient-air-quality-standards-NAAQS.

[25] *National Ambient Air Quality Standards for Particulate Matter and Ozone*, HARVARD.EDU (July 15, 2020), https://eelp.law.harvard.edu/2020/07/national-ambient-air-quality-standards-for-pm-and-ozone/.

[26] *Press Release, EPA Finalizes NAAQS for Particulate Matter*, EPA (Dec. 7, 2020), https://www.epa.gov/newsreleases/epa-finalizes-NAAQS-particulate-matter [hereinafter EPA NAAQS Press Release].

[27] *Id.*

[28] *Id.*

fine particles that reduce visibility and cause air to appear hazy[29]—fell by 44% in the U.S., while the average concentrations of $PM_{10}$ fell by 46%.[30]

Thus, by the time the EPA reviewed the NAAQS in 2020, many of the air pollution problems of the 1970s had been solved. While New York continues to experience smog and Los Angeles continues to combat wildfire-related soot, the grimy American air of the 1970s is no more. In its stead is some of the cleanest air modern America has ever had—hardly a justification for changing the NAAQS.

**B. The available scientific evidence does not call into question the EPA's well-considered 2020 determination to maintain the current PM standards.**

To be sure, an agency has the authority to repeal its own regulations.[31] However, this authority is not unlimited. When an agency repeals its own regulations, "such action must be neither arbitrary nor unreasonable."[32] Barely one year ago, the EPA conducted an extensive review which culminated in the 2020 determination that the current PM standards are adequate to protect human health within an adequate margin of safety. For the EPA to take the opposite position now, without any new scientific evidence, is the definition of arbitrary and unreasonable agency action.

*1. The EPA conducted an extensive review beginning in 2014 to reach the well-supported conclusion that the current standards protect human health.*

The Clean Air Act requires the EPA to review the NAAQS every five years.[33] The recently-concluded review began in December 2014, when the EPA issued a call for information regarding the NAAQS.[34] Shortly after, the EPA held a public workshop including internal and external subject matter experts who informed its review planning.[35] The Advisory Committee provided advice, supplemented by the Particulate Matter Review Panel, on the resulting integrated resource plan that was also discussed at two public teleconferences.[36]

---

[29] *Fine Particles (PM 2.5) Questions and Answers*, NY.GOV (Feb. 2018), https://www.health.ny.gov/environmental/indoors/air/pmq_a.htm.
[30] EPA NAAQS Press Release, *supra* note 26.
[31] *U.S. Lines, Inc. v. Federal Maritime Commission*, 584 F.2d. 519, 526 n. 20 (D.C. Cir. 1978).
[32] *Nader v. Bork*, 366 F.Supp. 104, 108 (D.D.C. 1973).
[33] 42 U.S.C. § 7409(d).
[34] Notice of Workshop and Call for Information on Integrated Science Assessment for Particulate Matter, 79 Fed. Reg. 71764 (Dec. 3, 2014).
[35] *Id.*
[36] 2020 NAAQS Review, *supra* note 12, at 82689.

In May 2018, the EPA announced its intention to ensure that any necessary revisions to the standards were finalized by December 2020.[37] Admirably, the EPA adhered to this timetable. The EPA released a draft integrated science assessment (ISA) in October 2018,[38] and the Advisory Committee reviewed the draft ISA at both a public meeting[39] and a public teleconference.[40] The EPA considered the comments received at these meetings in its final ISA.[41]

The EPA released a draft policy assessment in September 2019.[42] The EPA solicited comments from both the Advisory Committee and the public.[43] The current standards received great support. Specifically, the Advisory Committee recommended maintaining the 24-hour $PM_{2.5}$ and $PM_{10}$ standards and the current secondary standards.[44] The Advisory Committee did not reach consensus on the annual $PM_{2.5}$ standard.[45] In light of this advice, the EPA proposed maintaining all of the primary and secondary PM standards.[46]

On April 30, 2020, the EPA published this proposed decision in the Federal Register for public comment.[47] It held several virtual meetings on the proposal in May 2020.[48] It also responded to all significant comments.[49] Importantly, the EPA considered new scientific studies cited by commenters to determine "whether they warranted reopening the review."[50] The EPA ultimately found that they did not. The new studies, it found, "do not materially change any of the broad scientific conclusions regarding the health and welfare effects of PM in ambient air."[51]

