**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 24-1050 (and consolidated cases)**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

COMMONWEALTH OF KENTUCKY, et al.,
*Petitioners*,

*v.*

U.S. ENVIRONMENTAL PROTECTION AGENCY, MICHAEL S. REGAN
*Respondents.*

On Petitions for Review of Final Agency Action
of the United States Environmental Protection Agency
89 Fed. Reg. 16,202 (Mar. 6, 2024)

# DEFERRED JOINT APPENDIX
# VOLUME 5 OF 6
# JA2045 to JA2539

Lucinda Minton Langworthy
Erica N. Peterson
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
clangworthy@HuntonAK.com
epeterson@HuntonAK.com
(202) 955-1500

Elbert Lin
*Counsel of Record*
Hunton Andrews Kurth LLP
951 East Byrd Street, East Tower
Richmond, VA 23219
elin@HuntonAK.com
(804) 788-8200

October 7, 2024

*Counsel for Petitioners Chamber of Commerce of the United States of America, American Chemistry Council, American Forest & Paper Association, American Petroleum Institute, American Wood Council, National Association of Manufacturers, National Mining Association, and Portland Cement Association*

*Additional counsel listed on following pages*

Andrew R. Varcoe
Stephanie A. Maloney
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
(202) 463-5337
*Counsel for Petitioner*
*Chamber of Commerce of the*
*United States of America*

Erica Klenicki
Michael A. Tilghman II
NAM Legal Center
733 Tenth Street, NW, Suite 700
Washington, DC 20001
*Counsel for Petitioner*
*National Association of*
*Manufacturers*

Nate Curtisi
(D.C. Cir. Bar No. 65164)
Michael G. Bailey
(Arizona Bar No. 013747)
Arizona Chamber of Commerce
100 N. 7th Ave, Suite 120
Phoenix, Arizona 85007
(602) 248-4430
ncurtisi@azchamber.com
*Counsel for Arizona Chamber of*
*Commerce and Industry*

Brunn (Beau) W. Roysden III
(DC Cir. Bar No. 64493)
Fusion Law, PLLC
7600 N. 15th St., Suite 150
Phoenix, Arizona 85020
beau@fusion.law
(602) 315-7545
*Counsel for President of the Arizona*
*State Senate Warren Petersen and*
*Speaker of the Arizona House of*
*Representatives Ben Toma*

Kristina (Tina) R. Van Bockern
Holland & Hart LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Ph. 303-295-8107 / Fax 720-545-9952
trvanbockern@hollandhart.com

Emily C. Schilling
Sydney J. Sell
Holland & Hart LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101
Ph. 801-799-5753 / Fax 202-747-6574
ecschilling@hollandhart.com
sjsell@hollandhart.com
*Counsel for Petitioner*
*Essential Minerals Association*

**RUSSELL COLEMAN**
**Attorney General of Kentucky**
Matthew F. Kuhn
*Solicitor General*
Jacob M. Abrahamson
*Assistant Solicitor General*
Lindsey R. Keiser
*Assistant Attorney General*
Office of the Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jacob.Abrahamson@ky.gov
Lindsey.Keiser@ky.gov
*Counsel for Petitioner Commonwealth of Kentucky*

**PATRICK MORRISEY**
**Attorney General of West Virginia**
Michael R. Williams
*Principal Deputy Solicitor General*
Office of the West Virginia Attorney General
State Capitol, Bldg. 1, Room E-26
Charleston, West Virginia 25305
(681) 313-4550
Michael.R.Williams@wvago.gov
*Counsel for Petitioner State of West Virginia*

**STEVE MARSHALL**
**Attorney General of Alabama**
Edmund G. LaCour Jr.
*Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
*Counsel for Petitioner State of Alabama*

**TREG R. TAYLOR**
**Attorney General of Alaska**
Cody Doig
*Senior Assistant Attorney General*
Environmental Section
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 269-5211
cody.doig@alaska.gov
*Counsel for Petitioner State of Alaska*

**TIM GRIFFIN**
**Attorney General of Arkansas**
Nicholas J. Bronni
*Solicitor General*
Dylan L. Jacobs
*Deputy Solicitor General*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
Nicholas.Bronni@ArkansasAG.gov
Dylan.Jacobs@ArkansasAG.gov
*Counsel for Petitioner*
*State of Arkansas*

**ASHLEY MOODY**
**Attorney General of Florida**
Henry C. Whitaker
*Solicitor General*
James H. Percival
*Chief of Staff*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
henry.whitaker@myfloridalegal.com
james.percival@myfloridalegal.com
*Counsel for Petitioner*
*State of Florida*

**CHRISTOPHER M. CARR**
**Attorney General of Georgia**
Stephen J. Petrany
*Solicitor General*
Office of the Georgia Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
*Counsel for Petitioner*
*State of Georgia*

**RAÚL R. LABRADOR**
**Attorney General of Idaho**
Joshua N. Turner
*Chief of Constitutional Litigation and Policy*
Alan M. Hurst
*Solicitor General*
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720-0010
Tel: (208) 334-2400
Fax: (208) 854-8071
Josh.Turner@ag.idaho.gov
Alan.Hurst@ag.idaho.gov
*Counsel for Petitioner*
*State of Idaho*

**THEODORE E. ROKITA**
**Attorney General of Indiana**
James A. Barta
*Solicitor General*
Office of the Attorney General
IGC South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
(317) 232-0709
James.Barta@atg.in.gov
*Counsel for Petitioner*
*State of Indiana*

**BRENNA BIRD**
**Attorney General of Iowa**
Eric H. Wessan
*Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
*Counsel for Petitioner*
*State of Iowa*

**KRIS KOBACH**
**Attorney General of Kansas**
Anthony J. Powell
*Solicitor General*
Office of Kansas Attorney General
Kris W. Kobach
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Office: (785) 368-8539
Fax: (785) 296-3131
Anthony.Powell@ag.ks.gov
*Counsel for Petitioner*
*State of Kansas*

**LIZ MURRILL**
**Attorney General of Louisiana**
J. Benjamin Aguiñaga
*Solicitor General*
Office of the Louisiana Attorney General
1885 North Third Street
Baton Rouge, Louisiana 70802
(225) 485-2458
aguinagab@ag.louisiana.gov
*Counsel for Petitioner*
*State of Louisiana*

**LYNN FITCH**
**Attorney General of Mississippi**
Justin L. Matheny
*Deputy Solicitor General*
Office of the Mississippi Attorney General
P.O. Box 220
Jackson, Mississippi 39205-0220
(601) 359-3825
justin.matheny@ago.ms.gov
*Counsel for Petitioner*
*State of Mississippi*

**ANDREW BAILEY**
**Attorney General of Missouri**
Joshua M. Divine
*Solicitor General*
Office of the Attorney General
207 West High St.
Jefferson City, Missouri 65101
(573) 751-8870
Josh.Divine@ago.mo.gov
*Counsel for Petitioner*
*State of Missouri*

**AUSTIN KNUDSEN**
**Attorney General of Montana**
Christian B. Corrigan
*Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
*Counsel for Petitioner*
*State of Montana*

**MICHAEL T. HILGERS**
**Attorney General of Nebraska**
Grant D. Strobl
*Assistant Solicitor General*
Office of the Attorney General of Nebraska
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
Grant.Strobl@nebraska.gov
*Counsel for Petitioner*
*State of Nebraska*

**DREW WRIGLEY**
**Attorney General of North Dakota**
Philip Axt
*Solicitor General*
North Dakota Attorney General's Office
600 East Boulevard Avenue, Dept. 125
Bismarck, North Dakota 58505
(701) 328-2210
pjaxt@nd.gov
*Counsel for Petitioner*
*State of North Dakota*

**DAVE YOST**
**Attorney General of Ohio**
T. Elliot Gaiser
*Solicitor General*
Mathura Sridharan
*Deputy Solicitor General*
Ohio Attorney General's Office
30 E. Broad Street, Floor 17
Columbus, Ohio 43215
(614) 466-8980
elliot.gaiser@ohioago.gov
mathura.sridharan@ohioago.gov
*Counsel for Petitioner*
*State of Ohio*

**GENTNER F. DRUMMOND**
**Attorney General of Oklahoma**
Garry M. Gaskins, II
*Solicitor General*
Jennifer L. Lewis
*Deputy Attorney General*
Oklahoma Office of the Attorney General
313 Northeast 21st Street
Oklahoma City, Oklahoma 73105
(405) 312-2451
Garry.Gaskins@oag.ok.gov
*Counsel for Petitioner*
*State of Oklahoma*

**ALAN WILSON**
**Attorney General of South Carolina**
Robert D. Cook
*Solicitor General*
J. Emory Smith, Jr.
*Deputy Solicitor General*
Thomas T. Hydrick
*Assistant Deputy Solicitor General*
Joseph D. Spate
*Assistant Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov
*Counsel for Petitioner*
*State of South Carolina*

**MARTY J. JACKLEY**
**Attorney General of South Dakota**
Steven Blair
*Deputy Attorney General*
South Dakota Attorney General's Office
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501
(605) 773-3215
atgservice@state.sd.us
*Counsel for Petitioner*
*State of South Dakota*

**JONATHAN SKRMETTI**
**Attorney General & Reporter of Tennessee**
Whitney Hermandorfer
*Director of Strategic Litigation*
Harrison Gray Kilgore
*Strategic Litigation Counsel and Assistant Solicitor General*
Office of the Attorney General and Reporter of Tennessee
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 741-7403
Whitney.Hermandorfer@ag.tn.gov
Harrison.Kilgore@ag.tn.gov
*Counsel for Petitioner*
*State of Tennessee*

**SEAN D. REYES**
**Attorney General of Utah**
Stanford E. Purser
*Solicitor General*
Office of the Utah Attorney General
160 E. 330 S., 5th Floor
Salt Lake City, Utah 84111
(385) 382-4334
spurser@agutah.gov
*Counsel for Petitioner*
*State of Utah*

**BRIDGET HILL**
**Attorney General of Wyoming**
D. David DeWald
*Deputy Attorney General*
Wyoming Attorney General's Office
Water & Natural Resources Division
109 State Capitol
Cheyenne, Wyoming 82002
(307) 777-7895 phone
(307) 777-3542 fax
david.dewald@wyo.gov
*Counsel for Petitioner*
*State of Wyoming*

**KEN PAXTON**
**Attorney General of Texas**
Brent Webster
*First Assistant Attorney General*
James Lloyd
*Deputy Attorney General for Civil Litigation*
Kellie E. Billings-Ray
*Chief, Environmental Protection Division*
Clayton Smith
*Assistant Attorney General*
Office of the Attorney General of Texas Environmental Protection Division
P.O. Box 12548, MC 066
Austin, Texas 78711-2548
Tel: (512) 971-0139
Fax: (512) 320-0911
clayton.smith@oag.texas.gov
D.C. Circuit Bar No. 65145
Texas Bar No. 24091234
*Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality in Consolidated Case No. 24-1052*

TODD KIM
*Assistant Attorney General*
SARAH A. BUCKLEY
ALEXANDRA L. ST. ROMAIN
*Attorneys*
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 616-7554 (Buckley)
(202) 532-3284 (St. Romain)
sarah.buckley@usdoj.gov
alexandra.st.romain@usdoj.gov

Of Counsel:
David P.W. Orlin
*Attorney*
U.S. Environmental Protection
Agency

*Counsel for Respondents U.S. Environmental Protection Agency and Michael S. Regan, in his official capacity as Administrator, EPA*

FOR THE STATE OF CALIFORNIA
ROB BONTA
Attorney General of California
TRACY L. WINSOR
Senior Assistant Attorney General
MYUNG J. PARK
CHRISTIE VOSBURG
Supervising Deputy Attorneys General
STACY LAU
COREY M. MOFFAT
JONATHAN A. WIENER
Deputy Attorneys General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94114
(415) 510-3549
Jonathan.Wiener@doj.ca.gov

FOR THE STATE OF ARIZONA
KRISTIN K. MAYES,
Attorney General
KRISTIN M. WROBEL
Assistant Attorney General
Environmental Protection Unit
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-8594
ENVProtect@azag.gov

FOR THE STATE OF CONNECTICUT
WILLIAM TONG
Attorney General
MATTHEW I. LEVINE
Deputy Associate Attorney General
JILL LACEDONIA
Assistant Attorney General
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
(860) 808-5250
jill.lacedonia@ct.gov

FOR THE STATE OF ILLINOIS
KWAME RAOUL
Attorney General
JASON E. JAMES
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental Enforcement/
Asbestos Litigation Division
Office of the Attorney General
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(872) 276-3583
jason.james@ilag.gov

FOR THE STATE OF MARYLAND
ANTHONY G. BROWN
Attorney General
MICHAEL F. STRANDE
Assistant Attorney General
Office of the Attorney General
Maryland Dept. of the Environment
1800 Washington Blvd.
Baltimore, MD 21230
(410) 537-3014
Michael.Strande@maryland.gov

FOR THE COMMONWEALTH OF MASSACHUSETTS
ANDREA JOY CAMPBELL
Attorney General
TURNER SMITH
Assistant Attorney General & Deputy Chief
BRIAN CLAPPIER
Assistant Attorney General
MARCUS HOLMES
Assistant Attorney General
Energy & Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
Turner.Smith@mass.gov

FOR THE PEOPLE OF THE STATE OF MICHIGAN
ELIZABETH MORRISSEAU
Assistant Attorney General
Environment, Natural Resources, and Agriculture Division
6th Floor G. Mennen Williams Building
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
MorrisseauE@michigan.gov

FOR THE STATE OF MINNESOTA
KEITH ELLISON
Attorney General
PETER N. SURDO
Special Assistant Attorney General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 757-1061
Peter.Surdo@ag.state.mn.us

FOR THE STATE OF
NEW JERSEY
MATTHEW J. PLATKIN
Attorney General
LISA MORELLI
Deputy Attorney General
Division of Law
25 Market Street
P.O. Box 093
Trenton, NJ 08625-093
609-376-2740
lisa.morelli@law.njoag.gov

FOR THE STATE OF
NEW YORK
LETITIA JAMES
Attorney General
BARBARA D. UNDERWOOD
Solicitor General
JUDITH N. VALE
Deputy Solicitor General
ELIZABETH A. BRODY
Assistant Solicitor General
MICHAEL J. MYERS
Senior Counsel
NICHOLAS C. BUTTINO
Assistant Attorney General
Environmental Protection Bureau
The Capitol
Albany, NY 12224
(518) 776-2382
michael.myers@ag.ny.gov

FOR THE STATE OF OREGON
ELLEN F. ROSENBLUM
Attorney General
PAUL GARRAHAN
Attorney-in-Charge
STEVE NOVICK
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.oregon.gov
Steve.Novick@doj.oregon.gov

FOR THE COMMONWEALTH OF
PENNSYLVANIA
MICHELLE A. HENRY
Attorney General
ANN R. JOHNSTON
Assistant Chief Deputy Attorney
General
Civil Environmental Enforcement
Unit
Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
717-497-3678
ajohnston@attorneygeneral.gov

FOR THE STATE OF
RHODE ISLAND
PETER F. NERONHA
Attorney General
ALISON HOFFMAN CARNEY
Assistant Attorney General
Chief, Environment and Energy
Unit
Rhode Island Office of the Attorney
General
150 South Main Street
Providence, RI 02903
(401) 274-4400 ext 2116
acarney@riag.ri.gov

FOR THE STATE OF VERMONT
CHARITY R. CLARK
Attorney General
MELANIE KEHNE
Assistant Attorney General
Office of the Attorney
General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Melanie.kehne@vermont.gov

FOR THE STATE OF
WASHINGTON
ROBERT W. FERGUSON
Attorney General
CHRISTOPHER H. REITZ
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, Washington 98504-0117
(360) 586-4614
chris.reitz@atg.wa.gov

FOR THE STATE OF
WISCONSIN
JOSHUA L. KAUL
Attorney General
BRADLEY J. MOTL
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 267-0505
motlbj@doj.state.wi.us

FOR THE DISTRICT OF COLUMBIA
BRIAN L. SCHWALB
Attorney General
CAROLINE S. VAN ZILE
Solicitor General
Office of the Attorney General for the District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

FOR THE CITY OF NEW YORK
MURIEL GOODE-TRUFANT
Acting Corporation Counsel
CHRISTOPHER GENE KING
Senior Counsel, Environmental Law Division
NATHAN TAYLOR
Senior Counsel
New York City Law Department
100 Church Street
New York, NY 10007
212.356.2074
cking@law.nyc.gov

FOR HARRIS COUNTY, TEXAS
SARAH JANE UTLEY
Environmental Division Director
ELIZABETH HIDALGO
Assistant County Attorney
1019 Congress Plaza, 15th Floor
Houston, Texas 77002
713.274.5124
Sarah.Utley@cao.hctx.net

IRVINE & CONNER PLLC
CHARLES IRVINE
JANET CAMPOS
4709 Austin Street
Houston, Texas 77004
713.533.1704
charles@irvineconner.com
*Attorneys for Harris County, Texas*

Seth L. Johnson
Marvin C. Brown IV
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 797-5245
(202) 794-5355
sjohnson@earthjustice.org
mcbrown@earthjustice.org
*Counsel for Respondent-Intervenors Alliance of Nurses for Healthy Environments, American Lung Association, Environmental Defense Fund, Natural Resources Defense Council, Northeast Ohio Black Health Coalition, Rio Grande International Study Center, and Sierra Club*

John Walke
Emily Davis
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 289-6868
jwalke@nrdc.org
edavis@nrdc.org
*Counsel for Respondent-Intervenor Natural Resources Defense Council*

Shaun A. Goho
Hayden W. Hashimoto
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(617) 678-2516
sgoho@catf.us
hhashimoto@catf.us
*Counsel for Respondent-Intervenors Citizens for Pennsylvania's Future and Conservation Law Foundation*

# TABLE OF CONTENTS

## VOLUME 1 of 6

## ACTIONS UNDER REVIEW

EPA-HQ-OAR-2015-0072-1543, EPA, Reconsideration of the National Ambient Air Quality Standards for Particulate Matter; Proposed Rule, 88 Fed. Reg. 5558 (Jan. 27, 2023) .................................. JA0001

EPA-HQ-OAR-2015-0072-5839, EPA, Reconsideration of the National Ambient Air Quality Standards for Particulate Matter; Final Rule, 89 Fed. Reg. 16,202 (Mar. 6, 2024)...................................... JA0163

## INDEXED RECORD MATERIAL

EPA-HQ-OAR-2015-0072-0037, Comments by the Independent Particulate Matter Review Panel (formerly EPA CASAC Particulate Matter Review Panel) on EPA's Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft – September 2019) (Oct. 22, 2019) (excerpts) ........................................................................ JA0363

EPA-HQ-OAR-2015-0072-0069, EPA, Review of the National Ambient Air Quality Standards for Particulate Matter; Proposed Action, 85 Fed. Reg. 24,094 (Apr. 30, 2020) (excerpts) .......................... JA0414

EPA-HQ-OAR-2015-0072-0105, Qian Di, et al., *Air Pollution and Mortality in the Medicare Population*, NEW ENGLAND JOURNAL OF MEDICINE (June 29, 2017) ........................................................... JA0418

## VOLUME 2 of 6

EPA-HQ-OAR-2015-0072-0212, EPA, EPA/600/R-19/188, Integrated Science Assessment for Particulate Matter, (Dec. 2019) (excerpts) ......... JA0428

## VOLUME 3 of 6

EPA-HQ-OAR-2015-0072-0224, Press Release, EPA, Administrator Wheeler Announces New CASAC Member, Pool of NAAQS Subject Matter Experts (Sept. 13, 2019) ................................................ JA1186

EPA-HQ-OAR-2015-0072-0251, Letter from Dr. Louis Anthony Cox, Jr., Chair, Clean Air Scientific Advisory Committee, to The Honorable Andrew R. Wheeler, Administrator, EPA, re: CASAC Review of the EPA's *Integrated Science Assessment for Particulate Matter (External Review Draft – October 2018)* (Apr. 11, 2019) (excerpts) ................................................ JA1188

EPA-HQ-OAR-2015-0072-0260, Letter from Dr. Louis Anthony Cox, Jr., Chair, Clean Air Scientific Advisory Committee, to The Honorable Andrew R. Wheeler, Administrator, EPA, re: CASAC Review of the EPA's *Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft – September 2019)* (Dec. 16, 2019) (excerpts) ................................................ JA1190

EPA-HQ-OAR-2015-0072-0262, EPA, EPA-452/R-20-002, Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (Jan. 2020) (excerpts) [-0262 is duplicated in the docket at EPA-HQ-OAR-2015-0072-1583] ................. JA1200

EPA-HQ-OAR-2015-0072-0702, Comments by National Medical Societies and Public Health and Patient Advocacy Organizations on EPA's Proposed Rule on the National Ambient Air Quality Standards for Particulate Matter (undated) ................................................ JA1223

EPA-HQ-OAR-2015-0072-0752, Comments by Achieving Community Tasks Successfully (ACTS), et al. on EPA's Proposed Rule on the National Ambient Air Quality Standards for Particulate Matter (June 29, 2020) ................................................ JA1233

EPA-HQ-OAR-2015-0072-0973, Comments by Clean Air Task Force, et al. on EPA's Proposed Rule on the National Ambient Air Quality Standards for Particulate Matter, 85 Fed. Reg. 24,094 (Apr. 30, 2020) (June 29, 2020) (excerpts) ................................................ JA1236

EPA-HQ-OAR-2015-0072-1166, EPA, Review of the National Ambient Air Quality Standards for Particulate Matter; Final Action, 85 Fed. Reg. 82,684 (Dec. 18, 2020) .......... JA1256

EPA-HQ-OAR-2015-0072-1241_Attachment 2, Petition for Reconsideration submitted on behalf of the States of California (b and through Attorney General Xavier Becerra and the California Air Resources Board), Connecticut, Delaware, Illinois, Maryland, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin; the Commonwealths of Massachusetts, Pennsylvania, and Virginia; and the City of New York (Feb. 16, 2021) .......... JA1321

EPA-HQ-OAR-2015-0072-1242_Attachment 2, Petition for Reconsideration submitted by American Lung Association, Clean Air Task Force, Chesapeake Bay Foundation, Earthjustice, Environment America, Environmental Defense Fund, Environmental Law & Policy Center, National Parks Conservation Association, Natural Resources Defense Council, Sierra Club, and Union of Concerned Scientists (Feb. 16, 2020) .......... JA1455

EPA-HQ-OAR-2015-0072-1273, Press Release, EPA, EPA to Reexamine Health Standards for Harmful Soot that Previous Administration Left Unchanged (June 10, 2021) .......... JA1478

EPA-HQ-OAR-2015-0072-1277, Press Release, EPA, EPA Announces Selections of Charter Members to the Clean Air Scientific Advisory Committee; Concurrently, EPA issues a call for nominations for the CASAC Particulate Matter Panel (June 17, 2021) .......... JA1480

EPA-HQ-OAR-2015-0072-1285, Press Release, EPA, Administrator Regan Directs EPA to Reset Critical Science-Focused Federal Advisory Committees; Past administration actions hindered the recruitment and retention of members for the Science Advisory Board and the Clean Air Scientific Advisory Committee (Mar. 31, 2021) .......... JA1482

EPA-HQ-OAR-2015-0072-1394, Ki-Do Eum, et al., *Impact of long-term temporal trends in fine particulate matter (PM $_{2.5}$) on associations of annual PM$_{2.5}$ exposure and mortality; An analysis of over 20 million Medicare beneficiaries*, ENVIRONMENTAL EPIDEMIOLOGY (2018) .......... JA1484

EPA-HQ-OAR-2015-0072-1424, Joel Schwartz, et al., *A National Difference in Differences Analysis of the Effect of PM$_{2.5}$ on Annual Death Rates*, ENVIRONMENTAL RESEARCH (2021) .......... JA1491

EPA-HQ-OAR-2015-0072-1441, Lauren H. Wyatt, et al., *Association of short-term exposure to ambient PM$_{2.5}$ with hospital admissions and 30-day readmissions in end-stage renal disease patients: population-based retrospective cohort study*, BMJ OPEN (2020) .......... JA1516

EPA-HQ-OAR-2015-0072-1471, X. Wu, et al., *Evaluating the impact of long-term exposure to fine particulate matter on mortality among the elderly*, SCIENCE ADVANCES (2020) .......... JA1525

EPA-HQ-OAR-2015-0072-1501, EPA, EPA-452/R-15-007, EPA, Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone (Sept. 2015) (excerpts) .......... JA1535

EPA-HQ-OAR-2015-0072-1522, Comments by Joel Schwartz, Professor of Environmental Health, Harvard TH Chan School of Public Health, on EPA's Policy Assessment for PM2.5 (undated) (excerpts) .......... JA1545

EPA-HQ-OAR-2015-0072-1525, Comments on behalf of the Commonwealth of Kentucky and the States of Alabama, Alaska, Arkansas, Indiana, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, Utah, West Virginia, and Wyoming on Policy Assessment for Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, External Review Draft (Dec. 14, 2021) .......... JA1548

## VOLUME 4 of 6

EPA-HQ-OAR-2015-0072-1584, EPA, EPA-452/R-22-004, Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (May 2022) (excerpts)............. JA1561

EPA-HQ-OAR-2015-0072-1585, EPA, EPA/600/R-22/028, Supplement to the 2019 Integrated Science Assessment for Particulate Matter (May 2022) (excerpts)................................................ JA1836

EPA-HQ-OAR-2015-0072-1587, Letter from Dr. Elizabeth A. (Lianne) Sheppard, Chair, Clean Air Scientific Advisory Committee, to the Honorable Michael S. Regan, Administrator, EPA, re: CASAC Review of the EPA's *Supplement to the 2019 Integrated Science Assessment for Particulate Matter (External Review Draft – October 2021)* (excerpts) (Mar. 18, 2022) ....................... JA1995

EPA-HQ-OAR-2015-0072-1593, Letter from Dr. Elizabeth A. (Lianne) Sheppard, Chair, Clean Air Scientific Advisory Committee, to the Honorable Michael S. Regan, Administrator, EPA, re: CASAC Review of the EPA's *Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft – October 2021)* (excerpts) (Mar. 18, 2022) ............................................................ JA2000

EPA-HQ-OAR-2015-0072-1964, Comments by the Arizona Department of Environmental Quality on Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (Mar. 20, 2023) ......................................................................... JA2023

EPA-HQ-OAR-2015-0072-1989, Comments by the Arizona Chamber of Commerce & Industry and the Arizona Manufacturers Council on EPA's Proposed Rule on National Ambient Air Quality Standards for Particulate Matter (Mar. 24, 2023).................................... JA2028

EPA-HQ-OAR-2015-0072-2091, Comments by the Essential Minerals Association on Reconsideration of the National Ambient Air Quality Standards for Particulate Matter Proposed Rule (Mar. 28, 2023) ........................................................................................ JA2032

EPA-HQ-OAR-2015-0072-2125, Comments by Joel Schwartz, Professor of Environmental Epidemiology, Director, Harvard Center for Risk Analysis, Harvard University, on EPA's Proposed Revision to the PM2.5 NAAQS (undated) (excerpts) .............................. JA2038

## VOLUME 5 of 6

EPA-HQ-OAR-2015-0072-2192, Comments by the Texas Commission on Environmental Quality on EPA's Proposed Rule for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (Mar. 28, 2023).................................... JA2045

EPA-HQ-OAR-2015-0072-2193, Comments by the National Association of Manufacturers on EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (Mar. 28, 2023) ......................................................................... JA2079

EPA-HQ-OAR-2015-0072-2210, Comments by the National Mining Association on EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 88 Fed. Reg. 5558 (Jan. 27, 2023) (Mar. 28, 2023) ........................................................... JA2083

EPA-HQ-OAR-2015-0072-2212, Comments by the Commonwealth of Kentucky and the Energy and Environment Cabinet, the Division for Air Quality, on EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 88 Fed. Reg. 5558 (Jan. 27, 2023) (Mar. 28, 2023) ..................................... JA2140

EPA-HQ-OAR-2015-0072-2233_Attachment 1, Comments of Appalachian Mountain Club, Chesapeake Bay Foundation, Citizens For Pennsylvania's Future, Clean Air Council, Clean Air Task Force, CleanAirNow, Earthjustice, Environmental Defense Fund, Group Against Smog & Pollution, National Parks Conservation Association, Natural Resources Defense Council, Sierra Club, Southern Environmental Law Center, and Union of Concerned Scientists on the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (Mar. 28, 2023)." ............................................................................... JA2145

EPA-HQ-OAR-2015-0072-2348, Comments by Health, Medical, and Nursing Organizations on EPA's Proposed Rule in the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 88 Fed. Reg. 5558 (Jan. 27, 2023) (Mar. 28, 2023) .......... JA2322

EPA-HQ-OAR-2015-0072-2361, Comments by the NAAQS Regulatory Review & Rulemaking Coalition on EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (Mar. 28, 2023) .......... JA2336

## VOLUME 6 of 6

EPA-HQ-OAR-2015-0072-2422_Attachment 14, Industrial Economics, Inc., Analysis of $PM_{2.5}$-Related Health Burdens Under Current and Alternative NAAQS; Updated Final Report, 9 µg/$m^3$ Supplement Added March 21, 2023 (excerpts) .......... JA2540

EPA-HQ-OAR-2015-0072-2426, Comments by Boyden Gray & Associates PLLC on EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 88 Fed. Reg. 5558 (Jan. 27, 2023) (Mar. 28, 2023) .......... JA2617

EPA-HQ-OAR-2015-0072-2428, Comments by the Chamber of Commerce of the United States on EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 88 Fed. Reg. 5558 (Jan. 27, 2023) (Mar. 28, 2023) .......... JA2640

EPA-HQ-OAR-2015-0072-2482_Attachment 5, Ihab Mikati, BS, et al., *Disparities in Distribution of Particulate Matter Emission Sources by Race and Poverty Status*, AJPH ENVIRONMENTAL JUSTICE (Apr. 2018) .......... JA2655

EPA-HQ-OAR-2015-0072-2485_Attachment 8, Christopher W. Tessum, et al., *$PM_{2.5}$ polluters disproportionately and systemically affect people of color in the United States*, Science Advances (Apr. 28, 2021) .......... JA2661

EPA-HQ-OAR-2015-0072-2485_Attachment 9, Maninder P.S. Thind, et al., *Fine Particulate Air Pollution from Electricity Generation in the US: Health Impacts by Race, Income, and Geography*, ENVIRONMENTAL SCIENCE & TECHNOLOGY (2019) .................................. JA2668

EPA-HQ-OAR-2015-0072-4525, Comment by Ben Toma, Speaker of the House, Arizona House of Representatives on EPA's Proposed Rule Change for PM2.5 (posted May 3, 2023) ......................................... JA2678

EPA-HQ-OAR-2015-0072-6025, EPA, Responses to Significant Comments on the 2023 Proposed Rule for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (undated) ......................................................................................... JA2680

**<u>MATERIALS PROVIDED FOR THE CONVENIENCE OF THE COURT</u>**

Appalachian Power Co. et al. Respondents' Brief in Support of Petitioners, *Am. Trucking Ass'ns v. Whitman*, No. 99-1426 (U.S. July 20, 2000) (excerpts) ............................................................... JA2838

Appalachian Power Co. et al. Reply Brief, *Am. Trucking Ass'ns v. Whitman*, No. 99-1426 (U.S. Oct. 5, 2000) (excerpts) ............................. JA2842

Joint Reply Brief of State Petitioners, Non-State Petitioners, and Supporting Intervenors, *NEDA CAP v. EPA*, 686 F.3d 803 (D.C. Cir. 2012) (No. 10-1252, Feb. 8, 2012) (excerpts) .................................. JA2846

Final Joint Opening Brief of Industry Petitioners, *Murray Energy Corp. v. EPA*, 936 F.3d 597 (D.C. Cir. 2019) (No. 15-1385, Sept. 26, 2016) (excerpts) ......................................................................... JA2849

State Petitioners' Opening Brief, *Murray Energy Corp. v. EPA*, 936 F.3d 597 (D.C. Cir. 2019) (No. 15-1385, Sept. 26, 2016) (excerpts) ............................................................................................ JA2851

Respondent EPA's Motion to Continue Oral Argument, *Murray Energy Corp. v. EPA*, No. 15-1385 (D.C. Cir. Apr. 7, 2017) (ECF No. 1670218) (excerpt) ................................................................ JA2855

Office of Management and Budget Comments on EPA Proposed Rule: "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," RIN 2060-AV52, Cover Comments (undated), Docket No. EPA-HQ-OAR-2015-0072-1618_Attachment 1 ........................................................................ JA2856

Memorandum from Joseph Goffman, Assistant Administrator, EPA, to Regional Administrators Regions 1-10, re: Initial Area Designations for the 2024 Revised Primary Annual Fine Particle National Ambient Air Quality Standard (Feb. 7, 2024) ............................ JA2880

Jon Niermann, *Chairman*
Emily Lindley, *Commissioner*
Bobby Janecka, *Commissioner*
Erin E. Chancellor, *Interim Executive Director*

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

March 28, 2023

U.S. Environmental Protection Agency
EPA Docket Center, Air and Radiation Docket
Mail Code 28221T
1200 Pennsylvania Avenue NW, Washington, DC 20460

Attn: Docket ID No. EPA-HQ-OAR-2015-0072

Subject: Review of Proposed Rule, Reconsideration of the National Ambient Air Quality Standards for Particulate Matter

To Whom it May Concern:

The Texas Commission on Environmental Quality (TCEQ) appreciates the opportunity to comment on the United States Environmental Protection Agency's (EPA) Proposed Rule for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter. Notice of the availability of this draft for public review was provided in the January 27, 2023, edition of the Federal Register.

Enclosed, please find the TCEQ's detailed comments to the referenced EPA document. If there are any questions concerning the TCEQ's comments, please contact Ms. Allison Jenkins, Toxicology, Risk Assessment, and Research Division, at 512-239-0656 or allison.jenkins@tceq.texas.gov.

Sincerely,

Erin E. Chancellor
Interim Executive Director

Enclosures

# COMMENTS BY THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY REGARDING THE RECONSIDERATION OF THE NATIONAL AMBIENT AIR QUALITY STANDARDS FOR PARTICULATE MATTER, PROPOSED RULE, JANUARY 27, 2023

## DOCKET ID NO. EPA-HQ-OAR-2015-0072

### *Summary of Proposed Action*

On January 27, 2023, the United States Environmental Protection Agency (EPA) published in the Federal Register (88 FR 5558) notice of the availability and public comment period for the proposed decisions for the reconsideration of the 2020 final decision on the primary and secondary National Ambient Air Quality Standards (NAAQS) for Particulate Matter (PM) (hereafter PM Proposed Rule).

The EPA's notice summarizes the background and rationale for the EPA Administrator's decisions:

- to revise the primary annual $PM_{2.5}$ standard by lowering the level from 12.0 µg/$m^3$ to within the range of 9.0 to 10.0 µg/$m^3$ while taking comment on alternative annual standard levels down to 8.0 µg/$m^3$ and up to 11.0 µg/$m^3$;
- to retain the current primary 24-hour $PM_{2.5}$ standard at a level of 35 µg/$m^3$ and taking comment on revising the level as low as 25 µg/$m^3$;
- to retain the primary 24-hour $PM_{10}$ standard, without revision; and
- not to change the secondary PM standards at this time, while taking comment on revising the level of the secondary 24-hour $PM_{2.5}$ standard as low as 25 µg/$m^3$.

*The Texas Commission on Environmental Quality (TCEQ) is in support of retaining the primary annual $PM_{2.5}$ standard without revision.*

These comments were made by the Toxicology, Risk Assessment, and Research Division, Monitoring Division, Air Quality Division, and Air Permits Division of the TCEQ.

### *TCEQ TOXICOLOGY, RISK ASSESSMENT, AND RESEARCH DIVISION COMMENTS*

#### I. <u>General Comments</u>

*The epidemiology studies do not provide a sufficient basis for revising the current standards.*

Reconsideration of the standard for $PM_{2.5}$ is based mostly on epidemiology studies. Although statistical analyses may show a positive association between exposure to $PM_{2.5}$ and an outcome, it is prudent to recognize that an association does not equate to causality, particularly when the association is weak. The executive summary of the PM Proposed Rule focuses on statistical significance, even when many of the associations are weak and some encompass the null (i.e., no association at all, either positive or negative). In addition to the strength of association in determining causality, one must also duly consider biological plausibility, specificity, temporality, and consistency. It is unclear from the studies or from EPA's analysis, what specific biological mechanisms are triggered by ambient concentrations of $PM_{2.5}$ that ultimately result in morbidity and death. Indeed, there is no evidence presented that shows $PM_{2.5}$ is the actual trigger for morbidity and mortality that is attributed to ambient PM.

According to the EPA in the PM Proposed Rule, epidemiology studies available in this reconsideration demonstrate generally positive, and often statistically significant, $PM_{2.5}$ health effect associations. However, there are several uncertainties in the analyses conducted in the various epidemiology studies that are not presented by EPA in their summaries and that undermine EPA's conclusions. These uncertainties include exposure measurement error, potential confounded by copollutants, increasing uncertainty of associations at lower $PM_{2.5}$

concentrations, and heterogeneity of effects across different cities or regions. Because of this, the epidemiology studies do not provide a sufficient basis for revising the current standards. As the previous Clean Air Scientific Advisory Committee (CASAC) noted, "while the data on associations should certainly be carefully considered, this data should not be interpreted more strongly than warranted based on its methodological limitations" (CASAC April 11, 2019). The methodological limitations are still present in the underlying epidemiology studies.

*Criteria for a causal relationship are not met.*

The EPA defines a causal relationship on page 3-16 of the 2022 PM Policy Assessment (PA) (EPA 2022a) as follows, "the pollutant has been shown to result in health effects at relevant exposures based on studies encompassing multiple lines of evidence and chance, confounding, and other biases can be ruled out with reasonable confidence." The criteria for a causal relationship for mortality and cardiovascular effects have not been met, because chance, confounding and other biases cannot be ruled out with reasonable confidence. For example, potential confounders such as smoking are not always considered in the analyses, and when considered are not based on individual data but rather smoking information by county or zip code, or proxies such as lung cancer, lung cancer mortality, or chronic obstructive pulmonary disease (COPD) data in a region.

Furthermore, the EPA cites studies such as Pope et al. (2009), which evaluated changes in life expectancy and their relationship to $PM_{2.5}$. However, the increases in life expectancy from the 1970's to the 2000's do not simply reflect a decrease in ambient concentrations of $PM_{2.5}$. Advances in health care, including those in diagnosis, prevention, and treatment, are completely overlooked in discussion of causality, as is the decline in exposure to secondhand smoke due to banning of smoking in most public places, including workplaces where people spend at least 40 hours/week. Adjustment for socioeconomic status (SES) does not automatically adjust for these confounders. Moreover, tobacco use has declined significantly from 1970 to the 2000's. These are likely contributory to the declines in respiratory and cardiovascular mortality and morbidity from 1970 to present day. EPA's attribution of an increase in life expectancy of 0.61 years/10 $\mu g/m^3$ $PM_{2.5}$ from the 1970's to the 2000's (PM Proposed Rule, page 5581) to a decline in ambient concentrations of $PM_{2.5}$ is a serious oversimplification that cannot support EPA's conclusions.

*Information about biological plausibility does not support the conclusion that $PM_{2.5}$ causes all types of mortality.*

Furthermore, total mortality (i.e., all-cause mortality due to every non-accidental and accidental cause) is unlikely to be a biologically plausible outcome of PM-induced effects. A few specific causes of mortality that may be plausibly associated with PM should be scientifically identified and evaluated separately. Recent studies discussed in the Supplement to the 2019 Integrated Science Assessment (ISA) (Section 3.3.1, Recent Experimental Studies at Near-Ambient Concentrations) do little to supplement the inadequate assessment of biological plausibility of PM-associated health effects in the final ISA (see TCEQ comments on the 2021 PM ISA Supplement).

$PM_{2.5}$ would have to be capable of inducing mortality through a multitude of as yet unidentified toxicological pathways (that can be sufficiently perturbed at low PM[1] doses despite relatively robust homeostatic biological processes), to contribute to literally every non-accidental cause of death. Not to mention the accidental causes of death that are included in the Medicare cohort studies such as Di et al. (2017a). Evidence demonstrating such a phenomenon simply does not exist. In their 2019 PM ISA and 2022 PM ISA Supplement, EPA cites putative biological

---

[1] Thus, again, chance, confounding, and other biases cannot be ruled out with reasonable confidence in any associations with total non-accidental mortality.

plausibility pathways for cardiovascular disease, respiratory disease, and metabolic disease, as the basis for the long-term all-cause mortality conclusions. Setting aside any concerns about the accuracy or plausibility of those pathways at ambient concentrations of $PM_{2.5}$, those diseases do not comprise the totality of causes of death in the United States (US). In the top 15 causes of death in the US (CDC, 2021), cardiovascular diseases (diseases of heart #1, cerebrovascular disease #5, essential hypertension #13), respiratory diseases (chronic lower respiratory disease #4, pneumonitis #15), and metabolic diseases (diabetes #7) make up 39% of total deaths. But the list of the top 15 also includes malignant neoplasms (#2), accidents (#3), Alzheimer's disease (#6), kidney disease (#8), influenza & pneumonia (#9), suicide (#10), liver disease (#11), septicemia (#12), and Parkinson's disease (#14). Together these causes make up 41% of total deaths, with 20% of deaths not accounted for in the top 15 list. This means that 40-60% of deaths have no biologically plausible means by which $PM_{2.5}$ could contribute to them. This calls into question the conclusions that $PM_{2.5}$ meaningfully contributes to all-cause mortality (and shows why using all-cause mortality as an endpoint on epidemiology studies is misguided), and certainly argues against a risk assessment that evaluates impacts of $PM_{2.5}$ on all-cause mortality.

In summary, when taken together collectively, the information discussed in the sections above does not support lowering the current annual and 24-hour $PM_{2.5}$ standards, but rather by corollary supports retaining the current annual and 24-hour $PM_{2.5}$ NAAQS.

*Particulate matter is heterogeneous. Mass of PM is a poor toxicity surrogate for $PM_{2.5}$ and a poor basis for a one-size-fits-all nationwide standard.*

It is readily apparent from an extensive scientific database that not all $PM_{2.5}$ is created equal toxicologically, either in terms of the toxicity of PM components or the presence/absence of associations with increased mortality or morbidity risk. The bottom line scientifically is that mass of PM is a poor toxicity surrogate for $PM_{2.5}$ and a poor basis for a one-size-fits-all nationwide standard. That is, available scientific evidence suggests that PM mass is not equally toxic across the country or over time, resulting in significant heterogeneity of results.

PM mass may be comprised of constituents such as organic carbon, elemental carbon, nitrate, and sulfate, as well as trace elements such as iron, vanadium, and nickel, and many other metals or compounds (e.g., organics such as polycyclic aromatic hydrocarbons [PAHs]). These chemical constituents emanate from diverse anthropogenic and natural sources like soil or road dust, vehicle exhaust, biomass combustion, sea salt, and forest fires. The EPA has long acknowledged that they are unable to differentiate the sources or chemical components of $PM_{2.5}$ that are most closely related to health outcomes, with the implication being that they will continue to regulate on a $PM_{2.5}$ mass basis ($\mu g/m^3$).

The EPA has acknowledged that results from epidemiological studies evaluating health effects associated with long- and short-term $PM_{2.5}$ exposures show heterogeneity in responses between cities and effect estimates across geographic regions of the US. For example, short-term $PM_{2.5}$ exposure is associated with greater cardiovascular mortality and hospital admissions in the eastern versus western US, and the EPA has noted that this heterogeneity could be partly attributed to differences in $PM_{2.5}$ composition across the US as well as to exposure differences that vary regionally (e.g., personal activity patterns, microenvironmental characteristics). Additionally, EPA has acknowledged evidence indicating a greater risk of $PM_{2.5}$-associated mortality in the warmer months of the year. Similar to geographical heterogeneity, EPA has acknowledged that seasonal heterogeneity (within a region or across regions) could be attributed to a number of factors including varying $PM_{2.5}$ composition by season. Regional and seasonal heterogeneity in risk caused by known variables (e.g., differences in $PM_{2.5}$ composition across the country in conjunction with differences in chemical toxicity and potency) highlights the lack of credible scientific support for a nationwide, one-size-fits-all NAAQS for $PM_{2.5}$. The ability to differentiate the $PM_{2.5}$ constituents and/or sources most closely related to the various health outcomes is not necessary for the ability to understand that single nationwide estimates

or NAAQS are scientifically inappropriate given the heterogeneity in risk and $PM_{2.5}$ composition across the country.

Consistent with the information above, on page 5618 of the PM Proposed Rule, the EPA states, "…the scientific evidence in this reconsideration, as in previous reviews, continues to provide strong support for health effects associated with $PM_{2.5}$ mass.…available information continues to support the $PM_{2.5}$ mass-based indicator and remains too limited to support a distinct standard for any specific $PM_{2.5}$ component or group of components, and too limited to support a distinct standard for the ultrafine fraction." It is noteworthy that the EPA is seemingly unable to identify any chemical component(s) of $PM_{2.5}$ specifically culpable for any specific health outcome they evaluate, chemicals for which there is a wealth of toxicological information, and EPA apparently continues to consider that significant scientific shortcoming acceptable. The inability to identify any chemical component(s) of $PM_{2.5}$ specifically culpable for any specific health outcome says a great deal about the usefulness of the underlying science in differentiating and ultimately addressing the actual causative chemical agent(s) associated with the various effects evaluated by EPA in the ISA and PA. In an attempt to account for these scientific shortcomings, EPA regulates PM mass as a poor toxicity surrogate for the yet-to-be-identified causative chemical agent(s) that are culpable for associated health effects, despite the known significant heterogeneity in PM mass associations with health effects across both the U.S. and seasons.

In summary, when taken together collectively, the information discussed in the sections above does not support lowering the current annual and 24-hour $PM_{2.5}$ standards, but rather by corollary supports retaining the current annual and 24-hour $PM_{2.5}$ NAAQS.

*The significant uncertainties identified in previous PM reviews should be explicitly addressed and considered in this proposed rule to justify changes to the PM NAAQS.*

The EPA should explicitly address whether in this latest review they have diminished the uncertainties noted by the EPA administrator in previous reviews. For example, in the *Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter* dated January 2020 (i.e., p. 3-9 of EPA-452/R-20-002) [*emphasis added*], "The Administrator recognized that uncertainties remained in the scientific information. She specifically noted *uncertainties related to understanding the relative toxicity of the different components* in the fine particle mixture, the *role of $PM_{2.5}$* in the complex ambient mixture, *exposure measurement errors* in epidemiologic studies, and the *nature and magnitude of estimated risks related to relatively low ambient $PM_{2.5}$ concentrations*. Furthermore, the Administrator noted that epidemiologic studies had reported *heterogeneity in responses both within and between cities and in geographic regions across the U.S.* She recognized that this heterogeneity may be attributed, in part, to differences in fine particle composition in different regions and cities."

As discussed elsewhere in these comments, the following uncertainties still exist, and it is not clear that they have been diminished in any appreciable way to support the proposed revisions to the standard:

- Copollutants in the complex ambient mixture, particularly those that are correlated with PM, continue to pose problems for epidemiology study analysis. They could have a similar effect of linearizing and obscuring effects as errors in exposure estimates.
- Relative toxicity of components of PM are still unclear and remain a very important consideration because of the known differential toxicity of particular PM constituents.
- Exposure measurement error is a persistent problem, despite using different methods of exposure assessment. It still not clear how much error there is in the exposure estimates, which estimates are better, or the extent to which they represent actual personal exposure from individual-to-individual.

- The magnitude of risks at relatively low $PM_{2.5}$ concentrations continues to be highly uncertain, due to the statistical linearization of the C-R curve caused by exposure measurement error, as well as the increase in uncertainty in concentration modeling estimates at low concentrations.
- Regional heterogeneity in associations between $PM_{2.5}$ and mortality is still an open question. Despite substantial analyses that have considered housing characteristics, commuting, household heating type, meteorological features, and poverty, only up to 13% of the variability amongst cities has been explained (Baxter et al. 2017).

Changes to the NAAQS should be the result of significant improvements in the underlying science that are well documented by the EPA Administrator, including appreciable reduction of the significant scientific uncertainties identified in previous PM reviews as outlined above.

## II. Comments on Health Effect Study Information

*General summaries of studies are overly broad and do not capture the complexities of the actual results. The EPA should provide a balanced summary of study results that includes negative, positive, and null results, as well as uncertainties in the analysis.*

The PM Proposed Rule states that epidemiologic studies clearly demonstrate associations between long- and short-term $PM_{2.5}$ exposures and health outcomes. EPA further states that epidemiologic studies that employ alternative methods for confounder control report positive and consistent associations between long- and short-term exposure and mortality.

On page 3-89 of the final PA, the EPA makes a similar overall statement, “Based on the information in Figure 3-4 to Figure 3-7, key epidemiologic studies indicate generally positive and statistically significant associations between estimated $PM_{2.5}$ exposures (short- or long-term) and mortality or morbidity across a range of ambient $PM_{2.5}$ concentrations.” However, there are a number of non-statistically significant associations, and some negative associations, presented in those figures, particularly for respiratory mortality and for all morbidity endpoints, which EPA fails to address. The CASAC Review of the EPA’s Integrated Science Assessment for Particulate Matter (External Draft; April 11, 2019) also highlights studies showing a lack of association of PM exposures with all-cause mortality (e.g., discussion of Health Effects Institute 2013 on p. A-28, discussion of Puett et al. (2011) on pp. A-31 and A-69, discussion of Hartiala et al. (2016) on pp. A-32 and A-68).

For cardiovascular effects, the EPA again often summarizes information as being strong and consistent, when in fact the evidence being considered in this PM Proposed Rule is not strong and consistent. For example, there are numerous null findings for short-term and long-term $PM_{2.5}$ exposure and ischemic heart disease (IHD) and heart failure (HF). In Figure 6-17 of the 2019 ISA, for $PM_{2.5}$ and ischemic heart disease or myocardial infarction, of the presented effect estimates, only 1 out of 11 is statistically significant, and 4 out of the 6 US studies used $PM_{2.5}$ exposure estimates from before there was a nationwide monitoring network (thereby requiring extrapolation to estimate $PM_{2.5}$ concentrations). Similarly, Figure 3-2 in the 2022 ISA Supplement (reproduced below) shows that of 25 effect estimates presented, only 2 are statistically significantly positive, and 11 are null or negative. Negative findings for morbidity endpoints do not provide consistent or strong evidence that it is appropriate to model the risk for the associated mortality endpoint (i.e., IHD, stroke).




Source: Update of Figure 6-5, 2019 PM ISA.

Note: †Studies published since the 2009 PM ISA. *U.S. and Canadian studies published since the literature cutoff date (~January 2018) for the 2019 PM ISA. NR = not reported. Risk estimates are standardized to a 10 µg/m³ increase in $PM_{2.5}$ concentrations.

**Figure 3-2 Results of studies of short-term $PM_{2.5}$ exposure and hospital admissions and emergency department visits for stroke.**

The EPA notes on page 3-129 of the PM Proposed Rule that, "These alternative methods[2] studies reported consistent results among large study populations across the U.S. The results from studies that use alternative methods for confounder control further inform the relationship between long- and short-term $PM_{2.5}$ exposure and total mortality." However, aside from generally (although not entirely) positive associations, it is very difficult to tell if the results from the studies using alternative methods are consistent or not, because different metrics are used in these studies.

For example, in the 2021 PM ISA Supplement the results from Wei et al. (2020) are presented as numbers of excess deaths per 10 million person-days per 1 µg/m³ long-term $PM_{2.5}$ concentrations; the results from Wei et al. (2021b) were the number of early deaths per 1 µg/m³ annual average $PM_{2.5}$ concentrations; and Wu et al. (2020) presented the hazard ratio associated with a 10 µg/m³ change in average $PM_{2.5}$ concentrations. There is no way to tell from the presented metrics in Table 3-7 of the final ISA if the results are comparable or not. While the EPA cannot change what metrics the study authors choose to report, they could have discussed how these estimates may be similar or different from each other and/or the types of results presented in more traditional epidemiology studies. In addition, there is no discussion about

[2] "Alternative methods" studies are referred to as "causality" or "accountability" studies in the 2021 PM ISA Supplement and 2022 PM PA.

the quality of these studies (e.g., are there some methods that are better than others? Are there assumptions that are made or need to be tested, are the magnitude of the results comparable?). Altogether, because EPA did not address these considerations, the results from alternative methods studies are difficult to interpret and therefore of unknown value in supporting the PM NAAQS determinations.

*Because EPA did not consider confounding by long-term trends in the conclusions and interpretation of evidence from studies that rely on long-term changes in $PM_{2.5}$ concentrations, conclusions from these studies are not reliable for use in informing health effects of $PM_{2.5}$.*

The PM Proposed Rule states that analyses examining covariates (including copollutants, inadequate control from long-term temporal trends and weather) further confirm that the relationship between $PM_{2.5}$ exposure and mortality is unlikely to be biased by these factors. Similarly, on page 3-132 of the final PA (EPA 2022) the EPA states, "Finally, new studies assessed in the ISA Supplement evaluate the relationship between declines in ambient $PM_{2.5}$ concentrations over time and the potential for improvements in public health and support the conclusion in the 2020 PA; improvements in air quality are associated with improvements in public health." However, there is substantial discussion in the PM ISA Supplement (Section 3.2.2.2.6, Novel Methods to Address Potential Confounding) about the potential for long-term trend confounding with these types of studies.

In reference to this concern about confounding from long-term trends, on page 3-135 of the final PM PA (2022a) the EPA does note that "Some studies have expanded the examination of potential confounders to not only include copollutants, but also systematic evaluations of the potential impact of inadequate control from long-term temporal trends and weather (U.S. EPA, 2019, Section 11.1.5.1). Analyses examining these covariates further confirm that the relationship between $PM_{2.5}$ exposure and mortality is unlikely to be biased by these factors." But this conclusion (that relationships between $PM_{2.5}$ exposure and mortality are unlikely to be biased by these factors) is not correct. Section 3.2.2.2.6 of the PM ISA Supplement clearly shows an upward bias in effect estimates when long-term trends are not considered. EPA needed to evaluate this finding in the presented studies before stating that they support the presented conclusions. There are 8 studies listed in Table B.4 (in Section B.4 Details of Key Epidemiologic Studies, Including Study Design, Exposure Metric, and Statistical Analysis) of the final PM PA (2022) that use long-term trends in $PM_{2.5}$ concentrations (3- to 7-year moving averages), whose results needed to be evaluated for long-term trend confounding. In the absence of such an evaluation, the EPA cannot conclude that confounding for long-terms trends has been adequately considered in these studies, and so cannot rely on such evidence for their $PM_{2.5}$ health effects determinations.

*EPA should include their acknowledged uncertainties in health effects evidence in their interpretation of epidemiology studies and the application of those studies to the risk assessment.*

The EPA provides some discussion on uncertainties in the health effects evidence in the Proposed Rule, for example on page 5604, "Studies assessed in the 2019 ISA and ISA Supplement have advanced the state of exposure science by presenting innovative methodologies to estimate PM exposure, detailing new and existing measurement and modeling methods, and further informing our understanding of the influence of exposure measurement error due to exposure estimation methods on the associations between $PM_{2.5}$ and health effects reported in epidemiologic studies (U.S. EPA, 2019, Section 1.2.2; U.S. EPA, 2021a)". The considerations of exposure assessment and exposure measurement error are very important, and EPA's acknowledgement of these errors is laudable, but these issues must be considered in

caveating the interpretation of the epidemiology study results that use these exposure estimates. Further, these considerations must be taken into account when applying the epidemiology effect estimates to the risk assessment.

Similarly, the EPA discusses concerns about copollutant confounding in the PM Proposed Rule on page 5605, but generally dismisses these concerns in the rule, stating that, "the studies continue to provide evidence indicating that associations with $PM_{2.5}$ are relatively unchanged in copollutants models (U.S. EPA, 2019, Section 1.5.1; U.S. EPA, 2021a, Section 2.2.1)."

As noted in the TCEQ's comments on the Draft PM ISA supplement, the EPA does not fully discuss the relationship with copollutants. For example, the 2022 PM ISA Supplement states that, "Across studies that examined both gaseous and particulate (i.e., $PM_{10-2.5}$) pollutants, low to moderate correlations were reported with $PM_{2.5}$." In the 2019 EPA ISA, EPA provides those studies that examined potential confounding by gaseous copollutants (Di et al. (2017a); Lee et al. (2015); Pascal et al. (2014); Samoli et al. (2013) and concluded the $PM_{2.5}$-mortality relationship was relatively unchanged. However, EPA's summary is not fully descriptive of relationships presented in the cited studies and doesn't capture examples that do not follow that pattern. The EPA does not explain why they do not consider the examples that are inconsistent with their conclusions.

*Associations/coherence for respiratory and cardiovascular morbidities are less consistent than the associations for respiratory and cardiovascular mortality.*

The PM PA states on page 3-25, "The biological plausibility of $PM_{2.5}$-attributable mortality is supported by the coherence of effects across scientific disciplines (i.e., animal toxicological, controlled human exposure studies, and epidemiologic) when evaluating respiratory and cardiovascular morbidity effects, which are some of the largest contributors to total (nonaccidental) mortality." Yet the PM PA also states, "Although the largest mortality risk estimates were for respiratory mortality, the interpretation of the results was complicated by the limited coherence from studies of respiratory morbidity." "Although there is evidence for exacerbations of COPD and asthma, the collective body of respiratory morbidity evidence provides limited biological plausibility for $PM_{2.5}$-related respiratory mortality." Intuitively, it would make sense that if $PM_{2.5}$ concentrations were associated with respiratory mortality, then the association with respiratory morbidity would be as strong or stronger, but this is not what the epidemiology data show.

Similar results were seen with cardiovascular mortality and morbidity. The PM Proposed Rule states on p. 5585, "Though results for cardiovascular morbidity are less consistent than those for cardiovascular mortality (U.S. EPA, 2019, Section 6.2), studies in the 2019 ISA and ISA Supplement provide some evidence for associations between long-term $PM_{2.5}$ exposures and the progression of cardiovascular disease." Again, it would make sense that if $PM_{2.5}$ concentrations were associated with cardiovascular mortality, then the association with cardiovascular morbidity would be as strong or stronger, but this is not what the epidemiology data show.

This discrepancy calls into question the causal determinations of $PM_{2.5}$ exposure and respiratory and cardiovascular mortality; yet, EPA has not explained why their conclusions are valid in light of these inconsistencies.

*Epidemiology findings of an association between $PM_{2.5}$ and respiratory effects needs to be put into the context of the negative findings from controlled human exposure studies.*

The EPA's proposed rule concludes that the evidence supports a likely to be causal relationship between short-term exposures and respiratory effects. This conclusion was based mainly on the epidemiologic evidence demonstrating positive associations with various respiratory effects.

The lack of respiratory effects observed in controlled human exposure (CHE) studies of $PM_{2.5}$ needs to be adequately communicated and addressed for the causality determination.

In the few CHE studies conducted in individuals with asthma or COPD, $PM_{2.5}$ exposure mostly had no effect on respiratory symptoms, lung function, or pulmonary inflammation. Available studies in healthy people also did not clearly demonstrate respiratory effects following short-term $PM_{2.5}$ exposures. For instance, a study examining the respiratory effects of $PM_{2.5}$ on individuals with asthma was conducted by Urch et al. (2010) using a concentrated ambient particle (CAP) facility for $PM_{2.5}$ located in downtown Toronto, Canada. Exposure to either $PM_{2.5}$ CAPs alone or in addition to ozone ($O_3$) did not affect any measurement of pulmonary function, breathing parameters (tidal volume, breathing frequency, minute ventilation), or airway responsiveness, compared with exposure to a filtered-air control. The lack of effect of $PM_{2.5}$ CAPs on respiratory function observed in Urch et al. (2010) is consistent with the results of other CHE studies in which worsening of pulmonary function was not observed. The EPA needs to consider these CHE studies in their causality conclusions about the impacts of short-term exposure to $PM_{2.5}$ and respiratory effects; and explain why such direct study results were not considered to be more relevant than the epidemiological studies that were relied upon by EPA in support of its proposed revisions.

*The studies cited in the EPA's 2019 PM ISA and its 2022 Supplement, which are used as the basis for conclusions in the PM Proposed Rule, do not adequately discuss the limitations of the epidemiology studies and several other potential risk factors/confounders that are known to result in cardiovascular disease and mortality.*

Important potential risk factors/confounders for cardiovascular disease include smoking, obesity, high cholesterol including congenital causes of hypercholesterolemia, inadequate access to health care, and physical inactivity, among others. Smoking is a strong risk factor for cardiovascular disease and mortality. Some long-term studies included in the ISA Supplement (Section 3.1.2, Long-Term $PM_{2.5}$ Exposure), did not include many of these potential confounders (e.g., Chen et al. (2020), Danesh Yazdi et al. (2019), Rhinehart et al. (2020). When potential confounders are considered, these are not based on individuals, but rather on population-level summary statistics, including smoking, in a specific zip code or county (Henneman et al. (2019) Danesh Yazdi et al. (2019), and often from a timeframe that differs from the timeframe of the analysis. In one study, lung cancer hospitalization rate was used as a proxy for smoking in the population studied (Danesh Yazdi et al. (2021). Lung cancer hospitalization rate does not adequately reflect smoking incidence because not all smokers get lung cancer, and not all lung cancer is caused by smoking. Recent statistics show that approximately 7% and 20% of lung cancer in males and females, respectively, occurs in never smokers in the U.S. In other analyses (Shin et al. (2019), Bai et al. (2019), similar types of indirect adjustments for smoking, obesity, physical activity, and alcohol consumption were performed. These adjustments used population-based surveys, sometimes conducted during timeframes that differed from the timeframe of the analysis. The limitations in the studies likely result in imprecision in the analyses and this should be discussed in the proposed rule, along with EPA's rationale for why such limitations do not inhibit its conclusions.

*The methods used by epidemiology studies for evaluating the shape of the concentration-response (C-R) curve essentially ensure that the shape will appear linear. Because the EPA did not consider key assumptions and the impact that they have on the shape of the C-R curve, they cannot draw conclusions about the shape of the relationship between $PM_{2.5}$ concentrations and health effects.*

Failing to adequately address exposure considerations can lead to faulty conclusions about the risk of PM exposure and the shape of the C-R curve. A number of studies have demonstrated that C-R functions tend to be distorted toward linearity or supra-linearity as measurement error increased (Rhomberg et al., 2011). Measurement error can also obscure a threshold (Brauer et

al., 2002; Cox, 2018; Lipfert and Wyzga, 1996; Watt et al., 1995; Yoshimura, 1990). Notably, this concern is clearly expressed by the EPA in the ISA Preamble that the EPA used as their guide for developing the PM ISAs (US EPA 2015, Section 6c, page 29):

> "Various sources of variability and uncertainty, such as low data density in the lower concentration range, possible influence of exposure measurement error, and variability among individuals with respect to air pollution health effects, tend to smooth and "linearize" the concentration-response function and thus can obscure the existence of a threshold or nonlinear relationship. Because individual thresholds vary from person-to-person due to individual differences such as genetic differences or pre-existing disease conditions (and even can vary from one time to another for a given person), it can be difficult to demonstrate that a threshold exists in a population study. These sources of variability and uncertainty may explain why the available human data at ambient concentrations for some environmental pollutants (e.g., PM, $O_3$, Pb, environmental tobacco smoke, radiation) do not exhibit population-level thresholds for cancer or noncancer health effects, even though likely mechanisms include nonlinear processes for some key events."

These analyses suggest that greater scrutiny should be applied to evaluating the linear C-R functions reported in epidemiologic studies, as well as blanket statements in the PM Proposed Rule such as, "Studies evaluated in the 2019 ISA and the ISA Supplement examine this issue, and continue to provide evidence of linear, no-threshold relationships between long-term $PM_{2.5}$ exposures and all-cause and cause-specific mortality." The PM Proposed Rule goes on to state, "Generally, the evidence remains consistent in supporting a no-threshold relationship, and in supporting a linear relationship for $PM_{2.5}$ concentrations > 8 µg/m$^3$." The TCEQ urges the EPA to reconsider available data more objectively through evaluation of known errors as well as evaluating how those errors may impact the appearance of the C-R relationship. Methods that are known to inherently produce linear relationships are poor evidence of linearity indeed.

## III. <u>Concentrations in Key Epidemiology Studies</u>

*EPA has not appropriately addressed exposure assessments in key epidemiology studies that are used to inform the level of the $PM_{2.5}$ standard.*

As discussed elsewhere in these comments, the accurate assessment of exposure is a key part of an epidemiology study, and a large potential source of error or bias. One such source of error is in the estimation of exposure to $PM_{2.5}$ in years prior to 2000, when the US $PM_{2.5}$ monitoring network was established. There are a number of studies listed in Figures 3-4 to 3-7 and Table 3-6 of the PM PA that use air quality data from prior to 2000, including Lepeule et al. (2012), Elliott et al. (2020), Lefler et al. (2019), Pope et al. (2019), Turner et al. (2016), Weichenthal et al. (2014), Liu et al. (2019), Franklin et al. (2007), and others. The impact of exposure estimates for years when monitoring data were not available should be addressed. EPA should not consider those studies as key studies to inform the level of the $PM_{2.5}$ annual standard.

EPA also makes the assertion on page 5604 of the Proposed Rule that the newer hybrid exposure models have the potential to "reduce exposure measurement error and uncertainty in the health effect estimates from epidemiologic models of long-term exposure (U.S. EPA, 2019, Section 3.5; U.S. EPA, 2022a, Section 2.3.3)." However, later in the Proposed Rule the EPA states that "Factors likely contributing to poorer model performance often coincide with relatively low ambient $PM_{2.5}$ concentrations, in areas where predicted exposures are at a greater distance to

monitors, and under conditions where the reliability and availability of key datasets (e.g., air quality modeling) are limited. Thus, the PM Proposed Rule concludes on p. 5604 that the uncertainty in hybrid model predictions becomes an increasingly important consideration as lower predicted concentrations are considered." This suggests that these models may have greater exposure measurement error, particularly at the lower $PM_{2.5}$ concentrations that are of particular importance in this review. The EPA should systematically and quantitatively assess the potential impacts of exposure error from different types of exposure assessments and apply that to a quantitative uncertainty evaluation for the risk assessment.

*The EPA should not treat spatially-averaged $PM_{2.5}$ concentrations as being reflective of population-weighted $PM_{2.5}$ concentrations.*

In this review of the adequacy of the $PM_{2.5}$ standard, the EPA asked several important questions: How can the approaches used in key epidemiologic studies to estimate exposure affect the study-reported mean $PM_{2.5}$ concentrations? How do these approaches and the resulting means compare to one another? In their analyses in the PM PA, the EPA found, based on recent air quality in U.S. core-based statistical areas (CBSAs), that maximum $PM_{2.5}$ design values are about 10-20% higher than annual average $PM_{2.5}$ concentrations (i.e., averaged across multiple monitors in the same CBSA). For hybrid models that combined monitoring data with modeled data, the EPA found that an area's maximum annual design value was 40-50% higher than average $PM_{2.5}$ concentrations where population weighting was not used for aggregating the data and were 15-18% higher than modeled $PM_{2.5}$ concentrations that were population weighted. For the hybrid models, the EPA notes on page 5596 of the Proposed Rule that approaches that average grid cells to the zip-code level contain a form of population-weighting. However, zip codes are not population-weighted – that is, zip codes are not determined based on population density. So, averaging to the zip code does not impart a population weight. Therefore, studies that average grid cells to the zip code level do not impart a population weighting and their $PM_{2.5}$ annual average estimates may be up to 50% lower than the corresponding design value. EPA should correct this error in its analysis.

The EPA also considers averaging to census tracts and to postal codes as being population weighted, but these, as with zip codes, are spatially averaged, not population weighted. Indeed, Dr. Kevin Cromar, speaking to CASAC about the 2021 Draft PM PA on November 17th, 2021 on behalf of the American Thoracic Society, noted that the EPA should request population-weighted study averages from authors of key studies that use hybrid modeling techniques, to use in place of the spatially-weighted study averages. The EPA either needs to calculate the relationship between hybrid model zip code/census tract-weighted data and the corresponding design values, or they need to obtain population-weighted averages from the study authors to assess the relationship between the study averages and the standard design values. If they do not, they inappropriately characterize the relationship between the averages measured in the epidemiology studies (including Di et al., 2017a) and the design value. Because the average $PM_{2.5}$ concentrations in such studies are directly used to inform the choice of the $PM_{2.5}$ standard, such errors in comparisons can have a substantial effect on the $PM_{2.5}$ NAAQS. EPA should review its reliance on these studies and re-evaluate whether the information still supports its conclusions.

*The results of restricted concentration analyses should be evaluated in the context of the differences between average $PM_{2.5}$ concentrations from epidemiology studies and design values.*

Despite the substantial analysis conducted by the EPA to demonstrate the relationship between the average $PM_{2.5}$ concentrations presented in epidemiology studies and $PM_{2.5}$ design values, the EPA does not apply this information to their assessment of epidemiology analyses of restricted

$PM_{2.5}$ concentrations. The EPA instead generally draws conclusions based on the average $PM_{2.5}$ concentrations, such as the statement on page 5603 of the Proposed Rule that Di et al. (2017b) and Dominici et al. (2019) report positive and statistically significant associations in analyses restricted to concentrations less than 12.0 µg/m$^3$ for all-cause mortality and effect estimates are greater in the restricted analyses than effect estimates reported in main analyses. The Administrator goes on to note that a standard in the range of 9.0 to 10.0 mg/m$^3$ would be near the value of the study reported means from the two available long-term restricted analyses studies (i.e., 9.6 mg/m$^3$).

These statements inappropriately equate the averaged $PM_{2.5}$ to the $PM_{2.5}$ standard, which is based on the design value. A better way to address this concentration disparity is by calculating roughly equivalent concentrations based on the modeled differences between the averaged and design value $PM_{2.5}$ levels. For example, in Table 3-10 of the PM PA for Di et al. (2017a) and Dominici et al. (2019), a restricted concentration of 12 µg/m$^3$ is presented, with an overall study mean of 11 µg/m$^3$, and a restricted analysis mean of 9.6 µg/m$^3$. Because the exposure metric is modeled to daily $PM_{2.5}$ concentrations averaged to the zip code level and then averaged to produce an annual mean, there is no population weighting (as noted above, zip codes are not population-normalized and so do not confer population weighting), then the design value is anticipated to be 40-50% higher than the calculated annual average. This results in study restriction concentrations of 16.8 -18 µg/m$^3$, an overall mean of 15.4 – 16.5 µg/m$^3$, and a restricted analysis mean of 13.4 -14.4 µg/m$^3$. Using these more appropriate values for comparing to the standard, these results do not provide information about analyses that restrict the $PM_{2.5}$ concentrations to levels below the PM standard. This type of analysis should be done for all the restricted concentration evaluations to ensure an appropriate comparison between the epidemiology study concentrations and the PM NAAQS design value to provide adequate support for EPA's conclusions.

*The EPA has not adequately addressed the question of whether new studies provide information that shows health effects at concentrations lower than the standard.*

Because of the disparities between the epidemiology study average $PM_{2.5}$ concentrations and design value levels of $PM_{2.5}$, there remains an open question about whether these studies are indeed showing effects at average levels lower than the standard. This is a crucial question. One of the EPA's goals is to determine the adequacy of the $PM_{2.5}$ standard, and whether there are health effects at levels lower than the standard. From one perspective, the EPA concludes that the epidemiology studies do not show evidence of a threshold concentration, and the risk assessment assumes that any concentration higher than zero can cause health effects. That information alone cannot be used to determine where to set a particular standard, in the absence of the EPA providing guidance on how much risk (how many deaths, for example) is acceptable, and how much is not. On the other hand, EPA has approached the question of where to set the standard by looking at the concentrations measured in epidemiology studies, focusing on mean and percentile concentrations as indicating what concentrations study participants *were assumed to be exposed to*. This is then used to compare to the level of the standard to draw conclusions about levels that people *were assumed to have experienced that were associated with health effects*. Then the mean and percentile concentrations of the epidemiology studies are used to inform the choice of the level of the standard. To do this, the epidemiology study means have to be more consistently put into a format that is comparable to the standard. In the absence of this comparison, the EPA does not provide the necessary information for evaluating the adequacy of the current standard or for directly informing what level the annual or 24-hr standards should be. EPA provides no explanation for why

assumptions made in studies should be valued so highly, such that they support the proposed revisions.

Moreover, it is noted that generally, no actual individual exposure measurements of $PM_{2.5}$ concentrations are available for any individual with an adverse health effect, so technically it cannot be stated that there is significant evidence of adverse effects related to $PM_{2.5}$ exposure below current national standards as all such individual exposures are the cumulative result of the complex intermingling of many factors (e.g., daily mobility and activity patterns, variations in both indoor and outdoor sources and emissions) and are unknown.

## IV. Risk Assessment Methods

*The EPA should not inappropriately equate hazard ratios with relative risks, and they should not use hazard ratios in their risk calculations without proving that it is mathematically appropriate to do so.*

In the 2022 PM PA, Section C.1.1 (Selection of Key Health Endpoints and Specification of Concentration-Response Functions from Epidemiologic Studies), the EPA describes the methods by which the C-R functions from epidemiology studies are used to derive population risk estimates. The EPA treats hazard ratios like they were relative risks, and justifies this decision with the statement, "As noted in Sutradhar and Austin (2018), the HR [hazard ratio] associated with a Cox-proportional hazard model may approximate the RR [relative risk] when the effect estimate (and consequently the β) is relatively small. This is the case with the effect on mortality modeled for long-term exposure to ambient $PM_{2.5}$ (i.e., the size of the effect estimate supports an assumed equivalency between HR and RR). The near equivalency between the HR and RR, allows us to utilize the β derived above in a C-R function based on a log-linear functional form of the type presented earlier, to model changes in mortality related to changes in ambient PM." (page C-6). However, the referenced paper, Sutradhar and Austin (2018), states that "The **odds ratio** is close in value to the relative risk if the event probability is small." (emphasis added). Not only do the authors not state that hazard ratio and relative risk are similar when the effect estimate is small, they explicitly state right in the abstract that "This article demonstrates that although the *direction* of the HR can be used to explain the *direction* of the relative risk, the *magnitude* of the HR alone cannot be used to explain the *magnitude* of the relative risk." (emphasis in original), and in the summary, "Authors should refrain from using the magnitude of the HR to describe the magnitude of the relative risk – this is incorrect." In fact, Sutradhar and Austin (2018) make the statement (emphasis added) that the magnitude of the hazard ratio is not comparable to the magnitude of the relative risk no fewer than **13 times in the 4-page peer-reviewed publication**.

Because the EPA cannot therefore justify using the magnitude of the hazard ratio as equivalent to the magnitude of the relative risk, the EPA has to then determine the mathematically appropriate way to calculate risk based on a hazard ratio. As is laid out in Sutradhar and Austin (2018), and further explained in CASAC member Dr. Sabine Lange's comments to EPA on the 2019 PM PA (B-78 to B-80 in EPA 2019b), relative risk and hazard are not mathematically equivalent and so to use the hazard ratio the EPA must use a method that appropriately captures the mathematical nature of those estimates. This is particularly important because a small difference in the magnitude of the effect estimate can have a substantial impact when applied to a population of 60 million people in the risk assessment.

## V. Risk Assessment Results

*The overall weight of evidence shows that there is practically no statistical confidence that reducing the annual $PM_{2.5}$ NAAQS to 10 μg/m$^3$ or the 24-hour NAAQS to 30 μg/m$^3$ would actually reduce short-term exposure-related mortality risk.*

Examination of Table 3-14 from the 2022 PM PA (reproduced below) reveals that all short-term exposure related mortality risks (best estimates) associated with the current $PM_{2.5}$ NAAQS values are included in the risk confidence interval (CI) ranges for the alternative annual standard of 10 μg/m$^3$ or 24-hour standard of 30 μg/m$^3$. For example, the current standard best estimate of 2,490 based on Baxter (2017; all-cause mortality, primary PM-based modeling approach (Pri-PM)) falls well within the CIs for the alternative standards (i.e., CI of 850-3,460 for the alternative annual standard and 970-3,950 for the alternative 24-hour standard). This lack of effect is illustrated in Figure 1 below. Thus, based on Table 3-14 results for recent studies, there is no statistical confidence that reducing the annual $PM_{2.5}$ NAAQS to 10 μg/m$^3$ or the 24-hour NAAQS to 30 μg/m$^3$ would actually reduce short-term exposure related mortality risk.

**Table 3-14. Estimates of $PM_{2.5}$-associated mortality for air quality adjusted to just meet the current or alternative standards (47 urban study areas).**

| Exposure | Study & Ages | Simulation Method | Total Mortality Under the Current Standard (12/35-0) | % of Baseline Mortality Attributable to the Current Standard | Total Mortality Under an Alternative Annual Standard (10-0) | Total Mortality Under an Alternative 24-Hr Standard (30-0) |
|---|---|---|---|---|---|---|
| Long-Term | Di (65-99) | Pri PM | 40,600 (39,600 to 41,700) | 7.4 | 35,400 (34,400 to 36,300) | 40,100 (39,100 to 41,200) |
| | | Sec PM | 41,200 (40,200 to 42,300) | 7.5 | 34,800 (33,900 to 35,700) | 40,600 (39,500 to 41,600) |
| | Turner (30-99) | Pri PM | 44,400 (30,300 to 58,200) | 6.1 | 38,600 (26,300 to 50,700) | 43,900 (30,000 to 57,500) |
| | | Sec PM | 45,100 (30,800 to 59,000) | 6.2 | 38,000 (25,900 to 49,900) | 44,400 (30,300 to 58,200) |
| Short-Term | Baxter (0-99) | Pri PM | 2,490 (982 to 3,990) | 0.4 | 2,160 (850 to 3,460) | 2,460 (970 to 3,950) |
| | | Sec PM | 2,530 (997 to 4,050) | 0.4 | 2,120 (837 to 3,400) | 2,490 (982 to 3,990) |
| | Ito (0-99) | Pri PM | 1,180 (-15.8 to 2,370) | 0.2 | 1,020 (-13.7 to 2,050) | 1,160 (-15.6 to 2,340) |
| | | Sec PM | 1,200 (-16.0 to 2,400) | 0.2 | 1,000 (-13.5 to 2,020) | 1,180 (-15.8 to 2,370) |
| | Zanobetti (65-99) | Pri PM | 3,810 (2,530 to 5,080) | 0.7 | 3,300 (2,190 to 4,400) | 3,760 (2,500 to 5,020) |
| | | Sec PM | 3,870 (2,570 to 5,160) | 0.7 | 3,250 (2,160 to 4,330) | 3,810 (2,530 to 5,070) |




**Figure 1.** Illustration of the EPA's estimated short-term mortality (based on data from Table 3-14) for the current annual (12 µg/m³) and 24-hour (35 µg/m³) standards, as well as for an alternative annual standard (10 µg/m³) or an alternative 24-hour standard (30 µg/m³), using the primary PM (PriPM) modeling approach. Estimates based on C-R functions from three studies of 2 age groups was included: Baxter et al. (2017) (ages 0-99), Ito et al. (2013) (ages 0-99), and Zanobetti et al. (2014) (ages 65-99).

Applying the same consideration to short-term exposure related mortality risks in Table 3-16 from the 2022 PM PA (reproduced below) shows that in 21 of 24 cases, short-term exposure related mortality risks (best estimates) associated with the current $PM_{2.5}$ NAAQS values are included in the risk CI ranges for the alternative annual standards of 11, 9, or 8 µg/m³. In the three exceptions (i.e., Zanobetti et al. (2014), all-cause mortality, Pri-PM, 8 µg/m³ annual alternative standard, and secondary PM-based modeling approach (Sec-PM), 8 and 9 µg/m³ annual alternative standard), there is significant overlap in the risk CIs with only the best estimate for the Sec-PM 8 µg/m³ annual alternative standard (2,140) not falling within the CI for the current NAAQS (2,220-4,450). Thus, based on Table 3-16 results for recent studies, there is little statistical confidence that reducing the annual $PM_{2.5}$ NAAQS to a value in the 8 – 11 µg/m³ range would actually reduce short-term exposure related mortality risk.

**Table 3-16. Estimates of $PM_{2.5}$-associated mortality for the current and potential alternative annual standards in the 30 study areas where the annual standard is controlling.**

| Exposure | Study & Ages | Simulation Method | Total Risk Under the Current Standard (12/35-0) | % of Baseline Risk Attributable to the Current Standard | Total Risk Under an Alternative Annual Standard (11-0) | Total Risk Under an Alternative Annual Standard (10-0) | Total Risk Under an Alternative Annual Standard (9-0) | Total Risk Under an Alternative Annual Standard (8-0) |
|---|---|---|---|---|---|---|---|---|
| Long-Term | Di (65-99) | Pri PM | 34,900 (34,000 to 35,800) | 7.6 | 32,400 (31,600 to 33,300) | 29,900 (29,200 to 30,700) | 27,400 (26,700 to 28,100) | 24,900 (24,200 to 25,500) |
| | | Sec PM | 35,600 (34,700 to 36,500) | 7.7 | 32,500 (31,700 to 33,300) | 29,400 (28,600 to 30,100) | 26,300 (25,600 to 26,900) | 23,100 (22,500 to 23,700) |
| | Turner (30-99) | Pri PM | 38,200 (26,100 to 50,100) | 6.3 | 35,500 (24,200 to 46,500) | 32,700 (22,300 to 42,900) | 29,900 (20,400 to 39,300) | 27,200 (18,500 to 35,700) |
| | | Sec PM | 38,900 (26,600 to 51,000) | 6.4 | 35,500 (24,200 to 46,600) | 32,100 (21,900 to 42,100) | 28,700 (19,500 to 37,600) | 25,200 (17,100 to 33,100) |
| Short-Term | Baxter (0-99) | Pri PM | 2,150 (846 to 3,440) | 0.4 | 1,990 (784 to 3,190) | 1,830 (721 to 2,930) | 1,670 (658 to 2,680) | 1,510 (595 to 2,420) |
| | | Sec PM | 2,190 (862 to 3,510) | 0.4 | 1,990 (785 to 3,190) | 1,790 (707 to 2,880) | 1,600 (630 to 2,560) | 1,400 (552 to 2,250) |
| | Ito (0-99) | Pri PM | 1,010 (-13.6 to 2,040) | 0.2 | 939 (-12.6 to 1,880) | 864 (-11.6 to 1,730) | 789 (-10.6 to 1,580) | 713 (-9.57 to 1,430) |
| | | Sec PM | 1,030 (-13.9 to 2,070) | 0.2 | 940 (-12.6 to 1,890) | 847 (-11.4 to 1,700) | 754 (-10.1 to 1,510) | 661 (-8.87 to 1,330) |
| | Zanobetti (65-99) | Pri PM | 3,280 (2,180 to 4,370) | 0.7 | 3,040 (2,020 to 4,050) | 2,790 (1,860 to 3,730) | 2,550 (1,700 to 3,400) | 2,310 (1,540 to 3,080) |
| | | Sec PM | 3,340 (2,220 to 4,450) | 0.7 | 3,040 (2,020 to 4,050) | 2,740 (1,820 to 3,650) | 2,440 (1,620 to 3,260) | 2,140 (1,420 to 2,860) |

Based on the above considerations, it can be concluded that overall, there can be no statistical confidence that reducing the annual $PM_{2.5}$ NAAQS to a value in the 8-11 µg/m³ range or the 24-hour $PM_{2.5}$ NAAQS to 30 µg/m³ would actually reduce short-term exposure related mortality risk. EPA should explain how such lack of health benefits supports the proposed revisions.

*The overall weight of evidence is that there is practically no statistical confidence that reducing the annual $PM_{2.5}$ NAAQS (or the 24- hour NAAQS) would actually reduce long-term exposure-related mortality risk.*

Risk estimates based on recent literature do not provide a sufficiently sound scientific basis for expecting that reducing the annual or 24-hour $PM_{2.5}$ NAAQS values would result in actual reductions in long-term exposure related mortality risk. Examination of Table 3-16 above (from the EPA's Policy Assessment, EPA 2022a) reveals that for the much more age-inclusive analyses (ages 30-99) based on Turner et al. (2016), in most cases (62.5%), long-term exposure related mortality risks (best estimates) associated with the current $PM_{2.5}$ NAAQS values are included in the risk CI ranges for the alternative standards. This is illustrated in Figure 2. For example, the current standard best estimate of 38,200 (Pri-PM) based on the more age-inclusive Turner et al. (2016) falls well within the CIs for the alternative standards of 9-11 µg/m³ (e.g., CI of 22,300-42,900 for the 10 µg/m³ alternative standard). While this was not the case in three instances (37.5%), there is significant overlap in the risk CIs and the CI for the current standard (26,100-50,100; Pri-PM) contains the best estimate for the 8 µg/m³ alternative standard (27,200; Pri-PM). Additionally, the best estimate for the 9 µg/m³ alternative annual $PM_{2.5}$ standard based on Turner et al. (2016) (28,700; Sec-PM) falls within the CI for the current NAAQS (26,600-51,000; Sec-PM), consistent with results for Pri-PM (i.e., best estimate of 29,900 for the 9 µg/m³ alternative falls within the CI of 26,100-50,100 for the current annual NAAQS). Thus, based on EPA's results provided in the tables above, the overall weight of evidence (WOE) shows that

there is practically no statistical confidence that reducing the annual $PM_{2.5}$ NAAQS (or the 24-hour NAAQS) would actually reduce long-term exposure related mortality risk.




**Figure 2.** Illustration of the EPA's estimated long-term mortality (based on data from Table 3-16) for the current annual standard (12 µg/m$^3$) and for alternative annual standards (11, 10, 9, and 8 µg/m$^3$), using the primary PM (PriPM) modeling approach. Estimates based on C-R functions for Turner et al. (2016) (ages 30-99).

While results based on the much more age-inclusive analyses (ages 30-99) by Turner et al. (2016) are discussed above, other important limitations of the more age-restricted Di et al. (2017a) study also require discussion. The age-restricted Di et al. (2017a) study is the one favored in the PM Proposed Rule. As shown in Figure 3 below, the risk assessment results using Di et al. (2017a) do not overlap between different annual NAAQS standards, because the 95% CIs are much narrower than those in Turner et al. (2016). The reason for this is the precision of the C-R function generated by the Di et al. (2017a) study. Although it may seem that the estimate is more precise because there is a reduction in uncertainty in the relationship between $PM_{2.5}$ and all-cause mortality, the actual reason is that the Di study included more than 60 million people who were enrolled in Medicare (a retrospective administrative cohort), whereas Turner was a prospective cohort of approximately 670,000 people. The Turner study had substantially more information about the study participants at the individual level that was collected at the beginning of the study, in contrast to the Di study that only had information provided in the Medicare database, with many variables only available at the group level. Therefore, although the Turner study had better subject data, because the Di study had more participants there is the appearance that the C-R function (and the resultant risk estimates) are more certain purely because of a statistical effect of sample size.




**Figure 3.** Illustration of the EPA's estimated long-term mortality (based on data from Table 3-14) for the current annual (12 µg/m$^3$) and 24-hour (35 µg/m$^3$) standards, as well as for an alternative annual standard (10 µg/m$^3$) or an alternative 24-hour standard (30 µg/m$^3$), using the primary PM (Pri-PM) modeling approach. Estimates based on C-R functions from two studies of two age groups was included: Di et al., 2017b (ages 65-99) and Turner et al., 2016 (ages 30-99).

In addition, as discussed by Dr. James Boylan, a member of the EPA's CASAC, Di et al. (2017a) (as well as other similar studies) cannot honestly be said to demonstrate what EPA and the study authors purport it to show because of the nature of the exposure assessment. Dr. Boylan, in his comments as part of CASAC's review of the EPA Draft ISA on Particulate Matter (EPA 2019a)), stated, "Many other studies cited in the Draft ISA also misrepresent estimated exposures as if they were true exposures, leading to false statements about what has been found." (p. A-45 of CASAC April 11, 2019; EPA 2019a). In other words, the true exposures in the types of studies being relied upon by EPA for concentration-response functions are unknown, especially because they assume that concentrations in a single zip code represent the sum total of an individual person's $PM_{2.5}$ exposure. Di et al. (2017a) was provided by Dr. Boylan as an example of such false statements concerning estimated exposures being discussed as true exposures, specifically where Di et al. state,

> "In the entire Medicare population, there was significant evidence of adverse effects related to exposure to $PM_{2.5}$ and ozone at concentrations below current national standards. This effect was most pronounced among self-identified racial minorities and people with low income" (Di Q, Wang Y, Zanobetti A, et al. Air

> pollution and mortality in the Medicare population. N Engl J Med 2017a; 376: 2513-22)."

Dr. Boylan writes,

> "Again, this is a false and misleading statement, insofar as it suggests that adverse effects were observed "at concentrations below current national standards." In reality, the supplement to the article shows that the exposure concentrations of individuals with adverse effects were not measured. Instead, individual exposure concentrations were guessed at, or imputed... In other words, no actual measurements or observations of $PM_{2.5}$ concentrations for any individual with an adverse health effect were made in this study."

Di et al. do not know that any effects were due to exposure below current national standards. The TCEQ agrees with Dr. Boylan that the claim of significant evidence from Di et al. (2017a) of adverse effects related to exposure to $PM_{2.5}$ at concentrations below current national standards is not accurate. Particularly in the context of the discussion above comparing annual average concentrations from zip-code averaging in hybrid studies to the design value.

Thus, similar to risk results based on Turner et al. (2016), risk results based on Di et al. (2017a) cannot provide any real scientific confidence that an actual reduction in mortality risk will result from a reduction in the annual $PM_{2.5}$ NAAQS. Because the exposures estimated by Di et al. (2017a) are not the true exposures, by corollary, any risk estimates based on Di et al. (2017a), such as those in Tables 3-14 and 3-16 above (from EPA's 2022 PM PA), or based on any other study where the exposure concentrations of individuals with adverse effects were not measured, cannot truly be said to be an effect estimate at all since no actual measurements of $PM_{2.5}$ concentrations for any individual with an adverse health effect were made.

Based on the above considerations, it can be concluded that there can be no scientific confidence (statistical or otherwise) that reducing the annual $PM_{2.5}$ NAAQS to a value in the 8-11 $\mu g/m^3$ range (or the 24-hour $PM_{2.5}$ NAAQS to 30 $\mu g/m^3$) would actually reduce long-term exposure related mortality risk. EPA should explain how such lack of health benefits supports the proposed revisions.

*The EPA presents inconsistent long-term risk estimates in the PM Policy Assessment, calling into question the conclusions drawn from their risk modeling.*

In Table 3-14 of the PM PA (reproduced above), the EPA presents absolute risk estimates from 47 urban study areas of total mortality modeled to occur under the current $PM_{2.5}$ standard, compared to alternative annual and 24-hour standards. In Table 3-15 in the PM PA, the EPA presents the risk change in total mortality when moving from the current standard to an alternative annual or 24-hour standard. The difference in the absolute risks between the total mortality estimates in the Table 3-14, compared to those presented in Table 3-15 appeared to be quite comparable for the short-term mortality estimates (see Table 1 below for examples), but the risk difference in long-term mortality estimates from Table 3-15 are inflated compared to those calculated from absolute risks in Table 3-14. For example, from Table 3-14 the Di (65-99) Pri-PM mortality risk central estimate for the current standard is 40,600, and for the alternative annual standard is 35,400, which is a difference of *5,200*. The risk change presented in Table 3-15 is *5,630*. A similar pattern was seen for Turner (30-99). Because these differences are not seen for the short-term studies or for changes to the 24-hr standard, this indicates that there is an error in the estimates for the long-term risk estimates that calls into question the validity of those estimates. EPA should evaluate further and explain how such validity concerns impact its conclusions.

**Table 1.** Comparison of Differences Between Central Total Mortality Estimates from Table 3-14 of the 2022 PM PA, to the Differences Presented in Table 3-15 of the PM PA (EPA 2022a).

| Mortality Central Estimates | Long-Term Studies | | Short-Term Study |
|---|---|---|---|
| | Di et al. (2017a) | Turner et al. (2017) | Zanobetti et al. (2014) |
| Table 3-14 Current Standard (12/35) | 40,600 | 44,400 | 3,810 |
| Table 3-14 Alt Annual (10/35) | 35,400 | 38,600 | 3,300 |
| Difference b/w Table 3-14 Estimates | **5,200** | **5,800** | **510** |
| Table 3-15 Difference Current to Alt Annual | **5,630** | **6,120** | **513** |

## VI. At-Risk Population Analysis

*The EPA needs to justify the choice of health endpoint and key study C-R functions used for estimating risk in these populations.*

For the at-risk population C-R functions, the EPA describes their selection in Section 3.4.1.6 (At-Risk Analysis), and in Section C.3.2 (Concentration-Response Functions) of the PM PA. The EPA selected a set of C-R functions from Di et al. (2017a), assessing long-term $PM_{2.5}$ exposures and all-cause mortality. Di et al. (2017a) reported associations between long-term $PM_{2.5}$ exposures and mortality, stratified by race/ethnicity, in populations age 65 and older. The EPA notes the uncertainty in the at-risk analysis in the Proposed Rule and states that Di et al. (2017a) "was identified as best characterizing potentially at-risk minority populations across the U.S." The Administrator in the Proposed Rule states this at-risk analysis, "…may help to mitigate exposure and risk disparities."

However, all-cause mortality was not an endpoint that showed consistent differences by race in the studies that investigated this issue. This is characterized in the PM ISA Supplement, which summarized the findings from the 2019 ISA for race/ethnicity-specific differences in all-cause or total (nonaccidental) mortality as "inconsistent" (page 3-153 ISA Supplement), and concluded for the additional findings in studies conducted since the 2019 review: "However, similar to SES, there was less consistency when evaluating $PM_{2.5}$ exposure and all-cause or total (non-accidental) [mortality] (Section 3.3.3.2)." These conclusions are consistent with the effect estimates in Figure 3-17 of the 2022 PM PA, which show, for example, that of the eight studies comparing effects in White and Black populations, three had higher effect estimates in Blacks, two had higher effect estimates in Whites, and three had overlapping confidence intervals between the two groups. This inconsistent evidence does not support using long-term mortality as an endpoint for assessing risk disparities in different racial groups. By selecting a single study that showed racially disparate findings for the risk assessment, the EPA has obscured this uncertainty and inconsistency in the data. Other endpoints discussed in the PM ISA Supplement showed more consistent results and should be considered for use in the at-risk portion of the risk assessment instead of long-term mortality. EPA should further explain and support the use of this endpoint and its resulting conclusions that support the proposed revisions.

*The EPA's risk estimates are different between the total population risk estimates and the sum of the subpopulation risk estimates. This demonstrates uncertainties in the risk estimates that need to be addressed.*

In Section 3.4 and Appendix C of the PM PA, the EPA presents the risk estimates for the total population, as well as risk estimates for differential subpopulations in their at-risk analysis. However, there is a disparity between the risk estimates for the entire population and the total of the risk estimates for the different racial groups, as noted below.

**Table 2.** Total mortality risk estimates from Tables 3-14 and 3-16 (PM PA) for the main risk analysis, and the additive risk estimates for the at-risk populations presented in Table C-15 (PM PA).

| Study Areas | Standard | Main Analysis All Populations (3-14) | At-Risk Populations Total for All (C-15)[1] | Fold Difference |
|---|---|---|---|---|
| **47** | Just Meeting (12/35) | 40,600 (39,600 – 41,700) | 49,905 (47,100 – 52,400) | 1.23 |
| **47** | Alternative (10/30) | 35,400 (34,400 – 36,300) | 42,818 (40,600 – 45,100) | 1.21 |
| **30** | Just Meeting (12/35) | 34,900 (34,000 – 35,800) | 43,398 (41,100 – 45,600) | 1.24 |
| **30** | Interpolated 11 | 32,400 (31,600 – 33,300) | 40,282 (38,200 – 42,500) | 1.24 |
| **30** | Just Meeting (10/30) | 29,900 (29,200 – 30,700) | 37,155 (35,200 – 39,100) | 1.24 |
| **30** | Extrapolated 9 | 27,400 (26,700 – 28,100) | 34,139 (32,300 – 35,900) | 1.25 |
| **30** | Extrapolated 8 | 24,900 (24,200 – 25,500) | 30,982 (29,300 – 32,500) | 1.24 |

[1] Calculating by adding the central, lower, and higher estimates together from each racial subpopulation risk estimate in Table C-15 of the PM PA.

This shows that there are 25% more deaths when estimating separate subpopulations, compared to estimates of the total population. This also represents an uncertainty in the risk assessment that should be included in the uncertainty analysis section.

## VII. Quantitative Assessment of Uncertainty

*The quantitative uncertainty analysis for the risk assessment that informs the Proposed Rule should be based on more than just the use of two exposure scenarios and C-R functions (and their confidence intervals) from two studies.*

The quantitative uncertainty analysis described in the 2022 PM PA (EPA, 2022a) comprises the use of two exposure scenarios (Sec-PM and Pri-PM), and the use of two-to-three C-R functions and their confidence intervals. The main risk assessment results from the long-term mortality studies include the use of just two C-R functions. In particular, the EPA places a lot of weight in the uncertainty analysis on the C-R functions to address not just uncertainty in the risk assessment (uncertainty being a factor that can be reduced with more information), but also variability in the assessment (variability is innate in a system and cannot be reduced with more information; page C-70). The EPA does not explain how using multiple C-R functions can both take into account reduceable (uncertainty) and non-reduceable (variability) variation in the risk estimates. The same is true of the two exposure scenarios; the EPA cites these scenarios as capturing both variability and uncertainty (page C-70). The answer to the ambiguity of whether

different C-R functions or exposure scenarios are indicative of variability or uncertainty is to use other quantitative methods to specifically address uncertainty and variability.

As noted above, the EPA emphasizes the results from using different C-R functions to draw conclusions about uncertainty and variability. For example, EPA states, "The degree to which different C-R functions result in different risk estimates could reflect differences in study design and/or study populations evaluated, as well as other factors. In most instances in this risk assessment, the C-R function used has only a small impact on risk estimates." (page 3-164). Because of this emphasis on C-R functions as a basis of determining quantitative uncertainty, the EPA could expand the quantitative uncertainty analysis by using more C-R functions. This would allow a far better basis for the conclusion noted in the quote above – there is little basis for a statement that C-R functions have little impact on risk estimates when you are only using two C-R functions. Table 6 ($PM_{2.5}$ Study and Risk Estimate Identification Diagram) of the EPA 2021 TSD provides the list of studies and risk estimates that meet the minimum required criteria for calculating risk/benefits estimates for different health endpoints. For long-term mortality studies, the EPA identified 19 studies that provide 19 risk estimates for adults and older adults and 64 risk estimates for older adults alone. Of these risk estimates, EPA selected only a single one from each age group. Although not all 19 studies and 83 risk estimates would meet EPA's preferred inclusion criteria (described in Tables 1 and 2 of the TSD), certainly more than one risk estimate for these two age groups met the preferred criteria. The inclusion of those risk estimates in the uncertainty analysis would provide far more information than is currently provided by only two.

Given the importance of the risk assessment to the decision making for this very impactful nationwide standard, the EPA should do more work to quantify the uncertainty than just using two exposure scenarios and two C-R functions.

*The EPA should conduct a more comprehensive uncertainty analysis of their risk assessment, in keeping with the recommendations of the World Health Organization (WHO) for a complex risk assessment.*

When discussing the uncertainty analysis, the EPA notes in the final PM PA that "The overall analysis in the PM NAAQS risk assessment is relatively complex, thereby warranting consideration of a full probabilistic (WHO Tier 3) uncertainty analysis. However, limitations in available information prevent this level of analysis from being completed at this time." (page C-71 to C-72). They further state, "For most elements of this risk assessment, rather than conducting a full probabilistic uncertainty analysis, we have included qualitative discussions of the potential impact of uncertainty on risk results (WHO Tier 1) and/or completed sensitivity analyses assessing the potential impact of sources of uncertainty on risk results." Even if a full probabilistic analysis cannot be done, the EPA should review the possibility of doing a site-specific, partial probability analysis (Tier 2) or other more sophisticated analysis. It is not acceptable for the EPA to do the least difficult and least informative type of uncertainty analysis, just because the most appropriate option cannot be done. This constitutes less-than best available science. The EPA also noted in the quote above that they conducted sensitivity analyses to assess the potential impact of uncertainties. However, no sensitivity analyses are described in the risk assessment in the 2022 PM Policy Assessment. The EPA should certainly conduct sensitivity analyses of their results, which would help assess the uncertainty in the risk estimates.

There are methods that exist as well as available data to conduct quantitative uncertainty analysis on some of the factors that EPA lists in their qualitative uncertainty analysis. For example, there is work that has been done by Smith and colleagues, specifically investigating

the quantitative uncertainty of estimates that are produced by EPA's BenMAP program (Smith 2020, Smith and Gans, 2015). There are also estimates of uncertainty for particular inputs into the risk assessment calculations, as described by Dr. Sabine Lange in her comments on the 2019 Draft PM PA as a member of CASAC. Table 3 below is reproduced from her comments:

**Table 3.** An incomplete list of possible uncertainties in deriving risk estimates from reductions in $PM_{2.5}$ concentrations. (Reproduction of Table 1 of Sabine Lange's CASAC Comments on the EPA 2019 PM PA, page B-81)

| Source of Uncertainty | Example Magnitude | Example Reference |
|---|---|---|
| Generating the Concentration-Response (C-R) Function in Epidemiology Studies | | |
| Exposure Measurement Error | 31-85% | Spatial error + population error (Dionisio et al., 2016) |
| Model Misspecification Error | 50% | Generalized linear vs generalized additive models for $PM_{10}$ (Sheppard, 2003) |
| Alternative C-R Functions within One Study | 200% | Range of HRs generated using different exposure models (Jerrett et al., 2017) |
| Causal Relationship | 0.35-1 | US EPA Expert Elicitation of $PM_{2.5}$ causality – provided is the range of probabilities that $PM_{2.5}$ is causing mortality (Mansfield et al., 2009) |
| Air Quality Monitoring/Modeling | | |
| Air Monitoring | ± 10% | Allowable variation in 24-hour $PM_{2.5}$ monitored concentrations |
| Air Modeling | ± 30% | 10-90% range for prediction of change in $PM_{2.5}$ concentrations (Mansfield et al., 2009) |
| Applying the Concentration-Response Function | | |
| Choice of C-R Function | 400% | Variability in $PM_{2.5}$ long-term all-cause mortality estimates presented in Table 3-7 using C-R functions from different studies (PM PA 2019) |
| Baseline Incidence Rates | ± 5% | Influence Analysis 10-90% range for prediction of base mortality rates (Mansfield et al., 2009) |
| Population Forecasts | ± 10% | Influence Analysis 10-90% range for census 2020 population forecasts (Mansfield et al., 2009) |
| Use of National Estimates | ± 1000% | Range of C-R estimates across 77 study cities, compared to the national estimate (Baxter et al., 2017) |
| Threshold in C-R | 6-90% | Change in premature mortality from CPP repeal cutpoint analysis (LML cutpoint on low end of scale; NAAQS on high end of scale) (USEPA 2017) |

Abbreviations: HR, hazard ratio; CPP, Clean Power Plan; LML, lowest mean level

*EPA's statement about the impact of data error and biases on the shape of the C-R relationship needs to be a primary consideration in this document, not an isolated entry in a list of uncertainties.*

On pages 3-164 to 3-167 of the PM PA, the EPA lists the unquantified uncertainties that could impact the risk assessment results. Included in this list on pages 3-166 and 3-167 is the following entry "Shape of the concentration-response relationship at low ambient PM concentrations: Interpreting the shapes of concentration-response relationships, particularly at $PM_{2.5}$ concentrations near the lower end of the air quality distribution, can be complicated by relatively low data density in the lower concentration range, the possible influence of exposure measurement error, and variability among individuals with respect to air pollution health effects. These sources of variability and uncertainty tend to smooth and "linearize" population-level concentration-response functions, and thus could obscure the existence of a threshold or nonlinear relationship (U.S. EPA, 2015a, Section 6.c)." This is precisely the concern that is discussed earlier in these comments. *This uncertainty has the potential to completely alter the risk assessment results, and in fact may impact the conclusions about the adequacy of the $PM_{2.5}$ standard, because both are based on the lack of threshold observed (though not well investigated) in epidemiology studies. The fact of the matter is that the available science is inadequate to determine whether or not a threshold for effects exists.* In Table C-18 of the PM PA, this (and other) qualitative uncertainties are further described and comments about the uncertainty are included. For comments addressing the uncertainty about linearizing the C-R function, the EPA just reiterates that studies have continued to show linear trends with no evidence of threshold, without addressing the underlying concern that the known error in the variables that comprise the study may be obscuring those thresholds. There are methods, such as errors-in-variables methods, that can begin to address this problem (e.g., Imai et al. (2011), Blackwell et al. (2015)). The EPA should apply these methods, and should encourage study authors to apply the methods, so that this concern can be specifically addressed. EPA's failure to conduct such analysis, therefore, provides support for concluding that its risk analysis does not support the proposed revisions.

## TCEQ MONITORING DIVISION COMMENTS

*General Air Quality Index (AQI) Reporting Comments*

The EPA noted significant technological advances in air quality monitoring and data reporting since the Appendix G to 40 Code of Federal Regulations Part 58 was last revised in 1999. The advances in technology have enabled the ability to report the AQI in near real-time. The EPA recommended updates to Appendix G section 2.3, including the recommendation (not a requirement) to submit hourly data in real-time to the EPA's AirNow (or future analogous) system. The submittal of hourly real-time data for appropriate monitors satisfies the daily AQI reporting requirements.

The TCEQ seeks confirmation that "future analogous systems" do not include the EPA's Air Quality System (AQS). The TCEQ does not currently submit monitoring data to the EPA's AQS until the data have been verified (validated) as meeting data quality standards/objectives or has been flagged to indicate otherwise. The TCEQ notes that there is no current method of indicating data submitted to the EPA's AQS has been verified (validated) as meeting appropriate data quality standards/objectives. Without clear designation of the status/applicability of data within AQS, significant decisions could be made by incorporating invalid data values. The TCEQ does not concur with submitting unvalidated hourly data to AQS.

*Proposed Amendments to Ambient Monitoring and Quality Assurance Requirements - Proposal for Calibration of PM Federal Equivalent Method*

The EPA discussed challenges during the particulate matter (PM) monitoring federal equivalent method (FEM) approval process with limited data sets available during the initial field testing versus network data availability after deployment. The EPA proposed that a range of data, including geographic location data, could be used to develop and test new factory calibrations. The EPA solicited input on this approach and other alternatives that would lead to more sites meeting the bias method quality objectives (MQO).

The TCEQ supports the recommendation for PM FEM instrument manufacturers to evaluate nationally available valid federal reference method (FRM) data, including other data sets such as the performance evaluation audit program, to update factory calibrations. The TCEQ further recommends, that after final FEM approval and publication, manufacturers should be required to further evaluate the FEM monitoring data at defined intervals, including but not limited to the 2-year and 5-year approval anniversaries. The FEM designation process should require further evaluation to consider FEM calibration improvements and other optimization options to improve the method's data. Optimization of these FEM methods is of utmost importance to ensure accurate data reflective of ambient conditions. Attainment decisions based on biased data can have significant impacts to the state and local community.

The EPA noted options to implement updated factory calibrations including the treatment of data previously collected under the original factory calibration. The EPA requested comment on how to manage the time-period between when an updated factory calibration is approved by the EPA and when that updated calibration is implemented in the field and whether there should be an allowance to correct such data.

The TCEQ recommends allowing agencies flexibility to correct data based on the time-period of an EPA approved factory calibration update. Some agency networks, with considerable size and complexity, may not choose to correct the data and requiring them to correct the data can cause an undue burden to these agencies. Other agencies with sites near the level of the proposed primary annual $PM_{2.5}$ NAAQS may find this resource necessary. Concerns regarding correction of data include but are not limited to: increased potential for errors with manual manipulation of the data to apply correction factors; identifying the specific correction time-period for each sampler data set impacted (e.g. date of firmware update vs firmware installation and documentation thereof); redetermining validity of quality control results collected prior to the updated factory calibration; and reprocessing the data including reloading into data systems and documentation of all changes. The TCEQ also recommends that the EPA provide additional guidance to agencies with details of how to complete the factory calibration data corrections.

*Proposed Amendments to Ambient Monitoring and Quality Assurance Requirements - Proposed Amendment to the $PM_{2.5}$ Monitoring Network Design Criteria to Address At-Risk Communities*

The EPA proposed to modify $PM_{2.5}$ monitoring network design criteria to include an environmental justice factor that accounts for proximity of populations at increased risk of adverse health effects from $PM_{2.5}$ exposures to sources of concern. The EPA cited evidence indicating that the general population as well as specific populations and life stages were at risk for $PM_{2.5}$-related health effects. The EPA noted that evidence indicated that subpopulations were at potentially greater risk from $PM_{2.5}$ exposures including children, lower SES populations, minority populations (particularly Black populations), and people with certain preexisting

diseases (particularly cardiovascular disease and asthma). The EPA proposed that communities with relatively higher proportions of subpopulations at greater risk from $PM_{2.5}$ exposure should be considered “at-risk communities'' for these purposes. The EPA proposed $PM_{2.5}$ network design criteria revisions to account for at-risk populations, however, the application of this requirement is unclear.

Federal network design criteria require agencies to site monitors in populated areas that represent *regional* air quality where people live, work, and play. The public, including those populations at increased risk of adverse health effects from $PM_{2.5}$ exposures, are supported by ambient air monitoring data from air pollutant monitors located in metropolitan statistical areas with current or previous air quality concerns. The TCEQ disagrees that including an environmental justice factor is necessary because the current air monitoring network is designed to protect *all* citizens in the community. EPA has not provided any discussion of specific legal authority to support an additional monitoring requirement targeted to address environmental justice objectives. TCEQ objects to the broad and insufficient nature of the “environmental justice” characterization proposed to be utilized for the purpose of monitor network siting criteria. Such broad characterization would be difficult, overly burdensome, and resource intensive for states to apply.

*Part 58 – Ambient Air Quality Surveillance (Proposed changes) General Comments*

The EPA stated that the timeline to implement the proposed $PM_{2.5}$ sites in at-risk communities should allow monitoring agencies enough time for communities and other interested parties to provide their input regarding moving or adding new sites. The EPA also proposed that monitoring agencies should identify their approach to evaluate if new or moved sites are needed, to identify the potential communities in which they are considering adding monitoring, and to identify how they intend to meet the proposed $PM_{2.5}$ network design to address at-risk communities. The EPA solicited comment on whether additional time is needed.

The TCEQ notes that the July 1, 2024, timeline for this complex evaluation is insufficient. The TCEQ submits the draft annual monitoring network plan for public review and comment in mid-April for 30 days. The final plan, due July 1, must include the comments and a response to the comments and any potential changes based on those comments. The timeline does not take these requirements into consideration and allow for an extensive assessment of changes needed to meet new monitoring requirements, if such requirements are finalized. In addition, agencies will need sufficient time to identify and work with communities and interested parties to obtain input regarding moving or adding new sites.

The EPA also stated that it would be appropriate to provide at least 12 months from the effective date of a final rule for monitoring agencies to initiate planning to implement these measures to seek input, to consider revisions to their $PM_{2.5}$ networks, and to explain how the existing network meets the objectives of this proposed modification. The TCEQ notes that that agencies should be provided a minimum of 18 months after the final recommendation is published to add this information in the annual monitoring network plan.

The EPA stated its intent to amend § 58.12 by revising paragraphs (d)(1) and (3). The TCEQ notes that changes to Section 58.12 paragraph (d)(3) are missing from the proposal (FR page 5704). The TCEQ recommends that the EPA review the stated intent and add the necessary amendment or remove the intent. The TCEQ also recommends that the EPA allow agencies an opportunity to review these changes and provide comment prior to finalizing them.

The EPA proposed amendments and clarification for the spacing from obstructions and trees. The historical and current regulations for the spacing of probe inlets x require the probe inlet to be no closer than 10 meters from the driplines of trees. The EPA proposed a significant change to double the distance between the probe inlet and the dripline of trees. The proposed requirement now reads that probe inlets should be 20 meters or more from the dripline of trees. The TCEQ does not agree with this recommendation. New ambient air monitoring sites, such as the proposed sites for at-risk communities, will need to be located in well-established neighborhoods with mature trees. The TCEQ expects significant challenges in identifying suitable air monitoring site locations that consider community input while meeting the proposed 20-meter tree dripline distance.

In the complete revision of Appendix E to Part 58 – Probe and Monitoring Path Siting Criteria for Ambient Air Quality Monitoring, the EPA continued to recommend the use of *Figure E-1: Distance of PM samplers to nearest traffic lane (meters)* (see FR page 5172). The TCEQ has no comment on the figure content, however, notes that the image is distorted and of extremely poor quality rendering the text in places almost unreadable. The TCEQ recommends that the EPA provide a higher quality figure image so that agencies can fully interpret the figure to the extent that EPA requires. The EPA makes several references to Figure E-1 in Appendix E to Part 58. The figure provides detailed information with a range of acceptable probe distances from the roadway based on air monitoring spatial scales.

**Federal Register** / Vol. 88, No. 18 / Friday, January 27, 2023 / Proposed Rules




**Figure E-1. Distance of PM samplers to nearest traffic lane (meters)**

**Figure E-1 to Appendix E to Part 58**

*TCEQ AIR QUALITY DIVISION COMMENTS*

*The EPA should issue final designations guidance immediately following promulgation of a revised NAAQS and provide final schedules for the designations process, including exceptional events submittals.*

The proposal notes that the EPA intends to provide designations guidance to states around the time of the promulgation of a revised NAAQS. The TCEQ urges the EPA to issue the final designations guidance immediately following promulgation of the revised NAAQS to ensure

that information necessary to develop state designation submittals and the final schedule for the designations process, including the schedule for submittal of demonstrations to address exceptional events, are provided in a timely manner.

*The EPA should provide an appropriate schedule and expectations for the submittal of exceptional event demonstrations as part of the designations guidance for a revised annual $PM_{2.5}$ NAAQS. The deadline for submission of exceptional event demonstrations prior to designations should be no sooner than 18 months after the adoption of the new standard to allow for the data needed for the demonstration to be certified and the demonstration development process, including public review. States should be allowed sufficient time to complete exceptional event demonstrations prior to the initial round of area designations.*

Under federal Clean Air Act (FCCA), §319, states are responsible for both identifying air quality monitoring data affected by an exceptional event and requesting that the EPA exclude the data from consideration when determining whether an area is in attainment or nonattainment of the NAAQS. As the form and data characteristics of each standard is unique, the EPA should provide timely guidance on what will be expected in exceptional event demonstrations for the revised annual $PM_{2.5}$ NAAQS.

Attaining a revised annual $PM_{2.5}$ standard with the consideration of exceptional events will require "flagging" the air quality monitoring data and the exclusion of an unprecedented number of days corresponding to the flagged data. The timelines established by the EPA should consider that the form of the standard may require states to include numerous days in exceptional event demonstrations. Also, the guidance should consider when certified monitoring data will be available for review and potential inclusion in demonstrations. For example, if the revised standard is adopted in late 2023 and the expectation is that the designations will be based on data from 2021, 2022, and 2023, then the full set of data for potential inclusion in an exceptional event demonstration will not be certified until mid-2024. States need at least a year following the certification of the 2023 data to complete the exceptional event demonstration development process, including public review. On this example timeline, the exceptional event demonstration deadline should be no sooner than the end of 2025.

Texas may need to review large data sets associated with multiple areas. The EPA should set realistic expectations in the designations guidance for the revised annual $PM_{2.5}$ standard to ensure that states have adequate time to meet the technical requirements for exceptional events demonstrations laid out in EPA guidance.

*The EPA should consider the use of unclassifiable designations for areas that may be impacted by exceptional events.*

The EPA should ensure that the designations process includes adequate time for the EPA to fully evaluate and provide concurrence on exceptional events demonstrations prior to finalizing designations. However, if the EPA is unable to fully evaluate or concur with submitted exceptional events demonstrations within a timely manner prior to final designations, the EPA should consider the use of unclassifiable designations for areas for which a final determination has not been made or for which additional information is required to obtain concurrence. Areas designated as unclassifiable based on pending exceptional event submittals could be revised once EPA concurrence or non-concurrence is finalized.

*The EPA should provide information and schedules as part of the designations guidance for updating state designation submittals and submittal of additional exceptional event demonstrations if more recent years of monitoring data could be considered prior to final designations.*

The proposal states that the EPA will base final designations on three consecutive years of certified air quality monitoring data, likely 2021 through 2023. If the EPA intends to use 2021 through 2023 monitoring data for designations at the time a NAAQS revision is promulgated, but the timing of the designations process results in availability of 2022 through 2024 data, the EPA should provide an opportunity for states to update their initial designation submittals based on the latest available data, if desired, for consideration in final designation decisions. The EPA should address this scenario and provide a schedule for updating state designation submittals, as well as schedules for exceptional event demonstrations based on 2024 monitoring data, as part of the designations guidance.

*The EPA should consider the impact of foreign emissions in designations decisions and should provide for the submittal and evaluation of FCAA, §179B demonstrations as part of the designations guidance.*

In recent designation actions for El Paso County, Texas for the 2015 eight-hour ozone standard, the EPA contended that foreign contributions do not impact the EPA's analysis of domestic contributions in making designations decisions and that the influence of foreign contributions is properly addressed through the FCAA, §179B demonstration process, not the NAAQS designation process. However, foreign emissions can impact the regional air quality that is evaluated within the five factors the EPA considers relevant for determining nonattainment area boundaries and the FCAA does not preclude consideration of §179B in the NAAQS designations process. Without considering foreign emissions, it may be unclear whether there would be any nearby area "that does not meet the relevant NAAQS" in determining contribution to a particular county, making that contribution analysis improper and beyond the EPA's statutory authority (42 U.S.C. §7407(d)(1)(A)(i); FCAA, §107(d)(1)(A)(i)). The EPA should evaluate foreign emissions as part of the designations process and provide a schedule for consideration of FCAA, §179B demonstrations as part of the designations guidance.

*The TCEQ supports the EPA's proposal to retain the existing secondary PM standards.*

The TCEQ supports the EPA's conclusion that it is appropriate to retain the existing secondary standards as being adequate to protect against PM-related visibility impairment and that it is not appropriate to establish any distinct secondary PM standards to address non-visibility PM-related welfare effects. The TCEQ agrees that it is appropriate to rely on the Regional Haze Program in conjunction with the secondary PM NAAQS to achieve the requisite degree of protection from visibility impairment. As the TCEQ previously commented, setting a new PM-related secondary standard for visibility in urban areas at a national level would be problematic and any attempt to address PM-related visibility issues in urban areas should be coordinated with the EPA's specific authority related to visibility in FCAA, §169A and §169B. The programs established in those sections of the FCAA provide flexibility both for the EPA and the states while also reducing the possibility of competing guidance and methodologies for implementation purposes.

## *TCEQ Air Permits Division Comments*

*The EPA should support and expand inter-pollutant trading for applicable precursors.*

TCEQ recognizes that NAAQS determinations are health-based, and that the cost of implementation is not generally considered in setting the level of the standards. However, because of practical challenges in generating $PM_{2.5}$ emission credits, TCEQ believes that the EPA should allow inter-pollutant trading for applicable precursors and provide clear guidance on implementation of trading programs and exchange ratios.

## *REFERENCES*

Bai KJ, Chuang KJ, Chen CL, Jhan MK, Hsiao TC, Cheng TJ, Chang LT, Chang TY, Chuang HC. 2019. Microglial activation and inflammation caused by traffic-related particulate matter. Chem Biol Interact. 25;311:108762.

Baxter, L.K., Crooks, J.L., Sacks, J.D., 2017. Influence of exposure differences on city-to-city heterogeneity in PM2.5-mortality associations in US cities. Environ. Health 16, 1.

Blackwell, M., Honaker, J., King, G. 2015. A Unified Approach to Measurement Error and Missing Data: Overview and Applications. Sociological Methods & Research, 46(3), 303–341.

Brauer, M., Brumm, J., Vedal, S., Petkau, A.J., 2002. Exposure misclassification and threshold concentrations in time series analyses of air pollution health effects. Risk Anal. 22, 1183–93

Chen J and G. Hoek G. 2020. Long-term exposure to PM and all-cause and cause-specific mortality: A systematic review and meta-analysis. Environ Int. PMID: 32703584

Cox, L.A. (Tony), 2018. Effects of exposure estimation errors on estimated exposure-response relations for PM2.5. Environ. Res. 164, 636–646.

Danesh Yazdi M, Wang Y, Di Q, Zanobetti A, Schwartz J. 2019. Long-term exposure to $PM_{2.5}$ and ozone and hospital admissions of Medicare participants in the Southeast USA. Environ Int. 2019 Sep;130:104879. doi: 10.1016/j.envint.2019.05.073.

Danesh Yazdi M, Wang Y, Di Q, Wei Y, Requia WJ, Shi L, Sabath MB, Dominici F, Coull BA, Evans JS, Koutrakis P, Schwartz JD. 2021. Long-Term Association of Air Pollution and Hospital Admissions Among Medicare Participants Using a Doubly Robust Additive Model. Circulation. 143(16):1584-1596.

Di, Q, Wang, Y, Zanobetti, A, Wang, Y, Koutrakis, P, Choirat, C, Dominici, F and Schwartz, JD 2017a. Air pollution and mortality in the Medicare population. New England Journal of Medicine 376(26): 2513-2522.

Di, L, Wang, Y, Zanobetti, A, Choirat, C, Schwartz, JD and Dominici, F. 2017b. Association of short-term exposure to air pollution with mortality in older adults. JAMA: Journal of the American Medical Association 318(24): 2446-2456.

Dionisio, K.L., Baxter, L.K., Burke, J., Özkaynak, H., 2016. The importance of the exposure metric in air pollution epidemiology studies: When does it matter, and why? Air Qual. Atmos. Heal. 9, 495–502.

Dominici F, Schwartz J, Di Q, Braun D, Choirat C, Zanobetti A., 2019. Assessing Adverse Health Effects of Long-Term Exposure to Low Levels of Ambient Air Pollution: Phase 1. Res Rep Health Eff Inst.

Elliott, EG, Laden, F, James, P, Rimm, EB, Rexrode, KM and Hart, JE 2020. Interaction between Long-Term Exposure to Fine Particulate Matter and Physical Activity, and Risk of Cardiovascular

Disease and Overall Mortality in US Women. Environmental Health Perspectives 128(12): 127012.

US Environmental Protection Agency (EPA). 2017. Regulatory Impact Analysis for the Review of the Clean Power Plan: Proposal.

EPA. 2019a. Integrated Science Assessment (ISA) for Particulate Matter (Final Report, Dec 2019). EPA/600/R-19/188, December.

EPA. 2019b. Chartered Clean Air Scientific Advisory Committee (CASAC) Review of the EPA's Integrated Science Assessment for Particulate Matter (External Review Draft – October 2018). April 11, 2019.

EPA. 2019. CASAC Review of the EPA's Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft – September 2019). EPA-CASAC-20-001. December 16, 2019.

EPA. 2020. Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter. EPA-452/R-20-002. January.

EPA. 2021. Technical Support Document (TSD) for the Final Revised Cross-State Air Pollution Rule Update for the 2008 Ozone Season NAAQS Estimating PM2.5- and Ozone-Attributable Health Benefits. U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards. Research Triangle Park, NC. U.S. EPA. EPA-HQ-25 OAR-2020-0272. March 2021..

EPA. 2022. Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter. EPA-452/R-22-004. May

Franklin M, Zeka A, Schwartz J. 2007. Association between PM2.5 and all-cause and specific-cause mortality in 27 US communities. J Expo Sci Environ Epidemiol.

Hartiala J, Breton CV, Tang WH, Lurmann F, Hazen SL, Gilliland FD, Allayee H. 2016. Ambient Air Pollution Is Associated with the Severity of Coronary Atherosclerosis and Incident Myocardial Infarction in Patients Undergoing Elective Cardiac Evaluation. J Am Heart Assoc. Jul 28;5(8):e003947.

Henneman LRF, Liu C, Chang H, Mulholland J, Tolbert P, Russell A. 2019. Air quality accountability: Developing long-term daily time series of pollutant changes and uncertainties in Atlanta, Georgia resulting from the 1990 Clean Air Act Amendments. Environ Int.

Imai, K., Keele, L., Tingley, D., Yamamoto, T. (2011). Unpacking the Black Box of Causality: Learning about Causal Mechanisms from Experimental and Observational Studies. American Political Science Review, 105(4), 765–789.

Ito, K, Ross, Z, Zhou, J, Nádas, A, Lippmann, M and Thurston, GD. 2013. National Particle Component Toxicity (NPACT) initiative: Study 3. Time-series analysis of mortality, hospitalizations, and ambient PM2.5 and its components. 177. Health Effects Institute. Boston, MA.

Jerrett, M., Turner, M.C., Beckerman, B.S., Pope, C.A., van Donkelaar, A., Martin, R. V., Serre, M., Crouse, D., Gapstur, S.M., Krewski, D., Diver, W.R., Coogan, P.F., Thurston, G.D., Burnett, R.T., 2017. Comparing the Health Effects of Ambient Particulate Matter Estimated Using Ground-Based versus Remote Sensing Exposure Estimates. Environ. Health Perspect. 125, 552–559.

Lee CS, Chang KH, Kim H. 2018. Long-term (2005-2015) trend analysis of $PM_{2.5}$ precursor gas $NO_2$ and $SO_2$ concentrations in Taiwan. Environ Sci Pollut Res Int. PMID: 29802618

Lefler JS, Higbee JD, Burnett RT, Ezzati M, Coleman NC, Mann DD, Marshall JD, Bechle M, Wang Y, Robinson AL, Arden Pope C 3rd. 2019. Air pollution and mortality in a large, representative U.S. cohort: multiple-pollutant analyses, and spatial and temporal decompositions. Environ Health. 21;18(1):101.

Lepeule J, Laden F, Dockery D, Schwartz J. 2012. Chronic exposure to fine particles and mortality: an extended follow-up of the Harvard Six Cities study from 1974 to 2009. Environ Health Perspect.

Lipfert, F.W., Wyzga, R., 1996. The effects of exposure error on environmental epidemiology., in: Proceedings of the Second Colloquium on Particulate Air Pollution and Human Mortality and Morbidity. pp. 295–302.

Liu C, Zhang X, Wang Q, Shi K., 2019. Role of $PM_{2.5}$ in the photodegradation of the atmospheric benzene. Environ Pollut.

Mansfield, C., Sinha, P., Henrion, M., 2009. Influence Analysis in Support of Characterizing Uncertainty in Human Health Benefits Analysis.

Pope CA 3rd, Burnett RT, Krewski D, Jerrett M, Shi Y, Calle EE, Thun MJ. 2009. Cardiovascular mortality and exposure to airborne fine particulate matter and cigarette smoke: shape of the exposure-response relationship. Circulation.;120(11):941-8.

Pope CA 3rd, Coleman N, Pond ZA, Burnett RT. 2020. Fine particulate air pollution and human mortality: 25+ years of cohort studies. Environ Res.

Puett RC, Hart JE, Suh H, Mittleman M, Laden F. 2011. Particulate matter exposures, mortality, and cardiovascular disease in the health professionals follow-up study. Environ Health Perspect. Aug;119(8):1130-5.

Rhinehart ZJ, Kinnee E, Essien UR, et al. 2020. Association of Fine Particulate Matter and Risk of Stroke in Patients With Atrial Fibrillation. JAMA Netw Open. ;3(9)..

Rhomberg, L.R., Chandalia, J.K., Long, C.M., Goodman, J.E., 2011. Measurement error in environmental epidemiology and the shape of exposure-response curves. Crit. Rev. Toxicol. 41, 651–671.

Samoli E, Stafoggia M, Rodopoulou S, Ostro B, Declercq C, Alessandrini E, Díaz J, Karanasiou A, Kelessis AG, Le Tertre A, Pandolfi P, Randi G, Scarinzi C, Zauli-Sajani S, Katsouyanni K, Forastiere F., 2013. Associations between fine and coarse particles and mortality in Mediterranean cities: results from the MED-PARTICLES project. Environ Health Perspect.

Sheppard, L. 2003. Ambient Air Pollution and Nonelderly Asthma Hospital Admissions in Seattle, Washington, 1987-1994.

Smith AE. 2020. Using Uncertainty Analysis to Improve Consistency in Regulatory Assessments of Criteria Pollutant Standards. Risk Anal 40:442–9

Smith AE and Gans W. Enhancing the characterization of epistemic uncertainties in PM2.5 risk analyses. 2015.Risk Anal 2015;35:361–78.

Turner MC, Jerrett M, Pope CA 3rd, Krewski D, Gapstur SM, Diver WR, Beckerman BS, Marshall JD, Su J, Crouse DL, Burnett RT. 2016. Long-Term Ozone Exposure and Mortality in a Large Prospective Study. Am J Respir Crit Care Med. 2016 May 15;193(10):1134-42.

Urch, B; Speck, M; Corey, P; Wasserstein, D; Manno, M; Lukic, KZ; Brook, JR; Liu, L; Coull, B; Schwartz, J; Gold, DR; Silverman, F. 2010. Concentrated ambient fine particles and not ozone induce a systemic interleukin-6 response in humans. Inhal Toxicol 22: 210-218.

Watt, M., Godden, D., Cherrie, J., Seaton, A., 1995. Individual exposure to particulate air pollution and its relevance to thresholds for health effects: a study of traffic wardens. Occup. Environ. Med. 52, 790–2.

Wei FR, Xiong LL, Li W, Wang XR, Hong X, Chen BA., 2020. Relationship between Short-term Exposure to **PM** $_{2.5}$ and Daily Lung Cancer Mortality in Nanjing. Biomed Environ Sci.

Wei W, Wu BJ, Wu Y, Tong ZT, Zhong F, Hu CY., 2021. Association between long-term ambient air pollution exposure and the risk of breast cancer: a systematic review and meta-analysis. Environ Sci Pollut Res Int.

Weichenthal S, Hatzopoulou M, Goldberg MS., 2014. Exposure to traffic-related air pollution during physical activity and acute changes in blood pressure, autonomic and micro-vascular function in women: a cross-over study. Part Fibre Toxicol.

Wu AH, Wu J, Tseng C, Yang J, Shariff-Marco S, Fruin S, Larson T, Setiawan VW, Masri S, Porcel J, Jain J, Chen TC, Stram DO, Marchand LL, Ritz B, Cheng I., 2020. Association Between Outdoor Air Pollution and Risk of Malignant and Benign Brain Tumors: The Multiethnic Cohort Study. JNCI Cancer Spectr.

Yoshimura, I., 1990. The effect of measurement error on the dose-response curve. Environ. Health Perspect. 87, 173–8.

Zanobetti A, Austin E, Coull BA, Schwartz J, Koutrakis P. 2014. Health effects of multi-pollutant profiles. Environ Int. 2014 Jun 17;71:13-19.

NATIONAL ASSOCIATION OF Manufacturers

**Chris Morris**
*Director*
*Energy & Resources Policy*

March 28, 2023

U.S. Environmental Protection Agency
EPA Docket Center
Air and Radiation Docket
Mail Code 28221T
1200 Pennsylvania Ave. NW
Washington, DC 20460

**Re: EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, Docket No. EPA-HQ-OAR-2015-0072**

Introduction

As the nation's largest manufacturing association, the National Association of Manufacturers represents nearly 14,000 small, medium and large manufacturers in every industrial sector and in all 50 states. Manufacturers in the U.S. are committed to the communities in which they live and serve and are dedicated to protecting the health, safety and vibrancy of those communities. Through constant innovation, investment and dedication, manufacturers in the U.S. have become leaders in environmental stewardship and sustainability, while continuing to be the engine that drives our economic growth and prosperity. Today's domestic manufacturing sector is a clean and efficient operation that is technology driven and dedicated to the planet and its people.

The NAM welcomes the opportunity to comment on the EPA's Reconsideration of the NAAQS for PM. Manufacturers agree with the EPA's decision to maintain and not change the current secondary annual $PM_{2.5}$ standard, primary and secondary 24-hour $PM_{2.5}$ standards and primary and secondary $PM_{10}$ standards. However, manufacturers strongly oppose the EPA's decision to propose a new primary annual $PM_{2.5}$ standard from its current level of 12.0 $\mu g/m^3$ to within a range of 9.0 to 10.0 $\mu g/m^3$ and consider a standard as low as 8.0 $\mu g/m^3$.

The NAM strongly urges the EPA to maintain the existing annual 12.0 $\mu g/m^3$ $PM_{2.5}$ standard.

I. Unprecedented Complete Reconsideration

If the EPA finalizes this rule, it will do what no other administration has done before—complete reconsideration of a promulgated NAAQS. Procedures in a reconsideration outside the Clean Air Act's five-year review cycle depart significantly from the traditional NAAQS process, fundamentally altering what stakeholders have come to experience over a half-century

of NAAQS rulemaking. Additionally, if the EPA finalizes this rule, it will set a precedent that will add more uncertainty into the landscape of compliance.

Because this reconsideration is entirely discretionary, the EPA can and should consider costs and burdens in determining whether to proceed with this action. The EPA has substantial flexibility to consider any factor, including costs and burdens, when determining whether to finalize the reconsideration rule proposal. If considered fairly and objectively, these economic consequences will lead the EPA to withdraw its proposal.

II. Areas Already in Nonattainment

Across the country, there continue to be areas of the U.S. that are in nonattainment with the current 12.0 $\mu g/m^3$ $PM_{2.5}$ standard. Yet the EPA is determined to leave those nonattainment areas further behind by pursuing stricter $PM_{2.5}$ standards. Instead of proposing new standards, the EPA should focus on ensuring all areas of the U.S. achieve attainment with the current standards.

III. Manufacturing in the U.S. Outpacing Global Competitors on Environment

Manufacturers in the U.S. have invested heavily in new processes and technologies that have made manufacturing cleaner and more sustainable than ever. This innovation in the manufacturing sector has played a key role in the reduction of air pollution we have seen over the past 50 years. Across the board, levels of major pollutants have declined dramatically, and the United States is outpacing our global competitors in air quality improvements. According to the EPA, the U.S. has reduced six common NAAQS pollutants, including $PM_{2.5}$, by 78% between 1970 and 2020. Additionally, the EPA data show that $PM_{2.5}$ air quality has improved 43% between 2000 and 2020. Manufacturers are committed to ensuring that progress continues.

U.S. efforts to reduce air pollution have led to better air quality than is experienced by most of the rest of the world. According to the Organization for Economic Co-operation and Development, worldwide average exposure to $PM_{2.5}$ annually in 2018 to 2019 was 42 $\mu g/m^3$, compared to a U.S. average of 7.7 $\mu g/m^3$. The U.S. has lower $PM_{2.5}$ levels than France, Germany, Japan and the U.K.

IV. $PM_{2.5}$ Proposal's Effects on Local Manufacturing and Jobs

The EPA's proposal does not take into account the economic consequences a stricter $PM_{2.5}$ standard will have on manufacturers in the U.S. First, there is the direct economic exposure manufacturers will face, which is a measure of the gross value added or employment in the manufacturing sector that could be affected or at risk because of a new air quality standard. Second is the indirect economic exposure of manufacturing as a result of a stricter $PM_{2.5}$ standard. This refers to the effects on the sector as the consequences are felt throughout the supply chain due to decreased overall investment.

Additionally, there are economic consequences, given current manufacturing trends, of stricter $PM_{2.5}$ standards restricting future growth of U.S. manufacturers. The EPA must take into account the extent to which manufacturers will be restricted from expanding current facilities or prevented from breaking ground on new ones. The likelihood of lost jobs and livelihoods is significant, and much be considered before the EPA finalizes a new $PM_{2.5}$ standard.

V. Increase in Nonattainment Areas

The EPA's proposed rule would significantly increase the number of industrial centers and U.S. population hubs in nonattainment areas at a stricter $PM_{2.5}$ standard. A nonattainment designation under the CAA will directly negatively impact these communities' economies by making it difficult to attract and develop business. At a time when manufacturers and families are deeply concerned with finances and inflation, the EPA should be pursuing policies that incentivize growth, development and innovation, rather than making it harder for communities to thrive.

The NAM's Manufacturers' Outlook Survey for the first quarter of 2023 found that more than 55% of manufacturers anticipate that new EPA air standards will raise their costs of compliance, and one out of three manufacturers anticipate that the new standards would lead to increased permitting challenges and restrict investment and facility expansion plans.

VI. Impact on Manufacturers in Nonattainment Areas

Manufacturers in nonattainment areas will face various challenges if the EPA moves forward with stricter $PM_{2.5}$ standards. The EPA could not identify controls that would attain the potential range of standards in its own proposal. Additionally, states will have to look beyond many traditional sources of $PM_{2.5}$ that are already well-controlled.

A nonattainment designation also gives the EPA authority to revise any state permitting decision affecting the nonattainment area. A nonattainment designation can even detrimentally affect infrastructure development vital to manufacturers. One year after a nonattainment designation, federally supported highway and transit projects cannot proceed without a state demonstration that the project will not cause an increase in precursor emissions.

Nonattainment areas do not escape regulatory burden even if designated for a short period of time. Before a nonattainment area can be redesignated to attainment, the EPA must receive and approve an enforceable maintenance plan for the area that specifies measures providing continued maintenance of $PM_{2.5}$ emissions and contingency measures to be implemented if $PM_{2.5}$ standards are not met. For these reasons, increased costs associated with permit requirements and other restrictions can prevent manufacturers from building a facility emitting even the minimum $PM_{2.5}$ emissions necessary for economic development from building that facility in a nonattainment area.

The EPA projects that controls under this reconsideration could cost as much as $1.8 billion per year, but acknowledges that this "may be underestimated." The EPA must understand and consider all of the economic consequences of its $PM_{2.5}$ proposal before it considers finalizing the rule.

VII. Headroom Challenges in Attainment Areas

For areas that achieve attainment under a stricter $PM_{2.5}$ standard, there may not be sufficient headroom under that standard to prove that new manufacturing projects or expansion of existing projects will not cause or contribute to a violation of the $PM_{2.5}$ standard to proceed. Often, up to 3 $\mu g/m^3$ of headroom is needed to verify that a project will not jeopardize attainment for an area. Given the proposal from the EPA to consider a $PM_{2.5}$ standard as low as 8 $\mu g/m^3$, it will likely result in insufficient headroom for new manufacturing projects in attainment areas across the country.

Conclusion

The NAM and the EPA share the goal of pursuing the highest levels of environmental stewardship in the U.S. And manufacturers are committed to smart, strong environmental safeguards and improving the lives of all Americans so that no one—and no community—is left behind.

However, the EPA's proposed stricter $PM_{2.5}$ standard is not the path forward. The EPA's proposal will hinder domestic manufacturing growth, does not consider the widespread economic and job consequences and does not adequately identify feasible steps to even achieve attainment with new standards.

The NAM strongly urges the EPA to withdraw its proposal and maintain the existing annual 12.0 $\mu g/m^3$ $PM_{2.5}$ standard. We look forward to continuing to work with the EPA on this issue that is critical to the future of manufacturing's competitiveness in the United States.

Sincerely,

Chris Morris
Director, Energy and Resources Policy

***Submitted via Federal eRulemaking portal***

March 28, 2023

Administrator Michael Regan
U.S. Environmental Protection Agency
EPA Docket Center
Air and Radiation Docket
Mail Code 28221T
1200 Pennsylvania Avenue, NW
Washington, D.C. 20460

RE: Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, Proposed Rule, 88 Fed. Reg. 5558 (Jan. 27, 2023), EPA-HQ-OAR-2015-0072

Administrator Regan:

The National Mining Association ("NMA") appreciates the opportunity to comment on the U.S. Environmental Protection Agency's ("EPA") reconsideration of the National Ambient Air Quality Standards ("NAAQS") for Particulate Matter ("PM").[1] The NMA is a national trade association whose members include the producers of most of the nation's coal, metals, industrial and agricultural minerals; the manufacturers of mining and mineral processing machinery, equipment and supplies; and the engineering and consulting firms, financial institutions, and other firms serving the mining industry. We work to ensure America has secure and reliable supply chains, abundant and affordable energy, and the American-sourced materials necessary for U.S. manufacturing, national security and economic security, all delivered under world-leading environmental, safety and labor standards.

---

[1] 88 Fed. Reg. 5558 (Jan. 27, 2023).

The PM NAAQS are of critical importance to our member companies because of the direct impacts the $PM_{10}$ and $PM_{2.5}$ standards have on constructing, operating, and expanding surface mining operations, particularly in the arid and rural western United States. Demonstrating compliance with more stringent $PM_{10}$ and $PM_{2.5}$ standards would have significant technical and economic impacts on NMA's members, the communities in which they operate, and the states that implement the NAAQS. Our member's facilities are already meeting extensive requirements to control coarse PM through a variety of federally enforceable technology and management requirements imposed by State Implementation Plans and the New Source Review program.[2] Given the extensive nature of the controls that mines and related facilities are already subject to, we fear that little more can be done to comply with a more stringent coarse PM NAAQS other than to scale back or shut down operations.

The NMA joined the NAAQS Regulatory Review and Rulemaking ("NR3") Coalition in submitting comments that oppose EPA's proposal to lower the $PM_{2.5}$ NAAQS. NMA endorses and incorporates by this reference the comments submitted by the NR3 Coalition on the proposed revisions to the PM NAAQS. Additionally, in these comments, the NMA is attaching and re-submitting the comments we filed during the last NAAQS review that raised issues regarding the substantial uncertainties that continue to plague coarse PM health effects research. We continue to believe these uncertainties prevent promulgation of a more stringent coarse PM standard. We agree with the Administrator that the continuing uncertainties of the potential public health implications of a reduced $PM_{10}$ standard are so "considerable" to preclude any reduction in any form of the $PM_{10}$ NAAQS.[3]

Our prior comments also raised the importance of accounting for the impact of crustal PM on the $PM_{2.5}$ standard. Given the lack of demonstrated health effects from the coarse PM associated with emissions from mining operations, we are especially concerned that any reduction in the current PM standards—including failure to properly consider the impacts of crustal PM

---

[2] Additionally, mines and their associated facilities have extensive controls and emission standards governing emissions of PM precursors.

[3] 88 Fed. Reg. 5637/2 ("[T]he Administrator proposes to conclude that these limitations lead to ***considerable uncertainty*** regarding the potential public health implications of revising the level of the current primary 24-hour PM10 standard. Thus, based on his consideration of the evidence and associated uncertainties and limitations for PM10-2.5-related health effects … and his consideration of CASAC advice on the primary PM10 standard, the Administrator proposes to retain the current standard, without revision."

on compliance with the $PM_{2.5}$ standard—would inappropriately target areas where coarse PM dominates.[4]

We also continue to be concerned that lowering the PM NAAQS will result in significant implementation challenges, particularly in the western United States, because of the challenges faced by states in attaining the NAAQS while also dealing with increased wildfire frequency. If the PM NAAQS is lowered, states and local air agencies will need to prepare additional exceptional event demonstrations to address wildfires and windblown dust. Wildfires are a significant contributor to ambient PM. At the peak of 2020 wildfire season, 42 percent of $PM_{2.5}$ emissions in the Mountain region was attributed to wildfire.[5] $PM_{2.5}$ ambient trends in the Great Basin/Mountain Region show an increase of 0.05 to 0.97 $\mu g/m^3$ on an annual basis.[6]

Exceptional event demonstrations are resource intensive and dependent on EPA approval. EPA recognized this state of affairs in a recent GAO report where it committed to "[continue] to explore possible approaches to make the exceptional events process less resource-intensive for air agencies, specifically with regards to wildfire and prescribed fire events."[7] Yet, there is uncertainty as to how EPA will address this inevitable situation. We encourage the agency honor its commitment to GAO to address this critical implementation challenge before engaging in a discretionary rulemaking aimed at reconsidering the PM NAAQS just barely two years after EPA completed a review of the NAAQS as required by Clean Air Action section 109(d)(1). Without an effective and feasible plan for dealing with exceptional events, more counties will be designated as nonattainment and industrial sources will be faced with significant permitting challenges to address pollution that is neither created by nor can be remedied by industry. Consequently, economic development will be stifled without giving states the tools to address the largest contributors to nonattainment. This will result in perpetual nonattainment areas across the western United States.

---

[4] The proposed rule on reconsideration of the PM NAAQS does not even begin to address this issue as the Administrator identified crustal PM in just three passing instances in the entirety of a 161-page preamble. *See id.* at 5571 (arguing that crustal material is found in high concentrations in the northeast U.S.), & 5633/2, 5636/3 (briefly mentioning "crustal" material related to dust storm events).

[5] Li, Y., D. Tong, S. Ma, X Zhang, S. Kondragunta, F. Li and R. Saylor. 2021. Dominance of Wildfires Impact on Air Quality Exceedances During the 2020 Record-Breaking Wildfire Season in the United States. Geophysical Research Letters. Vol 48, 2021GL094908.

[6] McClure, C.D, and D.A. Jaffe. 2018. US Particulate Matter Air Quality Improves Except in Wildfire-Prone Areas. PNAS. Vol 115 (31) .7901-7906.

[7] WILDFIRE SMOKE: Opportunities to Strengthen Federal Efforts to Manage Growing Risks (GAO-23-104723), US Government Accountability Office, March 2023, p79.

Additionally, EPA requests comment on several issues related to implementation provisions. To allow meaningful comment, NMA urges EPA to formally seek comment though a rulemaking focused on these issues with specific, proposed language. For example, the use of low-cost sensor and satellite data in drawing non-attainment area boundaries or identifying sources for control is such a significant break with prior EPA policy that it warrants a more specific proposal beyond a mere weighing of pros and cons and a request for comment.[8] Similarly, the requirement for States to site monitors in “at-risk communities” necessitates a clear definition of those communities, and not simply requesting commenters to propose definitions.[9] EPA has been unable to propose a working definition for these communities for years, leading to various states and counties to create their own, sometimes incompatible definitions.

The NMA urges EPA to retain the current level of the primary and secondary standards for $PM_{10}$ and $PM_{2.5}$ and adequately consider the impacts of crustal PM in any change in the level of the $PM_{2.5}$ standard.

If you have any questions regarding these comments, please contact me at tbridgeford@nma.org or (202) 463-2629.

Sincerely,



Tawny A. Bridgeford
General Counsel & Senior Vice President, Regulatory Affairs

[8] 88 Fed. Reg. at 5680.

[9] *Id*. at 5676.

June 29, 2020

***Submitted via www.regulations.gov***

U.S. Environmental Protection Agency
EPA Docket Center
Docket ID No. EPA–HQ–OAR–2015–0072
1200 Pennsylvania Avenue, NW
Washington, DC 20460

ATTN: Docket ID No. EPA–HQ–OAR–2015–0072; "Review of the National Ambient Air Quality Standards for Particulate Matter;" 85 Fed. Reg. 24,094 (Apr. 30, 2020)

Dear Administrator Wheeler:

The National Mining Association ("NMA") appreciates the opportunity to comment on the U.S. Environmental Protection Agency's ("EPA") proposed National Ambient Air Quality Standards ("NAAQS") for Particulate Matter. 85 Fed. Reg. 24094 (April 30, 2020). NMA is a national trade association whose members include the producers of most of the nation's coal, metals, industrial and agricultural minerals; the manufacturers of mining and mineral processing machinery, equipment and supplies; and the engineering and consulting firms, financial institutions, and other firms serving the mining industry. The particulate matter NAAQS are of critical importance to our member companies because of the direct impacts the $PM_{10}$ and $PM_{2.5}$ standards have on constructing, operating, and expanding surface mining operations.

NMA supports EPA's proposal to retain the level of the current primary and secondary standards for $PM_{10}$ and $PM_{2.5}$, but proposes consideration of a different form of the $PM_{10}$ standard for continuous monitors that better accounts for weak causal health effects, high wind and wildfire events. NMA's comments also focus on: (1) the substantial uncertainties that continue to plague coarse PM health effects research, which prevent promulgation of a more stringent coarse PM standard; (2) support for a change in the form of the $PM_{10}$ Standard; and (3) the importance of accounting for the impact of crustal PM on the $PM_{2.5}$ Standard. NMA's comments and supporting technical reports authored by Ronn Smith of IML Air Science (a division of Pace Analytical Services, LLC) are attached.

If you have any questions regarding NMA's comments, please contact me at tbridgeford@nma.org or (202) 463-2629.

Tawny A. Bridgeford
Deputy General Counsel & Vice President, Regulatory Affairs

# UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

## *Proposed Rule for the National Ambient Air Quality Standards for Particulate Matter*

**85 Fed. Reg. 24094 (April 30, 2020)**

**Docket ID No. EPA-HQ-OAR-2015-0072**

## COMMENTS OF THE NATIONAL MINING ASSOCIATION ON EPA'S PROPOSED PARTICULATE MATTER NATIONAL AMBIENT AIR QUALITY STANDARDS

## TABLE OF CONTENTS


Page

I. Introduction & Executive Summary ..... 1

II. Discussion ..... 1

A. Legal Standard ..... 1

B. EPA Should Finalize Its Proposal to Retain the Current Level of the Standards Given the Weak Causal Relationship Between Coarse, Crustal PM and Adverse Health Outcomes ..... 3

1. Previous PM rulemakings have been plagued with uncertainties and weaknesses with respect to the health effects associated with PM10-2.5. ..... 3

2. Scientific studies since the last PM NAAQS review remain plagued with uncertainties and weaknesses and do not change the body of evidence related to health impacts of PM10-2.5 ..... 4

3. EPA previously recognized—and studies suggest—that crustal material is not associated with negative health effects. Moreover, newer studies cited by EPA continue to support this assertion. ..... 14

4. The geographic differences in particulate matter should be factored in when evaluating health effects and should be factored into the $PM_{10}$ standard. ..... 19

C. Lack of Health Effects of Coarse PM Supports a Change in the Form of the $PM_{10}$ Standard ..... 23

1. Problems with the Current Form of the $PM_{10}$ Standard ..... 23

2. Proposed changes to the form of the $PM_{10}$ standard ..... 25

D. EPA Must Account for Crustal impacts on $PM_{2.5}$ Standard ..... 26

1. EPA Recognizes that Fine and Coarse Particles are Fundamentally Different Pollutants with Different Health Effects ..... 26

2. EPA's Express Inclusion of Coarse Crustal Material in the Definition of PM2.5 Contradicts and Undermines the Purpose of the Fine PM NAAQS. ..... 27

3. Based on the attenuated causal link between PM coarse and health effects, any reduction in the current PM2.5 standard would inappropriately target coarse PM. ..... 28

III. Conclusion ..... 30

IV. Appendix ..... 31

**NATIONAL MINING ASSOCIATION'S COMMENTS ON EPA'S PROPOSED PARTICULATE MATTER NATIONAL AMBIENT AIR QUALITY STANDARDS 85 Fed. Reg. 24094 (April 30, 2020) Docket No. EPA-HQ-OAR-2015-0072**

## I. Introduction & Executive Summary

The National Mining Association ("NMA") appreciates the opportunity to comment on the U.S. Environmental Protection Agency's ("EPA") proposed National Ambient Air Quality Standards ("NAAQS") for Particulate Matter, 85 Fed. Reg. 24094 (April 30, 2020), (Docket No. EPA-HQ-OAR-2015-0072) ("Proposed Rule"). The NAAQS for particulate matter are of critical importance to our member companies because of the direct impacts the $PM_{10}$ and $PM_{2.5}$ standards have on constructing, operating, and expanding surface mining operations, particularly in the arid and rural western United States. Given the lack of demonstrated health effects from the coarse PM associated with emissions from mining operations, we are especially concerned that any reduction in the current PM standards—including failure to properly consider the impacts of crustal PM on compliance with the $PM_{2.5}$ standard—would inappropriately target areas where coarse PM dominates. Additionally, demonstrating compliance with more stringent $PM_{10}$ and $PM_{2.5}$ standards would have significant economic impacts on NMA's members and the communities in which they operate. Mines are already meeting requirements to control coarse PM through a variety of technology and management requirements, and little more can be done to comply with a more stringent coarse PM NAAQS other than to scale back or shut down operations.

In summary, the NMA supports EPA's proposal to retain the level of the current primary and secondary standards for $PM_{10}$ and $PM_{2.5}$, but proposes consideration of a different form of the $PM_{10}$ standard for continuous monitors that better accounts for weak causal health effects, high wind and wildfire events. NMA's comments focus on:

1) the substantial uncertainties that continue to plague coarse PM health effects research, which prevent promulgation of a more stringent coarse PM standard;

2) support for a change in the form of the $PM_{10}$ Standard; and

3) the importance of accounting for the impact of crustal PM on the $PM_{2.5}$ Standard.

## II. Discussion

### A. Legal Standard

NMA is supportive of EPA's proposal and finds that the Administrator has satisfied the legal standard for retaining the current primary and secondary standards for $PM_{10}$ and $PM_{2.5}$ under the Clean Air Act. Given the important uncertainties in the evidence noted in

these comments and the Proposed Rule, the Administrator has chosen a reasonable level for each of these standards, which should be finalized.

The Clean Air Act requires that EPA promulgate primary NAAQS that are "requisite to protect the public health" with an "adequate margin of safety."[1] In making this decision, the Administrator takes into consideration the Integrated Science Assessment, which reflects the "latest scientific knowledge useful in indicating the kind and extent" of public health impacts "which may be expected from the presence of such pollutant in the ambient air," EPA's Policy Assessments, and the recommendations of the Clean Air Scientific Advisory Committee ("CASAC").[2] The determination of the appropriate level of the standard requires the judgment of the Administrator to set a standard that is "requisite" to protect the public health or welfare.[3] This means setting a standard that is "sufficient, but not more than necessary."[4] EPA is not required to follow CASAC's advice, but if the Administrator comes to a different conclusion, EPA must explain why its determination differs from CASAC recommendations.[5]

As documented in the Proposed Rule, the Administrator's decision to retain the current level of the standards conforms to the legal standard and procedures required under the Clean Air Act. The Administrator has "considered the available scientific evidence assessed in the Integrated Science Assessment (ISA), analyses in the Policy Assessment (PA), and advice from the Clean Air Scientific Advisory Committee (CASAC)" in accordance with 42 U.S.C. §§ 7408(a)(2), 7409(d)(2).[6] Following this review, the Administrator has proposed to retain the $PM_{2.5}$ primary standards after "conclud[ing] that there are important uncertainties in the evidence for adverse health effects below the current standards and in the potential public health impacts of reducing ambient $PM_{2.5}$ concentrations below those standards."[7]

Similarly, the Administrator's decision to retain the current level of the $PM_{10}$ standard is supported given that "while the available health effects evidence has expanded, recent studies are subject to the same types of uncertainties that were judged important in the last review."[8] Finally, the proposed decisions of the Administrator are "consistent with the CASAC's consensus advice on the primary 24-hour $PM_{2.5}$ standard, the primary $PM_{10}$ standard, and the secondary standards."[9] While CASAC did not reach consensus on the primary annual $PM_{2.5}$ standard, there was overwhelming support within CASAC to retain the standard. Importantly, the Administrator fully explained his decision to differ from

[1] 42 U.S.C. § 7409(b)(1).
[2] 42 U.S.C. §§ 7408(a)(2), 7409(d)(2).
[3] 42 U.S.C. § 7409(b)(1).
[4] *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 473 (2001).
[5] 42 U.S.C. § 7409(d)(3).
[6] *See* 85 Fed. Reg. at 24095.
[7] *See id*.
[8] *See id*.
[9] *Id.*

recommendations for a revised primary annual $PM_{2.5}$ standard, including the one member's lone dissent for retaining the current standards.[10]

**B. EPA Should Finalize Its Proposal to Retain the Current Level of the Standards Given the Weak Causal Relationship Between Coarse, Crustal PM and Adverse Health Outcomes**

Given the substantial uncertainties that continue to plague coarse PM health effects research and the legal standard for setting the NAAQS, EPA should not promulgate a standard for coarse PM more stringent than the research suggests is necessary. In order to set a standard for the NAAQS that is "requisite" to protect the public health or welfare, EPA must ensure that the standard that is "sufficient, but not more than necessary."[11] EPA has long acknowledged the weak causal relationship between coarse, crustal PM and adverse health outcomes. Moreover, newer studies cited by EPA continue to support this assertion. Finally, the geographic differences in particulate matter should be factored in when evaluating health effects and should be factored into the PM10 standard. This is especially important for the NMA given the nature of our members' surface mining operations, particularly those located in the arid and rural western United States. For all these reasons, EPA should finalize its proposal to retain the current standards.

*1. Previous PM rulemakings have been plagued with uncertainties and weaknesses with respect to the health effects associated with PM10-2.5.*

The current review of the $PM_{10}$ NAAQS follows a long history of coarse PM regulation marked by scientific uncertainties and controversy. The PM NAAQS that EPA issued in 1987 excluded altogether particles above $PM_{10}$ due to a lack of evidence that the coarse fraction resulted in health effects.[12] In 1997, EPA recognized the fundamental difference between fine and coarse PM and initially proposed to set a 24-hour standard for fine PM, but not for coarse PM.[13] In its final rule, however, EPA reversed course and set a 24-hour standard at 150 µg/m3 based entirely on epidemiological studies reviewing health effects at levels well above 1000 µg/m3 – including both fine and coarse PM.[14] EPA's final rule continued to discount studies that relied on "multiple large exceedances of the 24-hour standard" and concluded that "they provide no basis to lower the level of the standard below 150 µg/m3."[15] The D.C. Circuit ultimately vacated the coarse PM standard on the grounds that the $PM_{10}$ standard improperly double regulated $PM_{2.5}$ by including PM fine within the $PM_{10}$ coarse standard.[16] As a result of the court's findings, the pre-existing 1987 $PM_{10}$ NAAQS remained in place until 2006.

---

[10] *See id*. at 24,119-21.
[11] 42 U.S.C. § 7409(b)(1) ;*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 473 (2001).
[12] 52 Fed. Reg. 24634 (July 1, 1987).
[1313] 61 Fed. Reg. 65638, 65661-62 (Dec. 13, 1996).
[14] 62 Fed. Reg. 38701 (July 18, 1997).
[15] 62 Fed. Reg. at 38679.
[16] *American Trucking Associations v. EPA*, 175 F.3d 1027, 1054-56 (D.C. Cir. 1999). *See also* 77 Fed. Reg. at 38945.

In 2006, EPA initially proposed an urban-only PM coarse standard (using a $PM_{10-2.5}$ indicator), which exempted rural coarse PM from agriculture and mining operations.[17] But the agency reversed course again and issued a final rule retaining the existing 150 µg/m3 24-hour $PM_{10}$ standard for all coarse PM pending development of further health evidence, and eliminated the annual $PM_{10}$ standard.[18] EPA concluded that the health evidence was "inconclusive," particularly for rural coarse PM, but adopted a cautionary standard[19] that was later upheld by the D.C Circuit.[20] In the preamble to the final 2006 rule, EPA also found that the "very high degree of uncertainty in the relevant population exposures implied by the morbidity studies suggests there is little basis for concluding at this time that a greater degree of protection is warranted."[21]

When EPA initiated its most recent evaluation of the PM NAAQS, EPA's Integrated Science Assessment[22] and Policy Assessment[23] acknowledged the continuing and substantial uncertainties in the health data analyzing the health effects of $PM_{10-2.5}$, particularly rural coarse PM.  EPA noted that "[g]iven the relatively small number of $PM_{10-2.5}$ monitoring sites, the relatively large spatial variability in ambient $PM_{10-2.5}$ concentrations . . . the use of different approaches to estimating ambient $PM_{10-2.5}$ concentrations across studies, and the limitations inherent in such estimates, the distributions of thoracic coarse particle concentrations over which reported health outcomes occur remain highly uncertain."[24] At the time, EPA attempted to resolve this uncertainty by asserting that the "net effects of the uncertainties on $PM_{10-2.5}$ epidemiological studies is to bias the results of such studies toward the null hypothesis."[25] This generalized assertion—that the exposure measurement error in the epidemiological studies results in a bias toward the null—was scientifically indefensible and likely resulted in the overstatement of the health effects.

2. *Scientific studies since the last PM NAAQS review remain plagued with uncertainties and weaknesses and do not change the body of evidence related to health impacts of PM10-2.5*

The studies of $PM_{10-2.5}$ continue to be plagued by uncertainties and limitations, which ultimately limits the overall body of epidemiological evidence linking $PM_{10}$ to negative health effects. EPA itself recognizes some of these uncertainties and limitations in the Proposed Rule. For example, EPA notes that the "number of epidemiologic studies that have employed copollutant models to address the potential for confounding, particularly by

---

[17] 71 Fed. Reg. 2620 (Jan. 17, 2006).
[18] 71 Fed. Reg. 61144 (Oct. 17, 2006).
[19] *Id.* at 61191.
[20] *American Farm Bureau Federation v. EPA*, 59 F.3d 512 (D.C. Cir. 2009).
[21] 71 Fed. Reg. at 61202.
[22] EPA, INTEGRATED SCIENCE ASSESSMENT FOR PARTICULATE MATTER, EPA/600/R-08/139F (Dec. 2009) ("2009 ISA").
[23] POLICY ASSESSMENT FOR THE REVIEW OF THE PARTICULATE MATTER NATIONAL AMBIENT AIR QUALITY STANDARDS, EPA452/R-11-003 (Apr. 2011) ("2011 Policy Assessment").
[24] 77 Fed. Reg. at 38951.
[25] *Id.*

$PM_{2.5}$, was limited."[26] Additionally, EPA highlights that the "composition of $PM_{10-2.5}$, and the effects associated with various components, were also key uncertainties in the available evidence."[27]

### i. Mortality and morbidity

EPA acknowledges that uncertainty surrounds the biological plausibility of associations between coarse PM exposure and mortality and morbidity. Moreover, EPA suggests that the studies linking $PM_{10-2.5}$ to mortality and morbidity are unpersuasive. EPA states:

> Only a limited number of experimental studies provided support for the associations reported in epidemiologic studies, resulting in further uncertainty regarding the plausibility of the associations between $PM_{10-2.5}$ and mortality and morbidity reported in epidemiologic studies . . . While $PM_{10-2.5}$ effect estimates reported for mortality and morbidity were generally positive, most were not statistically significant, even in single-pollutant models.[28]

### ii. Cardiovascular effects

In the 2009 ISA, EPA concluded that it could not define the causal relationship between long-term $PM_{10}$ exposure and cardiovascular effects, citing an insufficient body of evidence.[29] The 2019 ISA, however, represents a marked shift from that conclusion: EPA concluded there is enough evidence to define the causal relationship between long-term $PM_{10}$ exposure and cardiovascular effects.[30] It defines this relationship as "evidence is suggestive of, but not sufficient to infer, a causal relationship."[31]

Yet EPA itself acknowledges in the Proposed Rule that the evidence linking $PM_{10}$ exposure to cardiovascular effects remains insufficient. EPA asserts that there is "no consistent pattern of associations across studies,"[32] and that there is a substantial "data gap"[33] and "insufficient quantity"[34] of studies examining the toxicological and biological link between $PM_{10}$ and cardiovascular effects.

Despite data gaps and ongoing uncertainties in the existing data, EPA suggests in this Proposed Rule that it *can* reach a conclusion on the causal relationship—in other words, that there is now a sufficient body of evidence—because positive associations have

[26] 85 Fed. Reg. at 24121.
[27] *Id.* at 24122.
[28] *Id.* at 24121-22.
[29] 2009 ISA at 2-32.
[30] 2019 ISA at 6-277.
[31] *Id.*
[32] *Id.* at 6-276.
[33] *Id.* at 6-277.
[34] *Id.*

been observed in "some epidemiologic studies."[35] The studies EPA relied on in the 2019 ISA to reach this conclusion have several flaws and suggest that a high degree of uncertainty continues to plague any suggestion of a causal relationship. The following section outlines a number of these flaws and weaknesses and demonstrates why EPA's shift in defining the causal relationship is premature and should not be relied upon in finalizing the $PM_{10}$ standard or in future rulemakings.

EPA cites Chen et al., 2015a[36] and Mu et al., 2014[37] for the proposition that long-term exposure to $PM_{10}$ is associated with elevated blood pressure and hypertension risk. Chen et al., 2015a has several weaknesses making its conclusions tenuous. For example, the sample population examined were all individuals over the age of 65, and a significant number already exhibited hypertension.[38] These demographic characteristics make the results of the study harder to generalize to the population as a whole. The study itself acknowledged this point, stating: "[a]dditional investigations are needed to confirm whether the results can be extrapolated to younger populations and people in different geographical areas."[39] Similarly, the positive associations found in the study were stronger for individuals with pre-existing conditions—like hypertension, diabetes, or obesity.[40] And critically, associations between hypertension and 1-year exposures to air pollutants were not found when subjects with measured unknown hypertension were excluded from the study.[41] Finally, the researchers acknowledged that the source of the particulate matters when examining the health effects, noting that traffic emitted particles are key components related to cardiovascular health.[42]

In Mu et al. 2014, researchers observed participants blood pressure before, during and after the Beijing Olympics—as particulate matter levels were expected to decrease in Beijing during the Olympics.[43] Although levels of particulate matter were measured based on particle size, researchers did not isolate particle size when examining health effects. Consequently, it is unclear from this study whether the health effects observed when particulate matter exposures decreased can be attributed to a decrease in exposure to $PM_{10}$, $PM^{2.5}$, ultrafine PM, or a combination of all three. Moreover, the overall results of this study are unpersuasive. The researchers ultimately concluded that "the study didn't observe any clear pattern of blood pressure in response to the air pollution levels."[44] In addition, diastolic blood pressure among males *increased* during the games from the pre-

---

[35] *Id.*
[36] Chen SY, Wu CF, Lee JH, et al. *Associations between Long-Term Air Pollutant Exposures and Blood Pressure in Elderly Residents of Taipei City: A Cross-Sectional Study*. ENVIRON HEALTH PERSPECT. 2015;123(8):779-784.
[37] Mu L, Deng F, Tian L, et al. *Peak expiratory flow, breath rate and blood pressure in adults with changes in particulate matter air pollution during the Beijing Olympics: a panel study*. ENVIRON RES. 2014;133:4-11.
[38] Chen et al., 2015a at 779, 781.
[39] *Id.* at 784.
[40] *Id.* at 782.
[41] *Id.* at 783.
[42] *Id.*
[43] Mu et al., 2014.
[44] *Id.*

Olympic level; while researchers suggest that the stress of the Olympics may have caused the increase in blood pressure, this factor is mere conjecture.[45]

EPA cites Hart et al., 2015b[46] to suggest a link between $PM_{10}$ and heart disease. EPA, however, noted that associations "were less precise and somewhat attenuated" in a sensitivity analysis.[47] Moreover, the study itself concluded that the small associations observed between exposures to particulate matter and heart disease were not statistically significant.[48] In addition, the study itself recognized that based on the sample of individuals observed, the results cannot be generalized to men or to more diverse communities.[49] Likewise, EPA cites Puett et al., 2011[50] to suggest a link between an increased risk of nonfatal myocardial infarction and $PM_{10}$ exposures. Nevertheless, EPA acknowledged that there was no association after adjusting for $PM_{2.5}$.[51] Furthermore, researchers in this study observed no evidence of an association between all-cause mortality, total cardiovascular disease, and fatal heart disease and $PM_{10}$ and $PM_{10-2.5}$.[52] Finally, EPA relies on Cesaroni et al., 2014[53] in the 2019 ISA to suggest that there is an association between an increased risk for ischemic heart disease and $PM_{10}$. While researchers took into account some cardiovascular risk factors, researchers failed to account for differences in diet and cholesterol levels—as cholesterol data was only available for 36% of the cohorts examined.[54]

EPA references D'Souza et al., 2017[55] as an epidemiological study linking $PM_{10}$ exposure to small imprecise increases in right ventricular mass overall. Not only did this study emphasize that the association was stronger for individuals with emphysema and current smokers,[56] the researchers concluded that once they controlled for $PM_{2.5}$ and $NO_2$—which themselves are associated with RV mass—the association with $PM_{10-2.5}$ blunted.[57] Similarly, EPA cites Ohlwein et al., 2016[58] to demonstrate a potential relationship between $PM_{10-2.5}$ and E/E ratio, as well as left atrial volume index. Researchers

---

[45] *Id.*
[46] Hart JE, Puett RC, Rexrode KM, Albert CM, Laden F. *Effect Modification of Long-Term Air Pollution Exposures and the Risk of Incident Cardiovascular Disease in US Women*. J AM HEART ASSOC. 2015;4(12):
[47] 2019 ISA at 6-261.
[48] Hart et al., 2015b at 1.
[49] *Id.* at 11.
[50] Puett RC, Hart JE, Suh H, Mittleman M, Laden F. *Particulate matter exposures, mortality, and cardiovascular disease in the health professionals follow-up study*. ENVIRON HEALTH PERSPECT. 2011;119(8):1130-1135.
[51] 2019 ISA at 6-261.
[52] Puett et al., 2011 at 1132.
[53] Cesaroni G, Forastiere F, Stafoggia M, et al. *Long term exposure to ambient air pollution and incidence of acute coronary events: prospective cohort study and meta-analysis in 11 European cohorts from the ESCAPE Project*. BMJ. 2014;348:f7412.
[54] *Id.*
[55] D'Souza JC, Kawut SM, Elkayam LR, et al. *Ambient Coarse Particulate Matter and the Right Ventricle: The Multi-Ethnic Study of Atherosclerosis.* ENVIRON HEALTH PERSPECT. 2017;125(7):077019.
[56] D'Souza et al., 2017 at 1.
[57] D'Souza et al., 2017 at 3.
[58] Ohlwein S, Klümper C, Vossoughi M, et al. *Air pollution and diastolic function in elderly women - Results from the SALIA study cohort.* INT J HYG ENVIRON HEALTH. 2016;219(4-5):356-363

noted that "[w]hen adding covariates, most estimates turned toward a null association."[59] Moreover, the sample studied in Ohlwein likely cannot be generalized to a population at large; women aged 54 to 55 were studied, and 89.9% had hypertension.[60] And most importantly, Ohlwein's own researchers concluded the study should not be used in making a causality determination: "**In addition, our cross-sectional study design cannot provide any information on causal relationships**."[61]

Finally, there are several studies cited by EPA that failed to link $PM_{10}$ exposure to cardiovascular effects altogether or had inconsistent or statistically insignificant results. It is unclear how EPA factored in these studies when reaching a conclusion about the causal relationship between $PM_{10}$ and cardiovascular effects. For example, in Fuks et al., 2014[62] researchers noted that results showed positive associations in some cohorts and inverse associations in others.[63] Perez et al., 2015[64] too noted an inverse, not statistically significant association.[65]

In sum, the flaws underlying EPA's supportive studies, as well as the negative and uncertain findings in other studies cited by EPA in the 2019 ISA, highlight that the body of evidence supporting a causal relationship for cardiovascular effects remains insufficient to support any reduction in the level of the $PM_{10}$ standard. In light of the high levels of uncertainty surrounding these studies as whole, EPA should not be drawing any further conclusions regarding causality. Thus, the shift between the 2009 ISA and the 2019 ISA is unjustified.

### iii. Metabolic effects

The 2019 ISA also included a marked shift in the causal link between long term $PM_{10\text{-}2.5}$ exposures and metabolic effects. In the 2009 ISA, EPA concluded that evidence was insufficient to make a causal determination, as no studies at the time were reviewed that examined this category of health effects.[66] EPA now suggests there *is* enough evidence to suggest a causal relationship.[67] Like cardiovascular effects, the body of evidence supporting a causal relationship remains insufficient, and therefore this shift towards greater causality is similarly premature.

---

[59] Ohlwein et al., 2016 at 359.
[60] *Id*.
[61] *Id*. at 362 (emphasis added).
[62] Fuks KB, Weinmayr G, Foraster M, et al. *Arterial blood pressure and long-term exposure to traffic-related air pollution: an analysis in the European Study of Cohorts for Air Pollution Effects (ESCAPE).* ENVIRON HEALTH PERSPECT. 2014;122(9):896-905
[63] Fuks et al., 2014 at 900.
[64] Perez L, Wolf K, Hennig F, et al. *Air pollution and atherosclerosis: a cross-sectional analysis of four European cohort studies in the ESCAPE study*. ENVIRON HEALTH PERSPECT. 2015;123(6):597-605.
[65] Perez et al., 2015 at 597.
[66] 2019 ISA at 7-53.
[67] *Id*. at 7-56.

In the 2019 ISA, EPA relies primarily on one "high quality"[68] study reporting an association between long-term $PM_{10\text{-}2.5}$ exposure and incident diabetes to justify its decision to make a causality determination. In Puett et al., 2011,[69] researchers "did not find strong evidence for an association between exposure to . . . $PM_{10\text{–}2.5}$ in the 12 months before diagnosis and type 2 DM incidence among female nurses and male health professionals living in the northeastern and midwestern United States."[70] Specifically, researchers noted "weak nonstatistically significant" increased risks of incident diabetes associated with increases in $PM_{10\text{–}2.5}$ in the 12 months prior to diagnosis.[71] Moreover, the overall results of the study were inconsistent. Although the NHS cohort participants had its strongest association with $PM_{10\text{-}2.5}$ and its weakest association with $PM_{2.5}$, this pattern was reversed in the HPFS cohort—with the weakest association being $PM_{10\text{-}2.5}$.[72] Thus, it is unclear how EPA considers this study sufficient evidence on which to reach a conclusion about causality, given its non-statistically significant associations, as well as its inconsistent results amongst the cohorts studied. Moreover, the participants of the cohorts examined were located in the Midwest and Northeast; this geographical limitation makes the results of this study hard to extrapolate to the population at large or to populations with different components present in their particulate matter (such as the arid western U.S.).

EPA also cites two other studies to reach a conclusion about particulate matter's long-term causal relationship with metabolic effects. Teichert et al., 2013[73] found nominally significant associations between ambient levels of NO2 and NOx, and impaired glucose metabolism ("IGM"), **but not with particulate matter**.[74] Furthermore, researchers found that "different exposure measures of PM showed no significant association with IGM" and that they were "not able to detect any positive association between" $PM_{10}$ and soluble intracellular adhesion molecule 1 levels.[75]

The other study cited—Wolf et al., 2016[76]—identified positive associations between particulate matter exposures and diabetes indicators. Nevertheless, the researchers noted that the "cross-sectional study design limits our study findings in a way that we have one-time measurements **giving no indication of the sequence of events**."[77] Put differently, the cross-sectional design of the study makes the results of the study unreliable in making a determination of cause-and-effect—in other words, causality.

---

[68] *Id*.
[69] Puett RC, Hart JE, Schwartz J, Hu FB, Liese AD, Laden F. *Are particulate matter exposures associated with risk of type 2 diabetes?*. ENVIRON HEALTH PERSPECT. 2011;119(3):384-389.
[70] Puett et al., 2011 at 384.
[71] *Id*. at 387.
[72] *Id*. at 387-388.
[73] Teichert T, Vossoughi M, Vierkötter A, et al. *Association between traffic-related air pollution, subclinical inflammation and impaired glucose metabolism: results from the SALIA study*. PLOS ONE. 2013;8(12):e83042.
[74] Teichert et al., 2013 at 5 (emphasis added).
[75] *Id*. at 7.
[76] Wolf K, Popp A, Schneider A, et al. *Association Between Long-term Exposure to Air Pollution and Biomarkers Related to Insulin Resistance, Subclinical Inflammation, and Adipokines*. DIABETES. 2017 Oct;66(10).
[77] Wolf et al., 2017 at 3325 (emphasis added).

In sum, the limited number of studies relating to metabolic effects do not rise to a sufficient body of evidence suggesting causality. EPA therefore should not have made a causality determination with respect to long-term exposures to $PM_{10\text{-}2.5}$ and metabolic effects.

#### iv. Cancer and nervous system effects

The 2019 ISA also included a marked shift in the causal link between $PM_{10\text{-}2.5}$ exposures and cancer[78] and nervous system effects.[79] The 2019 ISA itself recognizes that the body of evidence supporting these shifts is limited and weak—and therefore the shift from "inadequate evidence" to make a causal determination to "suggestive of causality" is unsupported.

For example, EPA notes in the 2019 ISA that "there is limited evidence of a positive association between long-term $PM_{10\text{–}2.5}$ exposure and lung cancer incidence, with no studies examining lung cancer mortality"[80] and a "limited number of studies prevents a full assessment of the relationship between long-term $PM_{10\text{–}2.5}$ exposure and cancers in other sites."[81] In addition, both studies EPA cites to suggest a link between lung cancer and $PM_{10\text{-}2.5}$ only show an "imprecise" positive association.[82]

Likewise, for nervous system effects, EPA asserts in the 2019 ISA that the studies are limited in number, and that "evidence that long-term exposure to $PM_{10\text{–}2.5}$ may affect the nervous system is **very sparse**."[83] In terms of exposures to $PM_{10\text{-}2.5}$ and neurodevelopmental effects EPA concluded that "recently available studies do not provide strong evidence of an association."[84] Moreover—like the cancer studies referenced above—EPA relies on several studies that had "imprecise" associations between exposure to particulate matter and cognitive decline.[85]

Overall, for both cancer and nervous system effects, EPA still faces a limited number of studies reflecting negative health outcomes stemming from exposures to $PM_{10\text{-}2.5}$. Consequently, EPA should not have concluded that evidence is suggestive of a causal relationship. This shift is premature and unjustified. EPA should have instead asserted that the evidence currently available remains insufficient to draw any conclusion on causality.

#### v. Respiratory effects

In the 2009 ISA, EPA concluded that it could not define the causal relationship between long-term $PM_{10}$ exposure and respiratory effects, citing an insufficient body of

---

[78] 2019 ISA at 10-77, 87.
[79] *Id*. at 8-67,75.
[80] *Id*. at 10-86.
[81] *Id*.
[82] *Id*.
[83] *Id*. at 8-69 (emphasis added).
[84] *Id*. at 8-73.
[85] *Id*.

evidence.[86] Unlike the other health effects, the 2019 ISA reached the same conclusion—EPA asserted the evidence remained inadequate to define the causal relationship.[87] This section highlights why EPA's determination **is reasonable**, and further highlights why *the same conclusion on causality should have been reached for cardiovascular effects, metabolic effects, cancer, and nervous system effects.*

In the 2019, ISA EPA asserts that several analyses of birth cohorts and children have observed associations between $PM_{10-2.5}$ and a variety of lung function metrics. One such study cited by EPA is Gehrig et al., 2015(a).[88] The researchers in that study concluded that levels of $PM_{10-2.5}$ estimated at children's current addresses were associated with decreases in forced expiratory volume, forced volume capacity, and forced expiratory flow.[89] Importantly, researchers also warned: "the associations of health outcomes with PM coarse . . . we observed should be interpreted with caution as the performance of the land-use regression models for [this pollutant] was relatively poor."[90] Although researchers suggest "observed effect estimates are most likely underestimates of the true effects,"[91] this statement is unsubstantiated and unsupported. In addition, this study focused on the associations between components of particulate matter and lung functions. For example, researchers concluded that certain particulate matter constituents, such as copper and zinc, may adversely impact the lung functions of children.[92] Researchers assert that these constituents tend to stem from brake and tire wear.[93] This analysis further highlights the importance of recognizing local differences in the sources and components of particulate matter and their relative risks when EPA develops particulate matter standards.

Another European cohort study cited by EPA is Gehrig et al., 2013.[94] Although results showed that $PM_{10-2.5}$ exposures amongst children were negatively associated with forced expiratory volume, overall researchers concluded that: "lung function was associated with NO2, NOx, $PM_{2.5}$, and $PM_{2.5}$ absorbance, but not with $PM_{10}$ or PM coarse."[95] Moreover, some of the recognized weaknesses of this study include: 1) that exposure levels were determined by residential addresses and did not account for different exposures occurring at schools or daycares, and 2) children with allergy-prone parents were overrepresented in this study, making the results harder to generalize to a population at large.[96]

---

[86] 2009 ISA at 2-32.
[87] 2019 ISA at 5-277.
[88] Gehring U, Beelen R, Eeftens M, et al. *Particulate matter composition and respiratory health: the PIAMA Birth Cohort study*. EPIDEMIOLOGY. 2015;26(3):300-309.
[89] 2019 ISA at 5-272.
[90] Gehrig et al., 2015(a) at 305 (emphasis added).
[91] *Id*.
[92] *Id*.
[93] *Id*.
[94] Gehring U, Gruzieva O, Agius RM, et al. *Air pollution exposure and lung function in children: the ESCAPE project*. ENVIRON HEALTH PERSPECT. 2013;121(11-12):1357-1364.
[95] Gehrig et al., 2013 at 1362.
[96] Id. at 1363.

EPA cites Chen et al. 2015(a)[97] to support the proposition that $PM_{10-2.5}$ exposures result in decreased forced volume capacity and forced expiratory volume in schoolchildren.[98] Nevertheless, EPA suggests that the $PM_{10-2.5}$ exposure levels from this study should be viewed with caution: as $PM_{10-2.5}$ was determined by subtracting $PM_{10}$ from $PM_{2.5}$, and it was unclear from the study if researchers used collocated $PM_{10}$ and $PM_{2.5}$ monitors.[99] Another potential flaw in this study's exposure level is that researchers failed to account for particulate matter exposures at home versus at school and did not account for other air irritants that may impact lung functions—such as the presence of dust mites, pollen, and fungus.[100] Moreover, the researchers noted that due to the cross-sectional design of their study precaution should be taken in relying on the study to make any determinations of causality.[101]

The ISA references at least one study that found no correlation between particulate matter and weakened lung function in children. This study, Barone-Adesi et al., 2015[102] reached the opposite conclusion as Chen et al. 2015(a); it concluded there was no association between $PM_{10-2.5}$ exposures and forced volume capacity and forced expiratory volume. [103]

In addition, EPA cites one study in the ISA that looked at lung functions in adult cohorts exposed to particulate matter. Adam et al., 2015[104] ultimately reached inconsistent results in its study. While the cross-sectional study design found decreased forced expiratory volume and forced volume capacity associated with exposure to $PM_{10-2.5}$, the longitudinal study design actually recognized an increase in forced expiratory volume associated with exposure to $PM_{10-2.5}$.[105] EPA notes that this inconsistency is likely tied to unaccounted covariables in the cross-sectional study design—as longitudinal studies have certain "strengths" over cross-sectional studies.[106] More importantly, longitudinal studies are a better indicator of causality.[107]

In addition to lung functions, EPA looked at studies examining particulate matter exposure and other respiratory health indicators, such as asthma, allergies, and respiratory morality. EPA itself recognized that these studies are also plagued with inconsistencies and uncertainty. For example:

---

[97] Chen CH, Chan CC, Chen BY, Cheng TJ, Leon Guo Y. *Effects of particulate air pollution and ozone on lung function in non-asthmatic children*. ENVIRON RES. 2015;137:40-48.
[98] 2019 ISA at 5-272.
[99] Id. at 5-273.
[100] Chen et al. 2015(a) at 46-47.
[101] Id. at 46.
[102] Barone-Adesi F, Dent JE, Dajnak D, et al. *Long-Term Exposure to Primary Traffic Pollutants and Lung Function in Children: Cross-Sectional Study and Meta-Analysis*. PLOS ONE. 2015;10(11):e0142565.
[103] 2019 ISA at 5-272.
[104] Adam M, Schikowski T, Carsin AE, et al. *Adult lung function and long-term air pollution exposure. ESCAPE: a multicentre cohort study and meta-analysis*. EUR RESPIR J. 2015;45(1):38-50.
[105] 2019 ISA at 5-273.
[106] *Id.*
[107] *See e.g.*, https://www.iwh.on.ca/what-researchers-mean-by/cross-sectional-vs-longitudinal-studies

- **Asthma:** "Studies examining asthma prevalence in children reported contrasting evidence"[108] and "one epidemiologic study evaluated the effects of long-term $PM_{10-2.5}$ exposure in adults . . . [I]n a meta-analysis of all cohorts, annual $PM^{10-2.5}$ was not associated with higher odds of incident asthma."[109]

- **Allergies:** "The PIAMA cohort reported on associations between $PM_{10-2.5}$ and allergic outcomes noting that $PM_{10-2.5}$ was associated with increases in self-reported hay fever, rhinitis and allergic sensitization during the first 11 years of life."[110] On the other hand, "a 2006 U.S. National Health Interview Survey (NHIS) cross-sectional analysis . . . of children aged 3–17 years" found that $PM_{10-2.5}$ was not associated with respiratory allergy or hay fever.[111]

- **Respiratory mortality:** "Two recent European cohort studies evaluated the association between long-term $PM_{10-2.5}$ exposure and mortality and observed inconsistent results. In a pooled analysis of 22 cohorts from 13 European cohorts, Dimakopoulou et al., 2014 observed a null association with respiratory mortality in the ESCAPE cohort. In a French cohort, Bentayeb et al., 2015 observed a positive association between long-term $PM_{10-2.5}$ exposure and respiratory mortality."[112]

Finally, EPA relies on animal toxicological studies to demonstrate the biological plausibility of particulate matter negatively impacting respiratory health. These studies, however, are critically flawed in that "inhalation exposure of rodents . . . is technically difficult since rodents are obligatory nasal breathers."[113]

Taken together, the inconsistent study results—and the substantial flaws underlying the supportive studies cited by EPA—suggest that the causal relationship between particulate matter and respiratory health remains uncertain. In light of these uncertainties, EPA reasonably concluded the evidence remains inadequate to point toward a causal relationship. Moreover, the uncertainty associated with respiratory effects is similar in size and scope to the uncertainty surrounding cardiovascular effects, metabolic effects, cancer, and nervous system effects. Thus, EPA should not have prematurely concluded that for those health categories evidence is now "suggestive of" a causal relationship. Mining operations are specifically concerned that these premature shifts could result in a tightening of the $PM_{10}$ standard—disproportionately impacting areas where coarse PM predominates and a lack of evidence pervades the causality determinations of health effects.

---

[108] 2019 ISA at 5-273.
[109] *Id*. at 5-273-74.
[110] *Id*. at 5-274.
[111] *Id*.
[112] *Id*. at 5-276.
[113] *Id*. at 5-275.

3. *EPA previously recognized—and studies suggest—that crustal material is not associated with negative health effects. Moreover, newer studies cited by EPA continue to support this assertion.*

**i. Studies suggest there is no link between crustal material and negative health effects:**

Collectively, studies suggest that coarse crustal PM is not linked to negative health effects. Specifically, at least three reviews of epidemiological studies have called into question the association between crustal material and negative health impacts.

In a 2007 review[114] of epidemiological studies that examined the health impacts of common inorganic components of $PM_{2.5}$, researchers concluded that:

> [W]hile some epidemiology studies show that crustal associated components of $PM_{2.5}$ in certain areas seem to be associated with adverse health outcomes, there is little information from toxicology to provide biological plausibility for these specific components as causative factors.[115]

The review noted, for example, that the two major crustal-derived chemicals found in $PM_{2.5}$ are silicon and aluminum. For silicon, the researchers described that "silicon is occupationally classified as a nuisance dust having low toxicity."[116] For aluminum, the review explained that toxicity of aluminum to humans has primarily been studied in relationship to occupational exposures, and that aluminum or its related compounds are "rarely found alone in occupational environments."[117] Consequently, the researchers asserted that:

> [E]xposures producing high lung burdens are required to induce any pulmonary damages . . . [t]hus there is little to no evidence to suggest that aluminum in $PM_{2.5}$ is associated with any significant pulmonary health risk to the general population.[118]

Finally, the review posited—based on their total examination of epidemiological studies—that "studies using high concentrations of $PM_{2.5}$-associated crustal material have shown contradictory results," and "overall, the database for health effects from crustal materials in $PM_{2.5}$ is not sufficiently robust to allow for any differential health impact evaluation at this time."[119] Furthermore, the researchers explained that naturally occurring crustal material within $PM_{2.5}$ may be contaminated by other material, such as

---

[114] Richard B. Schlesinger (2007), *The Health Impact of Common Inorganic Components of Fine Particulate Matter (PM2.5) in Ambient Air: A Critical Review*, INHALATION TOXICOLOGY, 19:10, 811-832 ("2007 Review).
[115] *Id*. at 824.
[116] *Id*. at 821.
[117] *Id*.
[118] *Id*.
[119] *Id*. at 824.

road dust produced by moving vehicles, which can modify the toxicity of crustal material found in other studies.[120]

A 2011 review[121] of epidemiological studies concluded that cardiovascular health effects may be associated with $PM_{2.5}$ from crustal or combustion sources, including traffic, but "no consistent relationships have emerged."

Most recently, in 2018, a review[122] of epidemiological studies was conducted, wherein researchers examined evidence of health effects associated with exposure to particulate matter air pollution from five common outdoor emission sources, including crustal dust. The review concluded that source apportionment studies examining ordinary particulate matter exposures (as opposed to dust storm events), demonstrate that crustal dust has not been generally associated with adverse health effects.[123]

In addition, the review noted that, taken together, these studies suggest that crustal dust particles are less toxic than particulate matter composed of other sources. For example, the review highlighted that single city studies in New York and Seoul, South Korea observed associations between traffic-related $PM_{2.5}$ and daily cardiovascular hospital admissions and respiratory mortality—associations that were not observed for crustal dust.[124]

#### ii. EPA previously recognized a weak link between crustal material and negative health effects

The results from the 2007, 2011, and 2018 reviews are consistent with EPA's Air Quality Criteria for Particulate Matter published in 2004. In Chapter 8, "Epidemiology of Human Health Effects Associated with Ambient Particulate Matter," EPA highlighted several studies that looked at the health impacts associated with crustal material, including: Schwartz et al., 1999, which "concluded that there was no evidence to suggest that coarse (presumably crustal) particles were associated with daily mortality," and Laden et al., 2000 and Schwartz (2003a), which found "[n]o positive association . . . between the fine crustal mass factor and mortality."[125]

In both the 2009 ISA and the 2019 ISA EPA introduced newer studies evaluating $PM_{10}$ sources, including crustal material, and whether they have been associated with negative health impacts. At least one of these newer studies' conclusions was consistent with EPA's 2004 conclusion. A 2016 study included in the 2019 ISA investigated the association of long-term exposure to particulate matter and carotid intima-media thickness

---

[120] *Id.*

[121] Lindsay Wichers Stanek et al., *Attributing health effects to apportioned components and sources of particulate matter: An evaluation of collective results*. 45 ATMOSPHERIC ENVIRONMENT (2011): 5655-5663.

[122] Hime NJ, Marks GB, Cowie CT. *A Comparison of the Health Effects of Ambient Particulate Matter Air Pollution from Five Emission Sources*. INT J ENVIRON RES PUBLIC HEALTH. 2018;15(6):1206 ("2018 Review").

[123] *Id.* at 13.

[124] *Id.* at 6.

[125] Air Quality Criteria for Particulate Matter, Table 8-1, at 8-26, 8-27.

(CIMT)—a proxy for subclinical atherosclerosis; it concluded that "[a]n association with CIMT for the vehicular source but not for the crustal source of $PM_{2.5}$ was found."[126]

#### iii. The newer studies cited by EPA linking crustal material to negative health effects are flawed for failing to account for potential geographical differences in associations

Nevertheless, EPA asserts in the 2019 ISA and the Proposed Rule that some of these newer studies suggest that crustal material is associated with respiratory hospitalizations and cardiovascular mortality.[127] These newer studies, however, suffer from substantial uncertainties and EPA should not discount the scientific studies on which it previously relied to reach its 2004 conclusion: that crustal material has a limited potential for negative health effects. Indeed, the newer studies referenced in the 2009 and 2019 ISAs suggest—at best—that uncertainty and inconsistent results still underly any link between crustal material and negative health impacts. Moreover, the studies cited by EPA emphasize that particulate matter composition impacts the health effects of particulate matter—and therefore regional and local differences should be considered when setting a national standard.

One study cited by EPA in the 2009 ISA is the Zanobetti and Schwartz multi-city study, which examined particulate matter and mortality impacts. In this study, the regional effect estimates from western regions of the United States—where there are higher levels of $PM_{10-2.5}$—were generally not statistically significant. Moreover, the study failed to evaluate possible collinearity between $PM_{2.5}$ and $PM_{10-2.5}$, a concern previously noted by EPA because it raises the possibility that risks are double-counted. Finally, the associations identified in this study may be attributable to confounding variables such as $NO_2$ exposures.

Another study cited by EPA in the 2009 ISA is Anderson et al., 2007[128] for the proposition that crustal PM has been associated with cardiovascular disease. The authors looked at daily hospital admissions of children and the elderly in Copenhagen, Denmark. There, the authors expressed that their research "provides some support for biological plausibility of the relevance of crustal and secondary sources for cardiovascular disease," yet recognized that "other epidemiological source apportionment studies [had] not found associations between soil related particles and cardiovascular and total mortality."[129] The authors acknowledged that one explanation for the divergent results may stem from the fact that "different soil-related materials may have different composition and possibly toxicity dependent geographical area."[130] Specifically, the authors explained, "[C]onsidering that PM is a mix of components dependent on local sources and conditions

---

[126] 2019 ISA at 6-217.
[127] *Id*. at 6-210.
[128] Anderson et, al. (2007), *Ambient particle source apportionment and daily hospital admissions among children and elderly in Copenhagen*, JOURNAL OF EXPOSURE SCIENCE AND ENVIRONMENTAL EPIDEMIOLOGY 17, 625–636.
[129] *Id*. at 633.
[130] *Id*.

that influence its toxicological potency, results from this study may not necessarily be consistent with results achieved elsewhere."[131]

This point was further highlighted in the 2018 review of epidemiological studies, which noted that crustal dust particles "contain material picked up from industrialized and agricultural areas" and therefore, "[i]t is likely that constituents acquired during transport contribute to the toxicity of dust particles."[132] In other words, particulate matter and its components are dependent on other material present in the locality, and this other material matters when looking at the health effects associated with exposures.

The 2009 ISA acknowledges this point as well, noting that geographic or regional differences in particulate matter composition and source in U.S. cities and non-U.S. cities may result in different causal connections to health outcomes. The EPA noted:

> The excess risk of [cardiovascular disease] hospitalization may be somewhat greater in Europe and Australia/New Zealand than in the U.S. Sources including wood burning, oil burning, traffic and crustal material have been associated with increases in cardiovascular hospitalization or [emergency department] visits, **but the best evidence suggests that in the U.S.**, oil combustion, wood burning, and traffic are likely the sources of $PM_{2.5}$ most strongly associated with cardiovascular hospitalizations or [emergency department] visits.[133]

Notably, EPA excluded crustal material when describing the best evidence in the U.S. associating $PM_{2.5}$ sources with cardiovascular hospitalizations and emergency department visits.

This geographical limitation of the Anderson et al., 2007 study is bolstered by the Laden et al., 2000 study referenced above and cited by EPA in 2004. This study, in contrast to the Anderson study which only looked at a single non-U.S. city, examined U.S. cities, as part of the Harvard Six Cities study. Researchers looked at particulate matter in Watertown, Massachusetts, Kingston-Harriman, Tennessee, St. Louis, Missouri, Steubenville, Ohio, Portage, Wisconsin, and Topeka, Kansas. Researchers concluded "the crustal factor in fine particulate matter was not associated with mortality."[134]

Similarly, the 2009 ISA described mortality analyses conducted in Phoenix, AZ and Washington, DC. These studies, published in 2006, had "consistent" results with conclusions reached in the EPA's 2004 Air Quality Criteria for Particulate Matter, including

[131] *Id*. at 634.
[132] 2018 Review at 13.
[133] 2009 ISA, at 6-62 (emphasis added).
[134] Laden et al. (2000), Association of Fine Particulate Matter from Different Sources with Daily Mortality in Six U.S. Cities, Environ. Health Perspect. 108:941–947, 945.

that mortality "associations were reported with combustion-related $PM_{2.5}$, but not crustal source $PM_{2.5}$."[135]

In all, the newer studies that EPA cites in the 2009 and 2019 ISAs to suggest crustal material is associated with negative health effects should not outweigh EPA's prior conclusion from 2004, and the same conclusion reached in studies of eight U.S. cities: that crustal material is not associated with mortality. Further, EPA itself acknowledges there is no "best evidence" in the U.S. linking crustal material to cardiovascular hospitalizations and emergency department visits.

**iv. The newer studies cited by EPA linking crustal material to negative health effects are flawed for lumping crustal material with other anthropogenic sources of PM**

EPA's analysis of crustal material and negative health effects is further flawed because it fails to account for different health effects each source of PM is associated with. For example, in both the 2009 and 2019 ISAs, EPA lumps the health impacts of crustal material with the health impacts of other components of particulate matter—specifically soil, road dust and traffic. For example, in the 2019 ISA, EPA states "several PM sources (i.e., crustal/soil/road dust and traffic) were associated with increased cardiovascular mortality."[136] Likewise, in the 2009 ISA, EPA stated that "crustal/soil/road dust and traffic sources of PM have been found to be associated with increased respiratory symptoms in asthmatic children . . . ."[137]

Evaluating crustal material and soil with anthropogenic sources, like road dust and particulate matter attributed to traffic, fails to account for the individual health effects associated with each component separately. For example, in the 2018 review of epidemiological studies, researchers drew separate and individual conclusions for traffic related air pollution and crustal material. Moreover, the 2018 review noted that in Harvard Six Cities study the "magnitude of the effect of exposure to traffic-related $PM_{2.5}$ on daily mortality was greater than that for $PM_{2.5}$ from . . . crustal dust."[138]

EPA's failure to account for the different health effects associated with crustal material—as opposed to road dust and traffic—exemplifies one of the points made in the 2007 review: that contamination of crustal material by road dust or particulate matter produced by moving vehicles can modify the results of studies examining the health effects of crustal material.[139]

---

[135] See, 2009 ISA, at 6-197.
[136] 2019 ISA, at 6-122.
[137] 2009 ISA at 6-211.
[138] 2018 Review at 6.
[139] 2007 Review at 824.

**v. The newer studies cited by EPA linking crustal material to negative health effects are flawed for relying on dust storm studies, rather than studies examining ordinary, ambient air conditions**

Finally, another flaw in EPA's discussion of the negative health effects associated with crustal material is EPA's attempt to demonstrate the harmfulness of coarse crustal material in particulate matter by referencing dust storm studies in the 2009 and 2019 ISAs, as well as in this proposed action. For example, in the "short-term exposures" section of this proposed action, EPA highlights that "dust storm events resulting in high concentrations of crustal material were linked to increases in total cardiovascular disease emergency department visits and hospital admissions."[140] However, EPA also noted that epidemiological studies of this nature may suffer from exposure measurement error and co-pollutant confounding. Moreover, dust storm studies are not representative of ambient rural coarse PM levels in the U.S. and should not be relied upon as indicators of health risks from coarse PM in rural areas of the arid West. "Extreme weather events" should not be extrapolated to average daily conditions—especially when a body of epidemiological studies suggests that there are no adverse impacts from ambient levels of coarse crustal PM.

Ultimately, the lack of health impacts of crustal material—which predominates PM in the West—should be taken into consideration when setting a national standard. Furthermore, any future reduction of PM standards, the burden of which would largely fall on western mining operations—would result in misplaced control measures aimed at crustal material, without any corresponding public health benefits.

*4. The geographic differences in particulate matter should be factored in when evaluating health effects and should be factored into the $PM_{10}$ standard.*

Given that the large majority of studies assessing the health effects of coarse PM are conducted in urban areas rather than rural areas where coarse PM is made up of crustal material, significant uncertainties exist regarding the link between exposure to ambient levels of coarse PM and health effects in the arid West. With significant operations in the arid and rural western United States where crustal material dominates, the NMA is especially concerned that any reduction in the current PM standards would inappropriately the target areas where we operate without evidence that exposure to coarse, crustal PM results in negative health effects. The differences in urban and rural PM matters when examining health effects associated with particulate and should be factored into the $PM_{10}$ standard.

EPA acknowledges in this proposed action that most of the studies examining $PM_{10-2.5}$ and its associations with health effects occurred in urban areas.[141] As a result, these studies are not necessarily applicable to all regions of the country, and more importantly,

---

[140] 85 Fed. Reg. 24124.
[141] 85 Fed. Reg. 24126.

they are unreliable indicators of the health effects associated with coarse PM in the arid West. The foregoing section identifies two examples of why relying on urban PM studies to generalize health effects across environments is problematic.

First, the composition and source of particulate matter varies by geographical region. If more harmful components of PM are present in urban particles, then the negative health effects may not translate directly to arid West populations. EPA itself recognizes that PM composition varies by geographic area in urban versus rural environments. Specifically, the 2019 ISA notes that "anthropogenic sources account for nearly all urban primary $PM_{2.5}$ emissions."[142] These anthropogenic sources include industrial activities, motor vehicles, cooking, and fuel combustion, wood smoke, and construction and road dust.[143] At the same time EPA notes "natural sources are generally minor contributors to $PM_{2.5}$ in urban areas."[144] EPA further notes in the 2019 ISA that natural sources—including soil dust and sea salt—have been estimated to only account for 10% of urban $PM_{2.5}$.[145]

The opposite is true for non-urban environments. For example, EPA recognizes that crustal material is a "substantial contributor" to $PM_{2.5}$ mass in cities such as Phoenix and Denver, as well as other dry areas in the western region of the country.[146] Moreover, crustal material "largely dominates" $PM_{2.5}$ concentrations in the southwestern U.S.[147]

Thus, the negative health effects in the studies cited by EPA may not be generalizable to the western region of the country—as anthropogenic sources of PM tend to introduce toxic substances into particulate matter, toxic substances that have closer ties to negative health outcomes. On the other hand—as previously discussed—the science supporting negative health outcomes associated with crustal material is significantly limited.

This point and policy consideration was succinctly captured in CASAC member Dr. Joseph D. Brain's 2010 individual comment: "[h]ow do we make the distinction between those [particles] derived from fossil fuel combustion and resuspended crustal dust? There is consensus that resuspended crustal dust is less toxic than combustion products."

In addition to differing in source and composition, the EPA also recognizes that the fraction of $PM_{10}$ accounted for by $PM_{2.5}$ is higher in the eastern U.S. than in the western U.S. For example, in cities such as Dayton, Raleigh, and Philadelphia $PM_{2.5}$ composed of .66, .61, and .58 of $PM_{10}$ respectively, whereas in cities such as Tulsa, Albuquerque, and Denver, $PM_{2.5}$ only composed of .46, .45, and .41 of $PM_{10}$ respectively.[148] As a consequence, these

[142] 2019 ISA at ES-5.
[143] *Id.*
[144] *Id.* at 1-5.
[145] Id. at 1-12.
[146] *Id*. at 1-11.
[147] *Id*. at 1-11, 12.
[148] 2019 ISA at 2-56 and Table 2-7.

urban studies have a greater likelihood of associations being weakened when results are adjusted to account for $PM_{2.5}$.

The second reason why relying on urban PM studies to generalize health effects across environments is problematic is that coarse PM is significantly more correlated to $PM_{2.5}$ in large urban areas as opposed to the rural environments where our member companies operate mines. Consequently, epidemiological impacts outlined in the studies cited by EPA may be an artifact of coarse PM's correlation with $PM_{2.5}$ in the commonly studied metropolitan areas.

The lack of correlation between coarse and fine particulate matter is best illustrated by a case study from the northern Powder River Basin in Wyoming.[149] Specifically, the Buckskin Mine in that region has a 19-year history of continuous, collocated sampling of both $PM_{10}$ and $PM_{2.5}$. These data points enable in-depth comparisons between coarse PM (the difference between $PM_{10}$ and $PM_{2.5}$) and fine PM. Figure 1, below shows that there is a correlation between $PM_{10}$ and $PM_{2.5}$ (coefficient of determination R2 = 0.52); this is anticipated, as $PM_{10}$ encompasses $PM_{2.5}$—essentially guaranteeing some degree of correlation. But as Figure 2 below demonstrates, once PM coarse is isolated from $PM_{10}$, there is no significant correlation between PM coarse and fine PM at Buckskin (R2 =0.11).

Figure 1




Figure 2




This phenomenon is further supported by an examination of six Wyoming sites that also collocate continuous $PM_{10}$ and $PM_{2.5}$ samplers. Sites included in the study include three surface mines, two urban areas, and an oil and gas location.[150] Over a 5-year time period, the average R2 from correlating $PM_{10}$ and $PM_{2.5}$ is 0.56. Once coarse PM was isolated, however, the average R2 dropped to 0.05, i.e. there was no correlation between fine and

[149] *See* Appendix, Ronn Smith, "Distinguishing Between Coarse and Fine Particulate Matter," IML Air Science, Pace Analytical Services LLC (June 2020).
[150] *See id.*

coarse PM. The lack of significant correlation at the Buckskin data is corroborated and confirmed by an analysis of data at six Wyoming sites.

In addition, the Buckskin data offers insight into local sources as opposed to regional sources of particulate matter. On days with known impacts from wildfire smoke, the correlation of $PM_{10}$ and $PM_{2.5}$ was 0.67. To reiterate, this correlation is due to the inclusion of $PM_{2.5}$ in $PM_{10}$; moreover, a stronger correlation is more likely when $PM_{2.5}$ dominates. Nevertheless, removing the fine particles from the wildfire smoke days results in no correlation being found between coarse PM and $PM_{2.5}$. This lack of association underscores the regional nature of ambient $PM_{2.5}$, as western mines primarily emit coarse PM. In other words, because mining impacts on air quality come predominantly from locally generated coarse particles, the lack of correlation observed signifies that ambient $PM_{2.5}$ levels stem from regional sources (such as wildfire smoke)—as opposed to locally generated particles.

In contrast, when strong winds were studied, coarse particles made up a larger portion of $PM_{10}$; specifically, coarse particles increased with wind speeds above 11.2 mph. These coarse particles can be attributed to nearby natural and mining sources of fugitive dust. In contrast, fine particulates showed a slight decrease in their contribution to $PM_{10}$ as wind speeds increased. This decrease may be due to $PM_{2.5}$ levels being closely associated with regional sources, and therefore only contributing minorly to fugitive dust.

This data from Buckskin—specifically the lack of correlation between coarse PM and fine PM, and coarse PM largely comprising of local sources (such as mining)—does not similarly apply to large urban areas. This suggests that urban sources of particulate matter, unlike the mining sources studied above, tend to generate both particulate species.

In all, this case study demonstrates how in rural regions, coarse PM health effects may not exist after adjusting for $PM_{2.5}$ contribution. On the other hand, in urban environments—where coarse and fine PM correlate—it is more difficult to isolate the elusive effects of coarse PM from the obvious effects of fine PM. When coarse PM increases, so does fine PM, making it more likely that the latter is driving the imputed impacts of coarse PM on human health.

Ultimately, the differences in particulate matter composition in urban versus arid western environments, as well as the differences in coarse PM's correlation to $PM_{2.5}$, demonstrate the limited applicability of urban-only epidemiological studies relied on by EPA.

Furthermore, the geographic differences in particulate matter challenge the notion that $PM_{10}$ is a surrogate for $PM_{2.5}$. In western rural environments the $PM_{10}$ standard is overinclusive, because when PM coarse is isolated, there is no correlation between $PM_{10}$ and $PM_{2.5}$. Critically, then, strengthening or tightening the $PM_{10}$ standard—with the intention of reducing $PM_{2.5}$ concentrations—would be misguided from a policy perspective. Specifically, strengthening or tightening the $PM_{10}$ standard, with the goal of simultaneously

targeting $PM_{2.5}$ and improving health outcomes, would be misplaced in in arid western communities because:

- Coarse particulate matter is more correlated with $PM_{2.5}$ in **urban** environments;
- $PM_{2.5}$ makes up a **larger fraction** of $PM_{10}$ in **eastern environments** as opposed to western environments; and
- and the components of arid western PM—such as **crustal material**—are not linked to the same negative health effects as the components of urban, eastern PM.

### C. Lack of Health Effects of Coarse PM Supports a Change in the Form of the $PM_{10}$ Standard for Continuous Monitors

The lack of health effects for coarse PM supports a change in the form of the $PM_{10}$ standard for continuous monitors. As currently written, the standard allows no more than one exceedance per year averaged over any consecutive three-year period, for a design value threshold of 1. In both monitoring and modeling compliance, the current standard focuses on high ambient concentrations that are generally driven by exceptional events. An alternative form of the $PM_{10}$ standard for continuous monitors would reflect the limited health risks from coarse PM as well as minimize the impacts of exceptional events. Additionally, a standard that reduces the impact of 24-hour highs would result in a more reasonable and statistically defensible standard.

#### *1. Problems with the Current Form of the $PM_{10}$ Standard*

The migration to continuous sampling over the past two decades has in effect tightened the $PM_{10}$ standard, owing to sheer statistics.[151] A manual sampling schedule with frequency less than one will skip some days and therefore not necessarily coincide with the highest daily concentration in any given year. As a result, enforcing the 2nd high form of the standard imposes a penalty on continuous sampling, which accounts for every day of the year. In order to enforce equivalent 24-hour $PM_{10}$ standards between manual and continuous sampling, the current standard must be modified. For the same reasons, the current standard skews air quality modeling, which predicts impacts for every day. The requirement to use the current form of the 24-hour $PM_{10}$ standard as the basis for background concentrations places an undue burden on dispersion modeling for air quality permitting and NEPA analyses.

Indeed, EPA itself has noted that "since promulgation of the current 24-hour $PM_{10}$ standard in 1987, a number of concerns have been raised about the 1-expected-exceedance form,...in particular, the year-to-year stability of the number of exceedances, the stability of the attainment status of an area, and the complex data handling conventions specified in 40

[151] See Appendix, Ronn Smith, "Establishing Statistical Equivalency Between Continuous and Intermittent PM10 Sampling," IML Air Science, Pace Analytical Services LLC (June 2020).

CFR part 50, Appendix K, including the procedures for making adjustments for missing data and less-than-every-day monitoring."[152]

An assessment of monitoring impacts from Wyoming monitoring sites demonstrates the issues with the present form of the $PM_{10}$ standard.[153] In the last decade, the vast majority of the exceedances of the design value of 1 were caused by either high wind or wildfire events. As a result, a significant amount of time and resources have been spent demonstrating the exceedances were a result of exceptional events and not noncompliance. An alternative form of the $PM_{10}$ standard that recognizes this reality would provide sufficient margin to avoid most exceptional events demonstrations without disincentivizing compliance. Table 1 shows the yearly number of exceedances recorded at 40 continuous monitoring sites operated by mining facilities in Wyoming over the past 20 years.

Table 1

| Year | High Values > 150 | 2nd-High Values > 150 | 4th-High values > 150 |
|---|---|---|---|
| 2000 | 1 | 1 | 0 |
| 2001 | 3 | 3 | 0 |
| 2002 | 7 | 6 | 4 |
| 2003 | 6 | 4 | 1 |
| 2004 | 5 | 3 | 2 |
| 2005 | 3 | 3 | 1 |
| 2006 | 4 | 2 | 2 |
| 2007 | 11 | 5 | 2 |
| 2008 | 6 | 2 | 0 |
| 2009 | 2 | 1 | 0 |
| 2010 | 3 | 0 | 0 |
| 2011 | 7 | 3 | 0 |
| 2012 | 8 | 5 | 2 |
| 2013 | 4 | 1 | 0 |
| 2014 | 4 | 2 | 1 |
| 2015 | 9 | 2 | 0 |
| 2016 | 5 | 1 | 0 |
| 2017 | 10 | 4 | 0 |
| 2018 | 4 | 1 | 1 |
| 2019 | 2 | 0 | 0 |
| 2020 | 3 | 1 | 0 |
| Total | 107 | 50 | 16 |

[152] 62 Fed. Reg. 38652, 38672-73.

[153] See Appendix, Ronn Smith, "Effect on Exceptional Event Demonstrations," IML Air Science, Pace Analytical Services LLC (June 2020).

While the number of 1st-high exceedances increased over the last ten years in comparison to the previous ten years—due in part to having more continuous monitors installed in Wyoming—the number of 2nd- and 4-high exceedances have decreased significantly. The number of 2nd-high exceedances decreased by 30%. More importantly, the total number of 4th-high exceedances dropped by 75% during the same period. Remedial actions such as fugitive dust plans are likely responsible for this significant decrease and are generally effective unless the high concentrations coincide with an exceptional event such as high winds or wildfires. An alternative form of the standard, rather than the 2nd-high, could provide a compliance margin of safety without reducing incentives to manage fugitive dust.

An analysis of the effect of high-wind exceptional events in the last decade on permit compliance further supports an alternative forms of the 24-hour $PM_{10}$ standard. Changing to the 99th percentile as the 24-hour threshold for continuous $PM_{10}$ monitoring would virtually eliminate the burden of demonstrating exceptional events in order to avoid non-compliance. In the last decade the vast majority of the prospective violations of the design value of 1 in Wyoming were caused by high wind or wildfire events. A typical exceptional event demonstration requires roughly 100 person-hours to complete, and more time for agencies to review. A design value of 3 would have resulted in the need for 2 exceptional event demonstrations rather than 30 over the last decade in Wyoming alone. An alternative standard would therefore avoid most exceptional events demonstrations while still remaining in compliance.

*2. Proposed changes to the form of the $PM_{10}$ standard for continuous monitors*

To address the issues raised above, we propose that the EPA adopt the 99th percentile as the compliance threshold for the 24-hour $PM_{10}$ standard for continuous monitors. The current form of the standard would remain however for 1-in-6 samplers since the form should not make compliance more difficult for any particular monitoring technology. The 99the percentile would lower the compliance threshold from the 2nd high to the 4th high and would specify no more than 3 exceedances per year averaged over any three consecutive years. Using the 99th percentile as the Compliance Threshold for 24-hour $PM_{10}$ standard is still more conservative than the form of both the $PM_{2.5}$ and $NO_2$ short-term standards (98th percentile).

Using the 99th percentile as the form for the 24-hour $PM_{10}$ standard would improve compliance at rural mining operations, where coarse PM predominates. Modeling would predict lower source impacts by passing over the top 3 values for each year. Additionally, the background concentration that must be added to modeled impacts could also be lower (4th high from regional monitoring, rather than 2nd high). This combination helps to compensate for an inherent fallacy in using the monitored design value for background (currently 2nd high).

Adoption of the 99th-percentile form also would correct the concerns EPA has long noted about the current standard and would finalize its decision from 1997 to adopt this form. In 1997, EPA initially proposed adoption of the 98th-percentile form finding it would "provide adequate protection against the short-term effects of coarse particles that have been identified to date in the scientific literature."[154] Following the receipt of comments, however, EPA adopted the 99th-percentile form, averaged over 3 years, for the $PM_{10}$ 24-hour standard.[155] Ultimately, the D.C. Circuit vacated the coarse PM standard on the grounds the PM10 standard improperly double regulated PM2.5 by including PM fine within the PM10 coarse standard.[156] While the court's decision did not directly disapprove of the 99th-percentile form adopted by EPA, EPA deleted the 1997 PM10 standards pursuant to the court's decision and the pre-existing 1987 PM10 NAAQS remained in place.[157]

Combined with "more frequent sampling," the Administrator concluded in 1997 that the 99th-percentile form "would be an appropriate form."[158] When it finalized the rule, EPA similarly noted the advantages of a concentration-based form over the present standard as it "would be more directly related to the ambient PM concentrations that are associated with health effects" and "is inherently more stable that the current exceedance-based form."[159] Given the widespread adoption of continuous monitoring and the effective tightening of the $PM_{10}$ standard mentioned above, coupled with the weak causal link between PM coarse and health effects, now is the time to revisit this decision and change the form of the standard to the 99th-percentile.

### D. EPA Must Account for Crustal impacts on $PM_{2.5}$ Standard

#### 1. *EPA Recognizes that Fine and Coarse Particles are Fundamentally Different Pollutants with Different Health Effects*

The $PM_{2.5}$ NAAQS was established in 1997 to regulate *fine* particle components—and not coarse particle components—in recognition of the fundamental different properties, transport, and toxicities of these two pollutants.

Particulate matter falls into a "bi-modal" distribution of coarse and fine PM. Historically, EPA has recognized the distinction between fine and coarse particles as a "fundamental one."[160] The two modes "differ in sources, composition, transport and fate, as well as size."[161] Fine particles are formed primarily by combustion or chemical reactions,

[154] 61 Fed. Reg. 65638.
[155] 62 Fed. Reg. at 38652.
[156] *American Trucking Associations v. EPA*, 175 F.3d 1027, 1054-56 (D.C. Cir. 1999).
[157] *See id.*; 69 Fed. Reg. 45592, 45593.
[158] 62 Fed. Reg. at 38652.
[159] 62 Fed. Reg. at 38678.
[160] Air Quality Criteria for Particulate Matter, EPA/600/P-99/002af (October 2004) at 2-7.
[161] *Id.* at 2-14.

whereas coarse particles are formed by the mechanical breakdown of mineral, crustal material, and inorganic debris.[162]

In the 1997 PM NAAQS rulemaking, EPA determined there was a "need to consider the fine and coarse fractions as distinct classes of particles," because the "fine fraction appears to contain more of the reactive substances potentially linked to the kinds of effects observed in the recent epidemiological studies."[163] EPA ultimately concluded that separate standards for fine and coarse PM were appropriate due to their "significantly different physio-chemical properties and origins," and that "separate standards would permit more effective and efficient regulation of PM."[164]

As a result of distinguishing fine and coarse PM, EPA established in the 1997 NAAQS size-specific indicators for fine and coarse PM. The majority of fine PM is smaller than 1 µm in diameter, while the majority of coarse PM has a diameter greater than 3 µm. Thus, the particle diameter reflecting the mass minimum between fine and coarse mode typically lies between 1 µm and 3 µm.[165] However, both fine and coarse mode particles may be present in the intermodal range. Despite the potential for the presence of both fine and coarse particles in this range, EPA chose as part of the 1997 NAAQS rulemaking to control fine particles as a group and adopted $PM_{2.5}$ as the indicator of fine particles. At that time, EPA acknowledged that "[b]ecause of the potential overall of fine and coarse particle mass in this intermodal region, . . . any specific sampling cut point would result only in an approximation of the actual fine-mode particle mass."[166] EPA conceded that the choice of a specific diameter for the indicator "is largely a policy judgment." In making that policy judgment, however, EPA relied, *inter alia*, on assumptions about the "limited potential for intrusion of coarse fraction particles into the fine fraction."[167]

*2. EPA's Express Inclusion of Coarse Crustal Material in the Definition of PM2.5 Contradicts and Undermines the Purpose of the Fine PM NAAQS.*

Despite the fact that the $PM_{2.5}$ NAAQS were adopted as a standard to protect against health effects of fine PM, in 2007 EPA chose to define fine particles to include "inorganic material (including metals, dust, sea salt, and other trace elements) generally referred to as 'crustal' material," and to define direct $PM_{2.5}$ emissions to include "emissions of direct fine particulate matter, including miscellaneous inorganic material (i.e. crustal material)."[168] Thus, EPA is including coarse PM—a "fundamentally different" pollutant than fine PM with

[162] *Id*. at 2-15.
[163] National Ambient Air Quality Standards for Particulate Matter, 62 Fed. Reg. 38,652 at 38,666 (July 18, 1997).
[164] *Id.* at 38,667.
[165] *Id*.
[166] *Id.* at 38,667–68.
[167] *Id.* at 38,668.
[168] Clean Air Fine Particle Implementation Rule; Final Rule, 72 Fed. Reg. 20596 (April 25, 2007). *See also* Fine Particulate Matter (PM2.s) Precursor Demonstration Guidance (May 30, 2019) https://www.epa.gov/pm-pollution/pm25-precursor-demonstration-guidance

very different properties and toxicity—when determining compliance with the $PM_{2.5}$ NAAQs.

When EPA adopted the $PM_{2.5}$ cutoff, it was an admittedly over-inclusive indicator for *fine* PM. EPA's express inclusion of crustal material when assessing the protectiveness of the $PM_{2.5}$ NAAQS extends the overinclusive nature of $PM_{2.5}$ as the indicator for fine PM—and runs counter to EPA's policy judgment in 1997 that fine and coarse fractions are "distinct" classes of particulate matter and should be regulated separately.

*3. Based on the attenuated causal link between PM coarse and health effects, any reduction in the current PM2.5 standard would inappropriately target coarse PM.*

EPA noted in the 2019 ISA that "[t]he selection of $PM_{2.5}$ for the NAAQS was mainly to delineate the atmospheric fine (combustion derived, aggregates, acid condensates, secondary aerosols) and coarse (crustal, soil-derived dusts) PM modes."[169] EPA, however, has included in the definition of $PM_{2.5}$ the very coarse, crustal material that it concedes the $PM_{2.5}$ standard is not intended to control. If EPA reduces the $PM_{2.5}$ standard, concerns regarding the impacts of coarse PM intrusion are only heightened.

In the Final Rule issued in 2007, EPA asserted that "crustal material is only a minor part of $PM_{2.5}$ annual average concentrations."[170] EPA has since acknowledged that crustal material can predominate $PM_{2.5}$ measurements. For example, in the 2019 ISA, EPA asserted that:

> [N]atural sources including soil dust and sea salt have been estimated to account for approximately 10% of U.S. urban PM2.5 . . . Dust can also *make up a substantial fraction of total $PM_{2.5}$* in the Southwestern U.S. . . . [In] many locations in the Southwestern U.S., **crustal material from soil accounts for close to half of the annual average $PM_{2.5}$ mass.**[171]

[169] *Id*. at 1-119.
[170] Clean Air Fine Particle Implementation Rule; Final Rule, 72 Fed. Reg., at 20596.
[171] 2019 ISA, at 2-91 (emphasis added).

EPA further demonstrated this point in the 2019 ISA graphically, as shown below. The map below shows that in western states—like Nevada, Arizona, New Mexico, Colorado, and Wyoming—crustal material composes a large fraction of $PM_{2.5}$ measurements.[172]




The prominent presence of crustal material in $PM_{2.5}$ measurements, especially in the western region of the United States, is mentioned throughout the 2019 ISA. For instance:

- For $PM_{2.5}$, there are clear geographic differences in its composition. In the eastern U.S., sulfate and organic matter are the highest contributors to total mass while in the western U.S. organic matter most often is the highest contributor, although sulfate, nitrate, and crustal material can also be abundant.[173]

- Crustal material is a substantial contributor to $PM_{2.5}$ mass in dry areas of the western U.S., such as in Phoenix and Denver.[174]

- High PM concentrations in urban desert areas were associated with a substantial contribution from crustal material from both coarse and fine PM.[175]

- When examining whether there are regional differences in individual $PM_{2.5}$ component concentrations . . . [i]n east-west analyses, crustal components (e.g., Al, Si, Ti, Fe, and K) and nitrate were found to be higher in the West, whereas higher sulfur was observed in the East.[176]

---

[172] 2019 ISA, Figure 2-19, at 2-60.
[173] 2019 ISA, at 2-95.
[174] *Id*. at 2-62.
[175] *Id*. at 2-61.
[176] *Id*. at 11-27.

Moreover, the Draft PA further reiterates: **Major components of $PM_{2.5}$ mass include** sulfate ($SO_4 2-$), nitrate ($NO_3$ -), elemental or black carbon (EC or BC), organic carbon (OC), and **crustal materials.**[177]

Ultimately, EPA appropriately recognizes that the scientific evidence as a whole does not support a causal connection between health effects and coarse PM—particularly the crustal PM that predominates in rural areas of the West. EPA's inclusion of crustal material in the definition of $PM_{2.5}$, however, raises serious concerns and any future reduction in the $PM_{2.5}$ standard would inappropriately target coarse crustal PM—resulting in misplaced control measures without public health benefits and compliance costs inappropriately falling largely on Western mining operations.

## III. Conclusion

Based on the foregoing, NMA urges EPA to finalize its proposal to retain the current level of the primary and secondary standards for $PM_{10}$ and $PM_{2.5,}$ to finalize a 99th percentile form for the $PM_{10}$ standard for continuous monitors, and to adequately consider the impacts of crustal PM in any change in the level of the $PM_{2.5}$ standard.

[177] Draft PA, at 2-7 (emphasis added).

# IV. APPENDIX

# Establishing Statistical Equivalency Between Continuous and Intermittent $PM_{10}$ Sampling

By Ronn Smith

June 2020

*IML Air Science*

a division of Pace Analytical Services, LLC

Introduction

In 1987 EPA set the 24-hour $PM_{10}$ standard at 150 μg/m$^3$, not to be exceeded more than once per year on average over a 3-year period. At that time, the predominant measurement method was manual sampling for 24 hours every sixth day (a frequency of 1/6). In 1997 the 24-hour $PM_{2.5}$ standard was established as the 98th percentile averaged over a 3-year period. At the same time, a revised $PM_{10}$ standard was initially promulgated as the 99th percentile, averaged over 3 years. When the 1997 standards for $PM_{10}$ were vacated, EPA returned to the 1987 form of the standard. It is proposed here that reconsideration of the 99th percentile is warranted.

The migration to continuous sampling over the past two decades has in effect tightened the $PM_{10}$ standard, owing to sheer statistics. A manual sampling schedule with frequency less than 1 will skip some days and therefore not necessarily coincide with the highest daily concentration in a year. For that matter, there is a finite chance it may not detect the second, third, or even 10th highest day. It is a matter of probability. It will be shown here that at a sampling frequency of 1/6 over many years, the average true rank of the highest sampled day is slightly less than 4 (the 4th high out of 365 days, Figure 1). Relevant to the standard, the average true rank of the second highest sampled day is slightly less than 9 (the 9th high day of the year, Figure 2). For a sampling frequency of 1/3, the average true rank of the second highest sampled day is slightly more than 4 (the 4th high day of the year, Figure 2). Hence, enforcing the 2nd high form of the standard imposes a penalty on continuous sampling, which accounts for every day of the year. For the same reason, it penalizes air quality modeling, which predicts impacts for every day.

**FIGURE 1**



**FIGURE 2**




In Figures 1 and 2 the expected true rank is the rank between 1 and 365 that has a 50% probability of being detected by the sampled rank (either the 1st or 2nd high) at a given frequency. The more frequent the sampling, the lower the median true rank (or the higher the concentration). A derivation and validation of the underlying mathematics are provided below.

In order to enforce equivalent 24-hour $PM_{10}$ standards between manual and continuous sampling, the current standard must be modified. For 1-in-6 day sampling, the 2nd-high threshold corresponds to the 97.6th-percentile for continuous sampling (Figure 2). For 1-in-3 day sampling, it corresponds to the 98.6th-percentile for continuous sampling (Figure 2). Since the 2nd-high sampling threshold has been historically applied to both sampling frequencies, the 99th percentile (4th high) represents a conservative equivalent threshold for continuous sampling. It is proposed here that the 2nd high remain in force for intermittent manual sampling and the 4th high be applied to continuous sampling. The 4th high threshold should also be used to demonstrate compliance through dispersion modeling. Consistent with this proposal, the World Health Organization uses the 99th percentile of daily averages for 24-hour $PM_{10}$.

It is shown below that probability theory supports the proposed change to the form of the 24-hour $PM_{10}$ standard. The theory is corroborated by analyzing multi-year, continuous and intermittent sampling data from a variety of locations. Dispersion modeling of daily impacts at a typical surface coal mine further confirms the appropriateness of supplementing the 2nd high applied to manual sampling with the 99th percentile applied to continuous sampling.

Probability Theory

Manual sampling schedules are designed to represent each day of the week equally during the course of a year. Despite regular sampling intervals, this amounts to pseudorandom selection that adheres to the laws of probability.

Let f = the sampling frequency, where $0 < f \leq 1$ (f = 1/6 for 1-in-6 day, 1/3 for 1-in-3, and 1 for continuous). Let m = number of sampled days in a year such that m = 365f.

Let R = the true rank for a given sample day, where R =1 for the true highest concentration, R = 2 for the true 2nd highest concentration, R = 3 for the true 3rd highest, etc. up to 365.

Let $S_i$ = the true rank of the ith highest sample, such that $S_1$ = the true rank of the first high sampled day, and $S_2$ = the true rank of the 2nd high sampled day.

Objective: Find the probability that $S_1 \leq$ any R for $1 \leq R \leq 365(1 – f) + 1$, and the probability that $S_2 \leq$ any R for $2 \leq R \leq 365(1 – f) + 2$. Note that $S_2$ cannot logically equal 1 nor can it be greater than 365(1 – f) + 2 since the 2nd high sampled day implies all but 2 samples fall below it.

Rationale: The values of R (called R*) corresponding to a cumulative probability of 50% are the expected true ranks of the sampled ranks $S_1$ and $S_2$. Over a period of many years, half of the true ranks for the sampled high and 2nd high will fall below their respective R* and half will exceed that R*.

Procedure: Start with the probability that $S_1$ = 1 (sampled high = true high), and proceed with the probability that $S_1$ = 2 (sampled high = true second high), $S_1$ = 3 (sampled high = true third high), etc. for f = 1/6, then arrive at a generalized formula for any R and sampling frequency f.

$P(S_1 = 1) = f = \frac{1}{6}$ (a 1-in-6 chance of detecting the true maximum day)

$P(S_1 = 2) = f(1-f) = \frac{1}{6}\left(1-\frac{1}{6}\right) = \frac{5}{36}$ (conditional probability given that $S_1 \neq 1$)

$P(S_1 = 3) = f(1-f)^2 = \frac{1}{6}\left(1-\frac{1}{6}\right)^2 = \frac{25}{216}$ (conditional probability given that $S_1 \neq 1$ and $S_1 \neq 2$)

And so forth, up to $P(S_1 = R)$, where $1 \leq R \leq 365(1 – f) + 1$

$$P(S_1 = R) = f(1-f)^{R-1} = \frac{1}{6}\left(1-\frac{1}{6}\right)^{R-1}$$

The cumulative probability $P(S_1 \leq R)$ for any frequency f, is found by summing from 1 to R

$$P(S_1 \leq R) = \sum_{k=1}^{R} f(1-f)^{k-1} \qquad \text{Equation 1}$$

The probabilities for $S_2$ = 2 (second high sampled day) are more complex, requiring multiplication by the probabilities of two conditions. But first, the unconditional probability that the 2nd high sampled day coincides with R = 2 accounts for the true high day already having been sampled. This gives an unconditional coefficient of

$\frac{m-1}{365-1}$ where m – 1 = sample days below the high day, and 365 – 1 = true days left

The unconditional probability that the 2nd high sampled day coincides with R = 3 accounts for the high day already having been sampled with R ≤ 2, so there are 363 eligible days left:

$\frac{m-1}{365-2}$ where m – 1 = sample days below the high day, and 365 – 2 = true days left

In this manner, the unconditional probability that the 2nd high sampled day coincides with any given R accounts for the high day already having been sampled, leaving 365-R+1 eligible days:

$$\frac{m-1}{365-R+1}$$

This unconditional probability must be multiplied by the probabilities of two conditions: (a) the high sampled day has a true rank less than R, and (b) the 2nd-high sampled day does not have a true rank < R. The first probability can be obtained from Equation 1. The second probability can be obtained by successive application of Equation 2 below, starting at R = 2 (therefore Equation 2 is recursive). Note that for the first term $P(S_2 \leq 1) = 0$ since the 2nd high sampled day can never be the true highest day.

$$P(S_2 \leq R) = \frac{m-1}{365-R+1} \sum_{k=1}^{R} P\,(S_1 \leq k-1)[1 - P(S_2 \leq k-1)] \qquad \text{Equation 2}$$

Validation at Boundary Conditions

Figures 1 and 2 are the graphs of Equations 1 and 2 respectively, for f = 1/3 and f = 1/6. These equations can be validated by considering two limiting cases:

(1) $P(S_1 \leq 365 - 365f + 1) = P(S_2 \leq 365 - 365f + 2) = 1$ for all frequencies f

This requirement acknowledges that the sampled high and 2nd high each necessarily corresponds to one of the eligible days in a year. It is met, as demonstrated by the cumulative probability distributions in Figures 1 and 2 approaching 1 asymptotically.

(2) $P(S_1 = 1) = P(S_2 = 2) = 1$ for continuous sampling, i.e., a frequency f = 1

This requirement acknowledges that the sampled rank and the true rank are identical for continuous sampling. Equation 1 yields an indeterminate result when f = 1, but the limit of 0 raised to the power of 0 in this instance approaches 1 as f approaches 1. Equation 2 yields a coefficient of 365/365 = 1 and a summation result of 1 x 1 = 1.

Thus, both formulas satisfy the boundary conditions.

Empirical Validation

The above probability theory deals only with rankings, not concentrations. A review of typical manual and continuous sampler data at various industrial sites reveals normalized average concentrations consistent with the proposed 99th percentile form of the standard. Table 1 (top half) summarizes continuous sampler statistics at 5 sites over a period of 19 years. The table

shows that the proposed 99th percentile threshold yields an average of yearly concentrations about 58% of the average of yearly true maximum concentrations. Note that among the 5 sites, only 1 recorded a 99th percentile (4th high) concentration above 150 μg/m$^3$. Since the standard applies to any 3-year average, this site could not have violated the 99th percentile threshold. By the 2nd-high threshold, the same site measured 3 exceedances (not shown in Table 1).

**TABLE 1**

| **Continuous Site** | **Avg High** | **High Exceedances** | **Avg 4th High** | **4th High Exceedances** |
|---|---|---|---|---|
| Buckskin North | 104.60 | 4 | 63.93 | 0 |
| Buckskin West | 85.99 | 2 | 55.98 | 0 |
| NARM NA-8 | 127.90 | 6 | 79.33 | 0 |
| NARM RO-1 | 164.49 | 9 | 96.44 | 1 |
| Bridger JB4 | 156.72 | 5 | 70.18 | 0 |
| **Average Ratio of 4th High to High (Normalized)** | | | **58.33%** | |
| **Manual Site** | **Avg High** | **High Exceedances** | **Avg 2nd High** | **2nd High Exceedances** |
| Gillette | 41.40 | 0 | 34.60 | 0 |
| Westvaco 866 | 68.75 | 1 | 43.00 | 0 |
| Basin Electric LRS | 95.93 | 2 | 67.64 | 0 |
| **Average Ratio of 4th High to High (Normalized)** | | | **72.21%** | |

Table 1 (bottom half) also summarizes manual sampler statistics at 3 sites over a period of approximately 12 years. All three sites employ a 1-in-6 day sampling frequency. The table shows that the 2nd-high threshold yields an average concentration about 72% of the average maximum concentration (on the highest sampled day).

The normalized concentrations for continuous and manual samplers are not directly comparable because the reference maxima are not the same. For reasons explained above, the manually sampled high is generally lower than the continuously sampled high. Therefore, it requires an adjustment to enable direct comparison. The 72% ratio must be multiplied by the ratio of the expected concentration at R* (median true rank of sampled high) to the expected maximum concentration (R = 1). This adjustment is facilitated by a lognormal frequency distribution, typical of 24-hour $PM_{10}$ concentrations at any location. Figures 3 and 4 illustrate the lognormal distribution fitted to representative continuous and manual samplers, respectively. The continuous sampler data fit the lognormal curve more precisely than the manual sampler data, due primarily to the availability of more data points.

The expected true high concentration out of 365 daily values can be approximated as the 99.74th percentile on the lognormal curve (1 – 364/365). The expected sampled high concentration can be obtained as the 98.96th percentile in accordance with the median R* for 1-in-6 sampling (shown in Figure 1 above). The adjustment factor is the ratio of these two values:

$$Adj = \frac{Inverse\ Lognormal\ at\ probability\ 0.9896}{Inverse\ Lognormal\ at\ probability\ 0.9974} \qquad \underline{\text{Equation 3}}$$

This ratio does not depend on the mean of the lognormal distribution and is only mildly sensitive to the spread of the distribution (standard deviation of the logs). Equation 3 was applied to the 24-hour $PM_{10}$ distributions at several industrial sites, including the Buckskin Mine (Figure 3), yielding very similar ratios. For the Buckskin North site, Equation 3 was evaluated at 0.723.

**FIGURE 3**




**FIGURE 4**




All of the mining sites produced adjustment ratios less than 0.75 using Equation 3. A 5-year, manually sampled dataset from Denver, totaling 580 data points, also fits a lognormal

distribution, yielding an adjustment ratio of 0.80. For conservatism, the normalized average manual sampler ratio of 72.21% (Table 1) is multiplied by Denver's 80% adjustment factor to get a net ratio of sampled 2nd-high to true high of ***57.8%***. This agrees closely with the normalized ratio of true 4th-high to true high of ***58.3***% for continuous samplers (Table 1). Therefore, changing the form of the 24-hour $PM_{10}$ standard for continuous samplers from the 2nd high to the 4th high preserves the intent of the standard.

<u>Modeling Validation</u>

It has been shown that both probability theory and monitoring history (with manual sampling adjusted for a lognormal distribution) establish equivalency between the current 24-hour $PM_{10}$ standard for manual samplers and a new 99th-percentile standard for continuous samplers. This equivalency should also apply to modeling demonstrations, which mirror continuous monitoring. To validate the proposed standard for modeling, air quality impacts were modeled for a large surface coal mine in Montana using AERMOD. The Decker Mine has dozens of fugitive and stack sources of particulate emissions, modeled as open-pit, area, volume, line-volume and point sources. Decker was modeled for a 5-year period to predict annual 1st-high, 2nd-high, and 4th-high daily $PM_{10}$ concentrations at the 10 (out of 13,570) receptors predicted to show the greatest impacts. The annual ratios of 4th-high to 1st-high averaged ***70.4%*** over 5 years, more than the 58.3% and 57.8% obtained from continuous and intermittent monitoring data.

This demonstrates, at least for Decker, that modeling is more conservative than monitoring when both are held to the proposed 99th percentile form of the 24-hour $PM_{10}$ standard. From a regulatory standpoint, a compliant model using AERMOD foretells monitoring compliance with a margin of safety. The difference can be traced to the daily $PM_{10}$ concentration distributions, as monitored and as modeled. Figure 5 shows how 20 years of sampling results at Decker come close to fitting a lognormal distribution.

**FIGURE 5**



In contrast to the monitoring data, the model results for a typical high-impact receptor do not fit a lognormal distribution (Figure 6, left). In fact, they come closer to a normal distribution (Figure 6, right). This explains the higher normalized ratio (4th-high to 1st-high) obtained from modeling, and may reflect an inherent limitation of Gaussian dispersion models.

**FIGURE 6**




Even without this conservative modeling bias, the threshold for the current 24-hour $PM_{10}$ standard (2nd-high day of each year) is overly restrictive to modeling outcomes. The Decker model discussed above predicted the 2nd-high values for the top 10 receptors would average 80% of the maximum values over 5 years. This amounts to a 12% penalty when compared to the 99th percentile (4th-high day) for each year. In addition, a hidden penalty occurs through the presumed background concentrations. For Decker, the $PM_{10}$ modeling did not initially demonstrate compliance due to an excessive 24-hour background assigned by the State of Montana. It was discovered that the background, based on a 3-year average of sampled $PM_{10}$ concentrations in the region, had been distorted by severe wildfires. The highest concentration had been flagged as an exceptional event (EE) due to wildfire smoke, but was still included in the background calculation because EPA had not reviewed and approved the EE submittal. After obtaining permission from EPA to disregard this concentration, the 24-hour background was recalculated and the model passed.

The same problem occurred in modeling an in-situ uranium recovery (ISR) project in South Dakota. As part of an EIS, the ISR facility was modeled for air quality, visibility, and acid deposition impacts. Particular emphasis was placed on impacts to Wind Cave National Park, a nearby Class I area. The background $PM_{10}$ concentration was initially calculated with the inclusion of wildfire days near Wind Cave, resulting in a failed demonstration. After consultation with the South Dakota Department of Natural Resources, the highest wildfire impacts were removed from the background calculation and the model succeeded in demonstrating compliance. A 99th percentile standard would reduce the likelihood of a few, anomalously high values distorting the background calculation. This would lead to more realistic background concentrations, which are added to the modeled impacts.

**Effect on Exceptional Event Demonstrations**

The following report was prepared by Ronn Smith at IML Air Science.

Changing to the 99th percentile as the 24-hour threshold for continuous $PM_{10}$ monitoring would virtually eliminate the burden of demonstrating exception events (EE) in order to avoid non-compliance. In the last decade approximately 30 EE demonstrations were prepared for continuous monitoring exceedances at Wyoming mining facilities. A typical EE demonstration requires roughly 100 person-hours to complete, and more time for Wyoming Department of Environmental Quality's Air Quality Division (AQD) to review. Most of the demonstrations have been supported by AQD and forwarded to EPA for final approval. EPA has chosen not to review these submittals unless the associated exceedances could affect regional attainment status. Therefore, considerable time and effort are spent creating documents that lead to a dead end.

Table 1 shows the yearly number of exceedances recorded at 40 continuous monitoring sites operated by mining facilities in Wyoming. It shows less than one third as many 4th-high exceedances (99th percentile) as 2nd-high exceedances. In the last decade there have been only 4 exceedances among the 4th-high daily averages, compared to 20 exceedances among the 2nd-high averages.

**TABLE 1**

| Year | High Values > 150 | 2nd-High Values > 150 | 4th-High values > 150 |
|---|---|---|---|
| 2000 | 1 | 1 | 0 |
| 2001 | 3 | 3 | 0 |
| 2002 | 7 | 6 | 4 |
| 2003 | 6 | 4 | 1 |
| 2004 | 5 | 3 | 2 |
| 2005 | 3 | 3 | 1 |
| 2006 | 4 | 2 | 2 |
| 2007 | 11 | 5 | 2 |
| 2008 | 6 | 2 | 0 |
| 2009 | 2 | 1 | 0 |
| 2010 | 3 | 0 | 0 |
| 2011 | 7 | 3 | 0 |
| 2012 | 8 | 5 | 2 |
| 2013 | 4 | 1 | 0 |
| 2014 | 4 | 2 | 1 |
| 2015 | 9 | 2 | 0 |
| 2016 | 5 | 1 | 0 |
| 2017 | 10 | 4 | 0 |
| 2018 | 4 | 1 | 1 |
| 2019 | 2 | 0 | 0 |
| 2020 | 3 | 1 | 0 |

| | | | |
|---|---|---|---|
| Total | 107 | 50 | 16 |

Table 1 shows the number of 1st-high exceedances increased over the last 10 years, in comparison to the previous 10 years, due in part to having more continuous monitors installed in the state. In spite of this trend, the 2nd-high exceedances decreased by 30%. More importantly, the total number of 4th-high exceedances dropped by 75% during the same period. This may be attributed to fugitive dust action plans that have become more commonplace in mine air quality permits. These plans stipulate certain control measures to be implemented in response to high hourly and cumulative 24-hour $PM_{10}$ concentrations. Such remedial actions are generally effective unless the high concentrations coincide with an exceptional-event such as high winds or wildfires. As more mines implement dust action plans, 4th-high daily concentrations are more likely to diminish. Enforcing this threshold rather than the 2nd-high could provide a compliance margin of safety without reducing incentives to manage fugitive dust.

The proposed 99th percentile form of the 24-hour $PM_{10}$ standard would specify no more than 3 exceedances per year averaged over any 3 consecutive years. This is termed the design value. The current standard allows no more than 1 exceedance per year averaged over any consecutive 3-year period, for a design value threshold of 1. Table 2 shows that without any EE demonstrations this standard would have resulted in 29 violations over the last decade. By contrast, the 40 continuous monitoring sites at Wyoming mining facilities would have exceeded the proposed 99th percentile design value only 3 times. Thus, a 99th percentile threshold would have reduced the number of violations by an order of magnitude.

In the last decade a vast majority of the prospective violations of the design value of 1 were caused by high wind or wildfire events. Such violations were ultimately avoided through one of the 30 EE demonstrations submitted to AQD. A design value of 3 would have resulted in the need for 2 EE demonstrations rather than 30. It would therefore provide sufficient margin to avoid most EE demonstrations and still remain in compliance.

**TABLE 2**

| | |
|---|---|
| Design values > 1.0 since 2000 | 65 |
| Design values > 3.0 since 2000 | 22 |
| Exceptional Events since 2012 | 30 |
| Sites wth Exceptional Events | 23 |
| Design values > 1.0 since 2010 | 29 |
| Design values > 3.0 since 2010 | 3 |

**Distinguishing Between Coarse and Fine Particulate Matter**

The following report was prepared by Ronn Smith at IML Air Science.

$PM_{10}$ monitoring at western mines does not serve as a valid surrogate for $PM_{2.5}$ monitoring. The emission sources and behavior in the atmosphere of fine particulates ($PM_{2.5}$) differ from those of coarse particulates ($PM_{10-2.5}$). Due to entrainment potential and settling rates, $PM_{2.5}$ tends to be a regional pollutant whereas $PM_{10-2.5}$ is generally a local pollutant. The western mines primarily emit coarse PM. $PM_{10}$ monitoring accounts for both species, and their differences have been poorly understood. The Buckskin Mine in the northern Powder River Basin has a 19-year history of continuous sampling of both $PM_{10}$ and $PM_{2.5}$ at the same monitoring site, enabling in-depth comparisons between coarse PM (the difference between $PM_{10}$ and $PM_{2.5}$) and fine PM. Figure 1 (left) shows that the observed correlation between $PM_{10}$ and $PM_{2.5}$ (coefficient of determination $R^2 = 0.52$) is an artifact of their lack of independence. $PM_{10}$ includes $PM_{2.5}$, essentially guaranteeing some degree of correlation. Figure 1 (right) indicates no significant correlation between isolated coarse and fine PM at Buckskin ($R^2 = 0.11$).

Table 1 summarizes this phenomenon over the past 5 years for 6 Wyoming sites that collocate continuous $PM_{10}$ and $PM_{2.5}$ samplers. The average $R^2$ from correlating $PM_{10}$ and $PM_{2.5}$ is 0.56 (moderately correlated) whereas the average $R^2$ from comparing coarse PM to $PM_{2.5}$ is 0.05 (no correlation). These sites include 3 surface mines, 2 urban areas, and an oil and gas location.

Buckskin data offer insights into local mining emission sources and impacts vs. regional sources and impacts. Figure 2 (left) indicates a strong correlation between $PM_{10}$ and $PM_{2.5}$ on days with known impacts from wildfire smoke ($R^2 = 0.67$). Again, this is due to the dependency of $PM_{10}$ on $PM_{2.5}$, especially evident when $PM_{2.5}$ dominates. Removing the fine particles from $PM_{10}$ (Figure 2, right) destroys the correlation ($R^2 = 0.05$). This lack of association underscores the regional nature of ambient $PM_{2.5}$. Mining impacts on air quality come predominately from locally generated coarse particles. Figure 3 contrasts the impact of strong winds on coarse and fine particulate concentrations. 32 days with heavy wildfire smoke have been removed from the underlying dataset to avoid distortion. Coarse particulates increase with wind speeds above 11.2 mph due to nearby natural and mining sources of fugitive dust. Fine particulates show a slight decrease with increasing wind speeds, possibly due to their minor contribution to fugitive dust and their enhanced vertical dispersion in windy conditions.

Finally, Figure 4 reflects actual mining impacts on Buckskin's continuous samplers by graphing particulate concentrations with wind direction. The North Teom site is directly downwind from mining activities when the wind blows from a southerly direction (azimuth angle between 135° and 215° on Figure 4). The comparison shows that mining emissions are principally coarse particles, since coarse PM concentrations increase when detected downwind from the mine and fine PM concentrations do not.

The discussion above does not apply to large urban areas. Figure 5 illustrates how coarse PM does correlate with fine PM in Denver and Los Angeles. Both locations use manual samplers. To generate this graph, 3 outliers were removed from the Denver dataset and 5 outliers were removed from the Los Angeles dataset. Figure 6 shows Denver's most recent 5-year history, with outliers left intact. Figures 5 and 6 confirm that when $PM_{2.5}$ increases, coarse PM generally increases too. This suggests that urban sources, unlike mining, tend to generate both particulate species. For example, heavy traffic contributes to $PM_{2.5}$ due to diesel and gasoline engine exhaust. But it also contributes to coarse PM due to road dust and tire wear. The chemistry of the coarse and fine particulates may differ but their concentrations tend to run parallel.

**FIGURE 1**




TABLE 1

| Ambient Monitoring Site | No. of 5-YR Data Points | $PM_{2.5}/PM_{10}$ Ratio | $R^2$ $PM_{2.5}/PM_{10}$ | $R^2$ $PM_{2.5}/PM_{Coarse}$ | Dominant Sources |
|---|---|---|---|---|---|
| Antelope Mine | 485 | 0.1638 | 0.3404 | 0.0731 | Mining, oil and gas |
| Belle Ayr Mine | 561 | 0.3644 | 0.5895 | 0.0744 | Mining |
| Buckskin Mine | 1,464 | 0.3071 | 0.5202 | 0.0795 | Mining |
| Rock Springs | 595 | 0.3101 | 0.4950 | -0.0100 | Urban, traffic |
| Sheridan | 564 | 0.5104 | 0.7540 | 0.1079 | Urban, wood smoke, street sanding |
| Spring Creek | 1,596 | 0.4587 | 0.6672 | 0.0011 | Oil and gas |

FIGURE 2




FIGURE 3



**FIGURE 4**


Buckskin Coarse PM vs. Wind Direction
PM Coarse Concentration (µg/m³)
80
70
60
50
40
30
20
10
0
-10
0
100
200
300
Azimuth Angle (180° = South)


Buckskin PM2.5 vs. Wind Direction
PM2.5 Concentration (µg/m³)
80
70
60
50
40
30
20
10
0
-10
0
100
200
300
Azimuth Angle (180° = South)

**FIGURE 5**



Denver LaCasa 2019 PM Coarse vs. PM Fine
30
25
20
15
10
5
0
0
10
20
30
40
50
60
70
R² = 0.4636
PMCoarse (µg/m³)
PM2.5 (µg/m³)




Los Angeles North Main 2019 PM Coarse vs. PM Fine
40
35
30
25
20
15
10
5
0
0
5
10
15
20
25
30
35
R² = 0.3271
PMCoarse (µg/m³)
PM2.5 (µg/m³

**FIGURE 6**




The coarse/fine correlation in large urban areas may have influenced epidemiological studies over the past several decades. While the health effects of $PM_{2.5}$ (and $PM_{10}$ as a cofactor) are well documented, research has not conclusively related mortality and morbidity rates to coarse PM. Most of the international studies have concentrated on large cities around the world. Those studies that demonstrate health impacts from coarse PM may suffer from the correlation observed in Denver and Los Angeles. Higher coarse PM concentrations could be associated with more health incidents simply by virtue of the attendant increase in $PM_{2.5}$ concentrations, which has known effects.

ANDY BESHEAR
GOVERNOR

REBECCA W. GOODMAN
SECRETARY

ANTHONY R. HATTON
COMMISSIONER

**ENERGY AND ENVIRONMENT CABINET**
**DEPARTMENT FOR ENVIRONMENTAL PROTECTION**

300 SOWER BOULEVARD
FRANKFORT, KENTUCKY 40601
TELEPHONE: 502-564-2150
TELEFAX: 502-564-4245

March 28, 2023

Daniel Blackman, Regional Administrator
U.S. Environmental Protection Agency, Region 4
61 Forsyth Street SW
Atlanta, GA 30303

**Re: Comments relating to *Reconsideration of the National Ambient Air Quality Standards for Particulate Matter*; Docket ID:** EPA–HQ–OAR–2015–0072; FRL–8635–01– OAR

Dear Mr. Blackman,

On behalf of the Commonwealth of Kentucky and the Energy and Environment Cabinet, the Division for Air Quality (Division) respectfully submits the following comments relating to the United States Environmental Protection Agency's (EPA) proposed action in the January 27, 2023 Federal Register, soliciting comments on the proposed *Reconsideration of the National Ambient Air Quality Standards for Particulate Matter*.[1]

The Division requests that EPA withdraw the proposal and establish appropriate specific standards, based on technical rational and scientific basis, in a new rulemaking. Upon establishing a set standard, the Division recommends EPA re-propose the standard to allow for meaningful comment from all stakeholders.

The Division appreciates EPA's consideration of the attached comments. If you have questions or comments, please contact me at, Michael.Kennedy@ky.gov, at your convenience.

Sincerely,

Recoverable Signature

X Michael Kennedy

Signed by: Michael Kennedy

Michael Kennedy, P.E., Director
Kentucky Division for Air Quality

Attachment

[1] 88 Fed. Reg. 5,558 (Jan. 27, 2023).

# Kentucky Comments regarding the January 27, 2023 proposed Reconsideration of the National Ambient Air Quality Standards for Particulate Matter

## Retention of Current Standards

The Division for Air Quality (Division) believes the Environmental Protection Agency (EPA) should retain the current primary annual $PM_{2.5}$ National Ambient Air Quality Standard (NAAQS) of 12.0 µg/$m^3$. The Division supports EPA's proposal to retain the current primary 24-hour $PM_{2.5}$ standard of 35 µg/$m^3$. The Division also supports the proposal to retain the primary 24-hour $PM_{10}$ standard. The retention of the current secondary standards for both $PM_{2.5}$ and $PM_{10}$ is also supported by the Division.

As outlined below, the Division believes EPA needs to withdraw the $PM_{2.5}$ annual standard proposal and propose appropriate specific standards, based on technical rational and scientific basis, in a new rulemaking.

## A Range is not a Proposal

EPA is proposing to revise the primary annual $PM_{2.5}$ standard by lowering the current level from 12.0 µg/$m^3$ to within the range of 9.0 to 10.0 µg/$m^3$, while taking comment on alternative annual standard levels down to 8.0 µg/$m^3$ and up to 11.0 µg/$m^3$. In addition, EPA proposes to retain the primary 24-hour $PM_{10}$ standard, without revision; and, not to change the secondary PM standards in this proposal, while taking comment on revising the level of the secondary 24-hour $PM_{2.5}$ standard as low as 25 µg/m3.

The Administrator also solicits public comment on alternative annual standard levels down to 8.0 µg/m3 and up to 11.0 µg/m3, on an alternative 24-hour standard level as low as 25 µg/m3 and on the combination of annual and 24-hour standards that commenters may believe is appropriate. The Division cannot possibly speculate what possible combinations of standards commenters may believe appropriate, and thus cannot begin to evaluate those.

The Division believes this range is too broad and EPA needs to set a numerical standard. A range is impossible to fully evaluate as there are an infinite number of possible standards within that range. The Division does not have the resources necessary to fully evaluate each possible standard within the proposed range. The Division requests that EPA withdraw the proposal and propose appropriate specific standards, based on a technical, rational and scientific basis, in a new rulemaking. Upon establishing a set standard, the Division recommends EPA repropose the standard to allow for meaningful comment from all stakeholders.

Additionally, proposing a range of standards is much more appropriate in an Advanced Notice of Proposed Rulemaking (ANPRM), not a reconsideration request. A reconsideration request should not be to take comments on options for new standards. The Division understands the Administrator's duty to periodically evaluate the NAAQS; however, more specific criteria should be proposed so that states, regulated entities and the public-at-large have a full opportunity to participate and provide meaningful comment.

# Kentucky Comments regarding the January 27, 2023 proposed Reconsideration of the National Ambient Air Quality Standards for Particulate Matter

Based on 2020, 2021, and 2022 design values, the Division anticipates that the number of nonattainment areas at 9.0 µg/m$^3$ is quadruple the number of areas in Kentucky that would be designated nonattainment with a standard of 10.0 µg/m$^3$. Kentucky currently has no areas designated as nonattainment for the PM NAAQS. The significant increase in the number of areas that would be designated as nonattainment at 9.0 µg/m$^3$ is of great concern. This is of critical importance because many of these counties have never before experienced the ramifications of a nonattainment designation. This first-time nonattainment designation will require training and education for both impacted sources and Division staff, especially as it relates to the regulatory and permitting requirements.

Furthermore, lowering the standard at this time is not necessary to achieve the desired outcomes because other federal programs that will lead to reduced emissions are currently being implemented. These federal measures should be given time to have effect prior to the burdens of nonattainment designations being imposed.

Moreover, the Division finds that EPA cannot finalize a standard outside of the proposed range of 9-10 µg/m$^3$ regardless of the fact that EPA took comment on other options. This is inappropriate and a violation of the Administrative Procedure Act (APA) as EPA did not provide information to fully evaluate the possible standards outside of the 9-10 µg/m$^3$ range. As part of the public comment period, the Division heard numerous presenters at the virtual public hearing comment that the standard needs to be finalized at 8 µg/m$^3$; with some presenters even suggesting going as low as 5 µg/m$^3$. The Division cautions that any final standard outside of the proposed range is not a logical outgrowth of this proposal and is inappropriate. If EPA decides to go outside the range of 9-10 µg/m$^3$, the Division's contention is EPA must re-propose the standard to allow for full comment and participation in accordance with the requirements of the APA.

Similarly, EPA cannot finalize any changes to the primary 24-hour standard or the secondary standards for the same reasons.

**Disregard for Economic Impacts**

As previously discussed, a significant reduction of the current standard of 12.0 µg/m$^3$ to 9.0 µg/m$^3$ greatly increases the number of nonattainment areas in both Kentucky and the United States. One important impact to consider is that any standard more stringent than the current 12.0 µg/m$^3$ is only going to exacerbate the problems in areas that are currently designated nonattainment. These areas are going to have to make more reductions, and likely pull in even more sources as the standard is lowered. This will add to the amount of time these areas need to come into attainment and can potentially impact the measures that are already in place to support the redesignation of these areas to attainment.

If the EPA Administrator, after the public comment period, decides to lower the primary annual $PM_{2.5}$ standard from 12.0 µg/m$^3$ to 8.0 µg/m3 or lower and the secondary 24-hour standard from 35 µg/m$^3$ to 25 µg/m$^3$ or lower, it will pose a significant burden on the regulated community

during a critical time of inflation. A more gradual step-down while balancing public health and welfare concerns with the needs of the economy is essential. This is especially true in light of all of the uncertainties and limitations cited by EPA in the Proposed Rule.

The NAAQS should not only consider direct health impacts, but EPA must also consider the negative impact to human health that decreased economic activity will have. If the standard were set at 9 µg/m$^3$, Bell County, Kentucky would be designated nonattainment. EPA should reach out to distressed communities for meaningful engagement.

Kentucky has a strong manufacturing and construction industry that will be negatively impacted by a more stringent $PM_{2.5}$ standard. "In the United State (U.S.), the Recession disproportionately impacted already marginalized populations. Non-Hispanic blacks (NHB), Hispanics, and those with less than a college education suffered disproportionately high unemployment compared to other groups, due in part to their greater representation in the hard-hit construction and manufacturing industries.[1]"

The manufacturing of electric vehicles will have a greater beneficial impact on air quality in the U.S. than any regulations or NAAQS standard proposed by EPA. EPA should consider the real scenario that lowering the NAAQS may hinder the construction and operations of these manufacturing facilities. Thus, creating a situation that is very costly for Kentucky and the U.S., while also having a negative environmental and human health impact.

Multiple studies[2] have shown that a downturn in the economy has a negative impact on human health[3]. This must be considered by EPA in finalizing a new $PM_{2.5}$ standard. Kentucky's current unemployment rate is higher than the national standard. The decreased economic activity in Kentucky, and across the U.S., due to a more stringent $PM_{2.5}$ standard will lead to negative health impacts. These studies, and numerous others, are indicative there is clearly an impact to human health from an economic downturn. This should be considered by EPA during the rulemaking process, in order to ensure that distressed communities are not negatively impacted by any rule.

Other EPA rulemakings that have yet to take full effect will have major negative heath and economic impacts to Kentucky. The Division urges EPA to consider retaining the current standard.

**Meaningful Participation of States**

The Division believes that multiple significant regulatory actions proposed simultaneously interferes with the ability for states to provide meaningful participation and comment to EPA.

---

[1] Margerison-Zilko C, Goldman-Mellor S, Falconi A, Downing J. Health Impacts of the Great Recession: A Critical Review. Curr Epidemiol Rep. 2016 Mar;3(1):81-91. doi: 10.1007/s40471-016-0068-6. Epub 2016 Feb 3. PMID: 27239427; PMCID: PMC4880023.

[2] Failing Economy, Failing Health | Harvard Public Health Magazine | Harvard T.H. Chan School of Public Health

[3] https://doi.org/10.1371/journal.pmed.1003319

# Kentucky Comments regarding the January 27, 2023 proposed Reconsideration of the National Ambient Air Quality Standards for Particulate Matter

EPA has produced multiple regulatory and non-regulatory dockets over the past several months, with overlapping comment periods. EPA has consistently stated their commitment to the co-regulator relationship with state level environmental protection agencies. However, that relationship is not working out in the practical realm. The number of dockets and timeframes that EPA is pursuing with its massive resources is making it very difficult for the Division to provide timely and important input. As a result, the Division has not been able to fully evaluate each proposed rulemaking due to limited staff resources in the time allotted by EPA. Additionally, a proposed range inhibits the states from providing meaningful comment as there are simply too many possible scenarios for a final standard, and the states cannot predict what EPA will finalize.

**Miscellaneous Comments**

The Federal Equivalent Method (FEM) consistently reads higher than the Federal Reference Method (FRM). EPA must ensure that correction factors are considered at all monitors and in all area designations. These correction factors will be critical for air agencies during Prevention of Significant Deterioration and Nonattainment New Source Review modeling.

The Division does not support any changes to the Air Quality Index (AQI) as a part of this reconsideration. As previously discussed, it is inappropriate for EPA to take comment on a range, and the various changes to the AQI are too numerous to evaluate. The Division recommends EPA propose a numerical standard based on scientific evidence and simultaneously propose to adjust the AQI in relation to that standard.

The Division recommends EPA provide timely implementation guidance to states upon any final decision to revise the PM NAAQS. Timely guidance is necessary due to the expedited review for designations by the end of 2024.

The Division requests that EPA consider the resources necessary for state agencies related to ambient air monitoring. The Division will require more grant funding from EPA to expand the current PM monitoring network.

**COMMENTS OF**

APPALACHIAN MOUNTAIN CLUB

CHESAPEAKE BAY FOUNDATION

CITIZENS FOR PENNSYLVANIA'S FUTURE

CLEAN AIR COUNCIL

CLEAN AIR TASK FORCE

CLEANAIRNOW

EARTHJUSTICE

ENVIRONMENTAL DEFENSE FUND

GROUP AGAINST SMOG & POLLUTION

NATIONAL PARKS CONSERVATION ASSOCIATION

NATURAL RESOURCES DEFENSE COUNCIL

SIERRA CLUB

SOUTHERN ENVIRONMENTAL LAW CENTER

UNION OF CONCERNED SCIENTISTS

**ON THE RECONSIDERATION OF THE NATIONAL AMBIENT AIR QUALITY STANDARDS FOR PARTICULATE MATTER**

**88 Fed. Reg. 5558 (Jan. 27, 2023)**

**EPA-HQ-OAR-2015-0072**

**TABLE OF CONTENTS**

I. Executive Summary ..... 1

II. EPA's Legal Obligations in Setting and Reviewing the NAAQS ..... 4

A. EPA's role in setting and revising the primary NAAQS ..... 4

B. The Clean Air Act requires EPA to set primary NAAQS that protect public health, with an adequate margin of safety, including for at-risk populations ..... 5

1. EPA must establish NAAQS that protect vulnerable populations ..... 6

2. Where there is scientific uncertainty, EPA must take a protective approach to provide an adequate margin of safety ..... 8

3. The only lawful consideration in setting NAAQS is the effect of the pollutant in the ambient air on health and welfare ..... 8

4. This CASAC panel's recommendations merit significant deference ..... 10

C. EPA must engage in reasoned decision-making ..... 12

III. EPA's Prior Revisions of the Primary $PM_{2.5}$ NAAQS ..... 13

IV. The Sources of $PM_{2.5}$ Pollution Are Numerous and Widespread, and the Effects of This Pollution Are Not Evenly Spread ..... 17

V. Primary $PM_{2.5}$ NAAQS ..... 23

A. EPA must strengthen the annual standard to a level no higher than 8 $\mu g/m^3$ ..... 23

1. Overwhelming evidence demonstrates that the current annual standard does not protect public health with an adequate margin of safety ..... 23

2. To meet the Clean Air Act's mandates, which include advancing environmental justice, EPA must set the annual standard's level no higher than 8 $\mu g/m^3$ ..... 29

i. Copious evidence demonstrates that an annual standard no higher than 8 $\mu g/m^3$ is necessary to reduce disparities that disproportionately harm Black populations and other communities of color ..... 31

a. Disproportionate exposure and harms ..... 31

b. The RIA, PA, and premature mortality ..... 38

c. Recent studies regarding disparities ..... 42

ii. An annual standard no higher than 8 μg/m³ will save many thousands of lives and prevent significant numbers of other serious human health harms, including for children and for people experiencing poverty ..... 46

iii. The CASAC majority found an annual standard of 8 μg/m³ scientifically supported ..... 54

3. EPA's attempts to set a standard weaker than 8 μg/m³ are unlawful and arbitrary ..... 54

i. There is no meaningful doubt that $PM_{2.5}$ causes serious harms down to an annual average of 8 μg/m³ ..... 55

ii. The weight EPA places on study-reported means, as opposed to other measures of $PM_{2.5}$ concentrations, is irrational and unlawful ..... 57

iii. EPA's inflation of study-reported means in epidemiological studies is arbitrary and unlawful ..... 60

iv. EPA's discussion of Canadian epidemiological studies, restricted analyses, and accountability studies is unlawful and arbitrary ..... 73

a. Canadian epidemiological studies ..... 73

b. Restricted studies ..... 75

c. Accountability studies ..... 76

v. EPA's attempts to dismiss the results of its own risk assessment are arbitrary and unlawful ..... 77

vi. Standards with levels in and above EPA's proposed range would not comply with the Clean Air Act's health-protective mandate and would be arbitrary ..... 86

vii. If EPA insists on setting an annual standard with level above 8 μg/m³, it must select a level of 9 μg/m³ ..... 90

B. EPA must strengthen the 24-hour standard to no higher than 25 μg/m³ ..... 91

1. The latest scientific knowledge shows that the current 24-hour standard does not protect public health with an adequate margin of safety even in conjunction with a strengthened annual standard ..... 91

i. EPA must revise the 24-hour standard because the combination of primary standards must provide adequate protection from health risks linked to both long-term and short-term exposures ..... 92

ii. The available scientific evidence provides a strong basis for strengthening the 24-hour standard ..... 93

iii. Even an annual standard of 8 μg/m³ would not provide adequate protection from short-term peak exposures without a stronger 24-hour standard ..... 97

2. Monitor data shows that strengthening the 24-hour standard in combination with a strengthened annual standard provides significantly better protection against 2-hour and 4-hour peak exposures ..... 98

3. To meet the Clean Air Act's mandates and advance environmental justice, EPA must set the 24-hour standard's level no higher than 25 μg/m³ ..... 99

4. EPA's reasoning for retaining the 24-hour standard is arbitrary and inconsistent with the Clean Air Act ..... 103

i. Deciding whether or not to revise the 24-hour standard based on a comparison to the information and evidence available on the annual standard is arbitrary and unlawful ..... 104

ii. EPA's treatment of the scientific evidence and the risk assessment in deciding to retain the current 24-hour standard is arbitrary and unlawful ..... 104

iii. EPA arbitrarily relies on strengthening the annual standard to provide all the necessary protection against short-term peak exposures ..... 106

5. EPA should revise the form of the 24-hour standard to a 99th percentile of daily averages over 3 years ..... 107

VI. Secondary PM NAAQS ..... 107

A. EPA's legal obligations in reviewing and setting the secondary standards ..... 107

B. Public Welfare Impacts from $PM_{2.5}$ ..... 109

1. Ecosystems ..... 109

2. Visibility ..... 111

3. Materials ..... 112

C. EPA's proposal not to strengthen the secondary standards is unlawful and arbitrary ..... 112

1. EPA's proposal to retain the secondary 24-hour standard is unlawful and arbitrary ..... 113

i. EPA fails to rationally justify 30 deciviews as the visibility index target ..... 113

a. EPA fails to use the latest science to develop a visibility index level ..... 113

b. EPA's interpretation of the visibility preference studies irrationally leaves a tiny minority of study respondents accepting EPA's visibility target ..... 117

c. EPA illegally and arbitrarily relies on claimed uncertainties and concerns over overprotectiveness to propose a weaker visibility index target ..... 121

ii. EPA fails to rationally justify the 3-year average, 90th percentile form of the visibility index ..... 123

2. EPA must set a protective secondary 24-hour standard ..... 125

3. EPA fails to justify how the annual standard is sufficient to protect against any welfare impacts ..... 125

4. EPA illegally and arbitrarily refuses to identify the level requisite to protect against other important welfare harms ..... 126

VII. Air Quality Monitoring ..... 129

A. EPA must amend its monitoring network requirements to ensure adequate monitoring of air pollution in at-risk communities, including communities of color and low-income communities ..... 129

B. EPA should take steps to ensure that data resulting from new technologies for assessing real-world $PM_{2.5}$ pollution levels factors into regulatory decision-making that will reduce dangerous pollution levels ..... 132

1. Advancements in satellite and sensor technologies offer EPA opportunities to supplement data from the existing monitoring network ..... 133

i. Satellite-derived data ..... 133

ii. Air sensor data ..... 135

2. EPA should address temporal gaps in monitoring by reducing the use of intermittent monitoring and using data from supplemental technologies to fill gaps ........ 136

3. To fill gaps in the regulatory monitoring network, EPA should incorporate data from supplemental monitoring technologies and methods into its NAAQS attainment decisions ........ 137

VIII. Air Quality Index ........ 141

IX. Other Issues ........ 142

A. EPA must expeditiously conclude this reconsideration with final action ........ 142

B. EPA must hasten the designations process as much as possible ........ 144

C. EPA must ensure the standards are properly implemented ........ 146

D. EPA cannot lawfully include a grandfathering provision in its final action ........ 147

E. Impacts from concerns touching on issues like exceptional events must be addressed only in implementing stronger standards ........ 147

1. EPA may not consider background emissions levels, including from wildfires and international man-made sources, when setting NAAQS ........ 147

2. EPA's proposal properly rejects considering prescribed fires during standard setting ........ 149

3. EPA must decline any suggestion, from federal departments or agencies or any other parties, that EPA may consider prescribed fires when setting $PM_{2.5}$ health and welfare standards ........ 150

F. Even accounting for costs, stronger standards will be an immense benefit for the United States ........ 154

1. The benefits of stronger standards vastly outweigh the costs ........ 154

2. Existing and proposed EPA rules, in addition to significant changes in federal tax law and funding provisions, will likely make compliance with the particulate matter NAAQS easier than EPA assumed ........ 156

3. There are other means for controlling emissions that would be highly effective and efficient ........ 165

4. Polluters' repeated cries about costs have historically not been borne out ........ 166

X. Conclusion ........................................................................................................ 168

## I. EXECUTIVE SUMMARY

The U.S. Environmental Protection Agency ("EPA" or "the agency") must move expeditiously to finalize and implement a strengthened version of its proposed rule, Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 88 Fed. Reg. 5558 (Jan. 27, 2023). It is well established that fine particulate matter ("$PM_{2.5}$") air pollution kills and causes other severe health harms to people at levels below the current national ambient air quality standards ("standards" or "NAAQS") of 12 μg/m$^3$ for the annual standard and 35 μg/m$^3$ for the 24-hour standard. It is also well established that certain populations, like people of color—especially Black populations—and low-income communities bear a disproportionate share of the exposure to and health harms from $PM_{2.5}$ pollution.

**Primary Standards**. The combination of an annual standard no higher than 8 μg/m$^3$ and a 24-hour standard no higher than 25 μg/m$^3$ is necessary to protect public health with an adequate margin of safety, as the Clean Air Act requires. Any weaker standards would be unlawful and arbitrary. Importantly, EPA must set the standards to protect, with an adequate margin of safety, the health of sensitive subpopulations—like young children and older Black adults—not merely an average population. EPA declined to propose the needed standards, but is taking comment on more protective standards (8 μg/m$^3$ and 25 μg/m$^3$). These more protective standards would begin to close the unjust disparate public health burdens caused by $PM_{2.5}$ and would thus represent an important, though not the last, step toward finally achieving environmental justice.

Yet, EPA proposed only to strengthen the annual standard modestly, to 9-10 μg/m$^3$, and not to strengthen the 24-hour standard at all. Though the stronger end of EPA's proposal would mark an important, but limited, advance for public health and for somewhat narrowing inequitable disparate public health burdens of $PM_{2.5}$, the proposal is ultimately grossly inadequate. For example, EPA's proposal departs arbitrarily and unlawfully from the majority recommendations of the Clean Air Scientific Advisory Committee ("CASAC").

For the annual standard, EPA ignores important evidence that was before it, and turns the Act on its head by demanding an arbitrarily vague, but heightened, level of certainty, even though the Act's command for an adequate margin of safety means EPA is supposed to resolve lesser uncertainties in favor of protection. EPA further focuses on

means and averages of $PM_{2.5}$ concentrations in ways that are contrary to the evidence and Act: its approach would leave **un**protected the people who experience the $PM_{2.5}$ concentrations at which EPA itself has the highest confidence in $PM_{2.5}$'s harmful effects. That outcome would perpetuate ongoing environmental injustice. Accordingly, EPA must finalize stronger standards, both under its own vision of its mission and under the Clean Air Act.

EPA's proposal to retain the 24-hour standard is also unlawful and arbitrary. The latest scientific evidence shows that the existing 24-hour standard fails to protect public health with an adequate margin of safety. The agency unreasonably and unlawfully interprets or dismisses the compelling weight of epidemiologic and controlled human exposure studies in favor of arbitrarily and illegally heavily weighing the results of its risk assessment, the utility of which is severely limited for the 24-hour standard, as the CASAC majority notes. Strengthening the 24-hour standard in combination with a strengthened annual standard provides significantly better protection against 2-hour and 4-hour peak exposures than leaving the standard unchanged. Fundamentally, the agency irrationally relies on the annual standard to do essentially all the work, even though strengthened versions of the two standards will work together to effectively control both long- and short-term harmful $PM_{2.5}$ concentrations, and a stronger 24-hour standard is requisite to provide adequate protection against short-term peaks even with an annual standard of 8 $\mu g/m^3$. The form of the 24-hour standard remains deeply flawed, too, and EPA also must consider strengthening it so that it no longer allows so many dangerous $PM_{2.5}$ spikes to persist. To meet the Clean Air Act's requirements and advance environmental justice, EPA must strengthen the 24-hour standard to no higher than 25 $\mu g/m^3$.

**Secondary Standards**. As well as harming human health, $PM_{2.5}$ causes serious environmental harms, and the secondary standards must finally be updated to protect against them. EPA is now on a judicially enforceable deadline to review the aspect of the secondary standards that is supposed to protect against the ecological harms particulate matter ("PM") causes. We do not concede that it is lawful or rational for EPA to split up its review of the secondary PM standards, but, given the timeline of that review, we focus here on other welfare harms PM causes, chiefly to visibility.

To rationally meet the Clean Air Act's mandate that secondary standards protect public welfare against any known or anticipated adverse effects, the secondary

standards must be strengthened, which has not occurred since 2006 (and was done in an unlawful and arbitrary manner then). EPA's contrary proposal is unlawful and arbitrary. Instead, to protect against adverse effects on visibility, EPA must strengthen the 24-hour $PM_{2.5}$ standard to 25 μg/m$^3$. EPA's formulaic basis for declining to do so is inconsistent with the record and recommendations of experts, including CASAC. EPA provides no rational consideration of the annual $PM_{2.5}$ standard, and it too must be strengthened.

**Air Quality Monitoring & Air Quality Index**. If people and regulators don't know whether levels of $PM_{2.5}$ in the air are above or below the level of the standards, the standards cannot fully deliver their promised health protections. Effective, accurate air quality monitoring and timely provision of information to people about actual air quality conditions thus go hand-in-glove with standards. We accordingly generally support EPA's proposed changes to air quality monitoring network requirements and the air quality index, though we call for EPA to make certain key improvements to its proposal. We also are encouraged by EPA's request for comment on how to make use of air quality data resulting from new technologies. Real-world experience has shown that such data can help fill gaps in the regulatory monitoring network, making important information about air quality available to communities, especially overburdened ones, and helping make the promise of clean air real. EPA should encourage the generation and use of such data so that the data can make the most positive impact practicable.

**Other Issues**. Though implementation concerns cannot lawfully factor into EPA's standard-setting, we comment on several. Principally, we note how important it is for EPA to move swiftly to complete this rulemaking and to begin implementing strengthened standards through air quality designations that go into effect no later than the end of 2025. EPA must also ensure that illegal considerations, including those regarding impacts of emissions from exceptional events like prescribed fires, do not enter into the standard-setting process. Such events must be addressed in implementing the standards—not in setting them. And, though, again, implementation costs cannot be considered, we note that the benefits of stronger $PM_{2.5}$ standards will vastly outweigh the costs of implementing them. Indeed, existing and proposed rules, as well as cost-effective additional measures, will likely further reduce costs, as historically has been the case.

* * *

In sum, stronger standards are consistent with this EPA's priorities, are required by the Clean Air Act, and would yield real, necessary benefits. In particular, primary standards no higher than 8 $\mu g/m^3$ (annual) and 25 $\mu g/m^3$ (24-hour) have firm scientific and legal foundations and would mark important, concrete advances toward environmental justice. This Administration must not further delay them.

## II. EPA'S LEGAL OBLIGATIONS IN SETTING AND REVIEWING THE NAAQS

The Clean Air Act Amendments of 1970 first introduced the requirement to establish enforceable NAAQS. The amendments were intended to be "a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution." *Union Elec. Co. v. EPA*, 427 U.S. 246, 256 (1976). The 1970 amendments "carrie[d] the promise that ambient air in all parts of the country shall have no adverse effects upon any American's health." 116 Cong. Rec. 42,329, 42,381 (Dec. 18, 1970) (remarks of Senator Muskie).

The NAAQS drive the Clean Air Act's requirements for controlling emissions of conventional air pollutants. Once EPA establishes NAAQS, states and EPA identify those geographic areas that fail to meet the standards. 42 U.S.C. § 7407(d). Each state must prepare for EPA's approval or disapproval an "implementation plan" designed to control pollutant emissions in order to reduce the ambient concentrations of the pollutant to below the level of the NAAQS and maintain that improved air quality. *Id.* § 7410.

### A. EPA's role in setting and revising the primary NAAQS

The Clean Air Act provides a clear process for establishing the NAAQS. The first step involves identifying those pollutants, the "emissions of which, in [EPA's] judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare," and "the presence of which in the ambient air results from numerous or diverse mobile or stationary sources." *Id.* § 7408(a)(1)(A), (B). Once EPA identifies a pollutant, it must select a NAAQS that is based on air quality criteria that "shall accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air." *Id.* §§ 7408(a)(2), 7409.

Primary NAAQS must be set to be "requisite to protect the public health" with "an adequate margin of safety." *Id.* § 7409(b)(1). To ensure that the NAAQS keep pace with scientific understanding and continue to provide the necessary protection, EPA must review and revise as appropriate the underlying air quality criteria and the NAAQS themselves at least every five years. *Id.* § 7409(d)(1). Any primary NAAQS that EPA promulgates under these provisions must be adequate to protect public health and provide an adequate margin of safety, in order to prevent not only any known or anticipated adverse health effects from polluted air, but also those that are scientifically uncertain or that research has not yet uncovered. 88 Fed. Reg. at 5562.

Further, the statute makes clear that there are significant limitations on the discretion granted to EPA in setting the NAAQS. In exercising its judgment, EPA must err on the side of protecting public health, and may not consider cost or feasibility in connection with establishing the level of the NAAQS and its other elements (e.g., indicator, the form of the standard, and averaging time). The D.C. Circuit summed up EPA's mandate succinctly:

> Based on these comprehensive [air quality] criteria and taking account of the "preventative" and "precautionary" nature of the [A]ct, the Administrator must then decide what margin of safety will protect the public health from the pollutant's adverse effects—not just known adverse effects, but those of scientific uncertainty or that "research has not yet uncovered." Then, and without reference to cost or technological feasibility, the Administrator must promulgate national standards that limit emissions sufficiently to establish that margin of safety.

*Am. Lung Ass'n v. EPA*, 134 F.3d 388, 389 (D.C. Cir. 1998) (citations omitted); *see also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 464-71 (2001). Each of these substantive requirements is discussed in more detail below.

### B. The Clean Air Act requires EPA to set primary NAAQS that protect public health, with an adequate margin of safety, including for at-risk populations

The Clean Air Act requires the primary NAAQS be set to ensure that <u>everyone</u> has access to clean, healthy air. As its congressional drafters stated, the mandate "carries the promise that ambient air in all parts of the country shall have no adverse

effects upon any American's health," 116 Cong. Rec. 42,329, 42,381 (Dec. 18, 1970) (remarks of Senator Muskie).

Standards must be based on an air quality level requisite to protect public health and not on an estimate of how many persons will intersect given concentration levels.[1] EPA correctly interprets the Clean Air Act as providing citizens the opportunity to pursue their normal activities in a healthy environment. 44 Fed. Reg. 8,202, 8,210 (Feb. 8, 1979). Thus, as EPA has acknowledged, it cannot deny the people of this country protection from the effects of air pollution by claiming that the people experiencing those effects are insufficiently numerous, or that levels that are likely to cause adverse health effects occur only in areas that are infrequently visited.[2]

**1. EPA must establish NAAQS that protect vulnerable populations**

Because EPA must set the NAAQS to provide an adequate margin of safety for all, the NAAQS must be set at a level that protects against adverse effects in vulnerable subpopulations, such as children, the elderly, pregnant women, the socially disadvantaged, and people with heart and lung disease and other pre-existing health conditions. The D.C. Circuit has repeatedly found that if a certain level of a pollutant

---

[1] *See* 116 Cong. Rec. 32,821, 32,901 (Sept. 21, 1970) (remarks of Senator Muskie) ("This bill states that all Americans in all parts of the Nation should have clean air to breathe, air that will have no adverse effects on their health.").

[2] *See* 116 Cong. Rec. 32,981, 33,114 (Sept. 22, 1970) (remarks of Senator Nelson) ("This bill before us is a firm congressional statement that all Americans in all parts of the Nation should have clean air to breathe, air which does not attack their health."); *see also id.* at 33,116 (remarks of Senator Cooper) ("The committee modified the President's proposal somewhat so that the national ambient air quality standard for any pollution agent represents the level of air quality necessary to protect the health of persons."); 116 Cong. Rec. 42,329, 42,392 (Dec. 18, 1970) (remarks of Senator Randolph) ("[W]e have to insure the protection of the health of the citizens of this Nation, and we have to protect against environmental insults—for when the health of the Nation is endangered, so is our welfare, and so is our economic prosperity"); *id.* at 42,523 (remarks of Congressman Vanik) ("Human health and comfort has been placed in the priority in which it belongs—first place.").

"adversely affects the health of these sensitive individuals, EPA must strengthen the entire national standard." *American Lung*, 134 F.3d at 389 (citation omitted); *accord Coal. of Battery Recyclers Ass'n v. EPA*, 604 F.3d 613, 618 (D.C. Cir. 2010); *Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 524 (D.C. Cir. 2009). Thus, EPA must build into the NAAQS an adequate margin of safety for these sensitive subpopulations. *See Am. Farm Bureau Fed'n*, 559 F.3d at 525-26.

The drafters of the 1970 Clean Air Act Amendments made clear that the millions of people subject to respiratory ailments are entitled to the protection of the NAAQS: "Included among those persons whose health should be protected by the ambient standard are particularly sensitive citizens such as bronchial asthmatics and emphysematics who in the normal course of daily activity are exposed to the ambient environment." S. Rep. No. 91-1196, at 10 (1970). As the D.C. Circuit has explained:

> In its effort to reduce air pollution, Congress defined public health broadly. NAAQS must protect not only average healthy individuals, but also "sensitive citizens"—children, for example, or people with asthma, emphysema, or other conditions rendering them particularly vulnerable to air pollution.

*Am. Lung Ass'n*, 134 F.3d at 390 (citations omitted); *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 684 F.3d 803, 810 (D.C. Cir. 2012). NAAQS must "be set at a level at which there is 'an absence of adverse effect' on these sensitive individuals." *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1153 (D.C. Cir. 1980).

EPA agrees with the above, and notes that, where environmental justice factors implicate vulnerable or at-risk populations, the NAAQS review and revision process <u>must</u> incorporate those factors:

> In setting the NAAQS, EPA focuses on the health effects on population groups that are at higher risk of adverse health effects. Thus, the NAAQS are required to take certain environmental justice factors into account as part of the standard-setting process where those factors are consistent with consideration of at-risk populations.

EPA, Off. of Gen. Counsel, *EPA Legal Tools to Advance Environmental Justice* 15 (Pub. No. 360R22001, May 2022), https://www.epa.gov/system/files/documents/2022-05/EJ%20Legal%20Tools%20May%202022%20FINAL.pdf.

Put differently, due to the severe, inequitably distributed human harms particulate matter pollution causes, if EPA sets rational and lawful primary $PM_{2.5}$ standards, they will generate significant environmental justice benefits. *See* Richard L. Revesz, *Air Pollution and Environmental Justice*, 49 Ecology L.Q. 187, 189-90 (2022).

**2. Where there is scientific uncertainty, EPA must take a protective approach to provide an adequate margin of safety**

In the seminal case on the NAAQS, the D.C. Circuit found that Congress "specifically directed the Administrator to allow an adequate margin of safety to protect against effects which have not yet been uncovered by research and effects whose medical significance is a matter of disagreement." *Lead Indus. Ass'n*, 647 F.2d at 1154. Limited data is not an excuse for failing to establish the level at which there is no significant risk of adverse effects. To the contrary, "Congress' directive to the Administrator to allow an 'adequate margin of safety' alone plainly refutes any suggestion that the Administrator is only authorized to set primary air quality standards which are designed to protect against health effects that are known to be clearly harmful." *Id.* at 1154-55. Indeed, the requirement for an adequate margin of safety "means the agency is to 'err on the side of caution.'" *Am. Petroleum Inst. v. EPA*, 684 F.3d 1342, 1352 (D.C. Cir. 2012) (quoting *Am. Farm Bureau*, 559 F.3d at 533); *accord, e.g.*, *Coal. of Battery Recyclers Ass'n*, 604 F.3d at 621; *Am. Trucking Ass'ns v. EPA*, 283 F.3d 355, 369 (D.C. Cir. 2002) (Act requires "that the Agency err on the side of caution by setting primary NAAQS that 'allow an adequate margin of safety'" and "requires EPA to promulgate protective primary NAAQS even where…the pollutant's risks cannot be quantified or 'precisely identified as to nature or degree'" (cleaned up)).

**3. The only lawful consideration in setting NAAQS is the effect of the pollutant in the ambient air on health and welfare**

It is well-established that the Act requires EPA to set health- and welfare-protective NAAQS for a pollutant based solely on the health and welfare effects caused by that pollutant in the ambient air, without regard to the sources of the pollutant or any costs of implementing the standards. *E.g.*, *Whitman*, 531 U.S. at 465-71; *Am. Trucking Ass'ns v. EPA*, 175 F.3d 1027, 1040-41 (D.C. Cir. 1999), *upheld in relevant part sub nom. Whitman*, 531 U.S. 457; *Nat. Res. Def. Council v. EPA*, 902 F.2d 962, 972-73 (D.C. Cir. 1990), *vacated in unrelated part by* 921 F.2d 326 (D.C. Cir. 1991); *Nat. Res. Def. Council v.*

*EPA*, 824 F.2d 1146, 1157, 1159 (D.C. Cir. 1987) (en banc); *Am. Petroleum Inst. v. Costle*, 665 F.2d 1176, 1185 (D.C. Cir. 1981); *Lead Indus. Ass'n*, 647 F.2d at 1148-50. This principle was reaffirmed recently in *Murray Energy Corp. v. EPA*, 936 F.3d 597, 622-24 (D.C. Cir. 2019), where the D.C. Circuit held that EPA must set the primary NAAQS based exclusively on public-health considerations, without regard to "background" levels of the pollutant. "[A]ttainability and technological feasibility are not relevant considerations in the promulgation of NAAQS." *Id.* (cleaned up).

When the agency considers the public health and welfare benefits of a standard, however, it should not look at the standard in a vacuum. As explained above, EPA must set standards to protect sensitive populations. The factors that, in the real world, lead to sensitivities are complex and interrelated. Further, the Act commands EPA to include, "to the extent practicable," in the air quality criteria that form the basis for the NAAQS information on "those variable factors…which of themselves or in combination with other factors may alter the effects on public health" of the air pollutant under review, as well as on "the types of air pollutants which, when present in the atmosphere, may interact with [the pollutant under review] to produce an adverse effect on public health." 42 U.S.C. § 7408(a)(2)(A)-(B); *see also id.* § 7409(b), (d).

Thus, to meet the goals of the NAAQS program, EPA must also consider the cumulative impacts of PM on people who are exposed to a variety of pollutants, as is the case in most environmental justice or overburdened communities. EPA defines cumulative impacts as "the totality of exposures to combinations of chemical and non-chemical stressors and their effects on health, well-being, and quality of life outcomes," including "contemporary exposures to multiple stressors as well as exposures throughout a person's lifetime," and notes that such impacts "can be considered in the context of individuals, geographically defined communities, or definable population groups."[3]

[3] EPA, Off. of Res. & Dev't, *Cumulative Impacts Research: Recommendations for EPA's Office of Research and Development* at vii (EPA/600/R-22/014a, Sept. 2022), https://www.epa.gov/system/files/documents/2022-09/Cumulative%20Impacts%20Research%20Final%20Report_FINAL-EPA%20600-R-22-014a.pdf.

As EPA notes in its recent addendum to EPA's Legal Tools to Advance Environmental Justice, "[i]n communities with environmental justice concerns and other underserved populations, the combined exposures to…stressors (i.e., cumulative impacts) often increases their vulnerability to new or ongoing environmental hazards, which can cause, perpetuate, or exacerbate disproportionate environmental and public health harms and risks."[4] Application of these concepts here supports stronger standards, given the known disproportionate exposures to and health harms of $PM_{2.5}$. Moreover, PM is composed of various compounds including sulfates, nitrates, carbonaceous aerosol, and metals, including lead, and EPA does not account for the exact chemical makeup of PM at the hyper-local level. Yet, each of these PM compounds on its own has multiple pathways of exposure. Thus, to ensure that the $PM_{2.5}$ NAAQS is truly protective of public health, particularly for overburdened communities, EPA must set the most protective scientifically supported standard to protect against negative cumulative exposures to or interactions from compounds like lead.

**4. This CASAC panel's recommendations merit significant deference**

Under the Clean Air Act, EPA is required to ensure that the NAAQS "accurately reflect the latest scientific knowledge." 42 U.S.C. § 7408(a)(2). To do so, Congress directed EPA to create the Clean Air Scientific Advisory Committee ("CASAC"), made up "of seven members including at least one member of the National Academy of Sciences, one physician, and one person representing State air pollution control agencies." *Id.* § 7409(d)(2)(A). As the D.C. Circuit has noted, "[h]istorically, EPA advisory committees have included academic scientists who, supported by EPA grants, conduct cutting-edge scientific and technical research important to the agency's statutory mission." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 638 (D.C. Cir. 2020). But under the previous Administration, former Administrator Scott Pruitt announced a CASAC appointments policy that broke with decades of EPA practice and led to the

---

[4] EPA, Off. of Gen. Counsel, *EPA Legal Tools to Advance Environmental Justice: Cumulative Impacts Addendum* 1 (Pub. No. 360R22002, Jan. 2023) (footnotes omitted), https://www.epa.gov/system/files/documents/2022-12/bh508-Cumulative%20Impacts%20Addendum%20Final%202022-11-28.pdf; *see also id.* at 6 (noting one way in which cumulative impacts should be considered in NAAQS-setting).

formation of a CASAC without the requisite scientific expertise to provide adequate review of the standards.[5] Multiple courts found this action an arbitrary and severe departure from Congress's goals in setting up the committee.[6]

In contrast to the previous Administration, current Administrator Michael S. Regan has made it a point to restore CASAC's scientific integrity by resetting the committee with a mix of new and previously serving members, reestablishing a larger PM-specific panel made up of true subject-matter experts across the range of pertinent considerations, and ensuring that appointees had requisite expertise in their fields without facing irrelevant barriers to appointment.[7] Thus, among other members, the current CASAC includes eminent scholars and researchers like:

- Dr. Elizabeth (Lianne) Sheppard, Rohm & Haas Endowed Professor in Public Health Sciences and of Environmental and Occupational Health Sciences, and Biostatistics at the University of Washington, who has not only served on CASAC before (2015-2018), but also has deep expertise in epidemiology, biostatistics and exposure assessments. Dr. Sheppard also serves as the Chair of CASAC.

---

[5] Scott Pruitt, Adm'r, EPA, Strengthening and Improving Membership on EPA Federal Advisory Committees (Oct. 31, 2017), https://www.epa.gov/sites/default/files/2017-10/documents/final_draft_fac_directive-10.31.2017.pdf; Memorandum from Scott Pruitt, Adm'r, EPA, Strengthening and Improving Membership on EPA Federal Advisory Committees (Oct. 31, 2017), https://www.epa.gov/sites/default/files/2017-10/documents/final_draft_fac_memo-10.30.2017.pdf.

[6] *Physicians for Soc. Responsibility*, 956 F.3d at 647; *see Nat. Res. Def. Council v. EPA*, 438 F. Supp. 3d 220, 232 (S.D.N.Y. 2020).

[7] EPA, Press Release, Administrator Regan Directs EPA to Reset Critical Science-Focused Federal Advisory Committees (Mar. 31, 2021), https://www.epa.gov/newsreleases/administrator-regan-directs-epa-reset-critical-science-focused-federal-advisory; EPA, Press Release, EPA Announces Selections of Charter Members to the Clean Air Scientific Advisory Committee (June 17, 2021), https://www.epa.gov/newsreleases/epa-announces-selections-charter-members-clean-air-scientific-advisory-committee.

- Dr. Michelle L. Bell, the Mary E. Pinchot Professor of Environmental Health at the Yale University School of the Environment, whose work is based in epidemiology, biostatistics, and environmental engineering.
- Dr. Christina H. Fuller, Associate Professor of Environmental Health at Georgia State University, whose research in environmental health and justice is focused on exposure science and epidemiology, including air pollution exposure and health disparities.
- Dr. Mark Frampton, Professor Emeritus in Medicine in the Pulmonary and Critical Care Division of the University of Rochester Medical Center, who has not only worked as a physician, but has deep research experience on particle exposure on lung and cardiovascular functions.

Not only does the current CASAC have the experience to adequately advise EPA on the "latest scientific knowledge" on the public health and welfare effects of particulate matter, but the current CASAC is EPA's "most diverse panel since the committee was established."[8] As such, this CASAC's recommendations merit significant deference and great weight.

**C. EPA must engage in reasoned decision-making**

A fundamental precept of administrative law, a final rule must be the result of an agency's reasoned decision-making. The agency must have "weighed competing views, selected a [solution] with adequate support in the record, and intelligibly explained the reasons for making that choice."[9] A rule will be reversed if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."[10] *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.* provides the seminal test for reasoned decision-making:

---

[8] EPA, Press Release, EPA Announces Selections of Charter Members to the Clean Air Scientific Advisory Committee.

[9] *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 295 (2016).

[10] *See* 42 U.S.C. § 7607(d)(9); 5 U.S.C. § 706(2); *see also Catawba County v. EPA*, 571 F.3d 20, 41 (D.C. Cir. 2009) (explaining that the same standard applies under both these provisions).

> [T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[11]

Especially because EPA is charged with "the critical task of assessing the public health and the power to make decisions of national import in which individuals' lives and welfare hang in the balance," it "has the heaviest of obligations to explain and expose every step of its reasoning." *Am. Lung*, 134 F.3d at 392.

## III. EPA'S PRIOR REVISIONS OF THE PRIMARY $PM_{2.5}$ NAAQS

As scientific knowledge about the harmful health effects of particulate matter air pollution has advanced, EPA has moved cautiously to update its standards. In 1997, after being sued over missing its deadline for reviewing the then-governing 1987 standards, *American Lung Ass'n v. Browner*, 884 F. Supp. 345 (D. Ariz. 1994), EPA dramatically revised the NAAQS for PM by adding two new standards specifically targeting $PM_{2.5}$. 62 Fed. Reg. 38,652 (July 18, 1997). The new revision increased protections from $PM_{2.5}$ by setting annual and daily standards with that pollutant as the indicator, separate from the standards for coarse particular matter ("$PM_{10}$"). The new standards—a 15 µg/m$^3$ annual standard and a 65 µg/m$^3$ 24-hour standard—were added partially because of EPA's recognition that $PM_{10}$ often has a different health effect than $PM_{2.5}$. 62 Fed. Reg. at 38,667.

---

[11] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016) (similar).

Since EPA created the $PM_{2.5}$ standards, EPA has revised the annual and 24-hour standards once each. EPA's first, and only, revision of the 24-hour $PM_{2.5}$ standard occurred in 2006, the first time it reviewed the 1997 standards—and four years later than the Act commanded. At the time, EPA noted that compared to the previous review, there was a "stronger body of evidence now available on health effects related to both short- and long-term exposure to $PM_{2.5}$." 71 Fed. Reg. 61,144, 61,153 (Oct. 17, 2006). But, despite this evidence, EPA only revised the 24-hour standard down to 35 μg/m$^3$. *Id.* at 61,144. At the time, CASAC wrote to EPA to express its disappointment in the agency refusing to revise the annual standard despite "clear and convincing scientific evidence that significant adverse human-health effects occur in response to short-term and chronic particulate matter exposures at and below 15 μg/m$^3$, the level of the current annual $PM_{2.5}$ standard."[12] And after state and environmental petitioners challenged EPA's decision to not revise the annual standard in court, the D.C. Circuit found that "EPA did not adequately explain why an annual level of 15 μg/m$^3$ is sufficient to protect the public health while providing an adequate margin of safety." *Am. Farm Bureau Fed'n*, 559 F.3d at 528.

In late 2012, again later than the Act commanded review of the flawed 2006 decision, EPA finally revised the annual standard downward to 12 μg/m$^3$. In making this decision, EPA noted that the Clean Air Act requires the Administrator to set the standard at a level that "reduces risk sufficiently so as to protect public health, including the health of at-risk populations, with an adequate margin of safety." 78 Fed. Reg. 3086, 3161 (Jan. 15, 2013).

In 2020, some eight years after its last review, despite a growing body of evidence showing that the current standards are inadequate to protect public health, EPA decided to retain both the annual and 24-hour $PM_{2.5}$ standards at the levels that they were set in 2012 and 2006, respectively. 85 Fed. Reg. 82,684 (Dec. 18, 2020). EPA's decision relied on a flawed and illegal process that failed to meet the Clean Air Act's requirement that the agency consider "the latest scientific knowledge." 42 U.S.C.

---

[12] Letter from CASAC to Stephen L. Johnson, Adm'r, EPA, re Clean Air Scientific Advisory Committee Recommendations Concerning the Final National Ambient Air Quality Standards for Particulate Matter 1 (EPA-CASAC-LTR-06-003, Sept. 29, 2006) (emphasis removed).

§ 7408(a)(2). This included an improperly constituted CASAC panel that by its own admission lacked the necessary expertise to adequately review the standards, and that failed to consider recent studies, like a 2018 meta-analysis of 53 cohort studies which found significant associations between $PM_{2.5}$ concentrations well below 12 μg/m$^3$ and mortality.[13] This study, which was presented to CASAC during its deliberations, went unmentioned in CASAC's letter and by the Administrator. Throughout the review process, CASAC ignored, and EPA failed to evaluate, published studies that were directly relevant to the NAAQS, including studies that focused on mortality[14] and reduced life expectancy,[15] showing that there were adverse health responses at levels well below the current NAAQS. The profound process issues, self-confessed inadequacy of the CASAC that was convened in that review, and the fundamental flaws in its majority recommendations are described in detail in several sets of comments already in the docket. *E.g.*, EPA-HQ-OAR-2015-0072-0973 at 8-34, 41-69. In light of these issues, the conclusions EPA reached in the 2020 review, as well as the majority CASAC's advice at the time, merit no deference in this reconsideration.

In June 2021, EPA finally acknowledged that "available scientific evidence and technical information indicate that the current standards may not be adequate to protect

---

[13] Vodonos, Alina, Yara Abu Awad, and Joel Schwartz. 2018. "The Concentration Response between Long-Term $PM_{2.5}$ Exposure and Mortality; A Meta-Regression Approach." Environmental Research 166 (October): 677-89. https://doi.org/10.1016/j.envres.2018.06.021.

[14] Fan, Maoyong, and Yi Wang. 2020. "The Impact of $PM_{2.5}$ on Mortality in Older Adults: Evidence from Retirement of Coal-Fired Power Plants in the United States." Environmental Health 19 (1): 28. https://doi.org/10.1186/s12940-020-00573-2.

[15] Schwartz, Joel D., Yan Wang, Itai Kloog, Ma'ayan Yitshak-Sade, Francesca Dominici, and Antonella Zanobetti. 2018. "Estimating the Effects of $PM_{2.5}$ on Life Expectancy Using Causal Modeling Methods." Environmental Health Perspectives 126 (12): 127002. https://doi.org/10.1289/EHP3130; Bennett, James E, Helen Tamura-Wicks, Robbie M Parks, Richard T Burnett, C Arden Pope, Matthew J Bechle, Julian D Marshall, Goodarz Danaei, and Majid Ezzati. 2019. "Particulate Matter Air Pollution and National and County Life Expectancy Loss in the USA: A Spatiotemporal Analysis." PLOS Medicine, 18. https://doi.org/10.1371/journal.pmed.1002856.

public health and welfare, as required by the Clean Air Act."[16] Yet EPA's career staff had already reached that conclusion. EPA, Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter 3-106 (EPA-452/R-20-002, Jan. 2020) ("2020 PA").

Indeed, EPA's acknowledgment understates the strength of the available evidence. In late 2012, Canada set its ambient air quality standards for $PM_{2.5}$ to be significantly stronger than EPA's current ambient air quality standards—and even stronger than the standards EPA proposes now, though within the lower end of the range the CASAC majority recommended and that EPA is accepting comment on:[17]

---

[16] EPA, Press Release, EPA to Reexamine Health Standards for Harmful Soot That Previous Administration Left Unchanged (June 10, 2021), [https://www.epa.gov/newsreleases/epa-reexamine-health-standards-harmful-soot-previous-administration-left-unchanged.](https://www.epa.gov/newsreleases/epa-reexamine-health-standards-harmful-soot-previous-administration-left-unchanged)

[17] Canada Dep't of the Env't & Dep't of Health, Objectives for Ambient $PM_{2.5}$ and Ozone [Canadian Ambient Air Quality Standards (CAAQS) for $PM_{2.5}$ and Ozone], 147 C. Gaz. Pt.I 1243-44 & annex (May 25, 2013) (notice dated Dec. 12, 2012), https://www.canadagazette.gc.ca/rp-pr/p1/2013/2013-05-25/pdf/g1-14721.pdf#page=17; *see also* Gov't of Canada, Canadian Environmental Protection Act: guidelines and objectives, Environmental Quality (last modified Dec. 19, 2022) (confirming these remain the current Canadian ambient air quality standards for $PM_{2.5}$), https://www.canada.ca/en/environment-climate-change/services/canadian-environmental-protection-act-registry/guidelines-objectives-codes-practice/guidelines-objectives.html#toc4; Canadian Council of Ministers of the Env't, Air Quality Report, slide 7 (last visited Mar. 12, 2023) (same), https://ccme.ca/en/air-quality-report#slide-7.

| Averaging Time | Level | | Form |
|---|---|---|---|
| | In 2015 | In 2020 | |
| Annual (calendar year) | 10.0 μg/$m^3$ | 8.8 μg/$m^3$ | 3-year average of the annual average concentrations |
| 24 hours (calendar day) | 28 μg/$m^3$ | 27 μg/$m^3$ | 3-year average of the annual 98th percentile of the daily 24-hour average concentrations |

The World Health Organization in 2021 recommended as its air quality guidelines for $PM_{2.5}$ an annual level of 5 μg/$m^3$ and a 24-hour level of 15 μg/$m^3$ (99th percentile), both of which are substantially stronger than any of the standards EPA is currently considering.[18] Thus, EPA's reconsideration is consistent with—or even less protective than—what other health and environmental bodies have done.

## IV. THE SOURCES OF $PM_{2.5}$ POLLUTION ARE NUMEROUS AND WIDESPREAD, AND THE EFFECTS OF THIS POLLUTION ARE NOT EVENLY SPREAD

A wide array of anthropogenic sources emit $PM_{2.5}$ pollution within the United States. Mobile sources—cars and trucks—are a dominant contributor to direct $PM_{2.5}$ pollution in many urban areas, producing as much as 30% of primary $PM_{2.5}$ emissions in some highly populated counties. EPA, Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter 2-5 (EPA-452/R-22-004, May 2022) ("PA"). Light-duty vehicles and heavy-duty diesel vehicles also emit substantial quantities of elemental carbon, $NO_x$ and volatile organic compounds ("VOCs"), contributing to secondary $PM_{2.5}$ pollution both within and outside urban areas. Margaret Zawacki et al., *Mobile Source Contributions to Ambient Ozone and*

[18] World Health Org., *WHO Global Air Quality Guidelines* at xvii tbl.0.1 & n.a (2021), https://apps.who.int/iris/rest/bitstreams/1371692/retrieve.

*Particulate Matter in 2025*, 168 Atmospheric Env. 129, 136 (2018)[19]; PA at 2-9 fig.2-6, 2-11 fig.2-8; *see* EPA, Control of Air Pollution from New Motor Vehicles: Heavy-Duty Engine and Vehicle Standards: Regulatory Impact Analysis 300 (EPA-420-R-22-035, Dec. 2022) (modeling effects of reductions in heavy-duty vehicle emissions on $PM_{2.5}$ concentrations); 79 Fed. Reg. 23,414, 23,416 (Apr. 28, 2014) (describing light-duty vehicles' emissions).

Among stationary sources, electric generating stations—coal-fired power plants in particular—are responsible for most of the country's emissions of sulfur dioxide ("$SO_2$") and a substantial fraction of its nitrogen oxides ("$NO_X$") emissions, both precursors to $PM_{2.5}$. PA at 2-11 fig.2-8. Other industrial facilities—chemical plants and refineries, for example—produce substantial quantities of both direct $PM_{2.5}$, and $PM_{2.5}$ precursors. *Id.* at 2-7 fig.2-7, 2-11 fig.2-8 (industrial processes produced 20% of $SO_2$ emissions, 18% of VOC emissions, 12% of $NO_X$ emissions, and 5% of direct $PM_{2.5}$ in 2017); EPA, 2017 National Emissions Inventory: January 2021 Updated Release, Technical Support Document 2-11 to -12 tbl.2-3 (EPA-454/R-21-001, Feb. 2021) (listing emissions from different sectors), https://www.epa.gov/sites/default/files/2021-02/documents/nei2017_tsd_full_jan2021.pdf.

Agricultural dust and agricultural burning produce an additional substantial fraction of the nation's direct $PM_{2.5}$ emissions. PA at 2-4 to -5 & fig.2-2; EPA, Regulatory Impact Analysis for the Proposed Reconsideration of the National Ambient Air Quality Standards for Particulate Matter 2-10 fig.2-4 (EPA-452/P-22-001, Dec. 2022) ("RIA"), https://www.epa.gov/system/files/documents/2023-01/naaqs-pm_ria_proposed_2022-12.pdf. Agricultural livestock and waste are also the dominant source of ammonia ($NH_3$), a precursor to $PM_{2.5}$. PA at 2-10. Notably, though EPA reports that, from all emission sources reported in the National Emissions Inventory, direct $PM_{2.5}$ emissions, as well as all other precursor emissions, have dropped by 14-84% from 2002-2017, ammonia emissions have <u>risen</u>. *Id.* 2-28 tbl.2-2. Accordingly, we go into more detail about agricultural emissions of $PM_{2.5}$ and its precursors, focusing on ammonia.

---

[19] Available at https://www.sciencedirect.com/science/article/pii/S1352231018302966?ref=cra_js_challenge&fr=RR-1.

As of 2017, livestock waste was the largest source of ammonia emissions in the United States.[20] Concentrated Animal Feeding Operations ("CAFOs")—industrial livestock facilities that house many hundreds or thousands of animals in close confinement—are often the ultimate source for these emissions. When CAFO waste decomposes, it releases gases that include ammonia and hundreds of VOCs.[21] Waste pits, animal confinement buildings, and waste applied to fields emit these gases and compounds into the air. It is thus unsurprising that a recent study found that agricultural air pollution in the United States contributed to 17,900 deaths per year via its direct and secondary $PM_{2.5}$ emissions. Nina G.G. Domingo et al., *Air Quality-Related Health Damages of Food*, 118 PNAS e2013637118 (2021). Results suggest that California leads the country with the greatest number of air quality-related deaths (1,690 deaths per year) caused by its agricultural ammonia emissions—750 deaths more than the second leading state. *Id.* tbl.S2.

Moreover, the $PM_{2.5}$ compounds resulting from ammonia's reactions may have regional, if not larger impacts. $PM_{2.5}$ can persist for weeks in the atmosphere and travel tens to hundreds of miles. EPA, Integrated Science Assessment for Particulate Matter 2-5 tbl.2-1 (EPA/600/R-19/188, Dec. 2019) ("ISA"). Ammonia reacts with other compounds in the atmosphere to create "more stable PM with lower volatility," suggesting that it also contributes to $PM_{2.5}$ levels far from its origin. *Id.* at 2-13.

That said, sources that produce large fractions of $PM_{2.5}$ on a national basis are not all equally responsible for $PM_{2.5}$ pollution in the areas where such pollution is most severe. Sources responsible for $PM_{2.5}$ precursors, like power plants, contribute relatively uniformly to that pollution on a regional basis. *See id.* at 2-12, 2-65 to -66; PA 2-10. Likewise, mobile sources—cars, trucks, and buses powered by internal combustion engines—produce a consistently large fraction of direct and indirect $PM_{2.5}$ pollution in heavily polluted urban areas, though, importantly, the result of those emissions can be

---

[20] *See* EPA, 2017 National Emissions Inventory (NEI) Data, https://www.epa.gov/air-emissions-inventories/2017-national-emissions-inventory-nei-data#dataq (in the "Data Queries" section, select "Ammonia – NH3" in the "Pollutant" selection box).

[21] *See* Virginia T. Guidry et al., Hydrogen Sulfide Concentrations at Three Middle Schools Near Industrial Livestock Facilities, 27 J. Exposure Sci. & Env't Epidemiology 167 (2017).

spatially variable $PM_{2.5}$ levels. ISA at 2-12, 2-66. But while what EPA refers to as fire-related emissions represent a large part of national direct $PM_{2.5}$ emissions, they are a "much smaller fraction" within urban areas where $PM_{2.5}$ pollution is highest. ISA at 2-9; *see* PA at 2-5 (noting "notable difference in contributions of sources of $PM_{2.5}$ in urban areas compared to national emissions"). A wide and varied set of sources are responsible for direct $PM_{2.5}$ pollution in urban areas suffering from high $PM_{2.5}$ concentrations; refineries produce significant quantities of pollution in some, residential wood-burning in others, while waste disposal produces a large share in others. ISA at 2-9 to -12 & fig.2-3 (summarizing sources of primary emissions in 5 different counties); *see* RIA at 2-10. That heterogeneity underscores the need for, and potential efficacy of, the localized pollution-reduction regime by which the Clean Air Act achieves compliance with an updated NAAQS. *See* RIA at ES-4 n.2 (noting "the need for control of local primary $PM_{2.5}$ sources to address the highest $PM_{2.5}$ concentrations in urban areas").

We note also that evidence about the harms of ultrafine particulate matter ("UFP") has been developing. *E.g.*, ISA at ES-10 tbl.ES-1 (upgrading and making for the first time certain causality determinations for UFP); 88 Fed. Reg. at 5590. Further, there is evidence that ultrafine particulate matter is highly variable and may last short periods of time, suggesting that the current PM standards will not cover it well. *See* ISA at ES-5, 1-11 (UFP highest near roads, highly variable, often short time periods); *see also id.* at 1-6 to -7 (describing sources and emissions of UFP). CASAC raised concerns about the potential health harms of ultrafine particles, as well. Letter from Dr. Elizabeth A. (Lianne) Sheppard, Chair, Clean Air Scientific Advisory Committee, to Michael S. Regan, Adm'r, EPA, 15 (EPA-CASAC-22-002, Mar. 18, 2022) ("CASAC Letter on PA"). We thus endorse CASAC's recommendation for more research into the health effects of ultrafine particulate matter, and add that such research must include gathering reliable data regarding ultrafine particulate matter's ambient concentrations.

Among other harms, $PM_{2.5}$ pollution inflicts serious respiratory and cardiovascular harm, including death, to the population generally. EPA, Supplement to the 2019 Integrated Science Assessment for Particulate Matter 2-3 to -23 & tbls.2-1 & 2-2, 2-34 (EPA/600/R-22/028, May 2022) ("ISA Supplement") (detailing serious human health harms caused or likely caused by $PM_{2.5}$ and noting that "a large body of evidence shows that health effects related to PM exposure, particularly $PM_{2.5}$ exposure, occur across populations with diverse characteristics"). Those harms are especially severe for children, for whom long-term $PM_{2.5}$ exposure leads to impaired lung function and

increased likelihood of asthma. 88 Fed. Reg. at 5591; ISA Supplement at 2-35 to -36. The elderly also experience more serious consequences from $PM_{2.5}$ exposure. 88 Fed. Reg. at 5591 (describing "consistent evidence" associating increased short- and long-term $PM_{2.5}$ exposure by older adults with "cardiovascular or respiratory hospital admissions, emergency department visits, or mortality").

Historically marginalized communities experience a larger share of the harm caused by $PM_{2.5}$ pollution. *See* 88 Fed. Reg. at 5673 (scientific evidence "indicates that subpopulations at potentially greater risk include … lower socioeconomic status" and "minority populations (particularly Black populations)"); RIA at ES-20 to -21 ("Hispanics[22], Asians, Blacks, and those less educated … have higher national exposures" than "other populations"). This disproportionate burden is disturbingly deeply rooted: a recent study found that, as of 2010, the "redlining" that began in the 1930s and cut communities off from federal home loans on racially discriminatory bases (and was legally barred in 1968) was "associated with substantial intraurban air pollution disparities for…$PM_{2.5}$." Haley M. Lane et al., *Historical Redlining Is Associated with Present-Day Air Pollution Disparities in U.S. Cities*, Environ. Sci. & Tech. Letters 345, 345-46, 348 (2022), https://pubs.acs.org/doi/pdf/10.1021/acs.estlett.1c01012; *see generally* Richard Rothstein, *The Color of Law* 63-67, 70-75, 93-99 (2017). EPA's analyses suggest that Black and Hispanic populations especially have higher $PM_{2.5}$ exposures than non-Hispanic white populations. 88 Fed. Reg. at 5592, 5609; RIA at ES-20 to -21; *see* Christopher Tessum et al., "$PM_{2.5}$ Polluters Disproportionately and Systemically Affect People of Color in the United States," 7 Science Advances eabf4491 (April 2021).[23]

Similarly, populations consisting of people of color also face disparate burdens from $PM_{2.5}$ resulting from motor vehicles. Asian people are, on average, exposed to 34% higher levels of $PM_{2.5}$ from vehicles than the average for the total U.S. population, with Black populations' exposure being 24% higher and Latino populations' exposure 23% higher; on the other hand, exposure of white populations to $PM_{2.5}$ from vehicles is, on

---

[22] Because many of the underlying sources we discuss herein use the term "Hispanic," we generally use it throughout these comments for consistency. We also use the term "Latino" at times.

[23] Available at https://www.science.org/doi/10.1126/sciadv.abf4491.

average, 14% lower than the average exposure for everyone.[24] There are similar, but elevated, disparities in the Northeast and Mid-Atlantic regions, as well as California.[25]

The disproportionate effect of polluters on people of color Tessum et al. describe can also be seen in the agricultural sector. As mentioned above, CAFOs emit vast amounts of $PM_{2.5}$-forming ammonia. Decades of well-established evidence shows that CAFOs often disproportionately burden people of color and low-income communities. *E.g.*, Arbor J.L. Quist et al., *Disparities of Industrial Animal Operations in California, Iowa, and North Carolina* 7 (2022); Sacoby M. Wilson et al., *Environmental Injustice and the Mississippi Hog Industry*, 110 Env't Health Persps. 195, 199 (2002).

At a regional level there are additional differences in exposure. Under the current standard, in the northeastern United States, Black populations are exposed to significantly higher levels of $PM_{2.5}$ pollution, for example, while those living in poverty and those without a high school diploma are subject to higher relative levels of $PM_{2.5}$ pollution in California. RIA 6-12 to -14; *see also id.* at ES-21 (discussing regional differences in benefits of proposed standards). The impact of $PM_{2.5}$ pollution is further exacerbated within communities of color by "health risk disparities for both Hispanic and non-Hispanic Black populations compared to non-Hispanic White populations"; for example, asthma is especially prevalent in Black populations, as is hypertension and stroke. 88 Fed. Reg. at 5592.

As a result, EPA's "at-risk analysis indicates that Black populations may experience disproportionately higher exposures and risk under air quality conditions just meeting the current primary annual $PM_{2.5}$ standard in the study areas." 88 Fed. Reg.

---

[24] David Reichmuth, Air Pollution from Cars, Trucks, and Buses in the US: Everyone Is Exposed, but the Burdens Are Not Equally Shared, https://blog.ucsusa.org/dave-reichmuth/air-pollution-from-cars-trucks-and-buses-in-the-u-s-everyone-is-exposed-but-the-burdens-are-not-equally-shared/ (Oct. 16, 2019).

[25] Union of Concerned Scientists, *Inequitable Exposure to Air Pollution from Vehicles in the Northeast and Mid-Atlantic* 2 (2019), https://www.ucsusa.org/sites/default/files/attach/2019/06/Inequitable-Exposure-to-Vehicle-Pollution-Northeast-Mid-Atlantic-Region.pdf; Union of Concerned Scientists, *Inequitable Exposure to Air Pollution from Vehicles in California* 1 (2019), https://www.ucsusa.org/sites/default/files/attach/2019/02/cv-air-pollution-CA-web.pdf.

at 5607. And EPA's RIA indicates that more stringent standards offer especially high benefits to low-income communities and communities of color. RIA at 6-42 to -43.

## V. PRIMARY $PM_{2.5}$ NAAQS

Several important facts are well established:

- $PM_{2.5}$ kills people and causes other severe human health harms.
- It causes such harms over both long- and short-term exposures.
- $PM_{2.5}$ exposures and harms are not evenly distributed across the population.
- Communities of color, especially Black communities, and low-income communities generally experience higher exposures and greater harms.
- Children and older adults, too, are at elevated risk of harm.

Also well-established: the Clean Air Act requires EPA to protect such communities and population groups, with an adequate margin of safety, against adverse health effects, and basic administrative law requires EPA to act rationally in carrying out this statutory requirement. In its efforts to fulfill its health-protective legal obligation, EPA has established one standard primarily targeting annual levels of $PM_{2.5}$ and another primarily targeting 24-hour levels. These two standards both complement one another and work together to limit harmful $PM_{2.5}$ pollution in the air people breathe.

As explained below, the evidence already in the record and in these and other comments demonstrates that, to meet the Clean Air Act's requirements and to act rationally, EPA must strengthen the annual standard's level to no higher than 8 $\mu g/m^3$ and the 24-hour standard's level to no higher than 25 $\mu g/m^3$.

### A. EPA must strengthen the annual standard to a level no higher than 8 $\mu g/m^3$

#### 1. Overwhelming evidence demonstrates that the current annual standard does not protect public health with an adequate margin of safety

Overwhelming evidence demonstrates that the current annual standard does not protect public health within an adequate margin of safety. This finding is also supported by the unanimous agreement of CASAC members and the PA that the current level of the primary annual $PM_{2.5}$ standard is not sufficiently protective of public

health and must be lowered. PA at 3-206, 3-213. The scientific basis for this conclusion is strong: In describing EPA staff's conclusions for the Administrator's consideration in this reconsideration of the primary $PM_{2.5}$ standards, EPA notes that recent scientific studies, including those analyzed in the May 2022 Supplement to the 2019 Integrated Science Assessment for Particulate Matter, provide stronger support for health effect associations at lower ambient $PM_{2.5}$ levels than in previous reviews. PA at 3-199 to -207.

The ISA Supplement finds that more recent studies support the conclusions of the ISA that significant health effects occur at levels well below the current annual standard. For the mortality endpoint, the ISA Supplement finds that recent epidemiologic studies conducted in the U.S. and Canada consisting of cohorts with mean annual $PM_{2.5}$ concentrations mostly below 12 $\mu g/m^3$, with the majority ranging from 5.9 to 11.65 $\mu g/m^3$ (i.e., a range that is entirely below the level of the current annual standard), add to the large evidence base indicating consistent, positive associations between long-term $PM_{2.5}$ exposure and mortality detailed in the 2019 ISA. ISA Supplement at 5-3.

For cardiovascular endpoints, the ISA Supplement also notes that "Recent studies report consistent, positive associations for cardiovascular mortality, specifically [ischemic heart disease ("IHD")] and stroke mortality, across different cohorts at varying spatial scales and across different exposure assessment and statistical methods with the majority having annual $PM_{2.5}$ concentrations ranging from 8.6 to 13.7 $\mu g/m^3$," again concentrations that go well below the level of the current standard. *Id.* at 5-2. This component of EPA's analysis includes a key study of long-term exposures among 11 million Medicare recipients in the southeastern U.S. with exposures from 2000-2012 estimated via aerosol optical depth data from satellites, land use, and chemical transport models (Yazdi et al. 2019). Importantly, that study includes a restricted analysis for $PM_{2.5}$ levels below the level of the current standard. In the restricted analysis, the authors report, long-term $PM_{2.5}$ exposure was significantly associated with an increased hazard of admissions for all studied outcomes (stroke, COPD, myocardial infarction, pneumonia, lung cancer, and heart failure), compared to the unrestricted analyses. The PA is clear that, in this case and others, epidemiologic studies that restrict annual or daily $PM_{2.5}$ concentrations provide support for positive and statistically significant associations at long-term mean $PM_{2.5}$ concentrations lower than the current standard. PA at 3-202. In the PA, EPA acknowledges other studies it reviewed that also restrict their analyses to air quality below the current annual $PM_{2.5}$ standard. Those

studies, including Di et al. (2017b), Shi et al. (2016), and Dominici et al. (2019), report positive and significant associations, which are often greater in magnitude than the main (unrestricted) analyses.

Furthermore, in the PA, EPA highlights recent U.S. and Canadian epidemiologic studies that provide support for positive and statistically significant health effect associations across a broad range of ambient $PM_{2.5}$ concentrations, including for air quality distributions with overall mean concentrations lower than in previous reviews. *Id.* at 3-204.

The ISA Supplement finds that, collectively, the evidence consistently and powerfully continues to support a linear, no-threshold relationship at $PM_{2.5}$ concentrations > 8 μg/m$^3$. ISA Supplement at 5-3; PA at 3-205).

The risk assessment indicates that the current primary $PM_{2.5}$ standards allow a substantial number of deaths in the U.S., with the large majority of those deaths associated with long-term PM2.5 exposures. In its analysis, when air quality in the 47 study areas was adjusted to simulate just meeting the current standards, the risk assessment estimates 40,600-45,100 long-term $PM_{2.5}$ exposure-related deaths annually, with confidence intervals ranging from 30,300-59,000. While the absolute numbers of estimated deaths vary across exposure durations, populations, and concentration-response functions, EPA correctly notes in the PA that the general magnitude of risk estimates supports the potential for significant public health impacts in locations meeting the current primary $PM_{2.5}$ standards. PA at 3-203 to -04.

In commenting on the PA, CASAC noted a few potential areas for improvements in the risk assessment. These areas include "estimat[ing] the number of prevented deaths starting at current PM levels in the [core-based statistical areas ("CBSAs") analyzed in the risk assessment] and lowering them to alternative standards," considering morbidity-based risk assessments, and expanding the geographic scope of risk assessments. CASAC Letter on PA at 10.

A recent Industrial Economics ("IEc") analysis commissioned by the Environmental Defense Fund ("EDF") addresses several of CASAC's comments. IEc, *Analysis of $PM_{2.5}$-Related Health Burdens Under Current and Alternative NAAQS: Updated Final Report* (Mar. 21, 2023), https://globalcleanair.org/files/2023/03/Updated-IEc-PM-NAAQS-Analysis-March-2023.pdf. It finds that $PM_{2.5}$ levels in 2015 resulted in 42,000 $PM_{2.5}$ attributable adult deaths (at current conditions in the 47 CBSAs analyzed in the

PA). This was estimated using EPA's 12km air quality surface, which uses Bayesian downscaling to integrate monitor data with model data from a chemical transport model, county scale baseline mortality rates and concentration response functions from Turner et al. (2016). These are data and model inputs used by EPA in its PA, except that the IEc report uses the current conditions for 2015 rather than the simulated conditions of just meeting the current standard. It shows that despite being slightly lower, even without simulating just meeting the current annual average standard, populations in the 47 CBSAs are bearing significant health burdens due to $PM_{2.5}$ at current conditions.

To expand the geographic scope of the assessment across the nation beyond the CBSAs EPA analyzed in the Policy Assessment, the IEc report uses fine scale (1 $km^2$) ensemble model $PM_{2.5}$ data to assess the health burden—including morbidity—due to fine particle air pollution nationwide. The report finds that in 2015, $PM_{2.5}$ exposure, across the contiguous United States, resulted in:

- 120,000 premature adult deaths
- 75,000 respiratory emergency room visits
- 110,000 non-fatal heart attacks
- 27,000 cases of Alzheimer's disease
- 24,000 childhood asthma emergency room visits

The national morbidity impacts of $PM_{2.5}$ are substantial and devastating to families affected. The resulting missed school and workdays and increased health care costs are just the tip of the iceberg in terms of the ways this affects families' ability to thrive.

Also notable, up to 70% of these impacts are experienced in areas outside the 47 CBSAs analyzed in the Policy Assessment and therefore are not captured in EPA's analysis. Many of the populations bearing the burden in these areas are rural with lower access to health care. Many are Black, as well.

Though unhealthy air affects many people throughout this country, historically marginalized communities and communities of color are harmed disproportionately. EPA's most recent literature review of the science related to the health and welfare effects of particle pollution concluded that people of color, particularly Black populations, are at a greater risk for health impacts from fine particles, as are low

socioeconomic status populations.[26] Black and Hispanic populations generally experience exposures to greater levels of air pollution.[27] And numerous studies have found that Hispanic, Asian and especially Black populations have a higher risk of premature death from particle pollution than white populations do.[28] The largest examination of particle pollution-related mortality nationwide found that low socioeconomic status consistently increased the risk of premature death from fine particulate pollution.[29] And the risk of dying and likelihood for asthma increase in

---

[26] ISA Supplement at 3-160 to -61; ISA at 12-31 to -38.

[27] Nardone A, Casey JA, Morello-Frosch R, Mujahid M, Balmes JR, Thakur N. "Associations between historical residential redlining and current age-adjusted rates of emergency department visits due to asthma across eight cities in California: an ecological study." Lancet Planet Health. 2020:4(1):e24-e31; Miranda ML, Edwards SE, Keating MH, Paul CJ. "Making the environmental justice grade: The relative burden of air pollution exposure in the United States." Int J Environ Res Public Health. 2011; 8: 1755-1771; Ihab Mikati, Adam F. Benson, Thomas J. Luben, Jason D. Sacks, Jennifer Richmond-Bryant, "Disparities in Distribution of Particulate Matter Emission Sources by Race and Poverty Status", American Journal of Public Health 108, no. 4 (April 1, 2018): pp. 480-485, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5844406/.

[28] Kioumourtzoglou MA, Schwartz J, James P, Dominici F, Zanobetti A. $PM_{2.5}$ and mortality in 207 US cities: Modification by temperature and city characteristics. Epidemiology, 2016; 27: 221-227. Di Q, et al, Air Pollution and Mortality in the Medicare Population. N Engl J Med, 2017; 376:2513-2522.

[29] Zeger, Scott L., Francesca Dominici, Aidan McDermott, and Jonathan M. Samet. "Mortality in the Medicare population and chronic exposure to fine particulate air pollution in urban centers (2000–2005)." Environmental Health Perspectives 116, no. 12 (2008): 1614-1619. See above noting that Di et al. (2017a) showed chronic mortality risk three times higher for Black populations. The study, as noted above, involved air quality distributions allowed by the current NAAQS.

populations with higher unemployment, higher use of public transportation and among people eligible for Medicaid.[30]

A seminal Medicare chronic mortality study (Di et al. (2017a)) showed three times higher relative risk (hazard ratio) for Black populations compared to the general population (a hazard ratio of 1.21 per 10 μg/m$^3$ increase in $PM_{2.5}$). A study by Thind et al. (2019) identified high air pollution exposures among Black populations from electricity generation. In that study, disparities by race/ethnicity were observed for each income category, indicating that the racial/ethnic differences hold even after accounting for differences in income. The ISA notes specifically that analyses that directly compare PM-related health effects across groups—i.e., stratified analyses—indicate that communities of color have higher $PM_{2.5}$ exposures than white populations, contributing to adverse health risk in populations made up of people of color (ISA section 12.5.4). Drawing from such studies, the ISA concludes "[t]here is strong evidence demonstrating that black and Hispanic populations, in particular, have higher $PM_{2.5}$ exposures than non-Hispanic white populations" and "there is consistent evidence across multiple studies demonstrating an increase in risk for nonwhite populations." ISA at 12-38. Indeed, coupled with the fact that multiple epidemiologic studies show adverse effects—including premature mortality—in many areas of the country with air quality allowed by the current NAAQS, it is evident, as the 2020 PA finds, that the groups at increased risk "represent a substantial portion of the total U.S. population." 2020 PA 3-44.

---

[30] Bell ML, Dominici F. Effect modification by community characteristics on the short-term effects of ozone exposure and mortality in 98 US communities. Am J Epidemiol. 2008; 167: 986-997. Wang Y, Kloog I, Coul BA, Kosheleva A, Zanobetti A, Schwartz JD. Estimating causal effects of long-term $PM_{2.5}$ exposure on mortality in New Jersey. Environ Health Perspect. 2016; 124: 1182-1188. O'Lenick, CR et al. Assessment of neighbourhood-level socioeconomic status as a modifier of air pollution-asthma associations among children in Atlanta. J Epi Comm Health. 2017:71(2):129-136; Strickland MJ, et al. Modification of the effect of ambient air pollution on pediatric asthma emergency visits: susceptible subpopulations, Epidemiology. 2014; 25: 843-850

**2. To meet the Clean Air Act's mandates, which include advancing environmental justice, EPA must set the annual standard's level no higher than 8 µg/m³**

In 2018, researchers published systematic review and meta-analysis examining the association between long-term exposure to $PM_{2.5}$ and mortality derived from 53 studies, including 8 studies that had a mean $PM_{2.5}$ level <9 µg/m³.[31] The study concludes that significant effects were observed below 10 µg/m³ and a number of studies included evidence of effects down to a mean $PM_{2.5}$ level of 4.1 µg/m³.[32] Indeed, several Canadian-based research studies evaluate the effects of air pollution on heart and lung disease and find increased risk at levels even below the WHO guidelines of 5 µg/m³. A population-based cohort study conducted in Vancouver, Canada, investigates the association between air pollution—including black carbon, a constituent of $PM_{2.5}$—and chronic obstructive pulmonary disease ("COPD") and finds an increase in COPD hospitalization and mortality (mean $PM_{2.5}$ concentration of 4.1 ug/m³).[33] In a second study, the authors used the same cohort/population-level data to assess the association between air pollution and coronary heart disease ("CHD"). In this case, the authors observed a similar phenomenon in that long-term exposure to particulate pollution was associated with adverse cardiovascular outcomes—including hospitalization and mortality.[34] Importantly, the cohort-study population includes over 450,000 residents

---

[31] Vodonos, A., Awad, Y. A., & Schwartz, J. The concentration-response between long-term $PM_{2.5}$ exposure and mortality; A meta-regression approach (2018). *Environmental Research*, *166*, 677-689; available at https://www.sciencedirect.com/science/article/pii/S0013935118303256.

[32] *Id.*

[33] Gan, W. Q., FitzGerald, J. M., Carlsten, C., Sadatsafavi, M., & Brauer, M. Associations of ambient air pollution with chronic obstructive pulmonary disease hospitalization and mortality (2013). *American Journal of Respiratory and Critical Care Medicine*, *187*(7), 721-727; available at https://www.atsjournals.org/doi/full/10.1164/rccm.201211-2004OC.

[34] Gan, W. Q., Koehoorn, M., Davies, H. W., Demers, P. A., Tamburic, L., & Brauer, M. (2011). Long-term exposure to traffic-related air pollution and the risk of coronary heart

(between 45-85 years), and with such a large sample size the study has the statistical power to detect the observed health outcomes (COPD and CHD).

In a separate analysis, researchers conducted a prospective cohort study of respondents linked to the Canadian Community Health Survey, which includes a population size of nearly 300,000 individuals.[35] The study examines risks of circulatory and respiratory mortality and exposure to a mean $PM_{2.5}$ level of 6.3 μg/m$^3$ and finds that increased risk of mortality was observed even at such a low concentration.[36]

In a recent article published in Science, researchers evaluated the World Health Organization's guidelines, which were recently issued and propose an annual average concentration of 5 ug/m$^3$ for $PM_{2.5}$.[37] The authors undertook a population-based cohort study of 7.1 million individuals in one of the areas with the lowest exposure levels in order to address this question. At very low (5 μg/m$^3$) concentrations, the data show a supralinear concentration response connection between $PM_{2.5}$ and death. In comparison to prior estimates, this modified global concentration-response function integrating this new data implies that $PM_{2.5}$ causes an additional 1.5 million fatalities globally, each year.

Taking this evidence with the other evidence discussed below, including evidence of the disproportionate harms $PM_{2.5}$ has on communities of color and low-income communities EPA must set the annual standard no higher than 8 μg/m$^3$.

---

disease hospitalization and mortality (2011). *Environmental Health Perspectives*, *119*(4), 501-507; available at https://ehp.niehs.nih.gov/doi/full/10.1289/ehp.1002511.

[35] Pinault, L., Tjepkema, M., Crouse, D. L., Weichenthal, S., van Donkelaar, A., Martin, R. V., ... & Burnett, R. T. Risk estimates of mortality attributed to low concentrations of ambient fine particulate matter in the Canadian community health survey cohort (2016). *Environmental Health*, *15*(1), 1-15; available at https://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0111-6.

[36] *Id.*

[37] Weichenthal, S., Pinault, L., Christidis, T., Burnett, R. T., Brook, J. R., Chu, Y., & Brauer, M. How low can you go? Air pollution affects mortality at very low levels (2022). *Science Advances*, *8*(39), eabo3381; available at https://www.science.org/doi/10.1126/sciadv.abo3381.

**i. Copious evidence demonstrates that an annual standard no higher than 8 μg/m³ is necessary to reduce disparities that disproportionately harm Black populations and other communities of color**

Decades of historically racist policies such as redlining and siting of highways and polluting facilities have resulted in communities of color and other historically marginalized populations living in areas with a disproportionately higher number of $PM_{2.5}$ sources. This has resulted in populations of color and low-income communities experiencing higher exposure to a range of dangerous pollutants, including $PM_{2.5}$.

Studies from the last several years have quantified the magnitude of the disproportionate burden of $PM_{2.5}$ on Black and Hispanic populations. To set a standard that, consistent with the Clean Air Act, is truly protective of all populations, including the most at-risk, it is critical that EPA consider and maximally redress the pollution burden on the most sensitive populations. As we describe below, to do this, EPA must set the annual standard no higher than 8 μg/m³.

**a. Disproportionate exposure and harms**

A 2018 study by EPA scientists published in the American Journal of Public Health, for example, finds that communities of color overall experienced 1.28 times $PM_{2.5}$ emissions source burden of the general population, and Black populations, specifically, experienced the greatest degree of disparity in the siting of PM emitting facilities at national, state, and county levels, burdened with 1.54 times the PM emissions faced by the general population. Ihab Mikati et al., *Disparities in Distribution of Particulate Matter Emission Sources by Race and Poverty Status*, 108 Am. J. Pub. Health 480 (2018), https://doi.org/10.2105/AJPH.2017.304297)

An April 2021 study in Science Advances finds that nearly all categories of $PM_{2.5}$ emission sources contribute to the "systemic $PM_{2.5}$ exposure disparity experienced by people of color," and this is true across different states, in both rural and urban areas, and when income levels and exposure levels are controlled for. Tessum et al., *$PM_{2.5}$ Polluters Disproportionately and Systemically Affect People of Color in the United States*, at 1. The study finds that in "2014 total population average $PM_{2.5}$ exposure from all domestic anthropogenic sources is 6.5 μg $m^{-3}$ in the contiguous United States; exposures are higher than average for POC, Blacks, Hispanics, and Asians (7.4, 7.9, 7.2, and 7.7 μg $m^{-3}$,

respectively…) and lower than average for Whites (5.9 μg $m^{-3}$…).” The authors estimate that:

- White populations are exposed to 8% lower $PM_{2.5}$ concentrations than the average American, from emission sources causing 60% of overall exposure.
- Black populations are exposed to 21% greater $PM_{2.5}$ concentrations than the average American, from sources contributing 78% of exposure.
- Hispanic and Asian populations are exposed to $PM_{2.5}$ from 87% and 73% of sources, respectively, and experience 11% (0.72 μg $m^{-3}$) and 18% (1.20 μg $m^{-3}$) overall exposure disparities, respectively.

The recent nationwide IEc analysis, using the Di et al. (2019) ensemble model predictions at 1 $km^2$, finds that $PM_{2.5}$ disparities in exposure and resulting health outcomes were substantial across the U.S.

- Older Black, Asian and Hispanic populations had greater likelihood (58%, 84%, and 113% higher, respectively) than others of living in neighborhoods where $PM_{2.5}$ pollution levels were above 10 μg/$m^3$.
- Older low-income populations (below 2X federal poverty limit) were 49% more likely to live in neighborhoods where levels of $PM_{2.5}$ were above 12 μg/$m^3$.

EXHIBIT 5-4. LIKELIHOOD OF LIVING WHERE $PM_{2.5}$ EXCEEDS SPECIFIED CONCENTRATIONS - NATION, 65-99




Note: The reference group for each race is all *other* races combined. Comparisons between individual race groups will vary.

EPA has recognized the environmental injustice posed by PM pollution. However, in the proposed rule, EPA claims that "White, Hispanic, and Asian populations were exposed to similar average $PM_{2.5}$ concentrations," 88 Fed. Reg. at 5616, contradicting the body of evidence and conclusions in the PA that Hispanic populations have higher $PM_{2.5}$ exposure. In the PA, EPA says that "there is strong evidence for racial and ethnic disparities in $PM_{2.5}$ exposures and $PM_{2.5}$-related health risk," specifically "demonstrating that Black and Hispanic populations, in particular, have higher $PM_{2.5}$ exposures than non-Hispanic White populations." PA at 3-55 (citing ISA fig.12-2; ISA Supplement fig.3-38).

Inequities in health impacts from $PM_{2.5}$ do not result solely from inequities in exposure. Many of the same racist policies, institutional practices, and low representation have caused disinvestment in communities of color, resulting in differential quality and distribution of housing, transportation, economic opportunity, education, food, access to health care, chronic stress, and beyond. All these inequities manifest in health disparities, higher underlying mortality rates, and greater vulnerability to pollution-caused disease. Rachel Morello-Frosch et al., *Understanding the Cumulative Impacts of Inequalities in Environmental Health: Implications for Policy*, 30 Health Affairs 879 (2011); Devon C. Payne-Sturges et al., *Confronting Racism in Environmental*

*Health Sciences: Moving the Science Forward for Eliminating Racial Inequities*, 129 Environ. Health Perspectives 055002 (2021).

EPA acknowledges the evidence on this in the PA, stating:

> Current scientific evidence indicates that some populations, such as different racial/ethnic groups, face higher health burdens from $PM_{2.5}$, including for higher levels of exposure and for increased risk of adverse health responses to a given level of exposure….

PA at 3-156. In that document, EPA reports on its own risk analysis that incorporated race- and ethnicity-specific concentration-response functions from Di et al. (2017) and found that "[a]cross all scenarios and demographic groups evaluated, Black populations are associated with the largest $PM_{2.5}$-attributable mortality risk rate per 100,000 people." *Id.* at 3-158.

These findings are consistent with a range of studies and analyses that use different methods to assess exposure, extending the analysis to areas outside those assessed in the PA and to disease outcomes that affect younger populations' ability to grow into their full potential and communities' ability to thrive.

The 2023 IEc analysis finds that nationwide, Black populations over age 65 were three times more likely to die from exposure to particulate matter than other seniors. In fact, despite Black seniors making up only 9% of the 65-year-old and above population, they bear nearly 25% of the total mortality burden from $PM_{2.5}$ (over 29,000 deaths in this group in 2015 alone). Additionally, many of these risks were borne by populations outside the PA areas, highlighting the importance of looking beyond the urban areas analyzed in the PA to fully capture the harmful impacts of $PM_{2.5}$.

EXHIBIT 2-8. CURRENT NATIONAL $PM_{2.5}$-ATTRIBUTABLE MORTALITY BURDEN BY RACE, AGES 65-99




EXHIBIT 2-9. FINE SCALE $PM_{2.5}$-ATTRIBUTABLE MORTALITY BURDEN PER 100,000 FOR THOSE AGED 65-99, CENSUS TRACT LEVEL



According to the CDC, asthma is the leading cause of chronic disease among children, with about 6 million children in the United States living with asthma. CDC, Asthma in Children (last visited Mar. 22, 2023), https://www.cdc.gov/vitalsigns/childhood-asthma/index.html. About 16% of Black children and 7% of white children have asthma. *Id.* There are over 790,000 emergency room visits and over 64,000 hospitalizations among children annually due to asthma. CDC, Most Recent National Asthma Data (last visited Mar. 22, 2023), https://www.cdc.gov/asthma/most_recent_national_asthma_data.htm (click on "Heathcare Use" tab). Emergency room visits for asthma attacks were highest among young children and non-Hispanic Black children, and Black children are 5 times more likely to be hospitalized for asthma.

Developing asthma changes a child's life. It changes the trajectory of physical, emotional and academic growth. Asthma is the leading cause of missed school days each year and has been linked to diminished school performance. Bonnie B. Dean et al., *Uncontrolled Asthma: Assessing Quality of Life and Productivity of Children and Their Caregivers Using a Cross-Sectional Internet-Based Survey*, 8 Health & Quality of Life Outcomes 1 (2010). It also places an economic burden on the family. During 2008-2013, asthma was responsible for $3 billion in losses due to missed work and school days, $29 billion due to asthma-related mortality, and $50.3 billion in medical costs. Tursynbek Nurmagambetov et al., *The Economic Burden of Asthma in the United States, 2008-2013*, 15 Annals Am. Thoracic Soc'y 348 (2018).

There is a body of evidence that indicates that $PM_{2.5}$ is associated with asthma among children. The ISA concludes that the "[e]pidemiologic evidence strongly supports a relationship with decrements in lung function growth in children" and "with asthma development in children, with increased bronchitic symptoms in children with asthma, with an acceleration of lung function decline in adults, and respiratory mortality, including cause-specific respiratory mortality for COPD and respiratory infection." ISA at 1-34 tbl.1-2; PA at 3-38. Epidemiologic studies evaluated in the ISA continue to provide strong evidence for a relationship between short-term $PM_{2.5}$ exposure and several respiratory-related endpoints, including asthma exacerbation. The collective body of epidemiologic evidence for asthma exacerbation is more consistent in children than in adults. PA at 3-39 (citing ISA section 5.1.2.1).

Further, a study of over 600,000 asthma emergency department visits in Atlanta, Dallas and St. Louis (over 1993-2009), Alhanti et al. (2016), finds that $PM_{2.5}$ was associated with higher asthma emergency room visits among children, particularly among populations of color. Utilizing the results of this study, the 2023 IEc analysis finds that people of color who are children are six times more likely to visit the emergency room for air pollution-triggered childhood asthma than non-Hispanic white children. While Black children account for 14% of the population of children, they account for 30% of the PM-attributable asthma emergency room visits. More than half the PM-attributable childhood asthma emergency room visits among Black children occur outside the areas examined in the PA and considered by EPA in the current proposed rule.

EXHIBIT 2-12. CURRENT $PM_{2.5}$-ATTRIBUTABLE MORBIDITY BURDEN FOR ASTHMA ED VISITS IN CHILDREN AGED 0-18 (PER 100,000, STRATIFIED BY RACE/ETHNICITY)

| STRATIFIED RISK ESTIMATE ALHANTI ET AL., 2016 | RACE/ ETHNICITY | NATION | PA AREAS | | NON-PA AREAS |
|---|---|---|---|---|---|
| | | 1KM | 12KM | 1KM | 1KM |
| White | White, Non-Hispanic | 10 | 13 | 12 | 9 |
| Total Non-white | White, Hispanic<br>Plus All Other Races, Ethnicities | 58 | 57 | 69 | 50 |

EXHIBIT D-3. CURRENT $PM_{2.5}$-ATTRIBUTABLE MORBIDITY BURDEN FOR ASTHMA ED VISITS (STRATIFIED BY RACE/ETHNICITY)

| AUTHOR | CONCENTRATION - RESPONSE RELATIONSHIP | AGE GROUP | RACE | ETHNICITY | NATION | PA AREAS | | NON-PA AREAS |
|---|---|---|---|---|---|---|---|---|
| | | | | | 1KM | 12KM | 1KM | 1KM |
| Alhanti et al. (2016) | White | 0-18 | White | Non-Hispanic | 4,117 | 1,365 | 1,273 | 2,844 |
| | Non-white | | White | Hispanic | 9,820 | 5,295 | 5,056 | 4,764 |
| | Non-white | | Asian | All | 2,254 | 1,271 | 1,182 | 1,072 |
| | Non-white | | Black | All | 7,691 | 3,439 | 3,236 | 4,455 |
| | Non-white | | Native American | All | 459 | 153 | 145 | 314 |

While the etiopathology of asthma is multifactorial, it is unconscionable that the air our children breathe is another source of this disparity.

**b. The RIA, PA, and premature mortality**

In its RIA, EPA sought to calculate the "proportionality of $PM_{2.5}$ concentration changes when moving from the current (baseline) to alternative standard levels under air quality scenarios associated with [different] emission control strategies" at both the national and regional levels. RIA at 6-20. For the national level, EPA found that alternative standard levels linked with control measures reduce the average $PM_{2.5}$ exposure concentrations experienced by the reference population by a growing proportion when the alternative standards are lowered, with a 0.7% improvement for 12/35-10/35 and a 3.8% reduction for 12/35-8/35. *Id.* at 6-22 fig.6-9. Both Hispanic and Asian populations are expected to see the greatest percentage decreases in $PM_{2.5}$ concentrations under all alternative standard levels considered, followed by those with less education. *Id.* When shifting from 12/35-10/35, Black populations experience lesser proportional $PM_{2.5}$ concentration improvements than white populations, but, with moving to stronger standards, Black populations experience better proportional $PM_{2.5}$ concentration improvements than white populations, especially when moving from 12/35-8/35. *Id.* The RIA explains that this is most likely due to the fact that gaps in $PM_{2.5}$ concentrations experienced by Black populations versus those experienced by white populations in the baseline are greater at lower ambient $PM_{2.5}$ concentrations, with Black populations experiencing higher $PM_{2.5}$ levels relative to white populations throughout the distribution but especially at lower ambient concentrations. *Id.* at 6-21. Importantly, for lower alternative $PM_{2.5}$ limits, this results in proportionately bigger benefits for Black populations and effectively narrows disparities as compared to white populations. *Id.*

The RIA further analyzes the environmental justice implications of premature mortality, citing the ISA and ISA Supplement as finding notable differences in racial and ethnic $PM_{2.5}$ exposure across the United States, with Black populations experiencing some of the greatest disparities compared to white populations. *Id.* at 6-23 to -24. Furthermore, several studies found higher $PM_{2.5}$-related mortality and other health impacts from long-term $PM_{2.5}$ exposure in Black communities. *Id.* at 6-24. Taken together, Black people are at elevated risk for $PM_{2.5}$-related health consequences due in part to inequalities in exposure. *Id.*

Figures 6-11 and Figure 6-12 in the RIA depict the nationwide averages and distributions of estimated mortality rates per 100,000 people for different demographic

groups over the age of 64. The larger magnitude concentration-response relationship between exposure and mortality, which was outlined in Di et al. (2017), shows that Black populations experience higher mortality rates. *Id.* at 6-25. A heat map of this data shows the greatest decrease in mortality rates from 9/35 to 8/35 (572 per 100,000 to 559 per 100,000) when compared to a more moderate decrease in the standard of 12/35 to 10/35 (581 per 100,000 versus 579 per 100,000) for Black populations. *Id.* at 6-26 fig.6-11. It is important to note that white populations experience far fewer mortalities (over 30% fewer mortalities at the current standard of 12 $ug/m^3$) as well as substantially lower decreases in mortality at alternative standards—for 9/35 to 8/35, the mortality rate decreases from 184 per 100,000 to 181 per 100,000 versus 12/35 to 10/35 where the mortality rate only decreases from 186 per 100,000 to 185 per 100,000.

EPA's own analysis shows that it can achieve the greatest reductions in exposure and mortality disparities at 8 $ug/m^3$. Indeed, its analysis shows that it cannot possibly justify a less stringent standard given the reality that a stronger standard will achieve the greatest reductions in premature deaths, especially for Black populations and other communities of color. If not corrected, EPA's approach will leave the most affected, most overburdened populations—communities of color, especially Black populations, and low-income communities—to experience levels of $PM_{2.5}$ pollution that EPA knows cause serious adverse health effects, including death.

Further, the PA finds that, when considering both exposure and vulnerability disparities across race/ethnicity, strengthening the annual $PM_{2.5}$ standard from 12 to 8 $\mu g/m^3$ would, among the elderly in 30 metropolitan areas, prevent 4,260 $PM_{2.5}$-attributable deaths among Black populations, 1,290 $PM_{2.5}$-attributable deaths in Hispanic populations, 525 $PM_{2.5}$-attributable deaths in Asian populations, and 28 $PM_{2.5}$-attributable deaths among Native American populations; and reduce 7,490 $PM_{2.5}$-attributable deaths among white populations. PA at C-64 tbl.C-16.

The demographic risk analysis included in the PA captures average $PM_{2.5}$ concentration and mortality risk rate by demographic population under alternative $PM_{2.5}$ standards. It's critical to note that in all of the included scenarios, Black populations still experience higher average PM-attributable risk than every other demographic group; however, the gap between Black populations and other demographic groups decreases as the standard is lowered (as seen in Figure 3-20 of the PA). *Id.* at 3-159 to -160 & figs.3-20, 3-21, 3-162.




**Figure 3-20. Average $PM_{2.5}$ exposure concentration and $PM_{2.5}$-attributable risk estimates by demographic population when just meeting current or alternative $PM_{2.5}$ standards.**

According to the demographic risk analysis, as cited above, for Black populations, an annual $PM_{2.5}$ standard of 8 µg/m³ results in an average mortality risk rate reduction of over 250 per 100k, compared to just above 200 per 100k for 9 µg/m³ and less than 150 per 100k for 10 µg/m³. The average mortality risk rate for Black populations remains nearly three times that of white populations even under a standard of 8 µg/m³, and complementary policies to address the lingering inequity will be crucial. However, it's important to note that based on the information in EPA's own PA, a standard of 8 µg/m³ would reduce the average mortality risk rate by nearly twice as much as a standard of 10 µg/m³ and goes the furthest in reducing disparities.

The results, discussed more fully below, of Josey et al. (2023)[38] further support the findings of Di et al. (2017) (used in the PA), that the increase in mortality per unit increase in $PM_{2.5}$ is larger among older Black populations in comparison to older white populations. This recent study thus confirms that a standard of 8 μg/m³ is necessary.

In the proposed rule EPA acknowledges the benefits of stronger standards and the recommendation from CASAC:

> The risk assessment estimates that the current primary $PM_{2.5}$ standards could allow a substantial number of $PM_{2.5}$-associated deaths in the U.S. Additionally, compared to the current annual standard, meeting a revised annual standard with a lower level is estimated to reduce $PM_{2.5}$-associated health risks in the 30 study areas controlled by the annual standard by about 7-9% for a level of 11.0 μg/m³, 15-19% for a level of 10.0 μg/m³, 22-28% for a level of 9.0 μg/m³, and 30-37% for a level of 8.0 μg/m³) (U.S. EPA, 2022a, Table 3-17). The CASAC concurred with the PA's assessment that meaningful risk reductions will result from lowering the annual $PM_{2.5}$ standard (Sheppard, 2022a, p. 16 of consensus responses).

88 Fed. Reg. at 5627-28.

On February 16, 2023, President Biden signed a new Executive Order titled Further Advancing Racial Equity and Support for Underserved Communities Throughout the Federal Government. Exec. Order 14,091, 88 Fed. Reg. 10,825 (Feb. 22, 2023). The Executive Order sets up a process to "coordinate with the White House Environmental Justice Interagency Council to ensure that equity and environmental justice efforts are consistent and mutually reinforcing." *Id.* § 2(b), 88 Fed. Reg. at 10,827-28. News reports suggest the White House Environmental Justice Advisory Committee will call for the agency to strengthen the proposed rule to ensure adequate protections of underserved communities. *See WHEJAC Establishes Workgroup for Input on NAAQS*, InsideEPA.com (Mar. 3, 2023), https://insideepa.com/daily-feed/whejac-establishes-workgroup-input-naaqs. Additionally, the Executive Order expands on earlier equity-

---

[38] Josey K P, Delaney S W, Wu X, Nethery R C, DeSouza P, Braun D and Dominici F. 2023. *Air Pollution and Mortality at the Intersection of Race and Social Class*, New England Journal of Medicine, https://doi.org/10.1056/NEJMsa2300523

related Executive Orders (including the Executive Order on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis), by affirming the need to advance equity in health and to "deliver environmental justice." Exec. Order 14,091 § 1, 88 Fed. Reg. at 10,826. To effectively satisfy the provisions outlined in the most recent Executive Order along with Clean Air Act mandates, EPA must strengthen the annual $PM_{2.5}$ NAAQS to at least 8 ug/$m^3$, where it is reasonably certain that the NAAQS will provide the greatest health benefits for underserved communities. Disparities will remain, however, and EPA and the rest of the government must take action to close them, as well.

### c. Recent studies regarding disparities

Additional scientific evidence (including some studies published after EPA's ISA Supplement was finalized) indicates that long-term exposures to ambient $PM_{2.5}$ air pollution are even more harmful to historically marginalized populations than was previously understood.

Bravo et al. (2022) analyzes whether improvements in air quality ($PM_{2.5}$ and ozone) in North Carolina between 2002-2016 have been equitably distributed across subpopulations. The study estimates daily and annual $PM_{2.5}$ concentrations at the Census tract-level and calculated tract-level measures of: racial isolation of non-Hispanic Black individuals, educational isolation of non-college educated individuals, the neighborhood deprivation index, and percentage of the population in urban areas. The authors find that tracts with lower educational isolation and higher urbanicity had higher $PM_{2.5}$ and more pronounced declines in $PM_{2.5}$. Racial isolation was associated with higher $PM_{2.5}$ but not with the rate of decline in $PM_{2.5}$. This study adds to prior evidence, including in Colmer et al. (2020), that despite declines in pollutant concentrations, over time, disparities in exposure have increased for racially and educationally isolated communities.

Henneman et al. (2023) explores whether benefits from emissions reductions at U.S. coal-fired power plants over recent decades have accrued equitably across population groups. This study quantifies nationwide long-term changes in exposure to $PM_{2.5}$ associated with coal power plant $SO_2$ emissions by assessing how emissions changes from 1999-2020 in different locations have influenced exposure inequities, extending previous source-specific environmental justice analyses by accounting for

location-specific differences in racial/ethnic population distributions. Overall, this study finds that Black populations in the South and North Central United States and Native American populations in the western United States were inequitably exposed to coal-linked $PM_{2.5}$ early in the study period. Although the authors find that inequities decreased with falling emissions, facilities in states across the North Central United States continue to inequitably expose Black populations, and Native populations are inequitably exposed to $PM_{2.5}$ resulting from emissions from coal-fired power generation in the West.

Thind et al. (2023) explores inequitable $PM_{2.5}$ exposures and health effects by analyzing impacts from inter-regional freight transportation in the contiguous United States: total mortality attributable to $PM_{2.5}$ air pollution, racial-ethnic disparities in $PM_{2.5}$-attributable mortality (and CO2 emissions). This study is the first to comprehensively compare freight modes (truck, rail, barge, and aircraft) separately and the first to explore racial/ethnic exposure disparities by route and mode, nationally. The study finds that average $PM_{2.5}$ exposures from inter-regional truck and rail are the highest for white non-Hispanic people, those from barge are the highest for Black people, and those from aircraft are the highest for people who are mixed/other race.

Additional peer-reviewed science suggests that the exposure-response risk functions used by EPA in its risk assessment and PAs may also be significantly underestimating race-specific mortality due to long-term $PM_{2.5}$ exposure. Spiller et al. (2021) explores the policy implications of using race/ethnicity-specific concentration-response functions and mortality data in comparison to standard federal approaches when estimating the impact of air pollution on non-white racial/ethnic subgroups. Using new estimates from the epidemiological literature on race/ethnicity-specific concentration-response functions paired with race/ethnicity-specific mortality rates, the authors estimate the mortality impacts of air pollution from all sources from a uniform increase in concentrations and from the regulations imposed by the Mercury and Air Toxics Standards. Importantly, the study finds that application of race/ethnicity-specific information increased $PM_{2.5}$-related premature mortality estimates in older populations by 9% and among older Black populations by 150% for all-source pollution exposure. Under a uniform degradation of air quality and race/ethnicity-specific information, older Black people were found to have approximately 3 times higher mortality relative to white people, a finding that is obscured under a non-race/ ethnicity-specific modeling approach. Standard approaches of using non-racial/ethnic specific information

underestimate the benefits of the Mercury and Air Toxics Standards to older Black populations by almost 60% and overestimate the benefits to older white populations by 14%, relative to using a race/ethnicity-specific modeling approach.

Because of the public availability of the race-specific concentration-response functions, EPA should use this information to quantify disparity in $PM_{2.5}$ impacts on older Black populations. Based on these results, we recommend that the best available race/ethnicity-specific inputs be used in regulatory assessments to understand and reduce environmental injustices. Given that EPA deployed this type of "standard approach" in its assessment for the current proposal, there is strong reason to believe that the inequitable burdens of long-term $PM_{2.5}$ exposure are underestimated by EPA and that the current standard must be strengthened in accordance with the Clean Air Act to advance environmental health equity and address longstanding environmental injustice as it relates to the heavy burden of $PM_{2.5}$ air pollution on vulnerable populations.

Wang et al. (2022) details a population-based cohort study, comprising all Medicare enrollees aged 65 or older in the southeastern United States from 2000-2016, to explore the associations between long-term exposure to $PM_{2.5}$ major components and all-cause mortality among the elderly. The authors estimate ZIP code-level annual mean concentrations for five major $PM_{2.5}$ components, including black carbon, nitrate, organic matter, sulfate, and soil particles. Data are analyzed using Cox proportional hazards models, adjusting for potential confounders. In single component models, all five major $PM_{2.5}$ components are significantly associated with elevated all-cause mortality at the average exposure level of 9.56 $\mu g/m^3$ using satellite-derived, unweighted exposure estimates (25th percentile: 8.14 $\mu g/m^3$).

Shi et al. (2023) also finds evidence of $PM_{2.5}$ harms at annual average levels below 10 $\mu g/m^3$. The authors conducted a nationwide population-based cohort study (2000 to 2017) by integrating the Medicare Chronic Conditions Warehouse database and two independently sourced datasets of high-resolution $PM_{2.5}$ major chemical composition. Those air pollution estimates were retrieved from two independent sources, including black carbon, organic matter, nitrate, sulfate, ammonium, and soil dust. Using one exposure source, the dementia cohort had an average $PM_{2.5}$ mass concentration of 9.58 $\mu g/m^3$, with an interquartile range (IQR) of 3.68 $\mu g/m^3$. The secondary exposure data showed similar means and IQRs for all $PM_{2.5}$ constituents of interest except for black

carbon, which showed lower levels than exposure I, albeit with overlapping distributions. Results using two exposure datasets consistently indicated higher rates of incident dementia and Alzheimer's disease for an increased exposure to $PM_{2.5}$ and its major constituents. An interquartile range increase in $PM_{2.5}$ mass was associated with a 6 to 7% increase in dementia incidence and a 9% increase in Alzheimer's disease incidence.

An additional recent study (Josey et al. 2023)[39] further demonstrates that an annual standard no higher than 8 μg/m³ is necessary to reduce disparities that disproportionately harm marginalized subpopulations. This study analyzes Medicare data from 73 million people 65 years or older from 2000-2016 to estimate associations between annual $PM_{2.5}$ exposure and mortality in subpopulations defined simultaneously by racial identity (Black vs. white) and income level (Medicaid eligible vs. ineligible). Annual $PM_{2.5}$ exposure was estimated using a validated exposure prediction model that provides estimated daily $PM_{2.5}$ levels at a 1-km² grid scale across the contiguous United States.[40] The authors aggregated the gridded $PM_{2.5}$ exposure data to the ZIP code level to match the spatial resolution of Medicare data and averaged daily ZIP code level $PM_{2.5}$ estimates across each year of the study to estimate annual average $PM_{2.5}$ exposures. While the study reported that lower $PM_{2.5}$ exposure was associated with lower mortality in the full population, historically marginalized subpopulations benefited more as $PM_{2.5}$ levels decreased from 12 to 8 μg/m³. In this study analyzing health risks within the range of the proposed annual standard being considered by EPA, higher-income Black populations, low-income white populations, and low-income Black populations benefited more from lower $PM_{2.5}$ levels than higher-income white populations.

---

[39] Josey K P, Delaney S W, Wu X, Nethery R C, DeSouza P, Braun D and Dominici F. 2023. *Air Pollution and Mortality at the Intersection of Race and Social Class*, New England Journal of Medicine, https://doi.org/10.1056/NEJMsa2300523

[40] Di Q, Amini H, Shi L, et al. An Ensemble-Based Model of $PM_{2.5}$ Concentration Across the Contiguous United States with High Spatiotemporal Resolution. Environ Int 2019;130:104909. https://doi.org/10.1016/j.envint.2019.104909

**ii. An annual standard no higher than 8 μg/m³ will save many thousands of lives and prevent significant numbers of other serious human health harms, including for children and for people experiencing poverty**

EPA's own analysis, as well as more recent analysis, demonstrates that an annual standard no higher than 8 μg/m³ is requisite to protect public health with an adequate margin of safety. For the 30 CBSAs (25% of the full U.S. population) where the annual standard is controlling the air quality, 38,900 deaths (26,600-51,000) are attributed to $PM_{2.5}$ when just meeting the current standard of 12 μg/m³. PA at 3-152 tbl.3-16. This drops by 3,610 (9.3%), 7,200 (18.5%), 10,800 (28%) and 14,300 (37%) when moving from the current standard to alternative standards of 11 μg/m³, 10 μg/m³, 9 μg/m³ and 8 μg/m³, respectively, when controlling sources of pollutants that give rise to secondary $PM_{2.5}$ as the main process for achieving the alternate standards. *Id.* at 3-153 tbl.3-17.

The March 2023 IEc report builds on EPA's analysis of racial and ethnic disparities in pollution exposure and health impacts under the current and alternative standards, and supplements EPA's PA. This report considers current $PM_{2.5}$ levels in estimating the benefit of alternative standards, expands the geographic scope of the analysis, and assesses morbidity benefits and benefits to children. The study utilizes the Di et al. (2019) hybrid exposure model predictions at 1 km², Di et al. (2017) race- and ethnicity-specific effect estimates (for $PM_{2.5}$ and mortality), Alhanti et al. (2016) race- and ethnicity-specific effect estimates (for $PM_{2.5}$ and childhood asthma emergency room visits), and fine-scale race- and ethnicity-specific baseline disease rates and ACS data.

The findings of the report support the conclusion that the current standard is not adequate to protect health and finds significantly larger benefits to at-risk groups at an 8 μg/m³ annual standard over 10 μg/m³.

Nationally, a standard of 8 μg/m³ would have over 3 times greater health benefits than a standard of 10 μg/m³. Strengthening the annual standard to 8 ug/m³ could prevent 16,000 premature deaths and 10,000 respiratory emergency room visits each year, compared to an avoided 4,600 premature deaths and 3,000 respiratory emergency room visits avoided at an annual standard of 10 μg/m³. An annual standard of 9 ug/m³ would deliver nearly double the health benefits of a 10 ug/m³ standard, but 40% fewer health benefits than a 8 μg/m³ standard.

The benefits of finalizing a more protective standard than EPA proposed are particularly important for areas outside of the PA study areas ("non-PA areas") which bear up to 70% (up to 83,000 premature deaths) of the national burden of air pollution under current conditions. If annual average levels dropped to 10 μg/m³ in these non-PA areas (a flat rollback of $PM_{2.5}$ concentrations to 10 μg/m³) the reduction in PM attributable mortality would be only 420 deaths avoided from a burden of 83,000 premature deaths attributable to $PM_{2.5}$ under estimated current conditions in 2015. This is less than 1% reduction in air pollution mortality burden across a large part of the country. This is because most of these areas already have annual average $PM_{2.5}$ levels below 10 μg/m³. Nationally 11-19% of the population (differs by race and ethnicity) have annual average exposure above 10 ug/m³, but only 6% of the population is exposed to levels above this threshold in the non-PA areas. *See* Exhibit 1 (Population Exposure Percentages by Race and Geographic Area Relating to IEc Report (2023)). Thus, setting a standard of 10 μg/m³ will do very little to reduce air quality health burdens in these areas.

In the non-PA areas, reducing annual average exposures from 10 μg/m³ to 9 μg/m³ results in an additional 1,400 avoided deaths, and reducing exposures to 8 μg/m³ would result in 5,000 deaths avoided. Irrespective of race, ethnicity or poverty level, a standard of 8 μg/m³ would have 3 times higher and 15 times higher per capita $PM_{2.5}$ mortality rate reduction than 9 μg/m³ and 10 μg/m³ respectively in areas outside the study areas considered by EPA (70% of the U.S. population). In considering the benefit of federal policies, EPA must not ignore the burdens faced by communities across small towns and rural America.

As discussed above, there are dramatic racial and ethnic disparities in both exposure and health impacts from $PM_{2.5}$, and this holds in non-PA areas. Nearly 60% of the deaths among the older Black population occur outside the areas assessed by EPA. In these areas, alternate standards of 10 and 9 μg/m³ have little benefit in PM mortality burden among the older Black population (2% or less reduction). The benefit of an alternate standard of 8 μg/m³ in these areas is about 3.5 times higher than an annual standard of 9 ug/m³.

Black American PM attributable mortality (per 100,000 population) benefits of reducing PM concentrations to 10, 9, 8 µg/m3




EXHIBIT 5-12. MORTALITY RATES UNDER CURRENT AND ALTERNATIVE PM NAAQS, AGES 65-99




Because the recent IEc report examines non-PA areas, it also provides important information about disparities in $PM_{2.5}$ mortality impacts across poverty status that the

PA does not. The recent IEc report reveals that older adults experiencing poverty would see 35% higher benefits from a more protective standard in terms of per capita $PM_{2.5}$-attributable mortality avoided compared to higher income communities. Of the 16,000 air pollution-attributed deaths in 2015 avoided at 8 μg/m³, nearly 6,000 deaths are among populations below 2X poverty line. Of that nearly 2 out of 5 are among populations living in poverty in non-policy assessment areas. In the non-PA areas, including rural and small-town populations across the country, significant benefits are seen for populations below 2X poverty line. In those areas, under a 8 μg/m³ standard, the avoided PM mortality among populations below 2X poverty line would be 2.7X higher than that under a 9 μg/m³ and 8X higher than at 10 μg/m³.

As for populations under the age of 65, a standard of 8 μg/m³ would result in 16% lower childhood asthma emergency room visit burden. This is 3 times higher than the benefits under a 10 μg/m³ standard and 60% higher than the benefits at 9 μg/m³. Reducing $PM_{2.5}$ levels to 8 μg/m³ would go furthest in reducing disparities in $PM_{2.5}$ asthma emergency room visits between people of color who are children and white non-Hispanic children and those living above and below 2 times the poverty level.

EXHIBIT 5-15B. AVOIDED ASTHMA-RELATED EMERGENCY ROOM VISITS IN CHILDREN BY ALTERNATIVE NAAQS (PER 100,000, STRATIFIED BY RACE/ETHNICITY AND POVERTY)




The recent Josey et al. (2023) study, discussed also above, adds new information that buttresses the IEc report's findings. The Josey et al. (2023) analysis confirms that mortality impacts of $PM_{2.5}$ are higher for older Black populations than for older white

populations and adds the nuance that low income older white populations also bear higher mortality risks in comparison to higher income white populations.




**Figure 4. Differences in Mortality with Decreasing $PM_{2.5}$ Exposure among Marginalized Subpopulations.**

Shown are point estimates and 95% confidence intervals of the hazard ratio for death comparing different levels of annual average $PM_{2.5}$ exposure (12 μg per cubic meter vs. 11, 10, 9, or 8 μg per cubic meter) on average for subpopulations defined in selected ways. Low income was defined as dual eligibility for both Medicare and Medicaid. Confidence intervals were not adjusted for multiplicity; therefore, they should not be used in place of hypothesis testing.

As seen in Figure 4 of the paper shown above, lowering exposure from 12 μg/m³ to 8 μg/m³ was associated with a hazard ratio of 0.931 (95% CI, 0.909 to 0.953) for the higher-income Black population and 0.963 (95% CI, 0.955 to 0.970) for the higher-income white population; for the low-income white population, it was 0.940 (95% CI, 0.931 to 0.948), and for the low-income Black population, 0.939 (95% CI, 0.921 to 0.957). Put another way, the study finds that if that standard is lowered to 8 μg/m³, the result would be an estimated 4% reduction of mortality rate for higher-income white older adults, while for marginalized communities it would be considerably higher: approximately 7% for Black higher-income and 6% for both white low-income and Black low-income older adults. This means that the at-risk vulnerable population group is broader, and stronger standards are likely to produce greater benefits in terms of premature deaths avoided among a wider array of disproportionately affected people than estimated in the PA.

Further, separately in the RIA, EPA sought to analyze factors that might contribute to differing impacts on specific populations, with the populations at issue including children and communities of color. RIA at 6-24. Importantly, EPA cites its

ISA, which found "adequate evidence" that children and various races are at elevated risk of $PM_{2.5}$-related health impacts—due in part to inequities in exposure. *Id.* Yet, EPA claims it lacks the epidemiologic data needed to undertake a health impacts study for children. *Id.* EPA's failure to fully account for and address children's health in its proposal—and focus most of its health benefits analysis on mortality—results in individual level vulnerability during sensitive windows of development for which there is a robust literature base showing the adverse effects of $PM_{2.5}$ on child development.

In 2019, Project TENDR (Targeting Environmental Neurodevelopmental Risks) published a commentary describing the evidence-base linking neurodevelopmental disorders and exposure to air pollution in the American Journal of Public Health.[41] The commentary synthesizes the growing evidence base that associates air pollution exposure with adverse health outcomes in children, including preterm birth, low birth weight, developmental effects, and autism spectrum disorder (ASD).[42] Indeed, these effects have been observed in a number of peer-reviewed research articles, including the foundational Nurses' Health Study, which is an ongoing prospective cohort study that includes over 116,000 American nurses and their children.[43] Researchers conducted a

[41] Payne-Sturges DC, Marty MA, Perera F, Miller MD, Swanson M, Ellickson K, Cory-Slechta DA, Ritz B, Balmes J, Anderko L, Talbott EO, Gould R, Hertz-Picciotto I. Healthy Air, Healthy Brains: Advancing Air Pollution Policy to Protect Children's Health (2019). *Am J Public Health*. Apr; 109(4):550-554; available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6417586/. "Project TENDR (Targeting Environmental Neurodevelopmental Risks), a unique collaboration of leading scientists, health professionals, and children's and environmental health advocates, points to growing scientific evidence linking exposure to toxic chemicals during early brain development with brain disorders and calls on individuals, industries, and policymakers to reduce these exposures."

[42] *Id.*

[43] Raz R, Roberts AL, Lyall K, Hart JE, Just AC, Laden F, Weisskopf MG. Autism spectrum disorder and particulate matter air pollution before, during, and after pregnancy: a nested case-control analysis within the Nurses' Health Study II Cohort (2015). *Environ Health Perspect*. 2015 Mar; 123(3):264-70; available at https://pubmed.ncbi.nlm.nih.gov/25522338/.

nested-case control study of children born with ASD and those born without ASD and find that exposure to $PM_{2.5}$ during pregnancy was significantly associated with an increased risk of ASD and the association was strongest during the third trimester.[44]

In a recently published commentary, the lead authors of the aforementioned study describe the burgeoning epidemiological evidence that links air pollution and ASD and argues that while it may not be possible to conduct a randomized controlled trial (a gold-standard epidemiological research methodology), it is "imperative to act, in this case to protect children, [and we] cannot await a complete understanding of the exact details of how an environmental agent causes harm."[45] The Project TENDR commentary makes a similar plea and urges the EPA to "give greater consideration to the evidence on the effects of air pollutants on neurodevelopment when setting standards for combustion-related air pollution."[46]

Importantly, the current ISA updates the causality determination for nervous system effects, whereas the 2009 PM ISA was not able to make a causality determination based on a lack of available data.[47] The 2019 PM ISA determined that the toxicological and epidemiological evidence supports a "likely to be causal relationship between long-term $PM_{2.5}$ exposure and nervous system effects including…effects on neurodevelopment."[48] This causality determination means that the "evidence is sufficient to conclude that a causal relationship is likely to exist…[and] results are not explained by chance, confounding, and other biases, but uncertainties remain in the evidence overall."[49] The reality is that in just the span of a decade, the weight of evidence has grown immensely, and yet, the distinctive vulnerabilities surrounding

---

[44] *Id.*

[45] Raz, R., & Oulhote, Y. Invited Perspective: Air Pollution and Autism Spectrum Disorder: Are We There Yet? (2022). *Environmental Health Perspectives*, *130*(1), 011303; available at https://ehp.niehs.nih.gov/doi/full/10.1289/EHP10617.

[46] *Id* at 38.

[47] ISA at ES-15.

[48] *Id.*

[49] ISA at P-12 tbl.P-2.

child development have not been meaningfully accounted for in the standard-setting process.

In 2012, EPA's own Children's Health Protection Advisory Committee submitted a letter to the record during the last PM NAAQS review cycle in support of tightening the standard to the lowest end of the range recommended by CASAC.[50] The letter states that

> Children are a vulnerable population, due to unique sensitivities during early lifestages to $PM_{2.5}$ exposures. While far more studies assess adult morbidity and mortality due to $PM_{2.5}$ exposures, many epidemiologic studies report that exposures in childhood can significantly affect morbidity and subsequent respiratory health in adulthood. Therefore, when creating regulatory standards, children's health impacts due to $PM_{2.5}$ exposure deserve individualized and focused attention.[51]

There is no doubt that $PM_{2.5}$ has serious adverse effects on children's health and development. EPA must address those harms, as well, to ensure that the standards are truly protective of our nation's most vulnerable population.

Overall, looking at factors besides race and ethnicity, a standard of 8 $\mu g/m^3$ would go further than the other standards being considered to reduce the health burden of air pollution, and the inequities in that burden, with benefits for the most at risk in communities and families.

Even with strengthened standards, substantial disparities in the health impact of particulate pollution would persist. It is essential that EPA also takes complementary actions that directly tackle environmental injustice.

---

[50] Children's Health Protection Advisory Committee. National Ambient Air Quality Proposed Standards (September 10, 2012). Available at https://www.epa.gov/sites/default/files/2014-09/documents/9-10-2012-chpac-letter-on-pm-naaqs-and-naaqs.pdf.

[51] *Id.* at 3.

#### iii. The CASAC majority found an annual standard of 8 μg/m³ scientifically supported

The majority of CASAC found the scientific evidence they reviewed supported an annual standard as low as 8 μg/m³. *E.g.*, CASAC Letter on PA at 16 (majority endorses 8 μg/m³ as part of "the recommended alternative annual standard"). Indeed, CASAC said that the evidence for an 8 μg/m³ standard was both "strong and compelling." *Id.* at 6. Though CASAC noted generically that there is more uncertainty in the evidence at lower concentrations, it plainly found that uncertainty insufficient to override confidence that concentrations at least as low as 8 μg/m³ harm public health. Moreover, CASAC also pointed out that EPA's assessment had inconsistencies surrounding this claim of increasing uncertainty at lower concentrations. *Id.* at 14 (noting inconsistencies between draft PA's characterization of uncertainties and draft ISA Supplement's characterization of uncertainties being less even down to 4 μg/m³).

Beyond express statements, the overall letter reinforces the support the majority of CASAC provided for an 8 μg/m³ standard. For example, the majority repeatedly criticized the PA's emphasis on study-reported means (and comparing them with design values) as overly "conservative." *Id.* at 8-9, 16. CASAC repeatedly cited strong evidence that there is no threshold for effects of $PM_{2.5}$ exposure, criticizing the draft PA's weaker description. *E.g.*, *id.* at 9, 16. The majority also found substantial gains for Black residents would occur at levels of 9 μg/m³ or lower. *Id.* at 16.

### 3. EPA's attempts to set a standard weaker than 8 μg/m³ are unlawful and arbitrary

Seeking to justify a less protective standard than what the science and law demand, the approach in EPA's proposal takes numerous analytical steps that contravene the Clean Air Act, the record, and rational decision-making. If not corrected, EPA's approach will leave the most affected, most overburdened populations—communities of color, especially Black populations, and low-income communities—to experience levels of $PM_{2.5}$ pollution that EPA knows cause serious adverse health effects.

Going against the Act's protective direction, the agency seeks to cast doubt on the overwhelming record evidence that $PM_{2.5}$ causes adverse health effects at concentrations at least as low as 8 μg/m³.

EPA also fails to rationally and lawfully justify its proposed approach to considering data from epidemiologic studies in setting the standard's level. Despite the enormous scope of key studies—and the great statistical power they have, especially in conjunction with the wealth of other evidence establishing that $PM_{2.5}$ causes precisely the types of health harms they examine—EPA proposed to take the conservative approach of keying decision-making to the study-reported mean concentrations, rather than lower concentrations where evidence of $PM_{2.5}$-induced harm remains robust. The Act requires the agency to take a precautionary approach, not the conservative approach applied here.

Even if this mean-centric approach were rational, EPA's proposal is still illegal and arbitrary because it inflates the study-reported means via an irrational comparison with design values before proposing to establish the standard's level based off that inflated level. Among other unlawful and irrational flaws, this approach would leave the populations living in the most $PM_{2.5}$-polluted portions of areas to breathe air contaminated with $PM_{2.5}$ above the levels demonstrated to cause serious health harms. The Act does not permit an approach with that outcome, and EPA does nothing to rationally explain the contrary. Notably, record evidence demonstrates that these populations are sizable and tend to be made up of greater percentages of people of color and low-income communities than found in the relevant county as a whole.

EPA also arbitrarily treats evidence that demonstrates a standard at the levels it proposes would fail to protect public health with an adequate margin of safety. It does not rationally consider the results of Canadian epidemiologic studies, restricted analysis studies, or accountability studies in setting the standard's level. Nor is its consideration of its own risk assessment rational.

Accordingly, it would be arbitrary and unlawful for EPA to establish a standard with a level above 8 $\mu g/m^3$, especially standards of 10-11 $\mu g/m^3$.

**i. There is no meaningful doubt that $PM_{2.5}$ causes serious harms down to an annual average of 8 $\mu g/m^3$**

In declining to propose a standard of 8 $\mu g/m^3$, EPA points generically to the purported "uncertainties" of such a standard being "too great at this time" *See* 88 Fed. Reg. at 5629; *see also id.* at 5604-05 (discussing general uncertainties PA perceives in

evidence regarding health effects). These attempts lack support in the record and contravene the Clean Air Act.

EPA's attempts to cast doubt on the strength of the conclusion that 8 μg/$m^3$ average annual concentrations of $PM_{2.5}$ cause serious harms are irrational on this record. As explained herein, in EPA documents, and other comments, the evidence that $PM_{2.5}$ causes serious health harms at concentrations down to 8 μg/$m^3$ is extremely consistent and strong. The scientific basis for that conclusion rests on a variety of types of studies. Many of these studies have been and continue to be performed, and they collectively and individually tell a cohesive and compelling story. Indeed, when EPA tries to cast doubt on these studies as a whole, its efforts cannot be rationally reconciled with the actual facts before it, as we explain below in addressing EPA's groundless attempt to dismiss the results of its own risk assessment.

Even just considering EPA's own statements, EPA's efforts to identify uncertainties sizable enough to forego a standard of 8 μg/$m^3$ are arbitrary. Despite those efforts, EPA repeatedly acknowledges that the concentration-response function for $PM_{2.5}$ is well-characterized down to 8 μg/$m^3$. *Id.* at 5582-83, 5605, 5610, 5614, 5619, 5625. The evidence about concentration-response is "consistent" and has recently been strengthened by new studies. *E.g.*, *id.* at 5583. The only uncertainties regarding the concentration-response function that EPA identifies relate to its shape below 8 μg/$m^3$. *Id.* at 5582-83, 5605, 5610, 5614, 5619, 5625. EPA thus <u>strengthens</u> the case for there being no meaningful uncertainties at or above 8 μg/$m^3$.

EPA further notes that epidemiologic studies it had not previously considered "reduce key uncertainties identified in previous reviews, including those related to potential copollutant confounding." *Id.* at 5583; *see id.* at 5582, 5585, 5625 (discussing how new studies address potential confounding). Thus, EPA provides substantial evidence to support the conclusion that the harmful effects of $PM_{2.5}$ above 8 μg/$m^3$ are well established, with stronger and stronger evidence still accumulating. Nowhere does EPA give a rational basis to doubt that compelling evidence or provide substantial evidence contradicting the existing evidence. For EPA to conclude that there are somehow meaningful uncertainties about the harms $PM_{2.5}$ causes above 8 μg/$m^3$ thus lacks a rational connection to the substantial evidence in the record.

Finally, to the extent EPA seeks to seize on any relevant minor uncertainties to reject the 8 μg/$m^3$ annual standard that is requisite to protect public health with an

adequate margin of safety, such efforts are contrary to the Clean Air Act's protective purpose. Far from requiring the agency to act only with 100% certainty, the Act requires the agency to take a precautionary, health-protective approach. *See supra* § II.B.2; *see also, e.g.*, *Am. Petroleum*, 684 F.3d at 1353 (EPA has a "duty to err on the side of caution"); 88 Fed. Reg. at 5564 (requirement to include adequate margin of safety "address[es] uncertainties"). Indeed, "'[q]uestions involving the environment are particularly prone to uncertainty,' but 'the statutes and common sense demand regulatory action to prevent harm, even if the regulator is less than certain.'" *Wisconsin v. EPA*, 938 F.3d 303, 319 (D.C. Cir. 2019).

**ii. The weight EPA places on study-reported means, as opposed to other measures of $PM_{2.5}$ concentrations, is irrational and unlawful**

In considering the level for a revised annual standard, EPA chiefly relies on several U.S.-based epidemiologic studies examining the relationship between $PM_{2.5}$ concentrations and premature death, specifically on the mean $PM_{2.5}$ concentrations reported in these studies. *See* 88 Fed. Reg. at 5628; *see also id.* at 5625-29. Depending on how the studies characterize $PM_{2.5}$ exposure (via ground-based monitoring or hybrid modeling approaches that apply population weighting), EPA finds the range of study-reported means to vary from 9.3-12.2 $\mu g/m^3$ for studies using a hybrid modeling approach[52] and from 9.9-16.5 $\mu g/m^3$ for studies using ground-based monitoring. *Id.* at 5625-26; *see also id.* at 5602, 5611.

Though EPA has historically relied on study-reported means in establishing the level of the annual $PM_{2.5}$ standard, that approach is irrationally conservative for this reconsideration in light of the available evidence and advice from CASAC. Indeed, the majority of CASAC warned that "use of the mean to define where the data provide the most evidence is conservative since robust data clearly indicate effects below the mean in concentration-response functions." CASAC Letter on PA at 16. Such conservatism is unlawful and irrational in light of the Clean Air Act's precautionary, health-protective

[52] In this section of these comments, unless specifically stated otherwise, any reference to studies using a hybrid modeling approach includes only such studies that apply population weighting.

approach to the NAAQS. *See supra* § II.B.2. It is further irrational on the record before the agency.

Recent large-scale studies of $PM_{2.5}$'s health effects, including Di et al. (2017), Di et al. (2019), Vodonos and Schwartz (2021), Yazdi et al. (2019), and Yitshak-Sade et al. (2019), are based on gigantic datasets unlike those upon which earlier revisions of the standards relied. As Dr. Joel Schwartz explained, they thus provide "considerable confidence" that $PM_{2.5}$ exposure in various studies results in health effects at levels <u>below</u> the study-reported mean or median. EPA-HQ-OAR-2015-0072-1522 at 17-18 (discussing Wei 2021 study that has "over 60 million person-years in each decile of exposure" and accordingly "provides considerable confidence that effects continue below 8 [$\mu g/m^3$]"). Dr. Joel Schwartz highlighted the irrationality of EPA's contrary position. Dr. Schwartz is a noted expert epidemiologist, especially on the "health effects of air pollutants," including $PM_{2.5}$, and has published very extensively in this area. *See* https://connects.catalyst.harvard.edu/Profiles/display/Person/70291. In comments on the draft PA, he explained that, fundamentally, the strength of a study's support for observing effects below the mean "depends on the number of observations in that range, not the percentage": "The Medicare cohort, for example, had 637 million person-years of observation. Hence there were over 63 million observations at the tenth percentile or lower. This is a very large number for an epidemiology study and clearly would have enough health effects to generate confidence if it were a separate study on its own." EPA-HQ-OAR-2015-0072-1522 at 13-14. He characterized the PA's reliance on study-reported means as misunderstanding "both epidemiology and statistics" and having "no merit." *Id.* Specifically, he warned against using "averaged values in a study to estimate levels at which effects are seen" as "the way to determine levels at which effects are seen," explaining that instead "the appropriate way" looks at "the concentration-response curves reported, the sequential truncation models reported, and the decile comparisons reported in Wei." *Id.* at 16.

Consistent with Dr. Schwartz's comments, CASAC advised EPA that "[e]pidemiologic studies require consideration of distribution around the mean of exposure to identify effects and thus <u>lower levels than the mean must be considered as part of the range where the data provide higher confidence</u>." CASAC Letter on PA at 13 (emphasis added). CASAC further warned that EPA's "focus on the mean concentration in this approach has some limitations for informing the adequacy of the annual and 24-hour standards." *Id.* at 8.

Yet EPA's proposal repeatedly invokes that it has greatest confidence or the strongest support for adverse effects occurring at or near the study-reported mean, and relies chiefly on such means as a result. *E.g.*, 88 Fed. Reg. at 5595 (discussing PA), 5625-26, 5628, 5629; *see, e.g.*, *id.* 5629 (proposing not to set annual standard at 8 µg/$m^3$ because of purported "uncertainties"). This is arbitrary for at least two reasons. First, it does not address the discussion above and is thus both unsupported by the record and unexplained. Second, as explained repeatedly in these comments, the Act does not require EPA to act only when it has most confidence, but rather when it has sufficient confidence. EPA's explanation thus is irrational and unlawful under the Act. *See Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 81-83 (D.C. Cir. 2006) (basing regulatory judgment on mere categorization of one thing as "much" more of something than another thing, without any "points of comparison" is irrational).

Elsewhere, EPA describes the PA as deprecating reliance on 10th or 25th percentile concentrations on the purported basis that comparing design values with such concentrations "is more uncertain than such comparisons with the mean." 88 Fed. Reg. at 5612. The proposal's summary is also irrational for at least two reasons: as already explained, mere greater uncertainty isn't a rational basis for decisionmaking here and, as explained in the next section, fundamentally, comparison of study-reported concentrations with design values as EPA does is utterly irrelevant, unlawful, and irrational.

The proposal very briefly addresses $PM_{2.5}$ concentrations below study-reported means, but its treatment of them is irrational and illegal for similar reasons. It notes the PA's conclusion that such information is relevant to assessing where "the data become appreciably more sparse and, thus,…confidence in the associations observed in epidemiologic studies would become appreciably less," and notes that "most studies do not report such data." 88 Fed. Reg. at 5626. Relying on these notes, the proposal highlights purported "uncertainties" about the 25th percentile data, and frames consideration of such data as a matter for assessing the adequacy of the required margin of safety, before concluding that any level within the range of 8-11 µg/$m^3$ would do something to limit exposures at the 25th percentile, "with the lower end of this range further limiting those exposures." *Id.* at 5627.

Again, this explanation fails to rationally address the fundamental flaws with EPA's overreliance on study-reported means: (1) given the wealth of data, findings at lower levels of $PM_{2.5}$ concentrations have great statistical power; (2) it is not at all impossible to make the necessary determinations while remaining consistent with the Act's protective and precautionary approach to standard-setting; and (3) it focuses on relative confidence, rather than whether EPA has adequate confidence.

### iii. EPA's inflation of study-reported means in epidemiological studies is arbitrary and unlawful

Even if EPA's mean-centric approach were not illegal and irrational, the revised approach EPA takes here would still be illegal and irrational. Rather than simply propose to set the standard's level "somewhat below" the lowest study-reported mean, as EPA has successfully done repeatedly in the past, *Nat'l Ass'n of Mfrs. v. EPA*, 750 F.3d 921, 924 (D.C. Cir. 2014) (upholding 2012 PM NAAQS, which followed such an approach); *accord Am. Trucking Ass'ns*, 283 F.3d at 372 (upholding 1997 PM NAAQS, which followed similar approach), EPA first inflates the study-reported means by 10-20% or 15-18%, depending on how the study calculates exposure, saying it does so to relate the study-reported means to the design value that determines NAAQS compliance. 88 Fed. Reg. at 5625-26, 5628, 5629; *see also id.* at 5596-97. Only then does EPA address the question of what the standard's level ultimately should be—but now, rather than keying off study-reported means ranging from 9.3-12.2 $\mu g/m^3$ or 9.9-16.5 $\mu g/m^3$, depending on how the study calculates exposure, EPA keys its consideration off values ranging from 10.7-11 $\mu g/m^3$ or 10.9-11.9 $\mu g/m^3$. *Id.* at 5626. EPA's analysis is unlawful and arbitrary for several reasons.

First, EPA's analysis violates the Clean Air Act and is irrational because it leaves people who live in places with the most pollution to experience adverse health effects—including death—simply because other people happen to live farther from the most polluted places. Notably, as EPA has long recognized, the people most exposed to and most vulnerable to $PM_{2.5}$ are disproportionately people of color. *E.g.*, *id.* at 5561, 5576, 5592, 5609-10; 78 Fed. Reg. at 3125 (in 2006, EPA "found that the highest concentrations in an area tend to be measured at monitors located in areas where the surrounding population is more likely to have lower education and income levels and higher percentages of minority [*sic*] populations"). More specifically, comments on the draft PA addressed, for 10 areas including in EPA's risk assessment, the relationship between

the demographics within three miles of a controlling monitor compared with a county as a whole, finding that "populations living in the most polluted neighborhoods, as determined by the monitor network, tend to have higher percentages of [people of color] and greater poverty." EPA-HQ-OAR-2015-0072-1538 at 7-8. In warning EPA against following the line of analysis it ultimately proposes here, CASAC similarly noted that "people exposed to these higher concentrations are often disproportionately persons of color and lower-income populations." CASAC Letter on PA at 8-9.

New analysis reveals that, based on 2021 design values and the most recent population data available, the critiques of EPA's draft PA continue to hold, as substantial numbers of people live within 5 km of the monitor recording the highest design value ("controlling monitor" or "design value monitor") in a county, and the population living in this radius tends to have a greater percentage of Black residents, Hispanic residents, people of color, and people living in poverty than the county as a whole:

| | |
|---|---|
| # Counties with valid design value: | 517 |
| Population of counties with valid design value: | 201,085,798 |
| Population living within 5 km of controlling monitor: | 32,230,434 |
| % population living within 5 km of controlling monitor: | 16.03% |
| # Counties where % of population within 5 km of controlling monitor that is Black is > % of county population that is Black: | 323 |
| Average disparity (% within radius-% in county: | 4.07% |
| # Counties where % of population within 5 km of controlling monitor that is Hispanic is > % of county population that is Hispanic: | 336 |
| Average disparity (% within radius-% in county: | 1.05% |
| # Counties where % of population within 5 km of controlling monitor that is people of color is > % of county population that is people of color: | 347 |
| Average disparity (% within radius-% in county: | 5.16% |
| # Counties where % of population within 5 km of controlling monitor that is in poverty is > % of county population that is in poverty: | 355 |

| | |
|---|---|
| Average disparity (% within radius-% in county: | 5.37% |

Table 1: Summary of Near Controlling Monitor Demographic Analysis

Data Source for Table 1: Exhibit 2 (sheets titled "Summary" and "design_monitors_community_chara") (analysis of demographics of counties with valid monitoring data and near-monitor demographics).

EPA's proposal cannot and does not dispute any of this: significant numbers of people, disproportionately people of color and people with lower income and socioeconomic status, live in the portions of areas with the highest levels of $PM_{2.5}$ pollution, which control the design value for a broader area.

EPA's basis for inflating the study-reported means is that study-reported means for areas are not the same thing as design values for areas, and it is the design value that is compared to the standard's level; EPA thus proposes that in setting the level, EPA focuses on what design value will result in levels at or below overall area means reported in the relevant studies. 88 Fed. Reg. at 5625-26, 5628. EPA's approach amounts to inflating study-reported means, then setting the level somewhere below the inflated result. But the evidence that adverse health effects occur is by EPA's admission "strongest" at "the study-reported mean $PM_{2.5}$ concentrations." *Id.* at 5626. These study-reported means extend as low as 9.3 $\mu g/m^3$. And, as EPA itself acknowledges, areas are "expected" to have a "gradient of concentrations across the area," with the highest $PM_{2.5}$ levels "near the design value monitor." *Id.* at 5626 n.102. Thus, though EPA's inflationary approach might keep <u>overall</u> mean levels throughout an area below the study-reported means, it plainly allows $PM_{2.5}$ concentrations in portions of the area, including the area near the controlling design value monitor, to remain <u>above</u> the study-reported mean—concentrations where the evidence of adverse health effects is strongest. Many people live in those areas, and those people are, on average, more likely to be Black, Hispanic, people of color, and/or living in poverty. The outcome of EPA's inflationary approach contravenes the Clean Air Act's mandate (as definitively interpreted by the D.C. Circuit) that <u>all</u> populations in the country must be protected against adverse health effects, with an adequate margin of safety. *See supra* § II.B.1.

Notably, too, EPA itself "strongly" rejected a very similar argument when polluters made it in comments on the proposal for the 2012 NAAQS. 78 Fed. Reg. at 3146. There, polluters urged EPA to set the level by identifying a "mean composite monitor $PM_{2.5}$ level that should be achieved and then identify the maximum monitor

level that would result in that composite value." *Id.* EPA explained one reason for its strenuous disagreement with the polluters was that "for areas in which the maximum monitor concentration is appreciably higher than other monitor concentrations within the same area, public health would not be protected with an adequate margin of safety if the disproportionately higher exposures of at-risk, susceptible populations around the monitor measuring the highest concentration were in essence averaged away with measurements from monitors in other locations within large urban areas." *Id.* (emphasis added). The argument polluters made in 2012 is conceptually identical to the approach EPA proposes to take now. EPA shift of position is more than just profoundly disappointing—as explained above, "EPA had it right the first time" when it rejected the argument. *NRDC v. EPA*, 777 F.3d 456, 468 (D.C. Cir. 2014).

Second, EPA's reasoning to support this outcome is further irrational. EPA attempts to address how it is not providing requisite protection to the populations in the most exposed locations by seemingly contending that, under its approach,[53] "even those people living near an area design value monitor (where $PM_{2.5}$ concentrations are generally highest) will be exposed to $PM_{2.5}$ concentrations below the air quality conditions reported in the epidemiologic studies where there is the highest confidence of an association." 88 Fed. Reg. at 5626. Yet EPA's contention both lacks any supporting citation and is contradicted by other pieces of EPA's own analysis and regulations. In particular, EPA itself notes that an area's design value—*i.e.*, the highest known $PM_{2.5}$ concentration in an area—is 10-20% or 15-18% higher than the study-reported mean (depending on how exposure is characterized), and that such monitors are supposed to characterize $PM_{2.5}$ concentrations in at least a portion of an area (i.e., not characterize unique concentrations that appear nowhere else). *Id.*; 40 C.F.R. pt.58 app.D, § 4.7.1(b) ("The required monitoring stations or sites must be sited to represent area-wide air quality."), (b)(1) ("At least one monitoring station is to be sited at neighborhood or larger scale in an area of expected maximum concentration."), (c) (repeatedly emphasizing importance of having $PM_{2.5}$ monitors be "representative of," "represent," or "characterize" "human exposure," "similar situations," "conditions in areas where people commonly live and work for periods comparable to those specified in the

[53] To the extent the quoted statement addresses an alternative approach to establishing the standard's level, EPA would then entirely fail to consider the harmful ramifications of its proposed approach for the people living near design value monitors.

NAAQS," "an entire metropolitan or rural area," or "regional scale," with "most important spatial scale" being "neighborhood"). EPA gives no rational explanation for its refusal to provide requisite protection, with an adequate margin of safety, for populations living in the portions of areas with the highest $PM_{2.5}$ concentrations, and there is none.

Indeed, expert commenters, like Dr. Joel Schwartz, and CASAC (see below) highlighted the irrationality of EPA's analysis. In commenting on the draft PA, Dr. Schwartz described EPA's analysis on this point as "a bizarre analysis to justify the argument that the $PM_{2.5}$ exposure in the epidemiology studies using multiple exposure models, including the Di et al[.] exposure, produce lower effect estimates than the monitor level design value, and hence cannot be used to accurately judge the concentrations at which health effects are happening, or to set standards enforced at monitors." EPA-HQ-OAR-2015-0072-1522 at 3-4. He similarly explained that EPA's approach at issue in this section "turns logic on its head" and would result in standard-setting decisions that are "ridiculous":

> That studies using hybrid exposure models can capture whether there are health effects at low concentrations by providing evidence in suburban and rural areas is a key advantage of those studies. <u>To argue that their mean exposure (irrelevant to the C-R curves) is therefore lower than the exposure at the highest monitor and therefore allowing higher exposure at the highest monitor is protective, turns logic on its head.</u> The ability of hybrid exposure models to capture effects in suburban areas where exposure is lower is directly relevant to determining whether people in densely populated urban areas with currently higher exposures (e.g. the maximum monitor value) will benefit from a reduction in those exposures. Consider that in the Wei study, we found there is an elevated risk of death at 6.6 $\mu g/m^3$ in a study whose mean was 9.85 $\mu g/m^3$. Clearly this illustrates the poverty of interpreting the study as showing effects at it [*sic*] mean concentration. It also means that reducing exposure at the highest monitor from 10 $\mu g/m^3$ to 6.6 $\mu g/m^3$ would improve the health of people in that urban area who were exposed to 10, or 9, or 8, or 7 $\mu g/m^3$ by forcing all those exposures downward. <u>To describe that study as estimating effect at 9.85 $\mu g/m^3$, and argue that a maximum monitor value</u>

> of e.g. 11 or 12 μg/m³ would suffice to protect people against the exposures seen in that study is ridiculous.

*Id.* at 14 (emphasis added).

Dr. Schwartz explained further that EPA's analysis does not present relevant information regarding what $PM_{2.5}$ concentrations people are actually exposed to within an area (*i.e.*, does not actually test the accuracy of the hybrid modeling some of the key studies rely on). *See id.* at 4 ("If you want to compare to [*sic*] the hybrid predictions to the design values, you should compare the hybrid predictions at the design value monitor to that monitor's readings. But comparing predictions at lower exposure locations to the design monitor values misrepresents the ability of those models to capture true ambient concentrations." (emphasis added)). Dr. Schwartz related these irrationalities in EPA's analysis directly to its key irrational step of inflating study-reported means, as well as echoing the core concern—that EPA's approach ignores the people who live in the areas with highest pollution levels—expressed in these comments:

> While it is true that the maximum monitor value is higher than the population average, it is also true that some people live near the maximum monitor. Hence, if a study reports increased death rates in a neighborhood where the concentrations are e.g. 8 μg/m³, then failure to set a standard at 8 μg/m³ will result to increased risk to people living near the maximum monitor, and at every other location where the exposure is above 8 μg/m³, even if a maximum monitor value of e.g. 10 μg/m³ meant that most people in that urban area were exposed to concentrations below 8 μg/m³. Hence relying on most people being exposed below the maximum monitor value does not protect the heath [*sic*] of many people who are not.…The ability of hybrid exposure models to capture effects in suburban areas where exposure is lower is directly relevant to determining whether people in densely populated areas with currently higher exposures (e.g. the maximum monitor value) will benefit from a reduction in those exposures.

*Id.* at 14 (emphasis added). Without rational explanation, EPA's proposal replicates the flaws Dr. Schwartz warned of.

Moreover, for studies using hybrid modeling approaches to characterize $PM_{2.5}$ exposure, EPA's approach of comparing study-reported area-wide averages with design values likely introduces significant uncertainties in interpretation. At least in certain areas, different models, like EPA's downscaler and the model that resulted in the Di et al. data, depart by different degrees from the monitored values, including having their modeled high levels fail to match the monitored high levels, both in terms of level and location of high level within the area. Such uncertainties and challenges likely do not arise when simply interpreting the highly consistent results of epidemiologic studies that find associations between various health effects and $PM_{2.5}$ concentrations down to levels well below 10 $\mu g/m^3$ and which have been analyzed together to generate a concentration-response function in which researchers—and EPA—have very high levels of confidence down to at least 8 $\mu g/m^3$. *See* discussion throughout these comments on these points.

EPA's approach of allowing above-mean exposures also assumes the design value monitor is in fact located at the point of highest $PM_{2.5}$ concentration, but this may not be a reasonable assumption to make. As the U.S. Government Accountability Office found, the existing regulatory air quality monitoring system "is unable to meet needs for information on…air pollution hotspots, or local areas of high pollution."[54] Further, monitoring in these attainment areas is even less likely to occur if the area is "low-income (or nonwhite)."[55]

Though it still lacks the requisite three years of data, a new monitor in the Houston area illustrates many of these issues well. In 2021, after years of community

---

[54] GAO, *Opportunities to Better Sustain and Modernize the National Air Quality Monitoring System* 38, app.III 66 (GAO-21-38, Nov. 2020), https://www.gao.gov/assets/gao-21-38.pdf; *accord* GAO, *Need Remains for Plan to Modernize Air Monitoring* 7 (GAO-22-106136, July 2022), https://www.gao.gov/assets/gao-22-106136.pdf; *see also* Revesz, *Air Pollution and Environmental Justice*, at 240-44 (summarizing such flaws with monitoring system); Corbett Grainger & Andrew Schreiber, *Discrimination in Ambient Air Pollution Monitoring?*, 109 AEA Papers & Proceedings 277, 277 (2019) ("Relative to non-attainment counties, monitors in attainment counties tend to be less likely to be sited near pollution hotspots (as measured with remote sensing data).").

[55] Grainger & Schreiber, *Discrimination in Ambient Air Pollution Monitoring?*, at 281.

advocacy, the Texas Commission on Environmental Quality installed and began operating an air quality monitor at 7330 1/2 N. Wayside Drive, squarely within a residential neighborhood of Houston, Texas. More than 60,000 people live within three miles of the new North Wayside monitor; 97% are people of color, compared with 59% of the people in Texas and 40% of the people in the United States; 58% are low income, compared with 33% of the people in Texas and 30% of the people in the United States.[56] In 2021, the annual average of that monitor was the highest in the Houston area.[57] The second highest 2021 average was 11.39 $\mu g/m^3$, at the monitor at 822 North Loop, Houston, TX, which is about 50 yards from a major roadway, I-610.[58] Though official values for 2022 have not yet been reported, initial analysis shows that the new monitor continues to record higher $PM_{2.5}$ levels than any other monitor, including the currently controlling design value monitor for Harris County (822 North Loop):

[56] EJScreen Report at 3, https://ejscreen.epa.gov/mapper/ (search for "29.828086, -95.284096"; click on appropriate place on map; change "buffer" to 3 miles; click on "Get Printable Standard Report…").

[57] *See* EPA, $PM_{2.5}$ Design Values, 2021, tbl.5a (Site-Level Design Values for the 2012 Annual $PM_{2.5}$ NAAQS) (reporting 2021 "annual mean value" for this monitor of 12.51 $\mu g/m^3$) (filter for just monitors in CBSA "Houston-The Woodlands-Sugar Land, TX"), https://www.epa.gov/system/files/documents/2022-05/PM25_DesignValues_2019_2021_FINAL_05_24_22.xlsx. A similar result obtains for 24-hour 98th percentile values in 2021: this monitor's 24-hour 98th percentile value was 26.5 $\mu g/m^3$, the highest in the area. *See id.* tbl.5b (Site-Level Design Values for the 2006 24-hour $PM_{2.5}$ NAAQS).

[58] *Id.*




*Figure 1: 2022 $PM_{2.5}$ Monitoring Data at N. Wayside Monitor and Current Area Design Value Monitor*

Data Sources for Figure 1: Texas Comm'n on Envtl. Quality, Texas Air Monitoring System Database, https://www17.tceq.texas.gov/tamis/index.cfm?fuseaction=home.welcome (click "Start Report," then select "Raw Data Report (AQS)," enter dates to cover all of 2022, select appropriate individual sites and appropriate pollutant, then select "Valid Measurements Only" and 1-hour sample duration); and Texas Comm'n on Envtl. Quality, CAMS 1052 Monthly Summary Report, https://www.tceq.texas.gov/cgi-bin/compliance/monops/monthly_summary.pl?cams=1052 (generate monthly report for December 2022).

Scientific research confirms there is significant variability in PM levels within an urban area, as well.[59] Thus, when EPA proposes to set the level of the standard based

[59] *E.g.*, R.U. Shah et al., *Socio-Economic Disparities in Exposure to Urban Restaurant Emissions Are Larger Than for Traffic*, 15 Environ. Res. Lett. 114039, at 1-2 (2020), https://iopscience.iop.org/article/10.1088/1748-9326/abbc92/pdf; S. Jain et al., *Spatial Modeling of Daily $PM_{2.5}$, $NO_2$, and CO Concentrations Measured by a Low-Cost Sensor*

not on the study-reported mean, but a higher level, it is not just relegating the people near the design-value monitor to experience higher $PM_{2.5}$ concentrations than those EPA agrees cause serious health harms, it may be allowing even more people to experience such concentrations at even higher levels than EPA knows occur. *See* Revesz, *Air Pollution and Environmental Justice*, at 240-41.

Moreover, EPA's analysis of the relationship between study-reported means and design values depends on backward-looking data. But when EPA changes the standards, the range and pattern of concentrations itself may change, rendering it irrational to rely on its backward-looking analysis. EPA itself warned of this in 2012, when it rejected polluters' suggestion that it adopt an approach analogous to the one it now proposes to adopt:

> [T]he commenter's suggested approach would be based on annual average $PM_{2.5}$ concentrations that have been measured over some past time period. Such an approach would reflect the air quality that existed in the past, but it would not necessarily provide appropriate constraints on the range of concentrations that would be allowed by such a standard in the future, when relationships between maximum and composite monitor concentrations in areas across the country may be different."

78 Fed. Reg. at 3146.

EPA's 2012 rationale has support in reality, too. The trend of design values from 2012 through 2021 in four metropolitan areas (CBSAs for Pittsburgh, PA; Los Angeles, CA; Phoenix, AZ; and Detroit, MI) with multiple monitors shows differences in improvements over time, looking only at monitors with design values in both 2012 and 2021. *See* EPA, $PM_{2.5}$ Design Values, 2021, tbl.6a (Site-Level Design Value History for the 2012 Annual $PM_{2.5}$ NAAQS). In two airsheds (Los Angeles and Detroit), the location of

---

*Network: Comparison of Linear, Machine Learning, and Hybrid Land Use Models*, 55 Environ. Sci. Technol. 8631, 8631 (2021), https://pubs.acs.org/doi/pdf/10.1021/acs.est.1c02653 ("Numerous studies have shown that pollutant concentrations have small-scale spatial variations that are not captured by regulatory networks. These spatial variations create variations in human pollutant exposures and resultant health impacts." (citations omitted)).

the highest monitor changed over the decade. *See id.* (note also that in Detroit, the now-controlling monitor did not operate in 2012, but has the same level as the controlling monitor in 2012, and is about 2 miles away). Two areas (Los Angeles and Phoenix) had some monitoring locations increase with others decreasing. *See id.* For the two areas (Pittsburgh and Detroit) where all monitors operating in 2012 and 2021 saw improved air quality, the reductions were variable, modifying the spatial distribution of the more to less polluted neighborhoods. *See id.*

- Pittsburgh: 9 monitors. Design value decreases by 3.6 μg/m$^3$; changes throughout area range from 1.4 μg/m$^3$ increase to 4.7 μg/m$^3$ decrease; monitor average decreases by 3.0 μg/m$^3$. Design value monitor remains the same; rankings of other monitors shift, with, for example, the third-worst monitor in 2012 becoming the second-best in 2021.
- Los Angeles: 8 monitors. Highest monitor reporting design value in 2012 and 2021 increases by 0.5 μg/m$^3$; changes throughout area range from 0.8 μg/m$^3$ increase to 0.2 μg/m$^3$ decrease; monitor average increases by 0.4 μg/m$^3$. Highest monitor shifts location.
- Detroit: 7 monitors. Highest monitor reporting design value in 2012 and 2021 decreases by 0.8 μg/m$^3$; decreases throughout area ranging from 0.2 to 1.9 μg/m$^3$; monitor average decreases by 1.3 μg/m$^3$. Highest monitor shifts location. Monitor that did not operate in 2012 now records highest 2021 design value in the area, which is the same as the 2012 design value for the area, albeit in a different location.
- Phoenix: 6 monitors. Highest monitor reporting design value in 2012 and 2021 decreases by 0.5 μg/m$^3$; changes throughout area range from 1.2 μg/m$^3$ increase to 2.1 μg/m$^3$ decrease; monitor average decrease by 0.4 μg/m$^3$. Highest monitor remains the same; rankings of all other monitors change.

Third, EPA's proposed inflation of study-reported means based on its assessment of the relationship between study-reported means and design values departs irrationally and unlawfully from CASAC's unanimous warning that such inflation fails to provide requisite protection. CASAC Letter on PA at 8-9, 14. In specifically addressing the draft PA's treatment of potential annual standard levels, CASAC, without any disagreement, expressed its concern over EPA's inflation because "even if a design value is somewhat higher than the area average, it reflects actual exposure levels

and thus any portion of the population living near the design value monitor does experience exposures at that level and consequent health effects of exposure to that higher concentration." *Id.* at 13-14. CASAC accordingly recommended EPA "take into account th[is] perspective[]." *Id.* at 14. As explained above, EPA's proposal fails to do so rationally.

CASAC also went into great detail about how EPA's proposed approach falls short of the Act's requirements:

> The use of area mean values, and how they relate to the design value, is likely not providing adequate protection to people who live in areas with higher concentrations, such as those living near the monitoring location where the design value was recorded, and people who live in areas that do not have ground monitors but have concentrations higher than the design or mean value. Even though the design value is higher than the area mean value, people exposed to concentrations near the design value monitoring location may more often experience health effects as a function of the higher exposure at the design value monitor, not the area mean value. Thus, while the area mean value may be a useful metric for determining average health effects of the area population as a whole, health effects of that population may be unequally distributed and more pronounced among people living near the design value monitor and those exposed to higher ambient PM concentrations than the area mean value. Importantly, people exposed to these higher concentrations are often disproportionately persons of color and lower-income populations. Therefore, tying standards to the area mean value is not providing adequate protection to the entire population.

*Id.* at 8-9. CASAC may not have urged EPA to redo its analysis, but it suggested that EPA recognize "the limitations of the current approach" and discuss how relying on data other than study-reported means might make a difference. *Id.* at 9. EPA's proposal fails to provide any rational basis for departing from CASAC's advice and thus contravenes the Clean Air Act and is arbitrary.

Fourth, EPA's current approach cannot be reconciled with its past approach, nor does EPA even attempt to rationally explain how it is or why EPA is departing from its past, correct approach. We have already noted in this section several instances where

EPA in 2012 correctly interpreted the evidence, Act, and binding caselaw to bar the approach it takes here.

Another example is EPA's rejection in 2012 of polluters' opposition to EPA's proposal to eliminate spatial averaging as an option for complying with the annual standard. Polluters took a similar tack as EPA does in this proposal, arguing "that because spatial averaging is consistent with how air quality data are considered in the underlying epidemiological studies, such averaging should not be eliminated. Specifically, commenters…pointed out that $PM_{2.5}$ epidemiological studies use spatially averaged multi-monitor concentrations, rather than the single highest monitor, when evaluating health effects. Therefore, these commenters contended that allowing spatial averaging would make the $PM_{2.5}$ standard more consistent with the approaches used in the epidemiological studies upon which the standard is based." 78 Fed. Reg. at 3126. Similarly, in this proposal, EPA notes that epidemiologic studies report area-wide mean $PM_{2.5}$ concentrations that are associated with adverse health effects, rather than focusing on the highest monitor in the area, and putatively seeks to make the results of the study more consistent with the design value metric relevant to assessing compliance with the standard. But in 2012, EPA correctly rejected the polluters' comments:

> the Administrator concludes that public health would not be protected with an adequate margin of safety in all locations, as required by law, if disproportionately higher exposure concentrations in at-risk populations such as low income communities as well as minority communities were averaged together with lower concentrations measured at other sites in a large urban area. *See ALA v. EPA*, 134 F.3d 388, 389 (D.C. Cir. 1998) ("this court has held that 'NAAQS must protect not only average healthy individuals, but also sensitive citizens such as children,' and 'if a pollutant adversely affects the health of these sensitive individuals, EPA must strengthen the entire national standard'") and *Coalition of Battery Recyclers Association v. EPA*, 604 F.3d 613, 617 (D.C. Cir. 2010) ("Petitioners' assertion that the revised lead NAAQS is overprotective because it is more stringent than necessary to protect the entire population of young U.S. children ignores that the Clean Air Act allows protection of sensitive subpopulations.")[.] In reaching this conclusion, the Administrator further notes that her concern over possible disproportionate $PM_{2.5}$-related health impacts in at-risk populations extends to populations living near

important sources of $PM_{2.5}$, including the large populations that live near major roadways

78 Fed. Reg. 3127. EPA must again adopt its correct 2012 position and reject its illegal proposed approach or rationally explain why its new approach is consistent with the Act, an impossible task given the Act's health-protective focus and the record evidence that EPA's approach consigns significant portions of the population, disproportionately people of color and low-income communities, to air pollution levels EPA is quite confident cause death.

**iv. EPA's discussion of Canadian epidemiological studies, restricted analyses, and accountability studies is unlawful and arbitrary**

**a. Canadian epidemiological studies**

In the proposed rule, EPA cites several Canadian studies that support a clear causal relationship between elevated $PM_{2.5}$ concentrations and detrimental health effects. *See, e.g.*, 88 Fed. Reg. at 5585. In fact, EPA states that U.S. and Canadian epidemiological studies were critical to the Administrator's conclusion that the current primary $PM_{2.5}$ standard is inadequate to protect public health. *See id.* at 5580.

And yet, EPA then implausibly concludes that Canadian studies should not inform the level of the revised primary standard, because those studies "can be more difficult to directly compare to the [U.S.] annual design value." *Id.* at 5619. To justify this position, EPA vaguely invokes "differences between the exposure environments in the U.S. and Canada." *Id.* at 5627. The agency's reasoning is arbitrary and capricious for three reasons.

First, as discussed elsewhere in this comment, EPA's view that area averages in epidemiological studies must directly relate to U.S. design values is irrational. Thus, Canadian studies provide powerful evidence for adopting a primary standard level at the bottom of the EPA's considered range (8-11 $\mu g/m^3$), because they generally reported lower mean $PM_{2.5}$ concentrations than U.S. studies. *Id.* at 5602. This includes monitor-based studies (means ranged from 7-9 $\mu g/m^3$) and hybrid-modeled studies (means ranged from 6-8 $\mu g/m^3$, for studies examining nationwide exposure). *Id.* Thus, as CASAC noted, the Canadian studies are "paramount to assessing the 'low end' of the [concentration-response] curves." CASAC Letter on PA at A-56 to -57. By

demonstrating positive associations at average $PM_{2.5}$ concentrations below 8 μg/m³, the Canadian studies are "consistent with no threshold and a possible supra-linear concentration-response function" at levels approaching (or dipping below) 8 μg/m³. *Id.* at 16. Even if there are methodological differences between U.S. and Canadian studies, *see* CASAC Letter on PA at A-57, the agency irrationally fails to explain why the Canadian studies do not directionally support a level at the bottom of the proposed range.

Second, even if it were rational for EPA to relate area averages to design values, the agency entirely fails to consider (or even acknowledge) CASAC's conclusion that EPA can derive U.S. design values from the Canadian area averages. In CASAC's consensus responses to the PA, the committee emphasized that "while there may be no design value in Canada, there are data that indicate what a U.S. design value would be if an area average like that found in the Canadian studies were to occur in the U.S." CASAC Letter on PA at 13-14. For the same reason, one member of CASAC stated that "Canadian studies **should** contribute to consideration" of the level of the revised primary standard. *Id.* at A-93 (emphasis in original). Put simply, EPA's stated rationale for excluding Canadian studies (*i.e.*, the difficulty of correlating area averages with U.S. design values) fails by its own terms.

Nothing in the proposed rule acknowledges, much less disputes, CASAC's opinion that the agency could extrapolate U.S. design values from Canadian area averages. Instead, the agency simply offers the conclusory assertion that using Canadian studies to inform the U.S. design value will or may provoke "uncertainty" or "present challenges." 88 Fed. Reg. at 5598, 5627. An agency may not simply "recite the terms 'substantial uncertainty' as a justification for its actions." *See State Farm*, 463 U.S. at 52. It must arrive at a rational conclusion after considering all the available evidence. Here, EPA fails to explain how—if at all—it considered the Canadian epidemiological studies.

To be sure, the Administrator states that he is "not excluding Canadian studies from his consideration…but he is considering them in light of the limitations and challenges presented." *Id.* at 5627. Yet, the Administrator's subsequent discussion of a proposed range for the primary standard fails to mention a single Canadian study (while broadly referencing several U.S.-based studies). *Id.* at 5628-29. In essence, the Administrator claims he is not formally excluding Canadian studies from consideration,

while effectively excluding those studies from consideration. The agency cannot have it both ways. EPA thus failed to rationally explain why it effectively excluded Canadian studies from its analysis, and, as a result, the agency "entirely failed to consider an important aspect of the problem." *See State Farm*, 463 U.S. at 43.

Third, EPA's minimization of the Canadian studies relies on vague references to "differences in the exposure environments" between the U.S. and Canada. *See* 88 Fed. Reg. at 5610. This argument is conclusory and unexplained, especially in light of EPA's consistent reliance on Canadian research elsewhere in the rulemaking. *See, e.g.*, *id*. at 5598, 5619. Moreover, EPA's position conflicts with the agency's approach in previous particulate matter rulemakings. Nowhere in its 2012 or 2006 rulemakings did EPA suggest that the Canadian "exposure environment" was too unique to inform the level of a U.S. particulate matter standard. *See* 78 Fed. Reg. 3086; 71 Fed. Reg. 61,144. On the contrary, the 2006 rulemaking directly referenced several Canadian studies when evaluating the level for the PM10 standard. *See* 71 Fed. Reg. at 61,199. EPA has not, and cannot, provide a rational explanation for changing its position on the relevance of Canadian epidemiological studies when setting the level of a particulate matter standard, rendering its about-face arbitrary and capricious. *See FCC v. Fox Television Stations*, 556 U.S. 502, 515-16 (2009). Its generalized invocation of "differen[t] exposure environments" is hardly the required "detailed justification." *Id.*

**b. Restricted studies**

The proposed rule acknowledges several studies (i.e., "restricted studies") that analyze the health effects of $PM_{2.5}$ concentrations "below the level of the current annual standard." 88 Fed. Reg. at 5627. EPA cites two restricted studies—Di 2017b and Dominici 2019—in the proposed rule's preamble, noting that both studies' restricted analyses found positive associations with all-cause mortality at mean $PM_{2.5}$ concentrations of 9.6 $\mu g/m^3$. *Id.* The agency then notes that a standard of 9-10 $\mu g/m^3$ would be close to those reported mean values. *Id.*

EPA's discussion of restricted studies is arbitrary for two related reasons.

First, the proposed rule fails to mention several other studies that conducted restricted analyses at mean concentrations below 9.6 $\mu g/m^3$. For example, the PA cites two other restricted studies (in the U.S. and Canada) that EPA should have considered: Zhang 2021 and Shi 2016. *See* PA Supplement at 3-123 to -24. EPA presumably excludes

these studies from the proposed rule because they did not expressly report a mean $PM_{2.5}$ concentration for the restricted analysis. *Id.*

But this blinkered approach misses the point. Shi 2016's main analysis reported a mean concentration of 8.1 μg/$m^3$, implying that the restricted analysis's mean was "somewhat below" 8.1 μg/$m^3$. *Id.* The same logic applies to Zhang 2021, which found a mean concentration of 7.8 μg/$m^3$ in the main analysis. *Id.* CASAC agrees. In its consensus response to the PA, CASAC noted that "several newer studies . . . report health effects when . . . overall means are below 12 μg/$m^3$ and even below 8 μg/$m^3$, [meaning the studies would] have had even lower means when the data are restricted." CASAC Letter on PA at 13. Thus, EPA arbitrarily ignores studies that examined health impacts at mean concentrations well below the agency's proposed standard of 9-10 μg/$m^3$.

Second, and just as importantly, the studies that EPA ignores "report positive and significant associations, often with effect estimates that are greater in magnitude than those reported in the main analysis." PA at 3-219. Thus, EPA did not just ignore studies that examined mean concentrations below 9-10 μg/$m^3$, it ignored studies that suggested significant (and larger) public health improvements at mean concentrations below 9-10 μg/$m^3$. The agency does not adequately explain this decision, which clashes with the PA and CASAC's expert guidance. Therefore, the agency's treatment of restricted studies is arbitrary and capricious.

**c. Accountability studies**

The proposed rule acknowledges several recent accountability studies (Corrigan et al. (2018), Henneman et al. (2019b), and Sanders et al. (2020a)), which assess the health impacts of policy interventions that reduce ambient $PM_{2.5}$ concentrations. 88 Fed. Reg. at 5627. And EPA correctly acknowledges those studies find clear public health benefits to lowering the primary $PM_{2.5}$ standard below 12 μg/$m^3$. *Id.*

In the next sentence, however, EPA notes only that a revised standard of 9-10 μg/$m^3$ would "be at or below the lowest starting concentration of these accountability studies (*i.e.*, 10.0 μg/$m^3$)." *Id.* This misses the point. Even if the revised standard is below the accountability studies' starting mean concentrations, that does not demonstrate that the revised standard is low enough to protect public health. The better question is whether the accountability studies show robust health improvements at their ending

concentrations, which are often below the proposed standard of 9-10 μg/$m^3$. Even granting (for the sake of argument) that EPA correctly relies on average annual means to determine the level of the revised annual standard, the more relevant question is whether the accountability studies show robust health improvements at mean concentrations below the proposed standard of 9-10 μg/$m^3$.

At least one of the accountability studies does just that. Henneman (2019b) analyzes 30 million U.S. Medicare patients, noting that the patients' average $PM_{2.5}$ exposure fell from 10 μg/$m^3$ to 7.2 μg/$m^3$ between 2005 and 2012. *See* PA at 3-131; Henneman (2019b) at 4, 18. The study finds robust evidence of reduced cardiovascular morbidity during that period. *See* PA at 3-131 to -132. Thus, at the very least, Henneman (2019b) strongly suggests that a level of 10 μg/$m^3$ is insufficient to protect public health with an adequate margin of safety. EPA's focus on starting concentrations (rather than ending concentrations) irrationally ignores this fact. The agency does not rationally explain why a standard of 10 μg/$m^3$ will protect the public health, especially in the face of accountability studies (like Henneman 2019b) that suggest a lower primary standard will further reduce adverse health effects. As a result, EPA's minimization of the accountability studies is arbitrary and capricious.

**v. EPA's attempts to dismiss the results of its own risk assessment are arbitrary and unlawful**

EPA has irrationally discounted the risk assessment results when proposing to set the standard's level. *See* 88 Fed. Reg. 5627-28. Instead of taking into account the large benefits under a standard of 8 μg/$m^3$, EPA states that several factors create uncertainty in the benefits estimated at 8 μg/$m^3$. The purportedly meaningful uncertainties in sections II.C.2 and II.D.2.b of the proposal fall into three main categories:

1. Uncertainties related to the modeling and adjustment methods for simulating air quality scenarios;
2. The potential influence of confounders on the relationship between $PM_{2.5}$ exposure and mortality; and
3. The interpretation of the shapes of concentration-response functions, particularly at lower concentrations, which includes:
    a. Claims of relatively low data density in the lower concentration range, and

b. The possible influence of exposure measurement error.

The at-risk analysis highlights an additional purportedly meaningful uncertainty:

4. The claimed limited availability of studies to inform the at-risk analysis.

Below, we discuss these uncertainties in greater detail. The level of uncertainty does not rationally warrant dismissing a standard of 8 μg/m³.

1. Uncertainties related to the modeling and adjustment methods for simulating air quality scenarios:

The modeling scenarios in the Policy Assessment Supplement are based on "across-the-board" changes in primary $PM_{2.5}$ (Pri. PM) or $NO_X$ and $SO_2$ emissions from all anthropogenic sources (Sec. PM) throughout the U.S. by fixed percentages. This approach, while not tailored to specific periods or sources and not a real-world implementation plan, represents a subset of the possible emissions cases that could be used to adjust $PM_{2.5}$ concentrations. EPA carried out a sensitivity analysis that finds that the difference between the estimates developed under the two approaches do not change the conclusions of the risk assessment. As seen in Figure 3-19 of the Policy Assessment Supplement (shown below) the choice of modeling approach does not change the overall ranking of estimated benefits under different alternative standards.

| Annual Standard Change | Simulation Method | Annual PM Concentration of Lower Standard (1 μg/m³ bins) 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Sum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12-11 (interpolated) μg/m³ | Pri PM | | 0 | 3 | 11 | 17 | 39 | 110 | 381 | 1,534 | 763 | 62 | 2,920 |
| | Sec PM | | 0 | 4 | 9 | 26 | 40 | 122 | 628 | 1,836 | 858 | 89 | 3,611 |
| 12-10 μg/m³ | Pri PM | | 1 | 18 | 12 | 81 | 116 | 569 | 3,205 | 1,720 | 103 | | 5,826 |
| | Sec PM | | 1 | 23 | 23 | 89 | 287 | 1,632 | 3,377 | 1,681 | 87 | | 7,201 |
| 12-9 (extrapolated) μg/m³ | Pri PM | | 3 | 27 | 82 | 106 | 596 | 4,467 | 3,252 | 185 | | | 8,718 |
| | Sec PM | 0 | 5 | 48 | 98 | 529 | 2,754 | 4,953 | 2,334 | 47 | | | 10,768 |
| 12-8 (extrapolated) μg/m³ | Pri PM | 0 | 11 | 85 | 161 | 368 | 5,324 | 5,408 | 238 | | | | 11,595 |
| | Sec PM | 0 | 50 | 129 | 1,116 | 3,527 | 6,390 | 3,101 | | | | | 14,314 |

**Figure 3-19. Distribution of the difference in risk estimates between the current annual standard (level of 12.0 μg/m³) and alternative annual standards with levels of 11.0, 10.0, 9.0, and 8.0 μg/m³ for the subset of 30 urban study areas where the annual standard is controlling.**[70]

An alternative standard of 8 μg/m³ has the highest benefit to public health irrespective of air quality modeling strategy.

2. <u>The potential influence of confounders on the relationship between $PM_{2.5}$ exposure and mortality</u>:

This issue has been discussed in detail above, as well as in Dr. Schwartz's comments to EPA on the draft ISA Supplement/PA.

In summary, a multitude of studies, across different cohorts, time periods, populations, exposure ranges, and study and analytical designs, have found that the association between $PM_{2.5}$ exposure and mortality is not due to confounding, and confounding does not affect the conclusions of the risk assessment in terms of the magnitude and ranking of the benefits at different alternative standards.

EPA reaches the same conclusion in the Policy Assessment Supplement:

> Cohort studies used to characterize the $PM_{2.5}$-mortality relationship used a variety of approaches to account for these and other potential confounders (e.g., see Appendix B). Across studies, a variety of study designs and statistical approaches have been used to account for potential confounding in the $PM_{2.5}$-mortality relationship. The fact that across this diverse body of evidence epidemiologic studies continue to report consistently positive associations that are often similar in magnitude, adds support the conclusion that the $PM_{2.5}$-mortality association is robust. Specifically regarding copollutants, the final PM ISA notes that, overall, associations remained relatively unchanged in copollutant models for total (nonaccidental) mortality, cardiovascular, and respiratory adjusted for ozone. Studies focusing on copollutant models with NO2, $PM_{10\text{-}2.5}$, $SO_2$ and benzene were examined in individual studies, and across these studies the $PM_{2.5}$-mortality association was relatively unchanged."

PA at C-76 to -77.

At the proposal stage, EPA provides no evidence to support any rational meaningful doubt about these conclusions.

3. <u>The shape of C-R functions, particularly at lower concentrations</u>:

The shape of such functions as in the Di et al. (2017) study is not uncertain and does not create uncertainty in the estimates of health benefits at 8 μg/m$^3$ contained in the risk assessment. The Di et al. (2017) study evaluates the relationship between long-

term $PM_{2.5}$ exposure and all-cause mortality in nearly 61 million U.S. Medicare enrollees (over the age of 64) through 460 million person-years of follow-up and roughly 22 million observed deaths. This cohort comprises approximately 15% of the total U.S. population, includes people living in rural areas, and is one of the largest cohort studies published to date. The authors modeled $PM_{2.5}$ exposure across the contiguous U.S. using a hybrid methodology that included land use regression, satellite data, and monitor data, and resolved estimations to 1 x 1-kilometer areas. Di et al. (2017) uses Cox proportional-hazards models with a generalized estimating equation. Adjustment for potential confounding by the co-pollutant ozone was performed, which only slightly attenuated the relationship between $PM_{2.5}$ and mortality.

The C-R function in this study is plotted in Figure 3 of the paper and excerpted below. From this figure it is important to note that the confidence intervals of the association between $PM_{2.5}$ and mortality plotted on the graph here do not include 1 at 8 $\mu g/m^3$. In fact, the study authors note, "There was a significant association between $PM_{2.5}$ exposure and mortality when the analysis was restricted to concentrations below 12 μg per cubic meter, with a steeper slope below that level. … Moreover, we found no evidence of a threshold value—the concentration at which $PM_{2.5}$ exposure does not affect mortality—at concentrations as low as approximately 5 μg per cubic meter."

This means that the avoided mortality benefits of lowering $PM_{2.5}$ levels to 8 $\mu g/m^3$ are likely larger than what has been estimated by EPA.




**Figure 3. Concentration–Response Function of the Joint Effects of Exposure to $PM_{2.5}$ and Ozone on All-Cause Mortality.**
A log-linear model with a thin-plate spline was fit for both $PM_{2.5}$ and ozone, and the shape of the concentration-response surface was estimated (Fig. S8 in the Supplementary Appendix). The concentration–response curve in Panel A was plotted for an ozone concentration equal to 45 ppb. The concentration–response curve in Panel B was plotted for a $PM_{2.5}$ concentration equal to 10 μg per cubic meter. These estimated curves were plotted at the 5th and 95th percentiles of the concentrations of $PM_{2.5}$ and ozone, respectively. The complete concentration–response three-dimensional surface is plotted in Fig. S8 in the Supplementary Appendix.

This is now supported by multiple other studies. In particular, Vodonos et al. conducted a meta-analysis in 2018 that examined over 100 effect estimates from 52 cohorts, 14 of which had mean exposures below 10 μg/m³. They considered studies showing cardiovascular mortality impacts and all-cause mortality impacts. Integrating the literature, they found that the effect size for all-cause deaths varied with the mean $PM_{2.5}$ concentration, with the slope increasing at lower concentrations (supralinear effect). This is shown in the following plot from the paper, showing the slope of the C-R curve vs. mean $PM_{2.5}$ concentration. It shows the confidence interval does not include 0 down to 5 μg/m³ or less. CASAC highlighted this study in its recommendations to EPA, CASAC Letter on PA at 16, yet EPA does not even mention the study in the PA or the

proposal.




a. <u>Claims of relatively low data density</u>:

Such claims in the lower concentration range are not true and do not contribute to uncertainty in the concentration response function at 8 μg/m³ and therefore do not affect the certainty of the benefits at an alternative standard of 8 μg/m³. The Di et al. (2017) study is enormous, comprising over 61 million U.S. Medicare enrollees (over the age of 64) through 460 million person-years of follow-up and roughly 22 million observed deaths. During the course of the study, annual $PM_{2.5}$ concentrations ranged from 6.2 to 15.6 μg/m3 (5th and 95th percentiles, respectively). Qian Di et al., *Air Pollution and Mortality in the Medicare Population*, 376 New England J. Medicine 2513 (2017). This means that the data in the 5th percentile includes over 3 million Medicare beneficiaries or at the very least 23 million person years of observations below an annual average level of 6.2 μg/m³. This is much larger than the total population involved in the American Cancer Society Cancer Prevention Study-II.

b. The possible influence of exposure measurement error:

This is unlikely to be a large source of uncertainty in the risk assessment results. The Di et al. (2017) study utilizes hybrid models to predict $PM_{2.5}$ levels across the country developed earlier in Di et al. (2016). The model uses:

1) Air monitoring data from the U.S. EPA Air Quality System (for both model building and cross-validation),
2) Aerosol optical depth (AOD) data, obtained from the moderate resolution imaging spectroradiometer (MODIS),
3) Surface reflectance data obtained from MODIS (MOD09A1),
4) Chemical transport model outputs derived from the widely used GEOS-Chem model. In addition to producing ground-level PM2.5 estimates, the GEOS-Chem model is also useful for calibrating AOD,
5) Meteorological data from the North American Regional Reanalysis project (air temperature, accumulated total precipitation, downward shortwave radiation flux, accumulated total evaporation, planetary boundary layer height, low cloud area fraction, precipitable water for the entire atmosphere, pressure, specific humidity at 2 meters, visibility, wind speed, medium cloud area fraction, high cloud area fraction, and surface reflectance),
6) Aerosol index data taken from the absorbing aerosol index measured by the ozone monitoring instrument (OMI), onboard the Aura satellite,
7) Land-use terms representing emissions and helpful for informing small spatial scale variations; land-use data incorporate a variety of variables (such as population and road densities, emissions inventory, elevation, percentage urban, etc.),
8) Regional and dummy variables in the regression models to account for regional and temporal variability due to differences in meteorology and aerosol composition.

The $PM_{2.5}$ model performed relatively well, with $R^2$ of 0.84 (range 0.74 to 0.88). Further, the authors of the Di et al. (2017) study carried out a sensitivity analysis, matching a subgroup of the population in the study to the nearest monitoring site measurement within a distance of 50 km. While the health effect estimates using air pollution data from proximal monitoring sites are lower than estimated exposure data, they are still statistically significant.

EPA notes in the PA that exposure measurement error is likely to be a low source of uncertainty in the risk assessment. EPA reasons that

> While none of these approaches eliminates the potential for exposure error in epidemiologic studies, such error does not call into question the findings of key $PM_{2.5}$ epidemiologic studies. The ISA notes that, while bias in either direction can occur, exposure error tends to result in underestimation of health effects in epidemiologic studies of PM exposure (U.S. EPA, 2019, section 3.5). Consistent with this, a recent study Hart et al. (2015) reports that correction for $PM_{2.5}$ exposure error using personal exposure information results in a moderately larger effect estimate for long-term $PM_{2.5}$ exposure and mortality (though with wider confidence intervals). While most $PM_{2.5}$ epidemiologic studies have not employed similar corrections for exposure error, several studies report that restricting analyses to populations in close proximity to a monitor (i.e., in order to reduce exposure error) result in larger $PM_{2.5}$ effect estimates (e.g., Willis et al., 2003; Kloog et al., 2013). Thus, to the extent key $PM_{2.5}$ epidemiologic studies are subject to exposure error, correction for that error would likely result in larger effect estimates, and thus larger estimates of $PM_{2.5}$-associated mortality incidence in the risk assessment.

PA at C-79 to -80.

4. <u>The claimed limited availability of studies to inform the at-risk assessment</u>.

The Administrator points to purported uncertainties attributed to the limited availability of studies to inform the at-risk analysis as reason to avoid relying on the results of the at-risk analysis. However, EPA's PA assesses several studies that indicate higher risk of mortality due to $PM_{2.5}$ exposures among Black populations. PA at 3-144.

The Policy Assessment further states that Di et al., 2017b best characterizes potentially at-risk communities of color across the U.S. using study and risk estimate criteria described in the Estimating $PM_{2.5}$ and Ozone-Attributable Health Benefits TSD (U.S. EPA, 2022). *Id.* at 3-144 n.54.

| Demographic Population | Citation | Cohort | Location |
|---|---|---|---|
| White | Awad et al., 2019 | Medicare | National US |
| | Di et al., 2017 | Medicare | National US |
| | Lipfert et al., 2020 | Veterans | 31 VA clinics in 27 states |
| | Parker et al., 2018 | NHIS | National US |
| | Son et al., 2020 | North Carolina | North Carolina |
| | Wang et al., 2017 | Medicare | 7 southeastern states |
| | Wang et al., 2020 | Medicare | National US |
| White (75th percentile cities) | Kioumourtzoglou et al., 2016 | Medicare | National US (207 cities) |
| Black | Awad et al., 2019 | Medicare | National US |
| | Di et al., 2017 | Medicare | National US |
| | Lipfert et al., 2020 | Veterans | 31 VA clinics in 27 states |
| | Parker et al., 2018 | NHIS | National US |
| | Son et al., 2020 | North Carolina | North Carolina |
| | Wang et al., 2017 | Medicare | 7 southeastern states |
| | Wang et al., 2020 | Medicare | National US |
| Black (75th percentile cities) | Kioumourtzoglou et al., 2016 | Medicare | National US (207 cities) |
| Asian | Di et al., 2017 | Medicare | National US |
| | Son et al., 2020 | North Carolina | North Carolina |
| | Wang et al., 2020 | Medicare | National US |
| Asian (75th percentile cities) | Kioumourtzoglou et al., 2016 | Medicare | National US (207 cities) |
| Hispanic | Di et al., 2017 | Medicare | National US |
| | Parker et al., 2018 | NHIS | National US |
| | Son et al., 2020 | North Carolina | North Carolina |
| | Wang et al., 2020 | Medicare | National US |




**Figure 3-17. Available epidemiologic associations between long-term $PM_{2.5}$ exposure and mortality outcomes in demographic populations.**[55]

A recent study by scientists at Emory University, American Cancer Society and Harvard University, Liuhua Shi et al., *Low-Concentration Air Pollution and Mortality in American Older Adults: A National Cohort Analysis (2001-2017)*, 56 Environ. Sci. & Tech. 7194 (2021), further reinforces these conclusions. This analysis includes all Medicare beneficiaries, ages 65 years and older, in the contiguous U.S. from 2001 through 2017. The full cohort includes 68.7 million Medicare enrollees, 27.2 million deaths (39.7%) and the long-term mean $PM_{2.5}$ concentration was 9.7 ± 3.3 μg/m$^3$. In subgroup analyses, a higher estimated risk of mortality was observed among Black populations.

In contrast with the previous Di et al. (2017) analysis, this analysis uses updated and improved ensemble model $PM_{2.5}$ predictions with higher validity of predictions at lower $PM_{2.5}$ concentrations, sensitivity tests of robustness of findings to model specification (including application of advanced causal modeling approach) and additional 5 years of follow up in the Medicare population.




**vi. Standards with levels in and above EPA's proposed range would not comply with the Clean Air Act's health-protective mandate and would be arbitrary**

As an initial matter, annual standards above 8 μg/m³ would allow persistence of significant disparities in exposures to $PM_{2.5}$ concentrations and mortality risks from such exposures. This disparity is most striking between the more-exposed Black population, which has a much higher mortality risk rate, and the less-exposed, and substantially less-likely to die, white population in the locations EPA modeled. *See* PA at 3-162; *accord id.* at 3-159 to -163 & figs.3-20, 3-22. But with a standard of 8 μg/m³, "disparities in exposure are virtually eliminated." *Id.* at 3-162. The mortality risk gap persists at 8 μg/m³, but is the narrowest. *See id.* at 3-159 fig.3-20. Because national ambient air quality standards must protect vulnerable populations—not just the average or overall population—EPA must minimize the disparity in mortality risk that the Black population faces. Only a standard of 8 μg/m³ does that.

Looking at the broader population, too, standards above 8 μg/m³ would allow many more deaths and other health harms than a standard of 8 μg/m³. Specifically, a standard of 8 μg/m³ would have over 3 times the health benefits—prevented deaths and prevented emergency room visits for respiratory issues overall and for children with asthma—of a standard of 10 μg/m³. *See supra* § V.A.2.ii. Compared with a standard of 9 μg/m³, a standard of 8 μg/m³ would provide about 67% greater benefits. *See id.* EPA has

identified no rational basis for meaningfully doubting the harmful effects of $PM_{2.5}$, including at concentrations down to 8 μg/$m^3$. Accordingly, it is inconsistent with the Act not to set the standard's level at 8 μg/$m^3$ when such a level would save significantly more lives and avert many more other harms than higher standards, and EPA has offered no rational reason to conclude otherwise.

Moreover, standards above 8 μg/$m^3$ would provide little or no margin of safety for vulnerable populations like communities of color and low-income communities, and, in any event, EPA has not rationally explained how such standards would provide the legally required adequate margin of safety. EPA's explanation for the 9-10 μg/$m^3$ standard it proposes depends fundamentally on (1) narrowing the universe of epidemiologic studies it will principally rely on for establishing the level, (2) homing in on the study-reported means in that narrowed universe, and (3) inflating those study-reported means based on design values.[60] *See* 88 Fed. Reg. at 5628 (concluding with what EPA "provisionally concludes" regarding standard level); *see also id.* at 5628-29 (discussing "other lines of evidence" EPA "also considers" in arriving at proposed level). The PA's detailed summary of how key epidemiologic studies calculated their study-reported means makes clear that, with potentially two exceptions—both Canadian studies, upon which EPA did not rely (Erickson et al. 2020 and Pappin et al. 2019)—the study-reported means represented some broad average, not one that speaks to the disparate exposures EPA knows different populations experience. *See* PA at B-7 to -91 & tbl.B-4. EPA's explanation thus relies on <u>average</u> exposures in an <u>overall</u> population. Populations that are more vulnerable to lower $PM_{2.5}$ concentrations may thus have their experience drowned out by other populations that can endure higher concentrations. Accordingly, setting the standard's level by relying on concentrations below study-reported means is necessary to ensure vulnerable populations are protected with an adequate margin of safety against $PM_{2.5}$'s harmful effects. EPA fails to do that rationally here because its approach allows the many people who live in the portions of communities with the highest $PM_{2.5}$ concentrations to experience pollution levels <u>above</u> the study-reported means. The populations who will thus be affected are often disproportionately at-risk communities—communities of color and low-income communities. *See supra* § V.A.3.iii.

---

[60] As explained above, each of those three steps is irrational.

EPA's explanation of how it proposes to protect the health of vulnerable populations with an adequate margin of safety is further irrational. In its key substantive discussion of proposed levels, 88 Fed. Reg. at 5624-29, EPA provides details of how it is working the margin of safety into its decision-making in three places only. *See id.* at 5627, 5628, 5629; *see also id.* at 5624, 5627, 5628, 5629 (using phrase "margin of safety" precisely nine times). In the first place, EPA "preliminarily" takes the position "that a revised standard should limit exposures to ambient concentrations near the 25th percentile of reported studies" and finds that a standard in the 8-10 $\mu g/m^3$ "is generally within the range" of the 25th percentile values, and that the even broader range of 8-11 $\mu g/m^3$ "would limit exposures to ambient concentrations near the 25th percentile reported in the available studies," noting that lower standard levels would limit such exposures more. *Id.* at 5627. This position thus does no work because any standard level under consideration meets it, as does the current standard. *See id.* at 5623 ("the current level of the annual standard is above most of the 25th percentile values reported in the key epidemiologic studies" (emphasis added)). EPA's explanation is thus irrational because it justifies literally any decision EPA might make. *See, e.g., Shays v. FEC*, 414 F.3d 76, 114-15 (D.C. Cir. 2005) (agency action establishing threshold is invalid because rationale for the action applies with equal force to levels above and below the threshold); *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) (agency must articulate a "rational connection between the facts found and the choice made").

In the second place, wherein EPA walks through what it "provisionally concludes," EPA says the U.S.-based epidemiologic studies it relies on "include and assess impacts on the most at-risk populations" and that a standard in the 9-10 $\mu g/m^3$ range would purportedly "limit air quality exposures to concentrations well below those associated with the study reported mean" and thus provide an adequate margin of safety for such populations. 88 Fed. Reg. at 5628. But, as explained above, under EPA's approach to setting the standard's level, with a standard of 10 $\mu g/m^3$, at-risk populations would likely experience exposures to $PM_{2.5}$ concentrations above study-reported means EPA relies principally on, to say nothing of study-reported means in studies EPA refused to rely principally on or other relevant metrics in either set of studies. In 2012, EPA itself said this outcome did not provide an adequate margin of safety, for it rejected polluters' arguments that would've allowed $PM_{2.5}$ concentrations above the long-term mean reported in studies where there's a causal relationship between $PM_{2.5}$ exposure and adverse health effects. There, EPA reasoned that the

polluters' preferred outcome "would allow that level of air quality, where the evidence of health effects is strongest, and its associated risk of $PM_{2.5}$-related mortality and/or morbidity effects to continue. Selecting such a standard level could not be considered sufficient to protect the public health with an adequate margin of safety." 78 Fed. Reg. at 3147. Certainly, here EPA provides no rational explanation of how such an outcome now protects the health of—much less provides an adequate margin of safety for—the at-risk populations in areas with high levels of $PM_{2.5}$.

Similarly, with a standard of 9 $\mu g/m^3$, EPA has not rationally explained how the standard would provide at-risk populations requisite health protection with an adequate margin of safety when they would likely experience exposure to $PM_{2.5}$ concentrations within 0.3 $\mu g/m^3$ of a study-reported mean EPA relied principally on.

In the last place EPA provides some detail regarding how it is incorporating margin of safety considerations into its decision-making, EPA rationally explains how an approach to justify a standard above 10 $\mu g/m^3$ "may fail to provide an adequate margin of safety." 88 Fed. Reg. at 5629. Indeed, a standard above 10 $\mu g/m^3$, such as 11 $\mu g/m^3$, would fail to provide any margin of safety for all the reasons given above. We note also that the majority of CASAC declined to recommend a standard of 11 $\mu g/m^3$, further illustrating such a standard would be illegal and arbitrary. *See* CASAC Letter on PA at 16.

We further highlight that, even based solely on the studies EPA discusses and purports to give some weight in its proposal, a standard of 10 $\mu g/m^3$ would fail to protect public health with an adequate margin of safety and that EPA has failed to explain how it would. As discussed above, EPA addresses "two key studies" that include analyses restricted to $PM_{2.5}$ concentrations below 12 $\mu g/m^3$, explaining that both have mean concentrations of 9.6 $\mu g/m^3$. 88 Fed. Reg. at 5627. EPA notes that "these studies are useful in supporting the confidence and strength of associations at lower concentrations." *Id.* at 5603; *accord id.* at 5620. Though EPA points generally to purported uncertainties surrounding those analyses, the agency has not squared its endorsement of those studies, in addition to the great weight EPA places on study-reported means, with setting the standard at a level above those means. Similarly, the Henneman accountability study, also discussed above, has a starting concentration of 10 $\mu g/m^3$ and reported public health improvements resulted from lowering the concentration from that level. Were EPA to set the standard at 10 $\mu g/m^3$, the starting

concentration in the Henneman study would be lawful throughout the country and all the public health gains that would result from going below it would be forsaken. Whatever uncertainty remains in Henneman about whether a particular $PM_{2.5}$ concentration below 10 μg/m³ somehow represents a cut-point below which public health benefits might not be requisite, EPA gives no rational explanation—and none exists—of how a standard at 10 μg/m³ protects public health with any margin of safety, much less an adequate one.

Since early 2022, new studies have also come out that CASAC members may not have seen when they considered and drafted their letter on EPA's draft PA. *See supra* § V.A.2.i. These studies have further strengthened the existing record by providing, among other things, more studies with reported means below 10 μg/m³. The CASAC majority's recommendation might have shifted had they seen those studies. In any event, though the CASAC members are experts in their scientific fields, they are not legal experts, and the Clean Air Act's mandate is a legal one: "NAAQS must protect not only average healthy individuals, but also sensitive citizens such as children, and if a pollutant adversely affects the health of these sensitive individuals, EPA must strengthen the entire national standard." *Coal. of Battery Recyclers Ass'n*, 604 F.3d at 618 (quoting *Am. Lung Ass'n*, 134 F.3d at 389). A standard of 10 μg/m³ does not meet those legal requirements.

**vii. If EPA insists on setting an annual standard with level above 8 μg/m³, it must select a level of 9 μg/m³**

As explained above, the only rational option EPA has is to set the annual standard with a level of 8 μg/m³. If, nevertheless, it persists in refusing to do so, it must set the standard at 9 μg/m³ (or whatever lower level above 8 μg/m³ is the least departure justifiable). Indeed, EPA cannot and does not rationally explain how a standard of 10 μg/m³ protects public health with an adequate margin of safety. We note also that a standard of 9 μg/m³ would have huge benefits compared with the higher

alternative levels EPA is considering. For example, it would prevent about twice as many deaths as a standard of 10 μg/m³. RIA at ES-17 tbl.ES-6.[61]

### B. EPA must strengthen the 24-hour standard to no higher than 25 μg/m³

The latest scientific knowledge and CASAC majority recommendation show that the current 24-hour standard provides inadequate protection and would allow an unacceptably high level of risk to public health from short-term exposures to $PM_{2.5}$. EPA must revise the primary $PM_{2.5}$ 24-hour standard to no higher than 25 μg/m³ to protect public health with the adequate margin of safety required by the Clean Air Act.

#### 1. The latest scientific knowledge shows that the current 24-hour standard does not protect public health with an adequate margin of safety even in conjunction with a strengthened annual standard

The available scientific evidence indicates that the 24-hour standard must be lowered to protect public health with the adequate margin of safety required by the Clean Air Act. As the majority of CASAC found, "[t]here is substantial epidemiologic evidence from both morbidity and mortality studies that the current standard is not adequately protective" and the CASAC majority felt there was "less confidence that the annual standard could adequately protect against health effects of short-term exposures." CASAC Letter on PA at Cover Letter 3-4. A majority of the CASAC recommended "that the EPA revise the level as part of the current review, and that a range of 25-30 μg/m³ for the 24-hour $PM_{2.5}$ standard would be adequately protective." *Id.* at 17. The scientific evidence and CASAC majority recommendation clearly support a strengthened 24-hour standard.

[61] The PA does not analyze as many areas and reports a standard of 9 μg/m³ would save about 30% more lives than a standard of 10 μg/m³, accounting for just 30 areas. PA at 3-153 tbl.3-17.

#### i. EPA must revise the 24-hour standard because the combination of primary standards must provide adequate protection from health risks linked to both long-term and short-term exposures

To protect public health with an adequate margin of safety from health risks linked to both short-term and long-term exposures to $PM_{2.5}$, EPA must strengthen the 24-hour standard. It must do so even if the annual standard is set as low as 8 µg/m$^3$. The decision whether or not to strengthen the primary standards for fine particulate matter must be made based on whether the latest scientific knowledge indicates that the annual and 24-hour primary standards protect public health with the adequate margin of safety required by the Clean Air Act. For the 24-hour standard specifically, the question must be whether the current 24-hour standard of 35 µg/m$^3$ or a revised, more protective, standard, in combination with the levels of annual standards under consideration, will provide the required protection from the health effects associated with both long-term and short-term exposures to $PM_{2.5}$. Or as EPA describes it, "the current annual standard and 24-hour standard, together, are intended to provide public health protection against the full distribution of short- and long-term $PM_{2.5}$ exposures" and "changes in $PM_{2.5}$ air quality designed to meet either the annual or the 24-hour standard would likely result in changes to both long-term average and short-term peak $PM_{2.5}$ concentrations." 88 Fed. Reg at 5561.

The annual and 24-hour standards are not equally effective at addressing both types of exposures, because as EPA recognizes, "the annual standard is most effective at controlling exposures to 'typical' daily $PM_{2.5}$ concentrations that are experienced over the year, while the 24-hour standard, with its 98th percentile form, is most effective at limiting peak daily or 24-hour $PM_{2.5}$ concentrations" and "changes designed to meet a lower 24-hour standard, with a 98th percentile form, would most effectively result in fewer and lower peak 24-hour $PM_{2.5}$ concentrations, but also have an effect on lowering the annual average $PM_{2.5}$ concentrations." *Id.* at 5617. As we explain below, none of the levels for the annual standard under consideration in this proposal (proposed or which EPA has asked for comment on) would provide adequate protection without a strengthened 24-hour standard.

#### ii. The available scientific evidence provides a strong basis for strengthening the 24-hour standard

In addition to the health risks linked to long-term exposures to $PM_{2.5}$ discussed in § V.A, EPA has determined that there is a causal relationship between short-term exposures to $PM_{2.5}$ and mortality and cardiovascular effects, and that a causal relationship is likely to exist between short-term $PM_{2.5}$ exposure and respiratory effects. 88 Fed. Reg. at 5589. EPA has also determined that there is evidence suggestive of, but not sufficient to infer a causal relationship between short-term $PM_{2.5}$ exposure and nervous system effects, metabolic effects, reproduction and fertility, and pregnancy and birth outcomes. *Id.* at 5590. Since it is most effective at limiting short-term exposures, EPA must set the 24-hour standard at a level that provides adequate protection (in combination with the annual standard) from these health risks.

As the CASAC found, "both primary standards, 24-hour and annual, are critical to protect public health given the evidence on detrimental health outcomes at both short-term and longer-term exposures including peak events (e.g., wildfires)." CASAC Letter on PA at 13. Furthermore, a majority of the CASAC recommended both tightening the annual standard as low as 8 $\mu g/m^3$ and tightening the 24-hour standard to as low as 25 $\mu g/m^3$ which is indicative of the majority's lack of confidence that a tightened annual standard would be sufficient to address the risk of health effects from short-term exposures. *Id.* at 16-17.

The CASAC majority was "convinced that there is substantial epidemiologic evidence from both morbidity and mortality studies that the current standard is not adequately protective" including "three U.S. air pollution studies with analyses restricted to 24-hour concentrations below 25 $\mu g/m^3$." *Id.* at 17. EPA acknowledges that "the substantial epidemiologic evidence available in this reconsideration, including the studies that restrict short-term (24-hour average $PM_{2.5}$ concentrations) $PM_{2.5}$ exposures below 25 $\mu g/m^3$, provides support for positive and statistically significant associations between exposure to short-term $PM_{2.5}$ concentrations and all-cause mortality (Di et al., 2017a) and CVD hospital admissions (deSouza et al., 2021, and Di et al., 2017a)." 88 Fed. Reg. at 5621. The epidemiologic evidence is particularly relevant to this reconsideration because, as EPA acknowledges, "the epidemiologic studies available in this reconsideration include diverse populations that are broadly representative of the U.S. population as a whole, and include those populations identified as at-risk (i.e., children

and older adults), as well as individuals in the general population with pre-existing disease, such as cardiovascular disease and respiratory disease." *Id.* at 5625. This compares favorably to the other available information from controlled human exposure studies and the risk assessment, which are not as broadly representative of the entire nation's population.

EPA also admits that "for the available epidemiologic studies that employ restricted analyses of short-term exposure studies, multicity studies indicate that positive and statistically significant associations with mortality persist in analyses restricted to short-term (24-hour average $PM_{2.5}$ concentrations) $PM_{2.5}$ exposures below 35 $\mu g/m^3$ (Lee et al., 2015), below 30 $\mu g/m^3$ (Shi et al., 2016), and below 25 $\mu g/m^3$ (Di et al., 2017a)." *Id.* at 5621. Furthermore, "the Administrator agrees that these studies help to provide additional support for reaching conclusions on causality in the 2019 ISA." *Id.* at 5621. Despite acknowledging these associations and the relevance to causality, EPA treats the epidemiological studies that use restricted analyses as being more relevant to the annual standard, and not providing adequate evidence to strengthen the 24-hour standard. Indeed, EPA states that "[w]hile this is useful information, it does not help to inform questions on the adequacy of the current 24-hour standard given that the 24-hour standard focuses on reducing 'peak' exposures (with its 98th percentile form)." *Id.* EPA claims that these studies do not help address the 24-hour standard for three reasons, specifically that (1) there are uncertainties regarding the methodologies used to exclude concentrations, that (2) the studies evaluate concentrations that correspond to the levels of the standards, but not the forms and averaging times, and that (3) the study-reported means from these studies are not useful for identifying impacts from peak 24-hour exposures, but are more useful for identifying impacts from typical 24-hour exposures. *Id.*

On the first issue of uncertainty regarding the studies, it is worth noting that a majority of EPA's expert panel, which is composed of highly qualified experts in their fields, reviewed the available scientific research and felt that these studies could be relied upon. While some uncertainty is inevitable with scientific research, that cannot rationally preclude EPA from relying on relevant scientific studies. On the second purported problem, it is important to recognize that the forms and averaging in the 24-hour and annual standards actually result in less protection than the levels might otherwise suggest. Thus, if anything, EPA should be more concerned that the standard provides inadequate protection because of the averaging over multiple years and, in the

case of the 24-hour standard, the 98th percentile form that allows exceedances. Finally, while the study-reported means from these studies may be more useful for identifying impacts from typical 24-hour exposures, they also indicate health risks at relatively high exposures below the current 24-hour standard that must be addressed.

While these studies provide evidence to support strengthening the annual standard, as the average across the 24-hour periods in a year, they also provide evidence of potential health impacts from daily exposures at or below 25 $\mu g/m^3$. This is indicative of health impacts caused by peak exposures at levels below the current 24-hour standard. While these studies provide useful information and evidence in support of strengthening the annual standard, they also show harm when peak exposures are limited to levels that would comply with the existing 24-hour standard and therefore provide a strong basis for strengthening the 24-hour standard. EPA's assertion that these studies indicate the risks from short-term $PM_{2.5}$ exposure are not disproportionately driven by peak exposures does not suggest those peak exposures should not be addressed, and because no threshold has been identified below which exposure is not associated with health risks, those exposures still pose significant risks, which if addressed can also lower average exposures.

Far from undermining the epidemiologic evidence, controlled human exposure studies support the conclusion that the 24-hour standard must be strengthened. As the CASAC noted, controlled human exposure studies are not compelling evidence for retaining the 24-hour standard. As EPA acknowledges, the primary NAAQS must protect public health with an adequate margin of safety, including vulnerable populations. Controlled human exposure studies "preferentially recruit less susceptible individuals and have a typical exposure duration much shorter than 24 hours" and often do not expose people to the mix of pollutants that appears in the real world. CASAC Letter on PA at 6-7, 17. CASAC therefore warned against interpreting the absence of effects that may be found at a certain level in a particular controlled human exposure study to mean $PM_{2.5}$ causes no harmful effects at that level. *Id.* EPA appears to agree at least to some degree with the CASAC majority's concern, as "the Administrator agrees with the majority of the CASAC's comment that the controlled human exposure studies have significant limitations which must be considered when reaching conclusions on the adequacy of the current 24-hour standard." 88 Fed. Reg. at 5621.

The CASAC majority further explained that, even taking into consideration their limitations, the controlled human exposure studies provide some support for strengthening the 24-hour standard: "evidence of effects from controlled human exposure studies with exposures close to the current standard support epidemiological evidence for lowering the standard." CASAC Letter on PA 17. EPA claims "that $PM_{2.5}$ exposure concentrations evaluated in most of these controlled human exposure studies are well-above the 2-hour ambient $PM_{2.5}$ concentrations typically measured in locations meeting the current primary standards." 88 Fed. Reg. at 5594. However, as the CASAC noted, "if the prior 20 hours of ambient exposure and the 2-4 hours of the controlled human exposure were taken as a time-averaged 24-hour concentration, the exposure would likely be in the realm of normal ambient 24-hour exposures." CASAC Letter on PA at 7. Therefore, EPA must focus less on peak concentrations "typically measured" at locations meeting the current standards because even if those do not typically exceed the levels of the controlled human exposure studies, the 24-hour standard must protect against atypical peak concentrations that cause public health harm or reduce the margin of safety in the standard, and the current standard allows for exposures comparable to those in controlled human exposure studies.

Furthermore, it is important to view the controlled human exposure studies, which "are important in establishing biological plausibility," 88 Fed. Reg. at 5593, in light of the other scientific evidence, particularly the epidemiological studies, as the CASAC majority does. The combination of epidemiological studies that provide evidence of effects below the current 24-hour standard and controlled human exposure studies that provide biological plausibility and show effects at levels that, if averaged over 24 hours, would likely be in the realm of normal ambient 24-hour exposures, provides strong support for strengthening the 24-hour standard.

Also, EPA's risk assessment does little to inform a decision regarding the 24-hour standard. The risk assessment is limited in scope and does not provide a comprehensive view of the potential impact of a lower 24-hour standard. At best, the risk assessment provides a partial assessment of mortality risk that can be compared between the existing standard and a 30 $\mu g/m^3$ 24-hour standard because, as EPA admits, the risk assessment "did not provide quantitative information on risk impacts associated with an alternative 24-hour standard level of 25 $\mu g/m^3$." *Id.* at 5622. Any assertion of which standard is "controlling" based on the risk assessment does not apply to a 24-hour standard of 25 $\mu g/m^3$.

The CASAC majority was particularly "concerned that the risk assessment may not adequately capture areas with wintertime stagnation and residential wood-burning where the annual standard is less likely to be protective." CASAC Letter on PA at 17. This contradicts EPA's claim that "current air quality shows that the 24-hour standard is controlling in very few areas and thus, it is understandable that there are very few areas that would be included in the study areas in the risk assessment." 88 Fed. Reg. at 5622. In one example, Fairbanks, Alaska has been in nonattainment under the 24-hour standard since 2009, yet in that time has never been designated a nonattainment area under the annual standard, and was not included in the risk assessment. One member of the CASAC panel also expressed concern about areas in the Northwest with wintertime stagnation and heating by woodstoves being excluded because they are affected by periodic wildfires. CASAC Letter on PA at A-89.

Finally, the number of areas failing to attain the 24-hour standard without failing to attain the annual standard is not a rational relevant metric in determining whether the 24-hour standard is currently providing adequate protection from short-term exposures to $PM_{2.5}$. Consistent with its statements that the two standards work together, EPA must treat the 24-hour standard as a complement to the annual standard that provides better protection against peak exposures rather than as a kind of "backstop" value. Tightening the annual standard without tightening the 24-hour standard would leave an unacceptably high level of health risk from peak exposures because areas could attain the tightened annual standard without attaining a tighter 24-hour standard.

**iii. Even an annual standard of 8 μg/m³ would not provide adequate protection from short-term peak exposures without a stronger 24-hour standard**

An annual standard as low as 8 $\mu g/m^3$, while providing much better protection against typical/average exposures than the current annual standard, would not protect public health with the adequate margin of safety required by the Clean Air Act because it would not adequately address peak exposures.

Furthermore, the future areas that are not projected to attain either the annual or 24-hour standard could attain the annual standard but not necessarily attain the 24-hour standard because control measures that address typical exposures fail to adequately limit peak exposures to $PM_{2.5}$. With climate change affecting wildfires and weather

patterns, there is significant risk of unprecedented or unusual events, and therefore it is not rational for EPA to expect future events to reflect historical patterns. As the CASAC noted, "there is an underlying assumption that the 24-hour standard adequately controls for short-term effects of peak exposures embedded in the 24-hour period but there is no adjustment made regarding the increased incidences of short-term peak exposures in recent years." CASAC Letter on PA at 7. The Agency must therefore set the 24-hour standard at a protective level regardless of typical historical data regarding exposures under the existing standards. It would be arbitrary and capricious to retain the 24-hour standard based on historical data when EPA knows and has been warned about changes that suggest historical patterns may not be indicative of future exposures.

**2. Monitor data shows that strengthening the 24-hour standard in combination with a strengthened annual standard provides significantly better protection against 2-hour and 4-hour peak exposures**

Though controlled human exposure studies have limited value in deciding whether or not to strengthen the 24-hour standard, EPA acknowledges that "[s]tatistically significant effects on one or more indicators of cardiovascular function are often, though not always, reported following 2-hour exposures to average $PM_{2.5}$ concentrations at and above about 120 μg/m$^3$." 88 Fed. Reg. at 5593. EPA also notes that "Wyatt et al. (2020) found significant effects for some cardiovascular (*e.g.*, systematic inflammation markers, cardiac repolarization, and decreased pulmonary function) effects following 4-hour exposures to 37.8 μg/m$^3$ in healthy young participants (18-35 years, n=21) who were subject to intermittent moderate exercise." *Id.* Therefore, the 24-hour standard must at least provide protection from risk of the health effects shown in these studies. Analysis of recent monitor data shows that strengthened 24-hour and annual standards would provide significantly better protection from these types of exposures.

Looking at the range of combinations of standards recommended by CASAC, and based on 2017-2020 data, for monitors that achieved or were close to achieving an annual standard of 10 μg/m$^3$ and a 24-hour standard of 30 μg/m$^3$ (9.8-10.2 and 28-32), there are, on average, 1.5 days per monitor per year with 2-hour max over 120 μg/m$^3$, while for monitors that just achieved or were close to achieving a combination of 8 μg/m$^3$ and 25 μg/m$^3$ (7.8-8.2 and 23-27), there were on average only 0.2 days per

monitor per year that have 2-hour max over 120 μg/m$^3$, which is virtually eliminating those exposures. Considering the Wyatt et al. study, which showed health effects from peak exposures above 37.8 μg/m$^3$, for monitors that just achieved or were close to achieving standards of 10 μg/m$^3$ and 30 μg/m$^3$ (9.8-10.2 and 28-32), there are on average 24 days per monitor per year with 4-hour max over 37.7 μg/m$^3$. For monitors that achieved or were close to achieving standards of 8 μg/m$^3$ and 25 μg/m$^3$ (7.8-8.2 and 23-27), there were only 8 days per monitor per year. Based on data from 2017-2021, at any annual standard, monitors that just achieve or are close to achieving a standard of 35 μg/m$^3$ (33-37) averaged 1.81 days per monitor per year of peak 2-hour exposures over 120 μg/m$^3$ and 24.28 days per monitor per year of 4-hour peak exposures over 37.7 μg/m$^3$. For monitors just achieving or close to achieving 25 μg/m$^3$ (23-27), there were on average only .54 days per monitor per year of peak 2-hour exposures over 120 μg/m$^3$, and 10.27 days per monitor per year of 4-hour peak exposures over 37.7 μg/m$^3$.

Finally, the current 24-hour standard of 35 μg/m$^3$ was set back in 2006 when the annual standard was 15 μg/m$^3$. The scientific evidence connecting health risks to lower $PM_{2.5}$ concentrations has grown, yet as the annual standard has been tightened, the 24-hour standard has remained unchanged. The Independent Particulate Matter Review Panel noted that "[i]n past reviews and in this review, there is an underlying notion that there is a typical mean ratio between annual and 24-hour levels" and therefore "if the annual level is revised downward, the 24-hour level should be revised downward proportionally." EPA-HQ-OAR-2015-0072-0037 ("IPMRP Letter") B-31. If the annual standard is reduced from 12 μg/m$^3$ to 8-10, a linearly proportional reduction of the 24-hour standard would be 23-29 μg/m$^3$. *Id.*

### 3. To meet the Clean Air Act's mandates and advance environmental justice, EPA must set the 24-hour standard's level no higher than 25 μg/m$^3$

EPA must revise the 24-hour standard to 25 μg/m$^3$ for the primary standards to provide adequate protection against health effects linked to both long-term and short-term exposures for overburdened and historically marginalized groups. The CASAC majority felt that it was "important to note that risk disparities across racial and ethnic groups remain substantial with the focus on an annual standard." CASAC Letter on PA at Cover Letter 2. Concerns regarding some groups are further supported by a nationwide study of population-weighted mean exposures from 2012-2016, which found that compared to non-Hispanic white people, people of color experienced 23

more days with $PM_{2.5}$ concentrations greater than or equal to 15 μg/m$^3$, 6.4 more days with $PM_{2.5}$ concentrations greater than or equal to 25 μg/m$^3$, and 1.7 more days with $PM_{2.5}$ concentrations greater than or equal to 35 μg/m$^3$. Timothy Collins & Sara Grineski, *Racial/Ethnic Disparities in Short-Term $PM_{2.5}$ Air Pollution Exposures in the United States*, 130 Env't Health Persp., Aug. 2022, at 087701-1, 087701-1 to -3. The study found that "[d]isparities appear larger for short-term vs long-term $PM_{2.5}$ exposures nationwide." *Id.* at 087701-3. The study also found that "POC groups within regions were much more likely than NH White people to have greater than regional average exposure, whereas NH White people were more likely than POC groups to have less than regional average exposure." *Id*. at 087701-1.

An analysis of the projected populations in monitored counties that EPA projects would be in attainment and nonattainment areas in 2032 at various annual and 24-hour standard levels shows that there would be significantly larger populations of people of color living in nonattainment areas if the 24-hour standard is tightened. Measures in plans to implement the NAAQS to address this pollution and improve air quality would have large health benefits for such demographics because "[a]s part of these plans, states have the opportunity to use tools to advance environmental justice, in this case for overburdened communities in areas with high PM concentrations above the NAAQS, as provided in current PM NAAQS implementation guidance to meet requirements." 88 Fed. Reg. at 5563.




*Figure 2: Projected 2032 attainment/nonattainment county-level populations at various annual/daily standard combinations.*

Data Sources for Figure 2: Design Value data from EPA's 2032 Projections, County Max annual and daily values; Population values are taken from EPA's EJScreen dataset for 2021, Total and People of Color Populations

The chart shows the least to most stringent standard combinations from left to right, with changes in annual standard generally resulting in a greater shift in population from attainment to nonattainment counties than a shift in daily standard. Note that there are 569 counties that have a projected design value out of the over 3,100 counties in the continental U.S. Total U.S. population was nearly 325 million people, of whom nearly 128 million are people of color. The monitored counties include nearly 216 million people, with about 99 million people of color, representing ~2/3 of the total population and 77% of the population of people of color. Note monitoring is generally conducted in more populated and polluted areas.

For an annual standard of 10 µg/m$^3$, among the monitored populations, lowering the 24-hour standard from 35 µg/m$^3$ to 25 µg/m$^3$ results in the population of people of

color covered by nonattainment areas increasing by 9.5 million people, or a 9.6% increase. At an annual standard of 9 μg/$m^3$ the 24-hour standard of 25 μg/$m^3$ results in the nonattainment population of people of color increasing by an additional 4.8 million people, or nearly 5%. And at 8 μg/$m^3$ the nonattainment population of people of color increases by 3.3 million people, or 3.3%. These numbers show significant increases in the number of people of color who would be in nonattainment areas under a tightened 24-hour standard, and therefore benefit from air quality improvements from implementation. As a percentage of total U.S. population, at levels of 10 μg/$m^3$ for the annual and 35 for the 24-hour standard, the populations in nonattainment areas in this dataset would be 10.2% of the total white population and 21.6% of the population of people of color. For levels of 8 μg/$m^3$ for the annual and 25 μg/$m^3$ for the 24-hour standard, the percentages are 43.8% of the total white population and 57.2% of the population of people of color. In going from a combination of 10 μg/$m^3$ and 35 μg/$m^3$ to 8 μg/$m^3$ and 25 μg/$m^3$, the percentages increase by 33.6% for the white population and 35.6% for the population of people of color. Therefore, the increase in percentage of population in nonattainment areas increases by a larger amount for people of color than for the white population.

We also carried out an analysis based on current (2019-21) design values[62] and demographic data from EJScreen 2021. It shows similar trends to the results for EPA's projected 2032 design values. The counties with design values are mostly the same, but not entirely. The current design value set has about 15 million fewer people in counties with monitors. Both analyses are illustrative, since the designation process could include some counties without monitors, and the classification of counties with monitors in that process is likely to reflect the worst design values in the metro area, vs. a county-specific worst design values used here.

---

[62] As of the comment deadline, the 2021 design values are the most recent available. EPA, Air Quality Design Values, https://www.epa.gov/air-trends/air-quality-design-values#report; *see* EPA, $PM_{2.5}$ Design Values, 2021, https://www.epa.gov/system/files/documents/2022-05/PM25_DesignValues_2019_2021_FINAL_05_24_22.xlsx (design value report).




*Figure 3: County-level populations at various annual/daily standard combinations under most current (2021) design values.*

Data Sources for Figure 3: Design Value data from EPA's 2021 Design Value Report, County Max annual and daily values; Population values are taken from EPA's EJScreen dataset for 2021, Total and People of Color Populations.

### 4. EPA's reasoning for retaining the 24-hour standard is arbitrary and inconsistent with the Clean Air Act

EPA's proposed decision to retain the 24-hour standard is inconsistent with the scientific evidence and the advice of the majority of the CASAC. As discussed in § II.B.4, CASAC is a highly qualified panel established under the Clean Air Act. EPA has failed to provide an adequate reasoned explanation for proposing to retain the standard, and instead relies on arbitrary and capricious reasoning for contradicting the scientific evidence and CASAC in its proposed decision.

**i. Deciding whether or not to revise the 24-hour standard based on a comparison to the information and evidence available on the annual standard is arbitrary and unlawful**

EPA's discussion of whether "there is less information available to support decisions on the 24-hour standard" than the annual standard is arbitrary and capricious, and not a relevant consideration when deciding whether to revise the 24-hour standard. The relevant question is not whether "the Administrator finds it is less clear whether the available scientific evidence and quantitative information calls into question the adequacy of the public health protection afforded by the current 24-hour standard." 88 Fed. Reg. at 5624. Having less information available regarding one standard compared to the other does not rationally prevent EPA from revising either standard.

The decision regarding revising the 24-hour standard must be based on the combined protection offered by the standards from short-term and long-term exposures, not the relative strength of the evidence supporting revisions to either of the standards. While there is compelling evidence to support a revision to the 24-hour standard, even if the evidence and quantitative information in support of revising the 24-hour standard is not as compelling as the evidence supporting revision of the annual standard, revising the 24-hour standard is still supported and required.

**ii. EPA's treatment of the scientific evidence and the risk assessment in deciding to retain the current 24-hour standard is arbitrary and unlawful**

The available scientific evidence as previously discussed, *see supra* § V.B.1.ii, strongly supports revising the 24-hour standard. EPA's proposal to not revise the 24-hour standard and its treatment of the scientific evidence, the risk assessment, and the CASAC majority's recommendations regarding them are arbitrary and unlawful.

EPA claims that the epidemiologic evidence "provides limited support for judging adequacy of the level of the 24-hour standard" and that the studies relied on by the CASAC majority in recommending a revision to the 24-hour standard "are an inadequate basis for revising the level of the 24-hour $PM_{2.5}$ standard." 88 Fed. Reg. at 5623. As discussed in § V.B.1.ii, EPA claims that because of uncertainty regarding methodology, the studies not incorporating the form and averaging time of the 24-hour

standard, and the study-reported means being more useful for identifying impacts from typical exposures but not peak exposures, the epidemiologic studies with restricted analyses do not help address the 24-hour standard. These assertions run counter to the CASAC majority's recommendation, and for the reasons discussed in § V.B.1.ii, EPA's treatment of this evidence is arbitrary and unlawful.

EPA's treatment of the controlled human exposure studies is also arbitrary and unlawful, largely for reasons discussed in § V.B.1.ii. While the limitations of controlled human exposure studies have been well established, as discussed in § V.B.1.ii, those studies still provide support for tightening the 24-hour standard based on effects at levels of exposures that may occur in areas that attain the current 24-hour standard. EPA appears to dismiss the support from controlled human exposure studies by suggesting "it is unclear how the results from these studies alone and the importance of the effects observed in these studies, should be interpreted with respect to adversity to public health" and that "just observing the occurrence of impaired vascular function alone does not clearly suggest an adverse health outcome." 88 Fed. Reg. at 5593. However, as the agency acknowledges, "impaired vascular function can signal an intermediate effect along the potential biological pathways for cardiovascular effects following short-term exposure to $PM_{2.5}$ and show a role for exposure to $PM_{2.5}$ leading to potential worsening of IHD and heart failure followed potentially by ED visits, hospital admissions, or mortality." *Id.* And as previously discussed, the controlled human exposure studies are limited because they include only healthy individuals, and therefore are not representative of the U.S. population, which includes at-risk populations that must be protected. Even if the effects observed may not be clearly adverse in the controlled human exposure study participants, that does not mean they would not be clearly adverse for vulnerable or at-risk groups. The relevant question is not whether these effects are adverse to the limited participants in controlled human exposure studies, but whether they would be adverse to the more vulnerable or at-risk groups who must be protected by the standard.

EPA's treatment of the risk assessment, and the agency's reliance on the risk assessment as support for proposing not to revise the 24-hour standard are arbitrary and unlawful for the reasons more fully discussed in § V.B.1.ii. In brief, the CASAC majority was concerned about the scope of the risk assessment, and "the majority of CASAC members [were] concerned that the current risk assessment may not adequately characterize mortality risks associated with short-term $PM_{2.5}$ exposures."

CASAC Letter on PA at 11. The fact that the risk assessment, as designed, is not particularly helpful in determining whether the 24-hour standard is adequate does not weigh against revising the 24-hour standard. EPA's reliance on the risk assessment for the assertion that the annual standard is "the controlling standard" for most of the U.S. despite its serious limitations (including considering only the weakest standard recommended by the CASAC majority) is arbitrary and capricious, as is any decision to retain the 24-hour standard that is based on this notion of which standard is "controlling." 88 Fed. Reg. at 5561. As the agency acknowledges, "the risk assessment did not provide quantitative information on risk impacts associated with an alternative 24-hour standard level of 25 $\mu g/m^3$." *Id.* at 5622.

Furthermore, it would be arbitrary and capricious for EPA to retain the standard based on the expectation that, because the current standards have, for the most part, resulted in attainment areas having peak concentrations below levels in controlled human exposure studies in the past, they will continue to do so into the future. The standards should be set at levels that will provide adequate protection in the future, including where circumstances in the future may be different due to climate change.

**iii. EPA arbitrarily relies on strengthening the annual standard to provide all the necessary protection against short-term peak exposures**

While the annual standard and 24-hour standard may provide some protection against short-term and long-term exposures to $PM_{2.5}$, as EPA acknowledges, the 24-hour standard is better at and more targeted toward addressing the short-term peak exposures than the annual standard. EPA "notes that, for most of the U.S., the annual standard is the controlling standard and that the risk assessment estimates reductions in $PM_{2.5}$-associated risks across more of the population and in more areas with alternative annual standard levels compared to estimates for alternative 24-hour standard levels." 88 Fed. Reg. at 5624. However, this is based on the risk assessment (with its inherent limitations) and would be an arbitrary basis for not strengthening the 24-hour standard.

Furthermore, it is possible that areas failing to attain both the annual standard and 24-hour standard (for which EPA considers the annual standard "controlling") could achieve a tighter annual standard without achieving a tighter 24-hour standard because high peak concentrations may still be allowed by the annual standard. EPA

must provide adequate protection from the health effects associated with high short-term exposures, and therefore it would be arbitrary and capricious to leave the 24-hour standard unchanged while relying entirely on the annual standard to provide additional protection from short-term exposures.

**5. EPA should revise the form of the 24-hour standard to a 99th percentile of daily averages over 3 years**

EPA should revise the form of the 24-hour standard to a 99th percentile form to provide better protection from peak exposures. The current form of the standard ostensibly allows exceedances on 7 days per year, but is further weakened by being averaged over 3 years. In fact, for the four monitor locations that just met the current daily standard for 2019-21 (design value 35 $\mu g/m^3$), one site had 23 exceedances in one year; the average number over three years for the sites were 6.33, 9, 9, and 10.33. Fundamentally, there is a mismatch between EPA's stated concern about 24-hour peak exposures, which the 24-hour standard is supposed to most effectively control, 88 Fed. Reg. at 5617, 5618-19, and the form effectively writes off many high pollution days each year. The form is thus irrational.

Moreover, CASAC recommended that "EPA provide a more comprehensive assessment of the 24-hour standard that includes the form as well as the level" in future reviews and that "[i]n particular, the midnight-to-midnight averaging time splits high wood smoke episodes into two days, thus potentially underestimating the effect of high 24-hour exposures, especially in areas with wood-burning stoves and wintertime stagnation." CASAC Letter on PA at 18. In its letter, CASAC suggested "considering a rolling 24-hour average and examining alternatives to the 98th percentile of the 3-year average (e.g., average of concentrations ≥ 98th percentile or alternative percentiles)." *Id.* A 99th percentile form for the 24-hour standard would provide stronger protection for public health regardless of the level of the standard and EPA should consider it.

## VI. SECONDARY PM NAAQS

### A. EPA's legal obligations in reviewing and setting the secondary standards

The Act requires EPA to set and periodically revise secondary ambient air quality standards that protect public welfare, 42 U.S.C. §§ 7408(a), 7409(a)-(b), and

> [S]pecify a level of air quality the attainment and maintenance of which in the judgment of the Administrator, based on such criteria, is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air.

*Id.* § 7409(b)(2). Just as with the primary standards, EPA cannot lawfully consider costs in the standard-setting process. *Whitman*, 531 U.S. at 471 n.3 ("For many of the same reasons described in the body of the opinion, as well as the text of § [74]09(b)(2), which instructs the EPA to set the standards at a level 'requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air' (emphasis added), we conclude that the EPA may not consider implementation costs in setting the secondary NAAQS.'").

Under the Act, "[t]o ensure that the NAAQS take account of the current science," EPA must complete a thorough review of the standards "at least once every five years." 42 U.S.C. § 7409(d)(1); *Nat'l Ass'n of Mfrs.*, 750 F.3d at 923 ("To ensure that the NAAQS take account of current science, the Clean Air Act directs EPA to review the standards at least once every five years."). During this review, EPA must revise the criteria and standards or promulgate new standards as appropriate. 42 U.S.C. § 7409(d)(1). The secondary ("welfare") standards "shall specify a level of air quality the attainment and maintenance of which…is requisite to protect the public welfare from any known or anticipated adverse effects." *Id.* § 7409(b)(2); *Am. Farm Bureau Fed'n*, 559 F.3d at 530. Effects on welfare include impacts on "soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being, whether caused by transformation, conversion, or combination with other air pollutants." 42 U.S.C. § 7602(h).

In speaking about the amendments for public welfare during the Senate debates, one of the prime architects of the Act, Senator Muskie noted that the protections for public welfare "are especially important because some pollutants may have serious effects on the environment at levels below those where health effects may occur" and will be set to be "protective against any know[n] or adverse environmental effects." Legislative History of Clean Air Act Amendments of 1970 at 227 (Senate Debate on S. 4358, Sept. 21, 1970). The "ongoing, periodic review and revision process set up by Congress…ensure[s] that regulatory guidelines and standards which protect human

safety and welfare are kept abreast of rapid scientific and technological developments," *American Lung*, 884 F. Supp. at 347, and that "as the contours and texture of scientific knowledge change…EPA's NAAQS review necessarily changes as well." *Mississippi v. EPA*, 744 F.3d 1334, 1344 (D.C. Cir. 2013); *see also* discussion and caselaw cited above. The CASAC is chartered to offer recommendations on the secondary as well as the primary NAAQS.

### B. Public Welfare Impacts from $PM_{2.5}$

The wide range of harms $PM_{2.5}$ causes for public welfare is well-established. We describe three of the welfare values $PM_{2.5}$ harms below: ecosystems; visibility; and materials.

#### 1. Ecosystems

Fine particle pollution is made of many different compounds, which are independently harmful to ecosystems. $PM_{2.5}$ can be directly deposited on land and water, causing damage from acidification, eutrophication, deposition of toxic metals and organic compounds, and changes in soil and water chemistry. When deposited on plants, it can affect their ability to metabolize and photosynthesize correctly. Fine particles entering aquatic ecosystems can affect organisms both directly and through their role in acidification and affiliated heavy metal contamination. These metals, such as aluminum, are toxic to aquatic life.

Fine PM nitrogen pollution has ecological and water quality impacts. As anthropogenic nitrogen enters ecosystems it can contribute to a "nitrogen cascade" disrupting natural nutrient cycling. Damage to ecosystems that are typically nitrogen limited are particularly concerning where biodiversity can be reduced, and invasive species can be favored. For example, atmospheric deposition of nitrogen is a significant source of pollution affecting water quality in the Chesapeake Bay and contributing to persistent eutrophication in the estuary.[63] EPA's Chesapeake Bay Program reports that

---

[63] *See* U.S. EPA, *Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus, and Sediment*, at ES-3 (Dec. 2010), *available at* https://www.epa.gov/chesapeake-bay-tmdl/chesapeake-bay-tmdl-document ("Most of the Chesapeake Bay and its tidal waters are listed as impaired because of excess nitrogen, phosphorus and sediment. These

ammonia emissions account for an increasing amount of the total nitrogen from atmospheric deposition entering the Bay and its tidal rivers.[64] Ammonia emissions also contribute to the formation of PM.[65]

Fine PM can be a significant component of acid rain. When nitrogen and sulfur secondary particles dissolve in rain and cloud water they contribute to the devastating effects of acid rain on our ecosystems, particularly in the eastern U.S. and in the Rocky Mountains at high elevations where ecosystems are more fragile and acidic cloud water can be more prevalent. There are numerous negative ecosystem effects of acid

---

pollutants cause algae blooms that consume oxygen and create 'dead zones' where fish and shellfish cannot survive, block sunlight that is needed for underwater Bay grasses, and smother aquatic life on the bottom."); *id.* at 4-33 (noting that "[a]ir sources contribute about one-third of the total nitrogen loads delivered to the Chesapeake Bay"); *see also* Linker, Lewis C., et al., *Computing Atmospheric Nutrient Loads to the Chesapeake Bay Watershed and Tidal Waters*, Journal of the American Water Res. Ass'n. (JAWRA), 2013, 1-17, https://doi.org/10.1111/jawr.12112, https://d38c6ppuviqmfp.cloudfront.net/documents/Atmo_Dep__CB_TMDL_10-13.pdf.

[64] U.S. EPA, Chesapeake Bay Program, "Atmospheric Deposition of Nitrogen in the Chesapeake," at slides 7, 39, 58 (Oct. 2017), https://www.chesapeakebay.net/channel_files/25651/atmo_dep_webinar_draft_11-1-17.pdf ("Reduced nitrogen species (largely agricultural sources) in deposition are increasing"); *see also* Keith N. Eshleman, et al., *Declining nitrate-N yields in the Upper Potomac River Basin: What is really driving progress under the Chesapeake Bay restoration?*, Atmospheric Environment, Vol. 146, pp. 280-289 (Dec. 2016), https://doi.org/10.1016/j.atmosenv.2016.07.004.

[65] *See* Battye, W., et al., (2017), *Is nitrogen the next carbon?*, Earth's Future, 5,894–904, https://doi.org/10.1002/2017EF000592; Behera, S.N., et al., *Ammonia in the atmosphere: a review on emission sources, atmospheric chemistry and deposition on terrestrial bodies*, Envtl. Science and Pollution Research 20, 8092–8131 (2013), https://doi.org/10.1007/s11356-013-2051-9; Jason Plautz, *Piercing the Haze: Ammonia, a poorly understood smog ingredient could be key to limiting deadly pollution*, Science (Sep. 13, 2018), https://www.sciencemag.org/news/2018/09/ammonia-poorly-understood-smog-ingredient-could-be-key-limiting-deadly-pollution.

deposition like depletion of soil nutrients, aluminum mobilization, and acidification in waters that lead to accelerated plant die-off and depletion of oxygen, slower plant growth and damage to leaves and overall decreases in species diversity.

Additionally, $PM_{2.5}$ plays an important role in long-distance pollution transport. The formation of secondary $PM_{2.5}$ from gaseous precursors like sulfur dioxide, nitric acid, and ammonia helps transport these sulfur and nitrogen pollutants and deposit them far from their sources. If emissions of any of these reactive gaseous precursors were decreased, local concentrations of $PM_{2.5}$ would decrease and downwind deposition of sulfur and nitrogen would also decrease.

The collective effects of fine particulate matter on our ecosystems and on the experience of visitors to natural areas are extensive and deeply problematic for the health and public enjoyment of our national parks—places that bring in enormous economic benefits to surrounding communities and manifest values of our democracy in safeguarding our natural, cultural, and historic heritage.

**2. Visibility**

There is clear causality between $PM_{2.5}$ air pollution and visibility degradation. Visibility in many areas throughout the country is deteriorated by $PM_{2.5}$ and is unquestionably unacceptable to the general public.[66] Fine particulate matter is a primary driver of haze and visibility impairment and negatively affects many ecosystem functions. Regional haze obscures the stunning views in many of our prized national parks and wilderness areas.[67] Despite progress in reducing haze causing pollution, not a single one of the 156 designated "Class I" areas has achieved the statutory goal of natural visibility conditions. Visibility-impairing pollution travels far

[66] Malm, WC, et al., *Which Visibility Indicators Best Represent a Population's Preference for a Level of Visual Air Quality?*, 69 J. Air & Waste Mgmt. Ass'n 145 (2019), https://doi.org/10.1080/10962247.2018.1506370 ("(Malm et al. 2019)").

[67] Congress has also taken actions to establish public lands that are set aside for specific uses intended to provide benefits to the public welfare, including lands that are to be protected so as to conserve not only the scenic value, but also the natural vegetation and wildlife within such areas for the enjoyment of future generations, (i.e., in addition to national parks and wilderness areas, forests and wildlife refuges).

and wide. For example, in the Grand Canyon, 33% of the haze pollution found there originated from particle pollution generated in California. Beyond the confines of our "protected" parks and wilderness areas, impaired visibility adversely affects the enjoyment, wellbeing, and welfare of people everywhere, as the remote, rural, and urban scenes they're familiar with begin to fade from view.

The current secondary PM standards are based on consideration of the protection provided by the standards for visibility. While the Act's regional haze requirements apply to the Class I areas and focus on visibility, those requirements apply only in Class I areas, as compared to the secondary particulate matter NAAQS requirements, which apply to ambient air throughout the country.

#### 3. Materials

EPA has long acknowledged that PM damages and soils materials like metals, paint, stone, concrete, and glass. ISA Supplement at 2-40 tbl.2-3. In this way, PM harms important welfare values—it harms the materials and damages property, for example. ISA at 13-77 to -81; 42 U.S.C. § 7602(h). Information has recently been developing on the negative effects of PM on solar panels and energy efficiency, as well. ISA Supplement 2-39.

### C. EPA's proposal not to strengthen the secondary standards is unlawful and arbitrary

Here, EPA proposes to do nothing about any of the well-established welfare harms $PM_{2.5}$ causes. On ecosystems, it punts to a separate NAAQS review on ecosystems that is now subject to court-ordered deadlines. *See* Order, *Ctr. for Biological Diversity v. Regan*, No. 4:22-cv-2285-HSG (Oct. 12, 2022) (entering consent decree); EPA-HQ-OGC-2022-0447-0002 (proposed consent decree). On materials, it declines to set standards, claiming too profound uncertainties. For visibility, EPA proposes no change to the secondary standard, though it indicates its openness to changing the 24-hour $PM_{2.5}$ secondary standard. As we explain below, EPA must strengthen the secondary standards to protect important welfare values.

**1. EPA's proposal to retain the secondary 24-hour standard is unlawful and arbitrary**

**i. EPA fails to rationally justify 30 deciviews as the visibility index target**

CASAC's advice on the draft PA was that EPA needed to justify any decision to select 30 deciviews ("dv") as the target level of protection. EPA failed to make this justification in the proposed rule. The Administrator claimed uncertainties and limitations in the preference studies as a rationale to use the upper end of the range of 20-30 dv that 50% of the survey respondents found acceptable visibility. 88 Fed. Reg. at 5659-60. But, as described below, without explanation, EPA failed to take steps recommended by CASAC to reduce such purported uncertainties and instead relied on the fundamentally flawed review process that resulted in the 2020 decision that EPA is reconsidering here. The 2020 rationale is irrational for the reasons given by the outside panel of experts who reviewed the original draft PA.

**a. EPA fails to use the latest science to develop a visibility index level**

In the reconsideration, CASAC expressly advised EPA that "[t]he final PA should consider using an 'acceptable' contrast value to help develop the secondary PM standards." CASAC Letter on PA 22. CASAC explained that the draft ISA Supplement made clear that "contrast rather than total light extinction appears to make the level of acceptable visual air quality more uniform across different locations." *Id.* An individual CASAC panel member put it succinctly:

> I suggest that the Policy Assessment more fully consider new research explaining regional differences in visibility preferences, which was presented in the ISA Supplement. Visibility preferences are better explained by contrast than concentration.

*Id.* at A-91. As EPA already knows, the key research at issue is Malm et al. (2019), an important meta-analysis of visibility preference studies.[68] EPA itself was able to draw conclusions from that study about how to relate contrast to acceptable visibility preferences. ISA Supplement at 4-5 to -6.

Yet, in the proposal, EPA fails to consider the alternative ("contrast of distance") methodology. EPA summarizes Malm et al. (2019) but then ignores its findings, *see* 88 Fed. Reg. at 5649, even though it utilizes the same visual preference studies EPA relies on and that are included in past reviews. EPA's analysis summarizes the study but goes on to ignore the Independent Particulate Matter Review Panel's ("IPMRP") important finding that "addresses the limitations with the concept that there is any specific level of light extinction that is universally acceptable."[69] More specifically, the Malm et al. (2019) study evaluates a large number of visibility preference indicators and finds that the apparent contrast of distant, prominent but not necessarily dominant, scene elements is a much better and more consistent predictor of "acceptable" visibility than any specific level of light extinction. The IPMRP further suggested the methodology EPA can use to develop viewing distances across different areas and regions:

> Across all the currently available visibility preference studies, as the apparent contrast of distant, prominent scene elements approached an apparent contrast level of about -0.04 (i.e. very little contrast), 50% of respondents found the visibility unacceptable. <u>In simpler terms, as the visual range approaches the distance of distant scenic elements, people everywhere find the visibility unacceptable.</u> It would be a relatively straightforward GIS exercise to characterize typical average and/or maximal viewing distances across different urban/suburban/rural areas and regions.[70]

---

[68] *See, e.g.*, ISA Supplement 4-5 to -6; Letter from Dr. Elizabeth A. (Lianne) Sheppard, Chair, Clean Air Scientific Advisory Committee, to Michael S. Regan, Adm'r, EPA, at A-45 (EPA-CASAC-22-001, Mar. 18, 2022) ("CASAC Letter on ISA Supplement").

[69] IPMRP Letter at B-34.

[70] *Id.* (emphasis added).

The IPMRP's suggestion further illustrates that EPA's departure from CASAC's advice to consider the Malm et al. (2019) study in setting the secondary standard is irrational. Indeed, EPA cannot rationally ignore this study, for it suggests that replacing the current indicator with the contrast of distant scenic elements would be a significant improvement and more accurately evaluate public preferences.

| Location | Contrast Method (varying dv) | 30 dv |
|---|---|---|
| Denver |  60 km / 18.75 dv  130 km / 11.02 dv |  19.48 km / 30 dv |
| Phoenix, AZ |  42 km / 22.32 dv |  19.48 km / 30 dv |
| Washington, DC |  8 km / 38.9 dv |  19.48 km / 30 dv |

| | | |
|---|---|---|
| Grand Canyon, AZ |  170 km / 9.38 dv |  21.64 km / 30 dv |

Table 2: Images from WinHazeWeb depicting the contrast method results vs. 30 dv proposed by EPA

EPA's sole basis in the proposal for its refusal even to consider contrast is its claim that that there are not many studies using contrast "to evaluate public preference information," and EPA thinks it is therefore "difficult to evaluate them as an alternative to the light extinction approach." 88 Fed. Reg. at 5649-50. But EPA itself describes Malm et al. (2019) as evaluating the results of "six visibility preference studies" (in Washington, DC; Phoenix, AZ; Chilliwack, BC; Abbotsford, BC; Denver, CO; and the Grand Canyon, AZ), and summarizes the contrast analysis results for five "studies" (Phoenix, AZ; Chilliwack, BC; Abbotsford, BC; Denver, CO; and the Grand Canyon, AZ).[71] And, in the ISA, EPA indicates there are only "four North American visibility studies" regarding "visibility preference,"[72] addressing nearly the same areas (Washington, DC; Phoenix, AZ; Chilliwack, BC; Abbotsford, BC; and Denver, CO).[73] EPA thus leaves unexplained why essentially the same set of studies is adequate for analysis under a light extinction approach, but not under a contrast approach. This unexplained differential treatment is arbitrary.

As a result of EPA's departure from CASAC's advice, EPA's proposal instead falls back on the approach it took in the 2020 PA (as well as invoking purported uncertainties and limitations, which we address below). But that review lacked a proper

---

[71] ISA Supplement at 4-3, 4-6 fig.4-2.

[72] EPA's inconsistency in discussing the number of studies makes it quite difficult to understand what exactly it considered at various points in time and what its point is now.

[73] ISA at 13-42 (relying on 2009 PM ISA); *see also* EPA-HQ-OAR-2015-0072-1184 at 9-67 to -71 (2009 PM ISA).

external CASAC review panel. *See supra* § III. Within that review, an outside panel of experts that reviewed drafts of the 2020 PA found the current 24-hour secondary standard was not adequate to protect against visibility effects and explained how the PA must analyze options for alternative secondary standards, offering detailed recommendations regarding alternative indicators, averaging times, forms, and levels that should be considered.[74] The detailed comments further disregarded 30 dv as anything near protective of visibility.[75]

### b. EPA's interpretation of the visibility preference studies irrationally leaves a tiny minority of study respondents accepting EPA's visibility target

While we agree that comparing across visual assessment studies can be problematic as identified by Malm et al. (2019), those results can provide insight into what percentage of overall respondents would find acceptable visibility in the range of 20-30 dv at each location. The table below from EPA's 2010 Urban-Focused Visibility Assessment shows that of the four studies examined in the 2012 review, and revisited in this review, a 30 dv standard would leave under 10% of the respondents in each study other than the Washington, DC, one accepting visibility condition >29 dv. A target of 30 dv thus results in the irrational outcome of leaving the vast majority of people dissatisfied with the resulting visibility, especially irrational when EPA purports to be aiming for 50% satisfaction. Certainly, EPA has not explained how it reasonably complies with EPA's statutory duty or is reasonable decision-making.

---

[74] IPMRP Letter at 5, B-33 to-36 (citing especially comments from Richard Poirot).

[75] *Id.* at C-88 to -95 ("The combination of daily average, 90th percentile, 30 dv, filter-based reconstructed PM light extinction is a substantially weaker secondary standard than those considered by EPA staff and supported by CASAC in all previous (1987, 1997, 2006 and 2012) PM NAAQS reviews.").

**Table 2-3. Logit Model Estimated VAQ Values Corresponding to Various Percent Acceptability Values for the Four Cities**

| | Denver | British Columbia | Phoenix | Washington, DC |
|---|---|---|---|---|
| 90% Acceptability criteria | 14.21 | 16.80 | 24.15 | 23.03 |
| 75% Acceptability criteria | 17.05 | 19.63 | 21.80 | 26.03 |
| **50% Acceptability criteria** | **19.90** | **22.45** | **24.15** | **29.03** |
| 25% Acceptability criteria | 22.74 | 25.28 | 26.51 | 32.03 |
| 10% Acceptability criteria | 25.59 | 28.10 | 28.87 | 35.03 |

EPA, Particulate Matter Urban-Focused Visibility Assessment 2-29 tbl.2-3 (EPA 452/R-10-004, July 2010) ("UFVA").

Similarly, Malm et al. (2019) summarizes these same studies with one additional site in the Grand Canyon, AZ, and by separating the British Columbia studies into two sites. Here the units are in light extinction Mm-1. The results indicate the same issue that only 10% of respondents in 5 out of 6 studies found >191 Mm-1 (near 30 dv) acceptable, leaving 90% finding this threshold unacceptable visibility impairment. It is not difficult to <u>see</u> why this is the case. Table 3 below shows the visibility conditions at 30 dv using WinHazeWeb for all other available urban sites.

Based on these studies, a 75% acceptability is requisite to protect visibility resources. As explained in comments filed in the 2012 review,

> There is no question that using a logit regression to fit binary data is a proper method, and that 50% represents the data inflection point. However, EPA provides no rationale for why 50% is an appropriate metric for the secondary standard. We are concerned that leaving 50% of the public with perceived visibility impairment does not properly protect the public welfare under the CAA….

EPA-HQ-OAR-2007-0492-9562 at 8. Using the light extinction terms in Malm et al. (2019) Table 3, a 75% acceptability criterion would be on average 84.3 Mm-1, or approximately 47 km visual range and about 21 dv.

Table 3. Percentile acceptability levels and associated uncertainties, expressed in atmospheric extinction terms of $Mm^{-1}$, for each of the scenes studied.

| Percentile acceptability | 10% | 25% | 50% | 75% | 90% |
|---|---|---|---|---|---|
| Washington | 263.1 ± 1.0 | 227.5 ± 1.0 | 191.8 ± 0.7 | 156.1 ± 0.6 | 120.4 ± 0.4 |
| Phoenix | 186.4 ± 1.5 | 147.2 ± 1.3 | 116.2 ± 1.0 | 91.8 ± 0.8 | 72.5 ± 0.6 |
| Denver | 100.1 ± 2.4 | 87.4 ± 2.1 | 74.8 ± 1.7 | 62.1 ± 1.4 | 49.4 ± 1.0 |
| Chilliwack | 155.5 ± 2.1 | 134.7 ± 1.8 | 113.8 ± 1.5 | 93.0 ± 1.2 | 72.2 ± 0.9 |
| Abbotsford | 153.7 ± 2.3 | 130.6 ± 1.9 | 107.5 ± 1.6 | 84.4 ± 1.3 | 61.2 ± 1.0 |
| Grand Canyon | 32.6 ± 2.3 | 27.9 ± 2.0 | 23.2 ± 1.7 | 18.5 ± 1.3 | 13.8 ± 1.0 |

Though this would not be as clean as the contrast method indicates, which is approximately on average 61 km, 64 Mm-1, or 18 dv, either value is strikingly better protective than EPA's choice of 30 dv, as shown in Table 3 below.

| | | |
|---|---|---|
| **Boston, MA**<br>**Visibility:**<br>**64.13 $Mm^{-1}$ / 61 km / 18.58 dv**<br> | **Boston, MA**<br>**Visibility:**<br>**83.23 $Mm^{-1}$ / 47 km / 21.19 dv**<br> | **Boston, MA**<br>**Visibility:**<br>**200.86 $Mm^{-1}$ / 19.48 km / 30 dv**<br> |
| **Dallas, TX**<br>**Visibility: 64.13 $Mm^{-1}$ / 61 km / 18.58 dv**<br> | **Dallas, TX**<br>**Visibility: 83.23 $Mm^{-1}$ / 47 km / 21.19 dv**<br> | **Dallas, TX**<br>**Visibility: 200.86 $Mm^{-1}$ / 19.48 km / 30 dv**<br> |
| **Durango, CO**<br>**Visibility: 64.13 $Mm^{-1}$ / 61 km / 18.58 dv**<br> | **Durango, CO**<br>**Visibility: 83.23 $Mm^{-1}$ / 47 km / 21.19 dv**<br> | **Durango, CO**<br>**Visibility: 200.86 $Mm^{-1}$ / 19.48 km / 30 dv**<br> |
| **Fort Collins, CO** | **Fort Collins, CO** | **Fort Collins, CO** |

| | | |
|---|---|---|
| **Visibility: 64.13 Mm$^{-1}$ / 61 km / 18.58 dv**  | **Visibility: 83.23 Mm$^{-1}$ / 47 km / 21.19 dv**  | **Visibility: 200.86 Mm$^{-1}$ / 19.48 km / 30 dv**  |
| **Las Vegas - Red Mountain Wilderness, NV** **Visibility: 64.13 Mm$^{-1}$ / 61 km / 18.58 dv**  | **Las Vegas - Red Mountain Wilderness, NV** **Visibility: 83.23 Mm$^{-1}$ / 47 km / 21.19 dv**  | **Las Vegas - Red Mountain Wilderness, NV** **Visibility: 200.86 Mm$^{-1}$ / 19.48 km / 30 dv**  |
| **Tucson, AZ** **Visibility: 64.13 Mm$^{-1}$ / 61 km / 18.58 dv**  | **Tucson, AZ** **Visibility: 83.23 Mm$^{-1}$ / 47 km / 21.19 dv**  | **Tucson, AZ** **Visibility: 200.86 Mm$^{-1}$ / 19.48 km / 30 dv**  |

Table 3: WinHazeWeb images from urban sites comparing different visibility.

**c. EPA illegally and arbitrarily relies on claimed uncertainties and concerns over overprotectiveness to propose a weaker visibility index target**

Having irrationally dismissed the new science discussed above, EPA falls back on tired, meritless arguments for refusing to set a more protective standard.[76] EPA says (1) there are "significant questions about how to set a national standard for visibility that is not overprotective for some areas of the U.S," and proposes that (2) "the uncertainties and variability inherent in the public preference studies warrant setting a higher target level of protection than if the underlying methods and results from the public preference studies were more consistent." 88 Fed. Reg. at 5660. EPA then concludes that, (3) because the standard "is intended to address visibility impairment across a wide range of regions and circumstances" and there's a Regional Haze program, EPA proposes to use the upper end of the 20-30 dv range as a target. *Id.*

Each of these three arguments is inconsistent with the Act and irrational. EPA's purported concern about being "overprotective for some areas" ignores the governing text of the Act: a secondary standard must "specify a level of air quality the attainment and maintenance of which…is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air." 42 U.S.C. § 7409(b)(2). The word "any" sweeps broadly. *New York v. EPA*, 443 F.3d 880, 885 (D.C. Cir. 2006) ("any" has an "expansive reach" in the Act). Thus, if EPA identifies an effect that is known or anticipated to be adverse in portions of the country (outside Class I areas, at least), that effect remains known or anticipated to be adverse even if it may not constitute a known or anticipated adverse effect in some other portion of the country. Accordingly, EPA must set the standard to protect against it.

---

[76] *Cf. Murray Energy*, 936 F.3d at 618-20 (EPA's reliance on purported "'uncertainties and complexities'" did not rationally justify its refusal to set secondary standard to protect against adverse welfare effect); *Mississippi*, 744 F.3d at 1360 (rejecting EPA's decision, based on evidence being purportedly "limited and uncertain," to set secondary standard equal to primary standard); *Am. Farm Bureau*, 559 F.3d at 529-30 (rejecting EPA's decision, based on evidence being purportedly "uncertain," to set secondary standard equal to primary standard).

Further, EPA's proposal cannot and does not rationally explain why setting the standard at a level that does not protect against known or anticipated adverse welfare effects in portions of the country is requisite to protect the public welfare from any known or anticipated adverse effects. The proposal fails to mention, much less rationally explain how its concern about purported overprotectiveness is consistent with the statutory text or EPA's correct position on primary standards. And EPA's purported concern about overprotectiveness irrationally fails to consider the flip side: an under-protective standard.

EPA's "uncertainties" argument is also inconsistent with the Act and arbitrary. Similar to the primary standards, on secondary standards, the Act pushes for protection through its "preference for preventative…regulation." *Ctr. for Biological Diversity v. EPA*, 749 F.3d 1079, 1090 (D.C. Cir. 2014). It commands that EPA act not only when it might have "perfect information" or be able to predict adverse effect certainly, but to protect against "anticipated adverse effects," "suggesting that EPA must act as soon as it has enough information (even if crude) to 'anticipate[]' such effects." *Am. Trucking Ass'ns*, 283 F.3d at 380 (alteration in original); *see Ctr. for Biological Diversity*, 749 F.3d at 1090 & n.18. EPA's proposed decision to resolve purported uncertainties in favor of less protection is inconsistent with the Act's protective direction. EPA makes no attempt to show otherwise, which is itself arbitrary. Nor could it do so rationally.

The "uncertainties" argument is also irrational because EPA cannot "merely recite the terms 'substantial uncertainty' as a justification for its actions." *State Farm*, 463 U.S. at 52; *Murray Energy*, 936 F.3d at 619. As explained above, other experts, including CASAC, have suggested ways to overcome the uncertainties EPA claims cut against stronger protections. *E.g.*, IPMRP Letter at C-93 ("If this kind of approach were applied across multiple urban/suburban areas throughout the country, it would be clear that people in many diverse regions would likely find visibility impairment of 30 dv to be unacceptable."). Further, EPA gives no reason why it should resolve "uncertainties and variability" in favor of less protection rather than more, 88 Fed. Reg. at 5660.

Finally, for similar reasons, EPA's third argument—that it should set a visibility target at the upper end of the 20-30 dv range because there are many "regions and circumstances" for the secondary standard to operate and there is also a Regional Haze Program, *id.*—is arbitrary. There are two pieces to this. First is that the standard will operate in many regions and circumstances. For the reasons given above in addressing

EPA's concerns about purportedly being overprotective and about uncertainties, EPA's reliance on this point for targeting the upper end of the dv range is irrational and illegal.

Second is the Regional Haze Program. EPA identifies no rational connection between the Regional Haze Program and EPA's proposal to set the visibility target at the high end of the deciview range. The Regional Haze Program addresses Class I areas. *Id.* at 5658; *see Am. Corn Growers Ass'n v. EPA*, 291 F.3d 1, 2-4 (D.C. Cir. 2002); *Am. Trucking Ass'ns*, 175 F.3d at 1056 ("Congress required the EPA to implement a regional haze program specifically in order to address adverse visibility effects that persist in class I areas after attainment of the secondary NAAQS."), *overruled in other parts sub nom. Whitman*, 531 U.S. 457 (2001). EPA proposes in this very same notice to rely exclusively on the Regional Haze Program to protect visibility in Class I areas and give visibility in such areas no weight in its consideration of the secondary standard. 88 Fed. Reg. at 5658 ("the Administrator proposes to conclude that addressing visibility impairment in Class I areas is beyond the scope of the secondary PM NAAQS"). Thus, the Regional Haze Program provides no rational basis—certainly EPA identifies none—for EPA to select a visibility target in the upper end of its range. Moreover, even if it is rational for EPA not to rely exclusively on the secondary standard to address visibility in Class I areas, that hardly makes it rational to entirely ignore visibility in such areas in setting the secondary standard.

**ii. EPA fails to rationally justify the 3-year average, 90th percentile form of the visibility index**

EPA wrongly says CASAC didn't give feedback on the 3-year, 90th percentile aspect of the target, 88 Fed. Reg. at 5659 ("the Administrator notes that the CASAC did not provide advice or recommendations related to the form of the visibility index."). To the contrary, as with the target level, CASAC explicitly recommended that EPA justify its selection of metric and form.[77] EPA still has not done so, and its proposal thus arbitrarily departs from CASAC's recommendations and comments.

[77] CASAC Letter on PA at 22 ("The final PA should provide a robust justification for the daily light extinction percentile used in the analysis).

When EPA finally confronts the advice CASAC expressly provided regarding the form of the visibility index, it must find that the 90th percentile form is not appropriate for protecting visibility. The 90th percentile form is too low and would result in 36 days being excluded annually. This means that visibility could be worse than the standard on 36 days each year, but presumes the public only finds it objectionable when this happens on 37 or more days per year (further averaged over three years).

EPA's proposal asserts the following supports continued use of the 90th percentile form:

> [T]hat the Regional Haze Program targets the 20 percent most impaired days for improvements in visual air quality in Federal Class I areas and that the median of the distribution of these 20 percent worst days would be the 90th percentile . . . that strategies that are implemented so that 90 percent of days would have visual air quality that is at or below the level of the standard would reasonably be expected to lead to improvements in visual air quality for the 20 percent most impaired days.[78]

EPA asserts that using the 90th percentile for the secondary NAAQS would be consistent with the approach taken in the Regional Haze Program. This is a false equivalency. The Regional Haze Rule focuses on improving conditions on the worst days, which is why the 90th percentile is used. Applying the same "percentage as a NAAQS form has exactly the opposite effect"—it completely ignores the 36 worst visibility days, excusing them from being tracked and improved.[79]

EPA also fails to explain how averaging the form over three years is protective of visibility. The public does not perceive visibility in three-year averages. Therefore, providing for a three-year standard is simply not protective of visibility and public welfare. Additionally, while over the years the forms of the various secondary standards that have been considered and recommended by EPA staff and/or CASAC have varied, the 98th percentile was commonly recommended.[80] EPA's proposal lacks consideration of the 98th percentile. Even if EPA wanted to follow the regional haze

---

[78] 88 Fed. Reg. at 5651; *accord id.* 5659 & n.147.

[79] IPMRP Letter at C-94.

[80] *Id.*

approach, the question is to first identify the worst impaired days and then require pollution on those days be reduced.

EPA points back to the 2010 Urban-Focused Visibility Assessment, for justifying the 90th percentile. 88 Fed. Reg. at 5651; *see also id.* at 5659. But that document compared a completely different metric than the 24-hour average being considered now. It instead used an estimate of daily maximum daylight 1-hour $PM_{10}$ light extinction value in each year, comparing the 90th percentile of that maximum to the 98th percentile of all hours in a day.[81] Here, EPA only points back to outdated and irrelevant analyses and thus has not rationally justified its use of the 90th percentile in this reconsideration.

**2. EPA must set a protective secondary 24-hour standard**

Poor visibility impacts humans in a variety of ways, including their productivity, and mental status. Clear causality between $PM_{2.5}$ air pollution and visibility impairment requires EPA to act. Previous reviews have set forth alternative secondary standards based on $PM_{2.5}$ filter-based speciated reconstructed light extinction. Setting the target level of protection from visibility impairment must be linked to its harm rather than be pre-defined by the viable monitoring metrics. It is appropriate to translate the target level to a measured air quality metric as long as the standard set is the measure of protection against the harm. If harm is defined as the visibility levels that a percentage of the population find acceptable/unacceptable then the best information we have using the contrast method is an average of 61 km visual range. It is fair then to look at all scenes available at this visual range and move from there to the dv or $\mu g/m^3$. Considering the information above, approximately 20 dv, or about 25 $\mu g/m^3$ would be an appropriate strengthening of the standard, whereas 35 $\mu g/m^3$ is unacceptable.

**3. EPA fails to justify how the annual standard is sufficient to protect against any welfare impacts**

As explained above, and as is clear throughout the proposal, $PM_{2.5}$ causes serious welfare harms and the 24-hour and annual standard work together to limit that pollution and the harms it causes, both on a chronic and a more acute basis. *E.g.*, 88 Fed. Reg. at 5655-56. Though harms to visibility stem most obviously from sub-daily or daily

---

[81] *See* UFVA 4-4 to -6.

peak $PM_{2.5}$ levels, chronically elevated $PM_{2.5}$ still diminishes views.[82] Damage to materials and climate results from exposure to $PM_{2.5}$ over time, not merely (or even perhaps principally) on a daily basis. Accordingly, a current CASAC member and the IPMRP recommended EPA consider strengthening the annual standard to at least match the primary standard.[83]

Yet EPA's proposal is virtually silent on the annual $PM_{2.5}$ secondary standard. *See* 88 Fed. Reg. at 5561. The PA is, too. Likewise, EPA's final decision in 2020. Here, though, CASAC warned that "evidence to support a 15 μg/m$^3$ annual secondary standard needs to be provided."[84] EPA's unexplained failure to do so is arbitrary.

**4. EPA illegally and arbitrarily refuses to identify the level requisite to protect against other important welfare harms**

Although EPA's proposal explains that "the available evidence continues to support the conclusion that there is a causal relationship between PM deposition and materials effects," 88 Fed. Reg. at 5650, EPA fails to specify a level of air quality to protect against adverse effects from PM on materials. The overarching conclusion from the studies EPA discusses in the PA is clear: the current PM welfare standards fail to protect materials from the effects of PM. EPA acted arbitrarily in summarily dismissing the data as "insufficient information to inform quantitative analyses assessing materials effects to inform consideration of a national PM standard on materials." *Id.* at 5654-55. Furthermore, we disagree with EPA's assertion that quantitative relationships have not been established for PM-related soiling and corrosion and frequency of cleaning or repair that further the understanding of the public welfare implications of materials effects. *Id.* at 5650. For example, there is evidence on the cost of soiling from air pollution (*e.g.*, Besson et al., 2017; Grøntoft et al., 2019), and while the studies were conducted outside the U.S., the materials studied are used in the U.S. and thus the results should be fully considered by EPA.

---

[82] *See* EPA-HQ-OAR-2015-0072-0973 at 130 fig.1 (illustrating visibility impairment current annual secondary standard allows).

[83] IPMRP Letter at 5; CASAC Letter on PA at A-3.

[84] CASAC Letter on PA at 22.

- Besson *et al.* found that the effect of soiling on photovoltaic ("PV") systems negatively impacts their energy production and that the phenomenon is highly dependent on the environmental context and conditions of operation. Indeed, dirt, dust, and other air contaminants are site-specific and their accumulation on PV modules depends on the installation configuration. This study, conducted over a period of two and half years, focused on analyzing power production and soiling losses of three photovoltaic technologies, monocrystalline, polycrystalline, and thin-film Si. Further analyzing the seasonality of soiling rates, the study determined a yearly trend for soiling. Using the yearly soiling trend, the authors developed a link between economical parameters and the cleaning pattern applied.[85]
- Grøntoft *et al.* estimated maintenance-cleaning costs, cost savings and cleaning interval increases for structural surfaces and windows in Europe obtainable by reducing air pollution. The study considered a hypothetical 50% reduction in air pollution to determine savings in these cleaning costs. The study further observed that the reduction in air pollution, from 2002-2005 until 2011-2014, probably increased the cleaning interval for white painted steel with ~100% (from 12 to 24 years), representing reductions in the single intervention cleaning costs from 7 to 4%/year (= % of one cleaning investment, per year during the cleaning interval) and for the modern glass with ~65% (from 0.85 to 1.3 years), representing reductions in the cleaning cost from 124 to 95%/year. The cleaning cost reductions, obtainable by a 50% reduction in air pollution, would have been ~3 %/year for white painted steel and ~60%/year for the modern glass, representing ~100 and 50% additional cleaning interval increases. These potential cleaning cost savings are significantly higher than previously reported for the weathering of Portland limestone ornament and zinc monuments.[86]

---

[85] P. Besson, et al., Long-Term Soiling Analysis for Three Photovoltaic Technologies in Santiago Region, IEEE Journal of Photovoltaics, 7 (6): 1755-1760 (2017), https://ieeexplore.ieee.org/abstract/document/8057771.

[86] Terje Grøntoft et al., Cleaning costs for European sheltered white painted steel and modern glass surfaces due to air pollution since the year 2000. Atmosphere, 10 (4): 167 (2019), https://doi.org/10.3390/atmos10040167.

Additionally, EPA fails to provide a basis for many assertions in the proposal. For example, EPA proposes to conclude that it has "consider[ed] the evidence for PM-related impacts on climate and on materials and concludes that it is generally appropriate to retain the existing secondary standards." 88 Fed. Reg. at 5661. But there is nothing in the proposal that explains how the current standard is appropriate to protect materials from the effects of PM.

Moreover, the proposal asserts that "[w]hile some recent evidence on materials effects of PM is available in the 2019 ISA, EPA notes that this evidence is primarily from studies conducted outside of the U.S. in areas where PM concentrations in ambient air are higher than those observed in the U.S." *Id.* at 5661. The public cannot comment on this and EPA's other bald assertions[87] because EPA fails to provide references to the studies it refers to. EPA has not reasonably explained its do-nothing proposal: it must do more than share unsupported statements; its suggestion that it has exercised reasonable judgment does not make it so.[88] *Murray Energy*, 936 F.3d at 619 ("We defer to EPA's judgment that the available evidence is too uncertain only when the agency reasonably explains its decision.").

Finally, irreversible damage to the surface of materials and potentially higher degradation rates for polymeric materials, plastic, paint, and rubber due to increased oxidant concentrations and solar radiation were not considered in this proposal. In failing to propose a standard that covers materials and addresses the irreversible damage and higher degradation rates, EPA ignores the Act's requirement to set a standard that "specif[ies] a level of air quality requisite to protect the public welfare from any known or anticipated adverse effects." 42 U.S.C. § 7409(b)(2).

---

[87] *See, e.g.*, 88 Fed. Reg. at 5657 (referring to "studies examining PM-related effects on the energy efficiency of solar panels and passive cooling building materials, though there remains insufficient evidence to establish quantitative relationships between PM in ambient air and these or other materials effects").

[88] *Id.* at 5662 ("In the Administrator's preliminary judgment, such a suite of secondary PM standards and the rationale supporting not revising the current standards are reasonably judged to reflect the appropriate consideration of the strength of the available evidence and other information and their associated uncertainties and the advice of CASAC.").

## VII. AIR QUALITY MONITORING

### A. EPA must amend its monitoring network requirements to ensure adequate monitoring of air pollution in at-risk communities, including communities of color and low-income communities

In general, EPA is correct to amend its regulations to make sure that more air quality monitors are placed in at-risk communities. *See* 88 Fed. Reg. at 5673-76, 5709 (proposed to be codified at 40 C.F.R. pt.58 app.D, § 4.7.1(b)(3)). Such an amendment will serve the purposes of the Clean Air Act, including environmental justice, because communities that face elevated levels of $PM_{2.5}$ due to their proximity to high-emitting sources will be less at risk of having their local conditions go unmonitored. *See supra* § V.A.3.iii (explaining how newly operating monitor in community that scores high on environmental justice factors is recording highest $PM_{2.5}$ concentrations in the Houston area thus far).

In taking final action, EPA must make various changes and clarifications to its proposal to have air quality monitoring networks better address at-risk communities. First, EPA must amend its proposed regulatory text, which currently reads, "For areas with additional required SLAMS, a monitoring station is to be sited in an at-risk community, particularly where there are anticipated effects from sources in the area (e.g., a major port, rail yard, airport, industrial area, or major transportation corridor)." 88 Fed. Reg. at 5709 (proposed to be codified at 40 C.F.R. pt.58 app.D, § 4.7.1(b)(3)). This language neither requires the monitor be sited in an area of poor air quality, nor for the monitor to be actually in an area that is anticipated to experience poor air quality from unspecified (and thus potentially relatively insignificant) sources in the area. It thus leaves open the possibility that, to meet this requirement, a regulator could site a monitor in an at-risk community that does not also have poor air quality. *Cf.* 40 C.F.R. pt.58 app.D, § 4.7.1(b)(3) ("For areas with additional required SLAMS, a monitoring station is to be sited in an area of poor air quality."). Notwithstanding its draft regulatory language, we do not believe that this was EPA's intent. But to eliminate this possibility, EPA should add a clear statement in the preamble to that effect and, especially, stronger regulatory language. For example, EPA could add the following to the regulatory text: "For areas with additional required SLAMS, a monitoring station is to be sited in an at-risk community where air quality is expected to be poor and,

especially, where there are anticipated effects from sources in the area (e.g., a major port, rail yard, airport, industrial area, or major transportation corridor)."

Second, EPA's preamble and regulatory language appear to be in tension regarding the areas to which its new proposed language would apply. EPA's preamble makes it seem like the new requirement would apply only to third monitors in MSAs with populations above 1 million. *See* 88 Fed. Reg. at 5674-75. And while it would apply to these monitors, portions of EPA's regulations that it does not propose to revise (and that it should not revise) delineate the precise numbers of required monitors and siting requirements for them, and, coupled with EPA's proposed language, indicate that the new requirement would apply in other situations, as well, just as the existing requirement does. EPA's regulations require two monitors in a metropolitan statistical area ("MSA") with a population of 500,000 to 1,000,000 with a design value within 85% of any $PM_{2.5}$ NAAQS. 40 C.F.R. pt.58 app.D tbl.D-5. For such an area, one monitor must be located "in an area of expected maximum concentration," but the second monitor is not required to be a near-road monitor. *Id.* § 4.7.1(b)(1)-(2). Instead, it currently must be "sited in an area of poor air quality" because it is "an additional required SLAMS" beyond those EPA's other siting requirements apply to. *Id.* § 4.7.1(b)(3) ("For areas with additional required SLAMS, a monitoring station is to be sited in an area of poor air quality."). EPA's proposed amendment applies in exactly the same circumstance: where there is "an additional required SLAMS" beyond those EPA's other siting requirements apply to. 88 Fed. Reg. at 5709 (proposed to be codified at 40 C.F.R. pt.58 app.D, § 4.7.1(b)(3)). EPA must clarify its final preamble to make it consistent with what its regulatory text actually requires.

Third, EPA should require—rather than just recommend—that the at-risk site use continuous federal equivalent methods ("FEMs"). *See* 88 Fed. Reg. at 5675. As EPA explains, continuous FEMs provide better, more actionable data, in the places it's especially necessary. *Id.* By contrast, federal reference method ("FRM") monitors may be operated as infrequently as every three—or even six—days. 40 C.F.R. § 58.12(d)(1)(i); *see also id.* § 58.12(d)(1)(ii). If such intermittent monitoring is an option for monitors required to be sited in at-risk communities, there is a serious risk that pollution levels will be elevated on days without monitoring and misleadingly depressed on days when

the monitor operates.[89] Communities would thus be deprived of the benefit of the monitor. Continuous FEMS would mitigate this risk.

Fourth, EPA's proposed changes, though generally laudable, leave out many communities because they would have impacts only in larger metropolitan areas where pollution levels are already known to be at or near dangerous levels. There are many communities throughout the country that may very well have dangerously elevated $PM_{2.5}$ levels, but are not part of an MSA that EPA's rule applies to and/or that lack monitoring that a state or EPA would deem reliable enough to conclude that $PM_{2.5}$ levels are within 85% of a $PM_{2.5}$ NAAQS.[90] That EPA's changes would leave out these communities does not mean EPA should not finalize improvements to its proposal, but it does mean that EPA must make other changes to ensure that these communities know what levels of $PM_{2.5}$ pollution they are exposed to and ensure that, if those levels are unsafe, they get their dirty air cleaned up. To help do this, EPA should require states to ensure that at least some monitors located outside MSAs of the size the rule amendments cover are sited in at-risk communities, as well.

Fifth, consistent with the GAO reports cited above, EPA should extend its new siting requirement—that when the regulations require additional monitors, at least one monitor is located in an at-risk community where air quality is expected to be poor—to the monitoring network requirements for other standards, with such siting done in consultation with environmental justice communities, wherever possible, to advance environmental justice goals.

Sixth, more broadly, to more fully realize the goal of the NAAQS program, the monitoring network needs to be built out beyond what EPA proposes to require here. This would require more monitors in more locations with at-risk populations. EPA

---

[89] *See* Eric Yongchen Zou, *Unwatched Pollution: The Effect of Intermittent Monitoring on Air Quality*, 111 Am. Econ. Rev. 2101 (2021), available in alternatively paginated version at https://static1.squarespace.com/static/56034c20e4b047f1e0c1bfca/t/603afc5c6607da3e67640175/1614478432535/monitor_zou_202101.pdf.

[90] *See* GAO, *Opportunities to Better Sustain and Modernize the National Air Quality Monitoring System*, at 38 (current monitoring "system is unable to meet needs for information on…air quality in rural areas"), 67-68 (similar, and addressing wood smoke); *accord* GAO, *Need Remains for Plan to Modernize Air Monitoring*, at 8.

should encourage states to do so and ensure that EPA's funds to support state-run monitoring are used to supplement state funding, not replace it. Proactive maintenance of regulatory monitors and verification that monitors are providing accurate information is also extremely important.

Finally, community engagement in monitor siting decisions is vitally important. EPA thus should make sure that states provide genuine opportunities for public involvement in monitoring siting (including providing notice in alternative languages, consistent with Title VI guidance) and that EPA's review of monitoring network plans provides opportunities for public involvement.

**B. EPA should take steps to ensure that data resulting from new technologies for assessing real-world $PM_{2.5}$ pollution levels factors into regulatory decision-making that will reduce dangerous pollution levels**

Incorporating new technologies for assessing real-world $PM_{2.5}$ pollution levels is a critical step toward national improvements in air quality. Regulatory air quality monitors are limited in number and often only monitor intermittently, resulting in both geographic and temporal gaps in monitoring—the existing network does not fully account for pollution hotspots and transient pollution events.[91] Though it is well established that, among other things, disparities in air quality render vulnerable communities significantly more at-risk of adverse health effects, *see, e.g.*, ISA at 2-1, monitoring gaps make it difficult to assess the actual number of people exposed to dangerous pollution and the true degree of disparity between population groups. As EPA recognizes, the capital investment and costs of operating FRM and FEM monitors for criteria pollutant measurements may be substantial. Further, when there is no regulatory acknowledgment of dangerous levels of $PM_{2.5}$ air pollution, there is no assurance that the harmful levels will be addressed on the Clean Air Act's required timelines, if they are addressed at all. Accordingly, EPA should employ supplemental technologies and systems to increase coverage of the regulatory monitoring network

---

[91] *See, e.g.*, Genna Reed et al., Environmental Racism in the Heartland: Fighting for Equity and Health in Kansas City 4 (2021), https://www.ucsusa.org/sites/default/files/2021-11/ucs-mr-KC-10.21-Engl-web.pdf.

and obtain more complete data to further protect public health and address environmental injustice in air pollution exposure.

Emerging technologies and data sources create opportunities to strengthen and improve the existing monitoring network and the development of state implementation plans, including through siting decisions for regulatory monitors and determinations of nonattainment areas. They can also help identify when regulatory monitors may not be fully and accurately reporting air quality, allowing for timely improved reliability of regulatory monitoring data, and when regulatory monitors may miss episodes of elevated air pollution.[92] They also have helped shed light on the severity of disparities in air pollution exposures.[93] These technologies include satellites, low-cost sensors, models, and hybrid methodologies. Cumulatively, they support expanding the air quality monitoring paradigm from one based on "expensive, complex, stationary equipment, which limits who collects data, why data are collected, and how data are accessed" to a more widespread and accessible system that provides nearly real-time data.[94]

1. **Advancements in satellite and sensor technologies offer EPA opportunities to supplement data from the existing monitoring network**

    i. **Satellite-derived data**

Satellite-derived atmospheric composition data is available for use in measuring air pollutant concentrations, including levels of $PM_{2.5}$ along with other air pollutants including nitrogen dioxide, sulfur dioxide, ammonia, carbon monoxide, and certain

---

[92] *See* Paul English et al., *Performance of a Low-Cost Sensor Community Air Monitoring Network in Imperial County, CA*, 20 Sensors 3031, at 7, 9-10 (2020).

[93] Revesz, *Air Pollution and Environmental Justice*, at 200-01; *see also id.* 222-23.

[94] Emily G. Snyder et al., *The Changing Paradigm of Air Pollution Monitoring*, 47 Env't. Sci. & Tech. 11,369, 11,369 (2013).

volatile organic compounds.[95] These data are collected by numerous satellites using a variety of sensors, and launches of several additional satellites are already planned.[96]

All air quality monitoring technologies, including satellites, have inherent strengths and limitations. Researchers have noted caveats to satellite-derived data: that data accuracy depends in part on calibration with ground monitors; satellite outputs must be scaled to pollutants based on local conditions; and on cloudy, dusty, or smoky days, satellites are unable to measure ground level conditions at all.[97] For these reasons, satellite-derived data are most accurate over longer timescales, as averaging large quantities of the data can overcome many of the issues that would pose challenges if satellite data was used only on an hourly or daily basis.

Satellite-derived data present a unique opportunity to improve ground monitoring networks because their strengths and limitations are complementary to those of the existing ground monitoring network. As a result, they can create a more accurate and holistic monitoring network when employed in tandem with existing ground monitors. For example, the existing 1-in-3 or 1-in-6 day $PM_{2.5}$ FRM ground

---

[95] Bryan N. Duncan et al., *Satellite Data of Atmospheric Pollution for U.S. Air Quality Applications: Examples of Applications, Summary of Data End-User Resources, Answers to FAQs, and Common Mistakes to Avoid*, 94 Atmospheric Envt. 647, 648 (2014); see also Laura Gladson et al., *Evaluating the Utility of High-Resolution Spatiotemporal Air Pollution Data in Estimating Local $PM_{2.5}$ Exposures in California from 2015-2018*, 13 Atmosphere 2022, 85, 86 (2022); Aaron Van Donkelaar et al., *Global Estimates of Fine Particulate Matter Using A Combined Geophysical-Statistical Method With Information From Satellites, Models, And Monitors*, 50 Env't Sci. & Tech. 3762, 3762-3772 (2016).

[96] *See* Nat'l Sci. & Tech. Council, *Air Quality Observation Systems in the United States*, app.H (2013), https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/NSTC/air_quality_obs_2013.pdf; NASA, *Earth Science Mission Profile* (last revised Feb. 4, 2022), https://eospso.nasa.gov/files/mission_profile.pdf.

[97] Daniel M. Sullivan & Alan Krupnick, Using Satellite Data to Fill the Gaps in the US Air Pollution Monitoring Network 2, 10 (Res. for the Future, Working Paper 18-21, 2018), https://media.rff.org/documents/RFF20WP-18-21_0.pdf; *see also* 88 Fed. Reg. at 5679.

monitoring network, at its best, can provide accurate snapshots of site-level pollution concentrations but has limited temporal and geographic coverage. Conversely, satellite pollution sensing allows for higher temporal resolution and greater spatial coverage than ground monitors without the need for manual sampling, but at the cost of measurement precision and lost coverage during cloudy days.[98]

Other challenges associated with satellite-derived data can be overcome by combining the data with statistical methods and models. For example, statistical methods, such as land use regression and geographically weighted regression, have been used to improve the accuracy of $PM_{2.5}$ estimates derived from satellite data.[99]

In sum, incorporating satellite-derived data into regulatory decision-making can help identify areas where existing ground-based monitoring is lacking, whether temporally or spatially, and allow for better identification of pollution-burdened communities.

#### ii. Air sensor data

Low-cost sensors can also help fill in temporal and geographic monitoring gaps, provided that their implementation incorporates strategies both to maximize the accuracy of sensor networks and to prioritize the ability of environmental justice communities to obtain and use sensors. The term "low-cost sensors" is used to describe sensors with a maximum cost in the hundreds-of-dollars range (as opposed to thousands or tens of thousands of dollars for FRM or FEM monitors).[100] These sensors

---

[98] Laura Gladson et al., *Evaluating the Utility of High-Resolution Spatiotemporal Air Pollution Data in Estimating Local $PM_{2.5}$ Exposures in California from 2015-2018*, 13 Atmosphere 2022, 85, 86 (2022).

[99] Aaron Van Donkelaar et al., *Global Estimates of Fine Particulate Matter Using a Combined Geophysical-Statistical Method with Information from Satellites, Models, and Monitors*, 50 Env't Sci. & Tech. 3762, 3762-3772 (2016).

[100] Presentation, Ron Williams, Air & Energy Research Program, EPA, *New Paradigm for Air Pollution Monitoring: 2014-2018 Progress Report* (Apr. 30, 2018), https://www.epa.gov/sites/production/files/2018-03/documents/final_em-3_master_slide_set.pdf.

are designed to operate at high temporal frequencies and, because of their low cost, can potentially be deployed in large numbers.[101] Many low-cost sensors can report data at one-second intervals, and some vendors, such as the PurpleAir network, are already providing coverage of broad swaths of the United States.[102]

Regarding concerns about the accuracy of sensor data, accuracy can be improved by calibrating sensors to FRM or FEM monitors and incorporating other sources of information. The potentially overwhelming amount of data produced by sensors may present an additional challenge to communities without the resources or expertise to analyze it. Cost is another concern, as the initial cost of the sensor alone is not indicative of the total cost of operation, which can include costs of Wi-Fi and servers. Accordingly, environmental justice considerations must be prioritized when incorporating air sensors into air monitoring plans.

Despite these potential challenges to incorporating air sensor data into regulatory decision-making, integrating sensors into the air quality monitoring framework presents a unique opportunity to supplement monitoring data through a low-cost technology that provides large-scale data to monitor and improve air quality nationwide.

**2. EPA should address temporal gaps in monitoring by reducing the use of intermittent monitoring and using data from supplemental technologies to fill gaps**

EPA currently requires $PM_{2.5}$ manual samplers generally to operate on a minimum of a 1-in-3-day basis. 40 C.F.R. § 58.12(d). However, operating schedules for manual $PM_{2.5}$ monitors may be reduced to a 1-in-6-day sampling frequency upon receipt of waiver from the EPA Regional Administrator. *Id.* Pollution levels have been

---

[101] *Id.*

[102] *See* Real Time Map, PurpleAir, https://map.purpleair.com/1/mAQI/a10/p604800/cC0#3.35/37.53/-99.41.

found to increase on days when intermittent monitors do not operate, suggesting that temporal gaps in monitoring actually result in increased pollution.[103]

To address the temporal gaps in $PM_{2.5}$ monitoring, EPA should issue a plan to ultimately move all instruments to continuous monitoring. In the interim, EPA should eliminate the 1-in-6 day sampling waivers granted by EPA Regional Administrators and, to the extent such waivers are considered, provide an opportunity for public comment before such a waiver can be issued. Further, as discussed above, EPA should require the use of supplemental technologies such as satellites and sensors to assess whether missing air quality data from the regulatory monitoring network results in incomplete or biased data.

**3. To fill gaps in the regulatory monitoring network, EPA should incorporate data from supplemental monitoring technologies and methods into its NAAQS attainment decisions**

EPA should take data derived from satellites, low-cost sensors, and/or hybrid methodological approaches into account through a weight-of-the-evidence analysis when making NAAQS designations either when areas would otherwise be deemed "unclassifiable" or when data derived from supplemental technologies indicates nonattainment but FRM/FEM-data would permit an attainment designation. In addition, EPA should explore options for expanding the regulatory conceptualization of FEMs so that large-data approaches such as networks of low-cost sensors, satellite data, or model-measurement assimilations could qualify. Specifically, EPA should undertake a review of 40 C.F.R. Part 53 with the aim of designing protocols for designating large-data approaches as FEM.

Data from new monitoring technologies and hybrid modeling approaches has already shown how the current FRM and FEM approaches may not capture hotspots where pollution levels are higher than the NAAQS.[104] For instance, in an effort to

---

[103] Eric Yongchen Zou, *Unwatched Pollution: The Effect of Intermittent Monitoring on Air Quality*, 111 Am. Econ. Rev. 2101 (2021).

[104] Ann E. Carlson, *The Clean Air Act's Blind Spot: Microclimates and Hotspot Pollution*, 65 UCLA L. REV. 1036, 1060-67 (2018). Hotspots are microclimates, which due to land use,

identify potential hotspots missed by regulatory monitoring, EDF and its partners mounted air pollution sensors on Google street view cars that were driven on every street and highway in a study region in Oakland, CA to collect nearly three million unique air quality measurements.[105] The study found that NO, $NO_2$, and black carbon concentrations could vary by a factor of 8 times or more within a single neighborhood or city block.[106] Notably, the median concentrations of these pollutants across the study area differed 32-60% when compared to measurements taken by a regional monitor in Oakland.[107]

Hotspots typically occur near roadways and in fenceline communities, exposing residents in these areas to potentially dangerous levels of unmonitored air pollution. Millions of people live near highly trafficked roadways[108]—especially in urban areas where "a large fraction of the population typically lives within 1.5-2 km of a freeway"[109]—and are likely to be exposed to elevated levels of multiple pollutants, including $PM_{2.5}$, NO, $NO_2$, and black carbon, from vehicle emissions.[110]

---

geography, or the built environment have relatively high levels of air pollution. *Id.* at 1041.

[105] Joshua S. Apte et al., *High-resolution Air Pollution Mapping with Google Street View Cars: Exploiting Big Data*, 51 Envt. Sci. & Tech. 6999, 6999 (2017).

[106] *Id.* at 7003-04, 7006.

[107] *Id.* at 7006.

[108] A 2013 study found that about 11.3 million people live within 150 meters of a major highway. Tegan K. Boehmer et al., *Residential Proximity to Major Highways—United States, 2010, in* Centers for Disease Control & Prevention, CDC Health Disparities and Inequalities Report — United States, 2013, at 46-50 (2013), https://www.cdc.gov/mmwr/pdf/other/su6203.pdf.

[109] Wonsik Choi et al., *Prevalence of Wide Area Impacts Downwind of Freeways Under Pre-Sunrise Stable Atmospheric Conditions*, 62 Atmospheric Env't 318, 318, 326 (2012).

[110] *See* Health Effects Inst., *Traffic-Related Air Pollution: A Critical Review of the Literature on Emissions, Exposure, and Health Effects* 3-3 (2010) ("the highest direct exposures to

The Oakland study described above found that actual levels of NO, $NO_2$, and black carbon on busier streets and highways were substantially elevated compared to measurements taken by regulatory monitors, with median highway black carbon exceeding urban background levels by a factor of 2.7, NO by a factor of 4.8, and $NO_2$ by a factor of 1.8.[111] Pollutant concentrations on city-designated truck routes linking highways to industrial areas were 1.9-3.6 times higher than on other surface streets.[112] In addition, in a study of 41,000 Oakland residents, near-road elevated pollution levels were associated with an increased risk of heart attack, requiring heart surgery, and/or dying due to coronary heart disease.[113] Other studies have found near-road pollution to elevate the risk of asthma hospitalizations and emergency room visits.[114]

With leadership from resident led, community-based environmental justice organization West Oakland Environmental Indicators Project, data from the Oakland mobile monitoring campaign were utilized by West Oakland residents and the Bay Area Air Quality Management District to designate areas of West Oakland with elevated pollution as "impact zones" prioritized for exposure mitigation through the

---

traffic-related emissions are likely to occur at the local scale, that is, in a vehicle traveling in traffic or on a roadside out to a few hundred meters.").

111 Apte et al., *High-resolution Air Pollution Mapping*, at 7004.

112 *Id.*

113 Stacy E. Alexeeff et al., *High-resolution Mapping of Traffic Related Air Pollution with Google Street View Cars and Incidence of Cardiovascular Events Within Neighborhoods in Oakland, CA*, 17 Env't Health (2018).

114 S. Alexeeff et al., *Google Street View Car Measurements of Traffic Related Air Pollution Within Neighborhoods and Asthma-Related Emergency Department Visits and Hospitalizations*, 3 Env't Epidemiology 406 (2019); *see also* Sarah E. Chambliss et al., *Local- and Regional-scale Racial and Ethnic Disparities in Air Pollution Determined by Long-term Mobile Monitoring*, 118 PNAS e2109249118 (2021) (detailing racial and ethnic disparities in air pollution exposure in parts of San Francisco Bay area).

West Oakland Community Action Plan, adopted by the California Air Resources Board in 2019.[115]

In addition, since 2019, the resident-led organization Achieving Community Tasks Successfully ("ACTS") has managed the operation of a community-designed and community-owned network of lower-cost air pollution sensors in the Pleasantville neighborhood of Houston, Texas. Pleasantville is a historically Black neighborhood impacted by multiple air pollution sources, including congested freeways, truck-attracting warehouses and manufacturing facilities, rail, cement facilities, and the Houston Ship Channel and Port of Houston. In 2021, data from the community-owned network was used to demonstrate in comments to the Texas Commission on Environmental Quality ("TCEQ") that average concentrations of $PM_{2.5}$ at sensitive locations in the Pleasantville neighborhood, including an elementary school, were consistently higher than concentrations measured at a sensor co-located with the nearest regulatory monitor, two miles from Pleasantville. This data supported successful advocacy by Pleasantville residents to place a new regulatory monitor in their neighborhood—TCEQ is working with ACTS leadership to site the regulatory monitor where the community requested, adjacent to Pleasantville elementary school. Deployment is anticipated in the fourth quarter of 2023.

Future data collected by community groups selected will likely provide local insights not captured by regulatory monitors. EPA should issue guidance as soon as possible to ensure that data collected consistent with this guidance, using new technologies and hybrid approaches, may factor into regulatory decision-making. For example, Appalachian Voices was awarded a grant from EPA to expand particulate matter monitoring work in communities impacted by coal mining and combustion and by other polluting industries across Kentucky, Pennsylvania, Virginia, West Virginia, and Tennessee, in collaboration with local grassroots groups. Rural communities in these states are often far from the nearest regulatory monitor. Data collected by EPA funding awardees could fill in the gaps between regulatory monitors and guide solutions to reduce dangerous pollution.

---

[115] Owning Our Air: The West Oakland Community Action Plan – Volume 1 (2019), https://www.baaqmd.gov/~/media/files/ab617-community-health/west-oakland/100219-files/final-plan-vol-1-100219-pdf.

One particularly important application of large-data approaches is advancements in the identification and characterization of air pollution sources. Inverse modeling methods can help identify sources of air pollution. Running models backward to trace concentrations of air pollution to sources is inherently uncertain. Using multiple data inputs is a way to reduce that uncertainty and start to narrow down both locations of specific sources, and even actual emissions rates. EDF, working with partners in Salt Lake City, has a paper under review that demonstrates a method to identify the "exact" (down to 200 meters) location of an unknown source given many concentration data points around that source, plus meteorological data. With known source locations, it is believed that emissions rates can be estimated.

## VIII. AIR QUALITY INDEX

We agree with EPA that the air quality index ("AQI") is an important tool for communicating to the public whether the air is healthful to breathe on any given day. *See* 88 Fed. Reg. at 5637-38. The AQI allows individuals to understand easily what threats they may face to their health and, if necessary, tailor their behavior accordingly.[116]

Thus, we further agree with EPA's proposal to require daily AQI reporting seven days a week. *See* 88 Fed. Reg. at 5563, 5642. As EPA cogently explains, technological advances make this not just possible to do but routinely done. *Id.* at 5642; *see also, e.g.*, https://www.airnow.gov/state/?name=texas (select "Historical Air Quality" and select any recent weekend day to see that AQI values were reported); https://www.airnow.gov/state/?name=new-york (same).

Similarly, EPA is correct to at the very least strongly recommend states to report the AQI sub-daily and submit hourly monitoring data, where the monitor supports it. 88 Fed. Reg. at 5642-43. EPA should strongly consider making such reporting and submission a requirement, given the importance to the public of the information and the lack of any obvious downside to such a requirement: by EPA's own statements, "the

[116] Of course, the fundamental promise and goal of the Clean Air Act is that <u>everyone</u>, even those who may be especially at risk of harmful effects from elevated air pollution levels, can go outside and engage in their everyday activities without facing such threats. *See supra* § II.

public has come to rely on" "near-real time AQI reporting," and "[m]any…air agencies" already do such reporting," both of which indicate that such reporting and submission is generally feasible. *Id.*

We recognize that there may be some individual air agencies that may lack resources to transition to such reporting. Recent statutes, however, have charged EPA with distributing grants to improve air quality monitoring, and EPA should consider how its recent and ongoing grant-making can fill such resource gaps, ease air agencies' paths forward, and thus improve a vital tool for the public. *See, e.g.*, https://www.epa.gov/inflation-reduction-act/delivering-cleaner-air; https://www.epa.gov/arp/direct-awards-arp-enhanced-air-quality-monitoring; EPA, Enhanced Air Quality Monitoring Direct Awards (Nov. 7, 2022), https://www.epa.gov/system/files/documents/2022-11/Enhanced%20Air%20Quality%20Monitoring%20Direct%20Awards%2011-02-2022.pdf.

## IX. OTHER ISSUES

EPA's proposal raises several issues that are not legally relevant to the rulemaking. We comment on several of them nonetheless.

### A. EPA must expeditiously conclude this reconsideration with final action

As explained below, strengthening the $PM_{2.5}$ standards will be hugely beneficial, with the benefits vastly outweighing the costs, which, again, are legally irrelevant. *See also supra* §§ II, V, VI (explaining EPA's legal obligations in setting standards and how strong the scientific basis is for strengthening the standards). The sooner EPA finalizes its action, the sooner those benefits can begin accruing. *See also infra* § IX.B (explaining why EPA must hasten the designations process and how it can do so).

We are aware polluters have made arguments about considering costs in deciding whether EPA should proceed with this reconsideration, pointing to the 2008 ozone NAAQS reconsideration. Several of our groups were deeply involved in that reconsideration. There is no basis whatsoever for a repetition of that experience.

As an initial matter, the polluters' argument is legally baseless. The sole factors relevant to EPA's decision in reviewing a NAAQS are health and welfare. EPA's decision to reconsider the PM standards was based on those—the sole relevant—

factors. Indeed, concerns about costs would provide no basis for the agency to undertake a review of standards. EPA's decision on reconsideration must also be based solely on health and welfare. There simply is no room here for consideration of costs.

We note also that the decision to terminate the 2008 ozone NAAQS reconsideration was never judicially reviewed. Instead, the D.C. Circuit dismissed a challenge to the termination decision on procedural grounds. Order, *American Lung Ass'n v. EPA*, No. 11-1396, at 2 (Feb. 17, 2012). Thus, the polluters' argument has never been judicially tested, much less confirmed.

Further, even if costs could be lawfully considered, the circumstances here are significantly different from the ones at play in the 2008 ozone NAAQS reconsideration process. For one, EPA's regular review of the ozone NAAQS had commenced about a year before EPA announced it was reconsidering the 2008 NAAQS. *See* 73 Fed. Reg. 56,581 (Sept. 29, 2008) (announcing initiation of regular review). That context was key—undergirding the first and second points the Office of Information and Regulatory Affairs "emphasize[d]" in explaining the 2011 decision to terminate the reconsideration. Letter from Cass Sunstein, Adm'r, Off. of Info. & Reg'y Affairs, to Lisa P. Jackson, Adm'r, EPA, at 1 (Sept. 2, 2011), https://www.reginfo.gov/public/return/EPA_Return_Letter_9-2-2011.pdf. Here, EPA has not initiated its review of the PM standards at issue. Not seeing this reconsideration through would result in substantial and pointless delay. That delay would profoundly harm people throughout this country, especially those who are especially at risk. There would be no justification for that.

Moreover, here, EPA still has before it several petitions for reconsideration of the 2020 NAAQS decision under § 7607(d)(7)(B). *E.g.*, EPA-HQ-OAR-2015-0072-1242 (health and environmental groups); EPA-HQ-OAR-2015-0072-1241 (states and municipalities). These petitions have now been pending for over two years old, and EPA is legally obligated to act on them "within a reasonable time." 5 U.S.C. § 555(b). Among the bases for these petitions was that EPA had failed to rationally consider studies that post-dated the January 2018 cut-off for inclusion of studies in the ISA and that EPA must reconsider the standard under § 7607(d)(7)(B). EPA-HQ-OAR-2015-0072-1242 at 7-11; EPA-HQ-OAR-2015-0072-1241 at 10-19. The review EPA has already done of such studies—finding they strengthen the evidence supporting the conclusion that stronger annual standards are warranted and that stronger 24-hour standards are at least

reasonable to consider—confirms the merit of those reconsideration petitions under § 7607(d)(7)(B).[117] Under the Act, when there is a meritorious § 7607(d)(7)(B) reconsideration petition, EPA "shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed." 42 U.S.C. § 7607(d)(7)(B). That decisionmaking process leaves no room for consideration of costs. EPA should promptly grant the reconsideration petitions under § 7607(d)(7)(B) and announce that the instant reconsideration process constitutes its convening of the mandated reconsideration process.

**B. EPA must hasten the designations process as much as possible**

EPA's promulgation of nonattainment designations is necessary to trigger the Act's nonattainment provisions and bring about the attendant health and environmental benefits in areas with illegally elevated levels of $PM_{2.5}$ air pollution. *See* 88 Fed. Reg. at 5680-82, 5683-84. The Act prescribes the outer attainment deadlines for nonattainment areas: December 31 of six years after the calendar year air quality designations are made, which EPA interprets as the date such designations become effective. 42 U.S.C. § 7513(c)(1); *see* 40 C.F.R. § 51.1000.[118] Thus, if designations go into effect in January 2026, the backstop for polluted areas to come into attainment will be an entire year later than if designations go into effect in December 2025. Moving the backstop back would mean a year's delay in implementing stronger protections and thus an additional year of unnecessary health harms.

EPA must avoid such an outcome by ensuring that designations will take effect before the end of 2025, if not sooner. EPA has not just copious tools but also a statutory obligation to do so. Reflecting the importance of protecting public health, Congress mandated that EPA move the designations process along swiftly, authorizing EPA to direct states to submit recommended designations 4-12 months after EPA promulgates

---

[117] We maintain as well that the other arguments in the petitions are meritorious and compel EPA to grant the petitions.

[118] EPA's regulations provide that an area's outer attainment deadline may advance, depending on the contents of its attainment plan. 40 C.F.R. § 51.1004(a)(1); *see also id.* § 51.1002(a).

a revised NAAQS, and directing EPA to promulgate final designations "as expeditiously as practicable." 42 U.S.C. § 7407(d)(1)(A), (B)(i).

EPA acknowledges the importance for "environmental justice" of "promptly issu[ing] designations in accordance with the statutory requirements to ensure expeditious public health protections for all populations, including those currently experiencing disparities in $PM_{2.5}$ exposures and $PM_{2.5}$-related health risk." 88 Fed. Reg. at 5681. EPA should demonstrate not merely that it "intends" to take this vital step, *id.*, but should act on that intent and bind itself to it. Accordingly, there are at least three steps EPA can and must take to protect public health and welfare by advancing the designations process quickly.

First is to sign the final rule as quickly as possible, and, ideally, no later than mid-September 2023. Such a signature date would put the default date-certain deadline for EPA's signature of final designations two years later, in mid-September 2025. *See* 42 U.S.C. § 7407(d)(1)(B)(i) ("Upon promulgation or revision of a national ambient air quality standard, the Administrator shall promulgate the designations of all areas…as expeditiously as practicable, but in no case later than 2 years from the date of promulgation of the new or revised national ambient air quality standard.").

An effective date in December 2025 should then be possible, even with the time that might be taken to have the designations published in the Federal Register and for the designations then to take effect. Of course, EPA could and should seek expedited publication in the Federal Register. *See* Off. of the Fed. Register, *Document Drafting Handbook* 8-4, 8-6 (Jan. 7, 2022) (agency can request emergency or immediate filing for public inspection and publication in the Federal Register of a document), https://www.archives.gov/files/federal-register/write/handbook/ddh.pdf. Notably, the Administrative Procedure Act's default of a 30-day effective date delay does not apply here because the Clean Air Act exempts designations from that provision of the Administrative Procedure Act. 42 U.S.C. § 7407(d)(2)(B) (5 U.S.C. § 553 does not apply to designations under 42 U.S.C. § 7407(d)(1)); *see* 5 U.S.C. § 553(d). But, if EPA insisted on such a delay, it could and should shorten that delay to the extent necessary to avoid losing a year's time in implementation. *See* 77 Fed. Reg. 34,221, 34,221 (June 11, 2012) (making certain initial nonattainment designations under 2008 ozone NAAQS effective in under 60 days from publication); *see also* 83 Fed. Reg. 25,776, 25,783 (June 4, 2018)

(initial nonattainment designations under 2015 ozone NAAQS are not a "major rule" under the Congressional Review Act).

Second is for EPA to exercise its authority to require states to submit recommended designations sooner than a year after signature of the final standards. 42 U.S.C. § 7407(d)(1)(A). Doing so would ensure EPA has adequate time to review and make the modifications to the recommendations that it might deem necessary while still finalizing designations expeditiously, as the Act requires it to do. *Id.* § 7407(d)(1)(B).

Finally is for EPA to follow the legal command to promulgate final designations "as expeditiously as practicable." *Id.* § 7407(d)(1)(B)(i). EPA should ensure it does so by establishing a binding legal deadline for itself to sign those final nonattainment designations that is indeed as expeditiously as practicable and no later than mid-September 2025. *See id.* § 7601(a)(1) ("The Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under this chapter.").

### C. EPA must ensure the standards are properly implemented

Strengthened standards will result in more areas of the country being required to remedy unhealthy air. When an air agency seeking to carry out its legal obligations to clean the air needs resources and support to do its lawful work effectively, to the extent EPA can, we encourage it to provide the necessary resources and support. If additional assistance beyond what EPA can provide is necessary, we urge EPA to help the air agency in obtaining them.

Other air agencies have been more recalcitrant and have failed to timely implement all the measures they know can and must be used to improve air quality. For example, the San Joaquin Valley Air Pollution Control District, in California, has repeatedly refused for years to implement known measures that would reduce the extremely high $PM_{2.5}$ levels in the area, only eventually to take the steps it previously claimed were infeasible. *E.g.*, Letter from Tom Frantz, Ass'n of Irritated Residents, et al. to Michael S. Regan, Adm'r, EPA, attach.A at 2, attach.C at 9 (May 18, 2022). The San Joaquin Valley has repeatedly failed to attain the 1997 annual standard, has the highest annual design value of any area of the country, and also violates the 24-hour standard. *Id.* attach.C at 89; EPA, $PM_{2.5}$ Design Values, 2021, tbls.1a, 1b, 1c, 2a. The San Joaquin Valley's population is disproportionately low-income, high-poverty, and Latino compared with California's. Letter from Frantz et al. to Regan, attach.C at 94-95. EPA

must timely exercise oversight over the regulators who do not effectively carry out their legal responsibilities to timely implement the NAAQS. Such failings severely burden the health and well-being of residents, and they are counting on EPA to remedy past injustice by swiftly finalizing stronger standards and ensuring they are rapidly and effectively implemented.

### D. EPA cannot lawfully include a grandfathering provision in its final action

EPA correctly recognizes that, after the new standards go into effect, the Clean Air Act requires that a preconstruction prevention of significant deterioration permit cannot issue without a demonstration that the new or modified source of $PM_{2.5}$ will not cause or contribute to violations of the new standards, 88 Fed. Reg. at 5685-86. 42 U.S.C. § 7475(a)(3); *see Murray Energy*, 936 F.3d at 625-27. Though EPA may have included a grandfathering provision in a prior iteration of its PM NAAQS, the legal bar on including one here still applies. *Murray Energy*, 936 F.3d at 626-27; *see also* 88 Fed. Reg. at 5686 n.200.

### E. Impacts from concerns touching on issues like exceptional events must be addressed only in implementing stronger standards

Any concerns touching on exceptional events or similar programs, such as prescribed burns, relate solely to implementing the standard and thus are irrelevant to the standard-setting process. Moreover, however beneficial to ecosystems prescribed burns might be, concerns over such an implementation issue (or any other) must not affect anything—substantive or timing-wise—about setting health or welfare standards under the Clean Air Act. Emissions that result from prescribed burns can still harm human health and the welfare considerations protected by secondary standards. People have the right to know whether the air they are breathing is harmful.

#### 1. EPA may not consider background emissions levels, including from wildfires and international man-made sources, when setting NAAQS

As discussed earlier in these comments, it is well established that the only lawful consideration in setting NAAQS is the effect of the pollutant in the ambient air on health and welfare—not the cost or feasibility of implementing the standard, or any other implementation-related concern. *See supra* §§ II.B.3, VI.A. Indeed, the courts have already heard and rejected precisely an argument that background ozone pollution

levels—including from wildfires—could lawfully be considered in the standard-setting process. *Murray Energy*, 936 F.3d at 622-24 (citing "wildfire" as an example of "background" ozone pollution and holding "the Clean Air Act prohibits EPA from adjusting for background ozone in setting the NAAQS"); *see* Industry Pet'rs' Final Joint Opening Br. at 23, 2016 WL 5390603 (using wildfires as example of contributor to background ozone pollution levels). Allowing the standard to be weakened on account of background ozone pollution "would mean that, if the level of background ozone in any part of the country exceeds the level of ozone that is 'requisite to protect the public health,' EPA must set the NAAQS at the higher, unhealthy level," an outcome that could not be squared with the statute's command that the standard be "requisite to protect the public health" or longstanding precedent interpreting it. *Murray Energy*, 936 F.3d at 623-24. Even though the pollutant at issue here is different, the legal analysis is not: EPA may not somehow make room for these emissions when setting NAAQS.

Notably, in rejecting the background ozone arguments, it was immaterial to the *Murray Energy* court whether the legally irrelevant considerations arose from international or domestic emissions, or from man-made or natural sources. The court recognized that all these considerations were <u>implementation</u> concerns, and therefore legally improper concerns during EPA's <u>standard-setting</u> process. Responding to (hyperbolic) arguments by petitioners that "the presence of background ozone will make it impossible to achieve attainment," the court noted that "rather than watering down the nationally applicable standards" during the <u>standard-setting</u> process, Congress had designed a series of <u>implementation</u> flexibilities and responses, in the form of three statutory programs: (1) the "Exceptional Event" program; (2) the "International Transport" program; and (3) the "Rural Transport" program. *Murray Energy*, 936 F.3d at 623. The last does not apply for $PM_{2.5}$, but the rest, as well as additional programs, do. The court rightly observed that "[t]hese provisions make little sense under Petitioners' reading of the Act," concerning background ozone levels. *Id.* State Petitioners had argued that "it is more difficult to meet the terms of these exceptions than EPA asserts," *id.*, but the court found this argument unavailing, holding that "the fact remains that Congress decided that EPA should account for background ozone during enforcement, not when setting standards." *Id.*

### 2. EPA's proposal properly rejects considering prescribed fires during standard setting

As part of its 2023 rulemaking process, EPA properly concludes that the lawful way to address any impacts of prescribed fires on NAAQS attainment is through the Act's implementation programs, not through the health- and welfare-standard setting process in the instant rulemaking: "such issues are outside the scope of this proposal," and "these topics may arise in the context of implementation of any revised $PM_{2.5}$ NAAQS." 88 Fed. Reg. at 5570. As with previous rulemakings, EPA appropriately acknowledges and directs such concerns to the exceptional events rule. That rule is the proper venue for implementation matters related to prescribed fires and, "EPA is not proposing changes to implementation as part of this proposal." 88 Fed. Reg. at 5570.

The Act authorizes EPA to regulate how and when air monitoring data showing an exceedance or violation of the NAAQS that is clearly caused by an exceptional event may be excluded from regulatory attainment determinations. 42 U.S.C. 7619(b). The Act defines an "exceptional event" as an event that "(i) affects air quality; (ii) is not reasonably controllable or preventable; (iii) is an event caused by human activity that is unlikely to recur at a particular location or a natural event; and (iv) is determined by the Administrator through the process established in the regulations promulgated under paragraph (2) to be an exceptional event." *Id.* § 7619(b)(1)(A). EPA has twice issued regulations to implement its authority, and in both its 2007 and its superseding 2016 regulations, it specifically allowed prescribed fires to qualify[119] as exceptional events. 80 Fed. Reg. 68,216, 68,251-56 (Oct. 3, 2016); 72 Fed. Reg. 13,560, 13,566-67 (Mar. 22, 2007); *see* 40 C.F.R. § 50.14(b)(3) (current regulation). This program thus provides a pathway to address concerns about how prescribed burns affect attainment and nonattainment designations. That program offers the appropriate process, not this rulemaking.

[119] We say "qualify" because an "exceptional event" only exists under the Act and EPA's implementing regulations if the event is linked to elevated ambient pollution levels. *See* 42 U.S.C. § 7619(b)(1)(A)(iv), (3)(B)(ii); 40 C.F.R. § 50.1(j). Because whether emissions from a prescribed fire matter for regulatory purposes cannot be known in advance—and ideally they will not matter for regulatory purposes because ambient levels remain low—a prescribed fire can only qualify to later become an exceptional event.

Regarding the concerns of how wildfire and prescribed wildfire will impact NAAQS attainment designations, the proposal notes "EPA has already issued guidance addressing development of exceptional events demonstrations for both wildfire and prescribed fires on wildland." *Id.* at 5682. EPA acknowledges that prescribed fire is a valuable tool for managing fire-dependent ecosystems in order to reduce the frequency and magnitude of wildfires due to climate change by way of reducing fuel load. *Id.* at 5570. And EPA reiterates that "[t]hough such issues are outside the scope of this proposal, the EPA acknowledges that these topics may arise in the context of implementation of any revised $PM_{2.5}$ NAAQS and intends to work with stakeholders to address these issues." *Id.*

Elsewhere, the proposal notes:

> Under the 2016 Exceptional Events Rule, an air agency may submit to the EPA a demonstration with supporting information and analyses for each monitor and day the air agency claims should be excluded from design value calculations for regulatory purposes. The EPA has provided a number of tools to assist air agencies in preparing their demonstrations and will continue to work with air agencies as they identify, prepare and submit exceptional events demonstrations.

*Id.* at 5681 (footnote and citation omitted). Rules like the exceptional events rule that address implementation are the appropriate avenue to take up issues related to attainment of $PM_{2.5}$ health and welfare standards and the practice of prescribed fire.[120] The standard-setting process is an inappropriate and indeed unlawful avenue.

**3. EPA must decline any suggestion, from federal departments or agencies or any other parties, that EPA may consider prescribed fires when setting $PM_{2.5}$ health and welfare standards**

The docket for the instant rulemaking contains an undated four-page document that appears to have been authored by the Department of Interior's ("DOI") Office of Wildland Fire. *See* EPA-HQ-OAR-2015-0072-1627 (attach.1) ("DOI Comments"). In

[120] Other Clean Air Act implementation programs, like general conformity, also make allowances for prescribed fire. *E.g.*, 40 C.F.R. § 93.153(i)(2).

context, it is evident that DOI submitted the comments to EPA, via OMB, during the inter-agency review process concerning the draft proposal. The DOI "request[ed] a dialogue" with EPA concerning its comments. DOI Comments, at 1. This material is doubly irrelevant here. First, it is not part of the record for purposes of judicial review (and we do not attach or otherwise incorporate it herein). *See* 42 U.S.C. § 7607(d)(1)(A) (NAAQS revisions are subject to special rulemaking provisions of § 7607(d)), (d)(4)(B)(ii) (requiring interagency review materials to be placed in the docket), (d)(7)(A) (excluding interagency review materials from the record for judicial review).

Second, those comments pertain to and rely on implementation issues and discussions. The comments point to EPA discussions related to implementation topics in EPA's 2016 rule regarding $PM_{2.5}$ NAAQS implementation and in EPA's 2015 ozone NAAQS rule, which also discussed topics concerning transportation and general conformity, and the interstate and international transport of air pollution. The comments assert that the portions of those rules DOI cites are merely "primarily related to rule implementation," and thus DOI professes its misguided belief that those implementation rules and concerns somehow pertain to standard setting. *See* DOI Comments at 1-2 (internal citations omitted). DOI further urges EPA to consider implementation issues, including materials not contained in the "Policy Analysis [*sic*] or Integrated Science Assessment," contending without basis that this rulemaking has somehow been rushed. *Id.* at 1. DOI also notes it "supports clean air efforts for the protection of public health as well as our firefighters that respond to wildfires." *Id.* at 1.

The DOI comments wrongly claim the citations to the two earlier EPA rules were "primarily related to rule implementation." *Id.* The passages in the two EPA rules that the DOI comments referenced are entirely related to rule implementation, namely, implementation of the $PM_{2.5}$ and ozone NAAQS, respectively—not setting primary or secondary standards for $PM_{2.5}$ or ozone under the NAAQS program. Indeed, in the 2015 final rule for the ozone NAAQS cited in the DOI comments, it is clear that EPA included the referenced discussions as background for understanding future implementation of the newly revised ozone standard, not as any factors that EPA did or could consider when setting NAAQS. *See, e.g.*, 80 Fed. Reg. 65,292, 65,434 (Oct. 26, 2015) ("This section provides background information for understanding the implications of the revised $O_3$ NAAQS and describes the EPA's plans for providing revised rules or additional guidance on some subjects in a timely manner to assist states with their implementation efforts under the requirements of the CAA" (emphasis added)). EPA did not and could

not have, consistent with the Act and governing caselaw, taken into account implementation-related considerations when setting primary and secondary NAAQS. Thus, the DOI Comments are wrong to suggest that the cited passages were merely "primarily related to rule implementation."

Further, as explained above, the DOI Comments are mistaken that the "context" of those two earlier rules and the discussions in DOI's own comments "ha[ve] far broader applicability, including the setting of an implementable standard and a wide range of associated context." DOI Comments at 2 (emphasis added). The DOI Comments do not attempt to justify this incorrect and unlawful suggestion. The plain language of the Clean Air Act, the court decisions in *Whitman* and *Murray Energy*, and over five decades of consistent EPA practice all contradict the suggestion. *Whitman*, 531 U.S. at 465; *Murray Energy*, 936 F.3d at 623.

Similarly, nor is there any lawful basis for EPA here to consider materials outside the Policy Assessment and Integrated Science Assessment that pertain to implementation. As discussed herein, the DOI Comments are mistaken in the belief that such information is a relevant or permissible consideration when EPA sets primary and secondary NAAQS.[121] None of the implementation-related topics listed in the DOI

[121] The DOI Comments are further out-of-bounds in claiming that there was any "compressed review period" for the draft rulemaking proposal. DOI Comments at 1-2. Indeed, DOI's request for further "dialogue" with EPA—to raise issues that are unlawful and impermissible considerations during standard-setting—itself caused significant delays in signature and publication of a vital public health rulemaking. *See id.* at 1.

The DOI Comments are similarly wrong in alleging that EPA is engaging in an "an off-cycle review of NAAQs [*sic*]." *Id.* at 2. On January 20, 2021, President Biden's "Executive Order on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis" directed all departments and agencies "to immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the last 4 years" of the then-Trump administration that conflicted with the Biden-Harris administration's commitment to public health, the environment, and environmental justice. Exec. Order 13,990, § 1, 88 Fed. Reg. 7037, 7037 (Jan. 25, 2021). And, as the proposal notes, "[a]n

Comments is a permissible consideration when EPA sets standards that honestly, and in an enforceable manner, determine how much $PM_{2.5}$ air pollution is unsafe for people to breathe on an annual and daily basis, and how much $PM_{2.5}$ pollution harms the public welfare.

The *Murray Energy* ruling anticipates and rejects the arguments in the DOI Comments that the EPA Administrator can or should consider emissions from prescribed fires that contribute to background pollution levels or themselves cause monitored violations of a NAAQS: "the fact remains that Congress decided that EPA should account for background ozone during enforcement, not when setting standards." 936 F.3d at 623. And the reason for this is the same as the court's rationale for rejecting the arguments of Industry and State Petitioners in that case. Paraphrasing the decision's holding: accepting that argument would mean that, if the level of background $PM_{2.5}$ in any part of the country exceeds the level of $PM_{2.5}$ that is "requisite to protect the public health," "EPA must set the NAAQS at the higher, unhealthy level." *Id.* This outcome both harms public health and violates the Clean Air Act. EPA must continue to decline appeals to do so.

---

accompanying fact sheet provided a non-exclusive list of agency actions that agency heads should review in accordance with that order, including the 2020 Particulate Matter NAAQS Decision." 88 Fed. Reg. at 5567. DOI knew that during the inter-agency review period. The White House understands that it is in the public's interest to reconsider completion of a $PM_{2.5}$ NAAQS review by the Trump EPA Administrator that ignored clear medical evidence and health hazards, and ended with the conclusion that it was appropriate to maintain unsafe $PM_{2.5}$ health and welfare standards for Americans. EPA is undertaking the current $PM_{2.5}$ NAAQS rulemaking using a long-established procedure for reconsidering administrative rules, when justified; indeed, the Department of Interior has used this administrative tool itself. Charging falsely that EPA is engaged in an "off-cycle review of NAAQS," in the course of advancing unlawful arguments, does a disservice to the Department and the public.

### F. Even accounting for costs, stronger standards will be an immense benefit for the United States

In proposing to revise the primary standards, EPA developed a Regulatory Impact Analysis to evaluate the incremental costs and benefits of meeting the alternative $PM_{2.5}$ standards. Although the Clean Air Act prohibits EPA from considering costs in actually setting the NAAQS,[122] the RIA presents estimates of the incremental costs and benefits of meeting the proposed $PM_{2.5}$ NAAQS relative to meeting the existing standards in 2032, when EPA assumed moderate nonattainment areas under any proposed NAAQS would likely have to attain the standard.[123] To evaluate the costs of meeting the proposed alternative standards relative to existing $PM_{2.5}$ NAAQS, EPA first developed a future-year emissions inventory reflecting effects of finalized rules and other factors in 2032.[124] EPA then conducted a multistep modeling analysis to estimate the emissions reductions and associated costs of various control strategies that would be needed to meet the proposed new standards relative to the existing $PM_{2.5}$ NAAQS.[125] EPA then compared those projected, incremental compliance costs to the human health and economic benefits (or avoided adverse health and economic costs) associated with meeting the proposed, alternative standards.[126] The RIA demonstrates that stronger standards than those EPA proposed would easily pass any cost-benefit test. Indeed, the costs are likely overestimated, and polluters' dire warnings about projected costs echo prior warnings that have not proven true and thus should be discounted now.

#### 1. The benefits of stronger standards vastly outweigh the costs

While the Clean Air Act and Supreme Court precedent make clear that EPA cannot consider costs in setting the NAAQS, the benefits of reducing $PM_{2.5}$ concentrations as a result of revising the standards far outweigh the costs of

---

[122] *Whitman*, 531 U.S. at 471 ("the CAA as a whole, unambiguously bars cost considerations from the NAAQS-setting process").

[123] RIA at ES-2, 2-1.

[124] *Id.* at ES-3.

[125] *Id.* at ES-4; 2-1 to -2.

[126] *Id.* at ES-14 to -15.

implementation. Historically, the monetized value of reducing ambient concentrations of $PM_{2.5}$ has been particularly large due to the associated health benefits, especially of averted premature mortality. In a study of the benefits and costs of the Clean Air Act from 1990 to 2020, EPA noted that, for the Clean Air Act Amendments of 1990, "a very high percentage of the benefits is attributable to reduced premature mortality associated with reductions in ambient particulate matter and ozone"[127] and more specifically that "$1.7 trillion of the $2.0 trillion total benefit estimate in 2020, or 85 percent, is attributable to reductions in premature mortality associated with reductions in ambient particulate matter."[128]

The emissions reduced by control strategies identified by EPA in the RIA to achieve an annual standard of 8 $\mu g/m^3$ amount to quantified and monetized benefits of either $46 billion or $95 billion in 2032 (depending on the hazard ratio used), compared to costs of $1.8 billion. RIA at 5-35 tbl.5-6, 8-3. Therefore, net benefits would be either $44 billion or $93 billion. *Id.* at ES-26 tbl.ES-10. The benefits of control strategies assessed by EPA for achieving an annual standard of 8 $\mu g/m^3$ include avoiding up to 9,200 premature mortalities, up to 580,000 lost work days, 1.6 million cases of asthma symptoms, 4,100 emergency room visits, and 3.4 million days of restricted activities. RIA at 5-34 tbl.5-5. It is also worth noting that the cost estimate in EPA's RIA is likely a significant overestimate, as discussed further in §§ IX.F.2-3.

Furthermore, if all areas actually achieve an annual primary $PM_{2.5}$ NAAQS of 8 $\mu g/m^3$ through ways beyond the control strategies identified by EPA, the RIA estimates that this would result in avoiding 15,000 mortalities, 1 million lost work days, 2.9 million cases of asthma symptoms, 7,000 emergency room visits, and 5.9 million restricted activity days. RIA at 5A-3 tbl.5A-1. The value of these benefits could exceed $160 billion. *Id.* at 5A-6 tbl.5A-4.

Several other studies support the conclusion that stronger standards will be an economic benefit:

---

[127] EPA, *The Benefits and Costs of the Clean Air Act from 1990 to 2020*, at 7-7 (2011), https://www.epa.gov/sites/default/files/2015-07/documents/fullreport_rev_a.pdf.

[128] *Id.* at 7-3.

- Lauri Myllyvirta, Centre for Research on Energy and Clean Air, *Quantifying the Economic Costs of Air Pollution from Fossil Fuels* (2020), https://energyandcleanair.org/wp/wp-content/uploads/2020/02/Cost-of-fossil-fuels-briefing.pdf.
- Antoine Dechezleprêtre et al., *The Economic Cost of Air Pollution: Evidence From Europe* (OECD Economics Department Working Papers, No. 1584, 2019), doi:10.1787/56119490-en.
- Peter Tschofen et al., *Fine Particulate Matter Damages and Value Added in the US Economy*, 116 PNAS 19,857 (2019), doi:10.1073/pnas.1905030116
- Victor Lavy et al., *The Impact of Short Term Exposure to Ambient Air Pollution on Cognitive Performance and Human Capital Formation* (National Bureau of Economic Research Working Paper 20648, 2014), http://www.nber.org/papers/w20648.

Finally, even if costs were lawful to consider, the draft RIA makes clear that the net benefits are greatest for the strongest standards analyzed (8 $\mu g/m^3$ (annual), with no change to the 24-hour standard). RIA at ES-26 tbl.ES-10. For no analyzed standard combination would there be a negative net benefit, and, with the exception of the 10/35 and 10/30 combination, there is no overlap in the range of projected net benefits. *Id.* Thus, cost-benefit analysis here would favor stronger standards, not weaker ones. *See* Michael A. Livermore & Richard L. Revesz, *Rethinking Health-Based Environmental Standards*, 89 N.Y.U. L. Rev. 1184, 1188-89, 1236-1246, 1258-66 (2014).

**2. Existing and proposed EPA rules, in addition to significant changes in federal tax law and funding provisions, will likely make compliance with the particulate matter NAAQS easier than EPA assumed**

Although EPA's analysis already indicates that any of the proposed alternative standards would ultimately save billions of dollars in lost economic productivity, respiratory and cardiovascular illness costs, and premature mortality, the RIA almost certainly overestimates the costs of compliance with the proposed alternative standards. Indeed, the RIA overlooks a suite of existing and proposed EPA rules, in addition to significant changes in federal tax and appropriations, that will significantly reduce the local, state, and regional costs of compliance with any new PM standards.

***First***, the RIA does not account for a number of final EPA and state regulations that will continue the downward trend in particulate matter emissions, especially urban-scale particulate concentrations that tend to remain higher than surrounding areas.[129] In particular, the RIA does not account for EPA's recently-finalized regulations governing NOx from heavy-duty engines and vehicles.[130] EPA estimates that, by 2030, the final rule will result in the reduction of at least 115 tons of direct PM emissions, and more than 5,000 tons of VOCs and nearly 140,000 tons of NOx, thereby reducing secondary PM concentrations across the country.[131] By 2040, direct PM, VOC, and NOx reductions from heavy-duty engines will more than double as a result of the rule.[132] Given the significance of mobile source emissions for particulate matter concentrations, especially in urban areas,[133] those heavy-duty emission reductions are likely to reduce the cost of compliance with any of EPA's proposed PM NAAQS alternatives.

The RIA similarly excludes consideration of likely particulate matter reductions under EPA's Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards, 86 Fed. Reg. 74,434 (Dec. 30, 2021), and the Federal Implementation Plan for Managing Emissions from Oil and Natural Gas Sources on Indian Country Lands in Utah, 87 Fed. Reg. 75,334 (Dec. 8, 2022), each of which is expected to result in reductions of thousands of tons of direct and precursor particulate matter emissions. The RIA suggests that the impacts of these two rules are "likely to be small,"[134] but EPA does not explain why that is the case, especially given the significant role that mobile sources play in urban particulate matter concentrations,[135] and that

---

[129] RIA at ES-4 n.2.

[130] 88 Fed. Reg. 4296 (Jan. 24, 2023).

[131] *Id*. at 4418 tbl.VI-1.

[132] *Id*.

[133] *See, e.g.*, ISA at 2-9 to 2-12 & fig.2-3 (explaining that heavy-duty vehicles are responsible for between 4-11% of primary $PM_{2.5}$ emissions in several urban areas).

[134] RIA at 2-15 n.4.

[135] ISA at 2-9 to 2-12 & fig.2-3.

areas of the western United States, including the Salt Lake Valley, Utah, experience some of the "highest $PM_{2.5}$ concentrations in the country."[136]

The RIA likewise excludes consideration of California's Advanced Clean Cars regulations, which will rapidly scale down emissions of light-duty passenger cars, pickup trucks and SUVs starting with the 2026 model year through 2035.[137] The regulations are two-pronged. First, the new regulations amend the state's zero-emission vehicle regulation to require an increasing number of zero-emission vehicles, and relies on currently available advanced vehicle technologies, including battery-electric, hydrogen fuel cell electric and plug-in hybrid electric-vehicles, to meet air quality and climate change emissions standards. Second, the low-emission vehicle regulations were amended to include increasingly stringent standards for gasoline cars and heavier passenger trucks to continue to reduce smog-forming emissions. California estimates that the revised regulations will result in hundreds of tons of reduced direct $PM_{2.5}$ emissions annually, and likely significant secondary $PM_{2.5}$ emission reductions as a result of direct $NO_X$ reductions.[138] The California regulations will almost certainly reduce the costs of compliance with any strengthened $PM_{2.5}$ NAAQS, especially given that, at least for the 10/35 analytical option, the "majority" of EPA's assumed compliance costs "are incurred in California because 15 of the 24 counties that need emissions reductions are located in California."[139]

***Second***, in addition to excluding the likely $PM_{2.5}$ reductions associated with final federal and state rules, the RIA does not include the substantial $PM_{2.5}$ reductions likely to result from a number of proposed and impending rules, some of which have now been finalized, rendering the costs even more conservative. Relevant matters include:

---

[136] RIA at 2-6.

[137] *See generally* https://ww2.arb.ca.gov/rulemaking/2022/advanced-clean-cars-ii (to be codified at Title 13, CCR, Chapter 1, Section 1900 *et seq.*).

[138] *See* Final Statement of Reasons for Rulemaking, Including Summary of Comments and Agency Response, Appendix F Updated Costs and Benefits Analysis, at 8-10 (Cal. Air Res. Bd. Agenda Item No.: 22-10-1 Aug. 25, 2022), *available at* https://ww2.arb.ca.gov/sites/default/files/barcu/regact/2022/accii/fsorappf.pdf.

[139] RIA at ES-14.

- EPA's Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standards, proposed 87 Fed. Reg. 20,036 (Apr. 6, 2022), final version titled "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," signed March 15, 2023, prepublication version available at https://www.epa.gov/system/files/documents/2023-03/FRL%208670-02-OAR_Good%20Neighbor_Final_20230314_Signature_ADMIN%20%281%29.pdf. The final version of the Good Neighbor Rule addresses 23 states, requiring nitrogen oxide emission budgets for electric generating units ("EGUs") in 22 states, and non-EGU sources in 20 states, with reductions for EGUs beginning in the 2023 ozone season. EPA estimates that the final rule would reduce direct $PM_{2.5}$ emission from the EGU sector by approximately 1,000 tons per year, and reduce overall $PM_{2.5}$ precursor emissions of $SO_2$ and $NO_X$.[140]
- EPA's National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units – Revocation of the 2020 Reconsideration, and Affirmation of the Appropriate and Necessary Supplemental Finding (signed Feb. 15, 2023).[141] Under the rule, EPA reaffirmed the scientific, economic, and legal underpinnings of the 2012 Mercury and Air Toxics Standards ("MATS") Rule for power plants. Although the February 2023 rule does not itself require additional emission reductions, EPA is reconsidering, under 42 U.S.C. § 7412(d)(6), its prior risk and technology review of the MATS Rule to determine whether to impose more stringent standards reflecting developments in technology. Any such review would likely result in additional PM reductions from the EGU sector.
- On June 22, 2021, EPA announced its intent to reconsider its 2020 final rule captioned, "Promulgation of Air Quality Implementation Plans; State of Texas; Regional Haze and Interstate Visibility Transport Federal

---

[140] Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards at 669-70 tbl.VIII-1.

[141] 88 Fed. Reg. 13,956 (Mar. 6, 2023).

Implementation Plan," 85 Fed. Reg. 49,170 (Aug. 12, 2020).[142] EPA adopted the 2020 emission trading rule in lieu of requiring Texas EGUs to install and operate source-specific "best available retrofit technology," or "BART," as EPA's previous 2017 proposal had contemplated. Under that 2017 proposal, 18 Texas EGUs would have been required to reduce $SO_2$ emissions by 90-95%, resulting in significant secondary $PM_{2.5}$ reductions.[143] Reconsideration and implementation of source-specific BART controls for Texas EGUs could result in significant PM reductions across the central United States, lowering the cost of compliance with EPA's proposed NAAQS.

- On March 8, 2023, EPA announced a proposed rulemaking to strengthen certain Clean Water Act discharge limitations for Steam Electric Power Generating point sources.[144] Although those Clean Water Act regulations do not directly reduce $PM_{2.5}$ air emissions, the existing regulations allow point sources to commit to retire by 2028, rather than retrofit to comply with the regulation,[145] and the proposed rule and direct final rule that EPA recently released would retain and extend the deadline to select that option.[146] And as reflected in the attached exhibit and EGU notices collected to date, for whatever combinations of reasons, numerous sources have already committed to cease burning coal in lieu of retrofitting wastewater discharge

[142] https://www.epa.gov/system/files/documents/2021-07/tx-rh-bart-fip-response-signed_1.pdf.

[143] 82 Fed. Reg. 912 (Jan. 4, 2017).

[144] EPA, Press Release, Biden-Harris Administration Proposes Stronger Limits on Water Pollution from Power Plants (Mar. 8, 2023), https://www.epa.gov/newsreleases/biden-harris-administration-proposes-stronger-limits-water-pollution-power-plants.

[145] 40 C.F.R. § 423.16(g).

[146] *See* Steam Electric Power Generating Effluent Guidelines – 2023 Proposed Rule (Mar. 8, 2023), https://www.epa.gov/eg/steam-electric-power-generating-effluent-guidelines-2023-proposed-rule.

systems.[147] Allowing point sources to opt to cease burning coal in lieu of retrofitting would result in additional decreased PM emissions and reduce the federal, state, and local costs of complying with the NAAQS.

- Similarly, in October 2020, EPA began reconsidering aspects of the Coal Combustion Residuals ("CCR") Rule, which requires existing coal ash disposal units to have synthetic liners to protect groundwater, or meet other technical specifications.[148] As with EPA's wastewater regulations, the CCR Rule does not directly reduce PM emissions from EGUs, but it does allow power plants to commit to cease burning coal by 2023 or 2028, depending on the size of the power plant's coal ash disposal unit.[149] And as with EPA's wastewater regulations, discussed above, for whatever combinations of reasons, several EGUs have opted to cease burning coal in lieu of retrofitting. Revisions to the CCR Rule, coupled with continuing to allow coal EGUs to opt to cease burning coal, would likely result in additional PM reductions,

---

[147] *See* Exhibit 3. Under EPA's Clean Water Act regulations, EGUs opting to retire in lieu of retrofitting were required to submit to their state wastewater permitting authority a "notice of planned participation" in the so-called retirement subcategory. *See* 40 C.F.R. § 423.19(f)(1). We have endeavored in Exhibit 3 to create a complete list of EGUs that have thus far notified their permitting authorities of their planned intent to cease burning coal in lieu of retrofitting to comply with EPA's wastewater rules. Because permitting authorities are not required to post all such notices publicly, however, there may be additional notices not reflected on this list. EPA has also released a direct final rule that would extend the date for existing coal power plants to submit a notice of planned participation until 90 days from the date of publication in the Federal Register, so additional EGUs may also submit notices. Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category—Initial Notification Date Extension (Mar. 7, 2023), https://www.epa.gov/system/files/documents/2023-03/Prepublication FRN_OW_Steam Electric ELG_NOPP Extension_DFRM_03_07_2023_1.pdf.

[148] 85 Fed. Reg. 65,015 (Oct. 14, 2020).

[149] *See* 40 C.F.R. § 257.103(f)(2).

which would further reduce the overall cost of compliance with any revised PM NAAQS.

***Third***, in addition to overstating the cost of compliance with the $PM_{2.5}$ NAAQS by failing to account for the impact of final and impending rules that will independently result in PM reductions, an examination of EPA's emissions inventory assumptions indicates that the RIA likely overestimates future year EGU emissions by failing to account for actual or planned retirements. As reflected in the RIA, EPA's 2032 EGU emissions assumptions were developed using the agency's Summer 2021 version of the Integrated Planning Model ("IPM"), which, in turn, relies on the agency's National Electric Energy Data System ("NEEDS") database, "NEEDS v6 rev: 1-24-22."[150] Those modeling assumptions, however, are now outdated. On October 14, 2022, EPA released a new version of its NEEDS database, which represents existing EGUs and planned or likely EGU retirements through 2028, whereas EPA's previous, January 2022 NEEDS data reflected only planned retirements through 2023.[151] Comparing EPA's most-recent NEEDS database assumptions to those included in the RIA makes clear that numerous additional, fossil-fuel burning EGUs are now expected to retire before 2032, due to independent economic and environmental compliance factors. Indeed, EPA's most recent database indicates that, by 2028, nearly 400 more fossil-fuel, biomass, or landfill gas EGUs will retire than EPA's RIA assumes. Those retirements will result in significant local and regional PM reductions, thereby reducing the overall cost of PM NAAQS compliance.

It is worth pointing out that EPA's NEEDS database does not appear to account for all the planned EGU retirements linked to EPA's wastewater and CCR regulations, discussed above. Nor does the NEEDS database include EGU retirements beyond 2028, including planned retirements, EGUs that are required to convert from coal to burning gas, and retirements required by consent decrees. Each of those planned changes in operation will result in significant direct and secondary $PM_{2.5}$ reductions, both locally

---

[150] RIA app.2A at 2A-2 & n.1; *see also id.* at 2-15.

[151] *Compare* NEEDS-v6_1-24-22, *available at* https://www.epa.gov/system/files/documents/2022-01/needs-v6_01-24-2022-2.xlsx, *with* NEEDS v621_10-14-2022, *available at* https://www.epa.gov/system/files/documents/2022-10/NEEDS%20v621_10-14-2022.xlsx.

and regionally, yet EPA's RIA does not take those into account when quantifying the cost of compliance with the PM NAAQS.

***Finally***, in addition to underestimating PM reductions likely to occur as a result of existing and proposed rules and planned retirements, the RIA does not incorporate the substantial direct and secondary particulate matter reductions likely to occur under the 2022 Inflation Reduction Act ("IRA"), and thus likely overestimates the direct costs of compliance with the revised $PM_{2.5}$ NAAQS. The IRA contains extensive direct federal funding and tax credits to utilities, municipalities, governmental agencies, tribal authorities, small business, and individuals for clean energy and efficiency investments, which will directly reduce PM pollution, in at least two key ways.

At the outset, the new law provides extensive tax credits and direct funding mechanisms for utilities, municipalities, and non-profit entities to invest in clean energy generation and infrastructure.[152] Those electric sector tax credits and federal funding provisions are expected to result in significant additions of zero-marginal cost clean energy resources to the electric system, which will likely displace generation from higher-cost, fossil fuel resources. Indeed, in organized energy markets, the system operator dispatches lowest-cost resources first, and higher-cost resources are dispatched only as needed to meet demand. One recent electric sector modeling analysis indicates that by 2030, the IRA will increase in the nation's renewable energy generation to 69-75% of the overall mix, displacing significant portions of the country's natural gas and

[152] *See, e.g.*, Inflation Reduction Act, Section 13102 (extension of existing Investment Tax Credit through December 31, 2024); Section 13701, 13702 (creating of a new Clean Electricity Production Tax Credit and Clean Electricity Investment Credit that takes effect on January 1, 2025); Section 13103 (increase in energy credit for solar facilities placed in service in connection with low-income communities); Section 13801 (Elective payment for energy property and electricity produced from renewable energy for tax-exempt entities, including state and local governments, tribes); Section 22001 ($1 billion appropriated for loans to fund renewable energy); Section 22002 (funding for renewable energy and efficiency investments in rural areas); Section 22004 (USDA direct assistance for rural electric cooperatives); Section 50145 (Tribal renewable energy loan program).

coal generation.[153] The substantial shift from fossil-fuel generation to non-emitting renewable resources under the IRA will result in a substantial decline in emissions of $SO_2$ and $NO_X$, pollutants that contribute to fine particulate matter. According to that same study, by 2030, the IRA's electric sector tax credits and funding mechanisms will result in a 37-63% decline in $SO_2$ emissions, and a 36-53% decline in $NO_X$ emissions, from 2022 levels.[154] These changes will likewise substantially cut sulfate- and nitrate-based secondary $PM_{2.5}$ resulting from the electric sector, with serious health benefits.[155] Given the electric sector emission reductions expected under the IRA, the RIA likely overstates the costs of compliance with the updated $PM_{2.5}$ NAAQS.

In addition to electric sector particulate matter reductions, the IRA includes significant tax credits and direct funding for municipalities and governmental entities, tribal governments, small businesses, and individuals to invest in energy efficiency measures, electric vehicles, and electric appliances (*e.g.*, electric stoves, water heaters, dryers, and HVAC systems),[156] each of which will likely reduce direct and secondary particulate matter pollution, especially in urban areas where particulate levels remain stubbornly high.[157] As EPA's ISA indicates, commercial cooking sources, residential oil- and wood-burning heating systems, and light-duty vehicles are each significant sources of urban-scale particulate matter emissions; those sources account for up to 16%, 13%, and 10% of urban $PM_{2.5}$ emissions, respectively.[158] Other studies suggest that gas appliances are responsible for up to 321,000 tons per year of $NO_X$ emissions, and

[153] Nicholas Roy et al., *Beyond Clean Energy: The Financial Incidence and Health Effects of the IRA* (Resources for the Future Report 22-11, Oct. 2022), https://media.rff.org/documents/Report_22-11_v5.pdf.

[154] *Id.*

[155] *Id.*

[156] *See, e.g.*, Inflation Reduction Act §§ 13301-13304, 30002, 50122-50123, 50131.

[157] RIA at 2-9.

[158] ISA at 2-9 to 2-11 fig.2-3.

approximately 6,200 tons per year of direct particulate matter emissions.[159] After they are emitted from household appliances and heating systems, these $NO_X$ emissions react in the atmosphere to contribute to ground-level smog and secondary particulate matter, primarily in urban areas.[160] The IRA's incentives for building and vehicle electrification will almost certainly reduce nitrate-based particulate matter in many urban areas across the country, thereby reducing costs of ensuring compliance with the standard in those areas. For its part, the RIA emphasizes what it sees as "need for control of local primary $PM_{2.5}$ sources to address the highest $PM_{2.5}$ concentrations in urban area."[161] While we agree that urban-scale particulate matter reductions result in a net benefit, EPA's cost assumptions for urban particulate matter reductions are likely overstated, especially in light of the IRA's tax incentives and direct funding provisions. Indeed, the statute is specifically designed, in part, to reduce the cost of local and regional greenhouse gas and criteria pollution control measures. And given that those incentives are now codified in federal law, it is not reasonable for EPA to assume that compliance with the $PM_{2.5}$ NAAQS will drive or necessitate those investments.

In sum, EPA's RIA almost certainly overestimates the costs of compliance with the proposed, alternative $PM_{2.5}$ NAAQS because the analysis fails to account for recent final federal and state rules, impending federal rules, and the Inflation Reduction Act, each of which will lead to significant reductions in particulate matter pollution, thereby reducing the cost of compliance with any new standard.

### 3. There are other means for controlling emissions that would be highly effective and efficient

Beyond the actions discussed above, there are other actions that would effectively and feasibly reduce $PM_{2.5}$-precursor emissions and thus help reduce the harms $PM_{2.5}$ causes. A recent study reported that "farms have become the largest

---

[159] *See* Dennison, J., *et al.*, *How Air Agencies Can Help End Fossil Fuel Pollution from Buildings* (RMI 2021), *available at* https://rmi.org/insight/outdoor-air-quality-brief/; RMI Factsheet, Why EPA Must Address Appliance Pollution (June 4, 2021), https://rmi.org/wp-content/uploads/2021/04/rmi_factsheet_appliance_pollution.pdf.

[160] Dennison, J., et al., *How Air Agencies Can Help End Fossil Fuel Pollution from Buildings*.

[161] RIA at 2-11.

contributor to air pollution damages from $PM_{2.5}$-related emissions."[162] For example, several studies demonstrate that strategies for reducing ammonia emissions from agriculture are among the most effective for reducing $PM_{2.5}$ concentrations, especially during the winter time.[163] Ammonia emissions from dairy production can be reduced through strategies such as improving livestock feed to reduce excreted nutrients, altering manure storage and handling practices to prevent $NH_3$ emissions, and improving land application practices have been effectively implemented in some operations.[164] Further, various ammonia-reduction strategies are already widely adopted across parts of Europe. Emission control options like these represent another inexpensive, efficient way to reduce ambient $PM_{2.5}$ levels. Full consideration of the broad range of options would likely reduce estimated compliance costs still more.

#### 4. Polluters' repeated cries about costs have historically not been borne out

Complaints about health and environmental standards being purportedly too stringent to justify their costs are hardly new. Former EPA Administrator Lisa P. Jackson noted that they are also wrong:

> The Clean Air Act has faced incessant claims that it will spell economic doom for the American people.

---

[162] Peter Tschofen et al., *Fine Particulate Matter Damages and Value Added in the US Economy*, 116 PNAS 19,857, 19,857 (2019).

[163] Robert W. Pinder & Peter J. Adams, *Ammonia Emission Controls as a Cost-Effective Strategy for Reducing Atmospheric Particulate Matter in the Eastern United States*, 41 Environ. Sci. & Tech. 380 (2007); *see* Domingo et al., *Air Quality-Related Health Damages of Food*, 118 PNAS e2013637118 (changes in farming practices, many related to ammonia-emitted activities, could cut $PM_{2.5}$-related mortality in half).

[164] *E.g.*, Sharon L.M Preece et al., *Ammonia Emissions from Cattle Feeding Operations* 6-9 (Tex. A&M Univ. AgriLife Ext., AGEN-PU-063, 2022); Domingo et al., *Air Quality-Related Health Damages of Food*, 118 PNAS e2013637118; Susan Guthrie et al., *The Impact of Ammonia Emissions From Agriculture on Biodiversity* at iv fig.1 (2018), https://royalsociety.org/-/media/policy/projects/evidence-synthesis/Ammonia/Ammonia-report.pdf.

> Today's forecasts of economic doom are nearly identical—almost word for word—to the doomsday predictions of the last 40 years. This "broken-record" continues despite the fact that history has proven the doomsayers wrong again and again.
>
> * * *
>
> As you can see, the Clean Air Act has not only reduced harmful pollution—it has also been particularly effective at proving lobbyists wrong. This law not only respects but thrives on the openness and entrepreneurship of our economy. It creates a "virtuous cycle" in which clean air standards spark new technology—serving our fundamental belief that we can create jobs and opportunities without burdening our citizens with the effects of pollution.
>
> * * *
>
> True to form, the lobbyists have recycled their old predictions of job loss and economic catastrophe with regard to each and every one of these actions. That train's never late….Of course there have been claims about job killing regulations—despite the fact that cost-effective strategies to reduce air pollution should spark clean energy innovation and help create green jobs.

Lisa P. Jackson, Adm'r, EPA, Remarks on the 40th Anniversary of the Clean Air Act, As Prepared (Sept. 14, 2010), https://www.epa.gov/archive/epapages/newsroom_archive/speeches/7769a6b1f0a5bc9a8525779e005ade13.html. Administrator Jackson's faith in this country's ingenuity and American business's inventiveness applies just as strongly now as it did a decade ago.

Certainly, polluters' predictions have continued to be disproven. *See, e.g.*, 88 Fed. Reg. 13,956, 13,975-76 (Mar. 6, 2023) ("Compliance Cost Projections in the 2011 RIA Were Likely Significantly Overestimated"). Many academic studies strenuously support the conclusion that polluters' predictions are overstated, as well. *E.g.*, E. Mark Curtis, 99 J. Envtl. Econ. & Mgmt. 102261 (2020) (assessing impacts of nonattainment designations under 1997 ozone standard and finding "[t]he employment results are not in line with the industry view that these regulations are 'job-killers'"), *available in alternatively*

*paginated version at* https://www.sciencedirect.com/science/article/am/pii/S0095069618300494; Janet Currie & Reed Walker, *What Do Economists Have to Say about the Clean Air Act 50 Years after the Establishment of the Environmental Protection Agency?*, 33 J. of Econ. Perspectives 3, 19 (2019) ("One defining feature of the research on the costs of the Clean Air Act is that predicted costs of the regulations are often higher than the costs that actually occur."); Matthew E. Kahn, *The Beneficiaries of Clean Air Act Regulation*, 24 Regulation 34, 36 (2001) (finding no "significant negative effects on employment in the tightly regulated L.A. basin" and citing then-forthcoming study that suggested "local air quality regulations" "probably increased labor demand slightly").

And still, as Administrator Jackson explained and numerous studies also demonstrate, we have substantially improved air quality, saved and bettered many people's lives, and, in sum, resulted in a huge net benefit for our country. *See supra* § IX.F.1; *e.g.*, Currie & Walker, *What Do Economists Have to Say*, at 15 ("the current estimates suggest that the overall costs are likely to have been substantially less than the estimated benefits in terms of health and other outcomes."), 20 ("Although we have emphasized that forecasters have often overestimated the costs of environmental policies, researchers have also sometimes underestimated the benefits.").

## X. CONCLUSION

When CASAC commenced reconsidering the $PM_{2.5}$ NAAQS, Administrator Regan spoke at the meeting and, per the minutes, recognized the importance of protecting the most vulnerable by combining science and environmental justice:

> [Administrator Regan] indicated that from the beginning of his time as Administrator, he committed that science would serve as the backbone of everything EPA does to protect people and the environment from pollution….He stated he believes science and environmental justice must go hand-in-hand, to truly fulfill EPA's long-standing mission to protect all human health and the environment, especially those historically marginalized, over-burdened, under-served, and living with the legacy of structural racism. He encouraged the CASAC and the PM Panel to consider these disparities as they conduct their scientific review of EPA's work and that achieving environmental justice must be a collective task.

> He stated that the mission of protected [*sic*] health and the environment could only be achieved if a strong foundation of science were built and then acting on it [*sic*].

Summary Minutes of CASAC Particulate Matter Panel's Oct. 14, 2021, Public Meeting, at 2-3, https://casac.epa.gov/ords/sab/f?p=105:19:5822783535378:::RP,19:P19_ID:961#minutes.

As Administrator Regan said, science and environmental justice truly must go hand-in-hand. In its proposal, however, EPA does not follow the science. And, as a result, the proposal does not adequately advance environmental justice.

Fix one and EPA can fix the other. EPA still has the chance.

* * *

For the foregoing reasons, to fulfill the requirements of the Clean Air Act, and make important, overdue advances in public health and reduce unjust public health disparities, EPA must finalize the primary annual $PM_{2.5}$ standard to be no higher than 8 $\mu g/m^3$ and the primary 24-hour $PM_{2.5}$ standard to be no higher than 25 $\mu g/m^3$. Though stronger standards than 8 $\mu g/m^3$ and 25 $\mu g/m^3$ are justified, 8 $\mu g/m^3$ and 25 $\mu g/m^3$ would represent the minimum improvement necessary to protect public health and make an important advance on environmental justice. To protect public welfare, EPA must also strengthen the secondary 24-hour $PM_{2.5}$ standard to 25 $\mu g/m^3$ and strengthen the secondary annual $PM_{2.5}$ standard.

Just as strengthening the standards is vitally important, so too is ensuring that people know whether the air they are breathing is healthy. Accordingly, EPA must also update its regulations regarding air quality monitoring and the air quality index to help make the promise of the national ambient air quality standards—clean air for all, including vulnerable populations, like children, people with heart and lung disease, and older Black adults—all the more real.

Similarly, EPA must move swiftly and surely to finalize these important public health and environmental protections without further delay. The combination of stronger standards that protect the most at-risk among us, with expeditious, full implementation, is necessary to advance environmental justice.

Sincerely,

Seth L. Johnson
*Attorney*
Marvin C. Brown IV
*Attorney*
Michelle T. Mabson, MPH, MSc
*Staff Scientist*
**EARTHJUSTICE**

Georgia Murray
*Staff Scientist*
**APPALACHIAN MOUNTAIN CLUB**

Alison Prost
*Vice President for Environmental Protection and Restoration*
Ariel Solaski
*Litigation Staff Attorney*
**CHESAPEAKE BAY FOUNDATION**

John Graham
*Senior Scientist*
Hayden Hashimoto
*Attorney*
**CLEAN AIR TASK FORCE**

Elena Malik
*Attorney*
Ananya Roy
*Senior Health Scientist*
Aileen Nowlan
*U.S. Policy Director, Global Clean Air Initiative*
Taylor Bacon
*Consultant*
Peter Zalzal
*Senior Counsel and Associate Vice President for Clean Air Strategies*
**ENVIRONMENTAL DEFENSE FUND**

Ulla Reeves
*Campaigns Director, Clean Air Program*
**NATIONAL PARKS CONSERVATION ASSOCIATION**

Sara Laumann
Laumann Legal LLC
*Counsel for National Parks Conservation Association*

**NATURAL RESOURCES DEFENSE COUNCIL**

Sanjay Narayan
*Attorney*
**SIERRA CLUB**

Anita Desikan
*Senior Analyst*
Maria Cecilia Pinto de Moura
*Senior Vehicles Analyst*
**UNION OF CONCERNED SCIENTISTS**

**CLEANAIRNOW**

March 28, 2023

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20004

**Re: Comment on EPA's Proposed Rule in the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (Docket #EPA–HQ–OAR–2015–0072; RIN 2060–AV52)[1]**

Dear Administrator Regan:

The undersigned health, medical, and nursing organizations offer the following comments on EPA's Proposed Rule in the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (PM NAAQS). We call on EPA to follow the science and the law and finalize a primary annual standard of 8 µg/m$^3$ and a primary 24-hour standard of 25 µg/m$^3$. We further call on EPA to update the form of the 24-hour standard to the 99th percentile. These updates are all critical for providing an adequate margin of safety to protect public health, especially of at-risk groups.

Our organizations have submitted several detailed written and oral comments in support of a primary annual fine particulate matter ($PM_{2.5}$) standard of 8 µg/m$^3$ and primary 24-hour standard of 25 µg/m$^3$. We have engaged throughout this entire PM NAAQS review process, including the Clean Air Scientific Advisory Committee (CASAC) deliberations on the Integrated Science Assessment (ISA) and the Policy Assessment (PA), which started in 2021. These levels are not only supported by current science but are also within the recommended ranges of the large majority of the PM CASAC panel.

While the need to update the standards is clear, EPA's proposal falls short. In this rule, EPA acknowledges the inadequacy of current standards in protecting public health, but only to the extent of the annual standard. The agency proposes to revise the level of current annual standard from 12 µg/m$^3$ to within the range of 9-10 µg/m$^3$ calculated as an annual mean

[1] Environmental Protection Agency (Jan 27, 2023). Reconsideration of the National Ambient Air Quality Standards for Particulate Matter. [EPA–HQ–OAR–2015–0072; FRL–8635–01– OAR]; Federal Register Vol. 88, No. 18

averaged over 3 years, but to retain the current level and form of the 24-hour standard of 35 µg/m$^3$ calculated at the 98th percentile averaged over 3 years. The proposed levels do not follow the science, do not meet the statutory requirement of the Clean Air Act to protect public health, and do not include an adequate margin of safety to protect vulnerable groups.

Here we provide additional details and rationale in support of our ask - that EPA issue a final rule that sets the primary annual standard at 8 µg/m$^3$ and a primary 24-hour standard of 25 µg/m$^3$. We further call on EPA to update the form of the 24-hour standard to the 99th percentile. Finally, we urge EPA to finalize this rule by August 2023.

**Submitted by:**

Allergy & Asthma Network
American Academy of Pediatrics
American Cancer Society
American Cancer Society Cancer Action Network
American College of Physicians
American Heart Association
American Lung Association
American Public Health Association
Asthma and Allergy Foundation of America
Children's Environmental Health Network
National Association of Pediatric Nurse Practitioners
National League for Nursing
The Michael J. Fox Foundation for Parkinson's Research

**Contents**

1. Clean Air Act Requirements: Margin of Safety and Standard-Setting vs. Implementation ...... 3
2. Level of Primary Annual $PM_{2.5}$ NAAQS ........ 4
3. Level of Primary 24-hour $PM_{2.5}$ NAAQS ........ 7
4. Form of Primary 24-hour $PM_{2.5}$ NAAQS ........ 9
5. Air Quality Index ........ 10
6. Environmental and Social Injustice of $PM_{2.5}$ Pollution ........ 12
7. Conclusion ........ 14

## 1. Clean Air Act Requirements: Margin of Safety and Standard-Setting vs. Implementation

The Clean Air Act requires that the primary NAAQS be set at a level "requisite to protect the public health" with "an adequate margin of safety." 42 U.S.C. § 7409(b)(1). EPA must select a primary standard that is based on air quality criteria reflecting "the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air…" 42 U.S.C. § 7408(a)(2). In short, this means that EPA's standards must (1) protect public health and (2) provide an adequate margin of safety" in order to "3) prevent any known or anticipated health-related effects from polluted air.

In exercising their judgement, the EPA Administrator must err on the side of protecting public health and may not consider cost or feasibility. The U.S. Court of Appeals for the D.C. Circuit summed up EPA's mandate:

> Based on these comprehensive [air quality] criteria and taking account of the 'preventative' and 'precautionary' nature of the act, the Administrator must then decide what margin of safety will protect the public health from the pollutant's adverse effects – not just known adverse effects, but those of scientific uncertainty or that 'research has not yet uncovered.' Then, and without reference to cost or technological feasibility, the Administrator must promulgate national standards that limit emissions sufficiently to establish that margin of safety.

*American Lung Ass'n v. EPA,* 134 F.3d 388, 389 (D.C. Circ. 1998); see also *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 464-71 (2001).

EPA must err on the side of protecting public health when there is scientific uncertainty. Courts have properly characterized the NAAQS as "preventative in nature." *Ethyl Corp. v. EPA,* 541 F.2d1, 15 (D.C. Cir. 1976). The Act's mandate requires that in considering uncertainty, EPA must err on the side of caution in terms of protecting human health and welfare. The D.C. Circuit has held, "The Act requires EPA to promulgate protective primary NAAQS even where … the pollutant's risks cannot be quantified or 'precisely identified as to nature or degree." *Am. Trucking Ass'ns v. EPA*, 283 F.3d 355, 359 (D.C. Cir. 2002).

In keeping with the precautionary and preventative nature of the NAAQS, EPA must set a standard that protects against potential health effects – not just those impacts that have been well established by science. See *Am. Trucking Ass'ns,* 283 F.3d at 369 (citing Ozone NAAQS, 62 Fed. Reg. 38857 (section 109(b)(1)'s "margin of safety requirement was intended to address uncertainties associated with inconclusive scientific and technical information … as well as to provide a reasonable degree of protection against hazards that research has not yet identified"); see also *API v. EPA,* 684 F.3d 1342, 1352 (D.C. Cir. 2012.)

In a seminal NAAQS case, the D.C. Circuit found that Congress "specifically directed the Administrator to allow an adequate margin of safety to protect against effects which have not yet been uncovered by research and effects whose medical significance is a matter of disagreement." *Lead Indus. Ass'n v. EPA,* 647 F.2d 1130, 1154. Limited data are not an excuse for failing to establish the level at which there is an absence of adverse effect. To the contrary, "Congress' directive to the Administrator to allow an 'adequate margin of safety' alone plainly refutes any suggestion that the Administrator is only authorized to set the primary air quality standards which are designed to protect against health effects that are known to be clearly harmful." *Id.* at 1154-55.

The Clean Air Act's requirements also mean that implementation concerns, including costs and technical feasibility, have no place in the primary standard setting-process. The Supreme Court universally held that EPA may not consider implementation costs in setting the NAAQS. *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 464-71 (2001). The opinion cites an earlier Supreme Court case that held that "the most important forum for consideration of claims of economic and technological infeasibility is before the state agency formulating the implementation plan," *Union Elec. Co. v. EPA*, 427 U. S., at 266. Our organizations recognize that the implementation of the NAAQS will have important implications for all communities, including those seeking to mitigate the harm of catastrophic wildfire risk with the use of prescribed fire. We welcome EPA's work outside of the standard-setting process to further clarify how implementation of stronger PM NAAQS can work compatibly with the responsible use of prescribed fire as a tool to mitigate uncontrolled burns. However, EPA must not allow these or any other implementation issues to factor into the level of the NAAQS. To do so would violate the clear requirements of the Clean Air Act.

As we discuss below, to meet the Clean Air Act's requirements, EPA must finalize a primary annual standard of 8 µg/m$^3$ and a primary 24-hour standard of 25 µg/m$^3$ set at the 99th percentile.

## 2. Level of Primary Annual $PM_{2.5}$ NAAQS

EPA is proposing a primary annual $PM_{2.5}$ NAAQS of 9-10 µg/m$^3$ while taking comment on alternative annual standard levels down to 8.0 µg/m$^3$. Here we offer our analyses and rationale in support of this 8.0 µg/m$^3$ annual standard.

EPA's current reconsideration of the $PM_{2.5}$ NAAQS is a response to numerous petitions for review and for reconsideration of its decision on the 2020 review to retain the standards. In its own words, "(t)he EPA is reconsidering the December 2020 decision because the available scientific evidence and technical information indicate that the current standards may not be adequate to protect public health and welfare, as required by the Clean Air Act. The EPA noted that the 2020 PA concluded that the scientific evidence and information called into question the adequacy of the primary $PM_{2.5}$ standards and supported consideration of revising the level of the primary annual $PM_{2.5}$ standard to below the current level of 12.0 µg/m$^3$ while retaining the primary 24-hour $PM_{2.5}$ standard (U.S. EPA, 2020a)."[2]

EPA's 2019 Integrated Science Assessment (ISA) concluded that breathing $PM_{2.5}$ causes premature death, cardiovascular harm, likely causes respiratory harm, likely causes cancer, likely causes nervous system harm and may cause reproductive and developmental harm.[3]

The 2019 CASAC panel had noted that the Integrated Science Assessment (ISA), which underlies the 2019 Draft PA, "does not provide a sufficiently comprehensive, systematic assessment of the available science relevant to understanding the health impacts of exposure to PM, due largely to a lack of a comprehensive, systematic review of relevant scientific literature; inadequate evidence and rationale for altered causal determinations; and a need for clearer discussion of causality and causal biological mechanisms and pathways."[4] Even with

---

[2] U.S. EPA, Reconsideration of the National Ambient Air Quality Standards for Particulate Matter; page 10
[3] U.S. EPA, *Integrated Science Assessment (ISA) for Particulate Matter* (Final Report, 2019). U.S. Environmental Protection Agency, Washington, DC, EPA/600/R-19/188, 2019. Available at https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=347534
[4] Clean Air Scientific Advisory Committee (CASAC). (Dec 16, 2019). Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft – September 2019); Report #: EPA-CASAC-20-001; page 1

these limitations, the 2019 CASAC panel concluded that the current annual standard set in 2012 was inadequate to protect public health.

Further, in 2020 an Independent Particulate Matter Review Panel composed of experts previously appointed to the CASAC review panel determined that the current standards are not protective of health. Relying on studies published since 2012 that show exposure to $PM_{2.5}$ causes premature death at concentrations below current standards, the panel concluded:

> US multicity epidemiological studies, supported by consistent results from Canadian multicity epidemiologic studies, consistent results from accountability studies, and coherent results from animal toxicological and controlled human exposure studies, provide clear and compelling scientific evidence that the current $PM_{2.5}$ standards are not adequate to protect human health. The epidemiological evidence is based on different locations, study designs, and statistical approaches, which enhances its robustness.[5]

In comments to EPA in 2020, national health and medical organizations noted that in addition to the clear evidence demonstrating the inadequacy of the current standards, no evidence exists of a threshold for harm from PM. We identified U.S. studies that restricted the analysis to long-term exposures below 10 µg/m$^3$ and Canadian studies that find evidence down to and below 8 µg/m$^3$; all found premature deaths at those lower levels.[6,7] A Medicare cohort study found mortality associated with levels as low as 7 µg/m$^3$.[8]

As noted in the 2021 petition for reconsideration filed by several health and environmental organizations, numerous additional studies that conducted after EPA's cutoff for inclusion in the ISA for the 2020 standards further underscore the importance down to 8 µg/m$^3$. For example, one study found that "estimated mean age at death for a population with an annual average $PM_{2.5}$ exposure of 12 µg/m$^3$ was 0.89 years less … than estimated for a counterfactual $PM_{2.5}$ exposure of 7.5 µg/m$^3$."[9] Another found for each 5 µg/m$^3$ increase in annual $PM_{2.5}$ concentrations, the hazard ratio was 1.13 for first hospital admission for Parkinson's disease

[5] Frey HC, Adams P, Adgate JL, et al. Advice from the Independent Particulate Matter Review Panel (formerly EPA CASAC Particulate Matter Review Panel) on EPA's policy assessment for the review of the National Ambient Air Quality Standards for particulate matter (external review draft — September 2019), submitted to Hon. Andrew Wheeler, Administrator, docket ID no. EPA–HQ–OAR–2015–0072, and Clean Air Scientific Advisory Committee, U.S. Environmental Protection Agency. Washington, DC: October 22, 2019 Accessed at https://yosemite.epa.gov/sab/sabproduct.nsf/81DF85B5460CC14F8525849B0043144B/%24File/Independent+Particulate+Matter+Review+Panel+Letter+on+Draft+PA.pdf

[6] Shi I., et al. 2016. Low Concentration PM2.5 and mortality; estimating acute and chronic effects in population-based study. *Environmental Health Perspectives*, 124(1)46-52.

[7] Szyszkowicz M. 2009. Air pollution and ED visits for chest pain, *American Journal of Emergency Medicine*. 27(2): 165-168; Steib DM, et al. 2009 Air pollution and emergency department visits for cardiac and respiratory conditions: A Multi-city time series analysis. *Environmental Health: A Global Science Access Source.* 8(25):25; Weichenthal S. et al. 2016; Ambient PM2.5 and risk of emergency room visits from myocardial infarction: Impact of regional PM2.5 oxidative potential: a case-crossover study. *Environmental Health*. 15:46.; Weichenthal et al., 2016.; PM 2.5 and emergency room visits for respiratory illness: effect modification by oxidative potential." *AJRCCM*. 194(5): 577-586.

[8] Di Q, Dai L, Wang Y, Zanobetti A, Choirat C, Schwartz JD, Dominici F. Association of Short-Term Exposure to Air Pollution with Mortality in Older Adults. JAMA. 2017;318:2446-2456.

[9] Schwartz et al., 2018. Estimating The Effects Of PM2.5 On Life Expectancy Using Causal Modeling Methods. Environ Health Perspect 126:127002. https://ehp.niehs.nih.gov/doi/10.1289/EHP3130

and for Alzheimer's disease and related dementias. The mean $PM_{2.5}$ concentration for the whole cohort was 9.7 μg/$m^3$.[10]

A 2020 paper found that each 1 μg/$m^3$ increase in long- and short-term $PM_{2.5}$ levels was associated with increased excess deaths at an average level of 9.0 μg/$m^3$ long-term PM.[11] And a 2019 study found that exposure to levels of $PM_{2.5}$ between 8 and 10 μg/$m^3$ increased all-cause mortality compared to levels below 8 μg/$m^3$.[12]

In support of our ask, we offer for EPA's consideration this science-policy summation from the large majority of the current PM CASAC panel: based on EPA's 2019 ISA, 2022 ISA supplement and revised 2021 PA, the majority recommended that the annual standard be lowered to a range down to 8 μg/$m^3$, which is "supported by placing more weight on: epidemiologic studies in the United States that show positive associations between $PM_{2.5}$ exposure and mortality with precision among populations with mean concentrations likely at or below 10 μg/$m^3$; epidemiologic studies in the United States showing such associations at concentrations below 10 μg/$m^3$ and below 8 μg/$m^3$; Canadian studies, some of which show such associations at concentrations below 10 μg/$m^3$ and below 8 μg/$m^3$; a meta-analysis of 53 studies, 14 of which report such associations at concentrations below 10 μg/$m^3$ down to 5 μg/$m^3$; protection of at-risk demographic groups; evidence consistent with no threshold and a possible supra-linear concentration-response function at lower levels; recognition that the use of the mean to define where the data provide the most evidence is conservative since robust data clearly indicate effects below the mean in concentration-response functions; and consideration that people are not randomly distributed over space such that populations in neighborhoods near design value monitors are exposed to the levels indicated at those monitors and likely to be more at risk."[13]

We further note that while the current body of evidence outlined in the ISA and ISA supplement is sufficient to show that an annual standard of 8 μg/$m^3$ and a 24-hour standard of 25 μg/$m^3$ are required to protect health with an adequate margin of safety, those reviews fail to fully take into account the current evidence.

In the 2019 ISA, which underlies the PA on which EPA's proposed rule is based, EPA restricted its analyses to only those studies that fulfilled four criteria, including "(1) the studies examined exposures consisting of $PM_{2.5}$ from U.S. airsheds or those representative of the U.S. (e.g., Europe, Canada)" and these "criteria applied to both experimental and epidemiologic studies".[14] We point out that Canada, with its airsheds and air zones similar to those of US as EPA deems, has adopted much stricter standards than the US with a 24-hour standard of 27 μg/$m^3$ and an annual standard of 8.8 μg/$m^3$ annual average of the daily 24-hour average concentrations.[15]

---

[10] Shi, Liuhua, Xiao Wu, Mahdieh Danesh Yazdi, Danielle Braun, Yara Abu Awad, Yaguang Wei, Pengfei Liu, et al. "Long-Term Effects of PM2.5 on Neurological Disorders in the American Medicare Population: A Longitudinal Cohort Study." The Lancet Planetary Health 4, no. 12 (December 2020): e557–65. https://doi.org/10.1016/S2542-5196(20)30227-8

[11] Wei, Yaguang, Yan Wang, Xiao Wu, Qian Di, Liuhua Shi, Petros Koutrakis, Antonella Zanobetti, Francesca Dominici, and Joel Schwartz. "Causal Effects of Air Pollution on Mortality in Massachusetts." *American Journal of Epidemiology*, June 19, 2020. https://doi.org/10.1093/aje/kwaa098.

[12] Wu et al., 2019. Causal Inference In The Context Of An Error Prone Exposure: Air Pollution And Mortality. Ann Appl Stat 13(1):520-547. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6812524

[13] Clean Air Scientific Advisory Committee (CASAC). (Mar 18, 2022). Review of the EPA's Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft – October 2021); Report #: EPA-CASAC-22-002; page 3

[14] EPA. (Dec, 2019). Integrated Science Assessment for Particulate Matter, EPA/600/R-19/188; page 104 (P-15)

[15] Canada's Air (Accessed Mar, 2023). Canadian Ambient Air Quality Standards (CAAQS).

We appreciate that in the draft Policy Assessment, EPA included an examination of the relationship between $PM_{2.5}$ exposure and health outcomes with both a *causal* and *likely to be causal* relationship. However, we believe that the fact that the supplement to the 2019 ISA does not include more recent findings about respiratory health, cancer and nervous system effects may have limited the assessment in ways that will hamper the ability to fully evaluate the policy implications of the evidence.

The failure to take a full accounting of morbidity outcomes results in a disproportionately limited view of the effect of particle pollution on communities of color. People of color are more likely than white people to be living with one or more chronic conditions that make them more vulnerable to the health impacts of air pollution, including asthma, diabetes and heart disease. Recent scientific literature about these health outcomes would be useful in assessing the nature of health disparities.

Restricting the evidence review in the supplement to the 2019 ISA to cardiovascular outcomes and mortality also almost completely excludes children from this reconsideration. We have strong evidence of the deleterious effect of $PM_{2.5}$ exposure on the developing lungs in children, putting them at increased risk of a lifetime of compromised health. They deserve to be taken into consideration when determining the adequacy of the standards that will affect their future.

A primary annual standard of 8 $\mu g/m^3$ would ensure that public health is better protected from long-term particle pollution, with an adequate margin of safety to protect at-risk vulnerable subpopulations including those of racial and ethnic groups, of lower socio-economic position, at different life stage (e.g. elderly, children, pregnant people), those with pre-existing conditions or predisposed to morbidities, outdoor workers, and others. Finalizing a level that is any higher than this most stringent value recommended by the expert scientists on the CASAC panel and strongly supported by the public fails to follow the science and the law.

### 3. Level of Primary 24-hour $PM_{2.5}$ NAAQS

EPA is proposing "to retain the current primary 24-hour $PM_{2.5}$ standard (at a level of 35 $\mu g/m^3$) while taking comment on revising the level as low as 25 $\mu g/m^3$".[16] Here we offer our rationale to revise the level of the current primary 24-hour standard to 25 $\mu g/m^3$ to adequately protect public health from acute short term exposures to particle pollution.

Our ask is supported by science. A large majority of the current PM CASAC panel recommended that the level of the 24-hour standard be lowered to a range down to 25 $\mu g/m^3$ to be adequately protective of public health. In making this recommendation, they explained: "Regarding the 24-hour $PM_{2.5}$ standard, the majority of CASAC members find that the available evidence calls into question the adequacy of the current 24-hour standard…conditional on retaining the current form, the majority of CASAC members favor lowering the 24-hour standard. There is substantial epidemiologic evidence from both morbidity and mortality studies that the current standard is not adequately protective. This includes three U.S. air pollution studies with analyses restricted to 24-hour concentrations below 25 $\mu g/m^3$. The majority of CASAC members also note that controlled human exposure studies are not the best evidence to use for justifying retaining the 24-hour standard without revision. These studies preferentially recruit less susceptible individuals and have a typical exposure duration much shorter than 24 hours. Thus, the evidence of effects from controlled human exposure studies with exposures close to the current 24-hour standard supports epidemiological evidence for lowering the standard. Overall, this places greater weight on the scientific evidence than on the values estimated by the risk

[16] EPA Reconsideration of the National Ambient Air Quality Standards for Particulate Matter; page 3 (5560)

assessment. The risk assessment may not adequately capture areas with wintertime stagnation and residential wood-burning where the annual standard is less likely to be protective. There is also less confidence that the annual standard could adequately protect against health effects of short-term exposures."[17]

Multiple examples exist from the prior review of calls for a strengthening of the 24-hour standards. In comments to EPA in 2020, seventeen national health organizations noted, "Even at levels that meet current NAAQS, exposure to short-term $PM_{2.5}$ can be deadly. A 2016 study found that people aged 65 and older in New England faced a higher risk of premature death from particle pollution, even in places that met current standards for short-term particle pollution.[18] Another study in 2017 looked more closely at Boston and found a similar higher risk of premature death from particle pollution in a city that meets current limits on short-term particle pollution.[19] Looking nationwide in a 2017 study, researchers found more evidence that older adults faced a higher risk of premature death even when levels of short-term particle pollution remained well below the current national standards. This was consistent whether the older adults lived in cities, suburbs or rural areas.[20]

EPA's proposal, however, seems to follow the opinion of a minority of CASAC members, by evidently placing a greater weight on controlled human exposure studies and on risk assessment in deciding to retain the current 24-hour standard. In doing so it also subscribes to the minority of CASAC's contention that the "annual standard is the controlling standard across most of the urban study areas" and "revising the level of the 24-hour standard is estimated to have minimal impact on the $PM_{2.5}$-associated risks. Therefore, the annual standard can be used to limit both long- and short-term $PM_{2.5}$ concentrations."[21] EPA's data shows that there are areas that will attain an annual standard as low at 8 µg/m$^3$ and still exceed a daily standard as high as 35 µg/m$^3$. Demonstrating that the annual standard alone does not protect against high daily exposures. The proposal, like a minority of the CASAC panel, deemed "the annual standard was most effective in controlling ''typical'' $PM_{2.5}$ concentrations near the middle of the air quality distribution... but also provided some control over short-term peak $PM_{2.5}$ concentrations. On the other hand, the 24-hour standard, with its 98th percentile form, was most effective at limiting peak 24-hour $PM_{2.5}$ concentrations, but in doing so also had an effect on annual average $PM_{2.5}$ concentrations. Thus, while either standard could be viewed as providing some measure of protection against both average exposures and peak exposures, the 24-hour and annual standards were not expected to be equally effective at limiting both types of exposures."[22]

Despite this recognition, and against the recommendation of the majority of CASAC experts, the "Administrator concluded that an annual standard (as the arithmetic mean, averaged over three years) remained appropriate for targeting protection against the annual and daily $PM_{2.5}$ exposures around the middle portion of the $PM_{2.5}$ air quality distribution. Further, recognizing

---

[17] 2022 CASAC Review of the EPA's Policy Assessment for the Reconsideration of the NAAQS for PM; pages 3-4

[18] Shi L, Zanobetti A, Kloog I, et. al. Low-concentration PM2.5 and mortality: estimating acute and chronic effects in a population-based study. Environ Health Perspect. 2016; 124:46-52. http://dx.doi.org/10.1289/ehp.1409111

[19] Schwartz J, Bind MA, Koutrakis P. Estimating causal effects of local air pollution on daily deaths: Effect of low levels. Environ Health Perspect. 2017; 125:23-29. http://dx.doi.org/10.1289/EHP232.

[20] Di Q, Dai L, Wang Y, Zanobetti A, Choirat C, Schwartz JD, Dominici F. Association of Short-Term Exposure to Air Pollution with Mortality in Older Adults. JAMA. 2017;318:2446-2456.

[21] 2022 CASAC Review of the EPA's Policy Assessment for the Reconsideration of the NAAQS for PM; pages 3-4

[22] EPA 's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter; page 20 (5577)

that the 24-hour standard (with its 98th percentile form) was more directly tied to short-term peak $PM_{2.5}$ concentrations, and more likely to appropriately limit exposures to such concentrations, the Administrator concluded that the current 24-hour standard (with its 98th percentile form, averaged over three years) remained appropriate to provide a balance between limiting the occurrence of peak 24-hour $PM_{2.5}$."[23]

Looking at the history of the Clean Air Act and the primary $PM_{2.5}$ NAAQS, it is evident that two - a short-term 24-hour and a long-term annual – standards were established because neither one alone was deemed controlling of or sufficient to protect human health from particle pollution throughout the year.

EPA needs to revise the level of current 24-hour $PM_{2.5}$ primary NAAQS to 25 µg/m$^3$ to adequately protect the public from acute short-term exposures, as warranted by science.

### 4. Form of Primary 24-hour $PM_{2.5}$ NAAQS

The current 24-hour standard is calculated as the 3-year average of annual 98th percentile 24-hour average concentrations of $PM_{2.5}$ calculated (averaged from hourly measurements) or measured from midnight to midnight at each monitoring site (24-hour standard design value). This form of the standard excludes 7.3 days (24-hour periods) of highest $PM_{2.5}$ levels per year (~22 days over the 3-year averaging period) from standard attainment consideration. Additionally, days of poor air quality may be exempted from regulatory consideration due to unusual or naturally occurring exceptional events such as "wildfires, high wind dust events, prescribed fires, stratospheric ozone intrusions, and volcanic and seismic activities."[24] A recent study showed that "the frequency of exceptional event reporting for $PM_{2.5}$…had increased since 2007" and that "wildland fires and windblown dust drive many exceptional events in several EPA regions." [25] The authors "note the importance of growth in the number of exceptional event days due to wildfire smoke in the future due to climate change and point to possible changes to the NAAQS and implementations."[26]

Climate change has "health and welfare consequences beyond air quality and other effects from combinations of climate and air quality."[27] The ozone CASAC panel had noted the measurable penalty that climate change impacts impose on ambient air pollution, and the PM CASAC panel noted the "weather penalty" which is the result of "weather-associated changes in $PM_{2.5}$ composition, termed as due to increased temperature in the industrial Midwest and Northwest during the warm and cold seasons, and in the upper Midwest and West during the cold season, along with increased relative humidity and decreased wind speeds."[28] Both these penalties will only increase as the impacts of anthropogenic climate change become more frequent and intense.

---

[23] EPA Reconsideration of the National Ambient Air Quality Standards for Particulate Matter; page 20 (5577)

[24] "Exceptional Events are unusual or naturally occurring events that can affect air quality but are not reasonably controllable using techniques that tribal, state or local air agencies may implement in order to attain and maintain the National Ambient Air Quality Standards." Treatment of Air Quality Data Influenced by Exceptional Events (Homepage for Exceptional Events) | US EPA

[25] David, L. M. *et al*. (2021). Could the exception become the rule? 'Uncontrollable' air pollution events in the US due to wildland fires. *Environ. Res. Lett.* 16, 034029.

[26] David, L. M. *et al*. (2021). Could the exception become the rule? 'Uncontrollable' air pollution events in the US due to wildland fires. *Environ. Res. Lett.* 16, 034029.

[27] National Academies of Sciences, Engineering, and Medicine. (Oct, 2022). Advancing the Framework for Assessing Causality of Health and Welfare Effects to Inform National Ambient Air Quality Standard Reviews. ISBN: 978-0-309-69011-9; Sponsor: EPA, page 105.

[28] CASAC review of PM PA. (Nov 22, 2022), page 71 (A-35)

Areas experiencing the effects of an exceptional event may not need to claim an exemption if they are in attainment, but their citizens are exposed to poor air quality nonetheless. For example, smoke from western US and southern Canada wildfires moved into the eastern U.S. on July 21, 2021 resulting in poor air quality in several major cities from the Mid-Atlantic to the Northeast, including Philadelphia, New York City and Boston, with Washington DC and Baltimore issuing code orange air-quality alerts for that day.[29]

The PM CASAC panel noted that for the 24-hour standard, "the level is conditional on the form, and all of the CASAC members conclude that the Draft PA does not provide sufficient information to adequately consider alternative form and level combinations…The CASAC recommends that in future reviews, the EPA provide a more comprehensive assessment of the 24-hour standard that includes the form as well as the level. The CASAC recognizes that they have insufficient information with which to evaluate alternative forms of the 24-hour standard and the CASAC recommends that the form be revisited in future reviews."[30]

Given the increasingly severe and frequent threats to air quality from anthropogenic climate change and considering the long timeline between NAAQS reviews and also in the full implementation of revised standards, there is an urgent need to address the form now to protect the health of vulnerable at-risk populations. We ask that the form of the primary 24-hour $PM_{2.5}$ standard be set at the 99th percentile to reduce by half the number of currently allowed exceedances and to account for climate change impacts on air pollution, to protect the health of vulnerable at-risk populations with a margin of safety.

### 5. Air Quality Index

EPA proposes the following changes to the $PM_{2.5}$ sub-index of the *daily* AQI to align with any changes to the primary $PM_{2.5}$ standards that are being considered in this review:

> 1. Revise the lower AQI breakpoint of 50 (code Yellow; level of concern Moderate) within the range of 9.0 and 10.0 µg/m$^3$ and retain the AQI values of 100 (code Orange; level of concern Unhealthy for Sensitive Groups) and 150 (code Red; level of concern Unhealthy) at 35.4 µg/m$^3$ and 55.4 µg/m$^3$, respectively.
>
> 2. Revise the upper AQI breakpoints of 200 (code Purple; level of concern Very Unhealthy), 300 (code Maroon; level of concern Hazardous) and 500 to 125.4 µg/m$^3$, 225.4 µg/m$^3$, and 325.4 µg/m$^3$, respectively, replacing the current "linear-relationship approach" with one "that more fully considers the $PM_{2.5}$ health effects evidence from controlled human exposure and epidemiologic studies that has become available in the last 20 years", and
>
> 3. Revise the daily reporting requirement from 5 days per week to 7 days per week.

In the Lung Association's 2021 comments to CASAC on the draft PA, we noted that the inadequate 24-hour standard is the basis for EPA's Air Quality Index (AQI) that is used to communicate daily air pollution levels to the public. Using EPA's AirNow tool or similar communications from state and local air pollution agencies, the public is informed about air quality forecasts and pollutant levels in their community. The Air Quality Index suggests that only exposures of more than 35.5 µg/m$^3$ are unhealthy for sensitive groups and designated code orange. Days with $PM_{2.5}$ levels from 12.1 µg/m$^3$ to as high as 35.4 µg/m$^3$ are labeled "moderate" or code yellow days. This provides an inaccurate picture of the health risks of daily

---

[29] Samenow, J. (Jul 20, 2021). Wildfire smoke pouring into Mid-Atlantic prompts air-quality alert for D.C. and Baltimore. The Washington Post.
[30] CASAC review of PM PA. (Nov 22, 2022), page 2

exposure to $PM_{2.5}$.

EPA's official caution for a code yellow moderate day for $PM_{2.5}$ is,

> "Who Needs to be Concerned? Some people who may be unusually sensitive to particle pollution.
> What Should I Do? Unusually sensitive people: Consider reducing prolonged or heavy exertion. Watch for symptoms such as coughing or shortness of breath. These are signs to take it easier. Everyone else: It's a good day to be active outside."[31]

Further, in order for the warning level to be elevated to code red or "unhealthy", meaning that everyone needs to take precautions, the daily $PM_{2.5}$ levels must exceed 55.5 µg/$m^3$. Setting a more protective 24-hour standard will not only drive pollution cleanup, but also provide more accurate information so individuals, teachers, coaches and others can make decisions to reduce or prevent exposures to $PM_{2.5}$ at levels that threaten health.

The AQI is primarily a communication tool "to inform the public when air quality is poor and thus when they should consider taking actions to reduce their exposures."[32] Unlike the short-term pollutant standards to which it is tied, the AQI is not a regulatory tool to reduce air pollution and the "EPA does not provide guidance on the use of the AQI for such purposes."[33]

We note that EPA cites "new controlled human exposure and epidemiologic studies published since the completion of the 2009 ISA" and "considers it appropriate to consider scientific evidence for these purposes beyond the scope of the ISA" -- all of which in the Agency's view warrant updating the AQI-PM framework (revising the breakpoints for its color-coded $PM_{2.5}$ levels) but evidently do not warrant revising the primary 24-hour $PM_{2.5}$ standard.[34] In doing so, EPA is shifting its responsibility to protect citizens from acute or peak $PM_{2.5}$ exposures by setting stringent $PM_{2.5}$ standards to the citizens themselves.

We support revising the breakpoints for upper air quality indices of 200, 300, and 500 to fully reflect current science on the adverse health impacts daily exposures to high levels of fine $PM_{2.5}$. This adherence to current science needs to be reflected not only in revising AQI breakpoints but in setting the PM2.5 NAAQS themselves.

Changing the AQI reporting requirement to cover all seven days of the week is a good start. But to make the AQI a more useful and informational tool, EPA needs to go further and address other elements of the AQI:[35]

i. Daily reporting is currently required only of Metropolitan Statistical Areas (MSAs) with a population of more than 350,000 based on the latest available census population (which is updated on a decadal basis)
ii. Required reporting for the AQI is backward-looking – citizens are informed of yesterday's air quality: "It takes a full 24 hours to obtain an AQI value (that's 24 hourly values for PM or the max 1-hour or 8-hour value in a 24-hour period for other pollutants), so you are in

---

[31] Air quality Guide for Particle Pollution, August 2015, EPA-456/F-15-005 (airnow.gov)
[32] EPA Reconsideration of the National Ambient Air Quality Standards for Particulate Matter; page 81 (5638)
[33] EPA Reconsideration of the National Ambient Air Quality Standards for Particulate Matter; page 81 (5638)
[34] EPA Reconsideration of the National Ambient Air Quality Standards for Particulate Matter; page 81 (5638)
[35] Environmental Protection Agency. (Sep, 2018). Technical Assistance Document for the Reporting of Daily Air Quality – the Air Quality Index (AQI). EPA 454/B-18-007; page 1

effect required to report yesterday's AQI"

iii. Reporting on current AQI values as well as air quality forecasts, which are both useful and relevant, is voluntary
iv. Reporting on health effects of and cautionary statements for poor air quality is voluntary
v. Reporting on the AQI for sub-areas of the reporting area or less densely populated areas is voluntary
vi. Reporting on the causes for unusual AQI values is voluntary
vii. Reporting on actual pollutant concentrations is voluntary
viii. Reporting on "AQI for other pollutants or on statements that "blend" health effects and cautionary information for more than one pollutant" is voluntary.

To ensure that the *daily* AQI is of practical and immediate value to the public in protecting themselves, EPA needs to make mandatory the voluntary reporting elements listed above. Only then will the AQI be a useful and educational tool that helps citizens take action on days of poor air quality. The *daily* AQI works as a public health advisory tool as it is intended to be only if the 24-hour standard is strengthened. To truly protect citizens from harmful $PM_{2.5}$ pollution every day and all through the year, EPA needs to strengthen the annual standard to 8 and 24-hour standards to 25 µg/$m^3$ to fully reflect, in EPA's own words, "$PM_{2.5}$ health effects evidence from controlled human exposure and epidemiologic studies that has become available in the last 20 years".

## 6. Environmental and Social Injustice of $PM_{2.5}$ Pollution

Concentrations of criteria air pollutants have declined in recent decades in the U.S., but the improvements in air quality are not equitably distributed across various populations. A recent study showed that "despite declines in pollutant concentrations, over time, disparities in exposure increased for racially and educationally isolated communities."[36] A given area with "racial isolation was associated with higher $PM_{2.5}$ but not with the rate of decline in $PM_{2.5}$." The study authors suspect that "an overall improvement in air quality could, in fact, mask widening disparities based on geographic, social, or demographic factors."[37]

A recent study has shown that "most emission source types - representing ~75% of exposure to $PM_{2.5}$ in the United States - disproportionately affect racial-ethnic minorities. This phenomenon is systemic, holding for nearly all major sectors, as well as across states and urban and rural areas, income levels, and exposure levels. Industry, light-duty gasoline vehicles, construction, and heavy-duty diesel vehicles are often among the largest sources of disparity."[38] The disparity in exposure to air pollution and associated adverse health impacts is clearly seen with both chronic long-term (annual mean) as well as with acute short-term (daily peak) $PM_{2.5}$ exposures as discussed below.

A 2019 study of a very large cohort of more than 4.5 million U.S. veterans found the attributable burden of death (from nine causes) associated with exposures to annual mean $PM_{2.5}$ levels was "disproportionally borne by (B)lack individuals and socioeconomically disadvantaged communities; 99% of the burden was associated with $PM_{2.5}$ levels below (annual) standard set

---

[36] Bravo, M. A., et al. (2022). Where Is Air Quality Improving, and Who Benefits? A Study of PM2.5 and Ozone Over 15 Years. Am J Epidemiol, 191(7):1258-1269.
[37] Bravo, et al. Where Is Air Quality Improving, and Who Benefits? A Study of PM2.5 and Ozone Over 15 Years.
[38] Tessum, C. W. *et al*. (2021). $PM_{2.5}$ polluters disproportionately and systemically affect people of color in the United States. *Science Advances*, 7(18).

by EPA.[39] A very recent "national study of short-term air pollution exposure disparities revealed an environmentally unjust pattern for POC (people of color)."[40] The study found that between 2012–2016, people of color across the nation experienced 23, 6.4, and 1.7 more days overall with respective $PM_{2.5}$ concentrations of ≥15, 25, and 35 μg/m$^3$ than non-Hispanic white people. "Disparities appear larger for short-term vs. long-term $PM_{2.5}$ exposures nationwide. Although prior estimates of disparities in long-term $PM_{2.5}$ exposures (<10 μg/m$^3$) between the most and least exposed racial/ethnic groups were respectively 13% - 14% (absolute) and 1.1 (relative), we found worsening disparities as the short-term $PM_{2.5}$ threshold increased from 15 to 25 to 35 μg/m$^3$ (absolute: 25% to 69% to 109%; relative: 1.3 to 1.8 to 2.7). This suggests that tightening/lowering the $PM_{2.5}$ NAAQS toward WHO (World Health Organization) benchmarks might attenuate racial/ethnic exposure disparities."[41]

These studies make compelling arguments for strengthening both the annual and 24-hour $PM_{2.5}$ standards to reduce the disproportionate impacts of $PM_{2.5}$ exposure across all demographics and to ensure equitable distribution of the benefits of clean healthy air from implementing those standards. EPA's own Regulatory Impact Analysis (RIA)[42] bears out this understanding. EPA found in the RIA for this proposal that all populations would experience greater health benefits at 8 μg/m$^3$, and that only the tighter end of the standards analyzed would reduce racial disparities in air pollution exposure.

Figure 6-1 in the RIA shows Hispanic, Asian, and Black people (compared to White people) experience higher-than-national-average annual $PM_{2.5}$ levels under the current standard and this disparity is projected to persist at the same relative levels if the annual standard alone were lowered. However, lowering the annual standard to 8 μg/m$^3$, even while retaining the current 24-hour standard, shows significantly more reductions in exposure levels nationally for Asian (5.5%) and Hispanic people (4.8%) compared to proposed annual standards, (Figures 6-5 & 6-9, RIA).

Nationwide, Black people would experience the most reductions in total mortality rates per 100K by adopting 8/35 μg/m$^3$ compared to the current 12/35 μg/m$^3$ NAAQS, (Figure 6-11, RIA). Adopting an annual standard of 8 μg/m$^3$ translates to an average annual mortality rate reduction (per 100k) of >7.5 ~2.2x among Black people, ~2.7x, ~1.7x for Hispanic people, and 2.5x, ~1.6x for Asian people relative to adopting the proposed 10 μg/m$^3$, 9 μg/m$^3$ standards respectively, (Figure 6-15, RIA). A similar trend is seen in the national average percent mortality rate reductions (per 100k People) among these demographics (Figure 6-19, RIA).

Implementing an annual standard of 8 μg/m$^3$ saves 9,200 adults from premature death in 2032 (year of full implementation of new standards) alone, compared to 1,700 and 4,200 with an annual standard of 10 and 9 μg/m$^3$ respectively, (Table ES-6, RIA). This translates to 5.4x, ~2.5x more avoided PM-related premature mortalities among adults. This trend is also seen with infant mortality: ~6.9x, 6.1x reduction for 8 μg/m$^3$ vs a 10, 9 μg/m$^3$ standard as proposed in the rule, (Table ES-6, RIA). The overall estimated monetized benefits as well as those from avoided mortalities & morbidities among adults are also similarly >5x, >2x greater for 8/35 μg/m$^3$ relative to 10/35, 9/35 μg/m$^3$ (Tables ES-7 and ES-10, RIA).

[39] Bowe, B., Xie, Y., Yan, Y., & Al-Aly, Z. (2019). Burden of Cause-Specific Mortality Associated With PM2.5 Air Pollution in the United States. *JAMA Network Open*; 2(11): e1915834.
[40] Collins, T. W. & Grineski, S. E. (Aug 19, 2022). Racial/Ethnic Disparities in Short-Term PM2.5 Air Pollution Exposures in the United States. *Environmental Health Perspectives*, 130(8)
[41] Ibid 24
[42] EPA. (Dec, 2022). Regulatory Impact Analysis for the Proposed Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, EPA-452/P-22-001; page 24 (ES-2)

We are unable to assess or understand the projected additional net benefits of implementing our asks of annual/24-hour standard levels of 8/25 µg/$m^3$ because the RIA does not provide any data on this alternative standards suite although EPA is soliciting comment on both those levels.

The benefits of strengthening the annual standard to 8 µg/$m^3$ alone yield numerous net benefits as seen from EPA's own regulatory impact analyses. By setting truly protective primary annual/24-hour $PM_{2.5}$ NAAQS of 8/25 µg/$m^3$, EPA would be able to save more lives and reduce $PM_{2.5}$-related illnesses, address environmental justice for vulnerable communities by reducing disparities in exposures and associated health impacts, ensure a more equitable distribution of clean air benefits, gain economic and monetary benefits, act on current science and meet the requirements of the Clean Air Act.

## 7. Conclusion

The current $PM_{2.5}$ NAAQS reconsideration is a unique opportunity for the EPA to set meaningful and effective standards to truly protect public health with an adequate margin of safety from deadly particle pollution. Setting health protective standards is required by the Clean Air Act. We request that EPA follow the science and the law, and no later than August 2023 finalize the rule for a primary annual $PM_{2.5}$ standard of 8 µg/$m^3$ and a primary 24-hour $PM_{2.5}$ standard of 25 µg/$m^3$ set at the 99th percentile.

**NAAQS Regulatory Review & Rulemaking Coalition**

# COMMENTS OF THE NAAQS REGULATORY REVIEW & RULEMAKING COALITION ON EPA'S RECONSIDERATION OF THE NATIONAL AMBIENT AIR QUALITY STANDARDS FOR PARTICULATE MATTER

## DOCKET NO. EPA-HQ-OAR-2015-0072

American Chemistry Council
American Coke and Coal Chemicals Institute
American Forest & Paper Association
American Fuel & Petrochemical Manufacturers
American Iron and Steel Institute
American Petroleum Institute
American Wood Council
National Lime Association
National Mining Association
National Stone, Sand & Gravel Association
Oilseed Processors Coalition
- Corn Refiners Association
- National Cotton Council
- National Cotton Ginners Association
- National Cottonseed Processors Association
- National Oilseed Processors Association
- Texas Cotton Ginners' Association

Portland Cement Association
The Aluminum Association
The Fertilizer Institute

March 28, 2023

## NAAQS Regulatory Review & Rulemaking Coalition

# COMMENTS OF THE NAAQS REGULATORY REVIEW & RULEMAKING COALITION ON EPA'S RECONSIDERATION OF THE NATIONAL AMBIENT AIR QUALITY STANDARDS FOR PARTICULATE MATTER

## DOCKET NO. EPA–HQ–OAR-2015-0072

### Executive Summary

Under the Clean Air Act ("CAA" or "Act"),[1] primary National Ambient Air Quality Standards ("NAAQS") are set at a level that, in the judgment of the Administrator of the United States Environmental Protection Agency ( "EPA" or "Agency"), is requisite to protect the public health, allowing an adequate margin of safety.[2] Secondary NAAQS are set at a level that, in his judgment, is requisite to protect the public welfare from known or anticipated adverse effects.[3] In December 2020, EPA completed a review of its NAAQS for particulate matter ("PM") and decided to retain the existing standards without revision.[4] Those standards include an annual primary NAAQS for fine PM (measured as $PM_{2.5}$) of 12.0 $\mu g/m^3$, annual primary and secondary $PM_{2.5}$ NAAQS of 15.0 $\mu g/m^3$, 24-hour primary and secondary NAAQS of 35 $\mu g/m^3$ and 65 $\mu g/m^3$, and 24-hour primary and secondary NAAQS for coarse PM (measured as $PM_{10}$) of 150 $\mu g/m^3$.[5] That

[1] 42 U.S.C. §§ 7401-7671q.

[2] CAA § 109(b)(1). The Act does not require the Administrator to set NAAQS at a zero-risk level. *See Mississippi v. EPA*, 744 F.3d 1334, 1351 (D.C. Cir. 2013) (per curiam).

[3] CAA § 109(b)(2).

[4] 85 Fed. Reg. 82,684 (Dec. 18, 2020) (hereinafter "2020 PM NAAQS Rule").

[5] 40 C.F.R. §§ 50.6, 50.7, 50.13, & 50.18 (2021). The 15.0 $\mu g/m^3$ annual primary $PM_{2.5}$ NAAQS has been revoked except for areas designated nonattainment for it. 40 C.F.R. § 50.13(d).

decision was based on an Integrated Science Assessment ("ISA"),[6] a Policy Assessment ("PA"),[7] advice from the Clean Air Scientific Advisory Committee ("CASAC") on drafts of both of the documents and on whether revision of the PM NAAQS was appropriate,[8] and on over 1100 public comments.[9]

In June 2021, EPA announced that it would reconsider its December 2020 decision.[10] As part of that reconsideration, the Agency's career staff prepared a supplement to the 2019 ISA[11] and a new PA.[12] EPA also replaced many of CASAC's members[13] and obtained review of drafts of both the new documents by its new CASAC.[14] On January 28, 2023, the Administrator

[6] EPA, EPA/600/R-19/188, Integrated Science Assessment for Particulate Matter (Dec. 2019), Doc. ID EPA-HQ-OAR-2015-0072-0212, https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=347534 (hereinafter "2019 ISA"). An ISA serves as the air quality criteria on which the Administrator bases his decision on appropriate NAAQS and must "accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of [the pollutant in question] in the ambient air in varying quantities." CAA § 108(a)(s); *see also id*. § 109(b).

[7] EPA, EPA-452/R-20-002, Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (Jan. 2020), Doc. ID EPA-HQ-OAR-2015-0072-0237, https://www.epa.gov/naaqs/particulate-matter-pm-standards-policy-assessments-current-review-0 (hereinafter "2020 Policy Assessment").

[8] Letter from Dr. Louis Anthony Cox, Jr., Chair, CASAC, to the Hon. Andrew R. Wheeler, Administrator, EPA (Apr. 11, 2019), EPA-CASAC-19-002, https://casac.epa.gov/ords/sab/f?p=113:0:9863628038368:APPLICATION_PROCESS=REPORT_DOC:::REPORT_ID:1069; Letter from Dr. Louis Anthony Cox, Jr., Chair, CASAC, to the Hon. Andrew R. Wheeler, Administrator, EPA, No. EPA-CASAC-20-001 (Dec. 16, 2019) (hereinafter "2019 Cox Letter"), https://casac.epa.gov/ords/sab/f?p=113:0:3827699310090:APPLICATION_PROCESS=REPORT_DOC:::REPORT_ID:1073.

[9] *See* EPA, Review of the National Ambient Air Quality Standards for Particulate Matter, EPA-HQ-OAR-2015-0072, https://www.regulations.gov/docket/EPA-HQ-OAR-2015-0072/comments?postedDateFrom=2016-04-20&postedDateTo=2020-12-18&sortBy=postedDate&sortDirection=desc.

[10] Press Release, EPA, *EPA to Reexamine Health Standards for Harmful Soot that the Previous Administration Left Unchanged* (June 10, 2021), https://www.epa.gov/newsreleases/epa-reexamine-health-standards-harmful-soot-previous-administration-left-unchanged.

[11] EPA, EPA/600/R-22/028, Supplement to the 2019 Integrated Science Assessment for Particulate Matter (May 2022), https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=354490 (hereinafter "ISA Supplement").

[12] EPA, EPA-452/R-22-004, Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (May 2022), https://www.epa.gov/system/files/documents/2022-05/Final%20Policy%20Assessment%20for%20the%20Reconsideration%20of%20the%20PM%20NAAQS_May2022_0.pdf (hereinafter "2022 Policy Assessment").

[13] *See* Press Release, EPA, *EPA Announces Selections of Charter Members to the Clean Air Scientific Advisory Committee* (June 17, 2021), https://www.epa.gov/newsreleases/epa-announces-selections-charter-members-clean-air-scientific-advisory-committee.

[14] Letter from Dr. Elizabeth A. (Lianne) Sheppard, Chair, CASAC, to the Hon. Michael S. Regan, Administrator, EPA (Mar. 18, 2022), EPA-CASAC-22-002, https://casac.epa.gov/ords/sab/f?p=113:0:13970452662844:APPLICATION_PROCESS=REPORT_DOC:::REPOR

published a Reconsideration Proposal in the *Federal Register* soliciting comments on the action he intends to take at the end of this reconsideration.[15] In that proposal, the Administrator announced his proposed decision "to revise the level of the primary annual $PM_{2.5}$ standard from 12.0 µg/m$^3$ to within the range of 9.0 to 10.0 µg/m$^3$."[16] The Administrator proposed to retain the current secondary annual $PM_{2.5}$ NAAQS, primary and secondary 24-hour $PM_{2.5}$ NAAQS, and primary and secondary $PM_{10}$ NAAQS.

These are the comments of the NAAQS Regulatory Review & Rulemaking Coalition (hereinafter "NR3 Coalition" or "Coalition") on the Reconsideration Proposal. The NR3 Coalition is an ad hoc association of industry groups and companies supportive of NAAQS that provide the requisite protection of public health and welfare and that are implemented in ways that provide protection consistent with the economic health of the country.

Briefly, the NR3 Coalition concludes:

- In determining whether or not revisions to the PM NAAQS are "appropriate," the Administrator must consider costs and burdens to state, local, and tribal regulators and on stakeholders and base his decision on review of the entire record, including that of the 2020 proceeding. These considerations apply to EPA's discretionary reconsideration of the Agency's reconsideration of its 2020 decision to retain the current PM NAAQS. Based on both procedural and factual grounds, the Administrator must withdraw this reconsideration.

- The Administrator has not justified revision of the current primary $PM_{2.5}$ standards. Specifically, while he has "display[ed] awareness" that he is making a change from the prior Administrator's 2020 decision that revision was not appropriate, the current Administrator has not offered "good reasons" why a more stringent annual primary $PM_{2.5}$ NAAQS is warranted, based on the entire rulemaking record and in the absence of evidence

---

T_ID:1094 ("2022 Sheppard Letter"); Letter from Dr. Elizabeth A. (Lianne) Sheppard, Chair, CASAC, to the Hon. Michael S. Regan, Administrator, EPA (Mar. 18, 2022), EPA-CASAC-22-001, https://casac.epa.gov/ords/sab/f?p=113:0:13970452662844:APPLICATION_PROCESS=REPORT_DOC:::REPORT_ID:1093.

[15] 88 Fed. Reg. 5558 (Jan. 28, 2023).

[16] 88 Fed. Reg. at 5629. Although the Administrator refers to this as a revision of the current 12.0 µg/m$^3$ annual standard, he is actually proposing the *addition* of such a standard. The proposed regulatory language would add a new 40 C.F.R. § 50.20 to the *Code of Federal Regulations* but would make no change to the existing standards. Should EPA finalize a decision to establish a more stringent annual primary $PM_{2.5}$ NAAQS, the Agency should provide that the current annual primary $PM_{2.5}$ NAAQS will not longer apply after EPA promulgates designations for the new NAAQS.

of different health effects, greater health risk, or different "at-risk" populations. *Cf. FCC v. Fox Television Stations*, 556 U.S. 502, 129 S. Ct, 1800, 1811 (2009). On the other hand, the Administrator's conclusions, consistent with those of his predecessor, that the current primary 24-hour $PM_{2.5}$ and $PM_{10}$ NAAQS and the secondary NAAQS provide the requisite protection of public health and welfare are supported by the record.

- The Administrator has the statutory authority to set the effective date of a revised NAAQS two years after notice of that NAAQS revision is published in the *Federal Register*. If he revises a NAAQS at the conclusion of this reconsideration, he should exercise that option in this case. Doing so would not impair the timeline for area designations and state plan submissions. Moreover, given the significant implementation issues associated with EPA's proposed levels for an annual $PM_{2.5}$ NAAQS, and EPA's own schedule to complete ongoing implementation-related improvements, a sooner effective date would be arbitrary and capricious.

- As NAAQS become increasingly stringent – whether as a result of this proceeding or in future NAAQS reviews – EPA should encourage opportunities for flexible approaches to implementation. For example, EPA should encourage states to use emissions trading to achieve required PM air quality improvements, should support and promote exclusion of air quality data significantly impacted by international emissions or due to exceptional events, and should update its permitting and modeling requirements and guidance to eliminate excessive conservatism.

- EPA's draft Regulatory Impact Analysis ("RIA") is seriously deficient in that it fails to account for the significant uncertainty in the data on public health benefits that might result from a more stringent annual $PM_{2.5}$ NAAQS and does not attempt to estimate the full costs and economic impacts of attaining any such revised standard. As a result, the costs and economic impacts of a more stringent standard are understated, and therefore EPA has not adequately considered the consequences of its proposed action.

## Table of Contents

Executive Summary ........ i

I. Introduction........ 1

II. Under Section 109(d)(1), Costs Must Be Considered in Determining Whether To Revise a NAAQS........ 2

III. The Reconsideration Proposal Is Procedurally Unique; the Administrator Must Consider Costs and Burdens; and the Administrator Must Justify Policy Changes After Reconsidering the Entire Record. ........ 4

A. The Administrator Must Consider Costs and Burdens When Deciding Whether To Proceed with a Discretionary Reconsideration........ 4

1. The Administrator Must Consider Whether the Asserted Benefits Attributable to Reconsidering the Former Administrator's Determination in December 2020 Not To Revise the Current $PM_{2.5}$ Annual Standard Justify the Costs Associated with Revising that Standard. ........ 5

2. The Administrator Should Withdraw the Reconsideration Proposal Because it Creates Regulatory Uncertainty and Burdens in Economically Challenging Times. ........ 12

a. Even When Considering Statutory Provisions To Address Background Concentrations, EPA's Analysis Shows the Proposed Standards Will Be Unattainable. ........ 14

b. The Reconsideration Proposal's Impact on Nonattainment Areas Would Be Substantially More Than Estimated by EPA........ 17

c. The Reconsideration Proposal, if Finalized, Could Result in Vast Economic Impacts to Attainment Areas that EPA Does Not Estimate........ 20

3. The Administrator Should Withdraw the Reconsideration Proposal Because it Would Burden State Officials with Inconsistent, Incompatible, and Duplicative Requirements. ........ 21

B. The Reconsideration Proposal Is Arbitrary and Capricious Because it Does Not Reconsider the Entire Record and Justify Changes to Existing Policy. ........ 23

1. The Administrator Fails To Justify Disregarding His Predecessor's Decisions........ 25

2. The Administrator Fails To Address the Advice of the CASAC he Disbanded. ....26

3. The Administrator Must Justify New Positions Taken in a Revised "Response to Significant Comments" Document. ....28

4. The Public Must Have an Opportunity To Comment Meaningfully on Any Changes EPA Makes To Cure the Reconsideration Proposal's Flaws. ....28

IV. Should EPA Proceed with Revising the Standard, an Effective Date of Two Years Following Promulgation Is Necessary To Avoid Disruptions in PSD Permitting and Is Consistent with the Designation and SIP Development Schedule. ....30

V. EPA Must Develop an Effective and Feasible Implementation Strategy and Related Tools that States Can Use for Any More Stringent NAAQS. ....36

A. EPA Needs To Ensure its Recommended Models and Requirements for Using Models Yield Realistic Air Quality Predictions. ....36

1. EPA Needs To Correct its Conservative Approach to Air Quality Modeling To Facilitate the Permitting of New or Modified Sources in Areas Attaining the PM NAAQS. ....37

2. EPA Must Also Ensure its Requirements and Guidance for SIP Modeling Produce Realistic Air Quality Predictions. ....44

B. EPA Should Develop and Encourage States To Use Flexible and Cost-Effective Tools for Developing Control Strategies. ....45

VI. The Administrator Should Retain the 12.0 μg/m$^3$ Annual Primary $PM_{2.5}$ NAAQS. ....48

A. The Health Effects Evidence Is Consistent with that Considered in 2012 and 2020. ....49

1. This Reconsideration Does Not Add Any New Findings of Health Effects with a Causal or Likely Causal Association with $PM_{2.5}$ Exposure. ....49

2. Substantial Uncertainties and Limitations Remain in the Health Effects Evidence. ....51

3. Even if EPA Fails To Consider the Substantial Limitations in the Health Effects Evidence, Compliance with the Existing Standard Will Likely Achieve Average Exposure Levels that Fall within EPA's Proposed Range. ....54

B. CASAC's Comments Do Not Require Revision of the Annual Primary $PM_{2.5}$ NAAQS....56

C. The Populations Identified as "At-Risk" Are Appropriately Protected by the Current NAAQS....57

D. Risk Estimates Do Not Support the Need for a More Stringent NAAQS....58

E. The Administrator Must Consider Disbenefits of a More Stringent NAAQS....62

F. The Wide Range of Values for the Annual Primary $PM_{2.5}$ NAAQS on Which the Administrator Is Taking Comment Will Require him To Weigh Numerous Factors To Select an Appropriate Standard Level....65

VII. The Administrator's Proposal To Retain the 24-Hour Primary $PM_{2.5}$ NAAQS Is Appropriate....66

A. Evaluation of the 24-Hour Standard in the Context of the Full Suite of Primary $PM_{2.5}$ Standards Is Appropriate....68

B. The Scientific Evidence Concerning Health Effects of Short-Term $PM_{2.5}$ Exposure Has Not Changed Significantly Since the Previous NAAQS Review....69

1. The Effects Deemed To Have a Causal or Likely Causal Association with Short-Term $PM_{2.5}$ Exposure Have Not Changed....69

2. Uncertainties in and Limitations of the Evidence Supporting EPA's Causality Determinations Remain....70

C. Risks Associated with Exposure to Short-Term $PM_{2.5}$ Exposures Are Overstated in EPA's Risk Assessment....71

D. Retention of the Current 24-Hour $PM_{2.5}$ NAAQS Is Consistent with the CASAC's Advice....74

E. Disbenefits Support the Administrator's Preliminary Judgment that a More Stringent 24-Hour Primary $PM_{2.5}$ NAAQS Would Not Be Appropriate....75

VIII. The Administrator Properly Recognizes There Is No Basis for Increasing the Stringency of the Primary $PM_{10}$ NAAQS....76

IX. The Administrator's Proposal Not To Revise the Secondary NAAQS Is Reasonable and Consistent with the Scientific Evidence....78

A. The Current Secondary NAAQS Provide the Requisite Protection of Visibility....78

B. Revision of the NAAQS To Protect Materials and Climate Is Not Appropriate. ....80

X. Even if EPA Were Conducting a Review of the PM NAAQS, the Appropriate Action Would Be Retention of the Existing Standards. ....82

XI. EPA Should Follow the Suggestions of State, Local, and Tribal Agencies and Their Representatives in Revising Requirements for $PM_{2.5}$ Monitoring. ....83

XII. EPA Should Provide a More Realistic Picture of Costs and Benefits of Revised $PM_{2.5}$ NAAQS Under the Reconsideration Proposal. ....84

A. EPA Cannot Identify a Path Toward Complying with the Reconsideration Proposal's Stringent Standards. ....86

B. EPA's Failure to Estimate the Full Costs of Compliance Conflicts with its Statutory Obligation Under Section 312 of the CAA to Conduct a Comprehensive Analysis of the Impacts of EPA Regulations. ....88

C. EPA Grossly Underestimates the Cost of Controls To Comply with the Reconsideration Proposal's Stringent Standards. ....89

D. EPA Should Quantify Increased Permitting Costs in Attainment and Unclassifiable Areas Under the Reconsideration Proposal's Stringent Standards. ....91

E. Benefits Cited in the Reconsideration Proposal Are Subjective and Highly Uncertain. ....93

F. The Sensitivity of EPA's Benefits Calculations to Population Size Highlights the Need To Quantify Economy-Wide Impacts of More Stringent Standards. ....94

XIII. Conclusion. ....99

Attachment 1: Gradient, Comments on US EPA's Proposed Rule for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (Mar. 21, 2023) ("Gradient Comments")

Attachment 2: American Forest and Paper Association/American Wood Council, Impacts of a Lower Annual $PM_{2.5}$ Ambient Air Quality Standard on the Forest Products Industry (Feb. 2023) ("Impacts")

Attachment 3: NERA Economic Consulting, Estimating the Costs of Fully Attaining Proposed Alternative PM2.5 NAAQS Standards: Technical Comments on the Costs Estimates in the Regulatory Impact Analysis for the Proposed $PM_{2.5}$ NAAQS Rule (Mar. 22, 2023) ("NERA Report")

## I. Introduction.

Members of the NR3 Coalition and their member companies are committed to reducing emissions, consistent with the requirements of the Act, to provide air quality protective of public health and welfare, while continuing to facilitate economic growth in the United States. We, and they, have worked for many years with EPA, states, and local authorities to lower concentrations of PM and other criteria pollutants in ambient air. As a result, between 1970 and 2020, air quality throughout the nation improved dramatically, while both the US gross domestic product and population grew steadily.[17]

With regard to PM specifically, 24-hour average $PM_{10}$ concentrations declined 60 percent nationally between 1990 and 2021.[18] Annual average $PM_{2.5}$ levels fell 29 percent, and 24-hour $PM_{2.5}$ levels fell 34 percent between 2000 and 2021.[19] These reductions of PM in ambient air are, in part, a result of reductions in emissions of direct (primary) PM and of PM precursors made by NR3 Coalition members. Direct emissions of $PM_{10}$ declined by 33 percent, and those of $PM_{2.5}$ declined by 40 percent over this period.[20] Emissions of most PM precursors have also declined: sulfur dioxide ("$SO_2$") by 92 percent, nitrogen oxides ("NOx") by 70 percent, and volatile organic compounds (" VOCs") by 49 percent.[21] Emissions of these pollutants will certainly continue to decline as a result of private sector innovation; existing federal, state, and local programs aimed at reducing emissions; and improvements in energy efficiency.

Efforts at reducing air pollution in the United States have led to much better PM air quality than is experienced by most of the rest of the world. According to the Organisation for Economic

---

[17] *See* EPA, Our Nation's Air: Trends Through 2021, https://gispub.epa.gov/air/trendsreport/2022/#growth_w_cleaner_air (last visited Mar. 5, 2023).
[18] https://gispub.epa.gov/air/trendsreport/2022/#introduction (last visited Mar. 5, 2023).
[19] *Id.*
[20] *Id.*
[21] *Id.*

Co-operation and Development ("OECD"), worldwide average exposure to $PM_{2.5}$ annually in 2018 to 2019 was 42 µg/m$^3$, compared to a US average of 7.7 µg/m$^3$.[22] Average $PM_{2.5}$ exposures are lower in the US than in France, Germany, Japan, and the United Kingdom.[23]

It is against this backdrop that EPA, barely two years after the most recent PM NAAQS review – completed consistent with the timeline specified in § 109(d)(1) of the Act – is conducting a discretionary proceeding to reconsider the adequacy of the existing NAAQS to protect public health and welfare. We believe that, given the discretionary nature of this proceeding, and in the context of historical American air quality and current global air quality, EPA must, for the reasons discussed below, determine that no new, more stringent PM NAAQS is appropriate.

## II. Under Section 109(d)(1), Costs Must Be Considered in Determining Whether To Revise a NAAQS.

The gateway to a revision of a NAAQS is CAA § 109(d)(1). Under that section, EPA must complete a review of NAAQS at least once every five years and determine whether revisions to an existing standard "in accordance with" CAA § 109(b) "*may be appropriate*."[24] In reviewing an existing standard, the Administrator must consider the "latest scientific knowledge" on health effects contained in CAA § 108 criteria and consider advice from CASAC regarding standard revisions, including information on any "adverse health, welfare, social, economic or energy effects which may result from … strategies for attainment and maintenance of such" NAAQS. In determining whether, based on this record, revisions to the standard "may be appropriate," EPA

[22] *See* Air Pollution Exposure, Organisation for Economic Co-operation and Development, 2000-2019, https://data.oecd.org/air/air-pollution-exposure.htm (last visited Mar. 5, 2023).

[23] *Id.*

[24] Section 109(d)(1) establishes a duty to complete an review at least every five years, whereas the "appropriate" language gives the Administrator discretion to decide whether or not to revise a NAAQS. As the Second Circuit held in *EDF v. Thomas*, 870 F.2d 892, 898 (2d Cir. 1989), "as may be appropriate" is "nonmandatory language." That language, according to the court, "clearly suggests that the Administrator must exercise judgment . . . to make some formal decision whether to revise the NAAQS, the content of that decision being within the Administrator's discretion . . . ." *Id.*

must evaluate, and weigh, a broad range of factors that include the adverse consequences associated with implementing a more stringent standard. The Supreme Court's decision in *Michigan v. EPA*,[25] interpreting CAA § 112(n), confirms this reading of CAA § 109(d).

CAA § 112(n) uses an "appropriateness" test to determine whether to regulate hazardous air emissions from power plants, as does § 109(d)(1).[26] And just like CAA § 109(d), the record on which that CAA § 112(n) "appropriateness" determination must be based includes information on "technologies … to control … emissions, *and the cost of such technologies*."[27] In *Michigan*, the Court, quoting then Judge Kavanaugh's dissent below, noted that "'appropriate' is 'the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors.'"[28] As a result, according to the Court, "[a]gencies have long treated costs as centrally relevant factors when deciding whether to regulate."[29] This is because "cost includes more than just the expense of complying with regulations; any disadvantage ... [can be] a cost."[30] And "[n]o regulation is 'appropriate' if it does significantly more harm than good."[31]

In this rulemaking, EPA is reconsidering the determination of the prior Administrator that, under CAA § 109(d)(1), revisions were not "appropriate." To reconsider that "appropriateness" determination, and conclude that revised standards are "appropriate," the current Administrator must consider all costs that would result from implementation of the revisions he would propose.[32] EPA attempts to circumvent the requirements of CAA § 109(d)(1) by styling the rulemaking a

---

[25] *Michigan v. EPA*, 576 U.S. 743 (2015).

[26] An appropriateness finding under CAA § 109(d)(1) is required to undertake a NAAQS standard revision under § 109(b). An "appropriate and necessary" finding under § 112(n) is required to undertake regulation of electric generating units under §§ 112(d) and (f).

[27] *Michigan*, 576 U.S. at 753.

[28] *Id.* at 752.

[29] *Id.*

[30] *Id.*

[31] *Id.*; *see* Paul R. Noe & John D. Graham, *The Ascendancy of the Cost-Benefits State?*, 5 Admin. L. Rev. 85, 109-11 (2020).

[32] *See* Section III.A.

"reconsideration proposal." As discussed in the following section, EPA cannot evade consideration of costs in determining whether or not to revise a NAAQS by invoking an unprecedented procedure.

## III. The Reconsideration Proposal Is Procedurally Unique; the Administrator Must Consider Costs and Burdens; and the Administrator Must Justify Policy Changes After Reconsidering the Entire Record.

If the Administrator finalizes this rulemaking, he will do what no other Administrator has done before – complete reconsideration of a promulgated NAAQS. This reconsideration is entirely discretionary, and the Administrator has substantial flexibility to consider many factors, including costs and burdens, when determining whether to proceed to a final rule. Those factors should compel him to withdraw this reconsideration. Should the Administrator nevertheless proceed with this Reconsideration Proposal, then he must do more than is required under a regular NAAQS rulemaking. He must not only provide a reasonable explanation of his proposed decisions, but also justify changes to existing policy established in the 2020 PM NAAQS Rule. He must do so considering the entire record, including the contrary decisions of his predecessor and the CASAC he disbanded.

Simply put, the Reconsideration Proposal must "reconsider." It does not. Left unaddressed, this oversight renders any final rule emerging from the Reconsideration Proposal arbitrary and capricious. However, EPA cannot wait until preparing that final rule to address these fatal flaws. It first must issue a supplemental proposal to allow the public opportunity to comment meaningfully on EPA's changes.

### A. The Administrator Must Consider Costs and Burdens When Deciding Whether To Proceed with a Discretionary Reconsideration.

The Reconsideration Proposal would add inflationary pressures and increase risk of recession for a post-pandemic economy struggling to recover. It would impose significant new

burdens on states and local governments already facing numerous new requirements under the $PM_{2.5}$ NAAQS and other environmental programs. EPA claims that it may not consider implementation costs and burdens when setting a NAAQS.[33] Yet this overlooks the Administrator's first-order decision – whether to move forward with reconsideration at all.

**1. The Administrator Must Consider Whether the Asserted Benefits Attributable to Reconsidering the Former Administrator's Determination in December 2020 Not To Revise the Current $PM_{2.5}$ Annual Standard Justify the Costs Associated with Revising that Standard.**

As was noted previously, the setting of this proceeding to revise the $PM_{2.5}$ annual standard is rather unusual, insofar as it is taking place outside of (*i.e.*, some two years earlier than) the statutorily prescribed five-year review cycle set forth in CAA § 109(d).[34] EPA styles it as a "reconsideration" proceeding, a procedure to which the Agency has resorted to only once before in the last 50 years.[35] Given the all-but-unprecedented nature of EPA's approach here, it bears noting at the outset that nothing on the face of CAA § 109 actually authorizes the Agency to

[33] 88 Fed. Reg. at 5563.

[34] It is notable, too, that EPA had rarely, if ever, been able to meet the statutorily prescribed schedule for reviewing NAAQS at least every five years, until meeting that deadline, for both the PM NAAQS and the Ozone NAAQS, in December 2020. Up until then, EPA had "routinely tak[en] twice that time before finalizing a review and any accompanying revision." *See* Memorandum from E. Scott Pruitt, Administrator, EPA, to Assistant Administrators, (May 9, 2018), https://www.epa.gov/sites/default/files/2018-05/documents/image2018-05-09-173219.pdf, at 3 (hereinafter "Back-to-Basics"). Under this "Back-to-Basics" memorandum, the Agency announced its "intention to conduct the review of the PM NAAQS in such a manner as to ensure that any necessary revisions were finalized by December 2020," consistent with the provisions of CAA § 109(d)(1). *See* 88 Fed. Reg. 5567. Given unease among some former (and current) EPA career staff concerning the newly-accelerated – if statutorily mandated – review process, contrary to the more deliberate pace of work with which they were accustomed, *see e.g.*, Oral Comments of John Bachmann on behalf of the Environmental Protection Network to EPA Acting Administrator Andrew Wheeler and the Clean Air Scientific Advisory Committee ("CASAC") (Dec. 12, 2018), https://casac.epa.gov/ords/sab/f?p=113:0:10526369326702:APPLICATION_PROCESS=MEETING_FILE:::MM_ID:5314, it is perhaps surprising that EPA now professes such confidence in the output of the current process, and one undertaken in a hyper-abbreviated fashion, comparatively speaking.

[35] History repeats itself. EPA's acknowledged motive in January 2010 for "reconsidering" the Ozone NAAQS it promulgated in March 2008 was an intervening change in presidential administrations. *See* 75 Fed. Reg. 2938, 2943 (Jan. 19, 2010) ("Consistent with a directive of the new Administration regarding the review of new and pending regulations . . . the Administrator reviewed a number of actions that were taken in the last year by the previous Administration," with the "2008 final rule [being] included in this review."); *see also* 88 Fed. Reg. at 5567 ("On January 20, 2021, President Biden issued an 'Executive Order on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis' . . . which directed review of certain agency actions" including the 2020 "Particulate Matter NAAQS Decision.").

"reconsider" a decision by the Administrator not to revise a previously established NAAQS, made in conjunction with an earlier statutorily prescribed NAAQS review. EPA is simply assuming that it has some sort of inherent authority to act in this fashion, since it otherwise points to no statutory provision expressly granting it such authority.[36]

To be sure, the last sentence of CAA § 109(d)(1) provides that the Administrator "may review and revise criteria or promulgate new standards . . . more frequently" than the "five-year intervals" that are "required under this paragraph." But that is not what EPA says it is doing here.[37] Again, EPA purports to be "reconsidering" the decision made by the Administrator in December 2020 to, among other things, leave the $PM_{2.5}$ annual standard unchanged.[38] Based on this "reconsidering," EPA says that the Administrator has now "reached his provisional judgment to propose revising the annual standard level from 12.0 $\mu g/m^3$ to within a range of 9.0 $\mu g/m^3$ to 10.0 $\mu g/m^3$."[39] All this bespeaks a process for revising a NAAQS that is nowhere described on the face of CAA § 109. While this ad hoc approach on EPA's part may be convenient for policy purposes, it is nevertheless problematic statutorily speaking, particularly given that CAA § 109, in providing that both the primary and secondary standards "may be revised" subsequent to their initial promulgation, expressly states that any such revision should be effectuated "*in the same manner*" in which those standards were first "promulgated."[40] That is not what is happening in this instance. The proposal to revise the $PM_{2.5}$ annual standard is not the product of the Agency having initiated

[36] Nor, for that matter, did EPA identify such statutory "reconsideration" authority back in January 2021.
[37] Nowhere in the January 27, 2023, *Federal Register* notice does EPA even mention the last sentence of CAA § 109(d)(1).
[38] *See*, *e.g.*, 88 Fed Reg. at 5560 ("The EPA is *reconsidering* the December 2020 decision because the available scientific evidence and technical information indicate that the current standards may not be adequate to protect public health and welfare, as required by the Clean Air Act.").
[39] 88 Fed. Reg. at 5629.
[40] *See* CAA § 109(b)(1), (2) (emphasis added).

and completed a "thorough review of . . . the national ambient air quality standards" pursuant to CAA § 109(d)(1), and EPA nowhere claims that it is.

A rulemaking proceeding for the "promulgation *or revision* of any national ambient air quality standard" is governed by the provisions of CAA § 307(d)(1)(A). The *only* sort of "proceeding for reconsideration" contemplated under CAA § 307(d) is that described in subparagraph (B) of CAA § 307(d)(7).[41] Such a proceeding is not in view here.

Meanwhile, any assertion by EPA that it possesses some sort of inherent authority to act outside the statutorily prescribed "review" and "determine whether or not to revise" procedures of CAA § 109(d)(1) in reconsidering the former Administrator's December 2020 determination to leave unchanged the $PM_{2.5}$ annual standard must be assessed in light of such precedents as *American Methyl Corp. v. EPA*,[42] where the U.S. Court of Appeals for the D.C. Circuit observed that, "when Congress has provided a mechanism capable of rectifying mistaken actions . . . it is not reasonable to infer authority to reconsider agency action."[43] Here, while EPA is not exactly claiming that the former Administrator's December 2020 determination was "mistaken,"[44] to the extent the Agency now takes issue with the former Administrator's judgment in finding that the current $PM_{2.5}$ annual standard was "requisite to protect the public health," while allowing for an "adequate margin of safety," Congress has provided an express "mechanism" by which EPA is

[41] Subparagraph (B) provides that "the Administrator shall convene a *proceeding for reconsideration* of the rule" in those circumstances where a person who seeks to challenge a final rule on the basis of an objection not raised during the public comment period "can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule." CAA § 307(d)(7)(B) (emphasis added). Although petitions were filed seeking reconsideration of the 2020 decision retaining the PM NAAQS, the Administrator did not refer to those petitions when he announced he would reconsider that decision. *See* Press Release, EPA, *EPA to Reexamine Health Standards for Harmful Soot that Previous Administration Left Unchanged* (June 10, 2021).

[42] *American Methyl Corp. v. EPA*, 749 F.2d 826 (D.C. Cir. 1984).

[43] *See id.*, 749 F.2d at 835; *accord New Jersey v. EPA*, 517 F.3d 574, 583 (D.C. Cir. 2008).

[44] Specifically, EPA states that it is "reconsidering the December 2020 decision because the available scientific evidence and technical information indicate that the current standards may not be adequate to protect public health and welfare." 88 Fed. Reg. at 5560.

authorized to "review" and determine whether or not to "revise" that determination – *i.e.*, the procedures set forth expressly in CAA § 109(d)(1). It was incumbent on EPA to avail itself of those carefully crafted procedures, not to embark on an abbreviated "reconsideration" proceeding nowhere contemplated under CAA § 109 that is not constrained by those procedures.

In any event, assuming, for the sake of argument, that EPA is authorized under the Act to take the specific action at issue here – *i.e.*, the current Administrator's proposal to revise the $PM_{2.5}$ annual standard on the basis of his ad hoc "reconsideration" of the prior Administrator's decision in December 2020 to leave that standard unchanged[45] – the Agency remains obligated to engage in reasoned decision making. In the specific context here, this requires the Administrator to take account of the full range of costs associated with any decision on his part to "reconsider," and then depart from, his predecessor's determination to leave the current $PM_{2.5}$ annual standard unchanged. Failure to do so would render any such final action on the Administrator's part arbitrary and capricious, in that the costs associated with moving forward to promulgate a more stringent standard is obviously a "relevant factor" that the Administrator must consider, an "important aspect of the problem" that the Administrator cannot reasonably ignore.[46]

EPA gives no indication that it understands its obligations in this regard. In the January 27 *Federal Register* notice, EPA states that, "[i]n setting the NAAQS, the EPA may not consider the costs of implementing the standards," something that "was confirmed by the Supreme Court in *Whitman v. American Trucking Associations*, 531 U.S. 457, 465-472, 475-76 (2001)."[47] EPA's

---

[45] The NR3 Coalition does not concede that such is the case. Should EPA proceed to take final action in this matter and promulgate a more stringent $PM_{2.5}$ annual standard, the Agency must, at a minimum, identify the statutory basis upon which it is relying for conducting this "reconsideration" proceeding.

[46] *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (hereinafter "*State Farm*").

[47] *See* 88 Fed. Reg. at 5563; *see also id.* at 5564 ("In setting primary and secondary standards that are 'requisite' to protect public health and welfare, respectively, as provided in section 109(b), the EPA's task is to establish standards that are neither more nor less stringent than necessary. In so doing, the EPA may not consider the costs of implementing the standards. *See generally Whitman v. American Trucking Associations*, 531 U.S. 457,

repeated, reflexive invocation of *Whitman* suggests that the Agency has missed the point. In the present context – where the threshold issue is whether EPA should proceed to regulate at this time at all – *Whitman* does not control.

More pertinent to this threshold issue are observations made by the Supreme Court in *Michigan*, where the majority took note of the reality that "[a]gencies have long treated cost as a centrally relevant factor when deciding *whether to regulate*."[48] Further, the majority explained, the "[c]onsideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions."[49]

Notably, the dissenters in *Michigan* themselves raised no objection to the majority's observation that the "consideration of cost" should ordinarily weigh heavily on an agency's decision *whether* to regulate. "Cost is almost always a relevant – and usually, a highly important – factor in regulation," the dissent acknowledged, and "[u]nless Congress provides otherwise, an agency acts unreasonably in establishing 'a standard-setting process that ignore[s] economic considerations.'"[50] "That is because," the dissent continued, "at a minimum," such a process "would 'threaten[] to impose massive costs far in excess of any benefit.'"[51] "[A]bsent contrary indication from Congress," the dissent concluded, "an agency *must* take costs into account in some manner before imposing significant regulatory burdens."[52]

465-472, 475-76 (2001)."); *id.* ("As previously noted, the Supreme Court has held that section 109(b) 'unambiguously bars cost considerations from the NAAQS-setting process.' *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 471 (2001)."); *id.* n.7 ("Indeed, were the EPA to consider costs of implementation when reviewing and revising the standards 'it would be grounds for vacating the NAAQS.' *Whitman*, 531 U.S. at 471 n.4.").

[48] *Michigan*, 576 U.S. at 753 (2015) (emphasis added).

[49] *Id.* (emphasis in original).

[50] 576 U.S. at 769 (Kagan, J., dissenting) quoting *Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst.*, 448 U.S. 607, 670 (1980) (Powell, J., concurring in part and concurring in judgment).

[51] 576 U.S. at 769 (Kagan, J., dissenting), quoting *Entergy Corp. v. Riverkeeper, Inc.*, 556 U. S. 208, 234 (2009) (Breyer, J., concurring in part and dissenting in part).

[52] 576 U.S. at 769 (Kagan, J., dissenting).

In the present case, where EPA is choosing to act outside the statutorily prescribed procedure for reviewing an existing NAAQS, it cannot be plausibly asserted that Congress has precluded EPA from taking costs into consideration in proceeding to regulate. Before EPA can address the matter of how the current $PM_{2.5}$ annual standard might be revised, the Agency must first confront the threshold consideration *whether* to disturb the former Administrator's December 2020 determination that revisions to that standard were not appropriate. In deciding *that* question, EPA *must* take costs into consideration.

Finally, in this "reconsideration" setting, should EPA proceed to promulgate revisions to the $PM_{2.5}$ annual standard, as it is proposing to do, the Administrator must consider the broader social and economic impacts of the revised NAAQS in determining an acceptable level of risk. Here, where the threshold question is *whether* to regulate at all, or leave the current $PM_{2.5}$ annual standard unchanged, it is incumbent on EPA to bear in mind that, in summarizing its holding in *Whitman*, the Supreme Court has said "EPA may not consider *implementation costs* in setting primary and secondary NAAQS under § 109(b) of the CAA."[53] The Court did not otherwise construe CAA § 109(b) as imposing any sort of blanket prohibition on EPA's taking account of *other* types of costs – *i.e.*, those which, in current parlance, are typically labeled "disbenefits" – in setting a NAAQS. In this context, among the disbenefits that EPA would have to consider in any reasonable exercise of its decision making authority would, at a minimum, be those that, as it so happens, are specifically listed in CAA § 109 itself – *i.e.*, adverse "public health," "welfare," "social," "economic," and "energy" effects. [54]

---

[53] *See Whitman*, 531 U.S. at 486 (emphasis added).

[54] *See* CAA § 109(d)(2)(C)(iv). In a *per curiam* opinion issued some 18 years after *Whitman*, a D.C. Circuit panel rejected an argument advanced by certain industry petitioners who, as the court then characterized it, had "argue[d] that . . . consideration" by EPA "of other 'adverse economic, social, and energy impacts' is required" in the NAAQS-setting process. *See Murray Energy Corp. v. EPA*, 936 F.3d 597, 621 (D.C. Cir. 2019). "[A]t bottom," the panel believed, "this is the same argument rejected in *Whitman*, with the 'costs' of the revised and more stringent NAAQS merely reframed as 'impacts.'" *Id.* at 621. Such "impacts," the court said, were really "no

With this as a backdrop, the observation of Justice Breyer, writing separately in *Whitman* to the effect that the "statute . . . permits the Administrator to take account of *comparative health risks*," can be seen in a fuller context. *See Whitman*, 531 U.S. at 495 (Breyer, J. concurring in part and concurring in the judgment) (emphasis added). The Administrator, Justice Breyer said, "may consider whether a proposed rule promotes safety overall," given that a "rule likely to cause more harm to health than it prevents is not a rule that is 'requisite to protect the public health.'" *Id.*

Justice Breyer emphasized, in particular, that it bore noting that the very phrase in CAA § 109(b)(1) – "in the judgment of the Administrator" – operates to "grant[] the Administrator considerable discretionary standard-setting authority." 531 U.S. at 595.[55] "The statute's words,"

---

different than the 'economic costs' that the petitioners in *Whitman* worried 'might produce health losses sufficient to offset the health gains achieved in cleaning the air – for example, by closing down whole industries and thereby impoverishing the workers and consumers dependent upon those industries.'" 936 F.3d at 621-22, *quoting Whitman*, 531 U.S. at 466. The court said that "*Whitman* forbids EPA from taking these considerations into account, however denominated." *Id.*, 936 F.3d at 622. Writing nearly two decades removed from *Whitman*, the panel failed to appreciate that the Supreme Court's holding was expressly, and exclusively, focused on "*implementation* costs," as a more careful reading of the decision on its part would have made clear. Indeed, at the very outset of his *Whitman* opinion, Justice Scalia had so framed the matter: "These cases present the following questions: ". . . (2) Whether the Administrator may consider the *costs of implementation* in setting national ambient air quality standards (NAAQS) under § 109(b)(1)." 531 U.S. at 462. Then, writing some 15 years after *Whitman*, Justice Scalia observed in *Michigan* that "'cost' includes more than the expense of complying with regulations; *any disadvantage could be termed a cost*." 576 U.S. at 752 (emphasis added). In this specific context, the *Michigan* majority had taken issue with "EPA's interpretation" of the statutory provision at issue in that case, in that it "precludes the Agency from considering *any* type of cost – including, for instance, harms that regulation might do to human health or the environment." *Id.* (emphasis in original). While the panel in *Murray Energy* otherwise discussed the Supreme Court's *Michigan* decision, it did not address this part of the opinion.

[55] Justice Breyer's acknowledgment of the fact that CAA § 109 affords the EPA Administrator "considerable standard-setting authority" is particularly significant, in that it was made even though neither he, writing separately, nor Justice Scalia, writing for the Court in *Whitman*, had discussed the specific language of CAA § 109(d)(1), which, as was noted previously, indicates that, in the course of the mandatory five-year statutory review process, NAAQS are to be revised only "as may be appropriate," language that speaks directly to the broad scope of the Administrator's discretion. It is difficult to account for the *Whitman* Court's failure to interact with this critically important statutory language, particularly since industry respondents had in their own brief pointed to that same language in arguing that, in order to "establish that standard revision is 'appropriate' in accordance with §§ 108 and 109(b), the Agency must explain why a change in the status quo is 'requisite' to protect public health." *See* Brief for Respondents Appalachian Power Company, et al., in Support of Petitioners 39-40, *Am. Trucking Ass'ns v. Browner*, 530 U.S. 1259 (2000). "In other words," the industry respondents had further argued, the Administrator was required to "explain why the existing standard is no longer 'appropriate' in accordance with §§ 108 and 109(b) and the revised standard is." *Id.* at 40. Whatever the explanation, insofar as the *Whitman* Court failed to come to grips with this key bit of statutory language, this necessarily raises some doubts as to the continued vitality of the Court's holding even as to the consideration of "implementation costs," given the Court's subsequent elaboration, in *Michigan*, that "'appropriate' is 'the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors.'" *Michigan*, 576 U.S. at 752, *quoting White Stallion Energy Ctr.,*

he continued, "authorize the Administrator to consider" a wide range of relevant factors, including "the severity of a pollutant's potential adverse health effects, the number of those likely to be affected, the distribution of the adverse effects, and the uncertainties surrounding each estimate." *Id.* Further, the plain language of the statute "permits the Administrator to take account of comparative health consequences," while at the same time allowing him to "take account of context when determining the acceptability of small risks to health." *Id.* In the particular context of a "reconsideration" proceeding, where the Administrator is under no statutory obligation to act, he must embrace the comprehensive range of discretion that is afforded him, lest any decision he may make fail to reflect reasoned decision making.[56]

**2. The Administrator Should Withdraw the Reconsideration Proposal Because it Creates Regulatory Uncertainty and Burdens in Economically Challenging Times.**

The Administrator would not be the first to consider costs and burdens when withdrawing a NAAQS reconsideration. On September 2, 2011, the Obama Administration's Office of Information and Regulatory Affairs ("OIRA") sent EPA a letter directing it to withdraw a reconsideration of the Ozone NAAQS similar to the current reconsideration proceeding. Recognizing the need to "minimize regulatory *costs and burdens*, particularly in this economically

---

*LLC v. EPA*, 748 F.3d 1222, 1266 (D.C. Cir. 2014) (opinion of Kavanaugh, J.). When confronted by this very assertion in *Murray Energy*, the D.C. Circuit had to concede that the *Whitman* Court had nowhere addressed the "as may be appropriate" language of CAA § 109(d)(1), as is evidenced by the fact that the D.C. Circuit could but cite to its *own* decision in the case below in replying that "[w]e have already rejected the idea that 'appropriate' in section 109(d) requires consideration of economic costs." *Murray Energy*, 936 F.3d at 622, *citing Am. Trucking Ass'ns, Inc. v. EPA*, 175 F.3d 1027, 1040-41 (D.C. Cir. 1999). In the case below, however, the D.C. Circuit had done little more than point out that the "clause immediately following 'appropriate' . . . incorporates § 109(b) and thereby affirmatively precludes consideration of costs in revising NAAQS." *See* 175 F.3d at 1040. Apart from the seeming circularity of the D.C. Circuit's reasoning here, it must again be pointed out that nowhere in its *Whitman* decision did the Supreme Court discuss the "as may be appropriate" language in CAA § 109(d)(1), nor indicate that the D.C. Circuit's earlier take on the matter was correct as a matter of statutory interpretation.

[56] *See, e.g.*, *American Lung Ass'n v. EPA*, 985 F.3d 914, 944 (D.C. Cir. 2021), *rev'd on other grounds sub nom*, *West Virginia v. EPA*, 142 S. Ct. 2587 (2022) (A "regulation must be declared invalid, even though the agency might be able to adopt the regulation in the exercise of its discretion, if it 'was not based on the agency's own judgment but rather on the unjustified assumption that it was Congress' judgment that such a regulation is desirable' or required."), *quoting Prill v. NLRB*, 755 F.2d 941, 948 (D.C. Cir. 1985).

challenging time," the OIRA letter stated that "finalizing a new standard now is not mandatory and could produce needless uncertainty."[57] Notably, OIRA relied on this rationale despite explicitly "recogniz[ing] that the relevant provisions of the Clean Air Act forbid EPA to consider costs in deciding on the stringency of [NAAQS]"[58] – implying that CAA § 109(b)'s prohibition of the consideration of costs and burdens does not apply to the decision to move forward on a discretionary reconsideration under CAA § 109(d)(1). President Obama was even more direct in an accompanying press statement, stating that he requested the withdrawal due to "the importance of reducing regulatory burdens and regulatory uncertainty, particularly as our economy continues to recover."[59]

The country is, once again, facing economically challenging times. Similarly to twelve years ago, quarterly gross domestic product hovers at or just above recession levels, and today there is the added burden of high prices for consumer goods driven by historic inflationary pressure and challenges for the banking system. President Obama's concern that a reconsideration could create regulatory burdens and uncertainty for the economy was understandable at the time, and holds true today. Taken together, costs arising from the Reconsideration Proposal, if finalized, would undermine the competitiveness of American manufacturing and the businesses that support critical infrastructure and electricity needs of the U.S. The Reconsideration Proposal would drive business to countries with weaker environmental standards and less stringent worker safety laws.

---

[57] Letter from Cass Sunstein, OIRA Administrator, to Lisa Jackson, EPA Administrator (Sep. 2, 2011) (hereinafter "OIRA Letter") (emphasis added).

[58] OIRA Letter at 1 (emphasis added). Notably, the D.C. Circuit declined to rule on this withdrawal, finding that it "lacks jurisdiction" over a "non-final decision" on a "voluntary revision" of NAAQS. Order # 1359125, *Am. Lung Assoc. v. EPA*, No. 11-1396 (D.C. Cir. Feb. 17, 2012).

[59] Press Release, Statement by the President on the Ozone National Ambient Air Quality Standards (Sep. 2, 2011) ("Obama Ozone Reconsideration Statement").

#### a. Even When Considering Statutory Provisions To Address Background Concentrations, EPA's Analysis Shows the Proposed Standards Will Be Unattainable.

Congress intended for NAAQS to be "*national*" ambient air quality standards; thus, EPA is not required to tailor these national regulations for a specific region or locality.[60] Instead, EPA should account for background levels of air pollution during enforcement, not when setting standards.[61] It is for this reason, among others, that the CAA addresses high background levels–with the exclusion of exceptional events under CAA § 319(b), and ozone-specific provisions addressing international pollution and rural transport under CAA §§ 179B and 182(h)–outside of the standard setting process.

It is therefore surprising that EPA's PM NAAQS reconsideration side steps legal precedent and loosely interprets statutory criteria to provide for little to no interest balancing against on the ground constraints of cost and technical feasibility. For example, EPA's PM NAAQS reconsideration provides extensive evidence that questions concerning high background levels and attainability are not isolated in nature nor ones that can be addressed through the existing CAA exceptional event provision. Such actions by EPA would place a heavy burden on the States, who remain subject to the imposition of sanctions for failure to achieve unrealistic benchmarks which the Agency should not be considering as a topic in this rulemaking in the first instance.[62]

EPA's draft RIA demonstrates the magnitude of the attainment challenge. Despite developing a menu of known $PM_{2.5}$ controls[63] and excluding EPA-concurred exceptional events

---

[60] *See Am. Petrol. Inst. v. Costle*, 665 F.2d 1176, 1186 (D.C. Cir. 1981) ("[T]he agency need not tailor national regulations to fit each region or locale.").

[61] *Murray Energy*, 936 F.3d at 624 ("[E]ven if, as the states claim, it is more difficult to meet the terms of these exceptions than EPA asserts . . . the fact remains that Congress decided that EPA should account for background ozone during enforcement, not when setting standards.")

[62] See *supra*, discussion on *Am. Petrol. Inst. v. Costle*, 665 F.2d at 1186, and *Murray Energy*, 936 F.3d at 624.

[63] *See* US EPA, *Important Information Concerning the Menu of Control Measures* (Sept. 2022), https://www.epa.gov/sites/default/files/2016-02/documents/menuofcontrolmeasures.pdf.

and air quality deemed "atypical, extreme, or unrepresentative,"[64] EPA's own analysis could not identify or assess the cost of controls necessary for all areas of the country to attain the *current* $PM_{2.5}$ standards (12µg/m$^3$ annual standard/35µg/m$^3$ 24-hour standard). In fact, seven counties in California exhaust all of the candidate controls available to them without attaining the *current* annual standard, while Fresno County, California, and another nine counties in the RIA's West region are projected to still fail to meet the current *daily* standard of 35 µg/m$^3$.[65] As NERA's analysis of the draft RIA notes:

> Several of the major counties for which this RIA projects only partial attainment with the alternative standards actually enter the RIA's cost analysis with zero remaining options in the CoST [Control Strategy Tool] input data set. The RIA's partial cost analysis therefore estimates that these counties' costs for getting to 10/35, 9/35, or 8/35 are *zero* (*i.e.*, $0 per year). This is a remarkable example of this RIA's incompleteness, given that the RIA's analysis is actually finding that these counties face a huge remaining challenge (and compliance cost) even if the current standard is not tightened at all.[66]

Given that the draft RIA already excludes agreed-to Exception Events and atypical air quality events which could be considered exceptional, these counties face sanctions and perpetual nonattainment under the CAA for the $PM_{2.5}$ standards – outcomes not envisioned by Congress. Nor is California suffering from a lack of commitment or enforcement. In fact, the RIA assumes an additional 75 percent reduction in California $NO_x$ emissions projected to remain by 2032 before estimating the number of tons of direct $PM_{2.5}$ reduction still needed for these California

[64] 2022 Draft RIA at 2A-21.

[65] NERA Economic Consulting, Estimating the Costs of Fully Attaining Proposed Alternative $PM_{2.5}$ NAAQS Standards: Technical Comments on the Costs Estimates in the Regulatory Impact Analysis for the Proposed $PM_{2.5}$ NAAQS Rule at 41 n.70 (Mar. 22, 2023) ("NERA Report"), Attachment 3. This report has been submitted to Docket EPA-HQ-OAR-2015-0072, but has not yet been assigned a docket number.

[66] *Id*. at 15 (noting that when developing its lists of identifiable control measures and their associated annual costs for attaining each of the alternative standards that the RIA addresses, EPA uses the CoST module, and associated datasets generally referred to as the Control Measures Database (CMDB)).

nonattainment areas to attain the current $PM_{2.5}$ standard.[67] Even with this optimistic assumption, EPA could not identify controls for significant portions of the still-needed reductions.

**Table A-1. California Counties in Partial Attainment of Current 12/35 Standard**

| California County Not Attaining Annual Standard of 12 ug/m$^3$ by 2032 | Emissions Reductions in Direct $PM_{2.5}$ Needed to Attain 12/35 (tons) | Direct $PM_{2.5}$ Reductions Identified by CoST Model Before Reaching Its Limit (tons and % of tons needed) | Direct $PM_{2.5}$ Emissions Reductions Still Needed for Attaining 12/35 in the "Partial" Analytical Baseline (tons) |
|---|---|---|---|
| Imperial | 349 | 92 (26%) | 257 (74%) |
| Kern | 791 | 563 (71%) | 228 (29%) |
| Kings | 104 | 43 (41%) | 61 (59%) |
| Los Angeles | 313 | 313 (100%) | 0 (0%) |
| Plumas | 1,244 | 108 (9%) | 1,136 (91%) |
| Riverside | 1,478 | 192 (13%) | 1,286 (87%) |
| San Bernadino | 2,209 | 2,139 (97%) | 70 (3%) |
| Tulare | 230 | 177 (77%) | 53 (23%) |

EPA's October 2022 proposed decision to disapprove the San Joaquin Valley's state implementation plan for the 2012 $PM_{2.5}$ standards confirms the dire nature of this attainability challenge.[68] Backstopped by a decision of the U.S. Court of Appeals for the Ninth Circuit on the 2006 24-hour $PM_{2.5}$ standard for the San Joaquin Valley, EPA's proposed disapproval of the 2012 SIP cites the court's opinion with regard to the speculative nature of the proposed SIP controls: "[b]ecause these speculative assertions are unsupported by the evidence, they fail to ensure that California and the District have a plausible strategy for achieving this portion of the attainment strategy, and therefore do not collectively satisfy the second factor of the EPA's three-factor test." The court concluded that the EPA's analysis with respect to the second factor for evaluating enforceable commitments was arbitrary and capricious, vacated the final rule with respect to this factor, and remanded this matter to EPA for further consideration.[69]

---

[67] NERA Report at 41.
[68] 87 Fed Reg. 60,494 (Oct. 5, 2022).
[69] *Med. Advocs. for Healthy Air v. EPA,* Case No. 20-72780, 2022 WL 1109656 (9th Cir. 2022).

Notably, EPA's draft RIA does not offer California a remedy in the form of new technologies or ways to attain the existing standard. Instead, the draft RIA simply moves on to offer an expanded analysis of partial attainment of the newly proposed more stringent standards, demonstrating that this attainment gap only widens as EPA lowers the proposed standards. In evaluating an alternative annual standard of 10.0 $\mu g/m^3$ (while holding the daily standard at 35.0 $\mu g/m^3$) EPA is only able to identify 3,591 tons to reduce (*i.e.*, 29 percent) of the 12,491 tons needed to bring all areas into attainment. Roughly 71 percent or 8,930 tons of the needed reductions remain unidentified. At an alternative standard of 8.0 $\mu g/m^3$, only 80 of the initial 141 counties reach attainment.[70]

This is clear evidence of a breaking point having been reached, born of the statutory interpretations previously embraced by the courts. Despite its significant resources and history overseeing the implementation of the CAA, EPA is unable to propose a path by which States can achieve its newly proposed standards, assuring that more States will be subject to sanctions for failing to submit approvable plans. There is no evidence that Congress anticipated this degree of challenge or sustained likelihood of failure, much less intended such a result. Accordingly, EPA should defer any revision to the current standards pending development of strategies to attain any revised standard throughout the nation.

### b. The Reconsideration Proposal's Impact on Nonattainment Areas Would Be Substantially More Than Estimated by EPA.

The breadth of this present reconsideration is likely unprecedented. EPA's own data indicate that nearly half of the country's population would live in counties that could not attain an annual $PM_{2.5}$ NAAQS at the lower end of the range for which the Reconsideration Proposal

[70] NERA Report at 16.

requests comment.[71] A nonattainment designation under the Act would directly affect the economic vitality of these communities by making it difficult to attract and develop business.

Existing business operations would be required to install more restrictive emission control technology than is used for similar operations in attainment areas (*i.e.*, reasonably available control technology ("RACT"))[72] and may be required to do even more if necessary to attain the NAAQS.[73] As evidenced by the fact that EPA's RIA cannot identify controls that attain the potential range of standards, it could be significantly more challenging to identify controls to reach a revised $PM_{2.5}$ NAAQS than was the case with the withdrawn 2011 Ozone NAAQS reconsideration.

With many traditional sources of $PM_{2.5}$ already well-controlled, states would increasingly be required to look to control novel source categories that, unlike major sources, lack consolidated ownership, such as small businesses or residential wood combustors, or sources of emissions with no owner at all, such as non-point sources and forest fires, impacting local and state government budgets. Lacking a history of NAAQS regulation, many of these smaller sources potentially impacted by the Reconsideration Proposal likely remain unaware of the potential impacts of this reconsideration and, as a result, are not likely to participate in the rulemaking process without further outreach of the variety EPA has proposed in some of its most recent and economically significant rulemakings.

Moreover, companies building new facilities or performing major modifications to existing facilities in a nonattainment area that result in increased emissions of $PM_{2.5}$ or its precursors would be required to install emission reduction technology that produces the lowest achievable emission

[71] *See* Section XII.F., *infra*.
[72] CAA § 172(c)(1).
[73] *Id.* § 188(e) (requiring the most stringent measures that are included in the implementation plan of any State or are achieved in practice in any State for areas seeking extension of the attainment deadline for a Serious nonattainment area).

rate, without consideration of cost.[74] These companies would also be required to obtain offsets for such emissions by reducing emissions from other existing sources in a nonattainment area.[75] Available offsets have become more difficult, if not impossible, to find in many parts of the country. If no party is willing or able to provide offsets, then the project simply cannot go forward.

A nonattainment designation also gives EPA authority to intervene in and revise any state permitting decision affecting the nonattainment area, even if EPA has delegated permitting authority to the state.[76] A nonattainment designation can even profoundly affect infrastructure development vital to the business community. Beginning one year from the date of the nonattainment designation, federally supported highway and transit projects cannot proceed without a state demonstration that the project will not cause an increase in emissions.[77]

Nonattainment areas do not escape regulatory burden even if so-designated only briefly. Even after achieving attainment, these areas face a lasting legacy of EPA regulatory oversight. Before a nonattainment area can be redesignated to attainment, EPA must receive and approve an enforceable maintenance plan for the area that specifies measures providing continued maintenance of the NAAQS.[78]

EPA estimates that controls under this reconsideration could cost as much as $1.8 billion per year[79] but admits that amount "may be underestimated."[80] It is a gross underestimation. As explained further in Section XII of these comments, *infra*, EPA clearly underestimated that amount by only calculating costs for partial attainment. Indeed, control costs resulting from the

[74] *Id.* § 173(a)(2).
[75] *Id.* § 173(a)(1)(A).
[76] *Id.* § 505(b).
[77] *Id.* § 176(c).
[78] *Id.* § 107(e)(iv).
[79] Regulatory Impact Analysis for the Proposed Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, ES-14, tbl. ES-5 (hereinafter "RIA").
[80] *Id.* at 4-11.

reconsideration proposal could reach $23 billion per year.[81] Even that does not reflect all of the Reconsideration Proposal's economic burdens, including lost business opportunities from the stigma of nonattainment. Ignoring exponentially increasing costs of unknown controls does not change the heavy price Americans living in nonattainment areas would pay if EPA finalized the Reconsideration Proposal.

**c. The Reconsideration Proposal, if Finalized, Could Result in Vast Economic Impacts to Attainment Areas that EPA Does Not Estimate.**

Growing implementation challenges for Prevention of Significant Deterioration ("PSD") permitting extend the Reconsideration Proposal's impact to attainment and unclassifiable areas, as well. Before a major source can be built, modified, or expanded in an attainment or unclassifiable area, the source's proponent must obtain a permit, a condition of which is a modeling demonstration that the source will not cause or contribute to a $PM_{2.5}$ NAAQS or increment violation.[82] In addition, the source must make use of the best available control technology.[83]

Companies seeking to build or modify such projects and support development in local communities already face numerous challenges in making the necessary demonstrations under current NAAQS. These challenges include the layers of conservatism built into the required modeling analysis and the fact that truly representative monitored background air quality to be added to modeled concentrations may be unavailable.[84] These challenges would be amplified if the level of the standard were lowered close to background concentration. As a result, communities across the country would face increasing, expensive delays and difficulties in permitting new or expanded facilities, including for manufacturing, for new, state-of-the-art

[81] NERA Report at 3.
[82] Id. § 165(a)(3).
[83] *Id.* § 165(a)(4).
[84] *See* Section V.A., *infra*.

projects that create jobs and bring much-needed tax revenue to local communities in critical need of economic development.

### 3. The Administrator Should Withdraw the Reconsideration Proposal Because it Would Burden State Officials with Inconsistent, Incompatible, and Duplicative Requirements.

Beyond consequences for local economies, the Reconsideration Proposal would impose additional administrative burdens on state and local officials already working to implement multiple existing NAAQS. OIRA's comments on these concerns in 2011 are equally applicable today. Reminding EPA that President Obama's E.O. 13563 required agency actions to "avoid regulations that are inconsistent, incompatible, or duplicative with its other regulations,"[85] OIRA pointed out that the "Act explicitly sets out a five-year cycle for review of [NAAQS]."[86] With this schedule in mind, OIRA warned that finalizing an out-of-cycle ozone NAAQS reconsideration "would be problematic in view of the fact that a new assessment, and potentially new standards, will be developed in the relatively near future."[87] President Obama put a finer point on the issue, saying that "ultimately, I did not support asking state and local governments to begin implementing a new standard that will soon be reconsidered."[88]

On its current schedule, EPA would finalize this PM NAAQS reconsideration with potentially stringent new $PM_{2.5}$ standards this year. EPA would require states to implement not only the new $PM_{2.5}$ NAAQS but also the 2012 and 2006 $PM_{2.5}$ NAAQS, the $PM_{10}$ NAAQS, and, in some cases, aspects of the 1997 $PM_{2.5}$ NAAQS. This redundancy poses challenges for states, as the timelines for implementing these standards do not coincide.

[85] OIRA Letter at 2.
[86] *Id.* at 1.
[87] *Id.*
[88] Obama Ozone Reconsideration Statement.

Section 110(a)(2) lists numerous requirements state, local, and tribal agencies must meet as part of developing state implementation plans ("SIPs") for each NAAQS. These requirements include setting up and operating ambient air quality monitors and collecting and reporting the resulting data;[89] providing for enforcement of measures and regulation of new and modified sources;[90] prohibiting activity that would contribute significantly to nonattainment or interfere with measures to prevent significant deterioration of air quality or protect visibility in another state;[91] providing assurances of adequate resources and legal authority to implement SIPs;[92] requiring emissions monitoring for certain stationary sources;[93] establishing authority for emergency actions to protect public health;[94] providing for future SIP revisions in response to changing NAAQS or findings of SIP inadequacy;[95] meeting nonattainment planning requirements, if applicable;[96] meeting requirements related to consultation and public notification;[97] performing air quality modeling, if requested, to predict effects on air quality from pollutant emissions;[98] establishing a program of permitting fees to cover costs of permits required under the SIP;[99] and providing for consultation and participation by local political subdivisions affected by the SIP.[100] States with $PM_{2.5}$ nonattainment areas face additional requirements depending on the area's nonattainment classification.[101]

---

[89] CAA § 110(a)(2)(B).
[90] *Id.* § 110(a)(2)(C).
[91] *Id.* § 110(a)(2)(D).
[92] *Id.* § 110(a)(2)(E).
[93] *Id.* § 110(a)(2)(F).
[94] *Id.* § 110(a)(2)(G).
[95] *Id.* § 110(a)(2)(H).
[96] *Id.* § 110(a)(2)(I).
[97] *Id.* § 110(a)(2)(J).
[98] *Id.* § 110(a)(2)(K).
[99] *Id.* § 110(a)(2)(L).
[100] *Id.* § 110(a)(2)(M).
[101] *Id.* § 189.

Given the changing nature of $PM_{2.5}$ sources, EPA and states lack adequate information on local emissions sources, international emissions, exceptional events, appropriate controls, and air quality modeling needed to identify attainment strategies and effectively accomplish these tasks. EPA information on emissions estimates and control costs is often based on outdated and inconsistent data, confirming a lack of preparedness to implement any new $PM_{2.5}$ NAAQS. Compounding these challenges for state agencies, EPA has not issued adequate guidance on appropriate ways to estimate and control non-traditional sources, the emissions of which will be increasingly necessary to control under more stringent $PM_{2.5}$ NAAQS.

These requirements would be layered on top of numerous other administrative demands created by recently promulgated environmental regulations. Taken together, these requirements impose enormous, potentially inconsistent, incompatible, and duplicative burdens on state regulators. EPA should withdraw this reconsideration so it does not ask state and local governments to begin implementing an unnecessary and unjustified new NAAQS.

**B. The Reconsideration Proposal Is Arbitrary and Capricious Because it Does Not Reconsider the Entire Record and Justify Changes to Existing Policy.**

The Reconsideration Proposal states the basis for the Administrator's proposed decisions: "key aspects of the available health effects evidence[] and conclusions contained in the 2019 ISA and ISA Supplement, quantitative exposure/risk analyses and policy evaluations presented in the PA, advice from the CASAC, and public comment received as part of this reconsideration."[102] While explaining what the Administrator considered in making a NAAQS decision might ordinarily suffice, a reconsideration requires more. To reconsider something, one must "discuss or take up (a matter) *again*"[103] or "consider *again* especially with a view to changing or

[102] 88 Fed. Reg. at 5560.
[103] *Reconsider*, BLACK'S LAW DICTIONARY 1300 (8th ed. 2004) (emphasis added).

reversing."[104] In other words, a reconsideration must "reconsider," and not simply replace, a previous agency decision. Otherwise, it is inherently arbitrary and capricious.

This is not simply a matter of logic and linguistics; it is the law. When an agency changes policy, it must provide a "reasoned explanation" for "disregarding facts and circumstances that underlay . . . the prior policy" and, in doing so, provide a "more detailed justification" than it would for a new policy.[105] As the Northern District of California explained when overturning the Department of the Interior's 2018 recission of the 2016 Waste Prevention Rule, "an agency cannot flip-flop regulations on the whims of each new administration."[106] Instead, reasoned decision-making requires that, when departing from precedents or practices, an agency must "offer a reason to distinguish them or explain its apparent rejection of their approach."[107] "[H]owever the agency justifies its new position, what it may not do is 'gloss[] over or swerve[] from prior precedents without discussion.'"[108] Regardless how an agency chooses to characterize its action, its earlier determination is "clearly a 'relevant factor' the agency had to consider."[109]

The question is "whether [EPA] has provided a rational explanation of how it treated the evidence before it."[110] The universe of evidence now before EPA is that contained in the docket listed in the *Federal Register* for the Reconsideration Proposal, the same one established in 2015 for the review that culminated in the 2020 PM NAAQS Rule now under reconsideration: EPA-

---

[104] *Reconsider*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/reconsider (emphasis added).
[105] *FCC v. Fox*, 556 U.S. at 515 (2009).
[106] *California. v. Bernhardt,* 472 F. Supp.3d 573, 600-601 (N.D. Cal. 2020) (explaining further that agencies must use reasoning, deliberation, and process when reconsidering existing policy "because markets and industries rely on stable regulations.").
[107] *Physicians for Soc. Resp. v. Wheeler*, 956 F. 3d 634, 644 (D.C. Cir. 2020) (quoting *Southwest Airlines v. FERC*, 926 F.3d 851, 852 (D.C. Cir. 2019)).
[108] *Id.* (*quoting Southwest Airlines*, 926 F.3d at 856).
[109] *Id.* (*quoting State Farm*, 463 U.S. at 42).
[110] *Mississippi v. EPA*, 744 F.3d at 1351.

HQ-OAR-2015-0072. EPA may not be bound to past reviews,[111] but the Reconsideration Proposal is bound to its docket.

EPA must provide a complete justification for reversing the previous Administrator's decision to retain all the current PM NAAQS. In doing so, the Agency must distinguish and explain its new policy without glossing over or swerving from the previous Administrator's decision to retain the current standard.

The Administrator does none of this in EPA's Reconsideration Proposal. It is therefore arbitrary and capricious.

### 1. The Administrator Fails To Justify Disregarding His Predecessor's Decisions.

The Reconsideration Proposal notes that EPA completed a previous review of the PM NAAQS in 2020;[112] that the former Administrator emphasized uncertainties and limitations in several studies in the 2020 review;[113] and that based on these and other considerations the former Administrator decided to retain the existing standards.[114] The Reconsideration Proposal engages in no further substantive discussion of the former Administrator's decisions and certainly does not reconsider those decisions in a manner that considers all aspects of the problem, as required by basic administrative law principles.

The Reconsideration Proposal considers largely the same scientific evidence as did the 2020 PM NAAQS Rule.[115] The Administrator reviewed this evidence and determined it warranted proposing revisions to the $PM_{2.5}$ NAAQS. His predecessor came to the opposite conclusion.

---

[111] *See id*. at 1333-34.
[112] 88 Fed. Reg. at 5566-67.
[113] *Id*.
[114] *Id*.
[115] As discussed at Section VI.D., *supra*, the Reconsideration Proposal notes that the conclusions concerning health effects that have a causal or likely causal relationship with $PM_{2.5}$ remain consistent with those in the 2019 ISA. Furthermore, as noted at Section VII.B.1., risks estimated in the 2022 Policy Assessment are lower than those that were estimated in the 2020 Policy Assessment.

The Administrator not only must provide a reasoned explanation for his belief that the science is certain enough to revise the $PM_{2.5}$ NAAQS but also must justify that belief by distinguishing it from the contrary conclusions of his predecessor. In this reconsideration, the Administrator must make both positive and negative arguments – he must explain why it is reasonable to find the evidence certain enough to revise the NAAQS as proposed and why it is reasonable to conclude that his predecessor was wrong in finding the evidence too uncertain to support a revision.

Instead, the Reconsideration Proposal glosses over and swerves from past, contrary determinations without explanation. It is arbitrary and capricious.

**2. The Administrator Fails To Address the Advice of the CASAC he Disbanded.**

The Reconsideration Proposal states that the Administrator's determinations are informed, by, among other things, the advice of the CASAC.[116] The Administrator, however, considered only the advice of CASAC offered after he had "reestablished" its membership by "select[ing] seven members to serve on the chartered CASAC."[117] The Reconsideration Proposal later cites an EPA press release announcing the Administrator's decision to "reestablish," "reset," and "reorient" CASAC, which notes that the Administrator directed EPA to "initiate the release of current members of . . . the CASAC, to reconstitute, restore and create new committees to better address EPA priorities."[118]

Buried deeper in the Reconsideration Proposal, EPA states that "some members"[119] of the CASAC whose members had been "released" recommended retaining the existing $PM_{2.5}$ NAAQS

---

[116] 88 Fed. Reg. at 5560.
[117] *Id.* at 5719, n.2.
[118] *Id.* at 5568 (citing Press Release, *Administrator Regan Directs EPA to Reset Critical Science-Focused Federal Agency Committees* (March 21, 2021), https://www.epa.gov/newsreleases/administrator-regan-directs-epa-reset-critical-science-focused-federal-advisory (hereinafter "CASAC Reset Press Release")).
[119] In fact, all but one member of the disbanded CASAC expressed this opinion.

based on uncertainties in the underlying science.[120] The Reconsideration Proposal does not further address these views in a meaningful way. In other words, the Administrator's proposed decisions were informed by the views of the CASAC that he "reconstitute[ed], restore[d], and create[d] . . . to better address EPA priorities,"[121] but not the contrary views of the CASAC that he directed be "release[d]," "reestablish[ed]," "reset," and "reorient[ed]."[122] The Act does not permit the Administrator to pick the advice of his favored CASAC in this way, while ignoring contrary CASAC advice. At a minimum, the Administrator must explain why the uncertainties identified by released members of CASAC have been adequately resolved so as to warrant a change in the outcome of the PM NAAQS review.

The Administrator does not have to agree with the disbanded CASAC, but he cannot ignore it. The Act requires that any NAAQS proposal be accompanied by a statement setting forth "*any* pertinent findings, recommendations, and comments" of CASAC and that, "if the proposal differs in any important respect from *any* of these recommendations, an explanation of the reasons for such differences."[123] While it is unprecedented that one NAAQS rulemaking docket includes recommendations from two differently constituted CASACs with contrary views, that does not change the Administrator's duty under the Act. He is to respond to "any" pertinent findings, recommendations, and comments of CASAC, not just the most recent ones. EPA cannot evade this requirement by claiming that the findings, recommendations, and comments of the disbanded CASAC are not "pertinent." They are in the docket for this rulemaking.[124] Furthermore, the findings, recommendations, and comments of the disbanded CASAC are pertinent because the

[120] 88 Fed. Reg. at 5578.
[121] *See* CASAC Reset Press Release.
[122] *See id.*
[123] CAA § 307(d)(3) (emphasis added).
[124] *See* CASAC Reset Press Release.

prior Administrator's reliance on them means they are "clearly a 'relevant factor'" that EPA must take into account in its reconsideration.[125]

The Administrator must explain why he differs from any pertinent findings, recommendations, and comments by CASAC that are in the docket, whether or not he selected the members of that CASAC.

**3. The Administrator Must Justify New Positions Taken in a Revised "Response to Significant Comments" Document.**

The Act further specifies that a final NAAQS rulemaking be "accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period."[126] Such a response to comments document already exists in the docket in response to comments filed before the Administrator embarked on this reconsideration.[127] Should EPA issue another such document, then that document must distinguish or explain any apparent rejection of a position taken in the existing response to comments document.[128] If EPA does not do so, then it is being arbitrary and capricious. Where EPA does not address a contrary position, then EPA retains it.

**4. The Public Must Have an Opportunity To Comment Meaningfully on Any Changes EPA Makes To Cure the Reconsideration Proposal's Flaws.**

The Reconsideration Proposal does not comply with EPA's obligation to reconsider the entire record, including prior contrary decisions, and justify changes to existing EPA policy. Longstanding jurisprudence, as well as recent cases involving policy reversals, makes clear that

[125] *See Physicians for Soc. Resp.*, 956 F. 3d at 644 (quoting *State Farm*, 463 U.S. at 42); *see also Bernhardt*, 472 F.Supp.3d at 601 (finding that the Department of the Interior was arbitrary and capricious for disregarding independent reviews upon which the Department relied when establishing the Waste Prevention Rule).
[126] *Id.* § 307(d)(6)(B).
[127] *Responses to Significant Comments on the 2020 Proposed Rule on the National Ambient Air Quality Standards for Particulate Matter* (Dec. 2020), Docket No. EPA-HQ-OAR-2015-0072-1239.
[128] *See Physicians for Soc. Resp.*, 956 F. 3d at 644.

past determinations are "clearly a 'relevant factor' the agency had to consider"[129] in a reconsideration. Left unaddressed, the Reconsideration Proposal's failure to meaningfully reconsider the 2020 PM NAAQS Rule renders any resulting final rule arbitrary and capricious.

EPA cannot cure these fatal flaws by simply addressing them in a preamble to a final rule. That would deny commenters due process because EPA would be justifying its action on analysis not presented in the Reconsideration Proposal, unknown to stakeholders at the time comments were filed. Every part of the final rule must be a logical outgrowth of the Reconsideration Proposal. "A final rule is the 'logical outgrowth' of a proposed rule if 'interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period.'"[130] That is not the case here. Commenters have no way of anticipating the Administrator's justifications for swerving from his predecessor's reasoning.

The public can anticipate that EPA must change the final rule so that its is not arbitrary and capricious. That does not mean the change is a logical outgrowth of the Reconsideration Proposal. Rewriting the *Reconsideration* Proposal to meaningfully *reconsider* the policy it seeks to change exceeds the "certain degree of change" between a proposal and final rule "inherent" to the rulemaking process.[131] Indeed, the Reconsideration Proposal does not "expressly ask[] for comments on [the] particular issue" of justifying its changes to existing EPA policy, nor does it "[make] clear that the agency [is] contemplating" such a justification in the final rule.[132] Generally soliciting comments on the "array of issues associated with the reconsideration of these

---

[129] *Id.* (quoting *State Farm*, 463 U.S. at 42, 103 S. Ct. 2856).
[130] *Clean Air Council v. Pruitt*, 862 F.3d 1, 10 (D.C. Cir. 2017) (internal citation omitted).
[131] *See Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 632 n.51 (D.C. Cir. 1973).
[132] *See CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081 (D.C. Cir. 2009).

standards"[133] does not convert the Agency's "unexpressed intentions" to justify changes to existing policy into a logical outgrowth the public should have anticipated.[134] A supplemental proposal is imperative for stakeholders to comment meaningfully on the Reconsideration Proposal before its finalization. Interested parties should not be left to "divine the EPA's unspoken thoughts" on how it will make its rulemakings comply with the law.[135]

EPA must issue a supplemental proposal that satisfies its legal obligation to provide a reasonable explanation for the Reconsideration Proposal's changes to policy established in the 2020 PM NAAQS Rule. At a minimum, this supplemental proposal must: (1) justify rejecting the previous Administrator's decision to retain the $PM_{2.5}$ NAAQS and instead to propose more stringent standards; (2) explain the reasons why the Reconsideration Proposal differs from any pertinent findings, recommendations, and comments of CASAC; and (3) distinguish or explain any apparent rejection of a position taken in the "response to significant comments" document already in the docket.

## IV. Should EPA Proceed with Revising the Standard, an Effective Date of Two Years Following Promulgation Is Necessary To Avoid Disruptions in PSD Permitting and Is Consistent with the Designation and SIP Development Schedule.

The Reconsideration Proposal notes that EPA has "historically interpreted the requirement for an air quality impact analysis under CAA section 165(a)(3) and the implementing regulations" to "include a requirement to demonstrate that emissions from the proposed facility will not cause or contribute to a violation of any NAAQS" that is "in effect" as of the date a PSD permit is issued, "except to the extent that a pending permit application was subject to grandfathering provisions

---

[133] 88 Fed. Reg. at 5560.

[134] *See Shell Oil Co. v. EPA*, 950 F.2d 741, 751 (D.C. Cir. 1991) ("[A]n unexpressed intention cannot convert a final rule into a 'logical outgrowth' that the public should have anticipated. Interested parties cannot be expected to divine EPA's unspoken thoughts.").

[135] *See CSX Transp., Inc.*, 584 F.3d at 1080 (*citing Shell Oil Co.*, 950 F.2d at 751 (D.C. Cir. 1991)).

that the EPA had established through rulemaking."[136] Specifically, the preamble points to the "2012 $PM_{2.5}$ NAAQS (78 FR 3086, January 15, 2013) and 2015 Ozone NAAQS (80 FR 65292, October 26, 2015)" as examples of prior NAAQS revisions where the Agency had "included limited grandfathering provisions that exempted certain pending PSD permit actions" – i.e., those that had "reached a particular stage in the permitting process at the time the revised NAAQS was promulgated or became effective" – from the requirement to "demonstrate that the proposed emissions increases would not cause or contribute to a violation of the revised NAAQS."[137] Here, however, EPA proposed no such grandfathering provisions.[138]

EPA states that it changed its approach regarding grandfathering due to the decision of the U.S. Court of Appeals for the D.C. Circuit in *Murray Energy.* In that case, the preamble notes, the court "vacated the grandfathering provision in the PSD rules applicable to the 2015 Ozone NAAQS" because it found that the provision "contradicted 'Congress's 'express policy choice' not to allow construction which will 'cause or contribute to' nonattainment of 'any' effective NAAQS, regardless of when they are adopted or when a permit was completed.'"[139] Because EPA is "not proposing any grandfathering provision for this proposed $PM_{2.5}$ NAAQS revision, if finalized," "PSD permits issued on or after the *effective date* of any final revised $PM_{2.5}$ NAAQS" would require a "demonstration that the proposed emissions increases would not cause or contribute to a violation of the revised $PM_{2.5}$ NAAQS."[140]

While *Murray Energy* prohibits a grandfathering provision exempting PSD applicants from demonstrating compliance with "'any' effective NAAQS," the Agency can achieve the policy ends

---

[136] 88 Fed. Reg. at 5686-87.
[137] *Id.* at 5687.
[138] *Id.*
[139] *Id.*, *quoting Murray Energy*, 936 F.3d at 627.
[140] *Id.* at 5687 (emphasis added).

of grandfathering by establishing a later effective date for any revised standard. As explained below, EPA, like other agencies,[141] has clear authority to establish an effective date greater than 60 days after the date of publication. In the case of any revised PM NAAQS, a two-year effective date would avoid a suspension in PSD permitting without prejudicing any subsequent action a state may take to implement the revised standard. Failure to adopt this later effective date would be arbitrary and capricious and an abuse of discretion.

EPA's past practice with respect to NAAQS rulemakings has been to set a new standard's effective date at 60 days after *Federal Register* publication. This 60-day timeline is not itself required by law and, if imposed in this rulemaking, would require the reopening and amendment of pending applications and thereby significantly delay the processing of dozens of permit applications under development and in review. This reopening of applications would have to be undertaken at the same time that EPA, state staff, and industry applicants would be required to develop new modeling and other information needed to conform applications with any tightened standard. At best, the construction of needed facilities would be delayed, and many projects would likely be abandoned.

An effective moratorium on PSD permitting would have severe adverse consequences for the public interest and the regulated community. Over the last two years, Congress has enacted several statutes, including the Infrastructure, Investment and Jobs Act (P.L. 117-58), the CHIPS and Science Act (P.L. 117-167), and the Inflation Reduction Act (P.L. 117–169), to improve existing infrastructure and to provide public and private-sector funding for new businesses needed to expedite the United States' transition towards a less-polluting future. This funding promises

[141] *See* Debt Collection Practices, 85 Fed. Reg. 76,734, 76,863 (Nov. 30, 2020) ("The Bureau proposed that the final rule take effect one year after publication in the Federal Register . . . [we] received several comments on this aspect of the proposal . . . [and] determined that, as proposed, the final rule will become effective one year after publication in the Federal Register.").

much needed upgrades to the United States' aging infrastructure as well as the development of new technologies in the field of batteries, renewable energy, and semiconductors that are key to energy transition and a more competitive economy. Delay in permitting would disrupt financing and postpone construction of these needed infrastructure projects.

In a time of rising global tension, these issues have national security and supply chain implications. Preparing for an uncertain future requires the United States to move deftly and quickly to address supply chain weakness and to build the production capacity needed. Forcing new modeling and the submission of new applications could delay construction by months to years and threaten expected investments. EPA, consistent with the Clean Air Act's dual goals "to promote the public health and welfare *and* the productive capacity" of the United States,[142] must take lawful action to avoid disruptions in PSD permitting following promulgation of revised standards.

As noted above, historically, EPA has recognized the public interest in limiting NAAQS permitting delays following publication of a revised NAAQS by administratively grandfathering PSD applications. Under such grandfathering rules, a source was required to demonstrate compliance with the standard that was in effect when the application was filed, not a new, tighter standard that became effective 60 days after publication. Because PSD permitting is time- and resource-intensive, often requiring extensive legal, engineering, and air quality analysis, grandfathering avoided the unfairness caused by disruption of a process that had already consumed months, or even years. Establishment of a two-year effective date would accomplish the fairness and clean air policy objectives that grandfathering sought to achieve, but do so consistent with *Murray Energy*.[143]

---

[142] CAA § 101(b)(1) (emphasis added).
[143] *Murray Energy,* 936 F. 3d at 627; *see also* 42 U.S.C. § 7475.

A final rule's effective date establishes when that rule becomes a binding, enforceable legal requirement that supersedes prior rules. In the Administrative Procedure Act ("APA"), Congress required that the effective date of any substantive rule be "not less than 30 days" after publication in the *Federal Register*. 5 U.S.C. § 553(d). Subsequently, Executive Order 12866 extended this minimal period to "not less than 60 days" for "major" rules such as NAAQS. In the APA, the 30-day deferred effective date cannot be shortened except for "good cause," and Congress cautioned that "the specification of a 30-day deferred effective date is not to be taken as a maximum since there may be cases in which good administration or the convenience and necessity of the person subject to the rule reasonably requires a longer period."[144] As a result, EPA is authorized to adopt a later effective date for any revised PM NAAQS.

Setting a two-year effective date for any NAAQS revisions would prevent unnecessary disruptions and delays in the granting of PSD permits *without* impeding progress by states and EPA in implementing a new standard. The suggested two-year period would allow states and permit applicants preparing PSD air quality analyses to rely on the latest air quality information for modeling purposes. A two-year effective date for this rule would align the PSD permitting program with the first key deadline for developing new SIPs: EPA's promulgation of "the [attainment/nonattainment/unclassifiable] designation of areas" within each state.[145] Moreover, due to the conservatism of the modeling that EPA requires before a PSD permit can issue, a source issued a permit based on modeling that predicts air quality meeting the 12.0 $\mu g/m^3$ annual NAAQS, but not a new one in the proposed range of 9.0 to 10.0 $\mu g/m^3$ would be unlikely to be responsible for an actual violation of such a more stringent NAAQS.

---

[144] SENATE REP. NO. 752, at 201 (1945).

[145] *See* CAA § 107(d)(1)(B)(i) ("[T]he Administrator shall promulgate the designations . . . [within] 2 years from the date of [NAAQS] promulgation.").

Coordinating the effective date of any revised NAAQS with the two-year deadline for EPA's promulgation of designations creates a natural pivot and reset point for subjecting new PSD applications to a tightened standard. In the absence of a two-year effective date, state-level and EPA officials are operating with regulatory uncertainty with respect to their modeling and likely New Source Review ("NSR") obligations for areas within a state.[146] That said, the proposed two-year effective date would not disrupt the development of future SIPs and the deployment of new air quality controls, which do not have to be submitted until three years after the NAAQS *promulgation date*, which, as noted, EPA equates to the publication date.

A two-year effective date for any revised NAAQS: (1) would be consistent with the policies underlying Executive Orders, the APA, and the CAA provisions regarding rule effective dates; (2) would conform to recent case law in *Murray Energy*; (3) would not delay the CAA's schedule for § 107 designations and § 110 SIP preparation, submittal, and approval, which are tied to *promulgation date* rather than *effective date*; (4) would promote fairness to pending permit applicants; (5) would avoid disruption to permitting of important projects necessary for modernizing the nation's infrastructure and diversifying our production and energy sources; (6) would advance the public interest by assisting with the implementation of policies recently enacted by this Administration through Congress; and (7) would allow EPA time to develop new modeling and permitting tools, as discussed in Section V below.

In carrying out a congressional authorization, EPA must implement the Act consistent with its purpose section, *cf. Sierra Club v. Ruckelhaus,* 343 F. Supp. 253 (D.D.C. 1972), and adopt authorized measures needed to avoid unreasonable and unfair results. A two-year effective date is just such a measure. As is explained above, there are no adverse environmental consequences

[146] If more than two years are needed to develop modeling and other guidance, EPA has discretion to extend the effective date following notice and comment rulemaking.

associated with EPA's setting a two-year effective date, whereas EPA's refusal to do so would inflict considerable harm on the regulated community specifically and society generally. Nothing in *Murray Energy* can be read as precluding a two-year effective date. In these circumstances, the path forward is clear and compelled by the Act.

## V. EPA Must Develop an Effective and Feasible Implementation Strategy and Related Tools that States Can Use for Any More Stringent NAAQS.

A more stringent primary $PM_{2.5}$ NAAQS like those on which the Administrator has solicited comment would pose serious implementation challenges for attainment, unclassifiable, and future nonattainment areas. If EPA adopts its proposed revised NAAQS, the Agency must develop an effective and feasible implementation strategy and ensure the availability of appropriate tools to implement that strategy prior to the effective date of any more stringent NAAQS. An effective date for any new NAAQS that follows its promulgation by two years, as discussed above,[147] would provide the Agency with time to address current implementation challenges. In particular, it would allow EPA time to specify approaches to air quality modeling that provide more realistic, less conservative predictions for both permitting and SIP development purposes; issue updated permitting policies; and, implement model improvements. It would also allow the Agency to provide states with guidance on use of more flexible control strategies.

### A. EPA Needs To Ensure its Recommended Models and Requirements for Using Models Yield Realistic Air Quality Predictions.

The Act requires use of air quality modeling for both permitting and SIP development.[148] EPA's Guideline on Air Quality Models, commonly known as Appendix W, identifies EPA's preferred models and how those models should be used, including specifying inputs to them.[149]

[147] *See* Section IV, *supra*.
[148] *See, e.g.*, CAA §§ 165(e)(3)(D), 189(b)(i)(B).
[149] 40 C.F.R. pt. 51, app. W.

Although Appendix W recognizes that an alternative model or technique may sometimes be appropriate, use of such an alternative requires approval by EPA and evaluation of the model "from both a theoretical and a performance perspective."[150] The models that EPA recommends generally err on the side of conservatism, i.e., they are likely to predict concentrations higher than those measured in ambient air.

**1. EPA Needs To Correct its Conservative Approach to Air Quality Modeling To Facilitate the Permitting of New or Modified Sources in Areas Attaining the PM NAAQS.**

As the stringency of NAAQS has increased over time, use of EPA's preferred models, all of which are conservative, has significantly increased the challenges of permitting major new sources or major modifications to existing ones.[151] Such sources are essential for US economic growth and to provide new jobs.[152] When locating in an area designated attainment or unclassifiable for a NAAQS, an economically important source of this nature must receive a PSD permit based on its use of the Best Available Control Technology ("BACT") and a modeled demonstration that it will not cause or contribute to a violation of the NAAQS or an increment.[153] Such a demonstration is increasingly difficult in the face of ever-more-stringent NAAQS.

The table below, which was prepared by the environmental consulting firm ALL4, illustrates how a more stringent annual primary $PM_{2.5}$ NAAQS, if promulgated, would increase the already challenging process of obtaining the required PSD permit. The table summarizes modeled annual average $PM_{2.5}$ concentrations associated with recent permit applications for projects by members of several industries. These projects were permitted based on modeling in

[150] 40 C.F.R. pt. 51, app. W 3.2.2.

[151] It can also make obtaining minor source permits more difficult in a state that requires modeling to support issuance of such permits.

[152] One purpose of the Act is "promoting the productive capacity" of the US population. CAA § 101(b)(1). The purpose of the Act's PSD program is "to *ensure economic growth will occur* in a manner consistent with the preservation of existing clean air resources." CAA § 160(3) (emphasis added).

[153] CAA § 165(a).

accordance with Appendix W. None of them had an annual average modeled design concentration ("MDC") of greater than 6.0 μg/m$^3$. All of them were able to demonstrate that they would not cause or contribute to a violation of the current 12.0 μg/m$^3$ annual primary $PM_{2.5}$ NAAQS. However, 25 of these 32 projects would have been modeled to cause or contribute to a violation of an annual $PM_{2.5}$ NAAQS of 9.0 μg/m$^3$, the lower end of EPA's proposed range for an annual primary standard. Moreover, almost half of the projects were modeled as causing or contributing to an violation of a hypothetical annual $PM_{2.5}$ standard of 10.0 μg/m$^3$, the top of the Agency's proposed range.

| Facility | State | Annual Average $PM_{2.5}$ (micrograms per cubic meter) MDC (1) | Background (2) | Total (3) |
|---|---|---|---|---|
| Pulp & Paper Mill | Florida | 6.0 | 5.9 | 11.9 |
| Steel | Arkansas | 2.5 | 9.4 | 11.9 |
| Steel | Arkansas | 4.4 | 7.3 | 11.7 |
| Recycled Paper Mill | Oklahoma | 3.4 | 8.2 | 11.6 |
| Brick | Iowa | 3.5 | 8.0 | 11.5 |
| Steel | Illinois | 3.7 | 7.8 | 11.5 |
| Paper | Texas | 2.8 | 8.5 | 11.3 |
| Cement | Pennsylvania | 2.2 | 9.0 | 11.2 |
| Power | Wisconsin | 3.9 | 7.3 | 11.2 |
| Paper | Louisiana | 3.7 | 7.4 | 11.1 |
| Power | Pennsylvania | 3.0 | 8.1 | 11.1 |
| Cement | Georgia | 2.3 | 8.3 | 10.6 |
| Wood Products Panels | South Carolina | 3.1 | 7.1 | 10.2 |
| Steel | North Carolina | 1.2 | 8.9 | 10.1 |
| Lumber | Washington | 6.0 | 4.0 | 10.0 |
| Automotive | Georgia | 2.5 | 7.3 | 9.8 |
| Manufacturing | Washington | 3.3 | 6.5 | 9.8 |
| Aluminum | Kentucky | 1.5 | 8.1 | 9.6 |
| Steel | Kentucky | 1.7 | 7.8 | 9.5 |
| Paper | Texas | 0.9 | 8.5 | 9.4 |
| Gas-fired EGU | Georgia | 0.9 | 8.4 | 9.3 |
| Paper | Michigan | 4.6 | 4.7 | 9.3 |
| Steel | Kentucky | 1.9 | 7.4 | 9.3 |
| Feed & Grain | Idaho | 4.3 | 4.9 | 9.2 |
| Pharmaceutical | New York | 0.4 | 8.7 | 9.1 |
| Power | Wisconsin | 1.3 | 7.6 | 8.9 |
| Gas-fired EGU | Georgia | 0.9 | 7.9 | 8.8 |
| Gas-fired EGU | New York | 1.8 | 6.5 | 8.3 |
| Paper | Maine | 3.5 | 4.0 | 7.5 |
| Steel | Florida | 0.9 | 6.5 | 7.4 |
| Wood Products Panels | Michigan | 1.4 | 5.6 | 7.0 |
| LNG Storage | Massachusetts | 1.6 | 5.1 | 6.7 |
| **Count** | | **32** | **32** | **32** |
| **90th Percentile** | | **4.4** | **8.7** | **11.6** |
| **75th Percentile** | | **3.6** | **8.2** | **11.2** |
| **Average** | | **2.7** | **7.2** | **9.9** |
| **Median** | | **2.5** | **7.5** | **9.8** |
| **25th Percentile** | | **1.5** | **6.5** | **9.2** |
| **10th Percentile** | | **0.9** | **4.9** | **7.6** |

1. "MDC" denotes the **modeled design concentration** computed by AERMOD (i.e., the maximum 5-year average annual mean concentration) simulating cumulative impacts from applicant facility and nearby sources. Includes secondary $PM_{2.5}$ screening concentration from precursor emissions of $NO_X$ and $SO_2$ estimated using EPA's MERPs and related guidance.

2. "Background" denotes the background concentration accounting for all sources not explicitly simulated in AERMOD, typically quantified as the design value (3-year average) from a representative (usually nearest) Federal Reference Method or Federal Equivalent Method ambient monitor. Color coding denotes relatively higher (hotter) and lower (cooler) background concentrations among sampled analyses.

3. "Total" denotes the sum of the MDC and background, which is compared to the level of the NAAQS to demonstrate that the total ambient $PM_{2.5}$ concentration simulated in the cumulative impact analysis would not exceed the standard. Color coding dinstguishes total modeled annual average $PM_{2.5}$ concentrations from 11-12 (red), 10-11 (orange), 9-10 (yellow), 8-9 (blue), and less than 8 (green).

Based on the experience of NR3 Coalition member companies, most projects requiring a PSD permit need headroom of up to about 3.0 µg/m$^3$ between background and the standard level to demonstrate, in accordance with Appendix W's modeling requirements, that they will not cause or contribute to a violation of the annual $PM_{2.5}$ NAAQS.

As shown in green on Figure 1 below, such headroom is available under the current NAAQS in most of the country.[154]



Figure 1: Headroom Below a 12.0 µg/m$^3$ Annual NAAQS

Far less of the country would have sufficient headroom under a more stringent NAAQS. Figure 2 shows how much less of the United States would have 3.0 µg/m$^3$ of headroom if the NAAQS were reduced to 9.0 µg/m$^3$.

[154] Areas shown in red on Figures 1 and 2 are nonattainment for the 12.0 µg/m$^3$ NAAQS. Those shown in pink have less than 3.0 µg/m$^3$ of headroom. These figures were prepared by Alpine Geophysics using air quality data from 2019 to 2021. Maximum $PM_{2.5}$ Design Values ("DVs") were used for each monitored county. For counties without monitors, design values were estimated using geospatial statistical interpolation ("kriging") fill-in estimates. The five closest monitored values were used to estimate non-monitored county values using an inverse-distance weighted averaging method.



Figure 2: Headroom below a 9.0 µg/m$^3$ Annual NAAQS

Instead of allowing overly conservative modeling requirements to hamper economic growth in this country, EPA should revise those requirements to predict air quality more realistically. This would involve updating both Appendix W, including the preferred models identified in it, and related permitting and modeling guidance.

The Agency is currently planning to propose revisions to Appendix W this fall,[155] including updates to its preferred AERMOD model, and to finalize Appendix W updates in 2024.[156] The NR3 Coalition appreciates EPA's plans to update mobile source modeling, characterization of building downwash, conversion of nitrogen oxide emissions to nitrogen dioxide in ambient air, and representation of area source plume meander in AERMOD. We look forward to reviewing these proposed updates to the model, but additional model improvements are necessary to address

[155] *See* Tillerson, C.; G. Bridgers; R. C, Owen; D. Heist; J. Thurman; A. Piliero; C. Misenis & M. Porter, EPA's Near-Future Development Priorities for the AERMOD Model System, *EM* (Feb. 2023), https://www.awma.org/em.

[156] Should EPA defer the effective date of a new NAAQS for two years, as proposed above, *see* Section IV, *supra*, that would coincide with EPA's planned updates to its modeling requirements.

sources of $PM_{2.5}$ such as fugitive emissions that significantly affect model outputs. We urge the Agency also to consider further improvements to AERMOD's performance related to area and volume sources, including characterization of building shapes, of moist, buoyant plumes, and of ambient pollutant levels under low wind speed conditions.

In addition to updating AERMOD, EPA should consider updates to requirements for information to be input into the models. Specifically, Table 8-2 of Appendix W requires, for purposes of evaluating compliance with an annual or quarterly NAAQS, that the source seeking a permit be modeled as if it continually emits at its design capacity or its permit limit (unless a different operating capacity would lead to a higher predicted ambient impact). Moreover, the source and nearby sources must be modeled as emitting at their maximum allowable emission limit or their federally enforceable permit limit. The chance of these emission rates and operating conditions occurring simultaneously for a full year are vanishingly small, so the resulting air quality predictions are highly conservative.

EPA needs to provide an approach that lessens this conservatism. In some cases, data on a source's actual operating schedule, capacity, and emission rate may be available. In that case, modeling those conditions would be appropriate. If such data are unavailable for the specific source, but are available for a similar source, those data could be used to inform more realistic predictions. Ultimately, EPA should develop probabilistic approaches that could be used more generally instead of assuming continuous operation of multiple sources under the operating conditions that provide the highest estimated impacts and assuming the highest allowable rate of emissions at all times, as is often required currently.

Another aspect of modeling in which EPA's approach leads to unrealistically high concentrations is characterization of background for modeling the 24-hour NAAQS. Citing "the

many factors that contribute to the temporal and spatial variability of ambient concentrations across a typical modeling domain on an hourly basis," Appendix W rejects the pairing of monitored background with modeled air quality on an hourly or daily basis.[157] Predictions using EPA's approach fail, however, to capture the inherent variability of background. The result is predicted ambient concentrations that are biased high. EPA should either allow hourly or daily pairing of monitored and modeled values or should develop another approach that captures the variability of background. Furthermore, EPA should assist the states to leverage inherent flexibility in the Act. For characterization of background air quality, EPA should develop estimates of the contribution of international emissions and exceptional events to background at every Federal Reference Method ("FRM") monitor. EPA should permit the exclusion of these contributions from background for any source modeling impact analyses, as well as any SIP or compliance demonstration modeling.

EPA's approach to modeling $PM_{2.5}$ in particular, adds another unique factor into the general conservatism of its approved modeling approaches. Ambient $PM_{2.5}$ results from both primary emissions and secondarily formed particles. EPA's current approach requires modeling of primary and secondary $PM_{2.5}$ separately and then combining the highest $PM_{2.5}$ levels predicted by each model.[158] Because primary PM tends to have ambient impacts that are greatest close to a source, and secondary $PM_{2.5}$ impacts are generally greater farther from a source, combining these two predictions overstates ambient $PM_{2.5}$ concentrations. EPA should instead direct (or allow) combining predictions from the two models on a receptor-by-receptor basis.

[157] 40 C.F.R. pt. 51, app. W 8.3.2(e) and 8.3.3(d).

[158] EPA, *Guidance for Ozone and Fine Particulate Matter Permit Modeling,* EPA-454/R-22-005, at 52 (July 2022), https://www.epa.gov/system/files/documents/2022-07/Guidance_for_O3_PM25_Permit_Modeling.pdf.

EPA's interpretation of the spaces that are to be modeled adds further conservatism to modeling with regard to the risk of exposure of people to levels above a NAAQS. For example, EPA's approach requires that areas such as a sheer cliff, a river adjacent to a facility, a road beside a plant site, or a railroad line passing through such a site be treated as areas to which the public has access. Although it is true that the public may have access to these sites, there is very little probability of anyone spending a year – or 24 hours straight – at one of these locations represented as a receptor in a PSD modeling analysis. Modeling pollutant impacts in these locations as if people could be there adds yet another level of conservatism to the modeling EPA requires by those seeking a PSD permit.[159] EPA should revise its policy related to the definition of ambient air further to acknowledge that the probability of human exposure is a relevant factor.

Finally, EPA should retain project emissions accounting ("PEA") regulatory provisions in the NSR rules and consider further improvements to permitting guidance that would reduce the number of projects that are considered modifications of major sources that trigger air dispersion modeling. Such guidance improvements could include expansion of those activities that are considered to be routine maintenance, repair, and replacement ("RMRR"), debottlenecking guidance, and additional guidance on demand growth/accommodated emissions.

**2. EPA Must Also Ensure its Requirements and Guidance for SIP Modeling Produce Realistic Air Quality Predictions.**

Appendix W also specifies modeling requirements appliable to SIP submittals and revisions.[160] The excessive and unnecessary conservatism of Appendix W requirements discussed

---

[159] In 2019, EPA revised its policy on areas that need not be considered ambient air to acknowledge that barriers other than physical ones can exclude access to a property, and that, in such situations, air above the site should not be considered ambient air. *See* Memorandum from Andrew R. Wheeler, Administrator, EPA, to Regional Administrators (Dec. 2, 2019), https://www.epa.gov/sites/default/files/2019-12/documents/ambient_air2019.pdf. This clarification of what must be modeled as ambient air is inadequate, however, to reflect the reality of where people are potentially exposed to NAAQS violations. Further flexibility is needed to capture that reality when performing air quality modeling.

[160] 40 C.F.R. pt. 51, app. W 1.0(a).

above is equally a concern for SIP-related modeling. Reducing this conservatism would also provide more realistic information for SIP development.

For SIP submittals addressing $PM_{2.5}$, in particular, additional guidance on modeling is provided by EPA's Modeling Guidance for Demonstrating Air Quality Goals for Ozone, $PM_{2.5}$, and Regional Haze.[161] Although this guidance, which focuses on photochemical grid modeling of large numbers of sources across broad regions, largely avoids the overly conservative assumptions of Appendix W, combining predictions of a photochemical grid model with a dispersion model used to characterize ambient impacts of primary $PM_{2.5}$ emissions remains a concern. Furthermore, requiring modeling of areas where people are unlikely to be exposed for as long as the averaging time of the NAAQS addressed by the SIP is conservative and may drive unnecessary and costly emission reduction requirements.[162]

In short, EPA needs to reduce the conservatism in those aspects of its modeling requirements and guidance discussed above. Unless the Agency does so, it will be thwarting optimal economic development that could be achieved in this country, consistent with the protection of air quality as envisioned by Congress.

### B. EPA Should Develop and Encourage States To Use Flexible and Cost-Effective Tools for Developing Control Strategies.

If EPA promulgates a new PM NAAQS, the responsibility for ensuring that areas attain it will fall to the states.[163] Although EPA previously promulgated rules for implementing $PM_{2.5}$

[161] Air Quality Assessment Div., Office of Air Quality Planning and Standards, EPA, Doc. EPA 454/R-18-009, Modeling Guidance for Demonstrating Air Quality Goals for Ozone, $PM_{2.5}$, and Regional Haze (Nov. 2018), https://www.epa.gov/sites/default/files/2020-10/documents/o3-pm-rh-modeling_guidance-2018.pdf.

[162] When modeling was used in the absence of monitoring to determine nonattainment areas for the 1-hour NAAQS for $SO_2$, EPA instructed states to use several inputs that provided more realistic assessment of possible NAAQS violations, including placing receptors only in locations where a monitor could be placed and using actual emissions data. *See* Memorandum from Stephan D. Page, Director, Office of Air Quality and Standards, to Regional Air Directors, at 5 (Mar. 20, 2015), https://www.epa.gov/sites/default/files/2016-06/documents/20150320so2designations.pdf. This guidance illustrates EPA's flexibility to use realistic modeling.

[163] CAA §§ 110, 189.

NAAQS,[164] it should offer states guidance, either formally or informally, concerning flexible options for strategies to obtain the emission reductions necessary to attain any new, more stringent $PM_{2.5}$ NAAQS in a cost-effective manner. We present suggestions below for providing such flexibility.

Historically, PM NAAQS, including $PM_{2.5}$ NAAQS, have been implemented principally through reduction of emissions of $PM_{2.5}$ precursors from major stationary sources and motor vehicles. If EPA adopts a more stringent $PM_{2.5}$ NAAQS, however, it may be necessary to go beyond controls on those sources to control emissions from non-traditional sources such as area sources and sources of primary (direct) $PM_{2.5}$ that are not as well-controlled. EPA should advise states that it will look favorably on SIPs that use flexible approaches such as emissions trading or offsets to bring areas into attainment in a cost-effective manner.

A program allowing the use of offsets and/or trading can be designed to reduce health risks, particularly in disadvantaged communities, while also reducing costs. Such an approach is consistent with the intent of the Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population"[165] and with the direction of Section 110(a)(2)(A) of the Act to use "control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights)."[166]

Consistent with these statutory provisions, courts have recognized that RACT and other controls required for nonattainment areas can often be satisfied by averaging emissions, an approach that can be implemented through an emission offset or trading program. The D.C. Circuit

[164] *See* 81 Fed. Reg. 58,010 (Aug. 24, 2016).
[165] 42 U.S.C. § 7401(b)(1).
[166] CAA § 110(a)(2)(A).

has acknowledged that it is permissible "to meet RACT-level emissions through averaging within a nonattainment area."[167] The Sixth Circuit, in the context of reviewing SIP provisions for a redesignation to attainment, has found "EPA can plausibly and rationally interpret the statute to allow a wider purview than individual sources" and "do[es] not believe EPA must be limited to reductions within the nonattainment area."[168]

EPA has a history of using regional emissions trading to address air pollutant transport and to bring nonattainment areas into attainment. Most recently, these EPA programs have focused on attaining ozone NAAQS. The 2005 Clean Air Interstate Rule (CAIR), however, addressed both ozone and $PM_{2.5}$ NAAQS.[169] Although these were EPA trading programs, they can inform how a state-driven program to offset or trade emissions might work. The NR3 Coalition would be willing to work with EPA on strategies for scoping and undertaking these steps.

Implementation of the existing PM NAAQS, particularly for $PM_{2.5}$, has been challenging for EPA and states charged with developing plans for such implementation. Certain areas have been unable to attain those NAAQS, the most recent of which was promulgated more than a decade ago. Implementation of any new, more stringent NAAQS, if EPA ultimately promulgates one, would be even more difficult.

EPA must recognize the challenges that any new NAAQS would pose for attainment and unclassifiable areas as well as for those designated nonattainment and, if it intends to promulgate a stringent new NAAQS, should begin now to prepare both itself and states for those implementation challenges. Elimination of excessive conservatism in air quality modeling requirements and planning for the implementation flexibility that could be provided by state

---

[167] *S. Coast Air Quality Mgmt., Dist. v. EPA*, 882 F.3d 1138, 1154 (D.C. Cir. 2018).
[168] *Sierra Club v. EPA*, 793 F.3d 656, 667 (6th Cir. 2015); *see also S. Coast*, 882 F.3d at 1146-47 (The D.C. Circuit suggested that measures to satisfy RACM, including RACT, must be applied within the nonattainment area.).
[169] 70 Fed. Reg. 25,161 (May 12, 2005).

offset/emissions trading programs would help to address these challenges. Establishing an effective date for any revised $PM_{2.5}$ NAAQS that follows its promulgation by two years would provide time for these efforts, mitigating harmful effects on economic growth and other unintended consequences of implementing a new NAAQS.

## VI. The Administrator Should Retain the 12.0 µg/m$^3$ Annual Primary $PM_{2.5}$ NAAQS.

After proposing to conclude that the current primary $PM_{2.5}$ NAAQS do not provide the requisite degree of public health protection,[170] the Administrator seeks comment on revising the level of the annual primary NAAQS from 12.0 µg/m$^3$ to within the range of 9.0 µg/m$^3$ to 10.0 µg/m$^3$.[171] The Administrator also solicits comment on levels of up to 11.0 µg/m$^3$ and as low as 8.0 µg/m$^3$.[172] In particular, "EPA solicits comments on the uncertainties in the reported associations between daily or annual average $PM_{2.5}$ exposures and mortality and morbidity in the epidemiologic studies, the significance of the 25th percentile of ambient concentrations reported in studies, the relevance and limitations of international studies,"[173] among other issues. Any such more stringent standard would be intended to address health risks associated with both long-term and typical daily $PM_{2.5}$ exposures.[174] For the reasons explained below, however, the Administrator has not adequately justified his conclusion that the current suite of primary $PM_{2.5}$ NAAQS fails to protect public health with an adequate margin of safety. As a result, revision of the annual primary NAAQS is not appropriate, and the Administrator should withdraw or otherwise end reconsideration of this standard.[175]

---

[170] 88 Fed. Reg. at 5624.
[171] *Id.* at 5629.
[172] *Id.*
[173] *Id.*
[174] *Id.* at 5617.
[175] In the absence of a revision to the NAAQS, there is no reason to revise the Air Quality Index ("AQI") as EPA has proposed. *See id.* at 5641-42. Should EPA proceed with revision of the AQI, however, the Agency must ensure that such a revision does not lead the public to believe, mistakenly, that air quality has declined, and that $PM_{2.5}$ concentrations are increasing.

### A. The Health Effects Evidence Is Consistent with that Considered in 2012 and 2020.

The substance of the scientific record concerning health effects associated with exposure to $PM_{2.5}$ in ambient air has not changed meaningfully since the current suite of primary $PM_{2.5}$ NAAQS was promulgated in 2012.[176] The decision at that time to reduce the level of the annual primary $PM_{2.5}$ standard from 15.0 µg/m$^3$ to 12.0 µg/m$^3$ while retaining a 24-hour primary standard of 35 µg/m$^3$ was based on the science reflected in an ISA dated 2009.[177] The decision in 2020 to retain that suite of NAAQS was based on science reflected in a 2019 ISA.

#### 1. This Reconsideration Does Not Add Any New Findings of Health Effects with a Causal or Likely Causal Association with $PM_{2.5}$ Exposure.

As discussed in the Reconsideration Proposal, many conclusions concerning effects caused by or likely caused by ambient $PM_{2.5}$ remain the same as they were in the 2009 ISA. Examples include:

- "In the 2012 review, the 2009 ISA reported that the evidence was 'sufficient to conclude that the relationship between long-term $PM_{2.5}$ exposures and mortality is causal.'" Newer studies "continue to provide consistent evidence of positive associations between long-term $PM_{2.5}$ exposures and mortality."[178]

- "The 2009 ISA concluded that 'a causal relationship exists between short-term exposure to $PM_{2.5}$ and mortality.' . . . Multicity studies evaluated in the 2019 ISA and the ISA Supplement provide evidence of primarily positive associations between daily $PM_{2.5}$ exposures and mortality . . . ."[179]

- "Consistent with the evidence assessed in the 2009 ISA, the 2019 ISA concludes that recent studies, together with evidence available in previous reviews, support a causal relationship between long-term exposure to $PM_{2.5}$ and cardiovascular effects. . . .

[176] *See id.* at 5618 ("The evidence available in this reconsideration . . . reaffirms, and in some cases, strengths the conclusions from the 2009 ISA regarding the health effects of $PM_{2.5}$ exposures.").

[177] EPA, Integrated Science Assessment for Particulate Matter, EPA/600/R-08/139F (Dec 2009), https://ordspub.epa.gov/ords/eims/eimscomm.getfile?p_download_id=494959 (hereinafter "2009 ISA").

[178] 88 Fed. Reg. at 5581.

[179] *Id.* at 5583.

[S]tudies published since the completion of the 2019 ISA and evaluated in the ISA Supplement . . . further support such a conclusion."[180]

- "The 2009 ISA concluded that 'a causal relationship exists between short-term exposure to $PM_{2.5}$ and cardiovascular effects.' . . . Studies evaluated in the 2019 ISA provide additional support for a causal relationship between short-term $PM_{2.5}$ exposure and cardiovascular effects. . . . Moreover, recent multicity studies . . . evaluated in the ISA Supplement are consistent with studies evaluated in the 2019 ISA."[181]

- "The 2009 ISA concluded that 'a causal relationship is likely to exist between long-term $PM_{2.5}$ exposure and respiratory effects.' . . . Cohort studies evaluated in the 2019 ISA provided additional support for the relationship."[182]

- "The 2009 ISA . . . concluded that a 'causal relationship is likely to exist' between short-term $PM_{2.5}$ exposure and respiratory effects. . . . Epidemiological studies evaluated in the 2019 ISA continue to provide strong evidence for a relationship between short-term $PM_{2.5}$ exposure and several respiratory-related endpoints."[183]

In other cases, the Reconsideration Proposal notes that the conclusions concerning health effects that have a causal or likely causal relationship with $PM_{2.5}$ remain consistent with those in the 2019 ISA. For example, "For cardiovascular-related mortality, the evidence evaluated in the ISA Supplement is consistent with the evidence evaluated in the 2019 ISA."[184] Findings of likely causal associations between $PM_{2.5}$ exposure and lung cancer and $PM_{2.5}$ and nervous system effects were first reached in the 2019 ISA.[185] The Administrator took them into account in deciding in 2020 to retain the existing suite of standards.[186] The Reconsideration Proposal fails to explain adequately why the current Administrator now finds that these same effects warrant a more stringent annual primary $PM_{2.5}$ NAAQS.[187]

[180] *Id*. at 5585.
[181] *Id*. at 5586.
[182] *Id*. at 5587.
[183] *Id*. at 5588.
[184] *Id*. at 5581.
[185] *Id*. at 5589-90.
[186] 85 Fed. Reg. at 82,701-03.
[187] *See* Section III.B.1., *supra*.

### 2. Substantial Uncertainties and Limitations Remain in the Health Effects Evidence.

In proposing to find that the current NAAQS do not provide the requisite public health protection and therefore proposing revisions to the annual primary $PM_{2.5}$ NAAQS, the Administrator does not give appropriate weight to the uncertainties and limitations of the health effects evidence. If he had done so, it should have been apparent that the evidence does not provide a basis for questioning the adequacy of the health protection provided by the existing NAAQS.

In 2020, the Administrator noted and weighed the "important uncertainties and limitations" in the epidemiological evidence which formed the primary basis for the $PM_{2.5}$ NAAQS in reaching his decision to retain the existing suite of standards.[188] He cited these uncertainties and limitations in support of his conclusion that the current suite of standards remains requisite to protect the public health.[189]

The Reconsideration Proposal acknowledges the continued existence of such uncertainties and limitations.[190] The Reconsideration Proposal specifically recognizes that these uncertainties include "some evidence of potential confounding of the $PM_{2.5}$-mortality association by co-pollutants in some of the studies.[191] In addition, it acknowledges the potential for exposure error.[192] It admits unexplained differences remain in $PM_{2.5}$-mortality relationships from city to city and from region to region.[193]

In fact, as recognized by Gradient, a risk science consulting firm, the key epidemiologic studies relied on in the Reconsideration Proposal "have substantial uncertainties and limitations (*e.g.,* exposure measurement error, confounding, irrelevant exposure windows), and do not provide

---

[188] 85 Fed. Reg. at 82,714.
[189] *Id*. at 82,718.
[190] 88 Fed. Reg. at 5604, 5628.
[191] *Id*. at 5582.
[192] *Id*. at 5625.
[193] *Id*. at 5584.

adequate evidence of health effects occurring at $PM_{2.5}$ concentrations lower than the current primary annual standard of 12 µg/m$^3$."[194]

Similarly, the National Council for Air and Stream Improvement (NCASI), a research organization that addresses environmental topics relevant to the forest products industry, explains:

> While the current Particulate Matter Integrated Science Assessment (ISA) does compile a large swath of scientific literature related to the potential health effects from exposure to particulate matter, many, if not most of the critical features of systematic review are absent from the current process . . . . This leads to the reliance on studies that either have disqualifying amount of uncertainty inherent to their design or are not designed to address the policy relevant question at hand and, in some cases, exclusion of studies from consideration that may be extremely informative for evaluating cause-and-effect relationships between particulate matter and health outcomes.[195]

NCASI notes that because of "uncertainty, exposure misclassification, confounding, and other sources of risk of bias . . . the current evidence base does not support the need for an annual $PM_{2.5}$ standard of less than 12 µg/m$^3$ to protect public health."

One vital remaining uncertainty relates to the $PM_{2.5}$ levels associated with the health effects of concern. The Reconsideration Proposal recognizes that epidemiologic studies "do not identify particular $PM_{2.5}$ exposures that cause effects."[196] It indicates that more recent studies "continue to provide evidence" of linear, no-threshold concentration-response ("C-R") relationships between long- and short-term $PM_{2.5}$ exposure and mortality,[197] while indicating greater uncertainty about

---

[194] Gradient, Comments on US EPA's Proposed Rule for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter 3 (Mar. 21, 2023) (hereinafter "Gradient Comments"); *see also id*. at 9-12 (discussing specific uncertainties). The Gradient comments have been submitted to Docket EPA-HQ-OAR-2015-0072, but do not yet have a docket number. Gradient's comments are Attachment 1 to these comments.

[195] Letter from Giffe Johnson, PhD, NCASI, to US EPA Docket Center, on Reconsideration of the National Ambient Air Quality Standards for Particulate Matter 2 (undated) (hereinafter "NCASI Comments"). This letter has been submitted to Docket EPA-HQ-OAR-2015-0072, but does not yet have a docket number.

[196] 88 Fed. Reg. at 5605.

[197] *Id*. at 5582, 5585.

the shape of the C-R relationship for effects of long-term exposures to less than 8.0 µg/m$^3$ and short-term exposures to less than 5.0 µg/m$^3$ $PM_{2.5}$.[198]

In its comments, Gradient explains that:

> Exposure measurement errors, ranging from instrument imprecision to the practice of serially averaging measured constituent values over time and space, are pervasive in observational air pollution studies. These errors preclude the ability of these studies to detect a $PM_{2.5}$ threshold , if one were to exist. Given that such errors make determining the true shape of the $PM_{2.5}$ concentration-response function difficult, assessment of risks at low $PM_{2.5}$ exposure levels based on these curves are of dubious reliability.[199]

The level of $PM_{2.5}$ causing health effects and the associated risks to public health are, of course, the key questions when it comes to the adequacy of the current NAAQS. Assuming a linear, no-threshold C-R relationship without accounting for other uncertainties like those mentioned above is misleading and "will always lead to proportional decreases in risk (i.e., each additional µg/m$^3$ reduction produces additional benefits with no clear stopping point)."[200] EPA has treated the C-R relationship as a linear (or log-linear) one without a threshold for the past two PM NAAQS reviews,[201] however, so the assumption of such a relationship here without consideration of uncertainties does not signify health risk at lower $PM_{2.5}$ levels than previously believed.

The Reconsideration Proposal simply does not explain why evidence of associations of PM exposure with the same health effects that EPA considered previously, with significant remaining uncertainties, and given the longstanding assumption of a no-threshold C-R relationship, now warrants a more stringent annual primary $PM_{2.5}$ NAAQS. In the absence of any such explanation

[198] *Id.*
[199] Gradient Comments at 11.
[200] 88 Fed. Reg. at 5621.
[201] *See* 85 Fed. Reg. at 82,696; *see also* 78 Fed. Reg. at 3119.

and without a basis for such a conclusion, the Administrator should withdraw his reconsideration of the 2020 decision retaining this standard.

### 3. Even if EPA Fails To Consider the Substantial Limitations in the Health Effects Evidence, Compliance with the Existing Standard Will Likely Achieve Average Exposure Levels that Fall within EPA's Proposed Range.

While the Administrator draws on evidence-based and risk-based considerations in evaluating the need to revise the current PM standards, it is clear from his proposed stated rationale that evidenced-based considerations using mean values of key U.S. epidemiology studies are given the greatest weight:

> The Administrator provisionally concludes that a standard level within the range of 9.0 to 10.0 µg/m$^3$ would reflect appropriate approaches to placing the most weight on the strongest available evidence, while placing less weight on much more limited evidence and on more uncertain analyses of information available from a relatively small number of studies. He notes that a standard set at 9.0 to 10.0 µg/m$^3$ would be at or below the study-reported mean $PM_{2.5}$ concentrations in the key US epidemiologic studies, exposures for which we have the strongest support for adverse health effects occurring.[202]

EPA's implementation of the NAAQS, however, relies on *design values* instead of measurements which average the public's exposure. According to the 2022 Policy Assessment, the maximum annual $PM_{2.5}$ design values in U.S. CBSAs are often 10 to 20 percent *higher* than the annual average concentrations.[203] Thus, design values meeting the current $PM_{2.5}$ standard of 12.0 µg/m$^3$ are likely achieving equivalent average exposures of 9.6 to 10.8 µg/m$^3$ – a range that overlaps with EPA's proposed range of 9.0 to 10.0 µg/m$^3$ and which, according to the Administrator, provide the strongest support for adverse health effects.

Moreover, the 2022 Policy Assessment also notes that recent requirements for $PM_{2.5}$ monitoring at near-road locations in large urban areas may increase the ratios of maximum to

---

[202] 88 Fed. Reg. at 5,628.
[203] 2022 Policy Assessment at 2-45.

average annual design values.[204] To illustrate, a study cited by EPA in its 2022 Policy Assessment found that 52 percent of near-road monitors reported the highest annual $PM_{2.5}$ design value in the metropolitan statistical area; these design values were, on average, 0.8 µg/m$^3$ higher than the next highest measuring non-near-road monitors.[205] As states continue to install more near-road monitors in response to current EPA monitoring policy, the gap between design values and average exposure concentrations (most similar to study means in the key epidemiology studies) will widen such that compliance with an annual standard of 12.0 µg/m$^3$ is well within EPA's proposed range and the mean values of the key epidemiology studies cited by EPA as providing the strongest evidence.

Some observers may suggest the standard should be set in a manner to assure that no subgroup or even individual should be exposed to levels that approach the design value, shifting the focus from average exposure to a hypothetical exposure to the design value concentrations. This approach, however, is not supported by the key U.S. epidemiology studies on which the Administrator relies. Instead, these studies provide risk inferences that are based on average exposures of the study population that includes an exposure distribution. Simply put, within each study population, some individuals have higher exposures while others have less. Without further information, it is therefore inappropriate to make inferences about subgroup risks within these studies.

---

[204] *Id.* at 2-45.

[205] *Id.* at 2-33 (citing Owen Gantt et al., *Characterizing Nitrogen Oxides and Fine Particulate Matter near Major Highways in the United States Using the National Near-Road Monitoring Network*, ENVIRONMENTAL SCIENCE & TECHNOLOGY 55(5): 2831-2838 (2021).

### B. CASAC's Comments Do Not Require Revision of the Annual Primary $PM_{2.5}$ NAAQS.

In the Reconsideration Proposal, the Administrator reports that "every member of the CASAC found that the information . . . supported revising the annual level to 10.0 µg/m$^3$," with a minority recommending a standard in the range of 10.0 µg/m$^3$ to 11.0 µg/m$^3$ and the majority favoring one in the range of 8.0 µg/m$^3$ to 10.0 µg/m$^3$.[206] This, however, does not, accurately and fully characterize the record for this reconsideration and is therefore inaccurate and misleading. The record for this proceeding contains recommendations from two CASAC panels for the Administrator's action on NAAQS. Although the Reconsideration Proposal accurately characterizes the recommendations in the 2022 Sheppard Letter, those in the 2019 Cox Letter are not considered.[207]

The 2019 CASAC Letter explained:

> Given the[] limitations in the underlying science basis for policy recommendations, and diverse opinions about what quantitative uncertainty analysis and further analysis of all relevant data using the best available scientific methods would show, some CASAC members conclude that the Draft PM PA does not establish that new scientific evidence and data reasonably call into question the public health protection afforded by the current 2012 $PM_{2.5}$ annual standard. Other members of CASAC conclude that the weight of the evidence, particularly reflecting recent epidemiology studies showing positive associations between $PM_{2.5}$ and health effects at estimated annual average $PM_{2.5}$ concentrations below the current standard, does reasonably call into question the adequacy of the 2012 annual $PM_{2.5}$ National Ambient Air Quality Standards (NAAQS) to protect public health with an adequate margin of safety.[208]

This 257-page letter provided significant detail explaining why six of the seven members of CASAC at that time concluded that the record did not call into question the adequacy of the 12.0 µg/m$^3$ primary $PM_{2.5}$ NAAQS to provide the requisite public health protection. The

[206] 88 Fed. Reg. at 5626.
[207] As explained in section III.B.1., *supra*, the record on reconsideration must address the conclusions, bases, and rational for EPA's 2020 decision.
[208] 2019 Cox Letter at 1.

Administrator considered all of this advice from CASAC in proposing to retain the PM NAAQS without revision.[209] He considered the view of both the CASAC majority and minority when he concluded that the current primary $PM_{2.5}$ standards "are requisite to protect the public health from fine particles with an adequate margin of safety, including the health of at-risk populations."[210] It is arbitrary and capricious for the current Administrator not to consider this critical part of the record.

**C. The Populations Identified as "At-Risk" Are Appropriately Protected by the Current NAAQS.**

In setting NAAQS, EPA seeks to protect sensitive – or in EPA's terminology "at-risk" – populations.[211] The Reconsideration Proposal recognizes, "[t]he information available in this reconsideration has not altered our understanding of human populations at risk of health effects from $PM_{2.5}$ exposures."[212] Yet, despite indicating that the populations at greatest risk from exposure to ambient $PM_{2.5}$ have not changed, EPA asserts that evidence in the ISA Supplement shows that some of these "at-risk" groups are now recognized as being at greater risk from $PM_{2.5}$ due to higher exposures.[213] But EPA fails to address whether these higher exposures involve exposures that violate a NAAQS and, if so, to what extent. If a NAAQS is violated, that violation must be remedied. NAAQS must be attained in ambient air throughout the country. Lowering a NAAQS because of an existing NAAQS violation does not ensure that violation is remediated and would unnecessarily harm the nation's productivity.

Moreover, even if the higher exposures are unrelated to NAAQS violations, they do not provide the basis for a more stringent NAAQS. When revising the annual primary NAAQS from

---

[209] *See* 85 Fed. Reg. at 82,690.
[210] *Id.* at 82,718; *see also id.* at 82,706-07, 82,716.
[211] 88 Fed. Reg. at 5563 n.5.
[212] *Id.* at 5591.
[213] 88 Fed. Reg. at 5592.

15.0 μg/m$^3$ to 12.0 μg/m$^3$, EPA took the potential for higher exposures of "at-risk" groups into account. The Agency considered "potential impacts on low-income and minority populations" and modified the form of the standard "to avoid potential disproportionate impacts on" them.[214] The record does not indicate that this consideration of potential higher exposures of "at-risk" groups was inadequate.

The Reconsideration Proposal also refers to evidence for "health risk disparities" for these populations.[215] As an initial matter, many of the epidemiology studies on which the evaluation of the current standard is based involved populations from "at-risk" populations.[216] Moreover, the key studies on which EPA relies in assessing disparate health risk of mortality from long-term exposure to $PM_{2.5}$ do not support risk differences.[217] Thus, EPA lacks any meaningful evidence of differences in health risk on the basis of race or socioeconomic status.

**D. Risk Estimates Do Not Support the Need for a More Stringent NAAQS.**

The Reconsideration Proposal notes that the risk assessment in the 2022 Policy Assessment "includes updates and improvements to input data and modeling approaches" compared to the risk assessment in the 2020 Policy Assessment.[218] Importantly, the result of these updates and improvements is that the risks estimated in the 2022 Policy Assessment are *actually lower* than those that were estimated in the 2020 Policy Assessment on which the 2020 decision to retain the NAAQS was based. For estimates of mortality associated with long-term $PM_{2.5}$ exposure, the 2022 Policy Assessment relied on a hazard ratio of 1.073 (1.071-1.075) from Di, et al. (2017),[219]

---

[214] 78 Fed. Reg. 3086, 3267 (Jan. 15, 2013).
[215] 88 Fed. Reg. at 5592.
[216] Gradient Comments at 18.
[217] *Id.* at 19 ("[N]one of the five studies cited in the ISA Supplement … that valuated the dose-response relationship between long-term $PM_{2.5}$ exposure and total mortality stratified by race/ethnicity … support the conclusion that there is a disparity in $PM_{2.5}$-related mortality risk associated with race/ethnicity.").
[218] 88 Fed. Reg. at 5615.
[219] 2022 Policy Assessment C-8, tbl. C-1.

which is lower than the 1.084 (1.081-1.086) hazard ratio used for the risk assessment in the 2020 Policy Assessment.[220] Moreover, the 2022 Policy Assessment indicates that, while the risk assessment used a single-pollutant model, the Di, et al. (2017) study also included a co-pollutant model which, if it had been used, would have reduced mortality estimates by approximately a further 13 percent.[221]

The Administrator, however, does not recognize that the estimated risks have decreased. Indeed, the Reconsideration Proposal states:

> Although the methodologies and data used to estimate risks in this reconsideration differ in several ways from what was used in the 2020 review, the findings and considerations summarized in the PA present a pattern of exposure and risk that is *generally similar to that considered in the 2020 review and indicate a level of protection generally consistent with that describer in the 2020 PA*.[222]

The Administrator simply does not explain why these lower risks (or even similar risks) warrant a more stringent standard than the 12 μg/m$^3$ one EPA found in 2020 provided the requisite public health protection. In fact, the updated and improved information on risk assessment adds support for EPA's December 2020 decision to retain the annual primary $PM_{2.5}$ standard without revision.

The varying hazard indices and resulting risk estimates serve to highlight uncertainties about the entire risk assessment. The Reconsideration Proposal itself acknowledges:

> Uncertainty in risk estimates (e.g., in the size of risk estimated) can result from a number of factors, including the assumptions about the shape of the C-R function with mortality at low ambient PM concentrations, the potential for confounding and/or exposure measurement error in the underlying epidemiological studies, and the methods used to adjust $PM_{2.5}$ air quality. More specifically, the use of air quality modeling to adjust $PM_{2.5}$ concentrations are limited as they rely on model predictions, are based on emission changes are scaled by fixed percentages, and use only two of the full set of possible emission scenarios and linear

[220] *Id.*
[221] *Id.*, tbl. C-1, n.5.
[222] 88 Fed. Reg. at 5616 (emphasis added).

interpolation/extrapolation to adjust air quality that may not fully capture potential non-linearities associated with real-world changed in air quality.[223]

It also recognizes:

[T]he at-risk analysis is also subject to many of these same uncertainties. Additionally, the at-risk analysis included C-R functions from only one study . . .as opposed to the multiple studies used in the overall risk assessment to convey risk estimates.[224]

Gradient points to yet another limitation of the risk assessment:

The long-term exposure studies of $PM_{2.5}$ that US EPA evaluated did not assess the risks of lifetime exposures or determine how individuals' $PM_{2.5}$ exposures before the study period impact the interpretation of their results, even though it is hard to imagine these earlier exposures not playing a role if $PM_{2.5}$ exposure is indeed causal.[225]

These substantial uncertainties about and limitations of the risk assessment mean that it cannot provide meaningful insight into health risks associated with air quality associated with attainment of either the current or alternative annual $PM_{2.5}$ NAAQS. Thus, it does not provide a basis for a decision to increase the stringency of the NAAQS.

Finally, the risk assessment does not reflect risks associated with current air quality. Without information on those risks, it is impossible to assess whether lower NAAQS would lead to discernible public health improvement. Only five areas in the entire country do not meet the 12.0 $\mu g/m^3$ $PM_{2.5}$ NAAQS.[226] The 2022 Policy Assessment reports, "[a]t long-term monitoring sites in the U.S., annual $PM_{2.5}$ concentrations from 2017 to 2019 averaged 8.0 $\mu g/m^3$ (with the 10th and 90th percentiles at 5.9 and 10.0 $\mu g/m^3$, respectively)," even when days affected by episodic events such as wildfires and windstorms were included.[227] Information on the health risk posed

[223] 88 Fed. Reg. at 5606.
[224] *Id.* at 5607.
[225] Gradient Comments at 12.
[226] *See* EPA, Green Book *PM-2.5 (2012) Nonattainment Areas* (Feb. 28, 2023), https://www3.epa.gov/airquality/greenbook/knc.html.
[227] 2022 Policy Assessment at 2-28.

by $PM_{2.5}$ in ambient air should reflect this reality. In its risk assessment, however, EPA virtually ignores information on current air quality. Instead, the Agency seeks to characterize risks in a fictional world in which the current $PM_{2.5}$ NAAQS are just attained everywhere.[228] For this purpose, in selecting sites to be considered for the risk assessment, the Agency first focused on those areas in which either the annual or the 24-hour $PM_{2.5}$ NAAQS, or both, had been exceeded during the 2014 to 2016 period, and then added consideration of areas that met, but were close to, those NAAQS.[229] For those areas that met the NAAQS, EPA used a modeling approach to adjust $PM_{2.5}$ air quality data from 2015 upward (i.e., added additional theoretical $PM_{2.5}$ to what was actually present) to reflect what air quality might have been had the area just attained the NAAQS.[230] The Agency also used modeling to estimate air quality in these areas in 2015 as if they just attained an alternative annual NAAQS of 10.0 $\mu g/m^3$ and an alternative 24-hour NAAQS of 30 $\mu g/m^3$.[231] The Agency modeled and reported risks associated with these alternative NAAQS levels compared to risks if the current standard were just attained.[232] This is simply not reflective of reality and leads to significantly overstated health benefits of any more stringent standard.

Although EPA has air quality data from 2015 for all of the areas it addressed in its risk assessment,[233] and predicted health risk associated with that air quality,[234] it nowhere provides information on the specific estimated health risks with this actual, monitored air quality. Appendix C to the 2022 Policy Assessment includes limited information on predicted $PM_{2.5}$-related mortality associated with these "recent conditions,"[235] but the body of that document only says, in a footnote,

---

[228] *Id.* at 3-138.
[229] *Id.* at 3-141.
[230] *Id.* at 3-140 to 3-141.
[231] *Id.* at 3-140.
[232] *See id.* at 3-149, tbl. 3-14.
[233] *Id.* at 3-140, C-47, tbl. C-10.
[234] *Id.* at C-47, Fig. C-24.
[235] *Id.* at C-50, Fig. C-25; C-54, Fig. C-29; C-55, Fig. C-30. "Recent conditions" here is a bit of a misnomer. The monitored data are from eight years ago.

that "assumptions that PM concentrations would not increase would make results [of analyses of risks associated with recent conditions] difficult to interpret."[236] It is unrealistic to suggest that air quality in areas attaining the NAAQS will degrade. $PM_{2.5}$ concentrations have declined steadily since 1990.[237] States and localities have economic and other incentives to avoid air quality declines that could lead to a designation as nonattainment. Moreover, several CAA programs guard against such degradation. These programs include New Source Performance Standards,[238] Prevention of Significant Deterioration,[239] and emission standards for motor vehicles.[240]

Without information on health risks associated with current air quality, and given the uncertainty concerning attaining the current or alternative NAAQS, the risk assessment does not provide the Administrator with a rational basis for assessing the public health impact of a more stringent NAAQS. Any decision to revise the annual NAAQS that is based on this risk assessment would be arbitrary and capricious.

### E. The Administrator Must Consider Disbenefits of a More Stringent NAAQS.

Although courts have held that the Administrator may not consider the costs of attainment when promulgating a NAAQS,[241] as discussed above, costs are relevant when considering whether it is appropriate to continue with reconsideration of a NAAQS.[242] Moreover, the Administrator must also consider environmental disbenefits of a more stringent NAAQS.[243]

---

[236] 2022 Policy Assessment at 3-146, n.58.

[237] *See* EPA, Our Nation's Air: Trends Through 2021, https://gispub.epa.gov/air/trendsreport/2022/#introduction. Despite the steady decrease in concentrations of $PM_{2.5}$, as EPA recognizes, small year-to-year variability can occur. *See id.*

[238] CAA § 111.

[239] *Id.* §§ 160-169.

[240] *Id.* § 202.

[241] *Whitman*, at 465.

[242] *See* Sections II & III.A., *supra*.

[243] The D.C. Circuit has held that EPA must evaluate the net adverse health effects of a pollutant in the ambient air, including considering the pollutant's beneficent effects, when deciding whether to revise a NAAQS. *Am. Trucking Ass'ns v. EPA*, 175 F.3d at 1052-53, *aff'd in part and modified in part on other grounds on rehearing*, 195 F.3d 4, 10 (D.C. Cir. 1999), *rev'd in part on other grounds sub nom Whitman v. Am. Trucking Assn's,* 531 U.S.

Should the Administrator lower the level of the annual $PM_{2.5}$ NAAQS despite our recommendation to the contrary, that action could result in actions that themselves would cause increases in PM in ambient air. For example, requiring the operation of fabric filters, electrostatic precipitators and venturi scrubbers on sources emitting as few as five tons of $PM_{2.5}$ annually, as is contemplated in EPA's draft RIA,[244] would require additional energy usage, and the production of this energy would itself likely increase emissions into ambient air.[245] So, too, paving roads and road shoulders, as contemplated in the RIA,[246] would entail energy usage and increased emissions. Moreover, promulgation of a more stringent NAAQS would likely shift economic activity and growth to parts of the world with less stringent standards, potentially leading to a worldwide increase in $PM_{2.5}$. The Administrator must take these environmental and related health disbenefits into account in deciding whether to continue with this reconsideration, and discuss those impacts in any re-proposal, prior to revising the NAAQS.

Environmental impacts associated with implementation of a more stringent NAAQS would not be limited to impacts on air resources. Water resources could also be adversely impacted. Dust suppression measures require the use of water, a resource that is severely limited in some Western areas,[247] where the greatest number of nonattainment areas are likely.[248] The

457 (2001). Similarly, the Administrator should weigh negative environmental effects of a revised NAAQS against its benefits.

[244] RIA at 3-3, 4-3, and 4-8.

[245] A control strategy that focused on precursor emissions would also require additional energy consumption, with resulting increases in emissions.

[246] *See* RIA at 3A-3.

[247] *See* Bill Weir, "Scientists fear a Great Toxic Dustbowl could soon emerge from the Great Salt Lake," CNN (Feb. 10, 2023), https://www.cnn.com/2023/02/10/us/utah-great-salt-lake-dust-pollution-weir-wxc/index.html; Joshua Partlow, "Officials fear 'complete doomsday scenario' for drought-stricken Colorado River, Washington Post (Dec. 1, 2022), https://www.washingtonpost.com/climate-environment/2022/12/01/drought-colorado-river-lake-powell/.

[248] *See* RIA at 2-27.

Administrator should also weigh these adverse effects on the environment in reaching his decision on NAAQS revision.

Moreover, given that he must consider economic costs in deciding whether to reconsider the NAAQS and if so, what revision would be appropriate, the Administrator should consider both the economic cost of potential new control measures and other economic impacts of a more stringent NAAQS. A more stringent NAAQS would lead to delay, uncertainty, and disapprovals of permits even in areas where the NAAQS are not violated. A recent analysis by the forest products industry, for example, estimated that reducing the annual $PM_{2.5}$ standard to 10.0 $\mu g/m^3$ would cost pulp, paper, and packaging facilities between $1 and $2 billion and wood products manufacturing facilities between $500 and $750 million for emission controls in order to obtain required permits.[249] The cost to pulp, paper, and packaging facilities is estimated to be between $3 and $4 billion and to wood products manufacturing facilities between $900 million and $1 billion if the standard were reduced to 8.0 $\mu g/m^3$.[250] Assuming that other manufacturing sectors are similarly affected, the cost to manufacturing interests *in areas not violating* a 8.0 $\mu g/m^3$ NAAQS "could be almost $20 billion for direct $PM_{2.5}$ emissions . . . and even more when precursor emissions such as NOx, $SO_2$, VOC, and ammonia . . . are considered."[251] These estimates do not account for unquantifiable costs due to forgone opportunities for new facilities or facility expansions.

In short, before reaching a decision on reconsideration of the NAAQS, the Administrator must consider both adverse environmental effects of a more stringent standard and control costs in areas that meet the standard. Neither is reflected in EPA's draft RIA. Both are substantial.

[249] *See* Impacts at 3-4.
[250] *Id.* at 3-4.
[251] *Id.* at 4.

### F. The Wide Range of Values for the Annual Primary $PM_{2.5}$ NAAQS on Which the Administrator Is Taking Comment Will Require him To Weigh Numerous Factors To Select an Appropriate Standard Level.

Under the CAA, only the Administrator has the authority to set, review, and revise NAAQS.[252] To reach a decision in this proceeding on whether to uphold the 2020 decision to retain the 12.0 µg/m$^3$ annual primary $PM_{2.5}$ NAAQS or to revise it, and, if the latter, what the level of the revised NAAQS should be, the Administrator must base his judgment on the entire record, including the record underlying the 2020 decision to retain the standards. This record includes, *inter alia*, the advice of his staff and of CASAC, as well as public comment. The scientific evidence concerning health effects associated with long-term exposure to low levels of $PM_{2.5}$ is highly uncertain. This can be seen from the virtually opposite views of two CASACs on whether NAAQS revision is warranted. It can also be seen from the wide range of options on which the Reconsideration Proposal seeks comment, everything from retaining a standard of 12.0 µg/m$^3$ to reducing the level of the standard by a third, to 8.0 µg/m$^3$.

In the face of this uncertainty, the Administrator should consider whether he can judge that a more stringent standard – even one of 11.0 µg/m$^3$, which is at the top of the range for a possible standard revision – can reasonably be expected to yield public health benefits. If it would not, then the Administrator should continue to retain the current 12.0 µg/m$^3$ NAAQS. That is the case here.

First, the scientific uncertainties are too great for the Administrator to have confidence that further reducing the level of $PM_{2.5}$ in ambient air would reduce the risk to public health. Second, a NAAQS will produce health benefits only if it produces improvements in air quality. As illustrated by EPA's recent proposal to disapprove California's $PM_{2.5}$ SIP for the San Joaquin

---

[252] CAA §§ 109(b), (d).

Valley,[253] an area currently classified as Serious nonattainment for the 12.0 µg/m³ NAAQS,[254] parts of the country cannot attain even the current standard. EPA's proposed SIP disapproval is based in part on its conclusion that a plausible strategy has not been identified for achieving the necessary emission reductions.[255] If an area cannot attain the current 12.0 µg/m³ standard, it surely cannot attain any health benefits postulated to result from a more stringent one. Indeed, EPA itself fails in its RIA to identify control measures sufficient to attain any more stringent standard throughout the country.[256] Third, as discussed above, measures required to attain a more stringent NAAQS could themselves have adverse health effects.[257] Fourth, as discussed above, control costs, other economic factors, and implementation feasibility are relevant to a decision on whether reconsideration of a properly promulgated NAAQS is appropriate.[258] Finally, as Justice Breyer pointed out, "[t]he [CAA] by its express terms, does not compel the elimination of all risk, and it grants the Administrator sufficient flexibility to avoid setting ambient air quality standards ruinous to industry."[259] For all these reasons, the Administrator should judge that revision of the annual primary $PM_{2.5}$ NAAQS is not appropriate at this time and should withdraw this reconsideration.

## VII. The Administrator's Proposal To Retain the 24-Hour Primary $PM_{2.5}$ NAAQS Is Appropriate.

The Administrator proposes to retain the 35 µg/m³ 24-hour primary $PM_{2.5}$ NAAQS.[260] He does so "recogniz[ing] that the current annual standard . . . and 24-hour standard . . . together, are intended to provide public health protection against the full distribution of short- and long-term $PM_{2.5}$ exposures" and that "the 24-hour standard, with its 98th percentile form, is most effective

[253] 87 Fed. Reg. 60,494 (Oct, 5, 2022).
[254] https://www3.epa.gov/airquality/greenbook/knc.html.
[255] 87 Fed. Reg. at 60,514.
[256] NERA Report at 1.
[257] *See* Section VI.E., *supra*.
[258] *See* Section II, III.A., *supra.*
[259] *Whitman*, 531 U.S. at 494 (Breyer, J. concurring in part and dissenting in part).
[260] 88 Fed. Reg. at 5629.

at limiting peak daily or 24-hour concentrations."[261] Focusing first on the controlled human exposure studies, he notes that results of these studies, largely involving 2-hour exposures, "are inconsistent particularly at . . . $PM_{2.5}$ concentrations" lower than those found in ambient air.[262] He explains that, even at higher concentrations, the effects observed are "intermediate" ones that "typically, would not, by themselves, be judged as adverse."[263] Looking at monitored air quality in the United States, he "finds that the current suite of standards maintains sub-daily concentrations far below the current concentrations in controlled human exposure studies where consistent effects have been observed."[264] As to the epidemiologic evidence, the Administrator explains this evidence "does not help to inform questions on the adequacy of the current 24-hour standard given that the 24-hour standard focuses on reducing 'peak' exposures (with its 98th percentile form)."[265] Specifically, he notes difficulties in relating the air quality scenarios analyzed in the studies to the level and form of the current 24-hour standard.[266] With regard to the risk assessment, the Administrator recognizes it finds health benefits associated with a more stringent 24-hour standard only in a "more limited" population.[267] He also points out that neither the majority of CASAC members (who supported consideration of a more stringent 24-hour NAAQS) or the minority of CASAC members (who did not) indicated that the risk assessment justified a more stringent NAAQS.[268] The Administrator's proposal to retain the current 24-hour NAAQS is sound.

---

[261] *Id*. at 5617.
[262] *Id*. at 5620.
[263] *Id*.
[264] *Id*. at 5621.
[265] *Id*.
[266] *Id*.
[267] *Id*. at 5622, 5623.
[268] *Id*. at 5623.

### A. Evaluation of the 24-Hour Standard in the Context of the Full Suite of Primary $PM_{2.5}$ Standards Is Appropriate.

As a preliminary matter, the Administrator's evaluation of the adequacy of the 24-hour standard in the context of the protection provided by the suite of NAAQS follows a longstanding Agency practice. In 1997, when EPA first adopted NAAQS using a $PM_{2.5}$ indicator, the Administrator explained:

> [T]he suite of $PM_{2.5}$ standards could most effectively and efficiently be defined by treating the annual standard as the generally controlling standard for lowering both short- and long-term $PM_{2.5}$ concentrations. In conjunction with the annual standard, the 24-hour standard would serve to provide protection against days with high peak $PM_{2.5}$ concentrations, localized 'hot spots,' and risks arising from seasonal emissions that would not be well controlled by a national annual standard.[269]

EPA deviated from this approach in 2006, leading the D.C. Circuit to question whether the annual $PM_{2.5}$ standard would protect against short-term exposures.[270] Following the D.C. Circuit's remand of EPA's 2006 PM NAAQS rule, the Agency returned to its 1997 approach:

> [T]he Administrator conclude[d] that it is appropriate to set an annual standard that is generally controlling, which will lower the broad distribution of 24-hour average concentrations in an area as well as the annual average concentration, so as to provide protection from both long- and short-term $PM_{2.5}$ exposures. In conjunction with this, it is appropriate to set a 24-hour standard focused on providing supplemental protection, particularly for areas with high peak-to-mean ratios of 24-hour concentrations, possibly associated with strong local or seasonal sources, and for $PM_{2.5}$-related effects that may be associated with shorter-than-daily exposure periods.[271]

The Administrator is acting reasonably in continuing to follow this approach in the current proceedings. Moreover, recent air quality data show that peak $PM_{2.5}$ levels that the Administrator

[269] 62 Fed. Reg. 38,652, 38,669 (July 18, 1997). Petitions for review of the standards promulgated under this rationale were denied by the D.C. Circuit. *Am. Trucking Assn's v. EPA*, 283 F.3d 355, 374, 379 (D.C. Cir. 2002).

[270] *See Am. Farm Bureau Fed'n. v. EPA*, 559 F.3d 512, 524 (D.C. Cir. 2009) (remanding to EPA the final rule on PM NAAQS published at 71 Fed. Reg. 61,144 (Oct. 17, 2006)).

[271] 78 Fed. Reg. 3099, 3158 (Jan. 15, 2013). Petitions for review of this rule were also denied. *Nat'l Ass'n. Mfrs. v. EPA,* 750 F.3d 921, 927 (D.C. Cir. 2014).

has identified as being of concern do not occur in areas where the current suite of standards is attained.[272]

### B. The Scientific Evidence Concerning Health Effects of Short-Term $PM_{2.5}$ Exposure Has Not Changed Significantly Since the Previous NAAQS Review.

In fact, the Administrator's identification of effects of concern overstates the risks associated with short-term exposure to $PM_{2.5}$ in ambient air in light of the current suite of standards. The evidence for short-term effects is consistent with that at the time of the 2020 decision to retain the existing standards and is effectively consistent with the evidence considered in the previous review. This consistency extends not only to the level at which effects have been reported in studies but also to remaining uncertainties and limitations in the evidentiary database. Moreover, by ignoring these uncertainties and current air quality, EPA's risk assessment overstates the risk to public health that is associated with current air quality.

#### 1. The Effects Deemed To Have a Causal or Likely Causal Association with Short-Term $PM_{2.5}$ Exposure Have Not Changed.

In each ISA, EPA characterizes the scientific evidence for a causal relationship between the pollutant that is the subject of the ISA and specific types of health effects into five categories: causal relationship; likely to be a causal relationship; suggestive of, but not sufficient to infer, a causal relationship; inadequate to infer a causal relationship; and not likely to be a causal relationship.[273] EPA bases NAAQS on evidence of effects that are causal or likely causal. In reviewing a NAAQS, EPA builds on the evidence base as summarized in earlier ISAs.

In the present review and reconsideration, EPA compares causal determinations in the 2019 ISA with those in the 2009 ISA from the previous (2012) PM NAAQS review. In no case does the 2019 ISA conclude that the evidence now supports a new and different finding of a "causal"

[272] 2019 Policy Assessment at 3-221 to 3-222.
[273] EPA, Preamble to the Integrated Science Assessments 22-23 (2015).

or "likely causal" association between short-term exposure to $PM_{2.5}$ and a health effect of concern.[274] Specifically, the 2019 ISA continues to find evidence to support a causal association only between short-term $PM_{2.5}$ exposure and mortality and cardiovascular effects and a likely causal relationship between short-term $PM_{2.5}$ exposure and respiratory effects.[275] In fact, newer evidence supports, and is consistent with, earlier conclusions about causality:

- "In summary, recent evidence evaluated in the 2019 ISA and the ISA Supplement *further supports and extends the conclusions of the evidence base reported in the 2009 ISA*."[276]
- "*Consistent with the 2009 PM ISA*, the strongest evidence comes from epidemiologic studies that reported consistent positive associations between short-term $PM_{2.5}$ exposure and cardiovascular-related ED visits and hospital admissions."[277]
- "Taken together, the evidence described within the 2019 PM ISA *extends the consistency and coherence of the evidence base reported in the 2009 PM ISA* and 2004" Air Quality Criteria Document.[278]

**2. Uncertainties in and Limitations of the Evidence Supporting EPA's Causality Determinations Remain.**

Not only is evidence concerning the effects that EPA considers likely to be caused by short-term exposure to $PM_{2.5}$ consistent with that from prior NAAQS reviews, uncertainties and limitations of that evidence continue. One of the key limitations of the evidentiary database remains EPA's failure to have conducted a transparent, systematic review of the evidence.

NCASI points out that "a systematic process, with specific, measurable criteria to rank and weight studies is largely absent from the ISA."[279] Furthermore, "*Without a systematic process to select, rank, disqualify and weight studies with measurable features of study quality that are free*

---

[274] *See* 2019 ISA at 1-60, fig. 1-1. The ISA Supplement addresses "only the health effects evidence for which the 2019 PM ISA concluded a *causal relationship*." ISA Supplement at 1-3.
[275] 2019 ISA at 1-60, fig. 1-1. By citing to these EPA determinations, the NR3 Coalition is not indicating that it agrees with them. It is citing them solely for the purpose of showing that *EPA's* assessment of the effects associated with short-term exposure to $PM_{2.5}$ has not changed.
[276] 2022 Policy Assessment at 3-36 (emphasis added).
[277] ISA Supplement 2-7 (emphasis added).
[278] *Id.* at 3-7 (emphasis added).
[279] NCASI Comments at 12.

*from individual bias, the conclusions of the ISA are impaired and do not represent the best science available for policy decision-making.*"[280]

In addition to the problems posed by the lack of a systematic and transparent review of the scientific evidence, other acknowledged uncertainties and weaknesses remain in the evidentiary record. Gradient explains, "Considering the uncertainties in and limitations of the scientific evidence and qualitative information regarding short-term $PM_{2.5}$ exposure … we agree with the US EPA Administrator that the primary 24-hour $PM_{2.5}$ standard should be retained."[281]

### C. Risks Associated with Exposure to Short-Term $PM_{2.5}$ Exposures Are Overstated in EPA's Risk Assessment.

EPA's risk assessment overstates the health risks posed by exposure to 24-hour concentrations of $PM_{2.5}$ in ambient air and the potential health benefits of a more stringent standard for two fundamental reasons. First, the risk assessment does not address the uncertainties in the scientific evidence discussed above. By failing to do so, while at the same time providing statistical confidence intervals around the estimates, the risk assessment overstates the certainty that a more stringent 24-hour $PM_{2.5}$ NAAQS will produce the predicted benefits.

Second, the starting point for the risk assessment does not reflect current air quality. Only eleven areas in the entire country are designated nonattainment for the current 24-hour $PM_{2.5}$ NAAQS.[282] The 2022 Policy Assessment reports, "At long-term monitoring sites in the U.S., . . . the 98th percentiles of 24-hour concentrations [from 2017 to 2019] averaged 21.3 µg/m$^3$ (with the 10th and 90th percentiles at 14.0 and 29.7 µg/m$^3$ respectively)," even when days affected by

[280] *Id.* (emphasis in original).
[281] Gradient Comments at 17.
[282] *See* EPA, Green Book, *PM-2.5 (2006) Nonattainment Areas* (Feb. 28, 2023), https://www3.epa.gov/airquality/greenbook/rnc.html.

episodic events such as wildfires and windstorms were included.[283] Information on the health risk posed by $PM_{2.5}$ in ambient air should reflect this reality.

But, as discussed above,[284] in its risk assessment, EPA virtually ignores information on current air quality. Building from air quality in 2015, the Agency seeks to characterize risks in a fictional world in which the current $PM_{2.5}$ NAAQS are just attained everywhere.[285] The Agency then uses modeling to estimate air quality in these areas as if they just attained an alternative annual NAAQS of 10.0 $\mu g/m^3$ and an alternative 24-hour NAAQS of 30 $\mu g/m^3$.[286] The Agency reports risks associated with these alternative NAAQS levels compared to risks if the current standard were just attained.[287] This is simply not reflective of reality and leads to significantly overstated health benefits of any more stringent standard.

It is unrealistic to suggest that air quality in areas attaining the NAAQS in 2015 – let alone those attaining today – will degrade. $PM_{2.5}$ concentrations and emissions contributing to them have declined steadily since 1990.[288] Even apart from the general incentive that areas have to avoid designation as a nonattainment area, several CAA programs serve to protect against such degradation, including programs establishing New Source Performance Standards,[289] Prevention of Significant Deterioration,[290] and emissions standards for motor vehicles standards.[291]

In fact, modeling air quality as just meeting the current standards in areas where the air quality is cleaner leads to mortality predictions that are significantly overestimated when compared

[283] 2022 Policy Assessment at 2-28.
[284] *See* Section VI.C., *supra*.
[285] 2022 Policy Assessment at 3-138.
[286] *Id.* at 3-140.
[287] *See* 2022 Policy Assessment at 3-149, tbl. 3-14.
[288] *See* Section I, *supra*.
[289] CAA § 111.
[290] *Id.* §§ 160-169.
[291] *Id.* § 202.

to more realistic estimates using current air quality. As CASAC member Dr. James Boylan has explained:

> EPA's approach evaluates the change in risk associated with moving from $PM_{2.5}$ air quality "just meeting" the current standards (12/35) to "just meeting" alternative annual and/or 24-hour standards (10/30). While this approach is appropriate for CBSAs that are currently above the current standards, this approach is *not* appropriate for CBSAs that are currently below the current standards and results in estimated reductions in $PM_{2.5}$-a[ss]ociated mortality [risks] that are significantly overestimated compared to the actual number of prevented deaths. . . . *In order to accurately evaluate the number of* actual *deaths that will be prevented if the standard was lowered, the starting point for the risk analysis for each CBSA that is already below the current $PM_{2.5}$ NAAQS needs to be the 2018-2020 $PM_{2.5}$ design values, not the current NAAQS.*[292]

This overestimation of deaths avoided affects EPA's already small estimates of potential mortality benefits from lowering the existing 24-hour $PM_{2.5}$ standard. For example, the 24-hour $PM_{2.5}$ design value for Fulton County, Georgia, (home of Atlanta) for 2019-2021 was 21 $\mu g/m^3$ and that of New York-Newark-Jersey City Core-Based Statistical Area ("CBSA") was 22 $\mu g/m^3$,[293] both well below the 35 $\mu g/m^3$ level of the NAAQS. Accounting for current air quality in these cities would reduce the Agency's existing estimated 1 to 2 percent reduction in mortality from reducing the current 24-hour daily standard to 30 $\mu g/m^3$ to zero in each city. In other cities, the "corrected" estimate may well be within the margin of error of the analysis due to the many assumptions and uncertainties involved.

Given the significant overestimation of the benefits that might be anticipated from alternative NAAQS, the risk assessment cannot be relied upon as support for a more stringent 24-hour NAAQS. Instead, it supports the Administrator's proposal to retain the current 24-hour standard.

---

[292] 2022 Sheppard Letter at A-22 (individual comments of Dr. Boylan) (emphasis in original). As illustrated in the text, this statement remains valid for 2019 to 2021 design values.

[293] EPA, Air Quality Design Values (Aug. 2022), https://www.epa.gov/air-trends/air-quality-design-values#report (scroll to $PM_{2.5}$ Design Values, 2021).

### D. Retention of the Current 24-Hour $PM_{2.5}$ NAAQS Is Consistent with the CASAC's Advice.

As explained above, the record for this reconsideration contains letters from two different CASACs expressing their recommendations for the Administrator's action on the suite of standards.[294] The 2019 Cox letter indicates that CASAC found "the available evidence does not reasonably call into question the adequacy of the current 24-hour $PM_{2.5}$ standard."[295] One member, in his individual comments, questioned the protection provided by the combination of the annual and 24-hour standards.[296] In contrast, the 2022 Sheppard letter states, "the majority of CASAC members find that the available evidence calls into question the adequacy of the current 24-hour standard."[297] A minority of CASAC members found that EPA had justified retention of the current standard.[298] Because two members were members of both CASACs,[299] the Administrator received the advice of twelve members of the two CASACs. Although some CASAC members questioned the adequacy of the current 24-hour primary NAAQS, this was not a majority opinion. Thus, retaining the current primary 24-hour $PM_{2.5}$ standard is consistent with the CASAC advice in the rulemaking record.

Moreover, the diversity of CASAC member opinions in the face of scientific evidence that has not materially changed illustrates that the decision on whether standard revision is warranted is not a scientific question. Instead, it is one of science policy. As such, even if a majority of CASAC members had recommended revision of the NAAQS, the Administrator could reach a

[294] *See* Section III.B.2., *supra*.

[295] 2019 Cox Letter at 2 and Consensus Responses at 11.

[296] 2019 Cox Letter, Comments of Dr. Mark Frampton at 3.

[297] 2022 Sheppard Letter at 3. To the extent that CASAC members recommending a lower 24-hour $PM_{2.5}$ standard are concerned about exposure to $PM_{2.5}$ caused by wildfires, *see, e.g.*, *id.*, Consensus Responses at 13, it should be noted that the Clean Air Act directs EPA's program to exclude exceptional events, including natural events such as wildfires, from consideration when determining whether an area attains a NAAQS. Thus, a more stringent NAAQS would not reduce exposure to wildfire-generated $PM_{2.5}$.

[298] *Id.* at 4.

[299] *Compare* 2019 Cox Letter at ii (CASAC membership in 2019), *with* 2022 CASAC Letter at ii (CASAC membership in 2022).

different public health policy judgment.[300] Given the split among CASAC members, however, the Administrator public health policy judgment that revision of the NAAQS is not appropriate is consistent with CASAC's advice,[301] and is warranted for the reasons discussed above.

### E. Disbenefits Support the Administrator's Preliminary Judgment that a More Stringent 24-Hour Primary $PM_{2.5}$ NAAQS Would Not Be Appropriate.

For reasons discussed above, the Administrator would need to take costs into account before deciding during this reconsideration proceeding that a more stringent 24-hour primary NAAQS would be appropriate.[302] In addition, as explained above, he would need to weigh health and environmental disbenefits of such a NAAQS against its possible benefits.[303] The potential disbenefits of a more stringent 24-hour NAAQS would likely be similar to those of a more stringent annual standard. Once again, the control measures to reduce PM emissions could lead to increased energy usage, which would likely result in increases in emissions into the air. Such emissions could produce health and environmental harms. In addition, again water resources could be adversely impacted. Furthermore, a tighter 24-hour NAAQS could again impose significant costs on sources in and outside of nonattainment areas.[304] These disbenefits further support the Administrator's conclusion that increasing the stringency of the 24-hour primary $PM_{2.5}$ NAAQS is not appropriate.

[300] *See Mississippi*, 744 F.3d at 1357-58 n.6 (D.C. Cir. 2013) (explaining that when CASAC and EPA both exercise policy judgment, EPA's policy judgment is determinative).

[301] EPA points out that the 2022 CASAC, although questioning the form of the 24-hour standard, recommended retaining the current form at this time. 88 Fed. Reg. at 5619.

[302] *See* Sections II, III.A., *supra*.

[303] *See* Section VI.E., *supra*.

[304] *See generally*, Impacts.

## VIII. The Administrator Properly Recognizes There Is No Basis for Increasing the Stringency of the Primary $PM_{10}$ NAAQS.

Since 1987, EPA has enforced a 24-hour primary standard for $PM_{10}$ at a level of 150 µg/m$^3$, allowing an average of one exceedance of that level every three years.[305] That standard was retained by the 2020 rulemaking that the Agency is now reconsidering.[306] In the current reconsideration, the Administrator again proposes to retain the primary $PM_{10}$ standard.[307] This proposal is both appropriate and reasonable.

EPA now considers the $PM_{10}$ NAAQS a surrogate indicator for coarse PM – particles with a nominal mean aerodynamic diameter between 2.5 µg and 10.0 µg, denominated $PM_{10\text{-}2.5}$.[308] As both the 2019 ISA and the Reconsideration Proposal recognize, the scientific evidence does not support a causal or likely causal determination for any adverse health outcomes for short- or long-term exposure to $PM_{10\text{-}2.5}$.[309] In particular, the 2019 ISA concludes that the causality determinations for all health outcome categories for short- and long-term $PM_{10\text{-}2.5}$ exposure are "either suggestive of, but not sufficient to infer, a causal relationship or inadequate to infer the presence or absence of a causal relationship."[310] Although the 2022 Policy Assessment notes that the evidence for some $PM_{10\text{-}2.5}$-related health effects has "been strengthened," it recognizes that this evidence still suffers from significant uncertainties identified as long ago as the 2012 PM NAAQS review.[311] These uncertainties include questions about the $PM_{10\text{-}2.5}$ exposure estimates used in epidemiologic studies, about the potential for confounding by co-occurring pollutants,

[305] 52 Fed. Reg. 24,634 (July 1, 1987).
[306] 85 Fed. Reg. 82,687, 82,727 (Dec. 18, 2020).
[307] 88 Fed. Reg. at 5637.
[308] 2020 Policy Assessment at 4-18.
[309] 2019 ISA at 1-66 to 1-68, Tbl. 1-4; 88 Fed. Reg. at 5630. The ISA Supplement does not address $PM_{10\text{-}2.5}$ because it addresses only health effect relationships for which the 2019 ISA found a causal or likely causal relationship. 88 Fed. Reg. at 5630.
[310] 2019 ISA at ES-23 (emphasis omitted).
[311] 2022 Policy Assessment at 4-9.

about the independence of $PM_{10-2.5}$ health effect associations, and about the biological plausibility of the $PM_{10-2.5}$-related effects.[312] In 2022, CASAC concurred with this discussion of the uncertainties and noted "the difficulty in extracting the sole contribution of coarse PM to observed adverse health effects, in light of the causal evidence for $PM_{2.5}$ which can be a confounder in studies of $PM_{10}$ health effects."[313] Indeed, in 2019, then-CASAC Chair Tony Cox pointed out that studies reporting positive associations between health effects and $PM_{10-2.5}$ should not be used to assess causality because "positive associations that are not free from confounding, coincident historical trends, and other non-causal explanations, do not provide valid evidence for making or strengthening causal determinations. Using them for this purpose amounts to drawing causal conclusions from non-causal evidence, and is not scientifically valid."[314]

Recognizing the limitations in the scientific database, EPA staff conclude "the available evidence in this reconsideration of the 2020 final decision supports retaining the current standard."[315] The 2019 CASAC determined that the available evidence did not call into question the adequacy of the public health protection afforded by the existing primary $PM_{10}$ standard and expressed support for retaining the current standard.[316] The 2022 CASAC supported the recommendation to retain the primary $PM_{10}$ NAAQS without revision.[317] For these reasons, the Administrator's proposal to retain the primary $PM_{10}$ NAAQS is both appropriate and reasonable.[318]

---

[312] *Id.* at 4-9 to 4-10.
[313] 2022 Sheppard Letter, Consensus Responses at 19.
[314] Individual Comments of Dr. Tony Cox, 2019 Cox Letter at B-26.
[315] 2022 Policy Assessment at 4-19.
[316] 2019 Cox Letter, Consensus Responses at 13.
[317] 2022 Sheppard Letter, Consensus Responses at 19.
[318] One member of the NR3 Coalition, the National Mining Association, is filing separate comments that address the substantial uncertainties that continue to plague research into health effects of coarse PM that prevent promulgation of any more stringent NAAQS for coarse PM and the importance of accounting for the effect of crustal PM on judging compliance with the $PM_{2.5}$ NAAQS.

## IX. The Administrator's Proposal Not To Revise the Secondary NAAQS Is Reasonable and Consistent with the Scientific Evidence.

The Act directs EPA to set secondary NAAQS that specify a level of air quality that, "in the judgment of the Administrator," is requisite to protect the public welfare from "known or anticipated" risks of "adverse" effects.[319] As with the primary NAAQS, the Act does not require the Administrator to set secondary NAAQS at a zero-risk level.[320] Rather, secondary NAAQS are to be set at a level that limits risk sufficiently to protect the public welfare, but not at a level more stringent than necessary to provide this protection.[321]

The current secondary NAAQS for PM are equal to the primary NAAQS, with the exception that the secondary annual $PM_{2.5}$ standard is 15.0 µg/m$^3$ instead of 12.0 µg/m$^3$.[322] These standards are based on protection of visibility, taking into account effects on other welfare values, including climate change and materials damage. Consistent with the decision the Agency reached in 2020 that "the current secondary standards are requisite to protect the public welfare from known or anticipated adverse effects,"[323] the Administrator's proposal to determine "that no change to the current secondary PM standards is required at this time to provide requisite protection against the public welfare effects of PM within the scope of this reconsideration" is a reasonable exercise of his public welfare policy judgment authority under the Act.[324]

### A. The Current Secondary NAAQS Provide the Requisite Protection of Visibility.

In reaching his conclusion to propose retaining the current secondary NAAQS, the Administrator focuses first on the protection of visibility provided by the 24-hour $PM_{2.5}$ standard. He recognizes that the information on acceptable visibility "is largely the same as [it] was in the

---

[319] CAA § 109(b)(2).
[320] 88 Fed. Reg. at 5644.
[321] *Id.*
[322] *Id.*
[323] 85 Fed. Reg. 82,684, 82,744 (Dec. 18, 2020).
[324] *See* 88 Fed. Reg. at 5643.

[2012 and 2020] reviews."[325] The one new study of visibility preference in the United States is Malm, et al., (2019), which the Administrator recognizes cannot readily be compared to the earlier studies.[326] Further, the Administrator notes that the Malm study examined visibility in Grand Canyon National Park. He concludes that Congress intended that visibility protection for a Class I Area such as the Grand Canyon would be provided by the CAA's regional haze program rather than a secondary NAAQS.[327] As a result, he concludes that this study should not be the basis for his decision on whether the secondary NAAQS require revision.

Given the lack of new relevant scientific information, it is not surprising that the Administrator concludes that the current standards continue to protect public welfare with regard to visibility. The Administrator proposes to conclude that the indicator, form, and averaging time of that standard remain appropriate.[328] These conclusions are all rational, given that neither his career staff nor CASAC identified any alternatives for these aspects of the secondary NAAQS.[329]

Turning to the level of the standard, he, as have his predecessors, identifies a 30 deciview (dv) visibility as the level requisite to protect public welfare.[330] In doing so and responding to a request from the 2022 CASAC for better justification of the 30 dv level, the Administrator explains at some length the "substantial uncertainties and limitations" in the visibility preference studies that provide the basis for the secondary NAAQS.[331] He reasons that, given the uncertain nature of

---

[325] *Id.* at 5659.

[326] *Id.* at 5649-50; *see also* 2022 Policy Assessment at 5-24 to 5-25.

[327] 88 Fed. Reg. at 5658, 5660.

[328] *See* 88 Fed. Reg, at 5658-59; *see also* 2022 Policy Assessment at 5-27 to 5-29 (recommending retention of the present indicator, form, and averaging time for the standard).

[329] *See* 2022 Policy Assessment at 5-27 to 5-28; 2019 Cox Letter at 3. The 2022 CASAC suggests, "*For future reviews*, . . . a more extensive technical evaluation of the alternative measures to provide the basis for a secondary standard protective of visibility." 2022 Sheppard Letter at 4 (emphasis added). By tying this recommendation to future reviews, CASAC tacitly acknowledges that the current record does not support consideration of such alternatives.

[330] 88 Fed. Reg. at 5660; 85 Fed. Reg. at 82,741; 78 Fed. Reg. at 3226-27.

[331] 88 Fed. Reg. at 5660; *see also* 2022 Policy Assessment at 5-26, 5-29 (identifying remaining scientific uncertainties and limitations and expressing continued support for use of a 30 dv visibility index).

the data and recognizing that the Regional Haze Program works with the secondary NAAQS to protect visibility, "it is appropriate to establish a target level of protection based on the upper end of the range of [studied] levels."[332] He notes that these judgments are "consistent with similar judgments in past reviews,"[333] when the same underlying data were available. Citing analyses by his staff "demonstrat[ing] that the 3-year visibility metric is at or below 28 dv in all areas meeting the current 24-hour $PM_{2.5}$,"[334] and noting that the 2022 CASAC did not recommend any alternative level for the NAAQS,[335] he "proposes to conclude that the current secondary standards provide requisite protection against PM-related visibility effects."[336] This conclusion is well-grounded in the science and is appropriate.

**B. Revision of the NAAQS To Protect Materials and Climate Is Not Appropriate.**

The Administrator also considers evidence that PM causes impacts on materials and climate. He concludes that uncertainties and limitations of significance remain concerning the relationships between PM and damage to materials and changes in climate such that "it is not appropriate to establish any distinct secondary PM standards to address" them.[337] This conclusion is consistent with the advice of both CASAC panels and of his staff.[338]

[332] 88 Fed. Reg. at 5660.
[333] *Id.*
[334] *Id.*; *see also* 2022 Policy Assessment at 5-30 to 5-33.
[335] 88 Fed. Reg. at 5660. The 2019 CASAC explicitly concluded that "the available evidence does not call into question the protection afforded by the current secondary PM standards." 2019 Cox Letter, Consensus Responses to Charge Questions at 14.
[336] 88 Fed. Reg. at 5661. Noting the request of the 2022 CASAC for better justification for the determination that a 30 dv visual range is protective of public welfare, the Administrator solicits comment on a 24-hour $PM_{2.5}$ standard as low as 25 µg/m$^3$, noting the need for justification for any such comments. 88 Fed. Reg. at 5662. No such more stringent standard is justified in light of the uncertainties and limitations in the evidence concerning PM effects on visibility, as discussed in the proposal and in the 2022 PA.
[337] 88 Fed. Reg. at 5661.
[338] 2022 Sheppard Letter at 22-23 ("large uncertainties" remain concerning the relationship between PM and climate change, and quantitative information on the relationship between PM and materials damage "is lacking"); 2019 Cox Letter, Consensus Responses to Charge Questions at 13-14 (recognizing "uncertainties" about concerning the PM/materials damage and PM-climate relationships); 2022 Policy Assessment at 5-50 (recognizing "significant uncertainties" remain related to quantifying the relationship of PM to climate and materials).

With regard to PM effects on materials, EPA staff explain:

> While there are a number of studies in the 2019 ISA that investigate the effect of PM on newly studied materials and further characterize the effects of PM on previously studied materials, there remains insufficient evidence to relate soiling or damage to specific PM levels or to establish a quantitative relationship between PM in ambient air and materials degradation. Uncertainties that were identified in the 2012 review still largely remain with respect to quantitative relationships between particle size, concentration, chemical concentrations, and frequency of repainting and repair. No new studies are assessed in the 2019 ISA that link perceptions of reduced aesthetic appeal of buildings and other objects to PM-related materials effects. Moreover, uncertainties about the deposition rates of airborne PM to surfaces and the interaction of co-pollutants still remain.[339]

With regard to PM and climate, they state:

> [S]ignificant uncertainties remain that make it difficult to quantify the climate effects of PM. Such uncertainties include those related to our understanding of:
>
> - The magnitude of PM radiative forcing and the portion of that associated with anthropogenic emissions;
> - The contribution of regional differences in PM concentrations, and of individual components, to radiative forcing;
> - The mechanisms of climate responses and feedbacks resulting from PM-related radiative forcing; and,
> - The process by which PM interacts with clouds and how to represent such interactions in climate models.[340]

Declining to set a standard in the face of these uncertainties is appropriate. Revising a NAAQS in the face of uncertainties of this nature would be inappropriate. When an EPA Administrator lacks an adequate scientific basis to make a reasonable judgment on an appropriate standard to protect public welfare, any standard would be arbitrary and capricious, *per se*.[341]

[339] 2022 Policy Assessment at 5-46 to 5-47.
[340] *Id*. at 5-41.
[341] *Ctr. Biological Diversity v. EPA*, 749 F.3d 1079, 1087 (D.C. Cir. 2014).

## X. Even if EPA Were Conducting a Review of the PM NAAQS, the Appropriate Action Would Be Retention of the Existing Standards.

EPA has characterized the current proceeding as a reconsideration of its 2020 decision to retain the existing PM NAAQS.[342] That characterization is accurate. As the Agency recognizes, this proceeding is not based on a completely updated ISA,[343] which would be required before a review of the NAAQS would be appropriate. Instead, it builds on the record compiled by the prior administration, including the 2019 ISA.

Even if EPA instead considers the present proceeding to be a review of the NAAQS, retention of *all* the current PM NAAQS would remain the appropriate decision. A revision is not required each time a NAAQS is reviewed. The decision in 2020 that revision of the PM NAAQS was not then appropriate is consistent with this statutory scheme. Indeed, under both Democratic and Republican administrations, EPA has a history of concluding against revision of the NAAQS at the end of a review.[344]

As discussed above, the uncertainty about possible health effects below the level of the current annual and 24-hour primary $PM_{2.5}$ NAAQS is too great for revision of those standards to be appropriate now. Similarly, uncertainty about the benefit of any more stringent primary $PM_{10}$ NAAQS makes increasing the stringency of that standard inappropriate.[345] Furthermore, the evidence points to the adequacy of the present secondary NAAQS to protect visibility.[346] Finally, the science does not permit quantification of a level at which PM adversely affects materials and

[342] *See* 88 Fed. Reg. at 5560.
[343] *See id*. at 5568.
[344] *See, e.g.*, Review of the National Ambient Air Quality Standards for Oxides of Nitrogen, 83 Fed. Reg. 17,226 (Apr. 18, 2018); Review of the National Ambient Air Quality Standards for Lead, 81 Fed. Reg. 71,906 (Oct. 18, 2016); Secondary National Ambient Air Quality Standards for Oxides of Nitrogen and Sulfur, 77 Fed. Reg. 20,218 (Apr. 3, 2012); National Ambient Air Quality Standards for Ozone – Final Decision, 58 Fed. Reg. 13,008 (Mar. 9, 1993).
[345] *See* Section IX.A., *supra*.
[346] *See* Section IX.B., *supra*.

climate that would warrant consideration of a revision to the secondary NAAQS.[347] In short, given the nature of the scientific evidence, revision of *any* PM NAAQS at this time to increase its stringency is inappropriate.

## XI. EPA Should Follow the Suggestions of State, Local, and Tribal Agencies and Their Representatives in Revising Requirements for $PM_{2.5}$ Monitoring.

EPA is proposing numerous revisions to its requirements for $PM_{2.5}$ monitors, use of data from different types of $PM_{2.5}$ monitors, and monitor siting.[348] Some of these revisions appear ministerial.[349] Others are more significant and could affect determinations of whether NAAQS are attained.[350] As a preliminary matter, we agree with EPA that data that are not from a FRM or a FEM must not be used for regulatory purposes.[351]

EPA notes that it is using American Rescue Plan funds to upgrade FRM-only monitoring sites.[352] This is a reasonable use of those funds. When considering how to upgrade the $PM_{2.5}$ monitoring network, EPA should also consider providing funds to states to locate monitors in rural areas. Placing monitors in such areas could help address the PSD permitting challenges addressed in Sections V.A.1. above by providing more realistic values for background air quality. Alabama has sited such rural monitors and is finding that the data they provide indicate that background air quality is better than was previously assumed.

---

[347] *See* Section VI, VII, *supra*.

[348] 88 Fed. Reg. at 5662-5680.

[349] For example, EPA proposes to update references and codify existing practices for combining data from nearby sites. *Id*. at 5663.

[350] For example, EPA proposes to modify specifications for calibration of FEMs to address recognized biases in the comparability of certain Federal Equivalent Method ("FEM") monitors to FRMs. *Id*. at 5670.

[351] *Id*. at 5679-80 (explaining that satellite-based measurements and those from low cost, portable air sensors are not usable for regulatory uses). Because these data are not suitable for regulatory use, they should not be relied upon to make decisions about the boundaries of a nonattainment area, as EPA indicates has been done in the past. *See id*. at 5678.

[352] *Id*. at 5679.

For other aspects of the proposed rules, EPA must work with the state, local, and tribal agencies that are responsible for establishing monitoring networks, collecting air quality data, and reporting those data to EPA. EPA clearly recognizes the importance of these groups, having discussed the question of FEM bias with them.[353] It is less clear that EPA is following their recommendations.

For example, the Association of Air Pollution Control Agencies ("AAPCA") – not one state, as the Reconsideration Proposal says[354] – asked EPA to "Consider the use of correction factors developed for collocated FRMs and FEMs."[355] As EPA recognizes, CASAC also suggested this approach.[356] Yet EPA appears to dismiss this suggestion in favor of "a national solution in factory calibrations of approved FEMs through a firmware update."[357] Without taking a position on EPA's proposed solution, the NR3 Coalition urges EPA to give greater weight to the reactions of their state, local, and tribal partners to this proposal. Furthermore, EPA should give serious consideration to other recommendations by these partners.

## XII. EPA Should Provide a More Realistic Picture of Costs and Benefits of Revised $PM_{2.5}$ NAAQS Under the Reconsideration Proposal.

The RIA states that "[t]he prohibition against considering cost in the setting of the primary air quality standards does not mean that costs, benefits, or other economic consequences are unimportant."[358] These factors are even more important here since, as noted above, the Administrator can consider costs and burdens in deciding whether to move forward with this

---

[353] *Id.* at 5672.
[354] *Id.*
[355] Letter from Jason E Sloan, Executive Director, AAPCA, to Mr. Peter Tsirigotis, Director, Office of Air Quality Planning and Standards (OAQPS), at 2 (Nov. 23. 2022) (addressing particulate matter monitoring method comparability).
[356] 88 Fed. Reg. at 5682.
[357] 88 Fed. Reg. at 5670.
[358] RIA at ES-2.

reconsideration.[359] Thus, unlike in the normal five-year review cycle, this RIA is not simply for "informational purposes only."[360] The RIA must present a clear picture of the Reconsideration Proposal's benefits as well as its costs and burdens so that the Administrator can make an informed decision as to the appropriateness of finalizing reconsideration of the 2020 PM NAAQS and changing the existing EPA policy therein.

The RIA falls well short of providing such clarity. First, it fails to present a path toward attaining the Reconsideration Proposal's proposed and alternative standards. In doing so, it substantially underestimates costs to apply controls in and around nonattainment areas to meet those standards. As have RIAs in the past, this RIA completely excludes the substantial costs that sources in attainment areas would face due to permitting gridlock caused by more stringent $PM_{2.5}$ NAAQS. Second. it claims benefits of the Reconsideration Proposal that are premised on highly uncertain and subjective inputs. Fueled not by new risks but rather the substantial population residing in potential nonattainment areas, many of which would be nonattainment for the first time, the RIA projects significantly higher benefits for the Reconsideration Proposal than were found in past analyses. However, by failing to do economy-wide modeling, the RIA does not equally capture the sensitivities that such a large population base would have on costs arising from the Reconsideration Proposal.

The RIA is not just informational. It is critical to this reconsideration. EPA should revisit the RIA and work to provide a more realistic cost-benefit analysis of the Reconsideration Proposal – one that leads the Administrator to the sound public policy conclusion that this reconsideration should be withdrawn.

---

[359] *See* Section II, III.A., *supra*.
[360] *See* 88 Fed. Reg. at 5563.

**A. EPA Cannot Identify a Path Toward Complying with the Reconsideration Proposal's Stringent Standards.**

The Reconsideration Proposal's executive summary includes EPA's boilerplate RIA description, "As has *traditionally* been done in NAAQS rulemaking, the EPA prepared a Regulatory Impact Analysis (RIA) to provide the public with information on the potential costs and benefits of *attaining* several alternative $PM_{2.5}$ standard levels."[361] EPA should have been more careful when reproducing this language. This RIA is not traditional. Rather, for the first time in a NAAQS rulemaking, this RIA does not even attempt to provide the public with potential costs for fully attaining proposed or alternative standards.

This RIA is not the first to be unable to identify known controls necessary to achieve the range of revised standards discussed in the Reconsideration Proposal. While EPA's citation of unknown controls is not unique to the Reconsideration Proposal,[362] however, the scale of this reliance is. As seen in the table below, the percentage of unknown controls has grown substantially from the RIA for the Final 2012 PM NAAQS Rule to this RIA. In 2012, EPA projected that reducing the annual $PM_{2.5}$ NAAQS from the then-existing standard of 15.0 $\mu g/m^3$ down to 13.0 $\mu g/m^3$ would have required a reduction of 674 tons of emissions beyond those that could be obtained through application of known controls. An equivalent 2 $\mu g/m^3$ reduction from the current standard down to 10 $\mu g/m^3$ in this RIA yields an estimate that 8,330 tons of emissions would be required in addition to those obtainable through use of known controls – an astounding 1,136 percent increase in tons for which controls were not identified over the 2012 PM NAAQS Final RIA.

[361] *Id.* (emphasis added); *see also National Ambient Air Quality Standards for Particulate Matter, Proposed Rule*, 77 Fed. Reg. 38,889, 39,984 (June 29, 2012) (2012 $PM_{2.5}$ NAAQS proposal containing identical language).

[362] RIAs for both the 2012 PM NAAQS and 2015 Ozone NAAQS could model only partial attainment after applying known controls.

| Emissions Remaining After Application of Known Controls: 2012 PM NAAQS Final RIA and 2022 Reconsideration Proposal RIA | | | |
|---|---|---|---|
| **Reduction from Existing Standard** | **2012 PM NAAQS Final RIA[363]** | **2022 Reconsideration Proposal RIA[364]** | **Increase in Unknown Controls** |
| 2 $\mu g/m^3$ | 674 tons | 8,330 tons | 1,136% |
| 3 $\mu g/m^3$ | 3,190 tons | 18,157 tons | 469% |
| 4 $\mu g/m^3$ | 1,500 tons | 39,912 tons | 2,561% |

It is here where the RIA sharply breaks from past practice. So substantial is the issue of unknown controls in the Reconsideration Proposal that EPA does not even attempt to quantify the cost of such controls. In the past, EPA addressed unknown controls in NAAQS RIAs by assigning them a general cost per ton based on varied extrapolation assumptions.[365] While this approach almost certainly underestimated the rapidly increasing control costs, it was at least an attempt to calculate costs of all controls necessary to attain a more stringent standards.

In contrast, this RIA introduces the novel nomenclature of "*estimated* emissions reductions" (i.e., reductions that can be accomplished through known controls) and "*needed* emissions reductions" (i.e., reductions needed for compliance), abruptly stopping its analysis at the assumption that *estimated* emissions reductions "do not fully account" for *needed* emissions reductions.[366] The RIA admits that, with all known controls applied, "there are remaining air quality challenges in the northeast and southeast, as well as in the west and California."[367] In other words, the RIA concedes that the best that can be achieved is partial attainment of the Reconsideration Proposal's proposed and alternative standards.

The infeasibility of meeting a more stringent $PM_{2.5}$ NAAQS is illustrated by EPA's inability to project attainment at any of the standard levels on which the Agency has solicited

[363] Regulatory Impact Analysis for the Final Revisions to the National Ambient Air Quality Standards for Particulate Matter (undated) ("2012 PM NAAQS Final RIA"), 4-14 tbl. 4-4, EPA-452/R-12-005.
[364] Reconsideration Proposal RIA at ES-12 tbl. ES-4.
[365] NERA Report at 8-10.
[366] RIA at 3-25 (emphases in original).
[367] *Id*. at 4-10.

comment. The RIA highlights some of these concerns, noting that challenges inhibiting compliance include local source-to-monitor impacts, cross-border transport, effects of complex terrain in the West and California, and wildfire influence.[368] EPA effectively admits that the Reconsideration Proposal would create new, potentially permanent, nonattainment areas, in addition to those areas that have struggled for decades to attain NAAQS.

The RIA's inability to project a pathway toward complying with more stringent standards raises broader concerns about the Reconsideration Proposal's reasonableness. This is particularly the case in light of the substantial uncertainty in the science underlying the Administrator's proposed decision to revise the $PM_{2.5}$ NAAQS – including uncertainty identified by his predecessor and not properly reconsidered in the Reconsideration Proposal.[369]

### B. EPA's Failure to Estimate the Full Costs of Compliance Conflicts with its Statutory Obligation Under Section 312 of the CAA to Conduct a Comprehensive Analysis of the Impacts of EPA Regulations.

Under CAA § 312, the Administrator is required to conduct a "comprehensive analysis" of the "costs, benefits and other effects associated with compliance with each standard." In performing this analysis, CAA § 312(c) further requires the Administrator specifically to address the effects of such standards on "employment, productivity, cost of living, economic growth, and the overall economy of the United States." EPA's failure to estimate the full costs of compliance with any of the proposed $PM_{2.5}$ alternative standards, let alone compliance with the current standard, will prevent the Agency from fulfilling its statutory obligation under CAA § 312. It will also undermine Congress' intent that such information be made available to the public. Further, EPA's failure to conduct a full cost analysis will impede the ability of the Office of Management and Budget to fulfill its obligations under the Regulatory Right-to-Know Act to issue "an

[368] RIA at 4-11.
[369] *See* Section VI.A.2., VII.B.2.

accounting statement and associated report" to Congress each year that includes an estimate of the total annual costs and benefits of federal rules and paperwork.[370] EPA cannot thwart Congress' clear intent for transparency with regard to costs and benefits by attempting to hide the true cost of regulations by deciding not to estimate them. Any decision to do so would be arbitrary and capricious.

### C. EPA Grossly Underestimates the Cost of Controls To Comply with the Reconsideration Proposal's Stringent Standards.

The RIA concedes that, "[t]o the extent that additional $PM_{2.5}$ emissions reductions are required that were not identified in our analysis of these areas, the annualized control costs *may be* underestimated."[371] Yet, the RIA projects only partial attainment of revised $PM_{2.5}$ NAAQS, arbitrarily capping control costs at $160,000 per ton and failing to monetize unknown controls beyond that point.[372] Accordingly, the only way control costs *may be*, rather than *are*, underestimated is if EPA believes it is possible that (1) areas will elect not to install additional controls in the face of the Reconsideration Proposal's stringent standards and instead accept long-term nonattainment, or (2) current businesses in the area will cease to operate. Otherwise, it is undisputable that the RIA underestimates the costs of complying with the Reconsideration Proposal's proposed and alternative standards – by a wide margin. EPA should acknowledge that it cannot provide the public with a reasonably accurate estimate of the cost of attaining NAAQS if EPA cannot actually specify measures to bring all areas into attainment.

NERA Economic Consulting analyzed EPA's partial attainment approach, concluding that it leaves the RIA's cost estimates "incomplete to the point of having very limited usefulness to

[370] 31 U.S.C. § 1105 note. The Regulatory Right-to-Know Act was enacted as part of the of Treasury and General Government Appropriations Act, 2001, Pub. L. No. 106-554 (2000), https://www.govinfo.gov/content/pkg/PLAW-106publ554/html/PLAW-106publ554.htm.
[371] RIA at 4-11 (emphasis added).
[372] *Id.* at ES-10.

decision making or public understanding of the full potential impacts of any of the alternative standards."[373] Excluding unknown controls costs above $160,000 effectively cuts marginal costs off as they increase at their fastest pace. For example, EPA projects that Lancaster County, Pennsylvania, needs 1,537 tons of emissions reductions to attain an 8 μg/m$^3$ $PM_{2.5}$ NAAQS.[374] The RIA can identify only 937 tons of emissions reductions within the constraints of its modeling because control measures after that point cost more than $160,000 per ton.[375] As can be seen in the below graph reproduced from the NERA Comments,[376] this effectively masks the price of controls at the point marginal costs grow exponentially. The impact is astounding. EPA projects partial attainment will result in annual control costs for Lancaster County of $27.2 million.[377] When accounting for growing costs as controls become more scarce, NERA projects full attainment costs for just Lancaster Country to be $96 million – 450 percent greater than the RIA's reported partial attainment costs.[378]




[373] NERA Report at 6.
[374] *Id.* at 18.
[375] *Id.* at 19.
[376] *Id.* at 18, fig. 2.
[377] *Id.* at 19.
[378] *Id.*

NERA extrapolated full attainment costs for all counties modeled to partial attainment in the RIA (15 counties at an annual $PM_{2.5}$ NAAQS of 10.0 $\mu g/m^3$, 22 at a standard of 9.0 $\mu g/m^3$, and 61 at a standard of 8.0 $\mu g/m^3$).[379] The results show the astonishing gap in the RIA's cost analysis. While the RIA projects partial attainment of a 10.0 $\mu g/m^3$ annual $PM_{2.5}$ NAAQS would result in just $95 million in annual control costs, NERA finds that full attainment could cost as much as $4.3 billion per year.[380] The RIA projects partial attainment costs for a 9.0 $\mu g/m^3$ standard at $393 million and an 8.0 $\mu g/m^3$ standard at $1.8 billion, while NERA calculates full attainment costs at as much as $9.2 billion and $23.7 billion respectively.[381] As NERA concludes, "partial attainment costs provide no indication of either the absolute or relative costs of any of the alternative standards considered. Their presence in the RIA's executive summary is therefore misleading."[382]

The RIA caps Reconsideration Proposal control costs as they rapidly increase. The Agency should instead provide a full accounting of the Reconsideration Proposal's costs acknowledging that control option costs rise as states exhaust compliance options. Indeed, EPA should provide better information on the basis of its cost estimates in general. This includes providing a clearer picture of its cost analysis by specifically delineating costs and impacts to municipalities and small business through independent analyses.

### D. EPA Should Quantify Increased Permitting Costs in Attainment and Unclassifiable Areas Under the Reconsideration Proposal's Stringent Standards.

Even if the RIA were to more accurately portray control costs, it would capture only part of the Reconsideration Proposal's effect on nonattainment areas. Indeed, the Reconsideration

---

[379] *Id.* at 20 tbl. 2. NERA's methodology for deriving estimates of full attainment costs is explained at pages 21 to 27 of their comments.
[380] *Id.* at 31 tbl. 4.
[381] *Id.*
[382] *Id.* at 3, 38.

Proposal's impact would be still greater when considering the impact across the country on permitting necessary for economic development in local communities that are *in attainment or unclassifiable*. These costs grow every time EPA revises a NAAQS. Yet in the RIA, EPA once again fails to calculate the economic impact of more stringent NAAQS on PSD permitting. EPA should acknowledge the costly impact of any new NAAQS on permitting sources in areas attaining the NAAQS.

As discussed in Section V, *supra*, and Attachment 3, as NAAQS have become more stringent, the costs of permitting major sources and modifications in attainment and unclassifiable areas have increased over time and the Reconsideration Proposal's revised $PM_{2.5}$ NAAQS, if promulgated, would exacerbate this problem. Permitting obstacles undermine efforts to grow the economy and have a real-world impact on construction of projects with state-of-the-art pollution controls.[383]

This is not what Congress intended when it stated in the Act that PSD permitting should "insure that economic growth will occur in a manner consistent with the preservation of existing clean air resources."[384] And yet this is exactly what would happen under the more stringent $PM_{2.5}$ NAAQS suggested in the Reconsideration Proposal. Such a NAAQS would prevent companies from receiving needed permits, foreclose proposed projects, and ultimately inhibit job creation. EPA should provide a fuller picture of the Reconsideration Proposal's economic impacts by revising the RIA to address effects on PSD permitting within attainment areas.

[383] *See e.g., The American Energy Initiative: A Focus on the New Proposal to Tighten National Standards for Fine Particulate Matter: Hearing before the H. Comm. on Energy and Commerce, Subcomm. on Energy and Power* (June 28, 2012) (testimony from Charlotte Pipe and Foundry Company noting that $PM_{2.5}$ NAAQS permitting modeling requirements forced the company to abandon efforts to replace an aging foundry with a new, state-of-the-art, high-efficiency green facility).

[384] CAA §160(3).

### E. Benefits Cited in the Reconsideration Proposal Are Subjective and Highly Uncertain.

The RIA is deficient on both sides of the ledger, not only underestimating costs that will have certain impact, but also treating benefits of any more stringent NAAQS as more certain than is justified. At a fundamental level, the epidemiological associations on which those benefits are based suffer from substantial uncertainty.[385] Although EPA recognizes that the uncertainties about possible health benefits from improved air quality increase at lower $PM_{2.5}$ exposure levels,[386] the RIA fails to reflect the increasing uncertainty about benefits at the lowest levels of $PM_{2.5}$ exposure. Continuing disagreements over causality and the concentration-response relationship in benefit estimations raise questions as to the level of benefits, or whether those benefits should be counted at all. It was uncertainties like these that caused the former Administrator and prior CASAC to conclude that the $PM_{2.5}$ NAAQS should be retained – findings in this docket that are central to reconsidering the 2020 PM NAAQS.

The uncertainty underlying the science on which the Reconsideration Proposal relies is compounded by the manner in which benefits are monetized by the RIA. Reconsideration Proposal benefit estimations are overwhelmingly driven by the "value of statistical life" (VSL) metric. The higher the VSL, the higher the value of benefits attributed to a regulation – and EPA uses one of the highest VSLs used by government agencies to calculate benefits for its regulations.[387]

It is important to note that the VSL estimate upon which EPA relies in the RIA is not based on a single, comprehensive valuation analysis. Rather, it is a mean of a Weibull distribution fitted to 26 different VSL estimates identified in economics literature.[388] The data was highly dispersed,

---

[385] *See* discussion herein at Section II.A.1.a.
[386] 88 Fed. Reg. at 5627.
[387] Dave Merrill, *No One Values Your Life More Than the Federal Government*, Bloomberg.com (Oct. 19, 2017), https://www.bloomberg.com/graphics/2017-value-of-life/.
[388] EPA, *Mortality Risk Valuation Estimates* in GUIDELINES FOR PREPARING ECONOMIC ANALYSIS App. B (2014).

with VSL estimates ranging from as little as $850,000 ($2006) to as much as $19.8 million ($2006).[389] As such, EPA's central VSL estimate of $7.4 million ($2006) is subject to substantial variability, with a significantly high standard deviation of $4.7 million ($2006).[390]

Indeed, in his 1976 paper setting the foundation for VSL estimates, Robert Thaler, 2017 winner of the Nobel Prize for Economics and father of behavioral economics, suggested a VSL estimate that, if applied to the RIA, would reduce benefits in the Reconsideration Proposal by 80 percent.[391] Recent analysis building on Thaler's work raises questions as to whether a single VSL exists at all, noting that "[a] better understanding of how consumers value a wide range of non-market goods and services, including clean air, public transportation, school quality, and a host of other issues, will result in better policies going forward and have a positive impact on social welfare."[392]

This is not to argue that EPA has necessarily selected the wrong VSL. Rather, the discussion highlights the extent to which benefits in the Reconsideration Proposal are highly dependent on subjective VSL estimates. Accordingly, there is substantial quantitative uncertainty regarding benefits claimed in the Reconsideration Proposal, yet the costs remain highly certain – and significantly understated.

### F. The Sensitivity of EPA's Benefits Calculations to Population Size Highlights the Need To Quantify Economy-Wide Impacts of More Stringent Standards.

The uncertainty and subjectivity pervading the RIA's benefits calculation is particularly relevant when accounting for the sheer size of those benefits. This is not due to newly identified

[389] *Id.*
[390] *Id.*
[391] Richard Thaler & Sherwin Rosen, *The Value of Saving a Life: Evidence from the Labor Market*, in HOUSEHOLD PRODUCTION AND CONSUMPTION 294 (Nestor E. Terleckyj ed. 1976).
[392] Kyle Greenberg, Michael Greenstone, Stephen P. Ryan, & Michael Yankovich, The Heterogeneous Value of a Statistical Life: Evidence from U.S. Army Reenlistment Decisions (Sep. 30, 2021), https://bfi.uchicago.edu/working-paper/2021-75/.

risk, but rather the significant portion of U.S. population that would be affected by the Reconsideration Proposal. While the RIA's benefits estimate accounts for the base of population regulated, its cost projections do not reflect this same sensitivity.

EPA claims substantially more benefits in the RIA then it did in the 2012 PM NAAQS RIA[393] for the same incremental $PM_{2.5}$ NAAQS reduction. For example, the RIA estimates between 1,054 percent and 1,131 percent more benefits for full attainment of a 2.0 µg/m$^3$ drop in $PM_{2.5}$ annual NAAQS as compared to the 2012 PM NAAQS RIA. Overall C?R functions used in the two RIAs are similar,[394] and EPA maintains the same VSL estimate accounting for inflation. The primary difference is population affected.

**Benefits Claimed for Full Attainment in the 2012 PM NAAQS RIA and Reconsideration Proposal RIA[395]**

| Reduction of Annual $PM_{2.5}$ NAAQS | Estimate/ Discount | Benefits ($ Billions) | | | Increase |
|---|---|---|---|---|---|
| | | 2012 RIA | 2022 RIA | Difference | |
| 2 µg/m$^3$ | Low, 3% | 1.3 | 16 | 14.7 | 1.131% |
| | Low, 7% | 1.2 | 14 | 12.8 | 1.067% |
| | High, 3% | 2.9 | 33 | 30.1 | 1.038% |
| | High, 7% | 2.6 | 30 | 27.4 | 1.054% |
| 3 µg/m$^3$ | Low, 3% | 4.0 | 36 | 32.0 | 800% |
| | Low, 7% | 3.6 | 33 | 29.4 | 817% |
| | High, 3% | 9.1 | 76 | 66.9 | 735% |
| | High, 7% | 8.2 | 68 | 59.8 | 729% |
| 4 µg/m$^3$ | Low, 3% | 13.0 | 77 | 64.0 | 492% |
| | Low, 7% | 23.0 | 69 | 46.0 | 200% |
| | High, 3% | 29.0 | 160 | 131.0 | 452% |
| | High, 7% | 26.0 | 140 | 114.0 | 438% |

The RIA hints at the correlation between benefits claimed for the Reconsideration Proposal and the population living in areas above the level of the possible NAAQS, noting that

393 EPA, Regulatory Impact Analysis for the Final Revisions to the National Ambient Air Quality Standards for Particulate Matter (Feb. 28, 2013), EPA-452/R-12-005.

394 The 2012 PM NAAQS RIA utilizes $PM_{2.5}$ all-cause mortality risk estimates with a low value of 1.06 (Krewski et al., 2009) and high value of 1.14 (Lepeule et al., 2012). The Reconsideration Proposal relies on different studies with similar risk estimates of 1.066 (Wu et al., 2020) and 1.12 (Pope III et al., 2019).

395 2012 PM NAAQS RIA at 5-71; RIA at 5A-4.

approximately 25 percent of the U.S. population lives in areas that would see $PM_{2.5}$ concentration reductions at a 9.0 µg/m$^3$ standard.[396] Indeed, according to EPA $PM_{2.5}$ air quality data, 27 percent of the population live in counties that would not have attained an annual $PM_{2.5}$ NAAQS of 9.0 µg/m$^3$ in 2021. Revising the annual $PM_{2.5}$ NAAQS to just 10 µg/m$^3$ would still pull Chicago and Houston, the country's third and fourth largest cities, as well other counties that together comprise 16 percent of the U.S. population, into nonattainment. An 8.0 µg/m$^3$ standard would cause counties with populations comprising 43 percent -- nearly half – of Americans be nonattainment. Actual nonattainment would likely be even higher because counties surrounding a county out of attainment would also likely be pulled into a nonattainment area, even if their air quality otherwise attains the $PM_{2.5}$ NAAQS.

**Population in Nonattainment Counties Under Reconsideration Proposal[397]**

| Annual $PM_{2.5}$ NAAQS Standard | Population | | |
|---|---|---|---|
| | Counties With 2019-2021 Design Value Above Standard | Increase from Current Standard | Portion of U.S. |
| 12.0 µg/m$^3$ | 19,749,096 | n/a | 6% |
| 10.0 µg/m$^3$ | 53,481,243 | 171% | 16% |
| 9.0 µg/m$^3$ | 90,801,113 | 360% | 27% |
| 8.0 µg/m$^3$ | 141,528,251 | 617% | 43% |

It is not necessarily surprising that RIA benefits increase as more people live in areas that do not attain a NAAQS. However, the RIA is not equally sensitive to the effect of population on cost. While the RIA finds benefits for the many people that the Reconsideration Proposal would regulate, it does not fully account for their hardship.

The RIA only measures the costs of controls associated with the Reconsideration Proposal's proposed and alternative standards. Even if the RIA were to properly assess those costs, which is does not, that would only cover the Reconsideration Proposal's impact on sources. Left

396 RIA at 6-34.

397 Design values from EPA's $PM_{2.5}$ Design Value Report, 2021. Population data from U.S. Census Bureau's Annual Resident Population Estimates, April 1, 2020 to July 1 2021.

out is the impact of those costs as they trickle down to increased consumer expenses, lost business opportunities, and reduced job growth in nonattainment areas due to stigmatization and in attainment areas from permitting gridlock, and other economy-wide impacts. As the RIA notes, "[i]t is not possible to estimate the magnitude and direction of all these potential effects outside of the regulated sector(s) without an economy-wide modeling approach."[398]

Fortunately, Computable General Equilibrium ("CGE") models "are a tool for evaluating the impacts of a regulation on the broader economy."[399] CGE models can fill gaps in the RIA's control-centric cost assessment because "a CGE model captures the effects of behavioral responses on the part of consumers or other producer to changes in price *that are missed by an engineering estimate of costs*."[400]

In 2017, the Science Advisory Board ("SAB") "recommended that EPA integrate CGE modeling into regulatory analysis to offer a more comprehensive assessment of the effects of air regulation."[401] In response, EPA developed a CGE model called SAGE that the SAB peer-reviewed in 2020. As noted in the RIA, "EPA now has a peer-reviewed CGE model for analyzing the potential for economy-wide effects of regulations" and is "committed to the use of CGE models to evaluate the economy-wide effects of its regulations."[402] Unfortunately, "we did not use the model in the RIA for this proposal."[403]

The Agency's explanation for failing to use its SAGE model for the Reconsideration Proposal is insufficient. EPA claims, with no further explanation, that the SAGE model "does not have the resolution needed to accurately model the emissions inventory sectors being controlled

[398] RIA at 4-14.
[399] *Id.*
[400] *Id.* (emphasis added).
[401] *Id.* (citing *SAB Advice on Use of Economy-Wide Models in Evaluating the Social Costs, Benefits, and Economic Impacts of Air Regulations*, EPA-SAB-17-2017).
[402] *Id.* at 4-16.
[403] *Id.*

(e.g. area fugitive dust inventory sector, residential wood combustion inventor sector)."[404] Yet the SAB's 2020 final peer review report did not raise this as a concern about the model. Rather, the SAB described SAGE as "a dynamic intertemporal model of the U.S. economy *with subnational resolution* across both regions and households and can be used to estimate the welfare effects of an environmental policy."[405]

EPA went through the effort of developing and peer reviewing a tool specifically to address a major gap in the RIA's cost analysis. The Agency's reticence to now use that tool is puzzling. On one hand, the absence of known control data did not stop EPA from modelling control costs in the RIA, even if only to partial attainment. On the other, the lack of data on dust and home ovens makes EPA suddenly unwilling to model economy-wide costs. Indeed, this incongruity goes to the heart of this reconsideration. EPA refuses to use the SAGE model citing certain limited uncertainties, while at the same time proposes to lower the $PM_{2.5}$ NAAQS based on a scientific record that both an Administrator and a CASAC concluded *in this docket* is too uncertain to warrant revising standards.

As was the case in the 2012 PM NAAQS RIA, the RIA applies highly uncertain and subjective assumptions to calculate benefits. That those benefits are so much higher in the current RIA results predominately from the significantly larger affected population base. The RIA's benefits estimates are sensitive to population size. Because EPA failed to engage in economy-wide modeling, the RIA's costs estimates are not. EPA should either conduct economy-wide modeling, or clearly articulate why it cannot do so with the SAGE model. That way, the SAGE model can be quickly improved to at least be used in other near-term NAAQS rulemakings and environmental regulations.

---

[404] *Id*. at 4-13.

[405] EPA SAB, *Technical Review of EPA's Computable General Equilibrium Model, SAGE* (Aug. 28, 2020), EPA-SAB-02-010 (emphasis added).

## XIII. Conclusion.

For the foregoing reasons, EPA should withdraw or otherwise end this voluntary reconsideration proceeding regarding its 2020 decision to retain the existing PM NAAQS, leaving the existing standards in place. Any additional consideration of the 2020 PM NAAQS should be undertaken during the Agency's next statutorily mandated review of those standards. At this time, however, EPA should focus on developing approaches and tools for effective implementation of the NAAQS in a manner consistent with protecting the US economy and minimizing burdens to states and stakeholders.

**NAAQS Regulatory Review & Rulemaking Coalition**

# ATTACHMENT 1
# TO
## COMMENTS OF THE NAAQS REGULATORY REVIEW & RULEMAKING COALITION ON EPA'S RECONSIDERATION OF THE NATIONAL AMBIENT AIR QUALITY STANDARDS FOR PARTICULATE MATTER

**DOCKET NO. EPA–HQ–OAR-2015-0072**

American Chemistry Council
American Coke and Coal Chemicals Institute
American Forest & Paper Association
American Fuel & Petrochemical Manufacturers
American Iron and Steel Institute
American Petroleum Institute
American Wood Council
National Lime Association
National Mining Association
National Stone, Sand & Gravel Association
Oilseed Processors Coalition
- Corn Refiners Association
- National Cotton Council
- National Cotton Ginners Association
- National Cottonseed Processors Association
- National Oilseed Processors Association
- Texas Cotton Ginners' Association

Portland Cement Association
The Aluminum Association
The Fertilizer Institute

March 28, 2023

# Comments on US EPA's Proposed Rule for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter

# Docket No. EPA-HQ-OAR-2015-0072

March 21, 2023

GRADIENT

www.gradientcorp.com
One Beacon Street, 17th Floor
Boston, MA 02108
617-395-5000

# *Table of Contents*

Page

Executive Summary ........ ES-1

1 Introduction ........ 1

2 Primary Annual $PM_{2.5}$ Standard – Epidemiology Evidence ........ 3
2.1 Key Monitor-Based Studies ........ 3
2.1.1 Mean $PM_{2.5}$ Levels ........ 3
2.1.2 Mean $PM_{2.5}$ Concentrations Corresponding to the 25th and 10th Percentiles of Health Events ........ 4
2.2 Key Hybrid Model-Based Studies ........ 5
2.2.1 Mean $PM_{2.5}$ Levels ........ 5
2.2.2 Mean $PM_{2.5}$ Concentrations Corresponding to the 25th and 10th Percentiles of Estimated Exposures or Health Events ........ 7
2.3 Accountability Studies ........ 7
2.4 US Studies *vs*. Canadian Studies ........ 8
2.5 Uncertainties and Limitations ........ 9
2.5.1 Measurement Error ........ 9
2.5.2 Confounding ........ 10
2.5.3 Statistical Model ........ 11
2.5.4 $PM_{2.5}$ Exposure Threshold ........ 11
2.6 Conclusion ........ 12

3 Primary Annual $PM_{2.5}$ Standard – Experimental Evidence ........ 13
3.1 Controlled Human Exposure Studies ........ 13
3.2 Experimental Animal Studies ........ 14

4 Primary 24-Hour $PM_{2.5}$ Standard ........ 16

5 At-Risk Populations ........ 18

6 Conclusions ........ 20

References ........ 21

# *List of Tables*

Table 2.1 The Nine "Asks" of Epidemiology Research

# Abbreviations

| | |
|---|---|
| AOD | Aerosol Optical Depth |
| ATS | American Thoracic Society |
| CASAC | Clean Air Scientific Advisory Committee |
| CI | Confidence Interval |
| C-R | Concentration-Response |
| ERS | European Respiratory Society |
| HR | Hazard Ratio |
| ISA | Integrated Science Assessment |
| NAAQS | National Ambient Air Quality Standards |
| PA | Policy Assessment |
| PM | Particulate Matter |
| $PM_{10}$ | Particulate Matter with Particles 10 µm in Diameter or Less |
| $PM_{2.5}$ | Particulate Matter with Particles 2.5 µm in Diameter or Less |
| SES | Socioeconomic Status |
| US | United States |
| US EPA | United States Environmental Protection Agency |

# Executive Summary

On January 27, 2023, the United States Environmental Protection Agency (US EPA) released the Proposed Rule on the "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter" (hereafter referred to as the Proposed Rule) (US EPA, 2023). The US EPA Administrator proposes to lower the primary annual fine particulate matter (PM) (*i.e.*, particulate matter with particles 2.5 µm in diameter or less [$PM_{2.5}$]) standard from 12 µg/m$^3$ to 9-10 µg/m$^3$ (US EPA, 2023). The Administrator also proposes retaining the current primary and secondary 24-hour $PM_{2.5}$ standard of 35 µg/m$^3$, the primary and secondary 24-hour coarse PM (*i.e.*, particulate matter with particles 10 µm in diameter or less [$PM_{10}$]) standard of 150 µg/m$^3$, and the secondary annual $PM_{2.5}$ standard of 15 µg/m$^3$ (US EPA, 2023).

The Administrator concluded that, supported by the results of recent accountability studies with starting $PM_{2.5}$ concentrations that are relevant to the current primary annual standard and studies that restricted their analyses to $PM_{2.5}$ concentrations below the current standard, the key US epidemiology studies provide evidence of adverse health effects occurring at concentrations below the current standard of 12 µg/m$^3$ (US EPA, 2023). However, US EPA did not review these key epidemiology studies in a systematic, unbiased, or transparent manner, and inappropriately discounted the substantial uncertainties in and limitations of these studies (*e.g.*, exposure measurement error, confounding, irrelevant exposure windows). Therefore, these studies do not provide adequate evidence of health effects occurring at concentrations lower than the current standard of 12 µg/m$^3$.

Even if such evidence were certain, US EPA also failed to acknowledge that the area annual design values are generally higher than the mean concentrations in these key studies, such that the lowest mean concentration reported in the monitor-based studies (*i.e.*, 9.9 µg/m$^3$) and hybrid model-based studies with population weighting (*i.e.*, 9.3 µg/m$^3$) are associated with a range of annual $PM_{2.5}$ design values of 10.9-11.9 µg/m$^3$ and 10.6-11.0 µg/m$^3$, respectively. These values exceed design values reflected in US EPA's proposed range (9-10 µg/m$^3$) for the annual standard. Similarly, as noted in the 2022 Policy Assessment (PA) for the reconsideration of the PM National Ambient Air Quality Standards (NAAQS) (hereafter referred to as the 2022 PA), the recommended increase in near-road monitoring will further increase the ratios of maximum annual design values to averaged concentrations. In turn, this will increase the potential that continued implementation of the current standard could effectively achieve average concentration levels in many areas that approach US EPA's proposed range for what is required to protect public health.

US EPA evaluated controlled human exposure studies and experimental animal studies of $PM_{2.5}$ in the 2019 Integrated Science Assessment (ISA) of PM (hereafter referred to as the 2019 ISA), the 2022 Supplement to the 2019 ISA (hereafter referred to as the 2022 ISA Supplement), the 2022 PA, and the Proposed Rule (US EPA, 2019, 2022a,b, 2023). The Agency acknowledged that these studies mostly evaluated $PM_{2.5}$ exposure levels much higher than ambient PM concentrations. In addition, some of the health outcomes observed in the controlled human exposure studies may not be adverse. These are also studies of small populations that may not be representative of the larger United States (US) population that the NAAQS are intended to protect. Regarding the experimental animal studies, there is inherent uncertainty in extrapolating results from animal models to humans. We agree with US EPA that the available controlled human exposure studies and experimental animal studies do not provide evidence regarding exposures to ambient levels of $PM_{2.5}$. We also conclude that these studies support the existence of thresholds for health outcomes associated with $PM_{2.5}$ exposure.

In the Proposed Rule, the Administrator concluded that the available literature did not call into question the adequacy of the current primary 24-hour $PM_{2.5}$ standard of 35 $\mu g/m^3$ and proposed retaining that standard for now. In support of that decision, the Administrator noted that "the air quality concentrations in areas meeting the current standards are well below the $PM_{2.5}$ concentrations shown to elicit effects" (US EPA, 2023). Considering the uncertainties in and limitations of the scientific evidence and quantitative information on $PM_{2.5}$ exposure, we agree with the US EPA Administrator's current decision that the primary 24-hour $PM_{2.5}$ standard should be retained.

# 1 Introduction

In December 2020, based on the United States Environmental Protection Agency's (US EPA) review of the air quality criteria and the National Ambient Air Quality Standards (NAAQS) for particulate matter (PM), US EPA Administrator Andrew Wheeler retained the primary and secondary NAAQS for fine and coarse PM (*i.e.*, particulate matter with particles 2.5 and 10 µm in diameter or less [$PM_{2.5}$ and $PM_{10}$], respectively) without revision (US EPA, 2020a).

In June 2021, US EPA announced that it would reconsider the 2020 decision to retain the PM NAAQS (US EPA, 2023). As part of the reconsideration process, in May 2022, US EPA released the Supplement to the 2019 Integrated Science Assessment (ISA) for PM (hereafter referred to as the 2022 ISA Supplement) and the Policy Assessment (PA) for the reconsideration of the PM NAAQS (hereafter referred to as the 2022 PA) (US EPA, 2019, 2022a,b).

On January 27, 2023, US EPA released the Proposed Rule on the "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter" (hereafter referred to as the Proposed Rule) (US EPA, 2023). The Administrator proposes to lower the primary annual $PM_{2.5}$ standard from 12 µg/$m^3$ to 9-10 µg/$m^3$ and to retain the primary and secondary 24-hour $PM_{2.5}$ standard at 35 µg/$m^3$, the current primary and secondary 24-hour $PM_{10}$ standard at 150 µg/$m^3$, and the current secondary annual $PM_{2.5}$ standard at 15 µg/$m^3$ (US EPA, 2023).

To evaluate the adequacy of the current primary PM NAAQS, the Administrator considered the scientific evidence evaluated in the 2019 ISA and the 2022 ISA Supplement, as well as evaluations presented in the 2022 PA (US EPA, 2023). The Administrator considered the key epidemiology studies (including the key accountability studies), the available experimental animal and controlled human exposure studies, and air quality analyses, including the important strengths and limitations of these lines of evidence. In his evaluation, the Administrator placed the greatest weight on evidence regarding health effects that were determined to be causally or likely causally associated with short- and long-term $PM_{2.5}$ exposure in the 2019 ISA (US EPA, 2023).

Regarding the adequacy of the current primary annual $PM_{2.5}$ standard, the Administrator noted that "the evidence available in this reconsideration provides support for adverse health effect associations at lower ambient $PM_{2.5}$ concentrations than in previous reviews" (US EPA, 2023). He also stated that "a large number of key U.S. epidemiologic studies report positive and statistically significant associations for air quality distributions with overall mean $PM_{2.5}$ concentrations that are well below the current level of the annual standard of 12 µg/$m^3$… with concentrations ranging down as low as 9.9 µg/$m^3$ in U.S.-based monitor-based studies and 9.3 µg/$m^3$ in U.S.-based hybrid model-based studies" (US EPA, 2023). The Administrator acknowledged that the experimental studies (*i.e.*, controlled human exposure studies and experimental animal studies) mostly evaluate exposures well above ambient concentrations, and may measure outcomes that are not clinically significant. There are also issues with extrapolating results from animals or small human sample populations to the larger human population.

In the Proposed Rule, the Administrator concluded that the new literature did not call into question the adequacy of the current primary 24-hour $PM_{2.5}$ standard of 35 µg/$m^3$ and proposed retaining that standard. In support of that decision, the Administrator noted that "the air quality concentrations in areas meeting the current standards are well below the $PM_{2.5}$ concentrations shown to elicit effects" (US EPA, 2023).

As discussed below, the available scientific evidence and risk-based information do not call into question the adequacy of the public health protection provided by the current primary annual and 24-hour $PM_{2.5}$ standards or indicate that lower standards will increase public health protection against adverse health effects associated with $PM_{2.5}$ exposure.

# 2 Primary Annual $PM_{2.5}$ Standard – Epidemiology Evidence

To evaluate the adequacy of the current primary annual $PM_{2.5}$ standard, the Administrator cited all available lines of scientific evidence, the previous US EPA risk assessments of $PM_{2.5}$ in the 2019 ISA and the 2022 ISA Supplement, and the analysis of the available evidence in the 2022 PA (US EPA, 2023). This approach is consistent with those of previous NAAQS reviews. However, the Administrator's decision regarding the adequacy of the current standard and his proposal to lower the standard are driven primarily by a review of the study-reported means and lower values (*i.e.*, the 25th and 10th percentiles of estimated exposures or health events) from the key epidemiology studies of $PM_{2.5}$. The key epidemiology studies included studies that used monitors to estimate $PM_{2.5}$ exposures, as well as studies that used hybrid modeling approaches and applied population weighting in calculating $PM_{2.5}$ exposure levels (US EPA, 2023).

In the Proposed Rule, the Administrator noted that "the evidence available in this reconsideration provides support for adverse health effect associations at lower ambient $PM_{2.5}$ concentrations than in previous reviews" (US EPA, 2023). He also stated that "a large number of key U.S. epidemiologic studies report positive and statistically significant associations for air quality distributions with overall mean $PM_{2.5}$ concentrations that are well below the current level of the annual standard of 12 $\mu g/m^3$… with concentrations ranging down as low as 9.9 $\mu g/m^3$ in U.S.-based monitor-based studies and 9.3 $\mu g/m^3$ in U.S.-based hybrid model-based studies" (US EPA, 2023). The Administrator noted that, supported by the results of recent accountability studies with starting $PM_{2.5}$ concentrations that are more relevant to the current primary annual standard and studies that restricted their analyses to $PM_{2.5}$ concentrations below the current standard, the key US epidemiology studies provide evidence of health effects occurring at $PM_{2.5}$ concentrations lower than the current standard of 12 $\mu g/m^3$ (US EPA, 2023).

However, as noted below, these studies have substantial uncertainties and limitations (*e.g.*, exposure measurement error, confounding, irrelevant exposure windows), and do not provide adequate evidence of health effects occurring at $PM_{2.5}$ concentrations lower than the current primary annual standard of 12 $\mu g/m^3$.

## 2.1 Key Monitor-Based Studies

In the Proposed Rule, US EPA focused on 21 key monitor-based studies that were conducted in the US that evaluated both short-term and long-term $PM_{2.5}$ exposures and their associations with morbidity and mortality (US EPA, 2023). These studies reported overall mean $PM_{2.5}$ exposure concentrations between 9.9 and 16.5 $\mu g/m^3$ (US EPA, 2023). As discussed below, US EPA also considered key studies that reported mean $PM_{2.5}$ concentrations corresponding to the 25th and 10th percentiles of exposures or health events.

### 2.1.1 Mean $PM_{2.5}$ Levels

The key US monitor-based epidemiology studies considered in the Proposed Rule reported mean $PM_{2.5}$ exposure concentrations between 9.9 and 16.5 $\mu g/m^3$ (US EPA, 2023).

As noted in the Proposed Rule, the area annual design values for $PM_{2.5}$ are generally higher than the mean concentrations reported in the monitor-based studies by 10-20% (US EPA, 2023). Therefore, the range of area annual design values associated with the lowest mean concentration (*i.e.*, 9.9 $\mu g/m^3$) reported in these studies would be 10.9-11.9 $\mu g/m^3$. These levels are higher than the Administrator's proposed primary annual $PM_{2.5}$ standard of 9-10 $\mu g/m^3$. CASAC member Dr. James Boylan also discussed this issue in his comments on the draft of the 2022 PA (Sheppard, 2022; US EPA, 2021a).

In addition, there are major limitations to relying on mean $PM_{2.5}$ concentrations to evaluate the adequacy of the current primary annual standard. US EPA justifies this approach in the 2022 PA by stating that there is the most confidence in the reported magnitude of $PM_{2.5}$ exposure-response associations around the center of the distribution, which corresponds to the bulk of the underlying data (as indicated by narrow confidence intervals [CIs]). However, statistically, influential points for an exposure-response association tend to be located at the data extremes (*i.e.*, outliers), where data are sparse and each data point is given a disproportionately large weight in a least square fitting (Bollen and Jackman, 1985). Considering that the incidence of health effects increases with increasing $PM_{2.5}$ exposure concentrations in cohort studies (as demonstrated by positive associations in linear models), the observed associations at the center of the data are more likely to be at least partially driven by the upper portion of the air quality distribution than observations found lower on the distribution. In other words, while cohort studies report health effects that occurred in *study populations*, for which the average $PM_{2.5}$ exposure concentrations are below the current primary annual standard, they do not necessarily reflect health effects that occur in *individuals* who live in areas with $PM_{2.5}$ concentrations below the current standard.

The key monitor-based studies also have major uncertainties and methodological limitations (*e.g.*, exposure measurement error, confounding, irrelevant exposure windows). In the Proposed Rule, US EPA noted:

> [T]he PA recognizes that uncertainties associated with the epidemiologic evidence (e.g., the potential for copollutant confounding and exposure measurement error) remain, although new studies evaluated in the ISA Supplement employ statistical methods such as alternative methods for confounder control, to more extensively account for confounders, which are more robust to model misspecification. (US EPA, 2023).

As discussed below in Section 2.5, these uncertainties and limitations call into question the basis for moving towards a more stringent primary annual $PM_{2.5}$ standard.

### 2.1.2 Mean $PM_{2.5}$ Concentrations Corresponding to the 25th and 10th Percentiles of Health Events

As part of the PM NAAQS reconsideration process US EPA also considered the mean $PM_{2.5}$ concentrations corresponding to the 25th and 10th percentiles of estimated exposures or health events, when these values were available in the key epidemiology studies, in the 2022 PA (US EPA, 2022b).

As shown in Figure 1 of the Proposed Rule (US EPA, 2023), none of the long-term monitor-based epidemiology studies reported mean $PM_{2.5}$ concentrations corresponding to the 25th and 10th percentiles of estimated exposures or health events. Three short-term $PM_{2.5}$ exposure studies reported both of these values: Franklin *et al*. (2007), Zanobetti and Schwartz (2009), and Bell *et al*. (2008). The lowest mean $PM_{2.5}$ concentrations (*i.e.*, averaged over the study period for each study city) corresponding to the 25th and 10th percentiles of health events reported in these studies are 11.5 and 9.8 $\mu g/m^3$, respectively, both of which are reported by Bell *et al*. (2008). While US EPA (2023) noted that these small number of studies can be "considered to provide insight into the concentrations that comprise the lower quartiles of the air quality distributions," any direct comparisons of the $PM_{2.5}$ concentrations corresponding to lower percentiles (*i.e.*,

25th and/or 10th) with the annual design values is more uncertain than comparisons with the mean concentrations. As noted in the Proposed Rule:

> As such, the PA concludes that focusing on concentrations somewhat below the means (*e.g.*, 25th and 10th percentiles), when such information is available from epidemiologic studies, is a reasonable approach for considering lower portions of the air quality distribution. However, the PA recognizes that the health data are appreciably more sparse and an understanding of the magnitude and significance of the associations correspondingly become more uncertain in the lower part of the air quality distribution. While health effects can occur over the entire distribution of ambient $PM_{2.5}$ concentrations evaluated, and epidemiologic studies do not identify a population-level threshold below which it can be concluded with confidence that PM-associated health effects do not occur (U.S. EPA, 2019a, section 1.5.3), using values below the 10th percentile would lead to even greater uncertainties and diminished confidence in the magnitude and significance of the associations. (US EPA, 2023)

We concur with these points made by the Administrator and conclude that the mean $PM_{2.5}$ concentrations corresponding to the 25th and 10th percentiles of health events from the monitor-based studies should not be considered in setting the $PM_{2.5}$ NAAQS.

## 2.2 Key Hybrid Model-Based Studies

The 2019 ISA and the 2022 ISA Supplement included a substantial number of hybrid model-based studies that had been conducted since the 2012 PM NAAQS review (US EPA, 2023). These studies "employ various fusion techniques that combine ground-based monitor data with air quality modeled estimates and/or information from satellites to estimate $PM_{2.5}$ exposures" (US EPA, 2023). In the current Proposed Rule, US EPA focused on 11 key epidemiology studies that used hybrid model-predicted $PM_{2.5}$ concentrations and that also applied aspects of population weighting. Similar to the monitor-based studies, US EPA also focused on these studies' reported mean $PM_{2.5}$ concentrations and concentrations lower than the mean (*i.e.*, concentrations corresponding to the 25th and 10th percentiles of estimated exposures or health events). As discussed below, while the hybrid model-based studies overcome certain limitations found in the monitor-based studies, these studies also have limitations that are similar to those of the monitor-based studies.

### 2.2.1 Mean $PM_{2.5}$ Levels

Overall, the key US epidemiology studies considered in the Proposed Rule that used hybrid model-predicted $PM_{2.5}$ concentrations and that applied aspects of population weighting reported mean $PM_{2.5}$ exposure concentrations between 9.3 and 12.2 $\mu g/m^3$ (US EPA, 2023).

As noted in the Proposed Rule, area annual design values for $PM_{2.5}$ are generally higher than the mean concentrations reported in the hybrid model-based studies with population weighting by 14-18% (US EPA, 2023). Therefore, the range of area annual design values associated with the lowest mean concentration reported in these studies (*i.e.*, 9.3 $\mu g/m^3$) would be 10.6-11.0 $\mu g/m^3$. These levels are higher than the Administrator's proposed primary annual $PM_{2.5}$ standard of 9-10 $\mu g/m^3$. In his comment on the draft of the 2022 PA (US EPA, 2021a), CASAC member Dr. Boylan also calculated the potential range of area annual $PM_{2.5}$ design values based on the mean $PM_{2.5}$ concentrations reported in the hybrid model-based studies with population weighting.

Dr. Boylan concluded:

> Based on this information, an annual standard in the range of 10.6-12.2 μg/m$^3$ is appropriate. In order to protect public health with an adequate margin of safety, an annual standard in the range of 10.0-11.0 μg/m$^3$ is recommended. In addition, many accountability studies that report public health improvements have starting concentrations within that range. (Sheppard, 2022)

The key hybrid model-based studies also have major methodological limitations (*e.g.*, exposure measurement error, confounding, irrelevant exposure windows). For instance, Di *et al*. (2017a) evaluated the relationship between long-term $PM_{2.5}$ exposure and total mortality in Medicare enrollees in the continental US from 2000 to 2012. While this study used a model that was validated and more flexible regarding complex nonlinear relationships than the models used in many other studies, it is limited by the quality of the input variables, such as the aerosol optical depth (AOD) data, as satellite-based AOD measurements can be biased by unresolved clouds, water vapor, and smoke. In addition, because the study used Medicare records as the source of data regarding cohort members, residential mobility was not accounted for and deaths from unnatural causes were not excluded, resulting in errors in the study's exposure and outcome assessments. Annual average $PM_{2.5}$ concentrations in the year prior to cohort members' deaths or censoring were evaluated in the study's concentration-response (C-R) analysis, but this was likely was not the relevant exposure window, due to the lack of latency time. Regarding adjustment for confounders, while Di *et al*. (2017a) included several individual-level covariates, important confounders such as smoking and body mass index were not available for the Medicare enrollee cohort. Other key hybrid model-based studies have similar limitations.

## Restricted Analyses

The Proposed Rule stated that, consistent with advice from CASAC, US EPA examined epidemiology studies that included "analyses that restrict annual average $PM_{2.5}$ concentrations" to concentrations that are lower than the current annual $PM_{2.5}$ standard, in order to assess the adequacy of the current standard (US EPA, 2023). The current Proposed Rule considered two key studies (Di *et al*., 2017b; Dominici *et al*., 2019) that both used hybrid model-based exposure assessments with population weighting. Regarding these two studies, the Proposed Rule noted:

> These restricted analyses report positive and statistically significant associations with all-cause mortality and report mean $PM_{2.5}$ concentrations of 9.6 μg/m$^3$. Thus, these two epidemiologic studies provide support for positive and statistically significant associations at lower mean $PM_{2.5}$ concentrations. The Administrator does note that uncertainties exist in these analyses (described in more detail in sections II.B.3.b and II.D.2.a above), including uncertainty in how studies exclude concentrations (e.g., at what spatial resolution are concentrations being excluded), which would make any comparisons of concentrations in restricted analyses difficult to compare directly to design values. (US EPA, 2023)

Furthermore, as stated by Papadogeorgou *et al*. (2019):

> [R]estricting the analysis to a subset of the data has some interpretational limitations. Considering a subgroup of the data effectively changes the population of interest. Specifically, it is likely that the subpopulation exposed to low levels of $PM_{2.5}$ does not have the same characteristics as the full study population. If the distribution of certain modifiers of the association between $PM_{2.5}$ and the outcome of interest is different among participants living in lower exposure levels (e.g., rural vs. urban residence, age, socioeconomic status,

etc.) compared to the characteristics in the full population, then the effect estimates from the restricted analysis are not necessarily directly comparable to those of the full analysis.

In other words, just because statistically significantly positive associations remained in analyses restricted to subpopulations exposed to lower $PM_{2.5}$ concentrations, this does not necessarily mean that the upper portion of the air quality distribution was not the driver for the observed associations in the full analyses. In addition, the distributions of potential confounders and effect modifiers in the subpopulation and the full study population could differ, undermining the direct comparability of the results from restricted analyses and those of the full analyses.

### 2.2.2 Mean $PM_{2.5}$ Concentrations Corresponding to the 25th and 10th Percentiles of Estimated Exposures or Health Events

Similar to the monitor-based studies, only three hybrid model-based studies reported the mean $PM_{2.5}$ concentrations corresponding to the 25th and/or 10th percentiles of estimated exposures or health events. However, while all three of the monitor-based studies reporting these values were studies of short-term $PM_{2.5}$ exposure, two of the three hybrid model-based studies reporting at least one of these values studied long-term $PM_{2.5}$ exposure, as shown in Figure 2 of the Proposed Rule (US EPA, 2023). Wang *et al*. (2017) reported a mean $PM_{2.5}$ concentration corresponding to the 25th percentile of estimated exposure of 9.1 $\mu g/m^3$, and Di *et al*. (2017a) reported mean $PM_{2.5}$ concentrations corresponding to the 25th and 10th percentiles of exposure estimates of 9.1 and 7.3 $\mu g/m^3$, respectively. Di *et al*. (2017b), who conducted a study of short-term $PM_{2.5}$ exposure, reported mean $PM_{2.5}$ concentrations corresponding to the 25th and 10th percentiles of health events of 6.7 and 4.7 $\mu g/m^3$, respectively.

As discussed in Section 2.1.2, US EPA noted that considering the small number of available studies reporting these values and the uncertainties related to the $PM_{2.5}$ concentrations lower than the overall mean concentrations, these studies do not provide adequate evidence regarding associations between $PM_{2.5}$ exposure and morbidity/mortality at lower concentrations. In addition, as discussed above, the hybrid model-based studies have several limitations, such as exposure misclassification, the use of an irrelevant exposure window, a lack of consideration of residential mobility, and issues with residual confounding. As such, the mean $PM_{2.5}$ concentrations corresponding to the 25th and 10th percentiles of estimated exposures or health events should not be considered in setting the primary annual $PM_{2.5}$ standard.

## 2.3 Accountability Studies

As part of US EPA's evaluation of the adequacy of the current primary annual $PM_{2.5}$ standard, the Administrator also considered evidence from $PM_{2.5}$ accountability studies, which examine "past reductions in ambient $PM_{2.5}$ and the degree to which those reductions resulted in public health improvements" (US EPA, 2022b). The Administrator specifically noted what he considered to be three key accountability studies that present analyses with starting $PM_{2.5}$ concentrations (*i.e.*, concentrations prior to the policy change or intervention) below the current primary annual standard of 12.0 $\mu g/m^3$: Corrigan *et al*. (2018), Henneman *et al*. (2019), and Sanders *et al*. (2020). The Administrator concluded that these three studies "indicate positive and significant associations with mortality and morbidity and reductions in ambient $PM_{2.5}$" and "suggest public health improvements may occur at concentrations below 12 $\mu g/m^3$" (US EPA, 2023).

We agree with the Administrator that these three accountability studies have made methodological improvements in terms of focusing on $PM_{2.5}$ and starting from a mean $PM_{2.5}$ concentration of 12 $\mu g/m^3$ (*i.e.*, the current primary annual standard) or lower, and can further inform the relationship between $PM_{2.5}$

exposure and health effects. However, accountability studies can have crucial methodological limitations that undermine their findings. Some of these methodological limitations are the same as those commonly found in more traditional epidemiology studies, and others are unique to this specific study design and the statistical approaches these studies use. In addition, some of the significant methodological limitations that remain in these studies were also noted in the previous PA for the PM NAAQS from 2020 (hereafter referred to as the 2020 PA), including the fact that they were not able to "attribute changes in ambient $PM_{2.5}$ concentrations to the interventions under evaluation" and/or "disentangle health impacts of the intervention from background trends in health" (US EPA, 2020b). As a result, the association between a reduction in $PM_{2.5}$ concentrations below the current standard and improvement in health outcomes observed in these studies is not fully supported. Unless all of the aforementioned methodological limitations can be sufficiently addressed, we conclude that accountability studies do not provide adequate evidence to support a lower primary annual $PM_{2.5}$ standard.

## 2.4 US Studies *vs*. Canadian Studies

While the 2019 ISA considered and included epidemiology studies of $PM_{2.5}$ conducted globally (US EPA, 2019), the 2020 PA focused on epidemiology studies of $PM_{2.5}$ conducted in the US and Canada (US EPA, 2020b), because these studies were considered "most relevant to informing the level, form, averaging time, and indicator of the NAAQS for PM" (US EPA, 2022a). Following this approach, the 2022 ISA Supplement was also limited to studies of $PM_{2.5}$ conducted in the US and Canada (US EPA, 2022a).

In the 2022 PA and the Proposed Rule, US EPA noted the differences in exposure environments and population characteristics in the US and Canada (US EPA, 2022b, 2023). As stated in the Proposed Rule:

> [W]hile information from Canadian studies can be useful in assessing the adequacy of the annual standard, differences in the exposure environments and population characteristics between the U.S. and other countries can affect the study-reported mean value and its relationship with the annual standard level. Sources and pollutant mixtures, as well as $PM_{2.5}$ concentration gradients, may be different between countries, and the exposure environments in other countries may differ from those observed in the U.S. Furthermore, differences in population characteristics and population densities can also make it challenging to directly compare studies from countries outside of the U.S. to a design value in the U.S. (US EPA, 2023)

Therefore, US EPA concluded that "interpreting the data (*e.g.*, mean concentrations) from the Canadian studies in the context of a U.S.-based standard may present challenges in directly and quantitatively informing questions regarding the adequacy of the current or potential alternative [to] the levels of the annual standard" (US EPA, 2023). The Agency further noted that while both US and Canadian studies were considered in reaching conclusions, it considered that "the U.S.-based epidemiologic studies are most informative for comparisons with the annual standard metric and for reaching conclusions on the current standard and for informing potential alternative levels of the standard" (US EPA, 2023).

In the comments on the 2022 ISA Supplement, CASAC consultant Dr. Clougherty also recommended removing the Canadian studies from the evaluation of exposure disparities and dose-response relationships between $PM_{2.5}$ and health effects, for the following reasons: "different social & economic context, context of health disparities very different, different patterns of historical discrimination by race and ethnic group, universal access to healthcare and education alter interpretability of SES [socioeconomic status] indicators for US regulatory context" (Sheppard, 2022).

Considering the differences in exposure environments, demographics, and access to healthcare and education between the US and Canada, we concur with Dr. Clougherty that the Canadian studies should be excluded from consideration in the Agency's evaluation of the adequacy of the current primary annual $PM_{2.5}$ NAAQS.

## 2.5 Uncertainties and Limitations

A relatively recent industry-sponsored workshop focused on bridging the gap between epidemiologists and risk assessors in an effort to improve the value of epidemiology research for use in decision-making. It included a diverse group of US EPA researchers, industry scientists, national and international academics, and government scientists. Following this workshop, Burns *et al.* (2019) and LaKind *et al.* (2020) developed a matrix for communicating risk assessment "asks" of epidemiology research that describes the characteristics of epidemiology studies that should be considered when using them for hazard identification, dose-response assessment, and exposure assessment in a risk assessment setting (Table 2.1). By extension, these "asks" are equally important to US EPA's reliance on epidemiology studies when determining whether the existing standards are adequate to protect public health. The key characteristics of epidemiology studies include confirming exposure levels and outcomes and determining the direction and magnitude of error surrounding exposure and dose-response assessments, among others. The epidemiology studies reviewed in the Proposed Rule do not fully meet the risk assessment "asks" outlined by Burns *et al.* (2019) and LaKind *et al.* (2020) or appreciably reduce uncertainty regarding the associations between $PM_{2.5}$ exposure and morbidity or mortality, particularly at exposure concentrations below the current primary annual $PM_{2.5}$ standard. Compared to the studies reviewed in the 2009 ISA (US EPA, 2009), the more recent cohort studies evaluated in the 2019 ISA (US EPA, 2019) and the 2022 ISA Supplement (US EPA, 2022a) are subject to similar methodological limitations, and thus do not meaningfully reduce the uncertainty of the evidence; this prevents causal inference at exposures below the current NAAQS. These methodological limitations and sources of uncertainty are discussed further below.

**Table 2.1 The Nine "Asks" of Epidemiology Research[a]**

| Step of Risk Assessment | "Asks" | | |
|---|---|---|---|
| Hazard Identification | Confirm outcome? | Confirm exposure? | Report methods fully and transparently? |
| Dose-Response | Include information on shape of the curve? | Harmonize exposure categories (definitions)? | Describe direction/ magnitude of error? |
| Exposure Assessment | Evaluate source-to-intake pathways? | Provide complete exposure data? | Report on quality assurance/quality control? |

Note:
(a) Adapted from Table 3 in LaKind *et al.* (2020).

### 2.5.1 Measurement Error

Exposure measurement error is a key source of uncertainty, not only because it affects the reported $PM_{2.5}$ concentrations at which associations with morbidity or mortality are observed, but it can also introduce bias to the observed associations if the direction or magnitude of error is associated with the outcome status. The assessment of $PM_{2.5}$ concentrations in epidemiology studies can be subject to considerable measurement error due to unaccounted-for residential mobility, temporal variation, or poor prediction model performance.

Another important source of exposure measurement error is the placement of the $PM_{2.5}$ monitors from which measurements are taken. As noted in the 2022 PA, in response to a key change in US EPA's monitoring requirements, "the addition of $PM_{2.5}$ monitoring at near-road locations was phased in from 2015 to 2017"

(US EPA, 2022b), largely after the study periods covered by the key epidemiology studies. Since near-road monitoring sites tend to capture higher $PM_{2.5}$ concentrations than those in surrounding areas, had the near-road monitors been placed during the study periods, the study-reported mean $PM_{2.5}$ concentrations would have been higher.

In addition, long-term cohort studies of all-cause or nonaccidental mortality often do not assess exposure timing or duration during etiologically relevant periods within individuals' lifetimes. In most of these studies, ambient $PM_{2.5}$ exposure is only measured for a few years, often contemporaneously with follow-up, leading to innumerable misalignments between exposures and disease processes that inevitably result in death. In effect, these exposure measurement periods are only small parts of individuals' lifetimes that are not contemporaneous with the natural history of any particular health condition that leads to death. Because different causes of death have different etiologies, they also have very different relevant exposure windows. In addition, some causes of death are also more likely due to acute, rather than chronic, conditions.

Given the potential existence of multiple sources of exposure measurement error, assuming the association is causal at higher $PM_{2.5}$ concentrations, it is possible that the observed associations with mortality or morbidity at lower mean $PM_{2.5}$ concentrations simply reflect true associations at higher $PM_{2.5}$ concentrations that were substantially underestimated in the studies. This is particularly important when considering there is limited evidence regarding health effects at lower mean $PM_{2.5}$ concentrations.

In addition, the Proposed Rule noted that the 2022 PA "emphasize[d] multicity/multistate studies that examine health effect associations, as such studies are more encompassing of the diverse atmospheric conditions and population demographic in the U.S. than studies focus on a single city or state" (US EPA, 2023). However, these studies also have limitations, as noted by CASAC consultant Dr. Jane Clougherty in her comments on the draft of the 2022 PA (US EPA, 2021a). Dr. Clougherty noted that she had "some hesitance regarding *co-pollutant adjustment* and *spatial scale* in the $PM_{2.5}$ epidemiology literature to date" (Sheppard, 2022 [emphasis in original]). She explained that:

> There is an assumption throughout the document [*i.e.*, the draft of the 2022 PA] that *larger studies constitute better epidemiology*, though this is not necessarily the case, as larger studies often have greater exposure misclassification, as compromises are made in estimating exposures across larger populations/regions.
>
> Further, these studies are often implemented at larger spatial scales (e.g., 1 km x 1 km or larger), which is much larger than the scale of variance for many important co-pollutants (i.e., NOx [nitrogen oxides] can vary at 100 m or less); as such, studies at larger almost necessarily imperfectly adjust for co-pollutants…. Though larger scales may reasonably capture spatial variation in $PM_{2.5}$ concentrations, they do not fully capture variation in important co-pollutants, so these studies may well not accurately adjust for co-pollutant exposures. (Sheppard, 2022 [emphasis in original])

### 2.5.2 Confounding

Although some of the recent studies have considered potential confounding by copollutants, others have not, which may render the observed associations between $PM_{2.5}$ exposure and health effects in such studies uncertain. However, copollutant evaluations are themselves subject to methodological issues, such as mismatching the copollutant exposure window and mortality, failing to account for collinearity or a nonlinear relationship with $PM_{2.5}$ exposure, and failing to account for temporal variation. In fact, the 2022 ISA Supplement found that there is some evidence of potential confounding by copollutants in some studies

(US EPA, 2022a), which is inconsistent with the studies evaluated in the 2019 ISA that showed statistically significant results in both single and copollutant models, indicating that confounding by copollutants was not a significant source of uncertainty in the associations between $PM_{2.5}$ exposure and health effects observed in these studies (US EPA, 2019).

Three assessments by different researchers (Janes *et al*., 2007; Greven *et al*., 2011; Pun *et al*., 2017) using Medicare cohort data from different time periods have each detected confounding in their datasets, conferring doubt on the reliability/validity of national-level effect estimates derived from this cohort and similar cohorts. Each study observed remarkable differences between their temporal (global) effect estimates and their spatiotemporal (local) effect estimates. In the absence of confounding by variables trending on the national level, these decomposed estimates would be approximately equal. Local effect estimates, which are not confounded by national trends such as healthcare and economic changes, have shown little to no evidence of an association between $PM_{2.5}$ exposure and mortality. While these studies suggested the presence of some unmeasured confounding from epidemiology studies, US EPA did not take these findings into consideration in its causal determinations for $PM_{2.5}$ exposure and health outcomes in the 2019 ISA and 2022 ISA Supplement (US EPA, 2019, 2022a), which provided the scientific basis for the 2022 PA and the Proposed Rule (US EPA, 2022b, 2023).

### 2.5.3 Statistical Model

The Cox proportional hazards model used in cohort studies cannot adequately control for strong time-varying confounding. A recent simulation, based on a realistic cohort of 500,000 adults constructed using the National Cancer Institute Smoking History Generator, indicates that the Cox model poorly controls for a time-dependent strong risk factor (*e.g.*, smoking, which was used in this simulation), yielding unreliable relative risk estimates unless detailed, time-varying information is incorporated into the modeling. None of the studies identified as key in the 2022 PA incorporated these parameters in their modeling (US EPA, 2022b). As a result, the effect estimates from these studies are of questionable reliability, given the relatively modest association between $PM_{2.5}$ exposure and mortality (Moolgavkar *et al.*, 2018).

### 2.5.4 $PM_{2.5}$ Exposure Threshold

In the Proposed Rule, US EPA noted:

> Studies evaluated in the 2019 ISA and the ISA Supplement examine this issue, and continue to provide evidence of linear, no-threshold relationships between long-term $PM_{2.5}$ exposures and all-cause and cause-specific mortality…. Generally, the evidence remains consistent in supporting a no-threshold relationship, and in supporting a linear relationship for $PM_{2.5}$ concentrations > 8 $\mu g/m^3$. However, uncertainties remain about the shape of the C-R [concentration-response] curve at $PM_{2.5}$ concentrations < 8 $\mu g/m^3$, with some recent studies providing evidence for either a sublinear, linear, or supralinear relationship at these lower concentrations (U.S. EPA, 2019a, section 11.2.4; U.S. EPA, 2022a, section 2.2.3.2). (US EPA, 2023)

Rhomberg *et al.* (2011) showed that exposure measurement error can lead to the underestimation of risks at higher exposure levels and the overestimation of risk at lower exposure levels. Exposure measurement errors, ranging from instrument imprecision to the practice of serially averaging measured constituent values over time and space, are pervasive in observational air pollution studies. These errors preclude the ability of these studies to detect a $PM_{2.5}$ threshold, if one were to exist. Given that such errors make determining the true shape of the $PM_{2.5}$ concentration-response function difficult, assessments of risks at low $PM_{2.5}$ exposure levels based on these curves are of dubious reliability.

Similarly, in his comments on the draft of the 2022 ISA Supplement (US EPA, 2022a), CASAC member Dr. Jeremy Sarnat noted:

> A theoretical question related to the shape of C-R curves (for mainly long-term exposure and mortality) is whether we might expect to see differential measurement error at lower observed PM concentrations. For studies based primarily on measured estimates of population exposure I could hypothesize why differential error may exist and lead to differences in the shape of the curve along its full observed range. (US EPA, 2021b)

Furthermore, in her comments on the same document, CASAC member Dr. Deborah Corey-Slechta stated:

> One topic that does come to mind, although not necessarily related to the current document or its ultimate purpose and which may be included in the 2019 PM ISA is the fact that exposure to air pollution is lifelong, beginning in utero. Obviously, this cannot be accommodated in terms of data or specific calculations but may be an important reminder with respect to the problem itself, given that right now we're not even focused on lifetime exposures. (US EPA, 2021b)

This is an important point. The long-term exposure studies of $PM_{2.5}$ that US EPA evaluated did not assess the risks of lifetime $PM_{2.5}$ exposures or determine how individuals' $PM_{2.5}$ exposures before the study period impact the interpretation of their results, even though it is hard to imagine these earlier exposures not playing a role if $PM_{2.5}$ exposure is indeed causal. Not only can this impact the detection of a threshold, but these earlier exposures may be confounders that impact the interpretation of associations between $PM_{2.5}$ exposure and health effects at lower exposure concentrations.

Taken together, there is a high degree of uncertainty at long-term $PM_{2.5}$ concentrations below the current annual standard in epidemiology studies that evaluated concentration-response relationships.

## 2.6 Conclusion

In the Proposed Rule, US EPA (2023) concluded:

> Regardless of whether an epidemiologic study uses monitoring data or a hybrid modeling approach when estimating $PM_{2.5}$ exposures, the PA recognizes that it is challenging to interpret the study-reported mean $PM_{2.5}$ concentrations and how they compare to design values. This is particularly true given the variability that exists across the various approaches to estimate exposure and to calculate the study-reported mean.

We concur with US EPA that comparing the mean $PM_{2.5}$ concentrations reported from the key epidemiology studies to the annual design values is challenging. In addition, we recognize that the key epidemiology studies on which the Administrator based his proposal to lower the current standard were not reviewed in a systematic, unbiased, or transparent manner. These studies have substantial uncertainties and limitations (*e.g.*, exposure measurement error, confounding, irrelevant exposure windows) that were not adequately taken into account in the Administrator's evaluation of the current standard. Therefore, these studies do not provide adequate evidence for health effects occurring at $PM_{2.5}$ concentrations lower than the current standard of 12 $\mu g/m^3$.

# 3 Primary Annual $PM_{2.5}$ Standard – Experimental Evidence

US EPA described experimental studies in the 2019 ISA, 2022 ISA Supplement, 2022 PA, and Proposed Rule (US EPA, 2019, 2022a,b, 2023). The Agency acknowledged that these studies mostly evaluated exposures well above ambient $PM_{2.5}$ concentrations. We agree with US EPA that these studies do not provide evidence regarding ambient $PM_{2.5}$ exposures. We also conclude that these studies provide evidence that there are thresholds for health outcomes associated with $PM_{2.5}$ exposure.

## 3.1 Controlled Human Exposure Studies

Regarding the available controlled human exposure studies of $PM_{2.5}$, the 2022 PA stated:

> Taken together, these controlled human exposure studies support biological plausibility for the serious cardiovascular and respiratory effects that have been linked with ambient $PM_{2.5}$ exposures and seen in epidemiologic studies (U.S. EPA, 2019, Chapter 6). However, while these studies are important in establishing biological plausibility, it is unclear how the results alone and the importance of the effects observed in these studies, particularly in studies conducted at near-ambient $PM_{2.5}$ concentrations, should be interpreted with respect to adversity to public health. (US EPA, 2022b)

We disagree with the Agency's conclusion that these studies' results provide support for the biological plausibility of the health effects observed at ambient $PM_{2.5}$ concentrations in the epidemiology studies. Only a few such studies are available, and they mostly evaluated exposure concentrations well above ambient concentrations. In addition, the exposure concentrations these studies evaluated and the health outcomes they observed are not consistent or coherent. They also all had very small samples sizes and do not represent the larger population of people in the US that the NAAQS is intended to protect.

In addition, some of the effects observed in these studies are either not adverse themselves or are not necessarily indicative of potential adverse effects. US EPA acknowledged and discussed this in the Proposed Rule:

> [I]mpaired vascular function can signal an intermediate effect along the potential biological pathways for cardiovascular effects following short-term exposure to $PM_{2.5}$ and show a role for exposure to $PM_{2.5}$ leading to potential worsening of IHD [ischemic heart disease] and heart failure followed potentially by ED [emergency department] visits, hospital admissions, or mortality (U.S. EPA, 2019, section 6.1 and Figure 6-1). **However, just observing the occurrence of impaired vascular function alone does not clearly suggest an adverse health outcome.** (US EPA, 2023 [emphasis added])

Regarding this issue, US EPA also referenced the American Thoracic Society (ATS) and European Respiratory Society (ERS) statement on the adverse effects of air pollutants (Thurston *et al*., 2017) in the Proposed Rule, stating:

> While the ATS/ERS statement concluded that chronic endothelial and vascular dysfunction can be judged to be a biomarker of an adverse health effect from air pollution, they also conclude that "the health relevance of acute reductions in endothelial function induced by air pollution is less certain" (Thurston et al., 2017). This is particularly informative to our consideration of the controlled human exposure studies which are short-term in nature (*i.e.*, ranging from 2- to 5-hours), including those studies that are conducted at near-ambient $PM_{2.5}$ concentrations. (US EPA, 2023)

Many of the cardiovascular and respiratory effects assessed in the controlled human exposure studies have threshold modes of action and do not occur at lower $PM_{2.5}$ concentrations. If the threshold is above ambient concentrations, then these studies do not provide support for these effects at ambient concentrations.

In light of these issues, US EPA should not consider the results of the controlled human exposure studies of $PM_{2.5}$ to support the biological plausibility of health effects reported in epidemiology studies at near-ambient or lower $PM_{2.5}$ concentrations.

## 3.2 Experimental Animal Studies

With respect to the available experimental animal studies of $PM_{2.5}$, the 2022 PA noted that, except for two studies that examined $PM_{2.5}$ concentrations close to ambient concentrations, most of the studies examined short-term exposures to concentrations ranging from 100 to >1,000 $\mu g/m^3$ and long-term exposures to concentrations ranging from 66 to >400 $\mu g/m^3$, which are far above ambient levels in the US (US EPA, 2022b). Of the two exceptions, one study reported impaired lung development in mice following exposure to an average concentration of 16.8 $\mu g/m^3$ of $PM_{2.5}$ for 24 hours/day for several months (Mauad *et al*., 2008), and the other study reported increased carcinogenic potential following exposure to an average concentration of 17.7 $\mu g/m^3$ $PM_{2.5}$ for 2 months (Cangerana Pereira *et al*., 2011, as cited in US EPA, 2022b). The 2022 PA noted that while these two studies reported "serious effects following long-term exposures to $PM_{2.5}$ concentrations close to the ambient concentrations reported in some $PM_{2.5}$ epidemiologic studies (U.S. EPA, 2019, Table 1-2), [these concentrations are] still above the ambient concentrations likely to occur in areas meeting the current primary standards" (US EPA, 2022b).

The Administrator noted in the Proposed Rule:

> With regard to the animal toxicological studies, the PA recognizes that, unlike the controlled human exposure studies that provide insight on the exposure concentrations that directly elicit health effects in humans, there is uncertainty associated with translating the observations in the animal toxicological studies to potential adverse health effects in humans. The PA notes that the interpretation of these studies is complicated by the fact that $PM_{2.5}$ concentrations in animal toxicological studies are much higher than those shown to elicit effects in human populations. Moreover, the PA recognizes that there are also significant anatomical and physiological difference[s] between animal models and humans. (US EPA, 2023)

The Administrator concluded, "noting uncertainty in extrapolating the effects seen in animals, and the $PM_{2.5}$ exposures and doses that cause those effects to human populations, animal toxicological studies are of limited utility in informing decisions on the public health protection provided by the current or alternative primary $PM_{2.5}$ standards" (US EPA, 2023). We agree with the Administrator's judgment regarding the overall evidence from the experimental animal studies of $PM_{2.5}$.

# 4 Primary 24-Hour $PM_{2.5}$ Standard

In the Proposed Rule, the Administrator concluded that the available literature did not call into question the adequacy of the current primary 24-hour $PM_{2.5}$ standard of 35 μg/m$^3$ and proposed retaining that standard for now. In support of that decision, the Administrator noted that "the observations that the air quality concentrations in areas meeting the current standards are well below the $PM_{2.5}$ concentrations shown to elicit effects" (US EPA, 2023). However, because some CASAC members have proposed lowering the current primary 24-hour standard to between 25 and 30 μg/m$^3$, the Administrator will also take public comments on that proposal (US EPA, 2023).

Regarding the available epidemiology studies of short-term $PM_{2.5}$ exposure, the Administrator noted:

> While there are three studies available in this reconsideration that restricted 24-hour concentrations to concentrations below 25 μg/m$^3$ and while some members of CASAC pointed to these studies as the basis for their recommendation to revise the 24-hour standard, the Administrator preliminarily concludes that the results from these studies, particularly in light of the uncertainties associated with these studies… are an inadequate basis for revising the level of the 24-hour $PM_{2.5}$ standard. (US EPA, 2023)

The Administrator also noted that the risk assessment of long- and short-term $PM_{2.5}$ exposures and all-cause or nonaccidental mortality shows that:

> [E]stimated reduction in $PM_{2.5}$-associated risks is across a more limited population and is largely confined to a small number of areas located in the western U.S. Other areas included in the risk assessment were shown to experience risk reductions that were driven primarily by meeting a lower annual standard level (though the associated change in air quality also resulted in lower 24-hour standard concentrations). (US EPA, 2023)

In their review of the draft of the 2022 PA, some CASAC members recommended retaining the primary 24-hour $PM_{2.5}$ standard, primarily based on the US EPA risk assessment and evidence from controlled human exposure studies of $PM_{2.5}$. For example, in his comments on the draft of the 2022 PA, Dr. Boylan noted:

> EPA provides sufficient rationale to retain the current primary 24-hour $PM_{2.5}$ standard, without revision. The risk assessment not only accounts for the level of the standard, but also accounts for the form of the standard and the way attainment with the standard is determined (i.e., highest design value in the CBSA [core-based statistical areas]). The risk assessment indicates that the annual standard is the controlling standard across most of the urban study areas evaluated and revising the level of the 24-hour standard is estimated to have minimal impact on the $PM_{2.5}$-associated risks. Therefore, the annual standard can be used to limit both long- and short-term $PM_{2.5}$ concentrations.
>
> Epidemiologic studies provide the strongest support for reported health effect associations for the overall mean concentrations rather than near the upper end of the concentration distribution; therefore, there is limited epidemiologic evidence to determine the adequacy of the level of the 24-hour standard. The epidemiologic studies included in this document

> do not indicate that the reported health effect associations are strongly influenced by exposures to the peak concentrations in the air quality distribution.
>
> Finally, the $PM_{2.5}$ concentrations used in human clinical studies to show short-term exposure effects are well above those typically measured in areas meeting the current standards, suggesting that the current standards are providing adequate protection against these exposures. (Sheppard, 2022)

Considering the uncertainties in and limitations of the scientific evidence and quantitative information regarding short-term $PM_{2.5}$ exposure noted by both the Administrator and CASAC member Dr. Boylan, we agree with the US EPA Administrator that the primary 24-hour $PM_{2.5}$ standard should be retained.

# 5 At-Risk Populations

The Proposed Rule noted that at-risk populations "represent a substantial portion of the total U.S. population" and "[t]he information available in this reconsideration has not altered our understanding of human populations at risk of health effects from $PM_{2.5}$ exposures" (US EPA, 2023). These populations include children, older adults, individuals with pre-existing cardiovascular and/or respiratory diseases, individuals of Black and Hispanic race/ethnicity, and individuals of lower socioeconomic status (SES) (US EPA, 2023). However, the 2019 ISA indicates that "children and race were the only factors for which it was concluded that '*adequate evidence*' was available indicating that people of a specific lifestage and race are at increased risk of $PM_{2.5}$-related health effects" (US EPA, 2019 [emphasis in original]). For all the other risk factors, US EPA found the evidence to be suggestive of an association with an increased risk of $PM_{2.5}$-related health effects[1] (*e.g.*, pre-existing cardiovascular disease or respiratory disease, low SES) or inadequate to be able to assess that association (*e.g.*, older age) (US EPA, 2019). Highlighting environmental justice issues, the 2022 ISA Supplement focused on reviewing studies published since the 2019 ISA that examined disparities in $PM_{2.5}$ exposure or $PM_{2.5}$-related health risks based on SES and race/ethnicity (US EPA, 2022a). US EPA concluded in the 2022 ISA Supplement that the evidence from those studies "support the conclusions of the 2019 PM ISA," specifically that there is "suggestive" evidence that low SES is associated with an increased risk of $PM_{2.5}$-related health effects and "adequate" evidence that "race and ethnicity, specifically minority populations including Black populations, are at increased risk of $PM_{2.5}$-related health effects, in part due to disparities in exposure" (US EPA, 2022a).

With respect to children, the 2019 ISA stated that "[a]lthough stratified analyses do not indicate a difference in the risk of PM-related health effects between children and adults, there is strong evidence from studies focusing on children that demonstrate health effects only observable in growing children that [can be] attributed to $PM_{2.5}$ exposure" (US EPA, 2019). That is, while children may be susceptible to health outcomes that would not affect adults (*e.g.*, lung function growth), there is no evidence that the $PM_{2.5}$ exposure levels at which these effects occur are lower than the exposure levels at which other health effects can occur in children and adults. This indicates that the current primary annual and 24-hour $PM_{2.5}$ standards are adequate to protect children.

It is also notable that many of the epidemiology studies on which the evaluation of the current standard is based involved populations that the 2019 ISA indicated have suggestive evidence of being susceptible to $PM_{2.5}$ (US EPA, 2019). For example, studies of children, older adults, and people with pre-existing cardiovascular and respiratory diseases form the basis of causal conclusions in the 2019 ISA. In addition, three of the eight studies on which the $PM_{2.5}$ risk assessment presented in the 2022 PA was based (US EPA, 2022b) evaluated mortality risks in people over the age of 55 (*i.e.*, Thurston *et al.*, 2016) and 65 (*i.e.*, Di *et al.*, 2017a; Zanobetti *et al.*, 2014). Although the remaining five studies on which this risk assessment was based evaluated all ages (Baxter *et al.*, 2017; Ito *et al.*, 2013) and ages 30 and over (Jerrett *et al.*, 2017; Pope *et al.*, 2015; Turner *et al.*, 2016), the majority of the deaths observed in these studies occurred in older individuals.

In addition, while environmental justice issues are important and should continue to be studied, and there is clear evidence for disparities in $PM_{2.5}$ exposure associated with race and SES, the evidence to date regarding disparities in the risk of $PM_{2.5}$-related health effects associated with these factors does not support

[1] *i.e.*, "[The] evidence is limited due to some inconsistency within a discipline or, where applicable, a lack of coherence across disciplines" (US EPA, 2019)

a similar conclusion. Specifically, none of the five studies included in the 2022 ISA Supplement (US EPA, 2022a) that evaluated the dose-response relationship between long-term $PM_{2.5}$ exposure and total mortality stratified by race/ethnicity (*i.e.*, Awad *et al*., 2019; Lipfert and Wyzga, 2020; Parker *et al*., 2018; Son *et al*., 2020; Wang *et al*., 2020) support the conclusion that there is a disparity in $PM_{2.5}$-related mortality risk associated with race/ethnicity. Both Awad *et al*. (2019) and Lipfert and Wyzga (2020) reported stronger associations between long-term $PM_{2.5}$ exposure and mortality among Whites than among Blacks, while Son *et al*. (2020) and Wang *et al*. (2020) both reported associations of equal magnitude among Whites and Blacks (US EPA, 2022a). Regarding the fifth study by Parker *et al*. (2018), while the 2022 ISA Supplement stated that the "study reported a larger association, in terms of magnitude, among Black (HR: 1.05 [95% CI: 1.03, 1.09]) and White (HR: 1.02 [95% CI: 1.00, 1.05]) individuals and a null association among Hispanic individuals (HR: 0.98 [95% CI: 0.94, 1.03])" for all-cause mortality[2] (US EPA, 2022a), these hazard ratios (HRs) and CIs are not consistent with those reported in the study publication. Rather, Parker *et al*. (2018) reported no association between long-term $PM_{2.5}$ exposure and all-cause mortality among White (HR = 1.05, 95% CI: 1.00-1.11), Black (HR = 1.11, 95% CI: 0.97-1.28), or Hispanic individuals (HR = 0.97, 95% CI: 0.88-1.06). The results suggest that there were no statistically significant differences in the associations between long-term $PM_{2.5}$ exposure and all-cause mortality among different racial groups.

As with the key epidemiology studies of $PM_{2.5}$ exposure discussed in Section 2, US EPA did not systematically evaluate the quality of the studies evaluating $PM_{2.5}$ exposure and at-risk populations that the Agency reviewed in the 2022 ISA Supplement (US EPA, 2022a). For example, the study by Wang *et al*. (2020) is subject to several methodological limitations, primarily the potential for exposure measurement error, model misspecification, and multiple comparisons being performed, all of which could have biased the study's findings on racial disparities in mortality rates. Further, all five of the studies discussed above had very large sample sizes, ranging from approximately 660,000 to 53,000,000 (Awad *et al*., 2019; Lipfert and Wyzga, 2020; Parker *et al*., 2018; Son *et al*., 2020; Wang *et al*., 2020). As a result, any observed differences in the association between long-term $PM_{2.5}$ exposure and mortality across racial groups could have been due to overly sensitive statistical testing, rather than reflecting true underlying racial disparities in mortality associated with $PM_{2.5}$ exposure. Finally, there are few studies (maximum of two) available for each particular health outcome (*e.g*., overall cardiovascular mortality, hypertension, diabetes mortality), raising question about the certainty of the existing evidence.

[2] In addition, in Table A-16 of the 2022 ISA Supplement, US EPA reported a different risk estimate for all-cause mortality for white individuals (HR = 1.03, 95% CI: 1.02-1.03) (US EPA, 2022a). The risk estimates for the other two populations are the same as those provided in the main text.

# 6 Conclusions

Based on our review of the Proposed Rule, we conclude the following:

- The evidence does not support lowering the primary annual $PM_{2.5}$ standard.
  - The key epidemiology studies on which the Administrator based his proposal to lower the current standard were not reviewed in a systematic, unbiased, or transparent manner. These studies have substantial uncertainties and limitations (*e.g.*, exposure measurement error, confounding, irrelevant exposure windows) that were not adequately taken into account in the Administrator's evaluation of the current standard. Therefore, these studies do not provide adequate evidence for health effects occurring at $PM_{2.5}$ concentrations lower than the current standard of 12 $\mu g/m^3$.
  - The area annual $PM_{2.5}$ design values are generally higher than the mean concentrations reported in the monitor-based studies and the hybrid model-based studies that incorporated population weighting. The range of the area annual design values associated with the lowest reported mean $PM_{2.5}$ concentrations reported in these studies (*i.e.*, 9.9 $\mu g/m^3$ for the monitor-based studies and 9.3 $\mu g/m^3$ for the hybrid model-based studies with population weighting) would be 10.9-11.9 $\mu g/m^3$ and 10.6-11.0 $\mu g/m^3$, respectively. These levels are higher than the Administrator's proposed primary annual $PM_{2.5}$ standard of 9-10 $\mu g/m^3$.
  - Further, the recommended increase in near-road monitoring will further increase the ratios of maximum annual design values to averaged concentrations. In turn, this will increase the potential that continued implementation of the <u>current</u> standard could effectively achieve average concentration levels in many areas that approach US EPA's proposed range for what is required to protect public health.
  - While accountability studies can inform the relationship between $PM_{2.5}$ exposure and health effects, they can have crucial methodological limitations that undermine their findings, including some that are unique to this study design and the statistical approaches these studies use, and some common to epidemiology studies with a more-traditional study design (*e.g.*, exposure measurement error).
  - The experimental animal studies and controlled human exposure studies of $PM_{2.5}$ do not provide evidence regarding ambient $PM_{2.5}$ exposures.
- Considering the uncertainties in and limitations of the scientific evidence and quantitative information regarding short-term $PM_{2.5}$ exposure, we agree with the US EPA Administrator's current decision that the primary 24-hour $PM_{2.5}$ standard should be retained.

# References


Awad, YA; Di, Q; Wang, Y; Choirat, C; Coull, BA; Zanobetti, A; Schwartz, J. 2019. "Change in PM2.5 exposure and mortality among Medicare recipients: Combining a semi-randomized approach and inverse probability weights in a low exposure population." *Environ. Epidemiol.* 3(4):e054. doi: 10.1097/EE9.0000000000000054.

Baxter, LK; Crooks, JL; Sacks, JD. 2017. "Influence of exposure differences on city-to-city heterogeneity in PM2.5-mortality associations in US cities." *Environ. Health* 16(1):1. doi: 10.1186/s12940-016-0208-y.

Bell, ML; Ebisu, K; Peng, RD; Walker, J; Samet, JM; Zeger, SL; Dominici, F. 2008. "Seasonal and regional short-term effects of fine particles on hospital admissions in 202 US counties, 1999-2005." *Am. J. Epidemiol.* 168(11):1301-1310.

Bollen, KA; Jackman, RW. 1985. "Regression diagnostics: An expository treatment of outliers and influential cases." *Sociol. Methods Res.* 13(4):510-542. doi: 10.1177/0049124185013004004.

Burns, CJ; LaKind, JS; Mattison, DR; Alcala, CS; Branch, F; Castillo, J; Clark, A; Clougherty, JE; Darney, SP; Erickson, H; Goodman, M; Greiner, M; Jurek, AM; Miller, A; Rooney, AA; Zidek, A. 2019. "A matrix for bridging the epidemiology and risk assessment gap." *Glob. Epidemiol.* 1:100005. doi: 10.1016/j.gloepi.2019.100005.

Corrigan, AE; Becker, MM; Neas, LM; Cascio, WE; Rappold, AG. 2018. "Fine particulate matters: The impact of air quality standards on cardiovascular mortality." *Environ. Res.* 161:364-369. doi: 10.1016/j.envres.2017.11.025.

Di, Q; Wang, Y; Zanobetti, A; Wang, Y; Koutrakis, P; Choirat, C; Dominici, F; Schwartz, JD. 2017a. "Air pollution and mortality in the Medicare population." *N. Engl. J. Med.* 376(26):2513-2522. doi: 10.1056/NEJMoa1702747.

Di, Q; Dai, L; Wang, Y; Zanobetti, A; Choirat, C; Schwartz, JD; Dominici, F. 2017b. "Association of short-term exposure to air pollution with mortality in older adults." *JAMA* 318(24):2446-2456. doi: 10.1001/jama.2017.17923.

Dominici, F; Schwartz, J; Di, Q; Braun, D; Choirat, C; Zanobetti, A. 2019. "Assessing Adverse Health Effects of Long-Term Exposure to Low Levels of Ambient Air Pollution: Phase 1." Health Effects Institute. HEI Research Report No. 200. 74p., November. Accessed at https://www.healtheffects.org/publication/assessing-adverse-health-effects-long-term-exposure-low-levels-ambient-air-pollution.

Franklin, M; Zeka, A; Schwartz, J. 2007. "Association between PM-2.5 and all-cause and specific-cause mortality in 27 US communities." *J. Expo. Sci. Environ. Epidemiol.* 17:279-287.

Greven, S; Dominici, F; Zeger, S. 2011. "An approach to the estimation of chronic air pollution effects using spatio-temporal information." *J. Am. Stat. Assoc.* 106(494):396-406. doi: 10.1198/jasa.2011.ap09392.

Henneman, LRF; Choirat, C; Zigler, CM. 2019. "Accountability assessment of health improvements in the United States associated with reduced coal emissions between 2005 and 2012." *Epidemiology* 30(4):477-485. doi: 10.1097/EDE.0000000000001024.

Ito, K; Ross, Z; Zhou, J; Nadas, A; Lippmann, M; Thurston, GD. 2013. "NPACT Study 3. Time series analysis of mortality, hospitalizations, and ambient PM2.5 and its components." HEI Research Report 177 Part 3. In "National Particle Component Toxicity (NPACT) Initiative: Integrated Epidemiologic and Toxicologic Studies of the Health Effects of Particulate Matter Components." Health Effects Institute. p95-125. Accessed at https://www.healtheffects.org/publication/national-particle-component-toxicity-npact-initiative-integrated-epidemiologic-and.

Janes, H; Dominici, F; Zeger, SL. 2007. "Trends in air pollution and mortality: An approach to the assessment of unmeasured confounding." *Epidemiology* 18(4):416-423. doi: 10.1097/EDE.0b013e31806462e9.

Jerrett, M; Turner, M; Beckerman, BS; Pope, CA III; van Donkelaar, A; Martin, RV; Serre, M; Crouse, D; Gapstur, SM; Krewski, D; Diver, WR; Coogan, PF; Thurston, GD; Burnett, RT. 2017. "Comparing the health effects of ambient particulate matter estimated using ground-based versus remote sensing exposure estimates." *Environ. Health Perspect.* 125(4):552-559. doi: 10.1289/EHP575.

LaKind, JS; Burns, CJ; Erickson, H; Graham, SE; Jenkins, S; Johnson, GT. 2020. "Bridging the epidemiology risk assessment gap: An NO2 case study of the Matrix." *Glob. Epidemiol.* 2:100017. doi: 10.1016/j.gloepi.2020.100017.

Lipfert, FW; Wyzga, RE. 2020. "Environmental predictors of survival in a cohort of U.S. military veterans: A multi-level spatio-temporal analysis stratified by race." *Environ. Res.* 183:108842. doi: 10.1016/j.envres.2019.108842.

Mauad, T; Rivero, DH; de Oliveira, RC; Lichtenfels, AJ; Guimaraes, ET; de Andre, PA; Kasahara, DI; Bueno, HM; Saldiva, PH. 2008. "Chronic exposure to ambient levels of urban particles affects mouse lung development." *Am. J. Respir. Crit. Care Med.* 178(7):721-728.

Moolgavkar, SH; Chang, ET; Watson, HN; Lau, EC. 2018. "An assessment of the Cox proportional hazards regression model for epidemiologic studies." *Risk Anal.* 38(4):777-794. doi: 10.1111/risa.12865.

Papadogeorgou, G; Kioumourtzoglou, MA; Braun, D; Zanobetti, A. 2019. "Low levels of air pollution and health: Effect estimates, methodological challenges, and future directions." *Curr. Environ. Health Rep.* 6(3):105-115. doi: 10.1007/s40572-019-00235-7.

Parker, JD; Kravets, N; Vaidyanathan, A. 2018. "Particulate matter air pollution exposure and heart disease mortality risks by race and ethnicity in the United States: 1997 to 2009 National Health Interview Survey with mortality follow-up through 2011." *Circulation* 137(16):1688-1697. doi: 10.1161/CIRCULATIONAHA.117.029376.

Pope, CA III; Turner, MC; Burnett, RT; Jerrett, M; Gapstur, SM; Diver, WR; Krewski, D; Brook, RD. 2015. "Relationships between fine particulate air pollution, cardiometabolic disorders, and cardiovascular mortality." *Circ. Res.* 116(1):108-115. doi: 10.1161/CIRCRESAHA.116.305060.

Pun, VC; Kazemiparkouhi, F; Manjourides, J; Suh, HH. 2017. "Long-term PM2.5 exposure and respiratory, cancer, and cardiovascular mortality in older US adults." *Am. J. Epidemiol.* 186(8):961-969. doi: 10.1093/aje/kwx166.

Rhomberg, LR; Chandalia, JK; Long, CM; Goodman, JE. 2011. "Measurement error in environmental epidemiology and the shape of exposure-response curves." *Crit. Rev. Toxicol.* 41(8):651-671.

Sanders, NJ; Barreca, AI; Neidell, MJ. 2020. "Estimating causal effects of particulate matter regulation on mortality." *Epidemiology* 31(2):160-167. doi: 10.1097/EDE.0000000000001153.

Sheppard, EA. [US EPA, Clean Air Scientific Advisory Committee (CASAC)]. 2022. Letter to the Hon. M. Regan (US EPA) re: CASAC Review of the EPA's Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft – October 2021). EPA-CASAC-22-002. 132p., March 18.

Son, JY; Lane, KJ; Miranda, ML; Bell, ML. 2020. "Health disparities attributable to air pollutant exposure in North Carolina: Influence of residential environmental and social factors." *Health Place* 62(5):102287. doi: 10.1016/j.healthplace.2020.102287.

Thurston, GD; Ahn, J; Cromar, KR; Shao, Y; Reynolds, HR; Jerrett, M; Lim, CC; Shanley, R; Park, Y; Hayes, RB. 2016. "Ambient particulate matter air pollution exposure and mortality in the NIH-AARP Diet and Health Cohort." *Environ. Health Perspect.* 124(4):484-490. doi: 10.1289/ehp.1509676.

Thurston, GD; Kipen, H; Annesi-Maesano, I; Balmes, J; Brook, RD; Cromar, K; De Matteis, S; Forastiere, F; Forsberg, B; Frampton, MW; Grigg, J; Heederik, D; Kelly, FJ; Kuenzli, N; Laumbach, R; Peters, A; Rajagopalan, ST; Rich, D; Ritz, B; Samet, JM; Sandstrom, T; Sigsgaard, T; Sunyer, J; Brunekreef, B. 2017. "A joint ERS/ATS policy statement: What constitutes an adverse health effect of air pollution? An analytical framework." *Eur. Respir. J.* 49(1):1600419. doi: 10.1183/13993003.00419-2016.

Turner, MC; Jerrett, M; Pope, CA III; Krewski, D; Gapstur, SM; Diver, WR; Beckerman, BS; Marshall, JD; Su, J; Crouse, DL; Burnett, RT. 2016. "Long-term ozone exposure and mortality in a large prospective study." *Am. J. Respir. Crit. Care Med.* 193(10):1134-1142. doi: 10.1164/rccm.201508-1633OC.

US EPA. 2009. "Integrated Science Assessment for Particulate Matter (Final)." Office of Research and Development, National Center for Environmental Assessment (NCEA) - RTP Division. EPA/600/R-08/139F. 2228p., December.

US EPA. 2019. "Integrated Science Assessment for Particulate Matter (Final)." EPA/600/R-19/188. 1967p., December. Accessed at https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=347534.

US EPA. 2020a. "Review of the national ambient air quality standards for particulate matter (Final action)." *Fed. Reg.* 85(244):82684-82748. 40 CFR 50, December 18.

US EPA. 2020b. "Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (Final)." Office of Air Quality Planning and Standards, Health and Environmental Impacts Division. EPA-452/R-20-002. 534p., January.

US EPA. 2021a. "Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft)." Office of Air Quality Planning and Standards, Health and Environmental Impacts Division. EPA-452/P-21-001. 649p., October.

US EPA. 2021b. "Preliminary Comments from Members of the CASAC PM Panel on EPA's Supplement to the 2019 Integrated Science Assessment for Particulate Matter (External Review Draft – September 2021)." Clean Air Scientific Advisory Committee (CASAC), Particulate Matter (PM) Panel. 62p., November 15. Accessed at https://casac.epa.gov/ords/sab/f?p=105:19:6250813445454:::19:P19_ID:962#materials.

US EPA. 2022a. "Supplement to the 2019 Integrated Science Assessment for Particulate Matter (Final)." Office of Research and Development, Center for Public Health and Environmental Assessment. EPA/600/R-22/028. 328p., May.

US EPA. 2022b. "Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter." Office of Air Quality Planning and Standards, Health and Environmental Impacts Division. EPA-452/R-22-004. 685p., May.

US EPA. 2023. "Reconsideration of the National Ambient Air Quality Standards for particulate matter (Proposed Rule)." *Fed. Reg.* 88(18):5558-5719. 40 CFR 50, 53, 58, January 27.

Wang, Y; Shi, L; Lee, M; Liu, P; Di, Q; Zanobetti, A; Schwartz, JD. 2017. "Long-term exposure to PM2.5 and mortality among older adults in the Southeastern US." *Epidemiology* 28(2):207-214. doi: 10.1097/EDE.0000000000000614.

Wang, B; Eum, KD; Kazemiparkouhi, F; Li, C; Manjourides, J; Pavlu, V; Suh, H. 2020. "The impact of long-term PM2.5 exposure on specific causes of death: Exposure-response curves and effect modification among 53 million U.S. Medicare beneficiaries." *Environ. Health* 19(1):20. doi: 10.1186/s12940-020-00575-0.

Zanobetti, A; Schwartz, J. 2009. "The effect of fine and coarse particulate air pollution on mortality: A national analysis." *Environ. Health Perspect.* 117(6):898-903. doi: 10.1289/ehp.0800108.

Zanobetti, A; Dominici, F; Wang, Y; Schwartz, JD. 2014. "A national case-crossover analysis of the short-term effect of PM2.5 on hospitalizations and mortality in subjects with diabetes and neurological disorders." *Environ. Health* 13(1):38. doi: 10.1186/1476-069X-13-38.

**NAAQS Regulatory Review & Rulemaking Coalition**

# ATTACHMENT 2
# TO
## COMMENTS OF THE NAAQS REGULATORY REVIEW & RULEMAKING COALITION ON EPA'S RECONSIDERATION OF THE NATIONAL AMBIENT AIR QUALITY STANDARDS FOR PARTICULATE MATTER

**DOCKET NO. EPA–HQ–OAR-2015-0072**

American Chemistry Council
American Coke and Coal Chemicals Institute
American Forest & Paper Association
American Fuel & Petrochemical Manufacturers
American Iron and Steel Institute
American Petroleum Institute
American Wood Council
National Lime Association
National Mining Association
National Stone, Sand & Gravel Association
Oilseed Processors Coalition
- Corn Refiners Association
- National Cotton Council
- National Cotton Ginners Association
- National Cottonseed Processors Association
- National Oilseed Processors Association
- Texas Cotton Ginners' Association

Portland Cement Association
The Aluminum Association
The Fertilizer Institute

March 28, 2023

# Impacts of a Lower Annual $PM_{2.5}$ Ambient Air Quality Standard on the Forest Products Industry

American Forest and Paper Association/American Wood Council
February 2023

The Clean Air Act (CAA) requires the U.S. Environmental Protection Agency (EPA) to set National Ambient Air Quality Standards (NAAQS) for certain pollutants, termed "criteria pollutants." There are currently NAAQS for the following pollutants: ozone, nitrogen dioxide ($NO_2$), sulfur dioxide ($SO_2$), carbon monoxide (CO), particulate matter (PM) less than 10 microns in diameter ($PM_{10}$), particulate matter less than 2.5 microns in diameter ($PM_{2.5}$), and lead. The CAA directs EPA to review the NAAQS every five years. EPA is currently reconsidering its most recent review of the PM NAAQS.

Implementation of NAAQS poses challenges, even in areas that attain the NAAQS. Before a new major source can be built in such an area or an existing source be expanded, a demonstration is required to show that this activity will not cause or contribute to a NAAQS violation. Many factors contribute to the challenges of demonstrating compliance with the $PM_{2.5}$ NAAQS, including the layers of conservatism built into the modeling analysis, uncertainty related to $PM_{2.5}$ emission rates, and the fact that the monitored background concentration EPA requires be added to modeled concentrations is often not representative of true background. This discussion focuses on the background concentration issue.

The assigned background $PM_{2.5}$ concentrations in many areas where forest products facilities are located approach the current annual primary NAAQS of 12 µg/m$^3$. Because of this, the American Forest and Paper Association (AF&PA) and the American Wood Council (AWC) with the assistance of All4 Inc and Fisher International evaluated the potential impacts of a lower annual $PM_{2.5}$ NAAQS on the forest products industry. Although some forest products facilities are in locations that would transition to designation as a nonattainment area with a lower annual standard, for those locations that continue to attain the NAAQS, the difference between the background and the NAAQS would get smaller and make air quality modeling demonstrations more difficult. The lack of "headroom" between the background annual $PM_{2.5}$ concentration and a lower standard would increase the burden on facilities that would like to expand operations or renew air permits. AF&PA and AWC evaluated the impact of lowering the annual $PM_{2.5}$ NAAQS from 12 µg/m$^3$ to between 8 and 10 µg/m$^3$. Even reducing the standard from 12 to 10 µg/m$^3$ would be a decrease that is 10 times EPA's 0.2 µg/m$^3$ ambient $PM_{2.5}$ significant impact level.

AF&PA/AWC developed a list of forest products facilities (wood products manufacturing facilities and pulp, paper, and packaging manufacturing facilities) and their locations. Next, current publicly available EPA $PM_{2.5}$ monitoring data were used to assign a monitored or interpolated background value for the annual $PM_{2.5}$ standard to each facility's county. Then, the difference between the annual standard and the assigned background value was calculated for each facility (this value represents the headroom). The headroom was calculated for both the current annual NAAQS and hypothetical revised levels of the standard of 10, 9, and 8 µg/m$^3$.

In order to determine the headroom typically required by forest products facilities, AF&PA/AWC reviewed several recent permit applications for both greenfield facilities and modifications to existing facilities. For example, a permit application for a state of the art, greenfield pulp and

paper mill was submitted in the southern U.S in 2018. The modeling submitted with the air permit application indicates that the facility's $PM_{2.5}$ emissions consumed approximately 3 µg/m$^3$ of headroom. This mill was ultimately not constructed, but it was to be located on a large property in flat terrain, equipped with state-of-the-art PM emissions controls, and have exhaust stacks sized to optimize dispersion. Other recent air permit applications for pulp and paper mills that triggered PSD review and modeling for $PM_{2.5}$ required at least 3 µg/m$^3$ of headroom in order to model the mill's $PM_{2.5}$ emissions.

In a second example, a state-of-the-art, greenfield wood products manufacturing facility was constructed in the northern U.S in 2018. The modeling submitted with the permit application indicates that the facility's $PM_{2.5}$ emissions consumed approximately 1 µg/m$^3$ of headroom. Again, the new mill is located on a large property in flat terrain and has state of the art PM emissions controls. Other recent air permit applications for wood products mills that triggered PSD review and modeling for $PM_{2.5}$ required up to 3 µg/m$^3$ of headroom in order to model the mill's $PM_{2.5}$ emissions.

Currently, only seven pulp, paper, and packaging facilities and seven wood products mills are in areas that do not attain the annual $PM_{2.5}$ NAAQS. The following table shows the impacts on headroom for forest products facilities if the annual standard is reduced to 10, 9. or 8 µg/m$^3$. Of the 300 pulp, paper, and packaging facilities evaluated, 212 (about 71 percent) will have less than 3 µg/m$^3$ of headroom between the background and the standard (including 17 mills in nonattainment areas and 44 mills that already have less than 3 ug/m$^3$) if the annual $PM_{2.5}$ NAAQS is reduced to 10 ug/m$^3$ or less. And, of the 223 wood products facilities evaluated, 199 (about 89 percent) will have less than 3 µg/m$^3$ of headroom between the background and the standard (including 24 mills in nonattainment areas and 58 mills that already have less than 3 ug/m$^3$) if the annual $PM_{2.5}$ NAAQS is reduced to 10 µg/m$^3$ or less.

| Type of Facility | Total Facilities Evaluated | Mills with headroom less than 3 at 12 µg/m$^3$ | Mills with headroom less than 3 at 10 µg/m$^3$ | Mills with headroom less than 3 at 9 µg/m$^3$ | Mills with headroom less than 3 at 8 µg/m$^3$ |
|---|---|---|---|---|---|
| **Pulp, Paper, and Packaging** | 300 | 44 | 212 | 266 | 281 |
| **Wood Products** | 223 | 58 | 199 | 217 | 221 |

Less headroom between the background and the NAAQS will translate into capital expenditures related to conducting a successful air dispersion modeling analysis for $PM_{2.5}$ for addition of controls, stack modifications, etc. In some cases, a modeling demonstration will only be required for facilities that must submit modeling as part of a permit application for a modification that significantly increases $PM_{2.5}$ emissions. However, some permitting agencies require modeling demonstrations as part of the Title V renewal process or as part of minor permit applications. Achieving successful modeling analysis results for a project could force the facility to control emissions beyond what a Best Available Control Technology (BACT) analysis would require for modified sources and could require controls or modifications for sources that the facility was not modifying as part of an expansion project (and that were not required to apply BACT).

Unquantifiable costs are those of lost opportunities (e.g., a facility might not bother to proceed with a beneficial expansion project because of the cost of making modifications to the facility in order to successfully model below the NAAQS, or because offsets are not available, or because it would take too much time to set up a monitoring station and collect ambient data).

The majority (85%) of pulp, paper, and packaging facilities currently have a headroom of at least 3 $ug/m^3$. A headroom of 3 $ug/m^3$ is likely the minimum amount of headroom required to model a complex manufacturing facility like a pulp and paper mill, but a value of at least 5 $ug/m^3$ could be necessary based on recent permit applications with modeling. If the standard is lowered to 10 $ug/m^3$, an estimated 168 more mills than today will have headroom of less than 3 $ug/m^3$ and will likely need to implement improved emissions controls and make changes to exhaust stacks. The improved controls could include installation of polishing fabric filters or wet electrostatic precipitators (WESP) on solid-fuel boilers; electrostatic precipitators (ESP) on lime kilns currently controlled with wet scrubbers; improving ESP control efficiency on recovery furnaces; adding exhaust stacks to paper machines to improve dispersion; paving roads; increasing stack heights; moving stacks or sources that are close to the facility's fenceline; enclosing sources; or some combination of these. A complex mill (about 100 of the 300 mills) with at least one solid-fuel boiler, lime kiln, and recovery furnace might spend $20 million in capital[1] on these changes. A simpler recycle or converting mill may need to spend $2 to 4 million to reduce emissions and/or take steps to improve the dispersion characteristics of the $PM_{2.5}$ sources. Because the configuration of each mill is different and because we have interpolated design values in many locations, we developed a range of estimated costs at each level of the standard being contemplated by the proposal, based on a basic knowledge of the types of equipment at each mill and the types of projects that might need to be performed to improve a mill's ambient impacts.

- If the standard is reduced to 10 $ug/m^3$, the total cost to the pulp, paper, and packaging industry would be between $1 and 2 billion in capital.
- If the standard is reduced to 9 $ug/m^3$, the total cost to the pulp, paper, and packaging industry would be between $2 and 3 billion in capital.
- If the standard is reduced to 8 $ug/m^3$, the total cost to the pulp, paper, and packaging industry would be between $3 and 4 billion in capital.

The majority (74%) of wood products manufacturing facilities currently have a headroom of at least 3 $ug/m^3$ and 94% of wood products manufacturing facilities have a headroom of at least 1 $ug/m^3$. If the standard is lowered to 10 $ug/m^3$, an estimated 141 more facilities than today will have headroom less than 3 $ug/m^3$ and will likely need to implement improved emissions controls and make changes to exhaust stacks. The improved controls could include installation of wet electrostatic precipitators (WESP) on solid-fuel boilers; addition of or improvements to fabric filters on material handling sources; control of fugitive sources; moving stack or source locations; increasing stack heights; paving roads; or some combination of these. A complex

[1] Improving ESP controls on recovery furnaces would cost an estimated $3 million of capital for each project, on average. Adding fabric filter, ESP, or WESP controls on solid-fuel boilers, recovery furnaces, and lime kilns would cost between $4 million and $7 million of capital for each project, on average. Increasing stack height, moving stacks, or installing new stacks would cost an estimated at $1 million for each project, with multiple projects per mill.

wood products facility could spend $5 to 10 million in capital[2] on these changes. Because the configuration of each mill is different and because we have interpolated design values in many locations, we developed a range of estimated costs at each level of the standard being contemplated by the proposal, based on a basic knowledge of the types of equipment at each mill and the types of projects that might need to be performed to improve a mill's ambient impacts.

- If the standard is reduced to 10 ug/m$^3$, the total cost to the wood products manufacturing industry would be between $500 and 750 million in capital.
- If the standard is reduced to 9 ug/m$^3$, the total cost to the wood products manufacturing industry would be between $800 and 900 million in capital.
- If the standard is reduced to 8 ug/m$^3$, the total cost to the wood products manufacturing industry would be between $900 million and $1 billion in capital.

Based on EPA's 2017 National Emissions Inventory, forest products facilities contribute approximately 22 percent of total reported manufacturing industry direct (primary) $PM_{2.5}$ emissions. Therefore, although our study indicates that lowering the annual $PM_{2.5}$ NAAQS could have an impact on the forest products industry of $4 billion, the impact on the manufacturing sector could be almost $20 billion for direct $PM_{2.5}$ emissions assuming a similar level of additional controls and/or emissions reductions are required at facilities in other sectors, and even more when precursor emissions such as $NO_X$, $SO_2$, VOC, and ammonia, which form secondary $PM_{2.5}$, are considered.

[2] Improved fabric filter controls at wood products mills would cost an estimated $1 million for each upgrade. Adding or improving solid-fuel boiler controls would cost an estimated $3 million of capital per upgrade. Controlling additional sources of fine particulate would cost an estimated $3 million per control, on average. Increasing stack height, moving stacks, or installing new stacks could cost up to $3 million per mill.

**NAAQS Regulatory Review & Rulemaking Coalition**

# ATTACHMENT 3
# TO
## COMMENTS OF THE NAAQS REGULATORY REVIEW & RULEMAKING COALITION ON EPA'S RECONSIDERATION OF THE NATIONAL AMBIENT AIR QUALITY STANDARDS FOR PARTICULATE MATTER

**DOCKET NO. EPA–HQ–OAR-2015-0072**

American Chemistry Council
American Coke and Coal Chemicals Institute
American Forest & Paper Association
American Fuel & Petrochemical Manufacturers
American Iron and Steel Institute
American Petroleum Institute
American Wood Council
National Lime Association
National Mining Association
National Stone, Sand & Gravel Association
Oilseed Processors Coalition
- Corn Refiners Association
- National Cotton Council
- National Cotton Ginners Association
- National Cottonseed Processors Association
- National Oilseed Processors Association
- Texas Cotton Ginners' Association

Portland Cement Association
The Aluminum Association
The Fertilizer Institute

March 28, 2023

NERA
ECONOMIC CONSULTING

# POTENTIAL COSTS OF FULLY ATTAINING PROPOSED LOWER $PM_{2.5}$ NAAQS STANDARDS

## Technical Comments on the Cost Estimates in the Regulatory Impact Analysis for the Proposed $PM_{2.5}$ NAAQS Reconsideration Rule



Prepared for:
American Petroleum Institute

For Submission to Docket ID No. EPA-HQ-OAR-2019-0587

March 25, 2023

# Project Team

Anne E. Smith, Ph.D., Affiliated Consultant
Bharat Ramkrishnan, Senior Consultant
Ethan Caspi, Associate Analyst

***About NERA***

NERA Economic Consulting (www.nera.com) is a global firm of experts dedicated to applying economic, finance, and quantitative principles to complex business and legal challenges. For over half a century, NERA's economists have been creating strategies, studies, reports, expert testimony, and policy recommendations for government authorities and the world's leading law firms and corporations. We bring academic rigor, objectivity, and real-world industry experience to bear on issues arising from competition, regulation, public policy, strategy, finance, and litigation.

*This report reflects the research, opinions, and conclusions of its authors, and does not necessarily reflect those of NERA Economic Consulting, its affiliated companies, or any other organization.*

## Report Qualifications/Assumptions and Limiting Conditions

Information furnished by others, upon which all or portions of this report are based, is believed to be reliable, but has not been independently verified, unless otherwise expressly indicated. Public information and industry and statistical data are from sources we deem to be reliable; however, we make no representation as to the accuracy or completeness of such information. The findings contained in this report may contain predictions based on current data and historical trends. Any such predictions are subject to inherent risks and uncertainties including but not limited to free market behavior in the commodity markets. Projected costs of goods and services including liquid fuels (gasoline and diesel), are projected costs of compliance. The cost burden on the consumers will be determined by the competitive dynamics of wholesale and retail goods and fuels markets, including but not limited to supply and demand. NERA Economic Consulting accepts no responsibility for actual results or future events.

The opinions expressed in this report are valid only for the purpose stated herein and as of the date of this report. No obligation is assumed to revise this report to reflect changes, events or conditions, which occur subsequent to the date hereof. The opinions expressed in this report are those of the authors and do not necessarily represent the views of NERA Economic Consulting, other NERA consultants, or NERA's clients.

All decisions in connection with the implementation or use of advice or recommendations contained in this report are the sole responsibility of the client. This report does not represent investment advice, nor does it provide an opinion regarding the fairness of any transaction to any and all parties.

# Table of Contents

**EXECUTIVE SUMMARY** ....................1

**1. INTRODUCTION** ....................6

**2. BACKGROUND ON RIA COST ESTIMATION REQUIREMENTS** ....................8
How EPA Has Addressed the Problem of Partial Attainment in Prior RIAs ....................9
The Current RIA Deviates from EPA's Past Practices ....................12

**3. THIS RIA'S COST ANALYSIS METHODS AND RESULTING DEGREE OF PARTIAL ATTAINMENT** ....................14

**4. NERA'S METHOD FOR ESTIMATING COST OF FILLING THE FULL ATTAINMENT GAPS IN THE RIA'S ANALYSIS** ....................21
Constraints and Limitations of the CoST Modeling ....................21
NERA's Use of CoST Modeling Data to Estimate Options for Full Attainment ....................23
Key Attributes of Our Approach and Objectives ....................27

**5. FULL ATTAINMENT COST RESULTS SUMMARY** ....................28
Input Assumptions Used to Define a Range of Full Attainment Costs for Each County ....................28
Resulting Ranges of Estimates for Cost of Full Attainment ....................30
California's Challenge in Meeting the *Current* $PM_{2.5}$ Standard Exceeds the Challenge That Most Other Counties Would Face Under an 8/35 Standard ....................31

**6. DISCUSSION** ....................34

**7. CONCLUSION** ....................38

**8. REFERENCES** ....................39

**APPENDIX A. EVIDENCE IN THE RIA OF THE INABILITY OF SOME AREAS TO ATTAIN THE CURRENT STANDARD OF 12/35** ....................41

**APPENDIX B. COUNTY-BY-COUNTY ATTAINMENT OUTCOMES IN THE RIA PARTIAL ANALYSIS (TONS)** ....................43

**APPENDIX C. QUANTITATIVE IMPLICATIONS OF LOOSENING COST PER TON AND TON PER YEAR CONSTRAINTS** ....................51

## Indexes of Figures and Tables

Figure 1. Copy of Figure in 2012 $PM_{2.5}$ RIA Showing Steps Needed to Develop Estimates of Full Attainment Costs........ 11

Figure 2. Examples of County-Specific Marginal Cost Curves in RIA (for 8/35) Compared to the Tons of Emissions Reduction Needed for Full Attainment ........ 18

Figure 3. Illustration of Concept in Full Attainment Cost Estimation........ 24

Figure 4. Illustration of Building Blocks for Extending Marginal Cost Curves Through Deeper Cuts in Remaining Primary $PM_{2.5}$ Emissions from Non-point Sources........ 26

Figure 5. Copy of Figure 7 from HARC (2015) Showing Cost per Ton Reduced by Paving Unpaved Roads as Function of Vehicle Miles Travelled per Day on a 1-Mile Segment to be Paved and the Speed (mpg) of Vehicles on the Segment........ 29

Figure 6. Illustration of the Full Attainment Challenge Faced by Riverside County, CA Based on Data from the RIA CoST Analysis........ 33

Table 1. Summary of Aggregate Degree of Partial Attainment (in Tons and as % of Total Tons Needed)16

Table 2. Disaggregation of RIA's Partial Costs into Counties Reaching Full vs. Partial Attainment in the CoST Model........ 20

Table 3. Range of Assumptions Used About the Average Cost per Ton of Reduction in Each of the Four Blocks of the Extrapolation Calculation........ 28

Table 4. Comparison of NERA's Range of Estimates of Annual Cost of Full Attainment to Partial Cost Estimates Reported in RIA (Annual in 2032, millions of 2017$)........ 31

Table A-1. California Counties in Partial Attainment of Current 12/35 Standard........ 41

Table B-1. Degree of Attainment in RIA Analysis Results for 141 Counties Projected to Face Nonattainment for the Alternative Standard of 8/35 (continued next page)........ 43

Table B-2. Degree of Attainment in RIA Analysis Results for 51 Counties Projected to Face Nonattainment for the Alternative Standard of 9/35 (continued next page)........ 48

Table B-3. Degree of Attainment in RIA Analysis Results for 24 Counties Projected to Face Nonattainment for the Alternative Standard of 10/35........ 50

# EXECUTIVE SUMMARY

On January 27, 2023, the *Federal Register* published a Notice of Proposed Rulemaking (NPRM) from the Environmental Protection Agency (EPA), seeking comment on a reconsideration of the Agency's 2020 rulemaking on the current annual National Ambient Air Quality Standards (NAAQS) for fine particulate matter ($PM_{2.5}$).[1] The current NAAQS for $PM_{2.5}$ are 12 μg/m$^3$ for the annual average and 35 μg/m$^3$ for the daily (24-hour) average.[2] For simplicity of exposition, this combination of annual and daily standards will be referred to herein as "12/35." Upon reconsideration, EPA is proposing to tighten the current annual standard (without modification of the daily standard of 35 μg/m$^3$) to some level between 10 ug/m$^3$ and 9 ug/m$^3$, and is taking comment on a standard of 8 μg/m$^3$ and of up to 11 ug/m$^3$.[3] Hereafter, we refer to these three alternative standards by the labels "10/35," "9/35," "8/35," and "11/35." Simultaneously with the NPRM, EPA also publicly released its Regulatory Impact Analysis (RIA) for the proposed revisions.[4] This RIA contains, *inter alia*, estimates of the costs of control measures that form part of the illustrative control strategies intended to meet more stringent standards and the public health benefits of their associated ambient $PM_{2.5}$ reductions. The comment period for both the NRPM and the RIA ends on March 28, 2023.

The technical comments in this report address the RIA's estimates of the potential costs of attaining three of the four alternative annual standards listed above: 10/35, 9/35, and 8/35.[5] Key findings of this report are summarized below, and fully detailed in the main sections and appendices of this report.

Most generally, we find that the RIA's cost estimates are incomplete to the point of having very limited usefulness to decision making or public understanding of the full potential impacts of any of the alternative standards. Specifically, the RIA's cost estimates reflect control measures that produce only a fraction of the emissions reductions that it estimates will be needed for all counties in the U.S. to achieve full attainment of each of the alternative standards (*i.e.,* only 29% to 53% of the required emissions reductions nationally, and as little as 0% for some individual counties). In essence, the cost estimates reported in the RIA are only for "partial attainment."

Partial attainment is not a concept with any basis in economic practice or theory. It is simply the point at which a list of candidate control measures that EPA prepared prior to initiating its cost analysis is

[1] 88 *Federal Register* 5558, "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," January 27, 2023.

[2] These are the values that monitor-specific design values may not exceed. The annual average considers 3-year averages of the annual design values. The daily average standard must not be exceeded by the 3-year average of the 98th percentile of a monitor's 24-hour average values.

[3] The NPRM also solicits comments on a possible tightening of the daily standard to 30 μg/m$^3$ but the focus of these comments is only on analyses related to alternative annual standards discussed in the NPRM.

[4] EPA, 2022, *Regulatory Impact Analysis for the Proposed Reconsideration of the National Ambient Air Quality Standards for Particulate Matter*, EPA-452/P-22-001, December, available at https://www.epa.gov/system/files/documents/2023-01/naaqs-pm_ria_proposed_2022-12.pdf.

[5] The RIA does not explain why it has not provided an evaluation of 11/35 even though it does evaluate 8/35 and a daily standard of 30 μg/m$^3$ (*i.e.*, 10/30). Lacking any RIA analysis for 11/35, we do not attempt to comment on its costs in this report. While we do not quantitatively evaluate the RIA's cost estimates for 10/30, the comments and concerns we identify for the three alternative annual standards apply equally well to the RIA's estimates of 10/30.

completely used up, or contains only measures that are of a higher cost per ton than EPA has decided to consider,[6] or would be applied to emissions sources that emit fewer tons per year than EPA has decided to consider.[7] The constraints themselves have no foundation in the Clean Air Act nor in states' practices for developing NAAQS implementation plans, and may be unrealistic, given that states face sanctions if they cannot identify and impose controls sufficient to achieve attainment. These cost and size constraints likely play a role in why the RIA produces only partial attainment, but we also find that the list of candidate control measures does not even contain measures that would address a very large fraction of the baseline emissions that need to be reduced in order to achieve full attainment. The omitted potential control measures are inherently more costly than those included. The overall result of the RIA's cost analysis is significant understatement of the full attainment cost of each alternative standard.

There also is no basis in sound RIA practice for reporting only partial attainment costs. In fact, when EPA has run into the problem of partial attainment in its prior RIAs for both $PM_{2.5}$ and ozone NAAQS rulemakings (*e.g.*, EPA, 2012 and 2015), it provided estimates of only full attainment costs in those RIA's executive summaries. EPA treated its partial cost estimates as merely an initial step in the full cost analysis, relegating them to mere analytical details in later chapters of the RIAs. Inspection of the details in those prior RIAs finds that partial attainment costs were most often between 1% and 15% of EPA's respective full attainment cost estimates, and only one case reached as high as 50%.

These two prior NAAQS RIAs show — even by EPA's own calculations — that partial attainment costs are not at all indicative of the likely potential costs of attaining any of the alternative standards. Despite this, the current RIA for the $PM_{2.5}$ NAAQS reconsideration makes no attempt at all to develop cost estimates beyond those of its partial set of illustrative controls and does not even discuss why it has failed to develop full attainment cost estimates.

In this report, we carefully review the modeling inputs and outputs that were used to produce the RIA's partial cost estimates and we demonstrate how to provide a *range* of estimates for the potential cost of full attainment. In developing those full attainment cost estimates, we rely as much as possible on the data and general cost concepts used by EPA despite the fact that many of the cited references for control costs are often small in number and outdated.[8] We explain our approach and assumptions in the main body of this report. The resulting full attainment cost estimates are reported in Table ES-1, which compares them to the RIA's partial attainment costs (from the RIA's Table ES-5).[9]

---

[6] In this RIA, the limit allowed is $160,000 per ton removed.

[7] In this RIA, the minimum allowed is 5 tons per year of baseline emissions.

[8] The quality of the available emissions data that must be relied upon is particularly weak for non-point sources of emissions, as EPA has generally conducted less analysis for this category of emissions than for larger point sources. Given the high degree of reliance on non-point source primary $PM_{2.5}$ controls in the RIA for this NAAQS reconsideration, and the high degree of partial attainment that EPA then finds, EPA is effectively considering requiring states to embark on a major regulatory program with significantly less data and more uncertainty on both costs and effectiveness than is typical of past NAAQS RIAs.

[9] The ranges for our estimates of the full cost of attainment of each alternative standard reflect uncertainties in the various input assumptions used in the full attainment portion of the analysis. These ranges do not represent confidence intervals with a probabilistic interpretation. It is our professional judgment, as explained in the main body of this report, that the assumptions defining the lower and upper ends of the range stretch the boundaries of

**Table ES-1. Comparison of NERA's Range of Estimates of Annual Cost of Full Attainment to Partial Cost Estimates Reported in RIA (Annual in 2032, millions of 2017$)**

| Area | 10/35 | | | 9/35 | | | 8/35 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Partial (RIA) | Full (NERA) | | Partial (RIA) | Full (NERA) | | Partial (RIA) | Full (NERA) | |
| | | Low | High | | Low | High | | Low | High |
| Northeast | $7 | $7 | $7 | $206 | $226 | $335 | $1,100 | $2,147 | $6,271 |
| Southeast | $4 | $4 | $4 | $69 | $202 | $605 | $437 | $1,219 | $3,388 |
| West | $19 | $74 | $238 | $34 | $272 | $905 | $122 | $769 | $2,378 |
| California | $64 | $957 | $4,055 | $85 | $1,830 | $7,322 | $163 | $3,097 | $11,704 |
| Total | $95 | $1,042 | $4,305 | $393 | $2,529 | $9,167 | $1,822 | $7,232 | $23,741 |

As the table shows, the estimated potential full attainment costs, even at the low end, are vastly larger than the partial attainment costs that the RIA has reported. It shows that for the 8/35 standard, the potential full attainment will cost between about $7 billion and $24 billion, which is 4 to 13 times more than the RIA's partial cost estimate of less than $2 billion. Full attainment of 9/35 is projected to potentially cost 6 to 23 times more than the RIA's partial estimate. As for the least stringent alternative standard considered, 10/35, the potential full attainment cost is estimated to be between $1 billion and $4 billion per year, 11 to 45 times more than the RIA's partial estimate.[10]

These comparisons illustrate one of the most important reasons that partial attainment costs are inappropriate to report in an RIA executive summary: partial attainment costs provide no indication of either the absolute or relative costs of any of the alternative standards considered. Their presence in the RIA's executive summary is therefore misleading.

Even if fraught with enormous uncertainty, a concerted effort to characterize the full attainment costs is what is needed. It is not the role of an RIA to determine whether such actions will actually be undertaken, but only what potential types of action and associated costs would be necessary if an alternative standard is to be attained. To the extent that some of the additional control measures we identify as needed to achieve full attainment (as detailed in the main body of this report) might be considered technically, economically, or administratively nonviable, our analysis indicates a situation of long-term extensive nonattainment, nationally in the case of the 8/35 standard, and regionally in the case of the other two alternative standards (serving only to exacerbate a regional situation of perpetual nonattainment). This

reasonable expectation and thus the true costs of full attainment have a robust chance of falling within the ranges of potential costs that these input assumption sets project.

[10] We note that the ratios of the RIA's partial to their respective full attainment costs are generally similar to those found in the prior $PM_{2.5}$ and ozone NAAQS RIAs (EPA, 2012 and EPA, 2015). This should be viewed as coincidental but perhaps unsurprising. It is coincidental because the approach taken in this study did not follow the extrapolation procedures relied upon in the prior RIAs. As explained in the main body, our approach was more bottom-up in nature, relying on county-specific estimates of remaining tons of primary $PM_{2.5}$ that could still be controlled after adoption of all the allowed control measures in the EPA cost modeling database; in contrast, EPA used more abstract extrapolation formulas. Additionally, the illustrative control strategies in this RIA are based on reductions in primary $PM_{2.5}$ measures, whereas prior RIAs focused on reductions in $PM_{2.5}$ and ozone precursor gases. However, it is perhaps unsurprising given that EPA used the same basic cost modeling tool and an input list of candidate control measures that were inherently among the lowest-cost of the universe of all potential controls to determine its partial attainment costs.

insight from our full attainment cost assessment calls into question the wisdom of setting the annual $PM_{2.5}$ NAAQS at any of the alternative levels, no matter what may appear to be the net benefits of the first few "partial" steps in the direction of attainment identified in the RIA.

Thus, this full attainment cost analysis provides readers with some understanding of the regulatory challenges that the various alternative standards may entail. By failing to even explain the extent of regulatory challenge that is implicit in the analysis and data behind this RIA, EPA does a disservice to the public and policymakers. This report therefore provides important policy-relevant information and insights that the RIA does not. This report also describes some other important anomalies in this RIA compared to established RIA practice, such as EPA's failure to identify sufficient control measures for several areas of the U.S. to attain even the current $PM_{2.5}$ NAAQS of 12/35.

We have focused our analysis on the costs of full attainment as contrasted to "partial attainment" cost estimates. However, readers should be aware of how narrow even a full attainment cost estimate is. For example, RIAs' full attainment cost estimates omit or may otherwise be limited by the following issues:

(1) Costs and/or economic growth losses in *attainment* areas because of heightened difficulties for potential new plants or plant expansions in those clean air areas to demonstrate that they will not cause "significant deterioration" of air quality already meeting the NAAQS.[11]

(2) The economy-wide costs from the ripple effects on related businesses and employment that could be picked up though macroeconomic modeling of the attainment cost estimates (*e.g.*, using computable general equilibrium models);

(3) Administrative costs to states, which are likely to be amplified when addressing controls for many smaller sources that have never been regulated;

(4) Potential costs of sanctions — transportation and/or conformity freezes if states cannot submit approvable plans;[12]

(5) The cost of all nonattainment stationary source obligations (*e.g.*, NSR, RACM/BACM);

(6) The potential for significant increases in the costs of controls for many source categories given the outdated nature of the referenced source material for the control cost estimates;

(7) EPA's decision to include in its annualized control cost estimates only costs incurred starting in 2032, whereas the technology investments needed to reach attainment by 2032 will need to be incurred well before 2032;

(8) The cost of offsetting emission increases that may perversely occur as the result of the lower standards, such as the recent concerns expressed by the USFS and the Interior Department over

[11] This is more commonly known as the requirement for prevention of significant deterioration (PSD) demonstrations before a proposed new facility can obtain its emissions permit(s).

[12] *See, e.g.*: 87 *Federal Register* 60494, "Clean Air Plans; 2012 Fine Particulate Matter Serious Nonattainment Area Requirements; San Joaquin Valley, California," October 5, 2022, at 60528.

the effect of the new standards in limiting prescribed fires to manage and prevent higher $PM_{2.5}$ emissions from wildfires.[13]

Item (1) of the above list is becoming a heightened concern as the $PM_{2.5}$ NAAQS starts to near levels typical of most of the attaining U.S. As the Discussion section of this report explains, RIAs' traditional estimates of the costs of implementing emissions control measures in projected nonattainment areas may be becoming a smaller and smaller part of the overall burden that NAAQS rules may entail on the U.S. economy. Specifically, concerns are being expressed that a lowered $PM_{2.5}$ NAAQS may create substantially greater challenges for businesses seeking to pass demonstrations of prevention of significant deterioration (PSD) in order to be allowed to expand even in areas that face no risk of falling into nonattainment with a tightened NAAQS. This issue is explained in more depth in the Discussion section of this report because it suggests that heightened emissions control requirements even in attainment areas could become a substantial new compliance cost that a traditional NAAQS RIA does not consider. This RIA (and future RIAs for tighter NAAQS) should consider expanding their notion of NAAQS compliance costs to include incremental costs likely to be incurred in attaining areas across the U.S. Complicating this issue, however, is the possibility that heightened challenges in passing a PSD demonstration could lead businesses to reduce or forego otherwise desired capacity growth, and thus could hinder the economic growth prospects of attainment areas without any actual dollar expenditures ever being incurred. And in that sense, benefit-cost analyses for NAAQS that are based solely on concepts of spending on control equipment or changes in operational processes may be losing their originally intended policy relevance.

Finally, we note that the fact that these comments evaluate only the RIA's cost estimates does not mean that we do not have significant concerns with the numerical validity of its benefits estimates as well. Those benefits estimates are far more uncertain than any cost estimate because they are the subject of on-going questions regarding both their causal and quantitative interpretation. The epistemological issues for benefits calculations are well documented in the record for the proposed rule;[14] the debate is easily summed up as uncertainty over whether such benefits will be realized. In contrast, there is no debate about the existence of actual compliance costs, and it is important and relevant to policy deliberation to understand their potential full attainment cost — and the associated implied practical or technical challenges — even if that requires acknowledgement of a wide range of numerical uncertainty.

[13] *See, e.g.*: General Accounting Office, 2023, *Wildfire Smoke Opportunities to Strengthen Federal Efforts to Manage Growing Risk,* March. Available at https://www.gao.gov/assets/gao-23-104723.pdf#page=48&zoom=100,0,789.

[14] *See*, *e.g.*: NCASI (2023); Smith (2019a, 2019b); Smith and Chang (2020); and Gradient (2023).

# 1. INTRODUCTION

On January 27, 2023, the *Federal Register* published a Notice of Proposed Rulemaking (NPRM) from the Environmental Protection Agency (EPA), seeking comment on a reconsideration of the Agency's 2020 rulemaking on the current annual National Ambient Air Quality Standards (NAAQS) for fine particulate matter ($PM_{2.5}$).[15] The current NAAQS for $PM_{2.5}$ are 12 µg/m$^3$ for the annual average and 35 µg/m$^3$ for the daily (24-hour) average.[16] For simplicity of exposition, this combination of annual and daily standards will be referred to herein as "12/35." Upon reconsideration, EPA is proposing to tighten the current annual standard (without modification of the daily standard of 35 µg/m$^3$) to some level between 10 ug/m$^3$ and 9 ug/m$^3$, and is taking comment on a standard of 8 µg/m$^3$ and of up to 11 ug/m$^3$.[17] Hereafter, we refer to these three alternative standards by the labels "10/35," "9/35," "8/35," and "11/35." Simultaneously with the NPRM, EPA also publicly released its Regulatory Impact Analysis (RIA) for the proposed revisions.[18] This RIA contains, *inter alia*, estimates of the costs of control measures that form part of the illustrative control strategies intended to meet more stringent standards and the public health benefits of their associated ambient $PM_{2.5}$ reductions. The comment period for both the NRPM and the RIA ends on March 28, 2023.

The technical comments in this report address the RIA's estimates of the potential costs of attaining three of the four alternative annual standards listed above: 10/35, 9/35, and 8/35.[19] In brief, we conclude that the RIA's cost estimates are incomplete to the point of having very limited usefulness to decision making or public understanding of the full potential impacts of any of the alternative standards. We demonstrate how to provide a range of estimates for the potential cost of full attainment, relying as much as possible on the data and general cost concepts used by EPA.

Our analysis does not attempt to alter the RIA's assumptions about the costs of candidate control measures that the RIA does identify as a potential portion of state attainment strategies, despite the substantial uncertainties that are inevitably associated with such assumptions.[20] Rather, we focus on

[15] 88 *Federal Register* 5558, "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," January 27, 2023.

[16] These are the values that monitor-specific design values may not exceed. The annual average considers 3-year averages of the annual design values. The daily average standard must not be exceeded by the 3-year average of the 98th percentile of a monitor's 24-hour average values.

[17] The NPRM also solicits comments on a possible tightening of the daily standard to 30 µg/m$^3$ but the focus of these comments is only on analyses related to alternative annual standards discussed in the NPRM.

[18] EPA, 2022, *Regulatory Impact Analysis for the Proposed Reconsideration of the National Ambient Air Quality Standards for Particulate Matter*, EPA-452/P-22-001, December, available at https://www.epa.gov/system/files/documents/2023-01/naaqs-pm_ria_proposed_2022-12.pdf.

[19] The RIA does not explain why it has not provided an evaluation of 11/35 even though it does evaluate 8/35 and a daily standard of 30 µg/m3 (*i.e.*, 10/30). Lacking any RIA analysis for 11/35, we do not attempt to comment on its costs in this report. While we do not quantitatively evaluate the RIA's cost estimates for 10/30, the comments and concerns we identify for the three alternative annual standards apply equally well to the RIA's estimates of 10/30.

[20] The quality of the available emissions data that must be relied upon is particularly weak for non-point sources of emissions, as EPA has generally conducted less analysis for this category of emissions than for larger point sources. In general, the data are supported by a small number of references that are relatively old, and the cost assumptions in the EPA model lack of consideration of location-specific factors. Nevertheless, it is out of NERA's

documenting how profoundly incomplete (and hence understated) are the cost estimates that the RIA reports, and on demonstrating how EPA could have used its own data and evidence to provide readers with a proper and complete understanding of the potential costs of fully attaining each of the alternative standards. Recognizing that computing the cost estimates for full attainment involves some highly uncertain input assumptions about how to make use of the remaining evidence in the EPA control measures data sets, we provide a range of potential cost estimates for fully attaining each alternative standard. This is a more appropriate way to communicate about analytical uncertainties than to simply assume that the most difficult aspects of identifying illustrative attainment strategies will cost nothing, as the RIA has implicitly done.

Although we provide wide ranges of uncertainty in order to produce numerical cost estimates for full attainment, our analysis to develop those estimates indicates that finding sufficient control measures would pose a significant practical challenge for many of the RIA's areas of projected nonattainment. Although our analysis does identify a sufficient number of additional reductions in primary $PM_{2.5}$ emissions for almost all areas to reach full attainment without resorting to "unknown" or "unidentified" control measures, the evidence in EPA's data sets is that they will likely be very costly per ton and in total for the affected nonattainment areas.

It is not the role of an RIA to determine whether such actions will actually be undertaken, but only what types of action and associated costs would be necessary if an alternative standard is to be attained. Nevertheless, to the extent that some of the additional control measures we identify as needed for full attainment might be considered technically, economically, or administratively nonviable, our analysis indicates a situation of long-term extensive nonattainment, nationally in the case of the 8/35 standard, and regionally in the case of the other two alternative standards (serving only to exacerbate a regional situation of perpetual nonattainment). This insight from our full attainment cost assessment calls into question the wisdom of setting the annual $PM_{2.5}$ NAAQS at any of the alternative levels, no matter what may appear to be the net benefits of the first few "partial" steps in the direction of attainment identified in the RIA.

scope to attempt to remedy weaknesses in the emissions inventory or control technology cost data that the RIA uses. Our analysis also does not attempt to alter the RIA's assumption that attainment strategies will rely entirely on reductions in primary $PM_{2.5}$ emissions that account for the "urban increment" of consistently higher $PM_{2.5}$ concentrations over urban than surrounding areas, which the RIA suggests is the primary driver of the projected areas of nonattainment for annual standards lower than the current standard of 12 $\mu g/m^3$ (RIA, p. 1-2).

## 2. BACKGROUND ON RIA COST ESTIMATION REQUIREMENTS

Preparation of an RIA is required under executive order of the President for all proposed and final rulemakings of the federal government anticipated to have an annual effect of $100 million or more per year. The expected and required contents of RIAs are varied, but the most central requirement is to provide a thorough evaluation of the costs and benefits of a proposed or final rule, including for alternatives other than the specifically proposed or selected final rule.[21] Even for standards that, by law, cannot directly use evidence on costs or benefit-cost trade-offs in the selection of a standard level, providing this information to both policy makers and the interested public is an important part of creating a transparent understanding of the implications to society of the statutes that such regulations implement. As Professor Kenneth Arrow and other distinguished economists noted:

> *Although formal benefit-cost analysis should not be viewed as either necessary or sufficient for designing sensible public policy, it can provide an exceptionally useful framework for consistently organizing disparate information, and in this way, it can greatly improve the process and, hence, the outcome of policy analysis. If properly done, benefit-cost analysis can be of great help to agencies participating in the development of environment, health, and safety regulations, and it can likewise be useful in evaluating agency decision-making and in shaping statutes.*[22]

In cases where costs and economic impacts can, in fact, be a relevant factor in the regulatory decision, (as in the case of a reconsideration of a NAAQS[23]), it becomes particularly important that the RIA provide a balanced and complete understanding of the potential benefits and potential costs.

NAAQS rules for both $PM_{2.5}$ and ozone have traditionally presented special challenges for the development of robust cost estimates. One complication has been that states that find themselves to have one or more areas that do not attain a NAAQS are responsible for developing their own strategies (to be approved by the EPA) for reducing emissions sufficiently to get into attainment. Known as state implementation plans (SIPs), these documents account for location-specific air quality determinants to identify a set of control measures and other actions that a nonattainment state plans to adopt to achieve attainment. Thus, any RIA prepared by the federal government must attempt to simulate hypothetical or "illustrative" control strategies that are not guaranteed to be the most likely least-cost strategy or SIP

---

[21] For background on federal requirements for RIAs and a good synopsis of their additional merits beyond mere estimation of net benefits, *see* Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services, 2016, *Guidelines for Regulatory Impact Analysis*, available at https://aspe.hhs.gov/sites/default/files/private/pdf/242926/HHS_RIAGuidance.pdf. (For example, it states that an RIA "reflects a well-established and widely-used approach for collecting, organizing, and analyzing data on the impacts of policy options, to promote evidence-based decision-making. It provides an objective, unbiased assessment that is an essential component of policy development, considering both quantifiable and unquantifiable impacts.")

[22] K. J. Arrow, M. L. Cropper, *et al.* 1996. "Is There a Role for Benefit-Cost Analysis in Environmental, Health, and Safety Regulation," *Science*, Vol. 272:221-2.

[23] The relevance of costs and economic impacts to a NAAQS reconsideration is expressed in Sunstein (2011).

approach. Heightened lack of precision and accuracy of cost and benefit estimates in federal RIAs for NAAQS is thus an unavoidable and acknowledged feature of results reported in NAAQS RIAs.[24]

Whether "illustrative" or not, a significant complication that EPA has routinely encountered in evaluating attainment strategies in its past $PM_{2.5}$ and ozone NAAQS RIAs is that the Agency has routinely failed to assemble information on a sufficient set of candidate emissions control options to be able to produce a list of control measures that would provide sufficient emissions reductions for all projected nonattainment areas to reach attainment with a specific alternative NAAQS level. Thus, once the maximum set of control measures in the EPA cost analysis datasets are selected, EPA's analyses project that one or more areas of the country will still fail to attain a given standard. This condition is called "partial attainment" in RIAs, and the sum of all the costs associated with the specifically identified list of control measures is reported in the RIAs as the costs of *partial* attainment.

A partial attainment cost estimate is not an analytically proper estimate of the cost of the alternative standard in question, because one or more of the projected nonattainment areas would still need to make emissions reductions (at some cost) to fill the gap between the tons of reduction achieved by the partial list of measures and the total tons of reduction estimated by the air quality modeling to be *needed*. Without a thoughtfully structured effort to estimate that cost of the remaining tons of reduction still needed, the partial cost estimates, on their own, are uninformative regarding total costs and provide only limited insight on the nature of the controls that may be required. Indeed, these partial cost estimates should not even be presented in the RIA's executive summary or other comparisons of costs and benefits, as they completely misrepresent the absolute and relative difficulties of meeting alternative standards. Prior ozone and $PM_{2.5}$ NAAQS RIAs have been careful not to report partial attainment cost estimates in such ways.

Unfortunately, the current RIA for the $PM_{2.5}$ reconsideration not only runs into this common limitation seen in other NAAQS RIAs, but it then reports only the partial attainment costs. This represents its most prominent flaw and is significant enough that this RIA falls well short of meeting the objectives of the federal RIA requirement.[25]

## How EPA Has Addressed the Problem of Partial Attainment in Prior RIAs

The past record of NAAQS RIAs makes it clear that EPA has long understood that additional cost estimation is necessary to reflect the cost of filling the gap between tons of emissions reduced under the partial attainment limit of its set of candidate cost measures and the tons of emission reductions needed for full attainment. An estimate of the cost of the still-needed emissions reductions can be added to the

[24] It should be noted that the need to rely on illustrative control strategies creates inaccuracy in the benefits estimates of the RIA as well as in the cost estimates, as benefits estimates depend on the specific locations of emissions reductions that will be implemented, and this will vary the spatial pattern of ambient pollutant reductions that drives the benefits estimates.

[25] EPA's failure to conduct a broader analysis of costs and benefits also thwarts the Agency's ability to fulfill its nondiscretionary statutory obligation under Section 312 of the Clean Air Act to conduct "a comprehensive analysis" of the impact of this chapter (Chapter 85 Air Pollution Prevention and Control) which specifically references, as part of this analysis, 312(a)(1) the issuance of a NAAQS under 109. Additionally, it fails to provide any ranges reflecting the general uncertainty in its estimates, even though OMB's Circular A-4 (OMB, 2004) actually requires a full uncertainty analysis.

partial attainment cost estimate to provide the RIA's estimate of the "full attainment" cost for each alternative standard therein considered. Extrapolation from the costs of a technically detailed but partial list of controls in order to fill the still-needed gap with as-yet unidentified control measures is naturally fraught with even more uncertainty than those associated with estimating the costs of partial attainment. An appropriate analytical response to this uncertainty is to make a range of assumptions, and to represent full attainment costs in the RIA with the resulting wide range of costs for the extrapolated portion of the estimates.

Evidence of EPA's awareness of the need to roughly approximate the control costs for the still-needed tons is directly available in prior RIAs, such as the RIA for the 2015 ozone NAAQS decision (EPA, 2015)[26] and that for the 2012 $PM_{2.5}$ NAAQS decision (EPA, 2012).[27] Those RIAs also ran into the problem of partial attainment, but nevertheless provided a range of estimates for the cost of full attainment by making a range of assumptions about the marginal costs of control measures for filling the gap of still-needed emission reductions. For example, Figure 1 below provides a copy of the first figure in the executive summary of EPA (2012) — the last $PM_{2.5}$ NAAQS RIA before the current one — which shows the analytical steps in the RIA. It describes the distinction between partial and full attainment costs thus:

> *The partial attainment cost analysis reflects the costs associated with applying known controls. Costs for full attainment include estimates for the engineering costs of the additional tons of emissions reductions that are needed beyond identified controls, referred to as extrapolated costs. By definition, no cost data currently exist for the additional emissions reductions needed beyond known controls. We employ two methodologies for estimating the costs of unidentified future controls: a fixed-cost methodology and a hybrid methodology; both approaches assume either that existing technologies can be applied in particular combinations or to specific sources that we currently can't predict or that innovative strategies and new control options make possible the emissions reductions needed for attainment by 2020.*[28]

[26] EPA, 2015, *Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone*, EPA-452/R-15-007, September, available at: https://www3.epa.gov/ttnecas1/docs/20151001ria.pdf.

[27] EPA, 2012, *Regulatory Impact Analysis for the Final Revisions to the National Ambient Air Quality Standards for Particulate Matter*, EPA-452/R-12-005, December, available at: https://www.epa.gov/sites/default/files/2020-07/documents/naaqs-pm_ria_final_2012-12.pdf.

[28] EPA (2012), p. ES-13.

**Figure 1. Copy of Figure in 2012 $PM_{2.5}$ RIA Showing Steps Needed to Develop Estimates of Full Attainment Costs**

Source: EPA (2012), p. ES-3.




The 2012 RIA's executive summary reports only its estimates of full attainment costs, which include the extrapolated estimates of costs to fill the gap of still-needed emissions reductions after exhausting EPA's list of "known" control measures and getting only a partial attainment cost estimate. And that RIA also makes at least two alternative sets of assumptions for the extrapolation. The result is a range of costs in the executive summary for each of the alternative standards selected. The high end of the range differs from the low end by a factor of 5 to 10, depending on the alternative standard, reflecting the inherent uncertainty in making such extrapolations.[29]

The executive summary of that 2012 RIA for $PM_{2.5}$ does not report its partial attainment costs, but they can be found in the detailed Chapter 7 of that RIA. Notably, it shows that its partial attainment costs are

[29] EPA (2012), Table ES-2, p. ES-15.

only 1% to 10% of the full attainment cost estimates, except for one of the estimated total costs, in which partial attainment accounted for 31% of the full attainment costs.[30]

The 2015 ozone RIA (EPA, 2015) also ran into the problem of achieving only partial attainment; it also estimated full attainment costs using varied extrapolation assumptions. While the methods of extrapolation are different and some of the terminology is different,[31] the key point is that this 2015 RIA also eschewed reporting partial attainment costs in its executive summary.[32] Based on details in that RIA's cost analysis chapters, it can be seen that partial attainment costs accounted for about 50% of the full attainment cost estimate for the less stringent 70 ppb standard evaluated and about 15% for the more stringent 65 ppb alternative standard evaluated.[33]

## The Current RIA Deviates from EPA's Past Practices

These two prior NAAQS RIAs show — even by EPA's own calculations — that partial attainment costs are not at all indicative of the likely potential costs of attaining any of the alternative standards. Despite this, the current RIA for the $PM_{2.5}$ NAAQS makes no attempt at all to develop cost estimates beyond those of its partial set of illustrative controls and does not even discuss why it has failed to develop full attainment cost estimates. States do have some flexibility in how they will choose to attain a standard that can differ from an RIA's illustrative strategies, but an RIA should at least identify a justifiable path to get there; this RIA does not. It compounds this flaw by using its executive summary to compare the partial cost estimates to partial benefit estimates. In the logic of benefit-cost analysis, this is a misleading comparison, because the degree of difference between full and partial costs cannot be expected to be similar to the degree of difference between full and partial benefits estimates. This is because marginal costs are expected be rising at greater degrees of control, while the benefits are expected to be rising linearly (under EPA's linear, no-threshold benefits calculation assumptions).

Given the prior evidence that using an extrapolation approach to estimate a range of full attainment costs can completely alter the understanding of the absolute and relative difficulties of meeting alternative NAAQS standards, we consider it paramount to provide our own range of extrapolated cost estimates in response to this RIA.[34]

---

[30] EPA (2012), Tables 7-4 and 7-5, pp. 7-14 and 7-15.

[31] For example, EPA (2015) uses the term "identified" and "unidentified" controls to mean the same thing as "known" and "unknown" controls in EPA (2012). Also, EPA (2015) uses the term "total costs" in lieu of "full attainment."

[32] EPA (2015), pp. ES-15 to ES-19. Specifically, the total (full) attainment costs are $1.4b and $16b, respectively, for non-California U.S. in 2025; and $0.8b and $1.5b, respectively, for California "post-2025".

[33] EPA (2015), Table 4-1, p. 4-11.

[34] We also note that OMB Circular A-4, providing guidelines for conducting RIAs, expects Agencies to conduct an uncertainty analysis in addition to an accounting of fully meeting a standard. Specifically, OMB Circular A-4 states: "For rules that exceed the $1 billion annual threshold, a formal quantitative analysis of uncertainty is required. For rules with annual benefits and/or costs in the range from 100 million to $1 billion, you should seek to use more rigorous approaches with higher consequence rules." The RIA should have but does not provide any analysis of uncertainty surrounding its cost estimates. The full attainment cost estimates that we provide in these comments come in the form of ranges that reflect uncertainties in several key input assumptions.

The amount by which full attainment cost estimates can be expected to exceed the Agency's partial attainment cost estimates will depend on the size of the gap, or the number of still-needed tons of emission reductions relative to the number of tons of emissions reduced with the controls selected by EPA in its partial cost modeling. This gap gets larger as the alternative standard under consideration becomes more stringent. Similarly, the range of uncertainty in the extrapolated portion of the cost estimate will widen as the alternative standard under consideration becomes more stringent, but RIAs are not required to present only narrow ranges of cost estimates, if doing so makes them incomplete or not a meaningful indication of regulatory impact. However, the wider the range of the full attainment cost, the more an RIA is suggesting that attainment may not be economically viable. This is policy-relevant information, even if the quantitative values of the cost estimates are speculative and no one knows if the more likely outcome will be towards the higher or lower end of the provided range.

## 3. THIS RIA'S COST ANALYSIS METHODS AND RESULTING DEGREE OF PARTIAL ATTAINMENT

In developing its lists of identifiable control measures (and their associated annual costs) for attaining each of the alternative standards that the RIA addresses, EPA uses a model called the Control Strategy Tool (CoST), and associated datasets generally referred to as the Control Measures Database (CMDB).[35] Briefly, CoST identifies the least-cost set of control measures to meet a given target of emissions from an input file that identifies a fuller list of candidate control measures by U.S. county. Runs of the CoST model can include additional user-specified constraints on the control measures that can be considered from a full list of candidate measures. Two specific constraints on the CoST model's optimization are explicitly identified in the RIA. These are a ceiling on the estimated cost per ton reduced for a candidate control measure, and a minimum number of tons per year emitted by emissions sources that have candidate control measures listed for them in the main "all controls" input data file. As we discuss below, these are largely arbitrary constraints (whatever value is selected) and may not be supportable even for an illustrative assessment of control strategies, given that states face sanctions if they cannot identify and impose controls sufficient to achieve attainment. However, we also have determined that there are other, more quantitatively significant constraints embedded in the CoST modeling framework that affect its ability to identify full attainment strategies. These too are discussed below. For now, the important point is that the CoST modeling framework has some basic features that cause it to have difficulty in identifying a full attainment illustrative control strategy for many of the projected nonattainment areas.

The RIA finds that full attainment occurs (in a given county projected to otherwise be in nonattainment of the alternative standard of concern) if the CoST run can find a sufficient number of reductions of the targeted emissions species in that county to meet the RIA's specified reduction target for that county. Partial attainment occurs when the entire list of control measures that CoST identifies would produce fewer emissions reductions than the target value. Because the analysis of attainment in this RIA is performed on a county-specific basis, the RIA's summary of partial attainment cost estimates for each alternative standard are a sum of full attainment cost estimates for some of the nonattainment counties and partial cost estimates from others. Because of the latter fact, the aggregate cost estimates reported in the RIA are, by definition, incomplete, and clearly understated.

Specifically, the RIA reports that its partial attainment costs for the 10/35, 9/35, and 8/35 standards are, respectively, $94 million, $393 million, and $1.82 billion (annually).[36] Based on past experience with estimating full attainment costs after first estimating partial attainment costs, those RIA cost estimates cannot be relied upon as an indication of either the absolute or relative cost of the alternative standards. One only knows that they are too low.

### The RIA Fails to Identify Sufficient Controls to Attain Even the Current 12/35 Standard

It should be noted before going further that an RIA's estimates of costs for any alternative standard are traditionally reflective of the additional costs of emissions control *incremental* to whatever costs must be incurred to reach full attainment of the existing standards (*i.e.*, 12/35 in this case). Another important

---

[35] *See* EPA, "Cost Analysis Models/Tools for Air Pollution Regulations," available at https://www.epa.gov/economic-and-cost-analysis-air-pollution-regulations/cost-analysis-modelstools-air-pollution.

[36] RIA Table ES-5, p. ES-14.

anomaly in this RIA versus traditional RIA practice is that EPA cannot find sufficient control measures in its CoST model for several areas of the U.S. to attain even the current $PM_{2.5}$ NAAQS of 12/35. Thus, even its starting point for estimating incremental costs of standards tighter than the current one of 12/35 is one of partial attainment in this RIA. This very unusual situation is detailed in Appendix A. Its primary significance for the remainder of this report is:

(1) Several of the major counties for which this RIA projects only partial attainment with the alternative standards actually enter the RIA's cost analysis with zero remaining options in the CoST input data set. The RIA's partial cost analysis therefore estimates that these counties' costs for getting to 10/35, 9/35, or 8/35 are *zero* (*i.e.*, $0 per year). This is a remarkable example of this RIA's incompleteness, given that the RIA's analysis is actually finding that these counties face a huge remaining challenge (and compliance cost) even if the current standard is not tightened at all.

(2) The cost of them first fully attaining 12/35 ought to be estimated and reported in this RIA as well, because it would provide important policy-relevant context regarding how much more difficult it will be for those counties to reach any degree of attainment of standards tighter than 12/35. We provide such cost estimates in Section 5, although these are not included in our ranges of full attainment costs and are provided solely for context.

**Evidence of Significant Degree of Partial Attainment in RIA's Set of Identified Control Measures for Alternative Standards**

Focusing for the moment on the RIA's evaluation of the 8/35 alternative standard, the RIA identifies 141 counties that will require at least some reductions of primary $PM_{2.5}$ to attain 8/35,[37] for an aggregate reduction need of 86,869 tons.[38] It then runs its CoST model to identify controls of local primary $PM_{2.5}$ emissions sources that are reported to be available and estimated to be cost-effective in meeting each of the 141 counties' emissions reduction needs.[39] In running the CoST model, the RIA applies the following two constraints: (1) that any source undertaking a control measure have at least 5 tons per year of baseline emissions; and (2) that no control measure estimated by CoST input data to cost more than $160,000 per ton reduced will be required. While a total of 86,869 tons of reduction are needed for all these counties to

[37] RIA, Table 2A-14, pp. 2A-60 through 2A-64. The specific number of tons of reduction needed by each county is also shown in this table. This information is also provided in Appendix B of this report.

[38] This is three tons less than the value of 86,872 reported in RIA Table ES-2 at p. ES-9. NERA has confirmed that it is the result of rounding error in the way Table ES-2 was constructed. We will use the more precise values of emissions targets based on the target emissions input files to the CoST model. Discrepancies between what NERA has found in the raw CoST files and what is summarized in the RIA have been frequent but are minor enough not to affect the full attainment cost estimation that we have conducted for this report.

[39] The CoST model also allows counties in the Northeast and Southeast regions to turn to control measures in counties adjacent to them (within their same state) once all of the non-attaining county's identifiable measures have been selected. EPA counts these adjacent-counties' tons of reduction as only one-fourth of a ton towards the direct county's needed tons of reduction. In the following, we will use the term "effective tons" to be equal to the tons from adjacent counties divided by 4, while every ton reduced in a directly nonattaining county is equal to one effective ton.

attain 8/35, the CoST model finds only 46,073 effective tons,[40] with full attainment in only 80 of the initial 141 counties. Thus, another 40,796 effective tons of reduction are needed (in aggregate) to reach full attainment in the remaining 61 of the initial 141 counties.[41] Table 1 summarizes the degree of partial attainment in the RIA for all three alternative standards, showing that partial attainment is also a significant issue even for the less stringent alternative standards of 9/35 and 10/35.[42]

**Table 1. Summary of Aggregate Degree of Partial Attainment (in Tons and as % of Total Tons Needed)**

| | 10/35 | 9/35 | 8/35 |
|---|---|---|---|
| Emissions Reductions Needed (see Note 1) | 12,491 | 31,911 | 86,869 |
| "Effective" Emissions Reductions in RIA Partial Attainment Analysis (see Note 2) | 3,561 (29%) | 13,762 (43%) | 46,073 (53%) |
| "Effective" Emissions Reductions Still Needed | 8,930 (71%) | 18,149 (57%) | 40,796 (47%) |

Note 1: RIA Table ES-2 reports slightly different estimates of tons needed than used in this table. NERA concludes that Table ES-2 is subject to rounding error and does not precisely reflect the actual values used in its cost estimation modeling.
Note 2: RIA Table ES-3 reports actual tons reduced in adjacent counties whereas effective tons need to be used when assessing additional tons still needed for full attainment. The values in this row reflect the effective tons reduced, which equals the adjacent actual tons of reduction divided by 4. In the directly nonattaining counties of each region, actual tons are the same as effective tons. Additionally, NERA has found discrepancies between the actual tons reduced reported in Table ES-3 and those in the raw RIA CoST output files. This table uses the values as reported in RIA Table ES-3, as the discrepancies are too small to be material to any full attainment cost estimate.

Appendix B documents the degree of partial attainment in the RIA's analysis on a county-by-county level. When summed, the data in the tables of Appendix B match the information provided in Table 1. We provide the county-specific information because an assessment of full attainment costs requires a county-by-county cost extrapolation. Appendix B's tables reveal how extensive and deep partial attainment is for many individual counties, even while many other counties in the analysis do reach full attainment. Those tables also show that the counties that do reach full attainment in the RIA's partial analysis require, on average, substantially fewer tons of reduction than those that only reach partial attainment. Thus, the control effort to get the RIA's partially attaining counties into full attainment can be expected to be much larger than the cost of full attainment for those counties that do get into attainment.

---

[40] RIA, Table ES-3, p. ES-11. This is computed by adding the actual tons in the direct counties plus the actual tons in the adjacent counties divided by 4. The total of *actual* tons reported in the table is 61,321, but in terms of effective tons to be compared to the tons needed, it is 46,073.

[41] To the extent that some of these effective tons may need to be obtained by control measures in adjacent counties, the number of *actual* tons still needed would be larger than 40,796.

[42] Although the *percentage* of aggregate tons needed that are found (row 2 of Table 1) increases as the alterative standard tightens, the number of tons still needed (row 3) also increases. This seemingly counterintuitive trend in the percentages occurs because a rapidly increasing number of counties are projected to fall into nonattainment as the standard tightens, but mostly quite marginally (because the added counties *can* attain the next looser alternative standards). Because these additional counties have not yet had to undertake any of the control measures in the CoST data, many of them can get into full attainment even with the RIA's very limited set of candidate control measures. However, the number of counties that remain in partial attainment also continues to grow, and for those that are in partial attainment with one of the looser standards, their *individual* degree of partial attainment gets increasingly large as the alternative standard is tightened. The county-specific attainment percentages can be seen in Appendix B.

The significant shortfall in emissions reductions that the CoST model produces is a highly problematic result for a NAAQS RIA, given that stopping its control efforts at partial attainment is not a viable alternative for a nonattaining state under the Clean Air Act. States must demonstrate a plan for full attainment of each NAAQS within a federally prescribed time period or face a range of sanctions that have economic costs of their own. To the extent that the RIA's partial attainment outcomes are due to the EPA's arbitrary constraints on its CoST model,[43] or due to the CoST model's input file including an insufficiently broad list of candidate control measures, the requirement on states to demonstrate and achieve attainment will force adoption of additional options that the RIA has not identified, many of which will likely violate the limitations that EPA has built into its CoST modeling effort. Given the depth of the shortfall in the RIA analysis, those additional control measures are likely to cost more per ton (on average) than the average cost per ton of the measures selected in the RIA's partial attainment analysis. Thus, the shortfalls in tons reduced in the RIA's partial analysis (summarized in Table 1) most likely understate the degree to which the RIA's partial cost estimates fall short of full attainment costs.

**Evidence that Cost of Full Attainment Will Exceed Partial Attainment Cost by Even More Than the Estimated Deficits in Tons of Needed Reductions**

The above section has documented, relying on data that can be found in tables in various parts of the RIA, that the RIA has produced an incomplete evaluation of the costs of attaining each of the alternative standards, and that the deficit in tons of emission reductions that it has costed out is large, both in aggregate and county-specific terms. However, the central issue that this report addresses is how much it will *cost* to eliminate the deficit that we have so far stated only in terms of tons of emission reductions. The basic logic of least-cost analysis (including that reflected in the CoST model and its data) is that the cost per ton of emissions reduction will generally increase as regulators have to make deeper emissions cuts to meet more stringent standards. Thus, the cost of full attainment relative to that which a least-cost modeling exercise has found for partial attainment is likely to be proportionately more than the percentage of full attainment reductions relative to those achieved in the partial attainment analysis. More simply stated, if the tons of emission reductions needed for full attainment are double those reached in the partial attainment case, then the cost of full attainment likely will be more than double the partial attainment cost. The only ways that this basic logic might not hold when evaluating a strategy based solely on primary $PM_{2.5}$ control would be if the partial attainment analysis were either not least-cost in nature, or had failed to include in its list of identifiable candidate control measures some of the most cost-effective control options technically available. Based on an in-depth review of the data in the CoST model input files, we do not consider the latter possibility to have more than a marginal effect on the gap between CoST's project partial attainment and the RIA's projected total emissions reduction needs.[44]

[43] Specifically, these are a $160,000 per ton ceiling on control measures that CoST is allowed to select and a requirement that CoST not select any controls for emissions sources with less than 5 tons per year of baseline emissions.

[44] Another reason this logic might not hold would be if the illustrative strategies were to be broadened to consider more than just local primary $PM_{2.5}$ emissions reductions, such as more regional controls of $SO_2$, $NO_x$, and volatile organic gases. The RIA makes its case for assuming that control strategies for a tighter NAAQS will likely focus on primary $PM_{2.5}$ (RIA, p. 1-2). It is out of our scope to alter this RIA assumption but, given the apparent difficulties that states would face in reaching full attainment from primary $PM_{2.5}$ controls alone, the possibility that further controls on precursor emissions might be a necessary part of states' attainment strategies could be viewed as another insight arising from our full attainment cost analysis.

Figure 2 provides a visual summary of how the CoST model's county-specific marginal cost curve, relates to the RIA's county-specific estimate of tons needed for full attainment for two very different situations under the simulation of costs for meeting the 8/35 standard. On the left is the case of a county that is projected to be in nonattainment with 8/35 but which the RIA estimates will reach full attainment with measures available to it in the CoST model. This county (Davidson Co., NC) is projected to need 204 tons of reduction, indicated by the red vertical line.[45] The blue upward sloping line maps out the marginal cost curve in the CoST model for this county, up through the point of finding the full need of 204 tons of reduction.[46] This occurs well below the marginal cost limit of $160,000 per ton applied as a constraint in the CoST model run. The full cost of attainment for Davidson Co., NC is the area under the blue curve, left of the red line, down to the x-axis. It is, per NERA's review of the CoST output files, $3.3 million.[47]

**Figure 2. Examples of County-Specific Marginal Cost Curves in RIA (for 8/35) Compared to the Tons of Emissions Reduction Needed for Full Attainment**




County that reaches full attainment in RIA

County that is in partial attainment in RIA

On the right side of the figure is the case of a county that reaches only partial attainment in the RIA CoST analysis. This county (Lancaster Co., PA) needs 1,537 tons of emission reductions to attain 8/35,[48] but can find only 937 tons (61% of the full need) within the constraints of the CoST model data, resulting in a gap of 600 tons to reach full attainment.[49] Again, the blue line shows the marginal cost curve of the full

[45] RIA, p, 2A-62.

[46] NERA prepared this graph using the output of control measures selected for the 8/35 case in EPA's CoST run.

[47] It bears mentioning here that this is only the estimated cost (per the CoST model) of implementing the controls that will reduce that county's emissions by 204 tons. Even if it is taken as a sound estimate, it is probably dwarfed by the cost of developing or revising a SIP, much less meet all the additional requirements a state and businesses face under a nonattainment designation. We return to this question of the overall economic burdens of a tighter NAAQS in the Discussion section of this report.

[48] RIA, p. 2A-63.

[49] *See* for example, RIA Table 3-9, which shows 600 tons of emission reductions still needed for 8/35 in Lancaster Co., PA.

set of selected controls for this county in the CoST model output for 8/35. In this case it ends at 937 tons because that is where its control measures reach the RIA's marginal cost limit of $160,000 per ton, and where additional control measures in the CoST database all cost more than $160,000 per ton. The RIA's estimate of the cost incurred under 8/35 for Lancaster Co. is the area under the blue curve, to the left of the red dotted line, down to the x- axis. Per NERA's review of the CoST output file, this is $27.2 million — however, it is clearly only a part of the total costs that would be needed to keep adding more emissions reductions until the gap of 600 tons to full attainment is closed. Indeed, even if all the remaining 600 tons needed could be achieved at a flat $160,000 per ton, the cost of closing that 600-ton gap would be $96 million. In other words, the cost of meeting the first 61% of the attainment need would be only 28% of the full attainment cost, and the cost of full attainment for this county that gets to 100% of its need would be *4.5 times larger* than the reported partial attainment cost.

The big question for estimating the additional cost of full attainment of 8/35 is how much higher the cost per ton will be beyond the $160,000 per ton level for this county and the 60 other counties that reach only partial attainment in the RIA. That requires a county-by-county evaluation of the additional control opportunities in those 61 counties (and their adjacent counties for those in the Northeast and Southeast) individually. The approach we take is described in the next section of this report, and the results from applying that approach in the section thereafter.

However, as a prelude to that cost extrapolation section, we present Table 2 in which we have used EPA's CoST output files to replicate the U.S.-wide estimates of partial attainment costs in 2032 reported in the RIA.[50] Table 2 provides NERA's disaggregation of those costs into costs for all counties that do reach full attainment under the RIA CoST modeling, and costs for all counties that reach only partial attainment. We note that the RIA, when presenting these estimates of what it labels "annualized control costs" does not state clearly that these are only partial attainment costs — *i.e.*, that they are only the costs of control measures identified by the CoST model, with its limited set of candidate control measures and its marginal cost maximum of $160,000 per ton. However, NERA's table below, which was developed by NERA using the RIA's raw output files from the CoST modeling, shows the extent to which the U.S.-wide costs estimates provided in the RIA are predominantly in counties that do not reach full attainment in that RIA CoST analysis.

In our full cost estimation process, described in the next two sections, the cost estimate on the first row of the table will remain unchanged because they represent the portion of the RIA cost estimates that are consistent with full attainment in many of the counties projected to otherwise be in nonattainment, and our analysis makes no changes to the RIA's partial CoST analysis. However, the cost estimates in row 2 are patently incomplete and are subject to the type of cost increase illustrated for Lancaster Co., PA. To the extent that filling the gap of still-needed tons of reduction costs will cost more per ton than the limited set of control measures identified in CoST, Table 2 indicates that even a modest set of extrapolation assumptions can be expected to indicate that full attainment costs are likely substantially larger than the partial attainment costs reported in the RIA for each of the alternative standards.

[50] The RIA's U.S.-wide partial cost estimates are found in Table ES-5 on p. ES-14 of the RIA. They are $94.5 million, $393.3 million, and $1,821.7 million for 10/35, 9/35, and 8/35, respectively (2017$). Note that the RIA's caption to this control cost summary table does not state that these are only partial attainment costs; however, this fact is clear from the text.

**Table 2. Disaggregation of RIA's Partial Costs into Counties Reaching Full vs. Partial Attainment in the CoST Model.**

| | 10/35 | | 9/35 | | 8/35 | |
|---|---|---|---|---|---|---|
| | **Number of Counties** | **RIA Costs (million 2017$)** | **Number of Counties** | **RIA Costs (million 2017$)** | **Number of Counties** | **RIA Costs (million 2017$)** |
| Counties Reaching Full Attainment in RIA's CoST Modeling | 9 | $11.6 | 29 | $192.1 | 80 | $351.8 |
| Counties Remaining in Nonattainment in RIA's CoST Modeling | 15 | $82.9 | 22 | $201.2 | 61 | $1,469.9 |
| All Counties in RIA | 24 | $94.5 | 51 | $393.3 | 141 | $1,821.7 |

# 4. NERA'S METHOD FOR ESTIMATING COST OF FILLING THE FULL ATTAINMENT GAPS IN THE RIA'S ANALYSIS

## Constraints and Limitations of the CoST Modeling

As we have explained above, the RIA's analysis using the CoST model cannot identify a sufficient list of control measures to meet the estimated reductions in tons of primary $PM_{2.5}$ emissions required for a substantial portion of the counties that its air quality modeling indicates will otherwise fall into nonattainment with one or more of the alternative NAAQS standards. This partial attainment can be largely attributed by several important limitations of the CoST model's data base.

As we have noted in the prior section, EPA decided to limit the control measures that CoST could select to only sources with more than 5 tons per year of baseline emissions and to limit the cost of the selected control measures to not exceed $160,000 per ton relative to baseline controls in place. These are the most widely-discussed of the limitations imposed on the CoST analysis, and as we have noted, there is no basis for them in the Clean Air Act. They have thus received substantial comment and concern. NERA has reviewed the CoST model input and output files and performed several sensitivity runs of CoST in which these constraints are loosened. While projected reductions and costs do vary, it is only by a few percent and thus we conclude that these are not the keys to estimating anything close to full attainment. Appendix C provides more details on these findings.

On the other hand, our review of the CoST model found a much more significant limitation that is not widely known: after allowing for control of the first 25% non-point primary $PM_{2.5}$ sources in each county, the model does not allow any consideration of the possibility of applying control measures for any of the remaining 75%. We find that these remaining non-point source emissions sources are a primary route for identifying substantial quantities of additional needed reductions.

To explain in more detail, the CoST model's input file of candidate control measures contains control options for each of the emissions sources that are reported in the National Emissions Inventory (NEI) as aggregate county-wide sources (*i.e.*, primarily the non-point/area sources). That list of candidate control measures, however, is limited to either 10% or 25% "rule penetration" (RP). In the simplest terms, this means that if it is cost-effective to adopt a particular type of control (such as paving unpaved roads), CoST can only choose to control 10% of the unpaved road baseline emissions or (if more control is needed), to control 25% of that source category's baseline emissions. Options to apply controls addressing more than 25% of any county's road emissions are simply not in the CoST model's input file, even at a higher cost per ton (as higher rule penetration levels would almost certainly entail).[51] The above example is for the unpaved roads area source category, but applies to the majority of the non-point souce catgories in CoST.[52]

---

[51] We note that the cost per ton for reducing up to 25% of the unpaved road dusts assumed in CoST is only about half of the RIA's limit of $160,000 per ton (*i.e.*, $89,103 per ton) and thus even if the likely escalation in cost per ton were to be included, at least some additional tons of reduction could have been identified in the RIA even without having to raise its *ad hoc* marginal cost limit of $160,000 per ton.

[52] A few non-point source categories in CoST have candidate controls for which the RP is effectively 100%. The main ones are household burning and open burning, for which the control measure "chipping" is applied to 100%

We consider the latter point to be quite important to the question of how to use evidence-based logic to start to estimate the cost of getting each of the partial-attaining counties into full attainment. It is important because the tons of emission reductions from primary $PM_{2.5}$ controls *remaining* in the non-point source categories such as unpaved roads, paved roads, *etc*., is very large even if one accounts for reductions applied to the first 25% of that county's emissions inventory. In fact, NERA has used the CoST-related data files to estimate that, among the 61 counties that still need tons of reduction to reach full attainment of the 8/35 standard, there *remain* (after accounting for all the controls selected by these counties in the CoST partial attainment modeling of 8/35): about 11,000 effective tons of unpaved road dusts, about 23,000 effective tons of paved road dusts, and about 36,000 effective tons of all other non-point sources in CoST's inventory. [53,54] In aggregate, these 61 counties still need about 40,000 tons to get to full attainment. Reducing even some of these remaining non-point source emissions will almost certainly cost more *per ton* than the first 25% that has already been selected in the partial attainment analysis, but they do represent an *identifiable* path towards full attainment for many of the counties even for the very stringent standard of 8/35.[55]

We recognize, at this point, that these remaining non-point source emissions may not occur close enough to nonattaining monitors to affect their reading. If some or all of these reductions are *ineffective* at the offending monitor's location, then states would be wasting money to control them in pursuit of full

---

of the source category, if selected. A very small number of SCCs labelled "generic industrial processes" are treated as non-point in CoST, and the candidate measures for these (fabric filters, electrostatic precipitators, and venturi scrubbers) also would apply to the entire non-point source category, if selected.

[53] "Effective tons" means that remaining tons of emission reductions in counties adjacent to Northeast and Southeast directly nonattaining counties have been divided by four before adding them into the total.

[54] In estimating the remaining tons of emissions that can still be reduced in non-point source categories, we became aware that the CoST input file had not included *any* road or non-road dust emissions in quite a few counties that reach only partial attainment. We found estimates of these counties' road and/or unpaved road dusts with just existing controls in another EPA data file provided with the CoST input files (*see* 2032fj_from_2016_MY_from_afdust_2017NEI_NONPOINT_20200415_05aug2021_v0.csv). We note that the counties for which such emissions inventory data were not included in the CoST input file appear to be those that already report having controlled 25% or more of their road dusts; this implies the marginal cost of further reductions from roads in those counties would be higher than those assumed in CoST for the first 25% (and would likely exceed the *ad hoc* $160,000 per ton limit that the RIA has employed). Thus, if EPA *had* included these remaining inventories of paved and unpaved road dusts as candidate control measures, its CoST modeling results would likely not have selected them anyway. Nevertheless, for purposes of finding a set of control measures that provides the full need for attainment, without imposing an arbitrary cost per ton limit, we consider these additional tons of emission reductions important to our objective of estimating the complete cost of attaining the alternative standards. We therefore also extracted these NEI emission data for our county-by-county analysis, and they are included in the aggregate totals noted here.

[55] Aggregate comparisons can be misleading because the remaining tons that might be reduced in pursuit of full attainment need to be matched with the still-needed amount on a county-by-county basis. Upon performing the matching, we find that, if they were to be controlled to the maximum control effectiveness possible per the CoST model (*e.g.*, 60% reduction of paved roads whose shoulders become paved) these remaining non-point source emissions could get all but eight of the 32 northeast and southeast partial attaining counties into full attainment. We find, however, that even more reductions would be still needed for 20 of the 29 partially attaining counties in California and the West.

attainment.[56] This is a significant remaining source of uncertainty in the analysis of full cost of attainment. If more effective control measures do exist closer to the monitor of concern, they will still have a cost, and that cost is at least proxied in our analysis by an assumption that there is no decline in the *effectiveness* of a ton of emissions reduced from a non-point source if it occurs within the same county as the offending monitor. Obviously, if one were to be able to refine the analysis to include location-specific effectiveness estimates, some of the non-point source emissions controls would not be selected on the basis of cost per *effective* ton — but then some other unidentified measure from another source category would have to be adopted instead, and there is no reason to expect that its cost per ton would be less, even if its cost per *effective* ton were less.

## NERA's Use of CoST Modeling Data to Estimate Options for Full Attainment

The basic construct that NERA employs to estimate the cost of filling the gap from partial to full attainment is illustrated in Figure 3. For each county that the RIA leaves in partial attainment with an alternative standard, the marginal costs of its selected identified controls are shown as a stairstep-like curve in the figure (this stairstep is analogous to the blue lines in Figure 2). The cost of partial attainment is equal to the area denoted A in Figure 3. Given an extrapolation of the CoST-derived marginal cost curve, shown as the dotted line sloping upwards, the additional cost of making the still-needed reductions would be equal to the area denoted B.

This figure shows only one point of tons needed (from the baseline of 12/35) to reach attainment. However, there are three lines to consider when evaluating full attainment for 8/35, 9/35, and 10/35. If the line shown in Figure 3 reflects the tons needed for this county to fully attain 10/35, the cost of fully attaining 10/35 would be A+B. However, the tons needed for 9/35 and 8/35 would lie farther to the right on the x-axis, and the equivalent of area B would become larger for 9/35 and larger still for 8/35. Thus, the cost of full attainment becomes larger as the standard being analyzed becomes more stringent, but the concept of developing an extension of the RIA's initial marginal cost curve and then estimating costs under it up to the point of full attainment is the same for all three alternative standards.

[56] Although this same problem could arise with RPs of 10% or 25%, one can safely assume that counties attempting to rely on controls of any non-point source category for an attainment strategy will attempt to identify the most effective subsets of each category in terms of location relative to the monitor(s) of concern, and intensity of emissions, thus the first few percentage points of RP are the least likely to run into this uncertainty of having effect. We do consider this a significant uncertainty our full attainment cost assumptions for counties that require the most significant amount of non-point source RP to project cost of full attainment. Nevertheless, any estimate of full attainment must make some assumptions about the nature of the sources that will be controlled. To the extent that some counties are projected to require large RPs for all the non-point source categories in its current emissions inventory, if those latter controls become literally ineffective (not just *cost*-ineffective), some other category of emissions that is not a typical target of regulatory controls may become the only effective alternative.

**Figure 3. Illustration of Concept in Full Attainment Cost Estimation**




The concept may seem simple, but the challenge is in how one might go about extending or extrapolating the first, lowest-cost portion of the marginal cost curve revealed by the CoST analysis (shown as the blue lines in Figure 2, and illustrated as the stairsteps in Figure 3). We take a two-stepped approach for doing this, both steps grounded on the basic approach of the CoST modeling while making use of additional information available in the CoST datasets.

## Step 1: Additional Point Source Controls

In the first step, we considered extensions of the constraints EPA selected for its CoST runs. We considered the separate and combined effect of both the 5 ton per year baseline emissions constraint and the $160,000 per ton control cost constraint. As we explain in Appendix C, the results of these sensitivity analyses generally had little impact to either reduction of partial attainment or estimates of attainment costs (either partial or full). At the same time, as we also explain in Appendix C, we concluded that loosening the constraint of 5 tons of baseline emissions per year appeared to tap into a specious portion of the CoST data, causing us to decide that the CoST model was being pressed beyond its range of usefulness. Ultimately, the only way in which we decided to use additional controls from within the CoST list of candidate measures was to identify and include point source controls that cost more than $160,000 per ton (while retaining the 5 ton per year constraint).

The result of our Step 1 identified 66 additional or more stringent control measures on point sources in the 61 counties still needing controls to fully attain 8/35. All of these additional controls were in the Northeast and Southeast regions; none were identified in the partially attaining counties in the West and California. The aggregate net increase in effective tons of control over the RIA was 465 tons at an

additional aggregate annual cost of $205.6 million. Since none of the additional point source controls was found to cost more than $685,000 per ton, we did not elect to choose another (also *ad hoc*) cost limit below $685,000 per ton. This step produced no additional controls for the 10/35 standard and only 19 tons of control at an added cost of $5.3 million per year for the 9/35 standard. A listing of the additional point source controls included as a result of Step 1 is available on request.

Clearly, this effort to find more controls with a reasonable overall appearance of reliability by relaxing EPA's two explicit CoST modelling constraints made very little difference to the gap of about 40,000 additional tons of reduction needed. Thus, it is apparent that the only way to make a meaningful dent in the remaining 39,900, 18,160, and 8,930 tons of reductions needed to fully attain 8/35, 9/35, and 10/35, respectively, would be to include options for the partially attaining counties to resort to significant amounts of additional tons of reduction from their remaining non-point source emissions. As these deeper cuts were not even candidate control measures in the CoST data base, we incorporated them "off-line" as described in Step 2.

### Step 2: Additional Non-point Source Controls

Our second step for extension of the county-specific marginal cost curves is grounded in making deeper reductions in the non-point source controls than the maximal 25% control allowed for by the CoST model assumptions. Figure 4 illustrates the basic building blocks of this approach. Once the CoST controls have been exhausted (as they will have been in any partial-attainment county) and any additional controls from Step 1 are included, Step 2 starts to apply additional controls to the *remaining* tons in the county's database from three general source categories, represented by the next three "stairsteps" that start at the end of the partial marginal cost curve. These three steps are to be taken in their cost-effectiveness order until they have yielded the full amount of still-needed tons of reduction. Since the RIA's marginal cost for controlling 25% of each category is $89,103 per ton for unpaved roads, $155,521 per ton for shoulder paving, and starts at $471,406 for construction site water sprinkling, the figure shows that order for the stairsteps.

The total quantity of potential reduction from each category (*i.e.*, the width of each block) is 95% times the remaining tons of unpaved road dusts (which is the CoST model's assumption about the control effectiveness of paving a road), 60% times the remaining tons of paved road dusts (*i.e.*, the control effectiveness of paving shoulders in CoST) and 68.6% times the amount of other non-point source emissions (which is the control effectiveness for sprinkling water at construction sites). A listing of the remaining tons of non-point source emissions for the 61 partially-attaining counties is available on request.

The height of each of the three added stairsteps reflects an estimate of the cost per ton of controlling each category beyond the 25% RP level assumed in the CoST portion of the marginal cost curve. This is highly uncertain and we estimate alternative cost per ton levels for each of the three blocks, while not letting the paved and unpaved categories fall below the cost per ton levels used by CoST for the first 25% of controls. By varying these three categories' marginal costs, selecting from them in cost-effectiveness order, and stopping when a sufficient number of additional effective tons of reduction have been selected to reach full attainment in each affected county, we add the additional costs under that extended part of the curve to the costs from the RIA and Step 1 (*i.e.*, the area labelled A). For purposes of developing regional and national totals, we make no changes to the RIA's cost estimates for nonattaining counties

that the RIA does project to reach full attainment (*i.e.,* for those counties identified in Appendix B as attaining "100%" of their emissions reduction need in the RIA CoST analysis).

**Figure 4. Illustration of Building Blocks for Extending Marginal Cost Curves Through Deeper Cuts in Remaining Primary $PM_{2.5}$ Emissions from Non-point Sources**




A fourth and last stairstep is applied only in the counties with the most extreme partial attainment situation, which occurs if even 100% RP for all of the first three blocks (that are rooted in CoST non-point source emissions inventory data) is insufficient to meet the full attainment needs of some counties.[57] Here is where the full cost analysis must rely on assumptions that cannot be traced to any of the data in the EPA RIA datasets. Since nearly maximal control has, by this point, been extracted from the sources listed in the CoST database, the controls that this block would account for would likely be from source categories not even listed in the CoST database – agricultural dusts would be an example. Here, any assumed marginal cost will have a wide range of uncertainty because this last block falls into the category that we might call "truly unidentifed" at this point.

One might take the reliance on this last block of the extrapolated cost curve in the 8/35 case as an indication that the 8/35 standard may be unattainable as a practical matter, rather than just very high cost. It could also be viewed as an indication that the decision to develop illustrative control strategies solely on controls of primary $PM_{2.5}$ was ill-advised, and that further controls of precursor emissions (which are

[57] Our analysis finds that eight of the 32 northeast and Southeast partial attaining counties and 20 of the 29 partially attaining counties in California and the West end up relying on Block 4 for the 8/35 standard.

widely understood to be increasingly expensive after decades of controls) will in fact become an essential part of full attainment.

## Key Attributes of Our Approach and Objectives

The approach we have described above was designed to rely as much as possible on data about controls and reduction potential in EPA's own databases. We are aware of many concerns various parties have raised about the reliability of the CoST control cost assumptions, their cost-effectiveness, emissions inventory, estimates of tons needed for attainment, *etc.*[58] In our own explorations of CoST sensitivity runs, some of these became apparent to us directly. We have noted how some of these data issues caused us not to rely heavily on adjustment of the two overt CoST model constraints in estimating costs of full attainment (see Appendix C). We choose not to engage in in-depth criticisms of specific numerical assumptions in the RIA, and we do not attempt to replace any numerical assumptions of the RIA analysis used in its partial portion of its calculations. However, we acknowledge here that some of these concerns are real and that, if they could be addressed better, might alter the results of our analysis (as well as those of the RIA).

Instead, our focus is on demonstrating that the partial attainment costs in the RIA are not informative about either the absolute or relative cost of the three alternative standards. Our approach relies on the standard economists' concepts of extrapolating the "identified" marginal cost curve that even EPA has used in its prior $PM_{2.5}$ and ozone NAAQS RIA rather that boldly report only partial attainment cost estimates. That is the fundamental criticism that we level at this RIA, and we consider it a very serious flaw for the utility of this RIA. We find it deeply concerning if its partial cost estimates should be allowed to stand as a precedent for bad practices in future RIAs.

[58] Uncertainties are not just inherent in the cost modeling efforts of the RIA; it also exists in the PM modeling itself, since the model performance evaluation criteria accept inaccuracies of as much as +/- 50 percent.

# 5. FULL ATTAINMENT COST RESULTS SUMMARY

## Input Assumptions Used to Define a Range of Full Attainment Costs for Each County

Our approach to assessing the full cost of attainment is to provide a range of cost estimates for each alternative standard to reflect the great degree of uncertainty in the underlying assumptions it requires. Table 3 presents the costs per ton that we assume for each of the four blocks illustrated in Figure 4 to estimate costs at the lowest and highest end of those full attainment cost ranges. The reasoning behind each value in the table is summarized below.

**Table 3. Range of Assumptions Used About the Average Cost per Ton of Reduction in Each of the Four Blocks of the Extrapolation Calculation**

| Block | Lowest | Highest |
|---|---|---|
| Block 1: Paving remaining unpaved roads after first 25% | $89,103 | $356,412 |
| Block 2: Paving shoulders of remaining paved roads after first 25% | $155,521 | $622,084 |
| Block 3: Controls on remaining emissions in all other non-point sources included in CoST database | $20,000 | $471,406 |
| Block 4: Truly unknown controls after exhausting 100% controls on all non-point sources in the CoST model | $166, 667 | $500,000 |

For the lowest assumptions for Blocks 1 and 2, we assume that the marginal cost assumed for the first 25% of rule penetration would not increase for the remaining 75% of rule penetration. We consider this to be an extremely low estimate, given that the source document for the non-point CoST assumptions provides graphs indicating very steep rises in those sources' costs per ton as the road segments being addressed are less intensively used.[59] A copy of one of those figures is provided in Figure 5. It shows a rapid increase in the estimated cost per ton reduced as the vehicle miles travelled (VMT) on a 1-mile segment of road to be paved falls below 30 miles per day (which is the VMT level assumed in the CoST model's cost per ton for RPs of 10% and 25%), and also as the speed of travel on that road falls below 25 mph (which is the approximate speed assumed in the CoST model's cost per ton for RPs of 10% and 25%). If equally well-located with respect to an offending monitor, a SIP planner would choose to pave road segments with the highest average VMT, mpg, and vehicle weights.[60] Based on figures in HARC (2015), such as the example provided in Figure 5, it would be entirely plausible to assume that the last percentiles of currently unpaved roads to be paved (*i.e.,* as a SIP planner needs to start paving roads with lower vehicle travelling attributes) could be at least ten times more costly per ton reduced than the CoST model assumes for the RPs of 10% and 25%. In contrast, our high-end assumptions are only four times

[59] Houston Advanced Research Center and Texas Environmental Research Consortium (HARC), 2015, *Fine Particulate Matter in Harris County*, report prepared for Harris County, April 30, Figures 4-7, pp. 18-21. Available at: https://pm25.harcresearch.org/assets/FinalReport.pdf.

[60] These are the three key road characteristics that are used in the HARC (2015) formula for estimating the cost per ton reduced from paving a 1-mile road segment. The estimate in CoST of $89,103 per ton for paving an unpaved road is taken from HARC (2015) and assumes, per Appendix C of HARC (2015) at p.2, a daily VMT per mile of road of 30 miles, vehicle speed of 25.9 mpg, and vehicle weight of 1.8 tons.

the CoST assumption, which we consider a quite modest assumption for a possible high end. The use of a multiple of only four is taken to recognize that this assumption is an *average* cost per ton over the entire range from the 26th percent to a 100% rule penetration of the most cost-effective of the CoST model's road control measures.

**Figure 5. Copy of Figure 7 from HARC (2015) Showing Cost per Ton Reduced by Paving Unpaved Roads as Function of Vehicle Miles Travelled per Day on a 1-Mile Segment to be Paved and the Speed (mpg) of Vehicles on the Segment.**[61]




For Block 3, we use an extremely wide range because this category of remaining tons is a combination of all the other non-point source categories' tons, which creates substantial uncertainty and county-to-county variation in the primary sources of emissions in the block. At the low end, we assume only $20,000 per ton, which is roughly consistent with assuming that most of the remaining tons are either from residential wood combustion or from commercial cooking, and that the remaining tons (after measures have been applied in CoST) will cost, on average, about two times the marginal cost assumed in CoST for the first 25% of rule penetration. On the high end, we use the marginal cost per ton for the most cost-effective of the construction dust control measures ("soil moisture/sprinkler") in CoST's candidate measures input file for the first 25% of that sector's emissions (*i.e.,* RP of 25%). Because even this control measure exceeds the $160,000 per ton limit EPA has applied to its CoST modeling, the RIA applies no construction dust

[61] Note: The y-axis on this figure is for "normalized costs" and does not provide a numerical scale, so that a reader can only infer the *relative* cost impact of changing the assumptions on the graph.

controls at all in its partial attainment analysis. Thus, Block 3 effectively allows even some construction dust controls to start to be applied for full attainment.

For Block 4, there is no evidentiary basis in the EPA modeling data sets for estimating what these controls would be, what sources they would apply to, or what their average cost per ton might be. Clearly, not being even considered as candidates for control in CoST suggests these emissions come from sources that are either considered very high cost to control (or to control *further* than they might already be) or are considered uncontrollable for one or more possible reasons. Not knowing what they might, practically speaking, cost to control, but assuming they are inherently problematic to control, we have applied a wide range of costs per ton. We selected a high-end cost of $500,000 per ton, which is roughly consistent with the high-end cost of other blocks that are at least identifiable and thus somewhat evidence-based. For the low end, we took one-third of the high-end assumption, noting that it is approximately at the level of the cost limit that the RIA's CoST modeling chose to apply.

## Resulting Ranges of Estimates for Cost of Full Attainment

The full attainment cost estimates associated with simultaneously applying all four of the low-end cost per ton estimates in Table 3, and those associated with simultaneously applying all four of the high-end estimates are presented in Table 4. These ranges do not represent confidence intervals with a probabilistic interpretation. Rather, the lower ends of the ranges reflect the potential costs when one assumes the simultaneous combination of the lowest marginal cost estimates for the average cost per ton for reductions; the higher end values reflect the estimated costs when one assumes the simultaneous combination of our highest assumptions regarding the average cost per ton for the necessary number of tons of reduction in each of those four blocks. It is our professional judgment that both sets of input assumptions, *when taken simultaneously*, stretch the boundaries of reasonable expectation and thus the true costs for finding the RIA's estimated tons of reduction still needed have a robust chance of falling within the ranges of potential costs that these input assumption sets project. This judgment applies most strongly to the ranges for *total* full attainment costs (*i.e.*, the sum of costs estimated for all counties, shown in the bottom row of Table 4) than to ranges of cost estimates for any single county that lie beneath these totals.

The RIA's own estimates of costs for counties that it projects will reach full attainment are included in the "Full" cost ranges of Table 4 without any alteration by NERA. Because the RIA's cost estimates for those counties are just point estimates, the same values are included in the low and high ends for the "Full" cost ranges for each alternative standard, respectively.

The estimated potential full attainment costs, even at the low end, are vastly larger than the partial attainment costs that the RIA has reported (*e.g.*, in its Table ES-5). The RIA's partial attainment cost estimates are presented next to this study's range of full attainment cost estimates in the table. It shows that for the 8/35 standard, the potential full attainment will cost between about $7 billion and $24 billion, which is 4 to 13 times more than the RIA's partial cost estimate of less than $2 billion. Full attainment of 9/35 is projected to potentially cost 6 to 23 times more than the RIA's partial estimate. As for the least stringent alternative standard considered, 10/35, the potential full attainment cost is estimated to be between $1 billion and $4 billion per year, 11 to 45 times more than the RIA's partial estimate.

**Table 4. Comparison of NERA's Range of Estimates of Annual Cost of Full Attainment to Partial Cost Estimates Reported in RIA (Annual in 2032, millions of 2017$)**

| Area | 10/35 | | | 9/35 | | | 8/35 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Partial (RIA) | Full (NERA) | | Partial (RIA) | Full (NERA) | | Partial (RIA) | Full (NERA) | |
| | | Low | High | | Low | High | | Low | High |
| Northeast | $7 | $7 | $7 | $206 | $226 | $335 | $1,100 | $2,147 | $6,271 |
| Southeast | $4 | $4 | $4 | $69 | $202 | $605 | $437 | $1,219 | $3,388 |
| West | $19 | $74 | $238 | $34 | $272 | $905 | $122 | $769 | $2,378 |
| California | $64 | $957 | $4,055 | $85 | $1,830 | $7,322 | $163 | $3,097 | $11,704 |
| Total | $95 | $1,042 | $4,305 | $393 | $2,529 | $9,167 | $1,822 | $7,232 | $23,741 |

We also calculated full attainment cost estimates for all the possible combinations of the high and low average cost per ton assumptions for each block. This exercise produced a nearly uniform distribution of cost estimates between the low and high values, indicating that no single one of the four average cost per ton assumptions in Table 4 has a dominant effect on whether the full attainment cost estimate will be closer to the low end or to the high end.

For those who might view the above cost estimates as overstated, take note of the reasons they could be understated, especially at the lower end of the ranges.

- The low ends of the ranges assume that the marginal cost of obtaining additional reductions of non-point source controls is no higher than the CoST model assumes is the cost per ton from controlling the first 10% to 25% of emissions in each respective source category, despite extensive evidence in the reports that developed those costs per ton that costs per ton rapidly increase across the full source category. Review of EPA's CoST model input and related source data files indicate that EPA itself recognizes that as the fraction of road dusts already controlled increases, the marginal cost of reducing dusts on another fraction of the roads in that county increases. Apparently because this increased marginal cost estimate rises above $160,000 per ton, EPA elected to not include any candidate road dust control measures in counties indicating they have already controlled road dusts on 25% or more of their roads. Thus, our low-end assumption that all remaining 75% of the road dusts not controlled in the CoST run can be controlled at the CoST model's marginal cost for the first 25% appears to be lower than even EPA would have assumed, had it included such higher RP options in its CoST input file at all.

- The low ends of the ranges make no assumptions that the *effectiveness* of each incremental ton of reduction (with respect to reducing ambient concentrations at the specific location of offending monitors) declines as one reaches towards a 100% RP level in each partial-attaining county, even though this will almost certainly occur as well.

## California's Challenge in Meeting the *Current* $PM_{2.5}$ Standard Exceeds the Challenge That Most Other Counties Would Face Under an 8/35 Standard

The peculiar situation in this RIA of finding only partial attainment of the *current* standard of 12/35 in a number of counties further supports the notion that full attainment of any *tighter* standard will necessarily involve cost per ton assumptions higher than those assumed at the lower ends of each of our full

attainment cost ranges. For example, most of the higher cost of full attainment in the case of the loosest of the alternative standards (*i.e.*, 10/35) is projected to occur in the California and the West. This reflects the fact that a number of the California and West region counties exhaust all of the candidate controls available to them in the CoST data even before attaining the current standard of 12/35 — and so the RIA's partial attainment costs for these counties is reported to be *zero* dollars per year, rather than a much higher cost per ton needed than is assumed for other counties that have not exhausted their available control options in CoST to attain 12/35. While Table 4 suggests that California's incremental costs of attaining 10/35 will be about $1 billion to $4 billion (compared to the $0.06 billion reported in the RIA), we have used our extrapolation logic to estimate the cost of first getting the seven California counties that enter the analysis for 10/35 still in partial attainment of even 12/35 into full attainment with the *current* $PM_{2.5}$ NAAQS (*i.e.,* 12/35). The potential additional cost (above and beyond the point where the CoST-based control measures are exhausted) is estimated to be between $0.4 billion and $1.5 billion if those controls are to be based solely on local primary $PM_{2.5}$ controls, as the RIA has assumed.[62]

In undertaking these additional costs to first attain fully 12/35, the California counties would effectively be using up a large portion the remaining options for reducing non-point emissions that our estimates of full attainment costs presented in Table 4 have assumed would still be available once they have attained 12/35. Thus, our full attainment cost estimates for reaching any of the alternative standards in Table 4 should be viewed as understated in the case of the California region because we start the analysis of full attainment control options for meeting the alternative standards without first removing the portion of remaining tons that would need to be reduced to first attain 12/35; nor do we attempt to assign a higher cost per ton to reducing those remaining emissions to reflect that California counties will be well beyond the first 25% of rule penetration for those control measures.

Although this analysis of first getting California into attainment of 12/35 indicates that our full attainment costs for California in Table 4 are systematically understated, they more broadly demonstrate the exceptional technical challenge that the current standard of 12/35 itself still presents. To visualize the degree of challenge that these California counties face in simply attaining the 12/35 standard, consider the information in Figure 6, which shows what the RIA's analysis finds for Riverside Co., CA. In the figure, the leftmost red vertical line shows the tons of primary $PM_{2.5}$ the RIA estimates Riverside Co. will need to reduce just to get to attainment with the current 12/35 standard.[63] The amount of reduction that the CoST model finds for this county is difficult to even see on this scale but ends at the dotted green line (192 tons). Relative to the 192 tons that the CoST modeling can identify for Riverside Co., the still-needed tons just to get to full attainment of 12/35 is 1,286 tons — a reduction larger than is required by most of the 141 counties needing to attain 8/35 (see Appendix B). Since the CoST model cannot find even those tons, this county (and another six counties identified in Appendix A) are projected in the RIA partial cost

[62] The cost of getting to full attainment of 12/35 for those California counties might be less if California has more cost-effective control measures available to it from precursor emissions sources, and/or more controls than assumed in the analytical baseline from mobile sources. It is out of NERA's scope to determine that, but it should be noted that the RIA analysis did control $NO_x$ emissions by an additional 75% relative to projected emissions in 2032 under all existing regulations before estimating the tons of primary $PM_{2.5}$ reductions still needed to reach 12/35 or any of the alternative standards (RIA, pp. 2A-50 to 2A-53).

[63] Note that these estimates of the requirements for full attainment using primary $PM_{2.5}$ emissions reductions are computed *after* the RIA modeling has imposed a 75% reduction in California $NO_x$ relative to the projected 2032 $NO_x$ levels in its 2032 all-measures CMAQ run (*i.e.*, the result of "Step 1" described on p. 2-1 of the RIA).

analysis to undertake zero additional measures to close the ever-growing gap to 10/35, 9/35, or 8/35 — the size of those gaps being illustrated by the three other vertical red bars.

**Figure 6. Illustration of the Full Attainment Challenge Faced by Riverside County, CA Based on Data from the RIA CoST Analysis.**




Additional reasons why the full attainment cost estimates in Table 4 should not be considered an overstatement of the overall economic burden of meeting the tighter NAAQS alternatives are discussed in the next section of this report.

## 6. DISCUSSION

This report has made the case that it is inappropriate and highly misleading for an RIA to provide only partial attainment cost estimates. The ranges of full attainment cost estimates in the prior section demonstrate just how misleading partial attainment estimates can be of either the absolute or relative costs of alternative tighter NAAQS standards.

- For example, the RIA's partial attainment costs for 8/35 are 19 times higher than those for 10/35, while the respective full attainment cost estimates are only 5 to 6 times higher. This tells us that the partial attainment cost estimates for the least stringent alternative standard appear to be understated even more than those for the most stringent alternative — a finding that is not possible to anticipate just by observing the way the partial attainment cost estimates differ.

- In absolute terms, one could readily anticipate that the full attainment cost estimates would be higher, but not how much higher based on the partial attainment cost estimate levels. In the case of this set of alternative NAAQS standards, we find that the partial attainment costs are only about 2% to 9% of the full attainment costs for 10/35, about 4% to 16% of full attainment costs for 9/35, and about 8% to 25% of full attainment costs for 8/35.

Such large differences between CoST-based partial attainment cost estimates and the full cost estimate range are completely consistent with EPA's own record of prior $PM_{2.5}$ and ozone NAAQS cost estimates. As noted in Section 2, CoST model-based partial attainment costs in the 2012 $PM_{2.5}$ NAAQS RIA were only 1% to 31% of EPA's own full attainment cost estimates.[64] It is not possible to simply apply a multiplier to any given set of partial attainment costs: there is no pattern observable in the past record of partial *versus* full attainment cost estimates to predict the magnitude of the understatement as a function of the type or stringency of the alternative standard. Nevertheless, this study, combined with past EPA RIA analyses, indicates that the difference can be very large — large enough to be of importance to policy deliberations, and thus essential information for a reliable RIA.

This report also makes the point that full attainment cost estimates must be provided as quantitative ranges to help communicate to readers of the RIA the degree of uncertainty about what types of options will be used to achieve attainment once the (very) short list of candidate control measures that EPA has assembled for its CoST model is used up. The more that one can base the extrapolation to full attainment on control actions that can at least be named and partially quantified, the more reliable the resulting full attainment cost estimates may be, but this does not necessarily help narrow the uncertainty range. For example, in this study, the full attainment cost estimates are at least based on named non-point sources and the set of known options for limiting their emissions. As they involve far greater rule penetration than the CoST model accounts for, the cost per ton of those additional measures is still a critical uncertainty. We suggest, however, that a full cost estimation process that broadly identifies the most likely types and sources of additional control measures can produce a more confidence-inspiring cost range than a process that simply assumes a particular shape of a marginal cost curve (*e.g.*, flat, rising linearly, or rising exponentially) of unknown, unnamed, unidentified control measures that might fill the gap after the end of the CoST model's marginal cost curves. This study has taken the former approach, whereas the EPA's prior RIAs containing full attainment cost estimates have taken the latter approach.

---

[64] EPA (2012), Tables 7-4 and 7-5, pp. 7-14 and 7-15.

We have focused our analysis on the costs of full attainment as contrasted to "partial attainment" cost estimates only. Readers should be aware of how narrow even the full attainment cost estimate is. For example, these cost estimates omit or may otherwise be limited by the following issues:

(1) Costs and/or economic growth losses in *attainment* areas because of heightened difficulties for potential new plants or plant expansions in those clean air areas to demonstrate that they will not cause "significant deterioration" of air quality already meeting the NAAQS; [65]

(2) The economy-wide costs from the ripple effects on related businesses and employment that could be picked up though macroeconomic modeling of the attainment cost estimates (*e.g.*, using computable general equilibrium models);

(3) Administrative costs to states, which are likely to be amplified when addressing controls for many smaller sources that have never been regulated;

(4) Potential costs of sanctions — transportation and/or conformity freezes if states cannot submit approvable plans;[66]

(5) The cost of all nonattainment stationary source obligations (*e.g.*, NSR, RACM/BACM);

(6) The potential for significant increases in the costs of controls for many source categories given the outdated nature of the referenced source material for the control cost estimates;

(7) EPA's decision to include in its annualized control cost estimates only costs incurred starting in 2032, whereas the technology investments needed to reach attainment by 2032 will need to be incurred well before 2032;

(8) The cost of offsetting emission increases that may perversely occur as the result of the lower standards, such as the recent concerns expressed by the USFS and the Interior Department over the effect of the new standards in limiting prescribed fires to manage and prevent higher $PM_{2.5}$ emissions from wildfires.[67]

Item (1) in the list above merits some detailed discussion, as it raises the possibility of a tighter NAAQS resulting in incremental costs even in areas that remain in attainment with a tightened NAAQS. The numerical analyses in this report have focused solely on the costs of reducing criteria pollutant emissions to the degree estimated by the RIA to be needed to bring nonattainment areas into full attainment. That is the traditional focus of RIAs. However, as NAAQS regulations start to be driven down to levels close to those in relatively clean areas of the U.S. that do not face any risk of falling into nonattainment, RIA's estimates of the costs of implementing emissions control measures (even for full attainment) may be

[65] This is more commonly known as the requirement for prevention of significant deterioration (PSD) demonstrations before a proposed new facility can obtain its emissions permit(s).

[66] *See, e.g.*: 87 *Federal Register* 60494, "Clean Air Plans; 2012 Fine Particulate Matter Serious Nonattainment Area Requirements; San Joaquin Valley, California," October 5, 2022, at 60528.

[67] *See, e.g.*: General Accounting Office, 2023, *Wildfire Smoke Opportunities to Strengthen Federal Efforts to Manage Growing Risk,* March. Available at https://www.gao.gov/assets/gao-23-104723.pdf#page=48&zoom=100,0,789.

becoming a smaller and smaller part of the overall burden that NAAQS rules may entail on the U.S. economy at large, for reasons explained below.

Typically, RIAs acknowledge that there is an array of administrative costs for state governments to comply with SIPs and other implementation measures. Traditionally, it has been assumed that these costs are minor relative to the technical control measures themselves. That may still be the case. However, a tighter NAAQS also triggers increases in the challenges for businesses to demonstrate that any new or expanded major emissions source in attaining areas across the country will not result in new nonattainment or exacerbate any existing nonattainment. Known as the Clean Air Act's requirement for prevention of significant deterioration (PSD), "PSD demonstrations" are required of emitting manufacturing and industrial sources across the U.S. before they receive an air permit for a new or significantly expanded facility. There is nothing new about the PSD requirement, but as a NAAQS is tightened to levels increasingly close to the average ambient levels in areas that have no risk of nonattainment themselves, the chance that an increment in emissions from a new or expanded facility will exceed the allowable local air quality margin (called "headroom") becomes greater. If so, a detailed air quality modeling effort must be undertaken to demonstrate no significant deterioration would occur. To ensure passing that demonstration may require that proposed new sources agree to be built with emissions controls that are more expensive than is normally required outside of nonattainment areas.

Heightened emissions control requirements even in attainment areas could thus be an added cost that a traditional NAAQS RIA never considers, and could result in spending that is not insubstantial compared to the more narrowly defined costs of achieving attainment. For example, an analysis of additional costs due to additional controls on the wood and paper products industry that might become required in attaining areas if the PM2.5 NAAQS were tightened to 8/35 could cost over $4 billion in capital costs for that sector alone.[68] The paper suggests that if its analysis is representative of impacts to other U.S. manufacturing sectors, the overall increase in capital costs could be on the order of $20 billion. Although these costs are not directly comparable to the annualized costs estimated in the RIA, we estimate that, once annualized, they exceed the RIA's annual partial attainment costs for 8/35, and that they could be as much as 10% to 25% of our estimates of the full attainment costs of 8/35. Although these are rough estimates, they seem significant enough that this RIA (and future RIAs for tighter NAAQS) should start to consider expanding their notion of costs to include heightened costs in attaining areas across the U.S. in addition to the costs of eliminating projected nonattainment.

We also note that the PSD demonstration concern is not just that costs of manufacturing may increase more broadly than just in nonattainment areas. We also note that the heightened challenges in passing a PSD demonstration in many otherwise "clean" areas of the U.S. *could hinder their economic growth prospects without any actual dollar expenditures ever being incurred*. And in that sense in particular, benefit-cost analyses for NAAQS that are based solely on concepts of spending on control equipment or changes in operational processes may be losing their originally intended policy relevance. Consideration should be given to broadening the types of cost and economic impacts that future NAAQS RIAs should start to include.

[68] American Forest and Paper Association and American Wood Council, 2023, "Impacts of a Lower Annual $PM_{2.5}$ Ambient Air Quality Standard on the Forest Products Industry, February. To be submitted to the $PM_{2.5}$ Reconciliation docket EPA-HQ-OAR-2015-0072 as part of comments by the NR3 Coalition.

The analysis in this set of technical comments on the current $PM_{2.5}$ RIA is solely on the question of full attainment cost estimation to replace the misleading partial attainment costs in the RIA. The fact that we do not critique the RIA's estimates of benefits does not mean that we do not have significant concerns with their numerical validity as well. In fact, we note that those benefits estimates are far more uncertain than any cost estimate because they are the subject of on-going questions regarding both their causal and quantitative interpretation. Even if there is acceptance of a causal relationship reflected in the epidemiological associations on which RIA benefits are based, there is no evidence that the numerical values of those associations can be interpreted as unbiased quantitative predictors of the responses of public health to changes in concentrations in different locations, under different baseline exposures, and for different demographics than the original study. These epistemological issues for benefits calculations are well documented in comments on the rationale for the proposed rule;[69] the debate is easily summed up as uncertainty over whether such benefits will be realized. In contrast, there is no debate about the existence of actual compliance costs, and it is important and relevant to policy deliberation to understand their potential full attainment cost — and the associated implied practical or technical challenges — even if that requires acknowledgement of a wide range of numerical uncertainty.

[69] *See*, *e.g.*: NCASI (2023); Smith (2019a, 2019b); Smith and Chang (2020); and Gradient (2023).

## 7. CONCLUSION

In summary, the current RIA's cost estimates are inappropriately based on an undefined concept it calls "partial attainment." It is undefined because the "stopping point" at which control measures (and their costs) for getting closer to attainment stop being identified and are treated implicitly as zero cost; this is totally arbitrary and even differs in its degree of incompleteness with the location projected to be in nonattainment. Setting aside its ill-defined nature, partial attainment costs are inappropriate to report in an RIA executive summary because they bear no relationship whatsoever to the challenges, both technically and economically, of adopting a tighter standard or regulation, even though that sort of insight is one of the most important objectives of an RIA. Their presence in the executive summary is therefore misleading.

Even if fraught with enormous uncertainty, a concerted effort to characterize the full attainment costs is what is needed. If readers decide that the resulting cost ranges are too wide to be useful, the associated analysis to estimate those costs still provides readers with some understanding of the regulatory challenges that the various alternative standards may entail. By failing to even explain the extent of regulatory challenge that is implicit in the analysis and data behind this RIA, EPA does a disservice to the public and policymakers. This report provides important policy-relevant information and insights that the current RIA does not.

## 8. REFERENCES

American Forest and Paper Association and American Wood Council. 2023. "Impacts of a Lower Annual $PM_{2.5}$ Ambient Air Quality Standard on the Forest Products Industry, February. To be submitted to the $PM_{2.5}$ Reconciliation docket EPA-HQ-OAR-2015-0072 as part of comments by the NR3 Coalition.

Arrow, K. J., Cropper, M. L. *et al*. 1996. "Is There a Role for Benefit-Cost Analysis in Environmental, Health, and Safety Regulation," *Science*, Vol. 272:221-2.

EPA, "Cost Analysis Models/Tools for Air Pollution Regulations," available at https://www.epa.gov/economic-and-cost-analysis-air-pollution-regulations/cost-analysis-modelstools-air-pollution (accessed 3/13/23).

EPA. 2022. Regulatory Impact Analysis for the Proposed Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, EPA-452/P-22-001, December, available at https://www.epa.gov/system/files/documents/2023-01/naaqs-pm_ria_proposed_2022-12.pdf.

EPA. 2015. Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone, EPA-452/R-15-007, September, available at: https://www3.epa.gov/ttnecas1/docs/20151001ria.pdf.

EPA. 2012. Regulatory Impact Analysis for the Final Revisions to the National Ambient Air Quality Standards for Particulate Matter, EPA-452/R-12-005, December, available at: https://www.epa.gov/sites/default/files/2020-07/documents/naaqs-pm_ria_final_2012-12.pdf.

87 *Federal Register* 60494, "Clean Air Plans; 2012 Fine Particulate Matter Serious Nonattainment Area Requirements; San Joaquin Valley, California," October 5, 2022.

88 *Federal Register* 5558, "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," January 27, 2023.

General Accounting Office. 2023. Wildfire Smoke Opportunities to Strengthen Federal Efforts to Manage Growing Risk, March, available at https://www.gao.gov/assets/gao-23-104723.pdf#page=48&zoom=100,0,789.

Gradient. 2023. "Comments on US EPA's Proposed Rule for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter. Docket ID No. EPA-HQ-OAR-2015-0072." March 21. Submitted to docket EPA-HQ-OAR-2015-0072 (Comment Tracking Number: lfk-4z5n-amf4).

Houston Advanced Research Center and Texas Environmental Research Consortium. 2015. *Fine Particulate Matter in Harris County*, report prepared for Harris County, April 30, available at: https://pm25.harcresearch.org/assets/FinalReport.pdf.

Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services. 2016. *Guidelines for Regulatory Impact Analysis*, available at https://aspe.hhs.gov/sites/default/files/private/pdf/242926/HHS_RIAGuidance.pdf.

Office of Management and Budget (OMB). 2003. *Regulatory Analysis*, Circular A-4, September 17, available at https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A4/a-4.pdf.

NCASI. 2023. "RE: Reconsideration of the National Ambient Air Quality Standards for Particulate Matter: Docket ID No. EPA-HQ-OAR-2015-0072." March 16. Submitted to docket EPA-HQ-OAR-2015-0072 (Comment Tracking Number: lfb-dmdh-3ax8).

Smith, A. E. 2019a. "Comments to CASAC on the Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter, External Review Draft." October 21. Available at: file:///C:/Users/ANNE~1.SMI/AppData/Local/Temp/MicrosoftEdgeDownloads/aa26b030-21a1-43ac-adc9-9bdfeac0feb2/Smith%20Comments%20to%20CASAC%20on%20DraftPA_submitted_102119.pdf.

Smith, A. E. 2019b. "Oral Statement to CASAC on the Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter, External Review Draft." October 22. Available at: file:///C:/Users/ANNE~1.SMI/AppData/Local/Temp/MicrosoftEdgeDownloads/edb52cec-d35e-452b-a6c4-5918e493ba60/Smith%20Oral%20Statement.pdf.

Smith A. E. and Chang, W. 2020. "Exposure Window Uncertainty in Chronic Effects Associations of $PM_{2.5}$ and Health Risks." Submitted as Attachment 4 to comment of the NAAQS Regulatory Review & Rulemaking Coalition to the docket for the 2020 $PM_{2.5}$ NAAQS Proposed Rule, Docket reference number EPA-HQ-OAR-2015-0072-0915, June 28. Available at: file:///C:/Users/anne.smith/Downloads/EPA-HQ-OAR-2015-0072-0915_attachment_5.pdf.

Sunstein, C. R. 2011. Return Letter from Administrator of the Office of Regulatory Information and Affairs, Office of Management and Budget to EPA Administrator Jackson returning the draft final rule "Reconsideration of the 2008 Ozone Primary and Secondary National Ambient Air Quality Standards." September 2. Available at: https://www.reginfo.gov/public/return/EPA_Return_Letter_9-2-2011.pdf.

# APPENDIX A. EVIDENCE IN THE RIA OF THE INABILITY OF SOME AREAS TO ATTAIN THE CURRENT STANDARD OF 12/35

Before evaluating any of the alternative standards, this RIA first makes estimates of design values in 2032 (the assumed first year of full attainment) at existing monitors across the U.S. based on an assumption of implementation of all existing regulations, plus assumptions about economic growth through 2032. In this RIA, this 2032 projection indicates that, after imposition of all those current and future regulatory requirements, eight counties (all in California) are projected to still fail to attain the current *annual* standard of 12 $\mu g/m^3$.[70] These eight counties are identified in Table A-1.

The RIA analysis then applies a 75% reduction in $NO_x$ emissions projected to remain by 2032 in South Coast and San Joaquin Valley counties.[71] (Plumas Co. is the only one in the table below that is not in either the South Coast or San Joaquin Valley.) After accounting for the effects on the 2032 design values of this large additional $NO_x$ reduction, the RIA estimates the number of tons of primary $PM_{2.5}$ reduction that those California counties will still need to first attain the current 12/35 standard. Those additional tons of primary $PM_{2.5}$ estimated to be needed, and the tons that EPA finds for them using its CoST model are shown in Table A-1. Only one of the eight counties (Los Angeles Co.) is projected by the CoST model to have sufficient control options available to it to reach full attainment of the current 12/35 standard.

**Table A-1. California Counties in Partial Attainment of Current 12/35 Standard**

| California County Not Attaining Annual Standard of 12 ug/m$^3$ by 2032 | Emissions Reductions in Primary $PM_{2.5}$ Needed to Attain 12/35 (tons) | Primary $PM_{2.5}$ Reductions Identified by CoST Model Before Reaching Its Limit (tons and % of tons needed) | Primary $PM_{2.5}$ Emissions Reductions Still Needed for Attaining 12/35 in the "Partial" Analytical Baseline (tons) |
|---|---|---|---|
| Imperial | 349 | 92 (26%) | 257 (74%) |
| Kern | 791 | 563 (71%) | 228 (29%) |
| Kings | 104 | 43 (41%) | 61 (59%) |
| Los Angeles | 313 | 313 (100%) | 0 (0%) |
| Plumas | 1,244 | 108 (9%) | 1,136 (91%) |
| Riverside | 1,478 | 192 (13%) | 1,286 (87%) |
| San Bernadino | 2,209 | 2,139 (97%) | 70 (3%) |
| Tulare | 230 | 177 (77%) | 53 (23%) |

The remaining seven counties in California enter the RIA's analysis of costs of meeting alternative standards (tighter than 12/35) still in partial attainment with 12/35 and lacking any further options in the CoST model to rely on. As one can infer from the last column of Table A-1, they still need a combined total of 3,091 tons. Clearly these are the counties of the U.S. that face the highest additional costs to attain even tighter standards than 12/35; but because they are already out of candidate control measures in

[70] RIA, Table 2A-13. Fresno Co., CA and another nine counties in the RIA's West region are projected to still fail to meet the current *daily* standard of 35 $\mu g/m^3$. These are not discussed here, as we are focused on attainment of alternative annual standards only.

[71] *See* RIA, pp. 2A-50 to 2A-53 for a description of its assumptions regarding additional $NO_x$ reductions prior to estimating the need for reductions in primary $PM_{2.5}$ emissions in California counties.

EPA's CoST dataset, the RIA analysis of partial attainment implies that these seven counties will do *nothing* as the standard tightens — and that their assessed partial attainment cost reported in the RIA is *zero* dollars.

Several of the counties not attaining the daily standard in the 2032 baseline also exhaust their full set of controls in the CoST model and enter the main cost analysis in partial attainment of the daily standard, as well as show no cost (because they have no identified controls left) when they face one or more of the tighter alternative annual standards. These are Lemhi Co., ID, Shoshone Co., ID, and Yakima Co., WA.

# APPENDIX B. COUNTY-BY-COUNTY ATTAINMENT OUTCOMES IN THE RIA PARTIAL ANALYSIS (TONS)

The tables below summarize the degree of severity of the partial attainment outcome of the RIA CoST analysis for every county that the RIA projects will have a nonattainment status under a given alternative standard. These tables also include the counties for which the RIA's CoST analysis does find sufficient control measures to get into full attainment (*i.e.*, for which the last column indicates "100%".) Table B-1 reflects the results for the 141 counties that are projected to be in nonattainment for the 8/35 standard. Table B-2 reflects the RIA's results for the 51 counties that are projected to be in nonattainment for the 9/35 standard. Table B-3 reflects the RIA's results for the 22 counties that are projected to be in nonattainment for the 9/35 standard. Obviously, the 22 counties are a subset of the 51 counties, which are in turn are a subset of the 141 counties. Also, any county that reaches only partial attainment of a less stringent standard will also be in partial attainment of any of the more stringent standards, and the depth of their partial attainment will increase with the tighter alternative standards.

**Table B-1. Degree of Attainment in RIA Analysis Results for 141 Counties Projected to Face Nonattainment for the Alternative Standard of 8/35 (continued next page)**

| | (1) **Reductions Needed (Tons)** (Source: RIA Table 2A-14) | (2) **Reductions Achieved (Tons)** (1)-(3) | (3) **Reductions Still Needed (Tons)** (Source: RIA Table 3-9) | (4) **Percent of Emissions Reductions Needed That Are Achieved in RIA CoST Analysis (%)** (2)/(1) |
|---|---|---|---|---|
| **Northeast** | | | | |
| Jefferson County, OH | 893 | 213 | 680 | 24% |
| Camden County, NJ | 856 | 248 | 608 | 29% |
| Delaware County, PA | 1,405 | 435 | 970 | 31% |
| Lebanon County, PA | 776 | 253 | 523 | 33% |
| Brooke County, WV | 271 | 152 | 119 | 56% |
| St. Joseph County, IN | 498 | 291 | 207 | 58% |
| Marshall County, WV | 307 | 183 | 124 | 60% |
| New York County, NY | 666 | 400 | 266 | 60% |
| Lancaster County, PA | 1,537 | 937 | 600 | 61% |
| Marion County, IN | 1,149 | 759 | 390 | 66% |
| St. Louis City County, MO | 234 | 157 | 77 | 67% |
| Armstrong County, PA | 907 | 613 | 294 | 68% |
| Butler County, OH | 1,303 | 893 | 410 | 69% |
| Cuyahoga County, OH | 1,603 | 1,167 | 436 | 73% |
| Vigo County, IN | 315 | 252 | 63 | 80% |
| Wayne County, MI | 1,478 | 1,192 | 286 | 81% |
| Union County, NJ | 424 | 348 | 76 | 82% |
| Cambria County, PA | 761 | 632 | 129 | 83% |
| Allegheny County, PA | 2,305 | 1,923 | 382 | 83% |
| Hamilton County, OH | 637 | 601 | 36 | 94% |

**Table B-1. (continued-2) Degree of Attainment in RIA Analysis Results for 141 Counties Projected to Face Nonattainment for the Alternative Standard of 8/35 (continued next page)**

| | (1) **Reductions Needed (Tons)** (Source: RIA Table 2A-14) | (2) **Reductions Achieved (Tons)** (1)-(3) | (3) **Reductions Still Needed (Tons)** (Source: RIA Table 3-9) | (4) **Percent of Emissions Reductions Needed That Are Achieved in RIA CoST Analysis (%)** (2)/(1) |
|---|---|---|---|---|
| Philadelphia County, PA | 1,251 | 1,200 | 51 | 96% |
| Saint Clair County, IL | 695 | 682 | 13 | 98% |
| New Castle County, DE | 73 | 73 | 0 | 100% |
| Cook County, IL | 1,017 | 1,017 | 0 | 100% |
| Madison County, IL | 724 | 724 | 0 | 100% |
| Allen County, IN | 44 | 44 | 0 | 100% |
| Clark County, IN | 395 | 395 | 0 | 100% |
| Elkhart County, IN | 241 | 241 | 0 | 100% |
| Floyd County, IN | 29 | 29 | 0 | 100% |
| Lake County, IN | 644 | 644 | 0 | 100% |
| Vanderburgh County, IN | 263 | 263 | 0 | 100% |
| Jefferson County, KY | 593 | 593 | 0 | 100% |
| Howard County, MD | 124 | 124 | 0 | 100% |
| Baltimore (City) County, MD | 95 | 95 | 0 | 100% |
| Kent County, MI | 329 | 329 | 0 | 100% |
| Buchanan County, MO | 80 | 80 | 0 | 100% |
| Jackson County, MO | 37 | 37 | 0 | 100% |
| Jefferson County, MO | 344 | 344 | 0 | 100% |
| Saint Louis County, MO | 571 | 571 | 0 | 100% |
| Franklin County, OH | 95 | 95 | 0 | 100% |
| Lucas County, OH | 483 | 483 | 0 | 100% |
| Mahoning County, OH | 117 | 117 | 0 | 100% |
| Stark County, OH | 644 | 644 | 0 | 100% |
| Summit County, OH | 498 | 498 | 0 | 100% |
| Beaver County, PA | 293 | 293 | 0 | 100% |
| Berks County, PA | 102 | 102 | 0 | 100% |
| Chester County, PA | 681 | 681 | 0 | 100% |
| Dauphin County, PA | 241 | 241 | 0 | 100% |
| Lackawanna County, PA | 22 | 22 | 0 | 100% |
| Lehigh County, PA | 95 | 95 | 0 | 100% |
| Mercer County, PA | 278 | 278 | 0 | 100% |
| Washington County, PA | 241 | 241 | 0 | 100% |
| York County, PA | 381 | 381 | 0 | 100% |
| Providence County, RI | 168 | 168 | 0 | 100% |
| Davidson County, TN | 95 | 95 | 0 | 100% |
| Knox County, TN | 410 | 410 | 0 | 100% |
| Berkeley County, WV | 124 | 124 | 0 | 100% |

**Table B-1. (continued-3) Degree of Attainment in RIA Analysis Results for 141 Counties Projected to Face Nonattainment for the Alternative Standard of 8/35 (continued next page)**

| | (1) **Reductions Needed (Tons)** (Source: RIA Table 2A-14) | (2) **Reductions Achieved (Tons)** (1)-(3) | (3) **Reductions Still Needed (Tons)** (Source: RIA Table 3-9) | (4) **Percent of Emissions Reductions Needed That Are Achieved in RIA CoST Analysis (%)** (2)/(1) |
|---|---|---|---|---|
| **Southeast** | | | | |
| Cameron County, TX | 1,398 | 154 | 1,244 | 11% |
| Hidalgo County, TX | 1,840 | 455 | 1,385 | 25% |
| El Paso County, TX | 850 | 247 | 603 | 29% |
| Clayton County, GA | 433 | 129 | 304 | 30% |
| Muscogee County, GA | 523 | 258 | 265 | 49% |
| Fulton County, GA | 1,161 | 765 | 396 | 66% |
| Caddo Parish, LA | 1,145 | 786 | 359 | 69% |
| Bibb County, GA | 621 | 467 | 154 | 75% |
| West Baton Rouge Parish, LA | 515 | 460 | 55 | 89% |
| Floyd County, GA | 556 | 541 | 15 | 97% |
| Jefferson County, AL | 1,488 | 1,488 | 0 | 100% |
| Talladega County, AL | 131 | 131 | 0 | 100% |
| Pulaski County, AR | 777 | 777 | 0 | 100% |
| Union County, AR | 65 | 65 | 0 | 100% |
| District of Columbia | 139 | 139 | 0 | 100% |
| Cobb County, GA | 41 | 41 | 0 | 100% |
| DeKalb County, GA | 33 | 33 | 0 | 100% |
| Dougherty County, GA | 278 | 278 | 0 | 100% |
| Gwinnett County, GA | 16 | 16 | 0 | 100% |
| Richmond County, GA | 409 | 409 | 0 | 100% |
| Wilkinson County, GA | 760 | 760 | 0 | 100% |
| Wyandotte County, KS | 90 | 90 | 0 | 100% |
| East Baton Rouge Parish, LA | 531 | 531 | 0 | 100% |
| Iberville Parish, LA | 16 | 16 | 0 | 100% |
| St. Bernard Parish, LA | 57 | 57 | 0 | 100% |
| Hinds County, MS | 33 | 33 | 0 | 100% |
| Davidson County, NC | 204 | 204 | 0 | 100% |
| Mecklenburg County, NC | 90 | 90 | 0 | 100% |
| Wake County, NC | 65 | 65 | 0 | 100% |
| Tulsa County, OK | 74 | 74 | 0 | 100% |
| Greenville County, SC | 98 | 98 | 0 | 100% |
| Dallas County, TX | 33 | 33 | 0 | 100% |
| Harris County, TX | 1,905 | 1,905 | 0 | 100% |
| Nueces County, TX | 809 | 809 | 0 | 100% |
| Travis County, TX | 842 | 842 | 0 | 100% |

**Table B-1. (continued-4) Degree of Attainment in RIA Analysis Results for 141 Counties Projected to Face Nonattainment for the Alternative Standard of 8/35 (continued next page)**

| | (1) **Reductions Needed (Tons)** (Source: RIA Table 2A-14) | (2) **Reductions Achieved (Tons)** (1)-(3) | (3) **Reductions Still Needed (Tons)** (Source: RIA Table 3-9) | (4) **Percent of Emissions Reductions Needed That Are Achieved in RIA CoST Analysis (%)** (2)/(1) |
|---|---|---|---|---|
| **West** | | | | |
| Lemhi County, ID | 939 | 0 | 939 | 0% |
| Shoshone County, ID | 1,265 | 0 | 1,265 | 0% |
| Santa Cruz County, AZ | 444 | 13 | 431 | 3% |
| Lincoln County, MT | 1,422 | 225 | 1,197 | 16% |
| Benewah County, ID | 734 | 133 | 601 | 18% |
| Denver County, CO | 468 | 145 | 323 | 31% |
| Silver Bow County, MT | 281 | 133 | 148 | 47% |
| Harney County, OR | 267 | 148 | 119 | 55% |
| Maricopa County, AZ | 669 | 669 | 0 | 100% |
| Pinal County, AZ | 56 | 56 | 0 | 100% |
| Weld County, CO | 47 | 47 | 0 | 100% |
| Canyon County, ID | 383 | 383 | 0 | 100% |
| Missoula County, MT | 697 | 697 | 0 | 100% |
| Ravalli County, MT | 33 | 33 | 0 | 100% |
| Douglas County, NE | 19 | 19 | 0 | 100% |
| Sarpy County, NE | 28 | 28 | 0 | 100% |
| Clark County, NV | 561 | 561 | 0 | 100% |
| Dona Ana County, NM | 248 | 248 | 0 | 100% |
| Crook County, OR | 105 | 105 | 0 | 100% |
| Jackson County, OR | 533 | 533 | 0 | 100% |
| Klamath County, OR | 281 | 281 | 0 | 100% |
| Lane County, OR | 37 | 37 | 0 | 100% |
| King County, WA | 126 | 126 | 0 | 100% |
| Spokane County, WA | 65 | 65 | 0 | 100% |
| **California** | | | | |
| Imperial County, CA | 3,402 | 0 | 3,402 | 0% |
| Kern County, CA | 1,268 | 0 | 1,268 | 0% |
| Kings County, CA | 1,268 | 0 | 1,268 | 0% |
| Plumas County, CA | 810 | 0 | 810 | 0% |
| Riverside County, CA | 3,402 | 0 | 3,402 | 0% |
| San Bernardino County, CA | 3,402 | 0 | 3,402 | 0% |
| Tulare County, CA | 1,268 | 0 | 1,268 | 0% |
| Napa County, CA | 650 | 33 | 617 | 5% |
| Merced County, CA | 871 | 101 | 770 | 12% |
| Stanislaus County, CA | 965 | 113 | 852 | 12% |
| Madera County, CA | 813 | 111 | 702 | 14% |

**Table B-1. (continued-5) Degree of Attainment in RIA Analysis Results for 141 Counties Projected to Face Nonattainment for the Alternative Standard of 8/35**

| | (1) **Reductions Needed (Tons)** (Source: RIA Table 2A-14) | (2) **Reductions Achieved (Tons)** (1)-(3) | (3) **Reductions Still Needed (Tons)** (Source: RIA Table 3-9) | (4) **Percent of Emissions Reductions Needed That Are Achieved in RIA CoST Analysis (%)** (2)/(1) |
|---|---|---|---|---|
| Ventura County, CA | 1,012 | 229 | 783 | 23% |
| Fresno County, CA | 1,074 | 248 | 826 | 23% |
| San Luis Obispo County, CA | 504 | 128 | 376 | 25% |
| San Joaquin County, CA | 646 | 168 | 478 | 26% |
| Los Angeles County, CA | 3,402 | 1,159 | 2,243 | 34% |
| Solano County, CA | 317 | 150 | 167 | 47% |
| Sacramento County, CA | 396 | 228 | 168 | 58% |
| San Diego County, CA | 953 | 616 | 337 | 65% |
| Alameda County, CA | 666 | 491 | 175 | 74% |
| Sutter County, CA | 247 | 191 | 56 | 77% |
| Butte County, CA | 76 | 76 | 0 | 100% |
| Contra Costa County, CA | 355 | 355 | 0 | 100% |
| Marin County, CA | 44 | 44 | 0 | 100% |
| Santa Clara County, CA | 482 | 482 | 0 | 100% |

**Table B-2. Degree of Attainment in RIA Analysis Results for 51 Counties Projected to Face Nonattainment for the Alternative Standard of 9/35 (continued next page)**

| | (1) **Reductions Needed (Tons)** (Source: RIA Table 2A-14) | (2) **Reductions Achieved (Tons)** (1)-(3) | (3) **Reductions Still Needed (Tons)** (Source: RIA Table 3-9) | (4) **Percent of Emissions Reductions Needed That Are Achieved in RIA CoST Analysis (%)** (2)/(1) |
|---|---|---|---|---|
| **Northeast** | | | | |
| Delaware County, PA | 673 | 435 | 238 | 65% |
| Jefferson County, OH | 161 | 161 | 0 | 100% |
| Camden County, NJ | 124 | 124 | 0 | 100% |
| Lebanon County, PA | 44 | 44 | 0 | 100% |
| Lancaster County, PA | 805 | 805 | 0 | 100% |
| Marion County, IN | 417 | 417 | 0 | 100% |
| Armstrong County, PA | 176 | 176 | 0 | 100% |
| Butler County, OH | 571 | 571 | 0 | 100% |
| Cuyahoga County, OH | 871 | 871 | 0 | 100% |
| Wayne County, MI | 746 | 746 | 0 | 100% |
| Cambria County, PA | 29 | 29 | 0 | 100% |
| Allegheny County, PA | 1,573 | 1,573 | 0 | 100% |
| Philadelphia County, PA | 520 | 520 | 0 | 100% |
| Cook County, IL | 285 | 285 | 0 | 100% |
| **Southeast** | | | | |
| Cameron County, TX | 581 | 154 | 427 | 27% |
| Hidalgo County, TX | 1,022 | 455 | 567 | 45% |
| El Paso County, TX | 33 | 33 | 0 | 100% |
| Fulton County, GA | 343 | 343 | 0 | 100% |
| Caddo Parish, LA | 327 | 327 | 0 | 100% |
| Jefferson County, AL | 670 | 670 | 0 | 100% |
| Harris County, TX | 1,087 | 1,087 | 0 | 100% |
| Travis County, TX | 25 | 25 | 0 | 100% |
| **West** | | | | |
| Lemhi County, ID | 471 | 0 | 471 | 0% |
| Shoshone County, ID | 797 | 0 | 797 | 0% |
| Lincoln County, MT | 954 | 224 | 730 | 23% |
| Benewah County, ID | 267 | 133 | 134 | 50% |
| Maricopa County, AZ | 201 | 201 | 0 | 100% |
| Missoula County, MT | 229 | 229 | 0 | 100% |
| Clark County, NV | 94 | 94 | 0 | 100% |
| Jackson County, OR | 65 | 65 | 0 | 100% |
| **California** | | | | |
| Imperial County, CA | 2,551 | 0 | 2,551 | 0% |
| Kern County, CA | 951 | 0 | 951 | 0% |
| Kings County, CA | 951 | 0 | 951 | 0% |

**Table B-2. (continued-2) Degree of Attainment in RIA Analysis Results for 51 Counties Projected to Face Nonattainment for the Alternative Standard of 9/35**

| | (1) **Reductions Needed (Tons)** (Source: RIA Table 2A-14) | (2) **Reductions Achieved (Tons)** (1)-(3) | (3) **Reductions Still Needed (Tons)** (Source: RIA Table 3-9) | (4) **Percent of Emissions Reductions Needed That Are Achieved in RIA CoST Analysis (%)** (2)/(1) |
|---|---|---|---|---|
| Plumas County, CA | 493 | 0 | 493 | 0% |
| Riverside County, CA | 2,551 | 0 | 2,551 | 0% |
| San Bernardino County, CA | 2,551 | 0 | 2,551 | 0% |
| Tulare County, CA | 951 | 0 | 951 | 0% |
| Napa County, CA | 333 | 33 | 300 | 10% |
| Stanislaus County, CA | 648 | 113 | 535 | 17% |
| Merced County, CA | 554 | 101 | 453 | 18% |
| Madera County, CA | 496 | 112 | 384 | 23% |
| Fresno County, CA | 757 | 248 | 509 | 33% |
| Los Angeles County, CA | 2,551 | 1,158 | 1,393 | 45% |
| San Joaquin County, CA | 329 | 168 | 161 | 51% |
| San Luis Obispo County, CA | 187 | 128 | 59 | 68% |
| Ventura County, CA | 162 | 162 | 0 | 100% |
| Sacramento County, CA | 79 | 79 | 0 | 100% |
| San Diego County, CA | 102 | 102 | 0 | 100% |
| Alameda County, CA | 349 | 349 | 0 | 100% |
| Contra Costa County, CA | 38 | 38 | 0 | 100% |
| Santa Clara County, CA | 165 | 165 | 0 | 100% |

**Table B-3. Degree of Attainment in RIA Analysis Results for 24 Counties Projected to Face Nonattainment for the Alternative Standard of 10/35**

| | (1) **Reductions Needed (Tons)** (Source: RIA Table 2A-14) | (2) **Reductions Achieved (Tons)** (1)-(3) | (3) **Reductions Still Needed (Tons)** (Source: RIA Table 3-9) | (4) **Percent of Emissions Reductions Needed That Are Achieved in RIA CoST Analysis (%)** (2)/(1) |
|---|---|---|---|---|
| **Northeast** | | | | |
| Lancaster County, PA | 73 | 73 | 0 | 100% |
| Cuyahoga County, OH | 139 | 139 | 0 | 100% |
| Wayne County, MI | 15 | 15 | 0 | 100% |
| Allegheny County, PA | 842 | 842 | 0 | 100% |
| **Southeast** | | | | |
| Hidalgo County, TX | 204 | 204 | 0 | 100% |
| Harris County, TX | 270 | 270 | 0 | 100% |
| **West** | | | 0 | |
| Lemhi County, ID | 3 | 0 | 3 | 0% |
| Shoshone County, ID | 330 | 0 | 330 | 0% |
| Lincoln County, MT | 486 | 224 | 262 | 46% |
| **California** | | | | |
| Imperial County, CA | 1,701 | 0 | 1,701 | 0% |
| Kern County, CA | 634 | 0 | 634 | 0% |
| Kings County, CA | 634 | 0 | 634 | 0% |
| Plumas County, CA | 176 | 0 | 176 | 0% |
| Riverside County, CA | 1,701 | 0 | 1,701 | 0% |
| San Bernardino County, CA | 1,701 | 0 | 1,701 | 0% |
| Tulare County, CA | 634 | 0 | 634 | 0% |
| Stanislaus County, CA | 331 | 113 | 218 | 34% |
| Merced County, CA | 237 | 101 | 136 | 43% |
| Fresno County, CA | 440 | 248 | 192 | 56% |
| Madera County, CA | 179 | 112 | 67 | 63% |
| Los Angeles County, CA | 1,701 | 1,159 | 542 | 68% |
| Napa County, CA | 16 | 16 | 0 | 100% |
| San Joaquin County, CA | 12 | 12 | 0 | 100% |
| Alameda County, CA | 32 | 32 | 0 | 100% |

## APPENDIX C. QUANTITATIVE IMPLICATIONS OF LOOSENING COST PER TON AND TON PER YEAR CONSTRAINTS

In this study, efforts were made to determine whether the two constraints that EPA applied to its CoST model runs could be a significant cause of the extensive degree of partial attainment in the RIA cost analysis. NERA re-ran the EPA CoST model with loosened constraint levels. As explained below, these sensitivity cases showed that few additional controls could be found within the CoST input data, and many of the additional controls identified in these runs appeared to be using unreliable cost assumptions. Below we summarize more details of these findings and explain why we decided not to rely on many of the resulting selected control measures for our estimates of full attainment costs.

With regard to the 5 ton per year limit:

We first note that the 5 ton per year limit has only minimal effect on CoST's ability to select control measures for *non-point* or area sources. Although area sources, such as restaurants, are individually likely to be smaller than 5 tons per year, they are not represented individually in the NEI, nor in the CoST model. Rather, for each separate category of area sources (defined in NEI by their SCC codes, such as types of commercial cooking equipment), NEI estimates the total emissions from all such sources within a county. This total emissions estimate is what CoST's constraint requires to be more than 5 tons per year. While some counties may have so few individual sources within an SCC that they do not aggregate to at least 5 tons per year, we find that this is not a widespread phenomenon. The CoST model run with the 5 ton per year limit does identify and select controls for the various categories of non-point sources in a large fraction of the counties analyzed.

Our sensitivity run of CoST that reduced the 5 ton per year constraint to 1 ton per year identified only 157 more net effective tons of control from *non-point* sources across all of the potential nonattainment areas compared to the EPA run.[72] In general, and *because* these were very small missing control options to start with, the reduction in the gap to full attainment was at most a few tons for a few of the partially attaining counties. Given the effort of tailoring a full attainment estimate to capture these few additional tons, we elected not to manually incorporate them into our analysis. We found that the more important constraint for non-point sources in CoST is that it only provides control measures for the first 10% or 25% of any non-point source category's estimated emissions. We do address this constraint in the main part of our full attainment cost estimation (called "Step 2" in Section 4).

The effect of reducing the 5 ton per year limit to 1 ton per year was somewhat larger in the case of *point* source controls. We found that lowering this constraint identifies additional net reductions of 1,727 effective tons in the 61 counties that only partially attain 8/35. While this is a more substantial reduction of those counties' gap than that for non-point sources, when we reviewed the additional set of control measures selected for the point sources, we became uncomfortable with relying upon them. We noticed

[72] By "net" we mean total effective tons of increased reduction, and by "effective" we mean that tons reduced in adjacent counties are counted only as 0.25 tons of control for purposes of comparison to the estimate of tons of reduction needed to reach full attainment. In gross terms, the model identified additional measures summing to 179 tons of reduction in the nonattaining counties, and 59 effective tons among the various adjacent counties. However, these 238 additional effective tons were offset by about 81 fewer effective tons when various less cost-effective measures in the original EPA CoST run were no longer needed. (such off-setting would only occur in counties that can reach full attainment without exhausting all of their available control options).

that about three-fourths of these extra reductions were assigned the same cost per ton regardless of the size of the point source. In other words, point sources with the same SCC code that emit, for example, 200 tons per year apply these control measures at the same cost *per ton* as point sources that emit only 1 or 2 tons per year. We do not know the size basis that was used to estimate that single cost per ton that could be applied to *any* point source of any annual emissions size, but it is extremely unlikely that the estimate would have been viewed as appropriate for point sources emitting less than 5 tons per year. In fact, we wonder whether these size-invariant marginal cost estimates in CoST may also be inappropriate for application to sources in the 5 ton per year range. (Any alterations to the assumptions in the CoST model that EPA did elect to rely on are beyond NERA's scope, and we make this statement only as an observation worthy of future study regarding the general reliability of the current CoST dataset.)

The other one-quarter of the added reductions did show a well-defined size-dependent marginal cost assumption that continued as the annual tons were reduced below 5 tons per year. For each of the various control measures that were in this category, the cost per ton for a source of about 5 tons per year averaged nine times higher than the cost per ton for the same type of control measure on a source with 50 tons per year.[73]

While the latter subset of the control measure cost data did not appear unreasonable, those measures consistently had very high marginal costs (*e.g.,* greater than $70,000 per ton), while contributing little overall to reduction in the gap towards full attainment. Rather than attempt to pick and choose which subset of control measures in the less than 5 ton per year segment could be deemed reliable and which not, we decided not to include any controls with less than 5 tons per year. This decision has little impact on the approximately 40,000 of additional tons of reduction needed, nor, therefore, to our ultimate full attainment cost estimate. The sensitivity analysis was useful in revealing some of the potentially problematic assumptions even in the RIA cost estimates of partial attainment; correcting those was out of our scope.

<u>With regard to the $160,000 per ton limit:</u>

The $160,000 per ton constraint might appear even more *ad hoc* than that of the size constraint, given that there is no obvious "limit" at which it implies a technical impracticality.[74] Indeed, the RIA indicates that EPA selected this cost constraint value just so that some paved road dust controls would become part of

[73] When the cost limit of $160,000 per ton is also removed, point source control measures' marginal costs for sources of 2 tons per year were on average about five times higher than the same respective measures applied to facilities with about 5 tons per year baseline emissions. Because of the marginal cost escalation, we also noticed that over 80% of the point source control measures that *do* have a size-dependent marginal cost estimate in CoST and which emit less than 5 tons per year already have marginal costs greater than $160,000. Thus, it appears that the 5 ton per year limit, on its own, has almost the same effect as setting a $160,000 per ton limit on point source control measures.

[74] Indeed, the RIA analysis does not even respect this limit in adjacent counties. That is, a ton of reduction in an adjacent county costs the same (*e.g.*, $155,521 per ton for paving existing shoulders), but that ton of physical reduction counts towards the direct county's attainment need as only 0.25 tons. Thus, the marginal cost of control for any tons reduced in any adjacent county is four times higher per effective ton than in the directly nonattaining county that relies on such reductions. For example, the selection of paving shoulders in adjacent counties actually costs $622,084 per ton — and yet such controls are indeed selected in the RIA CoST modeling.

the identified control measures.[75] Notably, $160,000 is the nearest round number larger than the lowest cost-per-ton option for paved road controls, which is to pave existing shoulders at $155,521 per ton for the first 10% or 25% the paved road emissions of each county. We found that this cost limit had the merit of enabling the most cost-effective of the paved and unpaved road measures in the list of candidate control measures of CoST, while not allowing any further increase in controls from other sources, particularly point sources.

We realized, upon inspection of the control options available to non-point sources above the $160,000 per ton cost level, that it would likely be more cost-effective overall to allow counties to control the remaining tons in the various non-point source categories beyond the 25% RP mark using the most cost-effective control measures for those sources than to retain the 25% RP limit in CoST and force CoST to then adopt much higher cost-per-ton measures for just those first 25% of each source category's overall emissions. We therefore ran a sensitivity case in which the CoST limit of $160,000 per ton was lifted for point sources only. The initial sensitivity run raised the cost limit to $5 million, just to see how extreme the options might appear to be for point sources. That run (which retained the 5 ton per year limit) selected 66 additional control options within the 61 partial-attaining counties for 8/35. The average cost per ton of these additional measures was about $440,000 and the maximum cost per ton of the 66 extra controls was $685,000. As these additional point source controls did not appear to include any unreasonable-seeming outliers, we elected to include them in the set of control measures used as part of the effort of partial-attaining counties to reach full attainment. In aggregate, they have relatively little impact on closing that gap: an additional net reduction of 465 tons compared to the overall aggregate still-needed reductions of over 40,000 tons, adding $206 million to the RIA's original partial attainment cost for 8/35 of $1,822 million. These added control measures were found only in the Northeast and southeast regions.

[75] RIA, p. 3-11. ("We selected the $160,000/ton marginal cost threshold because it is around that cost level that (i) road paving controls get selected and applied (as seen by the slight uptick in the curves), and (ii) opportunities for additional emissions reductions diminish (as seen by the flattening of the curve around that cost threshold.")



NERA
ECONOMIC CONSULTING