**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 24-1050 (and consolidated cases)**

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

COMMONWEALTH OF KENTUCKY, et al.,
*Petitioners*,

*v.*

U.S. ENVIRONMENTAL PROTECTION AGENCY, MICHAEL S. REGAN
*Respondents.*

On Petitions for Review of Final Agency Action
of the United States Environmental Protection Agency
89 Fed. Reg. 16,202 (Mar. 6, 2024)

# DEFERRED JOINT APPENDIX
## VOLUME 6 OF 6
## JA2540 to JA2904

Lucinda Minton Langworthy
Erica N. Peterson
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
clangworthy@HuntonAK.com
epeterson@HuntonAK.com
(202) 955-1500

Elbert Lin
*Counsel of Record*
Hunton Andrews Kurth LLP
951 East Byrd Street, East Tower
Richmond, VA 23219
elin@HuntonAK.com
(804) 788-8200

October 7, 2024

*Counsel for Petitioners Chamber of Commerce of the United States of America, American Chemistry Council, American Forest & Paper Association, American Petroleum Institute, American Wood Council, National Association of Manufacturers, National Mining Association, and Portland Cement Association*

*Additional counsel listed on following pages*

Andrew R. Varcoe
Stephanie A. Maloney
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
(202) 463-5337
*Counsel for Petitioner Chamber of Commerce of the United States of America*

Erica Klenicki
Michael A. Tilghman II
NAM Legal Center
733 Tenth Street, NW, Suite 700
Washington, DC 20001
*Counsel for Petitioner National Association of Manufacturers*

Nate Curtisi
(D.C. Cir. Bar No. 65164)
Michael G. Bailey
(Arizona Bar No. 013747)
Arizona Chamber of Commerce
100 N. 7th Ave, Suite 120
Phoenix, Arizona 85007
(602) 248-4430
ncurtisi@azchamber.com
*Counsel for Arizona Chamber of Commerce and Industry*

Brunn (Beau) W. Roysden III
(DC Cir. Bar No. 64493)
Fusion Law, PLLC
7600 N. 15th St., Suite 150
Phoenix, Arizona 85020
beau@fusion.law
(602) 315-7545
*Counsel for President of the Arizona State Senate Warren Petersen and Speaker of the Arizona House of Representatives Ben Toma*

Kristina (Tina) R. Van Bockern
Holland & Hart LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Ph. 303-295-8107 / Fax 720-545-9952
trvanbockern@hollandhart.com

Emily C. Schilling
Sydney J. Sell
Holland & Hart LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101
Ph. 801-799-5753 / Fax 202-747-6574
ecschilling@hollandhart.com
sjsell@hollandhart.com
*Counsel for Petitioner Essential Minerals Association*

**RUSSELL COLEMAN**
**Attorney General of Kentucky**
Matthew F. Kuhn
*Solicitor General*
Jacob M. Abrahamson
*Assistant Solicitor General*
Lindsey R. Keiser
*Assistant Attorney General*
Office of the Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jacob.Abrahamson@ky.gov
Lindsey.Keiser@ky.gov
*Counsel for Petitioner*
*Commonwealth of Kentucky*

**PATRICK MORRISEY**
**Attorney General of West Virginia**
Michael R. Williams
*Principal Deputy Solicitor General*
Office of the West Virginia Attorney General
State Capitol, Bldg. 1, Room E-26
Charleston, West Virginia 25305
(681) 313-4550
Michael.R.Williams@wvago.gov
*Counsel for Petitioner*
*State of West Virginia*

**STEVE MARSHALL**
**Attorney General of Alabama**
Edmund G. LaCour Jr.
*Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
*Counsel for Petitioner*
*State of Alabama*

**TREG R. TAYLOR**
**Attorney General of Alaska**
Cody Doig
*Senior Assistant Attorney General*
Environmental Section
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 269-5211
cody.doig@alaska.gov
*Counsel for Petitioner*
*State of Alaska*

**TIM GRIFFIN**
**Attorney General of Arkansas**
Nicholas J. Bronni
*Solicitor General*
Dylan L. Jacobs
*Deputy Solicitor General*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
Nicholas.Bronni@ArkansasAG.gov
Dylan.Jacobs@ArkansasAG.gov
*Counsel for Petitioner*
*State of Arkansas*

**ASHLEY MOODY**
**Attorney General of Florida**
Henry C. Whitaker
*Solicitor General*
James H. Percival
*Chief of Staff*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
henry.whitaker@myfloridalegal.com
james.percival@myfloridalegal.com
*Counsel for Petitioner*
*State of Florida*

**CHRISTOPHER M. CARR**
**Attorney General of Georgia**
Stephen J. Petrany
*Solicitor General*
Office of the Georgia Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
*Counsel for Petitioner*
*State of Georgia*

**RAÚL R. LABRADOR**
**Attorney General of Idaho**
Joshua N. Turner
*Chief of Constitutional Litigation and Policy*
Alan M. Hurst
*Solicitor General*
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720-0010
Tel: (208) 334-2400
Fax: (208) 854-8071
Josh.Turner@ag.idaho.gov
Alan.Hurst@ag.idaho.gov
*Counsel for Petitioner*
*State of Idaho*

**THEODORE E. ROKITA**
**Attorney General of Indiana**
James A. Barta
*Solicitor General*
Office of the Attorney General
IGC South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
(317) 232-0709
James.Barta@atg.in.gov
*Counsel for Petitioner*
*State of Indiana*

**BRENNA BIRD**
**Attorney General of Iowa**
Eric H. Wessan
*Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
*Counsel for Petitioner*
*State of Iowa*

**KRIS KOBACH**
**Attorney General of Kansas**
Anthony J. Powell
*Solicitor General*
Office of Kansas Attorney General
Kris W. Kobach
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Office: (785) 368-8539
Fax: (785) 296-3131
Anthony.Powell@ag.ks.gov
*Counsel for Petitioner*
*State of Kansas*

**LIZ MURRILL**
**Attorney General of Louisiana**
J. Benjamin Aguiñaga
*Solicitor General*
Office of the Louisiana Attorney General
1885 North Third Street
Baton Rouge, Louisiana 70802
(225) 485-2458
aguinagab@ag.louisiana.gov
*Counsel for Petitioner*
*State of Louisiana*

**LYNN FITCH**
**Attorney General of Mississippi**
Justin L. Matheny
*Deputy Solicitor General*
Office of the Mississippi Attorney General
P.O. Box 220
Jackson, Mississippi 39205-0220
(601) 359-3825
justin.matheny@ago.ms.gov
*Counsel for Petitioner*
*State of Mississippi*

**ANDREW BAILEY**
**Attorney General of Missouri**
Joshua M. Divine
*Solicitor General*
Office of the Attorney General
207 West High St.
Jefferson City, Missouri 65101
(573) 751-8870
Josh.Divine@ago.mo.gov
*Counsel for Petitioner*
*State of Missouri*

**AUSTIN KNUDSEN**
**Attorney General of Montana**
Christian B. Corrigan
*Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
*Counsel for Petitioner*
*State of Montana*

**MICHAEL T. HILGERS**
**Attorney General of Nebraska**
Grant D. Strobl
*Assistant Solicitor General*
Office of the Attorney General of Nebraska
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
Grant.Strobl@nebraska.gov
*Counsel for Petitioner*
*State of Nebraska*

**DREW WRIGLEY**
**Attorney General of North Dakota**
Philip Axt
*Solicitor General*
North Dakota Attorney General's Office
600 East Boulevard Avenue, Dept. 125
Bismarck, North Dakota 58505
(701) 328-2210
pjaxt@nd.gov
*Counsel for Petitioner*
*State of North Dakota*

**DAVE YOST**
**Attorney General of Ohio**
T. Elliot Gaiser
*Solicitor General*
Mathura Sridharan
*Deputy Solicitor General*
Ohio Attorney General's Office
30 E. Broad Street, Floor 17
Columbus, Ohio 43215
(614) 466-8980
elliot.gaiser@ohioago.gov
mathura.sridharan@ohioago.gov
*Counsel for Petitioner*
*State of Ohio*

**GENTNER F. DRUMMOND**
**Attorney General of Oklahoma**
Garry M. Gaskins, II
*Solicitor General*
Jennifer L. Lewis
*Deputy Attorney General*
Oklahoma Office of the Attorney General
313 Northeast 21st Street
Oklahoma City, Oklahoma 73105
(405) 312-2451
Garry.Gaskins@oag.ok.gov
*Counsel for Petitioner*
*State of Oklahoma*

**ALAN WILSON**
**Attorney General of South Carolina**
Robert D. Cook
*Solicitor General*
J. Emory Smith, Jr.
*Deputy Solicitor General*
Thomas T. Hydrick
*Assistant Deputy Solicitor General*
Joseph D. Spate
*Assistant Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
(803) 734-3371
josephspate@scag.gov
*Counsel for Petitioner*
*State of South Carolina*

**MARTY J. JACKLEY**
**Attorney General of South Dakota**
Steven Blair
*Deputy Attorney General*
South Dakota Attorney General's Office
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501
(605) 773-3215
atgservice@state.sd.us
*Counsel for Petitioner*
*State of South Dakota*

**JONATHAN SKRMETTI**
**Attorney General & Reporter of Tennessee**
Whitney Hermandorfer
*Director of Strategic Litigation*
Harrison Gray Kilgore
*Strategic Litigation Counsel and Assistant Solicitor General*
Office of the Attorney General and Reporter of Tennessee
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 741-7403
Whitney.Hermandorfer@ag.tn.gov
Harrison.Kilgore@ag.tn.gov
*Counsel for Petitioner*
*State of Tennessee*

**SEAN D. REYES**
**Attorney General of Utah**
Stanford E. Purser
*Solicitor General*
Office of the Utah Attorney General
160 E. 330 S., 5th Floor
Salt Lake City, Utah 84111
(385) 382-4334
spurser@agutah.gov
*Counsel for Petitioner*
*State of Utah*

**BRIDGET HILL**
**Attorney General of Wyoming**
D. David DeWald
*Deputy Attorney General*
Wyoming Attorney General's Office
Water & Natural Resources Division
109 State Capitol
Cheyenne, Wyoming 82002
(307) 777-7895 phone
(307) 777-3542 fax
david.dewald@wyo.gov
*Counsel for Petitioner*
*State of Wyoming*

**KEN PAXTON**
**Attorney General of Texas**
Brent Webster
*First Assistant Attorney General*
James Lloyd
*Deputy Attorney General for Civil Litigation*
Kellie E. Billings-Ray
*Chief, Environmental Protection Division*
Clayton Smith
*Assistant Attorney General*
Office of the Attorney General of Texas Environmental Protection Division
P.O. Box 12548, MC 066
Austin, Texas 78711-2548
Tel: (512) 971-0139
Fax: (512) 320-0911
clayton.smith@oag.texas.gov
D.C. Circuit Bar No. 65145
Texas Bar No. 24091234
*Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality in Consolidated Case No. 24-1052*

TODD KIM
*Assistant Attorney General*
SARAH A. BUCKLEY
ALEXANDRA L. ST. ROMAIN
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 616-7554 (Buckley)
(202) 532-3284 (St. Romain)
sarah.buckley@usdoj.gov
alexandra.st.romain@usdoj.gov

Of Counsel:
David P.W. Orlin
*Attorney*
U.S. Environmental Protection Agency

*Counsel for Respondents U.S. Environmental Protection Agency and Michael S. Regan, in his official capacity as Administrator, EPA*

FOR THE STATE OF CALIFORNIA
ROB BONTA
Attorney General of California
TRACY L. WINSOR
Senior Assistant Attorney General
MYUNG J. PARK
CHRISTIE VOSBURG
Supervising Deputy Attorneys General
STACY LAU
COREY M. MOFFAT
JONATHAN A. WIENER
Deputy Attorneys General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94114
(415) 510-3549
Jonathan.Wiener@doj.ca.gov

FOR THE STATE OF ARIZONA
KRISTIN K. MAYES,
Attorney General
KRISTIN M. WROBEL
Assistant Attorney General
Environmental Protection Unit
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-8594
ENVProtect@azag.gov

FOR THE STATE OF CONNECTICUT
WILLIAM TONG
Attorney General
MATTHEW I. LEVINE
Deputy Associate Attorney General
JILL LACEDONIA
Assistant Attorney General
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
(860) 808-5250
jill.lacedonia@ct.gov

FOR THE STATE OF ILLINOIS
KWAME RAOUL
Attorney General
JASON E. JAMES
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental Enforcement/
Asbestos Litigation Division
Office of the Attorney General
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(872) 276-3583
jason.james@ilag.gov

FOR THE STATE OF MARYLAND
ANTHONY G. BROWN
Attorney General
MICHAEL F. STRANDE
Assistant Attorney General
Office of the Attorney General
Maryland Dept. of the Environment
1800 Washington Blvd.
Baltimore, MD 21230
(410) 537-3014
Michael.Strande@maryland.gov

FOR THE COMMONWEALTH OF MASSACHUSETTS
ANDREA JOY CAMPBELL
Attorney General
TURNER SMITH
Assistant Attorney General & Deputy Chief
BRIAN CLAPPIER
Assistant Attorney General
MARCUS HOLMES
Assistant Attorney General
Energy & Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
Turner.Smith@mass.gov

FOR THE PEOPLE OF THE STATE OF MICHIGAN
ELIZABETH MORRISSEAU
Assistant Attorney General
Environment, Natural Resources, and Agriculture Division
6th Floor G. Mennen Williams Building
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
MorrisseauE@michigan.gov

FOR THE STATE OF MINNESOTA
KEITH ELLISON
Attorney General
PETER N. SURDO
Special Assistant Attorney General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 757-1061
Peter.Surdo@ag.state.mn.us

FOR THE STATE OF
NEW JERSEY
MATTHEW J. PLATKIN
Attorney General
LISA MORELLI
Deputy Attorney General
Division of Law
25 Market Street
P.O. Box 093
Trenton, NJ 08625-093
609-376-2740
lisa.morelli@law.njoag.gov

FOR THE STATE OF
NEW YORK
LETITIA JAMES
Attorney General
BARBARA D. UNDERWOOD
Solicitor General
JUDITH N. VALE
Deputy Solicitor General
ELIZABETH A. BRODY
Assistant Solicitor General
MICHAEL J. MYERS
Senior Counsel
NICHOLAS C. BUTTINO
Assistant Attorney General
Environmental Protection Bureau
The Capitol
Albany, NY 12224
(518) 776-2382
michael.myers@ag.ny.gov

FOR THE STATE OF OREGON
ELLEN F. ROSENBLUM
Attorney General
PAUL GARRAHAN
Attorney-in-Charge
STEVE NOVICK
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.oregon.gov
Steve.Novick@doj.oregon.gov

FOR THE COMMONWEALTH OF
PENNSYLVANIA
MICHELLE A. HENRY
Attorney General
ANN R. JOHNSTON
Assistant Chief Deputy Attorney
General
Civil Environmental Enforcement
Unit
Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
717-497-3678
ajohnston@attorneygeneral.gov

FOR THE STATE OF
RHODE ISLAND
PETER F. NERONHA
Attorney General
ALISON HOFFMAN CARNEY
Assistant Attorney General
Chief, Environment and Energy
Unit
Rhode Island Office of the Attorney
General
150 South Main Street
Providence, RI 02903
(401) 274-4400 ext 2116
acarney@riag.ri.gov

FOR THE STATE OF VERMONT
CHARITY R. CLARK
Attorney General
MELANIE KEHNE
Assistant Attorney General
Office of the Attorney
General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Melanie.kehne@vermont.gov

FOR THE STATE OF
WASHINGTON
ROBERT W. FERGUSON
Attorney General
CHRISTOPHER H. REITZ
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, Washington 98504-0117
(360) 586-4614
chris.reitz@atg.wa.gov

FOR THE STATE OF
WISCONSIN
JOSHUA L. KAUL
Attorney General
BRADLEY J. MOTL
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 267-0505
motlbj@doj.state.wi.us

FOR THE DISTRICT OF COLUMBIA
BRIAN L. SCHWALB
Attorney General
CAROLINE S. VAN ZILE
Solicitor General
Office of the Attorney General for the District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

FOR HARRIS COUNTY, TEXAS
SARAH JANE UTLEY
Environmental Division Director
ELIZABETH HIDALGO
Assistant County Attorney
1019 Congress Plaza, 15th Floor
Houston, Texas 77002
713.274.5124
Sarah.Utley@cao.hctx.net

IRVINE & CONNER PLLC
CHARLES IRVINE
JANET CAMPOS
4709 Austin Street
Houston, Texas 77004
713.533.1704
charles@irvineconner.com
*Attorneys for Harris County, Texas*

FOR THE CITY OF NEW YORK
MURIEL GOODE-TRUFANT
Acting Corporation Counsel
CHRISTOPHER GENE KING
Senior Counsel, Environmental Law Division
NATHAN TAYLOR
Senior Counsel
New York City Law Department
100 Church Street
New York, NY 10007
212.356.2074
cking@law.nyc.gov

Seth L. Johnson
Marvin C. Brown IV
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 797-5245
(202) 794-5355
sjohnson@earthjustice.org
mcbrown@earthjustice.org
*Counsel for Respondent-Intervenors Alliance of Nurses for Healthy Environments, American Lung Association, Environmental Defense Fund, Natural Resources Defense Council, Northeast Ohio Black Health Coalition, Rio Grande International Study Center, and Sierra Club*

John Walke
Emily Davis
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 289-6868
jwalke@nrdc.org
edavis@nrdc.org
*Counsel for Respondent-Intervenor Natural Resources Defense Council*

Shaun A. Goho
Hayden W. Hashimoto
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(617) 678-2516
sgoho@catf.us
hhashimoto@catf.us
*Counsel for Respondent-Intervenors Citizens for Pennsylvania's Future and Conservation Law Foundation*

# TABLE OF CONTENTS

## VOLUME 1 of 6

## ACTIONS UNDER REVIEW

EPA-HQ-OAR-2015-0072-1543, EPA, Reconsideration of the National Ambient Air Quality Standards for Particulate Matter; Proposed Rule, 88 Fed. Reg. 5558 (Jan. 27, 2023) .................................. JA0001

EPA-HQ-OAR-2015-0072-5839, EPA, Reconsideration of the National Ambient Air Quality Standards for Particulate Matter; Final Rule, 89 Fed. Reg. 16,202 (Mar. 6, 2024)....................................... JA0163

## INDEXED RECORD MATERIAL

EPA-HQ-OAR-2015-0072-0037, Comments by the Independent Particulate Matter Review Panel (formerly EPA CASAC Particulate Matter Review Panel) on EPA's Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft – September 2019) (Oct. 22, 2019) (excerpts) ....................................................................... JA0363

EPA-HQ-OAR-2015-0072-0069, EPA, Review of the National Ambient Air Quality Standards for Particulate Matter; Proposed Action, 85 Fed. Reg. 24,094 (Apr. 30, 2020) (excerpts) ........................... JA0414

EPA-HQ-OAR-2015-0072-0105, Qian Di, et al., *Air Pollution and Mortality in the Medicare Population*, NEW ENGLAND JOURNAL OF MEDICINE (June 29, 2017) ......................................................................... JA0418

## VOLUME 2 of 6

EPA-HQ-OAR-2015-0072-0212, EPA, EPA/600/R-19/188, Integrated Science Assessment for Particulate Matter, (Dec. 2019) (excerpts) ......... JA0428

## VOLUME 3 of 6


EPA-HQ-OAR-2015-0072-0224, Press Release, EPA, Administrator Wheeler Announces New CASAC Member, Pool of NAAQS Subject Matter Experts (Sept. 13, 2019) ........ JA1186

EPA-HQ-OAR-2015-0072-0251, Letter from Dr. Louis Anthony Cox, Jr., Chair, Clean Air Scientific Advisory Committee, to The Honorable Andrew R. Wheeler, Administrator, EPA, re: CASAC Review of the EPA's *Integrated Science Assessment for Particulate Matter (External Review Draft – October 2018)* (Apr. 11, 2019) (excerpts) ........ JA1188

EPA-HQ-OAR-2015-0072-0260, Letter from Dr. Louis Anthony Cox, Jr., Chair, Clean Air Scientific Advisory Committee, to The Honorable Andrew R. Wheeler, Administrator, EPA, re: CASAC Review of the EPA's *Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft – September 2019)* (Dec. 16, 2019) (excerpts) ........ JA1190

EPA-HQ-OAR-2015-0072-0262, EPA, EPA-452/R-20-002, Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (Jan. 2020) (excerpts) [-0262 is duplicated in the docket at EPA-HQ-OAR-2015-0072-1583] ........ JA1200

EPA-HQ-OAR-2015-0072-0702, Comments by National Medical Societies and Public Health and Patient Advocacy Organizations on EPA's Proposed Rule on the National Ambient Air Quality Standards for Particulate Matter (undated) ........ JA1223

EPA-HQ-OAR-2015-0072-0752, Comments by Achieving Community Tasks Successfully (ACTS), et al. on EPA's Proposed Rule on the National Ambient Air Quality Standards for Particulate Matter (June 29, 2020) ........ JA1233

EPA-HQ-OAR-2015-0072-0973, Comments by Clean Air Task Force, et al. on EPA's Proposed Rule on the National Ambient Air Quality Standards for Particulate Matter, 85 Fed. Reg. 24,094 (Apr. 30, 2020) (June 29, 2020) (excerpts) ........ JA1236

EPA-HQ-OAR-2015-0072-1166, EPA, Review of the National Ambient Air Quality Standards for Particulate Matter; Final Action, 85 Fed. Reg. 82,684 (Dec. 18, 2020) .......... JA1256

EPA-HQ-OAR-2015-0072-1241_Attachment 2, Petition for Reconsideration submitted on behalf of the States of California (b and through Attorney General Xavier Becerra and the California Air Resources Board), Connecticut, Delaware, Illinois, Maryland, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin; the Commonwealths of Massachusetts, Pennsylvania, and Virginia; and the City of New York (Feb. 16, 2021) .......... JA1321

EPA-HQ-OAR-2015-0072-1242_Attachment 2, Petition for Reconsideration submitted by American Lung Association, Clean Air Task Force, Chesapeake Bay Foundation, Earthjustice, Environment America, Environmental Defense Fund, Environmental Law & Policy Center, National Parks Conservation Association, Natural Resources Defense Council, Sierra Club, and Union of Concerned Scientists (Feb. 16, 2020) .......... JA1455

EPA-HQ-OAR-2015-0072-1273, Press Release, EPA, EPA to Reexamine Health Standards for Harmful Soot that Previous Administration Left Unchanged (June 10, 2021) .......... JA1478

EPA-HQ-OAR-2015-0072-1277, Press Release, EPA, EPA Announces Selections of Charter Members to the Clean Air Scientific Advisory Committee; Concurrently, EPA issues a call for nominations for the CASAC Particulate Matter Panel (June 17, 2021) .......... JA1480

EPA-HQ-OAR-2015-0072-1285, Press Release, EPA, Administrator Regan Directs EPA to Reset Critical Science-Focused Federal Advisory Committees; Past administration actions hindered the recruitment and retention of members for the Science Advisory Board and the Clean Air Scientific Advisory Committee (Mar. 31, 2021) .......... JA1482

EPA-HQ-OAR-2015-0072-1394, Ki-Do Eum, et al., *Impact of long-term temporal trends in fine particulate matter ($PM_{2.5}$) on associations of annual $PM_{2.5}$ exposure and mortality; An analysis of over 20 million Medicare beneficiaries*, ENVIRONMENTAL EPIDEMIOLOGY (2018) .................................................. JA1484

EPA-HQ-OAR-2015-0072-1424, Joel Schwartz, et al., *A National Difference in Differences Analysis of the Effect of $PM_{2.5}$ on Annual Death Rates*, ENVIRONMENTAL RESEARCH (2021) .................................... JA1491

EPA-HQ-OAR-2015-0072-1441, Lauren H. Wyatt, et al., *Association of short-term exposure to ambient $PM_{2.5}$ with hospital admissions and 30-day readmissions in end-stage renal disease patients: population-based retrospective cohort study*, BMJ OPEN (2020) ............. JA1516

EPA-HQ-OAR-2015-0072-1471, X. Wu, et al., *Evaluating the impact of long-term exposure to fine particulate matter on mortality among the elderly*, SCIENCE ADVANCES (2020)......................................... JA1525

EPA-HQ-OAR-2015-0072-1501, EPA, EPA-452/R-15-007, EPA, Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone (Sept. 2015) (excerpts) ........................................................................... JA1535

EPA-HQ-OAR-2015-0072-1522, Comments by Joel Schwartz, Professor of Environmental Health, Harvard TH Chan School of Public Health, on EPA's Policy Assessment for PM2.5 (undated) (excerpts)........................................................................................ JA1545

EPA-HQ-OAR-2015-0072-1525, Comments on behalf of the Commonwealth of Kentucky and the States of Alabama, Alaska, Arkansas, Indiana, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, Utah, West Virginia, and Wyoming on Policy Assessment for Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, External Review Draft (Dec. 14, 2021) ....................................... JA1548

## VOLUME 4 of 6

EPA-HQ-OAR-2015-0072-1584, EPA, EPA-452/R-22-004, Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (May 2022) (excerpts) .............. JA1561

EPA-HQ-OAR-2015-0072-1585, EPA, EPA/600/R-22/028, Supplement to the 2019 Integrated Science Assessment for Particulate Matter (May 2022) (excerpts) ................................................ JA1836

EPA-HQ-OAR-2015-0072-1587, Letter from Dr. Elizabeth A. (Lianne) Sheppard, Chair, Clean Air Scientific Advisory Committee, to the Honorable Michael S. Regan, Administrator, EPA, re: CASAC Review of the EPA's *Supplement to the 2019 Integrated Science Assessment for Particulate Matter (External Review Draft – October 2021)* (excerpts) (Mar. 18, 2022) ....................... JA1995

EPA-HQ-OAR-2015-0072-1593, Letter from Dr. Elizabeth A. (Lianne) Sheppard, Chair, Clean Air Scientific Advisory Committee, to the Honorable Michael S. Regan, Administrator, EPA, re: CASAC Review of the EPA's *Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft – October 2021)* (excerpts) (Mar. 18, 2022) ........................................................... JA2000

EPA-HQ-OAR-2015-0072-1964, Comments by the Arizona Department of Environmental Quality on Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (Mar. 20, 2023) ........................................................................... JA2023

EPA-HQ-OAR-2015-0072-1989, Comments by the Arizona Chamber of Commerce & Industry and the Arizona Manufacturers Council on EPA's Proposed Rule on National Ambient Air Quality Standards for Particulate Matter (Mar. 24, 2023) ..................................... JA2028

EPA-HQ-OAR-2015-0072-2091, Comments by the Essential Minerals Association on Reconsideration of the National Ambient Air Quality Standards for Particulate Matter Proposed Rule (Mar. 28, 2023) ................................................................................. JA2032

EPA-HQ-OAR-2015-0072-2125, Comments by Joel Schwartz, Professor of Environmental Epidemiology, Director, Harvard Center for Risk Analysis, Harvard University, on EPA's Proposed Revision to the PM2.5 NAAQS (undated) (excerpts) .............................. JA2038

**VOLUME 5 of 6**

EPA-HQ-OAR-2015-0072-2192, Comments by the Texas Commission on Environmental Quality on EPA's Proposed Rule for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (Mar. 28, 2023)..................................... JA2045

EPA-HQ-OAR-2015-0072-2193, Comments by the National Association of Manufacturers on EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (Mar. 28, 2023) .......................................................................... JA2079

EPA-HQ-OAR-2015-0072-2210, Comments by the National Mining Association on EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 88 Fed. Reg. 5558 (Jan. 27, 2023) (Mar. 28, 2023) ............................................................ JA2083

EPA-HQ-OAR-2015-0072-2212, Comments by the Commonwealth of Kentucky and the Energy and Environment Cabinet, the Division for Air Quality, on EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 88 Fed. Reg. 5558 (Jan. 27, 2023) (Mar. 28, 2023) ...................................... JA2140

EPA-HQ-OAR-2015-0072-2233_Attachment 1, Comments of Appalachian Mountain Club, Chesapeake Bay Foundation, Citizens For Pennsylvania's Future, Clean Air Council, Clean Air Task Force, CleanAirNow, Earthjustice, Environmental Defense Fund, Group Against Smog & Pollution, National Parks Conservation Association, Natural Resources Defense Council, Sierra Club, Southern Environmental Law Center, and Union of Concerned Scientists on the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (Mar. 28, 2023)." ................................................................................ JA2145

EPA-HQ-OAR-2015-0072-2348, Comments by Health, Medical, and Nursing Organizations on EPA's Proposed Rule in the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 88 Fed. Reg. 5558 (Jan. 27, 2023) (Mar. 28, 2023) ........ JA2322

EPA-HQ-OAR-2015-0072-2361, Comments by the NAAQS Regulatory Review & Rulemaking Coalition on EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (Mar. 28, 2023) ........ JA2336

## VOLUME 6 of 6

EPA-HQ-OAR-2015-0072-2422_Attachment 14, Industrial Economics, Inc., Analysis of $PM_{2.5}$-Related Health Burdens Under Current and Alternative NAAQS; Updated Final Report, 9 µg/$m^3$ Supplement Added March 21, 2023 (excerpts) ........ JA2540

EPA-HQ-OAR-2015-0072-2426, Comments by Boyden Gray & Associates PLLC on EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 88 Fed. Reg. 5558 (Jan. 27, 2023) (Mar. 28, 2023) ........ JA2617

EPA-HQ-OAR-2015-0072-2428, Comments by the Chamber of Commerce of the United States on EPA's Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 88 Fed. Reg. 5558 (Jan. 27, 2023) (Mar. 28, 2023) ........ JA2640

EPA-HQ-OAR-2015-0072-2482_Attachment 5, Ihab Mikati, BS, et al., *Disparities in Distribution of Particulate Matter Emission Sources by Race and Poverty Status*, AJPH ENVIRONMENTAL JUSTICE (Apr. 2018) ........ JA2655

EPA-HQ-OAR-2015-0072-2485_Attachment 8, Christopher W. Tessum, et al., *$PM_{2.5}$ polluters disproportionately and systemically affect people of color in the United States*, Science Advances (Apr. 28, 2021) ........ JA2661

EPA-HQ-OAR-2015-0072-2485_Attachment 9, Maninder P.S. Thind, et al., *Fine Particulate Air Pollution from Electricity Generation in the US: Health Impacts by Race, Income, and Geography*, ENVIRONMENTAL SCIENCE & TECHNOLOGY (2019).................................. JA2668

EPA-HQ-OAR-2015-0072-4525, Comment by Ben Toma, Speaker of the House, Arizona House of Representatives on EPA's Proposed Rule Change for PM2.5 (posted May 3, 2023)......................................... JA2678

EPA-HQ-OAR-2015-0072-6025, EPA, Responses to Significant Comments on the 2023 Proposed Rule for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter (undated) ......................................................................................... JA2680

**MATERIALS PROVIDED FOR THE CONVENIENCE OF THE COURT**

Appalachian Power Co. et al. Respondents' Brief in Support of Petitioners, *Am. Trucking Ass'ns v. Whitman*, No. 99-1426 (U.S. July 20, 2000) (excerpts) .............................................................. JA2838

Appalachian Power Co. et al. Reply Brief, *Am. Trucking Ass'ns v. Whitman*, No. 99-1426 (U.S. Oct. 5, 2000) (excerpts) ............................. JA2842

Joint Reply Brief of State Petitioners, Non-State Petitioners, and Supporting Intervenors, *NEDA CAP v. EPA*, 686 F.3d 803 (D.C. Cir. 2012) (No. 10-1252, Feb. 8, 2012) (excerpts) .................................. JA2846

Final Joint Opening Brief of Industry Petitioners, *Murray Energy Corp. v. EPA*, 936 F.3d 597 (D.C. Cir. 2019) (No. 15-1385, Sept. 26, 2016) (excerpts) ......................................................................... JA2849

State Petitioners' Opening Brief, *Murray Energy Corp. v. EPA*, 936 F.3d 597 (D.C. Cir. 2019) (No. 15-1385, Sept. 26, 2016) (excerpts)......................................................................................... JA2851

Respondent EPA's Motion to Continue Oral Argument, *Murray Energy Corp. v. EPA*, No. 15-1385 (D.C. Cir. Apr. 7, 2017) (ECF No. 1670218) (excerpt) ................................................................ JA2855

Office of Management and Budget Comments on EPA Proposed Rule: "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," RIN 2060-AV52, Cover Comments (undated), Docket No. EPA-HQ-OAR-2015-0072-1618_Attachment 1 ........................................................................ JA2856

Memorandum from Joseph Goffman, Assistant Administrator, EPA, to Regional Administrators Regions 1-10, re: Initial Area Designations for the 2024 Revised Primary Annual Fine Particle National Ambient Air Quality Standard (Feb. 7, 2024) ............................ JA2880

IEc

# Analysis of $PM_{2.5}$-Related Health Burdens Under Current and Alternative NAAQS

Updated Final Report

9 µg/m[3] Supplement Added March 21, 2023

INDUSTRIAL ECONOMICS, INCORPORATED

IEc

## TABLE OF CONTENTS

Executive Summary ...ES-1
Background and Research Objectives ...ES-1
Current $PM_{2.5}$ Exposure and Health Burden ...ES-2
Benefits of Alternative Annual $PM_{2.5}$ Standards...ES-7
Conclusions ...ES-8
Chapter 1 | Introduction ... 1-1
Background ... 1-1
Research Objectives ... 1-2
General Approach ... 1-3
Report Contents ... 1-3
Chapter 2 | Current $PM_{2.5}$-Attributable Health Burden ... 2-1
Approach Overview ... 2-1
Variations in Current $PM_{2.5}$ Exposure ... 2-2
Current (2015) $PM_{2.5}$-Attributable Mortality Burden... 2-5
Total National-Level PM-Attributable Mortality Burden... 2-5
PM-Attributable Mortality Burden Stratified by Race ... 2-7
PM-Attributable Mortality Burden Stratified by Poverty ... 2-11
Current $PM_{2.5}$-Attributable Morbidity Burden ... 2-11
Total National-Level PM-Attributable Morbidity Burden ... 2-11
Asthma Emergency Department Visits by Race/Ethnicity ... 2-12
Effects of Fine Scale Modeling of Air Quality and Baseline Health Incidence on $PM_{2.5}$-Attributable Health Burden Estimates ... 2-13
Effect of Applying Fine-Scale Air Quality Data ... 2-13
Applying Fine Scale Mortality Incidence Data ... 2-16
Cumulative Effect of Fine Scale Modeling on Current $PM_{2.5}$-Attributable Burden... 2-16
Factors Influencing Differences in Current $PM_{2.5}$-Attributable Mortality Burden ... 2-16
Chapter 3 | Changes in $PM_{2.5}$ Attributable Health Burden Under Alternative $PM_{2.5}$ Standards of 8 and 10 $\mu g/m^3$ ... 3-1
Exposure Above Alternative Standards ... 3-1
Mortality Risk Reduction Under Alternative $PM_{2.5}$ Standards... 3-4

Morbidity Risk Reduction Under Alternative $PM_{2.5}$ Standards ..... 3-12

Chapter 4 | Fine Scale Morbidity Case Study: New Jersey ..... 4-1

Data Procurement and Processing ..... 4-1

Analysis ..... 4-2

Conclusions ..... 4-3

Chapter 5 | Changes in $PM_{2.5}$ Attributable Health Burden under an Alternative $PM_{2.5}$ Standard of 9 $\mu g/m^3$ ..... 5-1

Current $PM_{2.5}$ Exposure ..... 5-1

Exposure above 9 $\mu g/m^3$ ..... 5-4

Mortality Risk Reductions under an Alternative $PM_{2.5}$ Standard of 9 $\mu g/m^3$ ..... 5-7

Morbidity Risk Reduction under an Alternative $PM_{2.5}$ Standard of 9 $\mu g/m^3$ ..... 5-17

Chapter 6 | Discussion ..... 6-1

Conclusions ..... 6-1

Limitations ..... 6-2

Areas for Future Study ..... 6-4

References ..... R-1

Appendix A | Air Quality Inputs ..... A-1

Appendix B | Data Inputs ..... B-1

Appendix C | Supplemental Exposure Graphics ..... C-1

Appendix D | Supplemental Health Impact Results ..... D-1

Appendix E | Methodology Memorandum ..... E-1

IEc

# EXECUTIVE SUMMARY

This report represents an updated analysis of $PM_{2.5}$-related health burdens under current and alternative National Ambient Air Quality Standards (NAAQS). Our update includes supplementing previous estimates for standards of 8 and 10 µg/m$^3$ by analyzing and presenting results for an intermediate standard of 9 µg/m$^3$. In addition, estimates of reduction in mortality and morbidity burden by alternative standards were updated (Exhibits 3-4, 3-11).

## BACKGROUND AND RESEARCH OBJECTIVES

Air pollution is the greatest environmental health risk worldwide. Fine particle matter ($PM_{2.5}$) pollution is comprised of inhalable solid particles and liquid aerosols that are smaller than 2.5 microns in diameter. These fine particles can penetrate deep into the lungs and can enter the bloodstream, posing risks of cardiovascular, respiratory, and neurological diseases. In the United States, populations of color and those who experience low income bear a disproportionate burden of health impacts associated with $PM_{2.5}$ exposure. The United States Environmental Protection Agency (EPA) is required to use the best available science to set ambient air quality standards that are protective of human health, considering particularly vulnerable people within our communities.

Currently, the primary NAAQS for annual mean $PM_{2.5}$ concentrations is 12 µg/m$^3$. In consideration of a tighter $PM_{2.5}$ NAAQS, EPA published its draft Policy Assessment (PA) for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter in October 2021. The draft PA evaluates the policy implications of available scientific research on the health and welfare effects of ambient PM and considers whether the current standards provide adequate public health protection. As our understanding of air pollution and its impacts on human health have developed through peer-reviewed epidemiological and toxicological research, EPA has made PM standards more protective of public health over time. In the recent draft PA, EPA concludes that currently available scientific evidence provides support for tighter standards:

> "When taken together, we reach the conclusion that the available scientific evidence, air quality analyses, and the risk assessment… can reasonably be viewed as calling into question the adequacy of the public health protection afforded by the combination of the current annual and 24-hour primary $PM_{2.5}$ standards" (p. 3-188).

Further, a variety of epidemiological studies presents strong evidence that historically disadvantaged groups, such as Black and Hispanic communities, are exposed to higher $PM_{2.5}$ concentrations than white and non-Hispanic populations, contributing to increased risk of PM-related adverse health effects (Mikati, 2018; Nachman and Parker, 2012; Basu, 2004).

In this report, we assess both the current health burden of $PM_{2.5}$ and potential benefits of achieving stronger $PM_{2.5}$ standards, making use of fine scale data that reflects spatial variance in air quality, population, and baseline health. Use of these fine-scale datasets enables us to assess the distribution of

burden and potential benefits across racial and ethnic population subgroups, as well as those experiencing poverty. We highlight three specific research objectives addressed in this report:

- Characterize the $PM_{2.5}$-attributable health burden under the current $PM_{2.5}$ concentrations,
- Perform distributional analyses to estimate potential benefits from lower $PM_{2.5}$ NAAQS across racial and ethnic groups, and those experiencing poverty, and
- Assess the sensitivity of $PM_{2.5}$ estimates to the exposure model selected and the spatial scale of supporting demographic and health data.

## CURRENT $PM_{2.5}$ EXPOSURE AND HEALTH BURDEN

Using EPA's BenMAP-CE program, we quantify the current $PM_{2.5}$-attributable health outcomes across racial and ethnic groups. First, we assess how different racial and ethnic groups are exposed to differing concentrations of $PM_{2.5}$ nationwide. Exhibit ES-1 shows the fraction of the Hispanic and non-Hispanic populations currently exposed to different $PM_{2.5}$ concentrations based on the 1 x 1 km air quality surface from Di et al. (2019). Concentrations above 10 $\mu g/m^3$ are highlighted to emphasize the differences in exposure by ethnicity.

**EXHIBIT ES-1. PROPORTION OF POPULATION EXPOSED TO $PM_{2.5}$ CONCENTRATIONS ABOVE 10 μg/m³, ETHNICITY-STRATIFIED**




Exhibit ES-1 is clear: Hispanic Americans are consistently exposed to higher concentrations of $PM_{2.5}$ than white non-Hispanic populations. These patterns are similarly present by race (not depicted): Compared to 59% of the white population, larger portions of non-white populations (67 to 74%) are exposed to $PM_{2.5}$ concentrations above 8 μg/m³, except for Native Americans (45%).

Next, we estimate PM-attributable mortality and morbidity and, where possible, stratify by race and/or ethnicity. We present PM-attributable mortality rates in Exhibit ES-2 using Di et al. (2017) race-specific concentration-response functions. On average, we estimate that among individuals ages 65 and up, 300 deaths per 100,000 population result from particulate matter exposure. This value varies significantly by race: Black populations experience a heightened PM-attributable mortality rate (670 deaths per 100,000) relative to other races (170 to 210 per 100,00). While not depicted, we also find a heighted mortality rate for Hispanic populations (260 deaths per 100,00).

#### EXHIBIT ES-2. CURRENT $PM_{2.5}$-ATTRIBUTABLE MORTALITY RATE (PER 100,000)

| RACE | PM-ATTRIBUTABLE MORTALITY (PER 100K) |
|---|---|
| Asian | 170 |
| Black | 670 |
| Native American | 200 |
| White | 210 |
| **All** | **300** |

Exhibits ES-3 further depicts current $PM_{2.5}$-attributable mortality risk by race. The width of each rectangle indicates the total population of each race for the given geographic scale, and the height represents the $PM_{2.5}$-attributable mortality rate of each race, reported per 100,000 persons of each racial group. Thus, the area of each rectangle is representative of the current $PM_{2.5}$-attributable burden for each race, which is reported by racial group. The order of races in this figure represents increasing mortality burden per capita moving across the horizontal axis.

EXHIBIT ES-3. CURRENT NATIONAL $PM_{2.5}$-ATTRIBUTABLE MORTALITY BURDEN BY RACE




In total, we estimate roughly 110,000 deaths result from $PM_{2.5}$ exposure on an annual basis. These deaths are disproportionately borne by Black and Hispanic populations. In addition, we estimate significant PM-attributable burden of non-fatal health outcomes, displayed in Exhibit ES-4.

EXHIBIT ES-4. CURRENT $PM_{2.5}$-ATTRIBUTABLE MORBIDITY BURDEN (ALL RACE/ETHNICITY)

| ENDPOINT | CONCENTRATION-RESPONSE FUNCTION | AGE GROUP | PM-ATTRIBUTABLE CASES |
|---|---|---|---|
| HOSPITALIZATIONS | | | |
| Non-fatal acute myocardial infarction (AMI) | Peters et al. (2001) | 18-99 | 110,000 |
| Non-fatal AMI | Pooling 4 Studies* | 18-99 | 17,000 |
| All Respiratory | Ostro et al. (2016) | 0-18 | 9,900 |
| Respiratory-1 | Jones et al. (2015) | 0-99 | 6,100 |
| Respiratory-2 | Bell et al. (2015) | 65-99 | 2,100 |
| Cardio-, Cerebro- & Peripheral Vascular Disease | Bell et al. (2015) | 65-99 | 13,000 |
| All Cardiac Outcomes | Talbott et al. (2014) | 0-99 | 12,000 |
| Alzheimer's Disease | Kioumourtzoglou et al. (2016) | 65-99 | 27,000 |
| Parkinson's Disease | Kioumourtzoglou et al. (2016) | 65-99 | 4,500 |
| EMERGENCY ROOM VISITS | | | |
| Respiratory | Krall et al. (2016) | 0-99 | 75,000 |
| Emergency Hospitalizations - Respiratory** | Zanobetti et al. (2009) | 65-99 | 21,000 |
| INCIDENCE | | | |
| Asthma | Tetreault et al. (2016) | 0-17 | 260,000 |

Note: values are rounded to two significant figures
*Four AMI studies pooled together include: Pope et al., Sullivan et al., Zanobetti and Schwartz, and Zanobetti et al.
**Emergency Hospitalizations represent emergency department visits that result in a hospitalization.
Attributable burden assumes 100% reduction in fine PM and no threshold below which PM morbidity impacts are not observed.

Notably, the morbidity estimates presented in Exhibit ES-4 are not stratified by race or ethnicity due to data limitations. First, the incidence data commonly employed in these analyses (i.e., the default datasets in BenMAP-CE) are not stratified by race or ethnicity. Second, few epidemiological studies of non-fatal PM effects estimate separate concentration-response functions for these demographic variables. One exception, however, is Alhanti et al. (2016), which provides estimates of PM attributable asthma emergency department (ED) visits stratified by racial-ethnic groups. More specifically, the authors provide separate concentration-response relationships for (a) white, non-Hispanics and (b) non-White and/or Hispanic populations. Exhibit ES-5 presents asthma ED burden per capita (100,000) for these groups.

EXHIBIT ES-5. CURRENT $PM_{2.5}$-ATTRIBUTABLE ASTHMA ED BURDEN

| RACE/ ETHNICITY | ASTHMA ED VISITS (PER 100K) |
|---|---|
| White, Non-Hispanic | 10 |
| White Hispanic or Non-white | 58 |

The disparities in PM-attributable asthma ED burden appear even starker than those for mortality burden. More specifically, the Alhanti et al. effect coefficients result in a sixfold increase in asthma ED burden for non-white and white Hispanic populations (relative to white non-Hispanic populations).

## BENEFITS OF ALTERNATIVE ANNUAL $PM_{2.5}$ STANDARDS

Next, we assess the potential benefits of more stringent annual $PM_{2.5}$ standards by examining the PM-attributable health burden associated with standards of 8, 9, and 10 μg/m$^3$. Using the Di et al. (2019) 1 x 1 km air quality surface as a baseline, we model alternative standards using two complementary approaches. First, in areas modeled by EPA, we reduce $PM_{2.5}$ concentrations by the same proportion as in the PA. For example, in an area where EPA-modeled $PM_{2.5}$ concentrations dropped from 14 to 7 μg/m$^3$ (a 50% reduction), we would apply an identical relative reduction in concentrations of Di et al. modeled values in that area. Second, we conduct a simplistic "rollback to standard" in areas not modeled by EPA. For example, under a standard of 8 μg/m$^3$, all concentrations above the standard would be set to 8.

The benefits of more stringent $PM_{2.5}$ standards are sizable. In total, we estimate roughly 4,600 avoided deaths associated with moving to a standard of 10 μg/m$^3$ and 16,000 avoided deaths associated with 8 μg/m$^3$. Exhibit ES-6 presents benefits associated with an alternative standard of 8 and 10 μg/m$^3$, stratified by race and normalized by population. The exhibit further distinguishes between the two standards and by the areas analyzed by EPA ("PA Areas") and areas outside of the EPA study area ("Non-PA Areas").

### EXHIBIT ES-6. CHANGE IN AVOIDED DEATHS PER 100,000, BY ALTERNATIVE NAAQS

| CONCENTRATION - RESPONSE RELATIONSHIP | RACE | ETHNICITY | NATION | PA AREAS | NON-PA AREAS | NATION | PA AREAS | NON-PA AREAS |
|---|---|---|---|---|---|---|---|---|
| | | | 10 μg/m³ ALT NAAQS | | | 8 μ g/m³ ALT NAAQS | | |
| Hispanic | All | Hispanic | 20 | 44 | 2 | 48 | 91 | 17 |
| **Total All Races** | **All** | **All** | 10 | 32 | 1 | 35 | 79 | 17 |
| Asian | Asian | All | 14 | 26 | 1 | 33 | 56 | 11 |
| Black | Black | All | 28 | 69 | 3 | 110 | 190 | 58 |
| Native American | Native American | All | 8 | 40 | 1 | 21 | 74 | 8 |
| White | White | All | 8 | 26 | 1 | 27 | 64 | 14 |

Note: Values are rounded to two significant figures. All values are expressed in terms of avoided deaths per 100,000 individuals ages 65+.

Several patterns emerge from Exhibit ES-6. First, unsurprisingly, the 8 μg/m$^3$ standard results in greater benefits relative to the 10 μg/m$^3$ standard – the mortality risk reductions under the more stringent standard are roughly two to three times greater. This relationship is heightened when looking at specific demographic groups. For example, the 8 μg/m$^3$ standard results in three to four times greater mortality risk reductions than the 10 μg/m$^3$ standard for white and Black Americans, and in the non-PA areas the 8 μg/m$^3$ standard mortality risk reduction is over five times higher for all groups. Non-PA areas experience a negligible share of per capita benefits across all groups at 10 μg/m$^3$ but comprise a meaningful share of per capita benefits when the standard is lowered to 8 μg/m$^3$. This pattern is highlighted further in Exhibit

ES-7. These findings are reinforced by the supplemental work analyzing the health benefits associated with an alternative standard of 9 µg/m³.

### EXHIBIT ES-7. MORTALITY BURDEN UNDER CURRENT AND ALTERNATIVE PM NAAQS




Exhibit ES-7 demonstrates that incrementally stronger standards further reduce disparities between racial and ethnic groups and among those living above and below two times the poverty line, with the 8 µg/m³ standard resulting in the greatest reduction in disparities across the country (PA and non-PA areas). Based on the hybrid air quality surface for 2015 (Di et al. 2019), fewer individuals in non-PA areas are exposed to concentrations above 9 and 10 µg/m³. As such, standards of 9 and 10 µg/m³ provide limited reductions in disparities in non-PA areas, relative to a standard of 8 µg/m³. However, we note that our approach in non-PA areas does not benefit from the detailed EPA modeling of attainment conducted for PA areas. For example, we do not model benefits to non-PA areas that may result from attainment actions taken in PA areas.

## CONCLUSIONS

In this report, we used more finely resolved data sources for air quality, baseline health status, demographics, and risk to estimate the health burden of $PM_{2.5}$ exposures in the United States, both in total and across races, ethnicities, and poverty status. We also estimated the potential benefits of more health protective $PM_{2.5}$ standards in the United States across these subgroups. Our results have provided insights into the distribution of health burdens and the potential to both improve public health generally and reduce discrepancies in risk across subgroups by adopting more protective annual NAAQS. Further, the

results suggest there is value to using analytical inputs at finer geographic scales and inputs particular to specific subpopulations to better understand variabilities in risks.

Overall, our results bolster the findings in EPA's most recent PA; current $PM_{2.5}$ concentrations result in significant premature mortality and morbidity nationwide, and these impacts are disproportionately borne by Black and Hispanic populations, and those living in poverty. Strengthening PM NAAQS would lessen both the overall social costs of air pollution and the disparities in health outcomes by race, ethnicity, and income levels. Nonetheless, we anticipate that significant disparities would persist under more stringent standards due to (1) higher age-specific baseline mortality incidence in non-White populations and (2) stronger PM-mortality response among these populations, as estimated by emerging epidemiological research. Further, this work provides valuable results that can be broken down across four axes: 1) the importance of spatial resolution of annual average $PM_{2.5}$ concentrations in understanding related health impacts; 2) the distribution of health impacts across groups as defined by race, ethnicity, and income; 3) expansion upon the important work done by EPA in their most recent PA, and 4) state-level application of our method.

# CHAPTER 1 | INTRODUCTION

## BACKGROUND

Air pollution is the greatest environmental health risk worldwide, with much of that risk due to exposures to fine particles (Health Effects Institute, 2020). Fine particulate matter ($PM_{2.5}$) pollution results from a variety of sources consists of a mixture of inhalable solid particles and liquid aerosols that are smaller than 2.5 microns in diameter, much smaller than a human hair. These fine particles are small enough to penetrate deep into the lungs and enter the bloodstream, making them particularly hazardous. Exposure to $PM_{2.5}$ causes heart, lung, and other diseases, which result in emergency department visits, hospitalizations, missed days of work and school, and even death. In the United States, populations of color and those who experience low income bear a disproportionate burden of health impacts associated with $PM_{2.5}$ exposure (Morello-Frosch et al., 2001; Morello-Frosch et al., 2002; Schweitzer and Zhou, 2010; Miranda et al., 2010; Sadd et al., 2011). The United States Environmental Protection Agency (U.S. EPA) is required to use the best available science to set ambient air quality standards to protect human health, including the health of particularly vulnerable people within our communities. The U.S. EPA publishes ambient standards on a daily and annual basis for $PM_{2.5}$.[1] Currently, the primary National Ambient Air Quality Standards (NAAQS) for these pollutants are:

- **Annual mean $PM_{2.5}$:**[2] 12 $\mu g/m^3$
- **Daily mean $PM_{2.5}$ standard:**[3] 35 $\mu g/m^3$

As part of its periodic re-evaluation of the $PM_{2.5}$ NAAQS, the United States Environmental Protection Agency (EPA) published in October 2021 its draft Policy Assessment (PA) for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter. The draft PA evaluates the policy implications of available scientific research on the health and welfare effects of ambient PM and considers whether the current standards provide adequate public health protection. In doing so, EPA evaluates the potential benefits stemming from more stringent (i.e., lower) standards and discusses accompanying uncertainties.

As our understanding of air pollution and its impacts on human health have developed through peer-reviewed epidemiological and toxicological research, EPA has made PM standards more protective of

---

[1] EPA publishes both primary and secondary standards for PM: "Primary standards provide public health protection, including protecting the health of "sensitive" populations such as asthmatics, children, and the elderly. Secondary standards provide public welfare protection, including protection against decreased visibility and damage to animals, crops, vegetation, and buildings." See https://www.epa.gov/criteria-air-pollutants/naaqs-table. In this report, we focus on the primary annual mean standards for $PM_{2.5}$.

[2] The annual $PM_{2.5}$ standard is mean annual concentrations averaged over a 3-year window.

[3] The daily $PM_{2.5}$ standard is the 98th percentile of daily mean concentrations over a 3-year window.

public health over time. In the recent draft PA, EPA concludes that currently available scientific evidence provides support for tighter standards:

> "When taken together, we reach the conclusion that the available scientific evidence, air quality analyses, and the risk assessment… can reasonably be viewed as calling into question the adequacy of the public health protection afforded by the combination of the current annual and 24-hour primary $PM_{2.5}$ standards" (p. 3-188).

Further, a variety of epidemiological studies present strong evidence that historically disadvantaged groups, such as Black and Hispanic communities, are exposed to higher $PM_{2.5}$ concentrations than white and non-Hispanic populations, contributing to increased risk of PM-related adverse health effects (Mikati, 2018; Nachman and Parker, 2012; Basu, 2004). While EPA estimates considerable public health benefits from lowering the annual and 24-hour standards, the Agency notes some uncertainties regarding which alternative standard(s) are best supported by scientific research.

## RESEARCH OBJECTIVES

In this report, we assess both the current health burden of $PM_{2.5}$ and potential benefits of achieving stronger $PM_{2.5}$ standards, making use of fine scale data that reflects spatial variance in air quality, population, and baseline health. Use of these fine-scale datasets enables us to assess the distribution of burden and potential benefits across racial and ethnic population subgroups, as well as those experiencing poverty. We highlight three specific research objectives addressed in this report:

- **Characterize the $PM_{2.5}$-attributable health burden under current conditions**. In doing so, we consider how exposure, deaths and other adverse $PM_{2.5}$ effects vary across racial and ethnic groups and across different income levels under $PM_{2.5}$ concentrations as currently experienced.
- **Perform distributional analyses to estimate potential benefits from lower $PM_{2.5}$ NAAQS across racial and ethnic groups, and those experiencing poverty**. Increased policy emphasis on environmental justice requires a better understanding of the air pollution-related health burdens experienced by historically underserved groups. A growing body of literature explores racial-ethnic disparities in air pollution exposure (Rosofsky et al., 2018; Tessum et al, 2019; Colmer et al, 2020; Tessum et al, 2021) and epidemiological studies such as Di et al. 2017 are reporting differential estimates of risk to different racial-ethnic groups for the same increment in $PM_{2.5}$ exposure. In this analysis, we assess risks to various racial groups and those experiencing poverty. By modeling more protective annual $PM_{2.5}$ standards of 8, 9, and 10 $\mu g/m^3$, we also assess the potential benefits that may accrue to these groups and how the relative disparities in burden change under reduced fine particle standards.
- **Assess the sensitivity of $PM_{2.5}$ estimates to the exposure model selected and the spatial scale of supporting demographic and health data**. Hybrid exposure models that combine multiple data sources, including regulatory monitors, satellite-based estimates, photochemical modeling and other data, show promise for identifying exposure gradients at finer spatial scales We explore how applying finer-scale input data for air quality and for other relevant inputs in EPA's Environmental Benefits Mapping and Analysis Program – Community Edition (BenMAP-CE) tool can affect health burden or benefit estimates both in the aggregate and in terms of the distribution of health burdens across subpopulations of the United States.

## GENERAL APPROACH

Broadly, IEc's assessment of lower annual $PM_{2.5}$ standards involves (1) characterizing the geographic distribution of baseline annual $PM_{2.5}$ concentrations corresponding to the current conditions under the existing standard and the distribution of these concentrations under more protective NAAQS alternatives; (2) estimating the changes in health effects attributable to a particular policy compared to the baseline; and (3) economic valuation of these effects. We estimate the impact of ambient $PM_{2.5}$ on health outcomes (e.g., premature mortality or morbidity endpoints) by assessing the difference in risk under a baseline and control scenario, where the latter represents improved air quality under more stringent NAAQS. For this analysis, we use BenMAP-CE, an open-source program that allows users to estimate health and related economic impacts from changes in ambient air pollution. BenMAP-CE relies on epidemiological concentration-response functions to quantify the change in incidence of adverse health impacts stemming from changes in ambient pollutant concentrations. Additional detail on our technical approach can be found in Appendix E.

## REPORT CONTENTS

This report applies a standard analytic framework for assessing environmental health benefits, but using some of the latest available input data to better characterize the distribution of benefits across subpopulations. This document is organized as follows:

- In Chapter 2, we characterize current $PM_{2.5}$ concentrations and estimate PM-attributable mortality and morbidity. We discuss the factors influencing disparities by race, ethnicity and income level, including $PM_{2.5}$ exposure, baseline incidence, and evidence from epidemiological research.
- In Chapter 3, we present air quality and health benefits modeling results for alternative standards of 8 and 10 $\mu g/m^3$.
- In Chapter 4, we provide a state-level case study on the impact of fine-scale morbidity incidence data using results from New Jersey.
- In Chapter 5, we present new air quality and health benefits modeling results for an alternative standard of 9 $\mu g/m^3$.
- Finally, we summarize the results and discuss the implications of this work in Chapter 6
- This report also has five appendices: Appendix A provides details regarding the air quality surfaces we used in this analysis; Appendix B presents additional graphics summarizing key inputs to the analysis; Appendix C presents supplemental graphics of exposures based on the fine scale air quality data; Appendix D includes supplemental results for health impacts, including state-level results; and Appendix E presents a memo describing the overall methodology for the analysis.

# CHAPTER 2 | CURRENT $PM_{2.5}$-ATTRIBUTABLE HEALTH BURDEN

In this chapter, we estimate current $PM_{2.5}$-attributable health burdens related to $PM_{2.5}$ exposures nationwide using $PM_{2.5}$ air quality estimates from the year 2015. We analyze the impacts of increasingly fine scale data for air quality, health, and demographics to help us to better understand not only total health burden, but how those burdens are distributed across race, ethnicity, and poverty status.

We briefly review our approach to the current conditions analysis, then provide a characterization of the exposures experienced by different subpopulations based on spatial distribution. We investigate the implications of $PM_{2.5}$ exposures for mortality among different groups. We conclude this chapter by discussing the effect of applying fine scale modeling on $PM_{2.5}$ exposure and burden estimates and discuss three factors affecting the overall $PM_{2.5}$-attributable burden of each group: exposure, baseline mortality, and concentration-response relationships.

## APPROACH OVERVIEW

Our approach applies the standard methods for air pollution health impact assessment used by EPA in its recent PA and in other regulatory analyses; using this standard framework, we conduct multiple model runs that vary in the data sets used to characterize variations in air quality, baseline health status, and the level of hazard posed by $PM_{2.5}$. We apply these different data sets to better model spatial variation (e.g., in air quality), variation across subpopulations (e.g., level of hazard), or both (e.g. baseline health status). We then compare across these runs to assess the impact of these alternative data sources on health burden or health benefit results. For example, we apply a 1 x 1 km air quality surface and compare to results generated using a 12 x 12 km resolution air quality surface (EPA, 2021). Appendices A, B, and E provide additional details of our framework and methodology in developing BenMAP-CE runs that estimate current burden.

The PA focuses on $PM_{2.5}$-attributable health burden for 47 core based statistical areas (CBSAs) expected to be most affected by changes in the PM NAAQS ("PA areas"), and its 12 x 12 km air quality surface is restricted to these areas, which cover many major population centers in the United States. We expand on the geographic coverage of the PA to provide additional perspective regarding the potential magnitude of the PM mortality burden in the country, estimating health burden for three different geographic scales: (1) the contiguous United States ("Nation"), (2) PA areas, and (3) all areas not modeled in the PA ("non-PA areas"). This allows us to evaluate how estimates based on fine scale datasets compare to those that use datasets from the PA, while also providing a sense of the potential for health impacts in the rest of the country.[4].

[4] Not that our results, even those for PA areas, are not directly comparable to the published results in EPA's PA document. This reflects differences in the air quality conditions we use as baseline or reference conditions. We define the baseline as current $PM_{2.5}$ exposures from 2015, as a reflection of conditions under the current NAAQS. In the PA, EPA defines baseline as PM2.5 exposures under a hypothetical scenario modeled to

We evaluate improvements to the geographic scale and/or racial or ethnic specificity of the following key inputs to a health burden or health benefit analysis: 1) air quality; 2) demographics, including population and poverty status; 3) baseline health status (e.g. current mortality rates from all causes of death); and 4) measures of the effects of exposure to particles on mortality or emergency department visits.

Our selection of fine-scale and racially or ethnically stratified inputs is based on careful review and consideration of alternative models and datasets derived using current, peer-reviewed modeling techniques or obtained from reputable sources such as the Agency for Health Care Research and Quality's Healthcare Cost and Utilization Project (HCUP). Additional details of model considerations and rationale for data set selections can be found in Appendix E.

### VARIATIONS IN CURRENT $PM_{2.5}$ EXPOSURE

Spatial variability in $PM_{2.5}$ concentration and where people live result in different exposure profiles for different groups. Exhibit 2-1 shows the fraction of each race's population currently exposed at each PM concentration in the contiguous United States, based on the 1 x 1 km air quality surface from Di et al. (2019). Curves that are taller and shifted further to the right indicate higher levels of exposure for a particular group. Exhibits 2-1 and 2-2 use shading to emphasize populations exposed to $PM_{2.5}$ concentrations above 10 and 8 $\mu g/m^3$, respectively, and Exhibit 2-3 provides a tabular summary of these differences. We present assessments of the health impacts associated with exposure between the current and alternative NAAQS in Chapter 3. We present similar graphics that show the proportion of population exposed to $PM_{2.5}$ concentrations by ethnicity in Appendix C.

just meet the current NAAQS in which concentrations in some areas may be higher or lower than currently measured. EPA's approach is appropriate for the PA's policy evaluation objectives but is less well suited to our assessment of current burden. Thus, in order to facilitate a fairer comparison of our results with EPA's 12 km air quality-based results, we take EPA's approach in the PA an apply it to a separate baseline 12 km x 12 km 2015 current conditions air quality surface modeled by the agency and published in the PA docket (EPA, 2021).

IEc

EXHIBIT 2-1. PROPORTION OF POPULATION EXPOSED TO $PM_{2.5}$ CONCENTRATIONS 10+ µg/m³



EXHIBIT 2-2. PROPORTION OF POPULATION EXPOSED TO $PM_{2.5}$ CONCENTRATIONS 8+ µg/m³




EXHIBIT 2-3. PROPORTION OF POPULATION AGED 0-99 EXPOSED AT VARIOUS $PM_{2.5}$ CONCENTRATIONS

| RACE | ETHNICITY | PERCENT OF POPULATION EXPOSED TO $PM_{2.5}$ CONCENTRATIONS: > 12 µg/m³ | > 10 µg/m³ | > 8 µg/m³ | BETWEEN 10 & 12 µg/m³ | BETWEEN 8 & 10 µg/m³ |
|---|---|---|---|---|---|---|
| Asian | All | 4% | 19% | 67% | 15% | 48% |
| Black | All | 2% | 18% | 74% | 16% | 56% |
| Native American | All | 3% | 11% | 45% | 8% | 34% |
| White | All | 3% | 14% | 59% | 11% | 45% |

Values do not sum across rows

As shown in Exhibits 2-1 through 2-3, Black Americans are consistently exposed to higher concentrations of $PM_{2.5}$ than white Americans. At concentrations between 8 and 10 µg/m³ (56% of Black Americans versus 45% of white Americans). When we include any concentrations over 8, Black and Asian Americans are much more likely to be exposed to these levels (74% and 67%, respectively than white Americans (59%), while Native Americans (45%) are less likely to be exposed at these levels.

# 75% of Black Americans are exposed to PM2.5 concentrations greater than 8 µg/m³ each year, compared to 59% of white Americans.

## CURRENT (2015) $PM_{2.5}$-ATTRIBUTABLE MORTALITY BURDEN

We present below mortality burden attributable to $PM_{2.5}$ exposures under current conditions in the United States, first presenting total numbers of attributable deaths for the nation as a whole and then exploring how this risk burden varies across, race, and poverty status.

### TOTAL NATIONAL-LEVEL PM-ATTRIBUTABLE MORTALITY BURDEN

Exhibit 2-4 shows current (2015) $PM_{2.5}$-attributable mortality burden for all races and ethnicities at three geographic scales, estimated using a tract-level mortality incidence and air quality datasets of varying spatial scales. These estimates reflect current burden using incidence datasets that are not stratified by race and ethnicity.

EXHIBIT 2-4. CURRENT $PM_{2.5}$-ATTRIBUTABLE MORTALITY BURDEN USING FINE-SCALE INCIDENCE (TOTAL DEATHS, ALL RACE/ETHNICITY)

| ENDPOINT | CONCENTRATION - RESPONSE FUNCTION | AGE GROUP | NATION | PA AREAS | | NON-PA AREAS |
|---|---|---|---|---|---|---|
| | | | 1KM | 12KM | 1KM | 1KM |
| All Cause Mortality | Turner et al. (2016) | 30-99 | 120,000 | 43,000 | 40,000 | 83,000 |
| | Di et al. (2017) | 65-99 | 110,000 | 40,000 | 37,000 | 77,000 |

Note: values are rounded to two significant figures.
Attributable burden assumes 100% reduction in fine PM and no threshold below which PM mortality impacts are not observed.

We estimate current mortality burden nationally to be 120,000 across adults aged 30-99 using fine scale air quality and baseline incidence data, with the majority of this burden falling within the 65 to 99 age group (110,000). Applying the standard economic value from EPA's BenMAP tool for valuing cases of mortality (approximately $10 million per statistical case in 2020 dollars, assuming a 3% discount rate), the economic value of this health burden could be as high as $1.2 trillion dollars, not counting morbidity impacts. Current mortality burden estimated within the PA areas using the fine scale air quality surface is similar to but slightly less than the estimates generated using coarser air quality surface for the same year.

Exhibit 2-5 also shows the current (2015) $PM_{2.5}$-attributable mortality burden displayed in Exhibit 2-4 but with the use of a coarser, county-level, incidence dataset. When using the county-level incidence, we are also able to estimate the current $PM_{2.5}$-attributable mortality burden in infants.[5]

[5] The Woodruff et al. C-R function excludes neo-natal deaths (those occurring within the first 30 days after birth). Since the tract incidence dataset does not exclude neo-natal cases, we do not report tract incidence results for the Woodruff et al. study.

EXHIBIT 2-5. CURRENT $PM_{2.5}$-ATTRIBUTABLE MORTALITY BURDEN USING COARSE INCIDENCE (TOTAL DEATHS, ALL RACE/ETHNICITY)

| ENDPOINT | CONCENTRATION - RESPONSE FUNCTION | AGE GROUP | NATION | PA AREAS | | NON-PA AREAS |
|---|---|---|---|---|---|---|
| | | | 1KM | 12KM | 1KM | 1KM |
| All Cause Mortality | Woodruff et al. (2008) | 0-0 | 350 | 120 | 120 | 230 |
| | Turner et al. (2016) | 30-99 | 120,000 | 42,000 | 39,000 | 83,000 |
| | Di et al. (2017) | 65-99 | 110,000 | 38,000 | 36,000 | 76,000 |

Note: values are rounded to two significant figures. Attributable burden assumes 100% reduction in fine PM and no threshold below which PM mortality impacts are not observed.

For the adult mortality estimates, the use of more highly resolved tract-level baseline mortality incidence results in a slightly greater estimate of current burden than that estimated using county incidence, however, the aggregated estimates are largely in agreement with one another. To better understand the impact of these data set choices on variability in $PM_{2.5}$-attributable mortality, Exhibit 2-6 presents "box-and-whisker" plots that illustrate the spread and distribution of per-capita $PM_{2.5}$ mortality burden at the census tract level when using data of increased resolution or specificity. In each plot, the vertical line within the box represents the median; the lower and upper ends of the box represent the 25th and 75th percentiles, and the ends of the lines extending from the box represent the 5th and 95th percentiles.

### EXHIBIT 2-6. CURRENT PM2.5-ATTRIBUTABLE MORTALITY BURDEN (PER 100,000) IN CENSUS TRACTS INCLUDED IN EPA'S PA ANALYSIS, USING VARYING COMBINATIONS OF INCIDENCE AND AIR QUALITY DATASETS




Note: See Appendix D for box-and-whisker plot values. The tracts analyzed are limited to the tracts within the PA areas due to the coarse air quality surface being limited to the PA areas.

Exhibit 2-6 shows an increase in variability in current per-capita $PM_{2.5}$ mortality rates when moving from a coarse spatial resolution of air quality to a finer air quality surface and when moving from coarse baseline mortality rate data ("incidence" in the graph) o a fine-scale air quality surface and fine-scale incidence dataset. The increasing spread, particularly of higher PM-attributable mortality rates as you move from the top to bottom of the graph illustrates the additional information that can be gained when using fine-scale datasets, even when there appears to be no significant differences in the aggregated national $PM_{2.5}$ impacts. (Exhibits 2-4 and 2-5). See Appendix D, Exhibits D-18 through D-21, for additional tract-level comparisons between the fine-scale and coarse datasets.

#### PM-ATTRIBUTABLE MORTALITY BURDEN STRATIFIED BY RACE

Exhibit 2-7 presents per capita current mortality burden using race- and ethnicity-stratified baseline mortality incidence rates and race- and ethnicity-stratified estimates of PM-attributable risk from Di et al. (2017), where the latter represent potential differences in hazard to different subgroups exposed to the same change in PM. These data sets better represent the variation in baseline health of these subpopulations and allows for the possibility of differential effects of PM exposure on mortality across races and ethnicities. Presenting these results as per capita estimates (current burden per 100,000 persons) allows us to compare current $PM_{2.5}$-related health burdens across different groups. Detailed mortality results for the Di et al. (2017) concentration-response function can be found in Appendix D.

EXHIBIT 2-7. CURRENT $PM_{2.5}$-ATTRIBUTABLE MORTALITY RATE PER 100,000 INDIVIDUALS AGED 65-99, BY RACE

| STRATIFIED RISK ESTIMATE | RACE | ETHNICITY | NATION | PA AREAS | | NON-PA AREAS |
|---|---|---|---|---|---|---|
| | | | 1KM | 12KM | 1KM | 1KM |
| Hispanic | All | Hispanic | 260 | 310 | 290 | 240 |
| **Total All Races** | **All** | **All** | **300** | **330** | **300** | **230** |
| Asian | Asian | All | 170 | 200 | 190 | 140 |
| Black | Black | All | 670 | 770 | 710 | 650 |
| Native American | Native American | All | 200 | 250 | 230 | 190 |
| White | White | All | 210 | 270 | 240 | 200 |

Note: values are rounded to two significant figures. Results based on risk estimates from Di et al., 2017.

Comparing per capita current mortality burden estimates across races provides useful takeaways. Black populations experience more than three times as many $PM_{2.5}$-attributable deaths per 100,000 persons compared to all other races, a result consistent with EPA's findings in the PA that Black Americans are disproportionately affected under the current NAAQS relative to other races. However, while the PA bases their findings on a hypothetical baseline scenario that assumes all areas meet the current standard but which allows air quality in some areas to worsen and in others to improve from current values, the gap we observe reinforces that the disparity is of similar magnitude when estimated analyzing current exposures.

Current aggregated mortality burden estimates using the 1 x 1 km fine scale air quality surface are similar to estimates using coarser air quality. For example, across all races in PA areas for those aged 65-99, current mortality burden estimates are within 10 percent. Comparing current per capita health burden estimates across PA areas and non-PA areas, for each race, current burden is higher in PA areas than non-PA areas. This indicates that when we specify race-stratified concentration response functions, areas considered in the PA comprise the majority of current $PM_{2.5}$-attributable burden experienced by each group across the nation.

## Black populations aged 65+ experience three times as many $PM_{2.5}$-attributable deaths per capita compared to all other races.

Exhibit 2-8 depicts the $PM_{2.5}$-attributable mortality rate per capita by race at the national level under current (2015) $PM_{2.5}$ exposures. This figure is based on the Di et al. (2019) 1 x 1 km $PM_{2.5}$ air quality surface, county-level race-stratified incidence rates, and Di et al. (2017) race-specific concentration-response functions for those aged 65 and up. The width of each rectangle indicates the total population of each race for the given geographic scale, and the height represents the $PM_{2.5}$-attributable mortality rate of each race, reported per 100,000 persons of each racial group. Thus, the area of each rectangle is representative of the current $PM_{2.5}$-attributable burden for each race, which is reported by racial group.

The order of races in this figure represents increasing mortality burden per capita moving across the horizontal axis.

EXHIBIT 2-8. CURRENT NATIONAL $PM_{2.5}$-ATTRIBUTABLE MORTALITY BURDEN BY RACE, AGES 65-99




This exhibit illustrates that the results for total PM-attributable mortality burden and the risk per person can be quite different. Looking solely at total burden among those 65 and older, which is reflected above by the width of the rectangles, white Americans have the largest value in absolute terms, but this is driven in large part by the larger size of the white population in this age category. When looking on a per-person basis, illustrated by the height of the rectangles above, the story is quite different. Across the Nation, Black Americans have the highest risk of dying from $PM_{2.5}$ exposure on a per-person basis, with a rate. Black more than triple that of white Americans.

Exhibit 2-9 maps our results for current $PM_{2.5}$-attributable mortality burden per capita by race at the census tract level to help visualize disparities across the Nation and identify areas where risks may be particularly severe. We find that increased per person risk of PM mortality among Black Americans is found consistently throughout the United States. The map also shows many locations where Asian and Native Americans experience higher risk on a per person basis than their white counterparts.

EXHIBIT 2-9. FINE SCALE $PM_{2.5}$-ATTRIBUTABLE MORTALITY BURDEN PER 100,000 FOR THOSE AGED 65-99, CENSUS TRACT LEVEL



### PM-ATTRIBUTABLE MORTALITY BURDEN STRATIFIED BY POVERTY

Exhibit 2-10 illustrates the current per-capita $PM_{2.5}$ mortality burden for individuals whose income is less than two times the poverty line. Across the three study areas, individuals who experience low-income consistently experience higher rates of $PM_{2.5}$ mortality by 12% to 18%.

#### EXHIBIT 2-10. CURRENT $PM_{2.5}$-ATTRIBUTABLE MORTALITY RATE (PER 100,000) BY INCOME FOR THOSE AGED 65-99

| STRATIFIED RISK ESTIMATE | POVERTY STATUS | NATION | PA AREAS | | NON-PA AREAS |
|---|---|---|---|---|---|
| | | 1KM | 12KM | 1KM | 1KM |
| Combined Totals* | Below 2x Poverty Line | 270 | 350 | 330 | 250 |
| | Above 2x Poverty Line | 240 | 310 | 280 | 220 |

Note: values are rounded to two significant figures
*We use the sum of the $PM_{2.5}$-attributable mortality below or above 2x the poverty line derived from the Di et al. (2017) race-specific concentration-response functions.

### CURRENT $PM_{2.5}$-ATTRIBUTABLE MORBIDITY BURDEN

$PM_{2.5}$ is also associated with numerous non-fatal health conditions or episodes of poor health. We present below national estimates for these morbidity impacts and then, for one non-fatal health impact for which we have race/ethnicity stratified risk information, we stratify these results along that metric to illustrate disparity in morbidity risks.

#### TOTAL NATIONAL-LEVEL PM-ATTRIBUTABLE MORBIDITY BURDEN

Exhibit 2-11 shows current $PM_{2.5}$-attributable morbidity burdens across three geographic areas using fine-scale air quality but incidence rates at the county level (or higher). Similar to the mortality results (presented in Exhibit 2-5), these estimates reflect current morbidity burden when using incidence datasets not stratified by race and ethnicity.

EXHIBIT 2-11. CURRENT NATIONAL $PM_{2.5}$-ATTRIBUTABLE MORBIDITY BURDEN (ALL RACE/ETHNICITY)

| ENDPOINT | CONCENTRATION-RESPONSE FUNCTION | AGE GROUP | NATION | PA AREAS | | NON-PA AREAS |
|---|---|---|---|---|---|---|
| | | | 1KM | 12KM | 1KM | 1KM |
| **HOSPITALIZATIONS** | | | | | | |
| Non-fatal acute myocardial infarction (AMI) | Peters et al. (2001) | 18-99 | 110,000 | 37,000 | 35,000 | 74,000 |
| Non-fatal AMI | Pooling 4 Studies* | 18-99 | 17,000 | 6,000 | 5,600 | 11,000 |
| All Respiratory | Ostro et al. (2016) | 0-18 | 9,900 | 3,900 | 3,700 | 6,200 |
| Respiratory-1 | Jones et al. (2015) | 0-99 | 6,100 | 2,400 | 2,200 | 3,900 |
| Respiratory-2 | Bell et al. (2015) | 65-99 | 2,100 | 750 | 700 | 1,400 |
| Cardio-, Cerebro- & Peripheral Vascular Disease | Bell et al. (2015) | 65-99 | 13,000 | 4,900 | 4,600 | 8,800 |
| All Cardiac Outcomes | Talbott et al. (2014) | 0-99 | 12,000 | 4,300 | 4,100 | 8,000 |
| Alzheimer's Disease | Kioumourtzoglou et al. (2016) | 65-99 | 27,000 | 8,200 | 8,100 | 19,000 |
| Parkinson's Disease | Kioumourtzoglou et al. (2016) | 65-99 | 4,500 | 1,600 | 1,500 | 3,000 |
| **EMERGENCY ROOM VISITS** | | | | | | |
| Respiratory | Krall et al. (2016) | 0-99 | 75,000 | 27,000 | 26,000 | 49,000 |
| Emergency Hospitalizations - Respiratory** | Zanobetti et al. (2009) | 65-99 | 21,000 | 7,000 | 6,500 | 14,000 |
| **INCIDENCE** | | | | | | |
| Asthma | Tetreault et al. (2016) | 0-17 | 260,000 | 97,000 | 92,000 | 160,000 |

Note: values are rounded to two significant figures
*Four AMI studies pooled together include: Pope et al., Sullivan et al., Zanobetti and Schwartz, and Zanobetti et al.
**Emergency Hospitalizations represent emergency department visits that result in a hospitalization.
Attributable burden assumes 100% reduction in fine PM and no threshold below which PM morbidity impacts are not observed.

For all morbidity endpoints, estimates generated using the fine scale air quality surface show minimal impacts on the total estimated values in the PA-modeled areas. We also find a substantial PM-attributable morbidity burden outside of the PA-modeled areas, potentially up to two-thirds of the total impacts.

## ASTHMA EMERGENCY DEPARTMENT VISITS BY RACE/ETHNICITY

Exhibit 2-12 presents current morbidity burden per 100,000 persons for asthma Emergency Department (ED) visits using race-stratified baseline incidence and concentration-response estimates from Alhanti et al. (2016). Alhanti et al. (2016) provides estimates of PM attributable-risk for white, non-Hispanics and for all other race/ethnicity combinations.

EXHIBIT 2-12. CURRENT $PM_{2.5}$-ATTRIBUTABLE MORBIDITY BURDEN FOR ASTHMA ED VISITS IN CHILDREN AGED 0-18 (PER 100,000, STRATIFIED BY RACE/ETHNICITY)

| STRATIFIED RISK ESTIMATE ALHANTI ET AL., 2016 | RACE/ ETHNICITY | NATION | PA AREAS | | NON-PA AREAS |
|---|---|---|---|---|---|
| | | 1KM | 12KM | 1KM | 1KM |
| White | White, Non-Hispanic | 10 | 13 | 12 | 9 |
| **Total Non-white** | **White, Hispanic Plus All Other Races, Ethnicities** | 58 | 57 | 69 | 50 |

Risks of a PM-related asthma ED visit are substantially higher for non-white populations, with slightly higher rates in the PA-modeled areas. Use of the fine scale surface appears to show somewhat greater per-person rates compared with the coarser 12 km surface. In general, non-white Americans experience dramatically higher asthma ED visit burdens than white non-Hispanic Americans based on the Alhanti study, on the order of six times higher.

## The burden of PM-attributable asthma ED visits for non-white Americans is six times higher compared to white Americans.

### EFFECTS OF FINE SCALE MODELING OF AIR QUALITY AND BASELINE HEALTH INCIDENCE ON $PM_{2.5}$-ATTRIBUTABLE HEALTH BURDEN ESTIMATES

One key objective of this analysis is to explore the impacts (if any) of modeling at finer scales compared to what was specified in the PA. The PA specifies a 12 x 12 km air quality surface, and age-stratified county-level mortality incidence (not stratified by race or ethnicity). We build on the PA by assessing health burden with a 1 x 1 km modeled air quality surface from Di et al. (2019) and age-stratified census tract-level mortality incidence (not stratified by race or ethnicity) based on the U.S. Small-area Life Expectancy Estimates Project (USALEEP).

### EFFECT OF APPLYING FINE-SCALE AIR QUALITY DATA

We estimate current $PM_{2.5}$-attributable mortality and morbidity burden (regardless of stratification by race and/or ethnicity) using the 1 x 1 km air quality surface (provide value) to be similar but less than estimates using the 12 x 12 km air quality surface (provide value) when summed across the Nation We evaluate whether current health burden differences are attributable to air quality by comparing exposures between both air quality surfaces across three metrics: (1) geographic resolution, (2) age, and (3) race/ethnicity.

Exhibit 2-13 displays the differences in magnitude of $PM_{2.5}$ exposure between the fine-scale 1 x 1 km air quality surface and the 12 x 12 km air quality surface within areas analyzed by EPA in the PA. In this

figure, red and orange regions indicate PA areas in which exposures within the fine scale air quality surface exceed those of the 12 x 12 km surface, while blue and green regions indicate PA areas where exposures within the 12 x 12 km surface exceed those of the fine scale air quality surface. Gray regions indicate PA areas in which $PM_{2.5}$ exposure across both air quality surfaces are within 0.5 μg/m$^3$ of each other.

### EXHIBIT 2-13. DIFFERENCE IN CURRENT $PM_{2.5}$ EXPOSURE BETWEEN 1 X 1 KM AND 12 X 12 KM AIR QUALITY SURFACE




In the eastern United States, exposures within PA areas are relatively similar between both air quality surfaces, apart from two areas in Texas, which contain areas in which the fine scale air quality surface's exposures exceed that of the 12 x 12 km surface. In the western United States, there is a more noticeable difference in exposures between both surfaces, with many large differences concentrated in areas across central California. These wider variations in exposure could potentially be attributed to the wider spatial distribution in regulatory monitors across the western United States, as well as the uneven placement of regulatory monitors relative to the size of some PA areas.

Exhibits 2-14 and 2-15 compare population-weighted $PM_{2.5}$ exposure across race for those aged 65 and older using either (1) the 1 x 1 km model air quality surface or (2) the $PM_{2.5}$ concentration at the nearest

EPA regulatory monitor in 2015 to each 12 x 12 km cell. This comparison allows us to understand one of the variables, pollutant exposure, influencing our $PM_{2.5}$ mortality estimates and the differences we may see among the mortality estimates at the various geographic scales and when using the 1 x 1 km air quality surface versus the 12 x 12 km air quality surface.

### EXHIBIT 2-14. DIFFERENCES IN 65-99 POPULATION WEIGHTED $PM_{2.5}$ EXPOSURE BETWEEN 1 X 1 KM AIR QUALITY SURFACE AND NEAREST EPA REGULATORY MONITOR (2015)

| RACE | ETHNICITY | NATIONAL | | PA AREAS | | NON-PA AREAS | |
|---|---|---|---|---|---|---|---|
| | | 1 X 1 KM SURFACE | EPA 2015 NEAREST MONITOR | 1 X 1 KM SURFACE | EPA 2015 NEAREST MONITOR | 1 X 1 KM SURFACE | EPA 2015 NEAREST MONITOR |
| All | Hispanic | 8.6 | 8.7 | 10 | 10 | 7.5 | 7.7 |
| Asian | All | 8.8 | 8.9 | 9.7 | 9.9 | 7.9 | 8.0 |
| Black | All | 8.8 | 8.8 | 9.7 | 10 | 8.3 | 8.1 |
| Native American | All | 7.3 | 7.7 | 9.8 | 10 | 6.7 | 7.1 |
| White | All | 8.1 | 8.2 | 9.4 | 9.7 | 7.6 | 7.7 |

**Notes:** All $PM_{2.5}$-exposures are population weighted using race-, ethnicity- and age-stratified population data from 2015. Values are rounded to two significant figures.

### EXHIBIT 2-15. PERCENT DIFFERENCE BETWEEN $PM_{2.5}$ EXPOSURE IN PA AREAS VS. NON-PA AREAS FOR 1 X 1 KM SURFACE AND NEAREST EPA REGULATORY MONITOR (2015)

| RACE | ETHNICITY | % INCREASE IN EXPOSURE IN PA AREAS VS. IN NON-PA AREAS | |
|---|---|---|---|
| | | 1 X 1 KM MODEL | EPA 2015 NEAREST MONITOR |
| All | Hispanic | 35% | 33% |
| Asian | All | 23% | 23% |
| Black | All | 17% | 24% |
| Native American | All | 46% | 41% |
| White | All | 23% | 25% |

For results aggregated to large spatial scales, across all age categories and race/ethnicity groups, the fine-scale Di et al. (2019) based population-weighted $PM_{2.5}$ exposures in 2015 are very similar to those generated from the much coarser nearest monitor approach. In most cases, the fine scale estimates are slightly lower than exposures at the nearest EPA monitor from 2015. However, Black Americans experience the same exposure according with both methods nationally, and higher exposure outside of the PA-modeled areas. Results according to both air quality surfaces indicate Black and Asian populations experience the largest exposures. Across both air quality inputs, Native Americans experience the lowest population-weighted $PM_{2.5}$ exposure compared to all other races.

Similar to our comparison of health burden using fine-scale and 12 km model surfaces, the true benefit of using fine scale air quality inputs is less likely to be observed in results aggregated over large areas. Rather, as illustrated earlier in Exhibit 2-6, because these models better capture small-scale variation in exposure, the fine-scale air quality surfaces will produce an improved representation of variability in exposures across groups and may better detect unusually high-risk hot spots not otherwise identified.

#### APPLYING FINE SCALE MORTALITY INCIDENCE DATA

When we apply tract incidence when using all-race concentration-response functions from Di et al. (2017), as seen in Exhibit 2-4, we find that current mortality burden estimates are larger than when we apply county level mortality incidence.[6] For morbidity endpoints, we lack the detailed incidence data needed to explore the influence of local scale data nationally. However, we have conducted a state-level proof of concept analysis in the state of New Jersey, using zip-code level baseline incidence of ED visits stratified by race and ethnicity to evaluate morbidity burden estimates. Those case study findings are described in detail in Chapter 4.

#### CUMULATIVE EFFECT OF FINE SCALE MODELING ON CURRENT $PM_{2.5}$-ATTRIBUTABLE BURDEN

We use all-race current $PM_{2.5}$-attributable mortality burden estimates from Exhibit 2-5 to evaluate the cumulative effect of analyzing scenarios with both fine scale air quality and fine scale mortality incidence data. For the Di et al. (2017) all-race concentration-response function, when using the 12 x 12 km air quality surface and county-level mortality incidence, we estimate current $PM_{2.5}$-attributable mortality burden across PA areas to be 38,200 premature deaths. When we replace air quality with the 1 x 1 km air quality surface and use tract-level incidence, we estimate current mortality burden across PA areas to be 36,700 premature deaths. Thus, when we apply both fine scale air quality and mortality incidence, we find that current $PM_{2.5}$-attributable mortality burden decreases slightly, by 1,500. We find a similar difference when applying the Turner et al. (2016) all-race concentration-response function.. Due to data suppression issues, we are currently unable to evaluate the impact of combining fine-scale and race-specific baseline incidence rates simultaneously.

### FACTORS INFLUENCING DIFFERENCES IN CURRENT $PM_{2.5}$-ATTRIBUTABLE MORTALITY BURDEN

It is important to not only characterize disparities across different races, but also examine potential factors that explain these differences in current $PM_{2.5}$-attributable mortality. Exhibit 2-16 presents the factors explaining differences in $PM_{2.5}$-attributable mortality by race. These three factors include (1) $PM_{2.5}$ air quality exposure resolution, (2) baseline mortality rate resolution, and (3) concentration-response (C-R) relationships that define how mortality risk changes as a result of incremental changes in $PM_{2.5}$ exposure. In this figure, we show results for national-level BenMAP-CE scenarios using Di et al. (2019) 1 x 1 km $PM_{2.5}$ surface, county-level race-stratified incidence rates, and the Di et al. (2017) race-specific concentration-response functions for ages 65 and up.

[6] The USALEEP tract mortality incidence dataset is not stratified by race or ethnicity, so for our PA and national analysis, we are limited to comparing the impacts of utilizing fine scale mortality incidence data to all-race concentration-response functions.

**EXHIBIT 2-16. FACTORS INFLUENCING RACE-SPECIFIC PM-ATTRIBUTABLE MORTALITY ESTIMATES**




**Notes:** Results are specific to current $PM_{2.5}$-attributable mortality burden runs, including the use of county-level race-stratified incidence rates, Di et al. (2019) 1 x 1 km $PM_{2.5}$ surface, and the Di et al. (2017) race-specific concentration-response functions for ages 65 and up. Percent differences are relative to the population-weighted average values for all other races.

Overall, the race-specific Di et al. (2017) effect coefficients (i.e., slopes of the concentration-response functions) explain most differences in PM-attributable mortality by race. Effect coefficients range from 0.0061 (white) to 0.0189 (Black), representing a threefold difference in mortality impacts due to $PM_{2.5}$ exposure. In comparison, average $PM_{2.5}$ concentrations range from 7.28 $\mu g/m^3$ (Native American) to 8.83 $\mu g/m^3$ (Black) and 65+ baseline mortality incidence ranges from 2,117 deaths per 100,000 (Asian) to 4,352 (Black).[7] Across the three dimensions, Black Americans experience the highest $PM_{2.5}$ exposure, baseline all-cause mortality incidence, and $PM_{2.5}$-mortality response.

[7] Baseline mortality incidence for Black and White 65+ populations are relatively comparable nationwide; however, this takeaway may be misleading. Blacks experience significantly higher mortality incidence rates across all age groups; however, their 65+ population is, on average, younger than the White 65+ population. As such, the aggregate 65+ baseline incidence values appear comparable.

# CHAPTER 3 | CHANGES IN $PM_{2.5}$ ATTRIBUTABLE HEALTH BURDEN UNDER ALTERNATIVE $PM_{2.5}$ STANDARDS OF 8 AND 10 $\mu g/m^3$

In this chapter, we explore how the health burdens we calculated in the previous chapter might change if EPA were to adopt a more protective NAAQS. For context, we first characterize the likelihood that socially vulnerable groups live in areas in which $PM_{2.5}$ exposures exceed certain concentration thresholds. We discuss how these likelihoods compare across groups and identify populations that may benefit from reducing the current $PM_{2.5}$ annual average NAAQS from 12 $\mu g/m^3$ to either 10 or 8 $\mu g/m^3$.[8] We then present mortality and morbidity risk reduction estimates under both alternative NAAQS scenarios and compare benefits across scenarios, geographic areas, and socially vulnerable groups. All analyses focus on reduction of the annual mean $PM_{2.5}$ NAAQS only and are based on 1) air quality surfaces either generated by EPA (for PA areas at 12 km scale) or 2) air quality surfaces reflecting changes at 1 km scale that are proportional to the changes reflected in EPA's air quality surfaces for an emissions reduction strategy focusing on primary $PM_{2.5}$ sources.

## EXPOSURE ABOVE ALTERNATIVE STANDARDS

Before discussing health impacts, we first examine how $PM_{2.5}$ exposures are distributed among socially vulnerable groups experience above the standards we are assessing. We focus on two factors to identify socially vulnerable groups: 1) racial or ethnic groups that have been part of historical minorities;[9] and 2) those experiencing poverty. Within the minority subgroup, we assess impacts to Asian, Black, and Native American populations.[10] We assess exposure to Hispanic ethnicities separately where available.

Exhibits 3-1, 3-2, and 3-3 show the increased likelihood of these socially vulnerable groups to be exposed to $PM_{2.5}$ concentrations greater than the current NAAQS (12 $\mu g/m^3$) or greater than the two alternative standards assessed in this report (10 and 8 $\mu g/m^3$). The exposure likelihoods are assessed at three geographic scales: national, within PA areas, or non-PA areas. These graphics use race-specific populations at the census tract level distributed to 1 x 1 km grids by the proportion of the overall population within each 1 x 1 km grid (ages 65-99).[11]

---

[8] Our analysis focuses exclusively on changes to the annual average NAAQS. Changes to the daily NAAQS may results in additional benefits in particular areas identified by EPA as more sensitive to changes in the daily standard, but that is outside of the scope of this analysis.

[9] This report adopts the term "minority" for consistency with U.S. census data. There are important differences in the social vulnerability of individual communities that are included under the "minority" umbrella. This report includes, where possible, results for individual racial and ethnic groups.

[10] We define "low income" or "impoverished" groups as those whose income is less than twice the federal poverty line.

[11] Race-specific populations within each census tract are distributed to each 1 x 1 km grid within a tract using the proportion of the total population, across all races, within each 1 x 1 km to the total population, across all races, within the respective tract. For example, a 1 x 1 km grid that contains 50 people and falls within a census tract containing 100 people will be assigned 50 percent of each races population from that

**EXHIBIT 3-1. LIKELIHOOD OF LIVING WHERE $PM_{2.5}$ EXCEEDS SPECIFIED CONCENTRATIONS - NATION, 65-99**




Note: The reference group for each race is all *other* races combined. Comparisons between individual race groups will vary.

---

tract. This assumes that the distribution of the race-specific population within each 1 x 1 km grid is the same as the distribution of the race-specific population within the respective tracts.

EXHIBIT 3-2. LIKELIHOOD OF LIVING WHERE $PM_{2.5}$ EXCEEDS SPECIFIED CONCENTRATIONS - PA AREAS, 65-99




Note: The reference group for each race is all other races combined. Comparisons between individual race groups will vary.

EXHIBIT 3-3. LIKELIHOOD OF LIVING WHERE $PM_{2.5}$ EXCEEDS SPECIFIED CONCENTRATIONS - NON-PA AREAS, 65-99




Note: The reference group for each race is all other races combined. Comparisons between individual race groups will vary.

Aside from the non-PA areas, we consistently see increased likelihood of $PM_{2.5}$ higher exposure among low income and minority populations among the 65- to 99-year-old cohort. We also consistently see an increased likelihood in $PM_{2.5}$ exposure above the standards in the Asian, Black, and Hispanic populations, apart from some of the current NAAQS scenarios. However, unlike the other non-white groups, the Native American population typically displays a decrease in likelihood of exposure above the standards. These decreases are particularly dramatic in non-PA areas. Although it may appear from the fine scale air quality surface that Black Americans are less likely in general to live in areas where $PM_{2.5}$ exceeds 12 $\mu g/m^3$, they still are over four times more likely than white Americans to live in these high exposure areas.

## MORTALITY RISK REDUCTION UNDER ALTERNATIVE $PM_{2.5}$ STANDARDS

Exhibit 3-4 shows the mortality risk reduction under two alternative $PM_{2.5}$ standards (10 $\mu g/m^3$ and 8 $\mu g/m^3$) across three geographic areas and air quality and incidence datasets of varying spatial scale. These estimates reflect avoided deaths when utilizing incidence datasets not stratified by race and ethnicity.

### EXHIBIT 3-4. REDUCTION IN MORTALITY BURDEN BY ALTERNATIVE NAAQS (ALL RACE/ETHNICITY)

| ENDPOINT | CONCENTRATION-RESPONSE FUNCTION | AGE GROUP | NATION | PA AREA | NON-PA AREAS | NATION | PA AREA | NON-PA AREAS |
|---|---|---|---|---|---|---|---|---|
| | | | 10 μg/m³ ALT NAAQS | | | 8 μg/m³ ALT NAAQS | | |
| COUNTY LEVEL INCIDENCE | | | | | | | | |
| All-Cause Mortality | Woodruff et al. (2008)* | 0-0 | 14 | 13 | 1.2 | 49 | 30 | 18 |
| | Turner et al. (2016) | 30-99 | 4,600 | 4,200 | 420 | 16,000 | 10,000 | 5,800 |
| | Di et al. (2017) | 65-99 | 4,200 | 3,800 | 390 | 15,000 | 9,300 | 5,400 |
| Tract Level Incidence | | | | | | | | |
| All-Cause Mortality | Turner et al. (2016) | 30-99 | 4,800 | 4,300 | 420 | 16,000 | 11,000 | 5,900 |
| | Di et al. (2017) | 65-99 | 4,300 | 3,900 | 390 | 15,000 | 10,000 | 5,400 |

Note: values are rounded to two significant figures.
*The Woodruff et al. C-R function excludes neo-natal deaths (those occurring within the first 30 days after birth). Since the tract incidence dataset does not exclude neo-natal cases, we do not report tract incidence results for the Woodruff et al. study.

As with the current burden results in Chapter 2, the Turner et al. (2016) and Di et al. (2017) concentration-response functions produce higher risk reductions when using the tract-level incidence compared to the county incidence at the national scale and within PA areas. However, we see much closer, if not equal, results between the tract-level and county-level incidence within the non-PA areas. This suggests that the tract-level incidence provides additional context in areas where population densities are high, which may be useful in future fine-scale analyses. Interestingly, unlike in the total current burden results, the PA areas comprise more than 90 and 60 percent of the mortality risk reduction when assessing the 10 μg/m³ and 8 μg/m³ alternative standards, respectively.

Exhibit 3-5 presents per capita mortality risk reduction across the same geographies and air quality surfaces when using race-stratified incidence and a race-specific concentration-response function, from Di et al. (2017), for ages 65 to 99.

EXHIBIT 3-5. CHANGE IN AVOIDED DEATHS FOR THOSE AGED 65-99 BY ALTERNATIVE NAAQS (PER 100,000, STRATIFIED BY RACE)

| CONCENTRATION - RESPONSE RELATIONSHIP | RACE | ETHNICITY | NATION | PA AREAS | NON-PA AREAS | NATION | PA AREAS | NON-PA AREAS |
|---|---|---|---|---|---|---|---|---|
| | | | 10 μg/m³ ALT NAAQS | | | 8 μg/m³ ALT NAAQS | | |
| Hispanic | All | Hispanic | 20 | 44 | 2 | 48 | 91 | 17 |
| **Total All Races** | **All** | **All** | 10 | 32 | 1 | 35 | 79 | 17 |
| Asian | Asian | All | 14 | 26 | 1 | 33 | 56 | 11 |
| Black | Black | All | 28 | 69 | 3 | 110 | 190 | 58 |
| Native American | Native American | All | 8 | 40 | 1 | 21 | 74 | 8 |
| White | White | All | 8 | 26 | 1 | 27 | 64 | 14 |

Note: values are rounded to two significant figures.

Not only do we observe much larger avoided deaths when comparing the 8 μg/m3 standard to the 10 μg/m$^3$ in Exhibit 3-4, but we can also see that the 8 μg/m$^3$ alternative standard reduces mortality risk at almost two to three times the rate of the 10 μg/m$^3$ alternative standard in the PA areas. When we compare the reduction in mortality risk at the national level, the 8 μg/m$^3$ standard becomes three to four times higher than the 10 μg/m$^3$ standard for white and Black Americans, and in the non-PA areas the 8 μg/m$^3$ standard mortality rate is over five times higher for all groups. Non-PA areas experience a negligible share of per capita benefits across all groups at 10 μg/m$^3$ but comprise a meaningful share of per capita benefits when the standard is lowered to 8 μg/m$^3$.

Exhibit 3-6 further illustrates the potential reductions in the $PM_{2.5}$-attributable mortality rate by race across the U.S under an alternative standard of 8 μg/m$^3$. This figure complements Exhibit 2-8 in Chapter 2; the width of each rectangle indicates the total population of each race for the given geographic scale, and the height represents the $PM_{2.5}$-attributable mortality rate of each race, reported per 100,000 persons of each racial group.

EXHIBIT 3-6. REDUCTION IN $PM_{2.5}$-ATTRIBUTABLE MORTALITY RATE UNDER AN ALTERNATIVE STANDARD OF 8 µg/m³ BY RACE




On average across the United States, Black Americans stand to gain the highest reduction in per-capita mortality risk by reducing concentrations of $PM_{2.5}$ to 8 µg/m³ nationwide, while Native Americans' risk would fall the least. Unlike under the current $PM_{2.5}$ conditions, Asian Americans stand to experience greater per capita benefits in terms of mortality risk reduction than white Americans under an alternative standard of 8 µg/m³.

As shown in Chapter 2, a greater proportion of Black populations are exposed to $PM_{2.5}$ exposures between 8 and 10 µg/m³, relative to all other races. These findings are consistent with the findings above that these individuals experience larger benefits on a per-person basis when the current NAAQS is lowered to 10 and 8 µg/m³. When compared across races, the per-capita mortality risk reductions show that Black individuals benefit from more protective standards at two to three times the rate of all other races, with this difference in mortality rates increasing outside the PA areas and at a national scale. These results are consistent with the PA's findings that Black populations are disproportionately affected by $PM_{2.5}$ under current conditions relative to other races. However, our analysis provides additional context on the racial disparities outside of the PA areas assessed.

# Individuals living in poverty will experience 30 percent higher mortality benefits per capita from more protective $PM_{2.5}$ NAAQS.

In addition to assessing differences across race and ethnicity, we estimate the per-capita mortality risk reduction for low-income individuals, presented in Exhibit 3-7. Although observed disparities are not as dramatic as those experienced by Black or Hispanic populations, individuals living below two times the poverty line stand to experience 30 percent higher benefits due to reduced mortality rates at alternative standards, compared to those with higher incomes.

**EXHIBIT 3-7. CHANGE IN AVOIDED DEATHS FOR THOSE AGED 65-99 BY ALTERNATIVE NAAQS (PER 100,000)**

| CONCENTRATION - RESPONSE RELATIONSHIP | POVERTY STATUS | PA AREAS | NATION | NON-PA AREAS | PA AREAS | NATION | NON-PA AREAS |
|---|---|---|---|---|---|---|---|
| | | 10 µg/m³ ALT NAAQS | | | 8 µg/m³ ALT NAAQS | | |
| Combined Totals* | Below 2x Poverty Line | 38 | 12 | 3 | 91 | 42 | 22 |
| | Above 2x Poverty Line | 29 | 9 | 1 | 74 | 31 | 15 |

Note: values are rounded to two significant figures.
*We use the sum of the $PM_{2.5}$ attributable mortality below or above 2x the poverty line derived from the Di et al. (2017) race-specific concentration-response functions.

Exhibit 3-8 presents another view of the findings from Exhibit 3-6 and 3-7. It illustrates the disparities in mortality risk reduction across three spatial dimensions by race, ethnicity, and poverty status, starting from current mortality burden and ending at an alternative standard of 8 µg/m³. As seen in the length of the connecting lines that demonstrate how per capita $PM_{2.5}$-attributable risks decrease from current conditions to each alternative standard, the risk benefits vary by group and with each incremental change in the standard. We find that Black Americans stand to gain the most in terms of reductions in per capita mortality risk from more protective annual NAAQS. However, even when NAAQS is set at 8 µg/m³, Black populations still experience $PM_{2.5}$-attributable mortality risks that exceed that of all other races by a substantial margin. Our results also show that although Hispanic individuals do not benefit from the alternative standards at the same rate as Black individuals, their per-capita benefits are the second highest among all subpopulations. This suggests that Hispanic populations are also disproportionally affected by poor air quality.

Exhibit 3-8 demonstrates that incrementally stronger standards further reduce disparities between racial and ethnic groups and among those living above and below two times the poverty line, with the 8 µg/m³ standard resulting in the greatest reduction in disparities across the country (PA and non-PA areas). Based on the hybrid air quality surface for 2015 (Di et al. 2019), fewer individuals in non-PA areas are exposed to concentrations above 10 µg/m³. As such, a standard of 10 µg/m³ provides limited reductions in disparities in non-PA areas, relative to a standard of 8 µg/m³. However, we note that our approach in non-PA areas does not benefit from the detailed EPA modeling of attainment conducted for PA areas. For

example, we do not model benefits to non-PA areas that may result from attainment actions taken in PA areas.[12]

### EXHIBIT 3-8. MORTALITY RATES UNDER CURRENT AND ALTERNATIVE PM NAAQS, AGES 65-99




Exhibits 3-9 and 3-10 show the distribution of avoided deaths per 100,000 by race under the two alternative NAAQS scenarios, 8 and 10 µg/m$^3$. These maps show benefits from using the race-stratified Di et al. (2019) concentration-response function for ages 65-99. Non-PA areas with a zero value for deaths per capita reflect 1 x 1 km cells that contain current $PM_{2.5}$ exposure levels below the alternative NAAQS. For example, if a non-PA area has a current conditions $PM_{2.5}$ concentration of 9 µg/m$^3$, only the 8 µg/m$^3$ NAAQS scenario will model benefits within that area of reducing the baseline concentration of 9 µg/m$^3$ to 8 µg/m$^3$.[13] For the 10 µg/m$^3$ alternative NAAQS scenario, since the baseline $PM_{2.5}$ concentration is already below the alternative standard, no benefits are modeled.

As expected, a more protective standard of 8 µg/m$^3$ results in a higher rate of avoided deaths, particularly in areas not previously assessed by the PA. As seen by the greater density in coloring across non-PA areas for the 8 µg/m$^3$ scenario, lowering the NAAQS from 10 to 8 µg/m$^3$ captures a significant portion of benefits from non-PA areas that contain baseline $PM_{2.5}$ concentrations between 8 and 10 µg/m$^3$.

---

[12] Our analysis only evaluates EPA's air quality surface based on control of primary $PM_{2.5}$ emissions and does not consider control of secondary (area-source) $PM_{2.5}$ emissions

[13] Appendix E provides more detail into our modeling approach for estimating benefits under more stringent $PM_{2.5}$ NAAQS.

EXHIBIT 3-9. AVOIDED DEATHS PER 100,000 FOR 10 μg/m³ ALTERNATIVE NAAQS FOR AGES 65-99,1 X 1 KM AIR QUALITY SURFACE



EXHIBIT 3-10. AVOIDED DEATHS PER 100,000 FOR 8 μg/m³ ALTERNATIVE NAAQS FOR AGES 65-99, 1 X 1 KM AIR QUALITY SURFACE



### MORBIDITY RISK REDUCTION UNDER ALTERNATIVE $PM_{2.5}$ STANDARDS

Exhibit 3-11 shows the morbidity risk reduction under two alternative standards (10 µg/m³ and 8 µg/m³) across three geographies. These estimates reflect avoided hospitalizations, emergency department visits, and incidence of asthma and non-fatal acute myocardial infarctions (heart attacks) based on baseline rates of disease not stratified by race or ethnicity.

### EXHIBIT 3-11. AVOIDED $PM_{2.5}$-ATTRIBUTABLE MORBIDITY BURDEN (ALL RACE/ETHNICITY)

| ENDPOINT | CONCENTRATION - RESPONSE FUNCTION | AGE GROUP | NATION | PA AREA | NON-PA AREAS | NATION | PA AREA | NON-PA AREAS |
|---|---|---|---|---|---|---|---|---|
| | | | 10 µg/m³ ALT NAAQS | | | 8 µg/m³ ALT NAAQS | | |
| **HOSPITALIZATIONS** | | | | | | | | |
| Non-fatal AMI | Peters et al. (2001) | 18-99 | 4,400 | 4,000 | 360 | 15,000 | 9,700 | 5.500 |
| Non-fatal AMI | Pooling 4 Studies* | 18-99 | 640 | 590 | 52 | 2,200 | 1,400 | 800 |
| All Respiratory | Ostro et al. (2016) | 0-18 | 420 | 390 | 28 | 1,400 | 950 | 440 |
| Respiratory-1 | Jones et al. (2015) | 0-99 | 240 | 230 | 20 | 800 | 560 | 280 |
| Respiratory-2 | Bell et al. (2015) | 65-99 | 82 | 75 | 6.8 | 280 | 180 | 100 |
| Cardio-, Cerebro- & Peripheral Vascular Disease | Bell et al. (2015) | 65-99 | 530 | 480 | 43 | 1,800 | 1,200 | 610 |
| All Cardiac Outcomes | Talbott et al. (2014) | 0-99 | 450 | 420 | 36 | 1,600 | 1,000 | 550 |
| Alzheimer's Disease | Kioumourtzoglou et al. (2016) | 65-99 | 1,300 | 1,200 | 120 | 5,000 | 3,000 | 2,000 |
| Parkinson's Disease | Kioumourtzoglou et al. (2016) | 65-99 | 210 | 190 | 20 | 720 | 470 | 260 |
| **EMERGENCY ROOM VISITS** | | | | | | | | |
| Respiratory | Krall et al. (2016) | 0-99 | 3,000 | 2,800 | 230 | 10,000 | 6,700 | 3,400 |
| Emergency Hospitalizations - Respiratory** | Zanobetti et al. (2009) | 65-99 | 760 | 690 | 63 | 2,600 | 1,700 | 960 |
| **INCIDENCE** | | | | | | | | |
| Asthma | Tetreault et al. (2016) | 0-17 | 13,000 | 12,000 | 900 | 41,000 | 28,000 | 13,000 |

Note: values are rounded to two significant figures
*Four AMI studies pooled together include: Pope et al., Sullivan et al., Zanobetti and Schwartz, and Zanobetti et al.
**Emergency Hospitalizations represent emergency department visits that result in a hospitalization.

Overall, when we compare trends across scenarios and space, we find similar conclusions to our mortality benefits analysis. At an alternative standard of 10 µg/m³, PA areas capture the vast majority of benefits compared to non-PA areas.

However, at an alternative standard of 8 μg/m$^3$, while PA area-attributed benefits more than double, non-PA area-attributed benefits increase at a much larger rate. For example, hospital admission reductions in non-PA areas attributed to non-fatal acute myocardial infarction (as estimated based on Peters et al. 2001) rise from 358 for the 10 μg/m$^3$ standard scenario to 5,509 for the 8 μg/m$^3$ scenario. This represents a more than 1,500 percent increase when moving from 10 to 8 μg/m$^3$. As such, under an alternative NAAQS of 8 μg/m$^3$, avoided $PM_{2.5}$-attributable morbidity burden in non-PA areas represent nearly half of all benefits. This indicates the potential benefits of moving past an alternative standard of 10 μg/m$^3$ to 8 μg/m$^3$ for non-PA area populations.

Exhibit 3-12a and 3-12b presents avoided asthma-related emergency room visits (per capita) for children ages 0 to 18 across the same geographies and alternative NAAQS scenarios but stratified by race and ethnicity based on estimates from the Alhanti et al study. We observe the same trends across alternative NAAQS scenarios and space as found in Exhibit 3-11 for morbidity endpoints not stratified by race or ethnicity. In general, the rates of potential benefits for non-white groups from more protective NAAQS are several times larger than those for white Americans.

### EXHIBIT 3-12A. AVOIDED ASTHMA-RELATED EMERGENCY ROOM VISITS IN CHILDREN AGED 0-18 BY ALTERNATIVE NAAQS (PER 100,000, STRATIFIED BY RACE/ETHNICITY)

| RACE/ ETHNICITY | NATION | PA AREAS | NON-PA AREAS | NATION | PA AREAS | NON-PA AREAS |
|---|---|---|---|---|---|---|
| | 10 μg/m$^3$ ALT NAAQS | | | 8 μg/m$^3$ ALT NAAQS | | |
| White, Non-Hispanic | 0.31 | 1.1 | 0.050 | 1.2 | 2.8 | 0.66 |
| All White, Hispanic Plus All Other Races, Ethnicities | 3.1 | 7.5 | 0.27 | 9.6 | 19 | 3.8 |

EXHIBIT 3-12B. AVOIDED ASTHMA-RELATED EMERGENCY ROOM VISITS IN CHILDREN AGED 0-18 BY ALTERNATIVE NAAQS (PER 100,000, STRATIFIED BY RACE/ETHNICITY AND POVERTY)



# CHAPTER 4 | FINE SCALE MORBIDITY CASE STUDY: NEW JERSEY

In this chapter, we explore the sensitivity of morbidity results to the spatial scale and demographic stratification of incidence data. While previous chapters presented mortality data stratified by race and census tract, the morbidity incidence data that is publicly available for use in benefits analysis is, at best, aggregated at the county level typically is not stratified by race or ethnicity. As a proof-of-concept case study, we have explored the use of finer scale inputs, both in terms of spatial resolution and race- and ethnicity-stratification for a single state. We present below our approach and results for a calculation of PM-attributable asthma-related emergency department visits in New Jersey.[14]

## DATA PROCUREMENT AND PROCESSING

To compare results across spatial scales and demographic compositions, we obtained and processed discharge-level emergency department visit data for New Jersey from 2016 to 2019 from the Healthcare Cost and Utilization Project's State Emergency Department Database (HCUP SEDD). Processing involved identifying all non-fatal visits to the emergency department in which the primary diagnoses was asthma (ICD-10 J45). These cases were aggregated to different levels of spatial and geographic aggregation. Exhibit 4-1 presents these two levels of aggregation for New Jersey incidence data.

### EXHIBIT 4-1. AGGREGATION OF NEW JERSEY INCIDENCE DATA

| ENDPOINT | AGES | SPATIAL SCALE | RACIAL/ETHNIC STRATIFICATION |
|---|---|---|---|
| Emergency Department Visits, Asthma | 0-4, 5-18 | ZIP code* | White Hispanic, white non-Hispanic, non-white |
| | | ZIP3 | Not stratified by race or ethnicity |

Notes: *In instances where ZIP code and demographic stratified ED counts are below 11, we aggregate data from nearby ZIP codes to estimate a ZIP3-level rate. If cases are still <11, we aggregate further to the state level. The three racial/ethnic combinations are intended to match the categories in Alhanti et al. (2016). While further stratification is possible (e.g., by Black, Asian, and Native American), data suppression (i.e., instances where cases <11) results in more frequent use of imputation using rates at coarser geographic scales.

We produced two datasets: one for all race and ethnicity aggregated to the ZIP3 level, and one aggregated to the finer ZIP code level and stratified by white Hispanic, white non-Hispanic, and non-white. ZIP3s represent geographic aggregations of ZIP codes sharing the first three digits. There are 20 such areas in

[14] Our choice of endpoint and state were largely informed by data availability. Asthma ED visits are the only morbidity function for which we use race-specific effect coefficients (Alhanti et al. 2016). Further, we selected New Jersey because it is assessed in the PA (i.e., has relatively high $PM_{2.5}$ concentrations and available monitors) and provides the necessary data (ED counts) and data elements (race, ethnicity, zip code) upon purchase from the Healthcare Cost and Utilization Project State Emergency Department Database (HCUP-SEDD).

New Jersey, roughly equivalent to the number of counties (21).[15] We opted to compare these two datasets instead of using the default BenMAP-CE county-level incidence to minimize differences in datasets and data cleaning and processing.[16] Thus, the comparison presented below isolates the effects of geographic and demographic aggregation.

As expected, the resulting datasets characterize baseline asthma ED incidence with differing levels of variation across the state. Whereas the ZIP3 file includes 40 distinct incidence rates (20 per age group), the finely resolved dataset includes 1,336 unique values.

## ANALYSIS

We investigate the impact of incidence datasets by assessing the current $PM_{2.5}$ burden statewide. Total $PM_{2.5}$-attributable asthma ED visits are presented in Exhibit 4-2.

### EXHIBIT 4-2. $PM_{2.5}$-ATTRIBUTABLE ASTHMA ED VISITS IN NEW JERSEY

| | | TOTAL ED VISITS | | DIFFERENCE (ZIP3 - ZIP CODE) | |
|---|---|---|---|---|---|
| RACE | ETHNICITY | ZIP3 AGGREGATED | ZIP CODE & RACE/ETHNICITY | TOTAL | PERCENT |
| White | Non-Hispanic | 7,600 | 5,400 | -2,200 | -29.0% |
| White | Hispanic | 4,800 | 2,700 | -2,100 | -45% |
| Black | ALL | 4,000 | 7,700 | 3,700 | 91% |
| Asian | ALL | 1,600 | 2,000 | 370 | 23% |
| N. American | ALL | 120 | 220 | 100 | 84% |
| | Totals | 18,000 | 18,000 | 0 | 0% |

Statewide, the two incidence datasets produce comparable estimates overall. We estimate that ambient $PM_{2.5}$ results in an equivalent number of asthma ED visits each year, using either data set The ZIP3 data, however, fails to reflect important differences in incidence by race and ethnicity.

**Aggregated incidence rates overstate asthma ED incidence for white populations by 30% and understate incidence for other races by up to 90%.**

By stratifying estimates by race, ethnicity, and zip code, we calculate $PM_{2.5}$-attributable cases that vary substantially from the aggregated incidence estimates for each race. In general, we find that aggregated incidence rates overstate incidence for white populations and understate incidence for other races. These

[15] ZIP3s do not align with county borders. In at least one case (086), individual ZIP3s are split and do not represent one contiguous polygon.

[16] The differences between the BenMAP-CE and newly processed datasets include: (1) 2014 vs. 2016-2019 data, (2) medical coding of ICD-9 vs. ICD-10, and (3) processing for BenMAP-CE includes further imputation beyond state boundaries (e.g., regional datasets from HCUPnet).

differences are sizable. Employing finer scale and race/ethnicity stratified rates lowers white Hispanic estimates by 45 percent and increases Black estimates by 91 percent.

## CONCLUSIONS

Baseline incidence represents a key data input for estimating air pollution attributable health effects. We demonstrate that coarse geographic resolutions (e.g., ZIP3, county)—such as those used in the PA for hospitalizations and emergency room visits—should accurately characterize overall incidence; however, these datasets do not facilitate the reliable estimation of race-specific effects. Health datasets are increasingly reporting rates at fine scales and by demographic factors relevant to distributional analyses. Finally, we note that while not illustrated in this chapter, fine scale incidence data is more suitable for assessing impacts at smaller scales. Aggregation to the state level masks this observation.

# CHAPTER 5 | CHANGES IN $PM_{2.5}$ ATTRIBUTABLE HEALTH BURDEN UNDER AN ALTERNATIVE $PM_{2.5}$ STANDARD OF 9 µg/m$^3$

In this chapter, we explore how the baseline health burden calculated in Chapter 2 might change if EPA were to adopt a NAAQS of 9 µg/m$^3$. For context, we first discuss current exposure of different racial and ethnic groups to $PM_{2.5}$ concentrations over 9 µg/m$^3$. We then characterize the likelihood that socially vulnerable groups live in areas in which $PM_{2.5}$ exposures exceed certain concentration thresholds. We discuss how these likelihoods compare across groups and identify populations that may benefit from reducing the current $PM_{2.5}$ annual average NAAQS from 12 µg/m$^3$ to 9 µg/m$^3$.[17] We then present mortality and morbidity risk reduction estimates under this alternative NAAQS scenario and compare benefits across geographic areas and socially vulnerable groups. All analyses focus on reduction of the annual mean $PM_{2.5}$ NAAQS only and are based on 1) air quality surfaces either generated by EPA (for PA areas at 12 km scale) or 2) air quality surfaces reflecting changes at 1 km scale that are proportional to the changes reflected in EPA's air quality surfaces for an emissions reduction strategy focusing on primary $PM_{2.5}$ sources.

## CURRENT $PM_{2.5}$ EXPOSURE

We first assess how $PM_{2.5}$ exposures differ by racial and ethnic groups. Exhibit 5-1 shows the fraction of the Hispanic and non-Hispanic populations currently exposed to different $PM_{2.5}$ concentrations based on the 1 x 1 km air quality surface from Di et al. (2019). Concentrations above 9 µg/m$^3$ are highlighted to emphasize the differences in exposure by ethnicity.

[17] Our analysis focuses exclusively on changes to the annual average NAAQS. Changes to the daily NAAQS may result in additional benefits in particular areas identified by EPA as more sensitive to changes in the daily standard, but that is outside of the scope of this analysis.

EXHIBIT 5-1. PROPORTION OF U.S. POPULATION EXPOSED TO $PM_{2.5}$ CONCENTRATIONS ABOVE 9 µg/m³, ETHNICITY-STRATIFIED




Hispanic Americans are more likely to live in areas with $PM_{2.5}$ concentrations greater than 9 µg/m$^3$ than white non-Hispanic populations. 44 percent of Hispanic Americans are exposed to annual average $PM_{2.5}$ concentrations above 9 µg/m$^3$, compared to 35 percent of non-Hispanic Americans. This disparity occurs primarily at concentrations above 10 µg/m$^3$, but a substantial portion of the Hispanic American population (over 10 percent) would also benefit from reductions in $PM_{2.5}$ from 10 to 9 µg/m$^3$. We present a similar graphic in Appendix A using the EPA 12km surface (in PA areas only).[18]

Exhibit 5-2 presents a comparable graphic stratified by race. Taller segments of these curves reflect $PM_{2.5}$ concentrations with greater proportions of race-specific populations living in these areas. Distributions shifted further to the right indicate higher levels of exposure for a particular group. Like Exhibit 5-1, Exhibit 5-2 uses shading to emphasize populations exposed to $PM_{2.5}$ concentrations above 9 µg/m$^3$, and Exhibit 5-3 provides a tabular summary of these differences.

[18] "PA areas" reflect areas modeled and analyzed by EPA in their policy assessment. "Non-PA areas" reflect all areas outside of the EPA study area.

EXHIBIT 5-2. PROPORTION OF U.S. POPULATION EXPOSED TO $PM_{2.5}$ CONCENTRATIONS ABOVE 9 μg/m³, RACE-STRATIFIED




EXHIBIT 5-3. PROPORTION OF U.S. POPULATION AGED 0-99 EXPOSED AT VARIOUS $PM_{2.5}$ CONCENTRATIONS

| RACE | ETHNICITY | PERCENT OF POPULATION EXPOSED TO $PM_{2.5}$ CONCENTRATIONS: | | | | | |
|---|---|---|---|---|---|---|---|
| | | > 12 μg/m³ | > 10 μg/m³ | > 9 μg/m³ | > 8 μg/m³ | BETWEEN 10 & 12 μg/m³ | BETWEEN 8 & 10 μg/m³ |
| Asian | All | 4% | 19% | 43% | 67% | 15% | 48% |
| Black | All | 2% | 18% | 45% | 74% | 16% | 56% |
| Native American | All | 3% | 11% | 24% | 45% | 8% | 34% |
| White | All | 3% | 14% | 35% | 59% | 11% | 45% |

Values do not sum across rows.

As shown in Exhibits 5-2 and 5-3, Black Americans are consistently exposed to higher concentrations of $PM_{2.5}$ than white Americans. Black and Asian Americans are more likely to be exposed to concentrations above 9 μg/m³ (45% and 43%, respectively) than white Americans (35%), while Native Americans (24%) are less likely to be exposed at these higher levels.

### EXPOSURE ABOVE 9 µg/m$^3$

Before discussing health impacts, we first examine how $PM_{2.5}$ exposures are distributed among socially vulnerable groups above the 9 µg/m$^3$ standard. We focus on two factors to identify socially vulnerable groups: 1) racial or ethnic groups that have been part of historical minorities;[19] and 2) those experiencing poverty. Within the minority subgroup, we assess impacts to Asian, Black, and Native American populations.[20] We assess exposure to Hispanic ethnicities separately where available.

Exhibits 5-4, 5-5, and 5-6 show the increased likelihood of these socially vulnerable groups to be exposed to $PM_{2.5}$ concentrations greater than the current NAAQS (12 µg/m$^3$), greater than the two alternative standards assessed in Chapter 3, and greater than the alternative standard of 9 µg/m$^3$ assessed in this report. The exposure likelihoods are assessed at three geographic scales: national, within EPA Policy Assessment (PA) areas, or non-PA areas. These graphics divide race-specific populations at the census tract level distributed to 1 x 1 km grids by the proportion of the overall population within each 1 x 1 km grid (ages 65-99).[21]

[19] This report adopts the term "minority" for consistency with U.S. Census data. There are important differences in the social vulnerability of individual communities that are included under the "minority" umbrella. This report includes, where possible, results for individual racial and ethnic groups.

[20] We define "low income" or "impoverished" groups as those whose income is less than twice the federal poverty line.

[21] Race-specific populations within each census tract are distributed to each 1 x 1 km grid within a tract using the proportion of the total population, across all races, within each 1 x 1 km to the total population, across all races, within the respective tract. For example, a 1 x 1 km grid that contains 50 people and falls within a census tract containing 100 people will be assigned 50 percent of each race's population from that tract. This assumes that the distribution of the race-specific population within each 1 x 1 km grid is the same as the distribution of the race-specific population within the respective tracts.

**EXHIBIT 5-4. LIKELIHOOD OF LIVING WHERE $PM_{2.5}$ EXCEEDS SPECIFIED CONCENTRATIONS - NATION, 65-99**




Note: The reference group for each race is all *other* races combined. Comparisons between individual race groups will vary.

**EXHIBIT 5-5. LIKELIHOOD OF LIVING WHERE $PM_{2.5}$ EXCEEDS SPECIFIED CONCENTRATIONS - PA AREAS, 65-99**




Note: The reference group for each race is all other races combined. Comparisons between individual race groups will vary.

**EXHIBIT 5-6. LIKELIHOOD OF LIVING WHERE $PM_{2.5}$ EXCEEDS SPECIFIED CONCENTRATIONS - NON-PA AREAS, 65-99**




Note: The reference group for each race is all other races combined. Comparisons between individual race groups will vary.

Aside from the non-PA areas, we consistently see increased likelihood of higher $PM_{2.5}$ exposure among low income and minority populations in the 65- to 99-year-old cohort. We also observe an increased likelihood in $PM_{2.5}$ exposure above the specified levels in the Asian, Black, and Hispanic populations, apart from some of the current NAAQS scenarios. However, unlike the other non-white groups, the Native American population experiences a lower likelihood of exposure above the standards. These decreases are particularly dramatic in non-PA areas.

## MORTALITY RISK REDUCTIONS UNDER AN ALTERNATIVE $PM_{2.5}$ STANDARD OF 9 $\mu g/m^3$

Exhibit 5-7 presents the benefits—presented as reductions in mortality risk—under alternative $PM_{2.5}$ standards of 8, 9, and 10 $\mu g/m^3$. These estimates are presented as national totals and also divided into PA areas and non-PA areas. These estimates reflect avoided deaths when utilizing incidence datasets not stratified by race and ethnicity.

EXHIBIT 5-7. REDUCTION IN U.S. MORTALITY BURDEN BY ALTERNATIVE NAAQS (ALL RACE/ETHNICITY)

| ENDPOINT | CONCENTRATION-RESPONSE FUNCTION | AGE GROUP | NATION | PA AREAS | NON-PA AREAS | NATION | PA AREAS | NON-PA AREAS | NATION | PA AREAS | NON-PA AREAS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 10 µg/m³ Alt NAAQS | | | 9 µg/m³ Alt NAAQS | | | 8 µg/m³ Alt NAAQS | | |
| County Level Incidence | | | | | | | | | | | |
| All-Cause Mortality | Woodruff et al. (2008)* | 0-0 | 14 | 13 | 1.2 | 28 | 22 | 5.5 | 49 | 31 | 18 |
| | Turner et al. (2016) | 30-99 | 4,600 | 4,200 | 420 | 9,000 | 7,200 | 1,860 | 16,000 | 10,000 | 5,800 |
| | Di et al. (2017) | 65-99 | 4,200 | 3,800 | 390 | 8,300 | 6,600 | 1,700 | 15,000 | 9,300 | 5,400 |
| Tract Level Incidence | | | | | | | | | | | |
| All-Cause Mortality | Turner et al. (2016) | 30-99 | 4,800 | 4,300 | 420 | 9,300 | 7,400 | 1,900 | 16,000 | 11,000 | 5,900 |
| | Di et al. (2017) | 65-99 | 4,300 | 3,900 | 390 | 8,500 | 6,800 | 1,700 | 15,000 | 10,000 | 5,400 |

Note: values are rounded to two significant figures.
*The Woodruff et al. C-R function excludes neo-natal deaths (those occurring within the first 30 days after birth). Since the tract incidence dataset does not exclude neo-natal cases, we do not report tract incidence results for the Woodruff et al. study.

An alternative standard of 9 µg/m$^3$ is associated with a reduction in mortality burden of approximately 28 infants and 9,000 to 9,300 adults (30-99), over 90 percent of which come from those aged 65 to 99. As with the current burden results in Chapter 2, the Turner et al. (2016) and Di et al. (2017) concentration-response functions produce higher risk reductions when using the tract-level incidence compared to the county incidence at the national scale and within PA areas. However, consistent with the findings in Chapter 3, we observe comparable results between the tract-level and county-level incidence within the non-PA areas. The PA areas comprise approximately 80 percent of the mortality risk reduction when assessing the 9 µg/m$^3$ alternative standard.

Exhibits 5-8 and 5-9 present per-capita and total mortality risk reductions across the same geographies and air quality surfaces when using race-stratified incidence and a race-specific concentration-response function, from Di et al. (2017), for ages 65 to 99.

**EXHIBIT 5-8. CHANGE IN RATES OF AVOIDED DEATHS FOR THOSE AGED 65-99 BY ALTERNATIVE NAAQS (PER 100,000, STRATIFIED BY RACE)**

| CONCENTRATION - RESPONSE RELATIONSHIP | RACE | ETHNICITY | NATION | PA AREAS | NON-PA AREAS | NATION | PA AREAS | NON-PA AREAS | NATION | PA AREAS | NON-PA AREAS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 10 μg/m³ Alt NAAQS | | | 9 μg/m³ Alt NAAQS | | | 8 μg/m³ Alt NAAQS | | |
| Hispanic | All | Hispanic | 20 | 44 | 2.0 | 32 | 68 | 6.4 | 48 | 91 | 17 |
| **Total All Races** | **All** | **All** | 10 | 32 | 1.2 | 20 | 56 | 5.4 | 35 | 79 | 17 |
| Asian | Asian | All | 14 | 26 | 0.75 | 22 | 41 | 3.5 | 33 | 56 | 11 |
| Black | Black | All | 28 | 69 | 2.7 | 61 | 130 | 17 | 110 | 190 | 58 |
| Native American | Native American | All | 7.9 | 40 | 0.51 | 12 | 57 | 2.3 | 21 | 74 | 8.4 |
| White | White | All | 7.7 | 26 | 1.0 | 15 | 45 | 4.4 | 27 | 64 | 14 |

Note: values are rounded to two significant figures.

**EXHIBIT 5-9. CHANGE IN AVOIDED DEATHS FOR THOSE AGED 65-99 BY ALTERNATIVE NAAQS (STRATIFIED BY RACE)**

| AUTHOR | CONCENTRATION - RESPONSE RELATIONSHIP | AGE GROUP | RACE | ETHNICITY | NATION | PA AREAS | NON-PA AREAS | NATION | PA AREAS | NON-PA AREAS | NATION | PA AREAS | NON-PA AREAS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 10 μg/m³ Alt NAAQS | | | 9 μg/m³ Alt NAAQS | | | 8 μg/m³ Alt NAAQS | | |
| Di et al. (2017) | Hispanic | 65-99 | All | Hispanic | 735 | 692 | 43 | 1,190 | 1,053 | 137 | 1,763 | 1,411 | 352 |
| | Asian | | Asian | All | 254 | 248 | 7 | 417 | 385 | 32 | 619 | 521 | 98 |
| | Black | | Black | All | 1,218 | 1,145 | 73 | 2,632 | 2,186 | 446 | 4,749 | 3,210 | 1,538 |
| | Native American | | Native American | All | 22 | 21 | 1 | 35 | 29 | 5 | 57 | 38 | 19 |
| | White | | White | All | 3,116 | 2,807 | 309 | 6,129 | 4,800 | 1,329 | 10,872 | 6,783 | 4,090 |

Under an alternative standard of 9 µg/m³, in PA areas, Black Americans experience a per-capita mortality risk reduction larger than that of all other races, and nearly three times lower than White Americans. For all racial and ethnic groups, the per-capita mortality risk is significantly higher in PA areas compared to non-PA areas. More than 75 percent of avoided deaths for White Americans, and nearly 85 percent of avoided deaths for non-White Americans are experienced in PA areas.

Exhibit 5-10 further illustrates the potential reductions in $PM_{2.5}$-attributable mortality rates by race under an alternative standard of 9 µg/m³. The width of each rectangle indicates the 65-99-year-old population of each race, and the height represents the $PM_{2.5}$-attributable mortality rate of each race, reported per 100,000 persons of each racial group. The total area of each rectangle reflects the reduction in total $PM_{2.5}$-attributable mortality.

### EXHIBIT 5-10. REDUCTION IN $PM_{2.5}$-ATTRIBUTABLE MORTALITY RATE UNDER AN ALTERNATIVE STANDARD OF 9 µg/m³ BY RACE




Black Americans would experience the largest reduction in mortality risk under an alternative $PM_{2.5}$ standard of 9 µg/m³ nationwide. Asian Americans would also experience greater per-capita benefits than white Americans under an alternative standard of 9 µg/m³. The per-capita mortality risk reductions show that Black individuals benefit from a more protective standard at four times the rate of white Americans. These results are consistent with the PA's findings that Black populations are disproportionately affected

by $PM_{2.5}$ under current conditions relative to other races. However, our analysis provides additional context on the racial disparities outside of the PA areas assessed.

In addition to assessing differences across race and ethnicity, we estimate the per-capita mortality risk reduction for low-income individuals, presented in Exhibit 5-11. Although observed disparities are not as dramatic as those experienced by Black or Hispanic populations, individuals living below two times the poverty line stand to experience 25 percent higher benefits in reduced mortality rates at an alternative standard of 9 $\mu g/m^3$, compared to those with higher incomes.

EXHIBIT 5-11. CHANGE IN AVOIDED DEATH RATES FOR THOSE AGED 65-99 BY ALTERNATIVE NAAQS (PER 100,000)

| CONCENTRATION - RESPONSE RELATIONSHIP | POVERTY STATUS | NATION | PA AREAS | NON-PA AREAS | NATION | PA AREAS | NON-PA AREAS | NATION | PA AREAS | NON-PA AREAS |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 10 μg/m³ Alt NAAQS | | | 9 μg/m³ Alt NAAQS | | | 8 μg/m³ Alt NAAQS | | |
| Combined Totals* | Below 2x Poverty Line | 12 | 38 | 2.6 | 24 | 65 | 8.3 | 42 | 91 | 22 |
| | Above 2x Poverty Line | 9.0 | 29 | 0.50 | 18 | 52 | 4.1 | 31 | 74 | 15 |

Note: values are rounded to two significant figures.
*We use the sum of the $PM_{2.5}$-attributable mortality below or above 2x the poverty line derived from the Di et al. (2017) race-specific concentration-response functions.

Exhibit 5-12 presents another view of the findings from Exhibits 5-10 and 5-11. We illustrate the disparities in mortality risk reduction across three spatial dimensions by race, ethnicity, and poverty status. The length of the connecting lines demonstrates how per-capita $PM_{2.5}$-attributable risks decrease from current conditions to each alternative standard. Per-capita benefits vary by group and with each incremental change in the standard. We find that Black Americans stand to gain the most in terms of reductions in per-capita mortality risk from more protective annual NAAQS. However, even when NAAQS is set at 8 or 9 $\mu g/m^3$, Black populations still experience substantially elevated $PM_{2.5}$-attributable mortality risks relative to other races. Our results also show that per-capita benefits for Hispanic individuals are the second highest among all subpopulations.

Exhibit 5-12 demonstrates that incrementally stronger standards further reduce disparities between racial and ethnic groups and among those living above and below two times the poverty line, with the 8 $\mu g/m^3$ standard resulting in the greatest reduction in disparities across the country (PA and non-PA areas). Based on the hybrid air quality surface for 2015 (Di et al. 2019), fewer individuals in non-PA areas are exposed to concentrations above 9 and 10 $\mu g/m^3$. As such, standards of 9 and 10 $\mu g/m^3$ provide limited reductions in disparities in non-PA areas, relative to a standard of 8 $\mu g/m^3$. However, we note that our approach in non-PA areas does not benefit from the detailed EPA modeling of attainment conducted for PA areas. For example, we do not model benefits to non-PA areas that may result from attainment actions taken in PA areas.[22] Additional exhibits displaying the underlying values for Exhibit 5-12 can be found in Appendix D.

[22] Our analysis only evaluates EPA's air quality surface based on control of primary $PM_{2.5}$ emissions and does not consider control of secondary (area-source) $PM_{2.5}$ emissions.

## EXHIBIT 5-12. MORTALITY RATES UNDER CURRENT AND ALTERNATIVE PM NAAQS, AGES 65-99




Exhibit 5-13 shows the distribution of avoided deaths per 100,000 by race under the alternative NAAQS scenario of 9 µg/m$^3$. This map shows benefits from using the race-stratified Di et al. (2019) concentration-response function for ages 65-99. Non-PA areas with zero deaths per-capita have current $PM_{2.5}$ concentrations that are below the 9 µg/m$^3$.

At an alternative standard of 9 µg/m$^3$, all racial groups experience nonzero per-capita mortality risk reductions across much of the Western and Eastern United States, with particularly higher risk reductions experienced in California's Bay Area. Black Americans experience noticeably higher mortality risk reductions than other racial groups in additional areas, including Eastern Texas and the Northeast United States. At this alternative standard, many areas within the Great Plains and Mountain regions of the United States have current $PM_{2.5}$ concentrations below 9 µg/m$^3$, and thus do not experience noticeable mortality risk reductions.

IEc

EXHIBIT 5-13. AVOIDED DEATHS PER 100,000 FOR 9 μg/m³ ALTERNATIVE NAAQS FOR AGES 65-99,1 X 1 KM AIR QUALITY SURFACE



### MORBIDITY RISK REDUCTION UNDER AN ALTERNATIVE $PM_{2.5}$ STANDARD OF 9 $\mu g/m^3$

Exhibit 5-14 shows the morbidity risk reduction under the alternative standard of 9 $\mu g/m^3$ across three geographies. These estimates reflect avoided hospitalizations, emergency department visits, and incidence of asthma and non-fatal acute myocardial infarctions (heart attacks) based on baseline rates of disease not stratified by race or ethnicity.

EXHIBIT 5-14. AVOIDED $PM_{2.5}$-ATTRIBUTABLE MORBIDITY BURDEN (ALL RACE/ETHNICITY)

| ENDPOINT | CONCENTRATION - RESPONSE FUNCTION | AGE GROUP | NATION | PA AREAS | NON-PA AREAS | NATION | PA AREAS | NON-PA AREAS | NATION | PA AREAS | NON-PA AREAS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 10 µg/m³ Alt NAAQS | | | 9 µg/m³ Alt NAAQS | | | 8 µg/m³ Alt NAAQS | | |
| HOSPITALIZATIONS | | | | | | | | | | | |
| Non-fatal AMI | Peters et al. (2001) | 18-99 | 4,400 | 4,000 | 360 | 8,600 | 6,900 | 1,700 | 15,000 | 10,000 | 6,000 |
| Non-fatal AMI | Pooling 4 Studies* | 18-99 | 640 | 590 | 52 | 1,250 | 1,010 | 240 | 2,200 | 1,400 | 800 |
| All Respiratory | Ostro et al. (2016) | 0-18 | 420 | 390 | 28 | 800 | 700 | 130 | 1,400 | 950 | 440 |
| Respiratory-1 | Jones et al. (2015) | 0-99 | 240 | 230 | 20 | 480 | 390 | 90 | 800 | 560 | 280 |
| Respiratory-2 | Bell et al. (2015) | 65-99 | 82 | 75 | 6.8 | 160 | 130 | 30 | 280 | 180 | 100 |
| Cardio-, Cerebro- & Peripheral Vascular Disease | Bell et al. (2015) | 65-99 | 530 | 480 | 43 | 1,020 | 830 | 200 | 1,800 | 1,200 | 610 |
| All Cardiac Outcomes | Talbott et al. (2014) | 0-99 | 450 | 420 | 36 | 890 | 720 | 170 | 1,600 | 1,000 | 550 |
| Alzheimer's Disease | Kioumourtzoglou et al. (2016) | 65-99 | 1,000 | 1,000 | 120 | 2,800 | 2,200 | 620 | 5,000 | 3,000 | 2,000 |
| Parkinson's Disease | Kioumourtzoglou et al. (2016) | 65-99 | 210 | 190 | 20 | 420 | 330 | 90 | 720 | 470 | 260 |
| EMERGENCY ROOM VISITS | | | | | | | | | | | |
| Respiratory | Krall et al. (2016) | 0-99 | 3,000 | 2,800 | 230 | 5,800 | 4,700 | 1,055 | 10,000 | 6,700 | 3,400 |
| Emergency Hospitalizations - Respiratory** | Zanobetti et al. (2009) | 65-99 | 760 | 690 | 63 | 1,500 | 1,200 | 290 | 2,600 | 1,700 | 1,000 |
| INCIDENCE | | | | | | | | | | | |
| Asthma | Tetreault et al. (2016) | 0-17 | 13,000 | 12,000 | 900 | 24,000 | 20,000 | 4,200 | 41,000 | 28,000 | 13,000 |

Note: values are rounded to two significant figures
*Four AMI studies pooled together include: Pope et al., Sullivan et al., Zanobetti and Schwartz, and Zanobetti et al.
**Emergency Hospitalizations represent emergency department visits that result in a hospitalization.

Overall, when we compare trends across scenarios and space, we find similar conclusions to our mortality benefits analysis. At an alternative standard of 9 $\mu g/m^3$, PA areas capture the majority of benefits compared to non-PA areas. However, non-PA areas (i.e., those not modeled by EPA) comprise an important share of overall morbidity-related benefits, reflecting approximately 20% of all benefits across all analyzed morbidity endpoints.

Exhibit 5-15a and 5-15b presents avoided asthma-related emergency room visits (per-capita) for children stratified by race and ethnicity. This stratification is based on effect coefficients from the Alhanti et al. (2016) study. In general, per-capita benefits of an alternative NAAQS of 9 $\mu g/m^3$ for non-white groups are nearly nine times larger than for white Americans across the entire nation. Additional exhibits displaying the underlying values for Exhibit 5-15B can be found in Appendix D.

EXHIBIT 5-15A. AVOIDED ASTHMA-RELATED EMERGENCY ROOM VISITS IN CHILDREN AGED 0-18 BY ALTERNATIVE NAAQS (PER 100,000, STRATIFIED BY RACE/ETHNICITY)

| RACE/ ETHNICITY | 10 µg/m³ Alt NAAQS | | | 9 µg/m³ Alt NAAQS | | | 8 µg/m³ Alt NAAQS | | |
|---|---|---|---|---|---|---|---|---|---|
| | NATION | PA AREAS | NON-PA AREAS | NATION | PA AREAS | NON-PA AREAS | NATION | PA AREAS | NON-PA AREAS |
| White, Non-Hispanic | 0.31 | 1.1 | 0.050 | 0.67 | 1.9 | 0.22 | 1.2 | 2.8 | 0.66 |
| All White, Hispanic Plus All Other Races, Ethnicities | 3.1 | 7.5 | 0.27 | 5.9 | 13 | 1.2 | 9.6 | 19 | 3.8 |

EXHIBIT 5-15B. AVOIDED ASTHMA-RELATED EMERGENCY ROOM VISITS IN CHILDREN BY ALTERNATIVE NAAQS (PER 100,000, STRATIFIED BY RACE/ETHNICITY AND POVERTY)



# CHAPTER 6 | DISCUSSION

In this report, we used more finely resolved data sources for air quality, baseline health status, demographics, and risk to estimate the health burden of $PM_{2.5}$ exposures in the United States, both in total and across races, ethnicities, and poverty status. We also estimated the potential benefits of more health protective $PM_{2.5}$ standards in the United States across these subgroups. Our results have provided insights into the distribution of health burdens and the potential to both improve public health generally and reduce discrepancies in risk across subgroups by adopting more protective annual NAAQS. Further, the results suggest there is value to using analytical inputs at finer geographic scales and inputs particular to specific subpopulations to better understand variabilities in risks. In this chapter, we present the main conclusions from our analysis, review limitations associated with our approach, and highlight areas for future research and analysis to further inform our understanding of the impact of fine-scale inputs on distributional health risk analysis.

## CONCLUSIONS

Our results bolster the findings in EPA's most recent PA; current $PM_{2.5}$ concentrations result in significant premature mortality and morbidity nationwide, and these impacts are disproportionately borne by Black and Hispanic populations, and those living in poverty. Strengthening PM NAAQS would lessen both the overall social costs of air pollution and the disparities in health outcomes by race, ethnicity, and income levels.

This work provides valuable results that can be broken down across four axes: 1) the importance of spatial resolution of annual average $PM_{2.5}$ concentrations in understanding related health impacts; 2) the distribution of health impacts across groups as defined by race, ethnicity, and income; 3) expansion upon the important work done by EPA in their most recent PA, and 4) state-level application of our method.

We find that employing the fine scale air quality surface from Di et al., 2017 (at 1 x 1 km) has a bigger impact on characterizing variability in risks and identifying hot spots at the census tract level than on modifying large scale aggregations of results nationally. Use of this particular surface results in highly similar, but slightly lower estimates of total current health burden in areas modeled by EPA with 12 x 12 km air quality surfaces in the PA. However, the fine scale results identified a substantial number of census tracts with high per capita risk levels, many of which were in majority minority census tracts. This suggests that use of fine scale air quality data may be even more important for distributional analysis and neighborhood scale assessments. We also find that using fine scale (i.e., at the census tract level) baseline mortality incidence data tends to produce larger estimates of total current health burden compared to county-level mortality incidence, as these data may highlight people in more densely populated areas who experience poorer health generally and thus may be more susceptible to $PM_{2.5}$ In addition to shifting the reported health burden totals, these finer scale data can also help to better characterize distributions of health burden across disadvantaged groups in future analyses.

While finer scale spatial variability in air quality and baseline death rates explain some of the observed disparities in health outcomes, other factors play an important role as well. We estimate that Black Americans 65 and older experience three times as many PM-related deaths (per capita) as other racial groups at current air quality concentrations. This effect is primarily driven by the concentration-response relationship estimated by Di et al (2017) for Black Americans. Relative to other racial groups, Black Americans experience 9% higher $PM_{2.5}$ concentrations, 3% higher baseline mortality incidence rates, and a 202% higher PM-mortality risk.

Our broader geographic scope enables us to comment on existing disparities and potential benefits outside of the PA study areas. While concentrations outside of PA areas are notably lower on average, disparities in health outcomes are, in some cases, starker for regions not modeled by EPA. Although PM-attributable mortality and morbidity burden does not vary dramatically when stratified by poverty status within the PA areas, the pattern diverges significantly elsewhere. Outside of the PA areas, individuals living in poverty experience a 30 percent higher PM-attributable mortality rate relative to individuals with higher incomes. We note that the benefits of a more stringent 10 $\mu g/m^3$ annual standard represent a small fraction of total benefits outside of the PA areas where baseline concentrations tend to be lower; however, for a more stringent standards of 9 and 8 $\mu g/m^3$, non-PA areas could potentially comprise a meaningful share of benefits (20% and 35% respectively). In addition to broadening the geographic scope to the national level, we provided a state-level case study in New Jersey to highlight the value of fine-scale morbidity incidence data. This application demonstrated that while aggregated datasets may facilitate the accurate estimation of total impacts, they may mischaracterize impacts by race, ethnicity, or fine-scale geography. While we employed data from the same set of databases used in the PA (HCUP SEDD), we note that many states do not make such data available and the states that do partner with HCUP do not always have the necessary data elements for these types of analyses (e.g., ZIP code, race, ethnicity).

## LIMITATIONS

Our analysis is subject to the standard suite of uncertainties that accompany BenMAP-style health burden or health benefits analyses – uncertainties in concentration-response relationships between PM exposure and health outcomes; uncertainties in exposure assessment based on modeling of concentrations in locations distant from ground-level monitors; uncertainties in estimates of baseline health rates where data may need to be imputed or where available data must be used to approximate the population of interest; scenario uncertainty related to predicting future PM changes to meet alternative PM NAAQS; and in the economic values used to monetize these impacts. However, in addition to these there are some additional limitations particular to our approach and objectives.

First, we note that conclusions based on our use of fine scale modeling compared with EPA's 12 km model are limited by our use of a single air quality model for comparison; comparisons with additional hybrid air quality models would help make our findings more robust. Second, our use of ambient air quality estimates from the Di et al. model in non-PA areas, particularly outside of metropolitan areas, is subject to greater uncertainty than the results in the PA locations. We also direct readers to EPA's thorough discussion of ambient $PM_{2.5}$ exposure estimation in Chapter 2 of the PA. EPA comments on the heightened uncertainty in exposures in the western United States and in areas distant from monitors:

> "Excellent performance in cross-validation tests suggests that hybrid methods are reliable for estimating $PM_{2.5}$ exposure in many applications… However, there are also important limitations

> associated with the modeled fields… Performance evaluations for the [hybrid $PM_{2.5}$ modeling] methods are weighted toward densely monitored urban areas at the scales of representation of the monitoring networks. Predictions at different scales or in sparsely monitored areas are relatively untested. Second, studies have reported heterogeneity in performance with relatively weak performance in parts of the western United States, at low concentrations, at greater distance to monitors, and under conditions where the reliability and availability of key input datasets (e.g., satellite retrievals and air quality modeling) are limited." (p. 2-61).

This discussion underscores our conclusion that modeling PM-attributable health effects outside of PA areas is accompanied by greater uncertainty. Additionally, we apply a simplistic approach to modeling air quality in the non-PA areas under an alternative NAAQS in lieu of conducting additional air quality modeling of changes to specific emissions source, and it may differ from the ultimate approaches pursued at the state and local level to achieve compliance as defined under the Clean Air Act. We believe our approach is likely to approximate the magnitude of benefits of air quality changes in areas currently exceeding a revised NAAQS; we also note that it would not reflect additional benefits of air quality management plans that would result from reducing emissions sources that would also affect $PM_{2.5}$ concentrations areas below proposed alternative NAAQS levels.

Second, our use of USALEEP-based mortality incidence data at the census-tract level reflects not only the uncertainties associated with the model used in that study, but also includes approximations of rates for the 85+ category, which were not reported in the USALEEP results. We are currently in the process of obtaining administrative data sets for a series of locations that we will use to provide some spot validations of these estimates.[23]

The race-specific concentration-response estimates applied in this study are derived from high quality peer-reviewed epidemiological literature and build off a substantial foundation of such studies conducted over decades that have found associations between fine particle exposures and mortality and morbidity. Nonetheless, the estimation of these race- and ethnicity-stratified risk estimates is a recent development in the evolution of this literature; additional studies in this area will help give us a fuller picture of the uncertainty and variability in effect modification of PM mortality impacts by race and ethnicity. Our benefit results for NAAQS levels as low as 10 or 8 $\mu g/m^3$ presume that levels at or near these would still result in health impacts, and that the relationship would continue to be linear, as is assumed by EPA in its PA; this assumption continues to be supported by studies finding health impacts using studies of more recent air quality featuring lower mean concentrations (e.g., Pope et al, 2019, Wang et al. 2020, Wu et al., 2020).

Finally, our exploration of the use fine scale data was unable to address the impact of combined improvements in the geographic scale of inputs such as baseline health rates and improvements in the race-specificity of these data, due to extensive data suppression issues resulting from parsing of these data across both dimensions.

Our supplemental work analyzing the health benefits associated with an alternative standard of 9 $\mu g/m^3$ raised two additional limitations with respect to the air quality surface employed in this analysis. First, EPA's PA provides modeled air quality surfaces for alternative NAAQS of 10 and 8 $\mu g/m^3$, but not for 9

[23] Initial comparisons between USALEEP data and administrative data in Alameda County look promising. Using modeled USALEEP 0-99 incidence rates and observed death rates in the county, we calculate a Pearson correlation coefficient of 0.881 between values at the tract level.

μg/m$^3$. Instead, EPA conducted a linear interpolation of the air quality modeling results between 10 and 8 μg/m$^3$ to produce an air quality surface for an alternative NAAQS of 9 μg/m$^3$. Thus, our use of this interpolated air quality surface may not capture the effects of the sophisticated air quality modeling techniques employed for the two alternative NAAQS studied in the IEc (2022) report.

Second, EPA only applies the interpolated 9 μg/m$^3$ air quality surface to CBSAs they found to be controlled by the annual standard, which was 30 of the 47 CBSAs in their policy assessment. For this analysis, we perform the same interpolation for all 47 CBSAs. Notably, the 30 CBSAs specified by EPA are responsible for 77% of all PA-area mortality and 73% of all PA-area asthma-related impacts for the race-stratified runs.

## AREAS FOR FUTURE STUDY

Given the limitations of the current study, we present several areas for future work. First, we opted to analyze two alternative standards. 8 and 10 μg/m$^3$. The magnitude and distribution of benefits varied in important respects for each alternative. Analysis of intermediate (e.g., 11 μg/m$^3$) and more stringent standards (e.g., 6 μg/m$^3$) may be warranted; however, epidemiological literature may be limited to a greater degree at lower concentrations.

Second, we demonstrated that benefits calculations are sensitive to the input data selected. Consideration of additional datasets, such as air quality models or epidemiological studies, may be needed to better understand the range of potential benefits. While we selected the best available datasets according to our judgment, these datasets are nonetheless associated with uncertainty, and exploration of additional datasets would help improve the robustness of these findings. For example, additional investigation and comparison of hybrid air quality model performance in the Western United States across models would be useful to better understand implications of these uncertainties on results in that portion of the country.

Finally, our understanding of the potential improvements resulting from more geographical- and population specific data would benefit from additional investigation into statistical methods for addressing the censored data sets that result when data are parsed across multiple dimensions. Evaluation of alternative approaches to improve our understanding of spatial or subpopulation variation; enhance reliability in results generated using these data sets; and protect individuals' privacy are key to further progress toward the objective of more locally tuned benefits analysis.

## REFERENCES


Alhanti, B.A., Chang, H.H., Winquist, A., Mulholland, J.A., Darrow, L.A. and Sarnat, S.E., 2016. Ambient air pollution and emergency department visits for asthma: a multi-city assessment of effect modification by age. Journal of exposure science & environmental epidemiology, 26(2), pp.180-188.

Basu R, Woodruff TJ, Parker JD, Saulnier L, fnd Schoendorf KC. 2004. Comparing exposure metrics in the relationship between PM25 and birth weight in California. Journal of Exposure Analysis and Environmental Epidemiology, 14(5), 391-396. http://dx.doi.org/10.1038/sj.jea.7500336.

Berrocal, VJ, Gelfand, AE and Holland, DM. 2012. Space-time data fusion under error in computer model output: An application to modeling air quality. Biometrics 68(3): 837-8 848.

Bhan, N., Kawachi, I., Glymour, M. M., & Subramanian, S. V. 2015. Time Trends in Racial and Ethnic Disparities in Asthma Prevalence in the United States From the Behavioral Risk Factor Surveillance System (BRFSS) Study (1999-2011). *American journal of public health*, *105*(6), 1269–1275. https://doi.org/10.2105/AJPH.2014.302172.

Centers for Disease Control. *U.S. Small-area Life Expectancy Estimates Project – USALEEP*. Data accessed at https://www.cdc.gov/nchs/nvss/usaleep/usaleep.html#data.

Centers for Disease Control and Prevention, National Center for Health Statistics. Underlying Cause of Death 1999-2019 on CDC WONDER Online Database, released in 2020. Data are from Multiple Cause of Death Files, 1999-2019, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program Accessed at http://wonder.cdc.gov/ucd-icd10.html on Nov 30, 2021.

Colmer, J., Hardman, I., Shimshack, J., & Voorheis, J. 2020. Disparities in PM2.5 air pollution in the United States. *Science*, *369*(6503), 575-578.

Di, Q., Amini, H., Shi, L., Kloog, I., Silvern, R., Kelly, J., Sabath, B.M., Choirat, C., Koutrakis, P., Lyapustin, A., Wang, Y., Mickley, L.J., Schwartz, J. 2019. An ensemble-based model of $PM_{2.5}$ concentration across the contiguous United States with high spatiotemporal resolution. Environment International, 130.

Di, Q, Kloog, I, Koutrakis, P, Lyapustin, A, Wang, Y and Schwartz, J. 2016. Assessing PM2.5 exposures with high spatiotemporal resolution across the Continental United States. Environmental Science and Technology 50(9): 4712-4721.

Di, Q., Wang Y., Zanobetti, A., Wang, Y., Koutrakis, P., Choirat, C., Dominici, F., Schwartz, J.D. 2017. Air Pollution and Mortality in the Medicare Population. The New England Journal of Medicine, 376(26), pp. 2513-2522.

Hammer, MS, van Donkelaar, A, Li, C, Lyapustin, A, Sayer, AM, Hsu, NC, Levy, RC, Garay, 27 MJ, Kalashnikova, OV and Kahn, RA. 2020. Global estimates and long-term trends of fine particulate matter concentrations (1998–2018). Environmental Science & Technology 54(13): 7879-7890.

Health Effects Institute. 2020. State of Global Air 2020. Special Report. Boston, MA: Health Effects Institute.

Hu, X, Belle, JH, Meng, X, Wildani, A, Waller, LA, Strickland, MJ and Liu, Y. 2017. Estimating $PM_{2.5}$ Concentrations in the Conterminous United States Using the Random Forest Approach. Environmental Science and Technology 51(12): 6936-6944.

Mikati I, Benson AF, Luben TJ, Sacks JD, and Richmond-Bryant J. 2018. Disparities in distribution of particulate matter emission sources by race and poverty status. American Journal of Public Health, 2018, e1-e6. http://dx.doi.org/10.2105/AJPH.2017.304297.

Miranda ML, Edwards SE, Keating MH, Paul CJ. 2011. Making the Environmental Justice Grade: The Relative Burden of Air Pollution Exposure in the United States. *Intl J Environ Res Public Health*. 8(6): 1755-1771.

Morello-Frosch R, Pastor M, Sadd J. 2001. Enviornmental Justice and California's 'Riskscape': The Distribution of Air Toxics Exposures and Health Risks among Diverse Communities. *Urban Affairs Review* 36(4): 551-78.

Morello-Frosch R, Pastor Jr M, Porras C, Sadd J. 2002. Environmental Justice and Regional Inequity in Southern California: Implications for Future Research. *Environ Health Perspectives*. 110(2): 149-154.

Nachman KE and Parker JD. 2012. Exposures to fine particulate air pollution and respiratory outcomes in adults using two national datasets: a cross-sectional study. Environmental Health: A Global Access Science Source, 11. http://dx.doi.org/10.1186/1476-069X-11-25.

Pope III, C.A., Lefler, J.S., Ezzati, M., Higbee, J.D., Marshall, J.D., Kim, S.Y., Bechle, M., Gilliat, K.S., Vernon, S.E., Robinson, A.L. and Burnett, R.T., 2019. Mortality risk and fine particulate air pollution in a large, representative cohort of US adults. Environmental health perspectives, 127(7), p.077007.

Rosofsky, A., Levy, J. I., Zanobetti, A., Janulewicz, P., & Fabian, M. P. 2018. Temporal trends in air pollution exposure inequality in Massachusetts. Environmental research, 161, 76-86.

Sadd JL, Pastor M, Morello-Frosch R, Scoggins J, Jesdale B. 2011. Playing it Safe: Assessing Cumulative Impact and Social Vulnerability through an Environmental Justice Screening Method in the South Coast Air Basin, California.. *Int J Environ Res Public Health.* 8: 1441-1459.

Schweitzer L and Zhou J. 2010. Neighborhood Air Quality, Respiratory Health, and Vulnerable Populations in Compact and Sprawling Regions. *Journal of the American Planning Association*, 76:3, 363-371.

Tessum, C. W., Apte, J. S., Goodkind, A. L., Muller, N. Z., Mullins, K. A., Paolella, D. A., ... & Hill, J. D. 2019. Inequity in consumption of goods and services adds to racial–ethnic disparities in air pollution exposure. *Proceedings of the National Academy of Sciences*, *116*(13), 6001-6006.

Tessum, C. W., Paolella, D. A., Chambliss, S. E., Apte, J. S., Hill, J. D., & Marshall, J. D. 2021. PM2. 5 polluters disproportionately and systemically affect people of color in the United States. Science Advances, 7(18), eabf4491.

Turner, M.C., Jerrett, M., Pope III, C.A., Krewski, D., Gapstur, S.M., Diver, W.R., Beckerman, B.S., Marshall, J.D., Su, J., Crouse, D.L. and Burnett, R.T., 2016. Long-term ozone exposure and mortality in a large prospective study. American journal of respiratory and critical care medicine, 193(10), pp.1134-1142.

United States Centers for Disease Control and Prevention National Center for Health Statistics. 2012. Trends in Asthma Prevalence, Health Care Use and Mortality in the United States, 2001 -2010. NCHS Data Brief No 94, May. https://www.cdc.gov/nchs/products/databriefs/db94.htm.

US Environmental Protection Agency. 2021. *Climate Change and Social Vulnerability in the United States: A Focus on Six Impacts*. EPA 430-R-21-003. Available at www.epa.gov/cira/social-vulnerability-report.

United States Environmental Protection Agency. 2021. *Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, External Review Draft*. October 2021.

United States Environmental Protection Agency. 2021. Particulate Matter NAAQS Review – Analyses and Data Sets. Available at: https://www.epa.gov/air-quality-analysis/particulate-matter-naaqs-review-analyses-and-data-sets

US Environmental Protection Agency. 2021. *Supplement to the 2019 Integrated Science Assessment for Particulate Matter (External Review Draft, 2021)*. Available at https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=352823.

van Donkelaar, A, Martin, RV, Li, C and Burnett, RT. 2019. Regional estimates of chemical composition of fine particulate matter using a combined geoscience-statistical method with information from satellites, models, and monitors. Environmental Science & Technology 53(5).

Vodonos, A and Schwartz, J. 2021. Estimation of excess mortality due to long-term exposure to PM2.5 in continental United States using a high-spatiotemporal resolution model. Environmental Research 196: 110904.

Wang, B., Eum, K.D., Kazemiparkouhi, F., Li, C., Manjourides, J., Pavlu, V. and Suh, H., 2020. The impact of long-term PM2. 5 exposure on specific causes of death: exposure-response curves and effect modification among 53 million US Medicare beneficiaries. Environmental Health, 19(1), pp.1-12.

Woodruff, T.J., Parker, J.D. and Schoendorf, K.C., 2006. Fine particulate matter (PM2. 5) air pollution and selected causes of postneonatal infant mortality in California. Environmental health perspectives, 114(5), pp.786-790.

Wu, X., Braun, D., Schwartz, J., Kioumourtzoglou, M.A. and Dominici, F.J.S.A., 2020. Evaluating the impact of long-term exposure to fine particulate matter on mortality among the elderly. Science advances, 6(29), p.eaba5692.

BOYDEN GRAY & ASSOCIATES PLLC
801 17TH STREET NW, SUITE 350
WASHINGTON, DC 20006
(202) 955-0620

March 28, 2023

Michael S. Regan
Administrator
Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

**Re: RIN 2060–AV52, Reconsideration of the National Ambient Air Quality Standards for Particulate Matter**

Dear Mr. Regan:

This letter serves as a comment on the proposed rulemaking for RIN 2060-AV52, "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter." 88 Fed. Reg. 5,558 (Jan. 27, 2023). The Environmental Protection Agency (EPA) is proposing the revision of primary National Ambient Air Quality Standards (NAAQS) for Particulate Matter (PM), in particular, lowering the primary annual PM2.5 standard from 12.0 µg/m3 to within the range of 9.0 to 10.0 µg/m3, while taking comment on alternative annual standard levels down to 8.0 mg/m3 and up to 11.0 mg/m3. As the proposal explains, the timing of this proposed revision is unusual, as the last review of the PM NAAQS was completed in December 2020, and Section 109(d)(1) of the Clean Air Act requires review of existing standards only every five years.

As explained below, while we strongly support EPA's desire to improve human health and welfare, finalizing this proposal would not be an effective way of serving this goal and would be contrary to the law and the Constitution. The proposal is not grounded in sound scientific evidence and finalizing it would not be a proper exercise of EPA's discretion under the Clean Air Act. EPA should instead devote its resources to other, more pressing issues, or to clearing up the rampant uncertainty about the health effects of exposure to low concentrations of PM.

## I. An Increase of America's Already Stringent PM Standards Is Not Supported by the Evidence.

### A. The United States already has some of the cleanest air in the world.

EPA's clean air program has been an unprecedented success. As a result of the NAAQS program and other complementary laws, regulations, and enormous investments in lower-emitting technologies and pollution controls, the United States has seen tremendous reductions in the worst air pollutants. Since 1970, the combined emissions of six common pollutants have dropped by 78 percent. EPA, *Progress Cleaning the Air and Improving People's Health*, https://www.epa.gov/clean-air-act-overview/progress-cleaning-air-and-improving-peoples-health (last accessed Mar. 28, 2023). Direct emissions of PM2.5 and PM10 have decreased by 40 percent and 33 percent, respectively, from their 1990 levels. EPA, *Air Quality – National Summary*, https://www.epa.gov/air-trends/air-quality-national-summary (last accessed Mar. 28, 2023). Emissions of PM precursors have also dramatically declined, with nitrogen oxide emissions down 70 percent, volatile organic compound emissions down 49 percent and sulfur dioxide emission down 92 percent. *Id.*

As the proposal acknowledges, these falling emissions have led to significant improvements in ambient air quality. Indeed, from "2000 to 2019, national annual average PM2.5 concentrations declined from 13.5 µg/m to 7.6 µg/m, a 43 percent decrease. 88 Fed. Reg. 5,571. There is nowhere else in the developed world that is protecting air quality, and thus public health, to any level even close to the current U.S. standards. As a result, weighted by population density, the U.S. has among the lowest annual PM concentration in the world, and the few countries with lower concentrations (like Canada, Australia, and a few Scandinavian countries) all have much lower population densities. State of Global Air, *PM2.5 Exposure*, https://www.stateofglobalair.org/air/pm (last accessed Mar. 28, 2023).

Ambient levels of PM continue to fall. As the proposal's policy assessment acknowledges, three-year average annual nationwide PM2.5 concentrations are now approximately 5.3 µg/m3 and have been trending downward. Final Policy Assessment at 2-61. EPA's modeled emissions, reflecting anticipated reductions from federal regulations finalized as of Spring 2021, project that the vast majority of counties in the lower 48 states will meet the proposed primary fine particle standards in 2032, *even*

*without the proposed changes* to NAAQS. EPA, *EPA Modeling of Projected 2032 Emissions*, https://www.epa.gov/system/files/documents/2023-01/PM%20Maps%20-%202022%20proposal%20%282%29.pdf (last accessed Mar. 28, 2023). And EPA has continued to promulgate increasingly stringent emissions regulations since that date, and will presumably continue to do so, driving these projections even lower. *See e.g., Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards*, 86 Fed. Reg. 74,424 (Dec. 30, 2021).

The remaining significant sources of particulate matter are now composed predominantly of sources that are difficult, if not impossible, for states to control. According to EPA's calculations, 43 percent of direct PM 2.5 emissions now originate from fires—30 percent from wildland fires alone—with much of the remainder coming from overseas emissions, sea salt, naturally occurring dust, and volatile organic compounds released by plants. Final Policy Assessment at 2-5; 88 Fed. Reg. 5,569. Reducing emissions from fires in particular presents a considerable challenge. State and federal governments have neglected to actively remove dry underbrush and dead trees for nearly 40 years, resulting in dangerously high fuel loads that can easily ignite under the right conditions. To remedy this problem, the USDA and U.S. Forest Service recently issued a new wildfire strategy acknowledging the need to treat up to 50 million acres of overgrown forests to reduce fire risks. USDA & Forest Services, *Confronting the Wildfire Crisis,* at 4 (Jan. 2022), https://www.fs.usda.gov/sites/default/files/fs_media/fs_document/Confronting-the-Wildfire-Crisis.pdf. This strategy involves forest thinning and prescribed burns, requiring the employment of up to 575,000 individuals for this work. *Id.* at 10. Over the course of a 10-year plan, the administration aims to treat (read: burn) up to 20 million acres on National Forest System lands and an additional 30 million acres of other federal, state, tribal, and private lands, with provisions for long-term maintenance beyond this period. *Id.* at 4. Protecting against out-of-control wildfires is of course very important for human health and for environmental quality, but these activities would also emit tons of PM, interfering with many states abilities to meet the proposed NAAQS. While the proposal raises all these issues as potential barriers to compliance, it notes that they are "beyond the scope of this proposal." 88 Fed. Reg. 5,570.

### B. Further reductions would come only with significant collateral consequences.

Against these minimal expected air quality benefits, EPA projects that further restriction of PM2.5 NAAQS will likely force states to undertake hugely expensive infrastructure projects and impose Malthusian limitations on new and existing industrial and agricultural activities. Some of the significant contributors to PM emissions—for example, road dust, and wood stoves—would require massive undertakings to remedy—paving all roads and shoulders, swapping all wood stoves for natural gas—that would be counterproductive to EPA's other environmental protection goals. States would also be forced to impose additional limitations on permitting and operations of manufacturing facilities, mining, agriculture, and other sectors, at great cost to the public welfare. Emissions from new facilities or major upgrades to existing facilities must be offset by reducing emissions elsewhere in the area. If no party is willing to provide these offsets, new projects cannot proceed. These restrictions would inhibit economic growth and limit the ability of businesses to expand or develop new projects, adversely impacting local communities and eliminating jobs. And federally supported highway and transit projects may also face obstacles under more standards, as states would be required to demonstrate that such projects will not increase emissions. This may result in delays or cancellations of critical infrastructure projects, further impeding economic growth and development.

And these burdens will extend far beyond the businesses and states they directly impact to present real national security risks. Limiting manufacturing is effectively a requirement for the U.S. to import goods. But the U.S. is already a net importer of nearly $1 trillion in goods each year despite becoming a net exporter of energy to fuel other countries' economies, and a further increase in imports could undermine the nation's ability to maintain robust supply chains, leaving the nation vulnerable in times of crisis. As the COVID-19 pandemic laid bare, fragile supply chains and a lack of on-shore production capacity is very disruptive. *See* White House, *The Biden-Harris Plan to Revitalize American Manufacturing and Secure Critical Supply Chains in 2022*, (Feb. 24, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/24/the-biden-harris-plan-to-revitalize-american-manufacturing-and-secure-critical-supply-chains-in-2022/.

These burdens all stand athwart sound policy—which recognizes the important benefit that such projects have for human wellbeing—and the priorities of this administration, including the enormous buildout of "green" energy infrastructure. *See e.g.,* White House, *FACT SHEET: President Biden's Budget Lowers Energy Costs, Combats the Climate Crisis, and Advances Environmental Justice*, (Mar. 9, 2023), https://www.whitehouse.gov/omb/briefing-room/2023/03/09/fact-sheet-president-bidens-budget-lowers-energy-costs-combats-the-climate-crisis-and-advances-environmental-justice/. More stringent PM NAAQS would limit states' abilities to build infrastructure necessary for other EPA priorities, like reducing greenhouse gas emissions from electricity generation and transportation. For example, stringent standards could interfere with the manufacturing of materials for and construction of new lower-carbon generation sources and the hundreds of thousands of miles of transmission they require, as well as the mining of the critical minerals needed to manufacture electric cars. The potential consequences of more stringent PM2.5 NAAQS standards must be carefully weighed against the potential risks to national security, domestic production capabilities, the well-being of American workers and families, and all of the health consequences that flow from them, before any out-of-cycle reconsideration of these standards is undertaken.

**C. These burdens will be imposed based on only very weak evidence of health improvements from lowered ambient PM.**

The health evidence EPA relies on in support of its proposed changes is a thin reed. To begin with, the current PM2.5 NAAQS, which were promulgated in 2012 and retained in 2020, were based on scientific evidence reflected in the 2009 and 2019 Integrated Science Assessments. The proposal acknowledges that many conclusions about the effects caused by or likely caused by ambient PM2.5 remain the same as they were in the previous assessment, casting doubt on the need for more stringent PM2.5 standards based on any change in available evidence. And the evidence available has very little to say about the impact of PM2.5 at the very low concentrations that the proposal contemplates. For example, the studies highlighted by EPA in Figure 1 and Figure 2 of the proposal, which focus on the relationship between PM exposure and mortality, nearly all have mean ambient concentrations above 10 µg/m3. 88 Fed. Reg. 5,600–01. Indeed, the graph in Figure 1 does not even include *any* data

points at or below 9.5 µg/m3. *Id.* It is difficult to extrapolate from these ranges to support the conclusions EPA must make to enact what it proposes.

Additionally, the proposal concedes that these studies all suffer from limitations and uncertainties, such as the presence of "unmeasured confounding" factors for most causes of death. 88 Fed. Reg. 5,582. Of particular concern is the break between temporal and spatiotemporal correlations, which suggests that the relationship between the PM2.5 exposure that studies measure and the mortality they track may be much more complex than it appears.

And EPA confidence in the studies on which EPA bases its proposal should be further undermined by the lack of available supporting data and troubling calls by researchers conducting public health investigations to shield this data from review. The proposal relies heavily on taxpayer-funded and foreign-funded research, much of which is not publicly available and has not been independently replicated. A significant portion of the scientific work on which the EPA relies are studies of only domestic data, funded by NIH and EPA, from Harvard's T.H. Chan School of Public Health. The fact that these studies are not transparent and cannot be easily reviewed or reproduced by independent researchers raises concerns about the soundness of the evidence used to justify potential changes to the PM2.5 standards. This is not a situation where trade secrets, personal privacy, or other considerations can justify a "just-trust-us" approach. *See* Strengthening Transparency in Pivotal Science Underlying Significant Regulatory Actions and Influential Scientific Information, 86 Fed. Reg. 474 (Jan. 6, 2021) ("Because of the potential impact of the EPA's significant regulatory actions and influential scientific information on American lives and livelihoods, the American people deserve environmental decisions and policies that are based on the best scientific information."); *id.* at 482 ("Transparency is important in ensuring that the decisions the EPA makes are based on sound science.").

Ominously, the results of a new FOIA request show that Prof. Joel Schwartz, a faculty affiliate at the T.H. Chan School, wrote an email just days into the Biden administration, asking the four top *political* appointees at EPA to oppose scientific transparency and thanking them for rescinding a rule from the prior Administration that would require greater transparency of data from studies on which EPA establishes new standards. Protect The Public's Trust, October 2022 Interim Release of EPA FOIA, at 336–38 (Oct. 6, 2022), https://protectpublicstrust.org/wp-

content/uploads/2023/02/October-2022-Interim-Release-of-FOIA-EPA-2022-002747-Formal_FOIA20221006_Combined.pdf. Schwartz and his co-investigators have received at least $74 million dollars in federal funding from EPA and NIH to conduct epidemiological studies, including studies on which the proposal relies. See EPA, Grantee Research Project Results, https://cfpub.epa.gov/ncer_abstracts/index.cfm/fuseaction/search (last accessed Mar. 28, 2023); NIH, RePORTER, https://reporter.nih.gov/search/RwEP5Bfr-EqsP4r8u872EA/projects (last accessed Mar. 28, 2023). This lack of transparency and potential conflict of interest undermines the credibility of the evidence supporting changes to the PM2.5 standards and highlights the need for a thorough and unbiased examination of the available data before making any changes to the current standards.[1]

Also relevant here is ongoing FOIA litigation regarding documented communications involving senior political appointees within EPA and the White House regarding, inter alia, communications from EPA to the White House Climate Office regarding PM NAAQS, which may indicate that this proposal in reality is part of the administration's climate strategy. *See Energy Policy Advocates v. EPA*, No. 1:22-CV-298-TJK (D.D.C.); FOIA Request EPA-2021-006794. Further, if EPA has presented this rule or anything related to it to the White House climate office, it should disclose that prior to finalizing any new NAAQS rule.

## II. EPA Must Balance the Risk of "Hurtling Industry Over the Brink of Ruin" Against the Benefits of "Eliminat[ing] Every Health Risk."

### A. Section 109 requires EPA to consider context in deciding what risks are "appropriate."

The proposal explains that, "[i]n setting the NAAQS, the EPA may not consider the costs of implementing the standard." 88 Fed. Reg. 5,563. But this does not absolve EPA of evaluating the *reasonableness* of its policy choices. *See* 5 U.S.C. § 706(2); *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) ("The APA's arbitrary-and-

---

[1] For some of the same reasons described above the proposal may also violate the Evidence Act. The Foundations for Evidence-Based Policymaking Act of 2018, commonly referred to as the Evidence Act, contains several provisions that encourage agencies to disclose data and use high-quality, reliable evidence when making decisions and creating policies.

.

capricious standard requires that agency action be reasonable and reasonably explained"); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'" (citation omitted)).

*

The Supreme Court has held that EPA cannot consider the costs of implementation when establishing or revising NAAQS. *See Whitman v. American Trucking Associations*, 531 U.S. 457, 465–472, 475–76 (2001). "Section 109(b)(1) of the CAA … require[es] the EPA to set air quality standards at the level that is 'requisite'—that is, not lower or higher than is necessary—to protect the public health with an adequate margin of safety." *Id.* at 475–76. But *Whitman* did not give EPA permission to ignore the overall adverse consequences of implementing these standards.

As Justice Breyer explained in his concurring opinion in *Whitman*, Section "109 does not require the EPA to eliminate every health risk, however slight, at any economic cost, however great, to the point of hurtling industry over the brink of ruin or even forcing deindustrialization." *Id.* at 494 (Breyer, J., concurring in part and concurring in the judgment) (internal quotations omitted). And EPA has never before sought to go down that road.

Indeed, when EPA determines what levels of a pollutant are "requisite to protect" the public health and welfare, EPA must necessarily make an assessment of the extent to which the risks from exposure to the pollutant are acceptable. The only way to do this—as any risk with no tradeoffs would be unacceptable—is to turn to the economic, industrial, and public welfare factors that Justice Breyer identified in his concurrence and that this letter identifies in Section I, *supra*. *See also* Executive Order 13563, 76 Fed. Reg. 3,821 (Jan. 21, 2011) (requiring regulations "protect public health, welfare, safety, and our environment while promoting economic growth, innovation, competitiveness, and job creation.").

The D.C. Circuit, in a 2013 opinion acknowledged the Supreme Court's interpretation of Section 109 but confirmed Justice Breyer's analysis that revising NAAQS standards "may indeed require a contextual assessment of acceptable risk."

*Mississippi v. EPA*, 744 F.3d 1334, 1343 (D.C. Cir. 2013). As Prof. Cass Sunstein has explained, a context-free evaluation "assume[s] that whether air is 'safe' can be assessed solely on the basis of the facts. The truth is that the facts might be able to show the degree of risk (at least within a range), but they cannot show whether any particular degree of safety is 'safe enough.' Whether or not pollutants lack safe thresholds, 'the paradigm of selecting a standard at the lowest-observable-effects-level and then providing an adequate margin of safety is not possible.'" Cass Sunstein, *Is the Clean Air Act Unconstitutional?* 98 Mich. L. Rev 303, 376 (1999).

Consistent with this insight, and every one of EPA's prior NAAQS, Justice Breyer explained that the likely relevant contextual factors include: "the public's ordinary tolerance of the particular health risk in the particular context at issue," the "comparative health risks," and "the acceptability of small risks to health." *Whitman*, 531 U.S. at 494-95. Certainly, having some of the cleanest air in the world, *see* Section I, *supra*, suggests that the "public's ordinary tolerance of the particular health risk" supports leaving the standards alone.

And even purely maximizing "health" requires EPA to look at broader context. Lower PM NAAQS will have large adverse social and energy impacts, which in turn will ineluctably impact health. As Sunstein explains, sometimes a "costly regulation imposes health risks simply by virtue of its cost. If a regulation produces less employment and more poverty, it may result in worse health as well." Sunstein, *supra* at 375. The public's "tolerance" and "acceptability" of a particular level of risk will absolutely be affected by the standard's adverse impacts on the rest of their lives.

The necessity of weighing these considerations, albeit not in a traditional cost-benefit analysis, is reinforced by the requirement of Section 109(d)(1) that, during its periodic reviews, EPA is to make such revisions of the NAAQS only "as may be appropriate." In *Michigan v. EPA*, the Court explained that "read naturally" the phrase "'appropriate and necessary' requires at least some attention to cost." 576 U.S. 743, 752 (2015) ("One would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits."). Of course, what is "appropriate" will vary from context to context, but these words must be given some effect. *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (it is a "'cardinal principle' of interpretation that courts 'must

give effect, if possible, to every clause and word of a statute.") (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)).[2]

Any evaluation of "appropriateness" in the context of a revised NAAQS should account for the adverse impacts of a standard in the form of the "public's tolerance," "acceptability," or the possibility of "less employment and more poverty" that may result in worse health. Because the proposal claims not to have considered these things at all in proposing new PM NAAQS, any resulting rule that follows this approach would be arbitrary and capricious. This is not to say that a normal cost-benefit analysis would be appropriate—*Whitman* takes that off the table. Rather, the point is that reasonable protection of public health is impossible if one puts on blinders to all realities except for the goal of eliminating the marginal health risk posed by this or that pollutant.

As the D.C. Circuit has noted, "The lack of a threshold concentration below which [certain] pollutants are known to be harmless makes the task of setting primary NAAQS difficult, as EPA must 'select standard levels that reduce risks sufficiently to protect public health' even while recognizing that 'a zero-risk standard is not possible.'" *Am. Trucking Associations, Inc. v. EPA* , 283 F.3d 355, 360 (D.C. Cir. 2002) (quoting 62 Fed. Reg. at 38,863) (cleaned up)).

Certainly, no one could be blamed for concluding that there is significant tension between this pronouncement and *Whitman*'s statement that Section 109(b)(1)'s "language . . . 'is absolute,'" requiring nothing more (and nothing less) than "identify[ing] the maximum airborne concentration of a pollutant that the public health can tolerate" and then "decreas[ing] the concentration to provide an 'adequate'

---

[2] The D.C. Circuit has recently rejected the argument that *Michigan* has any impact on the interpretation of Section 109(b)(1), *see Murray Energy Corp. v. Env't Prot. Agency*, 936 F.3d 597, 622 (D.C. Cir. 2019), but (1) this proposal is engaging in rulemaking under 109(d)(1), *see* Section II.B, *infra*; and (2) its argument is unpersuasive as *Whitman* did not discuss the "appropriate[ness]" requirement. Similarly, the Court's discussion in *Michigan* that *Whitman* "has no application here" focuses narrowly on 109(b)(1), and does not discuss that 109(d)(1) requires that all review and revision of NAAQS standards be made only "as may be appropriate." As the Court noted today: "Speculating about what this Court might have thought about arguments it never addressed needlessly introduces confusion. This Court looks for definitive interpretations, not holdings in hiding." *Wilkins v. United States*, No. 21-1164, 2023 WL 2655449, at *7 (U.S. Mar. 28, 2023).

margin of safety." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 465 (2001). Indeed, it goes on to explain that Section "109(b)(1)'s terms 'adequate margin' and 'requisite'" do not "leave room to pad health effects with cost concerns." *Id.* at 468. Since every detrimental knock-on effect is—quite literally—a "cost," it is difficult to see why it should matter that a zero-risk standard is not practical or even possible. C*f. American Petroleum Institute* v. *Costle,* 665 F.2d 1176, 1185 (D.C. Cir. 1981) ("Attainability and technological feasibility are not relevant considerations in the promulgation of national ambient air quality standards.").

*Whitman*, however, did not actually impose quite such an uncompromising approach. In a subsequent passage, the Court acknowledged that Section 109 "require[s] the EPA to make judgments of degree" even when a pollutant "inflict[s] a continuum of adverse health effects at any airborne concentration greater than zero." *Id.* at 475. These judgements presuppose a "certain degree of discretion." *Id.* As this context demonstrates, this "discretion" can only mean authorization to consider other contextual factors, *not solely* "public health." As always, "discretion" cannot be the *sic volo, sic iubeo* of the agency—which must always act according to good reasons, reasonably explained. Again, this is why the statute refers to "appropriate[ness]."

Properly understood, then, while *Whitman* prohibits a traditional cost-benefit analysis, which allows for regulation only when the agency determines that there will be a net economic benefit, it affirmatively *requires* the agency to exercise reasoned discretion by considering contextual factors regarding the good and bad that will result from its actions. That one can characterize these contextual factors as costs and benefits not directly related to public health does not change this. If this were not the case, the Court would not have referred to the agency's discretion.

Theoretically, this may be hard to disentangle, but, in practice, EPA has successfully sailed through *Whitman*'s Scylla and Charybdis on more than one occasion, precisely because it has made policy judgments about what can—and cannot—be reasonably achieved. That's not a failure, it's what the statute requires and what *Whitman* explicitly contemplates.

Our point here is that the harms that would result from this proposal being finalized should not—and indeed—cannot be excluded from EPA's policymaking discretion.

**B. The Need to Carefully Balance These Interests is Heightened by the Posture of the Proposal as an Off-Cycle Reconsideration.**

As mentioned above, this revision is somewhat unusual as the last review of the PM NAAQS was completed in December 2020, and Section 109(d)(1) of the Clean Air Act requires review of existing standards only every five years. Modifying the standards in the context of reconsideration heightens and reinforces the requirement to consider the reasonableness—*vel non*—of the proposal. Because this is a discretionary decision as to "whether to regulate" rather than one of the Clean Air Act's mandatory requirements to regulate, there is an implicit requirement to consider costs.

Here is how this works. Section 109(d)(1) requires EPA to "at five-year intervals" review the NAAQS and make such revisions "in accordance with … subsection (b)." An on-schedule revision of the NAAQS is thus bound by the language "requisite to protect the public health" that the Supreme Court focused on in *Whitman*. (Again, we note that Section 109(d) also limits even EPA's on-cycle actions to those that are "appropriate.") But, for off-cycle reviews, Section 109(d) merely says the "Administrator *may* review and revise criteria or promulgate new standards earlier or more frequently than required under this paragraph," (emphasis added), and it does not contain any reference to the standards of subsection (b).

This decision "whether to regulate" is something the Supreme Court has explained, is one in which agencies are expected to treat "cost as a centrally relevant factor." *Michigan*, 576 U.S. at 753. In *Michigan,* the Court considered another Clean Air Act provision—Section 112(n)—that required EPA to regulate emissions of hazardous air pollutants from power plants if the Agency finds regulation "appropriate and necessary." *Id.* at 747. The Court reasoned that in this discretionary posture, "[c]onsideration of cost" was required and "reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions." *Id.*

Further, the proposal does not discuss reliance interests. Reliance interests are an important factor an agency must "consider" in "changing course," *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020), as EPA is proposing to do here through a discretionary reconsideration. *See also Nat'l Ass'n*

*of Trailer Owners, Inc. v. Day*, 299 F.2d 137, 139-40 (D.C. Cir. 1962) ("if there is to be any stability and fairness in administrative proceedings … [agencies' reconsideration] power must be exercised both within a reasonable time after the issuance of a final departmental decision and without subjecting the parties affected by any undue or unnecessary hardships.").

Virtually all U.S. industry will be profoundly impacted by this rule if it is finalized. *See* Part I, *supra*. EPA has left the current PM NAAQS in place for many years, and for good reason—they worked. There is no new scientific consensus or health data that mandates upsetting the many ways in which industry has relied on current NAAQS in planning how they will invest, build, etc. These costs are amply demonstrated across many of the comments from specific industry groups on this proposal. Certainly implementation plans will bear on how these costs are realized, but the key fact here is that they will be realized in one form or another if EPA finalizes this proposal. The reliance interests that have accrued under the long-standing PM NAAQS currently in force weigh heavily against EPA's proposed reconsideration.

### C. That the Proposal Would Not Set NAAQS to Zero Demonstrates That EPA *Did* Balance Other Risks, Just as *Whitman* Envisioned.

If EPA is not assessing the risks of implementing a more stringent NAAQS standard, it is difficult to understand why EPA has not simply set all of its PM NAAQS to zero.

In justifying its exclusion of the contextual factors discussed in Part I, *supra,* the proposal explains that EPA may not examine "cost," "attainability," "technological feasibility," but only "the nature and severity of the health effects involved, the size of the sensitive population(s), and the kind and degree of uncertainties." 88 Fed. Reg. 5,564. And in considering these health effects, EPA must ensure that its "primary standards provide an adequate margin of safety" to "address uncertainties associated with inconclusive scientific and technical information available at the time of standard setting. It was also intended to provide a reasonable degree of protection against hazards that research has not yet identified." *Id.* (citing *Lead Industries Association v. EPA*, 647 F.2d 1130, 1154 (D.C. Cir 1980); *American Petroleum Institute v. Costle*, 665 F.2d at 1186; *Coalition of Battery Recyclers Ass'n v. EPA*, 604 F.3d 613, 617–18 (D.C. Cir. 2010); *Mississippi v. EPA*, 744 F.3d 1334, 1353 (D.C. Cir. 2013)). This

requirement for an "adequate margin of safety" means that EPA must "not only … prevent pollution levels that have been demonstrated to be harmful *but also* to prevent lower pollutant levels that *may* pose an unacceptable risk of harm, even if the risk is not precisely identified as to nature or degree." *Id.* (emphasis added).

The proposal goes on to explain that the best evidence suggests health benefits from *all* reductions in PM, with no evidence of a threshold at which these benefits cease to be realized. *See Id.* at 5,583 ("[g]enerally, the evidence remains consistent in supporting a no-threshold relationship, and in supporting a linear relationship for PM2.5 concentrations > 8 mg/m3."). And while there is indeed some uncertainty regarding the *shape* of the benefits that would be obtained beneath 8 μg/m3, EPA does not suggest that any evidence points to a negative correlation between PM2.5 and mortality at any point on the curve. *Id.* ("However, uncertainties remain about the shape of the C–R curve at PM2.5 concentrations < 8 mg/m3, with some recent studies providing evidence for either a sublinear, linear, or supralinear relationship at these lower concentrations."). In other words, EPA's assessment is that the research has identified that *any* non-zero level of emissions whatever likely poses a "risk of harm."

But if all levels of PM pose a "risk of harm," and if EPA may only look at these "health effects" in setting NAAQS, and if EPA is required to prevent pollutant levels that it has identified "may pose an unacceptable risk of harm," then the only standard "allowing an adequate margin of safety" for health risks is zero.

How then, can EPA be justified in setting NAAQS levels to anything above zero? The proposal suggests that "[t]he CAA does not require the Administrator to establish a primary NAAQS at a zero-risk level or at background concentration levels." 88 Fed. Reg. 5,564. While this is literally true, in that the CAA does not specify a zero-risk level, EPA's interpretation of the statute ineluctably calls for such a reading in light its analysis of the data. Nor does the proposal point to any statutory basis for what the limit might be if the evidence shows—as the proposal suggests—that there are no levels which do not pose a risk of harm.

The only limiting principle that the proposal suggests is an epistemological one: while all benefits are somewhat uncertain, some benefits are too uncertain. *See* 88 Fed. Reg. 5,629. But EPA provides no guidance as to what levels of uncertainty rise to the point of barring action, or any statutory basis for why it chose the

particular levels it did. Indeed, EPA provides no metric by which any choice of any particular level can be compared to any other. And with EPA's interpretation of the statutes requiring it to look only at "health effects," it is hard to imagine what line EPA could draw. If positive health effects are expected—or even possible—and no costs may be weighed against these effects, then emissions must be set to zero, unless the agency can point to some other reason why lower levels would be "[in]appropriate."

Agencies must give reasons for the lines they draw. But the proposal does not suggest any rationale for its particular line drawing and instead (somewhat blithely) explains that "[t]he selection of any particular approach to providing an adequate margin of safety is a policy choice left specifically to the Administrator's judgment." As discussed above, "judgment" and "policy" are not blank checks that allow for arbitrary decisions. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019) ("The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."). As discussed above, *Whitman* expressly allows for this judgment to be exercised, but it must be connected to relevant contextual factors about why the proposal is a good idea.

## III. If the Clean Air Act Truly Provides No Ability to Balance Costs and Benefits, and No Limiting Principle for Health Benefits, Then it Violates the Nondelegation Doctrine.

### A. If EPA's current interpretation of the Clean Air Act is correct, the nondelegation doctrine requires holding the Act invalid.

If the proposal is correct (and *Whitman* is wrong), then the Clean Air Act in reality provides no ability to set standards by balancing any kinds of costs and benefits, provides no limit or standards by which to judge diminishing health benefits, and yet still "does not require the Administrator to establish a primary NAAQS at a zero-risk level or at background concentration levels." 88 Fed. Reg. 5,564. This would mean that the Clean Air Act after all provides no "intelligible principle" for the line drawing exercise and would thus violate the nondelegation doctrine, both as originally understood and—*Whitman* notwithstanding—even under the weaker, modern version of the doctrine.

1. The Founders "separated powers within the Federal Government: The legislative power went to Congress; the executive to the president; and the judicial to the courts. That is the equilibrium the Constitution demands. And when one branch impermissibly delegates its powers to another, that balance is broken." *Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 673 (6th Cir. 2021) (Thapar, J., concurring).

The original understanding of nondelegation prohibited any transfer of Congress's vested legislative powers to another entity. *See Gundy v. United States*, 139 S. Ct. 2116, 2135–37 (2019) (Gorsuch, J., joined by Roberts, C.J. and Thomas, J., dissenting). Article I of the Constitution begins: "*All* legislative Powers herein granted shall be vested in a Congress," (emphasis added), and the Constitution vests legislative power nowhere else. The legislative power is the power to "adopt generally applicable rules of conduct governing future actions by private persons." *Gundy*, 139 S. Ct. at 2133 & nn.17–18 (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting) (collecting sources); *see also Whitman*, 531 U.S. at 487 (2001) (Thomas, J., concurring) ("[T]here are cases in which … the significance of the delegated decision is simply too great for the decision to be called anything other than 'legislative.'").

This vesting means that Congress must "make[ ] the policy decisions when regulating private conduct" and only can "authorize another branch to 'fill up the details'" or "make the application of that rule depend on executive fact-finding." *Id.*; *see also Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Kavanaugh, J., statement respecting the denial of certiorari) ("[M]ajor national policy decisions must be made by Congress and the President in the legislative process, not delegated by Congress to the Executive Branch.").

But if the statutory grant of power to EPA is so broad and amorphous that EPA can label almost any NAAQS as "requisite" regardless of the results of "executive fact-finding," then the Clean Air Act has given EPA the power to "adopt generally applicable rules of conduct governing future actions by private parties." *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting). The Clean Air Act would therefore fail the original understanding of the nondelegation doctrine.

As Justice Thomas noted, this was true even under *Whitman*'s moderated approach. The argument is even stronger under the proposal's apparent view that

"judgment" and "discretion" are authorizations for EPA to declare its sovereign pleasure without the need to give reasons or act rationally. Government by the ukase of an imperial executive branch is precisely what the nondelegation doctrine prohibits.

2. Under EPA's proffered approach, the Clean Air Act would also violate the more modern intelligible-principle test. The intelligible-principle test permits an agency to undertake quasi-legislative action if Congress provided an "intelligible principle." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). Under that test, Congress still must "clearly delineate[ ]" the "boundaries of th[e] delegated authority." *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 214 (1989). What suffices as an intelligible principle will vary based on "'the extent and character'" of the power sought to be delegated, *Mistretta v. United States*, 488 U.S. 361, 372 (1989), and "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred," *Whitman*, 531 U.S. at 475.

While the Clean Air Act may have "clearly delineated" the "boundaries of th[e] delegated authority," the proposal's current interpretation of the Act effectively reads those provisions out of the statute. Instead, EPA lays claim to an incredibly broad power: to set PM levels at any level it without having to give any reasons that can be tethered to the statutory text. This is, in effect, the power to grind to a "hurtl[e] industry over the brink of ruin or even forc[e] deindustrialization," so long as EPA deems it politically expedient.

### B. The nondelegation doctrine cautions against such an interpretation of the Act.

This result cannot be what Congress intended. While nondelegation has not been used to invalidate a statute in recent years, the nondelegation doctrine has never ceased to critically influence judicial decisions. "Instead, while the Supreme Court upheld many broadly worded statutes, it had consistently looked to the nondelegation doctrine as a canon of construction to read such statutes narrowly when granting authority to administrative agencies." C. Boyden Gray, *Judge Stephen F. Williams and the Underestimates History of the Nondelegation Doctrine*, 16 N.Y.U. J. of L. & Liberty 10, 14 (2022); *see Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989) ("In recent years, our application of the nondelegation doctrine principally has been limited to the interpretation of statutory texts, and, more particularly, to giving narrow constructions to statutory delegations that might otherwise be thought to be

unconstitutional.”). For example, in *Kent v. Dulles,* the Court rejected the argument that a statute delegating the Secretary of State power to issue passports also gave him broad discretion to deny passports to communists and communist sympathizers. 357 U.S. 116, 129 (1958). Citing *Panama Refining,* the Court noted that delegated authority must have “standards ... adequate to pass scrutiny by the accepted tests” and it construed the statute narrowly to deny the Secretary unilateral power to restrict the free movement of citizens because of their beliefs or associations. *Id.*

Another relevant example is the *Industrial Union Department, AFL-CIO v. American Petroleum Inst.,* or the *“Benzene Case.”* There the Secretary of Labor interpreted the requirement of the Occupational Safety and Health Act to make regulations “reasonably necessary or appropriate to provide safe or healthful employment” to mean that because “no safe exposure level can be determined” for benzene, an exposure limit must be set to 1 ppm. 448 U.S. 607, 613 (1980). The Court found this untenable. Instead, the Court reasoned that there must be an implicit requirement to only regulate “significant risks of harm.” It explained such a construction was necessary because to do otherwise would implicate the nondelegation doctrine:

> If the Government was correct in arguing that [neither OSH Act provision requires the Secretary to make a showing of significant risk], the statute would make such a "sweeping delegation of legislative power" that it might be unconstitutional under the Court's reasoning in *A. L. A. Schechter Poultry Corp. v. United States* and *Panama Refining Co. v. Ryan*. A construction of the statute that avoids this kind of open-ended grant should certainly be favored.

*Id.* at 646.

These same principles underlay the Supreme Court’s reasoning in *Whitman* that the proposal misunderstands. *See* Section II, *supra.* In the initial challenge to the 1997 NAAQS revisions in the D.C. Circuit, non-state petitioners “argued that the EPA’s insistence on promulgating new ozone standards despite the lack of scientific certainty regarding their public health impacts risked violating *Panama Refining's* instruction that statutes must confine agencies to ‘making . . . subordinate rules within prescribed limits’” and that “the statute should be construed in a manner that would provide intelligible criteria for what constitutes an appropriate NAAQS

revision." Gray, *supra* at 19–20. These themes were elaborated on in Judge Williams opinion which found that EPA's interpretation of the Clean Air Act violated the non-delegation doctrine. *Id.* at 21. "But rather than hold the statute invalid—à la *Schechter Poultry*—the court adopted Judge Williams's subtler approach and remanded the matter to the EPA so the agency could try to better identify and honor the statute's intelligible principles." *Id.* Judge Williams explained that if the EPA could not find an intelligible principle, it should "so report to the Congress, along with such rationales as it has for the [NAAQS] it chose, and seek legislation ratifying its choice." *Am. Trucking Ass'ns, Inc. v. EPA*, 175 F.3d 1027, 1040 (D.C. Cir. 1999).

Although the Supreme Court reversed Judge Williams's decision, Justice Scalia's opinion did "champion[] the most relevant aspects of his opinion." Gray, *supra* at 21. "The EPA had convinced Justice Scalia that it lacked carte blanche and should survive nondelegation review, but only by conceding, consistent with Judge Williams's opinion, that the Clean Air Act authorized the EPA to tighten NAAQS only when necessary to prevent *significant* or *substantial* public health risks," *id* at 22 (emphasis added), a context-infused analysis that EPA here rejects.

The nondelegation doctrine has continued to gain momentum in the 22 years since *Whitman* was decided. As noted above, Justices Thomas, Alito, Gorsuch, and Kavanaugh have each independently voiced support for a more robust interpretation of the doctrine. The court put the point most directly in its recent opinion in *West Virginia v. EPA*. 142 S. Ct. 2587 (2022). There "the Court held that the EPA could not rely on vague language in a seldom used provision of the Clean Air Act to require power plants to shift electricity generation away from coal to other, less carbon intensive sources." Gray, *supra* at 25. Instead:

> Writing for the majority, Chief Justice Roberts rejected the EPA's position that it could mandate practically whatever degree of 'generation shifting' it desired, thereby restructuring the entire American energy market. He explained that for such extraordinary claims of regulatory power, "both separation of powers principles and a practical understanding of legislative intent make us 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there." Justice Gorsuch made clear in his concurring opinion that nondelegation would be a part of the Court's statutory interpretation for the

> foreseeable future, noting that even the dissenting Justices "recognized that the Constitution does impose some limits on the delegation of legislative power."

*Id.* (quoting *West Virginia v. EPA*, 142 S. Ct. at 2603–04, 2609, 2624).

*

Whether the nondelegation doctrine here "demand[s] the identification of implicit limiting principles" or "require[s] holding the statute invalid" remains to be seen. *Id.* But the proposal's interpretation of the Clean Air Act cannot not survive as written. That the Supreme Court interpreted Section 109(b) in a manner consistent with the intelligible-principle test does not mean that EPA's different interpretation in the proposal will pass muster, even assuming that its interpretation is entitled to any deference.

## IV. The Proposal Gives the Impression of Being a Pre-textual Attempt to Reduce Greenhouse-Gas Emissions.

That the evidence presented in the proposal does not appear to support the NAAQS it proposes or provide any guidance as to why they were chosen, creates the appearance that these standards may have been chosen pre-textually in an attempt to reduce greenhouse-gas emissions despite EPA's lack of authority to do so directly through NAAQS.

The Biden Administration has from the beginning expressed an intention to engage in a "whole of government" approach to addressing greenhouse gas emissions and climate.[3] EPA has been a central participant in this effort. EPA has already

---

[3] See, e.g., Executive Order 13990 Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis (Jan. 20, 2021) ("this order directs all executive departments and agencies (agencies) to immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the last 4 years that conflict with these important national objectives, and to immediately commence work to confront the climate crisis."); Executive Order 14057, Catalyzing Clean Energy Industries and Jobs

completed several rulemakings aimed explicitly at reducing greenhouse-gas emissions, *see e.g.* Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards 86 Fed. Reg. 74,434 (Dec. 30, 2021), and is planning many others, *see* EPA, *Climate Change Regulatory Actions and Initiatives*, https://www.epa.gov/climate-change/climate-change-regulatory-actions-and-initiatives (last accessed Mar. 28, 2023) ("EPA is considering rulemaking proposals to address some of our nation's largest sources of both climate- and health-harming pollution, such as the transportation, oil and natural gas, and power sectors."). And there is pressure for EPA to be creative in how it uses its rulemaking power, because the Supreme Court's recent decision in *West Virginia v. EPA* has cut off one route by which EPA might "get creative" to reduce GHG emissions in the absence of clear statutory authority. In *West Virginia*, the Court held that Section 111(d) of the Clean Air Act did not authorize EPA to devise greenhouse gas emissions caps based on a "generation shifting" approach, a "system" that would reduce pollution simply by "shifting" polluting activity "from dirtier to cleaner sources." 142 S. Ct. at 2595.

As a result, EPA has decided to "address some of our nation's largest sources" of greenhouse gases by using its powers to reduce other pollutants that may induce sources to reduce CO2 as well. For example, EPA explained that:

> EPA implements several health protections that affect power plants and reduce conventional air pollutants through the Acid Rain Program (ARP), the interstate air pollution transport programs, and the Mercury and Air Toxics Standards (MATS). As a result of these programs, fossil fuel-fired electric generating units reduce emissions of sulfur dioxide (SO2), nitrogen oxides (NOx), and hazardous air pollutants, including mercury (Hg), to protect human health and the

---

Through Federal Sustainability (Dec. 8, 2021); White House, FACT SHEET: President Biden Sets 2030 Greenhouse Gas Pollution Reduction Target Aimed at Creating Good-Paying Union Jobs and Securing U.S. Leadership on Clean Energy Technologies, (Apr. 22, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/22/fact-sheet-president-biden-sets-2030-greenhouse-gas-pollution-reduction-target-aimed-at-creating-good-paying-union-jobs-and-securing-u-s-leadership-on-clean-energy-technologies/ ("Today, President Biden will announce a new target for the United States to achieve a 50-52 percent reduction from 2005 levels in economy-wide net greenhouse gas pollution in 2030 – building on progress to-date and by positioning American workers and industry to tackle the climate crisis.").

> environment—and in doing so often adopt measures that reduce CO2 emissions as well.
>
> Despite significant progress in reducing greenhouse gas pollution from fossil fuel-fired power plants over the last decade, the power sector is by far the largest category of stationary sources of greenhouse gases in the United States. EPA is currently evaluating additional opportunities to achieve greenhouse gas emission reductions from power plants under the Clean Air Act.

EPA, *Climate Change Regulatory Actions and Initiatives*, https://www.epa.gov/climate-change/climate-change-regulatory-actions-and-initiatives (last accessed Mar. 28, 2023). Courts will take EPA at its word.

To be sure, EPA does not mention the proposed PM NAAQS among its climate change regulatory actions. But, as has often been noted, CO2 and PM are co-pollutants, and the reduction of one frequently accompanies the reduction of the other. The proposal notes that some of the largest "anthropogenic sources of PM"—and thus the best targets for reduction to attain NAAQS—include "fuel combustion for electricity production" and "diesel- and gasoline-powered highway vehicles": the *same sources* EPA lists as among its targets for climate change regulatory actions. 88 Fed. Reg. 5,569. In contexts other than the proposal, EPA has been active in advertising the co-benefits of its proposals. For example, in its recent Light-Duty Vehicle Greenhouse Gas Emissions Standard rulemaking, EPA explained that billions of dollars of benefits from that greenhouse-gas reducing rule will come from PM. 86 Fed. Reg. 74,443. While the present proposal is silent about these cross-cutting effects, high ranking EPA officials like then Acting General Counsel Melissa Hoffer were explicitly considering the intersection of PM2.5 limits and GHG emissions. *See* Protect The Public's Trust, *October 2022 Interim Release of EPA FOIA*, at 270 (Oct. 6, 2022), https://protectpublicstrust.org/wp-content/uploads/2023/02/October-2022-Interim-Release-of-FOIA-EPA-2022-002747-Formal_FOIA20221006_Combined.pdf.

These motivations are important because, as explained in Part I.A, *supra,* the United States does not have a meaningful particulate matter problem. But—at least from the Biden Administration's perspective—it *does* have a greenhouse-gas emission problem. If EPA's stated desire to reduce greenhouse-gas emissions is the true but

unstated motivation for this proposed reconsideration, this rulemaking would violate the APA's requirement for reasoned decision making. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019) ("The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise."). The Supreme Court has explained that the APA, in order to permit meaningful judicial review, requires an agency to "disclose the basis" of its action. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–169 (1962)). This is a simply a requirement for fairness and transparency. "Justice Holmes famously wrote that '[m]en must turn square corners when they deal with the Government.' But it is also true, particularly when so much is at stake, that 'the Government should turn square corners in dealing with the people.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020) (quoting *Rock Island, A. & L. R. Co. v. United States*, 254 U.S. 141, 143 (1920); *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961)).

The timing, stringency, and contextual evidence strongly suggests that there is an improper hidden motive here. In our view, the co-benefits here are—all else being equal—a good thing and something for the agency to consider, but it must be contemplated on the record and in the limited manner allowed by *Whitman*.

## Conclusion

We respectfully request that EPA abandon this proposal and focus its efforts on more pressing environmental and health issues.

U.S. Chamber of Commerce

1615 H Street, NW
Washington, DC 20062-2000
uschamber.com

March 28, 2023

Dr. Lars Perlmutt
Health and Environmental Impacts Division
Office of Air Quality Planning and Standards
U.S. Environmental Protection Agency
Research Triangle Park, NC 27711

*Via* https://www.regulations.gov

**Re: Proposed Rule, U.S. Environmental Protection Agency: Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 88 Fed. Reg. 5558-5719 (January 27, 2023)**

Dear Dr. Perlmutt:

The Chamber of Commerce of the United States ("Chamber") appreciates this opportunity to comment on the U.S. Environmental Protection Agency's ("EPA's" or the "Agency's") proposed rule, "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter."[1]

After completing a thorough review of the particulate matter ("PM") national ambient air quality standards ("NAAQS") and concluding in December 2020 that the existing standards protected the public health and welfare, EPA has now proposed to revise the primary annual fine PM ("$PM_{2.5}$") standard of 12.0 µg/m$^3$ to within the range of 9.0 to 10.0 µg/m$^3$, while taking comment on alternative standard levels as low as 8.0 µg/m$^3$ and as high as 11.0 µg/m$^3$. EPA has also proposed to retain the primary 24-hour $PM_{2.5}$ standard of 35 µg/m$^3$, while taking comment on revising the level to as low as 25 µg/m$^3$. EPA has proposed to retain the primary 24-hour standard for coarse PM ("$PM_{10}$"). EPA has proposed to retain the secondary PM standards, but has also asked for comment on potentially revising the level of the 24-hour secondary $PM_{2.5}$ standard to as low as 25 µg/m$^3$.

The Chamber believes EPA has correctly determined that it is not necessary to revise the 24-hour $PM_{2.5}$ standard, the standards for coarse $PM_{10}$, or the secondary PM standards. The Chamber disagrees, however, with EPA's proposed revision of the annual $PM_{2.5}$ NAAQS and recommends that EPA retain the existing 12 µg/m$^3$ standard. Particularly with a new five-year NAAQS review deadline on the horizon, attempting to tighten the PM NAAQS at this time through a short-circuited, truncated reconsideration proceeding would not be a prudent use of Agency resources. Conducting a full NAAQS review on the Agency's typical schedule,

[1] 88 Fed. Reg. 5,558 (Jan. 27, 2023) ("Proposed Rule").

accompanied by robust and comprehensive consideration of all factors relevant to a decision whether to maintain or change the NAAQS, is more likely to result in a durable policy outcome that will survive judicial scrutiny.

## I. The Considerable Progress Made in Reducing PM Emissions Shows that Existing Clean Air Programs Make it Unnecessary to Revise the NAAQS at this Time.

According to EPA's most recent air trends report, "[b]etween 1970 and 2021, the combined emissions of the six common pollutants," $PM_{2.5}$ and $PM_{10}$, sulfur dioxide, nitrogen oxides, volatile compounds, carbon monoxide, and lead, dropped by 77 percent.[2] Direct emissions of $PM_{2.5}$ and coarse PM are down 40 percent and 33 percent respectively from 1990 levels.[3] Emissions of PM precursors have also substantially declined, with nitrogen oxide emissions down 70 percent, volatile organic compound emissions down 49 percent, and sulfur dioxide emissions down 92 percent.[4]

The Proposed Rule itself acknowledges that air quality throughout the United States is remarkably good, particularly with respect to PM. As EPA explains, this air quality "reflect[s] the substantial reductions that have occurred across much of the U.S."[5] This includes a 43 percent decrease in national annual average $PM_{2.5}$ concentrations from 2000 to 2019.[6] Ultra-fine particles have decreased by approximately the same percentage amount.[7] Over the same period, $PM_{10}$ concentrations declined by approximately 46 percent.[8] Reductions have occurred in urban and rural areas and even at near-road monitoring sites.[9]

Additional progress is being made to reduce anthropogenic emissions even further through existing federal and state actions, as well as business-community innovation. For example, the majority of new power generation sources currently being planned and built are for renewable energy sources. The U.S. Energy Information Agency ("EIA") recently documented that the significant shift in the mix of U.S. electricity over the last few years has been attributed to shifts to natural gas as well as a large expansion of solar and wind generating capacity.[10] Many other investments are currently being made through recently passed

---

[2] Our Nation's Air, https://gispub.epa.gov/air/trendsreport/2022.

[3] *Id.*

[4] *Id.*

[5] *Id.* at 5571.

[6] *Id.*

[7] *Id.* at 5572.

[8] *Id.*

[9] *Id.* at 5571.

[10] EIA, Increasing renewables likely to reduce coal and natural gas generation over next two years (Jan. 19, 2023). https://www.eia.gov/todayinenergy/detail.php?id=55239 ("One of the most significant shifts in the mix of U.S. electricity generation over the past few years has been the rapid expansion of renewable energy resources, especially solar and wind. The U.S. electric power sector operated about 74 gigawatts (GW) of solar photovoltaic

legislation that will further this trend, meaning that progress toward cleaner air is happening as a result of existing efforts.

Given the progress made to date and the controls already in place at major sources, achieving further emission reductions through the addition of traditional emission control strategies on already well-controlled sources will be increasingly difficult and costly – if not impossible (as at a fully-controlled source). In some areas of the country, natural background emissions and international transport will make attaining stricter standards impossible as a practical matter. This in turn could have serious consequences for the economy, stifling manufacturing, energy, transportation infrastructure, and industrial investment and exacerbating permitting challenges.

Considering the enormous progress on air quality to date, the all-but-certain continuation of that progress into the future under the current PM NAAQS, the efforts many regions of the country are continuing to undertake to achieve attainment with the current 12.0 $\mu g/m^3$ standard, and the need to identify new approaches to address PM background and emissions from nontraditional sources, EPA should conclude that reconsideration of the PM NAAQS is not necessary or appropriate at this time.

The suite of control technologies that the agency has considered which would take the country only part of the way to compliance[11] – would cover a range of point and nonpoint sources. A review of the options under consideration demonstrates the likely serious impacts on homeowners, businesses, and governments. For instance, one option is to require homeowners to replace existing wood-burning fireplaces with natural gas fireplaces. Because commercial and residential cooking is the largest $PM_{2.5}$ emissions source in some counties, another option is to require small businesses to install catalytic oxidizers or electrostatic precipitators to reduce emissions from restaurants. A third option would require state and local governments to embark on massive road paving programs to reduce dust from unpaved roads and road shoulders. Paving roads and shoulders would account for up to 82 percent of the compliance costs under certain stringency levels considered. But, with the limited resources available to state and local governments, as well as the control scenarios' significant impact on homeowners and small businesses, it is questionable whether these could be implemented. Indeed, even if these measures can be implemented, they would undoubtedly foreclose spending on other more significant, higher priority public policy matters.

Instead of revising the NAAQS through disruptive and unnecessary reconsideration proceedings, EPA should look for ways to support innovative solutions – including through

---

capacity at the end of 2022, which is about three times the capacity at the end of 2017. U.S. wind power has grown by more than 60% since 2017 to about 143 GW of capacity."); EIA's Short Term Energy Outlook (Feb. 7, 2023), https://www.eia.gov/outlooks/steo/report/electricity.php ("Increases in U.S. electricity generation in our forecast come almost entirely from solar and wind. We expect renewable sources will provide 22% of U.S. generation in 2022 and 24% in 2023, up from 20% in 2021.").

[11] RIA, section 3.2 Illustrative Control Strategies and $PM_{2.5}$ Emissions Reductions from the Analytical Baseline.

leveraging new authorities and cost-effectively deploying the enormous amounts of funding available through the Energy Act of 2020, Infrastructure Investment and Jobs Act , Creating Helpful Incentives to Produce Semiconductors (CHIPS) Act, and the Inflation Reduction Act – to achieve further emission reductions. Such an approach is more flexible and is far more likely to achieve further, feasible progress on air quality without imposing undue burdens on individual citizens, businesses, and society.

## II. EPA Fails to Address Wildfires, the Largest Source of PM Emissions in Most Parts of the Country.

In parts of the country that have seen less improvement in air quality, wildfires have been increasingly common and are the dominant source of new emissions and air quality concerns. Indeed, the vast majority (over 84 percent) of PM emissions now come from non-point sources such as wildfires, construction, road dust, and international transport – factors that are either extremely difficult, or impossible, for individual regions and states to control. Indeed, according to EPA's Policy Assessment, wildfires alone account for "between 10 and 20 percent of primary PM emissions in the U.S. per year (U.S. EPA, 2019a, section 2.3.1), with much higher localized contributions near fire-affected areas."[12] Only 16 percent, on the other hand, come from industrial sources and power plants, with further improvements likely as new plants and technologies come online.

Emissions from wildfires are perhaps the best example of emissions that are beyond EPA and state ability to control pursuant to the Clean Air Act ("CAA"). Human activity is the cause of approximately 85 percent of wildfires, with the primary drivers being unattended campfires, debris burns, equipment usage and malfunction, discarded cigarettes, and arson.[13] A comprehensive analysis of California wildfires finds that "[h]umans were responsible for most of fires, accounting for 95 percent or more of the ignitions in two-thirds of the counties. However, certain northern California counties stood out as notable exceptions, e.g., in Siskiyou, Trinity, Lassen, Modoc and Plumas counties lightning accounted for one-quarter to more than half of all ignitions."[14]

The only reasonable way to address these wildfires and their emissions is through enhanced forest management policy, not CAA regulatory authority. Experts quoted in recent news reports over the last several years have made clear that poor forest management policy is responsible for the vast majority of wildfires.[15] The Biden Administration's U.S. Department of

[12] EPA Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter at 2-66 (May 2022).

[13] National Park Service, https://www.nps.gov/articles/wildfire-causes-and-evaluation.htm.

[14] Historical patterns of wildfire ignition sources in California ecosystems, International Journal of Wildland Fire (Jan 2018), https://www.publish.csiro.au/wf/wf18026.

[15] *See, e.g.*, California Globe, "California is On Fire Again and it was Preventable" (Sept. 8, 2020) (Recent upticks in uncontrolled fires in Western states like California, Washington, and Oregon, are most likely due to decades of poor forest management"), https://californiaglobe.com/articles/california-is-on-fire-again-and-it-was-

Agriculture Forest Service has confirmed these findings. In its most recent wildfire strategy, the Forest Service finds that U.S. forests have become so overgrown and provide a level of fuel for fires that the Service will need to treat up to 50 million acres through forest thinning and prescribed burns.[16] To put the scale of this work into perspective, the Service estimates that successful completion of this effort will require the hiring of up to 575,000 people.[17]

EPA often suggests it will address wildfire emissions and their impacts on air quality regulation through its exceptional events authority. This authority allows EPA to exclude emissions attributable to exceptional events, like wildfires, from regulatory decisions like determinations as to whether there has been a NAAQS exceedance. Implementation of EPA's exceptional events rule has, however, been unsuccessful in many respects. The rule places the burden on states to make demonstrations that the exceptional event at issue is responsible for a purported NAAQS exceedance. Making a demonstration that EPA is willing to accept has proven a challenge. As wildfire-related emissions become dominant causes of NAAQS exceedances, and PM emissions generally, EPA must revisit its current processes and policies for addressing exceptional events. Waiting until implementation of a newly revised PM NAAQS is not a responsible course of action. EPA should address this issue now as part of this proceeding, or more appropriately defer proceedings until the next five-year NAAQS review process.

## III. EPA Has Broad Discretion to Determine that Reconsideration of the PM NAAQS Is Not Warranted at This Time.

The CAA requires that EPA review and, if necessary, revise the NAAQS at least every five years.[18] EPA also has at least a colorable basis here for claiming the authority to reconsider the NAAQS, on the general principle that agencies have broad discretion to reconsider their rules at any time.[19]

When EPA is operating within the scope of a NAAQS review as was done in the most recent review in 2020 (i.e., when the agency is making scientific, technical, legal, and policy

---

preventable/; NBC News, "Decades of mismanagement led to choked forests — now it's time to clear them out, fire experts say" (Oct. 18, 2020), https://www.nbcnews.com/news/us-news/decades-mismanagement-led-choked-forests-now-it-s-time-clear-n1243599; H. Sterling Burnett, "Washington Post, Here Is the Truth About California Wildfires" (Oct. 23, 2020), https://climaterealism.com/2020/10/washington-post-here-is-the-truth-about-california-wildfires/.

[16] U.S. Forest Service, Confronting the Wildfire Crisis, January 2022, https://www.fs.usda.gov/managing-land/wildfire-crisis.

[17] *Id*.

[18] CAA § 109(b), (d), 42 U.S.C. § 7409(b), (d)..

[19] *See Prieto v. United States,* 655 F. Supp. 1187, 1191 (D.D.C. 1987) ("[T]he power to decide in the first instance carries with it the power to reconsider.") (citing *Trujillo v. Gen. Elec. Co.,* 621 F.2d 1084, 1086 (10th Cir. 1980)); *see also* CAA § 307(b)(1), 42 U.S.C. § 7607(b)(1) (noting that the filing of a petition for reconsideration does not extend the time for seeking judicial review).

judgments regarding setting a NAAQS, whether as an initial matter or as a matter of revising a previously set NAAQS), it is bound by the requirements of the CAA. Indeed, the CAA itself says that EPA may revise a NAAQS only "in the same manner as promulgated."[20] Thus, when setting a NAAQS, EPA must: (1) conduct a thorough review of the relevant science; (2) consider the advice of the Clean Air Scientific Advisory Committee ("CASAC"); and (3) consider beneficial effects as well as harm.[21]

Any decision whether to *reconsider* a NAAQS-setting decision is not the same as the original decision to *set* the NAAQS at a particular level and is not subject to the same statutory constraints. To the extent that EPA has reconsideration authority in this context, EPA has broad discretion to decide whether to undertake reconsideration or whether to complete reconsideration proceedings. Accordingly, a wide range of legitimate legal, technical, scientific, or policy reasons could support a decision to undertake, complete, or terminate reconsideration, even if those considerations would not be relevant to a decision to set or revise a standard itself.

EPA's past actions on reconsideration confirm the breadth of its discretion in this regard. In particular, in 2011, the Obama administration determined that it was appropriate to terminate its reconsideration of the 2008 ozone NAAQS. President Obama issued a statement announcing the end of the reconsideration proceeding, citing " the importance of reducing regulatory burdens and regulatory uncertainty, particularly as our economy continues to recover" from the 2008 financial crisis and resulting recession.[22]

A September 2, 2011, letter from the Office of Information and Regulatory Affairs within the Office of Management and Budget returning the then pending rule to reconsider the 2008 ozone NAAQS to EPA provides further evidence of the scope of EPA's authority to suspend reconsideration proceedings. That letter provided a number of reasons for ending reconsideration. Because the five-year clock for conducting a new review had not yet lapsed, the Office of Information and Regulatory Affairs said that "finalizing a new standard now is not mandatory and could produce needless uncertainty."[23] It also said that the science underlying the reconsideration was several years out of date and that a new scientific review would ensure that our regulatory system is based on the best available science, as required by Executive Order 13563.[24] The letter also cited the "series of strong and unprecedented steps to protect

---

[20] CAA § 109(b)(1), (2), 42 U.S.C. § 7409(b)(1), (2).

[21] *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468-471 (2001).

[22] The White House, Statement by the President on the Ozone National Ambient Air Quality Standards (Sept. 02, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/09/02/statement-president-ozone-national-ambient-air-quality-standards.

[23] Letter from Cass R. Sunstein, Administrator, Office of Information and Regulatory Affairs, Office of Management and Budget, to Lisa P. Jackson, Administrator, Environmental Protection Agency at 1 (Sept. 2, 2011), https://www.reginfo.gov/public/return/EPA_Return_Letter_9-2-2011.pdf.

[24] *Id*.

public health by reducing harmful air pollution in general and ozone in particular" under other EPA rules, along with Executive Order 12866, incorporated in Executive Order 13563, which states that each "agency shall avoid regulations that are inconsistent, incompatible, or duplicative with its other regulations …."[25] Finally, the letter cites Executive Order 13563 and its directive "to minimize regulatory costs and burdens, particularly in this economically challenging time."[26]

There are accordingly many reasons that EPA can – and should – lawfully and reasonably cite for a decision to end its pending discretionary reconsideration proceeding and to defer further action on the PM NAAQS to a future required review. As described above, the Chamber believes the significant progress on air quality and the need to develop new approaches to achieve further progress are sound reasons for EPA to determine that reconsideration is not, in fact, warranted at this time. EPA should also cite the rushed nature of these proceedings, and its inability to conduct a complete scientific review in support of its Proposed Rule, as reasons to end reconsideration. As described in the comments of the NAAQS Regulatory Review and Rulemaking Coalition, EPA should cite the scientific evidence and the fact that no significant developments have occurred since the completion of the 2020 review as a basis for ending the current reconsideration. Further, EPA should cite the need for regular process and certainty in the regulatory community as a reason for ending these proceedings, rather than acceding to political pressure to complete reconsideration and tighten the NAAQS without conducting a full and durable analysis.[27] Although reconsideration of NAAQS determinations made near the end of an administration has become more common, it is a potentially disruptive and sometimes unproductive approach to regulation. As a general matter, a focus on completing timely, regular five-year NAAQS reviews as Congress intended, rather than devoting resources to rushed discretionary reconsideration proceedings, would better conserve EPA resources, provide states with more predictable and manageable workloads, and generally promote better reasoned regulatory decision-making.

In addition, EPA could cite the complexity resulting from multiple layers of NAAQS requirements that apply to PM as a reason to end reconsideration. EPA has discretion to consider the costs to states and local governments, and regulated industries, businesses, and consumers as well as overall economic impacts that could come from conducting a NAAQS review so soon after the completion of the December 2020 NAAQS determination. EPA should

---

[25] *Id*. at 1-2.

[26] *Id*. at 2.

[27] In an apparent example of potentially counterproductive political pressure, environmental advocates reportedly took part in an event at EPA headquarters on March 28, 2023, regarding the Proposed Rule. According to one or more news accounts, two senior EPA officials met with the advocates and posed for photographs with the group. The officials were reported to have held boxes for the cameras that symbolized collections of written comments that favored more stringent regulatory options. The reported participation of EPA staff in this event, in this fashion, raises concerns about the appearance of improper partiality, potential closed-mindedness, and a lack of full and careful consideration of all relevant issues regarding the outcome of this proceeding.

exercise its discretion now to conclude that costs should foreclose reconsideration and leave a decision as to the appropriate level and form of a revised NAAQS for the next review.

New nonattainment designations would have considerable impacts on business and labor markets. Existing sources in nonattainment areas must install reasonably available control technology ("RACT"), the expense of which could force facilities to shut down, resulting in job losses. New sources in such areas would be subject to the stringent requirements of the nonattainment new source review program, which requires the installation of controls capable of achieving the lowest achievable emissions rate. Those sources would also be required to obtain "offsets" for any new emissions they will release, sometimes at greater than one-to-one ratios. These requirements increase the costs for new and existing facilities and can make businesses less likely to locate in nonattainment areas, thereby depressing economic opportunities for other local governments, businesses, and individuals that might depend on them. Moreover, as a result of any tighter NAAQS, many investments and associated economic growth could move overseas, to jurisdictions with less stringent environmental, safety, and human rights requirements. The proposal fails to consider these impacts and how they may offset the proposed rule's estimated benefits.

A revised PM NAAQS would have considerable negative impacts outside new nonattainment areas as well. Even in areas that meet the newly revised NAAQS, EPA's Prevention of Significant Deterioration ("PSD") program would require proposed sources and modifications to existing sources to demonstrate that their emissions will not cause or contribute to a violation of "any national ambient air quality standard in any air quality control region."[28] Placing this significant roadblock to economic development in areas throughout the country based on such a limited record must be avoided.

EPA should also consider potential and likely impacts on national security attributable to reconsidering the PM NAAQS and lowering the allowed level at this time. The U.S. is a net importer of more than $1 trillion in goods each year. The proposed NAAQS would result in restrictions on permitting and operation of manufacturing facilities, mining, agriculture, and other industries that would increase the nation's dependence on foreign imports and supply chains, increasing national security threats.

Previous NAAQS revisions have had these types of serious economic and policy impacts. A January 2020 study analyzing the effects of the 2004 ozone NAAQS revision and subsequent nonattainment designations, for instance, concluded there were overall negative impacts to economic productivity. Perhaps more concerning, the paper's author concludes, were the effects of new nonattainment designations on the number of new facilities entering the market and the size of existing facilities. The author concludes that the NAAQS may have had significant impacts on new business and favored large incumbents, thereby reducing market

[28] 40 C.F.R. § 52.21 (k)(1).

competition.[29] A 2013 report by RAND Corporation,[30] which "sought to better characterize the links between air quality and economic development to help understand how improving air quality in the Pittsburgh region could affect local economic growth," included a useful review of many studies in this area. That report finds that studies have generally shown that county-level nonattainment status is associated with a deterrent effect on businesses' locating in an area.[31] These findings that nonattainment status has negative economic impact are confirmed by more-recent studies, which indicate that new plants and relocating plants are less likely to locate in nonattainment areas than in attainment areas.[32] The RAND report also notes evidence from a national study that suggests that plants in nonattainment areas are more likely to shut down than plants in attainment.[33] Most of the studies evaluated also suggest that environmental regulations decrease firm productivity and that productivity levels in plants in nonattainment areas are between 2 and 5 percent lower than productivity levels of plants in attainment areas.[34]

The costs of a more stringent primary annual NAAQS for $PM_{2.5}$would be substantial, as demonstrated by EPA's own Regulatory Impact Analysis ("RIA"). In the RIA, EPA bases its cost estimates on "partial attainment" using its cost analysis tool Control Strategy Tool ("CoST").[35] Partial attainment costs are the sum of control measures used in counties where EPA's model was able to meet the proposed $PM_{2.5}$ NAAQS levels (or reached the ceiling boundary set by EPA in the CoST model discussed below). EPA's cost assessment excludes all other nonattainment counties. The analysis is incomplete. In particular, it significantly underestimates the true costs of meeting the proposed $PM_{2.5}$ NAAQS.

The RIA reports partial attainment costs for meeting three $PM_{2.5}$ alternative standards of 10 $\mu g/m^3$ ("10/35"), 9 $\mu g/m^3$ ("9/35"), and 8 $\mu g/m^3$ ("8/35") annual averages. Those costs are,

---

[29] E. Mark Curtis, Reevaluating the ozone nonattainment standards: Evidence from the 2004 expansion, Journal of Environmental Economics and Management, Volume 99, 2020, 102261, ISSN 0095-0696, https://doi.org/10.1016/j.jeem.2019.102261.

[30] Shanthi Nataraj, Ramya Chari, Amy Richardson, Henry H. Willis, Links Between Air Quality and Economic Growth Implications for Pittsburgh, https://www.rand.org/content/dam/rand/pubs/research_reports/RR200/RR260/RAND_RR260.pdf.

[31] *Id*. at 30 (citing Jeppesen, List, and Folmer (2002), List, McHone, and Millimet, 2003, List, Millimet, Fredriksson, et al., 2003; Morgan and Condliffe, 2009 ). For evidence from New York State, *see* List, McHone, and Millimet, 2003, and List, Millimet, Fredriksson, et al., (2003); for national evidence, *see* Morgan and Condliffe (2009).

[32] List, McHone, and Millimet, 2003 (showing evidence of negative economic impacts in New York State); List, Millimet, Fredriksson, et al., 2003 (New York State evidence); Morgan and Condliffe, 2009 (showing economic harm at the national level).

[33] *Id*. (citing Greenstone, List, and Syverson, 2012).

[34] Shanthi Nataraj, et. al. (citing Greenstone, List, and Syverson, 2012).

[35] Partial attainment is a condition where EPA is unable to meet its own proposed $PM_{2.5}$ NAAQS standards for all projected nonattainment counties to reach attainment after exhausting all pollution control measures in its cost model.

respectively, $95 million, $393 million, and $1.82 billion (annually).[36] A report by NERA[37] points out deficiencies in EPA's CoST model and estimates the costs of filling the full attainment gaps left in the RIA analysis. NERA re-estimates a range of potential costs of full attainment and compares the cost against EPA's RIA. NERA estimates that full attainment is 11 to 45 times more costly than the RIA's partial attainment estimate – potentially resulting in $23.7B billion in direct costs to states, local businesses, and consumers. Specifically, NERA finds that EPA was not able to find sufficient control measures in its CoST model for numerous counties to even comply with the current $PM_{2.5}$ NAAQS.[38] NERA also reports that EPA placed significant constraints in the CoST analysis that skewed the results by adding:

(1) an artificial ceiling on the estimated cost per ton ($160,000/ton) candidate control measures, which artificially stops the cost estimate and omits considerable costs to reach the proposed standard;[39] and

(2) a minimum number of tons per year emitted by emission sources that have candidate control measures installed (5 tons per year), which limits the number of emission sources identified in the model.[40]

In addition to these constraints, for several major counties significantly impacted by the proposed $PM_{2.5}$ NAAQS standards, EPA's cost analysis estimated zero dollars per year to meet the standards. EPA provided no explanation for this estimate.[41] Finally, NERA explains that EPA has not provided an estimated cost for bringing current nonattainment counties for $PM_{2.5}$ into attainment with the current $PM_{2.5}$ NAAQS. This information would give context on the level of effort and additional costs to meet the proposed standards.[42]

In sum, EPA's partial attainment cost analysis eschews the agency's obligation to conduct an "comprehensive analysis" under section 312 of the CAA and its obligation to conduct a full uncertainty analysis per OMB's Circular A-4 (OMB, 2004). The current record is not adequate for reconsidering and revising the NAAQS.

## IV. If EPA Decides to Proceed with Reconsideration, Any New NAAQS Levels that EPA Sets Must Comply with CAA Requirements.

---

[36] RIA Table ES-5, p. ES-14.

[37] NERA Economic Consulting, Potential Costs of Fully Attaining Proposed Lower $PM_{2.5}$ NAAQS Standards: Technical Comments on the Cost Estimates in the Regulatory Impact Analysis for the Proposed $PM_{2.5}$ NAAQS Rule at 14, n.30., [separately submitted to this regulatory docket on March 25, 2023].

[38] *Id*. at 17.

[39] *Id*. at 16, 19-20.

[40] *Id*. at 16.

[41] *Id*. at 17.

[42] *Id*. at 19.

While EPA has considerable discretion over whether to initiate or end a reconsideration proceeding, once the Agency undertakes reconsideration proceedings, any new NAAQS levels that it sets must abide by CAA requirements. These reconsideration proceedings fall short of those requirements in at least two key respects.

First, section 108 of the CAA requires EPA to prepare "air quality criteria," which are a comprehensive scientific review that must "accurately reflect the latest scientific knowledge useful in indicating the kind and extent of *all identifiable effects* on public health or welfare which may be expected from the presence of such pollutant in the ambient air, in varying quantities."[43] EPA must base the NAAQS on these air quality criteria, which EPA calls Integrated Science Assessments ("ISAs"). Section 109 of CAA confirms that when reviewing the NAAQS, EPA must comply with these same requirements.[44]

Instead of preparing a comprehensive analysis of the science for these proceedings, EPA has chosen to rely on the 2019 ISA used for the 2020 NAAQS review and to create a "targeted" ISA Supplement that looks only at science that EPA has determined is most likely to support revision of the standards. This is not consistent with the CAA's requirement that EPA evaluate the science related to all effects of a criteria air pollutant. In particular, it is important for EPA to evaluate all effects, negative or positive, that may result from the presence of a pollutant in the ambient air. By limiting the range of effects under consideration, EPA has not complied with the statutory requirement. Moreover, in limiting the scope of its review, EPA may have tipped the balance in developing the record and effectively prejudged the outcome.

To underscore this point, CASAC, as noted in the Proposed Rule, advised that the limited scope of the ISA Supplement should apply only to that document and should not establish precedent for future ISAs.[45] Regardless of whether the Supplemental ISA could be interpreted to support revision – and to be clear, it does not – such a narrowly constrained approach to reviewing air quality criteria does not meet the requirements of the CAA.

Second, the CAA requires EPA to take into account the advice of CASAC when reviewing the NAAQS. Further, if EPA decides to deviate from CASAC's scientific recommendations, the CAA requires the Administrator to explain that decision. In the Proposed Rule, EPA describes the advice of CASAC following that committee's reconstitution in June 2021, as advised by a PM Panel that the Administrator established in August 2021.

The current CASAC has failed to reach a unanimous recommendation on the primary annual standard for $PM_{2.5}$. A majority of CASAC recommends revising the annual $PM_{2.5}$ standard

---

[43] CAA § 108(a)(2), 42 U.S.C. § 7408(a)(2).

[44] CAA § 109(d), 42 U.S.C. § 7409(d).

[45] 88 Fed. Reg. at 5,569.

to within the range of range of 8–10 µg/$m^3$, while a minority recommends a range between 10–11 µg/$m^3$.[46] EPA has not fully evaluated the significance of this lack of consensus.

Moreover, EPA has not, however, addressed the advice of CASAC as it was constituted during the 2020 PM NAAQS review, which is necessary because that CASAC was key to the decision being reconsidered here. During the 2020 review, "some CASAC members expressed support for retaining the current annual standard while other members expressed support for revising that standard in order to increase public health protection."[47] The members who believed the evidence called into question the adequacy of the 12 µg/$m^3$ standard did not recommend a new level or form for the annual $PM_{2.5}$ NAAQS.

EPA's failure to evaluate the opinions of the 2020 CASAC violates the CAA. In reconstituting CASAC, EPA did not determine that the 2020 CASAC was invalid or unqualified. Rather, the Administrator cited his desire to return to a "time-tested, fair, and transparent process for soliciting membership to these critically important advisory bodies."[48] The decision to reconstitute CASAC has been challenged in the U.S. District Court for the District of Columbia.[49] Although the court concluded that the reconstitution was lawful (in a decision that is now on appeal in the D.C. Circuit), it did not find that there was anything wrong with the 2020 CASAC or that the views it expressed were unreliable.[50]

The relevance of the 2020 CASAC's views on the science and the adequacy of the existing NAAQS—and the primary $PM_{2.5}$ NAAQS in particular—is clear in light of the fact that the 2019 ISA still comprises the bulk of the scientific record at issue in this review. Although it may be difficult for EPA to reconcile all of the divergent views expressed by the members of the 2020 CASAC and the reconstituted CASAC under the CAA, it must nevertheless address all of the viewpoints expressed by both versions of CASAC and explain how EPA weighs the different recommendations the Agency has received. EPA has failed to do so here.

## V. EPA Must Address the Impacts that Implementation of the Proposed Rule Would Have on a Broad Range of Industries and Activities.

As noted above, the annual primary $PM_{2.5}$ NAAQS that EPA is proposing would require emission reductions from sources well beyond the major industrial sources and power plants that have previously borne the brunt of the PM NAAQS program. particularly at the lower levels of the range the agency identifies. Over 84 percent of emissions to be reduced would result

---

[46] *Id*. at 5,608.

[47] *See* 85 Fed. Reg. 82,706 (Dec. 18, 2020).

[48] https://www.epa.gov/newsreleases/administrator-regan-directs-epa-reset-critical-science-focused-federal-advisory.

[49] *Young v. United States Env't Prot. Agency*, No. CV 21-2623 (TJK), 2022 WL 4598693 (D.D.C. Sept. 30, 2022).

[50] *Young v. United States Env't Prot. Agency*, No. 22-5305 (D.C. Cir. filed Nov. 22, 2022).

from non-point sources such as wildfires, construction, and road dust. Just 16 percent would result from industrial sources and power plants.

The Proposed Rule, the RIA, and the other supporting documents in this reconsideration proceeding do not identify the suite of controls that would be needed to attain the proposed revised NAAQS. Nor do these documents adequately assess the costs that would be associated with these controls or whether the Proposed NAAQS would foreclose projects or development. Further, to the extent that the NAAQS grow increasingly stringent, they would get closer to background levels, leaving little room for new economic activity and growth (or for states to have any ability to reach attainment). EPA's Proposed Rule does not analyze the implications of this issue either. Without this analysis of control options and the impact of background concentrations, the proposal lacks adequate support.

The RIA does identify some sources of emissions that EPA expects states would need to at least achieve partial attainment of a revised $PM_{2.5}$ annual standard. This limited assessment raises more questions than it answers, however, and it highlights the extreme measures that would be needed to attain the NAAQS. For instance, according to the RIA, EPA expects that nearly 20 percent of the emissions reductions needed to comply with its Proposed Rule would come from eliminating road dust by requiring states to pave unpaved roads and unpaved shoulders of roads.[51] This might also include the use of chemical stabilizers and dust suppressants, which may give rise to other environmental impacts. Relatedly, the RIA further estimates that up to 64 percent of the total costs of the Proposed Rule would fall on area source fugitive dust.[52] The RIA does not evaluate who would be responsible for carrying out these projects or for funding them. It seems likely, however, that the responsibility would fall on state and local governments and relatively small businesses, many of which would undoubtedly struggle with the additional financial burden these programs would impose. State and local governments have limited ability to raise new revenue for such programs; and small businesses likewise have limited resources to devote to compliance with new measures that could be required by such programs.

The RIA also projects that significant emission reductions from the commercial cooking sector would be needed to comply with a revised $PM_{2.5}$ NAAQS. EPA projects that commercial cooking is the second largest non-point source of PM emissions and that 11 percent of total emissions reductions would need to come from this sector.[53] Such emission reduction requirements would impose significant new burdens on an industry that was particularly hard hit by the pandemic at a time where the sector's economic recovery may just be beginning. The National Restaurant Associations State of the Restaurant Industry report for 2023, for instance, notes that the "headwinds" of 2022 will continue to affect restaurants and the food service

---

[51] RIA, Page 3-22, Table 3-7 Summary of Estimated $PM_{2.5}$ Emissions Reductions.

[52] Id. at 4-7, Table 4-2 Summary of Annualized Costs specifically for the 8/35 scenario.

[53] *Id*. at 3-22, Table 3-7 Summary of Estimated $PM_{2.5}$ Emissions Reductions.

industry in 2023.[54] It further reports significant challenges for the current year, including increased food costs, understaffing, and growing competition.[55]

The RIA also suggests attainment strategies that would place burdens squarely on consumers. One of the compliance strategies set out in the RIA is replacement of residential wood stoves or fireplaces with natural gas stoves or gas log fireplaces. The Department of Energy ("DOE") is proposing energy efficiency rules that are so stringent that they may eliminate natural gas-fired water heaters and residential furnaces from the marketplace. DOE's proposed Energy Conservation Standards for Consumer Conventional Cooking Products would eliminate approximately 50 percent of current gas stove models from the market.[56] California's Air Resources Board is similarly working to ban various natural gas-fired appliances. The various conflicting policies could significantly hinder EPA's preferred approach to bringing areas into attainment. The RIA does not provide an adequate analysis of these challenges.

## VI. The Proposed Rule Would Impede Infrastructure Repair and Development Due to Transportation Conformity Requirements.

Section 176(c) of the CAA addresses "transportation conformity" requirements. That provision prohibits the federal government from funding or otherwise supporting "any activity which does not conform to" a CAA SIP.[57] It further prohibits any metropolitan planning organization from approving any project, program, or plan that does not conform to a CAA SIP.[58] The provision applies specifically to transportation plans and transportation improvement programs. It generally requires that transportation activities will not cause new air quality violations, worsen existing violations, or delay timely attainment of the NAAQS.

The transportation conformity requirements of the CAA apply in nonattainment areas. In those areas, no transportation project can move forward until a conformity determination has been made. Compliance with the transportation conformity requirements would impose significant new burdens in nonattainment areas created by any revised PM NAAQS. In particular, these requirements could frustrate the goals of the Infrastructure Investment and Jobs Act (IIJA), the Inflation Reduction Act (IRA), and the Creating Helpful Incentives to Produce Semiconductors (CHIPS) Act. EPA should reexamine its basis for undertaking reconsideration in light of these potential regulatory roadblocks and should balance the Agency's interest in revisiting regulation of air pollutants with the Agency's obligation to address other Administration priorities in making discretionary policy decisions.

---

[54] National Restaurant Association, State of the Restaurant Industry 2023, Executive Summary, https://restaurant.org/nra/media/research/reports/2023/2023-soi-executive-summary.pdf.

[55] *Id*.

[56] DOE, Notice of data availability, https://www.energy.gov/sites/default/files/2023-02/cp-ecs-noda.pdf.

[57] CAA § 176(c), 42 U.S.C. § 7506(c).

[58] *Id*.

**VII. Conclusion**

The Chamber appreciates the opportunity to provide these comments to EPA. The Chamber supports EPA's ongoing efforts, consistent with law, to ensure air quality that protects the public health and welfare alongside continued economic growth and productivity, as Congress intended when it enacted the CAA. The Chamber welcomes additional opportunities to collaborate with the Agency and to further advance EPA's mission to protect our environment.

Sincerely,



Martin J. Durbin
President, Global Energy Institute,
and Senior Vice President, Policy
U.S. Chamber of Commerce

# Disparities in Distribution of Particulate Matter Emission Sources by Race and Poverty Status

*Ihab Mikati, BS, Adam F. Benson, MSPH, Thomas J. Luben, PhD, MSPH, Jason D. Sacks, MPH, and Jennifer Richmond-Bryant, PhD*

*Objectives.* To quantify nationwide disparities in the location of particulate matter (PM)-emitting facilities by the characteristics of the surrounding residential population and to illustrate various spatial scales at which to consider such disparities.

*Methods.* We assigned facilities emitting PM in the 2011 National Emissions Inventory to nearby block groups across the 2009 to 2013 American Community Survey population. We calculated the burden from these emissions for racial/ethnic groups and by poverty status. We quantified disparities nationally and for each state and county in the country.

*Results.* For PM of 2.5 micrometers in diameter or less, those in poverty had 1.35 times higher burden than did the overall population, and non-Whites had 1.28 times higher burden. Blacks, specifically, had 1.54 times higher burden than did the overall population. These patterns were relatively unaffected by sensitivity analyses, and disparities held not only nationally but within most states and counties as well.

*Conclusions.* Disparities in burden from PM-emitting facilities exist at multiple geographic scales. Disparities for Blacks are more pronounced than are disparities on the basis of poverty status. Strictly socioeconomic considerations may be insufficient to reduce PM burdens equitably across populations. (*Am J Public Health.* 2018;108:480–485. doi:10.2105/AJPH.2017.304297)

**See also Houston, p. 441.**

The inequitable distribution of hazardous sites such as landfills and industrial facilities is one of the longest-standing concerns in the field of environmental justice. More than 3 decades ago in one of the earliest environmental justice studies, the US government reported a disproportionately high representation of socially disadvantaged populations residing in communities near landfills.[1] Disparities in residential proximity to pollution sources have been evaluated in terms of income level and poverty as well as race/ethnicity. A nationally representative 1986 sample found that Blacks were 1.54 times more likely than were Whites to live within 1 mile of a facility listed in the Toxics Release Inventory—a gap that remained statistically significant even after accounting for income and education level.[2] The distributions of specific air pollutants, and not just the facilities emitting them, also reflect racial disparities. For example, mean residential ambient nitrogen dioxide concentrations in 2010 were about 7% higher for those in poverty than for those above the poverty line, whereas the disparity for non-Whites (37% higher concentrations than for Whites) was substantially greater.[3]

There is considerable evidence concerning human health impacts of residential proximity to facilities emitting air pollutants.[4] One such pollutant is particulate matter (PM), a mixture of solid and liquid particles suspended in the air.[5] Exposure to $PM_{10}$ ($PM \leq 10$ μm in diameter) and especially to $PM_{2.5}$ ($PM \leq 2.5$ μm in diameter) has been associated with a number of health effects, including respiratory and cardiovascular diseases as well as premature mortality.[6–8] Although proximity to facilities emitting PM is not a direct measure of exposure, it is a valuable metric. Unlike natural events that contribute to ambient PM, such as wildfires, the siting of a facility is the result of a decision-making process. Disparities in siting may indicate underlying disparities in the power to influence that process. For example, an Environmental Protection Agency (EPA) investigation in Flint, Michigan, found a direct link between racial discrimination and the permitting of a power station there, stating, "The preponderance of evidence supports a finding of discriminatory treatment of African Americans by [the Department of Environmental Quality] in the public participation process."[9]

We aimed to quantify nationwide disparities in the distribution of PM-emitting facilities by the characteristics of the surrounding residential populations and to illustrate various spatial scales at which to consider such disparities. Previous literature has shown that non-Whites and below-poverty individuals are more likely to reside near stationary sites of $PM_{2.5}$ emissions[10]; we sought to update and expand on these findings.

## METHODS

We combined facility emissions data with demographic data to investigate racial/ethnic and economic disparities in residential proximity to sources of air pollution.

**ABOUT THE AUTHORS**

*Ihab Mikati and Adam F. Benson are participants in the Oak Ridge Institute for Science and Education research training program stationed with the National Center for Environmental Assessment, Office of Research and Development, US Environmental Protection Agency, Research Triangle Park, NC. Thomas J. Luben, Jason D. Sacks, and Jennifer Richmond-Bryant are staff members with the National Center for Environmental Assessment, Office of Research and Development, US Environmental Protection Agency, Research Triangle Park, NC.*

*Correspondence should be sent to Ihab Mikati, ORISE Program participant at the National Center for Environmental Assessment, Office of Research and Development, US Environmental Protection Agency—109 T.W. Alexander Drive, Research Triangle Park, NC 27709 (e-mail: mikati.ihab@epa.gov; please cc: mikati.ihab@gmail.com to ensure receipt). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints" link.*

*This article was accepted December 16, 2017.*
*doi: 10.2105/AJPH.2017.304297*

## Data Sources

We accessed population data via the US Census Bureau's 2009 to 2013 American Community Survey (ACS).[11] The ACS provides self-reported data on racial/ethnic identification and poverty status at the census block group level for all 50 states and Washington, DC. The block group is a single level of resolution finer than the census tract and commonly contains 600 to 3000 residents.

For our analyses, "White" refers to only non-Hispanic Whites; "non-White" refers to all others. Included in the latter group are Black (non-Hispanic) and Hispanic (any race). The Census Bureau determines poverty status by comparing household income to a threshold that varies by household size and composition.[12]

Because there are differences between rural and urban areas both in industrialization and in demographic composition, we also noted rural–urban status for all block groups. We made rural–urban status determinations from the US Department of Agriculture's rural–urban commuting area (RUCA) codes for 2010.[13] These codes are determined on the basis of census tract–level population density, urbanization, and daily commuting levels; they can be used to distinguish between metropolitan and micropolitan urban centers, commuting (suburban) areas, small towns, and rural areas.[13]

We collected emissions data on stationary human-made point sources from the US EPA National Emissions Inventory (NEI) "Facility-level by Pollutant" files for 2011, the year most closely aligned to the census data we used for our analysis.[14] This data source allowed us to consider not just the presence or absence of a facility but also the amount of the pollutant emitted. We considered annual NEI totals, in tons per year, for primary $PM_{2.5}$ and primary $PM_{10}$.

## Data Analysis

The spatial size (i.e., land area) of block groups can vary substantially between urban and rural areas because of the block group's restricted population range. As population densities increase and block groups shrink in urban areas, assignment via "unit–hazard coincidence" (the matching of a site to its host unit and no others, regardless of proximity) may underestimate the number of nearby hazards relative to those in large rural tracts.[15] To address this, we used a distance-based "centroid-containment" assignment instead.[15] We assigned each facility and its corresponding emissions (in tons per year) to all census block groups containing a centroid within a set radius of the facility's geographic coordinates. We analyzed radii ranging from 0.5 to 5.0 miles; in our main analysis, we used a 2.5-mile radius, following the NEI facility assignment of Boyce and Pastor.[10] We assigned facilities and emissions meeting the centroid-containment criteria for a block group to the population residing within that block group.

We measured the between-group differences in residential proximity to facilities and facility emissions by using 2 metrics: the absolute burden (i.e., the average number of facilities or average amount of PM, in tons/year, emitted within a set distance from an individual's block group centroid) and the proportional burden (i.e., the ratio between a demographic subgroup's average burden and that of the overall population).

To determine average absolute burden (Equation 1) for demographic subgroups, we multiplied the emissions (or total number of facilities) assigned to each block group by the subgroup's population size. We divided the sum of this value across block groups by the total subgroup population, similar to previous studies.[10,16,17]

$$(1)\quad \text{Absolute Burden} = \frac{\sum(\text{Population}_{\text{BlockGroup}} \times \text{Emissions}_{\text{BlockGroup}})}{\sum \text{Population}_{\text{BlockGroup}}}$$

We calculated proportional burdens (Equation 2) by dividing the absolute burden in a subgroup of the population by the absolute burden in the overall population. Scores above 1.0 indicate that the subgroup experienced higher burden than would be expected in a perfectly equitable scenario.

$$(2)\quad \text{Proportional Burden}_{\text{Subgroup}} = \frac{\text{Absolute Burden}_{\text{Subgroup}}}{\text{Absolute Burden}_{\text{Overall}}}$$

We carried out all data management and analysis by using R software version 3.1.2 (R Foundation for Statistical Computing, Vienna, Austria; packages used: dplyr, tidyr, bit64, data.table for data management; tigris for block group coordinates; Hmisc for calculation of correlations).

## Sensitivity Analyses

We conducted several sensitivity analyses to address the potential for small methodological changes to bias our results. To examine whether disparities were consistent at various distances from emissions sources, we used assignment radii at 0.50, 1.25, and 5.00 miles as alternatives to the 2.50-mile centroid-containment radius in the main analysis. To address whether the reported disparities were driven by assignments in extremely sparse or dense areas, we repeated the main analysis after eliminating the largest and smallest decile of block groups (by area). An additional analysis ensured that facilities were always assigned to their host block group by combining the centroid-containment assignment with the traditional unit–hazard coincidence; this helped us address concerns that centroid-containment assignment could underestimate the burden in rural areas, where facilities may be far from their host block group's centroid.

We repeated the main analysis using racial/ethnic population data from the 2010 Decennial Census (poverty data unavailable for this data set) to show that disparities were not specific to the census methodology of the ACS. We considered recent shifts in pollution data by substituting the 2008 or 2014 NEI in place of the 2011 data set. To gauge general applicability to other emissions, we also analyzed other criteria air pollutants available in the NEI: carbon monoxide (CO), lead (Pb), oxides of nitrogen ($NO_X$), and sulfur dioxide ($SO_2$).

# RESULTS

On average, there are 5.7 NEI facilities within 2.5 miles of an individual's census block group centroid (i.e., a facility burden of 5.7). For an individual in the overall US population, the mean absolute burden of $PM_{2.5}$ and $PM_{10}$ emitted from nearby facilities is 22.4 and 29.2 tons per year, respectively. As reported in Table 1, non-Whites and those living in poverty face a disproportionate burden from PM-emitting facilities. Blacks in particular are likely to live in high-emission areas; the average $PM_{2.5}$ burden in this group is 1.54 times that of the population overall. It is notable that this racial

**TABLE 1—Mean Absolute and Proportional Burdens From Facilities Emitting PM in the 2011 National Emissions Inventory, Selected Subgroups: American Community Survey, United States, 2009–2013**

| Variable | Proportion of Population, % | $PM_{2.5}$ Burden, Absolute (Proportional) | $PM_{10}$ Burden, Absolute (Proportional) | Facility Burden, Absolute (Proportional) |
|---|---|---|---|---|
| Overall population | 1.00 | 22.4 (. . .) | 29.2 (. . .) | 5.7 (. . .) |
| Race/ethnicity[a] | | | | |
| White | 0.63 | 18.8 (0.84) | 24.7 (0.85) | 4.1 (0.72) |
| Non-White | 0.37 | 28.6 (1.28) | 37.0 (1.27) | 8.5 (1.49) |
| Black | 0.12 | 34.5 (1.54) | 43.6 (1.49) | 6.2 (1.09) |
| Hispanic | 0.17 | 26.9 (1.20) | 35.9 (1.23) | 9.8 (1.70) |
| Poverty level | | | | |
| Above poverty | 0.85 | 20.9 (0.93) | 27.2 (0.93) | 5.5 (0.95) |
| Below poverty | 0.15 | 30.3 (1.35) | 39.3 (1.35) | 7.2 (1.26) |

*Note.* PM = particulate matter; PM2.5 = PM of ≤ 2.5 µm in diameter; PM10 = PM of ≤ 10 µm in diameter. Poverty level determined by the US Census Bureau in 2013. Burdens represent the PM emissions or the number of facilities in the 2011 National Emissions Inventory that are near the block group of residence for an average individual in the 2009–2013 American Community Survey population. Absolute burden units for PM emissions are tons/year; for facilities, they are the total number. Proportional burden is the ratio of subgroup burden to overall population burden.
[a]"White" refers to only non-Hispanic Whites; "non-White" refers to all others. Included in the latter group are Black (non-Hispanic) and Hispanic (any race).

disparity is larger than is the poverty-based $PM_{2.5}$ disparity (1.35 times the overall population average). Proportional burdens for $PM_{2.5}$ are highly similar to those for $PM_{10}$, but this is not true for proportional burdens in the total number of facilities. This difference suggests that the magnitude of emissions from a facility, and not simply its presence or absence, is valuable information when characterizing burden.

Figure 1 illustrates the population-wide distribution of absolute $PM_{2.5}$ burden for the overall population as well as for several subgroups. Because of a highly nonnormal distribution, individuals residing in block groups with emissions above the overall mean are among the top 15% most burdened. Across the distribution, the gap in burden between those above and those below the poverty line is smaller than is the gap between Whites and non-Whites. At the 50th percentile, Whites have an absolute $PM_{2.5}$ burden below 0.1 tons per year—more than an order of magnitude below the burden of any of their non-White counterparts. At the 80th percentile, the absolute burden for Whites (8.7 tons/year) is less than is half the absolute burden for equivalent non-Whites (20.1 tons/year).

The proportional $PM_{2.5}$ burden for non-Whites at the national level is 1.28 (Table 1). This indicates that high non-White populations coincide with high emissions nationally. Burdens can also be considered within finer spatial scales—for example, the ratio of burdens between non-Whites and the overall population in a particular state or county. Disparities operate in different ways at each scale, yet overall higher burdens for non-Whites are a consistent outcome at both state (Figure A, part a [available as a supplement to the online version of this article at http://www.ajph.org]) and county (Figure A, part b) levels. All but 4 states (Maryland, New Mexico, North Dakota, and West Virginia) and Washington, DC, have an elevated mean $PM_{2.5}$ burden for the non-White population (i.e., proportional burdens > 1.0). Comparing the White and non-White burdens across all states confirms a statistically significant overall difference in absolute $PM_{2.5}$ burdens (paired $t$ test mean of differences = –11.04 (–15.30, –6.79); $t(50)$ = –5.22; $P < 10^{-5}$). Likewise, the majority of counties have higher absolute $PM_{2.5}$ burdens for their non-White residents (paired $t$ test mean of differences = –3.43 (–4.37, –2.48); $t(3140)$ = –7.12; $P < 10^{-11}$).

We recognized rural–urban status as a potential modifier because of the




*Note.* PM2.5 = particulate matter of 2.5 micrometers in diameter or less. Burden scale (y-axis) is displayed logarithmically. Poverty level determined by the US Census Bureau in 2013.

**FIGURE 1—Distribution of Absolute Burdens of $PM_{2.5}$ Emissions From Nearby Facilities in the 2011 National Emissions Inventory, Stratified by Race/Ethnicity and Poverty Status: American Community Survey, United States, 2009–2013**

industrialization of cities combined with the high representation of non-Whites in population-dense centers. For this reason, we used the RUCA codes to characterize and stratify block groups by rural–urban status (Table A [available as a supplement to the online version of this article at http://www.ajph.org]). As shown in Figure 2, the overall national burdens are largely driven by high emissions in the metropolitan and micropolitan cores (those with populations of at least 50 000 and those with populations of at least 10 000 but less than 50 000, respectively). Although those living above the poverty line do experience a lower burden than do those below it within these urban areas, the disparities in emissions are especially pronounced for Blacks—reinforcing the overall finding that racial disparities appear to be markedly higher than are poverty-based disparities.

We also explored recent changes in emission distributions by considering available NEI year data for a 6-year range (Table B [available as a supplement to the online version of this article at http://www.ajph.org]). Absolute $PM_{2.5}$ burden dropped for all examined subgroups between the 2008 and 2014 NEI by a mean of 11.7 tons per year in the overall population (i.e., a 38% drop over the 6-year interval). This drop was slightly smaller (33%) for Blacks and slightly greater (41%) for Hispanics. Despite large drops in absolute burden for all groups, proportional burdens appear stagnant. The proportional $PM_{2.5}$ burden of 1.61 for Blacks in the 2014 NEI is higher than are the proportional burdens in the 2011 NEI (1.54; Table 1) and the 2008 NEI (1.50; Table B). Data are also provided using the 2012 to 2016 ACS and 2014 NEI (Table B). However, because comparison of overlapping ACS data sets is advised against,[18] this analysis is limited in that it considers only changes in $PM_{2.5}$ emissions and not changes in demographics during this time span. It is not possible to determine a causal relationship for changes over time from this analysis. Although there is evidence that lower property values attract minority populations after siting, high representation of those groups generally also exists before the siting of a facility in an area.[19]

We performed sensitivity analyses by repeating the main analysis after adjusting the centroid-containment radius; removing the smallest and largest decile of block groups; including all facilities hosted in a block group, regardless of distance to centroid; and using 2010 Decennial Census data instead of the 2009 to 2013 ACS. The results of these analyses were largely consistent with the original analysis, suggesting robustness in results despite alterations in methodology (Table C [available as a supplement to the online version of this article at http://www.ajph.org]). Extending the analysis to other criteria pollutants tracked by the NEI (CO, Pb, $NO_X$, and $SO_2$) also remained largely consistent with PM results with few exceptions (Table D [available as a supplement to the online version of this article at http://www.ajph.org]). The block group Spearman correlation of CO, Pb, $NO_X$, and $SO_2$ to $PM_{2.5}$ assignments were 0.92, 0.77, 0.94, and 0.93, respectively (Table E [available as a supplement to the online version of this article at http://www.ajph.org]); the amount of $PM_{2.5}$ emitted near a block group is likely a general indicator of the overall emissions in that area.




*Note.* PM2.5 = particulate matter of 2.5 micrometers in diameter or less; RUCA = rural–urban commuting area. Dashed line indicates mean overall burden for all groups in the United States (22.4 tons/year). The US Department of Agriculture defines and assigns RUCA codes. Poverty level determined by the US Census Bureau in 2013.

**FIGURE 2—RUCA-Stratified Absolute Burdens of $PM_{2.5}$ Emissions From Nearby Facilities in the 2011 National Emissions Inventory, Further Stratified by Race/Ethnicity and Poverty Status: American Community Survey, United States, 2009–2013**

## DISCUSSION

We characterized the populations residing near NEI facilities to determine whether individuals from certain subgroups face disproportionately high burden from nearby PM emissions. We observed disproportionately high burdens for non-Whites and those living in poverty (Table 1; Figure 1). Disparities for non-Whites persist at multiple scales: nationally, in the vast majority of states (Figure A, part a) and in the majority of individual counties (Figure A, part b). The lack of individual-level data on the intersection of racial/ethnic identification and poverty status limited our ability to make direct comparisons; however, overall, racial disparities for both $PM_{2.5}$ and $PM_{10}$—specifically between Blacks and Whites—are stronger than are poverty-based disparities (Table 1). This is a consistent observation even when considering urban Whites and Blacks alone (Figure 2). $PM_{2.5}$ and $PM_{10}$ disparities for Hispanics are less pronounced or consistent but still present. The diversity within the Hispanic population, which includes both native-born persons and recent immigrants from a variety of countries, has made the catchall "Hispanic" designation vexing for public health research.[20,21]

Our main finding of national disparities in $PM_{2.5}$ burdens by race is consistent with that of Boyce and Pastor,[10] who carried out a similar analysis on $PM_{2.5}$ using the 2008 NEI and reported results equivalent to a proportional burden of 1.25 for non-Whites (compared with our finding of 1.28). Such disparities in residential proximity to sites of pollution potentially correspond to disparities in a range of health outcomes.[22–24]

Exposure to $PM_{2.5}$ has been linked to increased morbidity and mortality.[6–8] Although our study focused on point source emissions and not on ambient $PM_{2.5}$, the racial disparity in burdens from nearby facilities parallels the disparities seen in both modeled[16] (Table F [available as a supplement to the online version of this article at http://www.ajph.org]) and monitored[17] ambient $PM_{2.5}$ concentration data. Disparities in exposure between Blacks and Whites have been reported to be greater than are disparities on the basis of poverty status,[16] whether considering only urban, suburban, or rural census tracts.[17] This potential increase in exposure for the Black population coupled with higher prevalence of conditions such as cardiovascular disease mortality[25] and asthma,[26] which are known to be linked to PM exposure, makes for a population of concern. Equivalent increases in $PM_{2.5}$ have been linked to statistically significantly higher associations in Blacks than in Whites for health outcomes ranging from asthma attacks[27] to overall mortality.[28] In the US Medicare population, Blacks who are not eligible for Medicaid (a proxy for higher economic status) have higher $PM_{2.5}$-related mortality risk than do Whites who are eligible.[28]

Our analysis considered disparities at various scales. Racial disparity at the national scale is driven by high emissions in areas with high non-White populations. However, areas with a proportionately higher White population may still be internally inequitable. The few non-Whites who do reside in such an area are disproportionately likely to live near a source of PM emissions. Figure A, part a highlights such areas; the largely White Midwestern states contain some of the most disproportionately high internal $PM_{2.5}$ burden for non-Whites. Indiana, for instance, is more than 80% White, but the disproportionality in non-White burden is greater there than in any other state. Mohai et al.[2] found a disproportionately high number of Black residences near polluting facilities in Midwestern metropolitan areas—much more so than in Southern cities and in rural areas. No single scale can be considered best for grouping populations. In this case, results at national, state, and county scales all indicate that non-Whites tend to be burdened disproportionately to Whites.

## Strengths and Limitations

Our methodology has advantages as well as limitations. We relied on proximity to stationary, human-made point sources of primary PM emissions rather than ambient concentrations. Because there is a collection of other factors that may affect ambient PM concentrations—including natural events, roadway activity, and the formation of secondary PM from precursor pollutants—this metric should not be interpreted as a direct measure of PM exposure. Aggregation of burdens to the census tract level allowed us to compare our absolute burden assignments to EPA's Fused Air Quality Surface Using Downscaling[29] model of $PM_{2.5}$ daily concentration averages for 2011. Despite the presence of small racial disparities in residential ambient $PM_{2.5}$ for the contiguous United States (Table F), mean ambient $PM_{2.5}$ concentration and tract $PM_{2.5}$ burden from emissions were only weakly correlated (Spearman $\rho = 0.30$). However, there are benefits to understanding proximity that go beyond direct health impacts, including monetary reasons. Nearby pollution-generating sites are a tangible and accessible marker of pollution, and residents' awareness of such sites is demonstrated by the negative effect on housing values.[30]

Our method of assignment was to link facilities to all block groups that had a centroid within a set radius of the coordinates given in the NEI. Centroid-containment and other distance-based methods employing circular buffers are better equipped than is unit–hazard coincidence (i.e., the assignment of point sources to only their host census unit) in assigning nearby hazards to a population.[15,31] Unit–hazard coincidence inherently de-emphasizes the impact of facilities near borders, which becomes increasingly important in small, dense, urban block groups. The result is an overrepresentation of large, rural areas. Because of the higher representation of the non-White population in urban areas, centroid containment offers a more appropriate characterization of Black burdens nationally. We took several sensitivity measures to address the potential resulting underestimates of burdens in rural areas. In one analysis, we combined unit–hazard coincidence with centroid containment to calculate burdens; in others, we varied the containment radius between 0.5 and 5.0 miles. Neither of these alterations to the methodology substantially changed the values reported in the main analysis, suggesting a robust result (Table C). Furthermore, even limiting analysis only to urban areas, a Black individual living in a metropolitan or micropolitan core has a higher burden than does her urban White counterpart (Figure 2).

An additional strength of our analysis is the inclusion of the total amount of pollutants emitted at each site, as opposed to only the presence or absence of a nearby facility. As seen in Table 1, the proportional burden in facility number for Blacks is only 1.09; the proportional burdens in total $PM_{2.5}$ (1.54) and $PM_{10}$ (1.49) are much higher. This is consistent with studies suggesting that scaling sites by the amount of pollution emitted can further reinforce findings of inequity.[32] The difference between disparities in facility number and disparities in total PM implies that the few extra facilities near the average Black residence tend to be among the highest emitters. The distribution shown in Figure 1 suggests that a relatively small proportion of the US population bears the vast majority of burden from $PM_{2.5}$ emissions. Analysis on the basis of the EPA's Toxic Release Inventory shows that extremely high-polluting "toxic outliers" tend to exist in places with higher non-White and low-income populations.[33]

## Public Health Implications

This research demonstrates an aspect of a multifaceted public health problem faced by marginalized groups. As was exemplified in the EPA's investigation of racially discriminatory treatment in a public participation process,[9] the lack of political capital is an obstacle to obtaining more desirable living conditions. In addition, social and economic challenges can lead marginalized people to further populate an area made less desirable by

proximity to sources of pollution.[19] The potential health effects of the resulting environmental burdens on these groups should be considered in conjunction with existing health disparities: access to health care has well-documented disparities by race/ethnicity,[34] and the prevalence of certain diseases is notably higher in non-White populations.[25,26] Along with other inequitable social and physical determinants of health, these interlocking mechanisms must all be addressed to establish environmental and public health justice.

We have presented a framework with which to consider the racial and economic disparities in residential proximity to sources of pollution in the United States. We have shown that a focus on poverty to the exclusion of race may be insufficient to meet the needs of all burdened populations. Application of this knowledge can be a valuable resource in improving equity. Disparity persists at multiple scales of observation, and this suggests that solutions can also be approached on multiple levels. AJPH

## CONTRIBUTORS

I. Mikati led project design, data analysis, and writing. A. F. Benson contributed to design, writing, and data visualization. T. J. Luben, J. D. Sacks, and J. Richmond-Bryant supported project design and writing.


## ACKNOWLEDGMENTS

This research was supported in part by an appointment to the Research Participation Program for the US Environmental Protection Agency (EPA), Office of Research and Development, administered by the Oak Ridge Institute for Science and Education through an interagency agreement between the US Department of Energy and the EPA.

We thank Julian Marshall for his suggestions on strengthening the study design and Danelle Lobdell and Jen Nichols for their helpful comments on the article.

**Note.** This document was reviewed in accordance with EPA policy and approved for publication. Mention of trade names or commercial products does not constitute endorsement or recommendation for use. The views expressed in this article are those of the authors and do not necessarily reflect the views or policies of the EPA.


## HUMAN PARTICIPANT PROTECTION

No protocol approval was necessary because all data were obtained from publicly available secondary sources.

## REFERENCES


1. US General Accounting Office. Siting of hazardous waste landfills and their correlation with racial and economic status of surrounding communities. 1983. Available at: http://www.gao.gov/products/RCED-83-168. Accessed March 13, 2017.

2. Mohai P, Lantz PM, Morenoff J, House JS, Mero RP. Racial and socioeconomic disparities in residential proximity to polluting industrial facilities: evidence from the Americans' Changing Lives Study. *Am J Public Health*. 2009;99(suppl 3):S649–S656.

3. Clark LP, Millet DB, Marshall JD. Changes in transportation-related air pollution exposures by race-ethnicity and socioeconomic status: outdoor nitrogen dioxide in the United States in 2000 and 2010. *Environ Health Perspect*. 2017;125(9):097012.

4. Brender JD, Maantay JA, Chakraborty J. Residential proximity to environmental hazards and adverse health outcomes. *Am J Public Health*. 2011;101(suppl 1): S37–S52.

5. US Environmental Protection Agency. Particulate matter (PM) basics. Available at: https://www.epa.gov/pm-pollution/particulate-matter-pm-basics. Accessed April 6, 2017.

6. Franklin M, Zeka A, Schwartz J. Association between PM2.5 and all-cause and specific-cause mortality in 27 US communities. *J Expo Sci Environ Epidemiol*. 2006;17(3): 279–287.

7. Pope CA, Dockery DW. Health effects of fine particulate air pollution: lines that connect. *J Air Waste Manag Assoc*. 2006;56(6):709–742.

8. Brook RD, Rajagopalan S, Pope CA, et al. Particulate matter air pollution and cardiovascular disease: an update to the scientific statement from the American Heart Association. *Circulation*. 2010;121(21):2331–2378.

9. US Environmental Protection Agency. 01R-94-R5 MDEQ closure letter. 2017. Available at: https://www.epa.gov/ocr/01r-94-r5-mdeq-closure-letter. Accessed March 24, 2017.

10. Boyce JK, Pastor M. Clearing the air: incorporating air quality and environmental justice into climate policy. *Clim Change*. 2013;120(4):801–814.

11. US Census Bureau. American Community Survey (ACS). Available at: https://www.census.gov/programs-surveys/acs. Accessed April 17, 2017.

12. US Census Bureau. How the census bureau measures poverty. Available at: https://www.census.gov/topics/income-poverty/poverty/guidance/poverty-measures.html. Accessed August 1, 2017.

13. US Department of Agriculture. 2010 rural–urban commuting area (RUCA) codes documentation. Available at: https://www.ers.usda.gov/data-products/rural–urban-commuting-area-codes/documentation. Accessed April 17, 2017.

14. US Environmental Protection Agency. 2011 National Emissions Inventory (NEI) data. Available at: https://www.epa.gov/air-emissions-inventories/2011-national-emissions-inventory-nei-data. Accessed April 17, 2017.

15. Mohai P, Saha R. Reassessing racial and socioeconomic disparities in environmental justice research. *Demography*. 2006;43(2):383–399.

16. Bell ML, Ebisu K. Environmental inequality in exposures to airborne particulate matter components in the United States. *Environ Health Perspect*. 2012;120(12): 1609–1704.

17. Bravo MA, Anthopolos R, Bell ML, Miranda ML. Racial isolation and exposure to airborne particulate matter and ozone in understudied US populations: environmental justice applications of downscaled numerical model output. *Environ Int*. 2016;92–93:247–255.

18. US Census Bureau. Comparing ACS data. Available at: https://www.census.gov/programs-surveys/acs/guidance/comparing-acs-data.html. Accessed April 11, 2017.

19. Mohai P, Saha R. Which came first, people or pollution? Assessing the disparate siting and post-siting demographic change hypotheses of environmental injustice. *Environ Res Lett*. 2015;10:115008.

20. Borrell LN. Racial identity among Hispanics: implications for health and well-being. *Am J Public Health*. 2005;95(3):379–381.

21. Palloni A, Arias E. Paradox lost: explaining the Hispanic adult mortality advantage. *Demography*. 2004; 41(3):385–415.

22. Maantay J. Asthma and air pollution in the Bronx: methodological and data considerations in using GIS for environmental justice and health research. *Health Place*. 2007;13(1):32–56.

23. Kouznetsova M, Huang X, Ma J, Lessner L, Carpenter DO. Increased rate of hospitalization for diabetes and residential proximity of hazardous waste sites. *Environ Health Perspect*. 2007;115(1):75–79.

24. Choi HS, Shim YK, Kaye WE, Ryan PB. Potential residential exposure to toxics release inventory chemicals during pregnancy and childhood brain cancer. *Environ Health Perspect*. 2006;114(7):1113–1118.

25. Mensah GA, Mokdad AH, Ford ES, Greenlund KJ, Croft JB. State of disparities in cardiovascular health in the United States. *Circulation*. 2005;111(10):1233–1241.

26. Centers for Disease Control and Prevention. Trends in asthma prevalence, health care use, and mortality in the United States, 2001–2010. 2012. Available at: https://www.cdc.gov/nchs/products/databriefs/db94.htm. Accessed April 17, 2017.

27. Nachman KE, Parker JD. Exposures to fine particulate air pollution and respiratory outcomes in adults using two national datasets: a cross-sectional study. *Environ Health*. 2012;11:25.

28. Di Q, Wang Y, Zanobetti A, et al. Air pollution and mortality in the Medicare population. *N Engl J Med*. 2017; 376(26):2513–2522.

29. US Environmental Protection Agency. RSIG-related downloadable data files. Available at: https://www.epa.gov/hesc/rsig-related-downloadable-data-files. Accessed April 17, 2017.

30. Davis LW. The effect of power plants on local housing values and rents. *Rev Econ Stat*. 2011;93(4):1391–1402.

31. Chakraborty J, Maantay JA, Brender JD. Disproportionate proximity to environmental health hazards: methods, models, and measurement. *Am J Public Health*. 2011;101(suppl 1):S27–S36.

32. McMaster RB, Leitner H, Sheppard E. GIS-based environmental equity and risk assessment: methodological problems and prospects. *Cartogr Geogr Inform*. 1997; 24(3):172–189.

33. Collins MB, Munoz I, JaJa J. Linking "toxic outliers" to environmental justice communities. *Environ Res Lett*. 2016;11(1):015004.

34. Smedley BD, Stith AY, Nelson AR, eds. *Unequal Treatment: Confronting Racial and Ethnic Disparities in Health Care*. Washington, DC: National Academies Press; 2003.

SCIENCE ADVANCES | RESEARCH ARTICLE

SCIENCE POLICY

# $PM_{2.5}$ polluters disproportionately and systemically affect people of color in the United States

Copyright © 2021 The Authors, some rights reserved; exclusive licensee American Association for the Advancement of Science. No claim to original U.S. Government Works. Distributed under a Creative Commons Attribution License 4.0 (CC BY).

**Christopher W. Tessum[1]*, David A. Paolella[2†], Sarah E. Chambliss[3], Joshua S. Apte[4,5], Jason D. Hill[6], Julian D. Marshall[2]**

**Racial-ethnic minorities in the United States are exposed to disproportionately high levels of ambient fine particulate air pollution ($PM_{2.5}$), the largest environmental cause of human mortality. However, it is unknown which emission sources drive this disparity and whether differences exist by emission sector, geography, or demographics. Quantifying the $PM_{2.5}$ exposure caused by each emitter type, we show that nearly all major emission categories—consistently across states, urban and rural areas, income levels, and exposure levels—contribute to the systemic $PM_{2.5}$ exposure disparity experienced by people of color. We identify the most inequitable emission source types by state and city, thereby highlighting potential opportunities for addressing this persistent environmental inequity.**

## INTRODUCTION

Ambient fine particulate matter air pollution ($PM_{2.5}$) is responsible for 85,000 to 200,000 excess deaths per year in the United States (*1*, *2*), with health effects observed even at concentrations below the current national standard of 12 μg $m^{-3}$ (*3*–*5*). Racial-ethnic and socioeconomic disparities in air pollution exposure in the United States are well documented (*6*–*10*) and have persisted despite overall decreases in $PM_{2.5}$ pollution (*11*–*13*).

Most evidence of exposure disparity relies on measured or empirically modeled ambient concentrations or on assessment of proximity to industrial or roadway emission sources (*6*, *10*, *12*–*20*). From the existing evidence, however, it is not possible to determine the relative contributions of different source types to racial-ethnic disparity in exposure to $PM_{2.5}$. Here, we model anthropogenic sources of $PM_{2.5}$ exposure resolved by race and ethnicity and show that nearly all major emission source sectors disproportionately affect people of color (POC).

We estimate exposure impacts for each emission source type on five racial-ethnic groups based on the U.S. Census: White (62% of the population), Black (12%), Hispanic (17%), Asian (5%), and POC (38%; see Materials and Methods for details). As a proxy for exposure to $PM_{2.5}$, we calculate population-weighted average ambient $PM_{2.5}$ concentrations for each race-ethnicity based on census-designated residential location.

We examine exposure disparity—the population-weighted concentration difference between each racial-ethnic group and the population average—in relative (percent) and absolute (μg $m^{-3}$) terms. Sources with the highest relative disparity may yield the largest disparity mitigation per unit mass of emission reduction, whereas sources with the highest absolute disparity may have the greatest potential for overall disparity reduction.

[1]Department of Civil and Environmental Engineering, University of Illinois at Urbana-Champaign, Urbana, IL 61801, USA. [2]Department of Civil and Environmental Engineering, University of Washington, Seattle, WA 98195, USA. [3]Department of Civil, Architectural and Environmental Engineering, University of Texas at Austin, Austin, TX 78712, USA. [4]Department of Civil and Environmental Engineering, University of California, Berkeley, Berkeley, CA 94720, USA. [5]School of Public Health, University of California, Berkeley, Berkeley, CA 94720, USA. [6]Department of Bioproducts and Biosystems Engineering, University of Minnesota, St. Paul, MN 55108, USA.
*Corresponding author. Email: ctessum@illinois.edu
†Present address: Clean Energy Transition Institute, Seattle, WA 98105, USA.

## RESULTS

Results indicate that emission sources that disproportionately expose POC are pervasive throughout society. Estimated year 2014 total population average $PM_{2.5}$ exposure from all domestic anthropogenic sources is 6.5 μg $m^{-3}$ in the contiguous United States; exposures are higher than average for POC, Blacks, Hispanics, and Asians (7.4, 7.9, 7.2, and 7.7 μg $m^{-3}$, respectively; Fig. 1, B to E) and lower than average for Whites (5.9 μg $m^{-3}$; Fig. 1A). Whites are exposed to lower-than-average concentrations from emission source types causing 60% of overall exposure (Fig. 1A), with an overall relative exposure disparity of −8% (−0.55 μg $m^{-3}$ absolute disparity) compared with the population average. Conversely, POC experience greater-than-average exposures from source types, causing 75% of overall exposure (Fig. 1B); their overall exposure disparity is 14% (0.90 μg $m^{-3}$). Blacks are exposed to greater-than-average concentrations from source types contributing 78% of exposure (Fig. 1C), with an overall exposure disparity of 21% (1.36 μg $m^{-3}$). Hispanics and Asians are disparately exposed to $PM_{2.5}$ from 87 and 73% of sources, respectively, and experience 11% (0.72 μg $m^{-3}$) and 18% (1.20 μg $m^{-3}$) overall exposure disparities, respectively (Fig. 1, D and E).

Grouping the source types (Fig. 1, A to E) into 14 source sectors (Fig. 1, F to J) reveals that source types that disproportionately expose POC, Blacks, Hispanics, and Asians to higher-than-average concentrations are dominant in most sectors. Whites are exposed to lower-than-average concentrations from most emission sectors (Fig. 1F). Blacks are exposed to higher-than-average concentrations from all sectors (Fig. 1H).

Of the emission source sectors that cause the largest absolute disparities, four out of the top six source sectors are the same for POC, Blacks, Hispanics, and Asians: industry, light-duty gasoline vehicles, construction, and heavy-duty diesel vehicles (Fig. 1, G to J). Residential gas combustion and commercial cooking are among the largest sources of relative disparities for all four groups (e.g., 41 and 35%, respectively for POC; Fig. 1, G to J). The only sectors that affect Whites substantially more than average are coal electric generation and agriculture (8 and 4% relative disparity, respectively; Fig. 1F). Consistent with previous findings (*11*, *21*), we find that POC, Hispanics, and Asians are exposed to less $PM_{2.5}$ from coal electric generators than average (−13%, −38%, and −18%, respectively), and Blacks are exposed to 18% more than average (Fig. 1H).

Downloaded from https://www.science.org on March 22, 2023




**Fig. 1. Source contributions to racial-ethnic disparity in $PM_{2.5}$ exposure.** (**A** to **E**) Individual source type ($n = 5434$ source types) contributions to exposure ($y$ axis) and % exposure disparity ($x$ axis, truncated at 200%, positive values are shaded red, negative values are shaded blue), with dashed lines denoting percent exposure caused by sources with positive exposure disparity. (**F** to **J**) Sources in (A) to (E) grouped into source sectors ($n = 14$ groups) and ranked vertically according to absolute exposure disparity, proportional to the area of each rectangle. As shown in (B), POC experience greater-than-average exposures from source types causing 75% of overall exposure. Source: data file S1, which also includes results for individual states and urban areas.

Nationally, racial-ethnic exposure disparities are not caused by a small number of emission sources; instead, most source types and sectors result in higher-than-average exposures for POC and lower-than-average exposures for Whites (Fig. 1). By examining the percent of exposures caused by these disproportionately exposing emission source types for each group [for example, 40% for Whites (Fig. 1A) and 75% for POC (Fig. 1B) nationally], we find that this is also largely true within individual U.S. states, within individual urban and rural areas, across incomes, and across exposure levels (Figs. 2 and 3).

In 45 of the 48 states studied, disproportionately exposing sources cause the majority of POC exposure (Fig. 2A). In the (population-weighted) average state, 78% of exposure is caused by sources that disproportionately expose POC (White: 29%; Black: 77%; Hispanic: 73%; and Asian: 75%; Figs. 2A and 3, C to E; these average-state disparities differ from the national average disparities above because national averages include disparities occurring among states in addition to within states).

We observe the same effect within urban areas (Fig. 2B), with 73% of exposure in the (population-weighted) average urban area caused by sources that disproportionately expose POC (White: 31%; Black: 71%; Hispanic: 71%; and Asian: 56%; Figs. 2B and 3, H to J). There is a notable exception: Asians are less exposed than average in many urban areas in California with large Asian populations (data file S1; for example, Los Angeles, San Francisco, and San Jose). In the (population-weighted) average urban area outside California, 67% of Asian exposure is caused by source types that disproportionately expose Asians, compared with 56% when including California. Disparities also consistently occur in rural areas (defined here as the complement of urban areas), where a large proportion of exposure is caused by sources that disproportionately expose POC (White: 39%; POC: 62%; Black: 63%; Hispanic: 57%; and Asian: 74%; Figs. 2C and 3, M to O). However, disparities in rural areas are not as pronounced as in urban areas (Fig. 2, B and C).

Last, systemic disparity exists at all income levels. Consistent with a large body of evidence (*12*, *22*), we find that racial disparities are not simply a proxy for economic-based disparities. POC at every income level are disproportionately exposed by the majority of sources, with a population-weighted average across income bins of 76% of exposure caused by source types that disproportionately

Downloaded from https://www.science.org on March 22, 2023




**Fig. 2. Percent of $PM_{2.5}$ exposure caused by emission source types that disproportionately expose people of color (POC) and Whites.** Data shown for (**A**) U.S. states ($n = 48$ states), (**B**) urbanized areas ($n = 481$ areas), (**C**) rural areas in each state ($n = 48$ states), and (**D**) income bins ($n = 16$ bins; last bin is >$200,000). Icon area is proportional to population; shaded areas are kernel density estimates. A *y* axis value of 50% would represent equity for that group (i.e., for the population-average exposure), meaning that half of their exposure comes from source types that disproportionately expose them and the other half is from source types that expose them less than average. Across geographies and levels of exposure (A to C), as well as incomes (D), most emission sources consistently result in higher exposures for POC and lower exposures for Whites. Source: data file S2.

Downloaded from https://www.science.org on March 22, 2023

expose POC (Fig. 2D and fig. S1). Exposures vary more by race-ethnicity than by income: The difference in average exposure between POC and Whites is 2.4 times larger than the range in average POC exposure among income levels (data files S1 and S2).

## DISCUSSION

Our results come with caveats. First, we use emission amounts and locations, reduced complexity air quality modeling, and population counts that all contain previously quantified uncertainty (*11*, *23*; Supplementary Text). However, our core findings are consistent across states, urban and rural areas, and concentration levels, rendering it improbable that they are attributable to model or measurement bias. Second, because aggregate results are more robust than results for any single location, we recommend additional analysis incorporating local data and expertise before local actions are taken. Third, our results for states and for urban and rural areas reflect exposure to ambient $PM_{2.5}$, including contributions from emission sources located outside the state, urban area, or rural area. This has implications for local authorities, who may not have jurisdiction over all sources of their exposure. Last, this analysis focuses on outdoor concentrations at locations of residence. Disparities in associated health impacts would also reflect racial-ethnic variability in mobility, microenvironment, outdoor-to-indoor concentration relationships, dose-response, access to health care, and baseline mortality and morbidity rates.

We have shown here that most emission source types—representing ~75% of exposure to $PM_{2.5}$ in the United States—disproportionately affect racial-ethnic minorities. This phenomenon is systemic, holding for nearly all major sectors, as well as across states and urban and rural areas, income levels, and exposure levels. Industry, light-duty gasoline vehicles, construction, and heavy-duty diesel vehicles are often among the largest sources of disparity, but this can vary widely by source type and location. Because of a legacy of racist housing policy (fig. S2; supporting results) and other factors, racial-ethnic exposure disparities have persisted even as overall exposure has decreased (*11*–*13*). Targeting locally important sources for mitigation could be one way to counter this persistence. We hope the information provided here can help guide national, state, and local stakeholders to design policies to efficiently reduce environmental inequity.




**Fig. 3. Percent of $PM_{2.5}$ exposure caused by emission source types that disproportionately expose each racial-ethnic group by location and race-ethnicity.** Icon area is proportional to population; shaded areas are kernel density estimates. This figure is analogous to Fig. 2 but with results for all five racial-ethnic groups. Source: data file S2.

## MATERIALS AND METHODS

We use a source-receptor matrix (*24*) created using the InMAP (*25*) air quality model to independently estimate concentrations in the contiguous United States resulting from anthropogenic emissions. We consider all 5434 source types [i.e., all U.S. Environmental Protection Agency (EPA) Source Classification Codes (SCCs) with nonzero emissions; we exclude the 8378 SCCs without emissions associated with them] in the 2014 EPA National Emissions Inventory (NEI) v1. County-level emissions are allocated to individual grid cells within the county using spatial surrogates. Emissions processing is described in further detail by Tessum *et al.* (*11*). To focus on impacts from modifiable factors, we do not investigate here emissions from biogenic, wildfire, or international sources. Exposure and health impacts resulting from these additional sources are quantified by Tessum *et al.* (*11*).

We investigate both primary (i.e., directly emitted) and secondary (i.e., formed in the atmosphere from other emissions) $PM_{2.5}$. We model secondary $PM_{2.5}$ formed from volatile organic compounds, oxides of nitrogen and sulfur ($NO_x$ and $SO_x$), and ammonia ($NH_3$). We aggregate the 5434 SCCs (source "types") into 14 source sectors (table S1), each accounting for >1% of total $PM_{2.5}$ exposure. InMAP predicts concentrations at a spatial scale ranging from 48 km in areas with low population density to as fine as 1 km in urban centers; this intraurban spatial scale is necessary to resolve differences in exposure among demographic groups (*26*). The population-weighted average horizontal grid cell edge length is 10.8 km nationwide and 3.4 km in urban areas. Additional grid statistics can be found in table S2.

The source-receptor matrix relates emissions in any one location in a gridded spatial domain to InMAP-computed concentrations in all other locations. These relationships are generated with independent simulations of the air quality model for each of over 50,000 grid cells covering the contiguous United States for both ground-level and elevated sources.

Population-weighted average ambient concentrations, our measure of exposure, are calculated using a conventional approach to weighted averages. Specifically, we first multiply, for each grid cell, the population and the concentration. The sum of those values across all cells in the given spatial domain is then divided by the corresponding population to yield the population-weighted average concentration: $PWA = \Sigma(PC)/\Sigma(P)$. Here, PWA is the population-weighted average, $P$ is the population in a grid cell, $C$ is the concentration in a grid cell, and the summations in the numerator and denominator are across all grid cells in the geography being studied (e.g., in a state, in the contiguous United States).

Population data by race-ethnicity are from the U.S. Census 2012–2016 American Community Survey (ACS) at Census Block Group level of spatial aggregation. We focus on the four largest race-ethnicity groups as determined by self-identification in the Census: Asian, Black or African American, Latino or Hispanic, and White. We aggregate these four population subgroups such that they are mutually exclusive: "Hispanic" including people of all races who

Downloaded from https://www.science.org on March 22, 2023

USCA Case #24-1050 Document #2078682 Filed: 10/07/2024 Page 151 of 390


identify as having Hispanic or Latino origin, and the other three groups (Asian, Black, and White) referring only to non-Latino/non-Hispanic persons. POC are defined herein as everyone except non-Latino/non-Hispanic Whites (i.e., individuals identifying as Hispanic plus non-Hispanic individuals identifying as Black or African American, American Indian or Alaska Native, Asian, Native Hawaiian and other pacific islander, some other race, or two or more races).

The 2012–2016 ACS provides income statistics by Census Tract, with 16 household income categories (lowest: "less than $10,000"; highest: "$200,000 or more"). We use the proportion of households in each income category to estimate population counts at the finest available level of race-ethnicity information: White and POC. Table S3 details the population distribution by income category.

To calculate exposure in individual urban areas, we use year 2018 urbanized area extents as defined by the U.S. Census (www.census.gov/geographies/mapping-files/time-series/geo/carto-boundary-file.html). We define "rural" as everywhere that is not within an urbanized area extent.

To calculate exposure by 1930s-era Home Owners' Loan Corporation (HOLC) grades, we use historical maps digitized by the Mapping Inequality project (*27*). HOLC maps classify urban neighborhoods into four grades: A (green; "best"), B (blue; "still desirable"), C (yellow; "definitely declining"), and D (red; "hazardous"). For results shown in fig. S2, we define "% exposure from disproportionately exposing source types" as the percent of exposure that is caused by source types that expose residents of a given race-ethnicity currently living in an area with the given historical HOLC grade in a given city more than the overall average exposure of all residents of HOLC-graded areas in that city.

## SUPPLEMENTARY MATERIALS

Supplementary material for this article is available at http://advances.sciencemag.org/cgi/content/full/7/18/eabf4491/DC1

## REFERENCES AND NOTES

1. Institute for Health Metrics and Evaluation (IHME), GBD Compare Data Visualization, accessed December 10, 2018; http://ghdx.healthdata.org/gbd-results-tool.
2. R. Burnett, H. Chen, M. Szyszkowicz, N. Fann, B. Hubbell, C. A. Pope III, J. S. Apte, M. Brauer, A. Cohen, S. Weichenthal, J. Coggins, Q. di, B. Brunekreef, J. Frostad, S. S. Lim, H. Kan, K. D. Walker, G. D. Thurston, R. B. Hayes, C. C. Lim, M. C. Turner, M. Jerrett, D. Krewski, S. M. Gapstur, W. R. Diver, B. Ostro, D. Goldberg, D. L. Crouse, R. V. Martin, P. Peters, L. Pinault, M. Tjepkema, A. van Donkelaar, P. J. Villeneuve, A. B. Miller, P. Yin, M. Zhou, L. Wang, N. A. H. Janssen, M. Marra, R. W. Atkinson, H. Tsang, T. Quoc Thach, J. B. Cannon, R. T. Allen, J. E. Hart, F. Laden, G. Cesaroni, F. Forastiere, G. Weinmayr, A. Jaensch, G. Nagel, H. Concin, J. V. Spadaro, Global estimates of mortality associated with long-term exposure to outdoor fine particulate matter. *Proc. Natl. Acad. Sci.* **115**, 9592–9597 (2018).
3. C. A. Pope III, D. W. Dockery, Health effects of fine particulate air pollution: Lines that connect. *J. Air Waste Manage. Assoc.* **56**, 709–742 (2006).
4. D. L. Crouse, P. A. Peters, A. van Donkelaar, M. S. Goldberg, P. J. Villeneuve, O. Brion, S. Khan, D. O. Atari, M. Jerrett, C. A. Pope, M. Brauer, J. R. Brook, R. V. Martin, D. Stieb, R. T. Burnett, Risk of nonaccidental and cardiovascular mortality in relation to long-term exposure to low concentrations of fine particulate matter: A Canadian national-level cohort study. *Environ. Health Perspect.* **120**, 708–714 (2012).
5. R. D. Brook, S. Rajagopalan, C. A. Pope III, J. R. Brook, A. Bhatnagar, A. V. Diez-Roux, F. Holguin, Y. Hong, R. V. Luepker, M. A. Mittleman, A. Peters, D. Siscovick, S. C. Smith Jr., L. Whitsel, J. D. Kaufman; American Heart Association Council on Epidemiology and Prevention, Council on the Kidney in Cardiovascular Disease, and Council on Nutrition, Physical Activity and Metabolism, Particulate matter air pollution and cardiovascular disease: An update to the scientific statement from the American Heart Association. *Circulation* **121**, 2331–2378 (2010).
6. R. D. Bullard, Solid waste sites and the Black Houston community. *Soc. Inquiry.* **53**, 273–288 (1983).
7. A. Hajat, C. Hsia, M. S. O'Neill, Socioeconomic disparities and air pollution exposure: A Global Review. *Curr. Environ. Heal. Rep.* **2**, 440–450 (2015).
8. P. Mohai, D. Pellow, J. T. Roberts, Environmental justice. *Annu. Rev. Env. Resour.* **34**, 405–430 (2009).
9. P. Mohai, R. Saha, Which came first, people or pollution? A review of theory and evidence from longitudinal environmental justice studies. *Environ. Res. Lett.* **10**, 125011 (2015).
10. J. D. Brender, J. A. Maantay, J. Chakraborty, Residential proximity to environmental hazards and adverse health outcomes. *Am. J. Public Health* **101**, S37–S52 (2011).
11. C. W. Tessum, J. S. Apte, A. L. Goodkind, N. Z. Muller, K. A. Mullins, D. A. Paolella, S. Polasky, N. P. Springer, S. K. Thakrar, J. D. Marshall, J. D. Hill, Inequity in consumption of goods and services adds to racial–ethnic disparities in air pollution exposure. *Proc. Natl. Acad. Sci.* **116**, 6001–6006 (2019).
12. J. Liu, L. P. Clark, M. Bechle, A. Hajat, S.-Y. Kim, A. Robinson, L. Sheppard, A. A. Szpiro, J. D. Marshall, Disparities in Air Pollution Exposure in the United States by Race-Ethnicity and Income, 1990–2010. *ChemRxiv. Preprint*. 10.26434/chemrxiv.13814711.v1 (2021).
13. J. Colmer, I. Hardman, J. Shimshack, J. Voorheis, Disparities in $PM_{2.5}$ air pollution in the United States. *Science* **369**, 575–578 (2020).
14. I. Mikati, A. F. Benson, T. J. Luben, J. D. Sacks, J. Richmond-Bryant, Disparities in distribution of particulate matter emission sources by race and poverty status. *Am. J. Public Health*, 480–485 (2018).
15. L. P. Clark, D. B. Millet, J. D. Marshall, Changes in transportation-related air pollution exposures by race-ethnicity and socioeconomic status: Outdoor nitrogen dioxide in the United States in 2000 and 2010. *Environ. Health Perspect.* **125**, 097012 (2017).
16. P. Mohai, P. M. Lantz, J. Morenoff, J. S. House, R. P. Mero, Racial and socioeconomic disparities in residential proximity to polluting industrial facilities: Evidence from the Americans' Changing Lives Study. *Am. J. Public Health* **99** (Suppl. 3), S649–S656 (2009).
17. M. L. Bell, K. Ebisu, Environmental inequality in exposures to airborne particulate matter components in the United States. *Environ. Health Perspect.* **120**, 1699–1704 (2012).
18. R. Morello-Frosch, R. Lopez, The riskscape and the color line: Examining the role of segregation in environmental health disparities. *Environ. Res.* **102**, 181–196 (2006).
19. M. R. Jones, A. V. Diez-Roux, A. Hajat, K. N. Kershaw, M. S. O'Neill, E. Guallar, W. S. Post, J. D. Kaufman, A. Navas-Acien, Race/ethnicity, residential segregation, and exposure to ambient air pollution: The multi-ethnic study of atherosclerosis (MESA). *Am. J. Public Health* **104**, 2130–2137 (2014).
20. A. Rosofsky, J. I. Levy, A. Zanobetti, P. Janulewicz, M. P. Fabian, Temporal trends in air pollution exposure inequality in Massachusetts. *Environ. Res.* **161**, 76–86 (2018).
21. M. P. S. Thind, C. W. Tessum, I. L. Azevedo, J. D. Marshall, Fine particulate air pollution from electricity generation in the US: Health impacts by race, income, and geography. *Environ. Sci. Technol.* **53**, 14010–14019 (2019).
22. P. Brown, Race, class, and environmental health: A review and systematization of the literature. *Environ. Res.* **69**, 15–30 (1995).
23. E. A. Gilmore, J. Heo, N. Z. Muller, C. W. Tessum, J. D. Hill, J. D. Marshall, P. J. Adams, An inter-comparison of the social costs of air quality from reduced-complexity models. *Environ. Res. Lett.* **14**, 074016 (2019).
24. A. L. Goodkind, C. W. Tessum, J. S. Coggins, J. D. Hill, J. D. Marshall, Fine-scale damage estimates of particulate matter air pollution reveal opportunities for location-specific mitigation of emissions. *Proc. Natl. Acad. Sci.* **116**, 8775–8780 (2019).
25. C. W. Tessum, J. D. Hill, J. D. Marshall, InMAP: A model for air pollution interventions. *PLOS ONE* **12**, e0176131 (2017).
26. D. A. Paolella, C. W. Tessum, P. J. Adams, J. S. Apte, S. Chambliss, J. Hill, N. Z. Muller, J. D. Marshall, Effect of model spatial resolution on estimates of fine particulate matter exposure and exposure disparities in the United States. *Environ. Sci. Technol.* **5**, 436–441 (2018).
27. R. K. Nelson, L. Winling, R. Marciano, N. Connolly, *et al.*, "Mapping Inequality," *American Panorama*, R. K. Nelson, E. L. Ayers, Eds., accessed February 3, 2021; https://dsl.richmond.edu/panorama/redlining/.
28. Federal Housing Administration (FHA), Underwriting Manual: Underwriting and Valuation Procedure Under Title II of the National Housing Act With Revisions to April 1, 1936 (Washington, D.C.), Part II, Section 2, Rating of Location.
29. An Act to amend certain Federal laws pertaining to community development, housing, and related programs, Enacted by the 95th United States Congress, October 12, 1977.
30. H. Simon, K. R. Baker, S. Phillips, Compilation and interpretation of photochemical model performance statistics published between 2006 and 2012. *Atmos. Environ.* **61**, 124–139 (2012).

**Acknowledgments:** We thank K. Harper for editorial support and N. Z. Muller for comments on a previous version of the manuscript. **Funding:** This publication was developed as part of the Center for Air, Climate and Energy Solutions (CACES), which was supported under Assistance Agreement No. R835873 awarded by the U.S. Environmental Protection Agency. It has not been formally reviewed by EPA. The views expressed in this document are solely those

Downloaded from https://www.science.org on March 22, 2023



JA2665

USCA Case #24-1050 Document #2078682 Filed: 10/07/2024 Page 152 of 390


of the authors and do not necessarily reflect those of the Agency. EPA does not endorse any products or commercial services mentioned in this publication. **Author contributions:** Conceived and designed the experiments: C.W.T., D.A.P., J.D.H., and J.D.M. Analyzed the data: C.W.T., D.A.P., and J.D.M. Wrote the paper: C.W.T., D.A.P., S.E.C., J.S.A., J.D.H., and J.D.M. **Competing interests:** The authors declare that they have no competing interests. **Data and materials availability:** All data needed to evaluate the conclusions in the paper are present in the paper and/or the Supplementary Materials. Additional data related to this paper may be requested from the authors.

Submitted 27 October 2020
Accepted 10 March 2021
Published 28 April 2021
10.1126/sciadv.abf4491

**Citation:** C. W. Tessum, D. A. Paolella, S. E. Chambliss, J. S. Apte, J. D. Hill, J. D. Marshall, $PM_{2.5}$ polluters disproportionately and systemically affect people of color in the United States. *Sci. Adv.* **7**, eabf4491 (2021).

Downloaded from https://www.science.org on March 22, 2023

Science Advances

# $PM_{2.5}$ polluters disproportionately and systemically affect people of color in the United States

Christopher W. Tessum, David A. Paolella, Sarah E. Chambliss, Joshua S. Apte, Jason D. Hill, and Julian D. Marshall

*Sci. Adv.*, **7** (18), eabf4491.
DOI: 10.1126/sciadv.abf4491

**View the article online**
https://www.science.org/doi/10.1126/sciadv.abf4491
**Permissions**
https://www.science.org/help/reprints-and-permissions

Downloaded from https://www.science.org on March 22, 2023

Use of this article is subject to the Terms of service

*Science Advances* (ISSN 2375-2548) is published by the American Association for the Advancement of Science. 1200 New York Avenue NW, Washington, DC 20005. The title *Science Advances* is a registered trademark of AAAS.
Copyright © 2021 The Authors, some rights reserved; exclusive licensee American Association for the Advancement of Science. No claim to original U.S. Government Works. Distributed under a Creative Commons Attribution License 4.0 (CC BY).

Environmental Science & Technology

Article

Cite This: *Environ. Sci. Technol.* XXXX, XXX, XXX−XXX

pubs.acs.org/est

# Fine Particulate Air Pollution from Electricity Generation in the US: Health Impacts by Race, Income, and Geography

Maninder P. S. Thind,[†] Christopher W. Tessum,[†] Inês L. Azevedo,[‡] and Julian D. Marshall*,[†]

[†]Department of Civil and Environmental Engineering, University of Washington, Seattle, Washington 98195, United States

[‡]Department of Energy Resources Engineering, School of Earth, Energy and the Environment, Stanford University, Stanford, California 94305, United States

*Supporting Information*

Downloaded via KAROLINSKA INST on November 21, 2019 at 06:52:25 (UTC).
See https://pubs.acs.org/sharingguidelines for options on how to legitimately share published articles.

**ABSTRACT:** Electricity generation is a large contributor to fine particulate matter ($PM_{2.5}$) air pollution. However, the demographic distribution of the resulting exposure is largely unknown. We estimate exposures to and health impacts of $PM_{2.5}$ from electricity generation in the US, for each of the seven Regional Transmission Organizations (RTOs), for each US state, by income and by race. We find that average exposures are the highest for blacks, followed by non-Latino whites. Exposures for remaining groups (e.g., Asians, Native Americans, Latinos) are somewhat lower. Disparities by race/ethnicity are observed for each income category, indicating that the racial/ethnic differences hold even after accounting for differences in income. Levels of disparity differ by state and RTO. Exposures are higher for lower-income than for higher-income, but disparities are larger by race than by income. Geographically, we observe large differences between where electricity is generated and where people experience the resulting $PM_{2.5}$ health consequences; some states are net exporters of health impacts, other are net importers. For 36 US states, most of the health impacts are attributable to emissions in other states. Most of the total impacts are attributable to coal rather than other fuels.




## 1. INTRODUCTION

Fine particulate matter ($PM_{2.5}$) is the largest environmental health risk in the United States (US) and globally.[1,2] $PM_{2.5}$ is associated with increased mortality rates from, e.g., cardiovascular disease (ischemic heart disease and stroke), chronic obstructive pulmonary disease, and lung cancer.[3−5]

Fuel combustion emits $PM_{2.5}$ directly ("primary $PM_{2.5}$") as well as sulfur dioxide ($SO_2$) and oxides of nitrogen ($NO_x$), which can react with ammonia ($NH_3$) in the atmosphere to form $PM_{2.5}$ ("secondary $PM_{2.5}$").[6] The US Environmental Protection Agency (US EPA) estimates that in 2014, electricity generating units (EGUs) contributed 67% of $SO_2$, 13% of $NO_x$, and 3% of primary $PM_{2.5}$ emissions nationwide.[7] In 2014, coal-fired EGUs generated ∼39% of the electricity in the US and contributed to 97%, 86%, and 81%, respectively, of $SO_2$, $NO_x$, and $PM_{2.5}$ total electricity emissions.[7] Although the health damages associated with these emissions continue to be important, EGU emissions have declined in recent decades[7,8] owing to environmental regulations[9] and a transition from coal to natural gas driven largely by market prices.

Existing estimates of annual $PM_{2.5}$-related mortality from EGUs in the US include the following: (i) for year 2005: 52 000 (Caiazzo et al. 2013),[10] 41 500 (Dedoussi et al. 2014),[11] 19 000 (Penn et al. 2017),[12] 38 000 (Fann et al. 2013);[13] (ii) for year 2010: 17 050 (Lelieveld et al. 2015);[14] (iii) for year 2014: 10 400 (Tessum et al. 2019);[15] and (iv) for year 2016 projected emissions: 17 000 (Fann et al. 2013).[13] Levy et al. (2009)[16] modeled the monetized damages associated with 407 coal-fired power plants in the United States. Buonocore et al. (2014)[17] estimated monetized health impacts of $PM_{2.5}$ from individual power plants and normalized to "per-ton emitted" using the Community Multiscale Air Quality (CMAQ) Model. Penn et al. (2017)[12] also quantified impacts from EGUs by state, finding 21 000 premature mortalities per year from EGU emissions ($PM_{2.5}$ and ozone [$O_3$]). Mortality estimates vary among studies owing to differences in methods, models, concentration−response functions, and years considered (total EGU emissions are decreasing over time).

The consideration of how exposure to air pollution differs by the demographic group is relevant to environmental justice (EJ).[18] Several studies have estimated health-impact disparities for air pollution from various source sectors,[19−27] but few studies have investigated EJ aspects of electricity generation in the US. Studying EGUs in the US, Levy et al. (2007)[28] quantified health benefits and the change in the spatial inequality of health risk for potential EGU pollution control strategies. They report 17 000−21 000 fewer premature deaths per year for hypothetical power-plant control scenarios in the

Received: April 26, 2019
Revised: September 12, 2019
Accepted: September 13, 2019

ACS Publications © XXXX American Chemical Society

US that aim to determine optimal control strategies. Martenies et al. (2017),[24] studying $PM_{2.5}$ health disparities in Detroit, Michigan, reported disproportionate burdens to Hispanics/Latinos owing to industrial emissions and to low-income populations owing to traffic emissions. Tessum et al. (2019) reported that although minorities are exposed to air pollution, they consume less and so, therefore, are less "responsible" for the generation of those emissions.[15] We are unaware of any prior national-scale investigation of EJ aspects of total $PM_{2.5}$ from electricity generation.

## 2. MATERIALS AND METHODS

We estimate $PM_{2.5}$-related health impacts from fossil-fuel-fired EGUs at the national scale, for each Regional Transmission Organizations (RTO), and, in terms of emissions and impacts (i.e., as a source vs receptor for pollution), for each US state. We use the year 2014 as our reference year. We characterize impacts disaggregated by race and income.

US Regional Transmission Organizations (RTOs) are electricity power markets responsible for dispatching more than 60% of the net electricity generation in the US (eGRID 2014 and 2016).[29] The seven US RTOs are Midcontinent Independent System Operator (MISO), California Independent System Operator (CAISO), Electric Reliability Council of Texas (ERCOT), Southwest Power Pool (SPP), Pennsylvania−New Jersey−Maryland (PJM) Interconnection, New York Independent System Operator (NYISO), and New England Independent System Operator (NEISO). Coal intensity is the greatest for MISO and SPP (>50% of generation comes from coal), followed by ERCOT and PJM (32 and 43%, respectively); the remaining RTOs (CAISO, NYISO, NEISO) are low coal (<5%) (Figure S1; data from eGRID 2014).[29] RTO demographics (Table S1) also differ by region; CAISO and ERCOT have >50% non-white population. We use RTOs as one of our units of analysis because they represent important geographic regions for electricity generation; they generally carry out electricity dispatch, which strongly impacts fuel use and emissions; and, they typically operate and make decisions independently.[30]

Multiple air-quality models are used in regulatory and research communities to link emissions with ambient concentrations, each with strengths and weaknesses.[17,31−53] Chemical Transport Models (CTMs) represent a state-of-the-science understanding of atmospheric chemistry and physics; they provide the most robust estimates available (i.e., the most robust representation of chemistry and physics) when time and computational constraints are not limiting.[49−53] CTMs are time- and resource-intensive. Reduced-complexity models (RCMs) are a less-intensive alternative.[17,31−48] RCMs are potentially less accurate than CTMs, but their reduced complexity allows for a far greater number of runs, thereby opening the door to sensitivity analyses, Monte Carlo approaches, longer simulation duration, and new understandings of source−receptor relationships. The RCM employed here, the Intervention Model for Air Pollution (InMAP),[37] employs smaller-sized grid cells than in conventional CTMs, thereby opening the door to the fine-scaled analysis generally thought to be important for EJ questions. Analyses carried out here would not be feasible using a conventional CTM, with current computational capacity. Other studies have demonstrated that InMAP and other RCMs can answer questions that could not be modeled using conventional CTMs.[28,54−58]

Details of InMAP, including model design, operation, and validation, are available elsewhere.[37,59] Briefly, InMAP is an Eulerian grid model that predicts the change in annual-average $PM_{2.5}$ concentration attributable to a change in annual emissions, based on steady-state solutions to equations representing pollution emission, transport, transformation, and removal. InMAP's representation of chemistry and meteorology is simplified relative to a conventional CTM, but it incorporates spatially varying parameters (e.g., rate constants) that are obtained from a CTM simulation. InMAP reflects the spatially varying rates of formation of $PM_{2.5}$, based on the (spatially varying) chemistry of the atmosphere (i.e., based on a CTM and a baseline [all-sources] emission inventory, here, the WRF-Chem model coupled with the National Emission Inventory [NEI]). Model runs carried out here focus only on emissions, concentrations, and health impacts from EGUs. The grid-cell size in InMAP varies from 1 km × 1 km (typically in urban areas) to 48 km × 48 km (typically in rural areas), depending on the gradient in the population density and pollutant concentrations. As configured here, InMAP also incorporates information about population, demographics, and concentration−response functions; we, therefore, use it to estimate concentrations and health impacts from EGU-attributable $PM_{2.5}$. Specifically, InMAP output for each grid cell includes annual-average $PM_{2.5}$ concentration ($\mu g/m^3$), the number of premature deaths by race and household income category, population size, and baseline mortality.

For research questions considered here, InMAP requires three main inputs:

(1) Annual emissions of VOC, $NO_x$, $NH_3$, $SO_2$, and primary $PM_{2.5}$ for each EGU; we employ US EPA's 2014 National Emission Inventory (NEI).[7] For point sources, such as the EGUs, the NEI provides stack attributes including height, diameter, temperature, and exit velocity.

(2) Census data on population (by block group) and household income (tract) for 2014 from the 2014 American Community Survey (ACS).[60] Demographic groups given in the ACS are self-reported white non-Latino, white Latino, black non-Latino, black Latino, Asian Latino, Asian non-Latino, Native American non-Latino, Native American Latino, mixed/other non-Latino, and mixed/other Latino. In our summaries, "non-white" refers to all categories except white non-Latino; "black", "Asian", and "Native American" include both Latino and non-Latino ethnicities. "Latino" refers to white Latinos, black Latinos, Asian Latinos, Native American Latinos, and mixed/other Latinos (according to the 2014 ACS, Latinos are 65% white, 31% mixed/other, 2% black, 1% Native American, and 0.3% Asian). Census income data are divided into 16 income groups for each of six racial categories: white non-Latino, white Latino, black, Asian, Native American, and mixed/other race groups. Therefore, following the Census data, our summaries present income-based results for "white Latino" category and not all "Latinos". We calculate the percentage of households in each income category in a given census tract and apply those percentages to population counts at the block group level (matching census tracts to the block groups that they contain) to calculate an estimate of people in each income group.


DOI: 10.1021/acs.est.9b02527
Environ. Sci. Technol. XXXX, XXX, XXX−XXX

(3) Baseline all-cause mortality data are for the year 2014 from the National Center for Health Statistics (NCHS) Office of Analysis and Epidemiology (OAE) at the Centers for Disease Control and Prevention (CDC).[61] Race-specific health impacts are calculated using all-cause mortality rates for the entire population of all age groups. Our analysis does not differentiate impacts by age group. Literature-derived estimates of mortality rates and the concentration−response (C−R) function are not sufficiently robust to allow race-ethnicity-specific values for those two parameters. Consistent with prior research[11−17,27] and in keeping with EPA norms,[62−64] we assume that all $PM_{2.5}$ particles are equally toxic.

We employ an expression derived from Krewski et al. (2009)[65] for our $PM_{2.5}$ concentration−response function, which is used to estimate $PM_{2.5}$-related health impacts (Cox proportional hazards model):

$$\text{number of premature deaths} = \left(e^{(PM_{2.5}\,\text{linear coefficient}\times[PM_{2.5}])} - 1\right) \times P \times \frac{\text{all-cause mortality rate}}{100\,000}$$

Here, $PM_{2.5}$ linear coefficient is assumed to be ln(1.078)/10 = 0.00751, i.e., a 7.8% increase in the number of premature deaths for every 10 $\mu g/m^3$ increase in the concentration of $PM_{2.5}$. $[PM_{2.5}]$ is the concentration of $PM_{2.5}$, $P$ is the total population. Mortality is then estimated as

$$\text{deaths per 100 000 people} = \frac{\text{number of premature deaths}}{\text{population}} \times 100\,000$$

We estimate premature mortality at the national scale, for each RTO, for each US state, and for each race/ethnicity and race/ethnicity−income group. We run InMAP for all EGUs to estimate impacts at the national scale. We also run InMAP separately for coal-fired EGUs, natural gas-fired EGUs, and all other fuel-type EGUs to estimate impacts by fuel-type at the national scale. Finally, we apportion health impacts by constituents of $PM_{2.5}$ at the national scale: primary $PM_{2.5}$, particulate $SO_4$ ($pSO_4$), particulate $NO_3$ ($pNO_3$), particulate $NH_4$ ($pNH_4$), and secondary organic aerosol (SOA; caused by VOC emissions). We run InMAP separately for each RTO. For each of 49 geographies in the contiguous US (i.e., the 48 states plus the District of Columbia; for brevity, we refer here to these 49 geographies as "states"), we use the InMAP Source−Receptor Matrix (ISRM) to estimate impacts from EGUs within and across state boundaries.[66] Total number of premature deaths, by race and income, are aggregated by RTO and by state. In some cases, analyses are constrained by available Census data. For example, Census data on ethnicity are available for whites, blacks, Asian, Native Americans, and mixed/other groups, i.e., each racial group is differentiated by ethnicity (Latino/non-Latino). In contrast, for combined race and income data, demographic data is differentiated by ethnicity for whites only, not for other races; results by income categories are available for six racial/ethnic categories (white non-Latino, white Latino, black, Asian, Native American, and mixed/other race groups), reflecting the race−income data available from the US Census. If robust, more-detailed demographic informations were publicly available, it would be straightforward to update our estimates.

Population-weighted concentrations are calculated as follows:

$$\text{population weighted average } PM_{2.5} \text{ concentration} = \frac{\sum_{i=1}^{n} (P_i \times [PM_{2.5}]_i)}{\sum_{i=1}^{n} P_i}$$

Here, $P_i$ is the number of people of a specific demographic group in grid cell $i$, $[PM_{2.5}]_i$ is the concentration in grid cell $i$, and $n$ is the total number of grid cells.

Damages are presented in terms of three types of metrics:

(a) We compute total damages in terms of deaths, by aggregating deaths (from total $PM_{2.5}$) in each grid cell for each state, RTO, and nationally and each race/ethnicity and race/ethnicity−income group in each spatial scale. For mortality rate in terms of deaths per 100 000 people, health impacts are normalized to the respective population in each geographic scale, race/ethnicity and race/ethnicity−income groups.

(b) We estimate "risk gap" for state-level mortality estimates to quantify the difference in environmental health risk (deaths per 100 000 people per year) between the most- and least-exposed group in a state. The advantage of this metric is that it does not force a preselection of specific groups to compare (e.g., blacks relative to whites, Asians relative to population average, lowest income relative to highest income) but instead is flexible across geographies to which groups are most and least exposed in that state.

(c) We compute the deaths per unit of electricity service provided (deaths per TWh) for the state, RTO, and nationally. This metric facilitates nationwide comparisons of the impacts of EGUs.

## 3. RESULTS

### 3.1. Total Premature Deaths and Deaths Per Unit of Electricity: Nationally, Regionally, and by State.

*3.1.1. Total National Damages.* For 2014, we estimate ∼16 400 $PM_{2.5}$-related premature deaths attributable to EGUs, for an average of ∼4 deaths/TWh electricity generated, corresponding to a total national population-weighted estimate of ∼0.82 $\mu g/m^3$ of EGU-$PM_{2.5}$. Most of the deaths (∼14 200 deaths or ∼86%; see Table 1) are attributable to EGUs that are in an RTO (the rest are caused by EGUs that are not in an RTO).

Deaths per unit energy generated (Table 1) vary substantially among regional grids, by up to a factor of ∼30 (MISO vs CAISO), with higher values in coal-heavy grids (MISO, SPP). Total attributable premature deaths vary even more by state (Table S2) from ∼1850 deaths/year (Pennsylvania) to ∼1 death/year (Montana). Among states, deaths per unit electricity generation (units: deaths/TWh) for each state (Table S3) vary from 0.02 (Vermont) to 14 (Indiana).

Of the ∼16 400 premature deaths from EGUs nationwide, we estimate that the vast majority (∼15 200 or ∼93%) is from coal EGUs, ∼800 (5%) from natural gas EGUs, and ∼460 from other fuel EGUs (Figure S2). Similar patterns hold in most states: coal-fired EGUs are the largest contributor to total EGU-$PM_{2.5}$ deaths (Table S4). Nationally, most EGU-$PM_{2.5}$

**Table 1. Estimated Deaths Per Unit Electricity Generation by RTO**

| RTO | annual net generation (TWh)[a] | total deaths attributable to RTO's emissions: total deaths | deaths per TWh | percent of generation by fuel[a]: coal (%) | natural gas (%) | oil, biomass, and other fossil fuels (%) |
|---|---|---|---|---|---|---|
| CAISO | 170 | 45 | 0.3 | 0.5 | 59 | 4 |
| ERCOT | 365 | 1788 | 4.9 | 32 | 46 | 0.7 |
| MISO | 691 | 5649 | 8.2 | 56 | 19 | 4 |
| NEISO | 110 | 48 | 0.4 | 5 | 43 | 10 |
| NYISO | 140 | 162 | 1.2 | 3 | 42 | 4 |
| PJM | 809 | 4868 | 6.0 | 43 | 17 | 2 |
| SPP | 238 | 1599 | 6.7 | 59 | 19 | 0.8 |

[a]From year 2014 in eGRID.[29]

impacts (∼73%) are from $pSO_4$, which is dominated by sulfur emissions from coal EGUs; contributions by other species (Figure S3) are 15% ($pNO_3$), 11% (primary $PM_{2.5}$), 1% ($pNH_4$), and ∼0% (SOA).

**3.2. Differences in Damages by Demographic Group.** *3.2.1. Race.* We find that year 2014 mortality rates from EGU-$PM_{2.5}$ are largest for black people, second largest for white non-Latino people, and lower-than-average for Asian, Native American, and Latino people (Figure 1). Differences by race vary by RTO (Figure S4) and species (Figure S5).




**Figure 1.** Deaths per 100 000 people attributable to $PM_{2.5}$ from electricity generation in the US in 2014.

The overall average mortality rates from EGU-$PM_{2.5}$ are 5.3 for all people, 6.6 for blacks, 5.9 for white non-Latinos, and 3.6 averaged across the remaining groups (Figure 1). We assessed the spatial distribution by race-ethnicity of mortality rate density (i.e., per km$^2$) from EGU-$PM_{2.5}$ (Figure S6A−C) and to identify where each group is most impacted. For example, for Native Americans, the density of deaths is greater in western Oklahoma than in most locations. Subdividing by fuel-type (Figure S7) reveals that blacks are the most-exposed group for all three fuel categories. For natural gas, exposures are higher than average for blacks, Asians, and Latinos and lower than average for white non-Latinos. For coal emissions, relative exposures are similar to Figure 1 except that Native Americans are slightly more exposed to coal emissions than Asians are.

*3.2.2. Income and Race.* Differences by race are observed across all income categories (Figure 2). Thus, differences by race/ethnicity (Figure 1) are not "merely" income differences; race/ethnicity differences are present even after accounting for differences in income (Figure 2).




**Figure 2.** Deaths per 100 000 people by income group and race/ethnicity. Icon area is proportional to population size.

On average, exposures are higher for lower-income households than for higher-income households. Considering Figure 2 (deaths per 100 000 people attributable to EGU-$PM_{2.5}$), the difference between most- and least-exposed income group is ∼1.0 for the overall population; the same difference is 1.5 for white non-Latino, 0.9 [black], 0.3 [white Latino], 0.5 [Asian], 0.9 [Native American], and 0.8 [mixed/other]. The difference between most- and least-exposed race is 3.6 for the overall population, 4.0 for the lowest-income population, and 2.8 for the highest-income population. Thus, differences by race are larger than differences by income.

Based on results in Figure 2, if we calculate the risks by race, but making the adjustment that all race/ethnicity groups have an income distribution equal to the national average distribution, then mortality rates from EGU-$PM_{2.5}$ (deaths per 100 000 people) would be 5.3 for all people, 6.4 for blacks, 5.9 for white non-Latinos, and 3.2 averaged across the remaining groups. Here too, analyses reveal that exposure differences by race are observed even after accounting for income differences.

Race−income results differ substantially by RTO (Figure S8), for example, exposures are higher for white non-Latino income groups than for black income groups for CAISO, MISO, NEISO, and SPP but not ERCOT, NYISO, and PJM.

We estimate exposures by household income group, for each state, from total EGU-$PM_{2.5}$; Figure 3 shows the most-exposed income category in each state and the risk gap (premature deaths per 100 000 people) between most- and least-exposed household income group. The "$10 000−$15 000 per year" household income category is the most-exposed category for 19 out of 49 states (risk gap varies between 0.06 and 3.6 for these 19 states). Overall, low-income categories are most exposed in a majority of the states [38 states], followed by middle income [5 states] and upper income [6 states]. The gap between most- and least-exposed household income category is sizeable (>2 premature deaths per 100 000 people) in only three states (Maryland [3.5], Virginia [3.6], Indiana [2.9]; total population = 21 million).

**3.3. Health Damages by State.** Our results estimate EGU-$PM_{2.5}$ health impacts, with each state as a source and a receptor of pollution (Figure 4). The maps reveal geographic differences between where EGU emissions are produced and where exposures and health impacts are experienced. For example, Texas experienced an estimated total of ∼1360 EGU-


DOI: 10.1021/acs.est.9b02527
Environ. Sci. Technol. XXXX, XXX, XXX−XXX




**Figure 3.** Most-exposed household income group in thousand US dollars (for overall population) and risk gap (units: deaths per 100 000 people attributable to EGU-$PM_{2.5}$ from all EGUs in the US) between the most- and least-exposed household income group in each US state. The income group that is the most exposed is shown for states where the gap in the mortality rate is greater than 1 death per 100 000 people. The remaining states are unlabeled because the gap between most- and least-exposed income group is small (less than 1 per 100 000 people). A version of the map displaying labels for all states is shown in Figure S9. Risk gap is shown by color gradation.

$PM_{2.5}$ premature deaths in 2014 (Figure 4A), most of which (~1160, or >80%) are attributable to EGU emissions occurring inside Texas (Figure 4B); the remainder (~200 deaths/year in Texas) were attributable to $PM_{2.5}$ in Texas caused by EGU emissions outside of Texas. EGU emissions in Texas caused an additional ~524 deaths/year in states other than Texas (Figure 4C). Thus, Texas is a net exporter of EGU-$PM_{2.5}$ deaths: the number of premature deaths per year caused by Texas EGU emissions (~1684; the sum of ~1160 in-state plus ~524 out-of-state) exceeds the number of EGU-$PM_{2.5}$ premature deaths in Texas (~1360) by ~325 (Figure 4D). For some states (e.g., Arizona), damages from their EGU emissions are large in many downwind states; for other states (e.g., Washington), damages are more local (Figure S10A). As expected, many of the net importing states are on the East Coast (Figure 4D). A bar chart of Figure 4 (Figure S11) reveals the comparison between health impacts among different states.

States with the largest EGU-$PM_{2.5}$ mortality are Pennsylvania, Texas, Ohio, New York, Indiana, Virginia, Maryland, Kentucky, North Carolina, New Jersey, Illinois, and Florida; states with the smallest values are New Hampshire, South Dakota, Nevada, New Mexico, Maine, Arizona, Utah, North Dakota, Vermont, Wyoming, Oregon, Idaho, and Montana.




**Figure 4.** Deaths from EGU-$PM_{2.5}$ by state. (A) Total deaths in each state from EGUs throughout the US, (B) total deaths in-state from EGUs in that state, (C) total deaths out-of-state from EGUs in that state, (D) net imports (negative values) or exports (positive values) of deaths. Values in D are calculated as B + C − A. Range limits for color bars in A, B, and C are by quantiles.


DOI: 10.1021/acs.est.9b02527
Environ. Sci. Technol. XXXX, XXX, XXX−XXX

The states with the largest import−export mortality imbalance are New York, Virginia, Maryland, New Jersey, North Carolina, and Ohio, which are net importers, i.e., the impacts from other states exceed impacts onto other states; Missouri, Texas, Kentucky, Illinois, West Virginia, and Indiana are the largest net exporters (i.e., the impacts to other states exceed impacts from other states). Among the largest net importing states, New York, Maryland, and New Jersey import the largest share of out-of-state impacts from Pennsylvania [29%, 36%, and 49%, respectively], North Carolina's largest share of out-of-state impacts comes from Kentucky [16%], Ohio from Indiana [37%], and Virginia from West Virginia [20%]. A similar number of states are net importers versus net exporters of EGU-$PM_{2.5}$ mortality (24 states and 24 states, respectively); importers (exporters) are more likely to be found in the Eastern (Western) portion of the US.

Our results reflect that EGU emissions travel great distances. For example, when considering states as receptors, in 39 states, a majority (>50%) of EGU-$PM_{2.5}$ mortality is attributable to EGU emissions in other states (Figure S12). When considering states as sources, in 35 states, a majority (>50%) of the state's EGU-$PM_{2.5}$ mortality impacts occurs outside of that state (Figure S10B).

**3.4 Variations by Geography and Race.** *3.4.1. Regional Transmission Organizations.* The most-impacted race/ethnicity varies by RTO (Figure S13): white non-Latino for NEISO; Asian [CAISO and NYISO]; white Latino [ERCOT]; black [PJM and MISO]; and Native American [SPP]. MISO and SPP (the two RTOs with >50% of generation from coal; Table 1) are the only RTOs where more than 50% of total premature deaths occurs outside RTO boundaries (Figures S14 and S15).

*3.4.2. States.* Environmental justice aspects of EGU-$PM_{2.5}$ vary by state and by EJ metric employed (Figures 5 and S16, Table S5). For example, the impacts in Texas from nationwide emissions are greater for blacks than any other race-ethnicity group, with a gap of ∼2.4 deaths/100 000 people between the most-exposed (black) and least-exposed (white Latino) group. In contrast, in Oklahoma, impacts are greatest for Native Americans, with a gap of ∼2.1 deaths/100 000 people between the most-exposed (Native American) and least-exposed (Asian) group. Among the seven states with the largest gaps by race (Figure 5; >2 premature deaths per 100 000 people), one can find examples where the most-exposed group is white non-Latino (Maryland, Pennsylvania, Virginia), black (Kentucky, Texas), white Latino (Mississippi), and Native American (Oklahoma); in total, these seven states comprise 64 million people (compared to 21 million people in the three analogous states (i.e., risk gap >2) from Figure 3). A map, analogous to Figures 3 and 5, but combining race/ethnicity and income, is in the Supporting Information (Figure S17). Impacts within each state by fuel-type and race-ethnicity are in Table S6.




**Figure 5.** Most-exposed race-ethnic group and risk gap (units: deaths per 100 000 people) between the most- and least-exposed race-ethnic groups in each US state from total EGU-$PM_{2.5}$ emissions in the entire US. Race-ethnicity labels are displayed for states with a gap in the mortality rate greater than 1 death per 100 000 people. The remaining states are unlabeled because the gap between most- and least-exposed race-ethnicity groups is relatively small (less than 1 per 100 000 people). A version of the map displaying labels for all states is in Figure S16. Risk gap is shown by color gradation.

## 4. DISCUSSION

Previous studies have estimated the total damages associated with $PM_{2.5}$ from the US electricity sector. This work complements those findings by systematically analyzing the damages for different geographical boundaries (RTOs and states) and for different demographic groups (race and income).

We find that blacks are disproportionately affected by EGU-$PM_{2.5}$ nationally, but most-exposed race/ethnicity varies by state and by RTO. Differences by race/ethnicity hold across all income groups. Exposures are higher for lower-income than for higher-income households, but differences by race/ethnicity are larger than differences by income.

A substantial portion of the health risks in most states is attributable to out-of-state emissions, reflecting that EGU-$PM_{2.5}$ is a long-range pollutant. Some states are net imports of harm, others are net exporters. Regarding issues related to cross-state damages, EPA regulations such as the Cross-State Air Pollution Rule (CSAPR)[67] address air pollution from upwind states that crosses state lines and affect air quality in downwind states. Our findings highlight the interstate nature of EGU-$PM_{2.5}$ impacts: $PM_{2.5}$ mortality impacts in a state often are highly impacted by out-of-state EGU emissions.

Our estimate of total premature deaths (∼16 400 EGU-$PM_{2.5}$ premature deaths in 2014) is on the low end of the range given in the literature (see above); reasons include (1) reduced emissions in 2014 relative to 2005 and (2) differences in concentration response functions used in other studies (see below).

Our investigation considers exposure and health impacts from EGU-$PM_{2.5}$, instead of proximity to EGUs, as considered by previous studies.[68] Previous work[68] reported that the proportion of the population living within 30 miles of a power plant is greater for blacks than whites. Power plants are mostly located in rural areas, but the long-range transport of emissions can impact downwind population groups at varying magnitudes and distances. In considering an effective policy for reducing EGU impacts and disparities in impacts, it is important to consider the spatial distribution of emissions and populations, and the long-range transport of $PM_{2.5}$ and its emission precursors.

Future research could usefully explore the impact on results of (1) alternative models and modeling approaches, (2) grid-cell size, (3) alternative concentration−response functions (e.g., a supralinear C−R) or allowing the C−R to vary by source, geography, or chemical components,[69−72] (4) health

impacts of tropospheric (i.e., ground-level) ozone ($O_3$) formation from $NO_x$ and VOCs emissions from EGUs, and (5) updated emissions for a more-recent year, such as 2017 NEI emissions.

Paolella et al. (2018)[73] demonstrated the importance of fine spatial resolution for identifying and quantifying exposure disparities. Our approach employs a reduced-complexity air-quality model (InMAP; ISRM) that uses a variable resolution grid (i.e., spatially fine grid in high population density areas). Thus, although our approach addresses the needs identified by Paolella et al. (2018)[73] (i.e., smaller-scale grid cells), we hypothesize that grid-cell size is less important for issues considered here because (1) EGUs typically have tall stacks, which spread pollution and reduce the relative importance of local conditions and (2) EGU-$PM_{2.5}$ is a long-range pollutant (secondary $PM_{2.5}$ formation is dominated by emissions of $SO_2$, which typically takes several days to transform into $PM_{2.5}$). Future research could test whether results seen here are also observed using other RCMs[74] or a conventional CTM.

Our study employs the mortality hazard ratio of 1.078 for all-cause mortality from the American Cancer Society (ACS) reanalysis study (Krewski et al. 2009)[65] to estimate premature deaths using a linear C−R function with no threshold. This C−R function is considered a US EPA standard and is commonly used in regulatory and academic air-quality research.[54,75,76] To understand the impact of alternative mortality hazard ratios on the premature deaths calculated in this work, as a sensitivity analysis we use values from Lepeule et al. (2012) (i.e., reanalysis of the Harvard Six Cities (H6C) study) [1.14, 95% CI = 1.07−1.22],[77] Vodonos et al. (2018) [1.129, 95% CI=1.109−1.150],[78] and Pope et al. (2019) [1.12, 95% CI = 1.08−1.15].[79] These alternative hazard ratios increase the national premature deaths estimated in this work substantially: by 75% [Lepeule et al. (2012)], 62% [Vodonos et al. (2018)], and 51% [Pope et al. (2019)]. Future research in the $PM_{2.5}$ C−R functions may benefit from relationships that are specific to the source sector, geographical region, or chemical constituents. Straightforward interpretation of the values individually reported by those three studies suggests an uncertainty of up to a factor of 2 (i.e., for Lepeule, the lower CI relative to the central estimate) if considering the 95% CIs, an uncertainty of 17% if considering just the three central-tendency estimates used in this sensitivity analysis, and an uncertainty of up to 75% if comparing those three studies against our base-case predictions. Detailed quantification of uncertainty in the C−R, via meta-analysis or other techniques, is outside the scope of research for this article; however, these comparisons suggest that our results are conservative, i.e., likely underestimate the true health impacts from air pollution.

Health impacts of ozone from EGU emissions have been previously modeled for the year 2005 and are estimated to be much smaller (~1−10% of the total impacts from EGUs in the US) than $PM_{2.5}$-related impacts.[10,12,13] We studied the year 2014 because it reflects the most-current, well-vetted NEI dataset available. Emissions and population patterns may differ for the year 2014 than for more-recent (and future) years, which would impact results here. In general, electricity generation has lower emissions and uses less coal today than in 2014.[80] For that reason, total deaths per year from EGU-$PM_{2.5}$ are likely lower for the present year than for 2014.

Our analysis could be extended to other specific sectors of the economy. We hope that results here are useful for scientists and policymakers to understand and address disparities in air pollution exposure by race, income, and geography. Reductions in EGU emissions and EGU-$PM_{2.5}$ would not only save lives but also can reduce environmental and health inequalities.

## ■ ASSOCIATED CONTENT

### Supporting Information

The Supporting Information is available free of charge on the ACS Publications website at DOI: 10.1021/acs.est.9b02527.

Map of US RTOs and their demographics, health impacts by race-ethnicity groups at national, RTO, and state level, health impacts by household income groups and race-ethnicity for each US RTO and state, population-weighted average $PM_{2.5}$ concentration for RTOs and states (PDF)

EGU-$PM_{2.5}$ health impacts from each state to the rest of the states and other summary tables (XLSX)

## ■ AUTHOR INFORMATION

### Corresponding Author

*E-mail: jdmarsh@uw.edu.

### ORCID

Maninder P. S. Thind: 0000-0003-3306-1507

Inês L. Azevedo: 0000-0002-4755-8656

### Notes

The authors declare no competing financial interest.

## ■ ACKNOWLEDGMENTS

This publication was developed as a part of the Center for Air, Climate, and Energy Solution (CACES), which was supported under Assistance Agreement No. R835873 awarded by the US Environmental Protection Agency. It has not been formally reviewed by EPA. The views expressed in this document are solely those of authors and do not necessarily reflect those of the Agency. EPA does not endorse any products or commercial services mentioned in this publication. This research was supported by the Center for Climate and Energy Decision Making (CEDM) through a cooperative agreement between the National Science Foundation and Carnegie Mellon University (SES-0949710 and SES-1463492).

## ■ REFERENCES

(1) Cohen, A. J.; Brauer, M.; Burnett, R.; Anderson, H. R.; Frostad, J.; Estep, K.; Balakrishnan, K.; Brunekreef, B.; Dandona, L.; Dandona, R.; Feigin, V.; Freedman, G.; Hubbell, B.; Jobling, A.; Kan, H.; Knibbs, L.; Liu, Y.; Martin, R.; Morawska, L.; Pope, C. A.; Shin, H.; Straif, K.; Shaddick, G.; Thomas, M.; van Dingenen, R.; van Donkelaar, A.; Vos, T.; Murray, C. J. L.; Forouzanfar, M. H. Estimates and 25-Year Trends of the Global Burden of Disease Attributable to Ambient Air Pollution: An Analysis of Data from the Global Burden of Diseases Study 2015. *Lancet* **2017**, *389*, 1907−1918.

(2) *Health and Environmental Effects of Particulate Matter (PM)*; US Environmental Protection Agency: Washington, DC, 2016. https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm (accessed April 11, 2018).

(3) Dockery, D. W.; Pope, C. A.; Xu, X.; Spengler, J. D.; Ware, J. H.; Fay, M. E.; Ferris, B. G., Jr.; Speizer, F. E. An Association Between Air Pollution and Mortality in Six US Cities. *New Engl. J. Med.* **1993**, *329*, 1753−1759.

(4) Pope, C. A., 3rd; Thun, M. J.; Namboodiri, M. M.; Dockery, D. W.; Evans, J. S.; Speizer, F. E.; Heath, C. W., Jr. Particulate Air Pollution as a Predictor of Mortality in a Prospective Study of US

Adults. *Am. J. Respir. Crit. Care Med.* 1995, *151*, 669−674. DOI: 10.1164/ajrccm/151.3_Pt_1.669
(5) Hoek, G.; Krishnan, R. M.; Beelen, R.; Peters, A.; Ostro, B.; Brunekreef, B.; Kaufman, J. D. Long-Term Air Pollution Exposure and Cardio-Respiratory Mortality: A Review. *Environ Health* **2013**, *12*, 43−57.
(6) Seinfeld, J. H.; Pandis, S. N. *Atmospheric Chemistry and Physics: From Air Pollution to Climate Change*, 2nd ed.; John Wiley & Sons, Inc.: Hoboken, New Jersey, 2006.
(7) *2014 National Emissions Inventory (NEI) Data*; US Environmental Protection Agency: Washington, DC, 2018. https://www.epa.gov/air-emissions-inventories/2014-national-emissions-inventory-nei-data (accessed April 11, 2018).
(8) Thind, M. P. S.; Wilson, E. J.; Azevedo, I. L.; Marshall, J. D. Marginal Emissions Factors for Electricity Generation in the Midcontinent ISO. *Environ. Sci. Technol.* **2017**, *51*, 14445−14452.
(9) Electric Power Generation, Transmission and Distribution (NAICS 2211): Laws and Regulations; US Environmental Protection Agency: Washington, DC, 2018. https://www.epa.gov/regulatory-information-sector/electric-power-generation-transmission-and-distribution-naics-2211 (accessed Nov 14, 2018).
(10) Caiazzo, F.; Ashok, A.; Waitz, I. A.; Yim, S. H. L.; Barrett, S. R. H. Air Pollution and Early Deaths in the United States. Part I: Quantifying the Impact of Major Sectors in 2005. *Atmos. Environ.* **2013**, *79*, 198−208.
(11) Dedoussi, I. C.; Barrett, S. R. H. Air Pollution and Early Deaths in the United States. Part II: Attribution of $PM_{2.5}$ Exposure to Emissions Species, Time, Location and Sector. *Atmos. Environ.* **2014**, *99*, 610−617.
(12) Penn, S. L.; Arunachalam, S.; Woody, M.; Heiger-Bernays, W.; Tripodis, Y.; Levy, J. I. Estimating State-Specific Contributions to $PM_{2.5}$- and $O_3$-Related Health Burden from Residential Combustion and Electricity Generating Unit Emissions in the United States. *Environ. Health Perspect.* **2017**, *125*, 324−332.
(13) Fann, N.; Fulcher, C. M.; Baker, K. The Recent and Future Health Burden of Air Pollution Apportioned Across US Sectors. *Environ. Sci. Technol.* **2013**, *47*, 3580−3589.
(14) Lelieveld, J.; Evans, J. S.; Fnais, M.; Giannadaki, D.; Pozzer, A. The Contribution of Outdoor Air Pollution Sources to Premature Mortality on a Global Scale. *Nature* **2015**, *525*, 367−371.
(15) Tessum, C. W.; Apte, J. S.; Goodkind, A. L.; Muller, N. Z.; Mullins, K. A.; Paolella, D. A.; Polasky, S.; Springer, S. P.; Thakrar, S. K.; Marshall, J. D.; Hill, J. D. Inequity in Consumption of Goods and Services Adds to Racial−Ethnic Disparities in Air Pollution Exposure. *Proc. Natl. Acad. Sci. U.S.A.* **2019**, *116*, 6001−6006.
(16) Levy, J. I.; Baxter, L. K.; Schwartz, J. Uncertainty and Variability in Health-Related Damages from Coal-Fired Power Plants in the United States. *Risk Anal.* **2009**, *29*, 1000−1014.
(17) Buonocore, J. J.; Dong, X.; Spengler, J. D.; Fu, J. S.; Levy, J. I. Using the Community Multiscale Air Quality (CMAQ) Model to Estimate Public Health Impacts of $PM_{2.5}$ from Individual Power Plants. *Environ. Int.* **2014**, *68*, 200−208.
(18) Environmental Justice; US Environmental Protection Agency: Washington, DC, 2018. https://www.epa.gov/environmentaljustice (accessed March 11, 2018).
(19) Collins, M. B.; Munoz, I.; JaJa, J. Linking 'Toxic Outliers' to Environmental Justice Communities. *Environ. Res. Lett.* **2016**, *11*, No. 015004.
(20) Zwickl, K.; Ash, M.; Boyce, J. K. Analysis Regional Variation in Environmental Inequality: Industrial Air Toxics Exposure in US Cities. *Ecol. Econ.* **2014**, *107*, 494−509.
(21) Benmarhnia, T.; Huang, J.; Basu, R.; Wu, J.; Bruckner, T. A. Decomposition Analysis of Black−White Disparities in Birth Outcomes: The Relative Contribution of Air Pollution and Social Factors in California. *Environ. Health Perspect.* **2017**, *125*, No. 107003.
(22) Ard, K. Trends in Exposure to Industrial Air Toxins for Different Racial and Socioeconomic Groups: A Spatial and Temporal Examination of Environmental Inequality in the US from 1995 to 2004. *Soc. Sci. Res.* **2015**, *53*, 375−390.
(23) Ottinger, G. The Winds of Change: Environmental Justice in Energy Transitions. *Sci. Cult.* **2013**, *22*, 222−229.
(24) Martenies, S. E.; Milando, C. W.; Williams, G. O.; Batterman, S. A. Disease and Health Inequalities Attributable to Air Pollutant Exposure in Detroit, Michigan. *Int. J. Environ. Res. Public Health* **2017**, *14*, No. 1243.
(25) Clark, L. P.; Millet, D. B.; Marshall, J. D. National Patterns in Environmental Injustice and Inequality: Outdoor $NO_2$ Air Pollution in the United States. *PLoS One* **2014**, *9*, No. e94431.
(26) Rosofsky, A.; Levy, J. I.; Zanobetti, A.; Janulewicz, P.; Fabian, M. P. Temporal Trends in Air Pollution Exposure Inequality in Massachusetts. *Environ. Res.* **2018**, *161*, 76−86.
(27) Maguire, K.; Sheriff, G. Comparing Distributions of Environmental Outcomes for Regulatory Environmental Justice Analysis. *Int. J. Environ. Res. Public Health* **2011**, *8*, 1707−1726.
(28) Levy, J. I.; Wilson, A. M.; Zwack, L. M. Quantifying the Efficiency and Equity Implications of Power Plant Air Pollution Control Strategies in the United States. *Environ Health Perspect.* **2007**, *115*, 743−750.
(29) *Emissions & Generation Resource Integrated Database (eGRID)*; US Environmental Protection Agency: Washington, DC, 2018. https://www.epa.gov/energy/emissions-generation-resource-integrated-database-egrid (accessed July 9, 2018).
(30) *Regional Transmission Organizations (RTO)/Independent System Operators (ISO)*; Federal Energy Regulatory Commission (FERC): Washington, DC, 2018. https://www.ferc.gov/industries/electric/indus-act/rto.asp (accessed Jan 1, 2019).
(31) Carnevale, C.; Finzi, G.; Pisoni, E.; Volta, M. Neuro-Fuzzy and Neural Network Systems for Air Quality Control. *Atmos. Environ.* **2009**, *43*, 4811−4821.
(32) GEOS-Chem Adjoint Model: Dedoussi, I. C.; Barrett, S. R. H. Air Pollution and Early Deaths in the United States. Part II: Attribution of $PM_{2.5}$ Exposure to Emissions Species, Time, Location and Sector. *Atmos. Environ.* **2014**, *99*, 610−617.
(33) DDM/ RSM Model: Foley, K. M.; Napelenok, S. L.; Jang, C.; Phillips, S.; Hubbell, B. J.; Fulcher, C. M. Two Reduced Form Air Quality Modeling Techniques for Rapidly Calculating Pollutant Mitigation Potential Across Many Sources, Locations and Precursor Emission Types. *Atmos. Environ.* **2014**, *98*, 283−289.
(34) Hakami, A.; Henze, D. K.; Seinfeld, J. H.; Singh, K.; Sandu, A.; Kim, S.; Byun, D.; Li, Q. The Adjoint of CMAQ. *Environ. Sci. Technol.* **2007**, *41*, 7807−7817.
(35) EASIUR Model: Heo, J.; Adams, P. J.; Gao, H. O. Reduced-Form Modeling of Public Health Impacts of Inorganic $PM_{2.5}$ and Precursor Emissions. *Atmos. Environ* **2016**, *137*, 80−89.
(36) *Technical Support Document for the Proposed PM NAAQS Rule: Response Surface Modeling, Tech. Rep.* US Environmental Protection Agency: Research Triangle Park, NC, 2006. http://www.epa.gov/scram001/reports/pmnaaqs_tsd_rsm_all_021606.pdf (accessed Feb 5, 2018).
(37) Tessum, C. W.; Hill, J. D.; Marshall, J. D. InMAP: A Model for Air Pollution Interventions. *PLoS One* **2017**, *12*, No. e0176131.
(38) Wagstrom, K. M.; Pandis, S. N.; Yarwood, G.; Wilson, G. M.; Morris, R. E. Development and Application of a Computationally Efficient Particulate Matter Apportionment Algorithm in a Three-Dimensional Chemical Transport Model. *Atmos. Environ.* **2008**, *42*, 5650−5659.
(39) Zhang, W.; Capps, S. L.; Hu, Y.; Nenes, A.; Napelenok, S. L.; Russell, A. G. Development of the High- Order Decoupled Direct Method in Three Dimensions for Particulate Matter: Enabling Advanced Sensitivity Analysis in Air Quality Models. *Geosci. Model Dev.* **2012**, *5*, 355−368.
(40) Cimorelli, A. J.; Perry, S. G.; Venkatram, A.; Weil, J. C.; Paine, R. J.; Wilson, R. B.; Lee, R. F.; Peters, W. D.; Brode, R. W. AERMOD: A Dispersion Model for Industrial Source Applications. Part I: General Model Formulation and Boundary Layer Characterization. *J. Appl. Meteorol.* **2005**, *44*, 682−693.

(41) Guttikunda, S. K. *SIM-Air Modeling Tools. UrbanEmissions.info*, 2009. http://www.urbanemissions.info/tools/ (accessed Feb 5, 2018).
(42) Logue, J. M.; Small, M. J.; Robinson, A. L. Evaluating the National Air Toxics Assessment (NATA): Comparison of Predicted and Measured Air Toxics Concentrations, Risks, and Sources in Pittsburgh, Pennsylvania. *Atmos. Environ.* **2011**, *45*, 476−484.
(43) Muller, N. Z. Boosting GDP growth by accounting for the environment. *Science* **2014**, *345* (6199), 873−874.
(44) *User's Manual for the Co-Benefits Risk Assessment Health Impacts Screening and Mapping Tool (COBRA)*. Tech. rep.; US Environmental Protection Agency: Washington, DC, 2012. https://www.epa.gov/sites/production/files/2017-10/documents/cobra_user_manual_september2017_508_v2.pdf (accessed Feb 5, 2018).
(45) *Revision to the Guideline on Air Quality Models: Enhancements to the AERMOD Dispersion Modeling System and Incorporation of Approaches to Address Ozone and Fine Particulate Matte*, Tech. rep. #2060-AS54; US Environmental Protection Agency: Washington, DC, 2015. http://www.epa.gov/ttn/scram/11thmodconf/9930-11-OAR_AppendixW_Proposal.pdf (accessed Feb 5, 2018).
(46) Draxler, R. R.; Hess, G. D. *Description of the HYSPLIT 4 Modeling System*; Tech. rep. NOAA Technical Memorandum ERL ARL-224; Silver Spring: MD, 1997. https://www.arl.noaa.gov/documents/reports/arl-224.pdf (accessed Feb 5, 2018).
(47) Scire, J. S.; Strimaitis, D. G.; Yamartino, R. J. *A User's Guide for the CALPUFF Dispersion Model*; Tech. Rep. Earth Tech, Inc.: Concord, MA, 2000. http://www.src.com/calpuff/download/CALPUFF_UsersGuide.pdf (accessed Feb 5, 2018).
(48) *CMB8.2 Users Manual*, Tech. Rep. #EPA-452/R-04-011; US Environmental Protection Agency: Washington, DC. http://www3.epa.gov/ttn/scram/models/receptor/EPA-CMB82Manual.pdf (accessed 5 February 2018), 2004.
(49) *GEOS-Chem Model*; Atmospheric Chemistry Modeling Group; Harvard University: Cambridge, MA, 2018. http://acmg.seas.harvard.edu/geos/index.html (accessed Feb 20, 2018).
(50) *Comprehensive Air Quality Model with Extensions*; Environ International Corporation: Novato, CA, 2016. http://www.camx.com/home.aspx (accessed Feb 20, 2018).
(51) Jacobson, M. Z. GATOR-GCMM: A Global-Through Urban-Scale Air Pollution and Weather Forecast Model: 1. Model Design and Treatment of Subgrid Soil, Vegetation, Roads, Rooftops, Water, Sea Ice, and snow. *J. Geophys. Res.* **2001**, *106*, 5385−5401.
(52) *WRF-CHEM*; National Center for Atmospheric Research; University Corporation for Atmospheric Research: Boulder, CO. https://www2.acom.ucar.edu/wrf-chem, 2018 (accessed 20 February 2018).
(53) *CMAQ: The Community Multiscale Air Quality Modeling System*; US Environmental Protection Agency: Washington, DC. https://www.epa.gov/cmaq, 2018 (accessed 20 February 2018).
(54) Thakrar, S. K.; Goodkind, A. L.; Tessum, C. W.; Marshall, J. D.; Hill, J. D. Life Cycle Air Quality Impacts on Human Health from Potential Switchgrass Production in the United States. *Biomass Bioenergy* **2018**, *114*, 73−82.
(55) Keeler, B. L.; Gourevitch, J. D.; Polasky, S.; Isbell, F.; Tessum, C. W.; Hill, J. D.; Marshall, J. D. The Social Costs of Nitrogen. *Sci. Adv.* **2016**, *2*, No. e1600219.
(56) Gourevitch, J. D.; Keeler, B. L.; Ricketts, T. H. Determining Socially Optimal Rates of Nitrogen Fertilizer Application. *Agric., Ecosyst. Environ.* **2018**, *254*, 292−299.
(57) Millstein, D.; Wiser, R.; Bolinger, M.; Barbose, G. The Climate and Air-Quality Benefits of Wind and Solar Power in the United States. *Nat. Energy* **2017**, *2*, No. 17134.
(58) Holland, S. P.; Mansur, E. T.; Muller, N. Z.; Yates, A. J. Damages and Expected Deaths due to Excess NOx Emissions from 2009 to 2015 Volkswagen Diesel Vehicles. *Environ. Sci. Technol.* **2016**, *50*, 1111−1117.
(59) Tessum, C. W.; Hill, J. D.; Marshall, J. D. Intervention Model for Air Pollution (InMAP). http://spatialmodel.com/inmap/ (accessed Jan 18, 2019).
(60) *The IPUMS National Historical Geographic Information System (NHGIS)*; University of Minnesota: Minneapolis, MN, 2018. https://data2.nhgis.org/main (accessed Aug 18, 2018).
(61) *CDC Wonder*; Center for Disease Control and Prevention: Atlanta, GA, 2018. https://wonder.cdc.gov/ (accessed Aug 18, 2018).
(62) *Integrated Science Assessment for Particulate Matter (Final Report)*; US Environmental Protection Agency: Research Triangle Park, NC, December 2009. https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=216546 (accessed Aug 18, 2018).
(63) Expanded Expert Judgment Assessment of the Concentration-Response Relationship Between $PM_{2.5}$ Exposure and Mortality (Final Report), *Office of Air Quality Planning and Standards*; US Environmental Protection Agency: Research Triangle Park, NC, September, 2006. Prepared by: Industrial Economics, Incorporated, Cambridge, MA. https://www3.epa.gov/ttnecas1/regdata/Uncertainty/pm_ee_report.pdf (accessed Aug 18, 2018).
(64) Health Benefits of the Second Section 812 Prospective Study of the Clean Air Act, *Review of EPA's Draft; Science Advisory Board*; US Environmental Protection Agency: Washington, DC, 2010.
(65) Krewski, D.; Jerrett, M.; Burnett, R. T.; Ma, R.; Hughes, E.; Shi, Y.; Turner, M. C.; Pope, C. A., III; Thurston, G.; Calle, E. E.; Thun, M. J. *Extended Follow-Up and Spatial Analysis of the American Cancer Society Study Linking Particulate Air Pollution and Mortality*; Research Report 140; Health Effects Institute: Boston, MA, May 2009. https://www.healtheffects.org/system/files/Krewski140.pdf (accessed July 8, 2018).
(66) Goodkind, A. L.; Tessum, C. W.; Coggins, J. S.; Hill, J. D.; Marshall, J. D. Fine-Scale Damage Estimates of Particulate Matter Air Pollution Reveal Opportunities for Location-Specific Mitigation of Emissions. *Proc. Natl. Acad. Sci. U.S.A.* **2019**, *116*, 8775−8780.
(67) *Overview of the Cross-State Air Pollution Rule (CSAPR)*; US Environmental Protection Agency: Washington, DC, 2018. https://www.epa.gov/csapr/overview-cross-state-air-pollution-rule-csapr (accessed July 10, 2018).
(68) Keating, M. H.; Davis, F. *Air of Injustice*; LaBerge Printers, Inc: Orlando, FL, October 2002. http://www.energyjustice.net/files/coal/Air_of_Injustice.pdf (accessed Aug 16, 2018).
(69) Nasari, M. M.; Szyszkowicz, M.; Chen, H.; Crouse, D.; Turner, M. C.; Jerrett, M.; Pope, C. A., III; Hubbell, B.; Fann, N.; Cohen, A.; Gapstur, S. M.; Diver, W. R.; Stieb, D.; Forouzanfar, M. H.; Kim, S.; Olives, C.; Krewski, D.; Burnett, R. T. A Class of Non-Linear Exposure-Response Models Suitable for Health Impact Assessment Applicable to Large Cohort Studies of Ambient Air Pollution. *Air Qual., Atmos. Health* **2016**, *9*, 961−972.
(70) Pope, C. A., III; Cropper, M.; Coggins, J.; Cohen, A. Health Benefits of Air Pollution Abatement Policy: Role of the Shape of the Concentration−Response Function. *J. Air Waste Manage. Assoc.* **2015**, *65*, 516−522.
(71) Levy, J. I.; Diez, D.; Dou, Y.; Barr, C. D.; Dominici, F. A Meta-Analysis and Multisite Time-Series Analysis of the Differential Toxicity of Major Fine Particulate Matter Constituents. *Am. J. Epidemiol.* **2012**, *175*, 1091−1099.
(72) Marshall, J. D.; Apte, J. S.; Coggins, J. S.; Goodkind, A. L. Blue Skies Bluer? *Environ. Sci. Technol.* **2015**, *49*, 13929−13936.
(73) Paolella, D. A.; Tessum, C. W.; Adams, P. J.; Apte, J. S.; Chambliss, S.; Hill, J.; Muller, N. Z.; Marshall, J. D. Effect of Model Spatial Resolution on Estimates of Fine Particulate Matter Exposure and Exposure Disparities in the United States. *Environ. Sci. Technol. Lett.* **2018**, *5*, 436−441.
(74) Gilmore, E. A.; Heo, J.; Muller, N. Z.; Tessum, C. W.; Hill, J. D.; Marshall, J. D.; Adams, P. J. An inter-comparison of the social costs of air quality from reduced-complexity models. *Environ. Res. Lett.* **2019**, *14*, 074016.
(75) *Integrated Science Assessment (ISA) for Particulate Matter (Final Report, Dec 2009)*; US Environmental Protection Agency: Washington, DC, EPA/600/R-08/139F, 2009. https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=216546 (accessed Aug 8, 2019).
(76) Hill, J.; Goodkind, A.; Tessum, C.; Thakrar, S.; Tilman, D.; Polasky, S.; Smith, T.; Hunt, N.; Mullins, K.; Clark, M.; Marshall, J.


DOI: 10.1021/acs.est.9b02527
*Environ. Sci. Technol.* XXXX, XXX, XXX−XXX

Air-Quality-Related Health Damages of Maize. *Nat. Sustainability* **2019**, *2*, 397−403.

(77) Lepeule, J.; Laden, F.; Dockery, D.; Schwartz, J. Chronic Exposure to Fine Particles and Mortality: An Extended Follow-Up of the Harvard Six Cities Study from 1974 to 2009. *Environ. Health Persp.* **2012**, *120*, 965−970.

(78) Vodonos, A.; Awad, Y. A.; Schwartz, J. The Concentration-Response Between Long-Term $PM_{2.5}$ Exposure and Mortality; A Meta-Regression Approach. *Environ. Res.* **2018**, *166*, 677−689.

(79) Pope, C. A., III; Lefler, J. S.; Ezzati, M.; Higbee, J. D.; Marshall, J. D.; Kim, S. Y.; Bechle, M.; Gilliat, K. S.; Vernon, S. E.; Robinson, A. L.; Burnett, R. T. Mortality Risk and Fine Particulate Air Pollution in a Large, Representative Cohort of U.S. Adults. *Environ. Health Perspect.* **2019**, No. 077007.

(80) *Electricity Data Browser*; US Energy Information Administration: Washington, DC, 2018. https://www.eia.gov/electricity/data/browser/ (accessed Aug 8, 2019).



DOI: 10.1021/acs.est.9b02527
*Environ. Sci. Technol.* XXXX, XXX, XXX−XXX

An official website of the United States Government.

Back to Document Comments (/document/EPA-HQ-OAR-2015-0072-1543/comment)

Share

PUBLIC SUBMISSION

# Comment submitted by Ben Toma

Posted by the **Environmental Protection Agency** on May 3, 2023

Docket (/docket/EPA-HQ-OAR-2015-0072)
/ Document (EPA-HQ-OAR-2015-0072-1543) (/document/EPA-HQ-OAR-2015-0072-1543) / Comment

Comment

As a member of the Arizona Legislature and Speaker of the Arizona House of Representatives, I appreciate the opportunity to address the EPA regarding its proposed rule change for PM2.5. This regulation may have needless and detrimental impacts on Arizona families and employers at a time when they can least afford it.

Specifically, the Arizonans I hear from every day are concerned about a looming threat of recession. They feel the impacts of record inflation at the gas station and grocery store, and they worry about running their businesses amid workforce shortages and supply chain challenges. As a small-business owner, I am keenly aware of the challenges that Arizona's small businesses face – often at the hands of government.

Additional regulatory red tape from the EPA will only make matters worse.

Now is not the time for one-size-fits-all regulation that doesn't take into account the unique needs and circumstances of individual states. Wind-blown dust, for example, has always presented a challenge for Arizona and other parts of the Desert Southwest when it comes to particulates monitoring. Additionally, our border communities are impacted by activities occurring in Mexico, where environmental standards and practices are far different than our own but result in emissions that know no jurisdictional boundaries. Meanwhile, wildfires caused by years of mismanagement on U.S. Forest Service land contribute more particulate matter to Arizona's air quality than the smoke that comes out of our stringently regulated power plants. Penalizing Arizona businesses and consumers for issues beyond our control would not be fair.

Give Feedback

The U.S. already has some of the toughest air quality standards in the world, such that many communities (including in Arizona) are in non-attainment. Tightening these requirements – in pursuit of uncertain benefit – will push many more communities out of compliance. Ironically, it may actually hurt the environment by discouraging manufacturers from planting their flag domestically and incentivizing industry to leave the U.S. in order to relocate in countries with more relaxed regulations or no regulations at all. This is a real threat to border states like mine.

The fact is, U.S. manufacturing is cleaner and more sustainable than ever. Manufacturers have led the way by revolutionizing how they produce, use, and recycle energy and other resources. Air quality has steadily improved, and the U.S. cut PM2.5 and five other common NAAQS pollutants by 78% between 1970 and 2020. Nationally, PM2.5 levels have been reduced by nearly half since 2000 alone.

Manufacturers and employers should be empowered to do what they do best: innovate and create jobs while protecting the environment we share. Onerous regulations and permitting are the wrong way to go. As a local leader fighting for Arizona's interests, I strongly urge the EPA to abandon its PM2.5 proposal.

Sincerely,

Ben Toma
Speaker of the House
Arizona House of Representatives

**Comment ID**

EPA-HQ-OAR-2015-0072-4525

**Tracking Number**

ley-xccs-nuaj

**Comment Details**

**Document Subtype**

Public Comment

**Received Date**

Mar 7, 2023

**Postmark Date**

Mar 7, 2023

**Page Count**

1

Give Feedback

Your Voice in Federal Decision Making

# Responses to Significant Comments on the 2023 Proposed Rule for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter

Docket Number OAR-2015-0072

U.S. Environmental Protection Agency

## Table of Contents

Frequently Cited Documents

I. Introduction

II. Comments on the Health Effects Evidence

- A. General Comments on the Integrated Science Assessment (ISA) and ISA Supplement
- B. Comments Related to Epidemiologic Studies
- C. Comments Related to Controlled Human Exposure Studies
- D. Other Comments on the Health Effects Evidence

III. Comments on the Quantitative Risk Assessment

IV. Responses to Significant Comments on the Proposed Primary $PM_{2.5}$ Standards

- A. General Comments on the Proposed Primary $PM_{2.5}$ Standards
- B. Specific Comments on the Proposed Primary $PM_{2.5}$ Standards
  1. Comments in Support of Revising the Primary Annual $PM_{2.5}$ Standard
  2. Comments in Support of Retaining the Primary Annual $PM_{2.5}$ Standard
  3. Comments in Support of Revising the Primary 24-hour $PM_{2.5}$ Standard
     - a. Form
     - b. Level
- C. Other Comments Related to the Primary $PM_{2.5}$ Standards

V. Responses to Significant Comments on the Primary $PM_{10}$ Standard

VI. Responses to Significant Comments on the Proposed Secondary Standards

VII. Response to Significant Comments Related to Communication of Public Health

- A. Comments on Proposed Revisions to the $PM_{2.5}$ AQI Breakpoints
  1. Comments on Proposed Revisions to the $PM_{2.5}$ AQI 50, 100, 150 Breakpoints
  2. Comments on Proposed Revisions to the $PM_{2.5}$ AQI 200 and Above Breakpoints
  3. Other Comments on Proposed Revisions to the $PM_{2.5}$ AQI
- B. Comments on Proposed Revisions AQI Reporting Requirements

VIII. Response to Significant Comments on Amendments to Ambient Monitoring and Quality Assurance Requirements

- A. Comments on Proposed Amendments to Ambient Monitoring and Quality Assurance Requirements

B. Comments on Proposed Revisions to Amendments to PM Ambient Air Quality Methodology

C. Comments on Proposed Revisions to $PM_{2.5}$ Monitoring Network Design Criteria to Address At-Risk Communities

D. Comments on Proposed Revisions to Probe and Monitoring Path Siting Criteria

IX. Responses to Significant Comments on Implementation

A. Comments on Attainment Planning

B. Comments on Initial Area Designations

C. Comments Related to Exceptional Events

D. Comments on New Source Review (NSR) Permitting

X. Response to Significant Comments on Legal, Administrative, and Procedural Issues and to Miscellaneous Comments

A. Legal Comments

B. Process Comments

C. Miscellaneous Comments

References

Appendix A: Studies cited in public comments related to the PM standards that were not included in the 2019 ISA or 2022 ISA Supplement and are provisionally considered in responding to comments

## Frequently Cited Documents

The following documents are frequently cited throughout the EPA's response to comments, often by means of the short names listed below:

*2019 Integrated Science Assessment (2019 ISA)*

Integrated Science Assessment for Particulate Matter: Final Report. Center for Public Health and Environmental Assessment-RTP Division, Office of Research and Development, Research Triangle Park, NC. EPA/600/R-19/188. December 2019. Available: *https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=347534*.

*2022 Supplement to the 2019 ISA for PM (ISA Supplement)*

Supplement to the 2019 Integrated Science Assessment for Particulate Matter (Final Report). Center for Public Health and Environmental Assessment-RTP Division, Office of Research and Development, Research Triangle Park, NC. EPA/600/R-22/028. May 2022. Available: *https://www.epa.gov/naaqs/particulate-matter-pm-standards-integrated-science-assessments-current-review.*

*2022 Policy Assessment (2022 PA)*

Policy Assessment for the Review of the Particulate Matter National Ambient Air Quality Standards. Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Research Triangle Park, NC. EPA 452/R-20-002. January 2020. Available: *https://www.epa.gov/naaqs/particulate-matter-pm-standards-policy-assessments-current-review-0.*

*Proposed Rule (Proposal or Proposed Action)*

Reconsideration of the National Ambient Air Quality Standards for Particulate Matter: Proposed Rule. 88 FR 5558, January 27, 2023.

*Preamble to the Final Rule (Final Action)*

Reconsideration of the National Ambient Air Quality Standards for Particulate Matter: Final Rule. To be published in the *Federal Register*.

## I. Introduction

This Response to Comments (RTC) document, together with the preamble to the final rule (or final action)[1] on the reconsideration of the national ambient air quality standards (NAAQS) for particulate matter (PM), presents the responses of the Environmental Protection Agency (EPA) to significant public comments received on the 2023 PM NAAQS proposal notice (88 FR 5558, January 27, 2023). This document also includes the EPA's provisional consideration of "new" studies submitted during the public comment period (i.e., those studies considered to be within the scope but published after the literature cutoff date for the Integrated Science Assessment (2019 ISA; U.S. EPA, 2019) and the Supplement to the 2019 ISA for PM (ISA Supplement, U.S. EPA, 2022b), and as such, not considered as part of the EPA and CASAC review of the air quality criteria (see Appendix A). The responses presented in this document are intended to augment the responses to comments that appear in the preamble to the final rule and to address comments not discussed in that preamble. Although portions of the preamble to the final rule are paraphrased in this RTC document, the preamble itself remains the definitive statement of the rationale for revising the level of the primary annual $PM_{2.5}$ standard to 9 $\mu g/m^3$ and retaining all other PM NAAQS.

Accordingly, this RTC, together with the preamble to the final rule and the information contained in the 2019 ISA, ISA Supplement, the 2022 PA, and the Notice of Proposed Rulemaking, should be considered collectively as the EPA's response to all of the significant comments submitted on the EPA's 2023 PM NAAQS proposed rule. This document incorporates, directly or by reference, the significant public comments addressed in the preamble to the PM NAAQS final rule, as well as other significant public comments that were submitted on the proposed rule.

Due to the large number of comments received overall and the number of comments that addressed similar issues, this RTC does not generally cross-reference responses to a particular commenter or commenters. However, commenters are identified in some cases where they provided particularly detailed comments that were used by the EPA to frame the overall response on an issue.

Comments on the health effects evidence and quantitative risk assessment are addressed in this document in sections II and III, respectively. Comments on the primary standards for $PM_{2.5}$ and $PM_{10}$ are addressed separately in this document in sections IV and V, respectively. Comments on secondary standards for fine and coarse particles are addressed below in section VI. Comments related to the communication of public health and the Air Quality Index (AQI) are addressed in section VII. Comments on amendments to ambient monitoring and quality assurance requirements are addressed in section VIII. Comments related to implementation are addressed in section IX. Comments on other topics, including legal, administrative, procedural, or miscellaneous comments, are addressed in section X.

## II. Comments on the Health Effects Evidence

[1] Consistent with CAA section 307(d)(2), we at times refer to the final "action" as a "rule" in the preamble to the final action and in this RTC document.

**A. General Comments on the Integrated Science Assessment (ISA) and ISA Supplement**

(1) **Comment:** A number of commenters question aspects of the EPA's process of ISA development, broadly, and some of the decisions made by EPA in the development of the Supplement to the 2019 PM ISA. Specifically, commenters assert that: (a) the ISA's framework for reviewing and interpreting the evidence and making causality determinations lacks specificity and detail, and is flawed; (b) the ISA lacks several critical features of modern systemic review practices and as a result the EPA does not use an unbiased and transparent systematic approach to reviewing the evidence as reflected in EPA's process of evaluating and interpreting studies, which includes the lack of detailed explanations of the protocol used to review the literature, the approach used to evaluate study quality, the methods and quality control approaches used to extract data, and the processes used to evaluate that data; and (c) the EPA does not clearly articulate the scope of the ISA and Supplement, and specifically decisions around the exclusion of some studies (e.g., non-U.S. studies, studies conducted at high [above typical] ambient concentrations, biochemical and histological studies [and more broadly in vitro studies]) and that the scope of the Supplement is too narrow.

**Response:** The EPA disagrees with each of the points raised by the commenters. Specifically for point (a), the EPA disagrees with the commenter's assertion regarding criticisms of the causal framework used to make key science judgments in the ISA. Since the inception of the ISAs in 2008, the EPA has relied on a weight-of-evidence approach to assessing the causal nature of relationships between exposure to criteria pollutants and health and welfare effects, which is similar to frameworks used by numerous scientific organizations (e.g., Institute of Medicine, Centers for Disease Control and Prevention, International Agency for Research on Cancer). Over time, this framework has evolved through substantive interactions with the CASAC, as well as ad hoc panels developed to support the chartered CASAC members during numerous public meetings. In addition, the EPA disagrees with commenters that the framework is inappropriate to use, either in being overly cautious or not detailed enough. With respect to the criticism that the EPA's causal framework is overly cautious, the EPA notes that the key science judgments (i.e., causality determinations) developed using the causal framework are the main pillars used in subsequent policy and technical documents that inform the Administrator's decision on the adequacy of the NAAQS. As such, the causal framework relies on the collective body of evidence spanning scientific disciplines to assess the consistency of evidence within a discipline, the coherence of effects across disciplines, and whether there is evidence of biological plausibility. Therefore, the degree of certainty conveyed using the causal framework in the ISAs in the assessment of the causal nature of relationships between health effects and criteria pollutants, including PM, is needed to fully inform additional steps of the NAAQS review process. It is important to accurately characterize uncertainties in the evidence so those uncertainties can be taken into account in decision making on the NAAQS, recognizing that the NAAQS are intended to provide a degree of protection against uncertain risks.

In addition, the EPA's conclusion that the causal framework is appropriate for use in NAAQS reviews is supported by the overall conclusions of the National Academies of Science, Engineering, and Medicine (NASEM) ad hoc committee convened to provide

independent advice to the EPA on the causal framework used in forming causality determinations in the ISA. This NASEM committee, consisting of 12 subject matter experts with expertise spanning disciplines including decision analysis, epidemiology, toxicology, dosimetry, biostatistics, experimental sciences, toxicokinetics, exposure-dose-response modeling, atmospheric sciences, ecology, and risk analysis, was tasked with reviewing the EPA's causal framework and making recommendations as to its development and use in ISAs. In October of 2022, NASEM released the report of the committee "Assessing Causality from a Multidisciplinary Evidence Base for National Ambient Air Quality Standards" (NASEM, 2022). While the committee provided recommendations that the EPA could address to improve the framework, overall, the committee concluded that "… the fundamental structure of the weight of evidence approach described in the 2015 Preamble allows effective determination of causality for both health and welfare effects." This conclusion, in combination with the origins of the EPA's causal framework being some of the leading scientific organizations in the world, as previously noted, provides additional support for its overall structure and the EPA's application of the framework in making key science judgments within ISAs.

For point (b), the EPA disagrees with the commenter's contention that the ISA development process is biased and lacks transparency. As a direct result of the substantive interactions with the CASAC over many years, ad hoc panels developed to support the chartered CASAC members and the public during numerous public meetings, the EPA has continuously strived to increase transparency in the ISA development process. Ultimately, the advice of the CASAC and the public contributed to the EPA publishing a separate document, titled Preamble to the ISA (U.S. EPA, 2015) (hereafter "Preamble"), with the sole purpose of clearly articulating each phase of the ISA development process to ensure transparency. The process for developing ISAs was summarized in the Preface and the Executive Summary of the 2019 ISA, referring readers to the Preamble for greater detail. In addition, in the final 2019 ISA, the EPA added an Appendix that provided detailed steps on the development of the PM ISA to address comments on the draft ISA from the CASAC and the public (U.S. EPA, 2019). This Appendix provides more detailed information that the commenters contend is lacking from the 2019 ISA. Specifically, the Appendix provides extensive details on all phases of the development of the 2019 ISA, including the literature search and initial screening and documentation of studies, the detailed evaluation of individual study quality (e.g., study scope, design, and methods), the peer review and public participation process, and the quality assurance steps that were taken to ensure accuracy. Also, as noted in the Appendix to the 2019 ISA, the EPA has undertaken a rigorous process of evaluating individual studies. As part of this process, the Agency relies on various scientific considerations, detailed in Table A-1 of the Appendix (U.S. EPA, 2019). These considerations allow the Agency to evaluate the strength of inference from studies spanning scientific disciplines and, ultimately, their utility in informing causality determinations. It is based on these individual study quality evaluations that the strength of the evidence base is assessed. If there are instances where there are inherent limitations in individual studies and in the overall body of evidence, this is reflected in the causality determination for a health effect category.

Lastly, with respect to point (c), the EPA disagrees with the commenters as the 2019 ISA clearly articulates the scope in Section P.3.1 while Section A.2 and A.3 of the Appendix

details the process of screening and selecting studies. The EPA also disagrees with the commenter's assertion that studies at higher concentrations should also be included in the 2019 ISA and ISA Supplement. Within the 2019 ISA, the focus is on assessing the causal nature of relationships between health effects and PM at relevant ambient concentrations. As such, Section P.3.1. of the 2019 ISA states that one of the areas of focus is on studies "conducted at concentrations of PM that are relevant to the range of human exposures across ambient microenvironments (up to 2 $mg/m^3$, which is one to two orders of magnitude above ambient concentrations)" (U.S. EPA, 2019). However, "the scope is broader for experimental studies when examining biological plausibility for PM health effects, and in some cases, includes in vitro studies, studies that use intratracheal (IT) installation, studies examining relative toxicity, and studies conducted at concentrations >2 $mg/m^3$" (U.S. EPA, 2019).

With respect to biochemical and histological studies, and more broadly, in vitro studies, the Preamble to the ISAs states "in vitro studies may provide mechanistic insight for effects examined in vivo or in epidemiologic studies" (U.S. EPA, 2015). It additionally states that "experimental results from in vivo studies involving animal models and humans, as well as from in vitro studies when appropriate, may be used to establish biological plausibility and to interpret other lines of evidence (e.g., health effects from epidemiologic studies)" (U.S. EPA, 2015). Therefore, in vitro studies are sometimes used in the process of assessing biological plausibility, but they do not encompass the main evidence base used to assess causality as the focus is on studies of inhalation exposures.

With respect to the ISA Supplement, the scope is described in detail in section 1.2 (U.S. EPA, 2022b). The scope of both 2019 ISA and ISA Supplement is rooted in identifying those studies that "address policy-relevant questions" as noted in the Integrated Review Plan (U.S. EPA, 2016). In the 2019 ISA, studies conducted across the world were considered and included in the evaluation of the scientific evidence. As described in section 1.2 of the ISA Supplement, studies considered for inclusion in that document were limited to U.S. and Canadian studies. The rationale for this approach is noted in section 1.2 of the ISA Supplement:

> "In addition to focusing on studies for health effect categories for which the 2019 PM ISA concluded *causal* or a *likely to be causal relationship*, as noted above, the 2020 PM PA also focused on a narrower set of studies conducted in locations that are most relevant to informing the level, form, averaging time, and indicator of the NAAQS for PM. Specifically, the 2020 PM PA states that the emphasis is on "multicity studies that examine health effect associations in the U.S. or Canada, as such studies examine potential associations over large geographic areas with diverse atmospheric conditions and population demographics (e.g., U.S. EPA, 2019 , sections 11.1 and 11.2). Additionally, studies examining associations outside the U.S. or Canada reflect air quality and exposure patterns that may be less typical of the U.S., and thus less likely to be informative for purposes of reviewing the NAAQS" (U.S. EPA, 2022a). Therefore, within this Supplement the studies considered for inclusion are limited to those studies conducted in the U.S. and Canada. However, it is the combination of the scientific evidence detailed in the 2019 PM ISA and this Supplement that forms the complete scientific record informing the reconsideration of the 2020 PM NAAQS."

The EPA also disagrees with the commenter's assertion that narrow scope of the ISA Supplement is inadequate and that the CASAC viewed the limited scope of the ISA Supplement as a flaw in the process of reconsidering the 2020 PM NAAQS. The EPA has a longstanding practice of supplementing ISAs with select, important additional studies that have been reviewed by CASAC, when appropriate (see, e.g., the discussion of this practice in the 2012 PM NAAQS final rule, 78 FR 3095-96). In the CASAC's consensus letter to the EPA Administrator for its review of the 2021 draft ISA Supplement, it noted that this limited scope is "appropriate for the targeted purpose of the Draft ISA Supplement." However, the CASAC did state that:

> "[t]his limitation should be explicitly acknowledged. It should also be noted in the Draft ISA Supplement that this limiting of scope applies only to this document and is not intended to establish a precedent for future ISAs."

As a result, based on this advice from the CASAC, the EPA in the ISA Supplement added text to reflect the point that the limited scope of the ISA Supplement does not influence decisions regarding the scope of future ISAs. This text states: "This targeted approach to developing the Supplement to the 2019 PM ISA for the purpose of reconsidering the 2020 PM NAAQS decision does not reflect a change to EPA's approach for developing ISAs for NAAQS reviews" (U.S. EPA, 2022b, section 1.2).

(2) **Comment:** Some commenters who support revising the primary $PM_{10}$ standard state that the EPA needs to properly consider the most recent scientific evidence in reaching decisions regarding the adequacy of the current standard. In so doing, these commenters note that in determining the scope of the 2022 ISA Supplement to support the reconsideration, the EPA did not include an evaluation of scientific evidence of $PM_{10\text{-}2.5}$-related health effects published since the literature cutoff date of the 2019 ISA because the evidence at that time did not support a causal relationship. These commenters also cite to the CASAC's advice in their review of the 2019 draft PA that there is a "clear progression" in the strength of the evidence, including for mortality, cardiovascular effects, and cancer. These commenters further cite two new studies that they assert have demonstrated links between $PM_{10\text{-}2.5}$ and respiratory effects, nervous system effects, and reproductive and developmental effects.

**Response:** The EPA disagrees with commenters that the most recent scientific evidence was not properly considered in reaching conclusions regarding the adequacy of the current primary $PM_{10}$ standard. As an initial matter, as noted by the commenters and described in section I.D.6, above, the scope of the 2022 ISA Supplement focused on those health effect categories for which the 2019 ISA concluded a "causal relationship" and subsequently the 2020 PA deemed to be of most importance in assessing the adequacy of the PM NAAQS. Similar to the 2009 ISA, $PM_{10\text{-}2.5}$ studies evaluated in the 2019 ISA had some of the same inherent limitations, resulting in the ISA concluding "uncertainties in the evidence regarding biological plausibility for health effects related to $PM_{10-2.5}$ exposure and in the methods used to assign $PM_{10-2.5}$ exposure in epidemiologic studies contributed to causality determinations of *suggestive of, but not sufficient to infer, a causal relationship* or *inadequate to infer the presence or absence of a causal relationship*" for health effect categories for both short- and long-term exposure. Therefore, the 2022 ISA Supplement did not include an evaluation of studies related to $PM_{10\text{-}2.5}$ exposures published since the literature cutoff date of the 2019

ISA. Further, we note that in CASAC's review of the 2021 draft PA, they did recognize that more scientific evidence has become available since the 2009 ISA that could potentially support an upgrading of some causality determinations in the 2019 ISA (Sheppard, 2022, p. 18 of consensus responses). While we agree with the commenters and the CASAC that the body of evidence related to $PM_{10-2.5}$ exposures and health effects has expanded since the 2009 ISA, there are still inherent limitations and uncertainties in the evidence base, as described above, that contributed to causality determinations of "inadequate to infer the presence or absence of a causal relationship" and "suggestive of, but not sufficient to infer a causal relationship" in the 2019 ISA. As a result, consistent with Agency recommendations in the 2012 review and the 2020 final decision, additional research is needed to address these uncertainties. Finally, we disagree with the commenters that the studies they provided support revising some causality determinations for health effect categories for $PM_{10-2.5}$. The studies by Kollath et al. (2022) and Herrera-Molina et al. (2021) are out of scope because these studies examine associations between $PM_{10}$ and health outcomes, which is important because the 2019 ISA reached conclusions regarding causality based on studies that examined short- and long-term $PM_{10-2.5}$ exposures and health effects, and not $PM_{10}$. Additionally, while the study by Enders et al. (2018) did examine associations between $PM_{10-2.5}$ exposures during gestation and low birthweight, and would be considered to be within the scope of the 2019 ISA, the EPA has provisionally considered this study and concludes that this one single study on its own would not be sufficient to warrant the changing of this causality determination, in light of the collective body of evidence that is considered in making conclusions regarding causality as detailed in the Preface to the 2019 ISA (U.S. EPA, 2019) and the Preamble to the ISA (U.S. EPA, 2015). Specifically, during the process of forming causality determinations, the EPA considers the broader body of scientific evidence and not only one line of evidence (e.g., epidemiology). As such, in evaluating a body of evidence the EPA considers the pattern of results across a scientific discipline, such as epidemiology, to assess whether there is consistency and the coherence of results across scientific disciplines including toxicological studies and controlled human exposure studies.

(3) **Comment**: Some commenters assert that, in assessing the evidence in the 2019 ISA and the ISA Supplement, the EPA ignored studies that reported no association with $PM_{2.5}$.

**Response:** The EPA also disagrees with the commenters' assertion that the Agency has not considered epidemiologic studies that did not report associations between $PM_{2.5}$ exposure and mortality in determining the adequacy of the current standard. As detailed in section 11.2 of the 2019 ISA, all studies of long-term $PM_{2.5}$ exposure and mortality that were within the scope of the 2019 ISA (as detailed in the Preface) were considered and included in the 2019 ISA. In assessing the full body of evidence in forming a causality determination, the EPA focuses on the pattern of results across studies and does not focus solely on statistical significance as described in detail in the Preamble to the ISAs (U.S. EPA, 2015). This is because statistical significance is an indicator of the precision of a study's results, which is influenced by a variety of factors including, but not limited to, the size of the study, exposure and measurement error, and statistical model specifications. As a result, in developing an integrated assessment of the health effects evidence for PM, the EPA has emphasized the importance of examining the pattern of results across various studies, not statistical significance. Therefore, in assessing the adequacy of the PM NAAQS within the 2022 PA, the EPA relies on the full suite of evidence used to inform causality determinations detailed

in the 2019 ISA, which includes studies that report no evidence of an association, but only pulls forward those studies of most relevance.

(4) **Comment**: Some commenters express concern about the difference in the strength of the associations for respiratory and cardiovascular morbidity compared to respiratory and cardiovascular mortality. Specifically, the commenters state that associations/coherence for respiratory and cardiovascular morbidities are less consistent than the associations for respiratory and cardiovascular mortality. These commenters state that if $PM_{2.5}$ concentrations were associated with respiratory and cardiovascular mortality, then one would expect the association with respiratory and cardiovascular morbidity to be as strong or stronger, but this is not the case as stated in the 2019 ISA and 2022 PA. Commenters state that the EPA does not explain this difference and requests the EPA provide an explanation. In addition, with respect to the causality determination for short-term $PM_{2.5}$ exposure and respiratory effects, the commenters contend that the causality determination is not supported because of the lack of observed respiratory effects in controlled human exposure studies. Commenters request the EPA provide an explanation as to why such direct study results were not considered to be more relevant than the epidemiologic studies.

**Response:** As an initial matter, the commenters do not define what they mean by "strength of the associations". Strength could be implied to mean either associations larger in magnitude or associations that are more precise. In the context of the 2019 ISA, which directly informed the 2022 PA, strength of the association is one of multiple key aspects to aid in judging causality considered as part of EPA's causal framework that is used to make causality determinations for the health effect categories evaluated in the 2019 ISA (U.S. EPA, 2015, Table I). Strength of the association on its own is not considered to be a greater attribute to inform causality than any of the other key aspects evaluated. As noted in the Preamble to the ISAs, the EPA states:

> "In evaluating the strength of the observed association, the U.S. EPA considers both the magnitude and statistical precision (i.e., width of confidence interval) of the association in epidemiologic studies. In a large study that accounts for several potential confounding factors, a strong association can serve to increase confidence that a finding is not due to a weak unmeasured confounder, chance, or other biases. However, in a study that accounts for several potential confounding factors and other sources of bias, a weak association does not rule out a causal connection. The health effects evaluated in the ISAs tend to have multiple risk factors that likely vary in strength of effect, and the magnitude of effect of air pollution exposure will depend on the prevalence of other risk factors in the study population. Further, a small effect size can be important from a public health impact perspective. The air pollution-related change in a health effect observed in a study can represent a shift in the distribution of responses in the study population and potentially an increase in the proportion of individuals with clinically important effects" (U.S. EPA, 2015, section 5).

In addition, when evaluating the different aspect considered in the process of assessing causality "it is important to note that the aspects…cannot be used as a strict checklist, but rather to determine the weight of evidence for inferring causality. Consistency of findings across studies is informed by the repeated observation of effects or associations across

multiple independent studies. Further strength is provided by reproducibility of findings in different populations under different circumstances" (U.S. EPA, 2015). Therefore, in assessing the causal nature of relationships between short- and long-term PM exposure and the health effects categories evaluated in the 2019 ISA, the totality of the evidence is considered. As a result, the causality determinations rely on different lines of evidence, by integrating evidence across scientific disciplines, including epidemiologic, animal toxicological, and controlled human exposure studies to assess consistency of effects within a discipline, coherence of effects across disciplines, and whether there is evidence of biological plausibility.

In providing this background, the EPA disagrees with the commenter's contention that the strength of the association should be the same for studies of morbidity and mortality. First, the commenters provide no basis for their assumption that the strength of the association should be different between outcomes. Second, as noted above multiple factors within each individual study can influence the strength of the association. Last, the outcomes within respiratory and cardiovascular morbidity that provide some of the strongest evidence in support of the causality determination for each health effect category report evidence of generally consistent positive associations as reflected in 2019 ISA (asthma; COPD; myocardial infarction/ischemic heart disease; heart failure). In addition, studies of respiratory and cardiovascular mortality, in combination with the morbidity evidence indicate a continuum of effects that could lead to mortality, which ultimately supports the causality determination for total mortality. Causality determinations are not made for individual cause-specific mortality outcomes. In conclusion, strength of the association is one of multiple key aspects considered in assessing causality, and therefore should not be given more weight than other aspects as suggested by the commenters.

In addition, the EPA disagrees with the commenters' contention that the causality determination of a "likely to be causal relationship" for short-term $PM_{2.5}$ exposure and respiratory effects is not appropriate because of the lack of evidence from controlled human exposure studies. In fact, the reason the causality determination is likely to be a causal relationship (and not a causal relationship) is because of the inconsistent evidence of respiratory effects in controlled human exposure studies. As detailed in Table II of the Preamble to the ISAs, a likely to be causal relationship can be concluded if:

> "Evidence is sufficient to conclude that a causal relationship is likely to exist with relevant pollutant exposures. That is, the pollutant has been shown to result in health effects in studies where results are not explained by chance, confounding, and other biases, but uncertainties remain in the evidence overall. For example: (1) observational studies show an association, but copollutant exposures are difficult to address and/or other lines of evidence (controlled human exposure, animal, or mode of action information) are limited or inconsistent, or (2) animal toxicological evidence from multiple studies from different laboratories demonstrate effects, but limited or no human data are available. Generally, the determination is based on multiple high-quality studies."

As described in section 1.4.1.1.1 and further expanded upon in section 5.1.12 of the 2019 ISA, the EPA states the conclusion of a "likely to be causal relationship" for short-term $PM_{2.5}$

exposure and respiratory effects "is based on multiple recent epidemiologic studies demonstrating generally consistent, positive associations with ED visits and hospital admissions for asthma, COPD, and combined respiratory-related diseases, as well as with respiratory mortality. Evidence from animal toxicological studies, although limited, is supportive of and provides biological plausibility for the associations observed in the epidemiologic studies related to exacerbation of asthma and COPD as well as respiratory infection." Therefore, the EPA also disagrees with the commenters assertion that the Agency has not clearly articulated the rationale and scientific basis supporting the "likely to be causal relationship" for short-term $PM_{2.5}$ exposure and respiratory effects.

## B. Comments Related to Epidemiologic Studies

(1) **Comment:** Some commenters contend that while the EPA recognized a number of areas of uncertainty associated with the epidemiologic studies, confounding was not adequately addressed or considered in reaching conclusions regarding the strength of the scientific evidence or the adequacy of the primary $PM_{2.5}$ standards. Specifically, the commenters highlight copollutant confounding, unmeasured confounding, and temporal and spatiotemporal confounding. The commenters cite to a number of studies that evaluate confounding in epidemiologic studies (e.g., Janes et al., 2007; Greven et al., 2011; Pun et al., 2017; Eum et al., 2018) in support of their comments related to confounding. Some commenters contend that the EPA did not appropriately take into account the finding of these studies in reaching conclusions regarding causality for long-term $PM_{2.5}$ exposure and mortality in the 2019 ISA and ISA Supplement, and recommend that the EPA consider confounding more comprehensively in NAAQS reviews.

**Response**: The EPA disagrees with the commenter's contention that the Agency did not consider studies that evaluate confounding in epidemiologic studies, including those cited by the commenters (Janes et al., 2007; Greven et al., 2011; Pun et al., 2017; Eum et al., 2018) in the process of concluding a "causal relationship" between long term PM2.5 exposure and mortality. The EPA initially addressed public comments on the studies conducted by Janes et al. (2007) and Greven et al. (2011) as a part of the 2012 final decision. As noted in the Responses to Comments document for the 2012 review, (U.S. EPA, 2012a, p. II-4) the Agency stated:

> The EPA evaluated the study by Janes et al. (2007) in the ISA (U.S. EPA, 2009, p. 7-88) and evaluated the study by Greven et al. (2011) (an extension of the study by Janes et al. (2007) incorporating three additional years of data) in the Provisional Science Assessment (U.S. EPA, 2012b). In the EPA's evaluation of the relationship between long-term exposure to $PM_{2.5}$ and mortality, the Janes et al. (2007) study was included in the body of evidence that supported the determination that a causal relationship existed (U.S. EPA, 2009, section 7.6.5.1). For the reasons discussed below, the EPA does not agree with the commenters' views that these two studies call into question the scientific merit or the consistency of the results of long-term exposure studies of mortality that contribute to this body of evidence. Both studies used nationwide Medicare mortality data to examine the association between monthly averages of $PM_{2.5}$ over the preceding 12 months and monthly mortality rates in 113 U.S. counties and examined whether community-specific trends in monthly $PM_{2.5}$ concentrations and mortality declined at the

same rate as the national rate. The investigators examined this by decomposing the association between $PM_{2.5}$ and mortality into two components: (1) "national" trends, defined as the association between the national average trend in monthly $PM_{2.5}$ concentrations averaged over the previous 12 months and the national average trend in monthly mortality rates and (2) "local" trends, defined as county-specific deviations in monthly $PM_{2.5}$ concentrations and monthly mortality rates from national trends. The EPA does not question the results of the national trends analyses conducted by Janes et al. (2007) and Greven et al. (2011).[2] Both Janes et al. (2007) and Greven et al. (2011) observed positive and statistically significant associations between long-term exposure to $PM_{2.5}$ and mortality in their national analyses. However, Janes et al. (2007) and Greven et al. (2011) eliminated all of the spatial variation in air pollution and mortality in their data set when estimating the national effect, focusing instead on both chronic (yearly) and sub-chronic (monthly) temporal differences in the data (Dominici et al., 2012). Janes et al. (2007) (Table 1) highlighted that over 90 percent of the variance in the data set used for the analyses conducted by both Janes et al. (2007) and Greven et al. (2011) was attributable to spatial variability, which the authors chose to discard. The focus of the analyses by Janes et al. (2007) and Greven et al. (2011) was on two components: (1) a temporal or time component, i.e., the "national" trends analysis, which examined the association between the national average trend in monthly $PM_{2.5}$ concentrations averaged over the previous 12 months and the national average trend in monthly mortality rates and (2) a space-by-time component, i.e., the "local" trends analysis, which examined county-specific deviations in monthly $PM_{2.5}$ concentrations and monthly mortality rates from national trends. These two components combined comprised less than 10 percent of the variance in the data set. The authors included a focus on the space-by-time component, which represented approximately 5 percent of the variance in the data set, in an attempt to identify, absent confounding, if $PM_{2.5}$ was associated with mortality at this unique exposure window. Thus, the national effects reported in these studies are not directly comparable to other cohort studies investigating the relationship between long-term exposure to $PM_{2.5}$ and mortality, which make use of spatial variability in air pollution and mortality data.[3] Indeed, the study authors noted expressly that "when one considers that this wealth of [spatial] information is not accounted for in that study, it is not as surprising that we see vastly different estimates of the $PM_{2.5}$/mortality relationship than in other studies that do exploit that variability" (Dominici et al., 2012, p. 2).

[2] In its evaluation of Janes et al. (2007) in the 2009 ISA, the EPA did not identify limitations in the statistical methods used per se (U.S. EPA, 2009, p. 7-88) and included the results of the national-scale analyses in that study in the body of evidence that supported the determination that there is a causal relationship between long-term $PM_{2.5}$ exposure and mortality.

[3] Though not directly comparable, the effect estimates for mortality reported by Janes et al. (2007) and Greven et al. (2011) were coincidentally similar in magnitude to those previously reported in other long-term cohort studies. It is important to note that previous cohort studies focused on identifying spatial differences in $PM_{2.5}$ concentrations between cities, while Janes et al. (2007) and Greven et al. (2011) primarily focused on temporal differences in $PM_{2.5}$ concentrations. In fact, Greven et al. (2011) stated, "We do not focus here on a third type [of statistical approach] used in cohort studies, measuring the association between average $PM_{2.5}$ levels and average age-adjusted mortality rates across cities (purely spatial or cross-sectional association)."

For the local analyses, both Janes et al. (2007) and Greven et al. (2011) observed associations between exposure to $PM_{2.5}$ and mortality that are near the null value, often negative, and not statistically significant. The fact that the authors did not observe an association in the local analyses is not surprising. As stated in Janes et al. (2007), they were estimating "associations between temporal changes in exposure and outcomes within counties relative to the national trend." However, a limitation of the analysis conducted by Janes et al. (2007) [and subsequently by Greven et al. (2011)], and recognized in a commentary by (Pope and Burnett, 2007) is the use of monthly average $PM_{2.5}$ concentrations to examine associations at the local scale. This is a limitation because such an exposure assignment approach does not provide enough exposure contrast to observe temporal changes in mortality. The ISA (U.S. EPA, 2009, p. 7-88) recognized comments made by (Pope and Burnett, 2007) that pointed out that the conclusions of Janes et al. (2007) "are overstated. . . their analysis tells us little or nothing about unmeasured confounding in those and related studies because the methodology of Janes et al largely excludes the sources of variability that are exploited in those other studies. By using monthly mortality counts and lagged 12-month average pollution concentrations, the authors eliminate the opportunity to exploit short-term or day-to-day variability."

Furthermore, the EPA disagrees with commenters that Janes et al. (2007) and Greven et al. (2011) provide evidence that other studies of long-term exposure to $PM_{2.5}$ and mortality are affected by unmeasured confounding. As noted above, the design of the studies conducted by Janes et al. (2007) and Greven et al. (2011) are fundamentally different than those used in other studies of long-term exposure to $PM_{2.5}$ and mortality, including the ACS cohort and the Harvard Six Cities study. Studies, such as the ACS and Harvard Six Cities studies, used the spatial variation between cities to measure the effect of long-term (annual) exposures to $PM_{2.5}$ on mortality risk, and did not conduct any analyses relying on the temporal variation in $PM_{2.5}$. The opposite is true of the Janes et al. (2007) and Greven et al. (2011) studies which first removed the spatial variability in $PM_{2.5}$ and then examined the temporal variation at both the national and local scale to measure the effects of temporal differences in $PM_{2.5}$ on mortality risk. Janes et al. (2007) and Greven et al. (2011) focus on changes in $PM_{2.5}$ concentrations over time and therefore control for confounders would be based on including variables that vary over time rather than over space. As a result, any evidence of potential confounding of the $PM_{2.5}$-mortality risk relationship derived from Janes et al. (2007) and Greven et al. (2011) cannot be extrapolated to draw conclusions related to potential spatial confounding in studies based on the spatial variation in $PM_{2.5}$ concentrations.

As detailed in the 2009 ISA (U.S. EPA, 2009, section 7.6), and recognized by the authors of Janes et al. (2007) and Greven et al. (2011), the cohort studies that informed the causality determination for long-term $PM_{2.5}$ exposure and mortality "have developed approaches to adjust for measured and unmeasured confounders" (Dominici et al., 2012). These approaches were specifically designed to adjust for spatial confounding. The hypothesis that the authors of Janes et al. (2007) and Greven et al. (2011) chose to examine was that differences in the local and national effects indicate unmeasured temporal confounding in either the local or national effect estimate. This hypothesis was specific to these two studies that examined temporal variability in exposure to air

pollution and did not include known potential confounders at either the national or local scale as covariates in the statistical model. The authors acknowledged that the interpretation of either the national or local estimates needs to occur with an appreciation of the potential confounding effects of national and local scale covariates that were omitted from the model (Dominici et al., 2012). It is important to recognize that because Janes et al. (2007) and Greven et al. (2011) focused on variations in $PM_{2.5}$ over time and not space, the results from these two studies do not provide any indication that other studies of long-term exposure to $PM_{2.5}$ and mortality exhibit spatial confounding, or that $PM_{2.5}$ does not cause mortality.[4] The authors of Janes et al. (2007) and Greven et al. (2011) recognized "it is entirely possible that these papers are looking for an association at a timescale for which no association truly exists" (Dominici et al., 2012, p. 3).

In summary, the EPA does not question the quantitative results presented by Janes et al. (2007) and Greven et al. (2011); however, the EPA disagrees that the results of these studies are comparable to the results of other cohort studies of long-term exposure to $PM_{2.5}$ and mortality, or that the results presented in these two studies invalidate either the results themselves, or the consistency of the results observed across other cohort studies of long-term exposure to $PM_{2.5}$ and mortality. Janes et al. (2007) and Greven et al. (2011) chose to eliminate the spatial variability in the air pollution and mortality data. Thus, the results of these studies cannot be directly compared to time-series studies of short-term exposure to $PM_{2.5}$ and mortality (which rely on day-to-day changes in $PM_{2.5}$ concentrations and mortality) because the authors only use temporal variability measured on a monthly scale. Nor can the results of these studies be directly compared to cohort studies of long-term exposure to $PM_{2.5}$ and mortality (which rely on the spatial variability of air pollution concentrations and mortality) because their analyses include a fixed effect for county in the regression model which eliminates spatial variability when estimating the national effect. Additionally, Janes et al. (2007) and Greven et al. (2011) use a different time scale in their analyses compared to the timescales used in other cohort studies. Janes et al. (2007) and Greven et al. (2011) examined whether an association exists at a sub-chronic (i.e., monthly) time scale. Thus, the results of the study by Janes et al. (2007) are included in the ISA and contributed to the body of evidence for an association between long-term $PM_{2.5}$ exposures and mortality but are not directly comparable to other cohort studies that rely on a different timescale and focus on spatial variability.

As demonstrated in the ISA, there is a large body of evidence supporting the association between long-term exposure to $PM_{2.5}$ and mortality that generally reports consistent relative risks between 1.0 and 1.5 (U.S. EPA, 2009, Figures 7.6 and 7.7). Based on this large body of evidence, the EPA concluded that a causal relationship exists between long-term exposure to $PM_{2.5}$ and mortality (U.S. EPA, 2009, section 7.6.5.1). The results presented by Janes et al. (2007) and Greven et al. (2011) are not comparable to the results of these studies on long-term exposure to $PM_{2.5}$ and mortality. Therefore, the EPA concludes that these studies do not invalidate the large body of epidemiological evidence

[4] Further, the EPA notes that Janes et al. (2007) and Greven et al. (2011) provide no information relevant to examining confounding in studies of short-term exposure to $PM_{2.5}$.

that supports the EPA's determination that a causal relationship exists between long-term $PM_{2.5}$ exposure and mortality.[5]"

In addition to the previous evaluation of Janes et al. (2007) and Greven et al. (2011), the EPA evaluated Pun et al. (2017) in the 2019 ISA (U.S. EPA, 2019, section 11.2.2.4) and Eum et al. (2018) in the ISA Supplement (U.S. EPA, 2022b, section 3.2.2.6). With respect to the 2019 ISA, the EPA stated "studies [such as Pun et al. (2017)] contribute to the body of epidemiologic evidence that informs the *causal relationship* between long-term $PM_{2.5}$ exposure and total mortality. Observing consistent results for this relationship across studies using different analytic techniques (i.e., difference-in-difference approach) increases our confidence in the relationship." Subsequently, in the evaluation of studies published since the literature cutoff date of the 2019 ISA, the EPA evaluated Eum et al. (2018) in the context of the studies published by Janes et al. (2007), Greven et al. (2011), and Pun et al. (2017). In addition to Eum et al. (2018), additional studies were evaluated that also examined the role of potential unmeasured confounders on the relationship between long-term $PM_{2.5}$ exposure and mortality. In considering all of these studies together in the ISA Supplement, the EPA concluded, "recent studies that further evaluate the potential implications of unmeasured confounders on the association between long-term PM2.5 exposure and mortality indicate that bias can occur in either direction. However, across the studies evaluated, the control for unmeasured confounders, as detailed in Eum et al. (2018), Wu et al. (2020), and Erickson et al. (2019) do not result in the elimination of the association, but instead provide additional confirmation that an association between long-term $PM_{2.5}$ exposure and mortality exists when accounting for additional confounders (U.S. EPA, 2022b, section 3.2.2.2.6)." In conclusion, the EPA disagrees with the commenter's assertion that the EPA did not consider these studies in forming the causality determination for long-term $PM_{2.5}$ exposure and mortality, when in fact, these studies were thoroughly evaluated and considered as part of the body of evidence that supported the conclusion of a "causal relationship."

(2) **Comment:** Commenters also assert that the effect estimates from the key epidemiologic studies in the 2022 PA are of "questionable reliability" because of the "modest" association between $PM_{2.5}$ exposure and mortality as a result of the use of Cox proportional hazards models that "cannot adequately control for strong time-varying confounding." These commenters contend that the Cox proportional hazard model poorly controls for a time-dependent strong risk factor (e.g., smoking), which yields unreliable relative risk estimates unless detailed, time-varying information is incorporated into the modeling.

**Response:** We disagree with commenters' assertion that the risk estimates from epidemiologic studies examining long-term $PM_{2.5}$ exposure and mortality are unreliable because they are of "modest size." This comment insinuates that the magnitude of the association must be large to support the conclusion of a "causal relationship." While the strength of the observed association is an important aspect to aid in judging causality, and "while large effects support causality, modest effects therefore do not preclude it" (U.S. EPA, 2009, Table 1-2, section 1.5.4). The weight of evidence approach used by the EPA

[5] We note that the EPA's conclusion with regard to the interpretation of the results from Janes et al. (2007) and Greven et al. (2011) is supported by the study authors' conclusion that "[o]ur results do not invalidate previous epidemiologic studies" (Dominici et al., 2012, p. 1).

encompasses a multitude of factors of which the magnitude of the association is only one component (U.S. EPA, 2009, Table 1-3). An evaluation of the association across multiple investigators and locations supports the "reproducibility of findings [which] constitutes one of the strongest arguments for causality" (U.S. EPA, 2009, Table 1-2). Even though the risk estimates for air pollution studies may be modest, the associations are consistent across hundreds of studies as demonstrated throughout the 2009 ISA (U.S. EPA, 2009, Figures 2-1, 6-27, and 7-7) as well as the 2019 ISA (U.S. EPA, 2019, Figures 11-17 and 11-18). Furthermore, the causality determinations rely on different lines of evidence, by integrating evidence across disciplines, including animal toxicological studies and controlled human exposure studies. The EPA recognizes that the population potentially affected by $PM_{2.5}$ is considerable, including large subgroups of the U.S. population that have been identified as at-risk populations (e.g., children, older adults, persons with underlying cardiovascular or respiratory disease). While individual effect estimates from epidemiologic studies may be modest in size, the public health impact of the mortality and morbidity associations can be quite large given that exposure to airborne $PM_{2.5}$ is ubiquitous. Taken together, this information indicates that exposure to ambient $PM_{2.5}$ concentrations has substantial public health impacts.

In citing potential issues in accounting for time-varying confounders in the Cox proportional hazards models often used in long-term $PM_{2.5}$ exposure epidemiologic studies, the commenters cite a study by Moolgavkar et al. (2018) that used a simulated cohort to mimic the structure of the American Cancer Society – Cancer Prevention Study II cohort used by Pope et al. (1995). In this study, the authors focus on the confounding structure between cigarette smoke and covariate X. However, the authors note "[o]ur analysis did not account for the use of ecologic measures of exposure (such as fine PM)." Therefore, it is unclear how the commenters can contend that the results of Moolgavkar et al. (2018) are applicable to studies examining air pollution exposures.

In addition, as noted in the 2004 PM AQCD, confounding is defined as "…a confusion of effects. Specifically, the apparent effect of the exposure of interest is distorted because the effect of an extraneous factor is mistaken for or mixed with the actual exposure effect (which may be null)" (U.S. EPA, 2004b, p. 8-10). The commenters do not indicate how smoking status can be a confounder if smoking status is not correlated with $PM_{2.5}$ concentrations. In order for smoking status to be a confounder, it would need to vary across locations as $PM_{2.5}$ concentrations vary. However, as was shown in the extended follow-up of the Harvard Six Cities study (Laden et al., 2006), the rank order of cities remains the same even as $PM_{2.5}$ concentrations decline (i.e., the cities with the highest concentrations continue to have the highest concentrations and those with the lowest concentrations continue to have the lowest). Therefore, the rate of smoking in each city would need to change in the same way in order for smoking to have a confounding effect on the association between $PM_{2.5}$ exposure and mortality.

Recent studies evaluated in the 2019 ISA, as well as the ISA Supplement, provide evidence that effect estimates from Cox proportional hazards models yield similar results to effect estimates from other statistical models (i.e., Poisson regression models). This evidence does not support the commenter's argument that effect estimates from Cox proportional models are of "questionable reliability". As detailed in section 11.2.2.1 of the 2019 ISA, Kloog et al.

(2013) and Shi et al. (2015) in studies conducted in Massachusetts and New England, respectively, used a 365-day moving average, which is similar to the statistical analyses used in short-term exposure time-series studies. Both studies reported positive associations with mortality, which were then confirmed in a larger national analysis conducted by Di et al. (2017) using the same $PM_{2.5}$ concentration data but a Cox proportional hazards model. Lastly, the similar results reported by Kloog et al. (2013), Shi et al. (2015), and Di et al. (2017) were further confirmed in a study by Wu et al. (2020) which also used the Medicare cohort and was evaluated in the ISA Supplement (U.S. EPA, 2022b, sections 3.2.2.2.1 and 3.2.2.3). Wu et al. (2020) examined associations between long-term $PM_{2.5}$ exposure and mortality using both a Cox proportional hazards model and a Poisson regression model, as well as three different alternative approaches developed to further account for potential confounders. Across all models the results were similar. This series of epidemiologic studies using different statistical approaches and reporting evidence of positive associations of similar magnitude and precision between long-term $PM_{2.5}$ exposure and mortality does not support the commenter's claim. The EPA disagrees with the commenter's assertion that there is a flaw in the use of the Cox proportional hazards model in epidemiologic studies of long-term $PM_{2.5}$ exposure and mortality.

(3) **Comment:** Some commenters recommend that the EPA should more comprehensively consider the impact of uncertainty in exposure estimates on effect estimates from epidemiologic studies. These commenters contend that epidemiologic studies that use monitor-based or hybrid model-based estimates of exposure can lead to exposure misclassification, which can bias the results of the studies. They further note that the use of one method of exposure assignment versus another may impact the degree to which exposure is accurately estimated because PM composition is spatially variable. Finally, the commenters assert that the reduced ability of exposure estimation methods in hybrid modeling studies at low concentrations (because of lack of monitoring data) may lead to differential exposure concentrations that may bias the results.

**Response:** The EPA agrees with the commenters that an assessment of exposure measurement error is an important aspect of assessing the results from epidemiologic studies as reflected by the fact there is an entire chapter devoted to a full evaluation of studies that inform our understanding of exposure issues that are specific to PM in the 2019 ISA (see U.S. EPA, 2019, chapter 3). However, the EPA disagrees with the commenters assertion that exposure misclassification can bias epidemiologic results to the point that the results of studies are uninterpretable. In the 2019 ISA, there is a section that focuses on the "Influence of Exposure Errors on Results from Epidemiologic Studies of Different Designs" (U.S. EPA, 2019, section 3.4.5). Within this section, the EPA states: "Exposure error can bias epidemiologic associations between ambient pollutant concentrations and health outcomes and tends to widen confidence intervals around those estimates (Sheppard et al., 2005 ; Zeger et al., 2000 )." However, the EPA also notes that "exposure error tends to underestimate health effects associations in epidemiologic studies of PM exposure" (U.S. EPA, 2019, p. 1-16). While it is plausible that bias can occur in either direction, bias away from the null only occurs under the unique circumstance where a monitor or model underestimates population exposure in long-term exposure studies (U.S. EPA, 2019, p. 3-1). Although exposure measurement error can influence individual epidemiologic study results, in assessing the collective body of evidence for a particular health outcome (e.g., respiratory-related ED

visits, mortality), the EPA evaluates the pattern of associations across studies. As a result, if across studies the direction of the association is consistent, even in the face of potential underestimation of the health effect association and widening confidence intervals, it provides support for a relationship between PM exposure and the health outcome of interest.

With respect to different exposure assessment methods, since the 2009 ISA, new approaches (e.g., hybrid models) have been developed and applied to assign exposure in epidemiologic studies, specifically for PM. These approaches generally increase/refine spatial and temporal coverage of exposure estimates and therefore errors in exposure estimates have been reduced. This is reflected by hybrid models typically having good cross-validation, especially for $PM_{2.5}$, and therefore having the potential to reduce exposure measurement error and resulting bias and uncertainty in the health effect estimates produced by epidemiologic models of long-term exposure to PM, even for spatially varying size fractions and components (U.S. EPA, 2019, p. 3-120). As a result, the 2019 ISA concluded that: “New developments in PM exposure assessment methods, including hybrid spatiotemporal models that incorporate satellite observations of aerosol optical depth (AOD), land use variables, surface monitoring data from Federal Reference Methods (FRMs), and/or chemical transport models (CTMs), have reduced bias and uncertainty in health effect estimates by improving the spatial resolution and accuracy of exposure predictions” (U.S. EPA, 2019, p. 3-1).

The EPA recognizes that exposure to ambient air pollutants, including PM, can be estimated using multiple approaches. The applicability of each approach in an epidemiologic study depends on the study design, as detailed in Table 3-5 of the 2019 ISA, which summarizes exposure estimation methods, their typical use in PM epidemiologic studies, and related errors and uncertainties (see U.S. EPA, 2019, p. 3-45). The 2019 ISA examined epidemiologic studies that used multiple exposure estimation methods (i.e., Dionisio et al., 2013; Mannshardt et al., 2013; McGuinn et al., 2017) and reported relatively consistent results across the different approaches used although some approaches did exhibit greater spatial variability in exposures.

Last, with respect to commenters assertions of exposure estimation methods in hybrid modeling studies at lower concentrations, studies using hybrid modeling methods have reduced exposure measurement error and uncertainty in the health effect estimates, as detailed in section II.A.2.d of the notice of final rulemaking, using a variety of approaches to estimate $PM_{2.5}$ concentrations and to assign exposure to assess the association between health outcomes and $PM_{2.5}$ exposure. The EPA recognizes that this variability in methodology has inherent limitations and uncertainties, as described in more detail in section 2.3.3.1.5 of the 2022 PA, and the performance of the modeling approaches depends on the availability of monitoring data which varies by location. However, the key U.S. epidemiologic studies that use hybrid modeling that were identified and used to inform the Administrator’s conclusions (as detailed in section II.B.4 of the notice of final rulemaking) were nationwide or region-wide studies, rather than studies completed only in rural areas with limited monitoring data and thus less reliable estimates of $PM_{2.5}$ concentrations in the hybrid model study. These key studies reported a thorough model performance evaluation for core years of the study (U.S. EPA, 2022a, p. 3-89). As such, the EPA considers that the potential for reduced ability of exposure estimation methods in hybrid modeling studies at low concentrations (due to a lack

of monitoring data), is unlikely to bias the results in the nationwide or region-wide, population-weighted epidemiologic studies.

(4) **Comment:** Some commenters argue that exposure measurement error makes it difficult to determine the true shape of the C-R function and that such errors do not allow for the determination of a $PM_{2.5}$ threshold, if one even exists. These commenters further assert that because of these issues, assessing risks associated with low $PM_{2.5}$ concentrations and exposures at these levels are not reliable. In addition, the commenters state that the long-term epidemiologic studies assessed in the 2019 ISA and ISA Supplement did not assess the risks of lifetime $PM_{2.5}$ exposures or how those exposures would impact the interpretation of the study results. Because of these uncertainties, the commenters conclude that there is a high degree of uncertainty in the C-R relationships for long-term $PM_{2.5}$ concentrations below the current level of the primary annual $PM_{2.5}$ standard.

**Response:** The EPA disagrees with the commenter's assertion regarding the role of exposure measurement error on assessing the concentration-response (C-R) relationship and whether a threshold exists for long-term $PM_{2.5}$ exposure and mortality. As noted in an earlier response, the 2019 ISA notes that "exposure error tends to underestimate health effects associations in epidemiologic studies of PM exposure, [and] although bias in either direction can occur" (U.S. EPA, 2019, p. 1-16), bias away from the null occurs under the unique circumstance where a monitor or model underestimates population exposure in long-term exposure studies (U.S. EPA, 2019, p. 3-1).

In addition, the EPA notes in an earlier comment that we disagree with commenters that there is greater exposure measurement error at lower concentrations which would impact the ability to assess the C-R relationship. There is no evidence showing that exposure estimation at low concentrations leads to differential exposure error. Although the impacts of nonambient sources on personal total exposure might increase at low ambient PM concentrations, nonambient sources impacts are Berkson-like errors, which will not bias health effect estimates. This is in the 2019 ISA, where the EPA stated that: "Berkson error may occur when personal monitors used in a panel study capture ambient and nonambient exposures, when the objective of the study is to evaluate the effect of ambient exposures on health and the ambient and nonambient exposures are independent of each other" (U.S. EPA, 2019, p. 3-4). However, the Agency does note in assessing that C-R relationship between long-term $PM_{2.5}$ exposure and mortality that there is a point below which we have less confidence in the shape of the C-R relationship. In the ISA Supplement, the EPA stated "consistent with the conclusions of the 2019 PM ISA, recent studies provide evidence that continues to support a linear, no-threshold C-R relationship for long-term $PM_{2.5}$ exposure and all-cause or cause-specific mortality across the range of exposure concentrations observed in North American cohort studies, with some studies characterizing the C-R relationship with certainty down to 4 $\mu g/m^3$ (i.e., the confidence intervals become relatively wide and in some instances the lower 95% CI crosses the null at this concentration). Generally, the evidence remains consistent in supporting a no-threshold relationship, and in supporting a linear relationship for $PM_{2.5}$ concentrations > 8 $\mu g/m^3$. However, uncertainties remain about the shape of the C-R curve at $PM_{2.5}$ concentrations < 8 $\mu g/m^3$, with some recent studies providing evidence for either a sublinear, linear, or supralinear relationship at these lower concentrations" (U.S. EPA, 2022b, section 3.2.2.2.7, p. 3-112).

The EPA also disagrees with the commenters contention that because cohort studies do not estimate lifetime exposures to $PM_{2.5}$ there is a high degree of uncertainty in the assessment of the C-R relationship. In the 2009 ISA, the EPA evaluated an analysis of the extended Harvard Six Cities Study by Schwartz et al. (2008) that used model averaging (i.e., multiple models were averaged and weighted by probability of accuracy) to assess exposure periods prospectively. The exposure periods were estimated across a range of unconstrained distributed lag models (i.e., same year, one year prior, two years prior to death). In comparing lags, the authors reported that the effects of changes in exposure to $PM_{2.5}$ on mortality were strongest within a two-year period prior to death (U.S. EPA, 2009, p. 7-92, Figure 7-9). More recently, Crouse et al. (2020) within the CanCHEC study examined associations between long-term $PM_{2.5}$ concentrations over different averaging times (i.e., 1-, 3-, and 8-year average $PM_{2.5}$ concentrations) and spatial domains (i.e., 1, 5, and 10 km). Whereas Schwartz et al. (2008) reported associations larger in magnitude for more recent years of $PM_{2.5}$ data, Crouse et al. (2020) showed that associations increased in magnitude as the averaging time increased (U.S. EPA, 2022b, Figure 3-20). This observation indicates that longer time periods of annual $PM_{2.5}$ concentrations may increase the magnitude of the association and studies that examine shorter averaging times may be underestimating the magnitude of the association; it does not indicate the epidemiologic studies are misrepresenting the association.

## C. Comments Related to Controlled Human Exposure Studies

(1) **Comment:** Some commenters disagree with the EPA's conclusion that controlled human exposure studies provide support for the biological plausibility of health effects observed at the $PM_{2.5}$ concentrations observed in epidemiologic studies. They argue that the few available studies evaluate exposure concentrations well above ambient levels and that the observed outcomes are not consistent or coherent. They also note that the studies include small sample sizes that are not representative of the larger population in the U.S. Specifically, these commenters contend that many of the respiratory and cardiovascular effects assessed in controlled human exposure studies have threshold modes of action and do not occur at lower $PM_{2.5}$ concentrations, and if that threshold is above ambient concentrations, these studies do not provide support for effects at ambient concentrations.

**Response:** As discussed in the 2022 PA, the EPA notes that controlled human exposure studies provide support understanding the effects of exposure to $PM_{2.5}$, and support for biologically plausible mechanisms through which adverse human health outcomes could occur (U.S. EPA, 2022a, p. 3-175). In addition, controlled human exposure studies have consistently reported that $PM_{2.5}$ exposures lasting from less than one hour up to five hours can impact cardiovascular function and provide some insight into how short-term exposure to $PM_{2.5}$ may impact cardiovascular function in ways that could lead to more serious outcomes. Additionally, while assessing plausible biological pathways is an important step in evaluating potential causal determinations, the degree of biological plausibility for different mechanisms and endpoints can also vary depending on ambient concentrations being evaluated (U.S. EPA, 2020a).

The 2019 ISA concludes that, when taken as a whole, controlled human exposure studies demonstrate that exposure to $PM_{2.5}$ may impact cardiovascular function in ways that could

lead to more serious outcomes (U.S. EPA, 2019, section 6.1.16). Thus, such studies can provide insight into the potential for specific $PM_{2.5}$ exposures to result in physiological changes that could increase the risk of more serious effects, though the health relevance of the occurrence of these acute effects is less certain (U.S. EPA, 2022a, p. 3-175). However, in reaching his proposed and final conclusions, the Administrator recognized that the concentrations reported in these studies are for observed effects that signal a change in the body likely due to short-term exposure to $PM_{2.5}$ and which may be the prelude to more adverse effects following longer duration and/or higher concentration exposures but typically would not, by themselves, be judged as adverse (88 FR 5620, January 27, 2023).

The EPA recognizes that while controlled human exposure studies provide support for the biological mechanisms and plausibility of the serious cardiovascular effects associated with ambient $PM_{2.5}$ exposures in epidemiologic studies (U.S. EPA, 2019, chapter 6), the exposures evaluated in most of these studies are well-above the ambient concentrations typically measured in locations meeting the current primary standards, and the results are variable across some of the controlled human exposure studies evaluated at near ambient $PM_{2.5}$ concentrations (U.S. EPA, 2022a, p. 3-176). The Administrator has taken these limitations and uncertainties into account in reaching his conclusions regarding the appropriate weight to place on these studies in reaching his final decisions.

## D. Other Comments on the Health Effects Evidence

(1) **Comment:** A few commenters believe the EPA is overestimating the health risks of exposure to $PM_{2.5}$ and in so doing question the relationship between short-term $PM_{2.5}$ exposure and health outcomes, specifically mortality. In support of this point they state that if the EPA is correct about the acute deadliness of $PM_{2.5}$, we should witness smokers dropping dead as they inhale tobacco smoke. Because a single cigarette exposes a smoker to levels of $PM_{2.5}$ well over 100 times higher than present $PM_{2.5}$ standards allow for an entire day. In order for the epidemiologic studies linking $PM_{2.5}$ pollution to acute illness and death to be true, smoking would also have to trigger acute illness and death in addition to the long-term health effects primarily associated with smoking. Furthermore, in expressing doubt in the relationship between short-term $PM_{2.5}$ exposure and mortality, the commenters focus on a study conducted by Young et al. (2017). In reference to this study, the commenters state:

> "[A] study of air pollution in California, which has the highest non-attainment of $PM_{2.5}$ standards in the country, did not find conclusive connections between $PM_{2.5}$ and acute deaths: Our analysis finds little evidence for association between air quality and acute deaths. These results are consistent with those for the widely cited [National Morbidity and Mortality Air Pollution Study] dataset when the latter are restricted to California. The daily death variability was mostly explained by time of year or weather variables; Neither $PM_{2.5}$ nor ozone added appreciably to the prediction of daily deaths. These results call into question the widespread belief that association between air quality and acute deaths is causal/near-universal."

The commenters also suggest that the fact that some Americans smoke cigarettes suggests the Administrator should not place as high a value on addressing mortality risks from ambient $PM_{2.5}$ exposures.

**Response:** Broadly, the EPA disagrees with the commenters contention that the scientific evidence does not support a relationship between short-term $PM_{2.5}$ exposure and mortality. With respect to the commenter's comparison of the risks of smoking with those of ambient PM2.5, the EPA disagrees as previous studies conducted at higher concentrations provide evidence of a relationship between short-term $PM_{2.5}$ exposures and mortality. The most prominent and earliest example of this stems from the work of Schwartz and Marcus (1990) on the London Fog episode, which was evaluated in the 1996 PM AQCD. Although the study focused on British Smoke, this information was relevant in establishing the Air Quality Index (AQI), 500 breakpoint. As noted in section IV of the proposal:

> "Due to limited ambient $PM_{2.5}$ monitoring data available at that time, the decision on the 500 breakpoint concentration for $PM_{2.5}$ was based on the stated assumption that PM concentrations measured by the British Smoke method were approximately equivalent to $PM_{2.5}$ concentrations (64 FR 42530, August 4, 1999)" (88 FR 5539, January 27, 2023). Additionally, "particle concentrations during these episodes, measured by the British Smoke method were in the range of 500 to 1000 $\mu g/m^3$" (88 FR 5539, January 27, 2023).

While the relationship between British Smoke and $PM_{2.5}$ is not one-to-one, the analysis of daily mortality during the London Fog episode, which is at much higher concentrations than those in question by the commenters, shows that high $PM_{2.5}$ concentrations can have detrimental impacts on public health, including mortality.

With respect to the commenter's contention that the causality determination for short-term $PM_{2.5}$ exposure and mortality is not supported by the current science, the EPA disagrees with this notion. As described in detail in section 11.1.12 in the 2019 ISA:

> "Recent multicity studies evaluated since the completion of the 2009 PM ISA continue to provide evidence of primarily positive associations between short-term $PM_{2.5}$ exposures and total (nonaccidental) mortality from studies conducted mostly in urban areas using traditional exposure assignment approaches (i.e., average of all available monitors) as well as studies with a larger spatial coverage (i.e., urban and rural areas) employing new methods using all available $PM_{2.5}$ data (i.e., combination of monitoring, satellite, and LUR). Additionally, the evidence from recent studies further substantiates the relationship between short-term $PM_{2.5}$ exposure and mortality by providing additional information on potential copollutant confounding; effect modification (e.g., stressors, pollutants, season); geographic heterogeneity in associations; and the shape of the C-R relationship, which collectively reaffirms that a *causal relationship* exists between short-term $PM_{2.5}$ exposure and mortality. The body of evidence for total mortality is supported by generally consistent positive associations with cardiovascular and respiratory mortality. Although there is coherence of effects across the scientific disciplines (i.e., animal toxicological, controlled human exposure studies, and epidemiologic) and biological plausibility for $PM_{2.5}$-related cardiovascular (Chapter 6) and respiratory (Chapter 5) morbidity, there is strong evidence indicating biological plausibility for $PM_{2.5}$-related cardiovascular mortality with more limited evidence for respiratory mortality." (U.S. EPA, 2019, p. 11-53 to 11-54)

The conclusion of a "causal relationship" between short-term $PM_{2.5}$ exposure and mortality was based on the collective body of evidence evaluated in the 2019 ISA. As such the results of one individual study are evaluated in the context of the results of the other studies evaluated. Within the 2019 ISA, Young et al. (2017) was evaluated and presented in Figure 11-1, which summarized results across all the multi-city studies included in the 2019 ISA as well as key multi-city studies evaluated in previous science assessments in support of the PM NAAQS. Across the studies evaluated in the 2019 ISA, Young et al. (2017) was one study that did not report evidence of a positive association between short-term $PM_{2.5}$ exposure and mortality. However, the results of Young et al. (2017) were at odds with the results of Ostro et al. (2006) that examined the same geographic location. Upon further evaluation of these two studies, the 2019 ISA noted:

> "The difference in results between these two studies could be attributed to: (1) the larger spatial domain over which exposure was assigned in Young et al. (2017), (i.e., an air basin [encompassing multiple counties]) compared with Ostro et al. (2006), (i.e., a single county); (2) the use of only the monitor with the highest concentration on each day to assign exposure (Young et al., 2017) versus the averaging of all monitors over the spatial domain examined (Ostro et al., 2006); and (3) the different statistical models used in the studies." (U.S. EPA, 2019, p. 11-9 to 11-10)

In conclusion, there is extensive scientific evidence indicating a relationship between short-term $PM_{2.5}$ exposure as detailed in the 2019 ISA, and reaffirmed in the ISA Supplement, which supports the conclusion of a causal relationship. However, for purposes of this reconsideration, "short-term $PM_{2.5}$ exposure" generally refers to exposures of 24-hours or less and is not intended to include exposure from a single cigarette. The commenter has not provided any scientific study establishing concentrations from cigarette smoke, nor has the EPA proposed or adopted a C-R function that purports to provide a comparison of the effects of a single cigarette with that of ambient $PM_{2.5}$ in this reconsideration. Thus, the EPA disagrees that the effects of a single cigarette undermine the conclusions of the 2019 ISA and ISA Supplement. In addition, for the reasons explained in the preamble, the Administrator judges that the current primary $PM_{2.5}$ NAAQS do not provide requisite protection for public health, including the risk of mortality. The Administrator does not find that the current prevalence of smoking leads him to conclude that less weight should be placed on avoiding mortality risks from $PM_{2.5}$, particularly given that those levels are relatively low and may be influenced by addictive properties of nicotine.

(2) **Comment:** Commenters contend that the available health effects evidence is consistent with that considered in the 2012 review and the 2020 final decision. Specifically, they assert that the available scientific evidence in this reconsideration does not add any new findings of health effects with a causal or likely causal association with $PM_{2.5}$ exposure, and causal determinations have remained the same since 2009. Furthermore, they contend that evidence in the ISA Supplement is consistent with the 2019 ISA and that the previous Administrator took into account the 2019 ISA in the reaching his final decision in 2020, and that the proposal fails to adequately explain why the current Administrator now finds that the same evidence warrants a more stringent annual primary $PM_{2.5}$ standard. They claim that the only difference in this reconsideration is the weight that the current Administrator places on the available epidemiologic evidence. Some commenters also suggest that there is minimal new

information available to inform decisions regarding the primary $PM_{2.5}$ standards, particularly because of the short amount of time between the 2020 final decision and the reconsideration, and as reflected by the EPA's development of the ISA Supplement – rather than a full ISA – to support the reconsideration.

**Response:** The EPA disagrees with the commenters' assertion that the health effects evidence has not changed since the 2012 review, that new scientific evidence does not warrant changing any of the causality determinations presented in the 2019 ISA, and that the Administrator did not adequately explain the basis for his decision. Since the completion of the 2009 ISA there has been an extensive body of new studies spanning scientific disciplines, as detailed in the 2019 ISA, that further informs our understanding of the relationship between both short- and long-term $PM_{2.5}$ exposures and health. Ultimately these new studies reaffirmed and extended the evidence base supporting the conclusion of a "causal relationship" between both short- and long-term $PM_{2.5}$ exposure and cardiovascular effects and mortality and supported the "likely to be causal relationship" between short- and long-term $PM_{2.5}$ exposure and respiratory effects conclusions from the 2009 ISA.

The EPA also disagrees with the commenter that the completion of the ISA Supplement reflects that there is only "minimal information" available to inform the Administrator's conclusions in the reconsideration. As an initial matter, we note that the Administrator considers the full body of scientific evidence, as assessed in both the 2019 ISA and ISA Supplement, in reaching his decisions on the current standard. As noted in the ISA Supplement, the EPA states "the evidence presented within the 2019 ISA, along with the targeted identification and evaluation of new scientific information in this Supplement, provide the scientific basis to support a robust and thorough reconsideration of the 2020 PM NAAQS" (U.S. EPA, 2022b, section 1.1, p. 1-1). Furthermore, the EPA also disagrees with the commenter that the scientific evidence published since the literature cutoff date of the 2019 ISA does not provide any new information to support a revision of the primary annual $PM_{2.5}$ standard. Numerous new studies, including multiple studies of long-term $PM_{2.5}$ exposure and mortality (U.S. EPA, 2022b, section 3.2.2.2, Figure 3-20), that were conducted at lower annual averages, lower than those studies evaluated in the 2019 ISA (U.S. EPA, 2022b, Figure 3-19), continue to report evidence of consistent, positive associations. For comparison, the EPA notes that one member of the CASAC who advised on both the 2019 draft PA and the 2021 draft PA changed his views as to whether the current primary annual $PM_{2.5}$ standard is adequate after review of the draft ISA Supplement and 2021 draft PA. This member of the CASAC recommended retaining the primary annual $PM_{2.5}$ standard in their review of the 2019 draft PA, but recommended revising the level of the primary annual $PM_{2.5}$ standard from its level of 12.0 $\mu g/m^3$ to within the range of 10-11 $\mu g/m^3$ in their review of the 2021 draft PA.

The previous Administrator concluded that, based on the available scientific evidence, quantitative risk assessment, CASAC advice, and public comments, the primary annual $PM_{2.5}$ standard was adequate and should be retained. In reaching this conclusion, the previous Administrator emphasized a number of uncertainties associated with the available information, as described in the 2020 notice of final rulemaking (85 FR 82714, December 18, 2020) and summarized in section II.A.1 of the notice of final rulemaking for this reconsideration. In so doing, the previous Administrator's conclusions "reflect[] the fact that

important limitations in the evidence remain" and "that these limitations lead to considerable uncertainty regarding the potential public health implications of revising the existing suite of $PM_{2.5}$ standards (85 FR 82718, December 18, 2020). The EPA notes that in reaching the conclusion that the existing $PM_{2.5}$ standards are requisite to protect public health with an adequate margin of safety, the then-Administrator concluded that it was appropriate to consider the study-reported means collectively and placed weight on the fact that the mean of the study-reported means (or medians) from key U.S. epidemiologic studies that are monitor-based (i.e., 13.5 $\mu g/m^3$) is above the level of the current primary annual $PM_{2.5}$ standard of 12.0 $\mu g/m^3$, which is a departure from how the EPA has considered study-reported means relative to the primary annual $PM_{2.5}$ standard in other recent PM NAAQS reviews (and from how the current Administrator has considered them in this reconsideration) (e.g., the individual study-reported mean $PM_{2.5}$ concentrations rather than an average of the study-reported means from all studies).

As recognized by the current Administrator in announcing the reconsideration of the 2020 final decision, the available scientific evidence and technical information indicate that the current standards may not be adequate to protect public health and welfare, as required by the Clean Air Act.[6] The Administrator reached this decision in part based on the fact that the EPA noted that the 2020 PA concluded that the scientific evidence and information called into question the adequacy of the primary annual $PM_{2.5}$ standard and supported revising the level to below the current level of 12.0 $\mu g/m^3$ while retaining the primary 24-hour $PM_{2.5}$ standard (U.S. EPA, 2020b). Thus, as described further in the preamble, the Administrator's decision to revise, rather than retain, the existing PM NAAQS was based on additional scientific evidence and information, and advice from the CASAC and public comment based on that additional evidence and information, as well as the Administrator's independent judgments regarding how to weigh the evidence, which in some ways differed from how the prior Administrator weighed the evidence that was before him.

(3) **Comment:** In their comments in support of retaining the current primary $PM_{2.5}$ standards, some commenters contend that because the EPA is relying on a mass-based indicator for the primary $PM_{2.5}$ standards, it raises questions about the usefulness of the available scientific evidence in differentiating and addressing the components associated with health effects. These commenters assert that a mass-based standard is a poor toxicity surrogate for $PM_{2.5}$ and a poor basis for a nationwide standard, citing to heterogeneity in responses to $PM_{2.5}$ exposures and geographical and seasonal differences in risk based on the available epidemiologic evidence. In so doing, these commenters conclude that the available scientific evidence suggests that PM mass is not equally toxic across the country or over time, and therefore, because of the heterogeneity in risk and $PM_{2.5}$ composition across the U.S. nationwide estimates or NAAQS based on $PM_{2.5}$ mass are scientifically inappropriate. Other commenters who support revising the primary $PM_{2.5}$ standards also reiterate that a mass-based standard does not distinguish between the toxic profiles of various components or sources of PM.

[6] The press release for this announcement is available at: https://www.epa.gov/newsreleases/epa-reexamine-health-standards-harmful-soot-previous-administration-left-unchanged.

**Response:** The EPA notes that the scientific evidence in this reconsideration, as in previous reviews, continues to provide strong support for health effects associated with $PM_{2.5}$ mass, and in its review of the 2021 draft PA, the CASAC reached consensus that the $PM_{2.5}$ mass-based indicator should be retained, without revision (Sheppard, 2022, p. 2 of consensus letter). In evaluating the latest scientific evidence in the 2019 ISA, the EPA assessed whether individual PM components or sources were more strongly associated with health effects than $PM_{2.5}$ mass. In that assessment the EPA concluded: "Overall, recent studies continue to demonstrate that many $PM_{2.5}$ components and sources are associated with health effects ranging from subclinical (e.g., changes in heart function, such as HRV, or circulating biomarkers) to the more overt (i.e., ED visits, hospital admissions, and mortality). The results of these studies confirm and further support the conclusion of the 2009 PM ISA that many $PM_{2.5}$ components and sources are associated with many health effects and that the evidence does not indicate that any one source or component is consistently more strongly related with health effects than $PM_{2.5}$ mass" (U.S. EPA, 2019, section 1.5.4). As discussed in the 2022 PA, the available information continues to support the $PM_{2.5}$ mass-based indicator and remains too limited to support a distinct standard for any specific $PM_{2.5}$ component or group of components (U.S. EPA, 2022a, section 3.6.3.2.1)..

(4) **Comment:** Some commenters that support revising the primary $PM_{2.5}$ standards also disagree with the use of a $PM_{2.5}$-mass based indicator, stating that ultrafine particles (UFPs) are the most toxic fraction of $PM_{2.5}$. These commenters assert that a particle number concentration is a more common metric for measuring UFPs and a better marker of UFP concentrations, and therefore, would be a better marker of health hazards.

**Response**: As discussed in the proposal (88 FR 5572, January 27, 2023), the EPA notes that compared to $PM_{2.5}$ mass, there is relatively little data on U.S. particle number concentrations, which are dominated by UFP. Long-term trends in UFP are not routinely available at U.S. monitoring sites. At one background site in Illinois with long-term data available, the annual average particle number concentration declined between 2000 and 2019, closely matching the reductions in annual $PM_{2.5}$ mass over that same period (U.S. EPA, 2022a, section 2.3.2.6). In addition, a small number of published studies have examined UFP trends over time. While limited, these studies also suggest that UFP number concentrations have declined over time along with decreases in $PM_{2.5}$ (U.S. EPA, 2022a, section 2.3.2.6). However, the relationship between changes in ambient $PM_{2.5}$ and UFPs cannot be comprehensively characterized due to the high variability and limited monitoring of UFPs (U.S. EPA, 2022a, section 2.3.2.6). As summarized here and discussed in the 2022 PA, the available information continues to support the $PM_{2.5}$ mass-based indicator and remains too limited to support a distinct standard for the ultrafine fraction.

The EPA also disagrees with the commenters' contention that the UFP size fraction is the most toxic fraction of $PM_{2.5}$. As discussed in the 2019 ISA, there are numerous challenges associated with examining the health effects attributed to UFP exposure. These challenges are reflected in the Preface of the 2019 ISA when outlining the scope of the evaluation of the health effects evidence for UFP, which states:

> "UFPs have often been defined as particles <0.1 µm (U.S. EPA, 2009), but depending on the scientific discipline, the methods used and the particle sizes examined to assess the

UFP-health effects relationship varies. UFP exposures in animal toxicological and controlled human exposure studies typically use a particle concentrator, which can result in exposures to particles <0.30 μm (Section 2.4.3.1). Whereas toxicological studies typically rely on examining UFP mass, epidemiologic studies examine multiple UFP metrics, including particle number concentration (NC), mass concentration (MC), and surface area concentration (SC). However, depending on the monitor used and the metric, the UFP size distribution included within each of these ranges can vary. Some studies that examine NC use no additional size classification and instead measure NC over the entire size range of the particle counter. If the entire size range is measured, limited available measurement data in the U.S. and Europe indicates that approximately 67 to 90% of NC consists of particles <0.1 μm (Section 2.4.3.1). Studies that examine MC or SC often include a range of particle sizes up to 0.3 μm. Currently, there is no consensus within the scientific community on the metric that best represents exposure to UFPs (Baldauf et al., 2016)." (U.S. EPA, 2019, section P.3.1)

Based on the scope for the evaluation of the health effects evidence for UFPs, the EPA stated in section 1.4.3 of the 2019 ISA:

> "Recent studies have further explored the relationship between short-and long-term UFP exposure and health effects; however, the assessment of study results across experimental and epidemiologic studies is complicated by the size distribution examined in each discipline and the nonuniformity in the exposure metric examined (i.e., the particle size range and indicators (e.g., particle number concentration [NC], surface area concentration [SC], and mass concentration [MC)]; see Preface). Specifically, experimental studies include size ranges up to 200 nm or higher. Epidemiologic studies often focus on various size ranges below 100 nm. However, if an epidemiologic study is focusing on NC it can include larger particle sizes, but it has been shown that 67−90% of NC represents particles <100 nm (section 2.4.3.1)
>
> Although there is some evidence of positive but imprecise associations across epidemiologic studies examining a range of health effects (e.g., cardiovascular and respiratory effects, and mortality), study results are difficult to interpret. This difficulty arises because most of the studies rely on a single monitor, which is inadequate, as shown in some monitoring campaigns that demonstrate a high degree of spatial variability in UFP concentrations and the fact the size distribution of UFPs changes with distance from a source (U.S. EPA, 2019, section 2.5.1). As noted above, examining coherence and biological plausibility of UFP-related health effects is complicated by the larger size distribution of UFPs examined in experimental studies compared with the size distribution examined in epidemiologic studies. However, animal toxicological studies provide emerging evidence for nervous system effects resulting from short-and long-term UFP exposure, including brain inflammation and oxidative stress, morphologic changes, behavioral, and neurodevelopmental effects.
>
> Based on the overarching uncertainties and inconsistency across studies in the characterization of UFP with respect to size distribution and exposure metric, across most health effects categories the collective evidence contributed to causality determinations

that did not exceed suggestive of, but not sufficient to infer, a causal relationship (Table 1-4)" (U.S. EPA, 2019).

In its review of the 2018 draft ISA, the CASAC found that there is inadequate evidence to revise the causality findings for UFP to "likely to be causal" (Cox, 2019b, p. 1 of consensus responses) and in its review of the 2021 draft PA, the CASAC recommended additional research on UFP health effects because of the significant uncertainties in the existing evidence, as well as the limited number of studies of UFP-related health effects in the U.S., and also noted that there are differing definitions of UFP in the research community (Sheppard, 2022, p. 15 of consensus responses). Therefore, we disagree with the commenters that there is a sufficient scientific basis to adopt a primary PM standard based on UFP at this time or that UFP number concentration would be a more appropriate indicator than the current $PM_{2.5}$ mass-based indicator for the primary $PM_{2.5}$ NAAQS.

(5) **Comment:** Some commenters assert that the EPA relies on studies that examine a relationship between $PM_{2.5}$ exposure and COVID-19 health outcomes, but fails to explain how these studies can support revising the NAAQS. The commenters identify a number of methodological uncertainties associated with these studies, consistent with those identified by the EPA in the ISA Supplement and the 2022 PA (e.g., timing of the studies, impact of "stay-at-home" orders). The commenters assert that these studies are not sufficient to suggest that a more stringent standard is necessary.

**Response**: The EPA would like to clarify that although assessments of short- and long-term $PM_{2.5}$ exposure and SARS-CoV-2 infection and COVID-19 death were within the scope of the ISA Supplement, these studies were not relied upon to inform decisions regarding the adequacy of the PM NAAQS because the EPA concluded that, while there is initial evidence of positive associations with SARS-CoV-2 infection and COVID-19 death, uncertainties remain due to methodological issues that require additional exploration.

Under the circumstances of a global pandemic and based on initial evidence, as well as a number of public comments on the 2020 notice of proposed rulemaking that cited such studies, the EPA decided to include studies assessing $PM_{2.5}$ exposure and SARS-CoV-2 infection and COVID-19 death within the scope of the ISA Supplement. As described in the ISA Supplement, the scope was defined to "focus on specific PM-related health and welfare effects most pertinent to EPA in support of the reconsideration of the primary and secondary PM NAAQS… [specifically] "the health effects evidence for which the 2019 PM ISA concluded a causal relationship." (U.S. EPA, 2022a, pp. 1-2 to 1-3)". In addition, the "this Supplement also considers recent health effects evidence that addresses key scientific topics for which the literature has evolved since the 2020 PM NAAQS review was completed, specifically since the literature cutoff date for the 2019 PM ISA" including "studies that assess the relationship between PM2.5 exposure and severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) infection and coronavirus disease 2019 (COVID-19) death" (U.S. EPA, 2022b) .

"Given the scope of this Supplement (i.e., not focusing on the broader body of experimental studies), it is important to recognize the evaluation conducted does not encompass the full multidisciplinary evaluation presented within the 2019 ISA as

described in the Preamble to the Integrated Science Assessments (U.S. EPA, 2015) that would result in weight-of-evidence conclusions on causality (i.e., causality determinations). Additionally, this scope does not allow for the evaluation of recent studies for health effect categories from the 2019 ISA for which a likely to be causal relationship was concluded nor an assessment as to whether recent evidence may strengthen the causality determination to a causal relationship.9 Therefore, this Supplement critically evaluates and provides key study-specific information for only those recent studies deemed to be of greatest significance for impending regulatory decisions regarding the PM NAAQS in the context of the body of evidence and scientific conclusions presented in the 2019 ISA. As such, the Supplement indicates whether recent evidence supports (is consistent with), supports and extends (is consistent with and reduces uncertainties), or does not support (is not consistent with) the causality determinations described in the 2019 ISA" (U.S. EPA, 2019; U.S. EPA, 2022b)

This context is important in responding to the commenters' criticism regarding the use of studies that examine the relationship between short- and long-term $PM_{2.5}$ exposure and SARS-CoV-2 infections and COVID-19 deaths in evaluating the adequacy of the PM NAAQS. As the ISA Supplement does not conduct a full weight-of-evidence evaluation and the ISA Supplement only focused on those health effect categories for which the 2019 ISA concluded a "causal relationship", studies examining short- and long-term $PM_{2.5}$ exposure and respiratory effects were not considered. It is within the evaluation of respiratory effects that studies of SARS-CoV-2 infection and COVID-19 death would be evaluated because they inform our understanding of the relationship between short- and long-term $PM_{2.5}$ exposure and respiratory infections.

## III. Comments on the Quantitative Risk Assessment

(1) **Comment:** Some commenters contend that it was inappropriate to limit the risk assessment to mortality risk and to not consider morbidity risk.

**Response:** The EPA disagrees with the commenters that it was inappropriate to limit the risk assessment to mortality risk and to not consider morbidity risk. As discussed in Appendix C of the 2022 PA, in determining the scope of the risk assessment, we first considered the health effects for which the 2019 ISA concluded that the evidence supports either a "causal" or a "likely to be causal" relationship with short- or long-term $PM_{2.5}$ exposures. These health effects include mortality, cardiovascular effects, and respiratory effects associated with long- and short-term $PM_{2.5}$ exposures, as well as cancer and nervous system effects associated with long-term $PM_{2.5}$ exposures. As detailed in Appendix C of the 2022 PA, we focused the risk assessment on short- and long-term PM exposure-related mortality, reflecting its clear public health importance, the large number of epidemiologic studies available for consideration, and the broad availability of baseline incidence data (U.S. EPA, 2022a, section C.1.1). The EPA believes that, although the risk assessment focuses on mortality risks, these risks also generally reflect the distribution and magnitude of risks of other health outcomes, including morbidity risks as raised by the commenters. That is, the results of the risk assessment indicate that the current primary $PM_{2.5}$ standards could allow a substantial number of $PM_{2.5}$-associated deaths in the U.S., but revising the level of the primary annual $PM_{2.5}$ standard is

also expected to reduce not only $PM_{2.5}$-associated mortality risks, but also other health risks as well.

(2) **Comment:** A few commenters stated that it is inappropriate to assign outcomes from controlled human exposure studies with relatively young, healthy study subjects to sensitive groups (i.e., infants, children, the elderly, pregnant people, persons with chronic diseases, or developing fetuses). The commenters assert that the EPA should include studies that examine health outcomes in these populations in the risk assessment for $PM_{2.5}$.

**Response:** As an initial matter, we note that as a part of this reconsideration, we conducted an epidemiologic-based risk assessment that uses C-R functions from epidemiologic studies and is not informed by controlled human exposure studies. It is not possible to use controlled human exposure study data in this type of analysis of risk. The EPA agrees with the commenters that because the controlled human exposure studies tend to include generally healthy adult individuals, these studies are somewhat limited in their ability to inform at what concentrations effects may be elicited in at-risk populations (88 FR 5594, January 27, 2023). Furthermore, we generally note that the cohorts examined in the key epidemiologic studies considered in this reconsideration include large numbers of individuals in the general populations, and often also include those populations identified as at-risk (i.e., children, older adults, minority populations, and individuals with pre-existing cardiovascular and respiratory disease) (U.S. EPA, 2022a, p. 3-78). With respect to the risk assessment, we note that the C-R functions selected are from large, multicity U.S. epidemiologic studies that evaluate the relationship between $PM_{2.5}$ exposures and mortality. The specific epidemiologic studies and C-R functions used in the risk assessment were identified using criteria that take into account factors such as study design, geographic coverage, demographic populations, and health endpoints (U.S. EPA, 2022a, Table 3-13 and section C.1.1; U.S. EPA, 2021a). Further, in the 2022 PA, we conducted an at-risk analysis as a part of the risk assessment that considered estimated risks among potentially at-risk populations specifically. In this analysis, we assessed long-term $PM_{2.5}$-attirbutable exposure and mortality risk, stratified by racial/ethnic demographic groups. In so doing, we evaluated exposure and risk, stratified by race-specific C-R functions from the Di et al. (2017) study of Medicare enrollees, which is a large, multicity U.S. epidemiologic study.

(3) **Comment:** Some commenters disagree with the study areas that were included in the risk assessment. These commenters specifically express concern about the exclusion of study areas that are frequently affected by wildfire smoke which results in certain geographic areas (i.e., Pacific Northwest, Northern Rockies, and Northern California), and thereby their populations, from being represented in the risk assessment. The commenters assert that the selection criteria result in the study areas primarily representing urban areas and populations and representing different pollution sources than those of areas not included in the risk assessment, many of which contribute to short-term peaks in $PM_{2.5}$ exposures because of topography and meteorological conditions, and also note the CASAC's statements regarding this point in their review of the 2021 draft PA. Further, these commenters state if areas from the geographic regions that are not represented in the risk assessment had been included, there would have been more CBSAs in the risk assessment where the daily standard is controlling.

**Response:** As discussed in detail in Appendix C of the 2022 PA, specific criteria were used to select study areas for inclusion in the risk assessment. Study areas were selected based on the availability of ambient air quality monitors, geographic diversity, and ambient $PM_{2.5}$ air quality concentrations. Using these criteria, 47 CBSAs were identified for inclusion in the risk assessment (U.S. EPA, 2022a, Figure 3-16 and section C.1.3), including 30 study areas where just meeting the current standards is controlled by the annual standard, 11 study areas where just meeting the current standards is controlled by the 24-hour standard, and 6 areas where the controlling standard differed depending on the air quality adjustment approach (U.S. EPA, 2022a). The 47 urban study areas include many highly populated CBSAs and represent approximately 30% of the total U.S. population (roughly 58.4 million people) above the age of 30. The risk assessment in this reconsideration includes study areas that are considerably more geographically representative compared to the risk assessment in 2012.

In designing the risk assessment and selecting study areas, the EPA excluded areas where air quality may be influenced by wildfires because wildfire influence is often excluded when determining attainment of the NAAQS. This is because wildfires can be identified as exceptional events, which are unusual or naturally occurring events that can affect air quality but are not reasonably controllable using techniques that Tribal, state or local air agencies may implement in order to attain and maintain the NAAQS. Based on this criterion, seven of the original areas identified for inclusion in the risk assessment were excluded from further consideration in the selection of study areas (U.S. EPA, 2022, section C.1.4.2).

While we generally agree with the commenters and the CASAC that excluding areas influenced by wildfires reduced the number of areas included in the risk assessment whether the 24-hour $PM_{2.5}$ standard is controlling, we believe that the 47 study areas provide a broad geographical representation of areas in the country.

(4) **Comment:** Some commenters contend that because the risk assessment does not reflect risks associated with current air quality that the risk assessment does not allow for an evaluation of whether a revised standard would lead to public health improvements. These commenters further state that the air quality adjustment approach used in the risk assessment does not reflect current air quality or ambient conditions and therefore results in overstating the public health benefits of an alternative standard level. The commenters also note that very few areas included in the risk assessment have $PM_{2.5}$ design values above the current primary annual and 24-hour $PM_{2.5}$ standards and that there are several programs in place that would prevent an area from degrading air quality. Because of these reasons, the commenters assert that the risk assessment does not provide the Administrator with a basis for revising the current primary $PM_{2.5}$ standards, with some commenters clearly stating that the risk assessment does not support revision of the level of the primary annual $PM_{2.5}$ standard to below 10 $\mu g/m^3$.

**Response:** We disagree that the EPA did not provide information on our assessment of risks associated with recent air quality conditions. As the commenters appear to be aware, Appendix C of the 2022 PA, and in particular Figure C-24 presents mortality estimates from the full 47 study areas under recent conditions (as well as from just meeting an annual standard of 12 $\mu g/m^3$ and of just meeting an annual standard of 10 $\mu g/m^3$), while Figures C-30 and C-31 present distributions of mortality and premature death, respectively, for recent conditions, and just meeting the current standards and various alternative standards. The EPA

disagrees that these data are insufficient to provide insight into the magnitude of risks presented by the current standard in areas with elevated ambient $PM_{2.5}$ concentrations and the potential benefits of a revised standard.

We also disagree with the commenters that the approach for adjusting air quality to "just meet" the standard is not an appropriate method to evaluate the risk allowable under the current and alternate standards. Inclusion of these areas that are below, but near, the levels of the standards requires an upward adjustment to $PM_{2.5}$ air quality concentrations in order to simulate just meeting the current standards (U.S. EPA, 2022a, section 3.4.1.5). This approach aligns with the CAA requirements for evaluating the adequacy of the current and potential alternative standards. In setting a NAAQS the Administrator is cognizant of his responsibility to provide requisite protection for those likely to be exposed to concentrations just meeting the level of the standard, while also recognizing that most areas of the country will not experience ambient $PM_{2.5}$ concentrations just meeting the levels of the standard. Thus, as noted in the 2022 PA, in performing a risk assessment, the purpose is to understand the exposures and risks associated with meeting a given level of a standard (see U.S. EPA, 2022a, p. 3-146 & footnote 56). In evaluating the adequacy of a primary annual $PM_{2.5}$ standard level of 12.0 $\mu g/m^3$, the exposures and risks must be estimated for air quality meeting a level of 12.0 $\mu g/m^3$ – that is to say, if we estimated exposures and risks for air quality that was above or below that level, we would not be able to directly evaluate the exposures and risks for a level of 12.0 $\mu g/m^3$. The same is true for any alternative standard levels. We take this approach in part because we do not believe that we can assume with confidence that if we retain the current standard then ambient concentrations will not increase but will remain well below the standard on a nationwide basis and we find this approach to be the most appropriate basis for comparing alternative standards. We note that the most recent air quality trends report, cited by commenters, shows a trend of increasing national average $PM_{2.5}$ concentrations for 2020 and 2021, although that reflects contributions from wildfires as well other sources. We further note that, in the 2012 review, the RIA projected that by 2020 all but seven counties would attain the revised primary annual $PM_{2.5}$ standard with its level of 12.0 $\mu g/m^3$. However, the final data indicate that in 2020, there were 21 counties that did not meet the 2012 primary annual $PM_{2.5}$ NAAQS.[7] Furthermore, there are nine monitors located within areas that were initially designated attainment/unclassifiable but have 2020-2022 design values that currently exceed the annual $PM_{2.5}$ standard. While again recognizing the contributions wildfires may have had in at least some of these areas, the EPA finds it would be inadequately protective of public health to assume that $PM_{2.5}$ concentrations will stay stable or trend down across the country for the foreseeable future. Similarly, the EPA does not agree that the existence of CAA programs such as New Source Performance Standards and emissions standards for motor vehicles justifies a conclusion that $PM_{2.5}$ emissions will not increase in the future. These programs may reduce emissions as compared to a baseline in which they did not exist but new industrial sources and additional vehicle miles traveled will continue to generate additional $PM_{2.5}$ emissions. We disagree that this approach results in overstating the public health

[7] A few of these counties represent areas that were unmonitored or had incomplete data in 2012 and therefore were not included in the original projection from the RIA in the 2012 review. The 2020 design values may include air quality data that could potentially be eligible for exclusion under the Exceptional Events Rule.

benefits of alternative standard levels. Furthermore, we agree with the commenters that there were a limited number of study areas with design values that exceed the level of the primary $PM_{2.5}$ standards (see U.S. EPA, 2022a, Table C-3). This is one of the primary reasons that the EPA selected additional study areas that had design values that were below, but near, the levels of the standards – to expand the number of study areas and include a greater proportion of the U.S. population in the risk assessment.

In reaching his final decisions regarding the primary $PM_{2.5}$ standards, the Administrator considers the results of the quantitative risk assessment, along with his consideration of and conclusions regarding the scientific evidence, to inform his conclusions regarding the appropriate level for the primary $PM_{2.5}$ standards. As described in more detail in section II.B.4 of the notice of final rulemaking, the Administrator recognizes that the risk estimates can help to place the evidence for specific health effects into a broader public health context, but should be considered along with the inherent uncertainties and limitations of such analyses when informing judgments about the potential for additional public health protection associated with $PM_{2.5}$ exposure and related health effects. The Administrator recognizes that the overall risk assessment estimates suggest that the current primary annual $PM_{2.5}$ standard is allowing a substantial number of $PM_{2.5}$-associated deaths in the U.S. (and could allow substantially more if ambient concentrations increased to higher levels permitted under the current standard), but considers the results of the risk assessment along with the full body of scientific evidence available in this reconsideration in reaching his decision to that the current standards are not requisite to protect public health with an adequate margin of safety. However, because of the uncertainties associated with the risk assessment, as described in greater detail in section II.B.4 of the notice of final rulemaking, the Administrator places little weight on the absolute results of the risk assessment, including the at-risk analysis, for purposes of selecting the level of the annual standard that is requisite.

(5) **Comment:** Some commenters contend that the EPA inappropriately equated hazard ratios with relative risks, and hazard ratios should not be used in the risk assessment calculations unless the EPA demonstrates that such an approach is appropriate. The commenters quote the 2022 PA, where the EPA justifies the use of hazard ratios by stating, "As noted in Sutradhar and Austin (2018), the HR [hazard ratio] associated with a Cox-proportional hazard model may approximate the RR [relative risk] when the effect estimate (and consequently the β) is relatively small. This is the case with the effect on mortality modeled for long-term exposure to ambient $PM_{2.5}$ (i.e., the size of the effect estimate supports an assumed equivalency between HR and RR). The near equivalency between the HR and RR, allows us to utilize the β derived above in a C-R function based on a log-linear functional form of the type presented earlier, to model changes in mortality related to changes in ambient PM" (U.S. EPA, 2022a, p. C-6). The commenters contend that the EPA incorrectly interpreted this paper, noting that Sutradhar and Austin (2018) state that "The odds ratio is close in value to the relative risk if the event probability is small." The commenters also quote from the abstract of Sutradhar and Austin (2018) , noting that "This article demonstrates that although the direction of the HR can be used to explain the direction of the relative risk, the magnitude of the HR alone cannot be used to explain the magnitude of the relative risk," and in the summary, "Authors should refrain from using the magnitude of the HR to describe the magnitude of the relative risk – this is incorrect." The commenters further argue that the study authors stated that the magnitude of the hazard ratio is not comparable to

the magnitude of the relative risk 13 times. The commenters assert that the relative risk and hazard ratios are not mathematically equivalent, and therefore, the EPA should use a method that appropriately captures the mathematical nature of the estimates, noting that this is of particular importance because a small difference in the magnitude of the effect estimate can have a substantial impact when it is applied to the population size (60 million people) included in the risk assessment.

**Response:** The EPA agrees with the commenter that the hazard ratio (HR) and the relative rate (RR) are not mathematically equivalent. However, when the baseline mortality rate is low, the two are roughly commensurate. In Table 1 of Sutradhar and Austin (2018) the authors illustrate this point. Here, the estimated difference between the HR and RR diminishes as the baseline rate of the event at time *t* among the controls declines. In that table, the smallest baseline event rate at time *t* is 0.1 and the difference between an HR of 1.5 and the corresponding RR is 0.039. Though the authors do not separately report the RR for a baseline event rate at time *t* for values smaller than 0.1, we can infer that the HR and RR would begin to converge. Within the U.S., the baseline rate of death for individuals ages 75-84 is 0.027. Hence, the EPA believes that it is reasonable to infer that when estimating the risks of PM-attributable mortality among such a population that the HR and RR are roughly commensurate.

(6) **Comment**: Some commenters who support retaining the current $PM_{2.5}$ annual primary standard raised concerns about the underlying long-term mortality studies selected by the EPA for its $PM_{2.5}$-associated risk assessment. They contend that the EPA's risk assessment does not provide sufficient evidence of causation to support revising the primary annual $PM_{2.5}$ standard and contend that the risk assessment and the underlying long-term mortality studies (e.g., Di et al. (2017) and Turner et al. (2016)) violate four steps for appropriately quantifying how reducing exposure to $PM_{2.5}$ would affect public health. They contend that the four steps necessary to appropriately quantify how reducing exposure to including: (1) using appropriate study designs to collect data that can support valid causal inferences (e.g., quasi-experiments, intervention studies); (2) appropriate causal analysis methods are used to estimate and validate causal impacts; (3) model assumptions are appropriate for the data analyzed; and (4) control for confounding. As such, the commenters argue that the quantitative risk assessment does not provide sufficient evidence of causation to support revising the level of the primary annual $PM_{2.5}$ annual standard and suggest that the EPA revise its risk assessment using data from quasi-experiments and intervention studies, as well as controlling for key confounding variables (such as income and weather variables). They contend that until these steps are taken, that there is not a scientifically sound basis for predicting that reductions in $PM_{2.5}$ concentrations in ambient air will have any causal effect on reducing mortality rates.

**Response:** The EPA disagrees with the commenters assertion regarding how the Agency uses epidemiologic evidence in the assessment of causality. First, it is important to recognize that the assessment of causality is conducted within the Integrated Science Assessment (ISA), not the quantitative risk assessment. In assessing causality in the ISA, as discussed in the Preamble to the ISAs (U.S. EPA, 2015) and the Appendix of the 2019 ISA (U.S. EPA, 2019), the EPA uses a weight-of-evidence approach. As such, the 2019 ISA focuses on evaluating the causal nature of relationships between both short- and long-term $PM_{2.5}$

exposure and various health effect categories, including mortality, by evaluating and integrating evidence across scientific disciplines (i.e., animal toxicological studies, controlled human exposure studies, and epidemiologic studies) and assessing whether there is consistency of evidence within a discipline, coherence of effects across disciplines, and evidence of biological plausibility.

In assessing the evidence that informed the causality determinations for both short- and long-term $PM_{2.5}$ exposure and mortality, some studies were evaluated that employed statistical approaches that attempted to more extensively account for confounders (i.e., used alternative methods for confounder control).[8] As an individual study on its own cannot inform causality, these studies represent an additional piece of evidence to evaluate when assessing causality and should not be misconstrued to represent a gold standard or viewed as a replacement for the large body of epidemiologic studies that have used more traditional statistical approaches. The role of individual studies in informing causality was also reiterated by the National Academies of Science, Engineering, and Mathematics (NASEM) in one of their conclusions in their assessment of the EPA's causal framework:

> "A single study will rarely definitively and comprehensively address issues associated with the determination of causality that are examined in ISAs. A weight of evidence approach—combining assessment of study quality with expert judgment—allows EPA to draw conclusions that integrate scientific findings across multiple study designs and disciplines, as required by the CAA" (NASEM, 2022, p. 2).

Within the 2019 ISA, as well as the ISA Supplement, many epidemiologic studies were evaluated that examined the relationship between short- and long-term $PM_{2.5}$ exposure and mortality. Across these studies different time periods, populations with different demographic characteristics, various statistical approaches, and a variety of well-known confounders were examined. In light of these differences across studies there was evidence of generally consistent, positive associations for both short-term and long-term $PM_{2.5}$ exposure and mortality (U.S. EPA, 2019, short-term $PM_{2.5}$ exposure: Figure 11-1; long-term $PM_{2.5}$ exposure: Figure 11-18 and 11-19). The consistency in results across studies, in light of the different study designs, populations, statistical approaches, and confounders examined, argues against there being fundamental flaws in the epidemiologic studies evaluated as the commenters insinuate.

Second, while the assessment of causality for mortality relies heavily on epidemiologic studies, the causality determination builds on the evidence for both cardiovascular (U.S. EPA, 2019, sections 6.1.9 and 6.2.10) and respiratory morbidity (U.S. EPA, 2019, sections 5.1.9 and 5.2.10). This evidence provides support for the continuum of effects that could ultimately lead to mortality. Therefore, the EPA disagrees with the commenters assertion that

---

[8] In the peer-reviewed literature, these epidemiologic studies are often referred to as causal inference studies or studies that used causal modeling methods. As noted in the ISA Supplement this terminology is not used by the EPA to prevent confusion with the main scientific conclusions (i.e., the causality determinations) presented within an ISA. In addition, as is consistent with the weight-of-evidence framework used within ISAs and discussed in the Preamble to the ISAs, an individual study on its own cannot provide the evidence needed to make a causality determination, but instead represents a piece of the overall body of evidence.

only epidemiology studies were relied upon in concluding a "causal relationship" for both short- and long-term $PM_{2.5}$ exposure and mortality.

Third, studies that examine reductions in air pollution concentrations and corresponding impacts on health, often termed accountability studies, are evaluated and included within the 2019 ISA and ISA Supplement. As noted above, these studies represent one line of evidence evaluated in assessing causality and similar to the epidemiologic studies that use alternative methods for confounder control should not be misconstrued to represent a gold standard. Additionally, as noted in Dr. John Vandenberg's (EPA) response[9] to CASAC chair Tony Cox regarding these types of studies he states:

> "The draft ISA builds on a long and extensive record of epidemiological and experimental studies and conveys the available evidence on the relationship between exposures and response, including studies that indicate the occurrence and extent of reduction in responses observed with reductions in PM exposures. Such studies, often termed accountability studies, are evaluated and discussed within the ISA if they fit the scope of the ISA as detailed in the Preface."

Therefore, the EPA disagrees with the commenter's assertion that the EPA's assessment of causality in the 2019 ISA is flawed because it should focus only on studies that show reducing $PM_{2.5}$ concentrations leads to a reduction in health impacts.

Lastly, the EPA disagrees with the commenters suggestion that the Agency should redo the quantitative risk assessment in light of the publication by Burns et al. (2020). We believe that the multiple C-R functions used in the risk assessment appropriately reflect variation in epidemiologic studies, such as the population (e.g., geographic locations and demographics), exposure estimation methods (e.g., monitor-based or hybrid techniques), and potential confounders included in the epidemiologic model (e.g., ozone). The EPA also disagrees that data from quasi-experiments and intervention studies should be used in the risk assessment, as these approaches are attempting to answer a different question then we are asking in the risk assessment and do not necessarily inform the relationship between exposure and health effects.

(7) **Comment**: A number of commenters argue that the EPA should use the National Academy of Science's (NAS) integrated uncertainty analysis (IUA) to evaluate overall uncertainty in the risk assessment. These commenters state that the EPA's approach uses qualitative and quantitative uncertainty assessments, but this approach only considers the statistical uncertainty and not the model uncertainty associated with the risk estimates. Some commenters also assert that if the EPA is unable to complete a full probabilistic analysis, the Agency should consider doing a site-specific, partial probably analysis. These commenters further note that while the EPA says that they conducted sensitivity analyses in evaluating uncertainties in the risk assessment, the 2022 PA did not include a description of such analyses. The commenters also suggested specific methods for investigating quantitative

[9] Available at:
*https://casac.epa.gov/ords/sab/r/sab_apex/casac/0?mm_id=5324&request=APPLICATION_PROCESS%3DMEETING_FILE&session=5686427276509*

uncertainty of the risk estimates in support of their comments (i.e., Smith, 2020; Smith and Gans, 2015).

**Response:** The EPA agrees that given sufficient time and resources, and appropriate information to develop key input factors, application of an IUA has the potential to provide a more rigorous and complete characterization of uncertainty. However, we determined that in the absence of those resources, a defensible IUA would not be possible to include in the 2022 PA and that such an analysis was outside of the scope of this reconsideration. Application of IUA requires specification of confidence distributions of key input parameters representing important sources of uncertainty. The specification of these confidence distributions is a critical step in implementing an IUA since these drive the outcome of the simulation. In addition, it is also important to specify any correlations between key inputs since these can also significantly impact the uncertainty analysis. The method used to establish confidence distributions (and any potential correlations between parameters) is critical to both the outcome of the IUA as well as the scientific defensibility of the overall analysis. Depending on analysis involved, experts can differ in their characterization of confidence for key input factors. For many important inputs to the risk assessment, there was insufficient information available to provide defensible specifications of distributions around those key input parameters. Thus, we determined that a defensible IUA would not be possible to include in the 2022 PA. Separately, the EPA disagrees with the commenters that the 2022 PA "did not include a description" of "sensitivity analyses" that evaluate uncertainties, as both the use of multiple C-R functions and approaches for estimating exposures are forms of sensitivity analyses.

(8) **Comment:** Some commenters contend that the uncertainty analysis for the risk assessment in the 2022 PA should be based on more than just two exposure scenarios and C-R functions from just two studies. The commenters contend that the EPA does not explain how using two exposure scenarios and multiple C-R functions can account for uncertainty and variability in the risk estimates. The commenters suggest that expanding the quantitative uncertainty analysis by using more C-R functions, particularly because the EPA relies on this analysis as the basis for their conclusion that the C-R functions have little impact on the risk estimates. These commenters note that the 2021 Technical Support Document includes 19 studies that provide 19 risk estimates for adults and older adults and 64 risk estimates for older adults alone, and that while not all of these studies would meet the EPA's preferred inclusion criteria, more than one risk estimate for the two age groups would have met the criteria and should have been selected.

**Response:** While there were additional high-quality epidemiology studies providing C-R functions relating $PM_{2.5}$ exposure to mortality effects identified in the 2021 Benefits TSD (U.S. EPA, 2021a), two studies were determined to best characterize risk in the U.S.. The EPA used all available C-R functions deemed to best characterize risk across the U.S., for both short- and long-term effects. The EPA disagrees that the risk assessment should be based on C-R functions from other studies, as the use of additional C-R functions would have been associated with additional uncertainties, such as study locations that do not cover the contiguous U.S. The EPA also disagrees that the risk assessment should be based on other exposure scenarios, as the two exposure scenarios used reflect two outcomes that could represent a potential range of $PM_{2.5}$ concentration changes in the study areas and the two

adjustment approaches used to guide the generation of these modeled surfaces were selected to span a wide range of possible $PM_{2.5}$ spatial response patterns.

(9) **Comment:** Some commenters assert that the EPA did not appropriately emphasize the impact of data error and biases on the shape of the C-R relationship in its evaluation of uncertainties associated with the risk estimates. In so doing, these commenters argue that this uncertainty has the potential to alter the results of the risk assessment and impact conclusions regarding the adequacy of the current primary $PM_{2.5}$ standards because they are based on a lack of a threshold in epidemiology studies. The commenters contend that, in the 2022 PA, the EPA reiterates that studies continue to show linear trends with no evidence of a threshold, and state that the EPA does not acknowledge the known error in the variables in the study may obscure thresholds. The commenters suggest that the EPA's failure to conduct analyses to address their concerns about the impact of data error and biases on the shape of the C-R provides support for concluding that the risk assessment does not support the proposed revisions to the PM NAAQS.

**Response:** The EPA performed both qualitative and quantitative assessments of uncertainty in the risk assessment, which can be found in Appendix C, section C.5, of the 2022 PA (U.S. EPA, 2022a). Uncertainty is also thoroughly considered in the 2019 ISA and 2022 ISA Supplement U.S. EPA, 2019; U.S. EPA, 2022b). In the 2022 PA, especially in Tables B-4 and C-1, the EPA explicitly considers the impacts of data error and biases for epidemiologic studies evaluated (U.S. EPA, 2022a). Furthermore, as described in responding to comments earlier in this section, the EPA notes that, in reaching his final decisions regarding the primary $PM_{2.5}$ standards, the Administrator considers the results of the quantitative risk assessment, along with his consideration of and conclusions regarding the scientific evidence, to inform his conclusions regarding the primary $PM_{2.5}$ standards. Because of the uncertainties associated with the risk assessment, as described in greater detail in section II.B.4 of the notice of final rulemaking, the Administrator places little weight on the absolute results of the risk assessment, including the at-risk analysis, for purposes of selecting the level of the annual standard that is requisite.

(10) **Comment:** A few commenters suggest that there is an error in the long-term risk estimates in the risk assessment. They note that the difference between the absolute risk between the total mortality estimates compared to the difference in the change in risk for short-term mortality estimates are comparable, but the difference for the long-term estimates is inflated. As an example, the commenters note that the difference in absolute risk based on the Di et al. (2017) study between the current primary annual $PM_{2.5}$ standard level of 12 $\mu g/m^3$ and an alternative standard level of 10 $\mu g/m^3$ is 5,200 and for the Turner et al. (2016) study is 5,800, compared to a change in risk of 5,630 and 6,120 for Di et al. (2017) and Turner et al. (2016), respectively. The commenters contend that because these differences are not observed with the short-term estimates or the estimates for the primary 24-hour $PM_{2.5}$ standard that the EPA should further evaluate these results and explain how their concerns regarding the validity of the long-term risk results impact the EPA's conclusions.

**Response:** The EPA does not agree there are errors in the risk assessment results. However, it should be noted that numbers may not sum/subtract accurately due to rounding of results.

Also, due to rounding, proportionally similar differences may not be visible in numbers that are smaller in absolute terms.

(11) **Comment:** Commenters who support retaining the current primary $PM_{2.5}$ standards suggest that the available scientific evidence does not support using long-term mortality as an endpoint for assessing risk disparities in different racial groups, as was done in the at-risk analysis in the 2022 PA. The commenters state that the ISA Supplement, in summarizing the conclusions of the 2019 ISA, noted that the evidence for race/ethnicity-specific differences in all-cause mortality were "inconsistent" (U.S. EPA, 2022b, p. 3-153). They further note that the ISA Supplement concluded that the since the literature cutoff date of the 2019 ISA, the recently available evidence continues to suggest that there is less consistency when evaluating $PM_{2.5}$ exposure and all-cause or total (nonaccidental) mortality (U.S. EPA, 2022b, section 3.3.3.2). The commenters contend that because of these conclusions, the EPA's selection of a single study for use in the at-risk assessment obscured the uncertainties and inconsistencies associated with the evidence. The commenters argue that there were other endpoints for which the results were more consistent that should have been considered in the at-risk analysis instead of long-term mortality.

**Response:** The 2019 ISA and the 2022 ISA Supplement noted that the available scientific evidence provides strong support for minority populations, and particularly Black/African American populations, being at increased risk from $PM_{2.5}$-related health effects, in part due to disparities in exposure, giving the EPA confidence in performing the quantitative at-risk analysis. The EPA also noted the various uncertainties associated with this analysis, including that there is higher confidence estimating race-stratified $PM_{2.5}$ health effects for Black and White populations than for other races/ethnicities and that using hazard ratios from a single study, even that of a large, high-quality study, comes with certain uncertainties (U.S. EPA, 2022a, section 3.4.1.8). The EPA also notes that the commenter's reference to evidence for race/ethnicity-specific differences in all-cause mortality being "inconsistent" is inaccurate and does not acknowledge the full sentence. This sentence, as written in the 2022 ISA Supplement, reads "While the studies that evaluated all-cause or total (nonaccidental) mortality were inconsistent, there was stronger evidence to indicate a greater risk of cause-specific mortality and some other health endpoints among people of color" (U.S. EPA, 2022b, p. 3-153). The EPA believes that the all-cause mortality hazard ratios stratified by race/ethnicity in the 2022 PA at-risk analysis best reflect race/ethnicity-stratified mortality impacts, due to the large cohort size (>60 million), high-quality study design, and sophisticated exposure estimation technique. While the EPA considers the stratified analysis informative, as described more fully in the notice of final rulemaking, the EPA also recognizes that there are a number of uncertainties and limitations associated with the at-risk analysis, including that it was based on one study of mortality risk for older adults (i.e., 65 years and older). Further, the EPA recognized that the results of the at-risk analysis can vary greatly depending on the inputs to the analyses, including the representativeness of the populations and demographics captured by the study areas included in the analysis and the C-R functions that are available from the epidemiologic studies that stratify by race and ethnicity. For these reasons, as well as those discussed more fully in the notice of final rulemaking, the Administrator places little weight on the absolute results of the risk assessment, including the at-risk analysis, for purposes of selecting the level of the annual standard that is requisite.

(12) **Comment:** Some commenters suggest that there are uncertainties in the risk assessment that the EPA has not addressed because the risk estimates between the total population from the risk assessment and sum of the risk estimates for the subpopulations from the at-risk analysis are not the same. The commenters assert that there are 25% more deaths when estimating risks for separate subpopulations compared to the estimates of the total populations, and that this uncertainty should be addressed in the uncertainty analysis section of the 2022 PA.

**Response:** It is unsurprising that results differ when using a single overall hazard ratio (HR) versus race/ethnicity stratified HR. This is because the majority population, in this case the White population, has a HR very close to the overall/reference population, whereas other populations, such as the Black population, are associated with larger magnitude HRs. This leads to a similar absolute estimate from the majority population and a larger magnitude estimate from the minority population, and an overall larger magnitude total estimate. The EPA believes the larger mortality estimates generated when using race/ethnicity stratified hazard ratios actually suggests that there may be an underestimate of risk when using the overall hazard ratio. As noted in responding the public comments above in this section and in the notice of final rulemaking, while the EPA notes that the risk assessment supports the conclusion that the primary $PM_{2.5}$ standards are not adequate, as detailed further in the proposal and above in section II.A.3, the EPA also cautions against an over-interpretation of the absolute results. For these reasons, the Administrator places little weight on the absolute results of the risk assessment, including the at-risk analysis, for purposes of selecting the level of the annual standard that is requisite.

(13) **Comment:** Some commenters who support revising the primary $PM_{2.5}$ standards suggest that the EPA's risk assessment underestimates the impacts of long-term $PM_{2.5}$ exposure. The commenters assert that recently available scientific evidence provides race-specific C-R functions that should be used to quantify disparity in $PM_{2.5}$ impacts in the risk assessment. Specifically, the commenters cite to a study by Spiller et al. (2021) that found that using race/ethnicity specific C-R functions and race/ethnicity specific mortality rates (compared to current approaches) resulted in increased $PM_{2.5}$-related premature mortality estimates in older populations and older Black populations, as well as three times higher mortality in older Black people than compared to white people.

**Response:** We disagree with the commenters' assertion that the risk assessment underestimates the impacts of long-term $PM_{2.5}$ exposure. Compared to the full risk assessment, the at-risk analysis estimated larger absolute mortality impacts of long-term $PM_{2.5}$ exposure when using race/ethnicity-stratified hazard ratios from the Di et al. (2017) study of Medicare enrollees (U.S. EPA, 2022a, section 3.4). The Spiller et al. (2021) study cited by the commenters was published after the literature cutoff date of the ISA Supplement. This study was provisionally considered, but does not materially change the scientific conclusions of the 2019 ISA or ISA Supplement in this reconsideration or the Administrator's final decision on the appropriate levels of the primary $PM_{2.5}$ NAAQS, which were set to protect the public health including at-risk populations with an adequate margin of safety. However, we note that this study has the potential to be informative in the next review of the PM NAAQS with regard to quantitative assessments of risk.

(14) **Comment:** Some commenters contend that there is no statistical confidence that reducing the levels of the primary $PM_{2.5}$ standards would reduce $PM_{2.5}$-exposure related mortality risk because the confidence intervals for the current and alternative standard levels overlap and that a lack of effect exists due to this overlap. These commenters assert that the EPA should explain how this lack of health benefits would support the proposed revisions to the PM NAAQS.

**Response:** First, we disagree with the commenters regarding the overlap of confidence intervals. For example, with the long-term estimates of mortality, there is no overlap between the estimates for Di et al. (2017) Pri-PM for an annual standard with a level of 12.0 $\mu g/m^3$ and a level of 9.0 $\mu g/m^3$ (U.S. EPA, 2022a, Table 3-16). While the commenters acknowledge that the long-term estimates for this study do not have the overlap that they claim is of great importance for interpreting the results of the risk assessment, the commenters then assert that the Di et al. (2017) study itself was preferentially selected by the EPA for this reconsideration and that the estimates do not overlap because of the precision in the C-R function for this study resulting from the substantial size of the database. We agree with the commenters that the Di et al. 2017 study has notably smaller confidence intervals due to its larger sample size but we disagree with the commenters because the risk assessment did not preferentially select a "best estimate" or place more weight on one C-R function over another. The C-R functions used in the risk assessment are from large, multicity U.S. epidemiologic studies that evaluate the relationship between long- and short-term $PM_{2.5}$ exposures and mortality, and the studies selected were based on criteria that take into account a number of factors including study design, geographic coverage, demographic populations, and health endpoints.[10] The risk assessment included multiple C-R functions in order to more fully evaluate the estimated exposures and risks for various cohorts.. Additionally, we disagree with the commenters that the large database for the Di et al. (2017) study somehow artificially influences the precision of the C-R function or the C-R function should be given less weight as a result of the tight confidence interval. Generally, epidemiologic studies with larger sample sizes will have tighter confidence intervals because the standard error is decreased. The Di et al. (2017) study has approximately 60 million people in its cohort, while the Turner et al. (2016) study has approximately 670,000 people. Therefore, we would expect tighter confidence intervals in the Di et al. (2017) compared to the Turner et al. (2016) study, though both studies have statistically significant effect estimates. Although the commenter presents arguments why the EPA should place weight primarily on the Turner et al. (2016) study instead of the Di et al. (2017) study, the EPA finds that both studies have their strengths and it has taken the appropriate approach in considering both of them without trying to choose one as more significant for the reconsideration.

Moreover, we disagree with the commenters' assertion that any overlap in the confidence intervals between estimates of $PM_{2.5}$-associated mortality for the current and alternative standard levels indicates that there is not statistical confidence in exposure and risk estimates and that this indicates a lack of effect that reducing the annual standard would reduce short-

[10] Additional detail regarding the selection of epidemiologic studies and specification of concentration-response functions can be found in Appendix C of the 2022 PA (U.S. EPA, 2022asection C.1.1) and the Estimating $PM_{2.5}$ and Ozone-Attributable Health Benefits TSD (U.S. EPA, 2021a).

and long-term exposure related mortality risk. An overlap of confidence intervals does not in and of itself necessarily demonstrate a lack of statistical confidence nor a lack of effect. Additionally, while some confidence intervals do overlap, there is a shifting of the distribution of estimated mortality impacts under alternative annual standards, which shows that largest possible number of estimated mortality impacts would be smaller than under the current standard. Therefore, we disagree with the commenters that the risk assessment does not provide meaningful information for consideration in reaching conclusions regarding the primary $PM_{2.5}$ standards.

Thus, in light of the full body of evidence, including the risk assessment, the Di et al. (2017) study and other epidemiologic studies and other supporting lines of evidence, as discussed at length in the notice of final rulemaking, the EPA disagrees with the commenter's view that there is practically no statistical confidence that reducing the primary annual $PM_{2.5}$ NAAQS (or the primary 24-hour $PM_{2.5}$ NAAQS) would actually reduce exposure-related mortality risk. To the contrary, while recognizing uncertainties in the evidence, the Administrator concludes that the available evidence indicates that more stringent NAAQS are needed to protect the public health from mortality and other adverse health effects.

Furthermore, as described in the preamble and in responding to comments earlier in this section, the Administrator considers the results of the quantitative risk assessment, along with his consideration of and conclusions regarding the scientific evidence, to inform his conclusions regarding the adequacy of the current primary $PM_{2.5}$ standards. As described in more detail in section II.B.4 of the notice of final rulemaking, the Administrator recognizes that the risk estimates can help to place the evidence for specific health effects into a broader public health context, but should be considered along with the inherent uncertainties and limitations of such analyses when informing judgments about the potential for additional public health protection associated with $PM_{2.5}$ exposure and related health effects. The Administrator recognizes that the overall risk assessment estimates suggest that the current primary annual $PM_{2.5}$ standard could allow a substantial number of $PM_{2.5}$-associated deaths in the U.S., and considers the results of the risk assessment along with the full body of scientific evidence available in this reconsideration in reaching his conclusion that the current standards do not provide requisite protection of public health with an adequate margin of safety. However, because of the uncertainties associated with the risk assessment, as described in greater detail in section II.B.4 of the notice of final rulemaking, the Administrator places little weight on the absolute results of the risk assessment, including the at-risk analysis, for purposes of selecting the level of the annual standard that is requisite.

(15) **Comment:** Some commenters assert that the Administrator did not recognize that the estimated risks from the risk assessment in the 2022 PA have decreased compared to the estimated risks from the risk assessment in the 2020 PA. These commenters contend that the Administrator does not explain why lower risk estimates – or even similar risk estimates – would warrant a more stringent primary annual $PM_{2.5}$ standard than was retained in the 2020 final action.

**Response:** We note that the commenters are correct that the risk estimates in the 2022 PA are lower than those in the 2020 PA because the EPA used different effect estimates for the two risk assessments. In the 2020 PA, the EPA selected the effect estimate for the single-pollutant

model from the Di et al. (2017) study to be consistent with effect estimates from the other epidemiologic studies (U.S. EPA, 2020b, Table C-1). However, since the completion of the 2020 PA, the EPA finalized the Estimating $PM_{2.5}$ and Ozone-Attributable Health Benefits Technical Support Document (TSD; U.S. EPA, 2021a). In developing the risk assessment for the 2022 PA, the EPA determined that it was most appropriate to follow the best practices outlined in that TSD for estimating risks based on changes in ambient $PM_{2.5}$ concentrations. In so doing, in the risk assessment in the 2022 PA, the EPA selected the copollutant model-based effect estimate from Di et al. (2017) (U.S. EPA, 2022a, Table C-1). Using the lower copollutant model-based effect estimate of 1.073 resulted in lower risk estimates in the 2022 PA than using the single-pollutant model effect estimate (1.084) than in the 2022 PA. On page C-8 of the 2020 PA, the EPA indicated that we anticipated lower risk estimates had the copollutant model-based effect estimate been used in the 2020 PA. We note that this footnote was inadvertently included in the 2022 PA on page C-8, since the 2022 PA did in fact use the copollutant model-based effect estimate.

It is important to note, however, that the then-Administrator placed "little weight on quantitative estimates of $PM_{2.5}$-associated mortality risk in reaching conclusions about the level of the primary $PM_{2.5}$ standards" in reaching his decision to retain the current standards in 2020. (85 FR 82717, December 18, 2020). Likewise, as described in responding to earlier comments in this RTC document and in section II.B.4 of the notice of final rulemaking, because of the uncertainties associated with the risk assessment, the current Administrator places little weight on the absolute results of the risk assessment for purposes of selecting the level of the annual standard that is requisite. Although the Administrator finds the effect estimate based on the copollutant model more appropriate to use, in light of the overall uncertainties associated with the risk assessment and the limited weight he places on the absolute risk assessment results, he does not find that the difference between the risk estimates using the single pollutant model and the copollutant model is materially relevant to his decision-making in this reconsideration. Moreover, the Administrator explains in the notice of final rulemaking that the record before him in this reconsideration is expanded and strengthened in a number of ways, notes the different judgments he has reached after consideration of the full evidence before him (as compared to the judgments of the then-Administrator in 2020), and explains why he finds more stringent standards are necessary to protect public health with an adequate margin of safety.

## IV. Responses to Significant Comments on Proposed Primary $PM_{2.5}$ Standards

### A. General Comments on Proposed Primary $PM_{2.5}$ Standards

A large number of comments on the proposed primary standards for $PM_{2.5}$ were very general in nature, basically expressing one of two substantively different views: (1) support for revisions to the primary standards to be more public health-protective or (2) opposition to any revision of the current $PM_{2.5}$ standards for a number of reasons. Some commenters expressed that the EPA must follow the best available science and recommend revisions to the standard down to a level with an adequate margin of safety that is scientifically supported. Others opposed to revision note that revision of the standards is not supported by the scientific evidence, while others express that the United States already has some of the cleanest air and revision is not needed. Many of these commenters simply expressed their views without stating any rationale,

while others gave general reasons for their views but without reference to the factual evidence or rationale presented in the proposal notice as a basis for the Agency's proposed decision. The preamble to the final rule in its entirety presents the Agency's response to these very general views.

### B. Specific Comments on Proposed Primary $PM_{2.5}$ Standards

A large number of commenters provided more detailed comments regarding the proposal to revise the level and form of the primary annual $PM_{2.5}$ standard in conjunction with retaining the current 24-hour standard. Below, the EPA provides more detailed responses to the full range of significant issues raised in these comments.

### 1. Comments in Support of Revising the Primary Annual $PM_{2.5}$ Standard

(1) **Comment:** Some commenters suggest that there are no meaningful uncertainties exist in the scientific evidence at or above 8 $\mu g/m^3$. They contend that the EPA itself recognizes that uncertainties have been reduced over time, and that not revising the level of the annual standard to 8 $\mu g/m^3$ is arbitrary. The commenters specifically point to the EPA's consideration of the available epidemiologic evidence in the proposal, noting that the EPA stated that these epidemiologic studies "reduce key uncertainties identified in previous reviews, including those related to potential copollutant confounding" (88 FR 5583, January 27, 2023). The commenters assert that the CAA requires that the EPA take a precautionary, health-protective approach when setting a primary annual $PM_{2.5}$ standard that is requisite to protect public health with an adequate margin of safety.

**Response:** First, the EPA agrees that uncertainties have been reduced over time and that the scientific evidence supports health effects associated with $PM_{2.5}$ concentrations at lower ambient concentrations than previous reviews. Additionally, the epidemiologic evidence is robust in studies that use a variety of statistical designs and employ a variety of methods to examine exposure measurement error as well as to control for confounding effects. Moreover, a subset of epidemiologic studies has emerged that further inform an understanding of the relationship between $PM_{2.5}$ exposure and health effects, including epidemiologic studies that employed statistical approaches that attempt to more extensively account for confounders and are more robust to model misspecification (i.e., used alternative methods for confounder control). Studies that employ alternative methods for confounder control to assess the association between long-term exposure to $PM_{2.5}$ and mortality reduce uncertainties related to confounding and provide additional support for the associations reported in the broader body of cohort studies that examined long-term $PM_{2.5}$ exposure and mortality.

At the same time, the EPA disagrees with the view that there are no meaningful uncertainties associated with a level of 8 $\mu g/m^3$. The decision of the appropriate standard level, which in conjunction with the other elements of the standard would protect public health with an adequate margin of safety, requires a public health policy judgment, taking into account all of the evidence and its related uncertainties. The EPA agrees that the CAA requires the Administrator to set a health-protective standards but notes that the CAA does not require the Administrator to establish a primary NAAQS at a zero-risk level, but rather at a level that

reduces risk sufficiently so as to protect public health with an adequate margin of safety. As detailed in section II.B.4 of the notice of final rulemaking, in considering the available scientific evidence, quantitative information, CASAC's advice, and public comments, the Administrator concludes that there are remaining uncertainties in the evidence associated with a standard with a level below 9.0 µg/m$^3$, and that the extent to which adopting such a standard could result in further public health improvements is sufficiently uncertain that he judges such a standard would be more stringent than requisite.

(2) **Comment:** Some commenters contend that there is substantial scientific evidence that demonstrates $PM_{2.5}$-related health effects, such as mortality and cardiovascular outcomes, occur at concentrations below 9 µg/m$^3$, and that uncertainty in the shape of the C-R curve is not uncertainty over whether health effects occur below those levels. These commenters assert that the EPA ignores studies that found statistically significant increases in mortality associated with $PM_{2.5}$ concentrations below 9 µg/m$^3$ because the exact increase differs across studies. The commenters state that regardless of uncertainties associated with the shape of the C-R function, the magnitude of the effect is substantial. These commenters cite to a recent meta-analysis in support of their comment (Vodonos et al., 2018). The commenters suggest that the number of studies that report effects at $PM_{2.5}$ concentrations below 9 µg/m$^3$ has increased in recent years. Other commenters note that the evidence continues to support a linear no-threshold relationship between $PM_{2.5}$ exposure and numerous health outcomes and that the shape of the C-R function is steeper below concentrations of 8 µg/m$^3$. They contend that the EPA acknowledges that the C-R function for $PM_{2.5}$ is well-characterized down to 8 µg/m$^3$, with some of these commenters pointing to evidence of a no threshold-relationship down to as low as 5 µg/m$^3$. Therefore, these commenters recommend revising the level of the standard to 8 µg/m$^3$ to provide requisite public health protection with an adequate margin of safety.

**Response:** The EPA disagrees with commenters who contend that uncertainty in the shape of the C-R curve is not relevant for setting the standard. First, the EPA has long recognized that the evidence does not identify a threshold below which there are no PM-related health effects. Consistent with the 2012 review, while the EPA recognizes that there likely are individual biologic thresholds for specific health responses, the 2019 ISA concluded that: "Recent studies that focus on the shape of the C-R curve expand upon the health effects evaluated in previous reviews and continue to provide evidence of a linear, no-threshold relationship between both short-and long-term $PM_{2.5}$ exposure and several respiratory and cardiovascular effects, and mortality" (U.S. EPA, 2019, section 1.5.3). However, in past NAAQS reviews, the EPA has never found that lack of evidence of a threshold for health effects is a sufficient basis to lower a NAAQS. Rather, the Administrator must consider the strength of the evidence, and the related uncertainties (including uncertainties about the concentration-response relationship), for adverse effects on public health in deciding the appropriate level at which to set the standard. We disagree with commenters that the shape of the C-R relationship is well-characterized down to 8 µg/m$^3$. As detailed in the 2019 ISA and ISA Supplement, there is variability at the point in which there is increased uncertainty in the C-R relationship across studies examining morbidity and mortality outcomes, and there is not a clear demarcation at 8 µg/m$^3$ within the scientific evidence evaluated. Studies examining short-term $PM_{2.5}$ exposure and morbidity and mortality outcomes provide evidence of increased uncertainty at long-term mean $PM_{2.5}$ concentrations of 10 µg/m$^3$ and 5 µg/m$^3$,

respectively (U.S. EPA, 2019, section 1.5.3.1). In addition, studies of long-term $PM_{2.5}$ exposure provide evidence of uncertainty in the C-R relationship within the range of 10 to 12 $\mu g/m^3$ when examining morbidity outcomes and 5 to 8 $\mu g/m^3$ when examining mortality (U.S. EPA, 2019, section 1.5.3.2). In considering this collective body of evidence in this reconsideration, the Administrator recognizes this variability across studies and also recognizes that some recent studies provide evidence for deviations from linearity (i.e., either a sublinear, linear, or supralinear) at the low end of the concentration distribution within the U.S. (U.S. EPA, 2019, section 11.2.4; U.S. EPA, 2022b, section 2.2.3.2). As discussed in section II.B.4 of the preamble, the Administrator has taken this evidence with its variability and uncertainty, as well as information and uncertainties about exposure risks from patterns of air quality under a standard of 9.0 $\mu g/m^3$ compared to 8.0 $\mu g/m^3$, into account in reaching his judgment that a standard more stringent than 9.0 $\mu g/m^3$ would be more stringent than necessary to protect the public health with an adequate margin of safety.

With regard to the study by Vodonos et al. (2018), in developing the ISA Supplement, this study was determined to be out of scope, as it is a meta-regression that includes studies conducted outside the U.S. and Canada. In defining the scope of the ISA Supplement, the EPA states that the focus is on "U.S. and Canadian epidemiologic studies for health effect categories for which the 2019 PM ISA concluded a *causal relationship* (i.e., short- and long-term $PM_{2.5}$ exposure and cardiovascular effects and mortality)" (U.S. EPA, 2022b, section 1.2.2see also section 1.2.1: "studies examining associations outside the U.S. or Canada reflect air quality and exposure patterns that may be less typical of the U.S., and thus less likely to be informative for purposes of reviewing the NAAQS"). As such, because Vodonos et al. (2018) includes studies conducted in Europe and Asia as part of the meta-regression, this study was deemed to be out of scope. However, in the broader assessment of the concentration-response relationship between long-term $PM_{2.5}$ exposure and mortality presented in previous PM science assessments, as well as the 2019 ISA (U.S. EPA, 2019, sections 11.2 and 11.2.4) and ISA Supplement (U.S. EPA, 2022b, sections 3.2.2 and 3.2.2.2.7), the U.S. based studies included in Vodonos et al. (2018) were evaluated and inform the Agency's conclusion regarding the shape of the concentration-response relationship, whether there is a threshold below which effects do not occur, and whether there is a point along the air quality distribution where the data density is lower and there is greater uncertainty in the shape of the concentration-response relationship.
However, the CAA does not require the Administrator to establish a primary NAAQS at a zero-risk level, but rather at a level that reduces risk sufficiently so as to protect public health with an adequate margin of safety. Moreover, while some studies indicate steeper slopes (e.g., larger effect estimates) at lower concentrations, interpreting the shapes of these relationships, particularly at $PM_{2.5}$ concentrations near the lower end of the air quality distribution, can be complicated by relatively low data density in the lower concentration range, the possible influence of exposure measurement error, and variability among individuals with respect to air pollution health effects (U.S. EPA, 2022a, p. 3-166). As such, these uncertainties are considered by the Administrator in determining the appropriate level of the standard in light of the CAA specifically stating the standard should protect public health with an adequate margin of safety.

(3) **Comment:** As part of their rationale to revise to level of the annual $PM_{2.5}$ standard to a level of 8 $\mu g/m^3$, some commenters cite to additional studies, noting that recent large-scale studies

of $PM_{2.5}$-related health effects, including Di et al. (2017), Di et al. (2019),Vodonos et al. (2018), Wei et al. (2020), Wei et al. (2021),Yazdi et al. (2019), and Yitshak-Sade et al. (2019), are based on very large datasets, unlike those available in previous reviews.

**Response:** While the public commenters identify additional studies as support for health effects at levels below the reported mean $PM_{2.5}$ concentrations, those studies did not meet the criteria outlined in the 2022 PA to include as key epidemiologic studies used to inform the adequacy and alternative levels of the $PM_{2.5}$ annual standard.[11] These criteria were adopted to identify studies which are most reliable for understanding the association between ambient $PM_{2.5}$ concentrations and reported health outcomes and were reviewed without comment by the CASAC in their review of the 2021 draft PA. Some of these epidemiologic studies (e.g., Wei et al., 2020, Wei et al., 2021, and Yitshak-Sade et al., 2019) employed statistical approaches that attempt to more extensively account for confounders. These studies used alternative methods for confounder control, and as a result they provide further support for the robustness of the associations exhibited in cohort studies but do not meet the criteria for being included in the group of key epidemiologic studies. Moreover, one study Yazdi et al. (2019) identified by commenters does not report a long-term mean $PM_{2.5}$ concentration and as such was not used to evaluate alternative levels of the annual $PM_{2.5}$ standard. Additionally, another study cited by public commenters is a meta-analysis (Vodonos et al., 2018), and in developing the ISA Supplement, this study was determined to be out of scope, as it is a meta-regression that includes studies conducted outside the U.S. and Canada. In defining the scope of the ISA Supplement, the EPA states that the focus is on "U.S. and Canadian epidemiologic studies for health effect categories for which the 2019 PM ISA concluded a causal relationship (i.e., short- and long-term $PM_{2.5}$ exposure and cardiovascular effects and mortality)" (U.S. EPA, 2022b, section 1.2.2). As such, because Vodonos et al. (2018) includes studies conducted in Europe and Asia as part of the meta-regression, this study was deemed to be out of scope. Finally, one study cited by commenters (Di et al., 2019) is not a health-based epidemiologic study, but is rather a publication that explains the development of a hybrid modeling surface of estimated $PM_{2.5}$ concentrations across the U.S. This hybrid modeling surface was used as part of the analysis comparing design values to mean $PM_{2.5}$ concentrations, as described further in the 2022 PA (U.S. EPA, 2022a, section 2.3.3.2.4).

(4) **Comment:** Some commenters suggested that the EPA's proposed rule failed to consider several epidemiologic studies that used restricted analyses (Zhang et al., 2021a; Shi et al., 2016) and that were discussed in the 2022 PA. The commenters disagree that the studies that used restricted analyses should not be included for consideration because they did not

[11] Key U.S. and Canadian epidemiologic studies are those that report overall mean (or median) $PM_{2.5}$ concentrations and for which the years of $PM_{2.5}$ air quality data used to estimate exposures overlap entirely with the years during which health events are reported. For some studies of long-term $PM_{2.5}$ exposures, exposure is estimated from air quality data corresponding to only part of the study period, often including only the later years of the health data, and are not likely to reflect the full ranges of ambient $PM_{2.5}$ concentrations that contributed to reported associations. Additionally, for studies that use hybrid modeling approaches to estimate $PM_{2.5}$ concentrations key studies include those for which recent methods and models were used (e.g., recent versions and configurations of the air quality models); studies that are fused with $PM_{2.5}$ data from national monitoring networks (i.e., FRM/FEM data); and studies that reported a thorough model performance evaluation for core years of the study (U.S. EPA, 2022a, p. 3-89).

expressly report a mean $PM_{2.5}$ concentration for the restricted analysis, and suggest that in doing so, the EPA arbitrarily ignored studies that examined health effects below the proposed range of alternative standard levels. Some commenters also cite to several additional epidemiologic studies that restrict analyses to $PM_{2.5}$ concentrations at or below a level of 12 $\mu g/m^3$ that report associations with $PM_{2.5}$-related morbidity effects (Qiu et al., 2023; Danesh Yazdi et al., 2022, Shi et al., 2021).

**Response:** The EPA disagrees with commenters that the proposal failed to consider these epidemiologic studies that used restricted analyses and were discussed in the 2022 PA (Zhang et al., 2021a; Shi et al., 2016). These studies do not report the mean $PM_{2.5}$ concentration for the restricted analyses. When a study does not report the mean $PM_{2.5}$ concentration for the restricted analysis, it is not possible to determine what concentration is associated with the health outcomes in those restricted analyses. Therefore, these studies do not provide sufficient information to inform conclusions regarding the level of the primary annual $PM_{2.5}$ standard. However, the EPA notes that the restricted analyses were helpful in providing evidence that even when highest exposure days are excluded from consideration, the association between exposure to $PM_{2.5}$ and morbidity and mortality remains, providing evidence that the association is not driven by the highest exposures.

We further note that the study by Shi et al. (2016) reports a mean $PM_{2.5}$ concentration in their main (unrestricted) analysis by computing the average of all grid cells in their analysis and therefore does not apply aspects of population weighting (U.S. EPA, 2022a, Table 3-8). In studies that use each grid cell to report a mean $PM_{2.5}$ concentration and do not apply aspects of population weighting, the study mean may not reflect the exposure concentrations used in the epidemiologic study to assess the reported association and as such, the reported mean may not reflect the reported association between $PM_{2.5}$ exposure and the health outcome. While the Administrator does not dispute the reported associations of epidemiologic studies that report long-term mean concentrations and do not apply aspects of population weighting, he judges that use of the reported long-term mean concentration from these in informing an appropriate level of the annual $PM_{2.5}$ standard is more uncertain. The study by Shi et al. (2016) reports positive and significant associations with long-term $PM_{2.5}$ exposure and mortality and helps provide overall support that the annual $PM_{2.5}$ standard is not adequate. However, because this study does not report a mean for the restricted analysis and does not apply aspects of populations weighting, it is of limited utility for informing conclusions regarding the appropriate level of the annual standard. We also note that the Zhang et al. (2021a) is a Canadian epidemiologic study. As discussed in more detail below, there are differences between the U.S. and Canadian epidemiologic studies (e.g., exposure environments, population densities) and the long-term means from Canadian epidemiologic studies are a less certain basis for informing the EPA's selection of the annual standard level. Therefore, we disagree with commenters that these studies were excluded from the proposal; rather, they were considered in the context of the broader evidence base but given less weight when reaching the proposed conclusions for all of the reasons discussed in section II.B.3 of the notice of final rulemaking.

With regard to the studies that use restricted analyses cited by the commenters, we first note that these studies (Danesh Yazdi et al., 2022; Qiu et al., 2023; Shi et al., 2022; Shi et al., 2021) were published after the literature cutoff date of the ISA Supplement. These studies

were provisionally considered but do not materially change the scientific conclusions of the 2019 ISA or ISA Supplement in this reconsideration. Secondly, three of the four studies do not utilize restricted analyses. The Shi et al. (2021) and Qiu et al. (2023) studies do not restrict the analysis in their studies of associations between $PM_{2.5}$ concentrations and neurological outcomes. Danesh Yazdi et al. (2022) is a study that employes alternative methods for confounding control, evaluating psychotic disorders associated with $PM_{2.5}$ exposure, using a difference-in-difference approach. As described in more detail in section II.A.2, studies that employ alternative methods for confounder control are more robust to model misspecification and support the robustness of associations exhibited in epidemiologic studies that use standard methods, but are not part of the key epidemiologic studies that are used to support alternative levels of the annual $PM_{2.5}$ standard. Lastly, while Shi et al. (2022) restricts their analysis to $PM_{2.5}$ concentrations of less than 12 $\mu g/m^3$ and reports a mean for the restricted analyses of 7.38 $\mu g/m^3$, this study is still subject to the same types of limitations outlined above, and as such, does not materially alter our conclusions regarding how this information can be used to inform conclusions regarding the primary annual $PM_{2.5}$ standard or the Administrator's decision on the appropriate level.

(5) **Comment:** Multiple commenters contend that the primary annual $PM_{2.5}$ standard should be revised to 8 $\mu g/m^3$ to reduce disproportionate health impacts for minority populations and low SES populations. In so doing, a number of these commenters cite to the importance of considering environmental justice and disparities in exposure and risk when reaching conclusions regard the appropriate level for the primary $PM_{2.5}$ standard. Some of these commenters also cite a recent study that they believe provides additional support for setting the standard at the lowest level that is being considered. The study found greater exposure to PM and greater susceptibility to disproportionate effects from PM exposure among minority populations and low SES populations, and concluded that the increased harm from $PM_{2.5}$ exposure was attributable to social structural forces, rather than any biological differences amongst the study groups (Josey et al., 2023).

**Response:** The 2019 ISA and ISA Supplement thoroughly evaluate studies examining whether specific populations are at increased risk of $PM_{2.5}$-related health effects including specific racial and ethnic groups or people encompassing different socioeconomic groups. The ISA Supplement builds upon the evidence presented in the 2019 ISA and concluded that: "[r]ecent studies that use a variety of metrics to represent SES, including educational attainment and income, along with studies that used composite metrics to represent neighborhood SES, provide additional support indicating there may be disparities in $PM_{2.5}$ exposure and health risk by SES. These studies indicate that the strongest evidence of a health risk disparity for low SES is for cause-specific mortality and certain health endpoints (i.e., MI and CHF) when compared with higher SES groups (U.S. EPA, 2022b, p. 5-4). The ISA Supplement further stated that: "Building upon the conclusions of the 2019 PM ISA, recent studies continue to support disparities in $PM_{2.5}$ exposure and health risks by race and ethnicity, with the strongest evidence for minority populations, specifically Black populations. Black populations or individuals that live in predominantly Black neighborhoods experience higher $PM_{2.5}$ exposures, in comparison with non-Hispanic White populations. Additionally, there is evidence of health risk disparities for both Hispanic and non-Hispanic Black populations compared with non-Hispanic White populations for cause-specific mortality and incident hypertension" (U.S. EPA, 2022b, p. 5-4).

Therefore, the EPA agrees with the commenters that examining whether there are disparities in health risk and/or exposure to $PM_{2.5}$ by race and income levels is important, and it is important to set the NAAQS to protect at-risk groups with an adequate margin of safety. However, the EPA recognizes that additional studies may become available after the literature cut-off date of the 2019 ISA, or in the case of this reconsideration, the ISA Supplement, that could add to the evidence base detailed in the scientific assessments that underpin the NAAQS review. The EPA has provisionally considered the study submitted by the commenters in support of revising the current standard, and the EPA concluded that this study does not materially change the broad scientific conclusions of the 2019 ISA regarding disparities in risk and exposure and thus would not materially affect decision making on the NAAQS. It is important to recognize that an individual study on its own does not change the broad scientific conclusions of the 2019 ISA or ISA Supplement and it must be considered within the broader body of scientific evidence that informs the key science judgments and conclusions of the 2019 ISA and ISA Supplement. The EPA will thoroughly consider and evaluate this study in the next review of the PM NAAQS.

(6) **Comment:** As support for their recommendation to revise the primary annual $PM_{2.5}$ standard to a level of 8 $\mu g/m^3$, numerous commenters cite a recent analysis by Industrial Economics (IEc) commissioned by the Environmental Defense Fund (EDF) that undertakes an analysis that is similar to the risk assessment in the 2022 PA. These commenters specifically note that, compared to the risk assessment in the 2022 PA, the IEc analysis has an expanded geographical scope, includes a higher population, and assesses morbidity in addition to mortality. These commenters contend that while the results are consistent with the 2022 PA risk assessment, the analyses suggest that 70% of the morbidity impacts are experienced in areas outside of the 47 study areas included in the EPA's risk assessment, and primarily in smaller cities and rural areas with larger minority populations and low SES populations. The commenters suggest that the IEc analyses highlight the importance of evaluating areas beyond the urban areas included in the risk assessment in the 2022 PA in order to fully capture the harmful effects of $PM_{2.5}$.

**Response:** It is important to note that the IEc analysis employed approaches that are different than those used in the risk assessment presented in the 2022 PA. These differences in methods are important when considering and comparing the results of the IEc analyses and those in the risk assessment in the 2022 PA.

Risk assessments that support PM NAAQS reviews have historically been performed in areas that exceed either or both of the primary $PM_{2.5}$ standards, as adjusting air quality downward is less uncertain than adjusting air quality upward. However, after applying the criteria for study area selection in designing the risk assessment in the 2022 PA, based on 2014-2016 design values, only 16 CBSAs met these criteria. Therefore, to mitigate uncertainties associated with upward adjustment of $PM_{2.5}$ air quality concentrations to simulate just meeting alternative standards while including more areas in the risk assessment, the EPA selected areas requiring a relatively modest upward adjustment (i.e., no more than 2.0 $\mu g/m^3$ for the annual standard and 5 $\mu g/m^3$ for the 24-hour standard, based on the 2014-2016 design value period). Using these criteria, 47 urban study areas were identified, which include nearly 60 million people aged 30-99, or approximately 30% of the U.S population in this age range (U.S. EPA, 2022a, Figure 3-16 and section C.1.3). This approach results in simulated air

quality surfaces for a subset of areas that "just meet" the current and alternate standards and can provide reasonable scenarios in which to evaluate allowable exposures and risk. In contrast, in order to evaluate the contiguous U.S., the IEc analyses defined the baseline as current $PM_{2.5}$ exposures from 2015, as a reflection of conditions under the current NAAQS. To evaluate lower standards, the IEc analyses performed a simplistic "roll back" approach. The EPA does not agree this is an equivalent or superior approach as it involves additional uncertainties in the exposure estimates. Due to these uncertainties, the EPA does not have sufficient confidence in the additional impacts estimated by the IEc analyses, nor do we believe that it is appropriate to compare the results of the IEc analysis to the risk assessment in the 2022 PA or to use the results of the IEc analyses to inform conclusions regarding the appropriate level of the primary $PM_{2.5}$ standards that is necessary to provide public health protection with an adequate margin of safety.

The EPA also believes that the mortality results of the areas evaluated in the risk assessment and at-risk analysis in the 2022 PA lead to the same overall conclusion as the national mortality and morbidity results of the IEc analyses. That is, the current primary $PM_{2.5}$ standards could allow a substantial number of $PM_{2.5}$-associated health impacts in the U.S. and revising the standard to a lower level could reduce $PM_{2.5}$-associated health risks, especially for those populations who may experience disparities in exposure and risk. The EPA appreciates the information from commenters suggesting that the results of the risk assessment are illustrative of risks faced by a wider range of communities across the country. The EPA notes that the risk assessment was never intended to represent the full scope of risk faced by Americans on a national scale, but rather was a quantitative estimation of exposure and risk based on certain parameters of the risk assessment (e.g., certain study areas, air quality years, and C-R functions) to provide a "snapshot" of these estimates in the context of the 2022 PA. However, while the EPA notes that the risk assessment, including the at-risk analysis support the conclusion that the primary $PM_{2.5}$ standards are not adequate, the EPA also cautions against an over-interpretation of the absolute results. For these reasons, the Administrator places little weight on the absolute results of the risk assessment, including the at-risk analysis, for purposes of selecting the level of the annual standard that is requisite.

(7) **Comment:** Some commenters contend that, in the proposal (citing to 88 FR 5616, January 27, 2023), the EPA inappropriately characterized the body of evidence and conclusions of the 2022 PA (citing to U.S. EPA, 2022a, p. 3-55) regarding $PM_{2.5}$ exposures for Hispanic populations.

**Response:** We disagree with the commenters on this point. On page 3-55 of the 2022 PA where the EPA states that "[t]here is strong evidence for racial and ethnic disparities in $PM_{2.5}$ exposures and $PM_{2.5}$-related health risk…demonstrating that Black and Hispanic populations, in particular, have higher $PM_{2.5}$ exposures than non-Hispanic White populations" (U.S. EPA, 2022a, p. 3-55), the EPA is summarizing the evidence from multiple studies assessed in the 2019 ISA and ISA Supplement. In the proposal, where the EPA states that "White, Hispanic, and Asian populations were exposed to similar average $PM_{2.5}$ concentrations" (88 FR 5616, January 27, 2023), the EPA is summarizing the results of the at-risk analysis from the 2022 PA. These are two different pieces of information – the scientific evidence and the quantitative analyses – and therefore, we disagree with the commenter that the EPA contradicts the evidence and conclusions of the 2022 PA in the proposal. Additionally, the

EPA recognizes that the at-risk analysis is subject to greater uncertainties for various reasons, as detailed more in section II.A.3 of the notice of final rulemaking, including that it incorporates C-R functions from only one study (Di et al., 2017b), which reported associations between long-term $PM_{2.5}$ exposures and mortality, stratified by race/ethnicity, in populations age 65 and older.

(8) **Comment:** As part of support for revising the annual $PM_{2.5}$ standard to a level of 8 µg/$m^3$, several commenters provide individual analyses that highlight disproportionate impacts in their own communities. Some cite statistics using EJScreen to highlight health impacts which commenters note is due to disproportionate pollution burdens. Other commenters use handheld monitors (non-FRM/FEM monitors) to evaluate the population below the poverty level at $PM_{2.5}$ concentrations of 8 µg/$m^3$, 9 µg/$m^3$, 10 µg/$m^3$, compared to 12, and contend that a stronger PM standard will impact a larger number of people in poverty and therefore stronger standards will impact more people and help to ultimately drive down PM pollution when standards are translated into implementation. Lastly, some comments, using published literature evaluated the number of premature deaths avoided in their communities if a standard of 8 µg/$m^3$ is met, noting the largest benefit would be in areas with the highest percent of poverty.

**Response:** The primary $PM_{2.5}$ standards are established at levels that are requisite to protect public health with an adequate margin of safety, including the health of at-risk populations. To achieve this, the decisions on the NAAQS are based on thorough and clear assessment of the available scientific evidence and associated risk analyses. In particular, the EPA explicitly considered the available evidence related to health effects among at-risk populations, including minority populations and low SES populations, when determining the primary PM NAAQS. In instances where groups facing disparities in exposure and risk are categorized as at-risk populations, the determination of the primary standards is focused on ensuring protection for these along with other at-risk populations and lifestages.

As detailed in the proposal, the EPA carefully considered the available evidence about the impacts of $PM_{2.5}$ exposure on the health of at-risk populations and determined that the existing set of primary $PM_{2.5}$ standards is not requisite and required revision. Apart from considering and making conclusions on the available epidemiologic and experimental evidence, the Administrator also takes into account the findings of the risk assessment when arriving at his decision on the primary annual $PM_{2.5}$ standard. In his final decision, the Administrator notes that the at-risk analysis, which estimated the potential long-term exposure and mortality risk associated with $PM_{2.5}$ among older adults stratified by racial/ethnic demographics, suggests that revising the annual standard down to 9.0 µg/$m^3$ would likely lead to reduction in $PM_{2.5}$ exposures as well as lower risk in at-risk populations.

The EPA also highlights that commenter arguments citing EJScreen statistics and handheld monitors involve setting the primary annual $PM_{2.5}$ NAAQS based on simulation of implementation rather than on health effects evidence. Although the full data explaining the basis of the simulation were not provided to the EPA, the EPA notes it establishes the NAAQS to provide the requisite protection of human health, which includes the health of sensitive sub-populations. However, the standards are not determined based on projections of the number of people living in areas expected to meet or not meet the standards.. This

approach is especially relevant considering the prohibition on considering the costs or feasibility of attaining the NAAQS. With further regard to comments presenting findings derived from analyses using handheld sensor-based air quality data, it is important to mention that the data employed for assessing compliance with the NAAQS must be sourced from FRMs/FEMs. The handheld sensors mentioned in the commenters' evaluation were not FRMs/FEMs. However, the EPA recognizes that sensors can provide useful information and that the revised NAAQS will provide substantial health benefits to many people across the country, including many low SES populations.

(9) **Comment:** Some commenters state that the EPA's approach to setting the level of the primary annual $PM_{2.5}$ standard focuses on what design value will result in levels at or below overall means reported in key epidemiologic studies. They contend that the EPA's approach inflates study-reported means from key epidemiologic studies, then selects the level of the annual standard somewhere below the inflated result. In disagreeing with the EPA's approach they point to the EPA's response to comments in the 2012 notice of final rulemaking, suggesting that at that time the EPA itself dismissed such an approach. The commenters note that, in that review, some past commenters urged the EPA to set a level for the primary annual $PM_{2.5}$ standard by identifying a "mean composite monitor $PM_{2.5}$ level that should be achieved and then identify the maximum monitor level that would result in that composite value" (78 FR 3146, January 15, 2013). The present commenters further assert that one of the EPA's reasons for not agreeing with the commenters in the 2012 review was that "for areas in which the maximum monitor concentration is appreciably higher than other monitor concentrations within the same area, public health would not be protected with an adequate margin of safety if the disproportionately higher exposures of at-risk, susceptible populations around the monitor measuring the highest concentration were in essence averaged away with measurements from monitors in other locations within large urban areas" (78 FR 3146, January 15, 2023). The commenters argue that, in this reconsideration, the EPA is taking an identical approach to the same approach that they disagreed with in the 2012 review.

Additionally, commenters also contend that the EPA has deviated from the approach taken in 2012 where the level of the annual standard was to just below the long-term reported mean $PM_{2.5}$ concentrations of the key epidemiologic studies. As an example, these commenters cite the EPA's rejection in 2012 of other commenters (e.g., industry) opposition to the EPA's proposal to eliminate spatial averaging. They contend that public commenters in 2012 take a similar approach to how the EPA has currently proposed setting the level of the annual standard to between 9-10 $\mu g/m^3$. These commenters further contend that the same commenters in 2012 argued "that because spatial averaging is consistent with how air quality data are considered in the underlying epidemiological studies, such averaging should not be eliminated. Specifically, commenters…pointed out that $PM_{2.5}$ epidemiological studies use spatially averaged multi-monitor concentrations, rather than the single highest monitor, when evaluating health effects. Therefore, these commenters contended that allowing spatial averaging would make the $PM_{2.5}$ standard more consistent with the approaches used in the epidemiological studies upon which the standard is based" (78 FR 3126, January 15, 2013). Commenters further contend that in the current reconsideration that the EPA notes that epidemiologic studies report area-wide mean $PM_{2.5}$ concentrations that are associated with adverse health effects, rather than focusing on the highest monitor in the area, and claim that

the EPA aims to make the results of the study-reported mean more consistent with the design value metric relevant to assessing compliance with the standard. However, they claim that in the 2012 decision, the EPA rejected claims by commenters specifically advocating for this approach and contend that the EPA must adopt the same approach used in 2012 to set the level of the annual $PM_{2.5}$ standard.

**Response:** As an initial matter and as detailed further in section II.B.4 of the notice of final rulemaking, the Administrator's final decision to set the level of the annual standard at 9.0 $\mu g/m^3$ reflects his judgment that the standard level be set below of the study-reported mean $PM_{2.5}$ concentrations for key epidemiologic studies. Consistent with some previous reviews, the decision on level centers on the average annual concentration observed in key epidemiologic studies, where mean $PM_{2.5}$ concentrations in key U.S. studies are as low as 9.3 $\mu g/m^3$.[12] Setting the annual standard level at 9.0 $\mu g/m^3$, which is below concentrations for which the evidence is the strongest in supporting an association between exposure to $PM_{2.5}$ and adverse health effects observed in the key epidemiologic studies available in this reconsideration, is expected to shift the distribution of $PM_{2.5}$ exposure concentrations in an area such that the area's highest monitor would generally be at or below 9.0 $\mu g/m^3$ annually, and most of the resulting $PM_{2.5}$ concentrations across the area would be even lower. In considering these air quality relationships, the Administrator judges that a revised annual standard level of 9.0 $\mu g/m^3$ would provide requisite protection with adequate margin of safety, for all populations, including those most at-risk.

The Administrator additionally notes that air quality analyses in the 2022 PA demonstrate that areas meeting a revised annual standard of 9.0 $\mu g/m^3$ would be expected to shift the distribution of $PM_{2.5}$ exposure concentrations in an area such that the area's highest monitor would generally be at or below 9.0 $\mu g/m^3$ annually, and most of the resulting $PM_{2.5}$ concentrations across the area would be even further below the study-reported means. Thus, a standard level of 9.0 $\mu g/m^3$ is expected to provide sufficient protection not only in areas where the highest allowable concentration would be located (i.e., near design value monitors) but also in other parts of the area where $PM_{2.5}$ concentrations would be expected to be maintained even lower.

As such, the EPA disagrees with commenters who contend that the EPA's approach to setting the level of the primary annual $PM_{2.5}$ standard focuses on what design value will result in levels at or below overall means reported in key epidemiologic studies. Further the EPA disagrees with commenters who contend that the EPA's current approach is based on evaluating the standard mean composite monitor $PM_{2.5}$ level that should be achieved and then identify the maximum monitor level that would result in that composite value.

---

[12] As detailed in the notice of final rulemaking, the Administrator acknowledges that in the 2020 final action, the then-Administrator took a somewhat different approach in deciding to retain the standard based in part on concerns about placing reliance on the epidemiologic studies and his judgment that even if he did rely on them, the majority of the studies had means or medians, as well as the mean of all of the key study-reported means or medians, above the level of the current annual standard. However, after considering the evidence, the advice of CASAC, and public comments the Administrator judges that in light of the evidence before him this approach is insufficient to protect public health with an adequate margin of safety.

Additionally, the EPA disagrees with commenters who contend that the EPA has deviated from the approach taken in 2012.

## 2. Comments in Support of Retaining the Primary Annual $PM_{2.5}$ Standard

(1) **Comment:** Some commenters who support retaining the current primary $PM_{2.5}$ standards contend that while recent studies provide support for exposure disparities for minority populations and low SES populations, these studies do not provide support for $PM_{2.5}$-related health effects associated with these factors. The commenters assert that none of the five studies included in the ISA Supplement that evaluated the dose-response relationship between long-term $PM_{2.5}$ exposure and total mortality stratified by race/ethnicity support the conclusion that there is a disparity in $PM_{2.5}$-related mortality risk associated with race/ethnicity Awad et al. (2019); Lipfert and Wyzga (2020); Parker et al. (2018) Son et al. (2020); and Wang et al. (2020) ). The commenters claim that the ISA Supplement's characterization of the Parker et al. (2018) study reported hazard ratios and confidence intervals that were inconsistent with those reported in the study. These commenters also assert that the results of these studies suggest that there were no statistically significant differences in the associations between long-term $PM_{2.5}$ exposure and all-cause mortality among different racial groups.

**Response:** In evaluating the evidence for potential disparities in $PM_{2.5}$ exposure and health risk by race/ethnicity, the ISA Supplement evaluated studies that examined both short- and long-term $PM_{2.5}$ exposure to inform conclusions. This is important to recognize as the commenters only focus on the results of long-term $PM_{2.5}$ exposure studies. With respect to the studies in question, while some studies did not report evidence of differences in health risk between different races and ethnicities, it is the collective body of evidence that informed ISA Supplement conclusions. In addition, as detailed in the Preamble to the ISAs (U.S. EPA, 2015), in assessing evidence to inform conclusions, the EPA focuses on the pattern of results across studies and does not focus solely on statistical significance as described in detail in the Preamble to the ISAs (U.S. EPA, 2015). This is because statistical significance is an indicator of the precision of a study's results, which is influenced by a variety of factors including, but not limited to, the size of the study, exposure and measurement error, and statistical model specifications. As a result, in developing an integrated assessment of the health effects evidence for PM, the EPA has emphasized the importance of examining the pattern of results across various studies, not statistical significance. Therefore, the EPA disagrees with the commenters that statistical significance is the sole criteria by which conclusions can be made with respect to whether there are disparities in health risks due to $PM_{2.5}$ exposure.

In addition, EPA disagrees with the commenters assertion that the Agency incorrectly presented results from Parker et al. (2018) . The results in Parker et al. (2018) are presented for a 10 $\mu g/m^3$ increase in annual $PM_{2.5}$ concentrations. As noted in Footnote 13 on Page 3-1 of the ISA Supplement, EPA states "Throughout this Supplement, as detailed in the Preface of the 2019 PM ISA, risk estimates from epidemiologic studies examining short-term exposures are for a 10 $\mu g/m^3$ increase in 24-hour average $PM_{2.5}$ concentrations and long-term exposures are for a 5 $\mu g/m^3$ increase in annual concentrations, unless otherwise noted" (U.S. EPA, 2022b, section P.3.2.2). Therefore, the difference in results between the ISA

Supplement and Parker et al. (2018) is due to scaling the risk estimate to represent a 5.0 $\mu g/m^3$ instead of 10 $\mu g/m^3$ increase in annual $PM_{2.5}$ concentrations.

(2) **Comment:** Some commenters contend that the current primary annual $PM_{2.5}$ standard should be retained because air quality in the U.S. has improved in recent years, with the exception of wildfires, and note that the current standards are working and show significant improvements in the nation's overall air quality. They claim, therefore, that revising primary $PM_{2.5}$ standards is not needed because the U.S. already has some of the cleanest air.

**Response:** As described in section I of the notice of final rulemaking, the EPA notes that the Administrator's decision on the primary annual $PM_{2.5}$ standard is constrained by the provision of the CAA that requires that the primary NAAQS be requisite to protect public health with an adequate margin of safety. This requires that his judgments are to be based on an interpretation of the evidence that neither overstates nor understates the strength and limitations of the evidence, or the appropriate inferences to be drawn from the evidence. As discussed in section II.B.4 of the notice of final rulemaking, the Administrator has considered the available scientific evidence, including epidemiologic studies that found associations between health effects and $PM_{2.5}$ concentrations at or below the level of the primary annual $PM_{2.5}$ standard, the quantitative risk assessment information, the advice of the CASAC, public comments in reaching his final decision to revise the level of the primary annual $PM_{2.5}$ standard. The Administrator does not have discretion to set a less stringent standard based on comparison to prior air quality and improvements in recent years.

(3) **Comment:** Some commenters contend that the current primary annual $PM_{2.5}$ standard should be retained because areas that meet the primary annual $PM_{2.5}$ standard level of 12 $\mu g/m^3$ are likely achieving equivalent average exposures of 9.6 to 10.8 $\mu g/m^3$, citing to the 2022 PA evaluation that demonstrated that the maximum annual $PM_{2.5}$ design values are often 10 to 20% higher than annual average concentrations. These commenters assert that this range of annual average concentrations overlaps with the proposed range of alternate levels of 9 to 10 $\mu g/m^3$ and, according to the Administrator, provide the strongest support for adverse health effects. The commenters also cite to a study in the 2022 PA that found that most near-road monitors are report the highest annual $PM_{2.5}$ design values in the metropolitan statistical areas (i.e., on average, 0.8 $\mu g/m^3$ higher than the next highest non-near-road monitor). The commenters suggest that as more near-road monitors are installed, the difference between design values and average exposure concentrations will increase, such that attaining a primary annual $PM_{2.5}$ standard of 12 $\mu g/m^3$ would be well within the proposed range and the mean values of the key epidemiologic studies.

**Response:** Based on the current scientific evidence and quantitative information, as well as the CASAC's advice and public comments, the Administrator concludes that the current primary annual $PM_{2.5}$ standard is not adequate to protect public health with an adequate margin of safety (see section II.B.4 of the notice of final rulemaking and 88 FR 5624, January 27, 2023). In so doing, among other considerations and public health policy judgments, the Administrator places the most weight on the large number and strength of epidemiologic studies that report positive, and often statistically significant, associations with long-term mean reported $PM_{2.5}$ concentrations well below the current level of the annual standard of 12.0 $\mu g/m^3$, as well as corroborating evidence from U.S. accountability studies

with starting concentrations below 12.0 µg/m$^3$ and studies that found positive and statistically significant associations in analyses restricted to concentrations less than 12 µg/m$^3$. Based on his interpretation of this evidence, the Administrator judges that the current primary annual $PM_{2.5}$ standard with its level of 12.0 µg/m$^3$ does not adequately protect public health with an adequate margin of safety, and therefore, should be revised to a level of 9.0 µg/m$^3$.

The EPA acknowledges that it is likely that people living and working in areas meeting a design value of 12 µg/m$^3$ likely have patterns of exposure which include areas below 12 µg/m$^3$. However, the Administrator has taken this variation into account in setting the standard, since his obligation is to set the standard with an adequate margin of safety, to provide a reasonable degree of protection against less certain or unknown risks. As such, the Administrator notes that setting the annual standard level at 9.0 µg/m$^3$, which is below the lowest study-reported mean $PM_{2.5}$ concentration from the key U.S. epidemiologic studies of 9.3 µg/m$^3$, would be expected to shift the distribution of $PM_{2.5}$ concentrations in an area such that the area's highest monitor would generally be at or below 9.0 µg/m$^3$ annually, when meeting the annual standard. In this situation, the resulting average or mean $PM_{2.5}$ concentration for the entire area (measured across a number of monitors) would be even further below the study-reported means, and will provide adequate protection not only in areas where the highest allowable concentrations would be expected (i.e., near design value monitors) but also in other parts of the area where $PM_{2.5}$ concentrations would be expected to be maintained even lower. As demonstrated by analyses in the 2022 PA, the highest monitored value would be expected to be greater than the study-reported mean values by 10-20% for monitor-based studies and 15-18% for hybrid modeling studies that apply aspects of population weighting. Furthermore, we note that as more or different data becomes available (i.e., from near-road monitors that are not yet installed, as cited by commenters) for consideration in future epidemiologic studies and informing future PM NAAQS reviews, the EPA will consider such data, as appropriate, but the EPA cannot consider data in this reconsideration that do not yet exist. However, the EPA disagrees that it would be appropriate under CAA 109 to conclude the current level of the annual standard of 12.0 µg/m$^3$ is providing requisite protection based on the expectation that most exposures would occur at concentrations between 9 and 10 µg/m$^3$. For the reasons stated in the preamble, the Administrator has concluded that a standard of 9.0 µg/m$^3$, which maintains most exposures below that level, is requisite to protect public health with an adequate margin of safety.

(4) **Comment:** Some commenters claim that the epidemiologic studies that the EPA relies on for informing conclusions on the primary annual $PM_{2.5}$ standard provides little information about the impact of $PM_{2.5}$ at low concentrations. In so doing, the commenters note that the key epidemiologic studies in Figures 1 and 2 in the proposal have mean $PM_{2.5}$ concentrations above 10 µg/m$^3$, with none of the studies included in Figure 1 with mean $PM_{2.5}$ concentrations at or below 9.5 µg/m$^3$. Therefore, the commenter suggests that it is difficult to extrapolate from the ranges in these studies to support the Administrator's proposed conclusions.

**Response:** We disagree with the commenters that the key epidemiologic studies presented in Figures 1 and 2 in the proposal do not provide support for the Administrator's decision to revise the level of the primary annual $PM_{2.5}$ standard to 9.0 µg/m$^3$. As an initial matter, we note that the Administrator judges that it is most appropriate to examine where the evidence of associations observed in the epidemiologic studies is strongest, and conversely, where he

has appreciably less confidence in the associations observed in the epidemiologic studies. In so doing, as described in more detail in the proposal (88 FR 5625, January 27, 2023) and in section II.B.4 of the notice of final rulemaking, he notes that in most past reviews, evidence-based approaches focused on identifying standard levels near or somewhat below long-term mean concentrations reported in key epidemiologic studies and were supported by previous CASAC advice as well as the CASAC's advice in their review of the 2021 draft PA as a part of this reconsideration (88 FR 5625, January 27, 2023).[13] In adopting this approach, the Administrator considers the long-term mean concentrations reported in two types of key epidemiologic studies: (1) monitor-based studies as shown in Figure 1 of the proposal and (2) hybrid modeling-based studies as shown in Figure 2 of the proposal. As there is no clear way to identify how much below the long-term mean $PM_{2.5}$ concentrations of key epidemiologic studies to set the level of a standard that would provide requisite protection with an adequate margin of safety, the Administrator recognizes that he must use his judgment regarding the appropriate weight to place on the available evidence and technical information, including uncertainties, in reaching his decision. As shown in Figures 1 and 2, for the key U.S. monitor-based epidemiologic studies, the study reported mean concentrations range from 9.9-16.5 $\mu g/m^3$ and for the U.S. hybrid modeling-based key epidemiologic studies, the mean concentrations range from 9.3-12.2 $\mu g/m^3$. The Administrator's proposed range of a level of 9.0 to 10.0 $\mu g/m^3$ for the primary annual $PM_{2.5}$ standard is consistent with the interpretation of the mean $PM_{2.5}$ concentrations from key epidemiologic studies, such that this range is at or just below the mean $PM_{2.5}$ concentrations presented in Figures 1 and 2.

Moreover, the Administrator is required to set primary standards that provide public health protection with an adequate margin of safety. The Clean Air Act does not require NAAQS to be set at zero but does requires a precautionary approach which addresses uncertainties associated with inconclusive scientific information available at the time of standard setting and provides a reasonable degree of protection against hazards that research has not yet identified. The need to provide an adequate margin of safety under CAA 109 contributes to the Administrator's decision to set the standard at 9.0 $\mu g/m^3$ even if many of the key epidemiologic studies have higher means.

Therefore, as discussed in section II.B.4 of the notice of final rulemaking, based on the current evidence and quantitative information, as well as consideration of CASAC advice and public comments, the Administrator concludes that the current annual primary $PM_{2.5}$ standard is not adequate to protect public health with an adequate margin of safety. The Administrator notes that the CASAC was unanimous in its advice on the 2021 draft PA regarding the need to revise the annual standard. In considering the appropriate level for a revised annual standard, the Administrator concludes that a standard set at a level of 9.0 $\mu g/m^3$ reflects his judgment about placing the most weight on the strongest available evidence while appropriately weighing the uncertainties.

---

[13] As noted above and in the preamble, the EPA recognizes that in providing advice on the 2019 draft PA some members of the CASAC recommended that retaining the current standards would properly weight recent epidemiologic evidence showing positive associations with long-term mean $PM_{2.5}$ concentrations below the level of the annual standard, in light of their concerns (e.g., about the possibility of potential sources of error and bias).

### 3. Comments in Support of Revising the Primary 24-hour $PM_{2.5}$ Standard

#### a. *Form*

(1) **Comment:** Some commenters, including those from public health and environmental organizations, state and local elected representatives, and some state and local government agencies, recommend that the 24-hour average should be calculated based on a 24-hour rolling average rather than the current midnight-to-midnight average. These commenters assert that the current midnight-to-midnight average can lead to an underestimation of 24-hour averages of $PM_{2.5}$. They further contend that there are overnight emissions and/or temperature inversions that impact the 24-hour $PM_{2.5}$ concentrations, and that the current midnight-to-midnight approach splits these events across two days, whereas a 24-hour rolling average would capture these events more appropriately. The commenters further suggest that a 24-hour rolling average that would account for these spikes in $PM_{2.5}$ would result in an increased number of days exceeding the standard and increased design values. In support for their recommendation, some commenters point to the CASAC's advice that the EPA should in future reviews consider alternative forms for the primary 24-hour $PM_{2.5}$ standard, specifically noting the advice of an individual CASAC member that suggested a 24-hour rolling average. Other commenters also note that existing continuous $PM_{2.5}$ monitors could support a 24-hour rolling average. In addition, some commenters provided local or regional air quality analyses to demonstrate the differences between the midnight-to-midnight averaging compared to the 24-hour rolling average.

**Response:** The EPA has considered these comments and the possibility of revising the calculation of the standard to a 24-hour rolling average and finds that there is currently insufficient support for such a change. First, the EPA notes that the health effects evidence for this reconsideration is largely based on the approach of categorizing exposures on a calendar day-basis (i.e., the current 12 am to 12 am calculation). Thus, the Administrator finds that using this calculation as the basis for the NAAQS when deciding how to set the NAAQS to protect public health with an adequate margin of safety is appropriate because it is consistent with the underlying health studies. Second, the Administrator notes that one commenter has provided analyses completed at one monitor (e.g., the Liberty monitor in Allegheny County, PA) for 2018-2020, showing that a rolling 24-hour average results in three more days over 35 $\mu g/m^3$ in 2018, one less day in 2019, and no change in 2020. The EPA does not consider this a sufficient basis for reaching conclusions about the impact of such a change on a nationwide basis, particularly given that it is unclear whether the effect of the change would be, as commenters suggest, to change design values by 7% or whether such a change is warranted. The EPA notes that the CASAC stated that they also considered the available information insufficient to evaluate alternative forms of the 24-hour standard, and for that reason, recommended that the EPA consider potential changes more fully in future reviews (Sheppard, 2022, p.18 of consensus responses). Third, there are practical and policy considerations which weigh against adoption of a rolling 24-hour average, at least in the absence of additional information and analysis (including notice and comment). For example, although many states operate continuous $PM_{2.5}$ monitors which are approved Federal Equivalent Monitors, the current Federal Reference Monitor (FRM) for $PM_{2,5}$ is a filter-based monitor which is only capable of providing a 24-hour measurement from mid-night to midnight under our existing programs. While the EPA could set up other sampling

periods for the FRM to quality assure continuous $PM_{2.5}$ FEMs, doing so may never adequately cover the rolling 24-hour period of interest. Thus, a change to a rolling 24-hour average would not have quality assurance data consistent with the time-period of interest. Also, not having FRM data on a consistent sampling schedule (i.e., midnight to midnight) may necessitate new approaches to data completeness which would benefit from public notice and comment. The EPA also notes that in 2015 it changed the calculation of the 8-hour daily maximum concentration for the ozone NAAQS to avoid a rolling average which overlaps consecutive calendar days (that is, the EPA calculates rolling 8-hour averages, but the calculation for each day starts at 7:00 am, so that 8-hour averages on consecutive days do not overlap). The EPA found this approach more appropriate because it ensures that all hourly concentrations are included in the design value calculation, but avoids the possibility that a single 8-hour period will be treated as two calendar days above the standard (see 80 FR 65292, 65412, December 28, 2015). The EPA notes that similar concerns – to ensure all data is represented but not over-represented – would need to be addressed before adoption of a 24-hour rolling average for the primary 24-hour $PM_{2.5}$ NAAQS. Finally, the EPA notes that as detailed further in section II.B.4 of the notice of final rulemaking, based on air quality analyses at monitors across the entire country, the Administrator finds that the current suite of standards maintains subdaily concentrations of $PM_{2.5}$ in ambient air far below the exposure concentrations in controlled human exposure studies where consistent effects have been observed. Taking all of these factors into consideration, the Administrator concludes that there is insufficient support for revising the calculation method of the 24-hour standard and retaining the current 24-hour standard with its current calculation method is requisite to protect public health with an adequate margin of safety.

**b.** ***Level***

(1) **Comment:** Some commenters contend that the EPA placed more weight on inconsistencies in the results of the controlled human exposure studies rather than placing weight on the fact that recent studies assessed in the ISA Supplement found effects related to cardiac function at levels at or below the level of the current primary 24-hour $PM_{2.5}$ standard. These commenters point to the 2022 PA statement that intermittent exercise in the 4-hour Wyatt et al. (2020) study would have produced exposure doses similar to those that occur in the 2-hour studies that find effects at higher levels. These commenters speculate that, based on the EPA's statement in the 2022 PA about shorter exposure durations at higher levels, the converse could also be true: longer exposures (e.g., 24 hours) would produce similar doses to those observed in that study at even lower $PM_{2.5}$ concentrations, particularly for people who live or work near sources that produce peak $PM_{2.5}$ concentrations and have some levels of daily activity.

**Response:** The EPA disagrees with the comments that we focused too much on the inconsistencies associated with recent controlled human exposure studies that investigated the effects of exposure to near ambient concentrations of $PM_{2.5}$ and did not give the findings proper consideration. These studies were assessed in the 2019 ISA (Hemmingsen et al., 2015a; Hemmingsen et al., 2015b) and the ISA Supplement (Wyatt et al., 2020), and considered in the 2022 PA (U.S. EPA, 2022a, sections 3.3.1.2 and 3.3.3.1). As noted in the ISA Supplement, "While Wyatt et al. (2020) provides evidence of some effects at lower $PM_{2.5}$ concentrations, overall there is inconsistent evidence for changes in lung function

(U.S. EPA, 2019, section 5.1.7.2 and section 5.1.2.3.3) and inflammation (U.S. EPA, 2019, section 6.1.11.2.1) in other controlled human exposure studies conducted at higher $PM_{2.5}$ concentrations evaluated in the 2019 PM ISA" (U.S. EPA, 2022b, p. 3-130). It is important to consider the results of individual studies in the context of the larger body of evidence when reaching conclusions and for consideration in reaching conclusions regarding the adequacy of the current standards. Additionally, as noted in the EPA's causal framework, assessing the evidence to inform causality consists of evaluating whether this is consistency in evidence within a discipline, coherence of effects across disciplines, and evidence of biological plausibility (U.S. EPA, 2015). As noted previously, the EPA's evaluation of controlled human exposure studies in the 2019 ISA, as well as in the ISA Supplement, identified inconsistencies in the results across these studies.

Furthermore, we disagree with the commenters' speculation regarding the applicability of the results of the controlled human exposure studies to real world exposures to ambient $PM_{2.5}$ for longer durations. While we do not disagree with the commenters that it might be possible that lower $PM_{2.5}$ concentrations could elicit similar effects to those observed in Wyatt et al. (2020) for longer exposure periods (e.g., 24 hours), particularly while engaged in physical activities, we have no evidence supporting that possibility, as studies of such exposures are not available for consideration as a part of this reconsideration. . In addition, as noted above, this assumption by the commenters is further complicated by the fact the results of Wyatt et al. (2020) are not consistent with other controlled human exposure studies evaluated in the 2019 ISA.

(2) **Comment:** Some commenters who support revising the level of the primary 24-hour $PM_{2.5}$ standard suggest that the EPA did not thoroughly consider evidence from epidemiologic panel studies in concluding that the current standard is adequate. These commenters contend that the EPA did not give sufficient weight to numerous panel studies that reported associations between short-term $PM_{2.5}$ exposure with changes in clinical endpoints that are on the pathway to adverse cardiovascular events. The commenters suggest that these short-term exposure panel studies are able to: (1) evaluate $PM_{2.5}$ exposures for at-risk populations below the current primary 24-hour $PM_{2.5}$ standard, (2) assess effects for multiple (i.e., 1-5) days of exposure, and (3) measure the same endpoints as the controlled human exposure studies. These commenters further state that the panel studies are supported by controlled human exposure studies that observed similar subclinical effects and contend that together these studies find consistent subclinical effects that are risk factors for adverse cardiovascular events. Additionally, they cite to one study (e.g., Zhang et al., 2021b) that linked exposure with adverse cardiopulmonary events. The commenters further contend that the EPA did not consider the implications of a number of panel studies that found cardiovascular effects related to $PM_{2.5}$ exposures that were included in the 2019 ISA and previous ISAs, and did not include relevant panel studies in the ISA Supplement (e.g., Zhang et al., 2021b). Finally, the commenters assert that these studies should have been considered within the body of evidence when reaching conclusions regarding the adequacy of the current primary 24-hour $PM_{2.5}$ standard. They contend that these studies should not only be used to support biological plausibility, and that these studies (including those that restrict concentrations to less than 35 $\mu g/m^3$), in conjunction with controlled human exposure studies, support revision of the level of the 24-hour standard to between 25 and 30 $\mu g/m^3$.

**Response:** In collectively considering the epidemiologic evidence, the 2019 ISA evaluated panel studies. As described in the Preamble to the ISAs, the EPA considers several categories of epidemiologic evidence, including cross-sectional, prospective cohort, time-series, and panel studies (U.S. EPA, 2015, p.15). We note that the Zhang et al. (2021b) study cited by the commenters was published after the literature cutoff date of the ISA Supplement. This study was provisionally considered but does not materially change the scientific conclusions of the 2019 ISA or ISA Supplement in this reconsideration.

With regard to considering the epidemiologic panel studies for purposes of informing conclusions regarding the adequacy of the current primary $PM_{2.5}$ standards, we note that the 2022 PA does not identify any panel studies as key epidemiologic studies. This is because panel studies, by their design, investigate clinical endpoints similar to those evaluated in controlled human exposure studies, with intermediate effects that are not clearly adverse. Thus, similar to short-term epidemiologic cohort studies, mean $PM_{2.5}$ concentrations from epidemiologic panel studies are an insufficient basis for concluding that the current 24-hour standard with its 98th percentile form is not providing the requisite degree of supplemental protection against peak exposures. However, we note that the experimental evidence, including evidence from epidemiologic panel studies, does inform our understanding of the biological plausibility and pathways for the more serious effects seen in epidemiologic studies of morbidity and mortality. In reaching his final decisions, the Administrator concluded that the combination of an annual standard of 9.0 $\mu g/m^3$ and a 24-hour standard of 35 $\mu g/m^3$ provide requisite protection for at-risk populations with an adequate margin of safety, for the reasons explained in section II.B.4 of the preamble.

(3) **Comment:** Some commenters who recommend that the level of the primary 24-hour $PM_{2.5}$ standard should be revised contend that the controlled human exposure studies provide support for strengthening the standard. In the broader context of considering the controlled human exposure studies and the CASAC's advice regarding these studies in their review of the 2021 draft PA, the commenters specifically ~~In so doing, these commenters~~ cite to the CASAC's advice, where they noted "if the prior 20 hours of ambient exposure and the 2-4 hours of the controlled human exposure were taken as a time-averaged 24-hour concentration, the exposure would likely be in the realm of normal ambient 24-hour exposures" (Sheppard, 2022, p. 7 of consensus responses).

**Response:** The EPA disagrees with the commenters that effects seen in controlled human exposure studies provide support for a more stringent primary 24-hour $PM_{2.5}$ standard because taking an average of the exposures during the controlled human exposure studies plus ordinary ambient concentrations "would likely be in the realm of normal ambient 24-hour exposures." First, the EPA notes that neither the CASAC nor the commenters present any analysis or data to support the claim either that the mathematical result of this averaging is equivalent to "normal" ambient exposures, or that the available scientific evidence would provide such analysis or data to support this claim. Additionally, the EPA does not believe that it is appropriate to set a standard intended to provide protection against peak concentrations by averaging short but extremely high concentrations (like those observed in the controlled human exposure studies) with much longer typical daily concentrations (like those from typical ambient air exposures). This is because such a pattern of air quality is not likely to be experienced from "normal ambient 24-hour exposures," as there are very few

instances where typical ambient air exposures to $PM_{2.5}$ concentrations similar to those in the controlled human exposure studies occur (much less occurs when ambient concentrations are otherwise normal), and it is unclear whether a standard based on such averaging would provide the requisite level of protection against patterns of air quality that are likely to occur. To the extent commenters and the CASAC are suggesting that it would be normal for people to be exposed to similar concentrations as the study participants in the controlled human exposure studies over short periods of time (e.g., 2-4 hours) because the current standards allow for such exposures, and therefore the 24-hour standard should be revised to be more stringent to prevent such exposures, the EPA disagrees. As noted in section II.B.4 of the notice of final rulemaking, the EPA's air quality analysis demonstrates that occurrences of $PM_{2.5}$ concentrations comparable to the exposure concentrations in the controlled human exposure studies are exceedingly rare. For the reasons stated in the notice of final rulemaking, the Administrator continues to conclude that the annual standard is sufficient to control "normal ambient 24-hour exposures" and that the 24-hour standard provides the requisite degree of supplemental control for peak daily concentrations.

(4) **Comment:** Some commenters who recommend revising the level of the 24-hour primary $PM_{2.5}$ standard to 25 $\mu g/m^3$ emphasize the impacts of particulate matter on children, including from in utero exposures. These commenters express concern over $PM_{2.5}$ exposures associated with early development, including respiratory system impacts and neural development impacts citing a number of recent studies in support of their rationale for revising the level of the current standard.

**Response:** As an initial matter, the primary (health-based) NAAQS are established at a level that is requisite to protect public health, including the health of sensitive or at-risk groups, with an adequate margin of safety. In so doing, the EPA expressly considers the available information regarding health effects among at-risk populations, including that available for children, in decisions on the primary (health-based) NAAQS.

The 2019 ISA evaluated studies that examined several health outcomes associated with $PM_{2.5}$ exposures during periods of early development, including cancer (Chapter 8), growth (Chapter 9), infection (Chapter 5), eczema (Chapter 5), neurodevelopmental effects including autism (Chapter 8), cardiovascular effects (Chapter 6), and respiratory effects including asthma (Chapter 5) (U.S. EPA, 2019, section 9.1.3). The results from studies examining these outcomes were considered in the causality determinations for long-term (i.e., months to years) $PM_{2.5}$ exposure and respiratory effects, cardiovascular effects, nervous system effects, and birth outcomes. In reaching his conclusions regarding the adequacy of the primary $PM_{2.5}$ standards, the Administrator places the greatest weight on evidence of effects for which the 2019 ISA determined there to be a "causal relationship" or "likely to be causal relationship" with long- and short-term $PM_{2.5}$ exposures. As in the 2020 review, the Administrator recognizes that the strongest evidence, including with regard to quantitative characterizations of relationships between $PM_{2.5}$ exposure and effects, continues to be for mortality and cardiovascular effects. While the Administrator places the greatest weight on evidence associated with these effects, he recognizes that, in setting standards that are requisite to protect public health with an adequate margin of safety against these effects, including protecting at-risk populations (e.g., children) and achieving such a level of protection would also result in air quality improvements that would also reduce other health outcomes.

In addition, the EPA disagrees with the commenters' rationale for why the level of the primary 24-hour $PM_{2.5}$ standard should be lowered. Specifically, the commenters note that evidence indicating reproductive and developmental effects supports revising the 24-hour standard. The 24-hour standard, however, with its 98th percentile form, is designed to protect against peak exposures. However, studies that evaluate effects noted by the commenters s do not examine exposure durations that would inform conclusions regarding the adequacy of the primary 24-hour $PM_{2.5}$ standard as these studies focus on longer-term exposures ranging from multiple months to multiple years, which could be more applicable to evaluating the adequacy of the annual standard. .

Finally, with regard to the studies cited by the commenters, we note that we have provisionally reviewed these studies and found they do not materially change the conclusions in the 2019 ISA and ISA Supplement regarding the health outcomes discussed above. A number of these studies (Johnson et al., 2021, Liu et al., 2018, Brumberg et al., 2021, Lin et al., 2021, and Payne-Sturges et al., 2019) are systematic reviews and are considered out of scope of the ISA as detailed in the Preamble to the ISA (U.S. EPA, 2015). While (Jedrychowski et al. (2013) examined the impact of prenatal exposure to fine particulate matter ($PM_{2.5}$) on recurrent broncho-pulmonary infections in early childhood and would be considered to be within the scope of the 2019 ISA and the evaluation of the relationship between long-term $PM_{2.5}$ exposure and respiratory effects, this one single study on its own would not be sufficient to warrant the changing of a causality determination, as the collective body of evidence is considered in making conclusions regarding causality as detailed in the Preface to the 2019 ISA (U.S. EPA, 2019) and the Preamble to the ISA (U.S. EPA, 2015).

(5) **Comment:** Some commenters contend that the EPA's discussion regarding there being less evidence to inform decisions on the 24-hour standard than the annual standard is arbitrary and capricious, because having less information for decisions on one standard compared to the other does not prevent revisions to either standard. They contend that the decision regarding the 24-hour standard must be based on the protection afforded by both primary $PM_{2.5}$ standards against short- and long-term $PM_{2.5}$ exposures and not on the strength of the evidence for either standard. These commenters assert that, even if the evidence is less compelling for the 24-hour standard than the annual standard, it still provides support for revising the level of the primary 24-hour $PM_{2.5}$ standard.

**Response:** The EPA agrees that the Administrator is required to make a decision whether to revise or retain the current standards based on his judgment, after considering all of the available evidence, whether the standards together are requisite to protect public health with an adequate margin of safety. The Administrator's decision to revise the annual standard and retain the 24-hour standard takes into consideration the available evidence and information as well as uncertainties. As explained in section II.B.4 of the preamble, his decision is based on his evaluation of the available evidence and how the evidence informs his judgments as to the protection afforded by the annual standard, the 24-hour standard, and the combination of the two, rather than simply considering the quantity of evidence available for evaluating each standard.

(6) **Comment:** With regard to the risk assessment, commenters contend that the analyses are limited in scope and do not provide a full evaluation of a lower primary 24-hour $PM_{2.5}$

standard. The commenters assert that, because the risk assessment does not provide quantitative information on the risk associated with an alternative standard level of 25 μg/m$^3$, any assertion regarding the "controlling" standard based on the risk assessment does not apply to a 24-hour standard of 25 μg/m$^3$. They state that the design is not particularly helpful in determining whether the 24-hour standard is adequate, and that the EPA's reliance on the risk assessment for asserting that the annual standard is "controlling" for most of the U.S. is arbitrary and capricious. These commenters also note that "the majority of CASAC members are concerned that the current risk assessment may not adequately characterize mortality risks associated with short-term $PM_{2.5}$ exposures" (Sheppard, 2022, p. 11 of consensus responses). Some commenters, in noting that the minority of the CASAC agreed with the EPA that the annual standard is controlling in urban areas, stated that the EPA did not consider the areas where the annual standard is not controlling.

**Response:** We recognize that the risk assessment did not provide quantitative information on risk impacts associated with an alternative standard level of 25 μg/m$^3$. The EPA determined that quantitative limitations associated with air quality modeling would introduce significant additional uncertainties into the risk assessment if alternative standard levels below 30 μg/m$^3$ were analyzed. Our fundamental approach to estimating human health risks associated with $PM_{2.5}$ exposure in this reconsideration involved using C-R functions derived from epidemiologic studies. These functions establish a link between ambient $PM_{2.5}$ exposure and mortality risk. Inputs required for risk modeling using C-R functions include the C-R functions themselves, baseline health incidence data and information on population demographics, study areas, and modeled ambient $PM_{2.5}$ concentrations corresponding to air quality scenarios of interest. Air quality modeling is used to develop gridded $PM_{2.5}$ concentration fields and adjustments are made to simulate just meeting the current standards and alternative standards to approximate air quality scenarios (U.S. EPA, 2022a, section C.1). For this reconsideration, linear interpolation and extrapolation was employed to simulate air quality for alternative standard levels for the annual standard below those that were simulated using air quality modeling. However, interpolation and extrapolation were not performed for additional alternative 24-hour standard levels beyond the modeled alternative of 30 μg/m$^3$ due to the weak relationship between the 98th percentile of the 24-hour $PM_{2.5}$ concentrations and the concentrations comprising the middle portion of the $PM_{2.5}$ air quality distribution. The 98th percentile 24-hour concentrations are most relevant for simulating air quality that just meets the 24-hour standard while in contrast, the concentrations representing the middle portion of the $PM_{2.5}$ air quality distribution are most relevant for estimating risks based on information from epidemiologic studies (U.S. EPA, 2022a, section C.1.4). Thus, the EPA had greater confidence in interpolation and extrapolation of the mean concentrations for the annual standard and less confidence for the 98th percentile of the 24-hour standard, and concluded that the uncertainties associated with modeling alternative air quality scenarios for a 24-hour standard of 25 μg/m$^3$ would be sufficiently large such that the results would be significantly less informative.

To the extent the commenters are suggesting that a standard of 25 μg/m$^3$ would result in a greater number of areas where the 24-hour standard was the controlling standard, the EPA acknowledges that this is possible but the EPA disagrees that this would fundamentally undermine any aspect of the Administrator's conclusions on the standards. The Administrator has carefully considered the risks of short-term exposure to $PM_{2.5}$, as discussed at length in

the preamble (particularly in section II.B.4). The EPA continues to believe, as explained in the preamble, that reducing the annual standard is a more appropriate way to reduce the risks from both typical and peak daily concentrations and that the current level of the 24-hour standard provides the requisite degree of supplemental protection from peak short-term exposures.

(7) **Comment:** Commenters suggest that if the primary annual $PM_{2.5}$ standard is lowered, the primary 24-hour $PM_{2.5}$ standard should also be lowered to maintain the "typical mean ratio" between the two standards (i.e., if the annual standard is revised from 12.0 $\mu g/m^3$ to 8-10 $\mu g/m^3$, a linearly proportional reduction of the 24-hour standard would be 23-29 $\mu g/m^3$).

**Response:** We disagree with the commenters that the primary 24-hour $PM_{2.5}$ standard should be set proportionally with the primary annual $PM_{2.5}$ standard. We are not aware of data establishing a "typical mean ratio" between the annual mean and 98th percentile concentrations, nor are the Administrator's decisions on the levels of the primary $PM_{2.5}$ standards based on any standard ratio or proportional relationship between the annual mean and 98th percentile concentrations. Broadly speaking, the Administrator recognizes that the annual standard is most effective at limiting exposures to "typical" daily $PM_{2.5}$ concentrations that are commonly encountered throughout the year. Conversely, with its 98th percentile form, the 24-hour standard is most effective at limiting peak daily or 24-hour $PM_{2.5}$ concentrations. In reaching conclusions on the adequacy of these standards, the Administrator considers the public health protection afforded by the standards together against the full distribution of long- and short-term $PM_{2.5}$ exposures. The Administrator finds that a proportional change to the 24-hour standard is not needed to increase protection from peak $PM_{2.5}$ exposures because the available scientific evidence for peak $PM_{2.5}$-related health effects indicates that the current primary 24-hour $PM_{2.5}$ standard with its level of 35 $\mu g/m^3$ in conjunction with a revised annual standard with its level of 9.0 $\mu g/m^3$ provides requisite protection.

(8) **Comment:** Some commenters claim that because of how the primary annual $PM_{2.5}$ standard is calculated – as the 3-year average of annual means, which is the weighted arithmetic mean based on quarterly means – it cannot be the controlling standard, and by design reflects the long-term chronic average daily exposure. The averaging used in calculating the annual standard flattens the daily peak $PM_{2.5}$ concentrations across the three years and does not capture the daily high peak $PM_{2.5}$ concentrations.

**Response:** As an initial matter, the EPA disagrees with commenters that contend the annual standard cannot be the controlling standard. As detailed more in the 2022 PA (U.S. EPA, 2022a, section 3.4.1.5), for the majority of the study areas included in the risk assessment, the annual standard is the "controlling standard" because when air quality is adjusted to simulate just meeting the current or alternative annual standard levels, air quality in those areas also would meet the current or alternative levels of the 24-hour standard.

The EPA acknowledges that the arithmetic mean form of the annual standard does combine both typical and peak data to produce an average concentration. However, as detailed in section II.B.4 of the notice of final rulemaking, in evaluating what existing or revised standards may be requisite to protect public health, the Administrator's approach recognizes

that the current annual standard (based on arithmetic mean concentrations) and 24-hour standard (based on 98th percentile concentrations), together, are intended to provide public health protection against the full distribution of short- and long-term $PM_{2.5}$ exposures. This approach recognizes that changes in $PM_{2.5}$ air quality designed to meet either the annual or the 24-hour standard would likely result in changes to both long-term average and short-term peak $PM_{2.5}$ concentrations. Further, consistent with the approach adopted in 2012, the Administrator concludes that the most effective and efficient way to reduce total population risk associated with both long- and short-term $PM_{2.5}$ exposures is to set a generally controlling annual standard, and to provide supplemental protection against the occurrence of peak 24-hour $PM_{2.5}$ concentrations by means of a 24-hour standard set at the appropriate level. In reaching this conclusion, the Administrator explicitly recognizes that air quality changes associated with meeting a revised annual standard would result in lowering risks associated with both long- and short-term $PM_{2.5}$ exposures by lowering the overall distribution of air quality concentrations, leading to not only in lower short- and long-term $PM_{2.5}$ concentrations near the middle of the air quality distribution, but also in fewer and lower short-term peak $PM_{2.5}$ concentrations. Similarly, the Administrator recognizes that changes in air quality to meet a 24-hour standard, would result not only in fewer and lower peak 24-hour $PM_{2.5}$ concentrations, but also in lower annual average $PM_{2.5}$ concentrations. However, as noted in 2012, he also recognizes that an approach that relies on setting the level of the 24-hour standard such that the 24-hour standard is generally controlling would be less effective and result in less uniform protection across the U.S. than an approach that focuses on setting a generally controlling annual standard. Thus, he concludes that relying on a revised annual standard as the controlling standard will reduce aggregate risks associated with both long- and short-term exposures more consistently than a generally controlling 24-hour standard. He further concludes that retaining a 24-hour standard at the appropriate level will ensure an adequate margin of safety against short-term effects in areas with high peak-to-mean ratios.

Additionally, in light of the Administrator's emphasis on the annual standard as the controlling standard, with the 24-hour standard providing supplemental protection against peak concentrations, the Administrator considers the potential impact of a revised annual standard of 9.0 $\mu g/m^3$ on the occurrence of peak sub-daily $PM_{2.5}$ concentrations. Specifically, the Administrator takes note of the new air quality analyses[14] where he observes that in areas meeting an annual standard of 9.0 $\mu g/m^3$ and a 24-hour standard of 35 $\mu g/m^3$ concentrations greater than 120 $\mu g/m^3$ and 38 $\mu g/m^3$ occur 0.029% and 0.41%, respectively, of the particular subdaily time period analyzed. For the reasons stated in the preamble, the Administrator concludes that this level of control of peak concentrations will provide requisite protection of public health. Thus, he concludes that the annual standard will continue to effectively limit both typical and peak daily concentrations, and the existing 24-hour standard, with its level of 35 $\mu g/m^3$ and 98th percentile form, will provide supplemental protection as needed against peak concentrations.

[14] Jones et al. (2023). Comparison of Occurrence of Scientifically Relevant Air Quality Observations Between Design Value Groups. Memorandum to the Rulemaking Docket for the Review of the National Ambient Air Quality Standards for Particulate Matter (EPA-HQ-OAR-2015-0072). Available at: https://www.regulations.gov/docket/EPA-HQ-OAR-2015-0072.

(9) **Comment:** A number of commenters who recommend revising the level of the primary 24-hour $PM_{2.5}$ standard contend that a lower standard is especially important for providing public health protection against short-term peak $PM_{2.5}$ concentrations. These commenters often cite specific or local sources that they state contribute to short-term peak $PM_{2.5}$ concentrations, including wildfires, wintertime woodburning, and industrial emissions. The commenters also emphasize inversions, particularly in the wintertime, in areas with these types of sources, which can impact exposure to peak $PM_{2.5}$ concentrations. Some commenters submitted local or regional air quality analyses to support this rationale for revision of the level of the primary 24-hour $PM_{2.5}$ standard and in particular highlight examples of areas where short-term $PM_{2.5}$ concentrations are above the current primary 24-hour $PM_{2.5}$ standard.

(10) **Response:** While the annual standard is the controlling standard for much of the U.S., the EPA recognizes that there are a small number of areas including areas with temperature inversions, wood smoke, and areas that are near manufacturing sources where the 24-hour standard is generally the controlling standard. The EPA's approach has been to focus on the annual standard as the principal means of limiting both long and short-term $PM_{2.5}$ concentrations recognizing that the 24-hour standard with its 98th percentile form, would provide additional protection against short-term peak exposures, particularly for areas with high peak-to-mean rations. Compared to the annual standard, we recognize that the 24-hour standard is less likely to appropriately limit the more typical $PM_{2.5}$ exposures (i.e., corresponding to the middle portion of the air quality distribution) that are most strongly associated with the health effects observed in epidemiologic studies. Thus, as in previous reviews (78 FR 3161-3162, January 15, 2013; 85 FR 82715, December 18, 2020), we focus on the 24-hour standard as a means of providing supplemental protection against the short-term exposures to "peak" $PM_{2.5}$ concentrations, such as can occur in areas with strong contributions from local or seasonal sources. As noted above and for the reasons stated in the preamble, the Administrator has concluded that the annual standard with its level of 9.0 $\mu g/m^3$ will continue to effectively limit both typical and peak daily concentrations, and the existing 24-hour standard, with its level of 35 $\mu g/m^3$ and 98th percentile form, will provide supplemental protection as needed against peak concentrations, including in areas subject to the conditions identified by the commenters. The 24-hour standard is not set with the intention of targeting specific sources of $PM_{2.5}$, but rather to ensure that air quality is set at a level to provide requisite public health protection all areas of the U.S. Rather than using the level of the NAAQS to target sources, the regulatory framework supporting NAAQS implementation provides mechanisms for controlling emissions from specific sources. Furthermore, we note that there are a number of non-regulatory programs that can help to reduce emissions from sources that contribute to peak $PM_{2.5}$ concentrations. One such program is the EPA's Burn Wise Program, which is a voluntary partnership program that promotes upgrades to cleaner burning technologies and education on proper use of wood burning appliances.[15]

(11) **Comment:** Commenters suggest that the primary 24-hour $PM_{2.5}$ standard should be lowered to 25 $\mu g/m^3$ to improve health outcomes for people living in communities strained by $PM_{2.5}$

[15] More information regarding the EPA's Burn Wise program is available at: *https://www.epa.gov/burnwise*.

pollution, especially for sensitive individuals. Commenters express concern over the rates of $PM_{2.5}$-attributable respiratory and cardiovascular events for older adults, children, people of color, and people in low-income communities.

**Response:** Regarding the protection of at-risk populations, the EPA has considered the health effects evidence in the 2019 ISA and ISA Supplement, including numerous epidemiologic studies focusing on at-risk populations such as children, older adults, individuals with preexisting conditions like cardiovascular and respiratory disease, minority populations, and low SES populations. Furthermore, the EPA considered epidemiologic studies in the 2022 PA that have cohorts that include large numbers of individuals in the general population, and often also include those populations identified as at-risk (i.e., children, older adults, minority populations, and individuals with pre-existing cardiovascular and respiratory disease) (U.S. EPA, 2022a, Figures 3-4 to 3-7). These studies evaluated various health outcomes, including morbidity and mortality associations in age-specific populations like Medicare beneficiaries, as well as hospital admissions for cardiovascular effects in populations age 65 and older. The primary $PM_{2.5}$ NAAQS are established at a level that is requisite to protect public health, including the health of sensitive or at-risk groups, with an adequate margin of safety. The EPA expressly considers the available information regarding health effects among at-risk populations in decisions on the primary $PM_{2.5}$ NAAQS. For the reasons stated in section II.B.4 of the preamble, the Administrator concludes that the combination of an annual standard with a level of 9.0 $\mu g/m^3$ and a 24-hour standard of 35 $\mu g/m^3$ will provide the requisite protection for public health with an adequate margin of safety.

(12) **Comment:** Some commenters who recommend revising the level of the primary 24-hour $PM_{2.5}$ standard to 25 $\mu g/m^3$ explicitly point to reducing environmental justice issues related to $PM_{2.5}$ exposure and health risks among minority populations and low SES populations. The commenters cite a number of nationwide epidemiologic studies as support for their position that lowering the 24-hour standard would in particular benefit communities with minority populations and low SES populations who experience disproportionately high exposures to $PM_{2.5}$ and its associated morbidity and mortality risks. Some commenters cite a study by Mullen et al. (2020) that focused on the cognitive impacts of short-term spikes in $PM_{2.5}$ caused by winter stagnation in Salt Lake County, Utah, and contend that concentration of 23 $\mu g/m^3$ was the peak threshold (e.g., the 95th percentile concentrations) that caused children to struggle with test scores countywide. These commenters assert that this study shows disproportionate burdens in specific localities dealing with health effects associated with short-term $PM_{2.5}$ spikes, reaching as low as 23 $\mu g/m^3$.

Some commenters further contend that inequalities in exposure and health risk would not be addressed by revising the primary annual $PM_{2.5}$ standard alone, and that these disparities would be best addressed through a revision of the 24-hour standard to 25 $\mu g/m^3$, coupled with siting permanent regulatory monitors in areas with high pollution. As a part of their rationale, these comments cite to a study by Wang et al. (2022) that investigates various emission-reduction approaches and the ability of those approaches to reduce $PM_{2.5}$ exposures.

Other commenters provide independent analyses of population data from EJScreen to determine which potential combinations of annual and daily standards best offsets current exposure disparities. Their analysis of the projected populations in monitored counties that the EPA projects would be in attainment and nonattainment areas in 2032 at various annual and 24-hour standard levels shows that there would be significantly more people of color living in nonattainment areas if the 24-hour standard is revised to 25 µg/m$^3$. A similar trend occurred when commenters carried out analysis using current design values (2019-2021) instead of 2032 projected design values. Altogether, these commenters estimate that millions of people of color would benefit from lowering the primary 24-hour $PM_{2.5}$ standard.

Other commenters performed an analysis of daily air quality data from Chicago Microsoft stationary sensors. Their analysis found that three South Side Chicago stations exceeded 35 µg/m$^3$ on 50 days. These commenters express concern over exceedances in the census tract associated with one of the three stations that has a population percentage below the federal poverty level of over 40%. These commenters suggest that it is important to prioritize the most vulnerable communities as the baseline when determining the NAAQS levels and that by doing so other areas will benefit as well. Some commenters further request that if the 24-hour standard is not lowered to 25 µg/m$^3$ for all communities, the standard should at least be lowered to 25 µg/m$^3$ for environmental justice communities.

**Response:** The primary $PM_{2.5}$ NAAQS are set together at levels that are requisite to protect public health with an adequate margin of safety. This protection includes the health of sensitive or at-risk groups. To do this, the decisions regarding the NAAQS are grounded in a comprehensive and explicit evaluation of the existing scientific evidence and associated risk analyses. To be more precise, the EPA explicitly takes into account the available information concerning health effects among at-risk populations when making decisions regarding the primary standards. The 2019 ISA and ISA Supplement identified children, older adults, people with pre-existing diseases (cardiovascular disease and respiratory disease), minority populations, and low SES populations as at-risk populations. In cases where populations with disparities in exposure and risk fall within the category of at-risk populations, the determination of the NAAQS is based on providing protection for these and other at-risk populations and lifestages. Thus, the PM NAAQS are set at a level that protects at-risk populations, including minority populations and low SES populations identified by the commenters, and the EPA considers the suggestion to set distinct standards for environmental justice communities as neither necessary nor consistent with the requirements of the CAA for setting *national* ambient air quality standards.

As outlined in the proposal, the EPA explicitly took into account the available information concerning health effects among at-risk populations in the proposed determination that the current suite of primary $PM_{2.5}$ NAAQS is not requisite and should be revised. Thus, in reaching his final decision, the Administrator is establishing primary $PM_{2.5}$ standards which, in his judgment, will provide protection for these at-risk populations, including minority populations, with an adequate margin of safety. Providing the requisite protection for the health of at-risk populations also results in protecting the public health of other populations and reducing risk disparities.

While Mullen et al. (2020) examined short-term $PM_{2.5}$ exposure and nervous system effects in children it was published outside the literature cutoff date for the 2019 ISA (i.e., January 2018). It is important to recognize that one single study on its own would not be sufficient to warrant the changing of a causality determination, as the collective body of evidence is considered in making conclusions regarding causality as detailed in the Preface to the 2019 ISA (U.S. EPA, 2019) and the Preamble to the ISA (U.S. EPA, 2015). Additionally, as noted in the ISA Supplement, short-term $PM_{2.5}$ exposure and nervous system effects was not evaluated as the ISA Supplement focused on those health outcome categories for which the 2020 PA deemed there to be sufficient information to support decisions on potential alternative standards, i.e., health outcome categories for which a "causal relationship" was concluded in the 2019 ISA (U.S. EPA, 2022b, section 1.2.1). With respect to the process of forming causality determinations, the EPA considers the broader body of scientific evidence and not only one line of evidence (e.g., epidemiology). As such, in evaluating a body of evidence the EPA considers the pattern of results across a scientific discipline, such as epidemiology, to assess whether there is consistency, the coherence of results across scientific disciplines including toxicological studies and controlled human exposure studies, and whether there is evidence of biological plausibility for the effects observed.

With regard to the Wang et al. (2022) study, this study used a model to estimate long-term average $PM_{2.5}$ concentrations across the U.S. to evaluate the effectiveness of three approaches for reducing $PM_{2.5}$ concentrations on reducing overall average exposures for the U.S. population and reducing average exposures for minority groups compared to the overall population. As an initial matter, we note that this study is outside of the scope of the 2019 ISA and ISA Supplement because this type of modeling study is not assessed in the ISA when reaching conclusions regarding causality. Furthermore, we note that this study is designed to evaluate approaches for reducing $PM_{2.5}$ emissions. In evaluating the adequacy of the standards, the EPA does not evaluate the various approaches for reducing emissions and/or attaining a NAAQS, but rather considers whether the current or alternative standard levels are protective of public health. Therefore, this study would not be informative for decisions regarding the adequacy or the appropriate level of the primary $PM_{2.5}$ standards.

With regard to the analyses submitted by the commenters that used EJScreen statistics and Chicago Microsoft stationary sensors, we disagree with the commenters that this analysis would support lowering the primary 24-hour $PM_{2.5}$ NAAQS. These analyses simulate implementation of the PM NAAQS. The EPA sets the NAAQS to ensure the requisite protection of human health, including for sensitive sub-populations, but does not base decisions on the standards on projections about the size of populations that will reside in attainment or nonattainment areas, particularly in light of the prohibition on considering the costs or feasibility of attaining the standards. In addition, the EPA risk assessment results suggest that revising the level of the 24-hour standard to 30 $\mu g/m^3$ is estimated to lower risks associated with $PM_{2.5}$ exposure to a much lesser degree than revising the annual standard to 9.0 $\mu g/m^3$. Further, risk reduction predictions associated with a lower primary 24-hour $PM_{2.5}$ standard are predominately confined to areas located in the western U.S., with several of these areas also expected to undergo risk reductions upon meeting a revised annual standard of 9.0 $\mu g/m^3$. With further regard to the comments that report results from analyses that use air quality data from Chicago Microsoft stationary sensors, we note that the data used to determine compliance with the NAAQS are required to be based on FRMs/FEMs, and

sensors such as those used in the commenters' assessment are not FRMs/FEMs. However, if regulatory monitors did find nonattainment with the primary 24-hour $PM_{2.5}$ standard, that may provide a basis for designation of an area and for consideration of control strategies to attain the standard.

(13) **Comment:** Commenters suggest that the 24-hour primary $PM_{2.5}$ standard should be set within a range of 25-30 $\mu g/m^3$ to protect disproportionately impacted communities. These commenters highlight a study by Collins et al. (2022) to note that communities of color, particularly in metropolitan areas, are disproportionately exposed to short-term $PM_{2.5}$.

**Response:** In considering the available epidemiologic evidence, the 2019 ISA assessed studies concerning short-term $PM_{2.5}$ exposure and disparities for at-risk populations including potential disparities by race and ethnicity (U.S. EPA, 2019, p. 12-34). We note that the study by Collins et al. (2022), which was referenced by the commenters, was published after the literature cutoff date for the ISA Supplement. While this study was provisionally considered, it does not significantly alter the scientific conclusions of the 2019 ISA or ISA Supplement in this reconsideration. The 2019 ISA and ISA Supplement concluded that race, ethnicity, and socioeconomic status were all factors that may contribute to increased risk of $PM_{2.5}$-related health effects. In reaching his final decisions, the Administrator took this evidence into consideration in concluding that the combination of an annual standard of 9 $\mu g/m^3$ and a 24-hour standard of 35 $\mu g/m^3$ provide requisite protection for at-risk populations with an adequate margin of safety, for the reasons explained in section II.B.4 of the preamble.

## C. Other Comments Related to the Primary $PM_{2.5}$ Standards

(1) **Comment:** Several commenters recommend revising the PM NAAQS to align with the 2021 World Health Organization (WHO) air quality guidelines for PM to provide increased public health protection, particularly for at-risk populations. The WHO air quality guideline for annual $PM_{2.5}$ is 5 $\mu g/m^3$, for 24-hour $PM_{2.5}$ is 15 $\mu g/m^3$, for annual $PM_{10}$ is 15 $\mu g/m^3$, for 24-hour $PM_{10}$ is 45 $\mu g/m^3$. Commenters provide a number of reasons to support their recommendation, including that the WHO air quality guidelines for PM are more stringent than the PM NAAQS, the development of the WHO air quality guidelines for PM follows a rigorous evaluation of scientific review and the involvement of a number of experts, and comparisons with air quality and air quality standards in other countries. Furthermore, some commenters provide a summary of how the WHO air quality guidelines were set, including the evaluation of health effects evidence associated with PM exposures. Many of the commenters recommend revising the primary $PM_{2.5}$ and $PM_{10}$ standards to be the same as, or close to, the levels of the WHO air quality guidelines.

**Response:** We disagree with the commenters that the primary PM NAAQS should be set at or close to the WHO air quality guidelines for PM. The EPA sets both primary (health-based) and secondary (welfare-based) NAAQS that include more than a numerical pollutant level, which is what the WHO air quality guidelines for PM are. The EPA's PM NAAQS consist of a level, an averaging time, and a form. As such, they are distinct from the WHO guidelines, which as WHO notes, "are not legally binding standards" (WHO, 2021, p. xv) and also include interim targets that can be found in the complete WHO air quality guidelines document. Direct comparisons of the EPA's PM NAAQS with the WHO air quality

guidelines for PM are difficult and often impractical, given differences in the types, locations, and numbers of monitors, averaging times, units of measure, statistical adjustments, and numbers of allowed exceedances.

Aside from the practical obstacles, the EPA also finds there would be legal obstacles to simply adopting the WHO guidelines. Under the Clean Air Act, the EPA is directed to undertake a review of the air quality criteria and to base decisions on the NAAQS on the air quality criteria. Likewise, the CASAC is required to advise the Administrator on revisions to the criteria and standards as appropriate. Under section 108, the air quality criteria "shall accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on the public health and welfare which may be expected from the presence of such pollutant in the ambient air, in varying quantities." It would not be consistent with the EPA's obligations under the Clean Air Act to replace its current process of fully assessing the science and consulting with the CASAC with a decision to simply defer to the WHO guidelines. As noted above, direct comparisons between WHO guidelines and NAAQS are difficult, so it is possible that the results of the two approaches may be similar although framed differently, but the Administrator's obligation under the Clean Air Act is to identify the standards that in his judgment provide requisite protection for public health with an adequate margin of safety.

(2) **Comment:** Some commenters suggest that the EPA should follow a similar approach to the one undertaken in the recent regulation for Mercury and Air Toxics Standards (MATS). Commenters state that the findings from the MATS rule found that the resulting human health impacts were disproportionate across populations, and that some of the most exposed populations are minority and/or low-income individuals. They argue that the EPA's risk analysis considered not just the average exposure, but those of sensitive populations. In suggesting that the EPA use a similar approach in this reconsideration of the PM NAAQS, the commenters contend that this approach would properly accounts for specific sensitive populations disproportionately impacted by PM exposure and would protect public health within the necessary margin of safety.

**Response:** As discussed in section II.B.4 of the notice of final rulemaking, the EPA has carefully evaluated the potential impacts on at-risk populations as a part of this reconsideration, including minority populations and low SES populations as discussed in sections II.A.2, II.A.3, II.B.2, and II.B.4 of the preamble. Furthermore, the 2019 ISA, ISA Supplement, and 2022 PA contain the evaluation of the scientific evidence, quantitative risk analyses and policy considerations that pertain to populations identified as at-risk. Therefore, the EPA disagrees with the commenters assertion that Agency did not appropriately take into consideration health impacts of $PM_{2.5}$ exposure on sensitive populations that are disproportionately affected by exposure to $PM_{2.5}$. The EPA notes the 2022 PA did include an at-risk analysis as a part of the risk assessment that is based on a recent epidemiologic study that is available in this reconsideration that provides mortality risk coefficients for older adults (i.e., 65 years and older) based on $PM_{2.5}$ exposure and stratified by race and ethnicity. Although recognizing that the results of this analysis are even more uncertain than similar estimates from the overall risk assessment due to additional sources of uncertainty specific to the at-risk analysis (as discussed in section II.A.3.b of the notice of final rulemaking). In light of the limitations of the risk assessment, the Administrator places little weight on the

absolute results of the risk assessment, including the at-risk analysis, for purposes of selecting the level of the annual standard, although the EPA notes the stratified population results of the risk assessment suggest that meeting a revised standard would result in higher risk and exposure reductions for minority and low SES populations. As discussed in the preamble and this RTC document, after fully considering all of the evidence and the results of the risk assessment, the Administrator is establishing the revised suite of standards that, in his judgment, will protect the health of at-risk populations, including minority and low SES populations, with an adequate margin of safety.

(3) **Comment:** The EPA also received a number of comments related to the primary $PM_{2.5}$ standards that were not directly related to the adequacy of the current primary $PM_{2.5}$ standards. These comments included recommendations for future research and data collection efforts that could address data gaps and uncertainties to inform future reviews. Some of these areas include additional scientific research to assess $PM_{2.5}$-related health effects in rural areas, minority populations, and Tribes.

**Response:** The EPA agrees with many of the suggestions from the commenters and notes that the 2022 PA highlighted key uncertainties and data gaps associated with reviewing and establishing secondary PM NAAQS and also areas for future welfare-related research and data gathering (U.S. EPA, 2022a, section 3.7). We encourage research in these areas, although we note that research planning and priority setting are beyond the scope of this action.

(4) **Comment**: Some commenters suggested that the EPA should set both the annual and 24-hour standards with one significant figure, i.e. 8.0 $\mu g/m^3$ not 8 $\mu g/m^3$ and 25.0 $\mu g/m^3$ not 25 $\mu g/m^3$, to ensure that the NAAQS are health protective.

**Response:** The EPA seeks to have a scientifically robust use of significant figures, taking into consideration the level and form of the standard and the precision of the monitors. This has led us to use one additional figure past the decimal point for the primary annual $PM_{2.5}$ standard where we average several dozen to hundreds of data points in a year. For the primary 24-hour $PM_{2.5}$ standard, we use an integer because we are looking at just one value in a year (i.e., the 98th percentile of each year). The EPA finds that this approach is appropriate for these standards and will ensure the NAAQS provide the intended level of protection for public health with an adequate margin of safety.

## V. Responses to Significant Comments on the Primary $PM_{10}$ Standard

The EPA received few comments on the proposed decision to retain the primary $PM_{10}$ standard. Comments related to retaining or revising the primary $PM_{10}$ standard are addressed in section III.B.3 of the preamble to the final rule. In addition to comments on the standard, some commenters provided additional comments on the scientific evidence and information available in this reconsideration. These comments are addressed below.

(1) **Comment:** Some commenters who state their support for retaining the current standard also provide comments on the evidence for $PM_{10-2.5}$ exposures and health effects detailed in the 2019 ISA. These commenters contend that the scientific evidence in the 2019 ISA does not

support changing causality determinations from "inadequate" in the 2009 ISA to "suggestive of, but not sufficient to infer, a causal relationship" in the 2019 ISA for long-term $PM_{10-2.5}$ exposure and cardiovascular effects, cancer, and mortality, or concluding "suggestive of, but not sufficient to infer, a causal relationship" for the initial review of metabolic and nervous system effects. They claim that the EPA should have instead asserted that the available evidence remains insufficient to draw any conclusion on causality. To support their position, they point to a statement from one member of the CASAC's individual comments in their review of the 2019 draft PA that studies reporting positive associations between health effects and $PM_{10-2.5}$ should not be used to assess causality because these findings are not without uncertainties and do not provide evidence for making or strengthening a causal determination, and thus, are not scientifically valid.

**Response:** The EPA disagrees with the commenter's assertion that the EPA's approach to assessing the available scientific evidence in the 2019 ISA and the application of the causal framework for reaching conclusions regarding causality determinations was inappropriate. We note that, while the causality determinations were changed from "inadequate" in the 2009 ISA to "suggestive of, but not sufficient to infer, a causal relationship" in the 2019 ISA for long-term $PM_{10-2.5}$ exposures for a few of the health outcome categories (i.e., mortality, cardiovascular effects, cancer) and causality determinations were made for the first time for long-term $PM_{10-2.5}$ exposures and new health outcome categories in the 2019 ISA (i.e., nervous system and metabolic effects), the EPA agrees with the commenters that there are still extensive uncertainties in the evidence base. It is important to note that a causality determination of "inadequate to infer the presence or absence of a causal relationship" is concluded when:

> "Evidence is inadequate to determine that a causal relationship exists with relevant pollutant exposures. The available studies are of insufficient quantity, quality, consistency, or statistical power to permit a conclusion regarding the presence or absence of an effect" (U.S. EPA, 2015).

Therefore, changing to a causality determination of "suggestive of, but not sufficient to infer, a causal relationship" is possible when evidence "is limited, and chance, confounding, and other biases cannot be ruled out" (U.S. EPA, 2015).

Therefore, as described in the 2019 ISA (U.S. EPA, 2019), the conclusion of a "suggestive of, but not sufficient to infer, a causal relationship" reflects both the studies finding evidence of associations between $PM_{10-2.5}$ concentrations and these health effects as well as the continued uncertainties in the available evidence, which in the case for studies of $PM_{10-2.5}$ includes differences in methods used for estimating $PM_{10-2.5}$ concentrations and uncertainty as to how well correlated the $PM_{10-2.5}$ concentrations are both spatially and temporally between the various methods used. The CASAC in their review of the draft ISA, also recognized that "[t]here is typically more uncertainty for health effects estimates caused by exposure to $PM_{10-2.5}$…than for health effects associated with $PM_{2.5}$ (Cox, 2019a p. 6 of consensus responses). Therefore, as detailed in the 2019 ISA, the available evidence, with its inherent uncertainties and limitations, supports "suggestive of, but not sufficient to infer, a causal relationship" between $PM_{10-2.5}$ exposures and health effects (U.S. EPA, 2019). In their review of the 2019 draft PA, some members of the CASAC agreed with the conclusions of

the 2019 ISA that "new studies since the previous review justify the change in causality determination from 'inadequate' to 'suggestive' for long-term exposure to $PM_{10-2.5}$ and mortality and cardiovascular effects, and that the new data strengthen evidence for effects on cancer, and short-term effects on mortality, cardiovascular disease, and respiratory disease," while other members found the definitions of the causality determinations to be unclear and the change to "suggestive" not clearly justified (Cox, 2019a, p. 3 of letter).

The EPA further notes that the causality determinations for $PM_{10-2.5}$-related health effects did not support revising the primary $PM_{10}$ standard in the 2020 final decision or this reconsideration. The 2020 PA and 2022 PA concluded that the currently available evidence does not call into question the adequacy of the current primary $PM_{10}$ standard. In their reviews of the 2019 draft PA and 2021 draft PA, the CASAC agreed with the EPA's conclusion that the available evidence does not call into question the adequacy of the public health protection afforded by the current primary $PM_{10}$ standard and that the evidence supports consideration of retaining the standard (Cox, 2019a, p. 3 of letter; Sheppard, 2022, p. 4 of letter). At the time of the proposal, recognizing the limitations in the available evidence, the EPA recognized that there is considerable uncertainty with regard to the public health implications of a revised primary $PM_{10}$ standard (88 FR 5650, January 27, 2023). In considering the body of available scientific evidence, with its inherent uncertainties and limitations as reflected by the "suggestive of, but not sufficient to infer," causal determinations for $PM_{10-2.5}$ exposures and health effects, the Administrator proposed to conclude that there is not adequate evidence to support to consider revisions to the primary $PM_{10}$ standard in this reconsideration (88 FR 5650, January 27, 2023).

(2) **Comment**: A number of commenters who support retaining the current standard assert that the epidemiologic studies of $PM_{10-2.5}$ related health effects are not applicable to all areas of the U.S. due to differences in sources and composition of coarse PM that are influenced by geographical (i.e., urban versus rural) distribution. Commenters contend that studies in the 2019 ISA linking crustal material to negative health effects are flawed because they combine crustal material with other anthropogenic sources of PM. Specifically, they state that studies in the 2009 ISA and 2019 ISA combine the health effects of crustal material with the health effects of other components of PM, including soil, road dust, and traffic-related particulates. Further, commenters assert that some of the studies rely on dust storms rather than studies that examine ordinary ambient air conditions of $PM_{10-2.5}$.

**Response:** We appreciate the support for the EPA's decision to retain the current standard, although we disagree with the commenters that the studies evaluated in the 2019 ISA are flawed. We note that in evaluating relationships between individual PM components and health, specific criteria were instituted as noted in the Scope of the 2019 ISA (see Section P.3.1), which states: "studies that focus on a single component, group of components, or source, must also examine a composite measure of PM (e.g., mass of $PM_{2.5}$ and/or $PM_{10–2.5}$, or in the case of ultrafine particles [UFP] mass, particle number, etc.). This requirement helps in comparing effects or associations observed for individual components or alternative metrics to the current mass-based PM indicators" (Section P.3.1.). The EPA's evaluation of PM components as summarized in Section 1.5.4 of the 2019 ISA, with an emphasis on evidence from studies of $PM_{2.5}$. This is because, to date, a limited number of studies have

been identified that attempted to examine relationships between $PM_{10-2.5}$ components and health and how those relationships compare to $PM_{10-2.5}$ mass.

Furthermore, the epidemiologic studies considered in the 2019 ISA that demonstrate associations between $PM_{10-2.5}$ exposure and health effects do not provide support for the suggestion that PM from certain geographic origins (i.e., non-urban areas) is not associated with health effects or is associated with different health effects than other geographic areas (i.e., urban areas). Finally, we note that while there are fewer studies of non-urban coarse PM than urban coarse PM, several studies have reported positive and statistically significant associations between coarse particles of crustal, non-urban origin (i.e., studies of Saharan dust) and morbidity (U.S. EPA, 2019, sections 5.3.5, 6.3.5, and 6.3.7). These studies formed part of the basis for the causality determinations for $PM_{10-2.5}$ exposures in the 2019 ISA.

In further considering these comments, we recognize that similar uncertainties and limitations have persisted since the completion of the 2009 ISA. As noted in the 2012 review, epidemiologic studies have not demonstrated that coarse particles of non-urban origin do not cause health effects, and commenters have not provided additional evidence on this point. While there are fewer studies of non-urban coarse particles than of urban coarse particles, as evaluated and described in previous assessments, several studies have reported positive and statistically significant associations between coarse particles of crustal, non-urban origin and mortality or morbidity (Bell et al., 2008; Ostro et al., 2003; Chan et al., 2008; Middleton et al., 2008; Perez et al., 2008). These studies formed part of the basis for the 2009 ISA conclusion that "recent studies have suggested that PM (both $PM_{2.5}$ and $PM_{10-2.5}$) from crustal, soil or road dust sources or PM tracers linked to these sources are associated with cardiovascular effects" (U.S. EPA, 2009, p. 2-26). Moreover, coarse crustal particles may be contaminated with toxic trace elements and other components from previously deposited fine PM from ubiquitous sources such as mobile source engine exhaust, as well as by toxic metals from smelters or other industrial activities, animal waste, or pesticides (U.S. EPA, 2004a, p. 8-344). Limited evidence evaluated in the 2019 ISA further supports conclusions from the 2009 ISA. For all of these reasons, we disagree with the commenters that the studies of $PM_{10-2.5}$-related health effects were flawed.

(3) **Comment:** Some commenters, while recognizing challenges associated with reliably measuring $PM_{10-2.5}$, assert that using $PM_{10}$ as a substitute for $PM_{10-2.5}$ until more data are available on $PM_{10-2.5}$ leads to inconsistencies and is confusing to the public. Further, these commenters assert that the current level of the primary $PM_{10}$ standard is arbitrary, noting that the level was established more than 30 years ago before there were improved methods of analysis while also noting that the 2022 PA concluded that the available scientific evidence does not call into question the adequacy of the current standard based on recent U.S.-based epidemiologic studies. Additionally, the commenters contend that there are several large epidemiologic studies that specifically examine the health effects of $PM_{10}$ and that these studies offer consistent and statistically strong evidence for the health effects of $PM_{10}$, including mortality, likely because of the high fraction of $PM_{2.5}$ that comprises $PM_{10}$ (i.e., more than 50% in urban areas). These commenters contend that $PM_{10}$ is not a good stand-in for $PM_{10-2.5}$ because they believe that the majority of $PM_{10}$ is made up of the $PM_{2.5}$ fraction, and because of this, retaining the primary 24-hour $PM_{10}$ standard at a level of 150 $\mu g/m^3$, which is four times greater than the primary 24-hour $PM_{2.5}$ standard level of 35 $\mu g/m^3$,

contradicts the available health effects evidence for $PM_{10}$. These commenters, citing available epidemiologic studies for $PM_{10}$, recommend that the level of the primary $PM_{10}$ standard be set close to or less than twice the level of the primary $PM_{2.5}$ standard.

**Response:** As an initial matter, in considering the appropriate indicator, we note that the primary $PM_{10}$ standard is intended to provide public health protection against health effects associated with exposures to $PM_{10-2.5}$. In the 1997 review, the EPA promulgated revisions to the PM NAAQS whereby it was determined that although the standards should continue to focus on protecting against health effects associated with thoracic particles ($PM_{10}$), the fine and coarse fractions of $PM_{10}$ should be considered separately (62 FR 38666-38668, 38677-38679, July 18, 1997). In that review, new primary 24-hour and annual standards were promulgated, with $PM_{2.5}$ as the indicator for fine particles. The primary 24-hour and annual $PM_{10}$ standards were retained in order to provide public health protection against health effects associated with a coarse fraction of $PM_{10}$ (referred to as thoracic coarse particles or $PM_{10-2.5}$) (62 FR 38666-38668, 38677-38679, July 18, 1997). Since that time, in the PM NAAQS reviews completed in 2006, 2012, and 2020, the then Administrators concluded that the primary 24-hour $PM_{10}$ standard continues to provide public health protection against exposures to $PM_{10-2.5}$ (62 FR 38652, 38662, July 18, 1997; 71 FR 61141, 61148 -61149, October 17, 2006; 85 FR 82725, December 18, 2020). In reaching conclusions in this reconsideration, the Administrator considered the available scientific evidence for $PM_{10-2.5}$-related health effects, including uncertainties and limitations, and concluded that the available information does not call into question the adequacy of the primary $PM_{10}$ standard, nor does the available evidence provide support for an alternative indicator. Furthermore, the Administrator recognized the CASAC's advice in their review of the 2019 draft PA and the 2021 draft PA that the current indicator continued to be appropriate (Cox, 2019a; Sheppard, 2022). In light of this information, the Administrator proposed to conclude that the current primary $PM_{10}$ standard, with its $PM_{10}$ indicator, remains appropriate (85 FR 5558, January 27, 2023).

The commenters also suggest that there are several epidemiologic studies that provide support for $PM_{10}$-related health effects. We first note that the commenters did not provide the studies that they reference for $PM_{10}$-related health effects. Therefore, the EPA is unable to consider these studies in responding to the commenters. Next, we further note that the proposal recognized that the $PM_{10}$ size fraction includes both fine ($PM_{2.5}$) and coarse ($PM_{10-2.5}$) particles, even in locations with the highest concentrations of $PM_{10-2.5}$. Because of the variability in the $PM_{10-2.5}$ and $PM_{2.5}$ contributions to $PM_{10}$ in different areas, the extent to which $PM_{10}$ effect estimates in epidemiologic studies reflect associations with $PM_{10-2.5}$ versus $PM_{2.5}$ can be highly uncertain. Additionally, it is often unclear how $PM_{10}$ health studies should be interpreted when considering a standard meant to protect against exposures to $PM_{10-2.5}$. Studies examining the relationship between exposure to $PM_{10}$ and health effects, generally cannot distinguish between whether the health effects are associated with $PM_{10-2.5}$, $PM_{2.5}$, or the total $PM_{10}$ exposures.

Given the uncertainties associated with studies of $PM_{10}$ (versus $PM_{10-2.5}$ or $PM_{2.5}$) exposures and health effects and the availability of a number of $PM_{10-2.5}$ health studies in this reconsideration, the 2019 ISA considered $PM_{10-2.5}$ studies but not $PM_{10}$ studies when drawing weight-of-evidence conclusions regarding the coarse fraction (U.S. EPA, 2019, section

P.3.2.1). Given the uncertainty in attributing the health effects associated with $PM_{10}$ in such studies to either the coarse or fine fractions, the EPA believes that the best evidence for effects associated with exposures to $PM_{10-2.5}$ comes from studies evaluating $PM_{10-2.5}$ itself rather than studies of $PM_{10}$. This approach, which draws weight-of-evidence conclusions for $PM_{2.5}$ and $PM_{10-2.5}$ but not for $PM_{10}$, was adopted in the 2009 ISA (U.S. EPA, 2009) and supported by the CASAC during their review of that document (Samet, 2009).The EPA continues to conclude that it is appropriate to focus on $PM_{10-2.5}$ health studies when considering the degree of public health protection provided by the current primary $PM_{10}$ standard, a standard intended exclusively to provide protection against exposures to $PM_{10-2.5}$.

Finally, we disagree with the commenters that the primary 24-hour $PM_{10}$ standard should be set proportionally to the primary 24-hour $PM_{2.5}$ standard. As described in section III.B.4 of the final rule and noted above, the primary $PM_{10}$ standard is intended to protect against health effects associated with exposure to $PM_{10-2.5}$, whereas the primary $PM_{2.5}$ standard is intended to provide protection against $PM_{2.5}$ exposures. In reaching conclusions on the adequacy of these standards, the Administrator considers the public health protection afforded by the standards against the fraction of PM for which the standard is intended to provide protection from. Therefore, the Administrator's decision to retain the current primary $PM_{10}$ standard – including its level of 150 $\mu g/m^3$ – is based on his consideration of the available scientific evidence for $PM_{10-2.5}$-related health effects and is not based on his conclusions regarding the primary $PM_{2.5}$ standard. The Administrator finds that proportionality is not needed to increase protection from $PM_{10-2.5}$exposures because the primary $PM_{10}$ standards continue to provide requisite protection against $PM_{10-2.5}$exposures.

(4) **Comment:** Some commenters who support revising the primary $PM_{10}$ standard state that the EPA needs to properly consider the most recent scientific evidence in reaching decisions regarding the adequacy of the current standard. In so doing, these commenters note that in determining the scope of the 2022 ISA Supplement to support the reconsideration, the EPA did not include an evaluation of scientific evidence of $PM_{10-2.5}$-related health effects published since the literature cutoff date of the 2019 ISA because the evidence at that time did not support a causal relationship. These commenters also cite the CASAC's advice in their review of the 2019 draft PA that there is a "clear progression" in the strength of the evidence, including for mortality, cardiovascular effects, and cancer. These commenters further cite new studies that they assert have demonstrated links between $PM_{10-2.5}$ and respiratory effects, nervous system effects, and reproductive and developmental effects.

**Response:** The EPA disagrees with commenters that the most recent scientific evidence was not properly considered in reaching conclusions regarding the adequacy of the current primary $PM_{10}$ standard. Furthermore, the EPA did consider scientific evidence of $PM_{10-2.5}$-related health effects published since the literature cutoff date of the 2019 ISA in determining the scope of the ISA Supplement. However, in determining the scope of the ISA Supplement, the EPA focused on health effects for which the evidence supported a "causal relationship" because those were the health effects that were most useful in informing conclusions in the

2020 PA (U.S. EPA, 2020b, section 1.2.1).[16] In reaching this decision on scope, the EPA concluded that it was not appropriate or necessary to include health effects evidence that were unlikely to provide new information that would materially change the conclusions of the 2019 ISA or that would not be useful for the Administrator's decision making. In the case of studies of $PM_{10-2.5}$ health effects, very little new information has become available since the literature cutoff date of the 2019 ISA. The 2019 ISA concluded that "uncertainties in the evidence regarding biological plausibility for health effects related to $PM_{10-2.5}$ exposure and in the methods used to assign $PM_{10-2.5}$ exposure in epidemiologic studies contributed to causality determinations of "suggestive of, but not sufficient to infer," a causal relationship or inadequate to infer the presence or absence of a causal relationship" for health effect categories for both short- and long-term exposure. Because of the extent of these uncertainties, the EPA judged that the body of science had not expanded enough since the cutoff date of the 2019 ISA to alter the conclusions regarding the causal relationships and that much more research is necessary to reach different conclusions. Therefore, the 2022 ISA Supplement did not include studies related to $PM_{10-2.5}$ exposures published since the literature cutoff date of the 2019 ISA.

Further, we note that in the CASAC's review of the 2019 draft PA, they did recognize that more scientific evidence has become available since the 2009 ISA that has supported the upgrading of some causality determinations in the 2019 ISA (Sheppard, 2022, p. 18 of consensus responses). While we agree with the commenters and the CASAC that the body of evidence related to $PM_{10-2.5}$ exposures and health effects has expanded since the 2009 ISA, there are still inherent limitations and uncertainties in the evidence base, as described above, that contributed to causality determinations of "inadequate to infer the presence or absence of a causal relationship" and "suggestive of, but not sufficient to infer a causal relationship" in the 2019 ISA. EPA has taken these causality determinations into account in determining that the current standards are requisite (i.e., neither more stringent or less stringent than necessary) to protect public health with an adequate of safety. However, the EPA does not consider the "progression" of the evidence in and of itself to warrant a more stringent standard at this time. Finally, the EPA has provisionally considered the studies submitted by the commenters in support of revising the current standard. As an initial matter, we note that the studies conducted by Kollath et al. (2022) and Herrera-Molina et al. (2021) are not considered to be within the scope of the ISA, as they do not directly inform our understanding of $PM_{10-2.5}$-related health effects. These two studies examine the health effects associated with $PM_{10}$, rather than $PM_{10-2.5}$. The study of low birth weight conducted by Enders et al. (2018) was also provisionally considered, and the EPA concluded that this study does not materially change the broad scientific conclusions of the ISA regarding birth

[16] As described in section 1.2.1 of the ISA Supplement: "In considering the public health protection provided by the current primary $PM_{2.5}$ standards, and the protection that could be provided by alternatives, [the U.S. EPA, within the 2020 PM PA] emphasized health outcomes for which the ISA determined that the evidence supports either a '*causal*' or a '*likely to be causal*' relationship with $PM_{2.5}$ exposures" (U.S. EPA, 2020b). Although the 2020 PA initially focused on this broader set of evidence, the basis of the discussion on potential alternative standards primarily focused on health effect categories where the 2019 PM ISA concluded a '*causal relationship*' (i.e., short- and long-term $PM_{2.5}$ exposure and cardiovascular effects and mortality) as reflected in Figures 3-7 and 3-8 of the 2020 PA (U.S. EPA, 2020b)."

outcomes. The 2019 ISA concluded that the evidence was "inadequate" to support a causal relationship between $PM_{10-2.5}$ exposure and birth outcomes, and the Enders et al. (2018) study is insufficient to alter that conclusion or warrant reopening the criteria or revising the standard.

## VI. Response to Significant Comments on the Secondary PM Standards

The EPA received relatively few comments on the proposed decision to retain the secondary PM standards. Comments related to retaining or revising the secondary PM standards are addressed in section V.B.3 of the preamble to the final rule. In addition to comments on the standards, some commenters provided additional comments on the scientific evidence and information available in this reconsideration. These comments are addressed below.

(1) **Comment:** One commenter suggested that in reviewing the secondary PM standards that the EPA should take into consideration the impact of PM on ecosystem functions.

**Response:** The EPA disagrees that the effects of PM on ecosystem functions are within the scope of this reconsideration. The EPA is separately reviewing the ecological effects associated with PM in conjunction with reviews of other pollutants that, along with PM, contribute jointly to atmospheric deposition. As explained in both the 2016 Integrated Review Plan (IRP) for PM (U.S. EPA, 2016, p. 1-17) and the IRP for review of the secondary NAAQS for oxides of nitrogen and oxides of sulfur (U.S. EPA, 2017, p. 1-1), and discussed in the proposal (88 FR 6543, January 27, 2023), oxides of nitrogen, oxides of sulfur, and PM are being reviewed together because they are interrelated through complex chemical and atmospheric processes and because they all contribute to nitrogen (N) and sulfur (S) deposition, which in turn contributes to well-documented ecological effects including reduction in growth and survival of various species, as well as altering species richness, species composition and biodiversity. Addressing the pollutants together enables the EPA to take a comprehensive approach to considering the nature and interactions of the pollutants, which is important for ensuring that all scientific information relevant to ecological effects is thoroughly evaluated.

This combined review of the ecological criteria for oxides of nitrogen, oxides of sulfur, and particulate matter is ongoing. The EPA initiated the review of the secondary standards for oxides of nitrogen, oxides of sulfur, and PM in August 2013 with a call for information in the Federal Register (78 FR 53452, August 29, 2013). The current review of the secondary standards for oxides of nitrogen, oxides of sulfur and PM considers secondary standards for these three pollutants together with regard to protection against adverse ecological effects on public welfare. This review differs from the review completed in 2012 in that the current review includes consideration of the secondary PM standards, in addition to the secondary standards for oxides of nitrogen and sulfur. Given the contribution of nitrogen compounds to PM, including but not limited to those related to oxides of nitrogen, the current review provides for an expanded and more integrated consideration of nitrogen deposition and the current related air quality information. The EPA finalized the IRP for this review in January 2017 and finalized the ISA in October 2020. The EPA also developed a Risk and Exposure Assessment Planning Document in August 2018. The draft PA, including the quantitative analyses for the review, was released in June 2023 (U.S. EPA, 2023; 88 FR 34852, May 31,

2023). This review is on a court ordered deadline, with a proposed decision no later than February 9, 2024, and a final decision no later than December 10, 2024 (87 FR 39821, July 5, 2022). More information about and documents associated with the review of the secondary standards for oxides of nitrogen, oxides of sulfur, and PM are available at: *https://www.epa.gov/naaqs/nitrogen-dioxide-no2-and-sulfur-dioxide-so2-secondary-air-quality-standards*.

(2) **Comment:** Some commenters agree with the majority of the CASAC's recommendation in their review of the 2021 draft PA that the EPA develop a Federal Reference Method (FRM) to directly measure light extinction. These commenters assert that continuous $PM_{2.5}$ measurements can support a sub-daily secondary $PM_{2.5}$ standard to address visibility impairment until the methods for measuring light extinction directly are established.

**Response:** The EPA disagrees that a FRM to directly measure light extinction is appropriate at this time. The 2019 ISA and ISA Supplement includes consideration of some recent research that confirms and adds to the body of knowledge regarding direct measurement of light extinction, no major new developments have been made with these measurement methods since prior reviews (U.S. EPA, 2019, section 13.2.2.2; U.S. EPA, 2022b, section 4.2). The 2019 ISA and ISA Supplement note that measurements of light extinction can be made with high time resolution, allowing for characterization of subdaily temporal patterns of visibility impairment. A number of measurement methods have been used for visibility impairment (e.g., transmissometers, integrating nephelometers, teleradiometers, telephotometers, and photography and photographic modeling), although each of these methods has its own strengths and limitations (U.S. EPA, 2019, Table 13-1). The EPA recognizes the advice of the majority of the CASAC, who suggested that "[a] more extensive technical evaluation of the alternatives for visibility indicators and practical measurement methods (including the necessity for a visibility FRM) is need for future reviews" and that they "recommend[ed] that an FRM for a directly measured $PM_{2.5}$ light extinction indicator be developed" to inform the consideration of the protection afforded by the secondary PM standards against visibility impairment (Sheppard, 2022, p. 22 of consensus responses). We also recognize that the minority of the CASAC "believe that a light extinction FRM is not necessary to set a secondary standard protective of visibility" (Sheppard, 2022, p. 22 of consensus responses). As such, the EPA included the development and implementation of direct monitoring of PM2.5 light extinction as a key area for future research and data gathering in the 2022 PA (U.S. EPA, 2022a, section 5.6). More research and information related to direct measurement of light extinction will help to characterize visibility and the relationships between PM component concentrations and light extinction and to evaluate and refine light extinction calculation algorithms for use in areas near anthropogenic sources, and would provide measurements for future visibility effects assessments.

With regard to the commenters' assertion that a sub-daily secondary $PM_{2.5}$ standard based on continuous $PM_{2.5}$ measurements is supported until such a time that these methods are more fully developed, and a monitoring network is established, we disagree that the currently available information warrants an alternative averaging time. The EPA has responded to comments related to alternative averaging times for the visibility index and the secondary 24-hour $PM_{2.5}$ standard in section V.B.3 of the notice of final rulemaking.

(3) **Comment:** Some commenters suggest that the appropriateness of the target level of protection for the visibility index (i.e., 25 dv versus 30 dv) is dependent on the frequency with which people could experience visible landscape features at further distances (i.e., greater than 40 km) versus closer distances (i.e., 10 km). These commenters argue that individuals find lower levels of visibility impairment to be unacceptable when the landscape features are at further distances. In so doing, these commenters cite to several studies (Schichtel et al., 2016; Stefani et al., 2012; Malm et al., 2019) that examine sight paths or the influence of including clouds in the scenes.

**Response:** We agree with the commenters that numerous factors influence public preferences related to visibility impairment, including the frequency of viewing landscape features at various distances and the inclusion of clouds in the images being considered. With regard to the citations provided by the commenters, we note that two of these citations (Schichtel et al., 2016; Stefani et al., 2012) are not peer-reviewed publications and, as such, do not meet the criteria for inclusion in the ISA. The Malm et al. (2019) study was included in the 2022 ISA Supplement. Malm et al. (2019) included an evaluation of the same public preference studies that have informed the EPA's conclusions regarding visibility preferences in the 2012 and 2020 reviews, as well as in this reconsideration (Ely et al., 1991; Pryor, 1996; BBC Research & Consulting, 2003; Abt Associates, 2001; Smith and Howell, 2009). As discussed in the proposal, differences between these studies include the variability in the sight paths and changes in meteorologic conditions (i.e., clouds) and these differences can influence preferences regarding visibility impairment (88 FR 5652, January 27, 2023). However, very little new information regarding public preferences has become available beyond those public preference studies, and as such, significant uncertainties remain regarding the variability in public preferences across the studies.

(4) **Comment:** Commenters who support revising the visibility index and the secondary 24-hour $PM_{2.5}$ standard argue that the EPA illegally and arbitrarily relies on uncertainties in the available information and on concerns over overprotectiveness of a more protective standard in reaching its proposed conclusions. These commenters contend that the EPA's concerns about a secondary standard being "overprotective in some areas" ignores the CAA requirement that a secondary standard must "specify a level of air quality the attainment and maintenance of which…is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air." These commenters state that the word "any" is broad sweeping, and that if the EPA identifies an effect that is known or anticipated to be adverse in portions of the country, that effect remains known or anticipated to be adverse even if it may not constitute a known or anticipated adverse effect in other parts of the country, and therefore, the EPA must set the standard to protect against it. These commenters further assert that the EPA's proposal does not mention or rationally explain how its concern about overprotectiveness is consistent with the CAA or the EPA's approach to the primary standards, and that the EPA irrationally fails to consider an under-protective standard. Further, these commenters assert that the EPA's reliance on uncertainties is arbitrary and inconsistent with the CAA. These commenters state that the CAA supports protection through its "preference for preventative…regulation" *Ctr for Biological Diversity v. EPA*, 749 F.3d 1079, 1090 (D.C. Cir. 2014) and that EPA should act not only when it might have "perfect information" or be able to predict adverse effect certainly, but to protect against "anticipated adverse effects," "suggesting that EPA must act

as soon as it has enough information (even if crude) to 'anticipate[]' such effects." *Am. Trucking Ass'ns*, 283 F.3d at 380 (alteration in original); *see Ctr. for Biological Diversity*, 79 F.3d at 1090 & n.18. These commenters further contend that EPA cannot "merely recite the terms 'substantial uncertainty' as a justification for its actions." *State Farm*, 463 U.S. at 52; *Murray Energy*, 936 F.3d at 619. The commenters note that, in past reviews, the CASAC and public commenters have provided suggestions for reducing uncertainty. Moreover, the commenters contend that the EPA has provided no reason for why it should resolve the uncertainties and limitations in favor of less protection rather than more.

**Response:** In reaching his final decision regarding the secondary PM standards, the Administrator recognizes that the assessment of when visibility impairment is adverse to public welfare requires a public welfare policy judgment informed by available scientific and quantitative information. In exercising his judgment to reach that decision, the Administrator finds it important to take into consideration the uncertainties in the evidence. With respect to visibility impairment, those uncertainties include significant uncertainties and variability in the scientific evidence and quantitative analyses. With regard to the scientific evidence, the Administrator specifically takes note of the variations in the available public preference studies, not only in terms of the methods and/or images used in conducted those studies, but also in the preferences of visibility impairment themselves. Some studies, such as the Phoenix, AZ, study, presented less noisy public preference results than other studies, but considering how to judge what is considered adverse to public welfare based on all of the public preference studies together is still bound by uncertainties that have not been addressed with additional research in recent years. Moreover, the Administrator recognizes that, while the relationship between PM and light extinction is well established, there is significant variability associated with estimating light extinction in different geographic areas of the U.S. and based on the version of the IMPROVE equation that is used. As detailed in section V.B.3 of the notice of final rulemaking, factors such as PM composition, size fraction, and age of the particles in ambient air, as well as relative humidity, can vary across geographical areas, and differences in these factors can influence the estimates of light extinction in areas differently. Moreover, the Administrator recognizes that these factors, along with the age of the PM in ambient air, can also complicate estimating light extinction because there is not necessarily a clear distinction regarding which IMPROVE equation is most appropriate in certain areas of the U.S. compared to others.

The Administrator finds it appropriate to take these uncertainties into consideration in reaching his decisions, but he also agrees that it is often necessary to set NAAQS on the frontiers of scientific knowledge and without perfect information. The Administrator has provided his rationale for his decision based on the record for this reconsideration and disagrees that his consideration of uncertainties in the evidence as part of his consideration of that evidence is arbitrary or capricious or that the revised secondary standards provide insufficient protection against known or anticipated adverse effects on public welfare.

(5) **Comment:** The EPA also received a number of comments related to the secondary PM standards that were not directly related to the adequacy of the current secondary PM standards. These comments included recommendations for future research and data collection efforts that could address data gaps and uncertainties to inform future reviews.

**Response:** The EPA agrees with many of the suggestions from the commenters and notes that the 2022 PA highlighted key uncertainties and data gaps associated with reviewing and establishing secondary PM NAAQS and also areas for future welfare-related research and data gathering (U.S. EPA, 2022a, section 5.6). We encourage research in these areas, although we note that research planning and priority setting are beyond the scope of this action.

(6) **Comment**: One commenter asserted that the EPA must consult under Section 7(a)(2) of the Endangered Species Act ("ESA") with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service when reviewing and revising the PM NAAQS.

The commenter claims that without consultation, the EPA cannot ensure that any final standard is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of critical habitat and further states that Section 7 "consultation" is required for "any action [that] may affect listed species or critical habitat." The commenter asserts that agency "action" is broadly defined in the ESA's implementing regulations at 50 CFR 402.02 to include:

> "all activities …of any kind …carried out, in whole or in part, by Federal agencies in the United State[sic] …. Examples include, but are not limited to: … (b) the promulgation of regulations; … or (d) actions directly or indirectly causing modifications to the land, water, or air."

The commenter also notes that ESA regulations at 50 CFR 402.03 provide that section 7 applies to all actions in which there is discretionary Federal involvement or control and asserts that the EPA has discretion to consider impacts to listed species in its review of both the primary and secondary NAAQS. With respect to the secondary NAAQS, the commenter argues that the protection of listed species and critical habitat is required in reviewing the secondary NAAQS designed to protect the "public welfare" which is defined to include effects on soil, water, crops, vegetation, animals, wildlife, weather, visibility, and climate. The commenter claims that that the protection of listed species and critical habitat is required in reviewing the primary NAAQS designed to protect the public health because the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked, and many people suffer significant long-term stress from species going extinct and their critical habitat being adversely modified. These commenters also contend that the EPA failed to discuss listed threatened or endangered species and habitats that would be affected by the PM NAAQS and its relationship to climate change.

The commenter also notes that listed species and their critical habitat may be useful to human health as a source of medicine, and that, following ESA consultation, the EPA can exercise its discretion in reviewing and revising the primary PM NAAQS by considering what standards would save species that could lead to drug developments that would improve human health. They further contend that this argument allows for the primary PM NAAQS to consider impacts to listed species and their critical habitat. The commenter further notes that the 2019 ISA failed to consider the transportation of antibiotics and antibiotic resistant bacteria through the environment via PM, and cite to several studies that provide evidence of effects to a number of bee species.

Moreover, the commenter asserts that in past reviews, the EPA has justified its failure to consult by claiming that a final decision not to revise a NAAQS would mean that it is not an agency action under ESA section 7. They claim that this justification does not apply in this reconsideration, given that the EPA is proposing to revise the primary annual $PM_{2.5}$ NAAQS. Furthermore, the commenter notes that this is a proposed rulemaking, and the EPA has not made a final decision regarding revisions to other PM NAAQS, and any predetermined final decisions prior to reviewing public comments would be illegal. Finally, the commenters argue that the EPA's justification for not engaging in consultation when retaining or not changing a standard "would lead to absurd results," in that revising a standard to a lower level would result in more protection for listed species and critical habitat would require consultation, whereas an unchanged standard would offer less protection but would not require consultation.

The commenter notes animal toxicological studies in the 2019 PM ISA and the 2022 PM ISA Supplement regarding the concept that PM affects lung growth in mice and that the EPA should extrapolate that study to other species in the same family or order, including listed rodent species. Similarly, the commenter further argues that animal toxicological studies in the 2019 PM ISA and the 2022 PM ISA Supplement also provide support for nervous system effects in rodents.

**Response:** Even assuming that the ESA consultation requirement could apply to a decision to revise the NAAQS, the EPA does not agree that leaving the secondary NAAQS unaltered triggers the requirement to consult under the ESA. Leaving the secondary NAAQS unchanged does not authorize or carry out any "action" under the statutory terms of the ESA.[17] Both the Code of Federal Regulations and the status quo regarding secondary NAAQS are entirely undisturbed. Moreover, leaving the secondary NAAQS unaltered will not require the EPA to make new air quality designations, nor will it require states or authorized tribes to undertake new planning or control efforts or to change air quality for the secondary NAAQS. Similarly, even if the EPA's review decision on the secondary PM NAAQS were found to be an "action" for ESA purposes, the EPA's decision to leave the secondary PM NAAQS unaltered causes no change to the status quo for air quality and regulatory requirements, and thus has no effect on species or their habitat. The EPA disagrees with the commenter that because this decision is contained within a notice that is described as a proposed rule that the decision thereby becomes an action subject to ESA section 7(a)(2) consultation. Likewise, the EPA disagrees that it is absurd that ESA consultation requirements could apply to the process of revising a NAAQS but not to unchanged NAAQS—that simply reflects both the requirements of the ESA and the basic distinction between action and inaction.

Further, even if the ESA consultation requirement could apply, as a general matter, to the EPA's review of a secondary NAAQS, the ESA would not apply to this reconsideration as regards ecological welfare effects because the EPA's review of the secondary PM NAAQS has been bifurcated, and ecological effects of PM deposition, including effects on species and habitats, are not a part of this review, and that EPA is taking no action in this reconsideration

[17] Section 7(a)(2) of the ESA only applies to "action authorized, funded, or carried out" by a federal agency.

regarding such effects. Rather, this review addresses non-ecological welfare effects, including climate. The ecological effects of PM deposition are beyond the scope of this review. As explained in both the PM IRP (U.S. EPA, 2016) and the $NO_X/SO_X$/PM IRP (U.S. EPA, 2017) and discussed in the preamble to the proposed rule, in recognition of the linkages between oxides of nitrogen, oxides of sulfur, and PM with respect to atmospheric chemistry and deposition, and with respect to ecological effects, the reviews of the ecological effects evidence and the secondary standards for these pollutants are being conducted together. Addressing the pollutants together enables the EPA to take a comprehensive look at the nature and interactions of the pollutants, which is important for ensuring that all scientific information relevant to ecological effects is thoroughly evaluated. Conducting the PM NAAQS review in two separate phases is eminently reasonable and supported by considerations of atmospheric science.

With respect to climate effects, the EPA agrees that potential effects of PM on climate are within the scope of this reconsideration. However, after a comprehensive review of the science, consultation with the CASAC, and consideration of public comment, the EPA concludes that the effects of PM on climate are diverse and uncertain. Depending on the circumstances, the radiative forcing effects of PM in the atmosphere can vary, such that positive forcing could result in warming of the Earth's surface, whereas a negative forcing could result in cooling (U.S. EPA, 2019, section 13.3.2.2). Moreover, there is not an adequate scientific basis to link attainment of any particular PM concentration in ambient air in the U.S. to specific climate effects. As a result, EPA concludes that it is not possible to set a secondary PM NAAQS to address climate effects at this time because there is insufficient scientific information to make a reasoned judgment identifying a standard that is requisite to protect against adverse effects of climate. As noted above and in the preamble, this conclusion was supported by the CASAC and is not contradicted by anything in the public comments.

In light of these limitations in currently available scientific information, the EPA is unable to identify for consideration any secondary PM standard to address climate effects that would be consistent with the requirements of the CAA., In these circumstances, the CAA does not provide the EPA authority to select a secondary PM standard to address climate effects. The EPA was not faced with a question of how to exercise its discretion when choosing from among a range of possible standards. Rather, any standard the Administrator selected to address PM-related climate effects would have been in conflict with the requirements of the Clean Air Act. In these circumstances, any consultation with the Services would have been similarly futile. The EPA also notes that the same scientific limitations make it impossible to assess with reasonable certainty any potential climate-related effects on listed species or critical habitat of a revised secondary PM standard, even if the EPA were able to select such a standard (which it cannot) under the CAA. Accordingly, the EPA had no obligation to consult under the ESA and properly declined to revise the secondary PM NAAQS to address climate effects.

Finally, the EPA does not believe it is necessary or appropriate to consider PM impacts on species and habitats as part of this reconsideration of the primary NAAQS. To the extent the commenter is suggesting the primary standard should be set to protect species and habitats, the EPA believes that would be inconsistent with the text and structure of the Clean Air Act.

Section 109 of the CAA requires the EPA to establish primary standards to protect public health (see section 109(b)(1)) and secondary standards to protect public welfare (see section 109(b)(2)). Under Section 109(b)(1) and *Whitman v. Am. Trucking Associations*, 531 U.S. 457 (2001), the EPA sets primary standards that are requisite to protect public health, allowing an adequate margin of safety. The EPA does not have discretion to set a different primary standard than the one the Administrator judges is required under Section 109(b)(1)) to protect public health in order to protect species and habitats. Rather, even assuming the ESA consultation requirement could apply to a decision to revise the NAAQS, these impacts on species and habitats should be evaluated in reviewing the secondary NAAQS, insofar as such evaluation is needed. As the commenter notes, the definition of effects on welfare in CAA section 302 clearly encompasses effects on animals and vegetation. Thus, any evaluation of these PM effects on species and habitats would be done in the context of setting and reviewing the secondary standard.

Similarly, to the extent the commenter is arguing that effects on species also have effects on people, e.g., because the commenter knows of people who place great value on the continued existence of species, the EPA finds those effects would fall within the scope of the review of the secondary standard. In considering the public welfare protection provided by the secondary NAAQS, the Administrator considers the potential for welfare effects to occur and the associated public welfare implications of those effects. In assessing public welfare implications, the Administrator considers the value placed by the public on the welfare effects that are being evaluated. The commenters' assertion that there are people who place great value on the continued existence of a particular species would, therefore, be most relevant in assessing public interest in such an effect and fall within the scope of the review of the secondary standard. Furthermore, the EPA would be unable to consider how effects on species can affect people without assessing the effects on species, which is done as part of the secondary review. Similarly, the possibility that protecting plants or wildlife would benefit people by reducing the prevalence of disease or supplying future medicines would be considerations in setting a secondary standard to provide requisite protection for plants and wildlife and ecosystem services. Thus, any such indirect effects on people are beyond the scope of this reconsideration. In addition, the EPA finds that, even if such effects were within the scope of this reconsideration, the EPA lacks sufficient information in the air quality criteria to base a standard on these effects. The commenter has not submitted published studies that might support consideration of effects on people, such as long-term stress, attributable to the effects on species, nor has the CASAC provided advice in this area.

## VII. Response to Significant Comments Related to Communication of Public Health

The final rule for PM revises 40 CFR 58.50 Appendix G with respect to specific breakpoints for the $PM_{2.5}$ Air Quality Index (AQI) and AQI reporting requirements and recommendations. In addition to responses contained in section IV of the preamble to the final rule, the EPA provides the following responses to specific comments related to the AQI sub-index for $PM_{2.5}$ and AQI reporting requirements and recommendations.

### A. Comments on Proposed Revisions to the $PM_{2.5}$ AQI Breakpoints

### 1. Comments on Proposed Revisions to the $PM_{2.5}$ AQI 50, 100, 150 Breakpoints

(1) **Comment:** Some commenters urged the EPA not to revise the 50 breakpoint of the AQI, even if the annual standard was revised, for programmatic reasons. Some state and local programs and policy decisions may be tied to the daily AQI breakpoint levels, and so the commenters argued that revising the 50 breakpoint of the AQI could create issues for decisions, such as crop residue burning and use of prescribed fire, that use a combination of concentration data and AQI values. Some commenters also argued that the proposed change in the AQI scale could result in more approved burning in the moderate category instead of the good category.

In supporting this, a few commenters noted that their ability to use prescribed fire could be inhibited since their permitting entities use the 50 breakpoint of the AQI to determine their permit eligibility. Therefore, if the annual primary $PM_{2.5}$ standard were lowered the 50 breakpoint of the AQI would also be lowered, reducing the opportunities for prescribed fire. In contrast, other commenters noted that revising the AQI breakpoints would not impact their prescribed fire planning because they use $PM_{2.5}$ concentrations and not AQI values.

**Response:** While the EPA recognizes that the AQI may be used in a variety of ways by other government agencies, the AQI was developed by the EPA to provide general information to the public about air quality and its relationship to public health. As noted in the August 4, 1999, rulemaking (64 FR 149, 42531) that established the current AQI, and in the proposed reconsideration (88 FR 5558, January 27, 2023), the EPA established the nationally uniform air quality index, called the Pollutant Standards Index (PSI), in 1976 to meet the communication needs of state and local agencies. Such information from the AQI can help the members of public learn when their health may be affected, so they can take actions to avoid or to reduce exposures to ambient pollution at concentrations of concern. The AQI is also used to encourage the public to take actions that will reduce air pollution on days when concentrations are projected to be of concern.

While other government agencies may decide to employ the AQI to make decisions on how to reduce public exposure to air pollution, the use of the AQI in these programs is determined by these agencies and not the EPA. In light of EPA's decision to revise the AQI, these agencies may determine it is appropriate to make changes in how they use the AQI in making certain decisions, such as tracking how the changes in the AQI affect their prescribed fire programs and deciding whether to use concentration-based approaches for purposes of their prescribed fire programs.

(2) **Comment**: A few commenters contended it is inappropriate to propose revisions to the 50 breakpoints of the AQI based on a proposed range for the primary $PM_{2.5}$ annual standard because there is not a discrete concentration to review for comment, but multiple possibilities making it difficult to review them all.

**Response**: The EPA disagrees with this comment. Proposing a range is common practice in NAAQS proposals to allow the Agency to better identify for the public the options under consideration, and potential associated rationales. EPA proposed a relatively narrow range for the annual standard and solicited comment on a wider range and does not consider that either range was so extensive as to make it difficult, much less impossible, for commenters to provide views on the proper breakpoints for the AQI.

### 2. Comments on Proposed Revisions to the $PM_{2.5}$ AQI 200 and Above Breakpoints

(1) **Comment**: A few commenters suggested the EPA should eliminate the usage of "beyond the index" when AQI values goes above 500 because it is confusing, and the health messaging does not change. Instead, the EPA should eliminate the ceiling for the Hazardous category or if preferred could add an "extremely hazardous" category. In doing this, the EPA should also adjust the AQI calculator and NowCast to account for this.

**Response**: The EPA agrees that "beyond the index" can be confusing and has been working outside this rulemaking to adjust AQI materials and public health information to continue the Hazardous category above the AQI breakpoint of 500 and remove the term "beyond the index." The EPA will continue to use the 500 breakpoint of the AQI, as noted in Appendix G, to calculate the AQI values in the hazardous category (AQI values above 300), with AQI values above 500 based on the same linear slope as the AQI values between 301 and 500.

### 3. Other Comments Related to Proposed Revisions to the $PM_{2.5}$ AQI

(1) **Comment:** Some commenters contended that while revisions to the AQI based on new scientific knowledge may or may not be needed, if the EPA proceeds with revisions to the AQI, it should inform the public that air quality overall is not declining, since it is not. The commenters note that the proposed changes could give the impression to the public that air quality is declining and so the EPA should ensure it communicates that air quality is not declining. One of the commenters suggested the EPA could address this issue is several ways including "identifying additional breakpoints," increasing the concentrations for breakpoints, or adjusting the category language to "more clearly convey the risk."

**Response:** Since the establishment of the AQI, the EPA and state and local air agencies and organizations have developed experience in educating the public about changes in the standards and, concurrently, related changes to AQI breakpoints and advisories. When the standards change, EPA and state and local agencies have tried to help the public understand that air quality is not getting worse, it's that the health evidence underlying the standards and the AQI has changed. EPA's Air Quality System (AQS), the primary repository for air quality monitoring data, is also adjusted to reflect the revised breakpoints. Specifically, all historical AQI values in AQS are recomputed with the revised breakpoints, so that all data queries and reports downstream of AQS will show appropriate trends in AQI values over time.

(2) **Comment:** A few commenters suggested that more significant changes would make the AQI more useful. Commenters expressed the view that the AQI has been underprioritized, and a separate rulemaking is needed to more fully address the tool and protect public health. In particular, they noted that the EPA should reassess the $PM_{2.5}$ AQI breakpoints given the critical use of the AQI in clinical settings, and recommended the EPA initiate a new and separate rulemaking process to more fully address revisions to the breakpoints and the associated health messaging. Some commenters noted they could only provide initial feedback on the proposed revisions to the 200, 300 and 500 breakpoints without also re-evaluating the accompanying health messaging.

Some commenters suggested the EPA should consider the usefulness of a multipollutant index, which may more clearly communicate air quality and more strongly protect public health than a single pollutant index. These commenters expressed the view that the AQI does not give an "accurate" representation of the overall air quality as a single pollutant index. Some of these commenters also suggested the EPA should consider additional indicators of $PM_{2.5}$ for the $PM_{2.5}$ AQI, such as black carbon, lung deposition and particle number concentration, as well considering health effects from exposure to "local combustion process, such as traffic," which would give a more detailed characterization of air quality to the public. One of these commenters further advised the EPA to include cumulative exposure in all categories and create a seventh category to better account for potential cumulative exposure at lower concentrations. This commenter also suggested updating the AQI category colors to account for people with vision deficiencies as has been piloted in the AirNow Fire and Smoke Map.

**Response:** The EPA appreciates the recognition of the AQI's importance to the public and the general support for revising the AQI breakpoints. At this time, the EPA is focused on revising the $PM_{2.5}$ AQI breakpoints.

As stated in the proposal (88 FR 5558, January 27, 2023), in 1976, the EPA established a nationally uniform air quality index, then called the Pollutant Standard Index (PSI), for use by State and local agencies per Sec. 319 of the Clean Air Act (CAA, 41 FR 37660, September 7, 1976; 52 FR 24634, July 1,1987). In August 1999, the EPA adopted revisions to this air quality index (64 FR 42530, August 4, 1999) and renamed the index the AQI.

The AQI establishes a nationally uniform system of indexing pollution concentrations for ozone, carbon monoxide, nitrogen dioxide, PM, and sulfur dioxide. Across these pollutants, the AQI index value of 100 typically corresponds to the level of the short-term (e.g., 24-hour, 8-hour, or 1-hour standard) NAAQS for each pollutant. Below an index value of 100, an intermediate value of 50 is defined either as the level of the annual standard if an annual standard has been established (e.g., $PM_{2.5}$, nitrogen dioxide), a concentration equal to one-half the value of the 24-hour standard used to define an index value of 100 (e.g., carbon monoxide), or a concentration based directly on health effects evidence (e.g., ozone). An AQI value greater than 100 means that a pollutant is in one of the unhealthy categories (i.e., unhealthy for sensitive groups, unhealthy, very unhealthy, or hazardous). An AQI value at or below 100 means that a pollutant concentration is in one of the satisfactory categories (i.e., moderate or good). The scientific evidence on pollutant-related health effects for each pollutant is evaluated in the pollutant-specific ISA, which forms the scientific basis of each NAAQS review. Where possible, the information presented in an ISA supports decisions related to pollutant concentrations at which to set the various AQI breakpoints, which delineate the AQI categories for each individual pollutant (i.e., the pollutant concentrations corresponding to index values of 150, 200, 300, and 500). The AQI identifies the pollutant with the highest index value for the day as the pollutant of concern and recommends at least reporting that value as the AQI for the day. However, index values for other pollutants are also calculated. Both ozone and $PM_{2.5}$ index values are commonly reported and easily available to the public, e.g., through EPA's AirNow program. The EPA does not find the available health information and air quality measurements support considering a different approach for reporting air quality, such as a multipollutant index or cumulative risk.

The EPA disagrees with the commenters assertion that a multipollutant index would more clearly communicate air quality conditions to the public. The EPA sets a uniform AQI for ozone, carbon monoxide, nitrogen dioxide, PM, and sulfur dioxide as noted in 42 U.S. Code § 7619 of the CAA. The scientific basis for the NAAQS that also informs the AQI is presented in the ISA. Within each ISA the focus is on assessing the criteria pollutant-health effects relationship. This information is ultimately used in determining the adequacy of the current NAAQS and generally used to set the 50 and 100 breakpoints of the AQI as mentioned above. Additional information in the ISA is then often used to inform the establishment of breakpoints above 100, which indicates when air quality starts to become unhealthy, and to identify those lifestages (e.g., children, older adults) and populations that may be at greater risk of experiencing a health effect in response to a criteria pollutant exposure. The identification of lifestages and populations at increased risk of experiencing health effects helps inform responses to the questions "Am I at risk? Should I take action to reduce my exposure?" The ISA also identifies health effects, including symptoms, that can occur from being exposed to a criteria pollutant. This information allows AQI advisories to provide an accurate list of potential symptoms to help people know when they may be affected by a pollutant and thus when to reduce exposure. Information from studies evaluated in the ISA examining dosimetry as well as studies that characterize criteria pollutant exposures, and specifically the relationship between indoor and outdoor exposures to ambient concentrations, can help inform recommendations on exposure reduction measures for each pollutant in AQI advisories. For these reasons, the EPA considers the individual pollutant format of the AQI the best supported and most effective approach to communicating air quality conditions and risks to the public, and it is consistent with the regulatory language of the CAA.

With respect to the commenter's contention that the EPA should use multiple different indicators for the PM AQI, the EPA disagrees with this assertion as it is not supported by the current scientific evidence detailed in the 2019 ISA (U.S. EPA, 2019). As part of the review of the latest scientific evidence to support the PM NAAQS review, the Agency assessed whether individual PM components or sources were more strongly associated with health effects than $PM_{2.5}$ mass. In that assessment the EPA concluded: "Overall, recent studies continue to demonstrate that many $PM_{2.5}$ components and sources are associated with health effects ranging from subclinical (e.g., changes in heart function, such as HRV, or circulating biomarkers) to the more overt (i.e., ED visits, hospital admissions, and mortality). The results of these studies confirm and further support the conclusion of the 2009 PM ISA that many $PM_{2.5}$ components and sources are associated with many health effects and that the evidence does not indicate that any one source or component is consistently more strongly related with health effects than $PM_{2.5}$ mass. (Section 1.5.4, 2019 ISA)" (U.S. EPA, 2019). The EPA concludes that there is insufficient scientific evidence to support the use of alternative indicators of $PM_{2.5}$ to communicate the AQI.

For similar reasons, the EPA does not agree with the commenters that suggest accounting for cumulative exposure in the AQI categories. The comment points to a single study which suggests that hospital admissions occur even when the AQI is "good." However, the Administrator has judged the current primary standards inadequate to protect public health with an adequate margin of safety and the AQI is being revised accordingly, so this study provides limited, if any, support for the conclusion that the structure of the AQI is

inadequate, nor do the commenters provide any suggestions for how cumulative risk should be represented in the AQI. As stated above, the EPA's judgment is that there is insufficient scientific evidence to support a multiple pollutant exposure index or an index that would account for cumulative exposures.

With regard to the commenter's suggestion to use colors that are more easily discernable by people who have problems seeing colors, the EPA appreciates this suggestion and as noted by the commenter has been piloting this color scale (Color Vision Assist) as a supplemental option on the AirNow Fire and Smoke map. The EPA plans to continue assessing this pilot and to consider if and how it could be used in other AQI products.

### B. Comments on Proposed Revisions to AQI Reporting Requirements

(1) **Comment**: Some commenters supported the EPA's proposed revision to recommend, but not require, near real-time reporting of the AQI and hourly air quality data submission. These commenters noted this revision would better inform the public about their air quality. Of these commenters, a few encouraged the EPA to make this proposed revision a requirement given the need for real-time information and "lack of downsides." Other commenters agreed with the EPA that it should be a recommendation and not a requirement.

A few commenters sought clarification on this proposed revision and whether the "future analogous systems" is the EPA's Air Quality System (AQS). If so, these commenters would oppose the recommendation to submit hourly data because of quality assurance and quality control issues.

**Response**: The EPA agrees with recommending but not requiring real-time AQI reporting and hourly air quality data submission to continue communication of air quality to the public. While some commenters did not see "downsides" with requiring this reporting, the EPA agrees with the many air agencies that preferred this to be a recommendation and not a requirement. The current AirNow system started in 1998 as the Ozone Mapping System. Initially only agencies on the east coast participated, but over time the system has grown to encompass the entire U.S. The program has always been structured as a voluntary, opt-in for state, Tribal and local air agencies, and has been very successful with that approach. Thus, EPA believes it is appropriate to maintain the current structure and its collaborative approach with state, Tribal and local air agencies, as well as to allow flexibility in reporting requirements. Also as discussed in the proposal (88 FR 5558, January 27, 2023), many state, Tribal and local air agencies already take these actions, meaning this recommendation aligns with current practices and there would be little benefit to making it a requirement. In response to the "future analogous system" question, the EPA intentionally used general terminology since this revision is codified and, given rapid technology change, the general term enables flexibility depending on technology needs and availability.

(2) **Comment**: Some commenters encouraged the EPA to work more closely with the Tribal Air Monitoring Support Center (TAMS) steering committee to ensure Tribal data is appropriately used for the AQI while respecting Tribal data sovereignty.

**Response**: The EPA appreciates this comment and will continue to work with Tribal partners such as the TAMS steering committee to ensure Tribal data sovereignty is respected while utilizing Tribal air quality data for the AQI.

## VIII. Response to Significant Comments Related to Proposed Amendments to Ambient Monitoring and Quality Assurance Requirements

The final rule for PM revises several technical areas found in 40 CFR parts 50 (appendix L), 53, and 58 (appendices A, B, C, D, and E). In addition to responses contained in section VII of the preamble to the final rule, the EPA provides the following responses to specific comments related to the ambient monitoring and quality assurance requirements.

### A. Comments on proposed Amendments to Ambient Monitoring and Quality Assurance Requirements

The EPA received several comments on the proposed changes to monitoring requirements in the Proposed Changes to 40 CFR part 58, appendix A - Ambient Air Quality Surveillance, and appendix B - Quality Assurance Requirements for Prevention of Significant Deterioration (PSD). The EPA's responses to comments that provide guidance and interpretation to the rule changes for revising appendices A and B are provided in section VII.C.1 and VII.C.2 of the preamble to the final rule. The remaining responses to the comments on the revisions to appendices A and B not addressed there are addressed below.

(1) **Comment:** A commenter stated that it was problematic to keep the same number of eight required audits ($PM_{2.5}$ Performance Evaluation Program) for large primary quality assurance organizations, especially when reaudits are often not possible for cases when the samples are rendered "invalid" due their low levels. The commenter also questioned the justification of the valid sample totals in general.

**Response:** There was no proposal in this rulemaking to modify the $PM_{2.5}$ Performance Evaluation Program audit frequency. The minimum value required by appendix A, section 3.2.4, to be considered valid sample pairs for the $PM_{2.5}$ Performance Evaluation Program (PEP) was changed from 3 $\mu g/m^3$ to 2 $\mu g/m^3$ in this rulemaking. This change should increase the number of valid samples at the existing required frequency. The EPA appreciates the comment, and notes that updates to the program frequency may be considered at a future time.

(2) **Comment:** A commenter indicated that while they agreed with many of the proposals, they are not applicable to the $PM_{2.5}$ rulemaking. Furthermore, they indicated that the EPA should continue the practice of making more general proposals in each of its proposed rule changes but identify these other changes in future proposals.

**Response:** The EPA appreciates the commenter supporting the practice of making more general proposals in rulemaking. The EPA did describe in detail the changes and justification for each of these in the preamble to the proposal.

(3) **Comment:** In section VII.C.2 of the preamble describing the proposed changes to Part 58, Appendix B, Quality Assurance Requirements for Prevention of Significant Deterioration

(PSD) Air Monitoring, the EPA erroneously referenced Appendix A in the proposal descriptions that followed.

**Response:** The EPA agrees that the references in section VII.C.2 should have referenced Appendix B. The EPA believes it is apparent that appendix B should have been referenced in this section given the notice of proposed rulemaking's Table of Contents, the proposed regulatory text, and the introductory language in section VII.C.2. Moreover, the proposed changes to appendix B mirrored those proposed to appendix A, a fact expressly recognized by two of the two commenters who submitted comments on this portion of the proposal, apparently without noticing the inadvertent error in section VII.C.2. Both commenters asked the EPA to apply their comments on the appendix A proposed changes equally to appendix B, with one commenter stating, "comments above related to Appendix A should also apply to Appendix B where U.S. EPA is mirroring the language."

## B. Comments on Proposed Revisions to Amendments to PM Ambient Air Quality Methodology

The EPA received comments on the proposed changes to 40 CFR part 58, appendix C – Ambient Air Quality Monitoring Methodology. The EPA's responses to comments that provide guidance and interpretation to the rule changes for revising appendices C is provided in section VII.C.3 of the preamble to the final rule. The remaining responses to the comments on the revisions to appendices C not addressed there are addressed below.

(1) **Comment:** One commenter pointed out that while regulatory-grade FRM data should form the foundation for FEM adjustments, many monitoring sites collect hourly data from various types of collocated FEMs, such as T640x, BAMs, TEOMs, but lack a robust FRM dataset to compare with.

**Response:** Performance criteria for approval of PM FRMs and FEMs are based on 24-hour data. Because the shortest time-period used in a NAAQS for any PM standard is based on 24 hours of data, the EPA believes that setting the performance criteria of the methods on a 24-hour basis is most appropriate.

(2) **Comment:** EPA received a comment that the proposed changes to the Class III equivalent methods for $PM_{10}$ should include an alternate inlet for the $PM_{10}$ FEM in areas that have not experienced concentrations close to the NAAQS in five years.

**Response:** The EPA disagrees that an alternative $PM_{10}$ inlet should be allowed at this time in such circumstances. Utilizing the standard EPA-approved $PM_{10}$ inlet head ensures that a consistent fractionation of PM aerosol will occur regardless of the ambient concentration, and independent of ambient wind speed and direction.

(3) **Comment:** A commenter suggested that the EPA should require FEM field comparability tests in the northwest (for example, in EPA Region 10) in areas where particulate derived from biomass predominates to ensure that certified instruments will perform reliably in areas influenced by these sources. A related comment asked that FEM determinations be required to include a representative test location that adequately compares the candidate device to the Federal Reference Method (FRM) in an area with significant levels of biomass particulate.

**Response:** The EPA notes that it did not propose any new test locations for field testing of candidate $PM_{2.5}$ FEMs. Also, while additional testing of FEMs may have merit—especially with regard to specific aerosols such as biomass (i.e., organic carbon)—any new requirements for testing would presumably only apply to new candidate methods and they would not address the nearly 900 $PM_{2.5}$ FEMs already deployed. Also, there are approved PM FEMs that work very well with high ratios of organic carbon and these methods were approved under the existing test specifications for Class III $PM_{2.5}$ FEMs (§ 53.35). Finally, the EPA is concerned that additional field testing could be considered a barrier for instrument companies to pursue designation when developing and pursuing new PM FEMs.

(4) **Comment:** A regional correction factor potentially could improve instrument accuracy to biomass sources that are a large component of PM in many Alaskan communities.

**Response:** For the reasons stated in the preamble of the final rule, the EPA is not pursuing local or regional correction factors. Also, as mentioned in the response above, there are already approved PM FEMs that work very well in areas with high ratios of organic carbon, and these methods were approved under the existing test specifications for Class III $PM_{2.5}$ FEMs (§ 53.35).

(5) **Comment:** Several commenters support allowing correction factors established by states using FRM monitor data to be applied to all $PM_{2.5}$ data obtained from co-located continuous FEM monitors, especially any and all data used for attainment demonstration. Related to this, another commenter identified that to ensure higher quality corrections are attained, the EPA must allow agencies the ability to locally correct their own data.

**Response:** As explained in the preamble of the final rule, the EPA is finalizing its proposal that valid State, local, and Tribal (SLT) air monitoring data from Federal Reference Methods (FRMs) generated in routine networks and submitted to the EPA may be used to improve the PM concentration measurement performance of approved FEMs. The EPA considered the comments recommending local and regional calibration of data, but due to negative comments from agencies not wanting to reinstall PM FRMs due to minimal staff resources and other reasons explained in the preamble, the EPA is not acting on the recommendations to allow regional and / or local calibration of data.

(6) **Comment:** One commenter suggested that it makes sense to keep the data submitted prior to the approval of a factory calibration "as is" unless there would be benefits to adjusting earlier data to either January 1st of the year in which the application was approved or to the beginning of the date range for the new calibration.

**Response:** In the preamble to the final rule, the EPA addresses reporting of data. Also, in the preamble to the final rule, the EPA identified that prior and future monitoring data and how it will be used in the implementation of this NAAQS, such as for designations, and for air quality regulatory programs is outside the scope of this rulemaking and will therefore be addressed by the EPA in a subsequent relevant action or actions.

(7) **Comment:** Another commenter identified that the EPA must allow for the use of either corrected FEM data or, in the case of collocated FRM and FEMs and the absence of a correction factor, the use of FRM data to make any attainment designation.

**Response:** In the preamble to the final rule, the EPA addresses reporting of data. Also, in the preamble to the final rule, the EPA identified that prior and future monitoring data and how it will be used in the implementation of this NAAQS, such as for designations, and for air quality regulatory programs is outside the scope of this rulemaking and will therefore be addressed by the EPA in a subsequent relevant action or actions. With regard to only using FRM data if FEM data are not adjusted, the EPA points out that the rules for combining data from FRMs and FEMs which are explained in Appendix N to part 50 would still apply.

(8) **Comment:** One commenter stated that no area should be designated nonattainment for the new $PM_{2.5}$ standard by an FEM if there are data from an FRM at the same site that contradicts that designation.

**Response:** The EPA provides the following responses to the several points made by this commenter. First, it is the monitoring agency that selects the method to be used in its annual monitoring network plan under 40 CFR § 58.10. Second, the quality of the data is based on the method used across the network of the primary quality assurance organization. Third, each year, the head official in each monitoring agency, or his or her designee, must certify that the previous year of ambient concentration and quality assurance data are completely submitted to AQS and that the ambient concentration data are accurate to the best of her or his knowledge, taking into consideration the quality assurance findings per 48 CFR § 58.15. And fourth, monitoring agencies can consider setting aside $PM_{2.5}$ FEM data in situations where FEMs that are collocated with FRMs do not meet sufficient comparability as described in 40 CFR part 53, subpart C, table C–4, leading the monitoring agency to request that the FEM data should not be used in comparison to the NAAQS per 40 CFR § 58.11. In considering all of these regulatory pieces, agencies can, on a limited basis, set aside $PM_{2.5}$ FEM data; however, for cases where the $PM_{2.5}$ FEM data quality is meeting the criteria cited in 40 CFR § 58.11, such data cannot be set aside.

(9) **Comment:** One commenter had a concern that agencies and tribes may not be able to opt out of the firmware updates if their analyses indicate that their instruments perform better prior to the update.

**Response:** The EPA addressed a related question in the preamble to the final rule. While the EPA expects in most cases that monitoring agencies will produce data with improved data quality following factory calibration, agencies that demonstrate the original method calibration provides better data quality—especially to meet the bias measurement quality objectives—they may opt out of the method update, so long as the original method designation remains valid.

(10) **Comment:** One commenter supports any action that results in the most accurate data possible for comparison against the NAAQS, ensuring that attainment designations and clean data determinations will be based on sound information.

**Response:** The EPA is finalizing its proposal that valid State, local, and Tribal (SLT) air monitoring data from Federal Reference Methods (FRMs) generated in routine networks and submitted to the EPA may be used to improve the PM concentration measurement performance of approved FEMs. The EPA believes this is an important step towards ensuring more sites meet the bias MQOs with automated PM FEMs.

(11) **Comment:** One commenter stated that comparing data from various types of collocated FEMs offers a unique opportunity to examine biases during different hours/times of the day and on a continuous basis, which is not possible using FRM datasets.

**Response:** The EPA concurs that the more PM FEMs operated, the more likely we can examine additional types of data such as diurnal variation not available when only PM FRMs are operated on a daily basis.

(12) **Comment:** One commenter suggests that the EPA should consider provisions that would allow correction factors to be developed in a way that accounts for outside factors such as differences in climate by allowing for the development of correction factors on a site-by-site basis when a FRM is co-located with the FEM and allows for a correction factor from a climatically similar site when there is no collocated FRM.

**Response:** With regard to the suggestion to allow correction factors to be developed in a way that accounts for outside factors such as differences in climate, entities seeking a correction may pursue such factors so long as any potential change can be demonstrated to work successfully across the full network in which it is used. The issue of an allowance for site-by-site correction factors is addressed in the preamble to the final rule.

(13) **Comment:** One commenter identified that alternative approaches, such as allowing operating agencies to make site-by-site adjustments, could be perceived as subjective and be difficult to manage, calling data quality into question.

**Response:** The EPA did not propose site-by-site site calibrations of data. However, the EPA did take comment on alternatives that could lead to more sites meeting the bias measurement quality objectives. The EPA is not finalizing any provisions related to site-by-site calibration of data but acknowledges the concern that such adjustments could be perceived as "subjective" and "difficult to manage" which could call data quality into question.

(14) **Comment:** One commenter strongly urges the EPA to allow correction factors to be applied on a site- or region-specific basis and apply the factor retroactively to FEM data for the dates used for the NAAQS design value determination to ensure a representative analysis.

**Response:** The EPA addresses the comments supporting site- or region-specific basis correction factors in the preamble to the final rule. Also, in the preamble to the final rule, the EPA identified that prior and future monitoring data and how it will be used in the implementation of this NAAQS, such as for designations, and for air quality regulatory programs is outside the scope of this rulemaking and will therefore be addressed by the EPA in a subsequent relevant action or actions.

(15) **Comment:** One commenter stated that further studies are warranted to account for correction factors, topography, regional variability, and manufacturers' standards.

**Response:** The EPA believes that in finalizing its new approach to calibration of PM FEMs, we will be able to take advantage of the large dataset already provided across the country in routine networks from SLT agencies. Therefore, while new studies are informative, there exists sufficient data from the operating network to support calibration and verification for any new factory calibration of a PM FEM.

(16) **Comment:** One commenter asked the EPA to approve and accept only these calculations (i.e., the data resulting from application of the calibration calculations) as submitted (i.e., by the State).

**Response:** The EPA does not believe it would be appropriate to have SLT agencies report only the result of the calibration calculations. Therefore, in the preamble to the final rule, the EPA states that monitoring agencies should continue to report PM FEM data as measured (i.e., they shall not correct data before reporting it).

(17) **Comment:** One commenter stated that because the states are required to rely fully on these method designations in choosing which instruments to utilize, and the EPA's designation of a biased instrument could not have been foreseen by states, the burden should not now fall to the states to provide justification on a case-by-case basis for these corrections.

**Response:** As explained in the preamble to the final rule, the EPA did not propose and is not finalizing any requirement that PM FEMs be calibrated on a site-by-site or regional basis.

(18) **Comment:** One commenter identified that to keep the light scattering in FEM within 10% of the FRM, the EPA should allow for customized linear regression calibrations. The commenter fully supports this proposed change, and encourages EPA to allow regionally specific calibrations, not just a single nationwide calibration from the instrument manufacturer.

**Response:** The EPA proposed and is finalizing its proposed action to allow valid SLT air monitoring data from PM FRMs and FEMs generated in routine networks and submitted to the EPA to update factory calibrations included as part of approved FEMs on a national basis. The EPA did not propose local or regional calibration of data and is not finalizing any requirement that PM FEMs be calibrated on a site-by-site or regional basis.

(19) **Comment:** One commenter recommends that manufacturers review FEM and FRM data closely on a regional basis, as the chemical composition of $PM_{2.5}$ can vary across regions, and therefore the bias that FEM instruments may introduce could vary as well. It would also be prudent for equipment manufacturers to review collocated FEM/FRM data on a regular basis to ensure whether correction factors should be updated.

**Response:** As discussed in the preamble to the final rule, the EPA notes that while it does not have the authority to require instrument companies to evaluate the quality of data from operating FEMs under 40 CFR part 58, EPA does routinely participate in conferences and workshops and makes assessments of data quality specific to instrument makes and models

publicly available. EPA also regularly summarizes relevant FRM and FEM data quality in documents such as the 2022 PA (U.S. EPA, 2022a).

(20) **Comment:** One commenter stated that the CASAC recommended that equivalency box criteria used in assessing FEM performance needs to have more stringent standards. The commenter agrees and further adds that until a gold standard FEM is created, much like what was done with FRM years ago, all FEM's will need to align very closely with the FRM.

**Response:** The CASAC offered multiple options on ways to improve FEM performance in its review of the 2021 draft PA (Sheppard, 2022). One option focused on calibrations, which is what is being finalized in this action on a national basis. The other was on the cited revision of the equivalency box. Revisions to the equivalency criteria won't improve the existing inventory of approximately 900 operating $PM_{2.5}$ FEM, since these methods are already deployed. However, it is also important to note that many of these operating $PM_{2.5}$ FEMs are already meeting measurement quality objectives, and more are expected to do so with the recently available method updated from one of the more prominently used PM FEMs.

(21) **Comment:** One commenter identified that State and local agencies have raised concerns about PM monitoring method comparability, an issue that needs to be evaluated in consideration of this proposal due to potential impacts on attainment recommendations and designations.

**Response:** With this final rule, the EPA is addressing PM method comparability by finalizing our proposal that valid State, local, and Tribal (SLT) air monitoring data from FRMs generated in routine networks and submitted to the EPA may be used to improve the PM concentration measurement performance of approved FEMs.

### C. Comments on Proposed Revisions to $PM_{2.5}$ Monitoring Network Design Criteria to address At-Risk Communities

The EPA received comments on the proposed changes to 40 CFR part 58, appendix D – Network Design Criteria for Ambient Air Quality Monitoring. The EPA's responses to comments that provide guidance and interpretation to the rule changes for revising appendices D are provided in section VII.C.4 of the preamble to the final rule. The remaining responses to the comments on the revisions to appendices D not addressed there are addressed below.

(1) **Comment:** One commenter requested additional time for comment to review network and monitoring requirements.

**Response:** The EPA believes it has provided sufficient time with respect to notice and comment on the proposal and declines to extend the comment period for this action.

(2) **Comment:** One commenter raised concerns with the Greeley Hospital monitor in Weld County, CO, and local sources.

**Response:** The comment is outside the scope of the proposal.

(3) **Comment:** One commenter stated that the Environment Justice inclusions need to be applied to all PM standards.

**Response:** Specific to ambient air monitoring of $PM_{2.5}$, the EPA addressed Environmental Justice in the PM NAAQS proposal (88 FR 5673–76, January 27, 2023). For $PM_{10}$ ambient air monitoring, while the EPA did not propose changes to the $PM_{10}$ standard, monitoring agencies are free to consider environmental justice considerations in their $PM_{10}$ networks in line with this final action. Additionally, as explained in the preamble to the final rule, because many $PM_{10}$ and $PM_{2.5}$ sites are already collocated, the EPA believes that many of the existing $PM_{2.5}$ sites are already in at-risk communities, meaning that many existing $PM_{10}$ sites may also already be in at-risk communities.

(4) **Comment:** One commenter stated that stronger annual and daily limits for $PM_{2.5}$ pollution must be accompanied by robust air quality monitoring techniques and technologies in order for the environmental justice potential of this regulation to be reached. While the proposed standards include various positive steps toward increasing the capacity of the monitoring system—such as incorporating an "environmental justice factor" in its design— there is a lack of concrete actionables to improve this network, which remains inadequate in accounting for environmental justice concerns on the ground. The commenter asked the EPA to expand the EJ factor to ensure the accuracy of monitoring technology in overburdened communities.

**Response:** The EPA believes that by finalizing its proposal, valid State, local, and Tribal (SLT) air monitoring data from FRMs generated in routine networks and submitted to the EPA may be used to improve the PM concentration measurement performance of approved FEMs, and that this will improve the monitoring methods used across the network, including for use in EJ communities.

(5) **Comment:** One commenter stated that the national system of air quality monitors provides a piecemeal and inaccurate accounting of air quality regulation breaches, allowing for source noncompliance and disproportionately affecting environmental justice communities. In addition to the improvement of the current monitoring network, the EPA should recognize the value of community-led monitoring as an invaluable scientific tool and promote the scientific data brought forth by the impacted communities to the level of regulatory data.

**Response:** The EPA believes that its long-standing network design criterion that there be at least one monitor in each CBSA required to have monitors in the area of expected maximum concentration ensures that all communities are protected, since if we protect the community with the high concentrations with the NAAQS, we protect all other communities in the same metropolitan statistical area with the NAAQS. With regard to the value of community-led monitoring, the EPA believes that data produced by any method should be utilized with a "fit for purpose" scope, so that the quality of the data produced is appropriate for the use of that data. At this time, the EPA does not agree with the commenter that data collected by non-FEM and -FRM methods, such as sensors, is appropriate for regulatory use.

(6) **Comment:** One commenter brought up a local mining issue that is not being caught on regulatory monitors, but sensors are showing very large concentrations.

**Response:** The comment is outside the scope of the proposal, although the EPA notes that a mining source-related issue is likely related to coarse particle emissions than rather than fine particle ones, and with this action, EPA is not addressing $PM_{10}$ monitoring requirements.

(7) **Comment:** One commenter believes that there is a lack of adequate monitoring in New Mexico, additional point source monitoring needed there, and there are legislative and funding concerns in the state.

**Response:** The comment is outside the scope of the proposal. However, the EPA's action requires that any new or moved minimally required $PM_{2.5}$ sites are to represent "area-wide" air quality, since these sites have the most utility in being applicable to both the annual and 24-hour $PM_{2.5}$ NAAQS. This applies to monitoring in New Mexico.

(8) **Comment:** One commenter brought up unmonitored communities near coal mining in Illinois.

**Response:** The comment is outside the scope of the proposal. Also, it is possible that a mining issue is more directly related to coarse particle considerations than to fine particle ones. The EPA notes it did not propose to make any changes in $PM_{10}$ monitoring requirements which includes coarse particles.

(9) **Comment:** One commenter provided comments that even within areas of similar economic, minority, and ethnic composition, there are large discrepancies in the spatial distribution of pollution, such that people can experience dramatically different levels within the same monitoring district. Severe hot spots of pollution can be completely missed by state monitoring networks. For example, a household downwind of a neighbor burning wood for heat during the winter can experience Beijing, China, levels of pollution, while an upwind neighbor can enjoy clean air. Studies from California show that within a single square kilometer of a residential area, concentrations of wood smoke can vary as much as 2,500 times. The highest measured concentrations were up to 100 times higher than the community average. Similar distribution discrepancies are in play within neighborhoods adjacent to freeways or near industrial facilities.

**Response:** The EPA has seen no evidence that any part of a community is 100 times higher than the community average of the same community for the time period (24-hours daily or 3-year annual average) of the $PM_{2.5}$ NAAQS. The commenter may be citing examples of very short durations; however, the scientific evidence of exposures is translated into averaging times associated with the $PM_{2.5}$ NAAQS, which in its shortest duration is 24 hours.

(10) **Comment:** One commenter stated they believe the proposal for at-risk community monitoring may conflict with the EPA's 1997 Network Design guidance.

**Response:** While no specific citations demonstrating the proposal for at-risk community monitoring may conflict with the EPA's 1997 Network Design guidance were provided, the EPA points out that if it did, a regulation would supersede any previously issued guidance.

(11) **Comment:** One commenter stated that the EPA should retain its current population-based analysis for network assessments.

**Response:** The EPA did not propose, nor is it finalizing any changes to its population-based requirements for monitoring in CBSA's that also factor in the relative design value of the MSA. See Table D-5 of Appendix D to Part 58 – $PM_{2.5}$ Minimum Monitoring Requirements. Therefore, these population-based requirements will remain a part of network assessments.

(12) **Comment:** One commenter stated that if this requirement (in reference to proposal to modify $PM_{2.5}$ monitoring network design criteria to include an environmental justice (EJ) factor) is implemented, the EPA should clarify that the requirement is for MSAs greater than 1 million people.

**Response:** As explained in the preamble to the final rule, the revised network design criteria apply to any case where at least one additional site is required but not already covered as required to meet another network design criteria. This will most often be for cases over 1 million, but in certain cases may also apply to cases in MSA's with populations between 500,000 and 1,000,000 where the most recent 3-year design value is >=85% of any $PM_{2.5}$ NAAQS. Also, as explained in the preamble, for various reasons the EPA believes that it is in the best interest of the network for sites to remain in existing locations and thus this requirement would only apply to new sites or in cases where a site needs to move.

(13) **Comment:** One commenter stated that they support efforts to monitor in at-risk communities if siting criteria can be met and there is accommodation for adjacent existing sites.

**Response:** The EPA notes the support for the proposal. With regard to meeting siting criteria and accommodations for adjacent existing sites, any site whether existing or new would need to meet siting criteria or a waiver may be sought according to the rules in Appendix E to 40 CFR Part 58.

(14) **Comment:** One commenter stated that the proposed changes to monitoring requirements should be better supported and that the EPA should fully evaluate the impact of the proposal to locate monitors in at-risk communities (e.g., will the proposal to include monitors in at-risk communities be beneficial).

**Response:** The EPA believes the proposal provided sufficient support for the proposed changes to the monitoring requirements (88 FR 5673–76, January 27, 2023). The EPA notes the largest share of commenters on the proposal were supportive of the proposed changes to monitoring. With respect to fully evaluating the impact of the proposal to locate monitors in at-risk communities, as explained in the preamble to the final rule, the scientific evidence evaluated in the 2019 ISA (U.S., EPA, 2019) and ISA Supplement (U.S. EPA, 2022) indicates that subpopulations at potentially greater risk from $PM_{2.5}$ exposures include: children, lower socioeconomic status (SES) populations, minority populations (particularly Black populations), and people with certain preexisting diseases (particularly cardiovascular disease and asthma). With much of the $PM_{2.5}$ ambient air data coming from the very sites that are already operational in State, local, and tribal routine networks, the EPA believes that it has sufficient information that these sites are already beneficial.

(15) **Comment:** One commenter stated that there is inadequate network coverage: with most monitors in urban areas, gaps in network in rural areas impacting permit applicants.

**Response:** The EPA believes that it would be impractical to have a site everywhere; however, as explained in the preamble to the final rule, we do have requirements for $PM_{2.5}$ monitors in rural areas. Specifically, the EPA requires each state to measure regional background and regional transport (40 CFR part 58, appendix D, section 4.7.3). These required sites at the state level are largely located in rural areas and may include use of IMPROVE samplers or continuous $PM_{2.5}$ monitors. While these requirements for monitoring in rural areas are minimums, monitoring agencies have the discretion to operate more monitors than the minimums.

(16) **Comment:** One commenter stated that the agency ought to expand its own air quality monitoring infrastructure to better quantify PM levels in non-attainment zones.

**Response:** While the comment does not address the proposal, the EPA notes the comment with a goal to better quantify PM levels in non-attainment zones.

(17) **Comment:** All public schools should have public WIFI monitors for $PM_{10}$ and $PM_{2.5}$ and PM, ozone and HCHO.

**Response:** While the comment does not address the proposal, the EPA notes the comment with a goal to better quantify PM, ozone, and HCHO levels in schools.

(18) **Comment:** One commenter stated that our wood smoke-polluted air is virtually unmonitored and in practice completely unregulated. We also badly need a more robust monitoring network. There is one regulatory $PM_{2.5}$ monitor in our entire geographically large county. One regulatory monitor in a geographically large and diverse county like ours is simply nowhere near adequate and does not protect the public.

**Response:** The EPA notes that while the comment does not address the proposal and that there are other opportunities to monitor beyond the existing regulatory network, some of these options were discussed in the Next Generation Data portion of the proposal preamble (88 FR 5678–80, January 27, 2023).

(19) **Comment:** One commenter requested to please expand air quality monitoring to better tally the true costs of soot pollution nationwide.

**Response:** The EPA notes that while the comment does not address the proposal, there are other opportunities to monitor beyond the existing regulatory network. Some of these options were discussed in the Next Generation Data portion of the proposal preamble (88 FR 5678–80, January 27, 2023).

(20) **Comment:** One commenter asked if the EPA could assist interested states in deploying speciation monitors at scale to resolve the difficulty of connecting beneficial fire to exceedances of the $PM_{2.5}$ standard.

**Response:** The EPA notes that while the comment does not address the proposal, there is an existing network of chemical speciation samplers known as the chemical section network (CSN). The CSN has both long term-sites as well as sites that can be associated with special projects and studies. Interested State, local, or tribal monitoring programs may pursue additional sites for the CSN as needed by contacting their EPA Regional office.

(21) **Comment:** One commenter stated that the EPA should require states to work with impacted communities and other stakeholders in network design evaluation.

**Response:** The EPA has an existing requirement that monitoring agencies subject to § 58.10 - Annual monitoring network plan and periodic network assessment - are to provide that annual monitoring network plans must be made available for public inspection and comment for at least 30 days prior to submission to the EPA and the final submitted plan shall include and address, as appropriate, any received comments. The EPA did not propose to change this part of the monitoring requirements.

(22) **Comment:** One commenter requested that the U.S. EPA provide additional clarity on the interpretation of footnote 4 in 40 CFR part 58, Appendix D, Table D-5. The footnotes states "These minimum monitoring requirements apply in the absence of a design value" with respect only to column 2 which addresses the number of monitors required in areas with design values <85% of the NAAQS. This would imply that U.S. EPA interprets the lack of meeting data completeness requirements (and therefore having an invalid design value) to presume the design value would be <85% of the NAAQS, regardless of what the available data shows. Therefore, fewer monitors could be required in such an MSA.

**Response:** Application of the lower required number of monitors per 40 CFR part 58, Appendix D, Table D-5 would only apply in the absence of any $PM_{2.5}$ design value for the history of the CBSA. Should the most current design value be incomplete such that a valid design value cannot be calculated, then apply the most recent valid design value.

(23) **Comment:** One commenter specified that the EPA stated its intent to amend § 58.12 by revising paragraphs (d)(1) and (3). The commenter notes that changes to Section 58.12 paragraph (d)(3) are missing from the proposal (88 FR 5704, January 27, 2023). The commenter recommends that the EPA review the stated intent and add the necessary amendment or remove the intent. The commenter also recommends that the EPA allow agencies an opportunity to review these changes and provide comment prior to finalizing them.

**Response:** The EPA did not intend to amend the language in paragraph (d)(3) of § 58.12 and is not finalizing any changes to this paragraph.

(24) **Comment:** One commenter stated that the current proposed deadline (for planning and implementing any newly required sites) should incorporate at least two years after adoption to formulate a site selection and plan development through the annual network plan, and then an additional two years after plan approval to deploy, given the timelines to procure sites and instruments.

**Response:** A discussion of the promulgated timeline for planning and implementing any newly required sites is discussed in the preamble to the final rule.

(25) **Comment:** One commenter offered a clarification that "The plan shall provide for any newly required sites to be operational no later than 24 months from date of approval of a plan or January 1, 2027, whichever comes first. Existing sites that necessitate relocation to meet this requirement shall be relocated at the time circumstances arise that require relocation."

**Response:** The EPA concurs that sites necessitating movement due to lost leases, construction, or related issues would need to be on their own timeline that would happen "…at the time circumstances arise that require relocation." For example, this would be true for a currently operating site where the lease is lost in 2025 or 2026. While monitoring agencies would need to expediently find a new suitable location, it may be on a timeline that takes more time than the EPA finalized with respect to cases where we know a new site is needed or a site needs to move at the time of the final rule becoming effective.

(26) **Comment:** One commenter stated that they need more monitors, and we need them to be placed in locations where they can record emissions in residential areas. The largest pollution source in many communities does not come from industry or traffic; it comes from wood stoves and fireplaces, but our current monitoring network does not reflect this.

**Response:** The EPA did not propose to add new sites beyond those required associated with the revised annual $PM_{2.5}$ NAAQS described in section II of the final rule as they pertain to the minimum requirements associated with Table D–5 of Appendix D to Part 58—$PM_{2.5}$ Minimum Monitoring Requirements. As explained in the preamble, the EPA did consider comments on the need to include additional localized sources such as communities with wood stoves.

## D. Comments on Proposed Revisions to Probe and Monitoring Path Siting Criteria

The EPA received few comments on the proposed changes to monitoring requirements in Appendix E—Probe and Monitoring Path Siting Criteria for Ambient Air Quality Monitoring (88 FR 5676-78). The EPA's responses to comments that are instructive and provide guidance and interpretation to the rule changes for revising Appendix E are provided in section VII.C.5 of the preamble to the final rule. Most of the comments received are addressed in the preamble. The remaining responses to the comments on the revisions to Appendix E are addressed below.

(1) **Comment:** A commenter stated that it can take years to secure a suitable site that meets the rigorous siting criteria in 40 CFR part 58, Appendix E. As such, the proposal's timelines for finding a suitable site, obtaining site approval from the EPA, and having the site fully installed with equipment and operating are problematic.

**Response:** While the EPA agrees that establishing a new site can be difficult and requires detailed planning, the EPA disagrees with the commenter that the proposed action's timelines are problematic. The intent of EPA's proposed revision to Appendix E was to communicate existing requirements more clearly and to correct a few existing unintended and conflicting regulatory requirements. Very few new requirements were proposed. As such, the EPA does

not anticipate the establishment of many new sites based on this action because a preponderance of the NAAQS sites already meet the regulatory requirements.

(2) **Comment:** A commenter stated that they support the EPA's proposed action to expand the list of acceptable probe materials for sampling reactive gases (88 FR 5678, January 27, 2023). The commenter suggested that the EPA also consider a similar regulatory change to allow additional materials for VOC monitoring.

**Response:** The EPA appreciates the comment and agrees that additional materials for sampling VOCs would be very advantageous. However, at the time of the proposal and rulemaking, the EPA did not have studies to support the request to expand the list of acceptable probe materials for sampling reactive gases beyond the list of NAAQS pollutants provided in the proposal.

(3) **Comment:** One commenter did not provide any objections to the proposed action but noted that the proposed amendments to 40 CFR part 58, Appendix E, Tables E-1, E-2, and E-3 to require that distance measurements will be rounded to retain at least two significant figures (88 FR 5676, January 27, 2023) also referenced a table that did not exist in the current regulation. The commenter noted that in the current regulations there is no Table E-3.

**Response:** The EPA acknowledges the commenter is correct and acknowledges the inaccuracy in the proposed action and the inadvertent misnumbering of the tables in the regulation that was current at the time of the proposed revisions. The EPA meant to state that the rounding convention would apply to the proposed tables E-1 – E-6 instead of the current regulation.

## IX. Responses to Significant Comments on Implementation

### A. Comments on Attainment Planning

(1) **Comment:** The EPA received comments on various topics related to attainment planning for nonattainment areas. For example, commenters suggested that the EPA revise the $PM_{2.5}$ State Implementation Plan (SIP) Requirements Rule (81 FR 58010, August 24, 2016); provide additional implementation guidance; and develop additional federal measures to help reduce emissions, among other comments.

**Response:** As stated in the NPRM, comments regarding implementation, including attainment planning, are outside the scope of this rulemaking, which is revising the PM NAAQS. The EPA acknowledges that many implementation-related comments were received and emphasizes that interested parties look to the $PM_{2.5}$ SIP Requirements Rule for guidance on implementation planning. In some instances, the comments regarded costs associated with implementation of the NAAQS. The EPA notes that under CAA Section 109(b)(1), the EPA is barred from considering costs in setting the NAAQS level. *Whitman v. American Trucking Associations*, 531 U.S. 457 (2001). The $PM_{2.5}$ SIP Requirements Rule was developed in such a way that it would apply to nonattainment areas for any $PM_{2.5}$ NAAQS that are revised in the future. To assist with implementation of the final revised $PM_{2.5}$ NAAQS, the EPA intends to provide a webinar for state, Tribal, and local air agencies, and other interested parties, following issuance of the final NAAQS, that reviews the

provisions of the $PM_{2.5}$ SIP Requirements Rule. The EPA intends to engage with state, Tribal, and local air agencies throughout the implementation process to assist in their development of approvable attainment plans.

(2) **Comment:** The EPA received a few comments requesting that we allow, in addition to EJ Screen, other EJ-related tools for attainment planning analysis.

**Response:** The EPA encourages air agencies to take EJ into consideration as they develop SIP submissions for the new $PM_{2.5}$ NAAQS. The EPA recognizes that tools similar to EJ Screen exist and may be beneficial for attainment planning purposes. The EPA recommends that air agencies consider the EJ-related guidance included in the SIP Requirements Rule, Section XI "Environmental Justice Considerations," (81 FR 58010, August 24, 2016), and utilize any appropriate tools to help provide a robust analysis. We note that the recently released Climate & Economic Justice Screening Tool (CEJST) also may be useful when developing an EJ analysis for attainment plans. The CEJST can be found at: *https://screeningtool.geoplatform.gov/en/*

## B. Comments on Initial Area Designations

(1) **Comment:** The EPA received comments on various topics related to initial area designations including but not limited to the proposed schedule, monitoring, consideration of background concentrations, international emissions, and emissions from prescribed fires and wildfires in the designations process.

**Response:** As stated in the NPRM, comments regarding initial area designations following promulgation of a new or revised NAAQS are outside the scope of this rulemaking, which is only revising the primary annual $PM_{2.5}$ standard for the NAAQS. As relevant and appropriate, the EPA expects to consider these comments as we develop the Initial Area Designations for the 2023 Revised Primary Annual Fine Particle National Ambient Air Quality Standard Memorandum (the "Annual $PM_{2.5}$ NAAQS Designations Memorandum"). In particular, the EPA acknowledges specific information on which commenters requested additional information and/or support in the context of designations. The EPA anticipates that the Annual $PM_{2.5}$ NAAQS Designations Memorandum will cover topics identified in the comments including certain aspects of the timing of submission of exceptional events demonstrations. As noted in the proposed rule, the EPA plans to release this memorandum around the time of promulgation of the revised PM NAAQS.

## C. Comments related to Exceptional Events

(1) **Comment:** The EPA received multiple comments raising a broad array of issues related to the exceptional events program, including requests for additional guidance or rules to inform the exceptional events process, questions regarding the schedule for submitting exceptional events initial notifications and demonstrations, and suggestions for streamlining the process for air agencies' preparation and the EPA's review of exceptional events demonstrations, in an effort to reduce time and resources spent by air agencies on the exceptional events process.

**Response:** As stated in the NPRM, comments regarding implementation, which include comments related to exceptional events matters, are outside the scope of this rulemaking. The EPA acknowledges the wide array of comments regarding the exceptional events program, including specific information about how exceptional events issues may impact timing for designations and other implementation considerations.

(2) **Comment:** Some commenters suggested that, given that the frequency and magnitude of wildfires have increased, the EPA streamline the exceptional events process in the following ways: allow a single demonstration for a range of dates regardless of whether those dates are consecutive; allow multi-agency or regional demonstrations; and allow the exclusion of concentrations affecting the annual standard.

**Response:** As stated in the NPRM, comments regarding implementation, which include comments regarding the Exceptional Events Rule, are outside the scope of this rulemaking. For clarification purposes, exceptional events demonstrations for multiple dates, multi-jurisdictional events, and concentrations affecting the annual standard are all permitted under the Exceptional Events Rule. The EPA will consider any exceptional event demonstration that has regulatory significance for the revised standard during the designations process, so long as the demonstration is submitted in the timeframe consistent with the exceptional events schedule for initial area designations, found at 40 CFR 50.14(c)(2)(vi). Additional resources regarding the Exceptional Events Rule, including best practices for multi-jurisdictional demonstrations, the Exceptional Events Frequently Asked Questions (FAQ) document, and example demonstrations, can be found at *https://www.epa.gov/air-quality-analysis/treatment-air-quality-data-influenced-exceptional-events-homepage-exceptional*.

(3) **Comment:** Some commenters stated that wildfires should no longer be considered exceptional events due to their increased frequency in recent years.

**Response:** As stated in the NPRM, comments regarding implementation, including comments related to the Exceptional Events Rule, are outside the scope of this rulemaking. For clarification purposes, CAA Section 319(b)(1)(A) defines an 'exceptional' event as an event that "(i) affects air quality; (ii) is not reasonably controllable or preventable; (iii) is an event caused by human activity that is unlikely to recur at a particular location or a natural event; and (iv) is determined by the Administrator through the process established in the regulations promulgated under paragraph (2) to be an exceptional event." The increased frequency of a natural event does not necessarily preclude the event from meeting this definition for the purposes of the Exceptional Events Rule. See *https://www.epa.gov/air-quality-analysis/treatment-air-quality-data-influenced-exceptional-events-homepage-exceptional* for more information on the Exceptional Events Rule.

(4) **Comment:** Several commenters expressed concerns that a revised NAAQS could inhibit prescribed burning. Some commenters expressed concern that state and local air agencies will issue burn bans and limit permitting of prescribed fires because of the potential that a prescribed burn will cause an exceedance or violation of the NAAQS. Further, commenters suggest that the Exceptional Events Rule discourages air agencies from issuing burn permits due to the resources required to prepare and submit an exceptional event demonstration were the burn to cause a regulatorily significant exceedance or violation of a NAAQS.

Commenters recommend the EPA provide additional resources or flexibilities for prescribed fires under the Exceptional Events Rule. Some commenters recommended the EPA consider some form of exemption for prescribed fires, such as removing the need for exceptional event demonstrations for prescribed fires.

**Response:** The EPA acknowledges the commenters' concerns regarding implementation of the Exceptional Events Rule. As stated in the NPRM, comments regarding the Exceptional Events Rule are outside the scope of this rulemaking.

## D. Comments on New Source Review (NSR) Permitting

(1) **Comment:** Several commenters expressed concern that the narrowing difference between an area's baseline ambient concentration and the NAAQS will prevent new project construction and/or plant expansions because companies will be unable to meet NSR preconstruction permitting requirements. These commenters state that the EPA's proposal to reduce the $PM_{2.5}$ NAAQS to a level close to measured ambient backgrounds in many areas is likely to halt new industrial projects and expansions. These commenters state that the required emission offsets are scarce and expensive, likely making it cost prohibitive to site a new facility or expand an existing one in a nonattainment area. Commenters also indicated that obtaining Prevention of Significant Deterioration (PSD) offsets is prohibitively expensive. One commenter added that this may also implicate minor source permitting. These commenters stated that projects that go forward may be forced to obtain expensive emissions offsets or would fail if those offsets are not available. Commenters provided examples of projects, especially power generation projects such as the installation of simple cycle combustion turbine (CT) natural gas units and reciprocating engines, that will be implicated by the revised NAAQS.

**Response:** As stated in the NPRM, comments regarding implementation are outside the scope of this rulemaking. For clarification purposes regarding permitting obligations that will become requirements upon the effective date of this rule, the EPA is providing the following information. The EPA is cognizant that the revised annual $PM_{2.5}$ NAAQS will result in new permitting analyses for new sources and major modifications of existing sources as of the effective date. As a general matter, these additional analyses and issues have existed for prior NAAQS revisions. The EPA has previously responded to many of the issues raised, indicating that sources can offset emissions increases to allow for expansion in the event that little room exists between an area's baseline ambient concentration and the revised NAAQS. *See, e.g.,* 44 FR 3274, 3278, January 16, 1979; See also *In re Interpower of New York, Inc.,* 5 E.A.D. 130, 141 (EAB 1994) (describing an EPA Region 2 PSD permit that relied in part on offsets to demonstrate the source would not cause or contribute to a violation of the NAAQS). 52 FR 24634, 24684, July 1, 1987; 78 FR 3085, 3261-62, Jan. 15, 2013. The EPA recognizes the ability of sources to obtain offsets in the context of PSD though the PSD provisions of the Act do not expressly reference offsets as the NNSR provisions of the Act do. *See* 80 FR 65292, 65441, October 26, 2015. The EPA is aware that offsets, either in the context of the required air quality impact demonstration under the PSD program or as required under the NNSR program, may be expensive and/or difficult to obtain as commenters note. Additionally, under CAA Section 109(b)(1), the EPA is barred from

considering costs in setting the NAAQS level. *Whitman v. American Trucking Associations*, 531 U.S. 457 (2001).

(2) **Comment:** Several commenters (including industry groups and two states) recommend that, to avoid significant challenges to PSD permitting for $PM_{2.5}$ and to address the 2019 court decision that does not allow grandfathering provisions, the EPA should consider establishing an effective date for a new primary annual $PM_{2.5}$ NAAQS later than the traditional 60 days after Federal Register publication. These commenters suggest that the EPA consider establishing an effective date of either one or two years after the final rule is published in the Federal Register. Another commenter adds that a two-year effective date for any revised NAAQS: (1) would be consistent with the policies underlying Executive Orders, the APA, and the CAA provisions regarding rule effective dates; (2) would conform to recent case law in Murray Energy; (3) would not delay the CAA's schedule for § 107 designations and § 110 SIP preparation, submittal, and approval, which are tied to promulgation date rather than effective date; (4) would promote fairness to pending permit applicants; (5) would avoid disruption to permitting of important projects necessary for modernizing the nation's infrastructure and diversifying our production and energy sources; (6) would advance the public interest by assisting with the implementation of policies recently enacted by this Administration through Congress; and (7) would allow the EPA time to develop new modeling and permitting tools. A state commenter requested that the EPA allow for a grace period for permit applications received prior to the revision of the standards. More specifically, the commenter requests a period of at least six months from when the application was received to give permitting authorities reasonable time to finalize issuance of permits submitted prior to the promulgation of the new standard. Another state commenter recognizes that the EPA can no longer provide for grandfathering of sources, but urges the EPA to find a solution to this issue.

Other commenters stated that the EPA correctly recognized that, after the new standards go into effect, the CAA requires that a preconstruction prevention of significant deterioration permit cannot issue without a demonstration that the new or modified source of $PM_{2.5}$ will not cause or contribute to violations of the new standards, 88 Fed. Reg. at 5685-86. 42 U.S.C. § 7475(a)(3); *see Murray Energy*, 936 F.3d at 625-27. Though the EPA may have included a grandfathering provision in a prior iteration of its PM NAAQS, the legal bar on including one here still applies. *Murray Energy*, 936 F.3d at 626-27; see also 88 FR at 5686 n.200.

**Response:** The EPA is not extending the effective date for the revised PM NAAQS for a number of reasons. The EPA has the authority to set a 60-day effective date, consistent with the Congressional Review Act (CRA) and the EPA's precedent for significant rules. The timing of the 60-day effective date will ensure that important health benefits associated with the revised NAAQS are not delayed. Finally, the timing of the 60-day effective date is not inconsistent with the D.C. Circuit Decision in *Murray Energy*. A delay of the type requested by commenters would essentially allow for increases in emissions that could cause or contribute to a violation of the revised standard, which conflicts with the PSD provisions of the CAA and could jeopardize attainment of the NAAQS in some areas. While the EPA is aware that the revised NAAQS will immediately take effect for PSD permitting purposes upon the effective date, and that new areas will later be designated nonattainment for the revised standard, there is not a sufficient record to support that the 60-day effective date

would disrupt PSD permitting. Regulated parties have had notice of this matter since at least 2019 when the D.C. Circuit issued the *Murray Energy* decision. Further information was also included in the January 2023 proposed $PM_{2.5}$ NAAQS revision. As described in the preamble to the final rule and elsewhere in this RTC, tools are available under the PSD and NNSR programs to facilitate permitting in most cases. In some limited cases, the air quality in an area and the projected impact of a new or modified source may be such that the source cannot make the required air quality impact demonstration under PSD or obtain required offsets under the NNSR program. The CAA requires that these criteria corresponding to the NAAQS be met before construction on new major stationary sources and major modifications may be authorized. Moreover, the EPA is barred from considering costs in setting the NAAQS level.

(3) **Comment:** A commenter stated that EPA "must clarify the applicability of 'Prevention of Significant Deterioration (PSD)' and 'Nonattainment New Source Review (NNSR)' permitting to ammonia to avoid predictable permitting impasses and resulting lost economic opportunities." The commenter requested confirmation that ammonia is not a NSR regulated pollutant under PSD, and that ammonia is not subject to a NNSR major modification significance level unless and until one is set by a state for its $PM_{2.5}$ nonattainment areas.

**Response:** The EPA previously addressed this comment in prior actions. With regard to ammonia and the PSD program, the EPA regulations explain that ammonia is not a regulated air pollutant under the PSD program. See 40 CFR 51.166(b)(49); 52.21(b)(50). See also 70 FR 65983, 66036 (November 1, 2005) (proposing not to identify ammonia as a regulated NSR pollutant for purposes of PSD in any attainment or unclassifiable areas); 73 FR 28321, 28330 (July 15, 2008) (reaffirming that ammonia is not a regulated NSR pollutant for PSD). Ammonia, as a precursor to $PM_{2.5}$, is a regulated air pollutant under the NNSR program. See 40 CFR 51.165(a)(1)(xxviii); 40 CFR part 51 Appendix S II.A.4.31. The EPA finalized a rule in 2016 requiring reviewing authorities to regulate ammonia, among other pollutants, as a precursor to $PM_{2.5}$ in all nonattainment areas. The EPA promulgated this rule following a D.C. Circuit Court decision, *NRDC v. EPA*, which required PM2.5 be implemented under subpart 4 of Title I, Part D of the CAA. No. 08-1250 (D.C. Cir. 2013). As subpart 4 includes requirements only pertinent to nonattainment areas, the EPA does not consider the portions of the 2008 $PM_{2.5}$ NSR Rule that address requirements for $PM_{2.5}$ attainment and unclassifiable areas to be affected by the court's opinion in *NRDC* v. *EPA*. Therefore, the EPA did not propose to revise any PSD requirements promulgated in the 2008 $PM_{2.5}$ NSR Rule in order to comply with the court's decision.

Ammonia is presumed to be a precursor to $PM_{2.5}$ in all $PM_{2.5}$ nonattainment areas. With respect to the regulation of ammonia as a precursor to $PM_{2.5}$ under the NNSR program and the requirement that the reviewing authority establish a significant emission rate for ammonia in certain circumstances, the EPA established a phase-in approach for newly designated $PM_{2.5}$ nonattainment areas in the absence of an approved $PM_{2.5}$ NNSR SIP. The phase-in provides a reasonable timeframe for submittal of a NNSR precursor demonstration or the establishment of a SER for ammonia, either area-wide or on a permit-specific basis, in accordance with 40 CFR part 51, Appendix S. 81 FR 58010, 58106 (August 24, 2016).

(4) **Comment:** A commenter stated its perspective that the practice of permitting facilities in areas with $PM_{2.5}$ concentrations at or near the NAAQS means that many permitted facilities are likely already violating the current $PM_{2.5}$ standards that we know are insufficient to protect human health and the environment. The commenters state that because facilities are often permitted at or near the NAAQS, and knowing that facilities will likely not be in continuous compliance, they request that the EPA to adopt the most stringent $PM_{2.5}$ standards recommended by the CASAC expert panel, of 8 $\mu g/m^3$ for the annual standard and 25 $\mu g/m^3$ for the 24-hour standard in order to address reduce the overall amount of $PM_{2.5}$ in these already overburdened airsheds and best protect the health of New Mexico's communities.

Reviewing authorities should not be permitting major modifications and new facilities that cause or contribute to a violation of the NAAQS. 42 USC 7475(d). Reviewing authorities should evaluate every project or new source permit to ensure that the project does not cause or contribute to a NAAQS violation. Id.

**Response:** The CAA and the EPA's implementing regulations require a PSD permit applicant to demonstrate that emissions from a proposed major stationary source or major modification will not cause or contribute to a violation of any NAAQS or PSD increment and to provide an analysis of the impact of those emissions on ambient air quality based on monitoring data and air quality modeling. *See* CAA § 165(a)(3), CAA § 165(e), 40 CFR 52.21(k) and 40 CFR 52.21(m). Each individual decision to issue a PSD permit must be supported by a record sufficient to demonstrate that the proposed construction and operation of a stationary source will not cause or contribute to a violation of the applicable NAAQS and PSD increments. The EPA agrees that reviewing authorities should ensure that such demonstrations and PSD permit records meet the requirements of the CAA and implementing PSD regulations.

(5) **Comment:** A commenter supports continued refinement of the EPA's regulatory tools to assess more accurately a source's impacts on air quality, including reducing conservatism in modeling and in tools that may overestimate emissions impacts on projected air quality. The EPA should continue to refine and expand data supporting tools, such as its 2019 Guidance on Modeled Emission Rates for Precursors (MERPs).

A state commenter recommends that the EPA's "Guidance for Ozone and Fine Particulate Matter Permit Modeling," is unduly burdensome and may prevent economic development opportunities at existing major sources, for projects with even minimal direct $PM_{2.5}$ emissions. The commenter therefore recommends that the EPA revisit the significant emission rate of 40 tons per year established for precursors to secondary PM2.5 formation, namely NOx and $SO_2$, established in 40 CFR 51.166(b)(23)(i) and 40 CFR 52.21(b)(23)(i). The commenter states that forty tons per year of either precursor does not equate to the significant emission rate of 10 tons per year of direct $PM_{2.5}$ and is overly conservative.

**Response:** As stated in the NPRM, comments regarding implementation, including NSR applicability and permit modeling guidance are outside the scope of this rulemaking which is setting the standard for the NAAQS. However, the EPA acknowledges commenter's statements regarding the EPA's guidance on modeling for particulate matter, including the

"Guidance for Ozone and Fine Particulate Matter Permit Modeling" and the significant emission rates for $PM_{2.5}$ precursors in the EPA NSR regulations.

## X. Response to Significant Comments on Legal, Administrative, and Procedural Issues and to Miscellaneous Comments

### A. Legal Comments

(1) **Comment:** A number of commenters contend that the proposal exceeds the EPA's statutory authority. These commenters argue that there is nothing in section 109 of the CAA that authorizes the Agency to reconsider a decision by the Administrator not to revise a NAAQS in a previous statutorily prescribed NAAQS review, and that the EPA assumes it has some inherent authority to do so without identifying such authority in January 2021. These commenters recognize that section 109(d)(1) of the CAA allows for the review and revision of the air quality criteria or promulgation of new standards more frequently than every five years, but assert that under section 109 "any such revision should be effectuated '*in the same manner*' in which those standards were first 'promulgated'" and that the proposed revision to the primary annual $PM_{2.5}$ standard is not the result of a "thorough review of…the national ambient air quality standards" pursuant to section 109(d)(1) of the CAA. Some commenters suggest that the EPA may not reopen the air quality criteria without undertaking a comprehensive review of the entire criteria. Furthermore, these commenters suggest that promulgation or revision of any NAAQS is governed by section 307(d)(1)(A), and that the only sort of reconsideration proceeding contemplated under section 307(d) is that described in section 307(d)(7), subparagraph (B). They state that subpart (B) "provides that 'the Administrator shall convene a *proceeding for reconsideration* of the rule' in those circumstances where a person who seeks to challenge a final rule on the basis of an objection not raised during the public comment period 'can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule.' CAA § 307(d)(7)(B) (emphasis added)." They further note that while several petitions for reconsideration were filed following the 2020 final decision, the Administrator did not refer to those petitions in announcing the reconsideration of the PM NAAQS. The commenters also contend that reconsideration of the 2020 final decision to retain the PM NAAQS must be considered in light of precedents such as *American Methyl Corp. v. EPA*, 749 F.2d 826 (D.C. Cir. 1984), and *New Jersey v. EPA*, 517 F.3d 574, 583 (D.C. Cir. 2008), noting that the U.S. Court of Appeals for the D.C. Circuit observed that, "when Congress has provided a mechanism capable of rectifying mistaken actions . . . it is not reasonable to infer authority to reconsider agency action." The commenters recognize that the Agency is not considering the 2020 final decision to be "mistaken" but state that Congress provided an express "mechanism" by which the EPA is authorized to review and determine whether or not to revise the NAAQS and that is under the procedures set for expressly under section 109(d)(1) of the CAA. Other commenters contend that the CAA does not give the EPA unlimited authority to address all environmental issues generally, stating that Congress determines the extent of that authority, not the Agency.

A number of commenters assert that, because they believe the reconsideration is a discretionary action, the Administration must justify cost. Some commenters suggest that, in reconsidering the "appropriateness" of the 2020 final decision that revisions to the PM NAAQS were not "appropriate," and in concluding that revisions to the PM NAAQS are "appropriate," the EPA must consider all costs that would result from the implementation of the proposed revisions. The commenters assert that the EPA cannot evade consideration of costs in determining whether or not to revise a NAAQS by invoking an unprecedented procedure (i.e., a reconsideration) to circumvent the requirements of section 109(d)(1) of the CAA. The commenters state that the EPA is obligated to engage in reasoned decision making, which requires the Administrator to account for the full range of costs associated with the decision to reconsider the PM NAAQS and to depart from the 2020 final decision. The commenters suggest that the cost of a more stringent standard is a relevant factor that must be considered and an important aspect of the problem that cannot be ignored, and failure to consider the full range of costs would render any final action arbitrary and capricious. These commenters further contend that the EPA does not indicate that it understands these obligations, suggesting that the EPA's invocation of *Whitman v. American Trucking Associations* is not valid in this context. Furthermore, these commenters argue that the EPA must first determine whether it should proceed to regulate at all at this time (including treating cost as a relevant factor in reaching such a decision) and before addressing how to revise the NAAQS, the EPA must confront whether to revise, and in reaching a decision to proceed, the EPA must take into consideration costs, citing to *Michigan v. EPA*, 576 U.S. 743 (2015). These commenters also suggest that if the EPA revises the PM NAAQS as proposed, the Agency must consider the broader social and economic impacts of a revised NAAQS in determining the acceptable level of risk. In so doing, the commenters note that, in *Whitman*, the EPA cannot consider implementation costs, but the EPA is not prohibited from considering other costs (i.e., "disbenefits"), specifically those listed in section 109 of the CAA, including adverse public health, welfare, social, economic, and energy effects. These commenters also point to Justice Breyer's separate opinion in *Whitman* and state that, in the reconsideration, the Administrator must embrace the range of discretion afforded to him to ensure reasoned decision making. These commenters further assert that the EPA should withdraw the reconsideration proposal because it creates regulatory uncertainty and burden in economically challenging times. These commenters note that this would not be the first Administrator to consider the costs and burdens when withdrawing a reconsideration, pointing to the decision to withdraw the reconsideration of the ozone NAAQS in 2011. These commenters state that the U.S. once again faces economically challenging times, and that the costs from any revisions that are finalized would undermine competitiveness of U.S. manufacturing and businesses that support critical infrastructure and electricity needs of the U.S., and businesses would be driven to other countries. These commenters also argue that the standards are unattainable, citing the Regulatory Impact Analysis (RIA) and analyses of the RIA, and should be withdrawn pending development of strategies to attain the proposed standards because Congress could not have anticipated the difficulties that may be associated with attaining the standard.

On the other hand, other commenters state that the EPA's decision on reconsideration must be based solely on health and welfare, and there is no room for consideration of costs. They suggest that the decision to end the previous reconsideration of the ozone standards was

made under different circumstances and the justification for ending the reconsideration was never judicially upheld. They also point to the reconsideration petitions pending before the Agency as supporting reconsideration of the PM NAAQS and supporting the conclusion that more stringent standards are warranted.

Some commenters question how the reconsideration will impact the five-year review cycle, as mandated by the CAA. These commenters ask if, given the reconsideration, the EPA should complete another PM NAAQS review in 2025 or if the next review should be in the 2028 timeframe.

**Response:** This action is squarely within EPA's authority under section 109 of the CAA and the EPA has always been clear it is acting under section 109 consistent with its statutory mandate from Congress. Congress intended the EPA to periodically revisit and revise, as appropriate, the air quality criteria and the NAAQS, and this action is consistent with both the EPA's implicit and explicit authority to revisit earlier decisions on the NAAQS. It is well-established that agencies generally have implicit, or inherent, authority to reconsider their prior actions and take new action in a different direction, provided the Agency is not precluded from doing so by the statute and has a sufficient rationale for the new action. See, e.g., *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009); *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co*., 463 U.S. 29, 42 (1983). Certainly nothing in the Clean Air Act precludes the EPA from revisiting earlier decisions on NAAQS, and the language of section 109 indicates that Congress clearly intended the EPA to revisit, reconsider, and revise earlier decisions as appropriate.

The EPA agrees with the commenters that the Agency is required to engage in reasoned decision-making in this action, but maintains that it has done so in both the notice of proposed rulemaking and in this final action. The EPA disagrees with the commenters that the requirement of reasoned decision-making for this action imposes an additional requirement that the Administrator consider costs of implementation of implementing a revised standard, and with the suggestion that the Supreme Court's holding in *Whitman* does not apply to reviews under section 109(d), including this reconsideration. The Supreme Court held in *Whitman v. American Trucking Ass'ns* that "The text of § 109(b), interpreted in its statutory and historical context and with appreciation for its importance to the CAA as a whole, unambiguously bars cost considerations from the NAAQS-setting process…." 531 U.S. 457, 471 (2001). There is no basis for suggesting that this holding is limited to reviews undertaken under section 109(b) but not those undertaken under section 109(d) since every review since 1990 (including the reviews at issue in *Whitman*) has necessarily been undertaken pursuant to both section 109(b) and 109(d) and 109(d) expressly references 109(b). Moreover, the Supreme Court in *Whitman* expressly considered and rejected the argument raised by petitioners that the EPA must consider "disbenefits" from adverse public health, welfare, social, economic or energy effects. The Court noted that Congress "not only anticipated that compliance costs could injure the public health, but provided for that precise exigency." *Id.* at 467. The Court went to note that "Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes" and that the statutory text left no room for the argument that the EPA was supposed to incorporate considerations of the effects of implementation into its decision making on the NAAQS. *Id.* at 468. Moreover, for the same

reasons, courts have consistently held that attainability of the standard is also not a relevant criterion in selecting a NAAQS. See *Lead Indus. Ass'n, Inc. v. EPA*, 647 F.2d 1130, 1148 (D.C. Cir. 1980); *Am. Petroleum Inst. v. Costle*, 665 F.2d 1176, 1185 (D.C. Cir. 1981); *Murray Energy Corp. v. EPA*, 936 F.3d 597, 623 (2019). The EPA also disagrees that the Regulatory Impact Analysis (RIA) demonstrates that the revised standards are unattainable or that Congress did not anticipate the difficulties associated with attainment of a standard based solely on public health without consideration of economic or technological feasibility. The RIA examines illustrative emissions control strategies toward reaching attainment and does not purport to make a judgment whether the standard will be attainable by the attainment dates established in the CAA. As the DC Circuit noted in *Lead Industries*, "[t]he 'technology-forcing' requirements of the Act are expressly designed to force regulated sources to develop pollution control devices that might at the time appear to be economically or technologically infeasible." 647 F.2d at 1149 (internal quotation omitted). Past experience with the NAAQS has demonstrated this to be true, as the City of Houston, which unsuccessfully challenged the 1979 ozone NAAQS in *API* on the grounds that it was unattainable, has since attained that standard (see 85 FR 8411, February 14, 2020). Likewise Congress has been well aware throughout the history of the CAA that attaining the NAAQS may pose severe challenges. The DC Circuit noted in *Lead Industries* that in establishing the NAAQS in the 1970 CAA the Senate drafters considered whether to use "the concept of technical feasibility as the basis for ambient air quality standards" but concluded that "the health of people is more important." 647 F.2d at 1149. However, Congress well understood that this approach could necessitate shutdown of existing sources of pollution, result in significant economic impacts, and might even prove beyond the ability of industry to meet. The court quotes Senator Muskie as saying "I think that we have an obligation to lay down the standards and requirements of this bill. I think that the industry has an obligation to try to meet them. If, in due course, it cannot, then it should come to Congress and share with the Congress the representatives of the people the need to modify the policy." Id. at 1150. Thus, the court finds that Congress has made a policy decision to base the standards on public health regardless of concerns about technical feasibility and if it turns out there is a problem then Congress is "the only institution with the authority to remedy the problem." Id. Of course it is worth noting that in later years Congress did amend the CAA to extend the attainment deadlines for different NAAQS where it found it appropriate to do so in light of the challenges of attaining the standards. For example, the attainment deadline for areas classified as serious nonattainment for the PM NAAQS is ten years, rather than five years, after designation. For all of these reasons, although the EPA does not agree that the standards have been shown to be unattainable, the Administrator has acted consistently with the requirements of the CAA in declining to consider the analyses in the RIA or attainability of the revised standards in revising the standards under section 109.

The EPA in this action is following the direction of *Whitman* and setting the NAAQS that provide the requisite protection for public health and welfare, as required by the CAA section 109. Nonetheless the EPA notes that some comments suggest that the EPA lacks authority to set such a NAAQS under the "major questions doctrine," on the theory that the revised NAAQS could have significant economic impacts. This of course is a perverse inversion of the holding of *Whitman,* which is commonly understood to be part of the "major questions doctrine" line of cases and held that the EPA is *required* to set NAAQS to protect public health and public welfare without consideration of the potential economic impact of the

standards. *See, e.g., Whitman*, 531 U.S. at 471 ("The text of § 109(b) … unambiguously bars cost considerations from the NAAQS-setting process, and thus ends the matter for us as well as the EPA."); *see also*, *West. Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (citing *Whitman* for the proposition that "Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'").

Similarly, some commenters argue that because under the CAA the Administrator is charged with periodically reviewing and making such revisions to air quality criteria and NAAQS "as may be appropriate" that the scope of "appropriate" in NAAQS reviews must encompass costs, under the Supreme Court's decision in *Michigan v. EPA*, 576 U.S. 743 (2015). Such an argument is also plainly inconsistent with the Supreme Court's decision in both *Whitman* and *Michigan*,[18] as well as the D.C. Circuit's decision in *Murray Energy* (*see* 936 F.3d 597, 621-622 (D.C. Cir. 2019)).

Some commenters further suggest that the EPA is at least required to consider costs because this is a reconsideration completed sooner than the statutory 5-year deadline for periodic NAAQS reviews. The EPA notes that section 109(b) provides that NAAQS "may be revised in the same manner as promulgated." The EPA understands this provision to authorize the Administrator to revise the NAAQS and to require that every NAAQS revision be subject to the same basic requirements under section 109 (and *Whitman*) – the standards must be based on the air quality criteria and must be requisite to protect the public health for primary standards and public welfare for secondary standards. The NAAQS decisions made in this action conform to those requirements for primary and secondary standards, respectively.[19] It would be an absurd result, contrary to both the statute and caselaw, if the Administrator was required to disregard costs of implementation in setting a NAAQS under the 5-year schedule but was free to turn around the following year and revise the NAAQS to a different level based on the costs of implementation.

Similarly, the EPA rejects the suggestion that it is required to consider costs of implementation in deciding whether to revise the NAAQS, or that it is required undertake any particular analysis to justify its decision to reconsider the NAAQS. Some commenters point to statements made by the President and the Administrator of OIRA regarding the completion of interagency review of a draft final decision on a prior reconsideration of a NAAQS. These statements, which were not made by the EPA, do not establish that the EPA Administrator has discretion, much less the obligation, to consider costs of implementation in making any decisions regarding the NAAQS under section 109, particularly where such considerations are prohibited under section 109. As just noted, section 109(b) provides that NAAQS may be revised in the same manner as promulgated, and section 109(d) provides that the Administrator "may review and revise criteria or promulgate new standards earlier or

[18] In *Michigan*, the Court did not over-rule *Whitman*; it simply noted the principles of *Whitman* were irrelevant to the statutory provision at issue in *Michigan*, highlighting textual differences between the statutory provision before it in *Michigan* and the provisions at issue in *Whitman* and repeating that the provision at issue in *Whitman* "does not encompass cost." *Michigan*, 576 U.S. at 755–56.

[19] Although section 109(b) does not specify any particular process that must be followed, this reconsideration followed the same notice and comment rulemaking procedures, as required by section 307(d), as previous reviews.

more frequently than required under this paragraph." Nothing in section 109 suggests that before undertaking a review of the air quality criteria or standards the Administrator is required to assess the potential economic or social impacts of a possible decision that he might reach to revise the NAAQS based on such a review. As noted above, the Supreme Court has held that "Congress does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions -- it does not, one might say, hide elephants in mouseholes." Imposing such a requirement on the Administrator as a precondition to reviewing the NAAQS would fundamentally alter the nature of the NAAQS review process away from its focus on the health of the public. "And because § 109(b)(1) and the NAAQS for which it provides are the engine that drives nearly all of Title I of the CAA, 42 U.S.C. §§ 7401-7515, that textual commitment must be a clear one." *Whitman*, 531 US at 468. There is no such textual commitment in section 109, and the EPA concludes there is no such requirement on the Administrator.

Some commenters also suggest that the EPA lacks authority to undertake this action because Congress has specified the mechanism for the EPA to revise NAAQS in section 109(d)(1) and this proceeding fails to satisfy the requirements of that provision. The EPA disagrees that this action falls outside the scope of section 109(d)(1). As noted above, section 109(d)(1) specifically authorizes the Administrator to "review and revise criteria or promulgate new standards earlier or more frequently than required under this paragraph." That is precisely what the Administrator is doing here. This reconsideration is based on the thorough review of the air quality criteria completed in 2020, as supplemented by the additional studies, information, and analyses in the ISA Supplement and 2022 PA. The EPA acknowledges that the ISA Supplement does not itself satisfy the EPA's obligation to periodically complete a thorough review of the air quality criteria. There are a number of areas, such as respiratory effects and reproductive and developmental effects, where commenters have identified new studies that the EPA judged did not warrant reopening the air quality criteria at this time but will warrant closer consideration in a future review. Thus, a "thorough review" of the air quality criteria for PM, along with any revisions to the criteria and NAAQS that may be appropriate, should still be completed within five years of the most recent complete review, which concluded in 2020. However, nothing in the last sentence of section 109(d)(1) indicates that the authority of the Administrator to revise air quality criteria or NAAQS is limited to the context of a new full review of the air quality criteria.

It is true that the first sentence of section 109(d)(1) imposes a duty on the Administrator to "complete a thorough review of the criteria published under section 7408 of this title and the national ambient air quality standards promulgated under this section and shall make such revisions in such criteria and standards and promulgate such new standards as may be appropriate …." However, a careful reading makes plain that the last sentence of section 109(d)(1) provides additional authority, independent of the requirement to undertake a full review of the air quality criteria and revise the criteria and the NAAQS, as appropriate, every five years. The first sentence of section 109(d)(1) clearly specifies that every five years the Administrator must undertake "a thorough review of the criteria" and then, based on that review make such changes in the air quality criteria and the NAAQS as may be appropriate. By contrast, the last sentence of section 109(d)(1) simply says "may review and revise criteria or promulgate new standards earlier or more frequently than required under this paragraph." Thus, while the first sentence of section 109(d)(1) establishes the baseline

requirement that the air quality criteria must undergo a "thorough review" at least every five years (which may necessitate revisions to the NAAQS), the last sentence authorizes the Administrator to review and revise *either* the air quality criteria or the NAAQS on a shorter schedule of the Administrator's choosing. The plain language of the last sentence of section 109(d)(1) authorizes the Administrator to revise the NAAQS *without* revising the air quality criteria. It also authorizes the Administrator to revise the air quality criteria, without undertaking a "thorough review" of the criteria. It follows that the action of the Administrator here, to reopen the air quality criteria to seek CASAC advice on certain studies he considered most useful in informing conclusions on the health effects of PM and revising the NAAQS based the entire air quality criteria (including both the thorough review completed in 2020 as well as additional studies judged most likely to be useful), was entirely consistent with the authority granted by Congress in section 109(d)(1).

Moreover, as explained at length in the final decision on the 2012 PM NAAQS (78 FR 3095-96), "[s]ince the 1970 amendments, the EPA has taken the view that NAAQS decisions are to be based on scientific studies and related information that have been assessed as a part of the pertinent air quality criteria." As a consequence, when the EPA believes new science is sufficiently important to be material to decision making on NAAQS, it reopens the air quality criteria to allow the CASAC and the public, as well as the Administrator, to fully consider the evidence. In each review the EPA faces the question of whether "new" studies that become available, or are brought to EPA's attention, at the time of the rulemaking but were not initially presented to the CASAC should be considered for decision making on the NAAQS, and where the EPA has concluded these studies should be considered for decision making, the EPA has reopened the air quality criteria for the review, as it has done here. Thus, the EPA finds that its approach to reopening the air quality criteria in this reconsideration, recognizing that there were additional studies that should be considered for decision making, and deciding to bring to the CASAC a draft ISA Supplement considering those studies most likely to be useful in judging whether the current standards are requisite, is entirely consistent with the CAA and the EPA's longstanding practice.

Finally, because the Administrator is acting within the scope of his authority under section 109 (whether that authority is characterized as implicit or explicit), it is irrelevant that CAA section 307(d)(7)(B) also requires the Administrator to convene a reconsideration proceeding under certain circumstances. Section 307(d)(7)(B) is intended to ensure that any objections to EPA's decisions on the NAAQS are brought before the Agency for consideration before being raised in judicial review. Thus, where a commenter identifies an issue of central relevance to the rule that was impracticable to raise an issue in public comment (or that arose after the public comment period but before judicial review), this provision specifies EPA shall convene a reconsideration proceeding to consider the issue. However, section 307(d)(7)((B) merely specifies certain circumstances when reconsideration is necessary—it does not limit the availability of reconsideration to only those circumstances, and it does not alter the Administrator's authority to revise NAAQS when acting within the scope of his authority under section 109.

(2) **Comment:** Some commenters, in their questioning of the Agency's statutory authority for the reconsideration, suggest that in reaching decisions regarding the adequacy of the NAAQS the CAA requires consideration of science-based criteria, not policy-based criteria.

Therefore, the commenters contend that policy initiatives, such as environmental justice, should not be included because the EPA does not have the authority to include them.

**Response:** The EPA agrees that the NAAQS must be based on the air quality criteria, although any decision on the appropriate NAAQS necessarily requires the Administrator to exercise his judgment, including with respect to science policy and public health policy judgments on the strength and uncertainties of the scientific evidence. The EPA did not seek to rewrite or expand its authority in this reconsideration but simply set standards requisite to protect the public health and welfare based on the air quality criteria. The Administrator expressly considered the available information regarding health effects among at-risk populations in reaching the proposed decisions that the current primary annual $PM_{2.5}$ standard is not requisite to protect public health with an adequate margin of safety, and should be revised. The 2019 ISA and ISA Supplement identified children, older adults, people with pre-existing diseases (cardiovascular disease and respiratory disease), minority populations, and low SES populations as at-risk populations. Consistent with the EPA's longstanding approach to the NAAQS, which is supported by legislative history and case law as discussed in section I of the preamble, the EPA set the NAAQS to protect the at-risk populations identified for this review, including minority and low SES populations.

(3) **Comment:** Several commenters contend that the EPA's reconsideration of the 2020 final decision is a discretionary action. Commenters assert that the EPA's proposed decision to reconsider the PM NAAQS is premature, and that the EPA should withdraw its reconsideration and defer further action to a future required review. Commenters also suggest that the reconsideration is based more on a change in administration rather than the NAAQS process as described in the CAA, that the proposed decision is based on politics rather than science, and that the reconsideration should be suspended.

Some commenters note that the CAA requires review of the NAAQS no more than five years after its previous review, and assert that the EPA should wait the mandatory timeframe before embarking on a new standard. Other commenters express concerns about proposing revisions to the standards in the reconsideration three years ahead of the schedule of the CAA statutorily-mandated review, suggesting that predictability helps state and local officials engage in long-term planning for NAAQS implementation and other environmental requirements.

**Response:** As discussed in responding to the earlier comment in this section, the CAA authorizes the Administrator to revise the air quality criteria or the NAAQS more frequently than every five years. The Administrator initiated the reconsideration because he concluded that the available scientific evidence and technical information indicated that the current standards may not be adequate to protect public health and welfare, which is a sufficient and appropriate basis for reconsidering the NAAQS. When such questions arise, the CAA does not require the Administrator to wait until the next statutory review deadline before addressing them. Moreover, the PM NAAQS was most recently revised in 2012 and Congress clearly anticipated that the NAAQS could – and, where appropriate based on a review of the science and the standards, should – be revised more often than every 10 years. To the extent that the comments related to implementation of the NAAQS implicate consideration of the costs of implementation or consideration of attainability and

technological feasibility, those are not relevant considerations in making decisions about whether to revise the NAAQS. *See, e.g., Whitman v. American Trucking Associations*, 531 U.S. 457, 465-472, 475-76 (2001); *American Petroleum Institute v. Costle*, 665 F.2d 1176, 1185 (D.C. Cir. 1981); *accord Murray Energy Corporation v. EPA,* 936 F.3d 597, 623-24 (D.C. Cir. 2019). Even assuming the concerns raised in these comments were appropriate for consideration in this action, there are no implementation activities that were triggered by the 2020 final decision to retain the PM NAAQS that could be disrupted by revising the NAAQS in this action.

As discussed in the preamble to the final rule, the decision to revise the NAAQS was based on additional scientific evidence that was not part of the criteria considered by the prior Administrator, and additional advice from the CASAC and public comment taking that additional evidence into account, as well as on the current Administrator's judgments about the evidence, including an approach to the epidemiologic evidence that is more in line with the EPA's approach to considering such evidence in past PM NAAQS reviews compared with the approach in the 2020 final decision. Thus, the EPA rejects the suggestion of some commenters that the reconsideration is not based on science or is not fully consistent with the requirements of the CAA.

(4) **Comment:** Other comments argue that, while the EPA may not consider the cost of implementing the standard, it may consider the relative proximity of the standard to background concentrations. These commenters assert that the proposal fails to meet this legal standard and revisions to the NAAQS will result in a $PM_{2.5}$ standard that is at or near existing background concentrations in the Western U.S., noting for example, increases in wildfires, and calculation of "background" $PM_{2.5}$ on a permit application. Some commenters acknowledge EPA's estimates of background as 0.5-3 $\mu g/m^3$ but suggest that estimate is not representative of the entire country, with one commenter citing an estimate of 6 $\mu g/m^3$ of "background" $PM_{2.5}$ which was modeled as part of an application to modify a state air pollution permit.

**Response:** The EPA agrees that, in the context of considering standard levels within the range of reasonable values supported by the air quality criteria and judgments of the Administrator, the EPA may consider proximity to background concentrations as a factor in the decision on whether and how to revise the NAAQS.[20] However, the EPA disagrees that the revised primary annual $PM_{2.5}$ NAAQS will be at or near existing background levels. The EPA presented two estimates for background $PM_{2.5}$ in the proposed rule, one based on zero-out modeling which produced a range of 0.5-3 $\mu g/m^3$ and one using speciated monitoring

[20] The EPA generally understands prior court decisions addressing consideration of background concentrations of a pollutant in NAAQS reviews to hold that while the Agency may not establish a NAAQS that is outside the range of reasonable values supported by the air quality criteria and the judgments of the Administrator because of proximity to background concentrations, it is not precluded from considering relative proximity to background concentrations as one factor in selecting among standards that are within that range. *See American Trucking Ass'ns v. EPA*, 283 F.3d 355, 379 (D.C. Cir. 2002); *Murray Energy v. EPA*, 936 F.3d 597, 622–624 (D.C. Cir. 2019); *American Petroleum Institute v. Costle*, 665 F.2d 1176, 1185 (D.C. Cir. 1982).

data from IMPROVE sites which suggests background concentrations are in the range of 1-3 μg/m$^3$. It is important to note that, as explained in the 2022 PA, the EPA defines U.S. background PM for this reconsideration as any PM formed from emissions other than U.S. anthropogenic (i.e., manmade) emissions. The EPA considers IMPROVE sites, which are generally located away from major sources of anthropogenic PM, to be suitable sites to examine background PM, but also notes that its estimate for background PM was supported by the zero-out modeling which looked at U.S. regions in addition to IMPROVE monitoring sites. By contrast, one commenter cites an estimate of 6 μg/m$^3$ of "background" which was modeled as part of an application to modify a state air pollution permit. Although neither the permit application nor the modeling itself was submitted and thus the EPA is unable to fully assess the validity of the modeling for these purposes, generally "background" in this context refers to emissions other than from the source, and would include anthropogenic emissions from other sources, thus explaining the higher value. Furthermore, as some commenters recognize, emissions attributable to wildfires may be eligible for exclusion from design value calculation under the Exceptional Event Rule. Thus, the EPA finds no reason to conclude that the revised primary annual $PM_{2.5}$ NAAQS will approach background levels. Even assuming background levels could be somewhat higher than 1-3 μg/m$^3$ they still wouldn't be at or near the level of the revised primary annual $PM_{2.5}$ NAAQS, and the Administrator set the standards based on his assessment of what is requisite to protect public health, consistent with the requirements of the CAA.

(5) **Comment:** A number of commenters contend that revising the PM NAAQS will impose harm, including economic impacts, employment impacts, exacerbating poverty, threatening electric grid reliability, national security risk, impacts on clean energy transition, and timing concerns, among others.

**Response:** The EPA notes that several commenters provide analyses in support of their claims that are of questionable or no relevance (e.g., analyzing impacts of a carbon dioxide tax of $300/ton, or of Clean Air Act regulations other than a PM NAAQS), and which ignore the health and economic benefits of reduced pollution and illness. Without conceding or agreeing with any of these commenters' predictions, such concerns would not be valid considerations for this action. As discussed in the preamble to the proposed and final rules and in response to other comments, the Clean Air Act, as the Supreme Court held in *Whitman*, "unambiguously bars cost considerations from the NAAQS-setting process," 531 U.S. at 471, including these various concerns raised by commenters. [21]

(6) **Comment:** Some commenters suggest that it was inappropriate to propose a range of levels for consideration in revising the primary annual $PM_{2.5}$ standards. These commenters suggest that the EPA should propose a recommended specific level in order to help define exactly what the EPA intends and to assist the public in providing more focused and specific comments regarding the proposal. Some commenters state that the range is too broad and is

[21] The EPA notes that in *Am. Petroleum Inst. v. Costle*, 665 F.2d 1176 (D.C. Cir. 1981), the City of Houston claimed that the then-recently adopted 1-hour ozone standard had been set below natural concentrations of ozone and was unattainable. The DC Circuit rejected the argument that "attainability" is a relevant criterion for the NAAQS, *id.* at 1185, and the EPA has since determined that air quality in the area including Houston has attained the 1979 1-hour ozone standard. See 85 FR 8411 (Feb. 14, 2020).

impossible to fully evaluate, and therefore, the EPA should withdraw the proposal and repropose specific standards for meaningful comment from the public. Some commenters also assert that proposing a range of options would be more appropriate in an Advanced Notice of Proposed Rulemaking (ANPRM) rather than in a reconsideration request and that the reconsideration request should not be to take comments on options for new standards.

**Response:** The EPA disagrees that it was inappropriate to propose a range, and to solicit comment on potential values above and below the range. The EPA recognizes that the NAAQS are of great significance to a wide variety of stakeholders and that often there is a range of reasonable values that could be supported by the air quality criteria and judgments of the Administrator. Accordingly, the EPA has in the past, as in this reconsideration, found it helpful to identify for public comment the range of values under closest consideration for the final decision, along with the rationale for identifying that range, while also soliciting comment on a wider range in order to benefit from stakeholder input before reaching a final decision. The proposed range for the level of the primary annual $PM_{2.5}$ standard was 9-10 $\mu g/m^3$, which is a fairly narrow range.

Had the EPA proposed a single level rather than proposing a range of levels, the Agency still would have solicited comment on a range of 8-11 $\mu g/m^3$ for the level of the primary annual $PM_{2.5}$ standard, which would have been entirely appropriate under the Clean Air Act and general principles of administrative law but would have provided even less guidance to public commenters.

Further, the EPA disagrees that it would be more appropriate to proceed by ANPRM instead of reconsideration, particularly given the scope of the record and the nature of the considerations that informed the initiation of the reconsideration. As explained in responding to other comments, considering revisions to the PM NAAQS through this reconsideration is consistent with the EPA's authority under the CAA.

(7) **Comment:** Some commenters state that having multiple significant regulatory actions proposed simultaneously interferes with the ability for states to provide meaningful participation and comment to the EPA, especially with overlapping public comment periods for proposed actions.

**Response:** The EPA recognizes that it has in a number of significant regulatory actions ongoing at various stages and appreciates the contributions of stakeholders through public comments to each of them. In the case of this action, the proposed decision was announced on January 6, 2023, and the pre-publication version of the notice of proposed rulemaking was posted to the EPA's website. The notice was published in the Federal Register on January 27, 2023, and the public comment period was open until March 28, 2023. In addition to the written public comment period, the EPA offered a multi-day virtual public hearing for the public to provide oral comments to the Agency on the proposed rule in February 2023. The EPA considers this a fully adequate amount of time for states and other commenters to provide comments to the Agency regarding the proposed decisions for the PM NAAQS Furthermore, we note that for this reconsideration, the public also had opportunities to provide written comments on the 2021 draft ISA Supplement and the 2021 draft PA, as well

as to offer oral comments at the public CASAC meetings during which these documents were reviewed.

## B. Process Comments

(1) **Comment:** Several commenters who support retaining the current PM standards contend that the proposal does not discuss the 2020 decision or clearly distinguish between the facts from the 2020 review and this reconsideration. These commenters state that it is unclear what differentiates the Administrator's proposed conclusions in this reconsideration from the decisions made in the 2020 final action. They further assert that the EPA must provide a full justification for reversing the 2020 final decision and must distinguish and explain its new policy without ignoring the previous Administrator's decision to retain the PM NAAQS. In so doing, the commenters note that the EPA is bound to the docket for the reconsideration proposal, which includes all of the information since its establishment in 2015. These commenters contend that the information available in the reconsideration, based on which the Administrator proposed to conclude that the current primary annual $PM_{2.5}$ standard is not adequate, is largely the same as the information considered by the Administrator in reaching his final decision in 2020 to retain the PM NAAQS. They state that the EPA must explain why the evidence is certain enough to revise the PM NAAQS in this reconsideration and why it is reasonable to conclude that the previous Administrator placed too much weight on the uncertainties in the 2020 final action.

Commenters state that a reconsideration must reconsider, not simply replace, a previous agency decision, otherwise it is arbitrary and capricious. These commenters assert that the EPA must provide a "reasoned explanation" for "disregarding facts and circumstances that underlay…the previous policy" and provide a "more detailed justification" than it would for a new policy, citing to *FCC v. Fox*, 566 U.S. at 515 (2009). These commenters also point to *California v. Bernhardt*, 472 F. Supp.3d 573, 600-601 (N.D. Cal. 2020) and *Physicians for Soc. Resp. v. Wheeler*, 956 F. 3d 634, 644 (D.C. Cir. 2020), arguing that "agency cannot flip-flop regulations on the whims of each new administration" and reasoned decision making requires the Agency to "offer a reason to distinguish them or explain its apparent rejection of their approach." Some industry commenters suggest there is a reliance interest at stake because state planning efforts and regulated industries likely assumed that the PM NAAQS would be retained for five years.

**Response:** The EPA agrees that the Administrator must provide a full explanation for his decisions in this reconsideration of the PM NAAQS, but notes that it has done so in this action. The EPA disagrees that it must provide a "more detailed justification" for the Administrator's decisions in this action than was provided for the 2020 decision, or that he has not offered "good reasons" for his decision. The Administrator has provided a very detailed explanation of the basis for his decision, carefully evaluating the scientific evidence and considering CASAC advice and public comments, and he has noted reasons why his decision differs from the decision of the prior Administrator. As explained in the preamble to the final rule, the decision to revise the NAAQS was based on the thorough review of the air quality criteria completed in 2020, as well as additional studies, information, and analyses that were not part of the criteria considered by the prior Administrator, and additional advice from the CASAC and public comments taking that additional evidence and information into

account. After considering the entire updated record, for the reasons explained in the preamble, the Administrator reached a different judgment than the prior Administrator reached based on the record that was before him. Moreover, the Administrator has explained how he has considered the uncertainties in the evidence before him in the record, recognizing his obligation to set standards that protect public health with an adequate margin of safety in the face of scientific uncertainties, but also selecting standards which are requisite for that purpose, and not more stringent than necessary. The EPA disagrees that the Clean Air Act or general principles of administrative law require more.

In particular, the EPA notes that the Supreme Court in *FCC v. Fox* held that an agency changing policy "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." 556 U.S. 502, 515 (2002).[22] It is true that the Court noted that in some circumstances an agency may have a higher burden of justification, such as when "its new policy rests upon factual findings that contradict those which underlay its prior policy" or when the former policy "engendered serious reliance interests" but neither of those is applicable here. For example, while the scientific record for this reconsideration is broader than what was available in the 2020 decision, it strengthens (by reducing uncertainties), rather than contradicts, the conclusions of the 2019 ISA. Nor does the EPA consider that reliance interests provide a basis for not revising the standards.

The EPA does not consider potential reliance interests a sufficient reason to alter the Administrator's judgment as to the requisite degree of protection of the NAAQS for multiple reasons. First, the statutory structure of the NAAQS is built on frequent review, and potential revisions of the air quality criteria and the standards. As such, it is very different from circumstances where a regulated entity takes action it believed was lawful based on a "longstanding, official administrative construction" of a statute,[23] or compensation practices for an entire industry have been structured for decades around a particular interpretation of a statute.[24] The central principle of the NAAQS is that they are based on the science – which is not static (as might be appropriate for a statutory interpretation), but instead subject to ongoing revision and development as the scientific community engages in ongoing research – and must be reviewed and revised as appropriate no later than every 5 years but possibly sooner. Thus, it is very doubtful that there could ever be "legitimate reliance on prior interpretation" of what NAAQS is requisite the protect the public health and welfare, or the anticipated schedule for NAAQS reviews. *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996).

---

[22] The EPA does not view the cases cited in the comments as inconsistent with *Fox,* nor, as lower court decisions, could they be. These decisions appear to turn on the agency's lack of explanation, but as noted in this final action the Administrator has provided a fulsome explanation of his decision, including identifying reasons why his judgment differed from that of the prior Administrator.

[23] *United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 670 (1973)

[24] *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)

However, further considering the potential for reliance, the EPA notes that the prior decision was to retain the standard. Thus, no state was required to undertake any planning obligation in response. At most, as a commenter suggests (but does not substantiate), it is possible that a state did not plan to undertake planning for the PM NAAQS and may incur planning obligations sooner than it expected. Likewise, no private entity was required to do anything as a result of the 2020 decision, and at most the reconsideration somewhat accelerates the timing of potential applicability of control strategies to a source. However, the decision to reconsider it was undertaken promptly thus making it even more unlikely that any actions were taken in reliance on the prior decision.

Furthermore, even if some entity for whatever reason made plans based on the assumption that the PM NAAQS would not change until the next review, due in 2025, the EPA would still not find this a sufficient basis for altering the Administrator's judgment about the appropriate PM NAAQS or for retaining NAAQS that in the Administrator's judgment did not provide the requisite protection. Such potential reliance interests can be viewed as another aspect of the costs of implementing the standard. Given that the costs of implementation are not a relevant consideration for the EPA in setting the NAAQS, as discussed in the preamble to the final rule and in responding to other comments on the proposal, it would not be consistent with the statute, or with Congressional intent, to delay or reduce the health and welfare benefits which Congress intended to achieve through the NAAQS in order to protect such potential reliance interests, particularly under the circumstances presented here, including the fact that the prior decision did not change the standards at all.

However, even there was some sort of specific, additional obligation on the Administrator to explain his decision, the Administrator's detailed rationale would satisfy the requirements of the Clean Air Act and relevant principles of administrative law. The Administrator has clearly identified the additional science that was before the CASAC and the Agency, as well his evaluation of the entire scientific record (which as noted differs in some ways from that of the prior Administrator). As the DC Circuit held in *Mississippi v. EPA*,

> Every time EPA reviews a NAAQS, it (presumably) does so against contemporary policy judgments and the existing corpus of scientific knowledge. See 42 U.S.C. §§ 7408–09. It would therefore make no sense to give prior NAAQS the sort of presumptive validity Mississippi insists upon. The statutory framework requires us to ask only whether EPA's proposed NAAQS is "requisite"; we need not ask why the prior NAAQS once was "requisite" but is no longer up to the task.

744 F.3d 1334, 1343 (2013). Here the Administrator has plainly met his burden to "reasonably explain [his] actions." Id.

(2) **Comment:** In addition to their comments on differing conclusions by different Administrators, several commenters who support retaining the current PM standards contend that the EPA must also take into consideration the advice of the CASAC during their review of the 2019 draft PA as a part of the 2020 rulemaking in addition to the CASAC's advice during their review of the 2021 draft PA as a part of this reconsideration. These commenters state that the CAA does not allow the EPA to pick advice of one CASAC over another and

that the EPA must discuss the viewpoints of the previous CASAC and the current CASAC and explain how the EPA weighs their advice and recommendations in reaching decisions in this reconsideration. Some commenters assert that the EPA has failed to do this in a meaningful way in the proposal.

Some commenters state that, in their review of the 2021 draft PA, the CASAC did not reach a unanimous recommendation on the level of the primary annual $PM_{2.5}$ standard, noting that the majority of the CASAC recommended revision to within the range of 8-10 µg/m$^3$, while the minority of the CASAC recommended revision to within the range of 10-11 µg/m$^3$. These commenters assert that the EPA does not fully evaluate the significance of the lack of consensus by the CASAC.

**Response:** In reaching his conclusions regarding the PM NAAQS, the Administrator considered all of the CASAC advice that was provided during the review and reconsideration. This includes the majority CASAC advice and minority CASAC advice for their review of both the 2019 draft PA and the 2021 draft PA (as well advice by the CASAC on the 2018 draft ISA and the 2021 draft ISA Supplement). The EPA noted the advice of the CASAC where it was pertinent to his consideration of the evidence and his decision on whether to retain or revise a standard. Furthermore, the Administrator noted that the 2021 draft PA included scientific evidence and quantitative risk information that was not available in the 2019 draft PA, and therefore, the advice and recommendations of the CASAC in their review of the 2021 draft PA are based on consideration of newly available information in this reconsideration that expands upon the information previously available. However, the EPA disagrees that it is required to further explain how it evaluates the significance of the lack of consensus within the CASAC or to attempt to characterize or reconcile the different advice provided by the CASAC on the 2019 draft PA and the 2021 draft PA. The CASAC provides advice on scientific and policy considerations which in part reflect the exercise of the individual members' expertise and judgment and the collective deliberation of the committee, and where there are differences in the views of CASAC members, those differences may also be informative. The Administrator recognizes that he received a range of advice from CASAC in the course of this review (and reconsideration). He has considered all of the advice of the CASAC and has explained his consideration of the CASAC's advice including by providing an explanation of why there are important differences between some of the CASAC's recommendations and his final decision. Particularly in light of the nature and range of CASAC advice in this review, this is appropriate and sufficient under the CAA.

(3) **Comment:** A number of commenters assert that the EPA's failure to reconsider the full record means that the proposal is flawed. The commenters contend that the flaws cannot be addressed in the final rule because it would deny the public due process because the EPA would be justifying its action on analysis that was not presented in the proposal. These commenters state that every part of the final rule must be a logical outgrowth of the proposal, and the public has no way of anticipating the Administrator's justifications for deviating from the prior Administrator's reasoning. Therefore, the commenters recommend a supplemental proposal to allow for meaningful public comment before finalization of the PM NAAQS, which must include (1) justifications for the Administrator reaching different conclusions in this reconsideration than the Administrator in the 2020 final decision; (2) explanations of differences from any pertinent findings, recommendations, and comments of

the CASAC; and (3) distinguishing or explaining any apparent rejection of a position taken in the 2020 RTC.

**Response:** The EPA disagrees that it has not considered the full record in this reconsideration, or that the notice of proposed rulemaking did not provide an adequate basis for commenters to comment on the Administrator's proposed decision. The EPA provided a very detailed explanation of its view of the science and the rationales that could support revision of the primary annual $PM_{2.5}$ standard to a level between 9 and 10 µg/m$^3$, as well as the Administrator's proposed rationale for concluding that the current PM NAAQS are not requisite to protect public health with an adequate margin of safety. Those detailed rationales were the proposed justifications for reaching different decisions in this action than the decision of the prior Administrator, for explaining differences from pertinent findings, recommendations and comments of the CASAC, and for explaining any differences with the 2020 RTC. The notice of proposed rulemaking made it very clear that the EPA was proposing, and soliciting comment on a proposal, to revise, rather than retain, the primary annual $PM_{2.5}$ NAAQS, as well as the reasons why the EPA was proposing that change. After consideration of public comments, these same considerations inform the Administrator's final decisions on the PM NAAQS, and to the extent there are differences between the proposed and final decision, the EPA views these as a logical outgrowth of the proposal. Thus, even if the commenters would have preferred the EPA to present its proposal with different phrasing, the central issues of the rule were the subject of thorough public comment and a supplemental proposal is unnecessary.

(4) **Comment:** Commenters who supported revising the current PM standards reiterate their concerns with the process and the CASAC from their comments on the 2020 proposal. In light of these comments, the commenters suggest that the conclusions reached in the 2020 decision, as well as the majority of the CASAC's advice at that time, merit no deference in this reconsideration.

**Response:** The EPA has considered commenters' concerns with the process and the CASAC for the 2020 decision. The EPA acknowledges that in reviewing the 2018 draft ISA, the CASAC indicated that it required additional expertise to provide a thorough review because the "breadth and diversity of evidence to be considered exceeds the expertise of the statutory CASAC members, or indeed of any seven individuals" (Cox, 2019b, p. 1 of consensus letter). However, in response to this request, the EPA did make additional subject matter experts available to the CASAC as part of their review of the 2019 draft PA. The Administrator has considered the advice of the CASAC on all of the documents on which it has provided advice, including the 2018 draft ISA and the 2019 draft PA in reaching his judgments about the appropriate PM NAAQS. Furthermore, he considers the expanded body of evidence available in this reconsideration and the CASAC's advice on the assessment of this evidence in the 2021 draft ISA Supplement. He recognizes that the 2021 draft PA included scientific evidence and quantitative risk information that was not available in the 2019 draft PA, and therefore, the advice and recommendations of the CASAC in their review of the 2021 draft PA are based on consideration of newly available information in this reconsideration that expands upon the information previously available to the CASAC at the time of their review of the 2019 draft PA.

(5) **Comment:** Commenters who support retaining the current PM standards assert that the decision to reconstitute the CASAC was undertaken prior to announcing the reconsideration of the 2020 final decision to set the stage for reconsideration with CASAC support. These commenters assert that the Agency selected scientists predisposed to supporting its desired policy outcomes, and then only used science that would support these outcomes while ignoring science that would undermine them. Some commenters similarly suggest that revisions to the air quality criteria and risk assessment were targeted to support revision of the NAAQS. Some of these commenters state that because the process informing the proposal was arbitrary and capricious, the proposal and entire rule are arbitrary and capricious.

**Response:** The decision to reconstitute the CASAC was made months before the decision to reconsider the PM NAAQS and the two decisions were made separately for their own independent reasons.[25] Moreover, no member of the CASAC was selected based on a purported predisposition to support any particular policy outcome. Indeed, the EPA notes that it reappointed two of the prior seven members of the chartered CASAC, and one of those members changed his advice on whether revisions to the primary annual $PM_{2.5}$ standard were required after considering the additional information available in the reconsideration. Likewise, while the EPA did seek to focus consideration of newly available scientific evidence on areas that would be most relevant to judging *whether* the standards are requisite to protect public health and welfare, including addressing certain uncertainties and gaps that had been identified in the 2020 final decision (and to update the quantitative risk assessment to reflect the newly available information in this reconsideration) that is because it is the Administrator's responsibility to determine *whether* the standards are requisite, not because the Administrator was seeking to determine *that* the standards are not requisite. The Administrator did not prejudge any aspect of the reconsideration of the PM NAAQS. The EPA further notes that Administrator's final decisions accord with some but not all recommendations of the majority of the CASAC from their review of the 2019 draft PA and some but not all of the recommendations of the majority of the CASAC from their review of the 2021 draft PA. Thus, the EPA disagrees that there was anything arbitrary or capricious about the process for this reconsideration, much less that any purported procedural issues were of such central relevance that they cause the resulting proposed and final rules to be arbitrary or capricious.

(6) **Comment:** Commenters contend that the CASAC failed to fulfill its statutory duties under sections 109(d)(2)(C)(iii) and (iv) of the CAA, in that they did not advice on the relative contribution of $PM_{2.5}$ concentrations of natural versus anthropogenic activities, nor did they

[25] See h*ttps://www.epa.gov/newsreleases/administrator-regan-directs-epa-reset-critical-science-focused-federal-advisory* (March 31, 2021, news release noting several "process irregularities" that were being corrected in the SAB and the CASAC); *https://www.epa.gov/newsreleases/epa-reexamine-health-standards-harmful-soot-previous-administration-left-unchanged* (June 10, 2021, news release noting reconsideration of PM NAAQS because "available scientific evidence and technical information indicate that the current standards may not be adequate to protect public health and welfare, as required by the Clean Air Act").

advise on "adverse public health, welfare, social, economic, or energy effects resulting from compliance" with a revised NAAQS.

**Response:** The CASAC did provide advice on the relative contribution of natural as well as anthropogenic activity to ambient concentrations of $PM_{2.5}$. Chapter 2 of each draft PA describes sources of PM emissions, specifically including anthropogenic sources (see, e.g., U.S. EPA, 2021b, section 2.1.1) as well as natural sources (see, e.g., U.S. EPA, 2021b, section 2.4.1). The CASAC provided some advice on chapter 2 in its review of the 2019 draft PA and additional, detailed comments on chapter 2 were provided in the CASAC's review of the 2021 draft PA. A request to "advise the Administrator of any adverse public health, welfare, social, economic, or energy effects which may result from various strategies for attainment and maintenance of such NAAQS" was included in the EPA's charge memorandum seeking the CASAC's review of the 2019 draft PA (Sasser, 2019). However, the EPA is not aware of, and the CASAC did not identify, potential adverse public health or welfare effects (as that term was interpreted in *Whitman*) which may result from various strategies to meet potential alternative NAAQS under consideration. The commenters' criticism of the CASAC for failing to provide advice on potential adverse social, economic, or energy effects from strategies to comply with the NAAQS is misplaced. Even if the CASAC had provided advice on potential adverse social, economic, or energy effects that may result from such strategies, the EPA could not have considered that advice in its decision making on the standards because consideration of such advice in decision making on the NAAQS would be grounds for vacating the NAAQS under *Whitman*.

(7) **Comment:** Some commenters assert that the EPA has not provided evidence that a reconsideration of the 2020 decision is necessary, as the reconsideration should include new evidence and the necessity of reaching a different conclusion from the 2020 review, and that the EPA failed to provide justification for reversing its 2020 final decision.

**Response:** As discussed above in response to comments, the EPA disagrees that it must establish that it is "necessary" to reconsider the 2020 review in order to reopen the air quality criteria and review the NAAQS. The Clean Air Act provides the EPA with authority to review and revise the criteria and the NAAQS, and the Administrator has provided sufficient rationale for his final decisions on the PM NAAQS, including his decision to revise the primary annual $PM_{2.5}$ NAAQS.

(8) **Comment:** Some commenters contend that the proposal violates the Unfunded Mandates Reform Act (UMRA) and suggest that, if the EPA moves forward with the final rule, it should explain why it finds that the federal mandates included in the proposal would not result in the expenditure by the private sector of $100 million in any one year. These commenters state that the proposal does not detail how the EPA has satisfied the procedural requirements of the UMRA, nor does it indicate that the EPA has undertaken analyses of the impacts of compliance on states, local governments, and Tribes.

**Response:** As the EPA explained in the notice of proposed rulemaking as well as in the final rule, the proposed (and final) rule does not contain an unfunded mandate within the meaning of the Unfunded Mandates Reform Act. First, the EPA notes that the adoption of a NAAQS does not itself impose any obligation on private industry, and this rule is not imposing

additional information collection burdens or other enforceable duties on state, local, or Tribal governments. While future designations under section 107 of the CAA could result in certain planning obligations for state or tribal governments, those designations triggering such planning obligations would be promulgated through a separate rulemaking and therefore that would be the relevant vehicle for EPA to evaluate any applicability of UMRA. The ultimate costs associated with attaining the NAAQS are a function of the control strategies adopted by state governments according to their air planning needs and policy choices. *Am. Trucking Associations, Inc. v. EPA,* 175 F.3d 1027, 1044 (D.C. Cir.), *opinion modified on reh'g*, 195 F.3d 4 (D.C. Cir. 1999), *aff'd in part, rev'd in part, Whitman v. Am. Trucking Associations,* 531 U.S. 457 (2001) ("the NAAQS themselves impose no regulations upon small entities"). Moreover, the EPA did prepare a Regulatory Impact Analysis, which provides an example of illustrative control strategies and the potential costs of applying these control strategies toward reaching the standards. However, as discussed in the preamble and elsewhere in this RTC document, it is well-established that the EPA may not consider the costs of implementation in decision making about revisions to the NAAQS, and thus the results of the RIA have not been, and could not be, considered in issuing this final rule.

(9) **Comment:** Some commenters assert that the reconsideration is connected to "the Biden Administration's climate agenda" because the reconsideration acknowledged that Executive Order 13990 ("Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis") directed the EPA to review the 2020 decision for possible reconsideration. Other commenters also contend that if the motivation for the reconsideration (by following Executive Order 13990) is to reduce greenhouse gases, the rulemaking violates the Administrative Procedure Act's (APA) requirement for reasoned decision making. On the other hand, certain commenters asserted that the EPA needed to use its statutory authority to address the climate crisis and to protect the constitutional rights of the nation's children.

**Response:** Although President Biden did ask the heads of all agencies to review agency actions taken between January 20, 2017, and January 20, 2021, for possible inconsistency with the policy of his Administration to, inter alia, "listen to the science; to improve public health and protect our environment; [and] to ensure access to clean air," this simply directed Administrator to review the 2020 final action. The decision whether to proceed to reconsider the PM NAAQS rested with the EPA. Indeed, in February 2021, the EPA requested a temporary abeyance in litigation over the 2020 final decision[26] to allow Administrator Regan to review the decision and determine whether to pursue further administrative action. The EPA completed its review of the 2020 final decision in June 2021, and at that time, the Administrator concluded it was appropriate to engage in a limited reopening of the air quality criteria and a reconsideration of the PM NAAQS based on the additional available information, as well as advice from the CASAC and public comment. Furthermore, it is worth noting that Executive Order 13990 covers a number of topics beyond the review of past actions, such as the Keystone XL pipeline, certain national monuments, and the Arctic Wildlife Refuge. Those topics have no relevance for this reconsideration. In particular, the

[26] *California v. EPA*, (D.C. Cir., No. 21-1014).

EPA has no intention or goal to reduce greenhouse gases through this rulemaking.[27] To the extent commenters were suggesting that EPA should take steps to address the climate crisis in this rulemaking, EPA reiterates that the scope of this rulemaking is limited to review of the PM NAAQS and, for the reasons stated in the preamble, it would not be appropriate to establish or revise a secondary standard for PM based on the air quality criteria for this review to address climate effects.

## C. Miscellaneous Comments

(1) **Comment:** Some commenters contend that in issuing another response to comments document as a part of the reconsideration, the EPA must distinguish or explain any apparent rejection of a position taken in responding to comments in the 2020 RTC and where the EPA does not address a contrary position, then the EPA retains it.

**Response:** The Agency has prepared an RTC to accompany the final action in this reconsideration. In some cases, commenters submitted the same comments for the reconsideration as they did for the 2020 proposal and the EPA's responses are largely the same in this document as in the prior RTC document because neither the decision nor the evidence has changed much. In other instances, changes in the evidence or the Administrator's decision, as well as changes in public comments, have resulted in changes in responses. While the prior response to comments remains in the record for this action, the EPA cautions commenters that the more recent preamble and RTC document reflects the EPA's latest views, and there may be issues where the prior RTC is outdated even if an issue has not been squarely raised and addressed in this document or the preamble. The EPA recognizes that the evidence before the Administrator differs from the evidence that was before the prior Administrator, and this Administrator has judged the evidence before him (particularly the epidemiologic evidence) differently in some respects than the prior Administrator judged the evidence before him, and has in some areas reached a different conclusion on whether to revise the NAAQS. The EPA has thoroughly explained the basis for the Administrator's conclusions and has responded to all significant comments on the Administrator's proposed decision in the preamble and this RTC document, and disagrees that more is required.

(2) **Comment:** Some commenters assert that the EPA's confidence in the scientific studies upon which the proposal is based should be undermined not only by limitations and uncertainties but also by the lack of available supporting data and "troubling calls by researchers conducting public health investigations to shield this data from review." These commenters further assert that the proposal relies heavily on research that is not publicly available and has not been independently replicated. In particular, these commenters note that many studies upon which the proposed decision are based are only U.S.-based studies, funded by NIH and EPA, from Harvard's T.H. Chan School of Public Health, suggesting that these studies are

[27] Generally, when the EPA refers to "greenhouse gases" it is referring to the six long-lived, well-mixed gases which were the subject of Endangerment Findings under CAA 202 and 231. It is worth nothing that, as discussed in the preamble to the final rule, PM has been found causally related to climate effects, but the EPA has concluded it would not be appropriate to establish or revise a secondary standard for PM to address climate effects.

not transparent, nor can they be easily reviewed or reproduced by independent researchers, which commenters claim raises concerns about the soundness of the science, specifically citing to the Federal Register notice for the January 6, 2021, "Strengthening Transparency in Pivotal Science Underlying Significant Regulatory Actions and Influential Scientific Information." The commenters further claim that the lack of transparency and potential conflict of interest undermines the credibility of the scientific evidence considered in reaching the proposed decisions on the primary $PM_{2.5}$ standards and contend that a thorough and unbiased examination of the available data is necessary prior to any revisions to the standards. In so doing, these commenters point to documents obtained from a FOIA request that included emails from Joel Schwartz to the EPA, apparently supporting the withdrawal of the January 6 Federal Register notice.

**Response:** The EPA disagrees that the fact that some studies may not be capable of easily being reproduced or reviewed by independent researchers should undermine the EPA's confidence in those studies, particularly when the studies are U.S.-based studies, which the EPA and the CASAC have generally considered the most relevant studies because of reduced concerns over comparability of air quality. The EPA notes that the commenters do not identify a specific study or a specific concern that would raise reasonable concerns about scientific credibility. The EPA notes that similar vague concerns have been raised in the past and the D.C. Circuit expressly upheld the EPA's view that it is reasonable to "rely on published studies without conducting an independent analysis of the enormous volume of raw data underlying them." *Am. Trucking Associations, Inc. v. EPA,* 283 F.3d 355, 372 (D.C. Cir. 2002). Moreover, when a reanalysis was eventually undertaken of prior research from the Harvard School of Public Health that has been significant for the PM NAAQS, the results of the reanalysis "assured the quality of the original data, replicated the original results, and tested those results against alternative risk models and analytic approaches without substantively altering the original findings of an association between indicators of particulate matter air pollution and mortality" (Krewski et al., 2000, p. iii-iv). As noted in section 11.2.2.1 of the 2019 ISA, this Harvard (Six Cities) study, and the ACS study, each "have undergone extensive independent replication and extended reanalysis." Thus, the EPA rejects the view that the simple allegation of a lack of transparency or potential conflict of interest is sufficient to undermine the credibility of scientific evidence which has been peer-reviewed before publication as well as considered closely by the CASAC and found to be highly relevant for the review. The EPA notes that the Federal Register notice for the January 6, 2021, "Strengthening Transparency in Pivotal Science Underlying Significant Regulatory Actions and Influential Scientific Information" was vacated by U.S. District Court for the District of Montana[28] as well as by a subsequent Federal Register notice (86 FR 29515, Junee 2, 2021) and thus does not represent current EPA policy. Although the email from Dr. Schwartz is not included in the comment, since the Federal Register notice has now been vacated by both a court and the EPA, the EPA fails to see any relevance for the scientific credibility of key studies, particularly U.S.-based studies, in the fact that Dr. Schwartz may have supported its withdrawal.

(3) **Comment:** Commenters noted that the NAAQS should be based on science indicating that the current standards and the margins of safety are inadequate. However, the goal of the

[28] *EDF v. EPA* (D. Mont., No, 4:21-cv-00003-BMM)

NAAQS is not to achieve attainment with a NAAQS, then revise the NAAQS upon attainment to set a new goal. These commenters point to the advice of the CASAC related to uncertainties in the scientific evidence and the additional areas for future research that the CASAC identified. In so doing, these commenters urge the EPA to take the opportunity and investment of public and private funds to more appropriately develop, review, and refine the ongoing assessment of the need to revise the PM NAAQS, rather than finalizing revisions to the primary annual $PM_{2.5}$ standard as a part of this reconsideration.

**Response:** The EPA agrees with the commenters that the NAAQS should be based on the science and revised when the science indicates that, in the judgment of the Administrator, the current standards are inadequate to protect public health with an adequate margin of safety. The EPA agrees that the degree of attainment with existing standards is generally not relevant to consideration of whether standards should be revised. The EPA has explained above and in the preamble why it believes it is appropriate to revise the primary annual $PM_{2.5}$ standard at this time,

(4) **Comment:** Commenters contend that there are incentives for the EPA to inflate the risks of $PM_{2.5}$, arguing that the proposal is politically driven because of alleged co-benefits of reducing PM in other Agency rulemakings and incentives to fund PM-related research.

**Response:** The EPA rejects the suggestion that it is revising the standards for any purpose other than achieving the public health and welfare goals of the Clean Air Act pursuant to statutory authority and direction from Congress. The EPA recognizes that revisions to the NAAQS are often significant and consequential to a large range of citizens and stakeholders and takes its responsibility seriously to identify primary standards that are neither more stringent nor less stringent than necessary to protect public health with an adequate margin of safety.

**References**

Abt Associates, Inc. (2001). Assessing public opinions on visibility impairment due to air pollution: Summary report. U.S. Environmental Protection Agency. Research Triangle Park, NC.

Awad, YA, Di, Q, Wang, Y, Choirat, C, Coull, BA, Zanobetti, A and Schwartz, J (2019). Change in PM2.5 exposure and mortality among Medicare recipients: Combining a semi-randomized approach and inverse probability weights in a low exposure population. Environmental Epidemiology 3(4): e054.

BBC Research & Consulting (2003). Phoenix area visibility survey. Denver, CO. *https://www.regulations.gov/document/EPA-HQ-OAR-2015-0072-0089*.

Bell, ML, Ebisu, K, Peng, RD, Walker, J, Samet, JM, Zeger, SL and Dominic, F (2008). Seasonal and regional short-term effects of fine particles on hospital admissions in 202 U.S. counties, 1999-2005. American Journal of Epidemiology 168(11): 1301-1310.

Brumberg, HL, Karr, CJ, Bole, A, Ahdoot, S, Balk, SJ, Bernstein, AS, Byron, LG, Landrigan, PJ, Marcus, SM and Nerlinger, AL (2021). Ambient air pollution: health hazards to children. Pediatrics 147(6).

Chan, CC, Chuang, KJ, Chen, WJ, Chang, WT, Lee, CT and Peng, CM (2008). Increasing cardiopulmonary emergency visits by long-range transported Asian dust storms in Taiwan. Environ Res 106(3): 393-400.

Collins, TW, Grineski, SE, Shaker, Y and Mullen, CJ (2022). Communities of color are disproportionately exposed to long-term and short-term PM(2.5) in metropolitan America. Environ Res 214(Pt 4): 114038.

Cox, LA. (2019a). Letter from Louis Anthony Cox, Jr., Chair, Clean Air Scientific Advisory Committee, to Administrator Andrew R. Wheeler. Re: CASAC Review of the EPA's *Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft - September 2019)*. December 16, 2019. EPA-CASAC-20-001. Office of the Administrator, Science Advisory Board U.S. EPA HQ, Washington DC. Available at: *https://www.epa.gov/sites/default/files/2019-09/documents/draft_policy_assessment_for_pm_naaqs_09-05-2019.pdf*.

Cox, LA. (2019b). Letter from Louis Anthony Cox, Jr., Chair, Clean Air Scientific Advisory Committee, to Administrator Andrew R. Wheeler. Re: CASAC Review of the EPA's *Integrated Science Assessment for Particulate Matter (External Review Draft - October 2018)*. April 11, 2019. EPA-CASAC-19-002. Office of the Administrator, Science Advisory Board U.S. EPA HQ, Washington DC. Available at: *https://casac.epa.gov/ords/sab/r/sab_apex/casac/0?report_id=1069&request=APPLICATION_PROCESS%3DREPORT_DOC&session=7184955370570*.

Crouse, DL, Erickson, AC, Christidis, T, Pinault, L, van Donkelaar, A, Li, C, Meng, J, Martin, RV, Tjepkema, M, Hystad, P, Burnett, R, Pappin, A, Brauer, M and Weichenthal, S

(2020). Evaluating the Sensitivity of PM2.5-Mortality Associations to the Spatial and Temporal Scale of Exposure Assessment. Epidemiology 31(2): 168-176.

Danesh Yazdi, M, Wei, Y, Di, Q, Requia, WJ, Shi, L, Sabath, MB, Dominici, F and Schwartz, J (2022). The effect of long-term exposure to air pollution and seasonal temperature on hospital admissions with cardiovascular and respiratory disease in the United States: A difference-in-differences analysis. Sci Total Environ 843: 156855.

Di, Q, Amini, H, Shi, L, Kloog, I, Silvern, R, Kelly, J, Sabath, MB, Choirat, C, Koutrakis, P and Lyapustin, A (2019). An ensemble-based model of PM2.5 concentration across the contiguous United States with high spatiotemporal resolution. Environment International 130: 104909.

Di, Q, Wang, Y, Zanobetti, A, Wang, Y, Koutrakis, P, Choirat, C, Dominici, F and Schwartz, JD (2017). Air pollution and mortality in the Medicare population. New England Journal of Medicine 376(26): 2513-2522.

Dionisio, KL, Isakov, V, Baxter, LK, Sarnat, JA, Sarnat, SE, Burke, J, Rosenbaum, A, Graham, SE, Cook, R, Mulholland, J and Oezkaynak, H (2013). Development and evaluation of alternative approaches for exposure assessment of multiple air pollutants in Atlanta, Georgia. Journal of Exposure Science & Environmental Epidemiology 23(6): 581-592.

Dominici, F, Zeger, S, Janes, H and Greven, S. (2012). Memorandum from Francesca Dominici, Harvard School of Public Health; Scott L. Zeger, The Johns Hopkins University; Sonja Greven, Ludwig-Maximilians-Universitat Munchen; and Holly Janes, University of Washington to Bryan Hubbell and Jason Sacks, U.S. EPA. Additional information to EPA for Janes et al. (2007) and Greven et al. (2011). August 28, 2012. Available at: *https://www.epa.gov/sites/default/files/2021-05/documents/transmittalofguidanceonsection303ofcaa040199.pdf.*

Ely, DW, Leary, JT, Stewart, TR and Ross, DM (1991). *The establishment of the Denver Visibility Standard*. Colorado Department of Health. Denver, Colorado.

Enders, C, Pearson, D, Harley, K and Ebisu, K (2018). Exposure to coarse particulate matter during gestation and term low birthweight in California: Variation in exposure and risk across region and socioeconomic subgroup. Science of The Total Environment 653: 1435-1444.

Erickson, AC, Brauer, M, Christidis, T, Pinault, L, Crouse, DL, van Donkelaar, A, Weichenthal, S, Pappin, A, Tjepkema, M, Martin, RV, Brook, JR, Hystad, P and Burnett, RT (2019). Evaluation of a method to indirectly adjust for unmeasured covariates in the association between fine particulate matter and mortality. Environmental Research 175: 108-116.

Eum, K, Suh, HH, Pun, V and Manjourides, J (2018). Impact of long-term temporal trends in fine particulate matter (PM2.5) on association of annual PM2.5 exposure and mortality: an analysis of over 20 million Medicare beneficiaries. Environmental Epidemiology 2(2): e009.

Greven, S, Dominici, F and Zeger, S (2011). An Approach to the Estimation of Chronic Air Pollution Effects Using Spatio-Temporal Information. Journal of the American Statistical Association 106(494): 396-406.

Hemmingsen, JG, Jantzen, K, Møller, P and Loft, S (2015a). No oxidative stress or DNA damage in peripheral blood mononuclear cells after exposure to particles from urban street air in overweight elderly. Mutagenesis 30(5): 635-642.

Hemmingsen, JG, Rissler, J, Lykkesfeldt, J, Sallsten, G, Kristiansen, J, Møller, P and Loft, S (2015b). Controlled exposure to particulate matter from urban street air is associated with decreased vasodilation and heart rate variability in overweight and older adults. Particle and Fibre Toxicology 12(1): 6.

Herrera-Molina, E, Gill, TE, Ibarra-Mejia, G and Jeon, S (2021). Associations between Dust Exposure and Hospitalizations in El Paso, Texas, USA. Atmosphere 12(11): 1413.

Janes, H, Dominici, F and Zeger, SL (2007). Trends in air pollution and mortality: an approach to the assessment of unmeasured confounding. Epidemiology 18(4): 416-423.

Jedrychowski, WA, Perera, FP, Spengler, JD, Mroz, E, Stigter, L, Flak, E, Majewska, R, Klimaszewska-Rembiasz, M and Jacek, R (2013). Intrauterine exposure to fine particulate matter as a risk factor for increased susceptibility to acute broncho-pulmonary infections in early childhood. International journal of hygiene and environmental health 216(4): 395-401.

Johnson, NM, Hoffmann, AR, Behlen, JC, Lau, C, Pendleton, D, Harvey, N, Shore, R, Li, Y, Chen, J and Tian, Y (2021). Air pollution and children's health—a review of adverse effects associated with prenatal exposure from fine to ultrafine particulate matter. Environmental health and preventive medicine 26: 1-29.

Josey, KP, Delaney, SW, Wu, X, Nethery, RC, DeSouza, P, Braun, D and Dominici, F (2023). Air Pollution and Mortality at the Intersection of Race and Social Class. N Engl J Med 388(15): 1396-1404.

Kloog, I, Ridgway, B, Koutrakis, P, Coull, BA and Schwartz, JD (2013). Long- and short-term exposure to $PM_{2.5}$ and mortality: Using novel exposure models. Epidemiology 24(4): 555-561.

Kollath, DR, Mihaljevic, JR and Barker, BM (2022). PM10 and Other Climatic Variables Are Important Predictors of Seasonal Variability of Coccidioidomycosis in Arizona. Microbiol Spectr 10(2): e0148321.

Krewski, D, Burnett, RT, Goldberg, MS, Hoover, BK, Siemiatycki, J, Jerrett, M, Abrahamowicz, M and White, WH (2000). Reanalysis of the Harvard Six Cities Study and American Cancer Society Study of Particulate Air Pollution and Mortality. Health Effects Institute. Boston.

Laden, F, Schwartz, J, Speizer, FE and Dockery, DW (2006). Reduction in fine particulate air pollution and mortality: extended follow-up of the Harvard Six Cities study. American Journal of Respiratory and Critical Care Medicine 173(6): 667-672.

Lin, C-K, Chang, Y-T, Lee, F-S, Chen, S-T and Christiani, D (2021). Association between exposure to ambient particulate matters and risks of autism spectrum disorder in children: a systematic review and exposure-response meta-analysis. Environmental Research Letters 16(6): 063003.

Lipfert, FW and Wyzga, RE (2020). Environmental predictors of survival in a cohort of U.S. military veterans: A multi-level spatio-temporal analysis stratified by race. Environmental Research 183(Elsevier): 108842.

Liu, H-Y, Dunea, D, Iordache, S and Pohoata, A (2018). A review of airborne particulate matter effects on young children's respiratory symptoms and diseases. Atmosphere 9(4): 150.

Malm, WC, Schichtel, B, Molenar, J, Prenni, A and Peters, M (2019). Which visibility indicators best represent a population's preference for a level of visual air quality? Journal of the Air & Waste Management Association 69(2): 145-161.

Mannshardt, E, Sucic, K, Jiao, W, Dominici, F, Frey, HC, Reich, B and Fuentes, M (2013). Comparing exposure metrics for the effects of fine particulate matter on emergency hospital admissions. Journal of Exposure Science & Environmental Epidemiology 23(6): 627-636.

McGuinn, LA, Ward-Caviness, C, Neas, LM, Schneider, A, Di, Q, Chudnovsky, A, Schwartz, J, Koutrakis, P, Russell, AG, Garcia, V, Kraus, WE, Hauser, ER, Cascio, W, Diaz-Sanchez, D and Devlin, RB (2017). Fine particulate matter and cardiovascular disease: Comparison of assessment methods for long-term exposure. Environmental Research 159: 16-23.

Middleton, N, Yiallouros, P, Kleanthous, S, Kolokotroni, O, Schwartz, J, Dockery, DW, Demokritou, P and Koutrakis, P (2008). A 10-year time-series analysis of respiratory and cardiovascular morbidity in Nicosia, Cyprus: the effect of short-term changes in air pollution and dust storms. Environ Health 7: 39.

Moolgavkar, SH, Chang, ET, Watson, HN and Lau, EC (2018). An Assessment of the Cox Proportional Hazards Regression Model for Epidemiologic Studies. Risk Anal 38(4): 777-794.

Mullen, C, Grineski, SE, Collins, TW and Mendoza, DL (2020). Effects of PM(2.5) on Third Grade Students' Proficiency in Math and English Language Arts. Int J Environ Res Public Health 17(18).

NASEM (2022). National Academies of Sciences, Engineering, and Medicine 2022. Advancing the Framework for Assessing Causality of Health and Welfare Effects to Inform National Ambient Air Quality Standard Reviews. The National Academies Press. Washington, DC. Available at: *https://doi.org/10.17226/26612*.

Ostro, B, Broadwin, R, Green, S, Feng, WY and Lipsett, M (2006). Fine particulate air pollution and mortality in nine California counties: Results from CALFINE. Environmental Health Perspectives 114(1): 29-33.

Ostro, B, Broadwin, R and Lipsett, M (2003). Coarse particles and daily mortality in Coachella Valley, California. In: Revised analyses of time-series studies of air pollution and health. Health Effects Institute. Boston, MA. *https://www.healtheffects.org/system/files/TimeSeries.pdf*.

Parker, JD, Kravets, N and Vaidyanathan, A (2018). Particulate matter air pollution exposure and heart disease mortality risks by race and ethnicity in the United States: 1997-2009 NHIS with mortality followup through 2011. Circulation 137(16): 1688-1697.

Payne-Sturges, DC, Marty, MA, Perera, F, Miller, MD, Swanson, M, Ellickson, K, Cory-Slechta, DA, Ritz, B, Balmes, J and Anderko, L (2019). Healthy air, healthy brains: advancing air pollution policy to protect children's health. American journal of public health 109(4): 550-554.

Perez, L, Tobias, A, Querol, X, Künzli, N, Pey, J, Alastuey, A, Viana, M, Valero, N, González-Cabré, M and Sunyer, J (2008). Coarse particles from Saharan dust and daily mortality. Epidemiology 19(6): 800-807.

Pope, C and Burnett, RT (2007). Commentary: Confounding in Air Pollution Epidemiology: The Broader Context. Epidemiology 18(4): 424-426.

Pope, CA, III, Thun, MJ, Namboodiri, MM, Dockery, DW, Evans, JS, Speizer, FE and Heath, CW, Jr. (1995). Particulate air pollution as a predictor of mortality in a prospective study of U.S. adults. American Journal of Respiratory and Critical Care Medicine 151(3 Pt. 1): 669-674.

Pryor, SC (1996). Assessing public perception of visibility for standard setting exercises. Atmospheric Environment 30(15): 2705-2716.

Pun, VC, Kazemiparkouhi, F, Manjourides, J and Suh, HH (2017). Long-term PM2.5 exposures and respiratory, cancer and cardiovascular mortality in American older adults. American Journal of Epidemiology 186(8): 961-969.

Qiu, X, Wei, Y, Weisskopf, M, Spiro, A, Shi, L, Castro, E, Coull, B, Koutrakis, P and Schwartz, J (2023). Air pollution, climate conditions and risk of hospital admissions for psychotic disorders in U.S. residents. Environ Res 216(Pt 2): 114636.

Samet, J. (2009). Letter from Jonathan Samet, Chair, Clean Air Scientific Advisory Committee, to Administrator Lisa Jackson. Re: CASAC Particulate Matter Review of Integrated Science Assessment for Particulate Matter (Second External Review Draft, July 2009). November 24, 2009. EPA-CASAC-10-001. Office of the Administrator, Science Advisory Board U.S. EPA HQ, Washington DC. Available at: *http://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P1005PH9.txt*.

Sasser, E. (2019). Memorandum from Erika N. Sasser, Director, Health and Environmental Impacts Division, Office of Air Quality Planning and Standards, to Aaron Yeow, Designated Federal Officer, Clean Air Scientific Advisory Committee, EPA Science Advisory Board Staff Office. CASAC Review of the document titled Policy Assessment for Review of the National Ambient Air Quality Standards for Particulate Matter – External Review Draft. September, 2019. United States Environmental Protection Agency Research Triangle Park, NC. Available at: *https://casac.epa.gov/ords/sab/r/sab_apex/casac/0?ac_id=2552&request=APPLICATION_PROCESS%3DAGENCY_CHARGE&session=16583820832559*

Schichtel, BA, Malm, WC, Schmidt, D and Hand, J (2016). Reconciliation of Urban Visibility Preference Studies: Implications for an Urban Visibility Standard. Air & Waste Management Association Conference: Atmospheric Optics: Aerosols, Visibility, and the Radiative Balance, Jackson Hole, WY.

Schwartz, J, Coull, B, Laden, F and Ryan, L (2008). The effect of dose and timing of dose on the association between airborne particles and survival. Environmental Health Perspectives 116(1): 64-69.

Schwartz, J and Marcus, A (1990). Mortality and air pollution in London: a time series analysis. Am J Epidemiol 131(1): 185-194.

Sheppard, EA. (2022). Letter from Elizabeth A. (Lianne) Sheppard, Chair, Clean Air Scientific Advisory Committee, to Administrator Michael S. Regan. Re: CASAC Review of the EPA's *Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft - October 2021)*. March 18, 2022. EPA-CASAC-22-002. Office of the Administrator, Science Advisory Board U.S. EPA HQ, Washington DC. Available at: *https://casac.epa.gov/ords/sab/r/sab_apex/casac/0?report_id=1094&request=APPLICATION_PROCESS%3DREPORT_DOC&session=7184955370570*

Sheppard, L, Slaughter, JC, Schildcrout, J, Liu, JS and Lumley, T (2005). Exposure and measurement contributions to estimates of acute air pollution effects. Journal of Exposure Analysis and Environmental Epidemiology 15(4): 366-376.

Shi, L, Rosenberg, A, Wang, Y, Liu, P, Danesh Yazdi, M, Réquia, W, Steenland, K, Chang, H, Sarnat, JA, Wang, W, Zhang, K, Zhao, J and Schwartz, J (2022). Low-Concentration Air Pollution and Mortality in American Older Adults: A National Cohort Analysis (2001-2017). Environ Sci Technol 56(11): 7194-7202.

Shi, L, Steenland, K, Li, H, Liu, P, Zhang, Y, Lyles, RH, Requia, WJ, Ilango, SD, Chang, HH, Wingo, T, Weber, RJ and Schwartz, J (2021). A national cohort study (2000-2018) of long-term air pollution exposure and incident dementia in older adults in the United States. Nat Commun 12(1): 6754.

Shi, L, Zanobetti, A, Kloog, I, Coull, BA, Koutrakis, P, Melly, SJ and Schwartz, JD (2015). Low-concentration PM2.5 and mortality: estimating acute and chronic effects in a population-based study. Environmental Health Perspectives 124(1): 46-52.

Shi, L, Zanobetti, A, Kloog, I, Coull, BA, Koutrakis, P, Melly, SJ and Schwartz, JD (2016). Low-concentration $PM_{2.5}$ and mortality: estimating acute and chronic effects in a population-based study. Environmental Health Perspectives 124(1): 46-52.

Smith, AE (2020). Using Uncertainty Analysis to Improve Consistency in Regulatory Assessments of Criteria Pollutant Standards. Risk Anal 40(3): 442-449.

Smith, AE and Gans, W (2015). Enhancing the Characterization of Epistemic Uncertainties in PM2.5 Risk Analyses. Risk Anal 35(3): 361-378.

Smith, AE and Howell, S (2009). An assessment of the robustness of visual air quality preference study results. CRA International. Washington, DC. *https://www.regulations.gov/document/EPA-HQ-ORD-2007-0517-0085*.

Son, JY, Lane, KJ, Miranda, ML and Bell, ML (2020). Health disparities attributable to air pollutant exposure in North Carolina: Influence of residential environmental and social factors. Health & Place 62: 102287.

Spiller, E, Proville, J, Roy, A and Muller, NZ (2021). Mortality Risk from PM2.5: A Comparison of Modeling Approaches to Identify Disparities across Racial/Ethnic Groups in Policy Outcomes. Environ Health Perspect 129(12): 127004.

Stefani, O, M. Bues, M, Pross, A, Mebben, S, Westner, P, Dudel, H and Rudolph, H (2012). Moving clouds on a virtual sky affect well-being and subjective tiredness positively. Conference of the International-Commission-on-Illumination on Lighting Quality and Energy Efficiency, Hangzhou, Peoples Republic of China.

Sutradhar, R and Austin, PC (2018). Relative rates not relative risks: addressing a widespread misinterpretation of hazard ratios. Ann Epidemiol 28(1): 54-57.

Turner, MC, Jerrett, M, Pope, A, III, Krewski, D, Gapstur, SM, Diver, WR, Beckerman, BS, Marshall, JD, Su, J, Crouse, DL and Burnett, RT (2016). Long-term ozone exposure and mortality in a large prospective study. American Journal of Respiratory and Critical Care Medicine 193(10): 1134-1142.

U.S. EPA (2004a). Air Quality Criteria for Particulate Matter. (Vol I of II). Office of Research and Development. Research Triangle Park, NC. U.S. EPA. EPA-600/P-99-002aF. October 2004. Available at: *https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P100LFIQ.txt*.

U.S. EPA (2004b). Air Quality Criteria for Particulate Matter. (Vol II of II). Office of Research and Development. Research Triangle Park, NC. U.S. EPA. EPA-600/P-99-002bF. October 2004. Available at: *https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P100LG7Q.txt*.

U.S. EPA (2009). Integrated Science Assessment for Particulate Matter (Final Report). Office of Research and Development, National Center for Environmental Assessment. Research

Triangle Park, NC. U.S. EPA. EPA-600/R-08-139F. December 2009. Available at: *https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=216546*.

U.S. EPA (2012a). Responses to Significant Comments on the 2012 Proposed Rule on the National Ambient Air Quality Standards for Particulate Matter (June 29, 2012; 77 FR 38890). Research Triangle Park, NC. U.S. EPA. Docket ID No. EPA-HQ-OAR-2007-0492. Available at: *https://www3.epa.gov/ttn/naaqs/standards/pm/data/20121214rtc.pdf*.

U.S. EPA (2012b). Provisional Assessment of Recent Studies on Health Effects of Particulate Matter Exposure. U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment. Research Triangle Park. U.S. EPA. EPA/600/R-12/056F. December 2012. Available at: *https://www.regulations.gov/document/EPA-HQ-OAR-2007-0492-10067*

U.S. EPA (2015). Preamble to the integrated science assessments. U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment, RTP Division. Research Triangle Park, NC. U.S. EPA. EPA/600/R-15/067. November 2015. Available at: *https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=310244*.

U.S. EPA (2016). Integrated review plan for the national ambient air quality standards for particulate matter. Office of Air Quality Planning and Standards. Research Triangle Park, NC. U.S. EPA. EPA-452/R-16-005. December 2016. Available at: *https://www3.epa.gov/ttn/naaqs/standards/pm/data/201612-final-integrated-review-plan.pdf*.

U.S. EPA (2017). Integrated Review Plan for the Secondary National Ambient Air Quality Standards for Ecological Effects of Oxides of Nitrogen, Oxides of Sulfur and Particulate Matter. Office of Air Quality Planning and Standards. Research Triangle Park, NC. U.S. EPA. EPA-452/R-17-002. January 2017. Available at: *https://www.epa.gov/sites/default/files/2018-08/documents/final_integrated_review_plan_for_nox_sox_pm_eco_-_011817-final.pdf*.

U.S. EPA (2019). Integrated Science Assessment (ISA) for Particulate Matter (Final Report). U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment. Washington, DC. U.S. EPA. EPA/600/R-19/188. December 2019. Available at: *https://www.epa.gov/naaqs/particulate-matter-pm-standards-integrated-science-assessments-current-review*.

U.S. EPA (2020a). Responses to significant comments on the 2020 proposed rule on the National Ambient Air Quality Standards for particulate matter (April 30, 2020; 85 FR 24094). EPA-HQ-OAR-2015-0072. *https://www.epa.gov/sites/production/files/2020-12/documents/pm_naaqs_response_to_comments_final.pdf*.

U.S. EPA (2020b). Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter. Office of Air Quality Planning and Standards, Health and Environmental Impacts Division. Research Triangle Park, NC. U.S. EPA. EPA-452/R-20-002. January 2020. Available at:

*https://www.epa.gov/system/files/documents/2021-10/final-policy-assessment-for-the-review-of-the-pm-naaqs-01-2020.pdf.*

U.S. EPA (2021a). Technical Support Document (TSD) for the Final Revised Cross-State Air Pollution Rule Update for the 2008 Ozone Season NAAQS Estimating PM2.5- and Ozone-Attributable Health Benefits. U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards. Research Triangle Park, NC. U.S. EPA. EPA-HQ-OAR-2020-0272. March 2021. Available at: *https://www.epa.gov/sites/default/files/2021-03/documents/estimating_pm2.5-_and_ozone-attributable_health_benefits_tsd_march_2021.pdf.*

U.S. EPA (2021b). Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft). Office of Air Quality Planning and Standards, Health and Environmental Impacts Division. Research Triangle Park, NC. U.S. EPA. EPA-452/P-21-001. October 2021. Available at: *https://www.epa.gov/system/files/documents/2022-05/Final%20Policy%20Assessment%20for%20the%20Reconsideration%20of%20the%20PM%20NAAQS_May2022_0.pdf.*

U.S. EPA (2022a). Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter. Office of Air Quality Planning and Standards, Health and Environmental Impacts Division. Research Triangle Park, NC. U.S. EPA. EPA-452/R-22-004. May 2022. Available at: *https://www.epa.gov/system/files/documents/2022-05/Final%20Policy%20Assessment%20for%20the%20Reconsideration%20of%20the%20PM%20NAAQS_May2022_0.pdf.*

U.S. EPA (2022b). Supplement to the 2019 Integrated Science Assessment for Particulate Matter (Final Report). U.S. Environmental Protection Agency, Office of Research and Development, Center for Public Health and Environmental Assessment. Research Triangle Park, NC. U.S. EPA. EPA/600/R 22/028. May 2022. Available at: *https://www.epa.gov/naaqs/particulate-matter-pm-standards-integrated-science-assessments-current-review.*

U.S. EPA (2023). Policy Assessment for the Review of the Secondary National Ambient Air Quality Standards for Oxides of Nitrogen, Oxides of Sulfur and Particulate Matter (External Review Draft). Office of Air Quality Planning and Standards, Health and Environmental Impacts Division. Research Triangle Park, NC. U.S. EPA. EPA-452/D-23-002. May 2023. Available at: *https://www.epa.gov/system/files/documents/2023-06/NOxSOxPM-PA-Draft-ERD_finalv3.pdf.*

Vodonos, A, Awad, YA and Schwartz, J (2018). The concentration-response between long-term PM(2.5) exposure and mortality; A meta-regression approach. Environ Res 166: 677-689.

Wang, B, Eum, KD, Kazemiparkouhi, F, Li, C, Manjourides, J, Pavlu, V and Suh, H (2020). The impact of long-term PM2.5 exposure on specific causes of death: exposure-response

curves and effect modification among 53 million U.S. Medicare beneficiaries. Environmental Health: A Global Access Science Source 19(1): 20.

Wang, Y, Apte, JS, Hill, JD, Ivey, CE, Patterson, RF, Robinson, AL, Tessum, CW and Marshall, JD (2022). Location-specific strategies for eliminating US national racial-ethnic [Formula: see text] exposure inequality. Proc Natl Acad Sci U S A 119(44): e2205548119.

Wei, Y, Wang, Y, Wu, X, Di, Q, Shi, L, Koutrakis, P, Zanobetti, A, Dominici, F and Schwartz, JD (2020). Causal effects of air pollution on mortality in Massachusetts. American Journal of Epidemiology 189(11): 1316–1323.

Wei, Y, Yazdi, MD, Di, Q, Requia, WJ, Dominici, F, Zanobetti, A and Schwartz, J (2021). Emulating causal dose-response relations between air pollutants and mortality in the Medicare population. Environmental Health: A Global Access Science Source 20(1): 53.

WHO (2021). *World Health Organization global air quality guidelines: particulate matter (PM2.5 and PM10), ozone, nitrogen dioxide, sulfur dioxide and carbon monoxide*. World Health Organization. Geneva. Available at: *https://apps.who.int/iris/handle/10665/345329*.

Wu, X, Braun, D, Schwartz, J, Kioumourtzoglou, MA and Dominici, F (2020). Evaluating the impact of long-term exposure to fine particulate matter on mortality among the elderly. Science Advances 6(29): eaba5692.

Wyatt, LH, Devlin, RB, Rappold, AG, Case, MW and Diaz-Sanchez, D (2020). Low levels of fine particulate matter increase vascular damage and reduce pulmonary function in young healthy adults. Particle and fibre toxicology 17(1): 1-12.

Yazdi, D, Wang, Y, Di, Q, Zanobetti, A and Schwartz, J (2019). Long-term exposure to PM2.5 and ozone and hospital admissions of Medicare participants in the Southeast USA. Environment International 130: 104879.

Yitshak-Sade, M, Kloog, I, Zanobetti, A and Schwartz, JD (2019). Estimating the causal effect of annual PM2.5 exposure on mortality rates in the Northeastern and mid-Atlantic states. Environmental Epidemiology 3(4): e052.

Young, SS, Smith, RL and Lopiano, KK (2017). Air quality and acute deaths in California, 2000-2012. Regulatory Toxicology and Pharmacology 88: 173-184.

Zeger, SL, Thomas, D, Dominici, F, Samet, JM, Schwartz, J, Dockery, D and Cohen, A (2000). Exposure measurement error in time-series studies of air pollution: Concepts and consequences. Environmental Health Perspectives 108(5): 419-426.

Zhang, S, Breitner, S, Cascio, WE, Devlin, RB, Neas, LM, Ward-Caviness, C, Diaz-Sanchez, D, Kraus, WE, Hauser, ER, Schwartz, J, Peters, A and Schneider, A (2021a). Association between short-term exposure to ambient fine particulate matter and myocardial injury in the CATHGEN cohort. Environ Pollut 275: 116663.

Zhang, Z, Wang, J, Kwong, JC, Burnett, RT, van Donkelaar, A, Hystad, P, Martin, RV, Bai, L, McLaughlin, J and Chen, H (2021b). Long-term exposure to air pollution and mortality in a prospective cohort: The Ontario Health Study. Environment International 154: 106570.

## Appendix A: Studies cited in public comments related to the PM standards that were not included in the 2019 ISA or 2022 ISA Supplement and are provisionally considered in responding to comments

This appendix includes those studies cited in public comments or otherwise identified by the EPA while responding to comments related ot the PM standards that were not included in the 2019 ISA or the 2022 ISA Supplement (i.e., published after the literature cutoff date for the 2019 ISA or ISA Supplement but would have been considered within scope of the 2019 ISA or ISA Supplement) (U.S. EPA, 2015; U.S. EPA, 2019; U.S. EPA, 2022b). These studies were provisionally considered by the EPA, as discussed in section I.D of the preamble to the final rule and in this RTC.

Alexeeff, SE, Deosaransingh, K, Van Den Eeden, S, Schwartz, J, Liao, NS and Sidney, S (2023). Association of Long-term Exposure to Particulate Air Pollution With Cardiovascular Events in California. JAMA Netw Open 6(2): e230561.

Boing, AF, deSouza, P, Boing, AC, Kim, R and Subramanian, SV (2022). Air Pollution, Socioeconomic Status, and Age-Specific Mortality Risk in the United States. JAMA Netw Open 5(5): e2213540.

Bouazza, N, Foissac, F, Urien, S, Guedj, R, Carbajal, R, Treluyer, JM and Chappuy, H (2018). Fine particulate pollution and asthma exacerbations. Arch Dis Child 103(9): 828-831.

Bozack, A, Pierre, S, DeFelice, N, Colicino, E, Jack, D, Chillrud, SN, Rundle, A, Astua, A, Quinn, JW, McGuinn, L, Yang, Q, Johnson, K, Masci, J, Lukban, L, Maru, D and Lee, AG (2022). Long-Term Air Pollution Exposure and COVID-19 Mortality: A Patient-Level Analysis from New York City. Am J Respir Crit Care Med 205(6): 651-662.

Brauer, M, Brook, JR, Christidis, T, Chu, Y, Crouse, DL, Erickson, A, Hystad, P, Li, C, Martin, RV, Meng, J, Pappin, AJ, Pinault, LL, Tjepkema, M, van Donkelaar, A, Weagle, C, Weichenthal, S and Burnett, RT (2022). Mortality-Air Pollution Associations in Low Exposure Environments (MAPLE): Phase 2. Research report (Health Effects Institute)(121): 1-91.

Bravo, MA, Warren, JL, Leong, MC, Deziel, NC, Kimbro, RT, Bell, ML and Miranda, ML (2022). Where Is Air Quality Improving, and Who Benefits? A Study of PM2.5 and Ozone Over 15 Years. Am J Epidemiol 191(7): 1258-1269.

Brink, L, Marshall, L, Hacker, K and Talbott, E (2020). Changes in emergency department visits for respiratory and cardiovascular disease after closure of a coking operation near Pittsburgh, PA. Journal of Air Pollution and Health 4(4).

Brokamp, C, Strawn, JR, Beck, AF and Ryan, P (2019). Pediatric Psychiatric Emergency Department Utilization and Fine Particulate Matter: A Case-Crossover Study. Environ Health Perspect 127(9): 97006.

Brunekreef, B, Strak, M, Chen, J, Andersen, ZJ, Atkinson, R, Bauwelinck, M, Bellander, T, Boutron, MC, Brandt, J, Carey, I, Cesaroni, G, Forastiere, F, Fecht, D, Gulliver, J, Hertel, O, Hoffmann, B, de Hoogh, K, Houthuijs, D, Hvidtfeldt, U, Janssen, N, Jorgensen, J, Katsouyanni, K, Ketzel, M, Klompmaker, J, Hjertager Krog, N, Liu, S, Ljungman, P, Mehta, A, Nagel, G, Oftedal, B, Pershagen, G, Peters, A, Raaschou-Nielsen, O, Renzi, M, Rodopoulou, S, Samoli, E, Schwarze, P, Sigsgaard, T, Stafoggia, M, Vienneau, D, Weinmayr, G, Wolf, K and Hoek, G (2021). Mortality and Morbidity Effects of Long-Term Exposure to Low-Level PM(2.5), BC, NO(2), and O(3): An Analysis of European Cohorts in the ELAPSE Project. Res Rep Health Eff Inst 2021(208): 1-127.

Bruyneel, L, Kestens, W, Alberty, M, Karakaya, G, Van Woensel, R, Horemans, C, Trimpeneers, E, Vanpoucke, C, Fierens, F, Nawrot, TS and Cox, B (2022). Short-Term exposure to ambient air pollution and onset of work incapacity related to mental health conditions. Environ Int 164: 107245.

Chen, M, Zhao, J, Zhuo, C and Zheng, L (2021). The Association Between Ambient Air Pollution and Atrial Fibrillation. Int Heart J 62(2): 290-297.

Chen, R, Jiang, Y, Hu, J, Chen, H, Li, H, Meng, X, Ji, JS, Gao, Y, Wang, W, Liu, C, Fang, W, Yan, H, Chen, J, Wang, W, Xiang, D, Su, X, Yu, B, Wang, Y, Xu, Y, Wang, L, Li, C, Chen, Y, Bell, ML, Cohen, AJ, Ge, J, Huo, Y and Kan, H (2022). Hourly Air Pollutants and Acute Coronary Syndrome Onset in 1.29 Million Patients. Circulation 145(24): 1749-1760.

Chen, X, Chen, S, Zhu, Z, Luo, J, Wang, H, Wulayin, M, Huang, C, Zhao, W and Wang, Q (2023a). Identifying the critical windows and joint effects of temperature and PM(2.5) exposure on small for gestational age. Environ Int 173: 107832.

Chen, Z, Sidell, MA, Huang, BZ, Chow, T, Martinez, MP, Lurmann, F, Gilliland, FD and Xiang, AH (2023b). The Independent Effect of COVID-19 Vaccinations and Air Pollution Exposure on Risk of COVID-19 Hospitalizations in Southern California. Am J Respir Crit Care Med 207(2): 218-221.

Chilian-Herrera, OL, Tamayo-Ortiz, M, Texcalac-Sangrador, JL, Rothenberg, SJ, Lopez-Ridaura, R, Romero-Martinez, M, Wright, RO, Just, AC, Kloog, I, Bautista-Arredondo, LF and Tellez-Rojo, MM (2021). PM(2.5) exposure as a risk factor for type 2 diabetes mellitus in the Mexico City metropolitan area. BMC Public Health 21(1): 2087.

Collins, TW, Grineski, SE, Shaker, Y and Mullen, CJ (2022). Communities of color are disproportionately exposed to long-term and short-term PM(2.5) in metropolitan America. Environ Res 214(Pt 4): 114038.

Cushing, LJ, Li, S, Steiger, BB and Casey, JA (2023). Historical red-lining is associated with fossil fuel power plant siting and present-day inequalities in air pollutant emissions. Nature Energy 8(1): 52-61.

Danesh Yazdi, M, Nassan, FL, Kosheleva, A, Wang, C, Xu, Z, Di, Q, Requia, WJ, Comfort, NT, Wu, H, Laurent, LC, DeHoff, P, Vokonas, P, Baccarelli, AA and Schwartz, JD (2023).

Short-term air pollution and temperature exposure and changes in the extracellular microRNA profile of Normative Aging Study (NAS) participants. Environ Int 171: 107735.

Danesh Yazdi, M, Wang, Y, Di, Q, Requia, WJ, Wei, Y, Shi, L, Sabath, MB, Dominici, F, Coull, B, Evans, JS, Koutrakis, P and Schwartz, JD (2021). Long-term effect of exposure to lower concentrations of air pollution on mortality among US Medicare participants and vulnerable subgroups: a doubly-robust approach. Lancet Planet Health 5(10): e689-e697.

Danesh Yazdi, M, Wei, Y, Di, Q, Requia, WJ, Shi, L, Sabath, MB, Dominici, F and Schwartz, J (2022). The effect of long-term exposure to air pollution and seasonal temperature on hospital admissions with cardiovascular and respiratory disease in the United States: A difference-in-differences analysis. Sci Total Environ 843: 156855.

Dominici, F, Zanobetti, A, Schwartz, J, Braun, D, Sabath, B and Wu, X (2022). Assessing Adverse Health Effects of Long-Term Exposure to Low Levels of Ambient Air Pollution: Implementation of Causal Inference Methods. Res Rep Health Eff Inst 2022(211): 1-56.

Enders, C, Pearson, D, Harley, K and Ebisu, K (2019). Exposure to coarse particulate matter during gestation and term low birthweight in California: Variation in exposure and risk across region and socioeconomic subgroup. Sci Total Environ 653: 1435-1444.

English, PB, Von Behren, J, Balmes, JR, Boscardin, J, Carpenter, C, Goldberg, DE, Horiuchi, S, Richardson, M, Solomon, G, Valle, J and Reynolds, P (2022). Association between long-term exposure to particulate air pollution with SARS-CoV-2 infections and COVID-19 deaths in California, U.S.A. Environ Adv 9: 100270.

Enstrom, JE (2005). Fine particulate air pollution and total mortality among elderly Californians, 1973-2002. Inhal Toxicol 17(14): 803-816.

Feng, Y, Wei, Y, Coull, BA and Schwartz, JD (2023). Measurement error correction for ambient PM(2.5) exposure using stratified regression calibration: Effects on all-cause mortality. Environ Res 216(Pt 4): 114792.

Fiffer, M, Kang, CM, Requia, WJ and Koutrakis, P (2020). Long-term impact of PM(2.5) mass and sulfur reductions on ultrafine particle trends in Boston, MA from 1999 to 2018. J Air Waste Manag Assoc 70(7): 700-707.

Frontera, A, Cianfanelli, L, Vlachos, K, Landoni, G and Cremona, G (2020). Severe air pollution links to higher mortality in COVID-19 patients: The "double-hit" hypothesis. J Infect 81(2): 255-259.

Gallo, E, Folino, F, Buja, G, Zanotto, G, Bottigliengo, D, Comoretto, R, Marras, E, Allocca, G, Vaccari, D, Gasparini, G, Bertaglia, E, Zoppo, F, Calzolari, V, Nangah Suh, R, Ignatiuk, B, Lanera, C, Benassi, A, Gregori, D and Iliceto, S (2020). Daily Exposure to Air Pollution Particulate Matter Is Associated with Atrial Fibrillation in High-Risk Patients. Int J Environ Res Public Health 17(17).

Gatto, NM, Henderson, VW, Hodis, HN, St John, JA, Lurmann, F, Chen, JC and Mack, WJ (2014). Components of air pollution and cognitive function in middle-aged and older adults in Los Angeles. Neurotoxicology 40: 1-7.

Gentile, DA, Morphew, T, Elliott, J, Presto, AA and Skoner, DP (2022). Asthma prevalence and control among schoolchildren residing near outdoor air pollution sites. J Asthma 59(1): 12-22.

Ghahremanloo, M, Choi, Y, Sayeed, A, Salman, AK, Pan, S and Amani, M (2021). Estimating daily high-resolution PM2. 5 concentrations over Texas: Machine Learning approach. Atmospheric Environment 247: 118209.

Grineski, S, Alexander, C, Renteria, R, Collins, TW, Bilder, D, VanDerslice, J and Bakian, A (2023). Trimester-specific ambient PM(2.5) exposures and risk of intellectual disability in Utah. Environ Res 218: 115009.

Hazlehurst, MF, Carroll, KN, Loftus, CT, Szpiro, AA, Moore, PE, Kaufman, JD, Kirwa, K, LeWinn, KZ, Bush, NR, Sathyanarayana, S, Tylavsky, FA, Barrett, ES, Nguyen, RHN and Karr, CJ (2021). Maternal exposure to PM(2.5) during pregnancy and asthma risk in early childhood: consideration of phases of fetal lung development. Environ Epidemiol 5(2).

Henneman, LRF, Rasel, MM, Choirat, C, Anenberg, SC and Zigler, C (2023). Inequitable Exposures to U.S. Coal Power Plant-Related PM2.5: 22 Years and Counting. Environ Health Perspect 131(3): 37005.

Hwa Jung, K, Pitkowsky, Z, Argenio, K, Quinn, JW, Bruzzese, JM, Miller, RL, Chillrud, SN, Perzanowski, M, Stingone, JA and Lovinsky-Desir, S (2022). The effects of the historical practice of residential redlining in the United States on recent temporal trends of air pollution near New York City schools. Environ Int 169: 107551.

Jbaily, A, Zhou, X, Liu, J, Lee, TH, Kamareddine, L, Verguet, S and Dominici, F (2022). Air pollution exposure disparities across US population and income groups. Nature 601(7892): 228-233.

Jin, T, Di, Q, Requia, WJ, Danesh Yazdi, M, Castro, E, Ma, T, Wang, Y, Zhang, H, Shi, L and Schwartz, J (2022). Associations between long-term air pollution exposure and the incidence of cardiovascular diseases among American older adults. Environ Int 170: 107594.

Josey, KP, Delaney, SW, Wu, X, Nethery, RC, DeSouza, P, Braun, D and Dominici, F (2023). Air Pollution and Mortality at the Intersection of Race and Social Class. N Engl J Med 388(15): 1396-1404.

Kim, E, Larson, TV, Hopke, PK, Slaughter, C, Sheppard, LE and Claiborn, C (2003). Source identification of PM2. 5 in an arid Northwest US City by positive matrix factorization. Atmospheric Research 66(4): 291-305.

Kim, H, Samet, JM and Bell, ML (2022a). Association between Short-Term Exposure to Air Pollution and COVID-19 Mortality: A Population-Based Case-Crossover Study Using Individual-Level Mortality Registry Confirmed by Medical Examiners. Environ Health Perspect 130(11): 117006.

Kim, KN, Sohn, JH, Cho, SJ, Seo, HY, Kim, S and Hong, YC (2022b). Effects of short-term exposure to air pollution on hospital admissions for autism spectrum disorder in Korean school-aged children: a nationwide time-series study. BMJ Open 12(9): e058286.

Lane, HM, Morello-Frosch, R, Marshall, JD and Apte, JS (2022). Historical Redlining Is Associated with Present-Day Air Pollution Disparities in U.S. Cities. Environ Sci Technol Lett 9(4): 345-350.

Lee, HH, Pan, SC, Chen, BY, Lo, SH and Guo, YL (2019a). Atrial fibrillation hospitalization is associated with exposure to fine particulate air pollutants. Environ Health 18(1): 117.

Lee, M, Schwartz, J, Wang, Y, Dominici, F and Zanobetti, A (2019b). Long-term effect of fine particulate matter on hospitalization with dementia. Environ Pollut 254(Pt A): 112926.

Liao, NS, Sidney, S, Deosaransingh, K, Van Den Eeden, SK, Schwartz, J and Alexeeff, SE (2021). Particulate Air Pollution and Risk of Cardiovascular Events Among Adults With a History of Stroke or Acute Myocardial Infarction. J Am Heart Assoc 10(10): e019758.

Liu, J, Clark, LP, Bechle, MJ, Hajat, A, Kim, SY, Robinson, AL, Sheppard, L, Szpiro, AA and Marshall, JD (2021). Disparities in Air Pollution Exposure in the United States by Race/Ethnicity and Income, 1990-2010. Environ Health Perspect 129(12): 127005.

Liu, RA, Wei, Y, Qiu, X, Kosheleva, A and Schwartz, JD (2022). Short term exposure to air pollution and mortality in the US: a double negative control analysis. Environ Health 21(1): 81.

Lohmann, U, Friebel, F, Kanji, ZA, Mahrt, F, Mensah, AA and Neubauer, D (2020). Future warming exacerbated by aged-soot effect on cloud formation. Nature Geoscience 13(10): 674-680.

Lu, W, Hackman, DA and Schwartz, J (2021). Ambient air pollution associated with lower academic achievement among US children: A nationwide panel study of school districts. Environ Epidemiol 5(6): e174.

Mirowsky, JE, Carraway, MS, Dhingra, R, Tong, H, Neas, L, Diaz-Sanchez, D, Cascio, WE, Case, M, Crooks, JL, Hauser, ER, Dowdy, ZE, Kraus, WE and Devlin, RB (2022). Exposures to low-levels of fine particulate matter are associated with acute changes in heart rate variability, cardiac repolarization, and circulating blood lipids in coronary artery disease patients. Environ Res 214(Pt 1): 113768.

Mullen, C, Grineski, SE, Collins, TW and Mendoza, DL (2020). Effects of PM(2.5) on Third Grade Students' Proficiency in Math and English Language Arts. Int J Environ Res Public Health 17(18).

Nguyen, AM, Malig, BJ and Basu, R (2021). The association between ozone and fine particles and mental health-related emergency department visits in California, 2005-2013. PLoS One 16(4): e0249675.

Ni, Y, Loftus, CT, Szpiro, AA, Young, MT, Hazlehurst, MF, Murphy, LE, Tylavsky, FA, Mason, WA, LeWinn, KZ, Sathyanarayana, S, Barrett, ES, Bush, NR and Karr, CJ (2022). Associations of Pre- and Postnatal Air Pollution Exposures with Child Behavioral Problems and Cognitive Performance: A U.S. Multi-Cohort Study. Environ Health Perspect 130(6): 67008.

Norris, G, YoungPong, SN, Koenig, JQ, Larson, TV, Sheppard, L and Stout, JW (1999). An association between fine particles and asthma emergency department visits for children in Seattle. Environmental health perspectives 107(6): 489-493.

Nunez, Y, Boehme, AK, Weisskopf, MG, Re, DB, Navas-Acien, A, van Donkelaar, A, Martin, RV and Kioumourtzoglou, MA (2021). Fine Particle Exposure and Clinical Aggravation in Neurodegenerative Diseases in New York State. Environ Health Perspect 129(2): 27003.

Pagalan, L, Bickford, C, Weikum, W, Lanphear, B, Brauer, M, Lanphear, N, Hanley, GE, Oberlander, TF and Winters, M (2019). Association of Prenatal Exposure to Air Pollution With Autism Spectrum Disorder. JAMA Pediatr 173(1): 86-92.

Qiu, L, Chen, M, Wang, X, Qin, X, Chen, S, Qian, Y, Liu, Z, Cao, Q and Ying, Z (2018). Exposure to Concentrated Ambient PM2.5 Compromises Spermatogenesis in a Mouse Model: Role of Suppression of Hypothalamus-Pituitary-Gonads Axis. Toxicol Sci 162(1): 318-326.

Qiu, X, Danesh-Yazdi, M, Wei, Y, Di, Q, Just, A, Zanobetti, A, Weisskopf, M, Dominici, F and Schwartz, J (2022a). Associations of short-term exposure to air pollution and increased ambient temperature with psychiatric hospital admissions in older adults in the USA: a case-crossover study. Lancet Planet Health 6(4): e331-e341.

Qiu, X, Danesh-Yazdi, M, Weisskopf, M, Kosheleva, A, Spiro, AS, Wang, C, Coull, BA, Koutrakis, P and Schwartz, JD (2022b). Associations between Air Pollution and Psychiatric Symptoms in The Normative Aging Study. Environ Res Lett 17(3).

Qiu, X, Fong, KC, Shi, L, Papatheodorou, S, Di, Q, Just, A, Kosheleva, A, Messerlian, C and Schwartz, JD (2020). Prenatal exposure to particulate air pollution and gestational age at delivery in Massachusetts neonates 2001-2015: A perspective of causal modeling and health disparities. Environ Epidemiol 4(5): e113.

Qiu, X, Wei, Y, Weisskopf, M, Spiro, A, Shi, L, Castro, E, Coull, B, Koutrakis, P and Schwartz, J (2023). Air pollution, climate conditions and risk of hospital admissions for psychotic disorders in U.S. residents. Environ Res 216(Pt 2): 114636.

Rahman, MM, McConnell, R, Schlaerth, H, Ko, J, Silva, S, Lurmann, FW, Palinkas, L, Johnston, J, Hurlburt, M, Yin, H, Ban-Weiss, G and Garcia, E (2022). The Effects of Coexposure to

Extremes of Heat and Particulate Air Pollution on Mortality in California: Implications for Climate Change. Am J Respir Crit Care Med 206(9): 1117-1127.

Rhee, J, Dominici, F, Zanobetti, A, Schwartz, J, Wang, Y, Di, Q, Balmes, J and Christiani, DC (2019). Impact of Long-Term Exposures to Ambient PM(2.5) and Ozone on ARDS Risk for Older Adults in the United States. Chest 156(1): 71-79.

Rhew, SH, Kravchenko, J and Lyerly, HK (2021). Exposure to low-dose ambient fine particulate matter PM2.5 and Alzheimer's disease, non-Alzheimer's dementia, and Parkinson's disease in North Carolina. PLoS One 16(7): e0253253.

Schwartz, JD, Yitshak-Sade, M, Zanobetti, A, Di, Q, Requia, WJ, Dominici, F and Mittleman, MA (2021). A self-controlled approach to survival analysis, with application to air pollution and mortality. Environ Int 157: 106861.

Shi, L, Rosenberg, A, Wang, Y, Liu, P, Danesh Yazdi, M, Réquia, W, Steenland, K, Chang, H, Sarnat, JA, Wang, W, Zhang, K, Zhao, J and Schwartz, J (2022). Low-Concentration Air Pollution and Mortality in American Older Adults: A National Cohort Analysis (2001-2017). Environ Sci Technol 56(11): 7194-7202.

Shi, L, Steenland, K, Li, H, Liu, P, Zhang, Y, Lyles, RH, Requia, WJ, Ilango, SD, Chang, HH, Wingo, T, Weber, RJ and Schwartz, J (2021). A national cohort study (2000-2018) of long-term air pollution exposure and incident dementia in older adults in the United States. Nat Commun 12(1): 6754.

Shi, L, Wu, X, Danesh Yazdi, M, Braun, D, Abu Awad, Y, Wei, Y, Liu, P, Di, Q, Wang, Y, Schwartz, J, Dominici, F, Kioumourtzoglou, MA and Zanobetti, A (2020). Long-term effects of PM(2.5) on neurological disorders in the American Medicare population: a longitudinal cohort study. Lancet Planet Health 4(12): e557-e565.

Shi, L, Zhu, Q, Wang, Y, Hao, H, Zhang, H, Schwartz, J, Amini, H, van Donkelaar, A, Martin, RV, Steenland, K, Sarnat, JA, Caudle, WM, Ma, T, Li, H, Chang, HH, Liu, JZ, Wingo, T, Mao, X, Russell, AG, Weber, RJ and Liu, P (2023). Incident dementia and long-term exposure to constituents of fine particle air pollution: A national cohort study in the United States. Proc Natl Acad Sci U S A 120(1): e2211282119.

Stafoggia, M, Oftedal, B, Chen, J, Rodopoulou, S, Renzi, M, Atkinson, RW, Bauwelinck, M, Klompmaker, JO, Mehta, A, Vienneau, D, Andersen, ZJ, Bellander, T, Brandt, J, Cesaroni, G, de Hoogh, K, Fecht, D, Gulliver, J, Hertel, O, Hoffmann, B, Hvidtfeldt, UA, Jockel, KH, Jorgensen, JT, Katsouyanni, K, Ketzel, M, Kristoffersen, DT, Lager, A, Leander, K, Liu, S, Ljungman, PLS, Nagel, G, Pershagen, G, Peters, A, Raaschou-Nielsen, O, Rizzuto, D, Schramm, S, Schwarze, PE, Severi, G, Sigsgaard, T, Strak, M, van der Schouw, YT, Verschuren, M, Weinmayr, G, Wolf, K, Zitt, E, Samoli, E, Forastiere, F, Brunekreef, B, Hoek, G and Janssen, NAH (2022). Long-term exposure to low ambient air pollution concentrations and mortality among 28 million people: results from seven large European cohorts within the ELAPSE project. Lancet Planet Health 6(1): e9-e18.

Strak, M, Weinmayr, G, Rodopoulou, S, Chen, J, de Hoogh, K, Andersen, ZJ, Atkinson, R, Bauwelinck, M, Bekkevold, T, Bellander, T, Boutron-Ruault, MC, Brandt, J, Cesaroni, G, Concin, H, Fecht, D, Forastiere, F, Gulliver, J, Hertel, O, Hoffmann, B, Hvidtfeldt, UA, Janssen, NAH, Jockel, KH, Jorgensen, JT, Ketzel, M, Klompmaker, JO, Lager, A, Leander, K, Liu, S, Ljungman, P, Magnusson, PKE, Mehta, AJ, Nagel, G, Oftedal, B, Pershagen, G, Peters, A, Raaschou-Nielsen, O, Renzi, M, Rizzuto, D, van der Schouw, YT, Schramm, S, Severi, G, Sigsgaard, T, Sorensen, M, Stafoggia, M, Tjonneland, A, Verschuren, WMM, Vienneau, D, Wolf, K, Katsouyanni, K, Brunekreef, B, Hoek, G and Samoli, E (2021). Long term exposure to low level air pollution and mortality in eight European cohorts within the ELAPSE project: pooled analysis. BMJ 374: n1904.

Strosnider, HM, Chang, HH, Darrow, LA, Liu, Y, Vaidyanathan, A and Strickland, MJ (2019). Age-Specific Associations of Ozone and Fine Particulate Matter with Respiratory Emergency Department Visits in the United States. Am J Respir Crit Care Med 199(7): 882-890.

Su, B, Liu, C, Chen, L, Wu, Y, Li, J and Zheng, X (2023). Long-term exposure to PM(2.5) and O(3) with cardiometabolic multimorbidity: Evidence among Chinese elderly population from 462 cities. Ecotoxicol Environ Saf 255: 114790.

Tao, B, Li, Z, Wang, Y, Wu, J, Shi, X, Shi, J, Liu, Q and Wang, J (2023). Environment pollutants exposure affects the endogenous activation of within-host Mycobacterium tuberculosis. Environ Res 227: 115695.

Teyton, A, Baer, RJ, Benmarhnia, T and Bandoli, G (2023). Exposure to Air Pollution and Emergency Department Visits During the First Year of Life Among Preterm and Full-term Infants. JAMA Netw Open 6(2): e230262.

Ulziikhuu, B, Gombojav, E, Banzrai, C, Batsukh, S, Enkhtuya, E, Boldbaatar, B, Bellinger, DC, Lanphear, BP, McCandless, LC, Tamana, SK and Allen, RW (2022). Portable HEPA Filter Air Cleaner Use during Pregnancy and Children's Cognitive Performance at Four Years of Age: The UGAAR Randomized Controlled Trial. Environ Health Perspect 130(6): 67006.

Wang, J, Yan, Y, Si, H, Li, J, Zhao, Y, Gao, T, Pi, J, Zhang, R, Chen, R, Chen, W, Zheng, Y and Jiang, M (2023a). The effect of real-ambient PM2.5 exposure on the lung and gut microbiomes and the regulation of Nrf2. Ecotoxicol Environ Saf 254: 114702.

Wang, X, Chen, L, Cai, M, Tian, F, Zou, H, Qian, ZM, Zhang, Z, Li, H, Wang, C, Howard, SW, Peng, Y, Zhang, L, Bingheim, E, Lin, H and Zou, Y (2023b). Air pollution associated with incidence and progression trajectory of chronic lung diseases: a population-based cohort study. Thorax 78(7): 698-705.

Wei, Y, Qiu, X, Sabath, MB, Yazdi, MD, Yin, K, Li, L, Peralta, AA, Wang, C, Koutrakis, P, Zanobetti, A, Dominici, F and Schwartz, JD (2022a). Air Pollutants and Asthma Hospitalization in the Medicaid Population. Am J Respir Crit Care Med 205(9): 1075-1083.

Wei, Y, Qiu, X, Yazdi, MD, Shtein, A, Shi, L, Yang, J, Peralta, AA, Coull, BA and Schwartz, JD (2022b). The Impact of Exposure Measurement Error on the Estimated Concentration-Response Relationship between Long-Term Exposure to PM2.5 and Mortality. Environ Health Perspect 130(7): 77006.

Weichenthal, S, Pinault, L, Christidis, T, Burnett, RT, Brook, JR, Chu, Y, Crouse, DL, Erickson, AC, Hystad, P and Li, C (2022). How low can you go? Air pollution affects mortality at very low levels. Science Advances 8(39): eabo3381.

Williams, AM, Phaneuf, DJ, Barrett, MA and Su, JG (2019). Short-term impact of PM(2.5) on contemporaneous asthma medication use: Behavior and the value of pollution reductions. Proc Natl Acad Sci U S A 116(12): 5246-5253.

Wu, PC, Cheng, TJ, Kuo, CP, Fu, JS, Lai, HC, Chiu, TY and Lai, LW (2020). Transient risk of ambient fine particulate matter on hourly cardiovascular events in Tainan City, Taiwan. PLoS One 15(8): e0238082.

Xi, Y, Richardson, DB, Kshirsagar, AV, Wade, TJ, Flythe, JE, Whitsel, EA, Peterson, GC, Wyatt, LH and Rappold, AG (2022). Effects of short-term ambient PM(2.5) exposure on cardiovascular disease incidence and mortality among U.S. hemodialysis patients: a retrospective cohort study. Environ Health 21(1): 33.

Xu, L, Taylor, JE and Kaiser, J (2022). Short-term air pollution exposure and COVID-19 infection in the United States. Environ Pollut 292(Pt B): 118369.

Yitshak-Sade, M, Kloog, I, Schwartz, JD, Novack, V, Erez, O and Just, AC (2021). The effect of prenatal temperature and PM(2.5) exposure on birthweight: Weekly windows of exposure throughout the pregnancy. Environ Int 155: 106588.

Younan, D, Petkus, AJ, Widaman, KF, Wang, X, Casanova, R, Espeland, MA, Gatz, M, Henderson, VW, Manson, JE, Rapp, SR, Sachs, BC, Serre, ML, Gaussoin, SA, Barnard, R, Saldana, S, Vizuete, W, Beavers, DP, Salinas, JA, Chui, HC, Resnick, SM, Shumaker, SA and Chen, JC (2020). Particulate matter and episodic memory decline mediated by early neuroanatomic biomarkers of Alzheimer's disease. Brain 143(1): 289-302.

Yu, W, Ye, T, Zhang, Y, Xu, R, Lei, Y, Chen, Z, Yang, Z, Zhang, Y, Song, J, Yue, X, Li, S and Guo, Y (2023). Global estimates of daily ambient fine particulate matter concentrations and unequal spatiotemporal distribution of population exposure: a machine learning modelling study. Lancet Planet Health 7(3): e209-e218.

Zare Sakhvidi, MJ, Yang, J, Lequy, E, Chen, J, de Hoogh, K, Letellier, N, Mortamais, M, Ozguler, A, Vienneau, D, Zins, M, Goldberg, M, Berr, C and Jacquemin, B (2022). Outdoor air pollution exposure and cognitive performance: findings from the enrolment phase of the CONSTANCES cohort. Lancet Planet Health 6(3): e219-e229.

Zhang, S, Breitner, S, Cascio, WE, Devlin, RB, Neas, LM, Ward-Caviness, C, Diaz-Sanchez, D, Kraus, WE, Hauser, ER, Schwartz, J, Peters, A and Schneider, A (2021). Association

between short-term exposure to ambient fine particulate matter and myocardial injury in the CATHGEN cohort. Environ Pollut 275: 116663.

Zhang, Y, Yin, Z, Zhou, P, Zhang, L, Zhao, Z, Norback, D, Zhang, X, Lu, C, Yu, W, Wang, T, Zheng, X, Zhang, L and Zhang, Y (2022). Early-life exposure to PM(2.5) constituents and childhood asthma and wheezing: Findings from China, Children, Homes, Health study. Environ Int 165: 107297.

[illegible]

# Supreme Court of the United States

[illegible]

[illegible] ADMINISTRATOR OF THE ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*[illegible]*

On a Writ of Certiorari to the
United States Court of Appeals
for the District of Columbia Circuit

## BRIEF FOR RESPONDENTS APPALACHIAN POWER COMPANY, *et al.*, IN SUPPORT OF PETITIONERS


DAVID E. MENOTTI
WILLIAM F. PEDERSEN
JEFFREY A. KNIGHT
SHAWPITTMAN
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8675
*Counsel for American Forest & Paper Association and American Iron & Steel Institute*

HENRY V. NICKEL
F. WILLIAM BROWNELL
*(Counsel of Record)*
JAMES N. CHRISTMAN
LUCINDA MINTON LANGWORTHY
HUNTON & WILLIAMS
1900 K Street, N.W.
Washington, D.C. 20006
(202) 955-1500
*Counsel for Appalachian Power Co., et al., American Public Power Association, and National Association of Home Builders*


July 20, 2000

*[Additional Counsel Listed Inside]*


WILSON-EPES PRINTING CO., INC. — (202) 789-0096 — WASHINGTON, D. C. 20001



USCA Case #24-1050 Document #2078682 Filed: 10/07/2024 Page 324 of 390

decisions is to address "*all* identifiable effects on public health or welfare expected from the presence of such pollutant in the ambient air, in varying quantities," as well as "variable factors (including atmospheric conditions) which of themselves or in combination with other factors may alter the effects [of the pollutant] on public health or welfare."[89] A range of health risks might flow from the presence of a pollutant in the ambient air, including both direct effects associated with exposures to the pollutant (e.g., inhalation health risks) and indirect health effects associated with how programs for reducing the pollutant as it is present "in the ambient air" are affected by NAAQS revision.

In other words, a standard that cannot be achieved, or that will render pollutant reduction efforts more "difficult, counter-productive, or confusing," Brief of Respondent EPA, at 73 (D.C. Cir. No. 97-1441), as compared to available alternatives, has identifiable and adverse impacts on public health. "[A]ll identifiable effects" of the pollutant as influenced by such real world factors are appropriate topics for consideration in the criteria document and by EPA during the NAAQS rulemaking. Indeed, in a portion of its decision not challenged by EPA, the lower court rejected EPA's refusal to construe the "all identifiable effects" language to include the UVB radiation effects of ozone reduction. 175 F.3d at 1051-52, App. 43a-46a. Clearly, this language is not limited to inhalation-related effects, as EPA has construed it.

Section 108 also directs EPA to address in its criteria "all identifiable effects" on "public ... welfare," CAA § 108(a)(2), a term that includes "economic values." CAA § 302(h). EPA must also provide "simultaneously" with issuance of the criteria document information on the "cost ...

[89] *See NRDC*, 902 F.2d at 973 (emphasis added) *(citing* CAA § 108(a)(2)).



energy requirements, emission reduction benefit, and environmental impact" of alternative control strategies. CAA § 108(b)(1). In view of this statutory language, EPA is required to have available to it for any NAAQS rulemaking all of the information it needs to exercise sound risk management judgment. That Congress directed EPA to develop this information under § 108 in time for consideration in NAAQS rulemakings does not mean that EPA must ignore it, but rather supports the conclusion that EPA should exercise its risk management judgment in light of this information and consistent with the statutory purposes of the Act.

In sum, Congress in §§ 108 and 109 did not tell EPA to exercise public health risk management judgment by ignoring the overall consequences of its action. Rather, Congress' broad delegation of risk management authority must be implemented by defining limiting standards that protect the "public health" while promoting the statutory purposes of the Act.

**B. Section 109(d) Confirms The Need For Consideration of the Impacts on Society of Decisions on Whether to Revise NAAQS.**

Once EPA has established a NAAQS for a pollutant, as it has for both pollutants in this case, Congress directed that EPA revise the standard periodically as "may be appropriate" in accordance with §§ 108 and 109(b). CAA § 109(d)(1). In the case of standard revision, there is by definition a standard in place that the Agency previously determined was "requisite to protect public health" with an "adequate margin of safety."

To establish that standard revision is "appropriate" in accordance with §§ 108 and 109(b), the Agency must explain



USCA Case #24-1050 Document #2078682 Filed: 10/07/2024 Page 325 of 390

why a change in the status quo is "requisite" to protect "public health." In other words, the agency must explain why the existing standard is no longer "appropriate" in accordance with §§ 108 and 109(b) and the revised standard is.

This analysis by definition recognizes the need to evaluate a broad range of relevant factors. *See West v. Gibson*, 527 U.S. 212, 218 (1998) ("The meaning of the word 'appropriate' permits its scope to expand" as changes in the law, or in the world, would require). In other words, the "appropriate" language confirms the importance of the ordinary meaning of "public health" and the statutory purposes as a source of decisional criteria for the Agency's exercise of discretion regarding NAAQS revision.

Furthermore, as discussed above, the broad language of § 109(b) contemplates the exercise of risk management judgment, and the information requirements of § 108 ensure that the Administrator will have at her disposal all of the information required for reasoned "public health" risk management. In the context of standard revision, § 109(d) specifically directs the Administrator to make any "appropriate" revisions "in accordance with § 108" – a provision that requires (under § 108(b)) development of information on implementation impacts "simultaneously" with public health information.

Whether standard revision is "appropriate in accordance with" § 108 and § 109(b) therefore does not limit the factors relevant to the exercise of risk management judgment. Rather, it contemplates the balancing of a range of factors consistent with the purposes of the Act.

In exercising her standard revision authority, Congress also required the Administrator to obtain the advice of her science advisers on a number of factors, including areas where additional knowledge is needed to understand the



adequacy of existing and revised NAAQS, and on the "public health, welfare, social, economic, or energy effects which may result" from alternative implementation programs.[90] CAA § 109(d)(2)(C)(iv).

Some of this information goes to the evaluation of the direct health risks of alternative air quality levels and implementation approaches. Other information goes to the risk management judgment on whether standard revision is "requisite" to protect public health, on whether margins of safety under existing and revised standards are "adequate," and on whether existing standards should be revised at all in light of "areas in which additional knowledge is required to appraise the adequacy" of existing standards. CAA § 109(d)(2)(C)(i).

The Administrator does not dispute that certain of the information her science advisers must develop (e.g., information on the "adequacy" and "basis" of existing and revised standards) is relevant to her decision on standard revision. She has asserted, however, that other information that must be developed (e.g., impacts resulting from alternative attainment strategies) is irrelevant to revising the standard.

The statute on its face does *not* direct the Administrator to consider only *some* of these § 109(d) factors and not others in determining what approach to managing uncertain health risk is "appropriate" in accordance with the "adequate" margin of safety and the "requisite" to protect "public health" language of § 109(b). Indeed, it would be unreasonable to conclude

[90] *See International Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 648 (D.C. Cir. 1973) (heightened standard of explanation required to override science advisor's advice).



USCA Case #24-1050 Document #2078682 Filed: 10/07/2024 Page 326 of 390

that Congress wanted EPA to have all of this information before it, but to consider only some of it.[91]

Congress, of course, commented in legislative history that the type of information identified in § 109(d) may be "of interest and assistance to the States and Congress."[92] Nevertheless, Congress directed CASAC *in the statute* "to advise the *Administrator* with respect to any harmful effects" of standard revision in the context of her consideration of standard revision. CAA § 109(d)(2)(C)(i) (emphasis added).

As this Court has recognized, an agency has a heightened burden to explain its decision to change an existing regulatory program.[93] In this case, where existing air quality standards were in place that EPA had previously determined were "requisite to protect the public health" with an "adequate margin of safety," CAA § 109(b)(1), the Agency cannot fulfill its obligation of reasoned decisionmaking by ignoring information that Congress told it to develop.

[91] *Cf. id.* at 642 (where data are uncertain or ambiguous, EPA must consider the "nature and consequences of the risk of error" in making regulatory decisions).

[92] H.R. Rep. No. 95-294, at 183 (1977), *reprinted in* 4 *1977 Legis. Hist.*, *supra* note 8, at 2650, OJA 3680.

[93] *See MVMA*, 463 U.S. at 42 ("[A]n agency changing its course ... is obligated to supply a reasoned analysis for the change *beyond that* which may be required when an agency does not act in the first instance.") (emphasis added); *see also Public Lands Council v. Babbitt*, 120 S.Ct. 1815, 1828-29 (2000) (O'Connor, J., concurring) ("Under [*MVMA v. State Farm*], an agency that departs from its previous rules will be found to have acted arbitrarily and capriciously, if it fails 'to supply a reasoned analysis for the change ....'").



## C. The Legislative History Confirms the Need For Balancing to Promote the Purposes of the Act.

The legislative history confirms the message of the statutory language that Congress intended the Agency to exercise sound public health risk management judgment in light of the purposes of the Act and the commonly understood meaning of "public health."

In enacting the NAAQS program in 1970, the Senate explained that the "primary" NAAQS were to set a "national health minimum" standard which would provide a "reasonable degree of protection." *See* S. Rep. No. 91-1196, at 10, *reprinted in* 1 *1970 Legis. Hist.*, *supra* note 7, at 410, OJA 3687. With this understanding, Congress left States the option to establish an ambient air quality standard "more stringent" than the "national health minimum." *Id.*

In 1977, when it amended the Act, Congress understood that the NAAQS did not incorporate a "no risk philosophy" and explained that NAAQS should reflect the principle that "public [health] policy ... [be] wise policy."[94] Further reflecting Congress' delegation of authority to EPA to manage (not eliminate) health risk to achieve the Act's "public" health objective, Congress established in 1977 an additional CAA program to prevent significant deterioration (PSD) of air quality in areas where air quality is better than the NAAQS.[95]

[94] *See* H.R. Rep. No. 95-294, at 127, *reprinted in* 4 *1977 Legis. Hist.*, *supra* note 8, at 2594, OJA 3678; *Hearings on S. 251, S. 252 and S. 253 Before the Subcomm. on Environmental Pollution of the Sen. Comm. on Env't and Pub. Works*, 95th Cong., 1st Sess., at 6-7 (1977) (Chmn. Muskie); *see also id.* at 37.

[95] *See* CAA Title I, Part C, §§ 160-169.



USCA Case #24-1050 Document #2078682 Filed: 10/07/2024 Page 327 of 390

No. 99-1426

IN THE
# Supreme Court of the United States

AMERICAN TRUCKING ASSOCIATIONS, INC., CHAMBER OF COMMERCE OF THE UNITED STATES, *et al.*,
*Petitioners,*
v.
CAROL M. BROWNER, ADMINISTRATOR OF THE ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Respondents.*

**On a Writ of Certiorari to the United States Court of Appeals For the District of Columbia Circuit**

## REPLY BRIEF


DAVID E. MENOTTI
WILLIAM F. PEDERSEN
JEFFREY A. KNIGHT
SHAWPITTMAN
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8675
*Counsel for American Forest & Paper Association and American Iron & Steel Institute*

HENRY V. NICKEL
F. WILLIAM BROWNELL
*(Counsel of Record)*
JAMES N. CHRISTMAN
LUCINDA MINTON LANGWORTHY
HUNTON & WILLIAMS
1900 K Street, N.W.
Washington, D.C. 20006
(202) 955-1500
*Counsel for Appalachian Power Co., et al., American Public Power Association, and National Association of Home Builders*


October 5, 2000

*[Additional Counsel Listed Inside]*

WILSON-EPES PRINTING CO., INC. – (202) 789-0096 – WASHINGTON, D. C. 20001

USCA Case #24-1050 Document #2078682 Filed: 10/07/2024 Page 328 of 390

standard revision required "policy" judgment by the Administrator to address a potential public health problem.[16]

The Administrator confirmed that her decisions here called for "policy" judgment.[17] This policy judgment addressed whether more "margin of safety" was appropriate in response to uncertain health risks, which the Administrator explained "may not be amenable to quantification in terms of what . . . is 'acceptable' or any other metric."[18] While EPA would now like to avoid discussing how it exercises risk management judgment in the face of uncertain science regarding the cause of a predicted health effect, the nature of EPA's risk management authority in revising NAAQS, therefore, is the critical issue in this case.

## II. THE CLEAN AIR ACT PROVIDES GUIDANCE FOR PUBLIC HEALTH RISK MANAGEMENT JUDGMENT.

EPA argues that the language of § 109 "unambiguously" requires it to base NAAQS decisions "*solely* on the health and welfare effects" of the pollutant, and not on "other considerations." EPA Br. (99-1426), at 14, 18, 19. To the contrary, EPA's response brief, as well as the statute's language, legislative history, and purposes, confirm that Congress did not tell EPA to ignore the consequences of its public health policy decisions.

### A. The Language of Section 109

EPA argues that "[s]ection 109's command that NAAQS be set at levels 'requisite' to protect public health and welfare unambiguously directs that the levels be set to achieve *that objective* . . . ." EPA Br. (99-1426), at 19 (emphasis added). But this tells us nothing, for the "objective" to which EPA

[16] *Id.* 4, PMJA 3164.

[17] 62 Fed. Reg. 38857, 38859, 38861, 38862, 38863, 38867, OJA 2, 4, 6, 7, 8, 12; *id.* 38653, 38668, 38669, 38671, 38672, PMJA 3, 18, 19, 21, 22.

[18] 62 Fed. Reg. 38883, OJA 28; *id.* 38688, PMJA 38.



refers is protecting the "public health." While EPA asserts elsewhere that it regulates in response to a "risk of adverse effects" or "medically significant risks," EPA Br. (99-1426), at 14, 33, EPA never explains what standards guide its "public health" decisions when confronted with, at most, a *potential* public health risk.

For example, in the case of ozone, a cough or a tightening of the chest on inhalation (a symptom one might experience by stepping out-of-doors on a cold morning) was observed during prolonged exercise under controlled laboratory conditions.[19] Based on these studies, EPA *predicted* that coughs would occur in a population (exercising children) that did *not* experience these symptoms when studied.[20] Furthermore, EPA's risk assessment predicted, based on a no-threshold assumption, that such *undemonstrated* effects would occur at levels below the lowest level tested in the controlled studies (i.e., below 0.08 ppm).[21]

EPA concedes that the statutory "public health" language requires that it focus on the "'health of the community at large.'" EPA Br. (99-1426), at 36 n.28. But how severe, how frequent or how certain must the *risk of an effect* be before it constitutes a potential "adverse" *public health* effect? The "endangerment" standard of the statute requires

[19] *See OSP*, *supra* note 3, at 28, 107-110, OJA 1838, 1917-20.

[20] *Id.* 55, OJA 1865 ("[C]hildren respond [functionally] to low-level [ozone] . . . albeit without symptoms [e.g., coughs].").

[21] *See* CASAC Tr. (9/19/95) 109, OJA 298 (noting exposures between 0.06 ppm and 0.08 ppm contribute the most risk); EPA Br. (99-1257), at 13-14. In the case of $PM_{2.5}$, EPA's risk assessment assumed a causal association between $PM_{2.5}$ and effects to "background" levels of PM. EPA, *Review of the National Ambient Air Quality Standards for Particulate Matter* VI-1, VI-3 (1996), PMJA 2051, 2053. The Agency acknowledges, however, that both the causal mechanism and the existence of an effects threshold are unknown. *See* 62 Fed. Reg. 38657, 38664-65, PMJA 7, 14-15.



USCA Case #24-1050 Document #2078682 Filed: 10/07/2024 Page 329 of 390

that EPA make a policy judgment as to what constitutes a "significant risk" to public health.[22] This policy judgment requires EPA to address explicitly the uncertainties inherent in its risk predictions and then to put those predictions in context, for example, of the risks federal agencies or the public have found acceptable, and of the public health risks that might be increased by regulation.[23]

Once it has articulated its basis for concluding that there is a potential public health problem (which EPA failed to do here), EPA may then set a standard at a level "requisite to protect" the public health, allowing an "adequate margin of safety." As EPA explained *after* the lower court's decision, the "requisite to protect" standard of § 109(b) contemplates air quality standards that are "neither more nor less stringent than necessary" to protect the public health.[24]

Even if this were EPA's position on remand,[25] how does EPA select an option that is neither more nor less stringent than "necessary" to protect "public health" where risk management options reflect similar levels of health

[22] *See* H.R. Rep. No. 95-294, at 3, 48-49, *reprinted in* 4 *1977 Legis. Hist., supra* note 2, at 2470, 2515-16; APC Br. (99-1426), at 37 n.87; ALA Br. (99-1257), at 20-21.

[23] *See* APC Br. (99-1426), at 30-32; GE Br. (99-1426), at 22-25; Mfrs. Alliance/MAPI, *et al.*, Br. (99-1257), at 15-20; 1 Presidential/ Congressional Comm'n on Risk Assessment and Risk Management, *Framework for Environmental Health Risk Management* 5, 35 (1997) (Risk management requires putting problems into real world context and considering "the potential . . . to increase one type of risk while reducing the risk of concern."), Reply App. 5a.

[24] *See* 195 F.3d at 6, App. 71a; *cf. Union Elec.*, 427 U.S. at 263 ("[T]he most natural reading of the 'as may be necessary' phrase in context is simply that the Administrator must assure that the minimal, or 'necessary,' requirements are met . . . .").

[25] EPA's proffered "intelligible principle" at rehearing was, of course, a post hoc rationalization that only confirms the correctness of the lower court's decision. *See* APC Br. (99-1257), at 26 n.60.



protection (as in the case of ozone)?[26] When a pollutant is associated with but not necessarily *the cause* of the effect (as with $PM_{2.5}$), how can EPA identify the NAAQS that is no more stringent than "necessary" to protect "public health"?[27]

As risk becomes more certain and differences between risk management options more apparent, more health protection may be "necessary." Where uncertainty is large and differences in risk small, a different judgment might result. In either case, what is necessary to protect the public health depends on an evaluation of whether marginal reductions in predicted risk are worth the collateral adverse health, environmental or economic costs of those reductions.

Congress also emphasized that the "adequate margin of safety" language of § 109 is intended to provide a "reasonable degree of protection" in response to uncertain science and unknown hazards.[28] Providing a "reasonable" degree of protection contemplates more than tallying predictions of uncertain health effects.[29] As this Court has

[26] For example, is a revised ozone NAAQS that imposes an estimated $9.6 billion in annual costs on society *on top of the cost of attaining the 1-hour standard, see* EPA, *Regulatory Impact Analyses for Particulate Matter and Ozone National Ambient Air Quality Standards and Proposed Regional Haze Rule* ES-12 (1997) [hereinafter *RIA*], OJA 2919, for no significant improvement in public health protection, "requisite" to protect "public health"?

[27] For example, is a revised NAAQS that is estimated to cause between 1,600 and 27,000 premature deaths, *see* APC Br. (99-1426), at 18, while preventing 3,700 to 16,600 predicted premature deaths (based on an uncertain, "assumed" causal relationship), *RIA, supra* note 26, at ES-18, OJA 2925, "requisite" to protect the "public health"?

[28] S. Rep. No. 91-1196, at 10, *reprinted* in 1 *1970 Legis. Hist., supra* note 2, at 410, OJA 3687; *see also* EPA Br. (99-1426), at 33-34 (describing margin of safety requirement in terms of a "reasonable degree of protection"); Mass/NJ Br. (99-1426), at 21 n.39.

[29] *See* SAB, *supra* note 4, at 14, 20 ("[T]echnical risk rankings, in isolation, offer[] insufficient guidance for policy decisions." What is needed is "open and comprehensive examination of environmental



USCA Case #24-1050 Document #2078682 Filed: 10/07/2024 Page 330 of 390

observed, the concept of reasonableness contemplates a "balancing of costs and benefits."[30]

Finally, where there is a NAAQS in place, and the States have put in place (or are putting in place) a program to meet that standard, EPA must determine whether a change in its earlier NAAQS risk management decision is "appropriate" in light of new information.[31] EPA argues that § 109(d)'s requirement that the Administrator revise NAAQS "*as may be appropriate* in accordance with [§§ 108 and 109(b)]" (emphasis added) adds nothing to § 109(b)'s requirement that NAAQS be set at levels "requisite" to protect "public health" with an "adequate margin of safety."

But whether additional "margin of safety" is an "appropriate" response to uncertain risk, or whether existing control programs should remain in place while additional scientific investigations are completed, can be resolved only based on the advice that CASAC must give to "the Administrator" (*not* the States) on the need for and adverse impacts of standard revision. CAA § 109(d)(2). Only with that information can the Administrator determine whether standard revisions are "appropriate." To ignore this information, as EPA and its supporters urge, could result in decisions that disrupt control programs under an existing NAAQS with no significant improvement in (or perhaps reduction in) public health protection. *See* APC Br. (99-1257), at 47-48.

problems."); *cf. Chemical Mfrs. Ass'n v. EPA*, 899 F.2d 344, 359 (5th Cir. 1990) ("[Q]uantity . . . without more, is . . . of little help in understanding what is meant by 'substantial.'").

[30] *American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 510 n.30 (1981); *see also Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1222 (5th Cir. 1991) (citing *Forester v. CPSC*, 559 F.2d 774, 789 (D.C. Cir. 1977)); *International Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 642 (D.C. Cir. 1973) (Regulation in the face of uncertainty requires weighing the "nature and consequences of risk of error."). Indeed, the D.C. Circuit has acknowledged such balancing by EPA when setting standards to protect the public health with an "ample margin of safety." *See NRDC v. EPA* ("*Vinyl Chloride*"), 824 F.2d 1146, 1165 (D.C. Cir. 1987) (*en banc*).

[31] This is an especially important question here, in light of the *statutory* program for ozone reductions that would be disrupted by EPA's standard revision. APC Br. (99-1257), at 42-50.



**B. The Structure of the Act and Its Legislative History**

Section 109(b)(1) requires that NAAQS be "based on" the air quality "criteria" document that EPA issues under § 108. *See* EPA Br. (99-1426), at 19. The § 108 criteria document is to contain scientific information on the effects "which may be expected to result from the presence of such pollutant in the ambient air." CAA§ 108(a)(2). Based on this language of §§ 108 and 109, EPA argues that it is precluded, in setting NAAQS, from considering factors *not* addressed in the criteria document. EPA Br. (99-1426), at 19.

As EPA and its supporters explain, however, the criteria are "*descriptive*; that is, they describe the *effects that have been observed* to occur when the ambient air level of a pollutant has reached or exceeded specific figures . . . ."[32] The criteria in fact "stress[] the *difficulties* of drawing a bright line between pollution that is harmful and pollution that is not."[33]

In revising NAAQS, however, the Administrator must exercise judgment in light of uncertain risk predictions. The words "based on" in § 109(b) therefore cannot suggest that the information in the § 108 criteria document is the exclusive record upon which NAAQS may be based. Rather, consistent with their plain meaning,[34] the words "based on"

[32] CBT Br. (99-1426), at 21 (emphasis added) (citations omitted); *see* Mass/NJ Br. (99-1426), at 18-19; EPA Br. (99-1426), at 24.

[33] Mass/NJ Br. (99-1426), at 9 (emphasis added); *see id.* 20 ("air quality criteria cannot be interpreted as threshold values").

[34] *See* 1 *The New Shorter Oxford English Dictionary* 187 (1993) ("act as a foundation for").



USCA Case #24-1050 Document #2078682 Filed: 10/07/2024 Page 331 of 390

**ORAL ARGUMENT SCHEDULED FOR MAY 3, 2012**

No. 10-1252 (Lead) and Consolidated Cases

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

NATIONAL ENVIRONMENTAL DEVELOPMENT ASSOCIATION'S CLEAN AIR PROJECT, *ET AL.*,

*Petitioners,*

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *ET AL.*,

*Respondents.*

On Petitions for Review of Final Agency Actions of the United States Environmental Protection Agency

# JOINT REPLY BRIEF OF STATE PETITIONERS, NON-STATE PETITIONERS, AND SUPPORTING INTERVENORS

ANDREA BEAR FIELD
LUCINDA MINTON LANGWORTHY
Hunton & Williams LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 955-1500
*Counsel for the $SO_2$ NAAQS Coalition and Utility Air Regulatory Group*

WAYNE STENEHJEM, Attorney General
PAUL M. SEBY
Special Assistant Attorney General
Moye White, LLP
1400 16th Street, 6th Floor
Denver, Colorado 80202-1486
(303) 292-2900
MARGARET I. OLSON
Assistant Attorney General
Office of the Attorney General
State of North Dakota
500 North Ninth Street
Bismarck, North Dakota 58501-4509
*Counsel for the State of North Dakota*
Additional counsel listed on inside front cover

**Dated: January 11, 2012**
**Final Form: February 8, 2012**

consider confounding factors that it suggested were present in the NYDOH study, *see* Resp.Br. at 45-46, and wholly ignores the Schwartz study and NYDOH studies authors' warning that their results may have been confounded. *See* Resp.Br. at 44. EPA has, therefore, waived its response to these arguments. *See Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1181 (D.C.Cir. 2011) (the government waives arguments when its brief on appeal does not dispute an argument made by petitioner) (citing *United States v. Ford*, 184 F.3d 566, 578 n.3 (6thCir. 1999) ("Even appellees waive arguments by failing to brief them.")).

## III. EPA'S DECISION UNLAWFULLY DISREGARDED CURRENT AIR QUALITY AND OTHER CAA PROGRAMS.

It is undisputed that ambient $SO_2$ concentrations have been on a downward trend that EPA expects will continue, *see* EPA, EPA-454/R-09-002, OUR NATION'S AIR: STATUS AND AIR TRENDS THROUGH 2008, at 27 (Feb. 2010), JA01600; that EPA's revised standards would create few, if any, health benefits, *see* EPA, EPA-452/R09-007, RISK AND EXPOSURE ASSESSMENT TO SUPPORT THE REVIEW OF THE $SO_2$ PRIMARY NATIONAL AMBIENT AIR QUALITY STANDARDS (July 2009) ("REA") at 312, JA00338; and that the CAA contains numerous programs that will continue reducing ambient $SO_2$ concentrations, *see* Pet.Br. at 56. EPA arbitrarily and capriciously failed to consider these factors—all of which are directly related to public health—in determining whether it was "appropriate" to revise the NAAQS. *See* Pet.Br. at 54-57.

EPA's brief does not justify its failure to consider these factors. First, EPA argues that it may not consider them because NAAQS revisions "must be appropriate 'in accordance . . . with subsection [CAA §109](b),'" which "provides no authority for the Administrator to allow a NAAQS to remain unchanged" if it is not "requisite to protect public health with an adequate margin of safety." Resp.Br. at 55 (quoting CAA §109(d)(1)). But EPA's reading would render the phrase "as may be appropriate" in CAA §109(d)(1) a nullity. If Congress did not intend EPA to have any discretion whether to revise the NAAQS, it would have directed EPA to make "revisions in such . . . standards and promulgate such new standards in accordance with . . . subsection (b) of this section." *See United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1198-99 (D.C.Cir. 2005) (government interpretation that "effectively ignor[ed] the words 'to prevent and restrain' . . . [unlawfully] nullified[d] the plain meaning of the terms").

Second, EPA argues that *Whitman*, 531 U.S. at 466, precludes it from considering these factors. But in *Whitman*, the Supreme Court expressly considered only the question "[w]hether the Administrator may consider the cost of implementation in setting [NAAQS] . . . *under [CAA] §109(b)(1)*." *Id.* at 462 (emphasis added). The Supreme Court did not address the meaning of the phrase at issue in this action, "as may be appropriate" in CAA §109(d)(1).

Even if *Whitman*'s holding about implementation costs were applicable, the decision was based on the principle that ambiguous statutory terms "are given content

**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 15-1385 (consolidated with Nos. 15-1392, 15-1490, 15-1491, and 15-1494)**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**MURRAY ENERGY CORPORATION,**

***Petitioner*,**

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**

***Respondent*.**

---

**On Petitions for Review of Final Action of the
United States Environmental Protection Agency**

---

# FINAL JOINT OPENING BRIEF OF INDUSTRY PETITIONERS

---

Scott C. Oostdyk
E. Duncan Getchell, Jr.
Michael H. Brady
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
(804) 775-4743
*Counsel for Petitioner Murray Energy Corporation*

James R. Bieke
Roger R. Martella
Joel F. Visser
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
*Counsel for Petitioners the Chamber of Commerce of U.S., Nat'l Ass'n of Mfrs, Am. Petroleum Inst., Portland Cement Ass'n, Am. Coke & Coal Chem. Inst., Indep. Petroleum Ass'n of Am., & Nat'l Oilseed Producers Ass'n*

Dated: September 26, 2016

Additional Counsel Listed on Inside Front Cover

general lawfulness of EPA's action in promulgating revised NAAQS, and do not depend on the circumstances of any specific company or facility. Similarly, the relief requested – *i.e.*, vacating the revised ozone NAAQS – would apply nationwide, rather than only to specific companies.

## ARGUMENT

### I. EPA's Failure to Take into Account the Impact of Background Ozone Levels on Achievability of the Revised NAAQS Was Unlawful.

An agency decision must be set aside as arbitrary and capricious if the agency failed to consider an important aspect of the problem or the full range of factors required by Congress. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004). The influence of uncontrollable background levels of ozone on the achievability of the ozone NAAQS was an important aspect of the problem faced by EPA in deciding whether to revise the NAAQS. Indeed, as discussed in Section A of the Statement of the Case and Facts (hereinafter "Statement"), the CAA requires EPA to consider the achievability of the NAAQS through regulation under SIPs and to set NAAQS at a level that can be attained through such regulation. Here, EPA failed to account for the influence of background ozone on the achievability of the revised NAAQS and, in fact, set standards that cannot be achieved in numerous areas of the country

**Oral Argument Not Yet Scheduled**

**No. 15-1385 (consolidated with 15-1392, 15-1490, 15-1491 & 15-1494)**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

MURRAY ENERGY CORPORATION,
*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondent.*

**On Petition for Review of Final Agency Action of the United States Environmental Protection Agency**
**80 FED. REG. 65,292 (OCT. 26, 2015)**

# STATE PETITIONERS' OPENING BRIEF

Brad D. Schimel
*Attorney General*
Misha Tseytlin
*Solicitor General*
*Counsel of Record*
Daniel P. Lennington
WISCONSIN DEPARTMENT OF JUSTICE
17 W. Main Street
Madison, WI 53707
(608) 267-9323
*Counsel for the State of Wisconsin*

Mark Brnovich
*Attorney General*
John R. Lopez, IV
*Solicitor General*
Dominic E. Draye
*Deputy Solicitor General*
*Counsel of Record*
Keith Miller
OFFICE OF THE ATTORNEY GENERAL
1275 W. Washington Street
Phoenix, AZ 85007
(602) 542-8255
*Counsel for the State of Arizona*

*Additional counsel listed on following pages*

comments raising that issue, *Home Box Office*, 567 F.2d at 35 & n.58. The Rule is thus unlawful on this basis alone.

### B. EPA Violated the CAA by Impermissibly Adopting a Non-Textual Limitation on Its Own Authority.

The Agency also acted unlawfully because it narrowed its consideration of the critical issue of the new standard's "achiev[ability]" in a manner unsupported by statutory text. 42 U.S.C. § 7407(a). In the Rule, EPA concluded that background ozone was relevant only to selecting the NAAQS level "within the range of reasonable values" the Administrator had already identified, but that background could not inform the selection of the "reasonable" range. 80 FR 65,328 (JA.327). EPA thus recognizes that achievability is relevant but, without statutory justification, treats it as ***selectively*** relevant. The Agency's non-textual narrowing of the NAAQS analysis violates the CAA. *See Michigan*, 135 S. Ct. at 2606-07 (EPA's erroneous conclusion that a mandatory factor is "irrelevant" to a regulatory decision renders the rule unlawful).

EPA's claim that it had to consider background ozone only when selecting the NAAQS standard from "within the range of reasonable values" is unauthorized. As noted above, the CAA assigns to States the

"primary responsibility" for ensuring that "national primary and secondary ambient air quality standards will be achieved and maintained." 42 U.S.C. § 7407(a). EPA's reading of the CAA as making "achiev[ability]" relevant ***only*** for selecting the NAAQS standard from "within a range of reasonable values," 80 FR 65,328 (JA.327), is irreconcilable with this statutory text. Put another way, nothing in the statute's expectation of "achiev[ability]" suggests that the concept should be ignored entirely in determining a "reasonable range," but then reemerge when selecting from within that range. EPA's error here is remarkably similar to the violation that the Supreme Court recently found fatal in *Michigan*. In that case, just as here, EPA ignored a mandatory consideration (there, costs; here, achievability) at the first step of its regulatory analysis, but said that it could consider the factor at a later step. *See* 135 S. Ct. at 2710-11.

EPA's position is also "inconsisten[t] with the design and structure of the statute as a whole," *UARG*, 134 S. Ct. at 2442 (quotation omitted), and raises serious federalism concerns, *Gregory v. Ashcroft*, 501 U.S. 452, 460-61 (1991). Under EPA's interpretation, if the Administrator selected a range that no State could meet "without action

affirmatively *extracting* chemicals from nature," *Am. Trucking Ass'ns v. EPA* ("*ATA I*"), 175 F.3d 1027, 1036 (D.C. Cir. 1999), *opinion modified on reh'g*, 195 F.3d 4, *aff'd in part, rev'd in part by Whitman*, the Agency would be duty-bound to impose upon States a standard within that impossible range. States, having no ability to "achieve" the impossible, would then be subject to severe sanctions under the CAA, including loss of highway funds. 42 U.S.C. § 7509(b)(1). It is hornbook administrative law that "[i]mpossible requirements imposed by an agency are perforce unreasonable." *Alliance for Cannabis Therapeutics v. DEA*, 930 F.2d 936, 940 (D.C. Cir. 1991). EPA's claim that Congress instructed the Agency to require the impossible here—especially in a context that carries severe punishments for noncompliance—is not credible.

In the Rule, EPA rested its argument on certain statements in *American Trucking* and *American Petroleum Institute v. Costle*, 665 F.2d 1176 (D.C. Cir. 1981). 80 FR 65,328 (JA.327). These cases do not support the Agency's position.

***First,*** in *American Trucking*, EPA had set the ozone NAAQS at 80ppb, in part because a 70ppb standard would be "too close to peak background levels." 283 F.3d at 379. This Court rejected a challenge to

**ORAL ARGUMENT SCHEDULED FOR APRIL 19, 2017**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| Murray Energy Corporation,<br><br>Petitioner,<br><br>v.<br><br>United States Environmental Protection Agency,<br><br>Respondent. | No. 15-1385<br>(Consolidated with Nos. 15-1392, 15-1490, 15-1491, 15-1494) |

**RESPONDENT EPA'S MOTION TO CONTINUE ORAL ARGUMENT**

Respondent United States Environmental Protection Agency (EPA) respectfully requests the Court continue the oral argument currently scheduled for April 19, 2017, on the petitions for review of the revised National Ambient Air Quality Standards (NAAQS) for ozone issued by EPA in 2015 (the 2015 Rule). In light of the recent change in administration, EPA requests continuance of the oral argument to give the appropriate officials adequate time to fully review the 2015 ozone NAAQS. EPA intends to closely review the 2015 Rule, and the prior positions taken by the Agency with respect to the 2015 Rule may not necessarily reflect its ultimate conclusions after that review is complete.

Counsel for EPA contacted coordinating counsel for Petitioners, Petitioner-Intervenors, and Respondent-Intervenors regarding their positions on this motion.

EPA Proposed Rule: "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," RIN 2060-AV52
Cover Comments

The Environmental Protection Agency is proposing to reconsider the National Ambient Air Quality Standards (NAAQS) for Particulate Matter (PM) last assessed in 2020. The next required evaluation of these standards is scheduled for 2025 on the normal 5-year cycle. The current standards for PM2.5 are 12 µg/$m^3$ on an annual basis and 35 µg/$m^3$ over 24 hours. For the annual standard EPA is proposing between 9 to 10 µg/$m^3$ while soliciting comments on 8 µg/$m^3$ and retaining the current 24-hour standard of 35 µg/$m^3$ while soliciting comments on 30 µg/$m^3$.

**General Comments – Reviewer 1**

The agency appreciates the opportunity to submit its comments during interagency review on the U.S. Environmental Protection Agency's (EPA) proposed rule entitled "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter" per EO 12866. The agency supports the Administrator's proposed decision to retain the current primary 24-hour $PM_{2.5}$ standard, the current secondary $PM_{2.5}$ standards, and the current primary $PM_{10}$ standard. As to the appropriate level of any new primary annual $PM_{2.5}$ standard, we will continue to review the preamble, regulation, and supporting documentation relating to such an annual standard and may provide additional comments during the public comment period.

The reviewing agency is concerned about the monitoring network necessary to implement any new $PM_{2.5}$ standard since multiple $PM_{2.5}$ monitoring sites have shut down over the last two years. If modeling is used for assessing area attainment status, modeling inputs and analysis will need to be refined and verified. Use of a photochemical or other complex modeling system would be necessary to properly apportion sources to impact areas for purposes of demonstrating compliance with the applicable $PM_{2.5}$ standard.

**General Comments – Reviewer 2**

<u>$PM_{2.5}$ Primary Annual Standard</u>

EPA has provided a clear and well-supported basis for the proposed annual standard range of 9 to 10 µg/$m^3$ however there are substantial implementation issues with this change. The proposal also discusses the increasing uncertainty and less than conclusive scientific support for 8 µg/$m^3$ and EPA solicits public comments on this level (Page 11 and elsewhere).

1) We recommend EPA clarify what is useful in public comments on the 8 µg/$m^3$ standard and frame the comments for consideration in the 2025 PM assessment or withdraw the request for public comments. The environmental community and others have already stated the support for the lowest possible annual standard despite acknowledged uncertainty by both the Administrator and the Clean Air Scientific Advisory Committee (CASAC). EPA should clarify this point for transparency to potential commenters.

EPA Proposed Rule: "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," RIN 2060-AV52
Cover Comments

Specifying the exact science needed for adoption of this 8 μg/m$^3$ level should be spelled out if comments are solicited. The current text requests comments with rationale which does not necessarily clarify specific needs. Wherever the noted public comment on this level is stated in the NPRM, it should be noted that they should provide additional science.

<u>$PM_{2.5}$ Primary 24-hour Standard</u>

The Proposed Rule clearly articulates the Administrator's finding that the range of the annual standard of 9 to 10 μg/m$^3$ while retaining the current 24-hour standard of 35 μg/m$^3$ will adequately protect the public. The proposed Rule solicits comment on a lower 24-hour 30 μg/m$^3$ standard.

1) EPA should clarify what is useful in public comments on the 30 μg/m$^3$ standard and frame the comments for consideration in the 2025 PM assessment or withdraw the request for public comments. The environmental community and others have already stated the support for the lowest possible 24-hour standard despite the views stated by the Administrator and shared by the reviewing agency. Specifying the exact science needed for adoption of this level should be spelled out if comments are solicited. The current text requests comments with rationale but does not clarify specific needs. Wherever the noted public comment on this level is stated in the NPRM, it should be noted that they should provide additional science.

## Air Quality Index Comments

The proposed changes will potentially affect all prescribed fire across the United States, both current levels of activity as well as needed increases to address The Wildfire Crisis. The USDA has reviewed the proposed range of 9 to 10 μg/m$^3$ and generally supports the approach proposed by the Administrator. There are some concerns regarding the plan for comments on the 8 μg/m$^3$ level noted below. EPA is proposing to modify the Air Quality Index (AQI) thresholds for Hazardous, Very Unhealthy, and Unhealthy which are typically reached down-wind of wildfires. This change will affect decision space regarding wildfire management for both the Agency Administrator and Incident Management Teams. The increase in days of hazardous and very unhealthy as well as triggering of these categories at lower concentrations of $PM_{2.5}$ will increase public and air regulatory pressure for full and direct suppression of wildfires posing potential increased risks to fire personnel. Our review of the science also raises concerns that there may not be adequate support in the relevant data and literature for the proposed AQI changes. The EPA is not planning to modify implementation rules such as the General Conformity Rule (2010), the Exceptional Events Rule (EER) (2016) or the PM2.5 NAAQS State Implementation Requirements Rule (2016). These rules may need modification to ensure the increase in the

number of new nonattainment areas is supported, and any potential to reduce the reviewing agency's ability to increase the use of prescribed fire to reduce wildfire risk is minimized.

Implementation Challenges of the Proposed Changes to the Upper Levels of the Air Quality Index and Questions Regarding the Supporting Science (VII. Communication of Public Health, Pages 280-295)

EPA has proposed lowering the thresholds for the Hazardous, Very Unhealthy and Unhealthy (upper $PM_{2.5}$ concentration $\mu g/m^3$ over 24-hours) categories of the Air Quality Index (AQI) for $PM_{2.5}$. Most instances of the AQI reaching these elevated concentrations of $PM_{2.5}$ are tied to wildfire smoke. These thresholds are important for the general public and those at-risk of $PM_{2.5}$ for planning how and when to best protect themselves. The goal is to communicate the public health risks based on quality science which the reviewing agency supports through its leadership of the Interagency Wildland Fire Air Quality Response Program (IWFAQRP), the partnership with EPA on the Fire and Smoke Map and efforts to foster the Smoke Ready Community effort. *It should be noted that the EPA and Forest Service partnership to create, maintain and improve the AirNow Fire and Smoke Map is not appropriately recognized throughout this section of the NPRM.* We also question the inclusion of the CARB created Smoke Spotter app in the NPRM when a key to emergency communication is consistent messaging. There are a number of policy and science concerns with the proposed changes to the upper $PM_{2.5}$ concentration thresholds for Hazardous to Unhealthy categories. AQI values of 200, 300 and 500 would be revised to 125.4 $\mu g/m^3$, 225.4 $\mu g/m^3$, and 325.4 $\mu g/m^3$ and upon review of 2020 and 2021 regulatory and temporary monitor data, would lead to substantially higher incidence of hazardous and very unhealthy readings for the public (figure 6, USFS). The implementation and effects of these changes pose significant policy questions on what expectations and responses are anticipated by EPA.

Increasing the incidence of hazardous and very unhealthy days conveys a perception of greater risk and urgency for the public, air quality regulatory agencies and public health departments. These perceived risks are directly conveyed to wildfire incident management teams and agency administrators as they are managing the emergency response efforts and balancing the many life-threatening risks attendant to current wildfires. In many instances during 2020 and 2021, resources for responding to wildfires were unavailable leaving response options limited. The substantial added public and regulatory pressure of these categories has led to decisions in the field which have placed wildfire suppression to reduce smoke impacts as a driver leading to injuries and fatalities of fire personnel. Every wildfire response balances the multiple types of risks and assesses likelihood of success throughout the duration of the incident. Air Resource Advisors are assigned to most long duration complex wildfires per the Dingell Act of 2019 and provide information to address air quality risks to the agency administrator and incident management team as well as the public. Increasing the pressure on these emergency managers

which would result from the proposed changes needs to be well supported by science which upon review, is not the case. The following section highlights a comprehensive summary of EPA's supporting information for the changes to the AQI. We are also including notes on the various studies to aid in review of this important challenge. A critical focus of much of the EPA cited supporting science focused on sensitive and at-risk individuals which are already being informed of significant health risk and to alter behavior to mitigate that risk at lower levels of the AQI.

The reviewing agency is interested in partnering on this critical science and policy need. *Upon review, the reviewing agency finds significant concerns with the proposed changes to AQI and believes these changes are premature and should be further investigated. This delay in proposing changes to the upper levels of the AQI could be revisited during the 2025 assessment of the PM NAAQS and perhaps would allow for more robust policies and programs to support the increased public concerns that will result from the increased incidence of hazardous and very unhealthy readings.* <u>A summary of these concerns are as follows:</u>

<u>Science Concerns with the proposed changes to the upper AQI categories:</u>

EPA cites ten controlled human exposure (Ramanathan et. al (2016), Urch et. al (2010), Sivagangabalan et al. (2011), Brook et. al (2009), Bellavia et al. (2013), Tong et. al (2015), Lucking et. al (2011), Behbod et. al (2013), Vieria et. al (2016a and b), Ghio et. al (2000 and 2003)) and three epidemiologic studies (Hutchinson et al. (2018), DeFlorio-Barker et al. (2019), Orr et. al (2020)) as evidence to reconsider AQI thresholds for hazardous, very unhealthy, and unhealthy categories by lowering the corresponding PM2.5 $\mu g/m^3$ values. We have several concerns about this evidence base cited to support these decisions. Topics of concern include the small amount of evidence used, the various limitations in both the controlled exposure and epidemiological studies, the small sample sizes across most studies, the study populations of participants in most studies, the methods for exposing subjects, and the different types of exposures used (traffic pollution, diesel exhaust), the particular health measures that are studied and their association with significant, chronic, and detrimental health effects and the lack of both statistical and clinical significance in many of the health measures that were studied.

Only three epidemiological studies informed these proposed decisions for the three different cut points. All the cited controlled human exposure studies have small sample sizes, ranging from 15-81 participants and most study participants were not representative of the general population, and/or the methods of their PM2.5 exposure were not representative of general ambient $_{2.5}$ exposures associated with wildfires. Veiria et. al (2016b) only studied 26 participants who had heart failure to assess the effects of a respiratory filter on a small cohort of patients with heart failure while they exercised. All three of the epidemiological studies were not representative of the general population but only of susceptible populations. Orr et. al (2020) had a small sample

size and significant dropout with the average age of the cohort of 63. Hutchinson et. al. (2018) studied only Medi-cal recipients and Deflorio-Barker et. al (2018) only included participants over age 65. Only three of the thirteen studies contained exposures at or close to the new proposed breakpoints for the AQI (Ghio et. al (2000 and 2003), Vieria et. al (2016), and Lucking et. al (2011). Four of the ten controlled human exposure studies exposed subjects to a very specific type of PM2.5 pollution, three were diesel exhaust and one was traffic pollution. In each of the 13 studies, it is not apparent how the health measures that are assessed correlate with levels of the AQI, as well as with actual health effects. In addition, null findings when it comes to the association between exposure and health outcomes, of which there are multiple in each listed study, are not mentioned or explained.

In addition to the aforementioned concerns, we have multiple questions about the evidence base cited. The most pressing questions are how it was determined which health measures/effects were considered significant, at what magnitudes they were considered significant, and how they relate to the breakpoints in AQI levels. It seems unclear how EPA deems what are detrimental and significant health effects to both sensitive groups and the healthy population and how these should correlate with the breakpoints in the AQI between unhealthy, very unhealthy, and hazardous. Detailed commentary for each study cited each AQI breakpoint is included at the end of NPRM and RIA comments.

Healthy to Very Unhealthy Break Point 200 (150 to proposed 125 μg/$m^{3)}$

Given the specifics of the evidence base cited, it seems as though there are not enough direct, applicable, and generalizable results available to justify moving the lower end of the "Very Unhealthy" breakpoint down to 125 μg/$m^3$. Similar to the studies cited for lowering the 500 level of the AQI, the evidence for this proposed decision seems to lack 1) the magnitude of change in measures as well as their transitory nature (Ramanathan et al. (2016, Urch et. al 2010, Sivagangabalan et al. (2011), Brook et. al (2009, Ghio et. al (2000 and 2003)) the study populations relevant for these levels of the AQI (Urch et. al (2010), Hutchinson et. al (2018), and Ghio et. al (2000 and 2003)) and 3) A proper explanation of the respiratory and cardiovascular measures in the studies as to how they match adverse effects at the level of "Very Unhealthy" (all studies). Much of the data suggest that there are only mild effects to specific indirect measures of respiratory or cardiovascular health, mostly in susceptible populations, and most often above 125 μg/$m^3$ PM2.5 exposures and specifically at 150 μg/$m^3$ , the current break point, or above.

Very Unhealthy to Hazardous breakpoint 300 (250 to 225 μg/$m^3$ )

Similar to the arguments and evidence base provided for proposing a change to the other AQI values, it seems as though there are not enough direct, applicable, and generalizable results

available to justify moving the lower end of the Hazardous breakpoint down to 225 μg/m$^3$. For this section, in particular, many of the results contradict one another as there are many mixed findings. This is especially apparent in Bellavia et al. (2013), Tong et. al (2015), and Lucking et. al (2011) where the findings on the changes in blood pressure do not agree. Again, the data suggest that there are only mild effects to specific indirect measures of health, mostly in sensitive groups, and in response to PM2.5 exposure levels around 250 μg/m$^3$ and higher, rather than close to the proposed new cut point. In addition, the studies cite many null or insignificant findings, for instance, DeFlorio-Barker et al. (2019) found that cardiovascular outcomes were likely to be more prevalent on non-smoke days compared to smoke days at the levels of unhealthy for sensitive groups, unhealthy, very unhealthy, and hazardous.

Upper Break Point of Hazardous 500 (500 to 325 μg/m$^3$ )

Concerning the proposed decision to lower the upper breakpoint concentration of hazardous (500) from 500 μg/m$^3$ to 325 μg/m$^3$, there seems to be both an inadequate amount of cited studies supporting this proposed decision (two controlled exposure and two epidemiological studies) as well as a lack of strength and applicability of the evidence to the high end of the Hazardous level of the AQI. The controlled exposure studies are the only ones that correlate to the new proposed AQI level and there is not a comparison point to exposure at the current 500 μg/m$^3$. The relevance and magnitude of measured outcomes from these studies are unclear, for example Lucking et. al (2011) found no change in blood pressure. The study populations are quite small (26-81 participants in 3 of the studies) and most are not representative of the general population but rather representative of sensitive populations as in the two epidemiological studies that represent the Medi-cal population and older adults.

**Detailed commentary for each study cited each AQI breakpoint**

Healthy to Very Unhealthy Break Point 200 (150 to 125 μg/m$^3$ )

- Ramanathan et. al (2016) was a small cohort of 30 participants. The observed transient reduction in antioxidant/anti-inflammatory function noted in the EPA document was only for participants with a low High-density lipoprotein oxidant index (below 2 and 1.5) and not the rest of the cohort. They did not observe any significant differences in the enzymatic activity of PON-1 (an important antioxidant enzyme associated with HDL) due to exposures at different time points. The authors concluded that "Altogether, these data suggest that PM2.5 exposure for only 2 hours, induced effects HDL anti-oxidant/anti-inflammatory function that was rather quick but resolved within 24 h after exposure, and not associated with alteration in PON-1 activity." So, these minor effects do not seem to correlate well with the mid-range of very unhealthy in the AQI. They

were observed at one time point and only transiently at the current breakpoint of 150 μg/m$^3$.

- Urch et. al (2010), only studied 15 of 23 participants (13 non-asthmatics and 10 asthmatics) at an exposure of 140 μg/m$^3$ PM2.5 from 1999-2003. There were no significant effects of the PM2.5 exposures on Interleukin 6 (IL-6) immediately after or the day after the 2-hr chamber study. For the > 100 μg/m2 PM2.5 exposures only (without Ozone) blood IL-6 levels were increased above pre-exposure slightly. With the same levels of PM2.5 and Ozone added they found no increase in Il-6 which warranted further investigation. The authors hypothesized that potentially the exposures we less controlled than initially thought, that there were group differences because they were not repeated exposures, or that the breathing patterns differed when exposed to Ozone as well. These results may not be accurate at the PM2.5 levels of around 140 μg/m$^3$ for multiple reasons and IL-6 was the only transient potential health effect seen in the study.

- Sivagangabalan et al. (2011) which was said to have indicated some evidence for conduction abnormalities, an indicator of possible arrhythmias in subjects may be over-interpreted. The authors of the study stated that "The magnitude of changes observed in spatial dispersion of repolarization in the current study was significant although small. The magnitude of change in global dispersion of repolarization is unlikely to pose an immediate risk to healthy individuals with normal cardiovascular reserve."

- Brook et. al (2009) exposed a moderate-sized cohort (compared with other studies cited) of 81 subjects at two different sites to varying levels of PM2.5. According to the EPA, the authors reported a transient increase of 2.9 mm Hg in diastolic blood pressure in healthy subjects during the 2-hour exposure to a mean concentration of 148 μg/m$^3$ of PM2.5. However, other measures of flow-mediated dilatation (FMD), and nitroglycerin-mediated dilatation (NMD), were not impaired immediately after exposure (Table 3). However, FMD significantly decreased 24 hours post-CAP exposure compared to baseline level (Table 3). An important point supported by their findings was the concept that aspects of exposure location (e.g. PM2.5 composition or sources) critically influence the breadth of cardiovascular responses. Particle exposures caused a similar diastolic BP elevation at both sites (Ann Arbor and Toronto), but only the fine particles from downtown Toronto, which are heavily influenced by local traffic, were capable of additionally triggering endothelial dysfunction even though mass concentrations were nearly identical between sites. The authors also stated a study in Northern Scotland had similar findings where there was a neutral effect of exposure to particles in Northern Scotland, but diesel exhaust did trigger endothelial dysfunction. The authors also stated "It is important to highlight in the context of short-term and rather low dose exposures performed on healthy humans that the adverse, yet modest, CV responses observed in this

study are at the very least on par with past reports. Nevertheless, the observed small degree of diastolic BP elevation and endothelial dysfunction poses little risk to healthy people."

- Hutchinson et al. (2018) was the only epidemiological study cited for lowering the µg/m$^3$ at the breakpoint between healthy and very unhealthy AQI levels. It was not mentioned that this study looked solely at Medi-Cal recipients in San Diego, 50% of which are 0-4 years old and all of which are considered a susceptible population. Other study limitations include using patient home addresses to estimate exposures resulting in potential exposure misclassification, no mention of pre-existing conditions, especially asthma, and high variability in monitored PM2.5 levels, resulting in difficulty extrapolating specifically to 125 µg/m$^3$ to 150 µg/m$^3$. Though there was an increase in respiratory-related visits, there were no changes in visits for heart-related problems. When assessing the odds of an emergency presentation the day after exposure to other AQI levels versus the AQI level of good, the 95% confidence intervals overlap for unhealthy for sensitive groups, unhealthy, and hazardous indicating that the estimated differences in medical visits during these various AQI levels are not significantly different from one another. The authors also found that visits for non-respiratory outcomes decreased.

- Both studies by Ghio et. al (2000 and 2003) had small sample sizes of mostly males and evaluated a plethora of outcomes. The authors did not mention any statistical bias or error that might arise from multiple comparisons, especially with uneven group sizes among the small samples. In Ghio et. al 2000, while in the exposure chamber, volunteers alternated between moderate exercise (15 min) and rest (15 min) for a total exposure time of 2 hours. There were no symptoms noted by volunteers after the exposure. Similarly, there were no decrements in pulmonary function. Eighteen hours after exposure, analysis of cells and fluid obtained by bronchoalveolar lavage showed a mild increase in neutrophils in both the bronchial and alveolar fractions in those individuals exposed to PM2.5 ranging 23.1 to 311.1 µg/m$^3$. In Ghio et. al 2003, the authors conclude that exposure of healthy volunteers to PM2.5 could be associated with a mild influx of neutrophils in the lower respiratory tract, but this did not appear to be associated with a lung injury in these individuals. Of the 40 outcomes measured in 2003, there were no changes in either inflammatory mediators in the blood or indices of coagulation/fibrinolysis other than fibrinogen. The authors concluded that exposure of healthy volunteers to PM2.5 can be associated with decreases in both white blood cell (WBC) count and LDH and increased concentrations of fibrinogen in the blood.

Very Unhealthy to Hazardous breakpoint 300 (250 to 225 µg/m$^3$)

- Bellavia et al. (2013) who exposed only 15 subjects to 242 μg/m$^3$ for 130 minutes saw a minute change ($_{2.5}$3 mm Hg) in systolic blood pressure (BP) and a non-significant change in diastolic BP which differs from Brook et. al (2009) that only saw a $_{2.5}$3 mm Hg change in diastolic BP after exposing individuals to 148 μg/m$^3$. These intermediate health outcomes at these different levels of PM2.5 exposure speak to both the transient and potentially nonsignificant changes in BP. Depending on the individuals' baseline BP as well as how long BP was elevated, there may be no clinical significance to these changes. In addition, this comparison was made between no exposure (Good AQI) and the upper end of the current Very Unhealthy AQI level. In this study, repetitive-element (Alu, long interspersed nuclear element-1 [LINE-1]) and candidate gene (TLR4, IL-12, IL-6, iNOS) blood methylation were also measured pre and post-exposure. PM2.5 exposures did not affect IL-6, IL-12, or iNOS methylation in this study. The authors controlled for multiple comparisons however the small sample size may have skewed these results.

- Tong et. al (2015) also found a significant change in BP but only in diastolic and not systolic when exposing 42 older participants (average age 58) to PM2.5 at a concentration of 253 (SD 16) μg/m$^3$ for 2 hours. The main purpose of this study was to see if olive oil or fish oil supplementation may protect against vascular effects of exposure to PM2.5 and therefore the design does not speak well to general health outcomes when exposed to ambient PM2.5. Also, each participant only completed one trial and therefore 13 participants were exposed without dietary supplementation. In addition, 253 μg/m$^3$ is right above the current cut point and exposures varied throughout each trial. Olive oil was suggested as a potential intervention to protect against vascular effects. The participant age range from 50 to 72 years old is not representative of the general or healthy population in regards to the AQI.

- In contrast to the other studies that assessed blood pressure, Lucking et. al (2011) did not observe changes in blood pressure when exposing healthy subjects to an average PM2.5 concentration of 320 μg/m$^3$ for a shorter duration of 1 hour. This study is also cited when discussing lowering the AQI level of 500 from 500 to 325 μg/m$^3$. It was noted that the authors saw no change in blood pressure when exposing a small cohort of 19 males to diesel exhaust. This evidence seems to contradict rather than support lowering the μg/m$^3$ for various AQI levels, especially because it adds to the mixed results of blood pressure changes across multiple controlled exposure studies. This population is also not representative as it is all male and it is another small sample size. The principal objective was to assess the impact of a commercially available particle trap on markers of cardiovascular health rather than measure the magnitude of impact on these measures from PM2.5. In addition, the authors did not adjust for multiple comparisons and they also found that the difference in net tissue-type plasminogen activator was not significant.

though the measures of cardiovascular health from this study "have been linked with the exacerbation of IHD and heart failure as well as MI and stroke" the magnitude of these measures as well as the acute time frame of measures does not speak to the clinical significance of these exposures, especially as it relates to the risk of the aforementioned cardiovascular events.

- Behbod et. al (2013) was another controlled exposure study that exposed 35 healthy adults to five 130-minute exposures at rest, the highest exposure was 250 μg/m$^3$. though this study has some interesting insights, similar to the other studies cited its exposure levels are at the current AQI threshold and therefore don't provide insight into the difference in health metrics at a lower exposure of PM2.5. For health outcomes, induced sputum cell counts were measured at screening and 24 hours post-exposure. Venous blood total leukocytes, neutrophils, interleukin-6, and high-sensitivity C-reactive protein (CRP) were measured pre-, 3, and 24 hours post-exposure. A small increase in blood leukocytes was detected when comparing fine concentrated ambient particles to the filtered air exposure, but not when compared to the medical air exposure, which was not anticipated. There were no associations with glucan concentrations or interleukin-6, CRP, or sputum responses. The authors found no significant findings in sputum and stated this may be due to the small sample size. When discussing the limitations of the study the authors made multiple points that should be taken into consideration when citing this study as evidence to the lower the AQI breakpoints. "While we controlled total mass levels in our study, we were limited by not accounting for particle composition which varies with time due to changes in source emissions and prevailing environmental conditions. CAPs composition also varies by study location, and therefore our results from Toronto may not represent what might be found elsewhere. The exposure duration (130-minutes) and length of follow-up (24 hours) were sufficient to elicit changes in IL-620. The lack of significant associations with IL-6 or CRP in this study may therefore be due to several other reasons, including 1) healthy subjects may not be representative of the population susceptive to the inflammatory effects of CAPs exposure; 2) other cytokines may have been released by macrophages, such as IL-1, IL-8, tumor necrosis factor-alpha (TNF-α), and platelet-activating factor (PAF); and 3) there may indeed have been no effects to detect."

- DeFlorio-Barker et al. (2019) is the one epidemiological study cited to inform the AQI value of 300. This study was conducted on adults 65 years and older which is more relevant to AQI values in the range of Unhealthy For Sensitive Groups. The PM2.5 concentrations over the study periods varied greatly which makes it difficult to inform the AQI values around 300. When looking at the estimated percentage increase of respiratory visits, cardiovascular outcomes, and asthma-related outcomes across multiple lags, not

only were the estimated percent increases very small (less than 1% for respiratory and cardiovascular) but all the confidence intervals overlapped when comparing smoke days to non-smoke days. For cardiovascular outcomes, it was actually estimated they would be higher on non-smoke days. When discussing limitations, the authors mentioned exposure misclassification.

Upper Break Point of Hazardous 500 (500 to 325 μg/m$^3$ )

- In the study conducted by Vieria et. al (2016a), 26 patients with heart failure (HF) were enrolled and only 15 control volunteers participated. though the concentration of PM2.5 was 325 μg/m$^3$, the exposure was to diesel exhaust (DE), which is a very specific type of PM2.5 exposure not representative of exposures from other sources, subjects were only exposed for 21 minutes, and the main aim of the study was to evaluate a respiratory filter. As stated by Brook et. al 2009, cited as evidence for lowering the cut point between unhealthy and very unhealthy, exposure types of PM2.5 can vary greatly depending on the location and source. In both the control and HF groups DE decreased the 6-min walking distance and arterial stiffness, although the filter (that greatly decreased PM2.5 exposure) did not change these responses. DE did not affect heart rate variability or exercise testing. The authors concluded that DE was well tolerated and there were no adverse events. Besides the 6-min walking test and reactive hyperemia index in HF patients only, no other measure was statistically significant in the control group or the HF group when comparing the exposure scenarios of clean air, air pollution, and filtered pollution, indicating that the drastic difference in PM2.5 exposure between these groups did not significantly increase any of the health effects measured. This study seems to imply that small changes to endothelial function were induced by exposure to 325 μg/m$^3$ of diesel exhaust in volunteers from a sensitive health group.

- The second study cited by Vieria et. al (2016b), tested the effects of a respiratory filter on a small cohort of patients with heart failure while they exercised. This type of study cannot be generalized to the healthy population and is not indicative of overall health effects at the hazardous level, especially because participants were exercising while exposed.

- The study by Lucking et. al (2011) was also cited looking at the breakpoint between very unhealthy and hazardous and the EPA noted how the authors saw no change in blood pressure when exposing a small cohort of 19 males to an average PM2.5 concentration of 320 μg/m$^3$ from diesel exhaust. The principal objective was to assess the impact of a commercially available particle trap on markers of cardiovascular health rather than measure the magnitude of impact on these measures from PM2.5. In addition, the authors did not adjust for multiple comparisons and they also found that the difference in net

tissue-type plasminogen activator was not significant. though the measures of cardiovascular health from this study "have been linked with the exacerbation of IHD and heart failure as well as MI and stroke" the magnitude of these measures as well as the acute time frame of measures does not speak to the clinical significance of these exposures, especially as it relates to the risk of the aforementioned cardiovascular events.

- For the Hutchinson et. al (2018) study, The EPA should consider the susceptible study population of Medi-Cal recipients, the focus on children from ages zero to four, as well as the estimate of exposures based on home address. though there was an increase in hospital admissions for respiratory-related issues as well as asthma, there was no change for heart-related issues. For asthma-related visits, the authors did not state whether patients were previously diagnosed with asthma or not. When assessing the odds of an emergency presentation the day after exposure to other AQI levels versus the AQI level of good, the 95% confidence intervals overlap for unhealthy for sensitive groups, unhealthy, and hazardous indicating that the estimated differences in medical visits during these various AQI levels are not significantly different from one another. The authors also found that visits for non-respiratory outcomes decreased.

- For the Orr et. al (2020) study, the cohorts from both Seeley Lake and Thompson Falls were quite small, 95 and 24 respectively. The cohort's average ages were 63 and 59 and represented the older adult population which is considered a sensitive group per the AQI. The Thompson Falls cohort was not recruited until 2018, a year after the fire events. Only 59 were able to go through initial spirometry testing in 2017 and much of the cohort was lost after the first year's measurements. Therefore, the longitudinal measures over multiple years are from a transient and very small sample size. Only 38 of the original participants were present for year 2 of spirometry testing and the authors did not state how many study volunteers participated in all 3 years of respiratory measurements. Members of both cohorts had pre-existing respiratory and/or cardiovascular conditions. The decreases in FEV1/FVC ratios were the only difference in predicted vs. observed but were above what is considered to be normal values. The average decline in pulmonary function in FEV1 was within what the Mayo Clinic considers the expected annual decline.

Implementation Challenges of the NPRM $PM_{2.5}$ Primary Annual and 24-hour Standards (Pages 423-449)

The Proposed Rule states that there is no plan to open any of the implementation rules that provide a basis for how the new standards would be implemented (pages 423-449). EPA also states that these are not relevant to the NPRM (page 424). The implementation rules are relevant

to the reviewing agency and its need to address the Wildfire Crisis[1], its 10-Year Implementation Plan[2], the implementation of the wildfire risk reduction provisions of the Bipartisan Infrastructure Law (BIL) and the Inflation Reduction Act (IRA), all of which plan and fund substantially greater levels of prescribed fire which emit $PM_{2.5}$. The implementation rules will potentially have significant effects on the nonattainment designation boundaries and design-day calculations which directly affect the ability to utilize prescribed fire in states where wildfire smoke impacted days occur.

Based on the $PM_{2.5}$ primary standards proposed and those being considered through the request for public comments along with the latest 2021 $PM_{2.5}$ monitoring data, nearly 1/3 of the western United States could be declared in nonattainment (see figure 1, 2 and 3). These maps are based on publicly available tools from EPA at https://www.epa.gov/air-trends/air-quality-design-values#report. The severe wildfire season of 2020 and 2021 had nationwide impacts on air quality with several thousand exceedances of the current standards occurring across the country as reflected in data compiled by the Western States Air Resources Council[3] (WESTAR) (figure 4). Some of these monitoring impacts are present in data supporting the maps developed by the Forest Service to depict impacts of the lower levels of the proposed primary standards. Roughly one in four wildfires impacted $PM_{2.5}$ monitor days are submitted to EPA for concurrence as a natural exceptional event at the current standard levels. The wildfire impacted monitor days not submitted to EPA remain in the data from which the annual and 24-hour design days and averaging for nonattainment determination will occur. As these wildfire smoke impacted monitor days are above the exceedance level of the current 24-hour standard of 35 $\mu g/m^3$, the presence of these higher value monitor days will raise the averages and could result in effects in nonattainment determination for the proposed standards. The NPRM stated that states are "required" to submit such wildfire impacted data (page 427) yet the data from WESTAR shows they are not submitting the data for roughly 75% of the impacted days that are exceedances above the 24-hour standard. This inclusion of several thousand wildfire impacted monitor days drives consideration of changes to the EER and should be discussed in the NPRM. The inflation of the averages could adversely affect the agency and land managers who seek to increase prescribed fire use to reduce wildfire risk as guided by the BIL and IRA due to additional nonattainment areas and more stringent requirements imposed by states seeking to meet the new standards. These inflated designations based on more recent data than the Regulatory Impact Assessment (RIA), which was likely under-estimated, will add to increased General Conformity efforts for federal land managers and federally funded prescribed fire use. A further concern is that the current EER does not allow for state submission of wildfire affected monitor days that

[1] **https://www.fs.usda.gov/managing-land/wildfire-crisis**
[2] US Forest Service. Confronting the Wildfire Crisis Implementation Plan. U.S. DEPARTMENT OF AGRICULTURE FS–1187b, January 2022.
[3] Jay Baker, WESTAR/WRAP. "2021 Western Wildfire Season Impacts on Air Quality", NW-AIRQUEST Conference, June 29, 2022.

fall above the annual average standard and below the 24-hour standard. These values will raise the average for the annual standard determination which could lead to elevated design days and more nonattainment designations. The number of days in this category is substantial during 2020 and 2021 (figure 5, USFS) with over 20,000 monitor days per year in a subsection of states that also experienced significant Air Quality Index defined hazardous and very unhealthy days. Note that in figure 5, the AQI moderate category corresponds to the range between the primary annual and the 24-hour standards. The increase from the current annual standard to the proposed 9 $\mu g/m^3$ increases this population of such days by over 50%. The impact of retaining these monitored days above the annual standard and below the 24-hour standard is not known but should be determined before concluding that implementation rule changes are not needed. These multiple factors challenge the assumptions provided by the EPA in the section on Implementation pages 423-449.

It should be noted that in the General Conformity Rule (2010), the prescribed fire portion of the rule is not currently aligned with the approaches and terminology present in the more recent EER (2016) and should be reopened as well to provide such alignment. With the potential for 125 or more nonattainment areas, many which will include federal lands or lands where federal funding will help support fuels treatments including use of prescribed fire, the importance of this rule revision and updating of guidance is very important. EPA notes that they are open to modifying only the guidance related to the General Conformity Rule (Page 449) which will not allow for alignment with the approaches and definitions of the EER.

EPA outlines the standard process for nonattainment boundary setting (pages 428-429 and elsewhere) which does not include any notification of federal land managers. As the new nonattainment areas could include millions of acres of federally managed land, a requirement should be added which provides notification by EPA at the same time the information is sent to the governors if a nonattainment area potentially includes federal land. This will inform the state of the emission potential of an area and any changing land management actions which may be relevant to the designation process. This step could also help a state understand if an area will likely have increased prescribed fire emissions which should be included in the state's plans subsequently developed to bring an area into attainment. The final designation boundary decision by EPA should also be transmitted to the respective federal land manager if federal land the boundary-setting process differs from the preliminary boundaries sent to the states.

This Implementation Section of the NPRM would be an ideal place to discuss the challenges of addressing the potential dramatic increases of prescribed fire needed to address wildfire risk. As the NPRM also addresses climate change and environmental justice in the context of the proposed standards, creating additional barriers to using prescribed fire and other fuels management approaches will further lead to greater risks to current carbon sequestration and

other adverse environmental effects which will likely affect some members of the public disproportionately.

**Regulatory Impact Analysis**

On page 46 of 556 of the rule text, EPA noted "…In recent years, the frequency and magnitude of wildfires have increased (Iglesias et al., 2022). These events produce high PM emissions that impact the PM concentrations in ambient air to the extent that such days with high PM concentrations from wildfire smoke events may affect the design values in a given area. The annual and daily design values affected by potential exceptional events associated with wildfire smoke may qualify to be excluded from design value calculations used for comparison to the NAAQS. The EPA's Exceptional Events Rule (81 FR 68216, October 3, 2016), most recently updated in 2016, describes the process by which these events can be excluded from the design values, and we generally exclude regionally-concurred exceptional events (as of June 2021) in design value calculations included in this proposal." In the footnote, EPA described "regionally concurred exceptional" events as unusual or naturally-occurring events such wildfires or high wind dust events that have (1) resulted in PM2.5 concentrations above the level of the NAAQS, (2) been submitted by tribal, state or local air agencies under the EPA's Exceptional Events Rule to their respective EPA Region, and (3) received concurrence.

In order to further understand the challenges posed by wildfire impacts on monitoring data, can EPA provide statistics that show the numerical breakdown between monitored days reasonably assumed to be impacted by wildfire that were above the level of the NAAQS and the actual count monitored days submitted by tribal, and state or local air agencies? Data compiled by WESTAR for the 2021 wildfire season showed that in the Western US alone, of 3,464 monitor days potentially affected by wildfire, only 1,068 of these monitor days were requested by respective air agencies for exclusion (~31%)(figure 7). Nationally, of 4,194 monitor days identified as potentially affected by wildfire, only 1,086 were submitted for exclusion (~26%)(figure 4). [4] These remaining wildfire impacted monitor days could have substantial impacts on nonattainment designations and design-day values as mentioned previously.

This retention of wildfire impacted days in the EPA's Air Quality System (AQS) poses the question if the EPA screening described in pages 2-18 and 2-19 of the Regulatory Impact Assessment (RIA) is representative and potentially overestimates the actual number of monitor days that have been flagged by states in the AQS in subsequent years. Summarily, relative response factors (RRFs) based upon the method EPA relied upon (which used the actual concurred exceptional events combined with the extreme value analysis method to remove

[4] Jay Baker, WESTAR/WRAP. "2021 Western Wildfire Season Impacts on Air Quality", NW-AIRQUEST Conference, June 29, 2022. Available at: http://lar.wsu.edu/nw-airquest/docs/20220628_meeting/NWAQ_20220629_1400_Baker_WF_Impacts.pdf

PM2.5 values above 61 μg/m$^3$) appears it could exclude a much higher percentage of monitor days compared to the actual number of monitored days submitted for exclusion as indicated by the WESTAR analysis of air quality data for the 2021 fire season. This further supports concerns about the wildfire impacted data and how it will affect designations which will affect possible needed increases for prescribed fire emissions in these areas.

The RIA maintained a standard modeling practice of holding wildfire and prescribed fire emissions constant between the base case and future year which does not consider the hazardous fuels management strategies for federal land managers that are guided by the Bipartisan Infrastructure Law (BIL) and Inflation Reduction Act (IRA). In real terms, the future year prescribed fire emissions are likely to be underestimated due to the land management responsibilities for hazardous fuels reduction required under the BIL and IRA. The Western Regional Air Partnership (WRAP) developed an analytical methodology to estimate changes in emissions under changing land management practices increasing the use of prescribed fire for Regional Haze purposes which demonstrates a viable alternative to holding these emissions constant. This is the first study by a multijurisdictional organization (MJO) to examine changes in land management practices and downstream changes in prescribed fire emissions. WRAP also had an increased wildfire scenario as well to reflect climate change effects that should have been considered rather than constant emissions for these sectors. EPA should examine this process to provide a more accurate future year impact analysis to reflect changes in use of prescribed fire that the BIL and IRA call for as part of the wildfire crisis response.

As a result of this apparent incongruity between EPA's method to screen data for calculating relative response factors (RRFs) versus the actual count of flagged data combined with the assumption of holding fire emission constant between base year and future year (not reflecting the long term hazardous fuels management strategies of land management agencies responding to the wildfire crisis), we surmise that the relative response factors, modeled absolute concentrations, and subsequent projected design values have been biased low in the RIA as compared to design values that EPA will use to make nonattainment designations. This would result in an under projection of areas that could be designated nonattainment identified with the RIA and would bias low the total control costs and projected economic impact of the proposed rulemaking. The inclusion of images from currently available design day values (figures 1, 2 and 3) help demonstrate this effect and the differences from the RIA to more current design day for the western US.

On page 53 of 461 the RIA, EPA states *"…historical and projected trends in NOX and SO2 emissions reductions (reducing background PM concentrations and increasing the importance of urban PM concentrations), we analyze direct PM emissions reductions because our modeling indicates that these reductions will be the most effective at reducing PM concentrations in counties projected to exceed the proposed standard levels."* Also, EPA noted on page 61 of 556

of the rule text, *"…IMPROVE sites can provide some insights into how contributions from different sources, including sources of background PM, may have changed over time."* Both IMPROVE and Chemical Speciation Network (CSN) are important tools in designing informed control strategies which reflect the unique composition of PM2.5 for specific localities.

Aerosol extinction budgets as denoted in historical IMPROVE data also confirm this trend of lowering NOx and $SO_2$ emissions reductions. However, Particulate Organic Matter (POM) component extinction has only modestly decreased between 2002 – 2018 but has exhibited a significant trend upward in the 2017 and 2018 years. A side effect of the reductions in $SO_4$ and $NH_3$ contributions to overall extinction budgets is that POM will represent an increasing percentage of the overall extinction budget in the southwest, intermountain west, and west coast. For example, the average percentage in the Regional Haze baseline period of 2002 – 2004, POM comprised between 39% - 41% in these regions, respectively. Hover, during the 2016 – 2018 period, POM had increased to 45% - 51% of the total extinction budget.[5]

Translating extinction budgets to the PM NAAQS control strategy implications for these regions of the country with a larger percentage of POM comprising the total PM2.5 monitored mass means that consideration of POM will be increasingly important for control strategy considerations. It is unlikely that mitigation measures of primary PM2.5 alone will be sufficient for areas designated nonattainment. With prescribed fire being one of the most important land management tools to help mitigate future catastrophic wildfires and being one of the largest contributors of POM outside of wildfire emissions in the western US, this could put this important tool "as a focus of local air regulatory agencies in future control strategy demonstrations.

This will make the Exceptional Events Rule (EER) an increasingly important tool given the planned increased use of prescribed fire and the paradox of a reduced PM NAAQS. This is countered the knowledge that the EER is not being utilized to the extent the EPA screening methodology for constructing the RRF's assumes, and it is not being used currently for any prescribed fire impacts. WESTAR compiled air quality statistics for the 2021 wildfire season and their analysis showed that western States are flagging only approximately 31% of wildfire influenced days for EER consideration, and apparently no monitor days for prescribed fire. This raises the concern that the existing form of the EER (2016) remains both an administrative and technical burden to States to fully use this regulatory mechanism to exclude wildfire days above the existing PM2.5 NAAQS from attainment status consideration or for prescribed fire impacts. As EPA did remove a portion of wildfire impacted monitoring data in the RIA effort, might such an approach be used to reduce some workload on states? As long as these barriers continue to exist, it is reasonable to anticipate that a reduced annual NAAQS will further incentivize States

[5] See "30 Years of the Clean Air Act Amendments: Impacts on haze in remote regions of the U.S. 1990-2018". IMPROVE Steering Committee Meeting, October 13, 2020. Available at: PowerPoint Presentation (colostate.edu)

to limit or preclude use of prescribed fire noted as the largest PM2.5 source besides dust in the model analysis (page 2-10) and consider those limitations as potential control strategy mitigation measures which is cited as such in the RIA (pages 2-41, 3-40).

EPA Proposed Rule: "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," RIN 2060-AV52
Cover Comments
Figure 1



EPA Proposed Rule: "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," RIN 2060-AV52
Cover Comments
Figure 2



EPA Proposed Rule: "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," RIN 2060-AV52
Cover Comments
Figure 3



EPA Proposed Rule: "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," RIN 2060-AV52
Cover Comments
Figure 4




Figure 5 –Count of monitor days of Moderate AQI in significantly wildfire impacted states

(12 µg/m$^3$ to 35 µg/m$^3$ purple, 10 µg/m$^3$ to 35 µg/m$^3$ green, 9 µg/m$^3$to 35 µg/m$^3$ yellow) (USFS 2022)



EPA Proposed Rule: "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," RIN 2060-AV52
Cover Comments
Figure 6 - Count of monitor days of Hazardous, Vary Unhealthy and Unhealthy at current AQI thresholds (solid colors) compared to proposed lower AQI thresholds (transparent colors) in significantly wildfire impacted states. (USFS 2022).



EPA Proposed Rule: "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," RIN 2060-AV52
Cover Comments
Figure 7



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

**OFFICE OF AIR AND RADIATION**

WASHINGTON, D.C. 20460

February 7, 2024

**MEMORANDUM**

**SUBJECT:** Initial Area Designations for the 2024 Revised Primary Annual Fine Particle National Ambient Air Quality Standard

**FROM:** Joseph Goffman
Assistant Administrator

**TO:** Regional Administrators
Regions 1-10

This memorandum provides information on the schedule and process for initially designating areas for the purpose of implementing the 2024 revised primary annual fine particulate matter ($PM_{2.5}$) national ambient air quality standard (NAAQS or standard). In addition, this memorandum identifies important factors that the Environmental Protection Agency (EPA) intends to evaluate in making area designations and nonattainment area boundary decisions for this standard. The EPA recommends that states[1] and Tribes also consider these factors in making their recommendations for area designations and nonattainment area boundaries. As in prior designations for the $PM_{2.5}$ NAAQS, the EPA will also consider other relevant information in making final designations and boundary determinations. Please share this information with state and Tribal agencies in your region.

On February 7, 2024, the EPA promulgated a revised primary annual $PM_{2.5}$ NAAQS. In that action, the EPA revised the primary annual $PM_{2.5}$ standard, strengthening it from 12.0 micrograms per cubic meter ($\mu g/m^3$) to 9.0 $\mu g/m^3$. The EPA revised the primary annual $PM_{2.5}$ standard based on an integrated assessment of an extensive body of new scientific evidence, which strengthens the EPA's body of knowledge regarding $PM_{2.5}$-related health effects. As a result of this NAAQS revision, the Clean Air Act (CAA) requires that the EPA designate all parts of the country with respect to the revised primary standard.

---

[1] CAA section 302(d) defines the term "State" to mean a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and American Samoa and includes the Commonwealth of the Northern Mariana Islands.

**Clean Air Act Designations Requirements**

Section 107(d) of the CAA governs the process for initial area designations after the EPA establishes a new or revised NAAQS. Under CAA section 107(d), states are required to submit designations recommendations to the EPA, by a date specified by the EPA, which cannot be sooner than 120 days after promulgation of the new or revised NAAQS and cannot be later than 1 year after the promulgation of the NAAQS. If the EPA decides that it is necessary to modify a state's recommendation and to promulgate a designation different from a state's recommendation, then the EPA must notify the state at least 120 days prior to promulgating the final designation, and the EPA must provide the state an opportunity to comment on the potential modification. These modifications may relate either to the designation category of an area or to the boundaries of an area, or both. The CAA requires the EPA to complete the initial area designations process within 2 years of promulgation of a new or revised NAAQS, unless the Administrator has insufficient information to make initial designations decisions in the 2-year time frame. In such circumstances, the EPA may take up to 1 additional year to make initial area designations decisions (i.e., no later than 3 years after promulgation of the standard). If a state or Tribe does not submit designations recommendations, then the EPA will promulgate the initial designations that it deems appropriate.

While section 107(d) of the CAA specifically addresses the designations process between the EPA and states, the EPA intends to follow the same process to the extent practicable for Tribes that choose to make initial area designations recommendations pursuant to section 301(d) of the CAA regarding Tribal authority and the Tribal Authority Rule (TAR) (63 FR 7254; February 12, 1998).[2] To provide clarity and consistency, in December 2011, the EPA issued a guidance memorandum concerning collaboration between the EPA and Tribes during the designations process.[3] In accordance with the TAR, the December 2011 Tribal designations guidance memorandum and the EPA's May 2011 Tribal Consultation Policy, the EPA intends to designate Tribal areas on the same schedule as state designations.[4]

**Schedule for Initial Area Designations**

Consistent with the schedule in CAA section 107(d)(1), state Governors are required to submit, and Tribes can choose to submit, their initial designations recommendations to the EPA for the 2024 revised primary annual $PM_{2.5}$ NAAQS no later than 1 year following promulgation of the revised NAAQS, or by February 7, 2025. Because of the form of the 2024 revised primary annual $PM_{2.5}$ NAAQS, states or Tribes recommendations will be based on air quality data from the 3 most recent years of monitoring data available at that time. Based upon these monitoring data, as well as the weight-of-evidence approach described in this memorandum, states or Tribes should identify areas as attainment, nonattainment, or unclassifiable.

---

[2] Tribes are not required to have "Treatment-In-A-Similar-Manner-As-A-State" (TAS) status to submit initial area designations recommendations to the EPA.

[3] Guidance to Regions for Working with Tribes during the National Ambient Air Quality Standards (NAAQS) Designations Process. Memorandum from Stephen D. Page, Director, EPA OAQPS to Regional Administrators, Regions I-X. December 20, 2011. Available at *https://www.epa.gov/sites/default/files/2017-02/documents/12-20-11_guidance_to_regions_for_working_with_tribes_naaqs_designations.pdf*.

[4] EPA Policy on Consultation and Coordination with Indian Tribes, May 4, 2011. Available at *https://www.epa.gov/sites/default/files/2013-08/documents/cons-and-coord-with-indian-tribes-policy.pdf*.

If the EPA decides it is necessary to make any modifications to a state's or Tribe's initial area designations recommendations, including area boundaries, then the EPA is required to notify the state or Tribe of this fact no later than 120 days prior to finalizing the designations. These notifications are commonly known as "120-day Letters." If a state or Tribe has additional information relevant to such an area that it wants the EPA to consider with respect to a designation recommendation that the EPA plans to modify, typically the EPA requests that such information be submitted no later than 60 days from the date of the EPA's 120-day Letter. This schedule will ensure that the EPA can fully consider any such additional information prior to issuing final designations.

Also, although CAA section 107(d) explicitly exempts the designations process from the normal public notice and comment rulemaking process, the EPA does intend to consider public input in the designations process. The EPA typically provides no less than a 30-day public comment period immediately following issuance of the 120-day Letters responding to the designations recommendations from states and Tribes. Attachment 1 summarizes an anticipated schedule based on the CAA's procedural guides.

**Identifying Nonattainment Areas**

Section 107(d)(1) of the CAA directs the EPA to designate an area nonattainment if it is violating the NAAQS or if it is contributing to a violation[5] of the NAAQS in a nearby area. To start the initial area designations process, states and the EPA must identify the areas that are violating the NAAQS. Thus, the first step in designating $PM_{2.5}$ nonattainment areas is to identify air quality monitoring sites with data that show a violation of the 2024 revised primary annual $PM_{2.5}$ NAAQS. For this purpose, the EPA intends to evaluate areas using the most recent complete 3 consecutive calendar years of quality-assured, certified air quality data in the EPA's Air Quality System (AQS).[6] In general, violations are identified using data from Federal Reference Method (FRM) and Federal Equivalent Method (FEM) monitors that are sited and operated in accordance with 40 CFR Part 58. Procedures for using the air quality data to determine whether a NAAQS violation has occurred are given in 40 CFR Part 50 Appendix N.

It is typical that in following a 2-year designations process, state and Tribal designations recommendations are based on one set of data years while the EPA's final designations decisions are based on an overlapping, but not identical, set of data years. This is because the most recent 3 years of certified air quality data used for final designations decisions will include 1 year of data that is not yet fully available while states and Tribes are developing their designations recommendations. The EPA expects that in providing designations recommendations, states and Tribes will review air quality data from 2021 to 2023. The EPA expects that in making final designations decisions, the EPA will rely on air quality data from 2022 to 2024. The process for determining appropriate nonattainment area boundaries, which must include areas nearby a violating monitor that are contributing to the violation, is discussed in detail in a later section of this memorandum.

---

[5] A violation of a NAAQS occurs when a design value is over the NAAQS level. An exceedance of a NAAQS occurs when a metric measure from a regulatory monitor is over the NAAQS level.

[6] More information on the EPA's AQS is available at *https://www.epa.gov/aqs*.

**Exceptional Events and Designations**

The EPA anticipates that exceptional events may be implicated during initial area designations for the 2024 revised primary annual $PM_{2.5}$ NAAQS. Initial area designations are an action of regulatory significance described in the EPA's "Treatment of Data Influenced by Exceptional Events" Final Rule (81 FR 68216; October 3, 2016) (Exceptional Events Rule or EER) and codified at 40 CFR 50.1, 50.14, and 51.930. Consistent with the Exceptional Events Rule, air quality monitoring data affected by exceptional events may be excluded from use in identifying a violation of regulatory significance at a regulatory ambient air monitoring site if the data meet the criteria for exclusion, as specified in the EER.

The EER contains general instructions and requirements for state and Tribal air agencies that wish to flag air quality data for certain days in AQS due to potential impacts from exceptional events (e.g., wildfires or high wind dust storms) and subsequently submit an exceptional events demonstration to the EPA. The EPA provides more information on the exceptional events-related deadlines as they relate to the current designations process in Attachment 2. These schedules reflect the EPA's interest in ensuring that exceptional events claims are fully considered, as appropriate, in final designations decisions. The EPA Regional offices are encouraged to work with states and Tribes with exceptional events claims to prioritize and expedite the demonstration development and review process for those claims for events in years 2022-2024 that have the potential to influence the EPA's regulatory decisions for initial area designations for the 2024 revised primary annual $PM_{2.5}$ NAAQS. Similarly, the EPA encourages states and Tribes to contact and collaborate with the appropriate EPA Regional office after identifying any exceptional events influencing ambient air quality concentrations in a way that could affect these initial area designations. The EPA may defer action on specific exceptional events requests by states or Tribes in our designations decisions if the EPA determines that concurrence on those events would not affect the designations decisions (i.e., the exceptional events claim would not have regulatory significance for initial area designations decisions). States and Tribes need not submit completed exceptional events demonstrations for data years that will not be relied upon by the EPA in making final designations decisions, however, they are expected to clearly indicate to the EPA if they believe any air quality data they rely on in their area designations recommendations were influenced by exceptional events.

In the context of initial area designations, the EPA acknowledges the possibility that the EPA will receive exceptional events demonstrations associated with Canadian wildfire smoke during the Summer 2023, as well as other types of events. The EPA is committed to ensuring a timely and efficient process for evaluating and making exceptional events determinations. The EPA intends to release additional tools and resources to assist air agencies developing PM-related exceptional events demonstrations, including events involving wildland fire. Additional information, resources, and best practice materials can be found at the EPA's exceptional events website located at *https://www.epa.gov/air-quality-analysis/final-2016-exceptional-events-rule-supporting-guidance-documents-updated-faqs*.

**Nonattainment Area Analyses and Boundary Determinations**

CAA section 107(d) explicitly requires that the EPA designate as nonattainment not only the area that is violating the standard at issue, but also those nearby areas that contribute to the violation(s). The EPA evaluates the boundaries for each nonattainment area on a case-by-case basis considering the specific facts and circumstances unique to the area.

After identifying each regulatory monitor or group of monitors that indicate a violation of the standard in an area, the EPA intends to begin its analysis of what nearby areas contribute to the violation(s) by considering those counties in the entire metropolitan area (i.e., Core Based Statistical Area (CBSA) or Combined Statistical Area (CSA)) in which the violating monitor(s) is (are) located.[7] The EPA also intends to evaluate any adjacent counties to the CBSA or CSA that have the potential to contribute. It is appropriate to start the analysis with the relevant CBSA or CSA for the area because measured ambient $PM_{2.5}$ concentrations across urban-scale distances tend to be highly correlated and composed of direct emissions and multiple secondarily-formed pollutants attributable to a variety of sources commonly found throughout urbanized areas.[8] Violations of the annual $PM_{2.5}$ NAAQS are usually the result of emissions from a broad variety of sources that are typically located across a metropolitan area. The CBSA or CSA for that area is thus a reasonable starting point for gathering information to conduct an analysis of what nearby areas may be contributing to the violation of the NAAQS at a given monitor or monitors in a violating area. Although the CBSA or CSA is the starting point for the EPA's evaluation of contributions to a violation, the EPA does not intend it to be a presumed nonattainment area boundary.

As a framework for area-specific analyses, the EPA intends to use, and recommends that states and Tribes base their nonattainment area boundary recommendations on, an evaluation of information relevant to five factors:[9] air quality data, emissions and emissions-related data, meteorology, geography/topography, and jurisdictional boundaries. Attachment 3 describes these factors and provides guidance regarding analyses relevant to each, consistent with those used in the designations processes for the 1997, 2006, and 2012 $PM_{2.5}$ standards and in designations for other NAAQS. Additionally, states and Tribes may identify and evaluate other relevant information or circumstances specific to a particular area to support nonattainment area boundary recommendations. For cases in which states and Tribes choose not to conduct an analysis justifying their boundary recommendation, or the EPA finds the analysis insufficient, the EPA will establish those boundaries that it determines to be appropriate based upon the five factor analysis and any other relevant information for a given area. While it is generally appropriate to include the entirety of a violating or contributing county in a $PM_{2.5}$ nonattainment area, the EPA recognizes that, in some cases, an assessment of relevant information may support inclusion of only part of a county. Specifically, the EPA intends to evaluate the five factors as applied to federal lands (such as national forests, national parks and/or wilderness areas) that may be fully or partially located within the bounds of a county otherwise identified as nonattainment. The EPA encourages states to also consider the relevance of federal lands and federal land boundaries and provide information and/or explanations for including federal lands within any nonattainment area

[7] The Office of Management and Budget (OMB) adopted standards for delineating metropolitan and micropolitan statistical areas on December 27, 2000 (65 FR 82229). These delineation standards established the terms CBSAs and CSAs. On July 16, 2021, OMB published their 2020 standards for delineating metropolitan and micropolitan statistical areas (86 FR 37770). The EPA intends to use the most recent list of CBSAs and CSAs in this designations process, published in March 2020.

[8] U.S. EPA (2019). Integrated Science Assessment for Particulate Matter: Final Report. National Center for Environmental Assessment-RTP Division, Office of Research and Development, Research Triangle Park, NC. EPA/600/R-19/188. December 2019. Available at *https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=347534*.

[9] These factors are derived, in part, from the CAA's ozone pollution provisions identifying factors the Administrator is to consider in determining portions of metropolitan areas that may be excluded from an ozone nonattainment area. (CAA section 107(d)(4)(A)(v)). These CAA factors include population density, traffic congestion, commercial development, industrial development, meteorological conditions, and pollution transport. The EPA finds these factors, and other information as indicated in this memorandum, relevant to evaluating areas potentially contributing to NAAQS violations more generally, including in the context of $PM_{2.5}$ pollution.

boundary recommendations to the EPA. For defining any partial county boundaries included in a nonattainment area, the EPA recommends the use of other well-defined legal jurisdictional boundaries, such as townships, tax maps, immovable landmarks such as major roadways, or other permanent and readily identifiable boundaries.

In addition, as provided for in the December 2011 guidance titled, "Policy for Establishing Separate Air Quality Designations for Areas of Indian Country," Tribes may recommend that the EPA designate areas of Indian country separately from the adjacent state areas.[10] This guidance provides for a nationally consistent approach for evaluating such designations recommendations from Tribes. The policy was designed to recognize Tribal sovereignty in air quality management matters affecting Indian country. In addition to nearby areas with emissions sources contributing to nonattainment, $PM_{2.5}$ concentrations in an area with a violating monitor may be affected by long-range or regional transport of $PM_{2.5}$ and its precursors.[11] Where this is the case, the CAA does not require that all contributing areas be designated nonattainment, only the contributing areas that are nearby. Attachment 3 addresses in more detail how to determine the area of analysis when determining nonattainment area boundaries.

As provided in CAA section 188(a), the EPA will initially classify all $PM_{2.5}$ nonattainment areas as "Moderate" when it promulgates initial area designations for the 2024 revised primary annual $PM_{2.5}$ NAAQS. In accordance with CAA section 188(c), the attainment date for each Moderate area shall be as expeditiously as practicable but no later than the end of the sixth calendar year after the effective date of the designation.

**Environmental Justice**

By adhering to the CAA's schedule for issuing timely area designations, the EPA helps ensure that public health protections under the 2024 revised primary annual $PM_{2.5}$ NAAQS are realized as soon as possible. The revised annual NAAQS was established to protect public health from fine particles, including the health of at-risk populations, with an adequate margin of safety. The "at-risk" populations identified in the supporting scientific evidence for the 2024 revised primary annual $PM_{2.5}$ NAAQS and documented in the proposed rulemaking includes subpopulations that comprise communities with environmental justice concerns.[12]

The EPA has tools that can help air agencies identify communities with potential environmental justice concerns, and such identification may be informative for purposes of developing designations recommendations. In May 2022, the EPA issued a document titled, "EPA Legal Tools to Advance Environmental Justice," which addresses, at a high level, different ways in which air agencies may consider environmental justice in the context of different CAA actions.[13] More specific to designations, the EPA has updated the $PM_{2.5}$ Designations Mapping Tool (which will be posted to the EPA's website)

[10] Guidance to Regions on the EPA's Policy for Establishing Separate Air Quality Designations for Areas of Indian Country. Memorandum from Stephen D. Page, Director, EPA OAQPS to Regional Administrators, Regions I-X. December 20, 2011. Available at *https://www.epa.gov/sites/default/files/2016-02/documents/indian-country-separate-area.pdf*.

[11] The main precursor gases associated with fine particle formation are sulfur dioxide ($SO_2$), oxides of nitrogen ($NO_x$), volatile organic compounds (VOC), and ammonia ($NH_3$) (*See* 81 FR 58010 at 58014, August 24, 2016). Unless otherwise noted, all references to $PM_{2.5}$ precursors in this memorandum and its attachments refer to at least these four gases.

[12] U.S. EPA, Reconsideration of the National Ambient Air Quality Standards (88 FR 5673, January 27, 2023).

[13] *https://www.epa.gov/system/files/documents/2022-05/EJ%20Legal%20Tools%20May%202022%20FINAL.pdf*.

to include a service layer to assist in identifying disadvantaged communities. Disadvantaged communities are defined as any community that meets at least one of the following characteristics: communities reflected in the Climate and Economic Justice Screening Tool (CEJST); any census block group that is at or above the 90th percentile for any of the Environmental Justice Screening and Mapping Tool's (EJSCREEN's) Supplemental Indexes when compared to the nation or state; and/or any geographic area within Tribal lands as included in EJSCREEN. The EPA encourages air agencies to use information from these tools (or other appropriate tools) to help target outreach efforts and facilitate meaningful involvement with disadvantaged communities as they develop their area recommendations.

Conduct outreach to interested parties

The EPA intends to use the $PM_{2.5}$ Designations Mapping Tool to identify disadvantaged communities in the area of analysis of any potential $PM_{2.5}$ nonattainment area for purposes of informing the EPA's outreach efforts associated with the EPA's designations process. The EPA expects to host at least one national webinar to engage with members of disadvantaged communities and receive feedback on the kinds of community outreach activities that air agencies and the EPA could use to facilitate consideration of potential environmental justice concerns in the designations process. At the regional/local level, the EPA may also host public meeting(s) to communicate information and gather feedback as part of the regulatory process on final designations. The EPA also intends to open a non-regulatory docket for the specific purpose of providing an opportunity for public feedback on the outreach process states might undertake in developing the recommendations they submit to the EPA, as well as outreach that the EPA might undertake associated with issuing final designations. The EPA is still working on the details regarding this outreach, with additional information to follow as the approach is finalized.

**Unclassifiable Areas**

In certain cases, there may be insufficient information to support a clear designation of nonattainment or attainment for an area. For example, the monitoring data may be incomplete, or the monitors may not be sited and operated in accordance with the regulatory requirements of 40 CFR part 58. In such cases the CAA provides for a designation of "unclassifiable" for any area that cannot be classified on the basis of available information as meeting or not meeting the NAAQS. In recommending boundaries for an unclassifiable area, the EPA recommends that states consider whether nearby areas have the potential to contribute to ambient air quality within the relevant area. As indicated in Attachment 3 of this memorandum, data from non-regulatory monitors and air quality modeling, where available, may help define an appropriate boundary for areas contributing to violations at regulatory monitors. The EPA notes that if sufficient information later becomes available indicating the unclassifiable area is violating the NAAQS and the EPA redesignates the area to nonattainment, the EPA would likely conduct a weight-of-evidence analysis as described in Attachment 3 of this memorandum to determine the appropriate area boundaries.

**Attainment/Unclassifiable Areas**

Once the EPA has determined the boundaries for nonattainment areas (areas that are violating the NAAQS or contributing to a nearby violation) and any unclassifiable areas, the EPA intends to designate the remainder of the state as "attainment/unclassifiable." The EPA requests that states and Tribes recommend how they would like the boundaries specified for their attainment/unclassifiable areas. During designations for previous $PM_{2.5}$ NAAQS, states have elected to specify boundaries for the

attainment/unclassifiable areas in a variety of ways, including as “rest of state” or “entire state,” by Air Quality Control Regions, by county, by previous nonattainment area boundaries, or by a combination of methods. The EPA recommends that the boundaries of attainment/unclassifiable areas generally not be smaller than a county.

**Summary**

This memorandum provides the EPA’s preliminary views on the process for determining initial area designations and boundaries for the 2024 revised primary annual $PM_{2.5}$ NAAQS. Recommendations contained herein are not binding on states, Tribes, the public, or the EPA. The EPA will make the designations determinations and nonattainment area boundary decisions for the 2024 revised primary annual $PM_{2.5}$ standards in a final regulatory action published in the *Federal Register*. When the EPA issues the final area designations, those decisions will be binding on states, Tribes, the public, and the EPA as a matter of law.

Four attachments to this memorandum provide additional information relevant to the initial area designations process. Attachment 1 is an anticipated timeline of important milestones in the initial area designations process for the 2024 revised primary annual $PM_{2.5}$ NAAQS. Attachment 2 identifies the schedule for exceptional events activities as prescribed in the Exceptional Events Rule (Table 2 of §50.14) for initial data flagging and submission of exceptional events demonstrations. Attachment 3 identifies the five general factors that the EPA intends to consider in evaluating and making decisions on nonattainment area boundaries and provides guidance regarding analyses relevant to support each of these factors. Attachment 4 provides information on preparing and running a Hybrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) modeling analysis for evaluating nonattainment area boundaries for the 2024 revised primary annual $PM_{2.5}$ NAAQS designations.

<u>Attachments</u>

Attachment 1: Anticipated Timeline For 2024 Revised Primary Annual $PM_{2.5}$ NAAQS Designations Process

Attachment 2: Schedule for Exceptional Events Flagging and Documentation Submission for Data to be Used in Initial Designation

Attachment 3: Factors the EPA Plans to Consider in Determining Nonattainment Area Boundaries in Designations for the 2024 Revised Primary Annual $PM_{2.5}$ NAAQS, and Guidance on Analyses to Support these Factors

Attachment 4: Preparing and Running a HYSPLIT Modeling Analysis for Evaluating Nonattainment Area Boundaries for the 2024 Revised Primary Annual $PM_{2.5}$ NAAQS Designations

**ATTACHMENT 1**

**Anticipated Timeline for 2024 Revised Primary Annual $PM_{2.5}$ NAAQS Initial Area Designations Process***

| Milestone | Date |
|---|---|
| The EPA promulgates 2024 Revised Primary Annual $PM_{2.5}$ NAAQS final rule | February 7, 2024 |
| 2023 Design Values Available | June 2024 |
| States and Tribes submit recommendations for $PM_{2.5}$ designations to the EPA | No later than February 7, 2025 |
| 2024 Design Values Available | June 2025 |
| The EPA notifies states and Tribes concerning any intended modifications to their recommendations (120-day Letters) | No later than October 9, 2025 (120 days prior to final $PM_{2.5}$ area designations) |
| The EPA publishes public notice of availability of state recommendations and the EPA's intended modifications, if any, and initiates 30-day public comment period | Mid-October 2025 |
| End of 30-day public comment period | Mid-November 2025 |
| States and Tribes submit additional information, if any, to respond to the EPA's modification of recommended designations | Mid-December 2025 (60 days following the publication of the notice of availability of state recommendations and the EPA's intended modifications) |
| The EPA promulgates final 2024 $PM_{2.5}$ NAAQS area designations | February 6, 2026 |

*This attachment reflects the EPA's anticipated designations timeline. Some dates may shift as the process moves forward. For specific questions about timing, please reach out to the appropriate EPA Regional office for assistance.

**ATTACHMENT 2**

**Schedule for Exceptional Events Flagging and Documentation Submission for Data to be Used in Initial Area Designations***

| Action | Anticipated Deadline | Applicable Data Years |
|---|---|---|
| Initial notifications for intent to submit exceptional events demonstrations for the purpose of initial area designations recommendations | No later than January 1, 2025 | 2021, 2022, 2023*<br><br>*States and Tribes are not required to submit initial notifications or demonstrations for data years that will not be relied upon for final area designations (data year 2021).[14] |
| Exceptional Events demonstration submittal | No later than February 7, 2025 | 2021, 2022, 2023 |
| State and Tribal initial area designations recommendations | No later than February 7, 2025 | 2021, 2022, 2023 |
| Initial notification and exceptional events demonstration submittal | No later than September 30, 2025 | 2024 |
| The EPA sends out 120-day Letters for initial area designations | October 9, 2025 | 2022, 2023, 2024 |
| The EPA promulgates final 2024 $PM_{2.5}$ NAAQS area designations | February 6, 2026 | 2022, 2023, 2024 |

*Submittal of exceptional events demonstrations is discretionary. This schedule is applicable to air agencies that intend to submit exceptional events demonstrations for events that have regulatory significance for the 2024 revised primary annual $PM_{2.5}$ NAAQS initial area designations. This schedule is based on a 2-year initial area designations schedule. If the Administrator has insufficient information to make initial designations decisions in the 2-year time frame, the EPA may take up to 1 additional year to make initial area designations decisions (i.e., no later than 3 years after promulgation of the standard). The Schedule for Exceptional Events for Use in Initial Area Designations is found in full at 40 CFR 50.14(c)(2)(vi) Table 2. For area-specific questions, please reach out to the appropriate EPA Regional office.

[14] At this time, the EPA does not anticipate that exceptional events associated with data year 2021 will have regulatory significance for the designations addressed in this memorandum. Unforeseeable circumstances could arise that might change this scenario; however, at this time, the EPA is working under the expectation that exceptional events demonstrations affecting designations would not be relevant for data year 2021.

**ATTACHMENT 3:**

**Factors the EPA Plans to Consider in Determining Nonattainment Area Boundaries in Designations for the 2024 Revised Primary Annual $PM_{2.5}$ NAAQS, and Guidance on Analyses to Support these Factors**

This attachment provides descriptions for five "factors" and relevant information informing these factors that the EPA intends to evaluate in making final nonattainment area designations decisions. The EPA notes that the five factors are comparable to the factors that states, Tribes, and the EPA used successfully for analytical purposes in prior designations for the 1997, 2006, and 2012 $PM_{2.5}$ NAAQS. The factors are intended to inform the EPA's analysis of the statutory definition of a nonattainment area, which is to include "any area that does not meet (or that contributes to ambient air quality in a nearby area that does not meet)" the $PM_{2.5}$ NAAQS. The EPA recommends that states and Tribes also consider these factors in making their recommendations for area designations and nonattainment area boundaries. The five factors[1] are:

1. Air quality data
2. Emissions and emissions-related data
3. Meteorology
4. Geography/topography
5. Jurisdictional boundaries

The EPA intends to evaluate these factors in its review of state and Tribal nonattainment area boundary recommendations. The EPA's recommendation of these factors is not intended to indicate that other relevant information should not be considered in the initial area designations process, as appropriate. The EPA will also evaluate any other relevant area-specific information in addition to the five factor analysis in cases where that information is provided by states or Tribes in supporting their designations recommendations. This document offers examples and recommendations about techniques and approaches. It does not contain requirements that must be strictly followed and should not be read as prescriptive with respect to the specific techniques recommended.

For initial area designations for the 2024 revised primary annual $PM_{2.5}$ NAAQS, the EPA will rely on monitoring data to identify areas to be designated nonattainment due to monitored violations of the standard. Consistent with the CAA and with previous area designations processes, the EPA will then determine the appropriate nearby areas to include within the nonattainment area boundary for the violating area based on emissions that contribute to these violations. For each monitor or group of monitors indicating a violation, the EPA intends to assess information related to five factors for the purpose of establishing the appropriate geographic boundaries for designated $PM_{2.5}$ nonattainment areas. The EPA will evaluate relevant information from the entire urbanized area (i.e., CBSA/CSA) containing the violating monitor(s) and any adjacent counties that have the potential to contribute to the violation, using a weight-of-evidence approach to draw conclusions.

[1] These factors are derived, in part, from the CAA's ozone pollution provisions identifying factors the Administrator is to consider in determining portions of metropolitan areas that may be excluded from an ozone nonattainment area. (CAA section 107(d)(4)(A)(v)). These factors include population density, traffic congestion, commercial development, industrial development, meteorological conditions, and pollution transport. The EPA finds these factors, and other information as indicated in this memorandum, relevant to evaluating areas potentially contributing to NAAQS violations more generally, including in the context of $PM_{2.5}$ pollution.

For those portions of the urbanized area where an evaluation of the available information clearly establishes that emissions sources in that portion of the area do not contribute to exceedances at the violating monitor(s), it may be appropriate to exclude that portion of the area from the nonattainment area. This weight-of-evidence approach to determining area boundaries could result in nonattainment areas consisting of the entire urbanized area, the urban area plus adjacent counties or partial adjacent counties, single counties, or, in cases supported by relevant evidence, partial counties, including partial counties within larger urban areas. While technical assessments can help to define the magnitude and relative magnitude of contribution from nearby areas, the EPA is not setting a threshold contribution level or bright line test for determining whether an area should be included within the boundaries of a given nonattainment area. Section 107(d) of the CAA does not require the EPA to set a threshold contribution and the EPA does not believe that such a threshold is helpful as it could result in boundaries that are either over- or under inclusive. For these reasons, and as was done in prior designations for the NAAQS, the contribution determination will be made through a case-by-case evaluation of the relevant facts and circumstances in each nonattainment area.

The EPA recognizes that some of the recommended assessments are data intensive. The EPA intends, wherever possible, to make the relevant data available to states and Tribes to facilitate their analyses. Table 3-1 below outlines the datasets that the EPA expects to make available to the public on the $PM_{2.5}$ designations website at *http://www.epa.gov/pmdesignations/* and the expected date of availability. The EPA may update this website during the initial area designations process as other relevant datasets are identified.

**Table 3-1. Datasets the EPA will provide via the EPA Air Quality Designations for Particle Pollution Website**

| Dataset | Expected Availability Date |
|---|---|
| Current annual $PM_{2.5}$ design values with all applicable updates | June 2024 |
| Chemical Speciation Network (CSN) data (same years as design values) | July 2024 |
| Interagency Monitoring of Protected Visual Environments (IMPROVE) speciation data (same years as design values) | November 2024 |
| 2022 Emissions Modeling Platform (EMP) data | Draft Estimates: April 2024<br>Final Estimates: July/August 2024 |
| Urban Increments | November 2024 |
| Wind speed/direction data | TBD |
| HYSPLIT trajectory data | TBD |

This attachment also offers recommendations concerning how states and Tribes can describe the basis for their initial designations recommendations. The EPA recommends that states and Tribes provide an explanation for those recommendations in a narrative format. Thus, this attachment provides some direction regarding the content and sequence of the narrative describing the nonattainment problem in an area with monitored violations of the NAAQS. The EPA recommends that a comprehensive

narrative articulate a conceptual model of $PM_{2.5}$ nonattainment that explains the nature and causes of the $PM_{2.5}$ air quality problem in the specific area, identifies the scope and scale of the air quality problem in that area, and describes all nearby emissions sources that contribute to the problem and those that do not. The EPA encourages states to work collaboratively with adjacent states to develop a comprehensive narrative for multi-state nonattainment areas. Similarly, the EPA encourages states and Tribes to work collaboratively to develop a comprehensive narrative for areas consisting of both state and Tribal lands.[2] The underlying analytical framework of the recommended narrative can be summarized as follows:

- Determine violating monitoring sites and gather data that enables an assessment of the CBSA or CSA, and potential nearby contributing areas, and the emissions sources in those areas.

- Assess and characterize air quality patterns at, and in proximity to, the violating monitoring site. Identify the conditions that are most associated with high average concentration levels of $PM_{2.5}$ in the area by quarter of the year. Further, identify the spatial extent of the high $PM_{2.5}$ concentrations. This analysis will provide a basic construct from which to evaluate potential contributing sources.

- Assess and characterize the spatial and temporal differences in $PM_{2.5}$ concentrations within an area using regulatory monitor data as well as any available relevant non-regulatory $PM_{2.5}$ data.

- Assess and characterize all relevant $PM_{2.5}$ chemical species over the analysis area. All parts of the year are important in determining contributions to the annual average concentration. However, a quarterly-average analysis in combination with other information may provide additional insight as to which emissions sources may play a greater role in contributing to a violation. This analysis can be an important first step in linking specific nearby sources of emissions to the violation.

- Assess and characterize the difference in quarterly and annual average $PM_{2.5}$ speciation values observed near the violating monitoring site(s) relative to monitoring sites outside the area under evaluation that reflect regional background concentrations. This "urban increment" analysis will help to differentiate the influence of more distant emissions sources from the influence of closer emissions sources, and thus to identify the relative magnitude of contributions from nearby emissions sources.

- Once the air quality factor analyses identified in the previous bullets are compiled, they can be evaluated in conjunction with emissions data and emissions-related data (e.g., vehicle miles traveled, population) to determine which source categories and source regions are most likely to contribute to the monitored violations.

[2] In these circumstances, each state and/or tribal entity would not be expected to describe the scope and scale of the air quality problem throughout the entire area, but rather would develop a conceptual model that describes only the contribution from their respective jurisdictions to the larger nonattainment area.

- Once the emissions and air quality assessments have been evaluated, it is valuable to then assess the meteorological characteristics of air quality throughout the year in the violating area. In many locations, the weather patterns will have a large impact on the eventual determination of which source categories and source regions in the area are most likely to contribute. This analysis will further help to identify the relative magnitude of contributions from emissions sources in nearby areas.

- It may be useful to assess any geographic/topographic or jurisdictional considerations that are relevant in the identification of the nonattainment area boundary.

- Finally, all of the previously described assessments are aggregated or synthesized into a cogent narrative that describes the relationship between emissions sources in the analysis area and the measured violation. This synthesis will represent a collective "weight-of-evidence" regarding the most appropriate boundaries for the nonattainment area.

While the general five factor framework should be comprehensive and provide the foundation for each assessment of nonattainment area boundary determinations, the extent of the analyses may vary on an area-by-area basis based on the nature, cause, and extent of the $PM_{2.5}$ air quality problem in the area. This attachment suggests analyses of certain data sets that can be useful to assess which nearby areas contribute to nonattainment at a monitor or monitors in a given area. In cases where more highly-resolved or newer data sets are available that are not explicitly mentioned here, the EPA recommends that states and Tribes consider their use, as appropriate. If these data are used, the EPA recommends that the states or Tribes fully describe the data and their derivation in supporting documentation for their designations recommendations.

The following sections provide more detail on the specific factor analyses and the approaches for synthesizing the five factors that the EPA plans to consider when evaluating state recommendations and determining nonattainment area boundaries for the annual $PM_{2.5}$ NAAQS.

## 1. Air Quality Data

The initial area designations process for $PM_{2.5}$ begins with an evaluation of available ambient air quality measurements from regulatory monitors to determine the location and magnitude of violations of the standard. In addition to data from violating monitors, the air quality data from other monitors can add to the weight-of-evidence in assessing the contribution of sources in areas outside the county with a violating monitor(s). Examples include the use of chemical speciation data to help characterize contributing emissions sources and the determination of nearby contributions through analyses that differentiate local and regional source contributions.

### 1.1 Current $PM_{2.5}$ Design Values

The first step in identifying an area that must be designated "nonattainment" and determining an appropriate nonattainment area boundary is to identify all monitored violations of the revised primary annual $PM_{2.5}$ NAAQS using the most recently available air quality data. The EPA determines NAAQS compliance by considering the "design value" for each air quality monitoring site. The design values for the 2024 revised primary annual $PM_{2.5}$ NAAQS are calculated using the 3-year

average (e.g., 2021 to 2023) of the annual mean concentrations, in which the annual mean concentrations are calculated using the mean of daily averages of each quarter in the given year.[3] The EPA calculates annual $PM_{2.5}$ design values based on ambient air quality data from the most recent three calendar year period from all regulatory monitors that are sited and operated in accordance with 40 CFR part 58, also known as Federal Reference Monitors (FRMs) and Federal Equivalent Monitors (FEMs). The EPA will designate as nonattainment all areas with one or more regulatory ambient $PM_{2.5}$ air quality monitors with a design value greater than the annual standard of 9.0 $\mu g/m^3$.

Because of the form of the annual $PM_{2.5}$ NAAQS, monitored ambient $PM_{2.5}$ levels throughout the entire 3-year period, including daily monitored levels below the numerical level of the NAAQS, are integral to the calculation of the design value at the monitor, and hence integral to determining whether there is a violation of the NAAQS. The amount by which monitored levels exceed the NAAQS level throughout the period can be an important consideration in determining appropriate boundaries for the nonattainment area because the monitored level indicates the magnitude of emissions contributions that result in such exceedance levels and whether there is a likelihood of influences from surrounding areas. Accordingly, contributions to monitored ambient $PM_{2.5}$ concentrations at a violating monitor throughout the entire 3-year period are relevant to determining the appropriate boundaries for a nonattainment area.

Individual measurements influenced by exceptional events for which the EPA concurs are excluded in accordance with the Exceptional Events Rule (EER), are not included in these calculations. State, local, and Tribal monitoring agencies are required to certify ambient air quality data submitted to AQS on an annual basis, by May 1st of the subsequent year. The EPA typically extracts ambient data from AQS and calculates official design values for regulatory purposes shortly after that certification due date (e.g., typically by June 1st) and then posts NAAQS design values for each regulatory monitor on a public website.

In addition to looking at the violating monitor site, an *intra*-urban analysis may be useful to understand emerging "within urban" gradients near violating monitor sites. This analysis can help further differentiate and isolate nearby contributing influences to the violating monitor site(s), particularly those that may be more evident at a refined scale such as localized plumes or suburban influences. This refined characterization of contributing emissions influences within the immediate urban area may in turn help to further identify the relative importance of surrounding areas in terms of their contribution to the violating monitor. In combination, analyzing the three spatial layers (urban, sub-urban, and rural) of $PM_{2.5}$ design values can provide a more complete understanding of the contributing urban and near monitor emissions, separate from the regional contributions. The ability to conduct an intra-urban analysis, however, is predicated on having data from multiple monitors within the urban study area, which may not be feasible for some areas being evaluated.

[3] Procedures for using the air quality data to determine whether a NAAQS violation has occurred are given in 40 CFR Part 50 Appendix N.

There are many possible drivers for intra-urban variability in $PM_{2.5}$ design values, including the following influences: local sources of primary PM emissions; transient emissions events; topographic barriers that isolate sub-regions of the urban area; meteorological phenomena that vary on spatial scales within the urban area; differences in behavior of semi-volatile components; and measurement error. The larger the contribution of regional sources, the more uniform is the intra-urban $PM_{2.5}$.

### 1.2 $PM_{2.5}$ Design Value Trends

In addition to identifying monitor sites where the most recent design values violate the 2024 revised primary annual $PM_{2.5}$ NAAQS, examining spatial and temporal trends in $PM_{2.5}$ air quality values (e.g., design values for the past 10 years) can improve one's understanding of the nature of the $PM_{2.5}$ ambient air quality problem in a violating area and thereby inform decisions regarding the sufficient size and shape of the nonattainment area boundary. Analyzing design value trends, particularly across multiple monitors in an area being evaluated, can show how $PM_{2.5}$ concentrations have changed and whether the most recent design value is consistent with that trend. Additionally, these trends analyses can show how frequently the design value at the 'defining' site (*i.e.*, the monitoring site with the highest design value for the area) has occurred at other monitoring locations in the area under consideration, and whether the design value trend across the evaluation area is homogeneous. This information can help to identify spatial and temporal patterns in the design values and, when combined with other information from the five factor analysis, can help identify nearby areas with emissions sources contributing to an area with a monitored violation.

Under normal circumstances, the mere fact that a nearby area has a monitor with a design value below the level of the NAAQS would not answer the question of whether that area was contributing to violations at a monitor in another area. Such an area might contain sources releasing very large amounts of emissions that together with emissions from sources in other nearby areas combine to cause the violation at the monitor. However, there may be circumstances in which the trend in emissions at the non-violating monitor in the potentially contributing area could be relevant to the evaluation of contribution. For example, a monitor on the border of a nearby county may show a downward trend in $PM_{2.5}$ design values below the level of the standard although a neighboring county has a clearly violating monitor for the current design value period. While the county with the violating monitor will be designated as "nonattainment," the downward trend in the monitor on the border of a nearby county may, along with other evidence from the five factor analysis, support a weight-of-evidence conclusion to exclude the nearby county from being included as part of the nonattainment area. Similarly, an upward trending site may be indicative of growth in nearby contributing emissions sources and provide more weight toward inclusion of the nearby area in the nonattainment area.

### 1.3 $PM_{2.5}$ Compositional Analysis

Measurements of the ambient $PM_{2.5}$ speciation can be used to determine which chemical species constitute $PM_{2.5}$ in the particular area of interest and/or at particular violating monitor(s). Identifying the major chemical species of the $PM_{2.5}$ mass in the area (e.g., sulfate, nitrate, organic carbon, elemental carbon, and crustal material) can provide insight into the types of emissions

sources that are contributing to the monitored $PM_{2.5}$ concentrations at the violating monitor, either from direct $PM_{2.5}$ emissions or from emissions of $PM_{2.5}$ precursor emissions. However, analysis of $PM_{2.5}$ speciation at the violating monitor alone will generally not be able to distinguish between local/nearby source contributions and regional background contributions. This assessment is therefore only one step in establishing a link between nearby emissions sources to violating monitors (i.e., the source types that appear to be important to the violations in the area but not specific facilities). Determining the specific facilities and emissions sources that are contributing to the violations requires the synthesis of results from an "urban increment" analysis, emissions data analysis, and an assessment of meteorological information as explained in subsequent sections.

The $PM_{2.5}$ speciation measurements for some locations are available from the routine urban and rural speciation monitoring networks – the CSN and IMPROVE, respectively. There may not always be a co-located speciation monitor at the exact location of a violating monitor site. In these cases, and where there are other nearby speciation monitors available, measurement data from the nearest monitor can be considered for use in a manner that best represents the conditions at the violating monitor site.

**1.4 Urban Increment Analyses**

$PM_{2.5}$ mass concentrations are generally higher in urban areas compared to surrounding regions. One conceptional model of this is the idea of an "urban increment" from locally generated and largely directly-emitted $PM_{2.5}$ in addition to regional contributions. Among the major contributors to $PM_{2.5}$ mass, the urban increment model generally predicts that sulfate originates mainly from regional sources; organic carbon and nitrate from a mix of regional and local sources; and black carbon and crustal material from local sources. The goal of the urban increment analysis is to estimate the local contribution to urban $PM_{2.5}$ as measured at violating regulatory monitor sites and thereby provide additional evidence to consider in deciding which nearby areas with sources contributing to the monitored violations in the area to include within the boundary of the designated nonattainment area. The urban increment analysis is a key part of the air quality data factor evaluation because it can suggest spatial and temporal correlations between contributing influences and areas by integrating information from violating monitors and $PM_{2.5}$ compositional data as described in the previous sections.

The basic approach for the urban increment analysis is to calculate the difference between the ambient $PM_{2.5}$ speciation levels at an urban area monitoring site and the ambient $PM_{2.5}$ speciation levels at a nearby rural area monitoring site(s). Local contributions to $PM_{2.5}$ speciation can be estimated by subtracting the rural concentration from the urban concentration. Assuming that the rural concentrations represent the regional background concentration, this difference is defined as the urban increment and calculated as follows:

In the equation above, the 'Urban Concentration' will preferably come from the same site as the violating $PM_{2.5}$ design value monitor or a nearby CSN site consistent with conditions at the violating monitor site in cases where a speciation monitor is not co-located with the violating $PM_{2.5}$ design value monitor. The EPA recommends that the calculation of the 'Regional Background Concentration' be prepared using data from IMPROVE monitors within the same airshed as the

violating design value monitor. For the urban increment dataset provided via the EPA PM Designations Website, the Urban Concentration will use $PM_{2.5}$ speciation data from the closest CSN site and the Regional Background Concentration will be calculated using the average of the $PM_{2.5}$ speciation data from IMPROVE sites within 150 miles or the closest IMPROVE site if none are within 150 miles. For each daily value of the $PM_{2.5}$ speciation used in urban increment calculation, data from both the CSN and IMPROVE site(s) must be available.

Linking the previously-described $PM_{2.5}$ speciation assessment with the urban increment analysis can also help identify the likely contributing emissions source types to the local or 'nearby' concentration increment. This is possible because different measured components of the $PM_{2.5}$ mass can be linked to specific types of emissions sources. For example, large stationary sources such as electric generating units (EGUs) are predominant contributors to the sulfate component of $PM_{2.5}$. High nitrate levels often indicate the presence of localized mobile sources, local or regional fuel-combustion sources, or a combination of these sources. Carbonaceous mass is typically associated with mobile sources, wood or biomass burning, and localized combustion sources. Carbonaceous mass is commonly a substantial component of the urban increment. A high elemental carbon to organic carbon mass ratio can be a signature of diesel combustion source contributions, such as diesel trucks, construction engines and vehicles, ships, and trains. A high organic carbon to elemental carbon ratio on the other hand is often a signature of biomass burning, such as residential wood combustion.

In areas experiencing seasonal fluctuations in $PM_{2.5}$ concentrations, it may be useful to perform a compositional analysis of the urban increments during these specific periods and to compare those results to other periods of the year that experience lower or less variable $PM_{2.5}$ concentrations. While all parts of the year are important to determine contributions to the annual average concentration, a quarterly compositional increment analysis in combination with other factor information may provide additional insight into contributing sources and/or contributing factors (e.g., local meteorology) influencing monitored violations. For example, residential wood combustion has a unique PM signature and can contribute appreciably to the organic fraction of wintertime $PM_{2.5}$. A review of both the urban increment results and the seasonal emissions inventory for the area can be an important synthesis analysis to better understand what specific emissions sources, and therefore which areas, may be contributing to a violating monitor.

## 2. Emissions and Emissions-Related Data

The sources and levels of emissions of $PM_{2.5}$-related pollutants are important factors in the initial area designations process. As noted previously, ambient $PM_{2.5}$ is formed through complex atmospheric processes with contributions from direct emissions of particles and from secondarily-formed particles that result from multiple $PM_{2.5}$ precursors. Air quality in a nonattainment area is also typically the result of a combination of regional and local emissions. In the designations process, for each metropolitan area with a violating monitor, the EPA evaluates the emissions data from both individual sources and area sources in nearby counties to assess each county's contribution to $PM_{2.5}$ concentrations at the violating monitor or monitors in the area under evaluation. Because $PM_{2.5}$ components such as sulfate and nitrate are formed through atmospheric processes and can be transported many hundreds of miles, sources of emissions outside the counties comprising the metropolitan area (CBSA or CSA) may also influence the regional

contribution measured at a particular site, but may not be considered in the designation determination to be "nearby" sources. Thus, the evaluation of the area is also a means to differentiate between those transported pollutants from more distant sources of emissions and those sources of emissions in nearby areas that should be part of the designated nonattainment area because they are part of the local nonattainment problem.

For initial area designations associated with the 2024 revised primary annual $PM_{2.5}$ NAAQS, the EPA intends to examine emissions of identified sources of direct $PM_{2.5}$, the major components of direct $PM_{2.5}$ (organic carbon, elemental carbon, crustal material and/or individual trace metal compounds), primary nitrate and primary sulfate, and precursor gaseous pollutants. The EPA anticipates that direct $PM_{2.5}$ emissions sources will generally be local in nature and will influence monitored values in a more direct fashion with little long-range transport. With respect to the gaseous precursors, on the other hand, the EPA anticipates that these will generally be more regional in nature (although the EPA also expects some local $NO_X$ and VOC emissions contributions from mobile and stationary sources) and transport from nearby areas can contribute to higher $PM_{2.5}$ levels at the violating monitors. The EPA recommends that analyses include reviewing data from the latest NEI or other relevant sources if available. Further, the EPA also recommends that the analysis also include examining the magnitude of relevant, county-level emissions and the geographic locations of sources of the relevant pollutants.

Analyzing the magnitude and spatial extent of emissions further informs the analysis of the urban/rural ambient relationship discussed earlier. In addition, combining these analyses (e.g., magnitude of emissions and point of release) with meteorological information can inform the evaluation of the degree of contribution from nearby areas. The EPA will also consider any additional information it receives on changes to emissions levels that are not reflected in the most recent emissions inventories. These changes may include emissions reductions due to permanent and enforceable emissions controls that will be in place before final designations are issued, and likewise may include emissions increases from new sources or increases at existing sources.
For the initial area designations for the 2024 revised primary annual $PM_{2.5}$ NAAQS, the EPA believes that it will be appropriate to use the draft 2022 emissions modeling platform (EMP) inventory version 1 ("2022v1 draft") because that will be the most recent and robust emissions inventory information available at the beginning of this designations process. While the 2022 EMP is not an NEI, it will be developed collaboratively, meaning some air agencies will be participating in the inventory development process. Like the NEI, EMPs include emissions inventories, generally, on an annual basis at the county level. Emissions from large stationary sources are available at a point in space; emissions from large fires are available as point sources for each day. More detailed inventories at a finer resolution than county estimates are also available as part of the EMP and could aid in partial area non-attainment boundary determinations. The 2022v1 EMP will include 12km gridded data. For the final area designations process, the EPA expects to have available the official 2022v1 EMP (which would incorporate comments by stakeholders on the draft 2022v1 EMP and appropriate corrections). Gridded emissions for the final 2022v1 EMP will be generated.

***Population density and degree of urbanization.*** The EPA has consolidated the sub-factors of population density, degree of urbanization, and vehicle use characteristics and trends within the "Emissions and Emissions-Related Data" factor as these elements supplement and help to inform the spatial analysis of emissions data. The EPA intends to provide these data as available, although

the EPA expects that states and Tribes may have independently developed datasets to better inform these elements, which are not available to the EPA. The EPA recommends that population density analyses examine the location and, when available, trends in population growth as potential indicators of the probable location and magnitude of emissions sources that may contribute to $PM_{2.5}$ concentrations in a given nonattainment area.

Related to population density is degree of urbanization, which indicates the relative spatial distribution of the total population of a multi-county metropolitan area across the counties contained in the area. Counties with a higher proportion of the areawide population are more likely to contain emissions sources that tend to be correlated with human activity, such as residential and commercial heating and cooking, vehicle emissions, and nonroad engines.

The NEI also contains county-level aggregate estimates of smaller stationary area and mobile sources emissions (gridded emissions as well as sub-annual emissions come from spatially and temporally allocating the NEI emissions). Emissions from these types of sources are often not reported on a fine scale and are estimated using less refined methods than emissions from larger stationary sources. An analysis of population density, degree of urbanization, and vehicle use characteristics and trends may provide insight into the location of emissions-related activity from these source types within the larger county, and thus may serve as a proxy for the spatial distribution of county-level emissions that may contribute to $PM_{2.5}$ formation in a given area. The EPA recommends that population density and degree of urbanization data from the 2020 U.S. Census be used for these analyses.

***Traffic and commuting patterns***. As with the previous factors discussed above, these factors are also secondary in nature to the actual emissions levels. Traffic and commuting pattern data can help assess the influence of mobile source emissions in a given area. The EPA recommends that analyses examine the location of major transportation arteries and information on traffic volume and commuting in and around the area containing a violating monitor. This would include examining the number of commuters in each nearby county who drive to a county within the area that has a violating monitor, the percent of total commuters in each county who commute to other counties with violating monitors within the metropolitan area, and the total Vehicle Miles Traveled (VMT) for each county. Areas with higher VMT and commuting levels can be an indicator of the location of mobile source emissions that may contribute to $PM_{2.5}$ concentrations at the violating monitor.

The NEI is one source of the county-wide VMT data and facilitates relative comparisons of traffic and commuting patterns between counties in a larger area. However, more detailed assessments provided by states or Tribes could help to highlight the magnitude and location of emissions activity. Along with gridded emissions from the 2022 EMP, the EPA will also provide gridded VMT data; however, as mentioned previously, these estimates may not correspond directly with state-based VMT data to which air agencies may already have access. Table 3.1 details all the datasets that the EPA will provide for use in this process.

**3. Meteorology**

The evaluation of meteorological data helps to determine the effect on the fate and transport of emissions contributing to $PM_{2.5}$ concentrations and to identify areas potentially contributing to the monitored violations. This section of the attachment provides recommendations for summarizing meteorological data and results in support of appropriate nonattainment area boundaries. One basic type of meteorological analysis involves assessing potential source-receptor relationships in the area using summaries of emissions, wind speed, and wind direction data. A more sophisticated assessment involves modeling air parcel trajectories. Even more sophisticated is source apportionment modeling that incorporates extensive meteorological and emissions data into a multi-dimensional photochemical grid model; this approach is discussed in the "Additional Analytical Tools" section of this document.

***HYSPLIT Trajectories.*** Air parcel trajectory models can help understanding of complex transport situations in an area. The HYSPLIT modeling system is useful for illustrating the three-dimensional paths traveled by air parcels over time to a violating monitor. The EPA will provide HYSPLIT trajectories as individual plots as well as part of density maps for the design value period. These depictions will be displayed in the Mapping Tool. Information will be plotted for each violating monitor, for all days within the design value period, as well as for the subset of all days within the design value period that have a 24-hr $PM_{2.5}$ average exceeding the annual standard. HYSPLIT inputs and settings are described in Attachment 4.

**4. Geography/topography**

Consideration of geography or topography can provide additional information relevant to defining nonattainment area boundaries. The EPA recommends that analyses examine the physical features of the land that might define the airshed and, therefore, affect the formation and distribution of $PM_{2.5}$ concentrations over an area. Mountains or other physical features may influence the fate and transport of emissions and $PM_{2.5}$ concentrations. Additional analyses may consider topographical features that cause local stagnation episodes via inversions. Valley-type features can cause local cold-air drainage patterns and vertical temperature inversions that effectively "trap" air pollution. Under these conditions emissions can accumulate leading to periods of elevated $PM_{2.5}$ concentrations. These air drainage patterns and inversions may be limited in extent and therefore may need to be separated from adjacent regions with more conventional air flow and $PM_{2.5}$ concentration patterns. Similarly, the absence of any such geographic or topographic features may also be a relevant consideration in a given nonattainment area.

**5. Jurisdictional boundaries**

Once the geographic extent of the area violating the $PM_{2.5}$ standard and the nearby area contributing to violations is determined, the EPA intends to consider existing jurisdictional boundaries for the purposes of providing a clearly defined legal boundary and carrying out the CAA's air quality planning and enforcement functions for nonattainment areas. Examples of jurisdictional boundaries include, but are not limited to, counties, air districts, areas of Indian country, metropolitan planning organizations, and existing nonattainment areas. The EPA encourages states to also consider federal land boundaries and provide information and/or explanations for including partial or full federal lands in any recommendations to the EPA. If an

existing jurisdictional boundary is used to help define the nonattainment area, it must encompass the entire area that has been identified as meeting the nonattainment definition. Where existing jurisdictional boundaries are not adequate to describe the nonattainment area, other clearly defined and permanent landmarks or geographic coordinates are recommended to be used.

**Synthesizing the Five Factors**

In making designations decisions for nonattainment area boundaries encompassing violating areas and contributing areas, the EPA intends to, and recommends that states and Tribes also, evaluate the five factors together and use a weight-of-evidence approach for this analysis. As explained above, the starting point for evaluating the factors is the air quality analysis. Of particular importance is the location(s) of the violating monitor(s) based on 2021-2023 air quality data and the characteristics of those violations (e.g., speciation and urban increment analyses).[4] Once the characteristics of the violations are established, one can begin to assess which nearby emissions sources or source categories and source regions may have contributed to those violations. This contribution evaluation should generally consider the location and magnitude of emissions, and the potential for these emissions to contribute to the ambient conditions at the violating monitors as informed by the meteorological and geographical/topographical analysis factors. The guiding principle for this evaluation is to include within the boundaries of the nonattainment area, any nearby areas with emissions of $PM_{2.5}$ or $PM_{2.5}$ precursors that have the potential to be transported to the violating monitor. The final factor, jurisdictional boundaries, is recommended to refine the nonattainment area boundary to ensure meaningful and effective air quality planning and regulation of emissions sources during the NAAQS implementation phase.

**Additional Analytical Tools**

While the EPA believes the synthesis evaluation of the five factors in the manner previously discussed is generally comprehensive and sufficient to make weight-of-evidence determinations in establishing nonattainment area boundaries for the 2024 revised primary annual $PM_{2.5}$ NAAQS, in some cases the EPA recognizes that it may also be useful to employ one or more of the additional analytical tools and approaches described below. These approaches involve combining inputs of emissions data, air quality information, and meteorology in an effort to evaluate the contributions from nearby areas to monitor violations. Due to the time and resources necessary to develop the inputs, run the models, and interpret the results, the EPA generally expects these analytical tools and approaches to be beyond what is necessary to inform nonattainment area boundaries. Nonetheless, there may be circumstances where undertaking such an effort could be highly beneficial to identify relative contributions qualitatively or quantitatively from source areas to violating monitors.

This section provides limited information regarding additional quantitative techniques that the EPA has experience with in past designations efforts. They include: (i) the weighted emissions score (WES); (ii) the contributing emissions score (CES); and (iii) source apportionment modeling (SAM). States may find WES and SAM useful, with some modifications, in preparing designations recommendations for the

---

[4] The EPA also anticipates considering 2024 air quality data in making final designations decisions. The entire year of that air quality data may not be fully available to states and Tribes during the period they are developing their designations recommendations.

2024 revised primary annual $PM_{2.5}$ standard. The CES should not be used to inform the 2024 revised primary annual $PM_{2.5}$ NAAQS initial area designations because it was designed specifically for a 24-hour standard, and therefore will not be further discussed in this document. The EPA does not plan to provide WES or SAM assessments for any areas as part of the area designations process for the 2024 revised primary annual $PM_{2.5}$ NAAQS. Where these additional analytical tools and approaches are used, the results of these approaches should be considered just one part of an overall assessment of the potential nonattainment area boundaries.

States and Tribes may also consider the potential value of additional methods beyond WES and SAM, such as receptor modeling techniques (e.g., Positive Matrix Factorization (PMF) and Chemical Mass Balance (CMB)) and advanced statistical analyses (e.g., non-parametric regression and cluster analyses) to better understand contributing influences to air quality. Because of the EPA's limited experience applying such techniques to the designations factor analysis, the EPA recommends that states and Tribes intending to use such methods consult with their EPA Regional office regarding their usage and intended applications.

Whenever states or Tribes elect to generate or use additional analytical tools or approaches (such as those identified in this section) in developing their nonattainment area recommendations, the EPA expects them to provide all the necessary underlying input data and model specifications, and provide detailed descriptions of the methodological approach and model evaluation so that the EPA can adequately evaluate the technical validity of the approach and results. In considering any of these additional approaches it is important to remember that the EPA's assessment of potential nonattainment area boundaries is based on all of the information available to the Agency for all of the factors identified in the EPA's designations memorandum. The EPA will base its final decisions on attainment and nonattainment areas on a collective assessment of the five factors.

***Weighted Emissions Score (WES).*** The WES analysis takes the urban increment compositional fractions of $PM_{2.5}$ determined through the technique described in Section 1.4 and applies them to each county's fraction of total emissions in the urban area for each PM species. In this manner it attempts to evaluate the level of contribution of a county's emissions to a violating monitor site by weighting each county's emissions by the fractional component observed at the violating monitor. The basic steps are as follows:

Step 1. The counties to be analyzed in relation to each urban area are first identified.
Step 2. For each analysis area, the urban increment compositional fraction of $PM_{2.5}$ mass is calculated according to the methodologies described in Section 1.4 above.
Step 3. The next step involves calculating, for each pollutant, the percentage of analysis area emissions attributable to each county (counties within and adjacent to the CBSA/CSA as applicable).
Step 4. The county's percentage of analysis area emissions for each pollutant is then multiplied by the corresponding $PM_{2.5}$ component percentage of urban increment mass.
Step 5. Sum the results for each $PM_{2.5}$ species within each county to get the county WES.
The EPA recommends that WES be regarded simply as one tool to evaluate the relative importance of multi-pollutant emissions from one county to others in the same nonattainment area. The WES of a county in one nonattainment area is not a suitable point of comparison to the WES of a county in another nonattainment area; the WES is only a meaningful tool to

evaluate the relative contribution of counties within the same nonattainment area. This analysis must be considered in combination with other air quality and emissions-related information, as well as information supporting the meteorology and geography factors, to support more specific conclusions.

***Source Apportionment Modeling*.** Source apportionment modeling (SAM) is another aggregation technique which may be useful to assess contribution to elevated $PM_{2.5}$ levels and thereby to help identify possible areas for inclusion in the nonattainment area because of their contribution to violations in nearby areas with violating monitors. SAM can track the contribution of directly-emitted $PM_{2.5}$ and $PM_{2.5}$ precursors at a receptor from any number of user-defined source regions and source types. Emissions are tracked with source apportionment through $PM_{2.5}$ formation, transport, and deposition processes in the host photochemical model (Yarwood, et al., 2007).[5] SAM combines into a single analysis several of the factors that the EPA believes are important for determining nonattainment area boundaries: emissions, meteorology, and geography/topography.

If a state chooses to conduct SAM, the EPA recommends that at least one entire year be modeled to capture as many source-receptor transport patterns as possible. Further, the EPA recommends that states and Tribes follow the relevant EPA guidance for photochemical modeling attainment demonstrations when establishing their SAM platform. In establishing the parameters of a SAM exercise, the violating monitors establish the receptors in the analysis. The EPA recommends that source regions include any and all nearby contributing areas broken out into appropriate jurisdictional areas (e.g., all CBSA/CSA counties and adjacent counties, or partial counties where appropriate, associated with the violation). When summarizing the outputs from the SAM, it is suggested that the relative contributions from nearby source regions be compared against one another. The primary metric from the SAM is the source region's contribution to the $PM_{2.5}$ annual mean. A threshold quantity indicating substantial influence will vary with local conditions, so that it is not possible to establish a clear-cut, universal threshold contribution level. However, a relative comparison of source regions should ensure capturing the relevant nearby contributing emissions sources within the nonattainment area.

[5] Yarwood, G., Morris, R. E., & Wilson, G. M. (2007). Particulate matter source apportionment technology (PSAT) in the CAMx photochemical grid model. In *Air pollution modeling and its application XVII* (pp. 478-492). Boston, MA: Springer US.

**ATTACHMENT 4**

## Preparing and Running a HYSPLIT Modeling Analysis for Evaluating Nonattainment Area Boundaries for the 2024 Revised Primary Annual $PM_{2.5}$ NAAQS Designations

The Hybrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT)[1] model is frequently used to produce trajectories for assessments associated with determining area boundaries. The trajectory model uses meteorological analysis and forecast fields from regional or global models to compute advection and stability of air parcels.

For these designations, HYSPLIT trajectories are plotted for each violating monitor, for all days within the design value period, as well as for the subset of all days within the design value period that have a 24-hr $PM_{2.5}$ average exceeding the annual standard. Backward trajectories may illustrate potential source regions for the air that affected the monitor on high concentration days. However, HYSPLIT trajectories alone do not conclusively indicate the contribution to a measured high concentration of $PM_{2.5}$, and HYSPLIT should not be used in isolation to determine an area boundary.

A HYSPLIT backward trajectory is usually depicted as a single line extending backward in time from a monitor location starting point. This single line should not be misinterpreted as having finer accuracy than the underlying meteorological model and data. For illustrating several years of backward trajectories, hundreds of lines can be confusing. Heat maps illustrating areas of high frequency of trajectory lines may be used to summarize the many trajectories.

The HYSPLIT trajectories contained in the $PM_{2.5}$ Designations Mapping Tool were prepared using HYSPLIT version 5.2.1. The input meteorology is the North American Mesoscale Forecast System (NAM) 12 km.[2] While HYSPLIT offers the user several options for vertical motion parameters within the model, these trajectories are computed using the vertical motion calculated by the NAM12 meteorology input.

Start times for backward trajectories are chosen to best coincide with times of maximum $PM_{2.5}$ concentrations. The Integrated Science Assessment[3] showed two typical periods of $PM_{2.5}$ concentration maxima, generally 0800 and 2200 local standard time (LST). Backward trajectories were initiated at these times for each day of the 2000-2022 period, with a trajectory length of 24 hours. Trajectories are computed with a starting elevation of 500 meters above ground level.[4] This height provides a good balance between remaining within the mixed layer at most times while avoiding terrain influences at lower elevations.

HYSPLIT output files containing latitude and longitude plot points for each trajectory will be posted on the EPA's Particle Pollution Designations Guidance and Data website.

---

[1] *https://www.arl.noaa.gov/hysplit/.*
[2] *ftp.arl.noaa.gov/archives/nam12.*
[3] U.S. EPA. Integrated Science Assessment (ISA) for Particulate Matter (Final Report, Dec 2019). U.S. Environmental Protection Agency, Washington, DC, EPA/600/R-19/188, 2019.
[4] Stein et al. (2016) NOAA's HYSPLIT Transport and Atmospheric Dispersion Modeling System, Bulletin of the American Meteorological Society (BAMS), 96(12): 2059-2077.