ORAL ARGUMENT NOT YET SCHEDULED

No. 24-1050 (and consolidated cases)

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

COMMONWEALTH OF KENTUCKY, et al.,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

# FINAL BRIEF OF STATE AND LOCAL GOVERNMENT RESPONDENT-INTERVENORS

ROB BONTA
Attorney General of California
TRACY L. WINSOR
Senior Assistant Attorney General
MYUNG J. PARK
CHRISTIE VOSBURG
Supervising Deputy Attorneys General

STACY LAU
COREY M. MOFFAT
JONATHAN A. WIENER
Deputy Attorneys General
455 Golden Gate Ave.
Suite 11000
San Francisco, CA 94114
(415) 510-3549
Jonathan.Wiener@doj.ca.gov

*Attorneys for Respondent-Intervenor State of California*

*Additional counsel listed in signature pages*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties, Intervenors, and Amici

All parties, intervenors, and amici appearing in these consolidated cases are listed in the Briefs of Petitioners, with the exceptions of the following:

*Amici supporting Petitioners*: Midwest Ozone Group

*Amici supporting Respondents:* WE ACT for Environmental Justice; West End Revitalization Association; South Bronx Unite; Community Health Aligning Revitalization, Resistance & Sustainability; National Parks Conservation Association; Environmental Protection Network; and Institute for Policy Integrity at New York University School of Law.

### B. Rulings Under Review

The ruling under review is listed in the Briefs for Petitioners.

### C. Related Cases

Aside from these consolidated petitions, there are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

## TABLE OF CONTENTS


CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........ ii

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iv

GLOSSARY ........ viii

INTRODUCTION ........ 1

STATUTES AND REGULATIONS ........ 2

STATEMENT OF THE CASE ........ 2

SUMMARY OF ARGUMENT ........ 2

ARGUMENT ........ 4

I. EPA Had Ample Authority for Its Targeted Reconsideration of the 2020 Rule ........ 4

A. The Clean Air Act authorizes targeted reconsiderations of NAAQS rules ........ 4

B. Statutory structure and prior consistent practice confirm EPA's authority for targeted reconsideration ........ 7

C. Any error would be harmless ........ 11

II. No Reliance Interests Weighed Against Reconsideration. ..... 13

III. EPA Was Prohibited from Considering Implementation Costs in its Reconsideration ........ 14

A. Section 109 Does Not Permit Consideration of Costs, At Any Step of the Standard-Setting Process .... 14

B. Requiring EPA to Consider Implementation Costs Violates the Statute's Cooperative-Federalism Structure ........ 18

C. Petitioners Do Not Articulate a Non-Delegation Problem ........ 23

## TABLE OF CONTENTS

IV. The Record Fully Justifies the Standard that Resulted from EPA's Reconsideration Process. .................................... 24

CONCLUSION ........................................................................... 27

CERTIFICATE OF COMPLIANCE ........................................................... 33

CERTIFICATE OF SERVICE ................................................................ 34

## TABLE OF AUTHORITIES

**Cases**

*Am. Farm Bureau Fed'n v. EPA*
559 F.3d 512 (D.C. Cir. 2009)............................................................ 8, 9

*Am. Methyl Corp. v. EPA*
749 F.3d 826 (D.C. Cir. 1984).................................................................6

*Am. Textile Mfrs. Inst. v. Donovan*
452 U.S. 490 (1981)........................................................................... 23

*Am. Trucking Ass'ns. v. EPA*
175 F.3d, 1027 (D.C. 1999) ............................................................. 8, 16

*Bell Atl. Tel. Cos. v. FCC*
79 F.3d 1195 (D.C. Cir. 1996)............................................................. 14

**Clean Air Council v. Pruitt*
862 F.3d 1 (D.C. Cir. 2017)............................................................ 4, 5, 7

*FCC v. Fox Television Stations, Inc.*
556 U.S. 502 (2009)..............................................................................9

*Lead Indus. Ass'n. v. EPA*
647 F.2d 1130 (D.C. Cir. 1980)...................................................... 17, 26

*Michigan v. EPA*
576 U.S. 743 (2015)......................................................................... 16, 17

*Mississippi v. EPA*
744 F.3d 1334 (D.C. Cir. 2013)............................................ 1, 6, 8, 9, 26

**Murray Energy Corp. v. EPA*
936 F.3d 597 (D.C. Cir. 2019)............................... 9, 10, 15, 16, 17, 23, 27

---

* Authorities chiefly relied upon are marked with asterisks.

**TABLE OF AUTHORITIES**

**Page**

*Nat. Res. Def. Council v. EPA*
902 F.2d 962 (D.C. Cir. 1990)........................................................... 16

*Nat. Res. Def. Council v. EPA*
438 F. Supp. 3d 220 (S.D.N.Y. 2020) .................................................. 14

*New Jersey v. EPA*
517 F.3d 574 (D.C. Cir. 2008)..............................................................6

*Ohio v. EPA*
144 S. Ct. 2040 (2024)....................................................................... 23

*Physicians for Soc. Responsibility v. Wheeler*
956 F.3d 634 (D.C. Cir. 2020)........................................................... 13

*Portland Cement Ass'n v. EPA*
665 F.3d 177 (D.C. Cir. 2011)..............................................................7

*Sierra Club v. Costle*
657 F.2d 298 (D.C. Cir. 1981)........................................................... 11

*Solenex LLC v. Bernhardt*
962 F.3d 520 (D.C. Cir. 2020)........................................................... 13

*Train v. Nat. Res. Def. Council*
421 U.S. 60 (1975).............................................................................. 19

*Union Elec. Co. v. EPA*
427 U.S. 246 (1976)...................................................................... 18, 19

*Watson v. U.S.*
552 U.S. 74 (2007)........................................................................ 17, 18

* *Whitman v. Am. Trucking Ass'ns Inc.*
531 U.S. 457 (2001)........................................................ 14, 15, 16, 17, 23

