ORAL ARGUMENT HELD ON DECEMBER 16, 2024

Case No. 24-1050 and Consolidated Cases

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE D.C. CIRCUIT

_____

COMMONWEALTH OF KENTUCKY, ET AL.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.,
*Respondents*.

_____

On Petitions for Review of Action by Environmental Protection Agency

_____

## RESPONDENTS' MOTION FOR VACATUR

_____

*Of Counsel*:
ISABELLA SMITH
    U.S. Environmental Protection
    Agency
    Office of General Counsel

ADAM R.F. GUSTAFSON
    *Principal Deputy Assistant Attorney
    General*

ROBERT N. STANDER
    *Deputy Assistant Attorney General*

SARAH IZFAR
ZOE B. PALENIK
    *Trial Attorneys*
    U.S. Department of Justice
    Environmental Defense Section
    P.O. Box 7611
    Washington, DC 20044
    (202) 532-3050
    Sarah.izfar@usdoj.gov

    *Counsel for Respondents*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................... iii

GLOSSARY ................................................................................................. vi

INTRODUCTION .......................................................................................... 1

BACKGROUND ............................................................................................ 4

      A.    Statutory background ............................................................... 4

      B.    Regulatory and procedural background ................................. 6

STANDARD OF REVIEW ............................................................................ 9

ARGUMENT ............................................................................................... 10

I.     EPA lacks statutory authority to revise standards absent a thorough review. ........................................................................ 10

      A.    Section 109(d)(1) requires EPA to complete a thorough review before revising a NAAQS. ........................................ 11

      B.    Section 109(b) does not provide standalone revision authority. ............................................................................... 15

II.    EPA unreasonably ignored costs when deciding whether to undertake a discretionary mid-cycle review. ................................. 18

III.   Vacatur is appropriate because EPA exceeded its statutory authority and failed to consider a relevant aspect of the problem. ..................................................................................... 21

CONCLUSION ............................................................................................ 23

CERTIFICATE OF COMPLIANCE .......................................................... 25

(Page 2 of Total)

# TABLE OF AUTHORITIES

## CASES

*Air All. Hous. v. EPA,*
  906 F.3d 1049 (D.C. Cir. 2018) .......................................................................22

*Allied- Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ................................................................... 21, 22

*Am. Equity Inv. Life Ins. v. SEC,*
  613 F.3d 166 (D.C. Cir. 2010) .......................................................................23

*Block v. Cmty. Nutrition Inst.,*
  467 U.S. 340 (1984) ........................................................................................14

*Catawba Cnty., N.C. v. EPA,*
  571 F.3d 20 (D.C. Cir. 2009) ..........................................................................19

*Davis v. Mich. Dep't of Treasury,*
  489 U.S. 803 (1989) ........................................................................................12

*Entergy Corp. v. Riverkeeper, Inc.,*
  556 U.S. 208 (2009) ........................................................................................19

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ........................................................................................15

*Genus Med. Techs. LLC v. FDA,*
  994 F.3d 631 (D.C. Cir. 2021) ........................................................................17

*Ivy Sports Med., LLC v. Burwell,*
  767 F.3d 81 (D.C. Cir. 2014) ..................................................................... 11, 12

*Limnia, Inc. v. DOE,*
  857 F.3d 379 (D.C. Cir. 2017) ........................................................................22

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ........................................................................................10

*Marx v. Gen. Revenue Corp.,*
  568 U.S. 371 (2013) ........................................................................................17

iii

*Michigan v. EPA,*
   576 U.S. 743 (2015) ................................................................ 19, 21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,*
   463 U.S. 29 (1983) ............................................................. 9, 10, 21

*New Jersey v. EPA,*
   517 F.3d 574 (D.C. Cir. 2008) ...................................................12

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
   566 U.S. 639 (2012) ....................................................................17

*Ross v. Blake,*
   578 U.S. 632 (2016) ....................................................................17

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
   985 F.3d 1032 (D.C. Cir. 2021) ..................................................22

*Sw. Airlines Co. v. Saxon,*
   596 U.S. 450 (2022) ....................................................................12

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.,*
   484 U.S. 365 (1988) ....................................................................15

*Van Buren v. United States,*
   593 U.S. 374 (2021) ................................................................ 16-17

*Waterkeepers Chesapeake v. FERC,*
   56 F.4th 45 (D.C. Cir. 2022) ......................................................22

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) ....................................................................12

