# Exhibit A

ORAL ARGUMENT HELD ON DECEMBER 16, 2024

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

COMMONWEALTH OF
KENTUCKY, ET AL.,

       *Petitioners*,

    v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, ET AL.,

       *Respondents*.

Case No. 24-1050 and
consolidated cases

**DECLARATION OF AARON SZABO**

I, Aaron Szabo, under penalty of perjury, affirm and declare that the following

statements are true and correct to the best of my knowledge and belief, and are

based on my own personal knowledge or on information contained in the record of

the United States Environmental Protection Agency (EPA) or supplied to me by

EPA employees under my supervision.

1. I am the Assistant Administrator for the United States Environmental

   Protection Agency Office of Air and Radiation (OAR), which is located at

   1200 Pennsylvania Avenue, NW, Washington D.C. 20460.

2. Prior to joining EPA, I served as a federal civil servant, first at the Nuclear

   Regulatory Commission, where I worked on nuclear power plant issues and

regulations, and then at the White House Office of Information and Regulatory Affairs, where I worked on major climate and air regulations. I continued my career civil service as the Senior Counsel at the Council on Environmental Quality, where my role expanded to include the National Environmental Policy Act and federal sustainability issues. I hold degrees in economics, government, and politics from the University of Maryland, College Park, and a law degree from George Washington University Law School.

3.  OAR is the EPA office with primary responsibility for administration of the Clean Air Act. As the Assistant Administrator for OAR, I serve as the principal advisor to the Administrator on matters pertaining to air and radiation programs and am responsible for managing these programs, including: policy development and evaluation; development of emissions standards; policy guidance and overview; and technical support and evaluation of regional air and radiation program activities.

4.  Through my role as Assistant Administrator for OAR, I am familiar with the development and implementation of EPA programs, policies, and regulations under the Clean Air Act. As part of my duties, I oversee the development and implementation of regulations, policy, and guidance under sections 108 and 109 of the Clean Air Act, 42 U.S.C. §§ 7408–09, including air quality

criteria and primary and secondary National Ambient Air Quality Standards (NAAQS) for particulate matter (PM).

5. The purpose of this declaration is to provide the Court with context, history, and factual assertions in support of the EPA's contemporaneously filed confession of error and motion for vacatur.

6. Upon review of the final rule entitled "Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," 89 Fed. Reg. 16202 (March 6, 2024) ("2024 Rule"), and the associated regulatory process, the EPA no longer seeks to defend the 2024 Rule and has asked the Department of Justice to file a motion confessing error and seeking vacatur of the 2024 Rule.

7. The EPA maintains air quality criteria for pollutants that must reflect the latest scientific knowledge regarding adverse impacts on public health and welfare.  42 U.S.C. §7408(a).  After issuing criteria for a pollutant, the EPA promulgates two types of NAAQS: primary and secondary.  "Primary" NAAQS—the type at issue in this litigation—are set "based on such criteria" at a level that the Administrator judges to be "requisite" to protect the "public health."  *Id.* § 7409(b)(1).  "Secondary" NAAQS are set "based on such criteria" at a level that the Administrator judges to be "requisite" to protect the "public welfare."  *Id.* § 7409(b)(2).  This declaration is primarily

focused on the PM primary standards, since that is the subject of this
litigation.

8. The EPA first established NAAQS for PM in 1971 (36 Fed. Reg. 8186, April
   30, 1971), based on an air quality criteria document prepared by a
   predecessor agency component in 1969.  The primary standards consisted of
   a 24-hour standard set at 260 $\mu g/m^3$ and an annual standard set at 75 $\mu g/m^3$.

9. In October 1979, the EPA announced the first periodic review of the air
   quality criteria and NAAQS for PM by publishing its "decision to revise the
   criteria documents for particular matter … underlying the [PM NAAQS]"
   and to propose and promulgate revisions to the NAAQS as appropriate based
   on the revised criteria (44 Fed. Reg. 56730, October 2, 1979).  The Agency
   noted that any "[s]uch revision necessarily entails the thorough additional
   review of criteria as contemplated in Section 109(d)(1) of the Clean Air
   Act," and that "[i]f any revised standards are to be proposed, they would be
   based on, and announced concurrently with, the final revised criteria
   document" (*id.* at 56731).

