---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

KENTUCKY, ET AL.,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL.,
*Respondents*.

---

Petition for Review of Final Administrative Action of the
United States Environmental Protection Agency

---

**HEALTH, ENVIRONMENTAL, AND COMMUNITY GROUP
RESPONDENT-INTERVENORS' RESPONSE IN OPPOSITION TO
RESPONDENTS' MOTION FOR VACATUR AND CROSS-MOTION TO
LIFT ABEYANCE AND PROCEED TO A MERITS RULING**

**Dated: December 16, 2025**

Seth L. Johnson
Marvin C. Brown IV
Sage Lincoln
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 797-5245
(202) 794-5355
(202) 830-3311
sjohnson@earthjustice.org
mcbrown@earthjustice.org
slincoln@earthjustice.org

*Counsel for Alliance of Nurses for
Healthy Environments, American Lung
Association, Environmental Defense*

Shaun A. Goho
Hayden W. Hashimoto
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(617) 678-2516
sgoho@catf.us
hhashimoto@catf.us

*Counsel for Citizens for Pennsylvania's
Future and Conservation Law
Foundation*

*(continues on inside cover)*

*Fund, Natural Resources Defense Council, Northeast Ohio Black Health Coalition, Rio Grande International Study Center, and Sierra Club*

John Walke
Emily Davis
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 289-6868
jwalke@nrdc.org
edavis@nrdc.org

*Counsel for Natural Resources Defense Council*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ..................................................................................1

BACKGROUND ....................................................................................2

ARGUMENT .........................................................................................4

  I.  THE COURT SHOULD LIFT THE ABEYANCE AND DECIDE THIS
     CASE. ...............................................................................................6

  II. EPA HAS AUTHORITY TO UPDATE NAAQS OUTSIDE A THOROUGH..
     REVIEW CYCLE. ...........................................................................9

     A. EPA's Motion merits no weight under *Loper Bright*. .............................10

     B. Section 109(b) authorizes EPA to revise NAAQS outside thorough
       reviews. ........................................................................................11

     C. Section 109(d)(1)'s two sentences do not displace EPA's authority to
       update NAAQS outside thorough reviews, but confirm it. ......................20

     D. EPA's Remaining Arguments Lack Merit. ............................................31

  III. EPA PROPERLY DECIDED TO RECONSIDER THE 2020 DECISION
      WITHOUT CONSIDERING LEGALLY IRRELEVANT, UNKNOWABLE
      COSTS. ...........................................................................................33

CONCLUSION ....................................................................................36

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT.................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adirondack Medical Ctr. v. Sebelius,*
    740 F.3d 692 (D.C. Cir. 2014) ........................................................ 19

*Alexander v. S.C. Conf. of the NAACP,*
    602 U.S. 1 (2024) ............................................................................. 16

*Am. Pub. Gas Ass'n v. DOE,*
    22 F.4th 1018 (D.C. Cir. 2022) .................................................. 8, 16

*Am. Trucking Ass'ns v. EPA,*
    175 F.3d 1027 (D.C. Cir. 1999) ....................................................... 9

*American Lung Ass'n v. EPA,*
    134 F.3d 388 (1998) ....................................................................... 27

*Arizona v. City & Cnty. of San Francisco,*
    596 U.S. 763 (2022) ......................................................................... 8

*Barnes v. Costle,*
    561 F.2d 983 (D.C. Cir. 1977) ......................................................... 6

*California v. EPA,*
    940 F.3d 1342 (D.C. Cir. 2019) ..................................................... 32

*In re Clean Water Act Rulemaking,*
    60 F.4th 583 (9th Cir. 2023) ............................................................ 6

*Corley v. United States,*
    556 U.S. 303 (2009) ....................................................................... 25

*Davis v. Michigan Department of Treasury,*
    489 U.S. 803 (1989) ....................................................................... 24

*Authorities we chiefly rely on are marked with an asterisk.*

*Ganem v. Heckler*,
746 F.2d 844 (D.C. Cir. 1984)..........................................................21

*Ivy Sports Med. v. Burwell*,
767 F.3d 81 (D.C. Cir. 2014)......................................................19, 20

*King v. Burwell*,
576 U.S. 473 (2015).................................................................27, 28

*Lead Indus. Ass'n v. EPA*,
647 F.2d 1130 (D.C. Cir. 1980)......................................................27

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)..................................................................10

*Loughrin v. United States*,
573 U.S. 351 (2014).................................................................23

*\* Mexichem Specialty Resins v. EPA*,
787 F.3d 544 (D.C. Cir. 2015).....................................................6, 8

*Mingo Logan Coal Co. v. EPA*,
714 F.3d 608 (D.C. Cir. 2013)......................................................19

*Mozilla Corp. v. FCC*,
940 F.3d 1 (D.C. Cir. 2019).........................................................17

*Murray Energy Corp. v. EPA*,
936 F.3d 597 (D.C. Cir. 2019)......................................................32

*N.Y. Stock Exchange v. SEC*,
2 F.4th 989 (D.C. Cir. 2021)........................................................29

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007)..................................................................19

*New Jersey v. EPA*,
517 F.3d 574 (D.C. Cir. 2008)......................................................19

*NRDC v. EPA*,
643 F.3d 311 (D.C. Cir. 2011)......................................................32

*NRDC v. EPA*,
706 F.3d 428 (D.C. Cir. 2013).............................................................33

*Rothe Dev. v. DOD*,
836 F.3d 57 (D.C. Cir. 2016)...............................................................16

*Russello v. United States*,
464 U.S. 16 (1983)..............................................................................23

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947)........................................................................5, 15

*Sierra Club v. EPA*,
21 F.4th 815 (D.C. Cir. 2021).............................................................23

*Soto v. United States*,
605 U.S. 360 (2025)............................................................................11

*Train v. NRDC*,
421 U.S. 60 (1975) .............................................................................27

*Union Elec. Co. v. EPA*,
427 U.S. 246 (1976)............................................................................13

*United States v. Hansen*,
599 U.S. 762 (2023)............................................................................13

*United States v. Miller*,
604 U.S. 518 (2025)............................................................................12

*United States v. Otunyo*,
63 F.4th 948 (D.C. Cir. 2023) ............................................................24

*United States v. Woods*,
571 U.S. 31 (2013).......................................................................25, 31

*Van Buren v. United States*,
593 U.S. 374 (2021)............................................................................23

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001).....................................................................9, 13, 29

*Young v. United States*,
  315 U.S. 257 (1942)............................................................6

*Ysleta Del Sur Pueblo v. Texas*,
  596 U.S. 685 (2022)...........................................................23

**Statutes**

42 U.S.C. § 7408(a)....................................................13, 18

42 U.S.C. § 7408(c).........................................................13

42 U.S.C. § 7409(a).........................................................17

42 U.S.C. § 7409(a)(1)(B)...........................................11, 26

42 U.S.C. § 7409(a)-(b).....................................................18

42 U.S.C. § 7409(a)-(b)(1)................................................13

42 U.S.C. § 7409(b)(1)-(2)................................................11

*42 U.S.C. § 7409(b)(1).......................................11, 25, 26

*42 U.S.C. § 7409(d)(1)...........................5, 14, 21, 22, 25

42 U.S.C. § 7502(e).........................................................26

42 U.S.C. § 7607(d).................................................17, 18, 26

42 U.S.C. § 7607(d)(1)(A).................................................17

42 U.S.C. § 7607(d)(9).....................................................26

*Pub. L. No. 91-604, 84 Stat. 1676 (1970)......................13, 23

*Pub. L. No. 95-95, 91 Stat. 685 (1977)....................14, 21, 23

**Regulations**

40 C.F.R. § 50.4............................................................30

40 C.F.R. § 50.6............................................................30

40 C.F.R. § 50.7............................................................30

40 C.F.R. § 50.13 ...........................................................................30

40 C.F.R. § 50.17 ...........................................................................30

40 C.F.R. § 50.18 ...........................................................................30

**Federal Register Notices**

52 FR 24,634 (July 1, 1987) ..........................................................30

62 FR 38,652 (July 18, 1997) ........................................................35

71 FR 61,144 (Oct. 17, 2006) ...................................................30, 35

73 FR 16,436 (Mar. 27, 2008) .......................................................35

73 FR 64,964 (Oct. 31, 2008) .........................................................14

75 FR 35,520 (June 22, 2010) .........................................................30

76 FR 8158 (Feb. 11, 2011) ............................................................14

80 FR 65,292 (Oct. 26, 2015) ...................................................14, 35

85 FR 82,684 (Dec. 18, 2020) ..........................................................2

89 FR 16,202 (Mar. 6, 2024) ............................2, 3, 14, 29, 30

89 FR 105,692 (Dec. 27, 2024) .......................................................14

**Legislative Histories**

123 Cong. Rec. 27,070 (1977) ........................................................29

H.R. Conf. Rep. No. 95-564 (1977) ...............................................29