---

[37] *Back-to-Basics Memo*, *supra* note 13.
[38] Integrated Science Assessment for Particulate Matter (External Review Draft), 83 Fed. Reg. 53471 (Oct. 23, 2018).
[39] Notification of a Public Meeting of the Chartered Clean Air Scientific Advisory Committee, 83 Fed. Reg. 55529 (Nov. 6, 2018).
[40] Notification of a Public Teleconference of the Chartered Clean Air Scientific Advisory Committee, 84 Fed. Reg. 8523 (Mar. 8, 2019).
[41] 2020 NAAQS Review, *supra* note 12, at 82689.
[42] Release of a Draft Document Related to the Review of the National Ambient Air Quality Standards for Particulate Matter, 84 Fed. Reg. 47944 (Sept. 11, 2019).
[43] 2020 NAAQS Review, *supra* note 12, at 82690.
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] Review of the National Ambient Air Quality Standards for Particulate Matter, 85 Fed. Reg. 24094 (Apr. 30, 2020).
[48] Public Hearing for the Review of the National Ambient Air Quality Standards for Particulate Matter, 85 Fed. Reg. 26635 (May 5, 2020).
[49] 2020 NAAQS Review, *supra* note 12, at 82690.
[50] *Id.*
[51] *Id.* at 82691.

Upon evaluating the vast amount of relevant information, the EPA maintained the current standards without revision.[52] Yet now, less than one year after this careful and deliberate determination—and entirely outside of the normal review cycle—the EPA seeks public comment on "whether to retain or revise the existing PM NAAQS."[53]

2. *The scientific literature in the Draft Assessment does not provide adequate grounds to reconsider the EPA's 2020 determination.*

The EPA circulated the Draft Assessment with its request for comments.[54] The Draft Assessment reviews the scientific analyses discussed by the December 2020 determination as well as "newly available" scientific information covered in a draft supplement.[55] A thorough review of the Draft Assessment shows that this "new" information does not support reconsidering the December 2020 determination.

The Draft Assessment begins with the disclaimer: "Much of the information in this Draft Assessment is drawn directly from information included in the 2019 ISA and the 2020 [Draft Assessment]."[56] After a detailed overview of the analytical steps involved in the recently-concluded review, the Draft Assessment further underscores the narrow scope of the 2021 draft ISA Supplement. Specifically, the 2021 draft ISA Supplement (draft 2021 ISA) "does not encompass the full multidisciplinary evaluation presented within the 2019 ISA that would result in weight-of-evidence conclusions on causality (*i.e.*, causality determinations)."[57] This means that the causality designations, which the new information cited in the draft 2021 ISA is intended to inform, have not undergone the same scientific scrutiny endured by the causality evaluations in the 2019 ISA. Even more important, the scientific information in the draft 2021 ISA does not come to a different conclusion than did the scientific information in the 2019 ISA.

In discussing the $PM_{2.5}$ health effects, the draft 2021 ISA notes that it focused on evidence where the 2019 ISA already found a causal relationship.[58] But the studies evaluated in the draft ISA Supplement are "[c]onsistent with the studies evaluated in the 2019 ISA" in their evaluation of $PM_{2.5}$ health effects.[59] The Draft Assessment

---

[52] *Id.* at 82684.
[53] Release of the Draft Policy Assessment for the Particulate Matter National Ambient Air Quality Standards, 86 Fed. Reg. 56263 (Oct. 8, 2021).
[54] *See* Draft Assessment, *supra* note 1.
[55] *Id.* at 1-1.
[56] *Id.* (citations omitted).
[57] *Id.* at 1-17.
[58] *Id.* at 3-16.
[59] *Id.* at 3-26–27.

also notes that the new research has "not altered our understanding of human populations at risk of health effects from $PM_{2.5}$ exposures."[60]

Moreover, the new studies on human exposure all evaluated levels of $PM_{2.5}$ exposure far in excess of the current standards.[61] The Draft Assessment also acknowledges that its interpretation of epidemiology study results is "complicated by the relatively sparse data available at the lower end" of the $PM_{2.5}$ distribution.[62] Theoretical models also perform poorly in predicting how human health is affected by low quantities of $PM_{2.5}$. The Draft Assessment, when discussing the models used to estimate $PM_{2.5}$ exposure, admits that "poorer model performance often coincide[s] with relatively low ambient $PM_{2.5}$ concentrations."[63]

Next, the Draft Assessment does not even attempt to engage in new analysis relating to $PM_{10}$ levels. It admits that "the draft [2021] ISA . . . does not include an evaluation of studies for" $PM_{10}$ levels.[64] Just like the earlier review, the Draft Assessment finds that "the limited information on the potential for confounding by copollutants and the limited support available for the biological plausibility of health effects following $PM_{10\text{-}2.5}$ exposures also continue to contribute to uncertainty in the $PM_{10\text{-}2.5}$ health evidence."[65] The Draft Assessment specifically notes that there is no certainty to conclude that long- or short-term $PM_{10\text{-}2.5}$ exposure has negative health effects on humans below the current standards.[66] Given the continuing uncertainty, it would be entirely unreasonable for the EPA to abruptly reverse the well-considered 2020 determination, which was the product of a six-year review.