## TABLE OF AUTHORITIES

**Page**

**STATUTES**

United States Code, Title 42
§ 7401(a)(3) ........ 18
§ 7407(a) ........ 18
§ 7407(d)(1)(B)(i) ........ 9
§ 7408(a)(2) ........ 5
§ 7409 ........ 1
§ 7409(b) ........ 4, 9
§ 7409(b)(1) ........ 1, 26
*§ 7409(d)(1) ........ 2, 4, 5, 6
§ 7410 ........ 18
§ 7410(a)(5)(A)(iii) ........ 19
§ 7410(g) ........ 19
§ 7410(l) ........ 19
§ 7411(b)(1)(B) ........ 5
§ 7412(d)(6) ........ 5
§ 7502(e) ........ 9
§ 7607(b) ........ 8
§ 7607(d)(1)(A) ........ 7
§ 7607(d)(7)(B) ........ 3, 4, 7
§ 7607(d)(8) ........ 3, 11, 12
§ 7607(d)(9)(A) ........ 9
§ 7607(d)(9)(D) ........ 3

**FEDERAL REGISTER**

68 Fed. Reg. 614 (Jan. 6, 2023) ........ 8

81 Fed. Reg. 35,824 (June 3, 2016) ........ 5

85 Fed. Reg. 82,684 (Dec. 18, 2020) ........ 1

*89 Fed. Reg. 16,202 (Mar. 6, 2024) ........ 1, 5, 24, 25, 27

# TABLE OF AUTHORITIES

**Page**

**STATE AUTHORITIES**


310 Mass. Code Regs. 7.25 ........ 20

310 Mass. Code Regs. 7.11(1)(b) ........ 20

Texas Comm'n on Envtl. Quality, Houston-Galveston-Brazoria 2008 Eight-hour Ozone Severe Area Attainment Demonstration State Implementation Plan Revision........ 21

Tex. Nat. Res. Conservation Comm'n, Control of Air Pollution from Motor Vehicles, Ch. 114-Rule Log No. 2001-025a-114-A ........ 21


**CONGRESSIONAL BILLS**


H.R. 4400 (1981) ........ 18

H.R. 2401 (2011) ........ 17

H.R. 3409 (2012) ........ 18

H.R. 1388 (2015) ........ 18

H.R. 5505 (2014) ........ 18

S.2882 (2016) ........ 18


**OTHER AUTHORITES**


Executive Order 12866 ........ 21

Executive Order 13563 ........ 21

Letter from Alabama Energy Institute, et al. to Scott Pruitt, EPA Administrator (Sept. 6, 2017) ........ 10

OMB Circular A-4 ........ 21

# GLOSSARY

| | |
|---|---|
| **The 2020 Rule** | Review of the National Ambient Air Quality Standards for Particulate Matter, 85 Fed. Reg. 82,684 (Dec. 18, 2020) |
| **The 2024 Rule** | Reconsideration of the National Ambient Air Quality Standards for Particulate Matter**,** 89 Fed. Reg. 16,202 (Mar. 6, 2024) |
| **The Act** | The Clean Air Act |
| **EPA** | United States Environmental Protection Agency |
| **EPA Br.** | Brief of United States Environmental Protection Agency |
| **Indus. Br.** | Brief of Industry and Arizona Coalition Petitioners |
| **Kentucky Br.** | Brief of State Petitioners |
| **NAAQS** | National Ambient Air Quality Standards |
| **NGO Br.** | Brief of Health, Environmental, and Community Intervenors |
| **$\mu g/m^3$** | Micrograms per cubic meter |

## INTRODUCTION

This case concerns the "centerpiece" of the Clean Air Act's National Ambient Air Quality Standards ("NAAQS") program, the health-based standards set by the U.S. Environmental Protection Agency (EPA) and implemented by States. *Mississippi v. EPA*, 744 F.3d 1334, 1339 (D.C. Cir. 2013) (citing 42 U.S.C. § 7409). Those standards must reflect the level "requisite to protect the public health" with an "adequate margin of safety," 42 U.S.C. § 7409(b)(1).

In December 2020, EPA declared the standards for particulate matter did not need to be strengthened to meet that requirement. 85 Fed. Reg. 82,684 (Dec. 18, 2020) (the 2020 Rule). In June 2021, heeding calls from many State Intervenors and others, EPA announced it would reconsider that decision.

Petitioners now challenge the result of that reconsideration, 89 Fed. Reg. 16,202 (Mar. 6, 2024) (the 2024 Rule), relying on strained interpretations of the Clean Air Act (the Act) that are inconsistent with the statute's text, structure, and decades of precedent and practice. But EPA was well within its authority to reconsider the 2020 Rule. And the agency's careful reconsideration of the scientific record, and its proper refusal to consider prohibited factors like costs, fully supported its decision in 2024 to

strengthen the standards for fine particulate matter to a new level the agency found was requisite to protect public health with an adequate margin of safety.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in the addenda to this brief, the Opening Brief of Industry and Arizona Coalition Petitioners ("Industry Br."), and Respondents' Brief ("EPA Br.").

## STATEMENT OF THE CASE

State Intervenors rely on the statements of the case in Respondents' Brief and the Brief of Health, Environmental and Community Intervenors ("NGO Br.").

## SUMMARY OF ARGUMENT

EPA had ample authority to undertake a targeted reconsideration of the 2020 Rule. State Intervenors agree with EPA, Br. 28-45, that the Act gives EPA authority to timely reconsider NAAQS rules, and that this authority is confirmed, rather than displaced, by the NAAQS program's periodic-review provision, 42 U.S.C. § 7409(d)(1). Industry Petitioners are incorrect that EPA could not reconsider the 2020 Rule without also conducting the original rulemaking from scratch and reviewing de novo all available scientific literature on the health effects of fine particulate matter. In this brief, State

Intervenors explain that statutory structure, precedent and prior practice all confirm that EPA could target its reconsideration. And even if Industry Petitioners were correct that EPA lacked authority under Section 109(d)(1) to undertake reconsideration without completing a full periodic review, such reconsideration would plainly have been authorized by the mandatory reconsideration authority in Section 307(d)(7)(B), 42 U.S.C. § 7607(d)(7)(B). Accordingly, Petitioners have identified, at most, a harmless procedural error, which provides no grounds for repealing or vacating the 2024 Rule. *See* 42 U.S.C. §§ 7607(d)(8), (9)(D).