**STATUTES**

42 U.S.C. § 7407(d) ..........................................................................9

42 U.S.C. § 7407(d)(1)(A) ...............................................................5

42 U.S.C. § 7407(d)(1)(B) .......................................................... 5, 23

42 U.S.C. § 7407(d)(1)(B)(i) ..........................................................14

42 U.S.C. § 7408 ...................................................................... 3, 4, 11

iv

42 U.S.C. § 7408(a)(2) ........................................................4

42 U.S.C. § 7409 ...............................................................4

42 U.S.C. § 7409(b) ................................... 2, 3, 4, 5, 15, 18

42 U.S.C. § 7409(b)(1) .................................................. 11, 16

42 U.S.C. § 7409(b)(2) .....................................................11

42 U.S.C. § 7409(d) ...........................................................2

42 U.S.C. § 7409(d)(1)...................... 5, 11, 12, 13, 16, 17, 18, 19

42 U.S.C. § 7409(d)(2).....................................................16

42 U.S.C. § 7410(a)(1) ................................................... 6, 14

42 U.S.C. § 7475 ................................................................5

42 U.S.C. § 7502(e) ...........................................................6

42 U.S.C. § 7513a(a)(2) ....................................................14

42 U.S.C. § 7607(d) ...........................................................4

42 U.S.C. § 7607(d)(9)................................................... 9, 21

42 U.S.C. § 7607(d)(9)(A) .................................................4

42 U.S.C. § 7607(d)(9)(C) ..................................................3

Pub. L. No. 91-604, 84 Stat. 1676 (1970).............................16

**FEDERAL REGISTER**

44 Fed. Reg. 56730 (Oct. 2, 1979)........................................6

62 Fed. Reg. 38652 (July 18, 1997) ....................................14

85 Fed. Reg. 82684 (Dec. 18, 2020) ................................ 7, 23

89 Fed. Reg. 16202 (Mar. 6, 2024)................... 1, 7, 8, 9, 18, 21

v

# GLOSSARY

| | |
|---|---|
| Act | Clean Air Act |
| EPA | United States Environmental Protection Agency |
| $\mu g/m^3$ | Micrograms per cubic meter |
| NAAQS or standard | National Ambient Air Quality Standard |
| $PM_{2.5}$ | Fine particulate matter (particles with a diameter less than 2.5 micrometers) |
| $PM_{10}$ | Coarse particulate matter (particles with a diameter less than 10 micrometers) |
| RTC | Response to Comments |
| Rule | Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," 89 Fed. Reg. 16202 (Mar. 6, 2024) |

**INTRODUCTION**

In March 2024, for the first time in nearly fifty years, EPA finalized a purported "reconsideration" of a national ambient air quality standard (NAAQS or standard), a central component of the Clean Air Act. It did so based on a novel interpretation of the statute and without the "thorough review" of the underlying air quality criteria and related standards required by the Act. *See* "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," 89 Fed. Reg. 16202 (Mar. 6, 2024) (Rule). EPA announced its intent to proceed with this regulatory shortcut only months after it had completed a thorough review of the air quality criteria and NAAQS for particulate matter. The result was an unlawful tightening of the annual standard for fine particulate matter ($PM_{2.5}$) from 12.0 $\mu g/m^3$ to 9.0 $\mu g/m^3$, without the rigorous, stepwise process that Congress required. EPA now confesses error and urges this Court to vacate the Rule before the area designation deadline of February 7, 2026.

For decades, EPA has interpreted section 109(d)(1) of the Act to require a thorough review of all aspects of the air quality criteria and related standards before revising a NAAQS. *See* Declaration of Aaron Szabo ¶¶ 9-11, 14-15, 17-21, Ex. A. Until 2024, each time EPA has revised a particulate matter standard it has conducted a thorough review of the relevant air quality criteria and related standards for the relevant pollutant. *Id*.

1

The Rule took a new approach, asserting for the first time in a final rule that EPA may partially "reconsider" a NAAQS outside of a thorough review by "supplementing" the prior review with a limited selection of additional studies and revising the NAAQS on that basis alone. *Id*. ¶¶ 36-38. EPA conceded that this limited analysis was not a thorough review. *Id*.

EPA also took the position that, in deciding whether to revise a NAAQS on a voluntary basis outside the thorough review process, it could not consider the costs associated with its discretionary action. The result was a standard, considered in isolation, that imposed extraordinary costs without the scientific rigor Congress required before imposing such costs in the ordinary course. *Id*. ¶ 26.

In this litigation, EPA initially defended the Rule, arguing that the second sentence of section 109(d)(1) independently authorizes EPA to revise a NAAQS at any time without first initiating and completing the thorough review required under the first sentence of section 109(d)(1). At oral argument, however, the panel proposed a different source of standalone revision authority, located in section 109(b). *See* 42 U.S.C. § 7409(b), (d). That provision was not the basis asserted in the Rule, and EPA has never attempted to bypass section 109(d)(1) by relying solely on section 109(b). Szabo Decl. ¶ 40. To view section 109(b) that way

2

contradicts decades of agency practice and improperly reads section 109(d)'s requirements out of the statute.