10. In July 1987, the EPA promulgated revised PM NAAQS after multiple
    rounds of public comment on the revised criteria document and,
    subsequently, on the proposed rule (52 Fed. Reg. 24634, July 1, 1987).  The

Agency detailed "[t]he process by which" it had "reviewed the original criteria and standards for particulate matter under section 109(d)" and explained how that process culminated in the final revisions (*id.* at 24635-37). Based on a review of the revised criteria, the final rule lowered the 24-hour primary standard to 150 µg/m$^3$ and the annual primary standard to 50 µg/m$^3$.

11. In April 1994, the EPA announced its plans for the second periodic review of the air quality criteria and NAAQS for PM, and in 1997 promulgated revisions to the NAAQS (62 Fed. Reg. 38652, July 18, 1997). The Agency explained that it began the review "by announcing its intention to develop a revised Air Quality Criteria Document for [PM]" (*id.* at 38654) and that it had "announced its proposed decision to revise the NAAQS for PM" two years later "based on the air quality criteria for PM" (*id.*). In finalizing the revised NAAQS, the EPA rejected arguments that it should base the standards on studies released after the criteria update or delay the rulemaking to account for such studies. Citing "section 109(d) of the Act," the EPA explained that it had not relied on such studies "based on its long-standing practice of basing NAAQS decisions on studies and related information included in the pertinent air quality criteria and available for CASAC review" (*id.* at 38662), and specifically noted this "longstanding

interpretation was strengthened by new legislative enactments enacted in 1977" as part of the addition of section 109(d) (*id.* at 38662 n.15).

12. The 1997 final rule addressed the fine ($PM_{2.5}$) and coarse ($PM_{10}$) fractions of PM separately for the first time. For $PM_{2.5}$, the primary standards were lowered to an annual standard of 15.0 $\mu g/m^3$ and a 24-hour standard of 65 $\mu g/m^3$. To continue to address the health effects of the coarse fraction of PM, the EPA retained the existing primary annual $PM_{10}$ standard and revised the form of the primary 24-hour $PM_{10}$ standard to be based on the 99th percentile of 24-hour $PM_{10}$ concentrations at each monitor in an area.

13. In May 1999, the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) upheld the EPA's decision to establish distinct $PM_{2.5}$ standards and to regulate coarse particle pollution separately, but vacated the particular 1997 $PM_{10}$ standards selected by the Agency. *Am. Trucking Ass'ns, Inc. v. EPA*, 175 F.3d 1027 (D.C. Cir. 1999). Pursuant to the D.C. Circuit's decision, the EPA subsequently removed the vacated 1997 $PM_{10}$ standards, and the pre-existing 1987 $PM_{10}$ standards remained in place (65 Fed. Reg. 80776, December 22, 2000).

14. In October 1997, the EPA published its plans for the third periodic review of the air quality criteria and NAAQS for PM (62 Fed. Reg. 55201, October 23, 1997). The Agency explained that "[a]s with all NAAQS reviews, the

purpose is to update the criteria and to determine whether it is appropriate to revise the standards in light of new scientific and technical information" (*id.*). The EPA anticipated developing a revised criteria document, providing for extensive peer review and public comment, and proposing any appropriate revisions when the criteria document was finalized (*id.* at 55202).

15. In October 2006, the EPA promulgated revisions to the primary NAAQS for PM based on a review of the revised criteria and after extensive public input (71 Fed. Reg. 61144, October 17, 2006). The Agency again reaffirmed its "view that NAAQS decisions are to be based on scientific studies and related information that have been assessed as a part of the pertinent air quality criteria" (*id.* at 61148). The EPA lowered the 24-hour $PM_{2.5}$ primary standard to 35 $\mu g/m^3$ and retained the existing annual $PM_{2.5}$ primary standard of 15.0 $\mu g/m^3$. With respect to $PM_{10}$, the EPA retained the 24-hour standard of 150 $\mu g/m^3$ and revoked the annual standards.