**Court Rules**

D.C. Cir. R. 28(d)(2) ......................................................................17

**INTRODUCTION**

The Court should deny EPA's irregular and deeply flawed Motion for Vacatur and instead issue a merits ruling fully upholding EPA's 2024 update to the health-protective national ambient air quality standards ("NAAQS") for fine particulate matter ("$PM_{2.5}$"). As already established in copious briefing and oral argument, the 2024 Rule rests on strong legal and scientific bases. Indeed, EPA's Motion casts no doubt on the science.[1] EPA has projected the 2024 Rule will save thousands of lives and prevent hundreds of thousands of other serious health harms annually.[2] The Clean Air Act permits (and, in reality, encourages) EPA to update NAAQS to address urgent public health threats—just as the 2024 Rule did.

Health, Environmental, and Community Groups thus oppose EPA's Motion and cross-move to lift this case's abeyance and proceed to a merits ruling. State Intervenors do not oppose the cross-motion. EPA, Industry Petitioners, and State Petitioners ("Kentucky") reserve their positions on the cross-motion until after reviewing it.

---

[1] *See* Resp'ts' Br. ("Resp.") 60-78 (describing evidence); Br. of Health, Environmental, and Community Group Resp't-Intervenors ("Health-Resp.-Ints.") 10-19 (same); Br. of State and Local Government Respondent-Intervenors ("State-Resp.-Ints.") 24-27 (same).

[2] Br. of Institute for Policy Integrity as Amicus Curiae ("IPI-Amicus") 13.

As explained below, EPA's Motion and the responses supporting it confirm three key points: (1) this Court should lift the abeyance and issue a full and final merits ruling considering all the arguments already before it; (2) EPA had authority to finalize its 2024 Rule updating the NAAQS for particulate matter ("PM") by strengthening the limit on the annual average level of $PM_{2.5}$ in the air people breathe; and (3) just as the Act bars EPA from considering potential implementation costs in the NAAQS-review process, it bars EPA from considering them in deciding whether to start such a process.[3]

## BACKGROUND

To the background State Intervenors' Opposition provides, we add:

In 2021, EPA initiated a rulemaking process to reconsider its 2020 decision to retain various PM NAAQS because "the available scientific evidence and technical information indicate[d] that the current standards may not be adequate to protect public health and welfare, as required by the Clean Air Act." 89 FR 16,202, 16,210/2 (Mar. 6, 2024), JA0171; *see also* 85 FR 82,684, 82,727/2-3 (Dec. 18, 2020) (2020 decision didn't address all PM-induced welfare effects), JA1299. Relying in part on timely administrative reconsideration petitions, EPA

---

[3] We agree with State Intervenors' Opposition that, if the Court found EPA committed reversible error, remand without vacatur would be proper.

"reopen[ed] the air quality criteria" and went through an extensive, rigorous process to evaluate and incorporate advances in scientific knowledge on certain effects of $PM_{2.5}$ that were published after the cutoff EPA set for consideration in the 2020 review. 89 FR 16,211/1-12/2, JA0172-73; EPA-HQ-OAR-2015-0072-6025 ("RTC") 134, JA2813. Based on the updated criteria—the 2019 Science Assessment and the 2022 Supplement—EPA carried out a notice-and-comment rulemaking under Clean Air Act § 307(d),[4] concluded the 2012 primary annual $PM_{2.5}$ NAAQS was not adequate to protect public health, and strengthened the NAAQS. 89 FR 16,202/1, 16,212-13/3, JA0163, 0173-74.

In the rulemaking, some commenters, including many Industry Petitioners, argued that EPA lacked authority to update NAAQS without carrying out the "thorough review" that § 109(d)(1)'s first sentence calls for. *See* RTC 116 (summarizing such comments), JA2795; *see also, e.g.*, EPA-HQ-OAR-2015-0072-2361 at 6-8 (coalition including six Industry Petitioners arguing § 109(d)(1) displaces EPA's implicit authority and § 109(b) authorizes EPA to revise NAAQS, but incorporates § 109(d)(1)'s first sentence's "thorough review" requirement), JA2350-52. Responding, EPA explained it was "acting within the scope of [its]

---

[4] EPA's merits brief uses U.S. Code section numbers in text, as does our merits brief; EPA switched in its Motion to Clean Air Act section numbers, and we also switch. This filing maintains our other prior short-hands.

authority under section 109 (whether that authority is characterized as implicit or explicit)." RTC 122, JA2801; *accord id.* 118 (similar), JA2797. EPA further explained "EPA understands [§ 109(b)] to authorize the Administrator to revise the NAAQS." RTC 120, JA2799. *But see* Mot. 2; Decl. of Aaron Szabo ¶ 40 (Nov. 24, 2025). And EPA responded specifically to the contention that § 109(d)(1) displaced any other authority for the 2024 Rule, explaining that the "thorough review" requirement of § 109(d)(1)'s first sentence doesn't extend beyond that sentence. RTC 121-22, JA2800-01.

## ARGUMENT

**Cross-Motion**. EPA's Motion confirms this case is ready for decision. To avoid inefficient piecemeal litigation that could improperly allow the agency to evade rulemaking requirements, the Court should lift the abeyance and proceed to a full merits ruling.

**Authority**. EPA's Motion and the supporting responses wrongly contend EPA lacks authority to address public health concerns by updating NAAQS outside a "thorough review" cycle. EPA's authority to do so flows directly from § 109. Both § 109(b)(1) and § 109(d)(1) provide EPA authority to update NAAQS, and basic statutory interpretation principles require interpreting them together, along with the ordinary background principle that agencies have implicit authority to timely reconsider prior decisions unless displaced. Section 109's text and statutory

4

history further confirm EPA has authority to update its 2019 Science Assessment and ultimately the NAAQS to address profound substantive and procedural flaws in prior decisionmaking and an urgent public health need without first undertaking an entirely new "thorough review," 42 U.S.C. § 7409(d)(1). Contrary to EPA's Motion, the periodic "thorough review" requirement retains meaning even when EPA engages in a targeted NAAQS update, as it did here. Also, in attempting to import "thorough review" into text where it doesn't appear, the Motion flouts basic statutory interpretation.

Contrary to Petitioners' assertions, neither *Chenery* nor the party-presentation principle prevent this Court from relying on § 109(b)(1) to uphold EPA's action. The statutory question Petitioners raised, in both the administrative record and their briefs, was whether EPA could update the criteria and, ultimately, NAAQS to address known public health harms without first undertaking a brand-new "thorough review." That is the statutory question EPA correctly answered "yes," in both the record and, along with State Intervenors, merits briefing. EPA plainly relied in the record on § 109 as a whole and its implicit authority, and the Court cannot resolve the statutory interpretation issue Petitioners have raised without construing <u>both</u> § 109(b) and (d).

**Costs**. The Motion's argument that EPA should have considered costs in deciding whether to initiate its rulemaking process conflicts with the Act.