In fact, the Draft Assessment specifically states that it does not support reconsideration of the $PM_{10}$ standard. It states, "the available evidence in this reconsideration of the 2020 final decision supports retaining the current standard."[67]

The Draft Assessment reaches the same conclusion regarding both the $PM_{2.5}$ and the $PM_{10}$ secondary standards. It says: "We have not identified new information available since the completion of the 2020 review in this reconsideration of the 2020 final decision that would challenge" the secondary standard determination.[68] The Draft Assessment's analysis of both climate effects and materials effects further

---

[60] *Id.* at 3-50.
[61] *Id.* at 3-58–60.
[62] *Id.* at 3-184.
[63] *Id.* at 3-126.
[64] *Id.* at 4-5-6.
[65] *Id.* at 4-10.
[66] *Id.*
[67] *Id.* at 4-18.
[68] *Id.* at 5-47.

supports the conclusion that the 2020 determination should remain in place, as "the available information does not call into question the adequacy of protection provided by the current standards."[69]

Overall, the Draft Assessment is clear: there is scant new evidence to support reconsidering the 2020 determination. The EPA should drop this ill-considered review of its 2020 determination. Its reconsideration here is certainly not supported by any new scientific evidence. It is therefore unwarranted, unnecessary, and unreasonable.

*3. The EPA should not confront a particularized problem with a national, one-size-fits-all solution that will impose uneven burdens on the States.*

The Draft Assessment includes a discussion of the sources of national $PM_{2.5}$ emissions. Only certain PM emissions occur due to human activity. Stationary fuel combustion accounts for only 11% of $PM_{2.5}$ emissions.[70] Mobile sources and industrial processes contribute 5% each, with agriculture contributing another 14%.[71] The largest primary source of $PM_{2.5}$ emissions—by far—is fires, especially wildfires and prescribed fires.[72] But this is not a national problem that would require a national solution. This is a local problem that requires a local solution.

The Draft Assessment notes that at locations where the PM is below current standards, "the highest 2-hour concentrations measured almost never occur outside of the period of peak wildfire frequency. Most of the sites measuring these very high concentrations are in the northwestern U.S. and California, where wildfires have been relatively common in recent years."[73]

**C. Changing the NAAQS affects more than air quality.**

Changes to the NAAQS do not occur within a vacuum. Any movement in these standards necessarily prompts other changes and actions.[74] Those actions have consequences. For instance, one study noted that from 1972-1987, counties targeted

---

[69] *Id.* at 5-48.
[70] *Id.* at 2-4–5.
[71] *Id.*
[72] *Id.* (noting that fires account for 43% of $PM_{2.5}$ national emissions and explaining that "[f]ires include wildfires, prescribed fires, and agricultural fires, with wildfires and prescribed fires accounting for most of the fire-related primary PM2.5 emissions nationally").
[73] *Id.* at 3-62–63 (parentheticals omitted).
[74] *See, e.g.*, Ilya Shapiro & David McDonald, *Regulation Uber Alles: How Governments Hurt Workers and Consumers in the New New Economy*, 2017 U. CHI. LEGAL F. 461, 463 (2017) (noting how changing the NAAQS produces costs that arise directly, such as when PM standards mandate new filtration standards, and indirectly, such as when regulations lead to layoffs, decreased hiring, and reduced investment in capital stock).

by Clean Air Act regulations lost almost 600,000 jobs.[75] Likewise, a 2019 study looked at counties impacted by the NAAQS and concluded that the data suggested "environmental regulation may have affected employment not by reducing output, but perhaps by inducing firms to change their production technology in a way affecting labor intensity."[76] As we know, "change in production technology" is often just another way of saying "abandon coal." And any regulatory scheme that induces firms to swap coal-generation for some other power source has a disparate impact on Kentucky. This is because Kentucky has the second-highest number of coal workers in the United States[77] and because Kentucky's coal workforce is concentrated in rural—and often impoverished—areas where other jobs are either unavailable or inaccessible.

Eastern Kentucky—one of the state's largest coal producing regions—is one such area. In 2011, there were around 14,000 coal jobs in Eastern Kentucky; but, by the third of quarter of 2021, there were just 2,619 coal jobs left in this region.[78] This is a decrease of over 80%, and it has had serious consequences. Kentucky's Fifth Congressional District, which encompasses mines producing about one-third of Kentucky's coal,[79] has the second-lowest median income of any congressional district in the nation.[80] The district has an average poverty rate of 27.3%, which is over twice the national average of 12.3%.[81] Beyond the economic impact, the loss of these jobs also has produced serious health consequences. For instance, in Hazard, Kentucky—one of the largest coal towns in the Eastern Kentucky region—high unemployment has been cited as a cause of opioid addictions and a Hepatitis-C outbreak.[82]

These serious consequences to public health should be part of the EPA's risk assessment. The NAAQS must be standards that "are requisite to protect the public health."[83] To make this judgment, the EPA may "take account of comparative health

---

[75] Michael Greenstone, *The Impacts of Environmental Regulations on Industrial Activity: Evidence from the 1970 and 1977 Clean Air Act Amendments and the Census of Manufactures*, 110 J. POL. ECON. 1175, 1176 (2002) (estimating the counties also lost $37 billion in capital stock and $75 billion of industrial output).