EPA's decision to reconsider the 2020 Rule was also substantively reasonable. There is no evidence EPA had an improper motive or failed to consider reliance interests. EPA Br. 75-79, 85-86. State Intervenors write separately to also explain that any hypothetical reliance interests engendered by the 2020 Rule would not have been reasonable.

EPA's reconsideration was also properly limited to the relevant statutory factors of protecting public health and ensuring an adequate margin of safety. Petitioners' claim that EPA was required to consider countervailing interests, such as implementation costs, is foreclosed by precedent from the U.S. Supreme Court and this Court. As EPA explains, Br. 45-52, Petitioners' contrary argument, that the Act's direction that EPA

revise the NAAQS "as may be appropriate" requires EPA to weigh implementation costs, finds no basis in the statutory text or case law. And as explained below, Petitioners' argument fails to account for the primary role of the States in implementing the NAAQS.

Finally, the record contains extensive evidence of the harm to public health from exposure to fine particulate matter at the level allowed by the 2020 Rule, and strongly supports the need for the public health protections provided by the 2024 Rule.

## ARGUMENT

### I. EPA Had Ample Authority for Its Targeted Reconsideration of the 2020 Rule

#### A. The Clean Air Act authorizes targeted reconsiderations of NAAQS rules

As this Court has recognized, EPA is "free to" partially reconsider its Clean Air Act rules, "so as long as the new policy is permissible under the statute, there are good reasons for it, and the agency believes it to be better." *Clean Air Council v. Pruitt*, 862 F.3d 1, 14 (D.C. Cir. 2017) (cleaned up) (citing 42 U.SC. § 7607(d)(7(B)). Here, EPA timely reconsidered and revised the 2020 Rule consistent with its authority to promulgate and revise NAAQS rules under Section 109, 42 U.S.C. §§ 7409(b), (d)(1). *See* EPA Br.

28-29; JA2797, JA2801[R-6025_118,122] (invoking general reconsideration authority).[1]

Nothing in the Act displaces this authority to reconsider recently promulgated NAAQS rules. All Industry Petitioners can point to, Br. 25-27, is Section 109(d)(1), 42 U.S.C. § 7409(d)(1). But that two-sentence provision *confirms*, rather than displaces, EPA's reconsideration authority.

Section 109(d)'s first sentence requires EPA to conduct comprehensive periodic reviews both of standards promulgated under Section 109(b) and of "air quality criteria" (the underlying scientific evidence of a given pollutant's effects on public health, *see* EPA Br. 4-5) issued under Section 108(a)(2), 42 U.S.C. § 7408(a)(2). Similar periodic-review provisions appear in many other Clean Air Act sections, including the same section that authorized the regulations at issue in *Clean Air Council*. *See* 81 Fed. Reg. 35,824, 35,829 (June 3, 2016) (citing 42 U.S.C. § 7411(b)(1)(B)); *see also* 42 U.S.C. § 7412(d)(6). The "non-discretionary duty," EPA Br. 35, Section 109(d)(1) imposes is not designed for "rectifying mistaken actions." Indus.

---

[1] The timeliness of EPA's reconsideration is undisputed. The agency announced it would reconsider the 2020 Rule just six months after promulgating it, noting that EPA's own policy assessment had concluded the underlying scientific evidence "called into question" whether the rule was adequate to protect public health with an adequate margin of safety. 89 Fed. Reg. at 16,210.

Br. 25 (citing *Am. Methyl. Corp. v. EPA*, 749 F.3d 826, 836 (D.C. Cir. 1984)). Rather, it involves multiple separate "stages" as part of a "yearslong" process, *Mississippi*, 744 F.3d, at 1346, 1349, and is distinct from EPA's authority to otherwise reconsider or revise its NAAQS rules.

This requirement ensures that EPA keeps pace with a broad array of scientific developments relevant to all air quality criteria and standards for a given pollutant. And the deadline to conduct this periodic review remains unchanged by any reconsideration of a prior NAAQS rule. *See* EPA Br. 43; JA28000[R-6025_121]. EPA's authority for targeted reconsideration thus does not "thereby writ[e]" the provision "out of the statute," and therefore is not displaced by that provision. *Am. Methyl*, 749 F.2d at 836; *see also New Jersey v. EPA*, 517 F.3d 574, 583 (D.C. Cir. 2008) (displacement where implicit reconsideration authority would "nullify" delisting provision).

The second sentence of Section 109(d)(1) also does not cabin EPA's reconsideration authority—it merely clarifies that the duty to conduct comprehensive periodic reviews of criteria and NAAQS does not prevent EPA from acting sooner or more frequently to either "review and revise criteria *or* promulgate new standards." 42 U.S.C. § 7409(d)(1) (emphasis added). This sentence, too, complements rather than displaces EPA's reconsideration authority. *See* EPA Br. 29-44.

### B. Statutory structure and prior practice confirm EPA's authority for targeted reconsideration

Beyond Section 109 itself, other provisions of the Act support EPA's authority to reconsider the parts of the 2020 Rule that warranted it, without conducting a full review of all the underlying scientific literature potentially relevant to other parts of the Rule.

For instance, under the Act's mandatory reconsideration provision, Section 307(d)(7), EPA *must* reconsider regulations, expressly including new and revised Section 109 standards, 42 U.S.C. §7607(d)(1)(A), when confronted with centrally relevant objections arising after the public comment period. *Id.* §7607(d)(7)(B). When EPA initiates reconsideration proceedings under this provision, those proceedings target the portions of the rule to which the objection applies: the agency is not required to reconsider everything anew. *See, e.g., Portland Cement Ass'n v. EPA*, 665 F.3d 177 (D.C. Cir. 2011) (upholding partial denial of reconsideration); *see also Clean Air Council*, 862 F.3d at 5 (no jurisdiction to review partial grant of reconsideration). And even when EPA does not initiate mandatory reconsideration proceedings, it still retains the authority to do so voluntarily. *Clean Air Council*, 862 F.3d. at 14. Nothing about this provision "in any way limits EPA's authority to reconsider" rules voluntarily. *Id.*

This Court and EPA have also embraced targeted reconsideration under the Act's judicial review provision, Section 307(b), 42 U.S.C. § 7607(b), further confirming that the Act does not prohibit it. That provision does not limit the relief available to parties challenging unlawful standards to an entirely new and years-long review of both criteria and standards. Indeed, this Court has consistently remanded discrete portions of NAAQS rules to EPA, without requiring the agency to reopen every part of those rules. *See, e.g., Mississippi*, 744 F.3d at 1362 (remanding one ozone standard but not the other); *Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 528-31 (D.C. Cir. 2009) (remanding standards for fine particulate matter but not larger particles); *Am. Trucking Ass'ns, Inc. v. EPA*, 175 F.3d 1027, 1053 (D.C. 1999) ("*ATA I*") (remanding for agency "to determine whether … tropospheric ozone has a beneficent effect, and if so, then to assess ozone's net adverse health effect by whatever criteria it adopts") (subsequent history omitted). And EPA can and sometimes does respond with a similarly targeted reconsideration. *See, e.g.,* 68 Fed. Reg. 614 (Jan. 6, 2023) (response to *ATA I* remand).