EPA has concluded that the position it advanced earlier is erroneous. The best reading of section 109(d)(1) is that EPA must complete a thorough review of the underlying criteria and corresponding standards before deciding to revise a standard. That follows from the text of section 109(d)(1) and its surrounding provisions, including section 108, which requires that criteria reflect the "latest scientific knowledge," and section 109(b), which provides that standards are "based on" the underlying criteria. *See* 42 U.S.C. §§ 7408, 7409(b). Revising a standard without a full review of the underlying criteria or related standards is not a thorough review. Moreover, the second sentence of 109(d)(1) must be read in context with the first and cannot dispense with the thorough review requirement for revising a standard.

Because EPA based its action on an erroneous interpretation of the statute and exceeded its authority by revising the standard without initiating and completing a thorough review, this Court should vacate the Rule. *Id.* § 7607(d)(9)(C).

In the alternative, EPA exercised any discretionary authority it may have had unreasonably by refusing to consider the costs associated with undertaking such a

3

revision mid-cycle.  The Court should therefore vacate the Rule because EPA failed to consider an important aspect of the problem.  *Id*. § 7607(d)(9)(A).

## BACKGROUND

### A.    Statutory background

The Act requires that EPA establish NAAQS to protect public health and welfare.  *Id.* § 7409(b).  EPA promulgates the standards in accordance with the substantive and procedural requirements of sections 109 and 307(d).  *See id.* §§ 7409, 7607(d).

Two sections govern the establishment and revision of the NAAQS.  Section 108 directs EPA to identify and list certain air pollutants and then to issue air quality criteria for those pollutants.  *Id.* § 7408.  Air quality criteria must "accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of [a] pollutant in the ambient air, in varying quantities."  *Id.* § 7408(a)(2).  Then, section 109 directs the Administrator to propose and promulgate "primary" and "secondary" NAAQS "based on such criteria" for the relevant pollutants.  *Id.* § 7409(b).  Section 109(b) defines primary standards as standards, "the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and allowing an adequate margin of safety,

4

are requisite to protect the public health." *Id.* This provision also states that primary standards "may be revised in the same manner as promulgated." *Id.*

Under section 109(d)(1), EPA must complete a "thorough review" of the underlying air quality criteria and related NAAQS "at five-year intervals." *Id.* § 7409(d)(1). After completing this review, EPA "shall make such revisions in such criteria and standards and promulgate such new standards as may be appropriate in accordance with section [108] and subsection (b) of [section 109]." *Id.* The second sentence of section 109(d)(1) provides that EPA "may review and revise criteria or promulgate new standards earlier or more frequently than required under this paragraph." *Id.*

Revising a standard triggers various statutory obligations for States, EPA, and regulated parties. As of the revision's effective date, permit applicants (including those with pending applications) must demonstrate that any new or modified major stationary source will not cause, or contribute to, a violation of the standard. *Id.* § 7475. Within one year of promulgation, States must identify and submit to EPA initial designations of whether areas in their jurisdictions meet the standard. *Id.* § 7407(d)(1)(A) (*e.g.*, designations of attainment, nonattainment, and unclassifiable). Generally, within two years EPA shall promulgate final designations. *Id.* § 7407(d)(1)(B). Within three years, States must submit revised plans that provide for implementation, maintenance, and enforcement of the

5

standard. *Id.* § 7410(a)(1). Ultimately, the Act contemplates that implementing a revised standard involves a long and resource-intensive process.

Once an area is designated nonattainment, EPA cannot "rela[x]" the applicable NAAQS unless it promulgates controls "not less stringent than the controls applicable to areas designated nonattainment before such relaxation." *Id.* § 7502(e). For that reason, the statute's textual requirements for revising the NAAQS bear particular importance.

### B.    Regulatory and procedural background

EPA first promulgated standards for particulate matter in 1971 and has completed five "thorough review[s]" to date under section 109(d)(1). Szabo Decl. ¶¶ 8-21. In 1997, EPA decided to maintain separate criteria and standards for fine particulate matter, $PM_{2.5}$, and coarse particulate matter, $PM_{10}$. *Id.* ¶ 12. EPA revised certain NAAQS for $PM_{2.5}$ in 2006 and 2012, and in 2020 retained the existing NAAQS following a thorough review. *Id.* ¶¶ 15-21; *see also* 89 Fed. Reg. at 16208. Across these actions, EPA consistently followed its position that any revised standard "necessarily entails the thorough additional review of criteria as contemplated in Section 109(d)(1) of the Clean Air Act" and "would be based on, and announced concurrently with, the final revised criteria document." 44 Fed. Reg. 56730, 56731 (Oct. 2, 1979) (initiating first review). Until 2024, EPA had never revised the particulate matter standards without relying on its section