16. In February 2009, the D.C. Circuit remanded the primary annual $PM_{2.5}$ standard for additional explanation on health protection. *Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512 (D.C. Cir. 2009). The EPA responded to the remand in its next review of the PM NAAQS, which was initiated in 2007.

17. In June 2007, the EPA initiated the fourth periodic review of the air quality criteria and NAAQS for PM by issuing a call for information (72 Fed. Reg. 35462, June 28, 2007). The Agency again explained that "Section 109(d) requires periodic review and, if appropriate, revision of existing air quality criteria," and that "EPA is then to revise the NAAQS, if appropriate, based on the revised air quality criteria" (*id.*).

18. In January 2013, the EPA promulgated revisions to the primary NAAQS for PM based on its review of the updated air quality criteria (78 Fed. Reg. 3086, January 15, 2013).  The Agency again reaffirmed its "longstanding interpretation" that "NAAQS decisions are to be based on scientific studies and related information that have been assessed as part of the pertinent air quality criteria," which was "strengthened by new legislative requirements enacted in 1977" (*id.* at 3095).  The EPA revised the annual $PM_{2.5}$ standard to 12.0 µg/m$^3$ and retained the 24-hour $PM_{2.5}$ standard of 35 µg/m$^3$. For the primary $PM_{10}$ standard, the EPA retained the 24-hour standard to continue to provide protection against effects associated with short-term exposure to thoracic coarse particles (*i.e.,* $PM_{10-2.5}$).

19. In December 2014, the EPA announced the initiation of the fifth periodic review of the air quality criteria and NAAQS for PM and issued a call for information (79 Fed. Reg. 71764, December 3, 2014).  On April 14, 2020,

the EPA proposed to retain the primary $PM_{2.5}$ and $PM_{10}$ standards without

revision based on the results of an integrated science assessment finalized in

2019 after peer review and public comment, which reviewed the criteria and

scientific developments since the last review (85 Fed. Reg. 24094, April 30,

2020).

20. In December 2020, the EPA finalized its decision to retain the existing

primary $PM_{2.5}$ and $PM_{10}$ standards (85 Fed. Reg. 82684, December 18,

2020). The Agency again reaffirmed its "longstanding interpretation"—

"strengthened by new legislative requirements enacted in 1977"—that

"NAAQS decisions are to be based on scientific studies and related

information that have been assessed as a part of the pertinent air quality

criteria" (*id.* at 82690).

21. The EPA concluded based on a review of the criteria and the 2019

integrated science assessment that the suite of primary $PM_{2.5}$ standards were

requisite to protect public health with an adequate margin of safety and

should be retained. The EPA also judged it appropriate to retain the primary

$PM_{10}$ standard to provide the requisite degree of public health protection

against exposures, regardless of location, source of origin, or particle

composition (*id.* at 82725).

22. In 2021, Executive Order 13990 directed review of certain agency actions (86 Fed. Reg. 7037, January 25, 2021). An accompanying fact sheet provided a non-exclusive list of agency actions that agency heads should review in accordance with that Executive Order, including the 2020 Particulate Matter NAAQS Decision.

23. On June 10, 2021, the Agency announced its decision to "reconsider" the 2020 PM NAAQS final action. The Agency announced that, in support of the reconsideration, it would develop a partial supplement to the 2019 integrated science assessment and a revised policy analysis, drafts of which would be reviewed by the CASAC. The draft supplement was released in September 2021 (86 Fed. Reg. 54186, September 30, 2021), and the final supplement was released in May 2022 after CASAC. For the health effects evidence, the supplement focused on studies from the U.S. and Canada for the health effects evidence for which the 2019 integrated science assessment concluded a causal relationship (*i.e.*, short- and long-term $PM_{2.5}$ exposure and cardiovascular effects and mortality) and studies that addressed key scientific topics for which the literature had evolved since the 2020 PM NAAQS review was complete. The draft policy assessment was released in October 2021 (86 Fed. Reg. 56263, October 8, 2021), and the final policy assessment was released in May 2022 after CASAC review.