### I. THE COURT SHOULD LIFT THE ABEYANCE AND DECIDE THIS CASE.

As State Intervenors' Opposition explains, this Court cannot grant EPA's Motion without reaching the merits of the arguments the Motion raises because reflexive acceptance would improperly allow EPA to "circumvent the rulemaking process through litigation concessions." *Mexichem Specialty Resins v. EPA*, 787 F.3d 544, 557 (D.C. Cir. 2015); *see In re Clean Water Act Rulemaking*, 60 F.4th 583, 594-96 (9th Cir. 2023) (courts lack equitable authority or authority under Administrative Procedure Act to vacate executive action without first "holding the executive action unlawful"). The government's "confession [of error] does not relieve this Court of the performance of the judicial function." *Young v. United States*, 315 U.S. 257, 258 (1942); *see also Barnes v. Costle*, 561 F.2d 983, 989 n.47 (D.C. Cir. 1977) ("[j]udicial responsibility to construe the governing statute remains" even after agency reconsiders position and seeks remand "on the eve of" this Court's decision).

In reaching the merits, the Court should not limit itself to the two merits issues EPA's Motion raises. In earlier motions practice, Health, Environmental, and Community Groups pointed to the agency's upcoming February 2026 deadline to designate portions of the country as attainment or nonattainment under the 2024 NAAQS as supporting prompt resolution of this case, to ensure that health benefits of the 2024 Rule accrue to their members. *See* Health, Environmental, and

Community Group Intervenors' Opp. to Resp'ts' Mot. to Hold Case in Abeyance (May 2, 2025) ("May Opp."); Health, Environmental, and Community Group Intervenors' Opp. to Resp'ts' Mot. to Extend Abeyance (Aug. 20, 2025). Now, with an eye toward that same upcoming deadline, EPA has moved this Court to decide part of this case, and Industry supports the Motion by further pointing to Petitioners' other merits arguments.[5] EPA's newfound desire for prompt resolution of some of this case similarly supports prompt resolution of the <u>whole</u> case, as Industry tacitly acknowledges. Health, Environmental, and Community Groups thus renew their request that the Court lift the abeyance and decide all aspects of this fully briefed and argued case.

Further support for lifting the abeyance and proceeding to a full merits ruling comes from EPA's and Petitioners' conspicuous silence on the notice-and-comment rulemaking that EPA, including the same declarant this Motion relies on, used to justify the abeyance. *See* EPA's Corrected Mot. to Hold Case in Abeyance 4 (Apr. 29, 2025) ("EPA has decided that it will initiate a new notice-and-comment process revisiting the challenged rule."); EPA's Mot. to Extend Abeyance 2 (Aug. 13, 2025) (EPA "expects to sign a proposed rule in the Fall of 2025"); Decl. of

---

[5] *See* Industry and Arizona Coalition Pet'rs' Resp. in Supp. of Resp'ts' Mot. ("Ind.-Mot.-Resp.") 15 (invoking other arguments Petitioners collectively made). *But see* Resp. 28-35, 48-86 (refuting Petitioners' arguments); Health-Resp.-Ints. 10-31 (same); State-Resp.-Ints. 4-27 (same).

Aaron Szabo ¶¶ 9-10 (Aug. 13, 2025) (same). EPA's new Motion and supporting declaration say nothing about that supposed rulemaking. With EPA now flip-flopping on some of the merits and asking the Court to eliminate the 2024 Rule without agency rulemaking, it is proper for the whole case to be decided, without EPA's litigation choices artificially limiting this Court's post-argument options. *See Arizona v. City & Cnty. of San Francisco*, 596 U.S. 763, 765-66 (2022) (Roberts, C.J., concurring) (government's use of judicial decisions to circumvent notice-and-comment requirements is a "tactic of 'rulemaking-by-collusive-acquiescence'" that raises fundamental concerns regarding the "principles of administrative law").

Respondent-Intervenors have defended and will continue to defend the 2024 Rule. EPA's merits brief remains fully available to this Court, for Respondent-Intervenors attach it here and base some of their arguments on that brief, including the portions EPA's Motion purports to withdraw, in both this filing and their own briefs. *See, e.g.*, Health-Resp.-Ints. 10, 21; State-Resp.-Ints. 4-6. It is hardly unusual for this Court to rule on—and uphold—agency actions that only Respondent-Intervenors defend.[6]

---

[6] *See, e.g.*, *Am. Pub. Gas Ass'n v. DOE*, 22 F.4th 1018, 1024, 1026, 1030 (D.C. Cir. 2022) (Ginsburg, J.) (upholding certain agency positions that agency opposed or no longer defended, but respondent-intervenors defended); *Mexichem*, 787 F.3d at 557 (denying stay motion that EPA consented to but respondent-intervenors

## II. EPA HAS AUTHORITY TO UPDATE NAAQS OUTSIDE A THOROUGH REVIEW CYCLE.

Across 1970 and 1977, Congress comprehensively addressed everything EPA must or may do to keep air quality criteria and NAAQS updated. EPA must regularly thoroughly review and update them, but EPA also may act more quickly, in a targeted way, when it finds that scientific knowledge has outstripped the regulatory status quo. EPA properly exercised that latter authority here.

As explained below, the best reading of § 109 is that EPA has authority to update NAAQS via the process it followed in the 2024 Rule. The "thorough review" requirement in § 109(d)(1)'s first sentence doesn't apply to the earlier-enacted § 109(b), displace EPA's implicit authority to revise NAAQS, or override the significantly different language Congress used in § 109(d)(1)'s second sentence. Instead, the requirement in § 109(d)(1)'s first sentence plays the important role of ensuring EPA regularly comprehensively reviews and updates criteria and NAAQS—a role that undisputedly remains entirely unaffected by EPA engaging in a targeted update that was, beyond serious question,[7] scientifically

opposed); *Am. Trucking Ass'ns v. EPA*, 175 F.3d 1027, 1055 (D.C. Cir. 1999) (rejecting argument "EPA never responds to," but "five northeastern states (as respondent intervenors and amici) do"), *partially aff'd and rev'd in other part sub nom. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001).

[7] In its Response, Kentucky perfunctorily tries (at 7, 13) to dispute the strong scientific record, but remains unable to identify any irrationality in the 2024 Rule's

justified. Further, the 2024 Rule can be understood as EPA promulgating a new NAAQS, and § 109(d)(1)'s second sentence doesn't require a thorough review before EPA does that.

### A. EPA's Motion merits no weight under *Loper Bright*.

EPA's Motion suggests (at 10) its changed statutory interpretation may merit some extra weight in the Court's statutory analysis. Not so. The change introduces an irrational incoherence in the Act and departs *sub silentio* from another long-held agency interpretation. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394, 399-402 (2024) (changed, unpersuasive interpretations merit less weight); May Opp. 4-5 (citing Industry's merits reply brief). Though § 109(d)(1) speaks to both review and revision of criteria and NAAQS, EPA's Motion doesn't change the agency's longstanding position that it can revise criteria in a targeted way. *See* Resp. 30-34, 80-81. EPA's Motion doesn't explain why it treats criteria and NAAQS differently. Nor does EPA's Motion dispute that the agency has repeatedly contemplated and initiated NAAQS reconsiderations. *Id.* 79-80 (examples of initiated NAAQS reconsiderations); State-Resp.-Ints. 10-11 (example of EPA contemplating such a reconsideration, with support from a Petitioner here).

---

scientific analysis. Resp. 60-74; Health-Resp.-Ints. 10-19; State-Resp.-Ints. 24-27. Further, no party identifies any way a broader review would have weakened the 2024 Rule's outcome.