[76] Glenn Sheriff et al., *How Did Air Quality Standards Affect Employment at US Power Plants? The Importance of Timing, Geography, and Stringency*, 6 J. ASSOC. ENVIRON RESOUR. ECON. 111, 126 (2019), https://perma.cc/Q454-FS5S.

[77] *Kentucky Coal Facts,* Kentucky Energy and Environment Cabinet 17 (2017), https://perma.cc/P5Z4-J6JE.

[78] Bill Estep, *'Noticeable impact.' Coal jobs and production up in Eastern Kentucky*, HERALD LEADER (Nov. 18, 2021), https://perma.cc/2PX2-MQRP (noting that this is actually an increase from the third quarter in 2020).

[79] *Kentucky Coal Facts, supra* note 77.

[80] Greg Giroux, *Rich, poor, young, old: Congressional districts at a glance,* Bloomberg Gov't (Sept. 15, 2017), https://perma.cc/9G2T-Q3M3.

[81] *Congressional District 5, KY.*, Data USA, https://perma.cc/T866-2HC4.

[82] Parija Kavilanz, *In a small Kentucky coal town, joblessness leads to a health crisis*, CNN (Nov. 8, 2017), https://perma.cc/TN8A-856Z.

[83] 42 U.S.C. § 7409(b).

risks."[84] According to Justice Breyer, writing in concurrence, "That is to say, [the EPA] may consider whether a proposed rule promotes safety overall. A rule likely to cause more harm to health than it prevents is not a rule that is 'requisite to protect the public health.'"[85]

And, while § 7408(b)(1) of the Clean Air Act does not allow the "costs of achieving [the] standard" to be included in the "initial calculation,"[86] this does not mean the EPA is required "to eliminate every health risk, however slight, at any economic cost, however great, to the point of hurtling industry over the brink of ruin, or even forcing deindustrialization."[87] Indeed, the purpose of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and *the productive capacity of its population*."[88] This purpose shows that Congress, like the Supreme Court, recognizes that there are "unquestionably" health "losses" that result from "closing down whole industries and thereby impoverishing the workers and consumers dependent upon those industries."[89]

Therefore, it is imperative that the Advisory Committee "advise the Administrator of any adverse public health, welfare, social, economic, or energy effects which may result from various strategies for attainment and maintenance" of the standard.[90] Such information will also aid the States in making informed decisions about "which abatement technologies are most efficient, and most economically feasible."[91] To neglect the impact changing the NAAQS will have on employment in the States is to ignore a very real and serious harm to public health.

## III. Conclusion

For these reasons, the Biden Administration should maintain the current NAAQS, which the EPA studied and reaffirmed just twelve months ago. For these same reasons, Kentucky and the undersigned States urge the EPA to consider, where permissible, the adverse policy effects of more stringent standards and for the Advisory Committee to advise the EPA regarding such effects. We look forward to your response.

---

[84] *American Trucking*, 531 U.S. at 495 (Breyer, J., concurring in part and in the judgment).
[85] *Id.*
[86] *Id.* at 465 (majority opinion).
[87] *Id.* at 494 (Breyer, J., concurring in part and in the judgment) (cleaned up).
[88] 42 U.S.C. § 7401(b)(1) (emphasis added).
[89] *American Trucking*, 531 U.S. at 466 (majority opinion).
[90] 42 U.S.C. § 7409(d)(2)(C)(iv).
[91] *American Trucking*, 531 U.S. at 470.

Respectfully submitted,

DANIEL CAMERON
Attorney General of Kentucky

STEVE MARSHALL
Attorney General of Alabama

JEFF LANDRY
Attorney General of Louisiana

TREG R. TAYLOR
Attorney General of Alaska

LYNN FITCH
Attorney General of Mississippi

LESLIE RUTLEDGE
Attorney General of Arkansas

ERIC S. SCHMITT
Attorney General of Missouri

TODD ROKITA
Attorney General of Indiana

AUSTIN KNUDSEN
Attorney General of Montana

DEREK SCHMIDT
Attorney General of Kansas

DOUGLAS J. PETERSON
Attorney General of Nebraska

JOHN M. O'CONNOR
Attorney General of Oklahoma

SEAN D. REYES
Attorney General of Utah

ALAN WILSON
Attorney General of South Carolina

PATRICK MORRISEY
Attorney General of West Virginia

KEN PAXTON
Attorney General of Texas

BRIDGET HILL
Attorney General of Wyoming