Contrary to Industry Petitioners' claims, Br. 27, EPA's authority to undertake targeted reviews and revisions is bounded by the Act. Section 109(b) continues to prescribe the factors for EPA to consider in setting or

revising standards. EPA Br. 41-42 (citing 42 U.S.C. § 7409(b)). Likewise, the Act's anti-backsliding provision ensures that any time EPA revises a NAAQS standard to a less-protective level, that revision will not cause air quality to erode in areas of the country designated non-attainment with the prior standard. *Sierra Club v. EPA*, 47 F.4th 738, 741 (D.C. Cir. 2022) (describing 42 U.S.C. § 7502(e)).[2]

EPA also remains subject to the Clean Air Act's arbitrary-and-capricious standard of review, 42 U.S.C. § 7607(d)(9)(A), which this Court has used for decades to police NAAQS revisions. *See, e.g., Am. Farm Bureau*, 559 F.3d at 528-31; *Mississippi*, 744 F.3d at 1361-62; *Murray Energy Corp. v. EPA*, 936 F.3d 597, 616-19 (D.C. Cir. 2019). EPA therefore must, for example, acknowledge and explain changes in position, provide a "more detailed justification" when changing its views on previously relied-upon scientific evidence, and consider any serious reliance interests that may have been engendered by its prior decision. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

---

[2] These designations must be made within two years of promulgation of a standard, 42 U.S.C. § 7407(d)(1)(B)(i), less time than typically taken for a full periodic review. Petitioners' argument thus would mean EPA could never revise a NAAQS to a less-stringent level in time to avoid triggering this provision.

Nor is there anything novel about EPA voluntarily taking a targeted approach to reconsideration of a NAAQS rule. *See* EPA Br. 80. Indeed, the last three Administrations have all announced plans to review and potentially reconsider recently promulgated standards, each time without restarting the full periodic-review process. In addition to those instances EPA describes, Br. 79, the agency told this Court in early 2017 that it intended to "closely review" and potentially reconsider the 2015 ozone NAAQS, and that "positions taken by the Agency with respect to the 2015 Rule may not necessarily reflect its ultimate conclusions after that review is complete." *Murray Energy v. EPA*, D.C. Cir. No. 15-1385, ECF#1670218 at 1 (April 7, 2017).

Many Petitioners appear to have recognized EPA's authority to quickly revise the 2015 rule via targeted voluntary reconsideration. With implementation deadlines approaching, many Petitioners nonetheless agreed to hold their challenges to the rule in abeyance so that EPA could reconsider it. *Id*. at 2. And Petitioner American Petroleum Institute, along with many members of other Petitioners, called for EPA to "expeditiously reconsider" the 2015 rule before that standard could be implemented. Letter from Alabama Energy Institute, et al. to Scott Pruitt, EPA Administrator (Sept. 6, 2017) (on file with American Petroleum Institute),

https://www.api.org/news-policy-and-issues/letters-or-comments/2017/09/06/state-coalition-letter-to-epa-regarding-naaqs (last visited Sept. 9, 2024). Nobody at the time suggested EPA lacked authority to conduct a partial reconsideration, and Petitioners' attempt to disavow that authority now rings hollow.

### C. Any error would be harmless

Industry Petitioners' authority argument fails for the additional and independent reason that they cannot show the procedural error they allege is anything but harmless. Under the Act's harmless error provision, a reviewing court may not invalidate a rule for a procedural error unless the error is "so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made." 42 U.S.C. § 7607(d)(8). "The essential message of so rigorous a standard is that Congress was concerned that EPA's rulemaking not be casually overturned for procedural reasons…." *Sierra Club v. Costle*, 657 F.2d 298, 391 (D.C. Cir. 1981).

Industry Petitioners cannot meet this burden. They argue that EPA could not *voluntarily* reconsider the 2020 Rule without also fully reviewing and revising the underlying criteria under Section 109(d)(1). But they ignore

that the agency could have undertaken the same targeted review via *mandatory* reconsideration, under Section 307(d)(7), *see supra* p. 7. Specifically, EPA could have granted the petitions for administrative reconsideration timely filed by coalitions of States and health and environmental groups. JA1321[R-1241]; JA1455[R-1242]. Those petitions pointed to new evidence and changed rationales that required EPA to initiate reconsideration. *See also* NGO Br. 8. And if EPA had formally granted those still-pending petitions, nothing about the 2024 Rule likely would have changed. As noted above, Section 307(d)(7) allows for EPA to conduct targeted reconsideration proceedings and does not require EPA to conduct the original rulemaking proceeding from scratch, or to do anything else differently than it did here.

EPA thus would have been able to follow the exact same process Petitioners say was prohibited here. Simply by granting the petitions for reconsideration, EPA could have reviewed the same evidence, received the same comments, and even drawn the same conclusions. Petitioners thus cannot show a "substantial likelihood that the rule would have been significantly changed," and thus are not entitled to relief under the Act. 42 U.S.C. § 7607(d)(8).

## II. No Reliance Interests Weighed Against Reconsideration

State Petitioners claim that, even if EPA could have reconsidered the 2020 Rule, it should not have done so, because of unspecified reliance interests the 2020 Rule might have engendered. Kentucky Br. 32. As EPA notes, Br. 86, State Petitioners do not even attempt to identify any such reliance interests, let alone claim that reliance on the 2020 Rule was reasonable. Such "unidentified and unproven reliance interests are not a valid basis on which to undo agency action." *Solenex LLC v. Bernhardt*, 962 F.3d 520, 529 (D.C. Cir. 2020). Rather, reliance "must be specifically identified, reasonably incurred, and causally tied" to the prior action. *Id*.