6

109(d)(1) authority and completing a thorough review of the air quality criteria. Szabo Decl. ¶¶ 36, 38.[1]

Since 2008, EPA has completed the thorough review of air quality criteria by drafting and finalizing an Integrated Science Assessment that examines peer-reviewed literature, published since the previous review cycle, on all identifiable effects of the pollutant on public health or welfare. 89 Fed. Reg. at 16207-08. In 2020, EPA completed a thorough review, which included reviewing an Integrated Science Assessment completed in 2019 (the 2019 Assessment), and issued a final decision explaining that the Administrator would retain the existing primary and secondary $PM_{10}$ and $PM_{2.5}$ standards. 85 Fed. Reg. 82684 (Dec. 18, 2020) (2020 Rule), JA1256.[2] That decision was therefore based on the available scientific evidence and data pertinent to the air quality criteria, as well as the Advisory Committee's advice and public comment. *Id*.

In January 2021, Executive Order 13,990 (now rescinded) ordered a review of the 2020 Rule. Szabo Decl. ¶ 22. A few months later, EPA announced that it

---

[1] EPA once proposed to "reconsider" and revise a NAAQS outside the "thorough review" process, but President Obama and OIRA Administrator Cass Sunstein instructed EPA not to finalize the reconsideration rule due to concerns regarding the "regulatory costs and burdens" associated with such a mid-cycle reconsideration. *See* Letter from Cass R. Sunstein, Administrator, OIRA, to Lisa P. Jackson, Administrator, EPA (Sep. 2, 2011), available at: https://obamawhitehouse.archives.gov/sites/default/files/ozone_national_ambient_air_quality_standards_letter.pdf.
[2] Petitions challenging the 2020 Decision are currently in abeyance pending the Court's decision in this case. *California v. EPA*, No. 21-1014 (D.C. Cir.).

7

would undertake a limited "reconsideration" of the 2020 Rule focused on key scientific topics.[3]  *Id.* ¶ 23.  To that end, the agency developed a "supplement" to the 2019 Assessment (the 2022 Supplement) and a revised policy assessment.  *Id.* The 2022 Supplement selected and analyzed several new studies on a targeted basis covering only part of the scientific literature supporting the 2020 Rule.  *See* 2022 Supplement at ES-i, 1-2, JA1845, 1849.

Importantly, EPA admitted that the 2022 Supplement did not "represent [a] full multidisciplinary evaluation of evidence" for the underlying air quality criteria. *See* 2022 Supplement at ES-i, JA1845.  Thus, EPA's 2022 Supplement did not "satisfy the EPA's obligation to periodically complete a thorough review of the air quality criteria."  Response to Comments (RTC) at 121, JA2800; *see also* 89 Fed. Reg. at 16212.  EPA explained that there were other effects related to the air quality criteria, such as respiratory effects, reproductive and developmental effects, and nervous system effects, that were not updated in this partial reconsideration of the 2020 thorough review.  RTC at 73, 121, JA2800, 2752.  Instead, EPA purported to evaluate a limited set of new studies, in conjunction with the full body

---

[3] *See* Press Release, EPA, EPA to Reexamine Health Standards for Harmful Soot that Previous Administration Left Unchanged (June 10, 2021) available at: https://www.epa.gov/newsreleases/epa-reexamine-health-standards-harmful-soot-previous-administration-left-unchanged.

8

of information from the 2019 Assessment, to inform its partial reconsideration.
RTC at 121, JA2800; *see also* 89 Fed. Reg. at 16213.

EPA then determined that the annual primary PM$_{2.5}$ standard was inadequate
and issued the challenged Rule. *Id*. at 16203. This final action triggered multiple
implementation activities, including stationary source air permitting obligations
and an initial area designations process described in 42 U.S.C. § 7407(d), to be
followed by additional implementation requirements. Szabo Decl. ¶¶ 27-33

Several petitioner groups challenged the Rule. Numerous groups intervened
on EPA's behalf. Oral argument was held in December 2024, but the litigation has
been held in abeyance following the change in administration and during the lapse
in appropriations, with motions to govern due within ten days of the restoration of
appropriations. ECF No. 2139392. EPA is filing this motion in lieu of a motion to
govern.