24. In January 2023, the EPA proposed to revise the annual PM$_{2.5}$ standard and to retain the primary 24-hour PM$_{2.5}$ standard and the primary 24-hour PM$_{10}$ standard (88 Fed. Reg. 5558, January 27, 2023). In March 2024, the EPA promulgated a final rule lowering the primary annual PM$_{2.5}$ standard from 12.0 μg/m$^3$ to 9.0 μg/m$^3$ and retaining the other standards as proposed.

25. In support of the 2024 Rule, the EPA prepared an illustrative analysis of the potential costs associated with the decision to lower the primary annual PM$_{2.5}$ standard to 9.0 μg/m$^3$ titled ''Regulatory Impact Analysis for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter'' (RIA). The EPA expressly stated in the 2024 Rule that it did not rely on the RIA or consider cost in deciding to revise the annual PM2.5 standard (89 Fed. Reg. at 16373). The RIA used national scale emissions, controls, and cost information to examine illustrative state and local level attainment of the revised annual PM$_{2.5}$ standard in 2032. The estimated costs reported in the RIA are associated with the control devices themselves and do not include the costs to the EPA, States, or localities of implementing the NAAQS or the costs of revising and implementing permit and permit conditions beginning on the effective date of the 2024 Rule.

26. The RIA estimated that control devices necessitated by the 2024 Rule would cost $590 million in 2017 dollars (approximately $780 million in 2025

dollars assuming an average annual inflation rate of 3.55%) each year. This estimate did not fully account for all the emissions reductions needed to attain the revised standard, and therefore was likely an underestimate of actual cost. Furthermore, citing technical limitations, the RIA did not account for indirect economic impacts on the entire economy from the illustrative control strategy, so therefore acknowledged that there may be additional costs to the economy that are not captured in the estimate. Commenters presented alternative analyses suggesting that EPA had significantly underestimated the costs of the rule, which, according to one analysis, were projected to be up to $9.1 billion." (Comments of the NAAQS Regulatory Review & Rulemaking Coalition, Attach. 3, EPA-HQ-OAR-2015-0072-2361, JA2481 (Mar. 28, 2023)).

27. The EPA's decision to revise the primary annual $PM_{2.5}$ standard triggered the Clean Air Act's complex implementation provisions and related statutory deadlines for action.

28. Upon promulgation of a revised NAAQS, States and the EPA must initiate the process for designating areas as meeting or not meeting the revised NAAQS, along with the areas nearby that may be contributing to nonattainment of the NAAQS. The timeline for initial area designations began with promulgation of the revised primary annual $PM_{2.5}$ standard. In

accordance with CAA section 107(d)(1), not later than 1 year after promulgation of a revised NAAQS, States must submit to EPA their determinations regarding whether EPA should designate areas within the state as nonattainment, attainment, or unclassifiable. If EPA disagrees with a State, the Agency notifies States of intended modifications in advance and invites an opportunity to respond. Under CAA section 107(d)(1)(B)(i), the EPA generally must promulgate final designations for all areas no later than 2 years after a revised NAAQS is promulgated, although this timeline may be extended for up to one year if there is "insufficient information to promulgate the designations." The EPA's revision of the primary annual $PM_{2.5}$ standard in the 2024 Rule triggered an obligation to finalize area designations by a default deadline of February 7, 2026.

29. In determining designations, the EPA evaluates each area on a case-by-case basis, considering the specific facts and circumstances unique to the area to support initial area designations and associated boundary decisions. The EPA has historically used area-specific analyses to support nonattainment area boundary determinations by evaluating factors such as air quality data, emissions and emissions-related data, meteorology, geography/topography, and jurisdictional boundaries. The EPA makes designations decisions based on complete, quality-assured, certified air quality data in the EPA's Air

Quality System.  The EPA typically looks to monitoring data from existing PM$_{2.5}$ Federal Equivalent Methods and Federal Reference Methods sites to determine violations of the NAAQS.  Air agencies may flag air quality data for certain days in the Air Quality System due to potential impacts from exceptional events (*e.g.*, events such as prescribed fires on wildland, wildfires, or high wind dust storms). Accordingly, for purposes of initial area designations, an air agency may submit to the EPA an exceptional events demonstration with supporting information and analyses for each monitoring site and day the air agency claims the EPA should exclude from design value calculations for designations purposes.  *See* 40 CFR 50.1, 50.14, 51.930.