**B. Section 109(b) authorizes EPA to revise NAAQS outside thorough reviews.**

**1.** As well as providing the foundational substantive requirements for primary NAAQS, § 109(b)(1) provides, in its second sentence, that "[s]uch primary standards may be revised in the same manner as promulgated." 42 U.S.C. § 7409(b)(1).[8] On its face, this provision thus expressly grants EPA authority to revise NAAQS, while also mandating the revision procedure—the notice-and-comment procedures and deadlines required for initial promulgation of NAAQS, set forth in the preceding subsection. *See id.* § 7409(a)(1)(B); Resp. 36. Though Congress used the passive voice in § 109(b)(1), context makes clear that it "authorizes the same entity that" promulgates NAAQS to revise them—EPA. *Soto v. United States*, 605 U.S. 360, 370 n.4 (2025). Nothing in § 109(b)(1) mandates a "thorough review" as part of this process.

EPA's Motion agrees § 109(b)(1) speaks to EPA's revision authority but apparently doesn't view § 109(b)(1)'s second sentence as an express grant of revision authority to EPA, but rather an explicit recognition of EPA's preexisting implicit authority. *See* Mot. 16 ("Before 1977, section 109 governed the <u>procedure</u> of revising a standard, but the <u>substantive</u> authority to revise the standards was part

---

[8] All references herein to "NAAQS" pertain solely to primary NAAQS, and we accordingly also address only § 109(b)(1)'s text, though the relevant language in § 109(b)(2) is identical. *See* 42 U.S.C. § 7409(b)(1)-(2).

of the agency's inherent authority to review a prior decision." (emphases in original)); *see also* RTC 118-22 (taking position consistent with this view), JA2797-801. To dispute the authority EPA says § 109(b)(1) embodies, EPA's Motion argues that, if that authority is implicit, it's displaced by § 109(d)(1)'s first sentence, and if it's explicit, § 109(b)(1) incorporates § 109(d)(1)'s first sentence's "thorough review" requirement. *See* Mot. 16-18. These arguments fail. They would require numerous unnatural readings, including rendering § 109(b)(1)'s second sentence superfluous, whereas all language in § 109(d)(1) retains meaning even when reading § 109(b)(1) as giving EPA revision authority. State-Resp.Ints. 4-12; *see infra* pp.17-20.

The Motion's hairsplitting between § 109(b)(1) as expressly granting authority versus merely acknowledging implicit authority accordingly marks a distinction without a difference because § 109(d)(1) doesn't displace EPA's implicit authority or get incorporated into § 109(b)(1). Thus, whether characterized as an express grant of authority or an explicit recognition of EPA's implicit authority, § 109(b)(1)'s plain text confirms EPA has authority to revise NAAQS.

**2.** This plain-text reading is supported by the Act's statutory structure and history. *See, e.g.*, *United States v. Miller*, 604 U.S. 518, 533 (2025) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."

(cleaned up)); *United States v. Hansen*, 599 U.S. 762, 775 (2023) ("[s]tatutory history is an important part" of statutory interpretation). The 1970 Clean Air Act Amendments established the NAAQS framework as the central element of the Amendments' "drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution." *Union Elec. Co. v. EPA*, 427 U.S. 246, 256 (1976); Pub. L. No. 91-604, 84 Stat. 1676 (Dec. 31, 1970); *see also Whitman*, 531 U.S. at 468 ("§ 109(b)(1) and the NAAQS for which it provides are the engine that drives nearly all of Title I of the [Act]").

The Amendments added three relevant provisions—§ 108(c), § 109(a), and § 109(b)—whose text has remained unchanged since 1970 and that, collectively, confirm Congress authorized EPA to revise air quality criteria and NAAQS to keep up with developments in "scientific knowledge." 42 U.S.C. § 7408(a); *see* Pub. L. No. 91-604, § 4, 84 Stat. at 1679-80 (enacting § 108(c) (current first sentence of 42 U.S.C. § 7408(c), as amended) and § 109(a)-(b)). In 1970, Congress directed EPA to review and update the criteria "from time to time," as appropriate, 42 U.S.C. § 7408(c), and gave EPA corresponding discretionary authority to revise NAAQS as necessary to "protect public health," through notice-and-comment rulemaking. *Id.* § 7409(a)-(b)(1). This system theoretically would have prevented health-based NAAQS from lagging behind growing scientific knowledge, but depended on EPA

taking the initiative. Between 1970 and 1977, EPA completed no such reviews or revisions.[9]

Recognizing the 1970 approach didn't work adequately to protect public health, Congress updated the statute in 1977. It added § 109(d)(1), mandating in that provision's first sentence that EPA "complete a thorough review of the criteria…and the [NAAQS]" every five years, and revise criteria and NAAQS and promulgate new NAAQS, as appropriate under § 108 and § 109(b). Pub. L. No. 95-95, § 106(a), 91 Stat. 685, 691 (Aug. 7, 1977) (codified at 42 U.S.C. § 7409(d)(1)). Congress thus ensured NAAQS wouldn't lag more than five years behind scientific developments. In § 109(d)(1)'s second sentence, Congress affirmed EPA's preexisting authority to review and revise criteria or promulgate new NAAQS more often, as discussed below. *Id*.; *see infra* pp.21-22. Congress didn't disturb § 108(c) and § 109(b)'s more discretionary authorizations, leaving them unchanged and fully available for EPA's use in 2024. *See* Pub. L. No. 95-95, §§ 104(b), 106, 91 Stat. at 689, 691 (adding new sentence to § 108(c) and adding § 109(c)-(d)). The Motion's counterarguments are unavailing because § 108(c), § 109(b)(1), and § 109(d)(1) harmoniously coexist without exporting "thorough review" from

---

[9] *See* 89 FR 16,207/1-2, JA0168 (detailing history of PM NAAQS reviews); 73 FR 64,964, 66,966/2-3 (2008) (same, for lead); 76 FR 8158, 8160/2-3 (2011) (same, for carbon monoxide); 89 FR 105,692, 105,694/2 (Dec. 27, 2024) (same, for sulfur dioxide and nitrogen dioxide); 80 FR 65,292, 65,296/1-2 (2015) (same, for ozone).

14

§ 109(d)(1)'s first sentence outside that sentence, but not vice versa. *See infra* pp.17-20, 22-27.

**3.** The Motion's and Petitioners' counterarguments on § 109(b)(1) are meritless.

**i.** As a preliminary issue, EPA's Motion asserts that § 109(b)(1) "was not the basis asserted in the rule." Mot. 2. Though EPA's Motion correctly doesn't so argue, Petitioners argue this Court thus cannot rely on § 109(b)(1). Ind.-Mot.-Resp. 8-11; State Pet'rs' Resp. in Supp. of Mot. for Vacatur ("State-Pet'rs-Mot.-Resp.") 3-7. EPA's Motion and Petitioners err. The 2024 Rule plainly relies on § 109 overall (which includes § 109(b)(1)) for authority. RTC 118, 122 (EPA "is acting under section 109"), JA2797, 2801. Further, responding to comments, EPA expressly said about § 109(b) that "EPA understands this provision to authorize the Administrator to revise the NAAQS." RTC 120, JA2799; *see also* Tr. 84:21-85:5 (State Intervenors cite JA2799 as where EPA "invokes 109(b) for authority to revise NAAQS").[10] Thus, EPA properly invoked § 109(b)(1) when it acted and its Motion cannot now erase that record argument that Respondent-Intervenors continue to defend. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("a

_____

[10] Industry disregards State Intervenors' unambiguous statement in claiming that at oral argument "no party identified any place where EPA had" argued § 109(b)(1) authorizes the 2024 Rule. Ind.-Mot.-Resp. 6.

reviewing court…must judge the propriety of [agency] action solely by the grounds invoked by the agency" when it took the action); *Am. Pub. Gas*, 22 F.4th at 1024, 1026 (where respondent-intervenors continued to defend action, "judicial review does not authorize the court to rewrite the decision being challenged, nor to disregard what the agency clearly said").[11]

Petitioners further claim that any arguments that § 109(b)(1) provides EPA authority have been forfeited under the party-presentation principle. State-Pet'rs-Mot.-Resp. 8-10; Ind.-Mot.-Resp. 12-13. But, as parties have recognized throughout this case, § 109(b)(1) is central to the NAAQS statutory framework and must be interpreted together with § 109(d)(1). *See* Resp. 34, 42, 48-49 (interpreting § 109(b)(1) and (d)(1) together); EPA Mot. 11, 15-18 (same); Ind.-Mot.-Resp. 13 (same). Further, petitioners may forfeit meritorious statutory challenges, but Petitioners identify no precedent where statutory authority vanished because an agency's litigation brief forfeited an argument. Indeed, parties cannot "stipulate" via litigation to rewrite governing law, and courts retain the "duty to assess independently the legal issue before" them. *E.g.*, *Alexander v. S.C. Conf. of the NAACP*, 602 U.S. 1, 19 n.6 (2024) (citing case construing statute); *Rothe Dev. v. DOD*, 836 F.3d 57, 63 (D.C. Cir. 2016).