State Petitioners' allusions to reliance meet none of those requirements. The 2024 Rule imposed no obligations on anyone, neither requiring states to submit implementation plans nor altering the regulatory landscape for sources large enough to need permits. And even if parties might sometimes be able to rely on EPA decisions not to strengthen health-based NAAQS, *contra* EPA Br. 86, nobody could reasonably have done so with the 2020 Rule. That rule was under a cloud of legal uncertainty from the outset. Even before it was published, this Court had already found fault with the underlying process. *Physicians for Soc. Responsibility v. Wheeler*, 956 F.3d

634, 644-48 (D.C. Cir. 2020) (purge of key scientific advisory committees unjustified); *see also Nat. Res. Def. Council v. EPA*, 438 F. Supp. 3d 220, 231-234 (S.D.N.Y. 2020) (same). And after publication, the 2020 Rule was almost immediately subject to petitions for both judicial review and administrative reconsideration, NGO Br. 8. *See Bell Atl. Tel. Cos. v. FCC*, 79 F.3d 1195, 1207 (D.C. Cir. 1996) (no reasonable reliance interests where "[t]he state of the law has never been clear, and the issue has been disputed since it first arose").

## III. EPA Was Prohibited from Considering Implementation Costs in its Reconsideration

### A. Section 109 Does Not Permit Consideration of Costs, At Any Step of the Standard-Setting Process

Petitioners' arguments that EPA erred by not considering costs as part of its reconsideration are indistinguishable from arguments previously rejected by the Supreme Court and this Court, and they fail for the same reasons.

As an initial matter, Petitioners necessarily concede that binding case law prohibits EPA from considering implementation costs or attainability when setting a standard. Indus. Br. 31. Indeed, the Supreme Court unanimously held that the Act "unambiguously bars cost considerations from the NAAQS-setting process." *Whitman v. Am. Trucking Ass'ns Inc.*,

531 U.S. 457, 471 (2001).[3] Rejecting the argument that the statute's use of the words "requisite" and "adequate" meant that EPA should consider implementation costs, the Court noted that the issue of costs "is *both* so indirectly related to public health *and* so full of potential for canceling the conclusions drawn from direct health effects that it would surely have been expressly mentioned in §§ 108 and 109 had Congress meant it to be considered." *Whitman*, 531 U.S. at 469 (emphasis in original). Indeed, consideration of implementation costs was the proverbial elephant that inspired Justice Scalia's famous statement that Congress "does not alter fundamental details of statutory schemes in vague or ancillary provisions." *Id*. at 468.

Industry Petitioners attempt to distinguish *Whitman* and similar cases by limiting them to initial standards promulgated only under Section 109(b), rather than standards revised or promulgated pursuant to Section 109(d)'s periodic-review provision. Industry Br. 31. That distinction is untenable. *See* EPA Br. 48-49. *Whitman* itself considered standards promulgated under Section 109(d), as did this Court in *Murray Energy*. *Whitman*, 531 U.S. at

[3] Those "costs considerations" include the "adverse economic, social, and energy impacts," of the sort Petitioners argue EPA had to consider here. *Murray Energy*, 936 F.3d at 621-22.

462; *Murray Energy*, 936 F.3d at 605. Moreover, this Court has held that there is "no legally relevant difference" between EPA's ability to consider costs when promulgating standards under section 109(b) and when doing so under section 109(d). *ATA I*, 175 F.3d at 1040.

Petitioners point to the word "appropriate" and invent a two-step process for EPA to follow under Section 109(d). Indus. Br. 33-42. In Petitioners' telling, EPA must consider costs in first determining *whether* it is "appropriate" to promulgate new or revised standards, and only then can it determine based on public-health factors alone, what the "appropriate" new or revised standards should be.

This effort to smuggle cost considerations into the standard-setting process fails for the same reasons prior attempts did. Just like "requisite" and "adequate," *Whitman*, 531 U.S. at 468-69, the word "appropriate" lacks a clear textual commitment to considering costs. Even before *Whitman*, a long line of precedent from this Court "emphatically stated that § 109 does not permit EPA to consider such costs in promulgating national ambient air quality standards." *Nat. Res. Def. Council v. EPA*, 902 F.2d 962, 973 (D.C. Cir. 1990), opinion vacated in part, 921 F.2d 326 (D.C. Cir. 1991).

None of this precedent was disturbed by *Michigan v. EPA*, 576 U.S. 743 (2015). Petitioners claim *Michigan*'s "*principles* require consideration

of costs here." Indus. Br. 29 (emphasis added). But *Michigan*'s text says the opposite: it expressly reaffirmed *Whitman*'s core holding that section NAAQS "does not encompass cost; it encompasses health and safety." 576 U.S. at 755. Four years later, this Court reiterated that *Michigan* did not revive the "already rejected [] idea that 'appropriate' in section 109(d) requires consideration of economic costs." *Murray Energy*, 936 F.3d at 622. As this Court recognized, *Michigan* "involved a different provision of the Clean Air Act," "emphasize[d] that its reading of 'appropriate' was dependent on the statutory context" and "explicitly distinguished" the provision it was analyzing "from section 109(b)(1)." *Id.*

Though *Michigan* did not change the law on this point, Congress, then as now, "remains free to alter" it. *Watson v. U.S.*, 552 U.S. 74, 82 (2007). But "only Congress, not the courts and not EPA, can make" that choice. *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1150 (D.C. Cir. 1980); *Murray Energy,* 936 F.3d at 624. And while Congress has regularly considered whether to override this precedent and make costs relevant to EPA's setting or revising of NAAQS, it has each time declined to do so. *E.g.*, H.R.2401 (2011) (House-passed bill would have required the Administrator "to take into consideration feasibility and cost" "[i]n establishing any national primary or secondary ambient air quality standard under section 109");

H.R.3409 (2012) (same); *see also, e.g.,* H.R. 4400 (1981) (introduced bill); H.R.5505 (2014) (same); H.R.1388 (2015) (same); S.2882 (2016) (same). "[T]his long congressional acquiescence has enhanced even the usual precedential force" that applies in cases of statutory stare decisis. *Watson*, 552 U.S. at 82-83 (quotations omitted).