## STANDARD OF REVIEW

Under the Clean Air Act, 42 U.S.C. § 7607(d)(9), the Court may reverse the
Rule if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in
accordance with law;" or "in excess of statutory jurisdiction, authority, or
limitations, or short of statutory right." An agency action is arbitrary and
capricious if, among other things, the agency "entirely failed to consider an
important aspect of the problem" or does not "examine the relevant data and

9

articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

In deciding questions of statutory interpretation, "[c]ourts must exercise their independent judgment," but "[c]areful attention to the judgment of the Executive Branch may help inform that inquiry." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024). Indeed, where the Executive Branch has given contemporaneous construction to statutory language and consistently maintained that interpretation, its views—though not dispositive—are accorded more weight. *Id.* at 386. Ultimately, to resolve the meaning of disputed statutory language, a court shall adopt the interpretation that, "after applying all relevant interpretive tools, [it] concludes is best." *Loper Bright*, 603 U.S. at 400.

## ARGUMENT

### I.     EPA lacks statutory authority to revise standards absent a thorough review.

The Court should vacate the Rule. The NAAQS are central to the Act, and the consequences of a revision are significant. EPA exceeded its authority in selectively revising a NAAQS without the "thorough review" of underlying criteria and related standards required by section 109(d)(1). EPA thus agrees with the Petitioners' arguments on this issue. Industry Br. at 24-28, ECF No. 2079902; Industry Reply Br. at 4-14, ECF No. 2079909. And EPA withdraws its brief taking a contrary position. EPA Response Br. at 35-45, ECF No. 2079971.

10

### A.    Section 109(d)(1) requires EPA to complete a thorough review before revising a NAAQS.

This case turns on whether EPA must revise a NAAQS pursuant to section 109(d)(1) or, rather, can revise whenever and however it wants so long as it also completes a five-year thorough review on a separate track.  Section 109(d)(1) requires EPA to complete a "*thorough* review" of both "the criteria published under [section 108] *and* the [NAAQS] promulgated under this section" before revising the NAAQS.  42 U.S.C. § 7409(d)(1) (emphases added).  That is the only reading that ensures consideration of the "latest scientific knowledge" on the public health or welfare effects of a pollutant as required for section 108 air quality criteria, *id.* § 7408, before deciding whether and how to revise the related NAAQS "based on such criteria" under section 109(b), *id.* § 7409(b)(1)–(2).  Here, where EPA compiled only a limited supplement to the 2019 Assessment, and the agency conceded during the rulemaking that such a limited supplement did not comprise a full review of the criteria and standards, the agency did not comply with the statutory requirements of section 109(d)(1).

When it added section 109(d) to the Act in 1977, Congress specified a single path—and the only path—by which EPA may revise a standard: complete a thorough review of both the air quality criteria and the related standards for the relevant pollutant.  This mechanism "displace[s]" any "inherent reconsideration authority" for EPA to revise or reconsider an existing standard.  *Ivy Sports Med.,*

11

*LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014).  "EPA may not construe [a] statute in a way that completely nullifies textually applicable provisions meant to limit its discretion."  *New Jersey v. EPA*, 517 F.3d 574, 583 (D.C. Cir. 2008) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 485 (2001)).

And while section 109(d)(1)'s second sentence authorizes EPA to revise a standard earlier or more often than at "five-year intervals" as required by the first sentence, it does not dispense with the thorough review requirement.  42 U.S.C. § 7409(d)(1).  Specifically, EPA "may review and revise [air quality] criteria or promulgate new standards earlier or more frequently than required under this paragraph."  *Id*.  "[T]hose words must be read and interpreted in their context, not in isolation."  *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (internal quotation marks omitted).  Here, the Act's use of the word "review" in the second sentence of section 109(d)(1) refers to the thorough review specified in the first sentence.  *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("The reference to 'the pay or compensation' in the last clause of § 111 must, in context, mean the same 'pay or compensation' defined in the first part of the section.").  In addition, the reference to "under this paragraph" in the second sentence is a signal that the provision's constituent parts are intended to work together.  *See id*.; *see also* Industry Br. at 25-26; Industry Reply at 10-13.

12

Indeed, section 109(d)(1) uses the word "review" only twice: Once in the first sentence to prescribe the thorough review required to revise the standards, and again in the second sentence to describe the review that EPA may conduct to revise the standards before its five-year deadline, that is, more often than at "five-year intervals." 42 U.S.C. § 7409(d)(1). It would have been odd for Congress to use "review" in the second sentence as an authorization to ignore the kind of review specified only one sentence earlier and to undertake some other, undefined, review process.

Thus, while EPA has authority under the second sentence to revise the standards more frequently than every five years, in doing so it must still meet the thorough review requirement in the first sentence. This interpretation is the most natural reading of the provision, which gives meaning to the thorough review requirement that Congress explicitly imposed.