30. Within 18 months of the effective date of area designations, any State in which a nonattainment area is located must submit a SIP revision that meets CAA requirements (*see* 42 U.S.C. § 7513a(a)(2)).  All areas initially designated nonattainment for PM$_{2.5}$ are classified as Moderate areas (*see* 42 U.S.C. § 7513(a)).  The EPA previously estimated that developing a SIP revision for PM$_{2.5}$ Moderate nonattainment areas costs each State $585,900 per nonattainment area in 2015 dollars (or approximately $800,000 in 2025 dollars assuming an average annual inflation rate of 3.17%).  For more information, please see the draft Information Collection Request Supporting Statement for the PM$_{2.5}$ NAAQS State Implementation Plan Requirements

Rule (EPA, DRAFT Information Collection Request Supporting Statement for the PM2.5 National Ambient Air Quality Standards State Implementation Plan Requirements Rule, EPA-HQ-OAR-2013-0691-0068 (Mar. 23, 2015), https://www.regulations.gov/document/EPA-HQ-OAR-2013-0691-0068).

31. Sections 110(a)(1) and 110(a)(2) of the CAA direct each State to develop and submit to the EPA a plan that provides for the implementation, maintenance, and enforcement of the NAAQS.  CAA section 110(a)(1) requires that each State make a new SIP submission within 3 years of promulgation of a revised primary NAAQS for approval into the existing SIP to assure that the SIP meets the applicable requirements for such revised NAAQS.  This type of SIP submission is commonly referred to as an "infrastructure SIP."  The EPA's revision of the primary annual $PM_{2.5}$ standard in the 2024 Rule triggered States' obligations to develop and submit these infrastructure SIPs for approval no later than February 7, 2027.  Under CAA section 110(k)(2), the EPA must generally review and issue a decision on SIP submissions within one year after the submissions are deemed complete.

32. The Clean Air Act contains preconstruction review and permitting programs applicable to new major stationary sources and major modifications of existing major sources, which is frequently called the new source review

program (NSR). The new source review program requirements vary based on whether the construction is occuring in areas designated attainment, nonattainment, or unclassifiable. In attainment and unclassifiable areas, the applicable NSR requirements are called Prevention of Significant Deterioration (PSD). In nonattainment areas, the NSR requirements are called nonattainment new source review (NNSR). Until the EPA completes area designations for the 2024 $PM_{2.5}$ NAAQS, new source review provisions applicable under an area's current designation for the prior $PM_{2.5}$ NAAQS applies. If an area is designated nonattainment for the1997, 2006, or 2012 $PM_{2.5}$ NAAQS, nonattainment new source review requirements will apply (*see* 40 CFR 51.166(i)(2) and 52.21(i)(2)). If an area is designated as attainment or unclassifiable for all three prior $PM_{2.5}$ NAAQS, the PSD requirements apply. Among other things, the PSD program requires a new major stationary source or a major modification to apply the "best available control technology" (BACT) to limit relevant emissions and to conduct an air quality impact analysis to demonstrate that the proposed major stationary source or major modification will not cause or contribute to a violation of any NAAQS or PSD increment (*see* 42 U.S.C. § 7475(a)(3) and (4); 40 CFR 51.166(j) and (k), 52.21(j) and (k)).

33. Upon the effective date of the revised primary annual $PM_{2.5}$ NAAQS in the 2024 Rule, the PSD program demonstration required under CAA section 165(a)(3) must include the revised NAAQS. This additional requirement increases the burden on any permit applicant subject to these provisions beyond those that were in effect as a consequence of the EPA's prior PM NAAQS revisions, most recently the 2012 $PM_{2.5}$ NAAQS.

34. The EPA has previously attempted to provide by rule that sources with pending PSD permit applications at the time of the effective date of the revised NAAQS need not demonstrate compliance with the revised NAAQS to obtain a permit, in recognition of the disruptive effects of a mid-process change. In August 2019, however, the D.C. Circuit vacated that provision in the PSD rules for the 2015 ozone NAAQS (*see Murray Energy Corp. v. EPA*, 936 F.3d 597, 627 (D.C. Cir. 2019)). Accordingly, the 2024 Rule's revision of the $PM_{2.5}$ NAAQS required any pending PSD permit applicants to revise their applications, including applications that may have been pending for quite some time and that were in the late stages of the approval process. This disruption in the application process threatens further delays, may require additional modeling and analyses, and may result in the imposition of additional controls and therefore previously unexpected costs.