---

[11] The Court thus needn't address Industry's (at 11) and Kentucky's (at 5-7) arguments about *Chenery*'s post-*Loper Bright* status.

Industry wrongly (at 12 n.2) insists Intervenors couldn't address § 109(b)(1) because EPA didn't raise it. But Intervenors' arguments on EPA's authority, both in the merits briefs and in the oppositions to EPA's Motion, properly address the core issues of these petitions for review, are "in support of" arguments EPA presented, and are fully cognizable. *See Mozilla Corp. v. FCC*, 940 F.3d 1, 48 (D.C. Cir. 2019) (intervenor's argument is "properly before us" because it is merely "a new argument in support of claims the Petitioners have presented," not one "with absolutely no substantive connection with the issues raised by the petition for review" (cleaned up)); *accord* D.C. Cir. R. 28(d)(2).

**ii.** On the merits, EPA's Motion wrongly argues (at 16-18) that "thorough review" trumps § 109(b)(1)'s text. It argues (at 18) that § 109(b)(1)'s "in the same manner as promulgated" incorporates a requirement for a "thorough review" from § 109(d)(1)'s first sentence, but the Act doesn't require EPA to promulgate NAAQS "in the…manner" of a "thorough review." Rather, § 109(a) and § 307(d) require promulgation must occur in the manner of notice-and-comment rulemaking meeting certain deadlines. 42 U.S.C. §§ 7409(a), 7607(d); *see* Resp. 34, 36. Statutory history supports this conclusion, as § 109(d)(1) didn't exist when Congress enacted § 109(a)-(b), while § 307(d) expressly governs the process for NAAQS revision and promulgation and integrates with § 109(a)'s requirements. 42 U.S.C. § 7607(d)(1)(A); *see supra* pp.13-15 (describing § 109's

development). Context also supports reading "in the same manner as promulgated" as speaking strictly to the notice-and-comment process: EPA can list new pollutants, establish criteria, and promulgate new NAAQS under § 108(a), § 109(a)-(b), and § 307(d)—all without § 109(d)(1)'s first sentence and its thorough review requirement applying. *See* 42 U.S.C. §§ 7408(a), 7409(a)-(b), 7607(d). Similarly, as discussed below, § 109(d)(1)'s second sentence allows EPA to promulgate new NAAQS outside the thorough review process, additionally demonstrating that § 109(d)(1)'s first sentence doesn't establish the mandatory promulgation standards. *See infra* pp.21-25.

EPA's Motion insists (at 16-17) that interpreting § 109(b)(1) as reflecting EPA's authority to revise NAAQS outside thorough reviews would render § 109(d)(1) superfluous. But § 109(d)(1)'s command for thorough reviews every five years retains vital effect: when EPA revises NAAQS outside a thorough review, that revision doesn't alter any aspect of—much less nullify—EPA's obligation to complete its periodic "thorough review," as EPA continues to recognize. Mot. 20 (2024 Rule "did not relieve EPA of its next obligation to complete a five-year mandatory thorough review" (citing RTC 121, JA2800)); Resp. 43-44 (citing same). Accordingly, § 109(d)(1) maintains an independent function. State-Resp.-Int. 6. Further, because there's no conflict between the provisions, the general-specific canon EPA's Motion invokes (at 17) doesn't apply.

*See Adirondack Medical Ctr. v. Sebelius*, 740 F.3d 692, 698 (D.C. Cir. 2014) ("The canon is impotent…unless the compared statutes are 'irreconcilably conflicting.'").

By contrast, reading "thorough review" into § 108(c) and § 109(b) would require concluding that Congress repealed or amended § 108(c) and § 109(b) by implication, but either conclusion is disfavored and incorrect. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 664 n.8 (2007). Neither should be implied "unless the later statute expressly contradicts the original act or unless such a construction is absolutely necessary in order that the words of the later statute shall have any meaning at all," but these conditions aren't met here for the same reasons the Motion's superfluousness argument fails. *Id.* 662; *see also Mingo Logan Coal Co. v. EPA*, 714 F.3d 608, 614-15 (D.C. Cir. 2013) (applying canon against implied repeal/amendment of statutory subsection to provision adding subsection to same section).

The Motion's claims that § 109(d)(1)'s first sentence displaces the implicit authority EPA thinks § 109(b) explicitly acknowledges fail thrice over, Mot. 11-12 (citing *Ivy Sports Med. v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014), and *New Jersey v. EPA*, 517 F.3d 574, 583 (D.C. Cir. 2008)). First, as State Intervenors have explained, and EPA doesn't dispute, the governing test for displacement of implicit authority depends on whether recognizing the implicit authority would "write the [displacing] provision out of the statute." State-Resp.-Ints. 5-6 (cleaned up). As

just explained, EPA's targeted revision authority is entirely compatible with an independent role for § 109(d)(1). *Id.* 6.

Second, the periodic thorough review requirement doesn't address "the <u>same</u> concerns" as targeted revision authority, *Ivy Sports*, 767 F.3d at 87 (emphasis added): the former ensures comprehensive reassessments regularly occur, whereas the latter allows EPA to move relatively more swiftly to respond to quick-developing science and address urgent public health harms, as it did here.

Third, the Motion's displacement argument assumes § 109(d)(1)'s second sentence incorporates all terms of that provision's first sentence, other than timing. *See* Mot. 12-13; *see also* Opening Br. of Industry and Arizona Pet'rs 26-27 (agreed with by Mot. 10) (arguing second sentence "effectively incorporates the process in the first sentence"). That argument is irreconcilable with the Act's text. *See infra* pp.22-25.

**C. Section 109(d)(1)'s two sentences do not displace EPA's authority to update NAAQS outside thorough reviews, but confirm it.**

EPA's Motion hinges on extending the "thorough review" requirement from § 109(d)(1)'s first sentence into other statutory text. *See* Mot. 11-18. Its effort to extend that language into § 109(b)(1) fails, as explained above. Below, we explain how the Motion's attempt to bring that language into § 109(d)(1)'s second sentence contravenes the Act's plain text, whereas the Act harmonizes when "thorough

20

review" is cabined to § 109(d)(1)'s first sentence. The Motion's contentions further conflict with the statutory and legislative histories of the 1977 Amendments. Read properly, § 109(d)(1) further supports and authorizes the 2024 Rule.