### B. Requiring EPA to Consider Implementation Costs Violates the Statute's Cooperative-Federalism Structure

Besides "creat[ing] a gaping hole" in the NAAQS program and being "practically unworkable," EPA Br. 52, Petitioners' attempt to selectively shoehorn cost considerations into Section 109(d)'s use of the word "appropriate" runs afoul of the Clean Air Act's cooperative-federalism structure. That structure makes air pollution and prevention "the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3). This is especially true under the NAAQS program, which tasks States with evaluating the potential implementation strategies available to them and choosing for themselves, subject to the need to attain the standards, which strategies are most suitable for their jurisdictions. *See Union Elec. Co. v. EPA*, 427 U.S. 246, 266-69 (1976); *see also* 42 U.S.C. §§ 7407(a), 7410 (describing state implementation plans). Indeed, it has long been settled that judgments about how to implement the NAAQS are the prerogative of States

in the first instance. *See Union Elec.*, 427 U.S. at 269 ("Congress plainly left with the States, so long as the national standards were met, the power to determine which sources would be burdened by regulation and to what extent."); *see also Train v. Nat. Res. Def. Council.*, 421 U.S. 60, 79 (1975) ("[T]he State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation.").

Furthermore, the Act requires each State to engage in a public-notice-and-hearing process with its residents before issuing or revising an implementation plan, which can further affect the ultimate selection of any pollution-reduction measures in that State. *See* 42 U.S.C. § 7410(*l*). And once a State Implementation Plan is approved, States can still revisit their judgments and revise their plans. 42 U.S.C. § 7410(a)(5)(A)(iii); *see also id.* § 7410(g) (temporary emergency suspensions of plan provisions).

By design, the costs of implementing standards are thus left to States and their residents to judge. EPA cannot know in advance how a single State, let alone all States, may decide to implement the standards in their jurisdictions, nor reliably determine the costs of those unknown decisions. *See* JA0335[R-5839_173] (pollution control strategies "will be developed by States on a case-by-case basis, and the EPA cannot predict whether the control options selected by States will include regulations on energy

suppliers, distributors, or users."). Indeed, States may vary in how they value the costs and benefits of different control strategies, and may, for example choose strategies that could appear less cost-effective but that have important co-benefits for the State or protect strategically important industries or activities.

For instance, as part of their implementation strategies for prior standards:

- California air regulators funded a leafblower trade-in program in Los Angeles that reduced not just air pollution but also noise. JA1544[R-1501_231].
- Massachusetts limited emissions of volatile organic compounds (chemicals which can contribute to higher levels of ozone and particulate matter) from paints, adhesive coatings, and consumer products like deodorant, reducing both smog formation in the ambient air and direct exposure to harmful pollutants. *See* 310 MASS. CODE REGS. 7.25. Massachusetts similarly prohibited motor-vehicle idling. *Id.* 7.11(1)(b)
- Texas provided motorists with no-cost towing for mechanical breakdowns on freeways in the Houston-Galveston area,

> reducing emissions, congestion, and hazardous road conditions. *See* TEXAS COMM'N ON ENVTL. QUALITY, HOUSTON-GALVESTON-BRAZORIA 2008 EIGHT-HOUR OZONE SEVERE AREA ATTAINMENT DEMONSTRATION STATE IMPLEMENTATION PLAN REVISION, APPENDIX E, at 4-5 (2024); *see also* TOW AND GO, https://www.towandgo.com (last visited Sept. 8, 2024). Previously, Texas also adopted restrictions on the hours diesel construction equipment could operate in the same area, only to abandon them in favor of alternative measures that would not burden the local construction industry. TEX. NAT. RES. CONSERVATION COMM'N, CONTROL OF AIR POLLUTION FROM MOTOR VEHICLES, Ch. 114-Rule Log No. 2001-025a-114-AI.[4]

EPA cannot be expected to have foreseen when setting standards that States would adopt these alternative strategies, among many others, let alone to have anticipated the costs and benefits these strategies would entail.[5]

---

[4] https://wayback.archive-it.org/414/*/https://www.tceq.texas.gov/assets/public/legal/rules/hist_rules/Complete.01s/01025a114/01025a114_ado.pdf (last visited Sept. 9, 2024).

[5] To be sure, EPA prepared a Regulatory Impact Analysis for this Rule, which estimated costs pursuant to an entirely separate federal mandate and for informational purposes only. JA0167[R-5839_5]; *see generally* Executive Order 13563, Executive Order 12866, OMB Circular A-4. That (continued…)

This problem would be exacerbated by Petitioners' rewriting of the statute. In that telling, EPA must consider whether unforeseen costs and benefits are "appropriate" when deciding *whether* to revise or promulgate new standards, *i.e.*, before EPA even knows the stringency of the standards that will result. *See* EPA Br. 52. That added blind spot would render even more speculative the other guesses EPA would need to hazard: (1) which counties or metropolitan areas within States will be designated non-attainment with the as-yet-to-be-determined standard, (2) which of the many possible implementation strategies States might choose to bring those areas into attainment, and (3) how much those undetermined implementation strategies might cost to implement. It defies text and logic to think Congress prohibited EPA from considering costs the agency could only guess at when EPA sets standards, but required EPA to consider those same costs when deciding *whether* to set standards in the first place.

---

document acknowledged the difficulty of estimating implementation costs. Final Regulatory Impact Analysis (Jan. 2024), https://tinyurl.com/39dext8w, p. 214 (noting analysis considered "only one potential pathway for controlling emissions"); *id*. at 216 (describing limitations of assessing applicability and appropriateness of control technology); *id.* at 251-52 ("EPA does not know what specific actions states will take to design their [implementation plans] to meet a revised standard."). But, even without accounting for State creativity, it shows that the 2024 NAAQS is well worth their estimated costs. *See* Amicus Br. of Inst. for Policy Integrity, 13-16.

Even if EPA had a crystal ball, the agency would still lack authority to decide whether the costs States might choose to bear in their implementation plans are "appropriate." That is a choice for each individual State to make in the first instance, and EPA cannot "question the wisdom" of those choices. *Ohio v. EPA*, 144 S. Ct. 2040, 2048 (2024).