The Act's structure further supports this reading. Revising a NAAQS triggers cascading and significant obligations many years after EPA revises a standard:

- States must submit initial air quality designations to EPA within one year of a standard's promulgation, and EPA must finalize designations within two years of promulgation. 42 U.S.C. § 7407(d)(1)(B)(i).

13

- Within three years of a standard's promulgation, States must submit plans to EPA providing for "implementation, maintenance, and enforcement" of the standard in their jurisdictions. *Id.* § 7410(a)(1).

- States that have designated nonattainment areas generally must develop plans addressing that nonattainment eighteen months after designation. *Id.* § 7513a(a)(2).

It follows that any revisions of the NAAQS are subject to the guardrail of completing a thorough review. Allowing ad hoc and partial review "would severely disrupt this complex and delicate administrative scheme." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 348 (1984).

That is how EPA consistently read the statute for decades. *See* Szabo Decl. ¶ 38 (explaining that for all five particulate matter reviews to date, EPA completed review of the criteria before deciding to revise the NAAQS). Indeed, EPA declines to base NAAQS revisions on "[r]ecent studies available after completion of criteria review," pursuant to the Agency's "long-standing practice of basing NAAQS decisions on studies and related information included in the pertinent air quality criteria and available for [Advisory Committee] review." 62 Fed. Reg. 38652, 38662 & n.15 (July 18, 1997); *see also* Szabo Decl. ¶¶ 15, 18, 20-21 (quoting similar language in 2006, 2012, and 2020).

14

The Rule was inconsistent with EPA's past practice. EPA has never attempted to rely solely upon the second sentence of section 109(d)(1) as its source of authority to revise a standard. *See id.* ¶ 39. While EPA has revised standards sooner than the prescribed five-year cycle (though never for PM$_{2.5}$), it did so via the required thorough review. *Id.* ¶¶ 36, 38.

Given the consequences of any revision, the thorough review process is critical to the statute's design. Just as the statute mandates a complex series of implementation actions and retains certain implementation actions even if a standard is later relaxed, so, too, does it require that EPA engage in a thorough review of all relevant information before triggering implementation by revising a standard. Reading section 109(d) as EPA's exclusive source of revision authority is the best way to "interpret the statute as a symmetrical and coherent regulatory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotation marks omitted); *see also United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988).

## B. Section 109(b) does not provide standalone revision authority.

At oral argument, the Court asked whether section 109(b) provides separate reconsideration authority. 42 U.S.C. § 7409(b); *see, e.g.*, Hr'g Tr. at 7:22-13:6, Ex. B. It does not. Section 109(b)(1)'s first sentence describes the requirements for setting a primary NAAQS. And the second sentence provides that standards

15

"may be revised in the same manner as promulgated," which speaks to the procedure of promulgation (e.g., notice and comment rulemaking).[4]  42 U.S.C. § 7409(b)(1).

In 1977, Congress overhauled the NAAQS-revision process by revamping section 109 of the Act.  *See* Pub. L. No. 91-604, 84 Stat. 1676, 1679–80 (1970). Before 1977, section 109 governed the *procedure* of revising a standard, but the *substantive* authority to revise the standards was part of the agency's inherent authority to review a prior decision.  *See id*.; *see also* Industry Br. 25.  But before EPA revised its initial standards, Congress amended the Act to add the substantive requirement in subsection (d) that EPA "complete a thorough review of the [air quality] criteria . . . and the . . . standards" and setting out mandatory period reviews at "five-year intervals."  42 U.S.C. § 7409(d)(1); *see also id.* § 7409(d)(2) (tying Advisory Committee review to the same periodic cycle).  Section 109(d)(1) now covers the waterfront.

Two principles of statutory interpretation command that section 109(b) does not overcome section 109(d)(1)'s "thorough review" requirement.  First, section 109(d)(1) post-dates 109(b).  Congress's 1977 amendment must be given meaning. "When Congress amends legislation, courts must presume it intends the change to have real and substantial effect."  *Van Buren v. United States*, 593 U.S. 374, 393

---

[4] No party disputed this at oral argument.  *See* Hr'g Tr. at 7:24-9:14.

(2021) (quoting *Ross v. Blake*, 578 U.S. 632, 641-42 (2016)).  If EPA could choose to revise a standard solely under section 109(b)(1), the Agency would have a blank check to circumvent the substantive review requirements Congress later added in section 109(d)(1).  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").  Congress could not have intended an earlier-in-time provision to nullify a later one.