35. In the 2024 Rule, the EPA conceded that the limited information added in the integrated science assessment supplement finalized in 2022, was not itself a thorough review. The EPA "acknowledge[d] that the ISA Supplement does not itself satisfy the EPA's obligation to periodically complete a thorough review of the air quality criteria" (Response to Comments ("RTC") at 121, JA2800; *see also* 89 Fed. Reg. at 16212). The EPA further conceded that the 2024 action did not satisfy the requirement in CAA section 109(d)(1) to complete a thorough review of the standards every five years. The EPA stated that review of the PM standards "should still be completed within five years of the most recent complete review, which concluded in 2020" (RTC at 121, JA2800).

36. The process followed to revise the primary annual $PM_{2.5}$ standard in the 2024 Rule through a partial "reconsideration" of the previous "thorough review" was unprecedented and departed markedly from the longstanding practice utilized in finalizing prior NAAQS revisions. The EPA purported to "supplement" the prior review completed in 2020 with a limited and narrow review of additional studies on some, but not all, areas impacting NAAQS review. Following this limited and narrow supplement, EPA flipped its ultimate determination in 2020, reached after a "thorough review" of the air quality criteria and related standards, on the appropriate level for the primary

annual PM$_{2.5}$ standard.  In doing so, the EPA for the first time finalized a rule that reconsidered and substantially revised a NAAQS outside of the "thorough review" prescribed by statute.

37. The 2024 PM NAAQS reconsideration process did not comprise a "thorough review."  Under CAA section 109, the EPA must first conduct a "thorough review" of underlying air quality criteria and standards before deciding whether to revise a NAAQS.  The combination of a prior thorough review, and a limited update of only some air quality criteria, cannot meet the requirement for a "thorough review."  If that were to be the case, EPA could serially issue supplemental assessments, combine them with a prior thorough review, and continually revise standards.  That cannot be what Congress envisioned when providing EPA with a statutory command to do a thorough review of standards every five years.

38. Prior to the 2024 Rule, the EPA consistently took the position that, pursuant to CAA section 109(d) and the surrounding provisions in section 108 and 109(d), the Agency must complete a review of and revisions to the air quality criteria before proposing any appropriate revisions to the NAAQS. The Agency reaffirmed this position in 2020, including by discussing the EPA's longstanding practice for considering claims that studies released in the final stages of a "thorough review" should be considered (85 Fed. Reg. at

82690).  Citing its 1993 decision on whether to revise the ozone NAAQS, the EPA reiterated that "'new' studies may sometimes be of such significance that it is appropriate to delay a decision in a NAAQS review and to supplement the pertinent air quality criteria so the studies can be taken into account" (*id.* at 82961 (citing 58 Fed. Reg. 13003, 13013-14, March 9, 1993)).  Under those circumstances, the EPA has sometimes "reopen[ed] the air quality criteria" for supplementation before proceeding to repropose and finalize a decision on NAAQS revision within the same thorough review (*id.*)  Thus, although thorough reviews sometimes involve multiple rounds of analysis prior to completion, the 2024 rule was an unusual departure from the body of practice in which the EPA understood its decision must reflect all the considerations under section 109(d).

39. Prior to 2024, the EPA never relied on the second sentence of section 109(d)(1), standing alone and apart from the first sentence of 109(d)(1), as an independent source of authority to revise the NAAQS.

40. To date, including in the 2024 Rule, the EPA never asserted that 109(b) alone authorized revising the NAAQS without also referencing 109(d).  To my knowledge, this issue was raised for the first time at the oral argument for this case before the D.C. Circuit on December 16, 2024 (*see, e.g.*, Hr'g Tr. at 7:22-13:6).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 24, 2025, in Washington, D.C.

_____
Aaron Szabo
Assistant Administrator, Office of Air and Radiation
U.S. Environmental Protection Agency