## 1.

**i.** Congress's enactment of § 109(d)(1)'s two sentences in 1977 newly obligated EPA to review and update criteria and NAAQS on a regular five-year cadence, thereby preventing criteria and NAAQS from falling too far behind scientific advancements, while also confirming EPA's authority to update criteria and NAAQS more frequently, without a "thorough review," if warranted. *See* Pub. L. No. 95-95, § 106(a), 91 Stat. at 691;[12] *supra* pp.13-15 (discussing § 108(c) and § 109(b)(1) and (d)(1)). Section 109(d)(1)'s first sentence adds the new nondiscretionary duty, mandating that EPA conduct a "thorough review" of criteria and NAAQS, and revise criteria, revise NAAQS, and promulgate new NAAQS, every five years, as appropriate under the Act. 42 U.S.C. § 7409(d)(1) ("at five-year intervals…, [EPA] shall complete a thorough review of the criteria…and

---

[12] The question arose at argument whether 42 U.S.C. § 7409(d)'s heading is part of the Act. Tr. 64:15-:17. It is not. *See* Pub. L. No. 95-95, § 106(a), 91 Stat. 691 (no header in § 109(d)). "Title 42…is a non-positive law title." Office of the Law Revision Counsel, *Positive Law Codification*, https://uscode.house.gov/codification/legislation.shtml (last accessed Dec. 15, 2025). Thus, created "without the approval of Congress," the heading "should be given no weight." *Ganem v. Heckler*, 746 F.2d 844, 851 (D.C. Cir. 1984).

[NAAQS] and shall make such revisions in such criteria and standards and promulgate such new standards as may be appropriate"). Complementing the first sentence, § 109(d)(1)'s second sentence omits the term "thorough review" and authorizes EPA to review and revise criteria, or promulgate new NAAQS, more often than every five years. *Id.* ("[EPA] may review and revise criteria or promulgate new standards earlier or more frequently than required"). Similarly, § 108(c) and § 109(b)(1) omit the term "thorough review," mandate that EPA review and revise criteria "from time to time," and authorize EPA to revise NAAQS. *See supra* pp.13-15. Via the overlaps and distinctions across these provisions, Congress thus obligated EPA to regularly undertake a thorough review, revise criteria, and revise and promulgate new NAAQS, as appropriate under the Act, and also authorized EPA to, at its discretion, revise criteria, and revise or promulgate new NAAQS—without necessarily undertaking a thorough review.

**ii.** The Motion's attempt (at 11-15) to import the first sentence's mandatory thorough review into § 109(d)(1)'s second sentence reads the Act unnaturally and violates the Act's plain text in four key ways.

First, because Congress demanded a "thorough review" in the first sentence, but omitted "thorough" from the second sentence, the Motion's attempt to introduce "thorough" into the second sentence violates the presumption "that Congress intended a difference in meaning" when it uses different language.

22

*Loughrin v. United States*, 573 U.S. 351, 358 (2014); *see also Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698 (2022) (noting the "usual presumption that differences in language…convey differences in meaning") (cleaned up).

EPA's Motion insists (at 12-13) that Congress meant to refer back to § 109(d)(1)'s first sentence, but that interpretation improperly requires reading a word cross-referencing "thorough review" into the text Congress actually enacted. Congress knows how to use such words. *See Van Buren v. United States*, 593 U.S. 374, 382-85 (2021) (parsing statute's use of "so" as a "term of reference"); *Sierra Club v. EPA*, 21 F.4th 815, 820 (D.C. Cir. 2021) (parsing Act's use of "such air pollutant"). Further, when Congress wanted a mandatory procedure to apply to both periodic and off-cycle reviews, it applied it expressly elsewhere in the 1977 Amendments, as it did in requiring EPA to review and, as appropriate, revise certain emission standards "at least every four years…following [a particular] procedure." Pub. L. No. 95-95, § 109(c)(2), 91 Stat. at 700 (amending § 111(b)(1)(B)); *see also* Pub. L. No. 91-604, § 4(a), 84 Stat. at 1684 (original § 111(b)(1)(B)). Because Congress elsewhere used the relevant types of cross-referencing words and specified a single procedure for periodic and off-cycle reviews, the absence of such language in § 109(d)(1) must be given effect. *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983).

Further, the Motion's citation (at 12) to *Davis v. Michigan Department of Treasury*, 489 U.S. 803, 809 (1989), is inapplicable. The two phrases at issue in *Davis* were precisely identical, with the phrase's latter usage including the referential word "the" that the first usage lacked. *See United States v. Otunyo*, 63 F.4th 948, 957 (D.C. Cir. 2023) (Ginsburg, J.) ("<u>the</u> connotes a thing previously noted or recognized.").

Second, that the first sentence covers more actions than the second confirms that Congress intended these sentences to operate independently, without the second incorporating the first. Under the Motion's reading, for the second sentence to address NAAQS revision, more words must be imported from the first sentence into the second. *See* Mot. 12-13. Yet § 109(b)(1) already reflects EPA's discretionary authority to revise NAAQS via notice-and-comment rulemaking, making it unnecessary for Congress to address NAAQS revision authority in § 109(d)(1)'s second sentence.[13] These additional textual differences further illustrate that § 109(d)(1)'s second sentence doesn't import the first.

Third, requiring a thorough review for off-cycle updates would collapse Congress's use of "and" in the first sentence with "or" in the second. The first sentence exclusively links its mandates with "and" (EPA "shall complete a

---

[13] Distinctly, § 109(d)(1)'s second sentence grants EPA discretionary authority to revise criteria, compared to § 108(c)'s nondiscretionary authority to revise criteria.

thorough review of the criteria…and [NAAQS] and shall make such revisions in such criteria and standards and promulgate such new standards…"), while the second sentence permits EPA to "review and revise criteria or promulgate new standards." 42 U.S.C. § 7409(d)(1) (emphasis added); *see also* Resp. 41-42 (discussing this difference). Courts ordinarily interpret "or" as joining a disjunctive list. *United States v. Woods*, 571 U.S. 31, 45 (2013). Read accordingly, the second sentence's plain text authorizes discretionary, off-cycle NAAQS updates without any review or revision of criteria (though such NAAQS still must be based on the criteria).[14] 42 U.S.C. § 7409(b)(1). Were a thorough review mandatory for off-cycle reviews, as the Motion claims, "or" would mean "and" and would make reviewing criteria a mandatory predicate to updating NAAQS. The Motion's doubly unnatural reading is untenable.

Fourth, mandating a thorough review when EPA updates criteria or NAAQS off-cycle would render superfluous § 108(c)'s and § 109(b)(1)'s authorizations for EPA to update criteria and NAAQS without a thorough review. *See Corley v. United States*, 556 U.S. 303, 314 (2009) (don't construe statute to make any part "be inoperative or superfluous, void or insignificant"); *supra* pp.13-15 (describing statutory provisions).

---

[14] EPA correctly doesn't disclaim its authority to make targeted updates to criteria.

**iii.** By contrast, following § 109(d)(1)'s plain text as authorizing EPA to update NAAQS without a thorough review gives effect to all the statutory provisions. Any targeted off-cycle NAAQS update leaves EPA's nondiscretionary periodic review deadline unchanged—EPA cannot postpone the regular thorough reviews of criteria and NAAQS. *See supra* pp.18-19.

Moreover, the Act's extensive express guardrails remain fully in place even for updates under § 109(d)(1)'s second sentence or any other authority. *See* Resp. 42-45 (describing NAAQS requirements). For example, NAAQS must always be based on the criteria, be requisite to protect public health with an adequate margin of safety, and be set through notice-and-comment rulemaking. 42 U.S.C. §§ 7409(a)(1)(B), (b)(1), 7607(d); RTC 120 n.19, JA2799. They must satisfy the Act's standard for judicial review, so if a targeted off-cycle review results in NAAQS that overlook relevant evidence or conflict with § 109(b)'s substantive requirements, injured parties can obtain relief. 42 U.S.C. § 7607(d)(9). Of course, Petitioners identify no such relevant evidence that EPA missed, as State Intervenors explain, and EPA doesn't disclaim its arguments that Petitioners have failed to demonstrate any such conflict. And, should EPA relax a NAAQS, the Act's anti-backsliding provision requires EPA to establish certain protections in "all areas which have not attained that standard" upon its relaxation. *Id.* § 7502(e). EPA's 2024 Rule gave effect to and operated within these guardrails, updating

NAAQS based on the 2019 Science Assessment and the 2022 Supplement addressing new relevant studies. *See* Health-Resp.-Ints. 8-19.