### C. Petitioners Do Not Articulate a Non-Delegation Problem

State Petitioners also invoke the nondelegation doctrine, Br. 41-43, as a reason for EPA to consider costs and other implementation-related issues. But their argument, that EPA's interpretation of precedent somehow violates the doctrine, at best repackages arguments previously rejected by the Supreme Court and this Court. *See Whitman,* 531 U.S. at 473-74 (non-delegation "is a question for the courts"); *Murray Energy*, 936 F.3d at 624 ("EPA's interpretation of the Act cannot alter whether the Act included an intelligible principle."). And as was true in those cases, the nondelegation doctrine does not justify delegating more authority to federal agencies. Indeed, as the *Whitman* court noted, authorizing an agency to consider costs is more likely to cause a nondelegation problem than to solve one. 531 U.S. at 473-74; *see also Am. Textile Mfrs. Inst. v. Donovan,* 452 U.S. 490, 545 (1981) (Rehnquist, J., dissenting). That concern has particular force here,

when the additional authority Petitioners seek to give the agency would intrude on authority expressly preserved for the States. *See supra* pp. 18-23.

## IV. THE RECORD FULLY JUSTIFIES THE STANDARD THAT RESULTED FROM EPA'S RECONSIDERATION PROCESS

Properly limited to considering public health factors, EPA reasonably determined that strengthening the annual primary standard to at least 9 μg/m$^3$ was requisite to protect public health with an adequate margin of safety. The record fully supports this determination.

EPA's determination was based on a careful review of "the full body of scientific evidence," including not just the evidence cited in the air quality criteria issued in 2019 that underlay the 2020 Rule, but also newly available studies that had not been fully considered. JA2705[R_6025_26]; *see also* 89 Fed. Reg. 16,202, 16,203. EPA supplemented the 2019 air quality criteria with a document its science advisors described as a "comprehensive evaluation of the new scientific information published since the 2019" criteria, including a "thorough" summary of health effects. JA1996[R-1587_2]; *see also* EPA Br. 18-21 (describing this supplement).

While the evidence considered in the 2019 air quality criteria alone already supported strengthening the annual standard to 9 μg/m$^3$, *see* NGO Br. 7, the newly available evidence addressed in the supplement further

compelled that conclusion. That evidence included several new studies showing that exposure to fine particulate matter at concentrations just above 9 μg/m$^3$ increases mortality and causes other severe health harms. Those studies, covering tens of millions of Americans, consistently found causal relationships between mortality and exposure to fine particulate matter at mean concentrations between 9.3 and 9.9 μg/m$^3$ . See JA1525, JA1527[R-1471_1,3]; JA1951[R-1585_3-88]; JA1484[R-1394]; *see also* JA1516[R-1441] (causal association with hospital readmission among kidney dialysis patients at mean concentration of 9.3 μg/m$^3$). Additionally, recent studies from Canada had found a causal relationship between fine particulate matter and mortality at even lower levels of exposure. *See*, *e.g.*, JA1992, JA1993[R-1585_A-26,29] (describing 2019 and 2020 studies with mean exposure ranging from 6.7 to 9.7 μg/m$^3$).

As EPA explained, these studies supported setting the standard at 9 μg/m$^3$, because that level was just below the lowest long-term mean concentration in the key epidemiologic studies. 89 Fed. Reg. at 16,279. In other words, it was just below where most of the data in these studies—and thus the most support for the reported adverse effects—was clustered. *Id.* And the agency's decision that setting the standards at that level was

necessary to protect public health with an adequate margin of safety marked a return to its historical approach. *See* EPA Br. 60-64.

Faced with this new evidence further supporting stronger standards, Petitioners do not point to any significant, or even relevant, scientific developments they say EPA should have accounted for. EPA Br. 43. Instead, Petitioners again resort to a previously rejected line of attack, arguing EPA's technical judgment was arbitrary because some of this evidence was subject to scientific uncertainty. Kentucky Br. 34-37. But all scientific evidence is subject to some degree of uncertainty, and setting NAAQS in particular involves "inevitable scientific uncertainties." *Mississippi*, 744 F.3d at 1344. And Congress designed the Clean Air Act "precisely to permit [EPA] to act in the face of uncertainty." *Lead Indus. Ass'n*, 647 F.2d at 1155. Specifically, Congress directed EPA to "err on the side of caution" when making decisions to protect public health, and required that standards contain "an adequate margin of safety." *Id*. at 1153 (quoting 42 U.S.C. § 7409(b)(1)).

EPA considered and acknowledged these uncertainties in the 2024 Rule. EPA Br. 70-74. Moreover, EPA found that the record here reduced uncertainties the agency had relied on in the 2020 Rule. For example, multiple new studies better accounted for confounding variables. *See*, *e.g.*,

89 Fed. Reg. at 16,257 (citing JA1491[R-1424]); JA1989, JA1994[R-1585_3-126,A-42]). EPA's "additional certainty that the line marked by the term 'requisite' has shifted is a reasonable—if not paradigmatic—basis for EPA to revise its prior standards." *Murray Energy,* 936 F.3d at 620.

**CONCLUSION**

The Court should deny the petitions.

Dated: October 15, 2024

Respectfully submitted,

ROB BONTA
Attorney General of California
TRACY L. WINSOR
Senior Assistant Attorney General
MYUNG J. PARK
CHRISTIE VOSBURG
Supervising Deputy Attorneys General

*/s/ Jonathan A. Wiener*
JONATHAN A. WIENER
STACY LAU
COREY M. MOFFAT
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3549
Jonathan.Wiener@doj.ca.gov

FOR THE STATE OF ARIZONA

KRISTIN K. MAYES,
ATTORNEY GENERAL

_/s/ Kristin M. Wrobel_
KRISTIN M. WROBEL
Assistant Attorney General
Environmental Protection Unit
2005 N. Central Ave
Phoenix, AZ 85004
(602) 542-8594
ENVProtect@azag.gov

FOR THE STATE OF CONNECTICUT

WILLIAM TONG
ATTORNEY GENERAL

_/s/ Jill Lacedonia_
MATTHEW I. LEVINE
Deputy Associate Attorney General
JILL LACEDONIA
Assistant Attorney General
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
(860) 808-5250
jill.lacedonia@ct.gov