Second, section 109(d) imposes substantive review requirements—the review must be "thorough" and include both "criteria … and … the [NAAQS]"—before standards may be revised.  42 U.S.C. § 7409(d)(1).  These specific review requirements govern the general.  *Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 638 (D.C. Cir. 2021); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645–46 (2012).  The "general-specific canon is particularly appropriate where, as here, the provisions at issue are 'interrelated and closely positioned' as 'parts of the same statutory scheme.'"  *Genus Med. Techs.*, 994 F.3d at 638 (quoting *RadLAX Gateway Hotel*, 566 U.S. at 645).  Thus, section 109(d)(1) governs the scope of EPA's NAAQS-revision authority.

This interpretation is consistent with EPA's longstanding practice.  Since the 1977 amendments, EPA has never used section 109(b) as an independent source of revision authority separate and apart from 109(d).  Szabo Decl. ¶ 40.  Even in the

17

Rule, EPA acknowledged that reconsideration "does not itself satisfy the EPA's obligation to periodically complete a thorough review" but insisted that its truncated scientific analysis should suffice in this context. *See* RTC at 121–22, JA2800-2801; *see also* 89 Fed. Reg. at 16206, 16211–13.

Even if the reference to revising the NAAQS in section 109(b) were not procedural, there would be no conflict between section 109(b) and section 109(d), and the two provisions are easily harmonized. Section 109(d) requires that standards be promulgated only after a thorough review of the air quality criteria. 42 U.S.C. § 7409(d)(1). Section 109(b) requires that revisions occur "in the same manner as promulgated." *Id*. § 7409(b). Put together, revisions to the standards require the same manner of review of the air quality criteria on which the standards were based when promulgated—a thorough review.

## II.    EPA unreasonably ignored costs when deciding whether to undertake a discretionary mid-cycle review.

In the alternative, EPA erred in refusing to consider the costs associated with its discretionary mid-cycle review. This was an important aspect of the problem before the Agency, and EPA thus agrees with certain of the Petitioners' arguments on this issue. Industry Br. at 28-32; Industry Reply Br. at 15-19, ECF No. 2079909. EPA withdraws its brief taking a contrary position. EPA Resp. Br. at 45-48, ECF No. 2079971.

18

The second sentence of section 109(d)(1) provides that EPA "may review and revise criteria or promulgate new standards earlier or more frequently than required under this paragraph."  42 U.S.C. § 7409(d)(1).  Even if that sentence conferred separate authority to revise a NAAQS—and it does not, *supra* Arg. I— its language gives EPA broad discretion to decide whether and when to "promulgate new standards" more frequently than at five-year intervals.  The sentence does not identify factors EPA should consider in deciding *whether* to perform such a voluntary revision, nor does it cross-reference sections 108 or 109(b).  Nothing prevents EPA from considering the costs of undertaking the earlier review.  *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 219 (2009) (concluding that where EPA enjoys discretion in making a statutory determination, EPA may weigh the costs and benefits of the exercise of its discretion); *Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 38 (D.C. Cir. 2009).  Reasoned agency decision-making ordinarily includes consideration of costs unless a statute precludes such consideration, and so, EPA's refusal to consider such costs was unreasonable. *Michigan v. EPA*, 576 U.S. 743, 753 (2015) ("Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions").

If EPA conducts a mid-cycle review under such a permissive authority, the costs of doing so are a permissible, and indeed relevant, consideration.

19

Implementation of the NAAQS is a complex process, which generates significant costs and reliance interests among States, local governments, and regulated parties. Szabo Decl. ¶¶ 26-33. Indeed, if the statute permitted a less-than-thorough review, that discretionary, mid-cycle NAAQS revision may be especially "problematic in view of the fact that a new assessment, and potentially new standards, will be developed in the relatively near future" when the next five-year review occurs.[5] Because a less-than-thorough mid-cycle review will not reset the five-year review cycle, EPA should take into account, among other things, (1) the impact of the change where regulated entities and States may still be in the process of complying with prior NAAQS; (2) whether steps that may be required to comply with a mid-cycle NAAQS change will interrupt the existing compliance schedule; (3) when the next five-year review cycle must be completed; and (4) the potential disruptive effects of requiring States and regulated sources to comply with a new NAAQS that may soon be superseded when the next through review concludes.

Here, EPA undertook its discretionary revision only months after finalizing its last mandatory review. Szabo Decl. ¶ 23. The results of EPA's review caused disruption to the State, local actors, and the regulated community, and yet did not relieve EPA of its next obligation to complete a five-year mandatory thorough review. RTC at 121, JA2800; Szabo Decl. ¶¶ 26-33.

---

[5] *See* Letter from Cass R. Sunstein, to Lisa P. Jackson, *supra* n.1, at 1.