**iv.** EPA's Motion (at 13-15) improperly seeks to turn the Act's carefully crafted NAAQS-implementation scheme into a limitation on EPA's authority to update NAAQS to address public health harms. The statutory development of the Act both refutes the Motion's argument and is consistent with the statutory text's plain meaning. "Congress enacted the Clean Air Act Amendments of 1970, mandating a 'massive attack on air pollution.'" *American Lung Ass'n v. EPA*, 134 F.3d 388, 388 (1998); *see Train v. NRDC*, 421 U.S. 60, 64 (1975) (through the 1970 Amendments, "Congress…t[ook] a stick to the States"). The 1977 Amendments "reaffirmed" Congress's 1970 goal, including reinforcing the NAAQS framework's "precautionary and preventative orientation." *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1152-57 & n.51 (D.C. Cir. 1980). That anti-pollution, health-protective orientation persists, for Congress hasn't changed the NAAQS-setting process since 1977. *See supra* pp.13-15.

A targeted accelerated review accords with Congress's prioritization of public health in the NAAQS framework and complements EPA's periodic "thorough review" duty by allowing the agency to more nimbly address strong scientific evidence that demands quick action to protect public health. *See, e.g.*, *King v. Burwell*, 576 U.S. 473, 492-95 (2015) (considering statutory phrase's

meaning in light of functioning of entire statute). A "thorough review" is a monumental effort that may involve parsing through hundreds of thousands of studies related to a pollutant's health and welfare impacts.[15] Suppose a new study published shortly after a thorough review irrefutably proves a serious health impact of $PM_{2.5}$ at levels below the current NAAQS, justifying updated NAAQS. Were a "thorough review" required for off-cycle updates, EPA would first have to spend years re-reviewing thousands of studies on <u>all</u> the health and welfare impacts of PM—including studies on how PM causes haze on window glass and affects how frequently building exteriors need to be cleaned.[16] During this lengthy re-review, the NAAQS program would allow that serious health effect to continue unabated. "It is implausible that Congress meant the Act to operate in this manner," *King*, 576 U.S. at 494, which is why in 1977 Congress both expressly authorized, in § 109(d)(1)'s second sentence, EPA to review and update criteria and NAAQS outside the five-year thorough review process, and maintained § 108(c)'s and § 109(b)(1)'s preexisting authority to review and revise criteria and NAAQS.

---

[15] In developing the 2019 Science Assessment in the 2020 thorough review, EPA identified and considered 321,827 sources, and ultimately directly cited over 2,600 studies. EPA-HQ-OAR-2015-0072-0212 ("2019 Science Assessment") A-4.

[16] EPA must review such welfare impacts in the "thorough review." *See, e.g.*, 2019 Science Assessment 13-84 to -87.

Last, the legislative history confirms that EPA can use targeted off-cycle updates to protect public health. The "overriding commitment of the 1977 Act (just as the 1970 legislation) is to the protection of public health." Clarifying Statement, 123 Cong. Rec. 27,070 (Aug. 4, 1977), *reprinted in* 1977 U.S.C.C.A.N. 1570; *see also Whitman*, 531 U.S. at 492 (Breyer, J., concurring) (citing Clarifying Statement). The 1977 Conference Report drills down specifically: "[EPA] is authorized to conduct review of existing ambient standards more frequently than every 5 years and is expected to revise standards whenever available information justifies a revision." Resp. 41 (citing H.R. Conf. Rep. No. 95-564, at 124 (1977) (emphasis added)); Tr. 74:16-75:16 (same).

**2.** Far from undermining EPA's authority to update NAAQS, § 109(d)(1) authorizes the 2024 Rule, regardless of § 109(b)(1) and implicit authority. Section 109(d)(1)'s second sentence expressly authorizes EPA to promulgate new NAAQS outside a thorough review, *see supra* pp.21-22, and EPA's 2024 action can be understood as a "new" NAAQS. *See* Tr. 72:24-73:15.

Though EPA often referred to the 2024 Rule as a revision, *e.g.*, 89 FR 16,202/1 ("EPA is revising the primary annual $PM_{2.5}$ standard"), JA0163, that label is not necessarily determinative. *See N.Y. Stock Exchange v. SEC*, 2 F.4th 989, 994 (D.C. Cir. 2021) ("an agency label does not determine the substantive legal standard under which we evaluate agency action") (emphasis in original). To

effectuate this revision of "the current suite of primary $PM_{2.5}$ standards," 89 FR 16,291/1, JA0252, EPA promulgated a new NAAQS. The 2012 annual $PM_{2.5}$ NAAQS remains codified at 40 C.F.R. § 50.18, and EPA's 2024 Rule made no changes to it or any other NAAQS regulation. EPA instead created a new annual $PM_{2.5}$ NAAQS, codified at 40 C.F.R. § 50.20. 89 FR 16,380/3, JA0341.

Tellingly, EPA knows how to revise preexisting NAAQS regulatory provisions. Indeed, EPA has previously revised existing regulatory provisions, sometimes in conjunction with promulgating new regulatory provisions.[17] But it chose a different path here.

Further, in the record, EPA quoted § 109(d)(1) as specific authorization for it to "'review and revise criteria or promulgate new standards earlier or more frequently than required under this paragraph,'" and said that was "precisely what [EPA] is doing here." RTC 121, JA2800. Just so—EPA promulgated the NAAQS solely as entirely new regulatory text.

---

[17] *See, e.g.*, 75 FR 35,520, 35,592/1-93/1 (2010) (culminating sulfur dioxide NAAQS review by amending 40 C.F.R. § 50.4 and adding new 40 C.F.R. § 50.17); 71 FR 61,144, 61,224/2 (2006) (culminating PM NAAQS review by amending 40 C.F.R. § 50.6 and adding "new" 40 C.F.R. § 50.13); 52 FR 24,634, 24,663/3-64/1 (1987) (culminating PM NAAQS review by revising 40 C.F.R. § 50.6 and "remov[ing] and reserv[ing]" 40 C.F.R. § 50.7).

## D. EPA's Remaining Arguments Lack Merit.

EPA's Motion relies heavily on the assertion that EPA has not previously performed an off-cycle NAAQS update under § 109(b)(1) or § 109(d)(1)'s second sentence. *See, e.g.*, Mot. 2-3, 6-7, 10, 14-15. Even if this assertion were true, it is irrelevant because "[a]n agency's failure to assert a power, even if prolonged, cannot alter the plain meaning of a statute." *Woods*, 571 U.S. at 46 n.5. The Motion's argument also ignores EPA's "well-established practice" of reopening criteria to "focus on a limited set of scientific studies" instead of performing a new thorough review. Resp. 44, 79-80; Tr. 81:5-82:9 (discussing EPA's other off-cycle revisions to criteria and reconsiderations of standards); *see also, e.g.*, Mot. 7 n.1 (acknowledging that EPA proposed to reconsider and revise ozone NAAQS outside a thorough review in 2009-2011, but didn't take final action).

Further undermining the relevance of the Motion's practice-based claim, EPA's thorough review that concluded in 2020 was itself unprecedented. It contained numerous irregularities, including disqualifying grant recipients as CASAC panelists and replacing most of CASAC under that illegal policy, entirely disbanding the PM-specific panel, and departing without notice from EPA's consistent approach to assessing epidemiological studies in a way that conflicted with the Act's health-protective approach. Health-Resp.-Ints. Br. 5-8, 11-13. It isn't surprising that EPA decided to undertake a targeted review following a highly

anomalous thorough review, while declining to do so following more-typical thorough reviews.