FOR THE STATE OF ILLINOIS

KWAME RAOUL
ATTORNEY GENERAL

_/s/ Jason E. James_
JASON E. JAMES
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental Enforcement/
Asbestos Litigation Division
Office of the Attorney General
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(872) 276-3583
jason.james@ilag.gov

FOR THE STATE OF MARYLAND

ANTHONY G. BROWN
ATTORNEY GENERAL

_/s/ Michael F. Strande_
MICHAEL F. STRANDE
Assistant Attorney General
Office of the Attorney General
Maryland Dept. of the Environment
1800 Washington Blvd.
Baltimore, MD 21230
(410) 537-3014
Michael.Strande@maryland.gov

FOR THE COMMONWEALTH OF MASSACHUSETTS

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

*/s/ Turner Smith*
TURNER SMITH
Assistant Attorney General & Deputy Chief
BRIAN CLAPPIER
Assistant Attorney General
MARCUS HOLMES
Assistant Attorney General
Energy & Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
Turner.Smith@mass.gov

FOR THE PEOPLE OF THE STATE OF MICHIGAN

*/s/ Elizabeth Morrisseau*
ELIZABETH MORRISSEAU
Assistant Attorney General
Environment, Natural Resources, and Agriculture Division
6th Floor G. Mennen Williams Building
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
MorrisseauE@michigan.gov

FOR THE STATE OF MINNESOTA

KEITH ELLISON
ATTORNEY GENERAL

*/s/ Peter N. Surdo*
PETER N. SURDO
Special Assistant Attorney General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 757-1061
Peter.Surdo@ag.state.mn.us

FOR THE STATE OF NEW JERSEY

MATTHEW J. PLATKIN
ATTORNEY GENERAL

*/s/ Lisa Morelli*
LISA MORELLI
Deputy Attorney General
Division of Law
25 Market Street
P.O. Box 093
Trenton, NJ 08625-093
609-376-2740
lisa.morelli@law.njoag.gov

FOR THE STATE OF NEW YORK

LETITIA JAMES
ATTORNEY GENERAL

/s/ *Michael J. Myers*
BARBARA D. UNDERWOOD
Solicitor General
JUDITH N. VALE
Deputy Solicitor General
ELIZABETH A. BRODY
Assistant Solicitor General
MICHAEL J. MYERS
Senior Counsel
NICHOLAS C. BUTTINO
Assistant Attorney General
Environmental Protection Bureau
The Capitol
Albany, NY 12224
(518) 776-2382
michael.myers@ag.ny.gov

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
ATTORNEY GENERAL

/s/ *Paul Garrahan*
PAUL GARRAHAN
Attorney-in-Charge
STEVE NOVICK
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.oregon.gov
Steve.Novick@doj.oregon.gov

FOR THE COMMONWEALTH OF PENNSYLVANIA

MICHELLE A. HENRY
ATTORNEY GENERAL

/s/ *Ann R. Johnston*
ANN R. JOHNSTON
Assistant Chief Deputy Attorney General
Civil Environmental Enforcement Unit
Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
717-497-3678
ajohnston@attorneygeneral.gov

FOR THE STATE OF RHODE ISLAND

PETER F. NERONHA
ATTORNEY GENERAL

/s/ *Alison Hoffman Carney*
ALISON HOFFMAN CARNEY
Assistant Attorney General
Chief, Environment and Energy Unit
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 ext 2116
acarney@riag.ri.gov

FOR THE STATE OF VERMONT

CHARITY R. CLARK
ATTORNEY GENERAL

*/s/ Melanie Kehne*
MELANIE KEHNE
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Melanie.kehne@vermont.gov

FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
ATTORNEY GENERAL

*/s/ Christopher H. Reitz*
CHRISTOPHER H. REITZ
Assistant Attorneys General
Office of the Attorney General
P.O. Box 40117
Olympia, Washington 98504-0117
(360) 586-4614
chris.reitz@atg.wa.gov

FOR THE STATE OF WISCONSIN

JOSHUA L. KAUL
ATTORNEY GENERAL

*/s/ Bradley J. Motl*
BRADLEY J. MOTL
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 267-0505
motlbj@doj.state.wi.us

FOR THE DISTRICT OF COLUMBIA

BRIAN L. SCHWALB
ATTORNEY GENERAL

*/s/ Caroline S. Van Zile*
CAROLINE S. VAN ZILE
Solicitor General
Office of the Attorney General for the District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

FOR THE CITY OF NEW YORK

MURIEL GOODE-TRUFANT
ACTING CORPORATION COUNSEL

*/s/ Christopher Gene King*
CHRISTOPHER GENE KING
Senior Counsel, Environmental Law Division
NATHAN TAYLOR
Senior Counsel
New York City Law Department
100 Church Street
New York, NY 10007
212.356.2074
cking@law.nyc.gov

FOR HARRIS COUNTY, TEXAS

*/s/ Sarah Jane Utley*
SARAH JANE UTLEY
Environmental Division Director
ELIZABETH HIDALGO
Assistant County Attorney
1019 Congress Plaza, 15th Floor
Houston, Texas 77002
713.274.5124
Sarah.Utley@cao.hctx.net

IRVINE & CONNER PLLC
CHARLES IRVINE
JANET CAMPOS
4709 Austin Street
Houston, Texas 77004
713.533.1704
charles@irvineconner.com

*Attorneys for Harris County, Texas*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitations of the applicable rules and this Court's briefing format order dated May 14, 2024 (ECF#2054255). According to Microsoft Word, the portions of this document not excluded by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1) contain 5,351 words. Combined with the word count of the Brief of Respondent-Intervenor Health and Environmental Groups, this does not exceed the 11,700 words the Court allocated to all Respondent-Intervenors. I further certify that this brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared using a proportionally spaced typeface (Times New Roman) in 14-point font.

Dated: October 15, 2024

*/s/ Jonathan A. Wiener*

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the Court's CM/ECF system. I further certify that all parties are participating in the Court's CM/ECF system and will be served electronically by that system.

Dated: October 15, 2024

*/s/ Jonathan A. Wiener*