20

Before concluding that revision was warranted, EPA should at least have considered the distinct costs associated with revising the NAAQS mid-cycle. EPA's disregard of this relevant factor was arbitrary and capricious because it was unreasonable for EPA to read an exercise of discretionary authority as an invitation to ignore a relevant factor like cost. *See State Farm*, 463 U.S. at 43; *Michigan*, 576 U.S. at 753.

### III. Vacatur is appropriate because EPA exceeded its statutory authority and failed to consider a relevant aspect of the problem.

EPA acknowledged the 2022 Supplement did not satisfy the thorough review requirement under section 109(d)(1). 89 Fed. Reg. at 16203; RTC at 121, JA2800. Because EPA lacks the statutory authority to revise a standard without conducting a thorough review, the Court should vacate the Rule. Alternatively, vacatur is appropriate because EPA failed to consider an important aspect of the problem by refusing to consider the costs associated with its mid-cycle revision.

Under the Act, "the court may reverse any such action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 42 U.S.C. § 7607(d)(9). Whether to vacate the Rule depends on "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988

21

F.2d 146, 150-51 (D.C. Cir. 1993) (internal quotation marks omitted). Both factors favor vacatur.

First, the seriousness of the error turns in part on whether the agency can correct the error on remand. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021). When, as here, an agency lacks statutory authority to have taken the challenged action, there is "no possibility" the agency could "find an adequate explanation" on remand. *Waterkeepers Chesapeake v. FERC*, 56 F.4th 45, 49-50 (D.C. Cir. 2022); *see supra* Argument I; *see also Air All. Hous. v. EPA*, 906 F.3d 1049, 1066 (D.C. Cir. 2018) (vacating rule because it exceeded EPA's statutory authority). And because EPA no longer intends to defend the Rule, there is no serious possibility that EPA would adopt the same approach on remand even if it could do so. *See* Szabo Decl. ¶ 6 (stating that EPA no longer intends to defend the Rule); *cf. Limnia, Inc. v. Dep't of Energy*, 857 F.3d 379, 386 (D.C. Cir. 2017) ("In general, a voluntary remand request made in response to a party's APA challenge may be granted only when the agency intends to take further action with respect to the original agency decision on review.").

Second, vacatur of the unlawful Rule now, before additional statutory obligations come into effect as soon as February 2026, would prevent disruption and unnecessary additional burdens to regulated parties and EPA alike. Although the 2024 Rule is in effect, the most significant implementation efforts, including

22

area designations and state implementation plan review, have not yet occurred.

Szabo Decl. ¶¶ 28-31.  Under the Rule, EPA must issue designations in February

2026 based on its unlawful standards.  *See* 42 U.S.C. § 7407(d)(1)(B).  But if the

2024 Rule were vacated, the 2020 Rule, which retained the 2012 NAAQS, would

go back into effect.  *See* 85 Fed. Reg. at 82684, JA1256.  Reinstatement of the

2020 Rule would essentially preserve the status quo, relieving EPA of the

obligation to make designations in furtherance of an unlawful standard and

preventing significant new regulatory obligations from taking effect following such

designations.  *Cf. Am. Equity Inv. Life Ins. v. SEC*, 613 F.3d 166, 179 (D.C. Cir.

2010).  Vacatur would thus leave in place standards that EPA concluded were

"requisite to protect public health, with an adequate margin of safety, from effects

of $PM_{2.5}$ in ambient air" based on EPA's most recent thorough review of the

particulate matter standards and air quality criteria.  85 Fed. Reg. at 82685,

JA1257.

## CONCLUSION

For the foregoing reasons, the Court should grant EPA's motion to vacate the

Rule.

Dated: November 24, 2025.

Respectfully submitted,

/s/ *Sarah Izfar*
ADAM R.F. GUSTAFSON
   *Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
   *Deputy Assistant Attorney General*
SARAH IZFAR
ZOE B. PALENIK
   *Trial Attorneys*
   Environmental Defense Section
   Environment and Natural Resources Div.
   U.S. Department of Justice
Of Counsel:                  P.O. Box 7611
   Washington, DC 20044
ISABELLA SMITH        (202) 532-3050
*Attorney*                 Sarah.izfar@usdoj.gov
U.S. Environmental
Protection Agency       *Counsel for Respondents*

24

**CERTIFICATE OF COMPLIANCE**

1.    This document complies with the type-volume limit of Federal Rule of Appellate Procedure 27 because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 5,199 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

*/s/ Sarah Izfar*
SARAH IZFAR

Counsel for Respondents

**CERTIFICATE OF SERVICE**

I hereby certify that on November 24, 2025, I filed the foregoing using the Court's CM/ECF system, which will electronically serve all counsel of record registered to use the CM/ECF system.

*/s/ Sarah Izfar*

25