Last, EPA's Motion asserts that the various obligations that flow from an updated NAAQS support requiring thorough reviews, to make the statute "symmetrical." Mot. 15. But the existence of implementation obligations that some states and industry, and now EPA's Motion, may disfavor doesn't mean this Court should rewrite the Act. In law generally, "symmetry is not required." *California v. EPA*, 940 F.3d 1342, 1353 (D.C. Cir. 2019). The Act itself is not crafted to be symmetrical but, particularly for the NAAQS, to put human health first. *See, e.g.*, *NRDC v. EPA*, 643 F.3d 311, 322 (D.C. Cir. 2011) (in another context, "the Act creates a one-way ratchet, placing states onto a one-way street whose only outlet is attainment of the NAAQS—even NAAQS EPA has subsequently replaced," so making "the ratchet two-way" is "a clear violation of the statute" (cleaned up)). Rather than limit EPA's authority to address public health harms, Congress coupled the health-oriented NAAQS with numerous express guardrails and detailed NAAQS-implementation requirements and relief valves. *See, e.g.*, *Murray Energy Corp. v. EPA*, 936 F.3d 597, 623 (D.C. Cir. 2019) (Congress made allowances for implementation challenges in the implementation process, including "developing a distinct program for non-attainment areas that gives states resources to bring those areas into compliance while also protecting the public health"); *see*

*also NRDC v. EPA*, 706 F.3d 428 (D.C. Cir. 2013) (construing Act's PM NAAQS-specific implementation requirements). But Congress declined to mandate a "thorough review" for off-cycle NAAQS updates in its carefully crafted approach to reducing pollution.

### III.    EPA PROPERLY DECIDED TO RECONSIDER THE 2020 DECISION WITHOUT CONSIDERING LEGALLY IRRELEVANT, UNKNOWABLE COSTS.

As an alternative basis for vacatur, EPA's Motion argues briefly that EPA needed to consider costs when deciding whether to embark on a rulemaking process that could result in an updated NAAQS. Mot. 18-20 (claiming Act doesn't stop "EPA from considering the costs of undertaking the earlier review" than statutorily required); *accord id.* 3-4 (contending EPA erred in "refusing to consider the costs associated with <u>undertaking</u> [a discretionary] revision mid-cycle" (emphasis added)).[18] This argument is meritless.

_____

[18] EPA's Motion pointedly agrees (at 18) with only "certain" arguments Petitioners made, withdrawing only pp.45-48 of the agency's merits brief. The Motion thus doesn't repudiate EPA's correct rejection of Industry's tortuous argument that, having begun a NAAQS rulemaking process, EPA must separately consider costs in deciding whether, but not how, to update NAAQS. Resp. 48-53 (rejecting that argument, including in context of mid-cycle review); Health-Resp.-Ints. 25-26 (providing examples of where Industry raised this argument before this Court and the Supreme Court and lost).

As Respondent-Intervenors have explained, for EPA to consider costs at such a pre-preliminary stage would require it to infringe on state prerogatives over NAAQS-implementation and speculate about potential costs (and potential benefits) of a suite of potential NAAQS, although the potential costs are legally irrelevant to the process's ultimate final decision. Health-Resp.-Ints. 21-22; *see also id.* 23-24 (explaining "self-defeating, contradictory results" of requiring EPA to consider costs at threshold stage of NAAQS rulemaking when EPA cannot consider them at final stage); State-Resp.-Ints. 22-23 (emphasizing federalism concerns with Petitioners' costs argument). Nothing in law or logic—or even Industry's own argument, which claims EPA must "consider all <u>relevant</u> factors," Ind.-Mot.-Resp. 15 (emphasis added)—requires such a pointless exercise. Rather, an unbroken line of decisions by this Court and the Supreme Court makes clear that costs are legally <u>irrelevant</u> to the outcome of the NAAQS-setting process. Health-Resp.-Ints. 19-20 (citing six example precedents).[19]

The Motion confirms the flaws in its own argument. It seeks to inject into the decisionmaking process the costs to regulated entities (but not the health and

---

[19] EPA's Motion alludes (at 20 n.5) to EPA's 2011 decision to abandon its reconsideration of the 2008 ozone NAAQS. As EPA's merits brief explains, that circumstance—where a periodic review was already well underway—is inapposite. Resp. 85. Here, there still is no post-2020 periodic review, and shortly after EPA's 2020 decision, the agency received administrative reconsideration petitions. Health-Resp.-Ints. 8, 13.

welfare benefits for people from cleaner air) that may ultimately follow from the rulemaking's end-result.[20] *See* Mot. 20 (citing Szabo Decl. ¶¶ 26-33 to support what "[t]he <u>results</u> of EPA's review caused," including implementation costs (emphasis added)). The Motion also lists (at 20) four more-generic "things" it claims EPA should have considered. These are unavailing. Three (Nos.1-2, 4) pertain to the interplay between implementing existing and an updated NAAQS, but this is makeweight, for EPA and states have successfully navigated such interplay under both PM and ozone NAAQS, both of which EPA has repeatedly updated since 1997. *E.g.*, 80 FR 65,292 (2015 ozone NAAQS); 73 FR 16,436 (2008 ozone NAAQS); 71 FR 61,144 (2006 PM NAAQS); 62 FR 38,652 (1997 PM NAAQS). And EPA actually considered the fourth—its deadline for completing a periodic review. RTC 121, JA2800.

In reality, in 2021, EPA properly undertook a rigorous process, culminating in a careful notice-and-comment rulemaking, to reassess its 2020 decision because it knew existing and near-contemporaneous scientific evidence cast significant doubt on that decision, as outside experts and its own staff had told it. Resp. 75-76,

---

[20] In any event, the 2024 Rule's benefits vastly outweigh its modest costs, even if the Motion's declarant's attempt to backpedal from the agency's assessment of costs were cognizable or credible. IPI-Amicus 7-9, 13-16 (EPA projected quantified benefits of $22-46 billion); *see* Szabo Decl. ¶ 26 (citing industry-presented estimate of "up to $9.1 billion" in costs). Several factors further "will assist with low-cost implementation." Health-Resp.-Ints. 5 n.3 (citing sources).

81; Health-Resp.-Ints. 11, 13-14. Further, EPA's 2020 decision was riddled with self-inflicted procedural irregularities and untenable legal positions. Health-Resp.-Ints. 11-13. EPA's decisions to start and finish the rulemaking to ensure the NAAQS comply with the Act's exclusively health-based requirements were not just reasonable but necessary.

## CONCLUSION

For the foregoing reasons, this Court should deny EPA's Motion, lift the abeyance, and proceed to a merits ruling.

Dated: December 16, 2025

Respectfully submitted,

*/s/ Seth L. Johnson*
Seth L. Johnson
Marvin C. Brown IV
Sage Lincoln
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 797-5245
(202) 794-5355
(202) 830-3311
sjohnson@earthjustice.org
mcbrown@earthjustice.org
slincoln@earthjustice.org

*Counsel for Alliance of Nurses for
Healthy Environments, American Lung
Association, Environmental Defense
Fund, Natural Resources Defense
Council, Northeast Ohio Black Health
Coalition, Rio Grande International
Study Center, and Sierra Club*

*/s/ John Walke (w/permission)*
John Walke
Emily Davis
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 289-6868
jwalke@nrdc.org
edavis@nrdc.org

*Counsel for Natural Resources Defense
Council*

*/s/ Shaun A. Goho (w/permission)*
Shaun A. Goho
Hayden W. Hashimoto
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(617) 678-2516
sgoho@catf.us
hhashimoto@catf.us

*Counsel for Citizens for
Pennsylvania's Future and
Conservation Law Foundation*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Counsel hereby certifies, in accordance with Federal Rule of Appellate Procedure 32(g)(1), that the foregoing **Health, Environmental, and Community Group Respondent-Intervenors' Opposition to Respondents' Motion for Vacatur and Cross-Motion to Lift Abeyance and Proceed to a Merits Ruling** contains 7,792 words, as counted by counsel's word processing system, and thus complies with the 7,800-word limit. *See* D.C. Cir. R. 27(c).

Further, this document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because this document has been prepared in a proportionally spaced typeface using **Microsoft Word for Microsoft 365** using **size 14 Times New Roman** font.

Dated: December 16, 2025                    */s/ Seth L. Johnson*
                                            Seth L. Johnson